GARY T. LAFAYETTE (SBN 88666)
SUSAN T. KUMAGAI (SBN 127667)
CHERYL A. STEVENS (SBN 146397)
LAFAYETTE & KUMAGAI LLP
1300 Clay Street, Suite 810
Oakland, California 94612
Telephone:     (415) 357-4600
Facsimile:     (415) 357-4605

Attorneys for Defendant
CITISTAFF SOLUTIONS, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON,<br><br>    Plaintiff,<br><br>vs.<br><br>TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive,<br><br>    Defendants. | Case No. 3:17-cv-06748-WHO<br><br>**DECLARATION OF SUSAN T. KUMAGAI IN SUPPORT OF DEFENDANT CITISTAFF SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION OF ISSUES**<br><br>Date:          October 23, 2019<br>Time:          2:00 p.m.<br>Courtroom:     2, 17th Floor<br>Judge:          Hon. William H. Orrick<br><br>Trial Date:     March 2, 2020<br>Complaint filed: October 16, 2017 |

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
1300 CLAY STREET, SUITE 810
OAKLAND, CALIFORNIA 94612
(415) 357-4600
FAX (415) 357-4605

**DECLARATION OF SUSAN T. KUMAGAI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION OF ISSUES (CASE NO. 3:17-cv-06748-WHO)**          1

I, SUSAN T. KUMAGAI, declare:

1.      I am a partner at the law firm of Lafayette & Kumagai LLP, attorneys of record for Defendant Citistaff Solutions, Inc. ("Defendant") in this action, and am admitted to practice in good standing in this State.  I make this declaration in support of Defendant's Motion for Summary Judgment or, in the Alternative, Motion for Summary Adjudication of Issues.  I make this declaration of my own personal knowledge and if called as a witness to testify regarding the matters stated in this declaration I would and could testify under oath competently thereto.

2.      Attached hereto as **Exhibit "A"** is a true and correct copy of the Amended Complaint for Damages in this matter, filed on December 26, 2018.

3.      Attached hereto as **Exhibit "B"** are true and correct copies of the witness oath, excerpts and exhibits from the deposition transcript of Owen Diaz, Volume One, taken on May 22, 2018.

4.      Attached hereto as **Exhibit "C"** are true and correct copies of the witness oath, excerpts and exhibits from the deposition transcript of Owen Diaz, Volume Two, taken on December 3, 2018.

5.      Attached hereto as **Exhibit "D"** are true and correct copies of the witness oath and excerpts from the deposition transcript of Owen Diaz, Volume Three, taken on June 21, 2019.

6.      Attached hereto as **Exhibit "E"** are true and correct copies of the witness oath and excerpts from the deposition transcript of Demetric Di-az, Volume One, taken on May 15, 2018.

7.      Attached hereto as **Exhibit "F"** are true and correct copies of the witness oath, excerpts and exhibits from the deposition transcript of Victor Quintero, taken on June 7, 2018.

8.      Attached hereto as **Exhibit "G"** are true and correct copies of the witness oath, excerpts and exhibits from the deposition transcript of Edward Romero, taken on November 30, 2018.

9.      Attached hereto as **Exhibit "H"** are true and correct copies of the witness oath and excerpts from the deposition transcript of Monica DeLeon, taken on December 6, 2018.

///

**DECLARATION OF SUSAN T. KUMAGAI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION OF ISSUES (CASE NO. 3:17-cv-06748-WHO)**                                              2

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
1300 CLAY STREET, SUITE 810
OAKLAND, CALIFORNIA 94612
(415) 357-4600
FAX (415) 357-4605

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
1300 CLAY STREET, SUITE 810
OAKLAND, CALIFORNIA 94612
(415) 357-4600
FAX (415) 357-4605

10.     Attached hereto as **Exhibit "I"** are true and correct copies of the witness oath, excerpts and exhibits from the deposition transcript of Wayne Jackson, taken on May 17, 2019.

11.     Attached hereto as **Exhibit "J"** are true and correct copies of the witness oath, and excerpts from the deposition transcript of Annalisa Heisen, taken on May 29, 2019.

12.     Attached hereto as **Exhibit "K"** are true and correct copies of the witness oath, and excerpts from the deposition transcript of Michael Wheeler, taken on June 12, 2019.

13.     Attached hereto as **Exhibit "L"** are true and correct copies of the witness oath and excerpts from the deposition transcript of Kevin McGinn, taken on June 17, 2019.

14.     Attached hereto as **Exhibit "M"** are true and correct copies of the witness oath, and excerpts from the deposition transcript of Lamar Patterson, taken on July 26, 2019.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed this 18th day of September 2019, in Oakland, California.

*/s/ Susan T. Kumagai*
SUSAN T. KUMAGAI

# EXHIBIT "A"

LAWRENCE A. ORGAN (SBN 175503)
NAVRUZ AVLONI (SBN 279556)
CALIFORNIA CIVIL RIGHTS LAW GROUP
332 San Anselmo Avenue
San Anselmo, California 94960
Tel.:   (415) 453-4740
Fax.:   (415) 785-7352
larry@civilrightsca.com
navruz@civilrightsca.com

Attorneys for Plaintiffs
DEMETRIC DI-AZ, OWEN DIAZ AND LAMAR PATTERSON

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

DEMETRIC DI-AZ, OWEN DIAZ and
LAMAR PATTERSON,

      Plaintiffs,

      v.

TESLA, INC. DBA TESLA MOTORS, INC.;
CITISTAFF SOLUTIONS, INC.; WEST
VALLEY STAFFING GROUP;
CHARTWELL STAFFING SERVICES, INC.;
NEXTSOURCE, INC.; and DOES 1-10,
inclusive,

      Defendants.

Case No. 17-cv-06748-WHO

AMENDED COMPLAINT FOR DAMAGES

1. Racial Discrimination, Harassment,
   Retaliation, Failure to Prevent, Constructive
   and Wrongful Termination in Violation of 42
   U.S.C. § 1981;
2. Racial Discrimination in Violation of the
   Unruh Civil Rights Act;
3. Retaliation - Unruh Civil Rights Act;
4. Threats of Violence in Violation of the Ralph
   Civil Rights Act;
5. Threats of Violence - Bane Act;
6. Interference with Constitutional Rights in
   Violation of the Bane Act;
7. Whistleblower Retaliation;
8. Racial Harassment under FEHA;
9. Racial Discrimination under FEHA;
10. Retaliation under FEHA;
11. Failure to Prevent under FEHA;
12. Negligent Infliction of Emotional Distress;
13. Intentional Infliction of Emotional Distress;
14. Negligent Hiring Retention and Supervision;
15. Wrongful Termination; and
16. Constructive Discharge.

JURY TRIAL DEMANDED

## **INTRODUCTION**

1.      Even amongst the giants of California's Silicon Valley, Tesla, Inc. stands out as an innovative and groundbreaking company that is at the forefront of the electric vehicle revolution. As a result, Owen Diaz, his son Demetric Di-az, and Lamar Patterson were thrilled when they landed work at Tesla's production factory, located in Fremont, California.

2.      Instead of a modern workplace, however, Plaintiffs encountered a scene straight from the Jim Crow era. Although the men worked in different areas of the factory, all three were targets of racially motivated abuse, including the frequent use of racial slurs. Plaintiffs complained to their supervisors, but Tesla, Inc., took no action. Plaintiffs quickly learned that Tesla's progressive image was a façade papering over its regressive, demeaning treatment of African-American employees.

## **PARTIES**

3.      Defendant Tesla, Inc., d.b.a. Tesla Motors, Inc., (hereinafter "Tesla") is a publicly-traded Delaware corporation whose principal place of business is located in Palo Alto, California. Tesla designs, manufactures, and sells electric vehicles. One of Tesla's vehicle manufacturing facilities, also known as the "Tesla Factory," is located at 45500 Fremont Boulevard in Fremont, California. The harassing conduct at issue in this case took place at the Tesla Factory in Fremont. Due to Tesla's ownership of the facility, its day-to-day managerial role in the facility, its right to hire, fire and discipline the employees, and its control of all terms and conditions of Plaintiff's employment, Tesla is Plaintiffs' joint employer, which provides employment pursuant to contract.

4.      Defendant Citistaff Solutions, Inc. (hereinafter "Citistaff") is a California corporation whose principal place of business is located in Orange, California. Citistaff is a staffing company that provides trained employees to businesses for short-and long-term assignments, and therefore provides employment pursuant to contract. When Citistaff's employees are sent to work at their client's sites, they receive paychecks from Citistaff. Citistaff retains control over hiring and firing decisions and also selects the locations where its employees work. Plaintiffs are informed and believe and on that basis allege that in addition to being joint

Amended Complaint for Damages and Demand for Jury Trial

employers, Defendants Tesla and Citistaff are alter egos and/or integrated enterprises such that the actions of one entity can be and are attributable to the other entity.

5.     Defendant West Valley Staffing Company (hereinafter "West Valley") is a staffing corporation with corporate offices in Sunnyvale, California. West Valley provides trained employees for short and long-term assignments to other businesses, and therefore provides employment pursuant to contract. When West Valley employees are sent to work at other business' sites, they receive paychecks from West Valley, West Valley retains control over hiring and firing decisions, and also selects the locations at which its employees work. Plaintiffs are informed and believe and on that basis allege that in addition to being joint employers, Defendants Tesla and West Valley are alter egos and/or integrated enterprises such that the actions of one entity can be and are attributable to the other entity.

6.     Defendant Chartwell Staffing Services Inc. (hereinafter "Chartwell"), doing business as Chartwell Staffing Solutions, is a staffing corporation with corporate offices in San Jose, California. Chartwell provides employees for short and long-term assignments to businesses in the United States, and therefore provides employment pursuant to contract. Plaintiff Lamar Patterson applied for a Tesla position through Chartwell. He received all relevant training and orientation directly through Tesla, clocked in and out using Tesla's timekeeping system, and Tesla maintained power over hiring and firing decisions. Plaintiff Lamar Patterson selected to work for Tesla, rather than being assigned a location by Chartwell. Plaintiffs are informed and believe and on that basis allege that in addition to being joint employers, Defendants Tesla and Chartwell are alter egos and/or integrated enterprises such that the actions of one entity can be and are attributable to the other entity.

7.     Defendant nextSource, Inc. (hereinafter "nextSource") is a Delaware corporation with its principal place of business located in New York City, New York. nextSource provides contract employees from staffing corporations, such as Defendant Citistaff, to contracting companies, such as Defendant Tesla. nextSource accordingly provides employees pursuant to contract. In addition, nextSource provides human resources functions to the contracting businesses and staffing agencies, has power to make hiring and firing decisions, and to select the

employees who work at a particular contracting company. Plaintiffs are informed and believe, and on that basis allege, that in addition to being joint employers, Defendants nextSource, Citistaff, and Tesla are alter egos and/or integrated enterprises such that the actions of one entity can be and are attributable to the other entity.

8.    Plaintiff Demetric Di-az (hereinafter "Demetric") was employed as a Production Associate jointly by defendants West Valley and Tesla from approximately August of 2015 through October of 2015. Demetric was placed by West Valley at the Tesla Factory in Fremont, California. Demetric is, and at all relevant times herein was, an adult African-American resident of California.

9.    Plaintiff Owen Diaz (hereinafter "Owen") was employed as an Elevator Operator jointly by defendants Citistaff, nextSource, and Tesla between approximately June 2015 and May of 2016. Owen was placed by Citistaff and nextSource at the Tesla Factory in Fremont, California. Owen is, and at all relevant times herein was, an adult African-American resident of California.

10.    Plaintiff Lamar Patterson (hereinafter "Lamar") was employed as an Elevator Operator jointly by defendants Chartwell and Tesla between approximately January 2016 and August 2016. Lamar is, and at all relevant times herein was, an adult African-American resident of California.

11.    Each Defendant is sued individually and as the agent or employee of every other Defendant acting within the course and scope of said agency or employment, with the knowledge or consent of the other co-Defendants.

## JURISDICTION AND VENUE

12.    This action is based on Plaintiffs' claims of employment discrimination against Defendants, which arise under the Civil Rights Act of 1866 (42 U.S.C. § 1981). This court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.

13.    This court also has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367. Plaintiffs' state law claims arise from the same common nucleus

of operative facts as the underlying federal claims. Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to all parties.

14.    This Court has personal jurisdiction over defendant Tesla, which is a corporation incorporated in the state of Delaware with its corporate offices and principal place of business located in Fremont, California.

15.    This Court has personal jurisdiction over defendant Citistaff, which is a corporation incorporated in the State of California with its corporate offices and principal place of business located in Newark, California.

16.    This Court has personal jurisdiction over defendant West Valley, which is a corporation incorporated in the State of California with its corporate offices and principal place of business located in Sunnyvale, California.

17.    This Court has personal jurisdiction over defendant nextSource, which is a corporation incorporated in the state of Delaware with its corporate offices and principal place of business located in New York City, New York. The acts and omissions of defendant nextSource complained of herein occurred in Defendant Tesla's Fremont, California factory.

18.    Venue is proper in this court pursuant to 28 U.S.C. 1391(b)(2), because the acts and omissions of Defendants complained of herein occurred in Fremont, California.

## FACTUAL ALLEGATIONS

### DEMETRIC DI-AZ

19.    In approximately August of 2015, Demetric's father, Owen, informed him that West Valley had openings for positions at the Tesla Factory in Fremont, California.

20.    Demetric was excited at the prospect of working at the Tesla Factory so he applied for a position with West Valley. His application was accepted, and he signed a contract and began his training on August 24, 2015.

21.    In approximately August 2015, Demetric began working at the Tesla Factory as a Production Associate. Demetric participated in the development and application of Tesla's manufacturing system for the battery of its electric sedan, the Model S.

5

22.     Demetric took pride in his work, and was excited to work on the creation of Tesla's innovative vehicles.

23.     However, Demetric found it increasingly difficult to enjoy his job because of the daily racist epithets that he had to endure throughout his shift.  Demetric was called "nigger" on a regular basis, and observed other African-American employees enduring the same treatment. Additionally, Demetric's father, Owen, told him about racist epithets directed at him and showed Demetric offensive drawings he came across at the Tesla Factory.

24.     This treatment continued throughout Demetric's employment for West Valley and Tesla. For example, when Owen came to Demetric's department to bring him lunch, Demetric's shift lead said, "All you fucking niggers - I can't stand you motherfuckers."

25.     Demetric found this treatment demeaning and unbearably offensive.

26.     Demetric complained to West Valley about the racist abuse he endured at work on a daily basis. West Valley took no action.

27.     Upset and offended, Demetric complained to his supervisor at Tesla in October of 2015. He stated, "The way you're treating me - calling me an 'n-word' every day - that's not right." His supervisor replied, "If you don't like how you're treated, your time here is going to end." "So," Demetric asked, "you're going to fire me?" His supervisor replied, "You're a temp, anyway."

28.     After Demetric complained, the racist abuse dramatically increased in frequency.

29.     Within days of making his complaint, Demetric was issued a written warning based on accusations of misconduct. He was accused of using his phone on the production line. Prior to this written warning, Demetric had a good performance record.

30.     Within just one week of his complaint to his supervisor at the Tesla Factory, he was terminated for "breaking the rules." Other employees with similar warning were not terminated.

31.     Demetric believed the written warning and subsequent termination were pretextual. Demetric believed that his employment was terminated because he objected to the racist harassment and discrimination.

32.     As a direct and proximate result of the acts and omissions of the Defendants, Demetric has suffered, and continues to suffer emotional distress and psychological damage. This includes, but is not limited to: humiliation, mental anguish, stress, fear, depression, and anxiety.

33.     Defendants' actions have also resulted in wage and benefit losses, and are expected to lead to additional economic loss in the future.

34.     As a result of the Defendants' actions, Demetric hired private counsel to prosecute this action. Pursuant to California Civil Codes Sections 52.1, 51.7, and 52(b)(3), and Title 42 USC section 1988, Demetric is entitled to recover attorney's fees associated with the prosecution of these claims.

35.     Defendants' acts were malicious or oppressive, and intended to vex, injure, annoy, humiliate, and embarrass Demetric, and with conscious disregard of the rights and safety of Demetric and other African-American employees of West Valley. Demetric is informed and believes, and based thereon alleges, that West Valley and Tesla's managing agents ratified the wrongful conduct of Tesla's employees, because they were aware of the discriminatory conduct, and  failed to take immediate remedial action after Demetric's report of the oppressive conduct.

## OWEN DIAZ

36.     Owen was elated when he discovered, in the summer of 2015, that he would be working at Tesla as an Elevator Operator through Citistaff and nextSource.

37.     In his early days at the Tesla Factory, Owen was excited to go to work every morning. He was a good and hardworking employee, and his performance caught his supervisors' attention. Within the first month of the start of his employment at the factory, an Asian-American supervisor promoted him to an elevator lead position.

38.     The supervisor warned him, however, that Tesla wouldn't want "someone like him" to be a lead. Owen believed his supervisor was stating that Tesla would not want an African-American man as a lead.

39.     Owen's opinion of Tesla quickly soured, as his supervisor's prediction proved true. After beginning his employment at the Tesla Factory, Owen became the subject of vitriolic

7

racial harassment. Tesla Factory employees directed racial epithets, such as "nigger," at him and other African-American Tesla employees on a daily basis.

40.     Other employees in the factory also instructed Owen, "Go back to Africa," implying that, as an African-American man, Owen did not belong in the United States.

41.     When Owen was operating the elevator with Conveyance Supervisor Robert (last name unknown), Robert instructed Owen to press the elevator by saying, "Nigger, hurry up, press the button."

42.     Robert regularly referred to Owen as "nigger," and also frequently called him "boy" in a demeaning tone.

43.     To Owen, these degrading modes of address were reminiscent of the way slave owners referred to their slaves. He found this racist behavior to be unbearable.

44.     Owen also witnessed racial slurs being used towards other African-American employees. His son, Demetric, worked in another department of the Tesla Factory. When Owen brought Demetric lunch one day, he overheard Demetric's supervisor referring to the African-American workers at the factory as "fucking niggers."

45.     Owen felt demeaned and offended when Tesla's employees referred to him as a "nigger." The constant use of this offensive language made him depressed. However, what truly broke Owen down was witnessing these racist epithets directed at his son, and hearing his son tell him about the racism he was experiencing at work.

46.     Owen complained verbally to Citistaff, but Citistaff took no action. Owen also complained to employees of Tesla and nextSource. However, no action was taken by any of the entities.

47.     Tesla's employees also drew racist and derogatory caricatures of African children that resembled the "pickaninny" imagery of the early twentieth century. These drawings typically featured images of dark-skinned individuals with big lips and bones in their hair. Features which are erroneously, and stereotypically, associated with African-American individuals. An example of such racially offensive conduct is attached as Exhibit A.

Amended Complaint for Damages and Demand for Jury Trial

48.     To ensure there was no doubt about the racist intent behind this appalling imagery, the drawings were typically accompanied with captions such as, "Booo!" - suggesting that African-American individuals are undesirable and unpleasant.

49.     These drawings were regularly placed around the factory, in locations where African-American employees, including Owen, were certain to view them.

50.     Constantly viewing this racially offensive and demeaning imagery, coupled with the offensive message, caused Owen to feel demeaned, disrespected, and devalued.

51.     Owen discovered that the elevator supervisor, Ramon, was the source of the drawings. Owen confronted Ramon and explained that he found the drawings offensive and demeaning. Owen requested that Ramon stop his behavior.

52.     Ramon responded flippantly, "We're just playing, why do you people take things so hard?" By "you people," Ramon meant African-American employees.

53.     Ramon refused to stop the offensive behavior.

54.     Owen was distressed that Ramon would make the assumption that his rightful anger over this racist act was merely oversensitivity.

55.     Tesla supervisor Michael Wheeler was aware of the harassment and offensive drawings made by Ramon around the factory, and so was Owen's supervisor Ed Romero (hereinafter "Romero"). Because Owen was hired by Citistaff and nextSource, and not Tesla, he was informed he could not complain to Tesla's Human Resources department. In frustration, he sent a written complaint to Romero, his supervisor at Tesla.

56.     Romero stated that he would look in to the issue, but took no action. The harassing Tesla employees remained employed, and Owen was forced to continue to endure their harassment.

57.     Owen also complained to Citistaff, but Citistaff likewise took no action. nextSource similarly failed to take sufficient action to timely address Owen's complaints.

58.     On approximately October 17, 2015, Owen was training another Citistaff employee, Rothai. He was in the middle of explaining to Rothai that Romero would be his supervisor when the elevator doors opened to reveal Ramon.

9

59.     Ramon flew into a rage upon overhearing their conversation, and shouted, "Do you have a problem with me?! Why are you telling him who his supervisor is?!" Owen and Rothai had not been speaking about Ramon at all.

60.     Fearful, Owen did not respond. Ramon followed him into the elevator, and came within inches of Owen's body, preventing him from escaping. Ramon continued to shout and gesture aggressively.

61.     Based on Ramon's threatening words and conduct, and previous racist and generally hostile conduct, Owen feared that Ramon would hit him or otherwise harm him.

62.     Ramon was an able-bodied male who worked as a laborer, so Owen reasonably believed that Ramon had the ability to physically harm him.

63.     Owen asked Ramon to step back, and reminded Ramon that a security camera was recording the exchange. Eventually, Ramon exited the elevator.

64.     Following this exchange, Owen contacted Romero via email. He wrote, "…because of the way Ramon was acting I don't feel safe around him now. Can you please talk to him[?] I don't need any problems. I just want to do my job."

65.     Romero responded by writing, "Owen, I will speak to Ramon and follow up by speaking to you." Romero never again contacted Owen regarding the incident. Ramon continued to work with Owen, and Owen was not aware of any disciplinary measures taken against Ramon.

66.     Owen contacted Citistaff regarding this incident, Citistaff still took no action.

67.     The harassment and discrimination Owen experienced escalated after he made this complaint. Tesla's employees used racial slurs with greater frequency.

68.     Although Tesla, nextSource, and Citistaff had notice of the discriminatory and harassing behavior at the Tesla Factory, Tesla, nextSource, and Citistaff took no steps to protect African-American employees.

69.     In fact, Tesla, nextSource, and Citistaff ratified and supported the racially harassing behavior. In the spring of 2016, Citistaff informed Owen that he would be demoted from his supervisory position, because he was causing too much trouble, despite the fact that he had no negative performance reviews or disciplinary issues.

10

70.     Owen believed this explanation was merely a pretext. Owen believed Citistaff, nextSource, and Tesla were threatening him with a demotion in retaliation for his complaints regarding the racist, discriminatory behavior he experienced.

71.     Eventually, in approximately May of 2016, Owen quit his employment. Owen could no longer bear the abusive, racially harassing treatment he encountered daily at work. Since Citistaff, nextSource, and Tesla had repeatedly refused to investigate the racist behavior and instead ratified the attempts at retaliation by threatening Owen with a demotion, he worried that the situation would only degenerate further.

72.     As a direct and proximate result of the acts and omissions of the Defendants, Owen has suffered, and continues to suffer emotional distress and psychological damage. This includes, but is not limited to: humiliation, mental anguish, stress, fear, depression, and anxiety.

73.     Defendants' actions have also resulted in past wage and benefit loss, and are expected to lead to additional economic loss in the future.

74.     As a result of the Defendants' actions, Owen hired private counsel to prosecute this action. Pursuant to California Civil Codes Sections 52.1, 51.7, and 52(b)(3), and Title 42 USC Section 1988, Owen is entitled to recover attorney's fees associated with the prosecution of these claims.

75.     Defendants' acts were malicious or oppressive, and intended to vex, injure, annoy, humiliate, and embarrass Owen, and with conscious disregard of the rights and safety of Owen and other African-American employees of Defendants. Owen is informed and believes, and based thereon alleges, that managing agents ratified the wrongful conduct of the Defendants' employees, because they were aware of this conduct and failed to take immediate remedial action, and retained the errant employees after Owen's report of the oppressive conduct.

**LAMAR PATTERSON**

76.     Lamar was excited to join Tesla as an Elevator Operator when he was hired in approximately January 2016. He worked hard and hoped to embark on a long-term career path at the company that he so much admired.

Amended Complaint for Damages and Demand for Jury Trial

77.     It did not take long for Lamar to learn that the company was a hotbed for racist behavior. Both employees and supervisors used the word "nigger" freely and frequently throughout the Tesla Factory, left racist caricatures, images, and effigies around the factory for African-American employees to see, and made "jokes" such as, "Go back to Africa. We don't want you here!"

78.     Lamar complained to Supervisor Ed Romero about the use of the word "nigger" and the hurtful "jokes." However, neither Romero nor anyone else at Tesla took action to address the issue; he continued to hear the racist epithets on a regular basis, throughout his workday.

79.     Unable to bear the abusive and racially harassing treatment he encountered daily at work any longer, Lamar quit his employment with Defendants Tesla and Chartwell in approximately August of 2016.

80.     As a direct and proximate result of the acts and omissions of the Defendants, Lamar has suffered, and continues to suffer emotional distress and psychological damage. This includes, but is not limited to: depression and anxiety.

81.     Defendants' actions have also resulted in past wage and benefit loss, and are expected to lead to additional economic loss in the future.

82.     As a result of the Defendants' actions, Lamar hired private counsel to prosecute this action. Pursuant to California Government Code section 12965(b), California Civil Codes Sections 52.1, 51.7, and 52(b)(3), and Title 42 USC Section 1988, Owen is entitled to recover attorney's fees associated with the prosecution of these claims.

83.     Defendants' acts were malicious or oppressive, and intended to vex, injure, annoy, humiliate, and embarrass Lamar, and with conscious disregard of the rights and safety of Lamar and other African-American employees of Defendants. Lamar is informed and believes, and based thereon alleges, that managing agents ratified the wrongful conduct of the Defendants' employees, because they were aware of this conduct and failed to take immediate remedial action, and retained the errant employees after Lamar's report of the oppressive conduct.

84.     On or about July 31, 2017, Lamar filed a timely charge against Defendants Tesla and Chartwell with the Department of Fair Employment and Housing alleging discrimination,

12

harassment and retaliation on the basis of race and color; failure to prevent harassment, discrimination and retaliation; and constructive termination. The DFEH issued a right-to-sue letter regarding this charge on July 31, 2017.

## FIRST CAUSE OF ACTION
RACIAL DISCRIMINATION, RACIAL HARASSMENT (HOSTILE WORK ENVIRONMENT), RETALIATION, FAILURE TO INVESTIGATE AND PREVENT DISCRIMINATION AND HARASSMENT, WRONGFUL TERMINATION, CONSTRUCTIVE DISCHARGE
42 U.S.C. § 1981
(As to All Plaintiffs; Against All Defendants)

85.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

86.     As African-American men, Plaintiffs are members of a protected class. At all relevant times herein, Demetric was in a contractual relationship with defendant West Valley within the meaning of 42 U.S.C. § 1981, as amended. At all relevant times herein, Owen was in a contractual relationship with defendants Citistaff, nextSource, and Tesla within the meaning of 42 U.S.C. § 1981, as amended. At all relevant times herein, Lamar was in a contractual relationship with defendants Chartwell and Tesla within the meaning of 42 U.S.C. § 1981, as amended.

87.     During the course of Demetric, Owen and Lamar's employment, defendants Tesla, West Valley, Citistaff, nextSource, and Chartwell violated Plaintiffs' rights by depriving Plaintiffs of their right to the enjoyment of all benefits, privileges, terms, and conditions of Plaintiffs' employment contract "as is enjoyed by white citizens," in direct violation of 42 U.S.C. § 1981(b).

88.     Specifically, Tesla's employees and supervisors subjected Plaintiffs and others to racial harassment, racial discrimination, and a racially hostile work environment, culminating in an end to their employment relationship with Tesla. Tesla, West Valley, Citistaff, nextSource, and Chartwell failed to investigate and prevent incidents of racial harassment, despite numerous reports and complaints, thereby evidencing a pattern and practice of racial discrimination and harassment. All five defendants retaliated against Plaintiffs for complaining of a hostile work

13

environment by issuing Demetric a written warning based on false allegations, approving the retaliatory termination of Demetric, and making the work environment so unbearable that Owen and Lamar had no choice but to quit their employment.

89.     Tesla acted intentionally to discriminate against Plaintiffs. Tesla's supervisory employees and agents used racial epithets and racist imagery to harass and intimidate Plaintiffs and others, and ignored Plaintiffs' repeated reports regarding this harassment and discrimination.

90.     Defendants failed to prevent the racially harassing and retaliatory behavior directed at Plaintiffs and others. Ultimately, Plaintiff Demetric was wrongfully terminated, and Plaintiffs Owen and Lamar were constructively terminated.

91.     Through their actions and treatment of Plaintiffs, Defendants and their agents intended to discriminate against Plaintiffs on the basis of their race.

92.     Defendants' violations of the Civil Rights Act of 1866, as amended, caused Plaintiffs to suffer harm as set forth above.

93.     As a result of Defendants' unlawful acts, Plaintiffs are entitled to damages as set forth herein.

94.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

95.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

//

//

//

//

Amended Complaint for Damages and Demand for Jury Trial

## SECOND CAUSE OF ACTION

RACIAL DISCRIMINATION IN VIOLATION OF THE UNRUH CIVIL RIGHTS ACT
Cal. Civ. Code § 51
(As to All Plaintiffs; Against Defendant Tesla)

96.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

97.     Plaintiffs are African-American men, and residents of California.

98.     Defendant Tesla's Factory in Fremont is a business establishment for the purposes of the Unruh Civil Rights Act. A business establishment is a facility which is offered "to qualified [workers], who are not the establishment's employees, in exchange for… considerations." *Payne v. Anaheim Memorial Medical Center, Inc.*, 130 Cal. App. 4th 729, 733 (2005) (review denied). Defendant Tesla operates its Fremont Factory as a business establishment, offering the use of its facilities to qualified contractors, who are not its employees, in exchange for payment.

99.     Tesla acted intentionally to discriminate in its business establishment against Plaintiffs. Tesla's supervisory employees and agents used racial epithets and racist imagery to harass and intimidate Plaintiffs, ignored Plaintiffs' repeated reports regarding this harassment and discrimination, and prevented Plaintiffs from accessing its facilities in retaliation for Plaintiffs' complaints of discrimination and harassment.

100.    Defendants' violations of the Unruh Civil Rights Act caused Plaintiffs to suffer harm as set forth above.

101.    As a result of Defendants' unlawful acts, Plaintiffs are entitled to recover statutory damages of a maximum of three times the amount of actual damages, or a minimum of $4,000.

102.    By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

103.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### THIRD CAUSE OF ACTION

RETALIATION IN VIOLATION OF THE UNRUH CIVIL RIGHTS ACT
Cal. Civ. Code § 51
(As to Plaintiffs' Demetric and Owen; Against Defendant Tesla)

104.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

105.    The Unruh Act prohibits retaliation against persons who complain about conduct they reasonably believe to violate the Act. *See, e.g.*, *Vaughn v. Hugo Neu Proler Int'l* (1990) 223 Cal.App.3d 1612, 1619.

106.    Plaintiffs reasonably believed the race harassment they experienced at Tesla's Fremont factory to be a violation of their rights under California law.

107.    Plaintiffs complained against the harassment, and Defendants retaliated against Plaintiffs for reporting the harassment by issuing Demetric a write up and subsequently terminating his employment, and by threatening Owen with a demotion. Defendants further retaliated against Plaintiffs by subjecting them to further harassment.

108.    Defendants' violations of the Unruh Civil Rights Act caused Plaintiffs to suffer harm as set forth above.

109.    As a result of Defendants' unlawful acts, Plaintiffs are entitled to recover statutory damages of a maximum of three times the amount of actual damages, or a minimum of $4,000.

110.    By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

16

Amended Complaint for Damages and Demand for Jury Trial

111.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## FOURTH CAUSE OF ACTION
THREATS OF VIOLENCE IN VIOLATION OF THE RALPH CIVIL RIGHTS ACT
Cal. Civ. Code § 51.7
(As to Owen; Against Defendants Citistaff, nextSource, and Tesla)

112.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

113.    Plaintiff Owen is an African-American man who worked at Tesla's Fremont Factory while employed by Citistaff and nextSource.

114.    While working at the factory, Owen was subjected to threats of violence by a Tesla employee, Ramon. Without any provocation, Ramon screamed at and physically intimidated Owen. Based on this and Ramon's previous hostile behavior, Owen believed that Ramon intended to hit him.

115.    In addition to his use of threatening language, Ramon, rushed into the elevator with Owen. He moved so that he was merely inches from Owen's body, preventing Owen from leaving the elevator. Ramon then continued to scream at Owen and berated and belittled him.

116.    Ramon's demeanor and conduct was threatening, such that Owen believed he was in imminent physical danger.  Ramon was an able-bodied male with the apparent ability to cause Owen physical harm.

117.    Based on Ramon's history of racially discriminatory and demeaning acts, Owen believed that Ramon's behavior was motivated by his hatred of and prejudice towards African-Americans.

118.    Owen reported Ramon's actions to Tesla. However, Tesla took no action, and implicitly ratified Ramon's abuse by failing to investigate his actions, and allowing Ramon to continue to abuse and harass Owen.

119.   Tesla further ratified Ramon's actions by retaliating against Owen and suggesting that Owen be demoted as punishment for reporting Ramon's racially abusive behavior.

120.   Because Tesla ratified Ramon's actions, Tesla is liable for his abuse under the doctrine of *respondeat superior*.

121.   Owen reported Ramon's actions to Citistaff and nextSource. However, Citistaff and nextSource took no action, and implicitly ratified Ramon's abusive behavior by failing to investigate his actions, and allowing Ramon to continue to abuse and harass Owen.

122.   Because Citistaff and Nextsource ratified Ramon's actions, Citistaff and nextSource are liable for his abuse.

123.   Defendants' violations of Section 51.7 of the California Civil Code caused Plaintiff Owen to suffer harm as set forth above.

124.   As a result of Defendants' unlawful acts, Plaintiff is entitled to recover a civil penalty of $25,000.

125.   By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

126.   Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### FIFTH CAUSE OF ACTION
THREATS OF VIOLENCE IN VIOLATION OF THE BANE ACT
Cal. Civ. Code § 52.1(a)
(As to Plaintiff Owen; Against Defendants Citistaff, nextSource, and Tesla)

127.   Plaintiff incorporates the foregoing paragraphs by reference, as though fully reproduced herein.

128.    Plaintiff Owen is an African-American man who worked at Tesla's Fremont Factory while employed by Citistaff and nextSource.

129.    While working at the factory, Owen was subjected to threats of violence by a Tesla employee, Ramon. Without any provocation, Ramon screamed at and physically intimidated Owen. Based on this and Ramon's previous hostile behavior, Owen believed that Ramon intended to hit him.

130.    In addition to his use of threatening language, Ramon, rushed into the elevator with Owen. He moved so that he was merely inches from Owen's body, preventing Owen from leaving the elevator. Ramon then continued to scream at Owen and berated and belittled him.

131.    Ramon's demeanor and conduct was threatening, such that Owen believed he was in imminent physical danger.  Ramon was an able-bodied male with the apparent ability to cause Owen physical harm.

132.    Based on Ramon's history of racially discriminatory and demeaning acts, Owen believed that Ramon's behavior was motivated by his hatred of and prejudice towards African-Americans.

133.    Owen reported Ramon's actions to Tesla. However, Tesla took no action, and implicitly ratified Ramon's abuse by failing to investigate his actions, and allowing Ramon to continue to abuse and harass Owen.

134.    Tesla further ratified Ramon's actions by retaliating against Owen and threatening demoting him as punishment for reporting Ramon's racially abusive behavior.

135.    Because Tesla ratified Ramon's actions, Tesla is liable for his abuse under the doctrine of *respondeat superior*.

136.    Owen reported Ramon's actions to Citistaff and nextSource. However, Citistaff and nextSource took no action, and implicitly ratified Ramon's abusive behavior by failing to investigate his actions, and allowing Ramon to continue to abuse and harass Owen.

137.    Because Citistaff and nextSource ratified Ramon's actions, Citistaff and nextSource are liable for his abuse under the doctrine of *respondeat superior*.

Amended Complaint for Damages and Demand for Jury Trial

138.     Defendants' violations of Section 52.1 of the California Civil Code caused Plaintiffs to suffer harm as set forth above.

139.     As a result of Defendants' unlawful acts, Plaintiff Owen is entitled to recover civil penalties of $25,000.

140.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

141.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## SIXTH CAUSE OF ACTION
INTERFERENCE WITH CONSTITUTIONAL RIGHTS IN VIOLATION OF BANE ACT
Cal. Civ. Code § 52.1(b)
(As to All Plaintiffs; Against All Defendants)

142.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

143.     Defendants interfered with Plaintiffs' constitutional right entitling them to equal protection.

144.     Defendants adopted the conduct, through their officers, directors, managing agents, or supervisory employees. They further ratified the conduct by failing to take appropriate prompt remedial action.

145.     A substantial motivating reason for Defendants' conduct was Plaintiffs' race.

146.     Defendants interfered with Plaintiffs' right to be free from discrimination on the basis of race as set forth above, and permitted working conditions that denied Plaintiffs their constitutional right entitling them to equal protection.

147.     Defendants' conduct caused Plaintiffs to suffer, and continue to suffer damages as set forth above.

148.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

149.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### SEVENTH CAUSE OF ACTION
WHISTLEBLOWER RETALIATION
(Cal. Labor Code 1102.5)
(As to Plaintiffs Demetric and Owen; Against All Defendants)

150.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

151.     At all relevant times mentioned herein, Plaintiffs were African-American residents of California.

152.     At all relevant times mentioned herein, Demetric was an employee of defendant West Valley and Tesla.

153.     Demetric engaged in protected activity when he reported the racially harassing and discriminatory behavior to West Valley and Tesla, including the threat to terminate his employment for his refusal to endure the daily racial harassment.

154.     Demetric had a reasonable, good-faith belief that this behavior was a violation of the federal Civil Rights Act of 1964, and other state and federal statutes.

155.     West Valley and Tesla took adverse employment action against Demetric. Without justification or basis in fact, both entities accepted as true the assertions of Demetric's harassers that he was a poor performer; they then terminated Demetric's employment on that

21

false basis. West Valley and Tesla did this even though they knew that Demetric's supervisor responded to his complaint of harassment by threatening to terminate Demetric's employment.

156.     In terminating Demetric, West Valley and Tesla ratified the discriminatory behavior.

157.     At all relevant times mentioned herein, Owen was an employee of defendants Citistaff, nextSource, and Tesla.

158.     Owen engaged in protected activity when he reported the racially harassing and discriminatory behavior to Citistaff, nextSource, and Tesla.

159.     Owen had a reasonable, good-faith belief that this behavior was a violation of the federal Civil Rights Act of 1964, and other state and federal statutes.

160.     Citistaff, nextSource, and Tesla took adverse employment action against Owen by threatening him with a demotion. However, Owen had a positive performance history, and Tesla only threatened Owen with a demotion as punishment for complaining of the racist harassment.

161.     In accepting as true the proffered reasons for threatening Owen with a demotion, even though Owen had complained to Citistaff, nextSource, and Tesla of the discriminatory behavior of Tesla's employees on numerous occasions, Citistaff, nextSource, and Tesla ratified and continued the discriminatory behavior.

162.     Defendants' violations of Section 1102.5 of the California Labor Code caused Plaintiffs to suffer harm as set forth above.

163.     As a result of Defendants' unlawful acts, Plaintiffs are entitled to recover civil penalties of $10,000 for each violation.

164.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

165.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice.

Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## EIGHTH CAUSE OF ACTION
RACIAL HARASSMENT
Cal. Govt. Code § 12940, *et seq.*
(As to Plaintiff Lamar; Against Defendants Tesla and Chartwell)

166.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

167.     Plaintiff Lamar at all times was an employee covered by the Fair Employment and Housing Act ("FEHA"), California Government Code §§ 12940(a) and (j), which prohibits an employer from discriminating and harassing an employee on the basis of color and race.

168.     Defendants Tesla and Chartwell were, at all times, employers as defined under the FEHA.

169.     The above-described actions constitute racial harassment and discrimination in violation of the FEHA. Plaintiff Lamar was subjected to working in a severe, persistent and/or pervasive racially hostile work environment, which interfered with his work performance, denied him employment privileges, and adversely affected the terms and conditions of his job on the basis of his race.

170.     The harassing conduct to which Plaintiff Lamar was subjected to was so severe, widespread, and/or persistent that a reasonable African American in Plaintiff Lamar's circumstances would have considered the work environment to be hostile and/or abusive.

171.     Plaintiff Lamar considered the work environment to be hostile and/or abusive.

172.     Defendants Tesla and Chartwell failed to take prompt, remedial and effective action to stop the harassers.

173.     Defendants' violations of the FEHA caused Plaintiff Lamar to suffer harm as set forth above.

174.     By reason of the conduct of Defendants as alleged herein, Plaintiff Lamar has necessarily retained attorneys to prosecute the within action.  Plaintiff Lamar is therefore entitled

to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

175.     Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## NINTH CAUSE OF ACTION
RACE DISCRIMINATION
Cal. Govt. Code § 12940, *et seq.*
(As to Plaintiff Lamar; Against Defendants Tesla and Chartwell)

176.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

177.     Plaintiff Lamar at all times was an employee covered by the FEHA, California Government Code §§ 12940(a) and (j), which prohibits an employer from discriminating against an employee on the basis of color and race.

178.     Defendants Tesla and Chartwell were at all times employers as defined under the FEHA.

179.     Tesla failed to take any action in response to Plaintiff's complaints because of his color and race.

180.     Defendants' practice of failing to take any action in response to Plaintiff's complaints was a substantial factor in causing Plaintiff's harm.

181.     Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

\\

182.     By reason of the conduct of Defendants as alleged herein, Plaintiff Lamar has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

183.    Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

### TENTH CAUSE OF ACTION
RETALIATION
Cal. Govt. Code 12940(h)
(As to Plaintiff Lamar; Against Defendants Tesla and Chartwell)

184.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

185.    Plaintiff Lamar complained of harassment and discrimination that violated the FEHA.

186.    Defendants Tesla and Chartwell took no action to ensure that Plaintiff was not retaliated against or threatened for having complained.

187.    As a result of Defendants Tesla and Chartwell's action or inaction, Plaintiff was subject to additional harassment, making the work environment so unbearable that Plaintiff Lamar had no choice but to quit his employment.

188.    Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

189.    By reason of the conduct of Defendants as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

190.    Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

//

25

## ELEVENTH CAUSE OF ACTION

### FAILURE TO PREVENT DISCRIMINATION AND HARASSMENT
Cal. Govt. Code § 12940, *et seq.*
(As to Plaintiff Lamar; Against Defendants Tesla and Chartwell)

191.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

192.    Defendants Tesla and Chartwell failed to take all reasonable steps to prevent the harassment and discrimination as described above. Defendants knew or should have known that Tesla's employees were engaged in racially offensive behavior in the past and failed to stop it.

193.    Despite being on notice of Tesla's employees' propensity to engage in harassing conduct, Defendants failed to act to prevent employees from harassing Plaintiff.

194.    Defendants also failed to enact an anti-discrimination policy and/or failed to distribute it appropriately and failed to effectively train its employees on racial harassment or discrimination.

195.    As a result of Defendants violations of the FEHA, Plaintiff suffered harm as set forth above.

196.    By reason of the conduct of Defendants as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

197.    Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## TWELFTH CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(As to All Plaintiffs; Against All Defendants)

198.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

26

199.     As employees and contractors of Defendants, Plaintiffs were owed a duty of due care by Defendants, and each of them, to ensure that Plaintiffs were not exposed to foreseeable harms.

200.     Defendants, and each of them, knew, or should have known, that Plaintiffs were being subjected to racial harassment, discrimination and retaliation, and that, by failing to exercise due care to prevent racially harassing, discriminatory and retaliatory course of conduct could and would cause Plaintiffs to suffer serious emotional distress.

201.     Defendants, and each of them, failed to exercise their duty of due care to prevent their employees, managers, supervisors and/or officers from racially harassing, discriminating and retaliating against Plaintiffs.

202.     As a direct and consequential result of Defendants' actions, Plaintiffs suffered serious mental and emotional distress, includes, but is not limited to, pain, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear. Plaintiffs allege Defendants are responsible for the harm they suffered.

203.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

204.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## THIRTEENTH CAUSE OF ACTION
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(As to All Plaintiffs; Against All Defendants)

205.   Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

Amended Complaint for Damages and Demand for Jury Trial

206.    Plaintiffs complained repeatedly to Tesla as well as to West Valley, Chartwell, nextSource, and Citistaff about the constant racial abuse they received on a daily basis. Plaintiffs made clear that the racial harassment caused them distress, humiliation, and suffering.

207.    When Defendants failed to take corrective action, Defendants knew that Plaintiffs would continue to suffer extreme emotional distress and harm as a result of their failure to act.

208.    As a direct and consequential result of Defendants' actions, Plaintiffs have suffered severe emotional distress to their persons. Such harm includes, but is not limited to, pain, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear. Plaintiffs allege Defendants are responsible for the harm they suffered.

209.    By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

210.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## FOURTEENTH CAUSE OF ACTION

### NEGLIGENT HIRING, RETENTION AND SUPERVISION
(As to All Plaintiffs; Against All Defendants)

211.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

212.    Upon information and belief, Defendants, by and through its agents and employees, knew or reasonably should have known through reasonable investigation of some of its agents and/or employees' propensity for unlawful racially harassing and physically aggressive behavior.

213. Defendants had a duty not to hire or retain these employees/agents given their wrongful, dangerous, and racially offensive propensities, and to provide reasonable supervision of these employees/agents.

214. Defendants negligently hired, retained and/or failed to adequately supervise these employees/agents in their positions where they were able to commit the wrongful acts complained of here against Plaintiffs. Defendants failed to provide reasonable supervision of these employees/agents despite knowing of their propensities and complaints made against them.

215. As a direct and consequential result of Defendants' actions, Plaintiffs have suffered serious emotional distress to their persons. Such harm includes, but is not limited to, pain, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear. Plaintiffs allege Defendants are responsible for the harm they suffered.

216. By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

217. Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### FIFTEENTH CAUSE OF ACTION
WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
(As to Plaintiff Demetric; Against Defendant West Valley and Tesla)

218. Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

219. Defendant Tesla and West Valley punished Demetric by terminating his employment.

220. Although Defendants stated that Demetric should be terminated for performance issues, this was merely a pretext. Demetric did not have a history of written warnings or

29

performance issues warranting a termination until he was issued a written warning for using his phone on the production line within days of complaining to his supervisor of the racially discriminatory and harassing behavior he was subjected to at work. His supervisor responded to his complaint by threatening to terminate Demetric's employment, and ultimately did terminate his employment approximately a week after Demetric made his complaint.

221.    West Valley ratified Tesla's discriminatory behavior by terminating Demetric without conducting any investigation into the veracity of the claims against him, thereby approving of Tesla's discriminatory motives.

222.    West Valley and Tesla's decision to terminate Demetric's employment based on discriminatory motives was contrary to the policies, rules, regulations, and laws of the State of California, which are in substantial part designed to protect employees from discriminatory, harassing, and otherwise harmful or unlawful conduct. Said policies are encoded in Article 1, Section 8 of the Constitution of the State of California, and in Section 12900 *et seq.* of the California Government Code. Demetric's termination therefore constituted an unlawful termination under California law.

223.    Defendants' violations of these constitutional and statutory provisions caused Plaintiff Demetric to suffer harm as set forth above.

224.    By reason of the conduct of Defendants as alleged herein, Plaintiff Demetric has necessarily retained attorneys to prosecute the present action.  Plaintiff Demetric is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

225.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff Demetric; with the conscious disregard of the rights and safety of Plaintiff Demetric; and with an improper and evil motive amounting to malice. Plaintiff Demetric is thus entitled to recover punitive damages from Defendants in an amount according to proof.

//

//

## SIXTEENTH CAUSE OF ACTION

CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY
(As to Plaintiff Owen and Lamar; Against Defendants Tesla, Citistaff, nextSource, and Chartwell)

226.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

227.    At all relevant times herein, Owen was an employee of Citistaff, nextSource, and Tesla; and Lamar was an employee of Chartwell and Tesla.

228.    Citistaff, nextSource, and Tesla constructively terminated Owen's employment, and Chartwell and Tesla constructively terminated Lamar's employment by permitting a hostile work environment to flourish at the Tesla Factory, where Owen and Lamar were continuously subjected to harassment and discrimination.

229.    Owen and Lamar complained about the use of racial slurs, the display of racially offensive images, and the use of offensive statements. Owen also complained in writing about the violent conduct Ramon directed towards him.

230.    When Owen complained of this conduct, Tesla's employees only escalated their threatening and discriminatory behavior, and attempted to demote Owen.

231.    No reasonable African-American person could have borne the constant harassment, discrimination, intimidation, and threatening behavior directed at Owen and Lamar on a daily basis.

232.    As a result, when Defendants Tesla, Citistaff, nextSource, and Chartwell repeatedly declined to intervene and prevent the harassment, Owen and Lamar had no choice but to quit.

233.    Defendants Tesla, Chartwell, nextSource, and Citistaff's failure to halt the racial harassment and discrimination was contrary to the policies, rules, regulations, and laws of the State of California, which are in substantial part designed to protect employees from discriminatory, harassing, and otherwise harmful or unlawful conduct. Said policies are encoded in Article 1, Section 8 of the Constitution of the State of California, and in Section 12900 *et seq.* of the California Government Code. Defendants Tesla, nextSource, and Citistaff's constructive

termination of Owen, and Defendants Tesla and Chartwell's constructive termination of Lamar therefore constituted a wrongful termination under California law.

234.     Defendants' violations of these constitutional and statutory provisions caused Plaintiffs Owen and Lamar to suffer harm as set forth above.

235.     By reason of the conduct of Defendants as alleged herein, Plaintiffs Owen and Lamar have necessarily retained attorneys to prosecute the present action.  Plaintiffs Owen and Lamar are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

236.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs Owen and Lamar; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs Owen and Lamar are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request judgment against the Defendants as follows:

1.     General damages according to proof, in an amount no less than the jurisdictional limit of this court;

2.     Special damages in amounts according to proof, together with prejudgment interest;

3.     Exemplary and punitive damages in amounts according to proof;

4.     Civil penalties pursuant to Section 52(a), 52(b)(2), and 52.1(a) of the California Civil Code; and Section 1102.5(f) of the California Labor Code;

5.     Attorneys' fees and costs pursuant to sections 52(a), 52(b)(3), and 52.1(h) of the California Civil Code; section 12965(b) of the California Government Code, and any other applicable statute;

6.     Interest as provided by law;

7.     Costs of suit incurred herein;

8.     Injunctive relief to require Defendants to better train its staff on race harassment, discrimination and retaliation, and develop effective policies and procedures to ensure that when harassment is reported, the company takes effective remedial measures; and

9.     For such other and further relief as the Court deems just and proper.

Dated: December 14, 2018                CALIFORNIA CIVIL RIGHTS LAW GROUP

_____
LAWRENCE A. ORGAN
NAVRUZ AVLONI
Attorneys for Plaintiffs
DEMETRIC DI-AZ, OWEN DIAZ and LAMAR PATTERSON

## DEMAND FOR JURY TRIAL

PLAINTIFFS hereby demand a jury trial on all issues.

Dated: December 14, 2018                CALIFORNIA CIVIL RIGHTS LAW GROUP

_____
LAWRENCE A. ORGAN
NAVRUZ AVLONI
Attorneys for Plaintiffs
DEMETRIC DI-AZ, OWEN DIAZ and LAMAR PATTERSON

33

# EXHIBIT "B"

1                UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4                                    REPORTER CERTIFIED
                                          TRANSCRIPT
5    _____

6    DEMETRIC DI-AZ, OWEN DIAZ and
     LAMAR PATTERSON, an individual,     CONFIDENTIAL
7
              Plaintiffs,

8
     Vs.                        Case No. 3:17-cv-06748-WHO
9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CitiStaff SOLUTIONS, INC.;
     WEST VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING SERVICES, INC.
     and DOES 1-10, inclusive,
12
              Defendants.
13   _____/

14

15

16                      CONFIDENTIAL

17             VIDEOTAPED DEPOSITION OF

18                      OWEN DIAZ

19             SAN FRANCISCO, CALIFORNIA

20              TUESDAY, MAY 22, 2018

21

22

23

24   Reported By:
     Candy Newland
25   CSR No. 14256
     File No. 18-25470

CHASE
LITIGATION SERVICES

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:12:56 | 1 | Madame Court Reporter, please swear the witness |
| | 2 | in. |
| | 3 | --oOo-- |
| | 4 | OWEN DIAZ, |
| | 5 | having first declared under penalty of perjury to tell |
| | 6 | the truth, was examined and testified as follows: |
| | 7 | --oOo-- |
| | 8 | EXAMINATION |
| | 9 | BY MS. ANTONUCCI: |
| 10:13:12 | 10 | Q.     My name is Barbara Antonucci.  I represent |
| 10:13:14 | 11 | defendant Tesla, Inc., dba Tesla Motors, Inc.  For |
| 10:13:19 | 12 | purposes of this deposition, I'll refer to my client as |
| 10:13:23 | 13 | Tesla. |
| 10:13:23 | 14 | Do you understand that? |
| 10:13:23 | 15 | A.     Yes, ma'am. |
| 10:13:26 | 16 | Q.     I also represent CitiStaff Solutions, Inc., and |
| 10:13:26 | 17 | for purposes of this depo, I'll refer to them as |
| 10:13:26 | 18 | CitiStaff. |
| 10:13:32 | 19 | Do you understand that? |
| 10:13:33 | 20 | A.     Yes, ma'am. |
| 10:13:33 | 21 | Q.     Could you please state your full name for the |
| 10:13:36 | 22 | record. |
| 10:13:36 | 23 | A.     My full name is Owen Orappio Diaz, Jr. |
| 10:13:36 | 24 | (Reporter Clarification.) |
| 10:13:36 | 25 | /// |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:36:40 | 1 | same thing I had to go through. |
| 10:37:09 | 2 | Q.      Have you ever declared bankruptcy? |
| 10:37:13 | 3 | A.      No, ma'am. |
| 10:37:39 | 4 | Q.      Have you ever had any judgments against you? |
| 10:37:42 | 5 | A.      No, ma'am. |
| 10:37:43 | 6 |         MR. ORGAN:  Objection to the extent it calls for |
| 10:38:10 | 7 | a legal conclusion. |
| 10:38:10 | 8 |         (EXHIBIT 1 was marked for identification.) |
| 10:38:10 | 9 | BY MS. ANTONUCCI: |
| 10:38:15 | 10 | Q.      Exhibit 1 is a document entitled "CitiStaff |
| 10:38:18 | 11 | Solutions, Inc., Application," and it's Bates-stamped at |
| 10:38:22 | 12 | the bottom 34 to 35. |
| 10:38:24 | 13 |         Do you see that? |
| 10:38:29 | 14 | A.      Yes, ma'am. |
| 10:38:30 | 15 | Q.      Is this a copy of the application you submitted |
| 10:38:33 | 16 | to CitiStaff? |
| 10:38:36 | 17 | A.      It appears so. |
| 10:38:39 | 18 | Q.      Is that your signature on the page Bates-stamped |
| 10:38:45 | 19 | 35 at the bottom? |
| 10:38:47 | 20 | A.      It looks like my signature, ma'am. |
| 10:38:53 | 21 | Q.      Is there anything that you see that's inaccurate |
| 10:38:57 | 22 | about this application? |
| 10:38:58 | 23 |         MR. ORGAN:  Objection.  Compound. |
| 10:39:35 | 24 |         THE WITNESS:  Looks like the date of my |
| 10:39:53 | 25 | franchise -- the end.  I could have made a typo there. |

```
10:41:20   1    A.      Yes.

10:41:21   2    Q.      Why didn't you mention the property crime at

10:41:25   3    this point?

10:41:27   4    A.      I had -- at that point, I had limited time to

10:41:34   5    fill out the application because they wanted me to hurry

10:41:37   6    up and go over to Tesla.

10:41:37   7    Q.      But was the property crime a felony?

10:41:42   8    A.      I believe so.

10:41:51   9    Q.      Any other reason why you didn't disclose it on

10:41:54   10   the application?

10:41:57   11   A.      Oversight.

10:42:08   12   Q.      How did you submit this application?  Was it in

10:42:12   13   person or electronically?

10:42:14   14   A.      In person.

10:42:16   15   Q.      Where did you submit it?

10:42:18   16   A.      I believe it was in Newark.

10:42:26   17   Q.      Was it at a CitiStaff office?

10:42:29   18   A.      Yes, ma'am.

10:42:31   19   Q.      Did you meet with anyone when you submitted your

10:42:34   20   application?

10:42:36   21   A.      Yes, ma'am.

10:42:37   22   Q.      Who did you meet with?

10:42:40   23   A.      I can't remember her name.

10:42:44   24   Q.      Can you remember what her role was?

10:42:51   25           MR. ORGAN:  Objection.  Vague and ambiguous.
```

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:59:31 | 1 | A.      I don't know. |
| 10:59:33 | 2 | Q.      How long did you work for CSC? |
| 10:59:37 | 3 | A.      About four months. |
| 10:59:53 | 4 | Q.      And what was your role at CSC? |
| 10:59:57 | 5 | A.      I worked the 49er games. |
| 11:00:02 | 6 | Q.      Were you a security officer? |
| 11:00:04 | 7 | A.      I stood on the field.  Yes. |
| 11:00:09 | 8 | Q.      Can you give me the dates of your employment at |
| 11:00:17 | 9 | CSC? |
| 11:00:27 | 10 | A.      I believe it's about 2013 to 2014. |
| 11:00:32 | 11 | Q.      And why did you leave CSC? |
| 11:00:36 | 12 | A.      Football season was over. |
| 11:00:45 | 13 | Q.      Any other jobs prior to applying for CitiStaff? |
| 11:00:53 | 14 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 11:00:59 | 15 | THE WITNESS:  Not that I recall at this time. |
| 11:01:02 | 16 | BY MS. ANTONUCCI: |
| 11:01:23 | 17 | Q.      The woman you met at the CitiStaff Newark |
| 11:01:27 | 18 | office, did you ever see her again after you met her on |
| 11:01:32 | 19 | that occasion? |
| 11:01:37 | 20 | A.      Maybe once or twice. |
| 11:01:44 | 21 | Q.      Where did you see her after the first occasion |
| 11:01:47 | 22 | you met her? |
| 11:01:48 | 23 | A.      The same office. |
| 11:01:55 | 24 | Q.      Okay.  So the second time you saw her, what did |
| 11:01:59 | 25 | you discuss with her? |

11:02:00  1   A.      My paycheck.

11:02:01  2   Q.      What did you discuss about your paycheck?

11:02:04  3   A.      Picking up my paycheck.

11:02:07  4   Q.      And when was that?

11:02:10  5   A.      Probably two weeks after I started.

11:02:18  6   Q.      Did you discuss anything else with her during

11:02:25  7   that time that you visited the Newark office?

11:02:30  8   A.      No.

11:02:39  9   Q.      Was there a third time that you met with her?

11:02:43 10   A.      Picking up my paycheck.

11:02:48 11   Q.      So you met with her a third time where you

11:02:51 12   picked up your paycheck from the Newark office?

11:02:55 13   A.      Yes, ma'am.

11:02:56 14   Q.      And when was that?

11:02:58 15   A.      A week later.

11:03:01 16   Q.      And what did you discuss with her a week later

11:03:04 17   when you picked up your paycheck?

11:03:06 18   A.      That I would be picking up my paychecks inside

11:03:11 19   the office from Tesla from now on.

11:03:11 20           MS. ANTONUCCI:  Can you read that back.

11:03:11 21           (Whereupon, the last answer was read back.)

11:03:15 22   BY MS. ANTONUCCI:

11:03:15 23   Q.      And why did you let her know you'd be picking up

11:03:31 24   your paychecks inside the office from Tesla from now on?

11:03:33 25   A.      I didn't let her know that.  She let me know

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:11:52 | 1 | office number was active? |
| 11:11:56 | 2 | A.      She said they should answer. |
| 11:12:07 | 3 | Q.      Was she just the receptionist that picked up? |
| 11:12:12 | 4 | A.      I don't know. |
| 11:12:14 | 5 | Q.      Was she the person that answered the phone? |
| 11:12:17 | 6 | A.      Yes. |
| 11:12:18 | 7 | Q.      Did she introduce herself? |
| 11:12:25 | 8 | A.      I don't remember. |
| 11:12:27 | 9 | Q.      Did you introduce yourself? |
| 11:12:29 | 10 | A.      Yes. |
| 11:12:30 | 11 | Q.      Okay.  Did you ever speak with anyone else |
| 11:12:38 | 12 | besides the people you've already talked to me about at |
| 11:12:42 | 13 | CitiStaff? |
| 11:12:43 | 14 | A.      No. |
| 11:12:44 | 15 | Q.      Did you ever write an e-mail or communicate in |
| 11:12:48 | 16 | writing in any way with anybody at CitiStaff other than |
| 11:12:52 | 17 | the folks you've already told me? |
| 11:12:55 | 18 | A.      Yes. |
| 11:12:55 | 19 | Q.      Who did you communicate with in writing from |
| 11:13:00 | 20 | CitiStaff? |
| 11:13:04 | 21 | A.      I have to look at the heading of the e-mail, |
| 11:13:11 | 22 | but -- I can't remember.  At this time I can't remember. |
| 11:13:14 | 23 | Q.      Which e-mail are you referring to? |
| 11:13:18 | 24 | A.      I sent the e-mail over to CitiStaff letting them |
| 11:13:27 | 25 | know about the effigy. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:13:27 | 1 | (Reporter clarification.) |
| 11:13:38 | 2 | BY MS. ANTONUCCI: |
| 11:13:38 | 3 | Q.     And which effigy is that? |
| 11:13:41 | 4 | A.     The drawing of a picaninny. |
| 11:13:46 | 5 | Q.     Can you describe the drawing? |
| 11:13:51 | 6 | A.     A depiction of an African-American with a bone |
| 11:14:00 | 7 | in his head with big lips. |
| 11:14:17 | 8 | Q.     Do you know who at CitiStaff you sent this to? |
| 11:14:22 | 9 | A.     I'd have to check the heading of the e-mail. |
| 11:14:26 | 10 | Q.     What did you say in the e-mail? |
| 11:14:33 | 11 | A.     That a drawing was found.  I went to talk to |
| 11:15:11 | 12 | Michael Wheeler and Israel.  I can't remember his last |
| 11:15:20 | 13 | name.  Bob Martinez admitted to the drawing. |
| 11:15:31 | 14 | Q.     Anything else? |
| 11:15:33 | 15 | A.     Yes.  But I would have to reread the e-mail to |
| 11:15:39 | 16 | get the exact... |
| 11:15:41 | 17 | Q.     Did you send pictures of the drawing? |
| 11:15:44 | 18 | A.     Yes. |
| 11:15:48 | 19 | Q.     And who took those pictures? |
| 11:15:50 | 20 | A.     I did. |
| 11:15:52 | 21 | Q.     On what phone? |
| 11:15:55 | 22 | A.     My iPhone. |
| 11:15:59 | 23 | Q.     Is that the same iPhone you have today? |
| 11:16:02 | 24 | A.     No. |
| 11:16:03 | 25 | Q.     Is it the same phone number? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:07:13 | 1 | A.       I can't recall. |
| 01:07:27 | 2 | Q.       Was Ed Romero ever present on any of the |
| 01:07:30 | 3 | occasions in which any employee used the N-word? |
| 01:07:34 | 4 | A.       No. |
| 01:07:43 | 5 | Q.       Did you ever report the use of the N-word at the |
| 01:07:47 | 6 | Tesla factory to anybody at CitiStaff? |
| 01:07:52 | 7 | MR. ORGAN:  Objection.  Asked and answered. |
| 01:07:54 | 8 | THE WITNESS:  No. |
| 01:08:00 | 9 | BY MS. ANTONUCCI: |
| 01:08:14 | 10 | Q.       Besides the cartoon that was depicted on the |
| 01:08:24 | 11 | cardboard bale and the graffiti in the bathroom, are |
| 01:08:28 | 12 | there any other pictures that you considered to be |
| 01:08:34 | 13 | racially harassing or discriminatory that you saw at the |
| 01:08:40 | 14 | Tesla factory? |
| 01:08:41 | 15 | MR. ORGAN:  Objection.  Vague and ambiguous and |
| 01:08:44 | 16 | misstates his testimony -- testimony relative to |
| 01:08:46 | 17 | cartoon, but you can answer. |
| 01:08:51 | 18 | THE WITNESS:  Not that I can recall at this |
| 01:08:51 | 19 | time. |
| 01:08:51 | 20 | BY MS. ANTONUCCI: |
| 01:09:04 | 21 | Q.       Did you ever report the use of the phrase "Go |
| 01:09:08 | 22 | back to Africa" to anyone as CitiStaff? |
| 01:09:08 | 23 | A.       No. |
| 01:09:19 | 24 | Q.       Did you ever report the graffiti in the bathroom |
| 01:09:22 | 25 | to anyone at CitiStaff? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:11:41 | 1 | Q.      Did you report the -- that the phrase "Go back |
| 01:11:45 | 2 | to Africa" was used to Ed Romero? |
| 01:11:49 | 3 | A.      Yes. |
| 01:11:55 | 4 | Q.      And other than Robert, Ramon Martinez, and Ed |
| 01:11:58 | 5 | Romero, did you report the use of the phrase "Go back to |
| 01:12:01 | 6 | Africa" to anyone else? |
| 01:12:03 | 7 | A.      No. |
| 01:13:00 | 8 |         MS. ANTONUCCI:  I'd like to mark this as |
| 01:13:38 | 9 | Exhibit 2. |
| 01:13:39 | 10 |         (EXHIBIT 2 was marked for identification.) |
| 01:13:43 | 11 | BY MS. ANTONUCCI: |
| 01:13:43 | 12 | Q.      Is this a true and correct copy of your resume |
| 01:13:46 | 13 | that you submitted to CitiStaff in connection with |
| 01:13:51 | 14 | trying to get a job working at the Tesla factory? |
| 01:14:12 | 15 | A.      Yes.  This is what I submitted. |
| 01:14:17 | 16 | Q.      Okay.  And is that your name at the top? |
| 01:14:24 | 17 | A.      Yes. |
| 01:14:25 | 18 | Q.      And is that your current phone number? |
| 01:14:29 | 19 | A.      Yes. |
| 01:14:29 | 20 | Q.      Is that your current address? |
| 01:14:31 | 21 | A.      No. |
| 01:14:38 | 22 | Q.      Is that your current e-mail? |
| 01:14:42 | 23 | A.      Yes. |
| 01:14:44 | 24 | Q.      And for the record, this is Tesla Bates-stamped |
| 01:14:50 | 25 | document 153 to 155. |

**Owen Diaz-Confidential**

01:29:18   1    Q.      And who's Tom Kawasaki?

01:29:21   2    A.      Supervisor.

01:29:23   3    Q.      What did he supervise?

01:29:29   4    A.      At that time, the elevator staff.

01:29:32   5    Q.      Did you report to Tom Kawasaki?

01:29:43   6    A.      Yes.

01:29:44   7    Q.      For how long?

01:29:47   8    A.      Till he left.

01:29:54   9    Q.      And when was that?

01:29:55  10    A.      I don't recall.

01:29:57  11    Q.      How long after you arrived at Tesla did Tom

01:30:03  12    Kawasaki leave?

01:30:05  13    A.      I don't recall.

01:30:07  14    Q.      Do you recall if it was more than a couple of

01:30:09  15    weeks?

01:30:12  16    A.      It's more than a couple weeks.  He was there for

01:30:22  17    a while.

01:30:25  18    Q.      And at some point, you started reporting to

01:30:28  19    Ed Romero; is that right?

01:30:29  20    A.      Yes.

01:30:30  21    Q.      Did you report to anyone other than Tom Kawasaki

01:30:34  22    or Ed Romero while you were assigned at Tesla?

01:30:39  23    A.      No.

01:30:48  24    Q.      You said you went through an orientation at

01:30:52  25    Tesla?

Owen Diaz-Confidential

| 01:44:09 | 1 | Q. Who did you communicate with at nextSource |
| 01:44:15 | 2 | regarding your assignment at Tesla? |
| 01:44:18 | 3 | A. I don't recall. |
| 01:44:33 | 4 | Q. Did CitiStaff have any onsite people at Tesla? |
| 01:44:38 | 5 | A. No. |
| 01:44:44 | 6 | Q. Did nextSource have any onsite people at Tesla? |
| 01:44:48 | 7 | A. Possibly. |
| 01:44:50 | 8 | Q. Do you know their names? |
| 01:45:00 | 9 | A. No. |
| 01:45:12 | 10 | Q. When you worked at Tesla, did you take |
| 01:45:15 | 11 | instruction from Tom Kawasaki? |
| 01:45:19 | 12 | A. Yes. |
| 01:45:20 | 13 | Q. And did you take instruction from Ed Romero? |
| 01:45:24 | 14 | A. Yes. |
| 01:45:24 | 15 | Q. Did you take instruction from anyone else at |
| 01:45:27 | 16 | Tesla? |
| 01:45:29 | 17 | MR. ORGAN: Objection. Vague and ambiguous as |
| 01:45:32 | 18 | to "instruction." |
| 01:45:34 | 19 | THE WITNESS: From Robert and Ramon. |
| 01:45:34 | 20 | BY MS. ANTONUCCI: |
| 01:45:44 | 21 | Q. But you didn't report to Robert or Ramon? |
| 01:45:49 | 22 | A. No. |
| 01:45:50 | 23 | Q. So then what kind of instruction did you take |
| 01:45:53 | 24 | from them? |
| 01:45:58 | 25 | MR. ORGAN: Objection. Argumentative. |

Owen Diaz-Confidential

| | | |
|---|---|---|
| 01:46:01 | 1 | THE WITNESS:  The departments overlap. |
| 01:46:01 | 2 | BY MS. ANTONUCCI: |
| 01:46:04 | 3 | Q.      How did they overlap? |
| 01:46:16 | 4 | A.      Whatever the upstairs needed, the elevator would |
| 01:46:19 | 5 | supply it.  They would bring it in from the warehouse. |
| 01:46:33 | 6 | Q.      So at the beginning of your assignment at Tesla, |
| 01:46:36 | 7 | you worked as an elevator operator; right? |
| 01:46:39 | 8 | A.      Yes. |
| 01:46:40 | 9 | Q.      And what were your responsibilities as an |
| 01:46:42 | 10 | elevator operator? |
| 01:46:47 | 11 | A.      Move material and people. |
| 01:46:58 | 12 | Q.      On the elevator? |
| 01:47:01 | 13 | A.      Yes. |
| 01:47:05 | 14 | Q.      So is it correct that it was your responsibility |
| 01:47:08 | 15 | to pick up material that was on one floor, load it into |
| 01:47:15 | 16 | the elevator, go up or down the elevator, and unload it |
| 01:47:19 | 17 | onto another floor? |
| 01:47:20 | 18 | A.      Yes. |
| 01:47:22 | 19 | Q.      Does that accurately describe your job as an |
| 01:47:26 | 20 | elevator operator? |
| 01:47:27 | 21 | A.      Yes. |
| 01:47:27 | 22 | Q.      Were there any other responsibilities involved |
| 01:47:30 | 23 | in your job as an elevator operator? |
| 01:47:34 | 24 | A.      No. |
| 01:47:39 | 25 | Q.      What kind of material were you responsible for |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:56:10 | 1 | corporate policy for Tesla? |
| 01:56:12 | 2 | MR. ORGAN:  Objection.  Calls for speculation. |
| 01:56:14 | 3 | THE WITNESS:  I don't know. |
| 01:57:25 | 4 | (EXHIBIT 3 was marked for identification.) |
| 01:57:25 | 5 | BY MS. ANTONUCCI: |
| 01:57:30 | 6 | Q.     Exhibit 3 is a document identified at the top as |
| 01:57:34 | 7 | "CitiStaff Solutions Inc., Assignment |
| 01:57:37 | 8 | Abandonment/Walk-Off" policy, and it's Bates-stamped at |
| 01:57:37 | 9 | the bottom as CitiStaff 39. |
| 01:57:41 | 10 | Do you recognize this document? |
| 01:57:51 | 11 | A.     I recognize my signature, but I don't remember |
| 01:57:54 | 12 | the document. |
| 01:57:55 | 13 | Q.     But that is your signature at the bottom? |
| 01:57:57 | 14 | A.     Yes. |
| 01:57:57 | 15 | Q.     So you signed this on June 2, 2015; correct? |
| 01:58:01 | 16 | A.     Yes. |
| 01:58:01 | 17 | Q.     And did you review it and read it before you |
| 01:58:05 | 18 | signed it? |
| 01:58:07 | 19 | MR. ORGAN:  Objection.  Compound. |
| 01:58:13 | 20 | THE WITNESS:  If I signed it at that time, I |
| 01:58:15 | 21 | reviewed it. |
| 01:58:15 | 22 | BY MS. ANTONUCCI: |
| 01:58:25 | 23 | Q.     Do you remember asking any questions about this |
| 01:58:28 | 24 | policy? |
| 01:58:30 | 25 | A.     No. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 02:08:11 | 1 | temporary employee when you were working at CitiStaff; |
| 02:08:20 | 2 | is that right? |
| 02:08:20 | 3 | A.     Yes. |
| 02:08:21 | 4 | Q.     And you understood you weren't eligible for any |
| 02:08:27 | 5 | benefits? |
| 02:08:28 | 6 | A.     Yes.  I didn't have any benefits. |
| 02:08:48 | 7 | Q.     Turn your attention to page 17, Bates-stamped at |
| 02:08:52 | 8 | the bottom 77. |
| 02:09:06 | 9 | MR. ORGAN:  I will object to the extent it's an |
| 02:09:09 | 10 | incomplete document. |
| 02:09:09 | 11 | BY MS. ANTONUCCI: |
| 02:09:24 | 12 | Q.     Do you see there where it says "the absences"? |
| 02:09:27 | 13 | A.     Yes. |
| 02:09:27 | 14 | Q.     And it says -- about the third sentence in -- |
| 02:09:32 | 15 | "On these occasions, employees are expected to |
| 02:09:35 | 16 | personally contact their immediate supervisor for a |
| 02:09:38 | 17 | minimum of two hours prior to the employee's scheduled |
| 02:09:42 | 18 | start time with an honest reason or explanation |
| 02:09:45 | 19 | regarding the absence." |
| 02:09:47 | 20 | Do you see that? |
| 02:09:48 | 21 | A.     Yes. |
| 02:09:48 | 22 | Q.     Was that your understanding of what you were |
| 02:09:50 | 23 | supposed to do if you were absent from work? |
| 02:09:53 | 24 | A.     Yes. |
| 02:10:15 | 25 | Q.     At the bottom of that section entitled |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 02:11:45 | 1 | BY MS. ANTONUCCI: |
| 02:11:58 | 2 | Q.      Did you understand that you were expected to |
| 02:12:00 | 3 | report any violence or threats of violence while you |
| 02:12:04 | 4 | were working at CitiStaff? |
| 02:12:08 | 5 | A.      I reported it. |
| 02:12:11 | 6 | Q.      My question's a little different. |
| 02:12:14 | 7 | Did you understand that that was your obligation |
| 02:12:17 | 8 | to report any violence or threats of violence that you |
| 02:12:20 | 9 | witnessed when you were at CitiStaff? |
| 02:12:23 | 10 | A.      No. |
| 02:12:23 | 11 | Q.      You didn't understand that to be your |
| 02:12:26 | 12 | obligation? |
| 02:12:26 | 13 | A.      No. |
| 02:12:28 | 14 | Q.      What threats of violence or violence did you |
| 02:12:32 | 15 | report when you were working at CitiStaff? |
| 02:12:41 | 16 | A.      Can you rephrase the question, please? |
| 02:12:48 | 17 | Q.      You testified that you reported a threat of |
| 02:12:51 | 18 | violence or violence when you were working at CitiStaff; |
| 02:12:55 | 19 | is that right? |
| 02:12:55 | 20 | A.      I reported it to Ed Romero. |
| 02:12:58 | 21 | Q.      What did -- what threat of violence or violence |
| 02:13:03 | 22 | did you report to Ed Romero? |
| 02:13:05 | 23 | A.      Exactly what Rothaj Foster said. |
| 02:13:12 | 24 | Q.      The shooting? |
| 02:13:13 | 25 | A.      Yes. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:21:00 | 1 | A. "Get some rest" or either "Get some sleep," and |
| 03:21:08 | 2 | he'll talk to the other guy. |
| 03:21:14 | 3 | Q. Have you given that e-mail to your attorney? |
| 03:21:18 | 4 | A. Possibility. |
| 03:21:24 | 5 | Q. Do you still have that e-mail? |
| 03:21:30 | 6 | A. Possibility. |
| 03:21:33 | 7 | Q. And do you know if he ever talked -- if Ed ever |
| 03:21:35 | 8 | talked to the other guy? |
| 03:21:39 | 9 | A. No, I do not know. |
| 03:21:45 | 10 | Q. So at this point, was Tom no longer your |
| 03:21:49 | 11 | supervisor? |
| 03:21:50 | 12 | A. Yes. |
| 03:21:51 | 13 | Q. And Ed was now your supervisor? |
| 03:21:53 | 14 | A. Yes. |
| 03:21:53 | 15 | Q. And did you get along with Ed? |
| 03:21:56 | 16 | A. I thought so. |
| 03:22:01 | 17 | Q. Do you have any reason to think that you didn't |
| 03:22:03 | 18 | get along with him? |
| 03:22:05 | 19 | A. No. |
| 03:22:40 | 20 | Q. Did you ever talk to Wayne Jackson about the |
| 03:22:43 | 21 | incident with Ramon in the elevator? |
| 03:22:50 | 22 | A. I can't recall. |
| 03:22:51 | 23 | Q. Do you know who Wayne Jackson is? |
| 03:22:58 | 24 | A. Yes. |
| 03:22:59 | 25 | Q. Who's Wayne Jackson? |

**Owen Diaz-Confidential**

03:23:05  1   A.      My understanding is that he was a liaison.

03:23:13  2   Q.      Liaison with who?

03:23:16  3   A.      Tesla and nextSource, I believe.

03:23:23  4   Q.      Did you understand that you could complain to

03:23:32  5   Wayne Jackson if you needed to about any concerns you

03:23:35  6   had in the workplace?

03:23:36  7           MR. ORGAN:   Objection.  Vague and ambiguous.

03:23:40  8           THE WITNESS:   If he was around.

03:23:40  9   BY MS. ANTONUCCI:

03:23:43  10  Q.      And he was on-site?

03:23:46  11  A.      Rarely.

03:23:50  12  Q.      How often would you say he was on-site?

03:23:58  13  A.      I don't know.

03:24:01  14  Q.      How many times a week?

03:24:03  15  A.      I don't know.

03:24:29  16  Q.      And this incident with Ramon, you know, right

03:24:33  17  outside, inside of the elevator, occurred around

03:24:36  18  October 17, 2015?

03:24:40  19  A.      Yes.  That's what the date is on the -- on the

03:24:44  20  e-mail.

03:24:45  21  Q.      And was that around 4:45 a.m.?

03:24:49  22  A.      Yes.

03:24:51  23  Q.      So you sent this e-mail right after it happened?

03:24:55  24  A.      I sent the e-mail out at 6:08 a.m., ma'am.

03:25:02  25  Q.      So about an hour and a half after it happened?

| | | |
|---|---|---|
| 03:42:13 | 1 | Mr. Foster reported -- Mr. Foster reportedly made |
| 03:42:19 | 2 | threats against Mr. Diaz and his car.  As a result, |
| 03:42:21 | 3 | Mr. Romero advised me that he was suspending Mr. Foster |
| 03:42:25 | 4 | and asked for security assistance. |
| 03:42:29 | 5 | I followed him to Mr. Foster's work area, stood |
| 03:42:30 | 6 | by while he was informed, and his badge was taken by |
| 03:42:34 | 7 | Mr. Romero.  We then escorted Mr. Foster out of the |
| 03:42:38 | 8 | building at the second Number 2 door, and I followed him |
| 03:42:41 | 9 | until he got into his vehicle, which was parked in a |
| 03:42:45 | 10 | handicapped space in front of Door 1.  I had a vehicle |
| 03:42:48 | 11 | patrol officer, Brian Deltoro, follow him as he drove |
| 03:42:53 | 12 | off the property. |
| 03:42:54 | 13 | Mr. Foster's badge was turned in to the control |
| 03:42:57 | 14 | center, and I was informed -- and I informed Mr. Romero |
| 03:43:01 | 15 | Mr. Foster left the property. |
| 03:43:03 | 16 | Nothing further to report." |
| 03:43:05 | 17 | Q.      Okay.  So is that correct that you got into a |
| 03:43:09 | 18 | verbal dispute with Mr. Foster on or about 11/5/2015? |
| 03:43:15 | 19 | A.      Yes. |
| 03:43:17 | 20 | Q.      And what was said during that verbal dispute? |
| 03:43:23 | 21 | A.      He said he was going to shoot me. |
| 03:43:25 | 22 | Q.      And what did you say? |
| 03:43:27 | 23 | A.      I contacted Mr. Romero. |
| 03:43:33 | 24 | Q.      Did you say anything to Mr. Foster? |
| 03:43:37 | 25 | A.      No.  I tried to get away from him as fast as |

| | |
|---|---|
| 03:45:48 1 | security; correct? |
| 03:45:49 2 | A.      That's what the e-mail says.  Yes. |
| 03:46:11 3 | MR. ORGAN:  You need a break? |
| 03:46:14 4 | THE WITNESS:  We can keep going. |
| 03:46:27 5 | (EXHIBIT 13 was marked for identification.) |
| 03:46:27 6 | BY MS. ANTONUCCI: |
| 03:46:29 7 | Q.      Exhibit 13 is an e-mail dated -- a series of |
| 03:46:35 8 | e-mails, rather, dated December 15, 2015, Bates-stamped |
| 03:46:37 9 | at the bottom Tesla 43 through 46. |
| 03:46:50 10 | Did you, on December 15, 2015, forward Lamar |
| 03:46:57 11 | Patterson's resume to Ed Romero? |
| 03:46:57 12 | A.      Yes. |
| 03:47:01 13 | Q.      Why did you do that? |
| 03:47:03 14 | A.      Because he was looking for a job. |
| 03:47:07 15 | Q.      Did you recommend to Ed Romero that he be hired? |
| 03:47:16 16 | A.      Yes. |
| 03:47:18 17 | Q.      And why did you think that Lamar Patterson would |
| 03:47:21 18 | be a good fit for the elevator job? |
| 03:47:27 19 | A.      Another African-American employee told me that |
| 03:47:30 20 | his family member was looking for a job, and he told me |
| 03:47:35 21 | he was a hard worker; so I recommended him for the job. |
| 03:47:39 22 | Q.      And who was the African-American employee that |
| 03:47:41 23 | told you his family member was looking for a job? |
| 03:47:46 24 | A.      I can't recall at this time. |
| 03:47:58 25 | Q.      Did you speak to Patterson about working at the |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:49:25 | 1 | remember their names. |
| 03:49:26 | 2 | Q.      Had Robert by this point called you the N-word? |
| 03:49:30 | 3 | A.      Yes. |
| 03:49:39 | 4 | Q.      And Lamar Patterson is African-American; |
| 03:49:42 | 5 | correct? |
| 03:49:42 | 6 | A.      Yes. |
| 03:50:01 | 7 | (EXHIBIT 14 was marked for identification.) |
| 03:50:01 | 8 | BY MS. ANTONUCCI: |
| 03:50:19 | 9 | Q.      Exhibit 14 is an e-mail from you to Ed Romero |
| 03:50:30 | 10 | where -- Bates-stamped Tesla 5 to Tesla 8. |
| 03:50:39 | 11 | Do you see that? |
| 03:50:39 | 12 | A.      Yes. |
| 03:50:42 | 13 | Q.      Did you send this e-mail? |
| 03:50:45 | 14 | A.      Yes. |
| 03:50:45 | 15 | Q.      The e-mail is dated January 22, 2016.  Did you |
| 03:50:51 | 16 | send it on that date? |
| 03:50:53 | 17 | A.      Yes. |
| 03:51:00 | 18 | Q.      Did anybody help you write this? |
| 03:51:03 | 19 | A.      No. |
| 03:51:03 | 20 | Q.      Had you had -- had you consulted an attorney |
| 03:51:08 | 21 | prior to writing this? |
| 03:51:10 | 22 | A.      No. |
| 03:51:13 | 23 | Q.      Did you take the photographs on Tesla 6 and 7 of |
| 03:51:20 | 24 | this document, Exhibit 14? |
| 03:51:22 | 25 | A.      Yes. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:51:31 | 1 | Q.       You said in this e-mail that it was a "picture |
| 03:51:34 | 2 | of a cartoon depicting a black-faced person with a bone |
| 03:51:39 | 3 | in his pair with a caption under it saying, 'Booo'"; is |
| 03:51:39 | 4 | that correct? |
| 03:51:44 | 5 | A.       Yes. |
| 03:51:44 | 6 | Q.       Why did you think it was a black-faced person? |
| 03:51:49 | 7 | Q.       It resembled the 1920s and '30s racist cartoons. |
| 03:51:55 | 8 | Q.       How did it resemble a 1930s racist cartoon? |
| 03:52:01 | 9 | A.       The bone in the guy -- the bone in the cartoon's |
| 03:52:06 | 10 | hair.  The -- the big lips. |
| 03:52:18 | 11 | Q.       And is this the same cartoon that we discussed |
| 03:52:24 | 12 | earlier in this deposition? |
| 03:52:26 | 13 | A.       Yes. |
| 03:52:27 | 14 | Q.       So there are no other cartoons that you saw at |
| 03:52:32 | 15 | the Tesla factory while you worked there that depicted |
| 03:52:37 | 16 | African-American people; is that right? |
| 03:52:40 | 17 | A.       No. |
| 03:52:42 | 18 | Q.       "That's not right" or "that is right"? |
| 03:52:45 | 19 | A.       There's no other.  Just this one. |
| 03:52:48 | 20 | Q.       Okay.  This is the one where it says, "Booo" at |
| 03:53:03 | 21 | the bottom; is that right? |
| 03:53:04 | 22 | A.       Yes. |
| 03:53:04 | 23 | Q.       And what did you interpret that to mean? |
| 03:53:07 | 24 | A.       Jigaboo. |
| 03:53:10 | 25 | Q.       And couldn't it have just been, "Boo," like |

Owen Diaz-Confidential

| | | |
|---|---|---|
| 04:10:35 | 1 | Q. Do you know if Mr. -- if Mr. Martinez was |
| 04:10:39 | 2 | investigated in response to your e-mail? |
| 04:10:42 | 3 | A. No. |
| 04:10:43 | 4 | Q. Do you know if Mr. Martinez was written up in |
| 04:10:47 | 5 | response to your e-mail? |
| 04:10:48 | 6 | A. No. |
| 04:10:49 | 7 | Q. Do you know if Mr. Martinez was suspended in |
| 04:10:55 | 8 | response to your e-mail? |
| 04:10:56 | 9 | A. No. |
| 04:11:02 | 10 | Q. So no one ever communicated to you what happened |
| 04:11:06 | 11 | to Mr. Martinez in response to this e-mail? |
| 04:11:09 | 12 | A. You're correct. |
| 04:11:51 | 13 | (EXHIBIT 15 was marked for identification.) |
| 04:11:51 | 14 | BY MS. ANTONUCCI: |
| 04:11:56 | 15 | Q. Exhibit 15 is a series of e-mails Bates-stamped |
| 04:12:06 | 16 | at the bottom CitiStaff 50 to -- through 55. |
| 04:12:16 | 17 | I'd like to turn your attention to exhibit -- to |
| 04:12:23 | 18 | the one marked at -- the e-mail dated January 22, 2016, |
| 04:12:30 | 19 | time 5:50 p.m., Bates-stamped at the bottom 52. |
| 04:12:43 | 20 | So this is your e-mail to Ed Romero dated |
| 04:12:46 | 21 | January 22, 2016, at 8:42 a.m. |
| 04:12:51 | 22 | Do you see that? |
| 04:12:51 | 23 | A. Yes. |
| 04:12:52 | 24 | Q. Okay. And the incident you say "occurred at |
| 04:12:58 | 25 | 9:10 p.m. in elevator 1." |

04:13:01  1          Do you see that?

04:13:01  2  A.      Yes.

04:13:02  3  Q.      On the previous evening?

04:13:06  4  A.      Yes.

04:13:06  5  Q.      Why did you wait until the next morning to

04:13:09  6  report it to Mr. Romero?

04:13:15  7  A.      The production floor was busy, and I had to

04:13:19  8  write the e-mail in pieces.

04:13:21  9  Q.      Did you say you had to write the e-mail in

04:13:23 10  pieces?

04:13:24 11  A.      Yes.

04:13:24 12  Q.      Where did you write the e-mail?

04:13:26 13  A.      My iPhone.

04:13:28 14  Q.      But where were you geographically when you wrote

04:13:32 15  it?

04:13:32 16  A.      At the warehouse.

04:13:34 17  Q.      So you were still at the warehouse at 8:42 a.m.?

04:13:39 18  A.      Yes.

04:13:45 19  Q.      I thought you said your shift ended at

04:13:49 20  6:00 a.m.?

04:13:49 21  A.      It does.

04:13:50 22  Q.      So why were you still at the warehouse at

04:13:53 23  8:42 a.m.?

04:13:56 24  A.      I don't know.

04:13:59 25  Q.      Do you remember where in the warehouse you wrote

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:14:02 | 1 | this e-mail? |
| 04:14:05 | 2 | A.      Not exactly.  No. |
| 04:14:10 | 3 | Q.      Where you in the cafe? |
| 04:14:17 | 4 | A.      I don't recall. |
| 04:14:22 | 5 | Q.      Were you in your car? |
| 04:14:25 | 6 | A.      No. |
| 04:14:26 | 7 | Q.      Were you outside? |
| 04:14:28 | 8 | A.      No. |
| 04:14:30 | 9 | Q.      You were inside the factory? |
| 04:14:31 | 10 | A.      Yes. |
| 04:14:33 | 11 | Q.      Okay.  And here Bates-stamped at the bottom 52, |
| 04:14:37 | 12 | you forwarded this e-mail to CitiStaff. |
| 04:14:40 | 13 |         Do you see that? |
| 04:14:40 | 14 | A.      Yes. |
| 04:14:44 | 15 | Q.      Why did you forward it to CitiStaff? |
| 04:14:50 | 16 | A.      Because I didn't want the situation to be |
| 04:14:57 | 17 | covered up. |
| 04:14:59 | 18 | Q.      And did you forward it to anybody in particular |
| 04:15:08 | 19 | at CitiStaff? |
| 04:15:11 | 20 | A.      I don't remember. |
| 04:15:19 | 21 | Q.      How did you get this CitiStaff e-mail address? |
| 04:15:25 | 22 | A.      I don't remember. |
| 04:15:29 | 23 | Q.      And you forwarded it to CitiStaff on Friday, |
| 04:15:37 | 24 | January 22nd at 5:50 p.m. |
| 04:15:40 | 25 |         Do you see that? |

**Owen Diaz-Confidential**

04:15:40  1    A.      Yes.

04:15:41  2    Q.      And why did you wait a whole day to forward it

04:15:43  3    to CitiStaff?

04:15:46  4    A.      I don't know.

04:15:51  5    Q.      Do you know what actions CitiStaff took in

04:15:54  6    response to this complaint?

04:15:56  7    A.      No.

04:15:58  8    Q.      Did anybody form CitiStaff ever communicate to

04:16:01  9    you what actions were taken in response to this e-mail?

04:16:05  10   A.      I don't recall.

04:17:13  11           (EXHIBIT 16 was marked for identification.)

04:17:13  12   BY MS. ANTONUCCI:

04:17:35  13   Q.      So Exhibit 16 is a series of e-mails

04:17:39  14   Bates-stamped at the bottom 80 through 84.

04:17:43  15           Do you see that?

04:17:43  16   A.      Yes.

04:17:58  17   Q.      And they're dated January 22, 2016.

04:18:01  18           Do you see that?

04:18:01  19   A.      Yes.

04:18:05  20   Q.      In the middle of the page Bates-stamped Tesla

04:18:11  21   80, it says, "Wayne, as we discussed in person, this is

04:18:16  22   very disappointing coming from one of our team

04:18:20  23   supervisors.  I agree with the recommendation to suspend

04:18:24  24   and issue a permanent written warning."

04:18:26  25           Do you see that?

| | | |
|---|---|---|
| 05:00:58 | 1 | Objection.  Vague and ambiguous. |
| 05:01:02 | 2 | THE WITNESS:  I believe safety gear should be |
| 05:01:05 | 3 | worn. |
| 05:01:05 | 4 | BY MS. ANTONUCCI: |
| 05:01:06 | 5 | Q.    And that includes safety shoes? |
| 05:01:09 | 6 | A.    Yes. |
| 05:01:27 | 7 | (EXHIBIT 24 was marked for identification.) |
| 05:01:27 | 8 | BY MS. ANTONUCCI: |
| 05:01:31 | 9 | Q.    Exhibit 24 is an e-mail from Ed Romero to you, |
| 05:01:38 | 10 | Bates-stamped at the bottom Tesla 1, where he responds |
| 05:01:45 | 11 | to your e-mail saying -- well, first of all -- strike |
| 05:01:45 | 12 | that. |
| 05:01:51 | 13 | Did you write the e-mail to Ed Romero, this |
| 05:01:54 | 14 | e-mail, Exhibit 24, on March 4, 2016, at 9:08 p.m. |
| 05:02:01 | 15 | letting him know that your mom passed on 2/27/2016? |
| 05:02:07 | 16 | A.    It was late February.  Yes. |
| 05:02:12 | 17 | Q.    And did you write this e-mail at the bottom of |
| 05:02:14 | 18 | Tesla 1? |
| 05:02:18 | 19 | A.    Sent from my iPhone.  Yes. |
| 05:02:22 | 20 | Q.    And you said you would be back on 3/12/16; |
| 05:02:27 | 21 | correct? |
| 05:02:31 | 22 | A.    That's what the e-mail says.  Yes. |
| 05:02:39 | 23 | Q.    Did Ed then respond, "I'm sorry for your loss. |
| 05:02:42 | 24 | Please call me today any time after 12 noon"? |
| 05:02:45 | 25 | A.    That's what the e-mail says.  Yes. |

120150



## application

### PERSONAL INFORMATION

| Last Name | First Name | M.I. | Social Security # |
|---|---|---|---|
| DIAZ | Owen | O | ████ |

| Street Address | | Apt # |
|---|---|---|
| ████ | | |

| City | State | Zip Code | Phone # |
|---|---|---|---|
| VALLEJO | CA | 94590 | ████ |

| Person to contact in case of emergency/ Phone Number | Alternate Number |
|---|---|
| | |

| Positions Interested In? | Can you demonstrate proof of Employment Eligibility? |
|---|---|
| Forklift Operator / Janitor | Yes |

### JOB EXPERIENCE

**General Labor**
- ☒ Loader/Unloader
- ☒ Assembly
- ☒ Production Line
- ☐ Machine Operator

**Forklifts**
- ☒ Sit-down-Standard
- ☒ Sit-down- with attachments
- ☒ Stand Up-Reach
- ☒ Stand Up-Cherry Picker
- ☒ Electric Pallet Jack
- ☐ Cranes

**Shipping/Receiving**
- ☒ UPS
- ☐ Fed-Ex
- ☐ Clerk
- ☒ Inventory
- ☒ Quality Control

**Other Skills**
- ☐ Restaurant
- ☐ Extrusion Equipment
- ☐ Welding
- ☒ Construction
- ☐ Customer Service

**Clerical**
WPM ____
Accuracy ____
- ☐ Receptionist
- ☐ Data Entry/ File Clerk
- ☐ Accounting
- ☒ Excel
- ☐ Word
- ☐ PowerPoint
- ☐ 10 Key
- ☐ Other Programs

**Languages**
- ☐ Cantonese
- ☐ Chinese
- ☐ English
- ☐ French
- ☐ German
- ☐ Spanish
- ☐ Vietnamese
- ☐ Other
____

### AVAILABILITY

**Status**
- ☒ Fulltime
- ☐ Part-time

**Overtime**
- ☒ Yes
- ☐ No

**Shift**
- ☒ 1st Shift
- ☒ 2nd Shift
- ☒ 3rd Shift

**Days**
- ☒ Monday
- ☒ Tuesday
- ☒ Wednesday
- ☒ Thursday
- ☒ Friday
- ☐ Saturday
- ☐ Sunday

**Transportation**
- ☒ Car/ Own Transportation
- ☐ Ride
- ☐ Bus/Public Transportation
- ☐ Assisted Transportation

**Personnel Equipment**
- ☒ Work boots
- ☒ Steel Toes
- ☐ Back Belt
- ☐ Hard Hat

EXHIBIT    I
WIT:  Diaz
DATE:  5-22-18
Candy Newland, CSR #14256

CITISTAFF-0000034

**PLEASE CHECK YES OR NO**

| | | | |
|---|---|---|---|
| Have you ever worked for CitiStaff Before? | ☐ Yes | ☑ No | Where? _____ |
| Have you ever been convicted of a felony? | ☑ Yes | ☐ No | Where & When 1988 |
| Can you comply with a Drug Test? | ☑ Yes | ☐ No | _____ |
| Conditions May require lifting between 30-50 pounds . Is this ok? | ☑ Yes | ☐ No | Explain _____ |
| Positions may require to standing up for 6-10 hours. Is this ok? | ☑ Yes | ☐ No | Explain _____ |

**EMPLOYMENT REFERENCES**

| | | For Recruiter Use Only |
|---|---|---|
| Company COVERALL | Position FRANCHISE Owner | Account # |
| City SAN FRANCISCO | State CA | Phone | Position |
| Starting Pay | End Pay | Start Date 3/99 | End Date 8/00 | |
| Reason for Leaving | Contact Name Owen | Can we contact? YES | Interviewer |

**EMPLOYMENT REFERENCES TWO**

| | | | Date |
|---|---|---|---|
| Company Hamilton Family center | Position Residenetial Counselor | |
| City SAN FRANCISCO | State CA | Phone 415-409-2100 | Status |
| Starting Pay 15.00 | End Pay 15.00 | Start Date 1/13 | End Date 2/14 | |
| Reason for Leaving funding | Contact Name FRANK | Can we contact? YES | |

**PLEASE ANSWER ALL QUESTIONS**

| How did you hear about CitiStaff? | What is your highest level of education? Name of school |
|---|---|
| ☐ Ad | 1 YEAR college |
| ☐ Walk-In | Do you have any diplomas, certificates, degrees or awards? |
| ☐ Job Fair | Yes, High School |
| ☐ Relative | In case of an injury, would you like to pre-designate your treating physician? |
| ☐ Friend | Yes ☐    No ☑ , if no, CitiStaff will automatically pre-designate |
| ☐ Client | your treating physician |
| InDeed | Initials _____ |
| | Desired Cities for Employment ANTiOch, CONCORD, PittsbuRg |

Customer Number One
Customer Number Two
Customer Number Three

You must be at least 18 years old and able to produce proof of citizenship or immigration status to begin employment. I certify that the facts in this employment application are true and complete. I understand that falsified statements are grounds for dismissal.

Recruiter Comments:

_____ Signature

6/2/15 Date

CONFIDENTIAL
CITISTAFF-0000035



## Assignment abandonment /Walk-Off

CitiStaff Solutions, Inc. values it's client customer and all associate relationships. We recommend that you maintain a clear line of communication with your CitiStaff Solutions, Inc representative.

On your acceptance of any assignments with CitiStaff Solutions, Inc., the following are guidelines that you need to understand and follow:

1. Prior to your assignment you are required to come into our office for your timecard, directions, job orientation, and any personal protective equipment that you might need for your assignment.

2. If you are not interested in the assignment, please let your representative know in advance and leave the opportunity to an associate that is willing to work.

If you accept an assignment and fail to show up, it will affect your standing with CitiStaff Solutions, Inc.

3. You should arrive at least 15 minutes before your start time on your first day of work.

4. If you're going to be late, have any appointments, going to be absent, or in case of an emergency, you need to notify us in advance. (At least 2 hours notice).

5. If you are not satisfied with your assignment you **MUST NOT** leave during your scheduled shift hours. Finish your shift then notify CitiStaff Solutions, Inc. representative to inform him/her of your assignment status.

6. CitiStaff Solutions, Inc. will **NOT TOLERATE** any assignment abandonment/walk-off for any reason. It is very important that you understand that you **WILL NOT** be compensated for any hours worked if you leave your assignment without notice. This is cause for immediate termination from CitiStaff Solutions, Inc.

I have carefully read and understood the guidelines stated above.

OWEN DIAZ
Print Name

_Signature_

6/2/15
Date

_____
CitiStaff Solutions, Inc Representative

_____
Date

**EXHIBIT** 3
WIT: Diaz
DATE: 5-22-18
Candy Newland, CSR #14256

CONFIDENTIAL

CITISTAFF-0000039

Begin forwarded message:

**From:** Owen Diaz <odiazjr68@gmail.com>
**Date:** January 22, 2016 at 8:42:10 AM PST
**To:** "Mr. Romero" <edromero@teslamotors.com>
**Subject: Racist effigy & drawing**

On 1/21/16 at 9:10 pm I was working elevator one, I was removing the recycling from the 2nd floor and taking said items to be staged on the first floor for removal. As I was removing those items I came upon the first cardboard bail of the night. As I pulled the pallet rider into position to pick up the bail I noticed a drawing on the bail. It was a picture of a cartoon depicting a black face person with a bone in his hair with the caption under it saying booo. Upon seeing this my stomach dropped and I wondered who could've done this in today's age. At that time I didn't know what to do, so I call Michael Wheeler and sent a text of the picture letting him know that someone on his team had sent this bail over to the elevator with this picture. Sense Michael was the lead for the recycling team at that time. I would let him take point and get to the bottom of the problem. Michael said, he would be there in a few minutes. when Michael arrived he arrived with Israel. They both took pictures and all three of us went upstairs. I had to stop and deal with the elevator crew but Michael and Israel heading over to the upstairs recycling center. They came back a few minutes later with Ramon Martinez. While the three of us were standing there discussing what happened. Ramon Martinez said,he had drew the picture and he was just playing. As a supervisors or leads we are held to a higher standard because The people we supervise look to us as examples. if a supervisor does this kind of thing in front of the employees employees what kind of example are we setting. A person should be able to come to work and not be harassed or degraded while they're trying to do their job. This is not the first time Ramon Martinez has been talk about his behavior. And because nothing has been done, it seems that his behavior is getting worse. As an employee I'm entitled to a safe and harassment free work environment.  And that all I ask  and hope for.

EXHIBIT 14
WIT: Diaz
DATE: 5-22-18
Candy Newland, CSR #14256



CONFIDENTIAL



TESLA-0000007

Sent from my iPhone

CONFIDENTIAL

1     I, CANDY NEWLAND, CSR No. 14256, certify that the

2   foregoing proceedings were taken before me at the time

3   and place herein set forth, at which time the witness

4   was duly sworn, and that the transcript is a true record

5   of the testimony so given.

6

7   Witness review, correction, and signature was

8   (X) by Code.                    (X) requested.

9   ( ) waived.                     ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13     The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificate null and void.

16     I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties nor of any of

19  the parties.

20     Dated this 29TH day of May, 2018.

21

22

23

24   _____

25        CANDY NEWLAND, CSR 14256

# EXHIBIT "C"

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    -------------------------------

REPORTER CERTIFIED
TRANSCRIPT

5    DEMETRIC DI-AZ, OWEN DIAZ and
LAMAR PATTERSON, an individual,

6

7              Plaintiffs,                **CONFIDENTIAL**

8       vs.                    No. 3:17-cv-06748-WHO
VOL II, pgs 187 - 292

9

TESLA, INC. DBA TESLA MOTORS,

10   INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING

11   GROUP; CHARTWELL STAFFING
SERVICES, INC. and DOES 1-10,

12   inclusive,

13              Defendants.

14   -------------------------------

15

16              CONFIDENTIAL

17         VIDEOTAPED DEPOSITION OF

18              OWEN DIAZ

19         SAN FRANCISCO, CALIFORNIA

20         MONDAY, DECEMBER 3, 2018

21

22

23   Reported by:

24   GINA V. CARBONE, CSR #8249
RPR, RMR, CRR, CCRR

25   FILE NO.:  18-27207

CHASE
LITIGATION SERVICES

```
10:30:31  1           MR. HORTON:  Fenn Horton on behalf of West
10:30:34  2   Valley Staffing Group; and my client Teresa
10:30:35  3   Kossayian is here as well from West Valley Staffing
10:30:39  4   Group.
10:30:41  5           MS. ANTONUCCI:  Could you please state your
10:30:42  6   name for the record.
10:30:43  7           THE WITNESS:  My name is Owen Diaz.
10:30:46  8           THE VIDEOGRAPHER:  Did you want to re-swear
10:30:47  9   him?
10:30:48 10           MS. ANTONUCCI:  Yes.  Would you please
10:30:59 11   re-swear the witness.
10:31:00 12
10:31:00 13                   OWEN DIAZ,
10:31:00 14   having first declared under penalty of perjury to
10:31:00 15   tell the truth, was examined and testified as
10:31:00 16   follows:
10:31:00 17
10:31:00 18            EXAMINATION BY MS. ANTONUCCI
10:31:02 19   BY MS. ANTONUCCI:
10:31:02 20       Q.  Mr. Diaz, do you remember at your last
10:31:04 21   deposition we went through some ground rules about
10:31:06 22   how to testify and what your deposition is going to
10:31:10 23   entail?
10:31:11 24       A.  Yes.  I remember.
10:31:13 25       Q.  Okay.
```

11:20:50  1        A.   Yes.

11:20:51  2        Q.   What did you report to Wayne Jackson?

11:20:54  3        A.   I do believe I tagged him into one of the

11:21:00  4   emails.

11:21:01  5        Q.   Which email?

11:21:05  6        A.   The picaninny.

11:21:11  7        Q.   Did you report any other conduct to Wayne

11:21:13  8   Jackson?

11:21:15  9        A.   It's a possibility.

11:21:18 10        Q.   At this time, can you recall that you ever

11:21:20 11   made any reports to Wayne Jackson besides the

11:21:23 12   picaninny drawing?

11:21:29 13        A.   Not that I can recall at this moment.

11:21:32 14        Q.   Did you ever report any of the conduct that

11:21:34 15   you found to be offensive at the Tesla factory to

11:21:40 16   CitiStaff?

11:21:42 17        A.   I do believe I tagged them in an email to

11:21:46 18   him.

11:21:46 19        Q.   What conduct did you report to CitiStaff?

11:21:56 20        A.   Ramon Martinez and probably the picaninny.

11:22:03 21   I'm not a hundred percent sure.

11:22:06 22        Q.   Any other conduct that you reported to

11:22:08 23   CitiStaff?

11:22:13 24             MR. ORGAN:   Objection.   Vague and

11:22:14 25   ambiguous.

11:22:19  1          THE WITNESS:  Not that I can recall at this

11:22:20  2  moment.

11:22:20  3  BY MS. ANTONUCCI:

11:22:25  4      Q.  And who did you report the picaninny and

11:22:28  5  the Ramon Martinez incident to?

11:22:34  6      A.  I believe it was Ed Romero and Wayne

11:22:48  7  Jackson, and I would have to see a copy of the email

11:22:52  8  to see who all was tagged in.

11:22:54  9      Q.  Who at CitiStaff did you report the

11:22:56 10  picaninny drawing to?

11:22:57 11          MR. ORGAN:  Objection.  Asked and answered.

11:23:01 12          THE WITNESS:  I can't recall at this

11:23:02 13  particular moment.

11:23:03 14  BY MS. ANTONUCCI:

11:23:03 15      Q.  And who at CitiStaff did you report the

11:23:09 16  Ramon Martinez incident to?

11:23:13 17      A.  I can't recall at this particular moment.

11:23:15 18      Q.  And what do you mean by the Ramon Martinez

11:23:18 19  incident?  Do you mean the elevator incident that

11:23:21 20  you discussed at your last deposition?

11:23:24 21          MR. ORGAN:  Objection.  Vague and

11:23:25 22  ambiguous.  Assumes facts not in evidence.

11:23:33 23          THE WITNESS:  I don't understand what you

11:23:33 24  mean.

         25

| | | |
|---|---|---|
| 11:35:08 | 1 | he stopped making those remarks to you? |
| 11:35:11 | 2 | MR. ORGAN:  Objection.  Compound. |
| 11:35:17 | 3 | THE WITNESS:  I don't recall. |
| 11:35:18 | 4 | BY MS. ANTONUCCI: |
| 11:35:19 | 5 | Q.  Did you ever tell Tom Kawasaki that you |
| 11:35:23 | 6 | felt like you could still work with Judy if he |
| 11:35:28 | 7 | stopped making those remarks? |
| 11:35:44 | 8 | A.  We never worked together in the beginning, |
| 11:35:45 | 9 | so I don't recall. |
| 11:35:51 | 10 | Q.  Did Judy stop bothering you after you |
| 11:35:54 | 11 | reported the conduct to Tom Kawasaki about the |
| 11:35:59 | 12 | comments he had made to you? |
| 11:36:04 | 13 | A.  I didn't see him after that. |
| 11:36:06 | 14 | Q.  So is that a yes? |
| 11:36:10 | 15 | A.  Yes. |
| 11:36:20 | 16 | MS. ANTONUCCI:  Let's take a short break. |
| 11:36:22 | 17 | THE VIDEOGRAPHER:  We're going off the |
| 11:36:22 | 18 | record.  The time is 11:36 a.m. |
| 11:36:26 | 19 | (Recess taken.) |
| 11:48:37 | 20 | (Whereupon, Exhibit 29 was marked for |
| 11:48:37 | 21 | identification.) |
| 11:49:27 | 22 | THE VIDEOGRAPHER:  We're back on the |
| 11:49:28 | 23 | record.  Time is 11:49 a.m.  This marks the |
| 11:49:30 | 24 | beginning of disc No. 2. |
| 11:49:32 | 25 | // |

| | | |
|---|---|---|
| 11:53:43 | 1 | Q.  Did he threaten to report you to your |
| 11:53:46 | 2 | supervisor? |
| 11:53:48 | 3 | A.  It's a possibility he threatened me. |
| 11:53:52 | 4 | Q.  To report you to your supervisor? |
| 11:53:57 | 5 | A.  I don't recall, but it's a possibility. |
| 11:54:06 | 6 | Q.  Have you told me everything you can recall |
| 11:54:08 | 7 | about that day that you had a negative interaction |
| 11:54:10 | 8 | with Robert? |
| 11:54:11 | 9 | A.  At this particular moment that I can |
| 11:54:14 | 10 | recall, what all I can recall, yes. |
| 11:54:19 | 11 | Q.  Had you ever had any other negative |
| 11:54:21 | 12 | interactions with Robert? |
| 11:54:23 | 13 | MR. ORGAN:  Objection.  Asked and answered. |
| 11:54:30 | 14 | THE WITNESS:  Yes. |
| 11:54:30 | 15 | BY MS. ANTONUCCI: |
| 11:54:31 | 16 | Q.  And how many times before? |
| 11:54:33 | 17 | A.  I can't recall. |
| 11:54:36 | 18 | Q.  How many times after? |
| 11:54:39 | 19 | A.  I can't recall. |
| 11:54:49 | 20 | Q.  Okay. |
| 11:54:56 | 21 | Do you believe that you were retaliated |
| 11:54:57 | 22 | against after you made a complaint to Tesla about |
| 11:55:03 | 23 | the conduct that you had endured? |
| 11:55:06 | 24 | A.  Yes. |
| 11:55:07 | 25 | Q.  How were you retaliated against? |

11:55:16  1          MR. ORGAN:  Objection.  Calls for a legal

11:55:17  2  conclusion.

11:55:20  3          You can answer.

11:55:25  4          THE WITNESS:   Threatened to demote me.

11:55:40  5  Just basically threatened me with my job is the

11:55:43  6  bottom line.

11:55:43  7  BY MS. ANTONUCCI:

11:55:44  8      Q.  And who did that?

11:55:58  9      A.  I spoke to Ed Romero and Wayne Jackson.

11:56:01 10      Q.  No, who threatened to demote you?

11:56:09 11      A.  Ed Romero and Wayne Jackson.

11:56:15 12      Q.  Anyone else?

11:56:23 13      A.  The ones I spoke to, Ed Romero and Wayne

11:56:25 14  Jackson.

11:56:26 15      Q.  Any other way in which you feel that you

11:56:28 16  were retaliated against for complaining about the

11:56:29 17  conduct you endured while at Tesla?

11:56:32 18          MR. ORGAN:  Objection.  Calls for a legal

11:56:33 19  conclusion.

11:56:58 20          THE WITNESS:  I don't know.  I don't know

11:57:04 21  the answer to that.

11:57:05 22  BY MS. ANTONUCCI:

11:57:05 23      Q.  Why don't you know how to answer that

11:57:08 24  question?  You just answered it before.

11:57:11 25      A.  Yeah, he threatened me with my job, but you

11:57:16   1   said "is there any other way."   And I don't know

11:57:17   2   what other tactics that were used or employed or

11:57:22   3   could have been used or employed, so I wouldn't have

11:57:25   4   the answer to that.

11:57:26   5        Q.   Okay.

11:57:27   6        A.   Sorry.

11:57:29   7        Q.   Are there any other negative repercussions

11:57:32   8   of you having made a complaint about your conduct at

11:57:36   9   Tesla that you know of?

11:57:37   10           MR. ORGAN:   Objection.   Vague and

11:57:37   11   ambiguous.

11:57:44   12           THE WITNESS:   Just asked the same question

11:57:46   13   over again.

11:57:46   14   BY MS. ANTONUCCI:

11:57:47   15        Q.   I'm sorry, what?

11:57:48   16        A.   You said is there any other way that was --

11:57:51   17   but that's the same question.   I'm sorry.

11:57:53   18        Q.   No, it's a different question.

11:57:54   19           Are you aware of any other negative

11:57:56   20   repercussions that followed you complaining about

11:58:01   21   the conduct that you suffered while you were at

11:58:04   22   Tesla?

11:58:04   23        A.   No, I'm not aware of any other.   No.

11:58:09   24           MR. ORGAN:   Madam Court Reporter, what time

11:58:10   25   did we go back on the record?

| | | |
|---|---|---|
| 11:58:23 | 1 | THE VIDEOGRAPHER:  It was 11:36 -- no. |
| 11:58:25 | 2 | Sorry. |
| 11:58:25 | 3 | MR. ORGAN:  That's when we went off. |
| 11:58:28 | 4 | THE VIDEOGRAPHER:  11:49. |
| 11:58:29 | 5 | MR. ORGAN:  49.  Thank you. |
| 11:58:31 | 6 | BY MS. ANTONUCCI: |
| 11:58:31 | 7 | Q.  Are you alleging that you suffered any |
| 11:58:33 | 8 | emotional distress or psychological damage as a |
| 11:58:35 | 9 | result of the conduct that you endured at the Tesla |
| 11:58:38 | 10 | factory? |
| 11:58:39 | 11 | A.  Yes. |
| 11:58:40 | 12 | Q.  And who caused you this emotional distress? |
| 11:58:47 | 13 | MR. ORGAN:  Objection.  Compound. |
| 11:58:56 | 14 | THE WITNESS:  Tesla. |
| 11:58:57 | 15 | BY MS. ANTONUCCI: |
| 11:58:57 | 16 | Q.  Who at Tesla? |
| 11:58:59 | 17 | A.  Employees. |
| 11:58:59 | 18 | Q.  Who specifically? |
| 11:59:07 | 19 | A.  Robert, Ramon, Ed Romero by not following |
| 11:59:12 | 20 | up on things that was handed to him, Victor |
| 11:59:20 | 21 | Quinterez, Jaime Salazar, the CitiStaff employee |
| 11:59:35 | 22 | that answered my email and didn't follow through |
| 11:59:37 | 23 | with it.  Pretty much. |
| 11:59:45 | 24 | Q.  I'm sorry.  Who is the CitiStaff employee |
| 11:59:47 | 25 | that answered your email and didn't follow through |

Owen Diaz, Vol. II-Confidential

11:59:50  1    with it?

11:59:51  2        A.   Oh, excuse me.   I'm sorry.

11:59:53  3        Q.   Go ahead.

11:59:53  4        A.   The person whoever I tagged into the email.

11:59:56  5        Q.   And which email was that?

12:00:01  6        A.   Complaining about the -- complaining about

12:00:03  7    the harassment and the picaninny.

12:00:07  8        Q.   The email about the drawing?

12:00:08  9        A.   Yes.

12:00:16  10       Q.   Anyone else caused you emotional distress?

12:00:25  11            MR. ORGAN:   Objection.   Vague and

12:00:26  12   ambiguous.

12:00:42  13            THE WITNESS:   Some of the things that

12:00:44  14   I've -- that I've read from the company CEO calling

12:00:57  15   me a barnacle, telling me that I was less educated.

12:01:08  16   That I should have thicker skin.

12:01:32  17   BY MS. ANTONUCCI:

12:01:32  18       Q.   Are you referring to the email that the

12:01:37  19   company CEO sent out to all employees?

12:01:41  20       A.   Yes.

12:01:49  21       Q.   Anything else?

12:01:52  22       A.   Not at this particular moment, no.

12:01:55  23       Q.   Can you describe the emotional distress

12:01:57  24   that you suffered as a result of the conduct that

12:02:00  25   you endured at the Tesla factory.

| | |
|---|---|
| 12:29:35 | 1 |

          MR. ORGAN:  Objection.  Calls for a legal

12:29:36   2   conclusion.

12:29:38   3          THE WITNESS:  No.  I do not own any Tesla

12:29:42   4   products.

12:29:45   5   BY MS. ANTONUCCI:

12:29:45   6      Q.  Okay.  I'd like to turn your attention to

12:29:48   7   Exhibit 32 (verbatim).  It's a sexual harassment

12:29:59   8   policy of CitiStaff Solutions.

12:30:00   9          Is that your name and signature at the

12:30:03  10   bottom there?

12:30:06  11      A.  Yes.

12:30:08  12      Q.  The first page, my apologies.

12:30:11  13          The second page is an acknowledgment of

12:30:17  14   policies, Bates stamped CITISTAFF 45 at the bottom.

12:30:22  15   Is that your name and signature at the bottom?

12:30:25  16      A.  Give me one second.  The other page was

12:30:29  17   upside down.  One second, please.

12:30:44  18          Yeah, they were my initials and signature.

12:30:47  19      Q.  So is it accurate that you received

12:30:49  20   Exhibit 32 at some point prior to or during your

12:30:56  21   employment with CitiStaff?

12:31:01  22          THE REPORTER:  I believe it's 33.

12:31:02  23          MR. ORGAN:  This is 33.

12:31:04  24   BY MS. ANTONUCCI:

12:31:04  25      Q.  I'm sorry, Exhibit 33.

12:31:05  1      A.  Yes.

12:31:14  2      Q.  Okay.

12:31:15  3          Turning our attention to Exhibit 34, pa- --

12:31:35  4  is a document, a series of emails Bates stamped at

12:31:38  5  the bottom 50 -- CITISTAFF 50 through 55.

12:31:44  6          Do you see that?

12:31:48  7      A.  I have the document that you just handed to

12:31:50  8  me.

12:31:52  9      Q.  So is Exhibit -- in the middle of

12:31:54 10  Exhibit 34, the email that begins on CitiStaff Bates

12:31:59 11  stamped No. 52, do you see that?  Right there.  That

12:32:13 12  page right there.

12:32:14 13      A.  I see this here.

12:32:16 14      Q.  You sent that email, correct?

12:32:20 15      A.  It's -- the paper says it's from my email

12:32:22 16  address.

12:32:22 17      Q.  Okay.  So did you send this email?

12:32:25 18      A.  Yes, it would appear so.

12:32:26 19      Q.  Okay.  Exhibit 35 here is a series of

12:32:54 20  emails Bates stamped at the bottom CITISTAFF 14

12:32:57 21  through 18.

12:32:59 22          Just turning your attention to the email

12:33:03 23  that begins in the middle of the first page there,

12:33:10 24  says from Owen Diaz dated Saturday, January 23rd,

12:33:17 25  2016 at 4:47 a.m., subject "Forward:  Ramon."



## Sexual Harassment Policy

It is the policy of CitiStaff Solutions Inc., that all employees are responsible for ensuring that the work place is free from sexual harassment. Because of CitiStaff Solutions Inc., strong disapproval of offensive or inappropriate sexual behavior at work, all employees must avoid any action or conduct which could be viewed as sexual harassment.

Sexual harassment includes unwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexually harassing nature, when: (1) submission to the harassment is made either explicitly or implicitly a term or condition of employment; (2) submission to or rejection of the harassment is used as the basis for employment decisions affecting the individual; or (3) the harassment has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Any employee who has a complaint of sexual harassment at work by anyone, including supervisors, co-workers or visitors, should first clearly inform the harasser that his/her behavior is offensive or unwelcome and request that the behavior stop. If the behavior continues, the employee must immediately bring the matter to the attention of his/her supervisor. If the immediate supervisor is involved in the harassing activity, the violation should be report to that supervisor's immediate supervisor, the department personnel officer, or the employee relations coordinator, who can be reached at 714-474-7880 (CitiStaff Corporate).

If a supervisor or personnel officer knows of an incident of sexual harassment, they shall take appropriate remedial action immediately. If the alleged harassment involves any types of threats of physical harm to the victim, the alleged harasser may be suspended. During such suspension, an investigation will be conducted by CitiStaff Solutions Inc., if the investigation support charges of sexual harassment, disciplinary action against the alleged harasser will take place and may include termination. If the investigation reveals that the charges were brought falsely and with malicious intent, the charging party may be subject to disciplinary action, including termination.

Any individual who believes he/she is subject to sexual harassment, or believes sexual harassment may be taking place whether or not it directly affects that individual, must report the circumstances as soon as possible to any one of the following: Immediate Supervisor, Human Resource Administrator, Officer of the Company, or any person designated in the CitiStaff Solutions Inc person at Corporate.

When a claim is raised, the Contact Person will prepare a written record of the complainant's factual allegations that the complainant will have an opportunity to review and sign. Complainants are encouraged to prepare their own written notes promptly after such events occur, describing the date, time, and specific actions of the alleged harasser that the complainant considers offensive.
With respect to this policy, it is also important to keep in mind:

1. Although we encourage and expect prompt reporting of claims so that rapid responses and appropriate action may be taken, no limited time frame will be instituted for reporting such claims. The late reporting of a claim will not, in and of itself, preclude the Company from taking remedial action.

2. The Company will not in any way retaliate against an individual who makes a report of sexual harassment, nor will it permit any employee to do so. Retaliation is a serious violation of the Company's sexual harassment policy and should be reported immediately.

3. Any allegation of sexual harassment raised with a Contact Person will be promptly investigated in a confidential manner so as to protect, to the extent possible, the privacy of the persons involved.

Owen Diaz
_____
Employee Name

_____
Employee Signature

6/2/15
_____
Date

EXHIBIT 33
Deponent O. Diaz
Date 12-3-18
Gina Carbone, CSR

CITISTAFF-0000043



Among the policies that have been adopted at CitiStaff Solution, Inc., are the following that we believe are important for an applicant to know in advance of employment. These are listed below. Your signature on this Release Form indicates that you have read, understand, and would agree to operate under these policies if employed at CitiStaff Solution, Inc.

This firm is an equal employment opportunity employer and does not discriminate because of age, sex, race, color, national origin, disability, or religious preference.

If you agree and want to continue with the application process please initial all sign and date.

O.D    CitiStaff Solutions, Inc. is a drug and alcohol free-workplace. Therefore I am willing to take a drug test according to CitiStaff Solutions, Inc. Policy.

O.D    I will release Background information inclusive of criminal records.

O.D    Acceptable Documents for Verifying Employment Authorization and Identity.

O.D    I have work history for the past 2 years and authorize CitiStaff Solutions, to release the information that I will provide in the application and its findings and work history of my employment to other firms or persons upon request.

Name: Owen Diaz

Signature: _____  Date: 6/2/15

CITISTAFF-0000045

1     I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2   CCRR, certify: that the foregoing proceedings were taken

3   before me at the time and place herein set forth; at

4   which time the witness was duly sworn; and that the

5   transcript is a true record of the testimony so given.

6

7     Witness review, correction and signature was

8   (X) by code.                    (X) requested.

9   ( ) waived.                     ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13    The dismantling or unbinding of the original

14  transcript will render the reporter's certificate null

15  and void.

16    I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any of

19  the parties.

20    Dated this 7th  day of December , 2018 .

21

22                  _____

23                  GINA V. CARBONE
                    CSR #8249, STATE OF CALIFORNIA

24

25

# EXHIBIT "D"

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4  DEMETRIC DIAZ, OWEN DIAZ, ) Case No. 3:17-CV-06748-WHO
   and LAMAR PATTERSON,      )
5                            )
                Plaintiffs,  )
6                            )
       vs.                   )
7                            )
   TESLA, INC. dba TESLA     )
8  MOTORS, INC.; CITISTAFF   )
   SOLUTIONS, INC.; WEST     )
9  VALLEY STAFFING GROUP;    )
   CHARTWELL STAFFING        )
10 SERVICES, INC.;           )
   NEXTSOURCE, INC.;         )
11 DOES 1-50, inclusive,     )
                             )
12              Defendants.  )
   _____)

13

14

15                 Volume III

16       DEPOSITION OF OWEN ORAPIO DIAZ, JR.

17            PAGES 293 THROUGH 441

18          SAN FRANCISCO, CALIFORNIA

19               JUNE 21, 2019

20

21

22

23

24

25 REPORTED BY:  MICHAEL CUNDY, CSR 12271



| | | |
|---|---|---|
| 1 | Kumagai, representing Citistaff. | 09:34:02 |
| 2 |      MS. JENG:  Patricia Jeng, from Sheppard | 09:34:07 |
| 3 | Mullin, representing Tesla. | 09:34:08 |
| 4 |      MS. AVLONI:  Navruz Avloni, here on behalf of | 09:34:10 |
| 5 | the plaintiff, Owen Diaz. | 09:34:12 |
| 6 |      THE VIDEOGRAPHER:  Would the court reporter | 09:34:15 |
| 7 | please swear in the witness? | 09:34:16 |
| 8 | | 09:34:34 |
| 9 | Whereupon, | 09:34:34 |
| 10 |        OWEN ORAPIO DIAZ, JR., | 09:34:34 |
| 11 | having first been called as a witness, was duly sworn | 09:34:34 |
| 12 | and testified as follows: | 09:34:34 |
| 13 | | 09:34:34 |
| 14 |        EXAMINATION | 09:34:34 |
| 15 | BY MR. ARANEDA: | 09:34:34 |
| 16 |   Q   Mr. Diaz, good morning.  My name is Juan | 09:34:34 |
| 17 | Araneda.  I'm representing Defendant nextSource, who | 09:34:37 |
| 18 | is now a party in this lawsuit. | 09:34:39 |
| 19 |      I appreciate you being here today. | 09:34:42 |
| 20 |      I'm going to be taking your deposition today, | 09:34:44 |
| 21 | and I understand that you have already sat through two | 09:34:45 |
| 22 | other sessions for your deposition; is that correct? | 09:34:47 |
| 23 |   A   Yes, sir. | 09:34:52 |
| 24 |   Q   Okay. | 09:34:52 |
| 25 |   A   Good morning to you, too. | 09:34:52 |



| | | |
|---|---|---|
| 1 | BY MR. ARANEDA: | 11:16:48 |
| 2 | Q    At this time, Rothaj still reported to you; | 11:16:48 |
| 3 | correct? | 11:16:52 |
| 4 | A    Yes, sir. | 11:16:54 |
| 5 | Q    And you reported to Mr. Ramero; correct? | 11:16:54 |
| 6 | A    Yes, sir. | 11:16:57 |
| 7 | Q    Okay.  I believe, after this -- you sent this | 11:16:59 |
| 8 | text, there was another incident with Mr. Foster where | 11:17:03 |
| 9 | he threatened shooting you; correct? | 11:17:08 |
| 10 | A    Yes.  He did threaten to kill me. | 11:17:12 |
| 11 | Q    Okay.  What happened -- what happened after | 11:17:14 |
| 12 | you reported -- strike that. | 11:17:18 |
| 13 | Did you report that to Ed Ramero? | 11:17:20 |
| 14 | A    Yes, sir. | 11:17:23 |
| 15 | Q    Okay.  Did you report Mr. Foster threatening | 11:17:24 |
| 16 | to shoot you to anyone else besides Mr. Ramero? | 11:17:28 |
| 17 | A    It's a possibility. | 11:17:32 |
| 18 | Q    Do you recall at this time? | 11:17:34 |
| 19 | A    No, I don't recall at this time. | 11:17:34 |
| 20 | Q    What happened to Mr. Foster after you | 11:17:37 |
| 21 | reported him? | 11:17:39 |
| 22 | MS. AVLONI:  Calls for speculation. | 11:17:41 |
| 23 | THE WITNESS:  Security escorted him from the | 11:17:48 |
| 24 | building. | 11:17:51 |
| 25 | \\\ | 11:17:51 |



OWEN ORAPIO DIAZ, JR. VOLUME III          June 21, 2019
DIAZ vs TESLA, INC.                           373

| | | |
|---|---|---|
| 1 | BY MR. ARANEDA: | 11:17:51 |
| 2 | Q    Did he ever come back to work at Tesla after | 11:17:51 |
| 3 | security escorted him from the building? | 11:17:55 |
| 4 | A    I don't know. | 11:18:02 |
| 5 | Q    Did you ever work with Mr. Foster after | 11:18:02 |
| 6 | security escorted him from the building? | 11:18:05 |
| 7 | A    No. | 11:18:07 |
| 8 | Q    Do you know who decided to have security | 11:18:10 |
| 9 | escort Mr. Foster from the building? | 11:18:14 |
| 10 | A    Ed Ramero. | 11:18:16 |
| 11 | Q    And after this incident with Mr. Foster being | 11:18:25 |
| 12 | escorted from the building, your position as lead | 11:18:29 |
| 13 | elevator operator remained the same? | 11:18:34 |
| 14 | A    I believe so, yes. | 11:18:38 |
| 15 | Q    Your schedule as lead elevator operator | 11:18:40 |
| 16 | remained the same? | 11:18:43 |
| 17 | A    I believe so, yes. | 11:18:45 |
| 18 | Q    Your rate of pay until you got a raise later | 11:18:46 |
| 19 | remained the same; correct? | 11:18:51 |
| 20 | A    I believe so, yes. | 11:18:53 |
| 21 | MR. ARANEDA:  We've been going for a little | 11:19:28 |
| 22 | bit over an hour. | 11:19:30 |
| 23 | Do you guys want to take a five-minute break? | 11:19:31 |
| 24 | MS. AVLONI:  How are you doing, Owen? | 11:19:34 |
| 25 | THE WITNESS:  We can keep it going.  I got to | 11:19:36 |



```
1   STATE OF CALIFORNIA              )
                                     )   SS:
2   CITY AND COUNTY OF SAN FRANCISCO )

3

4                  I, Michael Cundy, CSR NO. 12271, a

5   Certified Shorthand Reporter of the State of

6   California, do hereby certify:

7                  That the foregoing proceedings were

8   taken before me at the time and place herein set

9   forth; that any witnesses in the foregoing

10  proceedings, prior to testifying, were placed under

11  oath; that a verbatim record of the proceedings was

12  made by me using machine shorthand which was

13  thereafter transcribed under my direction; further,

14  that the foregoing is an accurate transcription

15  thereof.

16                  I further certify that I am neither

17  financially interested in the action nor a relative or

18  employee of any attorney or any of the parties.

19                  IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  July 3, 2019

23                                  _____

24                                  Michael Cundy, CSR NO. 12271

25
```



# EXHIBIT "E"

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4
                                    REPORTER CERTIFIED
5    _____        TRANSCRIPT

6    DEMETRIC DI-AZ, OWEN DIAZ, and
     LAMAR PATTERSON, an individual,    CONFIDENTIAL
7
             Plaintiffs,
8
     vs.                        Case No. 3:17-cv-06748-WHO
9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CITISTAFF SOLUTIONS, INC.;
     WEST VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING SERVICES, INC.
     and DOES 1-10, inclusive,
12
             Defendants.
13   _____/

14

15

16               CONFIDENTIAL

17        VIDEOTAPED DEPOSITION OF

18             DEMETRIC DI-AZ

19        SAN FRANCISCO, CALIFORNIA

20          TUESDAY, MAY 15, 2018

21

22

23

24   Reported By:
     Candy Newland
     CSR No. 14256
25   File No. 18-25468

| | | |
|---|---|---|
| 10:13:28 | 1 | MS. AVLONI: Navruz Avloni here on behalf of |
| 10:13:31 | 2 | plaintiff. |
| 10:13:31 | 3 | MR. ORGAN: Larry Organ for the plaintiff. |
| 10:13:35 | 4 | THE WITNESS: Demetric Di-az. |
| | 5 | THE VIDEOGRAPHER: Madame Court Reporter, will |
| | 6 | you please swear in the witness. |
| | 7 | --oOo-- |
| | 8 | DEMETRIC DI-AZ, |
| | 9 | having first declared under penalty of perjury to tell |
| | 10 | the truth, was examined and testified as follows: |
| | 11 | EXAMINATION |
| | 12 | BY MS. ANTONUCCI: |
| 10:13:49 | 13 | Q. Mr. Di-az, I represent defendant Tesla, also |
| 10:13:52 | 14 | known as Tesla Motors, Inc. For purposes of this |
| 10:13:56 | 15 | deposition, I'll just refer to my client as Tesla. |
| 10:13:59 | 16 | Do you understand that? |
| 10:14:00 | 17 | A. Yes. |
| 10:14:01 | 18 | Q. I also represent defendant City Staff Solutions, |
| 10:14:04 | 19 | Inc., and for purposes of this deposition, I'll refer to |
| 10:14:07 | 20 | my client as City Staff. |
| 10:14:08 | 21 | Do you understand? |
| 10:14:09 | 22 | A. Yes. |
| 10:14:09 | 23 | Q. You were never employed by City Staff, though; |
| 10:14:13 | 24 | correct? |
| 10:14:14 | 25 | MR. ORGAN: Objection. Calls for a legal |

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 02:59:54 | 1 | Q.      Okay.  So and that change wasn't made? |
| 02:59:58 | 2 | A.      No, it wasn't.  I just wanted to just clarify |
| 03:00:02 | 3 | just so you don't think lunch was in the morning or |
| 03:00:06 | 4 | anything like that. |
| 03:00:08 | 5 | Q.      Can you read paragraphs 14 through 30 and tell |
| 03:00:18 | 6 | me if there's anything inaccurate in this complaint? |
| 03:00:27 | 7 | A.      To my recollection, it's not inaccurate. |
| 03:01:17 | 8 | Q.      And this complaint was filed, as you can see, |
| 03:01:21 | 9 | the front of the document on October 16th, 2017? |
| 03:01:26 | 10 | A.      Yes. |
| 03:01:27 | 11 | Q.      And you reviewed it before it was filed? |
| 03:01:30 | 12 | A.      Yes. |
| 03:01:30 | 13 | Q.      And you checked it for accuracy? |
| 03:01:33 | 14 | A.      Yes. |
| 03:01:35 | 15 | Q.      In paragraph 14 you state "In approximately |
| 03:01:40 | 16 | August of 2015, Demetric's father, Owen, informed him |
| 03:01:45 | 17 | West Valley had openings for positions at the Tesla |
| 03:01:49 | 18 | factory." |
| 03:01:49 | 19 | Did your father tell you that West Valley had |
| 03:01:51 | 20 | openings? |
| 03:01:52 | 21 | A.      Yes. |
| 03:01:52 | 22 | Q.      Did your father encourage you to apply? |
| 03:01:55 | 23 | A.      Yes. |
| 03:01:56 | 24 | Q.      What did your father tell you about what it was |
| 03:01:59 | 25 | like to work at Tesla? |

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:02:00 | 1 | A.      He told me it was going to be a good experience |
| 03:02:04 | 2 | and that it would be -- like, it would be good.  I |
| 03:02:08 | 3 | bought into it because I thought it was going to be the |
| 03:02:12 | 4 | ultimate experience.  Like, oh, I get to work for Tesla. |
| 03:02:15 | 5 | They're making modern productions to build electrical |
| 03:02:20 | 6 | cars to make the world a better place.  Like, why |
| 03:02:23 | 7 | wouldn't I want to be a part of that? |
| 03:02:25 | 8 | Q.      Your father told you it was going to be a good |
| 03:02:29 | 9 | experience to work at Tesla? |
| 03:02:30 | 10 | A.      Yeah.  He told me it would be a good experience |
| 03:02:34 | 11 | and it was going to be good for me. |
| 03:02:36 | 12 | Q.      And that was right before you applied in August |
| 03:02:39 | 13 | of 2015? |
| 03:02:39 | 14 | A.      Yes. |
| 03:02:44 | 15 | Q.      Did your father tell you around the time you |
| 03:02:47 | 16 | applied in August 2015 anything about what his work |
| 03:02:53 | 17 | experience was like at Tesla? |
| 03:02:55 | 18 | A.      When I was applying there, he said that his work |
| 03:03:01 | 19 | experience was going okay.  From what I could tell, it |
| 03:03:04 | 20 | was going good. |
| 03:03:12 | 21 | Q.      I'm going to turn your attention to paragraph |
| 03:03:16 | 22 | 18.  You state that your father showed you offensive |
| 03:03:31 | 23 | drawings that he came across at the Tesla factory while |
| 03:03:34 | 24 | you were working at Tesla; is that right? |
| 03:03:36 | 25 |       MR. ORGAN:  Objection.  Misstates the document. |

1    I, CANDY NEWLAND, CSR No. 14256, certify that the

2    foregoing proceedings were taken before me at the time

3    and place herein set forth, at which time the witness

4    was duly sworn, and that the transcript is a true record

5    of the testimony so given.

6

7    Witness review, correction, and signature was

8    (X) by Code.                    (X) requested.

9    ( ) waived.                     ( ) not requested.

10   ( ) not handled by the deposition officer due to party

11   stipulation.

12

13   The dismantling, unsealing, or unbinding of the

14   original transcript will render the reporter's

15   certificate null and void.

16   I further certify that I am not financially

17   interested in the action, and I am not a relative or

18   employee of any attorney of the parties nor of any of

19   the parties.

20   Dated this 29th day of May, 2018.

21

22

23

24   _____

25   CANDY NEWLAND, CSR 14256

# EXHIBIT "F"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

       Plaintiffs,

      vs.                     No. 3:17-cv-06748-WHO

TESLA, INC., dba TESLA
MOTORS, INC.; CITISTAFF
SOLUTIONS, INC.; WEST VALLEY
STAFFING GROUP; CHARTWELL
STAFFING SERVICES, INC.;
and DOES 1-50, inclusive,

       Defendants.

_____//


DEPOSITION OF VICTOR QUINTERO

June 7, 2018


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to

 2    Notice of Taking Deposition, and on Thursday, June 7,

 3    2018, commencing at the hour of 3:06 p.m., before me,

 4    BRIDGET M. MATTOS, CSR No. 11410, there personally

 5    appeared

 6

 7                   VICTOR QUINTERO,

 8

 9    called as a witness by Plaintiff, who, having been

10    duly sworn, was examined and testified as is

11    hereinafter set forth.

12                         ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        A.    Yeah, now I got it now.

 2        Q.    -- those you can testify about.

 3              Does that make sense?

 4        A.    Yes, because some of that I didn't know at

 5   the time, until now.

 6        Q.    Right.

 7              That's the interesting thing about PMK

 8   depositions in federal court versus PMQ depositions in

 9   state court.  In state court, you don't have to learn

10   stuff.  In federal court, you have to learn it.  So

11   anyway -- okay.

12              What was your position in May 2014 when you

13   started working at Tesla?

14        A.    I was managing the food services, janitorial

15   services, grounds, landscaping, elevator services,

16   recycling services.  Yeah, I think that was it.

17        Q.    And what was your title?

18        A.    I was custodial program manager, was my

19   official title.

20        Q.    Custodian program manager?

21        A.    Yes.

22        Q.    How many employees were in those areas that

23   you oversaw, the food services, landscaping, elevator,

24   recycling?

25        A.    I don't have specific numbers.  I can give
```

 1          And you mentioned that some employees were

 2   contract employees, and other employees were Tesla

 3   employees; is that right?

 4       A.   Yes.

 5       Q.   And in terms of the people who reported

 6   directly to you, were those the supervisors?

 7       A.   Yes.   Contract supervisors.

 8       Q.   So what are contract supervisors?

 9       A.   Those are the people that report directly to

10   me, who help me manage the contractors -- the

11   contracts that we have with the contractors.

12       Q.   The contract supervisors were Tesla

13   employees, though?

14       A.   Yes.

15       Q.   And so the contract supervisors, they would

16   supervise the employees that were in the particular

17   areas?

18       A.   No, they would work --

19            MS. ANTONUCCI:   One second.

20            Objection; lacks foundation.

21            MR. ORGAN:   Q.   You have to let me finish the

22   question before you answer.

23       A.   Okay.

24       Q.   The contract supervisors, they would

25   supervise the employees who were in the different

```
 1              MS. ANTONUCCI:  Objection; vague, lacks
 2      foundation.
 3              THE WITNESS:  The scope of work would be part
 4      of the contract.
 5              MR. ORGAN:  Okay.
 6      Q.    But in terms of determining whether, you
 7      know, they work the -- were all of the elevator
 8      operators contract employees?
 9      A.    Yes.
10      Q.    And were they -- did the contract employees
11      who worked on the elevators, for example, they
12      received Tesla training; correct?
13              MS. ANTONUCCI:  Objection; calls for
14      speculation.
15              THE WITNESS:  They received training from
16      their own shift supervisors and leads.
17              MR. ORGAN:  Q.  But they would also receive
18      training on, like, what Tesla procedures were for
19      safety; right?
20              MS. ANTONUCCI:  Objection; vague, lacks
21      foundation.
22              THE WITNESS:  Everybody who works at Tesla,
23      whether you're an employee or a contractor, has to
24      take safety orientation class in order to work in the
25      factory.
```

```
 1    enough.  My suggestion to him was a final written
 2    warning with a three-day suspension without pay.
 3    Victor thought that was an even better idea.  Will
 4    this be acceptable to you?  And sorry for using my
 5    Tesla email, but I'm having connectivity issues up
 6    here with my nextSource computer."
 7              Does that help refresh your recollection
 8    about how you had suggested to do a final written
 9    warning, and that Wayne suggested that -- thought that
10    that wasn't enough and wanted to do a final written
11    warning with a three-day suspension without pay?
12        A.   Yeah, if I remember correctly, it was kind of
13    like a joint conversation and, you know, he
14    recommended something, and then I agreed and -- you
15    know.
16        Q.   Okay.  So it was a joint decision as to what
17    discipline was going to be taken, with respect to
18    Ramon Martinez, for the effigy incident; correct?
19        A.   Yeah, knowing that they had the -- pretty
20    much the final call on what they wanted to do with
21    their employee.
22        Q.   Right.  But you at least had input --
23        A.   That I agreed with, yes.
24        Q.   And you agreed with the decision; correct?
25        A.   Yes.
```

```
 1   contractors would engage in this kind of disturbing
 2   conduct; correct?
 3            MS. ANTONUCCI:  Objection; vague.
 4            THE WITNESS:  I was, you know, not happy
 5   about the fact that Owen felt offended; that somehow
 6   he felt offended by this, and therefore, you know, my
 7   job to try to take action to make sure it doesn't
 8   happen again.  Like with any other employee who may
 9   feel offended about something.  That has no purpose of
10   being work-related.
11            MR. ORGAN:  Let me make this 39.
12            (Whereupon Deposition Exhibit 39
13             was marked for identification.)
14            MR. ORGAN:  Exhibit 39, for the record, is a
15   four-page document, I think -- five-page document,
16   Bates-stamped Tesla 25 through 29.
17       Q.   And it's the -- Exhibit 37, and then an email
18   from Wayne Jackson to you, which says that "We need to
19   talk as soon as possible."
20            So I think that was before -- that's at 9:20
21   on January 22nd.  And then if you look at the first
22   email at the top, which is going to get to my point,
23   there's an email to you from Wayne Jackson at
24   6:20 p.m.
25            So it appears that sometime between 9:20 a.m.
```

1    and 6:20 p.m., you had the meeting with Wayne Jackson

2    about this racist image; correct?

3                  MS. ANTONUCCI:   Objection; vague.

4                  THE WITNESS:   No, I don't remember the exact

5    time and date.

6                  MS. ANTONUCCI:   Calls for a legal conclusion.

7                  MR. ORGAN:   Q.   Do you have any reason to

8    question the dates and times in this email, Exhibit

9    39?

10       **A.   Like I said, I don't remember the exact dates**

11   **and times.   I mean, that's -- it was around this time.**

12       Q.   Well, I'm asking you -- this is a document

13   produced by Tesla, as you can see from the Bates stamp

14   below in the lower right corner.   That's a Tesla

15   document that was produced to us in discovery, and I'm

16   wondering, do you have any reason to doubt the

17   authenticity of this document?

18       **A.   No.**

19       Q.   So in terms of the email that is at the top

20   of Exhibit 39, that's an email you sent to Wayne

21   Jackson about the racist effigy and drawing,

22   approximately 6:20 p.m. on January 22nd, 2016;

23   correct?

24       **A.   Yes.**

25       Q.   And this talks about -- this is an email

Message

| | |
|---|---|
| **From:** | Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR QUINTERO3A3] |
| **Sent:** | 1/22/2016 6:20:05 PM |
| **To:** | Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899] |
| **CC:** | Josue Torres [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Josue Eliseo Torresc2b]; Stefan Gerlicz [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Stefan Gerlicz9f5] |
| **Subject:** | RE: Racist effigy & drawing |

Wayne, as we discussed in person, this is very disappointing especially coming from one of our team supervisors. I agree with the recommendation to suspend and issue a permanent written warning. Also the apology from Ramon was a good starting point. One additional request would be if there is an opportunity to provide some type of diversity training for Ramon.

Victor

**From:** Wayne Jackson
**Sent:** Friday, January 22, 2016 9:20 AM
**To:** Victor Quintero <vquintero@teslamotors.com>
**Subject:** FW: Racist effigy & drawing
**Importance:** High

We need to talk as soon as possible.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
wjackson@nextsource.com

 nextSource

*Workforce Optimization, Business Enlightenment*

**From:** Owen Diaz [mailto:odiazjr68@gmail.com]
**Sent:** Friday, January 22, 2016 8:46 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** Fwd: Racist effigy & drawing

Begin forwarded message:

>   **From:** Owen Diaz <odiazjr68@gmail.com>
>   **Date:** January 22, 2016 at 8:42:10 AM PST


EXHIBIT
39 6-7-18
Quintero

**To:** "Mr. Romero" <edromero@teslamotors.com>
**Subject: Racist effigy & drawing**

On 1/21/16 at 9:10 pm I was working elevator one, I was removing the recycling from the 2nd floor and taking said items to be staged on the first floor for removal. As I was removing those items I came upon the first cardboard bail of the night. As I pulled the pallet rider into position to pick up the bail I noticed a drawing on the bail. It was a picture of a cartoon depicting a black face person with a bone in his hair with the caption under it saying booo. Upon seeing this my stomach dropped and I wondered who could've done this in today's age. At that time I didn't know what to do, so I call Michael Wheeler and sent a text of the picture letting him know that someone on his team had sent this bail over to the elevator with this picture. Sense Michael was the lead for the recycling team at that time. I would let him take point and get to the bottom of the problem. Michael said, he would be there in a few minutes. when Michael arrived he arrived with Israel. They both took pictures and all three of us went upstairs. I had to stop and deal with the elevator crew but Michael and Israel heading over to the upstairs recycling center. They came back a few minutes later with Ramon Martinez. While the three of us were standing there discussing what happened, Ramon Martinez said,he had drew the picture and he was just playing. As a supervisors or leads we are held to a higher standard because The people we supervise look to us as examples. if a supervisor does this kind of thing in front of the employees employees what kind of example are we setting. A person should be able to come to work and not be harassed or degraded while they're trying to do their job. This is not the first time Ramon Martinez has been talk about his behavior. And because nothing has been done, it seems that his behavior is getting worse. As an employee I'm entitled to a safe and harassment free work environment. And that all I ask and hope for.



CONFIDENTIAL



CONFIDENTIAL

Sent from my iPhone

CONFIDENTIAL

```
 1    State of California                )
 2    County of Marin                    )
 3
 4                I, Bridget M. Mattos, hereby certify
 5    that the witness in the foregoing deposition was by me
 6    duly sworn to testify to the truth, the whole truth
 7    and nothing but the truth in the within entitled
 8    cause; that said deposition was taken at the time and
 9    place herein named; that the deposition is a true
10    record of the witness's testimony as reported to the
11    best of my ability by me, a duly certified shorthand
12    reporter and disinterested person, and was thereafter
13    transcribed under my direction into typewriting by
14    computer; that the witness was given an opportunity to
15    read, correct and sign the deposition.
16                I further certify that I am not
17    interested in the outcome of said action nor connected
18    with or related to any of the parties in said action
19    nor to their respective counsel.
20                IN WITNESS WHEREOF, I have hereunder
21    subscribed my hand on June 7, 2018.
22
23                  BRIDGET M. MATTOS, CSR NO. 11410
24
25
```

# EXHIBIT "G"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

        Plaintiffs,

      vs.              No. 3:17-cv-06748-WHO

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; and DOES 1-50,
inclusive,

        Defendants.

_____//


DEPOSITION OF EDWARD ROMERO

November 30, 2018


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1                  P R O C E E D I N G S

 2          MR. ORGAN:  Today is Friday, November 30th,

 3   2018.  This is the deposition of Edward Romero by

 4   plaintiff Owen Diaz, in the matter of Di-az vs. Tesla,

 5   et al., in and for the United States District Court,

 6   for the Northern District of California; Case Number

 7   17-CV-06748WHO.

 8              My name is Larry Organ.  I'm videotaping this

 9   deposition on behalf of the plaintiff.  The deposition

10   is taking place before the deposition officer, Bridget

11   Mattos, and this deposition is taking place at the

12   California Civil Rights Law Group, 332 San Anselmo

13   Avenue, San Anselmo, California.  The time is now

14   10:01, and this is media 1 in the video recorder.

15              Will all parties in the room please state

16   their appearances.

17              MS. ANTONUCCI:  Barbara Antonucci for

18   defendant Tesla and City Staff.

19              MR. ORGAN:  Larry Organ for the plaintiff.

20              THE WITNESS:  Edward Romero.

21              MR. ORGAN:  Great.  Could you please swear

22   the witness.

23              (Witness sworn.)

24                          ---oOo---

25
```

1  working as the janitorial supervisor at Tesla.

2         So after you'd made the transition to a

3  regular Tesla employee, at that initial point in time

4  were your job duties the same as they were when you

5  were working as a janitorial supervisor for

6  nextSource?

7      **A.   Yes.**

8      Q.   And then at some point, Victor Quintero gave

9  you additional responsibilities; correct?

10     **A.   Correct.**

11     Q.   And Victor Quintero also promoted you to

12 contract services supervisor; is that correct?

13         MS. ANTONUCCI:  Objection; lacks foundation.

14         MR. ORGAN:  I'll scratch that question.

15     Q.   At some point in time, your job title changed

16 to contract services supervisor; is that correct?

17     **A.   Yes.**

18     Q.   Did you consider that a promotion?

19     **A.   I considered it just a change in title.**

20     Q.   Did you get a bump in pay?

21     **A.   I did not.**

22     Q.   When you moved from nextSource to Tesla as

23 the janitorial supervisor, did you get an increase in

24 pay for that?

25     **A.   I did not.**

1            MS. ANTONUCCI:  I can look on.

2            MR. ORGAN:  So for the record, this is

3    Tesla-211 to -- I think it's 219.

4        Q.   Have you ever seen this document before?

5        **A.   I don't recall ever seeing this document.**

6        Q.   So that's true even when you were a Tesla

7    employee; is that correct?

8            MS. ANTONUCCI:  And if you don't remember,

9    that's fine.

10           THE WITNESS:  I don't remember ever seeing

11   this document.  It doesn't mean -- meal break I did,

12   but I don't think that I did.

13           MR. ORGAN:   Okay.

14       Q.   Now, there was something called a personal

15   protective equipment program.  Do you know about that?

16       **A.   Yes.**

17       Q.   Tesla had some rules about that too?

18       **A.   Yes.**

19       Q.   I'm going to show you -- this has been

20   previously marked as Exhibit 29.  And it -- somehow

21   the Bates numbers have been cut off, but it's -- let's

22   see.  It looks like it's a six-page document, and it

23   was to the Caballero depo.

24           So I'll show you what's been previously

25   marked as Exhibit 29.

1              Have you seen this document before?

2        **A.    No.   Although, there could be a number of**

3    **variations of this, okay, throughout the company or**

4    **department.   But I don't remember seeing this document**

5    **specifically.**

6        Q.   But you do recall that you were subject to

7    Tesla's personal protective equipment program

8    guidelines or rules; right?

9        **A.    Yes.   Yeah, that was promoted throughout the**

10   **company.   They didn't want anybody to get hurt.**

11       Q.   And if you turn to the second page of Exhibit

12   29, if you look under "Responsibilities," if you see

13   3.3, "Supervisors, responsible for ensuring employees

14   wear appropriate PPE and to communicate changes in the

15   requirements for PPE; for example, new procedures,

16   processes requiring PPE, omission of a job or task."

17            As a -- you as a supervisor, did you ensure

18   that employees wore their appropriate PPE?

19       **A.   Every day.**

20       Q.   Every day.   Okay.

21            And that was something that all supervisors

22   were required to monitor; is that correct?

23       **A.   As far --**

24            MS. ANTONUCCI:   Objection; calls for

25   speculation.

```
 1        Q.   Do you know who they worked for?
 2        A.   Again, I think it was through nextSource, but
 3    it might have been some City Staff and other agencies
 4    also.
 5        Q.   And the elevators, this was the way that
 6    products got from either the lower level to the upper
 7    level or the upper level to the lower level; is that
 8    right?
 9        A.   Yes.  Moving production materials for the
10    building of cars.
11        Q.   These are, like, heavy-duty elevators, you
12    said; right?
13        A.   Yes, they're humongous, probably the size of
14    your -- half of your office here.
15        Q.   Okay.  I haven't been to the Tesla factory,
16    so tell me, pretty much, what was the role of the
17    elevators?  What were they supposed to do?
18        A.   Okay.  The elevators were there to move
19    product, and actually the primary responsibility was
20    to move material up and down for the production -- the
21    construction of cars.  Okay?
22             The group that I supervised, supervises the
23    two large elevators.  And we had forklift drivers,
24    tugger drivers, who moved this material up and down
25    the elevators all day long.  We had drop zones near
```

 1   **the elevators, where these materials were taken to,**

 2   **and then production staff from the factory would come**

 3   **and pick it up or return empty parts or empty pallets**

 4   **and things like that to us, and we moved them up and**

 5   **down.  So we didn't deliver items throughout the**

 6   **factory.  Our goal was to have these materials ready**

 7   **for everybody in the factory in their designated**

 8   **location around the drop zones around the elevators.**

 9       Q.   So the elevators were an integral part of

10   getting parts to different levels?

11       **A.   I would say they can't build cars without**

12   **them.**

13       Q.   So you'd agree that without the elevators

14   operating correctly, it could shut down the factory;

15   is that true?

16            MS. ANTONUCCI:  Objection; calls for

17   speculation.

18            THE WITNESS:  I guess I would say that if the

19   elevator broke down, it was going to have a big

20   impact.  Okay?  If we didn't have a good organization

21   around the elevators, well, it was going to impact the

22   delivery of those supplies.

23            MR. ORGAN:  Q.  And in terms of how the

24   supplies get to the elevator, those supplies would be

25   brought to the elevator either by Tesla employees or

1   by contract employees; is that correct?

2       A.   I don't know who they would be brought by

3   with.  You know, those -- those departments would

4   decide who was going to do that.

5       Q.   Okay.  But in terms of the coming and going

6   of the materials that would go on to the -- strike

7   that.

8            How many elevators were there, or are there,

9   at the factory?

10      A.   I don't know how many there are in the

11  factory.  I couldn't give you that number and be

12  accurate.  I'd be off.  But I only saw the two large

13  primary elevators.

14      Q.   And these two -- did they have a particular

15  name, or are they called, like, the production

16  elevators or --

17      A.   They were commonly known as elevator 1 and

18  elevator 2.

19      Q.   How many staff were there to operate the

20  elevators, the elevator 1 and elevator 2?

21      A.   I can't say definitely that there was a given

22  number every single day, you know.  They worked on a

23  compressed schedule.  In other words, we had primarily

24  two people on each elevator, okay.  Two on one and two

25  on the other, nighttime.  Two on one and two on the

1    **other during daytime.  But depending on production,**

2    **sometimes we brought in an extra person or two**

3    **persons, so it fluctuated.**

4        Q.   But the ideal was to have at least two people

5    on elevator 1 and two people on elevator 2, at all

6    times?

7        **A.   Typically.  And it didn't mean that if there**

8    **was one, there was a problem.  It could have been**

9    **production was slower during a given time, part of the**

10   **year, seasonal.  I don't know.  There's a lot of**

11   **factors that come into play.**

12       Q.   And in terms of the procedure for getting

13   products onto the elevators and then off of the

14   elevators, were the elevator operators supposed to put

15   the product onto the elevator and then take it off?

16           MS. ANTONUCCI:  Objection; lacks foundation.

17           MR. ORGAN:  Strike that.  Let me lay a

18   foundation.

19       Q.   You observed the elevators operating; is that

20   correct?

21       **A.   Correct.**

22       Q.   And you also observed materials going onto

23   the elevators and coming off the elevators; right?

24       **A.   Yes.**

25       Q.   So it's fair to say that you saw how the

1    he looks, I'd probably say 50.

2        Q.   Okay.  Fair enough.

3             And your first interaction with Owen Diaz, do

4    you remember what that was about?

5        A.   It wasn't necessarily an interaction; it was

6    more like observing him working there.  He was working

7    there as an elevator operator.  If I remember

8    correctly, he was a lead at that time.

9        Q.   And what was the difference between a lead

10   and someone else, on the elevator operators?

11       A.   A lead was expected to assume more

12   responsibility and making sure that product was moved

13   properly and safely and that the crews were working in

14   the same manner, using their PPE, and so on, and it

15   was to be an individual who could have good

16   interaction with other departments, other department

17   heads, supervisors, elevator drivers, tugger drivers

18   who came to the elevator.

19            We wanted an individual who could really

20   interact and work closely with them, a cooperative

21   spirit, not an angry person or somebody who, you know,

22   couldn't get along with people.  I would say

23   typically, that's the difference.

24       Q.   Did you promote Owen Diaz to a lead?

25       A.   I think he was a lead already when I got

1   **there.**

2       Q.   Did you ever talk to Jamie Salazar about Owen

3   Diaz?

4       **A.   Not to ask him the question specifically.**

5       Q.   Did you have any discussion with Jamie

6   Salazar about Owen Diaz's attitude, or anything like

7   that?

8       **A.   I can't say.   I don't remember that.**

9       Q.   Tell me about your first impression relative

10  to Owen Diaz when you observed him, when you took over

11  responsibility for the elevator operators.

12          MS. ANTONUCCI:   Vague.

13          THE WITNESS:   You want to rephrase that a

14  little bit or --

15          MR. ORGAN:   Actually, let me go back to the

16  lead thing.

17      Q.   So in terms of the lead position for the

18  elevator operators, the elevator operator leads were

19  expected to be more responsible; is that correct?

20      **A.   Yes.**

21      Q.   And the elevator operator leads were expected

22  to be more responsible in terms of moving product; is

23  that correct?

24      **A.   Moving it efficiently.**

25      Q.   Efficiently, yes.

1           And then you said that the elevator operator

2    leads were also responsible for making sure that their

3    crews used their PPEs?

4       **A.    Correct.**

5       Q.   And you said that the elevator operator leads

6    also had to make sure that they had good interactions

7    with other departments; right?

8       **A.    Correct.  They had to have good**

9    **communication, a spirit of cooperation, an ability to**

10   **resolve issues that came along that might impede the**

11   **movement of materials.**

12      **Q.    Elevator operator leads were supposed to try**

13   **and mitigate or reduce obstacles to getting product to**

14   **move between the floors; correct?**

15      **A.    Correct.  And they had to have good**

16   **interaction with the supervisors of the production --**

17   **of the -- of the different departments bringing**

18   **materials to the elevators.**

19           **In other words, if you have a lead -- because**

20   **I wasn't there at the elevators all day long, I had**

21   **other duties to do, and so on.  But a good lead**

22   **elevator operator, okay, would be able to communicate**

23   **with people who came to him and said, for example,**

24   **"I've got this material that's urgently needed in this**

25   **part of the factory," and work it out to get that**

```
 1        A.    I knew --
 2        Q.    Let me just finish the question.
 3        A.    Yeah.  Sorry.
 4        Q.    In terms of your -- when you were the
 5   janitorial supervisor working for nextSource, during
 6   that time, you at least had some contact with the
 7   elevator 1 and 2 operators; correct?
 8        A.    I can't say.  All I can say is it was
 9   limited, in the sense that from that responsibility I
10   had with nextSource, we only took trash down the
11   elevator and some recycled products.  I mean, some
12   cleaning products that were going up and down.  And
13   that was not my responsibility to drive them down
14   there and take them down the elevator.
15        Q.    Okay.
16        A.    That was -- the employees were doing that.
17        Q.    Then tell me about your impressions of Owen
18   Diaz as time went on, when you became his -- when you
19   took over responsibilities for overseeing elevators 1
20   and 2.
21        A.    I would say that Owen -- I observed that he
22   had a hard time getting along with people.
23        Q.    Was that all people or --
24        A.    I would say some people.
25        Q.    And who were the people who you observed Owen
```

1    having a hard time getting along with?

2        A.    I don't remember specific names, other than

3    sometimes comments were made:  Who is this guy?  How

4    come he's always upset?

5            You know, I'm just responding to your

6    question about what my impression was.

7        Q.    Yeah, I get that.

8        A.    I made no decisions as to what I felt would

9    be the ultimate result with anything.  I wanted to

10   work with Owen.  I like to give everybody a fair

11   chance.  But there were some instances where people

12   voiced that he was angry, or things like that.

13       Q.    When you say "things like that," in addition

14   to people voicing an opinion that Owen was angry, did

15   they voice anything else to you?

16       A.    That they didn't like the way he spoke to

17   them.

18       Q.    And do you remember any specifics as to what

19   people said about what they didn't like about the way

20   Owen Diaz spoke to them?

21       A.    I can only speak of maybe one specific case.

22       Q.    Okay.  Tell me about the case.

23       A.    Where he -- they accused him that he was

24   gossiping about them behind their back; that he's

25   divulging or gossiping about a relationship that two

1    operators about, I guess, some things with his

2    personal life or his attitude, and, you know, that he

3    didn't like his name being used by Owen.  Okay?  He

4    didn't feel that it was proper.

5        Q.   Well, how did he say that Owen was using his

6    name in a way that he didn't like?

7        A.   I think specifically and more so on how he --

8    he was another elevator lead, by the way.

9        Q.   Jesse was an elevator lead?

10       A.   Yes, on the daytime.

11       Q.   On the daytime.  Okay.

12       A.   He felt that Owen would bad-mouth him to

13   other employees, and these people were going,

14   supposedly, to Jesse and telling him.

15       Q.   Okay.  Jesse felt like Owen was saying

16   negative things about the job that Jesse was doing on

17   the day shift; right?

18       A.   Right.

19       Q.   Owen didn't say anything negative about Jesse

20   personally; correct?

21            MS. ANTONUCCI:  Objection; lacks foundation.

22            MR. ORGAN:  Q.  That you knew of.

23       A.   I couldn't say specifically, but he was

24   taking it personal.

25       Q.   Jesse was taking it personally?

1    the elevators and went down to their area, and they

2    were getting into some kind of discussion there.

3    Okay?  And that's when I heard that there was this

4    discussion between them.

5        Q.   And what did you hear about what the

6    discussion was between Hilda and Owen?

7        A.   About him not cooperating, and his overall

8    attitude that -- I always question him:  Why did you

9    go down there if you're assigned here?  Why did you go

10   over there?

11           And he said, "Oh, I just went over there."

12   It wasn't like he had a real good reason to go.  Okay?

13       Q.   Okay.

14       A.   And then somehow -- and I'm only saying what

15   Hilda told -- reported.  She reported that he started

16   making comments about that there was a relationship

17   between her and Aaron, and she felt offended because

18   she was married and the other guy was married, and she

19   felt that her name was being tossed around in a bad

20   way.

21       Q.   Okay.  Did you observe any of these

22   statements yourself by Owen?

23       A.   No.  I wasn't there when they had that

24   interaction.

25       Q.   Did you confront Owen about whether or not he

```
 1              MS. ANTONUCCI:  Objection; vague and lacks
 2    foundation.
 3              THE WITNESS:  I reported it to the people
 4    that I needed to report it to.
 5              MR. ORGAN:  Q.  And who did you report the
 6    interaction with Jesse to?
 7         A.   I think there's an email there, if I
 8    remember.  And I can't remember every single detail,
 9    because we write so many emails throughout our lives
10    anyway, but I think I reported it to Mr. Salazar and
11    to Mr. Quintero.
12         Q.   And what about the Hilda issue?
13         A.   It was all part of the same issue.
14         Q.   What's the timing of when you reported these
15    issues to Quintero and Salazar?
16         A.   You mean how many -- how much time did I let
17    go by?
18         Q.   Yeah.
19              Well, let's start it this way:  When did
20    Jesse bring to you his concerns about -- that Owen was
21    bad-mouthing him?
22         A.   I can't tell you the date.  It had to be on
23    or about the same time that these other complaints
24    came in.
25         Q.   So the complaints from Hilda and Jesse came
```

1    to you approximately the same time; is that right?

2         **A.   Yes.**

3         Q.   And was that right after you took over your

4    responsibilities as supervising the elevator

5    operators, or was it later?

6         **A.   It was during that transition time.**

7         Q.   So October of 2015 --

8         **A.   That was the transition time, yes.**

9              MS. ANTONUCCI:  Hold on.  Let him finish his

10   question.

11             MR. ORGAN:  Q.  So in approximately October

12   2015, when you were taking over responsibilities for

13   overseeing the elevator operators, that's the time

14   period when Jesse and Hilda came to you making

15   complaints about Owen Diaz; is that correct?

16        **A.   I think that Hilda called me because she was**

17   **concerned about not being able to use the elevators,**

18   **and then within a very short period of time, all these**

19   **other things happened.  Okay?**

20        Q.   And you think that --

21        **A.   But I can't remember if Jesse mentioned it a**

22   **little bit before that or right after that time or a**

23   **period after that.  I don't remember.**

24        Q.   It wasn't too long between the Hilda and the

25   Jesse --

     1      **A.   It was all, like, happening almost at the**
     2  **same time.**
     3      Q.   And your best recollection is that that
     4  occurred during the time that you were transitioning
     5  to take over supervising the elevator operators; is
     6  that right?
     7      **A.   Yes.**
     8      Q.   Did you talk to Owen about your concerns --
     9  or strike that.
    10      <u>You did talk to Owen about the concerns that</u>
    11  <u>Jesse raised to you?</u>
    12      <u>**A.   Yes.**</u>
    13      Q.   When did you talk to Owen about the concerns
    14  that Jesse raised?
    15      **A.   I would probably have to refer back to the**
    16  **email to remember that, because the email was written**
    17  **right as it happened, you know, as soon as it**
    18  **happened, and it would be more specific on, you**
    19  **know --**
    20      Q.   Okay.  What's your best estimate of when that
    21  was?
    22      **A.   I don't know what you mean.  You're talking**
    23  **about October?  Are you talking about a specific time?**
    24  **What do you mean?**
    25      Q.   Yeah.  What's your best estimate, in terms of

1    was it October, November, December, 2015, 2016?

2         A.   I think it was during October.

3         Q.   And then Hilda, what's your best estimate of

4    when you talked to Owen Diaz about Hilda or the issues

5    raised by Hilda?

6         A.   Again, I'd like to refer back to the

7    specifics on the email.

8         Q.   I get that, but I'm asking you for your best

9    memory now.

10        A.   I can't remember.

11        Q.   So it could have been 2016 when you talked to

12   Hilda?

13        A.   No.

14        Q.   To Owen?

15        A.   No, I can't remember during that month of

16   October.  Okay?

17        Q.   Fair enough.

18        A.   If this happened this day, this day, this

19   day, I just don't have the dates.

20        Q.   I get that.  But your best memory is that you

21   talked to Owen Diaz about the Jesse issues in October

22   2015; right?

23        A.   Yes.

24        Q.   And your best memory is that you talked to

25   Owen Diaz about the Hilda issues in October 2015;

1    correct?

2        A.   On or about that time, yes.

3        Q.   Let's talk about -- did you talk to Owen

4    directly, or did you email him?  How did you address

5    the issues that Jesse raised with Owen Diaz?

6        A.   If I remember correctly, it was Mr. Salazar

7    and myself.

8        Q.   Where did it happen?

9        A.   I think it happened on or around the

10   elevators, you know, that location.  To my best

11   recollection.

12       Q.   What did you and Mr. Salazar say to Mr. Owen

13   Diaz about what Jesse had raised?

14       A.   Basically, how Jesse Leite felt.  We gave him

15   counsel as to, you know, it's not good to just say

16   things to other people, because you could hurt

17   somebody.

18            I'm going by the gist of what I remember, and

19   how Jesse was hurt, and, you know, a lot of times --

20   you know, like I mentioned earlier, sometimes we don't

21   even know who left the materials, so why accuse

22   somebody that they did it type thing.

23       Q.   What did Mr. Owen Diaz say in response?

24       A.   I think he realized that he could have maybe

25   handled it differently.

1      **A.    As far as I can remember, yes.**

2      Q.    And how did Owen Diaz seem to you, relative

3   to things relating to Hilda?  Did he admit that he had

4   said things about Hilda and Aaron having some kind of

5   relationship?

6      **A.    From what I remember, he recognized that he**

7   **should have not done that.  Okay?**

8      Q.    Okay.

9      **A.    And, yes, I think he did acknowledge that,**

10  **you know, he would be more careful in the future about**

11  **things like that.**

12     Q.    Did you give any kind of written verbal

13  warning or written warning to Mr. Diaz, relative to

14  his conduct?

15     **A.    I don't recall that.  I can't remember right**

16  **now.**

17     Q.    Did you consider the issue handled at that

18  point, after you and Mr. Salazar talked to Owen about

19  Jesse and Hilda?

20     **A.    I think that that specific issue was dealt**

21  **with, and we do tell them that, you know, we didn't**

22  **want to revisit that or go back to that, have that**

23  **happen again, and I think he said that he was going to**

24  **try not to have it happen again.**

25     Q.    And did Jesse complain to you later that it

 1          MS. ANTONUCCI:  Do you think we could take a

 2   quick lunch break or --

 3          MR. ORGAN:  Yeah, sure.

 4          MS. ANTONUCCI:  Okay.

 5          MR. ORGAN:  Let's go off the record.  It's

 6   12:28.  We're going off the record.

 7              (Lunch recess taken from

 8              12:28 p.m. to 1:10 p.m.)

 9                    ---oOo---

10              AFTERNOON SESSION

11          EXAMINATION BY MR. ORGAN (Continued)

12          MR. ORGAN:  We're back on the record.  The

13   time is 1:23.

14      Q.   What's the next thing you can remember after

15   this incident with Jesse and Hilda?

16      **A.   I don't know what you mean, "the next thing."**

17      Q.   Yeah, that was a bad question.  Sorry about

18   that.

19          In terms of Mr. Diaz, Owen Diaz, what's the

20   next thing you can recall that was an issue that you

21   had to deal with relative to Owen Diaz?

22      **A.   I don't remember, as far as, like, the**

23   **sequence chronologically.**

24      Q.   Okay.  Well, tell me the other things that

25   you recall.  Even if you can't remember the chronology

 1   of them, tell me the other things you remember, in

 2   terms of issues that stood out for you, relative to

 3   Owen Diaz and any issues relating to the elevators

 4   or --

 5        A.   He had issues with other departments who made

 6   deliveries and pickups at the elevators.  They

 7   complained numerous times about him not being

 8   cooperative, him not communicating, shutting down.

 9   They asked him questions, to the point of saying, "I

10   don't want to talk to you anymore.  From now on, you

11   send emails to me," you know, things like that.

12             I think Joyce De La Grande was the manager of

13   these people, you know, who brought the deliveries to

14   the elevators and picked up, and they continued to

15   complain about his overall attitude; that it was

16   negative.

17        Q.   Did you ever write up Owen Diaz for any of

18   his attitude?

19        A.   For that situation, I don't think I did,

20   okay, because I was listening to both sides.  I was

21   trying to get to the bottom of it.  You know, it was

22   obvious that he wasn't cooperating at times.  I told

23   him, you know, "You need to think about what you do.

24   Just try to, you know, work with them."

25        Q.   Did you ever figure out what was going on

1      A.   No, no, this was after Tesla.  I called to

2  see how he was doing, and he said, "Oh, by the way,

3  next Saturday is my birthday.  Do you want to come

4  by?"  So...

5      Q.   Okay.  Now, at some point in time you became

6  aware of some issues between Ramon Martinez and Owen

7  Diaz; is that correct?

8      A.   Yes.

9      Q.   Tell me about that.  What do you recall about

10  that?

11      A.   I think there was an incident where Owen said

12  that Ramon was at the entrance to the elevator, on a

13  tugger, if I remember correctly, and that he got off

14  of the tugger, went in, and -- and this is what Owen

15  was telling me -- and that he was in his face, and he

16  was mad, and he was upset, and he said he felt that

17  that was inappropriate for Ramon to do that.

18      Q.   And did you talk to Ramon about it?

19      A.   No.  He was not my employee.  At that time,

20  Mr. Salazar was their supervisor, so I reported it to

21  him.

22      Q.   Did you ever have a discussion with Jesse

23  Salazar about what he found?

24      A.   Other than just informing him that -- you

25  know, what Owen had said.

1     Q.   Okay.  Did Mr. Salazar get back to you and
2  let you know what he discovered?
3     **A.   He did not.  It was reported to them, and I**
4  **assumed that they handled it.**
5     Q.   Well, Owen actually said that Ramon had
6  threatened him, right, physically threatened him?
7          MS. ANTONUCCI:  Objection; vague.
8          THE WITNESS:  He said that Ramon had gone off
9  the tugger, went into the elevator, and they were --
10  he was in his face.  That's the expression he used.
11          MR. ORGAN:  Q.  So Owen didn't tell you he
12  felt threatened by Ramon Martinez?
13     **A.   I don't remember him saying that.**
14     Q.   Okay.  Do you remember any other interactions
15  between Ramon Martinez and Owen Diaz?
16     **A.   One other incident.**
17     Q.   And what was the other incident?
18     **A.   The incident had to do with a drawing that**
19  **was put on a pallet of cardboard that was coming down**
20  **from the second floor to the first floor.  Owen, if I**
21  **recall, sent me an email and then called me, like,**
22  **early the next morning, after this happened, and said**
23  **that somebody had drawn a picture of something on a**
24  **pallet, and he was offended by it.**
25     Q.   Did you actually see the drawing?

1       **A.     I saw a picture of it.**

2       Q.     And what did you think?  Was it offensive?

3              MS. ANTONUCCI:  Objection; vague and calls

4    for a legal conclusion.

5              MR. ORGAN:  Strike that.

6       Q.     Did you think that the drawing was offensive?

7              MS. ANTONUCCI:  Objection; vague, calls for

8    speculation, legal conclusion.

9              THE WITNESS:  I would respond by saying that

10   I took it serious that Owen felt offended.

11             MR. ORGAN:  Q.  It was clear to you that Owen

12   felt offended; right?

13      **A.     Yes.**

14      Q.     Did you actually talk to Owen about it?

15      **A.     Yes.**

16      Q.     And when Owen talked to you about it, what

17   did he say?

18      **A.     He said that during the night, someone had**

19   **drawn this picture on this pallet of cardboard going**

20   **down, and that he took offense to it; that he felt bad**

21   **by -- you know, he didn't know who did it at the time,**

22   **and I guess after I spoke to him, he spoke to the**

23   **recycle people, and it came out that Ramon had**

24   **admitted to drawing the picture.**

25      Q.     And what happened next?

1      **A.    I reported it to Victor Quintero, who was in**

2   **charge of the recycling supervisors, and Ramon, who**

3   **was a supervisor, or is.  I don't know if he still is**

4   **or not.  And then I reported it to Wayne Jackson.**

5      Q.    Did you report the incident to Tesla HR?

6      **A.    I did not.**

7      Q.    Why not?

8      **A.    Because Ramon was not my employee.  I took it**

9   **directly to the manager of the department, and he said**

10  **that he would take care of it.**

11     Q.    Manager of the department being Victor

12  Quintero; correct?

13     **A.    Correct.**

14     Q.    Anything else that you can recall about that

15  interaction, or that incident regarding the picture?

16     **A.    No.**

17     Q.    Do you remember if Owen Diaz said why he was

18  offended by the picture?

19     **A.    I don't recall.**

20     Q.    Owen Diaz made it clear to you, didn't he,

21  that he felt like the picture was targeted to him

22  because he was black; right?

23          MS. ANTONUCCI:  Objection; vague.

24          MR. ORGAN:  Q.  Or African-American.

25     **A.    I know there's a text, a copy of a text that**

1    that's what it was all about.

2       Q.   Sure.   Okay.

3            Did you ever hear Ramon Martinez say anything

4    about the drawing?

5       A.   No.

6       Q.   Do you remember any specific comments that

7    Owen Diaz said about the drawing?

8       A.   Other than him informing me?

9       Q.   Yeah.

10      A.   No.

11      Q.   Did you actually have a one-on-one discussion

12   with Owen Diaz about the drawing?

13      A.   Yes, by telephone that morning.  He had

14   already texted me, and I called him, it must have been

15   7, 8 o'clock in the morning.  And I don't remember if

16   he called me or if I called him.  I don't remember.

17   But we did discuss what happened.

18      Q.   And what do you recall, as best you can, what

19   Owen said happened?

20      A.   Basically, that somebody had drawn a picture

21   on a pallet of cardboard coming down, and that it was

22   offensive, and he felt uncomfortable about it and that

23   he wanted something -- he wanted to let me know what

24   was going on.  Later, he met with Ramon and the

25   recycle people, and Ramon supposedly said, "I'm the

1    **one who did it."**

2        Q.   So after your phone call with Owen?

3        **A.    No, this is before.**

4        Q.   Okay.

5        **A.    This is before, during the night.  So when I**

6    **talked to him in the morning, I not only read his**

7    **text, but I also discussed what he was telling me**

8    **happened during the night.**

9        Q.   Okay.  So Owen also told you that he had met

10   with Ramon Martinez, who had admitted doing the

11   drawing?

12       **A.    I understood that he also had admitted that**

13   **Ramon had said he didn't mean it that way, and he**

14   **didn't think -- it wasn't his intent.  That's not what**

15   **he was trying to do.**

16       Q.   Did you hear what Ramon said his intent was?

17       **A.    I never spoke to Ramon.**

18       Q.   When you saw the drawing, did you think it

19   was funny?

20       **A.    I did not see the drawing until afterwards,**

21   **because it had already been taken away during the**

22   **night.  But they had taken pictures of it.**

23       Q.   When you saw the picture of the drawing, did

24   you think it was a joke?

25       **A.    I had no way of knowing if it was a joke.  It**

```
 1        A.    Michael Wheeler was one of the night recycle
 2   department supervisors.
 3        Q.    Now, Mr. Diaz was sending this text message
 4   to you.  That was okay for him to do that; right?
 5        A.    Yes.
 6        Q.    In fact, that was exactly what he was
 7   supposed to do, was send --
 8        A.    Was report it to his supervisor.
 9        Q.    And you were Mr. Diaz's supervisor at that
10   time; correct?
11              MS. ANTONUCCI:  Objection; calls for a legal
12   conclusion.
13              MR. ORGAN:  Q.  Correct?
14        A.    What are you asking me?
15        Q.    I said, at this point in time, January 22nd,
16   2016, at 8:42 a.m., you were Mr. Diaz's supervisor at
17   that time?
18        A.    I was.
19              MS. ANTONUCCI:  Objection; calls for a legal
20   conclusion.
21              MR. ORGAN:  Okay.
22        Q.    You then received this.  What did you do
23   next?  Once you received this email or text message --
24   whatever it was -- from Mr. Diaz, what do you do next?
25        A.    I don't remember if I contacted Wayne Jackson
```

1    **first or Victor Quintero or both of them at the same**

2    **time.  I don't remember.  But I did communicate with**

3    **my supervisor and with his supervisor.**

4        Q.   So you talked to Victor Quintero; correct?

5        **A.   Yes, to keep him informed as to what had**

6    **happened, and then Wayne Jackson being the account**

7    **manager of Owen Diaz.**

8        Q.   Then what did you do next?

9        **A.   Gave him all the information that I had, put**

10   **it in their hands, and that from what I understood,**

11   **Victor Quintero told Wayne Jackson to take action on**

12   **it.**

13       Q.   Did you send an email?  Did you forward this

14   email from Owen Diaz; did you forward that to Wayne

15   Jackson and Victor Quintero?

16       **A.   I don't remember.**

17       Q.   And then what was the next involvement you

18   had relative to this incident?

19       **A.   The brief meeting that occurred with Wayne**

20   **Jackson and Victor Quintero, and I think the meeting**

21   **was a very, very brief meeting.**

22       Q.   Okay.  And then what -- you mentioned that

23   there was a written warning that was given to Ramon

24   Martinez as a result of his drawing the effigy.  Do

25   you remember any other action that was taken relative

1    would be something that you, as the janitorial

2    services supervisor, would try and implement; correct?

3        A.   Yes.

4        Q.   So tell me about your discussions with Tom

5    Kawasaki about Owen Diaz.

6        A.   I think, from what I remember, this was, I

7    think, the beginning of August.  He -- Owen said that

8    he had spoken with Tomatsu about certain individuals

9    in the group making -- I think the word he used was

10   "derogatory remarks," or something like that.  I can't

11   remember, but I don't remember him using specific

12   other terms.

13            Maybe -- maybe one guy, racist remarks or

14   something.  This guy named Judy Tibreza, or something

15   like that.  Okay?  That's why I wanted to come back

16   and tell you, oh, I misunderstood what you said, and

17   yes, there was one other time that this happened.

18       Q.   Okay.  So Judy Tibreza, who was that?

19       A.   He was one of the elevator people, elevator

20   operators.

21       Q.   And was Judy Tibreza, do you know whether

22   Judy -- Judy is a male; is that right?

23       A.   Yes.

24       Q.   And it's spelled J-U-D-Y?

25       A.   That's -- I think that's the way it's

EDWARD ROMERO
November 30, 2018

Page 152

1       Q.   Do you know why Tom Kawasaki was sending this
2  email to you on July 31st of 2015?
3       A.   I do not.
4       Q.   Now, the email from Tom Kawasaki is copied to
5  Jamie Salazar and Victor Quintero; correct?
6       A.   Yes.
7       Q.   Does that refresh your recollection about
8  having a discussion with Victor Quintero about this
9  issue?
10      A.   I don't remember having a discussion with
11  Victor Quintero.  If they sent him a copy of this,
12  well, they did so.
13      Q.   Did you actually have a telephone
14  conversation with Tom Kawasaki about what the nature
15  of the racist comments were?
16      A.   I don't remember talking to him.  I do
17  remember that there was some text information going
18  back and forth, initially stating that Owen had these
19  concerns and complaints, but I don't recall having a
20  conversation with him.  I might have, but I don't
21  recall having it.
22      Q.   This helps refresh your recollection that
23  they were racist in nature, correct, or at least it
24  was brought to your attention that the comments were
25  racist in nature; right?

 1    I was going to be their supervisor.  I never told

 2    anyone, but I did get the email.

 3        Q.   You did get the email in Exhibit 42?

 4        A.   Mm-hm.  Yes.  I got this portion here.

 5        Q.   Right.  And did you forward it to anyone?

 6        A.   No.  I talked to Jamie Salazar about it.

 7        Q.   And have you already told me about your

 8    conversation with Jamie?

 9        A.   Other than telling them that I had received

10    this information from Tamotsu and that there were

11    these.

12        Q.   Okay.  Is this the only email you received

13    from Tom Kawasaki about the incident between Owen

14    and --

15        A.   It's the only one that I can recall.

16        Q.   Okay.  Did you review this document before

17    you testified for your deposition?

18        A.   Only this portion here (indicating).

19        Q.   Just the lower portion?

20        A.   Correct.

21        Q.   From Tom Kawasaki to you.

22        A.   Right.

23        Q.   Okay.  Where Tom says to you, "We are in the

24    process of reviewing all statements made in this

25    situation, and are figuring out what steps we are

1    coming today; correct?

2        A.    Yes, mm-hm.

3        Q.    This is an email you sent; is that correct?

4        A.    It is.

5        Q.    Why were you sending this email to Victor

6    Quintero?

7        A.    Just to keep him abreast of the accusations

8    that had come up, okay, and he was the manager, so I

9    felt he needed to know about it.

10       Q.    In your email in Exhibit 43, you say, "We

11   investigated by speaking to all witnesses present, but

12   they said they did not hear the remarks."

13              So you were part of the investigation;

14   correct?

15       A.    Well, as the group effort, yes.

16       Q.    That's why you said "we"; correct?

17       A.    Yes.

18       Q.    And then the next part of that sentence says,

19   "Although more than one person agreed, Mr. Timbreza

20   tendency to kid around excessively."

21       A.    Mm-hm.

22       Q.    So it at least appeared, based on the

23   investigation that was conducted, that Mr. Timbreza

24   had engaged in some inappropriate conduct; correct?

25              MS. ANTONUCCI:   Objection; misstates

1    point in time?

2       A.   Victor Quintero.

3       Q.   So at this time, when you wrote this email,

4    Victor Quintero was Jamie Salazar's supervisor;

5    correct?

6       A.   Yes.

7       Q.   And then eventually, you took over those

8    supervisor roles when you transitioned to a Tesla

9    employee; is that right?

10      A.   Yes.

11      Q.   Let's go back to this.

12           It says, "We have given Mr. Timbreza a verbal

13   warning and explained his need to treat his fellow

14   team members with dignity and respect."

15           The conclusion was, in the verbal warning,

16   that Mr. Timbreza had not treated his fellow team

17   members with dignity and respect; correct?

18      A.   Yes.

19      Q.   And in fact, if Mr. Timbreza engaged in any

20   similar conduct, he was going to be terminated; right?

21      A.   Yes.

22      Q.   It says here, "We have his signed verbal

23   notice filed in the nextSource office."

24           Do you know what that's referring to?

25      A.   I do not.

1      A.    Hilda was the same person that he had had a

2   problem with two or three weeks prior.

3      Q.    Okay.  So it appears, at least as of this

4   October 15th date, that Hilda and Owen Diaz are

5   getting along better, doesn't it?

6      A.    I had no reason to believe that any further

7   problems had occurred, because I didn't hear of any.

8      Q.    And it looks like they are cooperating, Hilda

9   and Owen are cooperating to try and cover a

10  short-staffing situation; correct?

11     A.    Yes.  Victor says that he had spoke to Israel

12  and Hilda about cooperating, and they agreed.

13     Q.    Now, at this point in time, October 15th and

14  October 19th, you are now a Tesla employee; correct?

15     A.    Yes.

16          MR. ORGAN:  Let's make this next in line,

17  which is 55.

18          (Whereupon Deposition Exhibit 55

19           was marked for identification.)

20          MR. ORGAN:  Q.  Exhibit 55, for the record,

21  is a one-page document.  I can't tell what the Bates

22  number is because that got cut off, but it's a series

23  of emails from October 17th, 2015, until October 19th

24  of 2015, where the subject line is Owen.  And the

25  bottom email, so the first in time is an email from

1    Ramon Martinez to you.

2              Do you see that?

3    A.   Mm-hm.   Yes, I do.

4    Q.   And then there's an email from you to Josue

5    Torres, where you tell Josue that you were going to

6    investigate that then, October 17th; correct?

7    A.   Yes.   Mm-hm.

8    Q.   Now, when you investigated, you actually

9    found that Mr. Diaz was complaining about

10   Mr. Martinez; correct?

11   A.   Ask that question again.

12   Q.   Yeah.

13             Did you investigate this complaint by Ramon

14   Martinez?

15   A.   I don't remember what the investigation

16   outcome was, and I'm being honest.   I don't remember

17   what it was.   Okay?

18   Q.   I understand that.   My question is whether

19   you investigated it or not.

20   A.   I think that I did.

21   Q.   Yeah, because you say here, "I will

22   investigate this today."

23   A.   Correct.

24   Q.   Okay.   When you did investigate, you actually

25   got information that Ramon Martinez had engaged in

```
 1              MR. ORGAN:  Q.  You think what?

 2        A.   I don't remember what I was going to say.

 3        Q.   Did you get a statement from Ramon Martinez?

 4        A.   I don't recall the whole situation; you know,

 5   I don't have -- other than this email saying that he's

 6   complaining about Owen, I have nothing else to go on.

 7              MR. ORGAN:  Okay.  Let's make this 56.

 8              (Whereupon Deposition Exhibit 56

 9               was marked for identification.)

10              MR. ORGAN:  Q.  Exhibit 56, for the record,

11   is a two-page document, Bates-stamped Tesla 135 and

12   136, and it's a -- something sent from an iPhone to Ed

13   Romero and Tom Kawasaki, from Owen Diaz, at 6:08 a.m.

14              Did you receive this?

15        A.   I remember seeing this, yes.

16        Q.   You understood that Mr. Owen Diaz was

17   complaining that Ramon Martinez had yelled at him in a

18   threatening manner; right?

19        A.   That is what Owen said.

20        Q.   And Owen said -- Owen Diaz also said that he

21   didn't feel safe around Ramon Martinez; right?  Is

22   that right?

23        A.   That's what I understood.

24        Q.   Okay.  And then it says, above that, there's

25   an email from Wayne Jackson, where it says -- this is
```

1    on the first page of Exhibit 56, here is Ramon's

2    statement:  "I'm waiting for Rathaj and Ramon to send

3    me theirs.  Ed has a meeting scheduled with them

4    Wednesday at 6:00 p.m. that I will be attending with

5    them."

6         Did you have a meeting with Rathaj and Ramon

7    and Wayne Jackson?

8         A.   No, I don't think that I did.  I think it was

9    referred to Wayne Jackson.

10        Q.   So when Wayne Jackson says in this email of

11   October 20th, "Ed has a meeting scheduled with them

12   for Wednesday at 6:00 p.m." --

13        A.   I see it.

14        Q.   -- you're saying that meeting didn't occur?

15        A.   I don't remember being in that meeting.

16        Q.   Did you ever get a copy of Ramon's statement?

17        A.   I think I did, and it was forwarded to Wayne

18   Jackson.

19        Q.   Okay.

20        A.   Or given to him.  I don't remember how that

21   was.

22        Q.   You received Ramon's statement, and then you

23   remember forwarding it to Wayne Jackson; is that

24   correct?

25        A.   I think that would have been the action I

1    A.   Yes.

2    Q.   And in that, you mentioned that Rathaj Foster

3    had been removed the previous night at 10:00 p.m. from

4    the Tesla premises; right?

5    **A.   He was removed to avoid any more friction**

6    **that day between him and Owen.**

7    Q.   Right.

8         And you had -- you first got a report where

9    Mr. Foster was making a claim about not being able to

10   take a break; correct?   That's what Mr. Foster was

11   claiming.

12   **A.   He did.   And there's other information that**

13   **Wayne -- I mean -- Wayne.   And I don't remember where**

14   **it is, but Owen was -- I don't know if these are**

15   **referring to the same night, that he asked Rathaj to**

16   **go -- to wait to take his break.**

17   Q.   And that was because they were short-staffed;

18   right?

19   **A.   Correct.   It could be that, or it could be**

20   **that there was a lot of production material to move.**

21   Q.   But Owen told you that Mr. Foster said, "You

22   better watch your car," or something like that;

23   correct?

24   **A.   He did say that.**

25   Q.   And then you interviewed someone else who was

1    present; right?   Jordano Ramirez.

2         A.    Jordan?

3         Q.    If you look at the bottom of the second page

4    of Exhibit 64, you'll see that you interviewed Jordano

5    Ramirez; right?

6         A.    Show me where that's at.

7         Q.    Actually, you've got a written statement from

8    him; correct?

9         A.    Yes.

10        Q.    And he wrote in his statement that he

11   witnessed Rathaj foster conducting himself in a

12   threatening manner towards Owen Diaz; right?

13        A.    Mm-hm.

14        Q.    So you were the one who called security and

15   explained the situation; right?

16        A.    I did.

17        Q.    You were the one that had Mr. Foster removed

18   from the premises; right?

19        A.    Yes.

20        Q.    Because you had corroboration that Mr. Foster

21   was threatening Mr. Diaz; right?

22        A.    Yes.

23        Q.    And that was inappropriate conduct; right?

24        A.    It was.   I took it very serious when anybody

25   made any threats toward anybody else.

```
 1    onboarded and Workday?

 2         A.   Yes.

 3         Q.   Was that the --

 4         A.   Yes.  Workday was their system, operating

 5    system, throughout the factory.

 6         Q.   So Tesla used Workday for its employees to

 7    keep information about its employees, as far as you

 8    understood?

 9         A.   Yes.

10              MR. ORGAN:  Okay.  This is 72.

11              (Whereupon Deposition Exhibit 72

12               was marked for identification.)

13              MR. ORGAN:  Q.  Exhibit 72, for the record,

14    is a four-page document, Bates-stamped Tesla 39 to 42.

15              At some point in time, Mr. Diaz, Owen Diaz,

16    recommended someone to work as an elevator operator, a

17    Lamar Patterson.  Do you recall that?

18         A.   I don't recall him.  He might have

19    recommended him to nextSource, but I don't know how he

20    did that.

21         Q.   Well, if you look at the email at the bottom

22    of the first page of Exhibit 72, it says -- it's an

23    email from you to Wayne Jackson, where you copy Jason

24    Alexander, where it's talking about a resumé.

25              Do you see that?
```

1          **A.    Yes, Lamar Patterson.**

2          Q.    And you sent this email to Wayne and said,

3    "This person is recommended from Owen Diaz.  The

4    person seems to have forklift experience.  Please see

5    what you can do.  Would be for night shift elevator."

6               Do you see that?

7          **A.   Mm-hm.**

8          Q.   That's what you wrote; correct?

9          **A.   Yes.**

10         Q.   And then Jason Alexander said that he would

11   contact Lamar; right?

12         **A.    Correct.**

13         Q.   Jason Alexander was from nextSource; correct?

14         **A.    Correct.  I didn't recommend him.  He was**

15   **being recommended.**

16         Q.   Yeah, I understand that.

17              Did you end up hiring Lamar?

18         **A.   The ones who would have hired him would have**

19   **been nextSource.**

20         Q.   Okay.  Did Lamar Patterson end up working as

21   an elevator operator?

22         **A.   He did end up being part of the team.**

23         Q.   Okay.  How long -- so he was -- Lamar

24   Patterson reporting to you at some point in time then?

25         **A.   Yes.**

| From: | Edward Romero </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38> |
| To: | Wayne Jackson |
| Sent: | 10/19/2015 11:16:22 PM |
| Subject: | Fwd: RE: Owen |

FYI

Sent from my Verizon 4G LTE Smartphone
---------- Forwarded message ----------
From: Josue Torres <jotorres@teslamotors.com>
Date: Oct 17, 2015 12:19 PM
Subject: RE: Owen
To: Edward Romero <edromero@teslamotors.com>, Jaime Salazar <jsalazar@teslamotors.com>
Cc:

Edward,

Thanks. Please send an update when you get the chance or feel free to give me a call.

Josue

From: Edward Romero
Sent: Saturday, October 17, 2015 6:59 AM
To: Josue Torres <jotorres@teslamotors.com>; Jaime Salazar <jsalazar@teslamotors.com>
Subject: Fwd: Owen

Josue, I will investigate this today. Thanks

Sent from my Verizon 4G LTE Smartphone
---------- Forwarded message ----------
From: Ramon Martinez <rammartinez@teslamotors.com>
Date: Oct 17, 2015 4:56 AM
Subject: Owen
To: Edward Romero <edromero@teslamotors.com>
Cc: Josue Torres <jotorres@teslamotors.com>

Hi Mr Romero I just want to bring to your attention that the lead for the elevator (Owen) he's not acting on the professional way with me and I would like to talk to you about it if there's any situation I like to fix it please
Thank you

EXHIBIT
55
11-30-16
Romero
PENGAD 800-631-6989

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Tuesday, October 20, 2015 11:56 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** RE: Ramon

Why is Ed meeting with them?


**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
tgarrett@nextsource.com
www.nextsource.com

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Tuesday, October 20, 2015 11:20 AM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** FW: Ramon

Here is Ramon's statement. I'm waiting for Rathaj and Ramon to send me theirs. Ed has a meeting scheduled with them Wednesday at 6pm that I will be attending with him.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com

**∴⋮⁚ nextSource**

*Workforce Optimization, Business Enlightenment*

**From:** Owen Diaz [mailto:sfrednose@gmail.com]
**Sent:** Tuesday, October 20, 2015 9:54 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** Fwd: Ramon


Sent from my iPhone

Begin forwarded message:

> **From:** Owen Diaz <sfrednose@gmail.com>
> **Date:** October 17, 2015 at 6:08:48 AM PDT

CONFIDENTIAL

TESLA-0000135

**To:** "edromero@teslamotors.com" <edromero@teslamotors.com>, "Tom @ Tesla"
<tkawasaki@teslamotors.com>
**Subject: Ramon**

Mr. Romero today @ 4:45 am I was working elevator 1 with rothaj foster training him, when the elevator doors opened on the first floor and we saw Ramon siting there. At the time I was explaining to Rothai what you had told me about the outside team and inside team and what his duties consisted of. I was explaining him that Tom would no longer be his supervisor it was going to be you. For some reason Ramon jump off the tugger he was on and started yelling at me in a Threatening manner, saying you have a problem with me! why are you telling him who his supervisor is! When I did not say anything to Ramon followed me into the elevator and stood next to the forklift I was on and keep yelling at me. I thought he was going to hit me, so I asked him to please step back. because of his threatening manner and reminded Ramon we were on camera. Mr. Romero because of the way Ramon was acting I don't feel safe around him now. Can you please talk to him I don't need any problems. I just want to do my job. You can check the surveillance system to confirm. I contacted Tom for advice and he said, if you don't have excess survelliance system please contact him.

Sent from my iPhone

TESLA-0000136

Message
| | |
|---|---|
| **From:** | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38] |
| **Sent:** | 11/5/2015 7:10:55 PM |
| **To:** | Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899] |
| **Subject:** | Fwd: Re: Elevator 1 out of service |

FYI



Sent from my Verizon 4G LTE Smartphone
---------- Forwarded message ----------
From: Edward Romero <edromero@teslamotors.com>
Date: Nov 5, 2015 5:51 AM
Subject: Re: Elevator 1 out of service
To: Owen Diaz <odiazjr68@gmail.com>
Cc: Victor Quintero <vquintero@teslamotors.com>

Thanks for the info.

Sent from my Verizon 4G LTE Smartphone
On Nov 5, 2015 5:25 AM, Owen Diaz <odiazjr68@gmail.com> wrote:
Yes, Mr. Foster had all the appropriate PPE. Safety glasses, bump cap, gloves and boots.  No nobody was in any danger.
From what I heard it seems like he made a mistake and no Mr. Foster did not call me right after the incident. When I
talked to Mr. Foster said, my cell phone died and I couldn't contact you. Mr. Romero I can't be 100% certain that Mr.
Foster was following procedures unless I reviewed the surveillance video of what happened. Mr. Foster did claim he was
following procedures, When the incident happened.

Sent from Owen's iPhone

On Nov 5, 2015, at 3:48 AM, Edward Romero <edromero@teslamotors.com> wrote:

> Owen,
> Please provide additional information. Was Foster wearing PPE and following procedures? Was anybody
> in danger? What did he do right after the incident, did he call you right away? Please respond via emal.
> Thanks
>
> Sent from my Verizon 4G LTE Smartphone
> On Nov 5, 2015 3:38 AM, Owen Diaz <odiazjr68@gmail.com> wrote:
> Talked to Mr. Foster he admits that on 11/5/15 around 2:00 am he hit the elevator door. Mr. Foster
> said, he missed judged the distance the door had risen.
> I advised Mr. Foster that he could not use any of the equipment until he has been recertified.
>
> On Nov 5, 2015, at 1:27 AM, Edward Romero <edromero@teslamotors.com> wrote:
>
>> Please assist with this request. See request below. Please confirm receipt. Thanks
>>
>> Sent from my Verizon 4G LTE Smartphone
>> ---------- Forwarded message ----------
>> From: Devin Williams <devwilliams@teslamotors.com>
>> Date: Nov 5, 2015 1:25 AM
>> Subject: RE: Elevator 1 out of service
>> To: Sarah Ficarra <sficarra@teslamotors.com>, Facilities

<Facilities@teslamotors.com>, PWTFremontMaterialsHUB
<PWTFremontMaterialsHUB@teslamotors.com>
Cc: PWT-Materials <PWT-Materials@teslamotors.com>, Edward Romero
<edromero@teslamotors.com>

Warehouse,

Since elevator #1 is currently down can we have assistance in moving the pallets from
elevator#1 to elevator#2

Thanks

**From:** Sarah Ficarra
**Sent:** Thursday, November 05, 2015 1:17 AM
**To:** Facilities
**Cc:** PWT-Materials; Edward Romero
**Subject:** Elevator 1 out of service

Facilities, please advise on Elevator 1. Out of service. Door was knocked out of place by
elevator operator.

**Sarah Ficarra | Associate Manager, Powertrain Conveyance**
45500 Fremont Blvd | Fremont, CA 94538
p 510-299-4774 | e sficarra@teslamotors.com

TESLA-0000052

Message

| | |
|---|---|
| From: | Jason Alexander [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JASON ALEXANDER4CB] |
| Sent: | 12/15/2015 11:44:47 PM |
| To: | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Edward Romeroe38]; Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899] |
| Subject: | RE: Resume |
| Attachments: | Gary Ebner Resume.pdf |

Hi Ed,

I will contact Lamar today. Also, I am sending a candidate to Chartwell for the day shift Elevator Operator position that you mentioned you have open. Hopefully his screenings will come back quickly. Attached is the resume.

Please let me know if you have questions.

Regards,


Jason Alexander
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (925) 784-2120
jaalexander@teslamotors.com
www.nextsource.com





*Workforce Optimization, Business Enlightenment*

**From:** Edward Romero
**Sent:** Tuesday, December 15, 2015 3:43 PM
**To:** Wayne Jackson
**Cc:** Jason Alexander
**Subject:** Fwd: Resume

Wayne, This person is a recommendation from Owen Diaz. Person seems to have fork lift experience. Please see what you can do, would be for night shift elevator.
Thanks

Sent from my Verizon 4G LTE Smartphone
-------- Forwarded message --------
From: Owen Diaz <odiazjr68@gmail.com>
Date: Dec 15, 2015 3:14 PM
Subject: Fwd: Resume
To: Edward Romero <edromero@teslamotors.com>
Cc:

CONFIDENTIAL

```
 1   State of California              )

 2   County of Marin                 )

 3

 4              I, Bridget M. Mattos, hereby certify

 5   that the witness in the foregoing deposition was by me

 6   duly sworn to testify to the truth, the whole truth

 7   and nothing but the truth in the within entitled

 8   cause; that said deposition was taken at the time and

 9   place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and disinterested person, and was thereafter

13   transcribed under my direction into typewriting by

14   computer; that the witness was given an opportunity to

15   read, correct and sign the deposition.

16              I further certify that I am not

17   interested in the outcome of said action nor connected

18   with or related to any of the parties in said action

19   nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on November 30, 2018.

22

23         BRIDGET M. MATTOS, CSR NO. 11410

24

25
```

# EXHIBIT "H"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


DEMETRIC DI-AZ, OWEN      )
DIAZ, and LAMAR           )
PATTERSON,                )
              Plaintiffs, )
vs.                       ) Case No.:  3:17-CV-066748
                          )                WHO
                          )
TESLA, INC., dba TESLA    )
MOTORS, INC.; CITISTAFF   )
SOLUTIONS, INC.; WEST     )
VALLEY STAFFING GROUP;    )
CHARTWELL STAFFING        )
SERVICES, INC.; and DOES  )
1-10, inclusive,          )
              Defendants. )
_____)


DEPOSITION OF MONICA DE LEON

Thursday, December 6, 2018


TAKEN BEFORE:

HEIDI BELTON, CSR, RPR, CRR, CCRR, CRC

CSR No. 12885

MONICA DE LEON
December 6, 2018

**Page 8**

```
           1   THURSDAY, DECEMBER 6, 2018              10:05 A.M.
           2                   P R O C E E D I N G S
10:04:09   3          MS. AVLONI:  Today is Thursday,
10:04:11   4   December 6, 2018.  This is the deposition of Monica
10:04:14   5   De Leon by plaintiffs in the matter of Di-az versus
10:04:18   6   Tesla, et al., in the United States District Court,
10:04:20   7   for the Northern District of California.  Case
10:04:23   8   number 3:17-CV-066748-WHO.
10:04:31   9          My name is Navruz Avloni, and I'm
10:04:34  10   videotaping this deposition on behalf of the
10:04:37  11   plaintiffs.  The deposition is taking place at the
10:04:41  12   California Civil Rights Law Group, located at 180
10:04:45  13   Grand Avenue, Suite 1380, in Oakland, California.
10:04:51  14   The time is now 10:05 a.m.  And this is media 1 in
10:04:55  15   the video recording.
10:04:58  16          Will all the parties in the room please
10:05:01  17   state their appearances.
10:05:02  18          MR. RUTSCHMAN:  Aaron Rutschman, counsel
10:05:03  19   for CitiStaff and Tesla.
10:05:06  20          MS. AVLONI:  And Navruz Avloni, here for
10:05:08  21   the plaintiffs.
10:05:09  22          Will the court reporter please swear the
10:05:11  23   witness.
10:05:11  24      (Whereupon, the witness, MONICA DE LEON,
10:05:11  25       having been duly sworn, testified as follows:)
```

10:18:20  1    **A.    No.  It was a long time ago.**

10:18:21  2         Q.    Okay.  When -- so when you began working

10:18:30  3    for CitiStaff in June of 2015, you started off as a

10:18:34  4    staff supervisor?

10:18:37  5         **A.    One more time?**

10:18:38  6         Q.    So when you began working for CitiStaff in

10:18:40  7    June of 2015, your job title was staff supervisor?

10:18:44  8         **A.    Yes.  That was my job title but I didn't**

10:18:50  9    **supervise anybody.**

10:18:51 10         Q.    Have you had any other positions at

10:18:52 11    CitiStaff other than the staff supervisor position?

10:19:00 12         **A.    One more time?**

10:19:02 13         Q.    Yeah.  Have you -- let me actually phrase

10:19:04 14    it differently.

10:19:05 15              Have you had any other job title at

10:19:07 16    CitiStaff?

10:19:07 17         **A.    No other job title.**

10:19:13 18         Q.    When you started working for CitiStaff

10:19:15 19    back in June 2015, do you recall what your duties

10:19:17 20    were as a staff supervisor?

10:19:28 21         **A.    Payroll; recruiting; filling orders for**

10:19:30 22    **the clients; any complaints or issues that anybody**

10:19:42 23    **had; any work comp issues that happened or arised**

10:19:51 24    **[sic].  Um -- yeah.**

10:19:57 25         Q.    I'm going to break these down just so I

10:43:28  1   BY MS. AVLONI:

10:43:29  2        Q.   What kind of paperwork would CitiStaff

10:43:31  3   provide to applicants when they register?

10:43:33  4        A.   Their application.   And in the application

10:43:36  5   it's in all the policies that we have.

10:43:45  6        Q.   So CitiStaff has applicants fill out an

10:43:47  7   application?

10:43:48  8        A.   Yes.

10:43:50  9        Q.   And CitiStaff provides the applicants with

10:43:52  10  policies?

10:43:53  11       A.   That's in the applications, yes.

10:43:56  12       Q.   Do you know what kind of policies are in

10:43:57  13  the application?

10:44:03  14       A.   From sexual harassment to job abandonment.

10:44:13  15  That's all I remember.

10:44:16  16       Q.   Does CitiStaff provide the applicants with

10:44:18  17  anything else other than the application and the

10:44:19  18  policies that are provided with it?

10:44:24  19            MR. RUTSCHMAN:   Objection; vague and

10:44:24  20  ambiguous.

10:44:27  21            THE WITNESS:   No.

10:44:27  22  BY MS. AVLONI:

10:44:33  23       Q.   Do you know if nextSource's orientation

10:44:39  24  packet also includes policies that cover topics like

10:44:44  25  sexual harassment?

```
10:54:39  1    ambiguous.

10:54:42  2              THE WITNESS:  No.

10:54:42  3    BY MS. AVLONI:

10:54:46  4         Q.    Have you ever had complaints of harassment

10:54:47  5    at the job site being brought to you by a CitiStaff

10:54:52  6    employee?

10:54:52  7              MR. RUTSCHMAN:  Objection; vague and

10:54:52  8    ambiguous.  Calls for a legal conclusion.

10:55:05  9              THE WITNESS:  One.

10:55:05 10    BY MS. AVLONI:

10:55:05 11         Q.    And do you recall approximately when that

10:55:06 12    was?

10:55:08 13         A.    No, I don't.

10:55:09 14         Q.    Do you recall what type of harassment was

10:55:11 15    being complained of?

10:55:20 16         A.    Just feeling uncomfortable and um --

10:55:28 17         Q.    Feeling uncomfortable because of what?

10:55:30 18         A.    Because of a picture that was drawn.

10:55:35 19         Q.    And are you referring to Owen Diaz

10:55:37 20    bringing this complaint to your attention?

10:55:40 21         A.    Yes.

10:55:45 22         Q.    And do you know if he brought this to your

10:55:47 23    attention verbally or writing?

10:55:49 24         A.    Verbally or what?

10:55:50 25         Q.    Or in writing.
```

| | | |
|---|---|---|
| 10:55:57 | 1 | **A.** It was given to me in e-mail. |
| 10:55:58 | 2 | Q. So you received an e-mail regarding Owen |
| 10:56:03 | 3 | feeling uncomfortable about a picture that was |
| 10:56:05 | 4 | drawn? |
| 10:56:05 | 5 | **A. Mm-hmm, but we spoke, yes.** |
| 10:56:07 | 6 | Q. And do you recall who that e-mail was sent |
| 10:56:10 | 7 | by? Was it Owen sending you the e-mail? |
| 10:56:25 | 8 | **A. Yes, it was.** |
| 10:56:26 | 9 | Q. And you said you spoke to Owen about him |
| 10:56:30 | 10 | feeling uncomfortable about it -- feeling |
| 10:56:33 | 11 | uncomfortable about the picture drawn. Did you |
| 10:56:35 | 12 | speak to Owen before he sent you that e-mail or |
| 10:56:38 | 13 | after he sent you that e-mail? |
| 10:56:40 | 14 | **A. After.** |
| 10:56:41 | 15 | MR. RUTSCHMAN: Objection; misstates the |
| 10:56:41 | 16 | witness' prior testimony. |
| 10:56:45 | 17 | THE WITNESS: So spoke to him after. |
| 10:56:47 | 18 | BY MS. AVLONI: |
| 10:56:59 | 19 | Q. I'll get back to this later. But other |
| 10:57:01 | 20 | than receiving complaints of CitiStaff employees not |
| 10:57:08 | 21 | liking their job or not liking their placement or |
| 10:57:11 | 22 | their position and other than receiving this |
| 10:57:15 | 23 | information from Owen about him being uncomfortable |
| 10:57:18 | 24 | about a picture drawn, do you recall any other type |
| 10:57:21 | 25 | of complaints that you would receive from CitiStaff? |

10:58:45   1          MR. RUTSCHMAN:  Objection; calls for

10:58:45   2   speculation.

10:58:45   3          THE WITNESS:  Yes.  They had to fill out

10:58:47   4   the whole application.  So --

10:58:48   5   BY MS. AVLONI:

10:58:48   6       Q.   And did they have to sign the application?

10:58:51   7       **A.   Yes, they had to fill it out and sign it.**

10:58:53   8       Q.   And the policies that were provided with

10:58:54   9   the application, were the applicants required to

10:58:58  10   sign the policies as well?

10:59:01  11       **A.   Yes.**

10:59:08  12       Q.   And do you recall if in addition to having

10:59:10  13   to sign the application and the policies that were

10:59:12  14   provided by CitiStaff, were the applicants required

10:59:16  15   to sign anything else for CitiStaff?

10:59:18  16          MR. RUTSCHMAN:  Objection; calls for

10:59:18  17   speculation.

10:59:21  18          THE WITNESS:  No.

10:59:27  19          MR. RUTSCHMAN:  It's also vague and

10:59:28  20   ambiguous.

10:59:28  21   BY MS. AVLONI:

10:59:29  22       Q.   Is there anything that was involved in

10:59:37  23   your -- actually, let me back up.

10:59:40  24          When you would receive complaints from

10:59:42  25   CitiStaff employees about issues, what would be the

| | | |
|---|---|---|
| 10:59:52 | 1 | steps that you would take to address these |
| 10:59:53 | 2 | complaints? |
| 10:59:54 | 3 | MR. RUTSCHMAN:  Objection; it's vague and |
| 10:59:55 | 4 | ambiguous.  Constitutes an incomplete hypothetical. |
| 11:00:02 | 5 | THE WITNESS:  In the case that somebody |
| 11:00:03 | 6 | came to me with, let's just say, they didn't like |
| 11:00:06 | 7 | their position -- I will talk to them, make sure if |
| 11:00:16 | 8 | they want to continue, see if they want to continue; |
| 11:00:22 | 9 | if they're going to return to work, ask them if |
| 11:00:26 | 10 | they -- you know, if it's -- if it's available to |
| 11:00:35 | 11 | move to a different department; and, you know, check |
| 11:00:49 | 12 | with them to make sure, see how they feel about |
| 11:00:54 | 13 | continuing or if they're not going to continue. |
| 11:00:56 | 14 | BY MS. AVLONI: |
| 11:00:56 | 15 | Q.   So you would do your best to resolve these |
| 11:00:59 | 16 | issues directly; correct? |
| 11:01:01 | 17 | **A.   Mm-hmm.** |
| 11:01:01 | 18 | MR. RUTSCHMAN:  Objection; misstates the |
| 11:01:02 | 19 | witness' prior testimony. |
| 11:01:04 | 20 | THE WITNESS:  Well, I would check in with |
| 11:01:05 | 21 | them to see how -- how they want to go about it, how |
| 11:01:09 | 22 | we can go about it. |
| 11:01:10 | 23 | BY MS. AVLONI: |
| 11:01:11 | 24 | Q.   When they tell you how they would want to |
| 11:01:13 | 25 | go about it, you would do your best to see if the |

11:01:16  1   issue could be resolved so that they could continue

11:01:19  2   being a CitiStaff employee and working at the

11:01:22  3   facility; is that correct?

11:01:22  4       **A.   Depending on how they want to go about it,**

11:01:25  5   **we would see if they can either be moved or if**

11:01:27  6   **they're not returning, then I would let the client**

11:01:29  7   **know and try to fill -- fill the order with somebody**

11:01:34  8   **else.**

11:01:43  9       Q.   Have you ever had any CitiStaff employees

11:01:44 10   tell you they didn't want to be at the Tesla

11:01:47 11   facility?

11:01:47 12       **A.   No.**

11:01:50 13       Q.   And then my next question -- actually, you

11:01:53 14   kind of already touched on -- is who would or would

11:01:58 15   anybody assist you in resolving these issues that

11:02:01 16   the CitiStaff employees would bring to you?

11:02:04 17           MR. RUTSCHMAN:   Objection; vague and

11:02:04 18   ambiguous.

11:02:11 19           THE WITNESS:   When they would complain to

11:02:12 20   me, I would also just talk to my supervisors as

11:02:15 21   well, let my supervisors know.

11:02:21 22   BY MS. AVLONI:

11:02:21 23       Q.   Would you always let your supervisors

11:02:23 24   know, or were there only specific situations that

11:02:26 25   you would let your supervisors know?

11:02:29  1            MR. RUTSCHMAN:  Objection; compound.

11:02:30  2    Calls for an incomplete hypothetical.

11:02:32  3            THE WITNESS:  I'll always check in with my

11:02:34  4    supervisors.

11:02:35  5    BY MS. AVLONI:

11:02:35  6        Q.   And who were your supervisors or who are

11:02:38  7    your supervisors at CitiStaff?

11:02:40  8        A.   At CitiStaff my supervisors were William

11:02:42  9    Hidalgo and Bruce Wismer.

11:02:52 10        Q.   I'm sorry.  I know I have Bruce Wismer's

11:02:53 11    last name.  But if you could actually spell it for

11:02:57 12    me, I would really appreciate it.

11:03:00 13        A.   Wismer.  W-I-S-M-E-R.

11:03:03 14        Q.   And do you recall what William Hidalgo's

11:03:06 15    job title was or is?

11:03:08 16            MR. RUTSCHMAN:  Objection; calls for

11:03:08 17    speculation.

11:03:11 18            THE WITNESS:  No, I don't remember.

11:03:12 19    BY MS. AVLONI:

11:03:12 20        Q.   Do you know what Bruce Wismer's job title

11:03:16 21    is?

11:03:17 22            MR. RUTSCHMAN:  Objection; calls for

11:03:17 23    speculation.

11:03:18 24            THE WITNESS:  Sales.

11:03:29 25    BY MS. AVLONI:

11:05:29  1      Q.   Other than Owen who worked for the Tesla

11:05:31  2   facility in Fremont, California, have you had any

11:05:33  3   other CitiStaff employees come to you with any

11:05:36  4   complaints whatsoever that worked at the Tesla

11:05:42  5   facility in Fremont, California?

11:05:44  6           MR. RUTSCHMAN:   Objection; vague and

11:05:44  7   ambiguous.

11:05:45  8           THE WITNESS:   Can you repeat that

11:05:46  9   question?

11:05:46 10   BY MS. AVLONI:

11:05:47 11      Q.   Yeah.   Other than Owen, who worked at the

11:05:51 12   Tesla's Fremont facility, have you had any other

11:05:54 13   CitiStaff employees who worked at the Tesla Fremont

11:05:58 14   facility come to you with any complaints?

11:06:00 15      A.   Oh, no.

11:06:01 16           MR. RUTSCHMAN:   Objection; vague and

11:06:01 17   ambiguous.

11:06:01 18           THE WITNESS:   No.

11:06:01 19   BY MS. AVLONI:

11:06:10 20      Q.   Is there anything else that you haven't

11:06:12 21   described or -- described to me that involved your

11:06:16 22   duties in handling CitiStaff employee complaints and

11:06:20 23   issues?

11:06:27 24      A.   No.

11:06:32 25      Q.   You also mentioned workers' comp --

11:16:06  1    ambiguous.

11:16:09  2              THE WITNESS:  The Owen Diaz situation.

11:16:17  3    BY MS. AVLONI:

11:16:17  4        Q.   And you mentioned one or two.  Is there

11:16:22  5    another investigation that you recall being involved

11:16:23  6    in?

11:16:24  7        A.   Just -- just from what I recall, just,

11:16:28  8    like, an altercation that happened between Owen Diaz

11:16:33  9    and another -- another gentleman, another candidate.

11:16:41 10        Q.   Do -- do you recall -- does the name

11:16:44 11    Rothaj Foster sound familiar?

11:16:46 12        A.   Yes, ma'am.

11:16:47 13        Q.   And so was the other investigation related

11:16:49 14    to the altercation between Rothaj Foster and Owen

11:16:52 15    Diaz?

11:16:52 16        A.   That's what it was, yes.

11:17:01 17        Q.   And Rothaj Foster was a CitiStaff

11:17:03 18    employee?

11:17:04 19              MR. RUTSCHMAN:  Objection; calls for

11:17:04 20    speculation and calls for a legal conclusion.

11:17:11 21              THE WITNESS:  Rothaj Foster did work for

11:17:12 22    CitiStaff.

11:17:13 23    BY MS. AVLONI:

11:17:13 24        Q.   And Owen was a CitiStaff employee?

11:17:16 25              MR. RUTSCHMAN:  Objection; calls for

11:35:35  1        Q.   CitiStaff has other offices, I'm assuming,

11:35:41  2   as well?

11:35:42  3        **A.   Yes.**

11:35:44  4        Q.   Does CitiStaff have any other offices in

11:35:46  5   California?

11:35:46  6             MR. RUTSCHMAN:   Objection; calls for

11:35:46  7   speculation.

11:35:50  8   BY MS. AVLONI:

11:35:50  9        Q.   That you know of.

11:35:51 10        **A.   That I know of?   There are offices down in**

11:35:56 11   **southern California.**

11:35:57 12        Q.   So there's the Newark office and there's

11:35:59 13   the -- there are offices in southern California.  Do

11:36:06 14   you know how many offices CitiStaff has in southern

11:36:08 15   California?

11:36:09 16        **A.   No, I do not.**

11:36:12 17        Q.   So can you provide an estimate of how many

11:36:15 18   offices CitiStaff might have in southern California?

11:36:22 19        **A.   One.   Two.**

11:36:26 20        Q.   So just a couple?

11:36:30 21        **A.   As -- yeah.**

11:36:30 22        Q.   Not more than five?

11:36:32 23        **A.   I don't think so.**

11:36:33 24        Q.   Do you know, other than having a couple of

11:36:35 25   offices in southern California and the Newark

11:59:58  1    CitiStaff would communicate this then to the client?

12:00:02  2              MR. RUTSCHMAN:  Objection; misstates

12:00:03  3    witness' prior testimony.

12:00:04  4              MS. AVLONI:  I'm sorry.

12:00:05  5              MR. RUTSCHMAN:  It's vague and ambiguous.

12:00:05  6              MS. AVLONI:  I totally got my words mixed

12:00:07  7    up.

12:00:08  8         Q.   So if a client had an issue with a

12:00:11  9    CitiStaff contractor, that issue would be

12:00:12  10   communicated to CitiStaff and then CitiStaff would

12:00:17  11   communicate that issue to the CitiStaff

12:00:20  12   contractor --

12:00:22  13             MR. RUTSCHMAN:  Objection --

12:00:22  14   BY MS. AVLONI:

12:00:22  15        Q.   -- is that correct?

12:00:23  16             MR. RUTSCHMAN:  -- misstates the witness'

12:00:25  17   prior testimony.  It's vague, and ambiguous.

12:00:27  18             THE WITNESS:  So if the client had an

12:00:30  19   issue with one of CitiStaff's contractors, the

12:00:35  20   client would talk with CitiStaff and let them know

12:00:39  21   what's going on.  And then CitiStaff would speak to

12:00:44  22   the CitiStaff contractor, see what's going on with

12:00:50  23   them.  Maybe they're going through illness or family

12:00:53  24   issues.  And then we would follow back up with the

12:01:01  25   client, let them know what's going on and proceed as

```
12:01:05   1    follows.   That's how we would do it.

12:01:07   2    BY MS. AVLONI:

12:01:08   3        Q.   And you've been involved in those

12:01:11   4    situations?

12:01:11   5                 MR. RUTSCHMAN:   Objection; vague and

12:01:11   6    ambiguous.

12:01:17   7                 THE WITNESS:   Yes.

12:01:17   8    BY MS. AVLONI:

12:01:21   9        Q.   Do you know if a CitiStaff client had the

12:01:25  10    authority to directly communicate to a CitiStaff

12:01:27  11    contractor about the contractor's issues?

12:01:31  12                 MR. RUTSCHMAN:   Objection; vague and

12:01:31  13    ambiguous, calls for speculation.

12:01:33  14    BY MS. AVLONI:

12:01:34  15        Q.   When I say any --

12:01:35  16                 MR. RUTSCHMAN:   Calls for speculation.

12:01:35  17    It's an incomplete hypothetical.

12:01:37  18    BY MS. AVLONI:

12:01:37  19        Q.   Any like performance, punctuality issues?

12:01:43  20                 MR. RUTSCHMAN:   Objection; vague and

12:01:43  21    ambiguous.

12:01:44  22                 THE WITNESS:   From what I know -- I don't

12:01:55  23    know.   Honestly.

12:01:56  24    BY MS. AVLONI:

12:01:56  25        Q.   That's fine and if you don't know, you
```

| 12:14:36 | 1 | Q.   I'm sorry.   Though -- I think I probably |
| 12:14:39 | 2 | mis-asked it. |
| 12:14:41 | 3 | You previously testified that when |
| 12:14:44 | 4 | providing applicants to like nextSource, |
| 12:14:47 | 5 | nextSource would require that there would be some |
| 12:14:50 | 6 | sort of a background check and I-9s completed.  Did |
| 12:14:56 | 7 | the background checks and the I-9s vary between the |
| 12:15:00 | 8 | CitiStaff clients? |
| 12:15:03 | 9 | MR. RUTSCHMAN:  Objection; misstates the |
| 12:15:05 | 10 | witness' previous testimony. |
| 12:15:07 | 11 | THE WITNESS:  Can you break that down? |
| 12:15:08 | 12 | BY MS. AVLONI: |
| 12:15:08 | 13 | Q.   Yeah, when proposing applicants for a |
| 12:15:10 | 14 | position at one of the clients' facilities or |
| 12:15:14 | 15 | locations, would CitiStaff have different |
| 12:15:19 | 16 | requirements for each client in terms of what to |
| 12:15:21 | 17 | submit for that applicant? |
| 12:15:27 | 18 | A.   CitiStaff didn't have the requirements; |
| 12:15:28 | 19 | the client had the requirements. |
| 12:15:31 | 20 | Q.   Okay.  And do you know if the requirements |
| 12:15:38 | 21 | for the client -- you mean the -- the contractor had |
| 12:15:42 | 22 | the requirements? |
| 12:15:43 | 23 | A.   The client. |
| 12:15:44 | 24 | Q.   So -- |
| 12:15:45 | 25 | A.   So the client required CitiStaff to assure |

| | | |
|---|---|---|
| 12:15:49 | 1 | **that we run their background, run their name or** |
| 12:15:56 | 2 | **assure that we go over the orientation and tell them** |
| 12:15:59 | 3 | **where to meet, who to meet, who to call.** |
| 12:16:01 | 4 | Q.   I see.   And would CitiStaff run the |
| 12:16:04 | 5 | background and the I-9s? |
| 12:16:06 | 6 | MR. RUTSCHMAN:   Objection; incomplete |
| 12:16:06 | 7 | hypothetical. |
| 12:16:09 | 8 | THE WITNESS:   Yes. |
| 12:16:09 | 9 | BY MS. AVLONI: |
| 12:16:09 | 10 | Q.   And would CitiStaff run the same |
| 12:16:11 | 11 | background check and the same I-9 -- do the same I-9 |
| 12:16:15 | 12 | process for all of its clients? |
| 12:16:16 | 13 | MR. RUTSCHMAN:   Objection; calls for |
| 12:16:16 | 14 | speculation. |
| 12:16:19 | 15 | THE WITNESS:   Just the ones that are |
| 12:16:21 | 16 | required.   Those -- |
| 12:16:22 | 17 | BY MS. AVLONI: |
| 12:16:23 | 18 | Q.   Were there clients that did not require |
| 12:16:25 | 19 | those? |
| 12:16:25 | 20 | MR. RUTSCHMAN:   Objection; calls for |
| 12:16:25 | 21 | speculation. |
| 12:16:27 | 22 | THE WITNESS:   Yes. |
| 12:16:41 | 23 | BY MS. AVLONI: |
| 12:16:41 | 24 | Q.   I'm sorry.   I'm blanking out.   I do -- I |
| 12:16:44 | 25 | don't -- I can't recall if you said that CitiStaff |

| 12:17:51 | 1 | hypothetical.  Calls for speculation. |
| 12:18:01 | 2 | THE WITNESS:  So in any case that -- in |
| 12:18:10 | 3 | any case that anyone complained about harassment -- |
| 12:18:15 | 4 | is that what you're asking?  If someone made -- |
| 12:18:18 | 5 | BY MS. AVLONI: |
| 12:18:18 | 6 | Q.   Let's see.  Let's say you found out a |
| 12:18:21 | 7 | CitiStaff contractor violated CitiStaff's harassment |
| 12:18:25 | 8 | policy.  Do you know whether -- what CitiStaff -- |
| 12:18:34 | 9 | what your obligations are as a staff supervisor in |
| 12:18:40 | 10 | that situation? |
| 12:18:41 | 11 | MR. RUTSCHMAN:  Objection.  The question |
| 12:18:43 | 12 | constitutes an incomplete hypothetical. |
| 12:18:47 | 13 | THE WITNESS:  So in that case I would |
| 12:18:51 | 14 | investigate the person as to what happened, what |
| 12:18:56 | 15 | took place.  I would also escalate it to my |
| 12:19:02 | 16 | supervisors and HR and, you know, check in with the |
| 12:19:10 | 17 | client, if the client hasn't already spoken with me, |
| 12:19:15 | 18 | and take down any notes of -- |
| 12:19:32 | 19 | BY MS. AVLONI: |
| 12:19:33 | 20 | Q.   But it would be up to the client to decide |
| 12:19:38 | 21 | whether to write up or terminate the relationship |
| 12:19:42 | 22 | with the contractor; right? |
| 12:19:43 | 23 | MR. RUTSCHMAN:  Objection; misstates the |
| 12:19:44 | 24 | witness' prior testimony.  Constitutes an incomplete |
| 12:19:49 | 25 | hypothetical. |

| | | |
|---|---|---|
| 12:19:50 | 1 | THE WITNESS:  In that case, in the case |
| 12:19:52 | 2 | that the client, let's just say in the case the |
| 12:19:56 | 3 | client tells us that a contractor has violated a |
| 12:20:04 | 4 | harassment policy or any policy, more than likely |
| 12:20:07 | 5 | the client is going to end the person's assignment. |
| 12:20:15 | 6 | Being said that someone's breaking any kind of rules |
| 12:20:18 | 7 | or policy.  But I would still check in with the |
| 12:20:25 | 8 | client to, you know, see if they have any reports or |
| 12:20:30 | 9 | any statements that they took down and see if they |
| 12:20:35 | 10 | want to -- a replacement for the person as well. |
| 12:20:43 | 11 | BY MS. AVLONI: |
| 12:20:44 | 12 | Q.  And what would you do with this individual |
| 12:20:46 | 13 | who had broken a policy? |
| 12:20:50 | 14 | MR. RUTSCHMAN:  Objection; constitutes an |
| 12:20:52 | 15 | incomplete hypothetical. |
| 12:20:55 | 16 | THE WITNESS:  So again in that case take |
| 12:21:00 | 17 | their statement, see what happened, check in with |
| 12:21:11 | 18 | HR, let HR know, make any reports and from there it |
| 12:21:22 | 19 | would be in HR's hands. |
| 12:21:32 | 20 | BY MS. AVLONI: |
| 12:21:32 | 21 | Q.  And that's Judy's -- |
| 12:21:35 | 22 | A.  Judy, yeah. |
| 12:21:36 | 23 | Q.  Would you keep info regarding any sort of |
| 12:21:38 | 24 | investigations that you described somewhere? |
| 12:21:41 | 25 | MR. RUTSCHMAN:  Objection; vague and |

```
12:23:51  1               THE WITNESS:  I don't remember when I

12:23:52  2   first -- first started.  Well, I believe so, yes.

12:24:09  3   BY MS. AVLONI:

12:24:09  4        Q.   And do you know if Tesla was ever a client

12:24:13  5   of CitiStaff?

12:24:16  6               MR. RUTSCHMAN:  Objection; calls for

12:24:16  7   speculation.

12:24:20  8               THE WITNESS:  No.

12:24:20  9   BY MS. AVLONI:

12:24:20 10        Q.   It was just -- to your knowledge you

12:24:22 11   believe nextSource was a client and to your

12:24:24 12   knowledge you don't believe that Tesla was a client

12:24:28 13   of CitiStaff when you were there?

12:24:30 14               MR. RUTSCHMAN:  Objection; misstates the

12:24:31 15   witness' prior testimony.

12:24:32 16               THE WITNESS:  To my knowledge CitiStaff

12:24:37 17   helped nextSource provide contractors for -- to

12:24:40 18   work at Tesla for Tesla.

12:24:43 19   BY MS. AVLONI:

12:24:43 20        Q.   Okay.  Did nextSource have -- to your

12:24:52 21   knowledge and based on your job duties as a staff

12:24:54 22   supervisor -- do you know if CitiStaff gave

12:25:00 23   nextSource the power to issue its contractors

12:25:08 24   raises?

12:25:09 25               MR. RUTSCHMAN:  Objection; vague,
```

| | | |
|---|---|---|
| 12:33:51 | 1 | of the complaint of the drawing, yes. |
| 12:33:53 | 2 | BY MS. AVLONI: |
| 12:33:56 | 3 | Q.   Okay.   How about just in general? |
| 12:34:01 | 4 | A.   In general, yes. |
| 12:34:11 | 5 | Q.   You seem hesitant.   Is there a reason? |
| 12:34:16 | 6 | A.   Like I said, it's just -- the situation |
| 12:34:19 | 7 | with the drawing, it seemed completely credible to |
| 12:34:24 | 8 | me.   But when it came to the altercation -- and I |
| 12:34:27 | 9 | did -- spoke to Owen about, you know, what happened |
| 12:34:30 | 10 | with him and Rothaj -- there was a lot of he |
| 12:34:33 | 11 | couldn't recall what was said or what was -- what |
| 12:34:40 | 12 | happened.   So in that situation I didn't -- it |
| 12:34:42 | 13 | didn't really seem too credible -- |
| 12:34:45 | 14 | Q.   Did you -- |
| 12:34:46 | 15 | A.   -- when we were speaking. |
| 12:34:49 | 16 | Q.   When you spoke to him about the Rothaj |
| 12:34:52 | 17 | situation, did you speak to him in person or by |
| 12:34:55 | 18 | phone? |
| 12:34:55 | 19 | A.   It was by phone. |
| 12:34:56 | 20 | Q.   And was he at home at that time, do you |
| 12:34:58 | 21 | know, or was he at work? |
| 12:35:00 | 22 | MR. RUTSCHMAN:   Objection; calls for |
| 12:35:00 | 23 | speculation. |
| 12:35:01 | 24 | BY MS. AVLONI: |
| 12:35:02 | 25 | Q.   If you know. |

12:35:03  1        **A.    That I don't remember.**

12:35:03  2        Q.    Did you speak to Rothaj in person or by

12:35:06  3   phone about that situation?

12:35:08  4        **A.    By phone.**

12:35:17  5        Q.    Have you -- while you were working for

12:35:20  6   CitiStaff, has anyone brought to your attention any

12:35:24  7   concerns about Owen Diaz?

12:35:27  8             MR. RUTSCHMAN:  Objection; vague and

12:35:27  9   ambiguous.

12:35:29 10             THE WITNESS:  Can you repeat the question?

12:35:31 11   BY MS. AVLONI:

12:35:31 12        Q.    Yes.  While you were working for

12:35:33 13   CitiStaff, has anyone at all brought any concerns to

12:35:37 14   you about Owen Diaz?

12:35:39 15        **A.    Yes, there was two concerns.  One was --**

12:35:47 16   **well, yes, there was.**

12:35:49 17        Q.    What were those concerns?

12:35:51 18        **A.    So I had spoke to Rothaj.  He had called**

12:35:57 19   **me and would let me know that -- he was letting me**

12:36:03 20   **know that, you know, Owen wasn't always at his post**

12:36:07 21   **where he was supposed to be, he would be gone for**

12:36:10 22   **long periods of time or would take longer lunch**

12:36:16 23   **breaks or long breaks.**

12:36:19 24             **There was an incident where he stated that**

12:36:20 25   **they were really backed up at the elevators and he**

12:48:49   1        Q.    These are the only two that you recall?

12:48:55   2        **A.    Yeah.**

12:48:56   3              MR. RUTSCHMAN:   Is that a yes?

12:48:56   4              THE WITNESS:   Yes.

12:48:56   5    BY MS. AVLONI:

12:48:57   6        Q.    And referring to Owen bringing concerns,

12:49:00   7    you recall him bringing two concerns to your

12:49:02   8    attention, one about the picture and the other one

12:49:04   9    about the altercation with Rothaj; is that correct?

12:49:06  10        **A.    Correct.**

12:49:08  11        Q.    In regards to the picture, when he

12:49:15  12    communicated that concern to you, what did you do?

12:49:17  13        **A.    So when he told me about it, you know, due**

12:49:25  14    **to the fact that we take it seriously, we**

12:49:30  15    **immediately took it up to HR -- Judy -- and let my**

12:49:38  16    **supervisors know about it as well, which they said**

12:49:44  17    **to talk to Judy for this case.**

12:49:51  18        Q.    Did you talk to Judy?

12:49:53  19        **A.    Yes, I did.**

12:49:57  20        Q.    What did you guys discuss?

12:49:59  21        **A.    I told Judy about, you know -- I told Judy**

12:50:03  22    **that I discussed -- spoke with Owen, you know.   I**

12:50:09  23    **checked in to -- with him to see do you -- are you**

12:50:19  24    **going to return to your -- to your job.   He said**

12:50:22  25    **yes.   I asked him if he wanted to be moved to a**

| | | |
|---|---|---|
| 12:50:26 | 1 | **different department.  He said no.  You know, he was** |
| 12:50:33 | 2 | **upset and a little aggravated.  But I let him know** |
| 12:50:42 | 3 | **that I'm -- HR is going to deal with this.  I have** |
| 12:50:47 | 4 | **already brought it up to them to their immediate** |
| 12:50:50 | 5 | **attention.  I let my supervisors know.  And I let** |
| 12:50:57 | 6 | **Chartwell -- I gave them the okay to consent to** |
| 12:51:00 | 7 | **speak with Owen Diaz.** |
| 12:51:12 | 8 | Q.   Do you recall discussing anything else |
| 12:51:13 | 9 | with Owen Diaz regarding this situation?  I'm sorry, |
| 12:51:19 | 10 | actually.  You were describing to me the |
| 12:51:20 | 11 | conversation you had with Judy; right? |
| 12:51:24 | 12 | **A.   Yes.** |
| 12:51:25 | 13 | Q.   Because -- let's back up.  Let's get a |
| 12:51:27 | 14 | clear record. |
| 12:51:27 | 15 | So when Owen raised the concern about the |
| 12:51:33 | 16 | picture to you, you talked to Owen.  And what did he |
| 12:51:42 | 17 | tell you? |
| 12:51:45 | 18 | MR. RUTSCHMAN:   Objection; asked and |
| 12:51:45 | 19 | answered. |
| 12:51:50 | 20 | THE WITNESS:   So he pretty much told me |
| 12:51:53 | 21 | how -- what happened, how he came across the |
| 12:51:58 | 22 | picture.  You know, he felt that the rac- -- the |
| 12:52:07 | 23 | picture was racist and that he wanted to make a |
| 12:52:17 | 24 | complaint. |
| 12:52:21 | 25 | BY MS. AVLONI: |

```
12:52:22  1        Q.   Did you have him fill out any sort of
12:52:24  2   paperwork to make a complaint?
12:52:33  3        A.   I don't remember.  But I do remember, you
12:52:34  4   know, taking notes and filling out --
12:52:40  5        Q.   And you saved those notes in the CitiStaff
12:52:41  6   system?
12:52:42  7        A.   System.
12:52:45  8        Q.   And then do you recall at all what he
12:52:47  9   described to you about the situation?  Because, you
12:52:49 10   know, he just said -- you just said that he
12:52:51 11   described what happened.  But do you recall
12:52:53 12   specifically what he told you about what happened?
12:52:57 13        A.   Specifically every detail I do not
12:52:59 14   remember.
12:52:59 15        Q.   Okay.  And then you had a conversation
12:53:02 16   with Judy -- right? -- about Owen's complaint?
12:53:06 17        A.   Yes.
12:53:07 18        Q.   Could you describe to me what you
12:53:08 19   discussed with Judy during this conversation?
12:53:10 20             MR. RUTSCHMAN:  Objection; asked and
12:53:10 21   answered.
12:53:12 22             THE WITNESS:  What I previously had
12:53:14 23   mentioned.
12:53:15 24   BY MS. AVLONI:
12:53:15 25        Q.   Which is that you -- that you met with
```

| | | |
|---|---|---|
| 12:53:18 | 1 | Owen.  He relayed this information to you about how |
| 12:53:21 | 2 | he came upon this picture.  He was upset, |
| 12:53:24 | 3 | aggravated.  And how you let Chartwell know that |
| 12:53:28 | 4 | they can speak with Owen? |
| 12:53:31 | 5 | **A.   Owen.** |
| 12:53:31 | 6 | Q.   Is there anything else you discussed with |
| 12:53:33 | 7 | Judy during that conversation? |
| 12:53:34 | 8 | **A.   Just -- yeah, other than, you know, this** |
| 12:53:42 | 9 | **picture he came across in which he -- he thought was** |
| 12:53:46 | 10 | **racist.  And other than that, it was --** |
| 12:54:08 | 11 | Q.   Did you take notes during that call? |
| 12:54:09 | 12 | **A.   With who?** |
| 12:54:10 | 13 | Q.   Judy. |
| 12:54:11 | 14 | **A.   Not that I remember.** |
| 12:54:14 | 15 | Q.   What did Judy tell you during the |
| 12:54:18 | 16 | conversation?  What was her reaction to Owen's |
| 12:54:20 | 17 | complaint? |
| 12:54:21 | 18 | **A.   So when I was telling -- when I told Judy** |
| 12:54:25 | 19 | **about it, I told her all the precautions, all the** |
| 12:54:28 | 20 | **steps that I took, and then she said that she was** |
| 12:54:34 | 21 | **going to take care of whatever else needed to be** |
| 12:54:41 | 22 | **done.  She told me everything I did was -- was good,** |
| 12:54:43 | 23 | **and that she would take care of the rest.** |
| 12:54:48 | 24 | Q.   Do you know if she took care of the rest? |
| 12:54:50 | 25 | **A.   I --** |

| | | |
|---|---|---|
| 12:57:04 | 1 | A.   I recall Owen Diaz saying that they had an |
| 12:57:08 | 2 | altercation and that Rothaj was threatening to shoot |
| 12:57:17 | 3 | him and threatening his car, because he had a nice |
| 12:57:24 | 4 | car at the time.  And that, you know, Rothaj was |
| 12:57:30 | 5 | being very aggressive and -- |
| 12:57:37 | 6 | Q.   And this is the conversation you had on |
| 12:57:38 | 7 | the phone? |
| 12:57:38 | 8 | A.   Yes. |
| 12:57:39 | 9 | Q.   Did he say anything else about the |
| 12:57:40 | 10 | situation that you recall? |
| 12:57:46 | 11 | A.   Not that I recall. |
| 12:57:47 | 12 | Q.   And what did you tell Owen? |
| 12:57:55 | 13 | A.   So I told Owen.  I said oh, okay, again, |
| 12:57:59 | 14 | are you going to return to work?  How do you feel? |
| 12:58:02 | 15 | Do you feel comfortable with going back to work?  He |
| 12:58:06 | 16 | said yes.  Do you feel comfortable with being in |
| 12:58:10 | 17 | your same position?  And -- or would you like to be |
| 12:58:17 | 18 | moved to a different spot.  He said no, he wanted to |
| 12:58:21 | 19 | continue where he was at.  So I let him know that in |
| 12:58:23 | 20 | this situation, you know, I'm going to take this up |
| 12:58:29 | 21 | to HR as well.  I'll be speaking with, you know, |
| 12:58:37 | 22 | Rothaj.  And I let him know that Chartwell would be |
| 12:58:40 | 23 | speaking to him and they would be doing their |
| 12:58:47 | 24 | investigation. |
| 12:58:49 | 25 | Q.   Did you take notes during that |

| | | |
|---|---|---|
| 12:58:51 | 1 | conversation? |
| 12:58:51 | 2 | **A.   I -- yeah.   I believe I did.** |
| 12:58:54 | 3 | Q.   And you would have saved those notes in |
| 12:58:56 | 4 | the CitiStaff system? |
| 12:58:58 | 5 | **A.   It would have been in the system.** |
| 12:59:00 | 6 | Q.   And then after he -- Owen raised this |
| 12:59:03 | 7 | concern to your attention, did you have a |
| 12:59:05 | 8 | conversation with Rothaj? |
| 12:59:08 | 9 | **A.   Yes.** |
| 12:59:08 | 10 | MR. RUTSCHMAN:   Objection; misstates the |
| 12:59:10 | 11 | witness' prior testimony. |
| 12:59:12 | 12 | THE WITNESS:   After I spoken [sic] and |
| 12:59:15 | 13 | took down the information from Owen Diaz, I did |
| 12:59:22 | 14 | later call Rothaj Foster as well to see what |
| 12:59:25 | 15 | happened on his side, on his end. |
| 12:59:28 | 16 | BY MS. AVLONI: |
| 12:59:28 | 17 | Q.   Okay.   And what did Rothaj tell you? |
| 12:59:33 | 18 | **A.   So Rothaj did admit to them having, you** |
| 12:59:38 | 19 | **know, an argument.   He did admit to, you know,** |
| 12:59:42 | 20 | **speaking kind of loud, raising his voice.   But he** |
| 12:59:46 | 21 | **denied that -- you know, he said that he never made** |
| 12:59:51 | 22 | **any threats of any sort about any caller, about** |
| 12:59:55 | 23 | **shooting anybody or any of that sort.   He said** |
| 01:00:02 | 24 | **that -- you know, that Owen Diaz was already kind of** |
| 01:00:09 | 25 | **aggressive and very strong -- he would come out very** |

| | | |
|---|---|---|
| 01:00:13 | 1 | **strong and very aggressive.  And, you know, that day** |
| 01:00:17 | 2 | **he said I do admit to -- to arguing and yelling** |
| 01:00:23 | 3 | **because I felt like -- he felt that Owen Diaz was** |
| 01:00:26 | 4 | **being disrespectful to him and, you know, taking** |
| 01:00:32 | 5 | **advantage of his power as a lead, telling him that** |
| 01:00:36 | 6 | **he can go to his break or his lunch whenever he** |
| 01:00:39 | 7 | **tells him to or --** |
| 01:00:47 | 8 | Q.   So he -- Rothaj told you that Owen Diaz |
| 01:00:49 | 9 | was being disrespectful by telling Rothaj that he |
| 01:00:53 | 10 | can go on break or his lunch when Owen told him to? |
| 01:00:56 | 11 | **A.   He said that -- that was something that he** |
| 01:00:58 | 12 | **said, but he was just being disrespectful as far as** |
| 01:01:04 | 13 | **cursing at him and telling him other things like,** |
| 01:01:09 | 14 | **you know, "shut up" or --** |
| 01:01:11 | 15 | Q.   He said that to you? |
| 01:01:13 | 16 | **A.   Rothaj.** |
| 01:01:16 | 17 | Q.   Do you know if Owen -- what Owen's job |
| 01:01:22 | 18 | title was as a CitiStaff contractor at the Tesla |
| 01:01:26 | 19 | facility? |
| 01:01:26 | 20 | **A.   Elevator lead.** |
| 01:01:28 | 21 | Q.   And how about Rothaj Foster?  Do you know |
| 01:01:30 | 22 | what his title was? |
| 01:01:31 | 23 | **A.   He was at the elevators as well, but --** |
| 01:01:36 | 24 | Q.   Do you know if an elevator lead had the |
| 01:01:39 | 25 | ability to tell someone like in Rothaj's position |

01:04:48   1   know, I let Chartwell speak to Owen and that they

01:04:57   2   were going to take care of the investigation, they

01:04:59   3   were going to investigate.

01:05:01   4   BY MS. AVLONI:

01:05:01   5       Q.   Do you know if Chartwell did investigate?

01:05:03   6       A.   **That I do not know.**

01:05:08   7       Q.   If somebody wanted to speak to a Chartwell

01:05:10   8   [sic] contractor like Owen, were they required --

01:05:12   9   were they required to get Chartwell's permission?

01:05:16  10            MR. RUTSCHMAN:   Objection; calls for

01:05:16  11   speculation.

01:05:17  12            THE WITNESS:   Can you repeat that?

01:05:18  13   BY MS. AVLONI:

01:05:18  14       Q.   Yeah.   While conducting investigations,

01:05:20  15   let's say, if a client or another -- if a client

01:05:28  16   like nextSource or Tesla or Chartwell, if one of

01:05:34  17   those entities wanted to talk to a Chartwell --

01:05:39  18   sorry -- a CitiStaff contractor, would they need to

01:05:41  19   get permission from CitiStaff?

01:05:43  20       A.   **Yeah, I would think so.**

01:05:46  21       Q.   Do you know why?

01:05:51  22       A.   **Disclosures.   Confidential.**

01:05:56  23       Q.   What does that mean?

01:05:57  24       A.   **Confidential?**

01:06:00  25       Q.   Mm-hmm.

MONICA DE LEON
December 6, 2018

Page 145

| | | |
|---|---|---|
| 01:06:00 | 1 | **A.   Just for -- for the person's own** |
| 01:06:04 | 2 | **confidential [sic], maybe they don't want to speak** |
| 01:06:07 | 3 | **to a third party; they want to -- you know.   Or if** |
| 01:06:11 | 4 | **they're concerned about maybe they think they're in** |
| 01:06:13 | 5 | **trouble or something like that.** |
| 01:06:19 | 6 | Q.   Did you ask Owen if it was okay for his |
| 01:06:22 | 7 | permission to speak to Chartwell? |
| 01:06:24 | 8 | **A.   Yes, I did.   When I spoke with him, I did** |
| 01:06:26 | 9 | **let him know Chartwell, they want to speak with you,** |
| 01:06:32 | 10 | **and are you willing to participate?   And he said** |
| 01:06:36 | 11 | **yes.** |
| 01:06:36 | 12 | Q.   And have you had a situation where you |
| 01:06:38 | 13 | refused to permit a CitiStaff contractor to talk to |
| 01:06:44 | 14 | like a client or an entity involved with a client? |
| 01:06:48 | 15 | **A.   No, I haven't had a situation like that.** |
| 01:06:53 | 16 | Q.   Did Judy ever talk to you about the |
| 01:06:56 | 17 | altercation between Rothaj and Owen Diaz after you |
| 01:07:04 | 18 | had that conversation with her where you described |
| 01:07:06 | 19 | to her what happened? |
| 01:07:09 | 20 | **A.   After that, no.** |
| 01:07:16 | 21 | Q.   How about the picture incident where Owen, |
| 01:07:19 | 22 | you know, raised a concern about an image that he |
| 01:07:23 | 23 | saw that he believe was racist.   Did you and Judy |
| 01:07:26 | 24 | ever have a conversation about that again after you |
| 01:07:29 | 25 | described to her Owen's complaints? |

01:09:26  1   by CitiStaff?

01:09:27  2              MR. RUTSCHMAN:  Objection; calls for

01:09:27  3   speculation.  Calls for a legal conclusion.

01:09:31  4              THE WITNESS:  That I don't know.

01:09:32  5   BY MS. AVLONI:

01:09:32  6       Q.   How about do you know if Owen Diaz still

01:09:34  7   works at the Tesla facility?

01:09:37  8              MR. RUTSCHMAN:  Calls for speculation.

01:09:39  9              THE WITNESS:  No.

01:09:40 10   BY MS. AVLONI:

01:09:40 11       Q.   And how do you know that he no --

01:09:43 12              MR. RUTSCHMAN:  I was just going to

01:09:43 13   clarify her response.  Was that no, he doesn't work

01:09:48 14   there, or no, you don't know?

01:09:49 15              THE WITNESS:  No, he doesn't work at

01:09:51 16   Tesla.

01:09:51 17   BY MS. AVLONI:

01:09:52 18       Q.   And how do you know Owen Diaz no longer

01:09:54 19   works at Tesla?

01:09:55 20       A.   When I was there, they had nextSource send

01:09:58 21   me an e-mail stating that they wanted to -- that

01:10:01 22   they had ended his assignment.

01:10:09 23       Q.   Okay.  nextSource sent you an e-mail

01:10:11 24   saying they had ended Owen Diaz' assignment at the

01:10:13 25   Tesla facility; is that correct?

| 01:10:14 | 1 | A. Mm-hmm. |
| 01:10:15 | 2 | Q. And what was your response to that? |

01:10:19   3   A. So we -- to take action. So since the
01:10:25   4   assignment ended, I gave Owen Diaz a call, letting
01:10:31   5   him know that his assignment had been ended and that
01:10:35   6   he was no longer able to return to the facility. So
01:10:45   7   to not report to work for his shift that day.

01:10:49   8   And he was mad, upset. He was cussing.
01:10:53   9   He was upset at the fact that, you know, he was
01:10:56  10   losing his job and that he wanted to continue
01:10:59  11   working at Tesla.

01:11:07  12   And, you know, I -- I let him know
01:11:09  13   unfortunately, you know, they have made a decision
01:11:13  14   to end your assignment. So, you know, please do not
01:11:17  15   return to the premises. Your badge is deactivated.
01:11:20  16   You won't be able to get in anyway if you tried.

01:11:24  17   So -- you know, and then after that he
01:11:31  18   continued to just kind of rant and just cussed a
01:11:37  19   little more. And then he eventually just hung up.

01:11:39  20   Q. And who from nextSource informed you
01:11:43  21   that Owen Diaz' assignment had ended?

01:11:45  22   A. It was Wayne Jackson.

01:11:47  23   Q. And did he inform you by e-mail or phone?

01:11:49  24   A. E-mail.

01:11:52  25   Q. He sent you an e-mail saying his

| | | |
|---|---|---|
| 01:11:54 | 1 | assignment has ended? |
| 01:11:56 | 2 | **A.   Mm-hmm.** |
| 01:11:56 | 3 | Q.   What did you respond with? |
| 01:11:57 | 4 | **A.   I responded him, let him know okay.   He --** |
| 01:12:01 | 5 | **I have let him know, and he won't be returning.** |
| 01:12:05 | 6 | Q.   You had let him know after Wayne Jackson |
| 01:12:07 | 7 | had sent you that e-mail; right?   Not before Wayne |
| 01:12:10 | 8 | Jackson sent you that e-mail? |
| 01:12:11 | 9 | **A.   I let him know after Wayne Jackson sent me** |
| 01:12:15 | 10 | **the e-mail stating that they were terminating Owen** |
| 01:12:17 | 11 | **Diaz' assignment.** |
| 01:12:19 | 12 | Q.   Did Wayne Jackson tell you why they were |
| 01:12:22 | 13 | terminating Owen Diaz' assignment? |
| 01:12:24 | 14 | **A.   It was a no-call/no-show.   He had -- he** |
| 01:12:31 | 15 | **had mentioned to me -- Owen Diaz had mentioned to me** |
| 01:12:33 | 16 | **that he was leaving to LA for a funeral.   And he** |
| 01:12:38 | 17 | **gave me specific dates.   It was like just a couple** |
| 01:12:42 | 18 | **of days, two or three days.   And I let nextSource** |
| 01:12:46 | 19 | **know.   And he was gone for longer than what he had** |
| 01:12:52 | 20 | **stated.** |
| 01:12:55 | 21 | Q.   Do you know whose funeral it was? |
| 01:12:57 | 22 | **A.   It was his mom's.** |
| 01:13:01 | 23 | Q.   Did you call Owen and ask him why he |
| 01:13:05 | 24 | hasn't returned? |
| 01:13:06 | 25 | **A.   I didn't know that he hadn't returned.** |

| | | |
|---|---|---|
| 01:15:27 | 1 | when you called him to tell him his assignment was |
| 01:15:30 | 2 | ended? |
| 01:15:31 | 3 | **A.   Maybe --** |
| 01:15:32 | 4 | MR. RUTSCHMAN:  Objection; misstates the |
| 01:15:32 | 5 | witness' prior testimony. |
| 01:15:34 | 6 | BY MS. AVLONI: |
| 01:15:36 | 7 | Q.   You did call Owen Diaz and tell him his |
| 01:15:39 | 8 | assignment had ended; right? |
| 01:15:41 | 9 | **A.   Yes.  I spoke to him over the phone.** |
| 01:15:42 | 10 | Q.   How long was that conversation? |
| 01:15:43 | 11 | **A.   That I don't remember.  Three, five** |
| 01:15:45 | 12 | **minutes.   Three minutes.** |
| 01:15:50 | 13 | Q.   Was it under five minutes? |
| 01:15:51 | 14 | **A.   Under five minutes, yes.** |
| 01:15:59 | 15 | Q.   And did Owen tell you -- did Owen tell you |
| 01:16:06 | 16 | why he was upset? |
| 01:16:07 | 17 | **A.   Well, as I stated previously, because he** |
| 01:16:09 | 18 | **wanted to keep his job and that he liked his job and** |
| 01:16:15 | 19 | **he was making good money and -- and that's pretty** |
| 01:16:24 | 20 | **much the majority of why -- of what he told me.** |
| 01:16:31 | 21 | Q.   Did he ask you why his assignment has |
| 01:16:33 | 22 | ended? |
| 01:16:35 | 23 | **A.   Yes.  Well, I had mentioned to him that** |
| 01:16:39 | 24 | **your assignment was ended due to no-call/no-show** |
| 01:16:44 | 25 | **And that's when, you know, he got mad and started** |

01:18:06  1        **A.    A what kind of policy?**

01:18:09  2        Q.    Bereavement.

01:18:11  3              MR. RUTSCHMAN:   Bereavement.

01:18:12  4   BY MS. AVLONI:

01:18:13  5        Q.    Bereavement.

01:18:13  6        **A.    Oh --**

01:18:14  7              MR. RUTSCHMAN:   Objection; calls for

01:18:14  8   speculation.

01:18:15  9   BY MS. AVLONI:

01:18:15 10        Q.    Leave policy.

01:18:16 11        **A.    That I don't know.**

01:18:16 12        Q.    Do you know if nextSource has a

01:18:19 13   bereavement leave policy?

01:18:21 14              MR. RUTSCHMAN:   Objection; calls for

01:18:21 15   speculation.

01:18:22 16              THE WITNESS:   That I don't know.

01:18:23 17   BY MS. AVLONI:

01:18:24 18        Q.    Tesla?  Do you know whether Tesla has such

01:18:26 19   a policy?

01:18:28 20              MR. RUTSCHMAN:   Objection; calls for

01:18:28 21   speculation.

01:18:29 22              THE WITNESS:   That I don't know.

01:18:30 23   BY MS. AVLONI:

01:18:30 24        Q.    Did you try to place Owen at another

01:18:34 25   facility after he was separated from Tesla?

01:18:37  1          MR. RUTSCHMAN:   Objection; vague and

01:18:38  2   ambiguous.

01:18:42  3          THE WITNESS:   I did mention that, you

01:18:45  4   know, we could possibly place him somewhere else.

01:18:48  5   But it wouldn't be making the same amount of money

01:18:51  6   that he was making there.   And he just -- basically

01:18:57  7   he didn't want to hear it.   He was like F that.

01:19:00  8   Thirteen dollars ain't -- ain't shit, basically.

01:19:07  9          So -- you know, I tried to get him to calm

01:19:15 10   down by telling him hey, you know, I could probably

01:19:18 11   place you somewhere else.   You're not just -- you

01:19:21 12   know, your assignment didn't work here, you know, it

01:19:24 13   ended here.   But, you know, do you want to try

01:19:27 14   something else.   And he didn't.   He didn't want to

01:19:30 15   do anything else basically.   So --

01:19:33 16   BY MS. AVLONI:

01:19:33 17       Q.   Was Tesla -- do you know if Tesla paid the

01:19:37 18   highest rate to CitiStaff contractors?

01:19:40 19          MR. RUTSCHMAN:   Objection; calls for

01:19:40 20   speculation.

01:19:45 21          THE WITNESS:   I don't know if Tesla paid

01:19:47 22   the highest rate to Citistaff contractors.   But when

01:19:51 23   a lot of people hear Tesla, it's a well-known

01:19:55 24   manufacturer for these electric cars.   So when

01:19:58 25   people hear Tesla, everybody just wants to work at

01:20:01  1    Tesla.

01:20:05  2    BY MS. AVLONI:

01:20:06  3        Q.    Yeah.    Do you know how much Owen was

01:20:08  4    receiving per hour when working at Tesla?

01:20:12  5            MR. RUTSCHMAN:    Objection; calls for

01:20:12  6    speculation.

01:20:16  7            THE WITNESS:    I don't recall the start.

01:20:18  8    It could be 16.    But I remember when they gave me

01:20:23  9    the raise for him, it was 18.

01:20:27 10    BY MS. AVLONI:

01:20:27 11        Q.    Did you have any other -- did CitiStaff

01:20:29 12    have any other clients at the time that you were

01:20:32 13    working there that paid $16 an hour or up?

01:20:41 14            MR. RUTSCHMAN:    Objection; calls for

01:20:41 15    speculation.

01:20:43 16            THE WITNESS:    Yeah, we did.

01:20:44 17    BY MS. AVLONI:

01:20:44 18        Q.    And how come you didn't offer any of those

01:20:46 19    positions to him?

01:20:49 20        A.    Well, I had mentioned it to him, but he

01:20:52 21    didn't want to take the offer.

01:20:53 22        Q.    Do you know -- did he tell you why not?

01:20:55 23        A.    He just said that wasn't enough.

01:20:58 24        Q.    Sixteen dollars wasn't enough?

01:20:59 25        A.    Yeah.

```
02:20:06  1   incomplete hypothetical.  Vague and ambiguous.

02:20:11  2          THE WITNESS:  In a case that something

02:20:13  3   like that would happen, it would be taken to HR,

02:20:15  4   immediately escalated.  And then it would be dealt

02:20:25  5   with from there.

02:20:26  6   BY MS. AVLONI:

02:20:26  7      Q.  So you don't know yourself -- you don't

02:20:28  8   know personally what kind of discipline would be

02:20:30  9   issued to a CitiStaff contractor that used the N

02:20:33 10   word?

02:20:38 11      A.  I didn't have -- don't have the authority

02:20:41 12   to make.  So I didn't -- I wouldn't be able to do --

02:20:45 13   I didn't have the authority.  I don't have the

02:20:47 14   authority to do -- to end the assignment or, you

02:20:51 15   know, tell them they're fired.  I would have to

02:20:55 16   follow up with HR.

02:20:59 17      Q.  Understood.  In terms of complaints, other

02:21:03 18   than receiving Owen Diaz' complaint about the

02:21:10 19   inappropriate picture, have you ever received any

02:21:14 20   complaints of race harassment from any CitiStaff

02:21:19 21   contractors?

02:21:20 22          MR. RUTSCHMAN:  Objection; vague and

02:21:20 23   ambiguous.  Calls for a legal conclusion.

02:21:27 24          THE WITNESS:  No, I don't [sic].

02:21:28 25   BY MS. AVLONI:
```

02:23:04   1    happened like graveyard shift, they would probably

02:23:13   2    contact the client, let the client know before

02:23:18   3    letting me know at -- out of the office at midnight.

02:23:22   4    BY MS. AVLONI:

02:23:22   5        Q.   Did CitiStaff have a requirement that its

02:23:25   6    contractors contact the CitiStaff personnel like

02:23:29   7    yourself when it comes to complaints of harassment?

02:23:30   8    Or can CitiStaff contractors make the complaints

02:23:36   9    directly to the clients?

02:23:37  10             MR. RUTSCHMAN:   Objection; compound.

02:23:40  11    Calls for speculation.   Asked and answered.

02:23:50  12             THE WITNESS:   So they would be able to

02:23:51  13    report to me as well.   And if for some reason they

02:23:54  14    can't get ahold of me and they felt they needed to

02:23:59  15    tell their supervisor -- they tell their supervisor

02:24:02  16    about it, then yeah, yes.

02:24:05  17    BY MS. AVLONI:

02:24:05  18        Q.   And would supervisors -- do you know if

02:24:08  19    they're required to notify you at some point if

02:24:11  20    supervisors become aware of such complaints?

02:24:14  21             MR. RUTSCHMAN:   Objection; calls for

02:24:14  22    speculation.

02:24:16  23             THE WITNESS:   In that case -- in this case

02:24:17  24    where it was the -- with Owen -- with Owen's

02:24:22  25    complaint, since it did happen during his graveyard

02:24:26  1    shift -- that is basically what happened.  He let

02:24:30  2    his supervisors know.  And they -- and nextSource.

02:24:36  3    And nextSource told me.  So -- in this case that

02:24:41  4    is what happened.  They -- he reported to his

02:24:44  5    supervisors in nextSource and they reported to me.

02:24:48  6    BY MS. AVLONI:

02:24:49  7        Q.    And why did they report to you; do you

02:24:52  8    know?

02:24:52  9        **A.    Since he was a CitiStaff contractor, that**

02:24:57 10    **is why they reported to me as well.**

02:25:11 11        Q.    If a CitiStaff contractor joined

02:25:13 12    CitiStaff, is there any sort of training provided at

02:25:16 13    all that you are aware of that tells that contractor

02:25:23 14    who to go to for what?  So, for example, you know,

02:25:26 15    go to CitiStaff employee for payroll issues.  Go to

02:25:31 16    this person for complaints.  Go to this person for

02:25:35 17    job description, go to this person on safety

02:25:39 18    reasons.  Is there some sort of a manual, tutorial,

02:25:42 19    or training that's provided to CitiStaff contractors

02:25:45 20    that tells the contractors where or who to go to in

02:25:50 21    these situations?

02:25:52 22            MR. RUTSCHMAN:  Objection; compound.

02:25:55 23    Vague and ambiguous.  Asked and answered.

02:25:57 24            THE WITNESS:  They -- the CitiStaff

02:26:00 25    contractors knew that, you know, I was the only one

| | | |
|---|---|---|
| 02:26:04 | 1 | in the office.  So I also let them know if you have |
| 02:26:08 | 2 | any questions or concerns, you can give me a call. |
| 02:26:14 | 3 | And, you know, let's just say if -- in any situation |
| 02:26:18 | 4 | anyone chose -- wanted to speak to somebody else |
| 02:26:22 | 5 | other than me, then I would follow up with them and |
| 02:26:25 | 6 | let them have corporate's number and, you know, |
| 02:26:28 | 7 | whatever the situation would be, direct them |
| 02:26:33 | 8 | where -- where to go or who to go to. |
| 02:26:36 | 9 | BY MS. AVLONI: |
| 02:26:37 | 10 |     Q.   Did you ever instruct Citistaff |
| 02:26:39 | 11 | contractors that they are required to contact you in |
| 02:26:43 | 12 | regards to any and all issues from payroll, to |
| 02:26:48 | 13 | complaints, to how to do their job? |
| 02:26:52 | 14 |          MR. RUTSCHMAN:  Objection; vague and |
| 02:26:52 | 15 | ambiguous.  Compound. |
| 02:27:00 | 16 |          THE WITNESS:  As I said, anytime before I |
| 02:27:03 | 17 | would dispatch them to the -- to the job site, I |
| 02:27:06 | 18 | would let them know if they have any questions or |
| 02:27:08 | 19 | concerns, they can give me a call or send me an |
| 02:27:11 | 20 | e-mail. |
| 02:27:12 | 21 | BY MS. AVLONI: |
| 02:27:13 | 22 |     Q.   But you never told them that they're |
| 02:27:14 | 23 | required to go to you instead of the client; is that |
| 02:27:17 | 24 | correct? |
| 02:27:18 | 25 |          MR. RUTSCHMAN:  Objection; misstates the |

02:27:19  1    witness' prior testimony.  Asked and answered.

02:27:24  2              THE WITNESS:  I would just, like I said,

02:27:25  3    tell them if you have any questions or concerns, you

02:27:35  4    can give me a call.

02:27:39  5    BY MS. AVLONI:

02:27:39  6        Q.   You know, you mentioned previously that

02:27:43  7    CitiStaff hands out policies to its contractors.  Do

02:27:47  8    you know who enforces those policies to ensure

02:27:52  9    they're being followed?

02:27:53 10              MR. RUTSCHMAN:  Objection; misstates the

02:27:54 11    witness' prior testimony.  Calls for speculation.

02:27:59 12              THE WITNESS:  No, I wouldn't know who

02:28:00 13    would enforce them.

02:28:02 14    BY MS. AVLONI:

02:28:02 15        Q.   Do you enforce those policies to make sure

02:28:05 16    they're being followed by CitiStaff contractors?

02:28:07 17        **A.   How so?**

02:28:09 18        Q.   Let's -- do you know any of the policies

02:28:14 19    at all that CitiStaff has that it hands out to its

02:28:20 20    contractors?

02:28:21 21              MR. RUTSCHMAN:  Objection; asked and

02:28:21 22    answered.

02:28:22 23              THE WITNESS:  I had mentioned before like

02:28:25 24    sexual harassment and -- well, harassment in general

02:28:28 25    and -- I forgot the others.

02:28:34   1   BY MS. AVLONI:

02:28:35   2       Q.   Let's use that as an example.   So let's

02:28:36   3   say -- is CitiStaff responsible for enforcing its

02:28:42   4   policy against sexual harassment?

02:28:43   5           MR. RUTSCHMAN:   Objection; vague,

02:28:45   6   ambiguous.   Calls for speculation.

02:28:49   7           THE WITNESS:   So anytime I would process

02:28:54   8   an applicant's application -- CitiStaff contractor's

02:28:59   9   application, I would just go over everything with

02:29:01   10   them, assuring everything is correct, spelled

02:29:06   11   correctly, and assure that they read and signed all

02:29:10   12   our policies.   And if they have any questions or

02:29:12   13   concerns and -- all of the time everyone understood

02:29:20   14   what they had read and signed.   And so that's how.

02:29:28   15   BY MS. AVLONI:

02:29:29   16       Q.   Do you know what nextSource's policies

02:29:31   17   are regarding harassment?

02:29:35   18       A.   I do not know.

02:29:35   19       Q.   Do you know what Tesla's policies are

02:29:38   20   regarding harassment?

02:29:39   21       A.   I do not know.

02:29:40   22       Q.   Do you know if calling somebody the N word

02:29:42   23   violates CitiStaff policies?

02:29:46   24       A.   Specifically?

02:29:49   25           MR. RUTSCHMAN:   Objection; it's vague,

```
02:30:55  1    BY MS. AVLONI:

02:31:45  2         Q.    Sitting here Today do you know if Rothaj

02:31:47  3    Foster ever received any training on harassment?

02:31:51  4              MR. RUTSCHMAN:   Objection; vague and

02:31:51  5    ambiguous.  Calls for speculation.

02:31:56  6              THE WITNESS:   I know that Rothaj signed

02:31:59  7    all policies of CitiStaff and read and signed any

02:32:11  8    paperwork that -- that was given to us from

02:32:16  9    nextSource -- nextSource paperwork that required

02:32:24 10    to be signed and read.

02:32:25 11    BY MS. AVLONI:

02:32:25 12         Q.    Do you know whether Rothaj Foster is

02:32:28 13    black?

02:32:28 14         A.    Yes, he is.

02:32:34 15         Q.    When you terminated Owen Diaz, was he

02:32:40 16    still a CitiStaff employee?

02:32:44 17              MR. RUTSCHMAN:   Objection; lacks

02:32:44 18    foundation.  Misstates the witness' prior testimony.

02:32:52 19    Calls for a legal conclusion.

02:32:58 20              THE WITNESS:   So when Owen Diaz'

02:33:00 21    assignment ended, he was still a contractor that was

02:33:11 22    registered with us as CitiStaff.  But he was no

02:33:15 23    longer an employee working on an assignment at

02:33:21 24    Tesla; at the facility, Tesla facility.

02:33:24 25    BY MS. AVLONI:
```

02:36:40  1    Bates labeled CitiStaff 34 to 35.  Please take a

02:36:44  2    minute to look at the second page and let me know

02:36:46  3    when you're done.

02:36:47  4         **A.   (Witness reviews document.)**

02:36:48  5              **Okay.**

02:36:48  6         Q.   And is this the entire CitiStaff

02:36:50  7    application, or are there more pages to it that --

02:36:53  8         **A.   No --**

02:36:53  9         Q.   -- you're aware of?

02:36:54 10         **A.   -- this is not the entire application.**

02:36:57 11         Q.   Okay.  Do you know what else goes into

02:36:59 12    this application that's missing?

02:37:03 13         **A.   The policies.  There was a quiz.  And**

02:37:13 14    **also, like, the county page which just states what**

02:37:22 15    **counties they've lived in too.**

02:37:35 16         Q.   Okay.  So let's start with these first two

02:37:37 17    pages.

02:37:39 18         **A.   Mm-hmm.**

02:37:39 19         Q.   Is this the -- you recognize this

02:37:42 20    application -- this CitiStaff application; correct?

02:37:45 21         **A.   Yes, I do.**

02:37:46 22         Q.   And is this the standard -- are these two

02:37:49 23    pages reflective of a portion of the application

02:37:53 24    that's given out to CitiStaff applicants?

02:37:58 25              MR. RUTSCHMAN:  Objection.  It's vague,

04:22:11   1        Q.    Correct.  Do you know who that is?

04:22:15   2        **A.    She was the main contact, like I had**

04:22:18   3   **mentioned earlier, for Tesla after Nancy.**

04:22:24   4        Q.    So a nextSource.  That's -- okay.

04:22:33   5              And when you received the e-mail from

04:22:35   6   Wayne Jackson back on November 6 of 2015, do you

04:22:39   7   recall reading the entire e-mail or the chain below

04:22:45   8   it?

04:22:48   9        A.    Yes.

04:22:59   10       Q.    And when you read the e-mail -- actually,

04:23:02   11   prior to receiving the e-mail on November 6, 10:21

04:23:07   12   a.m., had you had any information regarding the

04:23:11   13   altercation between Rothaj Foster and Owen Diaz?

04:23:13   14       **A.    Repeat the question?**

04:23:16   15       Q.    Prior to receiving the e-mail from Wayne

04:23:17   16   Jackson on November 6 of 2015 at 10:21 a.m., did you

04:23:23   17   have any information at all that there was an

04:23:25   18   altercation between Rothaj and Owen?

04:23:28   19       **A.    No.**

04:23:28   20       Q.    That's the first time you learned about

04:23:30   21   the altercation between Rothaj and Owen?

04:23:32   22       **A.    Yes.**

04:23:33   23       Q.    And then when you read the e-mail for

04:23:38   24   Wayne Jackson, what were your immediate impressions

04:23:46   25   about the altercation between Rothaj and Owen?

| 04:31:30 | 1 | **have it in the car in the dashboard or -- or -- in** |
| 04:31:35 | 2 | **the car.** |
| 04:31:36 | 3 | Q.   Did you ask him for a copy of it? |
| 04:31:38 | 4 | **A.   No, I did not.** |
| 04:31:41 | 5 | Q.   During your conversation with Owen Diaz |
| 04:31:44 | 6 | about the incident, did you ask Owen Diaz if he was |
| 04:31:46 | 7 | aware of any witnesses to the incident? |
| 04:31:58 | 8 | **A.   He did mention that there was somebody** |
| 04:31:59 | 9 | **there.  And -- yeah.  He did mention that.** |
| 04:32:14 | 10 | Q.   And it looks like you're asking nextSource |
| 04:32:17 | 11 | to essentially take Rothaj back here in your e-mail; |
| 04:32:20 | 12 | is that correct? |
| 04:32:21 | 13 | MR. RUTSCHMAN:  Objection; document speaks |
| 04:32:22 | 14 | for itself. |
| 04:32:24 | 15 | THE WITNESS:  I was trying to see if it |
| 04:32:32 | 16 | could be a possibility if he can go back to work |
| 04:32:36 | 17 | just separating them being given that I wasn't given |
| 04:32:42 | 18 | all the information.  So from what I was given, |
| 04:32:47 | 19 | based on what I was given, the information that I |
| 04:32:51 | 20 | was given, I felt that possibly the two -- Rothaj |
| 04:32:55 | 21 | can go back to work; just the two needed to be |
| 04:32:59 | 22 | separated so that they wouldn't bump heads or clash. |
| 04:33:03 | 23 | BY MS. AVLONI: |
| 04:33:03 | 24 | Q.   Okay.  So as a staff supervisor having |
| 04:33:09 | 25 | reviewed information provided to you in these |

04:33:11   1   e-mails, you thought it would be okay for Rothaj to

04:33:14   2   go back to work, just to be separated from Owen; is

04:33:17   3   that correct?

04:33:18   4            MR. RUTSCHMAN:   Objection; misstates the

04:33:19   5   witness' prior testimony.   The document speaks for

04:33:21   6   itself.

04:33:25   7            THE WITNESS:   I was trying to see if

04:33:26   8   Rothaj would be able to return in a different

04:33:30   9   department.   As well as Rothaj, you know, wanted to

04:33:35   10   try -- was trying to keep his job.   And at the same

04:33:39   11   time, you know, he -- when he was telling me his

04:33:47   12   part of the story, he was able to come across

04:33:49   13   clearly.   And, you know, he did mention that there

04:33:53   14   was an argument, but there was no threats made

04:34:00   15   and -- he didn't make any threats.   But he did agree

04:34:07   16   to the argument being -- um --

04:34:10   17   BY MS. AVLONI:

04:34:11   18       Q.   Did you take any steps to verify any of

04:34:15   19   what Rothaj told you?

04:34:17   20       A.   **What do you mean by that?**

04:34:18   21       Q.   Did you ask him for witnesses who would

04:34:22   22   corroborate his position or ask him for -- you know,

04:34:24   23   if he was aware of any recordings that would show

04:34:27   24   that he's being truthful?

04:34:31   25       A.   **He -- I mean, there's cameras in Tesla.**

MONICA DE LEON
December 6, 2018

**Page 274**

```
 1                    REPORTER'S CERTIFICATION

 2

 3          I, Heidi Belton, Certified Shorthand

 4   Reporter in and for the State of California, do

 5   hereby certify:

 6

 7          That the foregoing witness was by me duly

 8   sworn; that the deposition was then taken before me

 9   at the time and place herein set forth; that the

10   testimony and proceedings were reported

11   stenographically by me and later transcribed into

12   typewriting under my direction; that the foregoing

13   is a true record of the testimony and proceedings

14   taken at that time.

15

16          IN WITNESS WHEREOF, I have subscribed my

17   name on this date:

18

19

20

21

22   H.Belton

23   Heidi Belton, CSR, RPR, CRR, CCRR, CRC
              CSR No. 12885
24

25
```

# EXHIBIT "I"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

        Plaintiffs,

                              No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

        Defendants.
_____/

DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13571

BRIDGET MATTOS & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS

Certified Copy

1          BE IT REMEMBERED that, pursuant to Deposition Subpoena

2     and Notice of Taking Deposition, and on Friday, May 17, 2019,

3     commencing at the hour of 10:08 a.m., thereof, at California

4     Civil Rights Group, 180 Grand Avenue, Suite 1380, Oakland,

5     California, before me, PATRICIA ROSINSKI, CSR No. 4555, a

6     Certified Shorthand Reporter in and for the State of

7     California, there personally appeared

8

9                         WAYNE JACKSON,

10

11    produced as a witness in the above-entitled action, who,

12    being by me first duly sworn, was thereupon examined as a

13    witness in said action.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    MR. ARANEDA:  Objection.  Vague.

 2               Go ahead.

 3               THE WITNESS:  I've had some training, yes.

 4               MR. ORGAN:  Q.  Tell me about your training in

 5     investigations.

 6          A.   More or less, I had various companies I worked

 7     at where I was trained by the HR staff on doing various

 8     investigations and procedures.

 9          Q.   At some point in time, you came to work for

10     nextSource.

11               Is that correct?

12          A.   Yes, sir.

13          Q.   When did you first start working for

14     nextSource?

15          A.   I don't recall the exact date.

16          Q.   Do you remember the year?

17          A.   It might have been 2016, '15, '16.

18          Q.   Okay.  And what was your first job with

19     nextSource?

20          A.   Contract recruiter.

21          Q.   How long did you work as a contract recruiter

22     for nextSource?

23          A.   Almost a year, I'd say.  I'm not sure of the

24     exact length of time.

25          Q.   And then what was your next job with them?
```

Page 14

```
 1        A.     I was promoted to the program manager.

 2        Q.     How long were you a program manager for

 3   nextSource?

 4        A.     Oh, boy, about a year.   About a year's worth.

 5        Q.     Any other jobs with nextSource other than

 6   contract recruiter and program manager?

 7        A.     No, sir.

 8        Q.     Why did you leave nextSource?

 9        A.     Disagreement of things.

10        Q.     Without getting into the details of the

11   disagreement, other than -- let me ask you this:  Did it

12   have anything to do with the way workers were treated at

13   Tesla?

14        A.     No, it wasn't that.

15        Q.     In terms of the program manager position that

16   you had --

17        A.     Uh-hum.

18        Q.     -- you were a program manager for employees at

19   the Tesla factory.

20               Is that correct?

21               MR. ARANEDA:  Objection.  Vague.

22               THE WITNESS:  It was more of a liaison.  I

23   don't think I was really -- I didn't -- they called it a

24   program manager, but I didn't really manage the

25   employees, I guess is the best way to put it.
```

1          MR. ORGAN:  Q.  What was nextSource's

2   relationship to Tesla, as you understood it?

3       A.     They were a service provider.

4       Q.     What do you mean by "a service provider"?

5       A.     In the sense of they weren't a staffing agency

6   or anything.  Like I said, more of a liaison between a

7   staffing agency and Tesla for services Tesla had

8   requested.

9       Q.     When you were working as a recruiter for

10  nextSource, were you recruiting employees to Tesla?

11      A.     Yes, sir.

12      Q.     The employees who you were recruiting to Tesla,

13  were they primarily to work as production associates at

14  the Tesla factory?

15      A.     Not necessarily.  They were different areas of

16  facilities.  That was probably one of the main areas.

17      Q.     The facilities workers, what were the types of

18  jobs that they were typically doing that you were

19  recruiting for?

20      A.     HVAC techs, electricians, things of that

21  nature, power washers.

22      Q.     Who was your main contact person, then, at

23  nextSource when you were doing recruiting?

24      A.     My manager was Terri Garrett.

25      Q.     Do you remember what Terri Garrett's position

WAYNE JACKSON
May 17, 2019

1        position as more of a liaison.

2                Is that correct?

3        A.    Yes, sir.

4        Q.    In terms of a liaison, what were the things

5   that nextSource was doing for Tesla in terms of acting

6   as a liaison between Tesla and its contractors?

7                MR. ARANEDA:   To the extent that you know.

8                MR. ORGAN:   Right.

9                THE WITNESS:   Yeah.   As far as I know, it was

10   basically Tesla would say, we need so many people for

11   recycling, and we would reach out to the suppliers to

12   see if they were able to provide the individuals that

13   they needed.

14               MR. ORGAN:   Q.   And do you have any knowledge

15   as to why Tesla was using nextSource as a liaison as

16   opposed to just going directly to --

17       A.    No.

18       Q.    -- those contractors?

19       A.    No, sir, I don't.

20       Q.    Now, nextSource also fulfilled some kind of HR

21   functions for some of the contractors.

22               Is that true --

23       A.    Not really.

24       Q.    -- or not true?

25       A.    We would alert the supplier of any issues, more

1      **or less.**

2         Q.    Tell me how it worked in terms of, let's say

3      someone raised a complaint of discrimination or

4      harassment --

5         **A.    Uh-hum.**

6         Q.    -- what was your understanding of how such a

7      complaint was to be handled?

8              MR. ARANEDA:  It's vague.

9              MR. ORGAN:  It is a little big vague.  Let me

10     try it again so it's a little clearer.

11             THE WITNESS:  Uh-hum.

12             MR. ORGAN:  Q.  Let's assume that a contract

13     employee, meaning someone who wasn't a regular Tesla

14     employee but was a contract employee who nextSource was

15     doing liaison with, what was your understanding of the

16     procedure for -- if a contract employee for one of the

17     companies that you were doing liaison for made a

18     complaint of harassment or discrimination, what was the

19     process that was supposed to be followed?

20        **A.    I alerted the agency, usually one of the first**

21     **things I did, whatever supplier they were from.  I would**

22     **gather any information I could get, present that to the**

23     **agency, and then they would kind of conduct their**

24     **investigation from there.**

25        Q.    When such a complaint was raised, what was your

```
 1        A.    Not to my knowledge.

 2        Q.    NextSource, basically, just coordinated between

 3   the contractors and Tesla; right?

 4        A.    Yes, sir.

 5        Q.    And I think you said earlier that nextSource

 6   would typically get a request from Tesla for, like, a

 7   certain number of workers doing a certain type of work,

 8   and then nextSource would go to a contractor and say,

 9   "Can you fulfill that role"?

10        A.    To -- we call them suppliers, yes.

11        Q.    Suppliers, okay.

12        A.    Yes.

13        Q.    What was your understanding of the type of

14   training that was done for workers in terms of

15   harassment or discrimination policy?

16              MR. ARANEDA:  Objection.  Vague.

17              MR. ORGAN:  Yes, let me --

18              MS. STEVENS:  It assumes facts not in evidence.

19              MR. ORGAN:  Let me try a different question.

20        Q.    What was your understanding of what kind of

21   training was done for contract workers who nextSource

22   would ask to supply workers in terms of discrimination

23   or harassment?

24              MR. ARANEDA:  Objection.  It lacks foundation.

25              Go ahead.
```

1            THE WITNESS:  As far as I'm aware, I believe

2     they were all supposed to have any training at their

3     agency.

4            MR. ORGAN:  Okay.

5            THE WITNESS:  Yeah.

6            MR. ORGAN:  Q.  But in terms of your -- when

7     you became the manager, the program manager, you did

8     some investigations into complaints of discrimination

9     and harassment.

10            Is that true?

11     **A.     Some, yes, but more or less**

12     **information-gathering.  You know, I would gather the**

13     **information, and then submit it to the agency.**

14     Q.    Okay.  And in terms of your training into

15     investigating or fact-gathering relative to claims of

16     discrimination or harassment, would you agree that any

17     kind of investigation you would be doing would need to

18     be prompt, objective, and timely -- prompt, objective

19     and thorough -- sorry -- prompt, objective, and

20     thorough?

21     **A.     Yes.**

22     Q.    And did you participate in terms of any

23     investigations or fact-finding relative to claims of

24     discrimination or harassment at the Tesla factory?

25     **A.     Yes.**

```
 1        Q.    And was it your goal to try and fulfill those

 2   three goals of being prompt, objective, and thorough

 3   relative to the investigations you did at the Tesla

 4   factory?

 5        A.    Yes.

 6        Q.    Tell me, what are -- do you have any kind of

 7   checklist that you go through that, you know, you --

 8   that you use when you do an investigation?

 9        A.    Yes, I used to have it.  I don't have it now,

10   though.

11        Q.    Okay.

12        A.    I mean, everything's on my computer.

13        Q.    I see.

14              Did Tesla have, like, guidelines or anything

15   like that in terms of doing investigations or

16   fact-gathering at its facility?

17        A.    I don't recall them providing any.

18        Q.    But in terms of when you did the fact-gathering

19   or the investigations at the Tesla factory relative to

20   discrimination and harassment complaints, you provided

21   the information that you gathered to Tesla.

22              Is that true?

23        A.    No, I provided it to their employer, who was

24   the agency.

25        Q.    I see.
```

```
 1          A.    I don't know.

 2          Q.    Okay.  Going back to Mr. Diaz's complaint about

 3    the jigaboo, what did you do to investigate that

 4    incident?

 5          A.    If I recall correctly, I got statements.  I got

 6    photographs of the drawing.  I alerted Chartwell -- I

 7    believe it was Chartwell.  It might have been CitiStaff;

 8    I can't remember.

 9                Like I say, we had contractors from different

10    suppliers.

11          Q.    Sure.

12          A.    And I alerted the manager for Tesla over that

13    area, which was Victor Quintero.

14          Q.    Owen Diaz worked for CitiStaff.

15                Do you remember that?

16          A.    I don't recall if it was CitiStaff or

17    Chartwell.  Like I said, we had several suppliers, so...

18    It's been three, four years, so I couldn't tell you

19    exactly which one.

20          Q.    Do you remember the person who put up the

21    jigaboo drawing was Ramon Martinez?

22          A.    Yes.  I believe so, yes.

23          Q.    In addition to getting statements from

24    Mr. Martinez and Mr. Diaz, did you get statements from

25    anybody else other than those two?
```

WAYNE JACKSON
May 17, 2019

1      your deposition today?

2         A.     I haven't been able to.  I haven't had my

3      computer from nextSource since I left there, so I

4      couldn't review anything.

5         Q.     Do you remember what the outcome of your

6      investigation into the jigaboo drawing was?

7                MR. ARANEDA:  Objection.  Vague.

8                THE WITNESS:  I'm trying to think.  I believe,

9      if I'm not mistaken, there was a suspension for

10     Mr. Martinez.

11               MR. ORGAN:  Q.  Now, you mentioned

12     Victor Quintero.

13               Do you remember any discussions you had with

14     Victor Quintero about the jigaboo drawing?

15        A.     Some, yes.

16        Q.     Tell me what your best recollection is of --

17     how many -- strike that.

18               How many conversations did you have with

19     Victor Quintero?

20        A.     I don't recall how many exactly.

21        Q.     Was it more than one, though --

22        A.     Yes.

23        Q.     -- relative to the jigaboo drawing?

24        A.     Yes, sir.

25        Q.     And tell me your best recollection of what, at

Bridget Mattos & Associates
(415)747-8710

 1     least the topics are that you discussed or the substance

 2     you discussed with Victor Quintero about the jigaboo

 3     drawing.

 4             MR. ARANEDA:   Objection.   It calls for a

 5     narrative.

 6             THE WITNESS:   More or less if -- it was -- if

 7     I'm not mistaken, it was -- you'll have to give me a

 8     moment.   I'm trying to remember.

 9             MR. ORGAN:   No, that's okay.

10             THE WITNESS:   That it was a very offensive

11     drawing.   I believe, if I'm not mistaken, I recommended

12     to -- it might have been Chartwell -- and to

13     Mr. Quintero that we probably should terminate

14     Mr. Martinez.

15             But I couldn't terminate him because he wasn't

16     my employee, per se, but I did make the recommendation.

17             MR. ORGAN:   Q.   Do you remember what

18     Mr. Quintero said back in terms of your recommendation

19     of termination for Mr. Martinez?

20        **A.**    **If I'm not mistaken, he was, Let's see what**

21     **Chartwell -- check with Chartwell.   Because, once again,**

22     **it was Chartwell's employee, so we couldn't really -- I**

23     **could recommend termination, but I couldn't terminate,**

24     **per se.**

25        Q.   With the contract employees, Tesla could

```
 1      safety, yeah, because he had -- I believe he had ran
 2      into the elevator a couple of times.
 3          Q.    In terms of running into the elevator --
 4          A.    The elevators --
 5          Q.    -- with the forklift?
 6          A.    Yeah, they were going -- he was going too fast
 7      and would ran in and damaged the elevators on a few
 8      occasions.
 9              And he also -- like I said, his attitude, he
10      was -- I don't know the word to use, but he was -- if I
11      remember correctly, he really got into it with a lot of
12      other staff.  Argumentative, I guess, is probably the
13      word; I don't know.
14          Q.    Now, in terms of Mr. Diaz's attitude or
15      argumentativeness, did that occur after the jigaboo
16      drawing happened?
17          A.    No, sir, that was from, probably, day one, to
18      be honest.
19          Q.    So from day one that Mr. Diaz was working at
20      the factory, as far as you understood, Mr. Diaz had an
21      attitude issue?
22          A.    I don't know if it was an attitude issue, but,
23      like I said, he got -- he got into it with several other
24      contractors, as well as Tesla staff.
25              MR. HORTON:  Pardon me.  Can I ask for a
```

1              (Document reviewed by the deponent.)

2              THE WITNESS:  And what was the question?  I'm

3     sorry.

4              MR. ORGAN:  Q.  I'm just wondering if this

5     helps refresh your recollection in terms of --

6         **A.    Yeah, I believe this was the verbal altercation**

7     **that they had gotten into, yes.**

8         Q.    And Mr. Diaz suggests that Mr. Martinez started

9     this altercation by yelling at him in a threatening

10    manner, suggesting that Mr. Diaz had a problem with him;

11    right?  That's what Mr. Diaz's complaint was.

12             MR. ARANEDA:  The document speaks for itself.

13             THE WITNESS:  Yeah, that's what it says here.

14             MR. ORGAN:  Q.  Does that refresh your

15    recollection -- did you actually talk to Mr. Diaz after

16    you received his written complaint here in Exhibit 126?

17        **A.    I believe so, yes, sir.**

18        Q.    And was Mr. Diaz's complaint to you verbally

19    the same as his complaint in writing?

20        **A.    No, sir.**

21        Q.    There were additional things that Mr. Diaz told

22    you in the -- when he talked to you --

23        **A.    Well, what he's saying here about he thought he**

24    **was going to be struck, he didn't really express that.**

25        Q.    He didn't express that when you talked to him?

WAYNE JACKSON
May 17, 2019

1       A.   Yes, sir, if there was something serious.   If

2   it was someone late, no, we wouldn't notify them, but

3   anything else, yes.

4       Q.   Right.

5            So any kind of verbal altercation typically

6   would be copied to Tesla; right?

7       A.   I wouldn't --

8       Q.   Well, let me --

9       A.   -- say that, no, sir.

10      Q.   Any verbal altercation where there's

11  allegations of some kind of threat, that would be copied

12  to Tesla --

13      A.   Yes, sir.

14      Q.   -- right?

15           And, then, in that email from Terri to Erin,

16  Terri mentions in there, it says:

17           "It looks like Victor is asking Ed Romero to

18            get involved in a temporary worker ER [sic]

19            issue.  My recommendation is that Ed not be

20            involved."

21           I'm just wondering, do you have any

22  recollection of talking to Terri Garrett about Victor or

23  Ed's involvement in this investigation?

24      A.   Yes.  The email even shows that she had asked

25  me, you know, why is Ed doing this, and I said, "He was

Bridget Mattos & Associates
(415)747-8710

```
 1                  This is 127?

 2                  THE REPORTER:  Yes.

 3                  (Whereupon, Plaintiffs' Exhibit 127 was marked

 4                  for identification and is attached hereto.)

 5                  MR. ORGAN:  Exhibit 127, for the record, is a

 6      two-page document Bates-stamped TESLA-646 and 647, and

 7      they are emails from October 19th to October 21st.

 8                  (Document reviewed by the deponent.)

 9                  MR. ORGAN:  Q.  There's a reference here to a

10      Rothaj.  I think that's Rothaj Foster.

11      Is that correct?

12          A.     I don't remember the last name.

13          Q.     Do you remember who Rothaj worked for?

14          A.     No, I don't, sir.

15          Q.     If you look at your email down at the bottom,

16      that's an email that you sent to Terri Garrett?

17          A.     Uh-hum.

18          Q.     Do you see that?

19          A.     Yes.

20          Q.     It says (as read):

21                  This issue seems to be related to this, and we

22                  are going to have to do some in-depth

23                  investigation.

24                  Do you remember any discussions that you had

25      with Terri Garrett about that investigation in this
```

1          (Document reviewed by the deponent.)

2          MR. ORGAN:  Exhibit 128, for the record, is a

3  multiple-page document Bates-stamped TESLA-20 to 24.

4  And it starts with a picture on 23.  And then there's an

5  email from January 21st, January 22nd, I guess, and then

6  it ends on January 22nd, so...

7          (Document reviewed by the deponent.)

8          MR. ORGAN:  Q.  The picture that is TESLA-23,

9  is that one of the pictures that you saw, the big

10  jigaboo picture we were talking about before?

11     A.    Yes, sir.

12     Q.    And then there's another -- there's a wider

13  picture of a drawing on TESLA-22 in Exhibit 128.

14          And do you recognize that, too?

15     A.    Yes, sir.

16     Q.    Both of those pictures of the drawings were

17  provided to you at some point.

18          Is that right?

19     A.    Yes, sir.

20     Q.    And it shows here that Mr. Diaz informed

21  Mr. Romero of the racist effigy and drawing on or about

22  January 22nd of 2016, and then it was forwarded also to

23  you by Mr. Diaz.

24          Do you see that?

25     A.    Uh-hum.

WAYNE JACKSON
May 17, 2019

```
1              -- and then Erin Marconi?

2      A.    Yes, sir.

3      Q.    There are three recommendations -- or there are

4    three items that are identified as important here in

5    Exhibit 128.

6              Did you yourself talk to Ramon about --

7    Ramon Martinez about in terms of there's no further room

8    for error?

9      A.    Yes, sir.

10     Q.    So you yourself had a conversation with

11   Mr. Martinez; correct?

12     A.    Yes, I did have a conversation with

13   Mr. Martinez, and I also referred him to his agency who

14   also had a more in-depth conversation with him.

15     Q.    In the conversation that you had with

16   Mr. Martinez, you made it clear to Mr. Martinez that you

17   thought that the jigaboo drawing was inappropriate;

18   right?

19     A.    Yes, sir.

20     Q.    And you also made it clear to Mr. Martinez that

21   you thought the jigaboo poster was offensive to

22   African-Americans; right?

23     A.    Yes, sir.

24     Q.    In terms of Mr. Martinez's response, what was

25   his response when you told him that it was offensive to
```

Bridget Mattos & Associates
(415)747-8710

```
 1              Here Mr. Quintero says:
 2              "This is very disappointing, especially coming
 3              from one of our team supervisors.  I agree with
 4              the recommendation to suspend and issue a
 5              permanent written warning.  Also, the apology
 6              from Ramon was a good starting point.  One
 7              additional request would be if there is an
 8              opportunity to provide some type of diversity
 9              training for Ramon."
10         Do you know if any diversity training was done
11    for Mr. Martinez?
12         A.   I don't recall because that would have been
13    something that Chartwell would have done and not us.
14         Q.   And then in terms of the recommendation for a
15    suspension and permanent warning, do you know if that
16    was implemented?
17         A.   Yes, it was.
18         Q.   The apology from Ramon, was that an apology --
19    who was that an apology to?  Do you know?
20         A.   I believe they had him apologize to Owen.
21         Q.   Okay.
22         A.   If I'm not mistaken.
23         Q.   It sounds like you had a talk with Mr. Quintero
24    about these issues.
25              Do you remember that?
```

1      **A.    He didn't really specifically say that, that I**
2      **could recall, but he did say it was inappropriate.**
3      Q.    Okay.  And then there's a reference here to
4      Josue?
5      **A.    Josue, yes.**
6      Q.    Was Josue with Tesla or who was he with?
7      **A.    Tesla.**
8      Q.    Do you remember what Josue's position was?
9      **A.    I don't know.  It was more of a -- I don't know**
10     **if it was a supervisor or a manager of the recycling**
11     **area.**
12     Q.    And Josue -- he also agreed that the jigaboo
13     drawing was inappropriate; right?
14     **A.    Yes.**
15     Q.    Did Josue say anything about in terms of what
16     he thought was the appropriate remedy?
17     **A.    No, he was never really included in that**
18     **portion of it.**
19     Q.    Okay.
20           130?
21           THE REPORTER:  Yes.
22           (Whereupon, Plaintiffs' Exhibit 130 was marked
23           for identification and is attached hereto.)
24           MR. ORGAN:  Exhibit 130, for the record, is a
25     five-page document Bates-stamped TESLA-4 to 8, and it

WAYNE JACKSON
May 17, 2019

1    starts with the jigaboo drawing -- pictures of the

2    jigaboo drawing and Mr. Diaz's complaint.   Those are the

3    last four pages of the -- five pages of that, and then

4    there's an email on the first page.

5                (Document reviewed by the deponent.)

6                THE WITNESS:   Yes, sir.

7                MR. ORGAN:   Q.   And the email on the first page

8    is an email from you to Veronica Martinez at Chartwell.

9        A.    Uh-hum.

10       Q.    Was Ms. Martinez -- Veronica Martinez, was she

11   sort of a contact person that you had in Chartwell?

12       A.    Yes, sir.

13       Q.    And do you remember what Ms. Martinez's role

14   was at Chartwell?

15       A.    I believe she was the manager of that

16   particular branch.

17       Q.    Did you ever get from Chartwell what their

18   policy was regarding discrimination?

19       A.    I did not, but I'm sure Ms. Garrett had to have

20   gotten that as part of the contract.

21       Q.    So Terri Garrett did further liaison, then,

22   with Chartwell.

23             Is that right?

24       A.    She did all the contracts and such with any of

25   the agencies that we worked with.

Bridget Mattos & Associates
(415)747-8710

WAYNE JACKSON
May 17, 2019

```
 1      his return.

 2          Q.    Whatever that Wednesday was?

 3          A.    Yes, sir.

 4          Q.    And, then, did Victor ever report back to you

 5      that, in fact, he had talked to Mr. Martinez?

 6          A.    Yeah, I believe he did tell me he had spoke to

 7      Mr. Martinez.  I actually called Chartwell and sure

 8      they knew that Ramon was to report to Victor first.

 9          Q.    Okay.

10                This will be 134.

11                (Whereupon, Plaintiffs' Exhibit 134 was marked

12                for identification and is attached hereto.)

13                MR. ORGAN:   Are there enough of those?

14                MS. STEVENS:   Yes.

15                MR. ORGAN:   Okay.

16                Exhibit 134, for the record, is a one-page

17      document Bates-stamped TESLA-317, and this is

18      referencing -- this is from March of 2016, something

19      about a situation involving Owen Diaz and Troy Dennis.

20                (Document reviewed by the deponent.)

21                MR. ORGAN:   Q.   Do you know what that was

22      about?

23          A.    I believe, again, it was they got into a verbal

24      altercation.

25          Q.    And it says here that you were looking for some
```

1      good replacements.   That's your email to Mr. Romero.

2              Do you see that?

3      **A.    Yes.   They had actually asked me to start**

4      **looking just in case things didn't work out, yes.**

5      Q.    And were those -- were they looking for -- the

6      "they" being Ed Romero and Victor Quintero; right?

7      **A.    Yes.**

8      Q.    So Ed Romero and Victor Quintero were looking

9      for replacements for both Owen Diaz and Troy Dennis or

10     just Owen Diaz?

11     **A.    I believe it was for both.**

12     Q.    Okay.

13     **A.    I think they had -- like I said, they had a**

14     **verbal altercation in the middle of the factory in front**

15     **of a lot of people.**

16     Q.    Okay.

17     **A.    I believe -- I can't remember exactly the**

18     **incident, but it was something to that effect.**

19     Q.    Do you remember what it was about?

20     **A.    I do not.**

21     Q.    Okay.

22           This is 135.

23           (Whereupon, Plaintiffs' Exhibit 135 was marked

24           for identification and is attached hereto.)

25           (Document reviewed by the deponent.)

```
 1              MR. ORGAN:  Exhibit 135, for the record, is a
 2     one-page document Bates-stamped TESLA-319.
 3       Q.    This is something about a failure to bring
 4     safety shoes on March 3rd?
 5       A.    Yes.  We've had a -- they had a few issues
 6     where if you're an elevator operator dealing with
 7     forklifts, you had to have on the steel-toed shoes.  And
 8     we'd have a few employees that would show up without
 9     those shoes on, and in a lot of cases, we had to send
10     them home.
11       Q.    In this particular case, do you know if
12     Mr. Diaz got sent home?
13       A.    I don't recall because he was working grave and
14     I probably was asleep at the time, to be honest.
15       Q.    Fair enough.
16              Okay.  Let's go to the next one.
17              (Whereupon, Plaintiffs' Exhibit 136 was marked
18              for identification and is attached hereto.)
19              (Document reviewed by the deponent.)
20              THE WITNESS:  Oh, yeah.  Okay.  I do remember a
21     little more about this.
22              MR. ORGAN:  Q.  Tell me what else you remember
23     about -- so 136, for the record, is a one-page document
24     Bates-stamped TESLA-320.  It's an email from March 4th.
25       A.    Uh-hum.
```

1    Q.    And this is something about some PPE gear?

2    A.    Personal protective equipment.

3    Q.    Okay.

4    A.    Yeah, I believe the -- we had a safety

5    individual, Mr. Tyrone Hopper -- Hoper -- Hopper, and

6    part of his task was to go around and ensure everybody

7    had on the proper goggles, safety shoes, vests, things

8    of that nature.

9          And I think he had approached Mr. Diaz because

10   he didn't have a vest on, and then that's when he

11   discovered he didn't have his shoes, either.

12   Q.    Okay.

13   A.    And Mr. Diaz got confrontational with him as

14   the safety person.  So they were concerned, if I

15   remember.

16   Q.    This doesn't mention confrontational.

17         How do you --

18   A.    Yeah, I think they -- because I remember

19   Mr. Hopper was pretty upset about it because he said,

20   "Look.  I'm just trying to make sure you go home safe.

21   You arrive safe, go home safe."

22         And I guess there was an argument that ensued

23   with something to the effect of why are you worrying

24   about my shoes and not worrying about that guy's shoes,

25   because that guy is not part of our team type of deal.

WAYNE JACKSON
May 17, 2019

```
 1        Q.    Right.
 2              Did it seem to you that after the jigaboo -- I
 3     mean, it just seems from the emails that after the
 4     jigaboo incident in January, that there seemed to be
 5     more incidents of Mr. Diaz having verbal altercations
 6     with coworkers.
 7              MR. ARANEDA:   Objection.  Vague.
 8              THE WITNESS:   No, I would not say that, sir,
 9     because it was kind of continuous, to be very honest.
10     It was -- Owen was known as the kind of difficult
11     elevator operator at the plant.  That was just kind of
12     how people -- they didn't want to deal with him in a lot
13     of ways.
14              MR. ORGAN:   Okay.
15              THE WITNESS:   And I don't know how else to put
16     it, but that just was the feedback that I got.
17              MR. ORGAN:   Okay.
18              THE WITNESS:   He wasn't difficult with me,
19     per se, but, like I said, I only dealt with the men
20     there.
21              MR. ORGAN:   Q.  So in terms of your dealings
22     and Owen Diaz, you didn't have difficulty with him
23     personally.
24              Is that correct?
25        A.    On most occasions, no.  I mean, I -- we did
```

```
 1    having him terminated; correct?
 2        A.    I can't recall, but there were -- like I said,
 3    there were a lot of complaints that came in with regards
 4    to him.
 5        Q.    I understand that there were complaints.
 6        A.    Yeah.
 7        Q.    My question is a little different, though, a
 8    little narrower, and that is:  Did anyone tell you prior
 9    to March of 2016 that they thought that Owen Diaz should
10    be terminated?
11        A.    Yes.
12        Q.    Who?
13        A.    Ed Romero.
14        Q.    When did Ed tell you that he thought Mr. Diaz
15    should be terminated?
16        A.    It was on several occasions.  Like I said, he
17    would hear about the stuff sometimes before me.
18        Q.    Okay.
19        A.    And Ed, I think as his thing, he would always
20    say to me, like, "Wayne, I like the guy, but he's really
21    causing a lot of problems."  That would be his comment.
22        Q.    Okay.  Did he say what was causing the
23    problems?
24        A.    Attitude.
25        Q.    Attitude.
```

WAYNE JACKSON
May 17, 2019

1      **A.    He was very abrasive towards other staff.**

2      Q.    Was Owen Diaz abrasive with you?

3      **A.    On one occasion, but not -- like I said, after**

4      **I kind of let him know I'm here to help you, he kind of**

5      **calmed down, but initially, yes.**

6      Q.    When did that one occasion occur where Mr. Diaz

7      was abrasive with you or loud?   I think you said he was

8      loud.

9            Is that right?

10     **A.    Yeah.**

11           **I can't remember the exact date, to be very**

12     **honest.**

13     Q.    Was it toward the end of Owen's tenure there or

14     toward the beginning or in the middle?

15     **A.    Probably towards the beginning more.   Yeah, it**

16     **was probably more towards the beginning, I think.**

17     Q.    So once you had that conversation with Mr. Diaz

18     at the beginning about how you were there to help him,

19     you had no other issues with him throughout the entire

20     time that Mr. Diaz worked at Tesla; right?

21     **A.    I wouldn't say that.   I just -- we had a better**

22     **understanding of him not yelling at me.**

23     Q.    Okay.

24     **A.    I guess is the best way to put it.**

25     Q.    I see.

Bridget Mattos & Associates
(415)747-8710

WAYNE JACKSON
May 17, 2019

```
 1              This is 140?

 2              THE REPORTER:  140.

 3              (Whereupon, Plaintiffs' Exhibit 140 was marked

 4              for identification and is attached hereto.)

 5              (Document reviewed by the deponent.)

 6              THE WITNESS:  My daughter...

 7              MR. ORGAN:  Your daughter is calling you?

 8              THE WITNESS:  Yeah.

 9              MR. ORGAN:  Do you need to get it?

10              THE WITNESS:  I'll call her back in just a

11    minute.

12              MR. ORGAN:  Okay.

13              Well, somehow I only have two copies of this

14    one, too.  Sorry about that.

15              Exhibit 140, for the record, is a two-page

16    document Bates-stamped CITISTAFF-00009-10.

17         Q.   And it's just a -- there are two emails from

18    you --

19         A.   Uh-hum.

20         Q.   -- to Ms. De Leon and then from Monica De Leon

21    back to you regarding the termination of Mr. Diaz's

22    contract.  It's dated March 18th.

23              Do you see that?

24         A.   Yes, sir.

25         Q.   And then it says:
```

1              "Unfortunately, we will have to term the

2              assignment of Owen Diaz.  We have been trying

3              to work with him on some attendance and

4              performance issues, but we have been

5              unsuccessful."

6              And then he sent a doctor's note, but no

7    signature, and then the manager would just like to get

8    another candidate --

9        **A.    Yes.**

10       Q.    -- to backfill.

11             So --

12       **A.    That's more or less letting Citistaff know they**

13   **could reassign Owen to somewhere else.**

14       Q.    Do you remember a conversation, then, that you

15   had with either Monica or anybody else relative to this

16   issue about the doctor's note and the decision to

17   terminate him?

18       **A.    No, I believe I just forwarded the doctor's**

19   **notice to Monica.  I don't think it had a signature or**

20   **anything on it, a date or anything.**

21       Q.    Okay.

22       **A.    So it didn't -- it wasn't really a verifiable**

23   **note, I guess you could say.**

24       Q.    I see.

25             And you need that.

1       journal should have any kind of concerns?

2           **A.      Various notes would be placed there, yes.**

3           Q.      Like if there was a performance concern, it

4       should go in the requisition journal.

5               Is that right?

6               MR. ARANEDA:  Objection.

7               THE WITNESS:  Yes.

8               MR. ARANEDA:  It calls for speculation.

9               THE WITNESS:  Yes, that would go in there, as

10      well as if someone was doing, you know, above and

11      beyond, things of that nature.

12              MR. ORGAN:  I see, okay.

13              And Exhibit 142.

14              (Whereupon, Plaintiffs' Exhibit 142 was marked

15              for identification and is attached hereto.)

16              MR. ORGAN:  For the record, Exhibit 142 is a

17      two-page document Bates-stamped TESLA-752-753.  They're

18      emails from February 26 of 2016.

19              (Document reviewed by the deponent.)

20              THE WITNESS:  That's the lady,

21      Joyce Delagrande, yeah.

22              MR. ORGAN:  Okay.

23              THE WITNESS:  Yeah.  I knew it was something

24      where he got into it with somebody.  I couldn't recall

25      what it was.



| From: | Wayne Jackson </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/ON=WAYNE JACKSON899> |
|---|---|
| To: | Garrett, Terri |
| Sent: | 10/21/2015 10:49:35 AM |
| Subject: | RE: Employee Relations issue - Tesla |

Yes I have spoken with all 3 and will be speaking with Ramon and Owen again on Friday. I had a conversation with Ed at Victors desk yesterday and they just want us to verbally counsel each of them with regards to appropriate behavior in the workplace. No written warning needed right now.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com

 nextSource

*Workforce Optimization, Business Enlightenment*

From: Garrett, Terri [mailto:tgarrett@nextsource.com]
Sent: Wednesday, October 21, 2015 10:47 AM
To: Wayne Jackson <wajackson@teslamotors.com>
Subject: RE: Employee Relations issue - Tesla

Confirming via this email that we agree we do not need to do any formal investigation with Ramon, Owen and Rothaj.

**Terri Garrett**
Director of Operations
nextSource

Office: (949) 329-2581
Mobile: (562) 714-0552
tgarrett@nextsource.com
www.nextsource.com

From: Wayne Jackson [mailto:wajackson@teslamotors.com]
Sent: Monday, October 19, 2015 5:32 PM
To: Garrett, Terri <tgarrett@nextsource.com>
Subject: RE: Employee Relations issue - Tesla

Yes I'm actually on the phone now dealing with the Owen and Ramon issue. This issue seems to be related to this and we really are going to have to do some in depth investigation. I'll give you a call in a few minutes to discuss.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com



*Workforce Optimization, Business Enlightenment*

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Monday, October 19, 2015 2:17 PM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** FW: Employee Relations Issue - Tesla
**Importance:** High

Wayne, did you receive this from me on Friday?


**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
**tgarrett@nextsource.com**
**www.nextsource.com**

TESLA-0000647

Message

| | |
|---|---|
| **From:** | Garrett, Terri [tgarrett@nextsource.com] |
| **Sent:** | 1/22/2016 6:35:30 PM |
| **To:** | Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899] |
| **Subject:** | RE: Racist effigy & drawing |



EXHIBIT 128
WIT: Jackson
DATE: 5/17/19
PATRICIA ROSINSKI, CSR

Sorry for the delay, just got off the call for Tesla...

Perhaps we check in with Tesla HR (Erin Marconi) on this one, as I am surprised that he is so conservative on his stance......**do you want me to follow up with her?**

Three important things:

1) Make sure that the warning to Ramon is extremely clear and he has no room for further error
2) make sure that the impacted workers know the warning was given and any further issues are grounds for immediate termination
3) Let's send out an update to the workforce on the seriousness of this type of offense and remind them of zero tolerance policy

We can move on the 3 items above, once Tesla HR weighs in. Please do not take action until we have the feedback from HR.

**Terri Garrett**
Director of Operations
**nextSource**

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Friday, January 22, 2016 10:19 AM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** RE: Racist effigy & drawing
**Importance:** High

I just met with Victor. He suggested that we do a final written warning for Ramon. I told Victor I didn't think that was enough. My suggestion to him was a final written warning with a 3 day suspension without pay. Victor thought that was an even better idea. Will this be acceptable for you?

Sorry for using my tesla email but I'm having connectivity issues up here with my nextsource computer.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
wjackson@nextsource.com

 **nextSource**

*Workforce Optimization, Business Enlightenment*

CONFIDENTIAL

From: Garrett, Terri [mailto:tgarrett@nextsource.com]
Sent: Friday, January 22, 2016 9:33 AM
To: Wayne Jackson <wajackson@teslamotors.com>
Subject: RE: Racist effigy & drawing

Per our conversation, there are 2 options for Ramon:
1) Strong warning and grounds for termination if he has another mishap on any level
2) Termination due to the level of insult to the workforce and zero tolerance policy at Tesla


Terri Garrett
Director of Operations
nextSource


From: Wayne Jackson [mailto:wajackson@teslamotors.com]
Sent: Friday, January 22, 2016 9:19 AM
To: Garrett, Terri <tgarrett@nextsource.com>
Subject: FW: Racist effigy & drawing
Importance: High

OMG! I just would like one peaceful day around here.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
wjackson@nextsource.com

**nextSource**

*Workforce Optimization, Business Enlightenment*

From: Owen Diaz [mailto:odiazjr68@gmail.com]
Sent: Friday, January 22, 2016 8:46 AM
To: Wayne Jackson <wajackson@teslamotors.com>
Subject: Fwd: Racist effigy & drawing


Begin forwarded message:

> **From:** Owen Diaz <odiazjr68@gmail.com>
> **Date:** January 22, 2016 at 8:42:10 AM PST
> **To:** "Mr. Romero" <edromero@teslamotors.com>
> **Subject: Racist effigy & drawing**

CONFIDENTIAL

On 1/21/16 at 9:10 pm I was working elevator one, I was removing the recycling from the 2nd floor and taking said items to be staged on the first floor for removal. As I was removing those items I came upon the first cardboard bail of the night. As I pulled the pallet rider into position to pick up the bail I noticed a drawing on the bail. It was a picture of a cartoon depicting a black face person with a bone in his hair with the caption under it saying booo. Upon seeing this my stomach dropped and I wondered who could've done this in today's age. At that time I didn't know what to do, so I call Michael Wheeler and sent a text of the picture letting him know that someone on his team had sent this bail over to the elevator with this picture. Sense Michael was the lead for the recycling team at that time. I would let him take point and get to the bottom of the problem. Michael said, he would be there in a few minutes, when Michael arrived he arrived with Israel. They both took pictures and all three of us went upstairs, I had to stop and deal with the elevator crew but Michael and Israel heading over to the upstairs recycling center. They came back a few minutes later with Ramon Martinez. While the three of us were standing there discussing what happened. Ramon Martinez said, he had drew the picture and he was just playing. As a supervisors or leads we are held to a higher standard because The people we supervise look to us as examples. if a supervisor does this kind of thing in front of the employees employees what kind of example are we setting. A person should be able to come to work and not be harassed or degraded while they're trying to do their job. This is not the first time Ramon Martinez has been talk about his behavior. And because nothing has been done, it seems that his behavior is getting worse. As an employee I'm entitled to a safe and harassment free work environment. And that all I ask and hope for.



TESLA-0000022



Sent from my iPhone

CONFIDENTIAL

EXHIBIT 184
WIT: Jackson
DATE: 5/7/19
PATRICIA ROSINSKI, QSR

Message

| | |
|---|---|
| From: | Jackson, Wayne [wjackson@nextsource.com] |
| Sent: | 3/2/2016 1:40:32 AM |
| To: | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Edward Romeroe38] |
| CC: | Jackson, Wayne [wjackson@nextsource.com]; Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3] |
| Subject: | Re: Owen Diaz and ▮▮▮▮▮▮ |

Anytime Ed. They both have been made aware how critical it is for them to provide good customer service to their customers. They have been instructed to follow all direction and follow up with you or myself if they have any issues or concerns. They both understand that this is their final warning and any further issues will result in termination of their contract. We are looking for some good replacements now just in case they don't work out. Please let me know if I can assist in any other way.

*Sent from my Verizon Wireless 4G LTE DROID*

Edward Romero <edromero@teslamotors.com> wrote:

Wayne,

I appreciate you taking action with the situation involving Owen Diaz and ▮▮▮▮▮▮. I understood from you that they had received a final written notice
informing them that any negative incident involving them would lead to their immediate termination. It is vital that our elevator operators be professional, courteous,
responsive to our customers' needs and always provide good customer service.

Thank you for your action.

Edward Romero
Building Services Contract Supervisor
1-510-648-7393

CONFIDENTIAL

TESLA-0000317

EXHIBIT 136
WIT: _Jackson_
DATE: _5/17/19_
PATRICIA ROSINSKI, CSR

Message
_____

| From: | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38] |
| Sent: | 3/4/2016 4:26:04 AM |
| To: | Owen Diaz [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Owen Diazc16] |
| CC: | Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899]; Tyrone Hopper [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tyrone Hopperb3a] |
| BCC: | Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3] |
| Subject: | Safety Shoes |

Hello Owen,

I was informed by the Nextsource safety person that you reported to work today without your safety shoes. I think I understood that you had them in your vehicle. If so, please go get them asap. It is mandatory that safety gear (PPE) be worn at all times. Safety is a priority at Tesla.
Please make sure you and your associates always wear PPE.

Thanks

Edward Romero

Sent from my Verizon 4G LTE Smartphone

CONFIDENTIAL

**Monica Deleon**

| | |
|---|---|
| **From:** | Monica Deleon <mdeleon@citistaffsolutions.com> |
| **Sent:** | Friday, March 18, 2016 3:53 PM |
| **To:** | 'Jackson, Wayne' |
| **Cc:** | 'Tesla' |
| **Subject:** | RE: Term of contract for Owen Diaz |

Wayne,

No problem, I have already advised him. He knows not to return.

Monica De Leon
Staff Supervisor
CitiStaff Solutions
37053 Cherry Street Suite 204A
Newark, CA 94560.
Office 510-797-2581

**From:** Jackson, Wayne [mailto:wjackson@nextsource.com]
**Sent:** Friday, March 18, 2016 3:32 PM
**To:** mdeleon@citistaffsolutions.com
**Cc:** Tesla
**Subject:** Term of contract for Owen Diaz

Unfortunately we will have to term the assignment of Owen Diaz. We have been trying to work on him with some attendance and performance issues but we have been unsuccessful. At this point a lot of the Tesla staff don't even want to work with Owen. Owen was supposed to report back to work earlier this week and didn't. He did just send a doctor's note but there is no doctor's signature on the note he provided. At this time the manager would just like to get another candidate to back fill his role as soon as possible. Please notify Owen today that this assignment here has been ended.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@nextsource.com
www.nextsource.com

EXHIBIT
WIT: Jackson
DATE: 3/1/19
PATRICIA Y. SINSKI, CSR

CONFIDENTIAL                                                          CITISTAFF-0000009

EXHIBIT 142
WIT: Jackson
DATE: 5/17/19
PATRICIA ROSINSKI, CSR

| | |
|---|---|
| **From:** | Victor Quintero </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR QUINTERO3A3> |
| **To:** | Edward Romero |
| **Sent:** | 2/26/2016 7:50:51 AM |
| **Subject:** | RE: Owen |

Let me know what is Owens side of the story.

From my perspective we may need to ask Wayne to give him a final warning and if we continue to receive complaints he must be terminated.

Victor

**From:** Edward Romero
**Sent:** Friday, February 26, 2016 6:00 AM
**To:** Joyce Delagrande <jdelagrande@teslamotors.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>
**Subject:** Re: Owen

Good morning Joyce,

I am sorry to hear about this issue. I will deal with this matter and contact you if I have any questions or need clarification. I agree that we must maintain good communication, be professional and work together as a team at all times.

Thanks,

Edward Romero
Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Feb 26, 2016 1:24 AM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
Hi Edward,

So I am having a few more issues with Owen. Tonight my lead approached him to talk to him and he said for my associates to only talk to him if it is related to business because there are "so many snakes here at Tesla" . I guess he was having a "personal conversation "on the elevator with someone and felt Robert saying hi to him was rude. So my lead was coming out of the elevator and showed him a gear case rack that needed to go downstairs. His response to my lead was he does not want anyone talking to him, he we want him to do anything we have to email him. I do not personally have his email and I was unaware of this process change.

Owen is now here telling me that my associate threatened him because he said was going to contact you. I have instructed my leads to contact me if there are any more issues with him because we are really struggling with his customer service and it was not a threat, it was us letting him know that we really need the work to be done and if he will not do this we will contact his manager. My leads come to me if any of our associates have issues and since you are his boss he simply said he would contact you. Owen just told me he does not want my leads/associates talking to him anymore, he tried to tell me that he needs them to text him. I told him my leads should not have to text to him. He told me the rack my leads asked him to move did not need to be moved. He got a little loud and told my lead again to not talk to him.

My leads are telling me they feel really uncomfortable with him now, do you have anyone else that you send up here to work the elevator? He has a huge attitude and they do not feel at all as if he is approachable-especially now that he said not to talk to him. I have absolutely no issues at all with the team in the beginning of the week and I would love to be able to have a crew to work with the end of the week with the same work ethic.

Thank you Edward!

*Joyce DelaGrande*
*Production Control Supervisor-Powertrain*
*510-600-7448 Cell*
*Email : jdelagrande@teslamotors.com*
**T ☰ 🝫 L 🝫** TESLA MOTORS
*45500 Fremont Blvd.,Fremont, CA. 94538*

CONFIDENTIAL

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF CALIFORNIA        )
                                 )  ss.
 3    COUNTY OF MARIN            )

 4          I, PATRICIA ROSINSKI, hereby certify:

 5          That I am a Certified Shorthand Reporter in the

 6    State of California.

 7          That prior to being examined, WAYNE JACKSON,

 8    the witness named in the foregoing deposition, was by me

 9    duly sworn to testify the truth, the whole truth, and

10    nothing but the truth;

11          That said deposition was taken pursuant to

12    Notice of Deposition and agreement between the parties

13    at the time and place therein set forth and was taken

14    down by me in stenotype and thereafter transcribed by me

15    by computer and that the deposition is a true record of

16    the testimony given by the witness.

17          I further certify that I am neither counsel for

18    either, nor related in any way to any party to said

19    action, nor otherwise interested in the result or

20    outcome thereof.

21          Pursuant to Federal Rules of Civil Procedure,

22    Rule 30(e), review of the transcript was not requested

23    before the completion of the deposition.

24          PATRICIA ROSINSKI, CSR No. 4555

25              May 28, 2019

                                                          154
```

# EXHIBIT "J"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

              Plaintiffs,

                             No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

              Defendants.

_____/

DEPOSITION OF ANNALISA HEISEN

May 29, 2019

Reported by:

Bridget M. Mattos, CSR No. 11410

**BRIDGET MATTOS & ASSOCIATES**
CERTIFIED SHORTHAND REPORTERS

Certified Copy

```
 1                BE IT REMEMBERED that, pursuant to

 2      Notice of Taking Deposition, and on May 29, 2019,

 3      commencing at the hour of TIME a.m., at California

 4      Civil Rights Group, 332 San Anselmo Avenue, San

 5      Anselmo, California 94960, before me, BRIDGET M.

 6      MATTOS, CSR No. 11410, there personally appeared

 7

 8                      ANNALISA HEISEN,

 9

10      called as a witness by Plaintiff, who, having been

11      duly sworn, was examined and testified as is

12      hereinafter set forth.

13                      ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

1          MR ORGAN:   Exhibit 150, for the record, is a

2    two-page document Bates-stamped Tesla 842 to 843.

3    This was just produced today, and it's entitled

4    "Antiharassment and Discrimination Policy."

5         Q.   Do you recognize Exhibit 150?

6         A.   I do.

7         Q.   And what is it?

8         A.   It's the antiharassment and discrimination

9    policy for Tesla.

10        Q.   Is this the current version of the

11   antiharassment and discrimination policy for Tesla,

12   Exhibit 150?

13        A.   I'm familiar with there being multiple

14   versions of it.  I'm not sure if this is the current

15   version or not.

16        Q.   And how would you know whether or not it's a

17   current version or not?

18        A.   The current version is posted on our internal

19   Web page that's kept up-to-date.

20        Q.   In terms of changes to the antiharassment and

21   discrimination policy, have there been significant

22   changes in this policy during your tenure at Tesla?

23        A.   What do you mean by "significant"?

24        Q.   Meaning substantively different changes to

25   the policy since you started at Tesla.

1  versions.  The other, I don't know what they are off

2  the top of my head.

3           MR ORGAN:  Q.  Okay.  Let's go through

4  Exhibit 150.

5           Now, as to this policy, the antiharassment

6  and discrimination policy, this policy would apply to

7  all workers at the Tesla factory; correct?

8           MS. JENG:  Objection; vague and ambiguous and

9  calls for speculation.

10          THE WITNESS:  There's an expectation that

11  employees at Tesla as well as contractors and other

12  people on-site are in compliance with the policy.

13          MR ORGAN:  Q.  So Exhibit 150 does apply to

14  both contractors and regular employees, then; right?

15          MS. JENG:  Objection; asked and answered.

16          THE WITNESS:  There's an expectation that

17  both of those categories of workers would be in

18  compliance with those articulated.

19          MR ORGAN:  Okay.  And in terms of -- so if

20  both employees and contractors have to comply with

21  Exhibit 150, the policies in Exhibit 150, how do you

22  go about enforcing that?

23          MR. ARANEDA:  Misstates prior testimony.

24          MS. JENG:  And also vague and ambiguous as to

25  "enforce."



# T E S L R

## Anti-Harassment and Discrimination Policy

The Company is committed to providing a workplace that is free of discrimination and harassment. In keeping with this policy, we strictly prohibit discrimination of any kind including discrimination or harassment on the basis or race, color, veteran status, religion, gender, sex, sexual orientation, age, mental or physical disability, medical condition, national origin, marital status or any other characteristic protected under federal or state law or local ordinance.

Employees and Non-Employees: Tesla Motors prohibits harassment of employees by managers, supervisors, and co-workers. Similarly, all employees are prohibited from harassing employees and non-employees. Tesla Motors will also protect employees from harassment by non-employees in the workplace.

**Definitions of Harassment**: Harassment may take many forms, but the most common forms include:

Verbal Harassment: Such as jokes, epithets, slurs, negative stereotyping and unwelcome remarks about an individual's body, color, physical characteristics or appearance, questions about a person's sexual practices or gossiping about sexual relations.

Physical Harassment: Such as physical interference with normal work, impeding or blocking movement, assault, unwelcome physical contact, leering at a person's body or threatening, intimidating or hostile acts that relate to a protected characteristic.

Visual Harassment: Such as offensive or obscene photographs, calendars, poster, cards, cartoons, emails, drawings and gestures, display of sexually suggestive lewd objects, unwelcome notes or letters or any other written or graphic material that denigrates or shows hostility or aversion toward an individual characteristic, whether placed on walls, bulletin boards or elsewhere on the employer's premises or circulated in the workplace.

Sexual Harassment: There are two distinct categories of sexual harassment:

  a) Quid Pro Quo: When an individual's submission to or rejection of unwelcome sexual conduct is used as a basis for employment decisions affecting that individual including granting of employment benefits.
  b) Hostile Environment: When unwelcome sexual conduct unreasonably interferes with an individual's job performance or creates an intimidating, hostile or offensive working environment even if it does not lead to tangible or economic job consequences.

Sexual harassment includes harassment to women by men, of men by women, and same sex gender-based harassment. Sexual harassment is unlawful whether it involves co-worker harassment, harassment by a supervisor or manager, or by persons doing business with or for the Company.

The Company prohibits any and all conduct that may be interpreted as harassment as defined above whether or not such conduct is pervasive enough to meet the technical legal requirements of harassment.

**Reporting and Investigation**: If you believe that you have been subject to improper discrimination of any kind or to conduct that violates this policy, you must immediately report the facts of the conduct to your manager or to a Human Resources representative. If for any reason you do not feel comfortable discussing the matter with your manager, you should bring the matter to the attention of your second-tier manager or to a Human Resources representative. The important thing is that you bring the matter to the Company's attention promptly so that any concern of harassment or discrimination can be investigated and addressed appropriately. All complaints will be promptly and thoroughly investigated, and all information disclosed during the course of the investigation will remain as confidential as possible, except as necessary to conduct the investigation and take any remedial action in accordance with applicable law.

All employees and managers have a duty to cooperate in the investigation of alleged harassment or discrimination. Failing to cooperate or deliberately providing false information during an investigation shall be grounds for disciplinary action up to and including termination of employment. At the conclusion of our

CONFIDENTIAL

investigation, if we determine a violation of policy has occurred, we will take effective remedial action to commensurate with the severity of the offense. This may include disciplinary action against the accused party up to and including termination of employment. Steps will be taken as reasonable and necessary to prevent any further violations of policy.

**Retaliation:** Retaliation for reporting, in good faith, any incidents of harassment or discrimination or perceived harassment or discrimination, or for making any complaints, in good faith, of harassment or discrimination is strictly prohibited. Any report of retaliation by someone accused of harassment or discrimination by co-workers or managers will be promptly and thoroughly investigated in accordance with the investigation procedure outlined above. If a complaint of retaliation is substantiated, appropriate disciplinary action will be taken up to and including termination of employment.

**Discipline:** If an employee harasses another person, based on their membership in a protected class under applicable Federal, State or Local law, the harassing employee will be disciplined. Disciplinary action may range from warnings to immediate termination or employment, depending on the circumstances. If a non-employee harasses an employee, corrective action will be taken after the appropriate management personnel are consulted.

**Additional Enforcement:** In addition to our internal complaint procedure, you should be aware that the federal Equal Employment Opportunity Commission (EEOC) and the California Department of Fair Employment and Housing (DFEH) investigate and prosecute complaints or harassment and discrimination in employment. You may contact EEOC and DFEH directly; their phone numbers are listed in the telephone book.

**Modification:** This policy can be modified unilaterally by the Company at any time without notice. Modification may be necessary to maintain compliance with State and Federal regulations and/or accommodate organized changes within the Company.

*By my signature below, I acknowledge that I have read the above Anti-Harassment and Discrimination Policy and will comply with all the provisions.*


| | | |
|---|---|---|
| Employee Signature | Printed Name | Date |

ANNALISA HEISEN
May 29, 2019

```
 1    State of California                )

 2    County of Marin                    )

 3

 4              I, Bridget M. Mattos, hereby certify

 5    that the witness in the foregoing deposition was by me

 6    duly sworn to testify to the truth, the whole truth

 7    and nothing but the truth in the within entitled

 8    cause; that said deposition was taken at the time and

 9    place herein named; that the deposition is a true

10    record of the witness's testimony as reported to the

11    best of my ability by me, a duly certified shorthand

12    reporter and disinterested person, and was thereafter

13    transcribed under my direction into typewriting by

14    computer; that the witness was given an opportunity to

15    read, correct and sign the deposition.

16              I further certify that I am not

17    interested in the outcome of said action nor connected

18    with or related to any of the parties in said action

19    nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunder

21    subscribed my hand on May 29, 2019.

22    _____

23        BRIDGET M. MATTOS, CSR NO. 11410

24

25
```

Bridget Mattos & Associates
(415)747-8710

# EXHIBIT "K"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - -

DEMETRIC DIAZ, OWEN DIAZ, and        )

LAMAR PATTERSON,                     )

            Plaintiffs,        )   CASE NO.

vs.                                  )   3:17-CV-06748-WHO

TESLA, INC. dba TESLA MOTORS,        )

INC.; CITISTAFF SOLUTIONS,           )

INC.; WEST VALLEY STAFFING           )

GROUP; CHARTWELL STAFFING            )

SERVICES, INC.; and DOES 1-50,       )

inclusive,                           )

            Defendants.        )

- - - - - - - - - - - - - - - - - - -

DEPOSITION OF MICHAEL JOHN WHEELER

WEDNESDAY, JUNE 12, 2019

Reported by:

BY:  MELINDA M. SELLERS, CSR# 10686, RMR, CRC, CRR, CCRR

BRIDGET MATTOS & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS

Certified Copy

 1   NextSource, Inc.

 2       MS. JENG:  Patricia Jeng on behalf of Tesla,

 3   Inc.

 4           Before we start, I'll just go ahead and

 5   assert an objection as to the video recording, as

 6   it's not being administered by a certified

 7   videographer per the code.

 8       MS. KUMAGAI:  And CitiStaff will join in that

 9   objection.

10       MR. ADAMS:  So will NextSource.

11       MR. ORGAN:  And also the deposition officer,

12   could you please say your name for the record.

13       THE REPORTER:  My name is Melinda Sellers.

14       MS. SPEARMAN:  Will the court reporter please

15   swear the witness.

16           (The witness was duly sworn.)

17

18                       EXAMINATION

19   BY MR. ORGAN:

20       Q.   Good afternoon, Mr. Wheeler.  How are you

21   doing?

22       **A.   Doing well.**

23       Q.   So a deposition -- I assume you've never

24   had your depo taken before?

25       **A.   No.**

1   Diaz.  Do you remember what he said to you on the

2   phone call?

3       **A.    He did not tell me what.  He just said, you**

4   **know, "Hey, come check this out."**

5       Q.    Okay.

6       **A.    Something like that.**

7       Q.    Did he seem upset?

8       **A.    He was upset.**

9       Q.    Okay.  And then when you got to the

10  elevators, that's when you saw the bale of

11  recycling; is that right?

12      **A.    Correct.**

13      <u>Q.    And you obviously -- when you saw this</u>

14  <u>picture, what did you think?</u>

15      **<u>A.    I laughed.</u>**

16      Q.    Why did you laugh?

17      **A.    I -- so I have -- I'm -- the type of person**

18  **I am, I'm a fun-loving, fun-going person.  I feel**

19  **for me laughter is the better way to cope with**

20  **anything.  It's either that or tears.  But since I**

21  **don't feel like crying 24/7, I will do the latter.**

22  **So, yeah, I did.**

23          **And then we were talking about it, and I**

24  **want to say what happened after that is he called**

25  **Ramon over or Ramon showed up -- but I believe he**

```
 1  STATE OF CALIFORNIA        )
 2                             )     ss
 3  COUNTY OF CALAVERAS        )
 4            I hereby certify that the witness in the
 5  foregoing deposition of MICHAEL JOHN WHEELER was by
 6  me duly sworn to testify to the truth, the whole
 7  truth, and nothing but the truth in the
 8  within-entitled cause; that said deposition was taken
 9  at the time and place herein named; that the
10  deposition is a true record of the witness's
11  testimony as reported by me, a duly certified
12  shorthand reporter and a disinterested person, and
13  was thereafter transcribed into typewriting by
14  computer.
15            I further certify that I am not interested
16  in the outcome of the said action, nor connected
17  with, nor related to any of the parties in said
18  action, nor to their respective counsel.
19            IN WITNESS WHEREOF, I have hereunto set my
20  hand this 24th day of June, 2019.
21
22
23
24  MELINDA M. SELLERS, CSR NO. 10686
25  STATE OF CALIFORNIA
```

# EXHIBIT "L"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                    Plaintiffs,

                                        No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                    Defendants.
_____/

DEPOSITION OF KEVIN McGINN

June 17, 2019

Reported by:

Bridget M. Mattos, CSR No. 11410

BRIDGET MATTOS & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS

Certified Copy

 1            BE IT REMEMBERED that, pursuant to

 2    Notice of Taking Deposition, and on June 17, 2019,

 3    commencing at the hour of 10:12 a.m., at California

 4    Civil Rights Group, 180 Grand Avenue, Oakland,

 5    California, before me, BRIDGET M. MATTOS, CSR No.

 6    11410, there personally appeared

 7

 8                       KEVIN McGINN,

 9

10    called as a witness by Plaintiff, who, having been

11    duly sworn, was examined and testified as is

12    hereinafter set forth.

13                       ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. ORGAN:  Q.  And did nextSource provide

2   any associates, or what you referred to as

3   administrative employees, to Tesla?

4      **A.   Yes.**

5      Q.   Approximately how many administrative -- do

6   you refer to them interchangeably as administrative

7   employees or associates, if I refer to those two terms

8   or --

9      **A.   Yes.**

10     Q.   What's the term that you typically use?

11     **A.   Associates.**

12     Q.   So if I refer to "associates," you'll

13  understand those are administrative employees;

14  correct?

15     **A.   Yes.**

16     Q.   So approximately how many associates did

17  nextSource provide to Tesla, starting when you started

18  in October of 2015?

19     **A.   I would estimate -- so the head count levels**

20  **will fluctuate depending on demand at the direction of**

21  **the client, but the average associate staffing would**

22  **be between 30 and 40 associates.**

23     Q.   And the contract that nextSource had with

24  Tesla included at least a provision that allowed for

25  nextSource to provide those 30 to 40 associates to

1    one category of a managed service provider.

2         The second category would be the selection of

3    suppliers.  So supplier selection would be a service

4    that nextSource provides under its agreement.

5         Q.   And what does that mean, selection of

6    suppliers?  What does that involve?

7         **A.   So a client such as Tesla may have needs in a**

8    **certain geography or a certain, say, skill set.**

9    **NextSource associates provide only a part of those**

10   **needs; right?  So nextSource would select suppliers**

11   **who would provide additional supplier-employed workers**

12   **at the Tesla site.**

13        Q.   So in other words, nextSource would

14   coordinate with other staffing agencies to try and

15   accommodate Tesla's demand for associates at the

16   Fremont factory?

17             MR. GELLER:  Misstates his testimony.

18             Go ahead.

19             THE WITNESS:  NextSource would select

20   suppliers who would provide resources into the Tesla

21   factory at the direction of -- day-to-day direction of

22   Tesla.  However, those workers were employed; in other

23   words, they were recruited, onboarded and paid, and,

24   if needed, you know, terminated by the supplier

25   employer.

1      Q.   And then under managed service providers, in

2   terms of the functions that nextSource provided, those

3   sort of fall into two categories.

4           You would provide a platform, a technology

5   platform for associates to essentially submit

6   timesheets; is that correct?

7           MR. GELLER:  Misstates his testimony.

8           THE WITNESS:  The platform would be for the

9   supplier-employed workers to submit -- enter and

10  submit their timesheets, which would then be approved

11  by the -- well, to be approved by the client.

12          MR. ORGAN:  Okay.

13      Q.   So for example, nextSource chose CitiStaff

14  Solutions, Inc., as a provider; is that correct?

15      A.   Yes.

16      Q.   And then nextSource would establish the

17  technology platform for CitiStaff associates to, like,

18  submit their timesheets and things like that; is that

19  correct?

20      A.   Yes.

21      Q.   In addition to that, did nextSource provide

22  any additional services for CitiStaff employees, other

23  than the timekeeping function?

24      A.   No.

25      Q.   And then in addition to these sort of -- I'll

1      Q.   And so tell me, what were the functions that
2  the on-site program team would do that nextSource
3  provided?
4      A.   The key functions of a program team is to
5  take the client's direction and bring -- and really
6  facilitate those needs to the supplier workforce.   So
7  one would be, you know -- well that's it.   It
8  basically would -- any kind of client needs or wishes
9  would be messaged to the suppliers for the suppliers
10  to take whatever action they would deem necessary for
11  the workforce.   That's one area.
12           The second service that a program team would
13  perform would be managing the requisitions in the
14  platform to meet the head count level set by the
15  client.   So, expand just a little bit there:   The
16  client needs additional head count for a shift next
17  week.   NextSource program team will set up the
18  requisition in the software.   The suppliers will then
19  go out, find, recruit, onboard and hire those workers
20  to be placed onto the requisition in the system.
21           So I would say it's an information flow.
22  Information flows through nextSource, data flow, that
23  sort of thing.
24      Q.   So you mentioned essentially two additional
25  things that, under this third category, that

1    have to move on that, but I understand.

2        Q.   So let's talk about your policies and

3    procedures related to race harassment in effect from

4    2014 to present who applied to your professionals.

5            Some of the professionals that nextSource

6    employed worked at the Tesla factory; correct?

7        **A.   Yes.**

8        Q.   Do you know who those people were?

9        **A.   I believe it was Mr. Wayne Jackson.  There**

10   **was Vanessa parks, and there's a third lady who**

11   **actually left before -- right at the time I got there.**

12   **I don't remember her name.  It was a third female that**

13   **worked -- a professional who worked in that Tesla**

14   **site.**

15       Q.   Deb Gryske or Grayske?

16       **A.   Deb Gryske didn't work on-site, but she is a**

17   **professional of nextSource but not on-site at Tesla,**

18   **if that's the question.**

19       Q.   So what was -- Wayne Jackson we've deposed.

20   I know him.  He was your account manager; right?

21       **A.   I believe his title was program manager, but**

22   **essentially.**

23       Q.   And what's a program manager function?

24       **A.   So the program manager acts as a liaison**

25   **between Tesla, the client, Tesla's wishes, and the**

1   **suppliers -- you know the supplier workers, the**

2   **supplier-employed workers.   That's one of the primary**

3   **duties of a program manager.   He may also gather facts**

4   **at the direction of Tesla or at the request of Tesla.**

5   **He was a fact gatherer and will communicate to the --**

6   **either party to the client side or to the supplier**

7   **side, based on the facts.**

8       Q.   Okay.   And then you mentioned a Vanessa

9   Parks.   What was Vanessa Parks' job?

10      **A.   Vanessa was an administrative role there;**

11  **again, a professional of nextSource but worked in a --**

12  **in this example, I'm using "administrative" to mean**

13  **she would enter requisitions into the system.   She**

14  **would, you know -- data-keying, that sort of thing,**

15  **very administrative type of work.**

16      Q.   Like an administrative assistant kind of

17  thing?

18      **A.   Yeah, at the same level, yes.**

19      Q.   So Wayne Jackson, was he the highest-level

20  nextSource employee actually working at the Tesla

21  factory?

22      **A.   Yes.**

23      Q.   And then Vanessa Parks worked in an

24  administrative role at the Tesla factory too; is that

25  right?

 1            MR. GELLER:  That's all we've been doing,

 2    Counsel.

 3            MR. ORGAN:  No, making statements is not

 4    appropriate, and you know that.

 5       Q.   Now, let's talk about this:  Are you

 6    suggesting that the information you have is that Wayne

 7    Jackson did not meet with Victor Quintero?

 8       A.   No, I'm not suggesting that.

 9       Q.   In fact, the only information you have is

10    that Wayne Jackson did meet with Victor Quintero;

11    correct?

12       A.   According to this email, that is what this

13    says, yes.  I agree this email does state that, and --

14       Q.   You have no reason to doubt Mr. Jackson's

15    statement here that he met with Victor Quintero, do

16    you?

17       A.   I have no reason to doubt.  Yes.

18       Q.   Okay.  And in fact, that would be part of the

19    appropriate protocol, based on what you've already

20    testified to, as to what role Wayne Jackson was

21    playing in the investigation of Mr. Diaz's complaint;

22    correct?

23       A.   He would.  Wayne would gather the facts and

24    have a discussion with the client as to what the

25    client wants to be done.  So he will take -- the

1  **program manager will take the direction and wishes of**

2  **the client back to the supplier, so this appears to be**

3  **all within the course of that process, yes.**

4      Q.   Okay.  And then if you look at the next

5  sentence, it says, "He" -- meaning Victor --

6  "suggested that we do a final written warning for

7  Ramon."

8           You see that; right?

9      **A.   Yes.**

10     Q.   And it appears that Mr. Jackson indicated to

11  Mr. Quintero that he didn't think a final written

12  warning was sufficient discipline; right?

13     **A.   I see the -- I see that in the email, yes.**

14     Q.   And that's your understanding of what

15  happened in the meeting with Wayne Jackson and Victor

16  Quintero; right?

17          MR. GELLER:  Calls for speculation.

18          THE WITNESS:  According to this email, that's

19  the face of what the meeting was about -- what

20  occurred in the meeting right here.

21          MR. ORGAN:  Q.  And as far as nextSource is

22  concerned, that's nextSource's understanding what

23  happened in the meeting between Wayne Jackson and

24  Victor Quintero; correct?

25          MR. GELLER:  Calls for speculation.

KEVIN McGINN
June 17, 2019

```
 1    State of California              )

 2    County of Marin                  )

 3

 4              I, Bridget M. Mattos, hereby certify

 5    that the witness in the foregoing deposition was by me

 6    duly sworn to testify to the truth, the whole truth

 7    and nothing but the truth in the within entitled

 8    cause; that said deposition was taken at the time and

 9    place herein named; that the deposition is a true

10    record of the witness's testimony as reported to the

11    best of my ability by me, a duly certified shorthand

12    reporter and disinterested person, and was thereafter

13    transcribed under my direction into typewriting by

14    computer; that the witness was given an opportunity to

15    read, correct and sign the deposition.

16              I further certify that I am not

17    interested in the outcome of said action nor connected

18    with or related to any of the parties in said action

19    nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunder

21    subscribed my hand on June 17, 2019.

22

23              _____
                BRIDGET M. MATTOS, CSR NO. 11410

24

25
```

**Page 215**

Bridget Mattos & Associates
(415)747-8710

# EXHIBIT "M"

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                                          REPORTER CERTIFIED
                                              TRANSCRIPT
4    _____

5    DEMETRIC DI-AZ, OWEN DIAZ
     and LAMAR PATTERSON, an             No. 3:17-cv-06748-WHO
     individual,
6
                 Plaintiffs,
7                                         CONFIDENTIAL
          vs.
8
     TESLA, INC. DBA TESLA
9    MOTORS, INC.; CITISTAFF
     SOLUTIONS, INC.; WEST
10   VALLEY STAFFING GROUP;
     CHARTWELL STAFFING
11   SERVICES, INC., and DOES
     1-10, inclusive,
12
                 Defendants.
13   _____

14

15                  CONFIDENTIAL

16              Deposition of

17             LAMAR PATTERSON

18         San Francisco, California

19          Friday, July 26, 2019

20

21

22

23   REPORTED BY:
     Sarah Jean Seitz
     CSR No. 14175, RPR
24   FILE No:  19-29151

25

**Lamar Patterson-Confidential**

1          Friday, July 26, 2019; San Francisco, California

2                          10:12 a.m.

3                          ---oOo---

4                      LAMAR PATTERSON,

5     having first declared under penalty of perjury to tell

6       the truth, was examined and testified as follows:

7                          ---oOo---

8                        PROCEEDINGS

9          MS. JENG:  Patty Jeng for Tesla.

10          MS. KUMAGAI:  Susan Kumagai for CitiStaff

11    Solutions, Inc.

12          MR. ARANEDA:  Juan Araneda for nextSource.

13          MS. AVLONI:  Navruz Avloni here on behalf of

14    the witness, Lamar Patterson.

15          MS. BODIFORD:  Jamie Bodiford with Tesla.

16                          ---oOo---

17                        EXAMINATION

18    BY MS. JENG:

19        Q.  Good morning, Mr. Patterson.

20        A.  Good morning.

21        Q.  I'm Patty Jeng.  As I just said, I represent

22    Tesla.

23            Can you please state and spell your name for

24    the record.

25        A.  My name is Lamar Patterson.  First name

**Lamar Patterson-Confidential**

1    Q.   So it was while you guys were both together at

2  work?

3    A.   Right.

4    Q.   What did he say about Demetric?

5    A.   Just things about, you know -- things about a

6  father and son, just talking about him.

7    Q.   Just about his relationship with his son?

8    A.   Right.

9    Q.   Did he speak positively or negatively about his

10  relationship with his son?

11    A.   Positively.

12    Q.   Anything else you can recall about what Owen

13  told you about his son Demetric?

14    A.   No.

15    Q.   And you know Owen Diaz; right?

16    A.   Yeah.

17    Q.   Okay.  How did you meet Owen?

18    A.   At Tesla.

19    Q.   Did you ever meet him before you started

20  working at Tesla?

21    A.   No.

22    Q.   Did you know of him before you started working

23  at Tesla?

24    A.   No.

25    Q.   When was the first time you met Owen?

1    A.   My first day was -- when I started work.

2    Q.   Okay.  And what day was that?

3         MS. AVLONI:  If you remember.

4         THE WITNESS:  I don't recall the --

5    BY MS. JENG:

6    Q.   Exactly.

7    A.   -- the date.

8         Yeah.  I don't recall the date.

9    Q.   Does January 13, 2016, sound right?

10   A.   Yeah.

11   Q.   So you met Owen on your first day of work?

12   A.   Yes.

13   Q.   And what was your first interaction with him

14   like?

15   A.   Cool, down to earth.

16   Q.   So prior to working at Tesla, you had never

17   spoken or communicated with Owen?

18   A.   No.

19   Q.   Did Owen ever -- strike that.

20        So you were staffed at Tesla through a staffing

21   agency; correct?

22   A.   Yes.

23   Q.   Which staffing agency?

24   A.   Chartwell Staffing.

25   Q.   When did you apply to work for Chartwell?

**Lamar Patterson-Confidential**

1    CERTIFICATE OF REPORTER

2        I, SARAH J. SEITZ, CSR No. 14175, RPR, certify:

3    That the foregoing proceedings were taken before me at

4    the time and place herein set forth; at which time the

5    witness was duly sworn; and that the transcript is a

6    true record of the testimony so given.

7        Witness review, correction, and signature was

8    (X) By code.                    (X) Requested.

9    ( ) Waived.                     ( ) Not requested.

10   ( ) Not handled by the deposition officer due to party

11   stipulation.

12

13       The dismantling, unsealing, or unbinding of the

14   original transcript will render the reporter's

15   certificate null and void.

16       I further certify that I am not financially

17   interested in the action, and I am not a relative or

18   employee of any attorney of the parties, nor of any of

19   the parties.

20       Dated this 6th day of August, 2019.

21

22

23   _____

24   SARAH J. SEITZ, CSR No. 14175, RPR

25