LAWRENCE A. ORGAN (SBN 175503)
NAVRUZ AVLONI (SBN 279556)
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Ave.
San Anselmo, California, 94960
Telephone: (415) 453-4740
Facsimile: (415) 785-7352
larry@civilrightsca.com
navruz@civilrightsca.com

J. BERNARD ALEXANDER (SBN 128307)
**ALEXANDER KRAKOW + GLICK LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone: (310) 394-0888
Facsimile: (310) 394-0811
balexander@akgllp.com

Attorneys for Plaintiffs
DEMETRIC DI-AZ and OWEN DIAZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON, <br><br> Plaintiffs, <br><br> v. <br><br> TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive, <br><br> Defendants. | Case No. 3:17-cv-06748-WHO <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT CITISTAFF SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION OF ISSUES** <br><br> Date: October 23, 2019 <br> Time: 2:00 p.m. <br> Courtroom: 2, 17th Floor <br> Judge: Hon. William H. Orrick <br><br> Trial Date: March 2, 2020 <br> Complaint filed: October 16, 2017 |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Austin v. Terhune,*
  367 F.3d 1167 (9th Cir. 2004) ..................................................................................27

*Bains LLC v. Arco Prod. Co., Div. of Atlantic Richfield Co.,*
  405 F.3d 764 (9th Cir. 2005) ....................................................................................18

*Best Quality Coatings Corp. (ABQC) v. N.L.R.B.,*
  44 F.3d 516 (7th Cir. 1995) ......................................................................................17

*Davis v. Kiewit Pacific Co.,*
  220 Cal. App. 4th 358 (2013) ...................................................................................28

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
  504 U.S. 451 (1992)..................................................................................................15

*Edwards v. U.S. Fid. & Guar. Co.,*
  848 F.Supp.1460 (N.D. Cal. 1994) ...........................................................................27

*Ellison v. Brady,*
  924 F.2d 872 (9th Cir. 1991) ...............................................................................18, 23

*Farragher v. City of Boca Raton,*
  524 U.S. 775 (1998)..................................................................................................22

*Fuller v. City of Oakland,*
  47 F. 3d 1522 (9th Cir. 1995.) ............................................................................23, 28

*Hajianpour v. Synova, Inc.,*
  No. CV 12-1765-CAS RZX, 2012 WL 5468834 (C.D. Cal. Nov. 5, 2012)............17

*Hughes v. Pair,*
  46 Cal. 4th 1035 (2009) ............................................................................................26

*McGinest v. GTE Svc. Corp.,*
  360 F.3d 1103 (9th Cir. 2004) ..................................................................................17

*Metoyer v. Chassman,*
  504 F.3d 919 (9th Cir. 2007) ....................................................................................17

*Morrow v. City of Oakland,*
  2012 WL 368682 (N.D. Cal. Feb. 3, 2012) ..............................................................15

PLAINTIFFS' OPPOSITION TO CITISTAFF MOTION FOR SUMMARY JUDGMENT

*Ray v. Henderson,*
   217 F.3d 1234 (9th Cir. 2000) ...................................................................................21

*Rodgers v. Western-Southern Life Insurance Company,*
   12 F.3d 668 (7th Cir. 1993) ......................................................................................18

*Roe v. DDS,*
   2017 WL 2311303 (N.D. Cal. May 26, 2017) ..........................................................25

*Singh v. Southland Stone, U.S.A., Inc.,*
   186 Cal. App. 4th 338 (2d Dist. 2010)......................................................................26

*Steiner v. Showboat Operating Co.,*
   25 F.3d 1459 (9th Cir. 1994) ....................................................................................17

*Swinton v. Potomac Corp.,*
   270 F.3d 794 (9th Cir. 2001) ..............................................................................18, 28

*U.S. E.E.O.C. v. Global Horizons, Inc.,*
   915 F.3d 631 (9th Cir. 2019) .................................................................15, 16, 17, 20

*United States v. 1 Parcel of Real Property, Lot 4, Block 5 of Eaton Acres,*
   904 F.2d 487 (9th Cir. 1990) ....................................................................................15

*Velarde v. City of Alameda,*
   2016 WL 1588269 (N.D. 2016) ................................................................................25

**Statutes**

42 U.S.C. § 1981 ........................................................................15, 17, 18, 26, 27

Cal. Civ. Code § 51.7(a) ...............................................................................................25

Cal Civ. Code § 52.1(a) ................................................................................................25

California Civil Code §3294(b) ....................................................................................28

**Other Authorities**

Fed. R. Civ. P. 56(a) .....................................................................................................15

## I. __INTRODUCTION__

This is a hostile work environment case based on race.  While working at Defendant Tesla, Inc.'s factory in Fremont, California, Plaintiff Owen Diaz ("Plaintiff") was subjected to racial harassment. Over the course of nine months, Plaintiff was called the N-word multiple times,  instructed to "Go back to Africa", threatened with violence, subjected to multiple incidents of racist graffiti throughout the facility, and a racist effigy was left in his work area. Employees openly worked with swastikas tattooed on their heads.

When Plaintiff complained to his employer, Defendant CitiStaff Solutions, Inc. ("Defendant" or "CitiStaff"), he was treated as a "problem" employee who could not get along with others.  CitiStaff already had actual knowledge of at least one of Plaintiff's prior complaints, where he  reported that the harassment was getting worse. However, CitiStaff failed to conduct its own investigation or to take any corrective action to prevent further racist conduct.

CitiStaff does not dispute the harassment Plaintiff experienced.  Instead, CitiStaff claims that it cannot be held liable because it lacked actual notice of the harassment Plaintiff experienced, and promptly took corrective action once it become aware of the harassment.

The undisputed facts show the opposite. CitiStaff instructed Plaintiff  to bring any issues to the attention of on-site supervisors who worked for other companies. After Plaintiff dutifully followed these instructions he was targeted for retaliation. Moreover, even after CitiStaff was made aware of the harassment Plaintiff experienced, it conducted no investigation into Plaintiff's claims. An open and pervasive racially hostile work environment existed at the Tesla factory, which should have prompted corrective action from CitiStaff based on even minimal diligence. Based on the testimony and documents produced, any reasonable trier of fact could, and likely would, find CitiStaff knew or should have known of the racial hostility but failed to take appropriate preventative or remedial measures. As such, CitiStaff's motion should be denied.

## II. __FACTUAL BACKGROUND__

### A. **Plaintiff Is Hired And Trained By CitiStaff In The Summer Of 2015.**

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

1   ████████████████████████████████████████ and was thereafter "considered a CitiStaff employee."

