# Exhibit

# **1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


DEMETRIC DI-AZ, OWEN        )
DIAZ, and LAMAR            )
PATTERSON,                 )
            Plaintiffs,    )
vs.                        ) Case No.:  3:17-CV-066748
                           )                WHO
                           )
TESLA, INC., dba TESLA     )
MOTORS, INC.; CITISTAFF    )
SOLUTIONS, INC.; WEST      )
VALLEY STAFFING GROUP;     )
CHARTWELL STAFFING         )
SERVICES, INC.; and DOES   )
1-10, inclusive,           )
            Defendants.    )
_____)


DEPOSITION OF MONICA DE LEON

Thursday, December 6, 2018


TAKEN BEFORE:

HEIDI BELTON, CSR, RPR, CRR, CCRR, CRC

CSR No. 12885

```
 1                    December 6, 2018

 2                      10:05 a.m.

 3

 4         Videotaped deposition of MONICA DE

 5    LEON, held at the offices of California

 6    Civil Rights Law Group, 180 Grand

 7    Avenue, Suite 1380, Oakland, California,

 8    before Heidi Belton, a Certified

 9    Shorthand Reporter, Registered

10    Professional Reporter, Certified

11    Realtime Reporter, California Certified

12    Realtime Reporter, Certified Realtime

13    Captioner

14

15

16

17

18

19

20

21

22

23

24

25
```

10:19:59  1      understand what your job duties entailed.

10:20:01  2           A.    Okay.

10:20:01  3           Q.    Now you mentioned payroll.  Could you --

10:20:05  4      could you tell me how that process worked in terms

10:20:07  5      of you processing payroll as a staff supervisor at

10:20:10  6      CitiStaff?

10:20:15  7           A.    So for payroll I took in everyone's hours

10:20:21  8      from the clients --

10:20:21  9           Q.    And -- sorry.  I'm going to interrupt you

10:20:23 10      just because so I have context.

10:20:27 11                 When you say "everyone's hours," whose

10:20:30 12      hours?

10:20:31 13           A.    All the workers, all the contractors.

10:20:33 14           Q.    And these are contractors that were hired

10:20:38 15      by CitiStaff?

10:20:39 16           A.    Yes.

10:20:44 17           Q.    So you took CitiStaff contractors' hours

10:20:48 18      and then -- what did you do with those hours?

10:20:51 19           A.    I would input them in the system.  If

10:20:59 20      anyone was missing hours I would contact them to see

10:21:02 21      if they had sick hours or if -- if they were missing

10:21:07 22      or if there was any discrepancies.  And then I would

10:21:15 23      send the hours in to Emilio at corporate.

10:21:19 24           Q.    All right.  You would send these hours to

10:21:20 25      who?

| | | |
|---|---|---|
| 10:26:08 | 1 | three different way of obtaining their checks.  They |
| 10:26:12 | 2 | could pick them up from you -- |
| 10:26:16 | 3 | **A.   (Witness nods.)** |
| 10:26:16 | 4 | Q.   -- they could do a direct deposit, or they |
| 10:26:19 | 5 | could actually get them from the facility where they |
| 10:26:22 | 6 | were working? |
| 10:26:23 | 7 | **A.   Correct.** |
| 10:26:26 | 8 | Q.   And when you would drop the checks off at |
| 10:26:28 | 9 | the facilities, who would you leave the checks with? |
| 10:26:31 | 10 | **A.   To whoever the main contact was.** |
| 10:26:44 | 11 | Q.   And did you ever drop off checks at the |
| 10:26:46 | 12 | Tesla facility in Fremont, California? |
| 10:26:52 | 13 | **A.   In the beginning.  And then they -- in the** |
| 10:26:57 | 14 | **beginning, yes, I did drop them off.** |
| 10:27:00 | 15 | Q.   Do you remember who the contact was to |
| 10:27:02 | 16 | whom you would hand the checks to? |
| 10:27:03 | 17 | **A.   Nancy was the beginning.  And then it** |
| 10:27:06 | 18 | **became Vanessa.** |
| 10:27:14 | 19 | Q.   And do you have any information or any |
| 10:27:15 | 20 | knowledge of what the -- of whether Nancy was a |
| 10:27:17 | 21 | Tesla employee or not? |
| 10:27:18 | 22 | MR. RUTSCHMAN:  Objection; calls for |
| 10:27:18 | 23 | speculation.  Calls for a legal conclusion. |
| 10:27:24 | 24 | THE WITNESS:  No, I don't. |
| 10:27:25 | 25 | BY MS. AVLONI: |

10:45:49  1    provide him with a start date -- scratch that.

10:45:56  2            At what point can an applicant candidate

10:45:59  3    become an employee; do you know?

10:46:01  4            MR. RUTSCHMAN:  Objection; calls for a

10:46:02  5    legal conclusion.

10:46:04  6            THE WITNESS:  Become an employee to who?

10:46:06  7    To CitiStaff or to --

10:46:08  8    BY MS. AVLONI:

10:46:08  9       Q.   Let's say CitiStaff.  Do you know if -- at

10:46:10 10    what point an applicant becomes an employee of

10:46:13 11    CitiStaff?

10:46:13 12            MR. RUTSCHMAN:  Objection; calls for a

10:46:14 13    legal conclusion.

10:46:20 14            THE WITNESS:  To start work or --

10:46:25 15    BY MS. AVLONI:

10:46:26 16       Q.   Well, let's back up.  Let's say --

10:46:28 17       A.   Can you explain that a little?

10:46:29 18       Q.   Yeah, yeah.  I -- I'm as new to this area

10:46:33 19    in terms of understanding what CitiStaff does.  So

10:46:36 20    some of my questions may not make sense and I'm more

10:46:38 21    than happy to try to clarify or rephrase.

10:46:41 22       A.   No worries.  Thank you.

10:46:43 23       Q.   So let's say an applicant walks into the

10:46:45 24    CitiStaff doors and the applicant seems great and

10:46:47 25    you like the applicant and they submit their

| 10:46:49 | 1 | application and, you know, they're provided |
| 10:46:53 | 2 | CitiStaff policies on various topics, including |
| 10:46:56 | 3 | harassment.  And CitiStaff likes them -- likes the |
| 10:46:59 | 4 | candidate.  Does CitiStaff -- can then CitiStaff |
| 10:47:03 | 5 | bring on that candidate and say that, hey, we'll add |
| 10:47:12 | 6 | you to our system as, like, an employee?  Or -- is |
| 10:47:16 | 7 | there a process for converting like a potential |
| 10:47:18 | 8 | candidate to like a CitiStaff person? |
| 10:47:22 | 9 | MR. RUTSCHMAN:  Objection; compound.  It's |
| 10:47:23 | 10 | vague and ambiguous. |
| 10:47:26 | 11 | THE WITNESS:  Well, in a case like that, |
| 10:47:28 | 12 | when someone comes in, fills out the application, |
| 10:47:36 | 13 | they're already considered a CitiStaff employee, but |
| 10:47:39 | 14 | they just haven't been dispatched out yet to go on |
| 10:47:47 | 15 | an assignment.  So -- |
| 10:47:49 | 16 | BY MS. AVLONI: |
| 10:47:49 | 17 | Q.  I see.  Do the -- do the candidates' |
| 10:47:53 | 18 | applications have to be approved by CitiStaff first |
| 10:47:56 | 19 | before they become CitiStaff employees? |
| 10:47:59 | 20 | MR. RUTSCHMAN:  Objection; calls for a |
| 10:48:00 | 21 | legal conclusion. |
| 10:48:03 | 22 | THE WITNESS:  Can you ex- -- rephrase that |
| 10:48:05 | 23 | or say that again? |
| 10:48:07 | 24 | MS. AVLONI:  Yeah.  You know, you just |
| 10:48:09 | 25 | mentioned that when candidates come in and fill out |

| 10:51:32 | 1 | if in that case, the next step would be after them |
| 10:51:37 | 2 | getting all their paperwork and a start date and |
| 10:51:42 | 3 | everything, then they would be dispatched to -- to |
| 10:51:48 | 4 | the job site or told when to show -- when to go, who |
| 10:51:52 | 5 | to meet up with. |
| 10:51:55 | 6 | BY MS. AVLONI: |
| 10:51:56 | 7 |     Q.   When the CitiStaff employee is dispatched |
| 10:51:59 | 8 | to the job site, is there continued interaction with |
| 10:52:06 | 9 | the CitiStaff employee between you and the CitiStaff |
| 10:52:10 | 10 | employee? |
| 10:52:12 | 11 |         MR. RUTSCHMAN:  Objection; it's an |
| 10:52:13 | 12 | incomplete hypothetical.  Also, misstates the |
| 10:52:15 | 13 | witness' prior testimony. |
| 10:52:20 | 14 |         THE WITNESS:  After the -- in that case |
| 10:52:22 | 15 | after the person goes -- gets sent out, dispatched |
| 10:52:25 | 16 | to the job, there is communication because of their |
| 10:52:28 | 17 | hours and payroll and, you know, follow-ups. |
| 10:52:34 | 18 | BY MS. AVLONI: |
| 10:52:35 | 19 |     Q.   So CitiStaff continues to handle its |
| 10:52:40 | 20 | employees' hours and payroll after they're |
| 10:52:44 | 21 | dispatched to a facility; is that correct? |
| 10:52:46 | 22 |     **A.   Yes.** |
| 10:52:47 | 23 |     Q.   In addition to overseeing its employees' |
| 10:52:54 | 24 | hours and payroll information, is there anything |
| 10:52:58 | 25 | else that CitiStaff does with regards to its |

| 10:53:03 | 1 | employees after they're dispatched to a facility? |
| 10:53:08 | 2 | **A.   No.** |
| 10:53:09 | 3 | Q.   Okay. |
| 10:53:13 | 4 | MR. RUTSCHMAN:   I'm going to issue a late |
| 10:53:15 | 5 | objection that the question is vague and ambiguous. |
| 10:53:17 | 6 | BY MS. AVLONI: |
| 10:53:18 | 7 | Q.   How about -- you mentioned as part of your |
| 10:53:23 | 8 | duties -- correct my phrasing -- you also handled |
| 10:53:30 | 9 | complaints or issues; is that correct? |
| 10:53:34 | 10 | **A.   Correct.** |
| 10:53:37 | 11 | Q.   And could you describe to me what that |
| 10:53:40 | 12 | means, that as a staff supervisor you handled |
| 10:53:42 | 13 | complaints and/or issues. |
| 10:53:47 | 14 | **A.   Anybody that had any type of issue or** |
| 10:53:55 | 15 | **complaint or maybe they just -- maybe they didn't** |
| 10:53:59 | 16 | **like the job, or maybe they didn't want to be** |
| 10:54:08 | 17 | **warehouse, they wanted to do the forklift.   That** |
| 10:54:15 | 18 | **such [as said].** |
| 10:54:16 | 19 | Q.   So if you could just give me the standard |
| 10:54:19 | 20 | issues or the most common issues that you would deal |
| 10:54:21 | 21 | with.  You mentioned right now a CitiStaff employee |
| 10:54:26 | 22 | not liking their job or they wanted to handle a |
| 10:54:29 | 23 | different type of a position in the facility.  Any |
| 10:54:33 | 24 | other typical complaints, issues that came to you? |
| 10:54:39 | 25 | MR. RUTSCHMAN:   Objection; vague and |

MONICA DE LEON
December 6, 2018

Page 65

| | | |
|---|---|---|
| 11:14:03 | 1 | employer -- like, twice a year or once a year saying |
| 11:14:06 | 2 | hey, this is -- these are your strengths, these are |
| 11:14:09 | 3 | your weaknesses, this is how you're doing, this is |
| 11:14:11 | 4 | where we see you going.  I'm not saying the |
| 11:14:14 | 5 | performance review includes all of this.  But this |
| 11:14:16 | 6 | is what I mean by performance reviews when I'm |
| 11:14:18 | 7 | talking about performance reviews in general. |
| 11:14:20 | 8 | So do you know if CitiStaff clients such |
| 11:14:24 | 9 | as Tesla issued performance reviews to CitiStaff |
| 11:14:30 | 10 | employees? |
| 11:14:31 | 11 | MR. RUTSCHMAN:  Objection; vague and |
| 11:14:31 | 12 | ambiguous.  Calls for speculation. |
| 11:14:35 | 13 | THE WITNESS:  So what I recall, yes, they |
| 11:14:36 | 14 | would give some every now and then. |
| 11:14:40 | 15 | BY MS. AVLONI: |
| 11:14:40 | 16 | Q.  And so you recall specifically Tesla |
| 11:14:42 | 17 | giving CitiStaff employees performance reviews now |
| 11:14:45 | 18 | and then? |
| 11:14:46 | 19 | A.  I re- -- |
| 11:14:47 | 20 | MR. RUTSCHMAN:  Objection; vague and |
| 11:14:47 | 21 | ambiguous.  Calls for speculation. |
| 11:14:49 | 22 | THE WITNESS:  I recall nextSource. |
| 11:14:55 | 23 | BY MS. AVLONI: |
| 11:14:55 | 24 | Q.  You recall nextSource giving CitiStaff |
| 11:14:57 | 25 | employees performance reviews; is that correct? |

11:14:59  1          **A.    Mm-hmm.**

11:15:00  2                MR. RUTSCHMAN:  Objection; vague and

11:15:01  3  ambiguous.

11:15:03  4  BY MS. AVLONI:

11:15:03  5      Q.   And do you know how often nextSource

11:15:04  6  would give CitiStaff employees performance reviews?

11:15:12  7                MR. RUTSCHMAN:  Objection; vague and

11:15:12  8  ambiguous.  Calls for speculation.

11:15:15  9                THE WITNESS:  No, I don't remember.

11:15:16 10  BY MS. AVLONI:

11:15:25 11      Q.   Did you conduct any investigations while

11:15:30 12  working as a staff supervisor at CitiStaff?

11:15:32 13                MR. RUTSCHMAN:  Objection; vague and

11:15:32 14  ambiguous.

11:15:38 15                THE WITNESS:  Yes.

11:15:40 16  BY MS. AVLONI:

11:15:41 17      Q.   How many investigations have you handled

11:15:42 18  as a staff supervisor?

11:15:44 19                MR. RUTSCHMAN:  Objection; vague and

11:15:44 20  ambiguous.

11:15:52 21                THE WITNESS:  One.  One or two.

11:15:54 22  BY MS. AVLONI:

11:15:55 23      Q.   Do you recall the nature of those

11:15:59 24  investigations, what they involved?

11:16:06 25                MR. RUTSCHMAN:  Objection; vague and

11:44:15  1        Q.   Did you -- other than being trained by the

11:44:18  2    individual whose position you took over, did you

11:44:21  3    receive any other training from CitiStaff?

11:44:24  4            MR. RUTSCHMAN:  Objection; vague and

11:44:24  5    ambiguous.

11:44:26  6            THE WITNESS:  No.

11:44:27  7    BY MS. AVLONI:

11:44:27  8        Q.   Did you receive any training from any

11:44:29  9    organizations that were hired by CitiStaff to

11:44:32 10    perform the training?

11:44:33 11            MR. RUTSCHMAN:  Objection; vague and

11:44:33 12    ambiguous.

11:44:36 13            THE WITNESS:  No.

11:44:36 14    BY MS. AVLONI:

11:44:38 15        Q.   Were you ever trained by CitiStaff or

11:44:40 16    anybody hired by CitiStaff on harassment policies?

11:44:44 17            MR. RUTSCHMAN:  Objection; compound.

11:44:46 18    Vague and ambiguous.

11:44:49 19            THE WITNESS:  No.

11:44:49 20    BY MS. AVLONI:

11:44:53 21        Q.   How about were you trained by CitiStaff or

11:44:58 22    anybody that was hired by CitiStaff on

11:45:01 23    discrimination policies?

11:45:02 24            MR. RUTSCHMAN:  Objection; compound.

11:45:04 25    Vague and ambiguous.

11:45:06  1              THE WITNESS:  No.

11:45:06  2    BY MS. AVLONI:

11:45:08  3        Q.    How about retaliation policies?

11:45:11  4              MR. RUTSCHMAN:   Same objections.

11:45:12  5              THE WITNESS:  No.

11:45:13  6    BY MS. AVLONI:

11:45:18  7        Q.    Do you know how many clients CitiStaff

11:45:20  8    has?

11:45:22  9              MR. RUTSCHMAN:  Objection; calls for

11:45:22 10    speculation.

11:45:24 11              THE WITNESS:  At the time it was about

11:45:30 12    five.

11:45:31 13    BY MS. AVLONI:

11:45:32 14        Q.    And Tesla was one of those clients?

