1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19 EXHIBIT B
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                    Plaintiffs,

                                 No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                    Defendants.
_____/


DEPOSITION OF KEVIN McGINN

June 17, 2019


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1                BE IT REMEMBERED that, pursuant to

 2   Notice of Taking Deposition, and on June 17, 2019,

 3   commencing at the hour of 10:12 a.m., at California

 4   Civil Rights Group, 180 Grand Avenue, Oakland,

 5   California, before me, BRIDGET M. MATTOS, CSR No.

 6   11410, there personally appeared

 7

 8                     KEVIN McGINN,

 9

10   called as a witness by Plaintiff, who, having been

11   duly sworn, was examined and testified as is

12   hereinafter set forth.

13                     ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   not producing a witness on that basis, on the basis of
 2   our objections and that --
 3              MR. ORGAN:  I see here.
 4              MR. GELLER:  We didn't have a relationship
 5   with West Valley.
 6              MR. ORGAN:  I get that.  Okay.
 7              So as to Topic 3, there is no relationship
 8   between nextSource and West Valley Staffing; is that
 9   right?
10              MR. GELLER:  That's correct.
11              MR. ORGAN:  Q.  Why don't we start, then,
12   just going over the contractual relationship between
13   nextSource and Tesla.  How about that, okay?
14       A.   Okay.
15       Q.   Was there some kind of written contract
16   between Tesla and nextSource?
17       A.   Yes.
18       Q.   What was the nature of the contract?
19              MR. GELLER:  Subject to our objections, you
20   can testify generally about the terms, but we've made
21   objections on the basis of confidentiality and among
22   other things, and I instruct you not to get into the
23   details about the terms.
24              THE WITNESS:  Generally, nextSource provides
25   certain services to Tesla under the contract.
```

KEVIN McGINN
June 17, 2019

1    Tesla; is that right?

2         **A.    Yes.**

3         Q.    In addition to providing associates to work

4    at the Tesla factory -- strike that.

5              Were all of these associates working at the

6    Tesla factory in Fremont, California?

7         **A.    Yes.**

8         Q.    In addition to providing for the 30 to 40

9    associates who, on average, worked at the Fremont

10   factory, did the contract that nextSource had with

11   Tesla provide for any other services?

12        **A.    Yes.**

13        Q.    And what were the other services?

14        **A.    So nextSource provides what is known as MSP**

15   **services to our clients.**

16        Q.    And what does "MSP services" mean?

17        **A.    An MSP is a managed service provider.**

18        Q.    And what does a managed service provider

19   entail or encompass?

20        **A.    Right.   So in connection with that service,**

21   **nextSource will provide the technology platform under**

22   **which supplier workers -- supplier-employed workers --**

23   **would enter, submit timesheets, and the client would**

24   **approve those timesheets.   So it was an interface**

25   **between the supplier workers and the client.   That's**

Bridget Mattos & Associates
(415) 747-8710

1    one category of a managed service provider.

2         The second category would be the selection of

3    suppliers.  So supplier selection would be a service

4    that nextSource provides under its agreement.

5    Q.   And what does that mean, selection of

6    suppliers?  What does that involve?

7    A.   So a client such as Tesla may have needs in a

8    certain geography or a certain, say, skill set.

9    NextSource associates provide only a part of those

10   needs; right?  So nextSource would select suppliers

11   who would provide additional supplier-employed workers

12   at the Tesla site.

13   Q.   So in other words, nextSource would

14   coordinate with other staffing agencies to try and

15   accommodate Tesla's demand for associates at the

16   Fremont factory?

17        MR. GELLER:  Misstates his testimony.

18        Go ahead.

19        THE WITNESS:  NextSource would select

20   suppliers who would provide resources into the Tesla

21   factory at the direction of -- day-to-day direction of

22   Tesla.  However, those workers were employed; in other

23   words, they were recruited, onboarded and paid, and,

24   if needed, you know, terminated by the supplier

25   employer.

KEVIN McGINN
June 17, 2019

1            MR. ORGAN:   Q.   And when you're referring to
2   "suppliers" here, you're referring to companies that
3   would supply manpower; is that correct?
4        A.    Yes.
5        Q.    I don't mean to be sexist.  Manpower, women
6   power, whatever power.  People power.
7        A.    Yes.
8        Q.    And how did nextSource go about determining
9   which suppliers would be eligible to provide workers
10   at the Tesla factory in Fremont?
11        A.    So Tesla would have to approve any suppliers
12   that were -- would be utilized at their site, so the
13   approval of any supplier sits with Tesla.  The --
14   nextSource might recommend, you know, suppliers that
15   can support the program at Tesla.  So it really comes
16   down to supplier, selection, and recommendations,
17   would be a service that nextSource provided.
18        Q.    In addition to -- so you mentioned two things
19   that nextSource would do for Tesla.  One would be to
20   provide head count, actual head count of associates to
21   the Tesla factory; correct?
22        A.    Yes.
23        Q.    And then the second thing would be as a
24   managed service provider; is that correct?
25        A.    Yes.

KEVIN McGINN
June 17, 2019

1      Q.   And then under managed service providers, in
2  terms of the functions that nextSource provided, those
3  sort of fall into two categories.
4          You would provide a platform, a technology
5  platform for associates to essentially submit
6  timesheets; is that correct?
7              MR. GELLER:  Misstates his testimony.
8              THE WITNESS:  The platform would be for the
9  supplier-employed workers to submit -- enter and
10 submit their timesheets, which would then be approved
11 by the -- well, to be approved by the client.
12             MR. ORGAN:  Okay.
13     Q.   So for example, nextSource chose CitiStaff
14 Solutions, Inc., as a provider; is that correct?
15     A.   Yes.
16     Q.   And then nextSource would establish the
17 technology platform for CitiStaff associates to, like,
18 submit their timesheets and things like that; is that
19 correct?
20     A.   Yes.
21     Q.   In addition to that, did nextSource provide
22 any additional services for CitiStaff employees, other
23 than the timekeeping function?
24     A.   No.
25     Q.   And then in addition to these sort of -- I'll

Bridget Mattos & Associates
(415)747-8710

KEVIN McGINN
June 17, 2019

1      Q.   And so tell me, what were the functions that
2  the on-site program team would do that nextSource
3  provided?
4      A.   The key functions of a program team is to
5  take the client's direction and bring -- and really
6  facilitate those needs to the supplier workforce.  So
7  one would be, you know -- well that's it.  It
8  basically would -- any kind of client needs or wishes
9  would be messaged to the suppliers for the suppliers
10  to take whatever action they would deem necessary for
11  the workforce.  That's one area.
12          The second service that a program team would
13  perform would be managing the requisitions in the
14  platform to meet the head count level set by the
15  client.  So, expand just a little bit there:  The
16  client needs additional head count for a shift next
17  week.  NextSource program team will set up the
18  requisition in the software.  The suppliers will then
19  go out, find, recruit, onboard and hire those workers
20  to be placed onto the requisition in the system.
21          So I would say it's an information flow.
22  Information flows through nextSource, data flow, that
23  sort of thing.
24      Q.   So you mentioned essentially two additional
25  things that, under this third category, that

Bridget Mattos & Associates
(415)747-8710

1   nextSource would do.  One would be to essentially take

2   a client's direction and then translate or communicate

3   those needs to the supplier workforce; is that right?

4       **A.   That's correct.**

5       Q.   And then the other thing would be that

6   nextSource would manage requisitions to ensure that

7   the head count that Tesla needed was met by working

8   with the suppliers to fill those requisitions?

9       **A.   Yes.**

10      Q.   So who were the -- other than CitiStaff

11  Solutions, who were the other suppliers that

12  nextSource worked with when you first onboarded in

13  October of 2015, relative to the Tesla Fremont

14  factory?

15      **A.   CitiStaff is one supplier.  Chartwell was the**

16  **other, primary supplier.  I believe there was a third**

17  **supplier not relevant here, but I'm happy to share the**

18  **name.  Maliko, I believe, was another supplier**

19  **employer at the Tesla site.**

20      Q.   In terms of providing sort of

21  production-associate level employees, were the primary

22  suppliers that nextSource coordinate with CitiStaff

23  and Chartwell?

24      **A.   Yes.**

25      Q.   Approximately how many workers did nextSource

1    have to move on that, but I understand.

2        Q.    So let's talk about your policies and

3    procedures related to race harassment in effect from

4    2014 to present who applied to your professionals.

5            Some of the professionals that nextSource

6    employed worked at the Tesla factory; correct?

7        **A.    Yes.**

8        Q.    Do you know who those people were?

9        **A.    I believe it was Mr. Wayne Jackson.    There**

10   **was Vanessa parks, and there's a third lady who**

11   **actually left before -- right at the time I got there.**

12   **I don't remember her name.    It was a third female that**

13   **worked -- a professional who worked in that Tesla**

14   **site.**

15       Q.    Deb Gryske or Grayske?

16       **A.    Deb Gryske didn't work on-site, but she is a**

17   **professional of nextSource but not on-site at Tesla,**

18   **if that's the question.**

19       Q.    So what was -- Wayne Jackson we've deposed.

20   I know him.   He was your account manager; right?

21       **A.    I believe his title was program manager, but**

22   **essentially.**

23       Q.    And what's a program manager function?

24       **A.    So the program manager acts as a liaison**

25   **between Tesla, the client, Tesla's wishes, and the**

1    **suppliers -- you know the supplier workers, the**

2    **supplier-employed workers.   That's one of the primary**

3    **duties of a program manager.   He may also gather facts**

4    **at the direction of Tesla or at the request of Tesla.**

5    **He was a fact gatherer and will communicate to the --**

6    **either party to the client side or to the supplier**

7    **side, based on the facts.**

8        Q.    Okay.   And then you mentioned a Vanessa

9    Parks.   What was Vanessa Parks' job?

10       **A.    Vanessa was an administrative role there;**

11   **again, a professional of nextSource but worked in a --**

12   **in this example, I'm using "administrative" to mean**

13   **she would enter requisitions into the system.   She**

14   **would, you know -- data-keying, that sort of thing,**

15   **very administrative type of work.**

16       Q.    Like an administrative assistant kind of

17   thing?

18       **A.    Yeah, at the same level, yes.**

19       Q.    So Wayne Jackson, was he the highest-level

20   nextSource employee actually working at the Tesla

21   factory?

22       **A.    Yes.**

23       Q.    And then Vanessa Parks worked in an

24   administrative role at the Tesla factory too; is that

25   right?

1            MS. KUMAGAI:  Objection.

2            THE WITNESS:  I can't speculate on the

3    specifics between the employer, supplier and employer,

4    and their employee.  I could not speculate on that.

5            MR. ORGAN:  Okay.

6       Q.  But in terms of your suppliers, the companies

7    like CitiStaff and Chartwell, they're essentially just

8    providing employees to Tesla to work in Tesla's

9    factory; is that correct?

10            MR. GELLER:  Misstates his testimony.

11    Objection to the form.

12            MS. SWAFFORD-HARRIS:  And calls for

13    speculation.

14            THE WITNESS:  The supplier will, in the

15    course of their employment of the worker, will

16    recruit, onboard, and pay the worker.  They place that

17    worker at the Tesla site, who then works under the

18    day-to-day direction and control of Tesla.

19            MR. ORGAN:  Q.  So if I have this correctly,

20    then CitiStaff, which was one of the suppliers for

21    nextSource, CitiStaff would supply or provide an

22    employee, such as Mr. Diaz, to Tesla and go through

23    the recruitment, onboarding and paying of Mr. Diaz?

24    Is that what their function was?

25            MS. KUMAGAI:  Objection, to the extent it

1   calls for speculation.

2           MR. GELLER:   Join.

3           THE WITNESS:   Yeah, I can't speculate on all

4   the policies and procedures that might exist between a

5   third party and their employee.   But I'm really

6   speaking generally to what a supplier does, which is,

7   if they're supplying labor, right, they would recruit,

8   onboard and employ and pay that person to work at the

9   Tesla site under the day-to-day direction of Tesla.

10          MR. ORGAN:   Q.   But you do at least have

11  knowledge as to the suppliers who nextSource oversaw,

12  right, such as CitiStaff; is that correct?

13          MR. GELLER:   Misstates his testimony.

14  Objection to the form.   Vague and ambiguous.

15          THE WITNESS:   So you're asking me if I'm

16  aware that Chartwell and CitiStaff were suppliers of

17  workers into Tesla?

18          MR. ORGAN:   Q.   Yeah.

19      **A.   Yes.**

20      Q.   And Chartwell and CitiStaff were suppliers of

21  workers to Tesla via nextSource; correct?   Meaning,

22  nextSource had a role in making CitiStaff and

23  Chartwell suppliers to Tesla; right?

24      **A.   NextSource's role was in the supplier**

25  **selection, meaning in the selection of the companies**

**Page 100**

1    **that provide the resource.  NextSource does not have a**

2    **role in the selection of the employees that may work**

3    **at the Tesla site.  That is up to the -- well, I can't**

4    **speculate, but --**

5         Q.   I understand.

6              But in terms of -- I think you said earlier

7    that there were three suppliers that nextSource had at

8    the Tesla factory; correct?

9         **A.   Yes.**

10        Q.   CitiStaff was one of the suppliers that

11   nextSource had at the Tesla factory; right?

12        **A.   Yes.**

13        Q.   And Chartwell was another supplier that

14   nextSource had at the Tesla factory?

15        **A.   Yes.**

16        Q.   And then there was a third one that I can't

17   remember the name, but there was a third organization

18   or entity that also supplied workers to the Tesla

19   factory; right?

20        **A.   Yes.**

21        Q.   Okay.  And each of those agencies, at least

22   as to CitiStaff and Chartwell, they would do the

23   recruiting of employees, not nextSource; correct?

24        **A.   Yes.**

25        Q.   And CitiStaff and Chartwell would also take

1    I'm not going to permit you to testify about that.

2           MS. SWAFFORD-HARRIS:  Tesla joins that

3    objection.

4           MR. ORGAN:  Q.  I'm not asking for the

5    amounts; I just want to know the process.

6           In terms of how nextSource gets paid for the

7    employees that are recruited through the suppliers,

8    how do you get paid for those employees?

9           MR. GELLER:  It's vague, and I also object to

10   the form of the question.

11          Go ahead.

12          THE WITNESS:  I'll speak generally on this

13   because I don't -- I'll speak generally about this.

14          So suppliers will submit their timesheets

15   through the system.  The client will approve the

16   timesheets.  What happens here is nextSource will --

17   nextSource professionals will pull data from the

18   system and prepare a billing to the client.  Client

19   pays nextSource, then nextSource pays its suppliers.

20          And the last thing I'll say about this, you

21   remember there's a contractual relationship between

22   nextSource and Tesla, under which one of the items I

23   failed to mention earlier, one of the key items we

24   provide, consolidated billing, meaning that it's

25   easier for the client to approve one summary bill than

**Page 131**

KEVIN McGINN
June 17, 2019

1  it is a hundred bills from a hundred suppliers.  So

2  the consolidated billing is prepared by nextSource as

3  the MSP to the client.  And the client pays

4  nextSource; nextSource pays the various suppliers.

5       Q.   Okay.  So for example, in the Tesla

6  situation, just taking the two main suppliers there,

7  Chartwell and CitiStaff, the Chartwell CitiStaff

8  employees who are working under the direction and

9  control of Tesla, they enter their time into the TAMS

10  system.  The TAMS system then gets -- that time gets

11  approved by Tesla, and then nextSource bills for that

12  time, consolidated for both CitiStaff and Chartwell;

13  is that correct?

14            MR. GELLER:  Misstates his testimony.

15            THE WITNESS:  The timesheets are submitted by

16  the workers of the suppliers.  The consolidated

17  billing is prepared by -- the timesheets get approved

18  by the client.  We refer to them as the hiring

19  manager, usually.

20            The consolidated billing is prepared by

21  nextSource, presented to Tesla.  Tesla pays

22  nextSource; nextSource pays its suppliers.  That's a

23  general -- that is how these arrangements work.

24            MR. ORGAN:  Q.  And that's your understanding

25  of how the arrangements work with Tesla; is that

**Page 132**

KEVIN McGINN
June 17, 2019

1      **A.    I'm aware of that name through the**
2  **litigation.**
3      Q.    And was nextSource ever aware that -- strike
4  that.
5            Prior to the litigation, was nextSource ever
6  aware that Judy Timbreza was accused of using the "N"
7  word, or a version thereof, towards Owen Diaz?
8      **A.    Prior to the litigation, no, nextSource was**
9  **not involved, did not investigate, did not fact-gather**
10  **anything around that incident.**
11     Q.    Certainly, if nextSource became aware of the
12  use of the "N" word at the Tesla factory, they would
13  gather facts about that information; right?
14           MR. GELLER:  Calls for speculation.
15           MS. SWAFFORD-HARRIS:  Tesla joins.  It's also
16  incomplete hypothetical.
17           THE WITNESS:  Yes, theoretically speculating
18  that if we're aware of a nextSource associate or a
19  nextSource supplier employee doing something such as
20  that, I would speculate that we would gather the facts
21  on that.
22           MR. ORGAN:  Q.  And the reason you would
23  gather the facts on that is, use of the "N" word is
24  highly offensive conduct; right?
25     **A.    Yes.**

Bridget Mattos & Associates
(415)747-8710

 1    The top one is an email from Vanessa Parks to Ed

 2    Romero, talking about -- it says here, "All elevator

 3    contractors were under recycling at the time of the

 4    increase."

 5              Do you know what that's referring to?

 6              MR. GELLER:  This is outside the scope of the

 7    deposition topics.

 8              THE WITNESS:  I mean, I can only speculate.

 9    I'm aware that the elevator was a particular

10    department at Tesla; I know that the recycling was a

11    particular department at Tesla.  Beyond those two

12    facts, I can't speak to anything on this email about

13    increases for a supplier associate.

14              MR. ORGAN:  Q.  Is Vanessa Parks still with

15    nextSource?

16        **A.   No.**

17        Q.   Do you know where she went after working for

18    nextSource?

19        **A.   No.**

20              MR. ORGAN:  This is 178.

21              (Whereupon Deposition Exhibit 178

22               was marked for identification.)

23              MR. ORGAN:  Exhibit 178, for the record, is a

24    one-page document Bates-stamped NS-25.  It appears to

25    be an email from Ed Romero to Wayne Jackson, and then

**Page 179**

1    an email from Vanessa Parks back to Ed Romero.

2        Q.    This, again, is sort of the typical procedure

3    that would go back and forth between Tesla and

4    nextSource relative to employees supplied through

5    nextSource suppliers; is that correct?

6        A.    This email is a Ed Romero, the employee of

7    Tesla, directing Wayne to make a change to the pay

8    rate.  I'm assuming he means in TAMS.

9              So we talked about the TAMS maintenance as

10   one of our functions.  So to the degree this is him

11   saying change the TAMS rate to go from 16 to 18, then,

12   yes, that would be a normal function directed by the

13   client to make -- administer changes in the tool.

14   That would be normal.

15       Q.    Okay.

16             Now, this was previously marked as Exhibit

17   91.

18             Exhibit 91, for the record, is a two-page

19   document Bates-stamped CitiStaff 6 and 7.  And the

20   first -- it's two emails, one from January 28th of

21   2016, and then the top one from February 2nd of 2016.

22   And it appears that -- I guess my question is this:

23   Why would Vanessa Parks be emailing to Monica De Leon

24   from CitiStaff about pay increase -- pay rate

25   increases to the following contractors.  Why would she

1    be doing that?

2              MR. GELLER:  Excuse me.  Calls for

3    speculation.  It's outside the scope of the

4    deposition.

5              Go ahead.

6              THE WITNESS:  Yeah, this is normal.  I'd

7    speculate what I'm saying here is, in connection with

8    the email from three days prior -- I don't know if it

9    was Thursday -- where Tesla directed nextSource to

10   make the administrative change in the VMS system, this

11   is the other side of that -- it's client to

12   nextSource.  Right?  This is the other side.  This is

13   nextSource telling the supplier, right, that Tesla

14   wants this pay rate changed.

15             So the direction starts with Tesla, Ed

16   Romero.  Funnels through the facilitator, nextSource,

17   who changes the VMS and then who takes that same pay

18   change that Tesla directed, and directs --

19   communicates to the supplier Tesla's wishes.

20             So this is the other side of the

21   communication, starting with the client on a pay

22   change.  So this is, I would characterize it as

23   standard.

24             MR. ORGAN:  Q.  So in other words, Exhibit 91

25   is the other side of Exhibit 178?

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

EXHIBITS TO DEPOSITION OF KEVIN MCGINN

20
21

REDACTED – CONDITIONALLY FILED UNDER SEAL

22
23
24
25
26
27
28

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

```
 1    State of California              )

 2    County of Marin                  )

 3

 4             I, Bridget M. Mattos, hereby certify

 5    that the witness in the foregoing deposition was by me

 6    duly sworn to testify to the truth, the whole truth

 7    and nothing but the truth in the within entitled

 8    cause; that said deposition was taken at the time and

 9    place herein named; that the deposition is a true

10    record of the witness's testimony as reported to the

11    best of my ability by me, a duly certified shorthand

12    reporter and disinterested person, and was thereafter

13    transcribed under my direction into typewriting by

14    computer; that the witness was given an opportunity to

15    read, correct and sign the deposition.

16             I further certify that I am not

17    interested in the outcome of said action nor connected

18    with or related to any of the parties in said action

19    nor to their respective counsel.

20             IN WITNESS WHEREOF, I have hereunder

21    subscribed my hand on June 17, 2019.

22

23             BRIDGET M. MATTOS, CSR NO. 11410

24

25
```

**Page 215**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

Case No. 3:17-cv-06748-WHO

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION

FP 36147236.1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                Plaintiffs,

                                    No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                Defendants.
_____/

DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13571

1          BE IT REMEMBERED that, pursuant to Deposition Subpoena

2     and Notice of Taking Deposition, and on Friday, May 17, 2019,

3     commencing at the hour of 10:08 a.m., thereof, at California

4     Civil Rights Group, 180 Grand Avenue, Suite 1380, Oakland,

5     California, before me, PATRICIA ROSINSKI, CSR No. 4555, a

6     Certified Shorthand Reporter in and for the State of

7     California, there personally appeared

8

9                         WAYNE JACKSON,

10

11    produced as a witness in the above-entitled action, who,

12    being by me first duly sworn, was thereupon examined as a

13    witness in said action.

14

15

16

17

18

19

20

21

22

23

24

25

WAYNE JACKSON
May 17, 2019

1          **A.      I was promoted to the program manager.**

2          Q.      How long were you a program manager for

3    nextSource?

4          **A.      Oh, boy, about a year.   About a year's worth.**

5          Q.      Any other jobs with nextSource other than

6    contract recruiter and program manager?

7          **A.      No, sir.**

8          Q.      Why did you leave nextSource?

9          **A.      Disagreement of things.**

10         Q.      Without getting into the details of the

11   disagreement, other than -- let me ask you this:  Did it

12   have anything to do with the way workers were treated at

13   Tesla?

14         **A.      No, it wasn't that.**

15         Q.      In terms of the program manager position that

16   you had --

17         **A.      Uh-hum.**

18         Q.      -- you were a program manager for employees at

19   the Tesla factory.

20                 Is that correct?

21                 MR. ARANEDA:  Objection.  Vague.

22                 THE WITNESS:  It was more of a liaison.  I

23   don't think I was really -- I didn't -- they called it a

24   program manager, but I didn't really manage the

25   employees, I guess is the best way to put it.

**Page 15**

WAYNE JACKSON
May 17, 2019

1          MR. ORGAN:   Q.   What was nextSource's

2   relationship to Tesla, as you understood it?

3       A.    They were a service provider.

4       Q.    What do you mean by "a service provider"?

5       A.    In the sense of they weren't a staffing agency

6   or anything.   Like I said, more of a liaison between a

7   staffing agency and Tesla for services Tesla had

8   requested.

9       Q.    When you were working as a recruiter for

10   nextSource, were you recruiting employees to Tesla?

11       A.    Yes, sir.

12       Q.    The employees who you were recruiting to Tesla,

13   were they primarily to work as production associates at

14   the Tesla factory?

15       A.    Not necessarily.   They were different areas of

16   facilities.   That was probably one of the main areas.

17       Q.    The facilities workers, what were the types of

18   jobs that they were typically doing that you were

19   recruiting for?

20       A.    HVAC techs, electricians, things of that

21   nature, power washers.

22       Q.    Who was your main contact person, then, at

23   nextSource when you were doing recruiting?

24       A.    My manager was Terri Garrett.

25       Q.    Do you remember what Terri Garrett's position

Bridget Mattos & Associates
(415)747-8710

