JASON A. GELLER (CA SBN 168149)
jgeller@fisherphillips.com
JUAN C. ARANEDA (CA SBN 213041)
jaraneda@fisherphillips.com
VINCENT J. ADAMS (CA SBN 249696)
vadams@fisherphillips.com
FISHER & PHILLIPS LLP
One Embarcadero Center, Suite 2050
San Francisco, California 94111
Telephone:     (415) 490-9000
Facsimile:     (415) 490-9001

Attorneys for Defendant
nextSource, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO COURTHOUSE

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ and LAMAR PATTERSON,<br><br>                              Plaintiffs,<br><br>     vs.<br><br>TESLA, INC. DBA TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; NEXTSOURCE, INC.,<br><br>                              Defendants. | Case No. 3:17-cv-06748-WHO<br>*[Removed from Alameda Superior Court, Case No. RG17878854]*<br><br>**DECLARATION OF JUAN ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION OF ISSUES**<br><br>**Date:**         December 18, 2019<br>**Time:**         2:00 p.m.<br>**Courtroom:**  2<br>**Judge:**        Hon. William H. Orrick<br><br>Amended Complaint Filed: December 26, 2018 |

## **DECLARATION OF JUAN C. ARANEDA**

I, Juan C. Araneda, declare as follows:

1.      I am an attorney with the law firm of Fisher & Phillips LLP, attorneys of record for Defendant nextSource, Inc. ("Defendant") in this action. I am duly licensed to practice law in the State of California and before the United States District Court for the Northern District of California.  I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to these facts.

2.      Attached hereto as **Exhibit "A"** is a true and correct copy of the Amended Complaint for Damages in this matter filed on December 26, 2018.

3.      Attached hereto as **Exhibit "B"** are true and correct copies of excerpts and exhibits from the deposition transcript of Kevin McGinn, taken on June 17, 2019.

4.      Attached hereto as **Exhibit "C"** are true and correct copies of excerpts and exhibits from the deposition transcript of Wayne Jackson, taken on May 17, 2019.

5.      Attached hereto as **Exhibit "D"** is a true and correct copy of excerpts and exhibits from the deposition transcript of Owen Diaz, Volume I, taken on May 22, 2018.

6.      Attached hereto as **Exhibit "E"** is a true and correct copy of excerpts and exhibits from the deposition transcript of Owen Diaz, Volume II, taken on December 4, 2018.

7.      Attached hereto as **Exhibit "F"** is a true and correct copy of excerpts and exhibits from the deposition transcript of Owen Diaz, Volume III, taken on June 21, 2019.

8.      Attached hereto as **Exhibit "G"** is a true and correct copy of excerpts and exhibits from the deposition transcript of Monica DeLeon, taken on December 6, 2018.

9.      Attached hereto as **Exhibit "H"** is a true and correct copy of excerpts and exhibits from the deposition transcript of Victor Quintero, taken on June 7, 2018.

10.     Attached hereto as **Exhibit "I"** is a true and correct copy of excerpts and exhibits from the deposition transcript of Edward Romero, taken on November 30, 2018.

11.     Attached hereto as **Exhibit "J"** is a true and correct copy of excerpts and exhibits from the deposition transcript of Tamotsu Kawasaki, taken on October 9, 2019.

12.     Attached hereto as **Exhibit "K"** is a true and correct copy of excerpts and exhibits

1   from the deposition transcript of Annalisa Heisen, taken on May 29, 2019.

2        13.     Attached hereto as **Exhibit "L"** is a true and correct copy of excerpts and exhibits

3   from the deposition transcript of Ludivina Ledesma, taken on June 6, 2019.

4        I declare under penalty of perjury under the laws of the State of California and the United

5   States of America that the foregoing is true and correct. Executed this 29th day of October 2019

6   in San Francisco, California.

7

8

9        _____*/s/ Juan C. Araneda*_____
         JUAN C. ARANEDA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

1  LAWRENCE A. ORGAN (SBN 175503)
2  NAVRUZ AVLONI (SBN 279556)
   CALIFORNIA CIVIL RIGHTS LAW GROUP
3  332 San Anselmo Avenue
   San Anselmo, California 94960
4  Tel.:   (415) 453-4740
   Fax.:  (415) 785-7352
5  larry@civilrightsca.com
   navruz@civilrightsca.com
6
7  Attorneys for Plaintiffs
   DEMETRIC DI-AZ, OWEN DIAZ AND LAMAR PATTERSON
8
9           **UNITED STATES DISTRICT COURT**
10          **NORTHERN DISTRICT OF CALIFORNIA**
11
12 DEMETRIC DI-AZ, OWEN DIAZ and        ) Case No. 17-cv-06748-WHO
   LAMAR PATTERSON,                     )
13                                       ) AMENDED COMPLAINT FOR DAMAGES
          Plaintiffs,                    )
14                                       ) 1.  Racial Discrimination, Harassment,
       v.                                )     Retaliation, Failure to Prevent, Constructive
15                                       )     and Wrongful Termination in Violation of 42
   TESLA, INC. DBA TESLA MOTORS, INC.;  )     U.S.C. § 1981;
16 CITISTAFF SOLUTIONS, INC.; WEST      ) 2.  Racial Discrimination in Violation of the
   VALLEY STAFFING GROUP;               )     Unruh Civil Rights Act;
17 CHARTWELL STAFFING SERVICES, INC.;   ) 3.  Retaliation - Unruh Civil Rights Act;
   NEXTSOURCE, INC.; and DOES 1-10,     ) 4.  Threats of Violence in Violation of the Ralph
18 inclusive,                           )     Civil Rights Act;
19                                       ) 5.  Threats of Violence - Bane Act;
          Defendants.                    ) 6.  Interference with Constitutional Rights in
20                                       )     Violation of the Bane Act;
                                         ) 7.  Whistleblower Retaliation;
21                                       ) 8.  Racial Harassment under FEHA;
                                         ) 9.  Racial Discrimination under FEHA;
22                                       ) 10. Retaliation under FEHA;
                                         ) 11. Failure to Prevent under FEHA;
23                                       ) 12. Negligent Infliction of Emotional Distress;
                                         ) 13. Intentional Infliction of Emotional Distress;
24                                       ) 14. Negligent Hiring Retention and Supervision;
                                         ) 15. Wrongful Termination; and
25                                       ) 16. Constructive Discharge.
26                                       )
                                         ) JURY TRIAL DEMANDED
27                                       )
28 _____ )

**INTRODUCTION**

1.      Even amongst the giants of California's Silicon Valley, Tesla, Inc. stands out as an innovative and groundbreaking company that is at the forefront of the electric vehicle revolution. As a result, Owen Diaz, his son Demetric Di-az, and Lamar Patterson were thrilled when they landed work at Tesla's production factory, located in Fremont, California.

2.      Instead of a modern workplace, however, Plaintiffs encountered a scene straight from the Jim Crow era. Although the men worked in different areas of the factory, all three were targets of racially motivated abuse, including the frequent use of racial slurs. Plaintiffs complained to their supervisors, but Tesla, Inc., took no action. Plaintiffs quickly learned that Tesla's progressive image was a façade papering over its regressive, demeaning treatment of African-American employees.

**PARTIES**

3.      Defendant Tesla, Inc., d.b.a. Tesla Motors, Inc., (hereinafter "Tesla") is a publicly-traded Delaware corporation whose principal place of business is located in Palo Alto, California. Tesla designs, manufactures, and sells electric vehicles. One of Tesla's vehicle manufacturing facilities, also known as the "Tesla Factory," is located at 45500 Fremont Boulevard in Fremont, California. The harassing conduct at issue in this case took place at the Tesla Factory in Fremont. Due to Tesla's ownership of the facility, its day-to-day managerial role in the facility, its right to hire, fire and discipline the employees, and its control of all terms and conditions of Plaintiff's employment, Tesla is Plaintiffs' joint employer, which provides employment pursuant to contract.

4.      Defendant Citistaff Solutions, Inc. (hereinafter "Citistaff") is a California corporation whose principal place of business is located in Orange, California. Citistaff is a staffing company that provides trained employees to businesses for short-and long-term assignments, and therefore provides employment pursuant to contract. When Citistaff's employees are sent to work at their client's sites, they receive paychecks from Citistaff. Citistaff retains control over hiring and firing decisions and also selects the locations where its employees work. Plaintiffs are informed and believe and on that basis allege that in addition to being joint

employers, Defendants Tesla and Citistaff are alter egos and/or integrated enterprises such that the actions of one entity can be and are attributable to the other entity.

5.     Defendant West Valley Staffing Company (hereinafter "West Valley") is a staffing corporation with corporate offices in Sunnyvale, California. West Valley provides trained employees for short and long-term assignments to other businesses, and therefore provides employment pursuant to contract. When West Valley employees are sent to work at other business' sites, they receive paychecks from West Valley, West Valley retains control over hiring and firing decisions, and also selects the locations at which its employees work. Plaintiffs are informed and believe and on that basis allege that in addition to being joint employers, Defendants Tesla and West Valley are alter egos and/or integrated enterprises such that the actions of one entity can be and are attributable to the other entity.

6.     Defendant Chartwell Staffing Services Inc. (hereinafter "Chartwell"), doing business as Chartwell Staffing Solutions, is a staffing corporation with corporate offices in San Jose, California. Chartwell provides employees for short and long-term assignments to businesses in the United States, and therefore provides employment pursuant to contract. Plaintiff Lamar Patterson applied for a Tesla position through Chartwell. He received all relevant training and orientation directly through Tesla, clocked in and out using Tesla's timekeeping system, and Tesla maintained power over hiring and firing decisions. Plaintiff Lamar Patterson selected to work for Tesla, rather than being assigned a location by Chartwell. Plaintiffs are informed and believe and on that basis allege that in addition to being joint employers, Defendants Tesla and Chartwell are alter egos and/or integrated enterprises such that the actions of one entity can be and are attributable to the other entity.

7.     Defendant nextSource, Inc. (hereinafter "nextSource") is a Delaware corporation with its principal place of business located in New York City, New York. nextSource provides contract employees from staffing corporations, such as Defendant Citistaff, to contracting companies, such as Defendant Tesla. nextSource accordingly provides employees pursuant to contract. In addition, nextSource provides human resources functions to the contracting businesses and staffing agencies, has power to make hiring and firing decisions, and to select the

employees who work at a particular contracting company. Plaintiffs are informed and believe, and on that basis allege, that in addition to being joint employers, Defendants nextSource, Citistaff, and Tesla are alter egos and/or integrated enterprises such that the actions of one entity can be and are attributable to the other entity.

8. Plaintiff Demetric Di-az (hereinafter "Demetric") was employed as a Production Associate jointly by defendants West Valley and Tesla from approximately August of 2015 through October of 2015. Demetric was placed by West Valley at the Tesla Factory in Fremont, California. Demetric is, and at all relevant times herein was, an adult African-American resident of California.

9. Plaintiff Owen Diaz (hereinafter "Owen") was employed as an Elevator Operator jointly by defendants Citistaff, nextSource, and Tesla between approximately June 2015 and May of 2016. Owen was placed by Citistaff and nextSource at the Tesla Factory in Fremont, California. Owen is, and at all relevant times herein was, an adult African-American resident of California.

10. Plaintiff Lamar Patterson (hereinafter "Lamar") was employed as an Elevator Operator jointly by defendants Chartwell and Tesla between approximately January 2016 and August 2016. Lamar is, and at all relevant times herein was, an adult African-American resident of California.

11. Each Defendant is sued individually and as the agent or employee of every other Defendant acting within the course and scope of said agency or employment, with the knowledge or consent of the other co-Defendants.

## JURISDICTION AND VENUE

12. This action is based on Plaintiffs' claims of employment discrimination against Defendants, which arise under the Civil Rights Act of 1866 (42 U.S.C. § 1981). This court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.

13. This court also has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367. Plaintiffs' state law claims arise from the same common nucleus

4

of operative facts as the underlying federal claims. Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to all parties.

14.     This Court has personal jurisdiction over defendant Tesla, which is a corporation incorporated in the state of Delaware with its corporate offices and principal place of business located in Fremont, California.

15.     This Court has personal jurisdiction over defendant Citistaff, which is a corporation incorporated in the State of California with its corporate offices and principal place of business located in Newark, California.

16.     This Court has personal jurisdiction over defendant West Valley, which is a corporation incorporated in the State of California with its corporate offices and principal place of business located in Sunnyvale, California.

17.     This Court has personal jurisdiction over defendant nextSource, which is a corporation incorporated in the state of Delaware with its corporate offices and principal place of business located in New York City, New York. The acts and omissions of defendant nextSource complained of herein occurred in Defendant Tesla's Fremont, California factory.

18.     Venue is proper in this court pursuant to 28 U.S.C. 1391(b)(2), because the acts and omissions of Defendants complained of herein occurred in Fremont, California.

## FACTUAL ALLEGATIONS

### DEMETRIC DI-AZ

19.     In approximately August of 2015, Demetric's father, Owen, informed him that West Valley had openings for positions at the Tesla Factory in Fremont, California.

20.     Demetric was excited at the prospect of working at the Tesla Factory so he applied for a position with West Valley. His application was accepted, and he signed a contract and began his training on August 24, 2015.

21.     In approximately August 2015, Demetric began working at the Tesla Factory as a Production Associate. Demetric participated in the development and application of Tesla's manufacturing system for the battery of its electric sedan, the Model S.

5

22.     Demetric took pride in his work, and was excited to work on the creation of Tesla's innovative vehicles.

23.     However, Demetric found it increasingly difficult to enjoy his job because of the daily racist epithets that he had to endure throughout his shift.  Demetric was called "nigger" on a regular basis, and observed other African-American employees enduring the same treatment. Additionally, Demetric's father, Owen, told him about racist epithets directed at him and showed Demetric offensive drawings he came across at the Tesla Factory.

24.     This treatment continued throughout Demetric's employment for West Valley and Tesla. For example, when Owen came to Demetric's department to bring him lunch, Demetric's shift lead said, "All you fucking niggers - I can't stand you motherfuckers."

25.     Demetric found this treatment demeaning and unbearably offensive.

26.     Demetric complained to West Valley about the racist abuse he endured at work on a daily basis. West Valley took no action.

27.     Upset and offended, Demetric complained to his supervisor at Tesla in October of 2015. He stated, "The way you're treating me - calling me an 'n-word' every day - that's not right." His supervisor replied, "If you don't like how you're treated, your time here is going to end." "So," Demetric asked, "you're going to fire me?" His supervisor replied, "You're a temp, anyway."

28.     After Demetric complained, the racist abuse dramatically increased in frequency.

29.     Within days of making his complaint, Demetric was issued a written warning based on accusations of misconduct. He was accused of using his phone on the production line. Prior to this written warning, Demetric had a good performance record.

30.     Within just one week of his complaint to his supervisor at the Tesla Factory, he was terminated for "breaking the rules." Other employees with similar warning were not terminated.

31.     Demetric believed the written warning and subsequent termination were pretextual. Demetric believed that his employment was terminated because he objected to the racist harassment and discrimination.

6

32.     As a direct and proximate result of the acts and omissions of the Defendants, Demetric has suffered, and continues to suffer emotional distress and psychological damage. This includes, but is not limited to: humiliation, mental anguish, stress, fear, depression, and anxiety.

33.     Defendants' actions have also resulted in wage and benefit losses, and are expected to lead to additional economic loss in the future.

34.     As a result of the Defendants' actions, Demetric hired private counsel to prosecute this action. Pursuant to California Civil Codes Sections 52.1, 51.7, and 52(b)(3), and Title 42 USC section 1988, Demetric is entitled to recover attorney's fees associated with the prosecution of these claims.

35.     Defendants' acts were malicious or oppressive, and intended to vex, injure, annoy, humiliate, and embarrass Demetric, and with conscious disregard of the rights and safety of Demetric and other African-American employees of West Valley. Demetric is informed and believes, and based thereon alleges, that West Valley and Tesla's managing agents ratified the wrongful conduct of Tesla's employees, because they were aware of the discriminatory conduct, and  failed to take immediate remedial action after Demetric's report of the oppressive conduct.

**OWEN DIAZ**

36.     Owen was elated when he discovered, in the summer of 2015, that he would be working at Tesla as an Elevator Operator through Citistaff and nextSource.

37.     In his early days at the Tesla Factory, Owen was excited to go to work every morning. He was a good and hardworking employee, and his performance caught his supervisors' attention. Within the first month of the start of his employment at the factory, an Asian-American supervisor promoted him to an elevator lead position.

38.     The supervisor warned him, however, that Tesla wouldn't want "someone like him" to be a lead. Owen believed his supervisor was stating that Tesla would not want an African-American man as a lead.

39.     Owen's opinion of Tesla quickly soured, as his supervisor's prediction proved true. After beginning his employment at the Tesla Factory, Owen became the subject of vitriolic

7

racial harassment. Tesla Factory employees directed racial epithets, such as "nigger," at him and other African-American Tesla employees on a daily basis.

40.    Other employees in the factory also instructed Owen, "Go back to Africa," implying that, as an African-American man, Owen did not belong in the United States.

41.    When Owen was operating the elevator with Conveyance Supervisor Robert (last name unknown), Robert instructed Owen to press the elevator by saying, "Nigger, hurry up, press the button."

42.    Robert regularly referred to Owen as "nigger," and also frequently called him "boy" in a demeaning tone.

43.    To Owen, these degrading modes of address were reminiscent of the way slave owners referred to their slaves. He found this racist behavior to be unbearable.

44.    Owen also witnessed racial slurs being used towards other African-American employees. His son, Demetric, worked in another department of the Tesla Factory. When Owen brought Demetric lunch one day, he overheard Demetric's supervisor referring to the African-American workers at the factory as "fucking niggers."

45.    Owen felt demeaned and offended when Tesla's employees referred to him as a "nigger." The constant use of this offensive language made him depressed. However, what truly broke Owen down was witnessing these racist epithets directed at his son, and hearing his son tell him about the racism he was experiencing at work.

46.    Owen complained verbally to Citistaff, but Citistaff took no action. Owen also complained to employees of Tesla and nextSource. However, no action was taken by any of the entities.

47.    Tesla's employees also drew racist and derogatory caricatures of African children that resembled the "pickaninny" imagery of the early twentieth century. These drawings typically featured images of dark-skinned individuals with big lips and bones in their hair. Features which are erroneously, and stereotypically, associated with African-American individuals. An example of such racially offensive conduct is attached as Exhibit A.

48.     To ensure there was no doubt about the racist intent behind this appalling imagery, the drawings were typically accompanied with captions such as, "Booo!" - suggesting that African-American individuals are undesirable and unpleasant.

49.     These drawings were regularly placed around the factory, in locations where African-American employees, including Owen, were certain to view them.

50.     Constantly viewing this racially offensive and demeaning imagery, coupled with the offensive message, caused Owen to feel demeaned, disrespected, and devalued.

51.     Owen discovered that the elevator supervisor, Ramon, was the source of the drawings. Owen confronted Ramon and explained that he found the drawings offensive and demeaning. Owen requested that Ramon stop his behavior.

52.     Ramon responded flippantly, "We're just playing, why do you people take things so hard?" By "you people," Ramon meant African-American employees.

53.     Ramon refused to stop the offensive behavior.

54.     Owen was distressed that Ramon would make the assumption that his rightful anger over this racist act was merely oversensitivity.

55.     Tesla supervisor Michael Wheeler was aware of the harassment and offensive drawings made by Ramon around the factory, and so was Owen's supervisor Ed Romero (hereinafter "Romero"). Because Owen was hired by Citistaff and nextSource, and not Tesla, he was informed he could not complain to Tesla's Human Resources department. In frustration, he sent a written complaint to Romero, his supervisor at Tesla.

56.     Romero stated that he would look in to the issue, but took no action. The harassing Tesla employees remained employed, and Owen was forced to continue to endure their harassment.

57.     Owen also complained to Citistaff, but Citistaff likewise took no action. nextSource similarly failed to take sufficient action to timely address Owen's complaints.

58.     On approximately October 17, 2015, Owen was training another Citistaff employee, Rothai. He was in the middle of explaining to Rothai that Romero would be his supervisor when the elevator doors opened to reveal Ramon.

9

59.     Ramon flew into a rage upon overhearing their conversation, and shouted, "Do you have a problem with me?! Why are you telling him who his supervisor is?!" Owen and Rothai had not been speaking about Ramon at all.

60.     Fearful, Owen did not respond. Ramon followed him into the elevator, and came within inches of Owen's body, preventing him from escaping. Ramon continued to shout and gesture aggressively.

61.     Based on Ramon's threatening words and conduct, and previous racist and generally hostile conduct, Owen feared that Ramon would hit him or otherwise harm him.

62.     Ramon was an able-bodied male who worked as a laborer, so Owen reasonably believed that Ramon had the ability to physically harm him.

63.     Owen asked Ramon to step back, and reminded Ramon that a security camera was recording the exchange. Eventually, Ramon exited the elevator.

64.     Following this exchange, Owen contacted Romero via email. He wrote, "…because of the way Ramon was acting I don't feel safe around him now. Can you please talk to him[?] I don't need any problems. I just want to do my job."

65.     Romero responded by writing, "Owen, I will speak to Ramon and follow up by speaking to you." Romero never again contacted Owen regarding the incident. Ramon continued to work with Owen, and Owen was not aware of any disciplinary measures taken against Ramon.

66.     Owen contacted Citistaff regarding this incident, Citistaff still took no action.

67.     The harassment and discrimination Owen experienced escalated after he made this complaint. Tesla's employees used racial slurs with greater frequency.

68.     Although Tesla, nextSource, and Citistaff had notice of the discriminatory and harassing behavior at the Tesla Factory, Tesla, nextSource, and Citistaff took no steps to protect African-American employees.

69.     In fact, Tesla, nextSource, and Citistaff ratified and supported the racially harassing behavior. In the spring of 2016, Citistaff informed Owen that he would be demoted from his supervisory position, because he was causing too much trouble, despite the fact that he had no negative performance reviews or disciplinary issues.

10

70.     Owen believed this explanation was merely a pretext. Owen believed Citistaff, nextSource, and Tesla were threatening him with a demotion in retaliation for his complaints regarding the racist, discriminatory behavior he experienced.

71.     Eventually, in approximately May of 2016, Owen quit his employment. Owen could no longer bear the abusive, racially harassing treatment he encountered daily at work. Since Citistaff, nextSource, and Tesla had repeatedly refused to investigate the racist behavior and instead ratified the attempts at retaliation by threatening Owen with a demotion, he worried that the situation would only degenerate further.

72.     As a direct and proximate result of the acts and omissions of the Defendants, Owen has suffered, and continues to suffer emotional distress and psychological damage. This includes, but is not limited to: humiliation, mental anguish, stress, fear, depression, and anxiety.

73.     Defendants' actions have also resulted in past wage and benefit loss, and are expected to lead to additional economic loss in the future.

74.     As a result of the Defendants' actions, Owen hired private counsel to prosecute this action. Pursuant to California Civil Codes Sections 52.1, 51.7, and 52(b)(3), and Title 42 USC Section 1988, Owen is entitled to recover attorney's fees associated with the prosecution of these claims.

75.     Defendants' acts were malicious or oppressive, and intended to vex, injure, annoy, humiliate, and embarrass Owen, and with conscious disregard of the rights and safety of Owen and other African-American employees of Defendants. Owen is informed and believes, and based thereon alleges, that managing agents ratified the wrongful conduct of the Defendants' employees, because they were aware of this conduct and failed to take immediate remedial action, and retained the errant employees after Owen's report of the oppressive conduct.

## LAMAR PATTERSON

76.     Lamar was excited to join Tesla as an Elevator Operator when he was hired in approximately January 2016. He worked hard and hoped to embark on a long-term career path at the company that he so much admired.

77.     It did not take long for Lamar to learn that the company was a hotbed for racist behavior. Both employees and supervisors used the word "nigger" freely and frequently throughout the Tesla Factory, left racist caricatures, images, and effigies around the factory for African-American employees to see, and made "jokes" such as, "Go back to Africa. We don't want you here!"

78.     Lamar complained to Supervisor Ed Romero about the use of the word "nigger" and the hurtful "jokes." However, neither Romero nor anyone else at Tesla took action to address the issue; he continued to hear the racist epithets on a regular basis, throughout his workday.

79.     Unable to bear the abusive and racially harassing treatment he encountered daily at work any longer, Lamar quit his employment with Defendants Tesla and Chartwell in approximately August of 2016.

80.     As a direct and proximate result of the acts and omissions of the Defendants, Lamar has suffered, and continues to suffer emotional distress and psychological damage. This includes, but is not limited to: depression and anxiety.

81.     Defendants' actions have also resulted in past wage and benefit loss, and are expected to lead to additional economic loss in the future.

82.     As a result of the Defendants' actions, Lamar hired private counsel to prosecute this action. Pursuant to California Government Code section 12965(b), California Civil Codes Sections 52.1, 51.7, and 52(b)(3), and Title 42 USC Section 1988, Owen is entitled to recover attorney's fees associated with the prosecution of these claims.

83.     Defendants' acts were malicious or oppressive, and intended to vex, injure, annoy, humiliate, and embarrass Lamar, and with conscious disregard of the rights and safety of Lamar and other African-American employees of Defendants. Lamar is informed and believes, and based thereon alleges, that managing agents ratified the wrongful conduct of the Defendants' employees, because they were aware of this conduct and failed to take immediate remedial action, and retained the errant employees after Lamar's report of the oppressive conduct.

84.     On or about July 31, 2017, Lamar filed a timely charge against Defendants Tesla and Chartwell with the Department of Fair Employment and Housing alleging discrimination,

12

harassment and retaliation on the basis of race and color; failure to prevent harassment, discrimination and retaliation; and constructive termination. The DFEH issued a right-to-sue letter regarding this charge on July 31, 2017.

## FIRST CAUSE OF ACTION

RACIAL DISCRIMINATION, RACIAL HARASSMENT (HOSTILE WORK ENVIRONMENT), RETALIATION, FAILURE TO INVESTIGATE AND PREVENT DISCRIMINATION AND HARASSMENT, WRONGFUL TERMINATION, CONSTRUCTIVE DISCHARGE
42 U.S.C. § 1981
(As to All Plaintiffs; Against All Defendants)

85.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

86.     As African-American men, Plaintiffs are members of a protected class. At all relevant times herein, Demetric was in a contractual relationship with defendant West Valley within the meaning of 42 U.S.C. § 1981, as amended. At all relevant times herein, Owen was in a contractual relationship with defendants Citistaff, nextSource, and Tesla within the meaning of 42 U.S.C. § 1981, as amended. At all relevant times herein, Lamar was in a contractual relationship with defendants Chartwell and Tesla within the meaning of 42 U.S.C. § 1981, as amended.

87.     During the course of Demetric, Owen and Lamar's employment, defendants Tesla, West Valley, Citistaff, nextSource, and Chartwell violated Plaintiffs' rights by depriving Plaintiffs of their right to the enjoyment of all benefits, privileges, terms, and conditions of Plaintiffs' employment contract "as is enjoyed by white citizens," in direct violation of 42 U.S.C. § 1981(b).

88.     Specifically, Tesla's employees and supervisors subjected Plaintiffs and others to racial harassment, racial discrimination, and a racially hostile work environment, culminating in an end to their employment relationship with Tesla. Tesla, West Valley, Citistaff, nextSource, and Chartwell failed to investigate and prevent incidents of racial harassment, despite numerous reports and complaints, thereby evidencing a pattern and practice of racial discrimination and harassment. All five defendants retaliated against Plaintiffs for complaining of a hostile work

environment by issuing Demetric a written warning based on false allegations, approving the retaliatory termination of Demetric, and making the work environment so unbearable that Owen and Lamar had no choice but to quit their employment.

89. Tesla acted intentionally to discriminate against Plaintiffs. Tesla's supervisory employees and agents used racial epithets and racist imagery to harass and intimidate Plaintiffs and others, and ignored Plaintiffs' repeated reports regarding this harassment and discrimination.

90. Defendants failed to prevent the racially harassing and retaliatory behavior directed at Plaintiffs and others. Ultimately, Plaintiff Demetric was wrongfully terminated, and Plaintiffs Owen and Lamar were constructively terminated.

91. Through their actions and treatment of Plaintiffs, Defendants and their agents intended to discriminate against Plaintiffs on the basis of their race.

92. Defendants' violations of the Civil Rights Act of 1866, as amended, caused Plaintiffs to suffer harm as set forth above.

93. As a result of Defendants' unlawful acts, Plaintiffs are entitled to damages as set forth herein.

94. By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

95. Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

//

//

//

//

14

## SECOND CAUSE OF ACTION

RACIAL DISCRIMINATION IN VIOLATION OF THE UNRUH CIVIL RIGHTS ACT
Cal. Civ. Code § 51
(As to All Plaintiffs; Against Defendant Tesla)

96.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

97.     Plaintiffs are African-American men, and residents of California.

98.     Defendant Tesla's Factory in Fremont is a business establishment for the purposes of the Unruh Civil Rights Act. A business establishment is a facility which is offered "to qualified [workers], who are not the establishment's employees, in exchange for… considerations." *Payne v. Anaheim Memorial Medical Center, Inc.*, 130 Cal. App. 4th 729, 733 (2005) (review denied). Defendant Tesla operates its Fremont Factory as a business establishment, offering the use of its facilities to qualified contractors, who are not its employees, in exchange for payment.

99.     Tesla acted intentionally to discriminate in its business establishment against Plaintiffs. Tesla's supervisory employees and agents used racial epithets and racist imagery to harass and intimidate Plaintiffs, ignored Plaintiffs' repeated reports regarding this harassment and discrimination, and prevented Plaintiffs from accessing its facilities in retaliation for Plaintiffs' complaints of discrimination and harassment.

100.    Defendants' violations of the Unruh Civil Rights Act caused Plaintiffs to suffer harm as set forth above.

101.    As a result of Defendants' unlawful acts, Plaintiffs are entitled to recover statutory damages of a maximum of three times the amount of actual damages, or a minimum of $4,000.

102.    By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

103.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### THIRD CAUSE OF ACTION
RETALIATION IN VIOLATION OF THE UNRUH CIVIL RIGHTS ACT
Cal. Civ. Code § 51
(As to Plaintiffs' Demetric and Owen; Against Defendant Tesla)

104.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

105.     The Unruh Act prohibits retaliation against persons who complain about conduct they reasonably believe to violate the Act. *See, e.g.*, *Vaughn v. Hugo Neu Proler Int'l* (1990) 223 Cal.App.3d 1612, 1619.

106.     Plaintiffs reasonably believed the race harassment they experienced at Tesla's Fremont factory to be a violation of their rights under California law.

107.     Plaintiffs complained against the harassment, and Defendants retaliated against Plaintiffs for reporting the harassment by issuing Demetric a write up and subsequently terminating his employment, and by threatening Owen with a demotion. Defendants further retaliated against Plaintiffs by subjecting them to further harassment.

108.     Defendants' violations of the Unruh Civil Rights Act caused Plaintiffs to suffer harm as set forth above.

109.     As a result of Defendants' unlawful acts, Plaintiffs are entitled to recover statutory damages of a maximum of three times the amount of actual damages, or a minimum of $4,000.

110.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

111.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

**FOURTH CAUSE OF ACTION**

THREATS OF VIOLENCE IN VIOLATION OF THE RALPH CIVIL RIGHTS ACT
Cal. Civ. Code § 51.7
(As to Owen; Against Defendants Citistaff, nextSource, and Tesla)

112.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

113.    Plaintiff Owen is an African-American man who worked at Tesla's Fremont Factory while employed by Citistaff and nextSource.

114.    While working at the factory, Owen was subjected to threats of violence by a Tesla employee, Ramon. Without any provocation, Ramon screamed at and physically intimidated Owen. Based on this and Ramon's previous hostile behavior, Owen believed that Ramon intended to hit him.

115.    In addition to his use of threatening language, Ramon, rushed into the elevator with Owen. He moved so that he was merely inches from Owen's body, preventing Owen from leaving the elevator. Ramon then continued to scream at Owen and berated and belittled him.

116.    Ramon's demeanor and conduct was threatening, such that Owen believed he was in imminent physical danger.  Ramon was an able-bodied male with the apparent ability to cause Owen physical harm.

117.    Based on Ramon's history of racially discriminatory and demeaning acts, Owen believed that Ramon's behavior was motivated by his hatred of and prejudice towards African-Americans.

118.    Owen reported Ramon's actions to Tesla. However, Tesla took no action, and implicitly ratified Ramon's abuse by failing to investigate his actions, and allowing Ramon to continue to abuse and harass Owen.

17

119.     Tesla further ratified Ramon's actions by retaliating against Owen and suggesting that Owen be demoted as punishment for reporting Ramon's racially abusive behavior.

120.     Because Tesla ratified Ramon's actions, Tesla is liable for his abuse under the doctrine of *respondeat superior*.

121.     Owen reported Ramon's actions to Citistaff and nextSource. However, Citistaff and nextSource took no action, and implicitly ratified Ramon's abusive behavior by failing to investigate his actions, and allowing Ramon to continue to abuse and harass Owen.

122.     Because Citistaff and Nextsource ratified Ramon's actions, Citistaff and nextSource are liable for his abuse.

123.     Defendants' violations of Section 51.7 of the California Civil Code caused Plaintiff Owen to suffer harm as set forth above.

124.     As a result of Defendants' unlawful acts, Plaintiff is entitled to recover a civil penalty of $25,000.

125.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

126.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## FIFTH CAUSE OF ACTION
THREATS OF VIOLENCE IN VIOLATION OF THE BANE ACT
Cal. Civ. Code § 52.1(a)
(As to Plaintiff Owen; Against Defendants Citistaff, nextSource, and Tesla)

127.     Plaintiff incorporates the foregoing paragraphs by reference, as though fully reproduced herein.

18

128.    Plaintiff Owen is an African-American man who worked at Tesla's Fremont Factory while employed by Citistaff and nextSource.

129.    While working at the factory, Owen was subjected to threats of violence by a Tesla employee, Ramon. Without any provocation, Ramon screamed at and physically intimidated Owen. Based on this and Ramon's previous hostile behavior, Owen believed that Ramon intended to hit him.

130.    In addition to his use of threatening language, Ramon, rushed into the elevator with Owen. He moved so that he was merely inches from Owen's body, preventing Owen from leaving the elevator. Ramon then continued to scream at Owen and berated and belittled him.

131.    Ramon's demeanor and conduct was threatening, such that Owen believed he was in imminent physical danger. Ramon was an able-bodied male with the apparent ability to cause Owen physical harm.

132.    Based on Ramon's history of racially discriminatory and demeaning acts, Owen believed that Ramon's behavior was motivated by his hatred of and prejudice towards African-Americans.

133.    Owen reported Ramon's actions to Tesla. However, Tesla took no action, and implicitly ratified Ramon's abuse by failing to investigate his actions, and allowing Ramon to continue to abuse and harass Owen.

134.    Tesla further ratified Ramon's actions by retaliating against Owen and threatening demoting him as punishment for reporting Ramon's racially abusive behavior.

135.    Because Tesla ratified Ramon's actions, Tesla is liable for his abuse under the doctrine of *respondeat superior*.

136.    Owen reported Ramon's actions to Citistaff and nextSource. However, Citistaff and nextSource took no action, and implicitly ratified Ramon's abusive behavior by failing to investigate his actions, and allowing Ramon to continue to abuse and harass Owen.

137.    Because Citistaff and nextSource ratified Ramon's actions, Citistaff and nextSource are liable for his abuse under the doctrine of *respondeat superior*.

19

138.     Defendants' violations of Section 52.1 of the California Civil Code caused Plaintiffs to suffer harm as set forth above.

139.     As a result of Defendants' unlawful acts, Plaintiff Owen is entitled to recover civil penalties of $25,000.

140.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

141.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### SIXTH CAUSE OF ACTION
INTERFERENCE WITH CONSTITUTIONAL RIGHTS IN VIOLATION OF BANE ACT
Cal. Civ. Code § 52.1(b)
(As to All Plaintiffs; Against All Defendants)

142.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

143.     Defendants interfered with Plaintiffs' constitutional right entitling them to equal protection.

144.     Defendants adopted the conduct, through their officers, directors, managing agents, or supervisory employees. They further ratified the conduct by failing to take appropriate prompt remedial action.

145.     A substantial motivating reason for Defendants' conduct was Plaintiffs' race.

146.     Defendants interfered with Plaintiffs' right to be free from discrimination on the basis of race as set forth above, and permitted working conditions that denied Plaintiffs their constitutional right entitling them to equal protection.

