*Di-az et al v. Tesla, Inc. et al*
U.S. District Court for the Northern District of California
Case No. 17-cv-06748-WHO

# EXHIBIT 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

      Plaintiffs,

    vs.              No. 3:17-cv-06748-WHO

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; and DOES 1-50,
inclusive,

      Defendants.
_____//


           DEPOSITION OF EDWARD ROMERO

              November 30, 2018


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1   you had to take that training?
 2       A.   No, I can't remember the specifics, other
 3   than that they wanted me to take it.
 4       Q.   How many employees did you oversee when you
 5   were the janitorial supervisor for nextSource?
 6       A.   I think it was approximately --
 7            MS. ANTONUCCI:  Objection; lacks foundation.
 8            THE WITNESS:  I don't remember the head
 9   count.  I can give you an average head count.  It was
10   probably 35 to 40 people.  It fluctuated depending on
11   vacancies, people leaving and coming, and so on.
12            MR. ORGAN:  Q.  And in terms of your
13   supervising those 35 to 40 people when you were
14   nextSource's janitorial supervisor, could you assign
15   those people where they worked?
16       A.   Yes, because I was their direct supervisor at
17   nextSource.
18       Q.   And could you tell them how to do their job?
19       A.   I was expected to.
20       Q.   Did you have any say in how they were
21   evaluated as employees?
22       A.   Yes.
23       Q.   Could you hire them?
24       A.   No.
25       Q.   Could you fire them?
```

1       **A.    No.**

2       Q.    Could you recommend that they be hired or
3    fired?

4             MS. ANTONUCCI:  Objection; vague.

5             THE WITNESS:  I think as people came and
6    left, we -- I would only tell nextSource we have this
7    vacancy, and they would go out and hire the
8    individuals.

9             MR. ORGAN:  I see.  Okay.

10      Q.    We already talked, I think, a little bit.
11   You did monitor your employees to make sure that they
12   were following the Tesla PPE requirements; right?

13      **A.    Yes.**

14      Q.    And you said that you also had
15   responsibilities as a supervisor to make sure that
16   they weren't engaging in inappropriate conduct; is
17   that true?

18      **A.    Could you repeat that again?**

19      Q.    Yeah, let me rephrase it.

20            When you were the janitorial supervisor for
21   nextSource, you understood it to be one of your
22   supervisorial duties to ensure that employees did not
23   engage in any kind of racially discriminatory conduct;
24   right?

25      **A.    It was a given that we were to observe the**

```
 1      A.   No, no, this was after Tesla.  I called to
 2   see how he was doing, and he said, "Oh, by the way,
 3   next Saturday is my birthday.  Do you want to come
 4   by?"  So...
 5      Q.   Okay.  Now, at some point in time you became
 6   aware of some issues between Ramon Martinez and Owen
 7   Diaz; is that correct?
 8      A.   Yes.
 9      Q.   Tell me about that.  What do you recall about
10   that?
11      A.   I think there was an incident where Owen said
12   that Ramon was at the entrance to the elevator, on a
13   tugger, if I remember correctly, and that he got off
14   of the tugger, went in, and -- and this is what Owen
15   was telling me -- and that he was in his face, and he
16   was mad, and he was upset, and he said he felt that
17   that was inappropriate for Ramon to do that.
18      Q.   And did you talk to Ramon about it?
19      A.   No.  He was not my employee.  At that time,
20   Mr. Salazar was their supervisor, so I reported it to
21   him.
22      Q.   Did you ever have a discussion with Jesse
23   Salazar about what he found?
24      A.   Other than just informing him that -- you
25   know, what Owen had said.
```

