*Di-az et al v. Tesla, Inc. et al*
U.S. District Court for the Northern District of California
Case No. 17-cv-06748-WHO

# EXHIBIT 13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

        Plaintiffs,

                      No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

        Defendants.
_____/


DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019


Reported by:  Patricia Rosinski, CSR #4555




Job No. 13571

1	A.	I don't know.
2	Q.	Okay.  Going back to Mr. Diaz's complaint about
3	the jigaboo, what did you do to investigate that
4	incident?
5	A.	If I recall correctly, I got statements.  I got
6	photographs of the drawing.  I alerted Chartwell -- I
7	believe it was Chartwell.  It might have been CitiStaff;
8	I can't remember.
9		Like I say, we had contractors from different
10	suppliers.
11	Q.	Sure.
12	A.	And I alerted the manager for Tesla over that
13	area, which was Victor Quintero.
14	Q.	Owen Diaz worked for CitiStaff.
15		Do you remember that?
16	A.	I don't recall if it was CitiStaff or
17	Chartwell.  Like I said, we had several suppliers, so...
18	It's been three, four years, so I couldn't tell you
19	exactly which one.
20	Q.	Do you remember the person who put up the
21	jigaboo drawing was Ramon Martinez?
22	A.	Yes.  I believe so, yes.
23	Q.	In addition to getting statements from
24	Mr. Martinez and Mr. Diaz, did you get statements from
25	anybody else other than those two?

```
 1        A.    I believe --
 2        Q.    Well, let me --
 3        A.    I don't recall.
 4        Q.    Let me just --
 5        A.    I don't recall.
 6        Q.    Let me -- I forgot -- let me ask the
 7   preliminary question:  Did you get statements from
 8   Ramon Martinez and Owen Diaz, do you recall?
 9        A.    Actually, I believe I referred them both to
10   their agencies.
11        Q.    Okay.
12        A.    If I'm not mistaken.
13        Q.    Okay.  Do you recall seeing statements -- a
14   statement from Ramon Martinez relative to the jigaboo
15   poster?
16        A.    I don't recall.
17        Q.    Do you recall seeing any statement from
18   Owen Diaz relative to the jigaboo poster?
19        A.    I also don't recall.  I'm sure I did, but I
20   don't recall.
21        Q.    When I say "poster," I mean a drawing.
22              It was actually a drawing on the cardboard;
23   right?
24        A.    Yes, sir.
25        Q.    Did you review any documents to get ready for
```

```
 1    doing disciplinary or things of that nature, if I'm not
 2    mistaken.
 3            MR. ORGAN:  Q.  So your understanding of
 4    Ed Romero's tasks, though, relative to the elevator
 5    operators was that he could do scheduling, right --
 6        A.   Yes, sir.
 7        Q.   -- for them, and that Mr. Romero would at least
 8    direct their work; right?
 9        A.   Yes, sir.
10        Q.   How would discipline towards contract employees
11    take place, then, typically?
12        A.   If there was a complaint, I would alert their
13    agency of the complaint.
14        Q.   And then it was up to the agency to do the
15    disciplinary action.
16            Is that right?
17        A.   Yes, sir.  Whether they were terminated, I
18    couldn't terminate.  They weren't my employees.
19        Q.   I see.
20        A.   Yeah.
21        Q.   Could you recommend termination for people?
22        A.   I mean, I can make a recommendation, but it
23    wasn't -- the final decision wasn't mine.
24        Q.   I see.
25            Then in terms of Tesla's role in any kind of
```

```
 1        A.    Jaime, yes.
 2        Q.    Was that Jaime Salazar?
 3        A.    Yes, I believe that was his name.
 4        Q.    We know it's not Jaime Lannister from Game of
 5     Thrones.
 6        A.    I'm a GOT fan.
 7        Q.    Are ya?
 8        A.    Yes.
 9        Q.    What do you think of that last episode?  Have
10     you seen it?
11        A.    I think it cost her the throne.
12        Q.    Well, just one left, so...
13              Okay.  We are at 123?
14              THE REPORTER:  We are.
15              (Whereupon, Plaintiffs' Exhibit 123 was marked
16              for identification and is attached hereto.)
17              MR. ORGAN:  Now, this is 123.  It's a two-page
18     document Bates-stamped TESLA-629 and 630.
19              (Document reviewed by the deponent.)
20              MR. ORGAN:  Q.  And I guess there's some, well,
21     information about recruiting, and then there's some
22     discussion about a Ramon Martinez/Owen Diaz incident.
23              Is that right?
24        A.    Yes, sir.
25        Q.    And this is the -- so in October of 2015, you
```

