LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
NAVRUZ AVLONI (SBN 279556)
navruz@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:    (415)-453-7352
Facsimile:    (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
**ALEXANDER KRAKOW + GLICK LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:    (310) 394-0888
Facsimile:    (310) 394-0811

Attorneys for Plaintiffs,
DEMETRIC DI-AZ and OWEN DIAZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON,<br><br>             Plaintiffs,<br><br>    v.<br><br>TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive,<br><br>             Defendants. | Case No. 3:17-cv-06748-WHO<br><br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CLAIMS FOR UNRUH CIVIL RIGHTS ACT AND PUNITIVE DAMAGES**<br><br>Date: December 18, 2019<br>Time: 2:00 p.m.<br>Courtroom: 2, 17th Floor<br>Judge: Hon. William H. Orrick<br><br>Trial Date: March 2, 2020<br>Complaint filed: October 16, 2017 |

I. **SUMMARY OF ARGUMENT**

Plaintiffs Owen Diaz ("Owen") and Demetric Di-az ("Demetric") were subjected to vitriolic racial harassment at Defendant Tesla's Fremont factory. Tesla created a hostile work environment based on race, by allowing rampant use of racial epithets, racist graffiti, and personal race-based attacks inside the workplace. Tesla achieved this by (1) performing inadequate investigations of harassment complaints, (2) failing to take appropriate corrective action against harassers, and (3) relegating management of its workforce to multiple unregulated staffing companies. While Tesla's written policies profess to maintain a "zero tolerance" workplace free of discrimination and retaliation, in practice, supervisors make racially intolerant or indifferent decisions without guidance from Tesla human resources, and fail to correct racially discriminatory conduct.  In effect, Tesla supervisors or staffing companies make *ad hoc* decisions which perpetuate a cesspool of racial discrimination at Tesla's Fremont factory.

Though the work environment in the Tesla factory is a cesspool of unregulated racial harassment, Tesla moves for summary judgment to preclude Plaintiffs from seeking punitive damages. The evidence demonstrates that Tesla did not follow its written antidiscrimination policies. The *de facto* corporate polices in its factory tolerated and encouraged racial harassment.

Tesla allowed managers, supervisors, and staffing companies to make *ad hoc* decisions about whether to enforce Tesla's policies.  Indicative of this, Tesla manager Victor Quintero knew about harassment Plaintiff Owen Diaz was enduring at the hands of nextSource Supervisor Ramon Martinez, but exercised *ad hoc* policy-making by failing to take appropriate corrective action. Quintero is one of several individuals who exercised sufficient discretionary authority to be deemed "managing agents," sufficient to trigger liability for punitive damages as a matter of law. Because Tesla abrogated its non-delegable duty to keep the workplace free of discrimination, harassment, and retaliation, Tesla may be held accountable for punitive damages.

When all reasonable inferences are drawn in Plaintiffs' favor—as required on summary judgment—Tesla's motion must be denied, because any reasonable trier of fact would likely find that Tesla allowed an environment replete with racial hostility to flourish in its factory.

Plaintiffs do not contest Tesla's motion with respect to the Unruh Act claims.

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## II. <u>FACTUAL BACKGROUND</u>

**A. Plaintiffs Were Hired And Assigned To Tesla's Fremont Factory In Summer 2015.**

Owen completed a new hire application with a staffing agency, Defendant Citistaff Solutions, Inc. ("Citistaff"), on June 2, 2015. (P. 1, Exh. 1 to Declaration of Lawrence Organ ("Organ Dec"))

Owen was hired as an elevator operator "to move material up and down for the…construction of cars" on large industrial elevators. (Edward Romero Depo. 68:15-21, Exh. 2 to Organ Dec.) Based on Owen's good performance record, he was promoted to lead approximately one month later. (

Tamotsu Kawasaki Depo. 63:5-18, Exh. 3 to Organ Dec.) After his promotion, Owen was supervised by nextSource employee Ed Romero; in October of 2015, Tesla hired Romero as its Contract Services Supervisor, where he continued to supervise Owen. (                    Romero Depo. 8:17-18, 11:9-17, 18:9-20, 19:8-23)

Owen's second-level supervisor was Tesla's Custodial Program Manager, Victor Quintero. Quintero managed contracts for food and janitorial services, grounds, elevator services and recycling, encompassing between 118-221 employees while Diaz worked at Tesla. (Victor Quintero Depo. 12:12-21, 13:12-24, Exh. 4 to Organ Dec.) Quintero had decision-making authority to change employee assignments. (*Id*. 24:17-25:13) Quintero also set Tesla's policy with respect to contract employees. When he started working for Tesla in 2014, Quintero separated contract employees from regular Tesla employees. (*Id.* at 22:13-23:7) He instituted a two-tiered supervision policy, whereby contract employees had their own leads and supervisors, like Owen, and in turn Tesla's employees directed the work of these leads and supervisors. (*Id.* at 16:3-23) No one instructed Quintero to institute this policy.  Quintero did so based on his "years of experience" and "previous employment." (*Id.* at 25:14-20) In addition, he had the *ad hoc* authority to determine whether or not Tesla would investigate complaints, and could approve or reject proposed discipline from contractors. (*Id*. at 64:15-65:5; Jackson Depo. 75:4-13)

On August 21, 2015, West Valley Staffing Group ("WVSG") hired Demetric and

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

assigned him to work at the Tesla factory as a production associate. (P. 1, Exh. 5 to Organ Dec.)

Tesla employees, like Romero and Caballero, could recommend termination of a temporary employee's assignment and bar them from reentering the Fremont factory—effectively terminating their employment at the Fremont factory. (Monica De Leon Depo. 118:10-20, Exh. 6 to Organ Dec.; Annalisa Heisen Depo. 170:16-22, Exh. 7 to Organ Dec.)

