# Exhibit

# **1**

120150



# application

## PERSONAL INFORMATION

| Last Name | First Name | M.I | Social Security # |
|---|---|---|---|
| DIAZ | Owen | O | 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 |

Street Address: 1043 Tuolumne ST    Apt #

| City | State | Zip Code | Phone # |
|---|---|---|---|
| VALLEJO | CA | 94590 | 415-272-3648 |

Person to contact in case of emergency/ Phone Number    Alternate Number

Positions Interested in? FORKLIFT Operator / JANITOR

Can you demonstrate proof of Employment Eligibility? YES

## JOB EXPERIENCE

**General Labor**
- ☒ Loader/Unloader
- ☒ Assembly
- ☒ Production Line
- ☐ Machine Operator

**Forklifts**
- ☒ Sit-down-Standard
- ☒ Sit-down- with attachments
- ☒ Stand Up-Reach
- ☒ Stand Up-Cherry Picker
- ☒ Electric Pallet Jack
- ☐ Cranes

**Shipping/Receiving**
- ☒ UPS
- ☐ Fed-Ex
- ☐ Clerk
- ☒ Inventory
- ☒ Quality Control

**Other Skills**
- ☐ Restaurant
- ☐ Extrusion Equipment
- ☐ Welding
- ☒ Construction
- ☐ Customer Service

**Clerical**
WPM _____
Accuracy _____
- ☐ Receptionist
- ☐ Data Entry/ File Clerk
- ☐ Accounting
- ☐ Excel
- ☐ Word
- ☐ PowerPoint
- ☐ 10 Key
- ☐ Other Programs

**Languages**
- ☐ Cantonese
- ☐ Chinese
- ☐ English
- ☐ French
- ☐ German
- ☐ Spanish
- ☐ Vietnamese
- ☐ Other

## AVAILABILITY

**Status**
- ☒ Fulltime
- ☐ Part-time

**Overtime**
- ☒ Yes
- ☐ No

**Shift**
- ☒ 1st Shift
- ☒ 2nd Shift
- ☒ 3rd Shift

**Days**
- ☒ Monday
- ☒ Tuesday
- ☒ Wednesday
- ☒ Thursday
- ☒ Friday
- ☐ Saturday
- ☐ Sunday

**Transportation**
- ☒ Car/ Own Transportation
- ☐ Ride
- ☐ Bus/Public Transportation
- ☐ Assisted Transportation

**Personnel Equipment**
- ☒ Work boots
- ☒ Steel Toes
- ☐ Back Belt
- ☐ Hard Hat

CONFIDENTIAL

## PLEASE CHECK YES OR NO

| | | | |
|---|---|---|---|
| Have you ever worked for CitiStaff Before? | ☐Yes  ☒No | Where? _____ |
| Have you ever been convicted of a felony? | ☒Yes  ☐No | Where & When 1988 _____ |
| Can you comply with a Drug Test? | ☒Yes  ☐No | _____ |
| Conditions May require lifting between 30-50 pounds . Is this ok? | ☒Yes  ☐No | Explain _____ |
| Positions may require to standing up for 6-10 hours. Is this ok? | ☒Yes  ☐No | Explain _____ |

## EMPLOYMENT REFERENCES

| | | For Recruiter Use Only |
|---|---|---|
| Company **COVERALL** | Position **Franchise Owner** | Account # |
| City **SAN FRANCISCO** | State **CA** | Phone **415-272-3040** |
| Starting Pay | End Pay | Start Date **3/99** | End Date **8/09** | Position |
| Reason for Leaving | Contact Name **Owen** | Can we contact? **YES** | Interviewer |

## EMPLOYMENT REFERENCES TWO

| | | Date |
|---|---|---|
| Company **Hamilton Family Center** | Position **Residenetial Counselor** | |
| City **SAN FRANCISCO** | State **CA** | Phone **415-409-2100** |
| Starting Pay **15.00** | End Pay **15.00** | Start Date **1/13** | End Date **2/14** | Status |
| Reason for Leaving **Funding** | Contact Name **FRANK** | Can we contact? **YES** | Notes: |

## PLEASE ANSWER ALL QUESTIONS

**How did you hear about CitiStaff?**
- ☐ Ad
- ☐ Walk-In
- ☐ Job Fair
- ☐ Relative
- ☐ Friend
- ☐ Client

**INDeed**

**What is your highest level of education? Name of school**
**1 YEAR College**

**Do you have any diplomas, certificates, degrees or awards?**
**YES, HIGH School**

In case of an injury, would you like to pre-designate your treating physician?
Yes ☐   No ☒ . If no, CitiStaff will automatically pre-designate your treating physician          Initials

**Desired Cities for Employment**
**ANTIOCH. CONCORD. PITTSburg**

You must be at least 18 years old and able to produce proof of citizenship or immigration status to begin employment. I certify that the facts in this employment application are true and complete. I understand that falsified statements are grounds for dismissal.

Signature

**6/2/15**
Date

**Recruiter Comments:**

# Exhibit

# **2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

        Plaintiffs,

      vs.               No. 3:17-cv-06748-WHO

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; and DOES 1-50,
inclusive,

        Defendants.

_____//


DEPOSITION OF EDWARD ROMERO

November 30, 2018


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1                    A P P E A R A N C E S

 2

 3   FOR PLAINTIFF:

 4              CALIFORNIA CIVIL RIGHTS LAW GROUP

 5              BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW

 6              332 San Anselmo Avenue

 7              San Anselmo, California 94960

 8              (415) 453-4740

 9

10   FOR DEFENDANT:

11              CONSTANGY, BROOKS, SMITH & PROPHETE LLP

12              BY:  BARBARA ANTONUCCI, ATTORNEY AT LAW

13              2029 Century Park East, Suite 1100

14              Los Angeles, California 90067

15              (310) 909-7775

16

17

18

19

20

21

22

23

24

25
```

```
 1               MS. ANTONUCCI:  Yes.
 2               MR. ORGAN:  Q.  So, just so you understand,
 3      I'm not going to ask for your address, so I don't have
 4      to send a process server to serve you for the trial.
 5      The trial in this matter I think is currently set for
 6      May 12th or something like that.
 7               MS. ANTONUCCI:  13th.
 8               MR. ORGAN:  And it's probably going to get
 9      moved.
10         Q.   What we'll do is, we will send a subpoena to
11      your attorney rather than have to bother you at home.
12      Is that okay?
13         A.   Sure.
14         Q.   Tell me, at some point in time you worked for
15      Tesla; is that correct?
16         A.   Correct.
17         Q.   When was that?  When did you work at Tesla?
18         A.   From October 2015 to August of 2017.
19         Q.   Before October of 2015, where did you work
20      before that?
21         A.   Let me think for a second.
22              I was working for Pyramid Janitorial.
23         Q.   Have you ever had your --
24         A.   Let me correct that.  That's Paramount.
25         Q.   Paramount?
```

1      **A.   I do.**

2      Q.   Any other questions you have?

3      **A.   I do not.**

4      Q.   Now, you said that you were at Tesla from

5   October 2015 to August of 2017.  I'll just tell you,

6   I've got an email that's dated August 4th of 2015 from

7   you to Victor Quintero.

8      **A.   Yes.**

9      Q.   Is it possible that you were working at Tesla

10   before October 2015?

11      **A.   Okay, I'll clarify that.**

12      Q.   Huh?

13      **A.   I'll clarify that.**

14      Q.   Yes.

15      **A.   I got hired at Tesla as a contractor from**

16   **July 5th to October, so I was not working for Tesla; I**

17   **was working for a contractor, which was nextSource.**

18      Q.   Okay.  And what was the job that you were

19   doing from July 5th of 2015 to October of 2015?

20      **A.   I was a jani- -- I didn't mean to cut you**

21   **off.  I'm sorry.**

22      Q.   Go ahead.

23      **A.   I was a janitorial supervisor.**

24      Q.   And what did you supervise as the janitorial

25   supervisor?

1   that other people went from being contractors to then

2   working for Tesla as regular Tesla employees?

3             MS. ANTONUCCI:  Objection; lacks foundation.

4             THE WITNESS:  When I started with Tesla -- I

5   mean with nextSource, that was not my observation,

6   because I didn't know the system.  I didn't know how

7   people moved from one area to another.

8             MR. ORGAN:  Q.  I understand.  Okay.

9             Now, in terms -- you ended up getting a job

10  with Tesla; is that correct?

11       A.   Correct.

12       Q.   What was your job with Tesla once you got it

13  in October of 2015?

14       A.   It was also as a janitorial supervisor.

15       Q.   So your job title stayed the same?

16       A.   No.  I got hired on initially as a janitorial

17  supervisor.  Okay?

18       Q.   Working for nextSource?

19       A.   Correct.  No, I mean, when I got hired with

20  Tesla, it was as a janitorial supervisor also.

21       Q.   Okay.  When you went to work for nextSource

22  working at the Tesla plant, your job title was

23  janitorial supervisor; is that right?

24       A.   Correct.

25       Q.   And then when you transitioned from working

 1   from nextSource to Tesla, your job title was also

 2   janitorial supervisor?

 3        A.   Initially, yes.

 4        Q.   So in terms of your transition from working

 5   from nextSource to Tesla, your job title stayed the

 6   same, at least initially; is that right?

 7        A.   Yes.

 8        Q.   How did your job duties change from when you

 9   moved from a janitorial supervisor at nextSource to a

10   janitorial supervisor at Tesla?

11        A.   I was hired as a janitorial supervisor, okay,

12   but since my interview with Mr. Quintero, he explained

13   that his duties involved recycling services, primarily

14   recycling services and janitorial services, okay, and

15   he explained to me that if and when I started working

16   for Tesla, he wanted me to get involved a lot more in

17   the recycling part of the -- so I can be of assistance

18   in both areas.

19        Q.   Did your job title then change shortly after

20   you became a Tesla employee?

21        A.   Yes.

22        Q.   How did your job title change?

23        A.   To contract services supervisor.

24        Q.   Let me just go back to the question a couple

25   back where I asked you initially when you first were

```
 1       Q.   Do you know who they worked for?
 2       A.   Again, I think it was through nextSource, but
 3   it might have been some City Staff and other agencies
 4   also.
 5       Q.   And the elevators, this was the way that
 6   products got from either the lower level to the upper
 7   level or the upper level to the lower level; is that
 8   right?
 9       A.   Yes.  Moving production materials for the
10   building of cars.
11       Q.   These are, like, heavy-duty elevators, you
12   said; right?
13       A.   Yes, they're humongous, probably the size of
14   your -- half of your office here.
15       Q.   Okay.  I haven't been to the Tesla factory,
16   so tell me, pretty much, what was the role of the
17   elevators?  What were they supposed to do?
18       A.   Okay.  The elevators were there to move
19   product, and actually the primary responsibility was
20   to move material up and down for the production -- the
21   construction of cars.  Okay?
22            The group that I supervised, supervises the
23   two large elevators.  And we had forklift drivers,
24   tugger drivers, who moved this material up and down
25   the elevators all day long.  We had drop zones near
```

1   had said there was some kind of relationship between

2   Hilda and Aaron?

3       A.   My job was to -- if anybody had any concerns

4   or complaints, to escalate it to the point where I

5   could escalate it.  And so what I did is I reported it

6   to Mr. Salazar, which was the manager in recycling,

7   okay, and if I remember correctly, during that time I

8   was just being introduced to the elevators, so it was

9   kind of, like, they're still in charge, okay, and

10  that's the way it was handled.  It was escalated to

11  the right people.

12      Q.   So when you were a supervisor, your job,

13  whenever you heard a complaint, was to escalate that

14  complaint or those concerns to a level where someone

15  could address it; is that right?

16      A.   In other words, if it was -- as a supervisor,

17  I could take it to a certain level, which primarily

18  meant dealing with either Victor Quintero or HR or,

19  you know, one of those individuals.  Or the

20  contractors' representative, the account manager, I

21  would take it to that point, and then they would deal

22  with it from there.

23      Q.   Did you feel like any of these things you

24  heard about from either Jesse or Hilda were concerns

25  that needed to be raised to the HR level?

```
 1    his hair, with a caption under it saying "boo."
 2        A.    Mm-hm.
 3        Q.    Right?
 4        A.    Yes.
 5        Q.    That's what he told you; right?
 6        A.    Yes.
 7        Q.    And it was clear to you, wasn't it, that that
 8    was offensive to Mr. Diaz?
 9        A.    Of course.
10        Q.    In fact, down at the bottom, Mr. Diaz puts in
11    his text to you, "A person should be able to come to
12    work and not be harassed or degraded while they're
13    trying to do their job"; right?
14        A.    Yes.
15        Q.    It was clear to you that Mr. Diaz was
16    suggesting that he felt harassed and degraded by that
17    poster; right?
18        A.    That's why we took action.
19        Q.    He then references down here, "This is not
20    the first time Ramon Martinez has been" -- I think
21    "talked about, about his behavior."
22              That was in reference to the prior incident
23    where Mr. Diaz had complained about Ramon Martinez
24    saying things or threatening him on the elevator;
25    right?
```

EDWARD ROMERO
November 30, 2018

Page 127

1           MS. ANTONUCCI:   Objection; calls for a legal

2   conclusion, misstates prior testimony.

3           THE WITNESS:   He did not talk to me about

4   that, specifically.

5           MR. ORGAN:   Q.   Did you ask him about it?

6       A.   I did not.

7       Q.   Why not?

8       A.   Because I was going to direct this

9   information to the appropriate people to handle it.

10      Q.   And the appropriate people to handle it were

11   Wayne Jackson and Victor Quintero?

12      A.   Correct.

13      Q.   So once the information that was in this

14   email or text message -- whatever it was -- was

15   communicated by you to Wayne Jackson and Victor

16   Quintero, you felt like your role was over; is that

17   correct?

18           MS. ANTONUCCI:   Objection; misstates

19   testimony.   Vague.

20           THE WITNESS:   I didn't think that my

21   responsibilities were over.   I felt I had done what I

22   was supposed to do, placing it where some action could

23   be taken.

24           MR. ORGAN:   Okay.

25      Q.   If you go to the second page of Exhibit 37,

 1   terms; right?

 2       **A.   That the witnesses denied hearing any racial**

 3   **slurs being made.**

 4       Q.   But the witnesses also said that Mr. Timbreza

 5   had a tendency to kid around excessively.

 6       **A.   Correct.**

 7       Q.   Right?

 8            And you had no basis to suggest or think that

 9   Owen Diaz was lying about this, did you?

10       **A.   No.**

11            MS. ANTONUCCI:  Objection; vague.

12            MR. ORGAN:  Q.   In fact, a verbal warning was

13   issued to Mr. Timbreza, wasn't it?

14       **A.   It was for his kidding around excessively.**

15       Q.   Did it mention anything about racially

16   offensive remarks?

17       **A.   I don't think that it did.**

18       Q.   Did you see this verbal warning that --

19       **A.   I don't remember.**

20       Q.   Let me finish the question.

21       **A.   Okay.**

22       Q.   Did you see the verbal warning that was

23   issued to Mr. Timbreza?

24       **A.   I do not remember looking at it.  I can't**

25   **remember looking at it.**

1    **would have taken.**

2              MS. ANTONUCCI:  Don't speculate if you don't

3    remember.

4              THE WITNESS:  I don't remember.

5              MR. ORGAN:  Q.  But your practice would have

6    been if you received it, to forward it along; correct?

7        **A.    I think so.**

8        Q.    And you at least have a general recollection

9    of receiving a statement from Ramon about what he said

10   happened; right?

11       **A.    Yes.**

12       Q.    And then if you look -- let's go to the next

13   one.

14              (Whereupon Deposition Exhibit 57

15               was marked for identification.)

16              MR. ORGAN:  57.

17              Exhibit 57, for the record, is a one-page

18   document, Bates-stamped Tesla 134.  And it's a series

19   of emails from October 20th of 2015.

20       Q.    If you look at the email at 12:41 p.m., which

21   is the one in the middle, it says, "It looks like

22   Victor is asking Ed Romero to get involved in a

23   temporary worker ER issue.  My recommendation is that

24   Ed not be involved.  Can you help me sort this out."

25              Who was Terri Garrett at that point?

1      **A.      She was the nextSource manager out of New**

2  **York.**

3      Q.     It says here, "Two of the three workers have

4  already been interviewed.   Please advise."

5             Did you interview two of the three workers?

6      **A.      Where are you looking at that?**

7      Q.     That same paragraph.

8      **A.      Oh, I see.**

9             **No.   I remember Erin sending me this email, I**

10 **had not had -- now I remember, I didn't have any**

11 **meetings with anybody.   I had been asked to by Victor,**

12 **and before that ever happened, HR said no, no, no,**

13 **don't get involved in that.**

14     Q.     Who was Aaron Marconi?

15     **A.      She was the HR person for Tesla.**

16             **I need to go to the bathroom again.**

17             MR. ORGAN:   Let's take a break.

18             We're off the record.   The time is 4:06.

19             (Recess taken from 4:06 p.m. to 4:16 p.m.)

20             MR. ORGAN:   Back on the record.   The time is

21 4:16.

22             This is 58.

23             (Whereupon Deposition Exhibit 58

24              was marked for identification.)

25             MR. ORGAN:   Q.   Exhibit 58, for the record,

1    this incident?

2            MS. ANTONUCCI:  Objection; vague.

3            MR. ORGAN:  Q.  I'm just wondering, did it

4    appear to you that Mr. Owen Diaz followed the correct

5    procedure here with respect to this incident and the

6    elevator?

7        A.    I think that he looked into it appropriately.

8        Q.    And I guess Rathaj Foster was then

9    terminated; is that right?

10       A.    I don't recall if he was terminated because

11   of this.  This was -- as you notice, it was -- I think

12   we included Wayne Jackson as part of this.

13           MR. ORGAN:  Okay.  Let's make this 64.

14           (Whereupon Deposition Exhibit 64

15            was marked for identification.)

16           MR. ORGAN:  Q.  Exhibit 64, for the record,

17   is a two-page document -- three-page document,

18   Bates-stamped City Staff 11 through 13.  And the

19   subject matter is termination of Rathaj foster.

20           This was Mr. Foster engaged in threatening

21   conduct towards Owen Diaz; right?

22       A.    Yes.

23           MS. ANTONUCCI:  Objection; vague.

24           MR. ORGAN:  Q.  Well, that was your

25   understanding; that Rathaj Foster was removed from

1    A.    Yes.

2    Q.    And in that, you mentioned that Rathaj Foster

3  had been removed the previous night at 10:00 p.m. from

4  the Tesla premises; right?

5    **A.    He was removed to avoid any more friction**

6  **that day between him and Owen.**

7    Q.    Right.

8        And you had -- you first got a report where

9  Mr. Foster was making a claim about not being able to

10  take a break; correct?   That's what Mr. Foster was

11  claiming.

12    **A.    He did.   And there's other information that**

13  **Wayne -- I mean -- Wayne.   And I don't remember where**

14  **it is, but Owen was -- I don't know if these are**

15  **referring to the same night, that he asked Rathaj to**

16  **go -- to wait to take his break.**

17    Q.    And that was because they were short-staffed;

18  right?

19    **A.    Correct.   It could be that, or it could be**

20  **that there was a lot of production material to move.**

21    Q.    But Owen told you that Mr. Foster said, "You

22  better watch your car," or something like that;

23  correct?

24    **A.    He did say that.**

25    Q.    And then you interviewed someone else who was

1   present; right?  Jordano Ramirez.

2       A.   Jordan?

3       Q.   If you look at the bottom of the second page

4   of Exhibit 64, you'll see that you interviewed Jordano

5   Ramirez; right?

6       A.   Show me where that's at.

7       Q.   Actually, you've got a written statement from

8   him; correct?

9       A.   Yes.

10      Q.   And he wrote in his statement that he

11  witnessed Rathaj foster conducting himself in a

12  threatening manner towards Owen Diaz; right?

13      A.   Mm-hm.

14      Q.   So you were the one who called security and

15  explained the situation; right?

16      A.   I did.

17      Q.   You were the one that had Mr. Foster removed

18  from the premises; right?

19      A.   Yes.

20      Q.   Because you had corroboration that Mr. Foster

21  was threatening Mr. Diaz; right?

22      A.   Yes.

23      Q.   And that was inappropriate conduct; right?

24      A.   It was.  I took it very serious when anybody

25  made any threats toward anybody else.

1   State of California                )

2   County of Marin                    )

3

4            I, Bridget M. Mattos, hereby certify

5   that the witness in the foregoing deposition was by me

6   duly sworn to testify to the truth, the whole truth

7   and nothing but the truth in the within entitled

8   cause; that said deposition was taken at the time and

9   place herein named; that the deposition is a true

10  record of the witness's testimony as reported to the

11  best of my ability by me, a duly certified shorthand

12  reporter and disinterested person, and was thereafter

13  transcribed under my direction into typewriting by

14  computer; that the witness was given an opportunity to

15  read, correct and sign the deposition.

16            I further certify that I am not

17  interested in the outcome of said action nor connected

18  with or related to any of the parties in said action

19  nor to their respective counsel.

20            IN WITNESS WHEREOF, I have hereunder

21  subscribed my hand on November 30, 2018.

22

    _____

23      BRIDGET M. MATTOS, CSR NO. 11410

24

25

# Exhibit

# 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

DEMETRIC DIAZ, OWEN DIAZ AND          )
LAMAR PATTERSON,                      )
                                      )
                    Plaintiffs,       )CASE NO.
                                      )3:17-cv-06748-WHO
         vs.                          )
                                      )
TESLA, INC., DBA TESLA MOTORS,        )
INC.; CITISTAFF SOLUTIONS, INC.;      )
WEST VALLEY STAFFING GROUP;           )
CHARTWELL STAFFING SERVICES,          )
INC.; AND DOES 1-50, INCLUSIVE,       )
                                      )
                    Defendants.       )
_____)


VIDEOTAPED DEPOSITION OF TAMOTSU KAWASAKI


DATE:          OCTOBER 9, 2019

TIME:          2:05 P.M.

LOCATION:      CALIFORNIA CIVIL RIGHTS LAW GROUP
               180 GRAND AVENUE, SUITE 1380
               OAKLAND, CALIFORNIA




REPORTED BY:  ANGIE M. MATERAZZI
              Certified Shorthand Reporter
              License No. 13116

```
 1    APPEARANCES:
 2
           FOR THE PLAINTIFFS:
 3
                BY:  LAWRENCE A. ORGAN, ESQ.
 4              CALIFORNIA CIVIL RIGHTS LAW GROUP
                332 SAN ANSELMO AVENUE
 5              SAN ANSELMO, CALIFORNIA 94960
                (415)453-4720
 6              LARRY@CIVILRIGHTSCA.COM
 7
 8         FOR THE DEFENDANTS, TESLA MOTORS:
 9              BY:  PATRICIA M. JENG, ESQ.
                SHEPPARD MULLIN
10              FOUR EMBARCADERO CENTER, 17TH FLOOR
                SAN FRANCISCO, CALIFORNIA 94111
11              (415)434-9100
                PJENG@SHEPPARDMULLIN.COM
12
13         FOR DEFENDANTS, CITISTAFF SOLUTIONS:
14              BY:  SUSAN T. KUMAGAI, ESQ.
                LAFAYETTE & KUMAGAI
15              1300 CLAY STREET, SUITE 810
                OAKLAND, CALIFORNIA 94612
16              (415)357-4600
                SKUMAGAI@LKCLAW.COM
17
18         FOR DEFENDANTS, NEXTSOURCE:
19              BY:  JUAN C. ARANEDA, ESQ.
                FISHER PHILLIPS
20              ONE EMBARCADERO CENTER, SUITE 2050
                SAN FRANCISCO, CALIFORNIA 94111
21              (415)490-9000
                JARANEDA@FISHERPHILLIPS.COM
22
23
24
25
```

1   use the bathroom, I would step in and fill the position

2   for the five, ten minutes they left to go use the

3   bathroom, whatever it is, or get something to eat.  I

4   mean, we were working 12-hours days, I wasn't trying to

5   burn anybody out.  If they needed a break, they needed a

6   break.

7           And then he called me -- Owen had called me

8   and said he got into altercation, so I drove back to the

9   elevators and said what happened and they were arguing

10  and I can't -- can't really remember what the argument

11  was about, but I -- I think they -- I think some-

12  something -- I forget what he said.  He said

13  something -- that he called him something.  I just

14  forget what it was, but I have it all down in e-mail.  I

15  know I e-mailed everything to my immediate supervisor

16  that night.

17      Q.   Okay.  So I'm going to show you an e-mail that

18  you sent at the end of July, so July 31st.  This is

19  Exhibit 42.  And just so the record is clear, we're

20  looking at Tesla 510.

21           You mentioned an e-mail that you sent.  Is

22  this the e-mail you sent about what information you

23  received from Owen Diaz?

24      A.   Yep.

25      Q.   You mention in here -- and -- and you sent --

1    another employee.  Whether it was joking or not, you

2    still said it, you got to go home.

3         Q.   Right.  So let me just break that down.

4              So you recall that Mr. Timreza -- or at least

5    Mr. Diaz said that Mr. Timreza had used a racial slur

6    towards him, correct?

7         A.   Correct.

8         Q.   And that -- as you think about it, you recall

9    that -- at least one of the racial slurs he used was

10   dumb nigger; is that right?

11             MR. ARANEDA:   Objection, misstates his

12   testimony.

13             THE WITNESS:   It -- I know racial slurs were

14   said.  I can't very verify that the N-word was said, but

15   from what they were arguing about, I know Owen said he

16   called me the N-word.  I remember Owen saying that he

17   called me the N-word and they were arguing, where they

18   were almost about to get into a fight.  So I got into

19   the middle of it and said -- it happened and there was

20   other people around that said it as well, that this

21   altercation happened, so in my book, as a supervisor,

22   I'm going to separate the two.

23   BY MR. ORGAN:

24        Q.   Okay.  Okay.  So let me break that down.  So

25   you do recall that Mr. Diaz, at least, told you that

```
 1   Mr. Timreza had used the N-word towards him?
 2        A.   Correct.
 3        Q.   And you also recall that other people told you
 4   that they had heard racial terms used; is that right?
 5        A.   Correct.
 6             MR. ARANEDA:   Objection, misstates his
 7   testimony.
 8   BY MR. ORGAN:
 9        Q.   Did -- did anyone ever tell you -- anyone
10   else -- other than Mr. Diaz -- tell you they had also
11   heard the N-word directed towards Mr. Diaz?
12        A.   I don't remember anybody else telling me that
13   the N-word was directed towards him.  I mean, it's -- we
14   live in that era where that words is very -- throw
15   around very casually.
16        Q.   Right.  But in terms of workplace policy at
17   the Tesla factory, people were not supposed to use the
18   N-word there?
19        A.   Correct.  That's any workplace.
20        Q.   Right.  Whether people use the word
21   casually -- in their everyday life or not -- is
22   irrelevant, relative to the workplace, right?
23        A.   Correct.
24             MS. JENG:   Objection, calls for a legal
25   conclusion.
```

```
 1              THE WITNESS:  Correct.
 2   BY MR. ORGAN:
 3      Q.   And in terms of the way -- did you receive any
 4   training by Tesla about like workplace conduct on -- you
 5   know, things you shouldn't say and it's okay to say,
 6   any -- any training like that?
 7      A.   I didn't get any training from Tesla, if
 8   that's what you're saying.
 9      Q.   Okay.  So Tesla didn't give you any training
10   about discrimination or harassment?
11      A.   They gave me a paper, when I became a lead, to
12   sign and I read, but not per se going to a class and
13   doing any training.  It's just probably roughly a paper
14   to back themselves.
15      Q.   Okay.  And then let's -- let's go back to this
16   night, when you were talking to Owen Diaz.  You said
17   that you sent Judy Timbreza home.
18              Did Mr. Timreza admit that he had used some
19   inappropriate language?
20      A.   He -- he argued about it and said he didn't do
21   it.  But at that time, them really arguing, almost
22   getting into a fight, and other people in the area
23   telling me that -- that was said in nature, it was my --
24   my decision to say, hey, what -- I can't keep them both
25   together and I can't put Judy in another department,
```

1    **there's nothing else for me to put him, I need to**

2    **separate these guys and those natures were said.  At my**

3    **standpoint, I -- there's people around, they said what**

4    **they said.  Okay, well, you got to go home.  You --**

5    **that's not -- that's not cool, that's not right, you**

6    **can't do that.**

7         Q.   So -- so based on the information that you

8    received from the people that you talked to in the

9    general area were Owen and Judy Timbreza were working,

10   you -- you made the assessment that Mr. Timreza had at

11   least used some inappropriate words, correct?

12        **A.   Correct.**

13        Q.   And based on that determination you sent

14   Mr. Timreza home, correct?

15        **A.   Correct.**

16        Q.   Was there anybody who's -- who had said that

17   Mr. Diaz had used any inappropriate words?

18        **A.   Not from my recollection, no.**

19        Q.   Okay.  And then did -- do you remember whether

20   or not Mr. Diaz said that Mr. Timreza had used the word

21   jiggabo?

22             Do you remember him complaining about that

23   word?

24        **A.   No.  Not to me, per se, about jiggabo.  No,**

25   **that never --**

```
 1   on similar social positions with those two individuals?
 2             MS. JENG:  Objection, misstates --
 3             MR. ORGAN:  That's a bad question.
 4   BY MR. ORGAN:
 5       Q.   Let me -- were you -- you guys were friends at
 6   work; is that fair?
 7       A.   Everybody's friends at work.  Man, we're all
 8   colleagues, nobody wants to --
 9       Q.   Sure.
10       A.   -- be that guy, so.
11       Q.   Right.
12       A.   Yeah.
13       Q.   Did you -- did you socialize with either
14   Mr. Timreza or Mr. Diaz outside of work?
15       A.   No.
16       Q.   After work hours or anything like that?
17       A.   Never.  No, I don't have -- no, I don't do
18   that.
19       Q.   Okay.
20       A.   Sorry.  I had my own friends.
21       Q.   Okay.  I -- I get that too.
22             And did Mr. Romero follow up with you after
23   you sent the e-mail on the 31st, to ask you more
24   specifically what the racist words or comments were that
25   Mr. Timreza had used?
```

1      A.   Yeah.   I believe Edward came -- I want to say

2  that Monday, he came at the tail end of my shift and we

3  ate breakfast together in one of the cafeterias and

4  talked about what happened.

5           And I told him, This is what happened, other

6  people had told me, I took my own decision and said,

7  Hey, we've got to separate them, this guy has to go

8  home, so I sent him home.   And I said, I e-mailed you

9  guys and that's it.   Wherever you take it from there, I

10  mean that's -- the ball is in your court.

11      Q.   Okay.

12      A.   In my eyes, I just pretty much handed it off

13  to the next person.   It had nothing -- I -- because like

14  I said, I don't have the power to do anything like that,

15  these guys above me that can subsequently reprimand or

16  do whatever they so choose.

17      Q.   It wasn't your -- it wasn't your place to give

18  any kind of written warning or anything like that to

19  Mr. Timreza; is that right?   Is that what you're saying?

20      A.   So it was -- that's where it gets -- Edward

21  did come that Monday with -- he said there's a rule that

22  there's these three written warnings before anybody gets

23  laid off, I guess.   That's what -- that Monday he told

24  me about that.

25           Like I said, I didn't have any training or any

1    **knowledge of anything like that.  All I knew was, if**

2    **there was an issue on my shift, e-mail it and cc these**

3    **people on it.**

4         Q.   Okay.  And was -- did Edward Romero tell you

5    that -- because if you look at the top of the e-mail,

6    which is -- if you look at your -- it's 8/2 so --

7         **A.   August 2nd.**

8         Q.   Yeah, 2015.  It says, I believe we can handle

9    the situation.

10         Do you see that, where you're saying that to

11   Mr. Quintero?  Do -- do you remember -- does that

12   refresh your recollection about -- did you ever have any

13   conversations with Mr. Quintero about what had happened

14   between Judy Timbreza and Mr. Owen Diaz?

15        **A.   No -- no, I cc'd him.  As -- as you can see,**

16   **he replied back, Let me know if he can help in this**

17   **matter and he was on vacation that weekend.**

18        Q.   Oh, okay.  And then --

19        **A.   So that's where I said I think we can handle**

20   **the situation.**

21        Q.   And when you say the -- the we there, that we

22   can handle the situation, you included Ed Romero in the

23   we; is that correct?

24             MR. ARANEDA:  Objection, calls for

25   speculation -- I mean, lacks foundation.

```
 1        Q.   Okay.  All the time.

 2             Did you ever -- were you ever aware of any

 3   kind of run-ins or problems between Owen Diaz and Ramon

 4   Martinez?

 5        A.   I vaguely remember Owen saying that he -- him

 6   and Ramon didn't like each other.

 7        Q.   Okay.

 8        A.   But I don't remember why.  I mean, like I

 9   said, I keep to myself.  Stuff like that goes in one ear

10   and out the other.  What does it bother me, you guys

11   don't like each other.  You guys are -- you guys work

12   together.  What does it matter.  You don't got to like

13   everybody you work with.

14        Q.   Okay.

15        A.   Even right now, I don't like some people I

16   work with, but I deal with it.

17        Q.   Sure.  Okay.  Let's see.  Any -- do you

18   remember anything else about that conversation you had

19   with Ed Romero about the Judy Timbreza, Owen Diaz

20   interaction?

21        A.   Like I said, I -- the only thing I remember is

22   I know I e-mailed them.  He asked me what the e-mail was

23   about.  I told him they got into an altercation, racial

24   slurs were said -- that was said to Owen from Judy and I

25   sent Judy home and the ball is in your court.
```

 1          **And that's where Ed -- Edward came out with,**

 2  **Well, let's -- we can write him up for this situation**

 3  **right here and three write-ups is a layoff and then he**

 4  **gave me that paperwork and I in turn brought it to Judy**

 5  **and said you need to sign this, this is what happened.**

 6  **It's not saying you're going to get laid off.  It's just**

 7  **a document stating that this situation happened and**

 8  **you're being written up for it.**

 9      Q.   So do you recall that there was some kind of

10  writing, in terms of writing up Mr. Martinez (sic) for

11  his conduct, relative to Mr. Diaz; is that right?

12      A.   There should be documents that Ed gave to me

13  that I in turn had signed.  I don't know what Ed did

14  with those documents after.

15          That's -- like I said, I -- that's above my

16  pay grade.  I don't know -- like I said, I e-mailed,

17  they had me do what I -- I had to do -- have sign the

18  documents.  I gave everything over to them.  I don't

19  know what they did, where they filed it.  There

20  was nothing ever after that, towards me.

21      Q.   Okay.

22      A.   Like, they didn't say this is what happened,

23  this is what we're doing, nothing like that.

24      **Q.   Okay.  And then do -- do you remember if Ed**

25  **Romero actually did any kind of investigation of his**

1    own, that he made you aware of?

2        A.    Not that he made me aware of, like

3    investigation-wise.    I don't know.    I thought that he

4    just got written up for it and that was the end of it.

5    Like I said, my recollection is -- I got -- I gave him

6    the documents to sign, wrote up, I then in turn gave the

7    documents back to Edward.

8        Q.    Okay.    So if I have it down right, at some

9    point after the altercation between Owen Diaz and Judy

10   Timbreza, Mr. Romero gave you some kind of write-up for

11   Mr. Timreza; is that right?

12       A.    I -- I believe he said that was Tesla's, I

13   guess, their -- their way of backing themself, when an

14   altercation like -- something -- or any altercation that

15   happens, you can write them up for it and they had a

16   three write-up rule.    After the third write-up, was a

17   termination.

18       Q.    Okay.    And so in terms of the write-up for

19   Mr. Timreza, that was given to you by Mr. Diaz (sic) and

20   then you got Mr. Timreza to sign it and then returned it

21   to Mr. Diaz; is that right?

22       A.    Correct.

23       Q.    And -- and just so we're clear --

24       A.    Mr. Diaz -- Romero.    You're talking about --

25       Q.    I'm sorry.

```
 1       Q.   Okay.

 2       A.   So -- and I tried calling him, but he didn't

 3   answer, his phone was off.

 4       Q.   Okay.  Did -- did -- and after this e-mail

 5   exchange between you and Mr. Romero, did you have any

 6   additional discussions with Mr. Romero about Judy

 7   Timbreza, that you can recall?

 8       A.   We didn't have any different discussions.  All

 9   I know is after that, Judy did not work for Tesla

10   anymore or for the staffing company, so I took it upon

11   myself to believe he got laid off.  They didn't tell me

12   what was going to happen.

13       Q.   Okay.

14       A.   So...

15       Q.   So after -- after you had the -- the

16   discussion with Mr. Romero, you don't know what happened

17   to Judy Timbreza; is that right?

18       A.   He stopped -- he wasn't working for my shift

19   anymore.  For all I know, he could have been on day

20   shift.

21       Q.   Okay.

22       A.   But I'm assuming.

23       Q.   Now, I'm going to ask you if this refreshes

24   your recollection -- actually you're not on this e-mail.

25   This one.
```

```
 1   the elevator operator didn't show up and it was just you
 2   and Owen and it was just the two of you operating the
 3   elevators together?
 4        A.   Yes.  That happened a few times.
 5        Q.   Okay.  And in terms of Mr. Diaz's performance
 6   as a -- as an elevator operator, based just on your
 7   experience, how would you describe Mr. Diaz's
 8   performance, as an elevator operator?
 9        A.   I had no issues with him performing as an
10   elevator operator and I had no issues with him
11   performing as a lead.
12        Q.   Okay.
13        A.   I wouldn't have recommended a person that
14   wasn't ready for that position.  I mean, when I got
15   there, I busted my butt day in and day out, and somebody
16   else recognized it and put me in a position.  When I see
17   somebody busting their butt, I'm going to pay it forward
18   and put them in a position.
19        Q.   Did -- did any of the people who had to work
20   with -- you know, any of the -- the Tesla people that
21   had to work with the elevators, did anyone ever complain
22   to you about any of Owen Diaz's conduct in any way?
23        A.   Nope.  Everybody always had a complaint
24   because -- like I said, that elevator ran production.
25   So if the batteries weren't getting up, that means that
```

```
 1    factory, it doesn't stop.

 2         Q.   Sure.  I'm going to show you what's been

 3    previously marked as Exhibit 34.  Exhibit 34, for the

 4    record, is a one-page document Bates-stamped ODIAZ3 and

 5    it's an e-mail from Diaz to Mr. Romero and to you on

 6    October 17th at 6:08 p.m.

 7              Do you remember Mr. Diaz complaining about

 8    Ramon Martinez threatening him?

 9         A.   Yeah, I remember this.

10         Q.   Tell me -- tell me about what you recall

11    relating to this threatening incident by Mr. Martinez

12    towards Mr. Diaz.

13         A.   I remember Owen saying that -- like he stated,

14    that Roman was waiting down at the bottom elevator,

15    where Roman wasn't supposed to be because he had nothing

16    to do with the inside team.  He had everything to do

17    with the outside bailer team and bailing those

18    cardboards and putting them on the lift.  And then in

19    turn was trying to get over -- I guess he was trying to

20    be -- show Owen that he was the boss.  But at the same

21    time he wasn't because I had control of the team -- of

22    the inside building and the outside.

23              Now, in turn, he e-mailed this situation and I

24    believe I was off this day and I got the e-mail and

25    Edward got the e-mail, but Edward dealt with it.
```

```
 1    is 3:35.

 2              (Off the record at 3:35 p.m. and back on

 3               the record at 3:37 p.m.)

 4              MR. ORGAN:  Okay.  We're back on the record.

 5    The time is 3:37.

 6    BY MR. ORGAN:

 7       Q.   Did -- when you were walking around the

 8    facility, did you ever hear anyone using the N-word,

 9    even if you can't identify them, did you hear that word?

10       A.   I mean, I heard it all the over the facility.

11    I mean, it's -- there's a bunch of staffing companies,

12    man.  I mean, you had -- you had a range of people, man.

13    Staffing companies hire -- you go to a staffing company

14    because you can't get a job, per se, like a -- I guess a

15    real person or whatever, you have a background, whatever

16    it is.  I mean, we filtered through a lot of people.

17    I'm not knocking people for what they do, but it's a

18    staffing agency, per se.  So you got a wide arrange of

19    people.

20              Like I said, in our age, that word gets thrown

21    around very causally.  Now, if you -- there is tones the

22    way you say it and what it is, but -- I mean, I've heard

23    it thrown around there, yeah.

24       Q.   How -- how often do you think you heard the

25    N-word at the Tesla factory?
```

1      **A.   I couldn't -- I really could not tell you how**

2   **often I heard it.   But, I mean, you hear it.   I mean, it**

3   **is what it is.**

4      Q.   Okay.

5      **A.   I don't think nothing of it.   I mean, no**

6   **complaints were brought to me, so -- and I don't know**

7   **what was brought to other people, so.**

8      Q.   When you say no complaints were brought to

9   you, other than the one by --

10     **A.   Owen Diaz.**

11     Q.   Right.

12     **A.   Yeah.**

13     Q.   Okay.   And in terms of -- there was -- I -- I

14  saw an e-mail about an NDA, I -- which I think is a

15  Nondisclosure Agreement.

16         Did you -- did you have any -- were you

17  required to sign any kind of NDA, as part of your work

18  at Tesla?

19     **A.   I -- maybe, I don't know.   Was there -- maybe**

20  **if it was in the paperwork they had me sign.   I --**

21     Q.   Okay.

22     **A.   Like I said, I was juiced to become a lead.**

23  **Any paperwork they gave me, all right, I get a $5 pay**

24  **bump an hour, why not.**

25     Q.   And in -- and in terms of the policies that

```
 1              I wasn't totally clear.  Were you present for
 2   that altercation?
 3       A.   I was not present for the altercation.  I came
 4   afterwards, when I was called, to come to the
 5   altercation, and I was in a different part of the
 6   warehouse.  I don't recollect where I was in the
 7   warehouse.  But like I said, I had so many different
 8   positions to fill or oversee --
 9       Q.   Okay.
10       A.   -- in that warehouse.  When I got the call, I
11   went there immediately --
12       Q.   Got it.
13       A.   -- and they were still arguing.
14       Q.   Got it.  So did you witness any parts of the
15   altercation?
16       A.   I didn't witness any part of the altercation,
17   per se.  I just showed up and they were still arguing,
18   almost face-to-face, looked like they were about to
19   fight, so I got off of my cart and went to them and
20   said, You got guys to back away from each other, you
21   know, and what happened and I logged -- I asked Owen
22   what happened, I asked Judy what happened and then there
23   were people around and I asked them what happened.
24              Owen said racial slurs were said.  The people
25   around him said Judy said racial slurs towards Owen and
```

1    **like I said, my decision at that point was, these guys**

2    **are about to fight, one of them's got to go home.  It**

3    **was like Judy was the aggressor, saying racial slurs, so**

4    **I sent him home.**

5        Q.   So you heard -- you said they were still

6    fighting when you got there?

7        **A.   They were arguing.**

8        Q.   They were arguing.

9             Did you hear any part of the argument at all?

10       **A.   I just heard them saying, Back up.  They were**

11   **in each other's face and I remember Owen saying, Back up**

12   **and Judy was saying, What are you going to do and all**

13   **that.  And it looked like they were about to fight and**

14   **that's where I intercepted and broke them apart --**

15       Q.   Okay.

16       **A.   -- and said, You go over there and you go over**

17   **there and that's in turn why --**

18       Q.   So is that everything you remember hearing

19   from --

20       **A.   Yeah.  I just remember --**

21       Q.   -- that altercation?

22       **A.   -- them saying back up to each other.  I don't**

23   **remember hearing any -- like I said, I didn't hear any**

24   **racial slurs, I didn't -- all I got was from what**

25   **happened around at that time --**

Bridget Mattos & Associates
(415)747-8710

1          Okay, well, my decision, you got to go home

2     and I ended up covering the rest of the elevator shift

3     for that day.

4          Q.   And the other people that you spoke with, what

5     they were doing, when --

6          A.   So in the elevator -- it's -- it's -- there's

7     a walkway in front of it and like I say, you see the

8     elevator on the map, there's a cafeteria, so everybody

9     from that line side is coming to take their break.  I

10    think it might have been on a break time, where people

11    were falling off that line and they were just overseeing

12    it.

13          I don't know who they were.  Like I said, I

14    only know the employees that I have under me.  Everybody

15    else was a blur.

16          Q.   After you sent Mr. Timreza home that night,

17    did you ever see him at Tesla again?

18          A.   I think I -- I seen him the next day.

19          Q.   Okay.

20          A.   I seen him the next day.  I didn't send -- I

21    didn't say you're -- you're home indefinitely.  I just

22    said, You got to go home for the night.

23          Q.   You mentioned that at some point he no longer

24    worked at Tesla, as far as you knew, at least on your

25    shift.

1      A.    Yes.

2      Q.    Did Mr. Diaz work that day?

3      A.    Yes.

4      Q.    Okay.  Did you work Sunday?

5      A.    I did work Sunday.

6      Q.    Did Mr. Timreza work that day?

7      A.    I believe so, yeah, yeah.  He worked up until

8   Monday.  The last day I seen him -- he -- so he had

9   Monday, Tuesday off.

10      Q.    Okay.

11      A.    Right.  So he worked Wednesday, Thursday,

12   Friday, Saturday, Sunday.  He had Monday, Tuesday off.

13   He didn't come back -- they -- that's on Monday, they

14   told me that he's not coming back.

15      Q.    Okay.  And that's --

16      A.    Or they told me to fill the elevator position,

17   so I assumed he's not coming back.  They told me, You

18   need to find somebody on your shift that can cover the

19   elevator and that's where I assumed he's not coming back

20   and then he didn't come back that following Wednesday.

21      Q.    Okay.  When -- do you know if Mr. Diaz worked

22   the Saturday after the altercation?

23      A.    I believe he -- I believe he did because -- I

24   believe he did because I was very attentive on that

25   elevator that night, that Saturday night.  I was --

TAMOTSU KAWASAKI
October 9, 2019

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2

 3              I, ANGIE M. MATERAZZI, CSR No. 13116, duly

 4    authorized to administer oaths Pursuant to Section

 5    2093(b) of the California Code of Civil Procedure,

 6    hereby certify that the witness in the foregoing

 7    deposition was by me duly sworn to testify the truth,

 8    the whole truth and nothing but the truth in the

 9    within-entitled cause; that said deposition was taken at

10    the time and place therein stated; that the testimony of

11    the said witness was reported by me and thereafter

12    transcribed by me or under my direction into

13    typewriting; that the foregoing is a full, complete and

14    true record of said testimony; and that the witness was

15    given an opportunity to read and correct said deposition

16    and to subscribe the same.

17              I further certify that I am not of counsel nor

18    attorney for either or any of the parties in the

19    deposition and caption named, or in any way interested

20    in the outcome of the cause named in said caption.

21              I hereby certify this copy is a true and
      exact copy of the original.
22

23              _____
                ANGIE M. MATERAZZI, CSR 13116
24

25    Date:  _____
```

# Exhibit

# 4

```
                UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

                       ---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

           Plaintiffs,

         vs.                          No. 3:17-cv-06748-WHO

TESLA, INC., dba TESLA
MOTORS, INC.; CITISTAFF
SOLUTIONS, INC.; WEST VALLEY
STAFFING GROUP; CHARTWELL
STAFFING SERVICES, INC.;
and DOES 1-50, inclusive,

           Defendants.

_____//


              DEPOSITION OF VICTOR QUINTERO

                    June 7, 2018
```

Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1                 A P P E A R A N C E S

 2

 3   FOR PLAINTIFF:

 4             CALIFORNIA CIVIL RIGHTS LAW GROUP

 5             BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW

 6             332 San Anselmo Avenue

 7             San Anselmo, California 94960

 8             (415) 453-4740

 9

10   FOR DEFENDANT:

11             CONSTANGY, BROOKS, SMITH & PROPHETE

12             BY:  BARBARA ANTONUCCI, ATTORNEY AT LAW

13             351 California Street, Suite 200

14             San Francisco, California 94104

15             (415) 918-3006

16

17   (NOT PRESENT)

18   FOR DEFENDANT:

19             PAHL & MCCAY

20             BY:  FENN HORTON, ATTORNEY AT LAW

21             225 West Santa Clara Street, Suite 1500

22             San Jose, California 95113

23             (408) 286-5100

24

25   THE VIDEOGRAPHER:  SAJA SPEARMAN, CCRLG
```

1      A.    Yeah, now I got it now.

2      Q.    -- those you can testify about.

3            Does that make sense?

4      A.    Yes, because some of that I didn't know at

5  the time, until now.

6      Q.    Right.

7            That's the interesting thing about PMK

8  depositions in federal court versus PMQ depositions in

9  state court.  In state court, you don't have to learn

10 stuff.  In federal court, you have to learn it.  So

11 anyway -- okay.

12           What was your position in May 2014 when you

13 started working at Tesla?

14     A.    I was managing the food services, janitorial

15 services, grounds, landscaping, elevator services,

16 recycling services.  Yeah, I think that was it.

17     Q.    And what was your title?

18     A.    I was custodial program manager, was my

19 official title.

20     Q.    Custodian program manager?

21     A.    Yes.

22     Q.    How many employees were in those areas that

23 you oversaw, the food services, landscaping, elevator,

24 recycling?

25     A.    I don't have specific numbers.  I can give

Bridget Mattos & Associates
(415) 747-8710

1    you general numbers.

2        Q.    Yeah, give me a general number.

3        A.    So I think the janitorial was the largest

4    group we had, like about somewhere between 50 to a

5    hundred employees.

6        Q.    Okay.

7        A.    Food service had like -- I want to say

8    between 25 and 50.  Recycling had like -- I want to

9    say 25, 30.  And then the elevator service had -- it

10   was like four -- four -- like 12, 15.  And landscaping

11   had -- I don't know -- I want to say half a dozen.

12       Q.    So if I have it right, you supervised

13   approximately 118 to 221?

14       A.    I didn't directly supervise them.  I

15   basically managed the contract -- some employees at

16   the time were in-house.  I have supervisors working

17   for me that did supervise them directly.  The

18   employees that were contract employees were managed

19   through the -- their own company supervisors and shift

20   leads.  So basically, we managed the contract.

21       Q.    But there were approximately 118 to 221

22   employees within your sphere of managerial

23   responsibility; is that correct?

24       A.    Approximately.  Yes.

25       Q.    Right.  Approximately.

```
 1    leads, supervisors, and managers.
 2         A.    Yes.
 3         Q.    But in terms of the people who worked on the
 4    contracts -- for example, let's talk about janitorial.
 5    Was there a company that did the janitorial service?
 6         A.    Yes.
 7         Q.    And that company that did the janitorial
 8    service, they had their own shift lead, supervisors
 9    and managers; is that right?
10         A.    Yes, yes, on-site.
11         Q.    And then when they had their on-site shift
12    lead, supervisors and managers, there were also the
13    contract supervisors who were Tesla employees;
14    correct?
15         A.    Yes.
16         Q.    And the Tesla employees, if they wanted to
17    have the janitorial service work in a particular area
18    of the factory because some incident had happened
19    where there was a need for a cleanup, they could
20    direct the shift lead, supervisors and managers for
21    the janitorial contractor to get employees to go
22    there; correct?
23         A.    Yes.
24         Q.    And the contract supervisor could also at
25    least direct the work of those people who were
```

```
 1              MR. ORGAN:  Okay.
 2        Q.    The supervisors could hand out Tesla safety
 3    glasses to their contract employees; correct?
 4        A.    I don't know if they were Tesla or not.  It's
 5    a different company that provides them.  Mallory
 6    Safety or something.
 7        Q.    Are there any of the contractors who worked
 8    in the areas that you have -- for example, janitorial,
 9    food service, recycling, elevator, or landscaping --
10    that transitioned from a contract employee to a
11    regular Tesla employee?
12        A.    Yes.
13        Q.    And when they transition from a contract
14    employee to a regular Tesla employee, did they have to
15    move out of those particular areas, or could they
16    continue to work in the areas they previously worked
17    in?
18        A.    There was very few.  They eventually were
19    separated, so they couldn't -- no, they could not work
20    together.
21        Q.    When did that separation occur?
22        A.    Like shortly after I started working there.
23        Q.    You started in 2014?  You said May 12th of
24    2014?
25        A.    Yes.
```

VICTOR QUINTERO
June 7, 2018

1      Q.   So in 2015, were the workers separated so
2  that they couldn't work with the Tesla workers?
3      **A.   I did it probably like within the first three**
4  **months of my employment.**
5      Q.   Oh, so you separated the contract employees
6  from the regular Tesla employees?
7      **A.   Yes.**
8      Q.   So there would be interactions, though,
9  between regular Tesla employees and the contract
10  employees; right?
11     **A.   When I first started working there, yes.**
12     Q.   Well, for example, the elevator operators,
13  they had interactions with Tesla employees all the
14  time; right?
15     **A.   The elevator operators were never -- when I**
16  **first started working there and took over, there were**
17  **never Tesla employees and contract employees working**
18  **together side by side.**
19     Q.   Meaning, there were no elevator operators who
20  were Tesla employees?
21     **A.   That is correct.**
22     Q.   But Tesla employees would bring stuff onto
23  the elevators; correct?
24          MS. ANTONUCCI:  Objection; lacks foundation.
25          THE WITNESS:  Only the elevator operators

Bridget Mattos & Associates
(415) 747-8710

1    were allowed to bring things into the elevator.

2            MR. ORGAN:  Okay.

3       Q.   But taking stuff to the elevator, that was

4    something that Tesla employees could do; right?

5            MS. ANTONUCCI:  Objection; lacks foundation.

6            Go ahead.

7            THE WITNESS:  There's a drop zone where the

8    people who work on the line deliver things to the

9    line, would leave the product, and then the elevator

10   operators would take it from there, load it, bring it

11   down, and leave it downstairs in the drop zone, or up,

12   and then somebody else would take it from there.  So

13   elevator operators, they only took things up from the

14   top to the bottom or from the bottom up.  Not just

15   anybody could do it, only the elevator operators could

16   do it.

17           MR. ORGAN:  Q.   In terms of -- why did you

18   separate the Tesla employees from the contract

19   employees?

20      A.   Because I didn't want to have any

21   co-employment issues.

22      Q.   You didn't want to have any co-employment

23   issues, what do you mean by that?

24      A.   I didn't want to have contractors and Tesla

25   employees working together side by side; you know,

1    **they had to be separate.   They had to --**

2    **Q.    Why?**

3    **A.    Because I didn't want to have problems with**

4    **co-employment or anything like that.   Whenever**

5    **there's -- like let's say there's an HR issue.   If the**

6    **same company -- you know, they -- typically, they**

7    **handle their own issues.   They have to handle their**

8    **own issues.**

9    **        When you have different companies working**

10   **together side by side, it gets a little bit more**

11   **complicated, and, you know, this HR person has to talk**

12   **to that HR person, and then it's not like the same**

13   **company.   It gets kind of messy.**

14   Q.    Did someone tell you to do this?

15   **A.    No.**

16   Q.    What was your background that you decided

17   that you needed to keep the employees from working

18   together?

19   **A.    Just years of experience and, you know,**

20   **previous employment.**

21   Q.    What was your previous employment to Tesla?

22   **A.    I worked for Intel Corporation.**

23   Q.    Okay.   How long did you work for Intel?

24   **A.    30 years.   30-plus.**

25   Q.    And what did you do at Intel?

```
 1              MR. ORGAN:  Exhibit 35, for the record, is a
 2     three-page document, Bates-stamped Tesla 140 through
 3     142.  And it's some emails from October 20th of 2015.
 4          Q.   Have you seen this email before?
 5          A.   It doesn't show -- it says here "Ramon's
 6     statement," but I don't see Ramon's statement.
 7          Q.   No, I don't know where that is either.
 8          A.   Okay.
 9          Q.   Have you seen Ramon's statement?
10          A.   No.
11          Q.   Have you reviewed Ramon's statement to get
12     ready for today?
13          A.   No, I don't remember this.
14          Q.   You were involved, because your name's
15     referenced by Wayne Jackson.
16          A.   Yes.
17          Q.   What was Wayne Jackson's role?
18          A.   He was the on-site manager for nextSource.
19          Q.   It says here, Ed Romero was instructed by you
20     to meet with Ramon Martinez and Owen Diaz.
21               Do you see that?
22          A.   Yes.
23          Q.   Why were you instructing Ed Romero to get
24     involved in this issue between Ramon Martinez and Owen
25     Diaz?
```

1        MS. ANTONUCCI:  Objection; lacks foundation,
2   calls for speculation.
3        THE WITNESS:  Well, I guess because of the
4   fact that if there was a problem that needed to be
5   solved, he needed to work with him -- both of them
6   being shift supervisors or leads, you know, he needed
7   to make sure they were on the same page, as far as
8   what our expectations are.
9        MR. ORGAN:  Q.  So there was, at least,
10   interface between the Tesla managers and the contract
11   managers; correct?
12   **A.   Yes.**
13   Q.   And they were to work together to resolve
14   workplace issues; right?
15        MS. ANTONUCCI:  Objection; vague, lacks
16   foundation.
17        THE WITNESS:  Yes.  Typically, if there was a
18   problem, they would work together to solve the problem
19   or communicate to their management that there was a
20   problem they needed to go fix.
21        MR. ORGAN:  Q.  Have you ever seen the
22   interview notes between -- relative to Owen Diaz and
23   Ramon Martinez?
24        MS. ANTONUCCI:  Objection.
25        THE WITNESS:  No.

Bridget Mattos & Associates
(415) 747-8710

```
 1              MS. ANTONUCCI:  Vague.

 2              MR. ORGAN:  Q.  And when I'm talking about

 3      "interview notes," I'm talking about interview notes

 4      relating to this incident where Owen Diaz is talking

 5      about threatening conduct on the elevator on October

 6      17th.

 7         A.   I only saw this about a week ago.

 8         Q.   You don't recall what other involvement you

 9      had, other than to tell Ed Romero to work with Owen

10      Diaz and Ramon Martinez; right?

11         A.   Say that again.

12         Q.   You don't recall, other than the references

13      here to your asking Ed Romero to coordinate with Ramon

14      Martinez and Owen Diaz to work out that workplace

15      issue; correct?

16         A.   Yeah, I mean, I don't have the -- I don't

17      remember the specifics at the time.  But more than

18      likely, Ed may have talked to me about it, because I

19      know he did talk to me about Owen's pattern of

20      collaboration issues with people, you know, negative

21      behavior.

22         Q.   Ed Romero talked to you about that?

23         A.   Yes.

24         Q.   Okay.

25         A.   And so it would have been Ed's job to talk to
```

```
 1       Q.   Have you ever heard of a pickaninny?
 2       A.   Pickaninny?
 3       Q.   Pickaninny.
 4       A.   No.
 5       Q.   A pickaninny is an offensive image that was
 6  used at the turn of the last century to depict
 7  African-Americans in offensive ways.
 8            Have you ever of that?
 9       A.   No, not that.
10       Q.   Okay.
11       A.   I'm not that old.
12       Q.   No, I didn't think you were.
13            How old are you?
14       A.   59.
15       Q.   And what was done as a result of your
16  receiving this picture, which is the second page of
17  Exhibit 37?
18       A.   Yeah, so Wayne and I talked about it, and
19  Wayne stated that he was going to -- he either had or
20  was going to suspend Ramon, and that -- so we talked
21  about whether Ramon should be terminated or not.  And
22  so the decision was made to give him a permanent
23  written warning to make sure it didn't happen again.
24  And I remember the decision was based on the fact that
25  Ramon had never exhibited this type of behavior
```

1    **before, as far as like anything that was offensive to**

2    **anybody, doing anything that's offensive to anybody.**

3    **And, yeah, so that was the decision that was made at**

4    **the time.  Basically, it was Wayne's decision, and I**

5    **agreed.**

6         Q.   Okay.  So the two of you talked about it --

7         **A.   Yes.**

8         Q.   -- and decided on a course of action;

9    correct?

10        **A.   Yes.  But mainly, it was Wayne Jackson who**

11   **made the decision.  It's his employee, so...**

12        Q.   Did Wayne Jackson --

13        **A.   I can -- my perspective is I can only**

14   **recommend certain things, you know.**

15        Q.   What did you recommend should be done?

16        **A.   That I agreed with his recommendation to**

17   **suspend Ramon and give him a permanent written**

18   **warning, which basically meant that if it happened**

19   **again, he's terminated.**

20        Q.   Is Ramon Martinez still working at the Tesla

21   plant?

22        **A.   Yes.**

23        Q.   Where does he work now?

24        **A.   Same thing, recycling.**

25        Q.   But now he's got -- he's a supervisor now;

1    right?

2        **A.    Either he was at the time, but for sure he is**

3    **now.**

4        Q.    Is Ramon Martinez a regular Tesla employee

5    now?

6        **A.    No, he's a nextSource employee.    Supervisor.**

7        Q.    Okay.

8        **A.    And since then, he has never demonstrated any**

9    **other offensive behavior to anybody.**

10       Q.    Have you checked with the employees around to

11   find out if that's true?

12       **A.    No.    I don't talk to everybody myself, in**

13   **person.**

14       Q.    So how do you know he hadn't done anything

15   offensive to anyone else?

16       **A.    That has come to my attention.**

17       Q.    Who told you that?

18       **A.    That is what I know today.**

19       Q.    How do you know that?

20       **A.    Because since this happened, I have not**

21   **received any feedback on Ramon, as far as anybody**

22   **being offended by discrimination or harassment or**

23   **anything like that.**

24       Q.    Have you heard about the allegations that

25   there are numerous Tesla black employees who have been

1      Q.   What's his title?

2      **A.   I believe his title is recycling and**

3   **commodities manager.**

4      Q.   And how do you spell his last name?

5      **A.   L-O-W-E-R-Y.**

6      Q.   Do you remember the substance of your

7   conversation with Wayne Jackson, in terms of whether

8   either one of you recommended that Mr. Martinez be

9   fired for the picture that's in Exhibit 37?

10      **A.   If I remember correctly, we talked about it.**

11   **He was the one that recommended that Ramon be**

12   **suspended and given a warning, based on the fact that**

13   **this was like -- this type of situation never happened**

14   **before with Ramon, as far as someone being offended,**

15   **you know, by something that he did.**

16      Q.   Well, weren't you aware of the fact that

17   Mr. Diaz had alleged more than just the picture, the

18   pickaninny picture; that he had alleged that

19   Mr. Romero had engaged in inappropriate conduct?

20      **A.   No.**

21      Q.   Weren't you aware that Mr. Diaz at least

22   alleged that Mr. Martinez's behavior was getting

23   worse?

24      **A.   No.**

25      Q.   Weren't you aware that Mr. Diaz had claimed

```
 1    State of California              )

 2    County of Marin                  )

 3

 4                 I, Bridget M. Mattos, hereby certify

 5    that the witness in the foregoing deposition was by me

 6    duly sworn to testify to the truth, the whole truth

 7    and nothing but the truth in the within entitled

 8    cause; that said deposition was taken at the time and

 9    place herein named; that the deposition is a true

10    record of the witness's testimony as reported to the

11    best of my ability by me, a duly certified shorthand

12    reporter and disinterested person, and was thereafter

13    transcribed under my direction into typewriting by

14    computer; that the witness was given an opportunity to

15    read, correct and sign the deposition.

16                 I further certify that I am not

17    interested in the outcome of said action nor connected

18    with or related to any of the parties in said action

19    nor to their respective counsel.

20                 IN WITNESS WHEREOF, I have hereunder

21    subscribed my hand on June 7, 2018.

22

23       _____
            BRIDGET M. MATTOS, CSR NO. 11410

24

25
```

Exhibit

**5**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                Plaintiffs,

                                  No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                Defendants.
_____/

DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13571

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         CALIFORNIA CIVIL RIGHTS LAW GROUP
           By:  LAWRENCE A. ORGAN
 5              Attorney at Law
           332 San Anselmo Avenue
 6         San Anselmo, California 94960
           (415) 453-4740
 7         larry@civilrightsca.com

 8

 9    FOR THE DEFENDANT WEST VALLEY STAFFING GROUP:

10         PAHL & MCCAY
           By:  FENN C. HORTON, III
11              Attorney at Law
           225 West Santa Clara, Suite 1500
12         San Jose, California 95113
           (408) 286-5100
13         fhorton@pahl-mccay.com

14

15    FOR THE DEFENDANT NEXTSOURCE, INC.:

16         FISHER & PHILLIPS
           By:  JUAN C. ARANEDA
17              Attorney at Law
           One Embarcadero Center, Suite 2050
18         San Francisco, California 94111
           (415) 490-9000
19         jaraneda@fisherphillips.com

20

21    FOR THE DEFENDANT TESLA INC. dba TESLA MOTORS INC.:

22         SHEPPARD, MULLIN, RICHTER & HAMPTON
           By:  PATRICIA M. JENG
23              Attorney at Law
           Four Embarcadero Center, 17th Floor
24         San Francisco, California 94111
           (415) 434-9100
25         pjeng@sheppardmullin.com
```

```
1                A P P E A R A N C E S (continued)

2

3    FOR THE DEFENDANT CHARTWELL STAFFING SERVICES, INC.:

4         LAFAYETTE & KUMAGAI LLP
            By:  CHERYL A. STEVENS
5                Attorney at Law
          1300 Clay Street, Suite 810
6         Oakland, California 94612
          (415) 357-4600
7         cstevens@lkclaw.com

8

9

10

11
                           ---oOo---
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              MR. ORGAN:  Q.  What was nextSource's
 2    relationship to Tesla, as you understood it?
 3         A.     They were a service provider.
 4         Q.     What do you mean by "a service provider"?
 5         A.     In the sense of they weren't a staffing agency
 6    or anything.  Like I said, more of a liaison between a
 7    staffing agency and Tesla for services Tesla had
 8    requested.
 9         Q.     When you were working as a recruiter for
10    nextSource, were you recruiting employees to Tesla?
11         A.     Yes, sir.
12         Q.     The employees who you were recruiting to Tesla,
13    were they primarily to work as production associates at
14    the Tesla factory?
15         A.     Not necessarily.  They were different areas of
16    facilities.  That was probably one of the main areas.
17         Q.     The facilities workers, what were the types of
18    jobs that they were typically doing that you were
19    recruiting for?
20         A.     HVAC techs, electricians, things of that
21    nature, power washers.
22         Q.     Who was your main contact person, then, at
23    nextSource when you were doing recruiting?
24         A.     My manager was Terri Garrett.
25         Q.     Do you remember what Terri Garrett's position
```

WAYNE JACKSON
May 17, 2019

1      was?

2          **A.    I don't recall, no.  It's been a few years.**

3          Q.    Yes.

4                Director of Operations, does that sound

5      familiar?

6          **A.    Yeah, that could be.  That could be a better**

7      **title.**

8          Q.    You started working for nextSource, you think,

9      in around 2015.

10               Is that right?

11         **A.    Yeah, somewhere around there.  I'm not sure of**

12     **the exact date.**

13         Q.    And then you worked as a recruiter for,

14     perhaps, up to a year.

15               Is that right?

16         **A.    Close to a year, yes.**

17         Q.    And then you started -- you kind of shifted out

18     of recruiting to do, I think it was a program

19     coordinator role.

20               Is that correct?

21         **A.    Yes.**

22         Q.    Or program manager --

23         **A.    Manager, uh-hum.**

24         Q.    -- right.

25               But I think you described the program manager

Bridget Mattos & Associates
(415)747-8710

1    or less.

2        Q.    Tell me how it worked in terms of, let's say

3    someone raised a complaint of discrimination or

4    harassment --

5        A.    Uh-hum.

6        Q.    -- what was your understanding of how such a

7    complaint was to be handled?

8              MR. ARANEDA:   It's vague.

9              MR. ORGAN:   It is a little big vague.   Let me

10   try it again so it's a little clearer.

11             THE WITNESS:   Uh-hum.

12             MR. ORGAN:   Q.   Let's assume that a contract

13   employee, meaning someone who wasn't a regular Tesla

14   employee but was a contract employee who nextSource was

15   doing liaison with, what was your understanding of the

16   procedure for -- if a contract employee for one of the

17   companies that you were doing liaison for made a

18   complaint of harassment or discrimination, what was the

19   process that was supposed to be followed?

20       A.    I alerted the agency, usually one of the first

21   things I did, whatever supplier they were from.   I would

22   gather any information I could get, present that to the

23   agency, and then they would kind of conduct their

24   investigation from there.

25       Q.    When such a complaint was raised, what was your

1    function in terms of what did you do relative to Tesla

2    or alerting Tesla to the complaint?

3        A.    To alert Tesla, per se, it depended on what the

4    complaint was, to be very honest.

5        Q.    Let's say it's a race harassment or

6    discrimination complaint; would you alert Tesla as to

7    such a complaint like that?

8            MR. ARANEDA:  Objection.  Vague.  It calls for

9    speculation.  It's an incomplete hypothetical.

10            You can go ahead and answer if you understand

11    the question.

12            THE WITNESS:  Yes.  We would alert Tesla, yes.

13            MR. ORGAN:  Q.  And how would you alert Tesla

14    to a complaint of harassment or discrimination by a

15    contract employee working for one of the companies

16    you're doing liaison with?

17        A.    It would usually be to contact their HR

18    department.

19        Q.    Was there a particular person in Tesla human

20    resources who you would --

21        A.    No, sir.

22        Q.    -- work with?

23        A.    No, sir.  There was so many HR reps there.

24    Yeah, mostly there wasn't.

25        Q.    And would you -- was it your practice to alert

1            THE WITNESS:  As far as I'm aware, I believe

2      they were all supposed to have any training at their

3      agency.

4            MR. ORGAN:  Okay.

5            THE WITNESS:  Yeah.

6            MR. ORGAN:  Q.  But in terms of your -- when

7      you became the manager, the program manager, you did

8      some investigations into complaints of discrimination

9      and harassment.

10           Is that true?

11      **A.     Some, yes, but more or less**

12      **information-gathering.  You know, I would gather the**

13      **information, and then submit it to the agency.**

14      Q.    Okay.  And in terms of your training into

15      investigating or fact-gathering relative to claims of

16      discrimination or harassment, would you agree that any

17      kind of investigation you would be doing would need to

18      be prompt, objective, and timely -- prompt, objective

19      and thorough -- sorry -- prompt, objective, and

20      thorough?

21      **A.   Yes.**

22      Q.    And did you participate in terms of any

23      investigations or fact-finding relative to claims of

24      discrimination or harassment at the Tesla factory?

25      **A.     Yes.**

WAYNE JACKSON
May 17, 2019

1      Q.   And was it your goal to try and fulfill those

2   three goals of being prompt, objective, and thorough

3   relative to the investigations you did at the Tesla

4   factory?

5      **A.   Yes.**

6      Q.   Tell me, what are -- do you have any kind of

7   checklist that you go through that, you know, you --

8   that you use when you do an investigation?

9      **A.   Yes, I used to have it.  I don't have it now,**

10  **though.**

11     Q.   Okay.

12     **A.   I mean, everything's on my computer.**

13     Q.   I see.

14          Did Tesla have, like, guidelines or anything

15  like that in terms of doing investigations or

16  fact-gathering at its facility?

17     **A.   I don't recall them providing any.**

18     Q.   But in terms of when you did the fact-gathering

19  or the investigations at the Tesla factory relative to

20  discrimination and harassment complaints, you provided

21  the information that you gathered to Tesla.

22          Is that true?

23     **A.   No, I provided it to their employer, who was**

24  **the agency.**

25     Q.   I see.

1             In terms of Tesla keeping informed of what was

2    being investigated, was there any kind of procedures for

3    keeping -- making sure that Tesla was informed of

4    investigations?

5        A.    That was more up to the agency.  They -- they

6    really had to.

7        Q.    Okay.

8        A.    Because they weren't my employees, per se.

9        Q.    I see.

10            How many investigations did you do into

11   complaints of race harassment towards African-Americans

12   while you were --

13       A.    I only --

14       Q.    -- at Tesla?

15       A.    I only recall, maybe, one.

16       Q.    And was the one investigation that you worked

17   on relative to Owen Diaz?

18       A.    Yes, sir.

19       Q.    So tell me about the investigation you did

20   relative to Owen Diaz.

21            How did you first find out there was a problem?

22       A.    I'm trying to remember if it was a phone call

23   or an email.  I can't recall.  Yeah, I don't recall

24   exactly how I found out.  It was either a phone call or

25   an email.

WAYNE JACKSON
May 17, 2019

1       Q.    And do you remember what the information was
2   that you got that there was a problem relative to
3   Owen Diaz?
4       **A.    There was a disparaging picture found on some**
5   **boxes.**
6       Q.    Did you get a copy of the picture?
7       **A.    I believe so.  I believe it was e-mailed to me.**
8   **Someone took a photo and e-mailed it to me.**
9       Q.    It was a picture of a pickaninny.
10          Is that correct?
11      **A.    I don't --**
12      Q.    Is that your recollection?
13          MR. ARANEDA:   Objection.
14          THE WITNESS:   I don't know if it was a --
15          MR. ARANEDA:   Vague.
16          THE WITNESS:   Yeah.   I don't know what you'd --
17   you'd call it.   It was offensive.   It was a -- I think I
18   used to call it a jigaboo or something, you know.
19          MR. ORGAN:   Right.
20          THE WITNESS:   I forget what they called it.
21          MR. ORGAN:   Q.   It was an offensive depiction
22   of an African-American.
23          Is that correct?
24      **A.    Yes, sir.**
25      Q.    And you found it offensive, right, when you saw

WAYNE JACKSON
May 17, 2019

```
 1        A.     I don't know.

 2        Q.     Okay.  Going back to Mr. Diaz's complaint about

 3     the jigaboo, what did you do to investigate that

 4     incident?

 5        A.     If I recall correctly, I got statements.  I got

 6     photographs of the drawing.  I alerted Chartwell -- I

 7     believe it was Chartwell.  It might have been CitiStaff;

 8     I can't remember.

 9               Like I say, we had contractors from different

10     suppliers.

11        Q.     Sure.

12        A.     And I alerted the manager for Tesla over that

13     area, which was Victor Quintero.

14        Q.     Owen Diaz worked for CitiStaff.

15               Do you remember that?

16        A.     I don't recall if it was CitiStaff or

17     Chartwell.  Like I said, we had several suppliers, so...

18     It's been three, four years, so I couldn't tell you

19     exactly which one.

20        Q.     Do you remember the person who put up the

21     jigaboo drawing was Ramon Martinez?

22        A.     Yes.  I believe so, yes.

23        Q.     In addition to getting statements from

24     Mr. Martinez and Mr. Diaz, did you get statements from

25     anybody else other than those two?
```

```
 1      least the topics are that you discussed or the substance

 2      you discussed with Victor Quintero about the jigaboo

 3      drawing.

 4              MR. ARANEDA:  Objection.  It calls for a

 5      narrative.

 6              THE WITNESS:  More or less if -- it was -- if

 7      I'm not mistaken, it was -- you'll have to give me a

 8      moment.  I'm trying to remember.

 9              MR. ORGAN:  No, that's okay.

10              THE WITNESS:  That it was a very offensive

11      drawing.  I believe, if I'm not mistaken, I recommended

12      to -- it might have been Chartwell -- and to

13      Mr. Quintero that we probably should terminate

14      Mr. Martinez.

15              But I couldn't terminate him because he wasn't

16      my employee, per se, but I did make the recommendation.

17              MR. ORGAN:  Q.  Do you remember what

18      Mr. Quintero said back in terms of your recommendation

19      of termination for Mr. Martinez?

20      A.      If I'm not mistaken, he was, Let's see what

21      Chartwell -- check with Chartwell.  Because, once again,

22      it was Chartwell's employee, so we couldn't really -- I

23      could recommend termination, but I couldn't terminate,

24      per se.

25      Q.      With the contract employees, Tesla could
```

WAYNE JACKSON
May 17, 2019

1    terminate those employees in terms of saying, We don't

2    want them to work here anymore; right?

3       A.    They could basically say they didn't want them

4    on-site --

5       Q.    Okay.

6       A.    -- yeah.

7             They couldn't terminate them, though, because

8    they weren't Tesla employees.

9       Q.    But Tesla could say they can't work at the

10   Tesla factory anymore; right?

11      A.    Yeah.  As far as I know, yes.

12      Q.    So in terms of a contract employee working at

13   the Tesla factory, based on your understanding, Tesla

14   could at least stop the employee from working at the

15   Tesla factory; right?

16      A.    Yes, sir.

17      Q.    Did you ever have any discussions with an

18   Ed Romero about Mr. Diaz?

19      A.    Yes, sir.

20      Q.    Tell me about what you remember in terms of

21   your discussions with Edward Romero about Mr. Diaz.

22            MR. ARANEDA:  Objection.  Vague.

23            THE WITNESS:  I'm trying to think.  If I'm not

24   mistaken, Mr. Romero was having some issues with

25   Mr. Diaz with regards to attendance and attitude and

Bridget Mattos & Associates
(415)747-8710

 1      doing disciplinary or things of that nature, if I'm not

 2      mistaken.

 3              MR. ORGAN:  Q.  So your understanding of

 4      Ed Romero's tasks, though, relative to the elevator

 5      operators was that he could do scheduling, right --

 6          A.    Yes, sir.

 7          Q.    -- for them, and that Mr. Romero would at least

 8      direct their work; right?

 9          A.    Yes, sir.

10          Q.    How would discipline towards contract employees

11      take place, then, typically?

12          A.    If there was a complaint, I would alert their

13      agency of the complaint.

14          Q.    And then it was up to the agency to do the

15      disciplinary action.

16              Is that right?

17          A.    Yes, sir.  Whether they were terminated, I

18      couldn't terminate.  They weren't my employees.

19          Q.    I see.

20          A.    Yeah.

21          Q.    Could you recommend termination for people?

22          A.    I mean, I can make a recommendation, but it

23      wasn't -- the final decision wasn't mine.

24          Q.    I see.

25              Then in terms of Tesla's role in any kind of

```
 1        A.     Jaime, yes.

 2        Q.     Was that Jaime Salazar?

 3        A.     Yes, I believe that was his name.

 4        Q.     We know it's not Jaime Lannister from Game of

 5   Thrones.

 6        A.     I'm a GOT fan.

 7        Q.     Are ya?

 8        A.     Yes.

 9        Q.     What do you think of that last episode?  Have

10   you seen it?

11        A.     I think it cost her the throne.

12        Q.     Well, just one left, so...

13               Okay.  We are at 123?

14               THE REPORTER:  We are.

15               (Whereupon, Plaintiffs' Exhibit 123 was marked

16               for identification and is attached hereto.)

17               MR. ORGAN:  Now, this is 123.  It's a two-page

18   document Bates-stamped TESLA-629 and 630.

19               (Document reviewed by the deponent.)

20               MR. ORGAN:  Q.  And I guess there's some, well,

21   information about recruiting, and then there's some

22   discussion about a Ramon Martinez/Owen Diaz incident.

23               Is that right?

24        A.     Yes, sir.

25        Q.     And this is the -- so in October of 2015, you
```

WAYNE JACKSON
May 17, 2019

1    became aware of an incident between Mr. Martinez and

2    Mr. Diaz.

3              Is that correct?

4         A.   Yes, sir.  I was -- honestly, I was still in a

5    recruiter's role at that point.  They hadn't

6    transitioned me over as of yet.

7         Q.   I see.

8         A.   So I was kind of trying to fill two roles at

9    once.

10        Q.   Wearing two hats?

11        A.   Yes, sir.

12        Q.   Do you remember any of the details of what the

13   issue was?

14        A.   If I'm not mistaken, there was some type of

15   verbal altercation.

16        Q.   Mr. Martinez worked in recycling.

17             Is that right?

18        A.   Yes, sir.

19        Q.   And Mr. Diaz worked as one of the elevator --

20        A.   Yes.

21        Q.   -- operators?

22        A.   Yes, sir.

23        Q.   Do you remember what the nature of the verbal

24   altercation was in this October 2015 time period?

25        A.   I could not tell you the details, to be honest,

Bridget Mattos & Associates
(415)747-8710

WAYNE JACKSON
May 17, 2019

1    I -- it's been so long.  I remember it was something to
2    the effect they were trying to move some recycling
3    material in the elevators, and I guess there was -- I
4    don't know what -- I can't remember what it was, but
5    Ramon and Mr. Diaz got into a verbal altercation over
6    the use of the elevator.
7        Q.    Did you do an investigation into that incident?
8        A.    Like I said, I was just starting in that role,
9    so it wasn't really my role to do that at that point.  I
10   was still, honestly, a recruiter.
11       Q.    Okay.
12       A.    I asked Miss Garrett what did she want me to
13   do.  I believe we got statements from each of them, and
14   I let the -- let the agencies handle it from there.
15       Q.    Do you know who a Deb Gryske is?
16       A.    Yes, she was a -- I can't remember her role at
17   nextSource.  More of a technology person.
18       Q.    Okay.
19             We're going to -- this is Exhibit 124?
20             THE REPORTER:  Yes.
21             (Whereupon, Plaintiffs' Exhibit 124 was marked
22             for identification and is attached hereto.)
23             (Document reviewed by the deponent.)
24             MR. ORGAN:  Exhibit 124, for the record, is a
25   two-page document Bates-stamped TESLA-635 and 636.

```
 1        Q.    The laptop that you created the notes on, that
 2    would have been the laptop, though, that was the
 3    company's -- was nextSource's laptop?
 4        A.    Yes, sir.
 5        Q.    And when you left nextSource, you returned that
 6    laptop to them; correct?
 7        A.    Yes, sir.
 8        Q.    Do you remember the name or the title of the
 9    notes that you created?
10        A.    I have no recollection.  I'm sorry.  It's been
11    so long, yeah, I couldn't.
12        Q.    I get that.
13        A.    Okay.
14        Q.    If you look at the second page of Exhibit 126,
15    it mentions --
16              MR. ARANEDA:  What Bates are you looking at?
17              MR. ORGAN:  134, the second page.
18              MR. ARANEDA:  Okay.
19              MR. ORGAN:  Q.  -- there's an email kind of in
20    the middle from Terri Garrett to Erin Marconi.
21              Who was Erin Marconi?
22        A.    I believe she was in human resources for Tesla.
23        Q.    Was that typical protocol to at least inform
24    Tesla HR whenever there was some kind of fact-gathering
25    or investigation being done?
```

WAYNE JACKSON
May 17, 2019

1      **A.    Yes, sir, if there was something serious.   If**
2      **it was someone late, no, we wouldn't notify them, but**
3      **anything else, yes.**
4           Q.    Right.
5                 So any kind of verbal altercation typically
6      would be copied to Tesla; right?
7           **A.    I wouldn't --**
8           Q.    Well, let me --
9           **A.    -- say that, no, sir.**
10          Q.    Any verbal altercation where there's
11     allegations of some kind of threat, that would be copied
12     to Tesla --
13          **A.    Yes, sir.**
14          Q.    -- right?
15                And, then, in that email from Terri to Erin,
16     Terri mentions in there, it says:
17                "It looks like Victor is asking Ed Romero to
18                get involved in a temporary worker ER [sic]
19                issue.  My recommendation is that Ed not be
20                involved."
21                I'm just wondering, do you have any
22     recollection of talking to Terri Garrett about Victor or
23     Ed's involvement in this investigation?
24          **A.    Yes.  The email even shows that she had asked**
25     **me, you know, why is Ed doing this, and I said, "He was**

Bridget Mattos & Associates
(415)747-8710

WAYNE JACKSON
May 17, 2019

1        instructed by Victor."

2        Q.    Okay.  And, then, in terms of any discussions

3    that you had with Ed Romero, do you recall any

4    discussions with Ed about this altercation between

5    Mr. Diaz and Martinez?

6        A.    I'm sure I did, but I can't recall what the

7    details were, to be honest.

8        Q.    What was the ultimate outcome of this

9    investigation that you did into 126 -- into the

10   information in Exhibit 126?  Do you remember?

11       A.    I don't recall.  I believe it was a -- a

12   warning was issued.  Yeah, I believe so.

13       Q.    Was a warning issued to Mr. Martinez, then?

14       A.    I don't recall.  I think it was both in the

15   sense if I -- I can't even remember because, like I

16   said, Mr. Diaz had -- the timing is probably what's

17   throwing me off a little bit.

18            But he had a few interactions with employees

19   where he was pretty aggressive, I guess you could say,

20   and we probably verbally counseled both of them to --

21   to, you know, more or less, play nice with each other in

22   the sandbox.

23       Q.    And do you think -- if you go back to

24   Exhibit 125 where Mr. Ramon Martinez has that email on

25   October 17th at 4:56 a.m., do you recall that

1    Mr. Martinez said that Mr. Diaz was aggressive?

2              Because he doesn't mention that in the email.

3    He says unprofessional or --

4        **A.    Yeah, he didn't say -- yeah, I don't believe he**

5    **said that.  He just -- like I said, it was more of an**

6    **attitude issue.**

7        Q.    In terms of Ramon Martinez's complaint about

8    Mr. Diaz, it was more about Mr. Diaz's attitude, not

9    about his aggressiveness; correct?

10       **A.    More of about his professionalism, yes, sir.**

11       Q.    Mr. Martinez thought that Mr. Diaz needed to be

12   more professional with him.

13             Is that right?

14             MR. ARANEDA:  It calls for speculation.

15             THE WITNESS:  I wouldn't say with him, but more

16   with everybody.  He wasn't being professional with a few

17   people in the -- not only other contractors, but Tesla

18   employees.

19             MR. ORGAN:  Q.  Did Mr. Martinez tell you how

20   Mr. Diaz was not being professional?

21       **A.    Like I said, it was more of an attitude, so I**

22   **really couldn't -- I couldn't answer that for**

23   **Mr. Martinez, to be honest.  More or less, it was just**

24   **that Owen was getting into it with a lot of individuals.**

25       Q.    Okay.

```
 1     October 15th time period?
 2        A.   I don't remember the details, honestly.  I'm
 3     trying to think, and I just don't -- I just know there
 4     were -- it was more, like I said, kids not playing well
 5     in the sandbox together -- come on, what can we do to
 6     fix this type of deal so that you guys can all be
 7     successful.
 8        Q.   So was Rothaj then folded into your
 9     investigation?
10        A.   I believe so, because he and Owen, I believe,
11     had an issue as well.
12        Q.   Do you remember what the issue was between
13     Rothaj and Owen?
14        A.   I don't remember the details right at the
15     moment.  I think they got into a pretty heated verbal
16     altercation.
17        Q.   Okay.
18        A.   And I believe Owen -- I believe Owen claimed
19     that Rothaj said he was going to hurt him or something
20     to that effect, if I'm not mistaken.
21        Q.   Okay.
22        A.   But I didn't have any witnesses to that.
23        Q.   I see.
24             (Whereupon, Plaintiffs' Exhibit 128 was marked
25             for identification and is attached hereto.)
```

1                    (Document reviewed by the deponent.)

2                    MR. ORGAN:   Exhibit 128, for the record, is a

3         multiple-page document Bates-stamped TESLA-20 to 24.

4         And it starts with a picture on 23.   And then there's an

5         email from January 21st, January 22nd, I guess, and then

6         it ends on January 22nd, so...

7                    (Document reviewed by the deponent.)

8                    MR. ORGAN:   Q.   The picture that is TESLA-23,

9         is that one of the pictures that you saw, the big

10        jigaboo picture we were talking about before?

11             A.    Yes, sir.

12             Q.    And then there's another -- there's a wider

13        picture of a drawing on TESLA-22 in Exhibit 128.

14                   And do you recognize that, too?

15             A.    Yes, sir.

16             Q.    Both of those pictures of the drawings were

17        provided to you at some point.

18                   Is that right?

19             A.    Yes, sir.

20             Q.    And it shows here that Mr. Diaz informed

21        Mr. Romero of the racist effigy and drawing on or about

22        January 22nd of 2016, and then it was forwarded also to

23        you by Mr. Diaz.

24                   Do you see that?

25             A.    Uh-hum.

1      Q.    Now, you considered this a pretty serious

2    issue; correct?

3      A.    Yes, sir.

4      Q.    And just so we are clear, I think you said

5    before that you thought that Mr. Martinez should be

6    fired over this; right?

7      A.    Yes, sir, I did.

8      Q.    And you also found that image of the jigaboo

9    offensive to you; right?

10     A.    Yes, sir.

11     Q.    And when I say "offensive to you," offensive to

12   you as an African-American; right?

13     A.    Yes, sir.

14     Q.    You also understood that Mr. Diaz was offended

15   by this jigaboo drawing as an African-American; right?

16     A.    Yes, sir.

17     Q.    Did you have a meeting with Mr. Diaz about this

18   jigaboo drawing?

19     A.    I believe we did, yes, sir.

20     Q.    And did you take notes of that meeting that you

21   had relative to Mr. Diaz?

22     A.    I most likely did, yes, sir.

23     Q.    And would you have followed your typical

24   practice of taking the notes and then typing them up?

25     A.    Yes, sir.  If I took notes, I normally did, or

```
 1                                    12:11 p.m.

 2                        ---oOo---

 3             A F T E R N O O N   S E S S I O N

 4             MR. ORGAN:  Q.  Let's look at the top of

 5      Exhibit 128.

 6             (Document reviewed by the deponent.)

 7             MR. ORGAN:  Q.  Do you remember having a

 8      conversation with Terri about the jigaboo?

 9        A.   Yes.

10        Q.   And tell me about that conversation you had

11      with Terri -- well, strike that.

12             Did you have more than one with Terri Garrett

13      or just one about the jigaboo --

14        A.   I'm sure there was multiple, but it was more or

15      less providing her with the information that I had,

16      which was the copy of the picture.

17             The plan moving forward was to, you know, let

18      Chartwell deal with Ramon, if I'm not mistaken, and we

19      just made sure, like I said, that Tesla was aware by

20      Mr. Romero, Quintero, and I think it was Miss Marconi.

21        Q.   So the three people at Tesla that you believe

22      were informed of information about the jigaboo drawing

23      were Victor Quintero, Ed Martinez --

24        A.   Romero.

25        Q.   I'm sorry, Ed Romero.
```

WAYNE JACKSON
May 17, 2019

1                    Here Mr. Quintero says:

2                    "This is very disappointing, especially coming

3                    from one of our team supervisors.  I agree with

4                    the recommendation to suspend and issue a

5                    permanent written warning.  Also, the apology

6                    from Ramon was a good starting point.  One

7                    additional request would be if there is an

8                    opportunity to provide some type of diversity

9                    training for Ramon."

10                   Do you know if any diversity training was done

11      for Mr. Martinez?

12          A.    I don't recall because that would have been

13      something that Chartwell would have done and not us.

14          Q.    And then in terms of the recommendation for a

15      suspension and permanent warning, do you know if that

16      was implemented?

17          A.    Yes, it was.

18          Q.    The apology from Ramon, was that an apology --

19      who was that an apology to?  Do you know?

20          A.    I believe they had him apologize to Owen.

21          Q.    Okay.

22          A.    If I'm not mistaken.

23          Q.    It sounds like you had a talk with Mr. Quintero

24      about these issues.

25                   Do you remember that?

Page 88

1      A.    Yes, sir.

2      Q.    Is there anything that was substantive of that

3    talk that you had with Mr. Quintero about the drawing

4    that is not included in your email here or in the email

5    from Mr. Quintero to you, anything else that you guys

6    talked about?

7      A.    Not that I could think of.  I mean, like I

8    said, Mr. Quintero was -- was -- I wouldn't -- well,

9    upset about the drawing as well.  He felt it was very

10   inappropriate.

11          Like I said, I did mention that it was really a

12   terminatable [sic] offense, but we'd have to check with

13   Chartwell on that.

14     Q.    Chartwell ultimately decided they didn't want

15   to terminate.

16          Is that right?

17     A.    They ultimately went with the recommendation,

18   like I said, from Victor and myself where we decided

19   that we're going to suspend Mr. Martinez.

20     Q.    And the reason for the suspension was that was

21   something Victor had agreed to.

22          Is that right?

23          MR. ARANEDA:  Objection.

24          THE WITNESS:  Yeah.

25          MR. ORGAN:  Q.  Victor did not agree to

1      terminate Mr. Martinez; right?

2                  MR. ARANEDA:   Objection.   Vague.

3                  THE WITNESS:   Yeah, I wouldn't say that he did

4      not agree to terminate, but it was more that it wasn't

5      his employee to terminate.

6         Q.    Right.

7                  But Victor could have said he can't work here

8      anymore, right, being --

9         A.    He could have --

10        Q.    -- from Tesla?

11        A.    Yes.   He could have made that recommendation,

12     yes.

13        Q.    And initially when you met with Victor, Victor

14     didn't even want to suspend Mr. Martinez; correct?

15                 MR. ARANEDA:   Objection.   Vague.

16                 THE WITNESS:   I don't believe that was the

17     case, no.   He wanted disciplinary action, yes, he did.

18                 MR. ORGAN:   Q.   But the disciplinary action

19     that Victor had suggested originally was just a warning

20     letter, right, a final warning?

21        A.    I believe so, yes.

22        Q.    And then you had the conversation with him

23     where you said, Look, I think he should be terminated,

24     but if you're not going to terminate Mr. Martinez, you

25     should at least give a suspension; right?   That's what

1       you told Mr. Quintero?

2           **A.      Yes, sir.**

3           Q.      And then Mr. Quintero -- and then I think at

4       some point, you suggested what about a suspension?

5           **A.      Uh-hum.**

6           Q.      Is that what happened?

7           **A.      Yes, sir.**

8           Q.      And then Mr. Quintero agreed to the suspension

9       and the final written warning.

10               Is that right?

11          **A.      Yes, sir.**

12          Q.      And then Mr. Quintero recommended to -- I guess

13      it was Chartwell that had Mr. Martinez; right?

14          **A.      I believe so, yes, sir.**

15          Q.      So Mr. Quintero recommended a suspension and

16      final written warning and Chartwell agreed with that;

17      right?

18          **A.      Yes, sir.**

19          Q.      Okay.

20          **A.      They actually issued that to him.   It was an**

21      **unpaid suspension.**

22          Q.      Right.   I think a three-day suspension.

23               Is that right?

24          **A.      It was either three or five; I'm not sure.   I**

25      **can't recall.**

1    pretty difficult to reach, to be very honest.

2        Q.    And then there's a Judy.

3              Is Judy the same as Ludivina?

4        A.    I don't know.

5        Q.    Did you know a Judy Ledesma?

6        A.    That does not sound familiar.

7        Q.    Do you remember having any discussions with

8    Monica De Leon about the jigaboo?

9        A.    Yeah, I believe, like I said, I had alerted her

10   to it and made sure I provided her copies, if I'm not

11   mistaken, of the photos.

12       Q.    Do you remember an actual conversation that you

13   ended up having with her?

14       A.    I really don't.  Monica was really very

15   difficult to reach.

16       Q.    Okay.

17             This is 132.

18             (Whereupon, Plaintiffs' Exhibit 132 was marked

19             for identification and is attached hereto.)

20             MR. ORGAN:  Q.  Exhibit 132, for the record, is

21   a multiple-page document Bates-stamped 7 -- TESLA-730 to

22   737.  I guess it's an eight-page document.  It includes

23   some handwritten statements.

24             (Document reviewed by the deponent.)

25             MR. ORGAN:  Q.  And I'm wondering, do you -- do

 1              Do you remember sending any kind of email about
 2   what your discussion was with Mr. Diaz?
 3        A.    No, sir, I don't recall that.
 4        Q.    Did it concern you that after the altercation
 5   between Mr. Diaz and Mr. Martinez in the October time
 6   period and then come January you've got this jigaboo
 7   drawing, did that concern you?
 8              MR. ARANEDA:   Objection.
 9              THE WITNESS:   Yes, sir.
10              MR. ARANEDA:   Vague.
11              MR. ORGAN:   Q.   And what did you do to act on
12   that concern that you had?
13        A.    Like I said, I alerted the various agencies so
14   they could look into it a little further.
15        Q.    And, in fact, that's why you decided, in your
16   opinion, that Mr. Martinez had been -- had crossed the
17   line at least twice such that he needed to be
18   terminated; right?
19              MR. ARANEDA:   Objection.   It misstates his
20   testimony.
21              THE WITNESS:   I wouldn't say he crossed the
22   line twice.   Once again, the first incident was more or
23   less unsubstantiated.   There were no witnesses or
24   anybody.   It was kind of my-word-against-yours type of
25   deal.

 1     because, like I said, it wasn't my employee, so I had to

 2     refer it to Chartwell.  They had to make the final

 3     determination of anything with regards to their

 4     employment.  It wasn't up to me.

 5               MR. ORGAN:  Q.  Right.

 6               But Tesla also had to approve whatever that

 7     discipline was going to be; right?

 8          A.   No, they did not.

 9          Q.   In the incidence with the jigaboo drawing,

10     though, Tesla did get involved in what was the

11     appropriate discipline; right?

12          A.   Yes, sir.

13          Q.   So at least with respect to Mr. Diaz's

14     complaint about the jigaboo drawing, Mr. Quintero was

15     involved in deciding what was appropriate discipline;

16     right?

17               MR. ARANEDA:  Objection.  It lacks foundation.

18               MS. STEVENS:  Objection.  It misstates his

19     testimony.

20               MR. ARANEDA:  It calls for speculation.

21               THE WITNESS:  Could you repeat the question

22     again to me, please?

23               MR. ORGAN:  Q.  Sure.

24               With respect to the discipline the appropriate

25     discipline for the jigaboo drawing, you at least recall

1    that Mr. Quintero was involved in making the

2    recommendation for what that would be; right?

3        A.    Yes and no.  He can make a recommendation, but

4    the final say was not his.  It was up to Chartwell.

5        Q.    Well, the final in terms of whether or not

6    Mr. Martinez stayed working at the Tesla factory, that

7    was something that Mr. Quintero could determine; right?

8        A.    As far as I know, yes, sir.

9        Q.    Okay.

10            This is -- what is it; Exhibit 138?

11            THE REPORTER:  Yes.

12            (Whereupon, Plaintiffs' Exhibit 138 was marked

13            for identification and is attached hereto.)

14            MR. ORGAN:  Exhibit 138, for the record, is a

15    one-page document Bates-stamped TESLA-330.

16            (Document reviewed by the deponent.)

17            MR. ORGAN:  Q.  Could you tell me, what is --

18    is this a suggestion that Mr. Diaz move out of the lead

19    spot and just down to a regular elevator operator?

20        A.    I don't remember.  Yeah, I don't remember.

21    Sorry.

22        Q.    Mr. Diaz was out on leave at this particular

23    time.

24            Is that right?

25        A.    Once again, I don't recall what his leave was

```
 1        A.    No.

 2        Q.    -- at Tesla?

 3        A.    I wouldn't have.  I wouldn't have done anything

 4   with her, no.

 5        Q.    What's your opinion of West Valley Staffing

 6   Group?

 7        A.    They're a good staffing agency, just like any

 8   other staffing agency.

 9        Q.    I'm going to ask you about a word that has

10   been -- that's come up a few times in this case, and I

11   don't want you to be offended, but I have to use the

12   word.  The word is nigger.

13        A.    Yes, sir.

14        Q.    Did you ever hear anyone use that word at

15   Tesla?

16        A.    Yes, sir.

17        Q.    In what circumstances did you hear that word

18   being said?

19        A.    There had been times where I'd actually

20   walked -- been walking through the facility, and there

21   was -- one time in particular, there was two Asian or

22   Filipino gentlemen.  And one was, like, "What's up, my

23   nigga," to the other one.  That type of thing.

24              It still was offensive, but, you know, it

25   wasn't my employee, so I didn't engage in it.
```

```
 1     that?
 2              Objection.  Vague.
 3              THE WITNESS:  If you were to ask -- I don't
 4     know if I could answer, but if you were to ask me,
 5     people use it in different contexts.
 6              MR. HORTON:  So you're referring to "nigga"?
 7              THE WITNESS:  Yes, they use it in different
 8     context.
 9              MR. ORGAN:  Q.  So what you heard was "What's
10     up, my nigga"?
11        A.    Yes, sir.
12        Q.    N-I-G-G-A?
13        A.    Yes, sir.
14        Q.    Okay.
15        A.    And I will hear that often, to be honest.
16        Q.    Oh.  So you heard the A version of the N
17     word -- just so we don't have to use it again --
18        A.    Uh-hum.
19        Q.    -- the A version -- you testified about
20     nigga --
21        A.    Yes, sir.
22        Q.    -- so let's call that the A version --
23        A.    Yes.
24        Q.    -- of the N word.
25              Is that okay with you?
```

1        **A.      Yes, sir.**

2        Q.      You heard the A version of the N word on

3    numerous occasions throughout the factory.

4               Is that true?

5               MR. ARANEDA:  Objection.  Vague.  It misstates

6    his testimony.

7               THE WITNESS:  Do I answer?

8               MR. ORGAN:  Yes.

9               THE WITNESS:  Yes, I did.  I mean, like I said,

10   it's -- unfortunately, with music and things of that

11   nature nowadays, it's kind of the norm for these

12   youngsters now, the younger generation, unfortunately.

13   They don't understand the struggles or what people went

14   through with regards to that word.

15               MR. ORGAN:  Right.

16               THE WITNESS:  So, you know, they don't

17   understand the impact I think it has when they use it,

18   and it's just engrained in society around here, to be

19   honest.  You hear it on the street.  I mean, I hear it,

20   quite honestly, white people calling each other that at

21   this point in life, which is amazing to me.

22               MR. ORGAN:  Q.  Because it's offensive to you

23   as an African-American, isn't it --

24        **A.      Yes, sir.**

25        Q.      -- the use of the A version of the N word,

1      going to ask you was, you mentioned that you didn't

2      think that the workers who you overheard were intending

3      it to be offensive, but, certainly, as an

4      African-American male, any time anyone uses even -- the

5      A version of the N word, that's offensive to you, isn't

6      it?

7          A.     I wouldn't say that.  To be honest, a lot of

8      African-Americans use that word amongst each other.

9          Q.     Right.

10             But when an African-American uses that word,

11     the N word, that's different than when people who aren't

12     African-Americans use the word; right?

13         A.     Once again, it depends on which version they're

14     using.

15         Q.     Right.

16             But even the A version of the N word is

17     offensive to African-Americans if someone who's not

18     African-American is using it; right?

19         A.     It depends, once again, on the context of how

20     they're using it.

21         Q.     Okay.

22         A.     It is offensive, but, like I said, it depends

23     on how they're using it, you know.

24         Q.     Well, it's not something that should be used in

25     the workplace --

WAYNE JACKSON
May 17, 2019

1        **A.      There you go.**

2        Q.      -- right?

3        **A.      There you go.   It shouldn't be used at all,**

4   **so...**

5        Q.      And where you currently work --

6        **A.      Uh-hum.**

7        Q.      -- do you hear the N word there?

8        **A.      No, sir.**

9        Q.      All right.  And other than at the Tesla

10  factory, have you ever heard the N word used by

11  non-African-Americans in the workplace?

12       **A.      Yes, sir.**

13       Q.      Where else?

14       **A.      Places like Walmart, I've heard their**

15  **associates saying it to each other.**

16       Q.      Okay.

17       **A.      I mean, yeah, I have heard it in other places.**

18       Q.      Did you hear the E-R version of the N word at

19  Tesla?

20       **A.      No, I think that's even a more disparaging**

21  **version, so a lot of people are super offended by that.**

22       Q.      Right.

23               But you didn't hear that at Tesla; right?

24       **A.      No, I did not.**

25       Q.      In terms of the number of times that you heard

1    the N word with an A at Tesla, how many times -- what's

2    your best estimate of the number times you've heard

3    that?

4        A.   Three, four times, probably.

5        Q.   And did you report that to HR?

6        A.   No, sir.

7        Q.   Why not?

8        A.   Because of the context it was being used in

9    wasn't being used, at least in my opinion, to offend.

10   It was just people being ignorant.

11       Q.   You do know that some African-Americans are

12   offended by any use of the N word even with the A;

13   correct?

14       A.   And that's their preference, yes, sir.

15       Q.   And in terms of any kind of, like, diversity

16   training on the issue of the use of the N word, were you

17   aware of any such training during the time that you were

18   at the Tesla factory?

19       A.   I couldn't say I do know.  No, I don't know.  I

20   wasn't involved in their orientation or training

21   processes, no.

22       Q.   But in terms of your knowledge of whether or

23   not such training occurred, you're not aware of any kind

24   of diversity training that Tesla did around the N word;

25   correct?

Bridget Mattos & Associates
(415)747-8710

```
 1                    REPORTER'S CERTIFICATE

 2      STATE OF CALIFORNIA        )
                                   )  ss.
 3      COUNTY OF MARIN            )

 4              I, PATRICIA ROSINSKI, hereby certify:

 5              That I am a Certified Shorthand Reporter in the

 6      State of California.

 7              That prior to being examined, WAYNE JACKSON,

 8      the witness named in the foregoing deposition, was by me

 9      duly sworn to testify the truth, the whole truth, and

10      nothing but the truth;

11              That said deposition was taken pursuant to

12      Notice of Deposition and agreement between the parties

13      at the time and place therein set forth and was taken

14      down by me in stenotype and thereafter transcribed by me

15      by computer and that the deposition is a true record of

16      the testimony given by the witness.

17              I further certify that I am neither counsel for

18      either, nor related in any way to any party to said

19      action, nor otherwise interested in the result or

20      outcome thereof.

21              Pursuant to Federal Rules of Civil Procedure,

22      Rule 30(e), review of the transcript was not requested

23      before the completion of the deposition.
                _____
24               PATRICIA ROSINSKI, CSR No. 4555

25                     May 28, 2019
```

Exhibit

**6**



**From:** Raymond Soto <RSOTO@westvalley.com>
**Date:** August 21, 2015 at 8:05:12 AM PDT
**To:** Raymond Soto <RSOTO@westvalley.com>
**Subject: Tesla start information**

Hello,

You are confirmed for training on Monday August 24th starting at 1pm with Tesla Motors. You will be asking for Louis or Rovilla in the lobby. Please make sure to read this entire email as it includes a great deal of information. See below;

Tesla Motor

45500 Fremont Boulevard

Fremont, CA – 94538

www.tesla.com

**(FYI- you will NOT be parking at this location)**



You will be receiving the rest of your schedule on Monday, so once again please flexible. Also if don't have steel toes shoe please get some, we will reimburse up $70 with your receipt. Please make sure to wear your steel toes shoe, just in case they have you the floor.. I have also attached some Tesla Forms that I need you to print out and bring with you tomorrow morning.

When you arrive please proceed to the main lobby and ask for Rovilla Wetle.  Please make sure to print out the attached forms and hand them to her as well.


# Remember to arrive at least  45 minutes early to park see instruction below;

DDIAZ000004

Below are the 901 Page instructions, but they're pretty confusing. The instructions I was hoping for would show the back entrance on Kato Road. From Page you will need to drive around the building to the back and will then catch the shuttle near the back entrance. There's still plenty of parking there, however you may be better off parking at the overflow parking at Treasure Island (the training center where you interviewed and the assessments are held) and take the shuttle from there. It picks up from in front of the building.

**FREMONT PARKING NOTICE**

**Please find the details below and in the attached flyer:**

**Where: 901 Page Ave, Fremont, CA 94538**

**(access to the rear parking lot from A Street)**

**Job description**

Production Associate (Fremont, CA)

The Production Associate is a member of the Manufacturing Production Team.

He/she will participate in the development and application of Tesla's Manufacturing System for the body center of the Tesla Model S. Excellent attendance is crucial for team to achieve success. The ideal candidate has a proven record of success in the application of manufacturing systems in any type of manufacturing environment. He/she must have the ability to work with various teams in assembly including engineering, quality, and suppliers across a wide variety of issues/ corrective actions identified in production and field performance. Strong interpersonal and communication skills are an absolute requirement to establish effective working relationships within Tesla and outside.

The successful candidate for this position takes pride in his/her hands-on and analytical abilities, organization skills and attention to detail. He/she appreciates an environment where superior work is encouraged, noticed and rewarded.

Essential Functions and Duties:

Quality

- Demonstrated ability to perform standardized work process and defined work instructions.

- Understands and ensures adherence to required procedures and processes.

- Evaluates the assembly processes and equipment to look for continuous improvement opportunities.

- Acts as a consultant to other production/engineering groups on quality issues.

- Analyze quality data to determine and drive the desired outcome.

Communication

- Excellent written and verbal communication skills and people skills, comfortable presenting ideas and issues to peer groups and leaders.

- Escalates functional and process failures to the appropriate support groups and supervisors.

- Capable to develop and follow non-verbal communication (visual management: signs, work place organization, and pictures).

DDIAZ000005

Continuous Improvement

- Assist in the process design and tooling improvements â€" comfortable in suggesting and implementing new ideas that improve quality, reduce cost, support production work environment.

- Understands that there are always new opportunities for improvement and eliminate waste.

Motivation

- Ability to learn quickly and self-motivated.

- Positive energy and attitude, happy

- Poise when confronted with sudden setback or stressful situations.

- Willingness to operate in a dynamic environment and team structure.

Experience

- The candidate should have hands-on experience and proven track record in production in any high quality cutting edge products.

- MS Office programs (Word, Excel, and PowerPoint) experience

- May provide functional supervision in the absence of the supervisor.

- Production environment with team involvement

- Use of assembly equipment and tooling (power tools, automated equipment)

Skills and Abilities:

Physical Attributes

- Working for extended periods of time

- Lifting objects up to 15 pounds

- Use of tools that may produce vibration during use

- Use of complex tooling that requires specialized training

- Wearing Personal Protective Equipment: safety glasses, vests, shoes, hard hats

- Physical work including but not limited to pushing, pulling, gripping, twisting, reaching, etc.

- Working in a manufacturing environment

Mental Attributes

- Ability to follow a required specific sequence of steps in a process repetitively for an extended period of time

- Ability to understand codes used to make decisions

- Ability to detect abnormalities in the process using visual, touch, or auditory senses

- Ability to adjust to immediate process change due to process/shop improvement

- Perseverance in extensive process root cause analysis and countermeasure implementation

## Please send me an email once you have received this.

Thanks again

Raymond A. Soto |Sr. Technical Recruiter

West Valley Staffing Group

P: 408.735.1420 x3028 | F: 408.735.0034

E: rsoto@westvalley.com | W: www.westvalley.com

"#1 Staffing Agency in Silicon Valley" as rated by the Business Journal

"#1 Best Place to Work" as rated by San Francisco Business Times



*Comprehensive Staffing Solutions Through Specialization*

This email and any attachment are confidential. It may only be read, copied, and used by the intended recipient(s). If you are not the intended recipient(s), you may not copy, use, distribute, forward, store, or disclose this email or any attachment. If you are not the intended recipient(s) or have otherwise received this email in error, you should destroy it and any attachment and notify the sender by reply email or send a message to sysadmin@westvalley.com.

5 attachments



**image001.jpg**
92K

**Tesla NDA.PDF**
76K

**Meal Period Waiver (Tesla).pdf**
27K

**Tesla - Associate Acknowledgement (no driving).pdf**
114K

**Tesla - Contractor EHS Guidelines 4.14.docx**
30K

DDIAZ000007

# Exhibit

# 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
DEMETRIC DI-AZ, OWEN     )
DIAZ, and LAMAR          )
PATTERSON,               )
             Plaintiffs, )
vs.                      ) Case No.:  3:17-CV-066748
                         )              WHO
                         )
TESLA, INC., dba TESLA   )
MOTORS, INC.; CITISTAFF  )
SOLUTIONS, INC.; WEST    )
VALLEY STAFFING GROUP;   )
CHARTWELL STAFFING       )
SERVICES, INC.; and DOES )
1-10, inclusive,         )
             Defendants. )
_____)
```

DEPOSITION OF MONICA DE LEON

Thursday, December 6, 2018

TAKEN BEFORE:

HEIDI BELTON, CSR, RPR, CRR, CCRR, CRC

CSR No. 12885

```
 1                    December 6, 2018

 2                       10:05 a.m.

 3

 4          Videotaped deposition of MONICA DE

 5     LEON, held at the offices of California

 6     Civil Rights Law Group, 180 Grand

 7     Avenue, Suite 1380, Oakland, California,

 8     before Heidi Belton, a Certified

 9     Shorthand Reporter, Registered

10     Professional Reporter, Certified

11     Realtime Reporter, California Certified

12     Realtime Reporter, Certified Realtime

13     Captioner

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2
          For the Plaintiffs:
 3
              CALIFORNIA CIVIL RIGHTS LAW GROUP
 4            332 San Anselmo Avenue
              San Anselmo, California 94960
 5            By:  Navruz Avloni, Esq.
              Phone:  415.453.4740
 6            E-mail:  Navruz@civilrightsca.com

 7
          For the Defendant:
 8
              CONSTANGY BROOKS SMITH & PROPHETE, LLP
 9            2029 Century Park East, Suite 1100
              Los Angeles, California 90067
10            By:  Aaron M. Rutschman, Esq.
              Phone:  310.256.3083
11            E-mail:  Arutschman@constangy.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

12:28:48  1      Q.   -- that are working in the Tesla facility?

12:28:52  2      **A.   No, I do not know.**

12:28:56  3      Q.   Do you know if Tesla has the ability to

12:29:02  4   recommend discipline for CitiStaff contractors

12:29:06  5   working in a Tesla facility?

12:29:09  6           MR. RUTSCHMAN:  Objection; calls for

12:29:09  7   speculation.

12:29:10  8           THE WITNESS:  No, I do not.

12:29:16  9   BY MS. AVLONI:

12:29:16 10      Q.   Do you know if Tesla has the ability to

12:29:19 11   recommend termination of a relationship between a

12:29:21 12   CitiStaff contractor working at its facility?

12:29:26 13           MR. RUTSCHMAN:  Objection; calls for

12:29:26 14   speculation.

12:29:31 15           THE WITNESS:  In that case I would say

12:29:32 16   yes.  If there is -- if they're in a department

12:29:37 17   that's far away or -- and they're being supervised

12:29:43 18   by them and that supervisor, then, yes, I would say

12:29:47 19   in that case they would be able to tell nextSource

12:29:51 20   about the worker's performance.

12:29:59 21   BY MS. AVLONI:

12:30:00 22      Q.   Do you know if nextSource -- isn't it

12:30:03 23   true that nextSource is kind of just like a

12:30:05 24   middleman between CitiStaff providing employee --

12:30:09 25   contractors to nextSource and then nextSource

12:48:49  1        Q.    These are the only two that you recall?

12:48:55  2        A.    Yeah.

12:48:56  3              MR. RUTSCHMAN:  Is that a yes?

12:48:56  4              THE WITNESS:  Yes.

12:48:56  5   BY MS. AVLONI:

12:48:57  6        Q.    And referring to Owen bringing concerns,

12:49:00  7   you recall him bringing two concerns to your

12:49:02  8   attention, one about the picture and the other one

12:49:04  9   about the altercation with Rothaj; is that correct?

12:49:06  10       A.    Correct.

12:49:08  11       Q.    In regards to the picture, when he

12:49:15  12  communicated that concern to you, what did you do?

12:49:17  13       A.    So when he told me about it, you know, due

12:49:25  14  to the fact that we take it seriously, we

12:49:30  15  immediately took it up to HR -- Judy -- and let my

12:49:38  16  supervisors know about it as well, which they said

12:49:44  17  to talk to Judy for this case.

12:49:51  18       Q.    Did you talk to Judy?

12:49:53  19       A.    Yes, I did.

12:49:57  20       Q.    What did you guys discuss?

12:49:59  21       A.    I told Judy about, you know -- I told Judy

12:50:03  22  that I discussed -- spoke with Owen, you know.  I

12:50:09  23  checked in to -- with him to see do you -- are you

12:50:19  24  going to return to your -- to your job.  He said

12:50:22  25  yes.  I asked him if he wanted to be moved to a

| | | |
|---|---|---|
| 12:50:26 | 1 | **different department.  He said no.  You know, he was** |
| 12:50:33 | 2 | **upset and a little aggravated.  But I let him know** |
| 12:50:42 | 3 | **that I'm -- HR is going to deal with this.  I have** |
| 12:50:47 | 4 | **already brought it up to them to their immediate** |
| 12:50:50 | 5 | **attention.  I let my supervisors know.  And I let** |
| 12:50:57 | 6 | **Chartwell -- I gave them the okay to consent to** |
| 12:51:00 | 7 | **speak with Owen Diaz.** |
| 12:51:12 | 8 | Q.   Do you recall discussing anything else |
| 12:51:13 | 9 | with Owen Diaz regarding this situation?  I'm sorry, |
| 12:51:19 | 10 | actually.  You were describing to me the |
| 12:51:20 | 11 | conversation you had with Judy; right? |
| 12:51:24 | 12 | **A.   Yes.** |
| 12:51:25 | 13 | Q.   Because -- let's back up.  Let's get a |
| 12:51:27 | 14 | clear record. |
| 12:51:27 | 15 | So when Owen raised the concern about the |
| 12:51:33 | 16 | picture to you, you talked to Owen.  And what did he |
| 12:51:42 | 17 | tell you? |
| 12:51:45 | 18 | MR. RUTSCHMAN:  Objection; asked and |
| 12:51:45 | 19 | answered. |
| 12:51:50 | 20 | THE WITNESS:  So he pretty much told me |
| 12:51:53 | 21 | how -- what happened, how he came across the |
| 12:51:58 | 22 | picture.  You know, he felt that the rac- -- the |
| 12:52:07 | 23 | picture was racist and that he wanted to make a |
| 12:52:17 | 24 | complaint. |
| 12:52:21 | 25 | BY MS. AVLONI: |

01:21:03  1       Q.   Did you have any client that paid more

01:21:05  2   than $16 an hour?

01:21:07  3       A.   I don't think so.  Other than Tesla.

01:21:13  4            MS. AVLONI:  What time is it right now?

01:21:15  5   It's 1:21 p.m.  It makes sense, I think, to go on a

01:21:19  6   break.

01:21:21  7            MR. RUTSCHMAN:  Yes.

01:21:21  8            MS. AVLONI:  Okay.  So it is 1:21 and

01:21:24  9   we're going off the record.

01:21:25 10       (Recess taken from 1:21 p.m. to 2:18 p.m.)

02:18:36 11            MS. AVLONI:  The time is now 2:18 p.m.

02:18:38 12   And we're back on the record.

02:18:42 13       Q.   Ms. De Leon, what is your current address?

02:18:48 14       A.   My --

02:18:49 15            MR. RUTSCHMAN:  Objection; privacy.  She's

02:18:51 16   represented in this action, so you can contact her

02:18:54 17   through our firm.

02:18:55 18            MS. AVLONI:  And will you --

02:18:56 19            MR. RUTSCHMAN:  I'm going to instruct her

02:18:58 20   not to answer.

02:18:58 21            MS. AVLONI:  And will you agree to accept

02:19:00 22   a subpoena on behalf of Ms. De Leon, trial subpoena?

02:19:05 23            MR. RUTSCHMAN:  Yes.

02:19:06 24   BY MS. AVLONI:

02:19:06 25       Q.   And you're okay with your attorney

03:25:35  1   witnesses that observed the incident whether or not

03:25:39  2   they were CitiStaff temporary or not?

03:25:49  3       A.   It was more so she would tell me, you

03:25:50  4   know, when you talk to the client, ask them if they

03:25:53  5   have witness reports or any statement or any

03:26:01  6   documentation from the other parties.

03:26:09  7       Q.   In Owen Diaz' case, in regards to his

03:26:12  8   complaint about the inappropriate picture, did you

03:26:17  9   speak with nextSource about Owen's complaint?

03:26:25 10       A.   Yes.

03:26:26 11       Q.   Who did you speak to from nextSource?

03:26:33 12       A.   I don't recall.

03:26:36 13       Q.   Did you check with nextSource whether

03:26:39 14   they took down any statements or prepared any

03:26:42 15   reports?

03:26:43 16       A.   Yes.

03:26:45 17       Q.   And do you recall what nextSource said?

03:26:48 18       A.   I had asked nextSource for -- oh, no.

03:26:56 19   That wasn't the -- that wasn't the picture

03:26:58 20   situation.  That was the other situation.  So in the

03:27:02 21   picture situation, no, I don't recall them having

03:27:09 22   any witnesses or anything of that sort.

03:27:16 23       Q.   Do you recall asking from nextSource

03:27:20 24   whether there were any witnesses?

03:27:26 25       A.   There was -- no, not as far as witnesses.

03:27:29  1        Q.   Meaning no, you did not ask nextSource

03:27:30  2    or no, there were no witnesses that you're aware of?

03:27:35  3        **A.   There were no witnesses that I was aware**

03:27:36  4    **of.**

03:27:37  5        Q.   But you would have asked nextSource;

03:27:39  6    right?

03:27:40  7        **A.   Right.**

03:27:40  8             MR. RUTSCHMAN:  Objection; misstates the

03:27:41  9    witness' prior testimony.

03:27:45 10             THE WITNESS:  So I would have asked them

03:27:46 11    if there were, but there wasn't any.

03:27:51 12    BY MS. AVLONI:

03:27:52 13        Q.   And would your questions to nextSource

03:27:55 14    regarding this incident have been sent by e-mail or

03:27:58 15    would you have posed these questions by phone?

03:28:08 16        **A.   By phone, both.**

03:28:10 17        Q.   And would you have saved your e-mails to

03:28:14 18    the CitiStaff system?

03:28:15 19        **A.   Anything that I had saved at the time**

03:28:18 20    **would have been in the system.  But I don't know if**

03:28:23 21    **anything is still in there.**

03:28:24 22        Q.   Understood.  But you knew that based on

03:28:26 23    what Judy instructed you, it was important to keep

03:28:29 24    e-mails regarding the situation in the system;

03:28:31 25    right?

| | | |
|---|---|---|
| 03:51:45 | 1 | MR. RUTSCHMAN:  Objection; the document |
| 03:51:47 | 2 | speaks for itself. |
| 03:51:48 | 3 | THE WITNESS:  His ray rate. |
| 03:51:50 | 4 | BY MS. AVLONI: |
| 03:51:51 | 5 | Q.   Is that the new pay rate, the raise, or |
| 03:51:53 | 6 | the previous pay raise? |
| 03:51:55 | 7 | A.   That would be the new pay rate from his |
| 03:51:57 | 8 | raise that he got. |
| 03:51:58 | 9 | Q.   So what the document is saying is that |
| 03:52:01 | 10 | somewhere in August 16 of 2015 Owen Diaz' pay rate |
| 03:52:06 | 11 | increased to $18? |
| 03:52:08 | 12 | A.   Yes. |
| 03:52:08 | 13 | Q.   And then do you know what the regular |
| 03:52:09 | 14 | billing rate $23.76 means? |
| 03:52:13 | 15 | A.   That would have had to have been just in |
| 03:52:15 | 16 | the contract between nextSource and -- |
| 03:52:20 | 17 | Q.   Do you know if that's the amount that |
| 03:52:23 | 18 | CitiStaff billed nextSource for Owen's hourly |
| 03:52:29 | 19 | rate? |
| 03:52:30 | 20 | A.   I don't know. |
| 03:52:31 | 21 | Q.   And then if you look at "Status."  It says |
| 03:52:34 | 22 | "3."  Do you know what that means? |
| 03:52:40 | 23 | A.   I forgot what that was. |
| 03:52:42 | 24 | Q.   How about "Work code"?  Do you know what |
| 03:52:45 | 25 | that -- |

```
 1                  REPORTER'S CERTIFICATION

 2

 3           I, Heidi Belton, Certified Shorthand

 4   Reporter in and for the State of California, do

 5   hereby certify:

 6

 7           That the foregoing witness was by me duly

 8   sworn; that the deposition was then taken before me

 9   at the time and place herein set forth; that the

10   testimony and proceedings were reported

11   stenographically by me and later transcribed into

12   typewriting under my direction; that the foregoing

13   is a true record of the testimony and proceedings

14   taken at that time.

15

16           IN WITNESS WHEREOF, I have subscribed my

17   name on this date:

18

19

20

21

22           _____

23           Heidi Belton, CSR, RPR, CRR, CCRR, CRC
                      CSR No. 12885
24

25
```

# Exhibit

# 8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                    Plaintiffs,

                                    No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                    Defendants.
_____/


DEPOSITION OF ANNALISA HEISEN

May 29, 2019


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         CALIFORNIA CIVIL RIGHTS LAW GROUP
           By:  LAWRENCE A. ORGAN
 5              Attorney at Law
           332 San Anselmo Avenue
 6         San Anselmo, California 94960
           (415) 453-4740
 7         larry@civilrightsca.com

 8    ALSO PRESENT:  JEAN GER, CCRLG

 9

10    FOR THE DEFENDANT WEST VALLEY STAFFING GROUP:

11         PAHL & MCCAY
           By:  FENN C. HORTON, III
12              Attorney at Law
           225 West Santa Clara, Suite 1500
13         San Jose, California 95113
           (408) 286-5100
14         fhorton@pahl-mccay.com

15    ALSO PRESENT:
      TERESA KOSSAYIAN, WEST VALLEY STAFFING GROUP
16

17    FOR THE DEFENDANT NEXTSOURCE, INC.:

18         FISHER & PHILLIPS
           By:  JUAN C. ARANEDA
19              Attorney at Law
           One Embarcadero Center, Suite 2050
20         San Francisco, California 94111
           (415) 490-9000
21         jaraneda@fisherphillips.com

22

23

24

25
```

```
 1                  A P P E A R A N C E S (continued)

 2

 3   FOR THE DEFENDANT TESLA INC. Dba TESLA MOTORS INC.:

 4        SHEPPARD, MULLIN, RICHTER & HAMPTON
          By:  PATRICIA M. JENG
 5             Attorney at Law
          Four Embarcadero Center, 17th Floor
 6        San Francisco, California 94111
          (415) 434-9100
 7        pjeng@sheppardmullin.com

 8   FOR THE DEFENDANT CHARTWELL STAFFING SERVICES, INC.:
          LAFAYETTE & KUMAGAI LLP
 9         By:  CHERYL A. STEVENS
               Attorney at Law
10        1300 Clay Street, Suite 810
          Oakland, California 94612
11        (415) 357-4600
          cstevens@lkclaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    versions.  The other, I don't know what they are off

2    the top of my head.

3              MR ORGAN:  Q.  Okay.  Let's go through

4    Exhibit 150.

5              Now, as to this policy, the antiharassment

6    and discrimination policy, this policy would apply to

7    all workers at the Tesla factory; correct?

8              MS. JENG:  Objection; vague and ambiguous and

9    calls for speculation.

10             THE WITNESS:  There's an expectation that

11   employees at Tesla as well as contractors and other

12   people on-site are in compliance with the policy.

13             MR ORGAN:  Q.  So Exhibit 150 does apply to

14   both contractors and regular employees, then; right?

15             MS. JENG:  Objection; asked and answered.

16             THE WITNESS:  There's an expectation that

17   both of those categories of workers would be in

18   compliance with those articulated.

19             MR ORGAN:  Okay.  And in terms of -- so if

20   both employees and contractors have to comply with

21   Exhibit 150, the policies in Exhibit 150, how do you

22   go about enforcing that?

23             MR. ARANEDA:  Misstates prior testimony.

24             MS. JENG:  And also vague and ambiguous as to

25   "enforce."

1   discrimination policy?

2       **A.   My understanding is that the agencies who**

3   **employ the contractors are doing training on policies**

4   **and compliance.   I don't have visibility into their**

5   **processes.**

6       Q.   So your understanding is that the contracting

7   agencies are supposed to train their employees who

8   were working at the Tesla factory, on Tesla's

9   antiharassment and discrimination policy; correct?

10          MR. ARANEDA:   Misstates prior testimony.

11          THE WITNESS:   So, there's an expectation that

12   they're being trained by their staffing agencies on

13   antiharassment and discrimination, but this -- not

14   this policy specifically; I'm not sure what they're

15   doing.   I couldn't confirm if they're training this

16   policy, since they're employees.

17          MR ORGAN:   Q.   What steps does Tesla take to

18   ensure that contractors who come into and work in the

19   Tesla factory in Fremont have training relative to the

20   topic of antiharassment and discrimination?

21       **A.   We have an expectation that agencies are**

22   **training on antiharassment and discrimination.**

23       <u>Q.   And what is that expectation based on?</u>

24       **<u>A.   That they're legally compliant.</u>**

25       Q.   In terms of Tesla's expectation, is there an

1        Q.   In terms of if a Tesla employee -- let's say

2    a supervisor or a manager gets information from a

3    contract employee about harassment or discrimination,

4    Tesla's antiharassment and discrimination policy would

5    apply, in terms of reporting an investigation;

6    correct?

7        **A.   Correct.   To that employee of Tesla who**

8    **received information?**

9        Q.   Yes.

10       **A.   Correct.**

11       Q.   And so that employee of Tesla would have to

12   then take some action once they get information about

13   discrimination or harassment in the workplace;

14   correct?

15       **A.   That's the expectation.**

16       Q.   And that's true regardless of whether the

17   harassment or discrimination takes place in any area

18   of the Fremont factory; correct?

19       **A.   What do you mean, "area"?**

20       Q.   Well, there are different areas of the

21   Fremont factory, I understand; is that right?

22       **A.   Physical locations.**

23       Q.   Physical locations, yes.

24       **A.   That's my understanding.**

25       Q.   And in terms of the antiharassment and

 1    discrimination policy that Tesla has, that policy

 2    applies to all areas of the factory; right?

 3        A.    **That's my understanding.**

 4        Q.    There's not like an antiharassment-free zone;

 5    right?

 6        A.    **No.**

 7        Q.    So if a Tesla employee gets information about

 8    harassing conduct based on race in the factory, that's

 9    occurring in the factory, regardless of how they get

10    that information, they then have a reporting duty, in

11    terms of either providing that information to a

12    higher-level manager or sending it to HR; is that

13    true?

14        A.    **There's an expectation of that, as it's**

15    **articulated in the policy.**

16             MR ORGAN:  This is 151.

17             (Whereupon Deposition Exhibit 151

18              was marked for identification.)

19             MR ORGAN:  Exhibit 151, for the record, is a

20    six-page document Bates-stamped Tesla 819 to 824.

21    It's entitled "Policy Against Discrimination and

22    Harassment in the Workplace, U.S. Locations."

23        Q.    Do you recognize Exhibit 151?

24        A.    **I do.**

25        Q.    And what is Exhibit 151?

 1    be harassed or degraded while they're trying to do

 2    their job," you would agree that that is -- comports

 3    with Tesla's policies, doesn't it?

 4         **A.   I agree, yes.**

 5         Q.   And then Mr. Owen Diaz also says -- he said,

 6    "It's not the first time that Ramon Martinez has" -- I

 7    think "has been talked about his behavior," "has been

 8    talked to about his behavior."

 9              Is that your understanding?

10              MS. JENG:  Objection; the document speaks for

11    itself.  Misstating the evidence.

12              MR ORGAN:  Q.  You understood that Mr. Diaz

13    was complaining that the behavior towards Mr. Diaz was

14    getting worse; right?

15              MS. JENG:  Objection; lacks foundation,

16    misstates the evidence.  And the document speaks for

17    itself.

18              THE WITNESS:  He makes the statement here

19    towards the end of the document.  Owen alleges that

20    his behavior is getting worse.

21              MR ORGAN:  Q.  "His behavior," being

22    Mr. Martinez, is getting worse.

23         **A.   Yeah, yeah, Martinez.**

24         Q.   That is all something you would have

25    expected, the Tesla HR person who got involved, to

1    take into account when looking into Mr. Diaz's

2    complaint; correct?

3              MS. JENG:   Objection; lacks foundation.

4              THE WITNESS:   I could say that I would

5    imagine that those items would be taken into account

6    during an investigation, depending on whether it's the

7    Tesla HR person who conducted it or not.

8              MR ORGAN:   Q.   What does Tesla do to make

9    sure that its contractor organizations do a thorough

10   and effective investigation?

11        **A.   In general, when these complaints come to**

12   **Tesla's attention -- these complaints being harassment**

13   **and discrimination complaints -- if they involve**

14   **contractors, we expect that the Tesla HR person is in**

15   **communication with the agency.   So even if they're not**

16   **the ones conducting the investigation, they're making**

17   **sure that the issue is resolved by collaborating with**

18   **the agency.**

19        Q.   And what is the typical way that Tesla HR

20   communicates with the contract agencies?

21        **A.   What do you mean by "way"?**

22        Q.   Like email, is that the typical way --

23        **A.   Email is one way.   Phone, in person.**

24        Q.   If there are in-person communications, do HR

25   people typically take notes of those interactions with

 1    anything in writing that you have seen that indicates

 2    what contractors are supposed to do relative to

 3    enforcing Tesla's antiharassment policies?

 4        A.    Not that I've seen.

 5        Q.    And other than the policies that we've talked

 6    about and the investigation tool kit, which we don't

 7    have, other than those policies and procedures, are

 8    there any other policies or procedures for ensuring

 9    that workers who are working at your Fremont factory

10    are not subjected to harassment?

11        A.    Not that I'm aware of.

12        Q.    In terms of Tesla's antiharassment complaint

13    procedures, we saw some of those in the code of

14    conduct and then also in the antiharassment policy.

15             Other than those complaint procedures, are

16    there any other complaint procedures that Tesla has

17    that we haven't gone over?

18        A.    No, I think we covered everything.

19        Q.    It's fair to say that if someone wants to

20    make a complaint to Tesla about the way they're being

21    treated, some kind of harassment, they can do that

22    either in writing or verbally; is that true?

23        A.    That's correct.

24        Q.    And if a Tesla employee wants to complain

25    about harassment in the workplace, they can do that by

 1            MS. JENG:  Thank you.

 2            MR ORGAN:  Anybody else?

 3            MR. HORTON:  No questions.

 4            MR. ARANEDA:  No questions.

 5            MR ORGAN:  Okay.  I just have a follow-up on

 6     one of your answers to Patricia.

 7                         ---oOo---

 8            FURTHER EXAMINATION BY MR. ORGAN

 9            MR. ORGAN:  Q.  Relative to disciplinary

10     action, if Tesla finds or gets information that an

11     employee has engaged in harassing conduct, Tesla will

12     act on that, correct, even if it's a contractor doing

13     the harassing conduct?

14        **A.    Tesla would partner with the agency and**

15     **collaborate with them to come up with an action.**

16        Q.    And you would agree that Tesla, with respect

17     to any contract employee, can ask the contracting

18     agency not to send that individual to the Tesla

19     factory; right?

20        **A.    They can say that that person is no longer**

21     **allowed on the property, or request that the contract**

22     **with Tesla end.**

23        Q.    And certainly, if Tesla found or had

24     information that someone, a contractor, had engaged in

25     harassing conduct, Tesla would want to protect its

1    State of California              )

2    County of Marin                  )

3

4              I, Bridget M. Mattos, hereby certify

5    that the witness in the foregoing deposition was by me

6    duly sworn to testify to the truth, the whole truth

7    and nothing but the truth in the within entitled

8    cause; that said deposition was taken at the time and

9    place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and disinterested person, and was thereafter

13   transcribed under my direction into typewriting by

14   computer; that the witness was given an opportunity to

15   read, correct and sign the deposition.

16             I further certify that I am not

17   interested in the outcome of said action nor connected

18   with or related to any of the parties in said action

19   nor to their respective counsel.

20             IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on May 29, 2019.

22          _____

23            BRIDGET M. MATTOS, CSR NO. 11410

24

25

# Exhibit

# 9

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   DEMETRIC DI-AZ, OWEN DIAZ, and    )
     LAMAR PATTERSON,                  )
 6                                     )
                    Plaintiffs,        )
 7                                     )  Case No.
          vs.                          )  3:17-cv-06748-WHO
 8                                     )
     TESLA, INC. dba TESLA MOTORS,     )  Pages 1 - 142
 9   INC.; CITISTAFF SOLUTIONS, INC.;  )
     WEST VALLEY STAFFING GROUP;       )
10   CHARTWELL STAFFING SERVICES, INC.;)
     and DOES 1-50, inclusive,         )
11                                     )
                    Defendants.        )
12   _____)

13

14

15

16         VIDEO DEPOSITION OF ERIN MARCONI

17            MONDAY, OCTOBER 21, 2019

18                  11:39 A.M.

19

20

21

22

23   REPORTED BY:  LAURA J. MELLINI

24            CSR NO. 8181, RPR, CCRR

25   NDS JOB NO.:  220525
```

                                                              1

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFFS DEMETRIC DI-AZ AND OWEN DIAZ:

4

5              CALIFORNIA CIVIL RIGHTS LAW GROUP

6              BY:  LAWRENCE A. ORGAN, ESQ.

7              332 SAN ANSELMO AVENUE

8              SAN ANSELMO, CALIFORNIA 94960

9              415.453.4740

10             larry@civilrightsca.com

11

12   FOR DEFENDANTS TESLA, INC. dba TESLA MOTORS, INC.:

13

14             SHEPPARD MULLIN RICHTER & HAMPTON LLP

15             BY:  TRACEY A. KENNEDY, ESQ.

16             333 SOUTH HOPE STREET

17             43RD FLOOR

18             LOS ANGELES, CALIFORNIA 90071-1422

19             213.617.4249

20             tkennedy@sheppardmullin.com

21

22

23

24

25
```

                                                                    3

```
 1    APPEARANCES OF COUNSEL:   (Continued)

 2

 3    FOR DEFENDANT CITISTAFF SOLUTIONS, INC.:

 4

 5              (APPEARING TELEPHONICALLY)

 6              LAFAYETTE & KUMAGAI LLP

 7              BY:  SUSAN KUMAGI, ESQ.

 8              1300 CLAY STREET

 9              SUITE 810

10              OAKLAND, CALIFORNIA  94612

11              415.357.4600

12              skumagai@lkclaw.com

13

14    FOR DEFENDANT NEXTSOURCE, INC.:

15

16              (APPEARING TELEPHONICALLY)

17              FISHER PHILLIPS

18              BY:  VINCENT ADAMS, ESQ.

19              ONE EMBARCADERO CENTER

20              SUITE 2050

21              SAN FRANCISCO, CALIFORNIA  94111-3712

22              415.490.9000

23              vadams@fisherphillips.com

24

25
```

4

Erin Marconi                                                          October 21, 2019

| 1 | Q | And what was that job? | 11:44 |

2      A      Employee relations and generalist work for      11:44

3   staffing agency.                                          11:44

4      Q      What was the staffing agency you were working   11:44

5   for?                                                      11:44

6      A      Volt -- I think their full name is Workforce     11:44

7   Solutions.                                                11:44

8      Q      How long did you work for Volt?                  11:44

9      A      Just under three years.                          11:44

10     Q      And what was your job -- what was your job       11:44

11  title at Volt?                                            11:44

12     A      That is a fantastic question.                    11:44

13            My last job title at Volt was program manager.   11:44

14     Q      Okay.                                            11:44

15     A      What my first one was I am not sure.             11:44

16     Q      That's fine.  Program manager is good.           11:44

17            What did you do after you left Volt as a         11:44

18  program manager?                                          11:44

19     A      I went to Tesla as an HR business partner.       11:45

20     Q      So that would be approximately 2013?             11:45

21     A      Correct.                                         11:45

22     Q      How long were you an HR business partner at      11:45

23  Tesla?                                                    11:45

24     A      Until January 2017.                              11:45

25     Q      And what was your job title after you -- after   11:45

13

Erin Marconi                                                    October 21, 2019

```
 1    reported to me and I -- no.                          12:02

 2         Q    But you mentioned earlier that there were HR   12:02

 3    teams.                                                12:02

 4         A    There was an HR business partner team.  There  12:02

 5    were also some employee relations people that supported  12:02

 6    us.  They did a lot of administrative for the most part.  12:02

 7              Then there was a totally different group in HR  12:02

 8    that did onboarding, offboarding.  I can't recall what  12:02

 9    the name of that group was.                          12:02

10              There was recruiting.  There was just various  12:03

11    different areas.                                      12:03

12         Q    But the HR business partner team that you were  12:03

13    part of was in charge of handling, among other things,  12:03

14    complaints about discrimination or harassment; right?  12:03

15         A    Correct.                                    12:03

16         Q    And approximately how many members were there  12:03

17    in that HR business partner team that handled       12:03

18    discrimination and harassment complaints in that 2015,  12:03

19    '16 time period?                                      12:03

20         A    At least ten, to the best of my recollection.  12:03

21    That was a long time ago, though.                    12:03

22         Q    Okay.                                       12:04

23         A    Oh, 11.  Sorry.  I haven't thought about that  12:04

24    in a long time.                                       12:04

25         Q    That's all right.  That's all right.  I     12:04
```

27

| | | | |
|---|---|---|---|
| 1 | | appreciate you coming in to help us here. | 12:04 |
| 2 | | Did you have a job description for your job? | 12:04 |
| 3 | A | Not when I was hired. | 12:04 |
| 4 | Q | Okay. | 12:04 |
| 5 | A | I was the first person in that role, and | 12:04 |
| 6 | | someone that knew me from a previous life called, talked | 12:04 |
| 7 | | to me about the job. | 12:04 |
| 8 | Q | So you were the first person in the HR | 12:04 |
| 9 | | business partner role? | 12:04 |
| 10 | A | Correct. | 12:04 |
| 11 | Q | At Tesla? | 12:04 |
| 12 | A | Yes. | 12:04 |
| 13 | Q | Congratulations. | 12:04 |
| 14 | A | Thanks. | 12:04 |
| 15 | Q | Did you have -- well, let's -- let's do this. | 12:04 |
| 16 | | Let's -- I'm going to show you what's been previously | 12:04 |
| 17 | | marked as Exhibit 183.  And Exhibit 183 for the record | 12:05 |
| 18 | | is a one-page document Bates-stamped Tesla 889. | 12:05 |
| 19 | | My understanding is that Tesla HR was on the | 12:05 |
| 20 | | production floor; is that correct? | 12:05 |
| 21 | A | At some periods of time. | 12:05 |
| 22 | Q | And in the 2015, 2016 time period, do you | 12:05 |
| 23 | | remember whether HR was on the production floor? | 12:05 |
| 24 | A | I believe so. | 12:05 |
| 25 | Q | Okay.  So is there an area -- we only have | 12:05 |

28

```
 1        Q    Okay.  And in your role as the HR business      12:11

 2   partner, did you help enforce the anti-discrimination     12:11

 3   and anti-harassment policies that Tesla had?              12:11

 4        A    Yes.                                            12:11

 5        Q    Did you have any input on the written policies  12:11

 6   of the company?  In other words, did you help like with   12:11

 7   the anti-handbook handbook or any of that stuff?          12:11

 8        A    I don't recall who wrote the anti-handbook      12:11

 9   handbook.                                                 12:11

10        Q    Okay.  But in terms of other policies, other    12:11

11   HR policies, did you help at least with the drafting of   12:12

12   any of those other policies?                              12:12

13        A    Not that I recall.                             12:12

14        Q    Okay.  Do you remember who did have the         12:12

15   responsibilities for drafting those other HR policies?    12:12

16        A    I don't recall.                                 12:12

17        Q    Okay.  But it's fair to say that you at least   12:12

18   understood what Tesla's policies were in terms of         12:12

19   anti-discrimination and anti-harassment; right?          12:12

20        A    Correct.                                        12:12

21        Q    And Tesla has, or had when you were there, a    12:12

22   zero-tolerance policy for harassment; right?             12:12

23        A    Correct.                                        12:12

24        Q    And Tesla also has a zero-tolerance policy for  12:12

25   discrimination?                                           12:12
```

                                                                 33

| | | | |
|---|---|---|---|
| 1 | A | Correct. | 12:12 |

2      Q     What does that mean to have a zero-tolerance      12:12

3  policy under Tesla's formula?      12:12

4      A     That there's no tolerance of any of those      12:13

5  things which you just said, harassment, discrimination.      12:13

6      Q     Would you agree that based on your      12:13

7  understanding of Tesla's policies, that use of the      12:13

8  n-word by any worker at the factory would have violated      12:13

9  Tesla's anti-harassment policy?      12:13

10      A     I don't want to assume anything.  So what were      12:13

11  we talking about?      12:13

12      Q     Yeah.  You mentioned that you understood      12:13

13  Tesla's zero- -- that Tesla had a zero-tolerance policy      12:13

14  for discrimination and harassment; right?      12:13

15      A     Correct.      12:13

16      Q     And based on your understanding of that      12:13

17  policy, if a Tesla worker had used the n-word in the      12:13

18  workplace, would that have violated Tesla's      12:14

19  anti-harassment, anti-discrimination policy?      12:14

20      A     What do you mean by "n-word"?  I don't want to      12:14

21  assume what you mean.      12:14

22      Q     Oh, okay.  So I'll just say it once because      12:14

23  it's a highly offensive term to most people.  But my      12:14

24  understanding is and my use of "n-word" is either      12:14

25  "nigger," n-i-g-g-e-r, or "nigga," n-i-g-g-a.  Okay?      12:14

34

```
 1         A    Okay.                                          12:14

 2         Q    So with that understanding of the definition  12:14

 3    of n- -- of the n-word, is it your understanding that   12:14

 4    Tesla's anti-harassment and anti-discrimination         12:14

 5    zero-tolerance policies prohibit use of the n-word at   12:14

 6    the Tesla facility?                                     12:14

 7         A    Yes.                                           12:14

 8         Q    Let me just do a little more questions about  12:15

 9    your background.                                        12:15

10              In terms of the number of investigations that 12:15

11    you've done into harassment claims or, you know, words  12:15

12    that people found inappropriate, how many investigations 12:15

13    do you think you did to things like that during the time 12:15

14    that you were at Tesla?                                 12:15

15         A    I don't recall doing any of that particular... 12:15

16         Q    Okay.  Did you do any sexual harassment       12:15

17    investigations?                                         12:15

18         A    Yes.                                           12:15

19         Q    How many sexual harassment investigations did 12:15

20    you do?                                                 12:15

21         A    I have absolutely no idea.  I would be        12:15

22    guessing if I gave a number on --                       12:15

23         Q    More than ten do you think?                   12:15

24         A    Accusations?                                   12:16

25         Q    Yeah, yeah.  Complaints.  How many complaints 12:16
```

35

```
 1   of sexual harassment do you think you investigated at --      12:16
 2   what's your best estimate, at Tesla?                           12:16
 3        A    Maybe three.  Two that I can definitely             12:16
 4   recall.  Not during 2015 or 2016.                             12:16
 5        Q    Okay.  And if you had known about someone           12:16
 6   using the n-word at the Tesla factory, that would             12:16
 7   certainly be something that you would investigate;            12:16
 8   correct?                                                      12:16
 9        A    Absolutely.                                         12:16
10        Q    And the reason that you would investigate that      12:16
11   is use of the n-word at the Tesla factory could create a      12:16
12   hostile work environment for other workers; right?           12:16
13        A    Correct.                                            12:16
14        Q    Did you have -- and just so I'm clear, did you      12:17
15   ever investigate a claim where somebody at least alleged      12:17
16   that the n-word had been used?                                12:17
17        A    I don't recall.                                     12:17
18        Q    You don't recall doing that; correct?              12:17
19        A    Unh-unh.                                            12:17
20        Q    "No"?                                               12:17
21        A    "No."  I'm sorry.                                   12:17
22             MS. KENNEDY:  You asked it in the negative,         12:17
23   Larry.                                                        12:17
24             MR. ORGAN:  Oh, right.  Right.                      12:17
25   BY MR. ORGAN:                                                 12:17
```

36

| | | | |
|---|---|---|---|
| 1 | A | That's my understanding. | 12:39 |
| 2 | Q | You would agree that it's never okay to use | 12:39 |
| 3 | | the n-word in the workplace? | 12:39 |
| 4 | A | Correct. | 12:39 |
| 5 | Q | And you'd also agree that it's never okay to | 12:39 |
| 6 | | make offensive drawings that could be racial in nature; | 12:39 |
| 7 | | right? | 12:39 |
| 8 | A | Correct. | 12:39 |
| 9 | Q | You'd agree that every employer has a duty to | 12:39 |
| 10 | | provide a workplace where employees are not using the | 12:39 |
| 11 | | n-word towards other employees? | 12:39 |
| 12 | A | Yes. | 12:39 |
| 13 | Q | And under Tesla's policies, if someone | 12:39 |
| 14 | | complained to a supervisor, that satisfied the | 12:40 |
| 15 | | requirements of their reporting, correct, at least | 12:40 |
| 16 | | initially? | 12:40 |
| 17 | | MS. KENNEDY:  Objection.  Vague.  And | 12:40 |
| 18 | | objection to the form of the question. | 12:40 |
| 19 | | You may respond if you can. | 12:40 |
| 20 | | THE WITNESS:  Can you read the question? | 12:40 |
| 21 | BY MR. ORGAN: | | 12:40 |
| 22 | Q | I'll try a different way. | 12:40 |
| 23 | | If -- if a Tesla worker complains about | 12:40 |
| 24 | | harassment to their supervisor, that meets their at | 12:40 |
| 25 | | least initial burden under Tesla's policies for | 12:40 |

51

| | | |
|---|---|---|
| 1 | reporting harassment; right? | 12:40 |
| 2 |     A    Yes. | 12:40 |
| 3 |     Q    And under Tesla policies, supervisors are | 12:40 |
| 4 | supposed to report issues relating to harassment to | 12:40 |
| 5 | their managers and to HR? | 12:41 |
| 6 |     A    Yes. | 12:41 |
| 7 |     Q    Similarly, if an employee wanted to report an | 12:41 |
| 8 | issue of harassment to a manager, that would satisfy | 12:41 |
| 9 | Tesla's reporting requirements; right? | 12:41 |
| 10 |     A    Yes. | 12:41 |
| 11 |     Q    Now, there was a -- there were numerous | 12:41 |
| 12 | contractors who had employees working at the Tesla | 12:41 |
| 13 | facility, is that true, during the time that you were | 12:41 |
| 14 | there? | 12:41 |
| 15 |     A    I believe so. | 12:41 |
| 16 |     Q    Do you know what percentage of the workers | 12:41 |
| 17 | working at the Tesla factory were contractors? | 12:41 |
| 18 |         MS. KENNEDY:  At what point in time? | 12:42 |
| 19 |         MR. ORGAN:  Yeah, that's a good point.  I'll | 12:42 |
| 20 | withdraw that. | 12:42 |
| 21 |         MS. KENNEDY:  Okay. | 12:42 |
| 22 |         MR. ORGAN:  Yeah, because it's vague as to | 12:42 |
| 23 | time. | 12:42 |
| 24 | BY MR. ORGAN: | 12:42 |
| 25 |     Q    Let's talk about the 2015, 2016 time period. | 12:42 |

52

| | | |
|---|---|---|
| 1 | above; right? | 12:43 |
| 2 | A    Correct. | 12:43 |
| 3 | Q    And you did play a role in terms of recruiting | 12:43 |
| 4 | for those positions? | 12:43 |
| 5 | A    Recruiting, not so much.  Interview input, | 12:43 |
| 6 | yes.  And I wouldn't say a hundred percent of the time. | 12:43 |
| 7 | Q    Okay. | 12:43 |
| 8 | MR. ORGAN:  We've been going a little over an | 12:43 |
| 9 | hour, and we have to give our court reporter a break | 12:43 |
| 10 | every so often.  So why don't we go off the record. | 12:43 |
| 11 | THE VIDEO OPERATOR:  The time is 12:42.  This | 12:43 |
| 12 | ends disk number 1.  We're off the record. | 12:43 |
| 13 | (Brief recess taken.) | 12:43 |
| 14 | THE VIDEO OPERATOR:  The time is 12:57.  This | 12:58 |
| 15 | is disk number 2 of Erin Marconi.  We're back on the | 12:58 |
| 16 | record. | 12:58 |
| 17 | BY MR. ORGAN: | 12:58 |
| 18 | Q    What was Tesla's HR role in investigating | 12:58 |
| 19 | claims of harassment by contract workers who were | 12:58 |
| 20 | working at the Tesla facility? | 12:58 |
| 21 | A    Can you be more specific? | 12:58 |
| 22 | Q    Sure.  Let's say that a contract employee is | 12:58 |
| 23 | working somewhere in the Tesla factory and they complain | 12:58 |
| 24 | to a Tesla supervisor about harassment towards them by | 12:58 |
| 25 | someone else working at the plant. | 12:58 |

54

| | | |
|---|---|---|
| 1 | What role -- first of all, would the | 12:58 |
| 2 | supervisor -- the Tesla supervisor is supposed to report | 12:59 |
| 3 | that to Tesla HR; correct? | 12:59 |
| 4 | A    Correct. | 12:59 |
| 5 | Q    And then the supervisor's also supposed to | 12:59 |
| 6 | report that incident to contractors' HR; correct? | 12:59 |
| 7 | A    That typically I think would happen through | 12:59 |
| 8 | HR. | 12:59 |
| 9 | Q    Okay. | 12:59 |
| 10 | A    Depending on what you mean by "contractor." | 12:59 |
| 11 | Q    Okay.  I'm talking about someone who is | 12:59 |
| 12 | actually working in the facility as either a production | 12:59 |
| 13 | associate or -- | 12:59 |
| 14 | A    So a temporary worker -- | 12:59 |
| 15 | Q    Temporary -- | 12:59 |
| 16 | A    -- is I think what we call -- | 12:59 |
| 17 | Q    Okay.  What you call a temporary worker. | 12:59 |
| 18 | My understanding is that some people would | 12:59 |
| 19 | become permanent employees of Tesla, regular Tesla | 12:59 |
| 20 | employees, by first being a temporary worker.  Is that | 12:59 |
| 21 | true? | 12:59 |
| 22 | A    Yes. | 12:59 |
| 23 | Q    And in terms of the standards, the | 13:00 |
| 24 | anti-discrimination, anti-harassment policy standards | 13:00 |
| 25 | that applied to workers at the Tesla factory, those | 13:00 |

55

| | | |
|---|---|---|
| 1 | temporary worker would be to facilitate the | 13:03 |
| 2 | investigation.  Is that true typically? | 13:03 |
| 3 | A    Primary first thing would be obviously, | 13:03 |
| 4 | depending on what that is, are they comfortable or do | 13:03 |
| 5 | they feel threatened.  Those kind of things you want to | 13:03 |
| 6 | take care of in the immediate. | 13:03 |
| 7 | The next thing I would do is get them | 13:03 |
| 8 | connected with the person that would have been my role | 13:03 |
| 9 | for their employer. | 13:03 |
| 10 | Q    Okay.  And if someone does complain about what | 13:03 |
| 11 | they consider to be inappropriate conduct, and they feel | 13:03 |
| 12 | threatened, you would agree that as a Tesla HR person, | 13:03 |
| 13 | you would still have a responsibility to make sure that | 13:03 |
| 14 | nothing happened to them further; right? | 13:03 |
| 15 | A    Oh, absolutely. | 13:03 |
| 16 | Q    And as a Tesla HR person, if someone had | 13:03 |
| 17 | complained about like threatening conduct or feeling | 13:04 |
| 18 | that they were threatened, you would at least have to | 13:04 |
| 19 | make that workplace safe for them from that point that | 13:04 |
| 20 | you find out about it on; right? | 13:04 |
| 21 | A    In the immediate, absolutely.  If then it | 13:04 |
| 22 | was -- the investigation was conducted and it, say, only | 13:04 |
| 23 | involved temporary people that were all under West | 13:04 |
| 24 | Valley -- | 13:04 |
| 25 | Q    Yeah. | 13:04 |

58

Erin Marconi                                                    October 21, 2019

1        A     -- if West Valley investigated it and came        13:04

2    back and said there wasn't actually an issue, I'm going      13:04

3    to believe that West Valley did their investigation         13:04

4    thoroughly and if there was something to address,           13:04

5    addressed it.                                               13:04

6            Does that make sense?                                13:04

7        Q     Sure.                                              13:04

8            You -- you typically rely on the contract --         13:04

9    contracting agency to do an investigation into              13:04

10   complaints by their employees; is that right?               13:04

11       A     If it is involving other of their employees.      13:04

12            If it is involving Tesla employees, then I         13:05

13   would talk to probably Tesla employees, they would talk     13:05

14   to their employees.                                         13:05

15            If the stars align and everyone was in the         13:05

16   building or in the same side of the country and we would    13:05

17   help -- sometimes I had been there when they were           13:05

18   interviewing their employee and vice versa.  But I          13:05

19   wouldn't -- my preference would not be to interview         13:05

20   someone else's employee, and especially not without them    13:05

21   present.                                                    13:05

22       Q     In terms of Tesla's duty, though, to all of       13:05

23   its employees, it has a -- it has a duty to both its        13:05

24   regular employees and the contractors to make sure that     13:05

25   all of those people work in a work environment free from    13:05

                                                                      59

| | | |
|---|---|---|
| 1 | harassment or discrimination based on race; right? | 13:05 |
| 2 | A    Correct. | 13:05 |
| 3 | Q    And so if -- if Tesla HR became aware of a | 13:05 |
| 4 | problem, let's say use of the n-word or use of racial | 13:05 |
| 5 | drawings, Tesla would still have to make sure that that | 13:06 |
| 6 | conduct stopped; right? | 13:06 |
| 7 | A    Assuming that an investigation found that that | 13:06 |
| 8 | conduct did happen? | 13:06 |
| 9 | Q    Right. | 13:06 |
| 10 | A    Then yes. | 13:06 |
| 11 | Q    And, similarly, if like someone was | 13:06 |
| 12 | threatening someone because they're black or Latino or | 13:06 |
| 13 | something like that, Tesla would want to take action | 13:06 |
| 14 | there to make sure that there weren't further threats; | 13:06 |
| 15 | right? | 13:06 |
| 16 | A    Threatening for any reason wouldn't be okay. | 13:06 |
| 17 | Q    Right.  Okay. | 13:06 |
| 18 | Was there some kind of guidelines that dealt | 13:06 |
| 19 | with situations like you were just talking about where a | 13:06 |
| 20 | contractor was investigating a complaint by one of their | 13:06 |
| 21 | employees about inappropriate conduct in the workplace? | 13:06 |
| 22 | Did they have to follow the same sort of Tesla | 13:06 |
| 23 | guidelines of has to be prompt, thorough and objective? | 13:06 |
| 24 | A    I can't answer what they had to do based on | 13:07 |
| 25 | their employer.  The expectation of them from Tesla | 13:07 |

60

| | | |
|---|---|---|
| 1 | would be that they are following those. | 13:07 |
| 2 | Q    Okay. | 13:07 |
| 3 | (Reporter clarification.) | 13:07 |
| 4 | THE WITNESS:   The same guidelines we would. | 13:07 |
| 5 | BY MR. ORGAN: | 13:07 |
| 6 | Q    So the expectation from Tesla is that its | 13:07 |
| 7 | contracting agencies follow the same principles of | 13:07 |
| 8 | investigations that Tesla has? | 13:07 |
| 9 | A    Correct. | 13:07 |
| 10 | Q    And if someone is complaining about conduct, | 13:07 |
| 11 | do they have to complain in writing or can they also | 13:07 |
| 12 | complain verbally about inappropriate conduct in the | 13:07 |
| 13 | workplace at Tesla? | 13:07 |
| 14 | A    Either. | 13:07 |
| 15 | Q    When employees are complaining about conduct, | 13:08 |
| 16 | do they have to use magic words like, "I consider this | 13:08 |
| 17 | to be harassment" or "discrimination" or "retaliation," | 13:08 |
| 18 | or can they just tell -- talk about the conduct and you | 13:08 |
| 19 | would put it into a category? | 13:08 |
| 20 | A    Can you repeat that question? | 13:08 |
| 21 | Q    Sure. | 13:08 |
| 22 | When an employee makes a complaint about | 13:08 |
| 23 | inappropriate conduct in the workplace, do they have to | 13:08 |
| 24 | give it a particular label, such as, "I'm complaining | 13:08 |
| 25 | about harassment," or, "I'm complaining about | 13:08 |

61

| | | |
|---|---|---|
| 1 | Q    Okay.  What was the -- tell me about the | 13:41 |
| 2 | situation where you did sensitivity training for a | 13:41 |
| 3 | group. | 13:41 |
| 4 | A    It was an offensive drawing that we were | 13:41 |
| 5 | unable to determine who did the drawing.  And I say | 13:42 |
| 6 | "offensive"; it was a sexual drawing that clearly | 13:42 |
| 7 | offended folks. | 13:42 |
| 8 | That department was, I believe, over 500 | 13:42 |
| 9 | people.  So we brought everyone together each shift, | 13:42 |
| 10 | went over how that was not okay; if we ever could find | 13:42 |
| 11 | out who it was, it wouldn't be tolerated. | 13:42 |
| 12 | An investigation couldn't pinpoint who it was | 13:42 |
| 13 | because there wasn't a camera in that particular area, | 13:42 |
| 14 | we addressed the whole entire team, and then did | 13:42 |
| 15 | sensitivity training that covered pretty much | 13:42 |
| 16 | everything. | 13:42 |
| 17 | And even if I tell you a joke about the sky | 13:42 |
| 18 | being blue and you think it's funny today and you don't | 13:42 |
| 19 | tomorrow, then I can't tell you that joke anymore. | 13:42 |
| 20 | Q    Do you remember what department it was in? | 13:43 |
| 21 | A    I think it was stamping. | 13:43 |
| 22 | Q    Okay.  In terms of the drawing -- I don't mean | 13:43 |
| 23 | to offend you or anything, but can you describe the | 13:43 |
| 24 | sexual drawing that you ended up having to do | 13:43 |
| 25 | sensitivity training for. | 13:43 |

81

Erin Marconi                                                                October 21, 2019

| 1 | A    If I recall correctly, somebody put boobs on | 13:43 |
| 2 | like -- you know the male/female symbols on bathrooms? | 13:43 |
| 3 | Somebody drew boobs. | 13:43 |
| 4 | Q    Okay. | 13:43 |
| 5 | A    Yeah.  Definitely this is not the same group. | 13:43 |
| 6 | Q    Okay.  This being the chassis 3 that's | 13:43 |
| 7 | identified in Exhibit 189; right? | 13:44 |
| 8 | A    Correct. | 13:44 |
| 9 | Q    So chassis 3 is different from the stamping | 13:44 |
| 10 | division where the boobs on the bathroom drawing was; | 13:44 |
| 11 | right? | 13:44 |
| 12 | A    Uh-huh. | 13:44 |
| 13 | Q    "Yes"? | 13:44 |
| 14 | A    Correct. | 13:44 |
| 15 | Q    Okay. | 13:44 |
| 16 | A    So, similarly, if they had done something | 13:44 |
| 17 | here, I might not know about it if I'm not supporting | 13:44 |
| 18 | that group. | 13:44 |
| 19 | Q    I see. | 13:44 |
| 20 | MR. ORGAN:  What do you guys want to do about | 13:44 |
| 21 | lunch?  Because we probably have to give a lunch break | 13:44 |
| 22 | for our videographer and court reporter, and it's | 13:44 |
| 23 | already 1:44. | 13:44 |
| 24 | MS. KENNEDY:  Sure.  How much longer do you | 13:44 |
| 25 | have?  We can go grab a quick bite. | 13:44 |

82

| | | |
|---|---|---|
| 1 | (Whereupon, at 2:48 p.m. the proceedings | 14:49 |
| 2 | were reconvened.) | 14:49 |
| 3 | THE VIDEO OPERATOR:  The time is 2:48.  We're | 14:49 |
| 4 | back on the record. | 14:49 |
| 5 | BY MR. ORGAN: | 14:49 |
| 6 | Q    You said something when we -- just as we | 14:49 |
| 7 | finished -- | 14:49 |
| 8 | THE VIDEO OPERATOR:  Your microphone, | 14:49 |
| 9 | please. | 14:49 |
| 10 | MR. ORGAN:  Oh, I'm sorry. | 14:49 |
| 11 | BY MR. ORGAN: | 14:49 |
| 12 | Q    When we broke for lunch, you were talking | 14:49 |
| 13 | about a sensitivity training that you did for the | 14:49 |
| 14 | stamping department? | 14:49 |
| 15 | A    Correct. | 14:49 |
| 16 | Q    Do you remember that? | 14:49 |
| 17 | That sensitivity training came out of the fact | 14:49 |
| 18 | that there were these -- there was a visual harassment | 14:49 |
| 19 | in this -- the boobs on the bathroom door. | 14:49 |
| 20 | Is that what caused the training to come | 14:49 |
| 21 | about? | 14:49 |
| 22 | A    Yes.  Someone was offended by the boobs drawn. | 14:49 |
| 23 | Q    Okay.  And how was the decision made as a | 14:49 |
| 24 | result of that to do a sensitivity training?  Why was | 14:50 |
| 25 | that the outcome? | 14:50 |

84

Erin Marconi                                                    October 21, 2019

1        A    We wanted to make sure that everyone          14:50

2    understood what the expectation was, and if it makes   14:50

3    someone uncomfortable, it's not okay.                  14:50

4        Q    Right.  Okay.                                 14:50

5             And do you recall any other sensitivity       14:50

6    trainings that were done relative to either race or sex 14:50

7    issues that you were involved in?                      14:50

8        A    Not that I recall.  I mean, other than your   14:50

9    regular annual required of supervisor and above.       14:50

10       Q    Okay.  Who conducted the -- the annual        14:50

11   trainings for the management team members?             14:50

12       A    It would have been Beth Davies for the        14:51

13   training department.  I don't know if she actually did  14:51

14   it.  And then I know at some point I believe it moved to 14:51

15   online course and question and answer.  I don't know if 14:51

16   they still do that or not.                             14:51

17            Anything that was like corporate training     14:51

18   companywide would have been through Beth Davies.  And  14:51

19   then we supplemented where we saw necessary in our     14:51

20   groups.                                                14:51

21       Q    Okay.  Now, I'm going to show you what has    14:51

22   been previously marked as Exhibit 37.  And just so the 14:51

23   record is clear, Exhibit 37 is a three-page document   14:52

24   Bates-stamped Tesla 35 through 37, and it's a complaint 14:52

25   by Owen Diaz about a racist drawing, or what he        14:52

                                                               85

1   considered to be a racist drawing.                        14:52

2         And I'm wondering if you recall seeing this         14:52

3   email, or the picture that's attached.                    14:52

4         A    I don't recall seeing the picture, and I don't  14:52

5   specifically recall seeing it, given the time.  It very   14:52

6   well could have been something that I was -- "Here's a    14:53

7   heads-up" kind of thing, and I just don't recall.         14:53

8         Q    Okay.   Okay.                                   14:53

9         Based on your -- you just read the complaint        14:53

10  by Mr. Diaz from January 22nd, 2016.  Based on that       14:53

11  complaint and in your experience as a professional HR     14:53

12  person, would that be sufficient to trigger an            14:53

13  investigation, in your mind, his complaint along with     14:53

14  the pictures?                                             14:53

15        A    Yes.                                           14:53

16        Q    And would -- as a trained investigator, given  14:53

17  this written information and the confirming picture,      14:53

18  would you expect there to be an investigation as a        14:54

19  result of that?                                           14:54

20        A    Yes.                                           14:54

21        Q    If you were conducting the investigation,      14:54

22  would you interview the people that are identified in     14:54

23  Mr. Diaz's email?                                         14:54

24        A    Depending on if they were Tesla employees or   14:54

25  employees of another company, either I would if they      14:54

86

| | | |
|---|---|---|
| 1 | were Tesla employees, or I would ask that the primary | 14:54 |
| 2 | employer, for lack of a better way to put it, did.  And | 14:54 |
| 3 | if it was a combination, work together if at all | 14:54 |
| 4 | possible. | 14:54 |
| 5 | Q    So when there's a mixture of parties who | 14:54 |
| 6 | are -- some are Tesla employees and some are | 14:54 |
| 7 | temporary -- what did you call them?  Temporary workers? | 14:55 |
| 8 | A    Yeah. | 14:55 |
| 9 | Q    Then you would expect that Tesla HR and the | 14:55 |
| 10 | contracting -- or the staffing agencies would work | 14:55 |
| 11 | together as part of that investigation; is that right? | 14:55 |
| 12 | A    Not exactly. | 14:55 |
| 13 | So I don't know who Owen -- so just like -- if | 14:55 |
| 14 | all of these people worked for -- we'll use West Valley | 14:55 |
| 15 | because that's the example I've been using. | 14:55 |
| 16 | If all the people that are in here worked for | 14:55 |
| 17 | West Valley, I would ask West Valley to investigate. | 14:55 |
| 18 | Q    Okay.  So in this -- in this situation -- | 14:55 |
| 19 | A    And then get back to me. | 14:55 |
| 20 | Q    Okay.  In this situation, you would at least | 14:55 |
| 21 | expect that West Valley would keep -- assuming West | 14:55 |
| 22 | Valley were the contracting agency or staffing agency, | 14:55 |
| 23 | you would expect West Valley to keep Tesla HR informed | 14:56 |
| 24 | as to what their investigation found; right? | 14:56 |
| 25 | A    Correct. | 14:56 |

87

1    Q    And then based on that investigation, would    14:56

2  Tesla then decide what it might need to do relative to  14:56

3  that particular work environment to make sure that the  14:56

4  conduct didn't occur again?                            14:56

5    A    In making -- if it is all -- so we're saying   14:56

6  temporary workers, not contractors?                    14:56

7    Q    Correct.                                        14:56

8    A    So they're working with Tesla employees as     14:56

9  well?                                                  14:56

10   Q    They're working --                              14:56

11   A    Then yes, absolutely.                           14:56

12   Q    Right.                                          14:56

13        And so, for example, in a situation like this  14:56

14  where witnesses are identified -- and I'll just        14:56

15  represent to you that -- have you ever heard of Michael 14:56

16  Wheeler?  Is that name familiar?                       14:56

17   A    Doesn't ring a bell, but there were thousands   14:57

18  of employees over however many years.                  14:57

19   Q    Right.                                          14:57

20        So if Michael Wheeler and the Israel -- the    14:57

21  guy whose name is Israel in this were both Tesla       14:57

22  employees, those interviews you would expect would be  14:57

23  done by Tesla HR, and then the interviews -- assuming  14:57

24  that Ramon Martinez and Owen Diaz are temporary        14:57

25  employees working through a staffing agency, you would 14:57

88

1   expect that Owen and Ramon would be interviewed by their   14:57

2   respective contracting agencies; correct?                  14:57

3       A    Correct.                                          14:57

4            I have had occasion to that whoever was on        14:57

5   site for, say, West Valley wasn't well versed or           14:57

6   comfortable.  So if that kind of situation came up, I      14:57

7   would assist, but would make sure that they were there.    14:57

8       Q    I see.                                            14:58

9            So in a situation where the staffing agency       14:58

10  doesn't feel comfortable doing the investigation, you're   14:58

11  aware of at least one situation where Tesla HR helped       14:58

12  out in that situation?                                     14:58

13      A    Yeah, and I can't remember the details.  They     14:58

14  had someone new that was there.  I think it was two        14:58

15  people really not just -- just not getting along, and      14:58

16  whoever they had on site that day was newer and hadn't     14:58

17  done investigations.                                       14:58

18      Q    Okay.  And --                                     14:58

19      A    Similar to how when we would get new people a     14:58

20  lot of times, we would have them come along and make       14:58

21  sure the person that you're speaking to is comfortable     14:58

22  with that, because they're learning, before just saying,   14:58

23  "Hey, good luck."                                          14:58

24      Q    Well, that's good.                                14:58

25      A    Yeah.  But one way or another, make sure it       14:58

89

```
 1    this to Josue Torres and Eliseo Torres.  No, I think    15:00

 2    that's the same guy.                                    15:00

 3            Do you know who Josue Torres was?               15:00

 4        A    I do not recall offhand.                       15:00

 5        Q    He has been identified previously as a         15:00

 6    supervisor at Tesla.  Does that sound familiar to you?  15:00

 7        A    Does not sound familiar to me.                 15:00

 8        Q    Okay.  Okay.  I guess that's all we need from  15:00

 9    that one.                                               15:00

10            Let's go to the next one.  This will be         15:00

11    Exhibit 129.                                            15:01

12        A    That said, I may or may not have been --       15:01

13        Q    Huh?                                           15:01

14        A    I may have been in and out at that point if he 15:01

15    had become a supervisor.  I'm just clarifying.  It      15:01

16    doesn't sound familiar to me, but --                    15:01

17        Q    Okay.  Okay.                                   15:01

18            You were certainly at Tesla at some time        15:01

19    during January of 2016; correct?                        15:01

20        A    Possibly.  My mom was going through cancer     15:01

21    treatment for --                                        15:01

22        Q    I'm sorry to hear.                             15:01

23        A    And I was -- even if I got there in the        15:01

24    morning, it might be, "I got to go right now," and      15:01

25    verbally hand everything I had off.                     15:01
```

91

| | | | |
|---|---|---|---|
| 1 | Q | Okay. | 15:08 |
| 2 | A | -- was under nextSource. | 15:08 |
| 3 | Q | Yeah.  That's how -- that's my | 15:08 |
| 4 | understanding -- | | 15:08 |
| 5 | A | I'm guessing just based on the way this -- | 15:08 |
| 6 | | (Reporter clarification.) | 15:08 |
| 7 | BY MR. ORGAN: | | 15:08 |
| 8 | Q | That's my understanding is that Chartwell was | 15:08 |
| 9 | essentially providing staffing through nextSource to | | 15:08 |
| 10 | Tesla. | | 15:08 |
| 11 | A | Ah.  Yeah, Chartwell is a new one for me. | 15:08 |
| 12 | Q | Okay.  Let's -- if we go to the next one, do | 15:08 |
| 13 | you -- well, let me ask you this. | | 15:08 |
| 14 | | Do you remember ever having any discussions | 15:08 |
| 15 | with Victor Quintero about the drawing that we saw, the | | 15:08 |
| 16 | pickaninny drawing that Mr. Diaz complained about? | | 15:08 |
| 17 | A | I do not. | 15:09 |
| 18 | Q | Then this will be 128. | 15:09 |
| 19 | | Exhibit 128 for the record is a five-page | 15:09 |
| 20 | document Bates-stamped Tesla 20 through 24.  And if you | | 15:09 |
| 21 | could, look at the top email from Terri Garrett to Wayne | | 15:09 |
| 22 | Jackson dated January 22nd, 2016 at 6:35 p.m. | | 15:10 |
| 23 | A | Okay. | 15:10 |
| 24 | Q | So is Terri Garrett a man or a woman? | 15:10 |
| 25 | A | I don't want to speculate because I never met | 15:10 |

95

| | | |
|---|---|---|
| 1 | A    Yes. | 15:15 |
| 2 | Q    And that actually comports with Tesla's | 15:15 |
| 3 | policies on anti-discrimination, anti-harassment; right? | 15:15 |
| 4 | A    Correct. | 15:15 |
| 5 | Q    And it says: | 15:15 |
| 6 | "This is not the first time that Ramon | 15:15 |
| 7 | Martinez" -- | 15:15 |
| 8 | "This is not the first time Ramon Martinez | 15:15 |
| 9 | has been talked about his behavior..." | 15:15 |
| 10 | perhaps not the best English statement. | 15:15 |
| 11 | But if Mr. Diaz identified something as prior | 15:15 |
| 12 | conduct, that would be a concern to you as a trained | 15:15 |
| 13 | investigator, wouldn't it? | 15:15 |
| 14 | A    If I investigated it and found out that he had | 15:15 |
| 15 | actually been previously spoken to. | 15:15 |
| 16 | Q    Yeah.  Then that would be a major concern to | 15:15 |
| 17 | you, wouldn't it? | 15:15 |
| 18 | A    Yes. | 15:15 |
| 19 | Q    In fact, if -- if Mr. Martinez had posted this | 15:15 |
| 20 | poster, this drawing with the bone in the hair -- strike | 15:15 |
| 21 | that. | 15:16 |
| 22 | You understand that this drawing that's on the | 15:16 |
| 23 | fourth page of Exhibit 128, that that drawing is a | 15:16 |
| 24 | drawing that could be offensive to African Americans? | 15:16 |
| 25 | A    Yes. | 15:16 |

99

| | | | |
|---|---|---|---|
| 1 | Q | Right? | 15:16 |
| 2 | A | Yes. | 15:16 |
| 3 | Q | And it's a caricature that historically was | 15:16 |
| 4 | | used -- it's been called a "pickaninny."  Have you heard | 15:16 |
| 5 | | that expression before? | 15:16 |
| 6 | A | Yes. | 15:16 |
| 7 | Q | And it was historically -- this drawing with | 15:16 |
| 8 | | the bone in the hair was historically a way to put down | 15:16 |
| 9 | | African Americans; right? | 15:16 |
| 10 | A | That's my understanding. | 15:16 |
| 11 | Q | So if you had understood that Mr. Martinez had | 15:16 |
| 12 | | admitted to putting this poster -- to putting this | 15:16 |
| 13 | | drawing up, and also to have threatened Mr. Diaz | 15:16 |
| 14 | | previously, you would expect that Mr. Martinez would be | 15:16 |
| 15 | | fired pursuant to Tesla policy, wouldn't you? | 15:17 |
| 16 | A | Assuming all of that is true -- | 15:17 |
| 17 | Q | Yeah. | 15:17 |
| 18 | A | -- I wouldn't presume what nextSource does, | 15:17 |
| 19 | | but I would ask them not to have him return to an | 15:17 |
| 20 | | assignment at Tesla. | 15:17 |
| 21 | Q | Sure.  Okay. | 15:17 |
| 22 | | Now, if you go on to Mr. Diaz's statement: | 15:17 |
| 23 | | ..."and because nothing has been done, it | 15:17 |
| 24 | | seems that his behavior is getting worse." | 15:17 |
| 25 | | That would be a concern to you as a Tesla | 15:17 |

100

| | | | |
|---|---|---|---|
| 1 | | investigator, wouldn't it, if conduct is getting worse? | 15:17 |
| 2 | A | Absolutely. | 15:17 |
| 3 | Q | Where Mr. Diaz then says: | 15:17 |
| 4 | | "As an employee, I'm entitled to a safe | 15:17 |
| 5 | | and harassment-free work environment," | 15:17 |
| 6 | | that's true; right? | 15:17 |
| 7 | A | Yes. | 15:17 |
| 8 | Q | Do you remember having any prior knowledge | 15:18 |
| 9 | | about Ramon Martinez and Mr. Diaz, and Mr. Owen Diaz? | 15:18 |
| 10 | A | No.  To be perfectly honest, I probably had | 15:18 |
| 11 | | more than one person -- both of those names at various | 15:18 |
| 12 | | times throughout the years. | 15:18 |
| 13 | Q | Sure. | 15:18 |
| 14 | A | But none of them particularly ring a bell. | 15:18 |
| 15 | Q | Well, if it's any consolation, we served a guy | 15:18 |
| 16 | | named Ramon Martinez and he said, "I don't know what | 15:18 |
| 17 | | you're talking about.  I never worked at Tesla."  So -- | 15:18 |
| 18 | A | As I say, we had everybody. | 15:18 |
| 19 | Q | Okay. | 15:18 |
| 20 | | MR. ORGAN:  We're on 190, I think. | 15:18 |
| 21 | | THE REPORTER:  Yes. | 15:19 |
| 22 | | (The document referred to was marked by | 15:19 |
| 23 | | the CSR as Plaintiffs' Exhibit 190 for | 15:19 |
| 24 | | identification and attached to and made a part | 15:19 |
| 25 | | of this deposition.) | 15:19 |

101

1      Q    I'm going to show you Exhibit 34.  Exhibit 34      15:22

2   for the record is a one-page document Bates-stamped         15:22

3   ODIAZ 3, and it's an email from October 17th from Owen      15:22

4   Diaz to Ed Romero and Tom Kawasaki.  Let me know when       15:22

5   you finish reading it.                                      15:22

6      A    Okay.                                               15:22

7      Q    I'm wondering, does this ring a bell in terms       15:23

8   of anything that you remember finding out about while       15:23

9   you were at Tesla?                                          15:23

10      A    I believe it was something of an FYI to me         15:23

11   from -- it would have been probably either Andrew or       15:23

12   Paul, so whoever was covering second shift.                15:23

13      Q    Okay.                                              15:23

14      A    I don't remember the specifics.                    15:23

15      Q    Okay.  Now, certainly if Ramon Martinez were      15:23

16   yelling at him and threatening him, that would violate     15:23

17   Tesla's policies; right? -- at least the threatening       15:24

18   part?                                                      15:24

19      A    Yes.  Assuming it's Ramon Martinez.                15:24

20      Q    Yeah, Ramon Martinez.                              15:24

21      A    It just says "Ramon" everywhere.  We had a lot     15:24

22   of Ramons.                                                 15:24

23      Q    I'm sure that's true.                              15:24

24           Okay.  There's a reference here to -- Ed          15:24

25   Romero we've already talked about as one of the            15:24

                                                                  104

| | | |
|---|---|---|
| 1 | the CSR as Plaintiffs' Exhibit 191 for | 15:28 |
| 2 | identification and attached to and made a part | 15:28 |
| 3 | of this deposition.) | 15:28 |
| 4 | BY MR. ORGAN: | 15:28 |
| 5 | Q    Exhibit 191 for the record is a one-page | 15:28 |
| 6 | document Bates-stamped nextSource 101, and it's some | 15:28 |
| 7 | emails from October 19th and 20th.  And I'll just point | 15:28 |
| 8 | your attention to the top email. | 15:28 |
| 9 | A    Okay. | 15:28 |
| 10 | Q    So where Terri Garrett says here to Wayne | 15:28 |
| 11 | Jackson that they needed to get the employees' | 15:28 |
| 12 | statements and other witness statements to Tesla HR | 15:28 |
| 13 | today, that, again, is in line with the working | 15:28 |
| 14 | relationship between the different human resource | 15:28 |
| 15 | departments; is that correct? | 15:29 |
| 16 | A    Correct.  And I do recall having to push on | 15:29 |
| 17 | behalf of Tesla to get things from -- | 15:29 |
| 18 | Q    From nextSource? | 15:29 |
| 19 | A    Yes. | 15:29 |
| 20 | Q    Okay.  So -- | 15:29 |
| 21 | A    Not necessarily related to this one, but just | 15:29 |
| 22 | in general. | 15:29 |
| 23 | Q    Okay.  So in general, you had -- sometimes you | 15:29 |
| 24 | had to push nextSource to get you the information you | 15:29 |
| 25 | needed so that you could evaluate -- | 15:29 |

107

Erin Marconi                                                              October 21, 2019

| | | |
|---|---|---|
| 1 | A    And go about things the way that we had asked | 15:29 |
| 2 | them to go about them. | 15:29 |
| 3 | Q    Okay.  This is Exhibit 35. | 15:29 |
| 4 | Exhibit 35 for the record is a three-page | 15:29 |
| 5 | document Bates-stamped Tesla 140 to 142.  And it appears | 15:29 |
| 6 | that at least in this situation with respect to Ramon | 15:30 |
| 7 | Martinez and Owen Diaz, that eventually at least it got | 15:30 |
| 8 | forwarded to you. | 15:30 |
| 9 | Do you see that? | 15:30 |
| 10 | A    Yes. | 15:30 |
| 11 | Q    And so at least at some point you did get | 15:30 |
| 12 | Mr. Diaz's statement about his -- the threat that he | 15:30 |
| 13 | perceived from Ramon Martinez; correct? | 15:30 |
| 14 | A    Owen's statement? | 15:30 |
| 15 | Q    Yeah. | 15:31 |
| 16 | A    Assuming this whole thread was actually | 15:31 |
| 17 | forwarded at the time? | 15:31 |
| 18 | Q    Yeah. | 15:31 |
| 19 | A    Yes.  If it was, I can't say for sure. | 15:31 |
| 20 | Q    Okay.  But based on the email chain, I mean, | 15:31 |
| 21 | it looks like it was forwarded to you.  Do you see that? | 15:31 |
| 22 | A    Correct. | 15:31 |
| 23 | Q    Okay. | 15:31 |
| 24 | A    Several days later; right?  Yeah. | 15:31 |
| 25 | Q    Yeah. | 15:31 |

108

1    The complaint was made on the 17th, and then          15:31

2    forwarded again on the 20th to Wayne Jackson, and then   15:31

3    it looks like Wayne Jackson forwarded it to you on that   15:31

4    same day, on the 20th.                                    15:31

5        A    Terri.                                          15:31

6        Q    I'm sorry.  Terri.                              15:31

7        A    Yeah.                                           15:32

8        Q    Terri forwarded it to you that same day,        15:32

9    October 20th of 2015; right?                             15:32

10       A    Yes.  And based on that, it would appear that   15:32

11   it was all nextSource employees involved, other than     15:32

12   Victor and Ed.                                            15:32

13       Q    Okay.  And it looks like maybe Ed was talking   15:32

14   about getting involved here, and Terri Garrett was       15:32

15   asking for your help as to whether or not Mr. Romero     15:32

16   should be involved in the investigation; right?          15:32

17       A    It looks like she wants him not to be           15:32

18   involved.                                                15:32

19       Q    Right.                                          15:32

20       Okay.  And then this is Exhibit 126.  And           15:32

21   Exhibit 126 for the record is a four-page document       15:33

22   Bates-stamped 133 to 136, Tesla 133 to 136, and it has   15:33

23   emails from you on the second page, and then on the      15:33

24   first page, too.                                         15:33

25       A    Yep.                                            15:33

109

Erin Marconi                                                    October 21, 2019

1      Q     So the reason you would have canceled Ed --      15:33

2   Ed's investigation into this is because it appeared to    15:33

3   you that nextSource should be doing the investigation;    15:33

4   right?                                                    15:34

5      A     Yeah, I believe she said that two out of the     15:34

6   three had already been spoken to.                         15:34

7      Q     And Erin committed to you that she was going     15:34

8   to get you that information by the close of business      15:34

9   that day?                                                 15:34

10     A     Terri committed to me.                           15:34

11     Q     I'm sorry.  Terri did, yeah.                     15:34

12           And do you remember whether or not Terri did     15:34

13   get you those statements?                                 15:34

14     A     I do not.                                        15:34

15     Q     You at least had Mr. Diaz's statement, though,   15:34

16   about the threat and how he didn't feel safe; right?  If  15:34

17   you look at the last page.                                15:34

18     A     Again, presuming the entire email thread was     15:34

19   forwarded on?                                             15:34

20     Q     Yeah.                                            15:34

21           Well, you have no reason to doubt that, in       15:34

22   fact, Mr. Diaz's complaint of October 17th wasn't         15:34

23   forwarded on, do you?                                     15:34

24     A     I -- I don't have one to doubt it or not to      15:35

25   doubt it.  It's sent from a nextSource employee --        15:35

                                                                    110

1          "I should be able to have the information          15:36

2          to you by COB today," close of business today.     15:36

3          You would have expected Terri to send that to       15:36

4     you, correct, assuming she followed through?            15:36

5          A    I wouldn't assume she followed through.  My   15:36

6     expectation would be yes, but it was 8:13 p.m., which I  15:36

7     think she's on the East Coast, which would have been    15:36

8     5:00 o'clock.                                            15:36

9          Q    Okay.  Did you -- did you do any follow-up at  15:36

10    all with Mr. Owen Diaz to see if he started feeling      15:37

11    safe?                                                    15:37

12         A    I don't recall.                                15:37

13         Q    Do you know whether or not Ramon Martinez was  15:37

14    disciplined in any way because of threats towards        15:37

15    Mr. Owen Diaz?                                           15:37

16         A    I would presume from the documents you've      15:37

17    shown me that they did.  I don't recall specifically the 15:37

18    outcome.                                                 15:37

19         Q    Okay.  And from this point on, October 20th of 15:37

20    2015, you would at least agree that Tesla had at least   15:37

21    some knowledge as to threatening conduct by Ramon        15:37

22    Martinez towards Owen Diaz; right?                       15:37

23         A    I would agree that there was an ER -- how did  15:37

24    she put it?                                              15:38

25         Q    "ER issue."  "Temporary worker ER issue."      15:38

                                                                  112

```
 1        A    An ER issue with three temporary workers that      15:38

 2   she did not want Ed involved in.                             15:38

 3        Q    Right.  But regardless of whether or not Terri     15:38

 4   wants Ed involved or not, once Tesla finds out that          15:38

 5   there's inappropriate conduct going on in the workplace,     15:38

 6   you've already testified that that's something Tesla --      15:38

 7   once Tesla gets that knowledge, Tesla has an obligation      15:38

 8   to prevent any further inappropriate conduct; correct?       15:38

 9        A    Correct.  What I'm saying is she brings it to      15:38

10   me as two of the three -- worker -- "temporary worker ER     15:38

11   issue."                                                      15:38

12             I don't recall specifically seeing Owen Diaz's     15:38

13   statement.  It's easy to cut and paste it.  I can't          15:38

14   confirm that I was on notice of what exactly it was, and     15:39

15   who was involved.                                            15:39

16        Q    You just said something there.  What about cut     15:39

17   and paste?  What do you mean?                                15:39

18        A    It's easy to take off the bottom of an email       15:39

19   chain when you send stuff.                                   15:39

20        Q    Do you have any --                                 15:39

21        A    But I generally --                                 15:39

22        Q    Do you have any factual knowledge that in fact     15:39

23   Terri Garrett took off the complaint that Owen Diaz made     15:39

24   on the 17th and then forwarded to Wayne Jackson on the       15:39

25   20th?                                                        15:39
```

                                                                      113

| | | |
|---|---|---|
| 1 | On the first page, Ed Romero says that: | 15:43 |
| 2 | "I had Rothaj Foster removed from the | 15:44 |
| 3 | Tesla premises last night at 10:00 p.m.  The | 15:44 |
| 4 | reason is that he was conducting himself in a | 15:44 |
| 5 | threatening manner against Owen Diaz." | 15:44 |
| 6 | Then if you move up a little bit, Victor | 15:44 |
| 7 | Quintero says: | 15:44 |
| 8 | "I agree that the employee should not be | 15:44 |
| 9 | allowed to return." | 15:44 |
| 10 | And then after that, it was sent to you. | 15:44 |
| 11 | Do you see that? | 15:44 |
| 12 | A    Yes. | 15:44 |
| 13 | Q    Does it appear to you that the correct | 15:44 |
| 14 | procedure, at least with respect to Rothaj Foster, was | 15:44 |
| 15 | followed? | 15:44 |
| 16 | A    Yes. | 15:44 |
| 17 | Q    It appears they investigated, they got witness | 15:44 |
| 18 | statements and then made a decision that Mr. Foster | 15:44 |
| 19 | should not be there because he was engaging in | 15:44 |
| 20 | threatening conduct; right? | 15:44 |
| 21 | A    Correct. | 15:44 |
| 22 | Q    And the correct response to threatening | 15:44 |
| 23 | conduct is to remove that individual from the factory; | 15:44 |
| 24 | right? | 15:44 |
| 25 | A    Correct. | 15:44 |

116

1      Q    And then you -- Ed says that he -- I guess Ed    15:45

2   at this point was just keeping you informed of what they   15:45

3   had been doing.  That's what at least it appears; is       15:45

4   that right?                                                15:45

5      A    Yes, especially given the times.                  15:45

6      Q    Okay.  Do you know who Monica DeLeon is?          15:45

7      A    Doesn't ring a bell offhand.                      15:45

8      Q    Someone from Citistaff?  Does that --             15:45

9      A    Is that another one that went through             15:45

10  nextSource?                                                15:45

11     Q    Yeah.                                              15:45

12     A    Okay.  I would have thought all those people      15:45

13  were nextSource probably if they --                        15:45

14     Q    Well, you just saved yourself --                  15:45

15     A    -- didn't disclose it.                            15:45

16     Q    You just saved yourself three minutes of          15:45

17  questions.                                                 15:45

18     A    Fantastic.                                         15:45

19     Q    Okay.                                              15:45

20          I'm going to show you what's been previously      15:46

21  marked as Exhibit 42.  Exhibit 42 for the record is a     15:46

22  one-page document Bates-stamped Tesla 510.                15:46

23          You understand when I am reading out -- when I    15:46

24  say "Tesla 510," that means it's a document produced by   15:46

25  Tesla; right?                                              15:46

117

Erin Marconi                                                          October 21, 2019

| | | |
|---|---|---|
| 1 | A    Correct. | 15:46 |
| 2 | Q    Okay.  If you could please read this and then | 15:46 |
| 3 | I'll ask you some questions about it. | 15:46 |
| 4 | Assuming that these comments, the alleged | 15:47 |
| 5 | racist comments, had been made towards Mr. Diaz and | 15:47 |
| 6 | confirmed, you would have expected Mr. Quintero to let | 15:47 |
| 7 | you know about that; correct? | 15:47 |
| 8 | A    Yes. | 15:47 |
| 9 | Q    And -- | 15:47 |
| 10 | A    Assuming the person making the statements was | 15:47 |
| 11 | also Tesla.  I can't tell who's elevator employee 2, and | 15:47 |
| 12 | I don't know who Tom is.  So that -- I would think | 15:48 |
| 13 | someone would let me know as an FYI. | 15:48 |
| 14 | Q    Sure. | 15:48 |
| 15 | Okay.  And certainly if the person involved in | 15:48 |
| 16 | calling Owen Diaz racist things, if that had involved | 15:48 |
| 17 | the n-word, you would expect that to be brought to your | 15:48 |
| 18 | attention in HR, correct, by Mr. Quintero at a minimum? | 15:48 |
| 19 | A    Assuming all that, and assuming he knew that? | 15:48 |
| 20 | Q    Yeah. | 15:48 |
| 21 | A    Yes. | 15:48 |
| 22 | Q    If you -- let's -- this will be Exhibit 122. | 15:48 |
| 23 | Oh, it's at the top.  I wrote it on there, | 15:49 |
| 24 | too.  Sorry about that.  I didn't see -- | 15:49 |
| 25 | A    Although -- | 15:49 |

118

Erin Marconi                                                    October 21, 2019

| | | | |
|---|---|---|---|
| 1 | Q | Yeah. | 15:49 |
| 2 | A | Back to this one, 510. | 15:49 |
| 3 | Q | Back to 42?  Yeah. | 15:49 |
| 4 | A | Given the timing of it -- | 15:49 |
| 5 | Q | Yeah. | 15:49 |
| 6 | A | -- it may not have gone to me. | 15:49 |
| 7 | Q | Okay. | 15:49 |

8      A    I'm fairly certain that's right around a time      15:49

9  that I was out.                                             15:49

10     Q    August of 2015?                                    15:49

11     A    The July, August time frame.                       15:49

12     Q    Yeah.                                              15:49

13          Okay.  Who would it have gone to then if it        15:49

14  didn't go to you?                                          15:49

15     A    Whoever I reported to at that time decided was     15:49

16  covering my teams.                                         15:49

17     Q    Okay.  But you would expect someone in HR to       15:49

18  have been copied by Mr. Quintero on a racist comment;      15:49

19  right?                                                     15:49

20     A    I believe so, and -- yes.  Unless they came        15:49

21  back and said they couldn't substantiate it and it was     15:49

22  all nextSource.                                            15:49

23     Q    Okay.  But if an allegation of racist -- of a      15:49

24  racial term, particularly if it's the n-word, is          15:50

25  confirmed, that's the kind of information that            15:50

1    STATE OF CALIFORNIA        )

2                              )  ss.

3    COUNTY OF LOS ANGELES      )

4

5            I, LAURA J. MELLINI, Certified Shorthand

6    Reporter, Certificate No. 8181, for the State of

7    California, hereby certify:

8            I am the deposition officer that

9    stenographically recorded the testimony in the foregoing

10   deposition;

11           Prior to being examined the deponent was first

12   duly sworn by me;

13           The foregoing transcript is a true record of

14   the testimony given;

15           Before completion of the deposition, review of

16   the transcript [  X  ] was [    ] was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed are

19   appended hereto.

20

21   Dated_____.

22

23                   _____

24                          LAURA J. MELLINI

25                          CSR NO. 8181, RPR, CCRR

                                                          141

# Exhibit

# **10**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
--oOo--

DEMETRIC DI-AZ, OWEN DIAZ,      )
AND LAMAR PATTERSON,            )
                               )
         Plaintiffs,           )
                               )   Case No.
vs.                            )   3:17-cv-06748-WHO
                               )
TESLA, INC., dba TESLA         )
MOTORS, INC.; CITISTAFF        )
SOLUTIONS, INC.; WEST          )
VALLEY STAFFING GROUP;         )
CHARTWELL STAFFING             )
SERVICES, INC.; and DOES       )
1-50, inclusive,               )
                               )
         Defendants.           )
_____)

VIDEO DEPOSITION OF VERONICA MARTINEZ

TUESDAY, OCTOBER 15, 2019

STENOGRAPHICALLY REPORTED BY:

KIMBERLY E. D'URSO, RPR, CSR NO. 11372

Job No. 13937

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:

 4           CALIFORNIA CIVIL RIGHTS LAW GROUP
             LAWRENCE A. ORGAN, ESQ.
 5           332 San Anselmo Avenue
             San Anselmo, CA  94960
 6           415.453.4740

 7   FOR THE DEFENDANT TESLA:

 8           SHEPPARD MULLIN, LLP
             BY:  PATRICIA M. JENG, ESQ.
 9           Four Embarcadero Center, 17th Floor
             San Francisco, CA  94111
10           415.434.9100

11   FOR THE DEFENDANT NEXT SOURCE:

12           FISHER PHILLIPS, LLP
             BY:  JUAN C. ARANEDA, ESQ.
13           One Embarcadero Center, Suite 2050
             San Francisco, CA  94111
14           415.490.9012

15   FOR THE DEFENDANT CITISTAFF:

16           LAFAYETTE & KUMAGAI, LLP
             BY:  SUSAN T. KUMAGAI, ESQ.
17           1300 Clay Street, Suite 810
             Oakland, CA  94612
18           415.357.4600

19   FOR THE DEFENDANT CHARTWELL STAFFING:

20           GORDON & REES
             BY:  SARAH Y. OH, ESQ.
21           3 Parkcenter Drive, Suite 200
             Sacramento, CA  95825
22           916.830.6528

23                   --oOo--

24

25
```

```
         1    areas do you cover now?

         2        A.   Eight.

         3        Q.   So that was a promotion; right?

         4        A.   Correct.

02:07:45 5        Q.   Okay.  Congratulations.

         6        A.   Thank you.

         7        Q.   What was -- how long have you worked for

         8    Chartwell?

         9        A.   Since 2015.

02:07:53 10       Q.   2015?

        11        A.   Correct.

        12        Q.   And do you remember what month you started in

        13    2015?

        14        A.   March.

02:07:59 15       Q.   What was your first job for Chartwell Staffing

        16    in March of 2015?

        17        A.   Branch manager.

        18        Q.   How long were you a branch manager for

        19    Chartwell?

02:08:13 20       A.   Can't remember, but for a while.

        21        Q.   Okay.  So through the end of 2015?

        22        A.   I can't remember if it was 2015 or 2016.

        23        Q.   Okay.  You nervous?

        24        A.   No.

02:08:28 25       Q.   Okay.  It's okay to be nervous.  I'm always
```

1    nervous before these things too.

2            When -- when did you change your position from

3    branch manager to something else?  When did that change

4    happen?

02:08:43  5    A.   To area vice-president.  I can't remember if it

6    was 2015 or 2016.

7    Q.   Okay.  But you think sometime maybe in 2016 or

8    '15 you changed -- your job changed from branch manager

9    to area vice-president; is that correct?

02:08:58 10    A.   If I -- I can't remember if it -- between that

11   time frame, though.

12   Q.   Okay.  Tell me, what were your job duties as

13   the branch manager for Chartwell?

14   A.   I managed the branch, the staff.

02:09:22 15    Q.   And when you say you managed the branch and the

16   staff, what -- what do you mean by that?

17   A.   Worked with clients, employees.

18   Q.   So the clients are the companies that Chartwell

19   works with, in terms of staffing for them?

02:09:44 20    A.   Correct.

21   Q.   And the employees are the people who work for

22   Chartwell, either as a contractor for someone else or as

23   an employee for Chartwell?

24   A.   Correct.

02:09:55 25    Q.   Do you differentiate between an employee who

VERONICA MARTINEZ
October 15, 2019

```
            1     A.    420.
            2     Q.    Okay.  And do you have an estimate for what the
            3   number of field employees who were working out of the
            4   Hayward branch of Chartwell in 2015 or '16 was when you
02:21:36    5   were the branch manager?
            6     A.    No.
            7     Q.    Do you know whether the number of employees --
            8   field employees who were working at the Chartwell branch
            9   in Hayward in 2015 or '16 was higher or lower than the
02:21:50   10   420?
           11     A.    I -- I don't have that number in front of me.
           12     Q.    Okay.  Are you a member of any kind of human
           13   resources organizations like the Society for Human
           14   Resource Managers or anything like that?
02:22:06   15     A.    No.
           16     Q.    Have you ever had any training on what steps an
           17   employer is supposed to take when investigating a claim
           18   of discrimination or harassment?
           19     A.    We took the -- the sexual harassment
02:22:26   20   discrimination, two-hour course.
           21     Q.    And what is the sex harassment two-hour course?
           22   What -- when did you take that?
           23     A.    Recently.  This year.
           24     Q.    And then prior to taking the two-hour course --
02:22:44   25   that -- was that just about sex harassment?
```

Bridget Mattos & Associates
(415)747-8710

1          **A.    It's discrimination and harassment, sexual**

2    **harassment.**

3          Q.    Okay.  Prior to taking the two-hour course on

4    discrimination and harassment this year, have you ever

02:22:59  5    taken a course on harassment or discrimination

6    previously?

7          **A.    Yes.**

8          Q.    And when did you take the course previously?

9          **A.    When we were -- when I was with CRS.**

02:23:10 10    Q.    Okay.  So when you were with CRS Staffing, you

11    took a -- a course on discrimination and harassment

12    then; is that right?

13          **A.    Yes.**

14          Q.    But when you came on board to work for

02:23:30 15    Chartwell, you did not take any kind of new course when

16    you started at least; correct?

17          **A.    There was another course that we took.**

18          Q.    What was the course that you took when you

19    started working at Chartwell?

02:23:41 20    **A.    It was the same course.**

21          Q.    Okay.  So that would have been in 2015; is that

22    right?

23          **A.    Yes.**

24          Q.    And does this discrimination and harassment

02:23:54 25    course, is it an online course?

```
 1    STATE OF CALIFORNIA      )
                               ) ss:
 2    COUNTY OF ALAMEDA        )

 3

 4            I, KIMBERLY E. D'URSO, do hereby certify:

 5            That the witness named in the foregoing

 6    deposition was present and duly sworn to testify to the

 7    truth in the within-entitled action on the day and date

 8    and at the time and place therein specified;

 9            That the testimony of said witness was reported

10    by me in shorthand and was thereafter transcribed through

11    computer-aided transcription;

12            That the foregoing constitutes a full, true and

13    correct transcript of said deposition and of the

14    proceedings which took place;

15            Further, that if the foregoing pertains to the

16    original transcript of a deposition in a federal case,

17    before completion of the proceedings, review of the

18    transcript [ ] was [ ] was not requested.

19            That I am a disinterested person to the said

20    action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22    my hand this 30th day of October, 2019.

23

24    _____
      KIMBERLY D'URSO
25    RPR, CSR NO. 11372, STATE OF CALIFORNIA
```

# Exhibit

# 11

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        A Limited Liability Partnership
2       Including Professional Corporations
    TRACEY A. KENNEDY, Cal. Bar No. 150782
3   333 South Hope Street, 43rd Floor
    Los Angeles, California  90071-1422
4   Telephone:    213-620-1780
    Facsimile:    213-620-1398
5   Email:        tkennedy@sheppardmullin.com

6   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        A Limited Liability Partnership
7       Including Professional Corporations
    PATRICIA M. JENG, Cal. Bar No. 272262
8   REANNE SWAFFORD-HARRIS, Cal. Bar No. 305558
    Four Embarcadero Center, 17th Floor
9   San Francisco, California 94111-4109
    Telephone:    415.434.9100
10  Facsimile:    415.434.3947
    Email:        pjeng@sheppardmullin.com
11                rswafford-harris@sheppardmullin.com

12  Attorneys for Defendant,
    TESLA, INC. DBA TESLA MOTORS, INC.

13

14

15                  **UNITED STATES DISTRICT COURT**

16                  **NORTHERN DISTRICT OF CALIFORNIA**

17

18  DEMETRIC DI-AZ, OWEN DIAZ AND          Case No. 17-cv-06748-WHO
    LAMAR PATTERSON
19                                         **DEFENDANT TESLA, INC. DBA TESLA**
                   Plaintiffs,             **MOTORS, INC.'S RESPONSE TO PLAINTIFF**
20                                         **OWEN DIAZ'S REQUESTS FOR**
            v.                             **PRODUCTION OF DOCUMENTS, SET FIVE**
21
    TESLA, INC. DBA TESLA MOTORS,
22  INC., CITISTAFF SOLUTIONS, INC.;
    WEST VALLEY STAFFING GROUP;
23  CHARTWELL STAFFING SERVICES,
    INC.; NEXTSOURCE, INC.; and DOES
24  1-10, inclusive

25                 Defendants.            Amended Complaint Filed:  December 26, 2018
                                          Trial Date:               November 18, 2019
26

27

28

                                          -1-                    Case No. 17-cv-06748-WHO

| | |
|---|---|
| 1 | PROPOUNDING PARTY: | Plaintiff OWEN DIAZ |
| 2 | RESPONDING PARTY: | Defendant TESLA, INC. DBA TESLA MOTORS, INC. |
| 3 | SET NO.: | FIVE |

Pursuant to Federal Rule of Civil Procedure 34, Defendant Tesla, Inc. dba Tesla Motors, Inc. ("Defendant") hereby objects and responds to Plaintiff Owen Diaz's ("Plaintiff") Requests for Production of Documents, Set Five as set forth below.

## PRELIMINARY STATEMENT

These Responses are made solely for purposes of this dispute. Each Response is subject to all objections as to relevance, materiality and admissibility, and any and all other objections and grounds which would require the exclusion of any statements contained herein, if such statements were made by a witness present and testifying at court. All said objections and grounds are expressly reserved and may be interposed at the time of trial.

The Responses set forth herein are based solely on the investigation and discovery conducted in this dispute to date. Defendant's discovery and investigation are ongoing and continuing. Without incurring an obligation to do so, Defendant fully reserves the right to supplement, amend, or modify its Responses to these Requests for Production as its discovery and investigation continue.

## GENERAL OBJECTIONS

Defendant makes the following General Objections to each Request for Production, each of which is incorporated by this reference into each individual Response as if set forth there in full, and accordingly these General Objections will not be repeated in full therein. These General Objections apply to the entirety of the Requests for Production. The assertion of same, similar, or additional objections to an individual Request for Production does not waive any of Defendant's General Objections as set forth below. Likewise, insofar as a General Objection is not enumerated in a Response, it shall not be deemed waived.

1.     Defendant generally objects to the Requests for Production to the extent they seek the discovery of information covered by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege. Defendant provides its Responses on the condition that

1  an inadvertent production of documents covered by such privileges or doctrines does not waive

2  any of its rights to assert such privileges or doctrines and that it may withdraw from production

3  any such document inadvertently produced as soon as identified.  To the extent any Request seeks

4  information protected by the attorney-client privilege and/or attorney work-product doctrine,

5  Defendant declines to produce such Responses, including, without limitation:

6          a.      All information or documents that constitute correspondence or other

7  communications between counsel for Defendant or its respective agents or employees, on the one

8  hand, and Defendant or its respective agents or employees, on the other hand; and

9          b.      All documents prepared for use in this dispute, including notes, memoranda,

10  draft pleadings and correspondence prepared by, at the direction of, or for review of counsel for

11  Defendant.

12      2.    Defendant generally objects to the Requests for Production to the extent they

13  require Defendant to produce information within the exclusive possession, custody, or control of

14  third parties.

15      3.    Defendant generally objects to the Requests for Production to the extent they

16  require Defendant to produce information, public or otherwise, that is equally available to

17  Plaintiff, and may decline to produce any such information or documents.

18      4.    Defendant generally objects to Plaintiff's Requests for Production and to each

19  Request therein to the extent that the Requests for Production seek discovery of information, the

20  release of which would be a violation of any individual's right of privacy under any constitutional,

21  statutory or common law right of privacy of any person.

22      5.    Defendant generally objects to the Requests for Production to the extent they are

23  vague and ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to

24  the discovery of admissible evidence.  Defendant reserves any and all objections as to relevance

25  and materiality.  Defendant's responses are not intended to waive or prejudice any objections

26  Defendant may have or may assert later.

27      6.    Defendant objects to each Request to the extent it seeks information relating to

28  events that fall outside the relevant period.

SMRH:4837-9254-0823.1

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS FOR PRODUCTION
OF DOCUMENTS, SET FIVE

7.     Each of the above General Objections shall be deemed to apply to Defendant's Requests for Production set forth below, notwithstanding the fact that Defendant has supplied responses and specific objections to the propounded Requests.

Subject to the foregoing General Objections, which are incorporated into each specific Response below and expressly subject thereto, Defendant responds to Plaintiff's Demand for Production of Documents, Set One, as follows:

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 79:**

Please produce ANY DOCUMENTS or COMMUNICATIONS sent, created, or received by Joyce DelaGrande which RELATE to PLAINTIFF. (For the purposes of responding to this request, the term "COMMUNICATIONS" encompasses, but is not limited to, notes, letters, emails, text messages, social media posts (including, though not limited to, posts on Instagram, Facebook, LINE, or Twitter), social media direct messages (including, though not limited to, messages sent via Instagram, Facebook, LINE, or Twitter), and messages sent via a messaging application (including, though not limited to, Snapchat, LINE, WhatsApp, WeChat, or Slack).)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 79:**

Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "ANY DOCUMENTS or COMMUNICATIONS sent, created, or received by Joyce DelaGrande which RELATE to PLAINTIFF." Defendant further objects to this request on the grounds that it is burdensome, oppressive, and harassing to the extent that it seeks information and documents not relevant to any party's claims or defenses nor proportional to the needs of this case, especially given that it requests any documents "which RELATE to PLAINTIFF." Defendant further objects to this request to the extent that it seeks documents and information pertaining to employees or former employees of Defendant and thereby seeks to invade privacy rights established by the California Constitution.  Defendant further objects to this request to the extent that it seeks documents protected from disclosure by the attorney-client privilege and the attorney work product doctrine.  Defendant further objects to this request on the grounds that it is burdensome and harassing in that it is overbroad and vague and ambiguous as to

-4-

1   time.

2         Subject to and without waiving the foregoing objections, Defendant responds as follows:

3   Defendant will produce responsive documents in its possession, custody and control, if any.

4   Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

5   **REQUEST FOR PRODUCTION NO. 80:**

6         Please produce ANY DOCUMENTS or COMMUNICATIONS sent, created, or received

7   by Tamotsu Kawasaki which RELATE to PLAINTIFF. (For the purposes of responding to this

8   request, the term "COMMUNICATIONS" encompasses, but is not limited to, notes, letters,

9   emails, text messages, social media posts (including, though not limited to, posts on Instagram,

10  Facebook, LINE, or Twitter), social media direct messages (including, though not limited to,

11  messages sent via Instagram, Facebook, LINE, or Twitter), and messages sent via a messaging

12  application (including, though not limited to, Snapchat, LINE, WhatsApp, WeChat, or Slack).)

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 80:**

14        Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and

15  uncertain with regard to the phrase "ANY DOCUMENTS or COMMUNICATIONS sent, created,

16  or received by Tamotsu Kawasaki which RELATE to PLAINTIFF." Defendant further objects to

17  this request on the grounds that it is burdensome, oppressive, and harassing to the extent that it

18  seeks information and documents not relevant to any party's claims or defenses nor proportional

19  to the needs of this case, especially given that it requests any documents "which RELATE to

20  PLAINTIFF." Defendant further objects to this request to the extent that it seeks documents and

21  information pertaining to employees or former employees of Defendant and thereby seeks to

22  invade privacy rights established by the California Constitution.  Defendant further objects to this

23  request to the extent that it seeks documents protected from disclosure by the attorney-client

24  privilege and the attorney work product doctrine.  Defendant further objects to this request on the

25  grounds that it is burdensome and harassing in that it is overbroad and vague and ambiguous as to

26  time.

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS FOR PRODUCTION
OF DOCUMENTS, SET FIVE

1    Subject to and without waiving the foregoing objections, Defendant responds as follows:

2    Defendant will produce responsive documents in its possession, custody and control, if any.

3    Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

4    **REQUEST FOR PRODUCTION NO. 81:**

5    Please produce ANY DOCUMENTS or COMMUNICATIONS sent, created, or received

6    by Robert Hidalgo which RELATE to PLAINTIFF. (For the purposes of responding to this

7    request, the term "COMMUNICATIONS" encompasses, but is not limited to, notes, letters,

8    emails, text messages, social media posts (including, though not limited to, posts on Instagram,

9    Facebook, LINE, or Twitter), social media direct messages (including, though not limited to,

10   messages sent via Instagram, Facebook, LINE, or Twitter), and messages sent via a messaging

11   application (including, though not limited to, Snapchat, LINE, WhatsApp, WeChat, or Slack).)

12   **RESPONSE TO REQUEST FOR PRODUCTION NO. 81:**

13   Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and

14   uncertain with regard to the phrase "ANY DOCUMENTS or COMMUNICATIONS sent, created,

15   or received by Robert Hidalgo which RELATE to PLAINTIFF." Defendant further objects to this

16   request on the grounds that it is burdensome, oppressive, and harassing to the extent that it seeks

17   information and documents not relevant to any party's claims or defenses nor proportional to the

18   needs of this case, especially given that it requests any documents "which RELATE to

19   PLAINTIFF." Defendant further objects to this request to the extent that it seeks documents and

20   information pertaining to employees or former employees of Defendant and thereby seeks to

21   invade privacy rights established by the California Constitution.  Defendant further objects to this

22   request to the extent that it seeks documents protected from disclosure by the attorney-client

23   privilege and the attorney work product doctrine.  Defendant further objects to this request on the

24   grounds that it is burdensome and harassing in that it is overbroad and vague and ambiguous as to

25   time.

26   Subject to and without waiving the foregoing objections, Defendant responds as follows:

27   After a diligent search and reasonable inquiry, Defendant does not have any responsive documents

28

SMRH:4837-9254-
0823.1
DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS FOR PRODUCTION
OF DOCUMENTS, SET FIVE

1  in its possession, custody and control.  Discovery is ongoing.  Defendant reserves the right to

2  supplement this response as necessary.

3  **REQUEST FOR PRODUCTION NO. 82:**

4       Please produce ANY of YOUR organizational charts created between 2014 and the

5  present.

6  **RESPONSE TO REQUEST FOR PRODUCTION NO. 82:**

7       Defendant objects to this request on the grounds that it is vague and ambiguous as to the

8  term(s) and/or phrase(s) "organizational charts," and "created." Defendant further objects that this

9  request is not reasonably limited to time and/or scope, and thus overbroad, unduly burdensome,

10  oppressive, and harassing.  Defendant further objects that this request is overbroad and unduly

11  burdensome, particularly because it calls for all documents of Tesla, Inc., and its representatives,

12  including specifically its attorneys, as well as any owner, officer, director, shareholder, manager,

13  employee, managing agent, agent, or "any individual or entity acting with actual or apparent

14  authority of Tesla, Inc." Defendant further objects to the extent this request seeks documents that

15  are not relevant to the parties' claims or defenses and are not proportional to the needs of the case,

16  considering the importance of the issues at stake in the action, the amount in controversy,

17  Defendant's relative access to relevant information, the resources, importance of the discovery in

18  resolving the issues, and the burden or expense of the proposed discovery outweighs its likely

19  benefit.  Defendant further objects that this request seeks confidential information related to

20  business operations and/or private information.  Defendant further objects to the extent this

21  request expressly seeks documents protected from disclosure by the attorney-client privilege

22  and/or work product doctrine.  Defendant further objects that this request is too vague and

23  ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the

24  request fails to adequately describe with reasonable particularity the item or category of

25  documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

26  **REQUEST FOR PRODUCTION NO. 83:**

27       Please produce ANY and ALL documents that RELATE to PLAINTIFF's completion of

28  any training provided by or facilitated by YOU.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 83:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s) "ALL DOCUMENTS that RELATE to," "completion," "any training," "provided by," and "facilitated by YOU." Defendant further objects that this request is not reasonably limited to time and/or scope, and thus overbroad, unduly burdensome, oppressive, and harassing. Defendant further objects that this request is overbroad and unduly burdensome, particularly because it calls for all documents of Tesla, Inc., and its representatives, including specifically its attorneys, as well as any owner, officer, director, shareholder, manager, employee, managing agent, agent, or "any individual or entity acting with actual or apparent authority of Tesla, Inc." Defendant further objects to the extent this request seeks documents that are not relevant to the parties' claims or defenses and are not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, Defendant's relative access to relevant information, the resources, importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery outweighs its likely benefit. Defendant further objects that this request seeks confidential information related to business operations and/or private information. Defendant further objects to the extent this request expressly seeks documents protected from disclosure by the attorney-client privilege and/or work product doctrine. Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant will produce responsive documents in its possession, custody and control, if any. Discovery is ongoing. Defendant reserves the right to supplement this response as necessary.

**REQUEST FOR PRODUCTION NO. 84:**

Please produce ANY and ALL DOCUMENTS reflecting policy acknowledgment forms signed by PLAINTIFF.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 84:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s) "ALL DOCUMENTS reflecting" and "policy acknowledgment forms." Defendant further objects that this request is not reasonably limited to time and/or scope, and thus overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects to the extent this request seeks documents that are not relevant to the parties' claims or defenses and are not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, Defendant's relative access to relevant information, the resources, importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further objects that this request seeks confidential information related to business operations and/or private information.  Defendant further objects to the extent this request expressly seeks documents protected from disclosure by the attorney-client privilege and/or work product doctrine.  Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant will produce responsive documents in its possession, custody and control, if any. Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

**REQUEST FOR PRODUCTION NO. 85:**

Please produce ANY and ALL DOCUMENTS created, sent or received by Josh Hedges RELATED to PLAINTIFF.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 85:**

Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "ALL DOCUMENTS created, sent or received by Josh Hedges RELATED to PLAINTIFF." Defendant further objects to this request on the grounds that it is burdensome, oppressive, and harassing to the extent that it seeks information and documents not

-9-

Case No. 17-cv-06748-WHO

1  relevant to any party's claims or defenses nor proportional to the needs of this case, especially

2  given that it requests any documents "RELATED to PLAINTIFF." Defendant further objects to

3  this request to the extent that it seeks documents and information pertaining to employees or

4  former employees of Defendant and thereby seeks to invade privacy rights established by the

5  California Constitution.  Defendant further objects to this request to the extent that it seeks

6  documents protected from disclosure by the attorney-client privilege and the attorney work

7  product doctrine.  Defendant further objects to this request on the grounds that it is burdensome

8  and harassing in that it is overbroad and vague and ambiguous as to time.

9        Subject to and without waiving the foregoing objections, Defendant responds as follows:

10  Defendant will produce responsive documents in its possession, custody and control, if any.

11  Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

12  **REQUEST FOR PRODUCTION NO. 86:**

13        Any DOCUMENTS in Workday that RELATE to PLAINTIFF.

14  **RESPONSE TO REQUEST FOR PRODUCTION NO. 86:**

15        Defendant objects to this request on the grounds that it is vague and ambiguous as to the

16  term(s) and/or phrase(s) "DOCUMENTS in Workday," and "RELATE to PLAINTIFF."

17  Defendant further objects that this request is not reasonably limited to time and/or scope, and thus

18  overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects that this

19  request is overbroad and unduly burdensome, particularly because it calls for any documents from

20  an entire cloud based on-demand financial management and human capital management software

21  vendor.  Defendant further objects to the extent this request seeks documents that are not relevant

22  to the parties' claims or defenses and are not proportional to the needs of the case, considering the

23  importance of the issues at stake in the action, the amount in controversy, Defendant's relative

24  access to relevant information, the resources, importance of the discovery in resolving the issues,

25  and the burden or expense of the proposed discovery outweighs its likely benefit.  Defendant

26  further objects that this request seeks confidential information related to business operations

27  and/or private information.  Defendant further objects to the extent this request expressly seeks

28  documents protected from disclosure by the attorney-client privilege and/or work product doctrine.

1  Defendant further objects that this request is too vague and ambiguous to permit Defendant to

2  conduct a reasonable search for responsive documents, as the request fails to adequately describe

3  with reasonable particularity the item or category of documents requested as required by Federal

4  Rules of Civil Procedure section 34(b)(1)(A).

5        Subject to and without waiving the foregoing objections, Defendant responds as follows:

6  Defendant will produce Plaintiff Owen Diaz's Workday profile.  Discovery is ongoing.  Defendant

7  reserves the right to supplement this response as necessary.

8  **REQUEST FOR PRODUCTION NO. 87:**

9        Please provide any and all DOCUMENTS RELATING TO internal complaints made by

10 Nigel Jones related to race harassment, discrimination and/or the use of the N-word at Tesla.

11 **RESPONSE TO REQUEST FOR PRODUCTION NO. 87:**

12       Defendant objects to this request on the grounds that it is vague and ambiguous as to the

13 term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination,"

14 and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in

15 time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant

16 further objects to the extent this request seeks information that is not relevant to the claims or

17 defenses and/or proportional to the needs of the case, considering the importance of the issues at

18 stake in the action, the amount in controversy, the parties' relative access to relevant information,

19 the parties' resources, the importance of the discovery in resolving the issues, and whether the

20 burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further

21 objects that this request seeks confidential information related to business operations and/or

22 private information.  Defendant further objects to the extent this request seeks information

23 protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further

24 objects to the extent this request violates third party privacy rights and confidentiality of third-

25 party non-litigants to an extent incommensurate with Plaintiff's discovery needs.  Defendant

26 further objects that this request as phrased is argumentative and requires the adoption of an

27 assumption which is improper.  Defendant further objects that this request is too vague and

28 ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the

-11-

SMRH:4837-9254-
0823.1

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS FOR PRODUCTION
OF DOCUMENTS, SET FIVE

1  request fails to adequately describe with reasonable particularity the item or category of

2  documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

3  **REQUEST FOR PRODUCTION NO. 88:**

4       Please provide any and all DOCUMENTS RELATING TO internal complaints made by

5  Melvin Berry related to race harassment, discrimination and/or the use of the N-word at Tesla.

6  **RESPONSE TO REQUEST FOR PRODUCTION NO. 88:**

7       Defendant objects to this request on the grounds that it is vague and ambiguous as to the

8  term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination,"

9  and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in

10 time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant

11 further objects to the extent this request seeks information that is not relevant to the claims or

12 defenses and/or proportional to the needs of the case, considering the importance of the issues at

13 stake in the action, the amount in controversy, the parties' relative access to relevant information,

14 the parties' resources, the importance of the discovery in resolving the issues, and whether the

15 burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further

16 objects that this request seeks confidential information related to business operations and/or

17 private information.  Defendant further objects to the extent this request seeks information

18 protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further

19 objects to the extent this request seeks information equally available to Plaintiff and thus overly

20 burdensome.  Defendant further objects to the extent this request violates third party privacy rights

21 and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's

22 discovery needs.  Defendant further objects that this request as phrased is argumentative and

23 requires the adoption of an assumption which is improper.  Defendant further objects that this

24 request is too vague and ambiguous to permit Defendant to conduct a reasonable search for

25 responsive documents, as the request fails to adequately describe with reasonable particularity the

26 item or category of documents requested as required by Federal Rules of Civil Procedure section

27 34(b)(1)(A).

28

SMRH:4837-9254-
0823.1

**REQUEST FOR PRODUCTION NO. 89:**

Please provide any and all DOCUMENTS RELATING TO internal complaints made by Nathan Fraim related to race harassment, discrimination and/or the use of the N-word at Tesla.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 89:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination," and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing. Defendant further objects to the extent this request seeks information that is not relevant to the claims or defenses and/or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Defendant further objects that this request seeks confidential information related to business operations and/or private information. Defendant further objects to the extent this request seeks information protected by the attorney-client privilege or the attorney work product doctrine. Defendant further objects to the extent this request violates third party privacy rights and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's discovery needs. Defendant further objects that this request as phrased is argumentative and requires the adoption of an assumption which is improper. Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

**REQUEST FOR PRODUCTION NO. 90:**

Please provide any and all DOCUMENTS RELATING TO internal complaints made by Dewitt Lambert related to race harassment, discrimination and/or the use of the N-word at Tesla.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 90:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination," and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects to the extent this request seeks information that is not relevant to the claims or defenses and/or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further objects that this request seeks confidential information related to business operations and/or private information.  Defendant further objects to the extent this request seeks information protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further objects to the extent this request seeks information equally available to Plaintiff and thus overly burdensome.  Defendant further objects to the extent this request violates third party privacy rights and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's discovery needs particularly since DeWitt Lambert, who is not a party to this case, is represented by Plaintiff's counsel in a separate matter.  Defendant further objects that this request as phrased is argumentative and requires the adoption of an assumption which is improper.  Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

**REQUEST FOR PRODUCTION NO. 91:**

Please provide any and all DOCUMENTS RELATING TO internal complaints made by Tori Johnson related to race harassment, discrimination and/or the use of the N-word at Tesla.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 91:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination," and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects to the extent this request seeks information that is not relevant to the claims or defenses and/or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further objects that this request seeks confidential information related to business operations and/or private information.  Defendant further objects to the extent this request seeks information protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further objects to the extent this request violates third party privacy rights and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's discovery needs.  Defendant further objects that this request as phrased is argumentative and requires the adoption of an assumption which is improper.  Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

**REQUEST FOR PRODUCTION NO. 92:**

Please provide any and all DOCUMENTS RELATING TO internal complaints made by Titus McCaleb related to race harassment, discrimination and/or the use of the N-word at Tesla.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 92:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination," and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant

-15-

1    further objects to the extent this request seeks information that is not relevant to the claims or

2    defenses and/or proportional to the needs of the case, considering the importance of the issues at

3    stake in the action, the amount in controversy, the parties' relative access to relevant information,

4    the parties' resources, the importance of the discovery in resolving the issues, and whether the

5    burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further

6    objects that this request seeks confidential information related to business operations and/or

7    private information.  Defendant further objects to the extent this request seeks information

8    protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further

9    objects to the extent this request violates third party privacy rights and confidentiality of third-

10   party non-litigants to an extent incommensurate with Plaintiff's discovery needs.  Defendant

11   further objects that this request as phrased is argumentative and requires the adoption of an

12   assumption which is improper.  Defendant further objects that this request is too vague and

13   ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the

14   request fails to adequately describe with reasonable particularity the item or category of

15   documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

16   **REQUEST FOR PRODUCTION NO. 93:**

17           Please provide any and all DOCUMENTS RELATING TO internal complaints made by

18   Jakel Williams related to race harassment, discrimination and/or the use of the N-word at Tesla.

19   **RESPONSE TO REQUEST FOR PRODUCTION NO. 93:**

20           Defendant objects to this request on the grounds that it is vague and ambiguous as to the

21   term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination,"

22   and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in

23   time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant

24   further objects to the extent this request seeks information that is not relevant to the claims or

25   defenses and/or proportional to the needs of the case, considering the importance of the issues at

26   stake in the action, the amount in controversy, the parties' relative access to relevant information,

27   the parties' resources, the importance of the discovery in resolving the issues, and whether the

28   burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further

1  objects that this request seeks confidential information related to business operations and/or

2  private information.  Defendant further objects to the extent this request seeks information

3  protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further

4  objects to the extent this request seeks information equally available to Plaintiff and thus overly

5  burdensome.  Defendant further objects to the extent this request violates third party privacy rights

6  and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's

7  discovery needs.  Defendant further objects that this request as phrased is argumentative and

8  requires the adoption of an assumption which is improper.  Defendant further objects that this

9  request is too vague and ambiguous to permit Defendant to conduct a reasonable search for

10  responsive documents, as the request fails to adequately describe with reasonable particularity the

11  item or category of documents requested as required by Federal Rules of Civil Procedure section

12  34(b)(1)(A).

13  **REQUEST FOR PRODUCTION NO. 94:**

14        Please provide any and all DOCUMENTS RELATING TO any discipline imposed on

15  Judy Timbreza for any inappropriate workplace conduct, including but not limited to, the use of

16  racial slurs and/or physical violence.

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 94:**

18        Defendant objects to this request on the grounds that it is vague and ambiguous as to the

19  term(s) and/or phrase(s): "any discipline imposed," "on," and "inappropriate workplace conduct."

20  Defendant further objects that this request is not limited in time or scope, and thus is overbroad,

21  unduly burdensome, oppressive, and harassing.  Defendant further objects that this request as

22  phrased is argumentative and requires the adoption of an assumption which is improper.

23  Defendant further objects to the extent this request seeks information protected by the attorney-

24  client privilege or the attorney work product doctrine.  Defendant further objects to the extent this

25  request seeks information equally available to Plaintiff and overly burdensome, as Judy Timbreza

26  was never a Tesla employee, but an employee of Chartwell.  Defendant further objects to the

27  extent this request violates third party privacy rights and confidentiality of third-party non-litigants

28  to an extent incommensurate with Plaintiff's discovery needs.  Defendant further objects to the

1  extent this Request is duplicative and/or substantially similar to Plaintiff's Request for Production

2  of Documents, Set Three, No. 66.

3      Subject to and without waiving the foregoing objections, Defendant responds as follows:

4  After a diligent search and reasonable inquiry, no additional documents were found that have not

5  already been produced. Discovery is ongoing. Defendant reserves the right to supplement this

6  response as necessary.

7  **REQUEST FOR PRODUCTION NO. 95:**

8      Please provide any and all DOCUMENTS RELATING TO Brandi To's investigation of

9  Titus McCaleb's complaints of harassment, physical threats and/or retaliation.

10 **RESPONSE TO REQUEST FOR PRODUCTION NO. 95:**

11     Defendant objects to this request on the grounds that it is vague and ambiguous as to the

12 term(s) and/or phrase(s): "all DOCUMENTS RELATING TO," "investigation," "complaints of

13 harassment," "and "physical threats and/or retaliation." Defendant further objects that this request

14 is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and

15 harassing. Defendant further objects to the extent this request seeks information that is not

16 relevant to the claims or defenses and/or proportional to the needs of the case, considering the

17 importance of the issues at stake in the action, the amount in controversy, the parties' relative

18 access to relevant information, the parties' resources, the importance of the discovery in resolving

19 the issues, and whether the burden or expense of the proposed discovery outweighs its likely

20 benefit. Defendant further objects that this request seeks confidential information related to

21 business operations and/or private information. Defendant further objects to the extent this

22 request seeks information protected by the attorney-client privilege or the attorney work product

23 doctrine. Defendant further objects to the extent this request violates third party privacy rights and

24 confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's discovery

25 needs. Defendant further objects that this request as phrased is argumentative and requires the

26 adoption of an assumption which is improper. Defendant further objects that this request is too

27 vague and ambiguous to permit Defendant to conduct a reasonable search for responsive

28 documents, as the request fails to adequately describe with reasonable particularity the item or

-18-

1    category of documents requested as required by Federal Rules of Civil Procedure section

2    34(b)(1)(A).

3       Subject to and without waiving the foregoing objections, Defendant responds as follows:

4    After a diligent search and reasonable inquiry, Defendant does not have any responsive documents

5    in its possession, custody and control.  Discovery is ongoing.  Defendant reserves the right to

6    supplement this response as necessary.

7    **REQUEST FOR PRODUCTION NO. 96:**

8       Please provide any and all CORRESPONDENCE exchanged between Agnes Lewis and

9    Brandi To relating to Titus McCaleb.

10    **RESPONSE TO REQUEST FOR PRODUCTION NO. 96:**

11       Defendant objects to this request on the grounds that it is vague and ambiguous as to the

12    term(s) and/or phrase(s): "all CORRESPONDENCE," "exchanged between," "and "relating to."

13    Defendant further objects that this request is not limited in time or scope, and thus is overbroad,

14    unduly burdensome, oppressive, and harassing.  Defendant further objects to the extent this

15    request seeks information that is not relevant to the claims or defenses and/or proportional to the

16    needs of the case, considering the importance of the issues at stake in the action, the amount in

17    controversy, the parties' relative access to relevant information, the parties' resources, the

18    importance of the discovery in resolving the issues, and whether the burden or expense of the

19    proposed discovery outweighs its likely benefit.  Defendant further objects that this request seeks

20    confidential information related to business operations and/or private information.  Defendant

21    further objects to the extent this request seeks information protected by the attorney-client

22    privilege or the attorney work product doctrine.  Defendant further objects to the extent this

23    request violates third party privacy rights and confidentiality of third-party non-litigants to an

24    extent incommensurate with Plaintiff's discovery needs.  Defendant further objects that this

25    request as phrased is argumentative and requires the adoption of an assumption which is improper.

26    Defendant further objects that this request is too vague and ambiguous to permit Defendant to

27    conduct a reasonable search for responsive documents, as the request fails to adequately describe

28

SMRH:4837-9254-
0823.1

1 | with reasonable particularity the item or category of documents requested as required by Federal

2 | Rules of Civil Procedure section 34(b)(1)(A).

3 |      Subject to and without waiving the foregoing objections, Defendant responds as follows:

4 | Defendant will produce responsive documents in its possession, custody and control, if any.

5 | Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

6 |

7 | Dated:  May 24, 2019            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

8 |

9 | By: _____

10 |                          TRACEY A. KENNEDY
                         PATRICIA M. JENG

11 |                      REANNE SWAFFORD-HARRIS

12 |                        Attorneys for Defendant
              TESLA, INC. dba TESLA MOTORS, INC.

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

## CERTIFICATE OF SERVICE

*Demetric Di-Az, et al. v. Tesla, Inc., et al.*
USDC, Northern District of California, Case No. 3:17-cv-06748-WHO

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On May 24, 2019, I served true copies of the following document(s) described as:

**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET FIVE**

on the interested parties in this action as follows:

### SEE SERVICE LIST

☒ **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the firm's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.

☐ **BY FAX TRANSMISSION:**  I faxed a copy of the document(s) to the persons at the fax numbers listed in the Service List.  The telephone number of the sending facsimile machine was 415.434.3947.  The transmission was reported as complete and without error.  No error was reported by the fax machine that I used.  A transmission report was properly issued by the sending fax machine.

☐ **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address eruiz@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ **BY OVERNIGHT DELIVERY:**  I enclosed said document(s) in an envelope or package provided by the overnight service carrier and addressed to the persons at the addresses listed in the Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight service carrier or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents.

☐ **BY PERSONAL SERVICE:**  I personally delivered the document(s) to the person at the addresses listed in the Service List.  (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.  (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

SMRH:4837-9254-0823.1

Case No. 3:17-cv-06748-WHO
CERTIFICATE OF SERVICE

1   I declare under penalty of perjury under the laws of the State of California that the
2   foregoing is true and correct.

3       Executed on May 24, 2019, at San Francisco, California.

4

5   _____
6                                   Elena E. Ruiz
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-          Case No. 3:17-cv-06748-WHO
                                                                CERTIFICATE OF SERVICE

## SERVICE LIST

1

2  Lawrence A. Organ, Esq.                           Attorneys for Plaintiffs
   Navruz Avloni, Esq.                               DEMETRIC DI-AZ and OWEN DIAZ
3  **CALIFORNIA CIVIL RIGHTS LAW GROUP**
   332 San Anselmo Avenue
4  San Anselmo, CA 94960
   Telephone:     415-453-4740
5  Facsimile:     415-785-7352]
   Email:         larry@civiilrightsca.com
6                 navruz@civilrightsca.com

7  Gary T. Lafayette, Esq.                           Attorneys for Defendant
   Cheryl A. Stevens, Esq.                           CITISTAFF SOLUTIONS, INC.
8  **LAFAYETTE & KUMAGAI**
   1300 Clay Street, Suite 810
9  Oakland, CA 94612
   Telephone:     415-357-4600
10 Email:         glafayette@lkclaw.com
                  cstevens@lkclaw.com
11
   Jason A. Geller, Esq.                             Attorneys for Defendant
12 Juan C. Araneda, Esq.                             NEXTSOURCE, INC.
   Aaron D. Langberg, Esq.
13 **FISHER & PHILLIPS LLP**
   One Embarcadero Center, Suite 2050
14 San Francisco, CA 94111
   Telephone:     415-490-9000
15 Facsimile:     415-490-9001
   Email:         jgeller@fisherphillips.com
16                jaraneda@fisherphillips.com
                  alangberg@fisherphillips.com
17
   Fenn C. Horton III, Esq.                          Attorneys for Defendant
18 Helene Simvoulakis-Panos, Esq.                    WEST VALLEY STAFFING GROUP
   **PAHL & McCAY**
19 225 West Santa Clara Street, Suite 1500
   San Jose, CA 95113
20 Telephone:     408-286-5110
   Facsimile:     408-286-5722
21 Email:         fhorton@pahl-mccay.com
                  hsimvoulakis@pahl-mccay.com
22

23

24

25

26

27

28

-3-

SMRH:4837-9254-0823.1

# Exhibit

# 12

1   JASON A. GELLER (CA SBN 168149)
jgeller@fisherphillips.com

2   JUAN C. ARANEDA (CA SBN 213041)
jaraneda@fisherphillips.com

3   VINCENT J. ADAMS (CA SBN 249696)
vadams@fisherphillips.com

4   FISHER & PHILLIPS LLP
One Embarcadero Center, Suite 2050

5   San Francisco, California 94111
Telephone:   (415) 490-9000

6   Facsimile:   (415) 490-9001

7   Attorneys for Defendant
nextSource, Inc.

8

9                 UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO COURTHOUSE

12

13   DEMETRIC DI-AZ, OWEN DIAZ and
LAMAR PATTERSON,

14

15                  Plaintiffs,

16       vs.

17   TESLA, INC. DBA TESLA MOTORS, INC.;
CITISTAFF SOLUTIONS, INC.; WEST
VALLEY STAFFING GROUP;

18   CHARTWELL STAFFING SERVICES,
INC.; NEXTSOURCE, INC.,

19

20                  Defendants.

21

Case No. 3:17-cv-06748-WHO
*[Removed from Alameda Superior Court, Case No. RG17878854]*

**DEFENDANT NEXTSOURCE, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUEST FOR PRODUCTION OF DOCUMENTS – SET ONE**

22   PROPOUNDING PARTY:   PLAINTIFF, OWEN DIAZ

23   RESPONDING PARTY:    DEFENDANT, NEXTSOURCE, INC.

24   SET NUMBER:          ONE

25       Pursuant to Rule 34 of Federal Rules of Civil Procedure, Defendant NEXTSOURCE,

26   INC. ("Defendant") responds to Plaintiff OWEN DIAZ's Request for Production of Documents

27   (Set No. One) (the "Request") as follows:

28

**PRELIMINARY STATEMENT**

1.      The responses/objections herein are made solely for the purpose of this action. Defendant reserves all objections or other questions as to the competency, relevance, materiality, privilege or admissibility as evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever of its responses herein and any document or thing identified or provided in response to the Request.

2.      Defendant's response is governed by Rule 34 of Federal Rules of Civil Procedure and other applicable law, and not by the instructions, definitions or other prefatory remarks stated in the Request.

3.      The responses below are based upon information presently available to Defendant and upon documents known to be in its possession, custody or control.  No incidental or implied admissions are intended.  The fact that Defendant has responded to all or any part of any individual request or any subpart thereof should not be taken as an admission that Defendant accepts or admits the existence of any fact or facts set forth or assumed by such request or that such responses constitute admissible evidence. The fact that Defendant has responded to all or part of any individual request or subpart thereof is not intended to be and shall not be construed to be a waiver by Defendant of all or any part of any objection which is made to any individual request or subpart thereof.

Subject to the foregoing, Defendant hereby responds to specific Requests as follows:

**RESPONSE TO REQUEST FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1**

Please produce PLAINTIFF's personnel file.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "personnel file." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that Plaintiff was not

2

Case No. 3:17-cv-06748-WHO

1    an employee of Defendant, and this request is therefore inapplicable to Defendant.

2    **REQUEST FOR PRODUCTION NO. 2**

3         Please produce all DOCUMENTS, including COMMUNICATIONS, which RELATE

4    TO, reflect, refer, or discuss Plaintiff's job performance during his employment at the TESLA

5    FACTORY (in responding to this request, the term "COMMUNICATIONS" shall include, but

6    is not limited to, e-mails, text messages, chat logs, messages sent via mobile phone application

7    [including, though not limited to, Line, WhatsApp, or Signal], or messages and posts sent via

8    social media sites [including, though not limited to, Facebook, Twitter, Instagram, or Snapchat].)

9    **RESPONSE TO REQUEST FOR PRODUCTION NO. 2**

10        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

11   vague and ambiguous, including, but not limited to, its use of the phrase "Plaintiff's job

12   performance during his employment at the TESLA FACTORY."  Defendant further objects to

13   this request as burdensome, oppressive and harassing to the extent that it seeks documents not

14   relevant to any party's claims or defenses or that are not proportional to the needs of this case,

15   especially given that this request seeks the production of all documents that "RELATE TO,

16   reflect, refer or discuss Plaintiff's job performance." Defendant objects to this request to the

17   extent it seeks the production of electronically stored information (including, but not limited to

18   emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

19   proportion to the claims in this action. Defendant also objects to this request to the extent that it

20   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

21   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

22   request to the extent it seeks the production of documents that are equally available to Plaintiff.

23   Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

24   and this request is therefore inapplicable to Defendant.

25        Subject to and without waiving objections, Defendant responds: Subject to and without

26   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

27   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

28   and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 3**

Please produce all DOCUMENTS RELATING TO PLAINTIFF's job duties and responsibilities for each position held by PLAINTIFF at TESLA.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "job duties and responsibilities for each position held by PLAINTIFF at TESLA."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents that "RELATING TO PLAINTIFF'S job duties and responsibilities." Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

**REQUEST FOR PRODUCTION NO. 4**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF that he was called "Nigga" and/or "Nigger."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "all complaint(s) made by PLAINTIFF that he was called 'Nigga' and/or 'Nigger.'"  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case,

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 5**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called "Nigga" and/or "Nigger."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegations(s) that he was called 'Nigga' and/or 'Nigger.'" Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of

1   and in proportion to the claims in this action. Defendant also objects to this request to the extent

2   that it seeks documents protected by the attorney-client privilege, the attorney work product

3   doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to

4   this request to the extent it calls for documents that are protected from disclosure by third party

5   privacy rights under the Federal and California constitutions and applicable statutes. Defendant

6   objects to this request to the extent it seeks the production of documents that are equally available

7   to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee

8   of Defendant and this request is therefore inapplicable to Defendant.

9        Subject to and without waiving its objections, Defendant responds: Despite a diligent

10  search and reasonable inquiry Defendant, cannot comply with this request because no documents

11  in Defendant's possession, custody or control are responsive to this request. Discovery is

12  continuing, and Defendant reserves its right to supplement its response to this request.

13  **REQUEST FOR PRODUCTION NO. 6**

14       Please produce any and all statements from employees who were interviewed regarding

15  PLAINTIFF's complaint(s) or allegation(s) that he was called "Nigga" and/or "Nigger."

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 6**

17       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18  vague and ambiguous, including, but not limited to, its use of the term "statements" and the

19  phrase "any and all statements from employees who were interviewed by YOU regarding

20  PLAINTIFF's complaint(s) or allegations(s) that he was called 'Nigga' and/or 'Nigger.'"

21  Defendant further objects to this request as burdensome, oppressive and harassing to the extent

22  that it seeks documents not relevant to any party's claims or defenses or that are not proportional

23  to the needs of this case. Defendant objects to this request on the grounds that it is overbroad,

24  vague and ambiguous as to time. Defendant also objects to this request to the extent that it seeks

25  documents protected by the attorney-client privilege, the attorney work product doctrine and/or

26  other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

27  the extent it calls for documents that are protected from disclosure by third party privacy rights

28  under the Federal and California constitutions and applicable statutes. Defendant objects to this

1  request on the grounds that Plaintiff was not an employee of Defendant and this request is
2  therefore inapplicable to Defendant.

3      Subject to and without waiving its objections, Defendant responds: Despite a diligent
4  search and reasonable inquiry Defendant, cannot comply with this request because no documents
5  in Defendant's possession, custody or control are responsive to this request. Discovery is
6  continuing, and Defendant reserves its right to supplement its response to this request.

7  **REQUEST FOR PRODUCTION NO. 7**

8      Please produce the investigator's notes that were created in response to PLAINTIFF's
9  complaint(s) or allegation(s) that he was called "Nigga" and/or "Nigger."

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 7**

11      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,
12  vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes
13  that were created in response to PLAINTIFF's complaint(s) or allegations(s) that he was called
14  'Nigga' and/or 'Nigger.'"  Defendant further objects to this request as burdensome, oppressive
15  and harassing to the extent that it seeks documents not relevant to any party's claims or defenses
16  or that are not proportional to the needs of this case. Defendant objects to this request on the
17  grounds that it is overbroad, vague and ambiguous as to time. Defendant also objects to this
18  request to the extent that it seeks documents protected by the attorney-client privilege, the
19  attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.
20  Defendant objects to this request to the extent it calls for documents that are protected from
21  disclosure by third party privacy rights under the Federal and California constitutions and
22  applicable statutes. Defendant objects to this request on the grounds that Plaintiff was not an
23  employee of Defendant and this request is therefore inapplicable to Defendant.

24      Subject to and without waiving its objections, Defendant responds: Despite a diligent
25  search and reasonable inquiry Defendant, cannot comply with this request because no documents
26  in Defendant's possession, custody or control are responsive to this request. Discovery is
27  continuing, and Defendant reserves its right to supplement its response to this request.

28  ///

**REQUEST FOR PRODUCTION NO. 8**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF regarding "racially offensive remarks", including (though not limited to) the "racially offensive remarks" discussed at the previously produced document Bates- stamped TESLA-0000511.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by PLAINTIFF regarding 'racially offensive remarks'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 9**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) regarding "racially offensive remarks", including (though not limited to) the "racially offensive remarks" discussed at the previously produced document Bates – stamped TESLA-0000511.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) regarding 'racially offensive remarks'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 10**

Please produce any and all statements from employees who were interviewed regarding PLAINTIFF's complaint(s) or allegation(s) regarding "racially offensive remarks", including (though not limited to) the "racially offensive remarks" discussed at the previously produced document Bates- stamped TESLA-0000511.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaint(s) or allegation(s) regarding 'racially offensive remarks'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is

1  continuing, and Defendant reserves its right to supplement its response to this request.

2  **REQUEST FOR PRODUCTION NO. 11**

3      Please produce the investigator's notes that were created in response to PLAINTIFF's

4  complaint(s) or allegation(s) regarding "racially offensive remarks", including (though not

5  limited to) the "racially offensive remarks" discussed at the previously produced document

6  Bates- stamped TESLA-0000511.

7  **RESPONSE TO REQUEST FOR PRODUCTION NO. 11**

8      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

9  vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

10  that were created in response to PLAINTIFF's complaint(s) or allegation(s) regarding 'racially

11  offensive remarks'."  Defendant further objects to this request as burdensome, oppressive and

12  harassing to the extent that it seeks documents not relevant to any party's claims or defenses or

13  that are not proportional to the needs of this case. Defendant objects to this request on the grounds

14  that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the

15  extent it seeks the production of electronically stored information (including, but not limited to

16  emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

17  proportion to the claims in this action. Defendant also objects to this request to the extent that it

18  seeks documents protected by the attorney-client privilege, the attorney work product doctrine

19  and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

20  request to the extent it calls for documents that are protected from disclosure by third party

21  privacy rights under the Federal and California constitutions and applicable statutes. Defendant

22  objects to this request to the extent it seeks the production of documents that are equally available

23  to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee

24  of Defendant and this request is therefore inapplicable to Defendant.

25      Subject to and without waiving its objections, Defendant responds: Despite a diligent

26  search and reasonable inquiry Defendant, cannot comply with this request because no documents

27  in Defendant's possession, custody or control are responsive to this request. Discovery is

28  continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 12**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF that he was called a "jiggaboo".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by PLAINTIFF that he was called a 'jiggaboo'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 13**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU

12

regarding Plaintiff's complaint(s) or allegation(s) that he was called a "jiggaboo".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a 'jiggaboo.'" Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 14**

Please produce any and all statements from employees who were interviewed regarding PLAINTIFF's complaint(s) or allegation(s) that he was called a "jiggaboo".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14**

1   Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

2   vague and ambiguous, including, but not limited to, its use of the term "statements" and the

3   phrase "PLAINTIFF's complaint(s) or allegation(s) that he was called a 'jiggaboo'."  Defendant

4   further objects to this request as burdensome, oppressive and harassing to the extent that it seeks

5   documents not relevant to any party's claims or defenses or that are not proportional to the needs

6   of this case. Defendant objects to this request on the grounds that it is overbroad, vague and

7   ambiguous as to time. Defendant objects to this request to the extent it seeks the production of

8   electronically stored information (including, but not limited to emails, texts and meta-data) as

9   burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

10  Defendant also objects to this request to the extent that it seeks documents protected by the

11  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

12  or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

13  that are protected from disclosure by third party privacy rights under the Federal and California

14  constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

15  production of documents that are equally available to Plaintiff. Defendant objects to this request

16  on the grounds that Plaintiff was not an employee of Defendant and this request is therefore

17  inapplicable to Defendant.

18   Subject to and without waiving its objections, Defendant responds: Despite a diligent

19  search and reasonable inquiry Defendant, cannot comply with this request because no documents

20  in Defendant's possession, custody or control are responsive to this request. Discovery is

21  continuing, and Defendant reserves its right to supplement its response to this request.

22  **REQUEST FOR PRODUCTION NO. 15**

23   Please produce the investigator's notes that were created in response to PLAINTIFF's

24  complaint(s) or allegation(s) that he was called a "jiggaboo".

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 15**

26   Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

27  vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

28  that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a

'jiggaboo'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 16**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF that he was called a "porch monkey".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by PLAINTIFF that he was called a 'porch monkey'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 17**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a "porch monkey".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a 'porch monkey'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is

overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.   Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 18**

Please produce any and all statements from employees who were interviewed regarding PLAINTIFF's complaint(s) or allegation(s) that he was called a "porch monkey".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaint(s) or allegation(s) that he was called a 'porch monkey'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1  in this action.  Defendant also objects to this request to the extent that it seeks documents

2  protected by the attorney-client privilege, the attorney work product doctrine and/or other

3  privileges, protections, or doctrines of similar effect. Defendant objects to this request to the

4  extent it calls for documents that are protected from disclosure by third party privacy rights under

5  the Federal and California constitutions and applicable statutes. Defendant objects to this request

6  to the extent it seeks the production of documents that are equally available to Plaintiff.

7  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

8  and this request is therefore inapplicable to Defendant.

9       Subject to and without waiving its objections, Defendant responds: Despite a diligent

10  search and reasonable inquiry Defendant, cannot comply with this request because no documents

11  in Defendant's possession, custody or control are responsive to this request. Discovery is

12  continuing, and Defendant reserves its right to supplement its response to this request.

13  **REQUEST FOR PRODUCTION NO. 19**

14       Please produce the investigator's notes that were created in response to PLAINTIFF's

15  complaint(s) or allegation(s) that he was called a "porch monkey".

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 19**

17       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18  vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

19  that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a

20  'porch monkey'."  Defendant further objects to this request as burdensome, oppressive and

21  harassing to the extent that it seeks documents not relevant to any party's claims or defenses or

22  that are not proportional to the needs of this case. Defendant objects to this request on the grounds

23  that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the

24  extent it seeks the production of electronically stored information (including, but not limited to

25  emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

26  proportion to the claims in this action.  Defendant also objects to this request to the extent that it

27  seeks documents protected by the attorney-client privilege, the attorney work product doctrine

28  and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

18

1  request to the extent it calls for documents that are protected from disclosure by third party

2  privacy rights under the Federal and California constitutions and applicable statutes. Defendant

3  objects to this request to the extent it seeks the production of documents that are equally available

4  to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee

5  of Defendant and this request is therefore inapplicable to Defendant.

6        Subject to and without waiving its objections, Defendant responds: Despite a diligent

7  search and reasonable inquiry Defendant, cannot comply with this request because no documents

8  in Defendant's possession, custody or control are responsive to this request. Discovery is

9  continuing, and Defendant reserves its right to supplement its response to this request.

10  **REQUEST FOR PRODUCTION NO. 20**

11        Please produce all DOCUMENTS RELATING TO all complaint(s) made by

12  PLAINTIFF that he was called a "mayate".

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 20**

14        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

15  vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by

16  PLAINTIFF that he was called a 'mayate'."  Defendant further objects to this request as

17  burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

18  party's claims or defenses or that are not proportional to the needs of this case, especially given

19  that this request seeks the production of all documents "RELATING TO" other documents.

20  Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to

21  time. Defendant objects to this request to the extent it seeks the production of electronically stored

22  information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

23  oppressive in the context of and in proportion to the claims in this action.  Defendant also objects

24  to this request to the extent that it seeks documents protected by the attorney-client privilege, the

25  attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

26  Defendant objects to this request to the extent it calls for documents that are protected from

27  disclosure by third party privacy rights under the Federal and California constitutions and

28  applicable statutes. Defendant objects to this request to the extent it seeks the production of

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 21**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a "mayate".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a 'mayate." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   and this request is therefore inapplicable to Defendant.

2       Subject to and without waiving its objections, Defendant responds: Despite a diligent

3   search and reasonable inquiry Defendant, cannot comply with this request because no documents

4   in Defendant's possession, custody or control are responsive to this request. Discovery is

5   continuing, and Defendant reserves its right to supplement its response to this request.

6   **REQUEST FOR PRODUCTION NO. 22**

7       Please produce any and all statements from employees who were interviewed regarding

8   PLAINTIFF's complaint(s) or allegation(s) that he was called a "mayate".

9   **RESPONSE TO REQUEST FOR PRODUCTION NO. 22**

10      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

11  vague and ambiguous, including, but not limited to, its use of the term "statements" and the

12  phrase "PLAINTIFF's complaint(s) or allegation(s) that he was called a 'mayate'."  Defendant

13  further objects to this request as burdensome, oppressive and harassing to the extent that it seeks

14  documents not relevant to any party's claims or defenses or that are not proportional to the needs

15  of this case. Defendant objects to this request on the grounds that it is overbroad, vague and

16  ambiguous as to time. Defendant objects to this request to the extent it seeks the production of

17  electronically stored information (including, but not limited to emails, texts and meta-data) as

18  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

19  Defendant also objects to this request to the extent that it seeks documents protected by the

20  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

21  or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

22  that are protected from disclosure by third party privacy rights under the Federal and California

23  constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

24  production of documents that are equally available to Plaintiff.  Defendant objects to this request

25  on the grounds that Plaintiff was not an employee of Defendant and this request is therefore

26  inapplicable to Defendant.

27      Subject to and without waiving its objections, Defendant responds: Despite a diligent

28  search and reasonable inquiry Defendant, cannot comply with this request because no documents

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

1    in Defendant's possession, custody or control are responsive to this request. Discovery is

2    continuing, and Defendant reserves its right to supplement its response to this request.

3    **REQUEST FOR PRODUCTION NO. 23**

4        Please produce the investigator's notes that were created in response to PLAINTIFF's

5    complaint(s) or allegation(s) that he was called a "mayate".

6    **RESPONSE TO REQUEST FOR PRODUCTION NO. 23**

7        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

8    vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

9    that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a

10   'mayate'." Defendant further objects to this request as burdensome, oppressive and harassing to

11   the extent that it seeks documents not relevant to any party's claims or defenses or that are not

12   proportional to the needs of this case. Defendant objects to this request on the grounds that it is

13   overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it

14   seeks the production of electronically stored information (including, but not limited to emails,

15   texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to

16   the claims in this action.  Defendant also objects to this request to the extent that it seeks

17   documents protected by the attorney-client privilege, the attorney work product doctrine and/or

18   other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

19   the extent it calls for documents that are protected from disclosure by third party privacy rights

20   under the Federal and California constitutions and applicable statutes. Defendant objects to this

21   request to the extent it seeks the production of documents that are equally available to Plaintiff.

22   Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

23   and this request is therefore inapplicable to Defendant.

24       Subject to and without waiving its objections, Defendant responds: Despite a diligent

25   search and reasonable inquiry Defendant, cannot comply with this request because no documents

26   in Defendant's possession, custody or control are responsive to this request. Discovery is

27   continuing, and Defendant reserves its right to supplement its response to this request.

28   ///

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

**REQUEST FOR PRODUCTION NO. 24**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF that he was called a "mono".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by PLAINTIFF that he was called a 'mono.'"  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 25**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1    regarding Plaintiff's complaint(s) or allegation(s) that he was called a "mono".

2    **RESPONSE TO REQUEST FOR PRODUCTION NO. 25**

3           Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

4    vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted

5    by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a 'mono'."

6    Defendant further objects to this request as burdensome, oppressive and harassing to the extent

7    that it seeks documents not relevant to any party's claims or defenses or that are not proportional

8    to the needs of this case. Defendant objects to this request on the grounds that it is overbroad,

9    vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the

10   production of electronically stored information (including, but not limited to emails, texts and

11   meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims

12   in this action.  Defendant also objects to this request to the extent that it seeks documents

13   protected by the attorney-client privilege, the attorney work product doctrine and/or other

14   privileges, protections, or doctrines of similar effect. Defendant objects to this request to the

15   extent it calls for documents that are protected from disclosure by third party privacy rights under

16   the Federal and California constitutions and applicable statutes. Defendant objects to this request

17   to the extent it seeks the production of documents that are equally available to Plaintiff.

18   Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

19   and this request is therefore inapplicable to Defendant.

20          Subject to and without waiving its objections, Defendant responds: Despite a diligent

21   search and reasonable inquiry Defendant, cannot comply with this request because no documents

22   in Defendant's possession, custody or control are responsive to this request. Discovery is

23   continuing, and Defendant reserves its right to supplement its response to this request.

24   **REQUEST FOR PRODUCTION NO. 26**

25          Please produce any and all statements from employees who were interviewed regarding

26   PLAINTIFF's complaint(s) or allegation(s) that he was called a "mono".

27   **RESPONSE TO REQUEST FOR PRODUCTION NO. 26**

28          Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

1  vague and ambiguous, including, but not limited to, its use of the term "statements" and the

2  phrase "PLAINTIFF's complaint(s) or allegation(s) that he was called a 'mono'."  Defendant

3  further objects to this request as burdensome, oppressive and harassing to the extent that it seeks

4  documents not relevant to any party's claims or defenses or that are not proportional to the needs

5  of this case. Defendant objects to this request on the grounds that it is overbroad, vague and

6  ambiguous as to time. Defendant objects to this request to the extent it seeks the production of

7  electronically stored information (including, but not limited to emails, texts and meta-data) as

8  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

9  Defendant also objects to this request to the extent that it seeks documents protected by the

10 attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

11 or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

12 that are protected from disclosure by third party privacy rights under the Federal and California

13 constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

14 production of documents that are equally available to Plaintiff.  Defendant objects to this request

15 on the grounds that Plaintiff was not an employee of Defendant and this request is therefore

16 inapplicable to Defendant.

17       Subject to and without waiving its objections, Defendant responds: Despite a diligent

18 search and reasonable inquiry Defendant, cannot comply with this request because no documents

19 in Defendant's possession, custody or control are responsive to this request. Discovery is

20 continuing, and Defendant reserves its right to supplement its response to this request.

21 **REQUEST FOR PRODUCTION NO. 27**

22       Please produce the investigator's notes that were created in response to PLAINTIFF's

23 complaint(s) or allegation(s) that he was called a "mono".

24 **RESPONSE TO REQUEST FOR PRODUCTION NO. 27**

25       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

26 vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

27 that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a

28 'mono'."  Defendant further objects to this request as burdensome, oppressive and harassing to

the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 28**

Please produce all DOCUMENTS RELATING TO PLAINTIFF's complaints about Judy Timbreza.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "PLAINTIFF's complaints about Judy Timbreza."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant

1   objects to this request to the extent it seeks the production of electronically stored information

2   (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive

3   in the context of and in proportion to the claims in this action.  Defendant also objects to this

4   request to the extent that it seeks documents protected by the attorney-client privilege, the

5   attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

6   Defendant objects to this request to the extent it calls for documents that are protected from

7   disclosure by third party privacy rights under the Federal and California constitutions and

8   applicable statutes. Defendant objects to this request to the extent it seeks the production of

9   documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds

10  that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to

11  Defendant.

12      Subject to and without waiving its objections, Defendant responds: Despite a diligent

13  search and reasonable inquiry Defendant, cannot comply with this request because no documents

14  in Defendant's possession, custody or control are responsive to this request. Discovery is

15  continuing, and Defendant reserves its right to supplement its response to this request.

16  **REQUEST FOR PRODUCTION NO. 29**

17      Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU

18  regarding Plaintiff's complaints about Judy Timbreza.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 29**

20      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

21  vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted

22  by YOU regarding Plaintiff's complaints about Judy Timbreza."  Defendant further objects to

23  this request as burdensome, oppressive and harassing to the extent that it seeks documents not

24  relevant to any party's claims or defenses or that are not proportional to the needs of this case,

25  especially given that this request seeks the production of all documents "RELATING TO" other

26  documents. Defendant objects to this request on the grounds that it is overbroad, vague and

27  ambiguous as to time. Defendant objects to this request to the extent it seeks the production of

28  electronically stored information (including, but not limited to emails, texts and meta-data) as

burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 30**

Please produce any and all statements from employees who were interviewed regarding PLAINTIFF's complaints about Judy Timbreza.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaints about Judy Timbreza."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 31**

Please produce all DOCUMENTS RELATING TO PLAINTIFF's complaints about Ramon Martinez.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "PLAINTIFF's complaints about Ramon Martinez."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and

1  applicable statutes. Defendant objects to this request to the extent it seeks the production of

2  documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds

3  that neither Plaintiff nor Ramon Martinez was an employee of Defendant and this request is

4  therefore inapplicable to Defendant.

5       Subject to and without waiving objections, Defendant responds: Subject to and without

6  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

7  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

8  and Defendant reserves its right to supplement its response to this request.

9  **REQUEST FOR PRODUCTION NO. 32**

10      Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU

11  regarding Plaintiff's complaints about Ramon Martinez.

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 32**

13      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

14  vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted

15  by YOU regarding Plaintiff's complaints about Ramon Martinez."  Defendant further objects to

16  this request as burdensome, oppressive and harassing to the extent that it seeks documents not

17  relevant to any party's claims or defenses or that are not proportional to the needs of this case,

18  especially given that this request seeks the production of all documents "RELATING TO" other

19  documents. Defendant objects to this request on the grounds that it is overbroad, vague and

20  ambiguous as to time. Defendant objects to this request to the extent it seeks the production of

21  electronically stored information (including, but not limited to emails, texts and meta-data) as

22  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

23  Defendant also objects to this request to the extent that it seeks documents protected by the

24  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

25  or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

26  that are protected from disclosure by third party privacy rights under the Federal and California

27  constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

28  production of documents that are equally available to Plaintiff.  Defendant objects to this request

on the grounds that neither Plaintiff nor Ramon Martinez was an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 33**

Please produce any and all statements from employees who were interviewed regarding PLAINTIFF's complaints about Ramon Martinez.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaints about Ramon Martine."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that neither Plaintiff nor Ramon Martinez was an employee of Defendant and this request is therefore inapplicable to Defendant.

///

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 34**

Please produce the investigator's notes that were created in response to PLAINTIFF's complaints about Ramon Martinez.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to PLAINTIFF's complaints about Ramon Martinez."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that neither Plaintiff nor Ramon Martinez was an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

1   and Defendant reserves its right to supplement its response to this request.

2   **REQUEST FOR PRODUCTION NO. 35**

3         Please produce all DOCUMENTS RELATING TO PLAINTIFF's complaint about the

4   racist effigy drawing at the TESLA FACTORY.

5   **RESPONSE TO REQUEST FOR PRODUCTION NO. 35**

6         Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

7   vague and ambiguous, including, but not limited to, its use of the phrase "PLAINTIFF's

8   complaint about the racist effigy drawing."   Defendant further objects to this request as

9   burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

10   party's claims or defenses or that are not proportional to the needs of this case, especially given

11   that this request seeks the production of all documents "RELATING TO" other documents.

12   Defendant objects to this request to the extent it seeks the production of electronically stored

13   information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

14   oppressive in the context of and in proportion to the claims in this action.  Defendant also objects

15   to this request to the extent that it seeks documents protected by the attorney-client privilege, the

16   attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

17   Defendant objects to this request to the extent it calls for documents that are protected from

18   disclosure by third party privacy rights under the Federal and California constitutions and

19   applicable statutes. Defendant objects to this request to the extent it seeks the production of

20   documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds

21   that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to

22   Defendant.

23         Subject to and without waiving objections, Defendant responds: Subject to and without

24   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

25   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

26   and Defendant reserves its right to supplement its response to this request.

27   **REQUEST FOR PRODUCTION NO. 36**

28         Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU

1   regarding PLAINTIFF's complaint about the racist effigy drawing at the TESLA FACTORY.

2   **RESPONSE TO REQUEST FOR PRODUCTION NO. 36**

3   Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

4   vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted

5   by YOU regarding PLAINTIFF's complaint about the racist effigy drawing."  Defendant further

6   objects to this request as burdensome, oppressive and harassing to the extent that it seeks

7   documents not relevant to any party's claims or defenses or that are not proportional to the needs

8   of this case, especially given that this request seeks the production of all documents "RELATING

9   TO" other documents. Defendant objects to this request to the extent it seeks the production of

10  electronically stored information (including, but not limited to emails, texts and meta-data) as

11  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

12  Defendant also objects to this request to the extent that it seeks documents protected by the

13  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

14  or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

15  that are protected from disclosure by third party privacy rights under the Federal and California

16  constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

17  production of documents that are equally available to Plaintiff.  Defendant objects to this request

18  on the grounds that Plaintiff was not an employee of Defendant and this request is therefore

19  inapplicable to Defendant.

20  Subject to and without waiving objections, Defendant responds: Subject to and without

21  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

22  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

23  and Defendant reserves its right to supplement its response to this request.

24  **REQUEST FOR PRODUCTION NO. 37**

25  Please produce any and all statements from employees who were interviewed regarding

26  PLAINTIFF's complaint about the racist effigy drawing at the TESLA FACTORY.

27  **RESPONSE TO REQUEST FOR PRODUCTION NO. 37**

28  Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

34   Case No. 3:17-cv-06748-WHO

vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaint about the racist effigy drawing." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 38**

Please produce the investigator's notes that were created in response to PLAINTIFF's complaint about the racist effigy drawing at the TESLA FACTORY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to PLAINTIFF's complaint about the racist effigy drawing." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional

to the needs of this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 39**

Please produce any photographs or images that YOU collected when investigating PLAINTIFF's complaint about the racist effigy drawing at the TESLA FACTORY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "photographs or images that YOU collected when investigating PLAINTIFF's complaint about the racist effigy drawing." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the

Case No. 3:17-cv-06748-WHO

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

2   or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

3   that are protected from disclosure by third party privacy rights under the Federal and California

4   constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

5   production of documents that are equally available to Plaintiff.  Defendant objects to this request

6   on the grounds that Plaintiff was not an employee of Defendant and this request is therefore

7   inapplicable to Defendant.

8          Subject to and without waiving its objections, Defendant responds: Despite a diligent

9   search and reasonable inquiry Defendant, cannot comply with this request because no documents

10  in Defendant's possession, custody or control are responsive to this request. Discovery is

11  continuing, and Defendant reserves its right to supplement its response to this request.

12  **REQUEST FOR PRODUCTION NO. 40**

13         Please produce all DOCUMENTS RELATING TO all complaint(s) made by any

14  employee, contractor and/or agent about the use of RACIAL SLURS at the TESLA FACTORY

15  from 2012 to present. (For the purposes of responding to this request for production, the phrase

16  "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or

17  any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass

18  equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and

19  "mayate".)

20  **RESPONSE TO REQUEST FOR PRODUCTION NO. 40**

21         Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

22  vague and ambiguous, including, but not limited to, its use of the phrases "complaint(s) made by

23  any employee, contractor and/or agent about the use of RACIAL SLURS," "'nigger', 'nigga',

24  'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited

25  to, 'negrito', 'negrita', 'mono', and 'mayate'."  Defendant further objects to this request as

26  burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

27  party's claims or defenses or that are not proportional to the needs of this case, especially given

28  that this request seeks the production of all documents "RELATING TO" other documents and

seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 41**

Please produce any and all statements from any PERSON who was interviewed regarding complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof, "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and "mayate".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 41**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrases "complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly

seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 42**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and "mayate".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in

this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 43**

Please produce any photographs, images, or videos that YOU collected in response to complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and "mayate".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 43**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "photographs, images or videos that YOU collected in response to complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of

1   electronically stored information (including, but not limited to emails, texts and meta-data) as

2   burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

3   Defendant also objects to this request to the extent that it seeks documents protected by the

4   attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

5   or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

6   that are protected from disclosure by third party privacy rights under the Federal and California

7   constitutions and applicable statutes.

8   **REQUEST FOR PRODUCTION NO. 44**

9        Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of

10  any complaint(s) made by any employee, contractor and/or agent about the use of RACIAL

11  SLURS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this

12  request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the

13  terms "nigger", "nigga", "ninga", or any variant thereof; "porch monkey"; "monkey"; or

14  "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not

15  limited to, "negrito", "negrita", "mono", and "mayate".)

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 44**

17       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18  vague and ambiguous, including, but not limited to, its use of the phrases "discipline imposed as

19  a result of complaint(s) made by any employee, contractor and/or agent about the use of RACIAL

20  SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish,

21  including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'." Defendant further

22  objects to this request as burdensome, oppressive and harassing to the extent that it seeks

23  documents not relevant to any party's claims or defenses or that are not proportional to the needs

24  of this case, especially given that this request seeks the production of all documents "RELATING

25  TO" other documents and seeks the production of documents unrelated to Plaintiff and during

26  periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence

27  that is not relevant to the claims and defenses in this case. Defendant objects to this request to

28  the extent it seeks the production of electronically stored information (including, but not limited

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1  to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

2  proportion to the claims in this action.  Defendant also objects to this request to the extent that it

3  seeks documents protected by the attorney-client privilege, the attorney work product doctrine

4  and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

5  request to the extent it calls for documents that are protected from disclosure by third party

6  privacy rights under the Federal and California constitutions and applicable statutes.

7  **REQUEST FOR PRODUCTION NO. 45**

8       Please produce all DOCUMENTS RELATING TO all complaint(s) made any employee,

9  contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST

10  HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of

11  responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE

12  SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a

13  swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the

14  "Nazi eagle"; and slogans including "white power" or "fourteen words".)

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 45**

16       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

17  vague and ambiguous, including, but not limited to, its use of the phrases "complaint(s) made

18  any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE

19  SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE

20  SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a

21  swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the

22  'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further

23  objects to this request as burdensome, oppressive and harassing to the extent that it seeks

24  documents not relevant to any party's claims or defenses or that are not proportional to the needs

25  of this case, especially given that this request seeks the production of all documents "RELATING

26  TO" other documents and seeks the production of documents unrelated to Plaintiff and during

27  periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence

28  that is not relevant to the claims and defenses in this case. Defendant objects to this request to

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

1   the extent it seeks the production of electronically stored information (including, but not limited

2   to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

3   proportion to the claims in this action.  Defendant also objects to this request to the extent that it

4   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

5   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

6   request to the extent it calls for documents that are protected from disclosure by third party

7   privacy rights under the Federal and California constitutions and applicable statutes.

8   **REQUEST FOR PRODUCTION NO. 46**

9        Please produce any and all statements from any PERSON who was interviewed regarding

10  complaint(s) made by any employee, contractor and/or agent about SYMBOLS AND SLOGANS

11  OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present.

12  (For the purposes of responding to this request for production, the phrase "SYMBOLS AND

13  SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to,

14  symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the

15  "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 46**

17       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18  vague and ambiguous, including, but not limited to, its use of the term "statements" and the

19  phrases "complaint(s) made any employee, contractor and/or agent about SYMBOLS AND

20  SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS

21  OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such

22  as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or

23  the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further

24  objects to this request as burdensome, oppressive and harassing to the extent that it seeks

25  documents not relevant to any party's claims or defenses or that are not proportional to the needs

26  of this case, especially given that this request seeks the production of documents unrelated to

27  Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly

28  seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant

43                                    Case No. 3:17-cv-06748-WHO

objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 47**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 47**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "the investigator's notes that were created in response to complaint(s) made any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The

request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 48**

Please produce any photographs, videos, or images that YOU collected when investigating complaint(s) made by any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 48**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "photographs, videos or images that YOU collected when investigating complaint(s) made any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.   Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 49**

Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of any complaint(s) made by any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "discipline imposed as a result of complaint(s) made any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'." Defendant further

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 50**

Please produce all DOCUMENTS RELATING TO all complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited

1   to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

2   proportion to the claims in this action.  Defendant also objects to this request to the extent that it

3   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

4   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

5   request to the extent it calls for documents that are protected from disclosure by third party

6   privacy rights under the Federal and California constitutions and applicable statutes.

7   **REQUEST FOR PRODUCTION NO. 51**

8   Please produce any and all statements from any PERSON who was interviewed regarding

9   complaint(s) made by any employee, contractor and/or agent regarding references to slavery or

10  slave labor at the TESLA FACTORY from 2012 to present.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 51**

12  Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

13  vague and ambiguous, including, but not limited to, its use of the term "statements" and the

14  phrase "complaint(s) made any employee, contractor and/or agent regarding references to slavery

15  or slave labor."  Defendant further objects to this request as burdensome, oppressive and

16  harassing to the extent that it seeks documents not relevant to any party's claims or defenses or

17  that are not proportional to the needs of this case, especially given that this request seeks the

18  production of documents unrelated to Plaintiff during periods when Plaintiff did not work at

19  Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and

20  defenses in this case. Defendant objects to this request to the extent it seeks the production of

21  electronically stored information (including, but not limited to emails, texts and meta-data) as

22  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

23  Defendant also objects to this request to the extent that it seeks documents protected by the

24  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

25  or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

26  that are protected from disclosure by third party privacy rights under the Federal and California

27  constitutions and applicable statutes.

28  ///

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

**REQUEST FOR PRODUCTION NO. 52**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent regarding references to slavery or slave labor at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 52**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 53**

Please produce any photographs, videos, or images that YOU collected when investigating complaint(s) made by any employee, contractor and/or agent regarding references to slavery or slave labor at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 53**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "photographs, videos,

Case No. 3:17-cv-06748-WHO

1   or images that YOU collected when investigating complaint(s) made any employee, contractor

2   and/or agent regarding references to slavery or slave labor."  Defendant further objects to this

3   request as burdensome, oppressive and harassing to the extent that it seeks documents not

4   relevant to any party's claims or defenses or that are not proportional to the needs of this case,

5   especially given that this request seeks the production of documents unrelated to Plaintiff and

6   during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too"

7   evidence that is not relevant to the claims and defenses in this case. Defendant objects to this

8   request to the extent it seeks the production of electronically stored information (including, but

9   not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context

10  of and in proportion to the claims in this action.  Defendant also objects to this request to the

11  extent that it seeks documents protected by the attorney-client privilege, the attorney work

12  product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant

13  objects to this request to the extent it calls for documents that are protected from disclosure by

14  third party privacy rights under the Federal and California constitutions and applicable statutes.

15  **REQUEST FOR PRODUCTION NO. 54**

16        Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of

17  any complaint(s) made by any employee, contractor and/or agent regarding references to slavery

18  or slave labor at the TESLA FACTORY from 2012 to present.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 54**

20        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

21  vague and ambiguous, including, but not limited to, its use of the phrase "discipline imposed as

22  a result of any complaint(s) made any employee, contractor and/or agent regarding references to

23  slavery or slave labor."  Defendant further objects to this request as burdensome, oppressive and

24  harassing to the extent that it seeks documents not relevant to any party's claims or defenses or

25  that are not proportional to the needs of this case, especially given that this request seeks the

26  production of all documents "RELATING TO" other documents and seeks the production of

27  documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The

28  request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 55**

Please produce all DOCUMENTS RELATING TO all complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 55**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickanniny'- or 'golliwog'-style depictions of Black individuals."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production

of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 56**

Please produce any and all statements from any PERSON who was interviewed regarding complaint(s) made by any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 56**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrases "complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickanniny'- or 'golliwog'-style depictions of

Black individuals."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 57**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 57**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "the investigator's notes that were created in response to complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or

artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickanniny'- or 'golliwog'-style depictions of Black individuals."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 58**

Please produce any photographs, videos, or images that YOU collected when investigating complaint(s) made by any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 58**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "photographs, videos or images that YOU collected when investigating complaint(s) made any employee, contractor

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickanniny'- or 'golliwog'-style depictions of Black individuals."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 59**

Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of any complaint(s) made by any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 59**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

vague and ambiguous, including, but not limited to, its use of the phrases "discipline imposed as a result of any complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickaninny'- or 'golliwog'-style depictions of Black individuals."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 60**

Please produce all DOCUMENTS RELATING TO all complaint(s) made any employee, contractor and/or agent regarding racial harassment at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 60**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made any employee, contractor and/or agent regarding racial harassment."  Defendant further objects to

this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 61**

Please produce any and all statements from any PERSON who was interviewed regarding complaint(s) made by any employee, contractor and/or agent regarding racial harassment at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 61**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "complaint(s) made any employee, contractor and/or agent regarding racial harassment." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 62**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent regarding racial harassment at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 62**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to complaint(s) made any employee, contractor and/or agent regarding racial harassment." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

///

**REQUEST FOR PRODUCTION NO. 63**

Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of any complaint(s) made by any employee, contractor and/or agent regarding racial harassment at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 63**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "discipline imposed as a result of any complaint(s) made any employee, contractor and/or agent regarding racial harassment." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 64**

Please produce all DOCUMENTS detailing EXTERNAL COMPLAINTS of harassment based on race or color by any employee, contractor and/or agent at the TESLA FACTORY since 2012. (In responding to this request, the term EXTERNAL COMPLAINT encompasses complaints made to a governmental or administrative entity, including, though not limited to, state and federal courts; the EEOC; the DFEH; the DIR; the DLSE; OSHA; and CAL-OSHA.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 64**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS detailing EXTERNAL COMPLAINTS of harassment based on race or color by any employee, contractor and/or agent," and "EXTERNAL COMPLAINT encompasses complaints made to a governmental or administrative entity, including, though not limited to, state and federal courts; the EEOC; the DFEH; the DIR; the DLSE; OSHA; and CAL-OSHA." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "detailing" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request on the grounds that it seeks the production of documents that are equally available to Plaintiff as a matter of public record.

**REQUEST FOR PRODUCTION NO. 65**

Please produce the entire investigation files for any EXTERNAL COMPLAINTS of harassment based on race or color by any employee, contractor and/or agent at the TESLA FACTORY since 2012. (In responding to this request, the term EXTERNAL COMPLAINT encompasses complaints made to a governmental or administrative entity, including, though not limited to, state and federal courts; the EEOC; the DFEH; the DIR; the DLSE; OSHA; and CAL-

1   OSHA.)

2   **RESPONSE TO REQUEST FOR PRODUCTION NO. 65**

3         Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

4   vague and ambiguous, including, but not limited to, its use of the phrases "entire investigation

5   files for any EXTERNAL COMPLAINTS of harassment based on race or color by any employee,

6   contractor and/or agent," and "EXTERNAL COMPLAINT encompasses complaints made to a

7   governmental or administrative entity, including, though not limited to, state and federal courts;

8   the EEOC; the DFEH; the DIR; the DLSE; OSHA; and CAL-OSHA."  Defendant further objects

9   to this request as burdensome, oppressive and harassing to the extent that it seeks documents not

10  relevant to any party's claims or defenses or that are not proportional to the needs of this case,

11  especially given that this request seeks the production of documents unrelated to Plaintiff and

12  during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too"

13  evidence that is not relevant to the claims and defenses in this case. Defendant objects to this

14  request to the extent it seeks the production of electronically stored information (including, but

15  not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context

16  of and in proportion to the claims in this action.  Defendant also objects to this request to the

17  extent that it seeks documents protected by the attorney-client privilege, the attorney work

18  product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant

19  objects to this request to the extent it calls for documents that are protected from disclosure by

20  third party privacy rights under the Federal and California constitutions and applicable statutes.

21  Defendant objects to this request on the grounds that it seeks the production of documents that

22  are equally available to Plaintiff as a matter of public record.

23  **REQUEST FOR PRODUCTION NO. 66**

24        Please produce documents that reflect, evidence, or describe all of YOUR race

25  harassment or discrimination policies in effect at the TESLA FACTORY from 2010 to present.

26  **RESPONSE TO REQUEST FOR PRODUCTION NO. 66**

27        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

28  vague and ambiguous, including, but not limited to, its use of the phrase "race harassment or

discrimination policies in effect at the TESLA FACTORY." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of "documents that reflect, evidence, or describe" other documents and the production of documents during periods when Plaintiff did not work at Tesla. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 67**

Please produce all DOCUMENTS that discuss the procedures YOU instruct YOUR employees to follow when reporting harassment in the workplace at the TESLA FACTORY from 2010 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 67**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS that discuss the procedures YOU instruct YOUR employees to follow when reporting harassment in the workplace at the TESLA FACTORY." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents that "discuss" other documents and seeks the

1   production of documents during periods when Plaintiff did not work at Tesla. Defendant objects

2   to this request to the extent it seeks the production of electronically stored information (including,

3   but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the

4   context of and in proportion to the claims in this action.  Defendant also objects to this request to

5   the extent that it seeks documents protected by the attorney-client privilege, the attorney work

6   product doctrine and/or other privileges, protections, or doctrines of similar effect.

7          Subject to and without waiving objections, Defendant responds: Subject to and without

8   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

9   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

10  and Defendant reserves its right to supplement its response to this request.

11  **REQUEST FOR PRODUCTION NO. 68**

12         Please produce all DOCUMENTS that discuss the policies and procedures that YOUR

13  employees follow when investigating claims of harassment at the TESLA FACTORY from 2012

14  to the present.

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 68**

16         Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

17  vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS that

18  discuss the policies and procedures that YOUR employees follow when investigating claims of

19  harassment at the TESLA FACTORY."  Defendant further objects to this request as burdensome,

20  oppressive and harassing to the extent that it seeks documents not relevant to any party's claims

21  or defenses or that are not proportional to the needs of this case, especially given that this request

22  seeks the production of documents that "discuss" other documents and seeks the production of

23  documents during periods when Plaintiff did not work at Tesla. Defendant objects to this request

24  to the extent it seeks the production of electronically stored information (including, but not

25  limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of

26  and in proportion to the claims in this action.  Defendant also objects to this request to the extent

27  that it seeks documents protected by the attorney-client privilege, the attorney work product

28  doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1  this request to the extent it seeks documents that are private, confidential, business sensitive

2  and/or protected as a trade secret.

3       Subject to and without waiving objections, Defendant responds: Subject to and without

4  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

5  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

6  and Defendant reserves its right to supplement its response to this request.

7  **REQUEST FOR PRODUCTION NO. 69**

8       Please produce all DOCUMENTS that constitute the policies, procedures, checklists or

9  manuals that are used or relied on by YOUR employees when investigating complaints of race

10  harassment or discrimination at the TESLA FACTORY from 2010 to present.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 69**

12       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

13  vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS that

14  constitute the policies, procedures, checklists or manuals that are used or relied on by YOUR

15  employees when investigating complaints of race harassment or discrimination at the TESLA

16  FACTORY." Defendant further objects to this request as burdensome, oppressive and harassing

17  to the extent that it seeks documents not relevant to any party's claims or defenses or that are not

18  proportional to the needs of this case, especially given that this request seeks the production of

19  documents during periods when Plaintiff did not work at Tesla. Defendant objects to this request

20  to the extent it seeks the production of electronically stored information (including, but not

21  limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of

22  and in proportion to the claims in this action. Defendant also objects to this request to the extent

23  that it seeks documents protected by the attorney-client privilege, the attorney work product

24  doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to

25  this request to the extent it seeks documents that are private, confidential, business sensitive

26  and/or protected as a trade secret.

27       Subject to and without waiving objections, Defendant responds: Subject to and without

28  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

Case No. 3:17-cv-06748-WHO

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

FPDOCS 35497578.1

1   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

2   and Defendant reserves its right to supplement its response to this request.

3   **REQUEST FOR PRODUCTION NO. 70**

4       Please produce all pamphlets RELATED TO harassment that YOU have used or

5   distributed to employees, agents or contractors that work at the TESLA FACTORY between

6   2010 and the present.

7   **RESPONSE TO REQUEST FOR PRODUCTION NO. 70**

8       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

9   vague and ambiguous, including, but not limited to, its use of the phrase "pamphlets RELATED

10  TO harassment that YOU have used or distributed to employees, agents or contractors that work

11  at the TESLA FACTORY."  Defendant further objects to this request as burdensome, oppressive

12  and harassing to the extent that it seeks documents not relevant to any party's claims or defenses

13  or that are not proportional to the needs of this case, especially given that this request seeks the

14  production of documents during periods when Plaintiff did not work at Tesla. Defendant objects

15  to this request to the extent it seeks the production of electronically stored information (including,

16  but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the

17  context of and in proportion to the claims in this action.

18      Subject to and without waiving objections, Defendant responds: Subject to and without

19  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

20  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

21  and Defendant reserves its right to supplement its response to this request.

22  **REQUEST FOR PRODUCTION NO. 71**

23      Please produce all policies on harassment that YOU have posted from 2010 to the present

24  in the TESLA FACTORY.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 71**

26      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

27  vague and ambiguous, including, but not limited to, its use of the phrase "policies on harassment

28  that YOU have posted from 2010 to the present in the TESLA FACTORY."  Defendant further

1  objects to this request as burdensome, oppressive and harassing to the extent that it seeks

2  documents not relevant to any party's claims or defenses or that are not proportional to the needs

3  of this case, especially given that this request seeks the production of documents during periods

4  when Plaintiff did not work at Tesla. Defendant objects to this request to the extent it seeks the

5  production of electronically stored information (including, but not limited to emails, texts and

6  meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims

7  in this action.

8        Subject to and without waiving its objections, Defendant responds: Despite a diligent

9  search and reasonable inquiry Defendant, cannot comply with this request because no documents

10  in Defendant's possession, custody or control are responsive to this request. Discovery is

11  continuing, and Defendant reserves its right to supplement its response to this request.

12  **REQUEST FOR PRODUCTION NO. 72**

13        Please produce all DOCUMENTS, materials and videotapes RELATED TO harassment

14  training YOU have conducted or facilitated for employees, agents or contractors at the TESLA

15  FACTORY from 2010 to the present.

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 72**

17        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18  vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS,

19  materials and videotapes RELATED TO harassment training YOU have conducted or facilitated

20  for employees, agents or contractors at the TESLA FACTORY."  Defendant further objects to

21  this request as burdensome, oppressive and harassing to the extent that it seeks documents not

22  relevant to any party's claims or defenses or that are not proportional to the needs of this case,

23  especially given that this request seeks the production of documents during periods when Plaintiff

24  did not work at Tesla. Defendant objects to this request to the extent it seeks the production of

25  electronically stored information (including, but not limited to emails, texts and meta-data) as

26  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

27  Defendant also objects to this request to the extent that it seeks documents protected by the

28  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 73**

Please provide all DOCUMENTS related to any complaints made about Ramon Martinez that involved harassment or discrimination based on race or color.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 73**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS related to any complaints made about Ramon Martinez that involved harassment or discrimination based on race or color."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "related to" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request on the grounds that Ramon Martinez was not an employee of Defendant and this request is therefore inapplicable to Defendant.

///

**REQUEST FOR PRODUCTION NO. 74**

Please produce DOCUMENTS sufficient to describe the business relationship between YOU and Defendant Tesla, Inc. This request includes, though is not limited to, contracts and memoranda of understanding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 74**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sufficient to describe the business relationship between YOU and Defendant Tesla, Inc." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret.

**REQUEST FOR PRODUCTION NO. 75**

Please produce DOCUMENTS sufficient to describe the business relationship between YOU and Defendant Citistaff Solutions, Inc. This request includes, though is not limited to, contracts and memoranda of understanding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 75**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sufficient to describe the business relationship between YOU and Defendant Citistaff Solutions, Inc." Defendant further objects to this request as burdensome, oppressive and harassing to the

extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret.

**REQUEST FOR PRODUCTION NO. 76**

Please produce DOCUMENTS sufficient to describe the business relationship between YOU and Defendant West Valley Engineering, Inc. This request includes, though is not limited to, contracts and memoranda of understanding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 76**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sufficient to describe the business relationship between YOU and Defendant West Valley Engineering, Inc."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   protected as a trade secret.

2   **REQUEST FOR PRODUCTION NO. 77**

3       Please produce all DOCUMENTS, including, but not limited to e-mails, text messages

4   and instant messages sent or received by Wayne Jackson regarding the use of RACIAL SLURS

5   at the TESLA FACTORY. (For the purposes of responding to this request for production, the

6   phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga",

7   "ninga", or any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also

8   encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita",

9   "mono", and "mayate".)

10   **RESPONSE TO REQUEST FOR PRODUCTION NO. 77**

11       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

12   vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS …

13   regarding the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and

14   "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and

15   'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to

16   the extent that it seeks documents not relevant to any party's claims or defenses or that are not

17   proportional to the needs of this case, especially given that this request seeks the production of

18   documents unrelated to Plaintiff. Defendant objects to this request on the grounds that it is

19   overbroad, vague and ambiguous as to time. The request impermissibly seeks "me too" evidence

20   that is not relevant to the claims and defenses in this case. Defendant objects to this request to

21   the extent it seeks the production of electronically stored information (including, but not limited

22   to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

23   proportion to the claims in this action.  Defendant also objects to this request to the extent that it

24   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

25   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

26   request to the extent it calls for documents that are protected from disclosure by third party

27   privacy rights under the Federal and California constitutions and applicable statutes.

28   ///

**REQUEST FOR PRODUCTION NO. 78**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Wayne Jackson regarding PLAINTIFF OWEN DIAZ.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 78**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding PLAINTIFF OWEN DIAZ."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 79**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Nancy Uhlenbrock regarding the use of RACIAL SLURS at the TESLA FACTORY. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof, "porch monkey"; "monkey"; "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita",

"mono", and "mayate".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 79**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 80**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Terri Garrett regarding the use of RACIAL SLURS at the TESLA FACTORY. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and "mayate".)

///

**RESPONSE TO REQUEST FOR PRODUCTION NO. 80**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 81**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Wayne Jackson regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 81**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

1   vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS …

2   regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS,"

3   "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include,

4   but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin

5   lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or

6   'fourteen words'."   Defendant further objects to this request as burdensome, oppressive and

7   harassing to the extent that it seeks documents not relevant to any party's claims or defenses or

8   that are not proportional to the needs of this case, especially given that this request seeks the

9   production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at

10  Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and

11  defenses in this case. Defendant objects to this request to the extent it seeks the production of

12  electronically stored information (including, but not limited to emails, texts and meta-data) as

13  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

14  Defendant also objects to this request to the extent that it seeks documents protected by the

15  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

16  or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

17  that are protected from disclosure by third party privacy rights under the Federal and California

18  constitutions and applicable statutes.

19  **REQUEST FOR PRODUCTION NO. 82**

20          Please produce all DOCUMENTS, including, but not limited to e-mails, text messages

21  and instant messages sent or received by Nancy Uhlenbrock regarding SYMBOLS AND

22  SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012

23  to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS

24  AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not

25  limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning

26  bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen

27  words".)

28  ///

**RESPONSE TO REQUEST FOR PRODUCTION NO. 82**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 83**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Terri Garrett regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 83**

 Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 84**

 Please produce all DOCUMENTS reflecting complaints from other employees at the TESLA FACTORY about Plaintiff Owen Diaz's attitude or demeanor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 84**

 Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaints from other employees at the TESLA FACTORY about Plaintiff Owen Diaz's attitude or demeanor." Defendant further objects to this request as burdensome, oppressive and harassing to the extent

that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents "reflecting" other documents. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 85**

Please produce all DOCUMENTS that support any defense YOU have pleaded or will plead in this action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 85**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS that support any defense YOU have pleaded or will plead in this action."  Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

1    Subject to and without waiving objections, Defendant responds: Subject to and without

2    waiving its objections, Defendant responds: Defendant will produce responsive documents in its

3    possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

4    and Defendant reserves its right to supplement its response to this request.

5    **REQUEST FOR PRODUCTION NO. 86**

6    Please produce all DOCUMENTS sent to YOU by Citistaff Solutions, Inc. regarding

7    PLAINTIFF Owen Diaz.

8    **RESPONSE TO REQUEST FOR PRODUCTION NO. 86**

9    Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

10   vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sent to

11   YOU by Citistaff Solutions, Inc. regarding PLAINTIFF Owen Diaz."  Defendant further objects

12   to this request as burdensome, oppressive and harassing to the extent that it seeks documents not

13   relevant to any party's claims or defenses or that are not proportional to the needs of this case.

14   Defendant objects to this request to the extent it seeks the production of electronically stored

15   information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

16   oppressive in the context of and in proportion to the claims in this action.  Defendant also objects

17   to this request to the extent that it seeks documents protected by the attorney-client privilege, the

18   attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

19   Defendant objects to this request to the extent it calls for documents that are protected from

20   disclosure by third party privacy rights under the Federal and California constitutions and

21   applicable statutes. Defendant objects to this request to the extent it seeks the production of

22   documents that are equally available to Plaintiff.

23   Subject to and without waiving objections, Defendant responds: Subject to and without

24   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

25   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

26   and Defendant reserves its right to supplement its response to this request.

27   **REQUEST FOR PRODUCTION NO. 87**

28   Please produce all DOCUMENTS sufficient to reflect your present financial condition,

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

FPDOCS 35497578.1

including but not limited to, audited financial statements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 87**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sufficient to reflect your present financial condition, including but not limited to, audited financial statements."  Defendant further objects to this request as burdensome, oppressive and harassing on the grounds that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret.

Date:  May 29, 2019                           FISHER & PHILLIPS LLP


                                    By:      _/s/ Juan C. Araneda_____
                                             JUAN C. ARANEDA
                                             Attorneys for Defendant
                                             nextSource, Inc

**VERIFICATION**

I have read the foregoing **DEFENDANT NEXTSOURCE, INC. RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES – SET ONE** and know its contents.

I am Chief Financial Officer of nextSource, Inc., a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on May 23 , 2019, at Nashville, Tennessee.

I declare under penalty of perjury that the foregoing is true and correct.

Kevin McGinn
Chief Financial Officer
nextSource, Inc.

DEFENDANT NEXTSOURCE, INC. RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES – SET ONE

**CERTIFICATE OF SERVICE**

I, the undersigned, am employed in the County of San Francisco, State of California.  I am over the age of 18 and not a party to the within action; am employed with the law offices of Fisher & Phillips LLP and my business address is One Embarcadero Center, Suite 2050, San Francisco, California, 94111.

On May 29, 2019, I served the foregoing document entitled **DEFENDANT NEXTSOURCE, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUEST FOR PRODUCTION OF DOCUMENTS – SET ONE** on the parties listed below as follows:

| | |
|---|---|
| Lawrence A. Organ<br>Navruz Avloni<br>California Civil Rights Law Group<br>332 San Anselmo Avenue<br>San Anselmo, CA  94960-2664 | Attorneys for Plaintiffs<br>DEMETRIC  DIAZ,  OWEN  DIAZ  and<br>LAMAR PATTERSON<br><br>Tel.:    (415) 453-4740<br>Fax:    (415) 785-7352<br>Email: larry@civilrightsca.com<br>          navruz@civilrightsca.com |

☒      **BY ELECTRONIC SERVICE**:  Based on an agreement of the parties to accept service by electronic transmission, I electronically served the above-described document to the parties on the service list above.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed May 29, 2019 at San Francisco, California.

_/s/_
Catherine Schmitz

80

CERTIFICATE OF SERVICE

# CERTIFICATE OF SERVICE

I, the undersigned, am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action; am employed with the law offices of Fisher & Phillips LLP and my business address is One Embarcadero Center, Suite 2050, San Francisco, California 94111-3712.

On May 29, 2019 I served the foregoing document entitled **DEFENDANT NEXTSOURCE, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUEST FOR PRODUCTION OF DOCUMENTS – SET ONE** on the below listed parties in sealed envelope(s) addressed as follows:

| | |
|---|---|
| Tracey A. Kennedy<br>Sheppard Mullin<br>333 South Hope St., 43rd Flr.<br>Los Angeles, CA  90071 | Attorneys for Defendant<br>TESLA, INC.<br><br>tkennedy@sheppardmullin.ocm |
| Gary T. Lafayette<br>Cheryl A. Stevens<br>Lafayette & Kumagai<br>1300 Clay St., Ste. 810<br>Oakland, CA  94612 | Attorneys for Defendant<br>CITISTAFF SOLUTIONS<br><br>glafayette@lkclaw.com<br>cstevens@lkclaaw.com |
| Fenn C. Horton, III<br>Helene Anastasia Simvoulakis<br>Pahl & McKay<br>225 West Santa Clara St., Ste. 1500<br>San Jose, CA  95113 | Attorneys for Defendant<br>WEST VALLEY STAFFING GROUP<br><br>fhorton@pahl-mccay.com<br>hsimvoulakis@pahl-mccay.com |

☒ **[by MAIL]** - I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing this affidavit.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed May 29, 2019 at San Francisco, California.

_____/s/_____
Catherine Schmitz

CERTIFICATE OF SERVICE

FPDOCS 35497578.1

Exhibit

**13**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - -

DEMETRIC DIAZ, OWEN DIAZ, and          )

LAMAR PATTERSON,                       )

          Plaintiffs,              )  CASE NO.

vs.                                    )  3:17-CV-06748-WHO

TESLA, INC. dba TESLA MOTORS,          )

INC.; CITISTAFF SOLUTIONS,             )

INC.; WEST VALLEY STAFFING             )

GROUP; CHARTWELL STAFFING              )

SERVICES, INC.; and DOES 1-50,         )

inclusive,                             )

         Defendants.              )

- - - - - - - - - - - - - - - - - - - -


DEPOSITION OF MICHAEL JOHN WHEELER

WEDNESDAY, JUNE 12, 2019



Reported by:

BY:  MELINDA M. SELLERS, CSR# 10686, RMR, CRC, CRR, CCRR

```
 1    APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFFS:
 3        CALIFORNIA CIVIL RIGHTS LAW GROUP
 4        BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW
 5        332 San Anselmo Avenue
 6        San Anselmo, California 94960-2664
 7        Telephone:  (415) 453-4740
 8        Email:  larry@civilrightsca.com
 9
10    FOR DEFENDANT TESLA, INC.:
11        SHEPPARD MULLIN RICHTER & HAMPTON LLP
12        BY:  PATRICIA M. JENG, ATTORNEY AT LAW
13        Four Embarcadero Center, 17th Floor
14        San Francisco, California 94111-4109
15        Telephone:  (415) 434-9100
16        Email:  pjeng@sheppardmullin.com
17
18    FOR DEFENDANT NEXTSOURCE, INC.:
19        FISHER PHILLIPS LLP
20        BY:  VINCENT J. ADAMS, ATTORNEY AT LAW
21        One Embarcadero Center, Suite 2050
22        San Francisco, California 94111
23        Telephone:  (415) 490-9036
24        Email:  vadams@fisherphillips.com
25
```

```
 1    APPEARANCES OF COUNSEL (CONTINUED):

 2    FOR DEFENDANT CITISTAFF SOLUTIONS, INC.:

 3        LAFAYETTE & KUMAGAI

 4        BY:  SUSAN T. KUMAGAI, ATTORNEY AT LAW

 5        1300 Clay Street, Suite 810

 6        Oakland, California 94612

 7        Telephone:  (415) 357-4600

 8        Email:  skumagai@lkclaw.com

 9

10    ALSO PRESENT:

11        SAJA SPEARMAN, INTERN/VIDEOGRAPHER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MICHAEL JOHN WHEELER
June 12, 2019

```
 1       A.    Mm-hmm.

 2       Q.    Is that right?

 3       A.    Yes.

 4       Q.    And I think we said that was in either the

 5  September/October 2015 time frame that you moved up

 6  to supervisor --

 7       A.    Yes.

 8       Q.    -- is that right?

 9             Okay.  And when you moved up to supervisor,

10  the supervisor position wasn't necessarily an

11  employee or a direct employee of Tesla, right?

12       A.    No.

13       Q.    And tell me what the job duties were of the

14  supervisor position?

15       A.    So I managed the other 22 employees that

16  worked graveyard with me, making sure that they were

17  on time, they were following the protocols, safety,

18  lunch times were monitored, putting together plans

19  and working with Tesla employees to make the

20  recycling process better.  And then, of course,

21  disciplinary.

22       Q.    Okay.  So you would do, like, performance

23  appraisals or things like that?

24       A.    I would do all the way up to termination.

25       Q.    As the supervisor, did you have authority
```

MICHAEL JOHN WHEELER
June 12, 2019

1    to terminate --
2        A.    Yes.
3        Q.    -- people under you?
4        A.    Mm-hmm.  There are a few, yes, employees
5    that I did have to ask to leave.
6        Q.    Okay.  And when you asked people to leave,
7    did Tesla have input on that process?
8        A.    Josue and that circle, upper circle, yes,
9    they could.  For the most part anyone that I asked
10   to leave was a pretty serious offense.
11       Q.    Okay.  But in terms of terminating
12   employees, you would always consult with the -- the
13   managers from Tesla; is that right?
14       A.    No.  I would talk to -- I'd send the emails
15   out to the appropriate channels, but very rarely did
16   they respond.
17       Q.    Okay.
18       A.    A lot of those cases at Tesla are
19   cut-and-dry.  We have people that bring guns to
20   Tesla.  We have people that bring cocaine to Tesla.
21   We have people fornicating at Tesla.  So it's --
22   it's usually an easy fix.
23       Q.    Okay.  In terms of the policies that you
24   were enforcing as the supervisor in the recycling --
25   is it okay if I call it recycling?

1       **A.    Yeah, that's fine.**

2       Q.    Okay.  In terms of the policies that you

3   were enforcing in recycling at the Tesla factory,

4   those policies included the policies that Tesla had;

5   is that correct?

6       **A.    Correct.**

7       Q.    And --

8       **A.    To be specific is OSHA standards.**

9       Q.    Okay.  But Tesla also had some of its own

10  policies relative to conduct in the factory; is that

11  correct?

12      **A.    They did.**

13      Q.    And did you enforce Tesla's policies

14  relative to conduct in the factory?

15      **A.    I tried.**

16      Q.    Okay.

17      **A.    But Tesla does not enforce their own**

18  **policies.**

19      Q.    Okay.  When you say Tesla doesn't enforce

20  its own policies, what do you mean by that?

21      A.    So Josue and anyone above them -- I don't

22  know if we want to jump straight into the deep end

23  of things, but I had associates that were not

24  African-American who, one, took an eight-hour lunch

25  break and received no disciplinary action, even

1    **though everyone was aware of it.**

2            **I had another employee who took a picture**

3    **of an associate who was sleeping during his break.**

4    **That associate came and spoke to me.  I went and**

5    **took -- spoke to the individual who took the**

6    **picture.  He called me the N-word.  I reported it.**

7    **He got a promotion.**

8            **So that would be my meaning.**

9    Q.   You were called the N-word?

10   **A.   Oh, yes.**

11   Q.   On more than one occasion?

12   **A.   This was the -- no.  This was the one that**

13   **stands out the most.**

14   Q.   Who was the person who called you the

15   N-word?

16   **A.   This was Jesus.  I cannot remember his last**

17   **name.**

18          **(Viewing cell phone.)**

19   Q.   You might have it in your phone?

20   **A.   Possibly.**

21   Q.   Okay.

22   **A.   (Viewing cell phone.)**

23          **I do not.**

24   Q.   Okay.  So was Jesus a Chartwell employee or

25   was he an employee of Tesla?

1      A.    He was either Chartwell or Flagship.

2      Q.    Okay.  Tell me about this incident where

3  Jesus called you the N-word.

4      A.    I was -- it was pretty cut-and-dry.  I went

5  to speak with him about what had happened, to let

6  him know that it was inappropriate to take pictures

7  of other associates, but it was also inappropriate

8  to take pictures of associates while they're

9  off-duty.

10          He tried to justify his actions by saying,

11  "Well, he was sleeping.  He's not allowed to sleep."

12          I reminded him that he was not in any

13  position of authority and he needed to delete the

14  picture.

15          And then he turns around, says, you know --

16  I'm sorry.  Anyway, calls me the N-word and walks

17  off.

18          I report that to the Tesla supervisors and

19  also to Ramon Martinez, and that was that.  Nothing

20  happened.

21          Shortly after that, he was given his own

22  position as a supervisor in a different section.  So

23  still working for recycling, but just a little

24  further removed.

25      Q.    Okay.  So if I get this right, can you

1    remember exactly what Jesus said when he called you

2    the N-word?

3         A.    Not verbatim.

4         Q.    What's your best recollection of what Jesus

5    said when he called you the N-word after you told

6    him not to take the pictures?

7         A.    Would have been "F-U" and then the N-word.

8         Q.    So "F-U, N-word," is what he said --

9         A.    Mm-hmm.

10        Q.    Is that correct?

11        A.    Mm-hmm.

12        Q.    The N-word that he used, was it the "e-r"

13   version?

14        A.    It was the "e-r," yes.

15        Q.    Not that either version is okay.

16        A.    I'm glad --

17        Q.    I'm just trying to clarify.

18        A.    -- we're making that distinction.  It's

19   important.

20        Q.    Yeah, okay.

21              So do you remember when this occurred that

22   Jesus called you the N-word?

23        A.    I do not.  I remember where it occurred,

24   but I don't remember when.

25        Q.    Okay.  Let's get to that.

1      **A.    I can't remember what Owen called me.**

2      Q.    Okay.  So you informed Ramon Martinez that

3  you had been called the N-word.  And as far as you

4  know, nothing negative happened to Jesus after that,

5  correct?

6      **A.    As far as I know.**

7      Q.    In fact, what you know is that Jesus

8  received a promotion after that; is that correct?

9      **A.    Very closely after that, yes.**

10     Q.    So after you informed Ramon Martinez that

11  Jesus had called you the N-word, you found out that

12  Jesus received a promotion to supervisor; is that

13  correct?

14     **A.    Correct.**

15     Q.    And Jesus was working in the recycling

16  area; is that correct?

17     **A.    Correct.**

18     Q.    Or on the recycling team --

19     **A.    Yes.**

20     Q.    -- I think is how you refer to it?

21     **A.    Yes.**

22     Q.    Do you know whether Jesus' title was

23  supervisor, or was it lead, or was it -- do you

24  know?

25     **A.    I was told supervisor.  Definitely not**

Bridget Mattos & Associates
(415)747-8710

1  **lead.**

2      Q.   Okay.

3      **A.   Now, did I see it on paper?  I did not.**

4      Q.   Okay.  So your best recollection -- strike

5  that.

6           You were told that Jesus received a

7  promotion to the supervisor level; is that correct?

8      **A.   Told and saw.  So I did see him functioning**

9  **in his new position.**

10     Q.   Okay.  So you also observed Jesus

11  functioning in the position of supervisor; is that

12  right?

13     **A.   Correct.**

14     Q.   And do you know whether Jesus was a

15  employee of Chartwell or of Tesla?

16     **A.   Like I said, I do -- my best memory says he**

17  **was more Flagship.  I don't think he was with**

18  **Chartwell.**

19     Q.   Flagship, okay.  Sorry.

20     **A.   Yes, he was with Flagship.**

21     Q.   Okay.  And then you said you also told

22  Josue from Tesla about being called the N-word by

23  Jesus, correct?

24     **A.   Correct.**

25     Q.   And tell me about your complaint to Josue

 1    about being called the N-word.

 2        **A.   It would have been along the lines of --**

 3    **well, so I would have -- I inquired about what the**

 4    **rule is about taking pictures to see if I was in the**

 5    **wrong of, you know, confronting Jesus.**

 6             **He also confirmed that you are not to take**

 7    **pictures of other employees.  And it's the same**

 8    **thing.  They said they would talk to him.**

 9        Q.   So you talked to Josue.  And any -- who

10    else did you talk to in addition --

11        **A.   Just Ramon and Josue.**

12        Q.   Okay.  And how soon after you complained to

13    Ramon Martinez did you complain to Josue?

14        **A.   It would have been on the same day.  I'm**

15    **not --**

16        Q.   Okay.

17        **A.   -- one to wait.**

18        Q.   Do you remember Josue's last name?

19        **A.   Torres.**

20        Q.   Torres, okay.

21        **A.   T-o-r-r-e-s.**

22        Q.   Okay.  And what was Josue Torres' position?

23        **A.   He would have been environmental**

24    **sustainability supervisor.**

25        Q.   But Josue was an employee of Tesla; is that

1    And for him to sit there and lie to me and do what

2    he did, they just stopped talking to him after that.

3        Q.   Okay.  In terms of Ramon Martinez, did you

4    ever hear him use the N-word towards anyone else?

5        A.   No.  But as he's bilingual, whenever -- and

6    I mean this in the most non-, I don't know,

7    opinionated way.  So if you are not a Spanish

8    speaker or people aren't sure if you are, when you

9    come around and they're talking, they'll switch to

10   their native language so that you can't listen to

11   their conversations.  This happens in Tesla, outside

12   of Tesla.

13       Q.   Did you ever heard the word "negra"?  Ever

14   heard that?

15       A.   Not that I was listening, but no.

16       Q.   "Miyate," ever hear that word from them?

17       A.   I hear that all the time, so I can't tell

18   you from who I hear it from.

19       Q.   Okay.  So after you -- let's go back to the

20   conversation you had with Josue Torres about

21   complaining about Jesus calling you the N-word.

22       A.   Mm-hmm.

23       Q.   Where did that conversation take place?

24       A.   I do not remember.  I remember trying to

25   trek -- track Ramon down because we're always in

1      A.   Yes and no.   So I had a little cart that I

2  drove around, and so I wouldn't be -- I would be

3  moving too fast to really drop into a conversation.

4      Q.   I see.   Okay.

5           But it sounded like you did hear the N-word

6  used at other times in the factory --

7      A.   Yeah.

8      Q.   -- is that correct?

9      A.   During breaks or outside when they're

10 smoking or in passing, coming into the factory.

11     Q.   And do you remember who the people were who

12 you heard using the N-word?

13     A.   Everybody.   Blacks, whites, Mexican.

14     Q.   Okay.   And you said that you didn't think

15 it was used in an aggressive way?

16     A.   Not at all.

17     Q.   So when you were overhearing it, you were

18 hearing it more like, "Hey, how's my N-word," or

19 that kind of thing?

20     A.   Yeah.

21     Q.   And the N-word with an "A"?

22     A.   "A," correct.

23     Q.   Right.

24          However, N-word with an "A" can still be

25 offensive to an African-American, right?

```
 1      A.   Could be, yes.
 2      Q.   Okay.  Certainly the e-r version of the
 3 N-word you heard is always offensive, correct?
 4      A.   Correct.
 5      Q.   And you found it offensive.  And Jesus used
 6 the N-word towards you, right?
 7      A.   Yes.
 8      Q.   And in terms of what Josue said to you
 9 about what he would do about the fact that you had
10 been called the N-word, tell me, again, what did he
11 say he would do?
12      A.   That would have been in an email.
13      Q.   An email?
14      A.   Yeah.
15      Q.   So you complained to Josue in an email?
16      A.   Yes.  If you could -- I don't know if we --
17 if we could get to the phone, if we could get to a
18 supervisor phone -- if you could get into my email,
19 so much more could be taken care of.
20      Q.   I see.
21      A.   But right after I was terminated, they had
22 me turn in my phone.
23      Q.   Okay.  But the email goes through a
24 electronic service, so --
25      A.   Yes.
```

 1   that -- tell me what that might mean, if you know.

 2       A.   I wouldn't say the operators were

 3   recycling.

 4       Q.   Okay.

 5       A.   They literally stayed in the elevator all

 6   day, taking Tesla products and recycling products

 7   upstairs and downstairs --

 8       Q.   Okay.

 9       A.   -- but never did they need to move anything

10   other than off or onto the elevator.  So they did

11   not break down boxes or sort or anything of that

12   caliber.

13       Q.   Okay.  Did you actually supervise Owen Diaz

14   in any way?

15       A.   I was above Owen.  I never needed to do

16   more than ask him, "Hey, can you bring something

17   down?  Can you take this up?"

18       Q.   Okay.  So you had an ability to at least

19   direct Owen's work, but you didn't have

20   responsibility for his -- for -- direct supervision

21   of his work?  Or tell me what your leadership was.

22       A.   So I was technically Owen's superior.

23       Q.   Okay.

24       A.   And if I needed him to do something, that

25   would have been the chain of command.

1    factory.

2        Q.   Okay.

3        **A.**   **For instance, there was an incident where**

4    **the cart I told you about I drove around as a**

5    **supervisor, someone put feces on my seat, which I**

6    **later then sat in because I don't check my seat**

7    **before I sit down because that's the last thing I**

8    **was expecting to be there.**

9        Q.   Okay.  Let me -- let's go incident by

10   incident.

11            So you told Owen about an incident where

12   someone had put some feces in your seat; is that

13   right?

14       **A.**   **I told everyone about that incident.  I**

15   **sent out a very long email to Victor and anyone on**

16   **that thread, asking -- and security as well, asking**

17   **for them to check the cameras because this is**

18   **unacceptable.**

19       Q.   Right.  Do you think that someone put the

20   feces -- strike that.

21            This cart was your cart?

22       **A.**   **This was my cart.**

23       Q.   Okay.  So people would -- people who you

24   worked with would know that it was your cart?

25       **A.**   **Everyone knew it was my cart.**

```
 1      Q.   Okay.  And then you sat in human feces?
 2      A.   Slid right into -- I don't know what type.
 3      Q.   Okay.
 4      A.   I didn't --
 5      Q.   Okay.  You didn't test it?
 6      A.   No.
 7      Q.   Okay.  So you sat on feces that had been
 8  put on your seat; is that right?
 9      A.   Correct.
10      Q.   Then after this happened you sent an email
11  to Victor Quintero, to security, and to others?
12      A.   To everybody.
13      Q.   Okay.
14      A.   The whole management because I was -- I was
15  enrage -- I was so -- like, I was very upset.  I had
16  gone to lunch, came back.
17           And what upset me even more is security
18  said, "We can't see anything.  We can't see where
19  your car was parked," which I know for a fact is a
20  lie because at the front of the Tesla building, the
21  main facility, Elon has his speedsters -- his
22  Roadsters there, the main ones, his first cars.  My
23  car was parked within 10 to 15 feet of those cars at
24  the charging station that's right there.  So --
25      Q.   Is it like a golf cart?  Is that what it --
```

```
 1        A.    It's not a golf cart with a top on it, but
 2   it was a green cart with a grill and then a black
 3   bed for the back.
 4        Q.    That you could carry things around in?
 5        A.    Yes.
 6        Q.    Okay.  After you sent the email to Victor
 7   Quintero, did you ever get any kind of response from
 8   him about the feces in your seat?
 9        A.    Not that I remember.  I remember security
10   said there's nothing -- "We can't see anything."
11              And I'm pretty sure I threw a stink about
12   that.  I don't know for how long after.  Not, like,
13   anything crazy.  I didn't go, "Oh.  Was it you?  Was
14   it you?"  No.
15              But I do remember trying to push more to
16   see what was -- like, what was going on.
17        Q.    And you took pictures of the feces in your
18   cart?
19        A.    I did.
20        Q.    Right.
21        A.    On the Tesla phone.
22        Q.    And you sent copies of the pictures to
23   Victor Quintero?
24        A.    Should be in the email.
25        Q.    Okay.
```

1      A.   I feel like -- I hope I attached that in

2   the email.

3      Q.   Okay.  After this incident with the feces

4   on the seat, did anything -- was there anything else

5   other than that that happened to you, other than

6   that and the N-word incident that you felt was --

7   well, strike that.

8           Do you think that the feces was put on your

9   seat in part because you were African-American?

10      A.   I could assume that, but I can't say for

11   sure.  So I will not say that.  I will say it was an

12   act against me, but it could have been anyone.

13      Q.   What was the timing of that?  Do you

14   remember when that was?

15      A.   Timing --

16      Q.   The feces on the seat.

17      A.   It would have had to have been 2:00 a.m. to

18   3:00, in between there.  Would have been when I

19   would have taken my lunch.

20      Q.   Okay.  In terms of -- this was after you

21   became a supervisor --

22      A.   Yes.

23      Q.   -- right?

24           And you were issued the cart after you

25   became a supervisor; is that right?

1      Q.   Okay.  I'm just gonna -- I'm gonna show you

2   what's been previously marked as --

3      **A.   The pictures --**

4      Q.   -- Exhibit 128.

5           I don't know why I only have two copies.  I

6   apologize, Counsel.  It's Exhibit 128.

7           So Exhibit 128, for the record, is a

8   four-page document Bates-stamped TESLA 20 to 24 --

9   or 23, and it's got some pictures at the end of the

10  email from Mr. Diaz to Ed Ramiro.

11          Did you ever see the email that was --

12  that's on page 22, the third page?

13     **A.   I did not see the emails --**

14     Q.   Okay.

15     **A.   -- involving this incident.  But I did see**

16  **the bale.**

17     Q.   You saw the actual --

18     **A.   I saw the actual bale.**

19     Q.   So you saw the bale of cardboard that's in

20  Exhibit 128 that has the Picaninny and the "Boo"

21  underneath, correct?

22     **A.   Yes.**

23     Q.   And tell me, what were the circumstances in

24  which you happened to see the actual picture, which

25  is -- I guess a close-up of it is the fourth page of

1    Exhibit 128, which is also TESLA 23?

2         **A.    So --**

3         Q.    Why don't you turn to the last page of

4    Exhibit 128.

5         **A.    I remember this like it was yesterday.**

6         Q.    Okay.

7         **A.    But basically I was working in a different**

8    **part of the factory.  And I get a phone call from**

9    **Owen, and he asks me if I could come over to the**

10   **elevator.**

11        Q.    Okay.  Just so we're oriented, his email,

12   Owen's email, is dated January 22 of 2016.  Does

13   that kind of coincide with when you recall Owen

14   calling you up?

15        **A.    As far as -- I mean, he called me to come**

16   **look at this.**

17        Q.    Okay.

18        **A.    As we had spoken before.  So I was his**

19   **supervisor.**

20        Q.    Okay.

21        **A.    He wanted to make sure that another**

22   **supervisor other than Ramon had seen the picture.**

23        Q.    Okay.

24        **A.    Or the drawing.**

25        Q.    Did he know that it was Ramon Martinez who

1    **called Ramon over.  And we were trying to figure**

2    **out --**

3        Q.   Let's stick with -- let's -- I want to get

4    to that.

5        **A.   Okay.**

6        Q.   But let's stick with, so when you first get

7    there, you were laughing about it, but because

8    that's your way of coping with negative things; is

9    that correct?

10       **A.   Correct.**

11       Q.   And so you didn't think it was a laughing

12   matter when you saw this picture, did you?

13       **A.   Not after -- because it was a quick**

14   **chuckle, not a full -- not a lengthy laugh.  But I**

15   **did realize it was a serious situation, so I reeled**

16   **it in pretty quickly.**

17       Q.   And Owen wasn't laughing at all, was he?

18       **A.   He was not.  Didn't even have a smile on**

19   **his face.**

20       Q.   Right.  He considered this to be -- well,

21   strike that.

22            Did he tell you how he viewed this picture

23   of the Picaninny and the "Boo" underneath?

24       **A.   He did.**

25            **And, also, I believe Owen is a little older**

1    **than me, so this would strike him more specifically**

2    **than it would my generation of African-Americans.**

3    **Where they still use, you know, "spook" and things**

4    **of that, you know, nature.**

5    Q.   Did he tell you -- did Owen tell you that

6    he thought the "Boo" was short for jigaboo?

7    **A.   If he did mention it, I wasn't -- I was**

8    **more concerned with who, not what at that point.**

9    Q.   Okay.  Okay.  But the way you perceived it

10   as an African-American male, was you still perceived

11   this as some kind of racial drawing, right?

12   **A.   I perceived it as spook, "Boo" being**

13   **related to spook, not as jigaboo.**

14   Q.   Okay.  And it was still offensive to you as

15   an African-American male, right?

16   **A.   Correct.**

17   Q.   Okay.  So and certainly Owen Diaz expressed

18   to you that he was offended by this drawing, right?

19   **A.   Yes.**

20   Q.   And then -- okay.  What happens next?

21   **A.   So Ramon -- we call Ramon over.  I want to**

22   **say we called Ramon over to figure out what was**

23   **going on.  At this point -- because I don't think**

24   **Ramon drew it --**

25   Q.   Okay.

1    threatened to kill him?

2        Q.   Yeah.

3        A.   Is that the one?

4        Q.   Yeah.

5        A.   Okay.

6        Q.   You were aware of that --

7        A.   I was aware of that situation, yes.

8        Q.   You were also aware that Owen had

9    complained previously that Ramon Martinez had

10   threatened him, correct?

11       A.   I do not recall that.

12       Q.   Okay.  Now, in addition to you, Owen also

13   had other supervisors; is that correct?

14       A.   It would have been Ramon.

15       Q.   Ramon Martinez?

16       A.   And Israel, the swing shift.

17       Q.   Okay.

18       A.   Because I want to say Owen worked from

19   6:00 to 6:00.

20       Q.   Yeah.

21       A.   So he fell on to two different shifts.

22       Q.   Okay.  So because Owen worked 6:00 to 6:00,

23   he had multiple supervisors; is that correct?

24       A.   Correct.

25       Q.   And those supervisors included yourself; is

```
 1        Q.    That you painted --
 2        A.    -- that I painted for the students.
 3        Q.    Okay.  So you told the students that it was
 4    a great place to work, but you really felt it was a
 5    prison?
 6        A.    I told them it's a great place to work for
 7    engineers.
 8        Q.    Okay.
 9        A.    I tell everybody that.
10        Q.    Okay.  And I -- I guess I'll circle back on
11    that.
12              Do you remember anybody who had -- anybody
13    specific who had the swastika tattoos that you were
14    testifying about?
15        A.    I don't know his name.
16        Q.    Okay.
17        A.    I remember being -- it was -- I think I
18    spoke to one of my coworkers.  I was, like, "Man, we
19    have some skinheads here."  Yeah.  But I saw him in
20    passing.  He walked by, and I was looking at his --
21    he has a full head of tattoos, not just -- not just
22    the swastika, but a full head of tattoos.  I was,
23    like, how is that even allowed here.
24        Q.    Tattoos?
25        A.    No.  Just -- well, not tattoos.  Everyone
```

 1   **has tattoos, right?  But just, like, taken aback**

 2   **that that was going unchecked.**

 3       Q.   The tattoos on the head?

 4       **A.   The vulgarity of the tattoos on the head.**

 5       Q.   Did you ever complain about that to

 6   anybody?

 7       **A.   At this point, no, because I was well aware**

 8   **of the situation I was in.**

 9       Q.   Did you complain about the tattoos to

10   anybody else ever?

11       **A.   Not -- just conversation.  Just**

12   **conversation.**

13       Q.   Okay.

14       **A.   Not, like, "Oh, I can't believe this is**

15   **happening," no.**

16       Q.   Do you remember who you had conversations

17   about the head tattoos with, or any tattoos?

18       **A.   No.**

19       Q.   Okay.  Was it someone in HR?

20       **A.   No, not at all.**

21       Q.   And then you also mentioned, as part of

22   your description of Tesla as a prison, that they

23   wore pants around the ankles.

24       **A.   Yes.**

25       Q.   Would that be a problem if someone was

```
 1   STATE OF CALIFORNIA      )

 2                            )     ss

 3   COUNTY OF CALAVERAS      )

 4            I hereby certify that the witness in the

 5   foregoing deposition of MICHAEL JOHN WHEELER was by

 6   me duly sworn to testify to the truth, the whole

 7   truth, and nothing but the truth in the

 8   within-entitled cause; that said deposition was taken

 9   at the time and place herein named; that the

10   deposition is a true record of the witness's

11   testimony as reported by me, a duly certified

12   shorthand reporter and a disinterested person, and

13   was thereafter transcribed into typewriting by

14   computer.

15            I further certify that I am not interested

16   in the outcome of the said action, nor connected

17   with, nor related to any of the parties in said

18   action, nor to their respective counsel.

19            IN WITNESS WHEREOF, I have hereunto set my

20   hand this 24th day of June, 2019.

21

22

23            _____

24            MELINDA M. SELLERS, CSR NO. 10686

25            STATE OF CALIFORNIA
```

# Exhibit

# 14

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
TRACEY A. KENNEDY, Cal. Bar No. 150782
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:    213-620-1780
Facsimile:    213-620-1398
Email:          tkennedy@sheppardmullin.com

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
PATRICIA M. JENG, Cal. Bar No. 272262
REANNE SWAFFORD-HARRIS, Cal. Bar No. 305558
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947
Email:          pjeng@sheppardmullin.com
                    rswafford-harris@sheppardmullin.com

Attorneys for Defendant,
TESLA, INC. DBA TESLA MOTORS, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ AND LAMAR PATTERSON<br><br>                    Plaintiffs,<br><br>          v.<br><br>TESLA, INC. DBA TESLA MOTORS, INC., CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; NEXTSOURCE, INC.; and DOES 1-10, inclusive<br><br>                    Defendants. | Case No. 17-cv-06748-WHO<br><br>**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES, SET THREE**<br><br><br><br><br><br>Amended Complaint Filed:  December 26, 2018<br>Trial Date:                        November 18, 2019 |

SMRH:4850-8836-2648.1

PROPOUNDING PARTY:          Plaintiff OWEN DIAZ

RESPONDING PARTY:          Defendant TESLA, INC. DBA TESLA MOTORS, INC.

SET NO.:          THREE

**PRELIMINARY STATEMENT**

Pursuant to Federal Rule of Civil Procedure 33, Defendant Tesla, Inc. dba Tesla Motors, Inc. ("Defendant") hereby responds to Plaintiff Owen Diaz's ("Plaintiff") Interrogatories, Set Three.

The following responses and objections have been prepared prior to the completion of Defendant's investigation, discovery, and preparation for trial in this action. The responses and objections are based only on information, facts, and documents currently available and known to Defendant. Defendant reserves its right to make changes to the responses and objections if it appears that omissions or errors have been made in them, or that further and more accurate information, facts, and/or documents are available, but Defendant is under no obligation to do so. Defendant also reserves its right to rely upon and/or introduce into evidence at trial or any pre-trial proceeding any additional information, facts, and/or documents.

Defendant's responses and objections are for the purpose of discovery only, and are not an admission or acceptance that any response, fact, or document is relevant and/or admissible into evidence. Defendant reserves its right to object to the admissibility of any response, fact, or document at the time of trial or any pre-trial proceeding.

Defendant provides the following responses subject to, and without waiving the foregoing Preliminary Statement, which is incorporated by reference into each response below.

**GENERAL OBJECTIONS**

1.      Defendant reserves the right to object on any ground at any time to such other or supplemental Interrogatories, or any other discovery, as Plaintiff may at any time propound involving the subject matter of the Interrogatories.

2.      Defendant objects to the Interrogatories on the grounds and to the extent they seek information outside the possession, custody, or control of Defendant and that is not within Defendant's personal knowledge.

3.      Defendant objects to the Interrogatories because they are overbroad and unduly burdensome, and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Defendant objects to the Interrogatories on the grounds and to the extent they call for information which is protected by the by the attorney-client privilege, that was prepared in anticipation of litigation for trial or is covered by the work product doctrine, or which constitutes information which is privileged or related to confidential trade secrets or the right or privilege of privacy (including the freedom of association and financial privacy, the right of privacy held by non-party individuals with respect to their employment records).

Each of these general objections is incorporated by reference into each set of specific responses to each Interrogatory set forth below.  The fact that any of these general objections is set forth again specifically in response to any of the Interrogatories shall not be construed as a waiver of any of the other general objections set forth herein.

## RESPONSE TO INTERROGATORIES

**INTERROGATORY NO. 14:**

Please provide the last, best-known contact information of Judy Timbreza.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "best-known."  Defendant objects that this interrogatory is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing. Defendant further objects to the extent this interrogatory is invasive of the privacy rights and confidentiality of third-party non-litigants.  Defendant further objects to the extent this interrogatory seeks information that is not relevant to the claims or defenses and/or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

1    Subject to and without waiving any objections, Defendant responds as follows:  Judy

2  Timbreza was never a Tesla employee.  The last known contact information that Tesla has for

3  Judy Timbreza is judyannafuan18@gmail.com.

4  **INTERROGATORY NO. 15:**

5    Please DESCRIBE in comprehensive detail each position Judy Timbreza has held during

6  his employment at the TESLA FACTORY from 2014 to present. (For the purposes of responding

7  to this interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job

8  duties, hours worked, and dates the position was held.)

9  **RESPONSE TO INTERROGATORY NO. 15:**

10    Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

11  the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

12  FACTORY."  Defendant further objects to the extent this interrogatory is invasive of the privacy

13  rights and confidentiality of third-party non-litigants.  Defendant further objects to the extent this

14  interrogatory seeks information that is not relevant to the claims or defenses and/or proportional to

15  the needs of the case, considering the importance of the issues at stake in the action, the amount in

16  controversy, the parties' relative access to relevant information, the parties' resources, the

17  importance of the discovery in resolving the issues, and whether the burden or expense of the

18  proposed discovery outweighs its likely benefit.  Defendant objects that this interrogatory lacks

19  foundation, and assumes facts not in evidence, particularly, that Judy Timbreza had an assigned

20  schedule of "hours worked," and/or recorded the same.  Defendant further objects to the extent

21  this interrogatory necessitates the preparation or the making of a compilation, abstract, audit, or

22  summary.

23    Subject to and without waiving any objections, Defendant responds as follows:  Judy

24  Timbreza was never a Tesla employee.

25  **INTERROGATORY NO. 16:**

26    Please DESCRIBE in comprehensive detail each position Edward Romero has held during

27  his employment at the TESLA FACTORY from 2014 to present. (For the purposes of responding

28

-4-

1  to this interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job

2  duties, hours worked, and dates the position was held.)

3  **RESPONSE TO INTERROGATORY NO. 16:**

4      Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

5  the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

6  FACTORY."  Defendant further objects to the extent this interrogatory is invasive of the privacy

7  rights and confidentiality of third-party non-litigants and/or current or former employees of

8  Defendant.  Defendant further objects to the extent this interrogatory seeks information that is not

9  relevant to the claims or defenses and/or proportional to the needs of the case, considering the

10  importance of the issues at stake in the action, the amount in controversy, the parties' relative

11  access to relevant information, the parties' resources, the importance of the discovery in resolving

12  the issues, and whether the burden or expense of the proposed discovery outweighs its likely

13  benefit.  Defendant objects that this interrogatory lacks foundation, and assumes facts not in

14  evidence, particularly, that Edward Romero had an assigned schedule of "hours worked," and/or

15  recorded the same.  Defendant further objects to the extent this interrogatory necessitates the

16  preparation or the making of a compilation, abstract, audit, or summary.

17      Subject to and without waiving any objections, Defendant responds as follows:  Edward

18  Romero's position was Janitorial Supervisor, Production Facilities from on or about October 12,

19  2015 through on or about August 4, 2017.

20  **INTERROGATORY NO. 17:**

21      Please DESCRIBE in comprehensive detail each position Victor Quintero has held during

22  his employment at the TESLA FACTORY from 2014 to present. (For the purposes of responding

23  to this interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job

24  duties, hours worked, and dates the position was held.)

25  **RESPONSE TO INTERROGATORY NO. 17:**

26      Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

27  the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

28  FACTORY."  Defendant further objects to the extent this interrogatory is invasive of the privacy

1   rights and confidentiality of third-party non-litigants and/or current or former employees of

2   Defendant.  Defendant further objects to the extent this interrogatory seeks information that is not

3   relevant to the claims or defenses and/or proportional to the needs of the case, considering the

4   importance of the issues at stake in the action, the amount in controversy, the parties' relative

5   access to relevant information, the parties' resources, the importance of the discovery in resolving

6   the issues, and whether the burden or expense of the proposed discovery outweighs its likely

7   benefit.  Defendant objects that this interrogatory lacks foundation, and assumes facts not in

8   evidence, particularly, that Victor Quintero had an assigned schedule of "hours worked," and/or

9   recorded the same.  Defendant further objects to the extent this interrogatory necessitates the

10  preparation or the making of a compilation, abstract, audit, or summary.

11        Subject to and without waiving any objections, Defendant responds as follows:  Victor

12  Quintero's position is Manager, Recycling Services from May 12, 2015 through the date of this

13  response.

14  **INTERROGATORY NO. 18:**

15        Please DESCRIBE in comprehensive detail each position Ramon Martinez held during his

16  employment at the TESLA FACTORY. (For the purposes of responding to this interrogatory, the

17  term "DESCRIBE" means to list, for each position, the job title, job duties, hours worked, and

18  dates the position was held.)

19  **RESPONSE TO INTERROGATORY NO. 18:**

20        Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

21  the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

22  FACTORY."  Defendant further objects that this interrogatory is not limited in time or scope, and

23  thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects to the

24  extent this interrogatory is invasive of the privacy rights and confidentiality of third-party non-

25  litigants and/or current or former employees of Defendant.  Defendant further objects to the extent

26  this interrogatory seeks information that is not relevant to the claims or defenses and/or

27  proportional to the needs of the case, considering the importance of the issues at stake in the

28  action, the amount in controversy, the parties' relative access to relevant information, the parties'

-6-

1    resources, the importance of the discovery in resolving the issues, and whether the burden or

2    expense of the proposed discovery outweighs its likely benefit. Defendant objects that this

3    interrogatory lacks foundation, and assumes facts not in evidence, particularly, that Ramon

4    Martinez had an assigned schedule of "hours worked," and/or recorded the same. Defendant

5    further objects to the extent this interrogatory necessitates the preparation or the making of a

6    compilation, abstract, audit, or summary.

7        Subject to and without waiving any objections, Defendant responds as follows:  Ramon

8    Martinez was not employed by Tesla during the time that plaintiff Owen Diaz or Plaintiff

9    Demetric Di-az worked at Tesla.  Ramon Martinez's position from January 14, 2019 to the date of

10   this response is Lead Material Handler.

11   **INTERROGATORY NO. 19:**

12       Please DESCRIBE in comprehensive detail each position Joyce DelaGrande has held

13   during her employment at the TESLA FACTORY. (For the purposes of responding to this

14   interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job duties,

15   hours worked, and dates the position was held.)

16   **RESPONSE TO INTERROGATORY NO. 19:**

17       Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

18   the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

19   FACTORY." Defendant further objects that this interrogatory is not limited in time or scope, and

20   thus is overbroad, unduly burdensome, oppressive, and harassing. Defendant further objects to the

21   extent this interrogatory is invasive of the privacy rights and confidentiality of third-party non-

22   litigants and/or current or former employees of Defendant. Defendant further objects to the extent

23   this interrogatory seeks information that is not relevant to the claims or defenses and/or

24   proportional to the needs of the case, considering the importance of the issues at stake in the

25   action, the amount in controversy, the parties' relative access to relevant information, the parties'

26   resources, the importance of the discovery in resolving the issues, and whether the burden or

27   expense of the proposed discovery outweighs its likely benefit. Defendant objects that this

28   interrogatory lacks foundation, and assumes facts not in evidence, particularly, that Joyce

1   DelaGrande had an assigned schedule of "hours worked," and/or recorded the same.  Defendant

2   further objects to the extent this interrogatory necessitates the preparation or the making of a

3   compilation, abstract, audit, or summary.

4        Subject to and without waiving any objections, Defendant responds as follows:  Joyce

5   Delagrande's position from August 20, 2012 to November 30, 2012 was Production Associate; her

6   position from December 1, 2012 to June 31, 2013 was Supervisor Manufacturing; her position

7   from July 1, 2013 to October 30, 2015 was Associate Manager Supply Chain; her position from

8   October 31, 2015 to July 8, 2017 was Supervisor Supply Chain; and her position from July 9,

9   2017 to present is Associate Manager Supply Chain.

10  **INTERROGATORY NO. 20:**

11       If Ramon Martinez is no longer working at TESLA, please list all the reasons for his

12  separation.

13  **RESPONSE TO INTERROGATORY NO. 20:**

14       Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

15  the term(s) and/or phrase(s): "working," and "separation."  Defendant further objects to the extent

16  this interrogatory is invasive of the privacy rights and confidentiality of third-party non-litigants

17  and/or current or former employees of Defendant.  Defendant further objects to the extent this

18  interrogatory seeks information that is not relevant to the claims or defenses and/or proportional to

19  the needs of the case, considering the importance of the issues at stake in the action, the amount in

20  controversy, the parties' relative access to relevant information, the parties' resources, the

21  importance of the discovery in resolving the issues, and whether the burden or expense of the

22  proposed discovery outweighs its likely benefit.  Defendant objects to the extent this interrogatory

23  lacks foundation, and assumes facts not in evidence.  Defendant further objects to the extent this

24  interrogatory necessitates the preparation or the making of a compilation, abstract, audit, or

25  summary.

26  ///

27  ///

28  ///

-8-        Case No. 17-cv-06748-WHO

DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGATORIES, SET THREE

1          Subject to and without waiving any objections, Defendant responds as follows:  Not

2    applicable.

3

4    Dated:  May 24, 2019                  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

5

6                      By:  _____

7                                  TRACEY A. KENNEDY
                                   PATRICIA M. JENG

8                                  REANNE SWAFFORD-HARRIS

9                              Attorneys for Defendant
                       TESLA, INC. dba TESLA MOTORS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:4850 8836
2648.1         DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGATORIES, SET THREE

<u>**VERIFICATION**</u>

I, Nicole White, declare as follows:

I am HR Program Manager for Defendant TESLA, INC. DBA

TESLA MOTORS, INC.  In that capacity, I am authorized to make this verification on behalf of

Defendant.  I have reviewed and know the contents of the foregoing document entitled:

**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF**

**OWEN DIAZ'S INTERROGATORIES, SET THREE**

I am informed and believe the matters stated therein are true and on that ground declare

under penalty of perjury under the laws of the state of California that the same are true and correct.


DATED: June 25TH, 2019          _____

                                                           [Name]


1

**CERTIFICATE OF SERVICE**

*Demetric Di-Az, et al. v. Tesla, Inc., et al.*
USDC, Northern District of California, Case No. 3:17-cv-06748-WHO

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On May 24, 2019, I served true copies of the following document(s) described as:

**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES, SET THREE**

on the interested parties in this action as follows:

**SEE SERVICE LIST**

☒   **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the firm's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.

☐   **BY FAX TRANSMISSION:** I faxed a copy of the document(s) to the persons at the fax numbers listed in the Service List.  The telephone number of the sending facsimile machine was 415.434.3947.  The transmission was reported as complete and without error.  No error was reported by the fax machine that I used.  A transmission report was properly issued by the sending fax machine.

☐   **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address eruiz@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐   **BY OVERNIGHT DELIVERY:** I enclosed said document(s) in an envelope or package provided by the overnight service carrier and addressed to the persons at the addresses listed in the Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight service carrier or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents.

☐   **BY PERSONAL SERVICE:** I personally delivered the document(s) to the person at the addresses listed in the Service List. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.  (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

-1-

Case No. 3:17-cv-06748-WHO
CERTIFICATE OF SERVICE

SMRH:4850-8836-2648.1

1

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

2

3

Executed on May 24, 2019, at San Francisco, California.

4

5

6

_____

Elena E. Ruiz

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SERVICE LIST

| | |
|---|---|
| Lawrence A. Organ, Esq.<br>Navruz Avloni, Esq.<br>**CALIFORNIA CIVIL RIGHTS LAW GROUP**<br>332 San Anselmo Avenue<br>San Anselmo, CA 94960<br>Telephone:    415-453-4740<br>Facsimile:    415-785-7352]<br>Email:    larry@civiilrightsca.com<br>    navruz@civilrightsca.com | Attorneys for Plaintiffs<br>DEMETRIC DI-AZ and OWEN DIAZ |
| Gary T. Lafayette, Esq.<br>Cheryl A. Stevens, Esq.<br>**LAFAYETTE & KUMAGAI**<br>1300 Clay Street, Suite 810<br>Oakland, CA 94612<br>Telephone:    415-357-4600<br>Email:    glafayette@lkclaw.com<br>    cstevens@lkclaw.com | Attorneys for Defendant<br>CITISTAFF SOLUTIONS, INC. |
| Jason A. Geller, Esq.<br>Juan C. Araneda, Esq.<br>Aaron D. Langberg, Esq.<br>**FISHER & PHILLIPS LLP**<br>One Embarcadero Center, Suite 2050<br>San Francisco, CA 94111<br>Telephone:    415-490-9000<br>Facsimile:    415-490-9001<br>Email:    jgeller@fisherphillips.com<br>    jaraneda@fisherphillips.com<br>    alangberg@fisherphillips.com | Attorneys for Defendant<br>NEXTSOURCE, INC. |
| Fenn C. Horton III, Esq.<br>Helene Simvoulakis-Panos, Esq.<br>**PAHL & McCAY**<br>225 West Santa Clara Street, Suite 1500<br>San Jose, CA 95113<br>Telephone:    408-286-5110<br>Facsimile:    408-286-5722<br>Email:    fhorton@pahl-mccay.com<br>    hsimvoulakis@pahl-mccay.com | Attorneys for Defendant<br>WEST VALLEY STAFFING GROUP |

Case No. 3:17-cv-06748-WHO
CERTIFICATE OF SERVICE

Exhibit

**15**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


DEMETRIC DI-AZ, OWEN DIAZ,          )
and LAMAR PATTERSON,               )
                                   )
          Plaintiffs,              )
                                   )
vs.                                ) No. 3:17-cv-06748-WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.;   )
WEST VALLEY STAFFING GROUP;        )
CHARTWELL STAFFING SERVICES,       )
INC.; and DOES 1-50, inclusive,    )
                                   )
          Defendants.              )
                                   )



DEPOSITION OF TITUS McCALEB

San Jose, California

Tuesday, June 18, 2019







Reported by:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Job No. 38360

TITUS MCCALEB

June 18, 2019

```
 1    APPEARANCES:

 2

 3       On Behalf of Plaintiffs:

 4            CALIFORNIA CIVIL RIGHTS LAW GROUP
              BY:  NAVRUS AVLONI, ESQ.
 5            332 San Anselmo Avenue
              San Anselmo, California  94960
 6            415.453.4740
              navruz@civilrightsca.com
 7

 8
         On Behalf of Defendant West Valley Staffing Group:
 9
              PAHL & McCAY
10            BY:  FENN C. HORTON III, ESQ.
              225 West Santa Clara Street
11            Suite 1500
              San Jose, California  95113
12            408.286.5100
              fhorton@pahl-mccay.com
13

14
         On Behalf of Defendant Tesla, Inc.:
15
              SHEPPARD MULLIN RICHTER & HAMPTON LLP
16            BY:  PATRICIA M. JENG, ESQ.
              Four Embarcadero Center
17            17th Floor
              San Francisco, California  94111
18            415.434.9100
              pjeng@sheppardmullin.com
19

20
         On Behalf of Defendant nextSource, Inc.:
21
              FISHER & PHILLIPS, LLP
22            BY:  JUAN CARLOS ARANEDA, ESQ.
              One Embarcadero Center
23            Suite 2050
              San Francisco, California  94111
24            415.490.9000
              jarandeda@fisherphillips.com
25
```

TITUS MCCALEB

June 18, 2019

```
 1    APPEARANCES:

 2

 3        On Behalf of Defendant CitiStaff Solutions, Inc.:

 4            LAFAYETTE & KUMAGAI LLP
             BY:  SUSAN T. KUMAGAI, ESQ.
 5            1300 Clay Street
             Suite 810
 6            Oakland, California  94612
             415.357.4600
 7            skumagai@lkclaw.com

 8

 9        Also Present:

10            TERESA KASSAYAIN, West Valley Staffing Group

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

June 18, 2019

1    the B last name is.

2        Q.    Burris?

3        A.    Burris.   Thank you.

4        Q.    So you contacted those two people first?

5        A.    Yes.

6        Q.    Why did you contact Anton Baruh?

7        A.    To inform him of the discrimination.

8        Q.    What was it about Anton Baruh's position,

9    as you understood it, that you thought it would be

10   appropriate to email your timeline to him?

11       A.    They were in-house human resources for West

12   Valley contractors to communicate with at the time, so I

13   thought that that was the appropriate channels.

14       Q.    And the same for Lewis Burris?

15       A.    I thought they were part of the same team and

16   that's what I was instructed.

17       Q.    By whom?

18       A.    Themselves.

19       Q.    Did you have a supervisor while you worked for

20   West Valley Staffing Group when you were assigned at

21   Tesla?

22       A.    No.

23       Q.    What was your job at Tesla?

24       A.    I was a production associate, and I also

25   worked as part of the quality and manufacturing and

TITUS MCCALEB

June 18, 2019

 1    training team.  I worked as a media specialist and I

 2    was a quality inspector.

 3        Q.    Who was your supervisor for those positions?

 4        A.    As the production associate, as mentioned,

 5    Josh Vasquez, and Ron, with an L.

 6        Q.    We'll get the spelling for Ron.

 7        A.    Thanks.

 8        Q.    I know who you're talking about.

 9              So what did Ron L. supervise you for?

10        A.    Well, he took over for Josh.  He was the

11    powertrain, PWT's floor supervisor.

12        Q.    And Josh Vasquez had been the powertrain --

13        A.    Yeah, for a while.

14        Q.    -- supervisor?

15        A.    Yes.

16        Q.    Okay.  Did you have any other supervisors at

17    Tesla besides those two gentlemen?

18        A.    Oh, yeah.

19        Q.    Who?

20        A.    Maria, she was the supervisor for the

21    manufacturing and training department; Elon, because he

22    was part of the media specialist, he took the lead on

23    most of that stuff.

24        Q.    Elon who?

25        A.    As in Elon Musk.

TITUS MCCALEB

```
1    Disclosures Pursuant to General Order No. 71.
2              (Exhibit 2 marked for identification.)
3    BY MR. HORTON:
4        Q.    Have you seen Exhibit 2 before?
5        A.    No.
6        Q.    All right.  I'm going to point you to a
7    particular section of Exhibit 2.  I'd like you to turn
8    to page 8 of Exhibit 2, and I'd like you to look at
9    about the middle of the page where it says, "Titus
10   McCaleb."
11             Do you see that?
12       A.    I do see that.
13       Q.    Okay.  I'll just read it.  It says,
14   "Titus McCaleb," and then to the right of that it
15   says, "Mr. McCaleb may be contacted through Plaintiffs'
16   counsel," and then the next column reads:
17             "Mr. McCaleb has knowledge of the
18             racially harassing, discriminatory,
19             and retaliatory treatment of Defendant
20             West Valley's employees at Tesla's
21             Fremont factory."
22             Do you see that?
23       A.    Yes, I do.
24       Q.    Okay.  Is that statement that I just read
25   correct?
```

 1      A.    It's accurate, yes.

 2      Q.    What do you know about this particular subject

 3   matter?

 4            MS. AVLONI:  Objection.  Compound.  Vague and

 5   ambiguous.  Calls for a narrative.

 6            THE WITNESS:  That there were multiple

 7   racial -- highly racially charged words and slurs,

 8   things posted, etched into places, discriminatory

 9   things.  I've witnessed them, been part of them, been

10   treated with such, and also experienced the retaliation

11   for things that I spoke on.

12   BY MR. HORTON:

13      Q.    Anything else?

14            MS. AVLONI:  Vague and ambiguous.  Calls for a

15   narrative.

16            THE WITNESS:  Nothing else.  I don't...

17   BY MR. HORTON:

18      Q.    All right.  What words are you referring to?

19      A.    Are you asking me -- can you rephrase that?

20   I don't understand.

21      Q.    Well, I'd like you to give me more details

22   about the list that you just gave to us.  The first item

23   on your list was "racially charged words."

24      A.    Okay.  So --

25      Q.    Okay?  So what racially charged words did you

1   hear while working at Tesla?

2       A.    The N-word with g-g-e-r, which I guess I have

3   to say for the record it's "nigger" and I've heard the

4   N-word with the g-g-a, which is "nigga," and other terms

5   used for other ethnicities that -- yeah, I guess I have

6   to say them now because we're all here.

7       Q.    Yeah, you have to say them.

8       A.    People called spic, wetback.

9       Q.    I'm sorry.  What was that?

10      A.    Spic, wetback, gook, yellow-tailed assholes,

11  faggots, and those fucking queers.

12            My apologies.

13      Q.    Do you recall hearing any other similar types

14  of epithets at Tesla?

15      A.    I'm sorry.  Can you rephrase that.

16            And I may need to take a moment after this.

17      Q.    Okay.  Do you recall hearing any other similar

18  types of epithets while you were working at Tesla?

19      A.    Yeah, I'm a little upset.  I may need a

20  minute.

21            MS. AVLONI:  Can we take a break?

22  BY MR. HORTON:

23      Q.    Well, we might as well get the list out and

24  then you can take a break.  What other words do you

25  recall?

TITUS MCCALEB

June 18, 2019

1    Q.    Can you recall any other words?

2    **A.    No.**

3    Q.    Okay.  Who said the words that you listed?

4    **A.    A few of my production associates on lines**

5    **that I participated on, as well as seeing them scribbled**

6    **into stalls and on top of fliers.**

7    Q.    I'm just interested right now in the words

8    that you heard spoken.  Okay?

9    **A.    Okay.**

10   Q.    Who did you hear speak the words that you just

11   listed that you considered to be racially charged?

12   **A.    Production associates, other people on lines,**

13   **in the cafeterias, and throughout the warehouse, as well**

14   **as a lead.**

15   Q.    Anyone else?

16   **A.    Off the top of my head that's all I can**

17   **recall.**

18   Q.    Did you hear anyone you would characterize as

19   a supervisor saying any of these words while you worked

20   at Tesla?

21        MS. AVLONI:  Calls for a legal conclusion.

22   It's vague and ambiguous as to "a supervisor."

23        **THE WITNESS:  One more time with the question.**

24        MR. HORTON:  Would you read back the question,

25   please.

TITUS MCCALEB

1    Q.    Did anybody working for Tesla ever call you a

2  yellow-tailed asshole?

3    A.    No.

4    Q.    Did anybody working for Tesla call you a

5  faggot?

6    A.    No.

7    Q.    Did anybody working for Tesla call you one of

8  those fucking queers?

9    A.    No.

10    Q.    Did anybody working for West Valley say any of

11  those things to you, to call you one of those things?

12        MS. AVLONI:  Objection to the extent it calls

13  for speculation as to the relationship between the

14  individual and the entity.

15        You can answer.

16        THE WITNESS:  No.

17  BY MR. HORTON:

18    Q.    What were the circumstances of you hearing the

19  word n-i-g-g-e-r at Tesla?

20    A.    What were the circumstances --

21    Q.    Yes.

22    A.    -- for me hearing this?

23    Q.    Right.

24    A.    Explaining to a person in charge that I was

25  being called -- I'm going to refer to the word "nigger,"

June 18, 2019

 1   with "g-g-e-r" from here out and the word "nigga" with

 2   "g-g-a" from here out.

 3              When I mentioned anything or when I was

 4   referred to with the word g-g-e-r, it was due to

 5   speaking to someone who was supposed to be in charge

 6   about someone talking to me using the term or the

 7   word g-g-a.

 8       Q.   So when you were complaining about it or

 9   reporting it?

10       A.   Reporting it.  I was not complaining.

11       Q.   You weren't?

12       A.   I'm reporting the fact that I don't appreciate

13   it.

14       Q.   Okay.  Who actually said the word n-i-g-g-e-r

15   to you?

16       A.   Carlos, a Marcella -- do you need time?

17            MS. AVLONI:  I'm sorry, can you read back the

18   question.

19            (Record read as follows:

20            "Q.  Who actually said the word n-i-g-g-e-r

21            to you?")

22            THE WITNESS:  Oh, g-g-e-r.  I thought you

23   said -- so, yes.

24   BY MR. HORTON:

25       Q.   Let me restate the question.

TITUS MCCALEB

June 18, 2019

```
 1      A.    Yes, I've heard it spoken.

 2      Q.    And it was spoken as "Nguyen"?

 3      A.    Yes.

 4      Q.    Okay.  So Khoi Nguyen called you an

 5  n-i-g-g-e-r?

 6      A.    Yes.

 7      Q.    Did anybody else at Tesla call you an

 8  n-i-g-g-e-r?

 9      A.    No.

10      Q.    How many times did Khoi Nguyen called you an

11  n-i-g-g-e-r?

12      A.    It was just the once.

13      Q.    Who at Tesla called you n-i-g-g-a, if anybody?

14      A.    Carlos.

15      Q.    And what is Carlos' last name?

16      A.    Unfortunately, I do not remember his last

17  name.

18      Q.    Is it your understanding that Khoi Nguyen

19  worked for Tesla at the time that he called you an

20  n-i-g-g-e-r?

21      A.    Yes.

22            MS. AVLONI:  Objection.  Calls for speculation

23  as to the employment relationship.

24  BY MR. HORTON:

25      Q.    And what was Khoi Nguyen's position when he
```

TITUS MCCALEB

June 18, 2019

```
 1   called you an n-i-g-g-e-r?

 2        A.    A lead supervisor -- or a lead.  Sorry.

 3        Q.    Lead?

 4        A.    Just a lead.

 5        Q.    A lead what?  Lead production associate?

 6        A.    Oh, yes.

 7        Q.    And how do you know that he was a lead?

 8        A.    He was transferred from one line to work on

 9   our line.

10        Q.    And that made him a lead, in your mind?

11        A.    The supervisors gave him said title.

12        Q.    Which supervisor gave him that title?

13        A.    Josh.

14        Q.    How did Josh characterize Khoi Nguyen's

15   position as a lead?

16        A.    How did he characterize it?

17        Q.    Yeah.  What did Josh tell you to indicate to

18   you that Khoi Nguyen was a lead at that time?

19        A.    "Hey, guys, here's Khoi.  He's going to be

20   your new lead."

21        Q.    Okay.  Did Josh ever refer to Khoi Nguyen as a

22   supervisor?

23        A.    No.

24        Q.    As far as you understood, did Khoi Nguyen have

25   the power to fire you?
```

```
 1   BY MR. HORTON:
 2       Q.    Did anyone else while you worked at Tesla call
 3   you an n-i-g-g-e-r other than Khoi Nguyen?
 4       A.    No.
 5       Q.    And you've identified Carlos as a person at
 6   Tesla who called you an n-i-g-g-a; correct?
 7       A.    Correct.
 8       Q.    Did anyone else call you an n-i-g-g-a?
 9       A.    Yes.
10       Q.    Who else called you that?
11       A.    Marcello.
12       Q.    Who?
13       A.    Marcello.
14       Q.    Anybody else?
15       A.    Colton.
16       Q.    Anybody else?
17       A.    Giddeon.  That's G-i-d-d-e-o-n.
18       Q.    -d-d-o-n?
19       A.    G-i-d-d-e-o-n.
20       Q.    Did anyone else at Tesla call you an
21   n-i-g-g-a?
22       A.    Right now I can't exactly remember a name.
23       Q.    But there was one more person?
24       A.    I believe so, yes.
25       Q.    Can you describe that person?
```

```
 1    my job."

 2         Q.    So did she do that?

 3               MS. AVLONI:  Calls for speculation.

 4               THE WITNESS:  Yeah, I have no clue.

 5    BY MR. HORTON:

 6         Q.    Were you satisfied with the manner in which

 7    Agnes Lewis dealt with your reporting of Marcello's use

 8    of the nigga word?

 9         A.    Not at all.

10         Q.    And why not?

11         A.    Everything that transpired afterwards.  My

12    six-month contract was coming to an end.  Tesla sent me

13    a letter, you know, stating that I was -- congratulating

14    me that I was going to become a full-time employee.

15               These situations were being handled supposedly

16    by Agnes and Brandie To, and everything led on for --

17    like I said, my contract got extended and all these

18    different things started happening, and I had no clue

19    what was going on with Agnes' angle or Brandie's angle.

20    I didn't get any information and I was wrongfully

21    terminated and never got any answers from these people

22    about what their investigations were.  Instead I was

23    told by Agnes at an undisclosed meeting location in

24    Fremont that she was sorry that she couldn't get the

25    information and I needed to back off or, per what she
```

June 18, 2019

 1   was told, that I would be let go.  That's where that

 2   led me.

 3       Q.   Agnes actually told you you have to back off

 4   on your complaint about the use of the n-i-g-g-a word or

 5   you would be terminated?

 6       A.   Yes.  Based on not just the n-i-g-g-a word,

 7   but the complaints that were being filed with Brandie To

 8   and Afton.  She met me, like I told you, at an

 9   undisclosed location in Fremont.  We met for Indian

10   food, and that's where the conversation ensued.

11       Q.   So you had this offsite lunch with Agnes Lewis

12   while you were working at Tesla?

13       A.   Yes.

14       Q.   And where was that Indian restaurant?

15       A.   In Fremont.  She would have to give you that

16   location, or I can send it to my lawyer, if she wants.

17       Q.   Did she invite you to lunch?

18       A.   Yes.

19       Q.   Okay.  What did you discuss at that lunch?

20       A.   The HR complaints that I had already been

21   filing with her and with Tesla.

22       Q.   What specifically did she say to you about

23   those complaints during this lunch?

24       A.   That if I did not back off from all of the,

25   you know, accusations and things that I was bringing up,

TITUS MCCALEB

June 18, 2019

```
 1   was thinking, so I can't answer that.
 2        Q.   What did you understand -- what did you
 3   understand Agnes Lewis was telling you you should do at
 4   this lunch?
 5        A.   That I needed to leave my mouth shut and just
 6   go to work if I wanted to have that job.
 7        Q.   When did you have this lunch with Agnes Lewis?
 8        A.   The exact date, I could not give you.
 9        Q.   Can you give me an approximate date?
10        A.   It was roughly between the acceptance letter
11   from Tesla and the time that I was let go.
12        Q.   So sometime during your employment at Tesla?
13             MS. AVLONI:  Misstates prior testimony.
14             I think there's some confusion in regards to
15   the acceptance letter from Tesla.
16             THE WITNESS:  Oh, sorry.  I'll rephrase that
17   for you then.
18             The "Congratulations, you've been hired"
19   versus the West Valley acceptance letter of, you know,
20   "Come do six months under a West Valley contract," later
21   after my six-month contract was up, Tesla sent me a
22   separate email stating, "Congratulations, we want to
23   hire you on as a Tesla employee."
24   BY MR. HORTON:
25        Q.   And so that was at the conclusion of your
```

```
 1   BY MR. HORTON:
 2       Q.    At the conclusion of your interview what were
 3   you told?
 4       A.    "Congratulations."
 5       Q.    Who told you that?
 6       A.    The interviewer.
 7       Q.    Yeah.  Who was it that told you that,
 8   "Congratulations"?
 9       A.    The interviewer.
10       Q.    Right.  Who was that?
11       A.    The interviewer.
12       Q.    And you don't know who it was?
13             MS. AVLONI:  Asked and answered.
14             THE WITNESS:  As I stated, I did not remember
15   or recall the interviewer's name.
16   BY MR. HORTON:
17       Q.    Do you recall the interviewer's position at
18   Tesla?
19       A.    I don't recall the interviewer's name so I
20   don't recall their position.
21       Q.    What exactly did they say?  Just
22   "Congratulations"?
23       A.    "Congratulations and we will be talking about
24   this later.  You can go back to your line."  That was
25   that.
```

TITUS MCCALEB

June 18, 2019

```
 1        Q.    Did you ever hear from Tesla again?

 2        A.    About the position or --

 3        Q.    Yeah, about the position.

 4        A.    No.

 5        Q.    How were you notified that you were not going

 6    to be hired by Tesla?

 7        A.    I wasn't notified that I wasn't going to be

 8    hired.  I was notified that I would not be coming back.

 9        Q.    Coming back to what?

10        A.    To work.

11        Q.    So at one point in time somebody told you,

12    "You don't have to come in tomorrow," or the next day?

13        A.    Correct.

14        Q.    Who told you that?

15        A.    I can't recall right away.

16              THE WITNESS:  Sorry I was a little fast.

17    BY MR. HORTON:

18        Q.    Was it somebody employed by West Valley?

19        A.    Once again, I'm not going to state that I

20    remember if it was West Valley or Tesla.

21        Q.    How were you informed of that?

22        A.    Oh, I don't recall if it was direct or by

23    email -- it definitely wasn't by email, but I don't

24    remember if it was a direct conversation or if it was

25    through some other means.
```

TITUS MCCALEB

1    **A.    No.**

2    Q.    How many times did Giddeon say the word to

3    you?

4    **A.    The one time.**

5    Q.    Did you report Colton's use of the n-i-g-g-a

6    word to anybody?

7    **A.    As we just spoke about, due to the**

8    **circumstances and what was going on, I felt that my job**

9    **safety was already at risk.**

10   Q.    So your answer is "no"?

11   **A.    Yes, I did not.**

12   Q.    Did you report Giddeon's use of the n-i-g-g-a

13   word to anybody?

14   **A.    As I explained earlier, I did to Khoi.**

15   Q.    And you've already told us what Khoi's

16   response was.

17   **A.    Correct.**

18   Q.    All right.  What were the circumstances of

19   this Asian person working on the Ant Hill's use of the

20   n-i-g-g-a word in your presence?

21   **A.    One more time.  You said "the circumstances"?**

22   Q.    Circumstances.

23   **A.    I think the circumstance varied.  He just**

24   **flung it out like it was verbal candy per se.**

25   Q.    Okay.  To the best of your recollection, what

TITUS MCCALEB

1   exactly did this Asian person say to you?

2        A.     "Oh, nigga, you crazy.  Oh, nigga, come on.

3   Oh, nigga, I don't understand this.  Oh, nigga, are you

4   trying to tell me I can't say that?  Oh, nigga, hold

5   on."  I mean, and there were various other explicit ways

6   of using it that he just deemed appropriate.

7        Q.     So did you work with the Asian or was he

8   in another part of the production line that you only

9   occasionally had to visit?

10        A.     I worked with him at first on an occasional,

11   perhaps, chance and when I was moved much later closer

12   towards the termination, I worked directly with him on a

13   daily basis.

14        Q.     How many times did the Asian use the n-i-g-g-a

15   word?

16        A.     It was similar to Carlos where it would be

17   flung about every, you know, few minutes within an hour.

18        Q.     Did you complain to the Asian?

19        A.     I did not due to -- once again, this was after

20   the meeting with Agnes and so forth.

21        Q.     So the Asian started using the n-i-g-g-a word

22   at a point in time that was after this lunch that you

23   had with Agnes Lewis at the Indian restaurant?

24        A.     Closer towards my term- -- or termination, or

25   whatever the case was, yes.

TITUS MCCALEB

1      Q.    Did he ever use it before?

2      A.    Yes.

3      Q.    Did you complain about it before?

4      A.    No.  He was right in front of the supervisors

5   and leads slinging it out.

6      Q.    What supervisor heard him use that word?

7      A.    Josh, Ron, Afton heard him saying it.  The

8   other supervisors that were Ant Hill, I can't quite

9   remember their names.  But quite a few leads and

10  supervisors heard him say it, and I believe even

11  the -- not the director of ops but the manager in the

12  powertrain department heard him saying it as well in a

13  meeting.

14     Q.    I want to go back to Giddeon briefly.  Did you

15  report Giddeon's use of the n-i-g-g-a word to anybody at

16  West Valley Staffing Group?

17     A.    Yes.

18     Q.    Who?

19     A.    Lewis, Anton.

20     Q.    Anton Baruh?

21     A.    Yes.

22     Q.    He works at Tesla?

23     A.    At the time he was -- maybe we're thinking of

24  two different people.  But at the time what I know was

25  Anton was working with Lewis.

TITUS MCCALEB

June 18, 2019

 1                    Then all of this information was later --

 2    I don't know if you have these emails, if you're with

 3    West Valley, but I wrote out a long email to West Valley

 4    about the incidents.  And then there was -- like I

 5    mentioned before, I didn't get any kind of answers back.

 6    And after not getting any answers back I had to take up

 7    things with Tesla's HR.

 8                    I'm not sure if this is answering your

 9    question, but that's where and how I had to deal with

10    retaliation and discrimination and everything else going

11    on and making a paper trail, follow everything that was

12    happening that I noticed.

13        Q.    So what you just described is the treatment

14    and the retaliation that you felt was discriminatory?

15        A.    Well, it's part of it, you know.

16        Q.    Well, what treatment are you referring to that

17    was discriminatory?

18        A.    As to how I was discriminated against?

19        Q.    Yes.  You or other West Valley employees.

20              MS. AVLONI:  Objection to the extent it calls

21    for a legal conclusion.

22              You can answer.

23              THE WITNESS:  Can you repeat his question for

24    me, please.

25    / / /

TITUS MCCALEB

June 18, 2019

1   I complained directly to leads, supervisors, and anyone

2   else that would hear, whether on site or off site, about

3   my discriminatory actions that happened to me and about

4   the racial incidences that I was involved with with

5   someone coming to me to call me things that I found

6   offensive.  And I --

7   BY MR. HORTON:

8      Q.   And I think you've already --

9      A.   Can I finish talking --

10      Q.   -- described those things that were said --

11      A.   -- as you just asked me so I can answer the

12   question so she doesn't have to worry about two people

13   speaking, please?

14      Q.   Sure.

15      A.   Thank you.

16      I, Titus McCaleb, sat with your employees

17  as well as someone outside of the location to get more

18  information as to what someone was going to do to help

19  me with a human resource problem.  In turn, I was being

20  told that everything was being investigated.  When

21  I pushed further, I became part of the retaliation

22  treatment in which I got moved from the location that I

23  was a workstation trainer at, and I had basically built

24  up a lot of promotions to happen for me within a short

25  period of time that I was at Tesla, I was pushed out of

June 18, 2019

```
 1   this area.

 2              And the person who harassed me, threatened me,

 3   that I had to go to Fremont police to file a complaint

 4   on, stayed in this station and received a complete

 5   different treatment.  And while all this was occurring,

 6   I still could not get any information from your human

 7   resources department or Tesla's human resource

 8   department.

 9              I don't know how else to explain retaliatory

10   treatment, outside of what I noticed, besides watching

11   other Tesla employees being placed in corners, which I

12   already described earlier how this would occur, to get

13   you to understand how I noticed everything that you just

14   re-asked me about.

15              Am I not answering your question?

16       Q.    I need to know some more details, but I'm not

17   sure you really explained being placed in corners.  I

18   think you mentioned something about a lead who would

19   take somebody from one place in the production line

20   and put them in a less busy part of the line that you

21   referred to as "a corner."  I don't know what exactly

22   you mean by that though.

23              I'd like to get some more -- if you could be

24   a little clearer about that, I would appreciate that.

25   I'm not sure what you're saying.
```

1   that were occurring, but this isn't the full timeline

2   as -- that was provided to like EEOC or other places

3   that I have in my email as well.

4        Q.    Okay.  The timeline that you shared with

5   West Valley Staffing Group, is that contained in

6   Exhibit 4?

7             MS. AVLONI:  Carefully look through it if you

8   have to refresh your memory.

9             THE WITNESS:  Yeah.  No, it's not.  Once

10   again, I knew that off the top of my head.  No, it's

11   not.

12   BY MR. HORTON:

13        Q.    Are any parts of the timeline that you

14   provided to West Valley included in Exhibit 4?

15        A.    There are events that occurred that are

16   described in here.  But the timeline of things that

17   occurred per the racial incidents that I was involved in

18   or had been subjected to and incidents regarding to the

19   managers and everything else are not included in here.

20        Q.    And you do still have a copy of that timeline?

21        A.    Oh, yeah.

22        Q.    And you'll provide me a copy?

23        A.    Provided that it's okay with my lawyers, yes.

24        Q.    All right.  So you worked for West Valley

25   Staffing Group assigned to Tesla between November 7th --

TITUS MCCALEB

June 18, 2019

```
 1   I'm sorry -- November 6th of 2016 and June 6th of 2017;
 2   is that correct?
 3       A.   I don't have exact dates, but if you have them
 4   there in front of you.
 5       Q.   Well, does that sound right to you?
 6       A.   It sounds close to right.
 7       Q.   Do you have any reason to believe those are
 8   not the correct dates?
 9       A.   Other than not having the paperwork right
10   in front of me myself, yes, I do have reasons to not
11   answer "yes" to what you're saying.
12       Q.   Do you have any evidence to indicate that
13   those are not the correct dates of your employment at
14   West Valley Staffing Group?
15       A.   Do I have any evidence to prove that?  Is that
16   what you're asking me?
17       Q.   Yes.  Do you have any information to suggest
18   that November 6th, 2016, through June 6th, 2017, are
19   not the correct dates of your employment at West Valley
20   Staffing Group assigned to Tesla?
21       A.   I would have to look up the dates on my phone
22   to answer and say whether those are the dates or not.
23   I'm not sure.
24       Q.   It sounds right, though?
25       A.   Yes, it sounds like it could be right.
```

TITUS MCCALEB

June 18, 2019

```
1              I, JANIS JENNINGS, CSR No. 3942, Certified
2     Shorthand Reporter, certify:
3              That the foregoing proceedings were taken
4     before me at the time and place therein set forth, at
5     which time the witness was duly sworn by me;
6              That the testimony of the witness, the
7     questions propounded, and all objections and statements
8     made at the time of the examination were recorded
9     stenographically by me and were thereafter transcribed;
10             That the foregoing pages contain a full, true
11    and accurate record of all proceedings and testimony.
12             Pursuant to F.R.C.P. 30(e)(2) before
13    completion of the proceedings, review of the transcript
14    [  ] was [X] was not requested.
15             I further certify that I am not a relative or
16    employee of any attorney of the parties, nor financially
17    interested in the action.
18             I declare under penalty of perjury under the
19    laws of California that the foregoing is true and
20    correct.
21             Dated this 28th day of June 2019.
22
23
24    _____
      JANIS JENNINGS, CSR NO. 3942
25            CLR, CCRR
```

# Exhibit

# **16**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEMETRIC DIAZ, et al.,           )
                                 )
                Plaintiffs,      )
                                 )   Case No.
          v.                     )   3:17-cv-06748-WHO
                                 )
TESLA, INC., et al.,             )
                                 )
                Defendants.      )
_____  )

VIDEOTAPED DEPOSITION OF ANDRES DONET

DATE:            Thursday, October 24, 2019

TIME:            4:39 p.m.

LOCATION:        Sheppard, Mullin, Richter &
                 Hampton LLP
                 379 Lytton Avenue
                 Palo Alto, California   94301

REPORTED BY:     Peter Torreano, CSR, CRR
                 Certified Shorthand Reporter
                 License Number C-7623

```
 1                A P P E A R A N C E S:

 2     For the Plaintiffs:

 3             California Civil Rights Law Group
               By:  LAWRENCE A. ORGAN
 4             larry@civilrightsca.com
               332 San Anselmo Avenue
 5             San Anselmo, CA 94960
               (415) 453-4740
 6
       For the Tesla Defendants and the Deponent:
 7
               Sheppard, Mullin, Richter & Hampton LLP
 8             By:  SAMI HASAN
               shasan@sheppardmullin.com
 9             Four Embarcadero Center
               Fourteenth Floor
10             San Francisco, California  94111
               (415) 774-3286
11
       For Defendant NextSource, Inc.:
12     (Telephonically)

13             Fisher & Phillips LLP
               By:  VINCENT J. ADAMS
14             vadams@fisherphillips.com
               One Embarcadero Center
15             Suite 2050
               San Francisco, California  94111
16             (415) 490-9000


18

19

20

21

22

23

24

25
```

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

16:50:23  1          A.    Andre.

16:50:25  2          Q.    Andre.

16:50:26  3          A.    The same as my name but without the S.

16:50:30  4          Q.    Okay.  If you could spell that last name again

16:50:33  5    one more time.

16:50:33  6          A.    L-L-A-L-J-I-E.

16:50:36  7          Q.    L-L-A-L-J-I-E?

16:50:40  8          A.    Right.  Llaljie.  And that's the way they

16:50:43  9    pronounce that, "Llaljie."

16:50:44  10          Q.    Llaljie.  Okay.  So at some point when you

16:50:48  11    first started in August of 2015 you were reporting to

16:50:54  12    Victor Quintero; is that correct?

16:50:56  13          A.    Yes, that's correct.

16:50:58  14          Q.    And then sometime after that your job duties

16:51:01  15    were transferred -- I mean your reporting relationship

16:51:05  16    was transferred to an Andre?

16:51:07  17          A.    Llaljie.

16:51:08  18          Q.    Llaljie; is that correct?

16:51:09  19          A.    Llaljie.

16:51:10  20          Q.    Llaljie?

16:51:12  21          A.    Yeah.

16:51:12  22          Q.    And what was Mr. Llaljie's name -- title?

16:51:16  23          A.    He was the facilities director, as far as I

16:51:22  24    can remember.

16:51:22  25          Q.    Okay.  Now, in terms of -- were there some

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

16:51:42  1   sort of policies relating to what to do about graffiti

16:51:46  2   in the bathrooms that Tesla had?

16:51:48  3          MR. HASAN:  Objection.  Vague and ambiguous.

16:51:51  4          THE DEPONENT:  What do you mean with policies?

16:51:53  5   BY MR. ORGAN:

16:51:53  6      Q.   Like procedures or a checklist or anything

16:51:57  7   along those lines?

16:51:58  8      A.   No.  At that point -- we are talking about

16:52:02  9   that period of time.  Right?

16:52:04  10     Q.   2015, 2016, that time period.

16:52:06  11     A.   Yeah.  No.  It was sort of a non-written

16:52:14  12   process that the -- well, whoever any -- any employee

16:52:21  13   that went into the bathroom that saw the graffiti

16:52:24  14   there, they just report it in order to be cleaned, to

16:52:28  15   be erased.  Right?  That was pretty much the thing and

16:52:31  16   we sent a janitor employee to take care of.

16:52:35  17     Q.   So is it true that you helped develop then the

16:52:39  18   procedures for how to deal with graffiti in the

16:52:43  19   bathroom?

16:52:43  20     A.   No.

16:52:44  21          MR. HASAN:  Objection.  Assumes facts.

16:52:47  22          Give me some time to object.

16:52:48  23          THE DEPONENT:  Okay.  No, I did not.

16:52:50  24   BY MR. ORGAN:

16:52:50  25     Q.   Who came up with the procedures on how to deal

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:10:00  1   over and clean that thing out, off.  So that's the

17:10:05  2   whole thing.

17:10:05  3       Q.   I'm going to show you what's been marked as

17:10:08  4   Exhibit 193.  For the record Exhibit 193 is a

17:10:13  5   three-page document Bates-stamped Tesla 1003 to 1005.

17:10:23  6           Look it over and then I'll ask you some

17:10:25  7   questions.  1005.

17:10:50  8       A.   I don't remember this even though I sent an

17:10:53  9   e-mail reporting it was clean.  Yeah, that's me.  But I

17:10:59 10   don't -- are you sure these were together?

17:11:03 11       Q.   Yes.  I'm positive because that's how they

17:11:05 12   were produced to us.  And if you look at the second

17:11:08 13   page of it, the complaint from Mr. Colvin, Kevin

17:11:13 14   Colvin, you see that second page?  It says, "This is

17:11:15 15   the bathroom located by the elevator while walking

17:11:19 16   upstairs.  The writing says 'All niggers must die.'"

17:11:22 17           So that's the e-mail that was sent to three

17:11:25 18   people, Roel Kliatchko, Jonathan Baldoza and Rob Lewis.

17:11:33 19   Do you know who those people are?

17:11:34 20       A.   No.  I don't remember them.

17:11:36 21       Q.   Okay.  But at some point Roel --

17:11:39 22       A.   Kliatchko.

17:11:40 23       Q.   -- Kliatchko sent an e-mail back and then

17:11:44 24   you -- you somehow get it?

17:11:50 25       A.   Yeah.  Because I belong to the building

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:11:54  1   services areas.

17:11:55  2       Q.   I see.

17:11:56  3       A.   Yeah.  So that's why I -- I -- I answer.

17:12:02  4   Later I received a report back from the janitorial

17:12:06  5   company letting me know that the thing was cleaned.

17:12:10  6   But I don't recall this -- this picture, this graffiti.

17:12:14  7   It's pretty bad.

17:12:15  8       Q.   Pretty bad, yeah.

17:12:16  9       A.   Yeah.

17:12:16  10       Q.   You think the graffiti is pretty bad; right?

17:12:20  11       A.   Well, "The world will end."  Yeah, I can

17:12:26  12   understand about it.

17:12:26  13       Q.   Does the "all niggers must die," does that

17:12:30  14   bother you, too?

17:12:31  15       A.   Of course.  Nobody is supposed to die and

17:12:34  16   that's a bad word to say.  So yeah.

17:12:37  17       Q.   Were you aware -- when you were walking around

17:12:40  18   during your rounds did you ever hear the N word?

17:12:44  19       A.   No, no, no, no, no.

17:12:46  20       Q.   Never did.

17:12:47  21       A.   No, no, no.

17:12:47  22       Q.   And the swastika that's on this, that's pretty

17:12:51  23   bad, too, isn't it?

17:12:53  24       A.   It is.  But I haven't seen that before.

17:12:55  25       Q.   Okay.  Except when you received this picture?

1                  REPORTER'S CERTIFICATE

2              I, Peter Torreano, duly authorized to

3      administer oaths pursuant to Section 2093(b) of the

4      California Code of Civil Procedure, do hereby certify:

5              That the witness in the foregoing deposition

6      was administered an oath to testify to the whole truth

7      in the within-entitled cause; that said deposition was

8      taken at the time and place therein cited; that the

9      testimony of the said witness was reported by me and

10     was thereafter transcribed under my direction into

11     typewriting; that the foregoing is a full and

12     accurate record of said testimony; and that the witness

13     was given an opportunity to read and correct said

14     deposition and to subscribe the same.

15             Pursuant to Federal Rule 30(e), transcript

16     review was requested.

17             I further certify that I am not of counsel nor

18     attorney for any of the parties in the foregoing

19     deposition and caption named nor in any way interested

20     in the outcome of the cause named in said caption.

21                              Dated:  November 2, 2019

22

23

24     _____
       PETER TORREANO, CSR NO. 7623

25

# Exhibit

# **17**



## WEST VALLEY STAFFING GROUP

### THE WEST VALLEY STAFFING GROUP
### STAFFING SERVICES AGREEMENT FOR TESLA MOTORS, INC.

THIS STAFFING SERVICES AGREEMENT (the "Agreement") is made by and between Tesla Motors, Inc. ("Tesla"), a Delaware corporation, with offices located at 45500 Fremont Boulevard, Fremont, CA 94538, and West Valley Staffing Group ("WVSG"), a California corporation, with its principal place of business at 390 Potrero Avenue, Sunnyvale, CA 94085.

In consideration of the promises, mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, Tesla and WVSG agree as follows:

DEFINITIONS. The terms defined in this section shall have the meanings set forth below whenever they appear in this Agreement, unless a different definition is described for a particular Section or provision:

- "Associate" means the worker assigned by WVSG to work for Tesla.

- "Payroll Service Associates" means those individuals identified, screened, and selected by Tesla and subsequently placed on WVSG payroll.

- "Recruited Associates" means those individuals identified and screened by WVSG and then selected by Tesla and subsequently placed on WVSG payroll.

- "Direct Placements" means those individuals identified and screened by WVSG and hired as regular full time employees by Tesla.

- "On-Site Manager/Staff Members" means internal WVSG employees who manage and/or administer the WVSG staffing program at Tesla.

1

WV000051

I.    **THE ASSOCIATE**

WVSG will pay the wages of the Associates and will withhold all income and social security taxes from wages and will pay workers' compensation insurance premiums, state and federal unemployment taxes, and the employer's share of social security taxes on their behalf. WVSG is solely responsible for all such aspects of its employment relationship with the Associates, and WVSG reserves the exclusive right to negotiate with its Associates and make the final determination as to the rates of pay and total compensation to be paid to each of WVSG's Associates. Please see Exhibit A for WVSG's Proposed On-Site Program Model.

II.   **SUPERVISION**

WVSG will supply the Associates to Tesla to supplement Tesla's own work force. Tesla will direct and supervise the Associates on the job. WVSG does not supply persons to supervise or oversee the Associate absent specific written agreement.

III.  **GUARANTEE**

Our commitment to quality and excellent service has made our organization a leader in the staffing industry. To that end, WVSG is pleased to offer the following guarantee:

**Associates:**

WVSG assures Tesla's satisfaction with its Associates' service by offering an eight-hour guarantee. If Tesla is dissatisfied on the first day of employment with an Associate's technical abilities, WVSG will replace the individual, and Tesla will not be charged for the first eight (8) hours provided WVSG is notified within 24 hours after the Associate's initial start date. This guarantee will not apply to Payroll Service Associates.

**Direct Placements:**

For Direct Placements (individuals who become members of Tesla's regular work force), WVSG provides a 30-day guarantee. If within the first 30 days of employment Tesla is not satisfied with the Direct Placement's performance, WVSG will refund the entire 20% placement fee.

2

WV000052

**IV. PRICING AND CONVERSION TABLE:**

Pricing for Associates is based on the quoted bill rates below, which may be adjusted from time to time with the prior written agreement of Tesla. Statutory and other expenses are not included in the definition of "direct labor".

WVSG reserves the right to adjust these charges effective immediately based on changes in these expenses, which includes, but are not limited to, any increases in employer contributions to any social security, unemployment, disability, health insurance, welfare, Workers' Compensation or benefit program mandated by a federal, state or local government authority from or after the effective date of this Agreement.

1) All pricing for WVSG Recruited Associates will be at a quoted bill rate based on a markup of 32%

2) Payroll Service Staffing Option is based upon the following charges:

   *Payroll Service business:* 21% markup on direct labor.

   \* *Direct Labor Rate:* the hourly pay rate paid to the Associate by WVSG.

   ▪ (Example: Associate direct labor rate of $20.00/hr x 1.21 = (21% mark-up) = $24.20 bill rate)

3) The cost for criminal background checks for both Payroll Service Associates and WVSG Recruited Associates will be charged back to Tesla at cost.

4) No Monthly Fee for WVSG On-Site Manager / Staff Members (fee waived).

5) Quarterly rebate of 0.25% on all invoices paid within 15 days of invoice via ACH.

**Direct Placements**

The fee for all Direct Placements will be at 20% of the annual base salary inclusive of any sign-on bonuses and/or commissions.

| Example: | First year total compensation | = | $26,000 |
|---|---|---|---|
| | Placement fee: $26,000 X 20% | = | $5,200 |

3

WV000053

**WVSG Recruited Associates Conversion Placement Fee Schedule**

(A)   The conversion placement fee schedule is based on 20% of the annual compensation, inclusive of any sign-on bonus.

(B)   There is a reduction in this fee for conversions based on the number of regular hours worked by the Associate who is converted as follows:

| Regular Hours Worked | Reduction From Full Fee |
|---|---|
| 0–200 | 20% of base salary |
| 201–400 | 16% of base salary |
| 401–550 | 12% of base salary |
| 551–650 | 8% of base salary |
| 651–1040 | 4% of base salary |
| 1041+ | 0% of base salary |

(C)   There is no conversion fee for Payroll Service Associates. Payroll Service Associates may be converted at any time free of charge.

## V.   INVOICE TERMS

Tesla will be billed weekly for all hours worked by WVSG Associates. Invoice terms are net 30 days. All payments will be remitted to: P.O. Box 49212, San Jose, CA  95161.  Late payments will be assessed interest at no more than six (6) percent per annum.

### Direct Placements:

Direct Placement invoice terms are net 30 days from the start date of the placement.  *Direct Placement fees not received within the 30-day remittance period will void the Direct Placement guarantee.*

### General Terms:

All invoices will be remitted to: P.O. Box 49212, San Jose, CA 95161.  Late payments will be interest at no more than six (6) percent per annum.

4

**VI.** NON-SOLICITATION OF WVSG RECRUITED ASSOCIATES, ON-SITE MANAGERS, AND STAFF MEMBERS

All WVSG employees are subject to conversion and workforce transfer restrictions. Tesla agrees not to solicit any WVSG Recruited Associates, On-Site Managers or Staff Members, directly or indirectly, and Tesla agrees not to participate with any third party in soliciting any WVSG Recruited Associate, On-Site Manager or Staff Member, for the purpose of persuading the WVSG Recruited Associate, On-Site Manager or Staff Member to terminate their employment with WVSG and accept an offer of employment from Tesla, or from any third party who intends to hire the Associate for Tesla's benefit. This non-solicitation period is for a period of six (6) months after termination of this Agreement.

**VII.** LIQUIDATED DAMAGES

In the event that Tesla utilizes any third party staffing company to hire a WVSG Recruited Associated for Tesla's benefit, Tesla agrees to pay WVSG an amount equal to 30% of the total compensation that WVSG expected to pay that WVSG Recruited Associate for one year if the WVSG Recruited Associate had continued to be employed by WVSG. In such case, no conversion placement fee pursuant to Section IV will be required.

In the event that Tesla utilizes any third party staffing company to hire a WVSG On-Site Manager or Staff Member or participates with any third party in doing so for Tesla's benefit, Tesla agrees to pay WVSG, an amount equal to the total compensation that WVSG expected to pay that WVSG On-Site Manager or Staff Member for one (1) year if the WVSG On-Site Manager or Staff Member had continued to be employed by WVSG. The parties acknowledge that WVSG's actual damages in the event of Tesla's violation of Section VI, above, would be extremely difficult or impracticable to determine, therefore, the parties have agreed that the above amounts constitute a reasonable estimate of the damages that WVSG is likely to suffer as a result of Tesla's breach of Section VI, that the above amounts constitute liquidated damages, as defined by California Civil Code Section 1671, that these amounts are not intended as a forfeiture or penalty within the meaning of Civil Code sections 3275 or 3369, and that payment of these amounts shall be WVSG's exclusive remedy against Tesla in the event of Tesla's violation of Section VI. This Section VII shall survive the termination of this Agreement.

**VIII.** BILLING

WVSG's Associates will present a time card to his/her supervisor for approval at the end of each week. This allows WVSG to compensate the Associates on a weekly basis and bill Tesla weekly at the quoted bill rate. Tesla is responsible to make certain that the time card is accurate before it is approved and submitted to WVSG. Tesla is also responsible for paying WVSG according to the payment terms herein.

**IX.** INDEMNIFICATION

Tesla agrees to provide WVSG Associates whatever training, supervision, and equipment that may be necessary to preserve the Associate's right of privacy, to enable them to perform their assignment competently and safely, and as otherwise may be required by law. Tesla agrees to comply with all legal obligations relating to the protection of employees from unlawful discrimination and harassment, and to

5

WV000055

provide a safe workplace for WVSG Associates to enable them to perform their assignments, to the extent required by federal and state occupational safety and health laws.

**Indemnification by WVSG for Performance or Breach:**

WVSG will defend, indemnify and hold Tesla harmless from and against all Costs arising out of or resulting from a claim by a third party based upon or arising out of any of the following: (i)  services performed by WVSG under this Agreement, or the results thereof, which infringe a patent, copyright or other proprietary right or violate a trade secret; (ii) any negligent act or omission or willful misconduct of WVSG or its Associates; (iii) any breach of this Agreement by WVSG; and (iv) any breach by Associates or other individuals and entities performing services on behalf of WVSG (the "Claim(s)"). "Costs" is defined as any expenses reasonably related to the defense or payment of any Claims, including, but not limited to, damages, attorneys fees, expert witness fees, and court costs. Notwithstanding anything in this Agreement to the contrary, WVSG shall not be obligated to indemnify Tesla pursuant to this Section, unless Tesla: (i) promptly notifies WVSG in writing of all such Claims (provided, however, that failure to provide such timely notice shall not relieve WVSG of its obligation to indemnify unless such failure is prejudicial to the defense or settlement of the Claim); (ii) cooperates reasonably with WVSG in defending such Claims; and (iii) allows WVSG the sole right to control the defense (including the selection of counsel), or, at WVSG's sole option, to settle all such Claims. In the event of a Claim as described herein between or involving WVSG and Tesla, WVSG agrees to provide notice to Tesla of such claim and from time to time, apprise Tesla of the status of such Claim.  In addition, Tesla may participate in any such claim at its sole option and its own expense with counsel of its own choice and any settlement or other resolution of such a claim must be approved in writing by Tesla, such approval to not be unreasonably withheld. The foregoing states WVSG's entire obligation and liability and Tesla's sole and exclusive remedy with respect to any Tesla Claims.

**Indemnification by Tesla:**

Tesla shall indemnify, defend, and hold WVSG harmless from and against any and all Costs arising out of or resulting from a claim by a third party based upon or arising out of any of the following:  (i) conduct by Tesla which infringes a patent, copyright or other proprietary right or violates a trade secret; (ii) Tesla's failure to protect the confidential personnel information of WVSG's Associates in compliance with this Agreement; (iii) Tesla's breach of or failure to perform any of its obligations under this Agreement; and (iv) any reckless or willful act or omission of a Tesla's employee or employees that results in an injury of any kind to any of WVSG's Associates (the "WVSG Claim(s)").  "Costs" is defined as any expenses reasonably related to the defense or payment of any WVSG Claims, including, but not limited to, damages, attorneys fees, expert witness fees, and court costs. Notwithstanding anything in this Agreement to the contrary, Tesla shall not be obligated to indemnify WVSG pursuant to this Section, unless WVSG: (i) promptly notifies Tesla  in writing of all such WVSG Claims (provided, however, that failure to provide such timely notice shall not relieve Tesla's obligations to indemnify unless such failure is prejudicial to the defense or settlement of the WVSG Claim; (ii) cooperates reasonably with Tesla (at Tesla's expense) in defending such WVSG Claims; and (iii) allows Tesla the sole right to control the defense of (including the selection of counsel), or at Tesla's sole option, to settle all such WVSG Claims. In addition, WVSG may participate in any such claim at its sole option and its own expense with counsel of its own choice and any settlement or other

WV000056

resolution of such a claim must be approved in writing by WVSG, such approval to not be unreasonably withheld. The foregoing states Tesla's entire obligation and liability and WVSG's sole and exclusive remedy with respect to any WVSG Claims.

## X.   MISCELLANEOUS PROVISIONS

### Confidentiality

All information, documents, software, reports, data, records, forms and other material developed by WVSG or its personnel for Tesla or obtained by or disclosed to WVSG or its personnel by Tesla (whether belonging to Tesla or not) in the course of performing the services herein are the proprietary, confidential and trade secret information of Tesla. WVSG and its personnel will deliver to Tesla all tangible forms of such proprietary confidential and trade secret information and all copies thereof (and all other property obtained from or through Tesla) when Tesla requests the same or immediately upon termination of this Agreement. WVSG and its personnel agree during the term of this Agreement and thereafter that it will take all steps necessary to hold Tesla and any of Tesla's proprietary, confidential and trade secret information in trust and confidence. WVSG and its personnel shall not use or disclose to any person, firm or entity any proprietary, confidential or trade secret information of Tesla without Tesla's express, prior written permission. WVSG acknowledges and agrees that any breach or threatened breach of this confidentiality provision could cause harm to Tesla for which money damages may not provide an adequate remedy. As such, WVSG agrees that in the event of such a breach or threatened breach of this confidentiality provision, in addition to any other available remedies, Tesla may seek temporary and permanent injunctive relief restraining WVSG or its personnel from disclosing or using, in whole or in part, any Tesla confidential information. The stipulations in this paragraph will survive the termination of this Agreement.

### Intellectual Property

WVSG agrees for itself and its personnel that all inventions, discoveries, or other intellectual property, whether patentable or not, any works of authorship, whether copyrightable or not, authored, created or conceived by WVSG and its personnel in whole or in part during the term of this Agreement (whether during or after normal working hours) or in the course of or related to providing services to Tesla shall be treated as if it were a "work for hire" and WVSG and its personnel shall immediately disclose to Tesla all discoveries, inventions enhancements, improvements and similar creations (collectively, "creations") made in whole or in part, by WVSG or its personnel in the course of or related to providing services to Tesla. All ownership and control of the above materials and creations, including any copyright, patent rights and all other intellectual property rights therein, shall vest wholly and exclusively with Tesla. WVSG and each of its personnel hereby assigns to Tesla all right, title and interest that WVSG and its personnel may have in such materials and creations, without any additional compensation and free of all liens and encumbrances of any type. WVSG affirms that the fee it has negotiated for the services performed under this agreement includes payment for assigning such rights to Tesla. WVSG agrees to execute any and all documents required by Tesla to register its rights and to implement the provision herein. WVSG shall indemnify, defend and hold Tesla harmless from any liability for, or assessment of, any claims or penalties with respect to any infringement of a third party's

7

WV000057

intellectual property rights by WVSG or any of its personnel. The stipulations in this paragraph will survive the termination of this Agreement.

**Term and Termination**

This Agreement shall commence on 1/4/13 (the "Effective Date") and expire on 1/4/18. The parties may extend the term or any subsequent term by executing a separate written agreement of extension prior to the expiration of the term. This Agreement shall automatically renew every six months beginning on 1/4/18 unless either party receives written notification.

This Agreement may be terminated by Tesla with a 30 day written notice to the WVSG for any reason, with or without cause. WVSG may terminate this Agreement with a 30 day prior written notice to Tesla. Upon termination of this Agreement, WVSG shall deliver all complete and partial deliverables and work product to Tesla and return any Tesla equipment and/or information, and Tesla will pay WVSG the amount due for outstanding and undisputed invoices incurred up to and including the time of termination, and no further work will be rendered under this Agreement. Such payment will constitute a full and complete discharge of Tesla's obligations under this Agreement.

**Assignment**

WVSG shall not assign this Agreement nor any right or interest under this Agreement (excepting moneys due or to become due) nor delegate any obligation to be performed by WVSG or its personnel under this Agreement without the prior written consent of Tesla. Any attempted assignment or delegation in contravention of this provision shall be void and ineffective.

**No Licenses**

No licenses, express or implied, under any patents are granted by Tesla to WVSG or its personnel under this Agreement.

**Entire Agreement**

All transactions during the term of this Agreement relating to the subject matter of this Agreement shall be governed by the provisions of this Agreement, except as the parties may otherwise expressly agree in writing executed by both of them. No change, modification or waiver of any of the provisions of this Agreement or of any provisions of any agreement made pursuant to this Agreement shall be binding on the parties unless in writing executed by the duly authorized representative of the party against whom enforcement of any waiver, change or modification is sought. The provisions of the Agreement and any written attachments hereto shall constitute the entire agreement between the parties relating to said Agreement, superseding all prior oral and written quotations, communications, and understandings of the parties in respect of the subject matter of this Agreement.

WV000058

Section Headings

The headings of the sections herein are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement.

Choice of Law

The construction, interpretation and performance of this Agreement and all transactions under it shall be governed by the laws of the State of California, without giving effect to the principles of conflicts of laws thereof.  The stipulations in this paragraph will survive the termination of this Agreement.

Notice

Any notice or demand, acknowledgment or other communication which under the terms of this Agreement must or may be given or made by either party shall be given or made by personal delivery, a nationally recognized courier service, Email, facsimile transmission or certified or registered mail, return receipt requested.  Notices shall be sent to the address listed below.


Tesla Motors, Inc.

3500 Deer Creek Road

Palo Alto, CA 94304

Attn: Legal Department


West Valley Staffing Group

390 Potrero Ave.

Sunnyvale, CA 94085

Attn: Charlie Allport, EVP


Severability

In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this agreement shall not be affected, impaired or invalidated, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. WVSG represents that WVSG has read and understands the terms of this Agreement, has had an opportunity to ask any question and to seek the assistance of legal counsel regarding these terms, and is not relying upon any advice from Tesla in this regard.

9

WV000059

Counterparts

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

WV000060

XI.   ACKNOWLEDGEMENT

I have read, acknowledge, and agree to the above terms and conditions.  The parties have caused this Agreement to be executed by their duly authorized representatives and to be effective as of the Effective Date.

Tesla Motors, Inc.
45500 Fremont Blvd
Fremont, CA 94538

West Valley Staffing Group
390 Potrero Ave.
Sunnyvale, CA 94085

Name:   ARNNON GESHURI

Name:   Charlie Allport

Title:   VP, HUMAN RESOURCES

Title:   Executive Vice President

Signature:

Signature:

Date:   January 7ᵗʰ, 2013

Date:   January 4, 2013

11

WV000061

EXHIBIT A:  WVSG's Proposed On-Site Program Model

WVSG Service Model Includes:

- One full time On-Site Program Manager and additional support staff as necessary
- Manage all temporary employee relations issues
- Conduct On-boarding including:
  - Schedule group interview times with hiring managers
  - Contact designated candidates for interviews
  - Prepare interview folders for managers
  - Manage interview process
  - Review interview feedback from hiring managers
  - Contact selected candidates to offer position
  - Contact remaining candidates (non-selection)
  - Application processing of all new hires completed
  - Schedule start date
  - New hire orientation completed
- Conduct Off-boarding processes including termination procedure
- Implement WVSG Timekeeping/Payroll System
- Customized reporting and invoicing according to Tesla requirements
- Manage Co-employment to mitigate risk
- Screen all applicants with Tesla Human Resource requirements, including;
  - Verification of eligibility to work in the United States via the U.S. Justice Department I-9 form and E-Verify
  - WVSG to complete 7-year criminal background check
  - Complete WVSG and Tesla safety training
  - Administer all customized testing required by Tesla
- Develop and implement customized employee retention program
- Conduct Quarterly Business Reviews
- Conduct management and temporary employee surveys
- Full Service Recruiting via our four specialized companies:
  - West Valley Engineering, Inc. Engineering and Technical Personnel
  - Prostar Staffing Services, Inc. Clerical and Administrative Personnel
  - West Valley Technology Software and I.T. Personnel
  - Accountants Now, Inc. Accounting and Financial Personnel

12

WV000062

Tesla Motors Inc. is in compliance with Section 3(C) of the applicable California Wage Order and Labor Code Section 511 with respect to Alternative Workweek Schedule (AWS) to which any West Valley Staffing Group employee is assigned within Powertrain Department on the battery module line or in support of the battery line.

_____
Signature

1/31/13
_____
Date

WV000063