# Exhibit

# 1

120150



# application

## PERSONAL INFORMATION

| Last Name DIAZ | First Name Owen | M.I. O | Social Security # 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 |
|---|---|---|---|
| Street Address 1043 Tuolumne ST | | | Apt # |
| City VALLEJO | State CA | Zip Code 94590 | Phone # 415-272-3648 |

Person to contact in case of emergency/ Phone Number | Alternate Number

Positions interested in? FORKlift Operator / Janitor

Can you demonstrate proof of Employment Eligibility? Yes

## JOB EXPERIENCE

**General Labor**
☑ Loader/Unloader
☑ Assembly
☑ Production Line
☐ Machine Operator

**Forklifts**
☑ Sit-down-Standard
☑ Sit-down- with attachments
☑ Stand Up-Reach
☑ Stand Up-Cherry Picker
☑ Electric Pallet Jack
☐ Cranes

**Shipping/Receiving**
☑ UPS
☐ Fed-Ex
☐ Clerk
☑ Inventory
☑ Quality Control

**Other Skills**
☐ Restaurant
☐ Extrusion Equipment
☐ Welding
☑ Construction
☐ Customer Service

**Clerical**
WPM _____

Accuracy _____

☐ Receptionist
☐ Data Entry/ File Clerk
☐ Accounting
☐ Excel
☐ Word
☐ PowerPoint
☐ 10 Key
☐ Other Programs

**Languages**
☐ Cantonese
☐ Chinese
☐ English
☐ French
☐ German
☐ Spanish
☐ Vietnamese
☐ Other
_____

## AVAILABILITY

**Status**
☑ Fulltime
☐ Part-time

**Overtime**
☑ Yes
☐ No

**Shift**
☑ 1st Shift
☑ 2nd Shift
☑ 3rd Shift

**Days**
☑ Monday
☑ Tuesday
☐ Wednesday
☐ Thursday
☑ Friday
☐ Saturday
☐ Sunday

**Transportation**
☑ Car/ Own Transportation
☐ Ride
☐ Bus/Public Transportation
☐ Assisted Transportation

**Personnel Equipment**
☑ Work boots
☑ Steel Toes
☐ Back Belt
☐ Hard Hat

CONFIDENTIAL

## PLEASE CHECK YES OR NO

| | | | |
|---|---|---|---|
| Have you ever worked for CitiStaff Before? | ☐Yes | ☒No | Where? _____ |
| Have you ever been convicted of a felony? | ☒Yes | ☐No | Where & When 1988 |
| Can you comply with a Drug Test? | ☒Yes | ☐No | _____ |
| Conditions May require lifting between 30-50 pounds . Is this ok? | ☒Yes | ☐No | Explain _____ |
| Positions may require to standing up for 6-10 hours. Is this ok? | ☒Yes | ☐No | Explain _____ |

## EMPLOYMENT REFERENCES

| | | For Recruiter Use Only |
|---|---|---|
| Company COVERALL | Position FRANCHISE Owner | Account # |
| City SAN FRANCISCO | State CA | Phone 415-272-3040 |
| Starting Pay | End Pay | Start Date 3/99 | End Date 8/08 | Position |
| Reason for Leaving | Contact Name Owen | Can we contact? YES | Interviewer |

## EMPLOYMENT REFERENCES TWO

| | | |
|---|---|---|
| Company Hamilton Family Center | Position Residenetial Counselor | Date |
| City SAN FRANCISCO | State CA | Phone 415-409-2100 |
| Starting Pay 15.00 | End Pay 15.00 | Start Date 1/13 | End Date 2/14 | Status |
| Reason for Leaving FUNDING | Contact Name FRANK | Can we contact? YES | Notes: |

## PLEASE ANSWER ALL QUESTIONS

How did you hear about CitiStaff?
☐ Ad
☐ Walk-In
☐ Job Fair
☐ Relative
☐ Friend
☐ Client
INDEED

What is your highest level of education? Name of school
1 YEAR College

Do you have any diplomas, certificates, degrees or awards?
YES, High School

In case of an injury, would you like to pre-designate your treating physician?
Yes ☐   No ☒ . If no, CitiStaff will automatically pre-designate your treating physician
Initials

Desired Cities for Employment
ANTioch, CONCORD, Pittsburg

You must be at least 18 years old and able to produce proof of citizenship or immigration status to begin employment. I certify that the facts in this employment application are true and complete. I understand that falsified statements are grounds for dismissal.

Signature
Date 6/2/15

Recruiter Comments:

(right margin rotated text) Customer Number One   Customer Number Two   Customer Number Three

CONFIDENTIAL

CITISTAFF-0000035

# Exhibit

## 2

```
              UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

                     ---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

        Plaintiffs,

        vs.                      No. 3:17-cv-06748-WHO

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; and DOES 1-50,
inclusive,

        Defendants.

_____//


            DEPOSITION OF EDWARD ROMERO

               November 30, 2018
```

Reported by:

Bridget M. Mattos, CSR No. 11410

EDWARD ROMERO
November 30, 2018

Page 4

```
 1                    A P P E A R A N C E S

 2

 3   FOR PLAINTIFF:

 4              CALIFORNIA CIVIL RIGHTS LAW GROUP

 5              BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW

 6              332 San Anselmo Avenue

 7              San Anselmo, California 94960

 8              (415) 453-4740

 9

10   FOR DEFENDANT:

11              CONSTANGY, BROOKS, SMITH & PROPHETE LLP

12              BY:  BARBARA ANTONUCCI, ATTORNEY AT LAW

13              2029 Century Park East, Suite 1100

14              Los Angeles, California 90067

15              (310) 909-7775

16

17

18

19

20

21

22

23

24

25
```

```
 1              MS. ANTONUCCI:  Yes.

 2              MR. ORGAN:  Q.  So, just so you understand,

 3   I'm not going to ask for your address, so I don't have

 4   to send a process server to serve you for the trial.

 5   The trial in this matter I think is currently set for

 6   May 12th or something like that.

 7              MS. ANTONUCCI:  13th.

 8              MR. ORGAN:  And it's probably going to get

 9   moved.

10      Q.   What we'll do is, we will send a subpoena to

11   your attorney rather than have to bother you at home.

12   Is that okay?

13      A.   Sure.

14      Q.   Tell me, at some point in time you worked for

15   Tesla; is that correct?

16      A.   Correct.

17      Q.   When was that?  When did you work at Tesla?

18      A.   From October 2015 to August of 2017.

19      Q.   Before October of 2015, where did you work

20   before that?

21      A.   Let me think for a second.

22           I was working for Pyramid Janitorial.

23      Q.   Have you ever had your --

24      A.   Let me correct that.  That's Paramount.

25      Q.   Paramount?
```

1     **A.**   **I do.**

2     Q.   Any other questions you have?

3     **A.**   **I do not.**

4     Q.   Now, you said that you were at Tesla from

5  October 2015 to August of 2017.  I'll just tell you,

6  I've got an email that's dated August 4th of 2015 from

7  you to Victor Quintero.

8     **A.**   **Yes.**

9     Q.   Is it possible that you were working at Tesla

10  before October 2015?

11     **A.**   **Okay, I'll clarify that.**

12     Q.   Huh?

13     **A.**   **I'll clarify that.**

14     Q.   Yes.

15     **A.**   **I got hired at Tesla as a contractor from**

16  **July 5th to October, so I was not working for Tesla; I**

17  **was working for a contractor, which was nextSource.**

18     Q.   Okay.  And what was the job that you were

19  doing from July 5th of 2015 to October of 2015?

20     **A.**   **I was a jani- -- I didn't mean to cut you**

21  **off.  I'm sorry.**

22     Q.   Go ahead.

23     **A.**   **I was a janitorial supervisor.**

24     Q.   And what did you supervise as the janitorial

25  supervisor?

1   that other people went from being contractors to then

2   working for Tesla as regular Tesla employees?

3              MS. ANTONUCCI:  Objection; lacks foundation.

4              THE WITNESS:  When I started with Tesla -- I

5   mean with nextSource, that was not my observation,

6   because I didn't know the system.  I didn't know how

7   people moved from one area to another.

8              MR. ORGAN:  Q.  I understand.  Okay.

9              Now, in terms -- you ended up getting a job

10  with Tesla; is that correct?

11       A.   Correct.

12       Q.   What was your job with Tesla once you got it

13  in October of 2015?

14       A.   It was also as a janitorial supervisor.

15       Q.   So your job title stayed the same?

16       A.   No.  I got hired on initially as a janitorial

17  supervisor.  Okay?

18       Q.   Working for nextSource?

19       A.   Correct.  No, I mean, when I got hired with

20  Tesla, it was as a janitorial supervisor also.

21       Q.   Okay.  When you went to work for nextSource

22  working at the Tesla plant, your job title was

23  janitorial supervisor; is that right?

24       A.   Correct.

25       Q.   And then when you transitioned from working

1   from nextSource to Tesla, your job title was also

2   janitorial supervisor?

3       **A.    Initially, yes.**

4       Q.   So in terms of your transition from working

5   from nextSource to Tesla, your job title stayed the

6   same, at least initially; is that right?

7       **A.   Yes.**

8       Q.   How did your job duties change from when you

9   moved from a janitorial supervisor at nextSource to a

10  janitorial supervisor at Tesla?

11      **A.    I was hired as a janitorial supervisor, okay,**

12  **but since my interview with Mr. Quintero, he explained**

13  **that his duties involved recycling services, primarily**

14  **recycling services and janitorial services, okay, and**

15  **he explained to me that if and when I started working**

16  **for Tesla, he wanted me to get involved a lot more in**

17  **the recycling part of the -- so I can be of assistance**

18  **in both areas.**

19      Q.   Did your job title then change shortly after

20  you became a Tesla employee?

21      **A.   Yes.**

22      Q.   How did your job title change?

23      **A.   To contract services supervisor.**

24      Q.   Let me just go back to the question a couple

25  back where I asked you initially when you first were

```
 1        Q.   Do you know who they worked for?
 2        A.   Again, I think it was through nextSource, but
 3   it might have been some City Staff and other agencies
 4   also.
 5        Q.   And the elevators, this was the way that
 6   products got from either the lower level to the upper
 7   level or the upper level to the lower level; is that
 8   right?
 9        A.   Yes.  Moving production materials for the
10   building of cars.
11        Q.   These are, like, heavy-duty elevators, you
12   said; right?
13        A.   Yes, they're humongous, probably the size of
14   your -- half of your office here.
15        Q.   Okay.  I haven't been to the Tesla factory,
16   so tell me, pretty much, what was the role of the
17   elevators?  What were they supposed to do?
18        A.   Okay.  The elevators were there to move
19   product, and actually the primary responsibility was
20   to move material up and down for the production -- the
21   construction of cars.  Okay?
22             The group that I supervised, supervises the
23   two large elevators.  And we had forklift drivers,
24   tugger drivers, who moved this material up and down
25   the elevators all day long.  We had drop zones near
```

```
 1   had said there was some kind of relationship between
 2   Hilda and Aaron?
 3       A.   My job was to -- if anybody had any concerns
 4   or complaints, to escalate it to the point where I
 5   could escalate it.  And so what I did is I reported it
 6   to Mr. Salazar, which was the manager in recycling,
 7   okay, and if I remember correctly, during that time I
 8   was just being introduced to the elevators, so it was
 9   kind of, like, they're still in charge, okay, and
10   that's the way it was handled.  It was escalated to
11   the right people.
12       Q.   So when you were a supervisor, your job,
13   whenever you heard a complaint, was to escalate that
14   complaint or those concerns to a level where someone
15   could address it; is that right?
16       A.   In other words, if it was -- as a supervisor,
17   I could take it to a certain level, which primarily
18   meant dealing with either Victor Quintero or HR or,
19   you know, one of those individuals.  Or the
20   contractors' representative, the account manager, I
21   would take it to that point, and then they would deal
22   with it from there.
23       Q.   Did you feel like any of these things you
24   heard about from either Jesse or Hilda were concerns
25   that needed to be raised to the HR level?
```

1   his hair, with a caption under it saying "boo."

2       A.   Mm-hm.

3       Q.   Right?

4       A.   Yes.

5       Q.   That's what he told you; right?

6       A.   Yes.

7       Q.   And it was clear to you, wasn't it, that that

8   was offensive to Mr. Diaz?

9       A.   Of course.

10      Q.   In fact, down at the bottom, Mr. Diaz puts in

11  his text to you, "A person should be able to come to

12  work and not be harassed or degraded while they're

13  trying to do their job"; right?

14      A.   Yes.

15      Q.   It was clear to you that Mr. Diaz was

16  suggesting that he felt harassed and degraded by that

17  poster; right?

18      A.   That's why we took action.

19      Q.   He then references down here, "This is not

20  the first time Ramon Martinez has been" -- I think

21  "talked about, about his behavior."

22           That was in reference to the prior incident

23  where Mr. Diaz had complained about Ramon Martinez

24  saying things or threatening him on the elevator;

25  right?

1            MS. ANTONUCCI:   Objection; calls for a legal

2    conclusion, misstates prior testimony.

3            THE WITNESS:   He did not talk to me about

4    that, specifically.

5            MR. ORGAN:   Q.   Did you ask him about it?

6        **A.    I did not.**

7        Q.   Why not?

8        **A.    Because I was going to direct this**

9    **information to the appropriate people to handle it.**

10       Q.   And the appropriate people to handle it were

11   Wayne Jackson and Victor Quintero?

12       **A.    Correct.**

13       Q.   So once the information that was in this

14   email or text message -- whatever it was -- was

15   communicated by you to Wayne Jackson and Victor

16   Quintero, you felt like your role was over; is that

17   correct?

18           MS. ANTONUCCI:   Objection; misstates

19   testimony.   Vague.

20           THE WITNESS:   I didn't think that my

21   responsibilities were over.   I felt I had done what I

22   was supposed to do, placing it where some action could

23   be taken.

24           MR. ORGAN:   Okay.

25       Q.   If you go to the second page of Exhibit 37,

1    terms; right?

2        **A.    That the witnesses denied hearing any racial**

3    **slurs being made.**

4        Q.    But the witnesses also said that Mr. Timbreza

5    had a tendency to kid around excessively.

6        **A.    Correct.**

7        Q.    Right?

8              And you had no basis to suggest or think that

9    Owen Diaz was lying about this, did you?

10       **A.    No.**

11             MS. ANTONUCCI:  Objection; vague.

12             MR. ORGAN:  Q.   In fact, a verbal warning was

13   issued to Mr. Timbreza, wasn't it?

14       **A.    It was for his kidding around excessively.**

15       Q.    Did it mention anything about racially

16   offensive remarks?

17       **A.    I don't think that it did.**

18       Q.    Did you see this verbal warning that --

19       **A.    I don't remember.**

20       Q.    Let me finish the question.

21       **A.    Okay.**

22       Q.    Did you see the verbal warning that was

23   issued to Mr. Timbreza?

24       **A.    I do not remember looking at it.  I can't**

25   **remember looking at it.**

1    **would have taken.**

2              MS. ANTONUCCI:  Don't speculate if you don't

3    remember.

4              THE WITNESS:  I don't remember.

5              MR. ORGAN:  Q.  But your practice would have

6    been if you received it, to forward it along; correct?

7         **A.    I think so.**

8         Q.   And you at least have a general recollection

9    of receiving a statement from Ramon about what he said

10   happened; right?

11        **A.    Yes.**

12        Q.   And then if you look -- let's go to the next

13   one.

14              (Whereupon Deposition Exhibit 57

15               was marked for identification.)

16              MR. ORGAN:  57.

17              Exhibit 57, for the record, is a one-page

18   document, Bates-stamped Tesla 134.  And it's a series

19   of emails from October 20th of 2015.

20        Q.   If you look at the email at 12:41 p.m., which

21   is the one in the middle, it says, "It looks like

22   Victor is asking Ed Romero to get involved in a

23   temporary worker ER issue.  My recommendation is that

24   Ed not be involved.  Can you help me sort this out."

25              Who was Terri Garrett at that point?

1      **A.    She was the nextSource manager out of New**

2   **York.**

3      Q.    It says here, "Two of the three workers have

4   already been interviewed.   Please advise."

5            Did you interview two of the three workers?

6      **A.    Where are you looking at that?**

7      Q.    That same paragraph.

8      **A.    Oh, I see.**

9            **No.   I remember Erin sending me this email, I**

10  **had not had -- now I remember, I didn't have any**

11  **meetings with anybody.   I had been asked to by Victor,**

12  **and before that ever happened, HR said no, no, no,**

13  **don't get involved in that.**

14     Q.    Who was Aaron Marconi?

15     **A.    She was the HR person for Tesla.**

16         **I need to go to the bathroom again.**

17         MR. ORGAN:   Let's take a break.

18         We're off the record.   The time is 4:06.

19         (Recess taken from 4:06 p.m. to 4:16 p.m.)

20         MR. ORGAN:   Back on the record.   The time is

21  4:16.

22         This is 58.

23         (Whereupon Deposition Exhibit 58

24          was marked for identification.)

25         MR. ORGAN:   Q.   Exhibit 58, for the record,

1   this incident?

2           MS. ANTONUCCI:  Objection; vague.

3           MR. ORGAN:  Q.  I'm just wondering, did it

4   appear to you that Mr. Owen Diaz followed the correct

5   procedure here with respect to this incident and the

6   elevator?

7       **A.   I think that he looked into it appropriately.**

8       Q.   And I guess Rathaj Foster was then

9   terminated; is that right?

10      **A.   I don't recall if he was terminated because**

11   **of this.   This was -- as you notice, it was -- I think**

12   **we included Wayne Jackson as part of this.**

13          MR. ORGAN:   Okay.   Let's make this 64.

14          (Whereupon Deposition Exhibit 64

15           was marked for identification.)

16          MR. ORGAN:  Q.  Exhibit 64, for the record,

17   is a two-page document -- three-page document,

18   Bates-stamped City Staff 11 through 13.   And the

19   subject matter is termination of Rathaj foster.

20          This was Mr. Foster engaged in threatening

21   conduct towards Owen Diaz; right?

22      **A.   Yes.**

23          MS. ANTONUCCI:  Objection; vague.

24          MR. ORGAN:  Q.  Well, that was your

25   understanding; that Rathaj Foster was removed from

1      A.    Yes.

2      Q.    And in that, you mentioned that Rathaj Foster

3  had been removed the previous night at 10:00 p.m. from

4  the Tesla premises; right?

5      A.    He was removed to avoid any more friction

6  that day between him and Owen.

7      Q.    Right.

8            And you had -- you first got a report where

9  Mr. Foster was making a claim about not being able to

10  take a break; correct?   That's what Mr. Foster was

11  claiming.

12      A.    He did.   And there's other information that

13  Wayne -- I mean -- Wayne.   And I don't remember where

14  it is, but Owen was -- I don't know if these are

15  referring to the same night, that he asked Rathaj to

16  go -- to wait to take his break.

17      Q.    And that was because they were short-staffed;

18  right?

19      A.    Correct.   It could be that, or it could be

20  that there was a lot of production material to move.

21      Q.    But Owen told you that Mr. Foster said, "You

22  better watch your car," or something like that;

23  correct?

24      A.    He did say that.

25      Q.    And then you interviewed someone else who was

1   present; right?  Jordano Ramirez.

2       A.   **Jordan?**

3       Q.   If you look at the bottom of the second page

4   of Exhibit 64, you'll see that you interviewed Jordano

5   Ramirez; right?

6       A.   **Show me where that's at.**

7       Q.   Actually, you've got a written statement from

8   him; correct?

9       A.   **Yes.**

10      Q.   And he wrote in his statement that he

11  witnessed Rathaj foster conducting himself in a

12  threatening manner towards Owen Diaz; right?

13      A.   **Mm-hm.**

14      Q.   So you were the one who called security and

15  explained the situation; right?

16      A.   **I did.**

17      Q.   You were the one that had Mr. Foster removed

18  from the premises; right?

19      A.   **Yes.**

20      Q.   Because you had corroboration that Mr. Foster

21  was threatening Mr. Diaz; right?

22      A.   **Yes.**

23      Q.   And that was inappropriate conduct; right?

24      A.   **It was.  I took it very serious when anybody**

25  **made any threats toward anybody else.**

EDWARD ROMERO
November 30, 2018

Page 214

```
 1   State of California              )
 2   County of Marin                  )
 3
 4              I, Bridget M. Mattos, hereby certify
 5   that the witness in the foregoing deposition was by me
 6   duly sworn to testify to the truth, the whole truth
 7   and nothing but the truth in the within entitled
 8   cause; that said deposition was taken at the time and
 9   place herein named; that the deposition is a true
10   record of the witness's testimony as reported to the
11   best of my ability by me, a duly certified shorthand
12   reporter and disinterested person, and was thereafter
13   transcribed under my direction into typewriting by
14   computer; that the witness was given an opportunity to
15   read, correct and sign the deposition.
16              I further certify that I am not
17   interested in the outcome of said action nor connected
18   with or related to any of the parties in said action
19   nor to their respective counsel.
20              IN WITNESS WHEREOF, I have hereunder
21   subscribed my hand on November 30, 2018.
22
       _____
23         BRIDGET M. MATTOS, CSR NO. 11410
24
25
```

# Exhibit

# **3**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

DEMETRIC DIAZ, OWEN DIAZ AND          )
LAMAR PATTERSON,                      )
                                      )
                  Plaintiffs,         )CASE NO.
                                      )3:17-cv-06748-WHO
          vs.                         )
                                      )
TESLA, INC., DBA TESLA MOTORS,        )
INC.; CITISTAFF SOLUTIONS, INC.;      )
WEST VALLEY STAFFING GROUP;           )
CHARTWELL STAFFING SERVICES,          )
INC.; AND DOES 1-50, INCLUSIVE,       )
                                      )
                  Defendants.         )
_____)

VIDEOTAPED DEPOSITION OF TAMOTSU KAWASAKI

DATE:          OCTOBER 9, 2019

TIME:          2:05 P.M.

LOCATION:      CALIFORNIA CIVIL RIGHTS LAW GROUP
               180 GRAND AVENUE, SUITE 1380
               OAKLAND, CALIFORNIA

REPORTED BY:  ANGIE M. MATERAZZI
              Certified Shorthand Reporter
              License No. 13116

```
 1    APPEARANCES:
 2

          FOR THE PLAINTIFFS:
 3
               BY:  LAWRENCE A. ORGAN, ESQ.
 4             CALIFORNIA CIVIL RIGHTS LAW GROUP
               332 SAN ANSELMO AVENUE
 5             SAN ANSELMO, CALIFORNIA 94960
               (415)453-4720
 6             LARRY@CIVILRIGHTSCA.COM
 7
 8        FOR THE DEFENDANTS, TESLA MOTORS:
 9             BY:  PATRICIA M. JENG, ESQ.
               SHEPPARD MULLIN
10             FOUR EMBARCADERO CENTER, 17TH FLOOR
               SAN FRANCISCO, CALIFORNIA 94111
11             (415)434-9100
               PJENG@SHEPPARDMULLIN.COM
12
13        FOR DEFENDANTS, CITISTAFF SOLUTIONS:
14             BY:  SUSAN T. KUMAGAI, ESQ.
               LAFAYETTE & KUMAGAI
15             1300 CLAY STREET, SUITE 810
               OAKLAND, CALIFORNIA 94612
16             (415)357-4600
               SKUMAGAI@LKCLAW.COM
17
18        FOR DEFENDANTS, NEXTSOURCE:
19             BY:  JUAN C. ARANEDA, ESQ.
               FISHER PHILLIPS
20             ONE EMBARCADERO CENTER, SUITE 2050
               SAN FRANCISCO, CALIFORNIA 94111
21             (415)490-9000
               JARANEDA@FISHERPHILLIPS.COM
22
23
24
25
```

**Page 2**

1    use the bathroom, I would step in and fill the position

2    for the five, ten minutes they left to go use the

3    bathroom, whatever it is, or get something to eat.  I

4    mean, we were working 12-hours days, I wasn't trying to

5    burn anybody out.  If they needed a break, they needed a

6    break.

7            And then he called me -- Owen had called me

8    and said he got into altercation, so I drove back to the

9    elevators and said what happened and they were arguing

10   and I can't -- can't really remember what the argument

11   was about, but I -- I think they -- I think some-

12   something -- I forget what he said.  He said

13   something -- that he called him something.  I just

14   forget what it was, but I have it all down in e-mail.  I

15   know I e-mailed everything to my immediate supervisor

16   that night.

17       Q.   Okay.  So I'm going to show you an e-mail that

18   you sent at the end of July, so July 31st.  This is

19   Exhibit 42.  And just so the record is clear, we're

20   looking at Tesla 510.

21            You mentioned an e-mail that you sent.  Is

22   this the e-mail you sent about what information you

23   received from Owen Diaz?

24       A.   Yep.

25       Q.   You mention in here -- and -- and you sent --

 1   another employee.  Whether it was joking or not, you

 2   still said it, you got to go home.

 3        Q.   Right.  So let me just break that down.

 4             So you recall that Mr. Timreza -- or at least

 5   Mr. Diaz said that Mr. Timreza had used a racial slur

 6   towards him, correct?

 7        A.   Correct.

 8        Q.   And that -- as you think about it, you recall

 9   that -- at least one of the racial slurs he used was

10   dumb nigger; is that right?

11             MR. ARANEDA:   Objection, misstates his

12   testimony.

13             THE WITNESS:   It -- I know racial slurs were

14   said.  I can't very verify that the N-word was said, but

15   from what they were arguing about, I know Owen said he

16   called me the N-word.  I remember Owen saying that he

17   called me the N-word and they were arguing, where they

18   were almost about to get into a fight.  So I got into

19   the middle of it and said -- it happened and there was

20   other people around that said it as well, that this

21   altercation happened, so in my book, as a supervisor,

22   I'm going to separate the two.

23   BY MR. ORGAN:

24        Q.   Okay.  Okay.  So let me break that down.  So

25   you do recall that Mr. Diaz, at least, told you that

1   Mr. Timreza had used the N-word towards him?

2       **A.   Correct.**

3       Q.   And you also recall that other people told you

4   that they had heard racial terms used; is that right?

5       **A.   Correct.**

6           MR. ARANEDA:   Objection, misstates his

7   testimony.

8   BY MR. ORGAN:

9       Q.   Did -- did anyone ever tell you -- anyone

10  else -- other than Mr. Diaz -- tell you they had also

11  heard the N-word directed towards Mr. Diaz?

12      **A.   I don't remember anybody else telling me that**

13  **the N-word was directed towards him.   I mean, it's -- we**

14  **live in that era where that words is very -- throw**

15  **around very casually.**

16      Q.   Right.   But in terms of workplace policy at

17  the Tesla factory, people were not supposed to use the

18  N-word there?

19      **A.   Correct.   That's any workplace.**

20      Q.   Right.   Whether people use the word

21  casually -- in their everyday life or not -- is

22  irrelevant, relative to the workplace, right?

23      **A.   Correct.**

24          MS. JENG:   Objection, calls for a legal

25  conclusion.

```
 1              THE WITNESS:  Correct.
 2   BY MR. ORGAN:
 3       Q.   And in terms of the way -- did you receive any
 4   training by Tesla about like workplace conduct on -- you
 5   know, things you shouldn't say and it's okay to say,
 6   any -- any training like that?
 7       A.   I didn't get any training from Tesla, if
 8   that's what you're saying.
 9       Q.   Okay.  So Tesla didn't give you any training
10   about discrimination or harassment?
11       A.   They gave me a paper, when I became a lead, to
12   sign and I read, but not per se going to a class and
13   doing any training.  It's just probably roughly a paper
14   to back themselves.
15       Q.   Okay.  And then let's -- let's go back to this
16   night, when you were talking to Owen Diaz.  You said
17   that you sent Judy Timbreza home.
18              Did Mr. Timreza admit that he had used some
19   inappropriate language?
20       A.   He -- he argued about it and said he didn't do
21   it.  But at that time, them really arguing, almost
22   getting into a fight, and other people in the area
23   telling me that -- that was said in nature, it was my --
24   my decision to say, hey, what -- I can't keep them both
25   together and I can't put Judy in another department,
```

1    **there's nothing else for me to put him, I need to**

2    **separate these guys and those natures were said.  At my**

3    **standpoint, I -- there's people around, they said what**

4    **they said.  Okay, well, you got to go home.  You --**

5    **that's not -- that's not cool, that's not right, you**

6    **can't do that.**

7         Q.   So -- so based on the information that you

8    received from the people that you talked to in the

9    general area were Owen and Judy Timbreza were working,

10   you -- you made the assessment that Mr. Timreza had at

11   least used some inappropriate words, correct?

12        **A.   Correct.**

13        Q.   And based on that determination you sent

14   Mr. Timreza home, correct?

15        **A.   Correct.**

16        Q.   Was there anybody who's -- who had said that

17   Mr. Diaz had used any inappropriate words?

18        **A.   Not from my recollection, no.**

19        Q.   Okay.  And then did -- do you remember whether

20   or not Mr. Diaz said that Mr. Timreza had used the word

21   jiggabo?

22             Do you remember him complaining about that

23   word?

24        **A.   No.  Not to me, per se, about jiggabo.  No,**

25   **that never --**

```
 1   on similar social positions with those two individuals?
 2              MS. JENG:  Objection, misstates --
 3              MR. ORGAN:  That's a bad question.
 4   BY MR. ORGAN:
 5       Q.   Let me -- were you -- you guys were friends at
 6   work; is that fair?
 7       A.   Everybody's friends at work.  Man, we're all
 8   colleagues, nobody wants to --
 9       Q.   Sure.
10       A.   -- be that guy, so.
11       Q.   Right.
12       A.   Yeah.
13       Q.   Did you -- did you socialize with either
14   Mr. Timreza or Mr. Diaz outside of work?
15       A.   No.
16       Q.   After work hours or anything like that?
17       A.   Never.  No, I don't have -- no, I don't do
18   that.
19       Q.   Okay.
20       A.   Sorry.  I had my own friends.
21       Q.   Okay.  I -- I get that too.
22              And did Mr. Romero follow up with you after
23   you sent the e-mail on the 31st, to ask you more
24   specifically what the racist words or comments were that
25   Mr. Timreza had used?
```

1      A.   Yeah.   I believe Edward came -- I want to say

2  that Monday, he came at the tail end of my shift and we

3  ate breakfast together in one of the cafeterias and

4  talked about what happened.

5           And I told him, This is what happened, other

6  people had told me, I took my own decision and said,

7  Hey, we've got to separate them, this guy has to go

8  home, so I sent him home.   And I said, I e-mailed you

9  guys and that's it.   Wherever you take it from there, I

10  mean that's -- the ball is in your court.

11      Q.   Okay.

12      A.   In my eyes, I just pretty much handed it off

13  to the next person.   It had nothing -- I -- because like

14  I said, I don't have the power to do anything like that,

15  these guys above me that can subsequently reprimand or

16  do whatever they so choose.

17      Q.   It wasn't your -- it wasn't your place to give

18  any kind of written warning or anything like that to

19  Mr. Timreza; is that right?   Is that what you're saying?

20      A.   So it was -- that's where it gets -- Edward

21  did come that Monday with -- he said there's a rule that

22  there's these three written warnings before anybody gets

23  laid off, I guess.   That's what -- that Monday he told

24  me about that.

25           Like I said, I didn't have any training or any

1   **knowledge of anything like that.  All I knew was, if**

2   **there was an issue on my shift, e-mail it and cc these**

3   **people on it.**

4       Q.   Okay.  And was -- did Edward Romero tell you

5   that -- because if you look at the top of the e-mail,

6   which is -- if you look at your -- it's 8/2 so --

7       **A.   August 2nd.**

8       Q.   Yeah, 2015.  It says, I believe we can handle

9   the situation.

10          Do you see that, where you're saying that to

11  Mr. Quintero?  Do -- do you remember -- does that

12  refresh your recollection about -- did you ever have any

13  conversations with Mr. Quintero about what had happened

14  between Judy Timbreza and Mr. Owen Diaz?

15      **A.   No -- no, I cc'd him.  As -- as you can see,**

16  **he replied back, Let me know if he can help in this**

17  **matter and he was on vacation that weekend.**

18      Q.   Oh, okay.  And then --

19      **A.   So that's where I said I think we can handle**

20  **the situation.**

21      Q.   And when you say the -- the we there, that we

22  can handle the situation, you included Ed Romero in the

23  we; is that correct?

24          MR. ARANEDA:  Objection, calls for

25  speculation -- I mean, lacks foundation.

```
 1        Q.   Okay.  All the time.
 2             Did you ever -- were you ever aware of any
 3   kind of run-ins or problems between Owen Diaz and Ramon
 4   Martinez?
 5        A.   I vaguely remember Owen saying that he -- him
 6   and Ramon didn't like each other.
 7        Q.   Okay.
 8        A.   But I don't remember why.  I mean, like I
 9   said, I keep to myself.  Stuff like that goes in one ear
10   and out the other.  What does it bother me, you guys
11   don't like each other.  You guys are -- you guys work
12   together.  What does it matter.  You don't got to like
13   everybody you work with.
14        Q.   Okay.
15        A.   Even right now, I don't like some people I
16   work with, but I deal with it.
17        Q.   Sure.  Okay.  Let's see.  Any -- do you
18   remember anything else about that conversation you had
19   with Ed Romero about the Judy Timbreza, Owen Diaz
20   interaction?
21        A.   Like I said, I -- the only thing I remember is
22   I know I e-mailed them.  He asked me what the e-mail was
23   about.  I told him they got into an altercation, racial
24   slurs were said -- that was said to Owen from Judy and I
25   sent Judy home and the ball is in your court.
```

 1              And that's where Ed -- Edward came out with,

 2     Well, let's -- we can write him up for this situation

 3     right here and three write-ups is a layoff and then he

 4     gave me that paperwork and I in turn brought it to Judy

 5     and said you need to sign this, this is what happened.

 6     It's not saying you're going to get laid off.  It's just

 7     a document stating that this situation happened and

 8     you're being written up for it.

 9          Q.   So do you recall that there was some kind of

10     writing, in terms of writing up Mr. Martinez (sic) for

11     his conduct, relative to Mr. Diaz; is that right?

12          A.   There should be documents that Ed gave to me

13     that I in turn had signed.  I don't know what Ed did

14     with those documents after.

15              That's -- like I said, I -- that's above my

16     pay grade.  I don't know -- like I said, I e-mailed,

17     they had me do what I -- I had to do -- have sign the

18     documents.  I gave everything over to them.  I don't

19     know what they did, where they filed it.  There

20     was nothing ever after that, towards me.

21          Q.   Okay.

22          A.   Like, they didn't say this is what happened,

23     this is what we're doing, nothing like that.

24          Q.   Okay.  And then do -- do you remember if Ed

25     Romero actually did any kind of investigation of his

1   own, that he made you aware of?

2       **A.   Not that he made me aware of, like**

3   **investigation-wise.   I don't know.   I thought that he**

4   **just got written up for it and that was the end of it.**

5   **Like I said, my recollection is -- I got -- I gave him**

6   **the documents to sign, wrote up, I then in turn gave the**

7   **documents back to Edward.**

8       Q.   Okay.   So if I have it down right, at some

9   point after the altercation between Owen Diaz and Judy

10  Timbreza, Mr. Romero gave you some kind of write-up for

11  Mr. Timreza; is that right?

12      **A.   I -- I believe he said that was Tesla's, I**

13  **guess, their -- their way of backing themself, when an**

14  **altercation like -- something -- or any altercation that**

15  **happens, you can write them up for it and they had a**

16  **three write-up rule.   After the third write-up, was a**

17  **termination.**

18      Q.   Okay.   And so in terms of the write-up for

19  Mr. Timreza, that was given to you by Mr. Diaz (sic) and

20  then you got Mr. Timreza to sign it and then returned it

21  to Mr. Diaz; is that right?

22      **A.   Correct.**

23      Q.   And -- and just so we're clear --

24      **A.   Mr. Diaz -- Romero.   You're talking about --**

25      Q.   I'm sorry.

1      Q.   Okay.

2      **A.   So -- and I tried calling him, but he didn't**

3      **answer, his phone was off.**

4      Q.   Okay.  Did -- did -- and after this e-mail

5      exchange between you and Mr. Romero, did you have any

6      additional discussions with Mr. Romero about Judy

7      Timbreza, that you can recall?

8      **A.   We didn't have any different discussions.  All**

9      **I know is after that, Judy did not work for Tesla**

10     **anymore or for the staffing company, so I took it upon**

11     **myself to believe he got laid off.  They didn't tell me**

12     **what was going to happen.**

13     Q.   Okay.

14     **A.   So...**

15     Q.   So after -- after you had the -- the

16     discussion with Mr. Romero, you don't know what happened

17     to Judy Timbreza; is that right?

18     **A.   He stopped -- he wasn't working for my shift**

19     **anymore.  For all I know, he could have been on day**

20     **shift.**

21     Q.   Okay.

22     **A.   But I'm assuming.**

23     Q.   Now, I'm going to ask you if this refreshes

24     your recollection -- actually you're not on this e-mail.

25     This one.

1  the elevator operator didn't show up and it was just you

2  and Owen and it was just the two of you operating the

3  elevators together?

4      A.   Yes.  That happened a few times.

5      Q.   Okay.  And in terms of Mr. Diaz's performance

6  as a -- as an elevator operator, based just on your

7  experience, how would you describe Mr. Diaz's

8  performance, as an elevator operator?

9      A.   I had no issues with him performing as an

10  elevator operator and I had no issues with him

11  performing as a lead.

12      Q.   Okay.

13      A.   I wouldn't have recommended a person that

14  wasn't ready for that position.  I mean, when I got

15  there, I busted my butt day in and day out, and somebody

16  else recognized it and put me in a position.  When I see

17  somebody busting their butt, I'm going to pay it forward

18  and put them in a position.

19      Q.   Did -- did any of the people who had to work

20  with -- you know, any of the -- the Tesla people that

21  had to work with the elevators, did anyone ever complain

22  to you about any of Owen Diaz's conduct in any way?

23      A.   Nope.  Everybody always had a complaint

24  because -- like I said, that elevator ran production.

25  So if the batteries weren't getting up, that means that

1    **factory, it doesn't stop.**

2         Q.    Sure.   I'm going to show you what's been

3    previously marked as Exhibit 34.  Exhibit 34, for the

4    record, is a one-page document Bates-stamped ODIAZ3 and

5    it's an e-mail from Diaz to Mr. Romero and to you on

6    October 17th at 6:08 p.m.

7              Do you remember Mr. Diaz complaining about

8    Ramon Martinez threatening him?

9         **A.    Yeah, I remember this.**

10        Q.    Tell me -- tell me about what you recall

11   relating to this threatening incident by Mr. Martinez

12   towards Mr. Diaz.

13        A.    I remember Owen saying that -- like he stated,

14   that Roman was waiting down at the bottom elevator,

15   where Roman wasn't supposed to be because he had nothing

16   to do with the inside team.  He had everything to do

17   with the outside bailer team and bailing those

18   cardboards and putting them on the lift.  And then in

19   turn was trying to get over -- I guess he was trying to

20   be -- show Owen that he was the boss.  But at the same

21   time he wasn't because I had control of the team -- of

22   the inside building and the outside.

23              Now, in turn, he e-mailed this situation and I

24   believe I was off this day and I got the e-mail and

25   Edward got the e-mail, but Edward dealt with it.

1    is 3:35.

2              (Off the record at 3:35 p.m. and back on

3              the record at 3:37 p.m.)

4              MR. ORGAN:  Okay.  We're back on the record.

5    The time is 3:37.

6    BY MR. ORGAN:

7        Q.   Did -- when you were walking around the

8    facility, did you ever hear anyone using the N-word,

9    even if you can't identify them, did you hear that word?

10       A.   I mean, I heard it all the over the facility.

11   I mean, it's -- there's a bunch of staffing companies,

12   man.  I mean, you had -- you had a range of people, man.

13   Staffing companies hire -- you go to a staffing company

14   because you can't get a job, per se, like a -- I guess a

15   real person or whatever, you have a background, whatever

16   it is.  I mean, we filtered through a lot of people.

17   I'm not knocking people for what they do, but it's a

18   staffing agency, per se.  So you got a wide arrange of

19   people.

20              Like I said, in our age, that word gets thrown

21   around very causally.  Now, if you -- there is tones the

22   way you say it and what it is, but -- I mean, I've heard

23   it thrown around there, yeah.

24       Q.   How -- how often do you think you heard the

25   N-word at the Tesla factory?

1      **A.   I couldn't -- I really could not tell you how**

2    **often I heard it.   But, I mean, you hear it.   I mean, it**

3    **is what it is.**

4      Q.   Okay.

5      **A.   I don't think nothing of it.   I mean, no**

6    **complaints were brought to me, so -- and I don't know**

7    **what was brought to other people, so.**

8      Q.   When you say no complaints were brought to

9    you, other than the one by --

10     **A.   Owen Diaz.**

11     Q.   Right.

12     **A.   Yeah.**

13     Q.   Okay.   And in terms of -- there was -- I -- I

14   saw an e-mail about an NDA, I -- which I think is a

15   Nondisclosure Agreement.

16          Did you -- did you have any -- were you

17   required to sign any kind of NDA, as part of your work

18   at Tesla?

19     **A.   I -- maybe, I don't know.   Was there -- maybe**

20   **if it was in the paperwork they had me sign.   I --**

21     Q.   Okay.

22     **A.   Like I said, I was juiced to become a lead.**

23   **Any paperwork they gave me, all right, I get a $5 pay**

24   **bump an hour, why not.**

25     Q.   And in -- and in terms of the policies that

```
 1              I wasn't totally clear.  Were you present for
 2   that altercation?
 3        A.   I was not present for the altercation.  I came
 4   afterwards, when I was called, to come to the
 5   altercation, and I was in a different part of the
 6   warehouse.  I don't recollect where I was in the
 7   warehouse.  But like I said, I had so many different
 8   positions to fill or oversee --
 9        Q.   Okay.
10        A.   -- in that warehouse.  When I got the call, I
11   went there immediately --
12        Q.   Got it.
13        A.   -- and they were still arguing.
14        Q.   Got it.  So did you witness any parts of the
15   altercation?
16        A.   I didn't witness any part of the altercation,
17   per se.  I just showed up and they were still arguing,
18   almost face-to-face, looked like they were about to
19   fight, so I got off of my cart and went to them and
20   said, You got guys to back away from each other, you
21   know, and what happened and I logged -- I asked Owen
22   what happened, I asked Judy what happened and then there
23   were people around and I asked them what happened.
24              Owen said racial slurs were said.  The people
25   around him said Judy said racial slurs towards Owen and
```

1    **like I said, my decision at that point was, these guys**

2    **are about to fight, one of them's got to go home.   It**

3    **was like Judy was the aggressor, saying racial slurs, so**

4    **I sent him home.**

5        Q.   So you heard -- you said they were still

6    fighting when you got there?

7        **A.    They were arguing.**

8        Q.   They were arguing.

9             Did you hear any part of the argument at all?

10       **A.    I just heard them saying, Back up.   They were**

11   **in each other's face and I remember Owen saying, Back up**

12   **and Judy was saying, What are you going to do and all**

13   **that.   And it looked like they were about to fight and**

14   **that's where I intercepted and broke them apart --**

15       Q.   Okay.

16       **A.    -- and said, You go over there and you go over**

17   **there and that's in turn why --**

18       Q.   So is that everything you remember hearing

19   from --

20       **A.    Yeah.   I just remember --**

21       Q.   -- that altercation?

22       **A.    -- them saying back up to each other.   I don't**

23   **remember hearing any -- like I said, I didn't hear any**

24   **racial slurs, I didn't -- all I got was from what**

25   **happened around at that time --**

1          Okay, well, my decision, you got to go home

2    and I ended up covering the rest of the elevator shift

3    for that day.

4          Q.   And the other people that you spoke with, what

5    they were doing, when --

6          A.   So in the elevator -- it's -- it's -- there's

7    a walkway in front of it and like I say, you see the

8    elevator on the map, there's a cafeteria, so everybody

9    from that line side is coming to take their break.  I

10   think it might have been on a break time, where people

11   were falling off that line and they were just overseeing

12   it.

13          I don't know who they were.  Like I said, I

14   only know the employees that I have under me.  Everybody

15   else was a blur.

16          Q.   After you sent Mr. Timreza home that night,

17   did you ever see him at Tesla again?

18          A.   I think I -- I seen him the next day.

19          Q.   Okay.

20          A.   I seen him the next day.  I didn't send -- I

21   didn't say you're -- you're home indefinitely.  I just

22   said, You got to go home for the night.

23          Q.   You mentioned that at some point he no longer

24   worked at Tesla, as far as you knew, at least on your

25   shift.

```
1       A.    Yes.

2       Q.    Did Mr. Diaz work that day?

3       A.    Yes.

4       Q.    Okay.  Did you work Sunday?

5       A.    I did work Sunday.

6       Q.    Did Mr. Timreza work that day?

7       A.    I believe so, yeah, yeah.  He worked up until

8    Monday.  The last day I seen him -- he -- so he had

9    Monday, Tuesday off.

10      Q.    Okay.

11      A.    Right.  So he worked Wednesday, Thursday,

12   Friday, Saturday, Sunday.  He had Monday, Tuesday off.

13   He didn't come back -- they -- that's on Monday, they

14   told me that he's not coming back.

15      Q.    Okay.  And that's --

16      A.    Or they told me to fill the elevator position,

17   so I assumed he's not coming back.  They told me, You

18   need to find somebody on your shift that can cover the

19   elevator and that's where I assumed he's not coming back

20   and then he didn't come back that following Wednesday.

21      Q.    Okay.  When -- do you know if Mr. Diaz worked

22   the Saturday after the altercation?

23      A.    I believe he -- I believe he did because -- I

24   believe he did because I was very attentive on that

25   elevator that night, that Saturday night.  I was --
```

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2

 3              I, ANGIE M. MATERAZZI, CSR No. 13116, duly

 4    authorized to administer oaths Pursuant to Section

 5    2093(b) of the California Code of Civil Procedure,

 6    hereby certify that the witness in the foregoing

 7    deposition was by me duly sworn to testify the truth,

 8    the whole truth and nothing but the truth in the

 9    within-entitled cause; that said deposition was taken at

10    the time and place therein stated; that the testimony of

11    the said witness was reported by me and thereafter

12    transcribed by me or under my direction into

13    typewriting; that the foregoing is a full, complete and

14    true record of said testimony; and that the witness was

15    given an opportunity to read and correct said deposition

16    and to subscribe the same.

17              I further certify that I am not of counsel nor

18    attorney for either or any of the parties in the

19    deposition and caption named, or in any way interested

20    in the outcome of the cause named in said caption.

21              I hereby certify this copy is a true and
      exact copy of the original.
22

23                        _____

24                        ANGIE M. MATERAZZI, CSR 13116

25    Date:  _____
```

# Exhibit

# 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

     Plaintiffs,

       vs.                    No. 3:17-cv-06748-WHO

TESLA, INC., dba TESLA
MOTORS, INC.; CITISTAFF
SOLUTIONS, INC.; WEST VALLEY
STAFFING GROUP; CHARTWELL
STAFFING SERVICES, INC.;
and DOES 1-50, inclusive,

      Defendants.

_____//


DEPOSITION OF VICTOR QUINTERO

June 7, 2018


Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1                    A P P E A R A N C E S

 2

 3   FOR PLAINTIFF:

 4             CALIFORNIA CIVIL RIGHTS LAW GROUP

 5             BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW

 6             332 San Anselmo Avenue

 7             San Anselmo, California 94960

 8             (415) 453-4740

 9

10   FOR DEFENDANT:

11             CONSTANGY, BROOKS, SMITH & PROPHETE

12             BY:  BARBARA ANTONUCCI, ATTORNEY AT LAW

13             351 California Street, Suite 200

14             San Francisco, California 94104

15             (415) 918-3006

16

17   (NOT PRESENT)

18   FOR DEFENDANT:

19             PAHL & MCCAY

20             BY:  FENN HORTON, ATTORNEY AT LAW

21             225 West Santa Clara Street, Suite 1500

22             San Jose, California 95113

23             (408) 286-5100

24

25   THE VIDEOGRAPHER:  SAJA SPEARMAN, CCRLG
```

1       **A.    Yeah, now I got it now.**

2       Q.    -- those you can testify about.

3             Does that make sense?

4       **A.    Yes, because some of that I didn't know at**

5       **the time, until now.**

6       Q.    Right.

7             That's the interesting thing about PMK

8       depositions in federal court versus PMQ depositions in

9       state court.  In state court, you don't have to learn

10      stuff.  In federal court, you have to learn it.  So

11      anyway -- okay.

12            What was your position in May 2014 when you

13      started working at Tesla?

14      **A.    I was managing the food services, janitorial**

15      **services, grounds, landscaping, elevator services,**

16      **recycling services.  Yeah, I think that was it.**

17      Q.    And what was your title?

18      **A.    I was custodial program manager, was my**

19      **official title.**

20      Q.    Custodian program manager?

21      **A.    Yes.**

22      Q.    How many employees were in those areas that

23      you oversaw, the food services, landscaping, elevator,

24      recycling?

25      **A.    I don't have specific numbers.  I can give**

1   you general numbers.

2       Q.   Yeah, give me a general number.

3       A.   So I think the janitorial was the largest

4   group we had, like about somewhere between 50 to a

5   hundred employees.

6       Q.   Okay.

7       A.   Food service had like -- I want to say

8   between 25 and 50.  Recycling had like -- I want to

9   say 25, 30.  And then the elevator service had -- it

10  was like four -- four -- like 12, 15.  And landscaping

11  had -- I don't know -- I want to say half a dozen.

12      Q.   So if I have it right, you supervised

13  approximately 118 to 221?

14      A.   I didn't directly supervise them.  I

15  basically managed the contract -- some employees at

16  the time were in-house.  I have supervisors working

17  for me that did supervise them directly.  The

18  employees that were contract employees were managed

19  through the -- their own company supervisors and shift

20  leads.  So basically, we managed the contract.

21      Q.   But there were approximately 118 to 221

22  employees within your sphere of managerial

23  responsibility; is that correct?

24      A.   Approximately.  Yes.

25      Q.   Right.  Approximately.

1    leads, supervisors, and managers.

2        A.    Yes.

3        Q.    But in terms of the people who worked on the

4    contracts -- for example, let's talk about janitorial.

5    Was there a company that did the janitorial service?

6        A.    Yes.

7        Q.    And that company that did the janitorial

8    service, they had their own shift lead, supervisors

9    and managers; is that right?

10       A.    Yes, yes, on-site.

11       Q.    And then when they had their on-site shift

12   lead, supervisors and managers, there were also the

13   contract supervisors who were Tesla employees;

14   correct?

15       A.    Yes.

16       Q.    And the Tesla employees, if they wanted to

17   have the janitorial service work in a particular area

18   of the factory because some incident had happened

19   where there was a need for a cleanup, they could

20   direct the shift lead, supervisors and managers for

21   the janitorial contractor to get employees to go

22   there; correct?

23       A.    Yes.

24       Q.    And the contract supervisor could also at

25   least direct the work of those people who were

 1            MR. ORGAN:  Okay.

 2       Q.   The supervisors could hand out Tesla safety

 3   glasses to their contract employees; correct?

 4       A.   **I don't know if they were Tesla or not.  It's**

 5   **a different company that provides them.  Mallory**

 6   **Safety or something.**

 7       Q.   Are there any of the contractors who worked

 8   in the areas that you have -- for example, janitorial,

 9   food service, recycling, elevator, or landscaping --

10   that transitioned from a contract employee to a

11   regular Tesla employee?

12       A.   **Yes.**

13       Q.   And when they transition from a contract

14   employee to a regular Tesla employee, did they have to

15   move out of those particular areas, or could they

16   continue to work in the areas they previously worked

17   in?

18       A.   **There was very few.  They eventually were**

19   **separated, so they couldn't -- no, they could not work**

20   **together.**

21       Q.   When did that separation occur?

22       A.   **Like shortly after I started working there.**

23       Q.   You started in 2014?  You said May 12th of

24   2014?

25       A.   **Yes.**

1    Q.  So in 2015, were the workers separated so

2  that they couldn't work with the Tesla workers?

3    **A.  I did it probably like within the first three**

4  **months of my employment.**

5    Q.  Oh, so you separated the contract employees

6  from the regular Tesla employees?

7    **A.  Yes.**

8    Q.  So there would be interactions, though,

9  between regular Tesla employees and the contract

10  employees; right?

11    **A.  When I first started working there, yes.**

12    Q.  Well, for example, the elevator operators,

13  they had interactions with Tesla employees all the

14  time; right?

15    **A.  The elevator operators were never -- when I**

16  **first started working there and took over, there were**

17  **never Tesla employees and contract employees working**

18  **together side by side.**

19    Q.  Meaning, there were no elevator operators who

20  were Tesla employees?

21    **A.  That is correct.**

22    Q.  But Tesla employees would bring stuff onto

23  the elevators; correct?

24         MS. ANTONUCCI:  Objection; lacks foundation.

25         THE WITNESS:  Only the elevator operators

 1    were allowed to bring things into the elevator.

 2              MR. ORGAN:  Okay.

 3         Q.   But taking stuff to the elevator, that was

 4    something that Tesla employees could do; right?

 5              MS. ANTONUCCI:  Objection; lacks foundation.

 6              Go ahead.

 7              THE WITNESS:  There's a drop zone where the

 8    people who work on the line deliver things to the

 9    line, would leave the product, and then the elevator

10    operators would take it from there, load it, bring it

11    down, and leave it downstairs in the drop zone, or up,

12    and then somebody else would take it from there.  So

13    elevator operators, they only took things up from the

14    top to the bottom or from the bottom up.  Not just

15    anybody could do it, only the elevator operators could

16    do it.

17              MR. ORGAN:  Q.   In terms of -- why did you

18    separate the Tesla employees from the contract

19    employees?

20         A.   Because I didn't want to have any

21    co-employment issues.

22         Q.   You didn't want to have any co-employment

23    issues, what do you mean by that?

24         A.   I didn't want to have contractors and Tesla

25    employees working together side by side; you know,

1    **they had to be separate.   They had to --**

2    **Q.    Why?**

3    **A.    Because I didn't want to have problems with**

4    **co-employment or anything like that.   Whenever**

5    **there's -- like let's say there's an HR issue.   If the**

6    **same company -- you know, they -- typically, they**

7    **handle their own issues.   They have to handle their**

8    **own issues.**

9         **When you have different companies working**

10   **together side by side, it gets a little bit more**

11   **complicated, and, you know, this HR person has to talk**

12   **to that HR person, and then it's not like the same**

13   **company.   It gets kind of messy.**

14   Q.    Did someone tell you to do this?

15   **A.    No.**

16   Q.    What was your background that you decided

17   that you needed to keep the employees from working

18   together?

19   **A.    Just years of experience and, you know,**

20   **previous employment.**

21   Q.    What was your previous employment to Tesla?

22   **A.    I worked for Intel Corporation.**

23   Q.    Okay.   How long did you work for Intel?

24   **A.    30 years.   30-plus.**

25   Q.    And what did you do at Intel?

```
 1              MR. ORGAN:  Exhibit 35, for the record, is a
 2    three-page document, Bates-stamped Tesla 140 through
 3    142.  And it's some emails from October 20th of 2015.
 4         Q.   Have you seen this email before?
 5         A.   It doesn't show -- it says here "Ramon's
 6    statement," but I don't see Ramon's statement.
 7         Q.   No, I don't know where that is either.
 8         A.   Okay.
 9         Q.   Have you seen Ramon's statement?
10         A.   No.
11         Q.   Have you reviewed Ramon's statement to get
12    ready for today?
13         A.   No, I don't remember this.
14         Q.   You were involved, because your name's
15    referenced by Wayne Jackson.
16         A.   Yes.
17         Q.   What was Wayne Jackson's role?
18         A.   He was the on-site manager for nextSource.
19         Q.   It says here, Ed Romero was instructed by you
20    to meet with Ramon Martinez and Owen Diaz.
21              Do you see that?
22         A.   Yes.
23         Q.   Why were you instructing Ed Romero to get
24    involved in this issue between Ramon Martinez and Owen
25    Diaz?
```

1          MS. ANTONUCCI:  Objection; lacks foundation,

2    calls for speculation.

3          THE WITNESS:  Well, I guess because of the

4    fact that if there was a problem that needed to be

5    solved, he needed to work with him -- both of them

6    being shift supervisors or leads, you know, he needed

7    to make sure they were on the same page, as far as

8    what our expectations are.

9          MR. ORGAN:  Q.  So there was, at least,

10   interface between the Tesla managers and the contract

11   managers; correct?

12   **A.   Yes.**

13   Q.   And they were to work together to resolve

14   workplace issues; right?

15         MS. ANTONUCCI:  Objection; vague, lacks

16   foundation.

17         THE WITNESS:  Yes.  Typically, if there was a

18   problem, they would work together to solve the problem

19   or communicate to their management that there was a

20   problem they needed to go fix.

21         MR. ORGAN:  Q.  Have you ever seen the

22   interview notes between -- relative to Owen Diaz and

23   Ramon Martinez?

24         MS. ANTONUCCI:  Objection.

25         THE WITNESS:  No.

```
 1              MS. ANTONUCCI:  Vague.
 2              MR. ORGAN:  Q.  And when I'm talking about
 3     "interview notes," I'm talking about interview notes
 4     relating to this incident where Owen Diaz is talking
 5     about threatening conduct on the elevator on October
 6     17th.
 7        A.    I only saw this about a week ago.
 8        Q.    You don't recall what other involvement you
 9     had, other than to tell Ed Romero to work with Owen
10     Diaz and Ramon Martinez; right?
11        A.    Say that again.
12        Q.    You don't recall, other than the references
13     here to your asking Ed Romero to coordinate with Ramon
14     Martinez and Owen Diaz to work out that workplace
15     issue; correct?
16        A.    Yeah, I mean, I don't have the -- I don't
17     remember the specifics at the time.  But more than
18     likely, Ed may have talked to me about it, because I
19     know he did talk to me about Owen's pattern of
20     collaboration issues with people, you know, negative
21     behavior.
22        Q.    Ed Romero talked to you about that?
23        A.    Yes.
24        Q.    Okay.
25        A.    And so it would have been Ed's job to talk to
```

```
 1      Q.   Have you ever heard of a pickaninny?
 2      A.   Pickaninny?
 3      Q.   Pickaninny.
 4      A.   No.
 5      Q.   A pickaninny is an offensive image that was
 6 used at the turn of the last century to depict
 7 African-Americans in offensive ways.
 8           Have you ever of that?
 9      A.   No, not that.
10      Q.   Okay.
11      A.   I'm not that old.
12      Q.   No, I didn't think you were.
13           How old are you?
14      A.   59.
15      Q.   And what was done as a result of your
16 receiving this picture, which is the second page of
17 Exhibit 37?
18      A.   Yeah, so Wayne and I talked about it, and
19 Wayne stated that he was going to -- he either had or
20 was going to suspend Ramon, and that -- so we talked
21 about whether Ramon should be terminated or not.  And
22 so the decision was made to give him a permanent
23 written warning to make sure it didn't happen again.
24 And I remember the decision was based on the fact that
25 Ramon had never exhibited this type of behavior
```

1    **before, as far as like anything that was offensive to**

2    **anybody, doing anything that's offensive to anybody.**

3    **And, yeah, so that was the decision that was made at**

4    **the time.   Basically, it was Wayne's decision, and I**

5    **agreed.**

6        Q.   Okay.  So the two of you talked about it --

7        **A.   Yes.**

8        Q.   -- and decided on a course of action;

9    correct?

10       **A.   Yes.  But mainly, it was Wayne Jackson who**

11   **made the decision.  It's his employee, so...**

12       Q.   Did Wayne Jackson --

13       **A.   I can -- my perspective is I can only**

14   **recommend certain things, you know.**

15       Q.   What did you recommend should be done?

16       **A.   That I agreed with his recommendation to**

17   **suspend Ramon and give him a permanent written**

18   **warning, which basically meant that if it happened**

19   **again, he's terminated.**

20       Q.   Is Ramon Martinez still working at the Tesla

21   plant?

22       **A.   Yes.**

23       Q.   Where does he work now?

24       **A.   Same thing, recycling.**

25       Q.   But now he's got -- he's a supervisor now;

 1  right?

 2      **A.   Either he was at the time, but for sure he is**

 3  **now.**

 4      Q.   Is Ramon Martinez a regular Tesla employee

 5  now?

 6      **A.   No, he's a nextSource employee.   Supervisor.**

 7      Q.   Okay.

 8      **A.   And since then, he has never demonstrated any**

 9  **other offensive behavior to anybody.**

10      Q.   Have you checked with the employees around to

11  find out if that's true?

12      **A.   No.   I don't talk to everybody myself, in**

13  **person.**

14      Q.   So how do you know he hadn't done anything

15  offensive to anyone else?

16      **A.   That has come to my attention.**

17      Q.   Who told you that?

18      **A.   That is what I know today.**

19      Q.   How do you know that?

20      **A.   Because since this happened, I have not**

21  **received any feedback on Ramon, as far as anybody**

22  **being offended by discrimination or harassment or**

23  **anything like that.**

24      Q.   Have you heard about the allegations that

25  there are numerous Tesla black employees who have been

```
 1        Q.   What's his title?

 2        A.   I believe his title is recycling and

 3   commodities manager.

 4        Q.   And how do you spell his last name?

 5        A.   L-O-W-E-R-Y.

 6        Q.   Do you remember the substance of your

 7   conversation with Wayne Jackson, in terms of whether

 8   either one of you recommended that Mr. Martinez be

 9   fired for the picture that's in Exhibit 37?

10        A.   If I remember correctly, we talked about it.

11   He was the one that recommended that Ramon be

12   suspended and given a warning, based on the fact that

13   this was like -- this type of situation never happened

14   before with Ramon, as far as someone being offended,

15   you know, by something that he did.

16        Q.   Well, weren't you aware of the fact that

17   Mr. Diaz had alleged more than just the picture, the

18   pickaninny picture; that he had alleged that

19   Mr. Romero had engaged in inappropriate conduct?

20        A.   No.

21        Q.   Weren't you aware that Mr. Diaz at least

22   alleged that Mr. Martinez's behavior was getting

23   worse?

24        A.   No.

25        Q.   Weren't you aware that Mr. Diaz had claimed
```

 1    State of California             )

 2    County of Marin                 )

 3

 4               I, Bridget M. Mattos, hereby certify

 5    that the witness in the foregoing deposition was by me

 6    duly sworn to testify to the truth, the whole truth

 7    and nothing but the truth in the within entitled

 8    cause; that said deposition was taken at the time and

 9    place herein named; that the deposition is a true

10    record of the witness's testimony as reported to the

11    best of my ability by me, a duly certified shorthand

12    reporter and disinterested person, and was thereafter

13    transcribed under my direction into typewriting by

14    computer; that the witness was given an opportunity to

15    read, correct and sign the deposition.

16               I further certify that I am not

17    interested in the outcome of said action nor connected

18    with or related to any of the parties in said action

19    nor to their respective counsel.

20               IN WITNESS WHEREOF, I have hereunder

21    subscribed my hand on June 7, 2018.

22

23    _____
        BRIDGET M. MATTOS, CSR NO. 11410

24

25

# Exhibit

# **5**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                Plaintiffs,

                                 No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                Defendants.
_____/

DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13571

```
 1                  A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        CALIFORNIA CIVIL RIGHTS LAW GROUP
          By:  LAWRENCE A. ORGAN
 5             Attorney at Law
          332 San Anselmo Avenue
 6        San Anselmo, California 94960
          (415) 453-4740
 7        larry@civilrightsca.com

 8

 9   FOR THE DEFENDANT WEST VALLEY STAFFING GROUP:

10        PAHL & MCCAY
          By:  FENN C. HORTON, III
11             Attorney at Law
          225 West Santa Clara, Suite 1500
12        San Jose, California 95113
          (408) 286-5100
13        fhorton@pahl-mccay.com

14

15   FOR THE DEFENDANT NEXTSOURCE, INC.:

16        FISHER & PHILLIPS
          By:  JUAN C. ARANEDA
17             Attorney at Law
          One Embarcadero Center, Suite 2050
18        San Francisco, California 94111
          (415) 490-9000
19        jaraneda@fisherphillips.com

20

21   FOR THE DEFENDANT TESLA INC. dba TESLA MOTORS INC.:

22        SHEPPARD, MULLIN, RICHTER & HAMPTON
          By:  PATRICIA M. JENG
23             Attorney at Law
          Four Embarcadero Center, 17th Floor
24        San Francisco, California 94111
          (415) 434-9100
25        pjeng@sheppardmullin.com
```

```
 1              A P P E A R A N C E S (continued)

 2

 3    FOR THE DEFENDANT CHARTWELL STAFFING SERVICES, INC.:

 4         LAFAYETTE & KUMAGAI LLP
            By:  CHERYL A. STEVENS
 5              Attorney at Law
           1300 Clay Street, Suite 810
 6         Oakland, California 94612
           (415) 357-4600
 7         cstevens@lkclaw.com

 8

 9

10

11
                        ---oOo---
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            MR. ORGAN:   Q.   What was nextSource's

2     relationship to Tesla, as you understood it?

3        **A.      They were a service provider.**

4        Q.     What do you mean by "a service provider"?

5        **A.      In the sense of they weren't a staffing agency**

6     **or anything.   Like I said, more of a liaison between a**

7     **staffing agency and Tesla for services Tesla had**

8     **requested.**

9        Q.     When you were working as a recruiter for

10    nextSource, were you recruiting employees to Tesla?

11       **A.      Yes, sir.**

12       Q.     The employees who you were recruiting to Tesla,

13    were they primarily to work as production associates at

14    the Tesla factory?

15       **A.      Not necessarily.   They were different areas of**

16    **facilities.   That was probably one of the main areas.**

17       Q.     The facilities workers, what were the types of

18    jobs that they were typically doing that you were

19    recruiting for?

20       **A.      HVAC techs, electricians, things of that**

21    **nature, power washers.**

22       Q.     Who was your main contact person, then, at

23    nextSource when you were doing recruiting?

24       **A.      My manager was Terri Garrett.**

25       Q.     Do you remember what Terri Garrett's position

WAYNE JACKSON
May 17, 2019

1    was?

2        **A.     I don't recall, no.   It's been a few years.**

3        Q.     Yes.

4                Director of Operations, does that sound

5    familiar?

6        **A.     Yeah, that could be.   That could be a better**

7    **title.**

8        Q.     You started working for nextSource, you think,

9    in around 2015.

10               Is that right?

11       **A.     Yeah, somewhere around there.   I'm not sure of**

12   **the exact date.**

13       Q.     And then you worked as a recruiter for,

14   perhaps, up to a year.

15               Is that right?

16       **A.     Close to a year, yes.**

17       Q.     And then you started -- you kind of shifted out

18   of recruiting to do, I think it was a program

19   coordinator role.

20               Is that correct?

21       **A.     Yes.**

22       Q.     Or program manager --

23       **A.     Manager, uh-hum.**

24       Q.     -- right.

25               But I think you described the program manager

1     or less.

2          Q.    Tell me how it worked in terms of, let's say

3     someone raised a complaint of discrimination or

4     harassment --

5          A.    Uh-hum.

6          Q.    -- what was your understanding of how such a

7     complaint was to be handled?

8                MR. ARANEDA:   It's vague.

9                MR. ORGAN:   It is a little big vague.   Let me

10    try it again so it's a little clearer.

11               THE WITNESS:   Uh-hum.

12               MR. ORGAN:   Q.   Let's assume that a contract

13    employee, meaning someone who wasn't a regular Tesla

14    employee but was a contract employee who nextSource was

15    doing liaison with, what was your understanding of the

16    procedure for -- if a contract employee for one of the

17    companies that you were doing liaison for made a

18    complaint of harassment or discrimination, what was the

19    process that was supposed to be followed?

20         A.    I alerted the agency, usually one of the first

21    things I did, whatever supplier they were from.   I would

22    gather any information I could get, present that to the

23    agency, and then they would kind of conduct their

24    investigation from there.

25         Q.    When such a complaint was raised, what was your

1    function in terms of what did you do relative to Tesla

2    or alerting Tesla to the complaint?

3        A.    To alert Tesla, per se, it depended on what the

4    complaint was, to be very honest.

5        Q.    Let's say it's a race harassment or

6    discrimination complaint; would you alert Tesla as to

7    such a complaint like that?

8            MR. ARANEDA:  Objection.  Vague.  It calls for

9    speculation.  It's an incomplete hypothetical.

10           You can go ahead and answer if you understand

11   the question.

12           THE WITNESS:  Yes.  We would alert Tesla, yes.

13           MR. ORGAN:  Q.  And how would you alert Tesla

14   to a complaint of harassment or discrimination by a

15   contract employee working for one of the companies

16   you're doing liaison with?

17       A.    It would usually be to contact their HR

18   department.

19       Q.    Was there a particular person in Tesla human

20   resources who you would --

21       A.    No, sir.

22       Q.    -- work with?

23       A.    No, sir.  There was so many HR reps there.

24   Yeah, mostly there wasn't.

25       Q.    And would you -- was it your practice to alert

WAYNE JACKSON
May 17, 2019

1              THE WITNESS:  As far as I'm aware, I believe

2     they were all supposed to have any training at their

3     agency.

4              MR. ORGAN:  Okay.

5              THE WITNESS:  Yeah.

6              MR. ORGAN:  Q.  But in terms of your -- when

7     you became the manager, the program manager, you did

8     some investigations into complaints of discrimination

9     and harassment.

10             Is that true?

11        A.    Some, yes, but more or less

12     information-gathering.  You know, I would gather the

13     information, and then submit it to the agency.

14        Q.    Okay.  And in terms of your training into

15     investigating or fact-gathering relative to claims of

16     discrimination or harassment, would you agree that any

17     kind of investigation you would be doing would need to

18     be prompt, objective, and timely -- prompt, objective

19     and thorough -- sorry -- prompt, objective, and

20     thorough?

21        A.    Yes.

22        Q.    And did you participate in terms of any

23     investigations or fact-finding relative to claims of

24     discrimination or harassment at the Tesla factory?

25        A.    Yes.

1      Q.    And was it your goal to try and fulfill those

2      three goals of being prompt, objective, and thorough

3      relative to the investigations you did at the Tesla

4      factory?

5      **A.    Yes.**

6      Q.    Tell me, what are -- do you have any kind of

7      checklist that you go through that, you know, you --

8      that you use when you do an investigation?

9      **A.    Yes, I used to have it.  I don't have it now,**

10     **though.**

11     Q.    Okay.

12     **A.    I mean, everything's on my computer.**

13     Q.    I see.

14           Did Tesla have, like, guidelines or anything

15     like that in terms of doing investigations or

16     fact-gathering at its facility?

17     **A.    I don't recall them providing any.**

18     Q.    But in terms of when you did the fact-gathering

19     or the investigations at the Tesla factory relative to

20     discrimination and harassment complaints, you provided

21     the information that you gathered to Tesla.

22           Is that true?

23     **A.    No, I provided it to their employer, who was**

24     **the agency.**

25     Q.    I see.

1            In terms of Tesla keeping informed of what was

2    being investigated, was there any kind of procedures for

3    keeping -- making sure that Tesla was informed of

4    investigations?

5        **A.    That was more up to the agency.  They -- they**

6    **really had to.**

7        Q.    Okay.

8        **A.    Because they weren't my employees, per se.**

9        Q.    I see.

10            How many investigations did you do into

11    complaints of race harassment towards African-Americans

12    while you were --

13        **A.    I only --**

14        Q.    -- at Tesla?

15        **A.    I only recall, maybe, one.**

16        Q.    And was the one investigation that you worked

17    on relative to Owen Diaz?

18        **A.    Yes, sir.**

19        Q.    So tell me about the investigation you did

20    relative to Owen Diaz.

21            How did you first find out there was a problem?

22        **A.    I'm trying to remember if it was a phone call**

23    **or an email.  I can't recall.  Yeah, I don't recall**

24    **exactly how I found out.  It was either a phone call or**

25    **an email.**

WAYNE JACKSON
May 17, 2019

1      Q.   And do you remember what the information was

2  that you got that there was a problem relative to

3  Owen Diaz?

4      **A.   There was a disparaging picture found on some**

5  **boxes.**

6      Q.   Did you get a copy of the picture?

7      **A.   I believe so.  I believe it was e-mailed to me.**

8  **Someone took a photo and e-mailed it to me.**

9      Q.   It was a picture of a pickaninny.

10          Is that correct?

11     **A.   I don't --**

12     Q.   Is that your recollection?

13          MR. ARANEDA:   Objection.

14          THE WITNESS:   I don't know if it was a --

15          MR. ARANEDA:   Vague.

16          THE WITNESS:   Yeah.   I don't know what you'd --

17  you'd call it.   It was offensive.   It was a -- I think I

18  used to call it a jigaboo or something, you know.

19          MR. ORGAN:   Right.

20          THE WITNESS:   I forget what they called it.

21          MR. ORGAN:   Q.   It was an offensive depiction

22  of an African-American.

23          Is that correct?

24     **A.   Yes, sir.**

25     Q.   And you found it offensive, right, when you saw

WAYNE JACKSON
May 17, 2019

1       A.    I don't know.

2       Q.    Okay.  Going back to Mr. Diaz's complaint about

3   the jigaboo, what did you do to investigate that

4   incident?

5       A.    If I recall correctly, I got statements.  I got

6   photographs of the drawing.  I alerted Chartwell -- I

7   believe it was Chartwell.  It might have been CitiStaff;

8   I can't remember.

9            Like I say, we had contractors from different

10   suppliers.

11       Q.    Sure.

12       A.    And I alerted the manager for Tesla over that

13   area, which was Victor Quintero.

14       Q.    Owen Diaz worked for CitiStaff.

15            Do you remember that?

16       A.    I don't recall if it was CitiStaff or

17   Chartwell.  Like I said, we had several suppliers, so...

18   It's been three, four years, so I couldn't tell you

19   exactly which one.

20       Q.    Do you remember the person who put up the

21   jigaboo drawing was Ramon Martinez?

22       A.    Yes.  I believe so, yes.

23       Q.    In addition to getting statements from

24   Mr. Martinez and Mr. Diaz, did you get statements from

25   anybody else other than those two?

```
 1     least the topics are that you discussed or the substance

 2     you discussed with Victor Quintero about the jigaboo

 3     drawing.

 4              MR. ARANEDA:  Objection.  It calls for a

 5     narrative.

 6              THE WITNESS:  More or less if -- it was -- if

 7     I'm not mistaken, it was -- you'll have to give me a

 8     moment.  I'm trying to remember.

 9              MR. ORGAN:  No, that's okay.

10              THE WITNESS:  That it was a very offensive

11     drawing.  I believe, if I'm not mistaken, I recommended

12     to -- it might have been Chartwell -- and to

13     Mr. Quintero that we probably should terminate

14     Mr. Martinez.

15              But I couldn't terminate him because he wasn't

16     my employee, per se, but I did make the recommendation.

17              MR. ORGAN:  Q.  Do you remember what

18     Mr. Quintero said back in terms of your recommendation

19     of termination for Mr. Martinez?

20         A.     If I'm not mistaken, he was, Let's see what

21     Chartwell -- check with Chartwell.  Because, once again,

22     it was Chartwell's employee, so we couldn't really -- I

23     could recommend termination, but I couldn't terminate,

24     per se.

25         Q.     With the contract employees, Tesla could
```

1    terminate those employees in terms of saying, We don't

2    want them to work here anymore; right?

3        **A.    They could basically say they didn't want them**

4    **on-site --**

5        Q.    Okay.

6        **A.    -- yeah.**

7              **They couldn't terminate them, though, because**

8    **they weren't Tesla employees.**

9        Q.    But Tesla could say they can't work at the

10   Tesla factory anymore; right?

11       **A.    Yeah.   As far as I know, yes.**

12       Q.    So in terms of a contract employee working at

13   the Tesla factory, based on your understanding, Tesla

14   could at least stop the employee from working at the

15   Tesla factory; right?

16       **A.    Yes, sir.**

17       Q.    Did you ever have any discussions with an

18   Ed Romero about Mr. Diaz?

19       **A.    Yes, sir.**

20       Q.    Tell me about what you remember in terms of

21   your discussions with Edward Romero about Mr. Diaz.

22              MR. ARANEDA:  Objection.  Vague.

23              THE WITNESS:  I'm trying to think.  If I'm not

24   mistaken, Mr. Romero was having some issues with

25   Mr. Diaz with regards to attendance and attitude and

WAYNE JACKSON
May 17, 2019

1    doing disciplinary or things of that nature, if I'm not

2    mistaken.

3            MR. ORGAN:   Q.   So your understanding of

4    Ed Romero's tasks, though, relative to the elevator

5    operators was that he could do scheduling, right --

6        **A.    Yes, sir.**

7        Q.    -- for them, and that Mr. Romero would at least

8    direct their work; right?

9        **A.    Yes, sir.**

10       Q.    How would discipline towards contract employees

11   take place, then, typically?

12       **A.    If there was a complaint, I would alert their**

13   **agency of the complaint.**

14       Q.    And then it was up to the agency to do the

15   disciplinary action.

16            Is that right?

17       **A.    Yes, sir.   Whether they were terminated, I**

18   **couldn't terminate.   They weren't my employees.**

19       Q.    I see.

20       **A.    Yeah.**

21       Q.    Could you recommend termination for people?

22       **A.    I mean, I can make a recommendation, but it**

23   **wasn't -- the final decision wasn't mine.**

24       Q.    I see.

25            Then in terms of Tesla's role in any kind of

Bridget Mattos & Associates
(415)747-8710

```
 1        A.      Jaime, yes.

 2        Q.      Was that Jaime Salazar?

 3        A.      Yes, I believe that was his name.

 4        Q.      We know it's not Jaime Lannister from Game of

 5   Thrones.

 6        A.      I'm a GOT fan.

 7        Q.      Are ya?

 8        A.      Yes.

 9        Q.      What do you think of that last episode?  Have

10   you seen it?

11        A.      I think it cost her the throne.

12        Q.      Well, just one left, so...

13                Okay.  We are at 123?

14                THE REPORTER:  We are.

15                (Whereupon, Plaintiffs' Exhibit 123 was marked

16                for identification and is attached hereto.)

17                MR. ORGAN:  Now, this is 123.  It's a two-page

18   document Bates-stamped TESLA-629 and 630.

19                (Document reviewed by the deponent.)

20                MR. ORGAN:  Q.  And I guess there's some, well,

21   information about recruiting, and then there's some

22   discussion about a Ramon Martinez/Owen Diaz incident.

23                Is that right?

24        A.      Yes, sir.

25        Q.      And this is the -- so in October of 2015, you
```

1    became aware of an incident between Mr. Martinez and

2    Mr. Diaz.

3              Is that correct?

4        A.    Yes, sir.  I was -- honestly, I was still in a

5    recruiter's role at that point.  They hadn't

6    transitioned me over as of yet.

7        Q.    I see.

8        A.    So I was kind of trying to fill two roles at

9    once.

10       Q.    Wearing two hats?

11       A.    Yes, sir.

12       Q.    Do you remember any of the details of what the

13   issue was?

14       A.    If I'm not mistaken, there was some type of

15   verbal altercation.

16       Q.    Mr. Martinez worked in recycling.

17             Is that right?

18       A.    Yes, sir.

19       Q.    And Mr. Diaz worked as one of the elevator --

20       A.    Yes.

21       Q.    -- operators?

22       A.    Yes, sir.

23       Q.    Do you remember what the nature of the verbal

24   altercation was in this October 2015 time period?

25       A.    I could not tell you the details, to be honest,

WAYNE JACKSON
May 17, 2019

1    I -- it's been so long.  I remember it was something to

2    the effect they were trying to move some recycling

3    material in the elevators, and I guess there was -- I

4    don't know what -- I can't remember what it was, but

5    Ramon and Mr. Diaz got into a verbal altercation over

6    the use of the elevator.

7        Q.    Did you do an investigation into that incident?

8        A.    Like I said, I was just starting in that role,

9    so it wasn't really my role to do that at that point.  I

10   was still, honestly, a recruiter.

11       Q.    Okay.

12       A.    I asked Miss Garrett what did she want me to

13   do.  I believe we got statements from each of them, and

14   I let the -- let the agencies handle it from there.

15       Q.    Do you know who a Deb Gryske is?

16       A.    Yes, she was a -- I can't remember her role at

17   nextSource.  More of a technology person.

18       Q.    Okay.

19             We're going to -- this is Exhibit 124?

20             THE REPORTER:  Yes.

21             (Whereupon, Plaintiffs' Exhibit 124 was marked

22             for identification and is attached hereto.)

23             (Document reviewed by the deponent.)

24             MR. ORGAN:  Exhibit 124, for the record, is a

25    two-page document Bates-stamped TESLA-635 and 636.

Bridget Mattos & Associates
(415)747-8710

```
 1        Q.    The laptop that you created the notes on, that
 2   would have been the laptop, though, that was the
 3   company's -- was nextSource's laptop?
 4        A.    Yes, sir.
 5        Q.    And when you left nextSource, you returned that
 6   laptop to them; correct?
 7        A.    Yes, sir.
 8        Q.    Do you remember the name or the title of the
 9   notes that you created?
10        A.    I have no recollection.  I'm sorry.  It's been
11   so long, yeah, I couldn't.
12        Q.    I get that.
13        A.    Okay.
14        Q.    If you look at the second page of Exhibit 126,
15   it mentions --
16             MR. ARANEDA:  What Bates are you looking at?
17             MR. ORGAN:  134, the second page.
18             MR. ARANEDA:  Okay.
19             MR. ORGAN:  Q.  -- there's an email kind of in
20   the middle from Terri Garrett to Erin Marconi.
21             Who was Erin Marconi?
22        A.    I believe she was in human resources for Tesla.
23        Q.    Was that typical protocol to at least inform
24   Tesla HR whenever there was some kind of fact-gathering
25   or investigation being done?
```

1      **A.    Yes, sir, if there was something serious.  If**
2  **it was someone late, no, we wouldn't notify them, but**
3  **anything else, yes.**
4      Q.    Right.
5            So any kind of verbal altercation typically
6  would be copied to Tesla; right?
7      **A.    I wouldn't --**
8      Q.    Well, let me --
9      **A.    -- say that, no, sir.**
10     Q.    Any verbal altercation where there's
11  allegations of some kind of threat, that would be copied
12  to Tesla --
13     **A.    Yes, sir.**
14     Q.    -- right?
15           And, then, in that email from Terri to Erin,
16  Terri mentions in there, it says:
17           "It looks like Victor is asking Ed Romero to
18           get involved in a temporary worker ER [sic]
19           issue.  My recommendation is that Ed not be
20           involved."
21           I'm just wondering, do you have any
22  recollection of talking to Terri Garrett about Victor or
23  Ed's involvement in this investigation?
24     **A.    Yes.  The email even shows that she had asked**
25  **me, you know, why is Ed doing this, and I said, "He was**

1    instructed by Victor."

2      Q.    Okay.  And, then, in terms of any discussions

3    that you had with Ed Romero, do you recall any

4    discussions with Ed about this altercation between

5    Mr. Diaz and Martinez?

6      A.    I'm sure I did, but I can't recall what the

7    details were, to be honest.

8      Q.    What was the ultimate outcome of this

9    investigation that you did into 126 -- into the

10   information in Exhibit 126?  Do you remember?

11     A.    I don't recall.  I believe it was a -- a

12   warning was issued.  Yeah, I believe so.

13     Q.    Was a warning issued to Mr. Martinez, then?

14     A.    I don't recall.  I think it was both in the

15   sense if I -- I can't even remember because, like I

16   said, Mr. Diaz had -- the timing is probably what's

17   throwing me off a little bit.

18          But he had a few interactions with employees

19   where he was pretty aggressive, I guess you could say,

20   and we probably verbally counseled both of them to --

21   to, you know, more or less, play nice with each other in

22   the sandbox.

23     Q.    And do you think -- if you go back to

24   Exhibit 125 where Mr. Ramon Martinez has that email on

25   October 17th at 4:56 a.m., do you recall that

1    Mr. Martinez said that Mr. Diaz was aggressive?

2            Because he doesn't mention that in the email.

3    He says unprofessional or --

4        **A.    Yeah, he didn't say -- yeah, I don't believe he**

5    **said that.   He just -- like I said, it was more of an**

6    **attitude issue.**

7        Q.    In terms of Ramon Martinez's complaint about

8    Mr. Diaz, it was more about Mr. Diaz's attitude, not

9    about his aggressiveness; correct?

10       **A.    More of about his professionalism, yes, sir.**

11       Q.    Mr. Martinez thought that Mr. Diaz needed to be

12   more professional with him.

13           Is that right?

14           MR. ARANEDA:  It calls for speculation.

15           THE WITNESS:  I wouldn't say with him, but more

16   with everybody.  He wasn't being professional with a few

17   people in the -- not only other contractors, but Tesla

18   employees.

19           MR. ORGAN:  Q.  Did Mr. Martinez tell you how

20   Mr. Diaz was not being professional?

21       **A.    Like I said, it was more of an attitude, so I**

22   **really couldn't -- I couldn't answer that for**

23   **Mr. Martinez, to be honest.  More or less, it was just**

24   **that Owen was getting into it with a lot of individuals.**

25       Q.    Okay.

```
 1    October 15th time period?
 2       A.   I don't remember the details, honestly.  I'm
 3    trying to think, and I just don't -- I just know there
 4    were -- it was more, like I said, kids not playing well
 5    in the sandbox together -- come on, what can we do to
 6    fix this type of deal so that you guys can all be
 7    successful.
 8       Q.   So was Rothaj then folded into your
 9    investigation?
10       A.   I believe so, because he and Owen, I believe,
11    had an issue as well.
12       Q.   Do you remember what the issue was between
13    Rothaj and Owen?
14       A.   I don't remember the details right at the
15    moment.  I think they got into a pretty heated verbal
16    altercation.
17       Q.   Okay.
18       A.   And I believe Owen -- I believe Owen claimed
19    that Rothaj said he was going to hurt him or something
20    to that effect, if I'm not mistaken.
21       Q.   Okay.
22       A.   But I didn't have any witnesses to that.
23       Q.   I see.
24            (Whereupon, Plaintiffs' Exhibit 128 was marked
25            for identification and is attached hereto.)
```

```
 1                    (Document reviewed by the deponent.)

 2                    MR. ORGAN:   Exhibit 128, for the record, is a

 3         multiple-page document Bates-stamped TESLA-20 to 24.

 4         And it starts with a picture on 23.   And then there's an

 5         email from January 21st, January 22nd, I guess, and then

 6         it ends on January 22nd, so...

 7                    (Document reviewed by the deponent.)

 8                    MR. ORGAN:   Q.   The picture that is TESLA-23,

 9         is that one of the pictures that you saw, the big

10         jigaboo picture we were talking about before?

11              A.    Yes, sir.

12              Q.    And then there's another -- there's a wider

13         picture of a drawing on TESLA-22 in Exhibit 128.

14                    And do you recognize that, too?

15              A.    Yes, sir.

16              Q.    Both of those pictures of the drawings were

17         provided to you at some point.

18                    Is that right?

19              A.    Yes, sir.

20              Q.    And it shows here that Mr. Diaz informed

21         Mr. Romero of the racist effigy and drawing on or about

22         January 22nd of 2016, and then it was forwarded also to

23         you by Mr. Diaz.

24                    Do you see that?

25              A.    Uh-hum.
```

1       Q.    Now, you considered this a pretty serious

2    issue; correct?

3       **A.    Yes, sir.**

4       Q.    And just so we are clear, I think you said

5    before that you thought that Mr. Martinez should be

6    fired over this; right?

7       **A.    Yes, sir, I did.**

8       Q.    And you also found that image of the jigaboo

9    offensive to you; right?

10      **A.    Yes, sir.**

11      Q.    And when I say "offensive to you," offensive to

12   you as an African-American; right?

13      **A.    Yes, sir.**

14      Q.    You also understood that Mr. Diaz was offended

15   by this jigaboo drawing as an African-American; right?

16      **A.    Yes, sir.**

17      Q.    Did you have a meeting with Mr. Diaz about this

18   jigaboo drawing?

19      **A.    I believe we did, yes, sir.**

20      Q.    And did you take notes of that meeting that you

21   had relative to Mr. Diaz?

22      **A.    I most likely did, yes, sir.**

23      Q.    And would you have followed your typical

24   practice of taking the notes and then typing them up?

25      **A.    Yes, sir.  If I took notes, I normally did, or**

1                                        12:11 p.m.

2                        ---oOo---

3            A F T E R N O O N   S E S S I O N

4            MR. ORGAN:  Q.  Let's look at the top of

5    Exhibit 128.

6            (Document reviewed by the deponent.)

7            MR. ORGAN:  Q.  Do you remember having a

8    conversation with Terri about the jigaboo?

9        A.    Yes.

10       Q.    And tell me about that conversation you had

11   with Terri -- well, strike that.

12            Did you have more than one with Terri Garrett

13   or just one about the jigaboo --

14       A.    I'm sure there was multiple, but it was more or

15   less providing her with the information that I had,

16   which was the copy of the picture.

17            The plan moving forward was to, you know, let

18   Chartwell deal with Ramon, if I'm not mistaken, and we

19   just made sure, like I said, that Tesla was aware by

20   Mr. Romero, Quintero, and I think it was Miss Marconi.

21       Q.    So the three people at Tesla that you believe

22   were informed of information about the jigaboo drawing

23   were Victor Quintero, Ed Martinez --

24       A.    Romero.

25       Q.    I'm sorry, Ed Romero.

```
 1                    Here Mr. Quintero says:
 2                    "This is very disappointing, especially coming
 3                    from one of our team supervisors.  I agree with
 4                    the recommendation to suspend and issue a
 5                    permanent written warning.  Also, the apology
 6                    from Ramon was a good starting point.  One
 7                    additional request would be if there is an
 8                    opportunity to provide some type of diversity
 9                    training for Ramon."
10                    Do you know if any diversity training was done
11      for Mr. Martinez?
12           A.    I don't recall because that would have been
13      something that Chartwell would have done and not us.
14           Q.    And then in terms of the recommendation for a
15      suspension and permanent warning, do you know if that
16      was implemented?
17           A.    Yes, it was.
18           Q.    The apology from Ramon, was that an apology --
19      who was that an apology to?  Do you know?
20           A.    I believe they had him apologize to Owen.
21           Q.    Okay.
22           A.    If I'm not mistaken.
23           Q.    It sounds like you had a talk with Mr. Quintero
24      about these issues.
25                    Do you remember that?
```

Page 88

1        A.    Yes, sir.

2        Q.    Is there anything that was substantive of that

3    talk that you had with Mr. Quintero about the drawing

4    that is not included in your email here or in the email

5    from Mr. Quintero to you, anything else that you guys

6    talked about?

7        A.    Not that I could think of.  I mean, like I

8    said, Mr. Quintero was -- was -- I wouldn't -- well,

9    upset about the drawing as well.  He felt it was very

10   inappropriate.

11            Like I said, I did mention that it was really a

12   terminatable [sic] offense, but we'd have to check with

13   Chartwell on that.

14       Q.    Chartwell ultimately decided they didn't want

15   to terminate.

16            Is that right?

17       A.    They ultimately went with the recommendation,

18   like I said, from Victor and myself where we decided

19   that we're going to suspend Mr. Martinez.

20       Q.    And the reason for the suspension was that was

21   something Victor had agreed to.

22            Is that right?

23            MR. ARANEDA:   Objection.

24            THE WITNESS:   Yeah.

25            MR. ORGAN:   Q.   Victor did not agree to

WAYNE JACKSON
May 17, 2019

1      terminate Mr. Martinez; right?

2                   MR. ARANEDA:   Objection.   Vague.

3                   THE WITNESS:   Yeah, I wouldn't say that he did

4      not agree to terminate, but it was more that it wasn't

5      his employee to terminate.

6         Q.    Right.

7                   But Victor could have said he can't work here

8      anymore, right, being --

9         A.    He could have --

10        Q.    -- from Tesla?

11        A.    Yes.   He could have made that recommendation,

12     yes.

13        Q.    And initially when you met with Victor, Victor

14     didn't even want to suspend Mr. Martinez; correct?

15                  MR. ARANEDA:   Objection.   Vague.

16                  THE WITNESS:   I don't believe that was the

17     case, no.   He wanted disciplinary action, yes, he did.

18                  MR. ORGAN:   Q.   But the disciplinary action

19     that Victor had suggested originally was just a warning

20     letter, right, a final warning?

21        A.    I believe so, yes.

22        Q.    And then you had the conversation with him

23     where you said, Look, I think he should be terminated,

24     but if you're not going to terminate Mr. Martinez, you

25     should at least give a suspension; right?   That's what

1    you told Mr. Quintero?

2        **A.    Yes, sir.**

3        Q.    And then Mr. Quintero -- and then I think at

4    some point, you suggested what about a suspension?

5        **A.    Uh-hum.**

6        Q.    Is that what happened?

7        **A.    Yes, sir.**

8        Q.    And then Mr. Quintero agreed to the suspension

9    and the final written warning.

10            Is that right?

11       **A.    Yes, sir.**

12       Q.    And then Mr. Quintero recommended to -- I guess

13   it was Chartwell that had Mr. Martinez; right?

14       **A.    I believe so, yes, sir.**

15       Q.    So Mr. Quintero recommended a suspension and

16   final written warning and Chartwell agreed with that;

17   right?

18       **A.    Yes, sir.**

19       Q.    Okay.

20       **A.    They actually issued that to him.   It was an**

21   **unpaid suspension.**

22       Q.    Right.   I think a three-day suspension.

23            Is that right?

24       **A.    It was either three or five; I'm not sure.   I**

25   **can't recall.**

1     pretty difficult to reach, to be very honest.

2          Q.    And then there's a Judy.

3                Is Judy the same as Ludivina?

4          A.    I don't know.

5          Q.    Did you know a Judy Ledesma?

6          A.    That does not sound familiar.

7          Q.    Do you remember having any discussions with

8     Monica De Leon about the jigaboo?

9          A.    Yeah, I believe, like I said, I had alerted her

10    to it and made sure I provided her copies, if I'm not

11    mistaken, of the photos.

12         Q.    Do you remember an actual conversation that you

13    ended up having with her?

14         A.    I really don't.  Monica was really very

15    difficult to reach.

16         Q.    Okay.

17               This is 132.

18               (Whereupon, Plaintiffs' Exhibit 132 was marked

19               for identification and is attached hereto.)

20               MR. ORGAN:  Q.  Exhibit 132, for the record, is

21    a multiple-page document Bates-stamped 7 -- TESLA-730 to

22    737.  I guess it's an eight-page document.  It includes

23    some handwritten statements.

24               (Document reviewed by the deponent.)

25               MR. ORGAN:  Q.  And I'm wondering, do you -- do

1           Do you remember sending any kind of email about

2   what your discussion was with Mr. Diaz?

3       **A.    No, sir, I don't recall that.**

4       Q.    Did it concern you that after the altercation

5   between Mr. Diaz and Mr. Martinez in the October time

6   period and then come January you've got this jigaboo

7   drawing, did that concern you?

8               MR. ARANEDA:   Objection.

9               THE WITNESS:   Yes, sir.

10              MR. ARANEDA:   Vague.

11              MR. ORGAN:   Q.   And what did you do to act on

12  that concern that you had?

13      **A.    Like I said, I alerted the various agencies so**

14  **they could look into it a little further.**

15      Q.    And, in fact, that's why you decided, in your

16  opinion, that Mr. Martinez had been -- had crossed the

17  line at least twice such that he needed to be

18  terminated; right?

19              MR. ARANEDA:   Objection.   It misstates his

20  testimony.

21              THE WITNESS:   I wouldn't say he crossed the

22  line twice.   Once again, the first incident was more or

23  less unsubstantiated.   There were no witnesses or

24  anybody.   It was kind of my-word-against-yours type of

25  deal.

WAYNE JACKSON
May 17, 2019

 1    because, like I said, it wasn't my employee, so I had to

 2    refer it to Chartwell.  They had to make the final

 3    determination of anything with regards to their

 4    employment.  It wasn't up to me.

 5              MR. ORGAN:  Q.  Right.

 6              But Tesla also had to approve whatever that

 7    discipline was going to be; right?

 8        A.    No, they did not.

 9        Q.    In the incidence with the jigaboo drawing,

10    though, Tesla did get involved in what was the

11    appropriate discipline; right?

12        A.    Yes, sir.

13        Q.    So at least with respect to Mr. Diaz's

14    complaint about the jigaboo drawing, Mr. Quintero was

15    involved in deciding what was appropriate discipline;

16    right?

17              MR. ARANEDA:  Objection.  It lacks foundation.

18              MS. STEVENS:  Objection.  It misstates his

19    testimony.

20              MR. ARANEDA:  It calls for speculation.

21              THE WITNESS:  Could you repeat the question

22    again to me, please?

23              MR. ORGAN:  Q.  Sure.

24              With respect to the discipline the appropriate

25    discipline for the jigaboo drawing, you at least recall

Bridget Mattos & Associates
(415)747-8710

 1      that Mr. Quintero was involved in making the

 2      recommendation for what that would be; right?

 3          A.    Yes and no.  He can make a recommendation, but

 4      the final say was not his.  It was up to Chartwell.

 5          Q.    Well, the final in terms of whether or not

 6      Mr. Martinez stayed working at the Tesla factory, that

 7      was something that Mr. Quintero could determine; right?

 8          A.    As far as I know, yes, sir.

 9          Q.    Okay.

10                This is -- what is it; Exhibit 138?

11                THE REPORTER:  Yes.

12                (Whereupon, Plaintiffs' Exhibit 138 was marked

13                for identification and is attached hereto.)

14                MR. ORGAN:  Exhibit 138, for the record, is a

15      one-page document Bates-stamped TESLA-330.

16                (Document reviewed by the deponent.)

17                MR. ORGAN:  Q.  Could you tell me, what is --

18      is this a suggestion that Mr. Diaz move out of the lead

19      spot and just down to a regular elevator operator?

20          A.    I don't remember.  Yeah, I don't remember.

21      Sorry.

22          Q.    Mr. Diaz was out on leave at this particular

23      time.

24                Is that right?

25          A.    Once again, I don't recall what his leave was

1       A.      No.

2       Q.      -- at Tesla?

3       A.      I wouldn't have.  I wouldn't have done anything

4    with her, no.

5       Q.      What's your opinion of West Valley Staffing

6    Group?

7       A.      They're a good staffing agency, just like any

8    other staffing agency.

9       Q.      I'm going to ask you about a word that has

10   been -- that's come up a few times in this case, and I

11   don't want you to be offended, but I have to use the

12   word.  The word is nigger.

13      A.      Yes, sir.

14      Q.      Did you ever hear anyone use that word at

15   Tesla?

16      A.      Yes, sir.

17      Q.      In what circumstances did you hear that word

18   being said?

19      A.      There had been times where I'd actually

20   walked -- been walking through the facility, and there

21   was -- one time in particular, there was two Asian or

22   Filipino gentlemen.  And one was, like, "What's up, my

23   nigga," to the other one.  That type of thing.

24              It still was offensive, but, you know, it

25   wasn't my employee, so I didn't engage in it.

1    that?

2              Objection.  Vague.

3              THE WITNESS:  If you were to ask -- I don't

4    know if I could answer, but if you were to ask me,

5    people use it in different contexts.

6              MR. HORTON:  So you're referring to "nigga"?

7              THE WITNESS:  Yes, they use it in different

8    context.

9              MR. ORGAN:  Q.  So what you heard was "What's

10   up, my nigga"?

11        A.   Yes, sir.

12        Q.   N-I-G-G-A?

13        A.   Yes, sir.

14        Q.   Okay.

15        A.   And I will hear that often, to be honest.

16        Q.   Oh.  So you heard the A version of the N

17   word -- just so we don't have to use it again --

18        A.   Uh-hum.

19        Q.   -- the A version -- you testified about

20   nigga --

21        A.   Yes, sir.

22        Q.   -- so let's call that the A version --

23        A.   Yes.

24        Q.   -- of the N word.

25              Is that okay with you?

WAYNE JACKSON
May 17, 2019

1      A.     Yes, sir.

2      Q.     You heard the A version of the N word on

3    numerous occasions throughout the factory.

4            Is that true?

5            MR. ARANEDA:  Objection.  Vague.  It misstates

6    his testimony.

7                 THE WITNESS:  Do I answer?

8                 MR. ORGAN:  Yes.

9                 THE WITNESS:  Yes, I did.  I mean, like I said,

10   it's -- unfortunately, with music and things of that

11   nature nowadays, it's kind of the norm for these

12   youngsters now, the younger generation, unfortunately.

13   They don't understand the struggles or what people went

14   through with regards to that word.

15                 MR. ORGAN:  Right.

16                 THE WITNESS:  So, you know, they don't

17   understand the impact I think it has when they use it,

18   and it's just engrained in society around here, to be

19   honest.  You hear it on the street.  I mean, I hear it,

20   quite honestly, white people calling each other that at

21   this point in life, which is amazing to me.

22                 MR. ORGAN:  Q.  Because it's offensive to you

23   as an African-American, isn't it --

24      A.     Yes, sir.

25      Q.     -- the use of the A version of the N word,

1    going to ask you was, you mentioned that you didn't

2    think that the workers who you overheard were intending

3    it to be offensive, but, certainly, as an

4    African-American male, any time anyone uses even -- the

5    A version of the N word, that's offensive to you, isn't

6    it?

7        A.    I wouldn't say that.  To be honest, a lot of

8    African-Americans use that word amongst each other.

9        Q.    Right.

10            But when an African-American uses that word,

11   the N word, that's different than when people who aren't

12   African-Americans use the word; right?

13       A.    Once again, it depends on which version they're

14   using.

15       Q.    Right.

16            But even the A version of the N word is

17   offensive to African-Americans if someone who's not

18   African-American is using it; right?

19       A.    It depends, once again, on the context of how

20   they're using it.

21       Q.    Okay.

22       A.    It is offensive, but, like I said, it depends

23   on how they're using it, you know.

24       Q.    Well, it's not something that should be used in

25   the workplace --

1      **A.      There you go.**

2      Q.      -- right?

3      **A.      There you go.   It shouldn't be used at all,**

4      **so...**

5      Q.      And where you currently work --

6      **A.      Uh-hum.**

7      Q.      -- do you hear the N word there?

8      **A.      No, sir.**

9      Q.      All right.  And other than at the Tesla

10     factory, have you ever heard the N word used by

11     non-African-Americans in the workplace?

12     **A.      Yes, sir.**

13     Q.      Where else?

14     **A.      Places like Walmart, I've heard their**

15     **associates saying it to each other.**

16     Q.      Okay.

17     **A.      I mean, yeah, I have heard it in other places.**

18     Q.      Did you hear the E-R version of the N word at

19     Tesla?

20     **A.      No, I think that's even a more disparaging**

21     **version, so a lot of people are super offended by that.**

22     Q.      Right.

23             But you didn't hear that at Tesla; right?

24     **A.      No, I did not.**

25     Q.      In terms of the number of times that you heard

WAYNE JACKSON
May 17, 2019

1    the N word with an A at Tesla, how many times -- what's

2    your best estimate of the number times you've heard

3    that?

4        A.   **Three, four times, probably.**

5        Q.   And did you report that to HR?

6        A.   **No, sir.**

7        Q.   Why not?

8        A.   **Because of the context it was being used in**

9    **wasn't being used, at least in my opinion, to offend.**

10   **It was just people being ignorant.**

11       Q.   You do know that some African-Americans are

12   offended by any use of the N word even with the A;

13   correct?

14       A.   **And that's their preference, yes, sir.**

15       Q.   And in terms of any kind of, like, diversity

16   training on the issue of the use of the N word, were you

17   aware of any such training during the time that you were

18   at the Tesla factory?

19       A.   **I couldn't say I do know.  No, I don't know.  I**

20   **wasn't involved in their orientation or training**

21   **processes, no.**

22       Q.   But in terms of your knowledge of whether or

23   not such training occurred, you're not aware of any kind

24   of diversity training that Tesla did around the N word;

25   correct?

Bridget Mattos & Associates
(415)747-8710

1                    REPORTER'S CERTIFICATE

2      STATE OF CALIFORNIA        )
                                  )  ss.
3      COUNTY OF MARIN            )

4              I, PATRICIA ROSINSKI, hereby certify:

5              That I am a Certified Shorthand Reporter in the

6      State of California.

7              That prior to being examined, WAYNE JACKSON,

8      the witness named in the foregoing deposition, was by me

9      duly sworn to testify the truth, the whole truth, and

10     nothing but the truth;

11             That said deposition was taken pursuant to

12     Notice of Deposition and agreement between the parties

13     at the time and place therein set forth and was taken

14     down by me in stenotype and thereafter transcribed by me

15     by computer and that the deposition is a true record of

16     the testimony given by the witness.

17             I further certify that I am neither counsel for

18     either, nor related in any way to any party to said

19     action, nor otherwise interested in the result or

20     outcome thereof.

21             Pursuant to Federal Rules of Civil Procedure,

22     Rule 30(e), review of the transcript was not requested

23     before the completion of the deposition.

24              _____
                 PATRICIA ROSINSKI, CSR No. 4555

25                      May 28, 2019

# Exhibit

# 6



**From:** Raymond Soto <RSOTO@westvalley.com>
**Date:** August 21, 2015 at 8:05:12 AM PDT
**To:** Raymond Soto <RSOTO@westvalley.com>
**Subject: Tesla start information**

Hello,

You are confirmed for training on Monday August 24th  starting at 1pm with Tesla Motors. You will be asking for Louis or Rovilla in the lobby. Please make sure to read this entire email as it includes a great deal of information. See below;

Tesla Motor

45500 Fremont Boulevard

Fremont, CA – 94538

www.tesla.com

**(FYI- you will NOT be parking at this location)**



You will be receiving the rest of your schedule on Monday, so once again please flexible. Also if don't have steel toes shoe please get some, we will reimburse up $70 with your receipt. Please make sure to wear your steel toes shoe, just in case they have you the floor.. I have also attached some Tesla Forms that I need you to print out and bring with you tomorrow morning.

When you arrive please proceed to the main lobby and ask for Rovilla Wetle.  Please make sure to print out the attached forms and hand them to her as well.

## Remember to arrive at least  45 minutes early to park see instruction below;

DDIAZ000004

1/4

Below are the 901 Page instructions, but they're pretty confusing. The instructions I was hoping for would show the back entrance on Kato Road. From Page you will need to drive around the building to the back and will then catch the shuttle near the back entrance. There's still plenty of parking there, however you may be better off parking at the overflow parking at Treasure Island (the training center where you interviewed and the assessments are held) and take the shuttle from there. It picks up from in front of the building.

**FREMONT PARKING NOTICE**

**Please find the details below and in the attached flyer:**

**Where: 901 Page Ave, Fremont, CA 94538**

**(access to the rear parking lot from A Street)**

**Job description**

Production Associate (Fremont, CA)

The Production Associate is a member of the Manufacturing Production Team.

He/she will participate in the development and application of Tesla's Manufacturing System for the body center of the Tesla Model S. Excellent attendance is crucial for team to achieve success. The ideal candidate has a proven record of success in the application of manufacturing systems in any type of manufacturing environment. He/she must have the ability to work with various teams in assembly including engineering, quality, and suppliers across a wide variety of issues/ corrective actions identified in production and field performance. Strong interpersonal and communication skills are an absolute requirement to establish effective working relationships within Tesla and outside.

The successful candidate for this position takes pride in his/her hands-on and analytical abilities, organization skills and attention to detail. He/she appreciates an environment where superior work is encouraged, noticed and rewarded.

Essential Functions and Duties:

Quality

- Demonstrated ability to perform standardized work process and defined work instructions.

- Understands and ensures adherence to required procedures and processes.

- Evaluates the assembly processes and equipment to look for continuous improvement opportunities.

- Acts as a consultant to other production/engineering groups on quality issues.

- Analyze quality data to determine and drive the desired outcome.

Communication

- Excellent written and verbal communication skills and people skills, comfortable presenting ideas and issues to peer groups and leaders.

- Escalates functional and process failures to the appropriate support groups and supervisors.

- Capable to develop and follow non-verbal communication (visual management: signs, work place organization, and pictures).

DDIAZ000005

Continuous Improvement

- Assist in the process design and tooling improvements â€" comfortable in suggesting and implementing new ideas that improve quality, reduce cost, support production work environment.

- Understands that there are always new opportunities for improvement and eliminate waste.

Motivation

- Ability to learn quickly and self-motivated.

- Positive energy and attitude, happy

- Poise when confronted with sudden setback or stressful situations.

- Willingness to operate in a dynamic environment and team structure.

Experience

- The candidate should have hands-on experience and proven track record in production in any high quality cutting edge products.

- MS Office programs (Word, Excel, and PowerPoint) experience

- May provide functional supervision in the absence of the supervisor.

- Production environment with team involvement

- Use of assembly equipment and tooling (power tools, automated equipment)

Skills and Abilities:

Physical Attributes

- Working for extended periods of time

- Lifting objects up to 15 pounds

- Use of tools that may produce vibration during use

- Use of complex tooling that requires specialized training

- Wearing Personal Protective Equipment: safety glasses, vests, shoes, hard hats

- Physical work including but not limited to pushing, pulling, gripping, twisting, reaching, etc.

- Working in a manufacturing environment

Mental Attributes

- Ability to follow a required specific sequence of steps in a process repetitively for an extended period of time

- Ability to understand codes used to make decisions

- Ability to detect abnormalities in the process using visual, touch, or auditory senses

- Ability to adjust to immediate process change due to process/shop improvement

- Perseverance in extensive process root cause analysis and countermeasure implementation

**Please send me an email once you have received this.**

DDIAZ000006

Thanks again

Raymond A. Soto |Sr. Technical Recruiter

West Valley Staffing Group

P: 408.735.1420 x3028 | F: 408.735.0034

E: rsoto@westvalley.com | W: www.westvalley.com

"#1 Staffing Agency in Silicon Valley" as rated by the Business Journal

"#1 Best Place to Work" as rated by San Francisco Business Times



*Comprehensive Staffing Solutions Through Specialization*

This email and any attachment are confidential. It may only be read, copied, and used by the intended recipient(s). If you are not the intended recipient(s), you may not copy, use, distribute, forward, store, or disclose this email or any attachment. If you are not the intended recipient(s) or have otherwise received this email in error, you should destroy it and any attachment and notify the sender by reply email or send a message to sysadmin@westvalley.com.

5 attachments


**image001.jpg**
92K

**Tesla NDA.PDF**
76K

**Meal Period Waiver (Tesla).pdf**
27K

**Tesla - Associate Acknowledgement (no driving).pdf**
114K

**Tesla - Contractor EHS Guidelines 4.14.docx**
30K

DDIAZ000007

Exhibit

**7**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


DEMETRIC DI-AZ, OWEN      )
DIAZ, and LAMAR           )
PATTERSON,                )
            Plaintiffs,   )
vs.                       ) Case No.:  3:17-CV-066748
                          )                WHO
                          )
TESLA, INC., dba TESLA    )
MOTORS, INC.; CITISTAFF   )
SOLUTIONS, INC.; WEST     )
VALLEY STAFFING GROUP;    )
CHARTWELL STAFFING        )
SERVICES, INC.; and DOES  )
1-10, inclusive,          )
            Defendants.   )
_____)


DEPOSITION OF MONICA DE LEON

Thursday, December 6, 2018


TAKEN BEFORE:

HEIDI BELTON, CSR, RPR, CRR, CCRR, CRC

CSR No. 12885

```
 1                      December 6, 2018

 2                        10:05 a.m.

 3

 4        Videotaped deposition of MONICA DE

 5     LEON, held at the offices of California

 6     Civil Rights Law Group, 180 Grand

 7     Avenue, Suite 1380, Oakland, California,

 8     before Heidi Belton, a Certified

 9     Shorthand Reporter, Registered

10     Professional Reporter, Certified

11     Realtime Reporter, California Certified

12     Realtime Reporter, Certified Realtime

13     Captioner

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2
         For the Plaintiffs:
 3
             CALIFORNIA CIVIL RIGHTS LAW GROUP
 4           332 San Anselmo Avenue
             San Anselmo, California 94960
 5           By:  Navruz Avloni, Esq.
             Phone:  415.453.4740
 6           E-mail:  Navruz@civilrightsca.com

 7
         For the Defendant:
 8
             CONSTANGY BROOKS SMITH & PROPHETE, LLP
 9           2029 Century Park East, Suite 1100
             Los Angeles, California 90067
10           By:  Aaron M. Rutschman, Esq.
             Phone:  310.256.3083
11           E-mail:  Arutschman@constangy.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

12:28:48  1        Q.    -- that are working in the Tesla facility?

12:28:52  2        **A.    No, I do not know.**

12:28:56  3        Q.    Do you know if Tesla has the ability to

12:29:02  4   recommend discipline for CitiStaff contractors

12:29:06  5   working in a Tesla facility?

12:29:09  6             MR. RUTSCHMAN:   Objection; calls for

12:29:09  7   speculation.

12:29:10  8             THE WITNESS:   No, I do not.

12:29:16  9   BY MS. AVLONI:

12:29:16 10        Q.    Do you know if Tesla has the ability to

12:29:19 11   recommend termination of a relationship between a

12:29:21 12   CitiStaff contractor working at its facility?

12:29:26 13             MR. RUTSCHMAN:   Objection; calls for

12:29:26 14   speculation.

12:29:31 15             THE WITNESS:   In that case I would say

12:29:32 16   yes.   If there is -- if they're in a department

12:29:37 17   that's far away or -- and they're being supervised

12:29:43 18   by them and that supervisor, then, yes, I would say

12:29:47 19   in that case they would be able to tell nextSource

12:29:51 20   about the worker's performance.

12:29:59 21   BY MS. AVLONI:

12:30:00 22        Q.    Do you know if nextSource -- isn't it

12:30:03 23   true that nextSource is kind of just like a

12:30:05 24   middleman between CitiStaff providing employee --

12:30:09 25   contractors to nextSource and then nextSource

```
12:48:49  1        Q.   These are the only two that you recall?
12:48:55  2        A.   Yeah.
12:48:56  3             MR. RUTSCHMAN:  Is that a yes?
12:48:56  4             THE WITNESS:  Yes.
12:48:56  5   BY MS. AVLONI:
12:48:57  6        Q.   And referring to Owen bringing concerns,
12:49:00  7   you recall him bringing two concerns to your
12:49:02  8   attention, one about the picture and the other one
12:49:04  9   about the altercation with Rothaj; is that correct?
12:49:06 10        A.   Correct.
12:49:08 11        Q.   In regards to the picture, when he
12:49:15 12   communicated that concern to you, what did you do?
12:49:17 13        A.   So when he told me about it, you know, due
12:49:25 14   to the fact that we take it seriously, we
12:49:30 15   immediately took it up to HR -- Judy -- and let my
12:49:38 16   supervisors know about it as well, which they said
12:49:44 17   to talk to Judy for this case.
12:49:51 18        Q.   Did you talk to Judy?
12:49:53 19        A.   Yes, I did.
12:49:57 20        Q.   What did you guys discuss?
12:49:59 21        A.   I told Judy about, you know -- I told Judy
12:50:03 22   that I discussed -- spoke with Owen, you know.  I
12:50:09 23   checked in to -- with him to see do you -- are you
12:50:19 24   going to return to your -- to your job.  He said
12:50:22 25   yes.  I asked him if he wanted to be moved to a
```

| | | |
|---|---|---|
| 12:50:26 | 1 | **different department.   He said no.   You know, he was** |
| 12:50:33 | 2 | **upset and a little aggravated.   But I let him know** |
| 12:50:42 | 3 | **that I'm -- HR is going to deal with this.   I have** |
| 12:50:47 | 4 | **already brought it up to them to their immediate** |
| 12:50:50 | 5 | **attention.   I let my supervisors know.   And I let** |
| 12:50:57 | 6 | **Chartwell -- I gave them the okay to consent to** |
| 12:51:00 | 7 | **speak with Owen Diaz.** |
| 12:51:12 | 8 | Q.   Do you recall discussing anything else |
| 12:51:13 | 9 | with Owen Diaz regarding this situation?  I'm sorry, |
| 12:51:19 | 10 | actually.  You were describing to me the |
| 12:51:20 | 11 | conversation you had with Judy; right? |
| 12:51:24 | 12 | **A.   Yes.** |
| 12:51:25 | 13 | Q.   Because -- let's back up.  Let's get a |
| 12:51:27 | 14 | clear record. |
| 12:51:27 | 15 | So when Owen raised the concern about the |
| 12:51:33 | 16 | picture to you, you talked to Owen.  And what did he |
| 12:51:42 | 17 | tell you? |
| 12:51:45 | 18 | MR. RUTSCHMAN:  Objection; asked and |
| 12:51:45 | 19 | answered. |
| 12:51:50 | 20 | THE WITNESS:  So he pretty much told me |
| 12:51:53 | 21 | how -- what happened, how he came across the |
| 12:51:58 | 22 | picture.  You know, he felt that the rac- -- the |
| 12:52:07 | 23 | picture was racist and that he wanted to make a |
| 12:52:17 | 24 | complaint. |
| 12:52:21 | 25 | BY MS. AVLONI: |

01:21:03  1        Q.   Did you have any client that paid more

01:21:05  2   than $16 an hour?

01:21:07  3        A.   I don't think so.  Other than Tesla.

01:21:13  4             MS. AVLONI:  What time is it right now?

01:21:15  5   It's 1:21 p.m.  It makes sense, I think, to go on a

01:21:19  6   break.

01:21:21  7             MR. RUTSCHMAN:  Yes.

01:21:21  8             MS. AVLONI:  Okay.  So it is 1:21 and

01:21:24  9   we're going off the record.

01:21:25 10        (Recess taken from 1:21 p.m. to 2:18 p.m.)

02:18:36 11             MS. AVLONI:  The time is now 2:18 p.m.

02:18:38 12   And we're back on the record.

02:18:42 13        Q.   Ms. De Leon, what is your current address?

02:18:48 14        A.   My --

02:18:49 15             MR. RUTSCHMAN:  Objection; privacy.  She's

02:18:51 16   represented in this action, so you can contact her

02:18:54 17   through our firm.

02:18:55 18             MS. AVLONI:  And will you --

02:18:56 19             MR. RUTSCHMAN:  I'm going to instruct her

02:18:58 20   not to answer.

02:18:58 21             MS. AVLONI:  And will you agree to accept

02:19:00 22   a subpoena on behalf of Ms. De Leon, trial subpoena?

02:19:05 23             MR. RUTSCHMAN:  Yes.

02:19:06 24   BY MS. AVLONI:

02:19:06 25        Q.   And you're okay with your attorney

03:25:35  1   witnesses that observed the incident whether or not

03:25:39  2   they were CitiStaff temporary or not?

03:25:49  3        A.   It was more so she would tell me, you

03:25:50  4   know, when you talk to the client, ask them if they

03:25:53  5   have witness reports or any statement or any

03:26:01  6   documentation from the other parties.

03:26:09  7        Q.   In Owen Diaz' case, in regards to his

03:26:12  8   complaint about the inappropriate picture, did you

03:26:17  9   speak with nextSource about Owen's complaint?

03:26:25 10        A.   Yes.

03:26:26 11        Q.   Who did you speak to from nextSource?

03:26:33 12        A.   I don't recall.

03:26:36 13        Q.   Did you check with nextSource whether

03:26:39 14   they took down any statements or prepared any

03:26:42 15   reports?

03:26:43 16        A.   Yes.

03:26:45 17        Q.   And do you recall what nextSource said?

03:26:48 18        A.   I had asked nextSource for -- oh, no.

03:26:56 19   That wasn't the -- that wasn't the picture

03:26:58 20   situation.  That was the other situation.  So in the

03:27:02 21   picture situation, no, I don't recall them having

03:27:09 22   any witnesses or anything of that sort.

03:27:16 23        Q.   Do you recall asking from nextSource

03:27:20 24   whether there were any witnesses?

03:27:26 25        A.   There was -- no, not as far as witnesses.

03:27:29  1       Q.   Meaning no, you did not ask nextSource

03:27:30  2   or no, there were no witnesses that you're aware of?

03:27:35  3       A.   There were no witnesses that I was aware

03:27:36  4   of.

03:27:37  5       Q.   But you would have asked nextSource;

03:27:39  6   right?

03:27:40  7       A.   Right.

03:27:40  8            MR. RUTSCHMAN:   Objection; misstates the

03:27:41  9   witness' prior testimony.

03:27:45 10            THE WITNESS:   So I would have asked them

03:27:46 11   if there were, but there wasn't any.

03:27:51 12   BY MS. AVLONI:

03:27:52 13       Q.   And would your questions to nextSource

03:27:55 14   regarding this incident have been sent by e-mail or

03:27:58 15   would you have posed these questions by phone?

03:28:08 16       A.   By phone, both.

03:28:10 17       Q.   And would you have saved your e-mails to

03:28:14 18   the CitiStaff system?

03:28:15 19       A.   Anything that I had saved at the time

03:28:18 20   would have been in the system.   But I don't know if

03:28:23 21   anything is still in there.

03:28:24 22       Q.   Understood.   But you knew that based on

03:28:26 23   what Judy instructed you, it was important to keep

03:28:29 24   e-mails regarding the situation in the system;

03:28:31 25   right?

03:51:45 1          MR. RUTSCHMAN:  Objection; the document

03:51:47 2    speaks for itself.

03:51:48 3          THE WITNESS:  His ray rate.

03:51:50 4    BY MS. AVLONI:

03:51:51 5      Q.    Is that the new pay rate, the raise, or

03:51:53 6    the previous pay raise?

03:51:55 7      A.    That would be the new pay rate from his

03:51:57 8    raise that he got.

03:51:58 9      Q.    So what the document is saying is that

03:52:01 10   somewhere in August 16 of 2015 Owen Diaz' pay rate

03:52:06 11   increased to $18?

03:52:08 12     A.    Yes.

03:52:08 13     Q.    And then do you know what the regular

03:52:09 14   billing rate $23.76 means?

03:52:13 15     A.    That would have had to have been just in

03:52:15 16   the contract between nextSource and --

03:52:20 17     Q.    Do you know if that's the amount that

03:52:23 18   CitiStaff billed nextSource for Owen's hourly

03:52:29 19   rate?

03:52:30 20     A.    I don't know.

03:52:31 21     Q.    And then if you look at "Status."  It says

03:52:34 22   "3."  Do you know what that means?

03:52:40 23     A.    I forgot what that was.

03:52:42 24     Q.    How about "Work code"?  Do you know what

03:52:45 25   that --

```
1                    REPORTER'S CERTIFICATION

2

3          I, Heidi Belton, Certified Shorthand

4    Reporter in and for the State of California, do

5    hereby certify:

6

7          That the foregoing witness was by me duly

8    sworn; that the deposition was then taken before me

9    at the time and place herein set forth; that the

10   testimony and proceedings were reported

11   stenographically by me and later transcribed into

12   typewriting under my direction; that the foregoing

13   is a true record of the testimony and proceedings

14   taken at that time.

15

16          IN WITNESS WHEREOF, I have subscribed my

17   name on this date:

18

19

20

21

22          _____

23          Heidi Belton, CSR, RPR, CRR, CCRR, CRC
                     CSR No. 12885
24

25
```

# Exhibit

# 8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                    Plaintiffs,

                                   No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                    Defendants.
_____/


DEPOSITION OF ANNALISA HEISEN

May 29, 2019


Reported by:

Bridget M. Mattos, CSR No. 11410

ANNALISA HEISEN
May 29, 2019

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4          CALIFORNIA CIVIL RIGHTS LAW GROUP
            By:  LAWRENCE A. ORGAN
 5               Attorney at Law
            332 San Anselmo Avenue
 6          San Anselmo, California 94960
            (415) 453-4740
 7          larry@civilrightsca.com

 8    ALSO PRESENT:  JEAN GER, CCRLG

 9

10    FOR THE DEFENDANT WEST VALLEY STAFFING GROUP:

11          PAHL & MCCAY
            By:  FENN C. HORTON, III
12               Attorney at Law
            225 West Santa Clara, Suite 1500
13          San Jose, California 95113
            (408) 286-5100
14          fhorton@pahl-mccay.com

15    ALSO PRESENT:
      TERESA KOSSAYIAN, WEST VALLEY STAFFING GROUP
16

17    FOR THE DEFENDANT NEXTSOURCE, INC.:

18          FISHER & PHILLIPS
            By:  JUAN C. ARANEDA
19               Attorney at Law
            One Embarcadero Center, Suite 2050
20          San Francisco, California 94111
            (415) 490-9000
21          jaraneda@fisherphillips.com

22

23

24

25
```

**Page 4**

```
 1                  A P P E A R A N C E S (continued)

 2

 3   FOR THE DEFENDANT TESLA INC. Dba TESLA MOTORS INC.:

 4        SHEPPARD, MULLIN, RICHTER & HAMPTON
          By:  PATRICIA M. JENG
 5             Attorney at Law
          Four Embarcadero Center, 17th Floor
 6        San Francisco, California 94111
          (415) 434-9100
 7        pjeng@sheppardmullin.com

 8   FOR THE DEFENDANT CHARTWELL STAFFING SERVICES, INC.:
          LAFAYETTE & KUMAGAI LLP
 9         By:  CHERYL A. STEVENS
               Attorney at Law
10        1300 Clay Street, Suite 810
          Oakland, California 94612
11        (415) 357-4600
          cstevens@lkclaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   versions.  The other, I don't know what they are off

 2   the top of my head.

 3              MR ORGAN:  Q.  Okay.  Let's go through

 4   Exhibit 150.

 5              Now, as to this policy, the antiharassment

 6   and discrimination policy, this policy would apply to

 7   all workers at the Tesla factory; correct?

 8              MS. JENG:  Objection; vague and ambiguous and

 9   calls for speculation.

10              THE WITNESS:  There's an expectation that

11   employees at Tesla as well as contractors and other

12   people on-site are in compliance with the policy.

13              MR ORGAN:  Q.  So Exhibit 150 does apply to

14   both contractors and regular employees, then; right?

15              MS. JENG:  Objection; asked and answered.

16              THE WITNESS:  There's an expectation that

17   both of those categories of workers would be in

18   compliance with those articulated.

19              MR ORGAN:  Okay.  And in terms of -- so if

20   both employees and contractors have to comply with

21   Exhibit 150, the policies in Exhibit 150, how do you

22   go about enforcing that?

23              MR. ARANEDA:  Misstates prior testimony.

24              MS. JENG:  And also vague and ambiguous as to

25   "enforce."

1   discrimination policy?

2       **A.   My understanding is that the agencies who**

3   **employ the contractors are doing training on policies**

4   **and compliance.   I don't have visibility into their**

5   **processes.**

6       Q.   So your understanding is that the contracting

7   agencies are supposed to train their employees who

8   were working at the Tesla factory, on Tesla's

9   antiharassment and discrimination policy; correct?

10          MR. ARANEDA:   Misstates prior testimony.

11          THE WITNESS:   So, there's an expectation that

12   they're being trained by their staffing agencies on

13   antiharassment and discrimination, but this -- not

14   this policy specifically; I'm not sure what they're

15   doing.   I couldn't confirm if they're training this

16   policy, since they're employees.

17          MR ORGAN:   Q.   What steps does Tesla take to

18   ensure that contractors who come into and work in the

19   Tesla factory in Fremont have training relative to the

20   topic of antiharassment and discrimination?

21       **A.   We have an expectation that agencies are**

22   **training on antiharassment and discrimination.**

23       Q.   And what is that expectation based on?

24       **A.   That they're legally compliant.**

25       Q.   In terms of Tesla's expectation, is there an

1     Q.    In terms of if a Tesla employee -- let's say

2    a supervisor or a manager gets information from a

3    contract employee about harassment or discrimination,

4    Tesla's antiharassment and discrimination policy would

5    apply, in terms of reporting an investigation;

6    correct?

7         **A.    Correct.   To that employee of Tesla who**

8    **received information?**

9         Q.    Yes.

10        **A.    Correct.**

11        Q.    And so that employee of Tesla would have to

12   then take some action once they get information about

13   discrimination or harassment in the workplace;

14   correct?

15        **A.    That's the expectation.**

16        Q.    And that's true regardless of whether the

17   harassment or discrimination takes place in any area

18   of the Fremont factory; correct?

19        **A.    What do you mean, "area"?**

20        Q.    Well, there are different areas of the

21   Fremont factory, I understand; is that right?

22        **A.    Physical locations.**

23        Q.    Physical locations, yes.

24        **A.    That's my understanding.**

25        Q.    And in terms of the antiharassment and

1    discrimination policy that Tesla has, that policy

2    applies to all areas of the factory; right?

3         A.    **That's my understanding.**

4         Q.    There's not like an antiharassment-free zone;

5    right?

6         A.    **No.**

7         Q.    So if a Tesla employee gets information about

8    harassing conduct based on race in the factory, that's

9    occurring in the factory, regardless of how they get

10   that information, they then have a reporting duty, in

11   terms of either providing that information to a

12   higher-level manager or sending it to HR; is that

13   true?

14        A.    **There's an expectation of that, as it's**

15   **articulated in the policy.**

16             MR ORGAN:  This is 151.

17             (Whereupon Deposition Exhibit 151

18              was marked for identification.)

19             MR ORGAN:  Exhibit 151, for the record, is a

20   six-page document Bates-stamped Tesla 819 to 824.

21   It's entitled "Policy Against Discrimination and

22   Harassment in the Workplace, U.S. Locations."

23        Q.    Do you recognize Exhibit 151?

24        A.    **I do.**

25        Q.    And what is Exhibit 151?

1   be harassed or degraded while they're trying to do

2   their job," you would agree that that is -- comports

3   with Tesla's policies, doesn't it?

4        **A.   I agree, yes.**

5        Q.   And then Mr. Owen Diaz also says -- he said,

6   "It's not the first time that Ramon Martinez has" -- I

7   think "has been talked about his behavior," "has been

8   talked to about his behavior."

9             Is that your understanding?

10            MS. JENG:  Objection; the document speaks for

11   itself.  Misstating the evidence.

12            MR ORGAN:  Q.  You understood that Mr. Diaz

13   was complaining that the behavior towards Mr. Diaz was

14   getting worse; right?

15            MS. JENG:  Objection; lacks foundation,

16   misstates the evidence.  And the document speaks for

17   itself.

18            THE WITNESS:  He makes the statement here

19   towards the end of the document.  Owen alleges that

20   his behavior is getting worse.

21            MR ORGAN:  Q.  "His behavior," being

22   Mr. Martinez, is getting worse.

23        **A.   Yeah, yeah, Martinez.**

24        Q.   That is all something you would have

25   expected, the Tesla HR person who got involved, to

1  take into account when looking into Mr. Diaz's

2  complaint; correct?

3         MS. JENG:  Objection; lacks foundation.

4         THE WITNESS:  I could say that I would

5  imagine that those items would be taken into account

6  during an investigation, depending on whether it's the

7  Tesla HR person who conducted it or not.

8         MR ORGAN:  Q.  What does Tesla do to make

9  sure that its contractor organizations do a thorough

10  and effective investigation?

11     **A.   In general, when these complaints come to**

12  **Tesla's attention -- these complaints being harassment**

13  **and discrimination complaints -- if they involve**

14  **contractors, we expect that the Tesla HR person is in**

15  **communication with the agency.  So even if they're not**

16  **the ones conducting the investigation, they're making**

17  **sure that the issue is resolved by collaborating with**

18  **the agency.**

19     Q.   And what is the typical way that Tesla HR

20  communicates with the contract agencies?

21     **A.   What do you mean by "way"?**

22     Q.   Like email, is that the typical way --

23     **A.   Email is one way.  Phone, in person.**

24     Q.   If there are in-person communications, do HR

25  people typically take notes of those interactions with

1    anything in writing that you have seen that indicates

2    what contractors are supposed to do relative to

3    enforcing Tesla's antiharassment policies?

4        A.    Not that I've seen.

5        Q.    And other than the policies that we've talked

6    about and the investigation tool kit, which we don't

7    have, other than those policies and procedures, are

8    there any other policies or procedures for ensuring

9    that workers who are working at your Fremont factory

10   are not subjected to harassment?

11       A.    Not that I'm aware of.

12       Q.    In terms of Tesla's antiharassment complaint

13   procedures, we saw some of those in the code of

14   conduct and then also in the antiharassment policy.

15            Other than those complaint procedures, are

16   there any other complaint procedures that Tesla has

17   that we haven't gone over?

18       A.    No, I think we covered everything.

19       Q.    It's fair to say that if someone wants to

20   make a complaint to Tesla about the way they're being

21   treated, some kind of harassment, they can do that

22   either in writing or verbally; is that true?

23       A.    That's correct.

24       Q.    And if a Tesla employee wants to complain

25   about harassment in the workplace, they can do that by

```
 1              MS. JENG:  Thank you.

 2              MR ORGAN:  Anybody else?

 3              MR. HORTON:  No questions.

 4              MR. ARANEDA:  No questions.

 5              MR ORGAN:  Okay.  I just have a follow-up on

 6      one of your answers to Patricia.

 7                           ---oOo---

 8              FURTHER EXAMINATION BY MR. ORGAN

 9              MR. ORGAN:  Q.  Relative to disciplinary

10      action, if Tesla finds or gets information that an

11      employee has engaged in harassing conduct, Tesla will

12      act on that, correct, even if it's a contractor doing

13      the harassing conduct?

14         A.   Tesla would partner with the agency and

15      collaborate with them to come up with an action.

16         Q.   And you would agree that Tesla, with respect

17      to any contract employee, can ask the contracting

18      agency not to send that individual to the Tesla

19      factory; right?

20         A.   They can say that that person is no longer

21      allowed on the property, or request that the contract

22      with Tesla end.

23         Q.   And certainly, if Tesla found or had

24      information that someone, a contractor, had engaged in

25      harassing conduct, Tesla would want to protect its
```

ANNALISA HEISEN
May 29, 2019

1    State of California              )

2    County of Marin                  )

3

4              I, Bridget M. Mattos, hereby certify

5    that the witness in the foregoing deposition was by me

6    duly sworn to testify to the truth, the whole truth

7    and nothing but the truth in the within entitled

8    cause; that said deposition was taken at the time and

9    place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and disinterested person, and was thereafter

13   transcribed under my direction into typewriting by

14   computer; that the witness was given an opportunity to

15   read, correct and sign the deposition.

16              I further certify that I am not

17   interested in the outcome of said action nor connected

18   with or related to any of the parties in said action

19   nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on May 29, 2019.

22   _____

23        BRIDGET M. MATTOS, CSR NO. 11410

24

25

Bridget Mattos & Associates
(415)747-8710

# Exhibit

# 9

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   DEMETRIC DI-AZ, OWEN DIAZ, and      )
     LAMAR PATTERSON,                    )
 6                                       )
                     Plaintiffs,         )
 7                                       )  Case No.
          vs.                            )  3:17-cv-06748-WHO
 8                                       )
     TESLA, INC. dba TESLA MOTORS,       )  Pages 1 - 142
 9   INC.; CITISTAFF SOLUTIONS, INC.;    )
     WEST VALLEY STAFFING GROUP;         )
10   CHARTWELL STAFFING SERVICES, INC.;  )
     and DOES 1-50, inclusive,           )
11                                       )
                     Defendants.         )
12   _____)

13

14

15

16          VIDEO DEPOSITION OF ERIN MARCONI

17             MONDAY, OCTOBER 21, 2019

18                   11:39 A.M.

19

20

21

22

23   REPORTED BY:  LAURA J. MELLINI

24            CSR NO. 8181, RPR, CCRR

25   NDS JOB NO.:  220525
```

1

```
 1     APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS DEMETRIC DI-AZ AND OWEN DIAZ:

 4

 5              CALIFORNIA CIVIL RIGHTS LAW GROUP

 6              BY:  LAWRENCE A. ORGAN, ESQ.

 7              332 SAN ANSELMO AVENUE

 8              SAN ANSELMO, CALIFORNIA 94960

 9              415.453.4740

10              larry@civilrightsca.com

11

12    FOR DEFENDANTS TESLA, INC. dba TESLA MOTORS, INC.:

13

14              SHEPPARD MULLIN RICHTER & HAMPTON LLP

15              BY:  TRACEY A. KENNEDY, ESQ.

16              333 SOUTH HOPE STREET

17              43RD FLOOR

18              LOS ANGELES, CALIFORNIA 90071-1422

19              213.617.4249

20              tkennedy@sheppardmullin.com

21

22

23

24

25
```

                                                        3

```
1    APPEARANCES OF COUNSEL:  (Continued)

2

3    FOR DEFENDANT CITISTAFF SOLUTIONS, INC.:

4

5              (APPEARING TELEPHONICALLY)

6              LAFAYETTE & KUMAGAI LLP

7              BY:  SUSAN KUMAGI, ESQ.

8              1300 CLAY STREET

9              SUITE 810

10             OAKLAND, CALIFORNIA  94612

11             415.357.4600

12             skumagai@lkclaw.com

13

14   FOR DEFENDANT NEXTSOURCE, INC.:

15

16             (APPEARING TELEPHONICALLY)

17             FISHER PHILLIPS

18             BY:  VINCENT ADAMS, ESQ.

19             ONE EMBARCADERO CENTER

20             SUITE 2050

21             SAN FRANCISCO, CALIFORNIA  94111-3712

22             415.490.9000

23             vadams@fisherphillips.com

24

25
```

4

Erin Marconi                                                    October 21, 2019

| | | | |
|---|---|---|---|
| 1 | Q | And what was that job? | 11:44 |
| 2 | A | Employee relations and generalist work for | 11:44 |
| 3 | staffing agency. | | 11:44 |
| 4 | Q | What was the staffing agency you were working | 11:44 |
| 5 | for? | | 11:44 |
| 6 | A | Volt -- I think their full name is Workforce | 11:44 |
| 7 | Solutions. | | 11:44 |
| 8 | Q | How long did you work for Volt? | 11:44 |
| 9 | A | Just under three years. | 11:44 |
| 10 | Q | And what was your job -- what was your job | 11:44 |
| 11 | title at Volt? | | 11:44 |
| 12 | A | That is a fantastic question. | 11:44 |
| 13 | | My last job title at Volt was program manager. | 11:44 |
| 14 | Q | Okay. | 11:44 |
| 15 | A | What my first one was I am not sure. | 11:44 |
| 16 | Q | That's fine.  Program manager is good. | 11:44 |
| 17 | | What did you do after you left Volt as a | 11:44 |
| 18 | program manager? | | 11:44 |
| 19 | A | I went to Tesla as an HR business partner. | 11:45 |
| 20 | Q | So that would be approximately 2013? | 11:45 |
| 21 | A | Correct. | 11:45 |
| 22 | Q | How long were you an HR business partner at | 11:45 |
| 23 | Tesla? | | 11:45 |
| 24 | A | Until January 2017. | 11:45 |
| 25 | Q | And what was your job title after you -- after | 11:45 |

13

| | | |
|---|---|---|
| 1 | reported to me and I -- no. | 12:02 |
| 2 | Q    But you mentioned earlier that there were HR | 12:02 |
| 3 | teams. | 12:02 |
| 4 | A    There was an HR business partner team.  There | 12:02 |
| 5 | were also some employee relations people that supported | 12:02 |
| 6 | us.  They did a lot of administrative for the most part. | 12:02 |
| 7 | Then there was a totally different group in HR | 12:02 |
| 8 | that did onboarding, offboarding.  I can't recall what | 12:02 |
| 9 | the name of that group was. | 12:02 |
| 10 | There was recruiting.  There was just various | 12:03 |
| 11 | different areas. | 12:03 |
| 12 | Q    But the HR business partner team that you were | 12:03 |
| 13 | part of was in charge of handling, among other things, | 12:03 |
| 14 | complaints about discrimination or harassment; right? | 12:03 |
| 15 | A    Correct. | 12:03 |
| 16 | Q    And approximately how many members were there | 12:03 |
| 17 | in that HR business partner team that handled | 12:03 |
| 18 | discrimination and harassment complaints in that 2015, | 12:03 |
| 19 | '16 time period? | 12:03 |
| 20 | A    At least ten, to the best of my recollection. | 12:03 |
| 21 | That was a long time ago, though. | 12:03 |
| 22 | Q    Okay. | 12:04 |
| 23 | A    Oh, 11.  Sorry.  I haven't thought about that | 12:04 |
| 24 | in a long time. | 12:04 |
| 25 | Q    That's all right.  That's all right.  I | 12:04 |

27

1    appreciate you coming in to help us here.            12:04

2            Did you have a job description for your job?  12:04

3       A   Not when I was hired.                          12:04

4       Q   Okay.                                          12:04

5       A   I was the first person in that role, and      12:04

6    someone that knew me from a previous life called, talked  12:04

7    to me about the job.                                  12:04

8       Q   So you were the first person in the HR        12:04

9    business partner role?                                12:04

10      A   Correct.                                       12:04

11      Q   At Tesla?                                       12:04

12      A   Yes.                                           12:04

13      Q   Congratulations.                               12:04

14      A   Thanks.                                        12:04

15      Q   Did you have -- well, let's -- let's do this.  12:04

16   Let's -- I'm going to show you what's been previously  12:04

17   marked as Exhibit 183.  And Exhibit 183 for the record  12:05

18   is a one-page document Bates-stamped Tesla 889.       12:05

19           My understanding is that Tesla HR was on the  12:05

20   production floor; is that correct?                    12:05

21      A   At some periods of time.                       12:05

22      Q   And in the 2015, 2016 time period, do you     12:05

23   remember whether HR was on the production floor?      12:05

24      A   I believe so.                                  12:05

25      Q   Okay.  So is there an area -- we only have     12:05

                                                           28

Erin Marconi                                                      October 21, 2019

```
1         Q    Okay.  And in your role as the HR business    12:11

2    partner, did you help enforce the anti-discrimination   12:11

3    and anti-harassment policies that Tesla had?            12:11

4         A    Yes.                                           12:11

5         Q    Did you have any input on the written policies 12:11

6    of the company?  In other words, did you help like with 12:11

7    the anti-handbook handbook or any of that stuff?        12:11

8         A    I don't recall who wrote the anti-handbook     12:11

9    handbook.                                                12:11

10        Q    Okay.  But in terms of other policies, other   12:11

11   HR policies, did you help at least with the drafting of  12:12

12   any of those other policies?                             12:12

13        A    Not that I recall.                             12:12

14        Q    Okay.  Do you remember who did have the        12:12

15   responsibilities for drafting those other HR policies?   12:12

16        A    I don't recall.                                12:12

17        Q    Okay.  But it's fair to say that you at least  12:12

18   understood what Tesla's policies were in terms of        12:12

19   anti-discrimination and anti-harassment; right?          12:12

20        A    Correct.                                       12:12

21        Q    And Tesla has, or had when you were there, a   12:12

22   zero-tolerance policy for harassment; right?             12:12

23        A    Correct.                                       12:12

24        Q    And Tesla also has a zero-tolerance policy for 12:12

25   discrimination?                                          12:12
```

                                                                      33

| 1 | A     Correct. | 12:12 |
| 2 | Q     What does that mean to have a zero-tolerance | 12:12 |
| 3 | policy under Tesla's formula? | 12:12 |
| 4 | A     That there's no tolerance of any of those | 12:13 |
| 5 | things which you just said, harassment, discrimination. | 12:13 |
| 6 | Q     Would you agree that based on your | 12:13 |
| 7 | understanding of Tesla's policies, that use of the | 12:13 |
| 8 | n-word by any worker at the factory would have violated | 12:13 |
| 9 | Tesla's anti-harassment policy? | 12:13 |
| 10 | A     I don't want to assume anything.  So what were | 12:13 |
| 11 | we talking about? | 12:13 |
| 12 | Q     Yeah.  You mentioned that you understood | 12:13 |
| 13 | Tesla's zero- -- that Tesla had a zero-tolerance policy | 12:13 |
| 14 | for discrimination and harassment; right? | 12:13 |
| 15 | A     Correct. | 12:13 |
| 16 | Q     And based on your understanding of that | 12:13 |
| 17 | policy, if a Tesla worker had used the n-word in the | 12:13 |
| 18 | workplace, would that have violated Tesla's | 12:14 |
| 19 | anti-harassment, anti-discrimination policy? | 12:14 |
| 20 | A     What do you mean by "n-word"?  I don't want to | 12:14 |
| 21 | assume what you mean. | 12:14 |
| 22 | Q     Oh, okay.  So I'll just say it once because | 12:14 |
| 23 | it's a highly offensive term to most people.  But my | 12:14 |
| 24 | understanding is and my use of "n-word" is either | 12:14 |
| 25 | "nigger," n-i-g-g-e-r, or "nigga," n-i-g-g-a.  Okay? | 12:14 |

34

| | | |
|---|---|---|
| 1 | A    Okay. | 12:14 |
| 2 | Q    So with that understanding of the definition | 12:14 |
| 3 | of n- -- of the n-word, is it your understanding that | 12:14 |
| 4 | Tesla's anti-harassment and anti-discrimination | 12:14 |
| 5 | zero-tolerance policies prohibit use of the n-word at | 12:14 |
| 6 | the Tesla facility? | 12:14 |
| 7 | A    Yes. | 12:14 |
| 8 | Q    Let me just do a little more questions about | 12:15 |
| 9 | your background. | 12:15 |
| 10 | In terms of the number of investigations that | 12:15 |
| 11 | you've done into harassment claims or, you know, words | 12:15 |
| 12 | that people found inappropriate, how many investigations | 12:15 |
| 13 | do you think you did to things like that during the time | 12:15 |
| 14 | that you were at Tesla? | 12:15 |
| 15 | A    I don't recall doing any of that particular... | 12:15 |
| 16 | Q    Okay.  Did you do any sexual harassment | 12:15 |
| 17 | investigations? | 12:15 |
| 18 | A    Yes. | 12:15 |
| 19 | Q    How many sexual harassment investigations did | 12:15 |
| 20 | you do? | 12:15 |
| 21 | A    I have absolutely no idea.  I would be | 12:15 |
| 22 | guessing if I gave a number on -- | 12:15 |
| 23 | Q    More than ten do you think? | 12:15 |
| 24 | A    Accusations? | 12:16 |
| 25 | Q    Yeah, yeah.  Complaints.  How many complaints | 12:16 |

35

| | | |
|---|---|---|
| 1 | of sexual harassment do you think you investigated at -- | 12:16 |
| 2 | what's your best estimate, at Tesla? | 12:16 |
| 3 | A    Maybe three.  Two that I can definitely | 12:16 |
| 4 | recall.  Not during 2015 or 2016. | 12:16 |
| 5 | Q    Okay.  And if you had known about someone | 12:16 |
| 6 | using the n-word at the Tesla factory, that would | 12:16 |
| 7 | certainly be something that you would investigate; | 12:16 |
| 8 | correct? | 12:16 |
| 9 | A    Absolutely. | 12:16 |
| 10 | Q    And the reason that you would investigate that | 12:16 |
| 11 | is use of the n-word at the Tesla factory could create a | 12:16 |
| 12 | hostile work environment for other workers; right? | 12:16 |
| 13 | A    Correct. | 12:16 |
| 14 | Q    Did you have -- and just so I'm clear, did you | 12:17 |
| 15 | ever investigate a claim where somebody at least alleged | 12:17 |
| 16 | that the n-word had been used? | 12:17 |
| 17 | A    I don't recall. | 12:17 |
| 18 | Q    You don't recall doing that; correct? | 12:17 |
| 19 | A    Unh-unh. | 12:17 |
| 20 | Q    "No"? | 12:17 |
| 21 | A    "No."  I'm sorry. | 12:17 |
| 22 | MS. KENNEDY:  You asked it in the negative, | 12:17 |
| 23 | Larry. | 12:17 |
| 24 | MR. ORGAN:  Oh, right.  Right. | 12:17 |
| 25 | BY MR. ORGAN: | 12:17 |

36

```
 1        A    That's my understanding.                      12:39

 2        Q    You would agree that it's never okay to use   12:39

 3   the n-word in the workplace?                            12:39

 4        A    Correct.                                      12:39

 5        Q    And you'd also agree that it's never okay to  12:39

 6   make offensive drawings that could be racial in nature; 12:39

 7   right?                                                  12:39

 8        A    Correct.                                      12:39

 9        Q    You'd agree that every employer has a duty to 12:39

10   provide a workplace where employees are not using the   12:39

11   n-word towards other employees?                         12:39

12        A    Yes.                                          12:39

13        Q    And under Tesla's policies, if someone        12:39

14   complained to a supervisor, that satisfied the          12:40

15   requirements of their reporting, correct, at least      12:40

16   initially?                                              12:40

17             MS. KENNEDY:  Objection.  Vague.  And         12:40

18   objection to the form of the question.                  12:40

19             You may respond if you can.                   12:40

20             THE WITNESS:  Can you read the question?      12:40

21   BY MR. ORGAN:                                           12:40

22        Q    I'll try a different way.                     12:40

23             If -- if a Tesla worker complains about       12:40

24   harassment to their supervisor, that meets their at     12:40

25   least initial burden under Tesla's policies for         12:40
```

51

| | | |
|---|---|---|
| 1 | reporting harassment; right? | 12:40 |
| 2 | A   Yes. | 12:40 |
| 3 | Q   And under Tesla policies, supervisors are | 12:40 |
| 4 | supposed to report issues relating to harassment to | 12:40 |
| 5 | their managers and to HR? | 12:41 |
| 6 | A   Yes. | 12:41 |
| 7 | Q   Similarly, if an employee wanted to report an | 12:41 |
| 8 | issue of harassment to a manager, that would satisfy | 12:41 |
| 9 | Tesla's reporting requirements; right? | 12:41 |
| 10 | A   Yes. | 12:41 |
| 11 | Q   Now, there was a -- there were numerous | 12:41 |
| 12 | contractors who had employees working at the Tesla | 12:41 |
| 13 | facility, is that true, during the time that you were | 12:41 |
| 14 | there? | 12:41 |
| 15 | A   I believe so. | 12:41 |
| 16 | Q   Do you know what percentage of the workers | 12:41 |
| 17 | working at the Tesla factory were contractors? | 12:41 |
| 18 | MS. KENNEDY:  At what point in time? | 12:42 |
| 19 | MR. ORGAN:  Yeah, that's a good point.  I'll | 12:42 |
| 20 | withdraw that. | 12:42 |
| 21 | MS. KENNEDY:  Okay. | 12:42 |
| 22 | MR. ORGAN:  Yeah, because it's vague as to | 12:42 |
| 23 | time. | 12:42 |
| 24 | BY MR. ORGAN: | 12:42 |
| 25 | Q   Let's talk about the 2015, 2016 time period. | 12:42 |

52

1    above; right?                                        12:43

2        A    Correct.                                    12:43

3        Q    And you did play a role in terms of recruiting   12:43

4    for those positions?                                 12:43

5        A    Recruiting, not so much.  Interview input,  12:43

6    yes.  And I wouldn't say a hundred percent of the time.   12:43

7        Q    Okay.                                       12:43

8            MR. ORGAN:  We've been going a little over an   12:43

9    hour, and we have to give our court reporter a break   12:43

10   every so often.  So why don't we go off the record.  12:43

11           THE VIDEO OPERATOR:  The time is 12:42.  This   12:43

12   ends disk number 1.  We're off the record.           12:43

13           (Brief recess taken.)                        12:43

14           THE VIDEO OPERATOR:  The time is 12:57.  This   12:58

15   is disk number 2 of Erin Marconi.  We're back on the   12:58

16   record.                                              12:58

17   BY MR. ORGAN:                                        12:58

18       Q    What was Tesla's HR role in investigating   12:58

19   claims of harassment by contract workers who were    12:58

20   working at the Tesla facility?                       12:58

21       A    Can you be more specific?                   12:58

22       Q    Sure.  Let's say that a contract employee is   12:58

23   working somewhere in the Tesla factory and they complain   12:58

24   to a Tesla supervisor about harassment towards them by   12:58

25   someone else working at the plant.                   12:58

                                                               54

| | | |
|---|---|---|
| 1 | What role -- first of all, would the | 12:58 |
| 2 | supervisor -- the Tesla supervisor is supposed to report | 12:59 |
| 3 | that to Tesla HR; correct? | 12:59 |
| 4 | A    Correct. | 12:59 |
| 5 | Q    And then the supervisor's also supposed to | 12:59 |
| 6 | report that incident to contractors' HR; correct? | 12:59 |
| 7 | A    That typically I think would happen through | 12:59 |
| 8 | HR. | 12:59 |
| 9 | Q    Okay. | 12:59 |
| 10 | A    Depending on what you mean by "contractor." | 12:59 |
| 11 | Q    Okay.  I'm talking about someone who is | 12:59 |
| 12 | actually working in the facility as either a production | 12:59 |
| 13 | associate or -- | 12:59 |
| 14 | A    So a temporary worker -- | 12:59 |
| 15 | Q    Temporary -- | 12:59 |
| 16 | A    -- is I think what we call -- | 12:59 |
| 17 | Q    Okay.  What you call a temporary worker. | 12:59 |
| 18 | My understanding is that some people would | 12:59 |
| 19 | become permanent employees of Tesla, regular Tesla | 12:59 |
| 20 | employees, by first being a temporary worker.  Is that | 12:59 |
| 21 | true? | 12:59 |
| 22 | A    Yes. | 12:59 |
| 23 | Q    And in terms of the standards, the | 13:00 |
| 24 | anti-discrimination, anti-harassment policy standards | 13:00 |
| 25 | that applied to workers at the Tesla factory, those | 13:00 |

55

| | | |
|---|---|---|
| 1 | temporary worker would be to facilitate the | 13:03 |
| 2 | investigation.  Is that true typically? | 13:03 |
| 3 |     A     Primary first thing would be obviously, | 13:03 |
| 4 | depending on what that is, are they comfortable or do | 13:03 |
| 5 | they feel threatened.  Those kind of things you want to | 13:03 |
| 6 | take care of in the immediate. | 13:03 |
| 7 |        The next thing I would do is get them | 13:03 |
| 8 | connected with the person that would have been my role | 13:03 |
| 9 | for their employer. | 13:03 |
| 10 |     Q    Okay.  And if someone does complain about what | 13:03 |
| 11 | they consider to be inappropriate conduct, and they feel | 13:03 |
| 12 | threatened, you would agree that as a Tesla HR person, | 13:03 |
| 13 | you would still have a responsibility to make sure that | 13:03 |
| 14 | nothing happened to them further; right? | 13:03 |
| 15 |     A    Oh, absolutely. | 13:03 |
| 16 |     Q    And as a Tesla HR person, if someone had | 13:03 |
| 17 | complained about like threatening conduct or feeling | 13:04 |
| 18 | that they were threatened, you would at least have to | 13:04 |
| 19 | make that workplace safe for them from that point that | 13:04 |
| 20 | you find out about it on; right? | 13:04 |
| 21 |     A    In the immediate, absolutely.  If then it | 13:04 |
| 22 | was -- the investigation was conducted and it, say, only | 13:04 |
| 23 | involved temporary people that were all under West | 13:04 |
| 24 | Valley -- | 13:04 |
| 25 |     Q    Yeah. | 13:04 |

58

1       A      -- if West Valley investigated it and came        13:04

2   back and said there wasn't actually an issue, I'm going       13:04

3   to believe that West Valley did their investigation           13:04

4   thoroughly and if there was something to address,             13:04

5   addressed it.                                                 13:04

6          Does that make sense?                                  13:04

7       Q   Sure.                                                 13:04

8          You -- you typically rely on the contract --           13:04

9   contracting agency to do an investigation into                13:04

10  complaints by their employees; is that right?                 13:04

11      A    If it is involving other of their employees.         13:04

12         If it is involving Tesla employees, then I             13:05

13  would talk to probably Tesla employees, they would talk       13:05

14  to their employees.                                           13:05

15         If the stars align and everyone was in the             13:05

16  building or in the same side of the country and we would      13:05

17  help -- sometimes I had been there when they were             13:05

18  interviewing their employee and vice versa.  But I            13:05

19  wouldn't -- my preference would not be to interview           13:05

20  someone else's employee, and especially not without them      13:05

21  present.                                                      13:05

22      Q    In terms of Tesla's duty, though, to all of          13:05

23  its employees, it has a -- it has a duty to both its          13:05

24  regular employees and the contractors to make sure that       13:05

25  all of those people work in a work environment free from      13:05

                                                                      59

| 1 | harassment or discrimination based on race; right? | 13:05 |
|---|---|---|
| 2 | A    Correct. | 13:05 |
| 3 | Q    And so if -- if Tesla HR became aware of a | 13:05 |
| 4 | problem, let's say use of the n-word or use of racial | 13:05 |
| 5 | drawings, Tesla would still have to make sure that that | 13:06 |
| 6 | conduct stopped; right? | 13:06 |
| 7 | A    Assuming that an investigation found that that | 13:06 |
| 8 | conduct did happen? | 13:06 |
| 9 | Q    Right. | 13:06 |
| 10 | A    Then yes. | 13:06 |
| 11 | Q    And, similarly, if like someone was | 13:06 |
| 12 | threatening someone because they're black or Latino or | 13:06 |
| 13 | something like that, Tesla would want to take action | 13:06 |
| 14 | there to make sure that there weren't further threats; | 13:06 |
| 15 | right? | 13:06 |
| 16 | A    Threatening for any reason wouldn't be okay. | 13:06 |
| 17 | Q    Right.  Okay. | 13:06 |
| 18 | Was there some kind of guidelines that dealt | 13:06 |
| 19 | with situations like you were just talking about where a | 13:06 |
| 20 | contractor was investigating a complaint by one of their | 13:06 |
| 21 | employees about inappropriate conduct in the workplace? | 13:06 |
| 22 | Did they have to follow the same sort of Tesla | 13:06 |
| 23 | guidelines of has to be prompt, thorough and objective? | 13:06 |
| 24 | A    I can't answer what they had to do based on | 13:07 |
| 25 | their employer.  The expectation of them from Tesla | 13:07 |

60

| | | |
|---|---|---|
| 1 | would be that they are following those. | 13:07 |
| 2 | Q    Okay. | 13:07 |
| 3 | (Reporter clarification.) | 13:07 |
| 4 | THE WITNESS:  The same guidelines we would. | 13:07 |
| 5 | BY MR. ORGAN: | 13:07 |
| 6 | Q    So the expectation from Tesla is that its | 13:07 |
| 7 | contracting agencies follow the same principles of | 13:07 |
| 8 | investigations that Tesla has? | 13:07 |
| 9 | A    Correct. | 13:07 |
| 10 | Q    And if someone is complaining about conduct, | 13:07 |
| 11 | do they have to complain in writing or can they also | 13:07 |
| 12 | complain verbally about inappropriate conduct in the | 13:07 |
| 13 | workplace at Tesla? | 13:07 |
| 14 | A    Either. | 13:07 |
| 15 | Q    When employees are complaining about conduct, | 13:08 |
| 16 | do they have to use magic words like, "I consider this | 13:08 |
| 17 | to be harassment" or "discrimination" or "retaliation," | 13:08 |
| 18 | or can they just tell -- talk about the conduct and you | 13:08 |
| 19 | would put it into a category? | 13:08 |
| 20 | A    Can you repeat that question? | 13:08 |
| 21 | Q    Sure. | 13:08 |
| 22 | When an employee makes a complaint about | 13:08 |
| 23 | inappropriate conduct in the workplace, do they have to | 13:08 |
| 24 | give it a particular label, such as, "I'm complaining | 13:08 |
| 25 | about harassment," or, "I'm complaining about | 13:08 |

61

Erin Marconi                                              October 21, 2019

1      Q     Okay.  What was the -- tell me about the        13:41

2   situation where you did sensitivity training for a       13:41

3   group.                                                   13:41

4      A     It was an offensive drawing that we were        13:41

5   unable to determine who did the drawing.  And I say      13:42

6   "offensive"; it was a sexual drawing that clearly        13:42

7   offended folks.                                          13:42

8            That department was, I believe, over 500        13:42

9   people.  So we brought everyone together each shift,     13:42

10  went over how that was not okay; if we ever could find   13:42

11  out who it was, it wouldn't be tolerated.                13:42

12           An investigation couldn't pinpoint who it was   13:42

13  because there wasn't a camera in that particular area,   13:42

14  we addressed the whole entire team, and then did         13:42

15  sensitivity training that covered pretty much            13:42

16  everything.                                              13:42

17           And even if I tell you a joke about the sky     13:42

18  being blue and you think it's funny today and you don't  13:42

19  tomorrow, then I can't tell you that joke anymore.       13:42

20     Q     Do you remember what department it was in?      13:43

21     A     I think it was stamping.                        13:43

22     Q     Okay.  In terms of the drawing -- I don't mean  13:43

23  to offend you or anything, but can you describe the      13:43

24  sexual drawing that you ended up having to do            13:43

25  sensitivity training for.                                13:43

                                                             81

Erin Marconi                                                    October 21, 2019

1        A    If I recall correctly, somebody put boobs on      13:43

2    like -- you know the male/female symbols on bathrooms?      13:43

3    Somebody drew boobs.                                        13:43

4        Q    Okay.                                              13:43

5        A    Yeah.  Definitely this is not the same group.     13:43

6        Q    Okay.  This being the chassis 3 that's            13:43

7    identified in Exhibit 189; right?                           13:44

8        A    Correct.                                           13:44

9        Q    So chassis 3 is different from the stamping       13:44

10   division where the boobs on the bathroom drawing was;       13:44

11   right?                                                      13:44

12       A    Uh-huh.                                            13:44

13       Q    "Yes"?                                             13:44

14       A    Correct.                                           13:44

15       Q    Okay.                                              13:44

16       A    So, similarly, if they had done something         13:44

17   here, I might not know about it if I'm not supporting       13:44

18   that group.                                                 13:44

19       Q    I see.                                             13:44

20            MR. ORGAN:  What do you guys want to do about      13:44

21   lunch?  Because we probably have to give a lunch break      13:44

22   for our videographer and court reporter, and it's          13:44

23   already 1:44.                                               13:44

24            MS. KENNEDY:  Sure.  How much longer do you        13:44

25   have?  We can go grab a quick bite.                         13:44

                                                            82

```
 1              (Whereupon, at 2:48 p.m. the proceedings        14:49

 2        were reconvened.)                                     14:49

 3              THE VIDEO OPERATOR:  The time is 2:48.  We're    14:49

 4   back on the record.                                        14:49

 5   BY MR. ORGAN:                                              14:49

 6      Q    You said something when we -- just as we          14:49

 7   finished --                                                14:49

 8              THE VIDEO OPERATOR:  Your microphone,            14:49

 9   please.                                                    14:49

10              MR. ORGAN:  Oh, I'm sorry.                       14:49

11   BY MR. ORGAN:                                              14:49

12      Q    When we broke for lunch, you were talking          14:49

13   about a sensitivity training that you did for the          14:49

14   stamping department?                                       14:49

15      A    Correct.                                           14:49

16      Q    Do you remember that?                              14:49

17              That sensitivity training came out of the fact  14:49

18   that there were these -- there was a visual harassment     14:49

19   in this -- the boobs on the bathroom door.                 14:49

20              Is that what caused the training to come        14:49

21   about?                                                     14:49

22      A    Yes.  Someone was offended by the boobs drawn.     14:49

23      Q    Okay.  And how was the decision made as a          14:49

24   result of that to do a sensitivity training?  Why was     14:50

25   that the outcome?                                          14:50
```

84

1        A     We wanted to make sure that everyone            14:50

2   understood what the expectation was, and if it makes       14:50

3   someone uncomfortable, it's not okay.                      14:50

4        Q     Right.  Okay.                                   14:50

5              And do you recall any other sensitivity         14:50

6   trainings that were done relative to either race or sex    14:50

7   issues that you were involved in?                          14:50

8        A     Not that I recall.  I mean, other than your     14:50

9   regular annual required of supervisor and above.           14:50

10       Q     Okay.  Who conducted the -- the annual          14:50

11  trainings for the management team members?                 14:50

12       A     It would have been Beth Davies for the          14:51

13  training department.  I don't know if she actually did     14:51

14  it.  And then I know at some point I believe it moved to   14:51

15  online course and question and answer.  I don't know if    14:51

16  they still do that or not.                                 14:51

17             Anything that was like corporate training       14:51

18  companywide would have been through Beth Davies.  And      14:51

19  then we supplemented where we saw necessary in our         14:51

20  groups.                                                    14:51

21       Q     Okay.  Now, I'm going to show you what has      14:51

22  been previously marked as Exhibit 37.  And just so the     14:51

23  record is clear, Exhibit 37 is a three-page document       14:52

24  Bates-stamped Tesla 35 through 37, and it's a complaint    14:52

25  by Owen Diaz about a racist drawing, or what he            14:52

85

1    considered to be a racist drawing.                          14:52

2            And I'm wondering if you recall seeing this          14:52

3    email, or the picture that's attached.                      14:52

4        A    I don't recall seeing the picture, and I don't    14:52

5    specifically recall seeing it, given the time.  It very     14:52

6    well could have been something that I was -- "Here's a      14:53

7    heads-up" kind of thing, and I just don't recall.          14:53

8        Q    Okay.  Okay.                                       14:53

9            Based on your -- you just read the complaint        14:53

10   by Mr. Diaz from January 22nd, 2016.  Based on that        14:53

11   complaint and in your experience as a professional HR       14:53

12   person, would that be sufficient to trigger an             14:53

13   investigation, in your mind, his complaint along with      14:53

14   the pictures?                                               14:53

15       A    Yes.                                               14:53

16       Q    And would -- as a trained investigator, given     14:53

17   this written information and the confirming picture,        14:53

18   would you expect there to be an investigation as a         14:54

19   result of that?                                             14:54

20       A    Yes.                                               14:54

21       Q    If you were conducting the investigation,         14:54

22   would you interview the people that are identified in      14:54

23   Mr. Diaz's email?                                          14:54

24       A    Depending on if they were Tesla employees or      14:54

25   employees of another company, either I would if they       14:54

86

| | | |
|---|---|---|
| 1 | were Tesla employees, or I would ask that the primary | 14:54 |
| 2 | employer, for lack of a better way to put it, did.  And | 14:54 |
| 3 | if it was a combination, work together if at all | 14:54 |
| 4 | possible. | 14:54 |
| 5 | Q    So when there's a mixture of parties who | 14:54 |
| 6 | are -- some are Tesla employees and some are | 14:54 |
| 7 | temporary -- what did you call them?  Temporary workers? | 14:55 |
| 8 | A    Yeah. | 14:55 |
| 9 | Q    Then you would expect that Tesla HR and the | 14:55 |
| 10 | contracting -- or the staffing agencies would work | 14:55 |
| 11 | together as part of that investigation; is that right? | 14:55 |
| 12 | A    Not exactly. | 14:55 |
| 13 | So I don't know who Owen -- so just like -- if | 14:55 |
| 14 | all of these people worked for -- we'll use West Valley | 14:55 |
| 15 | because that's the example I've been using. | 14:55 |
| 16 | If all the people that are in here worked for | 14:55 |
| 17 | West Valley, I would ask West Valley to investigate. | 14:55 |
| 18 | Q    Okay.  So in this -- in this situation -- | 14:55 |
| 19 | A    And then get back to me. | 14:55 |
| 20 | Q    Okay.  In this situation, you would at least | 14:55 |
| 21 | expect that West Valley would keep -- assuming West | 14:55 |
| 22 | Valley were the contracting agency or staffing agency, | 14:55 |
| 23 | you would expect West Valley to keep Tesla HR informed | 14:56 |
| 24 | as to what their investigation found; right? | 14:56 |
| 25 | A    Correct. | 14:56 |

87

| | | |
|---|---|---|
| 1 | Q    And then based on that investigation, would | 14:56 |
| 2 | Tesla then decide what it might need to do relative to | 14:56 |
| 3 | that particular work environment to make sure that the | 14:56 |
| 4 | conduct didn't occur again? | 14:56 |
| 5 | A    In making -- if it is all -- so we're saying | 14:56 |
| 6 | temporary workers, not contractors? | 14:56 |
| 7 | Q    Correct. | 14:56 |
| 8 | A    So they're working with Tesla employees as | 14:56 |
| 9 | well? | 14:56 |
| 10 | Q    They're working -- | 14:56 |
| 11 | A    Then yes, absolutely. | 14:56 |
| 12 | Q    Right. | 14:56 |
| 13 |      And so, for example, in a situation like this | 14:56 |
| 14 | where witnesses are identified -- and I'll just | 14:56 |
| 15 | represent to you that -- have you ever heard of Michael | 14:56 |
| 16 | Wheeler?  Is that name familiar? | 14:56 |
| 17 | A    Doesn't ring a bell, but there were thousands | 14:57 |
| 18 | of employees over however many years. | 14:57 |
| 19 | Q    Right. | 14:57 |
| 20 |      So if Michael Wheeler and the Israel -- the | 14:57 |
| 21 | guy whose name is Israel in this were both Tesla | 14:57 |
| 22 | employees, those interviews you would expect would be | 14:57 |
| 23 | done by Tesla HR, and then the interviews -- assuming | 14:57 |
| 24 | that Ramon Martinez and Owen Diaz are temporary | 14:57 |
| 25 | employees working through a staffing agency, you would | 14:57 |

88

1    expect that Owen and Ramon would be interviewed by their    14:57

2    respective contracting agencies; correct?                   14:57

3        A    Correct.                                           14:57

4             I have had occasion to that whoever was on         14:57

5    site for, say, West Valley wasn't well versed or            14:57

6    comfortable.  So if that kind of situation came up, I       14:57

7    would assist, but would make sure that they were there.     14:57

8        Q    I see.                                             14:58

9             So in a situation where the staffing agency        14:58

10   doesn't feel comfortable doing the investigation, you're    14:58

11   aware of at least one situation where Tesla HR helped       14:58

12   out in that situation?                                      14:58

13       A    Yeah, and I can't remember the details.  They      14:58

14   had someone new that was there.  I think it was two         14:58

15   people really not just -- just not getting along, and       14:58

16   whoever they had on site that day was newer and hadn't      14:58

17   done investigations.                                        14:58

18       Q    Okay.  And --                                      14:58

19       A    Similar to how when we would get new people a      14:58

20   lot of times, we would have them come along and make        14:58

21   sure the person that you're speaking to is comfortable      14:58

22   with that, because they're learning, before just saying,    14:58

23   "Hey, good luck."                                           14:58

24       Q    Well, that's good.                                 14:58

25       A    Yeah.  But one way or another, make sure it        14:58

89

| | | |
|---|---|---|
| 1 | this to Josue Torres and Eliseo Torres.  No, I think | 15:00 |
| 2 | that's the same guy. | 15:00 |
| 3 | Do you know who Josue Torres was? | 15:00 |
| 4 | A    I do not recall offhand. | 15:00 |
| 5 | Q    He has been identified previously as a | 15:00 |
| 6 | supervisor at Tesla.  Does that sound familiar to you? | 15:00 |
| 7 | A    Does not sound familiar to me. | 15:00 |
| 8 | Q    Okay.  Okay.  I guess that's all we need from | 15:00 |
| 9 | that one. | 15:00 |
| 10 | Let's go to the next one.  This will be | 15:00 |
| 11 | Exhibit 129. | 15:01 |
| 12 | A    That said, I may or may not have been -- | 15:01 |
| 13 | Q    Huh? | 15:01 |
| 14 | A    I may have been in and out at that point if he | 15:01 |
| 15 | had become a supervisor.  I'm just clarifying.  It | 15:01 |
| 16 | doesn't sound familiar to me, but -- | 15:01 |
| 17 | Q    Okay.  Okay. | 15:01 |
| 18 | You were certainly at Tesla at some time | 15:01 |
| 19 | during January of 2016; correct? | 15:01 |
| 20 | A    Possibly.  My mom was going through cancer | 15:01 |
| 21 | treatment for -- | 15:01 |
| 22 | Q    I'm sorry to hear. | 15:01 |
| 23 | A    And I was -- even if I got there in the | 15:01 |
| 24 | morning, it might be, "I got to go right now," and | 15:01 |
| 25 | verbally hand everything I had off. | 15:01 |

91

Erin Marconi                                                    October 21, 2019

| | | | |
|---|---|---|---|
| 1 | Q | Okay. | 15:08 |
| 2 | A | -- was under nextSource. | 15:08 |
| 3 | Q | Yeah.  That's how -- that's my | 15:08 |
| 4 | | understanding -- | 15:08 |
| 5 | A | I'm guessing just based on the way this -- | 15:08 |
| 6 | | (Reporter clarification.) | 15:08 |
| 7 | BY MR. ORGAN: | | 15:08 |
| 8 | Q | That's my understanding is that Chartwell was | 15:08 |
| 9 | | essentially providing staffing through nextSource to | 15:08 |
| 10 | | Tesla. | 15:08 |
| 11 | A | Ah.  Yeah, Chartwell is a new one for me. | 15:08 |
| 12 | Q | Okay.  Let's -- if we go to the next one, do | 15:08 |
| 13 | | you -- well, let me ask you this. | 15:08 |
| 14 | | Do you remember ever having any discussions | 15:08 |
| 15 | | with Victor Quintero about the drawing that we saw, the | 15:08 |
| 16 | | pickaninny drawing that Mr. Diaz complained about? | 15:08 |
| 17 | A | I do not. | 15:09 |
| 18 | Q | Then this will be 128. | 15:09 |
| 19 | | Exhibit 128 for the record is a five-page | 15:09 |
| 20 | | document Bates-stamped Tesla 20 through 24.  And if you | 15:09 |
| 21 | | could, look at the top email from Terri Garrett to Wayne | 15:09 |
| 22 | | Jackson dated January 22nd, 2016 at 6:35 p.m. | 15:10 |
| 23 | A | Okay. | 15:10 |
| 24 | Q | So is Terri Garrett a man or a woman? | 15:10 |
| 25 | A | I don't want to speculate because I never met | 15:10 |

95

1      A      Yes.                                           15:15

2      Q      And that actually comports with Tesla's        15:15

3  policies on anti-discrimination, anti-harassment; right?  15:15

4      A      Correct.                                       15:15

5      Q      And it says:                                   15:15

6             "This is not the first time that Ramon         15:15

7          Martinez" --                                      15:15

8             "This is not the first time Ramon Martinez     15:15

9          has been talked about his behavior..."            15:15

10         perhaps not the best English statement.           15:15

11            But if Mr. Diaz identified something as prior   15:15

12  conduct, that would be a concern to you as a trained     15:15

13  investigator, wouldn't it?                               15:15

14     A      If I investigated it and found out that he had  15:15

15  actually been previously spoken to.                      15:15

16     Q      Yeah.  Then that would be a major concern to    15:15

17  you, wouldn't it?                                        15:15

18     A      Yes.                                           15:15

19     Q      In fact, if -- if Mr. Martinez had posted this  15:15

20  poster, this drawing with the bone in the hair -- strike  15:15

21  that.                                                   15:16

22            You understand that this drawing that's on the  15:16

23  fourth page of Exhibit 128, that that drawing is a       15:16

24  drawing that could be offensive to African Americans?    15:16

25     A      Yes.                                           15:16

Erin Marconi                                                              October 21, 2019

| 1  | Q    Right?                                            | 15:16 |
| 2  | A    Yes.                                              | 15:16 |
| 3  | Q    And it's a caricature that historically was      | 15:16 |
| 4  | used -- it's been called a "pickaninny."  Have you heard | 15:16 |
| 5  | that expression before?                               | 15:16 |
| 6  | A    Yes.                                              | 15:16 |
| 7  | Q    And it was historically -- this drawing with     | 15:16 |
| 8  | the bone in the hair was historically a way to put down | 15:16 |
| 9  | African Americans; right?                             | 15:16 |
| 10 | A    That's my understanding.                         | 15:16 |
| 11 | Q    So if you had understood that Mr. Martinez had   | 15:16 |
| 12 | admitted to putting this poster -- to putting this    | 15:16 |
| 13 | drawing up, and also to have threatened Mr. Diaz      | 15:16 |
| 14 | previously, you would expect that Mr. Martinez would be | 15:16 |
| 15 | fired pursuant to Tesla policy, wouldn't you?         | 15:17 |
| 16 | A    Assuming all of that is true --                  | 15:17 |
| 17 | Q    Yeah.                                             | 15:17 |
| 18 | A    -- I wouldn't presume what nextSource does,      | 15:17 |
| 19 | but I would ask them not to have him return to an     | 15:17 |
| 20 | assignment at Tesla.                                  | 15:17 |
| 21 | Q    Sure.  Okay.                                      | 15:17 |
| 22 |      Now, if you go on to Mr. Diaz's statement:       | 15:17 |
| 23 |      ..."and because nothing has been done, it        | 15:17 |
| 24 |      seems that his behavior is getting worse."       | 15:17 |
| 25 |      That would be a concern to you as a Tesla        | 15:17 |

100

Erin Marconi                                                    October 21, 2019

| | | | |
|---|---|---|---|
| 1 | | investigator, wouldn't it, if conduct is getting worse? | 15:17 |
| 2 | A | Absolutely. | 15:17 |
| 3 | Q | Where Mr. Diaz then says: | 15:17 |
| 4 | | "As an employee, I'm entitled to a safe | 15:17 |
| 5 | | and harassment-free work environment," | 15:17 |
| 6 | | that's true; right? | 15:17 |
| 7 | A | Yes. | 15:17 |
| 8 | Q | Do you remember having any prior knowledge | 15:18 |
| 9 | | about Ramon Martinez and Mr. Diaz, and Mr. Owen Diaz? | 15:18 |
| 10 | A | No.  To be perfectly honest, I probably had | 15:18 |
| 11 | | more than one person -- both of those names at various | 15:18 |
| 12 | | times throughout the years. | 15:18 |
| 13 | Q | Sure. | 15:18 |
| 14 | A | But none of them particularly ring a bell. | 15:18 |
| 15 | Q | Well, if it's any consolation, we served a guy | 15:18 |
| 16 | | named Ramon Martinez and he said, "I don't know what | 15:18 |
| 17 | | you're talking about.  I never worked at Tesla."  So -- | 15:18 |
| 18 | A | As I say, we had everybody. | 15:18 |
| 19 | Q | Okay. | 15:18 |
| 20 | | MR. ORGAN:  We're on 190, I think. | 15:18 |
| 21 | | THE REPORTER:  Yes. | 15:19 |
| 22 | | (The document referred to was marked by | 15:19 |
| 23 | | the CSR as Plaintiffs' Exhibit 190 for | 15:19 |
| 24 | | identification and attached to and made a part | 15:19 |
| 25 | | of this deposition.) | 15:19 |

101

| | | |
|---|---|---|
| 1 | Q    I'm going to show you Exhibit 34.  Exhibit 34 | 15:22 |
| 2 | for the record is a one-page document Bates-stamped | 15:22 |
| 3 | ODIAZ 3, and it's an email from October 17th from Owen | 15:22 |
| 4 | Diaz to Ed Romero and Tom Kawasaki.  Let me know when | 15:22 |
| 5 | you finish reading it. | 15:22 |
| 6 | A    Okay. | 15:22 |
| 7 | Q    I'm wondering, does this ring a bell in terms | 15:23 |
| 8 | of anything that you remember finding out about while | 15:23 |
| 9 | you were at Tesla? | 15:23 |
| 10 | A    I believe it was something of an FYI to me | 15:23 |
| 11 | from -- it would have been probably either Andrew or | 15:23 |
| 12 | Paul, so whoever was covering second shift. | 15:23 |
| 13 | Q    Okay. | 15:23 |
| 14 | A    I don't remember the specifics. | 15:23 |
| 15 | Q    Okay.  Now, certainly if Ramon Martinez were | 15:23 |
| 16 | yelling at him and threatening him, that would violate | 15:23 |
| 17 | Tesla's policies; right? -- at least the threatening | 15:24 |
| 18 | part? | 15:24 |
| 19 | A    Yes.  Assuming it's Ramon Martinez. | 15:24 |
| 20 | Q    Yeah, Ramon Martinez. | 15:24 |
| 21 | A    It just says "Ramon" everywhere.  We had a lot | 15:24 |
| 22 | of Ramons. | 15:24 |
| 23 | Q    I'm sure that's true. | 15:24 |
| 24 | Okay.  There's a reference here to -- Ed | 15:24 |
| 25 | Romero we've already talked about as one of the | 15:24 |

104

Erin Marconi                                                    October 21, 2019

```
 1                the CSR as Plaintiffs' Exhibit 191 for        15:28

 2                identification and attached to and made a part 15:28

 3                of this deposition.)                          15:28

 4    BY MR. ORGAN:                                             15:28

 5         Q    Exhibit 191 for the record is a one-page        15:28

 6    document Bates-stamped nextSource 101, and it's some      15:28

 7    emails from October 19th and 20th.  And I'll just point   15:28

 8    your attention to the top email.                          15:28

 9         A    Okay.                                           15:28

10         Q    So where Terri Garrett says here to Wayne       15:28

11    Jackson that they needed to get the employees'            15:28

12    statements and other witness statements to Tesla HR       15:28

13    today, that, again, is in line with the working           15:28

14    relationship between the different human resource         15:28

15    departments; is that correct?                             15:29

16         A    Correct.  And I do recall having to push on     15:29

17    behalf of Tesla to get things from --                     15:29

18         Q    From nextSource?                                15:29

19         A    Yes.                                            15:29

20         Q    Okay.  So --                                    15:29

21         A    Not necessarily related to this one, but just  15:29

22    in general.                                               15:29

23         Q    Okay.  So in general, you had -- sometimes you  15:29

24    had to push nextSource to get you the information you     15:29

25    needed so that you could evaluate --                      15:29
```

107

Erin Marconi                                                          October 21, 2019

1        A    And go about things the way that we had asked          15:29

2    them to go about them.                                          15:29

3        Q    Okay.  This is Exhibit 35.                             15:29

4             Exhibit 35 for the record is a three-page              15:29

5    document Bates-stamped Tesla 140 to 142.  And it appears        15:29

6    that at least in this situation with respect to Ramon           15:30

7    Martinez and Owen Diaz, that eventually at least it got         15:30

8    forwarded to you.                                               15:30

9             Do you see that?                                       15:30

10       A    Yes.                                                   15:30

11       Q    And so at least at some point you did get             15:30

12   Mr. Diaz's statement about his -- the threat that he            15:30

13   perceived from Ramon Martinez; correct?                         15:30

14       A    Owen's statement?                                      15:30

15       Q    Yeah.                                                  15:31

16       A    Assuming this whole thread was actually               15:31

17   forwarded at the time?                                          15:31

18       Q    Yeah.                                                  15:31

19       A    Yes.  If it was, I can't say for sure.                15:31

20       Q    Okay.  But based on the email chain, I mean,          15:31

21   it looks like it was forwarded to you.  Do you see that?       15:31

22       A    Correct.                                               15:31

23       Q    Okay.                                                  15:31

24       A    Several days later; right?  Yeah.                     15:31

25       Q    Yeah.                                                  15:31

108

1        The complaint was made on the 17th, and then        15:31

2   forwarded again on the 20th to Wayne Jackson, and then    15:31

3   it looks like Wayne Jackson forwarded it to you on that   15:31

4   same day, on the 20th.                                    15:31

5        A    Terri.                                          15:31

6        Q    I'm sorry.   Terri.                             15:31

7        A    Yeah.                                           15:32

8        Q    Terri forwarded it to you that same day,       15:32

9   October 20th of 2015; right?                              15:32

10       A    Yes.   And based on that, it would appear that 15:32

11  it was all nextSource employees involved, other than     15:32

12  Victor and Ed.                                            15:32

13       Q    Okay.   And it looks like maybe Ed was talking 15:32

14  about getting involved here, and Terri Garrett was       15:32

15  asking for your help as to whether or not Mr. Romero     15:32

16  should be involved in the investigation; right?          15:32

17       A    It looks like she wants him not to be          15:32

18  involved.                                                 15:32

19       Q    Right.                                         15:32

20       Okay.   And then this is Exhibit 126.   And         15:32

21  Exhibit 126 for the record is a four-page document       15:33

22  Bates-stamped 133 to 136, Tesla 133 to 136, and it has   15:33

23  emails from you on the second page, and then on the      15:33

24  first page, too.                                         15:33

25       A    Yep.                                           15:33

1      Q     So the reason you would have canceled Ed --     15:33

2   Ed's investigation into this is because it appeared to   15:33

3   you that nextSource should be doing the investigation;   15:33

4   right?                                                   15:34

5      A     Yeah, I believe she said that two out of the   15:34

6   three had already been spoken to.                        15:34

7      Q     And Erin committed to you that she was going    15:34

8   to get you that information by the close of business     15:34

9   that day?                                                15:34

10     A     Terri committed to me.                          15:34

11     Q     I'm sorry.  Terri did, yeah.                    15:34

12           And do you remember whether or not Terri did    15:34

13   get you those statements?                                15:34

14     A     I do not.                                        15:34

15     Q     You at least had Mr. Diaz's statement, though,  15:34

16   about the threat and how he didn't feel safe; right?  If 15:34

17   you look at the last page.                               15:34

18     A     Again, presuming the entire email thread was    15:34

19   forwarded on?                                            15:34

20     Q     Yeah.                                            15:34

21           Well, you have no reason to doubt that, in      15:34

22   fact, Mr. Diaz's complaint of October 17th wasn't        15:34

23   forwarded on, do you?                                    15:34

24     A     I -- I don't have one to doubt it or not to     15:35

25   doubt it.  It's sent from a nextSource employee --       15:35

110

```
 1                      "I should be able to have the information    15:36

 2              to you by COB today," close of business today.      15:36

 3              You would have expected Terri to send that to       15:36

 4      you, correct, assuming she followed through?                15:36

 5          A    I wouldn't assume she followed through.  My        15:36

 6      expectation would be yes, but it was 8:13 p.m., which I     15:36

 7      think she's on the East Coast, which would have been        15:36

 8      5:00 o'clock.                                               15:36

 9          Q    Okay.  Did you -- did you do any follow-up at      15:36

10      all with Mr. Owen Diaz to see if he started feeling         15:37

11      safe?                                                       15:37

12          A    I don't recall.                                    15:37

13          Q    Do you know whether or not Ramon Martinez was      15:37

14      disciplined in any way because of threats towards           15:37

15      Mr. Owen Diaz?                                              15:37

16          A    I would presume from the documents you've          15:37

17      shown me that they did.  I don't recall specifically the    15:37

18      outcome.                                                    15:37

19          Q    Okay.  And from this point on, October 20th of     15:37

20      2015, you would at least agree that Tesla had at least      15:37

21      some knowledge as to threatening conduct by Ramon           15:37

22      Martinez towards Owen Diaz; right?                          15:37

23          A    I would agree that there was an ER -- how did      15:37

24      she put it?                                                 15:38

25          Q    "ER issue."  "Temporary worker ER issue."         15:38
```

                                                                    112

```
 1        A    An ER issue with three temporary workers that    15:38
 2   she did not want Ed involved in.                            15:38
 3        Q    Right.  But regardless of whether or not Terri    15:38
 4   wants Ed involved or not, once Tesla finds out that         15:38
 5   there's inappropriate conduct going on in the workplace,    15:38
 6   you've already testified that that's something Tesla --     15:38
 7   once Tesla gets that knowledge, Tesla has an obligation     15:38
 8   to prevent any further inappropriate conduct; correct?      15:38
 9        A    Correct.  What I'm saying is she brings it to     15:38
10   me as two of the three -- worker -- "temporary worker ER    15:38
11   issue."                                                     15:38
12             I don't recall specifically seeing Owen Diaz's    15:38
13   statement.  It's easy to cut and paste it.  I can't         15:38
14   confirm that I was on notice of what exactly it was, and    15:39
15   who was involved.                                           15:39
16        Q    You just said something there.  What about cut    15:39
17   and paste?  What do you mean?                               15:39
18        A    It's easy to take off the bottom of an email      15:39
19   chain when you send stuff.                                  15:39
20        Q    Do you have any --                                15:39
21        A    But I generally --                                15:39
22        Q    Do you have any factual knowledge that in fact    15:39
23   Terri Garrett took off the complaint that Owen Diaz made    15:39
24   on the 17th and then forwarded to Wayne Jackson on the      15:39
25   20th?                                                       15:39
```

113

| | | |
|---|---|---|
| 1 | On the first page, Ed Romero says that: | 15:43 |
| 2 | "I had Rothaj Foster removed from the | 15:44 |
| 3 | Tesla premises last night at 10:00 p.m.  The | 15:44 |
| 4 | reason is that he was conducting himself in a | 15:44 |
| 5 | threatening manner against Owen Diaz." | 15:44 |
| 6 | Then if you move up a little bit, Victor | 15:44 |
| 7 | Quintero says: | 15:44 |
| 8 | "I agree that the employee should not be | 15:44 |
| 9 | allowed to return." | 15:44 |
| 10 | And then after that, it was sent to you. | 15:44 |
| 11 | Do you see that? | 15:44 |
| 12 | A    Yes. | 15:44 |
| 13 | Q    Does it appear to you that the correct | 15:44 |
| 14 | procedure, at least with respect to Rothaj Foster, was | 15:44 |
| 15 | followed? | 15:44 |
| 16 | A    Yes. | 15:44 |
| 17 | Q    It appears they investigated, they got witness | 15:44 |
| 18 | statements and then made a decision that Mr. Foster | 15:44 |
| 19 | should not be there because he was engaging in | 15:44 |
| 20 | threatening conduct; right? | 15:44 |
| 21 | A    Correct. | 15:44 |
| 22 | Q    And the correct response to threatening | 15:44 |
| 23 | conduct is to remove that individual from the factory; | 15:44 |
| 24 | right? | 15:44 |
| 25 | A    Correct. | 15:44 |

116

```
 1        Q    And then you -- Ed says that he -- I guess Ed    15:45

 2   at this point was just keeping you informed of what they   15:45

 3   had been doing.  That's what at least it appears; is        15:45

 4   that right?                                                 15:45

 5        A    Yes, especially given the times.                 15:45

 6        Q    Okay.  Do you know who Monica DeLeon is?          15:45

 7        A    Doesn't ring a bell offhand.                      15:45

 8        Q    Someone from Citistaff?  Does that --             15:45

 9        A    Is that another one that went through            15:45

10   nextSource?                                                 15:45

11        Q    Yeah.                                             15:45

12        A    Okay.  I would have thought all those people     15:45

13   were nextSource probably if they --                        15:45

14        Q    Well, you just saved yourself --                 15:45

15        A    -- didn't disclose it.                           15:45

16        Q    You just saved yourself three minutes of         15:45

17   questions.                                                  15:45

18        A    Fantastic.                                        15:45

19        Q    Okay.                                             15:45

20             I'm going to show you what's been previously     15:46

21   marked as Exhibit 42.  Exhibit 42 for the record is a      15:46

22   one-page document Bates-stamped Tesla 510.                 15:46

23             You understand when I am reading out -- when I   15:46

24   say "Tesla 510," that means it's a document produced by    15:46

25   Tesla; right?                                              15:46
```

117

Erin Marconi                                                    October 21, 2019

 1      A    Correct.                                           15:46

 2      Q    Okay.  If you could please read this and then      15:46

 3  I'll ask you some questions about it.                       15:46

 4           Assuming that these comments, the alleged          15:47

 5  racist comments, had been made towards Mr. Diaz and         15:47

 6  confirmed, you would have expected Mr. Quintero to let      15:47

 7  you know about that; correct?                               15:47

 8      A    Yes.                                               15:47

 9      Q    And --                                            15:47

10      A    Assuming the person making the statements was     15:47

11  also Tesla.  I can't tell who's elevator employee 2, and   15:47

12  I don't know who Tom is.  So that -- I would think         15:48

13  someone would let me know as an FYI.                       15:48

14      Q    Sure.                                             15:48

15           Okay.  And certainly if the person involved in    15:48

16  calling Owen Diaz racist things, if that had involved      15:48

17  the n-word, you would expect that to be brought to your    15:48

18  attention in HR, correct, by Mr. Quintero at a minimum?    15:48

19      A    Assuming all that, and assuming he knew that?     15:48

20      Q    Yeah.                                             15:48

21      A    Yes.                                              15:48

22      Q    If you -- let's -- this will be Exhibit 122.      15:48

23           Oh, it's at the top.  I wrote it on there,        15:49

24  too.  Sorry about that.  I didn't see --                   15:49

25      A    Although --                                       15:49

                                                                118

Erin Marconi                                                    October 21, 2019

```
1      Q    Yeah.                                       15:49

2      A    Back to this one, 510.                      15:49

3      Q    Back to 42?  Yeah.                          15:49

4      A    Given the timing of it --                   15:49

5      Q    Yeah.                                       15:49

6      A    -- it may not have gone to me.              15:49

7      Q    Okay.                                       15:49

8      A    I'm fairly certain that's right around a time  15:49

9   that I was out.                                     15:49

10     Q    August of 2015?                             15:49

11     A    The July, August time frame.                15:49

12     Q    Yeah.                                       15:49

13          Okay.  Who would it have gone to then if it  15:49

14  didn't go to you?                                   15:49

15     A    Whoever I reported to at that time decided was  15:49

16  covering my teams.                                  15:49

17     Q    Okay.  But you would expect someone in HR to  15:49

18  have been copied by Mr. Quintero on a racist comment;  15:49

19  right?                                              15:49

20     A    I believe so, and -- yes.  Unless they came  15:49

21  back and said they couldn't substantiate it and it was  15:49

22  all nextSource.                                     15:49

23     Q    Okay.  But if an allegation of racist -- of a  15:49

24  racial term, particularly if it's the n-word, is   15:50

25  confirmed, that's the kind of information that     15:50
```

                                                                119

Erin Marconi                                                            October 21, 2019

```
1    STATE OF CALIFORNIA          )

2                                 )  ss.

3    COUNTY OF LOS ANGELES        )

4

5            I, LAURA J. MELLINI, Certified Shorthand

6    Reporter, Certificate No. 8181, for the State of

7    California, hereby certify:

8            I am the deposition officer that

9    stenographically recorded the testimony in the foregoing

10   deposition;

11           Prior to being examined the deponent was first

12   duly sworn by me;

13           The foregoing transcript is a true record of

14   the testimony given;

15           Before completion of the deposition, review of

16   the transcript [  X  ] was [    ] was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed are

19   appended hereto.

20

21   Dated_____.

22

23                    _____

24                              LAURA J. MELLINI

25                              CSR NO. 8181, RPR, CCRR
```

                                                              141

# Exhibit

# **10**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
--oOo--

DEMETRIC DI-AZ, OWEN DIAZ,       )
AND LAMAR PATTERSON,             )
                                 )
        Plaintiffs,              )
                                 )   Case No.
vs.                              )   3:17-cv-06748-WHO
                                 )
TESLA, INC., dba TESLA           )
MOTORS, INC.; CITISTAFF          )
SOLUTIONS, INC.; WEST            )
VALLEY STAFFING GROUP;           )
CHARTWELL STAFFING               )
SERVICES, INC.; and DOES         )
1-50, inclusive,                 )
                                 )
        Defendants.              )
_____  )


VIDEO DEPOSITION OF VERONICA MARTINEZ

TUESDAY, OCTOBER 15, 2019


STENOGRAPHICALLY REPORTED BY:

KIMBERLY E. D'URSO, RPR, CSR NO. 11372

Job No. 13937

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:

 4           CALIFORNIA CIVIL RIGHTS LAW GROUP
             LAWRENCE A. ORGAN, ESQ.
 5           332 San Anselmo Avenue
             San Anselmo, CA  94960
 6           415.453.4740

 7   FOR THE DEFENDANT TESLA:

 8           SHEPPARD MULLIN, LLP
             BY:  PATRICIA M. JENG, ESQ.
 9           Four Embarcadero Center, 17th Floor
             San Francisco, CA  94111
10           415.434.9100

11   FOR THE DEFENDANT NEXT SOURCE:

12           FISHER PHILLIPS, LLP
             BY:  JUAN C. ARANEDA, ESQ.
13           One Embarcadero Center, Suite 2050
             San Francisco, CA  94111
14           415.490.9012

15   FOR THE DEFENDANT CITISTAFF:

16           LAFAYETTE & KUMAGAI, LLP
             BY:  SUSAN T. KUMAGAI, ESQ.
17           1300 Clay Street, Suite 810
             Oakland, CA  94612
18           415.357.4600

19   FOR THE DEFENDANT CHARTWELL STAFFING:

20           GORDON & REES
             BY:  SARAH Y. OH, ESQ.
21           3 Parkcenter Drive, Suite 200
             Sacramento, CA  95825
22           916.830.6528

23                      --oOo--

24

25
```

```
           1    areas do you cover now?
           2        A.    Eight.
           3        Q.    So that was a promotion; right?
           4        A.    Correct.
02:07:45   5        Q.    Okay.  Congratulations.
           6        A.    Thank you.
           7        Q.    What was -- how long have you worked for
           8    Chartwell?
           9        A.    Since 2015.
02:07:53  10        Q.    2015?
          11        A.    Correct.
          12        Q.    And do you remember what month you started in
          13    2015?
          14        A.    March.
02:07:59  15        Q.    What was your first job for Chartwell Staffing
          16    in March of 2015?
          17        A.    Branch manager.
          18        Q.    How long were you a branch manager for
          19    Chartwell?
02:08:13  20        A.    Can't remember, but for a while.
          21        Q.    Okay.  So through the end of 2015?
          22        A.    I can't remember if it was 2015 or 2016.
          23        Q.    Okay.  You nervous?
          24        A.    No.
02:08:28  25        Q.    Okay.  It's okay to be nervous.  I'm always
```

1    nervous before these things too.

2         When -- when did you change your position from

3    branch manager to something else?  When did that change

4    happen?

02:08:43  5    A.    To area vice-president.  I can't remember if it

6    was 2015 or 2016.

7    Q.    Okay.  But you think sometime maybe in 2016 or

8    '15 you changed -- your job changed from branch manager

9    to area vice-president; is that correct?

02:08:58 10    A.    If I -- I can't remember if it -- between that

11    time frame, though.

12    Q.    Okay.  Tell me, what were your job duties as

13    the branch manager for Chartwell?

14    A.    I managed the branch, the staff.

02:09:22 15    Q.    And when you say you managed the branch and the

16    staff, what -- what do you mean by that?

17    A.    Worked with clients, employees.

18    Q.    So the clients are the companies that Chartwell

19    works with, in terms of staffing for them?

02:09:44 20    A.    Correct.

21    Q.    And the employees are the people who work for

22    Chartwell, either as a contractor for someone else or as

23    an employee for Chartwell?

24    A.    Correct.

02:09:55 25    Q.    Do you differentiate between an employee who

```
         1      A.    420.
         2      Q.    Okay.  And do you have an estimate for what the
         3  number of field employees who were working out of the
         4  Hayward branch of Chartwell in 2015 or '16 was when you
02:21:36 5  were the branch manager?
         6      A.    No.
         7      Q.    Do you know whether the number of employees --
         8  field employees who were working at the Chartwell branch
         9  in Hayward in 2015 or '16 was higher or lower than the
02:21:50 10 420?
         11     A.    I -- I don't have that number in front of me.
         12     Q.    Okay.  Are you a member of any kind of human
         13 resources organizations like the Society for Human
         14 Resource Managers or anything like that?
02:22:06 15     A.    No.
         16     Q.    Have you ever had any training on what steps an
         17 employer is supposed to take when investigating a claim
         18 of discrimination or harassment?
         19     A.    We took the -- the sexual harassment
02:22:26 20 discrimination, two-hour course.
         21     Q.    And what is the sex harassment two-hour course?
         22 What -- when did you take that?
         23     A.    Recently.  This year.
         24     Q.    And then prior to taking the two-hour course --
02:22:44 25 that -- was that just about sex harassment?
```

1        **A.    It's discrimination and harassment, sexual**

2   **harassment.**

3        Q.    Okay.  Prior to taking the two-hour course on

4   discrimination and harassment this year, have you ever

02:22:59 5   taken a course on harassment or discrimination

6   previously?

7        **A.    Yes.**

8        Q.    And when did you take the course previously?

9        **A.    When we were -- when I was with CRS.**

02:23:10 10       Q.    Okay.  So when you were with CRS Staffing, you

11   took a -- a course on discrimination and harassment

12   then; is that right?

13       **A.    Yes.**

14       Q.    But when you came on board to work for

02:23:30 15   Chartwell, you did not take any kind of new course when

16   you started at least; correct?

17       **A.    There was another course that we took.**

18       Q.    What was the course that you took when you

19   started working at Chartwell?

02:23:41 20       **A.    It was the same course.**

21       Q.    Okay.  So that would have been in 2015; is that

22   right?

23       **A.    Yes.**

24       Q.    And does this discrimination and harassment

02:23:54 25   course, is it an online course?

VERONICA MARTINEZ
October 15, 2019

1   STATE OF CALIFORNIA      )
                            ) ss:
2   COUNTY OF ALAMEDA        )

3

4        I, KIMBERLY E. D'URSO, do hereby certify:

5        That the witness named in the foregoing

6   deposition was present and duly sworn to testify to the

7   truth in the within-entitled action on the day and date

8   and at the time and place therein specified;

9        That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12       That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15       Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19       That I am a disinterested person to the said

20  action;

21       IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 30th day of October, 2019.

23

24  _____
    KIMBERLY D'URSO
25  RPR, CSR NO. 11372, STATE OF CALIFORNIA

Bridget Mattos & Associates
(415)747-8710

# Exhibit

# 11

1 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
2 | Including Professional Corporations
TRACEY A. KENNEDY, Cal. Bar No. 150782
3 | 333 South Hope Street, 43rd Floor
Los Angeles, California  90071-1422
4 | Telephone:     213-620-1780
Facsimile:      213-620-1398
5 | Email:          tkennedy@sheppardmullin.com

6 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
7 | Including Professional Corporations
PATRICIA M. JENG, Cal. Bar No. 272262
8 | REANNE SWAFFORD-HARRIS, Cal. Bar No. 305558
Four Embarcadero Center, 17th Floor
9 | San Francisco, California 94111-4109
Telephone:     415.434.9100
10 | Facsimile:      415.434.3947
Email:          pjeng@sheppardmullin.com
11 |                 rswafford-harris@sheppardmullin.com

12 | Attorneys for Defendant,
TESLA, INC. DBA TESLA MOTORS, INC.

13

14

15 | **UNITED STATES DISTRICT COURT**

16 | **NORTHERN DISTRICT OF CALIFORNIA**

17

18 | DEMETRIC DI-AZ, OWEN DIAZ AND
LAMAR PATTERSON

Case No. 17-cv-06748-WHO

19 | Plaintiffs,

**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET FIVE**

20 | v.

21 | TESLA, INC. DBA TESLA MOTORS,
INC., CITISTAFF SOLUTIONS, INC.;
22 | WEST VALLEY STAFFING GROUP;
CHARTWELL STAFFING SERVICES,
23 | INC.; NEXTSOURCE, INC.; and DOES
1-10, inclusive
24 |

25 | Defendants.

Amended Complaint Filed:   December 26, 2018
Trial Date:                           November 18, 2019

26

27

28

-1-                                  Case No. 17-cv-06748-WHO

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS FOR PRODUCTION
OF DOCUMENTS, SET FIVE

1  PROPOUNDING PARTY:        Plaintiff OWEN DIAZ

2  RESPONDING PARTY:         Defendant TESLA, INC. DBA TESLA MOTORS, INC.

3  SET NO.:                  FIVE

4         Pursuant to Federal Rule of Civil Procedure 34, Defendant Tesla, Inc. dba Tesla Motors,

5  Inc. ("Defendant") hereby objects and responds to Plaintiff Owen Diaz's ("Plaintiff") Requests for

6  Production of Documents, Set Five as set forth below.

7                        **PRELIMINARY STATEMENT**

8         These Responses are made solely for purposes of this dispute.  Each Response is subject to

9  all objections as to relevance, materiality and admissibility, and any and all other objections and

10 grounds which would require the exclusion of any statements contained herein, if such statements

11 were made by a witness present and testifying at court.  All said objections and grounds are

12 expressly reserved and may be interposed at the time of trial.

13        The Responses set forth herein are based solely on the investigation and discovery

14 conducted in this dispute to date.  Defendant's discovery and investigation are ongoing and

15 continuing.  Without incurring an obligation to do so, Defendant fully reserves the right to

16 supplement, amend, or modify its Responses to these Requests for Production as its discovery and

17 investigation continue.

18                        **GENERAL OBJECTIONS**

19        Defendant makes the following General Objections to each Request for Production, each

20 of which is incorporated by this reference into each individual Response as if set forth there in full,

21 and accordingly these General Objections will not be repeated in full therein.  These General

22 Objections apply to the entirety of the Requests for Production.  The assertion of same, similar, or

23 additional objections to an individual Request for Production does not waive any of Defendant's

24 General Objections as set forth below.  Likewise, insofar as a General Objection is not enumerated

25 in a Response, it shall not be deemed waived.

26        1.     Defendant generally objects to the Requests for Production to the extent they seek

27 the discovery of information covered by the attorney-client privilege, the attorney work-product

28 doctrine, or any other applicable privilege.  Defendant provides its Responses on the condition that

-2-                          Case No. 17-cv-06748-WHO

1 | an inadvertent production of documents covered by such privileges or doctrines does not waive

2 | any of its rights to assert such privileges or doctrines and that it may withdraw from production

3 | any such document inadvertently produced as soon as identified.  To the extent any Request seeks

4 | information protected by the attorney-client privilege and/or attorney work-product doctrine,

5 | Defendant declines to produce such Responses, including, without limitation:

6 |         a.      All information or documents that constitute correspondence or other

7 | communications between counsel for Defendant or its respective agents or employees, on the one

8 | hand, and Defendant or its respective agents or employees, on the other hand; and

9 |         b.      All documents prepared for use in this dispute, including notes, memoranda,

10 | draft pleadings and correspondence prepared by, at the direction of, or for review of counsel for

11 | Defendant.

12 |     2.      Defendant generally objects to the Requests for Production to the extent they

13 | require Defendant to produce information within the exclusive possession, custody, or control of

14 | third parties.

15 |     3.      Defendant generally objects to the Requests for Production to the extent they

16 | require Defendant to produce information, public or otherwise, that is equally available to

17 | Plaintiff, and may decline to produce any such information or documents.

18 |     4.      Defendant generally objects to Plaintiff's Requests for Production and to each

19 | Request therein to the extent that the Requests for Production seek discovery of information, the

20 | release of which would be a violation of any individual's right of privacy under any constitutional,

21 | statutory or common law right of privacy of any person.

22 |     5.      Defendant generally objects to the Requests for Production to the extent they are

23 | vague and ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to

24 | the discovery of admissible evidence.  Defendant reserves any and all objections as to relevance

25 | and materiality.  Defendant's responses are not intended to waive or prejudice any objections

26 | Defendant may have or may assert later.

27 |     6.      Defendant objects to each Request to the extent it seeks information relating to

28 | events that fall outside the relevant period.

1       7.     Each of the above General Objections shall be deemed to apply to Defendant's

2 Requests for Production set forth below, notwithstanding the fact that Defendant has supplied

3 responses and specific objections to the propounded Requests.

4       Subject to the foregoing General Objections, which are incorporated into each specific

5 Response below and expressly subject thereto, Defendant responds to Plaintiff's Demand for

6 Production of Documents, Set One, as follows:

7           **RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS**

8 **REQUEST FOR PRODUCTION NO. 79:**

9       Please produce ANY DOCUMENTS or COMMUNICATIONS sent, created, or received

10 by Joyce DelaGrande which RELATE to PLAINTIFF. (For the purposes of responding to this

11 request, the term "COMMUNICATIONS" encompasses, but is not limited to, notes, letters,

12 emails, text messages, social media posts (including, though not limited to, posts on Instagram,

13 Facebook, LINE, or Twitter), social media direct messages (including, though not limited to,

14 messages sent via Instagram, Facebook, LINE, or Twitter), and messages sent via a messaging

15 application (including, though not limited to, Snapchat, LINE, WhatsApp, WeChat, or Slack).)

16 **RESPONSE TO REQUEST FOR PRODUCTION NO. 79:**

17       Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and

18 uncertain with regard to the phrase "ANY DOCUMENTS or COMMUNICATIONS sent, created,

19 or received by Joyce DelaGrande which RELATE to PLAINTIFF." Defendant further objects to

20 this request on the grounds that it is burdensome, oppressive, and harassing to the extent that it

21 seeks information and documents not relevant to any party's claims or defenses nor proportional

22 to the needs of this case, especially given that it requests any documents "which RELATE to

23 PLAINTIFF." Defendant further objects to this request to the extent that it seeks documents and

24 information pertaining to employees or former employees of Defendant and thereby seeks to

25 invade privacy rights established by the California Constitution.  Defendant further objects to this

26 request to the extent that it seeks documents protected from disclosure by the attorney-client

27 privilege and the attorney work product doctrine.  Defendant further objects to this request on the

28 grounds that it is burdensome and harassing in that it is overbroad and vague and ambiguous as to

1   time.

2       Subject to and without waiving the foregoing objections, Defendant responds as follows:

3   Defendant will produce responsive documents in its possession, custody and control, if any.

4   Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

5   **REQUEST FOR PRODUCTION NO. 80:**

6       Please produce ANY DOCUMENTS or COMMUNICATIONS sent, created, or received

7   by Tamotsu Kawasaki which RELATE to PLAINTIFF. (For the purposes of responding to this

8   request, the term "COMMUNICATIONS" encompasses, but is not limited to, notes, letters,

9   emails, text messages, social media posts (including, though not limited to, posts on Instagram,

10  Facebook, LINE, or Twitter), social media direct messages (including, though not limited to,

11  messages sent via Instagram, Facebook, LINE, or Twitter), and messages sent via a messaging

12  application (including, though not limited to, Snapchat, LINE, WhatsApp, WeChat, or Slack).)

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 80:**

14      Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and

15  uncertain with regard to the phrase "ANY DOCUMENTS or COMMUNICATIONS sent, created,

16  or received by Tamotsu Kawasaki which RELATE to PLAINTIFF." Defendant further objects to

17  this request on the grounds that it is burdensome, oppressive, and harassing to the extent that it

18  seeks information and documents not relevant to any party's claims or defenses nor proportional

19  to the needs of this case, especially given that it requests any documents "which RELATE to

20  PLAINTIFF." Defendant further objects to this request to the extent that it seeks documents and

21  information pertaining to employees or former employees of Defendant and thereby seeks to

22  invade privacy rights established by the California Constitution.  Defendant further objects to this

23  request to the extent that it seeks documents protected from disclosure by the attorney-client

24  privilege and the attorney work product doctrine.  Defendant further objects to this request on the

25  grounds that it is burdensome and harassing in that it is overbroad and vague and ambiguous as to

26  time.

27

28

1    Subject to and without waiving the foregoing objections, Defendant responds as follows:

2  Defendant will produce responsive documents in its possession, custody and control, if any.

3  Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

4  **REQUEST FOR PRODUCTION NO. 81:**

5    Please produce ANY DOCUMENTS or COMMUNICATIONS sent, created, or received

6  by Robert Hidalgo which RELATE to PLAINTIFF. (For the purposes of responding to this

7  request, the term "COMMUNICATIONS" encompasses, but is not limited to, notes, letters,

8  emails, text messages, social media posts (including, though not limited to, posts on Instagram,

9  Facebook, LINE, or Twitter), social media direct messages (including, though not limited to,

10  messages sent via Instagram, Facebook, LINE, or Twitter), and messages sent via a messaging

11  application (including, though not limited to, Snapchat, LINE, WhatsApp, WeChat, or Slack).)

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 81:**

13    Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and

14  uncertain with regard to the phrase "ANY DOCUMENTS or COMMUNICATIONS sent, created,

15  or received by Robert Hidalgo which RELATE to PLAINTIFF." Defendant further objects to this

16  request on the grounds that it is burdensome, oppressive, and harassing to the extent that it seeks

17  information and documents not relevant to any party's claims or defenses nor proportional to the

18  needs of this case, especially given that it requests any documents "which RELATE to

19  PLAINTIFF." Defendant further objects to this request to the extent that it seeks documents and

20  information pertaining to employees or former employees of Defendant and thereby seeks to

21  invade privacy rights established by the California Constitution.  Defendant further objects to this

22  request to the extent that it seeks documents protected from disclosure by the attorney-client

23  privilege and the attorney work product doctrine.  Defendant further objects to this request on the

24  grounds that it is burdensome and harassing in that it is overbroad and vague and ambiguous as to

25  time.

26    Subject to and without waiving the foregoing objections, Defendant responds as follows:

27  After a diligent search and reasonable inquiry, Defendant does not have any responsive documents

28

SMRH:4837-9254-
0823.1

1  in its possession, custody and control. Discovery is ongoing. Defendant reserves the right to

2  supplement this response as necessary.

3  **REQUEST FOR PRODUCTION NO. 82:**

4         Please produce ANY of YOUR organizational charts created between 2014 and the

5  present.

6  **RESPONSE TO REQUEST FOR PRODUCTION NO. 82:**

7         Defendant objects to this request on the grounds that it is vague and ambiguous as to the

8  term(s) and/or phrase(s) "organizational charts," and "created." Defendant further objects that this

9  request is not reasonably limited to time and/or scope, and thus overbroad, unduly burdensome,

10  oppressive, and harassing. Defendant further objects that this request is overbroad and unduly

11  burdensome, particularly because it calls for all documents of Tesla, Inc., and its representatives,

12  including specifically its attorneys, as well as any owner, officer, director, shareholder, manager,

13  employee, managing agent, agent, or "any individual or entity acting with actual or apparent

14  authority of Tesla, Inc." Defendant further objects to the extent this request seeks documents that

15  are not relevant to the parties' claims or defenses and are not proportional to the needs of the case,

16  considering the importance of the issues at stake in the action, the amount in controversy,

17  Defendant's relative access to relevant information, the resources, importance of the discovery in

18  resolving the issues, and the burden or expense of the proposed discovery outweighs its likely

19  benefit. Defendant further objects that this request seeks confidential information related to

20  business operations and/or private information. Defendant further objects to the extent this

21  request expressly seeks documents protected from disclosure by the attorney-client privilege

22  and/or work product doctrine. Defendant further objects that this request is too vague and

23  ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the

24  request fails to adequately describe with reasonable particularity the item or category of

25  documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

26  **REQUEST FOR PRODUCTION NO. 83:**

27         Please produce ANY and ALL documents that RELATE to PLAINTIFF's completion of

28  any training provided by or facilitated by YOU.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 83:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s) "ALL DOCUMENTS that RELATE to," "completion," "any training," "provided by," and "facilitated by YOU." Defendant further objects that this request is not reasonably limited to time and/or scope, and thus overbroad, unduly burdensome, oppressive, and harassing. Defendant further objects that this request is overbroad and unduly burdensome, particularly because it calls for all documents of Tesla, Inc., and its representatives, including specifically its attorneys, as well as any owner, officer, director, shareholder, manager, employee, managing agent, agent, or "any individual or entity acting with actual or apparent authority of Tesla, Inc." Defendant further objects to the extent this request seeks documents that are not relevant to the parties' claims or defenses and are not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, Defendant's relative access to relevant information, the resources, importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery outweighs its likely benefit. Defendant further objects that this request seeks confidential information related to business operations and/or private information. Defendant further objects to the extent this request expressly seeks documents protected from disclosure by the attorney-client privilege and/or work product doctrine. Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant will produce responsive documents in its possession, custody and control, if any. Discovery is ongoing. Defendant reserves the right to supplement this response as necessary.

**REQUEST FOR PRODUCTION NO. 84:**

Please produce ANY and ALL DOCUMENTS reflecting policy acknowledgment forms signed by PLAINTIFF.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 84:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s) "ALL DOCUMENTS reflecting" and "policy acknowledgment forms." Defendant further objects that this request is not reasonably limited to time and/or scope, and thus overbroad, unduly burdensome, oppressive, and harassing. Defendant further objects to the extent this request seeks documents that are not relevant to the parties' claims or defenses and are not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, Defendant's relative access to relevant information, the resources, importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery outweighs its likely benefit. Defendant further objects that this request seeks confidential information related to business operations and/or private information. Defendant further objects to the extent this request expressly seeks documents protected from disclosure by the attorney-client privilege and/or work product doctrine. Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

Subject to and without waiving the foregoing objections, Defendant responds as follows: Defendant will produce responsive documents in its possession, custody and control, if any. Discovery is ongoing. Defendant reserves the right to supplement this response as necessary.

**REQUEST FOR PRODUCTION NO. 85:**

Please produce ANY and ALL DOCUMENTS created, sent or received by Josh Hedges RELATED to PLAINTIFF.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 85:**

Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and uncertain with regard to the phrase "ALL DOCUMENTS created, sent or received by Josh Hedges RELATED to PLAINTIFF." Defendant further objects to this request on the grounds that it is burdensome, oppressive, and harassing to the extent that it seeks information and documents not

-9-

1   relevant to any party's claims or defenses nor proportional to the needs of this case, especially

2   given that it requests any documents "RELATED to PLAINTIFF." Defendant further objects to

3   this request to the extent that it seeks documents and information pertaining to employees or

4   former employees of Defendant and thereby seeks to invade privacy rights established by the

5   California Constitution.  Defendant further objects to this request to the extent that it seeks

6   documents protected from disclosure by the attorney-client privilege and the attorney work

7   product doctrine.  Defendant further objects to this request on the grounds that it is burdensome

8   and harassing in that it is overbroad and vague and ambiguous as to time.

9        Subject to and without waiving the foregoing objections, Defendant responds as follows:

10   Defendant will produce responsive documents in its possession, custody and control, if any.

11   Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

12   **REQUEST FOR PRODUCTION NO. 86:**

13        Any DOCUMENTS in Workday that RELATE to PLAINTIFF.

14   **RESPONSE TO REQUEST FOR PRODUCTION NO. 86:**

15        Defendant objects to this request on the grounds that it is vague and ambiguous as to the

16   term(s) and/or phrase(s) "DOCUMENTS in Workday," and "RELATE to PLAINTIFF."

17   Defendant further objects that this request is not reasonably limited to time and/or scope, and thus

18   overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects that this

19   request is overbroad and unduly burdensome, particularly because it calls for any documents from

20   an entire cloud based on-demand financial management and human capital management software

21   vendor.  Defendant further objects to the extent this request seeks documents that are not relevant

22   to the parties' claims or defenses and are not proportional to the needs of the case, considering the

23   importance of the issues at stake in the action, the amount in controversy, Defendant's relative

24   access to relevant information, the resources, importance of the discovery in resolving the issues,

25   and the burden or expense of the proposed discovery outweighs its likely benefit.  Defendant

26   further objects that this request seeks confidential information related to business operations

27   and/or private information.  Defendant further objects to the extent this request expressly seeks

28   documents protected from disclosure by the attorney-client privilege and/or work product doctrine.

-10-

1   Defendant further objects that this request is too vague and ambiguous to permit Defendant to

2   conduct a reasonable search for responsive documents, as the request fails to adequately describe

3   with reasonable particularity the item or category of documents requested as required by Federal

4   Rules of Civil Procedure section 34(b)(1)(A).

5       Subject to and without waiving the foregoing objections, Defendant responds as follows:

6   Defendant will produce Plaintiff Owen Diaz's Workday profile.  Discovery is ongoing.  Defendant

7   reserves the right to supplement this response as necessary.

8   **REQUEST FOR PRODUCTION NO. 87:**

9       Please provide any and all DOCUMENTS RELATING TO internal complaints made by

10  Nigel Jones related to race harassment, discrimination and/or the use of the N-word at Tesla.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 87:**

12      Defendant objects to this request on the grounds that it is vague and ambiguous as to the

13  term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination,"

14  and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in

15  time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant

16  further objects to the extent this request seeks information that is not relevant to the claims or

17  defenses and/or proportional to the needs of the case, considering the importance of the issues at

18  stake in the action, the amount in controversy, the parties' relative access to relevant information,

19  the parties' resources, the importance of the discovery in resolving the issues, and whether the

20  burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further

21  objects that this request seeks confidential information related to business operations and/or

22  private information.  Defendant further objects to the extent this request seeks information

23  protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further

24  objects to the extent this request violates third party privacy rights and confidentiality of third-

25  party non-litigants to an extent incommensurate with Plaintiff's discovery needs.  Defendant

26  further objects that this request as phrased is argumentative and requires the adoption of an

27  assumption which is improper.  Defendant further objects that this request is too vague and

28  ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the

-11-

1  request fails to adequately describe with reasonable particularity the item or category of

2  documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

3  **REQUEST FOR PRODUCTION NO. 88:**

4     Please provide any and all DOCUMENTS RELATING TO internal complaints made by

5  Melvin Berry related to race harassment, discrimination and/or the use of the N-word at Tesla.

6  **RESPONSE TO REQUEST FOR PRODUCTION NO. 88:**

7     Defendant objects to this request on the grounds that it is vague and ambiguous as to the

8  term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination,"

9  and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in

10 time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant

11 further objects to the extent this request seeks information that is not relevant to the claims or

12 defenses and/or proportional to the needs of the case, considering the importance of the issues at

13 stake in the action, the amount in controversy, the parties' relative access to relevant information,

14 the parties' resources, the importance of the discovery in resolving the issues, and whether the

15 burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further

16 objects that this request seeks confidential information related to business operations and/or

17 private information.  Defendant further objects to the extent this request seeks information

18 protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further

19 objects to the extent this request seeks information equally available to Plaintiff and thus overly

20 burdensome.  Defendant further objects to the extent this request violates third party privacy rights

21 and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's

22 discovery needs.  Defendant further objects that this request as phrased is argumentative and

23 requires the adoption of an assumption which is improper.  Defendant further objects that this

24 request is too vague and ambiguous to permit Defendant to conduct a reasonable search for

25 responsive documents, as the request fails to adequately describe with reasonable particularity the

26 item or category of documents requested as required by Federal Rules of Civil Procedure section

27 34(b)(1)(A).

28

**REQUEST FOR PRODUCTION NO. 89:**

Please provide any and all DOCUMENTS RELATING TO internal complaints made by Nathan Fraim related to race harassment, discrimination and/or the use of the N-word at Tesla.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 89:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination," and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects to the extent this request seeks information that is not relevant to the claims or defenses and/or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further objects that this request seeks confidential information related to business operations and/or private information.  Defendant further objects to the extent this request seeks information protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further objects to the extent this request violates third party privacy rights and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's discovery needs.  Defendant further objects that this request as phrased is argumentative and requires the adoption of an assumption which is improper.  Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

**REQUEST FOR PRODUCTION NO. 90:**

Please provide any and all DOCUMENTS RELATING TO internal complaints made by Dewitt Lambert related to race harassment, discrimination and/or the use of the N-word at Tesla.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 90:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination," and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing. Defendant further objects to the extent this request seeks information that is not relevant to the claims or defenses and/or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Defendant further objects that this request seeks confidential information related to business operations and/or private information. Defendant further objects to the extent this request seeks information protected by the attorney-client privilege or the attorney work product doctrine. Defendant further objects to the extent this request seeks information equally available to Plaintiff and thus overly burdensome. Defendant further objects to the extent this request violates third party privacy rights and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's discovery needs particularly since DeWitt Lambert, who is not a party to this case, is represented by Plaintiff's counsel in a separate matter. Defendant further objects that this request as phrased is argumentative and requires the adoption of an assumption which is improper. Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

**REQUEST FOR PRODUCTION NO. 91:**

Please provide any and all DOCUMENTS RELATING TO internal complaints made by Tori Johnson related to race harassment, discrimination and/or the use of the N-word at Tesla.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 91:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination," and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects to the extent this request seeks information that is not relevant to the claims or defenses and/or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further objects that this request seeks confidential information related to business operations and/or private information.  Defendant further objects to the extent this request seeks information protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further objects to the extent this request violates third party privacy rights and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's discovery needs.  Defendant further objects that this request as phrased is argumentative and requires the adoption of an assumption which is improper.  Defendant further objects that this request is too vague and ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the request fails to adequately describe with reasonable particularity the item or category of documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

**REQUEST FOR PRODUCTION NO. 92:**

Please provide any and all DOCUMENTS RELATING TO internal complaints made by Titus McCaleb related to race harassment, discrimination and/or the use of the N-word at Tesla.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 92:**

Defendant objects to this request on the grounds that it is vague and ambiguous as to the term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination," and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant

-15-

1  further objects to the extent this request seeks information that is not relevant to the claims or

2  defenses and/or proportional to the needs of the case, considering the importance of the issues at

3  stake in the action, the amount in controversy, the parties' relative access to relevant information,

4  the parties' resources, the importance of the discovery in resolving the issues, and whether the

5  burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further

6  objects that this request seeks confidential information related to business operations and/or

7  private information.  Defendant further objects to the extent this request seeks information

8  protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further

9  objects to the extent this request violates third party privacy rights and confidentiality of third-

10  party non-litigants to an extent incommensurate with Plaintiff's discovery needs.  Defendant

11  further objects that this request as phrased is argumentative and requires the adoption of an

12  assumption which is improper.  Defendant further objects that this request is too vague and

13  ambiguous to permit Defendant to conduct a reasonable search for responsive documents, as the

14  request fails to adequately describe with reasonable particularity the item or category of

15  documents requested as required by Federal Rules of Civil Procedure section 34(b)(1)(A).

16  **REQUEST FOR PRODUCTION NO. 93:**

17       Please provide any and all DOCUMENTS RELATING TO internal complaints made by

18  Jakel Williams related to race harassment, discrimination and/or the use of the N-word at Tesla.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 93:**

20       Defendant objects to this request on the grounds that it is vague and ambiguous as to the

21  term(s) and/or phrase(s): "internal complaints," "related to," "race harassment," "discrimination,"

22  and "the use of the N-word at Tesla." Defendant further objects that this request is not limited in

23  time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant

24  further objects to the extent this request seeks information that is not relevant to the claims or

25  defenses and/or proportional to the needs of the case, considering the importance of the issues at

26  stake in the action, the amount in controversy, the parties' relative access to relevant information,

27  the parties' resources, the importance of the discovery in resolving the issues, and whether the

28  burden or expense of the proposed discovery outweighs its likely benefit.  Defendant further

1   objects that this request seeks confidential information related to business operations and/or

2   private information.  Defendant further objects to the extent this request seeks information

3   protected by the attorney-client privilege or the attorney work product doctrine.  Defendant further

4   objects to the extent this request seeks information equally available to Plaintiff and thus overly

5   burdensome.  Defendant further objects to the extent this request violates third party privacy rights

6   and confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's

7   discovery needs.  Defendant further objects that this request as phrased is argumentative and

8   requires the adoption of an assumption which is improper.  Defendant further objects that this

9   request is too vague and ambiguous to permit Defendant to conduct a reasonable search for

10   responsive documents, as the request fails to adequately describe with reasonable particularity the

11   item or category of documents requested as required by Federal Rules of Civil Procedure section

12   34(b)(1)(A).

13   **REQUEST FOR PRODUCTION NO. 94:**

14       Please provide any and all DOCUMENTS RELATING TO any discipline imposed on

15   Judy Timbreza for any inappropriate workplace conduct, including but not limited to, the use of

16   racial slurs and/or physical violence.

17   **RESPONSE TO REQUEST FOR PRODUCTION NO. 94:**

18       Defendant objects to this request on the grounds that it is vague and ambiguous as to the

19   term(s) and/or phrase(s): "any discipline imposed," "on," and "inappropriate workplace conduct."

20   Defendant further objects that this request is not limited in time or scope, and thus is overbroad,

21   unduly burdensome, oppressive, and harassing.  Defendant further objects that this request as

22   phrased is argumentative and requires the adoption of an assumption which is improper.

23   Defendant further objects to the extent this request seeks information protected by the attorney-

24   client privilege or the attorney work product doctrine.  Defendant further objects to the extent this

25   request seeks information equally available to Plaintiff and overly burdensome, as Judy Timbreza

26   was never a Tesla employee, but an employee of Chartwell.  Defendant further objects to the

27   extent this request violates third party privacy rights and confidentiality of third-party non-litigants

28   to an extent incommensurate with Plaintiff's discovery needs.  Defendant further objects to the

-17-

1   extent this Request is duplicative and/or substantially similar to Plaintiff's Request for Production

2   of Documents, Set Three, No. 66.

3        Subject to and without waiving the foregoing objections, Defendant responds as follows:

4   After a diligent search and reasonable inquiry, no additional documents were found that have not

5   already been produced. Discovery is ongoing. Defendant reserves the right to supplement this

6   response as necessary.

7   **REQUEST FOR PRODUCTION NO. 95:**

8        Please provide any and all DOCUMENTS RELATING TO Brandi To's investigation of

9   Titus McCaleb's complaints of harassment, physical threats and/or retaliation.

10   **RESPONSE TO REQUEST FOR PRODUCTION NO. 95:**

11        Defendant objects to this request on the grounds that it is vague and ambiguous as to the

12   term(s) and/or phrase(s): "all DOCUMENTS RELATING TO," "investigation," "complaints of

13   harassment," "and "physical threats and/or retaliation." Defendant further objects that this request

14   is not limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and

15   harassing. Defendant further objects to the extent this request seeks information that is not

16   relevant to the claims or defenses and/or proportional to the needs of the case, considering the

17   importance of the issues at stake in the action, the amount in controversy, the parties' relative

18   access to relevant information, the parties' resources, the importance of the discovery in resolving

19   the issues, and whether the burden or expense of the proposed discovery outweighs its likely

20   benefit. Defendant further objects that this request seeks confidential information related to

21   business operations and/or private information. Defendant further objects to the extent this

22   request seeks information protected by the attorney-client privilege or the attorney work product

23   doctrine. Defendant further objects to the extent this request violates third party privacy rights and

24   confidentiality of third-party non-litigants to an extent incommensurate with Plaintiff's discovery

25   needs. Defendant further objects that this request as phrased is argumentative and requires the

26   adoption of an assumption which is improper. Defendant further objects that this request is too

27   vague and ambiguous to permit Defendant to conduct a reasonable search for responsive

28   documents, as the request fails to adequately describe with reasonable particularity the item or

1 | category of documents requested as required by Federal Rules of Civil Procedure section

2 | 34(b)(1)(A).

3 |      Subject to and without waiving the foregoing objections, Defendant responds as follows:

4 | After a diligent search and reasonable inquiry, Defendant does not have any responsive documents

5 | in its possession, custody and control.  Discovery is ongoing.  Defendant reserves the right to

6 | supplement this response as necessary.

7 | **REQUEST FOR PRODUCTION NO. 96:**

8 |      Please provide any and all CORRESPONDENCE exchanged between Agnes Lewis and

9 | Brandi To relating to Titus McCaleb.

10 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 96:**

11 |      Defendant objects to this request on the grounds that it is vague and ambiguous as to the

12 | term(s) and/or phrase(s): "all CORRESPONDENCE," "exchanged between," "and "relating to."

13 | Defendant further objects that this request is not limited in time or scope, and thus is overbroad,

14 | unduly burdensome, oppressive, and harassing.  Defendant further objects to the extent this

15 | request seeks information that is not relevant to the claims or defenses and/or proportional to the

16 | needs of the case, considering the importance of the issues at stake in the action, the amount in

17 | controversy, the parties' relative access to relevant information, the parties' resources, the

18 | importance of the discovery in resolving the issues, and whether the burden or expense of the

19 | proposed discovery outweighs its likely benefit.  Defendant further objects that this request seeks

20 | confidential information related to business operations and/or private information.  Defendant

21 | further objects to the extent this request seeks information protected by the attorney-client

22 | privilege or the attorney work product doctrine.  Defendant further objects to the extent this

23 | request violates third party privacy rights and confidentiality of third-party non-litigants to an

24 | extent incommensurate with Plaintiff's discovery needs.  Defendant further objects that this

25 | request as phrased is argumentative and requires the adoption of an assumption which is improper.

26 | Defendant further objects that this request is too vague and ambiguous to permit Defendant to

27 | conduct a reasonable search for responsive documents, as the request fails to adequately describe

28 |

SMRH:4837-9254-0823.1

1  with reasonable particularity the item or category of documents requested as required by Federal

2  Rules of Civil Procedure section 34(b)(1)(A).

3         Subject to and without waiving the foregoing objections, Defendant responds as follows:

4  Defendant will produce responsive documents in its possession, custody and control, if any.

5  Discovery is ongoing.  Defendant reserves the right to supplement this response as necessary.

6

7  Dated:  May 24, 2019                         SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

8

9                                  By: _____
                                              TRACEY A. KENNEDY
10                                            PATRICIA M. JENG
                                          REANNE SWAFFORD-HARRIS
11

12                                       Attorneys for Defendant
                                  TESLA, INC. dba TESLA MOTORS, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

*Demetric Di-Az, et al. v. Tesla, Inc., et al.*
USDC, Northern District of California, Case No. 3:17-cv-06748-WHO

    At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

    On May 24, 2019, I served true copies of the following document(s) described as:

**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET FIVE**

on the interested parties in this action as follows:

**SEE SERVICE LIST**

☒   **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the firm's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.

☐   **BY FAX TRANSMISSION:**  I faxed a copy of the document(s) to the persons at the fax numbers listed in the Service List.  The telephone number of the sending facsimile machine was 415.434.3947.  The transmission was reported as complete and without error.  No error was reported by the fax machine that I used.  A transmission report was properly issued by the sending fax machine.

☐   **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address eruiz@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐   **BY OVERNIGHT DELIVERY:**  I enclosed said document(s) in an envelope or package provided by the overnight service carrier and addressed to the persons at the addresses listed in the Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight service carrier or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents.

☐   **BY PERSONAL SERVICE:**  I personally delivered the document(s) to the person at the addresses listed in the Service List.  (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.  (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

SMRH:4837-9254-0823.1

1

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

2

3

Executed on May 24, 2019, at San Francisco, California.

4

5

6

_____

Elena E. Ruiz

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:4837-9254-0823.1

Case No. 3:17-cv-06748-WHO
CERTIFICATE OF SERVICE

## SERVICE LIST

| | |
|---|---|
| Lawrence A. Organ, Esq.<br>Navruz Avloni, Esq.<br>**CALIFORNIA CIVIL RIGHTS LAW GROUP**<br>332 San Anselmo Avenue<br>San Anselmo, CA 94960<br>Telephone:    415-453-4740<br>Facsimile:     415-785-7352]<br>Email:          larry@civiilrightsca.com<br>                      navruz@civilrightsca.com | Attorneys for Plaintiffs<br>DEMETRIC DI-AZ and OWEN DIAZ |
| Gary T. Lafayette, Esq.<br>Cheryl A. Stevens, Esq.<br>**LAFAYETTE & KUMAGAI**<br>1300 Clay Street, Suite 810<br>Oakland, CA 94612<br>Telephone:    415-357-4600<br>Email:          glafayette@lkclaw.com<br>                      cstevens@lkclaw.com | Attorneys for Defendant<br>CITISTAFF SOLUTIONS, INC. |
| Jason A. Geller, Esq.<br>Juan C. Araneda, Esq.<br>Aaron D. Langberg, Esq.<br>**FISHER & PHILLIPS LLP**<br>One Embarcadero Center, Suite 2050<br>San Francisco, CA 94111<br>Telephone:    415-490-9000<br>Facsimile:     415-490-9001<br>Email:          jgeller@fisherphillips.com<br>                      jaraneda@fisherphillips.com<br>                      alangberg@fisherphillips.com | Attorneys for Defendant<br>NEXTSOURCE, INC. |
| Fenn C. Horton III, Esq.<br>Helene Simvoulakis-Panos, Esq.<br>**PAHL & McCAY**<br>225 West Santa Clara Street, Suite 1500<br>San Jose, CA 95113<br>Telephone:    408-286-5110<br>Facsimile:     408-286-5722<br>Email:          fhorton@pahl-mccay.com<br>                      hsimvoulakis@pahl-mccay.com | Attorneys for Defendant<br>WEST VALLEY STAFFING GROUP |

-3-

Case No. 3:17-cv-06748-WHO

CERTIFICATE OF SERVICE

# Exhibit

# **12**

JASON A. GELLER (CA SBN 168149)
jgeller@fisherphillips.com
JUAN C. ARANEDA (CA SBN 213041)
jaraneda@fisherphillips.com
VINCENT J. ADAMS (CA SBN 249696)
vadams@fisherphillips.com
FISHER & PHILLIPS LLP
One Embarcadero Center, Suite 2050
San Francisco, California 94111
Telephone:    (415) 490-9000
Facsimile:    (415) 490-9001

Attorneys for Defendant
nextSource, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO COURTHOUSE

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ and LAMAR PATTERSON,<br><br>                      Plaintiffs,<br>    vs.<br><br>TESLA, INC. DBA TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; NEXTSOURCE, INC.,<br><br>                    Defendants. | Case No. 3:17-cv-06748-WHO<br>*[Removed from Alameda Superior Court, Case No. RG17878854]*<br><br>**DEFENDANT NEXTSOURCE, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUEST FOR PRODUCTION OF DOCUMENTS – SET ONE** |

PROPOUNDING PARTY:    PLAINTIFF, OWEN DIAZ

RESPONDING PARTY:      DEFENDANT, NEXTSOURCE, INC.

SET NUMBER:              ONE

      Pursuant to Rule 34 of Federal Rules of Civil Procedure, Defendant NEXTSOURCE,

INC. ("Defendant") responds to Plaintiff OWEN DIAZ's Request for Production of Documents

(Set No. One) (the "Request") as follows:

**PRELIMINARY STATEMENT**

1. The responses/objections herein are made solely for the purpose of this action. Defendant reserves all objections or other questions as to the competency, relevance, materiality, privilege or admissibility as evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever of its responses herein and any document or thing identified or provided in response to the Request.

2. Defendant's response is governed by Rule 34 of Federal Rules of Civil Procedure and other applicable law, and not by the instructions, definitions or other prefatory remarks stated in the Request.

3. The responses below are based upon information presently available to Defendant and upon documents known to be in its possession, custody or control.  No incidental or implied admissions are intended.  The fact that Defendant has responded to all or any part of any individual request or any subpart thereof should not be taken as an admission that Defendant accepts or admits the existence of any fact or facts set forth or assumed by such request or that such responses constitute admissible evidence. The fact that Defendant has responded to all or part of any individual request or subpart thereof is not intended to be and shall not be construed to be a waiver by Defendant of all or any part of any objection which is made to any individual request or subpart thereof.

Subject to the foregoing, Defendant hereby responds to specific Requests as follows:

**RESPONSE TO REQUEST FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1**

Please produce PLAINTIFF's personnel file.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "personnel file." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that Plaintiff was not

1   an employee of Defendant, and this request is therefore inapplicable to Defendant.

2   **REQUEST FOR PRODUCTION NO. 2**

3   Please produce all DOCUMENTS, including COMMUNICATIONS, which RELATE

4   TO, reflect, refer, or discuss Plaintiff's job performance during his employment at the TESLA

5   FACTORY (in responding to this request, the term "COMMUNICATIONS" shall include, but

6   is not limited to, e-mails, text messages, chat logs, messages sent via mobile phone application

7   [including, though not limited to, Line, WhatsApp, or Signal], or messages and posts sent via

8   social media sites [including, though not limited to, Facebook, Twitter, Instagram, or Snapchat].)

9   **RESPONSE TO REQUEST FOR PRODUCTION NO. 2**

10   Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

11   vague and ambiguous, including, but not limited to, its use of the phrase "Plaintiff's job

12   performance during his employment at the TESLA FACTORY."  Defendant further objects to

13   this request as burdensome, oppressive and harassing to the extent that it seeks documents not

14   relevant to any party's claims or defenses or that are not proportional to the needs of this case,

15   especially given that this request seeks the production of all documents that "RELATE TO,

16   reflect, refer or discuss Plaintiff's job performance." Defendant objects to this request to the

17   extent it seeks the production of electronically stored information (including, but not limited to

18   emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

19   proportion to the claims in this action. Defendant also objects to this request to the extent that it

20   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

21   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

22   request to the extent it seeks the production of documents that are equally available to Plaintiff.

23   Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

24   and this request is therefore inapplicable to Defendant.

25   Subject to and without waiving objections, Defendant responds: Subject to and without

26   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

27   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

28   and Defendant reserves its right to supplement its response to this request.

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

1   **REQUEST FOR PRODUCTION NO. 3**

2       Please produce all DOCUMENTS RELATING TO PLAINTIFF's job duties and

3   responsibilities for each position held by PLAINTIFF at TESLA.

4   **RESPONSE TO REQUEST FOR PRODUCTION NO. 3**

5       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

6   vague and ambiguous, including, but not limited to, its use of the phrase "job duties and

7   responsibilities for each position held by PLAINTIFF at TESLA."  Defendant further objects to

8   this request as burdensome, oppressive and harassing to the extent that it seeks documents not

9   relevant to any party's claims or defenses or that are not proportional to the needs of this case,

10  especially given that this request seeks the production of all documents that "RELATING TO

11  PLAINTIFF'S job duties and responsibilities." Defendant objects to this request to the extent it

12  seeks the production of electronically stored information (including, but not limited to emails,

13  texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to

14  the claims in this action. Defendant also objects to this request to the extent that it seeks

15  documents protected by the attorney-client privilege, the attorney work product doctrine and/or

16  other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

17  the extent it seeks the production of documents that are equally available to Plaintiff. Defendant

18  objects to this request on the grounds that Plaintiff was not an employee of Defendant and this

19  request is therefore inapplicable to Defendant.

20  **REQUEST FOR PRODUCTION NO. 4**

21      Please produce all DOCUMENTS RELATING TO all complaint(s) made by

22  PLAINTIFF that he was called "Nigga" and/or "Nigger."

23  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4**

24      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

25  vague and ambiguous, including, but not limited to, its use of the phrase "all complaint(s) made

26  by PLAINTIFF that he was called 'Nigga' and/or 'Nigger.'"  Defendant further objects to this

27  request as burdensome, oppressive and harassing to the extent that it seeks documents not

28  relevant to any party's claims or defenses or that are not proportional to the needs of this case,

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 5**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called "Nigga" and/or "Nigger."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegations(s) that he was called 'Nigga' and/or 'Nigger.'" Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   and in proportion to the claims in this action. Defendant also objects to this request to the extent

2   that it seeks documents protected by the attorney-client privilege, the attorney work product

3   doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to

4   this request to the extent it calls for documents that are protected from disclosure by third party

5   privacy rights under the Federal and California constitutions and applicable statutes. Defendant

6   objects to this request to the extent it seeks the production of documents that are equally available

7   to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee

8   of Defendant and this request is therefore inapplicable to Defendant.

9       Subject to and without waiving its objections, Defendant responds: Despite a diligent

10  search and reasonable inquiry Defendant, cannot comply with this request because no documents

11  in Defendant's possession, custody or control are responsive to this request. Discovery is

12  continuing, and Defendant reserves its right to supplement its response to this request.

13  **REQUEST FOR PRODUCTION NO. 6**

14      Please produce any and all statements from employees who were interviewed regarding

15  PLAINTIFF's complaint(s) or allegation(s) that he was called "Nigga" and/or "Nigger."

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 6**

17      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18  vague and ambiguous, including, but not limited to, its use of the term "statements" and the

19  phrase "any and all statements from employees who were interviewed by YOU regarding

20  PLAINTIFF's complaint(s) or allegations(s) that he was called 'Nigga' and/or 'Nigger.'"

21  Defendant further objects to this request as burdensome, oppressive and harassing to the extent

22  that it seeks documents not relevant to any party's claims or defenses or that are not proportional

23  to the needs of this case. Defendant objects to this request on the grounds that it is overbroad,

24  vague and ambiguous as to time. Defendant also objects to this request to the extent that it seeks

25  documents protected by the attorney-client privilege, the attorney work product doctrine and/or

26  other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

27  the extent it calls for documents that are protected from disclosure by third party privacy rights

28  under the Federal and California constitutions and applicable statutes. Defendant objects to this

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 7**

Please produce the investigator's notes that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called "Nigga" and/or "Nigger."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to PLAINTIFF's complaint(s) or allegations(s) that he was called 'Nigga' and/or 'Nigger.'"  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

///

**REQUEST FOR PRODUCTION NO. 8**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF regarding "racially offensive remarks", including (though not limited to) the "racially offensive remarks" discussed at the previously produced document Bates- stamped TESLA-0000511.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by PLAINTIFF regarding 'racially offensive remarks'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

**REQUEST FOR PRODUCTION NO. 9**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) regarding "racially offensive remarks", including (though not limited to) the "racially offensive remarks" discussed at the previously produced document Bates – stamped TESLA-0000511.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) regarding 'racially offensive remarks'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 10**

Please produce any and all statements from employees who were interviewed regarding PLAINTIFF's complaint(s) or allegation(s) regarding "racially offensive remarks", including (though not limited to) the "racially offensive remarks" discussed at the previously produced document Bates- stamped TESLA-0000511.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaint(s) or allegation(s) regarding 'racially offensive remarks'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is

1    continuing, and Defendant reserves its right to supplement its response to this request.

2    **REQUEST FOR PRODUCTION NO. 11**

3        Please produce the investigator's notes that were created in response to PLAINTIFF's

4    complaint(s) or allegation(s) regarding "racially offensive remarks", including (though not

5    limited to) the "racially offensive remarks" discussed at the previously produced document

6    Bates- stamped TESLA-0000511.

7    **RESPONSE TO REQUEST FOR PRODUCTION NO. 11**

8        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

9    vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

10   that were created in response to PLAINTIFF's complaint(s) or allegation(s) regarding 'racially

11   offensive remarks'."  Defendant further objects to this request as burdensome, oppressive and

12   harassing to the extent that it seeks documents not relevant to any party's claims or defenses or

13   that are not proportional to the needs of this case. Defendant objects to this request on the grounds

14   that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the

15   extent it seeks the production of electronically stored information (including, but not limited to,

16   emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

17   proportion to the claims in this action. Defendant also objects to this request to the extent that it

18   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

19   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

20   request to the extent it calls for documents that are protected from disclosure by third party

21   privacy rights under the Federal and California constitutions and applicable statutes. Defendant

22   objects to this request to the extent it seeks the production of documents that are equally available

23   to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee

24   of Defendant and this request is therefore inapplicable to Defendant.

25       Subject to and without waiving its objections, Defendant responds: Despite a diligent

26   search and reasonable inquiry Defendant, cannot comply with this request because no documents

27   in Defendant's possession, custody or control are responsive to this request. Discovery is

28   continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 12**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF that he was called a "jiggaboo".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by PLAINTIFF that he was called a 'jiggaboo'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 13**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU

1  regarding Plaintiff's complaint(s) or allegation(s) that he was called a "jiggaboo".

2  **RESPONSE TO REQUEST FOR PRODUCTION NO. 13**

3  Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

4  vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted

5  by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a 'jiggaboo.'"

6  Defendant further objects to this request as burdensome, oppressive and harassing to the extent

7  that it seeks documents not relevant to any party's claims or defenses or that are not proportional

8  to the needs of this case, especially given that this request seeks the production of all documents

9  "RELATING TO" other documents. Defendant objects to this request on the grounds that it is

10  overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it

11  seeks the production of electronically stored information (including, but not limited to emails,

12  texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to

13  the claims in this action. Defendant also objects to this request to the extent that it seeks

14  documents protected by the attorney-client privilege, the attorney work product doctrine and/or

15  other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

16  the extent it calls for documents that are protected from disclosure by third party privacy rights

17  under the Federal and California constitutions and applicable statutes. Defendant objects to this

18  request to the extent it seeks the production of documents that are equally available to Plaintiff.

19  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

20  and this request is therefore inapplicable to Defendant.

21  Subject to and without waiving its objections, Defendant responds: Despite a diligent

22  search and reasonable inquiry Defendant, cannot comply with this request because no documents

23  in Defendant's possession, custody or control are responsive to this request. Discovery is

24  continuing, and Defendant reserves its right to supplement its response to this request.

25  **REQUEST FOR PRODUCTION NO. 14**

26  Please produce any and all statements from employees who were interviewed regarding

27  PLAINTIFF's complaint(s) or allegation(s) that he was called a "jiggaboo".

28  **RESPONSE TO REQUEST FOR PRODUCTION NO. 14**

1    Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

2    vague and ambiguous, including, but not limited to, its use of the term "statements" and the

3    phrase "PLAINTIFF's complaint(s) or allegation(s) that he was called a 'jiggaboo'."  Defendant

4    further objects to this request as burdensome, oppressive and harassing to the extent that it seeks

5    documents not relevant to any party's claims or defenses or that are not proportional to the needs

6    of this case. Defendant objects to this request on the grounds that it is overbroad, vague and

7    ambiguous as to time. Defendant objects to this request to the extent it seeks the production of

8    electronically stored information (including, but not limited to emails, texts and meta-data) as

9    burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

10   Defendant also objects to this request to the extent that it seeks documents protected by the

11   attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

12   or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

13   that are protected from disclosure by third party privacy rights under the Federal and California

14   constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

15   production of documents that are equally available to Plaintiff. Defendant objects to this request

16   on the grounds that Plaintiff was not an employee of Defendant and this request is therefore

17   inapplicable to Defendant.

18   Subject to and without waiving its objections, Defendant responds: Despite a diligent

19   search and reasonable inquiry Defendant, cannot comply with this request because no documents

20   in Defendant's possession, custody or control are responsive to this request. Discovery is

21   continuing, and Defendant reserves its right to supplement its response to this request.

22   **REQUEST FOR PRODUCTION NO. 15**

23   Please produce the investigator's notes that were created in response to PLAINTIFF's

24   complaint(s) or allegation(s) that he was called a "jiggaboo".

25   **RESPONSE TO REQUEST FOR PRODUCTION NO. 15**

26   Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

27   vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

28   that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

'jiggaboo'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 16**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF that he was called a "porch monkey".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by PLAINTIFF that he was called a 'porch monkey'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 17**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a "porch monkey".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a 'porch monkey'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1  overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it

2  seeks the production of electronically stored information (including, but not limited to emails,

3  texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to

4  the claims in this action.   Defendant also objects to this request to the extent that it seeks

5  documents protected by the attorney-client privilege, the attorney work product doctrine and/or

6  other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

7  the extent it calls for documents that are protected from disclosure by third party privacy rights

8  under the Federal and California constitutions and applicable statutes. Defendant objects to this

9  request to the extent it seeks the production of documents that are equally available to Plaintiff.

10  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

11  and this request is therefore inapplicable to Defendant.

12      Subject to and without waiving its objections, Defendant responds: Despite a diligent

13  search and reasonable inquiry Defendant, cannot comply with this request because no documents

14  in Defendant's possession, custody or control are responsive to this request. Discovery is

15  continuing, and Defendant reserves its right to supplement its response to this request.

16  **REQUEST FOR PRODUCTION NO. 18**

17      Please produce any and all statements from employees who were interviewed regarding

18  PLAINTIFF's complaint(s) or allegation(s) that he was called a "porch monkey".

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18**

20      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

21  vague and ambiguous, including, but not limited to, its use of the term "statements" and the

22  phrase "PLAINTIFF's complaint(s) or allegation(s) that he was called a 'porch monkey'."

23  Defendant further objects to this request as burdensome, oppressive and harassing to the extent

24  that it seeks documents not relevant to any party's claims or defenses or that are not proportional

25  to the needs of this case. Defendant objects to this request on the grounds that it is overbroad,

26  vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the

27  production of electronically stored information (including, but not limited to emails, texts and

28  meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   in this action.   Defendant also objects to this request to the extent that it seeks documents

2   protected by the attorney-client privilege, the attorney work product doctrine and/or other

3   privileges, protections, or doctrines of similar effect. Defendant objects to this request to the

4   extent it calls for documents that are protected from disclosure by third party privacy rights under

5   the Federal and California constitutions and applicable statutes. Defendant objects to this request

6   to the extent it seeks the production of documents that are equally available to Plaintiff.

7   Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

8   and this request is therefore inapplicable to Defendant.

9       Subject to and without waiving its objections, Defendant responds: Despite a diligent

10   search and reasonable inquiry Defendant, cannot comply with this request because no documents

11   in Defendant's possession, custody or control are responsive to this request. Discovery is

12   continuing, and Defendant reserves its right to supplement its response to this request.

13   **REQUEST FOR PRODUCTION NO. 19**

14       Please produce the investigator's notes that were created in response to PLAINTIFF's

15   complaint(s) or allegation(s) that he was called a "porch monkey".

16   **RESPONSE TO REQUEST FOR PRODUCTION NO. 19**

17       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18   vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

19   that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a

20   'porch monkey'."   Defendant further objects to this request as burdensome, oppressive and

21   harassing to the extent that it seeks documents not relevant to any party's claims or defenses or

22   that are not proportional to the needs of this case. Defendant objects to this request on the grounds

23   that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the

24   extent it seeks the production of electronically stored information (including, but not limited to

25   emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

26   proportion to the claims in this action.   Defendant also objects to this request to the extent that it

27   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

28   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

18

1  request to the extent it calls for documents that are protected from disclosure by third party

2  privacy rights under the Federal and California constitutions and applicable statutes. Defendant

3  objects to this request to the extent it seeks the production of documents that are equally available

4  to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee

5  of Defendant and this request is therefore inapplicable to Defendant.

6        Subject to and without waiving its objections, Defendant responds: Despite a diligent

7  search and reasonable inquiry Defendant, cannot comply with this request because no documents

8  in Defendant's possession, custody or control are responsive to this request. Discovery is

9  continuing, and Defendant reserves its right to supplement its response to this request.

10  **REQUEST FOR PRODUCTION NO. 20**

11        Please produce all DOCUMENTS RELATING TO all complaint(s) made by

12  PLAINTIFF that he was called a "mayate".

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 20**

14        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

15  vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by

16  PLAINTIFF that he was called a 'mayate'."  Defendant further objects to this request as

17  burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

18  party's claims or defenses or that are not proportional to the needs of this case, especially given

19  that this request seeks the production of all documents "RELATING TO" other documents.

20  Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to

21  time. Defendant objects to this request to the extent it seeks the production of electronically stored

22  information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

23  oppressive in the context of and in proportion to the claims in this action.  Defendant also objects

24  to this request to the extent that it seeks documents protected by the attorney-client privilege, the

25  attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

26  Defendant objects to this request to the extent it calls for documents that are protected from

27  disclosure by third party privacy rights under the Federal and California constitutions and

28  applicable statutes. Defendant objects to this request to the extent it seeks the production of

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 21**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a "mayate".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a 'mayate." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 22**

Please produce any and all statements from employees who were interviewed regarding PLAINTIFF's complaint(s) or allegation(s) that he was called a "mayate".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaint(s) or allegation(s) that he was called a 'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents

1  in Defendant's possession, custody or control are responsive to this request. Discovery is

2  continuing, and Defendant reserves its right to supplement its response to this request.

3  **REQUEST FOR PRODUCTION NO. 23**

4      Please produce the investigator's notes that were created in response to PLAINTIFF's

5  complaint(s) or allegation(s) that he was called a "mayate".

6  **RESPONSE TO REQUEST FOR PRODUCTION NO. 23**

7      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

8  vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

9  that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a

10 'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to

11 the extent that it seeks documents not relevant to any party's claims or defenses or that are not

12 proportional to the needs of this case. Defendant objects to this request on the grounds that it is

13 overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it

14 seeks the production of electronically stored information (including, but not limited to emails,

15 texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to

16 the claims in this action.  Defendant also objects to this request to the extent that it seeks

17 documents protected by the attorney-client privilege, the attorney work product doctrine and/or

18 other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

19 the extent it calls for documents that are protected from disclosure by third party privacy rights

20 under the Federal and California constitutions and applicable statutes. Defendant objects to this

21 request to the extent it seeks the production of documents that are equally available to Plaintiff.

22 Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

23 and this request is therefore inapplicable to Defendant.

24     Subject to and without waiving its objections, Defendant responds: Despite a diligent

25 search and reasonable inquiry Defendant, cannot comply with this request because no documents

26 in Defendant's possession, custody or control are responsive to this request. Discovery is

27 continuing, and Defendant reserves its right to supplement its response to this request.

28 ///

**REQUEST FOR PRODUCTION NO. 24**

Please produce all DOCUMENTS RELATING TO all complaint(s) made by PLAINTIFF that he was called a "mono".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made by PLAINTIFF that he was called a 'mono'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 25**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU

Case No. 3:17-cv-06748-WHO

1   regarding Plaintiff's complaint(s) or allegation(s) that he was called a "mono".

2   **RESPONSE TO REQUEST FOR PRODUCTION NO. 25**

3       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

4   vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted

5   by YOU regarding Plaintiff's complaint(s) or allegation(s) that he was called a 'mono'."

6   Defendant further objects to this request as burdensome, oppressive and harassing to the extent

7   that it seeks documents not relevant to any party's claims or defenses or that are not proportional

8   to the needs of this case. Defendant objects to this request on the grounds that it is overbroad,

9   vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the

10  production of electronically stored information (including, but not limited to emails, texts and

11  meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims

12  in this action.   Defendant also objects to this request to the extent that it seeks documents

13  protected by the attorney-client privilege, the attorney work product doctrine and/or other

14  privileges, protections, or doctrines of similar effect. Defendant objects to this request to the

15  extent it calls for documents that are protected from disclosure by third party privacy rights under

16  the Federal and California constitutions and applicable statutes. Defendant objects to this request

17  to the extent it seeks the production of documents that are equally available to Plaintiff.

18  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

19  and this request is therefore inapplicable to Defendant.

20      Subject to and without waiving its objections, Defendant responds: Despite a diligent

21  search and reasonable inquiry Defendant, cannot comply with this request because no documents

22  in Defendant's possession, custody or control are responsive to this request. Discovery is

23  continuing, and Defendant reserves its right to supplement its response to this request.

24  **REQUEST FOR PRODUCTION NO. 26**

25      Please produce any and all statements from employees who were interviewed regarding

26  PLAINTIFF's complaint(s) or allegation(s) that he was called a "mono".

27  **RESPONSE TO REQUEST FOR PRODUCTION NO. 26**

28      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaint(s) or allegation(s) that he was called a 'mono'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 27**

Please produce the investigator's notes that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a "mono".

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to PLAINTIFF's complaint(s) or allegation(s) that he was called a 'mono'." Defendant further objects to this request as burdensome, oppressive and harassing to

1   the extent that it seeks documents not relevant to any party's claims or defenses or that are not

2   proportional to the needs of this case. Defendant objects to this request on the grounds that it is

3   overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it

4   seeks the production of electronically stored information (including, but not limited to emails,

5   texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to

6   the claims in this action.  Defendant also objects to this request to the extent that it seeks

7   documents protected by the attorney-client privilege, the attorney work product doctrine and/or

8   other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

9   the extent it calls for documents that are protected from disclosure by third party privacy rights

10  under the Federal and California constitutions and applicable statutes. Defendant objects to this

11  request to the extent it seeks the production of documents that are equally available to Plaintiff.

12  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant

13  and this request is therefore inapplicable to Defendant.

14          Subject to and without waiving its objections, Defendant responds: Despite a diligent

15  search and reasonable inquiry Defendant, cannot comply with this request because no documents

16  in Defendant's possession, custody or control are responsive to this request. Discovery is

17  continuing, and Defendant reserves its right to supplement its response to this request.

18  **REQUEST FOR PRODUCTION NO. 28**

19          Please produce all DOCUMENTS RELATING TO PLAINTIFF's complaints about Judy

20  Timbreza.

21  **RESPONSE TO REQUEST FOR PRODUCTION NO. 28**

22          Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

23  vague and ambiguous, including, but not limited to, its use of the phrase "PLAINTIFF's

24  complaints about Judy Timbreza."  Defendant further objects to this request as burdensome,

25  oppressive and harassing to the extent that it seeks documents not relevant to any party's claims

26  or defenses or that are not proportional to the needs of this case, especially given that this request

27  seeks the production of all documents "RELATING TO" other documents. Defendant objects to

28  this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 29**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaints about Judy Timbreza.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaints about Judy Timbreza."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 30**

Please produce any and all statements from employees who were interviewed regarding PLAINTIFF's complaints about Judy Timbreza.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaints about Judy Timbreza."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving its objections, Defendant responds: Despite a diligent search and reasonable inquiry Defendant, cannot comply with this request because no documents in Defendant's possession, custody or control are responsive to this request. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 31**

Please produce all DOCUMENTS RELATING TO PLAINTIFF's complaints about Ramon Martinez.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "PLAINTIFF's complaints about Ramon Martinez."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that neither Plaintiff nor Ramon Martinez was an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 32**

Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU regarding Plaintiff's complaints about Ramon Martinez.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted by YOU regarding Plaintiff's complaints about Ramon Martinez."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1  on the grounds that neither Plaintiff nor Ramon Martinez was an employee of Defendant and this

2  request is therefore inapplicable to Defendant.

3      Subject to and without waiving objections, Defendant responds: Subject to and without

4  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

5  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

6  and Defendant reserves its right to supplement its response to this request.

7  **REQUEST FOR PRODUCTION NO. 33**

8      Please produce any and all statements from employees who were interviewed regarding

9  PLAINTIFF's complaints about Ramon Martinez.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 33**

11      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

12  vague and ambiguous, including, but not limited to, its use of the term "statements" and the

13  phrase "PLAINTIFF's complaints about Ramon Martine."  Defendant further objects to this

14  request as burdensome, oppressive and harassing to the extent that it seeks documents not

15  relevant to any party's claims or defenses or that are not proportional to the needs of this case.

16  Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to

17  time. Defendant objects to this request to the extent it seeks the production of electronically stored

18  information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

19  oppressive in the context of and in proportion to the claims in this action.  Defendant also objects

20  to this request to the extent that it seeks documents protected by the attorney-client privilege, the

21  attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

22  Defendant objects to this request to the extent it calls for documents that are protected from

23  disclosure by third party privacy rights under the Federal and California constitutions and

24  applicable statutes. Defendant objects to this request to the extent it seeks the production of

25  documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds

26  that neither Plaintiff nor Ramon Martinez was an employee of Defendant and this request is

27  therefore inapplicable to Defendant.

28  ///

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

1  Subject to and without waiving objections, Defendant responds: Subject to and without

2  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

3  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

4  and Defendant reserves its right to supplement its response to this request.

5  **REQUEST FOR PRODUCTION NO. 34**

6  Please produce the investigator's notes that were created in response to PLAINTIFF's

7  complaints about Ramon Martinez.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 34**

9  Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

10  vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes

11  that were created in response to PLAINTIFF's complaints about Ramon Martinez."  Defendant

12  further objects to this request as burdensome, oppressive and harassing to the extent that it seeks

13  documents not relevant to any party's claims or defenses or that are not proportional to the needs

14  of this case. Defendant objects to this request on the grounds that it is overbroad, vague and

15  ambiguous as to time. Defendant objects to this request to the extent it seeks the production of

16  electronically stored information (including, but not limited to emails, texts and meta-data) as

17  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

18  Defendant also objects to this request to the extent that it seeks documents protected by the

19  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

20  or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

21  that are protected from disclosure by third party privacy rights under the Federal and California

22  constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

23  production of documents that are equally available to Plaintiff.  Defendant objects to this request

24  on the grounds that neither Plaintiff nor Ramon Martinez was an employee of Defendant and this

25  request is therefore inapplicable to Defendant.

26  Subject to and without waiving objections, Defendant responds: Subject to and without

27  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

28  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

1   and Defendant reserves its right to supplement its response to this request.

2   **REQUEST FOR PRODUCTION NO. 35**

3        Please produce all DOCUMENTS RELATING TO PLAINTIFF's complaint about the

4   racist effigy drawing at the TESLA FACTORY.

5   **RESPONSE TO REQUEST FOR PRODUCTION NO. 35**

6        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

7   vague and ambiguous, including, but not limited to, its use of the phrase "PLAINTIFF's

8   complaint about the racist effigy drawing."   Defendant further objects to this request as

9   burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

10  party's claims or defenses or that are not proportional to the needs of this case, especially given

11  that this request seeks the production of all documents "RELATING TO" other documents.

12  Defendant objects to this request to the extent it seeks the production of electronically stored

13  information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

14  oppressive in the context of and in proportion to the claims in this action.  Defendant also objects

15  to this request to the extent that it seeks documents protected by the attorney-client privilege, the

16  attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

17  Defendant objects to this request to the extent it calls for documents that are protected from

18  disclosure by third party privacy rights under the Federal and California constitutions and

19  applicable statutes. Defendant objects to this request to the extent it seeks the production of

20  documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds

21  that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to

22  Defendant.

23       Subject to and without waiving objections, Defendant responds: Subject to and without

24  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

25  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

26  and Defendant reserves its right to supplement its response to this request.

27  **REQUEST FOR PRODUCTION NO. 36**

28       Please produce all DOCUMENTS RELATING TO any investigation conducted by YOU

1    regarding PLAINTIFF's complaint about the racist effigy drawing at the TESLA FACTORY.

2    **RESPONSE TO REQUEST FOR PRODUCTION NO. 36**

3         Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

4    vague and ambiguous, including, but not limited to, its use of the phrase "investigation conducted

5    by YOU regarding PLAINTIFF's complaint about the racist effigy drawing."  Defendant further

6    objects to this request as burdensome, oppressive and harassing to the extent that it seeks

7    documents not relevant to any party's claims or defenses or that are not proportional to the needs

8    of this case, especially given that this request seeks the production of all documents "RELATING

9    TO" other documents. Defendant objects to this request to the extent it seeks the production of

10   electronically stored information (including, but not limited to emails, texts and meta-data) as

11   burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

12   Defendant also objects to this request to the extent that it seeks documents protected by the

13   attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

14   or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

15   that are protected from disclosure by third party privacy rights under the Federal and California

16   constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

17   production of documents that are equally available to Plaintiff.  Defendant objects to this request

18   on the grounds that Plaintiff was not an employee of Defendant and this request is therefore

19   inapplicable to Defendant.

20        Subject to and without waiving objections, Defendant responds: Subject to and without

21   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

22   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

23   and Defendant reserves its right to supplement its response to this request.

24   **REQUEST FOR PRODUCTION NO. 37**

25        Please produce any and all statements from employees who were interviewed regarding

26   PLAINTIFF's complaint about the racist effigy drawing at the TESLA FACTORY.

27   **RESPONSE TO REQUEST FOR PRODUCTION NO. 37**

28        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "PLAINTIFF's complaint about the racist effigy drawing." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff. Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 38**

Please produce the investigator's notes that were created in response to PLAINTIFF's complaint about the racist effigy drawing at the TESLA FACTORY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to PLAINTIFF's complaint about the racist effigy drawing." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional

to the needs of this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the production of documents that are equally available to Plaintiff.  Defendant objects to this request on the grounds that Plaintiff was not an employee of Defendant and this request is therefore inapplicable to Defendant.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 39**

Please produce any photographs or images that YOU collected when investigating PLAINTIFF's complaint about the racist effigy drawing at the TESLA FACTORY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "photographs or images that YOU collected when investigating PLAINTIFF's complaint about the racist effigy drawing." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

1   attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

2   or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

3   that are protected from disclosure by third party privacy rights under the Federal and California

4   constitutions and applicable statutes. Defendant objects to this request to the extent it seeks the

5   production of documents that are equally available to Plaintiff.  Defendant objects to this request

6   on the grounds that Plaintiff was not an employee of Defendant and this request is therefore

7   inapplicable to Defendant.

8        Subject to and without waiving its objections, Defendant responds: Despite a diligent

9   search and reasonable inquiry Defendant, cannot comply with this request because no documents

10  in Defendant's possession, custody or control are responsive to this request. Discovery is

11  continuing, and Defendant reserves its right to supplement its response to this request.

12  **REQUEST FOR PRODUCTION NO. 40**

13       Please produce all DOCUMENTS RELATING TO all complaint(s) made by any

14  employee, contractor and/or agent about the use of RACIAL SLURS at the TESLA FACTORY

15  from 2012 to present. (For the purposes of responding to this request for production, the phrase

16  "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or

17  any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass

18  equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and

19  "mayate".)

20  **RESPONSE TO REQUEST FOR PRODUCTION NO. 40**

21       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

22  vague and ambiguous, including, but not limited to, its use of the phrases "complaint(s) made by

23  any employee, contractor and/or agent about the use of RACIAL SLURS," "'nigger', 'nigga',

24  'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited

25  to, 'negrito', 'negrita', 'mono', and 'mayate'."  Defendant further objects to this request as

26  burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

27  party's claims or defenses or that are not proportional to the needs of this case, especially given

28  that this request seeks the production of all documents "RELATING TO" other documents and

seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 41**

Please produce any and all statements from any PERSON who was interviewed regarding complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof, "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and "mayate".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 41**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrases "complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 42**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and "mayate".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

FPDOCS 35497578.1

this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 43**

Please produce any photographs, images, or videos that YOU collected in response to complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and "mayate".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 43**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "photographs, images or videos that YOU collected in response to complaint(s) made by any employee, contractor and/or agent about the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   electronically stored information (including, but not limited to emails, texts and meta-data) as

2   burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

3   Defendant also objects to this request to the extent that it seeks documents protected by the

4   attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

5   or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents

6   that are protected from disclosure by third party privacy rights under the Federal and California

7   constitutions and applicable statutes.

8   **REQUEST FOR PRODUCTION NO. 44**

9       Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of

10  any complaint(s) made by any employee, contractor and/or agent about the use of RACIAL

11  SLURS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this

12  request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the

13  terms "nigger", "nigga", "ninga", or any variant thereof; "porch monkey"; "monkey"; or

14  "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not

15  limited to, "negrito", "negrita", "mono", and "mayate".)

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 44**

17      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18  vague and ambiguous, including, but not limited to, its use of the phrases "discipline imposed as

19  a result of complaint(s) made by any employee, contractor and/or agent about the use of RACIAL

20  SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish,

21  including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'." Defendant further

22  objects to this request as burdensome, oppressive and harassing to the extent that it seeks

23  documents not relevant to any party's claims or defenses or that are not proportional to the needs

24  of this case, especially given that this request seeks the production of all documents "RELATING

25  TO" other documents and seeks the production of documents unrelated to Plaintiff and during

26  periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence

27  that is not relevant to the claims and defenses in this case. Defendant objects to this request to

28  the extent it seeks the production of electronically stored information (including, but not limited

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

2   proportion to the claims in this action.  Defendant also objects to this request to the extent that it

3   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

4   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

5   request to the extent it calls for documents that are protected from disclosure by third party

6   privacy rights under the Federal and California constitutions and applicable statutes.

7   **REQUEST FOR PRODUCTION NO. 45**

8        Please produce all DOCUMENTS RELATING TO all complaint(s) made any employee,

9   contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST

10  HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of

11  responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE

12  SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a

13  swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the

14  "Nazi eagle"; and slogans including "white power" or "fourteen words".)

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 45**

16       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

17  vague and ambiguous, including, but not limited to, its use of the phrases "complaint(s) made

18  any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE

19  SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE

20  SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a

21  swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the

22  'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further

23  objects to this request as burdensome, oppressive and harassing to the extent that it seeks

24  documents not relevant to any party's claims or defenses or that are not proportional to the needs

25  of this case, especially given that this request seeks the production of all documents "RELATING

26  TO" other documents and seeks the production of documents unrelated to Plaintiff and during

27  periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence

28  that is not relevant to the claims and defenses in this case. Defendant objects to this request to

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 46**

Please produce any and all statements from any PERSON who was interviewed regarding complaint(s) made by any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrases "complaint(s) made any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant

objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 47**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 47**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "the investigator's notes that were created in response to complaint(s) made any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The

request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 48**

Please produce any photographs, videos, or images that YOU collected when investigating complaint(s) made by any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 48**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "photographs, videos or images that YOU collected when investigating complaint(s) made any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 49**

Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of any complaint(s) made by any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "discipline imposed as a result of complaint(s) made any employee, contractor and/or agent about SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'." Defendant further

objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 50**

Please produce all DOCUMENTS RELATING TO all complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited

Case No. 3:17-cv-06748-WHO
NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 51**

Please produce any and all statements from any PERSON who was interviewed regarding complaint(s) made by any employee, contractor and/or agent regarding references to slavery or slave labor at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 51**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

///

**REQUEST FOR PRODUCTION NO. 52**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent regarding references to slavery or slave labor at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 52**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 53**

Please produce any photographs, videos, or images that YOU collected when investigating complaint(s) made by any employee, contractor and/or agent regarding references to slavery or slave labor at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 53**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "photographs, videos,

or images that YOU collected when investigating complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 54**

Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of any complaint(s) made by any employee, contractor and/or agent regarding references to slavery or slave labor at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 54**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "discipline imposed as a result of any complaint(s) made any employee, contractor and/or agent regarding references to slavery or slave labor." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in

this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 55**

Please produce all DOCUMENTS RELATING TO all complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 55**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickanniny'- or 'golliwog'-style depictions of Black individuals."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production

of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 56**

Please produce any and all statements from any PERSON who was interviewed regarding complaint(s) made by any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 56**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrases "complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickanniny'- or 'golliwog'-style depictions of

Black individuals." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 57**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 57**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "the investigator's notes that were created in response to complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or

1  artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the

2  confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickanniny'- or

3  'golliwog'-style depictions of Black individuals."  Defendant further objects to this request as

4  burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any

5  party's claims or defenses or that are not proportional to the needs of this case, especially given

6  that this request seeks the production of documents unrelated to Plaintiff and during periods when

7  Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not

8  relevant to the claims and defenses in this case. Defendant objects to this request to the extent it

9  seeks the production of electronically stored information (including, but not limited to emails,

10  texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to

11  the claims in this action.  Defendant also objects to this request to the extent that it seeks

12  documents protected by the attorney-client privilege, the attorney work product doctrine and/or

13  other privileges, protections, or doctrines of similar effect. Defendant objects to this request to

14  the extent it calls for documents that are protected from disclosure by third party privacy rights

15  under the Federal and California constitutions and applicable statutes.

16  **REQUEST FOR PRODUCTION NO. 58**

17         Please produce any photographs, videos, or images that YOU collected when

18  investigating complaint(s) made by any employee, contractor and/or agent regarding

19  RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012

20  to present. (For the purposes of responding to this request for production, the phrase

21  "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited

22  to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming

23  cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and

24  "pickanniny"- or "golliwog"-style depictions of Black individuals.)

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 58**

26         Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

27  vague and ambiguous, including, but not limited to, its use of the phrases "photographs, videos

28  or images that YOU collected when investigating complaint(s) made any employee, contractor

and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickanniny'- or 'golliwog'-style depictions of Black individuals." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 59**

Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of any complaint(s) made by any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "RACIALLY OFFENSIVE DRAWINGS OR ARTWORK" shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; "88"; the confederate flag; twin lightning bolts; the "iron cross"; the "Nazi eagle"; and "pickanniny"- or "golliwog"-style depictions of Black individuals.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 59**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

vague and ambiguous, including, but not limited to, its use of the phrases "discipline imposed as a result of any complaint(s) made any employee, contractor and/or agent regarding RACIALLY OFFENSIVE DRAWINGS OR ARTWORK," "'RACIALLY OFFENSIVE DRAWINGS OR ARTWORK' shall include, though is not limited to, drawings or artwork depicting one or more of the following items: noose; swastika; flaming cross; '88'; the confederate flag; twin lightning bolts; the 'iron cross'; the 'Nazi eagle'," and "'pickaninny'- or 'golliwog'-style depictions of Black individuals." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 60**

Please produce all DOCUMENTS RELATING TO all complaint(s) made any employee, contractor and/or agent regarding racial harassment at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 60**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaint(s) made any employee, contractor and/or agent regarding racial harassment." Defendant further objects to

this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 61**

Please produce any and all statements from any PERSON who was interviewed regarding complaint(s) made by any employee, contractor and/or agent regarding racial harassment at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 61**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the term "statements" and the phrase "complaint(s) made any employee, contractor and/or agent regarding racial harassment." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 62**

Please produce the investigator's notes that were created in response to complaint(s) made by any employee, contractor and/or agent regarding racial harassment at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 62**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "the investigator's notes that were created in response to complaint(s) made any employee, contractor and/or agent regarding racial harassment." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

///

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

**REQUEST FOR PRODUCTION NO. 63**

Please produce all DOCUMENTS RELATING TO any discipline imposed as a result of any complaint(s) made by any employee, contractor and/or agent regarding racial harassment at the TESLA FACTORY from 2012 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 63**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "discipline imposed as a result of any complaint(s) made any employee, contractor and/or agent regarding racial harassment."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "RELATING TO" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 64**

Please produce all DOCUMENTS detailing EXTERNAL COMPLAINTS of harassment based on race or color by any employee, contractor and/or agent at the TESLA FACTORY since 2012. (In responding to this request, the term EXTERNAL COMPLAINT encompasses complaints made to a governmental or administrative entity, including, though not limited to, state and federal courts; the EEOC; the DFEH; the DIR; the DLSE; OSHA; and CAL-OSHA.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 64**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS detailing EXTERNAL COMPLAINTS of harassment based on race or color by any employee, contractor and/or agent," and "EXTERNAL COMPLAINT encompasses complaints made to a governmental or administrative entity, including, though not limited to, state and federal courts; the EEOC; the DFEH; the DIR; the DLSE; OSHA; and CAL-OSHA." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of all documents "detailing" other documents and seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes. Defendant objects to this request on the grounds that it seeks the production of documents that are equally available to Plaintiff as a matter of public record.

**REQUEST FOR PRODUCTION NO. 65**

Please produce the entire investigation files for any EXTERNAL COMPLAINTS of harassment based on race or color by any employee, contractor and/or agent at the TESLA FACTORY since 2012. (In responding to this request, the term EXTERNAL COMPLAINT encompasses complaints made to a governmental or administrative entity, including, though not limited to, state and federal courts; the EEOC; the DFEH; the DIR; the DLSE; OSHA; and CAL-

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1    OSHA.)

2    **RESPONSE TO REQUEST FOR PRODUCTION NO. 65**

3        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

4    vague and ambiguous, including, but not limited to, its use of the phrases "entire investigation

5    files for any EXTERNAL COMPLAINTS of harassment based on race or color by any employee,

6    contractor and/or agent," and "EXTERNAL COMPLAINT encompasses complaints made to a

7    governmental or administrative entity, including, though not limited to, state and federal courts;

8    the EEOC; the DFEH; the DIR; the DLSE; OSHA; and CAL-OSHA." Defendant further objects

9    to this request as burdensome, oppressive and harassing to the extent that it seeks documents not

10   relevant to any party's claims or defenses or that are not proportional to the needs of this case,

11   especially given that this request seeks the production of documents unrelated to Plaintiff and

12   during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too"

13   evidence that is not relevant to the claims and defenses in this case. Defendant objects to this

14   request to the extent it seeks the production of electronically stored information (including, but

15   not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context

16   of and in proportion to the claims in this action. Defendant also objects to this request to the

17   extent that it seeks documents protected by the attorney-client privilege, the attorney work

18   product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant

19   objects to this request to the extent it calls for documents that are protected from disclosure by

20   third party privacy rights under the Federal and California constitutions and applicable statutes.

21   Defendant objects to this request on the grounds that it seeks the production of documents that

22   are equally available to Plaintiff as a matter of public record.

23   **REQUEST FOR PRODUCTION NO. 66**

24       Please produce documents that reflect, evidence, or describe all of YOUR race

25   harassment or discrimination policies in effect at the TESLA FACTORY from 2010 to present.

26   **RESPONSE TO REQUEST FOR PRODUCTION NO. 66**

27       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

28   vague and ambiguous, including, but not limited to, its use of the phrase "race harassment or

61                Case No. 3:17-cv-06748-WHO

discrimination policies in effect at the TESLA FACTORY."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of "documents that reflect, evidence, or describe" other documents and the production of documents during periods when Plaintiff did not work at Tesla. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 67**

Please produce all DOCUMENTS that discuss the procedures YOU instruct YOUR employees to follow when reporting harassment in the workplace at the TESLA FACTORY from 2010 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 67**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS that discuss the procedures YOU instruct YOUR employees to follow when reporting harassment in the workplace at the TESLA FACTORY."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents that "discuss" other documents and seeks the

1  production of documents during periods when Plaintiff did not work at Tesla. Defendant objects

2  to this request to the extent it seeks the production of electronically stored information (including,

3  but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the

4  context of and in proportion to the claims in this action.  Defendant also objects to this request to

5  the extent that it seeks documents protected by the attorney-client privilege, the attorney work

6  product doctrine and/or other privileges, protections, or doctrines of similar effect.

7         Subject to and without waiving objections, Defendant responds: Subject to and without

8  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

9  possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

10 and Defendant reserves its right to supplement its response to this request.

11 **REQUEST FOR PRODUCTION NO. 68**

12        Please produce all DOCUMENTS that discuss the policies and procedures that YOUR

13 employees follow when investigating claims of harassment at the TESLA FACTORY from 2012

14 to the present.

15 **RESPONSE TO REQUEST FOR PRODUCTION NO. 68**

16        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

17 vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS that

18 discuss the policies and procedures that YOUR employees follow when investigating claims of

19 harassment at the TESLA FACTORY."  Defendant further objects to this request as burdensome,

20 oppressive and harassing to the extent that it seeks documents not relevant to any party's claims

21 or defenses or that are not proportional to the needs of this case, especially given that this request

22 seeks the production of documents that "discuss" other documents and seeks the production of

23 documents during periods when Plaintiff did not work at Tesla. Defendant objects to this request

24 to the extent it seeks the production of electronically stored information (including, but not

25 limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of

26 and in proportion to the claims in this action.  Defendant also objects to this request to the extent

27 that it seeks documents protected by the attorney-client privilege, the attorney work product

28 doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   this request to the extent it seeks documents that are private, confidential, business sensitive

2   and/or protected as a trade secret.

3       Subject to and without waiving objections, Defendant responds: Subject to and without

4   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

5   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

6   and Defendant reserves its right to supplement its response to this request.

7   **REQUEST FOR PRODUCTION NO. 69**

8       Please produce all DOCUMENTS that constitute the policies, procedures, checklists or

9   manuals that are used or relied on by YOUR employees when investigating complaints of race

10  harassment or discrimination at the TESLA FACTORY from 2010 to present.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 69**

12      Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

13  vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS that

14  constitute the policies, procedures, checklists or manuals that are used or relied on by YOUR

15  employees when investigating complaints of race harassment or discrimination at the TESLA

16  FACTORY." Defendant further objects to this request as burdensome, oppressive and harassing

17  to the extent that it seeks documents not relevant to any party's claims or defenses or that are not

18  proportional to the needs of this case, especially given that this request seeks the production of

19  documents during periods when Plaintiff did not work at Tesla. Defendant objects to this request

20  to the extent it seeks the production of electronically stored information (including, but not

21  limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of

22  and in proportion to the claims in this action. Defendant also objects to this request to the extent

23  that it seeks documents protected by the attorney-client privilege, the attorney work product

24  doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to

25  this request to the extent it seeks documents that are private, confidential, business sensitive

26  and/or protected as a trade secret.

27      Subject to and without waiving objections, Defendant responds: Subject to and without

28  waiving its objections, Defendant responds: Defendant will produce responsive documents in its

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 70**

Please produce all pamphlets RELATED TO harassment that YOU have used or distributed to employees, agents or contractors that work at the TESLA FACTORY between 2010 and the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 70**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "pamphlets RELATED TO harassment that YOU have used or distributed to employees, agents or contractors that work at the TESLA FACTORY." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents during periods when Plaintiff did not work at Tesla. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 71**

Please produce all policies on harassment that YOU have posted from 2010 to the present in the TESLA FACTORY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 71**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "policies on harassment that YOU have posted from 2010 to the present in the TESLA FACTORY." Defendant further

1  objects to this request as burdensome, oppressive and harassing to the extent that it seeks

2  documents not relevant to any party's claims or defenses or that are not proportional to the needs

3  of this case, especially given that this request seeks the production of documents during periods

4  when Plaintiff did not work at Tesla. Defendant objects to this request to the extent it seeks the

5  production of electronically stored information (including, but not limited to emails, texts and

6  meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims

7  in this action.

8        Subject to and without waiving its objections, Defendant responds: Despite a diligent

9  search and reasonable inquiry Defendant, cannot comply with this request because no documents

10  in Defendant's possession, custody or control are responsive to this request. Discovery is

11  continuing, and Defendant reserves its right to supplement its response to this request.

12  **REQUEST FOR PRODUCTION NO. 72**

13        Please produce all DOCUMENTS, materials and videotapes RELATED TO harassment

14  training YOU have conducted or facilitated for employees, agents or contractors at the TESLA

15  FACTORY from 2010 to the present.

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 72**

17        Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

18  vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS,

19  materials and videotapes RELATED TO harassment training YOU have conducted or facilitated

20  for employees, agents or contractors at the TESLA FACTORY."  Defendant further objects to

21  this request as burdensome, oppressive and harassing to the extent that it seeks documents not

22  relevant to any party's claims or defenses or that are not proportional to the needs of this case,

23  especially given that this request seeks the production of documents during periods when Plaintiff

24  did not work at Tesla. Defendant objects to this request to the extent it seeks the production of

25  electronically stored information (including, but not limited to emails, texts and meta-data) as

26  burdensome, costly and oppressive in the context of and in proportion to the claims in this action.

27  Defendant also objects to this request to the extent that it seeks documents protected by the

28  attorney-client privilege, the attorney work product doctrine and/or other privileges, protections,

1   or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents

2   that are private, confidential, business sensitive and/or protected as a trade secret.

3        Subject to and without waiving its objections, Defendant responds: Despite a diligent

4   search and reasonable inquiry Defendant, cannot comply with this request because no documents

5   in Defendant's possession, custody or control are responsive to this request. Discovery is

6   continuing, and Defendant reserves its right to supplement its response to this request.

7   **REQUEST FOR PRODUCTION NO. 73**

8        Please provide all DOCUMENTS related to any complaints made about Ramon Martinez

9   that involved harassment or discrimination based on race or color.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 73**

11       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

12  vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS related

13  to any complaints made about Ramon Martinez that involved harassment or discrimination based

14  on race or color."  Defendant further objects to this request as burdensome, oppressive and

15  harassing to the extent that it seeks documents not relevant to any party's claims or defenses or

16  that are not proportional to the needs of this case, especially given that this request seeks the

17  production of all documents "related to" other documents. Defendant objects to this request on

18  the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this

19  request to the extent it seeks the production of electronically stored information (including, but

20  not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context

21  of and in proportion to the claims in this action.  Defendant also objects to this request to the

22  extent that it seeks documents protected by the attorney-client privilege, the attorney work

23  product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant

24  objects to this request to the extent it calls for documents that are protected from disclosure by

25  third party privacy rights under the Federal and California constitutions and applicable statutes.

26  Defendant objects to this request on the grounds that Ramon Martinez was not an employee of

27  Defendant and this request is therefore inapplicable to Defendant.

28  ///

**REQUEST FOR PRODUCTION NO. 74**

Please produce DOCUMENTS sufficient to describe the business relationship between YOU and Defendant Tesla, Inc. This request includes, though is not limited to, contracts and memoranda of understanding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 74**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sufficient to describe the business relationship between YOU and Defendant Tesla, Inc." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret.

**REQUEST FOR PRODUCTION NO. 75**

Please produce DOCUMENTS sufficient to describe the business relationship between YOU and Defendant Citistaff Solutions, Inc. This request includes, though is not limited to, contracts and memoranda of understanding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 75**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sufficient to describe the business relationship between YOU and Defendant Citistaff Solutions, Inc."  Defendant further objects to this request as burdensome, oppressive and harassing to the

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or protected as a trade secret.

**REQUEST FOR PRODUCTION NO. 76**

Please produce DOCUMENTS sufficient to describe the business relationship between YOU and Defendant West Valley Engineering, Inc. This request includes, though is not limited to, contracts and memoranda of understanding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 76**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sufficient to describe the business relationship between YOU and Defendant West Valley Engineering, Inc."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it seeks documents that are private, confidential, business sensitive and/or

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1    protected as a trade secret.

2    **REQUEST FOR PRODUCTION NO. 77**

3        Please produce all DOCUMENTS, including, but not limited to e-mails, text messages

4    and instant messages sent or received by Wayne Jackson regarding the use of RACIAL SLURS

5    at the TESLA FACTORY. (For the purposes of responding to this request for production, the

6    phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga",

7    "ninga", or any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also

8    encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita",

9    "mono", and "mayate".)

10   **RESPONSE TO REQUEST FOR PRODUCTION NO. 77**

11       Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

12   vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS …

13   regarding the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and

14   "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and

15   'mayate'." Defendant further objects to this request as burdensome, oppressive and harassing to

16   the extent that it seeks documents not relevant to any party's claims or defenses or that are not

17   proportional to the needs of this case, especially given that this request seeks the production of

18   documents unrelated to Plaintiff. Defendant objects to this request on the grounds that it is

19   overbroad, vague and ambiguous as to time. The request impermissibly seeks "me too" evidence

20   that is not relevant to the claims and defenses in this case. Defendant objects to this request to

21   the extent it seeks the production of electronically stored information (including, but not limited

22   to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

23   proportion to the claims in this action. Defendant also objects to this request to the extent that it

24   seeks documents protected by the attorney-client privilege, the attorney work product doctrine

25   and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

26   request to the extent it calls for documents that are protected from disclosure by third party

27   privacy rights under the Federal and California constitutions and applicable statutes.

28   ///

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

**REQUEST FOR PRODUCTION NO. 78**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Wayne Jackson regarding PLAINTIFF OWEN DIAZ.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 78**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding PLAINTIFF OWEN DIAZ." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 79**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Nancy Uhlenbrock regarding the use of RACIAL SLURS at the TESLA FACTORY. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof, "porch monkey"; "monkey"; "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita",

"mono", and "mayate".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 79**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 80**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Terri Garrett regarding the use of RACIAL SLURS at the TESLA FACTORY. (For the purposes of responding to this request for production, the phrase "RACIAL SLURS" shall include, but is not limited to, the terms "nigger", "nigga", "ninga", or any variant thereof; "porch monkey"; "monkey"; or "jiggaboo". The term shall also encompass equivalent words in Spanish, including, though not limited to, "negrito", "negrita", "mono", and "mayate".)

///

**RESPONSE TO REQUEST FOR PRODUCTION NO. 80**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding the use of RACIAL SLURS," "'nigger', 'nigga', 'ninga', or any variant thereof," and "equivalent words in Spanish, including, though not limited to, 'negrito', 'negrita', 'mono', and 'mayate'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff. Defendant objects to this request on the grounds that it is overbroad, vague and ambiguous as to time. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 81**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Wayne Jackson regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 81**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 82**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Nancy Uhlenbrock regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

///

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

**RESPONSE TO REQUEST FOR PRODUCTION NO. 82**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'." Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 83**

Please produce all DOCUMENTS, including, but not limited to e-mails, text messages and instant messages sent or received by Terri Garrett regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS at the TESLA FACTORY from 2012 to present. (For the purposes of responding to this request for production, the phrase "SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS" shall include, but is not limited to, symbols such as a swastika, flaming cross, "88", the confederate flag, twin lightning bolts, the "iron cross", or the "Nazi eagle"; and slogans including "white power" or "fourteen words".)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 83**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrases "DOCUMENTS … regarding SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS," "'SYMBOLS AND SLOGANS OF WHITE SUPREMACIST HATE GROUPS' shall include, but is not limited to, symbols such as a swastika, flaming cross, '88', the confederate flag, twin lightning bolts, the 'iron cross', or the 'Nazi eagle'," and "slogans including 'white power' or 'fourteen words'."  Defendant further objects to this request as burdensome, oppressive and harassing to the extent that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents unrelated to Plaintiff and during periods when Plaintiff did not work at Tesla. The request impermissibly seeks "me too" evidence that is not relevant to the claims and defenses in this case. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action. Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

**REQUEST FOR PRODUCTION NO. 84**

Please produce all DOCUMENTS reflecting complaints from other employees at the TESLA FACTORY about Plaintiff Owen Diaz's attitude or demeanor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 84**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "complaints from other employees at the TESLA FACTORY about Plaintiff Owen Diaz's attitude or demeanor." Defendant further objects to this request as burdensome, oppressive and harassing to the extent

that it seeks documents not relevant to any party's claims or defenses or that are not proportional to the needs of this case, especially given that this request seeks the production of documents "reflecting" other documents. Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

Subject to and without waiving objections, Defendant responds: Subject to and without waiving its objections, Defendant responds: Defendant will produce responsive documents in its possession, custody and control, if any, to the extent they can be located. Discovery is continuing, and Defendant reserves its right to supplement its response to this request.

**REQUEST FOR PRODUCTION NO. 85**

Please produce all DOCUMENTS that support any defense YOU have pleaded or will plead in this action.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 85**

Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain, vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS that support any defense YOU have pleaded or will plead in this action."  Defendant objects to this request to the extent it seeks the production of electronically stored information (including, but not limited to emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in proportion to the claims in this action.  Defendant also objects to this request to the extent that it seeks documents protected by the attorney-client privilege, the attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this request to the extent it calls for documents that are protected from disclosure by third party privacy rights under the Federal and California constitutions and applicable statutes.

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE

1   Subject to and without waiving objections, Defendant responds: Subject to and without

2   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

3   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

4   and Defendant reserves its right to supplement its response to this request.

5   **REQUEST FOR PRODUCTION NO. 86**

6   Please produce all DOCUMENTS sent to YOU by Citistaff Solutions, Inc. regarding

7   PLAINTIFF Owen Diaz.

8   **RESPONSE TO REQUEST FOR PRODUCTION NO. 86**

9   Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

10   vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS sent to

11   YOU by Citistaff Solutions, Inc. regarding PLAINTIFF Owen Diaz."  Defendant further objects

12   to this request as burdensome, oppressive and harassing to the extent that it seeks documents not

13   relevant to any party's claims or defenses or that are not proportional to the needs of this case.

14   Defendant objects to this request to the extent it seeks the production of electronically stored

15   information (including, but not limited to emails, texts and meta-data) as burdensome, costly and

16   oppressive in the context of and in proportion to the claims in this action.  Defendant also objects

17   to this request to the extent that it seeks documents protected by the attorney-client privilege, the

18   attorney work product doctrine and/or other privileges, protections, or doctrines of similar effect.

19   Defendant objects to this request to the extent it calls for documents that are protected from

20   disclosure by third party privacy rights under the Federal and California constitutions and

21   applicable statutes. Defendant objects to this request to the extent it seeks the production of

22   documents that are equally available to Plaintiff.

23   Subject to and without waiving objections, Defendant responds: Subject to and without

24   waiving its objections, Defendant responds: Defendant will produce responsive documents in its

25   possession, custody and control, if any, to the extent they can be located. Discovery is continuing,

26   and Defendant reserves its right to supplement its response to this request.

27   **REQUEST FOR PRODUCTION NO. 87**

28   Please produce all DOCUMENTS sufficient to reflect your present financial condition,

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

1   including but not limited to, audited financial statements.

2   **RESPONSE TO REQUEST FOR PRODUCTION NO. 87**

3   　　　Objection. Defendant objects to this request on the grounds that it is overbroad, uncertain,

4   vague and ambiguous, including, but not limited to, its use of the phrase "DOCUMENTS

5   sufficient to reflect your present financial condition, including but not limited to, audited

6   financial statements."  Defendant further objects to this request as burdensome, oppressive and

7   harassing on the grounds that it seeks documents not relevant to any party's claims or defenses

8   or that are not proportional to the needs of this case. Defendant objects to this request to the

9   extent it seeks the production of electronically stored information (including, but not limited to

10  emails, texts and meta-data) as burdensome, costly and oppressive in the context of and in

11  proportion to the claims in this action.  Defendant also objects to this request to the extent that it

12  seeks documents protected by the attorney-client privilege, the attorney work product doctrine

13  and/or other privileges, protections, or doctrines of similar effect. Defendant objects to this

14  request to the extent it seeks documents that are private, confidential, business sensitive and/or

15  protected as a trade secret.

16  Date:  May 29, 2019                                    FISHER & PHILLIPS LLP

17

18                                           By:   _/s/ Juan C. Araneda_____

19                                                 JUAN C. ARANEDA
                                                   Attorneys for Defendant
20                                                 nextSource, Inc

21

22

23

24

25

26

27

28

NEXTSOURCE, INC.'S RESP. TO OWEN DIAZ'S REQUEST FOR PRODUCTION, SET ONE
FPDOCS 35497578.1

**VERIFICATION**

I have read the foregoing **DEFENDANT NEXTSOURCE, INC. RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES – SET ONE** and know its contents.

I am Chief Financial Officer of nextSource, Inc., a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on May _23_, 2019, at Nashville, Tennessee.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Kevin McGinn
Chief Financial Officer
nextSource, Inc.

DEFENDANT NEXTSOURCE, INC. RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES – SET ONE

**CERTIFICATE OF SERVICE**

I, the undersigned, am employed in the County of San Francisco, State of California.  I am over the age of 18 and not a party to the within action; am employed with the law offices of Fisher & Phillips LLP and my business address is One Embarcadero Center, Suite 2050, San Francisco, California, 94111.

On May 29, 2019, I served the foregoing document entitled **DEFENDANT NEXTSOURCE, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUEST FOR PRODUCTION OF DOCUMENTS – SET ONE** on the parties listed below as follows:

| | |
|---|---|
| Lawrence A. Organ<br>Navruz Avloni<br>California Civil Rights Law Group<br>332 San Anselmo Avenue<br>San Anselmo, CA  94960-2664 | Attorneys for Plaintiffs<br>DEMETRIC  DIAZ,  OWEN  DIAZ  and<br>LAMAR PATTERSON<br><br>Tel.:   (415) 453-4740<br>Fax:   (415) 785-7352<br>Email: larry@civilrightsca.com<br>          navruz@civilrightsca.com |

☒   **BY ELECTRONIC SERVICE**:  Based on an agreement of the parties to accept service by electronic transmission, I electronically served the above-described document to the parties on the service list above.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed May 29, 2019 at San Francisco, California.

_/s/_
Catherine Schmitz

80
CERTIFICATE OF SERVICE

FPDOCS 35497578.1

**CERTIFICATE OF SERVICE**

I, the undersigned, am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action; am employed with the law offices of Fisher & Phillips LLP and my business address is One Embarcadero Center, Suite 2050, San Francisco, California 94111-3712.

On May 29, 2019 I served the foregoing document entitled **DEFENDANT NEXTSOURCE, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S REQUEST FOR PRODUCTION OF DOCUMENTS – SET ONE** on the below listed parties in sealed envelope(s) addressed as follows:

| | |
|---|---|
| Tracey A. Kennedy<br>Sheppard Mullin<br>333 South Hope St., 43rd Flr.<br>Los Angeles, CA  90071 | Attorneys for Defendant<br>TESLA, INC.<br><br>tkennedy@sheppardmullin.ocm |
| Gary T. Lafayette<br>Cheryl A. Stevens<br>Lafayette & Kumagai<br>1300 Clay St., Ste. 810<br>Oakland, CA  94612 | Attorneys for Defendant<br>CITISTAFF SOLUTIONS<br><br>glafayette@lkclaw.com<br>cstevens@lkclaaw.com |
| Fenn C. Horton, III<br>Helene Anastasia Simvoulakis<br>Pahl & McKay<br>225 West Santa Clara St., Ste. 1500<br>San Jose, CA  95113 | Attorneys for Defendant<br>WEST VALLEY STAFFING GROUP<br><br>fhorton@pahl-mccay.com<br>hsimvoulakis@pahl-mccay.com |

☒ **[by MAIL]** - I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing this affidavit.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed May 29, 2019 at San Francisco, California.

<u>              /s/              </u>
Catherine Schmitz

81

FPDOCS 35497578.1

# Exhibit

# 13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - -

DEMETRIC DIAZ, OWEN DIAZ, and        )

LAMAR PATTERSON,                     )

             Plaintiffs,        )   CASE NO.

vs.                                  )   3:17-CV-06748-WHO

TESLA, INC. dba TESLA MOTORS,        )

INC.; CITISTAFF SOLUTIONS,           )

INC.; WEST VALLEY STAFFING           )

GROUP; CHARTWELL STAFFING            )

SERVICES, INC.; and DOES 1-50,       )

inclusive,                           )

             Defendants.        )

- - - - - - - - - - - - - - - - - - - -


DEPOSITION OF MICHAEL JOHN WHEELER

WEDNESDAY, JUNE 12, 2019



Reported by:

BY:  MELINDA M. SELLERS, CSR# 10686, RMR, CRC, CRR, CCRR

MICHAEL JOHN WHEELER
June 12, 2019

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3        CALIFORNIA CIVIL RIGHTS LAW GROUP

 4        BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW

 5        332 San Anselmo Avenue

 6        San Anselmo, California 94960-2664

 7        Telephone:  (415) 453-4740

 8        Email:  larry@civilrightsca.com

 9

10    FOR DEFENDANT TESLA, INC.:

11        SHEPPARD MULLIN RICHTER & HAMPTON LLP

12        BY:  PATRICIA M. JENG, ATTORNEY AT LAW

13        Four Embarcadero Center, 17th Floor

14        San Francisco, California 94111-4109

15        Telephone:  (415) 434-9100

16        Email:  pjeng@sheppardmullin.com

17

18    FOR DEFENDANT NEXTSOURCE, INC.:

19        FISHER PHILLIPS LLP

20        BY:  VINCENT J. ADAMS, ATTORNEY AT LAW

21        One Embarcadero Center, Suite 2050

22        San Francisco, California 94111

23        Telephone:  (415) 490-9036

24        Email:  vadams@fisherphillips.com

25
```

**Page 3**

```
 1   APPEARANCES OF COUNSEL (CONTINUED):

 2   FOR DEFENDANT CITISTAFF SOLUTIONS, INC.:

 3       LAFAYETTE & KUMAGAI

 4       BY:  SUSAN T. KUMAGAI, ATTORNEY AT LAW

 5       1300 Clay Street, Suite 810

 6       Oakland, California 94612

 7       Telephone:  (415) 357-4600

 8       Email:  skumagai@lkclaw.com

 9

10   ALSO PRESENT:

11       SAJA SPEARMAN, INTERN/VIDEOGRAPHER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      A.    Mm-hmm.

 2      Q.    Is that right?

 3      A.    Yes.

 4      Q.    And I think we said that was in either the

 5  September/October 2015 time frame that you moved up

 6  to supervisor --

 7      A.    Yes.

 8      Q.    -- is that right?

 9            Okay.  And when you moved up to supervisor,

10  the supervisor position wasn't necessarily an

11  employee or a direct employee of Tesla, right?

12      A.    No.

13      Q.    And tell me what the job duties were of the

14  supervisor position?

15      A.    So I managed the other 22 employees that

16  worked graveyard with me, making sure that they were

17  on time, they were following the protocols, safety,

18  lunch times were monitored, putting together plans

19  and working with Tesla employees to make the

20  recycling process better.  And then, of course,

21  disciplinary.

22      Q.    Okay.  So you would do, like, performance

23  appraisals or things like that?

24      A.    I would do all the way up to termination.

25      Q.    As the supervisor, did you have authority
```

```
 1    to terminate --

 2        A.   Yes.

 3        Q.   -- people under you?

 4        A.   Mm-hmm.  There are a few, yes, employees

 5    that I did have to ask to leave.

 6        Q.   Okay.  And when you asked people to leave,

 7    did Tesla have input on that process?

 8        A.   Josue and that circle, upper circle, yes,

 9    they could.  For the most part anyone that I asked

10    to leave was a pretty serious offense.

11        Q.   Okay.  But in terms of terminating

12    employees, you would always consult with the -- the

13    managers from Tesla; is that right?

14        A.   No.  I would talk to -- I'd send the emails

15    out to the appropriate channels, but very rarely did

16    they respond.

17        Q.   Okay.

18        A.   A lot of those cases at Tesla are

19    cut-and-dry.  We have people that bring guns to

20    Tesla.  We have people that bring cocaine to Tesla.

21    We have people fornicating at Tesla.  So it's --

22    it's usually an easy fix.

23        Q.   Okay.  In terms of the policies that you

24    were enforcing as the supervisor in the recycling --

25    is it okay if I call it recycling?
```

```
 1       A.   Yeah, that's fine.

 2       Q.   Okay.  In terms of the policies that you

 3  were enforcing in recycling at the Tesla factory,

 4  those policies included the policies that Tesla had;

 5  is that correct?

 6       A.   Correct.

 7       Q.   And --

 8       A.   To be specific is OSHA standards.

 9       Q.   Okay.  But Tesla also had some of its own

10  policies relative to conduct in the factory; is that

11  correct?

12       A.   They did.

13       Q.   And did you enforce Tesla's policies

14  relative to conduct in the factory?

15       A.   I tried.

16       Q.   Okay.

17       A.   But Tesla does not enforce their own

18  policies.

19       Q.   Okay.  When you say Tesla doesn't enforce

20  its own policies, what do you mean by that?

21       A.   So Josue and anyone above them -- I don't

22  know if we want to jump straight into the deep end

23  of things, but I had associates that were not

24  African-American who, one, took an eight-hour lunch

25  break and received no disciplinary action, even
```

1    though everyone was aware of it.

2          I had another employee who took a picture

3    of an associate who was sleeping during his break.

4    That associate came and spoke to me.  I went and

5    took -- spoke to the individual who took the

6    picture.  He called me the N-word.  I reported it.

7    He got a promotion.

8          So that would be my meaning.

9    Q.   You were called the N-word?

10   A.   Oh, yes.

11   Q.   On more than one occasion?

12   A.   This was the -- no.  This was the one that

13   stands out the most.

14   Q.   Who was the person who called you the

15   N-word?

16   A.   This was Jesus.  I cannot remember his last

17   name.

18        (Viewing cell phone.)

19   Q.   You might have it in your phone?

20   A.   Possibly.

21   Q.   Okay.

22   A.   (Viewing cell phone.)

23        I do not.

24   Q.   Okay.  So was Jesus a Chartwell employee or

25   was he an employee of Tesla?

1        A.    He was either Chartwell or Flagship.

2        Q.    Okay.  Tell me about this incident where

3   Jesus called you the N-word.

4        A.    I was -- it was pretty cut-and-dry.  I went

5   to speak with him about what had happened, to let

6   him know that it was inappropriate to take pictures

7   of other associates, but it was also inappropriate

8   to take pictures of associates while they're

9   off-duty.

10            He tried to justify his actions by saying,

11   "Well, he was sleeping.  He's not allowed to sleep."

12            I reminded him that he was not in any

13   position of authority and he needed to delete the

14   picture.

15            And then he turns around, says, you know --

16   I'm sorry.  Anyway, calls me the N-word and walks

17   off.

18            I report that to the Tesla supervisors and

19   also to Ramon Martinez, and that was that.  Nothing

20   happened.

21            Shortly after that, he was given his own

22   position as a supervisor in a different section.  So

23   still working for recycling, but just a little

24   further removed.

25        Q.    Okay.  So if I get this right, can you

1    remember exactly what Jesus said when he called you

2    the N-word?

3        A.    Not verbatim.

4        Q.    What's your best recollection of what Jesus

5    said when he called you the N-word after you told

6    him not to take the pictures?

7        A.    Would have been "F-U" and then the N-word.

8        Q.    So "F-U, N-word," is what he said --

9        A.    Mm-hmm.

10       Q.    Is that correct?

11       A.    Mm-hmm.

12       Q.    The N-word that he used, was it the "e-r"

13   version?

14       A.    It was the "e-r," yes.

15       Q.    Not that either version is okay.

16       A.    I'm glad --

17       Q.    I'm just trying to clarify.

18       A.    -- we're making that distinction.  It's

19   important.

20       Q.    Yeah, okay.

21             So do you remember when this occurred that

22   Jesus called you the N-word?

23       A.    I do not.  I remember where it occurred,

24   but I don't remember when.

25       Q.    Okay.  Let's get to that.

```
 1       A.   I can't remember what Owen called me.
 2       Q.   Okay.  So you informed Ramon Martinez that
 3  you had been called the N-word.  And as far as you
 4  know, nothing negative happened to Jesus after that,
 5  correct?
 6       A.   As far as I know.
 7       Q.   In fact, what you know is that Jesus
 8  received a promotion after that; is that correct?
 9       A.   Very closely after that, yes.
10       Q.   So after you informed Ramon Martinez that
11  Jesus had called you the N-word, you found out that
12  Jesus received a promotion to supervisor; is that
13  correct?
14       A.   Correct.
15       Q.   And Jesus was working in the recycling
16  area; is that correct?
17       A.   Correct.
18       Q.   Or on the recycling team --
19       A.   Yes.
20       Q.   -- I think is how you refer to it?
21       A.   Yes.
22       Q.   Do you know whether Jesus' title was
23  supervisor, or was it lead, or was it -- do you
24  know?
25       A.   I was told supervisor.  Definitely not
```

1   **lead.**

2       Q.   Okay.

3       **A.   Now, did I see it on paper?  I did not.**

4       Q.   Okay.  So your best recollection -- strike

5   that.

6            You were told that Jesus received a

7   promotion to the supervisor level; is that correct?

8       **A.   Told and saw.  So I did see him functioning**

9   **in his new position.**

10      Q.   Okay.  So you also observed Jesus

11  functioning in the position of supervisor; is that

12  right?

13      **A.   Correct.**

14      Q.   And do you know whether Jesus was a

15  employee of Chartwell or of Tesla?

16      **A.   Like I said, I do -- my best memory says he**

17  **was more Flagship.  I don't think he was with**

18  **Chartwell.**

19      Q.   Flagship, okay.  Sorry.

20      **A.   Yes, he was with Flagship.**

21      Q.   Okay.  And then you said you also told

22  Josue from Tesla about being called the N-word by

23  Jesus, correct?

24      **A.   Correct.**

25      Q.   And tell me about your complaint to Josue

 1    about being called the N-word.

 2        **A.    It would have been along the lines of --**

 3    **well, so I would have -- I inquired about what the**

 4    **rule is about taking pictures to see if I was in the**

 5    **wrong of, you know, confronting Jesus.**

 6            **He also confirmed that you are not to take**

 7    **pictures of other employees.  And it's the same**

 8    **thing.  They said they would talk to him.**

 9        Q.    So you talked to Josue.  And any -- who

10    else did you talk to in addition --

11        **A.    Just Ramon and Josue.**

12        Q.    Okay.  And how soon after you complained to

13    Ramon Martinez did you complain to Josue?

14        **A.    It would have been on the same day.  I'm**

15    **not --**

16        Q.    Okay.

17        **A.    -- one to wait.**

18        Q.    Do you remember Josue's last name?

19        **A.    Torres.**

20        Q.    Torres, okay.

21        **A.    T-o-r-r-e-s.**

22        Q.    Okay.  And what was Josue Torres' position?

23        **A.    He would have been environmental**

24    **sustainability supervisor.**

25        Q.    But Josue was an employee of Tesla; is that

1   And for him to sit there and lie to me and do what

2   he did, they just stopped talking to him after that.

3        Q.   Okay.  In terms of Ramon Martinez, did you

4   ever hear him use the N-word towards anyone else?

5        A.   No.  But as he's bilingual, whenever -- and

6   I mean this in the most non-, I don't know,

7   opinionated way.  So if you are not a Spanish

8   speaker or people aren't sure if you are, when you

9   come around and they're talking, they'll switch to

10  their native language so that you can't listen to

11  their conversations.  This happens in Tesla, outside

12  of Tesla.

13       Q.   Did you ever heard the word "negra"?  Ever

14  heard that?

15       A.   Not that I was listening, but no.

16       Q.   "Miyate," ever hear that word from them?

17       A.   I hear that all the time, so I can't tell

18  you from who I hear it from.

19       Q.   Okay.  So after you -- let's go back to the

20  conversation you had with Josue Torres about

21  complaining about Jesus calling you the N-word.

22       A.   Mm-hmm.

23       Q.   Where did that conversation take place?

24       A.   I do not remember.  I remember trying to

25  trek -- track Ramon down because we're always in

1      A.   Yes and no.  So I had a little cart that I

2   drove around, and so I wouldn't be -- I would be

3   moving too fast to really drop into a conversation.

4      Q.   I see.  Okay.

5           But it sounded like you did hear the N-word

6   used at other times in the factory --

7      A.   Yeah.

8      Q.   -- is that correct?

9      A.   During breaks or outside when they're

10   smoking or in passing, coming into the factory.

11     Q.   And do you remember who the people were who

12   you heard using the N-word?

13     A.   Everybody.  Blacks, whites, Mexican.

14     Q.   Okay.  And you said that you didn't think

15   it was used in an aggressive way?

16     A.   Not at all.

17     Q.   So when you were overhearing it, you were

18   hearing it more like, "Hey, how's my N-word," or

19   that kind of thing?

20     A.   Yeah.

21     Q.   And the N-word with an "A"?

22     A.   "A," correct.

23     Q.   Right.

24          However, N-word with an "A" can still be

25   offensive to an African-American, right?

```
 1      A.   Could be, yes.

 2      Q.   Okay.  Certainly the e-r version of the

 3   N-word you heard is always offensive, correct?

 4      A.   Correct.

 5      Q.   And you found it offensive.  And Jesus used

 6   the N-word towards you, right?

 7      A.   Yes.

 8      Q.   And in terms of what Josue said to you

 9   about what he would do about the fact that you had

10   been called the N-word, tell me, again, what did he

11   say he would do?

12      A.   That would have been in an email.

13      Q.   An email?

14      A.   Yeah.

15      Q.   So you complained to Josue in an email?

16      A.   Yes.  If you could -- I don't know if we --

17   if we could get to the phone, if we could get to a

18   supervisor phone -- if you could get into my email,

19   so much more could be taken care of.

20      Q.   I see.

21      A.   But right after I was terminated, they had

22   me turn in my phone.

23      Q.   Okay.  But the email goes through a

24   electronic service, so --

25      A.   Yes.
```

```
 1    that -- tell me what that might mean, if you know.
 2        A.    I wouldn't say the operators were
 3    recycling.
 4        Q.    Okay.
 5        A.    They literally stayed in the elevator all
 6    day, taking Tesla products and recycling products
 7    upstairs and downstairs --
 8        Q.    Okay.
 9        A.    -- but never did they need to move anything
10    other than off or onto the elevator.  So they did
11    not break down boxes or sort or anything of that
12    caliber.
13        Q.    Okay.  Did you actually supervise Owen Diaz
14    in any way?
15        A.    I was above Owen.  I never needed to do
16    more than ask him, "Hey, can you bring something
17    down?  Can you take this up?"
18        Q.    Okay.  So you had an ability to at least
19    direct Owen's work, but you didn't have
20    responsibility for his -- for -- direct supervision
21    of his work?  Or tell me what your leadership was.
22        A.    So I was technically Owen's superior.
23        Q.    Okay.
24        A.    And if I needed him to do something, that
25    would have been the chain of command.
```

 1    factory.

 2         Q.    Okay.

 3         A.    **For instance, there was an incident where**

 4    **the cart I told you about I drove around as a**

 5    **supervisor, someone put feces on my seat, which I**

 6    **later then sat in because I don't check my seat**

 7    **before I sit down because that's the last thing I**

 8    **was expecting to be there.**

 9         Q.    Okay.   Let me -- let's go incident by

10    incident.

11              So you told Owen about an incident where

12    someone had put some feces in your seat; is that

13    right?

14         A.    **I told everyone about that incident.   I**

15    **sent out a very long email to Victor and anyone on**

16    **that thread, asking -- and security as well, asking**

17    **for them to check the cameras because this is**

18    **unacceptable.**

19         Q.    Right.   Do you think that someone put the

20    feces -- strike that.

21              This cart was your cart?

22         A.    **This was my cart.**

23         Q.    Okay.   So people would -- people who you

24    worked with would know that it was your cart?

25         A.    **Everyone knew it was my cart.**

1    Q.   Okay.  And then you sat in human feces?

2    **A.   Slid right into -- I don't know what type.**

3    Q.   Okay.

4    **A.   I didn't --**

5    Q.   Okay.  You didn't test it?

6    **A.   No.**

7    Q.   Okay.  So you sat on feces that had been

8    put on your seat; is that right?

9    **A.   Correct.**

10   Q.   Then after this happened you sent an email

11   to Victor Quintero, to security, and to others?

12   **A.   To everybody.**

13   Q.   Okay.

14   **A.   The whole management because I was -- I was**

15   **enrage -- I was so -- like, I was very upset.  I had**

16   **gone to lunch, came back.**

17         **And what upset me even more is security**

18   **said, "We can't see anything.  We can't see where**

19   **your car was parked," which I know for a fact is a**

20   **lie because at the front of the Tesla building, the**

21   **main facility, Elon has his speedsters -- his**

22   **Roadsters there, the main ones, his first cars.  My**

23   **car was parked within 10 to 15 feet of those cars at**

24   **the charging station that's right there.  So --**

25   Q.   Is it like a golf cart?  Is that what it --

1     A.    It's not a golf cart with a top on it, but

2  it was a green cart with a grill and then a black

3  bed for the back.

4     Q.    That you could carry things around in?

5     A.    Yes.

6     Q.    Okay.  After you sent the email to Victor

7  Quintero, did you ever get any kind of response from

8  him about the feces in your seat?

9     A.    Not that I remember.  I remember security

10  said there's nothing -- "We can't see anything."

11          And I'm pretty sure I threw a stink about

12  that.  I don't know for how long after.  Not, like,

13  anything crazy.  I didn't go, "Oh.  Was it you?  Was

14  it you?"  No.

15          But I do remember trying to push more to

16  see what was -- like, what was going on.

17     Q.    And you took pictures of the feces in your

18  cart?

19     A.    I did.

20     Q.    Right.

21     A.    On the Tesla phone.

22     Q.    And you sent copies of the pictures to

23  Victor Quintero?

24     A.    Should be in the email.

25     Q.    Okay.

1       A.   I feel like -- I hope I attached that in

2   the email.

3       Q.   Okay.  After this incident with the feces

4   on the seat, did anything -- was there anything else

5   other than that that happened to you, other than

6   that and the N-word incident that you felt was --

7   well, strike that.

8            Do you think that the feces was put on your

9   seat in part because you were African-American?

10      A.   I could assume that, but I can't say for

11  sure.  So I will not say that.  I will say it was an

12  act against me, but it could have been anyone.

13      Q.   What was the timing of that?  Do you

14  remember when that was?

15      A.   Timing --

16      Q.   The feces on the seat.

17      A.   It would have had to have been 2:00 a.m. to

18  3:00, in between there.  Would have been when I

19  would have taken my lunch.

20      Q.   Okay.  In terms of -- this was after you

21  became a supervisor --

22      A.   Yes.

23      Q.   -- right?

24           And you were issued the cart after you

25  became a supervisor; is that right?

```
 1      Q.   Okay.  I'm just gonna -- I'm gonna show you
 2  what's been previously marked as --
 3      A.   The pictures --
 4      Q.   -- Exhibit 128.
 5           I don't know why I only have two copies.  I
 6  apologize, Counsel.  It's Exhibit 128.
 7           So Exhibit 128, for the record, is a
 8  four-page document Bates-stamped TESLA 20 to 24 --
 9  or 23, and it's got some pictures at the end of the
10  email from Mr. Diaz to Ed Ramiro.
11           Did you ever see the email that was --
12  that's on page 22, the third page?
13      A.   I did not see the emails --
14      Q.   Okay.
15      A.   -- involving this incident.  But I did see
16  the bale.
17      Q.   You saw the actual --
18      A.   I saw the actual bale.
19      Q.   So you saw the bale of cardboard that's in
20  Exhibit 128 that has the Picaninny and the "Boo"
21  underneath, correct?
22      A.   Yes.
23      Q.   And tell me, what were the circumstances in
24  which you happened to see the actual picture, which
25  is -- I guess a close-up of it is the fourth page of
```

 1    Exhibit 128, which is also TESLA 23?

 2        **A.    So --**

 3        Q.    Why don't you turn to the last page of

 4    Exhibit 128.

 5        **A.    I remember this like it was yesterday.**

 6        **Q.    Okay.**

 7        **A.    But basically I was working in a different**

 8    **part of the factory.   And I get a phone call from**

 9    **Owen, and he asks me if I could come over to the**

10    **elevator.**

11        Q.    Okay.   Just so we're oriented, his email,

12    Owen's email, is dated January 22 of 2016.   Does

13    that kind of coincide with when you recall Owen

14    calling you up?

15        **A.    As far as -- I mean, he called me to come**

16    **look at this.**

17        Q.    Okay.

18        **A.    As we had spoken before.   So I was his**

19    **supervisor.**

20        Q.    Okay.

21        **A.    He wanted to make sure that another**

22    **supervisor other than Ramon had seen the picture.**

23        Q.    Okay.

24        **A.    Or the drawing.**

25        Q.    Did he know that it was Ramon Martinez who

 1   **called Ramon over.  And we were trying to figure**

 2   **out --**

 3       Q.   Let's stick with -- let's -- I want to get

 4   to that.

 5       **A.   Okay.**

 6       Q.   But let's stick with, so when you first get

 7   there, you were laughing about it, but because

 8   that's your way of coping with negative things; is

 9   that correct?

10       **A.   Correct.**

11       Q.   And so you didn't think it was a laughing

12   matter when you saw this picture, did you?

13       **A.   Not after -- because it was a quick**

14   **chuckle, not a full -- not a lengthy laugh.  But I**

15   **did realize it was a serious situation, so I reeled**

16   **it in pretty quickly.**

17       Q.   And Owen wasn't laughing at all, was he?

18       **A.   He was not.  Didn't even have a smile on**

19   **his face.**

20       Q.   Right.  He considered this to be -- well,

21   strike that.

22           Did he tell you how he viewed this picture

23   of the Picaninny and the "Boo" underneath?

24       **A.   He did.**

25           **And, also, I believe Owen is a little older**

1    **than me, so this would strike him more specifically**

2    **than it would my generation of African-Americans.**

3    **Where they still use, you know, "spook" and things**

4    **of that, you know, nature.**

5        Q.   Did he tell you -- did Owen tell you that

6    he thought the "Boo" was short for jigaboo?

7        **A.   If he did mention it, I wasn't -- I was**

8    **more concerned with who, not what at that point.**

9        Q.   Okay.  Okay.  But the way you perceived it

10   as an African-American male, was you still perceived

11   this as some kind of racial drawing, right?

12       **A.   I perceived it as spook, "Boo" being**

13   **related to spook, not as jigaboo.**

14       Q.   Okay.  And it was still offensive to you as

15   an African-American male, right?

16       **A.   Correct.**

17       Q.   Okay.  So and certainly Owen Diaz expressed

18   to you that he was offended by this drawing, right?

19       **A.   Yes.**

20       Q.   And then -- okay.  What happens next?

21       **A.   So Ramon -- we call Ramon over.  I want to**

22   **say we called Ramon over to figure out what was**

23   **going on.  At this point -- because I don't think**

24   **Ramon drew it --**

25       Q.   Okay.

1    **threatened to kill him?**

2        Q.    Yeah.

3        **A.    Is that the one?**

4        Q.    Yeah.

5        **A.    Okay.**

6        Q.    You were aware of that --

7        **A.    I was aware of that situation, yes.**

8        Q.    You were also aware that Owen had

9    complained previously that Ramon Martinez had

10   threatened him, correct?

11       **A.    I do not recall that.**

12       Q.    Okay.  Now, in addition to you, Owen also

13   had other supervisors; is that correct?

14       **A.    It would have been Ramon.**

15       Q.    Ramon Martinez?

16       **A.    And Israel, the swing shift.**

17       Q.    Okay.

18       **A.    Because I want to say Owen worked from**

19   **6:00 to 6:00.**

20       Q.    Yeah.

21       **A.    So he fell on to two different shifts.**

22       Q.    Okay.  So because Owen worked 6:00 to 6:00,

23   he had multiple supervisors; is that correct?

24       **A.    Correct.**

25       Q.    And those supervisors included yourself; is

```
 1        Q.    That you painted --
 2        A.    -- that I painted for the students.
 3        Q.    Okay.  So you told the students that it was
 4   a great place to work, but you really felt it was a
 5   prison?
 6        A.    I told them it's a great place to work for
 7   engineers.
 8        Q.    Okay.
 9        A.    I tell everybody that.
10        Q.    Okay.  And I -- I guess I'll circle back on
11   that.
12              Do you remember anybody who had -- anybody
13   specific who had the swastika tattoos that you were
14   testifying about?
15        A.    I don't know his name.
16        Q.    Okay.
17        A.    I remember being -- it was -- I think I
18   spoke to one of my coworkers.  I was, like, "Man, we
19   have some skinheads here."  Yeah.  But I saw him in
20   passing.  He walked by, and I was looking at his --
21   he has a full head of tattoos, not just -- not just
22   the swastika, but a full head of tattoos.  I was,
23   like, how is that even allowed here.
24        Q.    Tattoos?
25        A.    No.  Just -- well, not tattoos.  Everyone
```

1   has tattoos, right?  But just, like, taken aback

2   that that was going unchecked.

3       Q.   The tattoos on the head?

4       A.   The vulgarity of the tattoos on the head.

5       Q.   Did you ever complain about that to

6   anybody?

7       A.   At this point, no, because I was well aware

8   of the situation I was in.

9       Q.   Did you complain about the tattoos to

10  anybody else ever?

11      A.   Not -- just conversation.  Just

12  conversation.

13      Q.   Okay.

14      A.   Not, like, "Oh, I can't believe this is

15  happening," no.

16      Q.   Do you remember who you had conversations

17  about the head tattoos with, or any tattoos?

18      A.   No.

19      Q.   Okay.  Was it someone in HR?

20      A.   No, not at all.

21      Q.   And then you also mentioned, as part of

22  your description of Tesla as a prison, that they

23  wore pants around the ankles.

24      A.   Yes.

25      Q.   Would that be a problem if someone was

```
 1   STATE OF CALIFORNIA      )

 2                            )     ss

 3   COUNTY OF CALAVERAS      )

 4            I hereby certify that the witness in the

 5   foregoing deposition of MICHAEL JOHN WHEELER was by

 6   me duly sworn to testify to the truth, the whole

 7   truth, and nothing but the truth in the

 8   within-entitled cause; that said deposition was taken

 9   at the time and place herein named; that the

10   deposition is a true record of the witness's

11   testimony as reported by me, a duly certified

12   shorthand reporter and a disinterested person, and

13   was thereafter transcribed into typewriting by

14   computer.

15            I further certify that I am not interested

16   in the outcome of the said action, nor connected

17   with, nor related to any of the parties in said

18   action, nor to their respective counsel.

19            IN WITNESS WHEREOF, I have hereunto set my

20   hand this 24th day of June, 2019.

21

22

23            _____

24            MELINDA M. SELLERS, CSR NO. 10686

25            STATE OF CALIFORNIA
```

# Exhibit

# **14**

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        A Limited Liability Partnership
2       Including Professional Corporations
    TRACEY A. KENNEDY, Cal. Bar No. 150782
3   333 South Hope Street, 43rd Floor
    Los Angeles, California  90071-1422
4   Telephone:     213-620-1780
    Facsimile:     213-620-1398
5   Email:         tkennedy@sheppardmullin.com

6   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        A Limited Liability Partnership
7       Including Professional Corporations
    PATRICIA M. JENG, Cal. Bar No. 272262
8   REANNE SWAFFORD-HARRIS, Cal. Bar No. 305558
    Four Embarcadero Center, 17th Floor
9   San Francisco, California 94111-4109
    Telephone:     415.434.9100
10  Facsimile:     415.434.3947
    Email:         pjeng@sheppardmullin.com
11                 rswafford-harris@sheppardmullin.com

12  Attorneys for Defendant,
    TESLA, INC. DBA TESLA MOTORS, INC.

13

14                  **UNITED STATES DISTRICT COURT**

15                  **NORTHERN DISTRICT OF CALIFORNIA**

16

17

18  | DEMETRIC DI-AZ, OWEN DIAZ AND LAMAR PATTERSON | Case No. 17-cv-06748-WHO |

19  Plaintiffs,     **DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF OWEN DIAZ'S INTERROGATORIES, SET THREE**

20       v.

21  TESLA, INC. DBA TESLA MOTORS, INC., CITISTAFF SOLUTIONS, INC.;
22  WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES,
23  INC.; NEXTSOURCE, INC.; and DOES 1-10, inclusive

24
                                        Amended Complaint Filed:  December 26, 2018
25       Defendants.                    Trial Date:               November 18, 2019

26

27

28

SMRH:4850-8836-
2648.1                DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGATORIES, SET THREE

1 | PROPOUNDING PARTY:     Plaintiff OWEN DIAZ

2 | RESPONDING PARTY:      Defendant TESLA, INC. DBA TESLA MOTORS, INC.

3 | SET NO.:               THREE

4 | **PRELIMINARY STATEMENT**

5 |       Pursuant to Federal Rule of Civil Procedure 33, Defendant Tesla, Inc. dba Tesla Motors,

6 | Inc. ("Defendant") hereby responds to Plaintiff Owen Diaz's ("Plaintiff") Interrogatories, Set

7 | Three.

8 |       The following responses and objections have been prepared prior to the completion of

9 | Defendant's investigation, discovery, and preparation for trial in this action.  The responses and

10 | objections are based only on information, facts, and documents currently available and known to

11 | Defendant.  Defendant reserves its right to make changes to the responses and objections if it

12 | appears that omissions or errors have been made in them, or that further and more accurate

13 | information, facts, and/or documents are available, but Defendant is under no obligation to do so.

14 | Defendant also reserves its right to rely upon and/or introduce into evidence at trial or any pre-trial

15 | proceeding any additional information, facts, and/or documents.

16 |       Defendant's responses and objections are for the purpose of discovery only, and are not an

17 | admission or acceptance that any response, fact, or document is relevant and/or admissible into

18 | evidence.  Defendant reserves its right to object to the admissibility of any response, fact, or

19 | document at the time of trial or any pre-trial proceeding.

20 |       Defendant provides the following responses subject to, and without waiving the foregoing

21 | Preliminary Statement, which is incorporated by reference into each response below.

22 | **GENERAL OBJECTIONS**

23 |       1.     Defendant reserves the right to object on any ground at any time to such other or

24 | supplemental Interrogatories, or any other discovery, as Plaintiff may at any time propound

25 | involving the subject matter of the Interrogatories.

26 |       2.     Defendant objects to the Interrogatories on the grounds and to the extent they seek

27 | information outside the possession, custody, or control of Defendant and that is not within

28 | Defendant's personal knowledge.

-2-          Case No. 17-cv-06748-WHO

3.      Defendant objects to the Interrogatories because they are overbroad and unduly

burdensome, and seek information that is neither relevant nor reasonably calculated to lead to the

discovery of admissible evidence.

4.      Defendant objects to the Interrogatories on the grounds and to the extent they call

for information which is protected by the by the attorney-client privilege, that was prepared in

anticipation of litigation for trial or is covered by the work product doctrine, or which constitutes

information which is privileged or related to confidential trade secrets or the right or privilege of

privacy (including the freedom of association and financial privacy, the right of privacy held by

non-party individuals with respect to their employment records).

Each of these general objections is incorporated by reference into each set of specific

responses to each Interrogatory set forth below.  The fact that any of these general objections is set

forth again specifically in response to any of the Interrogatories shall not be construed as a waiver

of any of the other general objections set forth herein.

## RESPONSE TO INTERROGATORIES

## INTERROGATORY NO. 14:

Please provide the last, best-known contact information of Judy Timbreza.

## RESPONSE TO INTERROGATORY NO. 14:

Defendant objects to this request on the grounds that it is overbroad, ambiguous, vague and

uncertain with regard to the phrase "best-known."  Defendant objects that this interrogatory is not

limited in time or scope, and thus is overbroad, unduly burdensome, oppressive, and harassing.

Defendant further objects to the extent this interrogatory is invasive of the privacy rights and

confidentiality of third-party non-litigants.  Defendant further objects to the extent this

interrogatory seeks information that is not relevant to the claims or defenses and/or proportional to

the needs of the case, considering the importance of the issues at stake in the action, the amount in

controversy, the parties' relative access to relevant information, the parties' resources, the

importance of the discovery in resolving the issues, and whether the burden or expense of the

proposed discovery outweighs its likely benefit.

1     Subject to and without waiving any objections, Defendant responds as follows:  Judy

2   Timbreza was never a Tesla employee.  The last known contact information that Tesla has for

3   Judy Timbreza is judyannafuan18@gmail.com.

4   **INTERROGATORY NO. 15:**

5     Please DESCRIBE in comprehensive detail each position Judy Timbreza has held during

6   his employment at the TESLA FACTORY from 2014 to present. (For the purposes of responding

7   to this interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job

8   duties, hours worked, and dates the position was held.)

9   **RESPONSE TO INTERROGATORY NO. 15:**

10     Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

11   the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

12   FACTORY."  Defendant further objects to the extent this interrogatory is invasive of the privacy

13   rights and confidentiality of third-party non-litigants.  Defendant further objects to the extent this

14   interrogatory seeks information that is not relevant to the claims or defenses and/or proportional to

15   the needs of the case, considering the importance of the issues at stake in the action, the amount in

16   controversy, the parties' relative access to relevant information, the parties' resources, the

17   importance of the discovery in resolving the issues, and whether the burden or expense of the

18   proposed discovery outweighs its likely benefit.  Defendant objects that this interrogatory lacks

19   foundation, and assumes facts not in evidence, particularly, that Judy Timbreza had an assigned

20   schedule of "hours worked," and/or recorded the same.  Defendant further objects to the extent

21   this interrogatory necessitates the preparation or the making of a compilation, abstract, audit, or

22   summary.

23     Subject to and without waiving any objections, Defendant responds as follows:  Judy

24   Timbreza was never a Tesla employee.

25   **INTERROGATORY NO. 16:**

26     Please DESCRIBE in comprehensive detail each position Edward Romero has held during

27   his employment at the TESLA FACTORY from 2014 to present. (For the purposes of responding

28

SMRH:4850-8836-
2648.1

1  to this interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job

2  duties, hours worked, and dates the position was held.)

3  **RESPONSE TO INTERROGATORY NO. 16:**

4        Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

5  the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

6  FACTORY."  Defendant further objects to the extent this interrogatory is invasive of the privacy

7  rights and confidentiality of third-party non-litigants and/or current or former employees of

8  Defendant.  Defendant further objects to the extent this interrogatory seeks information that is not

9  relevant to the claims or defenses and/or proportional to the needs of the case, considering the

10  importance of the issues at stake in the action, the amount in controversy, the parties' relative

11  access to relevant information, the parties' resources, the importance of the discovery in resolving

12  the issues, and whether the burden or expense of the proposed discovery outweighs its likely

13  benefit.  Defendant objects that this interrogatory lacks foundation, and assumes facts not in

14  evidence, particularly, that Edward Romero had an assigned schedule of "hours worked," and/or

15  recorded the same.  Defendant further objects to the extent this interrogatory necessitates the

16  preparation or the making of a compilation, abstract, audit, or summary.

17        Subject to and without waiving any objections, Defendant responds as follows:  Edward

18  Romero's position was Janitorial Supervisor, Production Facilities from on or about October 12,

19  2015 through on or about August 4, 2017.

20  **INTERROGATORY NO. 17:**

21        Please DESCRIBE in comprehensive detail each position Victor Quintero has held during

22  his employment at the TESLA FACTORY from 2014 to present. (For the purposes of responding

23  to this interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job

24  duties, hours worked, and dates the position was held.)

25  **RESPONSE TO INTERROGATORY NO. 17:**

26        Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

27  the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

28  FACTORY."  Defendant further objects to the extent this interrogatory is invasive of the privacy

1    rights and confidentiality of third-party non-litigants and/or current or former employees of

2    Defendant.  Defendant further objects to the extent this interrogatory seeks information that is not

3    relevant to the claims or defenses and/or proportional to the needs of the case, considering the

4    importance of the issues at stake in the action, the amount in controversy, the parties' relative

5    access to relevant information, the parties' resources, the importance of the discovery in resolving

6    the issues, and whether the burden or expense of the proposed discovery outweighs its likely

7    benefit.  Defendant objects that this interrogatory lacks foundation, and assumes facts not in

8    evidence, particularly, that Victor Quintero had an assigned schedule of "hours worked," and/or

9    recorded the same.  Defendant further objects to the extent this interrogatory necessitates the

10    preparation or the making of a compilation, abstract, audit, or summary.

11       Subject to and without waiving any objections, Defendant responds as follows:  Victor

12    Quintero's position is Manager, Recycling Services from May 12, 2015 through the date of this

13    response.

14    **INTERROGATORY NO. 18:**

15       Please DESCRIBE in comprehensive detail each position Ramon Martinez held during his

16    employment at the TESLA FACTORY. (For the purposes of responding to this interrogatory, the

17    term "DESCRIBE" means to list, for each position, the job title, job duties, hours worked, and

18    dates the position was held.)

19    **RESPONSE TO INTERROGATORY NO. 18:**

20       Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

21    the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

22    FACTORY."  Defendant further objects that this interrogatory is not limited in time or scope, and

23    thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects to the

24    extent this interrogatory is invasive of the privacy rights and confidentiality of third-party non-

25    litigants and/or current or former employees of Defendant.  Defendant further objects to the extent

26    this interrogatory seeks information that is not relevant to the claims or defenses and/or

27    proportional to the needs of the case, considering the importance of the issues at stake in the

28    action, the amount in controversy, the parties' relative access to relevant information, the parties'

Case No. 17-cv-06748-WHO

DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGATORIES, SET THREE

1  resources, the importance of the discovery in resolving the issues, and whether the burden or

2  expense of the proposed discovery outweighs its likely benefit.  Defendant objects that this

3  interrogatory lacks foundation, and assumes facts not in evidence, particularly, that Ramon

4  Martinez had an assigned schedule of "hours worked," and/or recorded the same.  Defendant

5  further objects to the extent this interrogatory necessitates the preparation or the making of a

6  compilation, abstract, audit, or summary.

7        Subject to and without waiving any objections, Defendant responds as follows:  Ramon

8  Martinez was not employed by Tesla during the time that plaintiff Owen Diaz or Plaintiff

9  Demetric Di-az worked at Tesla.  Ramon Martinez's position from January 14, 2019 to the date of

10  this response is Lead Material Handler.

11  **INTERROGATORY NO. 19:**

12        Please DESCRIBE in comprehensive detail each position Joyce DelaGrande has held

13  during her employment at the TESLA FACTORY. (For the purposes of responding to this

14  interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job duties,

15  hours worked, and dates the position was held.)

16  **RESPONSE TO INTERROGATORY NO. 19:**

17        Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

18  the term(s) and/or phrase(s): "comprehensive detail," "position," and "employment at TESLA

19  FACTORY."  Defendant further objects that this interrogatory is not limited in time or scope, and

20  thus is overbroad, unduly burdensome, oppressive, and harassing.  Defendant further objects to the

21  extent this interrogatory is invasive of the privacy rights and confidentiality of third-party non-

22  litigants and/or current or former employees of Defendant.  Defendant further objects to the extent

23  this interrogatory seeks information that is not relevant to the claims or defenses and/or

24  proportional to the needs of the case, considering the importance of the issues at stake in the

25  action, the amount in controversy, the parties' relative access to relevant information, the parties'

26  resources, the importance of the discovery in resolving the issues, and whether the burden or

27  expense of the proposed discovery outweighs its likely benefit.  Defendant objects that this

28  interrogatory lacks foundation, and assumes facts not in evidence, particularly, that Joyce

-7-

Case No. 17-cv-06748-WHO
DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGATORIES, SET THREE

1   DelaGrande had an assigned schedule of "hours worked," and/or recorded the same.  Defendant

2   further objects to the extent this interrogatory necessitates the preparation or the making of a

3   compilation, abstract, audit, or summary.

4          Subject to and without waiving any objections, Defendant responds as follows:  Joyce

5   Delagrande's position from August 20, 2012 to November 30, 2012 was Production Associate; her

6   position from December 1, 2012 to June 31, 2013 was Supervisor Manufacturing; her position

7   from July 1, 2013 to October 30, 2015 was Associate Manager Supply Chain; her position from

8   October 31, 2015 to July 8, 2017 was Supervisor Supply Chain; and her position from July 9,

9   2017 to present is Associate Manager Supply Chain.

10  **INTERROGATORY NO. 20:**

11          If Ramon Martinez is no longer working at TESLA, please list all the reasons for his

12  separation.

13  **RESPONSE TO INTERROGATORY NO. 20:**

14          Defendant objects to this interrogatory on the grounds that it is vague and ambiguous as to

15  the term(s) and/or phrase(s): "working," and "separation."  Defendant further objects to the extent

16  this interrogatory is invasive of the privacy rights and confidentiality of third-party non-litigants

17  and/or current or former employees of Defendant.  Defendant further objects to the extent this

18  interrogatory seeks information that is not relevant to the claims or defenses and/or proportional to

19  the needs of the case, considering the importance of the issues at stake in the action, the amount in

20  controversy, the parties' relative access to relevant information, the parties' resources, the

21  importance of the discovery in resolving the issues, and whether the burden or expense of the

22  proposed discovery outweighs its likely benefit.  Defendant objects to the extent this interrogatory

23  lacks foundation, and assumes facts not in evidence.  Defendant further objects to the extent this

24  interrogatory necessitates the preparation or the making of a compilation, abstract, audit, or

25  summary.

26  ///

27  ///

28  ///

1       Subject to and without waiving any objections, Defendant responds as follows:  Not

2  applicable.

3

4  Dated:  May 24, 2019                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

5

6                                         By:  _____

7                                               TRACEY A. KENNEDY
                                               PATRICIA M. JENG
                                               REANNE SWAFFORD-HARRIS
8

9                                         Attorneys for Defendant
                                        TESLA, INC. dba TESLA MOTORS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, _Nicole White_, declare as follows:

I am _HR Program Manager_ for Defendant TESLA, INC. DBA
TESLA MOTORS, INC.  In that capacity, I am authorized to make this verification on behalf of
Defendant.  I have reviewed and know the contents of the foregoing document entitled:

**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF**

**OWEN DIAZ'S INTERROGATORIES, SET THREE**

I am informed and believe the matters stated therein are true and on that ground declare
under penalty of perjury under the laws of the state of California that the same are true and correct.

DATED: _June 25TH_, , 2019         _____
                                    [Name]

1

**CERTIFICATE OF SERVICE**

2

*Demetric Di-Az, et al. v. Tesla, Inc., et al.*
USDC, Northern District of California, Case No. 3:17-cv-06748-WHO

3

At the time of service, I was over 18 years of age and **not a party to this action**.  I am

4

employed in the County of San Francisco, State of California.  My business address is Four
Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

5

On May 24, 2019, I served true copies of the following document(s) described as:

6

**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S RESPONSE TO PLAINTIFF**

7

**OWEN DIAZ'S INTERROGATORIES, SET THREE**

8

on the interested parties in this action as follows:

9

**SEE SERVICE LIST**

10

☒   **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection

11

and mailing, following our ordinary business practices.  I am readily familiar with the firm's practice for collecting and processing correspondence for mailing.  On the same day

12

that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage

13

fully prepaid.  I am a resident or employed in the county where the mailing occurred.

14

☐   **BY FAX TRANSMISSION:**  I faxed a copy of the document(s) to the persons at the fax numbers listed in the Service List.  The telephone number of the sending facsimile

15

machine was 415.434.3947.  The transmission was reported as complete and without error. No error was reported by the fax machine that I used.  A transmission report was properly

16

issued by the sending fax machine.

17

☐   **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address eruiz@sheppardmullin.com to the persons at

18

the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was

19

unsuccessful.

20

☐   **BY OVERNIGHT DELIVERY:**  I enclosed said document(s) in an envelope or package provided by the overnight service carrier and addressed to the persons at the addresses

21

listed in the Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight service carrier or

22

delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents.

23

☐   **BY PERSONAL SERVICE:**  I personally delivered the document(s) to the person at the

24

addresses listed in the Service List.  (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an

25

envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.  (2) For a party, delivery was made to

26

the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

27

28

-1-

Case No. 3:17-cv-06748-WHO
CERTIFICATE OF SERVICE

1    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

2

3    Executed on May 24, 2019, at San Francisco, California.

4

5

6    _____

     Elena E. Ruiz

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:4850-8836-2648.1

Case No. 3:17-cv-06748-WHO
CERTIFICATE OF SERVICE

## SERVICE LIST

| | |
|---|---|
| Lawrence A. Organ, Esq.<br>Navruz Avloni, Esq.<br>**CALIFORNIA CIVIL RIGHTS LAW GROUP**<br>332 San Anselmo Avenue<br>San Anselmo, CA 94960<br>Telephone:      415-453-4740<br>Facsimile:      415-785-7352]<br>Email:          larry@civiilrightsca.com<br>                navruz@civilrightsca.com | Attorneys for Plaintiffs<br>DEMETRIC DI-AZ and OWEN DIAZ |
| Gary T. Lafayette, Esq.<br>Cheryl A. Stevens, Esq.<br>**LAFAYETTE & KUMAGAI**<br>1300 Clay Street, Suite 810<br>Oakland, CA 94612<br>Telephone:      415-357-4600<br>Email:          glafayette@lkclaw.com<br>                cstevens@lkclaw.com | Attorneys for Defendant<br>CITISTAFF SOLUTIONS, INC. |
| Jason A. Geller, Esq.<br>Juan C. Araneda, Esq.<br>Aaron D. Langberg, Esq.<br>**FISHER & PHILLIPS LLP**<br>One Embarcadero Center, Suite 2050<br>San Francisco, CA 94111<br>Telephone:      415-490-9000<br>Facsimile:      415-490-9001<br>Email:          jgeller@fisherphillips.com<br>                jaraneda@fisherphillips.com<br>                alangberg@fisherphillips.com | Attorneys for Defendant<br>NEXTSOURCE, INC. |
| Fenn C. Horton III, Esq.<br>Helene Simvoulakis-Panos, Esq.<br>**PAHL & McCAY**<br>225 West Santa Clara Street, Suite 1500<br>San Jose, CA 95113<br>Telephone:      408-286-5110<br>Facsimile:      408-286-5722<br>Email:          fhorton@pahl-mccay.com<br>                hsimvoulakis@pahl-mccay.com | Attorneys for Defendant<br>WEST VALLEY STAFFING GROUP |

-3-

Case No. 3:17-cv-06748-WHO
CERTIFICATE OF SERVICE

# Exhibit

# **15**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


DEMETRIC DI-AZ, OWEN DIAZ,        )
and LAMAR PATTERSON,              )
                                  )
          Plaintiffs,             )
                                  )
vs.                               )  No. 3:17-cv-06748-WHO
                                  )
TESLA, INC., dba TESLA MOTORS,    )
INC., CITISTAFF SOLUTIONS, INC.;  )
WEST VALLEY STAFFING GROUP;       )
CHARTWELL STAFFING SERVICES,      )
INC.; and DOES 1-50, inclusive,   )
                                  )
          Defendants.             )
                                  )


DEPOSITION OF TITUS McCALEB

San Jose, California

Tuesday, June 18, 2019


Reported by:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Job No. 38360

TITUS MCCALEB

June 18, 2019

```
 1    APPEARANCES:

 2

 3        On Behalf of Plaintiffs:

 4            CALIFORNIA CIVIL RIGHTS LAW GROUP
              BY:  NAVRUS AVLONI, ESQ.
 5            332 San Anselmo Avenue
              San Anselmo, California  94960
 6            415.453.4740
              navruz@civilrightsca.com
 7

 8
          On Behalf of Defendant West Valley Staffing Group:
 9
              PAHL & McCAY
10            BY:  FENN C. HORTON III, ESQ.
              225 West Santa Clara Street
11            Suite 1500
              San Jose, California  95113
12            408.286.5100
              fhorton@pahl-mccay.com
13

14
          On Behalf of Defendant Tesla, Inc.:
15
              SHEPPARD MULLIN RICHTER & HAMPTON LLP
16            BY:  PATRICIA M. JENG, ESQ.
              Four Embarcadero Center
17            17th Floor
              San Francisco, California  94111
18            415.434.9100
              pjeng@sheppardmullin.com
19

20
          On Behalf of Defendant nextSource, Inc.:
21
              FISHER & PHILLIPS, LLP
22            BY:  JUAN CARLOS ARANEDA, ESQ.
              One Embarcadero Center
23            Suite 2050
              San Francisco, California  94111
24            415.490.9000
              jarandeda@fisherphillips.com
25
```

TITUS MCCALEB

June 18, 2019

```
 1     APPEARANCES:

 2

 3        On Behalf of Defendant CitiStaff Solutions, Inc.:

 4              LAFAYETTE & KUMAGAI LLP
                BY:  SUSAN T. KUMAGAI, ESQ.
 5              1300 Clay Street
                Suite 810
 6              Oakland, California  94612
                415.357.4600
 7              skumagai@lkclaw.com

 8

 9        Also Present:

10              TERESA KASSAYAIN, West Valley Staffing Group

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   the B last name is.

 2        Q.    Burris?

 3        **A.    Burris.   Thank you.**

 4        Q.    So you contacted those two people first?

 5        **A.    Yes.**

 6        Q.    Why did you contact Anton Baruh?

 7        **A.    To inform him of the discrimination.**

 8        Q.    What was it about Anton Baruh's position,

 9   as you understood it, that you thought it would be

10   appropriate to email your timeline to him?

11        **A.    They were in-house human resources for West**

12   **Valley contractors to communicate with at the time, so I**

13   **thought that that was the appropriate channels.**

14        Q.    And the same for Lewis Burris?

15        **A.    I thought they were part of the same team and**

16   **that's what I was instructed.**

17        Q.    By whom?

18        **A.    Themselves.**

19        Q.    Did you have a supervisor while you worked for

20   West Valley Staffing Group when you were assigned at

21   Tesla?

22        **A.    No.**

23        Q.    What was your job at Tesla?

24        **A.    I was a production associate, and I also**

25   **worked as part of the quality and manufacturing and**

 1   training team.  I worked as a media specialist and I
 2   was a quality inspector.
 3       Q.    Who was your supervisor for those positions?
 4       A.    As the production associate, as mentioned,
 5   Josh Vasquez, and Ron, with an L.
 6       Q.    We'll get the spelling for Ron.
 7       A.    Thanks.
 8       Q.    I know who you're talking about.
 9             So what did Ron L. supervise you for?
10       A.    Well, he took over for Josh.  He was the
11   powertrain, PWT's floor supervisor.
12       Q.    And Josh Vasquez had been the powertrain --
13       A.    Yeah, for a while.
14       Q.    -- supervisor?
15       A.    Yes.
16       Q.    Okay.  Did you have any other supervisors at
17   Tesla besides those two gentlemen?
18       A.    Oh, yeah.
19       Q.    Who?
20       A.    Maria, she was the supervisor for the
21   manufacturing and training department; Elon, because he
22   was part of the media specialist, he took the lead on
23   most of that stuff.
24       Q.    Elon who?
25       A.    As in Elon Musk.

TITUS MCCALEB

June 18, 2019

```
 1   Disclosures Pursuant to General Order No. 71.
 2              (Exhibit 2 marked for identification.)
 3   BY MR. HORTON:
 4        Q.    Have you seen Exhibit 2 before?
 5        A.    No.
 6        Q.    All right.  I'm going to point you to a
 7   particular section of Exhibit 2.  I'd like you to turn
 8   to page 8 of Exhibit 2, and I'd like you to look at
 9   about the middle of the page where it says, "Titus
10   McCaleb."
11              Do you see that?
12        A.    I do see that.
13        Q.    Okay.  I'll just read it.  It says,
14   "Titus McCaleb," and then to the right of that it
15   says, "Mr. McCaleb may be contacted through Plaintiffs'
16   counsel," and then the next column reads:
17              "Mr. McCaleb has knowledge of the
18               racially harassing, discriminatory,
19               and retaliatory treatment of Defendant
20               West Valley's employees at Tesla's
21               Fremont factory."
22              Do you see that?
23        A.    Yes, I do.
24        Q.    Okay.  Is that statement that I just read
25   correct?
```

TITUS MCCALEB

1      A.    It's accurate, yes.

2      Q.    What do you know about this particular subject

3   matter?

4            MS. AVLONI:  Objection.  Compound.  Vague and

5   ambiguous.  Calls for a narrative.

6            THE WITNESS:  That there were multiple

7   racial -- highly racially charged words and slurs,

8   things posted, etched into places, discriminatory

9   things.  I've witnessed them, been part of them, been

10  treated with such, and also experienced the retaliation

11  for things that I spoke on.

12  BY MR. HORTON:

13     Q.    Anything else?

14            MS. AVLONI:  Vague and ambiguous.  Calls for a

15  narrative.

16            THE WITNESS:  Nothing else.  I don't...

17  BY MR. HORTON:

18     Q.    All right.  What words are you referring to?

19     A.    Are you asking me -- can you rephrase that?

20  I don't understand.

21     Q.    Well, I'd like you to give me more details

22  about the list that you just gave to us.  The first item

23  on your list was "racially charged words."

24     A.    Okay.  So --

25     Q.    Okay?  So what racially charged words did you

 1   hear while working at Tesla?

 2       A.    The N-word with g-g-e-r, which I guess I have

 3   to say for the record it's "nigger" and I've heard the

 4   N-word with the g-g-a, which is "nigga," and other terms

 5   used for other ethnicities that -- yeah, I guess I have

 6   to say them now because we're all here.

 7       Q.    Yeah, you have to say them.

 8       A.    People called spic, wetback.

 9       Q.    I'm sorry.  What was that?

10       A.    Spic, wetback, gook, yellow-tailed assholes,

11   faggots, and those fucking queers.

12              My apologies.

13       Q.    Do you recall hearing any other similar types

14   of epithets at Tesla?

15       A.    I'm sorry.  Can you rephrase that.

16              And I may need to take a moment after this.

17       Q.    Okay.  Do you recall hearing any other similar

18   types of epithets while you were working at Tesla?

19       A.    Yeah, I'm a little upset.  I may need a

20   minute.

21              MS. AVLONI:  Can we take a break?

22   BY MR. HORTON:

23       Q.    Well, we might as well get the list out and

24   then you can take a break.  What other words do you

25   recall?

1      Q.    Can you recall any other words?

2      A.    No.

3      Q.    Okay.  Who said the words that you listed?

4      A.    A few of my production associates on lines

5      that I participated on, as well as seeing them scribbled

6      into stalls and on top of fliers.

7      Q.    I'm just interested right now in the words

8      that you heard spoken.  Okay?

9      A.    Okay.

10     Q.    Who did you hear speak the words that you just

11     listed that you considered to be racially charged?

12     A.    Production associates, other people on lines,

13     in the cafeterias, and throughout the warehouse, as well

14     as a lead.

15     Q.    Anyone else?

16     A.    Off the top of my head that's all I can

17     recall.

18     Q.    Did you hear anyone you would characterize as

19     a supervisor saying any of these words while you worked

20     at Tesla?

21            MS. AVLONI:  Calls for a legal conclusion.

22     It's vague and ambiguous as to "a supervisor."

23            THE WITNESS:  One more time with the question.

24            MR. HORTON:  Would you read back the question,

25     please.

TITUS MCCALEB

1      Q.    Did anybody working for Tesla ever call you a

2   yellow-tailed asshole?

3      A.    No.

4      Q.    Did anybody working for Tesla call you a

5   faggot?

6      A.    No.

7      Q.    Did anybody working for Tesla call you one of

8   those fucking queers?

9      A.    No.

10     Q.    Did anybody working for West Valley say any of

11  those things to you, to call you one of those things?

12          MS. AVLONI:  Objection to the extent it calls

13  for speculation as to the relationship between the

14  individual and the entity.

15          You can answer.

16          THE WITNESS:  No.

17  BY MR. HORTON:

18     Q.    What were the circumstances of you hearing the

19  word n-i-g-g-e-r at Tesla?

20     A.    What were the circumstances --

21     Q.    Yes.

22     A.    -- for me hearing this?

23     Q.    Right.

24     A.    Explaining to a person in charge that I was

25  being called -- I'm going to refer to the word "nigger,"

TITUS MCCALEB

June 18, 2019

```
 1   with "g-g-e-r" from here out and the word "nigga" with
 2   "g-g-a" from here out.
 3              When I mentioned anything or when I was
 4   referred to with the word g-g-e-r, it was due to
 5   speaking to someone who was supposed to be in charge
 6   about someone talking to me using the term or the
 7   word g-g-a.
 8        Q.    So when you were complaining about it or
 9   reporting it?
10        A.    Reporting it.  I was not complaining.
11        Q.    You weren't?
12        A.    I'm reporting the fact that I don't appreciate
13   it.
14        Q.    Okay.  Who actually said the word n-i-g-g-e-r
15   to you?
16        A.    Carlos, a Marcella -- do you need time?
17              MS. AVLONI:  I'm sorry, can you read back the
18   question.
19              (Record read as follows:
20                "Q.  Who actually said the word n-i-g-g-e-r
21              to you?")
22              THE WITNESS:  Oh, g-g-e-r.  I thought you
23   said -- so, yes.
24   BY MR. HORTON:
25        Q.    Let me restate the question.
```

TITUS MCCALEB

June 18, 2019

1      A.    Yes, I've heard it spoken.

2      Q.    And it was spoken as "Nguyen"?

3      A.    Yes.

4      Q.    Okay.  So Khoi Nguyen called you an

5    n-i-g-g-e-r?

6      A.    Yes.

7      Q.    Did anybody else at Tesla call you an

8    n-i-g-g-e-r?

9      A.    No.

10     Q.    How many times did Khoi Nguyen called you an

11   n-i-g-g-e-r?

12     A.    It was just the once.

13     Q.    Who at Tesla called you n-i-g-g-a, if anybody?

14     A.    Carlos.

15     Q.    And what is Carlos' last name?

16     A.    Unfortunately, I do not remember his last

17   name.

18     Q.    Is it your understanding that Khoi Nguyen

19   worked for Tesla at the time that he called you an

20   n-i-g-g-e-r?

21     A.    Yes.

22           MS. AVLONI:  Objection.  Calls for speculation

23   as to the employment relationship.

24   BY MR. HORTON:

25     Q.    And what was Khoi Nguyen's position when he

1    called you an n-i-g-g-e-r?

2        A.    A lead supervisor -- or a lead.  Sorry.

3        Q.    Lead?

4        A.    Just a lead.

5        Q.    A lead what?  Lead production associate?

6        A.    Oh, yes.

7        Q.    And how do you know that he was a lead?

8        A.    He was transferred from one line to work on

9    our line.

10       Q.    And that made him a lead, in your mind?

11       A.    The supervisors gave him said title.

12       Q.    Which supervisor gave him that title?

13       A.    Josh.

14       Q.    How did Josh characterize Khoi Nguyen's

15   position as a lead?

16       A.    How did he characterize it?

17       Q.    Yeah.  What did Josh tell you to indicate to

18   you that Khoi Nguyen was a lead at that time?

19       A.    "Hey, guys, here's Khoi.  He's going to be

20   your new lead."

21       Q.    Okay.  Did Josh ever refer to Khoi Nguyen as a

22   supervisor?

23       A.    No.

24       Q.    As far as you understood, did Khoi Nguyen have

25   the power to fire you?

TITUS MCCALEB

June 18, 2019

```
 1   BY MR. HORTON:
 2       Q.   Did anyone else while you worked at Tesla call
 3   you an n-i-g-g-e-r other than Khoi Nguyen?
 4       A.   No.
 5       Q.   And you've identified Carlos as a person at
 6   Tesla who called you an n-i-g-g-a; correct?
 7       A.   Correct.
 8       Q.   Did anyone else call you an n-i-g-g-a?
 9       A.   Yes.
10       Q.   Who else called you that?
11       A.   Marcello.
12       Q.   Who?
13       A.   Marcello.
14       Q.   Anybody else?
15       A.   Colton.
16       Q.   Anybody else?
17       A.   Giddeon.  That's G-i-d-d-e-o-n.
18       Q.   -d-d-o-n?
19       A.   G-i-d-d-e-o-n.
20       Q.   Did anyone else at Tesla call you an
21   n-i-g-g-a?
22       A.   Right now I can't exactly remember a name.
23       Q.   But there was one more person?
24       A.   I believe so, yes.
25       Q.   Can you describe that person?
```

```
 1   my job."

 2        Q.    So did she do that?

 3              MS. AVLONI:  Calls for speculation.

 4              THE WITNESS:  Yeah, I have no clue.

 5   BY MR. HORTON:

 6        Q.    Were you satisfied with the manner in which

 7   Agnes Lewis dealt with your reporting of Marcello's use

 8   of the nigga word?

 9        A.    Not at all.

10        Q.    And why not?

11        A.    Everything that transpired afterwards.  My

12   six-month contract was coming to an end.  Tesla sent me

13   a letter, you know, stating that I was -- congratulating

14   me that I was going to become a full-time employee.

15              These situations were being handled supposedly

16   by Agnes and Brandie To, and everything led on for --

17   like I said, my contract got extended and all these

18   different things started happening, and I had no clue

19   what was going on with Agnes' angle or Brandie's angle.

20   I didn't get any information and I was wrongfully

21   terminated and never got any answers from these people

22   about what their investigations were.  Instead I was

23   told by Agnes at an undisclosed meeting location in

24   Fremont that she was sorry that she couldn't get the

25   information and I needed to back off or, per what she
```

TITUS MCCALEB

June 18, 2019

```
 1   was told, that I would be let go.  That's where that
 2   led me.
 3       Q.   Agnes actually told you you have to back off
 4   on your complaint about the use of the n-i-g-g-a word or
 5   you would be terminated?
 6       A.   Yes.  Based on not just the n-i-g-g-a word,
 7   but the complaints that were being filed with Brandie To
 8   and Afton.  She met me, like I told you, at an
 9   undisclosed location in Fremont.  We met for Indian
10   food, and that's where the conversation ensued.
11       Q.   So you had this offsite lunch with Agnes Lewis
12   while you were working at Tesla?
13       A.   Yes.
14       Q.   And where was that Indian restaurant?
15       A.   In Fremont.  She would have to give you that
16   location, or I can send it to my lawyer, if she wants.
17       Q.   Did she invite you to lunch?
18       A.   Yes.
19       Q.   Okay.  What did you discuss at that lunch?
20       A.   The HR complaints that I had already been
21   filing with her and with Tesla.
22       Q.   What specifically did she say to you about
23   those complaints during this lunch?
24       A.   That if I did not back off from all of the,
25   you know, accusations and things that I was bringing up,
```

1   was thinking, so I can't answer that.

2      Q.    What did you understand -- what did you

3   understand Agnes Lewis was telling you you should do at

4   this lunch?

5      A.    That I needed to leave my mouth shut and just

6   go to work if I wanted to have that job.

7      Q.    When did you have this lunch with Agnes Lewis?

8      A.    The exact date, I could not give you.

9      Q.    Can you give me an approximate date?

10     A.    It was roughly between the acceptance letter

11  from Tesla and the time that I was let go.

12     Q.    So sometime during your employment at Tesla?

13           MS. AVLONI:  Misstates prior testimony.

14           I think there's some confusion in regards to

15  the acceptance letter from Tesla.

16           THE WITNESS:  Oh, sorry.  I'll rephrase that

17  for you then.

18           The "Congratulations, you've been hired"

19  versus the West Valley acceptance letter of, you know,

20  "Come do six months under a West Valley contract," later

21  after my six-month contract was up, Tesla sent me a

22  separate email stating, "Congratulations, we want to

23  hire you on as a Tesla employee."

24  BY MR. HORTON:

25     Q.    And so that was at the conclusion of your

TITUS MCCALEB

```
 1   BY MR. HORTON:
 2       Q.    At the conclusion of your interview what were
 3   you told?
 4       A.    "Congratulations."
 5       Q.    Who told you that?
 6       A.    The interviewer.
 7       Q.    Yeah.  Who was it that told you that,
 8   "Congratulations"?
 9       A.    The interviewer.
10       Q.    Right.  Who was that?
11       A.    The interviewer.
12       Q.    And you don't know who it was?
13             MS. AVLONI:  Asked and answered.
14             THE WITNESS:  As I stated, I did not remember
15   or recall the interviewer's name.
16   BY MR. HORTON:
17       Q.    Do you recall the interviewer's position at
18   Tesla?
19       A.    I don't recall the interviewer's name so I
20   don't recall their position.
21       Q.    What exactly did they say?  Just
22   "Congratulations"?
23       A.    "Congratulations and we will be talking about
24   this later.  You can go back to your line."  That was
25   that.
```

TITUS MCCALEB

June 18, 2019

```
 1      Q.    Did you ever hear from Tesla again?
 2      A.    About the position or --
 3      Q.    Yeah, about the position.
 4      A.    No.
 5      Q.    How were you notified that you were not going
 6   to be hired by Tesla?
 7      A.    I wasn't notified that I wasn't going to be
 8   hired.  I was notified that I would not be coming back.
 9      Q.    Coming back to what?
10      A.    To work.
11      Q.    So at one point in time somebody told you,
12   "You don't have to come in tomorrow," or the next day?
13      A.    Correct.
14      Q.    Who told you that?
15      A.    I can't recall right away.
16            THE WITNESS:  Sorry I was a little fast.
17   BY MR. HORTON:
18      Q.    Was it somebody employed by West Valley?
19      A.    Once again, I'm not going to state that I
20   remember if it was West Valley or Tesla.
21      Q.    How were you informed of that?
22      A.    Oh, I don't recall if it was direct or by
23   email -- it definitely wasn't by email, but I don't
24   remember if it was a direct conversation or if it was
25   through some other means.
```

TITUS MCCALEB

June 18, 2019

1       **A.      No.**

2       Q.      How many times did Giddeon say the word to

3    you?

4       **A.      The one time.**

5       Q.      Did you report Colton's use of the n-i-g-g-a

6    word to anybody?

7       **A.      As we just spoke about, due to the**

8    **circumstances and what was going on, I felt that my job**

9    **safety was already at risk.**

10      Q.      So your answer is "no"?

11      **A.      Yes, I did not.**

12      Q.      Did you report Giddeon's use of the n-i-g-g-a

13   word to anybody?

14      **A.      As I explained earlier, I did to Khoi.**

15      Q.      And you've already told us what Khoi's

16   response was.

17      **A.      Correct.**

18      Q.      All right.  What were the circumstances of

19   this Asian person working on the Ant Hill's use of the

20   n-i-g-g-a word in your presence?

21      **A.      One more time.  You said "the circumstances"?**

22      Q.      Circumstances.

23      **A.      I think the circumstance varied.  He just**

24   **flung it out like it was verbal candy per se.**

25      Q.      Okay.  To the best of your recollection, what

TITUS MCCALEB

June 18, 2019

1   exactly did this Asian person say to you?

2       A.    "Oh, nigga, you crazy.  Oh, nigga, come on.

3   Oh, nigga, I don't understand this.  Oh, nigga, are you

4   trying to tell me I can't say that?  Oh, nigga, hold

5   on."  I mean, and there were various other explicit ways

6   of using it that he just deemed appropriate.

7       Q.    So did you work with the Asian or was he

8   in another part of the production line that you only

9   occasionally had to visit?

10      A.    I worked with him at first on an occasional,

11  perhaps, chance and when I was moved much later closer

12  towards the termination, I worked directly with him on a

13  daily basis.

14      Q.    How many times did the Asian use the n-i-g-g-a

15  word?

16      A.    It was similar to Carlos where it would be

17  flung about every, you know, few minutes within an hour.

18      Q.    Did you complain to the Asian?

19      A.    I did not due to -- once again, this was after

20  the meeting with Agnes and so forth.

21      Q.    So the Asian started using the n-i-g-g-a word

22  at a point in time that was after this lunch that you

23  had with Agnes Lewis at the Indian restaurant?

24      A.    Closer towards my term- -- or termination, or

25  whatever the case was, yes.

TITUS MCCALEB

June 18, 2019

1      Q.    Did he ever use it before?

2      **A.    Yes.**

3      Q.    Did you complain about it before?

4      **A.    No.  He was right in front of the supervisors**

5      **and leads slinging it out.**

6      Q.    What supervisor heard him use that word?

7      **A.    Josh, Ron, Afton heard him saying it.  The**

8      **other supervisors that were Ant Hill, I can't quite**

9      **remember their names.  But quite a few leads and**

10     **supervisors heard him say it, and I believe even**

11     **the -- not the director of ops but the manager in the**

12     **powertrain department heard him saying it as well in a**

13     **meeting.**

14     Q.    I want to go back to Giddeon briefly.  Did you

15     report Giddeon's use of the n-i-g-g-a word to anybody at

16     West Valley Staffing Group?

17     **A.    Yes.**

18     Q.    Who?

19     **A.    Lewis, Anton.**

20     Q.    Anton Baruh?

21     **A.    Yes.**

22     Q.    He works at Tesla?

23     **A.    At the time he was -- maybe we're thinking of**

24     **two different people.  But at the time what I know was**

25     **Anton was working with Lewis.**

```
 1              Then all of this information was later --
 2   I don't know if you have these emails, if you're with
 3   West Valley, but I wrote out a long email to West Valley
 4   about the incidents.  And then there was -- like I
 5   mentioned before, I didn't get any kind of answers back.
 6   And after not getting any answers back I had to take up
 7   things with Tesla's HR.
 8              I'm not sure if this is answering your
 9   question, but that's where and how I had to deal with
10   retaliation and discrimination and everything else going
11   on and making a paper trail, follow everything that was
12   happening that I noticed.
13       Q.    So what you just described is the treatment
14   and the retaliation that you felt was discriminatory?
15       A.    Well, it's part of it, you know.
16       Q.    Well, what treatment are you referring to that
17   was discriminatory?
18       A.    As to how I was discriminated against?
19       Q.    Yes.  You or other West Valley employees.
20             MS. AVLONI:  Objection to the extent it calls
21   for a legal conclusion.
22             You can answer.
23             THE WITNESS:  Can you repeat his question for
24   me, please.
25   / / /
```

1    I complained directly to leads, supervisors, and anyone

2    else that would hear, whether on site or off site, about

3    my discriminatory actions that happened to me and about

4    the racial incidences that I was involved with with

5    someone coming to me to call me things that I found

6    offensive.  And I --

7    BY MR. HORTON:

8        Q.    And I think you've already --

9        A.    Can I finish talking --

10       Q.    -- described those things that were said --

11       A.    -- as you just asked me so I can answer the

12   question so she doesn't have to worry about two people

13   speaking, please?

14       Q.    Sure.

15       A.    Thank you.

16             I, Titus McCaleb, sat with your employees

17   as well as someone outside of the location to get more

18   information as to what someone was going to do to help

19   me with a human resource problem.  In turn, I was being

20   told that everything was being investigated.  When

21   I pushed further, I became part of the retaliation

22   treatment in which I got moved from the location that I

23   was a workstation trainer at, and I had basically built

24   up a lot of promotions to happen for me within a short

25   period of time that I was at Tesla, I was pushed out of

TITUS MCCALEB

June 18, 2019

```
 1   this area.
 2           And the person who harassed me, threatened me,
 3   that I had to go to Fremont police to file a complaint
 4   on, stayed in this station and received a complete
 5   different treatment.  And while all this was occurring,
 6   I still could not get any information from your human
 7   resources department or Tesla's human resource
 8   department.
```

 9           I don't know how else to explain retaliatory

10   treatment, outside of what I noticed, besides watching

11   other Tesla employees being placed in corners, which I

12   already described earlier how this would occur, to get

13   you to understand how I noticed everything that you just

14   re-asked me about.

15           Am I not answering your question?

16       Q.   I need to know some more details, but I'm not

17   sure you really explained being placed in corners.  I

18   think you mentioned something about a lead who would

19   take somebody from one place in the production line

20   and put them in a less busy part of the line that you

21   referred to as "a corner."  I don't know what exactly

22   you mean by that though.

23           I'd like to get some more -- if you could be

24   a little clearer about that, I would appreciate that.

25   I'm not sure what you're saying.

TITUS MCCALEB

June 18, 2019

1   that were occurring, but this isn't the full timeline

2   as -- that was provided to like EEOC or other places

3   that I have in my email as well.

4        Q.   Okay.  The timeline that you shared with

5   West Valley Staffing Group, is that contained in

6   Exhibit 4?

7             MS. AVLONI:  Carefully look through it if you

8   have to refresh your memory.

9             THE WITNESS:  Yeah.  No, it's not.  Once

10  again, I knew that off the top of my head.  No, it's

11  not.

12  BY MR. HORTON:

13       Q.   Are any parts of the timeline that you

14  provided to West Valley included in Exhibit 4?

15       A.   There are events that occurred that are

16  described in here.  But the timeline of things that

17  occurred per the racial incidents that I was involved in

18  or had been subjected to and incidents regarding to the

19  managers and everything else are not included in here.

20       Q.   And you do still have a copy of that timeline?

21       A.   Oh, yeah.

22       Q.   And you'll provide me a copy?

23       A.   Provided that it's okay with my lawyers, yes.

24       Q.   All right.  So you worked for West Valley

25  Staffing Group assigned to Tesla between November 7th --

TITUS MCCALEB

June 18, 2019

 1   I'm sorry -- November 6th of 2016 and June 6th of 2017;

 2   is that correct?

 3      A.    I don't have exact dates, but if you have them

 4   there in front of you.

 5      Q.    Well, does that sound right to you?

 6      A.    It sounds close to right.

 7      Q.    Do you have any reason to believe those are

 8   not the correct dates?

 9      A.    Other than not having the paperwork right

10   in front of me myself, yes, I do have reasons to not

11   answer "yes" to what you're saying.

12      Q.    Do you have any evidence to indicate that

13   those are not the correct dates of your employment at

14   West Valley Staffing Group?

15      A.    Do I have any evidence to prove that?  Is that

16   what you're asking me?

17      Q.    Yes.  Do you have any information to suggest

18   that November 6th, 2016, through June 6th, 2017, are

19   not the correct dates of your employment at West Valley

20   Staffing Group assigned to Tesla?

21      A.    I would have to look up the dates on my phone

22   to answer and say whether those are the dates or not.

23   I'm not sure.

24      Q.    It sounds right, though?

25      A.    Yes, it sounds like it could be right.

TITUS MCCALEB

June 18, 2019

1            I, JANIS JENNINGS, CSR No. 3942, Certified

2    Shorthand Reporter, certify:

3            That the foregoing proceedings were taken

4    before me at the time and place therein set forth, at

5    which time the witness was duly sworn by me;

6            That the testimony of the witness, the

7    questions propounded, and all objections and statements

8    made at the time of the examination were recorded

9    stenographically by me and were thereafter transcribed;

10           That the foregoing pages contain a full, true

11   and accurate record of all proceedings and testimony.

12           Pursuant to F.R.C.P. 30(e)(2) before

13   completion of the proceedings, review of the transcript

14   [  ] was [X] was not requested.

15           I further certify that I am not a relative or

16   employee of any attorney of the parties, nor financially

17   interested in the action.

18           I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21           Dated this 28th day of June 2019.

22

23

24   _____

     JANIS JENNINGS, CSR NO. 3942

25         CLR, CCRR

# Exhibit

# **16**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEMETRIC DIAZ, et al.,            )
                                  )
                Plaintiffs,       )
                                  )  Case No.
        v.                        )  3:17-cv-06748-WHO
                                  )
TESLA, INC., et al.,              )
                                  )
                Defendants.       )
_____)

VIDEOTAPED DEPOSITION OF ANDRES DONET

DATE:              Thursday, October 24, 2019

TIME:              4:39 p.m.

LOCATION:          Sheppard, Mullin, Richter &
                   Hampton LLP
                   379 Lytton Avenue
                   Palo Alto, California  94301

REPORTED BY:       Peter Torreano, CSR, CRR
                   Certified Shorthand Reporter
                   License Number C-7623

```
 1                    A P P E A R A N C E S:

 2      For the Plaintiffs:

 3              California Civil Rights Law Group
                By:  LAWRENCE A. ORGAN
 4              larry@civilrightsca.com
                332 San Anselmo Avenue
 5              San Anselmo, CA 94960
                (415) 453-4740
 6
        For the Tesla Defendants and the Deponent:
 7
                Sheppard, Mullin, Richter & Hampton LLP
 8              By:  SAMI HASAN
                shasan@sheppardmullin.com
 9              Four Embarcadero Center
                Fourteenth Floor
10              San Francisco, California  94111
                (415) 774-3286
11
        For Defendant NextSource, Inc.:
12      (Telephonically)

13              Fisher & Phillips LLP
                By:  VINCENT J. ADAMS
14              vadams@fisherphillips.com
                One Embarcadero Center
15              Suite 2050
                San Francisco, California  94111
16              (415) 490-9000


18

19

20

21

22

23

24

25
```

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

16:50:23  1       A.   Andre.

16:50:25  2       Q.   Andre.

16:50:26  3       A.   The same as my name but without the S.

16:50:30  4       Q.   Okay.  If you could spell that last name again

16:50:33  5  one more time.

16:50:33  6       A.   L-L-A-L-J-I-E.

16:50:36  7       Q.   L-L-A-L-J-I-E?

16:50:40  8       A.   Right.  Llaljie.  And that's the way they

16:50:43  9  pronounce that, "Llaljie."

16:50:44 10       Q.   Llaljie.  Okay.  So at some point when you

16:50:48 11  first started in August of 2015 you were reporting to

16:50:54 12  Victor Quintero; is that correct?

16:50:56 13       A.   Yes, that's correct.

16:50:58 14       Q.   And then sometime after that your job duties

16:51:01 15  were transferred -- I mean your reporting relationship

16:51:05 16  was transferred to an Andre?

16:51:07 17       A.   Llaljie.

16:51:08 18       Q.   Llaljie; is that correct?

16:51:09 19       A.   Llaljie.

16:51:10 20       Q.   Llaljie?

16:51:12 21       A.   Yeah.

16:51:12 22       Q.   And what was Mr. Llaljie's name -- title?

16:51:16 23       A.   He was the facilities director, as far as I

16:51:22 24  can remember.

16:51:22 25       Q.   Okay.  Now, in terms of -- were there some

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

16:51:42  1    sort of policies relating to what to do about graffiti

16:51:46  2    in the bathrooms that Tesla had?

16:51:48  3             MR. HASAN:  Objection.  Vague and ambiguous.

16:51:51  4             THE DEPONENT:  What do you mean with policies?

16:51:53  5    BY MR. ORGAN:

16:51:53  6        Q.   Like procedures or a checklist or anything

16:51:57  7    along those lines?

16:51:58  8        A.   No.  At that point -- we are talking about

16:52:02  9    that period of time.  Right?

16:52:04 10        Q.   2015, 2016, that time period.

16:52:06 11        A.   Yeah.  No.  It was sort of a non-written

16:52:14 12    process that the -- well, whoever any -- any employee

16:52:21 13    that went into the bathroom that saw the graffiti

16:52:24 14    there, they just report it in order to be cleaned, to

16:52:28 15    be erased.  Right?  That was pretty much the thing and

16:52:31 16    we sent a janitor employee to take care of.

16:52:35 17        Q.   So is it true that you helped develop then the

16:52:39 18    procedures for how to deal with graffiti in the

16:52:43 19    bathroom?

16:52:43 20        A.   No.

16:52:44 21             MR. HASAN:  Objection.  Assumes facts.

16:52:47 22             Give me some time to object.

16:52:48 23             THE DEPONENT:  Okay.  No, I did not.

16:52:50 24    BY MR. ORGAN:

16:52:50 25        Q.   Who came up with the procedures on how to deal

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:10:00 1   over and clean that thing out, off.  So that's the

17:10:05 2   whole thing.

17:10:05 3       Q.   I'm going to show you what's been marked as

17:10:08 4   Exhibit 193.  For the record Exhibit 193 is a

17:10:13 5   three-page document Bates-stamped Tesla 1003 to 1005.

17:10:23 6           Look it over and then I'll ask you some

17:10:25 7   questions.  1005.

17:10:50 8       A.   I don't remember this even though I sent an

17:10:53 9   e-mail reporting it was clean.  Yeah, that's me.  But I

17:10:59 10  don't -- are you sure these were together?

17:11:03 11      Q.   Yes.  I'm positive because that's how they

17:11:05 12  were produced to us.  And if you look at the second

17:11:08 13  page of it, the complaint from Mr. Colvin, Kevin

17:11:13 14  Colvin, you see that second page?  It says, "This is

17:11:15 15  the bathroom located by the elevator while walking

17:11:19 16  upstairs.  The writing says 'All niggers must die.'"

17:11:22 17          So that's the e-mail that was sent to three

17:11:25 18  people, Roel Kliatchko, Jonathan Baldoza and Rob Lewis.

17:11:33 19  Do you know who those people are?

17:11:34 20      A.   No.  I don't remember them.

17:11:36 21      Q.   Okay.  But at some point Roel --

17:11:39 22      A.   Kliatchko.

17:11:40 23      Q.   -- Kliatchko sent an e-mail back and then

17:11:44 24  you -- you somehow get it?

17:11:50 25      A.   Yeah.  Because I belong to the building

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:11:54   1   services areas.

17:11:55   2        Q.    I see.

17:11:56   3        A.    Yeah.  So that's why I -- I -- I answer.

17:12:02   4   Later I received a report back from the janitorial

17:12:06   5   company letting me know that the thing was cleaned.

17:12:10   6   But I don't recall this -- this picture, this graffiti.

17:12:14   7   It's pretty bad.

17:12:15   8        Q.    Pretty bad, yeah.

17:12:16   9        A.    Yeah.

17:12:16  10        Q.    You think the graffiti is pretty bad; right?

17:12:20  11        A.    Well, "The world will end."  Yeah, I can

17:12:26  12   understand about it.

17:12:26  13        Q.    Does the "all niggers must die," does that

17:12:30  14   bother you, too?

17:12:31  15        A.    Of course.  Nobody is supposed to die and

17:12:34  16   that's a bad word to say.  So yeah.

17:12:37  17        Q.    Were you aware -- when you were walking around

17:12:40  18   during your rounds did you ever hear the N word?

17:12:44  19        A.    No, no, no, no, no.

17:12:46  20        Q.    Never did.

17:12:47  21        A.    No, no, no.

17:12:47  22        Q.    And the swastika that's on this, that's pretty

17:12:51  23   bad, too, isn't it?

17:12:53  24        A.    It is.  But I haven't seen that before.

17:12:55  25        Q.    Okay.  Except when you received this picture?

1   REPORTER'S CERTIFICATE

2       I, Peter Torreano, duly authorized to

3   administer oaths pursuant to Section 2093(b) of the

4   California Code of Civil Procedure, do hereby certify:

5       That the witness in the foregoing deposition

6   was administered an oath to testify to the whole truth

7   in the within-entitled cause; that said deposition was

8   taken at the time and place therein cited; that the

9   testimony of the said witness was reported by me and

10  was thereafter transcribed under my direction into

11  typewriting; that the foregoing is a full and

12  accurate record of said testimony; and that the witness

13  was given an opportunity to read and correct said

14  deposition and to subscribe the same.

15      Pursuant to Federal Rule 30(e), transcript

16  review was requested.

17      I further certify that I am not of counsel nor

18  attorney for any of the parties in the foregoing

19  deposition and caption named nor in any way interested

20  in the outcome of the cause named in said caption.

21                          Dated:  November 2, 2019

22

23

24      _____
        PETER TORREANO, CSR NO. 7623

25

# Exhibit

# **17**



## WEST VALLEY STAFFING GROUP

### THE WEST VALLEY STAFFING GROUP
### STAFFING SERVICES AGREEMENT FOR TESLA MOTORS, INC.

**THIS STAFFING SERVICES AGREEMENT** (the "Agreement") is made by and between Tesla Motors, Inc. ("Tesla"), a Delaware corporation, with offices located at 45500 Fremont Boulevard, Fremont, CA 94538, and West Valley Staffing Group ("WVSG"), a California corporation, with its principal place of business at 390 Potrero Avenue, Sunnyvale, CA 94085.

In consideration of the promises, mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, Tesla and WVSG agree as follows:

**DEFINITIONS.** The terms defined in this section shall have the meanings set forth below whenever they appear in this Agreement, unless a different definition is described for a particular Section or provision:

- "Associate" means the worker assigned by WVSG to work for Tesla.

- "Payroll Service Associates" means those individuals identified, screened, and selected by Tesla and subsequently placed on WVSG payroll.

- "Recruited Associates" means those individuals identified and screened by WVSG and then selected by Tesla and subsequently placed on WVSG payroll.

- "Direct Placements" means those individuals identified and screened by WVSG and hired as regular full time employees by Tesla.

- "On-Site Manager/Staff Members" means internal WVSG employees who manage and/or administer the WVSG staffing program at Tesla.

1

WV000051

I.    **THE ASSOCIATE**

WVSG will pay the wages of the Associates and will withhold all income and social security taxes from wages and will pay workers' compensation insurance premiums, state and federal unemployment taxes, and the employer's share of social security taxes on their behalf. WVSG is solely responsible for all such aspects of its employment relationship with the Associates, and WVSG reserves the exclusive right to negotiate with its Associates and make the final determination as to the rates of pay and total compensation to be paid to each of WVSG's Associates. Please see <u>Exhibit A</u> for WVSG's Proposed On-Site Program Model.

II.   **SUPERVISION**

WVSG will supply the Associates to Tesla to supplement Tesla's own work force. Tesla will direct and supervise the Associates on the job. WVSG does not supply persons to supervise or oversee the Associate absent specific written agreement.

III.  **GUARANTEE**

Our commitment to quality and excellent service has made our organization a leader in the staffing industry. To that end, WVSG is pleased to offer the following guarantee:

**Associates:**

WVSG assures Tesla's satisfaction with its Associates' service by offering an eight-hour guarantee. If Tesla is dissatisfied on the first day of employment with an Associate's technical abilities, WVSG will replace the individual, and Tesla will not be charged for the first eight (8) hours provided WVSG is notified within 24 hours after the Associate's initial start date. This guarantee will not apply to Payroll Service Associates.

**Direct Placements:**

For Direct Placements (individuals who become members of Tesla's regular work force), WVSG provides a 30-day guarantee. If within the first 30 days of employment Tesla is not satisfied with the Direct Placement's performance, WVSG will refund the entire 20% placement fee.

WV000052

IV.   **PRICING AND CONVERSION TABLE:**

Pricing for Associates is based on the quoted bill rates below, which may be adjusted from time to time with the prior written agreement of Tesla. Statutory and other expenses are not included in the definition of "direct labor".

WVSG reserves the right to adjust these charges effective immediately based on changes in these expenses, which includes, but are not limited to, any increases in employer contributions to any social security, unemployment, disability, health insurance, welfare, Workers' Compensation or benefit program mandated by a federal, state or local government authority from or after the effective date of this Agreement.

1) All pricing for WVSG Recruited Associates will be at a quoted bill rate based on a markup of 32%

2) Payroll Service Staffing Option is based upon the following charges:

   *Payroll Service business:* 21% markup on direct labor.

   \* *Direct Labor Rate:* the hourly pay rate paid to the Associate by WVSG.

   - (Example:  Associate direct labor rate of $20.00/hr x 1.21 = (21% mark-up) = $24.20 bill rate)

3) The cost for criminal background checks for both Payroll Service Associates and WVSG Recruited Associates will be charged back to Tesla at cost.

4) No Monthly Fee for WVSG On-Site Manager / Staff Members (fee waived).

5) Quarterly rebate of 0.25% on all invoices paid within 15 days of invoice via ACH.

Direct Placements

The fee for all Direct Placements will be at 20% of the annual base salary inclusive of any sign-on bonuses and/or commissions.

| Example: | First year total compensation | = | $26,000 |
|----------|-------------------------------|---|---------|
|          | Placement fee:  $26,000 X 20% | = | $5,200  |

3

WV000053

**WVSG Recruited Associates Conversion Placement Fee Schedule**

(A)  The conversion placement fee schedule is based on 20% of the annual compensation, inclusive of any sign-on bonus.

(B)  There is a reduction in this fee for conversions based on the number of regular hours worked by the Associate who is converted as follows:

| Regular Hours Worked | Reduction From Full Fee |
|---|---|
| 0–200 | 20% of base salary |
| 201–400 | 16% of base salary |
| 401–550 | 12% of base salary |
| 551-650 | 8% of base salary |
| 651-1040 | 4% of base salary |
| 1041+ | 0% of base salary |

(C)  There is no conversion fee for Payroll Service Associates. Payroll Service Associates may be converted at any time free of charge.

## V.   INVOICE TERMS

Tesla will be billed weekly for all hours worked by WVSG Associates. Invoice terms are net 30 days. All payments will be remitted to: P.O. Box 49212, San Jose, CA  95161.  Late payments will be assessed interest at no more than six (6) percent per annum.

Direct Placements:

Direct Placement invoice terms are net 30 days from the start date of the placement. *Direct Placement fees not received within the 30-day remittance period will void the Direct Placement guarantee.*

General Terms:

All invoices will be remitted to: P.O. Box 49212, San Jose, CA 95161.  Late payments will be interest at no more than six (6) percent per annum.

4

WV000054

VI.   NON-SOLICITATION OF WVSG RECRUITED ASSOCIATES, ON-SITE MANAGERS, AND STAFF MEMBERS

All WVSG employees are subject to conversion and workforce transfer restrictions. Tesla agrees not to solicit any WVSG Recruited Associates, On-Site Managers or Staff Members, directly or indirectly, and Tesla agrees not to participate with any third party in soliciting any WVSG Recruited Associate, On-Site Manager or Staff Member, for the purpose of persuading the WVSG Recruited Associate, On-Site Manager or Staff Member to terminate their employment with WVSG and accept an offer of employment from Tesla, or from any third party who intends to hire the Associate for Tesla's benefit. This non-solicitation period is for a period of six (6) months after termination of this Agreement.

VII.   LIQUIDATED DAMAGES

In the event that Tesla utilizes any third party staffing company to hire a WVSG Recruited Associated for Tesla's benefit, Tesla agrees to pay WVSG an amount equal to 30% of the total compensation that WVSG expected to pay that WVSG Recruited Associate for one year if the WVSG Recruited Associate had continued to be employed by WVSG. In such case, no conversion placement fee pursuant to Section IV will be required.

In the event that Tesla utilizes any third party staffing company to hire a WVSG On-Site Manager or Staff Member or participates with any third party in doing so for Tesla's benefit, Tesla agrees to pay WVSG, an amount equal to the total compensation that WVSG expected to pay that employee for one (1) year if the WVSG On-Site Manager or Staff Member had continued to be employed by WVSG. The parties acknowledge that WVSG's actual damages in the event of Tesla's violation of Section VI, above, would be extremely difficult or impracticable to determine, therefore, the parties have agreed that the above amounts constitute a reasonable estimate of the damages that WVSG is likely to suffer as a result of Tesla's breach of Section VI, that the above amounts constitute liquidated damages, as defined by California Civil Code Section 1671, that these amounts are not intended as a forfeiture or penalty within the meaning of Civil Code sections 3275 or 3369, and that payment of these amounts shall be WVSG's exclusive remedy against Tesla in the event of Tesla's violation of Section VI. This Section VII shall survive the termination of this Agreement.

VIII.   BILLING

WVSG's Associates will present a time card to his/her supervisor for approval at the end of each week. This allows WVSG to compensate the Associates on a weekly basis and bill Tesla weekly at the quoted bill rate. Tesla is responsible to make certain that the time card is accurate before it is approved and submitted to WVSG. Tesla is also responsible for paying WVSG according to the payment terms herein.

IX.   INDEMNIFICATION

Tesla agrees to provide WVSG Associates whatever training, supervision, and equipment that may be necessary to preserve the Associate's right of privacy, to enable them to perform their assignment competently and safely, and as otherwise may be required by law. Tesla agrees to comply with all legal obligations relating to the protection of employees from unlawful discrimination and harassment, and to

5

WV000055

provide a safe workplace for WVSG Associates to enable them to perform their assignments, to the extent required by federal and state occupational safety and health laws.

**Indemnification by WVSG for Performance or Breach:**

WVSG will defend, indemnify and hold Tesla harmless from and against all Costs arising out of or resulting from a claim by a third party based upon or arising out of any of the following: (i)  services performed by WVSG under this Agreement, or the results thereof, which infringe a patent, copyright or other proprietary right or violate a trade secret; (ii) any negligent act or omission or willful misconduct of WVSG or its Associates; (iii) any breach of this Agreement by WVSG; and (iv) any breach by Associates or other individuals and entities performing services on behalf of WVSG (the "Claim(s)"). "Costs" is defined as any expenses reasonably related to the defense or payment of any Claims, including, but not limited to, damages, attorneys fees, expert witness fees, and court costs. Notwithstanding anything in this Agreement to the contrary, WVSG shall not be obligated to indemnify Tesla pursuant to this Section, unless Tesla: (i) promptly notifies WVSG in writing of all such Claims (provided, however, that failure to provide such timely notice shall not relieve WVSG of its obligation to indemnify unless such failure is prejudicial to the defense or settlement of the Claim); (ii) cooperates reasonably with WVSG in defending such Claims; and (iii) allows WVSG the sole right to control the defense (including the selection of counsel), or, at WVSG's sole option, to settle all such Claims. In the event of a Claim as described herein between or involving WVSG and Tesla, WVSG agrees to provide notice to Tesla of such claim and from time to time, apprise Tesla of the status of such Claim.  In addition, Tesla may participate in any such claim at its sole option and its own expense with counsel of its own choice and any settlement or other resolution of such a claim must be approved in writing by Tesla, such approval to not be unreasonably withheld. The foregoing states WVSG's entire obligation and liability and Tesla's sole and exclusive remedy with respect to any Tesla Claims.

**Indemnification by Tesla:**

Tesla shall indemnify, defend, and hold WVSG harmless from and against any and all Costs arising out of or resulting from a claim by a third party based upon or arising out of any of the following:  (i) conduct by Tesla which infringes a patent, copyright or other proprietary right or violates a trade secret; (ii) Tesla's failure to protect the confidential personnel information of WVSG's Associates in compliance with this Agreement; (iii) Tesla's breach of or failure to perform any of its obligations under this Agreement; and (iv) any reckless or willful act or omission of a Tesla's employee or employees that results in an injury of any kind to any of WVSG's Associates (the "WVSG Claim(s)"). "Costs" is defined as any expenses reasonably related to the defense or payment of any WVSG Claims, including, but not limited to, damages, attorneys fees, expert witness fees, and court costs. Notwithstanding anything in this Agreement to the contrary, Tesla shall not be obligated to indemnify WVSG pursuant to this Section, unless WVSG: (i) promptly notifies Tesla  in writing of all such WVSG Claims (provided, however, that failure to provide such timely notice shall not relieve Tesla's obligations to indemnify unless such failure is prejudicial to the defense or settlement of the WVSG Claim; (ii) cooperates reasonably with Tesla (at Tesla's expense) in defending such WVSG Claims; and (iii) allows Tesla the sole right to control the defense of (including the selection of counsel), or at Tesla's sole option, to settle all such WVSG Claims. In addition, WVSG may participate in any such claim at its sole option and its own expense with counsel of its own choice and any settlement or other

WV000056

resolution of such a claim must be approved in writing by WVSG, such approval to not be unreasonably withheld. The foregoing states Tesla's entire obligation and liability and WVSG's sole and exclusive remedy with respect to any WVSG Claims.

X.   MISCELLANEOUS PROVISIONS

### Confidentiality

All information, documents, software, reports, data, records, forms and other material developed by WVSG or its personnel for Tesla or obtained by or disclosed to WVSG or its personnel by Tesla (whether belonging to Tesla or not) in the course of performing the services herein are the proprietary, confidential and trade secret information of Tesla. WVSG and its personnel will deliver to Tesla all tangible forms of such proprietary confidential and trade secret information and all copies thereof (and all other property obtained from or through Tesla) when Tesla requests the same or immediately upon termination of this Agreement. WVSG and its personnel agree during the term of this Agreement and thereafter that it will take all steps necessary to hold Tesla and any of Tesla's proprietary, confidential and trade secret information in trust and confidence. WVSG and its personnel shall not use or disclose to any person, firm or entity any proprietary, confidential or trade secret information of Tesla without Tesla's express, prior written permission. WVSG acknowledges and agrees that any breach or threatened breach of this confidentiality provision could cause harm to Tesla for which money damages may not provide an adequate remedy. As such, WVSG agrees that in the event of such a breach or threatened breach of this confidentiality provision, in addition to any other available remedies, Tesla may seek temporary and permanent injunctive relief restraining WVSG or its personnel from disclosing or using, in whole or in part, any Tesla confidential information. The stipulations in this paragraph will survive the termination of this Agreement.

### Intellectual Property

WVSG agrees for itself and its personnel that all inventions, discoveries, or other intellectual property, whether patentable or not, any works of authorship, whether copyrightable or not, authored, created or conceived by WVSG and its personnel in whole or in part during the term of this Agreement (whether during or after normal working hours) or in the course of or related to providing services to Tesla shall be treated as if it were a "work for hire" and WVSG and its personnel shall immediately disclose to Tesla all discoveries, inventions enhancements, improvements and similar creations (collectively, "creations") made in whole or in part, by WVSG or its personnel in the course of or related to providing services to Tesla. All ownership and control of the above materials and creations, including any copyright, patent rights and all other intellectual property rights therein, shall vest wholly and exclusively with Tesla. WVSG and each of its personnel hereby assigns to Tesla all right, title and interest that WVSG and its personnel may have in such materials and creations, without any additional compensation and free of all liens and encumbrances of any type. WVSG affirms that the fee it has negotiated for the services performed under this agreement includes payment for assigning such rights to Tesla. WVSG agrees to execute any and all documents required by Tesla to register its rights and to implement the provision herein. WVSG shall indemnify, defend and hold Tesla harmless from any liability for, or assessment of, any claims or penalties with respect to any infringement of a third party's

7

WV000057

intellectual property rights by WVSG or any of its personnel. The stipulations in this paragraph will survive the termination of this Agreement.

**Term and Termination**

This Agreement shall commence on 1/4/13 (the "Effective Date") and expire on 1/4/18. The parties may extend the term or any subsequent term by executing a separate written agreement of extension prior to the expiration of the term. This Agreement shall automatically renew every six months beginning on 1/4/18 unless either party receives written notification.

This Agreement may be terminated by Tesla with a 30 day written notice to the WVSG for any reason, with or without cause. WVSG may terminate this Agreement with a 30 day prior written notice to Tesla. Upon termination of this Agreement, WVSG shall deliver all complete and partial deliverables and work product to Tesla and return any Tesla equipment and/or information, and Tesla will pay WVSG the amount due for outstanding and undisputed invoices incurred up to and including the time of termination, and no further work will be rendered under this Agreement. Such payment will constitute a full and complete discharge of Tesla's obligations under this Agreement.

**Assignment**

WVSG shall not assign this Agreement nor any right or interest under this Agreement (excepting moneys due or to become due) nor delegate any obligation to be performed by WVSG or its personnel under this Agreement without the prior written consent of Tesla. Any attempted assignment or delegation in contravention of this provision shall be void and ineffective.

**No Licenses**

No licenses, express or implied, under any patents are granted by Tesla to WVSG or its personnel under this Agreement.

**Entire Agreement**

All transactions during the term of this Agreement relating to the subject matter of this Agreement shall be governed by the provisions of this Agreement, except as the parties may otherwise expressly agree in writing executed by both of them. No change, modification or waiver of any of the provisions of this Agreement or of any provisions of any agreement made pursuant to this Agreement shall be binding on the parties unless in writing executed by the duly authorized representative of the party against whom enforcement of any waiver, change or modification is sought. The provisions of the Agreement and any written attachments hereto shall constitute the entire agreement between the parties relating to said Agreement, superseding all prior oral and written quotations, communications, and understandings of the parties in respect of the subject matter of this Agreement.

WV000058

Section Headings

The headings of the sections herein are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement.

Choice of Law

The construction, interpretation and performance of this Agreement and all transactions under it shall be governed by the laws of the State of California, without giving effect to the principles of conflicts of laws thereof.  The stipulations in this paragraph will survive the termination of this Agreement.

Notice

Any notice or demand, acknowledgment or other communication which under the terms of this Agreement must or may be given or made by either party shall be given or made by personal delivery, a nationally recognized courier service, Email, facsimile transmission or certified or registered mail, return receipt requested.  Notices shall be sent to the address listed below.


Tesla Motors, Inc.

3500 Deer Creek Road

Palo Alto, CA 94304

Attn: Legal Department


West Valley Staffing Group

390 Potrero Ave.

Sunnyvale, CA 94085

Attn: Charlie Allport, EVP


Severability

In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this agreement shall not be affected, impaired or invalidated, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. WVSG represents that WVSG has read and understands the terms of this Agreement, has had an opportunity to ask any question and to seek the assistance of legal counsel regarding these terms, and is not relying upon any advice from Tesla in this regard.

9

WV000059

Counterparts

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

WV000060

XI.     ACKNOWLEDGEMENT

I have read, acknowledge, and agree to the above terms and conditions. The parties have caused this Agreement to be executed by their duly authorized representatives and to be effective as of the Effective Date.

Tesla Motors, Inc.
45500 Fremont Blvd
Fremont, CA 94538

West Valley Staffing Group
390 Potrero Ave.
Sunnyvale, CA 94085

Name:   ARNNON GESHURI

Name:   Charlie Allport

Title:   VP, HUMAN RESOURCES

Title:   Executive Vice President

Signature:

Signature:

Date:   January 7th, 2013

Date:   January 4, 2013

11

WV000061

EXHIBIT A:  WVSG's Proposed On-Site Program Model

WVSG Service Model Includes:

- One full time On-Site Program Manager and additional support staff as necessary
- Manage all temporary employee relations issues
- Conduct On-boarding including:
  - Schedule group interview times with hiring managers
  - Contact designated candidates for interviews
  - Prepare interview folders for managers
  - Manage interview process
  - Review interview feedback from hiring managers
  - Contact selected candidates to offer position
  - Contact remaining candidates (non-selection)
  - Application processing of all new hires completed
  - Schedule start date
  - New hire orientation completed
- Conduct Off-boarding processes including termination procedure
- Implement WVSG Timekeeping/Payroll System
- Customized reporting and invoicing according to Tesla requirements
- Manage Co-employment to mitigate risk
- Screen all applicants with Tesla Human Resource requirements, including;
  - Verification of eligibility to work in the United States via the U.S. Justice Department I-9 form and E-Verify
  - WVSG to complete 7-year criminal background check
  - Complete WVSG and Tesla safety training
  - Administer all customized testing required by Tesla
- Develop and implement customized employee retention program
- Conduct Quarterly Business Reviews
- Conduct management and temporary employee surveys
- Full Service Recruiting via our four specialized companies:
  - West Valley Engineering, Inc. Engineering and Technical Personnel
  - Prostar Staffing Services, Inc. Clerical and Administrative Personnel
  - West Valley Technology Software and I.T. Personnel
  - Accountants Now, Inc. Accounting and Financial Personnel

WV000062

Tesla Motors Inc. is in compliance with Section 3(C) of the applicable California Wage Order and Labor Code Section 511 with respect to Alternative Workweek Schedule (AWS) to which any West Valley Staffing Group employee is assigned within Powertrain Department on the battery module line or in support of the battery line.

_____
Signature

1/31/13
_____
Date

WV000063