1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   DEMETRIC DI-AZ, et al.,                    Case No.  3:17-cv-06748-WHO

8              Plaintiffs,

9       v.                                     **ORDER ON MOTIONS FOR
                                               SUMMARY JUDGMENT**
10  TESLA, INC., et al.,
                                               Re: Dkt. Nos. 85, 91, 92, 116, 117, 118,
11             Defendants.
                                               119, 120, 124, 125, 131, 135
12

13         The facts of this racial discrimination and harassment case are as complex and overlapping

14  as the employment structure the defendants have fabricated.  According to plaintiffs (and father

15  and son) Owen Diaz and Demetric Di-az, the Tesla, Inc. factory in Fremont, California—where

16  they worked in 2015 and 2016—was a hotbed of racial hostility where they frequently heard the n-

17  word from supervisors and fellow employees.  Owen Diaz brings harassment and discrimination

18  claims against Tesla, CitiStaff Solutions, Inc. (his temporary staffing agency), and nextSource,

19  Inc. (the liaison between Tesla and CitiStaff); Demetric Di-az brings claims only against Tesla.[1]

20         Before me are the defendants' motions for summary judgment.  Material facts are in

21  dispute whether plaintiffs faced severe and pervasive racial harassment in the workplace and

22  whether Tesla, its staffing agency, and the on-scene liaison are joint employers.  Owen Diaz did

23  not rebut defendants' evidence that he failed to return to work as promised after a leave, so his

24  other employment-related discrimination claims fail.  For the reasons set forth below, I will grant

25  the motions in part and deny them in part.  This case will proceed to trial.

26

27  _____

28  [1] On December 18, 2019, I granted the parties' stipulation to dismiss defendant West Valley
    Staffing Group, Di-az's staffing agency.  Dkt. No. 138.

United States District Court
Northern District of California

United States District Court
Northern District of California

## BACKGROUND

### A.  Relationships between the Defendants

Before describing the environment at the Tesla factory that a jury could conclude was hostile in violation of 42 U.S.C. section 1981, it is necessary to discuss the employment structure Tesla created.  I will start with defendant CitiStaff, which admits to being Owen Diaz's employer.  It is a temporary staffing agency that provides contractors to clients for temporary work throughout California, including through a partnership with nextSource.  Ledesma Decl. ¶ 2; McGinn Depo. 22:13-15.  The application individuals fill out to become CitiStaff employees includes CitiStaff policies, from sexual harassment to job abandonment.  De Leon Depo 40:2-15.  New employees receive an Employee Handbook containing an anti-harassment policy that "sets forth examples of prohibited conduct including, but not limited to, the use of derogatory comments, statements, or innuendo in the workplace and requires employees to report conduct believed to violate this policy."  Ledesma Decl. ¶ 3.  Monica De Leon is the CitiStaff representative for Northern California.  She handles onboarding and processes applications to ensure that candidates have "read and signed all [CitiStaff's] policies."  De Leon Depo. 166:7-14.  CitiStaff did not have an employee on-site at the Tesla factory during Diaz's time there; instead, he and other contractors were told to contact their staffing supervisor with any problems at work.  Ledesma Decl. ¶ 2.  De Leon tells contractors that if they have questions or concerns they can also call or email her.  *See* De Leon Depo. 163:24-164:8.[2]

Defendant nextSource is a service provider that functions as a liaison between staffing agencies such as CitiStaff and nextSource's clients, including defendant Tesla.  Jackson Depo. 16:1-8.  When Tesla informs nextSource of its need for a particular service, nextSource contacts its suppliers to request individuals with the skills required to meet that need.  *Id.* at 18:4-13; McGinn Depo. 20:2-12, 20:22-25 (noting that agencies recruit and onboard individual workers).

---

[2] According to one colloquy during De Leon's deposition:  "Q: Did CitiStaff have a requirement that its contractors contact the CitiStaff personnel like yourself when it comes to complaints of harassment?  Or can CitiStaff contractors make the complaints directly to the clients?  A: So they would be able to report to me as well.  And if for some reason they can't get ahold of me and they felt they needed to tell their supervisor -- they tell their supervisor about it, then yeah, yes."  De Leon Depo. 162:12-16.

Once an individual is placed at the Tesla factory, Tesla gives them an orientation, directs their day-to-day activities, and determines their rate of pay. *See* Diaz Depo. 81:24-82:10; McGinn Depo. 20:19-22. NextSource facilitates "information flow": it communicates Tesla's needs or wishes to suppliers, and it provides a technology platform where contract workers enter their timesheets for Tesla's approval. McGinn Depo. 19:20-20:1, 24:4-23. Once timesheets have been approved, nextSource prepares a consolidated bill for Tesla. *Id.* at 131:14-132:4. Tesla pays nextSource, nextSource pays the staffing agencies, and the staffing agencies pay individual contractors. *Id.*

Wayne Jackson was nextSource's program manager during the time period in question, meaning that he acted as a liaison between Tesla and the contractors at the Tesla factory. Jackson Depo. 15:18-25, 22:2-4, McGinn Depo. 42:19-43:7. When there was an issue with a contracted employee, Jackson alerted the relevant agency along with Tesla.[3] *See* Jackson Depo. 19:12-24 (noting that "usually one of the first things [he] did" was to alert the agency), 19:25-20:18 (noting that he would alert Tesla's HR department), 40:10-13, 68:23-69:13; *see also* McGinn Depo. 43: 2-7 (indicating that Jackson would "communicate to the -- either party to the client side or to the supplier side, based on the facts").[4] He might gather facts at Tesla's request and communicate those facts to the staffing agency so that it could investigate. *See* McGinn Depo. 43:3-7; Jackson Depo. 19:12-24, 24:14-24. Jackson was the highest-level nextSource employee at the Tesla factory when the plaintiffs worked there. McGinn Depo. 43:19-22.

While working at Tesla, contractors are expected to comply with its safety rules and anti-harassment and discrimination policies.[5] Quintero Depo. 19:10-25; Heisen Depo. 70:1-9, 72:5-18. When an incident occurs at a Tesla factory, policy requires supervisors to inform their managers and HR. Heisen Depo. 78:1-10, 79:7-15; Marconi Depo. 52:3-6, 118:4-21 (noting that she would

---

[3] Diaz was aware he could talk to Jackson of nextSource. Diaz Depo. 131:23-132:8.

[4] Jackson testified that Monica De Leon of CitiStaff "was really very difficult to reach." Jackson Depo. 96:7-15. Erin Marconi of Tesla HR recalled "having to push on behalf of Tesla to get things from [nextSource]." Marconi Depo. 107:10-22.

[5] Tesla also expects that agencies will train employees on these issues. Heisen Depo. 75:21-22.

United States District Court
Northern District of California

United States District Court
Northern District of California

expect Quintero to inform her about racist comments).  Upon learning of an incident, Tesla HR would inquire about the contractor's comfort level and then connect the contractor to the HR representative in the relevant agency.  Marconi Depo. 58:3-9.  Tesla relied on agencies to conduct investigations involving their employees, but Tesla's HR department communicated and collaborated with the relevant agency to ensure that the issue was resolved.  Heisen Depo. 112:8-18, 170:9-15; Marconi Depo. 59:8-21 (noting that her preference "would not be to interview someone else's employee, especially not without them present"), 87:20-25 (noting that she would expect the agency to keep her informed on the findings of an investigation).  Tesla generally trusted the thoroughness of an agency's investigation process.  *See* Marconi Depo. 59:1-5 ("-- if West Valley investigated it and came back and said there wasn't actually an issue, I'm going to believe that West Valley did their investigation thoroughly and if there was something to address, addressed it.").

