LAWRENCE A. ORGAN (SBN 175503)
NAVRUZ AVLONI (SBN 279556)
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Ave.
San Anselmo, California, 94960
Telephone: (415) 453-4740
Facsimile: (415) 785-7352
larry@civilrightsca.com
navruz@civilrightsca.com

J. BERNARD ALEXANDER (SBN 128307)
**ALEXANDER KRAKOW + GLICK LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone: (310) 394-0888
Facsimile: (310) 394-0811
balexander@akgllp.com

Attorneys for Plaintiffs
DEMETRIC DI-AZ and OWEN DIAZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON,<br><br>        Plaintiffs,<br><br>   v.<br><br>TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive,<br><br>        Defendants. | Case No. 3:17-cv-06748-WHO<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION OF ISSUES**<br><br>Date: December 18, 2019<br>Time: 2:00 p.m.<br>Courtroom: 2, 17th Floor<br>Judge: Hon. William H. Orrick<br><br>Trial Date: March 2, 2020<br>Complaint filed: October 16, 2017 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Best Quality Coatings Corp. (ABQC) v. N.L.R.B.*,
    44 F.3d 516 (7th Cir. 1995) ...........................................................................20

*Bradley v. Department of Corrections & Rehab.*,
    158. Cal. App. 4th 1612, 1629 (2008) ..........................................................17

*CBOCS West, Inc. v. Humphries*,
    553 U.S. 442 (2008) ......................................................................................21

*Davis v. Kiewit Pacific Co.*,
    220 Cal. App. 4th 358 (2013) .................................................................28, 29

*Domino's Pizza, Inc. v. McDonald*,
    546 U.S. 470 (2006).................................................................................21, 22

*Ellison v. Brady*,
    924 F.2d 872 (9th Cir. 1991) .................................................................22, 24

*Ennix v. Stanten*,
    556 F. Supp. 2d 1073 (N.D. Cal. 2008) ........................................................21

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998) ......................................................................................25

*Fuller v. City of Oakland*,
    47 F. 3d 1522 (9th Cir. 1995.) ...............................................................24, 25

*Futrell v. Payday California, Inc.*,
    190 Cal. App. 4th 1419 (2010) ..............................................................19, 20

*Jimenez v. U.S. Continental Marketing, Inc.*,
    41 Cal.App. 5th 189 (2019) ..........................................................................25

*Kolstad v. American Dental Ass'n*,
    527 U.S. 526 ..................................................................................................28

*Martinez. Field v. American Mortgage Express Corp.*,
    2011 WL 3354344 (N.D. Cal. Aug. 2, 2011) ...............................................19

*Martinez v. Combs*,
    49 Cal. 4th 35 (2010) ..............................................................................19, 20

*McGinest v. GTE Svc. Corp.*,
   360 F.3d 1103 (9th Cir. 2004) ..................................................................................22

*Morrow v. City of Oakland*,
   2012 WL 368682 (N.D. Cal. Feb. 3, 2012) .....................................................17, 20

*Ray v. Henderson*,
   217 F.3d 1234 (9th Cir. 2000) ..................................................................................26

*Rodgers v. Western-Southern Life Insurance Company*,
   12 F.3d 668 (7th Cir. 1993) ......................................................................................23

*Roe v. DDS*,
   2017 WL 2311303 (N.D. Cal. May 26, 2017) .........................................................27

*Salazar v. McDonald's Corp.*,
   939 F.3d 1051 (9th Cir. 2019) ...........................................................................19, 20

*Steiner v. Showboat Operating Co.*,
   25 F.3d 1459 (9th Cir. 1994) ....................................................................................22

*Swinton v. Potomac Corp.*,
   270 F.3d 794 (9th Cir. 2001) ..............................................................................23, 28

*U.S. E.E.O.C. v. Global Horizons, Inc.*,
   915 F.3d 631 (9th Cir. 2019) .............................................................17, 18, 19, 20

*Velarde v. City of Alameda*,
   2016 WL 1588269 (N.D. Cal. 2016) .......................................................................27

*White v. Ultramar*,
   21 Cal. 4th 563 (1999) ..............................................................................................29

**Statutes**

42 U.S.C. § 1981 ......................................................2, 14, 17, 18, 19, 23, 25, 26, 28

Bane Act ..............................................................................................................................5

Cal. Civ. Code § 51.7(a) .................................................................................................27

Fair Labor Standards Act (FLSA) ...........................................................................19, 20

Migrant and Seasonal Agricultural Worker Protection Act ..........................................20

NLRA ................................................................................................................................20

Ralph Act ...........................................................................................................5, 26, 27, 29

Title VII of the Civil Rights Act ................................................................................17, 20, 24

PLAINTIFFS' OPPOSITION TO NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

While working at Defendant Tesla, Inc.'s factory in Fremont, California, as a temporary contract employee, Plaintiff Owen Diaz was subjected to severe and pervasive racial harassment. Over the course of nine months, Plaintiff was called the N-word multiple times, instructed to "Go back to Africa", threatened with violence, witnessed racist graffiti throughout the facility, and had a racist effigy left in his work area. Employees worked with swastikas forehead tattoos.

Pursuant to a contract with Tesla, Defendant nextSource ("Defendant" or "nextSource") was responsible for staffing contract employees, like Plaintiff, and managing their complaints. However, after Plaintiff complained about racist harassment to its employees, Plaintiff was treated as a "problem" for refusing to interact with harassers who called him racial slurs. Though nextSource knew about Plaintiff's prior complaints, it minimized the extent of the harassment to justify giving Plaintiff's harassers lenient punishment. Defendant failed to fully investigate Plaintiff's complaints of harassment, and did not take corrective action to prevent further racist conduct. This was part of a pattern: nextSource Program Manager, Wayne Jackson, admitted that he failed to take corrective action despite hearing racial slurs freely used in Tesla's factory.

Ignoring the hostile work environment created by constant use of the N-word, nextSource now seeks summary judgment, claiming that Plaintiff was only harassed on one occasion and that nextSource acted appropriately on this sole complaint. The facts demonstrate the opposite. After experiencing racial harassment, Plaintiff dutifully complained to nextSource employees Ed Romero and Jackson. While both Jackson and Romero were aware of Plaintiff's history of complaints against repeat harassers, they ignored Plaintiff's request for an investigation. Then, when Plaintiff's harassers complained about Plaintiff, Jackson and Romero targeted Plaintiff for retaliatory demotion and termination. Based on the testimony and documents, a reasonable trier of fact could—and likely would—find nextSource knew of the racially hostile work environment and failed to take appropriate preventative or remedial measures. As such, nextSource's motion should be denied with respect to Plaintiff's Section 1981 and Ralph Act claims.

Plaintiff does not contest nextSource's motion with respect to his Bane Act; NIED; IIED; Negligent Hiring, Retention, and Supervisor; and Constructive Discharge claims.

PLAINTIFFS' OPPOSITION TO NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT

I.  **FACTUAL BACKGROUND**

**A.  Citistaff Hires Plaintiff, and nextSource Places him to Work at the Tesla Factory.**

Citistaff hired Plaintiff on June 2, 2015 (Exh. 1 to the Declaration of Lawrence Organ ("Organ Dec.") at p. 1; Monica "De Leon" Depo. 42:23-43:15, Exh. 2 to Organ Dec.) NextSource placed Plaintiff at Tesla, with a start date of June 3, 2015. (Exh. A to to the Supplemental Declaration of Lawrence Organ ISO Plaintiff's Administrative Motion to File Under Seal ("Supp. Organ Dec.")) Plaintiff was an elevator operator, supervised by Elevator Lead Tamotsu Kawasaki, a temporary employee. (Tamotsu "Kawasaki" Depo. 22:25-23:12, Exh. 3 to Organ Dec.) Plaintiff's primary job duty "was to move material up and down for the…construction of cars" on industrial elevators. (Ed Romero ("Romero") Depo. 68:15-21, Exh. 4 to Organ Dec.)

