# Exhibit

# **A**

| | |
|---|---|
| **From**: | Uhlenbrock, Nancy [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=NUHLENBROCK@NEXTSOURCE3E2] |
| **Sent**: | 6/3/2015 12:31:57 AM |
| **To**: | Fremontcontrolroom [Fremontcontrolroom@teslamotors.com] |
| **CC**: | Jaime Salazar [jsalazar@teslamotors.com]; Sam Garcia @ teslamotors [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SamGarcia6f431@NextSource0a4] |
| **BCC**: | Uhlenbrock, Nancy [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Nuhlenbrock@NextSource3e2] |
| **Subject**: | Requesting Badge/ Owen Diaz |

Security –

Owen Diaz will be starting with us on  Wednesday, 06/03/15.

Please set him up with a badge under the COI time period for Chartwell.

He will be working with Jaime Salazar. **(Jaime – please reply "ALL" with your approval.)**


Thank you,
Nancy


Nancy Uhlenbrock
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (510) 283-3776
nuhlenbrock@nextsource.com
www.nextsource.com



# Exhibit

## B

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4

                                    REPORTER CERTIFIED
5    _____           TRANSCRIPT

6    DEMETRIC DI-AZ, OWEN DIAZ and
     LAMAR PATTERSON, an individual,
7                                    CONFIDENTIAL
            Plaintiffs,
8
     Vs.                    Case No. 3:17-cv-06748-WHO
9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CitiStaff SOLUTIONS, INC.;
     WEST VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING SERVICES, INC.
     and DOES 1-10, inclusive,
12
            Defendants.
13   _____/

14

15

16                  CONFIDENTIAL

             VIDEOTAPED DEPOSITION OF
17
                    OWEN DIAZ
18
             SAN FRANCISCO, CALIFORNIA
19
               TUESDAY, MAY 22, 2018
20

21

22

23
     Reported By:
24   Candy Newland
     CSR No. 14256
25   File No. 18-25470

CHASE

LITIGATION SERVICES

```
 1   Deposition of OWEN DIAZ, taken on behalf of Defendants

 2   at 351 California Street, Suite 200, San Francisco,

 3   California, commencing at 10:11 a.m. on Tuesday, May 15,

 4   2018, before Candy Newland, Certified Shorthand Reporter

 5   No. 14256.

 6

 7                    A P P E A R A N C E S

 8

 9   FOR THE PLAINTIFFS:

10

11            CALIFORNIA CIVIL RIGHTS LAW GROUP

12            BY:  LAWRENCE A. ORGAN, ESQ.

13            332 San Anselmo Avenue

14            San Anselmo, CA 94960

15            (415) 453-4740

16            larry@civilrightsca.com

17

18            CALIFORNIA CIVIL RIGHTS LAW GROUP

19            BY:  NAVRUZ AVLONI, ESQ.

20            332 San Anselmo Avenue

21            San Anselmo, CA 94960

22            (415) 453-4740

23            navruz@civilrightsca.com

24

25
```

```
 1   APPEARANCES(CONTINUED)

 2

 3   FOR THE DEFENDANT TESLA:

 4

 5           CONSTANGY BROOKS, SMITH & PROPHETE, LLP

 6           BY:  BARBARA I. ANTONUCCI, ESQ.

 7           351 California Street, Suite 200

 8           San Francisco, CA 94104

 9           (415) 918-3000

10           bantonucci@constangy.com

11

12   FOR THE DEFENDANT WEST VALLEY STAFFING:

13

14           PAHL & MCCAY

15           BY:  FENN C. HORTON, III, ESQ.

16           225 West Santa Clara, Suite 1500

17           San Jose, CA 95113-1752

18           (408) 286-5100

19           fhorton@pahl-mccay.com

20

21   ALSO PRESENT:

22           Jaime Bodiford, Tesla

23           Rob Delantoni, Videographer

24

25
```

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:16:06 | 1 | A.      Yes. |
| 11:16:06 | 2 | Q.      What number is that? |
| 11:16:08 | 3 | A.      (415) 272-3648. |
| 11:16:14 | 4 | Q.      And is that the same carrier? |
| 11:16:16 | 5 | A.      Yes. |
| 11:16:17 | 6 | Q.      And what carrier is that? |
| 11:16:18 | 7 | A.      AT&T. |
| 11:16:22 | 8 | Q.      You still have those pictures on your phone? |
| 11:16:27 | 9 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 11:16:31 | 10 | THE WITNESS:  Not this phone.  But the last |
| 11:16:37 | 11 | phone I had, they were on that one. |
| 11:16:41 | 12 | BY MS. ANTONUCCI: |
| 11:16:42 | 13 | Q.      Do you still have that phone that you had at the |
| 11:16:45 | 14 | time? |
| 11:16:45 | 15 | A.      No. |
| 11:16:45 | 16 | Q.      Did you download those pictures? |
| 11:16:50 | 17 | A.      I sent them in an e-mail, so I still had |
| 11:16:55 | 18 | e-mails. |
| 11:16:59 | 19 | Q.      And was it just one picture or multiple pictures |
| 11:17:02 | 20 | that you took of the drawing? |
| 11:17:05 | 21 | A.      It's one picture that I took.  Yes. |
| 11:17:13 | 22 | Q.      And what do you mean by "picaninny"? |
| 11:17:19 | 23 | A.      It's a racist -- turn of the century from the |
| 11:17:25 | 24 | 1900s cartoon. |
| 11:17:36 | 25 | Q.      And what made you think that that was a |

| | | |
|---|---|---|
| 11:17:40 | 1 | depiction of a picaninny? |
| 11:17:46 | 2 | A.    From seeing the cartoons from when I was a kid. |
| 11:17:54 | 3 | Q.    How did the picture you took resemble the |
| 11:17:58 | 4 | pictures you saw when you were a kid? |
| 11:18:04 | 5 | A.    African-American, bone in his hair, big lips |
| 11:18:09 | 6 | with a caption "Booo" under the bottom. |
| 11:18:19 | 7 | Q.    And why did you believe the picture depicted an |
| 11:18:23 | 8 | African-American? |
| 11:18:25 | 9 | A.    That's what the cartoons were when I was young. |
| 11:18:30 | 10 | Q.    But the picture that you saw, that you took a |
| 11:18:35 | 11 | picture of and you sent to CitiStaff, why did you |
| 11:18:38 | 12 | believe that picture depicted an African-American? |
| 11:18:41 | 13 |        MR. ORGAN:  Objection.  Asked and answered. |
| 11:18:43 | 14 |        THE WITNESS:  It looked identical to the |
| 11:18:45 | 15 | cartoons from when I was a kid. |
| 11:19:00 | 16 | BY MS. ANTONUCCI: |
| 11:19:00 | 17 | Q.    Do you have any understanding of what is meant |
| 11:19:02 | 18 | by the word "Booo" at the bottom? |
| 11:19:05 | 19 | A.    Yes. |
| 11:19:05 | 20 | Q.    What did you believe that meant? |
| 11:19:07 | 21 | A.    Jigaboo. |
| 11:19:10 | 22 | Q.    And what does that mean? |
| 11:19:13 | 23 | A.    It's a derogatory racist term that Caucasian |
| 11:19:21 | 24 | people used to call African-Americans. |
| 11:19:29 | 25 | Q.    Was there any other drawing on -- I'm sorry. |

| | | |
|---|---|---|
| 11:21:21 | 1 | BY MS. ANTONUCCI: |
| 11:21:21 | 2 | Q.    Had you ever seen any other drawings in the |
| 11:21:26 | 3 | Fremont Tesla factory? |
| 11:21:27 | 4 | MR. ORGAN:  Objection.  Vague and ambiguous as |
| 11:21:29 | 5 | to "drawings." |
| 11:21:31 | 6 | A.    Yes. |
| 11:21:33 | 7 | BY MS. ANTONUCCI: |
| 11:21:33 | 8 | Q.    What other drawings have you seen? |
| 11:21:39 | 9 | A.    Graffiti inside the bathrooms. |
| 11:21:51 | 10 | Q.    And what graffiti did you see in the bathrooms? |
| 11:22:00 | 11 | A.    The N-word wrote inside the bathroom stalls. |
| 11:22:09 | 12 | Q.    Anything else? |
| 11:22:18 | 13 | A.    Possibly, but not that I can recall at this |
| 11:22:23 | 14 | moment. |
| 11:22:27 | 15 | Q.    How many times did you see the N-word written |
| 11:22:30 | 16 | inside the bathroom stall? |
| 11:22:39 | 17 | A.    I don't understand the question. |
| 11:22:43 | 18 | Q.    Did you only see the N-word written inside the |
| 11:22:47 | 19 | bathroom stall once or multiple times? |
| 11:22:52 | 20 | A.    Do you mean every time I went to the bathroom, |
| 11:22:55 | 21 | or wrote on the bathroom walls? |
| 11:22:58 | 22 | Q.    Did you go to that bathroom more than one |
| 11:23:02 | 23 | occasion in which you saw the N-word written on the |
| 11:23:05 | 24 | stall? |
| 11:23:06 | 25 | A.    Yes. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:23:06 | 1 | Q.       How many occasions did you go to the bathroom |
| 11:23:08 | 2 | where you saw the N-word written on the bathroom stall? |
| 11:23:16 | 3 | A.       I used the bathroom maybe four or five times a |
| 11:23:21 | 4 | day. |
| 11:23:22 | 5 | Q.       And how long was the N-word written on the |
| 11:23:25 | 6 | bathroom stall? |
| 11:23:27 | 7 |         MR. ORGAN:  Objection.  Vague and ambiguous. |
| 11:23:29 | 8 | Compound. |
| 11:23:34 | 9 |         THE WITNESS:  To my knowledge, it's still there. |
| 11:23:37 | 10 | I don't know. |
| 11:23:37 | 11 | BY MS. ANTONUCCI: |
| 11:23:38 | 12 | Q.       Did you ever report to anyone that the N-word |
| 11:23:40 | 13 | was written on the bathroom stall? |
| 11:23:43 | 14 | A.       Yes. |
| 11:23:43 | 15 | Q.       Who did you report that to? |
| 11:23:45 | 16 | A.       Ed Romero. |
| 11:23:55 | 17 | Q.       And after you reported it, did someone actually |
| 11:23:59 | 18 | paint over the N-word? |
| 11:24:01 | 19 | A.       No. |
| 11:24:01 | 20 | Q.       It was still on the stall? |
| 11:24:04 | 21 | A.       Yes. |
| 11:24:05 | 22 | Q.       At the end of your employment, it was still on |
| 11:24:08 | 23 | the stall? |
| 11:24:12 | 24 | A.       That I know.  Yes, it was. |
| 11:24:14 | 25 | Q.       Did you always go to the same bathroom in the |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:24:17 | 1 | Fremont factory? |
| 11:24:21 | 2 | A.      No. |
| 11:24:22 | 3 | Q.      Okay.  Which bathroom did you see this in? |
| 11:24:26 | 4 | A.      The bathroom that's located between the |
| 11:24:40 | 5 | conveyance and the production floor.  The other bathroom |
| 11:24:47 | 6 | is located in between the --I believe it's the battery |
| 11:24:57 | 7 | line and the production floor. |
| 11:25:03 | 8 | Q.      Just one bathroom? |
| 11:25:04 | 9 | A.      No.  There's more than one bathroom. |
| 11:25:09 | 10 | Q.      I'm sorry.  Did you see the N-word written in |
| 11:25:13 | 11 | just one bathroom? |
| 11:25:14 | 12 | A.      No. |
| 11:25:14 | 13 | Q.      You saw it in two bathrooms? |
| 11:25:17 | 14 | A.      No. |
| 11:25:18 | 15 | Q.      How many bathrooms did you see the N-word |
| 11:25:21 | 16 | written in? |
| 11:25:28 | 17 | A.      About four bathrooms. |
| 11:25:32 | 18 | Q.      So one of them was on the conveyance -- near the |
| 11:25:40 | 19 | conveyance area on the production floor; correct? |
| 11:25:44 | 20 | A.      Yes. |
| 11:25:44 | 21 | Q.      And the second one was in the battery area on |
| 11:25:49 | 22 | the production floor? |
| 11:25:50 | 23 | A.      Yes. |
| 11:25:52 | 24 | Q.      Where are the other bathrooms that you saw the |
| 11:25:57 | 25 | N-word written in? |

**Owen Diaz-Confidential**

| 11:26:00 | 1 | A.      There's another bathroom that I saw.  I think |
| 11:26:05 | 2 | it's called the stater line.  I'm not 100 percent sure |
| 11:26:09 | 3 | what that line was called. |
| 11:26:12 | 4 | Q.      Also on the production floor? |
| 11:26:15 | 5 | A.      All the bathrooms are used for the production |
| 11:26:19 | 6 | workers. |
| 11:26:22 | 7 | Q.      What other bathrooms did you see the N-word |
| 11:26:26 | 8 | written inside the stall? |
| 11:26:33 | 9 | A.      Can't be 100 percent sure where the bathroom was |
| 11:26:41 | 10 | located but... |
| 11:26:44 | 11 | Q.      So the first time you saw the N-word written |
| 11:26:49 | 12 | inside the bathroom stall, was that before or after you |
| 11:26:54 | 13 | saw the picture that you described that you sent to |
| 11:26:57 | 14 | CitiStaff? |
| 11:26:58 | 15 | A.      Before. |
| 11:27:00 | 16 | Q.      How long before? |
| 11:27:09 | 17 | A.      I would say my second day of employment. |
| 11:27:23 | 18 | Q.      And which bathroom was the -- which bathroom did |
| 11:27:28 | 19 | you see the N-word written in on your second day of |
| 11:27:33 | 20 | employment? |
| 11:27:35 | 21 | A.      The bathroom between conveyance and the |
| 11:27:39 | 22 | production floor. |
| 11:27:40 | 23 | Q.      And when did you see the N-word written in the |
| 11:27:46 | 24 | bathroom stall in the battery bathroom? |
| 11:27:54 | 25 | A.      I can't be sure of the time. |

| | | |
|---|---|---|
| 11:27:56 | 1 | Q.      How long after you had been working there? |
| 11:28:13 | 2 | A.      I can't be sure. |
| 11:28:15 | 3 | Q.      But the first time you saw it was on your second |
| 11:28:24 | 4 | day of employment? |
| 11:28:25 | 5 | A.      Yes, ma'am. |
| 11:28:26 | 6 | Q.      And what about at the stater line?  Am I saying |
| 11:28:31 | 7 | that right?  Stater line? |
| 11:28:32 | 8 | A.      I believe that's what it is. |
| 11:28:34 | 9 | Q.      When did you see that N-word written in the |
| 11:28:39 | 10 | bathroom stall in the stater line bathroom? |
| 11:28:42 | 11 | A.      I can't recall. |
| 11:28:45 | 12 | Q.      But it was after your second day of employment? |
| 11:28:48 | 13 | A.      Yes. |
| 11:28:48 | 14 | Q.      Was it before you saw the picture that you you |
| 11:28:53 | 15 | sent to CitiStaff? |
| 11:28:55 | 16 | A.      Yes. |
| 11:29:06 | 17 | Q.      Okay.  Did you only report the N-word in any |
| 11:29:10 | 18 | bathroom stall to Romero on one occasion? |
| 11:29:14 | 19 | A.      No. |
| 11:29:15 | 20 | Q.      How many times did you report the N-word in the |
| 11:29:18 | 21 | bathroom stall to Romero? |
| 11:29:25 | 22 | A.      Three to seven times. |
| 11:29:34 | 23 | Q.      Did you tell him where it was? |
| 11:29:39 | 24 | A.      Yes. |
| 11:29:42 | 25 | Q.      Did you tell him about all of the different |

| | | |
|---|---|---|
| 11:29:46 | 1 | bathrooms that you saw? |
| 11:29:47 | 2 | A.      No. |
| 11:29:48 | 3 | Q.      Which bathroom did you tell him about? |
| 11:29:54 | 4 | A.      The one that was closer to the elevator, which |
| 11:29:59 | 5 | would be the conveyance, and the one that was by the |
| 11:30:06 | 6 | stater line. |
| 11:30:15 | 7 | Q.      And how did he respond when you told him about |
| 11:30:19 | 8 | having seen the N-word in the bathroom stall? |
| 11:30:23 | 9 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 11:30:25 | 10 | You can answer. |
| 11:30:27 | 11 | THE WITNESS:  He was dismissive. |
| 11:30:29 | 12 | BY MS. ANTONUCCI: |
| 11:30:30 | 13 | Q.      What does that mean? |
| 11:30:33 | 14 | A.      He told me he didn't know who was doing it. |
| 11:30:50 | 15 | Q.      Anything else? |
| 11:30:54 | 16 | A.      That's about it. |
| 11:30:58 | 17 | Q.      Did he say anything else? |
| 11:31:03 | 18 | A.      Not that I can recall. |
| 11:31:09 | 19 | Q.      What did you say? |
| 11:31:14 | 20 | A.      That it wasn't right. |
| 11:31:16 | 21 | Q.      Anything -- did you say anything else? |
| 11:31:31 | 22 | A.      I told him how I felt. |
| 11:31:34 | 23 | Q.      What did you tell Ed about how you felt? |
| 11:31:41 | 24 | A.      I felt that it was demoralizing. |
| 11:31:52 | 25 | Q.      Did you tell him anything else? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:32:02 | 1 | A.        Yes. |
| 11:32:03 | 2 | Q.        What did you say? |
| 11:32:06 | 3 | A.        That some of the employees were calling me the |
| 11:32:22 | 4 | N-word. |
| 11:32:24 | 5 | Q.        And how many times did you tell Ed Romero that |
| 11:32:34 | 6 | some employees were calling you the N-word? |
| 11:32:41 | 7 | A.        Probably three to seven times. |
| 11:32:49 | 8 | Q.        Was this on the same occasion that you discussed |
| 11:32:52 | 9 | the bathroom stall? |
| 11:33:00 | 10 | A.        Yes. |
| 11:33:09 | 11 | Q.        And what did -- did you say anything else to Ed |
| 11:33:13 | 12 | Romero when you discussed both the N-word on the |
| 11:33:17 | 13 | bathroom stall and employees calling you the N-word in |
| 11:33:22 | 14 | these three to seven times? |
| 11:33:24 | 15 | A.        That they were also telling me to go back to |
| 11:33:30 | 16 | Africa. |
| 11:33:30 | 17 | Q.        You told Ed Romero that? |
| 11:33:33 | 18 | A.        Yes. |
| 11:33:37 | 19 | Q.        Did you tell him who was calling you the N-word? |
| 11:33:44 | 20 | A.        I didn't know all their names. |
| 11:33:48 | 21 | Q.        So that's a "no"? |
| 11:33:59 | 22 |         MR. ORGAN:  Objection.  Compound. |
| 11:34:01 | 23 |         THE WITNESS:  I pointed out a couple of them. |
| 11:34:10 | 24 | BY MS. ANTONUCCI: |
| 11:34:11 | 25 | Q.        Did you tell him any names at all? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:34:14 | 1 | A.      I didn't know their names. |
| 11:34:18 | 2 | Q.      Do you know their names now? |
| 11:34:21 | 3 | A.      No. |
| 11:34:45 | 4 | Q.      How many people were calling you the N-word? |
| 11:34:52 | 5 | A.      Two of the supervisors and a few other |
| 11:35:02 | 6 | employees. |
| 11:35:12 | 7 | Q.      Do you know the names of the supervisors? |
| 11:35:16 | 8 | A.      Yes. |
| 11:35:17 | 9 | Q.      And who are they? |
| 11:35:19 | 10 | A.      Robert -- I don't know his last name -- and |
| 11:35:26 | 11 | Ramon Martinez. |
| 11:35:36 | 12 | Q.      And you said a few other employees.  Do you know |
| 11:35:38 | 13 | their names? |
| 11:35:42 | 14 | A.      No. |
| 11:35:45 | 15 | Q.      By "few," how many employees were calling you |
| 11:35:48 | 16 | the N-word? |
| 11:36:06 | 17 | A.      I'm going to to say around -- about 8 to 10. |
| 11:36:19 | 18 | Q.      Okay.  How many times did Robert call you the |
| 11:36:29 | 19 | N-word? |
| 11:36:32 | 20 | A.      I can't recall. |
| 11:36:34 | 21 | Q.      Was it less than five? |
| 11:36:44 | 22 | A.      No. |
| 11:36:44 | 23 | Q.      Was it more than five? |
| 11:36:46 | 24 | A.      Yes. |
| 11:36:46 | 25 | Q.      Was it less than 10? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:36:52 | 1 | A.      No. |
| 11:36:54 | 2 | Q.      Was it less than 15? |
| 11:37:01 | 3 | A.      I can't give you an exact number. |
| 11:37:05 | 4 | Q.      Was it somewhere between 10 and 15? |
| 11:37:09 | 5 | A.      I can't give you an exact number. |
| 11:37:11 | 6 | Q.      Okay.  I don't need an exact number.  I just |
| 11:37:14 | 7 | need an estimate to the best of your recollection. |
| 11:37:31 | 8 | A.      I'd say other 30 times. |
| 11:37:41 | 9 | Q.      And how many times did Ramon Martinez call you |
| 11:37:44 | 10 | the N-word? |
| 11:37:45 | 11 | A.      More than 30 times. |
| 11:37:55 | 12 | Q.      Is there anything you can describe to me about |
| 11:37:58 | 13 | the 8 to 10 employees that called you that -- called you |
| 11:38:01 | 14 | the N-word? |
| 11:38:08 | 15 | A.      They were just working on the production floor, |
| 11:38:12 | 16 | the battery line. |
| 11:38:16 | 17 | Q.      All 8 to 10 were working on the battery line? |
| 11:38:20 | 18 | A.      Either production or the battery line. |
| 11:38:40 | 19 | Q.      Were any of them in recycling? |
| 11:38:45 | 20 | A.      Possible. |
| 11:39:01 | 21 | Q.      What race is Robert? |
| 11:39:04 | 22 | A.      Hispanic. |
| 11:39:07 | 23 | Q.      And what about Ramon? |
| 11:39:09 | 24 | A.      Hispanic also. |
| 11:39:12 | 25 | Q.      And what about the 8 to 10 employees? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:41:40 | 1 | Q.     Can you remember the first time that Robert |
| 11:41:43 | 2 | called you the N-word? |
| 11:41:50 | 3 | A.     We were in the elevator. |
| 11:41:55 | 4 | Q.     And what did she say? |
| 11:41:59 | 5 | A.     "N, hurry up and push the button." |
| 11:42:19 | 6 | Q.     And what did you say? |
| 11:42:23 | 7 | A.     Nothing. |
| 11:42:33 | 8 | Q.     And did you report that to Mr. Romero? |
| 11:42:37 | 9 | A.     No. |
| 11:42:45 | 10 | Q.     Why not? |
| 11:42:51 | 11 | A.     I wanted to keep -- I didn't want to rock the |
| 11:42:55 | 12 | boat.  I wanted to keep working. |
| 11:42:58 | 13 | Q.     Do you remember the second time that Robert used |
| 11:43:09 | 14 | the N-word? |
| 11:43:12 | 15 | A.     I can't recall. |
| 11:43:28 | 16 | Q.     Was it in the elevator? |
| 11:43:34 | 17 | A.     I can't recall. |
| 11:43:39 | 18 | Q.     Do you remember what was said exactly? |
| 11:43:46 | 19 | A.     I can't recall exactly what was said, but I -- I |
| 11:44:19 | 20 | can't recall. |
| 11:44:19 | 21 | Q.     Do you remember generally what was said? |
| 11:44:28 | 22 | A.     I can't generally, no. |
| 11:44:35 | 23 | Q.     Do you remember what was said on any of the |
| 11:44:40 | 24 | other occasions that Robert called you the N-word? |
| 11:44:49 | 25 | A.     Some of them.  Yes. |

| | | |
|---|---|---|
| 11:44:51 | 1 | Q.      Okay.  Can you tell me about the ones you can |
| 11:44:53 | 2 | remember? |
| 11:44:58 | 3 | A.      It was to the effect that, "Boy, hurry up and |
| 11:45:03 | 4 | push them batteries and get them on the elevator.  You |
| 11:45:10 | 5 | N's are lazy."  I can't recall all the things, but it |
| 11:45:33 | 6 | was a part of what he used to tell me. |
| 11:45:33 | 7 |                  (Reporter clarification.) |
| 11:45:37 | 8 | BY MS. ANTONUCCI: |
| 11:45:37 | 9 | Q.      How many times did he say "Boy, hurry up and |
| 11:45:42 | 10 | push the button"? |
| 11:45:51 | 11 | A.      He actually said, "N, hurry and push the |
| 11:45:56 | 12 | button." |
| 11:45:56 | 13 | Q.      How many times did he say "N, hurry up and push |
| 11:46:01 | 14 | the button"? |
| 11:46:04 | 15 | A.      I can't recall. |
| 11:46:10 | 16 | Q.      And how many times did he say "You Ns are lazy"? |
| 11:46:18 | 17 | A.      I can't recall. |
| 11:46:25 | 18 | Q.      Other than "N, hurry up and push the button" and |
| 11:46:29 | 19 | "You Ns are lazy," did Robert ever say -- use the N-word |
| 11:46:34 | 20 | in any other context? |
| 11:46:39 | 21 | A.      I don't understand. |
| 11:46:41 | 22 | Q.      Did he ever use the N-word in any other way |
| 11:46:45 | 23 | other than the two ways you've told me, which is "N, |
| 11:46:49 | 24 | hurry up and push the button" and "You Ns are lazy"? |
| 11:46:56 | 25 | A.      Yes.  He used it in a malicious fashion. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:53:09 | 1 | before Demetric started working there? |
| 11:53:13 | 2 | A.    I can't recall. |
| 11:53:22 | 3 | Q.    Did Robert ever tell you to go back to Africa? |
| 11:53:42 | 4 | A.    I can't recall. |
| 11:53:45 | 5 | Q.    Did Ramon ever call you the N-word? |
| 11:53:51 | 6 | A.    Yes. |
| 11:53:52 | 7 | Q.    How many times? |
| 11:53:56 | 8 | A.    More than 30. |
| 11:54:12 | 9 | Q.    Can you tell me about all the different contexts |
| 11:54:16 | 10 | in which Ramon called you the N-word? |
| 11:54:19 | 11 |         MR. ORGAN:  Objection.  Compound. |
| 11:54:21 | 12 |         THE WITNESS:  I can't recall all the different |
| 11:54:25 | 13 | contexts. |
| 11:54:26 | 14 | BY MS. ANTONUCCI: |
| 11:54:27 | 15 | Q.    Can you recall any of the statements where Ramon |
| 11:54:30 | 16 | used the N-word? |
| 11:54:40 | 17 | A.    Yes. |
| 11:54:45 | 18 | Q.    Describe the statement in which Ramon used the |
| 11:54:50 | 19 | N-word. |
| 11:54:51 | 20 |         MR. ORGAN:  Objection.  Compound. |
| 11:54:57 | 21 |         THE WITNESS:  One time he told me, "I hate you" |
| 11:55:00 | 22 | and put the N on it. |
| 11:55:08 | 23 | BY MS. ANTONUCCI: |
| 11:55:08 | 24 | Q.    And that was just one time? |
| 11:55:10 | 25 | A.    It was more than one time at that particular |

| | | |
|---|---|---|
| 11:55:15 | 1 | time.  I can remember him saying he hated me and called |
| 11:55:19 | 2 | me the N-word. |
| 11:55:20 | 3 | Q.     Let me rephrase.  There's only one time he used |
| 11:55:23 | 4 | the N-word in the context of "I hate you, N-word"? |
| 11:55:28 | 5 | A.     That I can recall at this time.  Yes. |
| 11:55:31 | 6 | Q.     Can you recall any other statements that he made |
| 11:55:38 | 7 | using the N-word? |
| 11:55:47 | 8 | A.     He used to say "Ns are not shit.  He wished that |
| 11:56:08 | 9 | he could get all us Ns fired."  That's all I can recall |
| 11:56:41 | 10 | right now, ma'am. |
| 11:56:42 | 11 | Q.     Where were you when Ramon made the statement "I |
| 11:56:46 | 12 | hate you, N"? |
| 11:56:49 | 13 | A.     Outside. |
| 11:56:54 | 14 | Q.     Outside where? |
| 11:56:55 | 15 | A.     Outside near the -- near the recycling pile. |
| 11:57:14 | 16 |        MR. ORGAN:  You need a break? |
| 11:57:17 | 17 |        THE WITNESS:  Yes. |
| 11:57:18 | 18 |        MS. ANTONUCCI:  We'll go off the record. |
| 11:57:20 | 19 |        THE VIDEOGRAPHER:   We're going off the record |
| 11:57:22 | 20 | at 11:56 a.m.  This is the end of Media Number 1. |
| 12:46:38 | 21 |     (Off the record:  11:57 a.m. to 12:53 p.m.) |
| 12:46:38 | 22 |        THE VIDEOGRAPHER:   We're back on the record at |
| 12:53:23 | 23 | 12:52 p.m. in the deposition of Mr. Owen Diaz.  This is |
| 12:53:24 | 24 | the beginning of Media Number 2.  Please continue. |
| 12:53:24 | 25 | /// |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:00:12 | 1 | people? |
| 01:00:14 | 2 | A.      He directed it towards me. |
| 01:00:23 | 3 | Q.      Was he looking at anyone else when he said it? |
| 01:00:30 | 4 | A.      No. |
| 01:00:31 | 5 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 01:00:34 | 6 | BY MS. ANTONUCCI: |
| 01:01:02 | 7 | Q.      Did Mr. Martinez ever say "Go back to Africa"? |
| 01:01:11 | 8 | A.      Yes. |
| 01:01:13 | 9 | Q.      On how many occasions did he say that? |
| 01:01:21 | 10 | A.      Twice that I can recall. |
| 01:01:25 | 11 | Q.      And when was the first time he said, "Go back to |
| 01:01:28 | 12 | Africa"? |
| 01:01:35 | 13 | A.      I was in the trailer. |
| 01:01:47 | 14 | Q.      Was anyone else present? |
| 01:01:52 | 15 | A.      Yes. |
| 01:01:54 | 16 | Q.      Who else was there? |
| 01:01:58 | 17 | A.      I don't recall the employees names because I |
| 01:02:02 | 18 | never worked with them. |
| 01:02:04 | 19 | Q.      You recall what group they worked with? |
| 01:02:07 | 20 | A.      Recycling. |
| 01:02:19 | 21 | Q.      And, again, was that "Go back to Africa" -- the |
| 01:02:24 | 22 | first time it was said, was that before or after Lamar |
| 01:02:31 | 23 | Patterson stared working at Tesla? |
| 01:02:34 | 24 | A.      Before. |
| 01:02:35 | 25 | Q.      And was it before or after your son started |

01:04:53  1          MR. ORGAN:  Objection.  Compound.  Overbroad.