2   (Monica De Leon Deposition ("De Leon Depo.") at 42:23-43:15, Exh. 1 to the Declaration of

3   Lawrence Organ ("Organ Dec.").) Like other temporary CitiStaff employees, CitiStaff nominally

4   trained Plaintiff by perfunctorily providing him several written policies, and requiring him to

5   sign each policy to memorialize his receipt. (Ludivina Ledesma Deposition ("Ledesma Depo.")

6   at 81:2-19, Exh. 2 to Organ Dec.)  While CitiStaff's handbook contained a racial harassment

7   policy, Staff Supervisor Monica De Leon, who hired Plaintiff, did not recall distributing a copy

8   of the handbook to temporary employees like Plaintiff, nor was she "100 percent sure" that its

9   policies applied to temporary employees. (De Leon Depo. at 186:5-22, 269:3-14.) ████████

10  ██████████████████████████████████████████████████████████████

11      ████████████████████████████████████████████████████████

12  Plaintiff was an elevator operator. His primary job duty "was to move material up and down for

13  the…construction of cars" on industrial elevators. (Ed Romero Deposition ("Romero Depo.") at

14  68:15-21, Exh. 3 to Organ Dec.) ████████████████████████████████

15  ████████████████████████████████████████████████████

16      **B. CitiStaff adopted nextSource and Tesla's supervisors as its own supervisors.**

17      ██████████████████████████████████████████

18  CitiStaff's staff did not discipline, promote, or terminate employees placed at the Tesla factory.

19  (De Leon Depo. at 90:21-91:18, 99:17-23.) Rather, CitiStaff treated nextSource and Tesla's

20  supervisors as its own and relied on their recommendations. For instance, CitiStaff employees

21  approved requests for promotions and pay raises submitted by nextSource and Tesla. (*Id.* at

22  91:22-92:4, 114:20-115:4, 117:1-11.) CitiStaff allowed nextSource and Tesla to issue warnings

23  and performance evaluations to CitiStaff employees. (*Id.* at 65:8-66:1, 115:13-21.) CitiStaff

24  relied on nextSource and Tesla's recommendations when terminating employee assignments at

25  the Tesla factory. (*Id.* at 115:13-21, 118:10-20.) Indeed, CitiStaff ceded control so completely

26  that De Leon conceded that she had never terminated a temporary employee's assignment. (*Id.* at

27  99:17-23.) Thus, Plaintiff's supervisors were Tesla and nextSource employees, including

28  Michael Wheeler, Ramon Martinez, ████████████████████████████

1   ███████; Michael Wheeler Deposition ("Wheeler Depo") at 41:18-25, 74:12-21, Exh. 4 to Organ

2   Dec.)

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████ De Leon recalled telling temporary employees experiencing problems, "Let your supervisors

7   know. If for whatever reason you can't contact your supervisor, let me know." (De Leon Depo.

8   at 151:13-24.) However, De Leon was "very difficult to reach." (Wayne Jackson Deposition

9   ("Jackson Depo.") at 96:7-15, Exh. 5 to Organ Dec.) ████████████████████████

10  ██████████████████████████████████████  ██████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████

13       CitiStaff, nextSource, and Tesla employees all confirmed that CitiStaff relied on Tesla

14  and nextSource to address employee complaints and to escalate complaints to CitiStaff. De Leon

15  observed that she relied on on-site supervisors to "advise [her] to let [her] know what's going

16  on." (De Leon Depo. at 225:17-226:2.) When Jackson received temporary employee complaints,

17  he said, "I alerted the agency [i.e. CitiStaff], usually one of the first things I did…." (Jackson

18  Depo. at 19:12-24.) Romero agreed: it was his practice to escalate complaints to the appropriate

19  level, including to the "contractors' representative." (Romero Depo. at 88:12-22.)

20  **C.  CitiStaff Jointly Employed Plaintiff, Alongside NextSource and Tesla.**

21       While Plaintiff worked at Tesla, factory operations  were intertwined in a complex

22  overlap of duties, whereby Tesla, CitiStaff and nextSource shared the duties of an employer.

23  ██████████████████████████████, and Tesla provided his safety equipment. (████████████

24  ███████; Victor Quintero Deposition ("Quintero Depo") at 21:6-25, Exh. 6 to Organ Dec.)██

25  ████████████████████████████████████████████████████████████

26  ███ ██████████████████████████████████████████████████████

27  ██████████████████████████████████████████ Plaintiff followed Tesla's

28  policies, like its Personal Protective Equipment policy. (Romero Depo. at 25:23-26:25.)

1    NextSource hired Plaintiff's subordinates. (Kevin McGinn Deposition ("McGinn Depo.")

2    at 20:13-25, Exh. 7 to Organ Dec.; Romero Depo. at 60:15-20.)  Plaintiff used nextSource's

3    computer system to submit timesheets and track his time.  (McGinn Depo. at 22:4-20.) ███

4    ███████████████████████████████████████████████████████████ CitiStaff

5    then collected employees' hours from nextSource, and issued paychecks to its employees. (De

6    Leon Depo. at 22:3-23, 27:8-14.) nextSource also handled requests for pay increases and

7    conveyed them to CitiStaff. (*Id.* at 89:13-21.)

8    With respect to discipline and performance evaluations, nextSource issued performance

9    reviews to CitiStaff employees. (*Id*. at 65:8-66:1.) NextSource could recommend discipline,

10   termination, or suspension of CitiStaff employees. (*Id.* at 115:13-21.) NextSource also

11   "provide[d] CitiStaff with raises and promotions." (*Id.* at 115:6-11.) Tesla could also recommend

12   discipline or termination of CitiStaff employees' from positions on its job site. (*Id.* at 118:10-20.)

13   However, one nextSource employee observed, "If there was a complaint, I would alert their

14   agency of the complaint….I couldn't terminate. They weren't [nextSource] employees." (Jackson

15   Dep. at 40:10-23.) Essentially, nextSource and Tesla acted as CitiStaff's "eyes and ears" in the

16   factory, and CitiStaff relied on their recommendations when disciplining or terminating.

17   **D. The Racial Harassment Plaintiff Experienced at The Tesla Factory Was Severe,**

18   **Pervasive, and Never Stopped.**

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████ Within weeks of Plaintiff's start

21   date this warning proved to be true.

22   1. **Judy Timbreza repeatedly called Plaintiff racial slurs, but no action was taken**.