11:45:34 15        A.    Yes.

11:45:34 16        Q.    Do you know who the other clients were?

11:45:38 17              MR. RUTSCHMAN:  Objection; calls for

11:45:39 18    confidential business information.  I'm going to

11:45:42 19    instruct her not to answer that question.

11:45:46 20    BY MS. AVLONI:

11:45:46 21        Q.    Are you going to take your attorney's

11:45:47 22    instructions?

11:45:48 23        A.    Yes.

11:45:51 24        Q.    And do you know approximately how many

11:45:54 25    contractors CitiStaff had when you were working

11:52:42  1        Q.   Yes, so if I'm talking about -- I'll

11:52:46  2    refer -- I'll be -- let's refer to them as CitiStaff

11:52:49  3    contractors for now to make it more clear.

11:52:51  4             So these CitiStaff contractors, so when

11:52:54  5    they would receive a raise, that information would

11:52:57  6    come to you from nextSource, and you would notify

11:53:05  7    Emilio and then CitiStaff would implement that raise

11:53:08  8    and it would be reflected in the employee -- in the

11:53:11  9    CitiStaff contractor's paycheck; is that correct?

11:53:14 10             MR. RUTSCHMAN:  Objection; compound.

11:53:15 11    Incomplete hypothetical.

11:53:18 12    BY MS. AVLONI:

11:53:18 13        Q.   And correct me if I'm wrong; if any part

11:53:21 14    of this is wrong.  I just want to understand the

11:53:24 15    process.

11:53:25 16        A.   So in the case a CitiStaff contractor

11:53:27 17    would get a raise they would -- nextSource would

11:53:30 18    send it to me.  And then I would confirm it with

11:53:33 19    Emilio, let Emilio know, make those changes in the

11:53:38 20    pay rate so it can reflect on their check as of the

11:53:41 21    date that nextSource put in the e-mail.

11:53:45 22        Q.   Okay.  Did you consider yourself -- aside

11:53:51 23    from any legal jargon -- did you consider CitiStaff

11:53:56 24    contractors to be CitiStaff employees?

11:53:59 25             MR. RUTSCHMAN:  Objection; calls for a

11:54:00  1   legal conclusion.

11:54:05  2          THE WITNESS:  So can you repeat that

11:54:06  3   question?

11:54:06  4   BY MS. AVLONI:

11:54:07  5      Q.   Yeah.  Did you consider the people that

11:54:08  6   were CitiStaff contractors to be working for

11:54:11  7   CitiStaff?

11:54:12  8          MR. RUTSCHMAN:  Objection; vague,

11:54:14  9   ambiguous, calls for a legal conclusion.

11:54:17 10          THE WITNESS:  Well, since CitiStaff paid

11:54:19 11   them and gave them their check, I did consider them

11:54:25 12   working for Citistaff.

11:54:26 13   BY MS. AVLONI:

11:54:33 14      Q.   Is there -- how about writeups?  Are you

11:54:46 15   aware of any CitiStaff contractors receiving

11:54:52 16   writeups?

11:54:54 17          MR. RUTSCHMAN:  Objection; vague and

11:54:54 18   ambiguous.

11:54:56 19          THE WITNESS:  I don't recall.

11:54:57 20   BY MS. AVLONI:

11:54:57 21      Q.   Have you ever issued any writeups to

11:55:00 22   CitiStaff contractors?

11:55:02 23          MR. RUTSCHMAN:  Objection; vague and

11:55:02 24   ambiguous.

11:55:04 25          THE WITNESS:  I wasn't -- I didn't have

11:55:06  1   authority to do that.

11:55:08  2   BY MS. AVLONI:

11:55:09  3       Q.   Who had authority to issue raises to

11:55:13  4   CitiStaff contractors?

11:55:14  5           MR. RUTSCHMAN:  Objection; calls for

11:55:14  6   speculation.

11:55:18  7           THE WITNESS:  On what -- what side?  So

11:55:23  8   Can you repeat the question?

11:55:25  9   BY MS. AVLONI:

11:55:25 10       Q.   Sure.  I'll actually ask it differently.

11:55:28 11           Did CitiStaff have the ability to

11:55:31 12   recommend raises for CitiStaff contractors?

11:55:36 13           MR. RUTSCHMAN:  Objection; calls for

11:55:36 14   speculation.

11:55:45 15           THE WITNESS:  I wasn't -- I didn't have

11:55:46 16   the authority to give a raise.  So -- but if the

11:55:55 17   client sent us any raises or change of pay rates,

11:56:01 18   then I would take actions --

11:56:05 19   BY MS. AVLONI:

11:56:05 20       Q.   To make it happen --

11:56:07 21       A.   To make it happen with Emilio and --

11:56:10 22       Q.   So your understanding is that the client

11:56:14 23   would recommend the raises and that CitiStaff would

11:56:18 24   implement those raises?

11:56:20 25       A.   So the client would send us any raises or

| | | |
|---|---|---|
| 11:56:25 | 1 | **reviews and we would process as follows, yes.** |
| 11:56:33 | 2 | **Q.   Okay.   Have you ever denied a client's** |
| 11:56:36 | 3 | **request to raise someone's salary?** |
| 11:56:39 | 4 | **A.   No.** |
| 11:56:40 | 5 | Q.   So you've always authorized all raises |
| 11:56:43 | 6 | that were coming in from clients? |
| 11:56:45 | 7 | MR. RUTSCHMAN:  Objection; it's vague and |
| 11:56:47 | 8 | ambiguous. |
| 11:56:47 | 9 | BY MS. AVLONI: |
| 11:56:48 | 10 | Q.   Let me rephrase it.  That was vague and |
| 11:56:50 | 11 | ambiguous. |
| 11:56:51 | 12 | So would CitiStaff to your knowledge |
| 11:56:56 | 13 | pretty much always authorize all raise -- |
| 11:57:06 | 14 | recommendations for employees -- for CitiStaff |
| 11:57:09 | 15 | contractors coming from clients? |
| 11:57:10 | 16 | MR. RUTSCHMAN:  Objection; it's vague and |
| 11:57:11 | 17 | ambiguous.  Calls for speculation. |
| 11:57:14 | 18 | THE WITNESS:  So for CitiStaff |
| 11:57:17 | 19 | contractors, whenever nextSource would send us any |
| 11:57:22 | 20 | pay rate changes or increases, raises, I would send |
| 11:57:28 | 21 | them to Emilio.  Send the e-mail to have a |
| 11:57:34 | 22 | confirm -- confirmation of it, a written consent. |
| 11:57:36 | 23 | And we would process it as follows. |
| 11:57:38 | 24 | BY MS. AVLONI: |
| 11:57:39 | 25 | Q.   Okay.  Did CitiStaff have authority, do |

| | | |
|---|---|---|
| 12:04:26 | 1 | BY MS. AVLONI: |
| 12:04:27 | 2 | Q.   And sitting here today you know that you |
| 12:04:29 | 3 | didn't have the authority to issue them writeups? |
| 12:04:31 | 4 | **A.   I know I didn't, yeah.** |
| 12:04:35 | 5 | Q.   Have you ever had a situation where, let's |
| 12:04:37 | 6 | say, several clients were unhappy with a CitiStaff |
| 12:04:41 | 7 | contractor and there are several complaints, let's, |
| 12:04:43 | 8 | say, serious complaints about a CitiStaff |
| 12:04:45 | 9 | contractor, have you ever had a situation where |
| 12:04:49 | 10 | CitiStaff decided to fire that particular |
| 12:04:52 | 11 | contractor? |
| 12:04:53 | 12 | MR. RUTSCHMAN:  Objection; vague, |
| 12:04:54 | 13 | ambiguous.  Constitutes an incomplete hypothetical. |
| 12:04:58 | 14 | THE WITNESS:  No, I haven't had a |
| 12:04:59 | 15 | situation like that. |
| 12:05:00 | 16 | BY MS. AVLONI: |
| 12:05:02 | 17 | Q.   Do you know if CitiStaff has authority to |
| 12:05:04 | 18 | fire its contractors? |
| 12:05:07 | 19 | MR. RUTSCHMAN:  Calls for speculation. |
| 12:05:07 | 20 | THE WITNESS:  That I do not know. |
| 12:05:08 | 21 | BY MS. AVLONI: |
| 12:05:09 | 22 | Q.   Have you ever fired a contractor? |
| 12:05:12 | 23 | **A.   No.** |
| 12:05:13 | 24 | Q.   Have you ever participated -- |
| 12:05:14 | 25 | MR. RUTSCHMAN:  Objection -- sorry -- |

12:23:51  1              THE WITNESS:  I don't remember when I

12:23:52  2    first -- first started.  Well, I believe so, yes.

12:24:09  3    BY MS. AVLONI:

12:24:09  4         Q.   And do you know if Tesla was ever a client

12:24:13  5    of CitiStaff?

12:24:16  6              MR. RUTSCHMAN:  Objection; calls for

12:24:16  7    speculation.

12:24:20  8              THE WITNESS:  No.

12:24:20  9    BY MS. AVLONI:

12:24:20 10         Q.   It was just -- to your knowledge you

12:24:22 11    believe nextSource was a client and to your

12:24:24 12    knowledge you don't believe that Tesla was a client

12:24:28 13    of CitiStaff when you were there?

12:24:30 14              MR. RUTSCHMAN:  Objection; misstates the

12:24:31 15    witness' prior testimony.

12:24:32 16              THE WITNESS:  To my knowledge CitiStaff

12:24:37 17    helped nextSource provide contractors for -- to

12:24:40 18    work at Tesla for Tesla.

12:24:43 19    BY MS. AVLONI:

12:24:43 20         Q.   Okay.  Did nextSource have -- to your

12:24:52 21    knowledge and based on your job duties as a staff

12:24:54 22    supervisor -- do you know if CitiStaff gave

12:25:00 23    nextSource the power to issue its contractors

12:25:08 24    raises?

12:25:09 25              MR. RUTSCHMAN:  Objection; vague,

12:25:14  1    ambiguous, and calls for speculation.

12:25:21  2            THE WITNESS:   To my knowledge nextSource

12:25:23  3    did provide CitiStaff with raises for CitiStaff

12:25:26  4    contractors through the time that I was there.

12:25:29  5    BY MS. AVLONI:

12:25:30  6        Q.   And nextSource had agreed to provide and

12:25:33  7    recommend promotions for CitiStaff employees?

12:25:35  8            MR. RUTSCHMAN:   Objection; calls for

12:25:35  9    speculation.

12:25:39  10           THE WITNESS:   nextSource did provide

12:25:44  11   CitiStaff with raises and promotions.

12:25:50  12   BY MS. AVLONI:

12:25:50  13       Q.   And do you know if nextSource's had the

12:25:54  14   ability to discipline CitiStaff employees?

12:25:58  15           MR. RUTSCHMAN:   Objection; vague and

12:25:58  16   ambiguous.   Calls for speculation.

12:26:07  17           THE WITNESS:   Discipline?   As far as --

12:26:09  18   BY MS. AVLONI:

12:26:09  19       Q.   Issuing termination, issuing suspension,

12:26:12  20   writeup.

12:26:13  21       **A.   Yes.**

12:26:14  22           MR. RUTSCHMAN:   Same objections.

12:26:15  23   BY MS. AVLONI:

12:26:15  24       Q.   And to your knowledge nextSource had the

12:26:18  25   ability to demote CitiStaff contractors?

| | | |
|---|---|---|
| 12:26:22 | 1 | MR. RUTSCHMAN:  Objection; calls for |
| 12:26:22 | 2 | speculation. |
| 12:26:24 | 3 | THE WITNESS:  To my knowledge they did |
| 12:26:25 | 4 | provide us with a few promotions and demotions. |
| 12:26:32 | 5 | BY MS. AVLONI: |
| 12:26:33 | 6 | Q.   And to your knowledge nextSource had |
| 12:26:37 | 7 | this ability because of the type of relationship |
| 12:26:39 | 8 | that CitiStaff had with nextSource; is that |
| 12:26:42 | 9 | correct? |
| 12:26:42 | 10 | MR. RUTSCHMAN:  Objection; calls for |
| 12:26:42 | 11 | speculation.  It's vague and ambiguous. |
| 12:26:47 | 12 | THE WITNESS:  That I do not know. |
| 12:26:48 | 13 | BY MS. AVLONI: |
| 12:26:49 | 14 | Q.   Do you know if Tesla had the ability to |
| 12:27:01 | 15 | demand raises for CitiStaff contractors that were |
| 12:27:04 | 16 | working in its facility? |
| 12:27:05 | 17 | MR. RUTSCHMAN:  Objection; calls for |
| 12:27:05 | 18 | speculation. |
| 12:27:09 | 19 | THE WITNESS:  From what I know |
| 12:27:15 | 20 | supervisors, Tesla supervisors would speak with |
| 12:27:18 | 21 | nextSource and tell them about a certain |
| 12:27:20 | 22 | individual that they felt was doing great.  But |
| 12:27:25 | 23 | other than that, as far as like overview, I don't |
| 12:27:32 | 24 | know anything else. |
| 12:27:33 | 25 | BY MS. AVLONI: |

| | | |
|---|---|---|
| 12:27:33 | 1 | Q.   And how would you know -- how did you come |
| 12:27:36 | 2 | to know that in some situations Tesla supervisors |
| 12:27:40 | 3 | would tell nextSource that a CitiStaff contractor |
| 12:27:43 | 4 | is doing great? |
| 12:27:44 | 5 | A.   nextSource would tell me.  Sometimes |
| 12:27:46 | 6 | when I would speak with a few of them they'll let us |
| 12:27:50 | 7 | know and -- before they would send us the actual |
| 12:27:59 | 8 | e-mail consenting of their raise. |
| 12:28:01 | 9 | Q.   Have you ever seen nextSource decline a |
| 12:28:07 | 10 | raise request by a Tesla supervisor? |
| 12:28:09 | 11 | A.   No, I haven't seen that. |
| 12:28:12 | 12 | Q.   Okay.  Do you know if Tesla has the |
| 12:28:15 | 13 | ability to recommend promotions for CitiStaff |
| 12:28:19 | 14 | contractors working in the Tesla facility? |
| 12:28:21 | 15 | MR. RUTSCHMAN:  Objection; calls for |
| 12:28:21 | 16 | speculation. |
| 12:28:28 | 17 | THE WITNESS:  Can you repeat the question. |
| 12:28:29 | 18 | BY MS. AVLONI: |
| 12:28:29 | 19 | Q.   I know.  This verbiage gets all confusing. |
| 12:28:32 | 20 | Do you know if Tesla employees have the |
| 12:28:39 | 21 | ability to recommend promotions for CitiStaff |
| 12:28:46 | 22 | contractors -- |
| 12:28:47 | 23 | MR. RUTSCHMAN:  Objection; calls for |
| 12:28:47 | 24 | speculation. |
| 12:28:48 | 25 | BY MS. AVLONI: |

12:28:48  1      Q.   -- that are working in the Tesla facility?

12:28:52  2      A.   No, I do not know.

12:28:56  3      Q.   Do you know if Tesla has the ability to

12:29:02  4  recommend discipline for CitiStaff contractors

12:29:06  5  working in a Tesla facility?

12:29:09  6           MR. RUTSCHMAN:  Objection; calls for

12:29:09  7  speculation.

12:29:10  8           THE WITNESS:  No, I do not.

12:29:16  9  BY MS. AVLONI:

12:29:16 10      Q.   Do you know if Tesla has the ability to

12:29:19 11  recommend termination of a relationship between a

12:29:21 12  CitiStaff contractor working at its facility?

12:29:26 13           MR. RUTSCHMAN:  Objection; calls for

12:29:26 14  speculation.

12:29:31 15           THE WITNESS:  In that case I would say

12:29:32 16  yes.  If there is -- if they're in a department

12:29:37 17  that's far away or -- and they're being supervised

12:29:43 18  by them and that supervisor, then, yes, I would say

12:29:47 19  in that case they would be able to tell nextSource

12:29:51 20  about the worker's performance.