```
 1     or less.
 2        Q.    Tell me how it worked in terms of, let's say
 3     someone raised a complaint of discrimination or
 4     harassment --
 5        A.    Uh-hum.
 6        Q.    -- what was your understanding of how such a
 7     complaint was to be handled?
 8              MR. ARANEDA:  It's vague.
 9              MR. ORGAN:  It is a little big vague.  Let me
10     try it again so it's a little clearer.
11              THE WITNESS:  Uh-hum.
12              MR. ORGAN:  Q.  Let's assume that a contract
13     employee, meaning someone who wasn't a regular Tesla
14     employee but was a contract employee who nextSource was
15     doing liaison with, what was your understanding of the
16     procedure for -- if a contract employee for one of the
17     companies that you were doing liaison for made a
18     complaint of harassment or discrimination, what was the
19     process that was supposed to be followed?
20        A.    I alerted the agency, usually one of the first
21     things I did, whatever supplier they were from.  I would
22     gather any information I could get, present that to the
23     agency, and then they would kind of conduct their
24     investigation from there.
25        Q.    When such a complaint was raised, what was your
```

WAYNE JACKSON
May 17, 2019

1        Tesla via email?

2        **A.     Nine out of ten times, yes, it would be email.**

3        **Sometimes, no.**

4        Q.      In terms of training of the contract employees,

5        did nextSource play any role in training of the

6        employees?

7                MR. ARANEDA:   Objection.   Vague.

8                THE WITNESS:   Not that I was aware of, sir, no.

9                MR. ORGAN:   Okay.

10               THE WITNESS:   Other than safety, maybe, but

11       that was about it.

12               MR. ORGAN:   Q.   Not on the issue of harassment

13       or discrimination?

14       **A.     No, sir.**

15       Q.      Was it your understanding that the contract

16       employees who worked at the Tesla factory were subject

17       to the policies and procedures that Tesla had for its

18       workers?

19               MR. ARANEDA:   Objection.   Vague.

20               Go ahead.

21               MS. JENG:   It calls for speculation.

22               THE WITNESS:   Yeah, I'm not sure on that, to be

23       honest.

24               MR. ORGAN:   Q.   Did nextSource have any

25       contract employees working at the Tesla factory?

Bridget Mattos & Associates
(415) 747-8710

WAYNE JACKSON
May 17, 2019

1          A.      Not to my knowledge.

2          Q.      NextSource, basically, just coordinated between

3    the contractors and Tesla; right?

4          A.      Yes, sir.

5          Q.      And I think you said earlier that nextSource

6    would typically get a request from Tesla for, like, a

7    certain number of workers doing a certain type of work,

8    and then nextSource would go to a contractor and say,

9    "Can you fulfill that role"?

10         A.      To -- we call them suppliers, yes.

11         Q.      Suppliers, okay.

12         A.      Yes.

13         Q.      What was your understanding of the type of

14   training that was done for workers in terms of

15   harassment or discrimination policy?

16                 MR. ARANEDA:  Objection.  Vague.

17                 MR. ORGAN:  Yes, let me --

18                 MS. STEVENS:  It assumes facts not in evidence.

19                 MR. ORGAN:  Let me try a different question.

20         Q.      What was your understanding of what kind of

21   training was done for contract workers who nextSource

22   would ask to supply workers in terms of discrimination

23   or harassment?

24                 MR. ARANEDA:  Objection.  It lacks foundation.

25                 Go ahead.

**Page  22**

1              THE WITNESS:  As far as I'm aware, I believe

2      they were all supposed to have any training at their

3      agency.

4              MR. ORGAN:  Okay.

5              THE WITNESS:  Yeah.

6              MR. ORGAN:  Q.  But in terms of your -- when

7      you became the manager, the program manager, you did

8      some investigations into complaints of discrimination

9      and harassment.

10             Is that true?

11        A.    Some, yes, but more or less

12     information-gathering.  You know, I would gather the

13     information, and then submit it to the agency.

14        Q.    Okay.  And in terms of your training into

15     investigating or fact-gathering relative to claims of

16     discrimination or harassment, would you agree that any

17     kind of investigation you would be doing would need to

18     be prompt, objective, and timely -- prompt, objective

19     and thorough -- sorry -- prompt, objective, and

20     thorough?

21        A.    Yes.

22        Q.    And did you participate in terms of any

23     investigations or fact-finding relative to claims of

24     discrimination or harassment at the Tesla factory?

25        A.    Yes.

WAYNE JACKSON
May 17, 2019

```
 1        A.     I don't know.
 2        Q.     Okay.  Going back to Mr. Diaz's complaint about
 3    the jigaboo, what did you do to investigate that
 4    incident?
 5        A.     If I recall correctly, I got statements.  I got
 6    photographs of the drawing.  I alerted Chartwell -- I
 7    believe it was Chartwell.  It might have been CitiStaff;
 8    I can't remember.
 9               Like I say, we had contractors from different
10    suppliers.
11        Q.     Sure.
12        A.     And I alerted the manager for Tesla over that
13    area, which was Victor Quintero.
14        Q.     Owen Diaz worked for CitiStaff.
15               Do you remember that?
16        A.     I don't recall if it was CitiStaff or
17    Chartwell.  Like I said, we had several suppliers, so...
18    It's been three, four years, so I couldn't tell you
19    exactly which one.
20        Q.     Do you remember the person who put up the
21    jigaboo drawing was Ramon Martinez?
22        A.     Yes.  I believe so, yes.
23        Q.     In addition to getting statements from
24    Mr. Martinez and Mr. Diaz, did you get statements from
25    anybody else other than those two?
```

**Page 31**

```
1        A.    I believe --

2        Q.    Well, let me --

3        A.    I don't recall.

4        Q.    Let me just --

5        A.    I don't recall.

6        Q.    Let me -- I forgot -- let me ask the

7    preliminary question:  Did you get statements from

8    Ramon Martinez and Owen Diaz, do you recall?

9        A.    Actually, I believe I referred them both to

10   their agencies.

11       Q.    Okay.

12       A.    If I'm not mistaken.

13       Q.    Okay.  Do you recall seeing statements -- a

14   statement from Ramon Martinez relative to the jigaboo

15   poster?

16       A.    I don't recall.

17       Q.    Do you recall seeing any statement from

18   Owen Diaz relative to the jigaboo poster?

19       A.    I also don't recall.  I'm sure I did, but I

20   don't recall.

21       Q.    When I say "poster," I mean a drawing.

22             It was actually a drawing on the cardboard;

23   right?

24       A.    Yes, sir.

25       Q.    Did you review any documents to get ready for
```

```
 1       safety, yeah, because he had -- I believe he had ran
 2       into the elevator a couple of times.
 3           Q.    In terms of running into the elevator --
 4           A.    The elevators --
 5           Q.    -- with the forklift?
 6           A.    Yeah, they were going -- he was going too fast
 7       and would ran in and damaged the elevators on a few
 8       occasions.
 9               And he also -- like I said, his attitude, he
10       was -- I don't know the word to use, but he was -- if I
11       remember correctly, he really got into it with a lot of
12       other staff.  Argumentative, I guess, is probably the
13       word; I don't know.
14           Q.    Now, in terms of Mr. Diaz's attitude or
15       argumentativeness, did that occur after the jigaboo
16       drawing happened?
17           A.    No, sir, that was from, probably, day one, to
18       be honest.
19           Q.    So from day one that Mr. Diaz was working at
20       the factory, as far as you understood, Mr. Diaz had an
21       attitude issue?
22           A.    I don't know if it was an attitude issue, but,
23       like I said, he got -- he got into it with several other
24       contractors, as well as Tesla staff.
25               MR. HORTON:  Pardon me.  Can I ask for a
```

1    doing disciplinary or things of that nature, if I'm not

2    mistaken.

3          MR. ORGAN:  Q.  So your understanding of

4    Ed Romero's tasks, though, relative to the elevator

5    operators was that he could do scheduling, right --

6       **A.    Yes, sir.**

7       Q.    -- for them, and that Mr. Romero would at least

8    direct their work; right?

9       **A.    Yes, sir.**

10      Q.    How would discipline towards contract employees

11   take place, then, typically?

12      **A.    If there was a complaint, I would alert their**

13   **agency of the complaint.**

14      Q.    And then it was up to the agency to do the

15   disciplinary action.

16          Is that right?

17      **A.    Yes, sir.  Whether they were terminated, I**

18   **couldn't terminate.   They weren't my employees.**

19      Q.    I see.

20      **A.    Yeah.**

21      Q.    Could you recommend termination for people?

22      **A.    I mean, I can make a recommendation, but it**

23   **wasn't -- the final decision wasn't mine.**

24      Q.    I see.

25          Then in terms of Tesla's role in any kind of

WAYNE JACKSON
May 17, 2019

```
 1     discipline, could Tesla also make recommendations for
 2     termination or discipline?
 3             MR. ARANEDA:  Objection.  It lacks foundation.
 4     It calls for speculation.
 5             THE WITNESS:  Yeah, I guess they could.  I
 6     don't, you know --
 7             MR. ORGAN:  Q.  You don't know?
 8     A.      Yeah, not on that -- that level, no.
 9     Q.      In terms of your observations, though, you did
10     have an occasion to observe employees get issued
11     discipline; right?
12     A.      Yes, sir.
13     Q.      Based on your observations of the discipline
14     that was given to employees, did you ever see any kind
15     of discipline that was recommended by Tesla supervisors
16     that was then implemented by the agencies --
17             MR. ARANEDA:  Objection.
18             MR. ORGAN:  Q.  -- or the suppliers?
19             MR. ARANEDA:  Vague.
20             THE WITNESS:  No, sir.
21             Sorry.
22             MR. ORGAN:  Q.  You just didn't get into that
23     kind of detail.
24             Is that right?
25     A.      Yes, sir, I let the agencies handle it because
```

**Page  41**

WAYNE JACKSON
May 17, 2019

1       it was their employee.

2       Q.    I think I owe you a check for mileage, so I'm

3   going to give you that.

4       A.    Okay.

5             MR. ARANEDA:  And the appearance fee also.

6             MR. ORGAN:  I thought that we sent the

7   appearance fee --

8             MR. ARANEDA:  No.

9             MR. ORGAN:  -- did we not?

10            MR. ARANEDA:  No.

11            MR. ORGAN:  Okay.  I'll give you a check for

12  the appearance fee, too.

13            Let's take a short break, and then we'll start

14  going into the documents.

15            MR. ARANEDA:  Okay.

16            (Whereupon, a recess was held from

17            10:52 a.m. to 11:02 a.m.)

18            MR. ORGAN:  Q.  In terms of your discussions

19  with Victor Quintero, do you recall anything else that

20  you talked about other than what you've already

21  testified to about Owen Diaz?

22      A.    Not that I can recall.

23      Q.    Do you recall any of your conversations with

24  Ed Romero in terms of Owen Diaz?

25      A.    Specifics, no.  I don't recall specifics.  I

Bridget Mattos & Associates
(415)747-8710

```
 1      Judy Timbreza.
 2              (Document reviewed by the deponent.)
 3              MR. ORGAN:  Q.  I'm wondering if this helps
 4      refresh your recollection at all.
 5              MR. ARANEDA:  Objection.  It calls for
 6      speculation.
 7              THE WITNESS:  Yeah, I remember there was
 8      something.  Like I said, I just don't remember exactly
 9      what occurred with Ms. Timbreza.
10              MR. ORGAN:  Q.  Was Mr. Timbreza, was he a
11      nextSource employee?
12          A.    None of them were nextSource employees, really.
13      They were all --
14          Q.    Okay.
15          A.    -- agencies.  So, you know, I mean, she was
16      not.
17          Q.    And Judy Timbreza -- that's a man; right?
18          A.    No, that's a woman, if I'm not mistaken.
19          Q.    Is it?
20          A.    Yes.
21          Q.    Oh, okay.  Because I had -- okay.
22          A.    I could have sworn it was a lady.  It's been a
23      long while, but I don't think it's been that long.
24          Q.    Okay.  The only reason, if you look at this
25      document, it says here, "Mr. Owen still feels he can
```

WAYNE JACKSON
May 17, 2019

1    became aware of an incident between Mr. Martinez and

2    Mr. Diaz.

3              Is that correct?

4       A.    Yes, sir.  I was -- honestly, I was still in a

5    recruiter's role at that point.  They hadn't

6    transitioned me over as of yet.

7       Q.    I see.

8       A.    So I was kind of trying to fill two roles at

9    once.

10      Q.    Wearing two hats?

11      A.    Yes, sir.

12      Q.    Do you remember any of the details of what the

13   issue was?

14      A.    If I'm not mistaken, there was some type of

15   verbal altercation.

16      Q.    Mr. Martinez worked in recycling.

17            Is that right?

18      A.    Yes, sir.

19      Q.    And Mr. Diaz worked as one of the elevator --

20      A.    Yes.

21      Q.    -- operators?

22      A.    Yes, sir.

23      Q.    Do you remember what the nature of the verbal

24   altercation was in this October 2015 time period?

25      A.    I could not tell you the details, to be honest,

Bridget Mattos & Associates
(415) 747-8710

1    I -- it's been so long.  I remember it was something to

2    the effect they were trying to move some recycling

3    material in the elevators, and I guess there was -- I

4    don't know what -- I can't remember what it was, but

5    Ramon and Mr. Diaz got into a verbal altercation over

6    the use of the elevator.

7        Q.    Did you do an investigation into that incident?

8        A.    Like I said, I was just starting in that role,

9    so it wasn't really my role to do that at that point.  I

10   was still, honestly, a recruiter.

11       Q.    Okay.

12       A.    I asked Miss Garrett what did she want me to

13   do.  I believe we got statements from each of them, and

14   I let the -- let the agencies handle it from there.

15       Q.    Do you know who a Deb Gryske is?

16       A.    Yes, she was a -- I can't remember her role at

17   nextSource.  More of a technology person.

18       Q.    Okay.

19             We're going to -- this is Exhibit 124?

20             THE REPORTER:  Yes.

21             (Whereupon, Plaintiffs' Exhibit 124 was marked

22             for identification and is attached hereto.)

23             (Document reviewed by the deponent.)

24             MR. ORGAN:  Exhibit 124, for the record, is a

25   two-page document Bates-stamped TESLA-635 and 636.

WAYNE JACKSON
May 17, 2019

1       Q.     And it references your -- it says you're
2    actually on the phone doing the investigation of the
3    Ramon/Owen incident.
4       A.     I was probably on the phone with Chartwell, I
5    would assume, at that time.
6       Q.     Chartwell was the contractor that was employing
7    Mr. Martinez.
8              Is that right?
9       A.     Yes, it was either Chartwell or CitiStaff.   I
10   can have been talking to both of them.
11      Q.     Okay.
12      A.     I was just more or less alerting them as to
13   what was going on.
14      Q.     Okay.  Do you remember who you were talking to
15   at Chartwell?
16      A.     Most likely it was Veronica and at CitiStaff --
17   I can't think of the lady's name at Citistaff.  She was
18   very difficult to reach.
19      Q.     Okay.  Let's see.
20             (Whereupon, Plaintiffs' Exhibit 125 was marked
21             for identification and is attached hereto.)
22             MR. ORGAN:  Exhibit 125, for the record, is a
23   one-page document Bates-stamped TESLA- -- I think
24   it's -- 644.  It's either 644 or 611.  But, anyway,
25   they're emails from October 17th and October 19th of

WAYNE JACKSON
May 17, 2019

```
 1     2015.

 2             And the first document -- or the first email

 3     down at the bottom of Exhibit 125, this appears to be a

 4     complaint by Mr. Martinez about Mr. Diaz.

 5             (Document reviewed by the deponent.)

 6             MR. ORGAN:  Q.  Was that -- let me ask you

 7     this:  After you read this, does it refresh your

 8     recollection as to who actually made the complaint

 9     against each other in terms of Mr. Romero [sic] or

10     Mr. Diaz?

11         A.    No.  I couldn't tell you who made the

12     complaint.

13         Q.    Okay.

14             (Whereupon, Plaintiffs' Exhibit 126 was marked

15             for identification and is attached hereto.)

16             MR. ORGAN:  Exhibit 126, for the record, is a

17     four-page document, Bates-stamped TESLA-133 to 136.  It

18     is a series of emails starting with a complaint by

19     Mr. Diaz on 17th of October 2015, and then up to the

20     20th of October.

21         Q.    And I'm wondering if this refreshes your

22     recollection.

23             MR. ARANEDA:  Take your time and read through

24     it.

25             MR. ORGAN:  Yes.
```

**Page  63**

1                    (Document reviewed by the deponent.)

2                    THE WITNESS:  And what was the question?  I'm

3      sorry.

4                    MR. ORGAN:  Q.  I'm just wondering if this

5      helps refresh your recollection in terms of --

6          A.     **Yeah, I believe this was the verbal altercation**

7      **that they had gotten into, yes.**

8          Q.     And Mr. Diaz suggests that Mr. Martinez started

9      this altercation by yelling at him in a threatening

10     manner, suggesting that Mr. Diaz had a problem with him;

11     right?  That's what Mr. Diaz's complaint was.

12                   MR. ARANEDA:  The document speaks for itself.

13                   THE WITNESS:  Yeah, that's what it says here.

14                   MR. ORGAN:  Q.  Does that refresh your

15     recollection -- did you actually talk to Mr. Diaz after

16     you received his written complaint here in Exhibit 126?

17         A.     **I believe so, yes, sir.**

18         Q.     And was Mr. Diaz's complaint to you verbally

19     the same as his complaint in writing?

20         A.     **No, sir.**

21         Q.     There were additional things that Mr. Diaz told

22     you in the -- when he talked to you --

23         A.     **Well, what he's saying here about he thought he**

24     **was going to be struck, he didn't really express that.**

25         Q.     He didn't express that when you talked to him?

1    A.    No, sir.

2    Q.    You talked to Mr. Diaz after you received a

3    copy of his email complaint.

4          Is that true?

5    A.    Yes, sir, I believe so.

6    Q.    Did you ask him whether or not Mr. Martinez

7    threatened to hit him?

8    A.    It was more or less the conversation, if I

9    remember correctly -- Mr. Diaz was more of, "He's not

10   going to talk to me like that."

11         So, yeah, it was more of, like I said, "He

12   wasn't going to talk to me like that" more so than

13   anything.  It wasn't -- he didn't state that he was --

14   that he was going to fight, per se, I guess, or be

15   struck.

16   Q.    Do you have notes that you took of that

17   interview you did with Mr. Diaz?

18   A.    I don't, no, sir.

19   Q.    Did you take notes at the time --

20   A.    Yes, sir.

21   Q.    -- that you were meeting with Mr. Diaz?

22   A.    Yes, sir.  Every time I met with anybody, I

23   would take notes.  But I don't have those anymore.

24   Q.    What did you do with the notes once you

25   finished talking to Mr. Diaz?

WAYNE JACKSON
May 17, 2019

```
 1    practices; correct?
 2        A.    Yes, sir.
 3        Q.    And you do recall that you created notes
 4    relative to your interview with Mr. Diaz; right?
 5        A.    I do believe so, yes, sir.
 6        Q.    And, then, did you create notes, any notes
 7    relative to your interview with Ramon Martinez?
 8        A.    Yes, sir.
 9        Q.    You would have taken the same thing in terms of
10    documenting what Mr. Martinez told you in your
11    interview.
12              Is that right?
13        A.    Yes, sir.
14        Q.    And you would have typed those notes up, and
15    then sent that to the agency and to at least someone
16    in -- Terri Garrett in nextSource; right?
17        A.    Yes, sir.
18        Q.    Where would you save the documents that you
19    created?  The typewritten documents you created, where
20    would those be saved?
21        A.    Most likely on the laptop that I had.
22        Q.    Did your laptop connect to some kind of server
23    so that it would back up whatever information you were
24    typing?
25        A.    Not that I recall.
```

Page 67

WAYNE JACKSON
May 17, 2019

```
 1        Q.    The laptop that you created the notes on, that
 2   would have been the laptop, though, that was the
 3   company's -- was nextSource's laptop?
 4        A.    Yes, sir.
 5        Q.    And when you left nextSource, you returned that
 6   laptop to them; correct?
 7        A.    Yes, sir.
 8        Q.    Do you remember the name or the title of the
 9   notes that you created?
10        A.    I have no recollection.  I'm sorry.  It's been
11   so long, yeah, I couldn't.
12        Q.    I get that.
13        A.    Okay.
14        Q.    If you look at the second page of Exhibit 126,
15   it mentions --
16             MR. ARANEDA:  What Bates are you looking at?
17             MR. ORGAN:  134, the second page.
18             MR. ARANEDA:  Okay.
19             MR. ORGAN:  Q.  -- there's an email kind of in
20   the middle from Terri Garrett to Erin Marconi.
21             Who was Erin Marconi?
22        A.    I believe she was in human resources for Tesla.
23        Q.    Was that typical protocol to at least inform
24   Tesla HR whenever there was some kind of fact-gathering
25   or investigation being done?
```

Bridget Mattos & Associates
(415)747-8710

1      A.     Yes, sir, if there was something serious.   If

2   it was someone late, no, we wouldn't notify them, but

3   anything else, yes.

4      Q.     Right.

5             So any kind of verbal altercation typically

6   would be copied to Tesla; right?

7      A.     I wouldn't --

8      Q.     Well, let me --

9      A.     -- say that, no, sir.

10     Q.     Any verbal altercation where there's

11  allegations of some kind of threat, that would be copied

12  to Tesla --

13     A.     Yes, sir.

14     Q.     -- right?

15            And, then, in that email from Terri to Erin,

16  Terri mentions in there, it says:

17            "It looks like Victor is asking Ed Romero to

18            get involved in a temporary worker ER [sic]

19            issue.  My recommendation is that Ed not be

20            involved."

21            I'm just wondering, do you have any

22  recollection of talking to Terri Garrett about Victor or

23  Ed's involvement in this investigation?

24     A.     Yes.  The email even shows that she had asked

25  me, you know, why is Ed doing this, and I said, "He was

WAYNE JACKSON
May 17, 2019

1     instructed by Victor."

2         Q.    Okay.  And, then, in terms of any discussions

3     that you had with Ed Romero, do you recall any

4     discussions with Ed about this altercation between

5     Mr. Diaz and Martinez?

6         A.    I'm sure I did, but I can't recall what the

7     details were, to be honest.

8         Q.    What was the ultimate outcome of this

9     investigation that you did into 126 -- into the

10    information in Exhibit 126?  Do you remember?

11        A.    I don't recall.  I believe it was a -- a

12    warning was issued.  Yeah, I believe so.

13        Q.    Was a warning issued to Mr. Martinez, then?

14        A.    I don't recall.  I think it was both in the

15    sense if I -- I can't even remember because, like I

16    said, Mr. Diaz had -- the timing is probably what's

17    throwing me off a little bit.

18              But he had a few interactions with employees

19    where he was pretty aggressive, I guess you could say,

20    and we probably verbally counseled both of them to --

21    to, you know, more or less, play nice with each other in

22    the sandbox.

23        Q.    And do you think -- if you go back to

24    Exhibit 125 where Mr. Ramon Martinez has that email on

25    October 17th at 4:56 a.m., do you recall that

```
 1                This is 127?

 2           THE REPORTER:  Yes.

 3                (Whereupon, Plaintiffs' Exhibit 127 was marked

 4                for identification and is attached hereto.)

 5                MR. ORGAN:  Exhibit 127, for the record, is a

 6      two-page document Bates-stamped TESLA-646 and 647, and

 7      they are emails from October 19th to October 21st.

 8                (Document reviewed by the deponent.)

 9                MR. ORGAN:  Q.  There's a reference here to a

10      Rothaj.  I think that's Rothaj Foster.

11                Is that correct?

12      A.   I don't remember the last name.

13      Q.   Do you remember who Rothaj worked for?

14      A.   No, I don't, sir.

15      Q.   If you look at your email down at the bottom,

16      that's an email that you sent to Terri Garrett?

17      A.   Uh-hum.

18      Q.   Do you see that?

19      A.   Yes.

20      Q.   It says (as read):

21           This issue seems to be related to this, and we

22           are going to have to do some in-depth

23           investigation.