147.     Defendants' conduct caused Plaintiffs to suffer, and continue to suffer damages as set forth above.

148.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

149.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## SEVENTH CAUSE OF ACTION
### WHISTLEBLOWER RETALIATION
(Cal. Labor Code 1102.5)
(As to Plaintiffs Demetric and Owen; Against All Defendants)

150.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

151.     At all relevant times mentioned herein, Plaintiffs were African-American residents of California.

152.     At all relevant times mentioned herein, Demetric was an employee of defendant West Valley and Tesla.

153.     Demetric engaged in protected activity when he reported the racially harassing and discriminatory behavior to West Valley and Tesla, including the threat to terminate his employment for his refusal to endure the daily racial harassment.

154.     Demetric had a reasonable, good-faith belief that this behavior was a violation of the federal Civil Rights Act of 1964, and other state and federal statutes.

155.     West Valley and Tesla took adverse employment action against Demetric. Without justification or basis in fact, both entities accepted as true the assertions of Demetric's harassers that he was a poor performer; they then terminated Demetric's employment on that

false basis. West Valley and Tesla did this even though they knew that Demetric's supervisor responded to his complaint of harassment by threatening to terminate Demetric's employment.

156.    In terminating Demetric, West Valley and Tesla ratified the discriminatory behavior.

157.    At all relevant times mentioned herein, Owen was an employee of defendants Citistaff, nextSource, and Tesla.

158.    Owen engaged in protected activity when he reported the racially harassing and discriminatory behavior to Citistaff, nextSource, and Tesla.

159.    Owen had a reasonable, good-faith belief that this behavior was a violation of the federal Civil Rights Act of 1964, and other state and federal statutes.

160.    Citistaff, nextSource, and Tesla took adverse employment action against Owen by threatening him with a demotion. However, Owen had a positive performance history, and Tesla only threatened Owen with a demotion as punishment for complaining of the racist harassment.

161.    In accepting as true the proffered reasons for threatening Owen with a demotion, even though Owen had complained to Citistaff, nextSource, and Tesla of the discriminatory behavior of Tesla's employees on numerous occasions, Citistaff, nextSource, and Tesla ratified and continued the discriminatory behavior.

162.    Defendants' violations of Section 1102.5 of the California Labor Code caused Plaintiffs to suffer harm as set forth above.

163.    As a result of Defendants' unlawful acts, Plaintiffs are entitled to recover civil penalties of $10,000 for each violation.

164.    By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

165.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice.

Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### EIGHTH CAUSE OF ACTION
RACIAL HARASSMENT
Cal. Govt. Code § 12940, *et seq.*
(As to Plaintiff Lamar; Against Defendants Tesla and Chartwell)

166.　Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

167.　Plaintiff Lamar at all times was an employee covered by the Fair Employment and Housing Act ("FEHA"), California Government Code §§ 12940(a) and (j), which prohibits an employer from discriminating and harassing an employee on the basis of color and race.

168.　Defendants Tesla and Chartwell were, at all times, employers as defined under the FEHA.

169.　The above-described actions constitute racial harassment and discrimination in violation of the FEHA. Plaintiff Lamar was subjected to working in a severe, persistent and/or pervasive racially hostile work environment, which interfered with his work performance, denied him employment privileges, and adversely affected the terms and conditions of his job on the basis of his race.

170.　The harassing conduct to which Plaintiff Lamar was subjected to was so severe, widespread, and/or persistent that a reasonable African American in Plaintiff Lamar's circumstances would have considered the work environment to be hostile and/or abusive.

171.　Plaintiff Lamar considered the work environment to be hostile and/or abusive.

172.　Defendants Tesla and Chartwell failed to take prompt, remedial and effective action to stop the harassers.

173.　Defendants' violations of the FEHA caused Plaintiff Lamar to suffer harm as set forth above.

174.　By reason of the conduct of Defendants as alleged herein, Plaintiff Lamar has necessarily retained attorneys to prosecute the within action. Plaintiff Lamar is therefore entitled

to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

175.     Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

### NINTH CAUSE OF ACTION
RACE DISCRIMINATION
Cal. Govt. Code § 12940, *et seq.*
(As to Plaintiff Lamar; Against Defendants Tesla and Chartwell)

176.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

177.     Plaintiff Lamar at all times was an employee covered by the FEHA, California Government Code §§ 12940(a) and (j), which prohibits an employer from discriminating against an employee on the basis of color and race.

178.     Defendants Tesla and Chartwell were at all times employers as defined under the FEHA.

179.     Tesla failed to take any action in response to Plaintiff's complaints because of his color and race.

180.     Defendants' practice of failing to take any action in response to Plaintiff's complaints was a substantial factor in causing Plaintiff's harm.

181.     Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

\\

182.     By reason of the conduct of Defendants as alleged herein, Plaintiff Lamar has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

183.     Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## **TENTH CAUSE OF ACTION**
RETALIATION
Cal. Govt. Code 12940(h)
(As to Plaintiff Lamar; Against Defendants Tesla and Chartwell)

184.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

185.     Plaintiff Lamar complained of harassment and discrimination that violated the FEHA.

186.     Defendants Tesla and Chartwell took no action to ensure that Plaintiff was not retaliated against or threatened for having complained.

187.     As a result of Defendants Tesla and Chartwell's action or inaction, Plaintiff was subject to additional harassment, making the work environment so unbearable that Plaintiff Lamar had no choice but to quit his employment.

188.     Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

189.     By reason of the conduct of Defendants as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

190.     Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

//

## ELEVENTH CAUSE OF ACTION
### FAILURE TO PREVENT DISCRIMINATION AND HARASSMENT
Cal. Govt. Code § 12940, *et seq.*
(As to Plaintiff Lamar; Against Defendants Tesla and Chartwell)

191.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

192.    Defendants Tesla and Chartwell failed to take all reasonable steps to prevent the harassment and discrimination as described above. Defendants knew or should have known that Tesla's employees were engaged in racially offensive behavior in the past and failed to stop it.

193.    Despite being on notice of Tesla's employees' propensity to engage in harassing conduct, Defendants failed to act to prevent employees from harassing Plaintiff.

194.    Defendants also failed to enact an anti-discrimination policy and/or failed to distribute it appropriately and failed to effectively train its employees on racial harassment or discrimination.

195.    As a result of Defendants violations of the FEHA, Plaintiff suffered harm as set forth above.

196.    By reason of the conduct of Defendants as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

197.    Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## TWELFTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(As to All Plaintiffs; Against All Defendants)

198.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

26

199.     As employees and contractors of Defendants, Plaintiffs were owed a duty of due care by Defendants, and each of them, to ensure that Plaintiffs were not exposed to foreseeable harms.

200.     Defendants, and each of them, knew, or should have known, that Plaintiffs were being subjected to racial harassment, discrimination and retaliation, and that, by failing to exercise due care to prevent racially harassing, discriminatory and retaliatory course of conduct could and would cause Plaintiffs to suffer serious emotional distress.

201.     Defendants, and each of them, failed to exercise their duty of due care to prevent their employees, managers, supervisors and/or officers from racially harassing, discriminating and retaliating against Plaintiffs.

202.     As a direct and consequential result of Defendants' actions, Plaintiffs suffered serious mental and emotional distress, includes, but is not limited to, pain, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear. Plaintiffs allege Defendants are responsible for the harm they suffered.

203.     By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

204.     Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### THIRTEENTH CAUSE OF ACTION
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(As to All Plaintiffs; Against All Defendants)

205.   Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

27

206.    Plaintiffs complained repeatedly to Tesla as well as to West Valley, Chartwell, nextSource, and Citistaff about the constant racial abuse they received on a daily basis. Plaintiffs made clear that the racial harassment caused them distress, humiliation, and suffering.

207.    When Defendants failed to take corrective action, Defendants knew that Plaintiffs would continue to suffer extreme emotional distress and harm as a result of their failure to act.

208.    As a direct and consequential result of Defendants' actions, Plaintiffs have suffered severe emotional distress to their persons. Such harm includes, but is not limited to, pain, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear. Plaintiffs allege Defendants are responsible for the harm they suffered.

209.    By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

210.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### FOURTEENTH CAUSE OF ACTION

NEGLIGENT HIRING, RETENTION AND SUPERVISION
(As to All Plaintiffs; Against All Defendants)

211.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

212.    Upon information and belief, Defendants, by and through its agents and employees, knew or reasonably should have known through reasonable investigation of some of its agents and/or employees' propensity for unlawful racially harassing and physically aggressive behavior.

213.    Defendants had a duty not to hire or retain these employees/agents given their wrongful, dangerous, and racially offensive propensities, and to provide reasonable supervision of these employees/agents.

214.    Defendants negligently hired, retained and/or failed to adequately supervise these employees/agents in their positions where they were able to commit the wrongful acts complained of here against Plaintiffs. Defendants failed to provide reasonable supervision of these employees/agents despite knowing of their propensities and complaints made against them.

215.    As a direct and consequential result of Defendants' actions, Plaintiffs have suffered serious emotional distress to their persons. Such harm includes, but is not limited to, pain, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear. Plaintiffs allege Defendants are responsible for the harm they suffered.

216.    By reason of the conduct of Defendants as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action.  Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

217.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### FIFTEENTH CAUSE OF ACTION
WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
(As to Plaintiff Demetric; Against Defendant West Valley and Tesla)

218.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

219.    Defendant Tesla and West Valley punished Demetric by terminating his employment.

220.    Although Defendants stated that Demetric should be terminated for performance issues, this was merely a pretext. Demetric did not have a history of written warnings or

performance issues warranting a termination until he was issued a written warning for using his phone on the production line within days of complaining to his supervisor of the racially discriminatory and harassing behavior he was subjected to at work. His supervisor responded to his complaint by threatening to terminate Demetric's employment, and ultimately did terminate his employment approximately a week after Demetric made his complaint.

221.    West Valley ratified Tesla's discriminatory behavior by terminating Demetric without conducting any investigation into the veracity of the claims against him, thereby approving of Tesla's discriminatory motives.

222.    West Valley and Tesla's decision to terminate Demetric's employment based on discriminatory motives was contrary to the policies, rules, regulations, and laws of the State of California, which are in substantial part designed to protect employees from discriminatory, harassing, and otherwise harmful or unlawful conduct. Said policies are encoded in Article 1, Section 8 of the Constitution of the State of California, and in Section 12900 *et seq.* of the California Government Code. Demetric's termination therefore constituted an unlawful termination under California law.

223.    Defendants' violations of these constitutional and statutory provisions caused Plaintiff Demetric to suffer harm as set forth above.

224.    By reason of the conduct of Defendants as alleged herein, Plaintiff Demetric has necessarily retained attorneys to prosecute the present action.  Plaintiff Demetric is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

225.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff Demetric; with the conscious disregard of the rights and safety of Plaintiff Demetric; and with an improper and evil motive amounting to malice. Plaintiff Demetric is thus entitled to recover punitive damages from Defendants in an amount according to proof.

//
//

Amended Complaint for Damages and Demand for Jury Trial

## SIXTEENTH CAUSE OF ACTION
CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY
(As to Plaintiff Owen and Lamar; Against Defendants Tesla, Citistaff, nextSource, and Chartwell)

226.    Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

227.    At all relevant times herein, Owen was an employee of Citistaff, nextSource, and Tesla; and Lamar was an employee of Chartwell and Tesla.

228.    Citistaff, nextSource, and Tesla constructively terminated Owen's employment, and Chartwell and Tesla constructively terminated Lamar's employment by permitting a hostile work environment to flourish at the Tesla Factory, where Owen and Lamar were continuously subjected to harassment and discrimination.

229.    Owen and Lamar complained about the use of racial slurs, the display of racially offensive images, and the use of offensive statements. Owen also complained in writing about the violent conduct Ramon directed towards him.

230.    When Owen complained of this conduct, Tesla's employees only escalated their threatening and discriminatory behavior, and attempted to demote Owen.

231.    No reasonable African-American person could have borne the constant harassment, discrimination, intimidation, and threatening behavior directed at Owen and Lamar on a daily basis.

232.    As a result, when Defendants Tesla, Citistaff, nextSource, and Chartwell repeatedly declined to intervene and prevent the harassment, Owen and Lamar had no choice but to quit.

233.    Defendants Tesla, Chartwell, nextSource, and Citistaff's failure to halt the racial harassment and discrimination was contrary to the policies, rules, regulations, and laws of the State of California, which are in substantial part designed to protect employees from discriminatory, harassing, and otherwise harmful or unlawful conduct. Said policies are encoded in Article 1, Section 8 of the Constitution of the State of California, and in Section 12900 *et seq.* of the California Government Code. Defendants Tesla, nextSource, and Citistaff's constructive

termination of Owen, and Defendants Tesla and Chartwell's constructive termination of Lamar therefore constituted a wrongful termination under California law.

234.    Defendants' violations of these constitutional and statutory provisions caused Plaintiffs Owen and Lamar to suffer harm as set forth above.

235.    By reason of the conduct of Defendants as alleged herein, Plaintiffs Owen and Lamar have necessarily retained attorneys to prosecute the present action.  Plaintiffs Owen and Lamar are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

236.    Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiffs Owen and Lamar; with the conscious disregard of the rights and safety of Plaintiffs; and with an improper and evil motive amounting to malice. Plaintiffs Owen and Lamar are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request judgment against the Defendants as follows:

1.    General damages according to proof, in an amount no less than the jurisdictional limit of this court;

2.    Special damages in amounts according to proof, together with prejudgment interest;

3.    Exemplary and punitive damages in amounts according to proof;

4.    Civil penalties pursuant to Section 52(a), 52(b)(2), and 52.1(a) of the California Civil Code; and Section 1102.5(f) of the California Labor Code;

5.    Attorneys' fees and costs pursuant to sections 52(a), 52(b)(3), and 52.1(h) of the California Civil Code; section 12965(b) of the California Government Code, and any other applicable statute;

6.    Interest as provided by law;

7.    Costs of suit incurred herein;

Amended Complaint for Damages and Demand for Jury Trial

8. Injunctive relief to require Defendants to better train its staff on race harassment, discrimination and retaliation, and develop effective policies and procedures to ensure that when harassment is reported, the company takes effective remedial measures; and

9. For such other and further relief as the Court deems just and proper.


Dated: December 14, 2018                    CALIFORNIA CIVIL RIGHTS LAW GROUP




_____
LAWRENCE A. ORGAN
NAVRUZ AVLONI
Attorneys for Plaintiffs
DEMETRIC DI-AZ, OWEN DIAZ and LAMAR
PATTERSON



## **DEMAND FOR JURY TRIAL**

PLAINTIFFS hereby demand a jury trial on all issues.


Dated: December 14, 2018                    CALIFORNIA CIVIL RIGHTS LAW GROUP




_____
LAWRENCE A. ORGAN
NAVRUZ AVLONI
Attorneys for Plaintiffs
DEMETRIC DI-AZ, OWEN DIAZ and LAMAR
PATTERSON

33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

Case No. 3:17-cv-06748-WHO

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION

FP 36147236.1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

               Plaintiffs,

                          No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

               Defendants.

_____/

DEPOSITION OF KEVIN McGINN

June 17, 2019

Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to

 2   Notice of Taking Deposition, and on June 17, 2019,

 3   commencing at the hour of 10:12 a.m., at California

 4   Civil Rights Group, 180 Grand Avenue, Oakland,

 5   California, before me, BRIDGET M. MATTOS, CSR No.

 6   11410, there personally appeared

 7

 8                    KEVIN McGINN,

 9

10   called as a witness by Plaintiff, who, having been

11   duly sworn, was examined and testified as is

12   hereinafter set forth.

13                    ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

Bridget Mattos & Associates
(415)747-8710

KEVIN McGINN
June 17, 2019

```
 1   not producing a witness on that basis, on the basis of
 2   our objections and that --
 3             MR. ORGAN:  I see here.
 4             MR. GELLER:  We didn't have a relationship
 5   with West Valley.
 6             MR. ORGAN:  I get that.  Okay.
 7             So as to Topic 3, there is no relationship
 8   between nextSource and West Valley Staffing; is that
 9   right?
10             MR. GELLER:  That's correct.
11             MR. ORGAN:  Q.  Why don't we start, then,
12   just going over the contractual relationship between
13   nextSource and Tesla.  How about that, okay?
14       A.   Okay.
15       Q.   Was there some kind of written contract
16   between Tesla and nextSource?
17       A.   Yes.
18       Q.   What was the nature of the contract?
19             MR. GELLER:  Subject to our objections, you
20   can testify generally about the terms, but we've made
21   objections on the basis of confidentiality and among
22   other things, and I instruct you not to get into the
23   details about the terms.
24             THE WITNESS:  Generally, nextSource provides
25   certain services to Tesla under the contract.
```

**Page  17**

1    Tesla; is that right?

2        A.   Yes.

3        Q.   In addition to providing associates to work

4    at the Tesla factory -- strike that.

5             Were all of these associates working at the

6    Tesla factory in Fremont, California?

7        A.   Yes.

8        Q.   In addition to providing for the 30 to 40

9    associates who, on average, worked at the Fremont

10   factory, did the contract that nextSource had with

11   Tesla provide for any other services?

12       A.   Yes.

13       Q.   And what were the other services?

14       A.   So nextSource provides what is known as MSP

15   services to our clients.

16       Q.   And what does "MSP services" mean?

17       A.   An MSP is a managed service provider.

18       Q.   And what does a managed service provider

19   entail or encompass?

20       A.   Right.  So in connection with that service,

21   nextSource will provide the technology platform under

22   which supplier workers -- supplier-employed workers --

23   would enter, submit timesheets, and the client would

24   approve those timesheets.  So it was an interface

25   between the supplier workers and the client.  That's

1    one category of a managed service provider.

2           The second category would be the selection of

3    suppliers.  So supplier selection would be a service

4    that nextSource provides under its agreement.

5    Q.    And what does that mean, selection of

6    suppliers?  What does that involve?

7    A.    So a client such as Tesla may have needs in a

8    certain geography or a certain, say, skill set.

9    NextSource associates provide only a part of those

10   needs; right?  So nextSource would select suppliers

11   who would provide additional supplier-employed workers

12   at the Tesla site.

13   Q.    So in other words, nextSource would

14   coordinate with other staffing agencies to try and

15   accommodate Tesla's demand for associates at the

16   Fremont factory?

17          MR. GELLER:  Misstates his testimony.

18          Go ahead.

19          THE WITNESS:  NextSource would select

20   suppliers who would provide resources into the Tesla

21   factory at the direction of -- day-to-day direction of

22   Tesla.  However, those workers were employed; in other

23   words, they were recruited, onboarded and paid, and,

24   if needed, you know, terminated by the supplier

25   employer.

KEVIN McGINN
June 17, 2019

1          MR. ORGAN:   Q.   And when you're referring to

2    "suppliers" here, you're referring to companies that

3    would supply manpower; is that correct?

4        A.   Yes.

5        Q.   I don't mean to be sexist.   Manpower, women

6    power, whatever power.   People power.

7        A.   Yes.

8        Q.   And how did nextSource go about determining

9    which suppliers would be eligible to provide workers

10   at the Tesla factory in Fremont?

11       A.   So Tesla would have to approve any suppliers

12   that were -- would be utilized at their site, so the

13   approval of any supplier sits with Tesla.   The --

14   nextSource might recommend, you know, suppliers that

15   can support the program at Tesla.   So it really comes

16   down to supplier, selection, and recommendations,

17   would be a service that nextSource provided.

18       Q.   In addition to -- so you mentioned two things

19   that nextSource would do for Tesla.   One would be to

20   provide head count, actual head count of associates to

21   the Tesla factory; correct?

22       A.   Yes.

23       Q.   And then the second thing would be as a

24   managed service provider; is that correct?

25       A.   Yes.

KEVIN McGINN
June 17, 2019

1      Q.   And then under managed service providers, in
2   terms of the functions that nextSource provided, those
3   sort of fall into two categories.
4           You would provide a platform, a technology
5   platform for associates to essentially submit
6   timesheets; is that correct?
7           MR. GELLER:   Misstates his testimony.
8           THE WITNESS:   The platform would be for the
9   supplier-employed workers to submit -- enter and
10  submit their timesheets, which would then be approved
11  by the -- well, to be approved by the client.
12          MR. ORGAN:   Okay.
13     Q.   So for example, nextSource chose CitiStaff
14  Solutions, Inc., as a provider; is that correct?
15     A.   Yes.
16     Q.   And then nextSource would establish the
17  technology platform for CitiStaff associates to, like,
18  submit their timesheets and things like that; is that
19  correct?
20     A.   Yes.
21     Q.   In addition to that, did nextSource provide
22  any additional services for CitiStaff employees, other
23  than the timekeeping function?
24     A.   No.
25     Q.   And then in addition to these sort of -- I'll

Bridget Mattos & Associates
(415)747-8710

KEVIN McGINN
June 17, 2019

1       Q.    And so tell me, what were the functions that
2   the on-site program team would do that nextSource
3   provided?
4       A.    The key functions of a program team is to
5   take the client's direction and bring -- and really
6   facilitate those needs to the supplier workforce.  So
7   one would be, you know -- well that's it.  It
8   basically would -- any kind of client needs or wishes
9   would be messaged to the suppliers for the suppliers
10  to take whatever action they would deem necessary for
11  the workforce.  That's one area.
12          The second service that a program team would
13  perform would be managing the requisitions in the
14  platform to meet the head count level set by the
15  client.  So, expand just a little bit there:  The
16  client needs additional head count for a shift next
17  week.  NextSource program team will set up the
18  requisition in the software.  The suppliers will then
19  go out, find, recruit, onboard and hire those workers
20  to be placed onto the requisition in the system.
21          So I would say it's an information flow.
22  Information flows through nextSource, data flow, that
23  sort of thing.
24      Q.    So you mentioned essentially two additional
25  things that, under this third category, that

Bridget Mattos & Associates
(415)747-8710

1   nextSource would do.  One would be to essentially take

2   a client's direction and then translate or communicate

3   those needs to the supplier workforce; is that right?

4        **A.   That's correct.**

5        Q.   And then the other thing would be that

6   nextSource would manage requisitions to ensure that

7   the head count that Tesla needed was met by working

8   with the suppliers to fill those requisitions?

9        **A.   Yes.**

10        Q.   So who were the -- other than CitiStaff

11   Solutions, who were the other suppliers that

12   nextSource worked with when you first onboarded in

13   October of 2015, relative to the Tesla Fremont

14   factory?

15        **A.   CitiStaff is one supplier.  Chartwell was the**

16   **other, primary supplier.  I believe there was a third**

17   **supplier not relevant here, but I'm happy to share the**

18   **name.  Maliko, I believe, was another supplier**

19   **employer at the Tesla site.**

20        Q.   In terms of providing sort of

21   production-associate level employees, were the primary

22   suppliers that nextSource coordinate with CitiStaff

23   and Chartwell?

24        **A.   Yes.**

25        Q.   Approximately how many workers did nextSource

 1   have to move on that, but I understand.

 2       Q.   So let's talk about your policies and

 3   procedures related to race harassment in effect from

 4   2014 to present who applied to your professionals.

 5            Some of the professionals that nextSource

 6   employed worked at the Tesla factory; correct?

 7       **A.   Yes.**

 8       Q.   Do you know who those people were?

 9       **A.   I believe it was Mr. Wayne Jackson.   There**

10   **was Vanessa parks, and there's a third lady who**

11   **actually left before -- right at the time I got there.**

12   **I don't remember her name.   It was a third female that**

13   **worked -- a professional who worked in that Tesla**

14   **site.**

15       Q.   Deb Gryske or Grayske?

16       **A.   Deb Gryske didn't work on-site, but she is a**

17   **professional of nextSource but not on-site at Tesla,**

18   **if that's the question.**

19       Q.   So what was -- Wayne Jackson we've deposed.

20   I know him.   He was your account manager; right?

21       **A.   I believe his title was program manager, but**

22   **essentially.**

23       Q.   And what's a program manager function?

24       **A.   So the program manager acts as a liaison**

25   **between Tesla, the client, Tesla's wishes, and the**

1    **suppliers -- you know the supplier workers, the**

2    **supplier-employed workers.  That's one of the primary**

3    **duties of a program manager.  He may also gather facts**

4    **at the direction of Tesla or at the request of Tesla.**

5    **He was a fact gatherer and will communicate to the --**

6    **either party to the client side or to the supplier**

7    **side, based on the facts.**

8    Q.   Okay.  And then you mentioned a Vanessa

9    Parks.  What was Vanessa Parks' job?

10   **A.   Vanessa was an administrative role there;**

11   **again, a professional of nextSource but worked in a --**

12   **in this example, I'm using "administrative" to mean**

13   **she would enter requisitions into the system.  She**

14   **would, you know -- data-keying, that sort of thing,**

15   **very administrative type of work.**

16   Q.   Like an administrative assistant kind of

17   thing?

18   **A.   Yeah, at the same level, yes.**

19   Q.   So Wayne Jackson, was he the highest-level

20   nextSource employee actually working at the Tesla

21   factory?

22   **A.   Yes.**

23   Q.   And then Vanessa Parks worked in an

24   administrative role at the Tesla factory too; is that

25   right?

KEVIN McGINN
June 17, 2019

```
 1              MS. KUMAGAI:  Objection.

 2              THE WITNESS:  I can't speculate on the

 3   specifics between the employer, supplier and employer,

 4   and their employee.  I could not speculate on that.

 5              MR. ORGAN:  Okay.

 6        Q.   But in terms of your suppliers, the companies

 7   like CitiStaff and Chartwell, they're essentially just

 8   providing employees to Tesla to work in Tesla's

 9   factory; is that correct?

10              MR. GELLER:  Misstates his testimony.

11   Objection to the form.

12              MS. SWAFFORD-HARRIS:  And calls for

13   speculation.

14              THE WITNESS:  The supplier will, in the

15   course of their employment of the worker, will

16   recruit, onboard, and pay the worker.  They place that

17   worker at the Tesla site, who then works under the

18   day-to-day direction and control of Tesla.

19              MR. ORGAN:  Q.  So if I have this correctly,

20   then CitiStaff, which was one of the suppliers for

21   nextSource, CitiStaff would supply or provide an

22   employee, such as Mr. Diaz, to Tesla and go through

23   the recruitment, onboarding and paying of Mr. Diaz?

24   Is that what their function was?

25              MS. KUMAGAI:  Objection, to the extent it
```

Bridget Mattos & Associates
(415) 747-8710

KEVIN McGINN
June 17, 2019

 1   calls for speculation.

 2              MR. GELLER:   Join.

 3              THE WITNESS:   Yeah, I can't speculate on all

 4   the policies and procedures that might exist between a

 5   third party and their employee.   But I'm really

 6   speaking generally to what a supplier does, which is,

 7   if they're supplying labor, right, they would recruit,

 8   onboard and employ and pay that person to work at the

 9   Tesla site under the day-to-day direction of Tesla.

10              MR. ORGAN:   Q.   But you do at least have

11   knowledge as to the suppliers who nextSource oversaw,

12   right, such as CitiStaff; is that correct?

13              MR. GELLER:   Misstates his testimony.

14   Objection to the form.   Vague and ambiguous.

15              THE WITNESS:   So you're asking me if I'm

16   aware that Chartwell and CitiStaff were suppliers of

17   workers into Tesla?

18              MR. ORGAN:   Q.   Yeah.

19        **A.   Yes.**

20        Q.   And Chartwell and CitiStaff were suppliers of

21   workers to Tesla via nextSource; correct?   Meaning,

22   nextSource had a role in making CitiStaff and

23   Chartwell suppliers to Tesla; right?

24        **A.   NextSource's role was in the supplier**

25   **selection, meaning in the selection of the companies**

**Page 100**

1    **that provide the resource.  NextSource does not have a**

2    **role in the selection of the employees that may work**

3    **at the Tesla site.  That is up to the -- well, I can't**

4    **speculate, but --**

5        Q.   I understand.

6             But in terms of -- I think you said earlier

7    that there were three suppliers that nextSource had at

8    the Tesla factory; correct?

9        A.   Yes.

10       Q.   CitiStaff was one of the suppliers that

11   nextSource had at the Tesla factory; right?

12       A.   Yes.

13       Q.   And Chartwell was another supplier that

14   nextSource had at the Tesla factory?

15       A.   Yes.

16       Q.   And then there was a third one that I can't

17   remember the name, but there was a third organization

18   or entity that also supplied workers to the Tesla

19   factory; right?

20       A.   Yes.

21       Q.   Okay.  And each of those agencies, at least

22   as to CitiStaff and Chartwell, they would do the

23   recruiting of employees, not nextSource; correct?

24       A.   Yes.

25       Q.   And CitiStaff and Chartwell would also take

**Page 101**

1    I'm not going to permit you to testify about that.

2            MS. SWAFFORD-HARRIS:  Tesla joins that

3    objection.

4            MR. ORGAN:  Q.  I'm not asking for the

5    amounts; I just want to know the process.

6            In terms of how nextSource gets paid for the

7    employees that are recruited through the suppliers,

8    how do you get paid for those employees?

9            MR. GELLER:  It's vague, and I also object to

10   the form of the question.

11           Go ahead.

12           THE WITNESS:  I'll speak generally on this

13   because I don't -- I'll speak generally about this.

14           So suppliers will submit their timesheets

15   through the system.  The client will approve the

16   timesheets.  What happens here is nextSource will --

17   nextSource professionals will pull data from the

18   system and prepare a billing to the client.  Client

19   pays nextSource, then nextSource pays its suppliers.

20           And the last thing I'll say about this, you

21   remember there's a contractual relationship between

22   nextSource and Tesla, under which one of the items I

23   failed to mention earlier, one of the key items we

24   provide, consolidated billing, meaning that it's

25   easier for the client to approve one summary bill than

KEVIN McGINN
June 17, 2019

1   it is a hundred bills from a hundred suppliers.   So
2   the consolidated billing is prepared by nextSource as
3   the MSP to the client.   And the client pays
4   nextSource; nextSource pays the various suppliers.
5        Q.   Okay.   So for example, in the Tesla
6   situation, just taking the two main suppliers there,
7   Chartwell and CitiStaff, the Chartwell CitiStaff
8   employees who are working under the direction and
9   control of Tesla, they enter their time into the TAMS
10   system.   The TAMS system then gets -- that time gets
11   approved by Tesla, and then nextSource bills for that
12   time, consolidated for both CitiStaff and Chartwell;
13   is that correct?
14             MR. GELLER:   Misstates his testimony.
15             THE WITNESS:   The timesheets are submitted by
16   the workers of the suppliers.   The consolidated
17   billing is prepared by -- the timesheets get approved
18   by the client.   We refer to them as the hiring
19   manager, usually.
20             The consolidated billing is prepared by
21   nextSource, presented to Tesla.   Tesla pays
22   nextSource; nextSource pays its suppliers.   That's a
23   general -- that is how these arrangements work.
24             MR. ORGAN:   Q.   And that's your understanding
25   of how the arrangements work with Tesla; is that

**Page 132**

1      **A.    I'm aware of that name through the**
2  **litigation.**
3      Q.    And was nextSource ever aware that -- strike
4  that.
5            Prior to the litigation, was nextSource ever
6  aware that Judy Timbreza was accused of using the "N"
7  word, or a version thereof, towards Owen Diaz?
8      **A.    Prior to the litigation, no, nextSource was**
9  **not involved, did not investigate, did not fact-gather**
10  **anything around that incident.**
11      Q.    Certainly, if nextSource became aware of the
12  use of the "N" word at the Tesla factory, they would
13  gather facts about that information; right?
14            MR. GELLER:  Calls for speculation.
15            MS. SWAFFORD-HARRIS:  Tesla joins.  It's also
16  incomplete hypothetical.
17            THE WITNESS:  Yes, theoretically speculating
18  that if we're aware of a nextSource associate or a
19  nextSource supplier employee doing something such as
20  that, I would speculate that we would gather the facts
21  on that.
22            MR. ORGAN:  Q.  And the reason you would
23  gather the facts on that is, use of the "N" word is
24  highly offensive conduct; right?
25      **A.    Yes.**

1   The top one is an email from Vanessa Parks to Ed

2   Romero, talking about -- it says here, "All elevator

3   contractors were under recycling at the time of the

4   increase."

5          Do you know what that's referring to?

6          MR. GELLER:  This is outside the scope of the

7   deposition topics.

8          THE WITNESS:  I mean, I can only speculate.

9   I'm aware that the elevator was a particular

10  department at Tesla; I know that the recycling was a

11  particular department at Tesla.  Beyond those two

12  facts, I can't speak to anything on this email about

13  increases for a supplier associate.

14         MR. ORGAN:  Q.  Is Vanessa Parks still with

15  nextSource?

16     **A.   No.**

17     Q.   Do you know where she went after working for

18  nextSource?

19     **A.   No.**

20         MR. ORGAN:  This is 178.

21         (Whereupon Deposition Exhibit 178

22          was marked for identification.)

23         MR. ORGAN:  Exhibit 178, for the record, is a

24  one-page document Bates-stamped NS-25.  It appears to

25  be an email from Ed Romero to Wayne Jackson, and then

KEVIN McGINN
June 17, 2019

1    an email from Vanessa Parks back to Ed Romero.

2        Q.    This, again, is sort of the typical procedure

3    that would go back and forth between Tesla and

4    nextSource relative to employees supplied through

5    nextSource suppliers; is that correct?

6        A.    This email is a Ed Romero, the employee of

7    Tesla, directing Wayne to make a change to the pay

8    rate.   I'm assuming he means in TAMS.

9              So we talked about the TAMS maintenance as

10   one of our functions.   So to the degree this is him

11   saying change the TAMS rate to go from 16 to 18, then,

12   yes, that would be a normal function directed by the

13   client to make -- administer changes in the tool.

14   That would be normal.

15       Q.    Okay.

16             Now, this was previously marked as Exhibit

17   91.

18             Exhibit 91, for the record, is a two-page

19   document Bates-stamped CitiStaff 6 and 7.   And the

20   first -- it's two emails, one from January 28th of

21   2016, and then the top one from February 2nd of 2016.

22   And it appears that -- I guess my question is this:

23   Why would Vanessa Parks be emailing to Monica De Leon

24   from CitiStaff about pay increase -- pay rate

25   increases to the following contractors.   Why would she

**Page 180**

1    be doing that?

2              MR. GELLER:  Excuse me.  Calls for

3    speculation.  It's outside the scope of the

4    deposition.

5              Go ahead.

6              THE WITNESS:  Yeah, this is normal.  I'd

7    speculate what I'm saying here is, in connection with

8    the email from three days prior -- I don't know if it

9    was Thursday -- where Tesla directed nextSource to

10   make the administrative change in the VMS system, this

11   is the other side of that -- it's client to

12   nextSource.  Right?  This is the other side.  This is

13   nextSource telling the supplier, right, that Tesla

14   wants this pay rate changed.

15             So the direction starts with Tesla, Ed

16   Romero.  Funnels through the facilitator, nextSource,

17   who changes the VMS and then who takes that same pay

18   change that Tesla directed, and directs --

19   communicates to the supplier Tesla's wishes.

20             So this is the other side of the

21   communication, starting with the client on a pay

22   change.  So this is, I would characterize it as

23   standard.

24             MR. ORGAN:  Q.  So in other words, Exhibit 91

25   is the other side of Exhibit 178?