```
 1      Q.   Okay.  Did Mr. Salazar get back to you and
 2   let you know what he discovered?
 3      A.   He did not.  It was reported to them, and I
 4   assumed that they handled it.
 5      Q.   Well, Owen actually said that Ramon had
 6   threatened him, right, physically threatened him?
 7           MS. ANTONUCCI:  Objection; vague.
 8           THE WITNESS:  He said that Ramon had gone off
 9   the tugger, went into the elevator, and they were --
10   he was in his face.  That's the expression he used.
11           MR. ORGAN:  Q.  So Owen didn't tell you he
12   felt threatened by Ramon Martinez?
13      A.   I don't remember him saying that.
14      Q.   Okay.  Do you remember any other interactions
15   between Ramon Martinez and Owen Diaz?
16      A.   One other incident.
17      Q.   And what was the other incident?
18      A.   The incident had to do with a drawing that
19   was put on a pallet of cardboard that was coming down
20   from the second floor to the first floor.  Owen, if I
21   recall, sent me an email and then called me, like,
22   early the next morning, after this happened, and said
23   that somebody had drawn a picture of something on a
24   pallet, and he was offended by it.
25      Q.   Did you actually see the drawing?
```

1  **I was going to be their supervisor.  I never told**
2  **anyone, but I did get the email.**
3       Q.   You did get the email in Exhibit 42?
4       **A.   Mm-hm.  Yes.  I got this portion here.**
5       Q.   Right.  And did you forward it to anyone?
6       **A.   No.  I talked to Jamie Salazar about it.**
7       Q.   And have you already told me about your
8  conversation with Jamie?
9       **A.   Other than telling them that I had received**
10 **this information from Tamotsu and that there were**
11 **these.**
12      Q.   Okay.  Is this the only email you received
13 from Tom Kawasaki about the incident between Owen
14 and --
15      **A.   It's the only one that I can recall.**
16      Q.   Okay.  Did you review this document before
17 you testified for your deposition?
18      **A.   Only this portion here (indicating).**
19      Q.   Just the lower portion?
20      **A.   Correct.**
21      Q.   From Tom Kawasaki to you.
22      **A.   Right.**
23      Q.   Okay.  Where Tom says to you, "We are in the
24 process of reviewing all statements made in this
25 situation, and are figuring out what steps we are

```
 1   terms; right?
 2       A.   That the witnesses denied hearing any racial
 3   slurs being made.
 4       Q.   But the witnesses also said that Mr. Timbreza
 5   had a tendency to kid around excessively.
 6       A.   Correct.
 7       Q.   Right?
 8            And you had no basis to suggest or think that
 9   Owen Diaz was lying about this, did you?
10       A.   No.
11            MS. ANTONUCCI:  Objection; vague.
12            MR. ORGAN:  Q.  In fact, a verbal warning was
13   issued to Mr. Timbreza, wasn't it?
14       A.   It was for his kidding around excessively.
15       Q.   Did it mention anything about racially
16   offensive remarks?
17       A.   I don't think that it did.
18       Q.   Did you see this verbal warning that --
19       A.   I don't remember.
20       Q.   Let me finish the question.
21       A.   Okay.
22       Q.   Did you see the verbal warning that was
23   issued to Mr. Timbreza?
24       A.   I do not remember looking at it.  I can't
25   remember looking at it.
```

1    Q.   And the reason that you were giving a warning
2  to Judy Timbreza is because you came to the conclusion
3  that he had engaged in conduct that was not treating
4  his fellow team members with dignity and respect;
5  right?
6    **A.   Yes.**
7    Q.   And then it says, "Please call me in the
8  morning after 9:00 a.m. so we can discuss."
9         Did you ever have a follow-up discussion
10 with --
11   **A.   I don't remember if I did.  I can't recall**
12 **the conversation.  It might not have taken place; I**
13 **don't know.**
14   Q.   Well, if it says here, "I tried calling you,
15 but I believe I have the wrong numbers.  Both say your
16 phone is out of service."
17        Okay.  Maybe that's your phone number that's
18 blacked out there.
19   **A.   I don't know.**
20        MR. ORGAN:  This is Exhibit 45.
21        (Whereupon Deposition Exhibit 45
22         was marked for identification.)
23        MR. ORGAN:  Q.  Exhibit 45, for the record,
24 is a one-page document, Bates-stamped Tesla 513, and
25 it's a copy of Exhibit 43 with a response from Victor

 1    **A.    Hilda was the same person that he had had a**
 2   **problem with two or three weeks prior.**
 3        Q.   Okay.  So it appears, at least as of this
 4   October 15th date, that Hilda and Owen Diaz are
 5   getting along better, doesn't it?
 6        **A.    I had no reason to believe that any further**
 7   **problems had occurred, because I didn't hear of any.**
 8        Q.   And it looks like they are cooperating, Hilda
 9   and Owen are cooperating to try and cover a
10   short-staffing situation; correct?
11        **A.    Yes.  Victor says that he had spoke to Israel**
12   **and Hilda about cooperating, and they agreed.**
13        Q.   Now, at this point in time, October 15th and
14   October 19th, you are now a Tesla employee; correct?
15        **A.    Yes.**
16             MR. ORGAN:  Let's make this next in line,
17   which is 55.
18             (Whereupon Deposition Exhibit 55
19              was marked for identification.)
20             MR. ORGAN:  Q.  Exhibit 55, for the record,
21   is a one-page document.  I can't tell what the Bates
22   number is because that got cut off, but it's a series
23   of emails from October 17th, 2015, until October 19th
24   of 2015, where the subject line is Owen.  And the
25   bottom email, so the first in time is an email from

1    Ramon Martinez to you.
2            Do you see that?
3    **A.   Mm-hm.  Yes, I do.**
4    Q.   And then there's an email from you to Josue
5    Torres, where you tell Josue that you were going to
6    investigate that then, October 17th; correct?
7    **A.   Yes.  Mm-hm.**
8    Q.   Now, when you investigated, you actually
9    found that Mr. Diaz was complaining about
10   Mr. Martinez; correct?
11   **A.   Ask that question again.**
12   Q.   Yeah.
13           Did you investigate this complaint by Ramon
14   Martinez?
15   **A.   I don't remember what the investigation**
16   **outcome was, and I'm being honest.  I don't remember**
17   **what it was.  Okay?**
18   Q.   I understand that.  My question is whether
19   you investigated it or not.
20   **A.   I think that I did.**
21   Q.   Yeah, because you say here, "I will
22   investigate this today."
23   **A.   Correct.**
24   Q.   Okay.  When you did investigate, you actually
25   got information that Ramon Martinez had engaged in