Page 59

1   became aware of an incident between Mr. Martinez and
2   Mr. Diaz.
3           Is that correct?
4      A.   Yes, sir.  I was -- honestly, I was still in a
5   recruiter's role at that point.  They hadn't
6   transitioned me over as of yet.
7      Q.   I see.
8      A.   So I was kind of trying to fill two roles at
9   once.
10     Q.   Wearing two hats?
11     A.   Yes, sir.
12     Q.   Do you remember any of the details of what the
13  issue was?
14     A.   If I'm not mistaken, there was some type of
15  verbal altercation.
16     Q.   Mr. Martinez worked in recycling.
17          Is that right?
18     A.   Yes, sir.
19     Q.   And Mr. Diaz worked as one of the elevator --
20     A.   Yes.
21     Q.   -- operators?
22     A.   Yes, sir.
23     Q.   Do you remember what the nature of the verbal
24  altercation was in this October 2015 time period?
25     A.   I could not tell you the details, to be honest,

1    I -- it's been so long. I remember it was something to
2    the effect they were trying to move some recycling
3    material in the elevators, and I guess there was -- I
4    don't know what -- I can't remember what it was, but
5    Ramon and Mr. Diaz got into a verbal altercation over
6    the use of the elevator.
7        Q.   Did you do an investigation into that incident?
8        A.   Like I said, I was just starting in that role,
9    so it wasn't really my role to do that at that point. I
10   was still, honestly, a recruiter.
11       Q.   Okay.
12       A.   I asked Miss Garrett what did she want me to
13   do. I believe we got statements from each of them, and
14   I let the -- let the agencies handle it from there.
15       Q.   Do you know who a Deb Gryske is?
16       A.   Yes, she was a -- I can't remember her role at
17   nextSource. More of a technology person.
18       Q.   Okay.
19            We're going to -- this is Exhibit 124?
20            THE REPORTER:  Yes.
21            (Whereupon, Plaintiffs' Exhibit 124 was marked
22            for identification and is attached hereto.)
23            (Document reviewed by the deponent.)
24            MR. ORGAN:  Exhibit 124, for the record, is a
25   two-page document Bates-stamped TESLA-635 and 636.