**B. Tesla's Anti-Harassment And -Discrimination Policy At The Fremont Factory.**

)

Tesla expected temporary and full-time employees to comply with this policy. (Heisen Depo. 72:5-18)

Under this policy temporary employees, like Plaintiffs, could complain both verbally and in writing about violations to Tesla. (Heisen Depo. 78:1-10, 147:19-23; Erin Marconi Depo. 54:22-55:8, Exh. 8 to Organ Dec.)

Tesla supervisors or managers were expected to escalate complaints to higher-level managers or HR. (Heisen Depo. 78:1-8, 79:7-15; Marconi Depo. 54:22-55:8) Romero typically escalated complaints to HR or to his supervisor, Quintero. (Romero Depo. 88:12-22) Tesla delegated responsibility for training temporary employees and investigating their harassment complaints to the respective hiring staffing agencies. Tesla expected agencies to investigate and address their employee's harassment and discrimination issues. (Marconi Depo. 58:16-59:7) However, Tesla did not take steps to confirm that staffing agencies complied with Tesla policies. (Id. 60:18-61:1; Heisen Depo. 75:23-24) In truth, staffing agencies did not necessarily comply. Tesla HR Business Partner Erin Marconi had to "push" one agency, nextSource, to follow Tesla's investigation policies. (Marconi Depo. 107:10-108:2) Staffing agency Chartwell's Area Vice President, Veronica Martinez, only received training on sexual

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

harassment. (Veronica Martinez Depo. 9:15-10:9, 21:16-22:2, Exh. 9 to Organ Dec.)

Some harassment complaints were investigated in accordance with Tesla's policy. For instance, Marconi once received a complaint about a "sexual drawing," of breasts being drawn on the gender signs of the restroom doors. (Marconi Depo. 81:1-7, 81:22-23) In response to this act of perceived sexual harassment, Tesla gave sensitivity training to a department of "over 500 people." (*Id*. 81:1-19.) Tesla HR "brought everyone together each shift, went over how [the drawing] was not okay; if we could ever find out who it was, it wouldn't be tolerated….[We] did sensitivity training that covered pretty much everything." (*Id.,* 91:8-21.) Tesla communicated the message that "if it makes someone uncomfortable, it's not okay." (*Id.,* 84:23-85:3.) When Owen complained that an African-American contractor had threatened him, Tesla promptly investigated and ended the contractor's assignment. (Tesla's Mtn., 4:26-5:7.) Appropriately addressing harassment was the exception, not the rule, when it came to racial harassment.

**C. Demetric's Supervisor Calls Him the N-Word & Terminates Him For Complaining.**

1

2

3

4

5

6

7

8

9

10

11 **D. Owen's Complaints of Racial Harassment Go Unaddressed for Over 9 Months.**

12    **1. Judy Timbreza repeatedly calls Owen racial slurs, and Owen's supervisor Ed**

13       **Romero lies and claims Owen's complaints are uncorroborated.**

14

15

16

17

18

19    On or around July 31, 2015, Owen and Timbreza got into an altercation when Timbreza

20 called Owen a racial slur yet again. (Kawasaki Depo. 37:7-16)

21                                                                                                              ;

22 Kawasaki Depo. 42:3-22) Bystanders corroborated Owen's report that "Judy said racial slurs

23 towards Owen." (Kawasaki Depo. 43:3-5, 44:18-45:6, 81:14-82:4, 90:4-15)

24

25                                                                                        A few days

26 later, when Romero and Kawasaki met to discuss the situation, Kawasaki reiterated that

27 witnesses had corroborated Owen's version of events. (Kawasaki Depo. 47:22-48:10)

28    Rather than enforcing Tesla's "zero-tolerance" policy for harassment, Romero informed

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Kawasaki, "there's a rule that there's these three written warnings before anybody gets laid off." (Kawasaki Depo. 48:17-49:3) Kawasaki was not aware that Romero ever conducted a further investigation of Owen's report. (Kawasaki Depo. 54:24-55:7)

Consequently, Timbreza was only issued a verbal warning for "kidding around excessively" with no mention of the racial slurs. (Romero Depo. 158:12-14) At Romero's direction, Kawasaki minimized the import of the write-up, telling Timbreza, "It's not saying you're going to get laid off. It's just … stating that this situation happened and you're being written up for it." (Kawasaki Depo. 53:17-54:8)  Tesla <u>never</u> told Kawasaki that Timbreza had been laid off or fired; it just asked Kawasaki to fill his position. (Kawasaki Depo. 58:4-12, 92:6-20) Kawasaki assumed a "lay-off", but could only say that Timbreza no longer worked his shift. (Kawasaki Depo. 58:4-12, 58:15-20)

Telsa never disclosed whether Timbreza was terminated and never produced documentation of any counseling or warnings, despite Plaintiffs' discovery requests. (Exh. 10 to Organ Dec. at 17:13-18:6.) Plaintiff's requests for documentation of Romero's "investigation" likewise produced no responsive documents. (Exh. 11 to Organ Dec. at 26:18-29:10.)

### 2.  Owen is later called racial slurs by multiple other employees.

Romero's cover-up of Timbreza's harassment prompted other employees to ramp up their racial harassment. In particular, Supervisor Ramon Martinez targeted Owen for harassment. (Michael Wheeler Depo. 74:12-21, Exh. 12 to Organ Dec.) Supervisors in Martinez's position directed Owen's work and were empowered to recommend performance appraisals "all the way up to termination." Their recommendations were generally followed. (*Id.* 16:22-24, 17:6-16, 41:24-25)

and using the Spanish term "mayate"[1] "all the time." (Wheeler Depo. 33:16-18) Martinez was far from the only supervisor to invoke racial slurs against Owen.

**3.   Owen persistently complains about harassment; no action is taken.**

Owen dutifully complained about harassment to Kawasaki on multiple occasions, consistent with Tesla policies.

He never escalated Owen's complaints, per Tesla's policy. (Marconi Depo. 52:3-6)

**4.   With No Effective Corrective Action, the Harassment Escalates.**

---

[1] In Spanish, "mayate" is a slang term roughly equivalent to the English N-word.