Tesla has authority to exclude contract employees from the property and to end the contract with an individual.  Heisen Depo. 170:16-22; De Leon Depo. 118:10-20; *see* De Leon Depo. 110:6-111:19 (testifying, "let's just say in the case the client tells us that a contractor has violated a harassment policy or any policy, more than likely the client is going to end the person's assignment").  De Leon did not have the authority to end a CitiStaff employee's assignment; instead, she would have to follow up with HR.  De Leon Depo. 160:11-16.  Only the agency could actually terminate an individual worker.  Jackson Depo. 40:17-23 (noting that he could recommend termination, but the final decision rested with the agency).  NextSource and Tesla were permitted to issue warnings to CitiStaff employees and give them performance evaluations.  De Leon Depo. 65:8-66:1.

Various Tesla employees worked with and supervised contract workers during the time period in question.  In his role as contract services supervisor, Edward Romero escalated concerns or complaints to the right people.  Romero Depo. 88:3:11.  Within Tesla, that meant manager Victor Quintero or someone from Human Resources.  *Id.* at 88:16-19.  Where issues involved contract workers, Quintero informed their representative or account manager for them to handle it.  *Id.* at 88:17-22.

4

United States District Court
Northern District of California

**B.  Plaintiffs' Employment and Assignments**

Diaz was recruited and hired on June 2, 2015.  On that day, he signed CitiStaff's sexual harassment policy and abandonment/walk-off policy.[6]  Diaz Depo. 95:6-21, Ex. 33.  He was immediately assigned to work at Tesla's Fremont, California factory, and he began working as an elevator operator.  Diaz Depo. 90:6-11.  In that role he loaded heavy material from one floor onto the elevator and then unloaded it onto another floor as part of the construction of cars.  *Id.* at 90:14-21; Romero Depo. 68:15-69:8.  Tesla provided elevator operators with safety equipment.  Quintero Depo. 21:16-25.  All individuals who worked in the Tesla factory had to take safety orientation class.  Quintero Depo. 19:22-25.  Diaz's first supervisor was Tom Kawasaki, who promoted him; later he reported to Edward Romero.  Diaz Depo. 81:5-6, 18-20; *see* Kawasaki Depo. 63:5-18.

On June 24, 2015 Diaz became team lead, meaning that he assumed more responsibility and worked with other departments more often.  Romero Depo. 76:7-23.  Leads were expected to move product efficiently and responsibly and to have "good communication, a spirit of cooperation, an ability to resolve issues that came along that might impede the movement of materials."  *Id.* at 78:5-11.

**C.  Owen Diaz's Experiences of Racism at the Factory**

According to Diaz, he frequently experienced racism at the Tesla factory.  He testified that two supervisors and around eight to ten employees called him the n-word.  Diaz Depo. 55:4-17.  He estimated that the two supervisors, one of whom was Ramon Martinez, used the n-word more than 60 times.  *Id.* at 55:18-56:11.  For example, Martinez once said, "I hate you n------s," and he twice said, "Go back to Africa."  *Id.* at 63:15-22, 68:7-10.  Diaz also saw graffiti, including the n-word, inside about four bathrooms.  *Id.* at 48:2-11, 50:15-17.  The following incidents also occurred at the factory.

**1.      July 31, 2015**

On July 31, 2015 Diaz and that fellow elevator operator Judy Timbreza got into an

---

[6] There is no evidence in the record that Diaz received a policy specific to racial harassment.

argument and appeared as though they were about to fight.  Kawasaki Depo. 42:16-22.  Tesla

supervisor Tamotsu Kawasaki separated the two and then asked Diaz, Timbreza, and witnesses

what had happened.[7]  Kawasaki Depo. 42:16-22, 81:16-23.  Diaz reported that Timbreza called

him racial slurs, including the n-word.[8]  Kawasaki Depo. 42:13-18, 81:24-82:4.  Witnesses

confirmed that Timbreza had used racial slurs toward Diaz.  *Id.* at 81:24-82:4.  After confirming

that Timbreza was the aggressor and that he had behaved inappropriately, Kawasaki sent Timbreza

home.  *Id.* at 45:2-15, 82:1-4.  That same day, Kawasaki sent Romero and Quintero an email about

the incident.  Kawasaki Depo. 37:17-24, 47:22-48:1.  Soon after that, Romero came to speak to

Kawasaki about the incident.  Kawasaki shared all the information he had gathered and then

passed responsibility for next steps to Romero.  *See id.* at 47:22-48:10; Romero Depo. 152:4-21.

Romero determined that a verbal warning was appropriate because (according to Romero)

witnesses were not able to confirm what Timbreza had said.  Romero Depo. 156:5-21.  Several

agreed that Timbreza had a "tendency to kid around excessively."  *See id.*; Organ Decl. Ex. E

(contemporaneous email from Romero to Quintero).  The warning explained to Timbreza "his

need to treat his fellow team members with dignity and respect."  Romero Depo. 162:11-23

(quoting an email).  The Tesla supervisors agreed that if he engaged in similar conduct, he would

be terminated.  *Id.* at 162:19-21.  Diaz did not see Timbreza again after that.[9]  Diaz Depo. 232:10-

15.

### 2.   October 17, 2015

On October 17, 2015, Diaz reported to Romero that he had a negative incident with Ramon

Martinez, his supervisor at Tesla who was hired by Chartwell, a different staffing agency.[10]  Diaz

Depo. 132:16-24; Organ Decl. Ex. K (email from Diaz to Jackson); *see also* Kawasaki Depo.

---

[7] Both Timbreza and Kawasaki were temporary workers employed by a staffing agency other than
CitiStaff.  *See* Jackson Depo. 56:10-16.

[8] Kawasaki also testified that he heard the n-word "thrown around" at the Tesla factory,
distinguishing between its use "casually" and its use with a certain tone.  Kawasaki Depo. 76:7-23.
[9] Kawasaki testified that he was not aware of why Timbreza stopped working at Tesla only a few
days later.  *See* Kawasaki Depo. 92:6-20.

[10] Martinez made a complaint about Diaz the same day.

United States District Court
Northern District of California

65:10-25 (indicating that he had received an email because he was off on the day in question). Martinez got in Diaz's face with his fists balled up. *See* Romero Depo. 107:5-17. Jackson of nextSource interviewed both Diaz and Martinez about the incident. Jackson Depo. *See* 65:2-25, 67:2-17. It was his practice to take notes to document interviews and then send them to the relevant agencies.[11] *Id.* at 67:2-17. Jackson could not recall exactly what actions he took in this case, but he might have spoken with Chartwell or CitiStaff. *Id.* at 62:1-13.

Tesla HR learned about the incident on October 20. Marconi Depo. 109:1-12. Because in Tesla's view, the incident involved "all nextSource employees," it expected nextSource to conduct the investigation. *See id.* at 109:10-18, 110:1-6.

### 3.     November 5, 2015

On November 5, 2015, Diaz got into a verbal dispute with Rothaj Foster, another African American CitiStaff employee assigned to work at Tesla. Diaz Depo. 141:17-19; De Leon Depo. 67:17-22. During that dispute Foster, who was being aggressive, said he was going to shoot Diaz and threatened Diaz's car. *Id.* at 141:20-21; De Leon Depo. 139:1-5. Diaz reported the incident to Romero. Diaz Depo. 141:22-23. After Romero had corroborated the incident, he called security and had Foster removed from the Tesla premises to prevent any more problems between him and Diaz. Romero Depo. 199:2-6, 200:14-22; *see also* Marconi Depo. 116:13-25 (noting that the correct procedure was followed in response to this incident).