After approximately one month, Kawasaki was promoted. (Kawasaki Depo. 23:13-23:16.) Kawasaki and nextSource employee Deb Gryske recognized Plaintiff's good performance, and on their recommendations, nextSource placed Plaintiff in Kawasaki's old position. (Owen Diaz ("Diaz") Depo. 93:8-12, Exh. B to Supp. Organ Dec.; Kawasaki Depo. 23:17-24:2; Exh. C to Supp. Organ Dec.) After his promotion, Plaintiff was supervised by nextSource employee Ed Romero. (Diaz Depo. 89:13-14) [1]

**B.  Nextsource, Citistaff, and Tesla Jointly Employed Plaintiff.**

In May 2013, nextSource and Tesla entered into a contract whereby nextSource would provide temporary employees to work at Tesla's factory. (Kevin "McGinn" Depo. 18:1-22, Exh. 5 to Organ Dec.; Exh. D to Supp. Organ Dec.) NextSource also acted as a managed service provider, and selected other staffing agencies to supply temporary employees on Tesla's behalf. (McGinn Depo. 20:2-25) The contract provided that nextSource would "manage, supervise, and provide direction to" nextSource employees and temporary employees of other agencies sourced by nextSource. (Exh. D to Supp. Organ Dec. at p. 3, § 3.1(a-b)) NextSource was bound to perform "all employer related functions such as new hire processing and orientation, employee

---

[1] Romero was a nextSource employee until October of 2015, when Tesla hired him as a full-time employee. (Romero Depo. 11:9-17, 8:17-18.)

relations, compensation and benefits management, records administration, worker classification services, payroll processing, and reporting". (*Id.* at p. 16, § 2(a)(1)) NextSource and Tesla jointly set temporary employees' hourly pay rates, including the rates of janitorial and recycling employees like Plaintiff. (*Id.* at p. 17, § 3; p. 27-8, § 4; p. 30, § 1; p. 32-33) In reality, in a complex overlap of duties, nextSource, Citistaff and Tesla shared responsibility for temporary employees employed by or through nextSource, where nextSource delegated many of its contractual duties to other entities.

Plaintiff worked at Tesla's factory, and Tesla provided his safety equipment. (Diaz Depo. 73:12-15; Victor "Quintero" Depo. 21:6-25, Exh. 6 to Organ Dec.) Tesla employees set Plaintiff's work schedule. (*Id.* 78:9-16) Plaintiff took direction and supervision from Tesla and nextSource employees, like Romero. (*Id.* 425:20-25) Tesla conducted Plaintiff's orientation and training. (*Id.* 81:25-82:20) Plaintiff followed Tesla's workplace policies, like its Personal Protective Equipment policy. (Romero Depo. 25:23-26:25) nextSource hired Plaintiff's subordinates. (McGinn Depo. 20:13-25; Romero Depo. 40:12-41:8, 60:15-20)  Plaintiff used nextSource's computer system to submit timesheets and track his time. (McGinn Depo. 22:4-20) Tesla supervisors next approved Plaintiff's hours. (Exh. E to Supp. Organ Dec. at pp. 1, 3) CitiStaff then collected employees' hours from nextSource, and issued paychecks to its employees. (De Leon Depo. 22:3-23, 27:8-14) NextSource also handled requests for pay increases and conveyed them to CitiStaff. (*Id*. 89:13-21)

While CitiStaff paid its employees, covered their benefits and paid their Workers' Compensation insurance, CitiStaff's staff did not discipline, promote, or terminate employees placed at the Tesla factory. (De Leon Depo. 90:21-91:18, 99:17-23) Rather, CitiStaff delegated these duties to Tesla and nextSource. CitiStaff employees approved requests for promotions and pay raises submitted by nextSource and Tesla. (*Id.* 89:13-21, 91:22-92:4, 114:20-115:4, 117:1-11) In fact, nextSource recommended Plaintiff be promoted, and Citistaff followed this recommendation. (Exh. C.) CitiStaff allowed nextSource and Tesla to issue warnings and performance evaluations to CitiStaff employees. (De Leon Depo. 65:8-66:1, 115:13-21, 118:10-20) CitiStaff relied on nextSource and Tesla's recommendations when terminating employee

PLAINTIFFS' OPPOSITION TO NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT

assignments at the Tesla factory. (*Id.* 115:13-21, 118:10-20) Indeed, one CitiStaff employee admitted that she had never terminated a temporary employee, and relied on nextSource or Tesla to terminate their assignments. (*Id.* 99:17-23) NextSource employee Jackson observed, "I couldn't terminate [temporary employees]. They weren't [nextSource] employees." (Wayne "Jackson" Depo. 40:10-23, Exh. 7 to Organ Dec.) However, Jackson could recommend employees' removal from the job site—effectively terminating their assignment with an employer. (*see, e.g.*, Exh. F to Supp. Organ Dec.) Essentially, nextSource and Tesla acted as CitiStaff's "eyes and ears" in the factory, and CitiStaff relied on their recommendations when disciplining or terminating—thus dividing the typical responsibilities of an employer between the three entities.

Thus, Plaintiff's supervisors were Tesla and nextSource employees, including Michael Wheeler, Ramon Martinez, "Ed Romero and Thomas [sic] Kawasaki". (Diaz Depo. 130:1-2; Michael Wheeler ("Wheeler") Depo. 41:18-25, 74:12-21, Exh. 8 to Organ Dec.)

NextSource and Tesla also handled complaints from temporary employees. CitiStaff instructed Plaintiff to complain to his "on-site supervisor" or nextSource employees, like Jackson and Romero. (Diaz Depo. 129:17-25, 132:4-15) Given the patchwork of staffing agencies at Tesla, nextSource took the role of coordinating investigations between staffing agencies and gathering information to present to the agencies. (Jackson Depo. 19:12-24; 26:6-13) Tesla employees allowed nextSource to take the lead on investigating complaints from temporary employees, like Plaintiffs, although Tesla employees participated in investigations and offered input and feedback on how to resolve temporary employee complaints. (Exh. G to Supp. Organ Dec. at p. 1; Exh. H to Supp Organ Dec. at p.1) But nextSource could—and did—recommend specific outcomes to the staffing agencies with Tesla's input, which the agencies followed. (Jackson Depo. 120:12-15; 90:18-91:2, 91:8-11)

**C. The Racial Harassment Plaintiff Experienced at The Tesla Factory Was Severe, Pervasive, and Never Stopped.**

Plaintiff's first supervisor, Kawasaki warned Plaintiff that he would "run into resistance" because of his race. (Diaz Depo. 122:3-20) Within weeks of Plaintiff's start date this warning

proved to be true.