01:04:58  2          THE WITNESS:  That I can recall at this time.

01:05:02  3  BY MS. ANTONUCCI:

01:05:06  4  Q.      And I know you can't recall any of the names of

01:05:09  5  the 8 to 10 employees that used the N-word, but can you

01:05:15  6  recall the context in which they used it?

01:05:19  7  A.      Malicious.

01:05:21  8  Q.      Can you tell me, did they use it in a statement?

01:05:32  9  A.      Yes.

01:05:32 10  Q.      What statements can you recall that they used

01:05:36 11  the N-word in?

01:05:53 12  A.      "Hey, you, N."  That's all I can remember at

01:06:11 13  this time.

01:06:11 14          MR. ORGAN:  Counsel, can we have an agreement

01:06:14 15  that when he's using the initial "N," he's using that as

01:06:19 16  an abbreviation for the word "Nigger"?

01:06:22 17  BY MS. ANTONUCCI:

01:06:23 18  Q.      Is that how you're using that word?

01:06:25 19  A.      Yes.

01:06:25 20  Q.      "Hey, you, N."  Was there any other -- besides

01:06:42 21  "Hey, you N," are there any other contexts or statements

01:06:42 22  in which these 8 to 10 employees used the N-word?

01:07:05 23  A.      Not that I recall at this time.

01:07:05 24  Q.      On how many occasions did these 8 to 10

01:07:10 25  employees use the N-word?

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:11:41 | 1 | Q.      Did you report the -- that the phrase "Go back |
| 01:11:45 | 2 | to Africa" was used to Ed Romero? |
| 01:11:49 | 3 | A.      Yes. |
| 01:11:55 | 4 | Q.      And other than Robert, Ramon Martinez, and Ed |
| 01:11:58 | 5 | Romero, did you report the use of the phrase "Go back to |
| 01:12:01 | 6 | Africa" to anyone else? |
| 01:12:03 | 7 | A.      No. |
| 01:13:00 | 8 |         MS. ANTONUCCI:  I'd like to mark this as |
| 01:13:38 | 9 | Exhibit 2. |
| 01:13:39 | 10 |        (EXHIBIT 2 was marked for identification.) |
| 01:13:43 | 11 | BY MS. ANTONUCCI: |
| 01:13:43 | 12 | Q.      Is this a true and correct copy of your resume |
| 01:13:46 | 13 | that you submitted to CitiStaff in connection with |
| 01:13:51 | 14 | trying to get a job working at the Tesla factory? |
| 01:14:12 | 15 | A.      Yes.   This is what I submitted. |
| 01:14:17 | 16 | Q.      Okay.  And is that your name at the top? |
| 01:14:24 | 17 | A.      Yes. |
| 01:14:25 | 18 | Q.      And is that your current phone number? |
| 01:14:29 | 19 | A.      Yes. |
| 01:14:29 | 20 | Q.      Is that your current address? |
| 01:14:31 | 21 | A.      No. |
| 01:14:38 | 22 | Q.      Is that your current e-mail? |
| 01:14:42 | 23 | A.      Yes. |
| 01:14:44 | 24 | Q.      And for the record, this is Tesla Bates-stamped |
| 01:14:50 | 25 | document 153 to 155. |

| | | |
|---|---|---|
| 01:24:25 | 1 | THE WITNESS:  No. |
| 01:24:25 | 2 | BY MS. ANTONUCCI: |
| 01:24:28 | 3 | Q.    Do you know who decided what your rate of pay |
| 01:24:31 | 4 | would be? |
| 01:24:32 | 5 | A.    No. |
| 01:24:33 | 6 | Q.    Do you know who decided what your method of pay |
| 01:24:38 | 7 | would be? |
| 01:24:38 | 8 | A.    No. |
| 01:24:40 | 9 | Q.    Do you know who set your work schedule? |
| 01:24:43 | 10 | A.    Yes. |
| 01:24:44 | 11 | Q.    Who? |
| 01:24:45 | 12 | A.    Tesla. |
| 01:24:47 | 13 | Q.    Anyone in particular? |
| 01:24:56 | 14 | A.    I was just given a work schedule. |
| 01:24:57 | 15 | Q.    And who gave you a work schedule? |
| 01:25:13 | 16 | A.    Jaime Salazar. |
| 01:25:13 | 17 | Q.    And what was your work schedule when you were |
| 01:25:17 | 18 | assigned to work at Tesla? |
| 01:25:20 | 19 | A.    I was on an alternating work schedule. |
| 01:25:25 | 20 | Q.    What do you mean by that? |
| 01:25:29 | 21 | A.    Four days on, three days off.  Sometimes three |
| 01:25:34 | 22 | days on, four days off. |
| 01:25:38 | 23 | Q.    So is it correct that one week you would go four |
| 01:25:42 | 24 | days on, three days off, and then the following week you |
| 01:25:47 | 25 | would work three days on, four days off, and so on? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:29:18 | 1 | Q.      And who's Tom Kawasaki? |
| 01:29:21 | 2 | A.      Supervisor. |
| 01:29:23 | 3 | Q.      What did he supervise? |
| 01:29:29 | 4 | A.      At that time, the elevator staff. |
| 01:29:32 | 5 | Q.      Did you report to Tom Kawasaki? |
| 01:29:43 | 6 | A.      Yes. |
| 01:29:44 | 7 | Q.      For how long? |
| 01:29:47 | 8 | A.      Till he left. |
| 01:29:54 | 9 | Q.      And when was that? |
| 01:29:55 | 10 | A.      I don't recall. |
| 01:29:57 | 11 | Q.      How long after you arrived at Tesla did Tom |
| 01:30:03 | 12 | Kawasaki leave? |
| 01:30:05 | 13 | A.      I don't recall. |
| 01:30:07 | 14 | Q.      Do you recall if it was more than a couple of |
| 01:30:09 | 15 | weeks? |
| 01:30:12 | 16 | A.      It's more than a couple weeks.  He was there for |
| 01:30:22 | 17 | a while. |
| 01:30:25 | 18 | Q.      And at some point, you started reporting to |
| 01:30:28 | 19 | Ed Romero; is that right? |
| 01:30:29 | 20 | A.      Yes. |
| 01:30:30 | 21 | Q.      Did you report to anyone other than Tom Kawasaki |
| 01:30:34 | 22 | or Ed Romero while you were assigned at Tesla? |
| 01:30:39 | 23 | A.      No. |
| 01:30:48 | 24 | Q.      You said you went through an orientation at |
| 01:30:52 | 25 | Tesla? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:30:54 | 1 | A.      Yes. |
| 01:30:55 | 2 | Q.      What did your orientation consist of? |
| 01:31:05 | 3 | MR. ORGAN:  Objection.  Compound.  Overbroad. |
| 01:31:14 | 4 | THE WITNESS:  Class. |
| 01:31:14 | 5 | BY MS. ANTONUCCI: |
| 01:31:18 | 6 | Q.      How long was it? |
| 01:31:19 | 7 | A.      About an hour. |
| 01:31:26 | 8 | Q.      So only one hour of orientation during the whole |
| 01:31:31 | 9 | time you worked at Tesla? |
| 01:31:33 | 10 | A.      Yes. |
| 01:31:35 | 11 | Q.      And who conducted the orientation? |
| 01:31:39 | 12 | A.      I don't remember her name. |
| 01:31:42 | 13 | Q.      It was a woman? |
| 01:31:44 | 14 | A.      Yes. |
| 01:31:44 | 15 | Q.      Do you know if she worked for Tesla? |
| 01:31:46 | 16 | A.      Yes. |
| 01:31:49 | 17 | Q.      How do you know she worked for Tesla? |
| 01:31:53 | 18 | A.      That's what she said. |
| 01:31:57 | 19 | Q.      Did she say what department she worked in? |
| 01:32:01 | 20 | A.      I don't recall. |
| 01:32:04 | 21 | Q.      What was the subject matter of this orientation? |
| 01:32:09 | 22 | A.      Where to go get our badges from the security |
| 01:32:20 | 23 | office; what doors to use; the contractor was only |
| 01:32:28 | 24 | supposed to use the red door, no other door. |
| 01:32:34 | 25 | Q.      To go in and out? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:44:09 | 1 | Q.      Who did you communicate with at nextSource |
| 01:44:15 | 2 | regarding your assignment at Tesla? |
| 01:44:18 | 3 | A.      I don't recall. |
| 01:44:33 | 4 | Q.      Did CitiStaff have any onsite people at Tesla? |
| 01:44:38 | 5 | A.      No. |
| 01:44:44 | 6 | Q.      Did nextSource have any onsite people at Tesla? |
| 01:44:48 | 7 | A.      Possibly. |
| 01:44:50 | 8 | Q.      Do you know their names? |
| 01:45:00 | 9 | A.      No. |
| 01:45:12 | 10 | Q.      When you worked at Tesla, did you take |
| 01:45:15 | 11 | instruction from Tom Kawasaki? |
| 01:45:19 | 12 | A.      Yes. |
| 01:45:20 | 13 | Q.      And did you take instruction from Ed Romero? |
| 01:45:24 | 14 | A.      Yes. |
| 01:45:24 | 15 | Q.      Did you take instruction from anyone else at |
| 01:45:27 | 16 | Tesla? |
| 01:45:29 | 17 |         MR. ORGAN:  Objection.  Vague and ambiguous as |
| 01:45:32 | 18 | to "instruction." |
| 01:45:34 | 19 |         THE WITNESS:  From Robert and Ramon. |
| 01:45:34 | 20 | BY MS. ANTONUCCI: |
| 01:45:44 | 21 | Q.      But you didn't report to Robert or Ramon? |
| 01:45:49 | 22 | A.      No. |
| 01:45:50 | 23 | Q.      So then what kind of instruction did you take |
| 01:45:53 | 24 | from them? |
| 01:45:58 | 25 |         MR. ORGAN:  Objection.  Argumentative. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:51:43 | 1 | A.      Him not returning to work on time. |
| 01:51:48 | 2 | Q.      Was anybody else present during this argument? |
| 01:51:56 | 3 | A.      Yes. |
| 01:51:57 | 4 | Q.      Who? |
| 01:51:57 | 5 | A.      Staff that was on the floor. |
| 01:52:06 | 6 | Q.      Do you know their names? |
| 01:52:08 | 7 | A.      No. |
| 01:52:10 | 8 | Q.      At some point you were promoted to elevator |
| 01:52:35 | 9 | lead; is that right? |
| 01:52:36 | 10 | A.      Yes. |
| 01:52:37 | 11 | Q.      Do you know when that was? |
| 01:52:40 | 12 | A.      About a month after I started. |
| 01:52:53 | 13 | Q.      And how did your responsibilities change as an |
| 01:53:02 | 14 | elevator lead? |
| 01:53:09 | 15 | A.      Only difference was is now I was supervising |
| 01:53:13 | 16 | three to four guys. |
| 01:53:20 | 17 | Q.      And who were you supervising as an elevator |
| 01:53:23 | 18 | lead? |
| 01:53:25 | 19 | A.      One was Rothaj Foster, Lamar Patterson, and I |
| 01:53:38 | 20 | can't remember the other guys' names. |
| 01:53:41 | 21 | Q.      How many other people were you supervising |
| 01:53:44 | 22 | besides Rothaj Foster and Lamar Patterson? |
| 01:54:02 | 23 | A.      In total or at one time? |
| 01:54:05 | 24 | Q.      In total. |
| 01:54:06 | 25 | A.      It was a high turnover job, so I would say about |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 02:20:12 | 1 | Q.      Why not? |
| 02:20:15 | 2 | A.      Because he kept calling me the N-word and |
| 02:20:21 | 3 | calling me -- well, telling me to go back to Africa, |
| 02:20:30 | 4 | cursing at me. |
| 02:20:34 | 5 | Q.      Did you ever curse at him? |
| 02:20:39 | 6 | A.      Possibly. |
| 02:20:42 | 7 | Q.      What did you say? |
| 02:20:49 | 8 | A.      Probably, "Get the F out of my face.  Get the F |
| 02:20:54 | 9 | out of my face." |
| 02:21:03 | 10 | Q.      Did you ever call him any names? |
| 02:21:06 | 11 | A.      No, ma'am. |
| 02:21:13 | 12 | Q.      Did you ever see the surveillance video of this |
| 02:21:20 | 13 | incident? |
| 02:21:21 | 14 | A.      No, ma'am. |
| 02:21:24 | 15 | Q.      Did you ever discuss the surveillance video with |
| 02:21:29 | 16 | anyone else? |
| 02:21:32 | 17 | A.      In an e-mail, I asked Ed Romero to review it. |
| 02:21:39 | 18 | Q.      Do you know if he reviewed it? |
| 02:21:40 | 19 | A.      No, ma'am. |
| 02:22:10 | 20 | Before the next question, can I use the |
| 02:22:13 | 21 | bathroom, please? |
| 02:22:15 | 22 | Q.      Yes. |
| 02:22:15 | 23 | A.      Thank you.  I appreciate that. |
| 02:22:17 | 24 | THE VIDEOGRAPHER:   We're going off the record |
| 02:22:18 | 25 | at 2:21 p.m.  This is the end of Media Number 2. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:00:32 | 1 | been avoided if either of them would have used the chain |
| 03:00:35 | 2 | of command instead of creating a new one amongst |
| 03:00:39 | 3 | themselves.  Devin Burkhart." |
| 03:00:39 | 4 | Q.     Who is Devin Burkhart? |
| 03:00:41 | 5 | A.     Devin was one of the guys that I supervised in |
| 03:00:44 | 6 | the elevator. |
| 03:00:57 | 7 | Q.     And you -- when you received that e-mail from |
| 03:00:59 | 8 | Devin, you forwarded it to Tom? |
| 03:01:01 | 9 | A.     Yes. |
| 03:01:03 | 10 | Q.     Did you do anything else in response to that |
| 03:01:06 | 11 | e-mail? |
| 03:01:10 | 12 | A.     I talked to Hilda. |
| 03:01:14 | 13 | Q.     And what did you talk to Hilda about? |
| 03:01:16 | 14 | A.     I let her know that because of the slow |
| 03:01:19 | 15 | production that the elevator on that side was closed and |
| 03:01:23 | 16 | everything had to be brought to this side.  My immediate |
| 03:01:28 | 17 | supervisor at that time was Tom Kawasaki, closed the |
| 03:01:32 | 18 | elevator and told us not to operate that elevator, and |
| 03:01:38 | 19 | she got upset and went to go get this Aron guy. |
| 03:01:52 | 20 | Q.     And did you speak with Aron? |
| 03:01:55 | 21 | A.     No. |
| 03:01:57 | 22 | Q.     So she just reported it to Aron? |
| 03:01:59 | 23 | A.     No.  Her and Aron came back.  Aron said |
| 03:02:03 | 24 | something and I just walked away. |
| 03:02:04 | 25 | Q.     What did Aron say? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:02:07 | 1 | A.      He had just started to get up in me. |
| 03:02:21 | 2 | Q.      And where were you when he said that? |
| 03:02:38 | 3 | A.      On the stairs by the bathroom.  He kept |
| 03:02:42 | 4 | following me trying to get me to open up the elevator. |
| 03:02:47 | 5 | Q.      Was anyone else present? |
| 03:02:50 | 6 | A.      I don't know.  I was on the stairs. |
| 03:02:52 | 7 | Q.      Did you respond to him? |
| 03:03:09 | 8 | A.      No.  I didn't want the situation to keep |
| 03:03:13 | 9 | escalating, so I kept going. |
| 03:03:30 | 10 | Q.      And do you know what race Aron Deharto is? |
| 03:03:33 | 11 | A.      I can't be for sure. |
| 03:03:36 | 12 | Q.      Do you know what race Jessie Leite is? |
| 03:03:41 | 13 | A.      Unless I saw a picture, I couldn't be for sure. |
| 03:03:45 | 14 | Q.      What about Hilda Navarro? |
| 03:03:47 | 15 | A.      She was Hispanic. |
| 03:03:54 | 16 | Q.      Did you report this "All you Ns are starting to |
| 03:03:59 | 17 | get uppity" comment to anyone? |
| 03:04:04 | 18 | A.      Tom Kawasaki. |
| 03:04:09 | 19 | Q.      And what did Tom say? |
| 03:04:12 | 20 | A.      "Try to avoid him." |
| 03:04:28 | 21 | Q.      Do you know if he did anything after that? |
| 03:04:37 | 22 | MR. ORGAN:  Objection.  Vague and ambiguous as |
| 03:04:39 | 23 | to "he." |
| 03:04:39 | 24 | BY MS. ANTONUCCI: |
| 03:04:41 | 25 | Q.      Do you know if Tom did anything after that? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:04:46 | 1 | A.      I don't know because Tom had warned me in the |
| 03:04:49 | 2 | beginning. |
| 03:04:49 | 3 | Q.      What had Tom warned you? |
| 03:04:52 | 4 | A.      That when he had requested that I be a |
| 03:05:02 | 5 | supervisor, that they didn't want a person like me to be |
| 03:05:06 | 6 | a supervisor, so I would run into resistance. |
| 03:05:17 | 7 | Q.      When did he say that to you? |
| 03:05:19 | 8 | A.      When he first said he was going to put me in to |
| 03:05:23 | 9 | be a lead. |
| 03:05:27 | 10 | Q.      Did you have a good relationship with Tom? |
| 03:05:47 | 11 | A.      I thought so. |
| 03:05:50 | 12 | Q.      Did you ask him what he meant when he said to |
| 03:06:02 | 13 | you that they didn't want "a person like you" to be a |
| 03:06:06 | 14 | supervisor? |
| 03:06:06 | 15 | A.      He meant my race. |
| 03:06:08 | 16 | Q.      Well, my question is a little different. |
| 03:06:11 | 17 |         Did you ask him what he meant? |
| 03:06:13 | 18 | A.      Yes. |
| 03:06:15 | 19 | Q.      And what did he say? |
| 03:06:17 | 20 | A.      He meant my race. |
| 03:06:35 | 21 | Q.      Did he say anything else during this |
| 03:06:37 | 22 | conversation? |
| 03:06:38 | 23 | A.      At that point, he had -- when he first said that |
| 03:06:50 | 24 | he was going to put me in for a supervisor, he said he |
| 03:06:55 | 25 | was going to, kind of like, push it through because of |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:16:38 | 1 | A.       Again, posturing, balled-up fist, the tone, body |
| 03:16:46 | 2 | language. |
| 03:16:59 | 3 | Q.       Why did you think he was going the hit you? |
| 03:17:01 | 4 | A.       He was in my personal space with his fist balled |
| 03:17:07 | 5 | up, ma'am. |
| 03:17:10 | 6 | Q.       What did Rothaj do? |
| 03:17:15 | 7 | A.       Nothing. |
| 03:17:21 | 8 | Q.       He just watched? |
| 03:17:25 | 9 | A.       At that point, my focus was not on Rothaj.  My |
| 03:17:29 | 10 | focus was on not -- not being struck. |
| 03:17:33 | 11 | Q.       He didn't try to break it up? |
| 03:17:36 | 12 | A.       No, ma'am. |
| 03:17:47 | 13 | Q.       Did you and Rothaj discuss this incident |
| 03:17:50 | 14 | afterwards? |
| 03:17:52 | 15 | A.       Not that I recall.  The first thing I did was I |
| 03:17:58 | 16 | tried to write the e-mail. |
| 03:18:06 | 17 | Q.       You didn't discuss this with anyone at |
| 03:18:10 | 18 | CitiStaff; correct? |
| 03:18:11 | 19 | A.       I was directed from CitiStaff to direct all my |
| 03:18:18 | 20 | problems back to Tesla. |
| 03:18:21 | 21 | A.       Who at CitiStaff told you to direct your |
| 03:18:24 | 22 | problems to Tesla? |
| 03:18:24 | 23 | A.       Whenever I had a problem and I would, say, call |
| 03:18:28 | 24 | CitiStaff, they would tell me direct it to my on-site |
| 03:18:33 | 25 | supervisor. |

03:18:33  1   Q.      Who was your on-site supervisor?

03:18:36  2   A.      Ed Romero and Thomas Kawasaki.

03:18:41  3   Q.      And who told you to direct your problems to your

03:18:44  4   on-site supervisor?

03:18:45  5   A.      The Number 1 heavyset Hispanic female.

03:19:11  6   Q.      How many times did you call the Number 1

03:19:15  7   heavyset Hispanic female where she told you to direct

03:19:19  8   your problems to your on-site supervisor?

03:19:21  9   A.      Just once.

03:19:25 10   Q.      And when was that?

03:19:29 11   A.      I can't recall.

03:19:31 12   Q.      Was it after this incident or before?

03:19:34 13   A.      Before.

03:19:37 14   Q.      And what did you tell the Number 1 heavyset

03:19:50 15   Hispanic female, to which she responded, "Direct your

03:19:54 16   problems to the on-site supervisor"?

03:19:57 17   A.      I can't recall the conversation.

03:19:59 18   Q.      Did Tom talk to you about this incident?

03:20:19 19   A.      Yes.

03:20:20 20   Q.      What did he say?

03:20:22 21   A.      That he only had limited -- limited things that

03:20:33 22   he can do because Ed Romero was now my supervisor.

03:20:43 23   Q.      Did Ed Romero talk to you about this?

03:20:51 24   A.      No.  He sent me an e-mail.

03:20:56 25   Q.      What did he say in the e-mail?

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:23:05 | 1 | A.      My understanding is that he was a liaison. |
| 03:23:13 | 2 | Q.      Liaison with who? |
| 03:23:16 | 3 | A.      Tesla and nextSource, I believe. |
| 03:23:23 | 4 | Q.      Did you understand that you could complain to |
| 03:23:32 | 5 | Wayne Jackson if you needed to about any concerns you |
| 03:23:35 | 6 | had in the workplace? |
| 03:23:36 | 7 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 03:23:40 | 8 | THE WITNESS:  If he was around. |
| 03:23:40 | 9 | BY MS. ANTONUCCI: |
| 03:23:43 | 10 | Q.      And he was on-site? |
| 03:23:46 | 11 | A.      Rarely. |
| 03:23:50 | 12 | Q.      How often would you say he was on-site? |
| 03:23:58 | 13 | A.      I don't know. |
| 03:24:01 | 14 | Q.      How many times a week? |
| 03:24:03 | 15 | A.      I don't know. |
| 03:24:29 | 16 | Q.      And this incident with Ramon, you know, right |
| 03:24:33 | 17 | outside, inside of the elevator, occurred around |
| 03:24:36 | 18 | October 17, 2015? |
| 03:24:40 | 19 | A.      Yes.  That's what the date is on the -- on the |
| 03:24:44 | 20 | e-mail. |
| 03:24:45 | 21 | Q.      And was that around 4:45 a.m.? |
| 03:24:49 | 22 | A.      Yes. |
| 03:24:51 | 23 | Q.      So you sent this e-mail right after it happened? |
| 03:24:55 | 24 | A.      I sent the e-mail out at 6:08 a.m., ma'am. |
| 03:25:02 | 25 | Q.      So about an hour and a half after it happened? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:25:08 | 1 | A.      Yes. |
| 03:25:09 | 2 | Q.      And where did you send the e-mail from? |
| 03:25:11 | 3 | A.      My iPhone. |
| 03:25:14 | 4 | Q.      Prior to this point, had you had any other |
| 03:25:24 | 5 | interactions with Ramon? |
| 03:25:26 | 6 | A.      Yes. |
| 03:25:31 | 7 | Q.      In what context? |
| 03:25:33 | 8 | A.      Negative. |
| 03:25:34 | 9 | Q.      What other interactions had you had with Ramon |
| 03:25:42 | 10 | prior to October 17, 2015? |
| 03:25:52 | 11 | A.      Calling me the N-word.  Either "Go back to |
| 03:25:57 | 12 | Africa."  The incident where I told you he said "he |
| 03:26:05 | 13 | hated us" -- "he hated us F'ing Ns" or, you know, "hated |
| 03:26:12 | 14 | us Ns."  Can't be for sure or exactly, but there was a |
| 03:26:15 | 15 | few different negative interactions. |
| 03:26:19 | 16 | Q.      And when you had these negative interactions |
| 03:26:23 | 17 | with Ramon, why didn't you send an e-mail about those |
| 03:26:28 | 18 | interactions? |
| 03:26:32 | 19 | A.      Because I didn't have proof. |
| 03:27:51 | 20 |       (EXHIBIT 9 was marked for identification.) |
| 03:27:55 | 21 | BY MS. ANTONUCCI: |
| 03:27:56 | 22 | Q.      Exhibit 9 is an e-mail dated October 24, 2015, |
| 03:28:05 | 23 | Bates-stamped at the bottom 59, and it's from you to Ed |
| 03:28:10 | 24 | Romero about Rothaj Foster. |
| 03:28:15 | 25 |       Do you see that? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:53:13 | 1 | scary? |
| 03:53:14 | 2 | MR. ORGAN:  Objection.  Calls for speculation. |
| 03:53:16 | 3 | Assumes facts not in evidence.  Argumentative. |
| 03:53:19 | 4 | THE WITNESS:  No. |
| 03:53:19 | 5 | BY MS. ANTONUCCI: |
| 03:53:20 | 6 | Q.    Why not? |
| 03:53:24 | 7 | A.    From watching them cartoons and that's what they |
| 03:53:29 | 8 | call them, jigaboos. |
| 03:53:31 | 9 | Q.    But it doesn't say jigaboo; right? |
| 03:53:34 | 10 | A.    No. |
| 03:53:35 | 11 | Q.    It says, "Booo"? |
| 03:53:36 | 12 | A.    Yes. |
| 03:53:38 | 13 | Q.    In fact, it says, "Booo" with three "O's;" is |
| 03:53:43 | 14 | that correct? |
| 03:53:43 | 15 | A.    Yes. |
| 03:53:43 | 16 | Q.    Is jigaboo spelled with three "O's"? |
| 03:53:48 | 17 | A.    Might be a different spelling, but... |
| 03:54:03 | 18 | Q.    You called it a racist effigy in this e-mail; is |
| 03:54:09 | 19 | that right? |
| 03:54:09 | 20 | A.    Yes. |
| 03:54:09 | 21 | Q.    Did you think it was important to use the term |
| 03:54:12 | 22 | "racist"? |
| 03:54:13 | 23 | A.    Yes. |
| 03:54:13 | 24 | Q.    Why? |
| 03:54:14 | 25 | A.    Because that's what it is, racist effigy. |

**Owen Diaz-Confidential**

03:55:44  1   work environment."