23   ███████████████████████████████████████████████████

24   ██████████████████████████  ████████████████████

25   █████████████████████████  ████████████████████

26   ██████████████████████████████████████████████████

27   ██████████████████████████████████████

28   ████████████████████████████████████████████████

█████████████████████   ████████████████████████████

███████████████████████████████████████████████████

█████████████████████████   █████████████████████████████

███████████████████████████████   ███████████████████

████████████████████████   Nominal discipline was issued. Timbreza

received a mere verbal warning, <u>not for the use of racial slurs</u>, but "for his kidding around

excessively." (Romero Depo. at 158:12-14.) The harassment did not stop.

**2.   After Plaintiff's complaint, he and other African-American employees are harassed.**

After seeing Timbreza's nominal punishment, other employees were emboldened to

racially harass Plaintiff. In particular, Supervisor Ramon Martinez targeted Plaintiff for

harassment. Supervisors in Martinez's role could direct Plaintiff's work. (Wheeler Depo. at

41:18-25, 74:12-21.)  They were empowered to appraise performance "all the way up to

termination," and their recommendations were generally followed. (*Id.* at 16:22-24, 17:6-16.)

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████   Martinez also used the Spanish term "mayate"

in conversation "all the time." (Wheeler Depo. at 33:16-18.) "Mayate" literally means "dung

beetle", but it is also an offensive Spanish slang term for a black person.

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████   ████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

1  [REDACTED] Hurtado's prediction proved prescient: in early 2016, after Plaintiff could no

2  longer tolerate the harassment, he asked Hurtado to only speak to him about work-related

3  matters. (Exh. 8 to Organ Dec.) [REDACTED]

4  [REDACTED]

5  [REDACTED]

6  [REDACTED]

7  [REDACTED]

8  [REDACTED]

9  [REDACTED]

10  [REDACTED]

11  [REDACTED]

12  [REDACTED]

13  Wheeler recalled reprimanding an employee who called him the N-word, only to find that the

14  employee was later promoted to supervisor in Plaintiff's work area. (Wheeler Depo. at 20:2-24.)

15  [REDACTED]

16  [REDACTED]

17  [REDACTED]

18  [REDACTED] Jackson

19  observed non-African-American employees calling each other "nigga" and found it offensive.

20  (Jackson Depo. at 141:14-25.) He noted, "And I will hear that often, to be honest." (*Id.* at 144:9-

21  15.) Wheeler reported hearing the N-word "[d]uring breaks or outside when they're [employees]

22  smoking or in passing, coming into the factory." (Wheeler Depo. at 35:5-10.)

23  The harassment was also visual. For instance, Wheeler was "taken aback" by the

24  "vulgarity" of seeing an employee with a swastika tattooed on his head. (*Id.* 113:12-114:4.)

25  Predictably, Tesla, nextSource, and CitiStaff's nominal discipline failed to deter other harassers.

26  **3.  Plaintiff is confronted by racist graffiti in the restrooms.**

27  [REDACTED]

28  [REDACTED]

**4.  Plaintiff complains, repeatedly, about harassment and no action is taken.**

**5.  The harassment escalates because of the inaction.**

Predictably, inaction caused Plaintiff's harassers to grow bolder. This contributed to the hostile work environment in which Plaintiff was forced to work.

*i.  Ramon Martinez physically threatens Plaintiff.*

PLAINTIFFS' OPPOSITION TO CITISTAFF MOTION FOR SUMMARY JUDGMENT



No one interviewed Foster or reviewed the security footage. Instead, nextSource treated Plaintiff's complaint like a garden-variety workplace dispute: both Plaintiff and Martinez were "verbally counseled" and instructed to "play nice with each other in the sandbox," despite Plaintiff's history of complaints about Martinez. (Jackson Depo. at 70:8-22.) Plaintiff was issued a verbal warning because of "his professionalism", although he was the victim of a racially motivated attack. (*Id.* at 70:23-71:10.) Jackson of nextSource also contacted Defendant CitiStaff via phone to "alert[] them as to what was going on." (*Id*. at 62:1-13.) Thus, CitiStaff had notice of inappropriate conduct by October or November 2015.

### ii. *Plaintiff is Confronted with a racist effigy, drawn by Martinez.*

In January 2016, Martinez drew and positioned a racist effigy in Plaintiff's work area

With unambiguous proof of racist conduct, Plaintiff promptly complained to the nearest supervisor, Michael Wheeler, who also happened to be African-American. (Wheeler Depo. at 60:19-61:10, 65:14-16.)

Both



1    ███████ Jackson thought the "Booo" referred to "jiggaboo," ████████████████

2    ████████████████████████; Jackson Depo. at 26:9-18.) Wheeler understood the

3    caption to be a reference to a "spook", a midcentury racial slur. (Wheeler Depo. at 64:25-65:4.)

4    All three of these African-American men agreed that the effigy was offensive. (Jackson Depo. at

5    26:21-24; Wheeler Depo. at 65:14-19.)

23       Despite Plaintiff's prompt complaint, CitiStaff did not conduct its own investigation. As

24   CitiStaff admitted in verified discovery responses, "Defendant, through NextSource and

25   Chartwell…conducted an investigation. Defendant relied upon NextSource and Chartwell to

26   reprimand their employee, Martinez." (Exh. 9 to Organ Dec. at 7:7-16.) ████████████

PLAINTIFFS' OPPOSITION TO CITISTAFF MOTION FOR SUMMARY JUDGMENT

1 ███████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 █████████████████████████ No one from Chartwell, nextSource, CitiStaff, or

7 Tesla followed up on these blatant falsehoods or questioned Martinez's credibility. No one from

8 Chartwell, nextSource, CitiStaff, or Tesla interviewed the witnesses Israel or Wheeler. De Leon

9 testified, "There were no witnesses I was aware of", despite receiving an e-mail that identified

10 Israel and Wheeler by name. (De Leon Depo. at 200:13-201:4.) No one from Chartwell,

11 nextSource, CitiStaff, or Tesla followed up on Plaintiff's complaints of prior harassment.

12 Supervisor Romero admitted that it did not occur to him to inquire into this, even though

13 Plaintiff had complained to him before. (Romero Depo. at 126:19-127:12.) Jackson was

14 concerned that Martinez had created this racist effigy just a few months after threatening

15 Plaintiff, but the only step that he took was to "alert[] the various agencies so they could look

16 into it a little further." (Jackson Depo. at 101:4-14.) None of the employers investigated further.