12:29:59 21  BY MS. AVLONI:

12:30:00 22      Q.   Do you know if nextSource -- isn't it

12:30:03 23  true that nextSource is kind of just like a

12:30:05 24  middleman between CitiStaff providing employee --

12:30:09 25  contractors to nextSource and then nextSource

```
12:43:25  1   concern to you about Owen, did you communicate this
12:43:28  2   concern to nextSource?
12:43:35  3       A.   Not after Rothaj first told me.  I had
12:43:41  4   communicated just with Owen to let me know.  Or to
12:43:47  5   let -- to let him know.
12:43:51  6       Q.   How about did you communicate anything to
12:43:53  7   Tesla after Rothaj brought the concern to you?
12:43:57  8       A.   No, not to Tesla.
12:43:59  9       Q.   Did you communicate the concern up to
12:44:03 10   William?
12:44:07 11       A.   That after Rothaj told me, no.
12:44:10 12       Q.   How about Vanessa?
12:44:12 13       A.   No.
12:44:16 14       Q.   How about Bruce?
12:44:17 15       A.   I think I may have spoke with Bruce and
12:44:20 16   mentioned it from what I recall.
12:44:28 17       Q.   How about Judy?
12:44:28 18       A.   No, I didn't talk to Judy.
12:44:30 19       Q.   And the -- when the other person came
12:44:33 20   forward and brought up concerns about Owen, did you
12:44:37 21   communicate those concerns to nextSource?
12:44:42 22       A.   No.
12:44:43 23       Q.   Did you communicate those concerns to
12:44:45 24   Tesla?
12:44:45 25       A.   No.
```

| | | | |
|---|---|---|---|
| 12:44:46 | 1 | Q. | To William? |
| 12:44:48 | 2 | A. | No. |
| 12:44:48 | 3 | Q. | Bruce? |
| 12:44:49 | 4 | A. | To Bruce. |
| 12:44:51 | 5 | Q. | How about to Judy? |
| 12:44:58 | 6 | A. | Not that I remember. |
| 12:44:59 | 7 | Q. | Vanessa? |
| 12:44:59 | 8 | A. | Not that I remember, no. |

12:45:00  9      Q.   When you communicated to Bruce the

12:45:04 10   information that Rothaj brought forward to you about

12:45:07 11   Owen, what did Bruce tell you?

12:45:09 12      A.   So from what I can remember when I told

12:45:15 13   Bruce about it, Bruce asked me if the client has

12:45:20 14   anything said about Owen.  And I said no, I haven't

12:45:26 15   received any phone calls or e-mails, which I hadn't.

12:45:30 16   So he told me, you know, speak with the candidate,

12:45:35 17   the contractor -- you know, speak with them again --

12:45:41 18   let them know that this is a pattern that several

12:45:45 19   people have seen.  And this can -- that can possibly

12:45:48 20   lead into disciplinary actions, depending on what

12:45:56 21   the client wants to do.  And then, you know, just

12:46:00 22   take it from there.  So um --

12:46:05 23      Q.   And did you communicate that to Owen?

12:46:07 24      A.   Yes.

12:46:07 25      Q.   You told him that this pattern can lead to

| | | |
|---|---|---|
| 12:48:49 | 1 | Q.   These are the only two that you recall? |
| 12:48:55 | 2 | **A.   Yeah.** |
| 12:48:56 | 3 | MR. RUTSCHMAN:  Is that a yes? |
| 12:48:56 | 4 | THE WITNESS:  Yes. |
| 12:48:56 | 5 | BY MS. AVLONI: |
| 12:48:57 | 6 | Q.   And referring to Owen bringing concerns, |
| 12:49:00 | 7 | you recall him bringing two concerns to your |
| 12:49:02 | 8 | attention, one about the picture and the other one |
| 12:49:04 | 9 | about the altercation with Rothaj; is that correct? |
| 12:49:06 | 10 | **A.   Correct.** |
| 12:49:08 | 11 | Q.   In regards to the picture, when he |
| 12:49:15 | 12 | communicated that concern to you, what did you do? |
| 12:49:17 | 13 | **A.   So when he told me about it, you know, due** |
| 12:49:25 | 14 | **to the fact that we take it seriously, we** |
| 12:49:30 | 15 | **immediately took it up to HR -- Judy -- and let my** |
| 12:49:38 | 16 | **supervisors know about it as well, which they said** |
| 12:49:44 | 17 | **to talk to Judy for this case.** |
| 12:49:51 | 18 | Q.   Did you talk to Judy? |
| 12:49:53 | 19 | **A.   Yes, I did.** |
| 12:49:57 | 20 | Q.   What did you guys discuss? |
| 12:49:59 | 21 | **A.   I told Judy about, you know -- I told Judy** |
| 12:50:03 | 22 | **that I discussed -- spoke with Owen, you know.  I** |
| 12:50:09 | 23 | **checked in to -- with him to see do you -- are you** |
| 12:50:19 | 24 | **going to return to your -- to your job.  He said** |
| 12:50:22 | 25 | **yes.  I asked him if he wanted to be moved to a** |

| | | |
|---|---|---|
| 12:50:26 | 1 | **different department.  He said no.  You know, he was** |
| 12:50:33 | 2 | **upset and a little aggravated.  But I let him know** |
| 12:50:42 | 3 | **that I'm -- HR is going to deal with this.  I have** |
| 12:50:47 | 4 | **already brought it up to them to their immediate** |
| 12:50:50 | 5 | **attention.  I let my supervisors know.  And I let** |
| 12:50:57 | 6 | **Chartwell -- I gave them the okay to consent to** |
| 12:51:00 | 7 | **speak with Owen Diaz.** |
| 12:51:12 | 8 | Q.  Do you recall discussing anything else |
| 12:51:13 | 9 | with Owen Diaz regarding this situation?  I'm sorry, |
| 12:51:19 | 10 | actually.  You were describing to me the |
| 12:51:20 | 11 | conversation you had with Judy; right? |
| 12:51:24 | 12 | **A.  Yes.** |
| 12:51:25 | 13 | Q.  Because -- let's back up.  Let's get a |
| 12:51:27 | 14 | clear record. |
| 12:51:27 | 15 | So when Owen raised the concern about the |
| 12:51:33 | 16 | picture to you, you talked to Owen.  And what did he |
| 12:51:42 | 17 | tell you? |
| 12:51:45 | 18 | MR. RUTSCHMAN:  Objection; asked and |
| 12:51:45 | 19 | answered. |
| 12:51:50 | 20 | THE WITNESS:  So he pretty much told me |
| 12:51:53 | 21 | how -- what happened, how he came across the |
| 12:51:58 | 22 | picture.  You know, he felt that the rac- -- the |
| 12:52:07 | 23 | picture was racist and that he wanted to make a |
| 12:52:17 | 24 | complaint. |
| 12:52:21 | 25 | BY MS. AVLONI: |

01:13:10  1    The supervisors weren't aware as well.  They were

01:13:15  2    aware that he was leaving during the time that I had

01:13:17  3    mentioned to them -- to nextSource.  But he was

01:13:22  4    gone for an additional two, three days.  So I

01:13:27  5    didn't -- I didn't know until I spoke with

01:13:32  6    nextSource and Owen.

01:13:37  7        Q.   Did Owen tell you why he was gone for an

01:13:39  8    extra two, three days?

01:13:41  9        A.   He had said that he had told his

01:13:42 10    supervisors that he was going to be gone for an

01:13:49 11    extra few days, that he called in.  But he never

01:13:52 12    told me that.

01:13:53 13        Q.   Was he required to tell you that?

01:13:55 14        A.   Yes.  To let the supervisors know and, you

01:13:59 15    know, us at the office know; that way there's record

01:14:02 16    on both ends.

01:14:04 17             And I would always let all the temp- --

01:14:07 18    the contractor workers know that, you know, if

01:14:10 19    there's ever an issue to arise, let me know.  Let

01:14:15 20    your supervisors know.  If for whatever reason you

01:14:18 21    can't contact your supervisor, let me know.  I can

01:14:21 22    get in contact with them, let them know, whatever

01:14:23 23    the case is.  Any last-minute issues, you just call

01:14:27 24    in, let me know.

01:14:29 25        Q.   Do you know if Owen Diaz also went on

| | | |
|---|---|---|
| 01:18:06 | 1 | **A.    A what kind of policy?** |
| 01:18:09 | 2 | Q.    Bereavement. |
| 01:18:11 | 3 | MR. RUTSCHMAN:   Bereavement. |
| 01:18:12 | 4 | BY MS. AVLONI: |
| 01:18:13 | 5 | Q.    Bereavement. |
| 01:18:13 | 6 | **A.    Oh --** |
| 01:18:14 | 7 | MR. RUTSCHMAN:   Objection; calls for |
| 01:18:14 | 8 | speculation. |
| 01:18:15 | 9 | BY MS. AVLONI: |
| 01:18:15 | 10 | Q.    Leave policy. |
| 01:18:16 | 11 | **A.    That I don't know.** |
| 01:18:16 | 12 | Q.    Do you know if nextSource has a |
| 01:18:19 | 13 | bereavement leave policy? |
| 01:18:21 | 14 | MR. RUTSCHMAN:   Objection; calls for |
| 01:18:21 | 15 | speculation. |
| 01:18:22 | 16 | THE WITNESS:   That I don't know. |
| 01:18:23 | 17 | BY MS. AVLONI: |
| 01:18:24 | 18 | Q.    Tesla?  Do you know whether Tesla has such |
| 01:18:26 | 19 | a policy? |
| 01:18:28 | 20 | MR. RUTSCHMAN:   Objection; calls for |
| 01:18:28 | 21 | speculation. |
| 01:18:29 | 22 | THE WITNESS:   That I don't know. |
| 01:18:30 | 23 | BY MS. AVLONI: |
| 01:18:30 | 24 | Q.    Did you try to place Owen at another |
| 01:18:34 | 25 | facility after he was separated from Tesla? |

01:18:37   1            MR. RUTSCHMAN:   Objection; vague and

01:18:38   2   ambiguous.

01:18:42   3            THE WITNESS:   I did mention that, you

01:18:45   4   know, we could possibly place him somewhere else.

01:18:48   5   But it wouldn't be making the same amount of money

01:18:51   6   that he was making there.   And he just -- basically

01:18:57   7   he didn't want to hear it.   He was like F that.

01:19:00   8   Thirteen dollars ain't -- ain't shit, basically.

01:19:07   9            So -- you know, I tried to get him to calm

01:19:15   10   down by telling him hey, you know, I could probably

01:19:18   11   place you somewhere else.   You're not just -- you

01:19:21   12   know, your assignment didn't work here, you know, it

01:19:24   13   ended here.   But, you know, do you want to try

01:19:27   14   something else.   And he didn't.   He didn't want to

01:19:30   15   do anything else basically.   So --

01:19:33   16   BY MS. AVLONI:

01:19:33   17       Q.   Was Tesla -- do you know if Tesla paid the

01:19:37   18   highest rate to CitiStaff contractors?

01:19:40   19            MR. RUTSCHMAN:   Objection; calls for

01:19:40   20   speculation.

01:19:45   21            THE WITNESS:   I don't know if Tesla paid

01:19:47   22   the highest rate to Citistaff contractors.   But when

01:19:51   23   a lot of people hear Tesla, it's a well-known

01:19:55   24   manufacturer for these electric cars.   So when

01:19:58   25   people hear Tesla, everybody just wants to work at

01:21:03  1        Q.   Did you have any client that paid more

01:21:05  2   than $16 an hour?

01:21:07  3        **A.   I don't think so.   Other than Tesla.**

01:21:13  4             MS. AVLONI:  What time is it right now?

01:21:15  5   It's 1:21 p.m.  It makes sense, I think, to go on a

01:21:19  6   break.

01:21:21  7             MR. RUTSCHMAN:  Yes.

01:21:21  8             MS. AVLONI:  Okay.  So it is 1:21 and

01:21:24  9   we're going off the record.

01:21:25 10        (Recess taken from 1:21 p.m. to 2:18 p.m.)

02:18:36 11             MS. AVLONI:  The time is now 2:18 p.m.

02:18:38 12   And we're back on the record.

02:18:42 13        Q.   Ms. De Leon, what is your current address?

02:18:48 14        **A.   My --**

02:18:49 15             MR. RUTSCHMAN:  Objection; privacy.  She's

02:18:51 16   represented in this action, so you can contact her

02:18:54 17   through our firm.

02:18:55 18             MS. AVLONI:  And will you --

02:18:56 19             MR. RUTSCHMAN:  I'm going to instruct her

02:18:58 20   not to answer.

02:18:58 21             MS. AVLONI:  And will you agree to accept

02:19:00 22   a subpoena on behalf of Ms. De Leon, trial subpoena?

02:19:05 23             MR. RUTSCHMAN:  Yes.

02:19:06 24   BY MS. AVLONI:

02:19:06 25        Q.   And you're okay with your attorney

03:02:38  1   speculation.  Asked and answered.

03:02:42  2            THE WITNESS:  It was given to me as far as

03:02:48  3   I recall, yes.

03:02:49  4   BY MS. AVLONI:

03:02:49  5       Q.   Did you ever provide a handbook like this

03:02:51  6   to any of the CitiStaff contractors?

03:02:55  7       A.   Not that I recall.

03:02:57  8       Q.   Were you the only individual who would

03:03:01  9   provide policies and handbook information from

03:03:06 10   CitiStaff to Citistaff contractors that were

03:03:12 11   working -- that are tied to the Newark area?

03:03:19 12            MR. RUTSCHMAN:  Objection; calls for

03:03:19 13   speculation.  Vague and ambiguous.

03:03:22 14            THE WITNESS:  So as I stated earlier, I

03:03:24 15   was the one -- only one in the office, so I was the

03:03:27 16   one that gave them, you know, the applications that

03:03:33 17   included the policies and that such [as said].

03:03:36 18   BY MS. AVLONI:

03:03:36 19       Q.   And you never gave them this policy?

03:03:39 20       A.   This booklet?  This --

03:03:40 21       Q.   Correct.  Book.

03:03:42 22       A.   No.

03:03:44 23       Q.   Okay.  If you could look at page 5.  On

03:03:46 24   the very bottom you will see that there's a portion

03:03:54 25   that's redacted and it continues to be redacted for

03:23:57  1    there were any other -- you know, if the client took

03:23:59  2    down any statements or any reports; writing any --

03:24:06  3    keeping track of anything in -- in the person's file

03:24:09  4    in the system; making sure they had dates on

03:24:17  5    everything; and keeping anything -- anything as far

03:24:20  6    as e-mails that had to do with the situation.

03:24:28  7        Q.   Anything else that you recall included in

03:24:31  8    Judy's training on investigations?

03:24:34  9        A.   No.  Nothing else that I recall.

03:24:37 10        Q.   And when you say "contact the person in

03:24:42 11    the incident," who does that refer to?

03:24:44 12        A.   Well, in the Owen Diaz case, contacting

03:24:47 13    Owen Diaz.

03:24:49 14        Q.   Did Judy ever instruct you when conducting

03:24:51 15    investigations to contact potential witnesses?

03:24:56 16        A.   Contacting anyone who was involved or may

03:25:03 17    have been involved.

03:25:04 18        Q.   How about any -- did she ever instruct you

03:25:06 19    on conducting investigations to contact anyone who

03:25:09 20    might have observed the incident?

03:25:13 21        A.   The question one more time?  You're asking

03:25:16 22    me did she tell me to contact, let's say, another

03:25:20 23    person from another agency?  If that's the question?