24           Do you remember any discussions that you had

25      with Terri Garrett about that investigation in this
```

WAYNE JACKSON
May 17, 2019

```
 1              -- and then Erin Marconi?
 2      A.    Yes, sir.
 3      Q.    There are three recommendations -- or there are
 4   three items that are identified as important here in
 5   Exhibit 128.
 6              Did you yourself talk to Ramon about --
 7   Ramon Martinez about in terms of there's no further room
 8   for error?
 9      A.    Yes, sir.
10      Q.    So you yourself had a conversation with
11   Mr. Martinez; correct?
12      A.    Yes, I did have a conversation with
13   Mr. Martinez, and I also referred him to his agency who
14   also had a more in-depth conversation with him.
15      Q.    In the conversation that you had with
16   Mr. Martinez, you made it clear to Mr. Martinez that you
17   thought that the jigaboo drawing was inappropriate;
18   right?
19      A.    Yes, sir.
20      Q.    And you also made it clear to Mr. Martinez that
21   you thought the jigaboo poster was offensive to
22   African-Americans; right?
23      A.    Yes, sir.
24      Q.    In terms of Mr. Martinez's response, what was
25   his response when you told him that it was offensive to
```

Bridget Mattos & Associates
(415) 747-8710

```
 1        A.    He didn't really specifically say that, that I
 2    could recall, but he did say it was inappropriate.
 3        Q.    Okay.  And then there's a reference here to
 4    Josue?
 5        A.    Josue, yes.
 6        Q.    Was Josue with Tesla or who was he with?
 7        A.    Tesla.
 8        Q.    Do you remember what Josue's position was?
 9        A.    I don't know.  It was more of a -- I don't know
10    if it was a supervisor or a manager of the recycling
11    area.
12        Q.    And Josue -- he also agreed that the jigaboo
13    drawing was inappropriate; right?
14        A.    Yes.
15        Q.    Did Josue say anything about in terms of what
16    he thought was the appropriate remedy?
17        A.    No, he was never really included in that
18    portion of it.
19        Q.    Okay.
20              130?
21              THE REPORTER:  Yes.
22              (Whereupon, Plaintiffs' Exhibit 130 was marked
23              for identification and is attached hereto.)
24              MR. ORGAN:  Exhibit 130, for the record, is a
25    five-page document Bates-stamped TESLA-4 to 8, and it
```

1    starts with the jigaboo drawing -- pictures of the

2    jigaboo drawing and Mr. Diaz's complaint.  Those are the

3    last four pages of the -- five pages of that, and then

4    there's an email on the first page.

5              (Document reviewed by the deponent.)

6              THE WITNESS:  Yes, sir.

7              MR. ORGAN:  Q.  And the email on the first page

8    is an email from you to Veronica Martinez at Chartwell.

9        A.    Uh-hum.

10       Q.    Was Ms. Martinez -- Veronica Martinez, was she

11   sort of a contact person that you had in Chartwell?

12       A.    Yes, sir.

13       Q.    And do you remember what Ms. Martinez's role

14   was at Chartwell?

15       A.    I believe she was the manager of that

16   particular branch.

17       Q.    Did you ever get from Chartwell what their

18   policy was regarding discrimination?

19       A.    I did not, but I'm sure Ms. Garrett had to have

20   gotten that as part of the contract.

21       Q.    So Terri Garrett did further liaison, then,

22   with Chartwell.

23              Is that right?

24       A.    She did all the contracts and such with any of

25   the agencies that we worked with.

1    **pretty difficult to reach, to be very honest.**

2        Q.    And then there's a Judy.

3              Is Judy the same as Ludivina?

4        **A.    I don't know.**

5        Q.    Did you know a Judy Ledesma?

6        **A.    That does not sound familiar.**

7        Q.    Do you remember having any discussions with

8    Monica De Leon about the jigaboo?

9        **A.    Yeah, I believe, like I said, I had alerted her**

10   **to it and made sure I provided her copies, if I'm not**

11   **mistaken, of the photos.**

12       Q.    Do you remember an actual conversation that you

13   ended up having with her?

14       **A.    I really don't.  Monica was really very**

15   **difficult to reach.**

16       Q.    Okay.

17             This is 132.

18             (Whereupon, Plaintiffs' Exhibit 132 was marked

19             for identification and is attached hereto.)

20             MR. ORGAN:  Q.  Exhibit 132, for the record, is

21   a multiple-page document Bates-stamped 7 -- TESLA-730 to

22   737.  I guess it's an eight-page document.  It includes

23   some handwritten statements.

24             (Document reviewed by the deponent.)

25             MR. ORGAN:  Q.  And I'm wondering, do you -- do

WAYNE JACKSON
May 17, 2019

1    you remember if you ever saw the handwritten statements

2    that are -- were allegedly attached to Ms. Delgado's

3    email?

4        A.    No, I don't believe so.  Let me see.  No, I

5    don't recall seeing these.

6        Q.    Okay.

7        A.    I may have, but I don't recall.

8        Q.    And, then -- the only reason I ask is because

9    if you look at the first page of Exhibit 132, there's an

10   email from you to Victor, Josue, Jeff Lalich, and

11   Terri Garrett talking about "alleged victim statement."

12           Do you see that at the top?

13       A.    Yes, I do.

14       Q.    And PDF, suggesting that the attachments were

15   included by you to them.

16       A.    And it could have been.  I just don't recall

17   these attachments, to be really honest.

18       Q.    Okay.

19       A.    I probably -- if I did send them, I probably

20   did, just making sure that I kept everybody in the loop.

21       Q.    But in terms of what you did, the statements

22   themselves were not something that you took from the

23   employees --

24       A.    No.

25       Q.    -- is that correct?

Bridget Mattos & Associates
(415) 747-8710

WAYNE JACKSON
May 17, 2019

1       A.      No, these were from the Chartwell, yeah.

2       Q.      Okay.

3       A.      Yeah, these are the statements that they give

4    to Chartwell to give.

5       Q.      Okay.

6       A.      Yes.

7       Q.      And, again, in terms of who might have been

8    doing the investigation for Chartwell, do you remember

9    who that was?

10      A.      It was their HR team.

11      Q.      Okay.  Do you remember who was on Chartwell's

12   HR team?

13      A.      I did not really communicate with them.  I only

14   communicated with Veronica.

15      Q.      Now, if you look at the email from

16   Mr. Delgado [sic] to Veronica Martinez, it states that

17   Mr. Diaz was concerned about his safety and feeling

18   uncomfortable with working with Mr. Martinez.

19              That was something that did come up during your

20   investigation into these incidents, correct, that

21   Mr. Diaz was concerned about working with Mr. Martinez;

22   right?

23              MR. ARANEDA:  Objection.  Vague.  It lacks

24   foundation.

25              THE WITNESS:  Only via email.

**Page  98**

WAYNE JACKSON
May 17, 2019

1    his return.

2        Q.    Whatever that Wednesday was?

3        A.    Yes, sir.

4        Q.    And, then, did Victor ever report back to you

5    that, in fact, he had talked to Mr. Martinez?

6        A.    Yeah, I believe he did tell me he had spoke to

7    Mr. Martinez.  I actually called Chartwell and made sure

8    they knew that Ramon was to report to Victor first.

9        Q.    Okay.

10             This will be 134.

11             (Whereupon, Plaintiffs' Exhibit 134 was marked

12             for identification and is attached hereto.)

13             MR. ORGAN:  Are there enough of those?

14             MS. STEVENS:  Yes.

15             MR. ORGAN:  Okay.

16             Exhibit 134, for the record, is a one-page

17    document Bates-stamped TESLA-317, and this is

18    referencing -- this is from March of 2016, something

19    about a situation involving Owen Diaz and Troy Dennis.

20             (Document reviewed by the deponent.)

21             MR. ORGAN:  Q.  Do you know what that was

22    about?

23        A.    I believe, again, it was they got into a verbal

24    altercation.

25        Q.    And it says here that you were looking for some

**Page 106**

1    good replacements.  That's your email to Mr. Romero.

2         Do you see that?

3    A.    Yes.  They had actually asked me to start

4    looking just in case things didn't work out, yes.

5    Q.    And were those -- were they looking for -- the

6    "they" being Ed Romero and Victor Quintero; right?

7    A.    Yes.

8    Q.    So Ed Romero and Victor Quintero were looking

9    for replacements for both Owen Diaz and Troy Dennis or

10   just Owen Diaz?

11   A.    I believe it was for both.

12   Q.    Okay.

13   A.    I think they had -- like I said, they had a

14   verbal altercation in the middle of the factory in front

15   of a lot of people.

16   Q.    Okay.

17   A.    I believe -- I can't remember exactly the

18   incident, but it was something to that effect.

19   Q.    Do you remember what it was about?

20   A.    I do not.

21   Q.    Okay.

22         This is 135.

23         (Whereupon, Plaintiffs' Exhibit 135 was marked

24         for identification and is attached hereto.)

25         (Document reviewed by the deponent.)

**Page 107**

1           MR. ORGAN:  Exhibit 135, for the record, is a

2     one-page document Bates-stamped TESLA-319.

3     Q.     This is something about a failure to bring

4     safety shoes on March 3rd?

5     **A.     Yes.  We've had a -- they had a few issues**

6     **where if you're an elevator operator dealing with**

7     **forklifts, you had to have on the steel-toed shoes.  And**

8     **we'd have a few employees that would show up without**

9     **those shoes on, and in a lot of cases, we had to send**

10    **them home.**

11    Q.     In this particular case, do you know if

12    Mr. Diaz got sent home?

13    **A.     I don't recall because he was working grave and**

14    **I probably was asleep at the time, to be honest.**

15    Q.     Fair enough.

16           Okay.  Let's go to the next one.

17           (Whereupon, Plaintiffs' Exhibit 136 was marked

18           for identification and is attached hereto.)

19           (Document reviewed by the deponent.)

20           THE WITNESS:  Oh, yeah.  Okay.  I do remember a

21    little more about this.

22           MR. ORGAN:  Q.  Tell me what else you remember

23    about -- so 136, for the record, is a one-page document

24    Bates-stamped TESLA-320.  It's an email from March 4th.

25    **A.     Uh-hum.**

WAYNE JACKSON
May 17, 2019

1      Q.     And this is something about some PPE gear?

2      A.     Personal protective equipment.

3      Q.     Okay.

4      A.     Yeah, I believe the -- we had a safety

5   individual, Mr. Tyrone Hopper -- Hoper -- Hopper, and

6   part of his task was to go around and ensure everybody

7   had on the proper goggles, safety shoes, vests, things

8   of that nature.

9             And I think he had approached Mr. Diaz because

10  he didn't have a vest on, and then that's when he

11  discovered he didn't have his shoes, either.

12     Q.     Okay.

13     A.     And Mr. Diaz got confrontational with him as

14  the safety person.  So they were concerned, if I

15  remember.

16     Q.     This doesn't mention confrontational.

17            How do you --

18     A.     Yeah, I think they -- because I remember

19  Mr. Hopper was pretty upset about it because he said,

20  "Look.  I'm just trying to make sure you go home safe.

21  You arrive safe, go home safe."

22            And I guess there was an argument that ensued

23  with something to the effect of why are you worrying

24  about my shoes and not worrying about that guy's shoes,

25  because that guy is not part of our team type of deal.

**Page 109**

1       Q.      Right.

2               Did it seem to you that after the jigaboo -- I

3       mean, it just seems from the emails that after the

4       jigaboo incident in January, that there seemed to be

5       more incidents of Mr. Diaz having verbal altercations

6       with coworkers.

7               MR. ARANEDA:   Objection.   Vague.

8               THE WITNESS:   No, I would not say that, sir,

9       because it was kind of continuous, to be very honest.

10      It was -- Owen was known as the kind of difficult

11      elevator operator at the plant.   That was just kind of

12      how people -- they didn't want to deal with him in a lot

13      of ways.

14              MR. ORGAN:   Okay.

15              THE WITNESS:   And I don't know how else to put

16      it, but that just was the feedback that I got.

17              MR. ORGAN:   Okay.

18              THE WITNESS:   He wasn't difficult with me,

19      per se, but, like I said, I only dealt with the men

20      there.

21              MR. ORGAN:   Q.   So in terms of your dealings

22      and Owen Diaz, you didn't have difficulty with him

23      personally.

24              Is that correct?

25      A.      On most occasions, no.   I mean, I -- we did

1      having him terminated; correct?

2          A.    I can't recall, but there were -- like I said,

3      there were a lot of complaints that came in with regards

4      to him.

5          Q.    I understand that there were complaints.

6          A.    Yeah.

7          Q.    My question is a little different, though, a

8      little narrower, and that is:  Did anyone tell you prior

9      to March of 2016 that they thought that Owen Diaz should

10     be terminated?

11         A.    Yes.

12         Q.    Who?

13         A.    Ed Romero.

14         Q.    When did Ed tell you that he thought Mr. Diaz

15     should be terminated?

16         A.    It was on several occasions.  Like I said, he

17     would hear about the stuff sometimes before me.

18         Q.    Okay.

19         A.    And Ed, I think as his thing, he would always

20     say to me, like, "Wayne, I like the guy, but he's really

21     causing a lot of problems."  That would be his comment.

22         Q.    Okay.  Did he say what was causing the

23     problems?

24         A.    Attitude.

25         Q.    Attitude.

WAYNE JACKSON
May 17, 2019

1    A.    He was very abrasive towards other staff.

2    Q.    Was Owen Diaz abrasive with you?

3    A.    On one occasion, but not -- like I said, after

4    I kind of let him know I'm here to help you, he kind of

5    calmed down, but initially, yes.

6    Q.    When did that one occasion occur where Mr. Diaz

7    was abrasive with you or loud?  I think you said he was

8    loud.

9          Is that right?

10   A.    Yeah.

11         I can't remember the exact date, to be very

12   honest.

13   Q.    Was it toward the end of Owen's tenure there or

14   toward the beginning or in the middle?

15   A.    Probably towards the beginning more.  Yeah, it

16   was probably more towards the beginning, I think.

17   Q.    So once you had that conversation with Mr. Diaz

18   at the beginning about how you were there to help him,

19   you had no other issues with him throughout the entire

20   time that Mr. Diaz worked at Tesla; right?

21   A.    I wouldn't say that.  I just -- we had a better

22   understanding of him not yelling at me.

23   Q.    Okay.

24   A.    I guess is the best way to put it.

25   Q.    I see.

Bridget Mattos & Associates
(415)747-8710

WAYNE JACKSON
May 17, 2019

 1              This is 140?

 2              THE REPORTER:  140.

 3              (Whereupon, Plaintiffs' Exhibit 140 was marked

 4              for identification and is attached hereto.)

 5              (Document reviewed by the deponent.)

 6              THE WITNESS:  My daughter...

 7              MR. ORGAN:  Your daughter is calling you?

 8              THE WITNESS:  Yeah.

 9              MR. ORGAN:  Do you need to get it?

10              THE WITNESS:  I'll call her back in just a

11      minute.

12              MR. ORGAN:  Okay.

13              Well, somehow I only have two copies of this

14      one, too.  Sorry about that.

15              Exhibit 140, for the record, is a two-page

16      document Bates-stamped CITISTAFF-00009-10.

17      Q.      And it's just a -- there are two emails from

18      you --

19      A.      Uh-hum.

20      Q.      -- to Ms. De Leon and then from Monica De Leon

21      back to you regarding the termination of Mr. Diaz's

22      contract.  It's dated March 18th.

23              Do you see that?

24      A.      Yes, sir.

25      Q.      And then it says:

**Bridget Mattos & Associates**
(415) 747-8710

WAYNE JACKSON
May 17, 2019

1            "Unfortunately, we will have to term the

2            assignment of Owen Diaz.  We have been trying

3            to work with him on some attendance and

4            performance issues, but we have been

5            unsuccessful."

6            And then he sent a doctor's note, but no

7     signature, and then the manager would just like to get

8     another candidate --

9       A.    Yes.

10      Q.    -- to backfill.

11            So --

12      A.    That's more or less letting Citistaff know they

13    could reassign Owen to somewhere else.

14      Q.    Do you remember a conversation, then, that you

15    had with either Monica or anybody else relative to this

16    issue about the doctor's note and the decision to

17    terminate him?

18      A.    No, I believe I just forwarded the doctor's

19    notice to Monica.  I don't think it had a signature or

20    anything on it, a date or anything.

21      Q.    Okay.

22      A.    So it didn't -- it wasn't really a verifiable

23    note, I guess you could say.

24      Q.    I see.

25            And you need that.

```
 1      journal should have any kind of concerns?
 2          A.    Various notes would be placed there, yes.
 3          Q.    Like if there was a performance concern, it
 4      should go in the requisition journal.
 5                Is that right?
 6                MR. ARANEDA:  Objection.
 7                THE WITNESS:  Yes.
 8                MR. ARANEDA:  It calls for speculation.
 9                THE WITNESS:  Yes, that would go in there, as
10      well as if someone was doing, you know, above and
11      beyond, things of that nature.
12                MR. ORGAN:  I see, okay.
13                And Exhibit 142.
14                (Whereupon, Plaintiffs' Exhibit 142 was marked
15                for identification and is attached hereto.)
16                MR. ORGAN:  For the record, Exhibit 142 is a
17      two-page document Bates-stamped TESLA-752-753.  They're
18      emails from February 26 of 2016.
19                (Document reviewed by the deponent.)
20                THE WITNESS:  That's the lady,
21      Joyce Delagrande, yeah.
22                MR. ORGAN:  Okay.
23                THE WITNESS:  Yeah.  I knew it was something
24      where he got into it with somebody.  I couldn't recall
25      what it was.
```

**Page 131**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBITS TO DEPOSITION OF WAYNE JACKSON

# REDACTED – CONDITIONALLY FILED UNDER SEAL

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

```
1                    REPORTER'S CERTIFICATE

2   STATE OF CALIFORNIA        )
                               )  ss.
3   COUNTY OF MARIN            )

4            I, PATRICIA ROSINSKI, hereby certify:

5            That I am a Certified Shorthand Reporter in the

6   State of California.

7            That prior to being examined, WAYNE JACKSON,

8   the witness named in the foregoing deposition, was by me

9   duly sworn to testify the truth, the whole truth, and

10  nothing but the truth;

11           That said deposition was taken pursuant to

12  Notice of Deposition and agreement between the parties

13  at the time and place therein set forth and was taken

14  down by me in stenotype and thereafter transcribed by me

15  by computer and that the deposition is a true record of

16  the testimony given by the witness.

17           I further certify that I am neither counsel for

18  either, nor related in any way to any party to said

19  action, nor otherwise interested in the result or

20  outcome thereof.

21           Pursuant to Federal Rules of Civil Procedure,

22  Rule 30(e), review of the transcript was not requested

23  before the completion of the deposition.

24           PATRICIA ROSINSKI, CSR No. 4555

25                    May 28, 2019

                                                        154
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19 **EXHIBIT D**
20
21
22
23
24
25
26
27
28

Case No. 3:17-cv-06748-WHO

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION

FP 36147236.1

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4

                           REPORTER CERTIFIED

5  _____        TRANSCRIPT

6  DEMETRIC DI-AZ, OWEN DIAZ and
    LAMAR PATTERSON, an individual,

7                     **CONFIDENTIAL**

8        Plaintiffs,

9  Vs.                 Case No. 3:17-cv-06748-WHO

10  TESLA, INC. DBA TESLA MOTORS,
     INC.; CitiStaff SOLUTIONS, INC.;

11  WEST VALLEY STAFFING GROUP;
     CHARTWELL STAFFING SERVICES, INC.

12  and DOES 1-10, inclusive,

13        Defendants.
    _____/

14

15

16                 CONFIDENTIAL

17          VIDEOTAPED DEPOSITION OF

18               OWEN DIAZ

19        SAN FRANCISCO, CALIFORNIA

20        TUESDAY, MAY 22, 2018

21

22

23

24  Reported By:
    Candy Newland
    CSR No. 14256

25  File No. 18-25470

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:12:56 | 1 | Madame Court Reporter, please swear the witness |
| | 2 | in. |
| | 3 | --oOo-- |
| | 4 | OWEN DIAZ, |
| | 5 | having first declared under penalty of perjury to tell |
| | 6 | the truth, was examined and testified as follows: |
| | 7 | --oOo-- |
| | 8 | EXAMINATION |
| | 9 | BY MS. ANTONUCCI: |
| 10:13:12 | 10 | Q.     My name is Barbara Antonucci.  I represent |
| 10:13:14 | 11 | defendant Tesla, Inc., dba Tesla Motors, Inc.  For |
| 10:13:19 | 12 | purposes of this deposition, I'll refer to my client as |
| 10:13:23 | 13 | Tesla. |
| 10:13:23 | 14 | Do you understand that? |
| 10:13:23 | 15 | A.     Yes, ma'am. |
| 10:13:26 | 16 | Q.     I also represent CitiStaff Solutions, Inc., and |
| 10:13:26 | 17 | for purposes of this depo, I'll refer to them as |
| 10:13:26 | 18 | CitiStaff. |
| 10:13:32 | 19 | Do you understand that? |
| 10:13:33 | 20 | A.     Yes, ma'am. |
| 10:13:33 | 21 | Q.     Could you please state your full name for the |
| 10:13:36 | 22 | record. |
| 10:13:36 | 23 | A.     My full name is Owen Orappio Diaz, Jr. |
| 10:13:36 | 24 | (Reporter Clarification.) |
| 10:13:36 | 25 | /// |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:36:40 | 1 | same thing I had to go through. |
| 10:37:09 | 2 | Q.     Have you ever declared bankruptcy? |
| 10:37:13 | 3 | A.     No, ma'am. |
| 10:37:39 | 4 | Q.     Have you ever had any judgments against you? |
| 10:37:42 | 5 | A.     No, ma'am. |
| 10:37:43 | 6 |     MR. ORGAN:  Objection to the extent it calls for |
| 10:38:10 | 7 | a legal conclusion. |
| 10:38:10 | 8 |     (EXHIBIT 1 was marked for identification.) |
| 10:38:10 | 9 | BY MS. ANTONUCCI: |
| 10:38:15 | 10 | Q.     Exhibit 1 is a document entitled "CitiStaff |
| 10:38:18 | 11 | Solutions, Inc., Application," and it's Bates-stamped at |
| 10:38:22 | 12 | the bottom 34 to 35. |
| 10:38:24 | 13 |     Do you see that? |
| 10:38:29 | 14 | A.     Yes, ma'am. |
| 10:38:30 | 15 | Q.     Is this a copy of the application you submitted |
| 10:38:33 | 16 | to CitiStaff? |
| 10:38:36 | 17 | A.     It appears so. |
| 10:38:39 | 18 | Q.     Is that your signature on the page Bates-stamped |
| 10:38:45 | 19 | 35 at the bottom? |
| 10:38:47 | 20 | A.     It looks like my signature, ma'am. |
| 10:38:53 | 21 | Q.     Is there anything that you see that's inaccurate |
| 10:38:57 | 22 | about this application? |
| 10:38:58 | 23 |     MR. ORGAN:  Objection.  Compound. |
| 10:39:35 | 24 |     THE WITNESS:  Looks like the date of my |
| 10:39:53 | 25 | franchise -- the end.  I could have made a typo there. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:54:00 | 1 | MR. ORGAN:  Objection.  Privacy.  Financial |
| 10:54:02 | 2 | privacy.  Don't answer that. |
| 10:54:06 | 3 | BY MS. ANTONUCCI: |
| 10:54:12 | 4 | Q.     You also worked as a residential counselor at |
| 10:54:20 | 5 | the Hamilton Family Center; is that correct? |
| 10:54:22 | 6 | A.     Yes, ma'am. |
| 10:54:23 | 7 | Q.     And that was from January 2013 to February 2014? |
| 10:54:31 | 8 | A.     Sounds about accurate. |
| 10:54:33 | 9 | Q.     And what was the reason you left that job? |
| 10:54:36 | 10 | A.     Funding. |
| 10:54:37 | 11 | Q.     What does that mean? |
| 10:54:39 | 12 | A.     It was funded by the government.  Certain |
| 10:54:44 | 13 | positions was eliminated due to funding. |
| 10:54:48 | 14 | Q.     And was your position one that was eliminated? |
| 10:54:52 | 15 | A.     Yes. |
| 10:54:55 | 16 | Q.     So you submitted this application, marked as |
| 10:55:01 | 17 | Exhibit 1, on June 2, 2015; is that right? |
| 10:55:14 | 18 | A.     It looked like my -- I wrote the date. |
| 10:55:17 | 19 | Q.     So that's correct? |
| 10:55:19 | 20 | A.     Yes. |
| 10:55:20 | 21 | Q.     And at that time, had you had any other work |
| 10:55:25 | 22 | experience besides Hamilton Family Center and Cover-All? |
| 10:55:31 | 23 | MR. ORGAN:  Objection.  Argumentative. |
| 10:55:34 | 24 | THE WITNESS:  Yes. |
| 10:55:36 | 25 | /// |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:59:31 | 1 | A.      I don't know. |
| 10:59:33 | 2 | Q.      How long did you work for CSC? |
| 10:59:37 | 3 | A.      About four months. |
| 10:59:53 | 4 | Q.      And what was your role at CSC? |
| 10:59:57 | 5 | A.      I worked the 49er games. |
| 11:00:02 | 6 | Q.      Were you a security officer? |
| 11:00:04 | 7 | A.      I stood on the field.  Yes. |
| 11:00:09 | 8 | Q.      Can you give me the dates of your employment at |
| 11:00:17 | 9 | CSC? |
| 11:00:27 | 10 | A.      I believe it's about 2013 to 2014. |
| 11:00:32 | 11 | Q.      And why did you leave CSC? |
| 11:00:36 | 12 | A.      Football season was over. |
| 11:00:45 | 13 | Q.      Any other jobs prior to applying for CitiStaff? |
| 11:00:53 | 14 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 11:00:59 | 15 | THE WITNESS:  Not that I recall at this time. |
| 11:01:02 | 16 | BY MS. ANTONUCCI: |
| 11:01:23 | 17 | Q.      The woman you met at the CitiStaff Newark |
| 11:01:27 | 18 | office, did you ever see her again after you met her on |
| 11:01:32 | 19 | that occasion? |
| 11:01:37 | 20 | A.      Maybe once or twice. |
| 11:01:44 | 21 | Q.      Where did you see her after the first occasion |
| 11:01:47 | 22 | you met her? |
| 11:01:48 | 23 | A.      The same office. |
| 11:01:55 | 24 | Q.      Okay.  So the second time you saw her, what did |
| 11:01:59 | 25 | you discuss with her? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:02:00 | 1 | A.      My paycheck. |
| 11:02:01 | 2 | Q.      What did you discuss about your paycheck? |
| 11:02:04 | 3 | A.      Picking up my paycheck. |
| 11:02:07 | 4 | Q.      And when was that? |
| 11:02:10 | 5 | A.      Probably two weeks after I started. |
| 11:02:18 | 6 | Q.      Did you discuss anything else with her during |
| 11:02:25 | 7 | that time that you visited the Newark office? |
| 11:02:30 | 8 | A.      No. |
| 11:02:39 | 9 | Q.      Was there a third time that you met with her? |
| 11:02:43 | 10 | A.      Picking up my paycheck. |
| 11:02:48 | 11 | Q.      So you met with her a third time where you |
| 11:02:51 | 12 | picked up your paycheck from the Newark office? |
| 11:02:55 | 13 | A.      Yes, ma'am. |
| 11:02:56 | 14 | Q.      And when was that? |
| 11:02:58 | 15 | A.      A week later. |
| 11:03:01 | 16 | Q.      And what did you discuss with her a week later |
| 11:03:04 | 17 | when you picked up your paycheck? |
| 11:03:06 | 18 | A.      That I would be picking up my paychecks inside |
| 11:03:11 | 19 | the office from Tesla from now on. |
| 11:03:11 | 20 |         MS. ANTONUCCI:  Can you read that back. |
| 11:03:11 | 21 |         (Whereupon, the last answer was read back.) |
| 11:03:15 | 22 | BY MS. ANTONUCCI: |
| 11:03:15 | 23 | Q.      And why did you let her know you'd be picking up |
| 11:03:31 | 24 | your paychecks inside the office from Tesla from now on? |
| 11:03:33 | 25 | A.      I didn't let her know that.  She let me know |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:51:43 | 1 | A.      Him not returning to work on time. |
| 01:51:48 | 2 | Q.      Was anybody else present during this argument? |
| 01:51:56 | 3 | A.      Yes. |
| 01:51:57 | 4 | Q.      Who? |
| 01:51:57 | 5 | A.      Staff that was on the floor. |
| 01:52:06 | 6 | Q.      Do you know their names? |
| 01:52:08 | 7 | A.      No. |
| 01:52:10 | 8 | Q.      At some point you were promoted to elevator |
| 01:52:35 | 9 | lead; is that right? |
| 01:52:36 | 10 | A.      Yes. |
| 01:52:37 | 11 | Q.      Do you know when that was? |
| 01:52:40 | 12 | A.      About a month after I started. |
| 01:52:53 | 13 | Q.      And how did your responsibilities change as an |
| 01:53:02 | 14 | elevator lead? |
| 01:53:09 | 15 | A.      Only difference was is now I was supervising |
| 01:53:13 | 16 | three to four guys. |
| 01:53:20 | 17 | Q.      And who were you supervising as an elevator |
| 01:53:23 | 18 | lead? |
| 01:53:25 | 19 | A.      One was Rothaj Foster, Lamar Patterson, and I |
| 01:53:38 | 20 | can't remember the other guys' names. |
| 01:53:41 | 21 | Q.      How many other people were you supervising |
| 01:53:44 | 22 | besides Rothaj Foster and Lamar Patterson? |
| 01:54:02 | 23 | A.      In total or at one time? |
| 01:54:05 | 24 | Q.      In total. |
| 01:54:06 | 25 | A.      It was a high turnover job, so I would say about |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:56:10 | 1 | corporate policy for Tesla? |
| 01:56:12 | 2 | MR. ORGAN:  Objection.  Calls for speculation. |
| 01:56:14 | 3 | THE WITNESS:  I don't know. |
| 01:57:25 | 4 | (EXHIBIT 3 was marked for identification.) |
| 01:57:25 | 5 | BY MS. ANTONUCCI: |
| 01:57:30 | 6 | Q.    Exhibit 3 is a document identified at the top as |
| 01:57:34 | 7 | "CitiStaff Solutions Inc., Assignment |
| 01:57:37 | 8 | Abandonment/Walk-Off" policy, and it's Bates-stamped at |
| 01:57:37 | 9 | the bottom as CitiStaff 39. |
| 01:57:41 | 10 | Do you recognize this document? |
| 01:57:51 | 11 | A.    I recognize my signature, but I don't remember |
| 01:57:54 | 12 | the document. |
| 01:57:55 | 13 | Q.    But that is your signature at the bottom? |
| 01:57:57 | 14 | A.    Yes. |
| 01:57:57 | 15 | Q.    So you signed this on June 2, 2015; correct? |
| 01:58:01 | 16 | A.    Yes. |
| 01:58:01 | 17 | Q.    And did you review it and read it before you |
| 01:58:05 | 18 | signed it? |
| 01:58:07 | 19 | MR. ORGAN:  Objection.  Compound. |
| 01:58:13 | 20 | THE WITNESS:  If I signed it at that time, I |
| 01:58:15 | 21 | reviewed it. |
| 01:58:15 | 22 | BY MS. ANTONUCCI: |
| 01:58:25 | 23 | Q.    Do you remember asking any questions about this |
| 01:58:28 | 24 | policy? |
| 01:58:30 | 25 | A.    No. |