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBITS TO DEPOSITION OF KEVIN MCGINN

REDACTED – CONDITIONALLY FILED UNDER SEAL

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

KEVIN McGINN
June 17, 2019

```
 1   State of California              )

 2   County of Marin                  )

 3

 4            I, Bridget M. Mattos, hereby certify

 5   that the witness in the foregoing deposition was by me

 6   duly sworn to testify to the truth, the whole truth

 7   and nothing but the truth in the within entitled

 8   cause; that said deposition was taken at the time and

 9   place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and disinterested person, and was thereafter

13   transcribed under my direction into typewriting by

14   computer; that the witness was given an opportunity to

15   read, correct and sign the deposition.

16            I further certify that I am not

17   interested in the outcome of said action nor connected

18   with or related to any of the parties in said action

19   nor to their respective counsel.

20            IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on June 17, 2019.

22   _____

23            BRIDGET M. MATTOS, CSR NO. 11410

24

25
```

**Page 215**

Bridget Mattos & Associates
(415)747-8710

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

        Plaintiffs,

                             No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

        Defendants.
_____/

DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13571

```
 1          BE IT REMEMBERED that, pursuant to Deposition Subpoena

 2    and Notice of Taking Deposition, and on Friday, May 17, 2019,

 3    commencing at the hour of 10:08 a.m., thereof, at California

 4    Civil Rights Group, 180 Grand Avenue, Suite 1380, Oakland,

 5    California, before me, PATRICIA ROSINSKI, CSR No. 4555, a

 6    Certified Shorthand Reporter in and for the State of

 7    California, there personally appeared

 8

 9                        WAYNE JACKSON,

10

11    produced as a witness in the above-entitled action, who,

12    being by me first duly sworn, was thereupon examined as a

13    witness in said action.

14

15

16

17

18

19

20

21

22

23

24

25
```

Bridget Mattos & Associates
(415)747-8710

WAYNE JACKSON
May 17, 2019

```
 1        A.      I was promoted to the program manager.

 2        Q.      How long were you a program manager for

 3   nextSource?

 4        A.      Oh, boy, about a year.  About a year's worth.

 5        Q.      Any other jobs with nextSource other than

 6   contract recruiter and program manager?

 7        A.      No, sir.

 8        Q.      Why did you leave nextSource?

 9        A.      Disagreement of things.

10        Q.      Without getting into the details of the

11   disagreement, other than -- let me ask you this:  Did it

12   have anything to do with the way workers were treated at

13   Tesla?

14        A.      No, it wasn't that.

15        Q.      In terms of the program manager position that

16   you had --

17        A.      Uh-hum.

18        Q.      -- you were a program manager for employees at

19   the Tesla factory.

20                Is that correct?

21                MR. ARANEDA:  Objection.  Vague.

22                THE WITNESS:  It was more of a liaison.  I

23   don't think I was really -- I didn't -- they called it a

24   program manager, but I didn't really manage the

25   employees, I guess is the best way to put it.
```

**Page 15**

1           MR. ORGAN:   Q.   What was nextSource's
2    relationship to Tesla, as you understood it?
3       A.    They were a service provider.
4       Q.    What do you mean by "a service provider"?
5       A.    In the sense of they weren't a staffing agency
6    or anything.   Like I said, more of a liaison between a
7    staffing agency and Tesla for services Tesla had
8    requested.
9       Q.    When you were working as a recruiter for
10   nextSource, were you recruiting employees to Tesla?
11      A.    Yes, sir.
12      Q.    The employees who you were recruiting to Tesla,
13   were they primarily to work as production associates at
14   the Tesla factory?
15      A.    Not necessarily.  They were different areas of
16   facilities.  That was probably one of the main areas.
17      Q.    The facilities workers, what were the types of
18   jobs that they were typically doing that you were
19   recruiting for?
20      A.    HVAC techs, electricians, things of that
21   nature, power washers.
22      Q.    Who was your main contact person, then, at
23   nextSource when you were doing recruiting?
24      A.    My manager was Terri Garrett.
25      Q.    Do you remember what Terri Garrett's position

Bridget Mattos & Associates
(415)747-8710

```
 1      or less.
 2          Q.    Tell me how it worked in terms of, let's say
 3      someone raised a complaint of discrimination or
 4      harassment --
 5          A.    Uh-hum.
 6          Q.    -- what was your understanding of how such a
 7      complaint was to be handled?
 8                MR. ARANEDA:  It's vague.
 9                MR. ORGAN:  It is a little big vague.  Let me
10      try it again so it's a little clearer.
11                THE WITNESS:  Uh-hum.
12                MR. ORGAN:  Q.  Let's assume that a contract
13      employee, meaning someone who wasn't a regular Tesla
14      employee but was a contract employee who nextSource was
15      doing liaison with, what was your understanding of the
16      procedure for -- if a contract employee for one of the
17      companies that you were doing liaison for made a
18      complaint of harassment or discrimination, what was the
19      process that was supposed to be followed?
20          A.    I alerted the agency, usually one of the first
21      things I did, whatever supplier they were from.  I would
22      gather any information I could get, present that to the
23      agency, and then they would kind of conduct their
24      investigation from there.
25          Q.    When such a complaint was raised, what was your
```

```
 1    Tesla via email?
 2        A.    Nine out of ten times, yes, it would be email.
 3    Sometimes, no.
 4        Q.    In terms of training of the contract employees,
 5    did nextSource play any role in training of the
 6    employees?
 7              MR. ARANEDA:   Objection.   Vague.
 8              THE WITNESS:   Not that I was aware of, sir, no.
 9              MR. ORGAN:   Okay.
10              THE WITNESS:   Other than safety, maybe, but
11    that was about it.
12              MR. ORGAN:   Q.   Not on the issue of harassment
13    or discrimination?
14        A.    No, sir.
15        Q.    Was it your understanding that the contract
16    employees who worked at the Tesla factory were subject
17    to the policies and procedures that Tesla had for its
18    workers?
19              MR. ARANEDA:   Objection.   Vague.
20              Go ahead.
21              MS. JENG:   It calls for speculation.
22              THE WITNESS:   Yeah, I'm not sure on that, to be
23    honest.
24              MR. ORGAN:   Q.   Did nextSource have any
25    contract employees working at the Tesla factory?
```

**Page 21**

```
 1          A.     Not to my knowledge.

 2          Q.     NextSource, basically, just coordinated between

 3   the contractors and Tesla; right?

 4          A.     Yes, sir.

 5          Q.     And I think you said earlier that nextSource

 6   would typically get a request from Tesla for, like, a

 7   certain number of workers doing a certain type of work,

 8   and then nextSource would go to a contractor and say,

 9   "Can you fulfill that role"?

10          A.     To -- we call them suppliers, yes.

11          Q.     Suppliers, okay.

12          A.     Yes.

13          Q.     What was your understanding of the type of

14   training that was done for workers in terms of

15   harassment or discrimination policy?

16                 MR. ARANEDA:  Objection.  Vague.

17                 MR. ORGAN:  Yes, let me --

18                 MS. STEVENS:  It assumes facts not in evidence.

19                 MR. ORGAN:  Let me try a different question.

20          Q.     What was your understanding of what kind of

21   training was done for contract workers who nextSource

22   would ask to supply workers in terms of discrimination

23   or harassment?

24                 MR. ARANEDA:  Objection.  It lacks foundation.

25                 Go ahead.
```

**Page 22**

WAYNE JACKSON
May 17, 2019

1              THE WITNESS:  As far as I'm aware, I believe

2    they were all supposed to have any training at their

3    agency.

4              MR. ORGAN:  Okay.

5              THE WITNESS:  Yeah.

6              MR. ORGAN:  Q.  But in terms of your -- when

7    you became the manager, the program manager, you did

8    some investigations into complaints of discrimination

9    and harassment.

10             Is that true?

11        A.    Some, yes, but more or less

12    information-gathering.  You know, I would gather the

13    information, and then submit it to the agency.

14        Q.    Okay.  And in terms of your training into

15    investigating or fact-gathering relative to claims of

16    discrimination or harassment, would you agree that any

17    kind of investigation you would be doing would need to

18    be prompt, objective, and timely -- prompt, objective

19    and thorough -- sorry -- prompt, objective, and

20    thorough?

21        A.    Yes.

22        Q.    And did you participate in terms of any

23    investigations or fact-finding relative to claims of

24    discrimination or harassment at the Tesla factory?

25        A.    Yes.

WAYNE JACKSON
May 17, 2019

```
 1          A.     I don't know.

 2          Q.     Okay.   Going back to Mr. Diaz's complaint about

 3     the jigaboo, what did you do to investigate that

 4     incident?

 5          A.     If I recall correctly, I got statements.   I got

 6     photographs of the drawing.   I alerted Chartwell -- I

 7     believe it was Chartwell.   It might have been CitiStaff;

 8     I can't remember.

 9                 Like I say, we had contractors from different

10     suppliers.

11          Q.     Sure.

12          A.     And I alerted the manager for Tesla over that

13     area, which was Victor Quintero.

14          Q.     Owen Diaz worked for CitiStaff.

15                 Do you remember that?

16          A.     I don't recall if it was CitiStaff or

17     Chartwell.   Like I said, we had several suppliers, so...

18     It's been three, four years, so I couldn't tell you

19     exactly which one.

20          Q.     Do you remember the person who put up the

21     jigaboo drawing was Ramon Martinez?

22          A.     Yes.  I believe so, yes.

23          Q.     In addition to getting statements from

24     Mr. Martinez and Mr. Diaz, did you get statements from

25     anybody else other than those two?
```

**Page 31**

WAYNE JACKSON
May 17, 2019

```
 1        A.     I believe --

 2        Q.     Well, let me --

 3        A.     I don't recall.

 4        Q.     Let me just --

 5        A.     I don't recall.

 6        Q.     Let me -- I forgot -- let me ask the

 7     preliminary question:  Did you get statements from

 8     Ramon Martinez and Owen Diaz, do you recall?

 9        A.     Actually, I believe I referred them both to

10     their agencies.

11        Q.     Okay.

12        A.     If I'm not mistaken.

13        Q.     Okay.  Do you recall seeing statements -- a

14     statement from Ramon Martinez relative to the jigaboo

15     poster?

16        A.     I don't recall.

17        Q.     Do you recall seeing any statement from

18     Owen Diaz relative to the jigaboo poster?

19        A.     I also don't recall.  I'm sure I did, but I

20     don't recall.

21        Q.     When I say "poster," I mean a drawing.

22               It was actually a drawing on the cardboard;

23     right?

24        A.     Yes, sir.

25        Q.     Did you review any documents to get ready for
```

**Page 32**

WAYNE JACKSON
May 17, 2019

```
 1      safety, yeah, because he had -- I believe he had ran
 2      into the elevator a couple of times.
 3          Q.    In terms of running into the elevator --
 4          A.    The elevators --
 5          Q.    -- with the forklift?
 6          A.    Yeah, they were going -- he was going too fast
 7      and would ran in and damaged the elevators on a few
 8      occasions.
 9               And he also -- like I said, his attitude, he
10      was -- I don't know the word to use, but he was -- if I
11      remember correctly, he really got into it with a lot of
12      other staff.  Argumentative, I guess, is probably the
13      word; I don't know.
14          Q.    Now, in terms of Mr. Diaz's attitude or
15      argumentativeness, did that occur after the jigaboo
16      drawing happened?
17          A.    No, sir, that was from, probably, day one, to
18      be honest.
19          Q.    So from day one that Mr. Diaz was working at
20      the factory, as far as you understood, Mr. Diaz had an
21      attitude issue?
22          A.    I don't know if it was an attitude issue, but,
23      like I said, he got -- he got into it with several other
24      contractors, as well as Tesla staff.
25               MR. HORTON:  Pardon me.  Can I ask for a
```

**Page 36**

1    doing disciplinary or things of that nature, if I'm not

2    mistaken.

3          MR. ORGAN:  Q.  So your understanding of

4    Ed Romero's tasks, though, relative to the elevator

5    operators was that he could do scheduling, right --

6    **A.    Yes, sir.**

7    Q.    -- for them, and that Mr. Romero would at least

8    direct their work; right?

9    **A.    Yes, sir.**

10   Q.    How would discipline towards contract employees

11   take place, then, typically?

12   **A.    If there was a complaint, I would alert their**

13   **agency of the complaint.**

14   Q.    And then it was up to the agency to do the

15   disciplinary action.

16         Is that right?

17   **A.    Yes, sir.  Whether they were terminated, I**

18   **couldn't terminate.   They weren't my employees.**

19   Q.    I see.

20   **A.    Yeah.**

21   Q.    Could you recommend termination for people?

22   **A.    I mean, I can make a recommendation, but it**

23   **wasn't -- the final decision wasn't mine.**

24   Q.    I see.

25         Then in terms of Tesla's role in any kind of

1     discipline, could Tesla also make recommendations for

2     termination or discipline?

3             MR. ARANEDA:  Objection.  It lacks foundation.

4     It calls for speculation.

5             THE WITNESS:  Yeah, I guess they could.  I

6     don't, you know --

7             MR. ORGAN:  Q.  You don't know?

8        **A.    Yeah, not on that -- that level, no.**

9        Q.    In terms of your observations, though, you did

10    have an occasion to observe employees get issued

11    discipline; right?

12       **A.    Yes, sir.**

13       Q.    Based on your observations of the discipline

14    that was given to employees, did you ever see any kind

15    of discipline that was recommended by Tesla supervisors

16    that was then implemented by the agencies --

17            MR. ARANEDA:  Objection.

18            MR. ORGAN:  Q.  -- or the suppliers?

19            MR. ARANEDA:  Vague.

20            THE WITNESS:  No, sir.

21            Sorry.

22            MR. ORGAN:  Q.  You just didn't get into that

23    kind of detail.

24            Is that right?

25       **A.    Yes, sir, I let the agencies handle it because**

WAYNE JACKSON
May 17, 2019

1      **it was their employee.**

2          Q.    I think I owe you a check for mileage, so I'm

3      going to give you that.

4          **A.    Okay.**

5                MR. ARANEDA:  And the appearance fee also.

6                MR. ORGAN:  I thought that we sent the

7      appearance fee --

8                MR. ARANEDA:  No.

9                MR. ORGAN:  -- did we not?

10               MR. ARANEDA:  No.

11               MR. ORGAN:  Okay.  I'll give you a check for

12     the appearance fee, too.

13               Let's take a short break, and then we'll start

14     going into the documents.

15               MR. ARANEDA:  Okay.

16               (Whereupon, a recess was held from

17               10:52 a.m. to 11:02 a.m.)

18               MR. ORGAN:  Q.  In terms of your discussions

19     with Victor Quintero, do you recall anything else that

20     you talked about other than what you've already

21     testified to about Owen Diaz?

22         **A.    Not that I can recall.**

23         Q.    Do you recall any of your conversations with

24     Ed Romero in terms of Owen Diaz?

25         **A.    Specifics, no.  I don't recall specifics.  I**

```
 1     Judy Timbreza.
 2               (Document reviewed by the deponent.)
 3               MR. ORGAN:  Q.  I'm wondering if this helps
 4     refresh your recollection at all.
 5               MR. ARANEDA:  Objection.  It calls for
 6     speculation.
 7               THE WITNESS:  Yeah, I remember there was
 8     something.  Like I said, I just don't remember exactly
 9     what occurred with Ms. Timbreza.
10               MR. ORGAN:  Q.  Was Mr. Timbreza, was he a
11     nextSource employee?
12          A.    None of them were nextSource employees, really.
13     They were all --
14          Q.    Okay.
15          A.    -- agencies.  So, you know, I mean, she was
16     not.
17          Q.    And Judy Timbreza -- that's a man; right?
18          A.    No, that's a woman, if I'm not mistaken.
19          Q.    Is it?
20          A.    Yes.
21          Q.    Oh, okay.  Because I had -- okay.
22          A.    I could have sworn it was a lady.  It's been a
23     long while, but I don't think it's been that long.
24          Q.    Okay.  The only reason, if you look at this
25     document, it says here, "Mr. Owen still feels he can
```

WAYNE JACKSON
May 17, 2019

1    became aware of an incident between Mr. Martinez and

2    Mr. Diaz.

3           Is that correct?

4    A.    Yes, sir.  I was -- honestly, I was still in a

5    recruiter's role at that point.  They hadn't

6    transitioned me over as of yet.

7    Q.    I see.

8    A.    So I was kind of trying to fill two roles at

9    once.

10   Q.    Wearing two hats?

11   A.    Yes, sir.

12   Q.    Do you remember any of the details of what the

13   issue was?

14   A.    If I'm not mistaken, there was some type of

15   verbal altercation.

16   Q.    Mr. Martinez worked in recycling.

17         Is that right?

18   A.    Yes, sir.

19   Q.    And Mr. Diaz worked as one of the elevator --

20   A.    Yes.

21   Q.    -- operators?

22   A.    Yes, sir.

23   Q.    Do you remember what the nature of the verbal

24   altercation was in this October 2015 time period?

25   A.    I could not tell you the details, to be honest,

Bridget Mattos & Associates
(415)747-8710

1    I -- it's been so long.  I remember it was something to

2    the effect they were trying to move some recycling

3    material in the elevators, and I guess there was -- I

4    don't know what -- I can't remember what it was, but

5    Ramon and Mr. Diaz got into a verbal altercation over

6    the use of the elevator.

7        Q.    Did you do an investigation into that incident?

8        A.    Like I said, I was just starting in that role,

9    so it wasn't really my role to do that at that point.  I

10   was still, honestly, a recruiter.

11       Q.    Okay.

12       A.    I asked Miss Garrett what did she want me to

13   do.  I believe we got statements from each of them, and

14   I let the -- let the agencies handle it from there.

15       Q.    Do you know who a Deb Gryske is?

16       A.    Yes, she was a -- I can't remember her role at

17   nextSource.  More of a technology person.

18       Q.    Okay.

19             We're going to -- this is Exhibit 124?

20             THE REPORTER:  Yes.

21             (Whereupon, Plaintiffs' Exhibit 124 was marked

22             for identification and is attached hereto.)

23             (Document reviewed by the deponent.)

24             MR. ORGAN:  Exhibit 124, for the record, is a

25   two-page document Bates-stamped TESLA-635 and 636.

1    Q.    And it references your -- it says you're

2    actually on the phone doing the investigation of the

3    Ramon/Owen incident.

4    A.    I was probably on the phone with Chartwell, I

5    would assume, at that time.

6    Q.    Chartwell was the contractor that was employing

7    Mr. Martinez.

8          Is that right?

9    A.    Yes, it was either Chartwell or CitiStaff.  I

10   can have been talking to both of them.

11   Q.    Okay.

12   A.    I was just more or less alerting them as to

13   what was going on.

14   Q.    Okay.  Do you remember who you were talking to

15   at Chartwell?

16   A.    Most likely it was Veronica and at CitiStaff --

17   I can't think of the lady's name at Citistaff.  She was

18   very difficult to reach.

19   Q.    Okay.  Let's see.

20         (Whereupon, Plaintiffs' Exhibit 125 was marked

21         for identification and is attached hereto.)

22         MR. ORGAN:  Exhibit 125, for the record, is a

23   one-page document Bates-stamped TESLA- -- I think

24   it's -- 644.  It's either 644 or 611.  But, anyway,

25   they're emails from October 17th and October 19th of

WAYNE JACKSON
May 17, 2019

1       2015.

2               And the first document -- or the first email

3       down at the bottom of Exhibit 125, this appears to be a

4       complaint by Mr. Martinez about Mr. Diaz.

5               (Document reviewed by the deponent.)

6               MR. ORGAN:  Q.  Was that -- let me ask you

7       this:  After you read this, does it refresh your

8       recollection as to who actually made the complaint

9       against each other in terms of Mr. Romero [sic] or

10      Mr. Diaz?

11          A.   No.  I couldn't tell you who made the

12      complaint.

13          Q.   Okay.

14               (Whereupon, Plaintiffs' Exhibit 126 was marked

15               for identification and is attached hereto.)

16               MR. ORGAN:  Exhibit 126, for the record, is a

17      four-page document, Bates-stamped TESLA-133 to 136.  It

18      is a series of emails starting with a complaint by

19      Mr. Diaz on 17th of October 2015, and then up to the

20      20th of October.

21          Q.   And I'm wondering if this refreshes your

22      recollection.

23               MR. ARANEDA:  Take your time and read through

24      it.

25               MR. ORGAN:  Yes.

**Page  63**

WAYNE JACKSON
May 17, 2019

```
 1                    (Document reviewed by the deponent.)
 2                    THE WITNESS:  And what was the question?  I'm
 3      sorry.
 4                    MR. ORGAN:  Q.  I'm just wondering if this
 5      helps refresh your recollection in terms of --
 6           A.       Yeah, I believe this was the verbal altercation
 7      that they had gotten into, yes.
 8           Q.       And Mr. Diaz suggests that Mr. Martinez started
 9      this altercation by yelling at him in a threatening
10      manner, suggesting that Mr. Diaz had a problem with him;
11      right?  That's what Mr. Diaz's complaint was.
12                    MR. ARANEDA:  The document speaks for itself.
13                    THE WITNESS:  Yeah, that's what it says here.
14                    MR. ORGAN:  Q.  Does that refresh your
15      recollection -- did you actually talk to Mr. Diaz after
16      you received his written complaint here in Exhibit 126?
17           A.       I believe so, yes, sir.
18           Q.       And was Mr. Diaz's complaint to you verbally
19      the same as his complaint in writing?
20           A.       No, sir.
21           Q.       There were additional things that Mr. Diaz told
22      you in the -- when he talked to you --
23           A.       Well, what he's saying here about he thought he
24      was going to be struck, he didn't really express that.
25           Q.       He didn't express that when you talked to him?
```

**Page  64**

WAYNE JACKSON
May 17, 2019

1     A.     No, sir.

2     Q.     You talked to Mr. Diaz after you received a

3     copy of his email complaint.

4            Is that true?

5     A.     Yes, sir, I believe so.

6     Q.     Did you ask him whether or not Mr. Martinez

7     threatened to hit him?

8     A.     It was more or less the conversation, if I

9     remember correctly -- Mr. Diaz was more of, "He's not

10    going to talk to me like that."

11           So, yeah, it was more of, like I said, "He

12    wasn't going to talk to me like that" more so than

13    anything.  It wasn't -- he didn't state that he was --

14    that he was going to fight, per se, I guess, or be

15    struck.

16    Q.     Do you have notes that you took of that

17    interview you did with Mr. Diaz?

18    A.     I don't, no, sir.

19    Q.     Did you take notes at the time --

20    A.     Yes, sir.

21    Q.     -- that you were meeting with Mr. Diaz?

22    A.     Yes, sir.  Every time I met with anybody, I

23    would take notes.  But I don't have those anymore.

24    Q.     What did you do with the notes once you

25    finished talking to Mr. Diaz?

**Page 65**

1    practices; correct?

2        **A.    Yes, sir.**

3        Q.    And you do recall that you created notes

4    relative to your interview with Mr. Diaz; right?

5        **A.    I do believe so, yes, sir.**

6        Q.    And, then, did you create notes, any notes

7    relative to your interview with Ramon Martinez?

8        **A.    Yes, sir.**

9        Q.    You would have taken the same thing in terms of

10   documenting what Mr. Martinez told you in your

11   interview.

12          Is that right?

13       **A.    Yes, sir.**

14       Q.    And you would have typed those notes up, and

15   then sent that to the agency and to at least someone

16   in -- Terri Garrett in nextSource; right?

17       **A.    Yes, sir.**

18       Q.    Where would you save the documents that you

19   created?  The typewritten documents you created, where

20   would those be saved?

21       **A.    Most likely on the laptop that I had.**

22       Q.    Did your laptop connect to some kind of server

23   so that it would back up whatever information you were

24   typing?

25       **A.    Not that I recall.**

1      Q.    The laptop that you created the notes on, that

2    would have been the laptop, though, that was the

3    company's -- was nextSource's laptop?

4      **A.    Yes, sir.**

5      Q.    And when you left nextSource, you returned that

6    laptop to them; correct?

7      **A.    Yes, sir.**

8      Q.    Do you remember the name or the title of the

9    notes that you created?

10     **A.    I have no recollection.   I'm sorry.   It's been**

11   **so long, yeah, I couldn't.**

12     Q.    I get that.

13     **A.    Okay.**

14     Q.    If you look at the second page of Exhibit 126,

15   it mentions --

16           MR. ARANEDA:  What Bates are you looking at?

17           MR. ORGAN:  134, the second page.

18           MR. ARANEDA:  Okay.

19           MR. ORGAN:  Q.  -- there's an email kind of in

20   the middle from Terri Garrett to Erin Marconi.

21           Who was Erin Marconi?

22     **A.    I believe she was in human resources for Tesla.**

23     Q.    Was that typical protocol to at least inform

24   Tesla HR whenever there was some kind of fact-gathering

25   or investigation being done?

WAYNE JACKSON
May 17, 2019

1     A.     Yes, sir, if there was something serious.   If
2  it was someone late, no, we wouldn't notify them, but
3  anything else, yes.
4     Q.     Right.
5            So any kind of verbal altercation typically
6  would be copied to Tesla; right?
7     A.     I wouldn't --
8     Q.     Well, let me --
9     A.     -- say that, no, sir.
10    Q.     Any verbal altercation where there's
11  allegations of some kind of threat, that would be copied
12  to Tesla --
13    A.     Yes, sir.
14    Q.     -- right?
15           And, then, in that email from Terri to Erin,
16  Terri mentions in there, it says:
17           "It looks like Victor is asking Ed Romero to
18           get involved in a temporary worker ER [sic]
19           issue.  My recommendation is that Ed not be
20           involved."
21           I'm just wondering, do you have any
22  recollection of talking to Terri Garrett about Victor or
23  Ed's involvement in this investigation?
24    A.     Yes.  The email even shows that she had asked
25  me, you know, why is Ed doing this, and I said, "He was

1    instructed by Victor."

2      Q.    Okay.  And, then, in terms of any discussions

3    that you had with Ed Romero, do you recall any

4    discussions with Ed about this altercation between

5    Mr. Diaz and Martinez?

6      A.    I'm sure I did, but I can't recall what the

7    details were, to be honest.

8      Q.    What was the ultimate outcome of this

9    investigation that you did into 126 -- into the

10   information in Exhibit 126?  Do you remember?

11     A.    I don't recall.  I believe it was a -- a

12   warning was issued.  Yeah, I believe so.

13     Q.    Was a warning issued to Mr. Martinez, then?

14     A.    I don't recall.  I think it was both in the

15   sense if I -- I can't even remember because, like I

16   said, Mr. Diaz had -- the timing is probably what's

17   throwing me off a little bit.

18          But he had a few interactions with employees

19   where he was pretty aggressive, I guess you could say,

20   and we probably verbally counseled both of them to --

21   to, you know, more or less, play nice with each other in

22   the sandbox.

23     Q.    And do you think -- if you go back to

24   Exhibit 125 where Mr. Ramon Martinez has that email on

25   October 17th at 4:56 a.m., do you recall that

WAYNE JACKSON
May 17, 2019

```
 1              This is 127?
 2              THE REPORTER:  Yes.
 3              (Whereupon, Plaintiffs' Exhibit 127 was marked
 4              for identification and is attached hereto.)
 5              MR. ORGAN:  Exhibit 127, for the record, is a
 6      two-page document Bates-stamped TESLA-646 and 647, and
 7      they are emails from October 19th to October 21st.
 8              (Document reviewed by the deponent.)
 9              MR. ORGAN:  Q.  There's a reference here to a
10      Rothaj.  I think that's Rothaj Foster.
11              Is that correct?
12         A.   I don't remember the last name.
13         Q.   Do you remember who Rothaj worked for?
14         A.   No, I don't, sir.
15         Q.   If you look at your email down at the bottom,
16      that's an email that you sent to Terri Garrett?
17         A.   Uh-hum.
18         Q.   Do you see that?
19         A.   Yes.
20         Q.   It says (as read):
21              This issue seems to be related to this, and we
22              are going to have to do some in-depth
23              investigation.
24              Do you remember any discussions that you had
25      with Terri Garrett about that investigation in this
```

**Page  72**

WAYNE JACKSON
May 17, 2019

1          -- and then Erin Marconi?

2     **A.    Yes, sir.**

3     Q.    There are three recommendations -- or there are

4     three items that are identified as important here in

5     Exhibit 128.

6          Did you yourself talk to Ramon about --

7     Ramon Martinez about in terms of there's no further room

8     for error?

9     **A.    Yes, sir.**

10    Q.    So you yourself had a conversation with

11    Mr. Martinez; correct?

12    **A.    Yes, I did have a conversation with**

13    **Mr. Martinez, and I also referred him to his agency who**

14    **also had a more in-depth conversation with him.**

15    Q.    In the conversation that you had with

16    Mr. Martinez, you made it clear to Mr. Martinez that you

17    thought that the jigaboo drawing was inappropriate;

18    right?

19    **A.    Yes, sir.**

20    Q.    And you also made it clear to Mr. Martinez that

21    you thought the jigaboo poster was offensive to

22    African-Americans; right?

23    **A.    Yes, sir.**

24    Q.    In terms of Mr. Martinez's response, what was

25    his response when you told him that it was offensive to

1      A.    He didn't really specifically say that, that I

2   could recall, but he did say it was inappropriate.

3      Q.    Okay.  And then there's a reference here to

4   Josue?

5      A.    Josue, yes.

6      Q.    Was Josue with Tesla or who was he with?

7      A.    Tesla.

8      Q.    Do you remember what Josue's position was?

9      A.    I don't know.  It was more of a -- I don't know

10   if it was a supervisor or a manager of the recycling

11   area.

12      Q.    And Josue -- he also agreed that the jigaboo

13   drawing was inappropriate; right?

14      A.    Yes.

15      Q.    Did Josue say anything about in terms of what

16   he thought was the appropriate remedy?

17      A.    No, he was never really included in that

18   portion of it.

19      Q.    Okay.

20            130?

21            THE REPORTER:  Yes.

22            (Whereupon, Plaintiffs' Exhibit 130 was marked

23            for identification and is attached hereto.)

24            MR. ORGAN:  Exhibit 130, for the record, is a

25   five-page document Bates-stamped TESLA-4 to 8, and it

1    starts with the jigaboo drawing -- pictures of the

2    jigaboo drawing and Mr. Diaz's complaint.  Those are the

3    last four pages of the -- five pages of that, and then

4    there's an email on the first page.

5              (Document reviewed by the deponent.)

6              THE WITNESS:  Yes, sir.

7              MR. ORGAN:  Q.  And the email on the first page

8    is an email from you to Veronica Martinez at Chartwell.

9         A.    Uh-hum.

10        Q.    Was Ms. Martinez -- Veronica Martinez, was she

11   sort of a contact person that you had in Chartwell?

12        A.    Yes, sir.

13        Q.    And do you remember what Ms. Martinez's role

14   was at Chartwell?

15        A.    I believe she was the manager of that

16   particular branch.

17        Q.    Did you ever get from Chartwell what their

18   policy was regarding discrimination?

19        A.    I did not, but I'm sure Ms. Garrett had to have

20   gotten that as part of the contract.

21        Q.    So Terri Garrett did further liaison, then,

22   with Chartwell.

23              Is that right?

24        A.    She did all the contracts and such with any of

25   the agencies that we worked with.

WAYNE JACKSON
May 17, 2019

```
 1    pretty difficult to reach, to be very honest.

 2        Q.    And then there's a Judy.

 3              Is Judy the same as Ludivina?

 4        A.    I don't know.

 5        Q.    Did you know a Judy Ledesma?

 6        A.    That does not sound familiar.

 7        Q.    Do you remember having any discussions with

 8    Monica De Leon about the jigaboo?

 9        A.    Yeah, I believe, like I said, I had alerted her

10    to it and made sure I provided her copies, if I'm not

11    mistaken, of the photos.

12        Q.    Do you remember an actual conversation that you

13    ended up having with her?

14        A.    I really don't.  Monica was really very

15    difficult to reach.

16        Q.    Okay.

17              This is 132.

18              (Whereupon, Plaintiffs' Exhibit 132 was marked

19              for identification and is attached hereto.)

20              MR. ORGAN:  Q.  Exhibit 132, for the record, is

21    a multiple-page document Bates-stamped 7 -- TESLA-730 to

22    737.  I guess it's an eight-page document.  It includes

23    some handwritten statements.

24              (Document reviewed by the deponent.)

25              MR. ORGAN:  Q.  And I'm wondering, do you -- do
```

Bridget Mattos & Associates
(415)747-8710

1    you remember if you ever saw the handwritten statements

2    that are -- were allegedly attached to Ms. Delgado's

3    email?

4        A.    No, I don't believe so.  Let me see.  No, I

5    don't recall seeing these.

6        Q.    Okay.

7        A.    I may have, but I don't recall.

8        Q.    And, then -- the only reason I ask is because

9    if you look at the first page of Exhibit 132, there's an

10   email from you to Victor, Josue, Jeff Lalich, and

11   Terri Garrett talking about "alleged victim statement."

12            Do you see that at the top?

13       A.    Yes, I do.

14       Q.    And PDF, suggesting that the attachments were

15   included by you to them.

16       A.    And it could have been.  I just don't recall

17   these attachments, to be really honest.

18       Q.    Okay.

19       A.    I probably -- if I did send them, I probably

20   did, just making sure that I kept everybody in the loop.

21       Q.    But in terms of what you did, the statements

22   themselves were not something that you took from the

23   employees --

24       A.    No.

25       Q.    -- is that correct?

1       A.      No, these were from the Chartwell, yeah.

2       Q.      Okay.

3       A.      Yeah, these are the statements that they give

4   to Chartwell to give.

5       Q.      Okay.

6       A.      Yes.

7       Q.      And, again, in terms of who might have been

8   doing the investigation for Chartwell, do you remember

9   who that was?

10      A.      It was their HR team.

11      Q.      Okay.  Do you remember who was on Chartwell's

12  HR team?

13      A.      I did not really communicate with them.  I only

14  communicated with Veronica.

15      Q.      Now, if you look at the email from

16  Mr. Delgado [sic] to Veronica Martinez, it states that

17  Mr. Diaz was concerned about his safety and feeling

18  uncomfortable with working with Mr. Martinez.

19              That was something that did come up during your

20  investigation into these incidents, correct, that

21  Mr. Diaz was concerned about working with Mr. Martinez;

22  right?

23              MR. ARANEDA:  Objection.  Vague.  It lacks

24  foundation.

25              THE WITNESS:  Only via email.

```
 1    his return.

 2         Q.    Whatever that Wednesday was?

 3         A.    Yes, sir.

 4         Q.    And, then, did Victor ever report back to you

 5    that, in fact, he had talked to Mr. Martinez?

 6         A.    Yeah, I believe he did tell me he had spoke to

 7    Mr. Martinez.  I actually called Chartwell and sure

 8    they knew that Ramon was to report to Victor first.

 9         Q.    Okay.

10               This will be 134.

11               (Whereupon, Plaintiffs' Exhibit 134 was marked

12               for identification and is attached hereto.)

13               MR. ORGAN:  Are there enough of those?

14               MS. STEVENS:  Yes.

15               MR. ORGAN:  Okay.

16               Exhibit 134, for the record, is a one-page

17    document Bates-stamped TESLA-317, and this is

18    referencing -- this is from March of 2016, something

19    about a situation involving Owen Diaz and Troy Dennis.

20               (Document reviewed by the deponent.)

21               MR. ORGAN:  Q.  Do you know what that was

22    about?

23         A.    I believe, again, it was they got into a verbal

24    altercation.

25         Q.    And it says here that you were looking for some
```

WAYNE JACKSON
May 17, 2019

1     good replacements.   That's your email to Mr. Romero.

2          Do you see that?

3     A.    Yes.   They had actually asked me to start

4     looking just in case things didn't work out, yes.

5     Q.    And were those -- were they looking for -- the

6     "they" being Ed Romero and Victor Quintero; right?

7     A.    Yes.

8     Q.    So Ed Romero and Victor Quintero were looking

9     for replacements for both Owen Diaz and Troy Dennis or

10    just Owen Diaz?

11    A.    I believe it was for both.

12    Q.    Okay.

13    A.    I think they had -- like I said, they had a

14    verbal altercation in the middle of the factory in front

15    of a lot of people.

16    Q.    Okay.

17    A.    I believe -- I can't remember exactly the

18    incident, but it was something to that effect.

19    Q.    Do you remember what it was about?

20    A.    I do not.

21    Q.    Okay.

22          This is 135.

23          (Whereupon, Plaintiffs' Exhibit 135 was marked

24          for identification and is attached hereto.)

25          (Document reviewed by the deponent.)

**Page 107**

1           MR. ORGAN:  Exhibit 135, for the record, is a

2    one-page document Bates-stamped TESLA-319.

3        Q.    This is something about a failure to bring

4    safety shoes on March 3rd?

5        **A.    Yes.  We've had a -- they had a few issues**

6    **where if you're an elevator operator dealing with**

7    **forklifts, you had to have on the steel-toed shoes.  And**

8    **we'd have a few employees that would show up without**

9    **those shoes on, and in a lot of cases, we had to send**

10   **them home.**

11       Q.    In this particular case, do you know if

12   Mr. Diaz got sent home?

13       **A.    I don't recall because he was working grave and**

14   **I probably was asleep at the time, to be honest.**

15       Q.    Fair enough.

16             Okay.  Let's go to the next one.

17             (Whereupon, Plaintiffs' Exhibit 136 was marked

18             for identification and is attached hereto.)

19             (Document reviewed by the deponent.)

20             THE WITNESS:  Oh, yeah.  Okay.  I do remember a

21   little more about this.

22             MR. ORGAN:  Q.  Tell me what else you remember

23   about -- so 136, for the record, is a one-page document

24   Bates-stamped TESLA-320.  It's an email from March 4th.

25       **A.    Uh-hum.**

WAYNE JACKSON
May 17, 2019

1       Q.      And this is something about some PPE gear?

2       A.      Personal protective equipment.

3       Q.      Okay.

4       A.      Yeah, I believe the -- we had a safety

5   individual, Mr. Tyrone Hopper -- Hoper -- Hopper, and

6   part of his task was to go around and ensure everybody

7   had on the proper goggles, safety shoes, vests, things

8   of that nature.