```
 1            MR. ORGAN:  Q.  You think what?
 2       A.   I don't remember what I was going to say.
 3       Q.   Did you get a statement from Ramon Martinez?
 4       A.   I don't recall the whole situation; you know,
 5  I don't have -- other than this email saying that he's
 6  complaining about Owen, I have nothing else to go on.
 7            MR. ORGAN:  Okay.  Let's make this 56.
 8            (Whereupon Deposition Exhibit 56
 9             was marked for identification.)
10            MR. ORGAN:  Q.  Exhibit 56, for the record,
11  is a two-page document, Bates-stamped Tesla 135 and
12  136, and it's a -- something sent from an iPhone to Ed
13  Romero and Tom Kawasaki, from Owen Diaz, at 6:08 a.m.
14            Did you receive this?
15       A.   I remember seeing this, yes.
16       Q.   You understood that Mr. Owen Diaz was
17  complaining that Ramon Martinez had yelled at him in a
18  threatening manner; right?
19       A.   That is what Owen said.
20       Q.   And Owen said -- Owen Diaz also said that he
21  didn't feel safe around Ramon Martinez; right?  Is
22  that right?
23       A.   That's what I understood.
24       Q.   Okay.  And then it says, above that, there's
25  an email from Wayne Jackson, where it says -- this is
```

```
 1      Q.   During any of the conduct that you observed
 2   or recall, did you ever hear that Mr. Owen Diaz made a
 3   physical threat to anyone else?
 4      A.   At this moment, I cannot recall.
 5           MR. ORGAN:  Let's go to the next.  This will
 6   be Exhibit 65.
 7           (Whereupon Deposition Exhibit 65
 8            was marked for identification.)
 9           MR. ORGAN:  Q.  Exhibit 65, for the record,
10   is a two-page document, Bates-stamped Tesla 127 and
11   128.  And it's a series of emails that includes emails
12   from Exhibit 64, and then there's an email exchange
13   where Victor Quintero tells you on November 6, on the
14   first page, "Good job, Ed.  You handled the issue
15   appropriately.  I agree, the employee should not be
16   allowed to return."
17      A.   Could you please show me what section you're
18   at?
19      Q.   Right there, first page.  And then you said,
20   "Thank you.  I agree."
21      A.   All right.
22      Q.   So both you and Victor Quintero were agreed
23   that Mr. Foster should have been removed from the
24   premises; right?
25      A.   Yeah.
```

```
 1    State of California              )
 2    County of Marin                   )
 3
 4                I, Bridget M. Mattos, hereby certify
 5    that the witness in the foregoing deposition was by me
 6    duly sworn to testify to the truth, the whole truth
 7    and nothing but the truth in the within entitled
 8    cause; that said deposition was taken at the time and
 9    place herein named; that the deposition is a true
10    record of the witness's testimony as reported to the
11    best of my ability by me, a duly certified shorthand
12    reporter and disinterested person, and was thereafter
13    transcribed under my direction into typewriting by
14    computer; that the witness was given an opportunity to
15    read, correct and sign the deposition.
16                I further certify that I am not
17    interested in the outcome of said action nor connected
18    with or related to any of the parties in said action
19    nor to their respective counsel.
20                IN WITNESS WHEREOF, I have hereunder
21    subscribed my hand on November 30, 2018.
22
                    _____
23                     BRIDGET M. MATTOS, CSR NO. 11410
24
25
```