1    Q.   And it references your -- it says you're
2    actually on the phone doing the investigation of the
3    Ramon/Owen incident.
4    **A.   I was probably on the phone with Chartwell, I**
5    **would assume, at that time.**
6    Q.   Chartwell was the contractor that was employing
7    Mr. Martinez.
8         Is that right?
9    **A.   Yes, it was either Chartwell or CitiStaff.  I**
10   **can have been talking to both of them.**
11   Q.   Okay.
12   **A.   I was just more or less alerting them as to**
13   **what was going on.**
14   Q.   Okay.  Do you remember who you were talking to
15   at Chartwell?
16   **A.   Most likely it was Veronica and at CitiStaff --**
17   **I can't think of the lady's name at Citistaff.  She was**
18   **very difficult to reach.**
19   Q.   Okay.  Let's see.
20        (Whereupon, Plaintiffs' Exhibit 125 was marked
21        for identification and is attached hereto.)
22        MR. ORGAN:  Exhibit 125, for the record, is a
23   one-page document Bates-stamped TESLA- -- I think
24   it's -- 644.  It's either 644 or 611.  But, anyway,
25   they're emails from October 17th and October 19th of

```
 1    instructed by Victor."
 2        Q.    Okay.  And, then, in terms of any discussions
 3    that you had with Ed Romero, do you recall any
 4    discussions with Ed about this altercation between
 5    Mr. Diaz and Martinez?
 6        A.    I'm sure I did, but I can't recall what the
 7    details were, to be honest.
 8        Q.    What was the ultimate outcome of this
 9    investigation that you did into 126 -- into the
10    information in Exhibit 126?  Do you remember?
11        A.    I don't recall.  I believe it was a -- a
12    warning was issued.  Yeah, I believe so.
13        Q.    Was a warning issued to Mr. Martinez, then?
14        A.    I don't recall.  I think it was both in the
15    sense if I -- I can't even remember because, like I
16    said, Mr. Diaz had -- the timing is probably what's
17    throwing me off a little bit.
18              But he had a few interactions with employees
19    where he was pretty aggressive, I guess you could say,
20    and we probably verbally counseled both of them to --
21    to, you know, more or less, play nice with each other in
22    the sandbox.
23        Q.    And do you think -- if you go back to
24    Exhibit 125 where Mr. Ramon Martinez has that email on
25    October 17th at 4:56 a.m., do you recall that
```

```
 1                (Document reviewed by the deponent.)
 2                MR. ORGAN:   Exhibit 128, for the record, is a
 3      multiple-page document Bates-stamped TESLA-20 to 24.
 4      And it starts with a picture on 23.  And then there's an
 5      email from January 21st, January 22nd, I guess, and then
 6      it ends on January 22nd, so...
 7                (Document reviewed by the deponent.)
 8                MR. ORGAN:   Q.   The picture that is TESLA-23,
 9      is that one of the pictures that you saw, the big
10      jigaboo picture we were talking about before?
11         A.     Yes, sir.
12         Q.     And then there's another -- there's a wider
13      picture of a drawing on TESLA-22 in Exhibit 128.
14                And do you recognize that, too?
15         A.     Yes, sir.
16         Q.     Both of those pictures of the drawings were
17      provided to you at some point.
18                Is that right?
19         A.     Yes, sir.
20         Q.     And it shows here that Mr. Diaz informed
21      Mr. Romero of the racist effigy and drawing on or about
22      January 22nd of 2016, and then it was forwarded also to
23      you by Mr. Diaz.
24                Do you see that?
25         A.     Uh-hum.
```