### i.    Ramon Martinez physically threatens Owen.

On October 17, 2015, Supervisor Martinez rushed into an elevator with Owen and co-worker Rothaj Foster, "trying to show Owen that he was the boss." (Kawasaki Depo. 65:10-25; Exh. J to Supp. Organ Dec.) Martinez had been "waiting [for Owen] down at the bottom elevator," where Martinez "wasn't supposed to be" during his shift. (Kawasaki Depo. 65:10-25)

However, Romero immediately initiated an investigation based on Martinez's complaint, per Quintero's instructions. (                                        Quintero Depo. at 49:19-50:8, 51:8-21.)

Tesla delegated the investigation of Owen's complaint to nextSource. ( NextSource waited four days, until October 21, 2015, before deciding that it too would not formally investigate Owen's complaint.                                        No one interviewed Foster or reviewed the security footage. Instead, nextSource minimized of Owen's complaint. Treating the workplace attack like a garden-variety co-worker issue, Owen and Martinez were each "verbally counseled" to "play nice with each other in the sandbox," ignoring Owen's history of complaints about Martinez. (Jackson Depo. 70:8-22) Owen was issued a verbal warning for "his professionalism", despite being the victim of a racially motivated attack. (*Id.,* 70:23-71:10)

ii.      **Owen is Confronted by a racist picaninny drawn by Martinez.**

and Jackson thought "Booo" referred to "jiggaboo," a "derogatory racist term  for African-Americans." Jackson Depo. 26:9-18) Wheeler understood the caption to refer to a "spook", a midcentury racial slur. (Wheeler Depo. 64:25-65:4) All three African-American men agreed that the effigy was offensive. (Jackson Depo. 26:21-24; Wheeler Depo. 65:14-19)

Armed with unambiguous proof of racist conduct, Owen promptly complained to the nearest supervisor, Michael Wheeler. (Wheeler Depo. 60:19-61:10, 65:14-16)

Tesla relied on Martinez's employer, Chartwell, and nextSource to conduct an investigation.

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

No one from Chartwell, nextSource, CitiStaff, or Tesla questioned Martinez's credibility after seeing these blatant falsehoods. No one interviewed witnesses Zuniga or Wheeler.

Tesla's policies required that its HR investigate Owen's complaint that Martinez's racist behavior was escalating. (Heisen Depo. 111:12-112:17) However, Quintero denied being aware of Owen's complaint that Martinez's behavior was getting worse—suggesting that Quintero had not bothered to review Owen's complaint. (Quintero Depo. 68:16-24.) Nor did Romero investigate, though he'd received multiple complaints from Owen. (Romero Depo. 126:19-127:12) nextSource Program Manager Jackson was concerned that Martinez had created a racist effigy shortly after threatening Owen, the only action he took was to "alert[] the various agencies so they could look into it a little further." (Jackson Depo. 101:4-14) No one investigated further.

Quintero rejected Jackson's recommendation that Martinez be terminated. (Jackson Depo. 75:4-13)

Ignoring Owen's prior complaints, Quintero justified the lenient discipline because "Ramon had never exhibited this type of behavior before, . . . like anything that was offensive to anybody." (Quintero Depo. 64:15-65:5)

The proposed e-mail about the Tesla "zero-tolerance policy" was never sent. No "sensitivity training" was initiated.  No "final written warning" letter was produced to confirm that any actual discipline was ever imposed, requiring an inference that no discipline was imposed.

Martinez continued working at Tesla, through Chartwell, through 2018. (Quintero Depo.

65:20-66:23) Tesla hired Martinez, a serial harasser, as a Lead Material Handler on January 14, 2019—a position he held until at least until May 24, 2019. (Exh. 13 to Organ Dec. at 6:14-7:10)

Post-investigation, only De Leon contacted Owen by phone to " see… are you going to return…to your job. He said yes." (De Leon Depo. 133:20-134:7) At the time, Owen made $18 per hour, making it financially difficult for him not to return. (*Id.* 211:5-12.) "Other than Tesla," CitiStaff did not work with any companies that paid temporary employees over $16 per hour. (*Id.* 158:1-3)

**E. Many other African-Americans' complaints of harassment went unaddressed.**

Titus McCaleb worked in the production area of the Tesla factory from 2016 to 2017, employed by WVSG. (Titus McCaleb Depo. 34:23-35:2, 186:24-187:6, 186:24-187:6) He reported hearing "highly racially charged words and slurs" from at least 5 production associates and a lead, including the N-word. (*Id.* 62:13-63:11, 70:3-6, 77:10-78:4, 89:2-24, 63:25-64:12) McCaleb described one coworker's use of the N-word thusly: "He just flung it out like it was verbal candy per se." (*Id.* 126:23-127:13)  The coworker used the N-word "right in front of the supervisors and leads" and at least one manager. (*Id.* 128:3-13) McCaleb reported the harassment to WVSG, which took no action. (*Id.* 163:1-12) He reported the harassment to Tesla HR. (*Id.* 74:18-75:13; 163:1-12) This resulted in Tesla and WVSG pushing McCaleb out of work. (*Id.* 165:16-166:8) Although McCaleb interviewed for a treasured full-time Tesla position, none ever came. (*Id.* 105:6-106:10; 109:14-23, 119:2-11) Thereafter, following his repeated complaints of racial harassment, Tesla and WVSG retaliated against him by ending his contract. (*Id.* 120:5-13)

Michael Wheeler, Owen's supervisor, was called the N-word in response when he reprimanded an employee. Wheeler "report[ed] that to the Tesla [manager and] supervisors [i.e. Quintero and Romero] and also to Ramon Martinez, and that was that. Nothing happened. Shortly after that, [the employee who called me the n-word] was given his own position as a supervisor in a different section." (Wheeler Depo. 20:2-24) Tesla rewarded the harasser with a

promotion. Another employee placed feces on the seat of his cart. (*Id.* 54:3-8) Wheeler believed this was based on race, and asked Quintero to investigate and check the security footage. (*Id.* 54:9-18, 57:1-12) Though Tesla had security cameras trained on the area, Tesla claimed it could not identify the culprit. (*Id.* 55:14-24) Quintero never investigated further. (*Id.* 56:6-16)

**F.  A Racially Harassing Environment Permeated the Entire Factory.**

In addition to being severe and pervasive, the racial harassment at Tesla's factory was open and notorious. Owen, Jackson, Kawasaki, and Wheeler heard racial slurs used freely in the Tesla factory.