Diaz did not report the interaction to CitiStaff; instead, CitiStaff learned about it from Jackson of nextSource. De Leon Depo. 163:1-5; *see also id.* at 163:7-10 ("Q: And why did thy report to you; do you know? A: Since [Diaz] was a CitiStaff contractor, that is why they reported to me as well."). When De Leon learned about it, she followed up with both Diaz and Foster by phone to understand what had happened.[12] *See id.* at 122:8-123:4. When De Leon spoke with Diaz, he indicated that he was comfortable going back to work in the same position. De Leon

---

[11] Although he testified that it was his practice to take notes on his nextSource laptop, Jackson did not have a copy of any notes. Jackson Depo. 67:18-68:11.

[12] Diaz also allowed Chartwell to speak with Diaz, but she was not aware of whether they investigated the incident. De Leon Depo. 144:1-6.

Depo. 139:13-24.  When De Leon spoke with Foster, he admitted to raising his voice but denied making any threats.[13]  De Leon Depo. 140:18-23.  Foster's assignment with Tesla was terminated, and Diaz had no further interactions with him.[14]

### 4.   January 22, 2016

On January 22, 2016, Diaz emailed Romero in the morning about an incident that had occurred the previous evening.  Organ Decl. Ex. O (email from Diaz).  He wrote that as he was working, he saw a drawing on the cardboard bale he was about to move: "It was a picture of a cartoon depicting a black face person with a bone in his hair with the caption under it saying booo."  *Id.*  The image resembled racist cartoons from the 1920s and 1930s, and Diaz understood "Booo" to mean "Jigaboo."  Diaz Depo. 146:6-10, 20-25.  He wrote that his "stomach dropped." He called the recycling team lead and sent him a text of the picture.  Diaz wrote that Martinez's behavior was not new and "because nothing has been done, it seem[ed] that his behavior [was] getting worse."  He attached a picture of the image to the email.

Martinez admitted to drawing the picture but said that he was "just playing."  *See* Romero Depo. 109:16-24, 114:20-115:1.  He told Diaz, "You people can't take a joke."  Diaz Depo. 155:6-7.  Quintero of Tesla instructed Romero of Tesla to meet with Martinez and Diaz.  Quintero Depo. 49:19-22.  Chartwell, Martinez's staffing agency, investigated Diaz's complaint and interviewed both Martinez and Diaz within a few days of the incident.  V. Martinez Decl. ¶¶ 4-7.  It placed Martinez on "Corrective Action" from January 26, 2016 to December 31, 2016 and gave him a three-day suspension and a permanent warning.  *Id.* ¶ 8; *see* Quintero Depo. 64:18-65:5 (indicating that the suspension was Jackson's decision but that he agreed); Jackson Depo. 33:5-10, 88:14-17.

Diaz forwarded his email to CitiStaff on the evening of January 22 because he "didn't want

---

[13] Foster further told De Leon that he became angry because he felt Diaz, who was "very strong and very aggressive," was being disrespectful toward him and abusing his power as a lead.  De Leon Depo. 140:18-141:7.

[14] Because Foster wanted to keep his job at Tesla, De Leon reached out to nextSource to find out whether it would be possible for Foster to continue his assignment and simply be separated from Diaz.  De Leon Depo. 239:10-22, 240:7-16.

the situation to be covered up."[15]  Diaz Depo. 161:11-162:4.  De Leon "immediately took it up to HR" and informed her supervisors about it.  De Leon Depo. 133:6-17.  She then spoke with Diaz and asked him whether he was going to return to Tesla or whether he wanted to be moved to a different department.  *Id.* at 133:21-134:7.  Although Diaz was "upset and a little aggravated," he said he would stay at Tesla in the same department.  *Id.*  De Leon told Diaz that HR would deal with the issue.  *Id.*  She also gave Chartwell consent to speak with Diaz.  *Id.* at 134:5-7.  The HR representative told De Leon that what she had done was good and that HR would handle the rest. *Id.* at 136:15-23.

After learning about the January 25 incident, CitiStaff human resources manager Ludivina Ledesma told De Leon that he would investigate it.  Ledesma Decl. ¶ 5.  After De Leon told her that Chartwell had already investigated and disciplined the alleged harasser, Ledesma concluded that she "did not need to further investigate this complaint against a non-CitiStaff employee."  *Id.* According to Ledesma, prior to January 22, 2016, CitiStaff was unaware of the issues Diaz had experienced with Martinez or of any problems at the Tesla factory.  *Id.* ¶ 6.

**D.  Demetric Di-az's Experiences of Racism at the Factory**

Demetric Di-az was an employee of West Valley Staffing Group during the time that he worked at Tesla.[16]  After his training, Di-az began in the day shift and then transitioned to the night shift a few weeks later.  Di-az Depo. 101:4-18.

Diaz reported to Javier Caballero during the night shift.  *Id.* at 102:4-20.  Caballero harassed him and used the n-word on the daily basis.  *Id.* at 119:18-21.  A few days after Di-az joined the night shift, the team was a little behind for their meal break and Caballero said, "All you n-----s need to hurry the fuck up."  *Id.* at 170-20-171:3.  Another day when Demetric's father Owen was in his department for lunch, Caballero said, "All you fucking n-----s – I can't stand you mother fuckers."  *Id.* at 159:9-160:4.  It was directed to his team of six, three of whom were African American.  *Id.* at 160:19-161:8.  Di-az also saw offensive graffiti in the bathrooms at the

---

[15] Jackson also informed Diaz's staffing agency.  Jackson Depo. 31:2-8 (noting that he could not remember whether Diaz worked for Chartwell or CitiStaff).

[16] The parties stipulated to dismiss West Valley as a defendant on October 28, 2019.

Tesla factory.  The graffiti had messages like "fuck you, n-----" and "you n-----s don't belong here."  *Id.* at 154:4-6.  Di-az stopped using that bathroom.  *Id.* at 154:17-18.

Di-az complained of his treatment on a few occasions.  He told Caballero how the language made him feel, and Caballero essentially said, "You're a temp, and if you don't like it, you can get fired."  *Id.* at 161:18-22, 186:19-22; *see also id.* at 170:11-16 (noting that a member of Di-az's team said there was nothing to do because Caballero was their supervisor).  Di-az then reported the statement to Caballero's supervisor, who did nothing, and finally to someone with Tesla HR.  *Id.* at 162:2-10, 163:5-8.  Di-az also reported issues[17] to an individual from West Valley who was onsite at Tesla.  Di-az Depo. 74:7-75:1, 75:18-21.  That person said that he would investigate, but nothing came of Di-az's complaint.  *Id.* at 75:19-24.  Di-az did not report the graffiti he saw in the bathroom.  *Id.* at 154:10-18.