**1.**   **Judy Timbreza repeatedly called Plaintiff racial slurs. Instead of investigating, nextSource employee Romero lies to justify lenient discipline for Timbreza.**

Soon after Plaintiff's start date, coworker Judy Timbreza began calling Plaintiff "nigger," "porch monkey," and a monkey ("mono") in Spanish. (Diaz Depo. 217:11-218:11, 219:2-8, 220:1-14) On or around July 31, 2015, Plaintiff and Timbreza got into an altercation after Timbreza called Plaintiff a racial slur yet again. (Kawasaki Depo. 37:7-16) Plaintiff complained about Timbreza's use of racial slurs to Supervisor Kawasaki. (Diaz Depo. 215:23-216:10; Kawasaki Depo. 42:3-22) Kawasaki spoke to bystanders, who corroborated Plaintiff's claims: "[P]eople . . . said Judy said racial slurs towards Owen." (Kawasaki Depo. 43:3-5, 44:18-45:6, 81:14-82:4, 90:4-15) Kawasaki escalated the complaint to Romero (who was then a nextSource employee), Recycling Supervisor Jaime Salazar, and Custodial Program Manager Quintero. (Exh. I to Supp. Organ Dec.) A few days later, Kawasaki met with Romero and reported that witnesses corroborated Plaintiff's complaint. (Kawasaki Depo. 47:22-48:10)

Rather than enforce Tesla's purported "zero-tolerance" policy for harassment, nextSource employee Romero informed Kawasaki "there's a rule that there's these three written warnings before anybody gets laid off." (Kawasaki Depo. 48:17-49:3) Kawasaki was not aware of Romero ever conducting an independent investigation of Plaintiff's report. (Kawasaki Depo. 54:24-55:7) However, the following day Supervisor Romero emailed Manager Quintero, falsely stating that no witnesses had corroborated Plaintiff's complaint. (Exh. J to Supp. Organ Dec.) Consequently, Timbreza was only issued a verbal warning for "kidding around excessively" omitting any mention of racial slurs. (Romero Depo. 158:12-14) At Romero's direction, Kawasaki minimized the import of the write-up, telling Timbreza, "It's not saying you're going to get laid off. It's just … stating that this situation happened and you're being written up for it." (Kawasaki Depo. 53:17-54:8; Exh. J to Supp. Organ Dec.)

NextSource employee Romero never told Kawasaki that Timbreza had been laid off or fired. (Kawasaki Depo. 58:4-12) NextSource never disclosed whether Timbreza was terminated. Instead, Tesla asked Kawasaki to fill Timbreza's position. (Kawasaki Depo. 92:6-20) While

Kawasaki assumed a "lay-off", all Kawasaki could say with certainty was that Timbreza no longer worked his shift. (Kawasaki Depo. 58:4-12, 58:15-20)

No documentation of counseling, a write-up, or termination have ever been produced by nextSource. NextSource could not produce any documentation of Romero's alleged investigation. (Exh. 9 to Organ Dec. at 26:18-29:10) Thus, the Court must infer that no investigation was conducted and no discipline was issued.

**2.  After Plaintiff's complaint, he and other African-American employees are harassed.**

After seeing nextSource employee Romero's cover-up and Timbreza's nominal punishment, other employees were encouraged to racially harass Plaintiff. In particular, Supervisor Martinez targeted Plaintiff for harassment. Supervisors in Martinez's role could direct Plaintiff's work and were empowered to appraise performance "all the way up to termination," and their recommendations were generally followed. (Wheeler Depo. 41:18-25, 74:12-21, 16:22-24, 17:6-16)

Martinez used his authority to create a racially hostile work environment. He called Plaintiff the N-word at least 30 times (Diaz Depo. 56:9-11, 63:5-8), coupled with "'I hate you'" (*Id*. at 63:15-22), or "he hated us F[uck]ing N[-word]s" (*Id.* at 133:11-15), or "'N[-word]s are not shit'" (*Id.* at 64:6-10), or "'He wished that he could get all us N[-word]s fired'" (*Id*.), or to "Go back to Africa." (*Id*. at 68:7-10) Martinez also used the Spanish term "mayate" in conversation "all the time." (Wheeler Depo. 33:16-18) "Mayate" literally means "dung beetle," an offensive Spanish slang for a Black person—equivalent to the N-word.

Martinez was not the only supervisor to employ racial slurs against Plaintiff. Supervisor Robert Hurtado called Plaintiff the N-word approximately 30 times. (Diaz Depo. 55:18-56:8) Hurtado "supervised leads and employees" and Plaintiff "took instruction" from him. (*Id*. at 307:25-308:4, 309:7-15) When asking Plaintiff to perform tasks, Hurtado said things like, "N[-word], hurry up and push the button", or "You N[-word]s are lazy." (*Id*. at 58:1-5, 59:1-6) Hurtado derogatorily referred to Plaintiff as "boy" "[i]n a vindictive and malicious way" reminiscent of slavery-era references. (*Id*. at 310:6-8) When Plaintiff complained, Hurtado responded, "if you don't like your treatment your time there [*sic*], your employment could end."

(*Id.* at 309:2-6) Hurtado's prediction proved prescient: in early 2016, after Plaintiff could no longer tolerate the harassment, he asked Hurtado to only speak to him about work-related matters. (Exh. K to Supp. Organ Dec. at p. 1) This prompted Hurtado to complain about Plaintiff's attitude. Ignoring Plaintiff's repeated complaints about Hurtado,  Romero reprimanded Plaintiff for refusing to speak to his harasser. (*Id.*) Emboldened by Romero's support, Hurtado continued to call Plaintiff racial slurs throughout the remainder of Plaintiff's employment at the Tesla factory. (Diaz Depo. 312:8-12)

Other co-workers used racial slurs in the workplace as well. Aron Deharto told Plaintiff, "'All you N[-word]s are starting to get uppity." (Diaz Depo. 120:25-121:18) Plaintiff complained to Kawasaki, who simply advised Plaintiff to avoid Deharto. (*Id.* at 121:16-20) Plaintiff watched as Supervisor Javier Caballero told Plaintiff's son, Plaintiff Demetric Di-az, "'All you fucking niggers—I can't stand you motherfuckers." (Demetric Di-az Depo. 159:9-160:20, Exh. L to Supp. Organ Dec.; Diaz Depo. 270:23-271:4) Wheeler recalled reprimanding an employee who called him the N-word, only to later find that the employee was promoted to supervisor in Plaintiff's work area. (Wheeler Depo. 20:2-24)

Plaintiff and other employees also heard the N-word freely used in the factory. Eight to ten employees working on "[e]ither production or the battery line" called Plaintiff the N-word. (Diaz Depo. 55:12-17)  Plaintiff also reported hearing other employees maliciously use the N-word, e.g., "'Hey, you, N[-word].'" (Diaz Depo. 70:4-13) NextSource Program Manager Jackson observed non-African-American employees calling each other "nigga" and found it offensive. (Jackson Depo. 141:14-25) He noted, "And I will hear that often, to be honest." (*Id.* at 144:9-15) However, he made no report and took no corrective action despite hearing the N-word 3-4 times. (*Id.* at 150:25-151:10) Wheeler reported hearing the N-word "[d]uring breaks or outside when [employees are] smoking or in passing, coming into the factory." (Wheeler Depo. 35:5-10)

The harassment was also visual. For instance, Wheeler was "taken aback" by the "vulgarity" of seeing an employee with a swastika tattooed on his head. (*Id.,* 113:12-114:4)

### 3.   **Plaintiff is confronted by racist graffiti in the restrooms.**

Beginning on his second day of employment, Plaintiff saw the N-word scrawled on the

walls of the restroom stalls. (Diaz Depo. 48:8-11, 51:11-22) Similar graffiti appeared in approximately four different bathrooms on subsequent occasions, making it unavoidable. (*Id.* at 48:18-25, 50:15-17) Plaintiff never saw this offensive graffiti removed. (*Id*. at 49:1-10) Corroborating this, Plaintiff Di-az saw "'Fuck you, nigger' all in the bathroom stall. 'You all don't belong here. You niggers don't belong here.' Stuff like that." (Di-az Depo. 154:19-21) Plaintiff's subordinate, Lamar Patterson, also saw the N-word in the restrooms at least three times, along with "a Nazi sign [i.e. a swastika]." (Lamar Patterson Depo. 101:1-22, 105:5-19, 106:23-107:9, Exh. M to Supp. Organ Dec.) Although, as laid out below, Plaintiff complained to then-nextSource employee Romero the first time he saw such graffiti, the graffiti remained in the bathrooms months after Plaintiff stopped working at Tesla in March 2016. (Exhibit N to Supp. Organ Dec.)