03:55:45  2           Do you see that?

03:55:46  3   A.     Yes.

03:55:47  4   Q.     And you used the term "harassment" here;

03:55:53  5   correct?

03:55:54  6   A.     Yes.

03:55:57  7   Q.     Did you think it was important to use that term?

03:56:01  8           MR. ORGAN:  Objection.  Argumentative.  Vague

03:56:05  9   and ambiguous.

03:56:05 10           THE WITNESS:  Yes.

03:56:05 11   BY MS. ANTONUCCI:

03:56:06 12   Q.     Why?

03:56:07 13   A.     Because I was being harassed.

03:56:12 14   Q.     And you hadn't used that word at any time prior

03:56:15 15   to this e-mail; correct?

03:56:17 16   A.     Yes.

03:56:20 17   Q.     It says here, "It seems that his behavior is

03:56:25 18   getting worse."

03:56:26 19           Do you see that?

03:56:27 20   A.     Yes.

03:56:30 21   Q.     What did you mean by that?

03:56:33 22   A.     I had complained and his actions escalated.

03:56:44 23   Q.     How did his actions escalate?

03:56:53 24   A.     The harassment.

03:56:55 25   Q.     But a few months before, you recounted that you

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:59:56 | 1 | Q. So did Ramon report to Michael Wheeler? |
| 04:00:00 | 2 | A. I don't know. |
| 04:00:03 | 3 | Q. Did Michael Wheeler work within recycling? |
| 04:00:08 | 4 | A. Yes. |
| 04:00:09 | 5 | Q. So he worked with Ramon in recycling? |
| 04:00:13 | 6 | A. Possibility. |
| 04:00:15 | 7 | Q. So by contacting Michael Wheeler, did you mean |
| 04:00:31 | 8 | to report it to the recycling group? |
| 04:00:35 | 9 | A. Yes. |
| 04:00:39 | 10 | Q. And when Michael arrived, did you speak with him |
| 04:00:54 | 11 | about the cartoon? |
| 04:00:55 | 12 | A. Briefly. |
| 04:00:56 | 13 | Q. What did you say? |
| 04:00:58 | 14 | A. Someone from -- from the recycling team that he |
| 04:01:03 | 15 | was with had sent this cardboard bale with this racist |
| 04:01:10 | 16 | effigy over to the elevator. |
| 04:01:13 | 17 | Q. Michael said that? |
| 04:01:14 | 18 | A. No. You asked me what did I say to Michael. |
| 04:01:19 | 19 | Q. Okay. What did Michael say? |
| 04:01:21 | 20 | A. He wanted to see it. |
| 04:01:22 | 21 | Q. And so he came down with you to look at it? |
| 04:01:26 | 22 | A. No. |
| 04:01:27 | 23 | Q. Okay. How did he get down to the cardboard |
| 04:01:31 | 24 | bale? |
| 04:01:31 | 25 | A. He went up with me. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:01:33 | 1 | Q.    He went up with you.  Okay.  And when you went |
| 04:01:37 | 2 | upstairs, did -- was Israel with you as well? |
| 04:01:41 | 3 | A.    He came with Michael. |
| 04:01:43 | 4 | Q.    Is Michael African-American? |
| 04:01:45 | 5 | A.    Yes. |
| 04:01:45 | 6 | Q.    Is Israel African-American? |
| 04:01:47 | 7 | A.    No. |
| 04:01:49 | 8 | Q.    What nationality is Israel? |
| 04:01:53 | 9 | A.    I don't know. |
| 04:01:54 | 10 | Q.    What race? |
| 04:01:56 | 11 | A.    I don't know. |
| 04:01:58 | 12 | Q.    Did you -- did Israel say anything when he saw |
| 04:02:03 | 13 | the cartoon? |
| 04:02:05 | 14 | A.    No. |
| 04:02:05 | 15 | Q.    Did Michael say anything when he saw the |
| 04:02:08 | 16 | cartoon? |
| 04:02:09 | 17 | A.    Yes. |
| 04:02:10 | 18 | Q.    What did Michael say? |
| 04:02:12 | 19 | A.    "Who could have did this?" |
| 04:02:15 | 20 | Q.    And both Michael and Israel took pictures of the |
| 04:02:21 | 21 | cartoon? |
| 04:02:23 | 22 | A.    Yes. |
| 04:02:24 | 23 | Q.    Did Michael say anything else? |
| 04:02:28 | 24 | A.    I had to stop to talk to the elevator staff and |
| 04:02:31 | 25 | him, and Israel went over to the upstairs recycling |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:02:36 | 1 | room. |
| 04:02:37 | 2 | Q.    You talked to the elevator staff? |
| 04:02:40 | 3 | A.    Yes. |
| 04:02:40 | 4 | Q.    Who did you talk to? |
| 04:02:42 | 5 | A.    Lamar Patterson. |
| 04:02:48 | 6 | Q.    Did Lamar Patterson see this picture? |
| 04:02:51 | 7 | A.    Yes. |
| 04:02:52 | 8 | Q.    Did you show it to him? |
| 04:02:53 | 9 | A.    No. |
| 04:02:55 | 10 | Q.    How did he see it? |
| 04:03:00 | 11 | A.    He was pulling a pallet rider up under the |
| 04:03:08 | 12 | pallet. |
| 04:03:10 | 13 | Q.    Did you witness anyone else viewing this |
| 04:03:13 | 14 | cartoon? |
| 04:03:15 | 15 | A.    Yes. |
| 04:03:16 | 16 | Q.    Who else did you see viewing the cartoon? |
| 04:03:21 | 17 | A.    Other Tesla employees. |
| 04:03:23 | 18 | Q.    Which ones? |
| 04:03:28 | 19 | A.    I don't know their names. |
| 04:03:30 | 20 | Q.    It says here, "Ramon Martinez said he had drew |
| 04:04:19 | 21 | the picture and he was just playing." |
| 04:04:21 | 22 |     Do you see that? |
| 04:04:22 | 23 | A.    Yes. |
| 04:04:22 | 24 | Q.    How do you know that Ramon Martinez said that? |
| 04:04:26 | 25 | A.    He said it.  He said it verbally. |

04:04:30  1    Q.      Did you hear him say that?

04:04:31  2    A.      Yes.   But that's not what he said.

04:04:36  3    Q.      He didn't say he drew the picture?

04:04:38  4    A.      He said he drew the picture.

04:04:41  5    Q.      Did -- he didn't say he was just playing?

04:04:44  6    A.      It was actually -- I said he was playing, but

04:04:52  7    actually it was, "You people can't take a joke."

04:04:57  8    Q.      And he said that to you?

04:04:59  9    A.      Yes.

04:05:00  10   Q.      And where were you when he said that?

04:05:03  11   A.      Standing where the -- standing in front of the

04:05:08  12   elevator.

04:05:14  13   Q.      And did anybody witness him say, "You people

04:05:17  14   can't take the joke"?

04:05:18  15   A.      Israel and Michael Wheeler.

04:05:22  16   Q.      How did Ramon Martinez get to -- up to where the

04:05:28  17   cardboard bale was with the cartoon?

04:05:33  18   A.      I don't know.

04:05:34  19   Q.      Was he just passing by, or did someone call him

04:05:39  20   there?

04:05:41  21   A.      You mean, how did he get back to it the second

04:05:46  22   time, or...

04:05:46  23   Q.      Yeah.   After you saw the picture, you walked up

04:05:50  24   there with Michael and Israel; right?

04:05:54  25   A.      Uh-huh.

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:05:54 | 1 | Q.      Then Ramon Martinez comes -- right? -- at some |
| 04:05:58 | 2 | point? |
| 04:05:58 | 3 | A.      Michel and Israel went over to the recycling |
| 04:06:02 | 4 | center that's upstairs, and they came back with Ramon |
| 04:06:05 | 5 | Martinez. |
| 04:06:05 | 6 | Q.      Okay.  Did they tell you what they talked about |
| 04:06:08 | 7 | up in the recycling center when they went to get Ramon? |
| 04:06:12 | 8 | A.      No. |
| 04:06:14 | 9 | Q.      And they came back with Ramon, and you were |
| 04:06:18 | 10 | still waiting at cardboard bale? |
| 04:06:21 | 11 | A.      Yes. |
| 04:06:21 | 12 | Q.      Why were you waiting there?  Did they tell you |
| 04:06:24 | 13 | to wait there? |
| 04:06:25 | 14 | A.      No. |
| 04:06:25 | 15 | Q.      Why were you waiting there? |
| 04:06:26 | 16 | A.      I was dealing with the elevator crew. |
| 04:06:30 | 17 | Q.      Okay.  Besides Lamar Patterson, did anybody else |
| 04:06:38 | 18 | in the elevator crew see the cartoon? |
| 04:06:41 | 19 | A.      I don't know. |
| 04:06:50 | 20 | Q.      Okay.  So when they brought Ramon down, did he |
| 04:06:55 | 21 | admit that he was the one that drew the picture? |
| 04:06:57 | 22 | A.      Yes. |
| 04:07:00 | 23 | Q.      Did he apologize? |
| 04:07:02 | 24 | A.      No. |
| 04:07:06 | 25 | Q.      Did he say anything other than, "You people |

| | | |
|---|---|---|
| 04:07:09 | 1 | can't take a joke"? |
| 04:07:11 | 2 | A.      No. |
| 04:07:18 | 3 | Q.      What was his demeanor when he said that, "You |
| 04:07:21 | 4 | people can't take a joke"? |
| 04:07:23 | 5 | A.      Smirkish. |
| 04:07:23 | 6 | MR. ORGAN:  I'm sorry.  Can you read that back. |
| 04:07:23 | 7 | (Whereupon, the last answer was read back.) |
| 04:07:57 | 8 | BY MS. ANTONUCCI: |
| 04:07:57 | 9 | Q.      Okay.  So after you spoke with Ramon at the |
| 04:08:01 | 10 | cardboard bale, then what happened? |
| 04:08:03 | 11 | A.      I was upset so I left. |
| 04:08:08 | 12 | Q.      Did you leave early? |
| 04:08:10 | 13 | A.      No.  I didn't take off work.  I just left the |
| 04:08:13 | 14 | area. |
| 04:08:15 | 15 | Q.      But you stayed at work? |
| 04:08:18 | 16 | A.      Yes. |
| 04:08:18 | 17 | Q.      Did you discuss the drawing with anyone else? |
| 04:08:23 | 18 | A.      Other employees came around.  Yes. |
| 04:08:26 | 19 | Q.      Who did you discuss the drawing with? |
| 04:08:29 | 20 | A.      I can't recall. |
| 04:08:32 | 21 | Q.      Did you discuss the drawing with your son? |
| 04:08:36 | 22 | A.      Yes. |
| 04:08:37 | 23 | Q.      When? |
| 04:08:38 | 24 | A.      Can't be for sure. |
| 04:08:48 | 25 | Q.      And do you only have one son? |

**Owen Diaz-Confidential**

04:18:26  1    A.      Yes.

04:18:27  2    Q.      So is it your understanding that Mr. Martinez

04:18:31  3    was suspended and issued a permanent written warning?

04:18:36  4            MR. ORGAN:  Objection.  Compound and calls for

04:18:40  5    speculation.

04:18:40  6            THE WITNESS:  That's what this document says.

04:18:40  7    BY MS. ANTONUCCI:

04:18:43  8    Q.      And do you have any reason to believe that

04:18:46  9    Mr. Martinez was not suspended and issued a permanent

04:18:50  10   written warning?

04:18:51  11           MR. ORGAN:  Objection.  Calls for speculation.

04:18:58  12           THE WITNESS:  I don't know.

04:18:58  13   BY MS. ANTONUCCI:

04:18:59  14   Q.      It says here, "Also the apology from Ramon was a

04:19:04  15   good starting point."

04:19:04  16           Do you see that?

04:19:05  17   A.      Yes.

04:19:05  18   Q.      Do you have any reason to believe that Ramon did

04:19:08  19   not apologize?

04:19:10  20           MR. ORGAN:  Objection.  Calls for speculation.

04:19:13  21           THE WITNESS:  I don't know who he apologized to.

04:19:13  22   BY MS. ANTONUCCI:

04:19:19  23   Q.      Did Ramon Martinez ever apologize to you?

04:19:19  24   A.      No.

04:19:26  25   Q.      "One request would be that there is an

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:47:43 | 1 | replaced? |
| 04:47:44 | 2 | A.      I didn't know that. |
| 04:47:52 | 3 | Q.      Do you know anyone named Hugo? |
| 04:47:57 | 4 | A.      I can't recall.  I don't know. |
| 04:48:51 | 5 | Q.      Did you ever speak poorly of Robert to other |
| 04:48:56 | 6 | associates? |
| 04:48:57 | 7 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 04:48:59 | 8 | THE WITNESS:  Not that I recall. |
| 04:48:59 | 9 | BY MS. ANTONUCCI: |
| 04:49:04 | 10 | Q.      Did you ever speak poorly about Hugo to other |
| 04:49:10 | 11 | associates' employees? |
| 04:49:11 | 12 | A.      Again, I don't know who Hugo is. |
| 04:49:15 | 13 | Q.      Did you ever speak poorly about the leads in the |
| 04:49:25 | 14 | recycling group? |
| 04:49:27 | 15 | A.      No. |
| 04:49:28 | 16 | Q.      Did you ever speak poorly about the leads in the |
| 04:49:32 | 17 | production control group? |
| 04:49:33 | 18 | A.      No. |
| 04:49:44 | 19 | Q.      Did you ever speak poorly about the leads who |
| 04:49:49 | 20 | worked in the elevator team? |
| 04:49:52 | 21 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 04:49:53 | 22 | THE WITNESS:  No. |
| 04:50:28 | 23 | BY MS. ANTONUCCI: |
| 04:50:28 | 24 | Q.      Why did you leave Tesla? |
| 04:50:32 | 25 | A.      I just couldn't take the abuse anymore. |

1       I, CANDY NEWLAND, CSR No. 14256, certify that the

2   foregoing proceedings were taken before me at the time

3   and place herein set forth, at which time the witness

4   was duly sworn, and that the transcript is a true record

5   of the testimony so given.

6

7   Witness review, correction, and signature was

8   (X) by Code.                    (X) requested.

9   ( ) waived.                     ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13      The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificate null and void.

16      I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties nor of any of

19  the parties.

20      Dated this 29TH day of May, 2018.

21

22

23

24  _____

25      CANDY NEWLAND, CSR 14256

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4      --------------------------------
                                         REPORTER CERTIFIED
 5      DEMETRIC DI-AZ, OWEN DIAZ and          TRANSCRIPT
        LAMAR PATTERSON, an individual,
 6

 7                 Plaintiffs,              CONFIDENTIAL

 8        vs.                         No. 3:17-cv-06748-WHO
                                      VOL II, pgs 187 - 292
 9
        TESLA, INC. DBA TESLA MOTORS,
10      INC.; CITISTAFF SOLUTIONS,
        INC.; WEST VALLEY STAFFING
11      GROUP; CHARTWELL STAFFING
        SERVICES, INC. and DOES 1-10,
12      inclusive,

13                 Defendants.

14      --------------------------------

15

16                   CONFIDENTIAL

17            VIDEOTAPED DEPOSITION OF

18                   OWEN DIAZ

19            SAN FRANCISCO, CALIFORNIA

20             MONDAY, DECEMBER 3, 2018

21

22

23      Reported by:

24      GINA V. CARBONE, CSR #8249
        RPR, RMR, CRR, CCRR
25      FILE NO.:  18-27207
```

CHASE
LITIGATION SERVICES

```
 1            Deposition of OWEN DIAZ, Volume II, taken

 2   on behalf of Defendants at CONSTANGY, BROOKS, SMITH

 3   & PROPHETE LLP, 351 California Street, Suite 200,

 4   San Francisco, California 94104, commencing at

 5   10:29 a.m. on Monday, December 3, 2018, before

 6   Gina V. Carbone, Certified Shorthand Reporter

 7   No. 8249, RPR, RMR, CRR, CCRR.

 8

 9            A P P E A R A N C E S

10   For the Plaintiffs:

11       CALIFORNIA CIVIL RIGHTS LAW GROUP

12       By:  LAWRENCE A. ORGAN, Esq.

13       407 San Anselmo Avenue, Suite 201

14       San Anselmo, California 94612

15       (415) 453-4740

16       larry@civilrightsca.com

17

18   For the Defendants TESLA; CITISTAFF SOLUTIONS, INC.:

19       CONSTANGY, BROOKS, SMITH & PROPHETE LLP

20       By:  BARBARA I. ANTONUCCI, Esq.

21       351 California Street, Suite 200

22       San Francisco, California 94104

23       (415) 918-3000

24       bantonucci@constangy.com

25   //
```

```
 1   APPEARANCES (continued)

 2

 3   For the Defendant WEST VALLEY STAFFING:

 4       PAHL & MCCAY

 5       BY: FENN C. HORTON III, ESQ.

 6       225 West Santa Clara, Suite 1500

 7       San Jose, California 95113-1752

 8       (408) 286-5100

 9       fhorton@pahl-mccay.com

10

11   ALSO PRESENT:  Teresa Kossayian,
                    West Valley Staffing Group
12
                    Frank Quirarte, videographer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

11:03:52  1        Q.   Anything else?

11:03:56  2        A.   I can't recall at this moment.

11:04:01  3        Q.   What did you tell him about the picaninny?

11:04:08  4        A.   I had called him to see if -- what are his

11:04:18  5   memories because he was out on the recycling --

11:04:22  6   doing the recycling at that particular point.  He

11:04:24  7   had came upstairs, him and I believe it was Israel,

11:04:32  8   or maybe Ishmael.  I believe it was Israel.

11:04:37  9             They came upstairs.  I had explained to

11:04:44 10   them where I was sitting at.  I had to leave and

11:04:47 11   deal with the elevator staff, but yes.

11:04:57 12        Q.   Do you know what actions Michael Wheeler

11:04:59 13   took as a result of you telling him about the

11:05:01 14   picaninny?

11:05:08 15        A.   No.

11:05:09 16        Q.   And by "the picaninny," are you referring

11:05:11 17   to the drawing that was on the bale of cardboard

11:05:15 18   that you told me about during your last deposition?

11:05:18 19        A.   Yes.

11:05:39 20        Q.   I believe you said Tom Kawasaki also has

11:05:42 21   information about your claims?

11:05:44 22        A.   Yes.

11:05:44 23        Q.   What information do you believe Tom

11:05:46 24   Kawasaki has?

11:05:59 25        A.   It was the -- I complained to Tom Kawasaki

11:06:04  1  about a guy -- I think Judy -- Jul- -- I can't

11:06:09  2  remember his last name.  I think it started with a

11:06:12  3  T.  This guy was calling me the N-word and also a

11:06:17  4  porch monkey.

11:06:33  5       Q.  Anything else that you believe Tom Kawasaki

11:06:37  6  knows about your claims?

11:06:42  7       A.  He would know that I complained verbally to

11:06:51  8  hisself and Ed Romero.  And I believe he probably

11:06:59  9  tagged in a few of the upper management of Tesla in

11:07:10 10  his email alerting them of the situation.

11:07:15 11       Q.  When you say you complained to him and Ed

11:07:17 12  Romero, do you mean about this Judy person calling

11:07:20 13  you the N-word and a porch monkey?

11:07:24 14       A.  Yes.

11:07:25 15       Q.  Did you complain to Tom Kawasaki about

11:07:26 16  anything else?

11:07:30 17       A.  Not that I can recall at this moment.

11:07:35 18       Q.  Is that a no?

11:07:39 19       A.  Not that I can recall.

11:07:52 20       Q.  Did you provide any witnesses to Tom

11:07:56 21  Kawasaki that -- strike that.

11:08:00 22            Were there any witnesses to Judy Timbreza

11:08:04 23  calling you the N-word and a porch monkey?

11:08:11 24       A.  It was him and a few of his friends around

11:08:15 25  at that particular point.

| | | |
|---|---|---|
| 11:08:17 | 1 | Q.  Do you know the names of any of the |
| 11:08:19 | 2 | friends? |
| 11:08:19 | 3 | A.  I didn't even know that guy's name until I |
| 11:08:26 | 4 | pointed him out to Mr. Kawasaki. |
| 11:08:39 | 5 | Q.  How many friends were around him when he |
| 11:08:41 | 6 | called you the N-word and porch monkey? |
| 11:08:49 | 7 | A.  I can't recall. |
| 11:09:00 | 8 | Q.  Did you recognize any of the people around |
| 11:09:01 | 9 | him? |
| 11:09:05 | 10 | A.  I don't understand the question. |
| 11:09:07 | 11 | Q.  Can you identify any of the people that |
| 11:09:09 | 12 | were around when Mr. Timbreza called you the N-word |
| 11:09:15 | 13 | and porch monkey? |
| 11:09:18 | 14 | A.  I would have to see a photo, but it's a |
| 11:09:20 | 15 | possibility I can. |
| 11:09:22 | 16 | Q.  Can you specifically identify any of the |
| 11:09:24 | 17 | people by name? |
| 11:09:28 | 18 | A.  No, I would not know their names. |
| 11:09:38 | 19 | Q.  Why do you believe these people were his |
| 11:09:40 | 20 | friends? |
| 11:09:44 | 21 | A.  The guy had been getting into the elevator |
| 11:09:46 | 22 | with him and his guys, so they would ride up the |
| 11:09:51 | 23 | elevator.  He would say something in Spanish and |
| 11:09:59 | 24 | another thing, and I couldn't kind of catch it, so I |
| 11:10:02 | 25 | recorded it.  I do not have the recording anymore. |

11:10:07   1    I wish I would have kept it.

11:10:09   2        But -- and I had translated it through

11:10:15   3    Google because how they were doing it, he would say

11:10:17   4    it, and I would -- he was like yeah, yeah, yeah,

11:10:22   5    yeah, yeah, and I would nod like yes, yes.  And him

11:10:27   6    and his friends would just bust up laughing.

11:10:30   7        And so after a little while of this, I got

11:10:34   8    pretty curious of what they were saying.  That's why

11:10:37   9    I recorded it, and later on I had Googled the

11:10:41  10    translation and found out that they were calling me

11:10:44  11    a porch monkey and such.

11:10:51  12        Q.  Okay.  So did this -- where exactly did

11:10:56  13    this incident happen where he called you the N-word

11:10:58  14    and porch monkey?

11:11:00  15        A.  We were in the elevator.

11:11:01  16        Q.  Was the elevator closed or open?

11:11:06  17        A.  Closed.  We were -- sometimes it was open;

11:11:08  18    sometimes it was closed.

11:11:12  19        Q.  When the words were actually said, was the

11:11:15  20    elevator open or closed?

11:11:17  21        A.  Sometimes it was open; sometimes it was

11:11:19  22    closed.  We were riding up in the elevator

11:11:22  23    sometimes.  Sometimes we were loading things into

11:11:24  24    the elevator and he would say it.  And, you know, at

11:11:30  25    that point I would kind of like yeah, yeah, yeah,

11:11:32   1   yeah, yeah, yeah, and they would bust up laughing.

11:11:36   2       Q.   How many times did this happen?

11:11:37   3       A.   It went on for several weeks.

11:11:57   4       Q.   How many times?

11:12:00   5       A.   I can't recall.

11:12:07   6       Q.   How many times did he ride the elevator

11:12:10   7   while you were in it?

11:12:12   8       A.   I can't recall.

11:12:17   9       Q.   When did this happen, to the best of your

11:12:20   10  recollection?

11:12:32   11      A.   I'm going to say in the summer.

11:12:34   12      Q.   Summer of what year?

11:12:47   13      A.   Say summer 2016.

11:13:00   14           (Reporter clarification.)

11:13:01   15           THE WITNESS:   Summer.   I can't remember the

11:13:02   16  exact month, but it was in about the summer.

11:13:04   17  BY MS. ANTONUCCI:

11:13:05   18      Q.   Of 2016?

11:13:05   19      A.   I believe so.   I'm not a hundred percent

11:13:07   20  sure with the dates.   I apologize about that.

11:13:17   21      Q.   So is it true that you never heard Judy

11:13:19   22  Timbreza say the N-word or a porch monkey to you in

11:13:25   23  English?

11:13:25   24      A.   No, he wasn't saying it in English.   Porch

11:13:29   25  monkey, he wasn't saying it in English.

| | | |
|---|---|---|
| 11:13:32 | 1 | Q.  Did he say the N-word in English? |
| 11:13:34 | 2 | A.  Yes. |
| 11:13:47 | 3 | Q.  But he said porch monkey in Spanish? |
| 11:13:50 | 4 | A.  I believe it was, yes, in Spanish. |
| 11:13:52 | 5 | Q.  Do you remember the word that was actually |
| 11:13:53 | 6 | said in Spanish? |
| 11:13:59 | 7 | A.  Can't pronounce it, but it's |
| 11:14:01 | 8 | mono-something.  I can't repronounce it right now. |
| 11:14:03 | 9 | It was momo -- momo or mono something or another. |
| 11:14:13 | 10 | Q.  And what have you used to look up the |
| 11:14:15 | 11 | phrase? |
| 11:14:16 | 12 | A.  It was Google. |
| 11:14:18 | 13 | Q.  Google Translate? |
| 11:14:20 | 14 | A.  Yes. |
| 11:14:21 | 15 | Q.  And where did you look it up?  On your |
| 11:14:23 | 16 | phone? |
| 11:14:24 | 17 | A.  Yes. |
| 11:14:30 | 18 | Q.  And what did you do with the recording that |
| 11:14:31 | 19 | you made? |
| 11:14:34 | 20 | A.  I no longer have that particular phone |
| 11:14:37 | 21 | anymore. |
| 11:14:38 | 22 | Q.  What did you do with the recording, though, |
| 11:14:40 | 23 | after you made it? |
| 11:14:45 | 24 | A.  I don't know what I did with the phone.  I |
| 11:14:47 | 25 | could have turned it in or either sold the phone |

| | | |
|---|---|---|
| 11:58:23 | 1 | THE VIDEOGRAPHER:  It was 11:36 -- no. |
| 11:58:25 | 2 | Sorry. |
| 11:58:25 | 3 | MR. ORGAN:  That's when we went off. |
| 11:58:28 | 4 | THE VIDEOGRAPHER:  11:49. |
| 11:58:29 | 5 | MR. ORGAN:  49.  Thank you. |
| 11:58:31 | 6 | BY MS. ANTONUCCI: |
| 11:58:31 | 7 | Q.  Are you alleging that you suffered any |
| 11:58:33 | 8 | emotional distress or psychological damage as a |
| 11:58:35 | 9 | result of the conduct that you endured at the Tesla |
| 11:58:38 | 10 | factory? |
| 11:58:39 | 11 | A.  Yes. |
| 11:58:40 | 12 | Q.  And who caused you this emotional distress? |
| 11:58:47 | 13 | MR. ORGAN:  Objection.  Compound. |
| 11:58:56 | 14 | THE WITNESS:  Tesla. |
| 11:58:57 | 15 | BY MS. ANTONUCCI: |
| 11:58:57 | 16 | Q.  Who at Tesla? |
| 11:58:59 | 17 | A.  Employees. |
| 11:58:59 | 18 | Q.  Who specifically? |
| 11:59:07 | 19 | A.  Robert, Ramon, Ed Romero by not following |
| 11:59:12 | 20 | up on things that was handed to him, Victor |
| 11:59:20 | 21 | Quinterez, Jaime Salazar, the CitiStaff employee |
| 11:59:35 | 22 | that answered my email and didn't follow through |
| 11:59:37 | 23 | with it.  Pretty much. |
| 11:59:45 | 24 | Q.  I'm sorry.  Who is the CitiStaff employee |
| 11:59:47 | 25 | that answered your email and didn't follow through |

12:59:31  1   supervisor?

12:59:32  2       A.  I believe so.

12:59:34  3       Q.  That's your best recollection?

12:59:35  4       A.  Yes.

12:59:37  5       Q.  What did he say about his supervisor?