17 ████████████████████████████████████████████████████

18 █████████████████████████████████████████████ Tesla supervisor Victor

19 Quintero and Jackson jointly issued this discipline and "the decision was based on the fact that

20 Ramon had never exhibited this type of behavior before, as far as like anything that was

21 offensive to anybody." (Quintero Depo. at 64:15-65:5.) ████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████

24 By the time CitiStaff intervened in the investigation, its HR Head, Ludivina Ledesma,

25 stated, "there was nothing else for me to do, because it was already concluded, the

26 investigation." (Ledesma Depo. at 43:10-17.) In fact, Ledesma only reached out to De Leon to

27 initiate CitiStaff's investigation process "after the investigation had concluded." (*Id.* at 42:17-

28 20.) Ledesma never reviewed the statements of Plaintiff or Martinez. (*Id.* at 99:23-100:15.)

Although both Jackson and Plaintiff had reported the October physical threat incident to De Leon, De Leon never elevated this concern to Ledesma. (*Id.* at 115:12-18, 115:25-116:6.) In fact, CitiStaff never took steps to follow up on Plaintiff's complaints that Martinez's behavior was escalating—despite this complaint being on the face of the e-mail Plaintiff submitted to CitiStaff. (*Id.* at 129:25-130:5.)

CitiStaff's detached approach aligns with CitiStaff's inadequate investigation policies: as De Leon explained, Ledesma did not instruct her to take witness statements or independently investigate. Rather, "It was more so she would tell me, you know, when you talk to the client [i.e. Tesla and nextSource], ask them if they have any witness reports or any statement or any documentation from the other parties." (De Leon Dep. at 199:18-200:6.)

Throughout the entirety of the "investigation" process, CitiStaff reached out to Plaintiff just once. De Leon contacted him via phone, and said, "I checked in to—with him to see do you—are you going to return to your—to your job. He said yes." (De Leon Depo. 133:20-134:7.) Plaintiff's decision to return was understandable in light of the favorable wages he was earning. At the time, Plaintiff made $18 per hour. (*Id.* at 211:5-12.) "Other than Tesla," CitiStaff did not work with any companies that paid temporary employees more than $16 per hour. (*Id.* at 158:1-3.) Economic necessity dictated that Plaintiff would return to avoid a pay cut.

**E. Tesla, NextSource and CitiStaff Terminate Plaintiff from  Tesla While  Harasser Martinez and Others Continue Working There.**

██████████████████████████████████████████

████████████████████████████████████   ███████

███████████████████████████████████████████

██████   ████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

In contrast to Plaintiff's termination from the Tesla factory, Martinez worked as a Tesla

supervisor for another two years, until at least June 2018.  (Quintero Depo. at 65:20-66:3.)

After Plaintiff's assignment ended, CitiStaff never found Plaintiff an equivalent position to the one he held at Tesla. Instead, De Leon offered Plaintiff assignments to work for other companies, most of which would pay less, around $13 per hour, which Plaintiff rejected. (De Leon Depo. at 155:24-156:15.) She was not aware of *any* placements paying over $16 per hour. (*Id.* at 158:1-3.) Plaintiff had  made $18 per hour at Tesla. (*Id.* at 211:5-12.)

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

### III. LEGAL ARGUMENT

**A.  Summary Judgment Must be Denied, Since Triable Issues of Material Fact Remain.**

Under the Federal Rules, summary judgment is only appropriate where the court finds there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party's version of any disputed factual issue is "presumed correct" and all justifiable inferences must be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451, 455 (1992). The court may not weigh the evidence, and testimony by a single declarant may create a triable issue of material fact. *United States v. 1 Parcel of Real Property, Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487, 491-492 (9th Cir. 1990). When all inferences are drawn in Plaintiff's favor, as required, triable issues of material fact remain. Accordingly, summary judgment must be denied.

**B.  CitiStaff Jointly Employed Plaintiff, Along With NextSource and Tesla.**

In its Motion, CitiStaff does not dispute that it employed Plaintiff. However, "an individual can have more than one employer for Title VII purposes…The law recognizes that two entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions." *U.S. E.E.O.C. v. Global Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019) (citations omitted) ("*Global Horizons*"). In *Global Horizons*, the 9th Circuit held that the "common-law agency test should be

applied in the Title VII" joint-employer context. *Id.* at 638. [1]  "Under the common-law test, the 'principal guidepost' is the element of control—that is, 'the extent of control that one may exercise over the details of the work of the other.'" *Id.* at 638 (citation omitted).

Some factors courts consider under this "control" test include:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.  [Citation.]

*Id.* at 638. In determining whether "an employment relationship exists," the Court must look to "'all of the incidents of the relationship'" rather than focusing on a single factor. *Id.*

With respect to Tesla, the factors weigh in favor of a finding of joint employment. Plaintiff worked at Tesla's factory. Tesla supplied the instrumentalities and tools of Plaintiff's work, like the forklift Plaintiff used and safety equipment. Tesla's employees were empowered to give Plaintiff new or different work assignments. Tesla could recommend discipline or termination. Tesla set Plaintiff's schedule, over which Plaintiff had little control. Tesla paid Plaintiff's assistants or subordinates via nextSource. Tesla trained Plaintiff and Plaintiff was subject to Tesla safety policies while working in the Tesla factory. Last, the work Plaintiff performed as an elevator operator,  moving parts up and down floors of the factory for the construction of cars, was a part of Tesla's regular business. Here, the common-law test's "'principal guidepost'—the element of control—is determinative." *Global Horizons*, *supra*, 915 F.3d at 638. Tesla exercised a high degree of control over Plaintiff's day-to-day work at the Tesla factory. Accordingly, Tesla meets the definition of a "joint employer" under Title VII.

Similarly, the factors weigh in favor of joint employment with respect to nextSource, because nextSource exercised a high degree of control over the terms and conditions of Plaintiff's employment. ████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[1] The Northern District applies the principles applicable in a Title VII discrimination claim when evaluating claims under 42 U.S.C. § 1981. *Morrow v. City of Oakland*, 2012 WL 368682 at *12 (N.D. Cal. Feb. 3, 2012)

████████████ nextSource could also control Plaintiff's work by offering feedback, up to and including promotions or formal discipline. NextSource maintained the system whereby Plaintiff logged his hours worked and submitted them for remuneration. NextSource was responsible for coordinating, recruiting, and paying the contractors employed as Plaintiff's subordinates through various contract agencies. NextSource was also responsible for handling resolution of complaints, as displayed in a series of e-mails where Tesla employees state that they cannot be involved in the handling of temporary employee issues and must cede control to nextSource. NextSource thus exercised a high degree of control over the terms and conditions of Plaintiff's employment, because it hired his subordinates, monitored his performance, could effectively recommend discipline and termination; and could effectively recommend pay rate changes. Accordingly, nextSource also meets the definition of a "joint employer."