03:25:29 24        Q.   When training you on investigations, did

03:25:31 25    Judy ever tell you it's also important to talk to

| | | |
|---|---|---|
| 03:25:35 | 1 | witnesses that observed the incident whether or not |
| 03:25:39 | 2 | they were CitiStaff temporary or not? |
| 03:25:49 | 3 | A. It was more so she would tell me, you |
| 03:25:50 | 4 | know, when you talk to the client, ask them if they |
| 03:25:53 | 5 | have witness reports or any statement or any |
| 03:26:01 | 6 | documentation from the other parties. |
| 03:26:09 | 7 | Q. In Owen Diaz' case, in regards to his |
| 03:26:12 | 8 | complaint about the inappropriate picture, did you |
| 03:26:17 | 9 | speak with nextSource about Owen's complaint? |
| 03:26:25 | 10 | A. Yes. |
| 03:26:26 | 11 | Q. Who did you speak to from nextSource? |
| 03:26:33 | 12 | A. I don't recall. |
| 03:26:36 | 13 | Q. Did you check with nextSource whether |
| 03:26:39 | 14 | they took down any statements or prepared any |
| 03:26:42 | 15 | reports? |
| 03:26:43 | 16 | A. Yes. |
| 03:26:45 | 17 | Q. And do you recall what nextSource said? |
| 03:26:48 | 18 | A. I had asked nextSource for -- oh, no. |
| 03:26:56 | 19 | That wasn't the -- that wasn't the picture |
| 03:26:58 | 20 | situation. That was the other situation. So in the |
| 03:27:02 | 21 | picture situation, no, I don't recall them having |
| 03:27:09 | 22 | any witnesses or anything of that sort. |
| 03:27:16 | 23 | Q. Do you recall asking from nextSource |
| 03:27:20 | 24 | whether there were any witnesses? |
| 03:27:26 | 25 | A. There was -- no, not as far as witnesses. |

| | | |
|---|---|---|
| 03:27:29 | 1 | Q.   Meaning no, you did not ask nextSource |
| 03:27:30 | 2 | or no, there were no witnesses that you're aware of? |
| 03:27:35 | 3 | A.   There were no witnesses that I was aware |
| 03:27:36 | 4 | of. |
| 03:27:37 | 5 | Q.   But you would have asked nextSource; |
| 03:27:39 | 6 | right? |
| 03:27:40 | 7 | A.   Right. |
| 03:27:40 | 8 | MR. RUTSCHMAN:  Objection; misstates the |
| 03:27:41 | 9 | witness' prior testimony. |
| 03:27:45 | 10 | THE WITNESS:  So I would have asked them |
| 03:27:46 | 11 | if there were, but there wasn't any. |
| 03:27:51 | 12 | BY MS. AVLONI: |
| 03:27:52 | 13 | Q.   And would your questions to nextSource |
| 03:27:55 | 14 | regarding this incident have been sent by e-mail or |
| 03:27:58 | 15 | would you have posed these questions by phone? |
| 03:28:08 | 16 | A.   By phone, both. |
| 03:28:10 | 17 | Q.   And would you have saved your e-mails to |
| 03:28:14 | 18 | the CitiStaff system? |
| 03:28:15 | 19 | A.   Anything that I had saved at the time |
| 03:28:18 | 20 | would have been in the system.  But I don't know if |
| 03:28:23 | 21 | anything is still in there. |
| 03:28:24 | 22 | Q.   Understood.  But you knew that based on |
| 03:28:26 | 23 | what Judy instructed you, it was important to keep |
| 03:28:29 | 24 | e-mails regarding the situation in the system; |
| 03:28:31 | 25 | right? |

03:51:45  1          MR. RUTSCHMAN:  Objection; the document
03:51:47  2    speaks for itself.
03:51:48  3          THE WITNESS:  His ray rate.
03:51:50  4    BY MS. AVLONI:
03:51:51  5      Q.   Is that the new pay rate, the raise, or
03:51:53  6    the previous pay raise?
03:51:55  7      A.   That would be the new pay rate from his
03:51:57  8    raise that he got.
03:51:58  9      Q.   So what the document is saying is that
03:52:01 10    somewhere in August 16 of 2015 Owen Diaz' pay rate
03:52:06 11    increased to $18?
03:52:08 12      A.   Yes.
03:52:08 13      Q.   And then do you know what the regular
03:52:09 14    billing rate $23.76 means?
03:52:13 15      A.   That would have had to have been just in
03:52:15 16    the contract between nextSource and --
03:52:20 17      Q.   Do you know if that's the amount that
03:52:23 18    CitiStaff billed nextSource for Owen's hourly
03:52:29 19    rate?
03:52:30 20      A.   I don't know.
03:52:31 21      Q.   And then if you look at "Status."  It says
03:52:34 22    "3."  Do you know what that means?
03:52:40 23      A.   I forgot what that was.
03:52:42 24      Q.   How about "Work code"?  Do you know what
03:52:45 25    that --

04:09:47  1        Q.    Thank you.

04:09:48  2        **A.    Thank you.**

04:10:10  3        Q.    If, let's say, a CitiStaff temporary

04:10:11  4    employee made a complaint of some sort to one of

04:10:18  5    CitiStaff's clients, was that -- is it typically the

04:10:21  6    practice that those clients would then notify

04:10:24  7    CitiStaff?

04:10:25  8              MR. RUTSCHMAN:   Objection; vague and

04:10:25  9    ambiguous.   Calls for speculation.   Incomplete

04:10:32 10    hypothetical.

04:10:32 11              THE WITNESS:   So in a case that a

04:10:38 12    CitiStaff temp employee had an issue, is it the

04:10:42 13    practice that they would tell the --

04:10:46 14    BY MS. AVLONI:

04:10:47 15        Q.    No, I'm sorry.   That's not my -- that

04:10:49 16    wasn't my question.

04:10:51 17              My question was if a CitiStaff temporary

04:10:53 18    employee made a complaint to a CitiStaff client

04:11:02 19    about any particular issue, is it generally the

04:11:04 20    practice that those clients would then notify

04:11:07 21    CitiStaff?

04:11:07 22              MR. RUTSCHMAN:   Objection; vague and

04:11:07 23    ambiguous.   Calls for speculation.   Incomplete

04:11:12 24    hypothetical.

04:11:15 25              THE WITNESS:   In a case that were to

04:11:17   1   happen, they would generally advise me to let me

04:11:21   2   know what's going on.

04:11:23   3   BY MS. AVLONI:

04:11:23   4       Q.   But sitting here today you don't recall

04:11:26   5   being advised that Owen Diaz was complaining of

04:11:33   6   derogatory remarks back in summer and early fall of

04:11:40   7   2015?

04:11:41   8           MR. RUTSCHMAN:   Objection; asked and

04:11:41   9   answered.

04:11:45   10          THE WITNESS:   No.

04:11:46   11  BY MS. AVLONI:

04:12:08   12      Q.   I'm sorry.   Refresh my memory about

04:12:12   13  Vanessa Parks.   Vanessa Parks is the one who works

04:12:14   14  for nextSource; right?

04:12:16   15      **A.   She did payroll, yes, at nextSource.**

04:12:18   16      Q.   And you don't recall Vanessa's last name

04:12:20   17  that worked for CitiStaff?

04:12:23   18          MR. RUTSCHMAN:   Objection; asked and

04:12:23   19  answered.

04:12:25   20  BY MS. AVLONI:

04:12:26   21      Q.   Correct?

04:12:28   22      **A.   Correct, she worked.**

04:12:31   23      Q.   Do you know who Devon Burkhard is?

04:12:38   24      **A.   Devon -- last name?**

04:12:39   25      Q.   Burkhard.

05:27:27  1               THE WITNESS:  No, I did not.

05:27:28  2    BY MR. RUTSCHMAN:

05:27:28  3        Q.    To your knowledge, did anyone at CitiStaff

05:27:31  4    ever provide a copy of this employee handbook to any

05:27:34  5    CitiStaff temporary employees?

05:27:36  6               MS. AVLONI:  Asked and answered.

05:27:36  7               THE WITNESS:  No, no, not to my knowledge.

05:27:38  8    BY MR. RUTSCHMAN:

05:27:38  9        Q.    As you sit here today, are you 100 percent

05:27:41 10    sure that any of the policies contained in this

05:27:44 11    handbook apply to the temporary CitiStaff employees?

05:27:49 12               MS. AVLONI:  Calls for speculation.

05:27:49 13               THE WITNESS:  No, I'm not 100 percent

05:27:50 14    sure.

05:27:59 15               MS. AVLONI:  And misstates prior

05:27:59 16    testimony.

05:28:04 17               MR. RUTSCHMAN:  Can I ask you to hand back

05:28:06 18    to the witness Exhibit 93, please.

05:28:59 19                    (Reporter complies.)

05:29:00 20        Q.    Did Owen Diaz ever inform you in March of

05:29:02 21    2016 that a doctor had placed him off work for three

05:29:06 22    weeks?

05:29:06 23        A.    No, he did not.

05:29:08 24        Q.    Is that something that Owen Diaz should

05:29:10 25    have reported to you as a CitiStaff temporary

```
 1                    REPORTER'S CERTIFICATION

 2

 3            I, Heidi Belton, Certified Shorthand

 4   Reporter in and for the State of California, do

 5   hereby certify:

 6

 7            That the foregoing witness was by me duly

 8   sworn; that the deposition was then taken before me

 9   at the time and place herein set forth; that the

10   testimony and proceedings were reported

11   stenographically by me and later transcribed into

12   typewriting under my direction; that the foregoing

13   is a true record of the testimony and proceedings

14   taken at that time.

15

16            IN WITNESS WHEREOF, I have subscribed my

17   name on this date:

18

19

20

21

22       _____

23           Heidi Belton, CSR, RPR, CRR, CCRR, CRC
                   CSR No. 12885
24

25
```

# Exhibit

# **2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

               Plaintiffs,

                           No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

               Defendants.

_____/

DEPOSITION OF LUDIVINA LEDESMA

June 6, 2019

Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to

 2   Notice of Taking Deposition, and on June 6, 2019,

 3   commencing at the hour of 10:37 a.m., at California

 4   Civil Rights Group, 180 Grand Avenue, Oakland,

 5   California, before me, BRIDGET M. MATTOS, CSR No.

 6   11410, there personally appeared

 7

 8                     LUDIVINA LEDESMA,

 9

10   called as a witness by Plaintiff, who, having been

11   duly sworn, was examined and testified as is

12   hereinafter set forth.

13                     ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

 1  not in evidence.

 2          THE WITNESS:  Can you repeat the question?

 3          MR. ORGAN:  I'll rephrase it a little bit.

 4      Q.   Have you ever had any discussions with Monica

 5  De Leon about any issues relating to temporary

 6  associates at the Fremont factory of Tesla?

 7          MR. LAFAYETTE:  Objection.  The question's

 8  overbroad, vague and ambiguous and uncertain and

 9  unintelligible.  And could wind up violating the

10  rights of privacy of certain individuals.

11          THE WITNESS:  No.

12          MR. ORGAN:  Q.  Did you ever talk to Monica

13  De Leon about any issues relating to Owen Diaz?

14      **A.   Yes, at the end.**

15      Q.   I think you said "yes, at the end"?

16      **A.   Yes.**

17      Q.   At the end of Mr. Diaz's assignment at the

18  factory in Fremont?

19      **A.   No.  When I said "at the end," it's after the**

20  **investigations had concluded.**

21      Q.   Did Monica -- was it your understanding that

22  Monica De Leon did an investigation into Mr. Owen

23  Diaz's complaints at the Tesla factory?

24          MR. LAFAYETTE:  Objection.  Her understanding

25  is irrelevant, 1.  Number 2, you've already taken the

```
 1    deposition of Monica De Leon, and so this is becoming

 2    argumentative and cumulative.   Number 3, the question

 3    is vague and ambiguous in the use of the term, quote,

 4    "investigation," closed quote, in the context of the

 5    known facts in this case.

 6         MS. SWAFFORD-HARRIS:   I'm also going to

 7    object; that it's overbroad, and use of the word

 8    "complaint" is vague and ambiguous.

 9         THE WITNESS:  No.

10         MR. ORGAN:  Q.  You mentioned something about

11    after the investigation, what did you mean by that?

12         A.   I meant the last -- an email, it was an

13    email.   It was an email, and the last communication

14    that I had with her, it was that I will talk to her in

15    regards to Owen Diaz, but then there was nothing else

16    for me to do, because it was already concluded, the

17    investigation.   They already had taken action.

18         Q.   And what was the -- what was your

19    understanding of the action that was taken relative to

20    any investigation pertaining to Mr. Diaz?

21         A.   They had given him a three-day suspension and

22    a final warning.

23         Q.   And the "him" being Ramon Martinez; correct?

24         A.   Correct.

25         Q.   So you were informed that Ramon Martinez was
```

```
 1            MR. LAFAYETTE:  Okay.
 2            MR. ORGAN:  Q.  When someone -- when a
 3   temporary associate is onboarded for CitiStaff, do
 4   they receive any training on the issue of harassment
 5   or discrimination?
 6            MR. LAFAYETTE:  Objection to the use of the
 7   term, quote, "training," closed quote.  In this
 8   context, it's vague and ambiguous.
 9            You can answer.
10            THE WITNESS:  Only from the forms that
11   they've signed.
12            MR. ORGAN:  Q.  I see.  So in terms of they
13   read the policies, is that what you mean?
14       A.   Correct.
15       Q.   Other than providing policies to CitiStaff
16   employee -- or temporary associates, is there any
17   other type of training that is done to CitiStaff --
18   for CitiStaff employees when they first start?
19       A.   No.
20       Q.   And then in terms of harassment or
21   discrimination training that is done by CitiStaff for
22   its temporary associates, is there any kind of ongoing
23   training or regular training that is done for the
24   temporary associates?
25            MR. LAFAYETTE:  Objection to the use of the
```

Bridget Mattos & Associates
(415)747-8710

1          MR. ORGAN:  Okay.  Well, let me ask just a

2    couple preliminary questions.

3          MR. LAFAYETTE:  That's why I thought the

4    other exhibits might be a little more helpful.

5          MR. ORGAN:  Okay.  Let's see if we can get to

6    that one.

7      Q.   In terms of the text that is on the first

8    page of 165, which is an email from Mr. Diaz to his

9    supervisor, Mr. Romero, did you ever see that email?

10     **A.   I don't recall.**

11     Q.   Okay.  Do you know who Wayne Jackson is?

12     **A.   No.**

13     Q.   And what about Victor Quintero, have you ever

14    heard that name?

15     **A.   No.**

16     Q.   Did you review any documents relating to

17    Mr. Quintero?

18     **A.   No.**

19     Q.   I'm going to show you what's been previously

20    marked as Exhibit 132.

21          Exhibit 132, for the record, is an eight-page

22    document Bates-stamped Tesla 730 to Tesla 737.

23          Have you ever seen this document before?

24     **A.   No.**

25     Q.   There's a reference here, if you look at the

1    bottom of page 730, the first page of Exhibit 132, and

2    it says, "Attached you will find both statements from

3    the alleged accuser and the alleged harasser.  I

4    reached out to Monica De Leon, branch manager from

5    CitiStaff, and she gave me permission to interview

6    Mr. Owen."

7            Did Ms. De Leon ever talk to you about the

8    fact that they were -- she was giving permission to

9    interview Mr. Owen Diaz?

10   **A.    No.**

11       Q.    And if you look at pages 732 through 737,

12   those are handwritten notes on a Chartwell Staffing

13   Solution template.

14           Have you ever seen any of those?

15   **A.    No.**

16       Q.    And you didn't review those to get ready for

17   your deposition today, did you?

18           MR. LAFAYETTE:  Objection.  Now you're going

19   to the attorney-client privilege.  I'm going to

20   instruct her not to answer.

21           MS. SWAFFORD-HARRIS:  It's also

22   argumentative.

23           MR. ORGAN:  And just so we're clear, to get

24   ready for your testimony as the person most

25   knowledgeable on the topic of the circumstances of any

1  who had engaged in the harassing conduct towards your

2  employee, Owen Diaz, was someone from -- that was not

3  a CitiStaff employee; is that right?

4        MR. LAFAYETTE:  Can I have the question back

5  again?

6        (Record read as follows:

7        "QUESTION:  So Ms. De Leon informed you that

8  the employee who had engaged in the harassing conduct

9  towards your employee, Owen Diaz, was someone from --

10  that was not a CitiStaff employee; is that right?")

11        THE WITNESS:  Correct.

12        MR. ORGAN:  Q.  And Ms. De Leon also informed

13  you that Mr. Diaz had said that that was not the first

14  time that his harasser had engaged in inappropriate

15  behavior; right?

16        A.  No.

17        Q.  She didn't tell you that?

18        A.  No.  I was not aware of that.

19        Q.  Well, you did know that at the time, though;

20  right?

21        MR. LAFAYETTE:  Objection; lacking in

22  foundation, argumentative, assumes facts not in

23  evidence.  Aware of what?  It's also unspecific with

24  regard to conduct.

25        MR. ORGAN:  Q.  You were aware, at the time

1   that you had the phone conversation with Ms. De Leon,

2   that Mr. Diaz had complained that it was not -- that

3   the effigy was not the first time that his harasser

4   had engaged in what he considered to be inappropriate

5   behavior; right?

6       **A.   No.**

7           MR. ARANEDA:  Objection; vague.

8           MR. LAFAYETTE:  Objection; vague.  She didn't

9   know.

10          THE WITNESS:  No, I didn't know.

11          MR. ORGAN:  Q.  You would agree that a

12  CitiStaff employee who is working at a client such as

13  Tesla, is entitled to come to work and not be harassed

14  or degraded while they're doing their job; right?

15          MR. LAFAYETTE:  This is cumulative.  This is

16  the sixth time you've asked this question, and it has

17  now new terms in it, "degraded."  Vague and ambiguous.

18          Can we move on?  You really have covered

19  this.  You really have covered this.  And can you deal

20  with the objection where you're putting in these new

21  terms about "degraded," things like that?

22          MS. SWAFFORD-HARRIS:  Tesla is going to join

23  in that objection.