Owen Diaz-Confidential

| | | |
|---|---|---|
| 03:21:00 | 1 | A.      "Get some rest" or either "Get some sleep," and |
| 03:21:08 | 2 | he'll talk to the other guy. |
| 03:21:14 | 3 | Q.      Have you given that e-mail to your attorney? |
| 03:21:18 | 4 | A.      Possibility. |
| 03:21:24 | 5 | Q.      Do you still have that e-mail? |
| 03:21:30 | 6 | A.      Possibility. |
| 03:21:33 | 7 | Q.      And do you know if he ever talked -- if Ed ever |
| 03:21:35 | 8 | talked to the other guy? |
| 03:21:39 | 9 | A.      No, I do not know. |
| 03:21:45 | 10 | Q.      So at this point, was Tom no longer your |
| 03:21:49 | 11 | supervisor? |
| 03:21:50 | 12 | A.      Yes. |
| 03:21:51 | 13 | Q.      And Ed was now your supervisor? |
| 03:21:53 | 14 | A.      Yes. |
| 03:21:53 | 15 | Q.      And did you get along with Ed? |
| 03:21:56 | 16 | A.      I thought so. |
| 03:22:01 | 17 | Q.      Do you have any reason to think that you didn't |
| 03:22:03 | 18 | get along with him? |
| 03:22:05 | 19 | A.      No. |
| 03:22:40 | 20 | Q.      Did you ever talk to Wayne Jackson about the |
| 03:22:43 | 21 | incident with Ramon in the elevator? |
| 03:22:50 | 22 | A.      I can't recall. |
| 03:22:51 | 23 | Q.      Do you know who Wayne Jackson is? |
| 03:22:58 | 24 | A.      Yes. |
| 03:22:59 | 25 | Q.      Who's Wayne Jackson? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:23:05 | 1 | A.        My understanding is that he was a liaison. |
| 03:23:13 | 2 | Q.        Liaison with who? |
| 03:23:16 | 3 | A.        Tesla and nextSource, I believe. |
| 03:23:23 | 4 | Q.        Did you understand that you could complain to |
| 03:23:32 | 5 | Wayne Jackson if you needed to about any concerns you |
| 03:23:35 | 6 | had in the workplace? |
| 03:23:36 | 7 |            MR. ORGAN:  Objection.  Vague and ambiguous. |
| 03:23:40 | 8 |            THE WITNESS:  If he was around. |
| 03:23:40 | 9 | BY MS. ANTONUCCI: |
| 03:23:43 | 10 | Q.        And he was on-site? |
| 03:23:46 | 11 | A.        Rarely. |
| 03:23:50 | 12 | Q.        How often would you say he was on-site? |
| 03:23:58 | 13 | A.        I don't know. |
| 03:24:01 | 14 | Q.        How many times a week? |
| 03:24:03 | 15 | A.        I don't know. |
| 03:24:29 | 16 | Q.        And this incident with Ramon, you know, right |
| 03:24:33 | 17 | outside, inside of the elevator, occurred around |
| 03:24:36 | 18 | October 17, 2015? |
| 03:24:40 | 19 | A.        Yes.  That's what the date is on the -- on the |
| 03:24:44 | 20 | e-mail. |
| 03:24:45 | 21 | Q.        And was that around 4:45 a.m.? |
| 03:24:49 | 22 | A.        Yes. |
| 03:24:51 | 23 | Q.        So you sent this e-mail right after it happened? |
| 03:24:55 | 24 | A.        I sent the e-mail out at 6:08 a.m., ma'am. |
| 03:25:02 | 25 | Q.        So about an hour and a half after it happened? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:42:13 | 1 | Mr. Foster reported -- Mr. Foster reportedly made |
| 03:42:19 | 2 | threats against Mr. Diaz and his car.  As a result, |
| 03:42:21 | 3 | Mr. Romero advised me that he was suspending Mr. Foster |
| 03:42:25 | 4 | and asked for security assistance. |
| 03:42:29 | 5 | I followed him to Mr. Foster's work area, stood |
| 03:42:30 | 6 | by while he was informed, and his badge was taken by |
| 03:42:34 | 7 | Mr. Romero.  We then escorted Mr. Foster out of the |
| 03:42:38 | 8 | building at the second Number 2 door, and I followed him |
| 03:42:41 | 9 | until he got into his vehicle, which was parked in a |
| 03:42:45 | 10 | handicapped space in front of Door 1.  I had a vehicle |
| 03:42:48 | 11 | patrol officer, Brian Deltoro, follow him as he drove |
| 03:42:53 | 12 | off the property. |
| 03:42:54 | 13 | Mr. Foster's badge was turned in to the control |
| 03:42:57 | 14 | center, and I was informed -- and I informed Mr. Romero |
| 03:43:01 | 15 | Mr. Foster left the property. |
| 03:43:03 | 16 | Nothing further to report." |
| 03:43:05 | 17 | Q.      Okay.  So is that correct that you got into a |
| 03:43:09 | 18 | verbal dispute with Mr. Foster on or about 11/5/2015? |
| 03:43:15 | 19 | A.      Yes. |
| 03:43:17 | 20 | Q.      And what was said during that verbal dispute? |
| 03:43:23 | 21 | A.      He said he was going to shoot me. |
| 03:43:25 | 22 | Q.      And what did you say? |
| 03:43:27 | 23 | A.      I contacted Mr. Romero. |
| 03:43:33 | 24 | Q.      Did you say anything to Mr. Foster? |
| 03:43:37 | 25 | A.      No.  I tried to get away from him as fast as |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:43:41 | 1 | possible. |
| 03:43:41 | 2 | Q.      Did you feel threatened by Mr. Foster? |
| 03:43:44 | 3 | A.      Yes. |
| 03:43:49 | 4 | Q.      It says here that "Mr. Foster reportedly made |
| 03:43:53 | 5 | threats against Mr. Diaz and his car." |
| 03:43:56 | 6 | What did Mr. Foster say about your car? |
| 03:43:59 | 7 | A.      That he -- I believe he was going to vandalize |
| 03:44:07 | 8 | it and wait for me to come outside so he could do |
| 03:44:10 | 9 | further harm to myself or try to do harm to myself. |
| 03:44:14 | 10 | Q.      Why did he threaten to vandalize your car and |
| 03:44:19 | 11 | shoot you? |
| 03:44:20 | 12 | MR. ORGAN:  Objection.  Calls for speculation. |
| 03:44:22 | 13 | THE WITNESS:  I believe that it was from me |
| 03:44:32 | 14 | reporting to Ed Romero that he wasn't coming back, and |
| 03:44:40 | 15 | Ed Romero asked him why he wasn't coming back from his |
| 03:44:45 | 16 | breaks on time. |
| 03:44:45 | 17 | BY MS. ANTONUCCI: |
| 03:44:57 | 18 | Q.      And does this refresh your memory that it was |
| 03:44:59 | 19 | the 11/5 warning -- 11/5/2015 warning that you gave to |
| 03:45:05 | 20 | Mr. Foster that prompted him to threaten to shoot you? |
| 03:45:32 | 21 | A.      Yes.  Seemed like it was on the same day, ma'am. |
| 03:45:36 | 22 | Q.      And Mr. Romero immediately suspended Mr. Foster |
| 03:45:40 | 23 | after you brought this to his attention; right? |
| 03:45:43 | 24 | A.      Yes. |
| 03:45:44 | 25 | Q.      And he was escorted from the building by |

```
03:49:25  1    remember their names.

03:49:26  2    Q.      Had Robert by this point called you the N-word?

03:49:30  3    A.      Yes.

03:49:39  4    Q.      And Lamar Patterson is African-American;

03:49:42  5    correct?

03:49:42  6    A.      Yes.

03:50:01  7            (EXHIBIT 14 was marked for identification.)

03:50:01  8    BY MS. ANTONUCCI:

03:50:19  9    Q.      Exhibit 14 is an e-mail from you to Ed Romero

03:50:30  10   where -- Bates-stamped Tesla 5 to Tesla 8.

03:50:39  11           Do you see that?

03:50:39  12   A.      Yes.

03:50:42  13   Q.      Did you send this e-mail?

03:50:45  14   A.      Yes.

03:50:45  15   Q.      The e-mail is dated January 22, 2016.  Did you

03:50:51  16   send it on that date?

03:50:53  17   A.      Yes.

03:51:00  18   Q.      Did anybody help you write this?

03:51:03  19   A.      No.

03:51:03  20   Q.      Had you had -- had you consulted an attorney

03:51:08  21   prior to writing this?

03:51:10  22   A.      No.

03:51:13  23   Q.      Did you take the photographs on Tesla 6 and 7 of

03:51:20  24   this document, Exhibit 14?

03:51:22  25   A.      Yes.
```

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:58:33 | 1 | Q.      When you saw this cartoon, you took a picture of |
| 03:58:37 | 2 | it; correct? |
| 03:58:37 | 3 | A.      Yes. |
| 03:58:38 | 4 | Q.      Do you know that pictures are not permitted in |
| 03:58:42 | 5 | the factory? |
| 03:58:46 | 6 | A.      Possibility. |
| 03:58:48 | 7 | Q.      "Yes," you know that? |
| 03:58:53 | 8 | A.      I believe it was certain parts of the floor, but |
| 03:59:01 | 9 | yes. |
| 03:59:01 | 10 | Q.      Was it this part of the floor? |
| 03:59:04 | 11 | A.      I don't know. |
| 03:59:07 | 12 | Q.      Okay.  With Mr. Romero -- at the time that you |
| 03:59:16 | 13 | took a photograph of this cartoon, Mr. Romero was your |
| 03:59:23 | 14 | supervisor; right? |
| 03:59:24 | 15 | MR. ORGAN:  Objection.  Argumentative. |
| 03:59:26 | 16 | THE WITNESS:  Yes. |
| 03:59:26 | 17 | BY MS. ANTONUCCI: |
| 03:59:29 | 18 | Q.      So why did you call Michael?  And by "Michael," |
| 03:59:38 | 19 | you mean Michael Wheeler; correct? |
| 03:59:38 | 20 | A.      Yes. |
| 03:59:38 | 21 | Q.      So why did you call Michael and not Ed? |
| 03:59:44 | 22 | A.      Chain of command. |
| 03:59:46 | 23 | Q.      What does that mean? |
| 03:59:48 | 24 | A.      Because the recycling came from a different |
| 03:59:54 | 25 | area. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:59:56 | 1 | Q.      So did Ramon report to Michael Wheeler? |
| 04:00:00 | 2 | A.      I don't know. |
| 04:00:03 | 3 | Q.      Did Michael Wheeler work within recycling? |
| 04:00:08 | 4 | A.      Yes. |
| 04:00:09 | 5 | Q.      So he worked with Ramon in recycling? |
| 04:00:13 | 6 | A.      Possibility. |
| 04:00:15 | 7 | Q.      So by contacting Michael Wheeler, did you mean |
| 04:00:31 | 8 | to report it to the recycling group? |
| 04:00:35 | 9 | A.      Yes. |
| 04:00:39 | 10 | Q.      And when Michael arrived, did you speak with him |
| 04:00:54 | 11 | about the cartoon? |
| 04:00:55 | 12 | A.      Briefly. |
| 04:00:56 | 13 | Q.      What did you say? |
| 04:00:58 | 14 | A.      Someone from -- from the recycling team that he |
| 04:01:03 | 15 | was with had sent this cardboard bale with this racist |
| 04:01:10 | 16 | effigy over to the elevator. |
| 04:01:13 | 17 | Q.      Michael said that? |
| 04:01:14 | 18 | A.      No.  You asked me what did I say to Michael. |
| 04:01:19 | 19 | Q.      Okay.  What did Michael say? |
| 04:01:21 | 20 | A.      He wanted to see it. |
| 04:01:22 | 21 | Q.      And so he came down with you to look at it? |
| 04:01:26 | 22 | A.      No. |
| 04:01:27 | 23 | Q.      Okay.  How did he get down to the cardboard |
| 04:01:31 | 24 | bale? |
| 04:01:31 | 25 | A.      He went up with me. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:01:33 | 1 | Q.       He went up with you.   Okay.   And when you went |
| 04:01:37 | 2 | upstairs, did -- was Israel with you as well? |
| 04:01:41 | 3 | A.       He came with Michael. |
| 04:01:43 | 4 | Q.       Is Michael African-American? |
| 04:01:45 | 5 | A.       Yes. |
| 04:01:45 | 6 | Q.       Is Israel African-American? |
| 04:01:47 | 7 | A.       No. |
| 04:01:49 | 8 | Q.       What nationality is Israel? |
| 04:01:53 | 9 | A.       I don't know. |
| 04:01:54 | 10 | Q.       What race? |
| 04:01:56 | 11 | A.       I don't know. |
| 04:01:58 | 12 | Q.       Did you -- did Israel say anything when he saw |
| 04:02:03 | 13 | the cartoon? |
| 04:02:05 | 14 | A.       No. |
| 04:02:05 | 15 | Q.       Did Michael say anything when he saw the |
| 04:02:08 | 16 | cartoon? |
| 04:02:09 | 17 | A.       Yes. |
| 04:02:10 | 18 | Q.       What did Michael say? |
| 04:02:12 | 19 | A.       "Who could have did this?" |
| 04:02:15 | 20 | Q.       And both Michael and Israel took pictures of the |
| 04:02:21 | 21 | cartoon? |
| 04:02:23 | 22 | A.       Yes. |
| 04:02:24 | 23 | Q.       Did Michael say anything else? |
| 04:02:28 | 24 | A.       I had to stop to talk to the elevator staff and |
| 04:02:31 | 25 | him, and Israel went over to the upstairs recycling |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:02:36 | 1 | room. |
| 04:02:37 | 2 | Q. You talked to the elevator staff? |
| 04:02:40 | 3 | A. Yes. |
| 04:02:40 | 4 | Q. Who did you talk to? |
| 04:02:42 | 5 | A. Lamar Patterson. |
| 04:02:48 | 6 | Q. Did Lamar Patterson see this picture? |
| 04:02:51 | 7 | A. Yes. |
| 04:02:52 | 8 | Q. Did you show it to him? |
| 04:02:53 | 9 | A. No. |
| 04:02:55 | 10 | Q. How did he see it? |
| 04:03:00 | 11 | A. He was pulling a pallet rider up under the |
| 04:03:08 | 12 | pallet. |
| 04:03:10 | 13 | Q. Did you witness anyone else viewing this |
| 04:03:13 | 14 | cartoon? |
| 04:03:15 | 15 | A. Yes. |
| 04:03:16 | 16 | Q. Who else did you see viewing the cartoon? |
| 04:03:21 | 17 | A. Other Tesla employees. |
| 04:03:23 | 18 | Q. Which ones? |
| 04:03:28 | 19 | A. I don't know their names. |
| 04:03:30 | 20 | Q. It says here, "Ramon Martinez said he had drew |
| 04:04:19 | 21 | the picture and he was just playing." |
| 04:04:21 | 22 | Do you see that? |
| 04:04:22 | 23 | A. Yes. |
| 04:04:22 | 24 | Q. How do you know that Ramon Martinez said that? |
| 04:04:26 | 25 | A. He said it. He said it verbally. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:04:30 | 1 | Q.    Did you hear him say that? |
| 04:04:31 | 2 | A.    Yes.  But that's not what he said. |
| 04:04:36 | 3 | Q.    He didn't say he drew the picture? |
| 04:04:38 | 4 | A.    He said he drew the picture. |
| 04:04:41 | 5 | Q.    Did -- he didn't say he was just playing? |
| 04:04:44 | 6 | A.    It was actually -- I said he was playing, but |
| 04:04:52 | 7 | actually it was, "You people can't take a joke." |
| 04:04:57 | 8 | Q.    And he said that to you? |
| 04:04:59 | 9 | A.    Yes. |
| 04:05:00 | 10 | Q.    And where were you when he said that? |
| 04:05:03 | 11 | A.    Standing where the -- standing in front of the |
| 04:05:08 | 12 | elevator. |
| 04:05:14 | 13 | Q.    And did anybody witness him say, "You people |
| 04:05:17 | 14 | can't take the joke"? |
| 04:05:18 | 15 | A.    Israel and Michael Wheeler. |
| 04:05:22 | 16 | Q.    How did Ramon Martinez get to -- up to where the |
| 04:05:28 | 17 | cardboard bale was with the cartoon? |
| 04:05:33 | 18 | A.    I don't know. |
| 04:05:34 | 19 | Q.    Was he just passing by, or did someone call him |
| 04:05:39 | 20 | there? |
| 04:05:41 | 21 | A.    You mean, how did he get back to it the second |
| 04:05:46 | 22 | time, or... |
| 04:05:46 | 23 | Q.    Yeah.  After you saw the picture, you walked up |
| 04:05:50 | 24 | there with Michael and Israel; right? |
| 04:05:54 | 25 | A.    Uh-huh. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:05:54 | 1 | Q.        Then Ramon Martinez comes -- right? -- at some |
| 04:05:58 | 2 | point? |
| 04:05:58 | 3 | A.        Michel and Israel went over to the recycling |
| 04:06:02 | 4 | center that's upstairs, and they came back with Ramon |
| 04:06:05 | 5 | Martinez. |
| 04:06:05 | 6 | Q.        Okay.  Did they tell you what they talked about |
| 04:06:08 | 7 | up in the recycling center when they went to get Ramon? |
| 04:06:12 | 8 | A.        No. |
| 04:06:14 | 9 | Q.        And they came back with Ramon, and you were |
| 04:06:18 | 10 | still waiting at cardboard bale? |
| 04:06:21 | 11 | A.        Yes. |
| 04:06:21 | 12 | Q.        Why were you waiting there?  Did they tell you |
| 04:06:24 | 13 | to wait there? |
| 04:06:25 | 14 | A.        No. |
| 04:06:25 | 15 | Q.        Why were you waiting there? |
| 04:06:26 | 16 | A.        I was dealing with the elevator crew. |
| 04:06:30 | 17 | Q.        Okay.  Besides Lamar Patterson, did anybody else |
| 04:06:38 | 18 | in the elevator crew see the cartoon? |
| 04:06:41 | 19 | A.        I don't know. |
| 04:06:50 | 20 | Q.        Okay.  So when they brought Ramon down, did he |
| 04:06:55 | 21 | admit that he was the one that drew the picture? |
| 04:06:57 | 22 | A.        Yes. |
| 04:07:00 | 23 | Q.        Did he apologize? |
| 04:07:02 | 24 | A.        No. |
| 04:07:06 | 25 | Q.        Did he say anything other than, "You people |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:10:35 | 1 | Q.    Do you know if Mr. -- if Mr. Martinez was |
| 04:10:39 | 2 | investigated in response to your e-mail? |
| 04:10:42 | 3 | A.    No. |
| 04:10:43 | 4 | Q.    Do you know if Mr. Martinez was written up in |
| 04:10:47 | 5 | response to your e-mail? |
| 04:10:48 | 6 | A.    No. |
| 04:10:49 | 7 | Q.    Do you know if Mr. Martinez was suspended in |
| 04:10:55 | 8 | response to your e-mail? |
| 04:10:56 | 9 | A.    No. |
| 04:11:02 | 10 | Q.    So no one ever communicated to you what happened |
| 04:11:06 | 11 | to Mr. Martinez in response to this e-mail? |
| 04:11:09 | 12 | A.    You're correct. |
| 04:11:51 | 13 |        (EXHIBIT 15 was marked for identification.) |
| 04:11:51 | 14 | BY MS. ANTONUCCI: |
| 04:11:56 | 15 | Q.    Exhibit 15 is a series of e-mails Bates-stamped |
| 04:12:06 | 16 | at the bottom CitiStaff 50 to -- through 55. |
| 04:12:16 | 17 |        I'd like to turn your attention to exhibit -- to |
| 04:12:23 | 18 | the one marked at -- the e-mail dated January 22, 2016, |
| 04:12:30 | 19 | time 5:50 p.m., Bates-stamped at the bottom 52. |
| 04:12:43 | 20 |        So this is your e-mail to Ed Romero dated |
| 04:12:46 | 21 | January 22, 2016, at 8:42 a.m. |
| 04:12:51 | 22 |        Do you see that? |
| 04:12:51 | 23 | A.    Yes. |
| 04:12:52 | 24 | Q.    Okay.  And the incident you say "occurred at |
| 04:12:58 | 25 | 9:10 p.m. in elevator 1." |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:13:01 | 1 | Do you see that? |
| 04:13:01 | 2 | A.    Yes. |
| 04:13:02 | 3 | Q.    On the previous evening? |
| 04:13:06 | 4 | A.    Yes. |
| 04:13:06 | 5 | Q.    Why did you wait until the next morning to |
| 04:13:09 | 6 | report it to Mr. Romero? |
| 04:13:15 | 7 | A.    The production floor was busy, and I had to |
| 04:13:19 | 8 | write the e-mail in pieces. |
| 04:13:21 | 9 | Q.    Did you say you had to write the e-mail in |
| 04:13:23 | 10 | pieces? |
| 04:13:24 | 11 | A.    Yes. |
| 04:13:24 | 12 | Q.    Where did you write the e-mail? |
| 04:13:26 | 13 | A.    My iPhone. |
| 04:13:28 | 14 | Q.    But where were you geographically when you wrote |
| 04:13:32 | 15 | it? |
| 04:13:32 | 16 | A.    At the warehouse. |
| 04:13:34 | 17 | Q.    So you were still at the warehouse at 8:42 a.m.? |
| 04:13:39 | 18 | A.    Yes. |
| 04:13:45 | 19 | Q.    I thought you said your shift ended at |
| 04:13:49 | 20 | 6:00 a.m.? |
| 04:13:49 | 21 | A.    It does. |
| 04:13:50 | 22 | Q.    So why were you still at the warehouse at |
| 04:13:53 | 23 | 8:42 a.m.? |
| 04:13:56 | 24 | A.    I don't know. |
| 04:13:59 | 25 | Q.    Do you remember where in the warehouse you wrote |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:14:02 | 1 | this e-mail? |
| 04:14:05 | 2 | A.       Not exactly.  No. |
| 04:14:10 | 3 | Q.       Where you in the cafe? |
| 04:14:17 | 4 | A.       I don't recall. |
| 04:14:22 | 5 | Q.       Were you in your car? |
| 04:14:25 | 6 | A.       No. |
| 04:14:26 | 7 | Q.       Were you outside? |
| 04:14:28 | 8 | A.       No. |
| 04:14:30 | 9 | Q.       You were inside the factory? |
| 04:14:31 | 10 | A.       Yes. |
| 04:14:33 | 11 | Q.       Okay.  And here Bates-stamped at the bottom 52, |
| 04:14:37 | 12 | you forwarded this e-mail to CitiStaff. |
| 04:14:40 | 13 |          Do you see that? |
| 04:14:40 | 14 | A.       Yes. |
| 04:14:44 | 15 | Q.       Why did you forward it to CitiStaff? |
| 04:14:50 | 16 | A.       Because I didn't want the situation to be |
| 04:14:57 | 17 | covered up. |
| 04:14:59 | 18 | Q.       And did you forward it to anybody in particular |
| 04:15:08 | 19 | at CitiStaff? |
| 04:15:11 | 20 | A.       I don't remember. |
| 04:15:19 | 21 | Q.       How did you get this CitiStaff e-mail address? |
| 04:15:25 | 22 | A.       I don't remember. |
| 04:15:29 | 23 | Q.       And you forwarded it to CitiStaff on Friday, |
| 04:15:37 | 24 | January 22nd at 5:50 p.m. |
| 04:15:40 | 25 |          Do you see that? |

Owen Diaz-Confidential

| | | |
|---|---|---|
| 04:15:40 | 1 | A.      Yes. |
| 04:15:41 | 2 | Q.      And why did you wait a whole day to forward it |
| 04:15:43 | 3 | to CitiStaff? |
| 04:15:46 | 4 | A.      I don't know. |

04:15:51  5   Q.      Do you know what actions CitiStaff took in

04:15:54  6   response to this complaint?