9               And I think he had approached Mr. Diaz because

10  he didn't have a vest on, and then that's when he

11  discovered he didn't have his shoes, either.

12      Q.      Okay.

13      A.      And Mr. Diaz got confrontational with him as

14  the safety person.  So they were concerned, if I

15  remember.

16      Q.      This doesn't mention confrontational.

17              How do you --

18      A.      Yeah, I think they -- because I remember

19  Mr. Hopper was pretty upset about it because he said,

20  "Look.  I'm just trying to make sure you go home safe.

21  You arrive safe, go home safe."

22              And I guess there was an argument that ensued

23  with something to the effect of why are you worrying

24  about my shoes and not worrying about that guy's shoes,

25  because that guy is not part of our team type of deal.

**Page 109**

```
 1        Q.    Right.
 2              Did it seem to you that after the jigaboo -- I
 3    mean, it just seems from the emails that after the
 4    jigaboo incident in January, that there seemed to be
 5    more incidents of Mr. Diaz having verbal altercations
 6    with coworkers.
 7              MR. ARANEDA:   Objection.   Vague.
 8              THE WITNESS:   No, I would not say that, sir,
 9    because it was kind of continuous, to be very honest.
10    It was -- Owen was known as the kind of difficult
11    elevator operator at the plant.   That was just kind of
12    how people -- they didn't want to deal with him in a lot
13    of ways.
14              MR. ORGAN:   Okay.
15              THE WITNESS:   And I don't know how else to put
16    it, but that just was the feedback that I got.
17              MR. ORGAN:   Okay.
18              THE WITNESS:   He wasn't difficult with me,
19    per se, but, like I said, I only dealt with the men
20    there.
21              MR. ORGAN:   Q.   So in terms of your dealings
22    and Owen Diaz, you didn't have difficulty with him
23    personally.
24              Is that correct?
25        A.    On most occasions, no.   I mean, I -- we did
```

```
 1    having him terminated; correct?
 2        A.    I can't recall, but there were -- like I said,
 3    there were a lot of complaints that came in with regards
 4    to him.
 5        Q.    I understand that there were complaints.
 6        A.    Yeah.
 7        Q.    My question is a little different, though, a
 8    little narrower, and that is:  Did anyone tell you prior
 9    to March of 2016 that they thought that Owen Diaz should
10    be terminated?
11        A.    Yes.
12        Q.    Who?
13        A.    Ed Romero.
14        Q.    When did Ed tell you that he thought Mr. Diaz
15    should be terminated?
16        A.    It was on several occasions.  Like I said, he
17    would hear about the stuff sometimes before me.
18        Q.    Okay.
19        A.    And Ed, I think as his thing, he would always
20    say to me, like, "Wayne, I like the guy, but he's really
21    causing a lot of problems."  That would be his comment.
22        Q.    Okay.  Did he say what was causing the
23    problems?
24        A.    Attitude.
25        Q.    Attitude.
```

WAYNE JACKSON
May 17, 2019

1    A.    He was very abrasive towards other staff.

2    Q.    Was Owen Diaz abrasive with you?

3    A.    On one occasion, but not -- like I said, after

4  I kind of let him know I'm here to help you, he kind of

5  calmed down, but initially, yes.

6    Q.    When did that one occasion occur where Mr. Diaz

7  was abrasive with you or loud?  I think you said he was

8  loud.

9         Is that right?

10   A.    Yeah.

11         I can't remember the exact date, to be very

12  honest.

13   Q.    Was it toward the end of Owen's tenure there or

14  toward the beginning or in the middle?

15   A.    Probably towards the beginning more.  Yeah, it

16  was probably more towards the beginning, I think.

17   Q.    So once you had that conversation with Mr. Diaz

18  at the beginning about how you were there to help him,

19  you had no other issues with him throughout the entire

20  time that Mr. Diaz worked at Tesla; right?

21   A.    I wouldn't say that.  I just -- we had a better

22  understanding of him not yelling at me.

23   Q.    Okay.

24   A.    I guess is the best way to put it.

25   Q.    I see.

**Page 113**

WAYNE JACKSON
May 17, 2019

```
 1                This is 140?

 2                THE REPORTER:  140.

 3                (Whereupon, Plaintiffs' Exhibit 140 was marked

 4                for identification and is attached hereto.)

 5                (Document reviewed by the deponent.)

 6                THE WITNESS:  My daughter...

 7                MR. ORGAN:  Your daughter is calling you?

 8                THE WITNESS:  Yeah.

 9                MR. ORGAN:  Do you need to get it?

10                THE WITNESS:  I'll call her back in just a

11       minute.

12                MR. ORGAN:  Okay.

13                Well, somehow I only have two copies of this

14       one, too.  Sorry about that.

15                Exhibit 140, for the record, is a two-page

16       document Bates-stamped CITISTAFF-00009-10.

17           Q.   And it's just a -- there are two emails from

18       you --

19           A.   Uh-hum.

20           Q.   -- to Ms. De Leon and then from Monica De Leon

21       back to you regarding the termination of Mr. Diaz's

22       contract.  It's dated March 18th.

23                Do you see that?

24           A.   Yes, sir.

25           Q.   And then it says:
```

**Page 125**

WAYNE JACKSON
May 17, 2019

```
 1              "Unfortunately, we will have to term the
 2         assignment of Owen Diaz.  We have been trying
 3         to work with him on some attendance and
 4         performance issues, but we have been
 5         unsuccessful."
 6              And then he sent a doctor's note, but no
 7    signature, and then the manager would just like to get
 8    another candidate --
 9         A.   Yes.
10         Q.   -- to backfill.
11              So --
12         A.   That's more or less letting Citistaff know they
13    could reassign Owen to somewhere else.
14         Q.   Do you remember a conversation, then, that you
15    had with either Monica or anybody else relative to this
16    issue about the doctor's note and the decision to
17    terminate him?
18         A.   No, I believe I just forwarded the doctor's
19    notice to Monica.  I don't think it had a signature or
20    anything on it, a date or anything.
21         Q.   Okay.
22         A.   So it didn't -- it wasn't really a verifiable
23    note, I guess you could say.
24         Q.   I see.
25              And you need that.
```

**Page 126**

```
 1      journal should have any kind of concerns?

 2      A.     Various notes would be placed there, yes.

 3      Q.     Like if there was a performance concern, it

 4   should go in the requisition journal.

 5             Is that right?

 6             MR. ARANEDA:  Objection.

 7             THE WITNESS:  Yes.

 8             MR. ARANEDA:  It calls for speculation.

 9             THE WITNESS:  Yes, that would go in there, as

10   well as if someone was doing, you know, above and

11   beyond, things of that nature.

12             MR. ORGAN:  I see, okay.

13             And Exhibit 142.

14             (Whereupon, Plaintiffs' Exhibit 142 was marked

15             for identification and is attached hereto.)

16             MR. ORGAN:  For the record, Exhibit 142 is a

17   two-page document Bates-stamped TESLA-752-753.  They're

18   emails from February 26 of 2016.

19             (Document reviewed by the deponent.)

20             THE WITNESS:  That's the lady,

21   Joyce Delagrande, yeah.

22             MR. ORGAN:  Okay.

23             THE WITNESS:  Yeah.  I knew it was something

24   where he got into it with somebody.  I couldn't recall

25   what it was.
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBITS TO DEPOSITION OF WAYNE JACKSON

REDACTED – CONDITIONALLY FILED UNDER SEAL

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

```
1                    REPORTER'S CERTIFICATE

2   STATE OF CALIFORNIA        )
                               )  ss.
3   COUNTY OF MARIN            )

4            I, PATRICIA ROSINSKI, hereby certify:

5            That I am a Certified Shorthand Reporter in the

6   State of California.

7            That prior to being examined, WAYNE JACKSON,

8   the witness named in the foregoing deposition, was by me

9   duly sworn to testify the truth, the whole truth, and

10  nothing but the truth;

11           That said deposition was taken pursuant to

12  Notice of Deposition and agreement between the parties

13  at the time and place therein set forth and was taken

14  down by me in stenotype and thereafter transcribed by me

15  by computer and that the deposition is a true record of

16  the testimony given by the witness.

17           I further certify that I am neither counsel for

18  either, nor related in any way to any party to said

19  action, nor otherwise interested in the result or

20  outcome thereof.

21           Pursuant to Federal Rules of Civil Procedure,

22  Rule 30(e), review of the transcript was not requested

23  before the completion of the deposition.

24           PATRICIA ROSINSKI, CSR No. 4555

25                    May 28, 2019

                                                      154
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4

**REPORTER CERTIFIED TRANSCRIPT**

5 _____

6 DEMETRIC DI-AZ, OWEN DIAZ and
   LAMAR PATTERSON, an individual,

7                       **CONFIDENTIAL**

8        Plaintiffs,

   Vs.                Case No. 3:17-cv-06748-WHO

9

10 TESLA, INC. DBA TESLA MOTORS,
   INC.; CitiStaff SOLUTIONS, INC.;
   WEST VALLEY STAFFING GROUP;

11 CHARTWELL STAFFING SERVICES, INC.
   and DOES 1-10, inclusive,

12

       Defendants.

13 _____/

14

15

16            CONFIDENTIAL

17       VIDEOTAPED DEPOSITION OF

18           OWEN DIAZ

19     SAN FRANCISCO, CALIFORNIA

20      TUESDAY, MAY 22, 2018

21

22

23

24 Reported By:
   Candy Newland
   CSR No. 14256

25 File No. 18-25470

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:12:56 | 1 | Madame Court Reporter, please swear the witness |
| | 2 | in. |
| | 3 | --oOo-- |
| | 4 | OWEN DIAZ, |
| | 5 | having first declared under penalty of perjury to tell |
| | 6 | the truth, was examined and testified as follows: |
| | 7 | --oOo-- |
| | 8 | EXAMINATION |
| | 9 | BY MS. ANTONUCCI: |
| 10:13:12 | 10 | Q.     My name is Barbara Antonucci.  I represent |
| 10:13:14 | 11 | defendant Tesla, Inc., dba Tesla Motors, Inc.  For |
| 10:13:19 | 12 | purposes of this deposition, I'll refer to my client as |
| 10:13:23 | 13 | Tesla. |
| 10:13:23 | 14 | Do you understand that? |
| 10:13:23 | 15 | A.     Yes, ma'am. |
| 10:13:26 | 16 | Q.     I also represent CitiStaff Solutions, Inc., and |
| 10:13:26 | 17 | for purposes of this depo, I'll refer to them as |
| 10:13:26 | 18 | CitiStaff. |
| 10:13:32 | 19 | Do you understand that? |
| 10:13:33 | 20 | A.     Yes, ma'am. |
| 10:13:33 | 21 | Q.     Could you please state your full name for the |
| 10:13:36 | 22 | record. |
| 10:13:36 | 23 | A.     My full name is Owen Orappio Diaz, Jr. |
| 10:13:36 | 24 | (Reporter Clarification.) |
| 10:13:36 | 25 | /// |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:36:40 | 1 | same thing I had to go through. |
| 10:37:09 | 2 | Q.      Have you ever declared bankruptcy? |
| 10:37:13 | 3 | A.      No, ma'am. |
| 10:37:39 | 4 | Q.      Have you ever had any judgments against you? |
| 10:37:42 | 5 | A.      No, ma'am. |
| 10:37:43 | 6 |         MR. ORGAN:  Objection to the extent it calls for |
| 10:38:10 | 7 | a legal conclusion. |
| 10:38:10 | 8 |         (EXHIBIT 1 was marked for identification.) |
| 10:38:10 | 9 | BY MS. ANTONUCCI: |
| 10:38:15 | 10 | Q.      Exhibit 1 is a document entitled "CitiStaff |
| 10:38:18 | 11 | Solutions, Inc., Application," and it's Bates-stamped at |
| 10:38:22 | 12 | the bottom 34 to 35. |
| 10:38:24 | 13 |         Do you see that? |
| 10:38:29 | 14 | A.      Yes, ma'am. |
| 10:38:30 | 15 | Q.      Is this a copy of the application you submitted |
| 10:38:33 | 16 | to CitiStaff? |
| 10:38:36 | 17 | A.      It appears so. |
| 10:38:39 | 18 | Q.      Is that your signature on the page Bates-stamped |
| 10:38:45 | 19 | 35 at the bottom? |
| 10:38:47 | 20 | A.      It looks like my signature, ma'am. |
| 10:38:53 | 21 | Q.      Is there anything that you see that's inaccurate |
| 10:38:57 | 22 | about this application? |
| 10:38:58 | 23 |         MR. ORGAN:  Objection.  Compound. |
| 10:39:35 | 24 |         THE WITNESS:  Looks like the date of my |
| 10:39:53 | 25 | franchise -- the end.  I could have made a typo there. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:54:00 | 1 | MR. ORGAN:  Objection.  Privacy.  Financial |
| 10:54:02 | 2 | privacy.  Don't answer that. |
| 10:54:06 | 3 | BY MS. ANTONUCCI: |
| 10:54:12 | 4 | Q.     You also worked as a residential counselor at |
| 10:54:20 | 5 | the Hamilton Family Center; is that correct? |
| 10:54:22 | 6 | A.     Yes, ma'am. |
| 10:54:23 | 7 | Q.     And that was from January 2013 to February 2014? |
| 10:54:31 | 8 | A.     Sounds about accurate. |
| 10:54:33 | 9 | Q.     And what was the reason you left that job? |
| 10:54:36 | 10 | A.     Funding. |
| 10:54:37 | 11 | Q.     What does that mean? |
| 10:54:39 | 12 | A.     It was funded by the government.  Certain |
| 10:54:44 | 13 | positions was eliminated due to funding. |
| 10:54:48 | 14 | Q.     And was your position one that was eliminated? |
| 10:54:52 | 15 | A.     Yes. |
| 10:54:55 | 16 | Q.     So you submitted this application, marked as |
| 10:55:01 | 17 | Exhibit 1, on June 2, 2015; is that right? |
| 10:55:14 | 18 | A.     It looked like my -- I wrote the date. |
| 10:55:17 | 19 | Q.     So that's correct? |
| 10:55:19 | 20 | A.     Yes. |
| 10:55:20 | 21 | Q.     And at that time, had you had any other work |
| 10:55:25 | 22 | experience besides Hamilton Family Center and Cover-All? |
| 10:55:31 | 23 | MR. ORGAN:  Objection.  Argumentative. |
| 10:55:34 | 24 | THE WITNESS:  Yes. |
| 10:55:36 | 25 | /// |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 10:59:31 | 1 | A.      I don't know. |
| 10:59:33 | 2 | Q.      How long did you work for CSC? |
| 10:59:37 | 3 | A.      About four months. |
| 10:59:53 | 4 | Q.      And what was your role at CSC? |
| 10:59:57 | 5 | A.      I worked the 49er games. |
| 11:00:02 | 6 | Q.      Were you a security officer? |
| 11:00:04 | 7 | A.      I stood on the field.  Yes. |
| 11:00:09 | 8 | Q.      Can you give me the dates of your employment at |
| 11:00:17 | 9 | CSC? |
| 11:00:27 | 10 | A.      I believe it's about 2013 to 2014. |
| 11:00:32 | 11 | Q.      And why did you leave CSC? |
| 11:00:36 | 12 | A.      Football season was over. |
| 11:00:45 | 13 | Q.      Any other jobs prior to applying for CitiStaff? |
| 11:00:53 | 14 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 11:00:59 | 15 | THE WITNESS:  Not that I recall at this time. |
| 11:01:02 | 16 | BY MS. ANTONUCCI: |
| 11:01:23 | 17 | Q.      The woman you met at the CitiStaff Newark |
| 11:01:27 | 18 | office, did you ever see her again after you met her on |
| 11:01:32 | 19 | that occasion? |
| 11:01:37 | 20 | A.      Maybe once or twice. |
| 11:01:44 | 21 | Q.      Where did you see her after the first occasion |
| 11:01:47 | 22 | you met her? |
| 11:01:48 | 23 | A.      The same office. |
| 11:01:55 | 24 | Q.      Okay.  So the second time you saw her, what did |
| 11:01:59 | 25 | you discuss with her? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:02:00 | 1 | A.       My paycheck. |
| 11:02:01 | 2 | Q.       What did you discuss about your paycheck? |
| 11:02:04 | 3 | A.       Picking up my paycheck. |
| 11:02:07 | 4 | Q.       And when was that? |
| 11:02:10 | 5 | A.       Probably two weeks after I started. |
| 11:02:18 | 6 | Q.       Did you discuss anything else with her during |
| 11:02:25 | 7 | that time that you visited the Newark office? |
| 11:02:30 | 8 | A.       No. |
| 11:02:39 | 9 | Q.       Was there a third time that you met with her? |
| 11:02:43 | 10 | A.       Picking up my paycheck. |
| 11:02:48 | 11 | Q.       So you met with her a third time where you |
| 11:02:51 | 12 | picked up your paycheck from the Newark office? |
| 11:02:55 | 13 | A.       Yes, ma'am. |
| 11:02:56 | 14 | Q.       And when was that? |
| 11:02:58 | 15 | A.       A week later. |
| 11:03:01 | 16 | Q.       And what did you discuss with her a week later |
| 11:03:04 | 17 | when you picked up your paycheck? |
| 11:03:06 | 18 | A.       That I would be picking up my paychecks inside |
| 11:03:11 | 19 | the office from Tesla from now on. |
| 11:03:11 | 20 |          MS. ANTONUCCI:  Can you read that back. |
| 11:03:11 | 21 |          (Whereupon, the last answer was read back.) |
| 11:03:15 | 22 | BY MS. ANTONUCCI: |
| 11:03:15 | 23 | Q.       And why did you let her know you'd be picking up |
| 11:03:31 | 24 | your paychecks inside the office from Tesla from now on? |
| 11:03:33 | 25 | A.       I didn't let her know that.  She let me know |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:51:43 | 1 | A.      Him not returning to work on time. |
| 01:51:48 | 2 | Q.      Was anybody else present during this argument? |
| 01:51:56 | 3 | A.      Yes. |
| 01:51:57 | 4 | Q.      Who? |
| 01:51:57 | 5 | A.      Staff that was on the floor. |
| 01:52:06 | 6 | Q.      Do you know their names? |
| 01:52:08 | 7 | A.      No. |
| 01:52:10 | 8 | Q.      At some point you were promoted to elevator |
| 01:52:35 | 9 | lead; is that right? |
| 01:52:36 | 10 | A.      Yes. |
| 01:52:37 | 11 | Q.      Do you know when that was? |
| 01:52:40 | 12 | A.      About a month after I started. |
| 01:52:53 | 13 | Q.      And how did your responsibilities change as an |
| 01:53:02 | 14 | elevator lead? |
| 01:53:09 | 15 | A.      Only difference was is now I was supervising |
| 01:53:13 | 16 | three to four guys. |
| 01:53:20 | 17 | Q.      And who were you supervising as an elevator |
| 01:53:23 | 18 | lead? |
| 01:53:25 | 19 | A.      One was Rothaj Foster, Lamar Patterson, and I |
| 01:53:38 | 20 | can't remember the other guys' names. |
| 01:53:41 | 21 | Q.      How many other people were you supervising |
| 01:53:44 | 22 | besides Rothaj Foster and Lamar Patterson? |
| 01:54:02 | 23 | A.      In total or at one time? |
| 01:54:05 | 24 | Q.      In total. |
| 01:54:06 | 25 | A.      It was a high turnover job, so I would say about |

| | | |
|---|---|---|
| 01:56:10 | 1 | corporate policy for Tesla? |
| 01:56:12 | 2 | MR. ORGAN:  Objection.  Calls for speculation. |
| 01:56:14 | 3 | THE WITNESS:  I don't know. |
| 01:57:25 | 4 | (EXHIBIT 3 was marked for identification.) |
| 01:57:25 | 5 | BY MS. ANTONUCCI: |
| 01:57:30 | 6 | Q.      Exhibit 3 is a document identified at the top as |
| 01:57:34 | 7 | "CitiStaff Solutions Inc., Assignment |
| 01:57:37 | 8 | Abandonment/Walk-Off" policy, and it's Bates-stamped at |
| 01:57:37 | 9 | the bottom as CitiStaff 39. |
| 01:57:41 | 10 | Do you recognize this document? |
| 01:57:51 | 11 | A.      I recognize my signature, but I don't remember |
| 01:57:54 | 12 | the document. |
| 01:57:55 | 13 | Q.      But that is your signature at the bottom? |
| 01:57:57 | 14 | A.      Yes. |
| 01:57:57 | 15 | Q.      So you signed this on June 2, 2015; correct? |
| 01:58:01 | 16 | A.      Yes. |
| 01:58:01 | 17 | Q.      And did you review it and read it before you |
| 01:58:05 | 18 | signed it? |
| 01:58:07 | 19 | MR. ORGAN:  Objection.  Compound. |
| 01:58:13 | 20 | THE WITNESS:  If I signed it at that time, I |
| 01:58:15 | 21 | reviewed it. |
| 01:58:15 | 22 | BY MS. ANTONUCCI: |
| 01:58:25 | 23 | Q.      Do you remember asking any questions about this |
| 01:58:28 | 24 | policy? |
| 01:58:30 | 25 | A.      No. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:21:00 | 1 | A.      "Get some rest" or either "Get some sleep," and |
| 03:21:08 | 2 | he'll talk to the other guy. |
| 03:21:14 | 3 | Q.      Have you given that e-mail to your attorney? |
| 03:21:18 | 4 | A.      Possibility. |
| 03:21:24 | 5 | Q.      Do you still have that e-mail? |
| 03:21:30 | 6 | A.      Possibility. |
| 03:21:33 | 7 | Q.      And do you know if he ever talked -- if Ed ever |
| 03:21:35 | 8 | talked to the other guy? |
| 03:21:39 | 9 | A.      No, I do not know. |
| 03:21:45 | 10 | Q.      So at this point, was Tom no longer your |
| 03:21:49 | 11 | supervisor? |
| 03:21:50 | 12 | A.      Yes. |
| 03:21:51 | 13 | Q.      And Ed was now your supervisor? |
| 03:21:53 | 14 | A.      Yes. |
| 03:21:53 | 15 | Q.      And did you get along with Ed? |
| 03:21:56 | 16 | A.      I thought so. |
| 03:22:01 | 17 | Q.      Do you have any reason to think that you didn't |
| 03:22:03 | 18 | get along with him? |
| 03:22:05 | 19 | A.      No. |
| 03:22:40 | 20 | Q.      Did you ever talk to Wayne Jackson about the |
| 03:22:43 | 21 | incident with Ramon in the elevator? |
| 03:22:50 | 22 | A.      I can't recall. |
| 03:22:51 | 23 | Q.      Do you know who Wayne Jackson is? |
| 03:22:58 | 24 | A.      Yes. |
| 03:22:59 | 25 | Q.      Who's Wayne Jackson? |

**Owen Diaz-Confidential**

03:23:05  1    A.      My understanding is that he was a liaison.

03:23:13  2    Q.      Liaison with who?

03:23:16  3    A.      Tesla and nextSource, I believe.

03:23:23  4    Q.      Did you understand that you could complain to

03:23:32  5    Wayne Jackson if you needed to about any concerns you

03:23:35  6    had in the workplace?

03:23:36  7            MR. ORGAN:   Objection.   Vague and ambiguous.

03:23:40  8            THE WITNESS:   If he was around.

03:23:40  9    BY MS. ANTONUCCI:

03:23:43  10   Q.      And he was on-site?

03:23:46  11   A.      Rarely.

03:23:50  12   Q.      How often would you say he was on-site?

03:23:58  13   A.      I don't know.

03:24:01  14   Q.      How many times a week?

03:24:03  15   A.      I don't know.

03:24:29  16   Q.      And this incident with Ramon, you know, right

03:24:33  17   outside, inside of the elevator, occurred around

03:24:36  18   October 17, 2015?

03:24:40  19   A.      Yes.   That's what the date is on the -- on the

03:24:44  20   e-mail.

03:24:45  21   Q.      And was that around 4:45 a.m.?

03:24:49  22   A.      Yes.

03:24:51  23   Q.      So you sent this e-mail right after it happened?

03:24:55  24   A.      I sent the e-mail out at 6:08 a.m., ma'am.

03:25:02  25   Q.      So about an hour and a half after it happened?

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:42:13 | 1 | Mr. Foster reported -- Mr. Foster reportedly made |
| 03:42:19 | 2 | threats against Mr. Diaz and his car.  As a result, |
| 03:42:21 | 3 | Mr. Romero advised me that he was suspending Mr. Foster |
| 03:42:25 | 4 | and asked for security assistance. |
| 03:42:29 | 5 |         I followed him to Mr. Foster's work area, stood |
| 03:42:30 | 6 | by while he was informed, and his badge was taken by |
| 03:42:34 | 7 | Mr. Romero.  We then escorted Mr. Foster out of the |
| 03:42:38 | 8 | building at the second Number 2 door, and I followed him |
| 03:42:41 | 9 | until he got into his vehicle, which was parked in a |
| 03:42:45 | 10 | handicapped space in front of Door 1.  I had a vehicle |
| 03:42:48 | 11 | patrol officer, Brian Deltoro, follow him as he drove |
| 03:42:53 | 12 | off the property. |
| 03:42:54 | 13 |         Mr. Foster's badge was turned in to the control |
| 03:42:57 | 14 | center, and I was informed -- and I informed Mr. Romero |
| 03:43:01 | 15 | Mr. Foster left the property. |
| 03:43:03 | 16 |         Nothing further to report." |
| 03:43:05 | 17 | Q.     Okay.  So is that correct that you got into a |
| 03:43:09 | 18 | verbal dispute with Mr. Foster on or about 11/5/2015? |
| 03:43:15 | 19 | A.     Yes. |
| 03:43:17 | 20 | Q.     And what was said during that verbal dispute? |
| 03:43:23 | 21 | A.     He said he was going to shoot me. |
| 03:43:25 | 22 | Q.     And what did you say? |
| 03:43:27 | 23 | A.     I contacted Mr. Romero. |
| 03:43:33 | 24 | Q.     Did you say anything to Mr. Foster? |
| 03:43:37 | 25 | A.     No.  I tried to get away from him as fast as |

**Owen Diaz-Confidential**

| | |
|---|---|
| 03:43:41 1 | possible. |
| 03:43:41 2 | Q.      Did you feel threatened by Mr. Foster? |
| 03:43:44 3 | A.      Yes. |
| 03:43:49 4 | Q.      It says here that "Mr. Foster reportedly made |
| 03:43:53 5 | threats against Mr. Diaz and his car." |
| 03:43:56 6 |         What did Mr. Foster say about your car? |
| 03:43:59 7 | A.      That he -- I believe he was going to vandalize |
| 03:44:07 8 | it and wait for me to come outside so he could do |
| 03:44:10 9 | further harm to myself or try to do harm to myself. |
| 03:44:14 10 | Q.      Why did he threaten to vandalize your car and |
| 03:44:19 11 | shoot you? |
| 03:44:20 12 |         MR. ORGAN:  Objection.  Calls for speculation. |
| 03:44:22 13 |         THE WITNESS:  I believe that it was from me |
| 03:44:32 14 | reporting to Ed Romero that he wasn't coming back, and |
| 03:44:40 15 | Ed Romero asked him why he wasn't coming back from his |
| 03:44:45 16 | breaks on time. |
| 03:44:45 17 | BY MS. ANTONUCCI: |
| 03:44:57 18 | Q.      And does this refresh your memory that it was |
| 03:44:59 19 | the 11/5 warning -- 11/5/2015 warning that you gave to |
| 03:45:05 20 | Mr. Foster that prompted him to threaten to shoot you? |
| 03:45:32 21 | A.      Yes.  Seemed like it was on the same day, ma'am. |
| 03:45:36 22 | Q.      And Mr. Romero immediately suspended Mr. Foster |
| 03:45:40 23 | after you brought this to his attention; right? |
| 03:45:43 24 | A.      Yes. |
| 03:45:44 25 | Q.      And he was escorted from the building by |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:49:25 | 1 | remember their names. |
| 03:49:26 | 2 | Q.      Had Robert by this point called you the N-word? |
| 03:49:30 | 3 | A.      Yes. |
| 03:49:39 | 4 | Q.      And Lamar Patterson is African-American; |
| 03:49:42 | 5 | correct? |
| 03:49:42 | 6 | A.      Yes. |
| 03:50:01 | 7 | (EXHIBIT 14 was marked for identification.) |
| 03:50:01 | 8 | BY MS. ANTONUCCI: |
| 03:50:19 | 9 | Q.      Exhibit 14 is an e-mail from you to Ed Romero |
| 03:50:30 | 10 | where -- Bates-stamped Tesla 5 to Tesla 8. |
| 03:50:39 | 11 | Do you see that? |
| 03:50:39 | 12 | A.      Yes. |
| 03:50:42 | 13 | Q.      Did you send this e-mail? |
| 03:50:45 | 14 | A.      Yes. |
| 03:50:45 | 15 | Q.      The e-mail is dated January 22, 2016.  Did you |
| 03:50:51 | 16 | send it on that date? |
| 03:50:53 | 17 | A.      Yes. |
| 03:51:00 | 18 | Q.      Did anybody help you write this? |
| 03:51:03 | 19 | A.      No. |
| 03:51:03 | 20 | Q.      Had you had -- had you consulted an attorney |
| 03:51:08 | 21 | prior to writing this? |
| 03:51:10 | 22 | A.      No. |
| 03:51:13 | 23 | Q.      Did you take the photographs on Tesla 6 and 7 of |
| 03:51:20 | 24 | this document, Exhibit 14? |
| 03:51:22 | 25 | A.      Yes. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:58:33 | 1 | Q.      When you saw this cartoon, you took a picture of |
| 03:58:37 | 2 | it; correct? |
| 03:58:37 | 3 | A.      Yes. |
| 03:58:38 | 4 | Q.      Do you know that pictures are not permitted in |
| 03:58:42 | 5 | the factory? |
| 03:58:46 | 6 | A.      Possibility. |
| 03:58:48 | 7 | Q.      "Yes," you know that? |
| 03:58:53 | 8 | A.      I believe it was certain parts of the floor, but |
| 03:59:01 | 9 | yes. |
| 03:59:01 | 10 | Q.      Was it this part of the floor? |
| 03:59:04 | 11 | A.      I don't know. |
| 03:59:07 | 12 | Q.      Okay.  With Mr. Romero -- at the time that you |
| 03:59:16 | 13 | took a photograph of this cartoon, Mr. Romero was your |
| 03:59:23 | 14 | supervisor; right? |
| 03:59:24 | 15 |          MR. ORGAN:  Objection.  Argumentative. |
| 03:59:26 | 16 |          THE WITNESS:  Yes. |
| 03:59:26 | 17 | BY MS. ANTONUCCI: |
| 03:59:29 | 18 | Q.      So why did you call Michael?  And by "Michael," |
| 03:59:38 | 19 | you mean Michael Wheeler; correct? |
| 03:59:38 | 20 | A.      Yes. |
| 03:59:38 | 21 | Q.      So why did you call Michael and not Ed? |
| 03:59:44 | 22 | A.      Chain of command. |
| 03:59:46 | 23 | Q.      What does that mean? |
| 03:59:48 | 24 | A.      Because the recycling came from a different |
| 03:59:54 | 25 | area. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:59:56 | 1 | Q.    So did Ramon report to Michael Wheeler? |
| 04:00:00 | 2 | A.    I don't know. |
| 04:00:03 | 3 | Q.    Did Michael Wheeler work within recycling? |
| 04:00:08 | 4 | A.    Yes. |
| 04:00:09 | 5 | Q.    So he worked with Ramon in recycling? |
| 04:00:13 | 6 | A.    Possibility. |
| 04:00:15 | 7 | Q.    So by contacting Michael Wheeler, did you mean |
| 04:00:31 | 8 | to report it to the recycling group? |
| 04:00:35 | 9 | A.    Yes. |
| 04:00:39 | 10 | Q.    And when Michael arrived, did you speak with him |
| 04:00:54 | 11 | about the cartoon? |
| 04:00:55 | 12 | A.    Briefly. |
| 04:00:56 | 13 | Q.    What did you say? |
| 04:00:58 | 14 | A.    Someone from -- from the recycling team that he |
| 04:01:03 | 15 | was with had sent this cardboard bale with this racist |
| 04:01:10 | 16 | effigy over to the elevator. |
| 04:01:13 | 17 | Q.    Michael said that? |
| 04:01:14 | 18 | A.    No.  You asked me what did I say to Michael. |
| 04:01:19 | 19 | Q.    Okay.  What did Michael say? |
| 04:01:21 | 20 | A.    He wanted to see it. |
| 04:01:22 | 21 | Q.    And so he came down with you to look at it? |
| 04:01:26 | 22 | A.    No. |
| 04:01:27 | 23 | Q.    Okay.  How did he get down to the cardboard |
| 04:01:31 | 24 | bale? |
| 04:01:31 | 25 | A.    He went up with me. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:01:33 | 1 | Q.      He went up with you.   Okay.   And when you went |
| 04:01:37 | 2 | upstairs, did -- was Israel with you as well? |
| 04:01:41 | 3 | A.      He came with Michael. |
| 04:01:43 | 4 | Q.      Is Michael African-American? |
| 04:01:45 | 5 | A.      Yes. |
| 04:01:45 | 6 | Q.      Is Israel African-American? |
| 04:01:47 | 7 | A.      No. |
| 04:01:49 | 8 | Q.      What nationality is Israel? |
| 04:01:53 | 9 | A.      I don't know. |
| 04:01:54 | 10 | Q.      What race? |
| 04:01:56 | 11 | A.      I don't know. |
| 04:01:58 | 12 | Q.      Did you -- did Israel say anything when he saw |
| 04:02:03 | 13 | the cartoon? |
| 04:02:05 | 14 | A.      No. |
| 04:02:05 | 15 | Q.      Did Michael say anything when he saw the |
| 04:02:08 | 16 | cartoon? |
| 04:02:09 | 17 | A.      Yes. |
| 04:02:10 | 18 | Q.      What did Michael say? |
| 04:02:12 | 19 | A.      "Who could have did this?" |
| 04:02:15 | 20 | Q.      And both Michael and Israel took pictures of the |
| 04:02:21 | 21 | cartoon? |
| 04:02:23 | 22 | A.      Yes. |
| 04:02:24 | 23 | Q.      Did Michael say anything else? |
| 04:02:28 | 24 | A.      I had to stop to talk to the elevator staff and |
| 04:02:31 | 25 | him, and Israel went over to the upstairs recycling |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:02:36 | 1 | room. |
| 04:02:37 | 2 | Q.    You talked to the elevator staff? |
| 04:02:40 | 3 | A.    Yes. |
| 04:02:40 | 4 | Q.    Who did you talk to? |
| 04:02:42 | 5 | A.    Lamar Patterson. |
| 04:02:48 | 6 | Q.    Did Lamar Patterson see this picture? |
| 04:02:51 | 7 | A.    Yes. |
| 04:02:52 | 8 | Q.    Did you show it to him? |
| 04:02:53 | 9 | A.    No. |
| 04:02:55 | 10 | Q.    How did he see it? |
| 04:03:00 | 11 | A.    He was pulling a pallet rider up under the |
| 04:03:08 | 12 | pallet. |
| 04:03:10 | 13 | Q.    Did you witness anyone else viewing this |
| 04:03:13 | 14 | cartoon? |
| 04:03:15 | 15 | A.    Yes. |
| 04:03:16 | 16 | Q.    Who else did you see viewing the cartoon? |
| 04:03:21 | 17 | A.    Other Tesla employees. |
| 04:03:23 | 18 | Q.    Which ones? |
| 04:03:28 | 19 | A.    I don't know their names. |
| 04:03:30 | 20 | Q.    It says here, "Ramon Martinez said he had drew |
| 04:04:19 | 21 | the picture and he was just playing." |
| 04:04:21 | 22 |      Do you see that? |
| 04:04:22 | 23 | A.    Yes. |
| 04:04:22 | 24 | Q.    How do you know that Ramon Martinez said that? |
| 04:04:26 | 25 | A.    He said it.  He said it verbally. |

**Owen Diaz-Confidential**

| 04:04:30 | 1 | Q. | Did you hear him say that? |

04:04:31   2   A.   Yes.  But that's not what he said.

04:04:36   3   Q.   He didn't say he drew the picture?

04:04:38   4   A.   He said he drew the picture.

04:04:41   5   Q.   Did -- he didn't say he was just playing?