Page 74

1         -- and then Erin Marconi?
2    **A.   Yes, sir.**
3    Q.   There are three recommendations -- or there are
4    three items that are identified as important here in
5    Exhibit 128.
6         Did you yourself talk to Ramon about --
7    Ramon Martinez about in terms of there's no further room
8    for error?
9    **A.   Yes, sir.**
10   Q.   So you yourself had a conversation with
11   Mr. Martinez; correct?
12   **A.   Yes, I did have a conversation with**
13   **Mr. Martinez, and I also referred him to his agency who**
14   **also had a more in-depth conversation with him.**
15   Q.   In the conversation that you had with
16   Mr. Martinez, you made it clear to Mr. Martinez that you
17   thought that the jigaboo drawing was inappropriate;
18   right?
19   **A.   Yes, sir.**
20   Q.   And you also made it clear to Mr. Martinez that
21   you thought the jigaboo poster was offensive to
22   African-Americans; right?
23   **A.   Yes, sir.**
24   Q.   In terms of Mr. Martinez's response, what was
25   his response when you told him that it was offensive to

```
 1      you told Mr. Quintero?
 2          A.   Yes, sir.
 3          Q.   And then Mr. Quintero -- and then I think at
 4      some point, you suggested what about a suspension?
 5          A.   Uh-hum.
 6          Q.   Is that what happened?
 7          A.   Yes, sir.
 8          Q.   And then Mr. Quintero agreed to the suspension
 9      and the final written warning.
10               Is that right?
11          A.   Yes, sir.
12          Q.   And then Mr. Quintero recommended to -- I guess
13      it was Chartwell that had Mr. Martinez; right?
14          A.   I believe so, yes, sir.
15          Q.   So Mr. Quintero recommended a suspension and
16      final written warning and Chartwell agreed with that;
17      right?
18          A.   Yes, sir.
19          Q.   Okay.
20          A.   They actually issued that to him.  It was an
21      unpaid suspension.
22          Q.   Right.  I think a three-day suspension.
23               Is that right?
24          A.   It was either three or five; I'm not sure.  I
25      can't recall.
```

```
 1      A.    He didn't really specifically say that, that I
 2   could recall, but he did say it was inappropriate.
 3      Q.    Okay.  And then there's a reference here to
 4   Josue?
 5      A.    Josue, yes.
 6      Q.    Was Josue with Tesla or who was he with?
 7      A.    Tesla.
 8      Q.    Do you remember what Josue's position was?
 9      A.    I don't know.  It was more of a -- I don't know
10   if it was a supervisor or a manager of the recycling
11   area.
12      Q.    And Josue -- he also agreed that the jigaboo
13   drawing was inappropriate; right?
14      A.    Yes.
15      Q.    Did Josue say anything about in terms of what
16   he thought was the appropriate remedy?
17      A.    No, he was never really included in that
18   portion of it.
19      Q.    Okay.
20            130?
21            THE REPORTER:  Yes.
22            (Whereupon, Plaintiffs' Exhibit 130 was marked
23            for identification and is attached hereto.)
24            MR. ORGAN:  Exhibit 130, for the record, is a
25   five-page document Bates-stamped TESLA-4 to 8, and it
```

Page 93

```
 1     starts with the jigaboo drawing -- pictures of the
 2     jigaboo drawing and Mr. Diaz's complaint.  Those are the
 3     last four pages of the -- five pages of that, and then
 4     there's an email on the first page.
 5               (Document reviewed by the deponent.)
 6               THE WITNESS:  Yes, sir.
 7               MR. ORGAN:  Q.  And the email on the first page
 8     is an email from you to Veronica Martinez at Chartwell.
 9          A.   Uh-hum.
10          Q.   Was Ms. Martinez -- Veronica Martinez, was she
11     sort of a contact person that you had in Chartwell?
12          A.   Yes, sir.
13          Q.   And do you remember what Ms. Martinez's role
14     was at Chartwell?
15          A.   I believe she was the manager of that
16     particular branch.
17          Q.   Did you ever get from Chartwell what their
18     policy was regarding discrimination?
19          A.   I did not, but I'm sure Ms. Garrett had to have
20     gotten that as part of the contract.
21          Q.   So Terri Garrett did further liaison, then,
22     with Chartwell.
23               Is that right?
24          A.   She did all the contracts and such with any of
25     the agencies that we worked with.
```

Page 94

```
 1                    REPORTER'S CERTIFICATE
 2      STATE OF CALIFORNIA         )
                                    ) ss.
 3      COUNTY OF MARIN             )
 4              I, PATRICIA ROSINSKI, hereby certify:
 5              That I am a Certified Shorthand Reporter in the
 6      State of California.
 7              That prior to being examined, WAYNE JACKSON,
 8      the witness named in the foregoing deposition, was by me
 9      duly sworn to testify the truth, the whole truth, and
10      nothing but the truth;
11              That said deposition was taken pursuant to
12      Notice of Deposition and agreement between the parties
13      at the time and place therein set forth and was taken
14      down by me in stenotype and thereafter transcribed by me
15      by computer and that the deposition is a true record of
16      the testimony given by the witness.
17              I further certify that I am neither counsel for
18      either, nor related in any way to any party to said
19      action, nor otherwise interested in the result or
20      outcome thereof.
21              Pursuant to Federal Rules of Civil Procedure,
22      Rule 30(e), review of the transcript was not requested
23      before the completion of the deposition.
                                    _____
24                      PATRICIA ROSINSKI, CSR No. 4555
25                             May 28, 2019
```