Jackson observed non-African-American employees calling each other "nigga" and found it offensive, noting "And I will hear that often, to be honest." (Jackson Depo. 141:14-25, 144:15) Kawasaki heard the n-word used "all over the facility." (Kawasaki Depo. 76:7-77:3) Wheeler heard the N-word "[d]uring breaks or outside when [employees are] smoking or in passing, coming into the factory." (Wheeler Depo. 35:5-10) Wheeler was also "taken aback" by the "vulgarity" when he saw a swastika tattooed onto an employee's head. (*Id*. 113:12-114:4)

McCaleb also saw racial slurs "scribbled into stalls." (McCaleb Depo. 62:13-63:11, 70:3-6)

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Andres Donet, Tesla's Janitorial Employee Manager, confirmed non-investigation of graffiti was the norm. When an employee complained about graffiti, it "was sort of a non-written process that...any employee that went into the bathroom that saw the graffiti there, they just report it in order to be cleaned, to be erased." (Andres Donet Depo. 12:25-13:16, Exh. 15 to Organ Dec.) No steps were taken to prevent racist graffiti from reoccurring, and Tesla's response to complaints was not prompt.

## III.   LEGAL ARGUMENT

### A.   Tesla Fails to Negate an Essential Element of Plaintiffs' Claim.

In moving for summary judgment, Tesla must make a *prima facie* showing that no triable issues exist as to whether Caballero, Quintero, Romero, Kawasaki, or any other Tesla employees were Tesla managing agents, by producing evidence detailing their job duties. *Davis v. Kiewit Pacific Co.*, 220 Cal. App. 4th 358, 369 (2013). "[S]imply restating the applicable legal standard" for determining whether an employee is a managing agent <u>does not satisfy this affirmative duty</u> to make a *prima facie*. *Id*. Here, Tesla has not produced <u>any</u> evidence about these employees' job duties. It solely focuses on whether Caballero, Kawasaki, and Romero could fire Plaintiffs, with no further discussion. It never analyzes whether or not Quintero is a managing agent Accordingly, Tesla has not met its burden and the Court cannot grant its motion.

### B.   Tesla's Corporate Policy, of Condoning and Ignoring Racial Harassment, Gives Rise to Punitive Damage Liability Under Federal Law.

Under Section 1981a, a plaintiff is entitled to punitive damages where a managerial agent of his employer acts with "malice" or "reckless indifference" to "the employer's knowledge that it may be acting in violation of federal law." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). Here, Tesla's managerial agents acted with the requisite malice and indifference.

#### 1.   <u>Individuals Tesla Tasked with Receiving and Responding to Complaints of Discrimination are Managing Agents, as a Matter of Law.</u>

Tesla claims that none of the employees involved with Plaintiff's employment are

managing agents. However, where an employer delegates the duty to prevent discrimination to a specific supervisor, it necessarily vests that individual with sufficient discretionary authority to be deemed a "managing agent" as a matter of law. *Swinton v. Potomac Corp.* 270 F.3d 794, 810 (9th Cir. 2001):

> "Potomac takes the position that Stewart--though designated in the employee manual as the proper recipient of harassment complaints by virtue of his position as Swinton's supervisor--was only a low-level supervisor and was thus not employed in a "managerial capacity," permitting punitive damages under *Kolstad,* 527 U.S. at 542-43, 119 S.Ct. 2118. Courts in several other circuits have addressed similar situations, where a supervisor who did not actually perpetrate the harassment but nonetheless was responsible under company policy for receiving and acting upon complaints of harassment, failed to take action to remedy the harassment. They have reached the conclusion that **the inaction of even relatively low-level supervisors may be imputed to the employer if the supervisors are made responsible, pursuant to company policy, for receiving and acting on complaints of harassment.**" (emphasis added.)

Tesla's anti-harassment and -discrimination policy applied to contractors like Plaintiffs. (Heisen Depo. at 78:1-10; Marconi Depo. at 54:22-55:8)

Such employees were responsible for escalating complaints to higher-level managers or HR, where the complaint would be handled. (Heisen Depo. 78:1-8, 79:7-15; Marconi Depo. at 54:22-55:8) Tesla's focus on these employees' ability to hire and fire Plaintiffs or "set company policy" is simply inapposite under federal law. (Tesla's MPA at 11:27-12:5) Because Tesla's policies delegated the duty to receive and act on harassment complaints to supervisors and managers like Caballero, Kawasaki, Romero, and Quintero, these employees are managing agents as a matter of law.

Similarly, in delegating the power to investigate complaints of harassment and discrimination to staffing agencies, Tesla vested them with authority to make them managing agents as a matter of law. When staffing company employees complained of harassment or discrimination, Tesla deferred investigations to the staffing companies. (Marconi Depo. 109:8-12; 109:20-110:6)

Tesla HR agreed and told Romero not to be involved. (Romero Depo. 188:17-189:15;

Tesla's delegation of the duty to receive and respond to harassment complaints renders staffing agency employees, like Jackson, managing agents as a matter of law.