### E.  Plaintiffs' Assignments End

#### 1.  Owen Diaz

There are mixed reports of Diaz's work performance while at Tesla.  Kawasaki never experienced any issues with him as an elevator operator or as a lead.  Kawasaki Depo. 63:5-18 (noting that he would not have recommended Diaz for the lead position if he was unprepared).  He never heard complaints about Diaz's conduct.  *Id.* at 63:19-25.  According to Jackson of nextSource, however, "Owen was known as the kind of difficult elevator operator at the plant," and there were "a lot" of complaints related to him.  Jackson Depo. 110:2-13, 112:2-4, 112:22-113:1 (noting that the problem was Diaz's "attitude" and that he was "very abrasive" toward coworkers).  Jackson testified that Tesla's safety inspector approached Diaz because he was not wearing his safety vest or the required steel-toed shoes.  Jackson Depo. 108:5-10, 109:1-11.  Diaz became confrontational with the safety person.  *Id.* at 109:13-25.  Romero also observed that Diaz struggled to get along with some people.  Romero Depo. 81:17-24, 84:5-18.  Some people did not like the way Diaz spoke to them, and one individual felt Diaz gossiped about him behind his back.  *See id.* at 82:13-84:18.  Other departments also complained about "him not being cooperative, him

---

[17] It is not clear from the excerpts in the record exactly which incident(s) Di-az reported to West Valley.

United States District Court
Northern District of California

1    not communicating, shutting down." *Id.* at 98:5-16.

2         In March 2016, Diaz received approval to be away from work from March 4 to March 11

3    because his mother had died.  De Leon Depo. 150:12-25; Diaz Depo. 178:7-25.  He failed to

4    return to work when he was expected back on March 12.  *See* Diaz Depo. 178:7-25.  On March 18,

5    2016, Jackson from nextSource emailed De Leon of CitiSource to let it know Tesla had ended

6    Diaz's assignment.  De Leon Depo. 148:18-22, 149:20-24.

7         When De Leon called Diaz to tell him the news, he was "mad, upset" and "cussing"

8    because he wanted to continue working at Tesla, in part because he was making good money.[18]

9    *Id.* at 149:3-11, 153:15-20.  She told him not to return to the Tesla factory.  *Id.* at 149:12-16.  De

10   Leon has since offered Diaz other positions where he could earn $16 per hour, but he has declined

11   them.  *Id.* at 157:11-25.  Diaz remains a registered temporary employee with CitiStaff.  Ledesma

12   Decl. ¶ 7.

13              **2.    Demetric Di-az**

14        In October 2015, two months after he began working at Tesla, Di-az reported the factory

15   and learned that his contract had ended and his badge would no longer work.  Di-az Depo. 144:12-

16   17.  He did not receive an explanation.  *Id.* at 145:1-6.  Di-az believes he was fired because of his

17   complaints about the racist treatment he experienced.  *Id.* at 190:3-13.  After his threats, Caballero

18   "made sure [Di-az] got fired."  *Id.*

19        Although Di-az was initially told that he was eligible for another work assignment, his

20   staffing representative stopped returning his calls.  *Id.* at 145:12-23.  His experience at Tesla made

21   Di-az feel as if he lost himself.  *Id.* at 201:13-23.  He felt dehumanized and like less than a man.

22   *Id.*  He began eating less and stopped wanting to be around his peers and family.  *Id.* at 202:12-

23   203:21.

24                        **LEGAL STANDARD**

25        Summary judgment on a claim or defense is appropriate "if the movant shows that there is

26   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

27   _____

28   [18] De Leon testified that Diaz started out making $16 per hour but received a raise to $18 per hour at some point.  De Leon Depo. 157:3-9.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

2    the absence of a genuine issue of material fact with respect to an essential element of the non-

3    moving party's claim, or to a defense on which the non-moving party will bear the burden of

4    persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

5    made this showing, the burden then shifts to the party opposing summary judgment to identify

6    "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary

7    judgment must present affirmative evidence from which a jury could return a verdict in that

8    party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

9         On summary judgment, the court draws all reasonable factual inferences in favor of the

10   non-movant.  *Id.* at 255.  In deciding the motion, "[c]redibility determinations, the weighing of the

11   evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

12   judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact

13   and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594

14   F.2d 730, 738 (9th Cir. 1979).

15                                              **DISCUSSION**

16        The plaintiffs did not oppose defendants' motions for summary judgment on the following

17   claims: (i) against Tesla, Unruh Civil Rights Act claims (Oppo. Tesla 2); (ii) against nextSource,

18   Bane Act, NIED, IIED, negligent hiring, retention, and supervision, and constructive discharge

19   claims (Oppo. NextSource 5); (iii) against CitiStaff, retaliation claims under Section 1981 and

20   California Labor Code § 1102.5, negligent hiring, retention, and supervision, constructive

21   discharge in violation of public policy (Reply 2, 11-12, 14), and NIED and IIED (October 23,

22   2019 hearing).  The motions for summary judgment on those claims are GRANTED.

23        As relevant for this Order, the following remains.  Owen Diaz brings claims under section

24   1981 against all three defendants.  He brings Ralph Act claims against nextSource and CitiStaff

25   and Bane Act claims against CitiStaff.  Demetric Di-az asserts various causes of action only

26   against Tesla, which moves for summary judgment on his claim for punitive damages.

27   **I.    SECTION 1981 CLAIMS**

28        42 U.S.C. section 1981 prohibits racial discrimination in the making and enforcement of

                                                   12

private contracts. *Runyon v. McCrary*, 427 U.S. 160, 168 (1976). CitiStaff and nextSource raise several challenges to Diaz's section 1981 claims, chief among them that Diaz lacks evidence to support a finding that they jointly employed him. Diaz does not challenge defendants' contention that such a finding is a necessary prerequisite to any finding of liability under section 1981.

### A. Joint Employment

There is no dispute that CitiStaff employed Diaz; the question is whether he has evidence to support a finding that nextSource and Tesla were also his employers.[19] Diaz and nextSource first dispute the appropriate test for determining joint employment in this case. NextSource relies on the three formulations of the test set forth in *Martinez v. Combs*, 49 Cal. 4th 35, 42 (2010), *as modified* (June 9, 2010), while Diaz puts forth *U.S. Equal Employment Opportunity Comm'n v. Glob. Horizons, Inc.*, 915 F.3d 631, 639 (9th Cir. 2019) (hereinafter *Glob. Horizons*).[20] Diaz criticizes nextSource's reliance on *Martinez*, which indeed dealt with the California Labor Code. Oppo. NextSource 19. NextSource responds that the Ninth Circuit has not adopted the Title VII *Global Horizons* test for Section 1981 claims. Reply 12 n.3. The distinction is not great: similar principles of direction and control animate the tests the parties advance and the cases they cite. The federal common law test from *Global Horizons* is the correct one to apply, but the cases I rely on here will include analysis under state law insofar as it focuses on direction and control.

"[The] general principle—that an individual may be held to have more than one employer in the temporary-staffing context—has long been recognized for the purposes of applying state and federal antidiscrimination laws." *Jimenez v. U.S. Cont'l Mktg., Inc.*, 41 Cal. App. 5th 189, 197–98 (2019) (internal quotation marks and formatting omitted) (quoting *Bradley v. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1612, 1626 (2008)). Federal courts use a common-law agency test to determine joint employment "when a statute does not meaningfully define terms like 'employer' and 'employee.'" *Glob. Horizons, Inc.*, 915 F.3d at 639 (citing *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 444–45 (2003)).

---

[19] Tesla does not dispute a joint employment relationship for purposes of its motion for partial summary judgment.

[20] CitiStaff also relied on *Global Horizons* in its motion for summary judgment.

United States District Court
Northern District of California

The element of control is the "principal guidepost" in determining whether a joint employment relationship existed.  *Id.* at 638 (internal quotation marks omitted.  A non-exhaustive list of factors includes:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 638 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992).  No one factor is decisive.  *Id.*; *see also Horn v. Experis US Inc.*, No. 17-cv-0814, 2019 WL 2868963, at *6 (E.D. Cal. July 3, 2019), *report and recommendation adopted,* No. 17-cv-0814, 2019 WL 4955189 (E.D. Cal. Oct. 8, 2019) (finding that the contracting employer exercised joint control that employer hired plaintiff, trained her, managed her, directed her day-to-day activities, schedule, and assignments, and had the exclusive right to terminate or promote her).