### 4. Plaintiff complains, repeatedly, about harassment and no action is taken.

As instructed, Plaintiff dutifully complained about the harassment on multiple occasions. In addition to complaining to Kawasaki about Deharto and Timbreza, Plaintiff complained approximately three to seven times to his immediate supervisor, Romero, about the use of racial slurs (Diaz Depo. 53:24-54:7), about the "go back to Africa" references (*Id*. at 54:11-16), and approximately three to seven times about the racist graffiti. (*Id*. at 52:17-22) Romero seemed "dismissive," saying "he didn't know who was doing" the graffiti. (*Id*. at 53:11-24) No corrective action was taken. Romero never escalated Plaintiff's complaints to his manager or HR, as required by Tesla's policies. (Marconi Depo. 52:3-6)

### 5. The harassment escalates because of the inaction.

Predictably, inaction caused Plaintiff's harassers to grow bolder. This contributed to the hostility of Plaintiff's work environment.

#### i. *Ramon Martinez physically threatens Plaintiff.*

On October 17, 2015, Martinez rushed into an elevator with Plaintiff and another employee, Rothaj Foster, "trying to show Owen that he was the boss." (Kawasaki Depo. 65:10-25; Exh. O to Supp. Organ Dec.) Martinez had been "waiting down at the bottom elevator" for Plaintiff to arrive, where Martinez "wasn't supposed to be." (Kawasaki Depo. 65:10-25)

Martinez approached in a "threatening manner" and Plaintiff "thought [Martinez] was going to hit [him]." (Exh. O to Supp. Organ Dec.) Martinez was "[l]oud, boisterous, posturing, fists balled up, using threatening language" in addition to "[c]ursing, four letter words. Getting real close to [Plaintiff's] personal space to the point where [Plaintiff]…had [his] hands up to defend [him]self in case [Martinez] swung…." (Diaz. Depo. 227:6-20) Throughout, Martinez called Plaintiff the N-word. (*Id.* 126:24-127:1) Plaintiff reminded Martinez that security cameras were in the elevator and asked him to step back. (*Id.* 106:18-24) Plaintiff was "in fear for [his] safety" because he "had a guy that was in front of [him] with his fists balled up threatening to do [him] harm." (*Id.* 228:2-8) Plaintiff believed Martinez was "threatening to do [Plaintiff] physical harm" and "believed he was going to hit" him. (*Id.* 315:8-15)

As soon as his shift ended, Plaintiff promptly complained to Supervisors Kawasaki and Romero (who was then a Tesla employee), and asked Romero to review the security footage. (Diaz Depo. 109:12-19, 315:8-15; Exh. O to Supp. Organ Dec.) Plaintiff also told them, "I don't feel safe around [Martinez] now." (*Id.*) Turning the tables, that same night, Martinez complained that Plaintiff was not acting "on the professional way with me." (Exh. P to Supp. Organ Dec.) Plaintiff's complaints of violent behavior received no response. However, Romero and Quintero <u>immediately initiated an investigation based on Martinez's complaint</u>. (*Id.*)

In contrast, Tesla delegated the investigation of Plaintiff's complaint to nextSource. (Exh. G) NextSource waited four days before deciding that it would not formally investigate Plaintiff's complaint. (Exh. Q to Supp. Organ Dec.) No one interviewed Foster or reviewed (and preserved) the security footage. Instead, nextSource minimized Plaintiff's complaint. While Plaintiff described a witness and security footage in his e-mail, Jackson wrote off the complaint as "more or less unsubstantiated" and "kind of a my-word-against-yours type of deal" with "no witnesses." (Jackson Depo. 101:15-25) Treating the workplace attack like a garden-variety co-worker issue, Plaintiff and Martinez were each "verbally counseled" to "play nice with each other in the sandbox." Plaintiff was issued a verbal warning for "his professionalism", despite being the victim of a racially motivated attack. (Jackson Depo. 70:8-22, 70:23-71:10) NextSource ignored Plaintiff's prior complaints against Martinez.

PLAINTIFFS' OPPOSITION TO NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT

### ii.   *Plaintiff is Confronted with a racist "pickaninny", drawn by Martinez.*

In January 2016, Martinez drew and positioned a racist pickaninny that resembled a "racist…turn of the century…cartoon", or "pickaninny," in Plaintiff's work area for him to find. (Diaz Depo. 45:22-24.) The effigy depicted an "African-American, bone in his hair, big lips with a caption 'Booo' under [sic] the bottom." (*Id.* 45:25-46:6; Pg. 5 of Exh. R to Supp. Organ Dec.) Plaintiff and Jackson thought "Booo" referred to "jiggaboo," a "derogatory racist term for African-Americans." (Diaz Depo. 46:17-24; Jackson Depo. 26:9-18) Wheeler thought it referred to a "spook", a midcentury racial slur. (Wheeler Depo. 64:25-65:4) All three African-American men agreed that the effigy was offensive. (Jackson Depo. 26:21-24; Wheeler Depo. 65:14-19)

Armed with unambiguous proof of racist conduct, Plaintiff promptly complained to the nearest supervisor, Michael Wheeler. (Wheeler Depo. 60:19-61:10, 65:14-16) Wheeler, Plaintiff, and fellow supervisor Israel Zuniga took photographs of the pickaninny before searching for its creator. (Diaz Depo. 152:23-153:22) When they searched for the culprit, they quickly found Martinez, who admitted to drawing the pickaninny. (Diaz Depo. 154:13-155:18) When caught, Martinez offered with a "smirkish" demeanor: "You people [African-Americans] can't take a joke." (*Id.* 155:5-18, 157:3-5) He did not apologize. (*Id.* 156:20-24)

Once his shift ended on January 22, 2016, Plaintiff notified Romero, nextSource, and Citistaff of the pickaninny, describing it as a "Racist effigy." (Pg. 3, Exh. R) Plaintiff explained, "if a supervisor does this kind of thing in front of the employees [sic] what kind of example are we setting. A person should be able to come to work and not be harassed or degraded while they're trying to do their job. This is not the first time Ramon Martinez has been talk about [sic] his behavior. And because nothing has been done, it seems that his behavior is getting worse." (*Id.*)  Plaintiff's email highlighted his opinion that the drawing was "racist," and reminded nextSource and Tesla that he had previously complained about Martinez and "his actions escalated." (Diaz Depo. 147:21-25; 149:14-24) Although nextSource Program Manager Jackson was concerned that Martinez had created this racist effigy just months after physically threatening Plaintiff, the only action he took was to "alert[] the various agencies so they could look into it a little further." (Jackson Depo. 101:4-14) Despite its obligations to investigate

temporary employee complaints under the contract with Tesla, nextSource did not address Plaintiff's history of complaints.

NextSource relied on Martinez's employer, staffing agency Chartwell, to conduct an investigation into the pickaninny drawing. Chartwell only interviewed Plaintiff and Martinez. (Exh. S to Supp. Organ Dec., pp. 3-8) Plaintiff stated he did not "feel safe," that "the picture was [a] racial statement" and that Martinez "should be terminated." (*Id.* pp. 4-5)

In contrast, Martinez's handwritten statement falsely claimed that he had apologized to Plaintiff; that Plaintiff understood Martinez had no bad intentions with the drawing; and that Plaintiff had agreed to delete his e-mail to Romero after speaking to Martinez. (*Id*. pp. 7-8) No one from Chartwell, nextSource, CitiStaff, or Tesla questioned Martinez's credibility or inquired into these blatant falsehoods. Although Jackson claimed to "gather information" when investigating complaints, he did not interview the two known witnesses, Zuniga and Wheeler, and failed to follow up on his concerns about Martinez's behavior.