12:59:45  6       A.  I know his supervisor was calling him the

12:59:47  7   N-word.

12:59:53  8       Q.  Do you recall who Demetric said called him

12:59:54  9   the N-word?

12:59:57 10       A.  Supervisor.

01:00:00 11       Q.  What supervisor?  Did he give you any more

01:00:02 12   information about the identity of his supervisor

01:00:05 13   other than just to call him his supervisor?

01:00:11 14       A.  I didn't know his name.  Only Demetric

01:00:16 15   would know his name.

01:00:18 16       Q.  How did Demetric identify the supervisor

01:00:22 17   when he --

01:00:23 18           MR. ORGAN:  It's Demetric.

01:00:24 19   BY MR. HORTON:

01:00:24 20       Q.  I'm sorry about that.  I apologize.

01:00:26 21       A.  That's okay.  It's easy to mispronounce.

01:00:30 22   Can you repeat the question, please?

01:00:31 23       Q.  Okay.  How did Demetric describe the

01:00:34 24   supervisor that he said had called him the N-word?

01:00:40 25   What words did he use when he talked to you about

01:00:43  1   that?

01:00:52  2        A.   He didn't have to describe him because I

01:00:54  3   was actually a witness to his supervisor calling him

01:00:58  4   and -- him the N-word.

01:01:00  5             MR. HORTON:  Would you please read that

01:01:01  6   back.  I had trouble understanding that.

01:01:09  7             (Record read as follows: He didn't have to

01:01:09  8             describe him because I was actually a

01:01:09  9             witness to his supervisor calling him

01:01:09 10             and -- him the N-word.)

01:01:12 11   BY MR. HORTON:

01:01:12 12        Q.   Okay.  Did you know who Demetric was

01:01:16 13   talking about when he said his supervisor was

01:01:19 14   calling him the N-word at Tesla?

01:01:27 15             MR. ORGAN:  Objection.  Vague and

01:01:29 16   ambiguous.

01:01:30 17   BY MR. HORTON:

01:01:30 18        Q.   Do you understand my question?

01:01:32 19             MR. ORGAN:  Calls for speculation.

01:01:34 20             THE WITNESS:  No, I don't understand the

01:01:35 21   question.

01:01:36 22   BY MR. HORTON:

01:01:37 23        Q.   All right.  So Demetric told you that his

01:01:43 24   supervisor at Tesla was calling him the N-word; is

01:01:46 25   that correct?

1     I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2  CCRR, certify: that the foregoing proceedings were taken

3  before me at the time and place herein set forth; at

4  which time the witness was duly sworn; and that the

5  transcript is a true record of the testimony so given.

6

7     Witness review, correction and signature was

8  (X) by code.              (X) requested.

9  ( ) waived.               ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13     The dismantling or unbinding of the original

14  transcript will render the reporter's certificate null

15  and void.

16     I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any of

19  the parties.

20     Dated this 7th  day of December  , 2018  .

21

22     _____

23     GINA V. CARBONE
       CSR #8249, STATE OF CALIFORNIA

24

25

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   DEMETRIC DIAZ, OWEN DIAZ, ) Case No. 3:17-CV-06748-WHO
     and LAMAR PATTERSON,      )
 5                             )
                  Plaintiffs,  )
 6                             )
         vs.                   )
 7                             )
     TESLA, INC. dba TESLA     )
 8   MOTORS, INC.; CITISTAFF   )
     SOLUTIONS, INC.; WEST     )
 9   VALLEY STAFFING GROUP;    )
     CHARTWELL STAFFING        )
10   SERVICES, INC.;           )
     NEXTSOURCE, INC.;         )
11   DOES 1-50, inclusive,     )
                               )
12                  Defendants. )
     _____)
13

14

15                    Volume III

16         DEPOSITION OF OWEN ORAPIO DIAZ, JR.

17              PAGES 293 THROUGH 441

18            SAN FRANCISCO, CALIFORNIA

19                  JUNE 21, 2019

20

21

22

23

24

25   REPORTED BY:  MICHAEL CUNDY, CSR 12271
```



 1              DEPOSITION OF OWEN ORAPIO DIAZ, JR., taken

 2    at One Embarcadero Center, Suite 2050, San Francisco,

 3    California, on Friday, June 21, 2019, at 9:33 A.M.,

 4    before Michael Cundy, Certified Shorthand Reporter, in

 5    and for the State of California.

 6

 7    APPEARANCES:

 8    FOR THE PLAINTIFF:

 9                    CALIFORNIA CIVIL RIGHTS LAW GROUP
                     BY:  NAVRUZ AVLONI, ESQ.
10                    332 San Anselmo Avenue
                     San Anselmo, California 94960
11                    (415) 453-4740
                     navruz@civilrightsca.com
12
      FOR THE DEFENDANT, NEXTSOURCES, INC.:
13
                     FISHER & PHILLIPS
14                    BY:  JUAN C. ARANEDA, ESQ.
                     One Embarcadero Center
15                    Suite 2050
                     San Francisco, California 94111
16                    (415) 490-9000
                     jaraneda@fisherphillips.com
17
      FOR THE DEFENDANT, TESLA, INC.:
18
                     SHEPPARD MULLIN RICHTER & HAMPTON LLP
19                    BY:  PATRICIA M. JENG, ESQ.
                     Four Embarcadero Center
20                    17th Floor
                     San Francisco, California 94111
21                    (415) 434-9100
                     pjeng@sheppardmullin
22

23

24

25



```
 1    APPEARANCES:

 2    FOR THE DEFENDANT, WEST VALLEY STAFFING GROOP:

 3                      PAHL & McCAY
                        BY:  FENN C. HORTON, III, ESQ.
 4                      225 West Santa Clara Street
                        Suite 1500
 5                      San Jose, California 95113
                        (408) 286-5100
 6                      fhorton@pahl-mccay.com

 7    FOR THE DEFENDANT, CITISTAFF SOLUTIONS:

 8                      LAFAYETTE & KUMAGAI
                        BY:   GARY T. LAFAYETTE, ESQ.
 9                          CHERYL A. STEVENS, ESQ.
                        1300 Clay Street
10                      Suite 810
                        Oakland, California 94612
11                      (415) 357-4300
                        glafayette@lkclaw.com
12                      cstevens@klclaw.com

13    ALSO PRESENT:

14                      KEVEN McMAHON
                        VIDEOGRAPHER
15

16

17

18

19

20

21

22

23

24

25
```



| | | |
|---|---|---|
| 1 | BY MR. ARANEDA: | 09:41:43 |
| 2 | Q    What were those incidents that you recalled? | 09:41:43 |
| 3 | A    The bullying that I -- I received from the | 09:41:59 |
| 4 | other Tesla employees inside of the elevator, being -- | 09:42:04 |
| 5 | (Mr. Horton rejoins the proceedings.) | 09:41:20 |
| 6 | THE WITNESS:  -- called boy, the N-word, | 09:42:11 |
| 7 | hurry up, just, you know, some of the places that | 09:42:15 |
| 8 | sometimes I think that I don't know what could have | 09:42:27 |
| 9 | happened in today's climate.  I'm lucky I made it out | 09:42:30 |
| 10 | with my life. | 09:42:42 |
| 11 | BY MR. ARANEDA: | 09:42:43 |
| 12 | Q    I'm sorry.  You are lucky you made it out of | 09:42:43 |
| 13 | what? | 09:42:46 |
| 14 | A    I made it out of situations with my life. | 09:42:46 |
| 15 | Q    You said bullying received inside the | 09:42:54 |
| 16 | elevator.  Is that what you said? | 09:42:58 |
| 17 | I'm sorry.  If you could just speak up a | 09:43:00 |
| 18 | little, I'm having a hard time hearing you. | 09:43:02 |
| 19 | Did you say, inside the elevator? | 09:43:05 |
| 20 | A    Yes. | 09:43:08 |
| 21 | Q    Okay, okay. | 09:43:13 |
| 22 | And you mentioned about being called boy. | 09:43:13 |
| 23 | Who called you that? | 09:43:18 |
| 24 | A    Robert. | 09:43:21 |
| 25 | Q    You previously testified that one of the | 09:43:28 |



| 1  | people that you took instruction from was Robert.       | 09:43:30 |
| 2  | Is this the same Robert you are mentioning               | 09:43:34 |
| 3  | now?                                                      | 09:43:36 |
| 4  | A    Yes, sir.                                            | 09:43:38 |
| 5  | Q    Okay.  Last time your deposition was taken,          | 09:43:39 |
| 6  | you couldn't recall Robert's last name.                   | 09:43:41 |
| 7  | Do you know it now?                                        | 09:43:43 |
| 8  | A    No, sir.                                             | 09:43:46 |
| 9  | Q    Do you know who employed Robert?                     | 09:43:50 |
| 10 | A    Tesla.                                               | 09:43:55 |
| 11 | Q    Do you know what Robert's position was?              | 09:43:57 |
| 12 | A    I believe it was a lead.                             | 09:44:02 |
| 13 | Q    And what department did he work?                     | 09:44:06 |
| 14 | A    Conveyance.                                          | 09:44:12 |
| 15 | Q    And you testified previously that Robert, I          | 09:44:20 |
| 16 | believe, also called you the N-word.                      | 09:44:25 |
| 17 | Is this the same Robert?                                   | 09:44:28 |
| 18 | A    Yes, sir.                                            | 09:44:30 |
| 19 | Q    Okay.  And you understand when I'm referring         | 09:44:30 |
| 20 | to the N-word?                                            | 09:44:32 |
| 21 | A    Yes, sir.                                            | 09:44:33 |
| 22 | Q    Okay.  How did you come to the conclusion            | 09:44:39 |
| 23 | that Robert was employed by Tesla?                        | 09:44:42 |
| 24 | A    The role that he provided for the company,           | 09:44:52 |
| 25 | the fact that he mentioned it a few times and never       | 09:44:58 |



| | | |
|---|---|---|
| 1 | let me forget it. | 09:45:00 |
| 2 | Q    What did he mention to you? | 09:45:08 |
| 3 | A    Basically, like everyone else, you know, if | 09:45:26 |
| 4 | you didn't -- if you didn't want -- if you didn't like | 09:45:29 |
| 5 | your treatment your time there, your employment could | 09:45:34 |
| 6 | end. | 09:45:37 |
| 7 | Q    Well, what did he mention to you to lead you | 09:45:37 |
| 8 | to believe that he was employed by Tesla? | 09:45:39 |
| 9 | A    He said that he was employed by Tesla. | 09:45:48 |
| 10 | Q    And you say you also came to the conclusion | 09:45:53 |
| 11 | that he was employed by Tesla because he was -- the | 09:45:57 |
| 12 | role that he played. | 09:46:01 |
| 13 | What did you mean by that? | 09:46:03 |
| 14 | A    He supervised leads and employees up under | 09:46:15 |
| 15 | him. | 09:46:22 |
| 16 | Q    Do you recall the names of the leads that he | 09:46:28 |
| 17 | supervised? | 09:46:30 |
| 18 | A    No, sir. | 09:46:34 |
| 19 | Q    How many leads did he supervise? | 09:46:35 |
| 20 | A    I don't know the exact number. | 09:46:41 |
| 21 | Q    And were those -- where did those leads work? | 09:46:43 |
| 22 | A    Conveyance. | 09:46:49 |
| 23 | Q    Okay.  Anyone else besides Robert call you by | 09:46:59 |
| 24 | boy? | 09:47:03 |
| 25 | A    Not that I can recall at this particular | 09:47:11 |