Joint employer status does not conclusively establish liability. Courts apply a negligence standard regarding an employer's knowledge of the harassing conduct. "Liability may be imposed for a [joint] employer's discriminatory conduct only if the defendant employer knew or should have known about the other employer's conduct and 'failed to undertake prompt corrective measures within its control.'" *Id.* (citations omitted). The standard is analogous to "an employer's liability for the discriminatory conduct of third parties in the workplace." *Id*. In a contractor setting, this standard requires a joint employer to "protest [the unlawful action] or to exercise any contractual right it might possess to resist it." *Am.'s Best Quality Coatings Corp. (ABQC) v. N.L.R.B.*, 44 F.3d 516, 523 (7th Cir. 1995). This may include, for instance, requesting an investigation or assisting an unlawfully terminated plaintiff in finding a comparable placement. *See, e.g., Hajianpour v. Synova, Inc.*, No. CV 12-1765-CAS RZX, 2012 WL 5468834, at *8 (C.D. Cal. Nov. 5, 2012). When evaluated under this standard, Plaintiff's claims against CitiStaff raise triable issues of material fact.

## C.  Plaintiff's Claims Of Harassment And Discrimination Under 42 U.S.C. § 1981 Raise Triable Issues Of Material Fact.

Harassment claims under 42 U.S.C. § 1981 are analyzed using the same principles as Title VII discrimination cases. *See Metoyer v. Chassman*, 504 F.3d 919, 930 (9th Cir. 2007). To

PLAINTIFFS' OPPOSITION TO CITISTAFF MOTION FOR SUMMARY JUDGMENT

survive summary judgment under this standard, an African-American employee "must show the existence of a genuine factual dispute as to (1) whether a reasonable African American [employee] would find the workplace so objectively and subjectively racially hostile as to create an abusive working environment; and (2) whether [the employer] failed to take adequate remedial and disciplinary action" or is vicariously liable for the harassers' conduct. *McGinest v. GTE Svc. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004). A plaintiff makes this showing where "hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). The hostility of the working environment is analyzed from the perspective of a reasonable member of the plaintiff's protected class. *Ellison v. Brady*, 924 F.2d 872, 878-9 (9th Cir. 1991) ("*Ellison*").

Here, unquestionably, any reasonable African-American employee would have found the workplace permeated with severe, racially hostile conduct. Plaintiff estimates that supervisors Martinez and Hurtado called him the N-word on approximately sixty occasions—which means Plaintiff was called a racial slur approximately 8 times per month, or two times per week, during his eight-month tenure at the Tesla factory. Additionally, Plaintiff heard other employees freely using the slur in other areas. Courts recognize the N-word is not merely an offensive utterance, but "perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001). As the Seventh Circuit noted, "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Insurance Company*, 12 F.3d 668, 675 (7th Cir. 1993).

Plaintiff was subjected to a racist effigy drawn specifically for him by Martinez. Plaintiff was confronted with seeing the N-word scrawled in multiple bathrooms of the Tesla facility. Plaintiff subjectively found this behavior to be harassing, as confirmed by other African-American employees like Wheeler, Patterson, and Di-az.

CitiStaff does not dispute whether the racial harassment occurred. Instead, CitiStaff

argues that it cannot be held liable because Plaintiff failed to follow its written anti-harassment procedures and thus did not place CitiStaff on notice of the conduct. This argument is wholly spurious, because the policies that CitiStaff actually implemented and enforced with respect to Plaintiff were not the same written policies it now relies on to support its Motion.

1. **Under 42 U.S.C. 1981, liability attaches where—as here—an employer has actual or constructive knowledge of racial harassment.**

The Ninth Circuit has observed that a "written antidiscrimination policy does not insulate a company from liability if it does not enforce the antidiscrimination policy." *Bains LLC v. Arco Prod. Co., Div. of Atlantic Richfield Co.*, 405 F.3d 764, 774 (9th Cir. 2005). This is precisely the situation presented in Plaintiff's case. While CitiStaff has implemented racial harassment complaint procedures, its own employee De Leon admits that she did not distribute these policies to contractors like Plaintiffs, nor was she even sure the policies applied to contractors. CitiStaff offers no evidence to support its claim that it distributed these policies to contractors generally, let alone Plaintiff specifically.[2] The only written harassment policy that CitiStaff indisputably distributed to Plaintiff was its sexual harassment policy, which does not plainly apply to complaints of racial harassment.

In contrast, De Leon described an entirely different procedure that she instructs contractors to follow—perhaps understandably, as she herself received no training in CitiStaff's anti-harassment or anti-discrimination policies. (De Leon Depo. at 81:15-82:5.) When training CitiStaff contractors, De Leon instructs them, "Let your [on-site] supervisors know. If for whatever reason you can't contact your supervisor, let me know." (De Leon Depo. at 151:13-24.) CitiStaff had no on-site supervisors at the Tesla facility; thus, its contractors would logically complain to on-site supervisors like Jackson or Romero. Necessarily, they could not have followed De Leon's directive and complained to a CitiStaff employee. Indeed, when Plaintiff attempted to follow the policy that CitiStaff now seeks to enforce, De Leon instructed Plaintiff to complain to his on-site supervisor.  In this case the on-site supervisors—Tom Kawasaki, Ed

---

[2] While CitiStaff styles its factual allegations as "undisputed facts," it has never produced any proof Plaintiff received its handbook and only produced a blank, unsigned acknowledgement form.

Romero, Victor Quintero, and Wayne Jackson—were all employed by other companies.  In effect, CitiStaff's policy of telling Plaintiff to complain to other supervisors was to designate them as agents for the purpose of notice. Accordingly, when Plaintiff complained to his supervisors. Kawasaki and Quintero, about Timbreza calling him the N-word and other racial slurs in July 2015, this was effectively notice to CitiStaff based on the policy CitiStaff created.