24          MR. ORGAN:  Q.  Do you know the question?

25      **A.   Can you repeat it again?**

LUDIVINA LEDESMA
June 6, 2019

```
 1        A.    It was confirmed by Monica.

 2        Q.    Did Monica explain to you how she knew it was

 3   confirmed?

 4        A.    No.

 5        Q.    Did Monica De Leon tell you anything about

 6   her conversations with Owen Diaz?

 7        A.    No.

 8        Q.    Did Monica De Leon tell you that she had

 9   actually met with Owen Diaz about his complaint?

10        A.    No.

11        Q.    Did Monica De Leon tell you that Mr. Diaz was

12   upset by what had happened to him?

13        A.    No.

14        Q.    Did Monica De Leon communicate to you that

15   Mr. Diaz was upset by the racist drawing?

16             MR. LAFAYETTE:  Objection as framed.  The

17   question is argumentative, by the drawing that was

18   described as racist.

19             Is that all right with you?

20             MR. ORGAN:  I'll change the question.

21        Q.    Did Monica De Leon tell you or inform you

22   that Owen Diaz was upset by the drawing, which is page

23   5 of Exhibit 131?

24        A.    No.

25        Q.    Did CitiStaff take any additional steps,
```

Bridget Mattos & Associates
(415)747-8710

1   other than getting information on what had happened to

2   the harasser, to find out if Mr. Owen Diaz had

3   concerns about any other racist conduct at the Tesla

4   factory?

5        A.   No.

6        Q.   Now, there's a Vanessa, I believe, who worked

7   at CitiStaff; is that right?

8        A.   Yes.

9        Q.   And what's her last name?

10       A.   Her last name?

11       Q.   Yes.  Vanessa.

12       A.   Garcia.

13       Q.   Did you have any conversations with Vanessa

14   Garcia about Mr. Diaz's complaint, in any way?

15       A.   No.

16       Q.   What is Ms. Garcia's title?

17       A.   HR generalist.

18       Q.   So Ms. Garcia reported to you; is that

19   correct?

20       A.   Yes.

21       Q.   Is Ms. Garcia still with CitiStaff?

22       A.   Yes.

23       Q.   Where does she work?  Down in Orange County?

24       A.   Yes.

25       Q.   Were you aware of anything that Tesla did to

1    State of California              )

2    County of Marin                  )

3

4              I, Bridget M. Mattos, hereby certify

5    that the witness in the foregoing deposition was by me

6    duly sworn to testify to the truth, the whole truth

7    and nothing but the truth in the within entitled

8    cause; that said deposition was taken at the time and

9    place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and disinterested person, and was thereafter

13   transcribed under my direction into typewriting by

14   computer; that the witness was given an opportunity to

15   read, correct and sign the deposition.

16              I further certify that I am not

17   interested in the outcome of said action nor connected

18   with or related to any of the parties in said action

19   nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on June 6, 2019.

22

23   _____
     BRIDGET M. MATTOS, CSR NO. 11410

24

25

# Exhibit

# **3**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

        Plaintiffs,

      vs.              No. 3:17-cv-06748-WHO

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; and DOES 1-50,
inclusive,

        Defendants.

_____//

DEPOSITION OF EDWARD ROMERO

November 30, 2018

Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to

 2     Notice of Taking Deposition, and on November 30, 2018,

 3     commencing at the hour of 10:00 a.m., at CALIFORNIA

 4     CIVIL RIGHTS LAW GROUP, 332 San Anselmo Avenue, San

 5     Anselmo, California, before me, BRIDGET M. MATTOS, CSR

 6     No. 11410, there personally appeared

 7

 8                     EDWARD ROMERO,

 9

10     called as a witness by Plaintiff, who, having been

11     duly sworn, was examined and testified as is

12     hereinafter set forth.

13                        ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

1            MR. ORGAN:  Q.  As far as you know?

2       **A.    As far as I know, everyone was subject to**

3  **follow the rules on PPE.**

4       Q.   And that was true regardless of whether they

5  were a contractor or whether they were a regular Tesla

6  employee; right?

7       **A.   Yes.**

8            MS. ANTONUCCI:  Objection; calls for

9  speculation.

10           MR. ORGAN:  Q.  So in terms of, like, the

11 safety requirements, as far as you understood it and

12 as far as you were trained, it was your understanding

13 that regular Tesla employees and contractors both had

14 to follow the personal protection equipment program;

15 correct?

16      **A.   Yes.**

17           MS. ANTONUCCI:  Objection; calls for

18 speculation.

19           Can you give me one second?  Just take a

20 breath.

21           THE WITNESS:  I will.

22           MS. ANTONUCCI:  Okay.  Thank you.

23           MR. ORGAN:  Q.  Tesla also required employees

24 to wear personal protective equipment, or PPE, in the

25 factory; is that true?

1       **A.    Could you restate that again?**

2       Q.    Yeah.

3             You understood that Tesla required the

4    employees, whether they be contractors or regular

5    Tesla employees, to wear personal protective equipment

6    in the factory?

7       **A.    Yes.**

8       Q.    And Tesla supplied that personal protective

9    equipment to the employees; is that correct?

10      **A.    From what I understand, overall, yes.   I**

11   **can't speak for other departments.   Maybe they had**

12   **different guidelines because of the type of work that**

13   **they did there, so I can't speak for all of Tesla.   I**

14   **only knew a portion of it.**

15      Q.    Sure.   But in terms of the -- you were in

16   maintenance and janitorial -- or recycling and

17   janitorial.   In that area, all employees had to wear

18   PPE; is that correct?

19      **A.    Yes.**

20      Q.    And that was true whether they were an

21   employee of Tesla or whether they were an -- or a

22   contractor; correct?

23      **A.    Yes.   Because even the contractors would be**

24   **called to their attention if they were not wearing**

25   **their PPE.**

1    scope of work.  Okay?  I did not supervise their

2    employees; I did not direct their employees.  Okay?  I

3    was to supervise the contractors.

4         Q.   So you worked with the contracting agencies

5    then as the --

6         A.   Their representatives.

7         Q.   And who was the nextSource representative?

8         A.   Wayne Jackson.

9         Q.   And who was City Staff?

10         A.   Oh, I don't know who they were.  It's my

11    understanding that they worked together.  I don't know

12    what type of arrangement they had, but I think

13    nextSource took the lead in bringing in people into

14    the factory.

15         Q.   So it was your understanding that nextSource

16    took the lead in bringing in employees into the

17    factory, even if they worked for a different

18    contractor, like City Staff?

19         A.   That was my understanding.  It was my

20    understanding.

21         Q.   I understand.

22         A.   I have no more knowledge of that.

23         Q.   That's all I'm asking for is your

24    understanding of stuff.

25              Okay.  Then in terms of -- do you know what

```
 1      Q.   Do you know who they worked for?
 2      A.   Again, I think it was through nextSource, but
 3   it might have been some City Staff and other agencies
 4   also.
 5      Q.   And the elevators, this was the way that
 6   products got from either the lower level to the upper
 7   level or the upper level to the lower level; is that
 8   right?
 9      A.   Yes.  Moving production materials for the
10   building of cars.
11      Q.   These are, like, heavy-duty elevators, you
12   said; right?
13      A.   Yes, they're humongous, probably the size of
14   your -- half of your office here.
15      Q.   Okay.  I haven't been to the Tesla factory,
16   so tell me, pretty much, what was the role of the
17   elevators?  What were they supposed to do?
18      A.   Okay.  The elevators were there to move
19   product, and actually the primary responsibility was
20   to move material up and down for the production -- the
21   construction of cars.  Okay?
22           The group that I supervised, supervises the
23   two large elevators.  And we had forklift drivers,
24   tugger drivers, who moved this material up and down
25   the elevators all day long.  We had drop zones near
```

1   had said there was some kind of relationship between

2   Hilda and Aaron?

3       A.   My job was to -- if anybody had any concerns

4   or complaints, to escalate it to the point where I

5   could escalate it.  And so what I did is I reported it

6   to Mr. Salazar, which was the manager in recycling,

7   okay, and if I remember correctly, during that time I

8   was just being introduced to the elevators, so it was

9   kind of, like, they're still in charge, okay, and

10  that's the way it was handled.  It was escalated to

11  the right people.

12      Q.   So when you were a supervisor, your job,

13  whenever you heard a complaint, was to escalate that

14  complaint or those concerns to a level where someone

15  could address it; is that right?

16      A.   In other words, if it was -- as a supervisor,

17  I could take it to a certain level, which primarily

18  meant dealing with either Victor Quintero or HR or,

19  you know, one of those individuals.  Or the

20  contractors' representative, the account manager, I

21  would take it to that point, and then they would deal

22  with it from there.

23      Q.   Did you feel like any of these things you

24  heard about from either Jesse or Hilda were concerns

25  that needed to be raised to the HR level?

1    his hair, with a caption under it saying "boo."

2        A.    Mm-hm.

3        Q.    Right?

4        A.    Yes.

5        Q.    That's what he told you; right?

6        A.    Yes.

7        Q.    And it was clear to you, wasn't it, that that

8    was offensive to Mr. Diaz?

9        A.    Of course.

10       Q.    In fact, down at the bottom, Mr. Diaz puts in

11   his text to you, "A person should be able to come to

12   work and not be harassed or degraded while they're

13   trying to do their job"; right?

14       A.    Yes.

15       Q.    It was clear to you that Mr. Diaz was

16   suggesting that he felt harassed and degraded by that

17   poster; right?

18       A.    That's why we took action.

19       Q.    He then references down here, "This is not

20   the first time Ramon Martinez has been" -- I think

21   "talked about, about his behavior."

22             That was in reference to the prior incident

23   where Mr. Diaz had complained about Ramon Martinez

24   saying things or threatening him on the elevator;

25   right?

1          MS. ANTONUCCI:  Objection; calls for a legal

2   conclusion, misstates prior testimony.

3          THE WITNESS:  He did not talk to me about

4   that, specifically.

5          MR. ORGAN:  Q.  Did you ask him about it?

6      A.    I did not.

7      Q.    Why not?

8      A.    Because I was going to direct this

9   information to the appropriate people to handle it.

10     Q.    And the appropriate people to handle it were

11  Wayne Jackson and Victor Quintero?

12     A.    Correct.

13     Q.    So once the information that was in this

14  email or text message -- whatever it was -- was

15  communicated by you to Wayne Jackson and Victor

16  Quintero, you felt like your role was over; is that

17  correct?

18          MS. ANTONUCCI:  Objection; misstates

19  testimony.  Vague.

20          THE WITNESS:  I didn't think that my

21  responsibilities were over.  I felt I had done what I

22  was supposed to do, placing it where some action could

23  be taken.

24          MR. ORGAN:  Okay.

25     Q.    If you go to the second page of Exhibit 37,

1  terms; right?

2      A.   **That the witnesses denied hearing any racial**

3  **slurs being made.**

4      Q.   But the witnesses also said that Mr. Timbreza

5  had a tendency to kid around excessively.

6      A.   **Correct.**

7      Q.   Right?

8           And you had no basis to suggest or think that

9  Owen Diaz was lying about this, did you?

10     A.   **No.**

11          MS. ANTONUCCI:  Objection; vague.

12          MR. ORGAN:  Q.   In fact, a verbal warning was

13  issued to Mr. Timbreza, wasn't it?

14     A.   **It was for his kidding around excessively.**

15     Q.   Did it mention anything about racially

16  offensive remarks?

17     A.   **I don't think that it did.**

18     Q.   Did you see this verbal warning that --

19     A.   **I don't remember.**

20     Q.   Let me finish the question.

21     A.   **Okay.**

22     Q.   Did you see the verbal warning that was

23  issued to Mr. Timbreza?

24     A.   **I do not remember looking at it.  I can't**

25  **remember looking at it.**

```
 1    State of California              )

 2    County of Marin                  )

 3

 4              I, Bridget M. Mattos, hereby certify

 5    that the witness in the foregoing deposition was by me

 6    duly sworn to testify to the truth, the whole truth

 7    and nothing but the truth in the within entitled

 8    cause; that said deposition was taken at the time and

 9    place herein named; that the deposition is a true

10    record of the witness's testimony as reported to the

11    best of my ability by me, a duly certified shorthand

12    reporter and disinterested person, and was thereafter

13    transcribed under my direction into typewriting by

14    computer; that the witness was given an opportunity to

15    read, correct and sign the deposition.

16              I further certify that I am not

17    interested in the outcome of said action nor connected

18    with or related to any of the parties in said action

19    nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunder

21    subscribed my hand on November 30, 2018.

22
              _____
23              BRIDGET M. MATTOS, CSR NO. 11410

24

25
```

# Exhibit

# 4

```
                UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA
- - - - - - - - - - - - - - - - - - - - -
DEMETRIC DIAZ, OWEN DIAZ, and      )

LAMAR PATTERSON,                   )

              Plaintiffs,          )  CASE NO.

vs.                                )  3:17-CV-06748-WHO

TESLA, INC. dba TESLA MOTORS,      )

INC.; CITISTAFF SOLUTIONS,         )

INC.; WEST VALLEY STAFFING         )

GROUP; CHARTWELL STAFFING          )

SERVICES, INC.; and DOES 1-50,     )

inclusive,                         )

              Defendants.          )
- - - - - - - - - - - - - - - - - - - - -




            DEPOSITION OF MICHAEL JOHN WHEELER

                WEDNESDAY, JUNE 12, 2019




    Reported by:

    BY:  MELINDA M. SELLERS, CSR# 10686, RMR, CRC, CRR, CCRR
```

```
 1

 2

 3

 4

 5

 6

 7

 8

 9        Deposition of MICHAEL JOHN WHEELER, taken on

10    behalf of PLAINTIFFS, at 180 Grand Ave., Suite 1380,

11    Oakland, California, commencing at 12:18 p.m.,

12    WEDNESDAY, JUNE 12, 2019, before Melinda M. Sellers,

13    Certified Shorthand Reporter No. 10686, pursuant to

14    Notice.

15

16

17

18

19

20

21

22

23

24

25
```

 1     **A.    Mm-hmm.**

 2     Q.    Is that right?

 3     **A.    Yes.**

 4     Q.    And I think we said that was in either the

 5     September/October 2015 time frame that you moved up

 6     to supervisor --

 7     **A.    Yes.**

 8     Q.    -- is that right?

 9          Okay.  And when you moved up to supervisor,

10     the supervisor position wasn't necessarily an

11     employee or a direct employee of Tesla, right?

12     **A.    No.**

13     Q.    And tell me what the job duties were of the

14     supervisor position?

15     **A.    So I managed the other 22 employees that**

16     **worked graveyard with me, making sure that they were**

17     **on time, they were following the protocols, safety,**

18     **lunch times were monitored, putting together plans**

19     **and working with Tesla employees to make the**

20     **recycling process better.  And then, of course,**

21     **disciplinary.**

22     <u>Q.    Okay.  So you would do, like, performance</u>

23     <u>appraisals or things like that?</u>

24     **<u>A.    I would do all the way up to termination.</u>**

25     Q.    As the supervisor, did you have authority

1    to terminate --

2        A.   Yes.

3        Q.   -- people under you?

4        A.   Mm-hmm.  There are a few, yes, employees

5    that I did have to ask to leave.

6        Q.   Okay.  And when you asked people to leave,

7    did Tesla have input on that process?

8        A.   Josue and that circle, upper circle, yes,

9    they could.  For the most part anyone that I asked

10   to leave was a pretty serious offense.

11       Q.   Okay.  But in terms of terminating

12   employees, you would always consult with the -- the

13   managers from Tesla; is that right?

14       A.   No.  I would talk to -- I'd send the emails

15   out to the appropriate channels, but very rarely did

16   they respond.

17       Q.   Okay.

18       A.   A lot of those cases at Tesla are

19   cut-and-dry.  We have people that bring guns to

20   Tesla.  We have people that bring cocaine to Tesla.

21   We have people fornicating at Tesla.  So it's --

22   it's usually an easy fix.

23       Q.   Okay.  In terms of the policies that you

24   were enforcing as the supervisor in the recycling --

25   is it okay if I call it recycling?

1       A.   He was either Chartwell or Flagship.

2       Q.   Okay.  Tell me about this incident where

3   Jesus called you the N-word.

4       A.   I was -- it was pretty cut-and-dry.  I went

5   to speak with him about what had happened, to let

6   him know that it was inappropriate to take pictures

7   of other associates, but it was also inappropriate

8   to take pictures of associates while they're

9   off-duty.

10           He tried to justify his actions by saying,

11   "Well, he was sleeping.  He's not allowed to sleep."

12           I reminded him that he was not in any

13   position of authority and he needed to delete the

14   picture.