04:15:56  7   A.      No.

04:15:58  8   Q.      Did anybody form CitiStaff ever communicate to

04:16:01  9   you what actions were taken in response to this e-mail?

04:16:05  10  A.      I don't recall.

04:17:13  11          (EXHIBIT 16 was marked for identification.)

04:17:13  12  BY MS. ANTONUCCI:

04:17:35  13  Q.      So Exhibit 16 is a series of e-mails

04:17:39  14  Bates-stamped at the bottom 80 through 84.

04:17:43  15          Do you see that?

04:17:43  16  A.      Yes.

04:17:58  17  Q.      And they're dated January 22, 2016.

04:18:01  18          Do you see that?

04:18:01  19  A.      Yes.

04:18:05  20  Q.      In the middle of the page Bates-stamped Tesla

04:18:11  21  80, it says, "Wayne, as we discussed in person, this is

04:18:16  22  very disappointing coming from one of our team

04:18:20  23  supervisors.  I agree with the recommendation to suspend

04:18:24  24  and issue a permanent written warning."

04:18:26  25          Do you see that?

| | | |
|---|---|---|
| 04:24:23 | 1 | Q.     Did anybody ever communicate to you that |
| 04:24:26 | 2 | Chartwell took any action in response to this drawing? |
| 04:24:30 | 3 | A.     No. |
| 04:25:16 | 4 | MS. ANTONUCCI:  We can take a break so he can |
| 04:25:18 | 5 | change the tape. |
| 04:25:20 | 6 | THE VIDEOGRAPHER:   We're going off the record |
| 04:25:21 | 7 | at 4:24 p.m.  This is the end of Media Number 3. |
| 04:25:21 | 8 | (Off the record:  4:25 p.m. to 4:37 p.m.) |
| 04:37:58 | 9 | THE VIDEOGRAPHER:   We are back on the record at |
| 04:38:03 | 10 | 4:37 p.m.  This is beginning of Media Number 4.  Please |
| 04:38:07 | 11 | continue. |
| 04:38:33 | 12 | (EXHIBIT 19 was marked for identification.) |
| 04:38:33 | 13 | BY MS. ANTONUCCI: |
| 04:38:38 | 14 | Q.     Exhibit 19 are e-mails of various dates |
| 04:38:45 | 15 | Bates-stamped at the bottom CitiStaff 6 to 7.  Turning |
| 04:38:50 | 16 | your attention to page 6, it states -- it's an e-mail |
| 04:38:58 | 17 | from Vanessa Parks at nextSource to Monica DeLeon at |
| 04:39:04 | 18 | CitiStaff Solutions, cc to Tesla and Ed Romero. |
| 04:39:13 | 19 | "Subject:  Pay Rate Increase."  And it says, "Hi Monica, |
| 04:39:16 | 20 | please process a pay rate increase to the following |
| 04:39:23 | 21 | contractors:  Owen Diaz, effective 1/25/16; new pay rate |
| 04:39:27 | 22 | $18 an hour." |
| 04:39:28 | 23 | So is it correct that you received a pay |
| 04:39:32 | 24 | increase of up to $18 an hour on January 28, 2016? |
| 04:39:32 | 25 | A.     Yes. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:39:45 | 1 | Q.      And that was three days after you made your |
| 04:39:52 | 2 | complaint; is that correct? |
| 04:40:10 | 3 | A.      It appears that way. |
| 04:40:14 | 4 | Q.      Do you know Joyce Dela Grande? |
| 04:40:31 | 5 | A.      Not that I can recall. |
| 04:40:35 | 6 | Q.      Did she ever engage in any discriminating or |
| 04:40:42 | 7 | harassing conduct towards you? |
| 04:40:44 | 8 | A.      Possible. |
| 04:40:46 | 9 | Q.      Why do you say it's possible? |
| 04:40:49 | 10 | A.      Until I can see the picture or anything, I |
| 04:40:53 | 11 | wouldn't know who Joyce was. |
| 04:40:57 | 12 | Q.      Do you know Hugo Gulagos? |
| 04:41:01 | 13 | A.      No. |
| 04:41:10 | 14 | Q.      Do you know Robert Hertado? |
| 04:41:14 | 15 | A.      I know a Robert, but I don't know if it's the |
| 04:41:18 | 16 | same person's last name or not.  I don't know if it's |
| 04:41:19 | 17 | his last name. |
| 04:41:19 | 18 | Q.      So you're not sure whether the Robert that you |
| 04:41:22 | 19 | referenced earlier today is named Robert Hertado? |
| 04:41:26 | 20 | A.      Yes. |
| 04:41:27 | 21 | Q.      You don't know? |
| 04:41:28 | 22 | A.      I don't know. |
| 04:41:29 | 23 | Q.      Have you ever called Robert a snake? |
| 04:41:46 | 24 | A.      I don't recall. |
| 04:41:53 | 25 | Q.      Did Robert ever complain to his boss about you |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBITS TO DEPOSITION OF OWEN DIAZ, Vol. I

REDACTED – CONDITIONALLY FILED UNDER SEAL

Case No. 3:17-cv-06748-WHO

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

1        I, CANDY NEWLAND, CSR No. 14256, certify that the

2   foregoing proceedings were taken before me at the time

3   and place herein set forth, at which time the witness

4   was duly sworn, and that the transcript is a true record

5   of the testimony so given.

6

7   Witness review, correction, and signature was

8   (X) by Code.                    (X) requested.

9   ( ) waived.                     ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13       The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificate null and void.

16       I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties nor of any of

19  the parties.

20       Dated this 29TH day of May, 2018.

21

22

23

24       _____

25       CANDY NEWLAND, CSR 14256

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

# EXHIBIT E

19
20
21
22
23
24
25
26
27
28

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4    --------------------------------

**REPORTER CERTIFIED
TRANSCRIPT**

5    DEMETRIC DI-AZ, OWEN DIAZ and
     LAMAR PATTERSON, an individual,

6

7            Plaintiffs,                        **CONFIDENTIAL**

8        vs.                      No. 3:17-cv-06748-WHO
                                  VOL II, pgs 187 - 292

9

     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CITISTAFF SOLUTIONS,
     INC.; WEST VALLEY STAFFING
11   GROUP; CHARTWELL STAFFING
     SERVICES, INC. and DOES 1-10,
12   inclusive,

13           Defendants.

14   --------------------------------

15

16            CONFIDENTIAL

17       VIDEOTAPED DEPOSITION OF

18            OWEN DIAZ

19       SAN FRANCISCO, CALIFORNIA

20        MONDAY, DECEMBER 3, 2018

21

22

23   Reported by:

24   GINA V. CARBONE, CSR #8249
     RPR, RMR, CRR, CCRR
25   FILE NO.:  18-27207

**CHASE**
LITIGATION SERVICES

10:30:31  1          MR. HORTON:  Fenn Horton on behalf of West

10:30:34  2   Valley Staffing Group; and my client Teresa

10:30:35  3   Kossayian is here as well from West Valley Staffing

10:30:39  4   Group.

10:30:41  5          MS. ANTONUCCI:  Could you please state your

10:30:42  6   name for the record.

10:30:43  7          THE WITNESS:  My name is Owen Diaz.

10:30:46  8          THE VIDEOGRAPHER:  Did you want to re-swear

10:30:47  9   him?

10:30:48 10          MS. ANTONUCCI:  Yes.  Would you please

10:30:59 11   re-swear the witness.

10:31:00 12

10:31:00 13                    OWEN DIAZ,

10:31:00 14   having first declared under penalty of perjury to

10:31:00 15   tell the truth, was examined and testified as

10:31:00 16   follows:

10:31:00 17

10:31:00 18              EXAMINATION BY MS. ANTONUCCI

10:31:02 19   BY MS. ANTONUCCI:

10:31:02 20      Q.  Mr. Diaz, do you remember at your last

10:31:04 21   deposition we went through some ground rules about

10:31:06 22   how to testify and what your deposition is going to

10:31:10 23   entail?

10:31:11 24      A.  Yes.  I remember.

10:31:13 25      Q.  Okay.

| | | |
|---|---|---|
| 11:35:08 | 1 | he stopped making those remarks to you? |
| 11:35:11 | 2 | MR. ORGAN:  Objection.  Compound. |
| 11:35:17 | 3 | THE WITNESS:  I don't recall. |
| 11:35:18 | 4 | BY MS. ANTONUCCI: |
| 11:35:19 | 5 | Q.  Did you ever tell Tom Kawasaki that you |
| 11:35:23 | 6 | felt like you could still work with Judy if he |
| 11:35:28 | 7 | stopped making those remarks? |
| 11:35:44 | 8 | A.  We never worked together in the beginning, |
| 11:35:45 | 9 | so I don't recall. |
| 11:35:51 | 10 | Q.  Did Judy stop bothering you after you |
| 11:35:54 | 11 | reported the conduct to Tom Kawasaki about the |
| 11:35:59 | 12 | comments he had made to you? |
| 11:36:04 | 13 | A.  I didn't see him after that. |
| 11:36:06 | 14 | Q.  So is that a yes? |
| 11:36:10 | 15 | A.  Yes. |
| 11:36:20 | 16 | MS. ANTONUCCI:  Let's take a short break. |
| 11:36:22 | 17 | THE VIDEOGRAPHER:  We're going off the |
| 11:36:22 | 18 | record.  The time is 11:36 a.m. |
| 11:36:26 | 19 | (Recess taken.) |
| 11:48:37 | 20 | (Whereupon, Exhibit 29 was marked for |
| 11:48:37 | 21 | identification.) |
| 11:49:27 | 22 | THE VIDEOGRAPHER:  We're back on the |
| 11:49:28 | 23 | record.  Time is 11:49 a.m.  This marks the |
| 11:49:30 | 24 | beginning of disc No. 2. |
| 11:49:32 | 25 | // |

12:23:20  1          (Whereupon, Exhibit 32 was marked for

12:23:20  2          identification.)

12:23:42  3   BY MS. ANTONUCCI:

12:23:43  4      Q.   Exhibit 32 appears to be a version of your

12:23:45  5   resumé Bates stamped at the bottom ODIAZ181 to 184.

12:23:54  6          Do you know when you prepared this version

12:23:56  7   of your resumé?

12:24:07  8      A.   I don't recall when it was prepared.

12:24:09  9      Q.   You see there on the top of page -- or in

12:24:14 10   the middle of page 182 at the bottom it describes

12:24:17 11   your work at CitiStaff/Tesla.  Do you see that?

12:24:42 12          MR. ORGAN:  At the bottom?

12:24:43 13          MS. ANTONUCCI:  No.  In the middle I said.

12:24:45 14          MR. ORGAN:  Oh, sorry.

12:24:46 15   BY MS. ANTONUCCI:

12:24:46 16      Q.   You see where it says "Shift Leader,"

12:24:49 17   CitiStaff/Tesla Motors?

12:24:52 18      A.   Uh-huh.

12:24:52 19      Q.   Okay.  So you must have prepared this

12:24:56 20   document at some point after you worked at the Tesla

12:25:00 21   factory, correct?

12:25:11 22      A.   I don't recall.

12:25:12 23      Q.   You don't recall when you prepared this

12:25:14 24   document?

12:25:15 25      A.   I don't recall when this was prepared.

12:25:16  1        Q.   Can you read that section that says "Shift

12:25:18  2   Leader" there on the page Bates stamped 182.

12:25:29  3             Tell me if that accurately reflects your

12:25:32  4   job duties --

12:25:33  5        A.   "Shift Leader."

12:25:35  6        Q.   You don't need to read it out loud, but

12:25:37  7   just the part, the portion where it says --

12:25:38  8        A.   "Responsibilities"?

12:25:38  9        Q.   Yes, correct.

12:25:39  10            Does that accurately reflect your

12:25:40  11  responsibilities while you worked for CitiStaff at

12:25:42  12  the Tesla factory?

12:25:47  13            MR. ORGAN:   Objection.   Compound.

12:25:53  14            THE WITNESS:   Pretty much what I was doing.

12:25:55  15  BY MS. ANTONUCCI:

12:25:57  16       Q.   Do you know if this is the resumé you

12:25:59  17  submitted to AC Transit?

12:26:06  18       A.   I don't know.

12:26:06  19       Q.   You did prepare this resumé, though,

12:26:14  20  correct?

12:26:14  21       A.   I don't know.   Could have been my wife.

12:26:34  22       Q.   It says here, in describing your work at

12:26:40  23  CitiStaff -- for CitiStaff at the Tesla factory,

12:26:43  24  that you were a shift leader.   Is that an accurate

12:26:48  25  description of your position?

**Owen Diaz, Vol. II-Confidential**

| | | |
|---|---|---|
| 12:29:35 | 1 | MR. ORGAN:  Objection.  Calls for a legal |
| 12:29:36 | 2 | conclusion. |
| 12:29:38 | 3 | THE WITNESS:  No.  I do not own any Tesla |
| 12:29:42 | 4 | products. |
| 12:29:45 | 5 | BY MS. ANTONUCCI: |
| 12:29:45 | 6 | Q.  Okay.  I'd like to turn your attention to |
| 12:29:48 | 7 | Exhibit 32 (verbatim).  It's a sexual harassment |
| 12:29:59 | 8 | policy of CitiStaff Solutions. |
| 12:30:00 | 9 | Is that your name and signature at the |
| 12:30:03 | 10 | bottom there? |
| 12:30:06 | 11 | A.  Yes. |
| 12:30:08 | 12 | Q.  The first page, my apologies. |
| 12:30:11 | 13 | The second page is an acknowledgment of |
| 12:30:17 | 14 | policies, Bates stamped CITISTAFF 45 at the bottom. |
| 12:30:22 | 15 | Is that your name and signature at the bottom? |
| 12:30:25 | 16 | A.  Give me one second.  The other page was |
| 12:30:29 | 17 | upside down.  One second, please. |
| 12:30:44 | 18 | Yeah, they were my initials and signature. |
| 12:30:47 | 19 | Q.  So is it accurate that you received |
| 12:30:49 | 20 | Exhibit 32 at some point prior to or during your |
| 12:30:56 | 21 | employment with CitiStaff? |
| 12:31:01 | 22 | THE REPORTER:  I believe it's 33. |
| 12:31:02 | 23 | MR. ORGAN:  This is 33. |
| 12:31:04 | 24 | BY MS. ANTONUCCI: |
| 12:31:04 | 25 | Q.  I'm sorry, Exhibit 33. |

12:31:05   1         A.   Yes.

12:31:14   2         Q.   Okay.

12:31:15   3              Turning our attention to Exhibit 34, pa- --

12:31:35   4    is a document, a series of emails Bates stamped at

12:31:38   5    the bottom 50 -- CITISTAFF 50 through 55.

12:31:44   6              Do you see that?

12:31:48   7         A.   I have the document that you just handed to

12:31:50   8    me.

12:31:52   9         Q.   So is Exhibit -- in the middle of

12:31:54   10   Exhibit 34, the email that begins on CitiStaff Bates

12:31:59   11   stamped No. 52, do you see that?  Right there.  That

12:32:13   12   page right there.

12:32:14   13        A.   I see this here.

12:32:16   14        Q.   You sent that email, correct?

12:32:20   15        A.   It's -- the paper says it's from my email

12:32:22   16   address.

12:32:22   17        Q.   Okay.  So did you send this email?

12:32:25   18        A.   Yes, it would appear so.

12:32:26   19        Q.   Okay.  Exhibit 35 here is a series of

12:32:54   20   emails Bates stamped at the bottom CITISTAFF 14

12:32:57   21   through 18.

12:32:59   22              Just turning your attention to the email

12:33:03   23   that begins in the middle of the first page there,

12:33:10   24   says from Owen Diaz dated Saturday, January 23rd,

12:33:17   25   2016 at 4:47 a.m., subject "Forward:  Ramon."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

EXHIBITS TO DEPOSITION OF OWEN DIAZ, Vol. II

20

21

REDACTED – CONDITIONALLY FILED UNDER SEAL

22

23

24

25

26

27

28

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

1    I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2   CCRR, certify: that the foregoing proceedings were taken

3   before me at the time and place herein set forth; at

4   which time the witness was duly sworn; and that the

5   transcript is a true record of the testimony so given.

6

7        Witness review, correction and signature was

8   (X) by code.              (X) requested.

9   .( ) waived.              ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13       The dismantling or unbinding of the original

14  transcript will render the reporter's certificate null

15  and void.

16       I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any of

19  the parties.

20       Dated this 7th   day of December  , 2018  .

21

22                    _____

23                    GINA V. CARBONE
                       CSR #8249, STATE OF CALIFORNIA

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19   EXHIBIT G
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


DEMETRIC DI-AZ, OWEN          )
DIAZ, and LAMAR              )
PATTERSON,                    )
            Plaintiffs,      )
vs.                          ) Case No.:  3:17-CV-066748
                             )                WHO
                             )
TESLA, INC., dba TESLA        )
MOTORS, INC.; CITISTAFF       )
SOLUTIONS, INC.; WEST         )
VALLEY STAFFING GROUP;        )
CHARTWELL STAFFING            )
SERVICES, INC.; and DOES      )
1-10, inclusive,              )
            Defendants.       )
_____)


DEPOSITION OF MONICA DE LEON

Thursday, December 6, 2018


TAKEN BEFORE:

HEIDI BELTON, CSR, RPR, CRR, CCRR, CRC

CSR No. 12885

MONICA DE LEON
December 6, 2018

Page 8

|  |  |  |
|---|---|---|
| | 1 | THURSDAY, DECEMBER 6, 2018                    10:05 A.M. |
| | 2 |                    P R O C E E D I N G S |
| 10:04:09 | 3 |          MS. AVLONI:  Today is Thursday, |
| 10:04:11 | 4 | December 6, 2018.  This is the deposition of Monica |
| 10:04:14 | 5 | De Leon by plaintiffs in the matter of Di-az versus |
| 10:04:18 | 6 | Tesla, et al., in the United States District Court, |
| 10:04:20 | 7 | for the Northern District of California.  Case |
| 10:04:23 | 8 | number 3:17-CV-066748-WHO. |
| 10:04:31 | 9 |          My name is Navruz Avloni, and I'm |
| 10:04:34 | 10 | videotaping this deposition on behalf of the |
| 10:04:37 | 11 | plaintiffs.  The deposition is taking place at the |
| 10:04:41 | 12 | California Civil Rights Law Group, located at 180 |
| 10:04:45 | 13 | Grand Avenue, Suite 1380, in Oakland, California. |
| 10:04:51 | 14 | The time is now 10:05 a.m.  And this is media 1 in |
| 10:04:55 | 15 | the video recording. |
| 10:04:58 | 16 |          Will all the parties in the room please |
| 10:05:01 | 17 | state their appearances. |
| 10:05:02 | 18 |          MR. RUTSCHMAN:  Aaron Rutschman, counsel |
| 10:05:03 | 19 | for CitiStaff and Tesla. |
| 10:05:06 | 20 |          MS. AVLONI:  And Navruz Avloni, here for |
| 10:05:08 | 21 | the plaintiffs. |
| 10:05:09 | 22 |          Will the court reporter please swear the |
| 10:05:11 | 23 | witness. |
| 10:05:11 | 24 |     (Whereupon, the witness, MONICA DE LEON, |
| 10:05:11 | 25 |      having been duly sworn, testified as follows:) |

| | | |
|---|---|---|
| 10:43:28 | 1 | BY MS. AVLONI: |
| 10:43:29 | 2 | Q.   What kind of paperwork would CitiStaff |
| 10:43:31 | 3 | provide to applicants when they register? |
| 10:43:33 | 4 | A.   Their application.   And in the application |
| 10:43:36 | 5 | it's in all the policies that we have. |
| 10:43:45 | 6 | Q.   So CitiStaff has applicants fill out an |
| 10:43:47 | 7 | application? |
| 10:43:48 | 8 | A.   Yes. |
| 10:43:50 | 9 | Q.   And CitiStaff provides the applicants with |
| 10:43:52 | 10 | policies? |
| 10:43:53 | 11 | A.   That's in the applications, yes. |
| 10:43:56 | 12 | Q.   Do you know what kind of policies are in |
| 10:43:57 | 13 | the application? |
| 10:44:03 | 14 | A.   From sexual harassment to job abandonment. |
| 10:44:13 | 15 | That's all I remember. |
| 10:44:16 | 16 | Q.   Does CitiStaff provide the applicants with |
| 10:44:18 | 17 | anything else other than the application and the |
| 10:44:19 | 18 | policies that are provided with it? |
| 10:44:24 | 19 | MR. RUTSCHMAN:  Objection; vague and |
| 10:44:24 | 20 | ambiguous. |
| 10:44:27 | 21 | THE WITNESS:  No. |
| 10:44:27 | 22 | BY MS. AVLONI: |
| 10:44:33 | 23 | Q.   Do you know if nextSource's orientation |
| 10:44:39 | 24 | packet also includes policies that cover topics like |
| 10:44:44 | 25 | sexual harassment? |

| | | |
|---|---|---|
| 10:55:57 | 1 | A.    It was given to me in e-mail. |
| 10:55:58 | 2 | Q.    So you received an e-mail regarding Owen |
| 10:56:03 | 3 | feeling uncomfortable about a picture that was |
| 10:56:05 | 4 | drawn? |
| 10:56:05 | 5 | A.    Mm-hmm, but we spoke, yes. |
| 10:56:07 | 6 | Q.    And do you recall who that e-mail was sent |
| 10:56:10 | 7 | by?  Was it Owen sending you the e-mail? |
| 10:56:25 | 8 | A.    Yes, it was. |
| 10:56:26 | 9 | Q.    And you said you spoke to Owen about him |
| 10:56:30 | 10 | feeling uncomfortable about it -- feeling |
| 10:56:33 | 11 | uncomfortable about the picture drawn.  Did you |
| 10:56:35 | 12 | speak to Owen before he sent you that e-mail or |
| 10:56:38 | 13 | after he sent you that e-mail? |
| 10:56:40 | 14 | A.    After. |
| 10:56:41 | 15 | MR. RUTSCHMAN:  Objection; misstates the |
| 10:56:41 | 16 | witness' prior testimony. |
| 10:56:45 | 17 | THE WITNESS:  So spoke to him after. |
| 10:56:47 | 18 | BY MS. AVLONI: |
| 10:56:59 | 19 | Q.    I'll get back to this later.  But other |
| 10:57:01 | 20 | than receiving complaints of CitiStaff employees not |
| 10:57:08 | 21 | liking their job or not liking their placement or |
| 10:57:11 | 22 | their position and other than receiving this |
| 10:57:15 | 23 | information from Owen about him being uncomfortable |
| 10:57:18 | 24 | about a picture drawn, do you recall any other type |
| 10:57:21 | 25 | of complaints that you would receive from CitiStaff? |

| 11:16:06 | 1 | ambiguous. |
| 11:16:09 | 2 | THE WITNESS:  The Owen Diaz situation. |
| 11:16:17 | 3 | BY MS. AVLONI: |
| 11:16:17 | 4 | Q.  And you mentioned one or two.  Is there |
| 11:16:22 | 5 | another investigation that you recall being involved |
| 11:16:23 | 6 | in? |
| 11:16:24 | 7 | A.  **Just -- just from what I recall, just,** |
| 11:16:28 | 8 | **like, an altercation that happened between Owen Diaz** |
| 11:16:33 | 9 | **and another -- another gentleman, another candidate.** |
| 11:16:41 | 10 | Q.  Do -- do you recall -- does the name |
| 11:16:44 | 11 | Rothaj Foster sound familiar? |
| 11:16:46 | 12 | A.  **Yes, ma'am.** |
| 11:16:47 | 13 | Q.  And so was the other investigation related |
| 11:16:49 | 14 | to the altercation between Rothaj Foster and Owen |
| 11:16:52 | 15 | Diaz? |
| 11:16:52 | 16 | A.  **That's what it was, yes.** |
| 11:17:01 | 17 | Q.  And Rothaj Foster was a CitiStaff |
| 11:17:03 | 18 | employee? |
| 11:17:04 | 19 | MR. RUTSCHMAN:  Objection; calls for |
| 11:17:04 | 20 | speculation and calls for a legal conclusion. |
| 11:17:11 | 21 | THE WITNESS:  Rothaj Foster did work for |
| 11:17:12 | 22 | CitiStaff. |
| 11:17:13 | 23 | BY MS. AVLONI: |
| 11:17:13 | 24 | Q.  And Owen was a CitiStaff employee? |
| 11:17:16 | 25 | MR. RUTSCHMAN:  Objection; calls for |

12:33:51  1    of the complaint of the drawing, yes.