04:04:44   6   A.   It was actually -- I said he was playing, but

04:04:52   7   actually it was, "You people can't take a joke."

04:04:57   8   Q.   And he said that to you?

04:04:59   9   A.   Yes.

04:05:00   10   Q.   And where were you when he said that?

04:05:03   11   A.   Standing where the -- standing in front of the

04:05:08   12   elevator.

04:05:14   13   Q.   And did anybody witness him say, "You people

04:05:17   14   can't take the joke"?

04:05:18   15   A.   Israel and Michael Wheeler.

04:05:22   16   Q.   How did Ramon Martinez get to -- up to where the

04:05:28   17   cardboard bale was with the cartoon?

04:05:33   18   A.   I don't know.

04:05:34   19   Q.   Was he just passing by, or did someone call him

04:05:39   20   there?

04:05:41   21   A.   You mean, how did he get back to it the second

04:05:46   22   time, or...

04:05:46   23   Q.   Yeah.  After you saw the picture, you walked up

04:05:50   24   there with Michael and Israel; right?

04:05:54   25   A.   Uh-huh.

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:05:54 | 1 | Q.        Then Ramon Martinez comes -- right? -- at some |
| 04:05:58 | 2 | point? |
| 04:05:58 | 3 | A.        Michel and Israel went over to the recycling |
| 04:06:02 | 4 | center that's upstairs, and they came back with Ramon |
| 04:06:05 | 5 | Martinez. |
| 04:06:05 | 6 | Q.        Okay.  Did they tell you what they talked about |
| 04:06:08 | 7 | up in the recycling center when they went to get Ramon? |
| 04:06:12 | 8 | A.        No. |
| 04:06:14 | 9 | Q.        And they came back with Ramon, and you were |
| 04:06:18 | 10 | still waiting at cardboard bale? |
| 04:06:21 | 11 | A.        Yes. |
| 04:06:21 | 12 | Q.        Why were you waiting there?  Did they tell you |
| 04:06:24 | 13 | to wait there? |
| 04:06:25 | 14 | A.        No. |
| 04:06:25 | 15 | Q.        Why were you waiting there? |
| 04:06:26 | 16 | A.        I was dealing with the elevator crew. |
| 04:06:30 | 17 | Q.        Okay.  Besides Lamar Patterson, did anybody else |
| 04:06:38 | 18 | in the elevator crew see the cartoon? |
| 04:06:41 | 19 | A.        I don't know. |
| 04:06:50 | 20 | Q.        Okay.  So when they brought Ramon down, did he |
| 04:06:55 | 21 | admit that he was the one that drew the picture? |
| 04:06:57 | 22 | A.        Yes. |
| 04:07:00 | 23 | Q.        Did he apologize? |
| 04:07:02 | 24 | A.        No. |
| 04:07:06 | 25 | Q.        Did he say anything other than, "You people |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:10:35 | 1 | Q.     Do you know if Mr. -- if Mr. Martinez was |
| 04:10:39 | 2 | investigated in response to your e-mail? |
| 04:10:42 | 3 | A.     No. |
| 04:10:43 | 4 | Q.     Do you know if Mr. Martinez was written up in |
| 04:10:47 | 5 | response to your e-mail? |
| 04:10:48 | 6 | A.     No. |
| 04:10:49 | 7 | Q.     Do you know if Mr. Martinez was suspended in |
| 04:10:55 | 8 | response to your e-mail? |
| 04:10:56 | 9 | A.     No. |
| 04:11:02 | 10 | Q.     So no one ever communicated to you what happened |
| 04:11:06 | 11 | to Mr. Martinez in response to this e-mail? |
| 04:11:09 | 12 | A.     You're correct. |
| 04:11:51 | 13 | (EXHIBIT 15 was marked for identification.) |
| 04:11:51 | 14 | BY MS. ANTONUCCI: |
| 04:11:56 | 15 | Q.     Exhibit 15 is a series of e-mails Bates-stamped |
| 04:12:06 | 16 | at the bottom CitiStaff 50 to -- through 55. |
| 04:12:16 | 17 | I'd like to turn your attention to exhibit -- to |
| 04:12:23 | 18 | the one marked at -- the e-mail dated January 22, 2016, |
| 04:12:30 | 19 | time 5:50 p.m., Bates-stamped at the bottom 52. |
| 04:12:43 | 20 | So this is your e-mail to Ed Romero dated |
| 04:12:46 | 21 | January 22, 2016, at 8:42 a.m. |
| 04:12:51 | 22 | Do you see that? |
| 04:12:51 | 23 | A.     Yes. |
| 04:12:52 | 24 | Q.     Okay.  And the incident you say "occurred at |
| 04:12:58 | 25 | 9:10 p.m. in elevator 1." |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:13:01 | 1 | Do you see that? |
| 04:13:01 | 2 | A.      Yes. |
| 04:13:02 | 3 | Q.      On the previous evening? |
| 04:13:06 | 4 | A.      Yes. |
| 04:13:06 | 5 | Q.      Why did you wait until the next morning to |
| 04:13:09 | 6 | report it to Mr. Romero? |
| 04:13:15 | 7 | A.      The production floor was busy, and I had to |
| 04:13:19 | 8 | write the e-mail in pieces. |
| 04:13:21 | 9 | Q.      Did you say you had to write the e-mail in |
| 04:13:23 | 10 | pieces? |
| 04:13:24 | 11 | A.      Yes. |
| 04:13:24 | 12 | Q.      Where did you write the e-mail? |
| 04:13:26 | 13 | A.      My iPhone. |
| 04:13:28 | 14 | Q.      But where were you geographically when you wrote |
| 04:13:32 | 15 | it? |
| 04:13:32 | 16 | A.      At the warehouse. |
| 04:13:34 | 17 | Q.      So you were still at the warehouse at 8:42 a.m.? |
| 04:13:39 | 18 | A.      Yes. |
| 04:13:45 | 19 | Q.      I thought you said your shift ended at |
| 04:13:49 | 20 | 6:00 a.m.? |
| 04:13:49 | 21 | A.      It does. |
| 04:13:50 | 22 | Q.      So why were you still at the warehouse at |
| 04:13:53 | 23 | 8:42 a.m.? |
| 04:13:56 | 24 | A.      I don't know. |
| 04:13:59 | 25 | Q.      Do you remember where in the warehouse you wrote |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:14:02 | 1 | this e-mail? |
| 04:14:05 | 2 | A.      Not exactly.  No. |
| 04:14:10 | 3 | Q.      Where you in the cafe? |
| 04:14:17 | 4 | A.      I don't recall. |
| 04:14:22 | 5 | Q.      Were you in your car? |
| 04:14:25 | 6 | A.      No. |
| 04:14:26 | 7 | Q.      Were you outside? |
| 04:14:28 | 8 | A.      No. |
| 04:14:30 | 9 | Q.      You were inside the factory? |
| 04:14:31 | 10 | A.      Yes. |
| 04:14:33 | 11 | Q.      Okay.  And here Bates-stamped at the bottom 52, |
| 04:14:37 | 12 | you forwarded this e-mail to CitiStaff. |
| 04:14:40 | 13 | Do you see that? |
| 04:14:40 | 14 | A.      Yes. |
| 04:14:44 | 15 | Q.      Why did you forward it to CitiStaff? |
| 04:14:50 | 16 | A.      Because I didn't want the situation to be |
| 04:14:57 | 17 | covered up. |
| 04:14:59 | 18 | Q.      And did you forward it to anybody in particular |
| 04:15:08 | 19 | at CitiStaff? |
| 04:15:11 | 20 | A.      I don't remember. |
| 04:15:19 | 21 | Q.      How did you get this CitiStaff e-mail address? |
| 04:15:25 | 22 | A.      I don't remember. |
| 04:15:29 | 23 | Q.      And you forwarded it to CitiStaff on Friday, |
| 04:15:37 | 24 | January 22nd at 5:50 p.m. |
| 04:15:40 | 25 | Do you see that? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:15:40 | 1 | A.      Yes. |
| 04:15:41 | 2 | Q.      And why did you wait a whole day to forward it |
| 04:15:43 | 3 | to CitiStaff? |
| 04:15:46 | 4 | A.      I don't know. |

04:15:51  5    Q.      Do you know what actions CitiStaff took in

04:15:54  6    response to this complaint?

04:15:56  7    A.      No.

04:15:58  8    Q.      Did anybody form CitiStaff ever communicate to

04:16:01  9    you what actions were taken in response to this e-mail?

04:16:05 10    A.      I don't recall.

04:17:13 11            (EXHIBIT 16 was marked for identification.)

04:17:13 12    BY MS. ANTONUCCI:

04:17:35 13    Q.      So Exhibit 16 is a series of e-mails

04:17:39 14    Bates-stamped at the bottom 80 through 84.

04:17:43 15            Do you see that?

04:17:43 16    A.      Yes.

04:17:58 17    Q.      And they're dated January 22, 2016.

04:18:01 18            Do you see that?

04:18:01 19    A.      Yes.

04:18:05 20    Q.      In the middle of the page Bates-stamped Tesla

04:18:11 21    80, it says, "Wayne, as we discussed in person, this is

04:18:16 22    very disappointing coming from one of our team

04:18:20 23    supervisors.  I agree with the recommendation to suspend

04:18:24 24    and issue a permanent written warning."

04:18:26 25            Do you see that?

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:24:23 | 1 | Q.      Did anybody ever communicate to you that |
| 04:24:26 | 2 | Chartwell took any action in response to this drawing? |
| 04:24:30 | 3 | A.      No. |
| 04:25:16 | 4 |         MS. ANTONUCCI:  We can take a break so he can |
| 04:25:18 | 5 | change the tape. |
| 04:25:20 | 6 |         THE VIDEOGRAPHER:   We're going off the record |
| 04:25:21 | 7 | at 4:24 p.m.  This is the end of Media Number 3. |
| 04:25:21 | 8 |         (Off the record:  4:25 p.m. to 4:37 p.m.) |
| 04:37:58 | 9 |         THE VIDEOGRAPHER:   We are back on the record at |
| 04:38:03 | 10 | 4:37 p.m.  This is beginning of Media Number 4.  Please |
| 04:38:07 | 11 | continue. |
| 04:38:33 | 12 |         (EXHIBIT 19 was marked for identification.) |
| 04:38:33 | 13 | BY MS. ANTONUCCI: |
| 04:38:38 | 14 | Q.      Exhibit 19 are e-mails of various dates |
| 04:38:45 | 15 | Bates-stamped at the bottom CitiStaff 6 to 7.  Turning |
| 04:38:50 | 16 | your attention to page 6, it states -- it's an e-mail |
| 04:38:58 | 17 | from Vanessa Parks at nextSource to Monica DeLeon at |
| 04:39:04 | 18 | CitiStaff Solutions, cc to Tesla and Ed Romero. |
| 04:39:13 | 19 | "Subject:  Pay Rate Increase."  And it says, "Hi Monica, |
| 04:39:16 | 20 | please process a pay rate increase to the following |
| 04:39:23 | 21 | contractors:  Owen Diaz, effective 1/25/16; new pay rate |
| 04:39:27 | 22 | $18 an hour." |
| 04:39:28 | 23 |         So is it correct that you received a pay |
| 04:39:32 | 24 | increase of up to $18 an hour on January 28, 2016? |
| 04:39:32 | 25 | A.      Yes. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:39:45 | 1 | Q.       And that was three days after you made your |
| 04:39:52 | 2 | complaint; is that correct? |
| 04:40:10 | 3 | A.       It appears that way. |
| 04:40:14 | 4 | Q.       Do you know Joyce Dela Grande? |
| 04:40:31 | 5 | A.       Not that I can recall. |
| 04:40:35 | 6 | Q.       Did she ever engage in any discriminating or |
| 04:40:42 | 7 | harassing conduct towards you? |
| 04:40:44 | 8 | A.       Possible. |
| 04:40:46 | 9 | Q.       Why do you say it's possible? |
| 04:40:49 | 10 | A.       Until I can see the picture or anything, I |
| 04:40:53 | 11 | wouldn't know who Joyce was. |
| 04:40:57 | 12 | Q.       Do you know Hugo Gulagos? |
| 04:41:01 | 13 | A.       No. |
| 04:41:10 | 14 | Q.       Do you know Robert Hertado? |
| 04:41:14 | 15 | A.       I know a Robert, but I don't know if it's the |
| 04:41:18 | 16 | same person's last name or not.  I don't know if it's |
| 04:41:19 | 17 | his last name. |
| 04:41:19 | 18 | Q.       So you're not sure whether the Robert that you |
| 04:41:22 | 19 | referenced earlier today is named Robert Hertado? |
| 04:41:26 | 20 | A.       Yes. |
| 04:41:27 | 21 | Q.       You don't know? |
| 04:41:28 | 22 | A.       I don't know. |
| 04:41:29 | 23 | Q.       Have you ever called Robert a snake? |
| 04:41:46 | 24 | A.       I don't recall. |
| 04:41:53 | 25 | Q.       Did Robert ever complain to his boss about you |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBITS TO DEPOSITION OF OWEN DIAZ, Vol. I

REDACTED – CONDITIONALLY FILED UNDER SEAL

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

1       I, CANDY NEWLAND, CSR No. 14256, certify that the

2   foregoing proceedings were taken before me at the time

3   and place herein set forth, at which time the witness

4   was duly sworn, and that the transcript is a true record

5   of the testimony so given.

6

7   Witness review, correction, and signature was

8   (X) by Code.                    (X) requested.

9   ( ) waived.                    ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13      The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificate null and void.

16      I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties nor of any of

19  the parties.

20      Dated this 29TH day of May, 2018.

21

22

23

24  _____

25       CANDY NEWLAND, CSR 14256

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT E

Case No. 3:17-cv-06748-WHO

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4     -------------------------------
                                          REPORTER CERTIFIED
5     DEMETRIC DI-AZ, OWEN DIAZ and              TRANSCRIPT
      LAMAR PATTERSON, an individual,
6

7                Plaintiffs,              **CONFIDENTIAL**

8        vs.                       No. 3:17-cv-06748-WHO
                                   VOL II, pgs 187 - 292
9
      TESLA, INC. DBA TESLA MOTORS,
10    INC.; CITISTAFF SOLUTIONS,
      INC.; WEST VALLEY STAFFING
11    GROUP; CHARTWELL STAFFING
      SERVICES, INC. and DOES 1-10,
12    inclusive,

13               Defendants.

14    -------------------------------

15

16               CONFIDENTIAL

17          VIDEOTAPED DEPOSITION OF

18               OWEN DIAZ

19          SAN FRANCISCO, CALIFORNIA

20           MONDAY, DECEMBER 3, 2018

21

22

23    Reported by:

24    GINA V. CARBONE, CSR #8249
      RPR, RMR, CRR, CCRR
25    FILE NO.:  18-27207

**Owen Diaz, Vol. II-Confidential**

| | | |
|---|---|---|
| 10:30:31 | 1 | MR. HORTON:  Fenn Horton on behalf of West |
| 10:30:34 | 2 | Valley Staffing Group; and my client Teresa |
| 10:30:35 | 3 | Kossayian is here as well from West Valley Staffing |
| 10:30:39 | 4 | Group. |
| 10:30:41 | 5 | MS. ANTONUCCI:  Could you please state your |
| 10:30:42 | 6 | name for the record. |
| 10:30:43 | 7 | THE WITNESS:  My name is Owen Diaz. |
| 10:30:46 | 8 | THE VIDEOGRAPHER:  Did you want to re-swear |
| 10:30:47 | 9 | him? |
| 10:30:48 | 10 | MS. ANTONUCCI:  Yes.  Would you please |
| 10:30:59 | 11 | re-swear the witness. |
| 10:31:00 | 12 | |
| 10:31:00 | 13 | OWEN DIAZ, |
| 10:31:00 | 14 | having first declared under penalty of perjury to |
| 10:31:00 | 15 | tell the truth, was examined and testified as |
| 10:31:00 | 16 | follows: |
| 10:31:00 | 17 | |
| 10:31:00 | 18 | EXAMINATION BY MS. ANTONUCCI |
| 10:31:02 | 19 | BY MS. ANTONUCCI: |
| 10:31:02 | 20 | Q.  Mr. Diaz, do you remember at your last |
| 10:31:04 | 21 | deposition we went through some ground rules about |
| 10:31:06 | 22 | how to testify and what your deposition is going to |
| 10:31:10 | 23 | entail? |
| 10:31:11 | 24 | A.  Yes.  I remember. |
| 10:31:13 | 25 | Q.  Okay. |

| | | |
|---|---|---|
| 11:35:08 | 1 | he stopped making those remarks to you? |
| 11:35:11 | 2 | MR. ORGAN:  Objection.  Compound. |
| 11:35:17 | 3 | THE WITNESS:  I don't recall. |
| 11:35:18 | 4 | BY MS. ANTONUCCI: |
| 11:35:19 | 5 | Q.  Did you ever tell Tom Kawasaki that you |
| 11:35:23 | 6 | felt like you could still work with Judy if he |
| 11:35:28 | 7 | stopped making those remarks? |
| 11:35:44 | 8 | A.  We never worked together in the beginning, |
| 11:35:45 | 9 | so I don't recall. |
| 11:35:51 | 10 | Q.  Did Judy stop bothering you after you |
| 11:35:54 | 11 | reported the conduct to Tom Kawasaki about the |
| 11:35:59 | 12 | comments he had made to you? |
| 11:36:04 | 13 | A.  I didn't see him after that. |
| 11:36:06 | 14 | Q.  So is that a yes? |
| 11:36:10 | 15 | A.  Yes. |
| 11:36:20 | 16 | MS. ANTONUCCI:  Let's take a short break. |
| 11:36:22 | 17 | THE VIDEOGRAPHER:  We're going off the |
| 11:36:22 | 18 | record.  The time is 11:36 a.m. |
| 11:36:26 | 19 | (Recess taken.) |
| 11:48:37 | 20 | (Whereupon, Exhibit 29 was marked for |
| 11:48:37 | 21 | identification.) |
| 11:49:27 | 22 | THE VIDEOGRAPHER:  We're back on the |
| 11:49:28 | 23 | record.  Time is 11:49 a.m.  This marks the |
| 11:49:30 | 24 | beginning of disc No. 2. |
| 11:49:32 | 25 | // |

12:23:20  1              (Whereupon, Exhibit 32 was marked for

12:23:20  2              identification.)

12:23:42  3    BY MS. ANTONUCCI:

12:23:43  4        Q.   Exhibit 32 appears to be a version of your

12:23:45  5    resumé Bates stamped at the bottom ODIAZ181 to 184.

12:23:54  6              Do you know when you prepared this version

12:23:56  7    of your resumé?

12:24:07  8        A.   I don't recall when it was prepared.

12:24:09  9        Q.   You see there on the top of page -- or in

12:24:14  10   the middle of page 182 at the bottom it describes

12:24:17  11   your work at CitiStaff/Tesla.  Do you see that?

12:24:42  12             MR. ORGAN:  At the bottom?

12:24:43  13             MS. ANTONUCCI:  No.  In the middle I said.

12:24:45  14             MR. ORGAN:  Oh, sorry.

12:24:46  15   BY MS. ANTONUCCI:

12:24:46  16       Q.   You see where it says "Shift Leader,"

12:24:49  17   CitiStaff/Tesla Motors?

12:24:52  18       A.   Uh-huh.

12:24:52  19       Q.   Okay.  So you must have prepared this

12:24:56  20   document at some point after you worked at the Tesla

12:25:00  21   factory, correct?

12:25:11  22       A.   I don't recall.

12:25:12  23       Q.   You don't recall when you prepared this

12:25:14  24   document?

12:25:15  25       A.   I don't recall when this was prepared.

Owen Diaz, Vol. II-Confidential

| | | |
|---|---|---|
| 12:25:16 | 1 | Q.  Can you read that section that says "Shift |
| 12:25:18 | 2 | Leader" there on the page Bates stamped 182. |
| 12:25:29 | 3 | Tell me if that accurately reflects your |
| 12:25:32 | 4 | job duties -- |
| 12:25:33 | 5 | A.  "Shift Leader." |
| 12:25:35 | 6 | Q.  You don't need to read it out loud, but |
| 12:25:37 | 7 | just the part, the portion where it says -- |
| 12:25:38 | 8 | A.  "Responsibilities"? |
| 12:25:38 | 9 | Q.  Yes, correct. |
| 12:25:39 | 10 | Does that accurately reflect your |
| 12:25:40 | 11 | responsibilities while you worked for CitiStaff at |
| 12:25:42 | 12 | the Tesla factory? |
| 12:25:47 | 13 | MR. ORGAN:  Objection.  Compound. |
| 12:25:53 | 14 | THE WITNESS:  Pretty much what I was doing. |
| 12:25:55 | 15 | BY MS. ANTONUCCI: |
| 12:25:57 | 16 | Q.  Do you know if this is the resumé you |
| 12:25:59 | 17 | submitted to AC Transit? |
| 12:26:06 | 18 | A.  I don't know. |
| 12:26:06 | 19 | Q.  You did prepare this resumé, though, |
| 12:26:14 | 20 | correct? |
| 12:26:14 | 21 | A.  I don't know.  Could have been my wife. |
| 12:26:34 | 22 | Q.  It says here, in describing your work at |
| 12:26:40 | 23 | CitiStaff -- for CitiStaff at the Tesla factory, |
| 12:26:43 | 24 | that you were a shift leader.  Is that an accurate |
| 12:26:48 | 25 | description of your position? |

| | |
|---|---|
| 12:29:35 | 1 |
| 12:29:36 | 2 |
| 12:29:38 | 3 |
| 12:29:42 | 4 |
| 12:29:45 | 5 |
| 12:29:45 | 6 |
| 12:29:48 | 7 |
| 12:29:59 | 8 |
| 12:30:00 | 9 |
| 12:30:03 | 10 |
| 12:30:06 | 11 |
| 12:30:08 | 12 |
| 12:30:11 | 13 |
| 12:30:17 | 14 |
| 12:30:22 | 15 |
| 12:30:25 | 16 |
| 12:30:29 | 17 |
| 12:30:44 | 18 |
| 12:30:47 | 19 |
| 12:30:49 | 20 |
| 12:30:56 | 21 |
| 12:31:01 | 22 |
| 12:31:02 | 23 |
| 12:31:04 | 24 |
| 12:31:04 | 25 |

MR. ORGAN:  Objection.  Calls for a legal conclusion.

THE WITNESS:  No.  I do not own any Tesla products.

BY MS. ANTONUCCI:

Q.  Okay.  I'd like to turn your attention to Exhibit 32 (verbatim).  It's a sexual harassment policy of CitiStaff Solutions.

Is that your name and signature at the bottom there?

A.  Yes.

Q.  The first page, my apologies.

The second page is an acknowledgment of policies, Bates stamped CITISTAFF 45 at the bottom. Is that your name and signature at the bottom?

A.  Give me one second.  The other page was upside down.  One second, please.

Yeah, they were my initials and signature.

Q.  So is it accurate that you received Exhibit 32 at some point prior to or during your employment with CitiStaff?

THE REPORTER:  I believe it's 33.

MR. ORGAN:  This is 33.

BY MS. ANTONUCCI:

Q.  I'm sorry, Exhibit 33.

| 12:31:05 | 1 | A. Yes. |

12:31:14  2      Q.  Okay.

12:31:15  3          Turning our attention to Exhibit 34, pa- --

12:31:35  4  is a document, a series of emails Bates stamped at

12:31:38  5  the bottom 50 -- CITISTAFF 50 through 55.

12:31:44  6          Do you see that?

12:31:48  7      A.  I have the document that you just handed to

12:31:50  8  me.

12:31:52  9      Q.  So is Exhibit -- in the middle of

12:31:54 10  Exhibit 34, the email that begins on CitiStaff Bates

12:31:59 11  stamped No. 52, do you see that?  Right there.  That

12:32:13 12  page right there.

12:32:14 13      A.  I see this here.

12:32:16 14      Q.  You sent that email, correct?

12:32:20 15      A.  It's -- the paper says it's from my email

12:32:22 16  address.

12:32:22 17      Q.  Okay.  So did you send this email?

12:32:25 18      A.  Yes, it would appear so.

12:32:26 19      Q.  Okay.  Exhibit 35 here is a series of

12:32:54 20  emails Bates stamped at the bottom CITISTAFF 14

12:32:57 21  through 18.

12:32:59 22          Just turning your attention to the email

12:33:03 23  that begins in the middle of the first page there,

12:33:10 24  says from Owen Diaz dated Saturday, January 23rd,

12:33:17 25  2016 at 4:47 a.m., subject "Forward:  Ramon."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19  EXHIBITS TO DEPOSITION OF OWEN DIAZ, Vol. II
20
21  REDACTED – CONDITIONALLY FILED UNDER SEAL
22
23
24
25
26
27
28

1      I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2   CCRR, certify: that the foregoing proceedings were taken

3   before me at the time and place herein set forth; at

4   which time the witness was duly sworn; and that the

5   transcript is a true record of the testimony so given.

6

7      Witness review, correction and signature was

8   (X) by code.                (X) requested.

9   ( ) waived.                 ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13     The dismantling or unbinding of the original

14  transcript will render the reporter's certificate null

15  and void.

16     I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any of

19  the parties.

20     Dated this 7th   day of December  , 2018  .

21

22                    _____

23                    GINA V. CARBONE
                      CSR #8249, STATE OF CALIFORNIA

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT F

**In the Matter Of:**

DIAZ vs TESLA, INC.

3:17-CV-06748-WHO

---

## OWEN ORAPIO DIAZ, JR.

*June 21, 2019*

*VOLUME III*

---



800.211.DEPO (3376)
EsquireSolutions.com

| | | |
|---|---|---|
| 1 | Kumagai, representing Citistaff. | 09:34:02 |
| 2 | MS. JENG:  Patricia Jeng, from Sheppard | 09:34:07 |
| 3 | Mullin, representing Tesla. | 09:34:08 |
| 4 | MS. AVLONI:  Navruz Avloni, here on behalf of | 09:34:10 |
| 5 | the plaintiff, Owen Diaz. | 09:34:12 |
| 6 | THE VIDEOGRAPHER:  Would the court reporter | 09:34:15 |
| 7 | please swear in the witness? | 09:34:16 |
| 8 | | 09:34:34 |
| 9 | Whereupon, | 09:34:34 |
| 10 | OWEN ORAPIO DIAZ, JR., | 09:34:34 |
| 11 | having first been called as a witness, was duly sworn | 09:34:34 |
| 12 | and testified as follows: | 09:34:34 |
| 13 | | 09:34:34 |
| 14 | EXAMINATION | 09:34:34 |
| 15 | BY MR. ARANEDA: | 09:34:34 |
| 16 | Q    Mr. Diaz, good morning.  My name is Juan | 09:34:34 |
| 17 | Araneda.  I'm representing Defendant nextSource, who | 09:34:37 |
| 18 | is now a party in this lawsuit. | 09:34:39 |
| 19 | I appreciate you being here today. | 09:34:42 |
| 20 | I'm going to be taking your deposition today, | 09:34:44 |
| 21 | and I understand that you have already sat through two | 09:34:45 |
| 22 | other sessions for your deposition; is that correct? | 09:34:47 |
| 23 | A    Yes, sir. | 09:34:52 |
| 24 | Q    Okay. | 09:34:52 |
| 25 | A    Good morning to you, too. | 09:34:52 |



| | | |
|---|---|---|
| 1 | employees -- of who the employees of nextSource were | 09:51:18 |
| 2 | at Tesla? | 09:51:23 |
| 3 |      MS. AVLONI:  Objection to the extent that | 09:51:25 |
| 4 | this has been previously asked and answered. | 09:51:27 |
| 5 |      THE WITNESS:  I don't understand the | 09:51:31 |
| 6 | question. | 09:51:32 |
| 7 | BY MR. ARANEDA: | 09:51:33 |
| 8 |   Q    Do you know who was employed by nextSource | 09:51:33 |
| 9 | that was working on-site at -- at Tesla? | 09:51:38 |
| 10 |   A    Wayne Jackson, I knew he was a liaison. | 09:51:46 |
| 11 |   Q    And when you say, "liaison," what do you mean | 09:51:54 |
| 12 | by that? | 09:51:58 |
| 13 |   A    I would see him every now and again. | 09:52:00 |
| 14 |   Q    Other than seeing him every now and again, do | 09:52:07 |
| 15 | you mean anything else by the word "liaison"? | 09:52:10 |
| 16 |   A    Do you want the dictionary definition of it? | 09:52:18 |
| 17 |   Q    No.  I want your understanding of it. | 09:52:21 |
| 18 |   A    Someone that -- that facilitates information | 09:52:25 |
| 19 | or -- back and forth. | 09:52:31 |
| 20 |   Q    Right.  And so what -- do you know what | 09:52:33 |
| 21 | information Wayne Jackson was facilitating back and | 09:52:36 |
| 22 | forth? | 09:52:39 |
| 23 |   A    You would have to ask him that. | 09:52:40 |
| 24 |   Q    You don't know? | 09:52:42 |
| 25 |   A    No. | 09:52:43 |



| 1 | Q    Okay.  And do you know who he was | 09:52:43 |
| 2 | facilitating that information back and forth between? | 09:52:46 |
| 3 | A    I would assume nextSource and Tesla. | 09:52:51 |
| 4 | Q    Do you know, though?  I don't want you to | 09:52:55 |
| 5 | guess.  Is that a guess, or is that what you know? | 09:52:57 |
| 6 | A    I don't know. | 09:53:01 |
| 7 | Q    Did you ever report the use of the terms | 09:53:05 |
| 8 | "boy" or "hurry up" by Robert to anyone at Citistaff? | 09:53:11 |
| 9 | A    I don't recall. | 09:53:21 |
| 10 | Q    You also mentioned that Robert used the | 09:53:21 |
| 11 | N-word with you. | 09:53:24 |
| 12 | Did you ever report that to anyone at | 09:53:26 |
| 13 | nextSource? | 09:53:27 |
| 14 | MS. AVLONI:  Objection to the extent it calls | 09:53:29 |
| 15 | for speculation as to who was an employee of | 09:53:31 |
| 16 | nextSource. | 09:53:33 |
| 17 | THE WITNESS:  I don't recall. | 09:53:37 |
| 18 | BY MR. ARANEDA: | 09:53:39 |
| 19 | Q    Did you ever report the use of the N-word | 09:53:39 |
| 20 | towards you by Robert to anyone at Citistaff? | 09:53:45 |
| 21 | A    I don't recall. | 09:53:52 |
| 22 | Q    You mentioned in your prior testimony that | 09:53:53 |
| 23 | Ramon Martinez also directed the N-word towards you. | 09:53:56 |
| 24 | Did you ever report the use of the N-word | 09:54:00 |
| 25 | towards you by Ramon Martinez to anyone at nextSource? | 09:54:04 |



OWEN ORAPIO DIAZ, JR. VOLUME III                     June 21, 2019
DIAZ vs TESLA, INC.                                              344

```
 1    BY MR. ARANEDA:                                     10:37:12

 2       Q    After reporting Ramon Martinez for this     10:37:12

 3    picture that he drew on the bale of cardboard in    10:37:18

 4    January of 2016, did you ever have any other issues 10:37:22

 5    with Mr. Martinez?                                  10:37:26

 6            MS. AVLONI:  Asked and answered.            10:37:27

 7            THE WITNESS:  Not that I can recall.        10:37:30

 8    BY MR. ARANEDA:                                     10:37:32

 9       Q    Did you ever work with Mr. Martinez after you 10:37:32

10    complained about him drawing that picture on a bale of 10:37:36

11    cardboard?                                          10:37:40

12            MS. AVLONI:  Asked and answered.            10:37:40

13            THE WITNESS:  Not that I can recall.        10:37:46

14    BY MR. ARANEDA:                                     10:37:47

15       Q    When you were -- when you saw this picture on 10:37:47

16    a bale of cardboard, what was your position?        10:37:50

17       A    Elevator lead.                              10:37:55

18       Q    Okay.  After reporting Ramon Martinez for   10:37:56

19    that incident in January 25 [sic] -- I mean -- strike 10:37:59

20    that -- in January 2016, for the picture on the bale 10:38:04

21    of incident {sic}, did your position at --          10:38:08

22            THE REPORTER:  Can you rephrase -- can you  10:38:16

23    say that again?                                     10:38:16

24            MR. ARANEDA:  Sure.  I will start over.     10:38:16

25       \\\                                              10:38:16
```



OWEN ORAPIO DIAZ, JR. VOLUME III                    June 21, 2019
DIAZ vs TESLA, INC.                                          372

```
 1   BY MR. ARANEDA:                                    11:16:48

 2      Q    At this time, Rothaj still reported to you;  11:16:48

 3   correct?                                           11:16:52

 4      A    Yes, sir.                                  11:16:54

 5      Q    And you reported to Mr. Ramero; correct?   11:16:54

 6      A    Yes, sir.                                  11:16:57

 7      Q    Okay.  I believe, after this -- you sent this  11:16:59

 8   text, there was another incident with Mr. Foster where  11:17:03

 9   he threatened shooting you; correct?               11:17:08

10      A    Yes.  He did threaten to kill me.          11:17:12

11      Q    Okay.  What happened -- what happened after  11:17:14

12   you reported -- strike that.                       11:17:18

13           Did you report that to Ed Ramero?          11:17:20

14      A    Yes, sir.                                  11:17:23

15      Q    Okay.  Did you report Mr. Foster threatening  11:17:24

16   to shoot you to anyone else besides Mr. Ramero?    11:17:28

17      A    It's a possibility.                        11:17:32

18      Q    Do you recall at this time?                11:17:34

19      A    No, I don't recall at this time.           11:17:34

20      Q    What happened to Mr. Foster after you      11:17:37

21   reported him?                                      11:17:39

22           MS. AVLONI:  Calls for speculation.        11:17:41

23           THE WITNESS:  Security escorted him from the  11:17:48

24   building.                                          11:17:51

25      \\\                                             11:17:51
```