**2. Under Federal Law, Tesla's Corporate Culture of Tolerance Towards Racial Harassment Constitutes Malice.**

In *Kolstad v. American Dental Ass'n*, 527 U.S. at 542-43, 119 S.Ct. 2118 (1999), the Supreme Court observed that the terms "malice" and "reckless indifference," as used in Section 1981a(b)(1), pertain not to the employer's knowledge that it may be engaging in discrimination, but rather to the employer's knowledge that it may be acting in violation of federal law. *See U.S. ex rel. Bryant v. Williams Bldg. Corp*., 158 F. Supp. 2d 1001, 1007 (D.S.D. 2001). Evidence that a company's corporate culture encourages or tolerates discrimination is highly probative on this point—*inter alia*, it helps to establish: (1) corporate liability for punitive damages; (2) liability on a failure to prevent claim; and/or (3) the employer's discriminatory intent. Indeed, many cases recognize the admissibility of "corporate culture" evidence in an employment discrimination case as probative of (among other things) the employer's discriminatory or retaliatory intent. *See e.g., Brewer v. Quaker State Oil. Refining Corp.*, 72 F.3d 326, 333-34 (3rd Cir.1995) (admitting evidence in an age discrimination case of a corporate culture favoring younger workers); *Ryder v. Westinghouse*, 128 F.3d 128, 130-34 (3rd Cir. 1997) (same).

Such evidence is relevant to punitive damages liability because maintenance of a corporate culture that encourages and tolerates harassment and discrimination can constitute reprehensible conduct sufficient to justify a punitive damages award. In *Pavon v. Swift Transp. Co., Inc*., the Ninth Circuit upheld an award of punitive damages, finding that "the jury could have found that racial insults and slurs were a common occurrence on [the employer, Swift's,] shop floor and that management was aware of this behavior and took no meaningful steps to stop it. The jury could have concluded that Swift did not believe [the plaintiff's] allegations and never seriously investigated the situation. Moreover, the jury could have found that Swift's refusal to investigate stemmed from its blame-the-victim mentality, wherein it wrongly perceived Pavon as the problem, labeled him a troublemaker, and terminated him." *Pavon v. Swift Transp. Co., Inc.* 192 F.3d 902, 909 (9th Cir. 1999). Such conduct, the court concluded, was sufficiently

1    reprehensible to support an award for punitive damages. *Id*.

2         Under the above facts, Tesla management has abandoned any semblance of protecting

3    the workplace from race-based discrimination and retaliation—giving rise to reprehensible

4    conduct that allows for an award of punitive damages.

5         **i.    Racial Epithets Directed at Plaintiff Echo Routine Unregulated Use of the**

6              **N-word.**

7         Regardless of its written policies, Telsa has an unwritten policy of disregarding rampant

8    use of the word "nigger" inside its workplace. The word "nigger" or "nigga" was commonly and

9    casually used "all over the facility" at the Tesla worksite. (Jackson Depo. 141:14-16, 144:9-23,

10   145:2-14, 150:25-151:10; Wheeler Depo. 35:5-16; Kawasaki Depo. 76:7-77:12) Tesla concedes

11   that use of the word "nigger" its  factory creates a hostile work environment. (Marconi Depo.

12   28:22-24; 36:5-13) Despite acknowledging that the N-word should not be used inside the

13   workplace, nextSource managers took no corrective action because "it wasn't my employee, so I

14   didn't engage…" (Jackson Depo. 141:17-25, 145:2-21, 149:24-150:4, 151:11-14)

15

16

17

18                                                                                        Rather

19   than reprimanding and terminating supervisors who engaged in racist conduct, Tesla employees

20   and agents promoted individuals who used racial slurs (Wheeler Depo. 18:19-19:9, 36:5-16;

21   20:2-24, 21:4-14, 25:2-9, 22-26:1, 6-9; 27:18-24) and reward contractors who engage in racial

22   harassment, like Martinez, with full-time Tesla positions. (Exh. 13 6:14-7:10)

23         **ii.   Tesla HR Understood Use of the N-word was Inappropriate in the**

24              **Workplace, but Took No Action.**

25         Tesla Human Resources Business Partner Marconi was in charge of handling complaints

26   of discrimination and harassment, from 2013 to January 2017. (Marconi Depo. 13:17-24, 27:12-

27   15) HR was physically located on the production floor in 2015 and 2016. (*Id*. 28:22-24)

28   According to Marconi, Tesla's "zero-tolerance policy for harassment" prohibits use of the N-

word at the Tesla facility. (*Id*. 33:21-34:1, 35:2-7) There are no circumstances under which use of the N-word inside the workplace is appropriate. (*Id*. 51:2-4)

If Marconi had known of staff using the n-word at the Tesla factory, that would "absolutely" warrant investigation, because use of the word "nigger" at a Tesla factory creates a hostile work environment. (Marconi Depo. 28:22-24, 36:5-13) From a Tesla HR perspective, if the N-word were used inside the Tesla workplace once, let alone more than once, it would be "a fairly big issue", and something to be addressed in order to stop use of the N-word in the future. (*Id*. 38:10-13, 36:5-13, 17-22, 38:23-39:1)

### iii. Tesla HR Understood the Pickaninny Drawing was Inappropriate, but Took No Action.

As of her deposition on October 21, 2019, Marconi denied ever having previously seen the picaninny drawn by Martinez. (Marconi Depo. 85:21-86:6) Marconi agreed that the picaninny caricature might be considered offensive to African Americans. (*Id*. 99:22-25, 100:3-10) Had she seen Martinez' picaninny drawing, she "would [have] ask[ed] them not to have him return to any assignment at Tesla," because Tesla does not tolerate the presence of racially offensive drawings. (*Id*. 51:5-8, 100:11-20) However, she had no knowledge of what actual discipline was imposed. (*Id*. 112:13-18) Marconi denies ever discussing the pickaninny drawing or Plaintiff's complaint with Quintero, the Tesla manager who approved the decision to suspend rather than terminate Martinez. (*Id*. 95:14-17) Marconi denies any recall of the picaninny matter altogether. (*Id*. 101:8-10)

However, the evidence demonstrates that Marconi was forwarded an e-mail describing Plaintiff's original complaint, advising her of the pickaninny incident. (Marconi Depo. 108:3-10) Moreover, an e-mail from nextSource's Garrett to Jackson instructs Jackson, "Please do not take action [on suspending and issuing a warning to Martinez] until we have the feedback from [Tesla] HR." (Jackson Depo. 16:22-17:7, 96:2-17; Exh. Q) Nor was this the first time Tesla was advised of Martinez's harassing conduct.