Even if a joint-employment relationship exists, one employer is not "automatically" liable for another's conduct.  *Glob. Horizons*, 915 F.3d at 641.  "Liability may be imposed for a co-employer's discriminatory conduct only if the defendant employer knew or should have known about the other employer's conduct and failed to undertake prompt corrective measures within its control."  *Id.* (internal quotation marks and citation omitted).

In one case, the Honorable Edward M. Chen of this district concluded that a defendant company was not a joint employer where it controlled only a limited area of the plaintiff's work. *Field v. Am. Mortg. Exp. Corp.*, No. 09-cv-5972-EMC, 2011 WL 3354344, at *8 (N.D. Cal. Aug. 2, 2011).  There was no genuine dispute of material fact that the company lacked sufficient control over the plaintiff's wages or working conditions.[21]  *Id.* at *5-*6.  Evidence suggested that the company exercised "limited control over certain aspects of the working conditions," namely by administering 401(k) and benefits plans, consulting on HR matters, providing limited training, and

---

[21] Judge Chen applied the first test from the California Supreme Court case *Martinez v. Combs*, 49 Cal. 4th 35 (2010), analyzing whether the defendant "exercised control over the plaintiff's wages, hours, or working conditions."  *Field*, 2011 WL 3354344, at *3.

helping to enforce a sexual harassment policy. *Id.* at \*6-\*7; *see also id.* at \*4 (noting that the company formally issued paychecks and W-2s, but another company actually paid the wages). This evidence was not enough to establish the requisite control. *Id.* at \*8. The professional services agreement also confirmed that another entity was responsible for the day-to-day job duties and had the right and obligation to supervise, direct, and control workers. *Id.* at \*5.

### 1. Whether There is Evidence that NextSource was a Joint Employer

NextSource argues that the undisputed material facts show that it lacked direction and control over the conditions of his employment. NextSource MSJ 10. Diaz disagrees, asserting that nextSource exercised a "high degree" of control. Oppo. NextSource 18. He offers the following specifics: (i) nextSource employee Romero supervised him, (ii) he received new assignments, promotions, or terminations at nextSource's recommendation, (iii) nextSource handled complaints and offered recommendations on next steps, (iv) nextSource disciplined Diaz and his peers on multiple occasions, (v) nextSource maintained the system for hours and remuneration, and (vi) nextSource set Diaz's pay rates. Diaz also cites the agreement between nextSource and Tesla. Oppo. NextSource 19; *see* Organ Decl. Ex. D ("Tesla-nextSource Contract").

I will address each of Diaz's pieces of evidence, beginning with the agreement. It provides that nextSource "will, to the extent applicable, manage, supervise, and provide direction to Supplier Personnel and cause Supplier Personnel to comply with the obligations and restrictions applicable to Supplier Personnel under this Agreement." Tesla-nextSource Contract § 3.1(b). "'Supplier Personnel' means any personnel furnished by [nextSource] to perform any part of the Services, including employees and independent contractors of Supplier, its Affiliates and subcontractors." *Id.* § 3.1(a). Under the contract, Tesla has the right to inform nextSource of any personnel who need to be replaced for unsatisfactory performance. *Id.* § 3.3. This language supports a finding that nextSource was a joint employer.

*Romero's supervision*: Diaz argues that nextSource employee Romero exercised control over him as his supervisor. NextSource points out that Romero became a Tesla employee in October 2015, and only at that point did he become Diaz's supervisor. Diaz did not refute this

15

1    contention at the December 17, 2019 hearing.  This evidence does not support a finding of joint

2    employment.

3         *Receiving assignments, promotions, terminations at nextSource's recommendation*:  Diaz

4    cites two emails from nextSource employees to Tesla employees.  In one, a nextSource employee

5    wrote that she thought Diaz "would be a great candidate for the Floor Supervisor position."  Organ

6    Decl. Ex. C.  In another, a nextSource employee asked whether Tesla would like to replace Diaz,

7    and later Jackson responded that he would need to be replaced as soon as possible.  *Id.* Ex. U.  As

8    Diaz acknowledges, this evidence does not show that nextSource was the final decisionmaker on

9    issues like promotion or termination; however, it does show that nextSource exerted some

10   influence over these decisions.  This role supports a finding of joint employment.

11        *Handling complaints and proposing next steps*:  Diaz cites a series of emails from October

12   2015 in which nextSource and Tesla employees addressed Diaz's confrontation with Martinez.

13   Organ Decl. Ex. G.  NextSource does not dispute that it played a role in responding to complaints

14   involving temporary employees, but it argues that its role was to gather information and share it

15   with Tesla and the employees' agencies.  As the evidence below reinforces, there are disputes of

16   fact over the extent of nextSource's role in the complaint process.

17        *Disciplining Diaz and his peers*:  Diaz asserts that nextSource was involved in his own

18   discipline along with discipline of his peers.  Romero gave Timbreza a Verbal Warning (which

19   Diaz asserts was insufficient) when he was still a nextSource employee.  Organ Decl. Ex. J.

20   Jackson was involved in determining the discipline Diaz and Martinez received after the October

21   2015 incident.[22]  *See* Jackson Depo. 70:8-22, 70:23-71:10.  The record suggests that Jackson gave

22   Diaz a written warning after an altercation with another coworker.  Organ Decl. Ex. X (emails

23   between Jackson and Romero).  Jackson wrote, "They have both been made aware how critical it

24   is for them to provide good customer service to their customers.  They have been instructed to

25   follow all direction and follow up with you or myself if they have any issues or concerns.  They

26

27   _____

28   [22] The level of Jackson's involvement is not clear from the record.  Although Diaz cites to the
     Jackson deposition to support his contention that Jackson himself actually disciplined Diaz, that
     testimony is not clear on the question.  *See* Jackson Depo. 70:8-22, 70:23-71:10.

United States District Court
Northern District of California

both understand that this is their final warning and any further issues will result in termination of their contract." Organ Decl. Ex. X. This evidence supports a finding of joint employment.

*System for hours and remuneration*: There is no dispute that nextSource provided the technology platform for the input of temporary workers' hours, but payroll processing does not show control. *See Field*, 2011 WL 3354344, at *6 (describing administration of a 401(k) and benefits as "a ministerial task analogous to payroll processing").

Taken as a whole, this evidence is enough to create a triable issue over whether nextSource was Diaz's joint employer. The Tesla-nextSource agreement obligated nextSource to manage and supervise temporary personnel, and evidence suggests that nextSource did so in a few key respects. Although there is also evidence that nextSource's role was limited to that of a middleman or a facilitator, disputes of fact prevent me from making this determination as a matter of law.

NextSource next argues that even if a joint employment relationship existed, it cannot be liable under *Global Horizons* because there is no evidence that it "failed to undertake prompt corrective measures within its control." *See Glob. Horizons*, 915 F.3d at 641. But Diaz's theory of the case is that while there were various responses to the incidents he experienced, those responses were insufficient. Even if a jury agrees with nextSource that its role was limited in certain ways—for example, to making recommendations to Tesla and/or the relevant staffing agency—it could still find that nextSource failed to respond adequately to the pervasive racial harassment Diaz alleges that he experienced. A jury could conclude that nextSource should have taken a more active role in redressing the hostile environment at the factory. Disputes of fact prevent judgment as a matter of law in favor of nextSource.