After learning of the racist effigy, Quintero's tepid response was to suggest issuing Martinez a final written warning. (Exh. T to Supp. Organ Dec. at p. 1) NextSource was "surprised that [Quintero was] so conservative on his stance." (*Id*.) At Jackson's urging, Tesla and nextSource approved a final written warning and three-day suspension without pay for Martinez, which Chartwell purportedly implemented. (*Id*.) Quintero explained, "Basically, it was Wayne's decision [on how to discipline Martinez], and I agreed." (Quintero Depo. 64:15-65:5) Ignoring Plaintiff's history of prior complaints, Quintero justified Jackson's lenient discipline because "Ramon had never exhibited this type of behavior before, . . . like anything that was offensive to anybody." (*Id*.) No one ever informed Plaintiff that Martinez was disciplined, and Martinez never apologized. (Diaz Depo.: 153:2-12; 163:14-24)

In addition to the written warning, nextSource proposed to "make sure that the impacted workers know the warning was given and any further issues are grounds for immediate termination", and to "send out an update to the workforce on the seriousness of this type of offense and remind them of [the] zero tolerance policy [towards racial harassment]." (Exh. T to Supp. Organ Dec. at p. 1) The proposed e-mail about Tesla's "zero-tolerance policy" was never

sent. Jackson recalled sending an "email saying we need to meet with each team, with each group" to discuss the situation, but didn't recall if the meeting or any kind of training ever occurred. (Jackson Depo. 84:5-19) Moreover, no "final written warning" letter has ever been produced to confirm that any actual discipline was ever imposed on Martinez.

Post-investigation, only De Leon contacted Plaintiff by phone to "check[] in to—with him to see do you—are you going to return to your—to your job. He said yes." (De Leon Depo. 133:20-134:7) However, "[o]ther than Tesla," CitiStaff did not work with any companies that paid temporary employees over $16 per hour. (*Id.* 158:1-3) At the time, Plaintiff made $18 per hour. (*Id.* 211:5-12) Had Plaintiff sought reassignment, he would have essentially been punished with a pay cut for being the victim of harassment.

**E. Tesla, NextSource and CitiStaff Terminate Plaintiff from Tesla while Martinez is rewarded with a promotion to a full-time position.**

Despite the economic benefits, Plaintiff ultimately stopped working for Tesla when he "couldn't take the abuse anymore." (Diaz Depo. 172:24-25) The same day that Romero and Jackson received a doctor's note placing Plaintiff off on leave for three weeks, Jackson decided that he needed to "replace [Plaintiff] as soon as possible. (Exh. U to Supp. Organ Dec.) That same day, Jackson told Citistaff that Plaintiff's assignment at the Tesla factory was ended. (Exh. V to Supp. Organ Dec.) Based on Jackson's request, Citistaff informed Plaintiff his assignment at Tesla had ended. (*Id.*) This decision was based on Plaintiff's refusal to interact with his harassers. (Exh. W to Supp. Organ Dec. at pg. 1)

After Plaintiff's assignment ended, CitiStaff offered Plaintiff assignments to work for other companies, most of which would pay around $13 per hour, which Plaintiff rejected. (De Leon Depo. 155:24-156:15) Plaintiff made $18 per hour at Tesla. (*Id.* 211:5-12) De Leon was not aware of *any* CitiStaff placements paying over $16 per hour. (*Id.* 158:1-3)

In contrast, Martinez continued working at Tesla, through Chartwell and nextSource, through 2018. (Quintero Depo. 65:20-66:23) Martinez, a serial harasser, was elevated to a full-time Tesla position. Tesla hired Martinez as a Lead Material Handler on January 14, 2019—a position he held until at least until May 2019. (Exh. 10 to Organ Dec. at 6:14-7:10)

Plaintiff's experiences at Tesla left him "emotionally damaged" and depressed. (Diaz Depo. 238:7-14) His harassers caused this distress, as well as the Tesla, CitiStaff, and nextSource employees who took little or no action to address his complaints. (*Id.* at 238:18-23)

## II. LEGAL ARGUMENT

### A. NextSource CitiStaff and Tesla Are Joint Employers of Plaintiff.

In its motion, nextSource disputes that it employed Plaintiff. However, "an individual can have more than one employer for Title VII purposes…The law recognizes that two entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions." *U.S. E.E.O.C. v. Global Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019) (citations omitted) ("*Global Horizons*"). In *Global Horizons*, the 9th Circuit held that the "common-law agency test should be applied in the Title VII" joint-employer context. *Id.* at 638. [2] "Under the common-law test, the 'principal guidepost' is the element of control—that is, 'the extent of control that one <u>may</u> exercise over the details of the work of the other.'" *Id.* at 638 (citation omitted, emphasis added).

Some factors courts consider under this "control" test include:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.  [Citation.]

*Id.* at 638. In determining whether "an employment relationship exists," the Court must look to "'all of the incidents of the relationship'" rather than focusing on a single factor. *Id.* In the temporary staffing context, "[t]he key is that liability is predicated on the allegations of harassment or discrimination involving the terms, conditions, or privileges of employment <u>under the control of the employer</u>, and that the employment relationship exists…within the context of the control retained." *Bradley v. Department of Corrections & Rehab.*, 158. Cal. App. 4th 1612, 1629 (2008) (applying common-law "control" test to analogous California state statute).

---

[2] The Northern District applies the principles applicable in a Title VII discrimination claim when evaluating claims under 42 U.S.C. § 1981. *Morrow v. City of Oakland*, 2012 WL 368682 at *12 (N.D. Cal. Feb. 3, 2012)

These factors weigh in favor of joint employment with respect to nextSource. From July to October of 2015, Plaintiff was supervised by nextSource employee Romero. (Diaz Depo. 89:13-14) At the recommendation of nextSource, Plaintiff received new assignments, promotions or terminations. (Exh. C; Exh. U) NextSource also handled complaints, as reflected in a series of Tesla e-mails where employees state that they cannot be involved in handling temporary employee issues and cede control to nextSource. (Exh. G) After investigating these complaints, nextSource could further control Plaintiff's work by offering resolution, up to and including promotions, demotions, or other formal discipline. NextSource disciplined Plaintiff and his peers on multiple occasions: Romero failed to take appropriate corrective action after Timbreza used racial slurs (Exh. J); Jackson counseled Martinez and Plaintiff for "unprofessionalism" after failing to investigate the October threats incident (Jackson Depo. 70:8-22, 70:23-71:10); and Jackson issued Plaintiff a written warning for a verbal altercation with coworker Troy Dennis— another employee with a record of using racial slurs in the workplace. (Exh. X to Supp. Organ Dec.; Exh. Y to Supp. Organ Dec.)

Far from the "attenuated" relationship nextSource claims it played in Plaintiff's employment (Def.'s Mtn., 12:3-4), nextSource exercised substantial control over the day-to-day aspects of Plaintiff's employment. In addition to supervising and disciplining Plaintiff, nextSource maintained the system whereby Plaintiff logged and submitted his work hours for remuneration.  (McGinn Depo. 22:4-20) Along with Tesla, it set Plaintiff's pay rate. (*Id.* at p. 17, § 3; p. 27-8, § 4; p. 30, § 1; p. 32-33) NextSource hired and coordinated the contractors employed as Plaintiff's subordinates. (McGinn Depo. 20:2-25.; Exh. D at p. 3, § 3.1(a-b)) Thus, NextSource exercised a high degree of control over the terms and conditions of Plaintiff's employment, because it hired his subordinates, monitored his performance, could effectively recommend discipline and termination; and could effectively recommend pay rate changes.

In addition, as the *Global Horizons* court noted, delegation of a duty to a fellow joint employer does not change this analysis. In *Global Horizons*, a group of growers contracted with another entity to discharge certain legal obligations under the H2-A foreign guest worker program. *Global Horizons*, *supra*, 915 F.3d 631, 640. The court held that, because

"responsibility for compliance ultimately rested on the Growers' shoulders", the contractual delegation of duties did not change the Growers' status as joint employers.