```
 1   moment.                                                    09:47:13

 2        Q    You said someone also told you to hurry up.     09:47:13

 3             Who is the -- who mentioned hurry up to you?     09:47:18

 4        A    That was Robert, telling me to press the         09:47:21

 5   elevator button.                                           09:47:24

 6        Q    When he called you boy, how did -- how did he    09:47:31

 7   say it in a sentence to you?                               09:47:34

 8        A    In a vindictive and malicious way.               09:47:38

 9        Q    Do you recall exactly how he used it in a        09:47:42

10   sentence?                                                  09:47:44

11             MS. AVLONI:  Objection.  Asked and answered.     09:47:45

12   This has previously been gone over.                        09:47:46

13             MR. ARANEDA:  Not this -- not this boy issue.    09:47:49

14             MS. AVLONI:  It has, and it's on page 59 of      09:47:52

15   the first day of deposition transcript.                    09:47:56

16             MR. LAFAYETTE:  I'll just make an objection       09:48:03

17   to the objection.  He wasn't at the last deposition,       09:48:06

18   and he's entitled to ask questions even if the             09:48:09

19   questions were asked by other people, to get his           09:48:11

20   clarification.  There is no rule -- federal rule that      09:48:14

21   stops him from doing so.                                   09:48:16

22             MS. AVLONI:  Just for the record, I disagree.    09:48:20

23   We can meet and confer during the break, but I'm not       09:48:22

24   going to let a ton of similar questions to be asked        09:48:25

25   today.                                                     09:48:27
```



| | | |
|---|---|---|
| 1 | Tesla was it that Robert first told you to -- used | 09:49:41 |
| 2 | these words, "boy, hurry up"? | 09:49:49 |
| 3 |     A    I can't recall. | 09:49:53 |
| 4 |     Q    Were you still an elevator operator, or were | 09:49:57 |
| 5 | you a lead operator -- elevator operator when Robert | 09:50:01 |
| 6 | used these words towards you? | 09:50:05 |
| 7 |     A    I believe I was a lead. | 09:50:10 |
| 8 |     Q    Did Robert ever stop using those words | 09:50:19 |
| 9 | towards you during your employment -- well, during the | 09:50:23 |
| 10 | time that you worked at Tesla? | 09:50:27 |
| 11 |         MS. AVLONI:  Vague and ambiguous. | 09:50:30 |
| 12 |         THE WITNESS:  No, sir. | 09:50:34 |
| 13 | BY MR. ARANEDA: | 09:50:36 |
| 14 |     Q    Did you work with Robert throughout the time | 09:50:36 |
| 15 | that you worked at the Tesla factory? | 09:50:39 |
| 16 |         MS. AVLONI:  Vague and ambiguous. | 09:50:41 |
| 17 |         THE WITNESS:  Occasionally. | 09:50:46 |
| 18 | BY MR. ARANEDA: | 09:50:51 |
| 19 |     Q    Did you ever report Robert's use of the word | 09:50:51 |
| 20 | "boy" or "hurry up" to nextSource? | 09:50:57 |
| 21 |         MS. AVLONI:  Objection to the extent it calls | 09:51:04 |
| 22 | for speculation as to who was employed by nextSource. | 09:51:05 |
| 23 |         THE WITNESS:  I don't recall. | 09:51:12 |
| 24 | BY MR. ARANEDA: | 09:51:15 |
| 25 |     Q    Do you have an understanding of the | 09:51:15 |



| | | |
|---|---|---|
| 1 | MS. AVLONI:  Objection to the extent it calls | 09:54:08 |
| 2 | for speculation. | 09:54:10 |
| 3 | THE WITNESS:  I don't recall. | 09:54:16 |
| 4 | BY MR. ARANEDA: | 09:54:21 |
| 5 | Q    Did you ever report the use of the N-word | 09:54:21 |
| 6 | towards you by Ramon Martinez to anyone at Citistaff? | 09:54:23 |
| 7 | A    I don't recall. | 09:54:45 |
| 8 | Q    You testified earlier that you don't know how | 09:54:45 |
| 9 | you made it out alive. | 09:54:48 |
| 10 | What did you mean by that? | 09:54:50 |
| 11 | A    When a person that's been bullying you | 09:55:00 |
| 12 | corners you and accosts you inside of an elevator and | 09:55:04 |
| 13 | has a threatening demeanor, that's yelling at you, | 09:55:08 |
| 14 | threatening to do you physical harm, I believed he was | 09:55:17 |
| 15 | going to hit me, and I just know -- | 09:55:21 |
| 16 | MS. STEVENS:  Mr. Diaz, can you speak up? | 09:55:26 |
| 17 | Your voice -- | 09:55:28 |
| 18 | THE WITNESS:  Excuse me. | 09:55:30 |
| 19 | MS. STEVENS:  Is very low.  Thank you. | 09:55:32 |
| 20 | THE WITNESS:  I was saying, when being | 09:55:33 |
| 21 | confronted by a person that's been bullying you for a | 09:55:35 |
| 22 | while, being accosted in an elevator, not knowing what | 09:55:37 |
| 23 | his intentions were. | 09:55:46 |
| 24 | (Mr. Lafayette exits the proceedings.) | 09:55:49 |
| 25 | \\\ | 09:55:53 |



| | | |
|---|---|---|
| 1 | N-word or threatening you. | 12:46:50 |
| 2 | Is there any reason why you didn't tell | 12:46:52 |
| 3 | Citistaff about Ramon calling you the N-word? | 12:46:54 |
| 4 | MS. AVLONI:  The same objection to the extent | 12:46:58 |
| 5 | calls for speculation as to who was employed by | 12:47:00 |
| 6 | Citistaff. | 12:47:02 |
| 7 | THE WITNESS:  I didn't want to pull the race | 12:47:09 |
| 8 | card by saying something.  A lot of times, especially | 12:47:12 |
| 9 | me being African-American, I have to have proof | 12:47:16 |
| 10 | instead of just saying something. | 12:47:20 |
| 11 | BY MS. STEVENS: | 12:47:23 |
| 12 | Q    So, Mr. Diaz, did you have an understanding | 12:47:25 |
| 13 | that you were employed by Citistaff? | 12:47:27 |
| 14 | MS. AVLONI:  Calls for a legal conclusion. | 12:47:30 |
| 15 | You can respond. | 12:47:31 |
| 16 | THE WITNESS:  I had an understanding that | 12:47:35 |
| 17 | Citistaff placed me at Tesla to work.  I believe I was | 12:47:37 |
| 18 | an employee for Tesla. | 12:47:43 |
| 19 | BY MS. STEVENS: | 12:47:45 |
| 20 | Q    You believe you were an employee for Tesla? | 12:47:45 |
| 21 | MS. AVLONI:  Objection.  Calls for a legal | 12:47:48 |
| 22 | conclusion. | 12:47:50 |
| 23 | You can respond. | 12:47:50 |
| 24 | THE WITNESS:  Yeah.  That's what it seemed | 12:47:52 |
| 25 | like.  I got all of my direction from them. | 12:47:56 |



1   STATE OF CALIFORNIA              )
                                     )  SS:
2   CITY AND COUNTY OF SAN FRANCISCO )

3

4                     I, Michael Cundy, CSR NO. 12271, a

5   Certified Shorthand Reporter of the State of

6   California, do hereby certify:

7                         That the foregoing proceedings were

8   taken before me at the time and place herein set

9   forth; that any witnesses in the foregoing

10  proceedings, prior to testifying, were placed under

11  oath; that a verbatim record of the proceedings was

12  made by me using machine shorthand which was

13  thereafter transcribed under my direction; further,

14  that the foregoing is an accurate transcription

15  thereof.

16                    I further certify that I am neither

17  financially interested in the action nor a relative or

18  employee of any attorney or any of the parties.

19                    IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  July 3, 2019

23                         _____

24                         Michael Cundy, CSR NO. 12271

25



# Exhibit

# C

**From**: Uhlenbrock, Nancy [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=NUHLENBROCK@NEXTSOURCE3E2]
**Sent**: 6/24/2015 5:16:57 AM
**To**: Wayne Jackson [wajackson@teslamotors.com]
**Subject**: Resume/Owen Diaz
**Attachments**: Owen's Resume.docx

Wayne -

Owen is currently an Elevator Operator - he has not been with us very long.

Every time I speak with him, I am more and more impressed.  I think he would be a great candidate for the
Floor Supervisor position.

Nancy

Nancy Uhlenbrock
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (510) 283-3776
nuhlenbrock@nextsource.com
www.nextsource.com

CONFIDENTIAL

# Owen O Diaz

1043 Tuolumne Street Vallejo, Ca

(415) 272-2648

ODiazjr68@Gmail.Com

**Objective:** To secure a position in the organization that offers challenge and opportunity for my career development and at the same time serve the organization to the best of my capabilities. I would like to gain new skills while utilizing my current area of expertise of procurement and employee satisfaction services with in a positive team environment.

---

**Education:** Dewey High School, Oakland, Ca                                    June 15th 1986

---

## Acquired Professional Skills

- Ability to work with individuals that represent diverse backgrounds and communities.
- Team Leader.
- Takes Pride in
- Quality of Work, ensure Professionalism is maintained at all times.
- Respond to accidents and provide basic first aid and/or CPR
- Cook.
- Desk Clerk.
- HVAC.
- Pluming.
- Carpentry.
- Automotive Mechanic
- Landscaping.
- Janitorial.
- Residential Maintenance
- 10 to 40k Hydro-blast.
- 5+ years safety management experience
- Has been trained in and follows all OSHA, company and Facilities department safety guidelines on a daily basis.
- Ability to train and educate others
- Ensure project specific safety training is provided and all employees, including subcontractors, are aware of site specific safety requirements, Contractor's site specific plans, and required Federal, State, and local laws, rules and regulations.

---------------------------------------------------------------------------------------------------------------------------

**Work Experience:**

**Hamilton Family Center**          **Residential Counselors**          **1/2013-2/2014**

- Conducts a daily safety walk-through of the Facility to identify and address any immediate safety concerns. Meets with the District Facilities Technician Manager on a regular basis.
- Model and facilitate appropriate behavior for clients in terms of daily living skills, self-care, personal interaction, social relationships, and constructive time management.
- Member of the safety committee

CONFIDENTIAL                                                                                    NS000176

- Ensure the safety of clients and staff by limiting facility access to clients, staff, and authorized visitors and service providers.
- Respond appropriately to emergencies, including contacting appropriate staff and interacting with police, fire, and medical personnel as needed.
- Effectively communicate necessary information to all supervisors, staff, and shifts as appropriate.
- Provide front desk and other reception duties in a professional and courteous manner; relay timely and accurate messages to clients and staff. Provide information upon request about available services.
- Conduct regular rounds of the interior and exterior of the facility and help ensure that health and safety standards are maintained throughout. • Interact with clients to share information, provide supplies, and facilitate interventions as necessary; maintain appropriate professional boundaries with clients and staff; respond to client requests in a professional and courteous manner; and maintain client confidentiality.
- Bilingual positions require providing verbal and written program and other information as needed to clients who are predominantly monolingual in the language for which a bilingual premium applies.
- Complete and maintain required handwritten and computer-based records, files, correspondence, and statistics in a timely, clear and thorough, accurate, and legible manner. Required documentation may include but is not limited to conducting or assisting with intakes, reviewing program agreements and rules, shift log notes, bed rosters, maintenance requests, incident reports, late arrivals, sign-in sheets, shower and/or laundry schedules, and other documentation as directed by supervisors.
- Perform daily cleaning and kitchen duties as needed, including but not limited to assisting in preparing units for incoming families;, cleaning and maintaining kitchen, dining, and community areas as needed; routine upkeep and cleaning of the facility; and assisting in preparing and/or serving client meals as needed.
- Provide varying shift coverage as needed and available.
- Administer and enhance the safety incentive program with HR.
- Maintain shift coverage and primary supervision and support of clients.
- Set and contribute to a safe, dignified, orderly atmosphere by enforcing program rules, policies, and procedures in accordance with San Francisco's Shelter Grievance Policy.

**Contemporary Services Corporation**          **Event Staff**          **5/2013-1/2014**

- Monitor alarm systems, Took part in creating a detail staffing plan that designates a location for each worker.
- Being alert and attentive; not appearing distracted or disinterested
- Ensure building and premises security.
- Conducts a safety walk-through of the arena to identify and address any immediate safety concerns.
- Respond to alarms ( fire alarm, panic alarms)
- Entrance and Exit Security.
- Crowd Control.
- Monitor alarm systems, Initiated a sincere, friendly, and greeting guests at the venue entrance, aisle, concourse area or other location.
- Provided guests with helpful directions and/or suggestions, which enhanced their entertainment experience.
- Used a natural speaking voice, with natural inflections and friendly tone.
- Being friendly with guests when they were departing and upon their arrival  smiling and providing an appropriate phrase, such as "Good night, have a safe drive home", or "Good night, thank you for coming".

**Cover-All Cleaning Concepts       Franchise Owner       03/1999-08-2004**

- Set in place and ensured all safety manuals, policies and practices were current and meet the needs of the workers and operating polices.
- Enforced safety regulations; identifies and reported or corrects safety hazards.
- Prepared apartments for move in by cleaning, painting, repairing, replacing, and/or refinishing surfaces, windows, appliances, carpets, drapes.
- Perform accident investigations and complete reports.
- Direct oversight of all building construction turnover functions.
- Administers annual performance reviews for the maintenance and janitorial staff.
- Changed all air-conditioning filters at least every six months.
- Maintained and repaired electrical, plumbing, heating and cooling equipment; doors, keys, locks and hinges; windows, roof, parking areas, fences, lighting, grounds
- Oversee the care and maintenance of turf/grass, bunkers, landscaping, and the entire property.
- Planted and maintained ornamental trees, shrubs, flowers, and lawns, and applying fertilizers, pesticides, and other chemicals, according to contract specifications.
- Foreclosure Clean Up.

# Exhibit

# D



# Tesla Motors, Inc.
# Master Services Agreement

This Services Agreement ("*Agreement*") is entered into by and between Tesla Motors Inc., a Delaware corporation with offices at 3500 Deer Creek Road, Palo Alto, California, 94304 ("*Tesla*") and the service provider identified below ("*Supplier*") effective as of October 20, 2014 ("*Effective Date*") and govern Supplier's performance, and Tesla's purchase, of services.

**1.      THE SERVICES**

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

**1.2**      Scope of the Services.  The "*Services*" are the following, as they may be supplemented, modified or replaced during the Term: (a) the functions described in this Agreement or in an Approved Work Order as functions for which Supplier is responsible, including the functions to be performed by Supplier pursuant to Schedule A (Approved Work Order for Services); (b) such additional service, functions and responsibilities as the Parties may agree from time to time through the execution of Approved Work Orders; and (c) any functions related to the foregoing that are not specifically described in this Agreement or in an Approved Work Order but are required for the provision of the Services in accordance with this Agreement.

**1.3**      Authorization of Services through Approved Work Orders.  Schedule A sets forth the Services that Supplier has been engaged to perform as of the Effective Date.  Supplier shall provide, and Tesla may purchase, additional Services pursuant to an Approved Work Order.  Each Approved Work Order issued to and accepted by Supplier becomes a part of this Agreement as if fully set forth in the body of this Agreement.  If there is a conflict between this Agreement and an Approved Work Order, the terms of this Agreement will prevail; except that an Approved Work Order may amend or override the terms of this Agreement if and to the extent that the Approved Work Order identifies the provision(s) of the Agreement the Approved Work Order is intended to amend or override and the executed version of the Approved Work Order has been approved by legal counsel for both Parties, as evidenced in writing on the executed version of the Approved Work Order.

**1.4**      Services Not Exclusive.  Supplier is a non-exclusive provider of Services.  Tesla and its Affiliates have no obligation to order or purchase any Services.  The extent and quantity of Services purchased shall be determined by Tesla.  Tesla may purchase from any third party services that are identical or similar to the Services described in this Agreement.  Supplier will cooperate and coordinate with Tesla or any other service providers selected by Tesla as reasonably required for Tesla or the service provider to perform services for which it is responsible.

**1.5**      Relationship of the Parties.  Supplier is an independent contractor and is not an agent, servant, employee, legal representative, partner or joint venturer of Tesla or any Affiliate of Tesla.  Nothing in this Agreement shall be deemed to create a joint venture or partnership between Supplier and Tesla or any of Tesla's Affiliates.  Supplier has the sole right and obligation to supervise, manage, and direct all work to be performed by Supplier Personnel under this Agreement.  Supplier has no authority to represent or bind Tesla.

**2.      PERFORMANCE**

**2.1**      Time of Performance.  Supplier will provide the resources necessary to, and will, complete all Services diligently, in a timely manner, and in accordance with the time schedules set forth in this Agreement (or applicable Approved Work Order).  Time is of the essence with respect to the provision of Services under this Agreement. Supplier will promptly notify Tesla in writing upon becoming aware of any circumstances that may reasonably be expected to jeopardize the timely completion of any Services.  Supplier will use Commercially Reasonable Efforts to avoid or minimize any delays in performance and will inform Tesla of (a) the steps Supplier is taking or will take to do so and (b) the projected completion time.

**2.2**      Manner of Performance.  Supplier will perform the Services at the Tesla Facilities listed or described in Schedule A or the applicable Approved Work Order.  Supplier will manage and successfully perform, complete and deliver the Services in accordance with applicable Approved Work Orders.  In cases where this Agreement or an

CONFIDENTIAL                                                                    TESLA-0001014

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

Approved Work Order does not prescribe or otherwise regulate the manner of Supplier's performance of the Services, Supplier will render the Services in accordance with Supplier's prevailing practices, which will not be less favorable to Tesla than the established best practices followed by the leading providers of similar services.

**2.5**   Reporting.  If required by Tesla, on or before the fifteenth (15th) day of each month during the Term, Supplier shall provide those reports requested by Tesla relative to the Supplier Personnel furnished under this Agreement and any Work Order. Real-time, online reporting will be available to Tesla in the event that Tesla agrees to deploy Supplier's Talent Acquisition Management Solution (TAMS) to support the Services.  At Tesla's request, on or before the fifteenth (15th) day of each month during the Term, Supplier shall also provide a written progress report detailing (a) Supplier's activities and performance against any Service Levels in the preceding month, (b) progress towards milestones, and (c) any actual or anticipated delays that might affect completion of Services in accordance with the project plan or timeline set forth in an Approved Work Order.

**2.6**   Compliance with Laws and Tesla Policies.

(a)      Supplier will, at its cost and expense, obtain all necessary regulatory approvals, licenses, and permits (collectively, "***Permits***") applicable to its business and comply with all Laws applicable to its business or the performance of its obligations under this Agreement, as such Laws may be revised from time to time.  Supplier shall provide copies of any such Permits at Tesla's request.

(b)      Supplier will comply with, and perform the Services in compliance with, all Laws pertaining to: (i) occupational safety and health; (ii) protection of persons and property from death, injury or damage; (iii) the environment and the use, handling, storage, labeling and disposal of toxic or hazardous materials; (iv) labor and employment conditions; (v) wages and hours; (vi) workmen's compensation and unemployment insurance; (vii) affirmative action and equal employment opportunity; and (viii) to the extent relevant to Supplier's performance of Services, Laws with respect to data privacy, data protection, and consumer privacy.

(c)      To the extent not prohibited by Law, Supplier will promptly notify Tesla in writing of any investigation or inquiry into whether Supplier (or any of its subcontractors) is charged with failing to comply with any Laws that may or will impact, or are otherwise applicable to, Supplier's performance under this Agreement.

(d)      Supplier will comply with any Tesla policies, standards, rules, and procedures (collectively, "***Tesla Policies***") applicable to performance of the Services or the Tesla Facility that are disclosed to Supplier in writing, as such Tesla Policies may be revised from time to time.  The Tesla Policies as of the Effective Date are attached hereto as Schedule B.

CONFIDENTIAL                    TESLA-0001015

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



**3.**     **SUPPLIER PERSONNEL AND SUBCONTRACTING**

**3.1**     General Requirements for Supplier Personnel.

(a)     "*Supplier Personnel*" means any personnel furnished by Supplier to perform any part of the Services, including employees and independent contractors of Supplier, its Affiliates and subcontractors.

(b)     Supplier will assign an adequate number of Supplier Personnel to perform the Services specified by Tesla who are properly educated, trained, familiar with and fully qualified for the Services they are assigned to perform (including, without limitation, licensed in the relevant regions to provide work that requires a license). Supplier will assign sufficient program management personnel to provide adequate liaison with Tesla. Supplier will, to the extent applicable, manage, supervise, and provide direction to Supplier Personnel and cause Supplier Personnel to comply with the obligations and restrictions applicable to Supplier Personnel under this Agreement. Supplier is responsible for the negligent acts and omissions of Supplier Personnel under or relating to this Agreement. Supplier is responsible for validating the identity of and ensuring that Supplier Personnel assigned to perform Services (i) have the legal right to work in the country(ies) in which they are assigned to work, and (ii) conform to all applicable Tesla Policies (furnished to Supplier consistent with Schedule B)with respect to personal and professional conduct (including the wearing of an identification badge and adhering to general safety, dress, behavior, and security practices).

CONFIDENTIAL

TESLA-0001016


DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

## 4.   CHARGES

**4.1**   <u>Charges, Generally</u>.  Each Approved Work Order sets forth (or will set forth) the unit rates and charges payable to Supplier for performing the Services and the associated invoicing and payment procedures and terms under that Work Order (collectively, the "***Charges***").  Tesla will not be required to pay Supplier any amounts under this Agreement other than the Charges payable to Supplier under, and calculated in accordance with, Approved Work Orders.

**4.2**   <u>Invoicing</u>.

(a)      Supplier shall submit invoices to Tesla on a bi-weekly basis in accordance with the method of electronic communication specified by Tesla.  All invoices must reference Tesla's Approved Work Order/release number (where applicable), contain an itemization of amounts for Services rendered during the applicable invoice period (including, if applicable and requested by Tesla, a separate break-down of charges for goods and services used by Supplier in performance of the Services, and detailed time card entries with respect to Services that are charged on a time & materials basis), and must comply with the provisions of this Agreement and such other reasonable requirements as may be prescribed by Tesla from time to time. All invoices and payments will be in United States dollars regardless of the country in which the Services are performed.  All invoices will be sent directly to Tesla's accounts payable department as follows: Tesla Motors, Inc., 45500 Fremont Blvd, Fremont, CA 94538, <u>Attn</u>: Accounts Payable.



CONFIDENTIAL

TESLA-0001017

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



## 5.    TESLA RESPONSIBILITIES

**5.1**    <u>Tesla Responsibilities, Generally</u>.  In order to facilitate Supplier's performance of the Services, Tesla will, at its own cost and expense, perform those tasks and fulfill those responsibilities of Tesla as set forth in this Agreement ("***Tesla Responsibilities***").  Supplier's performance of the Services may be dependent in some circumstances on Tesla's timely and effective performance of the Tesla Responsibilities and timely decisions and approvals by Tesla.



CONFIDENTIAL                                                                TESLA-0001018

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



**6.   CONFIDENTIALITY**

**6.1**   <u>Confidentiality</u>.  Tesla's mutual non-disclosure agreement as of the Effective Date or, if applicable, the signed non-disclosure agreement then in effect between the Parties ("***NDA***") sets forth the Parties' respective confidentiality obligations hereunder.  The NDA is hereby incorporated by reference in this Agreement, and the terms and conditions of the NDA will continue in force throughout the Term.  Tesla's Confidential Information shall be deemed, for purposes of this Agreement, to include all Intellectual Property Rights owned or separately licensed by Tesla.



**7.   INTELLECTUAL PROPERTY RIGHTS**



CONFIDENTIAL                                                      TESLA-0001019



**7.5**    Open Source Code.  Supplier represents and warrants that it will not incorporate any Open Source Code into a Deliverable or other work product to be delivered to Tesla without Tesla's express, prior written consent.

**7.6**    Intellectual Property Rights Agreements with Supplier Personnel.  Supplier is responsible for having in place with all Supplier Personnel (either directly or indirectly through their respective employers) such agreements respecting Intellectual Property Rights as are necessary to comply with this Section 7 (Intellectual Property Rights).

**7.7**    Licenses and Rights Survive Bankruptcy.  All licenses and rights of Use granted under or pursuant to this Agreement shall be deemed to be licenses to rights in "intellectual property" for the purposes of Section 365(n) of the United States Bankruptcy Code.

**7.8**    No Interference.  Nothing in this Agreement will be deemed to prevent Supplier from carrying on its business or developing for itself or others materials that are similar to or competitive with those produced as a result of the Services provided they do not contain or disclose any Confidential Information or proprietary information of Tesla or otherwise infringe or constitute a misappropriation of Tesla's Intellectual Property Rights.

## 8.    TERM AND TERMINATION

**8.1**    Initial Term.  Unless terminated earlier as provided below, the term of the Agreement will be from the Effective Date until Supplier has completed performance of all of the Services and has received all payments due to Supplier under the Agreement (the "*Term*").

CONFIDENTIAL

TESLA-0001020

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

**9.       REPRESENTATIONS AND WARRANTIES OF SUPPLIER AND TESLA**

**9.1**     Performance of Services.  Supplier represents and warrants that it will perform all Services (i) in accordance with this Agreement and the Approved Work Orders; (ii) in a good, professional and workmanlike manner, free from defects in material and workmanship and in accordance with applicable industry standards; (iii) in strict accordance with Supplier's specifications, samples or other descriptions provided to Tesla or approved or adopted by Tesla; (iv) in compliance with all applicable Laws; (v) efficiently and in a cost-effective manner subject to the requirements of this Agreement; and (vi) using qualified personnel with suitable training, education, experience and skill to perform the Services in accordance with timing and other requirements of the Agreement.

**9.2**     Non-Infringement.   Supplier represents and warrants that: (a) the Services will not infringe or misappropriate any Intellectual Property Rights of any third party; (b) Supplier has all rights and licenses necessary to convey to Tesla the ownership of (or license rights to Use) as required under this Agreement or the Approved Work Order, all Intellectual Property Rights in Deliverables, Developed Materials and other materials provided to Tesla; and (c) no Deliverables or other materials provided to Tesla, nor their use by Tesla will infringe or constitute an infringement or misappropriation of any Intellectual Property Rights of any third party.

**9.3**     Malware.  Supplier represents and warrants that it will not introduce Malware into Tesla's or any of its Affiliates' systems and that Supplier will exercise Commercially Reasonable Efforts to prevent Malware from being so introduced.  If Malware is found to have been introduced into Tesla's or any of its Affiliates' systems as a result of a breach of the foregoing warranty, Supplier will, at no additional charge, assist Tesla in eradicating the Malware and reversing its effects and, if the Malware causes a loss of data or operational efficiency, to assist Tesla in mitigating and reversing such losses.

**9.4**     Debarment.  For the full term of the Contract, Supplier represents and warrants that it shall not be: (i) debarred, suspended, excluded or disqualified from doing business with the United States Government; or (ii) listed on the Excluded Parties List System maintained by the General Services Administration of the United States Government (found at www.epls.gov).  Supplier agrees to immediately notify Tesla in writing in the event Supplier breaches any of its representations and warranties or has reason to believe that it will become in breach of any of such representations and warranties.

**10.     INSURANCE**

**10.1**   Types of Insurance.  During the Term of this Agreement, Supplier shall obtain and maintain at its own cost and expense (and shall cause each subcontractor to maintain) policies for the following insurance coverages:

(a)       Commercial general liability insurance with minimum coverage of at least One Million Dollars ($1,000,000) combined single limit per occurrence and Two Million Dollars ($2,000,000) general aggregate, naming Tesla as an additional insured.  This will include coverage for: bodily injury; property damage; premises and operations; products and completed operations; broad form property damage including completed operations; explosion, collapse, underground hazards; contractual liability; contractors' protective liability; and personal injury liability.

(b)       Employer's liability insurance with minimum coverage of at least One Million Dollars ($1,000,000). Supplier shall also comply with all applicable workers' compensation and/or other laws that may accrue in favor of any Supplier Personnel in all locales where Supplier Personnel perform(s) hereunder.

(c)       Automobile liability insurance on all  non-owned and/or hired vehicles with minimum coverage of at least One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage, and physical damage insurance for the actual cash value of each such vehicle.

(d)       All risk property perils insurance covering the full replacement value of Tesla property while in Supplier's care, custody, or control and naming Tesla as loss payee.

(e)       Errors and Omissions Liability Insurance covering liability for loss or damage due to an act, error, omission or negligence, with a minimum limit per event of One Million Dollars ($1,000,000).

CONFIDENTIAL                                                                                                                                         TESLA-0001021

**10.2**   <u>Insurance, Generally</u>.  Supplier will be responsible for all deductibles and retentions with regard to its insurance.  In the case of loss or damage or other event that requires notice or other action under the terms of any insurance coverage described above, Supplier will be solely responsible for taking such action.  Supplier will provide Tesla with contemporaneous notice and such other reasonable and relevant information as Tesla may request regarding the event.  The policies shall: (a) be primary and not contributory with any liability coverage carried by Tesla or any Affiliate of Tesla; (b) name Tesla and any other entity reasonably requested by Tesla as additional insureds; (c) provide for severability of interests; (d) provide for waiver of subrogation; (e) be with one or more insurance companies rated A minus or better (as determined by A.M. Best & Company), and licensed to do business in the locations where Services are to be performed; and (f) require the insurer to give Tesla at least 30 days' prior written notice of any restrictive change, non-renewal or cancellation that may affect Tesla's rights thereunder.  Supplier will furnish to Tesla a certificate evidencing such coverage, upon request.

**11.**     **INDEMNIFICATION**



CONFIDENTIAL

TESLA-0001022

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



**12.    LIABILITY**



CONFIDENTIAL

TESLA-0001023

DocuSign Envelope ID: 9CF4A603-D71C-4TE5-B825-00A3C7063213

## 13.    DISPUTE RESOLUTION

**13.1**    Informal Dispute Resolution.  In the event any disputes, differences or controversies arise between the Parties, out of or in relation to or in connection with the provisions of this Agreement, the Parties shall thoroughly explore all possibilities for an amicable settlement.

**13.2**    Jurisdiction and Venue.

(a)      Any dispute arising out of or relating to the Agreement that is not resolved through negotiation will be settled exclusively by final and binding arbitration conducted in accordance with the then-current Commercial Arbitration Rules of the Judicial Arbitration and Mediation Services/Endispute ("*JAMS*").  The existence, content and result of the arbitration shall be held in confidence by the Parties, their representatives, any other participants, and the arbitrator.  The arbitration will be conducted by a single arbitrator selected by agreement of the Parties or, failing such agreement, appointed in accordance with the JAMS rules.  The arbitrator shall be experienced in agreements for services similar to the Services.  Any demand for arbitration and any counterclaim will specify in reasonable detail the facts and legal grounds forming the basis for the claimant's request for relief and will include a statement of the total amount of damages claimed, if any, and any other remedy sought by the claimant.  The arbitration will be conducted in the English language in Palo Alto, California.  Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in their discretion, award reasonable costs and fees to the prevailing Party.  The arbitrator will have full power and authority to determine issues of arbitrability and to interpret or construe the applicable provisions of this Agreement and to fashion appropriate remedies for breaches of this Agreement (including interim or permanent injunctive relief); provided that the arbitrator will not have any right or authority: (i) in excess of the authority of a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement; (ii) to award damages in excess of the types and limitation of damages found in this Agreement; or (iii) to modify the terms of this Agreement.  The award of the arbitrator will be issued within thirty (30) days of the completion of the hearing, shall be in writing, and shall state the reasoning on which the award is based.  Judgment upon the award rendered in the arbitration may be entered in any court of competent jurisdiction.  Each Party will have the right to apply at any time to a judicial authority for appropriate injunctive relief (or other interim or conservatory measures), and by doing so will not be deemed to have breached its agreement to arbitrate or to have impaired the powers reserved to the arbitrator.

(b)      Subject to Section 13.2(a), for any litigation arising out of or relating to the Agreement, regardless of the form of action or the Party that initiates it, the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of and venue in the United States District Court for the Northern District of California or, if that court does not have jurisdiction, in the Superior Court of the State of California, County of Santa Clara.  The Parties irrevocably and unconditionally waive any objection to the laying of venue of any proceeding arising out of or relating to the Agreement in such courts.  The Parties further consent to the jurisdiction of any state or federal court with subject matter jurisdiction located within a district that encompasses assets of a Party against whom a judgment (or award) has been rendered for the enforcement of the judgment (or award) against the assets of such Party.

## 14.    MISCELLANEOUS

**14.1**    Waiver.  No failure or delay by a Party in exercising any right, power or remedy will operate as a waiver of that right, power or remedy, and no waiver will be effective unless it is in writing and signed by an authorized representative of the waiving Party.  If a Party waives any right, power or remedy, the waiver will not waive any successive or other right, power or remedy that Party may have.

**14.2**    Remedies Cumulative.  All remedies provided in this Agreement are cumulative and in addition to and not in lieu of any other remedies available to a Party under this Agreement, at law, or in equity.

**14.3**    Assignment.  Supplier may not assign, transfer or otherwise convey or delegate any of its rights or duties under this Agreement to any other Party (except to the successor in a merger or acquisition of Supplier) without the prior written consent of Tesla, and any attempt to do so will be void.  This Agreement shall be binding upon the respective successors and permitted assigns of the Parties.

**14.4**    Governing Law.  This Agreement will be interpreted and construed in accordance with the substantive laws of California and the United States generally applicable therein, without regard to any provisions of its choice of law rules that would result in a different outcome.

CONFIDENTIAL

TESLA-0001024

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

**14.5**   Audits and Records.   During business hours and upon reasonable advance notice, Tesla and its agents may inspect, examine and audit the records and data of Supplier (and its subcontractors) that pertain to the Services to verify (a) the accuracy of Supplier's invoices, and (b) Supplier's compliance with this Agreement.  In support of the foregoing right, Supplier will keep and maintain (i) financial records relating to this Agreement in accordance with generally accepted accounting principles, (ii) records substantiating Supplier's invoices, (iii) records pertaining to Supplier's compliance with this Agreement and the Approved Work Orders, and (iv) such other operational records pertaining to performance of the Services as Supplier keeps in the ordinary course of its business.  Supplier will retain such records for the longer of three (3) years after the Term ends or as required by applicable Laws.  Supplier will make such records available to Tesla and its auditors for examination and copying upon request.

**14.6**   Notices.   All formal notices, requests, demands, approvals and communications under this Agreement (other than routine operational communications) (collectively, "**Notices**") will be in writing and may be served either (i) in person or (ii) by registered or certified mail with proof of delivery, addressed to the Party at the addresses set forth below.  Notices given as described in the preceding sentence will be considered received on the day of actual delivery.  A Party may change its address or designee for notification purposes by giving the other Party prior written notice of the new address or designee in the manner provided above.  The Parties may mutually agree that certain types of routine approvals and notices of a non-legal nature may be given by electronic mail.

| In the case of Tesla: | With a copy to: |
|---|---|
| Tesla Motors, Inc.<br>45500 Fremont Blvd, Fremont, CA 94538<br>Attn: Sr. Mgr. Indirect Purchasing  & Global Capital | Tesla Motors, Inc.<br>3500 Deer Creek Road, Palo Alto, CA 94304<br>Attn: Legal Department |
| In the case of Supplier:<br><br>nextSource Inc.<br>1040 Avenue of the Americas -- 24th Floor<br><br>New York, NY    10018<br><br>Attn: Procurement **Department**_____ | |

**14.7**   Interpretation.   Section references are to sections of the document in which the reference is contained and will be deemed to refer to and include all subsections of the referenced section.  The section headings in this Agreement are for reference purposes only and may not be construed to modify or restrict any of the terms of this Agreement.  This Agreement will be deemed to have been written by both Parties.  Unless the context requires otherwise, (i) "including" (and any of its derivative forms) means including but not limited to, (ii) "may" means has the right, but not the obligation to do something and "may not" means does not have the right to do something, and (iii) "will" and "shall" are expressions of command, not merely expressions of future intent or expectation.

**14.8**   Order of Precedence.   In the event of a conflict between or among the documents comprising the Agreement, the following order of precedence will apply (documents listed in descending order of priority): General Terms; NDA; Schedule A and other Approved Work Orders; and other schedules.  In the event of a conflict between the documents comprising this Agreement as of the Effective Date and the documents comprising an Approved Work Order executed subsequent to the Effective Date, the terms of the Approved Work Order will prevail; provided, however, that an Approved Work Order may amend or override the terms and conditions set forth in these General Terms only if (and to the extent that) the Approved Work Order specifically identifies the provision(s) of the Agreement the Approved Work Order is intended to amend or override.

**14.9**   Severability.   If any provision of this Agreement or an Approved Work Order is held invalid by a court with jurisdiction over the Parties to this Agreement, such provision will be severed from the Agreement, and the remainder of this Agreement will remain in full force and effect.

**14.10**   Third Party Beneficiaries.   This Agreement is entered into solely between Tesla and Supplier and, except for the Parties' indemnification obligations under Section 11 (Indemnification) and the Service Recipients, will not be deemed to create any rights in any third parties or to create any obligations of either Tesla or Supplier to any third parties.

**14.11**   Survival.   Any provision of this Agreement that contemplates or governs performance or observance subsequent to termination or expiration of this Agreement will survive the expiration or termination of this

CONFIDENTIAL                                                                      TESLA-0001025

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

Agreement for any reason, including the following Sections: 6 (Confidentiality), 7 (Intellectual Property Rights), 9 (Representations and Warranties of Supplier), 11 (Indemnification), 12 (Liability), and 14.5 (Audits and Records).

**14.12** Entire Agreement. This Agreement including all Schedules constitutes the entire agreement between the Parties with respect to its subject matter and merges, integrates and supersedes all prior and contemporaneous agreements and understandings between the Parties, whether written or oral, concerning its subject matter. Any terms and conditions on any order or written notification from either Party that purport to vary or supplement this Agreement shall not be effective or binding on the other Party. This Agreement may be amended or modified solely in a writing signed by a duly authorized representative of each Party.

**14.13** Defined Terms. Terms used in this Agreement with initial capitalization have the meanings specified where used or in this Section 14.13.

(a)    *"Affiliate"* means with respect to an entity, any other entity or person controlling, controlled by, or under common control with, such entity. For purposes of this Agreement, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

(b)    *"Change"* means any material change to the scope of, charges for, or other contractual commitments of a Party with respect to, the Services being provided by Supplier.

(c)    *"Change Order"* means a mutually agreed Change to the scope, timing, manner or cost of performing the Services pursuant to an Approved Work Order. A change order may not modify the terms of the body of this Agreement.

(d)    *"Claim"* means any demand, or any civil, criminal, administrative or investigative claim, action or proceeding (include arbitration) asserted, commenced or threatened against an entity or person by an unaffiliated third party. For the purposes of this definition, an employee of either Party is considered an unaffiliated third party.

(e)    *"Commercially Reasonable Efforts"* means taking all such steps and performing in such a manner as a well-managed company would undertake where it was acting in a determined, prudent and reasonable manner to achieve a particular desired result for its own benefit.

(f)    *"Deliverable"* means any work product identified as a 'Deliverable' in the Agreement or an Approved Work Order.

(g)    *"Intellectual Property Rights"* means all (i) patents, patent applications, patent disclosures and inventions (whether patentable or not), (ii) trademarks, service marks, trade dress, trade names, logos, corporate names, Internet domain names, and registrations and applications for the registration for any of them, together with all goodwill associated with any of them, (iii) copyrights and copyrightable works (including computer programs and mask works) and registrations and applications for registration, (iv) trade secrets, know-how and other confidential information, (v) waivable or assignable rights of publicity, waivable or assignable moral rights, (vi) unregistered and registered design rights and any applications for registration, and (vii) database rights and all other forms of intellectual property, such as data.

(h)    *"Law(s)"* means any statute, regulation, ordinance, rule, order, decree or governmental requirement enacted, promulgated or imposed by any governmental authority at any level (*e.g.*, municipal, county, province, state or national).

(i)    *"Malware"* means program code or programming instruction(s) or set(s) of instructions intentionally designed to disrupt, disable, harm, interfere with or otherwise adversely affect computer programs, data files or operations, or other code typically described as a virus, Trojan horse, worm, back door or other type of harmful code.