Moreover, Jackson and Romero both testified that it was their standard procedure to escalate claims of harassment to the respective agencies (in this case, CitiStaff). Therefore, a trier of fact could conclude that CitiStaff should have known as early as July 2015 that Plaintiff was being subjected to racial harassment, yet CitiStaff took no action to prevent it.  To further support this interpretation, both Jackson and Plaintiff observed that it was difficult to make contact with De Leon, which suggests that she was not always available to accept complaints. Indeed, Jackson cited at least one occasion prior to the racist effigy—Martinez's physical threats in October of 2015—where Jackson relayed a complaint to CitiStaff but encountered difficulties reaching De Leon. Although both Plaintiff and Jackson followed the proscribed procedures, Defendant claimed that it never received the complaint. (Defendant's Motion at 7:10.) A trier of fact could conclude that CitiStaff should have known about this complaint, and further that the complaint placed CitiStaff on notice of Martinez's prior harassment, as Plaintiff observed in the complaint that Martinez had harassed him previously.

Moreover, it is undisputed that CitiStaff received a second complaint from Plaintiff in January 2016 that placed CitiStaff on notice of Martinez's history of harassing behavior. Yet CitiStaff failed to appropriately investigate the complaint. CitiStaff did not investigate until all other parties had completed their investigation, and CitiStaff's employees testified there was nothing left for them to do by the time they initiated an investigation. Its employees never asked what Plaintiff meant when he indicated it was not the first time Martinez had harassed him, or that Martinez's behavior was escalating. *Even after* CitiStaff was indisputably placed on notice, it simply ignored the evidence before it and, by its own admission, relied upon nextSource and Chartwell to inadequately address the situation.

While CitiStaff correctly notes that it did not have the power to terminate other entities'

employees, it neglects to address the fact that it "'failed to undertake prompt corrective measures within its control." *Global Horizons*, *supra*, 915 F.3d at 641 (9th Cir. 2019). CitiStaff could have initiated an investigation of its own, but chose not to do so. It could have inquired further into Plaintiff's complaints that Martinez's behavior was escalating, or that Plaintiff felt unsafe at work, but chose not to. It could have weighed in on nextSource and Chartwell's decision to nominally discipline Martinez and requested nextSource change its decision, ███████████ ████████████████████████████████████████████████ Under the contract, CitiStaff had several options within its control yet exercised <u>none of them</u>. The Court need not reach the issue of whether CitiStaff's response was adequate, because the undisputed facts show that CitiStaff took no action beyond adopting the results of nextSource and Chartwell's paltry "investigation."

If the Court views the facts in the light most favorable to Plaintiff, as it must on summary judgment, a different portrait emerges than the skewed and self-serving image CitiStaff has created. A trier of fact could reasonably look at the assembled facts and determine that CitiStaff relied upon nextSource and Tesla to accept claims of harassment and discrimination and escalate such claims to CitiStaff. A trier of fact could conclude that Plaintiff, as a dutiful employee, reported complaints of harassment and discrimination through the appropriate channels. A trier of fact could conclude that, after receiving instructions from CitiStaff's employees not to report issues to CitiStaff, Plaintiff was simply following instructions by complaining to his on-site supervisors. Given CitiStaff's consistent instructions, a trier of fact could conclude that this should have placed CitiStaff on notice of the harassment—especially in light of the fact that both Romero and Jackson testified they did not have the authority to discipline contract employees and thus escalated complaints to the contracting agency. Based on the testimony of Plaintiff and Jackson that De Leon was "extremely" difficult to make contact with, a trier of fact could readily conclude that Jackson and Romero appropriately attempted to escalate complaints, as they testified was their practice, and were unable to do so. Given CitiStaff's failure to investigate either the October 2015 physical threats or the January 2016 racist effigy, a trier of fact could also reasonably conclude that CitiStaff received prior complaints and simply ignored them. Far from being settled as a matter of law, the material facts underpinning Plaintiff's harassment

claims are disputed. Because triable issues of material fact remain when all inferences are drawn, as required, in Plaintiff's favor, the Court cannot grant summary judgment on this claim.

**2. Defendant's *Farragher/Ellerth* defense does not bar Plaintiff's claims.**

First, the *Farragher/Ellerth* defense is not available in situations where an employee has been terminated. Less than two months after Plaintiff complained about the offensive drawing, he was terminated. The temporal proximity of his complaint and his termination raises an inference that the two are related. *Ray v. Henderson,* 217 F.3d 1234, 1244 (9th Cir. 2000) ("That an employer's actions were caused by an employee's engagement in protected activities may be inferred from the 'proximity in time between the protected action and the allegedly retaliatory employment decision.'") At a minimum, Defendant's inability to show that it offered Plaintiff a comparable position at the same rate of pay eviscerates its argument that it did not, at a minimum, constructively terminate Plaintiff when it ended his employment at Tesla.

Even assuming*, in arguendo*, that Plaintiff was not terminated, his claim is not barred under *Farragher*. A *Farragher*/*Ellerth* defense bars a plaintiff's claims where

> [a]n employer has provided a proven, effective mechanism for reporting and resolving complaints of…harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventative or remedial apparatus, she should not recover damages that could have been avoided if she had done so.

*Farragher v. City of Boca Raton*, 524 U.S. 775, 806-7 (1998). However, in *Farragher* the Supreme Court actually <u>rejected</u> the employer's attempts to assert a defense based on its policies. *Id*. at 808. In *Farragher*, the defendant-employer "entirely failed to disseminate its policy against sexual harassment among" employees of the Plaintiff's class, and the employer "could not reasonably have thought that precautions against hostile work environments in any one of many departments in far-flung locations could be effective without communicating some formal policy against harassment, with a sensible complaint procedure." *Id.* at 808-9.

Here, CitiStaff has offered no proof that it provided Plaintiff with a mechanism for reporting and resolving complaints of racial harassment. Nor was the mechanism effective, as displayed by CitiStaff's decision not to investigate or take corrective action with respect to complaints of (1) racist slurs, (2) physical threats, or (3) the racist effigy. De Leon's instructions

1    to complain to on-site supervisors when Plaintiff attempted to complain to her were equally

2    ineffective, given that CitiStaff never addressed Plaintiff's other complaints. CitiStaff's

3    prohibitions against harassment could never be effective with respect to Plaintiff where its

4    policies were never communicated to temporary employees like Plaintiff; or where its own

5    employees were not trained on its policies and instructed Plaintiff to follow alternative policies.