15           And then he turns around, says, you know --

16   I'm sorry.  Anyway, calls me the N-word and walks

17   off.

18           I report that to the Tesla supervisors and

19   also to Ramon Martinez, and that was that.  Nothing

20   happened.

21           Shortly after that, he was given his own

22   position as a supervisor in a different section.  So

23   still working for recycling, but just a little

24   further removed.

25       Q.   Okay.  So if I get this right, can you

1    And for him to sit there and lie to me and do what

2    he did, they just stopped talking to him after that.

3        Q.   Okay.  In terms of Ramon Martinez, did you

4    ever hear him use the N-word towards anyone else?

5        A.   No.  But as he's bilingual, whenever -- and

6    I mean this in the most non-, I don't know,

7    opinionated way.  So if you are not a Spanish

8    speaker or people aren't sure if you are, when you

9    come around and they're talking, they'll switch to

10   their native language so that you can't listen to

11   their conversations.  This happens in Tesla, outside

12   of Tesla.

13       Q.   Did you ever heard the word "negra"?  Ever

14   heard that?

15       A.   Not that I was listening, but no.

16       Q.   "Miyate," ever hear that word from them?

17       A.   I hear that all the time, so I can't tell

18   you from who I hear it from.

19       Q.   Okay.  So after you -- let's go back to the

20   conversation you had with Josue Torres about

21   complaining about Jesus calling you the N-word.

22       A.   Mm-hmm.

23       Q.   Where did that conversation take place?

24       A.   I do not remember.  I remember trying to

25   trek -- track Ramon down because we're always in

1       A.   Yes and no.  So I had a little cart that I

2   drove around, and so I wouldn't be -- I would be

3   moving too fast to really drop into a conversation.

4       Q.   I see.  Okay.

5            But it sounded like you did hear the N-word

6   used at other times in the factory --

7       A.   Yeah.

8       Q.   -- is that correct?

9       A.   During breaks or outside when they're

10  smoking or in passing, coming into the factory.

11      Q.   And do you remember who the people were who

12  you heard using the N-word?

13      A.   Everybody.  Blacks, whites, Mexican.

14      Q.   Okay.  And you said that you didn't think

15  it was used in an aggressive way?

16      A.   Not at all.

17      Q.   So when you were overhearing it, you were

18  hearing it more like, "Hey, how's my N-word," or

19  that kind of thing?

20      A.   Yeah.

21      Q.   And the N-word with an "A"?

22      A.   "A," correct.

23      Q.   Right.

24           However, N-word with an "A" can still be

25  offensive to an African-American, right?

1    that -- tell me what that might mean, if you know.

2        A.    I wouldn't say the operators were

3    recycling.

4        Q.    Okay.

5        A.    They literally stayed in the elevator all

6    day, taking Tesla products and recycling products

7    upstairs and downstairs --

8        Q.    Okay.

9        A.    -- but never did they need to move anything

10   other than off or onto the elevator.  So they did

11   not break down boxes or sort or anything of that

12   caliber.

13       Q.    Okay.  Did you actually supervise Owen Diaz

14   in any way?

15       A.    I was above Owen.  I never needed to do

16   more than ask him, "Hey, can you bring something

17   down?  Can you take this up?"

18       Q.    Okay.  So you had an ability to at least

19   direct Owen's work, but you didn't have

20   responsibility for his -- for -- direct supervision

21   of his work?  Or tell me what your leadership was.

22       A.    So I was technically Owen's superior.

23       Q.    Okay.

24       A.    And if I needed him to do something, that

25   would have been the chain of command.

Bridget Mattos & Associates
(415)747-8710

```
 1        Q.   Okay.  I'm just gonna -- I'm gonna show you
 2   what's been previously marked as --
 3        A.   The pictures --
 4        Q.   -- Exhibit 128.
 5             I don't know why I only have two copies.  I
 6   apologize, Counsel.  It's Exhibit 128.
 7             So Exhibit 128, for the record, is a
 8   four-page document Bates-stamped TESLA 20 to 24 --
 9   or 23, and it's got some pictures at the end of the
10   email from Mr. Diaz to Ed Ramiro.
11             Did you ever see the email that was --
12   that's on page 22, the third page?
13        A.   I did not see the emails --
14        Q.   Okay.
15        A.   -- involving this incident.  But I did see
16   the bale.
17        Q.   You saw the actual --
18        A.   I saw the actual bale.
19        Q.   So you saw the bale of cardboard that's in
20   Exhibit 128 that has the Picaninny and the "Boo"
21   underneath, correct?
22        A.   Yes.
23        Q.   And tell me, what were the circumstances in
24   which you happened to see the actual picture, which
25   is -- I guess a close-up of it is the fourth page of
```

1     Exhibit 128, which is also TESLA 23?

2          A.   So --

3          Q.   Why don't you turn to the last page of

4     Exhibit 128.

5          A.   I remember this like it was yesterday.

6          Q.   Okay.

7          A.   But basically I was working in a different

8     part of the factory.  And I get a phone call from

9     Owen, and he asks me if I could come over to the

10    elevator.

11         Q.   Okay.  Just so we're oriented, his email,

12    Owen's email, is dated January 22 of 2016.  Does

13    that kind of coincide with when you recall Owen

14    calling you up?

15         A.   As far as -- I mean, he called me to come

16    look at this.

17         Q.   Okay.

18         A.   As we had spoken before.  So I was his

19    supervisor.

20         Q.   Okay.

21         A.   He wanted to make sure that another

22    supervisor other than Ramon had seen the picture.

23         Q.   Okay.

24         A.   Or the drawing.

25         Q.   Did he know that it was Ramon Martinez who

1    called Ramon over.  And we were trying to figure

2    out --

3        Q.   Let's stick with -- let's -- I want to get

4    to that.

5        A.   Okay.

6        Q.   But let's stick with, so when you first get

7    there, you were laughing about it, but because

8    that's your way of coping with negative things; is

9    that correct?

10       A.   Correct.

11       Q.   And so you didn't think it was a laughing

12   matter when you saw this picture, did you?

13       A.   Not after -- because it was a quick

14   chuckle, not a full -- not a lengthy laugh.  But I

15   did realize it was a serious situation, so I reeled

16   it in pretty quickly.

17       Q.   And Owen wasn't laughing at all, was he?

18       A.   He was not.  Didn't even have a smile on

19   his face.

20       Q.   Right.  He considered this to be -- well,

21   strike that.

22            Did he tell you how he viewed this picture

23   of the Picaninny and the "Boo" underneath?

24       A.   He did.

25            And, also, I believe Owen is a little older

1   **than me, so this would strike him more specifically**

2   **than it would my generation of African-Americans.**

3   **Where they still use, you know, "spook" and things**

4   **of that, you know, nature.**

5       Q.   Did he tell you -- did Owen tell you that

6   he thought the "Boo" was short for jigaboo?

7       **A.   If he did mention it, I wasn't -- I was**

8   **more concerned with who, not what at that point.**

9       Q.   Okay.  Okay.  But the way you perceived it

10  as an African-American male, was you still perceived

11  this as some kind of racial drawing, right?

12      **A.   I perceived it as spook, "Boo" being**

13  **related to spook, not as jigaboo.**

14      Q.   Okay.  And it was still offensive to you as

15  an African-American male, right?

16      **A.   Correct.**

17      Q.   Okay.  So and certainly Owen Diaz expressed

18  to you that he was offended by this drawing, right?

19      **A.   Yes.**

20      Q.   And then -- okay.  What happens next?

21      **A.   So Ramon -- we call Ramon over.  I want to**

22  **say we called Ramon over to figure out what was**

23  **going on.  At this point -- because I don't think**

24  **Ramon drew it --**

25      Q.   Okay.

1   threatened to kill him?

2        Q.   Yeah.

3        A.   Is that the one?

4        Q.   Yeah.

5        A.   Okay.

6        Q.   You were aware of that --

7        A.   I was aware of that situation, yes.

8        Q.   You were also aware that Owen had

9   complained previously that Ramon Martinez had

10  threatened him, correct?

11       A.   I do not recall that.

12       Q.   Okay.  Now, in addition to you, Owen also

13  had other supervisors; is that correct?

14       A.   It would have been Ramon.

15       Q.   Ramon Martinez?

16       A.   And Israel, the swing shift.

17       Q.   Okay.

18       A.   Because I want to say Owen worked from

19  6:00 to 6:00.

20       Q.   Yeah.

21       A.   So he fell on to two different shifts.

22       Q.   Okay.  So because Owen worked 6:00 to 6:00,

23  he had multiple supervisors; is that correct?

24       A.   Correct.

25       Q.   And those supervisors included yourself; is

```
 1      Q.   That you painted --
 2      A.   -- that I painted for the students.
 3      Q.   Okay.  So you told the students that it was
 4   a great place to work, but you really felt it was a
 5   prison?
 6      A.   I told them it's a great place to work for
 7   engineers.
 8      Q.   Okay.
 9      A.   I tell everybody that.
10      Q.   Okay.  And I -- I guess I'll circle back on
11   that.
12           Do you remember anybody who had -- anybody
13   specific who had the swastika tattoos that you were
14   testifying about?
15      A.   I don't know his name.
16      Q.   Okay.
17      A.   I remember being -- it was -- I think I
18   spoke to one of my coworkers.  I was, like, "Man, we
19   have some skinheads here."  Yeah.  But I saw him in
20   passing.  He walked by, and I was looking at his --
21   he has a full head of tattoos, not just -- not just
22   the swastika, but a full head of tattoos.  I was,
23   like, how is that even allowed here.
24      Q.   Tattoos?
25      A.   No.  Just -- well, not tattoos.  Everyone
```

1  **has tattoos, right?  But just, like, taken aback**

2  **that that was going unchecked.**

3      Q.   The tattoos on the head?

4      **A.   The vulgarity of the tattoos on the head.**

5      Q.   Did you ever complain about that to

6  anybody?

7      **A.   At this point, no, because I was well aware**

8  **of the situation I was in.**

9      Q.   Did you complain about the tattoos to

10  anybody else ever?

11      **A.   Not -- just conversation.  Just**

12  **conversation.**

13      Q.   Okay.

14      **A.   Not, like, "Oh, I can't believe this is**

15  **happening," no.**

16      Q.   Do you remember who you had conversations

17  about the head tattoos with, or any tattoos?

18      **A.   No.**

19      Q.   Okay.  Was it someone in HR?

20      **A.   No, not at all.**

21      Q.   And then you also mentioned, as part of

22  your description of Tesla as a prison, that they

23  wore pants around the ankles.

24      **A.   Yes.**

25      Q.   Would that be a problem if someone was

```
 1    STATE OF CALIFORNIA      )
 2                             )     ss
 3    COUNTY OF CALAVERAS      )
 4              I hereby certify that the witness in the
 5    foregoing deposition of MICHAEL JOHN WHEELER was by
 6    me duly sworn to testify to the truth, the whole
 7    truth, and nothing but the truth in the
 8    within-entitled cause; that said deposition was taken
 9    at the time and place herein named; that the
10    deposition is a true record of the witness's
11    testimony as reported by me, a duly certified
12    shorthand reporter and a disinterested person, and
13    was thereafter transcribed into typewriting by
14    computer.
15              I further certify that I am not interested
16    in the outcome of the said action, nor connected
17    with, nor related to any of the parties in said
18    action, nor to their respective counsel.
19              IN WITNESS WHEREOF, I have hereunto set my
20    hand this 24th day of June, 2019.
21
22
23              _____
24              MELINDA M. SELLERS, CSR NO. 10686
25              STATE OF CALIFORNIA
```

Exhibit

**5**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

               Plaintiffs,

                             No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

               Defendants.
_____/

DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13571

 1          BE IT REMEMBERED that, pursuant to Deposition Subpoena

 2    and Notice of Taking Deposition, and on Friday, May 17, 2019,

 3    commencing at the hour of 10:08 a.m., thereof, at California

 4    Civil Rights Group, 180 Grand Avenue, Suite 1380, Oakland,

 5    California, before me, PATRICIA ROSINSKI, CSR No. 4555, a

 6    Certified Shorthand Reporter in and for the State of

 7    California, there personally appeared

 8

 9                         WAYNE JACKSON,

10

11    produced as a witness in the above-entitled action, who,

12    being by me first duly sworn, was thereupon examined as a

13    witness in said action.

14

15

16

17

18

19

20

21

22

23

24

25

Bridget Mattos & Associates
(415)747-8710

WAYNE JACKSON
May 17, 2019

```
 1       or less.

 2          Q.   Tell me how it worked in terms of, let's say

 3       someone raised a complaint of discrimination or

 4       harassment --

 5          A.   Uh-hum.

 6          Q.   -- what was your understanding of how such a

 7       complaint was to be handled?

 8               MR. ARANEDA:  It's vague.

 9               MR. ORGAN:  It is a little big vague.  Let me

10       try it again so it's a little clearer.

11               THE WITNESS:  Uh-hum.

12               MR. ORGAN:  Q.  Let's assume that a contract

13       employee, meaning someone who wasn't a regular Tesla

14       employee but was a contract employee who nextSource was

15       doing liaison with, what was your understanding of the

16       procedure for -- if a contract employee for one of the

17       companies that you were doing liaison for made a

18       complaint of harassment or discrimination, what was the

19       process that was supposed to be followed?

20          A.   I alerted the agency, usually one of the first

21       things I did, whatever supplier they were from.  I would

22       gather any information I could get, present that to the

23       agency, and then they would kind of conduct their

24       investigation from there.

25          Q.   When such a complaint was raised, what was your
```

Bridget Mattos & Associates
(415)747-8710

WAYNE JACKSON
May 17, 2019

```
 1      Q.    And do you remember what the information was
 2   that you got that there was a problem relative to
 3   Owen Diaz?
 4      A.    There was a disparaging picture found on some
 5   boxes.
 6      Q.    Did you get a copy of the picture?
 7      A.    I believe so.  I believe it was e-mailed to me.
 8   Someone took a photo and e-mailed it to me.
 9      Q.    It was a picture of a pickaninny.
10            Is that correct?
11      A.    I don't --
12      Q.    Is that your recollection?
13            MR. ARANEDA:  Objection.
14            THE WITNESS:  I don't know if it was a --
15            MR. ARANEDA:  Vague.
16            THE WITNESS:  Yeah.  I don't know what you'd --
17   you'd call it.  It was offensive.  It was a -- I think I
18   used to call it a jigaboo or something, you know.
19            MR. ORGAN:  Right.
20            THE WITNESS:  I forget what they called it.
21            MR. ORGAN:  Q.  It was an offensive depiction
22   of an African-American.
23            Is that correct?
24      A.    Yes, sir.
25      Q.    And you found it offensive, right, when you saw
```

1    doing disciplinary or things of that nature, if I'm not

2    mistaken.

3            MR. ORGAN:  Q.  So your understanding of

4    Ed Romero's tasks, though, relative to the elevator

5    operators was that he could do scheduling, right --

6        **A.    Yes, sir.**

7        Q.    -- for them, and that Mr. Romero would at least

8    direct their work; right?

9        **A.    Yes, sir.**

10       Q.    How would discipline towards contract employees

11   take place, then, typically?

12       **A.    If there was a complaint, I would alert their**

13   **agency of the complaint.**

14       Q.    And then it was up to the agency to do the

15   disciplinary action.

16            Is that right?

17       **A.    Yes, sir.  Whether they were terminated, I**

18   **couldn't terminate.  They weren't my employees.**

19       Q.    I see.

20       **A.    Yeah.**

21       Q.    Could you recommend termination for people?

22       **A.    I mean, I can make a recommendation, but it**

23   **wasn't -- the final decision wasn't mine.**

24       Q.    I see.

25            Then in terms of Tesla's role in any kind of

WAYNE JACKSON
May 17, 2019

1      Q.    And it references your -- it says you're

2   actually on the phone doing the investigation of the

3   Ramon/Owen incident.

4      A.    I was probably on the phone with Chartwell, I

5   would assume, at that time.

6      Q.    Chartwell was the contractor that was employing

7   Mr. Martinez.

8            Is that right?

9      A.    Yes, it was either Chartwell or CitiStaff.   I

10   can have been talking to both of them.

11     Q.    Okay.

12     A.    I was just more or less alerting them as to

13   what was going on.

14     Q.    Okay.  Do you remember who you were talking to

15   at Chartwell?

16     A.    Most likely it was Veronica and at CitiStaff --

17   I can't think of the lady's name at Citistaff.  She was

18   very difficult to reach.

19     Q.    Okay.  Let's see.

20           (Whereupon, Plaintiffs' Exhibit 125 was marked

21           for identification and is attached hereto.)