12:33:53  2    BY MS. AVLONI:

12:33:56  3        Q.    Okay.   How about just in general?

12:34:01  4        **A.    In general, yes.**

12:34:11  5        Q.    You seem hesitant.   Is there a reason?

12:34:16  6        **A.    Like I said, it's just -- the situation**

12:34:19  7    **with the drawing, it seemed completely credible to**

12:34:24  8    **me.   But when it came to the altercation -- and I**

12:34:27  9    **did -- spoke to Owen about, you know, what happened**

12:34:30  10   **with him and Rothaj -- there was a lot of he**

12:34:33  11   **couldn't recall what was said or what was -- what**

12:34:40  12   **happened.   So in that situation I didn't -- it**

12:34:42  13   **didn't really seem too credible --**

12:34:45  14       Q.    Did you --

12:34:46  15       **A.    -- when we were speaking.**

12:34:49  16       Q.    When you spoke to him about the Rothaj

12:34:52  17   situation, did you speak to him in person or by

12:34:55  18   phone?

12:34:55  19       **A.    It was by phone.**

12:34:56  20       Q.    And was he at home at that time, do you

12:34:58  21   know, or was he at work?

12:35:00  22           MR. RUTSCHMAN:   Objection; calls for

12:35:00  23   speculation.

12:35:01  24   BY MS. AVLONI:

12:35:02  25       Q.    If you know.

| | | |
|---|---|---|
| 12:35:03 | 1 | A.   That I don't remember. |
| 12:35:03 | 2 | Q.   Did you speak to Rothaj in person or by |
| 12:35:06 | 3 | phone about that situation? |
| 12:35:08 | 4 | A.   By phone. |
| 12:35:17 | 5 | Q.   Have you -- while you were working for |
| 12:35:20 | 6 | CitiStaff, has anyone brought to your attention any |
| 12:35:24 | 7 | concerns about Owen Diaz? |
| 12:35:27 | 8 | MR. RUTSCHMAN:  Objection; vague and |
| 12:35:27 | 9 | ambiguous. |
| 12:35:29 | 10 | THE WITNESS:  Can you repeat the question? |
| 12:35:31 | 11 | BY MS. AVLONI: |
| 12:35:31 | 12 | Q.   Yes.  While you were working for |
| 12:35:33 | 13 | CitiStaff, has anyone at all brought any concerns to |
| 12:35:37 | 14 | you about Owen Diaz? |
| 12:35:39 | 15 | A.   Yes, there was two concerns.  One was -- |
| 12:35:47 | 16 | well, yes, there was. |
| 12:35:49 | 17 | Q.   What were those concerns? |
| 12:35:51 | 18 | A.   So I had spoke to Rothaj.  He had called |
| 12:35:57 | 19 | me and would let me know that -- he was letting me |
| 12:36:03 | 20 | know that, you know, Owen wasn't always at his post |
| 12:36:07 | 21 | where he was supposed to be, he would be gone for |
| 12:36:10 | 22 | long periods of time or would take longer lunch |
| 12:36:16 | 23 | breaks or long breaks. |
| 12:36:19 | 24 | There was an incident where he stated that |
| 12:36:20 | 25 | they were really backed up at the elevators and he |

12:48:49  1          Q.    These are the only two that you recall?

12:48:55  2          **A.    Yeah.**

12:48:56  3                MR. RUTSCHMAN:  Is that a yes?

12:48:56  4                THE WITNESS:  Yes.

12:48:56  5    BY MS. AVLONI:

12:48:57  6          Q.    And referring to Owen bringing concerns,

12:49:00  7    you recall him bringing two concerns to your

12:49:02  8    attention, one about the picture and the other one

12:49:04  9    about the altercation with Rothaj; is that correct?

12:49:06 10          **A.    Correct.**

12:49:08 11          Q.    In regards to the picture, when he

12:49:15 12    communicated that concern to you, what did you do?

12:49:17 13          **A.    So when he told me about it, you know, due**

12:49:25 14    **to the fact that we take it seriously, we**

12:49:30 15    **immediately took it up to HR -- Judy -- and let my**

12:49:38 16    **supervisors know about it as well, which they said**

12:49:44 17    **to talk to Judy for this case.**

12:49:51 18          Q.    Did you talk to Judy?

12:49:53 19          **A.    Yes, I did.**

12:49:57 20          Q.    What did you guys discuss?

12:49:59 21          **A.    I told Judy about, you know -- I told Judy**

12:50:03 22    **that I discussed -- spoke with Owen, you know.  I**

12:50:09 23    **checked in to -- with him to see do you -- are you**

12:50:19 24    **going to return to your -- to your job.  He said**

12:50:22 25    **yes.  I asked him if he wanted to be moved to a**

12:50:26  1    different department.  He said no.  You know, he was

12:50:33  2    upset and a little aggravated.  But I let him know

12:50:42  3    that I'm -- HR is going to deal with this.  I have

12:50:47  4    already brought it up to them to their immediate

12:50:50  5    attention.  I let my supervisors know.  And I let

12:50:57  6    Chartwell -- I gave them the okay to consent to

12:51:00  7    speak with Owen Diaz.

12:51:12  8         Q.   Do you recall discussing anything else

12:51:13  9    with Owen Diaz regarding this situation?  I'm sorry,

12:51:19 10    actually.  You were describing to me the

12:51:20 11    conversation you had with Judy; right?

12:51:24 12         A.   Yes.

12:51:25 13         Q.   Because -- let's back up.  Let's get a

12:51:27 14    clear record.

12:51:27 15              So when Owen raised the concern about the

12:51:33 16    picture to you, you talked to Owen.  And what did he

12:51:42 17    tell you?

12:51:45 18              MR. RUTSCHMAN:  Objection; asked and

12:51:45 19    answered.

12:51:50 20              THE WITNESS:  So he pretty much told me

12:51:53 21    how -- what happened, how he came across the

12:51:58 22    picture.  You know, he felt that the rac- -- the

12:52:07 23    picture was racist and that he wanted to make a

12:52:17 24    complaint.

12:52:21 25    BY MS. AVLONI:

12:57:04  1        A.    I recall Owen Diaz saying that they had an

12:57:08  2    altercation and that Rothaj was threatening to shoot

12:57:17  3    him and threatening his car, because he had a nice

12:57:24  4    car at the time.  And that, you know, Rothaj was

12:57:30  5    being very aggressive and --

12:57:37  6        Q.    And this is the conversation you had on

12:57:38  7    the phone?

12:57:38  8        A.    Yes.

12:57:39  9        Q.    Did he say anything else about the

12:57:40 10    situation that you recall?

12:57:46 11        A.    Not that I recall.

12:57:47 12        Q.    And what did you tell Owen?

12:57:55 13        A.    So I told Owen.  I said oh, okay, again,

12:57:59 14    are you going to return to work?  How do you feel?

12:58:02 15    Do you feel comfortable with going back to work?  He

12:58:06 16    said yes.  Do you feel comfortable with being in

12:58:10 17    your same position?  And -- or would you like to be

12:58:17 18    moved to a different spot.  He said no, he wanted to

12:58:21 19    continue where he was at.  So I let him know that in

12:58:23 20    this situation, you know, I'm going to take this up

12:58:29 21    to HR as well.  I'll be speaking with, you know,

12:58:37 22    Rothaj.  And I let him know that Chartwell would be

12:58:40 23    speaking to him and they would be doing their

12:58:47 24    investigation.

12:58:49 25        Q.    Did you take notes during that

| | | |
|---|---|---|
| 12:58:51 | 1 | conversation? |
| 12:58:51 | 2 | A.   I -- yeah.   I believe I did. |
| 12:58:54 | 3 | Q.   And you would have saved those notes in |
| 12:58:56 | 4 | the CitiStaff system? |
| 12:58:58 | 5 | A.   It would have been in the system. |
| 12:59:00 | 6 | Q.   And then after he -- Owen raised this |
| 12:59:03 | 7 | concern to your attention, did you have a |
| 12:59:05 | 8 | conversation with Rothaj? |
| 12:59:08 | 9 | A.   Yes. |
| 12:59:08 | 10 | MR. RUTSCHMAN:   Objection; misstates the |
| 12:59:10 | 11 | witness' prior testimony. |
| 12:59:12 | 12 | THE WITNESS:   After I spoken [sic] and |
| 12:59:15 | 13 | took down the information from Owen Diaz, I did |
| 12:59:22 | 14 | later call Rothaj Foster as well to see what |
| 12:59:25 | 15 | happened on his side, on his end. |
| 12:59:28 | 16 | BY MS. AVLONI: |
| 12:59:28 | 17 | Q.   Okay.   And what did Rothaj tell you? |
| 12:59:33 | 18 | A.   So Rothaj did admit to them having, you |
| 12:59:38 | 19 | know, an argument.   He did admit to, you know, |
| 12:59:42 | 20 | speaking kind of loud, raising his voice.   But he |
| 12:59:46 | 21 | denied that -- you know, he said that he never made |
| 12:59:51 | 22 | any threats of any sort about any caller, about |
| 12:59:55 | 23 | shooting anybody or any of that sort.   He said |
| 01:00:02 | 24 | that -- you know, that Owen Diaz was already kind of |
| 01:00:09 | 25 | aggressive and very strong -- he would come out very |

MONICA DE LEON
December 6, 2018

Page 141

01:00:13 1   strong and very aggressive.  And, you know, that day

01:00:17 2   he said I do admit to -- to arguing and yelling

01:00:23 3   because I felt like -- he felt that Owen Diaz was

01:00:26 4   being disrespectful to him and, you know, taking

01:00:32 5   advantage of his power as a lead, telling him that

01:00:36 6   he can go to his break or his lunch whenever he

01:00:39 7   tells him to or --

01:00:47 8       Q.   So he -- Rothaj told you that Owen Diaz

01:00:49 9   was being disrespectful by telling Rothaj that he

01:00:53 10  can go on break or his lunch when Owen told him to?

01:00:56 11      A.   He said that -- that was something that he

01:00:58 12  said, but he was just being disrespectful as far as

01:01:04 13  cursing at him and telling him other things like,

01:01:09 14  you know, "shut up" or --

01:01:11 15      Q.   He said that to you?

01:01:13 16      A.   Rothaj.

01:01:16 17      Q.   Do you know if Owen -- what Owen's job

01:01:22 18  title was as a CitiStaff contractor at the Tesla

01:01:26 19  facility?

01:01:26 20      A.   Elevator lead.

01:01:28 21      Q.   And how about Rothaj Foster?  Do you know

01:01:30 22  what his title was?

01:01:31 23      A.   He was at the elevators as well, but --

01:01:36 24      Q.   Do you know if an elevator lead had the

01:01:39 25  ability to tell someone like in Rothaj's position

01:04:48  1   know, I let Chartwell speak to Owen and that they

01:04:57  2   were going to take care of the investigation, they

01:04:59  3   were going to investigate.

01:05:01  4   BY MS. AVLONI:

01:05:01  5       Q.   Do you know if Chartwell did investigate?

01:05:03  6       A.   **That I do not know.**

01:05:08  7       Q.   If somebody wanted to speak to a Chartwell

01:05:10  8   [sic] contractor like Owen, were they required --

01:05:12  9   were they required to get Chartwell's permission?

01:05:16 10            MR. RUTSCHMAN:  Objection; calls for

01:05:16 11   speculation.

01:05:17 12            THE WITNESS:  Can you repeat that?

01:05:18 13   BY MS. AVLONI:

01:05:18 14       Q.   Yeah.  While conducting investigations,

01:05:20 15   let's say, if a client or another -- if a client

01:05:28 16   like nextSource or Tesla or Chartwell, if one of

01:05:34 17   those entities wanted to talk to a Chartwell --

01:05:39 18   sorry -- a CitiStaff contractor, would they need to

01:05:41 19   get permission from CitiStaff?

01:05:43 20       A.   **Yeah, I would think so.**

01:05:46 21       Q.   Do you know why?

01:05:51 22       A.   **Disclosures.  Confidential.**

01:05:56 23       Q.   What does that mean?

01:05:57 24       A.   **Confidential?**

01:06:00 25       Q.   Mm-hmm.

01:06:00  1        A.   Just for -- for the person's own

01:06:04  2    confidential [sic], maybe they don't want to speak

01:06:07  3    to a third party; they want to -- you know.  Or if

01:06:11  4    they're concerned about maybe they think they're in

01:06:13  5    trouble or something like that.

01:06:19  6        Q.   Did you ask Owen if it was okay for his

01:06:22  7    permission to speak to Chartwell?

01:06:24  8        A.   Yes, I did.  When I spoke with him, I did

01:06:26  9    let him know Chartwell, they want to speak with you,

01:06:32 10    and are you willing to participate?  And he said

01:06:36 11    yes.

01:06:36 12        Q.   And have you had a situation where you

01:06:38 13    refused to permit a CitiStaff contractor to talk to

01:06:44 14    like a client or an entity involved with a client?

01:06:48 15        A.   No, I haven't had a situation like that.

01:06:53 16        Q.   Did Judy ever talk to you about the

01:06:56 17    altercation between Rothaj and Owen Diaz after you

01:07:04 18    had that conversation with her where you described

01:07:06 19    to her what happened?

01:07:09 20        A.   After that, no.

01:07:16 21        Q.   How about the picture incident where Owen,

01:07:19 22    you know, raised a concern about an image that he

01:07:23 23    saw that he believe was racist.  Did you and Judy

01:07:26 24    ever have a conversation about that again after you

01:07:29 25    described to her Owen's complaints?

01:09:26  1    by CitiStaff?

01:09:27  2              MR. RUTSCHMAN:  Objection; calls for

01:09:27  3    speculation.  Calls for a legal conclusion.

01:09:31  4              THE WITNESS:  That I don't know.

01:09:32  5    BY MS. AVLONI:

01:09:32  6        Q.   How about do you know if Owen Diaz still

01:09:34  7    works at the Tesla facility?

01:09:37  8              MR. RUTSCHMAN:  Calls for speculation.

01:09:39  9              THE WITNESS:  No.

01:09:40 10    BY MS. AVLONI:

01:09:40 11        Q.   And how do you know that he no --

01:09:43 12              MR. RUTSCHMAN:  I was just going to

01:09:43 13    clarify her response.  Was that no, he doesn't work

01:09:48 14    there, or no, you don't know?

01:09:49 15              THE WITNESS:  No, he doesn't work at

01:09:51 16    Tesla.

01:09:51 17    BY MS. AVLONI:

01:09:52 18        Q.   And how do you know Owen Diaz no longer

01:09:54 19    works at Tesla?

01:09:55 20        A.   When I was there, they had nextSource send

01:09:58 21    me an e-mail stating that they wanted to -- that

01:10:01 22    they had ended his assignment.

01:10:09 23        Q.   Okay.  nextSource sent you an e-mail

01:10:11 24    saying they had ended Owen Diaz' assignment at the

01:10:13 25    Tesla facility; is that correct?

MONICA DE LEON
December 6, 2018

**Page 149**

| | | | |
|---|---|---|---|
| 01:10:14 | 1 | A. | Mm-hmm. |
| 01:10:15 | 2 | Q. | And what was your response to that? |
| 01:10:19 | 3 | A. | So we -- to take action.  So since the |

01:10:25  4    assignment ended, I gave Owen Diaz a call, letting

01:10:31  5    him know that his assignment had been ended and that

01:10:35  6    he was no longer able to return to the facility.  So

01:10:45  7    to not report to work for his shift that day.

01:10:49  8         And he was mad, upset.  He was cussing.

01:10:53  9    He was upset at the fact that, you know, he was

01:10:56 10    losing his job and that he wanted to continue

01:10:59 11    working at Tesla.

01:11:07 12         And, you know, I -- I let him know

01:11:09 13    unfortunately, you know, they have made a decision

01:11:13 14    to end your assignment.  So, you know, please do not

01:11:17 15    return to the premises.  Your badge is deactivated.

01:11:20 16    You won't be able to get in anyway if you tried.

01:11:24 17         So -- you know, and then after that he

01:11:31 18    continued to just kind of rant and just cussed a

01:11:37 19    little more.  And then he eventually just hung up.

01:11:39 20    Q.   And who from nextSource informed you

01:11:43 21    that Owen Diaz' assignment had ended?

01:11:45 22    A.   It was Wayne Jackson.

01:11:47 23    Q.   And did he inform you by e-mail or phone?

01:11:49 24    A.   E-mail.

01:11:52 25    Q.   He sent you an e-mail saying his

01:11:54  1    assignment has ended?

01:11:56  2         A.   Mm-hmm.

01:11:56  3         Q.   What did you respond with?

01:11:57  4         A.   I responded him, let him know okay.   He --

01:12:01  5    I have let him know, and he won't be returning.

01:12:05  6         Q.   You had let him know after Wayne Jackson

01:12:07  7    had sent you that e-mail; right?   Not before Wayne

01:12:10  8    Jackson sent you that e-mail?

01:12:11  9         A.   I let him know after Wayne Jackson sent me

01:12:15 10    the e-mail stating that they were terminating Owen

01:12:17 11    Diaz' assignment.

01:12:19 12         Q.   Did Wayne Jackson tell you why they were

01:12:22 13    terminating Owen Diaz' assignment?

01:12:24 14         A.   It was a no-call/no-show.   He had -- he

01:12:31 15    had mentioned to me -- Owen Diaz had mentioned to me

01:12:33 16    that he was leaving to LA for a funeral.   And he

01:12:38 17    gave me specific dates.   It was like just a couple

01:12:42 18    of days, two or three days.   And I let nextSource

01:12:46 19    know.   And he was gone for longer than what he had

01:12:52 20    stated.

01:12:55 21         Q.   Do you know whose funeral it was?

01:12:57 22         A.   It was his mom's.

01:13:01 23         Q.   Did you call Owen and ask him why he

01:13:05 24    hasn't returned?

01:13:06 25         A.   I didn't know that he hadn't returned.

```
01:18:06  1        A.    A what kind of policy?

01:18:09  2        Q.    Bereavement.

01:18:11  3              MR. RUTSCHMAN:  Bereavement.

01:18:12  4   BY MS. AVLONI:

01:18:13  5        Q.    Bereavement.

01:18:13  6        A.    Oh --

01:18:14  7              MR. RUTSCHMAN:  Objection; calls for

01:18:14  8   speculation.

01:18:15  9   BY MS. AVLONI:

01:18:15 10        Q.    Leave policy.

01:18:16 11        A.    That I don't know.

01:18:16 12        Q.    Do you know if nextSource has a

01:18:19 13   bereavement leave policy?

01:18:21 14              MR. RUTSCHMAN:  Objection; calls for

01:18:21 15   speculation.

01:18:22 16              THE WITNESS:  That I don't know.

01:18:23 17   BY MS. AVLONI:

01:18:24 18        Q.    Tesla?  Do you know whether Tesla has such

01:18:26 19   a policy?

01:18:28 20              MR. RUTSCHMAN:  Objection; calls for

01:18:28 21   speculation.

01:18:29 22              THE WITNESS:  That I don't know.

01:18:30 23   BY MS. AVLONI:

01:18:30 24        Q.    Did you try to place Owen at another

01:18:34 25   facility after he was separated from Tesla?
```

01:18:37 1                    MR. RUTSCHMAN:  Objection; vague and

01:18:38 2     ambiguous.

01:18:42 3                    THE WITNESS:  I did mention that, you

01:18:45 4     know, we could possibly place him somewhere else.

01:18:48 5     But it wouldn't be making the same amount of money

01:18:51 6     that he was making there.  And he just -- basically

01:18:57 7     he didn't want to hear it.  He was like F that.

01:19:00 8     Thirteen dollars ain't -- ain't shit, basically.

01:19:07 9                    So -- you know, I tried to get him to calm

01:19:15 10    down by telling him hey, you know, I could probably

01:19:18 11    place you somewhere else.  You're not just -- you

01:19:21 12    know, your assignment didn't work here, you know, it

01:19:24 13    ended here.  But, you know, do you want to try

01:19:27 14    something else.  And he didn't.  He didn't want to

01:19:30 15    do anything else basically.  So --

01:19:33 16    BY MS. AVLONI:

01:19:33 17        Q.   Was Tesla -- do you know if Tesla paid the

01:19:37 18    highest rate to CitiStaff contractors?

01:19:40 19                   MR. RUTSCHMAN:  Objection; calls for

01:19:40 20    speculation.

01:19:45 21                   THE WITNESS:  I don't know if Tesla paid

01:19:47 22    the highest rate to Citistaff contractors.  But when

01:19:51 23    a lot of people hear Tesla, it's a well-known

01:19:55 24    manufacturer for these electric cars.  So when

01:19:58 25    people hear Tesla, everybody just wants to work at

| | | |
|---|---|---|
| 01:20:01 | 1 | Tesla. |
| 01:20:05 | 2 | BY MS. AVLONI: |
| 01:20:06 | 3 | Q.  Yeah.  Do you know how much Owen was |
| 01:20:08 | 4 | receiving per hour when working at Tesla? |
| 01:20:12 | 5 | MR. RUTSCHMAN:  Objection; calls for |
| 01:20:12 | 6 | speculation. |
| 01:20:16 | 7 | THE WITNESS:  I don't recall the start. |
| 01:20:18 | 8 | It could be 16.  But I remember when they gave me |
| 01:20:23 | 9 | the raise for him, it was 18. |
| 01:20:27 | 10 | BY MS. AVLONI: |
| 01:20:27 | 11 | Q.  Did you have any other -- did CitiStaff |
| 01:20:29 | 12 | have any other clients at the time that you were |
| 01:20:32 | 13 | working there that paid $16 an hour or up? |
| 01:20:41 | 14 | MR. RUTSCHMAN:  Objection; calls for |
| 01:20:41 | 15 | speculation. |
| 01:20:43 | 16 | THE WITNESS:  Yeah, we did. |
| 01:20:44 | 17 | BY MS. AVLONI: |
| 01:20:44 | 18 | Q.  And how come you didn't offer any of those |
| 01:20:46 | 19 | positions to him? |
| 01:20:49 | 20 | A.  Well, I had mentioned it to him, but he |
| 01:20:52 | 21 | didn't want to take the offer. |
| 01:20:53 | 22 | Q.  Do you know -- did he tell you why not? |
| 01:20:55 | 23 | A.  He just said that wasn't enough. |
| 01:20:58 | 24 | Q.  Sixteen dollars wasn't enough? |
| 01:20:59 | 25 | A.  Yeah. |

| | | |
|---|---|---|
| 02:23:04 | 1 | happened like graveyard shift, they would probably |
| 02:23:13 | 2 | contact the client, let the client know before |
| 02:23:18 | 3 | letting me know at -- out of the office at midnight. |
| 02:23:22 | 4 | BY MS. AVLONI: |
| 02:23:22 | 5 | Q.   Did CitiStaff have a requirement that its |
| 02:23:25 | 6 | contractors contact the CitiStaff personnel like |
| 02:23:29 | 7 | yourself when it comes to complaints of harassment? |
| 02:23:30 | 8 | Or can CitiStaff contractors make the complaints |
| 02:23:36 | 9 | directly to the clients? |
| 02:23:37 | 10 | MR. RUTSCHMAN:   Objection; compound. |
| 02:23:40 | 11 | Calls for speculation.   Asked and answered. |
| 02:23:50 | 12 | THE WITNESS:   So they would be able to |
| 02:23:51 | 13 | report to me as well.   And if for some reason they |
| 02:23:54 | 14 | can't get ahold of me and they felt they needed to |
| 02:23:59 | 15 | tell their supervisor -- they tell their supervisor |
| 02:24:02 | 16 | about it, then yeah, yes. |
| 02:24:05 | 17 | BY MS. AVLONI: |
| 02:24:05 | 18 | Q.   And would supervisors -- do you know if |
| 02:24:08 | 19 | they're required to notify you at some point if |
| 02:24:11 | 20 | supervisors become aware of such complaints? |
| 02:24:14 | 21 | MR. RUTSCHMAN:   Objection; calls for |
| 02:24:14 | 22 | speculation. |
| 02:24:16 | 23 | THE WITNESS:   In that case -- in this case |
| 02:24:17 | 24 | where it was the -- with Owen -- with Owen's |
| 02:24:22 | 25 | complaint, since it did happen during his graveyard |

MONICA DE LEON
December 6, 2018

**Page 163**

02:24:26  1   shift -- that is basically what happened.  He let

02:24:30  2   his supervisors know.  And they -- and nextSource.