OWEN ORAPIO DIAZ, JR. VOLUME III                    June 21, 2019
DIAZ vs TESLA, INC.                                          373

```
 1   BY MR. ARANEDA:                                  11:17:51

 2        Q     Did he ever come back to work at Tesla after   11:17:51

 3   security escorted him from the building?         11:17:55

 4        A     I don't know.                         11:18:02

 5        Q     Did you ever work with Mr. Foster after  11:18:02

 6   security escorted him from the building?         11:18:05

 7        A     No.                                   11:18:07

 8        Q     Do you know who decided to have security  11:18:10

 9   escort Mr. Foster from the building?             11:18:14

10        A     Ed Ramero.                            11:18:16

11        Q     And after this incident with Mr. Foster being   11:18:25

12   escorted from the building, your position as lead   11:18:29

13   elevator operator remained the same?            11:18:34

14        A     I believe so, yes.                    11:18:38

15        Q     Your schedule as lead elevator operator   11:18:40

16   remained the same?                              11:18:43

17        A     I believe so, yes.                    11:18:45

18        Q     Your rate of pay until you got a raise later   11:18:46

19   remained the same; correct?                      11:18:51

20        A     I believe so, yes.                    11:18:53

21        MR. ARANEDA:  We've been going for a little   11:19:28

22   bit over an hour.                               11:19:30

23        Do you guys want to take a five-minute break?   11:19:31

24        MS. AVLONI:  How are you doing, Owen?       11:19:34

25        THE WITNESS:  We can keep it going.  I got to   11:19:36
```



| | | |
|---|---|---|
| 1 | THE WITNESS:  I can't recall. | 11:21:13 |
| 2 | BY MR. ARANEDA: | 11:21:18 |
| 3 |     Q    Do you know what -- after you reported | 11:21:18 |
| 4 | Mr. Timbreza about the comments that you recorded him | 11:21:22 |
| 5 | and then later translated, do you know what happened, | 11:21:27 |
| 6 | whether -- strike that. | 11:21:33 |
| 7 |     Do you know if Mr. Timbreza was issued any | 11:21:34 |
| 8 | disciplinary action after you complained about him? | 11:21:38 |
| 9 |     A    No, I do not know. | 11:21:41 |
| 10 |     Q    Did you ever work with Mr. Timbreza after you | 11:21:45 |
| 11 | made the complaint about him? | 11:21:47 |
| 12 |     A    No. | 11:21:54 |
| 13 |     Q    All right.  When -- when you complained about | 11:22:12 |
| 14 | Mr. Timbreza, did you make any complaints or at least | 11:22:28 |
| 15 | alert nextSource about your complaints regarding | 11:22:34 |
| 16 | Mr. Timbreza? | 11:22:36 |
| 17 |     A    I don't recall. | 11:22:44 |
| 18 |     Q    Did you make any -- did you relay your | 11:22:44 |
| 19 | complaints about Mr. Timbreza to anyone at Citistaff? | 11:22:50 |
| 20 |     A    I don't recall. | 11:23:09 |
| 21 |     Q    Did you ever learn that workers at Tesla were | 11:23:09 |
| 22 | complaining about you? | 11:23:16 |
| 23 |     A    Yes. | 11:23:23 |
| 24 |     Q    When did you first learn that workers at | 11:23:24 |
| 25 | Tesla were complaining about you? | 11:23:29 |



| | | |
|---|---|---|
| 1 | A    Through these documents. | 11:23:35 |
| 2 | Q    Did you learn that workers at Tesla were | 11:23:38 |
| 3 | complaining about you while you were still working at | 11:23:42 |
| 4 | Tesla? | 11:23:45 |
| 5 | A    No. | 11:23:48 |
| 6 | Q    Did you know that workers at Tesla had | 11:23:49 |
| 7 | complained about you abusing your authority as a lead | 11:23:55 |
| 8 | elevator operator? | 11:24:00 |
| 9 | A    No. | 11:24:04 |
| 10 | Q    Did you learn while you worked at Tesla that | 11:24:04 |
| 11 | workers there had complained that you were being | 11:24:11 |
| 12 | confrontational? | 11:24:16 |
| 13 | A    No. | 11:24:17 |
| 14 | Q    Did you learn while you were working at Tesla | 11:24:17 |
| 15 | that workers there complained about your attitude? | 11:24:20 |
| 16 | A    No. | 11:24:29 |
| 17 | Q    At some point, you were informed that you | 11:24:30 |
| 18 | were going to be moved from your 6:00 P.M. to 6:00 | 11:24:33 |
| 19 | A.M. shift to a day shift; correct? | 11:24:41 |
| 20 | A    I don't recall. | 11:24:51 |
| 21 | Q    Did anyone ever inform you that you were | 11:24:51 |
| 22 | going to be switched from your night -- from your 6:00 | 11:24:56 |
| 23 | P.M. to 6:00 A.M. shift to a day shift? | 11:24:59 |
| 24 | A    I don't recall. | 11:25:07 |
| 25 | Q    All right.  This is previously marked as | 11:25:07 |



| | | |
|---|---|---|
| 1 | Exhibit 24 to your deposition. | 11:25:17 |
| 2 | (Previously marked Exhibit 24.) | 11:25:37 |
| 3 | BY MR. ARANEDA: | 11:25:37 |
| 4 | Q    The first e-mail in time here is March 4th, | 11:25:37 |
| 5 | and it looks like you are writing to Ed Ramero because | 11:25:45 |
| 6 | your mother passed away on February 27, 2016, and you | 11:25:49 |
| 7 | say, I will be gone on these days.  I will be back on | 11:25:52 |
| 8 | March 12, 2016. | 11:25:56 |
| 9 | What days were you indicating that you would | 11:26:00 |
| 10 | be gone? | 11:26:03 |
| 11 | A    Up until March 12th. | 11:26:08 |
| 12 | Q    So from March 4th until March 12th, you would | 11:26:10 |
| 13 | be out of work? | 11:26:14 |
| 14 | A    That's what the e-mail says. | 11:26:21 |
| 15 | Q    Okay.  I just want to get your understanding. | 11:26:23 |
| 16 | So you were going to be gone from March 4th | 11:26:25 |
| 17 | to March 12, 2016; correct? | 11:26:28 |
| 18 | A    Yes.  I wrote the e-mail on March the 4th at | 11:26:31 |
| 19 | 9:08 P.M., and I explained to them that I would be | 11:26:33 |
| 20 | back on 3-12-16. | 11:26:36 |
| 21 | Q    Did you -- after March 4th, did you ever come | 11:26:38 |
| 22 | back to work at Tesla? | 11:26:41 |
| 23 | A    No. | 11:26:43 |
| 24 | Q    Did you ever inform anyone, either at Tesla | 11:26:45 |
| 25 | or at Citistaff, that you would not be coming back? | 11:26:49 |



 1   BY MS. STEVENS:                                        12:47:59

 2       Q     And you received a paycheck every week or   12:47:59

 3   every two weeks?                                       12:48:01

 4       A     Once a week.                                 12:48:03

 5       Q     And did you ever -- did you get an actual    12:48:04

 6   paycheck in hand or was it direct deposit?             12:48:07

 7       A     In the beginning, I had a physical paycheck. 12:48:09

 8       Q     And did the paycheck indicate who signed the 12:48:12

 9   paycheck or what company issued the paycheck?          12:48:15

10       A     I believe it was Citistaff.                  12:48:18

11       Q     And were you ever advised of someone at      12:48:20

12   Citistaff to communicate with if you had to be late    12:48:23

13   for work or could not attend work?                     12:48:26

14       A     No.                                          12:48:29

15       Q     You were never told that?                    12:48:30

16       A     No.  I was supposed to contact Tesla and let 12:48:31

17   the Tesla supervisor know I was going to be late for   12:48:34

18   work or wasn't coming in that day.  All communications 12:48:37

19   were directed towards Ed Ramero.                       12:48:42

20       Q     And at some point in January when the        12:48:45

21   incident with the drawing on the cardboard, you        12:48:48

22   elected -- in addition to sending an e-mail to Ed      12:48:51

23   Ramero, you also sent an e-mail to Monica de Leon at   12:48:54

24   Citistaff; is that right?                              12:48:59

25       A     Yes.                                         12:49:00



```
1   STATE OF CALIFORNIA              )
                                     )   SS:
2   CITY AND COUNTY OF SAN FRANCISCO )

3

4                   I, Michael Cundy, CSR NO. 12271, a

5   Certified Shorthand Reporter of the State of

6   California, do hereby certify:

7                       That the foregoing proceedings were

8   taken before me at the time and place herein set

9   forth; that any witnesses in the foregoing

10  proceedings, prior to testifying, were placed under

11  oath; that a verbatim record of the proceedings was

12  made by me using machine shorthand which was

13  thereafter transcribed under my direction; further,

14  that the foregoing is an accurate transcription

15  thereof.

16                  I further certify that I am neither

17  financially interested in the action nor a relative or

18  employee of any attorney or any of the parties.

19                  IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  July 3, 2019

23                           _____

24                           Michael Cundy, CSR NO. 12271

25
```



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


DEMETRIC DI-AZ, OWEN      )
DIAZ, and LAMAR           )
PATTERSON,                )
            Plaintiffs,   )
vs.                       ) Case No.:  3:17-CV-066748
                          )              WHO
                          )
TESLA, INC., dba TESLA    )
MOTORS, INC.; CITISTAFF   )
SOLUTIONS, INC.; WEST     )
VALLEY STAFFING GROUP;    )
CHARTWELL STAFFING        )
SERVICES, INC.; and DOES  )
1-10, inclusive,          )
            Defendants.   )
_____)


DEPOSITION OF MONICA DE LEON

Thursday, December 6, 2018


TAKEN BEFORE:

HEIDI BELTON, CSR, RPR, CRR, CCRR, CRC

CSR No. 12885

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | THURSDAY, DECEMBER 6, 2018              10:05 A.M.      |
|          | 2  | P R O C E E D I N G S                                  |
| 10:04:09 | 3  | MS. AVLONI:  Today is Thursday,                        |
| 10:04:11 | 4  | December 6, 2018.  This is the deposition of Monica    |
| 10:04:14 | 5  | De Leon by plaintiffs in the matter of Di-az versus    |
| 10:04:18 | 6  | Tesla, et al., in the United States District Court,    |
| 10:04:20 | 7  | for the Northern District of California.  Case         |
| 10:04:23 | 8  | number 3:17-CV-066748-WHO.                             |
| 10:04:31 | 9  | My name is Navruz Avloni, and I'm                      |
| 10:04:34 | 10 | videotaping this deposition on behalf of the           |
| 10:04:37 | 11 | plaintiffs.  The deposition is taking place at the     |
| 10:04:41 | 12 | California Civil Rights Law Group, located at 180      |
| 10:04:45 | 13 | Grand Avenue, Suite 1380, in Oakland, California.      |
| 10:04:51 | 14 | The time is now 10:05 a.m.  And this is media 1 in     |
| 10:04:55 | 15 | the video recording.                                   |
| 10:04:58 | 16 | Will all the parties in the room please                |
| 10:05:01 | 17 | state their appearances.                               |
| 10:05:02 | 18 | MR. RUTSCHMAN:  Aaron Rutschman, counsel               |
| 10:05:03 | 19 | for CitiStaff and Tesla.                               |
| 10:05:06 | 20 | MS. AVLONI:  And Navruz Avloni, here for               |
| 10:05:08 | 21 | the plaintiffs.                                        |
| 10:05:09 | 22 | Will the court reporter please swear the               |
| 10:05:11 | 23 | witness.                                               |
| 10:05:11 | 24 | (Whereupon, the witness, MONICA DE LEON,               |
| 10:05:11 | 25 | having been duly sworn, testified as follows:)         |

```
10:43:28  1    BY MS. AVLONI:
10:43:29  2         Q.   What kind of paperwork would CitiStaff
10:43:31  3    provide to applicants when they register?
10:43:33  4         A.   Their application.  And in the application
10:43:36  5    it's in all the policies that we have.
10:43:45  6         Q.   So CitiStaff has applicants fill out an
10:43:47  7    application?
10:43:48  8         A.   Yes.
10:43:50  9         Q.   And CitiStaff provides the applicants with
10:43:52 10    policies?
10:43:53 11         A.   That's in the applications, yes.
10:43:56 12         Q.   Do you know what kind of policies are in
10:43:57 13    the application?
10:44:03 14         A.   From sexual harassment to job abandonment.
10:44:13 15    That's all I remember.
10:44:16 16         Q.   Does CitiStaff provide the applicants with
10:44:18 17    anything else other than the application and the
10:44:19 18    policies that are provided with it?
10:44:24 19              MR. RUTSCHMAN:  Objection; vague and
10:44:24 20    ambiguous.
10:44:27 21              THE WITNESS:  No.
10:44:27 22    BY MS. AVLONI:
10:44:33 23         Q.   Do you know if nextSource's orientation
10:44:39 24    packet also includes policies that cover topics like
10:44:44 25    sexual harassment?
```

| | | |
|---|---|---|
| 10:55:57 | 1 | A.   It was given to me in e-mail. |
| 10:55:58 | 2 | Q.   So you received an e-mail regarding Owen |
| 10:56:03 | 3 | feeling uncomfortable about a picture that was |
| 10:56:05 | 4 | drawn? |
| 10:56:05 | 5 | A.   Mm-hmm, but we spoke, yes. |
| 10:56:07 | 6 | Q.   And do you recall who that e-mail was sent |
| 10:56:10 | 7 | by?  Was it Owen sending you the e-mail? |
| 10:56:25 | 8 | A.   Yes, it was. |
| 10:56:26 | 9 | Q.   And you said you spoke to Owen about him |
| 10:56:30 | 10 | feeling uncomfortable about it -- feeling |
| 10:56:33 | 11 | uncomfortable about the picture drawn.  Did you |
| 10:56:35 | 12 | speak to Owen before he sent you that e-mail or |
| 10:56:38 | 13 | after he sent you that e-mail? |
| 10:56:40 | 14 | A.   After. |
| 10:56:41 | 15 | MR. RUTSCHMAN:  Objection; misstates the |
| 10:56:41 | 16 | witness' prior testimony. |
| 10:56:45 | 17 | THE WITNESS:  So spoke to him after. |
| 10:56:47 | 18 | BY MS. AVLONI: |
| 10:56:59 | 19 | Q.   I'll get back to this later.  But other |
| 10:57:01 | 20 | than receiving complaints of CitiStaff employees not |
| 10:57:08 | 21 | liking their job or not liking their placement or |
| 10:57:11 | 22 | their position and other than receiving this |
| 10:57:15 | 23 | information from Owen about him being uncomfortable |
| 10:57:18 | 24 | about a picture drawn, do you recall any other type |
| 10:57:21 | 25 | of complaints that you would receive from CitiStaff? |

11:16:06  1   ambiguous.

11:16:09  2         THE WITNESS:  The Owen Diaz situation.

11:16:17  3   BY MS. AVLONI:

11:16:17  4      Q.   And you mentioned one or two.  Is there

11:16:22  5   another investigation that you recall being involved

11:16:23  6   in?

11:16:24  7      **A.   Just -- just from what I recall, just,**

11:16:28  8   **like, an altercation that happened between Owen Diaz**

11:16:33  9   **and another -- another gentleman, another candidate.**

11:16:41 10      Q.   Do -- do you recall -- does the name

11:16:44 11   Rothaj Foster sound familiar?

11:16:46 12      **A.   Yes, ma'am.**

11:16:47 13      Q.   And so was the other investigation related

11:16:49 14   to the altercation between Rothaj Foster and Owen

11:16:52 15   Diaz?

11:16:52 16      **A.   That's what it was, yes.**

11:17:01 17      Q.   And Rothaj Foster was a CitiStaff

11:17:03 18   employee?

11:17:04 19         MR. RUTSCHMAN:  Objection; calls for

11:17:04 20   speculation and calls for a legal conclusion.

11:17:11 21         THE WITNESS:  Rothaj Foster did work for

11:17:12 22   CitiStaff.

11:17:13 23   BY MS. AVLONI:

11:17:13 24      Q.   And Owen was a CitiStaff employee?

11:17:16 25         MR. RUTSCHMAN:  Objection; calls for

12:33:51  1    of the complaint of the drawing, yes.

12:33:53  2    BY MS. AVLONI:

12:33:56  3        Q.    Okay.  How about just in general?

12:34:01  4        **A.    In general, yes.**

12:34:11  5        Q.    You seem hesitant.  Is there a reason?

12:34:16  6        **A.    Like I said, it's just -- the situation**

12:34:19  7    **with the drawing, it seemed completely credible to**

12:34:24  8    **me.  But when it came to the altercation -- and I**

12:34:27  9    **did -- spoke to Owen about, you know, what happened**

12:34:30 10    **with him and Rothaj -- there was a lot of he**

12:34:33 11    **couldn't recall what was said or what was -- what**

12:34:40 12    **happened.  So in that situation I didn't -- it**

12:34:42 13    **didn't really seem too credible --**

12:34:45 14        Q.    Did you --

12:34:46 15        **A.    -- when we were speaking.**

12:34:49 16        Q.    When you spoke to him about the Rothaj

12:34:52 17    situation, did you speak to him in person or by

12:34:55 18    phone?

12:34:55 19        **A.    It was by phone.**

12:34:56 20        Q.    And was he at home at that time, do you

12:34:58 21    know, or was he at work?

12:35:00 22            MR. RUTSCHMAN:  Objection; calls for

12:35:00 23    speculation.

12:35:01 24    BY MS. AVLONI:

12:35:02 25        Q.    If you know.

12:35:03  1        A.    That I don't remember.

12:35:03  2        Q.    Did you speak to Rothaj in person or by

12:35:06  3   phone about that situation?

12:35:08  4        A.    By phone.

12:35:17  5        Q.    Have you -- while you were working for

12:35:20  6   CitiStaff, has anyone brought to your attention any

12:35:24  7   concerns about Owen Diaz?

12:35:27  8              MR. RUTSCHMAN:  Objection; vague and

12:35:27  9   ambiguous.

12:35:29 10              THE WITNESS:  Can you repeat the question?

12:35:31 11   BY MS. AVLONI:

12:35:31 12        Q.    Yes.  While you were working for

12:35:33 13   CitiStaff, has anyone at all brought any concerns to

12:35:37 14   you about Owen Diaz?

12:35:39 15        A.    Yes, there was two concerns.  One was --

12:35:47 16   well, yes, there was.

12:35:49 17        Q.    What were those concerns?

12:35:51 18        A.    So I had spoke to Rothaj.  He had called

12:35:57 19   me and would let me know that -- he was letting me

12:36:03 20   know that, you know, Owen wasn't always at his post

12:36:07 21   where he was supposed to be, he would be gone for

12:36:10 22   long periods of time or would take longer lunch

12:36:16 23   breaks or long breaks.

12:36:19 24              There was an incident where he stated that

12:36:20 25   they were really backed up at the elevators and he

12:48:49   1        Q.    These are the only two that you recall?

12:48:55   2        A.    Yeah.

12:48:56   3              MR. RUTSCHMAN:  Is that a yes?

12:48:56   4              THE WITNESS:  Yes.

12:48:56   5    BY MS. AVLONI:

12:48:57   6        Q.    And referring to Owen bringing concerns,

12:49:00   7    you recall him bringing two concerns to your

12:49:02   8    attention, one about the picture and the other one

12:49:04   9    about the altercation with Rothaj; is that correct?

12:49:06  10        A.    Correct.

12:49:08  11        Q.    In regards to the picture, when he

12:49:15  12    communicated that concern to you, what did you do?

12:49:17  13        A.    So when he told me about it, you know, due

12:49:25  14    to the fact that we take it seriously, we

12:49:30  15    immediately took it up to HR -- Judy -- and let my

12:49:38  16    supervisors know about it as well, which they said

12:49:44  17    to talk to Judy for this case.

12:49:51  18        Q.    Did you talk to Judy?

12:49:53  19        A.    Yes, I did.

12:49:57  20        Q.    What did you guys discuss?

12:49:59  21        A.    I told Judy about, you know -- I told Judy

12:50:03  22    that I discussed -- spoke with Owen, you know.  I

12:50:09  23    checked in to -- with him to see do you -- are you

12:50:19  24    going to return to your -- to your job.  He said

12:50:22  25    yes.  I asked him if he wanted to be moved to a

MONICA DE LEON
December 6, 2018

Page 134

12:50:26  1    different department.   He said no.   You know, he was
12:50:33  2    upset and a little aggravated.   But I let him know
12:50:42  3    that I'm -- HR is going to deal with this.   I have
12:50:47  4    already brought it up to them to their immediate
12:50:50  5    attention.   I let my supervisors know.   And I let
12:50:57  6    Chartwell -- I gave them the okay to consent to
12:51:00  7    speak with Owen Diaz.
12:51:12  8          Q.   Do you recall discussing anything else
12:51:13  9    with Owen Diaz regarding this situation?   I'm sorry,
12:51:19 10    actually.   You were describing to me the
12:51:20 11    conversation you had with Judy; right?
12:51:24 12          A.   Yes.
12:51:25 13          Q.   Because -- let's back up.   Let's get a
12:51:27 14    clear record.
12:51:27 15          So when Owen raised the concern about the
12:51:33 16    picture to you, you talked to Owen.   And what did he
12:51:42 17    tell you?
12:51:45 18          MR. RUTSCHMAN:   Objection; asked and
12:51:45 19    answered.
12:51:50 20          THE WITNESS:   So he pretty much told me
12:51:53 21    how -- what happened, how he came across the
12:51:58 22    picture.   You know, he felt that the rac- -- the
12:52:07 23    picture was racist and that he wanted to make a
12:52:17 24    complaint.
12:52:21 25    BY MS. AVLONI:

```
12:57:04  1        A.   I recall Owen Diaz saying that they had an
12:57:08  2   altercation and that Rothaj was threatening to shoot
12:57:17  3   him and threatening his car, because he had a nice
12:57:24  4   car at the time.  And that, you know, Rothaj was
12:57:30  5   being very aggressive and --
12:57:37  6        Q.   And this is the conversation you had on
12:57:38  7   the phone?
12:57:38  8        A.   Yes.
12:57:39  9        Q.   Did he say anything else about the
12:57:40 10   situation that you recall?
12:57:46 11        A.   Not that I recall.
12:57:47 12        Q.   And what did you tell Owen?
12:57:55 13        A.   So I told Owen.  I said oh, okay, again,
12:57:59 14   are you going to return to work?  How do you feel?
12:58:02 15   Do you feel comfortable with going back to work?  He
12:58:06 16   said yes.  Do you feel comfortable with being in
12:58:10 17   your same position?  And -- or would you like to be
12:58:17 18   moved to a different spot.  He said no, he wanted to
12:58:21 19   continue where he was at.  So I let him know that in
12:58:23 20   this situation, you know, I'm going to take this up
12:58:29 21   to HR as well.  I'll be speaking with, you know,
12:58:37 22   Rothaj.  And I let him know that Chartwell would be
12:58:40 23   speaking to him and they would be doing their
12:58:47 24   investigation.
12:58:49 25        Q.   Did you take notes during that
```

| | | |
|---|---|---|
| 12:58:51 | 1 | conversation? |
| 12:58:51 | 2 | **A.   I -- yeah.   I believe I did.** |
| 12:58:54 | 3 | Q.   And you would have saved those notes in |
| 12:58:56 | 4 | the CitiStaff system? |
| 12:58:58 | 5 | **A.   It would have been in the system.** |
| 12:59:00 | 6 | Q.   And then after he -- Owen raised this |
| 12:59:03 | 7 | concern to your attention, did you have a |
| 12:59:05 | 8 | conversation with Rothaj? |
| 12:59:08 | 9 | **A.   Yes.** |
| 12:59:08 | 10 | MR. RUTSCHMAN:   Objection; misstates the |
| 12:59:10 | 11 | witness' prior testimony. |
| 12:59:12 | 12 | THE WITNESS:   After I spoken [sic] and |
| 12:59:15 | 13 | took down the information from Owen Diaz, I did |
| 12:59:22 | 14 | later call Rothaj Foster as well to see what |
| 12:59:25 | 15 | happened on his side, on his end. |
| 12:59:28 | 16 | BY MS. AVLONI: |
| 12:59:28 | 17 | Q.   Okay.   And what did Rothaj tell you? |
| 12:59:33 | 18 | **A.   So Rothaj did admit to them having, you** |
| 12:59:38 | 19 | **know, an argument.   He did admit to, you know,** |
| 12:59:42 | 20 | **speaking kind of loud, raising his voice.   But he** |
| 12:59:46 | 21 | **denied that -- you know, he said that he never made** |
| 12:59:51 | 22 | **any threats of any sort about any caller, about** |
| 12:59:55 | 23 | **shooting anybody or any of that sort.   He said** |
| 01:00:02 | 24 | **that -- you know, that Owen Diaz was already kind of** |
| 01:00:09 | 25 | **aggressive and very strong -- he would come out very** |

01:00:13 1    strong and very aggressive.  And, you know, that day

01:00:17 2    he said I do admit to -- to arguing and yelling

01:00:23 3    because I felt like -- he felt that Owen Diaz was

01:00:26 4    being disrespectful to him and, you know, taking

01:00:32 5    advantage of his power as a lead, telling him that

01:00:36 6    he can go to his break or his lunch whenever he

01:00:39 7    tells him to or --

01:00:47 8       Q.   So he -- Rothaj told you that Owen Diaz

01:00:49 9    was being disrespectful by telling Rothaj that he

01:00:53 10   can go on break or his lunch when Owen told him to?

01:00:56 11      A.   He said that -- that was something that he

01:00:58 12   said, but he was just being disrespectful as far as

01:01:04 13   cursing at him and telling him other things like,

01:01:09 14   you know, "shut up" or --

01:01:11 15      Q.   He said that to you?

01:01:13 16      A.   Rothaj.

01:01:16 17      Q.   Do you know if Owen -- what Owen's job

01:01:22 18   title was as a CitiStaff contractor at the Tesla

01:01:26 19   facility?

01:01:26 20      A.   Elevator lead.

01:01:28 21      Q.   And how about Rothaj Foster?  Do you know

01:01:30 22   what his title was?

01:01:31 23      A.   He was at the elevators as well, but --

01:01:36 24      Q.   Do you know if an elevator lead had the

01:01:39 25   ability to tell someone like in Rothaj's position

MONICA DE LEON
December 6, 2018

Page  144

01:04:48  1    know, I let Chartwell speak to Owen and that they

01:04:57  2    were going to take care of the investigation, they

01:04:59  3    were going to investigate.

01:05:01  4    BY MS. AVLONI:

01:05:01  5        Q.   Do you know if Chartwell did investigate?

01:05:03  6        A.   **That I do not know.**

01:05:08  7        Q.   If somebody wanted to speak to a Chartwell

01:05:10  8    [sic] contractor like Owen, were they required --

01:05:12  9    were they required to get Chartwell's permission?

01:05:16 10            MR. RUTSCHMAN:  Objection; calls for

01:05:16 11    speculation.

01:05:17 12            THE WITNESS:  Can you repeat that?

01:05:18 13    BY MS. AVLONI:

01:05:18 14        Q.   Yeah.  While conducting investigations,

01:05:20 15    let's say, if a client or another -- if a client

01:05:28 16    like nextSource or Tesla or Chartwell, if one of

01:05:34 17    those entities wanted to talk to a Chartwell --

01:05:39 18    sorry -- a CitiStaff contractor, would they need to

01:05:41 19    get permission from CitiStaff?

01:05:43 20        A.   **Yeah, I would think so.**

01:05:46 21        Q.   Do you know why?

01:05:51 22        A.   **Disclosures.  Confidential.**

01:05:56 23        Q.   What does that mean?

01:05:57 24        A.   **Confidential?**

01:06:00 25        Q.   Mm-hmm.

01:06:00 1        A.   Just for -- for the person's own
01:06:04 2    confidential [sic], maybe they don't want to speak
01:06:07 3    to a third party; they want to -- you know.   Or if
01:06:11 4    they're concerned about maybe they think they're in
01:06:13 5    trouble or something like that.
01:06:19 6        Q.   Did you ask Owen if it was okay for his
01:06:22 7    permission to speak to Chartwell?
01:06:24 8        A.   Yes, I did.   When I spoke with him, I did
01:06:26 9    let him know Chartwell, they want to speak with you,
01:06:32 10   and are you willing to participate?   And he said
01:06:36 11   yes.
01:06:36 12       Q.   And have you had a situation where you
01:06:38 13   refused to permit a CitiStaff contractor to talk to
01:06:44 14   like a client or an entity involved with a client?
01:06:48 15       A.   No, I haven't had a situation like that.
01:06:53 16       Q.   Did Judy ever talk to you about the
01:06:56 17   altercation between Rothaj and Owen Diaz after you
01:07:04 18   had that conversation with her where you described
01:07:06 19   to her what happened?
01:07:09 20       A.   After that, no.
01:07:16 21       Q.   How about the picture incident where Owen,
01:07:19 22   you know, raised a concern about an image that he
01:07:23 23   saw that he believe was racist.   Did you and Judy
01:07:26 24   ever have a conversation about that again after you
01:07:29 25   described to her Owen's complaints?

**Page 148**

```
01:09:26  1   by CitiStaff?
01:09:27  2              MR. RUTSCHMAN:  Objection; calls for
01:09:27  3   speculation.  Calls for a legal conclusion.
01:09:31  4              THE WITNESS:  That I don't know.
01:09:32  5   BY MS. AVLONI:
01:09:32  6       Q.   How about do you know if Owen Diaz still
01:09:34  7   works at the Tesla facility?
01:09:37  8              MR. RUTSCHMAN:  Calls for speculation.
01:09:39  9              THE WITNESS:  No.
01:09:40 10   BY MS. AVLONI:
01:09:40 11       Q.   And how do you know that he no --
01:09:43 12              MR. RUTSCHMAN:  I was just going to
01:09:43 13   clarify her response.  Was that no, he doesn't work
01:09:48 14   there, or no, you don't know?
01:09:49 15              THE WITNESS:  No, he doesn't work at
01:09:51 16   Tesla.
01:09:51 17   BY MS. AVLONI:
01:09:52 18       Q.   And how do you know Owen Diaz no longer
01:09:54 19   works at Tesla?
01:09:55 20       A.   When I was there, they had nextSource send
01:09:58 21   me an e-mail stating that they wanted to -- that
01:10:01 22   they had ended his assignment.
01:10:09 23       Q.   Okay.  nextSource sent you an e-mail
01:10:11 24   saying they had ended Owen Diaz' assignment at the
01:10:13 25   Tesla facility; is that correct?
```

```
01:10:14  1          A.    Mm-hmm.

01:10:15  2          Q.    And what was your response to that?

01:10:19  3          A.    So we -- to take action.  So since the

01:10:25  4    assignment ended, I gave Owen Diaz a call, letting

01:10:31  5    him know that his assignment had been ended and that

01:10:35  6    he was no longer able to return to the facility.  So

01:10:45  7    to not report to work for his shift that day.

01:10:49  8          And he was mad, upset.  He was cussing.

01:10:53  9    He was upset at the fact that, you know, he was

01:10:56 10    losing his job and that he wanted to continue

01:10:59 11    working at Tesla.

01:11:07 12          And, you know, I -- I let him know

01:11:09 13    unfortunately, you know, they have made a decision

01:11:13 14    to end your assignment.  So, you know, please do not

01:11:17 15    return to the premises.  Your badge is deactivated.

01:11:20 16    You won't be able to get in anyway if you tried.

01:11:24 17          So -- you know, and then after that he

01:11:31 18    continued to just kind of rant and just cussed a

01:11:37 19    little more.  And then he eventually just hung up.

01:11:39 20          Q.    And who from nextSource informed you

01:11:43 21    that Owen Diaz' assignment had ended?

01:11:45 22          A.    It was Wayne Jackson.

01:11:47 23          Q.    And did he inform you by e-mail or phone?

01:11:49 24          A.    E-mail.

01:11:52 25          Q.    He sent you an e-mail saying his
```

| | | |
|---|---|---|
| 01:11:54 | 1 | assignment has ended? |
| 01:11:56 | 2 | A.   Mm-hmm. |
| 01:11:56 | 3 | Q.   What did you respond with? |
| 01:11:57 | 4 | A.   I responded him, let him know okay.  He -- |
| 01:12:01 | 5 | I have let him know, and he won't be returning. |
| 01:12:05 | 6 | Q.   You had let him know after Wayne Jackson |
| 01:12:07 | 7 | had sent you that e-mail; right?  Not before Wayne |
| 01:12:10 | 8 | Jackson sent you that e-mail? |
| 01:12:11 | 9 | A.   I let him know after Wayne Jackson sent me |
| 01:12:15 | 10 | the e-mail stating that they were terminating Owen |
| 01:12:17 | 11 | Diaz' assignment. |
| 01:12:19 | 12 | Q.   Did Wayne Jackson tell you why they were |
| 01:12:22 | 13 | terminating Owen Diaz' assignment? |
| 01:12:24 | 14 | A.   It was a no-call/no-show.  He had -- he |
| 01:12:31 | 15 | had mentioned to me -- Owen Diaz had mentioned to me |
| 01:12:33 | 16 | that he was leaving to LA for a funeral.  And he |
| 01:12:38 | 17 | gave me specific dates.  It was like just a couple |
| 01:12:42 | 18 | of days, two or three days.  And I let nextSource |
| 01:12:46 | 19 | know.  And he was gone for longer than what he had |
| 01:12:52 | 20 | stated. |
| 01:12:55 | 21 | Q.   Do you know whose funeral it was? |
| 01:12:57 | 22 | A.   It was his mom's. |
| 01:13:01 | 23 | Q.   Did you call Owen and ask him why he |
| 01:13:05 | 24 | hasn't returned? |
| 01:13:06 | 25 | A.   I didn't know that he hadn't returned. |

01:18:06  1         **A.    A what kind of policy?**

01:18:09  2         Q.    Bereavement.

01:18:11  3              MR. RUTSCHMAN:  Bereavement.

01:18:12  4    BY MS. AVLONI:

01:18:13  5         Q.    Bereavement.

01:18:13  6         **A.    Oh --**

01:18:14  7              MR. RUTSCHMAN:  Objection; calls for

01:18:14  8    speculation.

01:18:15  9    BY MS. AVLONI:

01:18:15 10         Q.    Leave policy.

01:18:16 11         **A.    That I don't know.**

01:18:16 12         Q.    Do you know if nextSource has a

01:18:19 13    bereavement leave policy?

01:18:21 14              MR. RUTSCHMAN:  Objection; calls for

01:18:21 15    speculation.

01:18:22 16              THE WITNESS:  That I don't know.

01:18:23 17    BY MS. AVLONI:

01:18:24 18         Q.    Tesla?  Do you know whether Tesla has such

01:18:26 19    a policy?

01:18:28 20              MR. RUTSCHMAN:  Objection; calls for

01:18:28 21    speculation.

01:18:29 22              THE WITNESS:  That I don't know.

01:18:30 23    BY MS. AVLONI:

01:18:30 24         Q.    Did you try to place Owen at another

01:18:34 25    facility after he was separated from Tesla?

01:18:37 1              MR. RUTSCHMAN:  Objection; vague and
01:18:38 2    ambiguous.
01:18:42 3              THE WITNESS:  I did mention that, you
01:18:45 4    know, we could possibly place him somewhere else.
01:18:48 5    But it wouldn't be making the same amount of money
01:18:51 6    that he was making there.  And he just -- basically
01:18:57 7    he didn't want to hear it.  He was like F that.
01:19:00 8    Thirteen dollars ain't -- ain't shit, basically.
01:19:07 9              So -- you know, I tried to get him to calm
01:19:15 10   down by telling him hey, you know, I could probably
01:19:18 11   place you somewhere else.  You're not just -- you
01:19:21 12   know, your assignment didn't work here, you know, it
01:19:24 13   ended here.  But, you know, do you want to try
01:19:27 14   something else.  And he didn't.  He didn't want to
01:19:30 15   do anything else basically.  So --
01:19:33 16   BY MS. AVLONI:
01:19:33 17       Q.   Was Tesla -- do you know if Tesla paid the
01:19:37 18   highest rate to CitiStaff contractors?
01:19:40 19              MR. RUTSCHMAN:  Objection; calls for
01:19:40 20   speculation.
01:19:45 21              THE WITNESS:  I don't know if Tesla paid
01:19:47 22   the highest rate to Citistaff contractors.  But when
01:19:51 23   a lot of people hear Tesla, it's a well-known
01:19:55 24   manufacturer for these electric cars.  So when
01:19:58 25   people hear Tesla, everybody just wants to work at

MONICA DE LEON
December 6, 2018

Page 157

01:20:01  1    Tesla.

01:20:05  2    BY MS. AVLONI:

01:20:06  3        Q.   Yeah.  Do you know how much Owen was

01:20:08  4    receiving per hour when working at Tesla?

01:20:12  5              MR. RUTSCHMAN:  Objection; calls for

01:20:12  6    speculation.

01:20:16  7              THE WITNESS:  I don't recall the start.

01:20:18  8    It could be 16.  But I remember when they gave me

01:20:23  9    the raise for him, it was 18.

01:20:27 10    BY MS. AVLONI:

01:20:27 11        Q.   Did you have any other -- did CitiStaff

01:20:29 12    have any other clients at the time that you were

01:20:32 13    working there that paid $16 an hour or up?

01:20:41 14              MR. RUTSCHMAN:  Objection; calls for

01:20:41 15    speculation.

01:20:43 16              THE WITNESS:  Yeah, we did.

01:20:44 17    BY MS. AVLONI:

01:20:44 18        Q.   And how come you didn't offer any of those

01:20:46 19    positions to him?

01:20:49 20        A.   Well, I had mentioned it to him, but he

01:20:52 21    didn't want to take the offer.

01:20:53 22        Q.   Do you know -- did he tell you why not?

01:20:55 23        A.   He just said that wasn't enough.

01:20:58 24        Q.   Sixteen dollars wasn't enough?

01:20:59 25        A.   Yeah.

MONICA DE LEON
December 6, 2018

Page 162

| | | |
|---|---|---|
| 02:23:04 | 1 | happened like graveyard shift, they would probably |
| 02:23:13 | 2 | contact the client, let the client know before |
| 02:23:18 | 3 | letting me know at -- out of the office at midnight. |
| 02:23:22 | 4 | BY MS. AVLONI: |
| 02:23:22 | 5 | Q.   Did CitiStaff have a requirement that its |
| 02:23:25 | 6 | contractors contact the CitiStaff personnel like |
| 02:23:29 | 7 | yourself when it comes to complaints of harassment? |
| 02:23:30 | 8 | Or can CitiStaff contractors make the complaints |
| 02:23:36 | 9 | directly to the clients? |
| 02:23:37 | 10 | MR. RUTSCHMAN:   Objection; compound. |
| 02:23:40 | 11 | Calls for speculation.   Asked and answered. |
| 02:23:50 | 12 | THE WITNESS:   So they would be able to |
| 02:23:51 | 13 | report to me as well.   And if for some reason they |
| 02:23:54 | 14 | can't get ahold of me and they felt they needed to |
| 02:23:59 | 15 | tell their supervisor -- they tell their supervisor |
| 02:24:02 | 16 | about it, then yeah, yes. |
| 02:24:05 | 17 | BY MS. AVLONI: |
| 02:24:05 | 18 | Q.   And would supervisors -- do you know if |
| 02:24:08 | 19 | they're required to notify you at some point if |
| 02:24:11 | 20 | supervisors become aware of such complaints? |
| 02:24:14 | 21 | MR. RUTSCHMAN:   Objection; calls for |
| 02:24:14 | 22 | speculation. |
| 02:24:16 | 23 | THE WITNESS:   In that case -- in this case |
| 02:24:17 | 24 | where it was the -- with Owen -- with Owen's |
| 02:24:22 | 25 | complaint, since it did happen during his graveyard |

02:24:26  1   shift -- that is basically what happened.  He let

02:24:30  2   his supervisors know.  And they -- and nextSource.