### iv. Tesla HR Understood Martinez's Threatening Behavior in October 2015 was Wrong, But Took No Action.

1

2          Unquestionably, as of at least October 20, 2015, Tesla

3   had knowledge of Martinez's threatening conduct toward Owen. (Marconi Depo. 112:19-24)

4   Rather than encouraging Tesla staff to investigate, Marconi cancelled Ed Romero's

5   investigation, and requested that nextSource investigate. (*Id.* 109:8-12, 109:20-110:6)

6          Yelling and screaming at Owen plainly violated Tesla policy. (Marconi Depo. 104:15-19)

7   In fact, Tesla was prompted to remove contractor Rothaj Foster when Foster yelled at Owen and

8   physically threatened him. (Marconi Depo. 116:13-25; Exh. S to Supp. Organ Dec. at pp. 2-3;

9   Romero Depo. 197:8-22, 199:2-200:22; Jackson Depo. 73:8-22) This begs the question as to

10  why Martinez was not similarly barred.

11              **v.    Tesla Takes Appropriate Corrective Action—But Not in Response to**

12                     **Racial Harassment.**

13         Once Tesla had notice of inappropriate conduct in the workplace, it was obligated to

14  prevent further inappropriate conduct. (Marconi Depo. 113:3-9) Consistent with this, when

15  "boobs" were drawn over the male and female symbols on the bathroom doors, which Tesla

16  perceived as sexually offensive, Tesla took corrective action by conducting "sensitivity" training

17  for a department of 500 people—even though it could not locate the culprit. (Marconi Depo.

18  81:1-82:3; 84:23-85:3) Yet, despite rampant use of the word "nigger" inside the Tesla workplace

19  and multiple incidents of racist graffiti, no "sensitivity training" occurred.  To the contrary,

20  supervisors who invoked racist epithets, like Martinez, were rewarded with promotions.

21         Here, as required under *Kolstad*, Tesla knew the harassing conduct Plaintiffs experienced

22  was wrong, but failed to appropriately investigate or discipline Plaintiffs' harassers. As in *Pavon*,

23  allowing a culture of racial harassment to flourish in the face of such knowledge constitutes

24  reprehensible conduct sufficient to sustain a punitive damages award. A trier of fact could

25  reasonably conclude that Tesla decided to foster a corporate culture of racial harassment in the

26  face of its knowledge that harassment was unlawful, and the court thus cannot grant summary

27  judgment.

28  **C.  Tesla's Ambivalence Towards Racial Harassment Renders it Liable for Punitive**

**Damages Under California Law.**

California Civil Code §3294(a) provides that punitive damages may be awarded where the defendant is guilty of "oppression, fraud, or malice." Malice is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Civil Code §3294(c)(1). Oppression means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Civil Code §3294(c)(2). "Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy." *Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.,* 185 Cal.App.3d 1149, 1154 (1986). Punitive damages can only be awarded where a managing agent of the corporation engaged in oppressive or malicious conduct, or authorized or ratified such conduct. *Weeks v. Baker & McKenzie*, 63 Cal.App.4th 1128, 1151 (1998).

1.   <u>Under California Law, Quintero Was a Managing Agent.</u>

Section 3294(b) limits the punitive liability of a corporation to acts ratified, authorized, or committed by a corporate officer, director, or managing agent. *Weeks*, *supra*, 63 Cal.App.4th at 1151. A managing agent is "only those corporate employees who exercise substantial independent authority and judgment in their corporate decision making so that their decisions ultimately determine corporate policy." *White v. Ultramar, Inc*., 21 Cal.4th 563, 566-567 (1999). To show that an employee is a managing agent, "a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." *Id*. at 577. The scope of a corporate employee's discretion and authority under the managing agent test is a question of fact for decision on a case-by-case basis. *Id.* at 567; *see also Davis v. Kiewit Pacific Co*., 220 Cal.App.4th 358, 366 (2013).

The managing agent test is not as onerous as Tesla claims. In the seminal *White v. Ultramar* case, the California Supreme Court found that a "zone manager" responsible for supervision of eight stores and sixty-five employees was a managing agent because that represented "a significant aspect of Ultramar's business." *White*, 21 Cal.4th at 577. Though this zone manager, Salla, consulted with human resources before firing the plaintiff and reported to

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

other department heads, she held sufficient discretionary authority to qualify as a managing agent. *Id.* at 577. "In firing White for testifying at an unemployment hearing, Salla exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a most crucial aspect of Ultramar's business." *White*, *supra*, 21 Cal.4th at 577. In a concurrence, two justices noted that although Salla did not "set any firm-wide or official policy … she exercised authority that 'necessarily result[ed] in the ad hoc formulation of policy' that negatively affected the plaintiff.  Specifically, she engaged in a local practice of retaliating against, by firing, an employee who testified at the unemployment hearing of another Ultramar employee." *Id.* at 580 (Mosk, J., concurring).  In *Egan v. Mutual of Omaha Insurance Co.*, 24 Cal.3d 809, 816 (1979), the California Supreme Court held that an insurance claims adjuster was a managing agent. The *Egan* court reasoned that when "employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation." *Egan*, *supra*, 24 Cal.3d at 823.  This discretion, the court explained, "necessarily results in the *ad hoc* formulation of policy." *Id*; *see also Major v. Western Home Insurance Co*., 169 Cal.App.4th 1197, 1219-1221 (2009).