### 2.     Whether There is Evidence that Tesla was a Joint Employer

Although Tesla itself does not dispute joint employment for purposes of its motion, CitiStaff argues that there is not enough evidence to support such a finding. Diaz counters with the following: (i) Tesla trained Diaz, expected him to follow its safety policies, and provided tools—including safety equipment—for Diaz's work; (ii) Tesla employees set Diaz's work schedule, gave him assignments, and changed assignments; (iii) Tesla had the power to

1   recommend discipline or termination; and (iv) Diaz worked in the factory helping to assemble

2   cars, which is Tesla's regular business.  Oppo. 16.

3        CitiStaff does not meaningfully engage with Diaz's evidence and argument.  *See* Reply 8-

4   9.  Applying the control factors to Tesla's role in Diaz's work at the factory, there is evidence to

5   support a finding that Tesla was Diaz's joint employer.  Tesla trained him and provided him with

6   safety and other equipment.  Tesla exercised control over Diaz's his day-to-day work and

7   assignments, gave him promotions, and determined his rate of pay.  Finally, Tesla was involved in

8   responding to Diaz's complaints and disciplining employees, and eventually it terminated Diaz's

9   assignment.  This evidence is enough to send the question of joint employment to a jury.

10        CitiStaff next argues that Diaz lacks evidence to show that it "failed to undertake prompt

11   corrective measures within its control."  *See Glob. Horizons*, 915 F.3d at 641.  It asserts that (i) it

12   did not know of any incidents other than the cartoon, (ii) Diaz fails to prevent evidence that it

13   should have known of any of the other incidents, and (iii) as to the cartoon, CitiStaff acted

14   promptly.  Again, there is evidence to support a verdict in Diaz's favor.  For example, there is

15   evidence suggesting that CitiStaff knew or should have known about more than just the drawing.

16   The record shows that there were open lines of communication between the various entities, and

17   Jackson testified that he routinely contacted the relevant staffing agencies when problems arose.

18   He also testified that De Leon from CitiStaff was difficult to reach; attempts to contact her could

19   be enough to allow a jury to conclude that CitiStaff should have known about the incidents.  As far

20   as whether CitiStaff could have done more, it did little or nothing in response to the earlier

21   incidents if it was indeed aware of them.

22        For all of these reasons, there are triable issues over whether nextSource and Tesla jointly

23   employed Diaz.

24        **B.  Contractual Relationship with NextSource**

25        NextSource asserts that Diaz's claim under section 1981 has a second foundational defect:

26   he was not in a contractual relationship with nextSource.  NextSource MSJ 14-15.  Diaz argues

27   that he can sue under section 1981 because he was a third-party beneficiary of the contract

28   between nextSource and CitiStaff, which entitled him to pay for the work he did while on

United States District Court
Northern District of California

United States District Court
Northern District of California

1    assignment.  Oppo. NextSource 21.

2         "Any claim brought under § 1981 . . . must initially identify an impaired 'contractual

3    relationship,' § 1981(b), under which the plaintiff has rights."  *Domino's Pizza, Inc. v. McDonald*,

4    546 U.S. 470, 476 (2006).  The Supreme Court has recognized the possibility that "a third-party

5    intended beneficiary of a contract may have rights under § 1981."  *Id.* at 476 n.3.  The law of the

6    forum state determines questions of contract under Section 1981, provided that it is not

7    inconsistent with federal law.  *Judie v. Hamilton*, 872 F.2d 919, 923 (9th Cir. 1989) (applying

8    Washington law).  Beginning with the written contract, California courts interpret contracts "so as

9    to give effect to the mutual intention of the contracting parties at the time the contract was

10   formed."  *Serv. Employees Internat. Union, Local 99 v. Options--A Child Care & Human Servs.*

11   *Agency*, 200 Cal. App. 4th 869, 879 (2011).  "A third party may enforce a contract made for his or

12   her benefit or made for the benefit of a class of which he or she is a member."  *Serv. Employees*

13   *Internat. Union, Local 99 v. Options--A Child Care & Human Servs. Agency*, 200 Cal. App. 4th

14   869, 878 (2011).  While the third-party need not be the "sole or even primary beneficiary," if their

15   benefit "is only incidental or remote," they will not be considered a third-party beneficiary.  *Id.*

16        There is no dispute that CitiStaff and nextSource entered into a contract to connect

17   temporary workers with nextSource clients.  As a temporary worker with CitiStaff, Diaz was part

18   of the class of people intended to benefit under that contract.  Although the temporary workers

19   may not have been the primary beneficiaries, their benefit was more than incidental or remote.

20   Diaz's section 1981 claim against nextSource can proceed.

21        **C.  Theories of Liability under Section 1981**

22        Diaz raises four theories of liability under section 1981:  racial discrimination, retaliation,

23   racial harassment, and failure to prevent.  Two survive.

24             **1.  Racial Discrimination**

25        Section 1981 discrimination claims are analyzed using the Title VII burden-shifting

26   analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Surrell v.*

27   *California Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).  "Under *McDonnell*

28   *Douglas*, Diaz must prove a prima facie case of discrimination by showing (1) he is a member of a

                                        19

protected class, (2) he was performing the position she held competently, (3) he suffered an adverse employment action, and (4) circumstances . . . give rise to an inference of unlawful discrimination." *Means v. City & Cty. of San Francisco, Dep't of Pub. Health*, 749 F. Supp. 2d 998, 1004 (N.D. Cal. 2010) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If Diaz succeeds in this showing, the burden shifts to CitiStaff to "rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The plaintiff "may defeat summary judgment by offering direct or circumstantial evidence that a discriminatory reason more likely motivated the employer, or that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Anthoine v. N. Cent. Ctys. Consortium*, 605 F.3d 740, 753 (9th Cir. 2010) (analyzing a claim under Section 1983 but using the *McDonnell Douglas* framework) (internal quotation marks and citation omitted). An opposition based only on "denying the credibility of the defendant's proffered reason for the challenged employment action" will not succeed. *Id.* Instead, the plaintiff's evidence must be "specific and substantial." *Id.* (determining that the plaintiff failed to "carry his burden of showing his employer's explanation was unworthy of credence").

According to both nextSource and CitiStaff, Diaz fails to make out a prima facie case of race discrimination because he cannot show that they subjected him to an adverse employment action.[23] CitiStaff MSJ 13; NextSource MSJ 16. As CitiStaff puts it, they "did not discipline, demote, terminate or, in any other way, treat Plaintiff differently than any other employee not in Plaintiff's protected class." CitiStaff MSJ 13. But a jury could determine that the defendants were joint employers, and Tesla subjected Diaz to an adverse employment action when it terminated his placement.[24] Accordingly, this argument fails.

---

[23] CitiStaff does not concede that Diaz was performing his position competently. CitiStaff MSJ 13.

[24] A jury could potentially find that CitiStaff subjected Diaz to an adverse employment action when it failed to advocate for his assignment to continue at Tesla, which it did after Foster was terminated. *See* De Leon Depo. 239:10-22, 240:7-16.

United States District Court
Northern District of California

The stronger argument is nextSource's.  Even assuming Diaz can make out a prima facie case, there was a legitimate, nondiscriminatory reason to end his assignment:  he failed to show up for work.  NextSource MSJ 16.  I agree; non-attendance is, on its face, a legitimate reason for termination.  There is no dispute that Diaz failed to return to work on the day he said he would.  Given this showing by the defendants, the burden shifted to Diaz to offer "specific and substantial" evidence to show that the reason for ending his assignment is pretextual.  He has not done so.[25]  Accordingly, this theory of section 1981 liability fails.