The *Global Horizons* principles apply to the instant case. Under its contract with Tesla, nextSource was legally required to "manage, supervise, and provide direction to Supplier Personnel." (Exh. D at p. 3, § 3.1(b)) Under the contract, "Supplier Personnel" includes nextSource employees, like Jackson and Romero, in addition to "employees and independent contractors of [nextSource's]… Affiliates, and subcontractors." (*Id.* at § 3.1(a)) NextSource was legally bound to perform "all employer related functions such as new hire processing and orientation, employee relations, compensation and benefits management, records administration, worker classification services, payroll processing, and reporting" for these employees. (*Id.* at p. 16, § 2(a)(1)) Under the contract, nextSource and Tesla jointly set temporary employees' hourly pay rates, including the rates of janitorial and recycling employees like Plaintiff. (*Id.* at p. 17, § 3; p. 27-8, § 4; p. 30, § 1; p. 32-33) The contract imposed these legal obligations on nextSource, and the fact that nextSource delegated these duties to employees of Tesla, CitiStaff, or Chartwell does not change the fact that ultimately, legal responsibility for compliance rested on nextSource's shoulders. NextSource's right to control the terms and conditions of Plaintiff's employment—even when delegated to other parties—renders it a joint employer.

Most of the cases cited by nextSource represent a deliberate attempt to mislead the Court as to the current state of the law vis-à-vis joint employment relationships. *Martinez* is a California Supreme Court case addressing the statutory definition of "employer" under the California Industrial Wage Commission's ("IWC") Wage Orders, in a suit brought under California law for nonpayment of minimum wages. *Martinez v. Combs*, 49 Cal. 4th 35 (2010). Likewise, *Salazar* discusses the statutory definition of an employer under the IWC's applicable wage order in a suit brought under California law for nonpayment of wages. *Salazar v. McDonald's Corp.*, 939 F.3d 1051 (9th Cir. 2019). *Field* is also a case brought for unpaid wages and analyzed using the IWC's statutory definitions of "employer" under *Martinez*. *Field v. American Mortgage Express Corp.*, 2011 WL 3354344 (N.D. Cal. Aug. 2, 2011). Similarly, *Futrell* is a case dealing with nonpayment of wages under the IWC's wage orders and the federal

PLAINTIFFS' OPPOSITION TO NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT

Fair Labor Standards Act. *Futrell v. Payday California, Inc*., 190 Cal. App. 4th 1419 (2010). The *Futrell* court held that the definition of an employer in wage cases is based on the <u>statutory definition contained in the applicable IWC wage order under California law</u>. (*Id.* at 1429.) Under the FLSA, the court observed that it must apply the "'economic reality test'". (*Id.* at 1435-6.)

In *Global Horizons* the Ninth Circuit unambiguously <u>rejected</u> "the chief alternative [to the "right to control" test] for analyzing employment relationships in the Title VII context: the economic reality test." *Global Horizons*, *supra*, 915 F.3d at 638. The court rejected this test because "the economic-reality test was developed in the context of the Fair Labor Standards Act (FLSA) and the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), two statutes that <u>differ from Title VII in material respects</u>." *Id*. at 639. Like the California wage orders in *Martinez*, *Salazar*, and *Futrell*, the court observed, the "economic-reality test is based on the broad statutory definitions found in the FLSA and the AWPA" and the accompanying regulatory guidance—"features that are not present in the Title VII scheme". *Id*. Given that courts apply Title VII principles in Section 1981 cases, law governing California wage orders or the FLSA does not apply. *Morrow v. City of Oakland*, 2012 WL 368682 at *12 (N.D. Cal. Feb. 3, 2012).

However, joint employer status does not conclusively establish liability. "Liability may be imposed for a [joint] employer's discriminatory conduct only if the defendant employer knew or should have known about the other employer's conduct and 'failed to undertake prompt corrective measures within its control.'" *Global Horizons*, *supra*, 915 F.3d at 638. (citations omitted). The standard is analogous to "an employer's liability for the discriminatory conduct of third parties in the workplace." *Id*. In a contractor setting, this standard requires a joint employer to "protest [the unlawful action] or to exercise any contractual right it might possess to resist it." *Am.'s Best Quality Coatings Corp. (ABQC) v. N.L.R.B.*, 44 F.3d 516, 523 (7th Cir. 1995) (discussing joint employment in the context of the NLRA). Under its contract with Tesla, where nextSource had a duty to "comply with…all Laws pertaining to…affirmative action and equal employment opportunity", this would have taken the form of conducting a prompt and impartial investigation into complaints of racial harassment. (Exh. D at p. 2, § 2.6(b)) When evaluated under this standard, Plaintiff's claims against nextSource raise triable issues of material fact.

**B. Plaintiff's Claims Of Harassment And Discrimination Under 42 U.S.C. § 1981 Raise Triable Issues Of Material Fact.**

**1. Plaintiff was in a contractual relationship with nextSource within the meaning of 42 U.S.C. § 1981.**

As nextSource correctly notes, a contract is a prerequisite to suit under Section § 1981. *Ennix v. Stanten*, 556 F. Supp. 2d 1073, 1082 (N.D. Cal. 2008). "[A § 1981] plaintiff cannot state a claim…unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.' Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not someone else's." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 (2006). The Supreme Court has noted that this does *not* require a plaintiff to be a party to a contract, and "a third-party intended beneficiary of a contract may have rights under § 1981." *Id*. To make this showing, the third-party beneficiary must prove that he "has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Id*. at 479-80. Plaintiff can make just this showing.

NextSource had a duty to employ and pay individuals at the Tesla factory, and to uphold affirmative action and equal employment opportunity laws, pursuant to its contract with Tesla. (Exh. D p. 2, § 2.6(b)) NextSource contracted with CitiStaff, among other agencies, to employ and pay workers at the Tesla factory. Under this contract, Plaintiff had a right to employment and remuneration in return for his work at the Tesla factory. While Plaintiff was not a party to the contract, he was plainly an intended, third-party beneficiary of the contract between Citistaff and nextSource. Because Plaintiff had rights as a third-party beneficiary under this contract, as required under *Domino's Pizza*, Plaintiff can state a cognizable claim under Section 1981.

Moreover, the references to "contract" in Section 1981 have been interpreted to encompass the "contract" inherent in an employment relationship, and the statute protects employees from racial discrimination in the workplace, including (though not limited to) "'harassment, discharge, demotion, promotion, transfer, retaliation, and hiring.'" *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 450-1 (2008) (citations omitted). Because nextSource jointly employed Plaintiff, it was in a "contract" with Plaintiff within the meaning of Section 1981.

The primary holding of *Domino's Pizza* itself is inapposite. In *Domino's Pizza*, the plaintiff was the sole shareholder and contracting agent of a corporation. 546 U.S. 470, 472. Domino's Pizza declined to form a contract with the corporation after learning that the plaintiff was black. *Id.* at 473-474. The Supreme Court rejected the plaintiff's claims under Section 1981, because the plaintiff would have had no rights under the contract—only the corporation would have had rights under the putative contract. *Id.* at 477. Unlike the Plaintiff in *Domino's Pizza*, Plaintiff himself had rights under the contract—thus entitling him to sue under Section 1981.

### 2.   Plaintiff was subjected to racial harassment and discrimination within the meaning of 42 U.S.C. § 1981.

To survive summary judgment on Section 1981 harassment and discrimination claims, an African-American employee "must show the existence of a genuine factual dispute as to (1) whether a reasonable African American [employee] would find the workplace so objectively and subjectively racially hostile as to create an abusive working environment; and (2) whether [the employer] failed to take adequate remedial and disciplinary action" or is vicariously liable for the harassers' conduct. *McGinest v. GTE Svc. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004). A plaintiff makes this showing where "hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). The hostility of the working environment is analyzed from the perspective of a reasonable member of the plaintiff's protected class. *Ellison v. Brady*, 924 F.2d 872, 878-9 (9th Cir. 1991) ("*Ellison*").