(j)    *"Open Source Code"* means software that requires as a condition of its use, modification or distribution, that it be disclosed or distributed in source code form or made available at no charge, including, without limitation, software licensed under the GNU General Public License (GPL) or the GNU Lesser/Library GPL.

(k)    *"Party"* means either Tesla or Supplier, as required by the context.

CONFIDENTIAL

TESLA-0001026

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



(m)     "*Project*" means a group of related functions or activities that spans multiple days, weeks, or months and builds cumulatively toward the achievement of defined target outcomes or objectives.  A Project typically has multiple phases or life-cycle stages and involves written project plans with defined interim milestones and deliverables to measure progress toward the achievement of its target outcomes or objectives.  The Services provided for each Tesla Facility will be deemed a separate Project for purposes of this Agreement.

(n)     "*Service Level*" means a standard of performance with respect to the Services.

(o)     "*Service Level Credit*" means a monetary credit potentially payable to Tesla in respect of a Service Level Default.

(q)     "*Service-Related Taxes*" means, for each Project, transactional taxes in respect of the Services assessed by the tax authorities of the United States or the country in which Tesla receives the Services that Supplier is legally responsible to collect and remit to the applicable taxing authorities and for which Tesla is responsible for paying or reimbursing Supplier, and does not include any of the following:  (i) any taxes that are assessed on any goods or services used or consumed by Supplier (or its Subcontractors) in providing the Services where the tax is imposed on Supplier's (or its Subcontractor's) acquisition or use of the goods or services in its provision of the Services; or (ii) any taxes assessed by taxing authorities in countries other than the United States or the country in which Tesla receives the Services.

(r)     "*Tesla Data*" means all data and information regarding Tesla, its customers and suppliers that is either: (i) furnished, disclosed or otherwise made available to Supplier Personnel, directly or indirectly, by or on behalf of Tesla pursuant to this Agreement; or (ii) collected or created by Supplier Personnel on behalf of Tesla in the course of performing the Services.  Tesla Data will be deemed to be Confidential Information that is subject to the NDA.

(s)     "*Tesla Facility*" means, collectively, the Tesla facility or real property at which Supplier will perform Services and the reasonable office space, furniture, fixtures, equipment, hardware, software, telephones, office supplies, and other facility resources to be provided or made available by Tesla to Supplier Personnel who are assigned by Supplier to work on Tesla premises by mutual agreement of the Parties, as evidenced in the applicable Approved Work Order.

(t)     "*Use*" means the right to use, execute, display, copy, perform, distribute copies of, maintain, modify, enhance, and create derivative works of software or other copyrighted or copyrightable works.

(u)     "*Work Order*" means the form of document that will be used to authorize Supplier to perform Services by mutual agreement of the Parties.  When duly executed by the authorized representatives of both Parties, a Work Order becomes an "*Approved Work Order*."

CONFIDENTIAL

TESLA-0001027

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

Intending to be legally bound, each of the undersigned parties has caused its duly authorized representative to execute this Agreement as of the Effective Date.

**Tesla Motors, Inc.**

By: _____

Printed: PETER CARLSSON

Title: VP & GLOBAL SUPPLY CHAIN

Date: 11/3/2014

**Supplier**

By: _____
DocuSigned by:
B63FA96A9A724A0

Printed: Catherine Candland

Title: CEO

Date: Ocober 27, 2014

Company: nextSource, Inc.

Address: 1040 Avenue of Americas, Floor 24, New York, NY 10018

CONFIDENTIAL

TESLA-0001028

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

CONFIDENTIAL

TESLA-0001029

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

CONFIDENTIAL

TESLA-0001030

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

Schedule A
Page A-3

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

Schedule A
Page A-4

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

CONFIDENTIAL

TESLA-0001034

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

(c)       As a continuing condition of Supplier's use of and access to the Tesla Facility, Supplier shall ensure that no third party obtains any lien or other right in the Tesla Facility and hereby waives and relinquishes, and agrees to obtain from any third parties who might claim any such lien (including without limitation mechanic's liens) or right a written waiver and relinquishment of all rights, if any, to any lien, right, or remedy with respect to the Tesla Facility. The provisions of this Section 1.2(c) are a bargained-for consideration essential to the Contract.

**1.3** Insurance.  (Not applicable to Approved Work Order No. 1 For Services)

Supplier shall also obtain and maintain at its own cost and expense (and shall cause each subcontractor to maintain) policies for the following insurance coverages in accordance with Section 10.1 of the Master Services Agreement:

(a)       If the Services include remediation of or exposure to hazardous materials (e.g., asbestos-containing materials, contaminated soil, etc.), contractor's pollution liability with minimum coverage of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate for bodily injury, personal injury and property damage.

(b)       If the Services involve use of a helicopter or other aircraft, aviation liability insurance with minimum coverage of at least Five Million Dollars ($5,000,000) per occurrence.

CONFIDENTIAL                                                                                                                           TESLA-0001035

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

## ANNEX 3 – INFORMATION TECHNOLOGY SERVICES

This MSA Rider describes certain terms and conditions that apply to Supplier's performance of, and Tesla's purchase of, information technology-related Services.

**1.1**    **Access to Tesla Systems and Facilities**.  With reference to Section 5.3 of the General Terms, the following terms and conditions shall apply:

(a)    Tesla hereby grants Supplier a limited, non-transferable license to Use certain Systems as determined by Tesla from time to time.  Each employee, agent or Subcontractor of Supplier having access to the Systems will: (i) be assigned a separate User ID by Supplier and only use that ID when logging on to the Systems; (ii) log off the Systems immediately upon completion of each session of service; (iii) not allows unauthorized individuals to access the Systems; (iv) keep strictly confidential the User ID and password and all other information that enables such access; (v) not reuse a compromised password (e.g., a password that has become known to anyone else at any time, including in an emergency); (vi) only utilize such access to the Systems to perform his or her obligations to Tesla; (vii) comply with Tesla's encryption requirements or other service policies instituted by Tesla from time to time; (viii) not perform any unauthorized exploring or mining of the Systems; and (ix) only have access to the portion of the Systems necessary to perform Supplier's obligations.

(b)    Except as set forth in an Approved Work Order, Tesla will provide to Supplier Personnel assigned to work at Tesla premises the reasonable use of Tesla Facilities.  Supplier will use the Tesla Facilities in an efficient manner and for the sole purpose of providing the Services.  Supplier will be responsible for any damage to the Tesla Facilities caused by Supplier Personnel.  Supplier will permit Tesla and its agents and representatives to enter into those portions of Tesla premises that are occupied by Supplier Personnel at any time.  When the Tesla Facilities are no longer required for performance of the Services, Supplier will return them to Tesla in substantially the same condition as they were in when Supplier began use of them, subject to reasonable wear and tear.

**1.2**    **Supplier Audits**.  Supplier will conduct its own Audits pertaining to the Services consistent with the audit practices of well managed companies that perform services similar to the Services.  If applicable, Supplier will perform a security Audit at least annually and will cause a SSAE 16 SOC 1 Type II audit (or equivalent audit) ("*SSAE 16 Audit*") to be conducted annually for each shared services facility at or from which Services are provided.  The SSAE 16 Audit will be conducted in accordance with Tesla's control requirements as communicated by Tesla.  Supplier will permit Tesla to participate in the planning of each SSAE 16 Audit, will confer with Tesla as to the scope and timing of the Audit and will accommodate Tesla requirements and concerns to the extent practicable.  Each SSAE 16 Audit will be scheduled so as to facilitate annual compliance reporting by Tesla and the Service Recipients under the Sarbanes-Oxley Act of 2002 and any regulations promulgated under it.  Supplier will provide Tesla and its independent Auditors with a summary of the SSAE 16 Audit Findings as soon as reasonably possible, and in any event within thirty (30) days after completion of the Audit report.  To the extent the resulting Audit report reveals an actual or potential adverse effect on Tesla and/or the Service Recipients, Supplier will correct any errors or problems identified in the Audit report as soon as reasonably possible.

**1.3**    **Deliverables and Related Documentation**.  (Not applicable to Approved Work Order No. 1 For Services)

(a)    Supplier warrants that each Deliverable will not, from the time of delivery to Tesla through the period ending one year after Tesla's final acceptance of the Deliverable, deviate in any material respect from the specifications for such Deliverable set forth or referred to in the applicable Approved Work Order.  If the Deliverable is or becomes part of a System or environment for which Supplier has ongoing maintenance and support responsibility, Supplier's maintenance and support obligations for such System or environment will include providing maintenance and support for the Deliverable.  If Tesla notifies Supplier of a breach of this warranty, Supplier will promptly correct and redeliver the affected Deliverable at no additional charge to Tesla within a reasonable period of time, and in any event in accordance with any applicable time period specified in the applicable Approved Work Order.

(b)    Supplier warrants that any Software or system documentation developed for Tesla by or on behalf of Supplier will (i) accurately and with reasonable comprehensiveness describe the operation, functionality and use of the Software or system, and (ii) accurately describe in terms understandable to a typical system user the functions and features of the Software or system and the procedures for exercising such functions and features.  If Tesla notifies Supplier of a breach of this warranty within the applicable warranty period, Supplier will correct and redeliver the affected documentation at no additional charge to Tesla within a reasonable period of time, and in any event within thirty (30) days after receiving Tesla's notice.

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

(c)     Supplier warrants that any Deliverables and other components of the Services that are intended to interact or otherwise work together as part of a functioning system as indicated in their specifications or the applicable Approved Work Order under which they are to be produced, will be compatible and will properly inter-operate and work together as components of an integrated system.

Master Services Agreement

CONFIDENTIAL

TESLA-0001037

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

**SCHEDULE B**

**TESLA POLICIES**

Tesla has separately provided or made available to Supplier the Tesla Policies as of the Effective Date.

CONFIDENTIAL

TESLA-0001039



## Amendment No. 1 to Master Services Agreement

This Amendment No. 1 ("Amendment") to Master Services Agreement between Tesla Motors Inc. ("Tesla") and nextSource Inc. ("Supplier") is entered as of March 19, 2015 (the "Amendment Effective Date"). This Amendment shall be governed and construed in accordance with the terms and conditions of the Master Services Agreement. To the extent that there is any conflict or inconsistency between the terms and conditions of this Amendment and the terms and conditions of the Master Services Agreement, the terms and conditions of this Amendment shall govern with respect to the subject matter hereunder.

WHEREAS, Tesla and Supplier are parties to the Master Services Agreement dated October 20, 2014 ("Agreement") and now wish to amend the Agreement pursuant to the terms and conditions of this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, Tesla and Supplier agree as follows:

[REDACTED]

2.  Subparagraph 3.1(c) of the Agreement is deleted and replaced with the following:

    "3.1(c)  Prior to assigning any Supplier Personnel to perform any Services, Supplier shall perform background checks of the personnel. Such background checks may have been performed as part of Supplier's standard pre-employment screening process and will include the following, at a minimum: (i) felony and misdemeanor criminal checks (7 years prior to coming onto Tesla's site for federal and county) and (ii) social security verification. In addition, Supplier will use best efforts to perform the following additional checks: (x) education verification (highest degree obtained); and (y) prior employment verification for all employees for 7 years prior to coming on Tesla's site. In each case of (i), (ii), (x) and (y), Tesla may require Supplier to provide written evidence of successful background checks on Supplier Personnel at any time. Unless prohibited by law, Supplier may not assign any person to perform Services for Tesla who was convicted of a crime without Tesla's prior written consent."

3.  Paragraph 3.4 of the Agreement is modified to add a new Subparagraph (c) as follows:

    "(c)     With regard to the approval requirements of Section 3.4 (a) above, Supplier will request approval in writing from any of the following Tesla contacts, as may be amended in writing, from time to time, by Tesla:

    IndirectPurchasing@teslamotors.com, jalee@teslamotors.com, or treth@teslamotors.com"

4.  The table included in Subparagraph 3 of Schedule A - Approved Work Order No. 1 for Services is deleted in its entirety and replaced with the table set forth below:

CONFIDENTIAL                                                      TESLA-0001040

| California Hourly Markup Rate | Nevada Hourly Markup Rate |
|---|---|
| 25% | 21% |
| 22% | 20% |
| 33% | 31% |
| 38% | 37% |
| 48% | 47% |
| 39.5% | 35% |
| 37.5% | 34% |
| 44% | 41% |
| 49% | 46% |
| 57% | 55% |
| 10% | 8% |

CONFIDENTIAL



CONFIDENTIAL

## Amendment No. 2 to Master Services Agreement

This Amendment No. 2 ("Amendment") to the Master Services Agreement, dated October 20, 2014, between Tesla Motors Inc. ("Tesla") and nextSource Inc. ("Supplier"), as amended, ("Agreement") is hereby further amended, effective as of September 9, 2015 ("Amendment Effective Date"). This Amendment to the Master Services Agreement shall be governed and construed in accordance with the terms and conditions of the Master Services Agreement. To the extent that there is any conflict or inconsistency between the terms and conditions of this Amendment and the terms and conditions of the Master  Services Agreement, the terms and conditions of this Amendment shall govern with respect to the Services described in the below Schedule A.

WHEREAS, Tesla and Supplier are parties to the Master Services Agreement dated October 20, 2014 and;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Parties, Tesla and Supplier agree to amend the Master Services Agreement, effective as of the Amendment Effective date, as follows:

| California Hourly Markup Rate | Nevada Hourly Markup Rate |
|---|---|
| 25% | 21% |
| 22% | 20% |
| 33% | 31% |
| 38% | 37% |
| 48% | 47% |
| 39.5% | 35% |
| 37.5% | 34% |
| 44% | 41% |
| 49% | 46% |
| 57% | 55% |
| 10% | 8% |

Except as provided herein, the terms and conditions of the Master Services Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective duly authorized representatives as of the Amendment Effective Date.

Tesla Motors, Inc.

By: _____

Printed
Name: _____CHUCK SHUMANI_____

Title: _____Director_____

Date: _____9/29/15_____

nextSource Inc.

By: _____

Printed
Name: _____EDWARD J. KEMUS_____

Title: _____SVP_____

Date: _____9/29/15_____

## Amendment No. 3 to Master Services Agreement

This Amendment No. 3 to the Master Services Agreement dated October 20, 2014 between Tesla Motors Inc. ("Tesla") and nextSource Inc. ("Supplier") as amended is hereby further amended, effective February 16, 2016 ("Amendment Effective Date").  This Amendment No. 3 to the Master Services Agreement shall be governed and construed in accordance with the terms and conditions of the Master Services Agreement.  To the extent that there is any conflict or inconsistency between the terms and conditions of this Amendment No. 3 and the terms and conditions of the Master Services Agreement, the terms and conditions of this Amendment No. 3 shall govern.

WHEREAS, Tesla and Supplier are parties to the Master Services Agreement dated October 20, 2014 and;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Parties, Tesla and Supplier agree to amend the Master Services Agreement, effective as of the Amendment Effective date, as follows:



| PAID SICK LEAVE (PSL) | | |
|---|---|---|
| | California Hourly Markup Rate | |
| | 23% | |
| | 20% | |
| | 24% | |
| | 24% | |
| | 24% | |
| | 24% | |
| | 24% | |
| | 24% | |
| | 24% | |
| | 24% | |
| | 24% | |
| | 24% | |



CONFIDENTIAL

DocuSign Envelope ID: 86B23FFD-9FF1-4FA2-80B3-8A212C6ECA98



## MUTUAL NON-DISCLOSURE AGREEMENT

### Effective Date: October 17, 2014

### Name of your Tesla Contact: Touch Reth

THIS MUTUAL NON-DISCLOSURE AGREEMENT (this "Agreement") is entered into as of the date indicated above (the "Effective Date") between Tesla Motors, Inc., a Delaware corporation ("Tesla"), and nextSource, Inc, a(n) Delaware corporation (the "Company"). Tesla and Company hereby agree as follows:



2. <u>Purpose</u>.  Disclosing Party and/or its Affiliates may disclose Confidential Information to the Receiving Party and/or its Affiliates for the sole purpose of (a) considering a potential business relationship with each other, and/or (b) fulfilling the objectives of such business relationship (collectively, the "Purpose").

3. <u>Non-use and Non-Disclosure Obligations</u>.  Subject to Section 5 of this Agreement, Receiving Party agrees not to: (a) use Disclosing Party's Confidential Information for any reason, other than for the Purpose; and (b) disclose the Disclosing Party's Confidential Information to any third party except its employees, consultants, directors and Affiliates, and their employees, consultants and directors that have a "need to know" such Confidential Information for furtherance of the Purpose.  Receiving Party shall exercise the same degree of care in protecting Disclosing Party's Confidential Information that it uses for its own confidential information of a similar nature, but in no event less than reasonable care.  The Receiving Party shall be responsible for any unauthorized use or disclosure of Confidential Information by any of its employees, consultants, directors or Affiliates, and their employees,

consultants and directors.

5. <u>Exceptions</u>.  The obligations of Section 3 of this Agreement shall not apply to information that: (a) is already known to the Receiving Party or its Affiliates at the time of disclosure without obligation of confidentiality to the Disclosing Party, (b) is or becomes publicly known through no wrongful act or omission of the Receiving Party or its Affiliates, (c) is rightfully received by the Receiving Party or its Affiliates from a third party without obligation of confidentiality, (d) is approved for release by written authorization of the Disclosing Party, or (e) was developed by the Receiving Party or its Affiliates independently and without the use or benefit of any of the Confidential Information.  A disclosure of Confidential Information that is required to be made by the Receiving Party pursuant to any request, order or requirement of a court, administrative agency or any other governmental agency shall not be deemed a breach of this Agreement, provided that the Receiving Party has: (x) immediately notified the Disclosing Party in writing of such, request, order or requirement, (y) given the Disclosing Party an opportunity to contest disclosure or seek an appropriate protective order, and (z) cooperated with Disclosing Party to narrow the scope of such disclosure to only that portion of the Confidential Information that is necessary to fulfill the request, order or requirement.

6. <u>Ownership</u>.  All Confidential Information and derivations thereof shall remain the sole and exclusive property of the Disclosing Party and no license or other right to such Confidential Information or either party's intellectual property is granted or implied hereby.

7. <u>As-Is Disclosures</u>.  The Disclosing Party warrants that it has the right to disclose the Confidential Information to the Receiving Party.  Except for the foregoing, (a) no other warranties are made whether express, implied or statutory, (b) all Confidential Information is provided on an "AS IS" basis, and (c) no representation, warranty,

CONFIDENTIAL                                                                 TESLA-0001047

DocuSign Envelope ID: 86B23FFD-9FF1-4FA2-80B3-8A212C6ECA98

# TESLA

assurance, or guarantee is made by the Disclosing Party with respect to the accuracy, performance, completeness, or suitability of the Confidential Information or non-infringement of third-party rights based on use of the Confidential Information by the Receiving Party.

8.  Current and Future Development.  Nothing in this Agreement will be construed as a representation or inference that Receiving Party will not develop, or have developed, products or services that, without violation of this Agreement, compete with the products or services of the Disclosing Party.

10. Affiliate.  As used herein, "Affiliate" shall mean an entity which: (a) controls or is controlled by a party hereto or (b) is under common control with a party hereto: where "control" means that more than fifty percent (>50%) of the controlled entity's shares or ownership interest representing the right to make decisions for such entity are owned or controlled, directly or indirectly, by the controlling entity.

11. Notices.  Any notice required or permitted by this Agreement shall be made in writing and be deemed delivered upon verification of delivery to the other party.

12. Termination of this Agreement.  This Agreement shall be effective as of the Effective Date and shall expire on the third (3rd) anniversary of the Effective Date.  Either party may terminate this Agreement for any or no reason upon written notice to the other party, and termination shall be effective sixty (60) calendar days after receipt of such notice.  No expiration or termination shall affect either party's rights or obligations with respect to Confidential Information disclosed prior to such expiration or termination.  Notwithstanding any expiration or termination of this Agreement, Sections 3–5 and 9–16, inclusive, of this Agreement shall survive for five (5) years following the date of any such expiration or termination.

15. Entire Agreement; Severability.  This Agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof and supersedes all prior agreements, representations and understandings, oral or written, between the parties regarding the subject matter hereof.  If any provision of this Agreement is held by a court of competent jurisdiction to be illegal or unenforceable, such provision shall be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law and the remaining provisions of this Agreement shall remain in full force and effect.

16. Waiver.  A waiver of any right hereunder shall in no way waive any other rights.  No waiver, alteration, modification or amendment of this Agreement shall be effective unless in writing and signed by both parties.

17. Counterparts.  This Agreement may be signed in duplicate originals, or in separate counterparts, which are effective as if the parties signed a single original.  A facsimile of an original signature or electronically signed version transmitted to the other party is effective as if the original was sent to the other party.

\*        \*        \*

DocuSign Envelope ID: 86B23FFD-9FF1-4FA2-80B3-8A212C6ECA98



IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives and to be effective as of the Effective Date.

**COMPANY**

_____
(SIGNATURE)

**Will Morse**
(PRINT NAME)

**Senior Vice President**
(PRINT TITLE)

**Contact Information:**

Name/Dept.: Will Morse_____

Address: 1040 Avenue of Americas, 24th Floor _____

New York, New York 10018_____

_____

Phone: (212) 736-5870_____

Fax: (888) 663-6760_____

**TESLA MOTORS, INC.**

_____
(SIGNATURE)

_____
(PRINT NAME)

_____
(PRINT TITLE)

Contact Information:

| Name/Dept.: | General Counsel / Legal |
| Address: | Tesla Motors, Inc. |
| | 3500 Deer Creek Road |
| | Palo Alto, CA  94555 |
| Phone: | (650) 681-5000 |
| Fax: | (650) 681-5203 |

CONFIDENTIAL        TESLA-0001049

CONFIDENTIAL

# Exhibit

# E

From: Victor Quintero <CN=TESLAOU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR QUINTERO9A>
To: Jaime Salazar; Parks, Vanessa (vparks@nextsource.com); Edward Romero; Jeff Lallum; Jesus Torres; Dean Valentine; Howard Lowrey; Jaime Sota
CC: Stefan Gerlicz
Sent: 11/2/2015 12:35:21 PM
Subject: RE: Recycling payroll file week ending 11-1-15.csv
Attachments: Recycling payroll file week ending 11-1-15.csv

Howard/Jaime, you also need to approve, or reject, payroll hours for your assigned nextSource employees.

Victor Quintero

From: Jaime Salazar
Sent: Monday, November 02, 2015 12:33 PM
To: Parks, Vanessa (vparks@nextsource.com); Edward Romero <edromero@teslamotors.com>; Jeff Lallum <jlallum@teslamotors.com>; Jesus Torres <jstorres@teslamotors.com>; Dean Valentine <dcvalentine@teslamotors.com>
Cc: Victor Quintero <vquintero@teslamotors.com>; Stefan Gerlicz <sgerlicz@teslamotors.com>
Subject: FW: Recycling payroll file week ending 11-1-15.csv

Hello all.

I approve the names on and below from Recycling Center and perimeter route department.

Team Can you approve the employees under you department?





From: Peña, Vanessa [mailto:vpena@nextsource.com]
Sent: Monday, November 02, 2015 1:03 PM
To: Victor Quintero; Jaime Salazar; Jesse Torrez; Jeff Leitch
Subject: Everyday payroll file week ending 11-1-15.csv

Good Afternoon,

Thank You

TESLA-0000668

CONFIDENTIAL

EMPLOYEE_ID,PROF_LAST_NAME,PROF_FIRST_NAME,WEEK_DATE,DAY1_HOURS,DAY2_HOURS,DAY3_HOURS,D
AY4_HOURS,DAY5_HOURS,DAY6_HOURS,DAY7_HOURS,WEEK_REG_HOURS,WEEK_OT_HOURS,WEEK_OT1_HOURS,
WEEK_OT2_HOURS,WEEK_OT7_HOURS,WEEK_DT_HOURS,



100999,Diaz,Owen,11/1/2015,0,0,11.25,11.25,11.25,12.5,0,32,13.75,0,0,0,0.5,







CONFIDENTIAL

Exhibit

F

Message

| | |
|---|---|
| **From:** | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38] |
| **Sent:** | 3/18/2016 10:12:52 PM |
| **To:** | Jackson, Wayne [wjackson@nextsource.com] |
| **CC:** | Gryske, Deb [DGryske@nextsource.com]; Parks, Vanessa [vparks@nextsource.com] |
| **Subject:** | Re: Owen Diaz Doctors Note |

I will cover using OT as necessary. Please find me a qualified person with Fork lift experience.

Edward Romero Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Mar 18, 2016 3:09 PM, "Jackson, Wayne" <wjackson@nextsource.com> wrote:
Unfortunately I think it is time to move forward and term his contact. Ed will you have coverage until we can find you a qualified replacement?

*Sent from my Verizon Wireless 4G LTE DROID*


Edward Romero <edromero@teslamotors.com> wrote:

Please speak to Wayne.
We spoke this morning. Seems Owen has refused to speak to Wayne.

Edward Romero Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Mar 18, 2016 3:00 PM, "Parks, Vanessa" <vparks@nextsource.com> wrote:

Good Afternoon Ed,

I just spoke with Owen. His doctor has taken him off work for 3 weeks . (please see Attachment) Would you like to replace Owen at this time?

Thank you

Vanessa Parks
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (646) 532-7476
Vparks@nextsource.com
www.nextsource.com


Workforce Optimization, Business Enlightenment.

CONFIDENTIAL

# Exhibit

# G

| | |
|---|---|
| **From**: | Garrett, Terri [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP<br>(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TGARRETT@NEXTSOURCE58A] |
| **Sent**: | 10/20/2015 8:13:09 PM |
| **To**: | Erin Marconi [emarconi@teslamotors.com] |
| **Subject**: | RE: Ramon |

Yes, I should be able to have the information to you by COB today. Thank you for your support!

**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
t garrett@nextsource.com
www.nextsource.com

**From:** Erin Marconi [mailto:emarconi@teslamotors.com]
**Sent:** Tuesday, October 20, 2015 1:07 PM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** RE: Ramon

Okay, Ed will cancel his meeting so NextSource can look into the claim. Please let me know ASAP how Tesla can support.

I am out of the office Thursday, Friday & Monday so am hoping to be able to meet with Ed on the initial complaint we discussed 10/15/2015. Do you think you will be able to provide the summaries from your employee interviews today? Please let me know.

Thanks,

Erin

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Tuesday, October 20, 2015 12:56 PM
**To:** Erin Marconi <emarconi@teslamotors.com>
**Subject:** RE: Ramon

Yes, we are working on this complaint as we speak. Thank you,

**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
t garrett@nextsource.com
www.nextsource.com

**From:** Erin Marconi [mailto:emarconi@teslamotors.com]
**Sent:** Tuesday, October 20, 2015 12:55 PM

**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** RE: Ramon

I can ask Ed to cancel his meeting scheduled for 6pm Wednesday. IF so, will you be looking into the complaint below regarding Ramon? Please advise.

Thanks,

Erin

---

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Tuesday, October 20, 2015 12:41 PM
**To:** Erin Marconi <emarconi@teslamotors.com>
**Subject:** FW: Ramon

Erin,

Can I ask for your help on the email chain below? It looks like Victor is asking Ed Romero to get involved in an temporary worker ER issue, my recommendation is that Ed NOT be involved. Can you help me sort this out? Two of the 3 workers have already been interviewed, please advise.

**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
**tgarrett@nextsource.com**
**www.nextsource.com**

---

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Tuesday, October 20, 2015 12:30 PM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** RE: Ramon

He was instructed by victor

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com



*Workforce Optimization, Business Enlightenment*

                                                       NS000109

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Tuesday, October 20, 2015 11:56 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** RE: Ramon

Why is Ed meeting with them?


**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
**tgarrett@nextsource.com**
**www.nextsource.com**

---

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Tuesday, October 20, 2015 11:20 AM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** FW: Ramon

Here is Ramon's statement.  I'm waiting for Rathaj and Ramon to send me theirs.  Ed has a meeting scheduled with them Wednesday at 6pm that I will be attending with him.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com



*Workforce Optimization, Business Enlightenment*

---

**From:** Owen Diaz [mailto:sfrednose@gmail.com]
**Sent:** Tuesday, October 20, 2015 9:54 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** Fwd: Ramon


Sent from my iPhone

Begin forwarded message:

**From:** Owen Diaz <sfrednose@gmail.com>
**Date:** October 17, 2015 at 6:08:48 AM PDT
**To:** "edromero@teslamotors.com" <edromero@teslamotors.com>, "Tom @ Tesla"

CONFIDENTIAL                                                                    NS000110

<tkawasaki@teslamotors.com>
**Subject: Ramon**

Mr. Romero today @ 4:45 am I was working elevator 1 with rothaj foster  training him, when the elevator doors opened  on the first floor and we saw Ramon siting there. At the time I was explaining to Rothai  what you had told me about the outside team and inside team and what his duties consisted of. I was  explaining him that Tom would no longer be his supervisor it was going to be you. For some reason Ramon jump off the tugger he was on and started yelling at me in a Threatening manner, saying you have a problem with me! why are you telling him who his supervisor is! When I did not say anything to Ramon followed me into the elevator and stood next to the forklift I was on and keep yelling at me. I thought he was going to hit me. so I asked him to please step back. because of his threatening manner and reminded Ramon we were on camera. Mr. Romero because of the way Ramon was acting I don't feel safe around him now. Can you please talk to him I don't need any problems. I just want to do my job. You can check the surveillance system to confirm. I contacted Tom for advice and he said, if you don't have excess surveillance system please contact him.

Sent from my iPhone

Exhibit

**H**

| | |
|---|---|
| **From**: | Garrett, Terri [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TGARRETT@NEXTSOURCE58A] |
| **Sent**: | 1/22/2016 6:36:13 PM |
| **To**: | Jackson, Wayne [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wjackson@NextSourcedd0] |
| **Subject**: | FW: Racist effigy & drawing |

**From:** Garrett, Terri
**Sent:** Friday, January 22, 2016 10:35 AM
**To:** 'Wayne Jackson' <wajackson@teslamotors.com>
**Subject:** RE: Racist effigy & drawing

Sorry for the delay, just got off the call for Tesla...
Perhaps we check in with Tesla HR (Erin Marconi) on this one, as I am surprised that he is so conservative on his stance.....**do you want me to follow up with her?**

Three important things:
1)      Make sure that the warning to Ramon is extremely clear and he has no room for further error
2)      make sure that the impacted workers know the warning was given and any further issues are grounds for immediate termination
3)      Let's send out an update to the workforce on the seriousness of this type of offense and remind them of zero tolerance policy

We can move on the 3 items above, once Tesla HR weighs in. Please do not take action until we have the feedback from HR.

**Terri Garrett**
Director of Operations
**nextSource**

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Friday, January 22, 2016 10:19 AM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** RE: Racist effigy & drawing
**Importance:** High

I just met with Victor.   He suggested that we do a final written warning for Ramon.  I told Victor I didn't think that was enough.   My suggestion to him was a final written warning with a 3 day suspension without pay.  Victor thought that was an even better idea. Will this be acceptable for you?

Sorry for using my tesla email but I'm having connectivity issues up here with my nextsource computer.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
wjackson@nextsource.com

CONFIDENTIAL                                                    NS000095



*Workforce Optimization, Business Enlightenment*

---

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Friday, January 22, 2016 9:33 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** RE: Racist effigy & drawing

Per our conversation, there are 2 options for Ramon:
1)      Strong warning and grounds for termination if he has another mishap on any level
2)      Termination due to the level of insult to the workforce and zero tolerance policy at Tesla


**Terri Garrett**
Director of Operations
**nextSource**

---

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Friday, January 22, 2016 9:19 AM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** FW: Racist effigy & drawing
**Importance:** High

OMG! I just would like one peaceful day around here.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
wjackson@nextsource.com



*Workforce Optimization, Business Enlightenment*

---

**From:** Owen Diaz [mailto:odiazjr68@gmail.com]
**Sent:** Friday, January 22, 2016 8:46 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** Fwd: Racist effigy & drawing

Begin forwarded message:

**From:** Owen Diaz <odiazjr68@gmail.com>
**Date:** January 22, 2016 at 8:42:10 AM PST
**To:** "Mr. Romero" <edromero@teslamotors.com>
**Subject: Racist effigy & drawing**

On 1/21/16 at 9:10 pm I was working elevator one, I was removing the recycling from the 2nd floor and taking said items to be staged on the first floor for removal. As I was removing those items I came upon the first cardboard bail of the night. As I pulled the pallet rider into position to pick up the bail I noticed a drawing on the bail. It was a picture of a cartoon depicting a black face person with a bone in his hair with the caption under it saying booo. Upon seeing this my stomach dropped and I wondered who could've done this in today's age. At that time I didn't know what to do, so I call Michael Wheeler and sent a text of the picture letting him know that someone on his team had sent this bail over to the elevator with this picture. Sense Michael was the lead for the recycling team at that time. I would let him take point and get to the bottom of the problem. Michael said, he would be there in a few minutes. when Michael arrived he arrived with Israel. They both took pictures and all three of us went upstairs. I had to stop and deal with the elevator crew but Michael and Israel heading over to the upstairs recycling center. They came back a few minutes later with Ramon Martinez. While the three of us were standing there discussing what happened. Ramon Martinez said,he had drew the picture and he was just playing. As a supervisors or leads we are held to a higher standard because The people we supervise look to us as examples. if a supervisor does this kind of thing in front of the employees employees what kind of example are we setting. A person should be able to come to work and not be harassed or degraded while they're trying to do their job. This is not the first time Ramon Martinez has been talk about his behavior. And because nothing has been done, it seems that his behavior is getting worse. As an employee I'm entitled to a safe and harassment free work environment.  And that all I ask  and hope for.

                                                                                           NS000097



NS000098



CONFIDENTIAL

Sent from my iPhone

# Exhibit

# I

| From: | Tamotsu Kawasaki </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TAMOTSU KAWASAKI766> |
|-------|------|
| To: | Victor Quintero |
| Sent: | 8/2/2015 7:23:14 PM |
| Subject: | Re: Confidential elevator issues(Owen) |

I believe we can handle the situation. Just keeping you informed of the situation so you don't get blindsided with the matter. I hope you hade a great vacation.

Thank you
   Tamotsu Kawasaki

Sent from my iPhone

On Aug 2, 2015, at 6:20 PM, Victor Quintero <vquintero@teslamotors.com> wrote:

Let me know if you need my help with this matter.

Victor

**From:** Tamotsu Kawasaki
**Sent:** Friday, July 31, 2015 2:15 PM
**To:** Edward Romero
**Cc:** Jaime Salazar; Victor Quintero
**Subject:** Confidential elevator issues(Owen)

Confidential information

Elevator 2 employee(Owen) has brought to my attention of comments being made towards him that are racist in nature. Now I have brought this issue to the attention of my supervisor Edward and Jaime. We are in the process of reviewing all statements made in this situation and are figuring out what steps we are going to take. I will send another email on final decision we will make as a group.

Thank you
   Tamotsu Kawasaki

Sent from my iPhone

TESLA-0000510

Exhibit

J

**From:**       Edward Romero </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP
                (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38>
**To:**         Victor Quintero
**Sent:**       8/4/2015 11:00:39 AM
**Subject:**    Judy Tibreza ( Verbal Warning)


On July 31, 2025 Owen Diaz (elevator operator) complained that Judy Timbreza had made some racially
offensive remarks toward Mr. Owen. We investigated by speaking to all witnesses  present but they said they
did not hear the remarks, although more than one person agreed Mr. Timbroza tendency to kid ground
excessively.  Mr. Owen says this has happened before. Mr. Owen still feels he can work with Judy if he stops
his remarks. We have given Mr. Timbreza a Verbal Warning, and explained his need to treat his fellow team
members with dignity and respect. Any further incidence may lead to his termination. We have his signed
Verbal Notice filed in the Next Source office.
Sent from my Verizon 4G LTE Smartphone

CONFIDENTIAL                                        TESLA-0000511

# Exhibit

# K

Message

| From: | Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR QUINTERO3A3] |
|---|---|
| Sent: | 2/29/2016 3:59:27 PM |
| To: | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Edward Romeroe38] |
| Subject: | RE: Owen |

Let me know if you my help in anyway.

vq

**From:** Edward Romero
**Sent:** Saturday, February 27, 2016 10:52 AM
**To:** Joyce Delagrande <jdelagrande@teslamotors.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>
**Subject:** Re: Owen

Joyce,

I really appreciate your patience. Rest assured I'm dealing with this. I'll have this resolved by Monday or Tuesday at the latest.

Thanks

Edward Romero

Sent from my Verizon 4G LTE Smartphone
On Feb 27, 2016 10:12 AM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
Thank you. The day before he made it clear he did not want my associates talking to him but it seems it's only the leads Robert and Hugo...and those are the two leads in charge of the elevator. I caught him talking bad about them to other associates last night and I really can not have the disrespect having within the area.

Joyce

Sent from my iPhone

On Feb 27, 2016, at 6:12 AM, Edward Romero <edromero@teslamotors.com> wrote:

Hi Joyce,
I am in the process of doing that real soon. Working with my boss and his agency.

Talk to you on Monday.

Edward Romero

Sent from my Verizon 4G LTE Smartphone
On Feb 26, 2016 11:38 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
Edward,

I would really prefer that he is placed somewhere else. When can we make this happen? I think the issues have been going on long enough to show he is not improving.

CONFIDENTIAL

Joyce

Sent from my iPhone

On Feb 26, 2016, at 7:11 PM, Edward Romero <edromero@teslamotors.com> wrote:

Hi Joyce, I am working on this and will keep young posted.

Sent from my Verizon 4G LTE Smartphone
On Feb 26, 2016 5:41 PM, Joyce Delagrande <jdelagrande@teslamotors.com>
wrote:
Thank you Edward! I really appreciate your support with this issue. The rest of your
team is doing an awesome job-we even noticed Junior stepping up. I truly appreciate
you making sure we have that teamwork atmosphere that is much needed here at Tesla.

Joyce DelaGrande
Production Control Supervisor-Powertrain
510-600-7448 Cell
Email : jdelagrande@teslamotors.com
<image001.jpg>  TESLA MOTORS
45500 Fremont Blvd.,Fremont, CA. 94538

**From:** Edward Romero
**Sent:** Friday, February 26, 2016 6:00 AM
**To:** Joyce Delagrande <jdelagrande@teslamotors.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>
**Subject:** Re: Owen

Good morning Joyce,

I am sorry to hear about this issue. I will deal with this matter and contact you if I
have any questions or need clarification. I agree that we must maintain good
communication, be professional and work together as a team at all times.

Thanks,

Edward Romero
Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Feb 26, 2016 1:24 AM, Joyce Delagrande <jdelagrande@teslamotors.com>
wrote:
Hi Edward,

So I am having a few more issues with Owen. Tonight my lead approached him to talk to
him and he said for my associates to only talk to him if it is related to business because
there are "so many snakes here at Tesla" . I guess he was having a "personal
conversation "on the elevator with someone and felt Robert saying hi to him was rude.
So my lead was coming out of the elevator and showed him a gear case rack that
needed to go downstairs. His response to my lead was he does not want anyone talking
to him, he we want him to do anything we have to email him. I do not personally have
his email and I was unaware of this process change.

CONFIDENTIAL

Owen is now here telling me that my associate threatened him because he said was going to contact you. I have instructed my leads to contact me if there are any more issues with him because we are really struggling with his customer service and it was not a threat, it was us letting him know that we really need the work to be done and if he will not do this we will contact his manager. My leads come to me if any of our associates have issues and since you are his boss he simply said he would contact you. Owen just told me he does not want my leads/associates talking to him anymore, he tried to tell me that he needs them to text him. I told him my leads should not have to text to him. He told me the rack my leads asked him to move did not need to be moved. He got a little loud and told my lead again to not talk to him.

My leads are telling me they feel really uncomfortable with him now, do you have anyone else that you send up here to work the elevator? He has a huge attitude and they do not feel at all as if he is approachable-especially now that he said not to talk to him. I have absolutely no issues at all with the team in the beginning of the week and I would love to be able to have a crew to work with the end of the week with the same work ethic.

Thank you Edward!

Joyce DelaGrande
Production Control Supervisor-Powertrain
510-600-7448 Cell
Email : jdelagrande@teslamotors.com
<image001.jpg> TESLA MOTORS
45500 Fremont Blvd.,Fremont, CA. 94538

# Exhibit

# L

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4
                              **REPORTER CERTIFIED**
5    _____   **TRANSCRIPT**

6    DEMETRIC DI-AZ, OWEN DIAZ, and
     LAMAR PATTERSON, an individual,   **CONFIDENTIAL**
7
           Plaintiffs,
8
     vs.                    Case No. 3:17-cv-06748-WHO
9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CITISTAFF SOLUTIONS, INC.;
     WEST VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING SERVICES, INC.
     and DOES 1-10, inclusive,
12
           Defendants.
13   _____/

14

15

16                   CONFIDENTIAL

17          VIDEOTAPED DEPOSITION OF

18               DEMETRIC DI-AZ

19          SAN FRANCISCO, CALIFORNIA

20            TUESDAY, MAY 15, 2018

21

22

23
     Reported By:
24   Candy Newland
     CSR No. 14256
25   File No. 18-25468

**Demetric Di-Az-Confidential**

 1   Deposition of DEMETRIC DI-AZ, taken on behalf of

 2   Defendants at 351 California Street, Suite 200, San

 3   Francisco, California, commencing at 10:11 a.m. on

 4   Tuesday, May 15, 2018, before Candy Newland, Certified

 5   Shorthand Reporter No. 14256.

 6

 7                    A P P E A R A N C E S

 8

 9   FOR THE PLAINTIFFS:

10

11            CALIFORNIA CIVIL RIGHTS LAW GROUP

12            BY:  LAWRENCE A. ORGAN, ESQ.

13            332 San Anselmo Avenue

14            San Anselmo, CA 94960

15            (415) 453-4740

16            larry@civilrightsca.com

17

18            CALIFORNIA CIVIL RIGHTS LAW GROUP

19            BY:  NAVRUZ AVLONI, ESQ.

20            332 San Anselmo Avenue

21            San Anselmo, CA 94960

22            (415) 453-4740

23            navruz@civilrightsca.com

24

25

Demetric Di-Az-Confidential