6        Given the foregoing failings, Plaintiff's failure to follow policies that were never

7    distributed to him was not unreasonable, as required under *Farragher*. Instead, Plaintiff

8    reasonably relied on CitiStaff's representations that Plaintiff should raise any complaints with his

9    on-site supervisors, Jackson and Romero. In fact, it would have been <u>unreasonable</u> for Plaintiff

10   to complain to CitiStaff after De Leon instructed him not to do so. Thus, if the facts are

11   interpreted in the light most favorable to Plaintiff—as they must be on summary judgment—

12   CitiStaff's policy was never provided to Plaintiff, was ineffective when Plaintiff followed it, and

13   Plaintiff's failure to follow the policy was reasonable based on his employer's representations.

14   Because Plaintiff did not unreasonably fail to take advantage of preventative or corrective

15   opportunities offered by Defendant, and rather reasonably relied on Defendant's representations

16   when reporting the harassment, the *Farragher/Ellerth* defense does not bar Plaintiff's claims.

17       **D.  Plaintiff's Failure To Prevent Claim Raises Triable Issues Of Material Fact.**

18       According to the Ninth Circuit, "the reasonableness of an employer's remedy will depend

19   on its ability to stop harassment by the person who engaged in harassment. In evaluating the

20   adequacy of the remedy, the court may also take into account the remedy's ability to persuade

21   potential harassers from unlawful conduct." *Ellison, supra*, 924 F.2d at 881 (9th Cir. 1991). This

22   "two-part test… goes beyond short term-results….The fact that harassment stops is only a test

23   for measuring the *efficacy* of a remedy, not a way of excusing the *obligation* to remedy." *Fuller*

24   *v. City of Oakland*, 47 F. 3d 1522, 1528 (9th Cir. 1995.) (emphasis original) ("*Fuller*"). The

25   *Fuller* court went on to explain that the obligation to remedy and prevent harassment

26           will not be discharged until action—prompt, effective action—has been taken.
             Effectiveness will be measured by the twin purposes of ending the current harassment
27           and deterring future harassment—by the same offender or others. *Ellison*, 924 F.2d at
             882. If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability
28           will attach….It does not follow that the employer's failure to act will be acceptable if
             harassment stops.

Putting it another way, even if inaction through some Orwellian twist is described as a "remedy," it will fail the deterrence prong of the *Ellison* test whether or not the individual harasser has voluntarily ceased harassment. Nor can inaction fairly be said to qualify as a remedy "reasonably calculated to end the harassment." Title VII does not permit employers to stand idly by once they learn that…harassment has occurred. <u>To do so amounts to a ratification of the prior harassment.</u>

*Id*. at 1528-9 (emphasis added). The situation described in *Fuller* precisely describes CitiStaff's inaction in the face of Plaintiff's repeated complaints.

De Leon testified that CitiStaff's contractors could complain to an on-site supervisor. It is uncontested that Plaintiff complained to Kawasaki, who raised that complaint to Romero and Jackson. Therefore, as far back as July 2015, CitiStaff should have known that Plaintiff was being harassed, which in turn triggered CitiStaff's obligation to protect him and to prevent future harassment. Yet CitiStaff took no action.

Jackson testified, without dispute, that he reported Plaintiff's October 2015 complaint about physical threats from Martinez to De Leon. Plaintiff again reported this complaint to De Leon in January 2016, which CitiStaff does not dispute. Yet the undisputed facts demonstrate that De Leon took no action on this October complaint despite being placed on notice <u>twice</u>. Failing to respond to an employee's repeated complaints does not constitute "prompt, effective action".

Moreover, the undisputed facts demonstrate that, once Plaintiff's January e-mail  placed CitiStaff on notice that Martinez had a history of harassing behavior and that behavior that was escalating, CitiStaff simply stood idly by. CitiStaff employees admitted to never having read Plaintiff's statement, where he described feeling unsafe working with Martinez; never interviewed other witnesses, who could have corroborated Plaintiff's version of events; and did not realize that Plaintiff was complaining about ongoing harassment, even though such a complaint was plainly detailed in Plaintiff's e-mail. Instead, CitiStaff blindly deferred to the investigations conducted by nextSource and Chartwell, effectively ratifying  the prior harassment. Given Martinez's prior history of reported harassment and Plaintiff's numerous complaints, Martinez should not have had an opportunity to draw the racist effigy, because CitiStaff should have taken effective action to prevent and deter future harassment. CitiStaff's

proposal that liability could only attach if Martinez drew a second racist effigy is nonsense given CitiStaff's repeated failures to appropriately respond to Plaintiff's prior complaints.

In addition to the two complaints of which CitiStaff had actual notice, as discussed above, it should have known of Plaintiff's repeated complaints to Romero about use of the N-word in the exercise of reasonable care. Plaintiff diligently followed the reporting procedures that De Leon instructed him to follow, and dutifully complained to Romero and Jackson as instructed by De Leon. Despite Plaintiff's diligent follow-through on CitiStaff's stated (to Plaintiff) complaint procedures, CitiStaff took no action on Plaintiff's numerous complaints. CitiStaff's attempt to disclaim liability on this ground is patent nonsense: it cannot turn Plaintiff away when he seeks help, and then place the blame on Plaintiff for its lack of actual knowledge. Rather, the fault lies with CitiStaff, in placing its reliance on individuals who either did not receive Plaintiff's complaints (in the case of De Leon) or potentially failed to escalate Plaintiff's complaints (in the case of Jackson and Romero). Given that Plaintiff faithfully followed CitiStaff's directives, a trier of fact could readily conclude that CitiStaff should have known of the harassment Plaintiff experienced; accordingly, summary judgment must be denied.

**E.  Triable Issues Of Fact Remain as to Plaintiff's Ralph And Bane Act Claims.**

The Ralph Act prohibits violence or threats of violence against individuals based on their membership in a protected class, including race. Cal. Civ. Code § 51.7(a). Similarly, the Bane Act prohibits interference with an individual's constitutional rights by violence or threats of violence. Cal Civ. Code § 52.1(a). This requires Plaintiff to show (1) CitiStaff threatened or committed a violent act against him; (2) CitiStaff was motivated by his race; (3) he was harmed and (4) CitiStaff's conduct was a substantial factor in causing the harm. *Velarde v. City of Alameda*, 2016 WL 1588269 at *7 (N.D. 2016). Liability under both Acts may also be premised on traditional vicarious liability principles. *see, e.g., Roe v. DDS*, 2017 WL 2311303 at *4 (N.D. Cal. May 26, 2017) (holding triable issue of fact remained with respect to Ralph Act claim against state agency where agency's employee sexually assaulted Plaintiff).