22           MR. ORGAN:  Exhibit 125, for the record, is a

23   one-page document Bates-stamped TESLA- -- I think

24   it's -- 644.  It's either 644 or 611.  But, anyway,

25   they're emails from October 17th and October 19th of

WAYNE JACKSON
May 17, 2019

1      instructed by Victor."

2          Q.    Okay.  And, then, in terms of any discussions

3      that you had with Ed Romero, do you recall any

4      discussions with Ed about this altercation between

5      Mr. Diaz and Martinez?

6          A.    I'm sure I did, but I can't recall what the

7      details were, to be honest.

8          Q.    What was the ultimate outcome of this

9      investigation that you did into 126 -- into the

10     information in Exhibit 126?  Do you remember?

11         A.    I don't recall.  I believe it was a -- a

12     warning was issued.  Yeah, I believe so.

13         Q.    Was a warning issued to Mr. Martinez, then?

14         A.    I don't recall.  I think it was both in the

15     sense if I -- I can't even remember because, like I

16     said, Mr. Diaz had -- the timing is probably what's

17     throwing me off a little bit.

18               But he had a few interactions with employees

19     where he was pretty aggressive, I guess you could say,

20     and we probably verbally counseled both of them to --

21     to, you know, more or less, play nice with each other in

22     the sandbox.

23         Q.    And do you think -- if you go back to

24     Exhibit 125 where Mr. Ramon Martinez has that email on

25     October 17th at 4:56 a.m., do you recall that

WAYNE JACKSON
May 17, 2019

1    Mr. Martinez said that Mr. Diaz was aggressive?

2            Because he doesn't mention that in the email.

3    He says unprofessional or --

4        **A.    Yeah, he didn't say -- yeah, I don't believe he**

5    **said that.  He just -- like I said, it was more of an**

6    **attitude issue.**

7        Q.    In terms of Ramon Martinez's complaint about

8    Mr. Diaz, it was more about Mr. Diaz's attitude, not

9    about his aggressiveness; correct?

10       **A.    More of about his professionalism, yes, sir.**

11       Q.    Mr. Martinez thought that Mr. Diaz needed to be

12   more professional with him.

13           Is that right?

14           MR. ARANEDA:  It calls for speculation.

15           THE WITNESS:  I wouldn't say with him, but more

16   with everybody.  He wasn't being professional with a few

17   people in the -- not only other contractors, but Tesla

18   employees.

19           MR. ORGAN:  Q.  Did Mr. Martinez tell you how

20   Mr. Diaz was not being professional?

21       **A.    Like I said, it was more of an attitude, so I**

22   **really couldn't -- I couldn't answer that for**

23   **Mr. Martinez, to be honest.  More or less, it was just**

24   **that Owen was getting into it with a lot of individuals.**

25       Q.    Okay.

Bridget Mattos & Associates
(415)747-8710

1        pretty difficult to reach, to be very honest.

2            Q.    And then there's a Judy.

3                  Is Judy the same as Ludivina?

4            A.    I don't know.

5            Q.    Did you know a Judy Ledesma?

6            A.    That does not sound familiar.

7            Q.    Do you remember having any discussions with

8     Monica De Leon about the jigaboo?

9            A.    Yeah, I believe, like I said, I had alerted her

10    to it and made sure I provided her copies, if I'm not

11    mistaken, of the photos.

12           Q.    Do you remember an actual conversation that you

13    ended up having with her?

14           A.    I really don't.   Monica was really very

15    difficult to reach.

16           Q.    Okay.

17                 This is 132.

18                 (Whereupon, Plaintiffs' Exhibit 132 was marked

19                 for identification and is attached hereto.)

20                 MR. ORGAN:   Q.   Exhibit 132, for the record, is

21    a multiple-page document Bates-stamped 7 -- TESLA-730 to

22    737.   I guess it's an eight-page document.   It includes

23    some handwritten statements.

24                 (Document reviewed by the deponent.)

25                 MR. ORGAN:   Q.   And I'm wondering, do you -- do

1          Do you remember sending any kind of email about

2    what your discussion was with Mr. Diaz?

3       A.    No, sir, I don't recall that.

4       Q.    Did it concern you that after the altercation

5    between Mr. Diaz and Mr. Martinez in the October time

6    period and then come January you've got this jigaboo

7    drawing, did that concern you?

8               MR. ARANEDA:   Objection.

9               THE WITNESS:   Yes, sir.

10              MR. ARANEDA:   Vague.

11              MR. ORGAN:   Q.   And what did you do to act on

12   that concern that you had?

13      A.    Like I said, I alerted the various agencies so

14   they could look into it a little further.

15      Q.    And, in fact, that's why you decided, in your

16   opinion, that Mr. Martinez had been -- had crossed the

17   line at least twice such that he needed to be

18   terminated; right?

19              MR. ARANEDA:   Objection.   It misstates his

20   testimony.

21              THE WITNESS:   I wouldn't say he crossed the

22   line twice.   Once again, the first incident was more or

23   less unsubstantiated.   There were no witnesses or

24   anybody.   It was kind of my-word-against-yours type of

25   deal.

```
 1        A.    No.

 2        Q.    -- at Tesla?

 3        A.    I wouldn't have.  I wouldn't have done anything

 4    with her, no.

 5        Q.    What's your opinion of West Valley Staffing

 6    Group?

 7        A.    They're a good staffing agency, just like any

 8    other staffing agency.

 9        Q.    I'm going to ask you about a word that has

10    been -- that's come up a few times in this case, and I

11    don't want you to be offended, but I have to use the

12    word.  The word is nigger.

13        A.    Yes, sir.

14        Q.    Did you ever hear anyone use that word at

15    Tesla?

16        A.    Yes, sir.

17        Q.    In what circumstances did you hear that word

18    being said?

19        A.    There had been times where I'd actually

20    walked -- been walking through the facility, and there

21    was -- one time in particular, there was two Asian or

22    Filipino gentlemen.  And one was, like, "What's up, my

23    nigga," to the other one.  That type of thing.

24              It still was offensive, but, you know, it

25    wasn't my employee, so I didn't engage in it.
```

WAYNE JACKSON
May 17, 2019

```
 1    that?
 2                 Objection.  Vague.
 3                 THE WITNESS:  If you were to ask -- I don't
 4    know if I could answer, but if you were to ask me,
 5    people use it in different contexts.
 6                 MR. HORTON:  So you're referring to "nigga"?
 7                 THE WITNESS:  Yes, they use it in different
 8    context.
 9                 MR. ORGAN:  Q.  So what you heard was "What's
10    up, my nigga"?
11         A.    Yes, sir.
12         Q.    N-I-G-G-A?
13         A.    Yes, sir.
14         Q.    Okay.
15         A.    And I will hear that often, to be honest.
16         Q.    Oh.  So you heard the A version of the N
17    word -- just so we don't have to use it again --
18         A.    Uh-hum.
19         Q.    -- the A version -- you testified about
20    nigga --
21         A.    Yes, sir.
22         Q.    -- so let's call that the A version --
23         A.    Yes.
24         Q.    -- of the N word.
25                 Is that okay with you?
```

Page 144

```
 1                    REPORTER'S CERTIFICATE

 2      STATE OF CALIFORNIA          )
                                     )  ss.
 3      COUNTY OF MARIN              )

 4              I, PATRICIA ROSINSKI, hereby certify:

 5              That I am a Certified Shorthand Reporter in the

 6      State of California.

 7              That prior to being examined, WAYNE JACKSON,

 8      the witness named in the foregoing deposition, was by me

 9      duly sworn to testify the truth, the whole truth, and

10      nothing but the truth;

11              That said deposition was taken pursuant to

12      Notice of Deposition and agreement between the parties

13      at the time and place therein set forth and was taken

14      down by me in stenotype and thereafter transcribed by me

15      by computer and that the deposition is a true record of

16      the testimony given by the witness.

17              I further certify that I am neither counsel for

18      either, nor related in any way to any party to said

19      action, nor otherwise interested in the result or

20      outcome thereof.

21              Pursuant to Federal Rules of Civil Procedure,

22      Rule 30(e), review of the transcript was not requested

23      before the completion of the deposition.
                       _____
24                     PATRICIA ROSINSKI, CSR No. 4555

25                          May 28, 2019
```

# Exhibit

# 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

      Plaintiffs,

      vs.                  No. 3:17-cv-06748-WHO

TESLA, INC., dba TESLA
MOTORS, INC.; CITISTAFF
SOLUTIONS, INC.; WEST VALLEY
STAFFING GROUP; CHARTWELL
STAFFING SERVICES, INC.;
and DOES 1-50, inclusive,

      Defendants.

_____//


DEPOSITION OF VICTOR QUINTERO

June 7, 2018


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1    talking about is -- the new-employee training is the
 2    training that every employee is supposed to take that
 3    goes into the Tesla factory.   It doesn't matter
 4    whether they're a contractor or not; right?
 5        A.   Yes.
 6        Q.   Okay.  Now, with respect to any kind of
 7    safety equipment for your contractors, let's say if
 8    they needed safety goggles, could they get safety
 9    goggles from the vending machines that Tesla had?
10        A.   The supervisors and the managers had access
11    to the vending machines.
12        Q.   And so if there was a -- let's say there was
13    a -- well, the elevator operators, they're working in
14    the area that's surrounded by the line; right?
15        A.   Yes.
16        Q.   And so they needed to wear safety goggles
17    whenever they might leave the elevator area to go,
18    let's say, to the bathroom; right?
19        A.   Okay.
20        Q.   The equipment, like the safety equipment like
21    the goggles, those would be provided by Tesla; right?
22             MS. ANTONUCCI:  Objection; lacks foundation.
23             THE WITNESS:  The supervisors had access to
24    the vending machines, so they could get them and hand
25    them out to the employees as needed.
```

VICTOR QUINTERO
June 7, 2018

```
 1      Q.   Have you ever heard of a pickaninny?
 2      A.   Pickaninny?
 3      Q.   Pickaninny.
 4      A.   No.
 5      Q.   A pickaninny is an offensive image that was
 6   used at the turn of the last century to depict
 7   African-Americans in offensive ways.
 8           Have you ever of that?
 9      A.   No, not that.
10      Q.   Okay.
11      A.   I'm not that old.
12      Q.   No, I didn't think you were.
13           How old are you?
14      A.   59.
15      Q.   And what was done as a result of your
16   receiving this picture, which is the second page of
17   Exhibit 37?
18      A.   Yeah, so Wayne and I talked about it, and
19   Wayne stated that he was going to -- he either had or
20   was going to suspend Ramon, and that -- so we talked
21   about whether Ramon should be terminated or not.  And
22   so the decision was made to give him a permanent
23   written warning to make sure it didn't happen again.
24   And I remember the decision was based on the fact that
25   Ramon had never exhibited this type of behavior
```

Page  64

1   before, as far as like anything that was offensive to

2   anybody, doing anything that's offensive to anybody.

3   And, yeah, so that was the decision that was made at

4   the time.  Basically, it was Wayne's decision, and I

5   agreed.

6        Q.   Okay.  So the two of you talked about it --

7        A.   Yes.

8        Q.   -- and decided on a course of action;

9   correct?

10       A.   Yes.  But mainly, it was Wayne Jackson who

11  made the decision.  It's his employee, so...

12       Q.   Did Wayne Jackson --

13       A.   I can -- my perspective is I can only

14  recommend certain things, you know.

15       Q.   What did you recommend should be done?

16       A.   That I agreed with his recommendation to

17  suspend Ramon and give him a permanent written

18  warning, which basically meant that if it happened

19  again, he's terminated.

20       Q.   Is Ramon Martinez still working at the Tesla

21  plant?

22       A.   Yes.

23       Q.   Where does he work now?

24       A.   Same thing, recycling.

25       Q.   But now he's got -- he's a supervisor now;

1    right?

2        **A.    Either he was at the time, but for sure he is**

3    **now.**

4        Q.    Is Ramon Martinez a regular Tesla employee

5    now?

6        **A.    No, he's a nextSource employee.  Supervisor.**

7        Q.    Okay.

8        **A.    And since then, he has never demonstrated any**

9    **other offensive behavior to anybody.**

10        Q.    Have you checked with the employees around to

11    find out if that's true?

12        **A.    No.  I don't talk to everybody myself, in**

13    **person.**

14        Q.    So how do you know he hadn't done anything

15    offensive to anyone else?

16        **A.    That has come to my attention.**

17        Q.    Who told you that?

18        **A.    That is what I know today.**

19        Q.    How do you know that?

20        **A.    Because since this happened, I have not**

21    **received any feedback on Ramon, as far as anybody**

22    **being offended by discrimination or harassment or**

23    **anything like that.**

24        Q.    Have you heard about the allegations that

25    there are numerous Tesla black employees who have been

```
 1    State of California              )

 2    County of Marin                  )

 3

 4                 I, Bridget M. Mattos, hereby certify

 5    that the witness in the foregoing deposition was by me

 6    duly sworn to testify to the truth, the whole truth

 7    and nothing but the truth in the within entitled

 8    cause; that said deposition was taken at the time and

 9    place herein named; that the deposition is a true

10    record of the witness's testimony as reported to the

11    best of my ability by me, a duly certified shorthand

12    reporter and disinterested person, and was thereafter

13    transcribed under my direction into typewriting by

14    computer; that the witness was given an opportunity to

15    read, correct and sign the deposition.

16                 I further certify that I am not

17    interested in the outcome of said action nor connected

18    with or related to any of the parties in said action

19    nor to their respective counsel.

20                 IN WITNESS WHEREOF, I have hereunder

21    subscribed my hand on June 7, 2018.

22
                  _____
23                  BRIDGET M. MATTOS, CSR NO. 11410

24

25
```

# Exhibit

# 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                    Plaintiffs,

                                No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                    Defendants.
_____/


DEPOSITION OF KEVIN McGINN

June 17, 2019


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to
 2   Notice of Taking Deposition, and on June 17, 2019,
 3   commencing at the hour of 10:12 a.m., at California
 4   Civil Rights Group, 180 Grand Avenue, Oakland,
 5   California, before me, BRIDGET M. MATTOS, CSR No.
 6   11410, there personally appeared
 7
 8                     KEVIN McGINN,
 9
10   called as a witness by Plaintiff, who, having been
11   duly sworn, was examined and testified as is
12   hereinafter set forth.
13                     ---oOo---
14
15
16
17
18
19
20
21
22
23
24
25
```

1    one category of a managed service provider.

2          The second category would be the selection of

3    suppliers.  So supplier selection would be a service

4    that nextSource provides under its agreement.

5      Q.   And what does that mean, selection of

6    suppliers?  What does that involve?

7      A.   So a client such as Tesla may have needs in a

8    certain geography or a certain, say, skill set.

9    NextSource associates provide only a part of those

10   needs; right?  So nextSource would select suppliers

11   who would provide additional supplier-employed workers

12   at the Tesla site.

13     Q.   So in other words, nextSource would

14   coordinate with other staffing agencies to try and

15   accommodate Tesla's demand for associates at the

16   Fremont factory?

17          MR. GELLER:  Misstates his testimony.

18          Go ahead.

19          THE WITNESS:  NextSource would select

20   suppliers who would provide resources into the Tesla

21   factory at the direction of -- day-to-day direction of

22   Tesla.  However, those workers were employed; in other

23   words, they were recruited, onboarded and paid, and,

24   if needed, you know, terminated by the supplier

25   employer.