02:24:36  3   And nextSource told me.  So -- in this case that

02:24:41  4   is what happened.  They -- he reported to his

02:24:44  5   supervisors in nextSource and they reported to me.

02:24:48  6   BY MS. AVLONI:

02:24:49  7       Q.   And why did they report to you; do you

02:24:52  8   know?

02:24:52  9       **A.   Since he was a CitiStaff contractor, that**

02:24:57 10   **is why they reported to me as well.**

02:25:11 11       **Q.   If a CitiStaff contractor joined**

02:25:13 12   **CitiStaff, is there any sort of training provided at**

02:25:16 13   **all that you are aware of that tells that contractor**

02:25:23 14   **who to go to for what?  So, for example, you know,**

02:25:26 15   **go to CitiStaff employee for payroll issues.  Go to**

02:25:31 16   **this person for complaints.  Go to this person for**

02:25:35 17   **job description, go to this person on safety**

02:25:39 18   **reasons.  Is there some sort of a manual, tutorial,**

02:25:42 19   **or training that's provided to CitiStaff contractors**

02:25:45 20   **that tells the contractors where or who to go to in**

02:25:50 21   **these situations?**

02:25:52 22       **MR. RUTSCHMAN:  Objection; compound.**

02:25:55 23   **Vague and ambiguous.  Asked and answered.**

02:25:57 24       **THE WITNESS:  They -- the CitiStaff**

02:26:00 25   **contractors knew that, you know, I was the only one**

02:26:04  1   in the office.  So I also let them know if you have

02:26:08  2   any questions or concerns, you can give me a call.

02:26:14  3   And, you know, let's just say if -- in any situation

02:26:18  4   anyone chose -- wanted to speak to somebody else

02:26:22  5   other than me, then I would follow up with them and

02:26:25  6   let them have corporate's number and, you know,

02:26:28  7   whatever the situation would be, direct them

02:26:33  8   where -- where to go or who to go to.

02:26:36  9   BY MS. AVLONI:

02:26:37 10       Q.   Did you ever instruct Citistaff

02:26:39 11   contractors that they are required to contact you in

02:26:43 12   regards to any and all issues from payroll, to

02:26:48 13   complaints, to how to do their job?

02:26:52 14            MR. RUTSCHMAN:  Objection; vague and

02:26:52 15   ambiguous.  Compound.

02:27:00 16            THE WITNESS:  As I said, anytime before I

02:27:03 17   would dispatch them to the -- to the job site, I

02:27:06 18   would let them know if they have any questions or

02:27:08 19   concerns, they can give me a call or send me an

02:27:11 20   e-mail.

02:27:12 21   BY MS. AVLONI:

02:27:13 22       Q.   But you never told them that they're

02:27:14 23   required to go to you instead of the client; is that

02:27:17 24   correct?

02:27:18 25            MR. RUTSCHMAN:  Objection; misstates the

02:30:55  1    BY MS. AVLONI:

02:31:45  2         Q.   Sitting here Today do you know if Rothaj

02:31:47  3    Foster ever received any training on harassment?

02:31:51  4              MR. RUTSCHMAN:  Objection; vague and

02:31:51  5    ambiguous.  Calls for speculation.

02:31:56  6              THE WITNESS:  I know that Rothaj signed

02:31:59  7    all policies of CitiStaff and read and signed any

02:32:11  8    paperwork that -- that was given to us from

02:32:16  9    nextSource -- nextSource paperwork that required

02:32:24 10    to be signed and read.

02:32:25 11    BY MS. AVLONI:

02:32:25 12         Q.   Do you know whether Rothaj Foster is

02:32:28 13    black?

02:32:28 14         **A.   Yes, he is.**

02:32:34 15         Q.   When you terminated Owen Diaz, was he

02:32:40 16    still a CitiStaff employee?

02:32:44 17              MR. RUTSCHMAN:  Objection; lacks

02:32:44 18    foundation.  Misstates the witness' prior testimony.

02:32:52 19    Calls for a legal conclusion.

02:32:58 20              THE WITNESS:  So when Owen Diaz'

02:33:00 21    assignment ended, he was still a contractor that was

02:33:11 22    registered with us as CitiStaff.  But he was no

02:33:15 23    longer an employee working on an assignment at

02:33:21 24    Tesla; at the facility, Tesla facility.

02:33:24 25    BY MS. AVLONI:

```
04:17:06  1        Q.   So CitiStaff essentially wouldn't get
04:17:07  2   involved in any way unless something was brought to
04:17:11  3   their attention; is that correct?
04:17:13  4              MR. RUTSCHMAN:   Objection; misstates the
04:17:14  5   witness' prior testimony.   Calls for speculation.
04:17:19  6   BY MS. AVLONI:
04:17:19  7        Q.   When it comes to complaints.
04:17:21  8        A.   When it comes to complaints?  What is the
04:17:24  9   question again?
04:17:25 10        Q.   Yeah.   You know what?   Scratch that
04:17:27 11   question.   I'm going to --
04:17:36 12              Joyce de la Grande.   Have you ever heard
04:17:38 13   of her?
04:17:38 14        A.   No.
04:17:49 15              MS. AVLONI:   I'm going to go ahead and
04:17:51 16   introduce the next exhibit.
04:18:09 17                          (Exhibit 88 marked.)
04:18:09 18   BY MS. AVLONI:
04:18:17 19        Q.   Please take as much time as you need to
04:18:20 20   fully review Exhibit 88.
04:20:26 21        A.   (Witness reviews document.)
04:20:27 22             Okay.
04:20:28 23        Q.   Have you ever seen this document before?
04:20:30 24        A.   Yes.
04:20:33 25        Q.   And if you look at the top portion of this
```

MONICA DE LEON
December 6, 2018

Page 231

04:20:41 1    document, is this an e-mail that you wrote to Wayne

04:20:45 2    Jackson?

04:20:49 3         A.   The first one?  Yes.

04:20:53 4         Q.   And does this e-mail accurately reflect

04:20:58 5    what you recall writing to Wayne Jackson?

04:21:01 6         A.   Yes.

04:21:01 7         Q.   And -- and this e-mail is -- is this

04:21:17 8    e-mail related to the altercation between Rothaj

04:21:22 9    Foster and Owen Diaz that we earlier discussed?

04:21:26 10        A.   Yes.

04:21:30 11        Q.   And the e-mail below your e-mail where

04:21:33 12   it's stated as coming from Wayne Jackson to you, is

04:21:37 13   that an e-mail that you recall receiving from Wayne

04:21:41 14   Jackson?

04:21:41 15        A.   Yes.

04:21:44 16        Q.   That statement is accurate?

04:21:45 17        A.   Yes.

04:21:49 18             MR. RUTSCHMAN:  Belated objection that the

04:21:50 19   document speaks for itself.

04:21:57 20   BY MS. AVLONI:

04:21:58 21        Q.   Do you see the name at the top of the

04:22:00 22   subject, it says Deb Griskey.

04:22:02 23        A.   For the bottom one on the first page?

04:22:05 24        Q.   Right on the top.  It says Deb Griskey.

04:22:10 25        A.   Right here; right?

04:22:11   1        Q.    Correct.  Do you know who that is?

04:22:15   2        **A.    She was the main contact, like I had**

04:22:18   3   **mentioned earlier, for Tesla after Nancy.**

04:22:24   4        Q.    So a nextSource.  That's -- okay.

04:22:33   5             And when you received the e-mail from

04:22:35   6   Wayne Jackson back on November 6 of 2015, do you

04:22:39   7   recall reading the entire e-mail or the chain below

04:22:45   8   it?

04:22:48   9        **A.    Yes.**

04:22:59  10        Q.    And when you read the e-mail -- actually,

04:23:02  11   prior to receiving the e-mail on November 6, 10:21

04:23:07  12   a.m., had you had any information regarding the

04:23:11  13   altercation between Rothaj Foster and Owen Diaz?

04:23:13  14        **A.    Repeat the question?**

04:23:16  15        Q.    Prior to receiving the e-mail from Wayne

04:23:17  16   Jackson on November 6 of 2015 at 10:21 a.m., did you

04:23:23  17   have any information at all that there was an

04:23:25  18   altercation between Rothaj and Owen?

04:23:28  19        **A.    No.**

04:23:28  20        Q.    That's the first time you learned about

04:23:30  21   the altercation between Rothaj and Owen?

04:23:32  22        **A.    Yes.**

04:23:33  23        Q.    And then when you read the e-mail for

04:23:38  24   Wayne Jackson, what were your immediate impressions

04:23:46  25   about the altercation between Rothaj and Owen?

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19  EXHIBITS TO DEPOSITION OF MONICA DELEON
20
21  REDACTED – CONDITIONALLY FILED UNDER SEAL
22
23
24
25
26
27
28

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

```
 1                    REPORTER'S CERTIFICATION

 2

 3            I, Heidi Belton, Certified Shorthand

 4    Reporter in and for the State of California, do

 5    hereby certify:

 6

 7            That the foregoing witness was by me duly

 8    sworn; that the deposition was then taken before me

 9    at the time and place herein set forth; that the

10    testimony and proceedings were reported

11    stenographically by me and later transcribed into

12    typewriting under my direction; that the foregoing

13    is a true record of the testimony and proceedings

14    taken at that time.

15

16            IN WITNESS WHEREOF, I have subscribed my

17    name on this date:

18

19

20

21

22    H. Belton

23    Heidi Belton, CSR, RPR, CRR, CCRR, CRC
                     CSR No. 12885
24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19 EXHIBIT I
20
21
22
23
24
25
26
27
28

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

        Plaintiffs,

      vs.             No. 3:17-cv-06748-WHO

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; and DOES 1-50,
inclusive,

        Defendants.

_____//


DEPOSITION OF EDWARD ROMERO

November 30, 2018


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to

 2    Notice of Taking Deposition, and on November 30, 2018,

 3    commencing at the hour of 10:00 a.m., at CALIFORNIA

 4    CIVIL RIGHTS LAW GROUP, 332 San Anselmo Avenue, San

 5    Anselmo, California, before me, BRIDGET M. MATTOS, CSR

 6    No. 11410, there personally appeared

 7

 8                     EDWARD ROMERO,

 9

10    called as a witness by Plaintiff, who, having been

11    duly sworn, was examined and testified as is

12    hereinafter set forth.

13                     ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

1      Q.    Well, you received training on what is

2    harassing or discriminatory conduct; right?

3      **A.    Correct.**

4      Q.    And would you agree if someone used the word

5    "nigger" or "nigga" in the workplace, that would be

6    inappropriate conduct; right?

7      **A.    In general, yes, it would be very**

8    **inappropriate.**

9      Q.    Do you find those terms offensive?

10     **A.    I do.**

11     Q.    So instead of using "nigger" or "nigga," I'm

12   going to use the "'N' word" okay?

13     **A.    Okay.**

14     Q.    Is that fair enough?

15     **A.    Yeah, because the other words kind of make me**

16   **feel uncomfortable too.**

17     Q.    Sure.  I bet they do.

18          So did you ever observe -- and I mean

19   personally observe, not be told about -- but did you

20   ever observe anyone using the "N" word at the Tesla

21   factory when you were there?

22     **A.    No.**

23     Q.    Did you ever -- were you ever told or

24   informed that someone was using the "N" word at the

25   factory?

EDWARD ROMERO
November 30, 2018

**Page 66**

1      A.   I was informed that there was language that

2  offended someone or hurt someone's feelings, but I did

3  not hear it directly.

4      Q.   And how many employees gave you

5  information -- or strike that.

6         How many employees did you hear about who

7  claimed to be offended or hurt by language at the

8  Tesla factory?

9      A.   I can only think of one.

10     Q.   And who is the one that you can think of?

11     A.   Owen Diaz.

12     Q.   And how did you know Owen Diaz?

13     A.   After I started working for Tesla, within a

14  few weeks they asked me to help them with the elevator

15  services.

16     Q.   So this was while you were at nextSource, or

17  this is when you were at Tesla?

18     A.   This is when I became a Tesla employee.

19     Q.   So that was sometime in October then of 2015?

20     A.   I would say that in October, they were -- I

21  was dealing more with kind of the recycling and being

22  introduced into the elevator services.

23     Q.   So sometime in October of 2015, or

24  approximately October of 2015, you started taking over

25  some responsibility for overseeing the elevators?

1    he looks, I'd probably say 50.

2        Q.    Okay.   Fair enough.

3            And your first interaction with Owen Diaz, do

4    you remember what that was about?

5        A.    It wasn't necessarily an interaction; it was

6    more like observing him working there.   He was working

7    there as an elevator operator.   If I remember

8    correctly, he was a lead at that time.

9        Q.    And what was the difference between a lead

10   and someone else, on the elevator operators?

11       A.    A lead was expected to assume more

12   responsibility and making sure that product was moved

13   properly and safely and that the crews were working in

14   the same manner, using their PPE, and so on, and it

15   was to be an individual who could have good

16   interaction with other departments, other department

17   heads, supervisors, elevator drivers, tugger drivers

18   who came to the elevator.

19            We wanted an individual who could really

20   interact and work closely with them, a cooperative

21   spirit, not an angry person or somebody who, you know,

22   couldn't get along with people.   I would say

23   typically, that's the difference.

24       Q.    Did you promote Owen Diaz to a lead?

25       A.    I think he was a lead already when I got

```
 1    there.

 2         Q.   Did you ever talk to Jamie Salazar about Owen

 3    Diaz?

 4         A.   Not to ask him the question specifically.

 5         Q.   Did you have any discussion with Jamie

 6    Salazar about Owen Diaz's attitude, or anything like

 7    that?

 8         A.   I can't say.  I don't remember that.

 9         Q.   Tell me about your first impression relative

10    to Owen Diaz when you observed him, when you took over

11    responsibility for the elevator operators.

12              MS. ANTONUCCI:  Vague.

13              THE WITNESS:  You want to rephrase that a

14    little bit or --

15              MR. ORGAN:  Actually, let me go back to the

16    lead thing.

17         Q.   So in terms of the lead position for the

18    elevator operators, the elevator operator leads were

19    expected to be more responsible; is that correct?

20         A.   Yes.

21         Q.   And the elevator operator leads were expected

22    to be more responsible in terms of moving product; is

23    that correct?

24         A.   Moving it efficiently.

25         Q.   Efficiently, yes.
```

 1            And then you said that the elevator operator
 2    leads were also responsible for making sure that their
 3    crews used their PPEs?
 4        A.    Correct.
 5        Q.    And you said that the elevator operator leads
 6    also had to make sure that they had good interactions
 7    with other departments; right?
 8        A.    Correct.  They had to have good
 9    communication, a spirit of cooperation, an ability to
10    resolve issues that came along that might impede the
11    movement of materials.
12        Q.    Elevator operator leads were supposed to try
13    and mitigate or reduce obstacles to getting product to
14    move between the floors; correct?
15        A.    Correct.  And they had to have good
16    interaction with the supervisors of the production --
17    of the -- of the different departments bringing
18    materials to the elevators.
19            In other words, if you have a lead -- because
20    I wasn't there at the elevators all day long, I had
21    other duties to do, and so on.  But a good lead
22    elevator operator, okay, would be able to communicate
23    with people who came to him and said, for example,
24    "I've got this material that's urgently needed in this
25    part of the factory," and work it out to get that

```
1        A.    I knew --

2        Q.    Let me just finish the question.

3        A.    Yeah.   Sorry.

4        Q.    In terms of your -- when you were the

5   janitorial supervisor working for nextSource, during

6   that time, you at least had some contact with the

7   elevator 1 and 2 operators; correct?

8        A.    I can't say.   All I can say is it was

9   limited, in the sense that from that responsibility I

10  had with nextSource, we only took trash down the

11  elevator and some recycled products.   I mean, some

12  cleaning products that were going up and down.   And

13  that was not my responsibility to drive them down

14  there and take them down the elevator.

15       Q.    Okay.

16       A.    That was -- the employees were doing that.

17       Q.    Then tell me about your impressions of Owen

18  Diaz as time went on, when you became his -- when you

19  took over responsibilities for overseeing elevators 1

20  and 2.

21       A.    I would say that Owen -- I observed that he

22  had a hard time getting along with people.

23       Q.    Was that all people or --

24       A.    I would say some people.

25       Q.    And who were the people who you observed Owen
```

EDWARD ROMERO
November 30, 2018

Page 82

```
 1   having a hard time getting along with?
 2       A.    I don't remember specific names, other than
 3   sometimes comments were made:  Who is this guy?  How
 4   come he's always upset?
 5              You know, I'm just responding to your
 6   question about what my impression was.
 7       Q.    Yeah, I get that.
 8       A.    I made no decisions as to what I felt would
 9   be the ultimate result with anything.  I wanted to
10   work with Owen.  I like to give everybody a fair
11   chance.  But there were some instances where people
12   voiced that he was angry, or things like that.
13       Q.    When you say "things like that," in addition
14   to people voicing an opinion that Owen was angry, did
15   they voice anything else to you?
16       A.    That they didn't like the way he spoke to
17   them.
18       Q.    And do you remember any specifics as to what
19   people said about what they didn't like about the way
20   Owen Diaz spoke to them?
21       A.    I can only speak of maybe one specific case.
22       Q.    Okay.  Tell me about the case.
23       A.    Where he -- they accused him that he was
24   gossiping about them behind their back; that he's
25   divulging or gossiping about a relationship that two
```

1   operators about, I guess, some things with his

2   personal life or his attitude, and, you know, that he

3   didn't like his name being used by Owen.  Okay?  He

4   didn't feel that it was proper.

5       Q.   Well, how did he say that Owen was using his

6   name in a way that he didn't like?

7       A.   I think specifically and more so on how he --

8   he was another elevator lead, by the way.

9       Q.   Jesse was an elevator lead?

10      A.   Yes, on the daytime.

11      Q.   On the daytime.  Okay.

12      A.   He felt that Owen would bad-mouth him to

13  other employees, and these people were going,

14  supposedly, to Jesse and telling him.

15      Q.   Okay.  Jesse felt like Owen was saying

16  negative things about the job that Jesse was doing on

17  the day shift; right?

18      A.   Right.

19      Q.   Owen didn't say anything negative about Jesse

20  personally; correct?

21          MS. ANTONUCCI:  Objection; lacks foundation.

22          MR. ORGAN:  Q.  That you knew of.

23      A.   I couldn't say specifically, but he was

24  taking it personal.

25      Q.   Jesse was taking it personally?

 1    the elevators and went down to their area, and they

 2    were getting into some kind of discussion there.

 3    Okay?  And that's when I heard that there was this

 4    discussion between them.

 5        Q.   And what did you hear about what the

 6    discussion was between Hilda and Owen?

 7        A.   About him not cooperating, and his overall

 8    attitude that -- I always question him:  Why did you

 9    go down there if you're assigned here?  Why did you go

10    over there?

11             And he said, "Oh, I just went over there."

12    It wasn't like he had a real good reason to go.  Okay?

13        Q.   Okay.

14        A.   And then somehow -- and I'm only saying what

15    Hilda told -- reported.  She reported that he started

16    making comments about that there was a relationship

17    between her and Aaron, and she felt offended because

18    she was married and the other guy was married, and she

19    felt that her name was being tossed around in a bad

20    way.

21        Q.   Okay.  Did you observe any of these

22    statements yourself by Owen?

23        A.   No.  I wasn't there when they had that

24    interaction.

25        Q.   Did you confront Owen about whether or not he

```
 1              MS. ANTONUCCI:  Objection; vague and lacks
 2    foundation.
 3              THE WITNESS:  I reported it to the people
 4    that I needed to report it to.
 5              MR. ORGAN:  Q.  And who did you report the
 6    interaction with Jesse to?
 7         A.   I think there's an email there, if I
 8    remember.  And I can't remember every single detail,
 9    because we write so many emails throughout our lives
10    anyway, but I think I reported it to Mr. Salazar and
11    to Mr. Quintero.
12         Q.   And what about the Hilda issue?
13         A.   It was all part of the same issue.
14         Q.   What's the timing of when you reported these
15    issues to Quintero and Salazar?
16         A.   You mean how many -- how much time did I let
17    go by?
18         Q.   Yeah.
19              Well, let's start it this way:  When did
20    Jesse bring to you his concerns about -- that Owen was
21    bad-mouthing him?
22         A.   I can't tell you the date.  It had to be on
23    or about the same time that these other complaints
24    came in.
25         Q.   So the complaints from Hilda and Jesse came
```

1    to you approximately the same time; is that right?

2        A.    Yes.

3        Q.    And was that right after you took over your

4    responsibilities as supervising the elevator

5    operators, or was it later?

6        A.    It was during that transition time.

7        Q.    So October of 2015 --

8        A.    That was the transition time, yes.

9             MS. ANTONUCCI:   Hold on.   Let him finish his

10   question.

11            MR. ORGAN:   Q.   So in approximately October

12   2015, when you were taking over responsibilities for

13   overseeing the elevator operators, that's the time

14   period when Jesse and Hilda came to you making

15   complaints about Owen Diaz; is that correct?

16        A.    I think that Hilda called me because she was

17   concerned about not being able to use the elevators,

18   and then within a very short period of time, all these

19   other things happened.   Okay?

20        Q.    And you think that --

21        A.    But I can't remember if Jesse mentioned it a

22   little bit before that or right after that time or a

23   period after that.   I don't remember.

24        Q.    It wasn't too long between the Hilda and the

25   Jesse --

1      A.   It was all, like, happening almost at the

2   same time.

3      Q.   And your best recollection is that that

4   occurred during the time that you were transitioning

5   to take over supervising the elevator operators; is

6   that right?

7      A.   Yes.

8      Q.   Did you talk to Owen about your concerns --

9   or strike that.

10        You did talk to Owen about the concerns that

11   Jesse raised to you?

12      A.   Yes.

13      Q.   When did you talk to Owen about the concerns

14   that Jesse raised?

15      A.   I would probably have to refer back to the

16   email to remember that, because the email was written

17   right as it happened, you know, as soon as it

18   happened, and it would be more specific on, you

19   know --

20      Q.   Okay.  What's your best estimate of when that

21   was?

22      A.   I don't know what you mean.  You're talking

23   about October?  Are you talking about a specific time?

24   What do you mean?

25      Q.   Yeah.  What's your best estimate, in terms of

1   was it October, November, December, 2015, 2016?

2      A.   I think it was during October.

3      Q.   And then Hilda, what's your best estimate of

4   when you talked to Owen Diaz about Hilda or the issues

5   raised by Hilda?

6      A.   Again, I'd like to refer back to the

7   specifics on the email.

8      Q.   I get that, but I'm asking you for your best

9   memory now.

10      A.   I can't remember.

11      Q.   So it could have been 2016 when you talked to

12   Hilda?

13      A.   No.

14      Q.   To Owen?

15      A.   No, I can't remember during that month of

16   October.  Okay?

17      Q.   Fair enough.

18      A.   If this happened this day, this day, this

19   day, I just don't have the dates.

20      Q.   I get that.  But your best memory is that you

21   talked to Owen Diaz about the Jesse issues in October

22   2015; right?

23      A.   Yes.

24      Q.   And your best memory is that you talked to

25   Owen Diaz about the Hilda issues in October 2015;

1   correct?

2       A.   On or about that time, yes.

3       Q.   Let's talk about -- did you talk to Owen

4   directly, or did you email him?  How did you address

5   the issues that Jesse raised with Owen Diaz?

6       A.   If I remember correctly, it was Mr. Salazar

7   and myself.

8       Q.   Where did it happen?

9       A.   I think it happened on or around the

10  elevators, you know, that location.  To my best

11  recollection.

12      Q.   What did you and Mr. Salazar say to Mr. Owen

13  Diaz about what Jesse had raised?

14      A.   Basically, how Jesse Leite felt.  We gave him

15  counsel as to, you know, it's not good to just say

16  things to other people, because you could hurt

17  somebody.

18           I'm going by the gist of what I remember, and

19  how Jesse was hurt, and, you know, a lot of times --

20  you know, like I mentioned earlier, sometimes we don't

21  even know who left the materials, so why accuse

22  somebody that they did it type thing.

23      Q.   What did Mr. Owen Diaz say in response?

24      A.   I think he realized that he could have maybe

25  handled it differently.

1      A.   As far as I can remember, yes.

2      Q.   And how did Owen Diaz seem to you, relative

3  to things relating to Hilda?  Did he admit that he had

4  said things about Hilda and Aaron having some kind of

5  relationship?

6      A.   From what I remember, he recognized that he

7  should have not done that.  Okay?

8      Q.   Okay.

9      A.   And, yes, I think he did acknowledge that,

10  you know, he would be more careful in the future about

11  things like that.

12      Q.   Did you give any kind of written verbal

13  warning or written warning to Mr. Diaz, relative to

14  his conduct?

15      A.   I don't recall that.  I can't remember right

16  now.

17      Q.   Did you consider the issue handled at that

18  point, after you and Mr. Salazar talked to Owen about

19  Jesse and Hilda?

20      A.   I think that that specific issue was dealt

21  with, and we do tell them that, you know, we didn't

22  want to revisit that or go back to that, have that

23  happen again, and I think he said that he was going to

24  try not to have it happen again.

25      Q.   And did Jesse complain to you later that it