02:24:36  3   And nextSource told me.  So -- in this case that

02:24:41  4   is what happened.  They -- he reported to his

02:24:44  5   supervisors in nextSource and they reported to me.

02:24:48  6   BY MS. AVLONI:

02:24:49  7        Q.   And why did they report to you; do you

02:24:52  8   know?

02:24:52  9        **A.   Since he was a CitiStaff contractor, that**

02:24:57 10   **is why they reported to me as well.**

02:25:11 11        Q.   If a CitiStaff contractor joined

02:25:13 12   CitiStaff, is there any sort of training provided at

02:25:16 13   all that you are aware of that tells that contractor

02:25:23 14   who to go to for what?  So, for example, you know,

02:25:26 15   go to CitiStaff employee for payroll issues.  Go to

02:25:31 16   this person for complaints.  Go to this person for

02:25:35 17   job description, go to this person on safety

02:25:39 18   reasons.  Is there some sort of a manual, tutorial,

02:25:42 19   or training that's provided to CitiStaff contractors

02:25:45 20   that tells the contractors where or who to go to in

02:25:50 21   these situations?

02:25:52 22            MR. RUTSCHMAN:  Objection; compound.

02:25:55 23   Vague and ambiguous.  Asked and answered.

02:25:57 24            THE WITNESS:  They -- the CitiStaff

02:26:00 25   contractors knew that, you know, I was the only one

02:26:04  1    in the office.  So I also let them know if you have

02:26:08  2    any questions or concerns, you can give me a call.

02:26:14  3    And, you know, let's just say if -- in any situation

02:26:18  4    anyone chose -- wanted to speak to somebody else

02:26:22  5    other than me, then I would follow up with them and

02:26:25  6    let them have corporate's number and, you know,

02:26:28  7    whatever the situation would be, direct them

02:26:33  8    where -- where to go or who to go to.

02:26:36  9    BY MS. AVLONI:

02:26:37  10        Q.    Did you ever instruct Citistaff

02:26:39  11   contractors that they are required to contact you in

02:26:43  12   regards to any and all issues from payroll, to

02:26:48  13   complaints, to how to do their job?

02:26:52  14           MR. RUTSCHMAN:  Objection; vague and

02:26:52  15   ambiguous.  Compound.

02:27:00  16           THE WITNESS:  As I said, anytime before I

02:27:03  17   would dispatch them to the -- to the job site, I

02:27:06  18   would let them know if they have any questions or

02:27:08  19   concerns, they can give me a call or send me an

02:27:11  20   e-mail.

02:27:12  21   BY MS. AVLONI:

02:27:13  22        Q.    But you never told them that they're

02:27:14  23   required to go to you instead of the client; is that

02:27:17  24   correct?

02:27:18  25           MR. RUTSCHMAN:  Objection; misstates the

02:30:55  1   BY MS. AVLONI:

02:31:45  2        Q.   Sitting here Today do you know if Rothaj

02:31:47  3   Foster ever received any training on harassment?

02:31:51  4             MR. RUTSCHMAN:  Objection; vague and

02:31:51  5   ambiguous.  Calls for speculation.

02:31:56  6             THE WITNESS:  I know that Rothaj signed

02:31:59  7   all policies of CitiStaff and read and signed any

02:32:11  8   paperwork that -- that was given to us from

02:32:16  9   nextSource -- nextSource paperwork that required

02:32:24  10  to be signed and read.

02:32:25  11  BY MS. AVLONI:

02:32:25  12       Q.   Do you know whether Rothaj Foster is

02:32:28  13  black?

02:32:28  14       **A.   Yes, he is.**

02:32:34  15       Q.   When you terminated Owen Diaz, was he

02:32:40  16  still a CitiStaff employee?

02:32:44  17            MR. RUTSCHMAN:  Objection; lacks

02:32:44  18  foundation.  Misstates the witness' prior testimony.

02:32:52  19  Calls for a legal conclusion.

02:32:58  20            THE WITNESS:  So when Owen Diaz'

02:33:00  21  assignment ended, he was still a contractor that was

02:33:11  22  registered with us as CitiStaff.  But he was no

02:33:15  23  longer an employee working on an assignment at

02:33:21  24  Tesla; at the facility, Tesla facility.

02:33:24  25  BY MS. AVLONI:

04:17:06  1        Q.   So CitiStaff essentially wouldn't get

04:17:07  2   involved in any way unless something was brought to

04:17:11  3   their attention; is that correct?

04:17:13  4             MR. RUTSCHMAN:  Objection; misstates the

04:17:14  5   witness' prior testimony.  Calls for speculation.

04:17:19  6   BY MS. AVLONI:

04:17:19  7        Q.   When it comes to complaints.

04:17:21  8        A.   **When it comes to complaints?  What is the**

04:17:24  9   **question again?**

04:17:25 10        Q.   Yeah.  You know what?  Scratch that

04:17:27 11   question.  I'm going to --

04:17:36 12             Joyce de la Grande.  Have you ever heard

04:17:38 13   of her?

04:17:38 14        A.   **No.**

04:17:49 15             MS. AVLONI:  I'm going to go ahead and

04:17:51 16   introduce the next exhibit.

04:18:09 17                             (Exhibit 88 marked.)

04:18:09 18   BY MS. AVLONI:

04:18:17 19        Q.   Please take as much time as you need to

04:18:20 20   fully review Exhibit 88.

04:20:26 21        A.   **(Witness reviews document.)**

04:20:27 22             **Okay.**

04:20:28 23        Q.   Have you ever seen this document before?

04:20:30 24        A.   **Yes.**

04:20:33 25        Q.   And if you look at the top portion of this

| | | |
|---|---|---|
| 04:20:41 | 1 | document, is this an e-mail that you wrote to Wayne |
| 04:20:45 | 2 | Jackson? |
| 04:20:49 | 3 | A.   **The first one?   Yes.** |
| 04:20:53 | 4 | Q.   And does this e-mail accurately reflect |
| 04:20:58 | 5 | what you recall writing to Wayne Jackson? |
| 04:21:01 | 6 | A.   **Yes.** |
| 04:21:01 | 7 | Q.   And -- and this e-mail is -- is this |
| 04:21:17 | 8 | e-mail related to the altercation between Rothaj |
| 04:21:22 | 9 | Foster and Owen Diaz that we earlier discussed? |
| 04:21:26 | 10 | A.   **Yes.** |
| 04:21:30 | 11 | Q.   And the e-mail below your e-mail where |
| 04:21:33 | 12 | it's stated as coming from Wayne Jackson to you, is |
| 04:21:37 | 13 | that an e-mail that you recall receiving from Wayne |
| 04:21:41 | 14 | Jackson? |
| 04:21:41 | 15 | A.   **Yes.** |
| 04:21:44 | 16 | Q.   That statement is accurate? |
| 04:21:45 | 17 | A.   **Yes.** |
| 04:21:49 | 18 | MR. RUTSCHMAN:  Belated objection that the |
| 04:21:50 | 19 | document speaks for itself. |
| 04:21:57 | 20 | BY MS. AVLONI: |
| 04:21:58 | 21 | Q.   Do you see the name at the top of the |
| 04:22:00 | 22 | subject, it says Deb Griskey. |
| 04:22:02 | 23 | A.   **For the bottom one on the first page?** |
| 04:22:05 | 24 | Q.   Right on the top.  It says Deb Griskey. |
| 04:22:10 | 25 | A.   **Right here; right?** |

04:22:11  1        Q.    Correct.  Do you know who that is?

04:22:15  2        **A.    She was the main contact, like I had**

04:22:18  3    **mentioned earlier, for Tesla after Nancy.**

04:22:24  4        Q.    So a nextSource.  That's -- okay.

04:22:33  5            And when you received the e-mail from

04:22:35  6    Wayne Jackson back on November 6 of 2015, do you

04:22:39  7    recall reading the entire e-mail or the chain below

04:22:45  8    it?

04:22:48  9        **A.    Yes.**

04:22:59 10        Q.    And when you read the e-mail -- actually,

04:23:02 11    prior to receiving the e-mail on November 6, 10:21

04:23:07 12    a.m., had you had any information regarding the

04:23:11 13    altercation between Rothaj Foster and Owen Diaz?

04:23:13 14        **A.    Repeat the question?**

04:23:16 15        Q.    Prior to receiving the e-mail from Wayne

04:23:17 16    Jackson on November 6 of 2015 at 10:21 a.m., did you

04:23:23 17    have any information at all that there was an

04:23:25 18    altercation between Rothaj and Owen?

04:23:28 19        **A.    No.**

04:23:28 20        Q.    That's the first time you learned about

04:23:30 21    the altercation between Rothaj and Owen?

04:23:32 22        **A.    Yes.**

04:23:33 23        Q.    And then when you read the e-mail for

04:23:38 24    Wayne Jackson, what were your immediate impressions

04:23:46 25    about the altercation between Rothaj and Owen?

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

EXHIBITS TO DEPOSITION OF MONICA DELEON

20
21

REDACTED – CONDITIONALLY FILED UNDER SEAL

22
23
24
25
26
27
28

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

```
 1                    REPORTER'S CERTIFICATION

 2

 3            I, Heidi Belton, Certified Shorthand

 4    Reporter in and for the State of California, do

 5    hereby certify:

 6

 7            That the foregoing witness was by me duly

 8    sworn; that the deposition was then taken before me

 9    at the time and place herein set forth; that the

10    testimony and proceedings were reported

11    stenographically by me and later transcribed into

12    typewriting under my direction; that the foregoing

13    is a true record of the testimony and proceedings

14    taken at that time.

15

16            IN WITNESS WHEREOF, I have subscribed my

17    name on this date:

18

19

20

21

22    H. Belton

23        Heidi Belton, CSR, RPR, CRR, CCRR, CRC
                         CSR No. 12885
24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19                         EXHIBIT H
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

       Plaintiffs,

      vs.                      No. 3:17-cv-06748-WHO

TESLA, INC., dba TESLA
MOTORS, INC.; CITISTAFF
SOLUTIONS, INC.; WEST VALLEY
STAFFING GROUP; CHARTWELL
STAFFING SERVICES, INC.;
and DOES 1-50, inclusive,

       Defendants.

_____//

DEPOSITION OF VICTOR QUINTERO

June 7, 2018

Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to

 2    Notice of Taking Deposition, and on Thursday, June 7,

 3    2018, commencing at the hour of 3:06 p.m., before me,

 4    BRIDGET M. MATTOS, CSR No. 11410, there personally

 5    appeared

 6

 7                   VICTOR QUINTERO,

 8

 9    called as a witness by Plaintiff, who, having been

10    duly sworn, was examined and testified as is

11    hereinafter set forth.

12                        ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                MR. ORGAN:  Q.  Mr. Quintero, am I saying it
 2    right?
 3        A.    Yes.
 4        Q.    How do you -- please spell your name for the
 5    record.
 6        A.    Q-U-I-N-T-E-R-O.
 7        Q.    Have you gone by any other names, other than
 8    Victor Quintero?
 9        A.    No.
10        Q.    When did you start working for Tesla?
11        A.    May 12, 19 -- 2014.
12        Q.    Do you currently work for Tesla?
13        A.    Yes.
14                MS. ANTONUCCI:  Victor, just take a little
15    breath between the question and the answer, so that I
16    can object, if I have to.
17                THE WITNESS:  Okay.
18                MR. ORGAN:  Q.  You have been designated as
19    the person most knowledgeable on three topics.  One is
20    plaintiff Owen Diaz's work performance for defendant
21    Tesla.
22                Do you understand that?
23        A.    Work performance, yes.
24        Q.    You've also been designated as the person
25    most knowledgeable about any discipline issued to
```

```
 1              MS. ANTONUCCI:  Objection; vague, lacks
 2      foundation.
 3              THE WITNESS:  The scope of work would be part
 4      of the contract.
 5              MR. ORGAN:  Okay.
 6        Q.    But in terms of determining whether, you
 7      know, they work the -- were all of the elevator
 8      operators contract employees?
 9        A.    Yes.
10        Q.    And were they -- did the contract employees
11      who worked on the elevators, for example, they
12      received Tesla training; correct?
13              MS. ANTONUCCI:  Objection; calls for
14      speculation.
15              THE WITNESS:  They received training from
16      their own shift supervisors and leads.
17              MR. ORGAN:  Q.  But they would also receive
18      training on, like, what Tesla procedures were for
19      safety; right?
20              MS. ANTONUCCI:  Objection; vague, lacks
21      foundation.
22              THE WITNESS:  Everybody who works at Tesla,
23      whether you're an employee or a contractor, has to
24      take safety orientation class in order to work in the
25      factory.
```

```
 1                THE WITNESS:  Yeah.  Everybody has to have
 2    a -- PPE, yes.
 3                MR. ORGAN:  Q.  Everybody at Tesla was
 4    subject to the PPE policies; correct?
 5        A.   Yes.
 6                MS. ANTONUCCI:  Objection; vague, lacks
 7    foundation.
 8                Give me one second.
 9                THE WITNESS:  Sorry.
10                MS. ANTONUCCI:  It's okay.
11                MR. ORGAN:  Q.  When you say "PPE policies,"
12    what do you mean?
13        A.   Personal protective equipment.
14        Q.   Everybody at Tesla was subject to the --
15    whether they were a contractor or a regular Tesla
16    employee -- was subject to the antidiscrimination
17    policies; correct?
18                MS. ANTONUCCI:  Objection; vague.
19                THE WITNESS:  I don't work for HR, but I
20    would imagine so.  I mean, antidiscrimination is a
21    federal law, so...
22                MR. ORGAN:  Q.  Tesla has a zero tolerance
23    policy for harassment; right?
24                MS. ANTONUCCI:  Objection; vague, calls for a
25    legal conclusion.
```

1          THE WITNESS:  Yes, as far as I know.

2              MR. ORGAN:  Q.  There weren't two sets of

3     rules, as far as you know, for the contractors, in

4     terms of how they would report harassment versus how a

5     regular employee would report harassment; am I right?

6              MS. ANTONUCCI:  Objection; vague, lacks

7     foundation.

8              THE WITNESS:  I would imagine the contract

9     companies have their own processes or procedures for

10    how they report issues and problems.

11             MR. ORGAN:  Q.  But in terms of if a

12    contractor, contract employee, reported an issue of

13    harassment to a Tesla employee, that Tesla employee

14    would have a responsibility to report that up the

15    chain, wouldn't they?

16             MS. ANTONUCCI:  Objection; vague, lacks

17    foundation.

18             THE WITNESS:  If they were to report it to

19    one of my supervisors, yes, that supervisor would have

20    a responsibility to escalate it.

21             MR. ORGAN:  Q.  Who were your supervisors?

22    **A.   At the time?**

23    Q.   In 2015 and '16.

24    **A.   Josue Torres, Jaime Salazar, Ed Romero,**

25    **Andres Donet.**

```
 1    State of California              )
 2    County of Marin                  )
 3
 4              I, Bridget M. Mattos, hereby certify
 5    that the witness in the foregoing deposition was by me
 6    duly sworn to testify to the truth, the whole truth
 7    and nothing but the truth in the within entitled
 8    cause; that said deposition was taken at the time and
 9    place herein named; that the deposition is a true
10    record of the witness's testimony as reported to the
11    best of my ability by me, a duly certified shorthand
12    reporter and disinterested person, and was thereafter
13    transcribed under my direction into typewriting by
14    computer; that the witness was given an opportunity to
15    read, correct and sign the deposition.
16              I further certify that I am not
17    interested in the outcome of said action nor connected
18    with or related to any of the parties in said action
19    nor to their respective counsel.
20              IN WITNESS WHEREOF, I have hereunder
21    subscribed my hand on June 7, 2018.
22
23              BRIDGET M. MATTOS, CSR NO. 11410
24
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION

FP 36147236.1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

        Plaintiffs,

      vs.             No. 3:17-cv-06748-WHO

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; and DOES 1-50,
inclusive,

        Defendants.

_____//


DEPOSITION OF EDWARD ROMERO

November 30, 2018


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to

 2   Notice of Taking Deposition, and on November 30, 2018,

 3   commencing at the hour of 10:00 a.m., at CALIFORNIA

 4   CIVIL RIGHTS LAW GROUP, 332 San Anselmo Avenue, San

 5   Anselmo, California, before me, BRIDGET M. MATTOS, CSR

 6   No. 11410, there personally appeared

 7

 8                   EDWARD ROMERO,

 9

10   called as a witness by Plaintiff, who, having been

11   duly sworn, was examined and testified as is

12   hereinafter set forth.

13                   ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        Q.   Well, you received training on what is
 2   harassing or discriminatory conduct; right?
 3        A.   Correct.
 4        Q.   And would you agree if someone used the word
 5   "nigger" or "nigga" in the workplace, that would be
 6   inappropriate conduct; right?
 7        A.   In general, yes, it would be very
 8   inappropriate.
 9        Q.   Do you find those terms offensive?
10        A.   I do.
11        Q.   So instead of using "nigger" or "nigga," I'm
12   going to use the "'N' word" okay?
13        A.   Okay.
14        Q.   Is that fair enough?
15        A.   Yeah, because the other words kind of make me
16   feel uncomfortable too.
17        Q.   Sure.  I bet they do.
18             So did you ever observe -- and I mean
19   personally observe, not be told about -- but did you
20   ever observe anyone using the "N" word at the Tesla
21   factory when you were there?
22        A.   No.
23        Q.   Did you ever -- were you ever told or
24   informed that someone was using the "N" word at the
25   factory?
```

EDWARD ROMERO
November 30, 2018

**Page 66**

1      A.    I was informed that there was language that

2  offended someone or hurt someone's feelings, but I did

3  not hear it directly.

4      Q.    And how many employees gave you

5  information -- or strike that.

6          How many employees did you hear about who

7  claimed to be offended or hurt by language at the

8  Tesla factory?

9      A.    I can only think of one.

10     Q.    And who is the one that you can think of?

11     A.    Owen Diaz.

12     Q.    And how did you know Owen Diaz?

13     A.    After I started working for Tesla, within a

14  few weeks they asked me to help them with the elevator

15  services.

16     Q.    So this was while you were at nextSource, or

17  this is when you were at Tesla?

18     A.    This is when I became a Tesla employee.

19     Q.    So that was sometime in October then of 2015?

20     A.    I would say that in October, they were -- I

21  was dealing more with kind of the recycling and being

22  introduced into the elevator services.

23     Q.    So sometime in October of 2015, or

24  approximately October of 2015, you started taking over

25  some responsibility for overseeing the elevators?

```
1    he looks, I'd probably say 50.
2         Q.   Okay.   Fair enough.
3              And your first interaction with Owen Diaz, do
4    you remember what that was about?
5         A.   It wasn't necessarily an interaction; it was
6    more like observing him working there.   He was working
7    there as an elevator operator.   If I remember
8    correctly, he was a lead at that time.
9         Q.   And what was the difference between a lead
10   and someone else, on the elevator operators?
11        A.   A lead was expected to assume more
12   responsibility and making sure that product was moved
13   properly and safely and that the crews were working in
14   the same manner, using their PPE, and so on, and it
15   was to be an individual who could have good
16   interaction with other departments, other department
17   heads, supervisors, elevator drivers, tugger drivers
18   who came to the elevator.
19              We wanted an individual who could really
20   interact and work closely with them, a cooperative
21   spirit, not an angry person or somebody who, you know,
22   couldn't get along with people.   I would say
23   typically, that's the difference.
24        Q.   Did you promote Owen Diaz to a lead?
25        A.   I think he was a lead already when I got
```

1    there.

2        Q.   Did you ever talk to Jamie Salazar about Owen

3    Diaz?

4        A.   **Not to ask him the question specifically.**

5        Q.   Did you have any discussion with Jamie

6    Salazar about Owen Diaz's attitude, or anything like

7    that?

8        A.   **I can't say.  I don't remember that.**

9        Q.   Tell me about your first impression relative

10   to Owen Diaz when you observed him, when you took over

11   responsibility for the elevator operators.

12        MS. ANTONUCCI:  Vague.

13        THE WITNESS:  You want to rephrase that a

14   little bit or --

15        MR. ORGAN:  Actually, let me go back to the

16   lead thing.

17        Q.   So in terms of the lead position for the

18   elevator operators, the elevator operator leads were

19   expected to be more responsible; is that correct?

20        A.   **Yes.**

21        Q.   And the elevator operator leads were expected

22   to be more responsible in terms of moving product; is

23   that correct?

24        A.   **Moving it efficiently.**

25        Q.   Efficiently, yes.

1            And then you said that the elevator operator

2    leads were also responsible for making sure that their

3    crews used their PPEs?

4        A.    Correct.

5        Q.    And you said that the elevator operator leads

6    also had to make sure that they had good interactions

7    with other departments; right?

8        A.    Correct.   They had to have good

9    communication, a spirit of cooperation, an ability to

10   resolve issues that came along that might impede the

11   movement of materials.

12       Q.    Elevator operator leads were supposed to try

13   and mitigate or reduce obstacles to getting product to

14   move between the floors; correct?

15       A.    Correct.   And they had to have good

16   interaction with the supervisors of the production --

17   of the -- of the different departments bringing

18   materials to the elevators.

19            In other words, if you have a lead -- because

20   I wasn't there at the elevators all day long, I had

21   other duties to do, and so on.   But a good lead

22   elevator operator, okay, would be able to communicate

23   with people who came to him and said, for example,

24   "I've got this material that's urgently needed in this

25   part of the factory," and work it out to get that

EDWARD ROMERO
November 30, 2018

**Page 81**

1       A.   I knew --

2       Q.   Let me just finish the question.

3       A.   Yeah.  Sorry.

4       Q.   In terms of your -- when you were the

5    janitorial supervisor working for nextSource, during

6    that time, you at least had some contact with the

7    elevator 1 and 2 operators; correct?

8       A.   I can't say.  All I can say is it was

9    limited, in the sense that from that responsibility I

10   had with nextSource, we only took trash down the

11   elevator and some recycled products.  I mean, some

12   cleaning products that were going up and down.  And

13   that was not my responsibility to drive them down

14   there and take them down the elevator.

15      Q.   Okay.

16      A.   That was -- the employees were doing that.

17      Q.   Then tell me about your impressions of Owen

18   Diaz as time went on, when you became his -- when you

19   took over responsibilities for overseeing elevators 1

20   and 2.

21      A.   I would say that Owen -- I observed that he

22   had a hard time getting along with people.

23      Q.   Was that all people or --

24      A.   I would say some people.

25      Q.   And who were the people who you observed Owen

EDWARD ROMERO
November 30, 2018

Page 82

1   having a hard time getting along with?

2      A.   I don't remember specific names, other than

3   sometimes comments were made:  Who is this guy?  How

4   come he's always upset?

5           You know, I'm just responding to your

6   question about what my impression was.

7      Q.   Yeah, I get that.

8      A.   I made no decisions as to what I felt would

9   be the ultimate result with anything.  I wanted to

10  work with Owen.  I like to give everybody a fair

11  chance.  But there were some instances where people

12  voiced that he was angry, or things like that.

13     Q.   When you say "things like that," in addition

14  to people voicing an opinion that Owen was angry, did

15  they voice anything else to you?

16     A.   That they didn't like the way he spoke to

17  them.

18     Q.   And do you remember any specifics as to what

19  people said about what they didn't like about the way

20  Owen Diaz spoke to them?

21     A.   I can only speak of maybe one specific case.

22     Q.   Okay.  Tell me about the case.

23     A.   Where he -- they accused him that he was

24  gossiping about them behind their back; that he's

25  divulging or gossiping about a relationship that two

1   operators about, I guess, some things with his

2   personal life or his attitude, and, you know, that he

3   didn't like his name being used by Owen.  Okay?  He

4   didn't feel that it was proper.

5       Q.   Well, how did he say that Owen was using his

6   name in a way that he didn't like?

7       A.   I think specifically and more so on how he --

8   he was another elevator lead, by the way.

9       Q.   Jesse was an elevator lead?

10      A.   Yes, on the daytime.

11      Q.   On the daytime.  Okay.

12      A.   He felt that Owen would bad-mouth him to

13  other employees, and these people were going,

14  supposedly, to Jesse and telling him.

15      Q.   Okay.  Jesse felt like Owen was saying

16  negative things about the job that Jesse was doing on

17  the day shift; right?

18      A.   Right.

19      Q.   Owen didn't say anything negative about Jesse

20  personally; correct?

21          MS. ANTONUCCI:  Objection; lacks foundation.

22          MR. ORGAN:  Q.  That you knew of.

23      A.   I couldn't say specifically, but he was

24  taking it personal.

25      Q.   Jesse was taking it personally?

1    the elevators and went down to their area, and they

2    were getting into some kind of discussion there.

3    Okay?  And that's when I heard that there was this

4    discussion between them.

5        Q.   And what did you hear about what the

6    discussion was between Hilda and Owen?

7        A.   About him not cooperating, and his overall

8    attitude that -- I always question him:  Why did you

9    go down there if you're assigned here?  Why did you go

10   over there?

11            And he said, "Oh, I just went over there."

12   It wasn't like he had a real good reason to go.  Okay?

13       Q.   Okay.

14       A.   And then somehow -- and I'm only saying what

15   Hilda told -- reported.  She reported that he started

16   making comments about that there was a relationship

17   between her and Aaron, and she felt offended because

18   she was married and the other guy was married, and she

19   felt that her name was being tossed around in a bad

20   way.

21       Q.   Okay.  Did you observe any of these

22   statements yourself by Owen?

23       A.   No.  I wasn't there when they had that

24   interaction.

25       Q.   Did you confront Owen about whether or not he

```
 1              MS. ANTONUCCI:  Objection; vague and lacks
 2    foundation.
 3              THE WITNESS:  I reported it to the people
 4    that I needed to report it to.
 5              MR. ORGAN:  Q.   And who did you report the
 6    interaction with Jesse to?
 7         A.   I think there's an email there, if I
 8    remember.   And I can't remember every single detail,
 9    because we write so many emails throughout our lives
10    anyway, but I think I reported it to Mr. Salazar and
11    to Mr. Quintero.
12         Q.   And what about the Hilda issue?
13         A.   It was all part of the same issue.
14         Q.   What's the timing of when you reported these
15    issues to Quintero and Salazar?
16         A.   You mean how many -- how much time did I let
17    go by?
18         Q.   Yeah.
19              Well, let's start it this way:   When did
20    Jesse bring to you his concerns about -- that Owen was
21    bad-mouthing him?
22         A.   I can't tell you the date.   It had to be on
23    or about the same time that these other complaints
24    came in.
25         Q.   So the complaints from Hilda and Jesse came
```

1    to you approximately the same time; is that right?

2        A.   Yes.

3        Q.   And was that right after you took over your

4    responsibilities as supervising the elevator

5    operators, or was it later?

6        A.   It was during that transition time.

7        Q.   So October of 2015 --

8        A.   That was the transition time, yes.

9             MS. ANTONUCCI:   Hold on.   Let him finish his

10   question.

11            MR. ORGAN:   Q.   So in approximately October

12   2015, when you were taking over responsibilities for

13   overseeing the elevator operators, that's the time

14   period when Jesse and Hilda came to you making

15   complaints about Owen Diaz; is that correct?

16        A.   I think that Hilda called me because she was

17   concerned about not being able to use the elevators,

18   and then within a very short period of time, all these

19   other things happened.   Okay?

20        Q.   And you think that --

21        A.   But I can't remember if Jesse mentioned it a

22   little bit before that or right after that time or a

23   period after that.   I don't remember.

24        Q.   It wasn't too long between the Hilda and the

25   Jesse --

```
 1        A.   It was all, like, happening almost at the
 2   same time.
 3        Q.   And your best recollection is that that
 4   occurred during the time that you were transitioning
 5   to take over supervising the elevator operators; is
 6   that right?
 7        A.   Yes.
 8        Q.   Did you talk to Owen about your concerns --
 9   or strike that.
10             You did talk to Owen about the concerns that
11   Jesse raised to you?
12        A.   Yes.
13        Q.   When did you talk to Owen about the concerns
14   that Jesse raised?
15        A.   I would probably have to refer back to the
16   email to remember that, because the email was written
17   right as it happened, you know, as soon as it
18   happened, and it would be more specific on, you
19   know --
20        Q.   Okay.  What's your best estimate of when that
21   was?
22        A.   I don't know what you mean.  You're talking
23   about October?  Are you talking about a specific time?
24   What do you mean?
25        Q.   Yeah.  What's your best estimate, in terms of
```

EDWARD ROMERO
November 30, 2018

**Page  92**

1   was it October, November, December, 2015, 2016?

2        A.   I think it was during October.

3        Q.   And then Hilda, what's your best estimate of

4   when you talked to Owen Diaz about Hilda or the issues

5   raised by Hilda?

6        A.   Again, I'd like to refer back to the

7   specifics on the email.

8        Q.   I get that, but I'm asking you for your best

9   memory now.

10       A.   I can't remember.

11       Q.   So it could have been 2016 when you talked to

12   Hilda?

13       A.   No.

14       Q.   To Owen?

15       A.   No, I can't remember during that month of

16   October.   Okay?

17       Q.   Fair enough.

18       A.   If this happened this day, this day, this

19   day, I just don't have the dates.

20       Q.   I get that.  But your best memory is that you

21   talked to Owen Diaz about the Jesse issues in October

22   2015; right?

23       A.   Yes.

24       Q.   And your best memory is that you talked to

25   Owen Diaz about the Hilda issues in October 2015;

1   correct?

2       A.   On or about that time, yes.

3       Q.   Let's talk about -- did you talk to Owen

4   directly, or did you email him?  How did you address

5   the issues that Jesse raised with Owen Diaz?

6       A.   If I remember correctly, it was Mr. Salazar

7   and myself.

8       Q.   Where did it happen?

9       A.   I think it happened on or around the

10  elevators, you know, that location.  To my best

11  recollection.

12      Q.   What did you and Mr. Salazar say to Mr. Owen

13  Diaz about what Jesse had raised?

14      A.   Basically, how Jesse Leite felt.  We gave him

15  counsel as to, you know, it's not good to just say

16  things to other people, because you could hurt

17  somebody.

18           I'm going by the gist of what I remember, and

19  how Jesse was hurt, and, you know, a lot of times --

20  you know, like I mentioned earlier, sometimes we don't

21  even know who left the materials, so why accuse

22  somebody that they did it type thing.

23      Q.   What did Mr. Owen Diaz say in response?

24      A.   I think he realized that he could have maybe

25  handled it differently.

```
 1        A.    As far as I can remember, yes.

 2        Q.    And how did Owen Diaz seem to you, relative

 3   to things relating to Hilda?  Did he admit that he had

 4   said things about Hilda and Aaron having some kind of

 5   relationship?

 6        A.    From what I remember, he recognized that he

 7   should have not done that.  Okay?

 8        Q.    Okay.

 9        A.    And, yes, I think he did acknowledge that,

10   you know, he would be more careful in the future about

11   things like that.

12        Q.    Did you give any kind of written verbal

13   warning or written warning to Mr. Diaz, relative to

14   his conduct?

15        A.    I don't recall that.  I can't remember right

16   now.

17        Q.    Did you consider the issue handled at that

18   point, after you and Mr. Salazar talked to Owen about

19   Jesse and Hilda?

20        A.    I think that that specific issue was dealt

21   with, and we do tell them that, you know, we didn't

22   want to revisit that or go back to that, have that

23   happen again, and I think he said that he was going to

24   try not to have it happen again.

25        Q.    And did Jesse complain to you later that it
```

1          MS. ANTONUCCI:  Do you think we could take a
2    quick lunch break or --
3          MR. ORGAN:  Yeah, sure.
4          MS. ANTONUCCI:  Okay.
5          MR. ORGAN:  Let's go off the record.  It's
6    12:28.  We're going off the record.
7               (Lunch recess taken from
8               12:28 p.m. to 1:10 p.m.)
9                    ---oOo---
10              AFTERNOON SESSION
11          EXAMINATION BY MR. ORGAN (Continued)
12          MR. ORGAN:  We're back on the record.  The
13    time is 1:23.
14     Q.   What's the next thing you can remember after
15    this incident with Jesse and Hilda?
16     **A.   I don't know what you mean, "the next thing."**
17     Q.   Yeah, that was a bad question.  Sorry about
18    that.
19          In terms of Mr. Diaz, Owen Diaz, what's the
20    next thing you can recall that was an issue that you
21    had to deal with relative to Owen Diaz?
22     **A.   I don't remember, as far as, like, the**
23    **sequence chronologically.**
24     Q.   Okay.  Well, tell me the other things that
25    you recall.  Even if you can't remember the chronology

1    of them, tell me the other things you remember, in

2    terms of issues that stood out for you, relative to

3    Owen Diaz and any issues relating to the elevators

4    or --

5        A.    He had issues with other departments who made

6    deliveries and pickups at the elevators.   They

7    complained numerous times about him not being

8    cooperative, him not communicating, shutting down.

9    They asked him questions, to the point of saying, "I

10   don't want to talk to you anymore.   From now on, you

11   send emails to me," you know, things like that.

12           I think Joyce De La Grande was the manager of

13   these people, you know, who brought the deliveries to

14   the elevators and picked up, and they continued to

15   complain about his overall attitude; that it was

16   negative.

17       Q.    Did you ever write up Owen Diaz for any of

18   his attitude?

19       A.    For that situation, I don't think I did,

20   okay, because I was listening to both sides.   I was

21   trying to get to the bottom of it.   You know, it was

22   obvious that he wasn't cooperating at times.   I told

23   him, you know, "You need to think about what you do.

24   Just try to, you know, work with them."

25       Q.    Did you ever figure out what was going on

```
 1        A.   No, no, this was after Tesla.  I called to
 2    see how he was doing, and he said, "Oh, by the way,
 3    next Saturday is my birthday.  Do you want to come
 4    by?"  So...
 5        Q.   Okay.  Now, at some point in time you became
 6    aware of some issues between Ramon Martinez and Owen
 7    Diaz; is that correct?
 8        A.   Yes.
 9        Q.   Tell me about that.  What do you recall about
10    that?
11        A.   I think there was an incident where Owen said
12    that Ramon was at the entrance to the elevator, on a
13    tugger, if I remember correctly, and that he got off
14    of the tugger, went in, and -- and this is what Owen
15    was telling me -- and that he was in his face, and he
16    was mad, and he was upset, and he said he felt that
17    that was inappropriate for Ramon to do that.
18        Q.   And did you talk to Ramon about it?
19        A.   No.  He was not my employee.  At that time,
20    Mr. Salazar was their supervisor, so I reported it to
21    him.
22        Q.   Did you ever have a discussion with Jesse
23    Salazar about what he found?
24        A.   Other than just informing him that -- you
25    know, what Owen had said.
```

```
 1        A.    I saw a picture of it.

 2        Q.    And what did you think?  Was it offensive?

 3              MS. ANTONUCCI:  Objection; vague and calls

 4    for a legal conclusion.

 5              MR. ORGAN:  Strike that.

 6        Q.    Did you think that the drawing was offensive?

 7              MS. ANTONUCCI:  Objection; vague, calls for

 8    speculation, legal conclusion.

 9              THE WITNESS:  I would respond by saying that

10    I took it serious that Owen felt offended.

11              MR. ORGAN:  Q.  It was clear to you that Owen

12    felt offended; right?

13        A.    Yes.

14        Q.    Did you actually talk to Owen about it?

15        A.    Yes.

16        Q.    And when Owen talked to you about it, what

17    did he say?

18        A.    He said that during the night, someone had

19    drawn this picture on this pallet of cardboard going

20    down, and that he took offense to it; that he felt bad

21    by -- you know, he didn't know who did it at the time,

22    and I guess after I spoke to him, he spoke to the

23    recycle people, and it came out that Ramon had

24    admitted to drawing the picture.

25        Q.    And what happened next?
```

EDWARD ROMERO
November 30, 2018

**Page 110**

1        **A.     I reported it to Victor Quintero, who was in**

2     **charge of the recycling supervisors, and Ramon, who**

3     **was a supervisor, or is.   I don't know if he still is**

4     **or not.   And then I reported it to Wayne Jackson.**

5        Q.   Did you report the incident to Tesla HR?

6        **A.   I did not.**

7        Q.   Why not?

8        **A.   Because Ramon was not my employee.   I took it**

9     **directly to the manager of the department, and he said**

10    **that he would take care of it.**

11       Q.   Manager of the department being Victor

12    Quintero; correct?

13       **A.   Correct.**

14       Q.   Anything else that you can recall about that

15    interaction, or that incident regarding the picture?