The *Davis* Court likewise held that the lower court erred in granting defendant's motion for summary adjudication based on the following ground:

> "Lochner, as Kiewit's EEO officer, had the duties and responsibilities to enforce its policies against discrimination, retaliation, and harassment based on gender and other protected classes ... based on the description of Lochner's position, a trier of fact could reasonably infer he had authority and discretion in making, interpreting, and applying Kiewit's EEO policies on a corporation wide basis and therefore had authority and discretion to make decisions that ultimately determine corporate policy.  Furthermore, a trier of fact could reasonably infer that, despite the fear Davis expressed to him regarding possible retaliation for her reporting of the portable toilet issue, Lochner exercised his authority and discretion to not enforce Kiewit's policy against retaliation and/or to protect her from retaliation and, in so doing, exercised authority that resulted in the ad hoc formulation of corporate policy." *Davis*, *supra*, 220 Cal. App. 4th at 372, *citing to White, supra*, 21 Cal.4th at 566-567, 577, and *Egan v. Mutual of Omaha Ins. Co*. (1979) 24 Cal.3d 809, 823.

If there is "a triable issue of fact regarding whether a corporate employee is a managing agent under the *White* test, that factual question <u>must be determined by the trier of fact and not the court on a motion for summary adjudication</u>." *Davis*, 220 Cal.App.4th at 366 (emphasis

added).

As a manager, Quintero had the ability to set policy for the 118-221 employees he supervised. Quintero exercised this authority when creating the policies governing supervision of contract employees. (Quintero Depo. 16:3-23, 22:13-23:7.) He created these policies on his own, without any direction. (Id. 25:14-20) Based on this, a trier of fact could reasonably conclude Quintero exercised substantial discretionary authority over a substantial aspect of Tesla's business, and find he was a managing agent.

Quintero also exercised discretion when it came to investigating complaints of harassment. Quintero approved the decision to suspend rather than terminate Martinez for the picaninny drawing, though he had the ability to bar contract employees from working at the facility. (Jackson Depo. 34:25-35:11, 88:14-22, 81:7-16, 89:14-21, 89:25-90:12, 91:15-21, 121:5-12, 121:24-122:8) In fact, Quintero rejected Jackson's recommendation that Martinez be terminated. (Jackson Depo. 75:4-13) Quintero originally considered discipline of only a "stern written warning," but Jackson persuaded Quintero this discipline was inadequate.  (Jackson Depo. 120:12-15; 90:18-91:2, 8-11) As an African American, Jackson agreed with Plaintiff that the picaninny was offensive.  Mindful of Martinez' October 2015 verbal altercation and threat toward the Plaintiff (Jackson Depo. 59:15-60:2; 60:25-61:6; 74:2-19, 82:24-83:7), Martinez' "jigaboo" drawing caused Jackson to have more concern. (Jackson Depo. 101:4-9) However, Jackson had no power to terminate Martinez and could only make recommendations, because Martinez was a Chartwell not a nextSource employee. (Jackson Depo. 34:10-17, 40:121-23) Tesla employee Quintero had the ability to bar contract employees from working at the facility. (Jackson Depo. 34:25-35:11; 121:24-122:8)

If the N-word or other racial epithets were directed at Plaintiff, HR should have participated in any decision-making. (Marconi Depo. 117:20-118:8, 15-21; 119:17-22) Quintero made this decision without consulting with Tesla HR. (Marconi Depo. 95:14-17) This substantial authority and discretion in making, interpreting, and applying EEO policies, in addition to his ability to set corporate policy with respect to his subordinates, renders Quintero a managing agent under California law.

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1    **2.   Tesla Acted with Malice in Ratifying and Ignoring Racial Harassment.**

2    "Malice" means that the defendant acted "with a willful and conscious disregard" of the

3    plaintiff's rights. Cal. Civ. Code §3294(c)(1). "[U]nless the defendant is willing to take the stand

4    and admit its 'evil mind,' the plaintiff must prove entitlement to punitive damages with

5    circumstantial evidence. Thus, whether the defendant intended to injure the plaintiff or

6    consciously disregarded the plaintiff's rights may be suggested by a pattern of similar unfair

7    practices." *See e.g.*, *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 498-499 (1987). In the

8    employment context, evidence showing that it was "common knowledge" that the employer was

9    flouting a law designed to protect employees will support a finding that an employer consciously

10   disregarded the rights and safety of its employees, and thus the imposition of punitive damages.

11   *Weeks v. Baker & McKenzie*, 63 Cal.App.4th 1128, 1159 (1998).

12   Constitutional excessiveness review requires an evaluation of the reprehensibility of the

13   corporation's conduct – including whether the corporation is a recidivist and/or whether the

14   misconduct directed at the plaintiff was the product of corporate policies, practices or culture that

15   encouraged discrimination. *Roby v. McKesson Corp.*, 47 Cal.4th 686, 713, 715-716 (2009). As

16   the California Supreme Court stressed in *Johnson v. Ford Motor Co.*, 35 Cal.4th 1191, 1206 fn. 6

17   (2005):

18       By placing the defendant's conduct on one occasion into the context of a business
19       practice or policy, an individual plaintiff can demonstrate that the conduct toward him or
         her was more blameworthy and warrants a stronger penalty to deter continued or repeated
20       conduct of the same nature.

21   *Roby* is a reminder that corporate reprehensibility analysis must carefully focus on the

22   corporation's conduct (not just that of the individual actors). *Roby*, 47 Cal.4th at 713-714. The

23   *Roby* court drastically reduced the jury's punitive damages verdict, largely because the plaintiff

24   failed to offer evidence that the discriminatory acts towards the plaintiff "were the product of a

25   corporate culture that encouraged similar supervisor misconduct" or that the defendant employer

26   was guilty of "repeated corporate misconduct" of a similar nature. *Id.* at 715-716.

27   Here, Tesla acted with flagrant disregard to Plaintiffs' rights due to its *de facto* corporate

28   policy of failing to address rampant racial epithets or adequately discipline harassers.