### 2.  Retaliation

"To establish a *prima facie* case of retaliation, a plaintiff must demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action."  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034–35 (9th Cir. 2006).  Temporal proximity between the protected action and the employment decision can give rise to an inference of causation.  *Id.* at 1035.  Retaliation claims can also rely on the *McDonnell Douglas* burden-shifting framework.  *Id.*

Diaz asserts a theory of retaliation under Section 1981 that he was terminated less than two months after reporting the racist drawing incident, which was a protected activity.  It fails for the same reasons that the racial discrimination claim fails.  The defendants offered a legitimate, nondiscriminatory reason for terminating Diaz's assignment with Tesla, and Diaz failed to raise a genuine issue of material fact that defendants' reason was pretextual.

### 3.  Racial Harassment

To make a prima facie showing of a hostile work environment under section 1981, Diaz will have to prove that:  "(1) he was subjected to verbal or physical conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment."  *Johnson v. Riverside*

---

[25] At the hearing, Diaz for the first time asserted that his failure to return to work should be considered a constructive discharge.  This argument is unpersuasive for several reasons.  Diaz dropped his claim for constructive discharge in violation of public policy, his amended complaint contains no allegations specific to constructive discharge under section 1981, and he failed to articulate this theory in his briefing.

United States District Court
Northern District of California

*Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (internal quotation marks and formatting omitted).  The environment must be both objectively offensive to a reasonable person in the protected class and subjectively offensive to the plaintiff.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *see Ellison v. Brady*, 924 F.2d 872, 878-79 (9th Cir. 1991) (analyzing sex harassment from the perspective of a reasonable woman).  "Simple teasing" and "offhand comments" may not be sufficient even where the conduct is "offensive and inappropriate."  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003).  Summary judgment may be appropriate where events, while troubling, occurred over a long span of time.  *See id.* (granting summary judgment where over two-and-a-half years, employees made jokes using the phrase "China man," ridiculed a mispronunciation, and pulled back their eyes).

Both nextSource and CitiStaff challenge Diaz's ability to make a prima facie showing because according to them, his claim rests on a single event:  the racist drawing.[26]  But Diaz asserts that he experienced harassment throughout his time at the factory, and there are material disputes of fact over its severity and pervasiveness.  The Ninth Circuit has noted that the n-word is "perhaps the most offensive and inflammatory racial slur in English, a word expressive of racial hatred and bigotry."  *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (quoting *Merriam–Webster's Collegiate Dictionary* 784 (10th ed. 1993)).  Diaz testified that he frequently heard the n-word during the ninth months he worked at the Tesla factory, including from supervisors, and he reported one such incident as early as July 31, 2015.  Coupled with the other incidents alleged—some of which Diaz theorizes were also race-based—there is a triable issue.

In addition, there is evidence that could allow a fact finder to conclude that all of the

---

[26] Specifically, CitiStaff argues that it cannot be liable for events about which it was unaware.  In response to this argument, and throughout his opposition to CitiStaff, Diaz asserts that it instructed him to bring problems to on-site supervisors.  *See* Oppo. 6, 19, 22-23.  In support of this contention, he takes deposition testimony out of context.  When discussing the policy around contractors informing the defendant entities about the need to be away from work at the last minute, De Leon testified, "And I would always let all the temp- -- the contractor workers know that, you know, if there's ever an issue to arise, let me know. **Let your supervisors know. If for whatever reason you can't contact your supervisor, let me know.** I can get in contact with them, let them know, whatever the case is. Any last-minute issues, you just call in, let me know."  De Leon Depo. 151:17-24.  Diaz quotes only the bolded portion with none of the surrounding context, which makes the quote misleading and misrepresents the record.  His counsel is admonished to avoid such conduct in the future.

defendants knew or should have known about the allegedly hostile environment at the Tesla factory.  The record shows that there were open lines of communication when issues arose.  Jackson, the nextSource representative on-side at the Tesla factory, testified that he routinely informed the relevant staffing agencies if there were any problems with temporary employees.  Jackson Depo. 19:12-24.  Romero testified that he escalated complaints as well.  Romero Depo. 88:12-22.  Jackson himself heard the n-word used in the Tesla factory, although he concluded that its use was not offensive in those instances.  Jackson Depo. 141:9-25, 151:1-10.

Finally, CitiStaff argues that it is not liable because it can show "(a) that [it] exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  Here, too, material disputes prevent summary judgment in favor of CitiStaff.  If a jury finds that CitiStaff was aware of prior incidents, or should have known about them, it could conclude that CitiStaff did not exercise reasonable care to prevent and promptly correct the harassment.  Even with the racist drawing incident—about which CitiStaff undisputedly knew—a jury could conclude that CitiStaff should have done more than merely adopt the actions of other investigating entities.[27]  Of course, it could also find that CitiStaff's approach was reasonable because the alleged harasser was removed from his position.  Finally, although the undisputed evidence shows that Diaz declined CitiStaff's offer to change his placement, a jury could find that his failure to take advantage of this corrective opportunity was not unreasonable.  This theory of section 1981 liability survives.

### 4.      Failure to Prevent

Employers have a "statutory obligation to provide a workplace free from [] harassment." *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991).  When incidents of harassment occur,

---

[27] On this point, CitiStaff argues that it could not have done more to remedy the problems with Martinez because he was not a CitiStaff employee.  CitiStaff MSJ 14.  But as Diaz contends, a jury could find that CitiStaff could have done more to advocate for the wellbeing of its employee, even if it did not have final control over Martinez.

United States District Court
Northern District of California

employers should respond in a way that "reasonably calculated to end the harassment." *Id.*

(internal quotation marks omitted). "[T]he reasonableness of an employer's remedy will depend

on its ability to stop harassment by the person who engaged in harassment." *Id.* The success of a

claim for failure to prevent harassment or discrimination is dependent on a finding that actionable

harassment or discrimination in fact occurred. *See Trujillo v. N. Cty. Transit Dist.*, 63 Cal. App.

4th 280, 289 (1998), *as modified* (May 12, 1998).

    CitiStaff and nextSource raise several challenges to Diaz's failure to prevent claim.

NextSource MSJ 18. First, nextSource argues that Diaz cannot show a tangible employment

action. Second, both CitiStaff and nextSource assert they exercised reasonable care to prevent and

respond to harassment. CitiStaff MSJ 15; nextSource MSJ 17-18. Finally, CitiStaff asked Diaz

whether he wanted a new assignment after the racist drawing incident, and Diaz declined.

    If a jury concludes that Tesla, nextSource, and CitiStaff were joint employers of Diaz, it

could also find that they failed to meet their joint obligation to provide a workplace free from

harassment. Even considering the arguably limited control nextSource and CitiStaff had over

some of the employees at the factory, their response to earlier incidents—or lack thereof,

according to Diaz—could be considered insufficient to deter future harassment. This theory of

liability survives.

## II.    THE RALPH ACT AND THE BANE ACT

    Diaz brings claims under two state civil rights statutes. The Ralph Civil Rights Act,

California Civil Code section 51.7 states that persons within California have the right to be free

from any "violence, or intimidation by threat of violence, committed against their persons or

property" because of characteristics including race. *See* Cal. Civ. Code § 51.7(a); Cal. Civ. Code

§ 51(e)(6). The Bane Civil Rights Act, California Civil Code section 52.1, prohibits all people

from interfering "by threat, intimidation, or coercion . . . with the exercise or enjoyment by any

individual or individuals of rights secured by the Constitution or laws of the United States, or of

the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a).