Bizarrely, nextSource claims that Plaintiff was subjected to just a single instance of racial harassment. (Def. MPA p. 17:3-17.) The facts demonstrate the opposite: any reasonable African-American employee would have found the Tesla factory permeated with severe, racially hostile conduct. Plaintiff testified that supervisors Martinez and Hurtado called him the N-word approximately sixty times—which means Plaintiff was called a racial slur approximately twice a week at the Tesla factory. (Diaz Depo. 55:18-56:8, 56:9-11, 63:5-8) Additionally, Plaintiff and other African-American employees heard other employees freely using the slur in other areas of the workplace, which no one investigated. (*see, e.g.*, Diaz Depo. 55:12-17) Courts recognize the

N-word is not merely an offensive utterance, but "perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001). As the Seventh Circuit noted, "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Insurance Company*, 12 F.3d 668, 675 (7th Cir. 1993).

In addition to frequent use of virulent racial slurs, Plaintiff viewed a racist effigy that Martinez drew specifically to offend him. (Exh. R) Plaintiff also saw the N-word scrawled in multiple bathrooms at the Tesla facility. (Diaz Depo. 48:8-25, 50:15-17, 51:11-22) Plaintiff subjectively found this behavior to be harassing, as would any reasonable African-American, as confirmed by Wheeler, Patterson, and Di-az.

NextSource next claims that this conduct cannot be imputed to nextSource, because it did not employ Martinez. However, a plaintiff may also impute harassing conduct to the employer where his employer effectively ratifies the harassment by failing to take prompt, effective action to end the harassment of which it is aware. The facts demonstrate that nextSource did just that.

When Plaintiff complained to nextSource employee Romero that Timbreza called him the N-word, Romero ratified the harassment. He lied and claimed that no witnesses had corroborated Plaintiff's version of events, and then allegedly issued Timbreza a lenient verbal warning for "kidding around"—a warning that nextSource has never produced. (Exh. I) When Plaintiff complained about Martinez's repeated use of racial slurs and the racist graffiti in the bathroom, his nextSource supervisor, Romero, took no action. When Plaintiff complained about Martinez's threatening conduct in October 2015, Terri Garrett, Director of Operations, indicated that NextSource would "look into the claim." (Exh. G) Instead, nextSource decided that it did not need to investigate and reprimanded both Plaintiff and Martinez for "unprofessional conduct." (Exh. Q; Jackson Depo. 70:8-22, 70:23-71:10) When Martinez drew the racist effigy, nextSource employee Jackson admitted that he did not investigate Plaintiff's complaints about Martinez's pattern of behavior, but decided to give Martinez a short suspension and alleged warning, which

nextSource has never produced. (Exh. T to Supp. Organ Dec. at p. 1.) Under no circumstances can the consistent inaction and outright malice of nextSource's employees fairly be said to constitute "prompt, effective action" as required to escape liability. Based on these facts, a trier of fact could conclude that nextSource effectively ratified the harassment Plaintiff experienced, making summary judgment inappropriate.

### 3. Plaintiff's Failure To Prevent Claim Raises Triable Issues Of Material Fact.

An employer is also liable for its failure to take all reasonable steps to promptly end harassment and discrimination. In the Ninth Circuit, "the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment. In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers from unlawful conduct." *Ellison, supra*, 924 F.2d at 881. This "two-part test… goes beyond short term-results….The fact that harassment stops is only a test for measuring the *efficacy* of a remedy, not a way of excusing the *obligation* to remedy." *Fuller v. City of Oakland*, 47 F. 3d 1522, 1528 (9th Cir. 1995.) (emphasis original) ("*Fuller*"). The *Fuller* court went on to explain that the obligation to remedy and prevent harassment

> "will not be discharged until action—prompt, effective action—has been taken. Effectiveness will be measured by the twin purposes of ending the current harassment and deterring future harassment—by the same offender or others. *Ellison*, 924 F.2d at 882. If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach….It does not follow that the employer's failure to act will be acceptable if harassment stops. [¶] Putting it another way, even if inaction through some Orwellian twist is described as a "remedy," it will fail the deterrence prong of the *Ellison* test whether or not the individual harasser has voluntarily ceased harassment. Nor can inaction fairly be said to qualify as a remedy "reasonably calculated to end the harassment." Title VII does not permit employers to stand idly by once they learn that…harassment has occurred. <u>To do so amounts to a ratification of the prior harassment</u>. *Id*. at 1528-9 (emphasis added).

The situation described in *Fuller* precisely describes nextSource's inaction in the face of Plaintiff's repeated complaints.

After Plaintiff complained in July 2015 that Timbreza called him a racial slur, nextSource employee Romero not only failed to take appropriate action to end the harassment—but communicated the message that harassers would not be punished for their actions by covering up witnesses' corroboration of the use of racial slurs. (Exh. J) Predictably, despite Plaintiff's

repeated complaints to nextSource employees, the harassment continued in the form of slurs and graffiti. NextSource further failed to take action on the October complaint, by failing to investigate or discipline Martinez for his threatening behavior, and on the January complaint, by giving Martinez an alleged "final warning" for which no documentation exists.

That Timbreza or Martinez did not work with Plaintiff again is irrelevant. Under *Fuller*, liability will attach where an employer fails to take action to deter future harassment by others. Plaintiff's uncontested testimony demonstrates that he was called racial slurs repeatedly after the July incident with Timbreza, and after the October and January incidents with Martinez. In no universe can the nominal punishments nextSource recommended for these contractors be fairly said to constitute prompt and effective action reasonably calculated to end future harassment by the same harassers or others, because the harassment did not stop until Plaintiff quit his position.

Nor does nextSource's *Faragher/Ellerth* defense operate as a bar to Plaintiff's claims. First, the *Faragher/Ellerth* defense is not available in situations where an employee has been terminated. *Faragher v. City of Boca Raton*, 524 U.S. 775, 806-807 (1998). Less than two months after Plaintiff complained about the offensive drawing, he was effectively terminated. In a situation involving placement through a staffing agency, the relevant question is whether the placement or relationship with the workplace was terminated, not whether the employee's position with the staffing agency was terminated. *Jimenez v. U.S. Continental Marketing, Inc.*, 41 Cal.App. 5th 189 (2019). In other words, the relevant inquiry is whether Plaintiff's placement at the Tesla factory was terminated. The undisputed facts establish that this was the case, and that Jackson ultimately made the decision to terminate Plaintiff's assignment on Romero's recommendation. Accordingly, the defense is not available to nextSource.

Even assuming, *in arguendo*, that the defense was available, nextSource has failed to prove both essential elements of the defense. First, nextSource must show that it exercised reasonable care to prevent and promptly correct harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 806-807 (1998). Here, nextSource's employees lied to protect Plaintiff's harassers in July 2015 (Exh. I); decided not to investigate Plaintiff's complaints of harassment in October 2015 (Exh. Q); decided not to investigate Plaintiff's claims about Martinez's pattern of harassing

PLAINTIFFS' OPPOSITION TO NEXTSOURCE, INC.'S MOTION FOR SUMMARY JUDGMENT

behavior in January 2016 (Jackson Depo. 101:4-14); and admitted hearing the n-word used freely throughout the factory but took no action (*Id.* at 144:9-15). Under no circumstances could these facts demonstrate that nextSource took prompt corrective action to end the harassment.

Second, nextSource must show that Plaintiff unreasonably failed to take advantage of preventative and corrective opportunities provided by nextSource. NextSource offers no evidence to demonstrate this element of the defense, because the undisputed facts show that Plaintiff did take advantage of such opportunities and was terminated for his efforts.