```
 1   APPEARANCES(CONTINUED)

 2

 3   FOR THE DEFENDANT TESLA:

 4

 5           CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

 6           BY:  BARBARA I. ANTONUCCI, ESQ.

 7           351 California Street, Suite 200

 8           San Francisco, CA 94104

 9           (415) 918-3000

10           bantonucci@constangy.com

11

12   FOR THE DEFENDANT WEST VALLEY STAFFING:

13

14           PAHL & MCCAY

15           BY:  FENN C. HORTON III, ESQ.

16           225 West Santa Clara, Suite 1500

17           San Jose, CA 95113-1752

18           (408) 286-5100

19           fhorton@pahl-mccay.com

20

21   ALSO PRESENT:

22           Teresa Kossayian, West Valley Staffing Group

23           Jaime Bodiford, Tesla

24           Frank Quirarte, Videographer

25
```

**Demetric Di-Az-Confidential**

| | |
|---|---|
| 03:06:23  1 | you were working at Tesla? |
| 03:06:24  2 | A.      Yes. |
| 03:06:25  3 | Q.      What did you see? |
| 03:06:27  4 | A.      "Fuck you, nigger" all in the bathroom stall. |
| 03:06:36  5 | "You all don't belong here.  You niggers don't belong |
| 03:06:37  6 | here."  Stuff like that. |
| 03:06:47  7 | Q.      Anything else that you saw that was offensive |
| 03:06:51  8 | graffiti while you were working at Tesla? |
| 03:06:53  9 | A.      No. |
| 03:06:58 10 | Q.      Did you report it to anyone when you saw the |
| 03:07:02 11 | words, "Fuck you, nigger" in the bathroom stall? |
| 03:07:04 12 | A.      No. |
| 03:07:04 13 | Q.      Did you report it to anyone when you saw "You |
| 03:07:09 14 | niggers don't belong here" in the bathroom stall? |
| 03:07:11 15 | A.      No. |
| 03:07:12 16 | Q.      Why not? |
| 03:07:13 17 | A.      I didn't know who to report it to.  I just |
| 03:07:17 18 | stopped going to that bathroom. |
| 03:07:22 19 | Q.      Where was that bathroom? |
| 03:07:24 20 | A.      If I'm not mistaken, it was in the center of the |
| 03:07:24 21 | production floor. |
| 03:07:24 22 |                 (Reporter clarification.) |
| 03:07:24 23 |         THE WITNESS:  I just wanted to have one with |
| 03:07:40 24 | more bathrooms in the facility. |
| 03:07:40 25 | Q.      And were both of these statements written in the |

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:13:48 | 1 | while you were working at Tesla? |
| 03:13:50 | 2 | A.      Who? |
| 03:13:53 | 3 | Q.      Rathaj Foster? |
| 03:13:53 | 4 | A.      I don't know who that is. |
| 03:13:54 | 5 | Q.      Did you ever have any contact with any |
| 03:13:57 | 6 | individual working in your dad's department while you |
| 03:14:00 | 7 | were at Tesla? |
| 03:14:01 | 8 | A.      No. |
| 03:14:03 | 9 | Q.      I'd like to turn your attention to paragraph 19. |
| 03:14:28 | 10 | It says here "When Owen came to Demetric's department to |
| 03:14:28 | 11 | bring him lunch, Demetric's shift lead said 'All you |
| 03:14:28 | 12 | fucking niggers -- I can't stand you mother fuckers.'" |
| 03:14:39 | 13 | Do you see that? |
| 03:14:40 | 14 | A.      Yes. |
| 03:14:40 | 15 | Q.      On the day your father brought you lunch, who |
| 03:14:43 | 16 | was present? |
| 03:14:45 | 17 | A.      It was me, T.J., and, like, the rest of my team |
| 03:14:53 | 18 | were getting ready to go to our meal break. |
| 03:15:11 | 19 | Q.      Who else on your team was present when these |
| 03:15:15 | 20 | words were said? |
| 03:15:16 | 21 | A.      I was in the first zone; so it's me, T.J., and |
| 03:15:23 | 22 | then everybody else was just spread out, getting ready |
| 03:15:27 | 23 | to come. |
| 03:15:28 | 24 | Q.      And who stated this phrase? |
| 03:15:31 | 25 | A.      Javier.  I think his last name is Caballero. |

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:15:37 | 1 | You said his name. |
| 03:15:38 | 2 | Q.      Javier Caballero said this, quote, "All you |
| 03:15:45 | 3 | fucking niggers -- I can't stand you motherfuckers"? |
| 03:15:45 | 4 | A.      Yes. |
| 03:15:48 | 5 | Q.      And in paragraph 19 you say that it was your |
| 03:15:51 | 6 | shift lead? |
| 03:15:53 | 7 | A.      It's my shift supervisor. |
| 03:15:55 | 8 | Q.      So it wasn't your shift lead? |
| 03:15:58 | 9 | A.      No.  That's probably a mistake. |
| 03:16:09 | 10 | Q.      Where was this statement said? |
| 03:16:12 | 11 | A.      Right on the production floor. |
| 03:16:15 | 12 | Q.      Where on the production floor? |
| 03:16:17 | 13 | A.      Within zone 1 and getting ready to walk out of |
| 03:16:22 | 14 | our section. |
| 03:16:23 | 15 | Q.      And how many other people besides you and T.J. |
| 03:16:26 | 16 | were present? |
| 03:16:27 | 17 | A.      Me, T.J., my father, and the rest of my team |
| 03:16:30 | 18 | that was getting ready to leave. |
| 03:16:32 | 19 | Q.      It was directed at your whole team? |
| 03:16:35 | 20 | A.      Yes. |
| 03:16:48 | 21 | Q.      Sorry.  Did you tell me how many people are on |
| 03:16:51 | 22 | your team? |
| 03:16:51 | 23 | A.      I think I told you earlier. |
| 03:16:53 | 24 | Q.      Can you tell me again? |
| 03:16:54 | 25 | A.      I think approximately about six. |

1          I, CANDY NEWLAND, CSR No. 14256, certify that the

2     foregoing proceedings were taken before me at the time

3     and place herein set forth, at which time the witness

4     was duly sworn, and that the transcript is a true record

5     of the testimony so given.

6

7     Witness review, correction, and signature was

8     (X) by Code.                    (X) requested.

9     ( ) waived.                     ( ) not requested.

10    ( ) not handled by the deposition officer due to party

11    stipulation.

12

13         The dismantling, unsealing, or unbinding of the

14    original transcript will render the reporter's

15    certificate null and void.

16         I further certify that I am not financially

17    interested in the action, and I am not a relative or

18    employee of any attorney of the parties nor of any of

19    the parties.

20         Dated this 29th day of May, 2018.

21

22

23

24    _____

25         CANDY NEWLAND, CSR 14256

# Exhibit

# M

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REPORTER CERTIFIED
TRANSCRIPT

DEMETRIC DI-AZ, OWEN DIAZ
and LAMAR PATTERSON, an                No. 3:17-cv-06748-WHO
individual,

         Plaintiffs,

                                       **CONFIDENTIAL**
     vs.

TESLA, INC. DBA TESLA
MOTORS, INC.; CITISTAFF
SOLUTIONS, INC.; WEST
VALLEY STAFFING GROUP;
CHARTWELL STAFFING
SERVICES, INC., and DOES
1-10, inclusive,

         Defendants.

_____


                    CONFIDENTIAL

                   Deposition of

                  LAMAR PATTERSON

              San Francisco, California

               Friday, July 26, 2019


REPORTED BY:
Sarah Jean Seitz
CSR No. 14175, RPR
FILE No:  19-29151

**CHASE**
LITIGATION SERVICES

Lamar Patterson-Confidential

1        Deposition of LAMAR PATTERSON, taken on behalf

2   of Defendants at Four Embarcadero Center, 17th Floor,

3   San Francisco, California 94111, commencing at 10:12

4   a.m. on Friday, July 26, 2019, before Sarah Seitz,

5   Certified Shorthand Reporter No. 14175, RPR.

6                    APPEARANCES

7   FOR THE PLAINTIFFS AND THE WITNESS:

8        CALIFORNIA CIVIL RIGHTS LAW GROUP

9        BY:  NAVRUZ AVLONI, Attorney at Law

10        332 San Anselmo Avenue

11        San Anselmo, California 94960

12        415-453-4740

13        navruz@civilrightsca.com

14

15   FOR THE DEFENDANT NEXTSOURCE:

16        FISHER PHILLIPS

17        BY:  JUAN C. ARANEDA, Attorney at Law

18        One Embarcadero Center, Suite 2050

19        San Francisco, California 94111

20        415-490-9012

21        jaraneda@fisherphillips.com

22

23

24

25

Lamar Patterson-Confidential

```
 1              APPEARANCES (CONTINUED)

 2    FOR THE DEFENDANT WEST VALLEY STAFFING:

 3         PAHL & MCCAY

 4         BY:  FENN C. HORTON III, Attorney at Law

 5         225 West Santa Clara Street, Suite 1500

 6         San Jose, California 95113-1752

 7         408-286-5100

 8         fhorton@pahl-mccay.com

 9

10    FOR THE DEFENDANT TESLA:

11         SHEPPARD MULLIN RICHTER & HAMPTON LLP

12         BY:  PATRICIA M. JENG, Attorney at Law

13         Four Embarcadero Center, 17th Floor

14         San Francisco, California 94111

15         415-434-9100

16         pjeng@sheppardmullin.com

17

18    FOR THE DEFENDANT CITISTAFF:

19         LAFAYETTE & KUMAGAI

20         BY:  SUSAN T. KUMAGAI, Attorney at Law

21         1300 Clay Street, Suite 810

22         Oakland, California 94612

23         415-357-1600

24         skumagai@lkclaw.com

25
```

Lamar Patterson-Confidential

1          APPEARANCES (CONTINUED)

2     ALSO PRESENT:

3          Jamie Bodiford - Tesla

4

5                    ---oOo---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lamar Patterson-Confidential

1    Q.   Okay.   Do you remember anything else about the

2    written N-word in the bathroom closest to the elevator?

3    A.   No.

4    Q.   What did -- what did it say?   Was it just "N

5    dash word"?   Was it spelled out?

6    A.   It was spelled out.

7    Q.   How was it spelled out?

8    A.   N-I-G-G-E-R.

9    Q.   Do you remember seeing anything else in that

10   bathroom?

11        MS. AVLONI:   Vague and ambiguous.   Overbroad.

12        MS. JENG:   That was -- sorry.   Let me re-ask

13   that question.

14   BY MS. JENG:

15   Q.   Do you remember seeing anything else in the

16   bathroom closest to Elevator 1 that you found offensive?

17   A.   There was a Nazi sign.

18   Q.   Okay.   Anything else?

19   A.   That's it that I can recall.

20   Q.   Okay.   Did you see the Nazi sign the same time

21   you saw the N-word?

22   A.   Yes.

23   Q.   And do you recall generally what date that was?

24   A.   I'm not sure exactly the date.

25   Q.   Okay.   Was it towards the beginning of your

1   that you used.

2          You said the other two, there was one upstairs

3   and one downstairs; right?

4      A.   Correct.

5      Q.   So let's talk about the one upstairs first.

6          What words or drawings did you see in that

7   bathroom at any point in time?

8          MS. AVLONI:   If you remember.

9          THE WITNESS:   Just the ones I mentioned.

10  BY MS. JENG:

11     Q.   Which were what?

12     A.   Was the N-word, and that was it.

13     Q.   Anything else?

14     A.   No.

15     Q.   Do you remember how the N-word was written in

16  this bathroom?

17         MS. AVLONI:   Vague and ambiguous.

18         THE WITNESS:   Just the same as what I saw in

19  the other bathroom.

20  BY MS. JENG:

21     Q.   So was it just the word by itself?

22     A.   Yes.

23     Q.   It wasn't used in a sentence?

24     A.   I don't recall.

25     Q.   Okay.  Did you ever report the N-word that you

1  saw written in the second upstairs bathroom to anybody

2  at Tesla?

3          MS. AVLONI:  If you remember.

4          THE WITNESS:  Just to Owen and Ed.  That's the

5  only two.

6  BY MS. JENG:

7      Q.  Okay.  Was this at that same time that you told

8  Owen about the first bathroom?

9      A.  I don't recall.

10     Q.  Okay.  Do you recall what month this was

11 between January and August?

12     A.  No.

13     Q.  Did you also leave Ed a voicemail about seeing

14 the N-word in the upstairs bathroom?

15     A.  I'm not sure.

16     Q.  So you are not sure you told Ed about this one?

17     A.  I'm not sure if I told him about the second

18 bathroom or not.

19     Q.  Okay.  Do you recall telling anybody else,

20 other than Owen, about seeing the N-word in the second

21 upstairs bathroom?

22     A.  No.

23     Q.  Okay.  Let's talk about the downstairs

24 bathroom.  And that's the only bathroom downstairs that

25 you used; right?

Lamar Patterson-Confidential

1        A.   That I can recall.

2        Q.   Okay.   And what did you see that was offensive

3    in the downstairs bathroom that you used?

4        A.   The same things I seen in the other bathroom.

5        Q.   Again, that was the N-word?

6        A.   Yes.

7        Q.   Did you see anything else in the downstairs

8    bathroom that you found offensive?

9        A.   No.

10        Q.   Okay.   And, again, do you remember when this

11    was that you saw the N-word in the downstairs bathroom?

12        A.   No.

13        Q.   You have no sense of what month it was between

14    January and August of 2016?

15        A.   No.

16        Q.   And who did you tell, if anyone, about the

17    N-word that you saw written in the downstairs bathroom?

18        A.   Just Owen and Ed.

19        Q.   And who?

20        A.   And Ed.

21        Q.   And what did you tell Owen about this N-word

22    that you saw in the downstairs bathroom?

23        A.   What did I tell him?

24        Q.   Yes.

25        A.   What do you mean?

Lamar Patterson-Confidential