Martinez's October threats of violence trigger liability under both the Bane and the Ralph Acts. As discussed above, CitiStaff is vicariously liable for the October assault because it had

actual notice—first in October from Jackson, and later in January from Plaintiff himself—of Martinez's violent threats and failed to take *any* corrective action or conduct an investigation. In the context of harassment and discrimination suits, CitiStaff's inaction operates as ratification. Moreover, it is undisputed that Martinez stood in close proximity to Plaintiff, in the enclosed space of an elevator, with his fists balled up and adopting an aggressive demeanor. He essentially backed Plaintiff up into a wall, placing Plaintiff "in fear for [his] safety". A reasonable trier of fact could interpret this as an implicit threat of violence. Second, a trier of fact could reasonably conclude Martinez engaged in this conduct because of Plaintiff's race, based on Martinez's documented history of using racial slurs like the N-word and mayate in the workplace and the fact that he called Plaintiff the N-word while assaulting them. Next, Plaintiff suffered emotional distress as a direct result of Martinez's actions. Finally, CitiStaff is vicariously liable for Martinez's conduct, because it should have known about the harassment Plaintiff experienced as early as July of 2015, and its failure to take appropriate corrective action acted as implicit ratification of Martinez's conduct. Accordingly, Plaintiff's claims under the Ralph and Bane Acts present triable issues of material fact and cannot be dismissed.

### F. Genuine Issues of Material Fact Exist Regarding Plaintiff's IIED and NIED Claims.

### 1. Plaintiff's claims are not preempted.

"Conduct in which an employer steps out of its 'proper role' as an employer or conduct of 'questionable relationship to the employment'… is not encompassed within the compensation bargain and is not subject to the exclusivity rule." *Singh v. Southland Stone, U.S.A., Inc*., 186 Cal. App. 4th 338, 367 (2d Dist. 2010) (citations omitted). This includes conduct which is a "violation of a fundamental public policy", because violations of public policy are not included in the "normal course of the employment relationship". *Id.* at 368. Racial harassment is just such conduct in the employment context, as it violates the well-settled public policy expressed in Title VII, California's FEHA, and Section 1981 that African-American employees should not be subjected to racial discrimination and harassment in the workplace. Thus, the claims are not preempted by the worker's compensation exclusivity rule.

\\

**2.   Plaintiff's IIED claim presents triable issues of material fact.**

To prevail on this claim, Plaintiff must demonstrate that CitiStaff exhibited (1) extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) they experienced severe or extreme emotional distress; and (3) actual and proximate causation exists. *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009). Plaintiff can make just such a showing. CitiStaff engaged in outrageous conduct with reckless disregard for the probability of causing emotional distress when it intentionally decided not to investigate Plaintiff's January complaint of harassment, even though Plaintiff *explicitly* complained that he felt unsafe and uncomfortable and that Martinez had engaged in a pattern of harassing behavior. Plaintiff did, in fact, suffer severe emotional distress in the form of "emotional damage" and depression. This depression, by Plaintiff's own admission, was actually caused by CitiStaff's failure to follow up on his repeated complaints and offer to, essentially, demote Plaintiff to a position with lower pay by moving him to a different assignment. There are no intervening causes for this emotional distress. Thus, actual and proximate causation exist; accordingly, triable issues of material fact remain with respect to this claim.

**G.   Plaintiff's NIED Claim Presents Triable Issues Of Material Fact.**

To state a claim for NIED, Plaintiff must establish that he (1) suffered serious emotional distress; that (2) was actually and proximately caused by; (3) wrongful conduct; (4) by a defendant who should have foreseen that the conduct would cause such distress. *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004).) A claim for negligent infliction of emotional distress cannot be based on intentional conduct. *Edwards v. U.S. Fid. & Guar. Co*., 848 F.Supp.1460, 1466 (N.D. Cal. 1994) Here, Defendant engaged in wrongful conduct when it repeatedly rebuffed Plaintiff's attempts to complain directly to it, and when it failed to establish and enforce effective anti-harassment complaint procedures. Defendant reasonably should have foreseen that this failure to implement and enforce effective anti-harassment complaint procedures would have resulted in an ineffective response to complaints of racial harassment, which, in turn, would cause emotional distress to harassed employees. As laid out above, Plaintiff suffered serious emotional distress as a result of this conduct and CitiStaff's negligence

1  was both the actual and proximate cause. Accordingly, a triable issue of material fact remains on

2  Plaintiff's NIED claim.

3  **H. Plaintiff's Claim For Punitive Damages Presents Triable Issues Of Material Fact.**

4  Defendant fails to argue Plaintiff's punitive damages claims under Section 1981, so the

5  Court should deny the motion as to Plaintiff's Section 1981 claims. Based on the pervasive

6  nature of the harassment, Plaintiff's complaints of harassment to his supervisors as early as July

7  2015, and Human Resources Head Ledesma and Staff Supervisor De Leon—who was in charge

8  of taking complaints (De Leon Depo. 48:7-18)—receiving Plaintiff's complaint but failing to

9  investigate or take any action, Defendant clearly ratified the harassing conduct pursuant to the

10  *Fuller* factors. In *Swinton*, 240 F.3d at 810, such conduct was sufficient for punitive damages.

11  With respect to Plaintiff's state claims, they are equally unpersuasive. California Civil

12  Code §3294(b) provides for punitive liability if an employer "authorized or ratified the wrongful

13  conduct." As noted above, Defendant's advance knowledge and failure to investigate or

14  remediate the harassment create the basis for liability under state law, too. Whether Ledesma or

15  De Leon were managing agents is typically a question of fact. In *Davis v. Kiewit Pacific Co*.,

16  220 Cal. App. 4th 358, 367-8 (2013), a project manager and an EEO officer (much like a Staff

17  Supervisor or Human Resources head) were found to be managing agents. *Id*. at 370-373.

18  Ledesma, Defendant's Human Resources Head, authorized and ratified Martinez's wrongful

19  conduct after she was indisputably placed on notice of the conduct and failed to conduct even the

20  most basic investigation or ensure that others were protected against further harassment.

21  Accordingly, a triable issue of material fact remains on this claim.

22  **IV. CONCLUSION**

23  For the foregoing reasons, Defendant's motion must be denied in its entirety.

24  CALIFORNIA CIVIL RIGHTS LAW GROUP

25

26  DATED:  October 2, 2019         By:         /s/ Lawrence Organ
                                              Lawrence A. Organ, Esq.
27                                            Navruz Avloni, Esq.
                                              Attorneys for Plaintiffs
28                                            DEMETRIC DI-AZ AND OWEN DIAZ