1        Q.   And then under managed service providers, in
2    terms of the functions that nextSource provided, those
3    sort of fall into two categories.
4             You would provide a platform, a technology
5    platform for associates to essentially submit
6    timesheets; is that correct?
7             MR. GELLER:   Misstates his testimony.
8             THE WITNESS:   The platform would be for the
9    supplier-employed workers to submit -- enter and
10   submit their timesheets, which would then be approved
11   by the -- well, to be approved by the client.
12            MR. ORGAN:   Okay.
13       Q.   So for example, nextSource chose CitiStaff
14   Solutions, Inc., as a provider; is that correct?
15       A.   Yes.
16       Q.   And then nextSource would establish the
17   technology platform for CitiStaff associates to, like,
18   submit their timesheets and things like that; is that
19   correct?
20       A.   Yes.
21       Q.   In addition to that, did nextSource provide
22   any additional services for CitiStaff employees, other
23   than the timekeeping function?
24       A.   No.
25       Q.   And then in addition to these sort of -- I'll

1   State of California                )
2   County of Marin                    )

3

4                  I, Bridget M. Mattos, hereby certify
5   that the witness in the foregoing deposition was by me
6   duly sworn to testify to the truth, the whole truth
7   and nothing but the truth in the within entitled
8   cause; that said deposition was taken at the time and
9   place herein named; that the deposition is a true
10  record of the witness's testimony as reported to the
11  best of my ability by me, a duly certified shorthand
12  reporter and disinterested person, and was thereafter
13  transcribed under my direction into typewriting by
14  computer; that the witness was given an opportunity to
15  read, correct and sign the deposition.
16                  I further certify that I am not
17  interested in the outcome of said action nor connected
18  with or related to any of the parties in said action
19  nor to their respective counsel.
20                  IN WITNESS WHEREOF, I have hereunder
21  subscribed my hand on June 17, 2019.
22
           _____
23              BRIDGET M. MATTOS, CSR NO. 11410
24
25

# Exhibit

# 8

**From:** Lamar Patterson <lamarp28@gmail.com>
**Date:** February 26, 2016 at 6:39:56 PM PST
**To:** Owen Diaz <Odiazjr68@gmail.com>

On February 26
I can't remember the exact time, myself Owen and Robert were in the elevator going up. Owen and I were having a conversation when Robert rudely interrupted. Owen stop the conversation and turn to Robert and stated, Robert no disrespect but if this conversation doesn't have anything to do with our job, I prefer not to discuss it with you. Owen turned and started resuming talking  me, but Robert said, what's wrong with you why don't want you to talk let's discuss it. Owen told Robert he preferred to keep all conversations with him job related and if it didn't have anything to do with the job he did not want to talk about it. Robert got mad rode out of the elevator and told owen to pick up this rack and take it downstairs that's job related, Owen explain to Robert  we don't take the racks downstairs until later.  Robert  then threaten Owen by stating I'll just email Mr. Romero and tell him you're not doing your job. At no time did Owen get upset he kept calm. I don't know what going on but to me it seems like robert was the only one hostile in this encounter.

ODIAZ000209

# Exhibit

# 9

1  KENENTH D. SULZER (State Bar No. 120253)
2  ksulzer@constangy.com
   **CONSTANGY, BROOKS, SMITH & PROPHETE LLP**
3  2029 Century Park East, Suite 1100
4  Los Angeles, California 90067
   Telephone: (310) 909.7775
5
6  BARBARA I. ANTONUCCI (State Bar No. 209039)
   bantonucci@constangy.com
7  AARON M. RUTSCHMAN (State Bar No. 288273)
8  arutschman@constangy.com
   **CONSTANGY, BROOKS, SMITH & PROPHETE LLP**
9  351 California Street, Suite 200
10 San Francisco, California 94104
   Telephone: (415) 918.3000
11
12 Attorneys for Defendant
   CITISTAFF SOLUTIONS, INC.
13
14              **UNITED STATES DISTRICT COURT**
15            **NORTHERN DISTRICT OF CALIFORNIA**
16
   DEMETRIC DI-AZ, OWEN DIAZ and        Case No. 3:17-cv-06748-WHO
17 LAMAR PATTERSON, an individual,
18              Plaintiffs,             **DEFENDANT CITISTAFF
                                        SOLUTIONS, INC.'S RESPONSE TO
19      vs.                            PLAINTIFF OWEN DIAZ'S
                                        INTERROGATORIES – SET ONE**
20 TESLA, INC. DBA TESLA MOTORS,
   INC.; CITISTAFF SOLUTIONS, INC.;
21 WEST VALLEY STAFFING GROUP;
   CHARTWELL STAFFING SERVICES,
22 INC. and DOES 1-10, inclusive ,
23              Defendants.
24
25
26 PROPOUNDING PARTY:      Plaintiff, OWEN DIAZ
27 RESPONDING PARTY:       Defendant, CITISTAFF SOLUTIONS, INC.
28 SET NO.:                One

                              -1-

1

2      Defendant CitiStaff Solutions, Inc.'s ("Defendant") hereby responds to Plaintiff

3 Owen Diaz's ("Plaintiff") Interrogatories, Set One, pursuant to Federal Rules of Civil

4 Procedure, Rule 33, as follows:

5               **PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

6      1.     Defendant has not completed its investigation of the facts relating to this

7 case, has not fully completed its discovery in this action, and has not completed its

8 preparation for trial. Defendant's responses herein are based upon and reflect the

9 current state of its knowledge, and are made without prejudice to Defendant's right to

10 produce and utilize any subsequently discovered evidence or interpretations thereof.

11      2.     All the responses contained herein are based only upon such information

12 and documents which are presently available to and specifically known to Defendant

13 and disclose only those contentions which presently occur to Defendant. It is

14 anticipated that further discovery, independent investigation, legal research and

15 analysis will supply additional facts, and meaning to the known facts, as well as

16 establish entirely new factual conclusions and legal contentions, all of which may lead

17 to substantial additions, changes and variations to the contentions set forth herein.

18      3.     The following responses are given without prejudice to Defendant's right

19 to produce evidence of any subsequently discovered fact or facts revealed by further

20 investigation. Defendant accordingly reserved the right to change any and all answers

21 herein as additional facts are ascertained, analyses are made, legal research is

22 completed and contentions are made. The answers contained herein are made in a

23 good faith effort to supply as much factual information as is presently known but in no

24 way may be used to the prejudice of this responding party in relation to further

25 discovery, research or analysis.

26

27

28

CITISTAFF'S RESPONSE TO PLAINTIFF'S           CASE NO. 3:17-CV-06748-WHO
INTERROGATORIES – SET ONE

4.     To the extent that these Interrogatories seek information privileged against disclosure by the attorney-client privilege and/or protected by the attorney work-product doctrine, Defendant objects to them.

5.     No incidental or implied admissions are intended by these responses. The fact that Defendant responds to or objects to any interrogatory should not be taken as an admission that Defendant accepts or admits the existence of any facts assumed by such interrogatory, or that such response or objection constitutes admissible evidence as to any such assumed facts.  The fact that Defendant responds to part of or all of any interrogatory is not intended to be, and shall not be construed as, a waiver by Defendant of any part of any objection to any interrogatory.

6.     Each of the foregoing general objections is hereby incorporated by reference into each and every one of the responses contained herein as though fully set forth therein, regardless of whether any or all of the foregoing general objections are repeated in response to any request.

## RESPONSE TO INTERROGATORIES – SET ONE
### INTERROGATORY NO. 1:

Describe in comprehensive detail each position PLAINTIFF has held with YOU, including the dates PLAINTIFF held such jobs. (In responding to this interrogatory, the term describe includes, but is not limited to, the job title, functions, hours and responsibilities for each job held by PLAINTIFF.)

### RESPONSE TO INTERROGATORY NO. 1:

Defendant objects to this interrogatory on the grounds that it is overbroad, ambiguous, vague, uncertain, and unintelligible with regard to the definition of the term "describe" and the phrase "[d]escribe in comprehensive detail each position PLAINTIFF has held with YOU."  Subject to and without waiving its objections and to the extent it is understood, and limiting its response to information that reasonably

-3-

pertains to the claims in this case, Defendant responds: Elevator Operator; Elevator Lead. Plaintiff was temporarily assigned to Tesla, Inc. dba Tesla Motors, Inc. from approximately August 16, 2015 to March 20, 2016.

**INTERROGATORY NO. 2:**

Identify the business relationship between YOU and Tesla, Inc.

**RESPONSE TO INTERROGATORY NO. 2:**

Defendant objects to this interrogatory on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "Identify the business relationship between YOU and Tesla, Inc."   Defendant further objects to this interrogatory on the grounds that it seeks information not relevant to any party's claims or defenses nor proportional to the needs of this case.   Defendant further objects to this interrogatory to the extent that it seeks confidential and proprietary business information.

Subject to and without waiving its objections and to the extent it is understood and limiting its response to information that reasonably pertains to the claims in this case, Defendant responds: It is Defendant's understanding that Tesla, Inc. dba Tesla Motors, Inc. contracts with NextSource to staff temporary employees at its facilities. Defendant contracts with NextSource to secure temporary employees to work at the facilities of third party employers, including Tesla. Discovery is ongoing and Defendant reserves the right to supplement its response.

**INTERROGATORY NO. 3:**

Identify the business relationship between YOU and NextSource.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant objects to this interrogatory on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "Identify the business

-4-

relationship between YOU and NextSource." Defendant further objects to this interrogatory on the grounds that it seeks information not relevant to any party's claims or defenses nor proportional to the needs of this case. Defendant further objects to this interrogatory to the extent that it seeks confidential and proprietary business information.

Subject to and without waiving its objections and to the extent it is understood, and limiting its response to information that reasonably pertains to the claims in this case, Defendant responds: Defendant contracts with NextSource to secure temporary employees to work at the facilities of third party employers, including Tesla. Discovery is ongoing and Defendant reserves the right to supplement its response.

**INTERROGATORY NO. 4:**

Please describe all formal complaints made by Citistaff Solutions, Inc. employees working at the TESLA FACTORY in the last ten years RELATED TO harassment based on race or color. (In responding to this interrogatory, the term formal complaint includes, but it is not limited to, complaints with the EEOC, DFEH, or civil actions for harassment based on race or color. Please list the name, address, phone number and job title of the complainant, the date of the complaint, name of the person listed as the harasser and description of the complaint.)

**RESPONSE TO INTERROGATORY NO. 4:**

Defendant objects to this interrogatory on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "all formal complaints made by Citistaff Solutions, Inc. employees working at the TESLA FACTORY in the last ten years RELATED TO harassment based on race or color. (In responding to this interrogatory, the term formal complaint includes, but it is not limited to, complaints with the EEOC, DFEH, or civil actions for harassment

-5-

based on race or color. Please list the name, address, phone number and job title of the complainant, the date of the complaint, name of the person listed as the harasser and description of the complaint.)." Defendant further objects to this interrogatory to the extent that it seeks information not relevant to any party's claims or defenses nor proportional to the needs of this case.  Defendant further objects to this interrogatory to the extent that it seeks documents and information pertaining to employees or former employees of Defendant and thereby seeks to invade privacy rights established by the California Constitution.  Defendant further objects to this interrogatory on the grounds it seeks information protected by the attorney-client privilege and/or by the attorney work product doctrine.  Defendant further objects to this request on the grounds that it is burdensome and harassing in that it is overbroad as to time and not limited to Plaintiff or the specific department(s) Plaintiff temporarily worked in and it seeks information that is equally available to Plaintiff through public court records. This request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case.

**INTERROGATORY NO. 5:**

Please describe in comprehensive detail all steps taken to prevent future race harassment or discrimination as a result of PLAINTIFF's complaints.   (In responding to this interrogatory, the term describe includes but is not limited to dates and actions that were taken in response to each complaint.)

**RESPONSE TO INTERROGATORY NO. 5:**

Defendant objects to this interrogatory on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "all steps taken to prevent future race harassment or discrimination as a result of PLAINTIFF's complaints.  (In responding to this interrogatory, the term describe includes but is not limited to dates and actions that were taken in response to each complaint.)." Defendant further

-6-

objects to this interrogatory to the extent that it seeks information not relevant to any party's claims or defenses nor proportional to the needs of this case. Defendant further objects to this interrogatory on the grounds it seeks information protected by the attorney-client privilege and/or by the attorney work product doctrine.  Defendant further objects to this request on the grounds that it is overbroad and vague and ambiguous as to Plaintiff's alleged "complaints," which are not defined here.

Subject to and without waiving its objections and to the extent it is understood, and limiting its response to information that reasonably pertains to the claims in this case, Defendant responds: Defendant was made aware by third party NextSource of a compliant made by Plaintiff Owen Diaz on or around January 22, 2016 against Ramon Martinez regarding alleged harassment. This is the only complaint of alleged harassment by Plaintiff Owen Diaz of which Defendant is aware. Defendant, through NextSource and Chartwell, who upon information and belief, employed Mr. Martinez, conducted and investigation. Defendant relied upon NextSource and Chartwell to reprimand their employee, Mr. Martinez. Discovery is ongoing and Defendant reserves the right to supplement its response.

**INTERROGATORY NO. 6:**

Please describe in comprehensive detail how Citistaff Solutions, Inc. educates its employees to ensure familiarity with its policies and practices regarding race harassment or discrimination. (In responding to this interrogatory, the term employee includes, but is not limited to, managers.)

**RESPONSE TO INTERROGATORY NO. 6:**

Defendant objects to this interrogatory on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "describe in comprehensive detail how Citistaff Solutions, Inc. educates its employees to ensure familiarity with its policies and practices regarding race harassment or discrimination.

-7-

(In responding to this interrogatory, the term employee includes, but is not limited to, managers.).)" Defendant further objects to this interrogatory to the extent that it seeks information not relevant to any party's claims or defenses nor proportional to the needs of this case. Defendant further objects to this interrogatory on the grounds it seeks information protected by the attorney-client privilege and/or by the attorney work product doctrine.  Defendant further objects to this request on the grounds that it is burdensome and harassing in that it is overbroad and vague and ambiguous as to time and not limited in any manner in geographical scope.

**INTERROGATORY NO. 7:**

Describe every fringe benefit available to PLAINTIFF as part of his employment with Citistaff Solutions, Inc. (In responding to this interrogatory, the term describe includes, but is not limited to, the nature, approximate annual dollar value to PLAINTIFF, and minimum number of work hours to qualify for each fringe benefit).

**RESPONSE TO INTERROGATORY NO. 7:**

Defendant objects to this interrogatory on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "[d]escribe every fringe benefit available to PLAINTIFF as part of his employment with Citistaff Solutions, Inc. (In responding to this interrogatory, the term describe includes, but is not limited to, the nature, approximate annual dollar value to PLAINTIFF, and minimum number of work hours to qualify for each fringe benefit)." Defendant further objects to this interrogatory on the grounds that the definition of the term "describe" is overbroad, burdensome and harassing. Defendant is not responsible for calculating the approximately annual dollar value to plaintiff of benefits he was entitled to from Defendant, if any.

1        Subject to and without waiving its objections and to the extent it is understood,

2    and limiting its response to information that reasonably pertains to the claims in this

3    case, Defendant responds: Plaintiff was not entitled to "fringe benefits" from

4    Defendant during his period of employment.

5

6    Dated: June 4, 2018          CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

7

8                                /s/ Barbara Antonucci
                                 Barbara I. Antonucci
9                                Aaron M. Rutschman
                                 Attorney for Defendant
10                               CITISTAFF SOLUTIONS, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-9-

## **VERIFICATION**

I, Ludivina Ledesma, declare:

I am authorized to make this Verification on behalf of CitiStaff Solutions, Inc. The document entitled **DEFENDANT CITISTAFF SOLUTIONS, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES – SET ONE** is the product of information gathered by others, and on that basis I am informed and believe, and on the basis of such information and belief, declare that the facts stated therein are true.

Executed on June _4_, 2018.  I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.

_Ludivina Ledesma_
LUDIVINA LEDESMA

**PROOF OF SERVICE**

*U.S. District Court*
*California Northern District (San Francisco)*
*CIVIL DOCKET FOR CASE #: 3:17-cv-06748-WHO*

I am over 18 years of age and not a party to the within entitled action. I am employed at the law firm of CONSTANGY, BROOKS, SMITH & PROPHETE LLP, and my business address is 2029 Century Park East, Suite 1100, Los Angeles, California 90067. On June 4, 2018, I served a copy of the following:

1. **DEFENDANT CITISTAFF SOLUTIONS, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES – SET ONE**

on the attorney(s) for the parties to this action by the following method:

X    **BY MAIL**:  By placing same, with postage fully prepared, in the United States Mail, addressed as indicated below. I am readily familiar with the practices of these law offices for collection and processing of correspondence for mailing with the United States Postal Service. Such correspondence is deposited with the United States Postal Service in the same day in the ordinary course of business.

Lawrence Anthony Organ
Navruz Avloni
California Civil Rights Law Group
332 San Anselmo Avenue
San Anselmo, CA 94960
Tel.: 415-453-4740
Fax: 415-785-7352
Email: larry@civilrightsca.com
Email: navruz@civilrightsca.com

*Attorneys for Plaintiffs'*
*DEMETRIC DI-AZ, OWEN DIAZ,*

Fenn C. Horton , III
Helene Anastasia Simvoulakis
Pahl & McKay, APC
225 West Santa Clara Street, Suite 1500
San Jose, CA 95113-1752
Tel.:408-286-5100
Fax.: 408-286-5722
Email: fhorton@pahl-mccay.com
Email: hsimvoulakis@pahl-mccay.com

*Attorneys for Defendant*
*WEST VALLEY STAFFING GROUP*

[FEDERAL] I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made, under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 4, 2018 at Los Angeles, California.

Lorna Hatch

PROOF OF SERVICE