```
 1              MS. ANTONUCCI:  Do you think we could take a
 2     quick lunch break or --
 3              MR. ORGAN:  Yeah, sure.
 4              MS. ANTONUCCI:  Okay.
 5              MR. ORGAN:  Let's go off the record.  It's
 6     12:28.  We're going off the record.
 7                   (Lunch recess taken from
 8                    12:28 p.m. to 1:10 p.m.)
 9                        ---oOo---
10                   AFTERNOON SESSION
11                EXAMINATION BY MR. ORGAN (Continued)
12              MR. ORGAN:  We're back on the record.  The
13     time is 1:23.
14       Q.   What's the next thing you can remember after
15     this incident with Jesse and Hilda?
16       A.   I don't know what you mean, "the next thing."
17       Q.   Yeah, that was a bad question.  Sorry about
18     that.
19              In terms of Mr. Diaz, Owen Diaz, what's the
20     next thing you can recall that was an issue that you
21     had to deal with relative to Owen Diaz?
22       A.   I don't remember, as far as, like, the
23     sequence chronologically.
24       Q.   Okay.  Well, tell me the other things that
25     you recall.  Even if you can't remember the chronology
```

1    of them, tell me the other things you remember, in

2    terms of issues that stood out for you, relative to

3    Owen Diaz and any issues relating to the elevators

4    or --

5         A.    He had issues with other departments who made

6    deliveries and pickups at the elevators.   They

7    complained numerous times about him not being

8    cooperative, him not communicating, shutting down.

9    They asked him questions, to the point of saying, "I

10   don't want to talk to you anymore.   From now on, you

11   send emails to me," you know, things like that.

12        I think Joyce De La Grande was the manager of

13   these people, you know, who brought the deliveries to

14   the elevators and picked up, and they continued to

15   complain about his overall attitude; that it was

16   negative.

17        Q.    Did you ever write up Owen Diaz for any of

18   his attitude?

19        A.    For that situation, I don't think I did,

20   okay, because I was listening to both sides.   I was

21   trying to get to the bottom of it.   You know, it was

22   obvious that he wasn't cooperating at times.   I told

23   him, you know, "You need to think about what you do.

24   Just try to, you know, work with them."

25        Q.    Did you ever figure out what was going on

```
 1        A.    No, no, this was after Tesla.  I called to
 2   see how he was doing, and he said, "Oh, by the way,
 3   next Saturday is my birthday.  Do you want to come
 4   by?"  So...
 5        Q.    Okay.  Now, at some point in time you became
 6   aware of some issues between Ramon Martinez and Owen
 7   Diaz; is that correct?
 8        A.    Yes.
 9        Q.    Tell me about that.  What do you recall about
10   that?
11        A.    I think there was an incident where Owen said
12   that Ramon was at the entrance to the elevator, on a
13   tugger, if I remember correctly, and that he got off
14   of the tugger, went in, and -- and this is what Owen
15   was telling me -- and that he was in his face, and he
16   was mad, and he was upset, and he said he felt that
17   that was inappropriate for Ramon to do that.
18        Q.    And did you talk to Ramon about it?
19        A.    No.  He was not my employee.  At that time,
20   Mr. Salazar was their supervisor, so I reported it to
21   him.
22        Q.    Did you ever have a discussion with Jesse
23   Salazar about what he found?
24        A.    Other than just informing him that -- you
25   know, what Owen had said.
```

1        **A.    I saw a picture of it.**

2        Q.    And what did you think?  Was it offensive?

3              MS. ANTONUCCI:  Objection; vague and calls

4    for a legal conclusion.

5              MR. ORGAN:  Strike that.

6        Q.    Did you think that the drawing was offensive?

7              MS. ANTONUCCI:  Objection; vague, calls for

8    speculation, legal conclusion.

9              THE WITNESS:  I would respond by saying that

10   I took it serious that Owen felt offended.

11             MR. ORGAN:  Q.  It was clear to you that Owen

12   felt offended; right?

13       **A.    Yes.**

14       Q.    Did you actually talk to Owen about it?

15       **A.    Yes.**

16       Q.    And when Owen talked to you about it, what

17   did he say?

18       **A.    He said that during the night, someone had**

19   **drawn this picture on this pallet of cardboard going**

20   **down, and that he took offense to it; that he felt bad**

21   **by -- you know, he didn't know who did it at the time,**

22   **and I guess after I spoke to him, he spoke to the**

23   **recycle people, and it came out that Ramon had**

24   **admitted to drawing the picture.**

25       Q.    And what happened next?

**Page 110**

1       **A.     I reported it to Victor Quintero, who was in**

2   **charge of the recycling supervisors, and Ramon, who**

3   **was a supervisor, or is.   I don't know if he still is**

4   **or not.   And then I reported it to Wayne Jackson.**

5       Q.   Did you report the incident to Tesla HR?

6       **A.   I did not.**

7       Q.   Why not?

8       **A.   Because Ramon was not my employee.   I took it**

9   **directly to the manager of the department, and he said**

10  **that he would take care of it.**

11      Q.   Manager of the department being Victor

12  Quintero; correct?

13      **A.   Correct.**

14      Q.   Anything else that you can recall about that

15  interaction, or that incident regarding the picture?

16      **A.   No.**

17      Q.   Do you remember if Owen Diaz said why he was

18  offended by the picture?

19      **A.   I don't recall.**

20      Q.   Owen Diaz made it clear to you, didn't he,

21  that he felt like the picture was targeted to him

22  because he was black; right?

23          MS. ANTONUCCI:  Objection; vague.

24          MR. ORGAN:  Q.  Or African-American.

25      **A.   I know there's a text, a copy of a text that**

1   going to take.  I will send another email on final

2   decision we will make as a group."

3          Were you part of some group that was making a

4   decision about what to do?

5      A.   No.  I had assumed that he was referring to

6   him looking into the matter and Jamie looking into the

7   matter.

8      Q.   And you never conducted any kind of

9   investigation into this issue relating to Judy

10  Timbreza using any kind of racist words or racially

11  offensive remarks towards Owen Diaz; correct?

12     A.   I don't remember.  I don't think I made that

13  type of investigation.  It was kind of -- Tom did

14  something; Jamie did something; they were talking to

15  these people, and we were informed that the people

16  denied hearing those remarks.

17             MR. ORGAN:  Okay.  This will be Exhibit 43.

18             (Whereupon Deposition Exhibit 43

19              was marked for identification.)

20             MR. ORGAN:  Q.  Exhibit 43, for the record,

21  is a one-page document, Bates-stamped Tesla 511.

22     A.   Okay.

23     Q.   Have you seen this email before?

24     A.   I did.

25     Q.   This was an email that you reviewed prior to

1   coming today; correct?

2        A.    Yes, mm-hm.

3        Q.    This is an email you sent; is that correct?

4        A.    It is.

5        Q.    Why were you sending this email to Victor

6   Quintero?

7        A.    Just to keep him abreast of the accusations

8   that had come up, okay, and he was the manager, so I

9   felt he needed to know about it.

10       Q.    In your email in Exhibit 43, you say, "We

11  investigated by speaking to all witnesses present, but

12  they said they did not hear the remarks."

13            So you were part of the investigation;

14  correct?

15       A.    Well, as the group effort, yes.

16       Q.    That's why you said "we"; correct?

17       A.    Yes.

18       Q.    And then the next part of that sentence says,

19  "Although more than one person agreed, Mr. Timbreza

20  tendency to kid around excessively."

21       A.    Mm-hm.

22       Q.    So it at least appeared, based on the

23  investigation that was conducted, that Mr. Timbreza

24  had engaged in some inappropriate conduct; correct?

25            MS. ANTONUCCI:  Objection; misstates

1    testimony.  Calls for speculation.

2              THE WITNESS:  What was your question?

3              MR. ORGAN:  Q.  As part of the investigation

4    of the group, the "we" that you refer to here --

5    actually, who are the "we"?

6        A.   Tamotsu, or Tom, okay, Jamie Salazar, were

7    taking the lead on this.

8        Q.   Tom and Jamie were taking the lead?

9        A.   Yes, they were.

10       Q.   What are you looking at there?

11       A.   No, I thought it was something different than

12   this (indicating).

13             MS. ANTONUCCI:  It's the same.

14             THE WITNESS:  It's the same.

15             MR. ORGAN:  Q.  So Tom and Jamie took the

16   lead, but they kept you informed as part of their

17   investigation; correct?

18       A.   Yes, correct.

19       Q.   Did they take notes, do you know?

20       A.   I have no idea if they did.

21       Q.   Did they give you summaries of the

22   information that they learned?

23       A.   I think Jamie Salazar said, "Ed, we talked to

24   these people; they deny every hearing any of that."

25       Q.   They denied hearing the specific racial

1    terms; right?

2        A.    That the witnesses denied hearing any racial

3    slurs being made.

4        Q.    But the witnesses also said that Mr. Timbreza

5    had a tendency to kid around excessively.

6        A.    Correct.

7        Q.    Right?

8              And you had no basis to suggest or think that

9    Owen Diaz was lying about this, did you?

10       A.    No.

11             MS. ANTONUCCI:  Objection; vague.

12             MR. ORGAN:   Q.   In fact, a verbal warning was

13    issued to Mr. Timbreza, wasn't it?

14       A.    It was for his kidding around excessively.

15       Q.    Did it mention anything about racially

16    offensive remarks?

17       A.    I don't think that it did.

18       Q.    Did you see this verbal warning that --

19       A.    I don't remember.

20       Q.    Let me finish the question.

21       A.    Okay.

22       Q.    Did you see the verbal warning that was

23    issued to Mr. Timbreza?

24       A.    I do not remember looking at it.  I can't

25    remember looking at it.

Page 159

1       Q.    Well, you knew about what was in it, though;

2    right?

3       A.    Yes.

4       Q.    Because the two people who looked into it,

5    Tom and Jamie, they told you about the verbal warning;

6    right?

7       A.    I remember Jamie Salazar telling me about it.

8       Q.    At that point in time, were you Jamie's boss?

9       A.    I've never been Jamie's boss.

10      Q.    Why were Tom and Jamie talking to you at all

11   about this?

12            MS. ANTONUCCI:  Calls for speculation.

13            THE WITNESS:  I don't know.

14            MR. ORGAN:  Q.  Why were you involved in this

15   investigation in this point in time, if you weren't

16   Tom and Jamie's supervisor?

17      A.    When I got hired -- I'll say it again.

18            When I got hired by nextSource and

19   interviewed by nextSource and Victor Quintero, Victor

20   Quintero must have seen something in me that he

21   thought would be good for Tesla, okay, so I got hired

22   on as a janitorial supervisor.  But being that he felt

23   that he was going to be losing me in the near future

24   in his group, he wanted me to start knowing what they

25   do in recycling and the other janitorial areas.  Okay?

EDWARD ROMERO
November 30, 2018

Page 161

```
 1    not a lead or supervisor.
 2         Q.   That's what I said.  I thought I said that.
 3         A.   No, I understood it differently.
 4         Q.   Judy Timbreza was just an elevator operator?
 5         A.   Correct.
 6         Q.   And then Tom Kawasaki was the lead above
 7    Mr. Timbreza; is that correct?
 8         A.   Correct.
 9         Q.   And then Jamie was the supervisor for the
10    elevator operators and the leads; correct?
11         A.   Correct.
12         Q.   So if I have the progression right, you have
13    Timbreza is just an elevator operator, just a worker;
14    right?
15         A.   Yes.
16         Q.   And then his immediate supervisor is Tom
17    Kawasaki --
18         A.   Yes.
19         Q.   -- the lead; correct?
20         A.   Yes.
21         Q.   And then Tom Kawasaki's supervisor is the
22    elevator supervisor, who was Jamie Salazar; is that
23    correct?
24         A.   Yes.
25         Q.   And then who was above Jamie Salazar at that
```

1    point in time?

2        A.    Victor Quintero.

3        Q.    So at this time, when you wrote this email,

4    Victor Quintero was Jamie Salazar's supervisor;

5    correct?

6        A.    Yes.

7        Q.    And then eventually, you took over those

8    supervisor roles when you transitioned to a Tesla

9    employee; is that right?

10        A.    Yes.

11        Q.    Let's go back to this.

12              It says, "We have given Mr. Timbreza a verbal

13    warning and explained his need to treat his fellow

14    team members with dignity and respect."

15              The conclusion was, in the verbal warning,

16    that Mr. Timbreza had not treated his fellow team

17    members with dignity and respect; correct?

18        A.    Yes.

19        Q.    And in fact, if Mr. Timbreza engaged in any

20    similar conduct, he was going to be terminated; right?

21        A.    Yes.

22        Q.    It says here, "We have his signed verbal

23    notice filed in the nextSource office."

24              Do you know what that's referring to?

25        A.    I do not.

EDWARD ROMERO
November 30, 2018

**Page 179**

```
 1       A.    Yes.
 2             MR. ORGAN:   Let's mark this as Exhibit 53.
 3             (Whereupon Deposition Exhibit 53
 4              was marked for identification.)
 5             MR. ORGAN:   Q.   Exhibit 53, for the record,
 6   is a one-page document, Bates-stamped Tesla 308.
 7             So this was an email that you sent to Victor
 8   Quintero with a copy to Jamie Salazar down at the
 9   bottom.   This is -- I think you've already testified a
10   bit about the tension or problems that were going on
11   between Hilda, Aaron and Jesse and Owen Diaz; correct?
12       A.    Yes.
13       Q.    Does this refresh your recollection on any
14   more details?   Exhibit 53, does it refresh your
15   recollection about any more details?
16       A.    No.   I think it's covered on the things I
17   mentioned before.
18       Q.    In the meeting that you had with Owen Diaz,
19   it says here, down on Number 5, that Mr. Diaz agreed
20   that he needed to stop his conduct and make
21   improvements; right?
22       A.    Yes.
23       Q.    And he said he'd try to take steps to improve
24   his relationship with others, including Jesse; right?
25       A.    Yes.
```

1      **A.     Hilda was the same person that he had had a**
2   **problem with two or three weeks prior.**
3      Q.    Okay.  So it appears, at least as of this
4   October 15th date, that Hilda and Owen Diaz are
5   getting along better, doesn't it?
6      **A.    I had no reason to believe that any further**
7   **problems had occurred, because I didn't hear of any.**
8      Q.    And it looks like they are cooperating, Hilda
9   and Owen are cooperating to try and cover a
10  short-staffing situation; correct?
11     **A.    Yes.  Victor says that he had spoke to Israel**
12  **and Hilda about cooperating, and they agreed.**
13     Q.    Now, at this point in time, October 15th and
14  October 19th, you are now a Tesla employee; correct?
15     **A.    Yes.**
16          MR. ORGAN:  Let's make this next in line,
17  which is 55.
18          (Whereupon Deposition Exhibit 55
19           was marked for identification.)
20          MR. ORGAN:  Q.  Exhibit 55, for the record,
21  is a one-page document.  I can't tell what the Bates
22  number is because that got cut off, but it's a series
23  of emails from October 17th, 2015, until October 19th
24  of 2015, where the subject line is Owen.  And the
25  bottom email, so the first in time is an email from

1   Ramon Martinez to you.

2          Do you see that?

3   A.   Mm-hm.   Yes, I do.

4   Q.   And then there's an email from you to Josue

5   Torres, where you tell Josue that you were going to

6   investigate that then, October 17th; correct?

7   A.   Yes.   Mm-hm.

8   Q.   Now, when you investigated, you actually

9   found that Mr. Diaz was complaining about

10  Mr. Martinez; correct?

11  A.   Ask that question again.

12  Q.   Yeah.

13         Did you investigate this complaint by Ramon

14  Martinez?

15  A.   I don't remember what the investigation

16  outcome was, and I'm being honest.   I don't remember

17  what it was.   Okay?

18  Q.   I understand that.   My question is whether

19  you investigated it or not.

20  A.   I think that I did.

21  Q.   Yeah, because you say here, "I will

22  investigate this today."

23  A.   Correct.

24  Q.   Okay.   When you did investigate, you actually

25  got information that Ramon Martinez had engaged in

 1    inappropriate threatening conduct, didn't you?

 2           MS. ANTONUCCI:  Objection; misstates prior

 3    testimony.  And it's an improper conclusion.

 4           THE WITNESS:  I would have to look to see

 5    what you're referencing to, because I don't

 6    remember -- I can't remember right now, you know, what

 7    transpired after this, and who said what.  I don't

 8    remember.

 9           MR. ORGAN:  Q.  What was your relationship

10    with Ramon Martinez?

11       **A.    I don't know him, other than seeing him as**

12    **part of the recycling team.**

13       Q.    Did you ever socialize with Mr. Martinez?

14       **A.    Never.**

15       Q.    Approximately how old was Ramon Martinez?

16       **A.    My estimated guess would be probably late**

17    **40s.**

18       Q.    You had information that Mr. Martinez did not

19    get along with Mr. Diaz correct?

20           MS. ANTONUCCI:  Objection; calls for

21    speculation.  Vague.

22           THE WITNESS:  Only on the matters that had

23    come to light on them having problems.

24           MR. ORGAN:  Q.  Mr. Martinez, in this email,

25    alleged that Owen Diaz was not acting in a

1   professional way with him; correct?

2       A.   Correct.

3       Q.   And you also had information that Owen Diaz

4   claimed that Mr. Martinez acted in an unprofessional

5   way with Mr. Diaz; correct?

6           MS. ANTONUCCI:  Objection.

7           THE WITNESS:  I think that going on the --

8           MS. ANTONUCCI:  Objection; vague, calls for a

9   legal conclusion, misstates testimony.

10          MR. ORGAN:  Q.  Keep going.  What were you

11   going to say?

12      A.   That's all.

13          MR. ORGAN:  I'm sorry.  Can you read back his

14   answer?

15          (Record read as follows:

16          "ANSWER:  I think that going on the --")

17          MS. ANTONUCCI:  Can you read back the

18   question?

19          MR. ORGAN:  Yes.

20          (Record read as follows:

21          "QUESTION:  And you also had information that

22   Owen Diaz claimed that Mr. Martinez acted in an

23   unprofessional way with Mr. Diaz; correct?

24          "MS. ANTONUCCI:  Objection.

25          "THE WITNESS:  I think that going on the --")

```
1              MR. ORGAN:  Q.  You think what?
2         A.   I don't remember what I was going to say.
3         Q.   Did you get a statement from Ramon Martinez?
4         A.   I don't recall the whole situation; you know,
5    I don't have -- other than this email saying that he's
6    complaining about Owen, I have nothing else to go on.
7              MR. ORGAN:  Okay.  Let's make this 56.
8              (Whereupon Deposition Exhibit 56
9               was marked for identification.)
10             MR. ORGAN:  Q.  Exhibit 56, for the record,
11   is a two-page document, Bates-stamped Tesla 135 and
12   136, and it's a -- something sent from an iPhone to Ed
13   Romero and Tom Kawasaki, from Owen Diaz, at 6:08 a.m.
14             Did you receive this?
15        A.   I remember seeing this, yes.
16        Q.   You understood that Mr. Owen Diaz was
17   complaining that Ramon Martinez had yelled at him in a
18   threatening manner; right?
19        A.   That is what Owen said.
20        Q.   And Owen said -- Owen Diaz also said that he
21   didn't feel safe around Ramon Martinez; right?  Is
22   that right?
23        A.   That's what I understood.
24        Q.   Okay.  And then it says, above that, there's
25   an email from Wayne Jackson, where it says -- this is
```

1   on the first page of Exhibit 56, here is Ramon's

2   statement:  "I'm waiting for Rathaj and Ramon to send

3   me theirs.  Ed has a meeting scheduled with them

4   Wednesday at 6:00 p.m. that I will be attending with

5   them."

6        Did you have a meeting with Rathaj and Ramon

7   and Wayne Jackson?

8        A.   No, I don't think that I did.  I think it was

9   referred to Wayne Jackson.

10       Q.   So when Wayne Jackson says in this email of

11  October 20th, "Ed has a meeting scheduled with them

12  for Wednesday at 6:00 p.m." --

13       A.   I see it.

14       Q.   -- you're saying that meeting didn't occur?

15       A.   I don't remember being in that meeting.

16       Q.   Did you ever get a copy of Ramon's statement?

17       A.   I think I did, and it was forwarded to Wayne

18  Jackson.

19       Q.   Okay.

20       A.   Or given to him.  I don't remember how that

21  was.

22       Q.   You received Ramon's statement, and then you

23  remember forwarding it to Wayne Jackson; is that

24  correct?

25       A.   I think that would have been the action I

1   this incident?

2            MS. ANTONUCCI:  Objection; vague.

3            MR. ORGAN:  Q.  I'm just wondering, did it

4   appear to you that Mr. Owen Diaz followed the correct

5   procedure here with respect to this incident and the

6   elevator?

7       A.   I think that he looked into it appropriately.

8       Q.   And I guess Rathaj Foster was then

9   terminated; is that right?

10      A.   I don't recall if he was terminated because

11  of this.  This was -- as you notice, it was -- I think

12  we included Wayne Jackson as part of this.

13           MR. ORGAN:  Okay.  Let's make this 64.

14           (Whereupon Deposition Exhibit 64

15            was marked for identification.)

16           MR. ORGAN:  Q.  Exhibit 64, for the record,

17  is a two-page document -- three-page document,

18  Bates-stamped City Staff 11 through 13.  And the

19  subject matter is termination of Rathaj foster.

20           This was Mr. Foster engaged in threatening

21  conduct towards Owen Diaz; right?

22      A.   Yes.

23           MS. ANTONUCCI:  Objection; vague.

24           MR. ORGAN:  Q.  Well, that was your

25  understanding; that Rathaj Foster was removed from

```
 1   Tesla on November -- I guess it was 5th, because he
 2   was conducting himself in a threatening manner against
 3   Owen Diaz?
 4          MS. ANTONUCCI:  Objection; vague, calls for
 5   speculation.
 6          MR. ORGAN:  Q.  Your understanding -- the
 7   question is, your understanding was that Mr. Foster
 8   had conducted himself in a way where he threatened
 9   Owen Diaz; right?
10          MS. ANTONUCCI:  Take your time to read the
11   document.  Have you read all of it?
12          THE WITNESS:  Did I.
13          MS. ANTONUCCI:  Even the second page?
14          THE WITNESS:  I did, yes.  I did.
15          MS. ANTONUCCI:  Objection; vague, lacks
16   foundation.
17          MR. ORGAN:  Well, let's just establish the
18   foundation.
19      Q.   You wrote that email on Page 2; right?
20      A.   I did.
21      Q.   That's an email you wrote on November 6th at
22   12:12 a.m., to Wayne Jackson; right?
23      A.   Yes.
24      Q.   You copied it to Victor Quintero and Jamie
25   Salazar; right?
```

1          A.    Yes.

2          Q.    And in that, you mentioned that Rathaj Foster

3     had been removed the previous night at 10:00 p.m. from

4     the Tesla premises; right?

5          A.    He was removed to avoid any more friction

6     that day between him and Owen.

7          Q.    Right.

8                And you had -- you first got a report where

9     Mr. Foster was making a claim about not being able to

10    take a break; correct?   That's what Mr. Foster was

11    claiming.

12         A.    He did.   And there's other information that

13    Wayne -- I mean -- Wayne.   And I don't remember where

14    it is, but Owen was -- I don't know if these are

15    referring to the same night, that he asked Rathaj to

16    go -- to wait to take his break.

17         Q.    And that was because they were short-staffed;

18    right?

19         A.    Correct.   It could be that, or it could be

20    that there was a lot of production material to move.

21         Q.    But Owen told you that Mr. Foster said, "You

22    better watch your car," or something like that;

23    correct?

24         A.    He did say that.

25         Q.    And then you interviewed someone else who was

EDWARD ROMERO
November 30, 2018

Page 200

1    present; right?  Jordano Ramirez.

2         A.   Jordan?

3         Q.   If you look at the bottom of the second page

4    of Exhibit 64, you'll see that you interviewed Jordano

5    Ramirez; right?

6         A.   Show me where that's at.

7         Q.   Actually, you've got a written statement from

8    him; correct?

9         A.   Yes.

10         Q.   And he wrote in his statement that he

11    witnessed Rathaj foster conducting himself in a

12    threatening manner towards Owen Diaz; right?

13         A.   Mm-hm.

14         Q.   So you were the one who called security and

15    explained the situation; right?

16         A.   I did.

17         Q.   You were the one that had Mr. Foster removed

18    from the premises; right?

19         A.   Yes.

20         Q.   Because you had corroboration that Mr. Foster

21    was threatening Mr. Diaz; right?

22         A.   Yes.

23         Q.   And that was inappropriate conduct; right?

24         A.   It was.  I took it very serious when anybody

25    made any threats toward anybody else.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19         EXHIBITS TO DEPOSITION OF EDWARD ROMERO
20
21         REDACTED – CONDITIONALLY FILED UNDER SEAL
22
23
24
25
26
27
28

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

```
 1   State of California            )
 2   County of Marin               )
 3
 4              I, Bridget M. Mattos, hereby certify
 5   that the witness in the foregoing deposition was by me
 6   duly sworn to testify to the truth, the whole truth
 7   and nothing but the truth in the within entitled
 8   cause; that said deposition was taken at the time and
 9   place herein named; that the deposition is a true
10   record of the witness's testimony as reported to the
11   best of my ability by me, a duly certified shorthand
12   reporter and disinterested person, and was thereafter
13   transcribed under my direction into typewriting by
14   computer; that the witness was given an opportunity to
15   read, correct and sign the deposition.
16              I further certify that I am not
17   interested in the outcome of said action nor connected
18   with or related to any of the parties in said action
19   nor to their respective counsel.
20              IN WITNESS WHEREOF, I have hereunder
21   subscribed my hand on November 30, 2018.
22
23              BRIDGET M. MATTOS, CSR NO. 11410
24
25
```