16       **A.   No.**

17       Q.   Do you remember if Owen Diaz said why he was

18    offended by the picture?

19       **A.   I don't recall.**

20       Q.   Owen Diaz made it clear to you, didn't he,

21    that he felt like the picture was targeted to him

22    because he was black; right?

23            MS. ANTONUCCI:   Objection; vague.

24            MR. ORGAN:   Q.   Or African-American.

25       **A.   I know there's a text, a copy of a text that**

1  going to take.  I will send another email on final

2  decision we will make as a group."

3          Were you part of some group that was making a

4  decision about what to do?

5      A.   No.  I had assumed that he was referring to

6  him looking into the matter and Jamie looking into the

7  matter.

8      Q.   And you never conducted any kind of

9  investigation into this issue relating to Judy

10  Timbreza using any kind of racist words or racially

11  offensive remarks towards Owen Diaz; correct?

12      A.   I don't remember.  I don't think I made that

13  type of investigation.  It was kind of -- Tom did

14  something; Jamie did something; they were talking to

15  these people, and we were informed that the people

16  denied hearing those remarks.

17          MR. ORGAN:  Okay.  This will be Exhibit 43.

18          (Whereupon Deposition Exhibit 43

19           was marked for identification.)

20          MR. ORGAN:  Q.  Exhibit 43, for the record,

21  is a one-page document, Bates-stamped Tesla 511.

22      A.   Okay.

23      Q.   Have you seen this email before?

24      A.   I did.

25      Q.   This was an email that you reviewed prior to

EDWARD ROMERO
November 30, 2018

**Page 156**

1    coming today; correct?

2        A.    Yes, mm-hm.

3        Q.    This is an email you sent; is that correct?

4        A.    It is.

5        Q.    Why were you sending this email to Victor

6    Quintero?

7        A.    Just to keep him abreast of the accusations

8    that had come up, okay, and he was the manager, so I

9    felt he needed to know about it.

10        Q.    In your email in Exhibit 43, you say, "We

11    investigated by speaking to all witnesses present, but

12    they said they did not hear the remarks."

13            So you were part of the investigation;

14    correct?

15        A.    Well, as the group effort, yes.

16        Q.    That's why you said "we"; correct?

17        A.    Yes.

18        Q.    And then the next part of that sentence says,

19    "Although more than one person agreed, Mr. Timbreza

20    tendency to kid around excessively."

21        A.    Mm-hm.

22        Q.    So it at least appeared, based on the

23    investigation that was conducted, that Mr. Timbreza

24    had engaged in some inappropriate conduct; correct?

25            MS. ANTONUCCI:  Objection; misstates

1    testimony.  Calls for speculation.

2              THE WITNESS:  What was your question?

3              MR. ORGAN:  Q.  As part of the investigation

4    of the group, the "we" that you refer to here --

5    actually, who are the "we"?

6        A.   Tamotsu, or Tom, okay, Jamie Salazar, were

7    taking the lead on this.

8        Q.   Tom and Jamie were taking the lead?

9        A.   Yes, they were.

10       Q.   What are you looking at there?

11       A.   No, I thought it was something different than

12   this (indicating).

13             MS. ANTONUCCI:  It's the same.

14             THE WITNESS:  It's the same.

15             MR. ORGAN:  Q.  So Tom and Jamie took the

16   lead, but they kept you informed as part of their

17   investigation; correct?

18       A.   Yes, correct.

19       Q.   Did they take notes, do you know?

20       A.   I have no idea if they did.

21       Q.   Did they give you summaries of the

22   information that they learned?

23       A.   I think Jamie Salazar said, "Ed, we talked to

24   these people; they deny every hearing any of that."

25       Q.   They denied hearing the specific racial

1    terms; right?

2        A.   That the witnesses denied hearing any racial

3    slurs being made.

4        Q.   But the witnesses also said that Mr. Timbreza

5    had a tendency to kid around excessively.

6        A.   Correct.

7        Q.   Right?

8             And you had no basis to suggest or think that

9    Owen Diaz was lying about this, did you?

10       A.   No.

11            MS. ANTONUCCI:  Objection; vague.

12            MR. ORGAN:   Q.   In fact, a verbal warning was

13   issued to Mr. Timbreza, wasn't it?

14       A.   It was for his kidding around excessively.

15       Q.   Did it mention anything about racially

16   offensive remarks?

17       A.   I don't think that it did.

18       Q.   Did you see this verbal warning that --

19       A.   I don't remember.

20       Q.   Let me finish the question.

21       A.   Okay.

22       Q.   Did you see the verbal warning that was

23   issued to Mr. Timbreza?

24       A.   I do not remember looking at it.  I can't

25   remember looking at it.

Page 159

```
 1        Q.   Well, you knew about what was in it, though;
 2   right?
 3        A.   Yes.
 4        Q.   Because the two people who looked into it,
 5   Tom and Jamie, they told you about the verbal warning;
 6   right?
 7        A.   I remember Jamie Salazar telling me about it.
 8        Q.   At that point in time, were you Jamie's boss?
 9        A.   I've never been Jamie's boss.
10        Q.   Why were Tom and Jamie talking to you at all
11   about this?
12             MS. ANTONUCCI:  Calls for speculation.
13             THE WITNESS:  I don't know.
14             MR. ORGAN:  Q.  Why were you involved in this
15   investigation in this point in time, if you weren't
16   Tom and Jamie's supervisor?
17        A.   When I got hired -- I'll say it again.
18             When I got hired by nextSource and
19   interviewed by nextSource and Victor Quintero, Victor
20   Quintero must have seen something in me that he
21   thought would be good for Tesla, okay, so I got hired
22   on as a janitorial supervisor.  But being that he felt
23   that he was going to be losing me in the near future
24   in his group, he wanted me to start knowing what they
25   do in recycling and the other janitorial areas.  Okay?
```

```
 1    not a lead or supervisor.
 2         Q.   That's what I said.  I thought I said that.
 3         A.   No, I understood it differently.
 4         Q.   Judy Timbreza was just an elevator operator?
 5         A.   Correct.
 6         Q.   And then Tom Kawasaki was the lead above
 7    Mr. Timbreza; is that correct?
 8         A.   Correct.
 9         Q.   And then Jamie was the supervisor for the
10    elevator operators and the leads; correct?
11         A.   Correct.
12         Q.   So if I have the progression right, you have
13    Timbreza is just an elevator operator, just a worker;
14    right?
15         A.   Yes.
16         Q.   And then his immediate supervisor is Tom
17    Kawasaki --
18         A.   Yes.
19         Q.   -- the lead; correct?
20         A.   Yes.
21         Q.   And then Tom Kawasaki's supervisor is the
22    elevator supervisor, who was Jamie Salazar; is that
23    correct?
24         A.   Yes.
25         Q.   And then who was above Jamie Salazar at that
```

1    point in time?

2         A.    Victor Quintero.

3         Q.    So at this time, when you wrote this email,

4    Victor Quintero was Jamie Salazar's supervisor;

5    correct?

6         A.    Yes.

7         Q.    And then eventually, you took over those

8    supervisor roles when you transitioned to a Tesla

9    employee; is that right?

10        A.    Yes.

11        Q.    Let's go back to this.

12             It says, "We have given Mr. Timbreza a verbal

13   warning and explained his need to treat his fellow

14   team members with dignity and respect."

15             The conclusion was, in the verbal warning,

16   that Mr. Timbreza had not treated his fellow team

17   members with dignity and respect; correct?

18        A.    Yes.

19        Q.    And in fact, if Mr. Timbreza engaged in any

20   similar conduct, he was going to be terminated; right?

21        A.    Yes.

22        Q.    It says here, "We have his signed verbal

23   notice filed in the nextSource office."

24             Do you know what that's referring to?

25        A.    I do not.

```
 1       A.    Yes.
 2             MR. ORGAN:   Let's mark this as Exhibit 53.
 3             (Whereupon Deposition Exhibit 53
 4              was marked for identification.)
 5             MR. ORGAN:   Q.   Exhibit 53, for the record,
 6  is a one-page document, Bates-stamped Tesla 308.
 7             So this was an email that you sent to Victor
 8  Quintero with a copy to Jamie Salazar down at the
 9  bottom.  This is -- I think you've already testified a
10  bit about the tension or problems that were going on
11  between Hilda, Aaron and Jesse and Owen Diaz; correct?
12       A.    Yes.
13       Q.    Does this refresh your recollection on any
14  more details?  Exhibit 53, does it refresh your
15  recollection about any more details?
16       A.    No.   I think it's covered on the things I
17  mentioned before.
18       Q.    In the meeting that you had with Owen Diaz,
19  it says here, down on Number 5, that Mr. Diaz agreed
20  that he needed to stop his conduct and make
21  improvements; right?
22       A.    Yes.
23       Q.    And he said he'd try to take steps to improve
24  his relationship with others, including Jesse; right?
25       A.    Yes.
```

 1      **A.    Hilda was the same person that he had had a**
 2  **problem with two or three weeks prior.**
 3      Q.    Okay.  So it appears, at least as of this
 4  October 15th date, that Hilda and Owen Diaz are
 5  getting along better, doesn't it?
 6      **A.    I had no reason to believe that any further**
 7  **problems had occurred, because I didn't hear of any.**
 8      Q.    And it looks like they are cooperating, Hilda
 9  and Owen are cooperating to try and cover a
10  short-staffing situation; correct?
11      **A.    Yes.  Victor says that he had spoke to Israel**
12  **and Hilda about cooperating, and they agreed.**
13      Q.    Now, at this point in time, October 15th and
14  October 19th, you are now a Tesla employee; correct?
15      **A.    Yes.**
16          MR. ORGAN:  Let's make this next in line,
17  which is 55.
18          (Whereupon Deposition Exhibit 55
19           was marked for identification.)
20          MR. ORGAN:  Q.  Exhibit 55, for the record,
21  is a one-page document.  I can't tell what the Bates
22  number is because that got cut off, but it's a series
23  of emails from October 17th, 2015, until October 19th
24  of 2015, where the subject line is Owen.  And the
25  bottom email, so the first in time is an email from

1    Ramon Martinez to you.

2           Do you see that?

3    A.    Mm-hm.   Yes, I do.

4    Q.    And then there's an email from you to Josue

5    Torres, where you tell Josue that you were going to

6    investigate that then, October 17th; correct?

7    A.    Yes.   Mm-hm.

8    Q.    Now, when you investigated, you actually

9    found that Mr. Diaz was complaining about

10   Mr. Martinez; correct?

11   A.    Ask that question again.

12   Q.    Yeah.

13          Did you investigate this complaint by Ramon

14   Martinez?

15   A.    I don't remember what the investigation

16   outcome was, and I'm being honest.   I don't remember

17   what it was.   Okay?

18   Q.    I understand that.   My question is whether

19   you investigated it or not.

20   A.    I think that I did.

21   Q.    Yeah, because you say here, "I will

22   investigate this today."

23   A.    Correct.

24   Q.    Okay.   When you did investigate, you actually

25   got information that Ramon Martinez had engaged in

1    inappropriate threatening conduct, didn't you?

2         MS. ANTONUCCI:  Objection; misstates prior

3    testimony.  And it's an improper conclusion.

4         THE WITNESS:  I would have to look to see

5    what you're referencing to, because I don't

6    remember -- I can't remember right now, you know, what

7    transpired after this, and who said what.  I don't

8    remember.

9         MR. ORGAN:  Q.  What was your relationship

10   with Ramon Martinez?

11       **A.   I don't know him, other than seeing him as**

12   **part of the recycling team.**

13       Q.   Did you ever socialize with Mr. Martinez?

14       **A.   Never.**

15       Q.   Approximately how old was Ramon Martinez?

16       **A.   My estimated guess would be probably late**

17   **40s.**

18       Q.   You had information that Mr. Martinez did not

19   get along with Mr. Diaz correct?

20        MS. ANTONUCCI:  Objection; calls for

21   speculation.  Vague.

22        THE WITNESS:  Only on the matters that had

23   come to light on them having problems.

24        MR. ORGAN:  Q.  Mr. Martinez, in this email,

25   alleged that Owen Diaz was not acting in a

1   professional way with him; correct?
2         A.    Correct.
3         Q.    And you also had information that Owen Diaz
4   claimed that Mr. Martinez acted in an unprofessional
5   way with Mr. Diaz; correct?
6               MS. ANTONUCCI:  Objection.
7               THE WITNESS:  I think that going on the --
8               MS. ANTONUCCI:  Objection; vague, calls for a
9   legal conclusion, misstates testimony.
10              MR. ORGAN:  Q.  Keep going.  What were you
11  going to say?
12        A.    That's all.
13              MR. ORGAN:  I'm sorry.  Can you read back his
14  answer?
15              (Record read as follows:
16              "ANSWER:  I think that going on the --")
17              MS. ANTONUCCI:  Can you read back the
18  question?
19              MR. ORGAN:  Yes.
20              (Record read as follows:
21              "QUESTION:  And you also had information that
22  Owen Diaz claimed that Mr. Martinez acted in an
23  unprofessional way with Mr. Diaz; correct?
24              "MS. ANTONUCCI:  Objection.
25              "THE WITNESS:  I think that going on the --")

```
1              MR. ORGAN:  Q.  You think what?
2         A.   I don't remember what I was going to say.
3         Q.   Did you get a statement from Ramon Martinez?
4         A.   I don't recall the whole situation; you know,
5    I don't have -- other than this email saying that he's
6    complaining about Owen, I have nothing else to go on.
7              MR. ORGAN:  Okay.  Let's make this 56.
8              (Whereupon Deposition Exhibit 56
9               was marked for identification.)
10             MR. ORGAN:  Q.  Exhibit 56, for the record,
11   is a two-page document, Bates-stamped Tesla 135 and
12   136, and it's a -- something sent from an iPhone to Ed
13   Romero and Tom Kawasaki, from Owen Diaz, at 6:08 a.m.
14             Did you receive this?
15        A.   I remember seeing this, yes.
16        Q.   You understood that Mr. Owen Diaz was
17   complaining that Ramon Martinez had yelled at him in a
18   threatening manner; right?
19        A.   That is what Owen said.
20        Q.   And Owen said -- Owen Diaz also said that he
21   didn't feel safe around Ramon Martinez; right?  Is
22   that right?
23        A.   That's what I understood.
24        Q.   Okay.  And then it says, above that, there's
25   an email from Wayne Jackson, where it says -- this is
```

1   on the first page of Exhibit 56, here is Ramon's

2   statement:  "I'm waiting for Rathaj and Ramon to send

3   me theirs.  Ed has a meeting scheduled with them

4   Wednesday at 6:00 p.m. that I will be attending with

5   them."

6        Did you have a meeting with Rathaj and Ramon

7   and Wayne Jackson?

8        A.   No, I don't think that I did.  I think it was

9   referred to Wayne Jackson.

10       Q.   So when Wayne Jackson says in this email of

11   October 20th, "Ed has a meeting scheduled with them

12   for Wednesday at 6:00 p.m." --

13       A.   I see it.

14       Q.   -- you're saying that meeting didn't occur?

15       A.   I don't remember being in that meeting.

16       Q.   Did you ever get a copy of Ramon's statement?

17       A.   I think I did, and it was forwarded to Wayne

18   Jackson.

19       Q.   Okay.

20       A.   Or given to him.  I don't remember how that

21   was.

22       Q.   You received Ramon's statement, and then you

23   remember forwarding it to Wayne Jackson; is that

24   correct?

25       A.   I think that would have been the action I

EDWARD ROMERO
November 30, 2018

**Page 197**

1  this incident?

2          MS. ANTONUCCI:  Objection; vague.

3          MR. ORGAN:  Q.  I'm just wondering, did it

4  appear to you that Mr. Owen Diaz followed the correct

5  procedure here with respect to this incident and the

6  elevator?

7      **A.   I think that he looked into it appropriately.**

8      Q.   And I guess Rathaj Foster was then

9  terminated; is that right?

10     **A.   I don't recall if he was terminated because**

11 **of this.  This was -- as you notice, it was -- I think**

12 **we included Wayne Jackson as part of this.**

13         MR. ORGAN:  Okay.  Let's make this 64.

14         (Whereupon Deposition Exhibit 64

15          was marked for identification.)

16         MR. ORGAN:  Q.  Exhibit 64, for the record,

17 is a two-page document -- three-page document,

18 Bates-stamped City Staff 11 through 13.  And the

19 subject matter is termination of Rathaj foster.

20         This was Mr. Foster engaged in threatening

21 conduct towards Owen Diaz; right?

22     **A.   Yes.**

23         MS. ANTONUCCI:  Objection; vague.

24         MR. ORGAN:  Q.  Well, that was your

25 understanding; that Rathaj Foster was removed from

EDWARD ROMERO
November 30, 2018

**Page 198**

```
 1    Tesla on November -- I guess it was 5th, because he

 2    was conducting himself in a threatening manner against

 3    Owen Diaz?

 4            MS. ANTONUCCI:  Objection; vague, calls for

 5    speculation.

 6            MR. ORGAN:  Q.  Your understanding -- the

 7    question is, your understanding was that Mr. Foster

 8    had conducted himself in a way where he threatened

 9    Owen Diaz; right?

10            MS. ANTONUCCI:  Take your time to read the

11    document.  Have you read all of it?

12            THE WITNESS:  Did I.

13            MS. ANTONUCCI:  Even the second page?

14            THE WITNESS:  I did, yes.  I did.

15            MS. ANTONUCCI:  Objection; vague, lacks

16    foundation.

17            MR. ORGAN:  Well, let's just establish the

18    foundation.

19        Q.    You wrote that email on Page 2; right?

20        A.    I did.

21        Q.    That's an email you wrote on November 6th at

22    12:12 a.m., to Wayne Jackson; right?

23        A.    Yes.

24        Q.    You copied it to Victor Quintero and Jamie

25    Salazar; right?
```

1     A.     Yes.

2     Q.     And in that, you mentioned that Rathaj Foster

3   had been removed the previous night at 10:00 p.m. from

4   the Tesla premises; right?

5     A.     He was removed to avoid any more friction

6   that day between him and Owen.

7     Q.     Right.

8            And you had -- you first got a report where

9   Mr. Foster was making a claim about not being able to

10  take a break; correct?   That's what Mr. Foster was

11  claiming.

12    A.     He did.   And there's other information that

13  Wayne -- I mean -- Wayne.   And I don't remember where

14  it is, but Owen was -- I don't know if these are

15  referring to the same night, that he asked Rathaj to

16  go -- to wait to take his break.

17    Q.     And that was because they were short-staffed;

18  right?

19    A.     Correct.   It could be that, or it could be

20  that there was a lot of production material to move.

21    Q.     But Owen told you that Mr. Foster said, "You

22  better watch your car," or something like that;

23  correct?

24    A.     He did say that.

25    Q.     And then you interviewed someone else who was

1    present; right?   Jordano Ramirez.

2         A.   Jordan?

3         Q.   If you look at the bottom of the second page

4    of Exhibit 64, you'll see that you interviewed Jordano

5    Ramirez; right?

6         A.   Show me where that's at.

7         Q.   Actually, you've got a written statement from

8    him; correct?

9         A.   Yes.

10        Q.   And he wrote in his statement that he

11   witnessed Rathaj foster conducting himself in a

12   threatening manner towards Owen Diaz; right?

13        A.   Mm-hm.

14        Q.   So you were the one who called security and

15   explained the situation; right?

16        A.   I did.

17        Q.   You were the one that had Mr. Foster removed

18   from the premises; right?

19        A.   Yes.

20        Q.   Because you had corroboration that Mr. Foster

21   was threatening Mr. Diaz; right?

22        A.   Yes.

23        Q.   And that was inappropriate conduct; right?

24        A.   It was.   I took it very serious when anybody

25   made any threats toward anybody else.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBITS TO DEPOSITION OF EDWARD ROMERO

REDACTED – CONDITIONALLY FILED UNDER SEAL

DECLARATION OF JUAN C. ARANEDA IN SUPPORT OF DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION
FP 36147236.1

```
 1   State of California            )
 2   County of Marin                )
 3
 4              I, Bridget M. Mattos, hereby certify
 5   that the witness in the foregoing deposition was by me
 6   duly sworn to testify to the truth, the whole truth
 7   and nothing but the truth in the within entitled
 8   cause; that said deposition was taken at the time and
 9   place herein named; that the deposition is a true
10   record of the witness's testimony as reported to the
11   best of my ability by me, a duly certified shorthand
12   reporter and disinterested person, and was thereafter
13   transcribed under my direction into typewriting by
14   computer; that the witness was given an opportunity to
15   read, correct and sign the deposition.
16              I further certify that I am not
17   interested in the outcome of said action nor connected
18   with or related to any of the parties in said action
19   nor to their respective counsel.
20              IN WITNESS WHEREOF, I have hereunder
21   subscribed my hand on November 30, 2018.
22
23              BRIDGET M. MATTOS, CSR NO. 11410
24
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19    EXHIBIT J
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

DEMETRIC DIAZ, OWEN DIAZ AND       )
LAMAR PATTERSON,                   )
                                   )
                Plaintiffs,        )CASE NO.
                                   )3:17-cv-06748-WHO
        vs.                        )
                                   )
TESLA, INC., DBA TESLA MOTORS,     )
INC.; CITISTAFF SOLUTIONS, INC.;   )
WEST VALLEY STAFFING GROUP;        )
CHARTWELL STAFFING SERVICES,       )
INC.; AND DOES 1-50, INCLUSIVE,    )
                                   )
                Defendants.        )
_____)

VIDEOTAPED DEPOSITION OF TAMOTSU KAWASAKI

DATE:           OCTOBER 9, 2019

TIME:           2:05 P.M.

LOCATION:       CALIFORNIA CIVIL RIGHTS LAW GROUP
                180 GRAND AVENUE, SUITE 1380
                OAKLAND, CALIFORNIA

REPORTED BY:  ANGIE M. MATERAZZI
              Certified Shorthand Reporter
              License No. 13116

 1   He's not a certified court -- videographer.

 2              MR. ARANEDA:  NextSource joins.

 3              MS. KUMAGAI:  Same as CitiStaff.

 4              MR. ORGAN:  Okay.  And I'm Larry Organ for the

 5   Plaintiff.

 6              Will the court reporter please swear the

 7   witness.

 8

 9                      TAMOTSU KAWASAKI

10              _____

11   called as a witness by the Plaintiffs, who, having been

12   first duly sworn, was examined and testified as follows:

13                          --oOo--

14                 EXAMINATION BY MR. ORGAN

15       Q.   Could you please state your full name for the

16   record.

17       **A.   Tamotsu Edwin Kawasaki.**

18       Q.   And you also go by --

19       **A.   Tom.**

20       Q.   -- Tom?

21       **A.   It's just real easier and more American for**

22   **people to pronounce.  I hate when people butch my name,**

23   **so.**

24       Q.   How do you spell --

25       **A.   T-A-M-O-T-S-U, Ta mot su.**

1            In terms of your getting the job at -- at

2    Tesla, it sounds like you applied through Chartwell; is

3    that right?

4        A.   That was the staffing company.  I applied

5    for -- so I had my resume on Indeed and then it pinged

6    and I went for an interview and they told me they had

7    positions open at Tesla.  Okay.  I mean, I -- I'm

8    working for a staffing company, so my employer is not

9    Tesla, though.

10       Q.   Okay.  And how long did you work for Chartwell

11   at the Tesla factory?

12       A.   I want to say roughly 'til mid -- what is it?

13   I've been four-and-a-half years in the union.  What is

14   that?  Roughly 'til -- I guess it had to have been

15   before that.  Roughly 'til 20- -- early 2015, maybe

16   March, April 2015.  I'm not sure.  I was working two

17   jobs at the time.

18       Q.   Okay.

19       A.   So...

20       Q.   What was the other job you were working?

21       A.   So I'm an actual -- I'm in the Plumbers Union,

22   Local 38, San Francisco, so that's the day job and then

23   I was supervisor at night.

24            MS. JENG:  Could you maybe tell us --

25            THE WITNESS:  Local 38, Plumbers Union,

1    guys are coming at me, so.

2        Q.   I understand that.  I -- I appreciate that.

3    Thank you -- thank you for coming today.

4        A.   Uh-huh.

5        Q.   Now, when you started working at the Tesla

6    factory through Chartwell, what -- what was your first

7    job?

8        A.   Cardboard organizer -- I don't know what you

9    would call it.  I was just pretty much throwing

10   cardboard into bails at certain sections in the

11   warehouse and it would be a different section, as

12   staffing needed.

13       Q.   Okay.  And that was in the Recycling

14   Department?

15       A.   Yes.  Environmental Sustainability.

16       Q.   Okay.  So the department you worked in was

17   called Environmental Sustainability.

18       A.   (No audible response.)

19       Q.   And who was your supervisor when you first

20   started?

21       A.   Javi -- Javi.  I think his name is Javi.

22       Q.   Okay.

23       A.   Javier, is his real name, I think.

24       Q.   Do you remember his last name, by any chance?

25       A.   I can look it up on LinkedIn, I think.

TAMOTSU KAWASAKI
October 9, 2019

```
 1        A.   Not in different areas, no.  So I was just a
 2   lead in my area.  So it was just pretty much telling --
 3   letting the bosses know that, hey, this person didn't
 4   show up.
 5        Q.   Okay.
 6        A.   Or we need -- which would be Javi.
 7        Q.   Javi was your boss?
 8        A.   (No audible response.)
 9        Q.   Okay.  And then do you remember who was above
10   Javi?
11        A.   I believe his boss was Victor Quintero.
12        Q.   Okay.  Do you know whether Javi worked for
13   Chartwell too or whether he worked for Tesla?
14        A.   He was a --
15             MS. JENG:   Objection, calls for speculation.
16             THE WITNESS:   He was a Tesla employee.
17   BY MR. ORGAN:
18        Q.   Okay.  So your supervisor, Javi, was a Tesla
19   employee; is that right?
20        A.   Correct.
21        Q.   And how long were you a lead in Environmental
22   Sustainability?
23        A.   From that point on.  I mean, I didn't drop
24   from position.  You don't go backwards, right?
25        Q.   Okay.  Did you get a promotion from the lead
```

Bridget Mattos & Associates
(415) 747-8710

1      Q.    Were any of the people who actually reported

2    to you as the lead, were any of those people regular

3    Tesla employees?

4      **A.    No.**

5      Q.    Okay.  And what was your reporting

6    relationship with Ed Romero?

7      **A.    Ed Romero came in -- as I was promoted to**

8    **elevator lead, he came in and they just told me that he**

9    **was our new middleman, so we go through Ed and then Ed**

10   **would in turn go to Javi or Victor for us.**

11     Q.    Did you know a man named Jaime Salazar?

12     **A.    Oh, so I got the name wrong.  It is Jaime.**

13   **That is his name, Jaime.  It's Jaime Salazar.  That's**

14   **right under -- Victor Quintero.**

15     Q.    That's the --

16     **A.    -- Victor Quintero.  Yes, correct.**

17     Q.    Okay, okay.

18     **A.    Sorry.**

19     Q.    That's okay.  So when you testified Javi, you

20   meant Jaime Salazar; is that right?

21     **A.    Yes, correct.**

22     Q.    Okay.  That's right.  I mean, I -- I have the

23   benefit of having documents, which I know you don't and

24   I know it's been a while, so I appreciate -- appreciate

25   anything you can remember.

**Page  20**

1              Okay.  So -- so throughout the time that you

2    were in Environmental Sustainability, you reported to

3    Jaime Salazar; is that correct?

4         A.    Correct.

5         Q.    And did Mr. Salazar then report up to Victor

6    Quintero?  Do you know what that reporting relationship

7    was?

8         A.    From my knowledge, that was the chain of

9    command.

10        Q.    Okay.

11        A.    It was Jaime and then Victor was above him and

12   then that's as far as I got it.

13        Q.    Okay.

14        A.    Of my knowledge, Victor was the top of

15   Environmental Sustainability.

16        Q.    Okay.  So in terms of the person who was

17   overall in charge of Environmental Sustainability,

18   including the elevator area, that was Victor Quintero,

19   as far as you knew, right?

20        A.    To my knowledge, yes.

21        Q.    And -- and under Victor was Jaime Salazar; is

22   that right?

23        A.    Correct.

24        Q.    And then under Jamie Salazar, Ed Romero came

25   in at some point; is that correct?

1    son got a job here and was working on the production

2    line.  I said, Okay, well, good for you.

3        Q.   Do you know how Mr. Demetric Diaz got a job at

4    Tesla?

5        A.   I do not.

6        Q.   Did Owen ever ask you whether there was job

7    openings at Tesla for either his son or any of his

8    friends?

9        A.   Owen asked how I got in and I told him I got

10   through Chartwell.  I said, If you want a job, go to

11   Chartwell.  If you need somebody that has a job, go to a

12   staffing company, that's who's bringing it in.  I mean,

13   at that -- I think I applied for a actual full-time job

14   at Tesla, but applied online, and didn't get anything,

15   so I --

16       Q.   Do you know who Mr. Judy Timbreza's employer

17   was?

18       A.   I think it was Chartwell, like me, I think.

19   I -- I don't know.  Like I said, those concerns aren't

20   anything to do with me.  That's people's personal lives.

21   I don't know how they get there.

22       Q.   Do you know who Mr. Martinez -- Ramon

23   Martinez's employer was?

24       A.   I -- I'm assuming Chartwell like me.  I --

25   'Til they tell me who their employer is, I'm assuming

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2

 3              I, ANGIE M. MATERAZZI, CSR No. 13116, duly

 4    authorized to administer oaths Pursuant to Section

 5    2093(b) of the California Code of Civil Procedure,

 6    hereby certify that the witness in the foregoing

 7    deposition was by me duly sworn to testify the truth,

 8    the whole truth and nothing but the truth in the

 9    within-entitled cause; that said deposition was taken at

10    the time and place therein stated; that the testimony of

11    the said witness was reported by me and thereafter

12    transcribed by me or under my direction into

13    typewriting; that the foregoing is a full, complete and

14    true record of said testimony; and that the witness was

15    given an opportunity to read and correct said deposition

16    and to subscribe the same.

17              I further certify that I am not of counsel nor

18    attorney for either or any of the parties in the

19    deposition and caption named, or in any way interested

20    in the outcome of the cause named in said caption.

21              I hereby certify this copy is a true and
      exact copy of the original.
22

23                          _____
                            ANGIE M. MATERAZZI, CSR 13116
24

25    Date:  _____
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

               Plaintiffs,

                        No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

               Defendants.

_____/

DEPOSITION OF ANNALISA HEISEN

May 29, 2019

Reported by:

Bridget M. Mattos, CSR No. 11410

ANNALISA HEISEN
May 29, 2019

```
 1              BE IT REMEMBERED that, pursuant to

 2    Notice of Taking Deposition, and on May 29, 2019,

 3    commencing at the hour of TIME a.m., at California

 4    Civil Rights Group, 332 San Anselmo Avenue, San

 5    Anselmo, California 94960, before me, BRIDGET M.

 6    MATTOS, CSR No. 11410, there personally appeared

 7

 8                      ANNALISA HEISEN,

 9

10    called as a witness by Plaintiff, who, having been

11    duly sworn, was examined and testified as is

12    hereinafter set forth.

13                      ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 6**

1  complaint?

2      A.    I don't recall when Mr. Quintero was

3  notified.  I know that nextSource was looped in and

4  that Ed Romero spoke with people in the area during

5  the incident and had gathered information.

6      Q.    Judy Timbreza, was that a Tesla employee, or

7  was Judy Timbreza a contract employee?

8      A.    A contract employee.

9      Q.    And do you know what happened to

10  Mr. Timbreza, in terms of his employment?

11      A.    As far as his employment is concerned?

12      Q.    Yes.

13      A.    I don't know of anything related to this.

14      Q.    Relative to Mr. Owen Diaz's complaint about

15  Mr. Judy Timbreza using an offensive racial comment

16  towards him Mr. Diaz, do you know whether or not that

17  was substantiated or not?

18      A.    My understanding is that the comment wasn't

19  substantiated.  Mr. Romero spoke to witnesses in the

20  area, and none of them could confirm hearing the

21  comment, or they didn't hear the comment.

22      Q.    Do you remember what Judy Timbreza said, in

23  terms of his perspective of the interaction with

24  Mr. Owen Diaz?

25      A.    I didn't see a specific response from Judy.

ANNALISA HEISEN
May 29, 2019

```
 1   State of California              )
 2   County of Marin                  )
 3
 4                 I, Bridget M. Mattos, hereby certify
 5   that the witness in the foregoing deposition was by me
 6   duly sworn to testify to the truth, the whole truth
 7   and nothing but the truth in the within entitled
 8   cause; that said deposition was taken at the time and
 9   place herein named; that the deposition is a true
10   record of the witness's testimony as reported to the
11   best of my ability by me, a duly certified shorthand
12   reporter and disinterested person, and was thereafter
13   transcribed under my direction into typewriting by
14   computer; that the witness was given an opportunity to
15   read, correct and sign the deposition.
16                 I further certify that I am not
17   interested in the outcome of said action nor connected
18   with or related to any of the parties in said action
19   nor to their respective counsel.
20                 IN WITNESS WHEREOF, I have hereunder
21   subscribed my hand on May 29, 2019.
22
23            _____
                 BRIDGET M. MATTOS, CSR NO. 11410
24
25
```

Bridget Mattos & Associates
(415)747-8710

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19          EXHIBIT L
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                    Plaintiffs,

                                        No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                    Defendants.
_____/


DEPOSITION OF LUDIVINA LEDESMA

June 6, 2019


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1              BE IT REMEMBERED that, pursuant to

 2   Notice of Taking Deposition, and on June 6, 2019,

 3   commencing at the hour of 10:37 a.m., at California

 4   Civil Rights Group, 180 Grand Avenue, Oakland,

 5   California, before me, BRIDGET M. MATTOS, CSR No.

 6   11410, there personally appeared

 7

 8                       LUDIVINA LEDESMA,

 9

10   called as a witness by Plaintiff, who, having been

11   duly sworn, was examined and testified as is

12   hereinafter set forth.

13                       ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE WITNESS:  Correct.
 2              MR. ORGAN:  Q.  As far as you understand it,
 3  Mr. Diaz complied with CitiStaff's complaint policy
 4  relative to his complaint about that drawing; correct?
 5       A.   Repeat the question again.
 6              MR. ORGAN:  Could you read it back, please.
 7              (Record read as follows:
 8              "QUESTION:  As far as you understand it,
 9  Mr. Diaz complied with CitiStaff's complaint policy
10  relative to his complaint about that drawing;
11  correct?")
12              THE WITNESS:  Correct.
13              MR. ORGAN:  Q.  In terms of the reason why
14  Owen Diaz's employment ended with CitiStaff?
15       A.   His employment has not ended with CitiStaff.
16       Q.   That was going to be my question.  You beat
17  me to the punch, but okay.  Maybe we should switch
18  spots.  You should start asking the questions.
19              And I believe when we were going through the
20  policies, practices and procedures for promoting
21  employees, your testimony is that it's the CEO that
22  makes those decisions; correct?
23       A.   Correct.
24       Q.   For CitiStaff.
25              Okay.  Did you have any interaction
```

LUDIVINA LEDESMA
June 6, 2019

```
1    State of California              )
2    County of Marin                  )
3
4              I, Bridget M. Mattos, hereby certify
5    that the witness in the foregoing deposition was by me
6    duly sworn to testify to the truth, the whole truth
7    and nothing but the truth in the within entitled
8    cause; that said deposition was taken at the time and
9    place herein named; that the deposition is a true
10   record of the witness's testimony as reported to the
11   best of my ability by me, a duly certified shorthand
12   reporter and disinterested person, and was thereafter
13   transcribed under my direction into typewriting by
14   computer; that the witness was given an opportunity to
15   read, correct and sign the deposition.
16             I further certify that I am not
17   interested in the outcome of said action nor connected
18   with or related to any of the parties in said action
19   nor to their respective counsel.
20             IN WITNESS WHEREOF, I have hereunder
21   subscribed my hand on June 6, 2019.
22
23             BRIDGET M. MATTOS, CSR NO. 11410
24
25
```

Bridget Mattos & Associates
(415)747-8710