Employers have a duty to take all reasonable steps to prevent harassment, discrimination, and retaliation from occurring. Cal. Gov. Code §12940(k); *Scotch v. Art Inst. of Cal.* 173 Cal. App. 4th 986, 1021 (2009). The duty to prevent discrimination and harassment is a non-delegable duty of the company itself. *American Airlines, Inc. v. Superior Court*, 114 Cal. App. 4th 881, 890 (2003) (Holding that FEHA imposes an "affirmative and mandatory duty" on employers to "take all reasonable steps necessary to prevent discrimination and harassment from occurring" in the workplace"); *see also Snyder v. Southern Cal. Edison Co.*, 44 Cal.2d 793, 800 (1955) ("A non-delegable duty is a definite affirmative duty the law imposes on one by reason of his or her relationship with others. One cannot escape this duty by entrusting it to an independent contractor.")  In *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 103 Cal.App.4th 1021, 1035-1036 (2002), the California Court of Appeal states:

> "The public policy of the State of California is to protect and safeguard the civil rights of all individuals to seek, have access to, obtain, and hold employment without discrimination because of race ...." Moreover, employers must "take all reasonable steps necessary to prevent discrimination and harassment from occurring." (citations.) The employer's duty to prevent harassment and discrimination is affirmative and mandatory. (citation) Prompt investigation of a discrimination claim is a necessary step by which an employer meets its obligation to ensure a discrimination-free work environment. (citations)."

Here, Tesla abrogated its authority and responsibility to staffing agencies, and Quintero, each of whom would qualify as managing agents. However, delegation of that duty does <u>not</u> free Tesla from the non-delegable responsibility to guarantee a workplace free of harassment and discrimination to its employees—as Tesla wrongly assumes.

Plaintiff's picaninny complaint should have triggered an investigation where Plaintiff and Martinez were *first* interviewed by their respective staffing companies. (Marconi Depo. 86:9-20; 86:21-87:4, 20-25; 88:20-89:3)  Program Manager Jackson obtained statements from Owen and Martinez as to the picaninny incident, and forwarded them so that the staffing employers could conduct their own investigation and determine appropriate discipline.  (Jackson Depo. 25:10-18; 26:1-5, 16-24; 61:7-14, 19:2-24, 23:6-13, 22-25, 24:18-24, 20:5-18, 40:10-17;         While Jackson alerted Tesla manager Quintero, and he acknowledged that Tesla HR should be alerted

for serious issues, such as a verbal altercation with allegations of a threat. (Jackson Depo. 31:2-13, 68:21-69:3, 69:10-13) *Then* Tesla would decide the next course of action in order to assure that the conduct wasn't repeated. (Id. 88:1-11)

This next step—involvement of Tesla human resources--never occurred.  Instead, Tesla deferred investigations to staffing companies. (Marconi Depo. 109:8-12, 109:20-110:6) When Romero was asked to address a workplace issue, Terri Garrett (a nextSource manager out of New York) intervened to stop Romero's involvement.  Tesla HR instead directed that Romero not to be involved. (Romero Depo. 188:17-189:15;          Tellingly, Tesla HR never took any independent action or followed up. It simply assumed the staffing companies took appropriate action and disregarded the potential for future harassment.

It seems it also deferred to others in disregarding rampant use of the N-word. It deferred to others as to the degree and implementation of discipline. In doing so, Tesla abrogated its responsibility to protect its workers against a racially hostile environment. In effect, decision-making as to the Tesla's workplace was relegated to underlings and staffing companies. This deferral and willful ignorance amounts to conscious disregard for the rights of Plaintiffs and other African-American employees.

Similarly, in opting not to terminate Martinez, despite his repeated acts of racial harassment against the Plaintiff, Quintero exercised authority that resulted in the *ad hoc* formulation of Tesla corporate policy. *See Bains LLC v. Arco Products Co., Div. of Atlantic Richfield Co.*, 405 F.3d 764, 773-4 (9th Cir. 2005) (if company official with sufficient authority to trigger vicarious liability supports racist employee's racially motivated conduct instead of protecting the victim, company is liable for punitive damages even if supervisor's motivation is nonracial, such as loyalty to subordinate or desire to avoid conflict within company; further, written antidiscrimination policy does not insulate company if it does not enforce that policy and, by its actions, instead supports discrimination). Quintero's use of his authority to shield Martinez from discipline operated as an effective ratification of Martinez's conduct, and provides the

PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

requisite malice for a punitive damages claim.

In contrast, Plaintiff's harasser, Ramon Martinez, continued to work as a supervisor before Tesla rewarded him with promotion to a full-time Tesla position in 2019. (Exh. 13 to Organ Dec. at 6:14-7:10) Where "a [ ] managing agent eventually became aware of [] unlawful harassment [and defendant] thereafter continued to employ [the harasser] as [plaintiff's] supervisor without taking any corrective measures indicates "conscious disregard of the rights or safety of others" (Cal. Civ. Code, § 3294, subd. (b)), thus warranting punitive damages." *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 715.

In its motion, Defendant fails to analyze Quintero as a managing agent (California standard) or managerial employee (*Kolstad/Swinton* standard) analysis. With respect to Kawasaki, Romero and Caballero, Tesla's analysis is wanting as its sole focuses is on the ability to hire and fire. Finally, Tesla never addresses that by keeping Martinez employed, it effectively ratified the harassing conduct. *Roberts v. Ford Aerospace*, 224 Cal.App.3d 793, 801 (1990). Moreover, the fact that harassing conduct continued in a repeated manner suggests a higher degree of reprehensibility in this case. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  Here, a triable issue of fact exists as to punitive liability against Tesla.

## IV. CONCLUSION

For the foregoing reasons, Tesla's motion must be denied with respect to Plaintiffs' punitive damages claims.

CALIFORNIA CIVIL RIGHTS LAW GROUP

DATED:  November 19, 2019            By:   _____
                                    Lawrence A. Organ, Esq.
                                    Navruz Organ, Esq.
                                    J. Bernard Alexander, Esq.
                                    Attorneys for Plaintiffs
                                    DEMETRIC DI-AZ AND OWEN DIAZ