    Diaz must show the following under section 51.7: "(1) the defendant threatened or

committed violent acts against the plaintiff; (2) the defendant was motivated by his perception of

24

plaintiff's race; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial

factor in causing the plaintiff's harm." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1167

(N.D. Cal. 2009), *amended in part* (Sept. 8, 2009).  Under the Bane Act "speech alone" is not

enough, "except upon a showing that the speech itself threatens violence against a specific person

or group of persons; and the person or group of persons against whom the threat is directed

reasonably fears that, because of the speech, violence will be committed against them or their

property and that the person threatening violence had the apparent ability to carry out the threat."

Cal. Civ. Code § 52.1(k).  Employers can be vicariously liable for the actions of their employees

under this section.  *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1168 (N.D. Cal.

2009), *amended in part* (Sept. 8, 2009) (applying vicarious liability to police officers under section

52.1).

   Diaz's Ralph and Bane Act claims are based on Martinez's October 2015 threats of

violence.  He argues that both nextSource and CitiStaff are vicariously liable for Martinez's

conduct, which harmed him.  Oppo. CitiStaff 25-26.  But Diaz fails to articulate any viable theory

under which the actions of Martinez—a Chartwell employee—could be imputed to either

nextSource or CitiStaff under respondeat superior.[28]  *See* Oppo. NextSource 27 (arguing only that

the defendants "knew about the harassment and failed to take appropriate corrective action,

implicitly ratifying Martinez's conduct").  The motions for summary judgment on the Ralph and

Bane Act claims are GRANTED.

## III. PUNITIVE DAMAGES

   All three defendants move for summary judgment on the claims for punitive damages.  The

federal and state standards for punitive damages are similar.  "Agency principles limit vicarious

liability for punitive damages awards."  *Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*,

405 F.3d 764, 773 (9th Cir. 2005).  A corporate employer is not liable for punitive damages based

on acts of its employees unless an officer, director, or managing agent (i) knew the employee was

unfit and employed him with a conscious disregard for others' safety, (ii) authorized or ratified the

---

[28] He does not assert that nextSource jointly employed Martinez.

United States District Court
Northern District of California

wrongful conduct, or (iii) was personally guilty of oppression, fraud, or malice.  Cal. Civ. Code § 3294(b); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543 (1999) (quoting similar tests from Second Restatement of Torts).

In determining whether someone is in a managerial capacity, "the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished."  *Kostad*, 527 U.S. at 543.  According to the California Supreme Court, managing agents are those employees who "exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy."  *White*, 21 Cal. 4th at 573.  Under federal law, the actions of employees who are only low-level managers may still be imputed to an employer "if the supervisors are made responsible, pursuant to company policy, for receiving and acting on complaints of harassment."  *Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001).[29]

I am not convinced that the defendants are entitled to summary judgment.  The disputed nature of the plaintiffs' harassment claims means that punitive damages could be available.  Plaintiffs allege that racial harassment was so pervasive at the Tesla factory that they heard the n-word on a near-daily basis, including from their supervisors.  If a jury credits their evidence that such an environment indeed existed, it could also find that a managing agent necessarily must have known about that environment—and that by failing to correct it, those managing agents ratified the wrongful conduct.  The defendants cannot wash their hands of potential liability for punitive damages by painting all the players at issue in this case as low-level managers.

## IV.    MOTIONS TO SEAL

A party seeking to seal court records must overcome a strong presumption in favor of the public's right to access those records.  *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir.), *cert. denied sub nom. FCA U.S. LLC v. Ctr. for Auto Safety*, 137 S. Ct. 38 (2016).  The Ninth Circuit imposes the "compelling reasons" standard on most motions to seal,

---

[29] The defendants argue that plaintiffs' citations to *Kolstad* and *Swinton* are inapposite because they are not asserting a good faith defense.  I disagree that those cases are so limited.  *See Gaines v. AT&T Mobility Servs., LLC*, 19-cv-946, 2019 WL 6716733, at *8 (S.D. Cal. Dec. 10, 2019).

United States District Court
Northern District of California

which requires a court to explain its findings "without relying on hypothesis or conjecture." *Id.* at 1096–97. Sealing requests must be "narrowly tailored to seek sealing only of sealable material." Civ. L.R. 79-5(b). Further, "[r]eference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Civ. L.R. 79-5(d)(1)(A).

The parties have filed motions to seal information and exhibits associated with: (i) Diaz's opposition to CitiStaff's motion, Dkt. No. 92, (ii) nextSource's motion for summary judgment, Dkt. No. 116, (iii) Tesla's motion for partial summary judgment, Dkt. No. 118, (iv) Diaz's opposition to nextSource's motion, Dkt. No. 124, (v) plaintiffs' opposition to Tesla's motion, Dkt. No. 125, (vi) Tesla's reply, Dkt. No. 131, and (vii) plaintiffs' opposition to Tesla's motion to retain confidentiality of documents,[30] Dkt. No. 135. Plaintiffs do not seek sealing of the information themselves; instead, they make their requests on behalf of the defendants, who marked information and exhibits as confidential pursuant to the protective order in this case.

Civil Local Rule 79-4(e)(1) required the defendants to file a declaration within four days establishing that the designated material referenced above was sealable under Civil Local Rule 79-5(d)(1)(A). None of the defendants did so.[31] Moreover, the defendants' own motions failed to heed this district's admonitions that (i) a confidentiality designation under a protective order is insufficient justification for sealing and (ii) requests should be narrowly tailored. *See* Civ. L.R. 79-5(d)(1)(A)-(B). These failures are grounds for me to deny the motions in their entirety and unseal every brief and exhibit in the docket.

Instead, I will give the defendants another opportunity. They should note that the compelling justifications standard is high; very little of the information I have reviewed—if any—is sealable. None of the information in this Order is sealable. The defendants should review the Civil Local Rules, Ninth Circuit authority, and my prior orders to understand just what

---

[30] I denied that motion without prejudice in the minute entry following the December 17, 2019 hearing, noting that I will address any confidentiality issues during the pretrial. *See* Dkt. No. 136.

[31] It is particularly galling that Tesla failed to submit a declaration in support of sealing the very documents it had separately moved to preserve as confidential. *See* Dkt. No. 135.

United States District Court
Northern District of California

1  "compelling reasons" and "narrowly tailored" mean.  For example, I will not seal general

2  information about investigations into the incidents alleged here, and I will not seal entire exhibits

3  or entire pages of deposition testimony.

4       If the defendants wish that certain narrowly tailored information remain under seal, they

5  shall file the following no later than **January 16, 2020**.  First, they shall submit a single joint table

6  outlining the information they believe should be sealed.  Their table should clearly identify, by

7  docket entry, page number, and line, which redactions they seek and which docket entries that are

8  currently under seal can be unsealed in their entirety.  They shall also file declarations from

9  knowledgeable individuals that detail the harm they or others will suffer if the documents are

10  made public.  Once I have ruled on the defendants' joint requests, I will order that the appropriate

11  docket entries be unsealed and that the parties submit properly redacted versions of documents as

12  necessary.

13                                        **CONCLUSION**

14       As set forth above, the defendants' motions for summary judgment are GRANTED IN

15  PART and DENIED IN PART.

16       **IT IS SO ORDERED.**

17       Dated: December 30, 2019

18

19                                             

20                                             William H. Orrick
                                               United States District Judge

21

22

23

24

25

26

27

28