### 4. Plaintiff was subjected to retaliation within the meaning of 42 U.S.C. § 1981.

The temporal proximity of Plaintiff's complaints of harassment and his termination raise an inference that the two are related. *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) ("That an employer's actions were caused by an employee's engagement in protected activities may be inferred from the 'proximity in time between the protected action and the allegedly retaliatory employment decision'"). This inference is strengthened by the fact that Romero, together with Jackson, decided to terminate Plaintiff's employment. (Exh. U) As far back as July 2015, Romero showed disdain for African-Americans by lying and covering up the fact that witnesses corroborated Plaintiff's complaints about Timbreza. (Exh. J) Romero received Plaintiff's repeated complaints about racial harassment and knew that the individuals who complained about Plaintiff's "bad attitude"—like Jesse Leite, Aron Deharto, and Robert Hurtado—were the very harassers calling Plaintiff racial slurs in the workplace. Instead of taking corrective action, Romero branded Plaintiff a "difficult" employee for refusing to interact with the harassers and terminated him, in substantial part, on that basis. (Exh. K) A trier of fact could reasonably conclude that nextSource effectively ratified Romero's discriminatory, retaliatory animus when Jackson decided to terminate Plaintiff. Moreover, as noted above, the appropriate inquiry here is whether Plaintiff's assignment at the Tesla factory was terminated—which it indisputably was—not whether Plaintiff continued to work for Citistaff. Thus, summary judgment is inappropriate on this claim.

### C. Triable Issues of Fact Remain as to Plaintiff's Ralph Act Claims.

The Ralph Act prohibits violence or threats of violence against individuals based on their

membership in a protected class, including race. Cal. Civ. Code § 51.7(a). This requires Plaintiff to show that nextSource (1) threatened to commit or committed a violent act against him; (2) was motivated by his race; (3) Plaintiff was harmed and (4) the conduct was a substantial factor in causing the harm. *Velarde v. City of Alameda*, 2016 WL 1588269 at *7 (N.D. Cal. 2016). Liability under the Act may also be premised on traditional vicarious liability principles. *see, e.g., Roe v. DDS*, 2017 WL 2311303 at *4 (N.D. Cal. May 26, 2017) (holding Ralph Act claim could proceed against agency where agency employee assaulted Plaintiff).

Martinez's October threats of violence trigger liability under the Ralph Act. NextSource is vicariously liable for the October assault because (1) it had actual notice of Martinez's violent threats (Exh. O), (2) decided that it did not need to investigate (Exh. Q), and (3) did not properly discipline Martinez for engaging in threatening conduct. (Jackson Depo. 70:8-22, 70:23-71:10) NextSource's inaction ratified Martinez's behavior. Moreover, it is undisputed that Martinez stood in close proximity to Plaintiff, in the enclosed space of an elevator, with his fists balled up and adopting an aggressive demeanor. (Diaz. Depo. 227:6-20)  Martinez essentially backed Plaintiff up into a wall, placing Plaintiff "in fear for [his] safety". (*Id.* 228:2-8) A reasonable trier of fact could interpret this as an implicit threat of violence. Second, a trier of fact could reasonably conclude Martinez engaged in this conduct because of Plaintiff's race, based on (1) Martinez's documented history of generally using racial slurs like the N-word and mayate in the workplace (*Id.* 56:9-11, 63:5-8), (2) Martinez' specific use of the N-word while assaulting Plaintiff (*Id.* 126:24-127:1.), and (3) Martinez drawing of the racist picaninny for Plaintiff to see (Exh. R, p. 3). Next, Plaintiff suffered emotional distress because of Martinez's actions. Finally, nextSource is vicariously liable for Martinez's conduct, because it knew about the harassment and failed to take appropriate corrective action, implicitly ratifying Martinez's conduct. Accordingly, Plaintiff's claims under the Ralph Act present triable issues of material fact.

**D.  Plaintiff's Claim For Punitive Damages Presents Triable Issues of Fact.**

**1.  NextSource has failed to negate an essential element of Plaintiff's claim.**

In moving for summary judgment, nextSource must produce sufficient evidence to make a *prima facie* showing that no triable issues exist as to whether Jackson, Romero, or any other

nextSource employees involved with Plaintiff's employment were managing agents of nextSource, by producing those employees' job descriptions or declarations detailing their job duties. *Davis v. Kiewit Pacific Co*., 220 Cal. App. 4th 358, 369 (2013). "[S]imply restating the applicable legal standard" for determining whether an employee is a managing agent and saying "there is simply no evidence" does not satisfy this affirmative duty to make a *prima facie* showing that its employees were not managing agents. *Id.*; Def.'s Mtn. at 24:13-5, 24:23-25. Because nextSource has not met its burden of production, the Court <u>cannot</u> grant its motion.

> **2.   Plaintiff's claim for punitive damages presents triable issues of material fact.**

Even assuming, *in arguendo*, that nextSource met its burden of production (which it did not), nextSource's motion should still be denied on the merits. Under federal law, where an employer delegates the duty to prevent discrimination or harassment to a specific supervisor, it necessarily vests that individual with sufficient authority to be deemed a managing agent <u>as a matter of law</u>. *Swinton v. Potomac Corp*., 270 F.3d 794, 810 (9th Cir. 2001). Once Plaintiffs identify such an agent, Section 1981 "does not require a showing of egregious or outrageous discrimination". *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535. Rather, the employer must act with "malice" or "reckless indifference" to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* Essentially, "in the context of § 1981a, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.*

This is precisely the situation presented here. NextSource tasked Jackson, and from July to October of 2015 Romero, with receiving and responding to complaints of harassment and discrimination. In August of 2015, Romero intentionally lied about Plaintiff's claims to justify a lenient "warning" for Timbreza. (Exh. J.) Jackson admitted that he was concerned about Ramon Martinez's pattern of harassing behavior yet took no action. (Jackson Depo. 101:4-14) Jackson also heard the n-word used throughout Tesla's factory, but did not act. (Id. at 144:9-15) Terri Garrett, Director of Operations, was aware of the October complaint but after stating that nextSource needed to investigate, decided not to conduct any investigation. (Exhs. Q; R) A trier of fact could readily conclude that Romero, Jackson, and Garrett's actions, in addition to

ratifying intentional discrimination, were undertaken in the face of a perceived risk that such actions would violate federal law, because <u>no</u> reasonable employee would believe that use of virulent racial slurs in the workplace did not violate federal law. The inaction towards and effective ratification of plainly illegal conduct supports an award of punitive damages.

Similarly, under California law, "to demonstrate that an employee is a true managing agent under [Civil Code] section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." *White v. Ultramar*, 21 Cal. 4th 563, 573 (1999). Jackson, as the program manager, was nextSource's top onsite manager, with responsibility to act as a liaison between Tesla, nextSource, and numerous other staffing companies. He supervised numerous employees, conducted investigations, and ensured that employees complied with Tesla policies and applicable law. In performing such duties, "a trier of fact could reasonably infer he exercised substantial authority and discretion regarding a broad range of issues involving" nextSource's contract with Tesla, making Jackson a managing agent. *Davis v. Kiewit Pacific Co.*, 220 Cal. App. 4th 358, 370. Similarly, based on the facts presented, a trier of fact could reasonably conclude that Jackson authorized or ratified the racial harassment in failing twice— first in October 2015, and again in January 2016—to conduct a meaningful investigation into Martinez's escalating pattern of behavior. Given that a triable issue of fact remains, nextSource's motion must be denied.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion must be denied with respect to Plaintiff's claims under Section 1981, the Ralph Act, and for punitive damages.

CALIFORNIA CIVIL RIGHTS LAW GROUP

DATED:  November 19, 2019          By:  ____/s/ Lawrence Organ_____
                                   Lawrence A. Organ, Esq.
                                   Navruz Avloni, Esq.
                                   J. Bernard Alexander, Esq.
                                   Attorneys for Plaintiffs
                                   DEMETRIC DI-AZ AND OWEN DIAZ