```
 1              CERTIFICATE OF REPORTER
 2        I, SARAH J. SEITZ, CSR No. 14175, RPR, certify:
 3   That the foregoing proceedings were taken before me at
 4   the time and place herein set forth; at which time the
 5   witness was duly sworn; and that the transcript is a
 6   true record of the testimony so given.
 7        Witness review, correction, and signature was
 8   (X) By code.              (X) Requested.
 9   ( ) Waived.               ( ) Not requested.
10   ( ) Not handled by the deposition officer due to party
11   stipulation.
12
13        The dismantling, unsealing, or unbinding of the
14   original transcript will render the reporter's
15   certificate null and void.
16        I further certify that I am not financially
17   interested in the action, and I am not a relative or
18   employee of any attorney of the parties, nor of any of
19   the parties.
20        Dated this 6th day of August, 2019.
21
22
23   _____
24   SARAH J. SEITZ, CSR No. 14175, RPR
25
```

# Exhibit

# N

Message

| | |
|---|---|
| **From:** | Andres Donet [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ANDRES L DONETD49] |
| **Sent:** | 5/21/2016 7:59:25 PM |
| **To:** | Liza Lipson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Liza Lipsonb7a]; Gregory Slettvet [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Gslettvet] |
| **CC:** | Andre' Lalljie [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=User8d52a49b]; Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3]; Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Edward Romeroe38]; James Moffitt [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=James Moffitt94f] |
| **Subject:** | FW: Racism writing the bathroom |
| **Attachments:** | 20160521_105018_resized.jpg |

Graffiti found and cleaned up. Men's RR K-26.

Regards,

**Andres Donet** | Facilities Contract Supervisor |
**Facilities**
45500 Fremont Blvd. | Fremont, CA 94538
c: 650.730.0103| adonet@teslamotors.com



---

**From:** Roel Kliatchko
**Sent:** Saturday, May 21, 2016 11:13 AM
**To:** Kevin Colvin <kcolvin@tesla.com>; Jonathan Baldoza <jbaldoza@tesla.com>; Rob Lewis <kelewis@tesla.com>; Robin Aylsworth <raylsworth@tesla.com>
**Cc:** buildingservices@teslamotors.com <buildingservices@tesla.com>; Matt Pennington <mpennington@tesla.com>
**Subject:** RE: Racism writing the the bathroom

Adding Robin A.

Kevin,

Can you provide nearest column # and what floor?

Building services can we send a Team member for clean up?

Best Regards,

**Roel Kliatchko (SDI) Supervisor**
| 45500 Fremont Blvd. Fremont, CA 94538 |
| Cell: (510) 203-6146 | rkliatchko@teslamotors.com |

**From:** Kevin Colvin
**Sent:** Saturday, May 21, 2016 11:02 AM
**To:** Roel Kliatchko; Jonathan Baldoza; Rob Lewis
**Subject:** Racism writing the the bathroom

This is in the bathroom located by the elevator while walking upstairs

The writing says "All niggers must die"


Kevin Colvin
PWT SDU Inverter
Production Associate



CONFIDENTIAL



TESLA-0001005

Exhibit

O

Message

| | |
|---|---|
| **From:** | Owen Diaz [sfrednose@gmail.com] |
| **Sent:** | 10/20/2015 4:54:12 PM |
| **To:** | Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899] |
| **Subject:** | Fwd: Ramon |

Sent from my iPhone

Begin forwarded message:

> **From:** Owen Diaz <u>sfrednose@gmail.com</u>>
> **Date:** October 17, 2015 at 6:08:48 AM PDT
> **To:** "<u>edromero@teslamotors.com</u>" <<u>edromero@teslamotors.com</u>>, "Tom @ Tesla" <<u>tkawasaki@teslamotors.com</u>>
> **Subject: Ramon**
>
> Mr. Romero today @ 4:45 am I was working elevator 1 with rothaj foster  training him, when the elevator doors opened  on the first floor and we saw Ramon siting there. At the time I was explaining to Rothai  what you had told me about the outside team and inside team and what his duties consisted of. I was  explaining him that Tom would no longer be his supervisor it was going to be you. For some reason Ramon jump off the tugger he was on and started yelling at me in a Threatening manner, saying you have a problem with me! why are you telling him who his supervisor is! When I did not say anything to Ramon followed me into the elevator and stood next to the forklift I was on and keep yelling at me. I thought he was going to hit me. so I asked him to please step back. because of his threatening manner and reminded Ramon we were on camera. Mr. Romero because of the way Ramon was acting I don't feel safe around him now. Can you please talk to him I don't need any problems. I just want to do my job. You can check the surveillance system to confirm. I contacted Tom for advice and he said, if you don't have excess surveillance system please contact him.
>
> Sent from my iPhone

CONFIDENTIAL

Exhibit

**P**

| | |
|---|---|
| **From:** | Josue Torres </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JOSUE ELISEO TORRESC2B> |
| **To:** | Edward Romero; Jaime Salazar |
| **Sent:** | 10/17/2015 12:19:06 PM |
| **Subject:** | RE: Owen |

Edward,

Thanks. Please send an update when you get the chance or feel free to give me a call.

Josue

**From:** Edward Romero
**Sent:** Saturday, October 17, 2015 6:59 AM
**To:** Josue Torres <jotorres@teslamotors.com>; Jaime Salazar <jsalazar@teslamotors.com>
**Subject:** Fwd: Owen

Josue, I will investigate this today. Thanks

Sent from my Verizon 4G LTE Smartphone
---------- Forwarded message ----------
From: Ramon Martinez <rammartinez@teslamotors.com>
Date: Oct 17, 2015 4:56 AM
Subject: Owen
To: Edward Romero <edromero@teslamotors.com>
Cc: Josue Torres <jotorres@teslamotors.com>

Hi Mr Romero I just want to bring to your attention that the lead for the elevator (Owen) he's not acting on the professional way with me and I would like to talk to you about it if there's any situation I like to fix it please
Thank you

# Exhibit

# Q

| | |
|---|---|
| **From**: | Garrett, Terri [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TGARRETT@NEXTSOURCE58A] |
| **Sent**: | 10/21/2015 5:46:47 PM |
| **To**: | Wayne Jackson [wajackson@teslamotors.com] |
| **Subject**: | RE: Employee Relations issue - Tesla |

Confirming via this email that we agree we do not need to do any formal investigation with Ramon, Owen and Rothaj.


**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
tgarrett@nextsource.com
www.nextsource.com

---

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Monday, October 19, 2015 5:32 PM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** RE: Employee Relations issue - Tesla

Yes I'm actually on the phone now dealing with the Owen and Ramon issue.  This issue seems to be related to this and we really are going to have to do some in depth investigation.  I'll give you a call in a few minutes to discuss.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com



*Workforce Optimization, Business Enlightenment*

---

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Monday, October 19, 2015 2:17 PM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** FW: Employee Relations issue - Tesla
**Importance:** High

Wayne, did you receive this from me on Friday?


**Terri Garrett**
Director of Operations
**nextSource**

CONFIDENTIAL                                                            NS000138

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
tgarrett@nextsource.com
www.nextsource.com

CONFIDENTIAL

NS000139

Exhibit

R



**From:** Monica Deleon [mailto:mdeleon@citistaffsolutions.com]
**Sent:** Tuesday, January 26, 2016 2:32 PM
**To:** lledesma@citistaffsolutions.com
**Cc:** nchavolla@citistaffsolutions.com
**Subject:** RE: Racist effigy & drawing

Hey Ludivina
I am going on lunch I am super hungry. I'll be back at 3:30

Monica De Leon
Staff Supervisor
CitiStaff Solutions
37053 Cherry Street Suite 204A
Newark, CA 94560
Office 510-797-2581


**From:** Ludivina Ledesma [mailto:lledesma@citistaffsolutions.com]
**Sent:** Tuesday, January 26, 2016 12:25 PM
**To:** mdeleon@citistaffsolutions.com
**Cc:** nchavolla@citistaffsolutions.com
**Subject:** RE: Racist effigy & drawing

I will call you now


**From:** Monica Deleon [mailto:mdeleon@citistaffsolutions.com]
**Sent:** Tuesday, January 26, 2016 9:28 AM
**To:** lledesma@citistaffsolutions.com
**Cc:** nchavolla@citistaffsolutions.com
**Subject:** RE: Racist effigy & drawing

Good Morning,
Any time is fine. You can call me know

Monica De Leon
Staff Supervisor
CitiStaff Solutions
37053 Cherry Street Suite 204A
Newark, CA 94560
Office 510-797-2581


**From:** Ludivina Ledesma [mailto:lledesma@citistaffsolutions.com]
**Sent:** Tuesday, January 26, 2016 9:26 AM

1

CONFIDENTIAL

CITISTAFF-0000050

**To:** mdeleon@citistaffsolutions.com
**Cc:** nchavolla@citistaffsolutions.com
**Subject:** RE: Racist effigy & drawing

Hi Monica

I will be handling this issue moving forward, I have a couple of questions to ask you. Let me know when is the best time to talk?

Thanks

Judy



**From:** "Monica Deleon" <mdeleon@citistaffsolutions.com>
**Date:** January 25, 2016 at 9:30:57 AM PST
**To:** "Bruce Wismer" <bwismer@citistaffsolutions.com>
**Cc:** "'William Hidalgo'" <whidalgo@citistaffsolutions.com>
**Subject: RE: Racist effigy & drawing**
**Reply-To:** <mdeleon@citistaffsolutions.com>

Good Morning Bruce,
Can you review this. Thank you

Monica De Leon
Staff Supervisor

2

CONFIDENTIAL

CITISTAFF-0000051

CitiStaff Solutions
37053 Cherry Street Suite 204A
Newark, CA 94560
Office 510-797-2581

**From:** Owen Diaz [mailto:odiazjr68@gmail.com]
**Sent:** Friday, January 22, 2016 5:50 PM
**To:** Citistaff
**Subject:** Fwd: Racist effigy & drawing

Sent from my iPhone

Begin forwarded message:

> **From:** Owen Diaz <odiazjr68@gmail.com>
> **Date:** January 22, 2016 at 8:42:10 AM PST
> **To:** "Mr. Romero" <edromero@teslamotors.com>
> **Subject: Racist effigy & drawing**

On 1/21/16 at 9:10 pm I was working elevator one, I was removing the recycling
from the 2nd floor and taking said items to be staged on the first floor for
removal. As I was removing those items I came upon the first cardboard bail of
the night. As I pulled the pallet rider into position to pick up the bail I noticed a
drawing on the bail. It was a picture of a cartoon  depicting a black face person
with a bone in his hair with the caption under it saying booo. Upon seeing this my
stomach dropped and I wondered who could've done this in today's age. At that
time I didn't know what to do, so I call Michael Wheeler and sent a text of the
picture letting him know that someone on his team had sent this bail over to the
elevator with this picture. Sense Michael was the lead for the recycling team at
that time. I would let him take point and get to the bottom of the problem.
Michael said, he would be there in a few minutes. when Michael arrived he
arrived with Israel. They both took pictures and all three of us went upstairs. I had
to stop and deal with the elevator crew but Michael and Israel heading over to the
upstairs recycling center. They came back a few minutes later with Ramon
Martinez. While the three of us were standing there discussing what happened.
Ramon Martinez said,he had drew the picture and he was just playing. As a
supervisors or leads we are held to a higher standard because The people we
supervise look to us as examples.  if a supervisor does this kind of thing in front
of the employees employees what kind of example are we setting. A person
should be able to come to work and not be harassed or degraded while they're
trying to do their job. This is not the first time Ramon Martinez has been talk
about his behavior. And because nothing has been done, it seems that his behavior
is getting worse. As an employee I'm entitled to a safe and harassment free work
environment.  And that all I ask  and hope for.

3

CITISTAFF-0000052



4

CONFIDENTIAL



5

CONFIDENTIAL

Sent from my iPhone

CONFIDENTIAL

CITISTAFF-0000055

# Exhibit

# S

| From: | Jackson, Wayne [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WJACKSON@NEXTSOURCEDD0] |
| Sent: | 1/25/2016 10:06:37 PM |
| To: | Victor Quintero [vquintero@teslamotors.com]; Josue Torres [jotorres@teslamotors.com]; Jeff Lalich |
| | [jlalich@teslamotors.com] |
| CC: | Garrett, Terri [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tgarrett@NextSource58a] |
| Subject: | FW: NextSource Ramon Martinez Status Update |
| Attachments: | Alleged Victim-Statement (Owen).pdf; Alleged Harasser-Statement (Ramon).pdf |
| | |
| Importance: | High |

Hi Victor here are the result of the investigation conducted by Chartwell.  They have done a final written warning for Ramon and he has been placed on a 3 day suspension as a result.  He will  be eligible to return to his duties on Wednesday.

**From:** Veronica Martinez [mailto:veronica.martinez@chartwellstaff.com]
**Sent:** Monday, January 25, 2016 1:26 PM
**To:** Jackson, Wayne <wjackson@nextsource.com>
**Cc:** Jackelin Delgado <jackelin.delgado@chartwellstaff.com>; Jessy Meneses <jessy.meneses@chartwellstaff.com>; Garrett, Terri <tgarrett@nextsource.com>
**Subject:** FW: NextSource
**Importance:** High

Wayne,

As per our conversation this afternoon. I have attach the forms that I have received from my HR department. Ramon will be placed in corrective action and will  be given a final written warning. I will be calling Ramon in today so he can sign documentation. Once you are able to speak with Victor we can have Ramon go back to work on Wednesday at his normal start time.

Thanks
Veronica

**From:** Jackelin Delgado
**Sent:** Monday, January 25, 2016 11:07 AM
**To:** Veronica Martinez <veronica.martinez@chartwellstaff.com>
**Cc:** Jessy Meneses <jessy.meneses@chartwellstaff.com>
**Subject:** NextSource
**Importance:** High

Good Morning Veronica,

Attached you will find both statements from the alleged accuser and the alleged harasser. I reached out to Monica De Leon (Branch Manager) from Citistaff and she gave me permission to interview Mr. Owen. After reviewing both statements, we want to ensure a safe and harassment-free workplace for all of our employees. With this being said we will be sure to place Mr. Ramon on Corrective Action.

Does Mr. Ramon and Mr. Owen work in separate departments? He is concerned for his safety and would not feel comfortable working with Mr. Ramon. Will this be a reasonable recommendation to have both employees work apart.

If you can reach out to the client and see how we can all work together to come to a resolution and close this investigation, this would be great.

CONFIDENTIAL                                                                                   NS000038

On our end, Ramon will be returning the branch office and he will be placed on corrective action-with a final warning for harassment in the workplace due to offensive behavior.
Which I will send to you after you have spoken to the client along with additional forms to go over with Mr. Ramon.

Let me know what else you need from our end. But for now we await on the client's point of view. We will proceed from there.

Thank you for your help.

## Jackelin Delgado
Vice President of Human Resources

 Chartwell Staffing Solutions



**Web:** www.ChartwellStaff.com
**Phone:**(510)314-0381 Ext.304 **Cell:**(408)355-0366
**Email:** Jackelin.Delgado@ChartwellStaff.com

This email, its contents, and any files transmitted with it are confidential, may be legally privileged or protected, and are intended solely for the use of the individual(s) to whom the email is addressed.  If you received this email in error or are not the intended recipient, you may not forward, use, reproduce, disclose, or distribute this message, its contents, or its attachments for any purpose.  In such case, please notify me immediately and then delete the message.

# Chartwell Staffing Solutions™

*Spoke to Monica Deleon Branch Mgr. 9:58am
Citi Staff* 10:00am

Alleged Victim-Investigation Questions  *Granted HR-VP*   Today's Date: 1/25/2016
*permission to speak to Mr. Omar.*

1. What occurred?

Working over at elevator (1) (because he is the lead at Elev.(1))
Palletwriter/Cardboard bale wrapped in wire. When he went
to lift the bale, he said that the picture was there for
him to see. He took a picture of it right away and
called Micheal Wheeler and Isreal and they both took pictures
*attached.*

2. Who committed the alleged harassment?

The alleged Harrassment was committed by Ramon

3. When and where did the harassment occur?

The drawing was done on the cardboard from the
recycle center



4. How often has the offensive behavior occurred?

Owen mentioned history that happened in in elevator. He was not aware nor was Veronica Branch manager. The email was sent to Wayne Jackson (supervisor)

5. How did it affect you and how did you react?

My Stomach dropped

6. Has your job been affected?

Yes. I look around behind my back when I pick-up balers and I don't feel safe.

7. Were there any other people present when the incident occurred?

No just myself.

2

Chartwell Staffing Solutions, Inc. | Confidential



8. Are there any other notes, physical evidence or other documentation to support the harassment claim?

Yes, the drawing on the cardboard and the
pictures we took and my email that
I sent to client

9. Do you know any other pertinent information?

No

10. How would you like to see the information resolved?

He should be terminated. I do not
trust him.

For additional notes:

- Afraid of retaliation
- Sent an e-mail with picture to
  Client Supervisors
- Feel that picture was racial statement
  (jigaboo).





# Chartwell Staffing Solutions™

Alleged Harasser-Investigation Questions                    Today's Date: 01/22/18

1. What are your thoughts on the allegation?

    I understand tha what I draw it's
    was not ok but I never try to
    offend No Body.

2. Why would the alleged victim make such claims?

    I dont know like I say want
    I draw it I never mean nothing
    bad.

3. Are there any notes, physical evidence or other documentation to refute the claim?

    yes a picture that I draw



CONFIDENTIAL                                                    NS000043

4. Were there any other people present when the incident occurred?

Wen I draw No body was around me

5. Do you know any other people with pertinent information?

Yes affter owen saw the picture. Israel Zuñiga and Michael Wheeler. where with us)

For additional notes:

In our area at work we process carbcoal. and one of the coworker (Worses(aa) he draw a picture of a pac-man Chasing two little ghoes. and on the pac-man top he draw a Swing shift nane and in the two little ghoes he punt morning and grave yard shif, because he was playing on the way and he's shift it is more organized and so I draw the carnival Just to let him know that my shif (grave Yard) can be better that he's shift.

2

Chartwell Staffing Solutions, Inc. | Confidential



and I wrong the word (boob) to say him.
I never try to offend nobody with this
draw and went Israel show up to
the area where I was (Q 22) and ask
me if I know who draw that on the
basic of carboard I say it was me
he told me that (Owen) was really
upsed about it the I say (wow) I never
thing that it can be that bad
so I went to see Owen and he was
walking with Mike (Wheeler) (believe
to see me.
so I tell him Owen Im sorry I did
draw the picture and never mean nothin
bad I explain him all about it and
he tell me that white people use it
for other porposes, but he understand
that caming from me it nob be bad.
I replay please forget me and I apologou
to him again
he also mention to me that he was about to
send a e-mail to the office but because
it was me he understand that my meaning
on the picture that I draw wasn't bad
and he was or he dolet the e-mail

‡Ramon Martinez

time  4:30
1/22/16

CONFIDENTIAL

NS000045

Exhibit

T

| From: | Garrett, Terri [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TGARRETT@NEXTSOURCE58A] |
|---|---|
| Sent: | 1/22/2016 6:36:13 PM |
| To: | Jackson, Wayne [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wjackson@NextSourcedd0] |
| Subject: | FW: Racist effigy & drawing |

**From:** Garrett, Terri
**Sent:** Friday, January 22, 2016 10:35 AM
**To:** 'Wayne Jackson' <wajackson@teslamotors.com>
**Subject:** RE: Racist effigy & drawing

Sorry for the delay, just got off the call for Tesla...
Perhaps we check in with Tesla HR (Erin Marconi) on this one, as I am surprised that he is so conservative on his stance.....**do you want me to follow up with her?**

Three important things:
1)      Make sure that the warning to Ramon is extremely clear and he has no room for further error
2)      make sure that the impacted workers know the warning was given and any further issues are grounds for immediate termination
3)      Let's send out an update to the workforce on the seriousness of this type of offense and remind them of zero tolerance policy

We can move on the 3 items above, once Tesla HR weighs in. Please do not take action until we have the feedback from HR.

**Terri Garrett**
Director of Operations
**nextSource**


**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Friday, January 22, 2016 10:19 AM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** RE: Racist effigy & drawing
**Importance:** High

I just met with Victor.   He suggested that we do a final written warning for Ramon.  I told Victor I didn't think that was enough.   My suggestion to him was a final written warning with a 3 day suspension without pay.  Victor thought that was an even better idea. Will this be acceptable for you?

Sorry for using my tesla email but I'm having connectivity issues up here with my nextsource computer.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
wjackson@nextsource.com

CONFIDENTIAL                                           NS000095



*Workforce Optimization, Business Enlightenment*

---

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Friday, January 22, 2016 9:33 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** RE: Racist effigy & drawing

Per our conversation, there are 2 options for Ramon:
1)      Strong warning and grounds for termination if he has another mishap on any level
2)      Termination due to the level of insult to the workforce and zero tolerance policy at Tesla

**Terri Garrett**
Director of Operations
**nextSource**

---

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Friday, January 22, 2016 9:19 AM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** FW: Racist effigy & drawing
**Importance:** High

OMG! I just would like one peaceful day around here.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
wjackson@nextsource.com



*Workforce Optimization, Business Enlightenment*

---

**From:** Owen Diaz [mailto:odiazjr68@gmail.com]
**Sent:** Friday, January 22, 2016 8:46 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** Fwd: Racist effigy & drawing

Begin forwarded message:

**From:** Owen Diaz <odiazjr68@gmail.com>
**Date:** January 22, 2016 at 8:42:10 AM PST
**To:** "Mr. Romero" <edromero@teslamotors.com>
**Subject: Racist effigy & drawing**

On 1/21/16 at 9:10 pm I was working elevator one, I was removing the recycling from the 2nd floor and taking said items to be staged on the first floor for removal. As I was removing those items I came upon the first cardboard bail of the night. As I pulled the pallet rider into position to pick up the bail I noticed a drawing on the bail. It was a picture of a cartoon  depicting a black face person with a bone in his hair with the caption under it saying booo. Upon seeing this my stomach dropped and I wondered who could've done this in today's age. At that time I didn't know what to do, so I call Michael Wheeler and sent a text of the picture letting him know that someone on his team had sent this bail over to the elevator with this picture. Sense Michael was the lead for the recycling team at that time. I would let him take point and get to the bottom of the problem. Michael said, he would be there in a few minutes. when Michael arrived he arrived with Israel. They both took pictures and all three of us went upstairs. I had to stop and deal with the elevator crew but Michael and Israel heading over to the upstairs recycling center. They came back a few minutes later with Ramon Martinez. While the three of us were standing there discussing what happened. Ramon Martinez said,he had drew the picture and he was just playing. As a supervisors or leads we are held to a higher standard because The people we supervise look to us as examples.  if a supervisor does this kind of thing in front of the employees employees what kind of example are we setting. A person should be able to come to work and not be harassed or degraded while they're trying to do their job. This is not the first time Ramon Martinez has been talk about his behavior. And because nothing has been done, it seems that his behavior is getting worse. As an employee I'm entitled to a safe and harassment free work environment.  And that all I ask  and hope for.

   NS000097



NS000098



NS000099

Sent from my iPhone

Exhibit

**U**

| | |
|---|---|
| **From**: | Jackson, Wayne [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WJACKSON@NEXTSOURCEDD0] |
| **Sent**: | 3/18/2016 10:09:57 PM |
| **To**: | Gryske, Deb [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DGryske@NextSource7b3]; Parks, Vanessa [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Vparks@NextSourcedc2] |
| **Subject**: | Fwd: Owen Diaz Doctors Note |

We will need to replace him as soon as possible. Elevator days

*Sent from my Verizon Wireless 4G LTE DROID*

-------- Original Message --------
Subject: Re: Owen Diaz Doctors Note
From: Edward Romero <edromero@teslamotors.com>
To: "Parks, Vanessa" <vparks@nextsource.com>
CC: "Jackson, Wayne" <wjackson@nextsource.com>,"Gryske, Deb" <DGryske@nextsource.com>

Please speak to Wayne.
We spoke this morning. Seems Owen has refused to speak to Wayne.

Edward Romero Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Mar 18, 2016 3:00 PM, "Parks, Vanessa" <vparks@nextsource.com> wrote:

Good Afternoon Ed,

I just spoke with Owen. His doctor has taken him off work for 3 weeks . (please see Attachment) Would you like to replace Owen at this time?

Thank you

Vanessa Parks
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (646) 532-7476
Vparks@nextsource.com
www.nextsource.com


Workforce Optimization, Business Enlightenment.

# Exhibit

# V

CONFIDENTIAL

CITISTAFF-0000009

## Monica Deleon

**From:**      Monica Deleon <mdeleon@citistaffsolutions.com>
**Sent:**      Friday, March 18, 2016 3:53 PM
**To:**        'Jackson, Wayne'
**Cc:**        'Tesla'
**Subject:**   RE: Term of contract for Owen Diaz

Wayne,
No problem, I have already advised him. He knows not to return.

Monica De Leon
Staff Supervisor
CitiStaff Solutions
37053 Cherry Street Suite 204A
Newark, CA 94560
Office 510-797-2581

**From:** Jackson, Wayne [mailto:wjackson@nextsource.com]
**Sent:** Friday, March 18, 2016 3:32 PM
**To:** mdeleon@citistaffsolutions.com
**Cc:** Tesla
**Subject:** Term of contract for Owen Diaz

Unfortunately we will have to term the assignment of Owen Diaz. We have been trying to work on him with some attendance and performance issues but we have been unsuccessful. At this point a lot of the Tesla staff don't even want to work with Owen. Owen was supposed to report back to work earlier this week and didn't. He did just send a doctor's note but there is no doctor's signature on the note he provided. At this time the manager would just like to get another candidate to back till his role as soon as possible. Please notify Owen today that his assignment here has been ended.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wjackson@nextsource.com
www.nextsource.com

CONFIDENTIAL

CITISTAFF-0000010



# Exhibit

# W

| Message | |
|---|---|
| **From:** | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38] |
| **Sent:** | 3/4/2016 4:49:32 AM |
| **To:** | Joyce Delagrande [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jdelagrande] |
| **CC:** | Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3]; Cameron Smith [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Cameron LaHaie Smith3ab]; Jeremy Fabian [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jeremy Fabian96d] |
| **Subject:** | RE: Owen |

Hi Joyce,

I can understand your frustration. We are not ignoring your concerns. I have communicated your concerns to my manager and am working to make the changes. I want to handle this appropriately.

We are looking for a qualified person who we can put in to the lead position. I want to replace two staff members who are currently working nights. If you feel that you want to communicate with my manager please feel free to do so. I report to Victor Quintero.

With the increased production I want to make an effective transition with minimal effect on production.

I hope you understand. The situation will be resolved very soon. I am already speaking to associates who are interested in changing shifts.

Thanks,

Edward Romero
Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Mar 3, 2016 8:28 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
Edward,

I was just notified that Owen is still working on the elevator. Can you tell me when we will be receiving a replacement for him? He made it clear last week that he does not want to have anything to do with my leads and I need to have someone working the elevator that they can communicate with.

Joyce DelaGrande
Production Control Supervisor-Powertrain
510-600-7448 Cell
Email : jdelagrande@teslamotors.com
**T ≡ S L ⊓** TESLA MOTORS
45500 Fremont Blvd.,Fremont, CA. 94538

**From:** Joyce Delagrande
**Sent:** Saturday, February 27, 2016 10:13 AM
**To:** Edward Romero <edromero@teslamotors.com>
**Subject:** Re: Owen

Thank you. The day before he made it clear he did not want my associates talking to him but it seems it's only the leads Robert and Hugo...and those are the two leads in charge of the elevator. I caught him talking bad about them to other associates last night and I really can not have the disrespect having within the area.

Joyce

Sent from my iPhone

On Feb 27, 2016, at 6:12 AM, Edward Romero <edromero@teslamotors.com> wrote:

> Hi Joyce,
> I am in the process of doing that real soon. Working with my boss and his agency.
>
> Talk to you on Monday.
>
> Edward Romero
>
> Sent from my Verizon 4G LTE Smartphone
> On Feb 26, 2016 11:38 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
> Edward,
>
> I would really prefer that he is placed somewhere else. When can we make this happen? I think the issues have been going on long enough to show he is not improving.
>
> Joyce
>
> Sent from my iPhone
>
> On Feb 26, 2016, at 7:11 PM, Edward Romero <edromero@teslamotors.com> wrote:
>
>> Hi Joyce, I am working on this and will keep young posted.
>>
>> Sent from my Verizon 4G LTE Smartphone
>> On Feb 26, 2016 5:41 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
>> Thank you Edward! I really appreciate your support with this issue. The rest of your team is doing an awesome job-we even noticed Junior stepping up. I truly appreciate you making sure we have that teamwork atmosphere that is much needed here at Tesla.
>>
>> Joyce DelaGrande
>> Production Control Supervisor-Powertrain
>> 510-600-7448 Cell
>> Email : jdelagrande@teslamotors.com
>> <image001.jpg>  TESLA MOTORS
>> 45500 Fremont Blvd.,Fremont, CA. 94538
>>
>> **From:** Edward Romero
>> **Sent:** Friday, February 26, 2016 6:00 AM
>> **To:** Joyce Delagrande <jdelagrande@teslamotors.com>
>> **Cc:** Victor Quintero <vquintero@teslamotors.com>
>> **Subject:** Re: Owen
>>
>> Good morning Joyce,
>>
>> I am sorry to hear about this issue. I will deal with this matter and contact you if I have any questions or need  clarification. I agree that we must maintain good communication, be professional and work together as a team at all times.

Thanks,

Edward Romero
Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Feb 26, 2016 1:24 AM, Joyce Delagrande <jdelagrande@teslamotors.com>
wrote:
Hi Edward,

So I am having a few more issues with Owen. Tonight my lead approached him to talk to
him and he said for my associates to only talk to him if it is related to business because
there are "so many snakes here at Tesla" . I guess he was having a "personal
conversation "on the elevator with someone and felt Robert saying hi to him was rude.
So my lead was coming out of the elevator and showed him a gear case rack that
needed to go downstairs. His response to my lead was he does not want anyone talking
to him, he we want him to do anything we have to email him. I do not personally have
his email and I was unaware of this process change.

Owen is now here telling me that my associate threatened him because he said was
going to contact you. I have instructed my leads to contact me if there are any more
issues with him because we are really struggling with his customer service and it was not
a threat, it was us letting him know that we really need the work to be done and if he
will not do this we will contact his manager. My leads come to me if any of our
associates have issues and since you are his boss he simply said he would contact you.
Owen just told me he does not want my leads/associates talking to him anymore, he
tried to tell me that he needs them to text him. I told him my leads should not have to
text to him. He told me the rack my leads asked him to move did not need to be moved.
He got a little loud and told my lead again to not talk to him.

My leads are telling me they feel really uncomfortable with him now, do you have
anyone else that you send up here to work the elevator? He has a huge attitude and
they do not feel at all as if he is approachable-especially now that he said not to talk to
him. I have absolutely no issues at all with the team in the beginning of the week and I
would love to be able to have a crew to work with the end of the week with the same
work ethic.

Thank you Edward!


Joyce DelaGrande
Production Control Supervisor-Powertrain
510-600-7448 Cell
Email : jdelagrande@teslamotors.com
<image001.jpg>  TESLA MOTORS
45500 Fremont Blvd.,Fremont, CA. 94538

# Exhibit

# X

Message

| | |
|---|---|
| **From:** | Jackson, Wayne [wjackson@nextsource.com] |
| **Sent:** | 3/2/2016 1:40:32 AM |
| **To:** | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Edward Romeroe38] |
| **CC:** | Jackson, Wayne [wjackson@nextsource.com]; Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3] |
| **Subject:** | Re: Owen Diaz and Troy Dennis |

Anytime Ed. They both have been made aware how critical it is for them to provide good customer service to their customers. They have been instructed to follow all direction and follow up with you or myself if they have any issues or concerns. They both understand that this is their final warning and any further issues will result in termination of their contract. We are looking for some good replacements now just in case they don't work out. Please let me know if I can assist in any other way.

*Sent from my Verizon Wireless 4G LTE DROID*


Edward Romero <edromero@teslamotors.com> wrote:

Wayne,

I appreciate you taking action with the situation involving Owen Diaz and Troy Dennis. I understood from you that they had received a final written notice
informing them that any negative incident involving them would lead to their immediate termination. It is vital that our elevator operators be professional, courteous,
responsive to our customers' needs and always provide good customer service.

Thank you for your action.

Edward Romero
Building Services Contract Supervisor
1-510-648-7393

Exhibit

Y

**To:**    Edward Romero[edromero@teslamotors.com]; Parks, Vanessa[vparks@nextsource.com]
**Cc:**    Victor Quintero[vquintero@teslamotors.com]; Erin Marconi[emarconi@teslamotors.com]
**From:**  Jackson, Wayne[wjackson@nextsource.com]
**Sent:**  Thur 1/7/2016 5:04:45 PM (UTC)
**Subject:**  RE: Personnel Issues

Ed Vanessa will be meeting with these employees tonight around 10pm and investigate the incidents.  We will get back to you with the corrective actions that will be taken.

**From:** Edward Romero [mailto:edromero@teslamotors.com]
**Sent:** Wednesday, December 30, 2015 3:41 AM
**To:** Jackson, Wayne <wjackson@nextsource.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>; Erin Marconi <emarconi@teslamotors.com>
**Subject:** Personnel Issues

Wayne,

There are two issues that arose today that need to be dealt with.



2. Javier Temores and Troy Dennis:

I was approached by Javier with a complaint about Troy Dennis. He said that Troy Dennis had gotten upset and called him a "nigger". He said that Anthony Neely the night Lead had heard Troy use that word against Javier. I approached Anthony and asked him if he had heard Troy use that word against Javier. Although he hesitated for a moment he did admit that Troy said that against Javier. Anthony said he told Troy that he should not have used that word.  I explained to Anthony that it is unacceptable for anyone to use that type of language. I told him I was obligated to report the incident. I told him to try to keep Javier assigned to the other elevator.

Javier Temores is very hurt and feels he cannot work around or near Troy Dennis.

Please look into these two situations.

Thank You,

Edward Romero
Building Services Contract Manager
(510) 648-7393