# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON, | ) )  |
|  | ) |
| Plaintiffs, | ) |
| vs. | ) No. 3:17-cv-06748-WHO |
|  | ) |
| TESLA, INC., dba TESLA MOTORS, INC., CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive, | ) ) ) ) ) |
|  | ) |
| Defendants. | ) |
|  | ) |

DEPOSITION OF TITUS McCALEB

San Jose, California

Tuesday, June 18, 2019

Reported by:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Job No. 38360

TITUS MCCALEB

June 18, 2019

1      A.    No.

2      Q.    This will be an easy question:  Have you

3   ever spoken with Owen Diaz, as you understand -- as

4   far as you understand, have you ever spoken with

5   Owen Diaz?

6      A.    No.  I don't know who Owen Diaz is; so, no.

7      Q.    All right.  Have you spoken with a person

8   named Demetric Di-Az?

9      A.    No.

10     Q.    Have you heard of somebody named Demetric

11  Di-Az?

12     A.    I have heard of Demetric Di-Az, but I don't

13  know if it's the same one you're speaking of.

14     Q.    Have you heard about Demetric Di-Az from

15  anybody other than from your attorney?

16     A.    No.

17     Q.    Well, what do you know about this particular

18  lawsuit other than what your attorney has told you?

19          MS. AVLONI:  Asked and answered.

20          THE WITNESS:  Yeah, I definitely agree with

21  that, "Asked and answered."  You asked me and I told you

22  what I knew.

23  BY MR. HORTON:

24     Q.    Well, you can answer it again, please.

25     A.    That it's a case about discrimination.

Exhibit 1, Page 5

TITUS MCCALEB

June 18, 2019

```
 1    the B last name is.

 2        Q.    Burris?

 3        A.    Burris.  Thank you.

 4        Q.    So you contacted those two people first?

 5        A.    Yes.

 6        Q.    Why did you contact Anton Baruh?

 7        A.    To inform him of the discrimination.

 8        Q.    What was it about Anton Baruh's position,

 9    as you understood it, that you thought it would be

10    appropriate to email your timeline to him?

11        A.    They were in-house human resources for West

12    Valley contractors to communicate with at the time, so I

13    thought that that was the appropriate channels.

14        Q.    And the same for Lewis Burris?

15        A.    I thought they were part of the same team and

16    that's what I was instructed.

17        Q.    By whom?

18        A.    Themselves.

19        Q.    Did you have a supervisor while you worked for

20    West Valley Staffing Group when you were assigned at

21    Tesla?

22        A.    No.

23        Q.    What was your job at Tesla?

24        A.    I was a production associate, and I also

25    worked as part of the quality and manufacturing and
```

Exhibit 1, Page 6

TITUS MCCALEB

June 18, 2019

```
 1    training team.  I worked as a media specialist and I
 2    was a quality inspector.
 3         Q.    Who was your supervisor for those positions?
 4         A.    As the production associate, as mentioned,
 5    Josh Vasquez, and Ron, with an L.
 6         Q.    We'll get the spelling for Ron.
 7         A.    Thanks.
 8         Q.    I know who you're talking about.
 9               So what did Ron L. supervise you for?
10         A.    Well, he took over for Josh.  He was the
11    powertrain, PWT's floor supervisor.
12         Q.    And Josh Vasquez had been the powertrain --
13         A.    Yeah, for a while.
14         Q.    -- supervisor?
15         A.    Yes.
16         Q.    Okay.  Did you have any other supervisors at
17    Tesla besides those two gentlemen?
18         A.    Oh, yeah.
19         Q.    Who?
20         A.    Maria, she was the supervisor for the
21    manufacturing and training department; Elon, because he
22    was part of the media specialist, he took the lead on
23    most of that stuff.
24         Q.    Elon who?
25         A.    As in Elon Musk.
```

Exhibit 1, Page 7

1    stages or sections --

**2        A.    Yes.**

3        Q.    -- that you went through and then you were

4    told to go and wait and then you had to come back, that

5    sort of thing?

**6        A.    I'm sorry.  Could you restate the question.**

7        Q.    You said in total it was about an hour that

8    you spent at this hall in Fremont during this first

9    meeting to apply for this job at West Valley Staffing

10   Group.  Right?

**11       A.    Correct.**

12       Q.    All right.  Now, you say "in total."  Why is

13   it in total?  Were you involved with other things while

14   you were there?

**15       A.    So, as you said -- that's why I get it now --**

**16   yeah, there were stages.**

17       Q.    Okay.  So you would do one thing and then

18   be asked to wait and then you'd be called back in to do

19   something else and then you'd go out and wait in a room

20   somewhere, that sort of thing?

**21       A.    Correct.**

22       Q.    All right.  What was the result of this first

23   meeting?

**24       A.    The entire interview process?**

25       Q.    Just this first meeting.  What were you told

TITUS MCCALEB

June 18, 2019

1   at the end of this meeting in Fremont?

2       A.      "Congratulations, you excel above these

3   numbers.  We would like to offer you a job as part of

4   our production associates whom will be working in the

5   powertrain part of Tesla's factory in Fremont."

6       Q.      Were you told anything else about the job?

7       A.      At the time I was not.

8       Q.      So what you just told me is the total of what

9   you were told about this position at Tesla that you were

10  hired for?

11          MS. AVLONI:  Vague and ambiguous.

12          THE WITNESS:  At the time that's what I was

13  told.

14  BY MR. HORTON:

15      Q.      All right.  Do you recall being told anything

16  else about the job?

17      A.      At the moment, unfortunately, I do not.

18      Q.      All right.  So what happened next in the

19  application process?

20      A.      They emailed me information with a start date

21  for an orientation which would occur at the Fremont

22  warehouse.

23      Q.      At Tesla's Fremont warehouse?

24      A.      Correct.

25      Q.      By the way, what was the date, approximately,

TITUS MCCALEB

June 18, 2019

```
 1   BY MR. HORTON:
 2       Q.    Please take a look at Exhibit 3 and tell us
 3   when you're done reviewing it.
 4             Exhibit 3 is an email string that begins
 5   on Wednesday, October 19th, 2016, from Phillip Jaco,
 6   J-a-c-o.
 7             Are you done reviewing Exhibit 3?
 8       A.    Yes.
 9       Q.    Did you receive this from West Valley Staffing
10   Group when you were told that you were being hired by
11   West Valley to work at Tesla?
12       A.    This was the onboarding, the initial
13   onboarding I received.
14       Q.    Okay.  And you remember receiving this on or
15   about October 19, 2016?
16       A.    I want to say that that may be the correct
17   dates.  I'd have to check my emails, but this looks like
18   the same email.
19       Q.    And then you started work shortly thereafter?
20       A.    Yeah.  We started orientations.
21             MR. HORTON:  I'm going to mark this next
22   exhibit, Exhibit 5.
23             MS. AVLONI:  Counsel, I believe we're on
24   Exhibit 4.
25             MR. HORTON:  Oh, Exhibit 4?
```

Exhibit 1, Page 10

TITUS MCCALEB

June 18, 2019

```
1    talking to at Tesla's HR department?
2        A.    No.
3        Q.    Okay.  Do you remember speaking or
4    communicating with anyone from Tesla's Employee
5    Relations group?
6             MS. AVLONI:  Calls for speculation.
7             If you know.
8    BY MS. JENG:
9        Q.    Yeah, if you know.
10       A.    I'm sorry, I don't even know what that
11   department is; so, no.
12            MS. JENG:  Okay.  I don't think I have any
13   more questions.
14            MS. KOSSAYIAN:  Are we done now?
15            MS. AVLONI:  Fenn, do you have anything else?
16
17                  FURTHER EXAMINATION
18   BY MR. HORTON:
19       Q.    Just a couple of things I want to clarify.
20             When you referred to "Ron," are you referring
21   to Ron Lardizabal?
22       A.    Oh, there you go.  I think you almost
23   pronounced his name right.  That would be the Ron that
24   we're seeing in here (indicating).
25       Q.    And is that who you were referring to earlier
```

TITUS MCCALEB

1          THE WITNESS:  She's the associate manager.

2   BY MR. HORTON:

3      Q.    So when you referred to "Afton" you were

4   referring to Afton Versteegh, V-e-r-s-t-e-e-g-h; is that

5   correct?

6      A.    Correct.

7      Q.    And just a couple more follow-ups on the --

8   just towards your discrimination just to get some

9   identifications.

10          If you'll look at Exhibit 5, and specifically

11   page WV000397.  And I'd like you to look at the

12   Particulars section.  In the second paragraph where it

13   starts:

14          "I am African American.  On or about

15          November 7 or 8, 2016, a non-management

16          co-worker (non-African American) at TESLA

17          called me a 'nigger'/'nigga' while in the

18          presence of several Leads."

19          Who were you referring to?

20      A.    That was Carlos at that time.

21      Q.    That was who?

22      A.    Carlos.

23      Q.    Carlos.

24          MS. AVLONI:  Fenn, I'm just going to object

25   to the extent that my understanding was you had finished

TITUS MCCALEB

June 18, 2019

```
 1   your questioning, counsel had some follow-up questions,
 2   and it sounds like you're reopening your line of
 3   questions again with completely new questions, so --
 4            MR. HORTON:  Well, we're not at seven hours
 5   yet.
 6            MS. AVLONI:  We're not at seven hours.  It's
 7   just you're not really following the procedures set out
 8   under the Federal Rules of Civil Procedure.  I'll go
 9   ahead and let you --
10            MR. HORTON:  This is a deposition.
11            MS. AVLONI:  Yeah, I understand that.  I'll
12   go ahead and let you continue.  I just hope that you're
13   going to not go into a ton of new things that you
14   haven't already --
15            MR. HORTON:  I'm just trying to identify some
16   people.  That's all.
17            MS. AVLONI:  Okay.
18   BY MR. HORTON:
19      Q.   And then midway through the middle of that
20   same paragraph it starts:
21            "Finally, on or around June 2, 2017, yet
22            another non-management co-worker referred
23            to me as 'nigga.'"
24            Who are you referring to in that sentence?
25      A.   I'm not sure if this one is Giddeon or if this
```

Exhibit 1, Page 13

TITUS MCCALEB

June 18, 2019

```
 1   one is Marcel.  I'm taking it that the 15th would have
 2   been Marcel because he came to the line before Giddeon,
 3   so...  That would only make sense based on...
 4       Q.    Okay.  So in the sentence before that it
 5   starts:
 6            "On or around March 15, 2017, another
 7            non-management co-worker called me this
 8            word again."
 9            Who is that person you're referring to?  Is
10   that Giddeon?
11            MS. AVLONI:  Asked and answered.
12            MR. HORTON:  I asked it but he didn't answer.
13   BY MR. HORTON:
14       Q.    Is that Giddeon you were referring to in that
15   sentence?
16       A.    No.  I just said it right before when you
17   asked me that question.  You asked about June 2nd, and I
18   told you about March 15th, that that would have possibly
19   been Marcel because he was employed before Giddeon,
20   which would mean that Giddeon would have been June 2nd.
21       Q.    All right.  And then further down you say,
22   "Another manager, Afton Zersteegh," that should be
23   "Versteegh," though, shouldn't it?  V-e-r-s-t-e-e-g-h,
24   not "Zersteegh"?
25       A.    Correct.
```

Exhibit 1, Page 14

TITUS MCCALEB

June 18, 2019

1            I, JANIS JENNINGS, CSR No. 3942, Certified

2     Shorthand Reporter, certify:

3            That the foregoing proceedings were taken

4     before me at the time and place therein set forth, at

5     which time the witness was duly sworn by me;

6            That the testimony of the witness, the

7     questions propounded, and all objections and statements

8     made at the time of the examination were recorded

9     stenographically by me and were thereafter transcribed;

10           That the foregoing pages contain a full, true

11    and accurate record of all proceedings and testimony.

12           Pursuant to F.R.C.P. 30(e)(2) before

13    completion of the proceedings, review of the transcript

14    [  ] was [X] was not requested.

15           I further certify that I am not a relative or

16    employee of any attorney of the parties, nor financially

17    interested in the action.

18           I declare under penalty of perjury under the

19    laws of California that the foregoing is true and

20    correct.

21           Dated this 28th day of June 2019.

22

23

24    _____
      JANIS JENNINGS, CSR NO. 3942

25           CLR, CCRR

Exhibit 1, Page 15

On Wed, Oct 19, 2016 at 3:38 PM, Phillip Jaco <pjaco@westvalley.com> wrote:

Hello Titus,



EXHIBIT   3
The Cal sb  6/12/19
(WITNESS)        (DATE)
JANIS JENNINGS, CSR, CCRR

My name is Phillip and I wanted to say Congratulations on your new position at
Tesla Motors through West Valley Staffing Group (WVSG), we are excited to be
working with you! Please read this email thoroughly and complete all the
information.

Exhibit 1, Page 16

To start the application process; please follow the steps listed below. For your convenience you can complete all these steps at home.  If you have any questions during this process, please contact me directly so I may assist you through the process.

**Step 1:** View and Complete the Safety Training Video and Test at
www.westvalley.com/test

**Step 2:** You will receive an email from systems@efficientforms.com with instructions on how to complete your online employment application. (Please check your spam folder, as most emails end up there) If you have not received an email from us, please contact me and I will resend it.  During this process you will complete your online employment application and upload your 2 forms of valid identification for employment purposes.

> **▪ You must provide WVSG with acceptable documents as part of the I-9 process, or upload them into the Efficient Forms Systems.  The complete list will be provided when you fill out the Form I-9.**

>> 1.  You can take a picture of your ID's with your phone and email them to WVSG if you are having issues uploading them. Just make sure the picture is clear, and/or bring the original documents to the WVSG Office.

**Step 3:** The online employment application will include the following:

> ▪ Creating a pin for online signatures

> ▪ W-4 completion

> ▪ I-9 Verification, including providing WVSG with approved required documents

> ▪ Setting up Direct Deposit

> **▪ You must E-Sign your Application AND I9 Document to Finish the Process**

>> ➢ You will enter in your pin TWICE to complete the online Application Process.

Step 4:  Post-Offer Physical Exam

Print the Treatment Authorization form and take it with you to your appointment

The Newark facility has the most bandwidth to take walk-ins; we recommend that you go to Newark facility for your post offer Physical

*If you are not able to schedule a physical before your start date, please schedule an appointment off work hours at your earliest convenience.*

\*** You will know when you are done with the online application because you will have *two line items*; one that says "Employee Onboarding" and the other "I9" and *both* should have a "Pending Manager Approval" in the Status Column.

**Phillip Jaco** | Recruiter Administrative Assistant

**West Valley Staffing Group**

P: 408.735.1420 x3029| F: 408.730.5659

E: pjaco@westvalley.com  |  W: www.westvalley.com

*"#1 Staffing Agency in Silicon Valley" as rated by the Business Journal*

*"#1 Best Place to Work" as rated by the San Francisco Business Times*

# EXHIBIT 2

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    --------------------------------

REPORTER CERTIFIED
TRANSCRIPT

5    DEMETRIC DI-AZ, OWEN DIAZ and
     LAMAR PATTERSON, an individual,

6

7              Plaintiffs,                    **CONFIDENTIAL**

8        vs.                    No. 3:17-cv-06748-WHO
                                VOL II, pgs 187 - 292

9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CITISTAFF SOLUTIONS,
     INC.; WEST VALLEY STAFFING
11   GROUP; CHARTWELL STAFFING
     SERVICES, INC. and DOES 1-10,
12   inclusive,

13              Defendants.

14   --------------------------------

15

16              CONFIDENTIAL

17        VIDEOTAPED DEPOSITION OF

18              OWEN DIAZ

19        SAN FRANCISCO, CALIFORNIA

20        MONDAY, DECEMBER 3, 2018

21

22

23   Reported by:

24   GINA V. CARBONE, CSR #8249
     RPR, RMR, CRR, CCRR
25   FILE NO.:  18-27207

**Owen Diaz, Vol. II-Confidential**

| | | |
|---|---|---|
| 10:33:05 | 1 | Q.  Is there any reason that you feel you can't |
| 10:33:06 | 2 | proceed with your deposition today? |
| 10:33:08 | 3 | A.  No. |
| 10:33:09 | 4 | Q.  If at any point you feel like you can no |
| 10:33:11 | 5 | longer answer my questions truthfully and |
| 10:33:13 | 6 | accurately, will you let me know? |
| 10:33:15 | 7 | A.  Yes. |
| 10:33:18 | 8 | Q.  Have you taken any medicine that might |
| 10:33:20 | 9 | affect your ability to testify truthfully today? |
| 10:33:23 | 10 | A.  No. |
| 10:33:28 | 11 | Q.  Do you know Teshawna Stewart? |
| 10:33:34 | 12 | A.  I don't know.  I have to -- I'm pretty bad |
| 10:33:38 | 13 | with names, but maybe if you had a photo, I might |
| 10:33:44 | 14 | know the person. |
| 10:33:45 | 15 | Q.  Does the name sound familiar to you at all? |
| 10:33:54 | 16 | A.  Again, like I said, in order for me to |
| 10:33:57 | 17 | know.... |
| 10:34:01 | 18 | Q.  Sorry, are you finished? |
| 10:34:03 | 19 | A.  Oh, I would have to see a photo. |
| 10:34:05 | 20 | Q.  Okay.  The name, you don't recognize the |
| 10:34:08 | 21 | name? |
| 10:34:14 | 22 | A.  No. |
| 10:34:15 | 23 | Q.  How about Nigel Jones, do you know him? |
| 10:34:18 | 24 | A.  Again, I would have to see a photo. |
| 10:34:20 | 25 | Q.  Do you recognize his name? |

Exhibit C Page 21

**Owen Diaz, Vol. II-Confidential**

| | | |
|---|---|---|
| 10:34:27 | 1 | A.  Not everybody goes by their birth given |
| 10:34:29 | 2 | name, so they might go by a variation of their name, |
| 10:34:35 | 3 | so again, like I said, until I could see a photo, I |
| 10:34:38 | 4 | wouldn't know if I would know that person. |
| 10:34:41 | 5 | Q.  Do you recognize his name at all, then? |
| 10:34:44 | 6 | A.  No. |
| 10:34:49 | 7 | Q.  Do you believe Teshawna Stewart has any |
| 10:34:50 | 8 | information about your claims against Tesla or |
| 10:34:54 | 9 | CitiStaff? |
| 10:34:55 | 10 | MR. ORGAN:  Objection.  Calls for a legal |
| 10:34:57 | 11 | conclusion. |
| 10:34:58 | 12 | You can answer. |
| 10:35:03 | 13 | THE WITNESS:  I don't know. |
| 10:35:05 | 14 | BY MS. ANTONUCCI: |
| 10:35:06 | 15 | Q.  Did Teshawna Stewart witness any of the |
| 10:35:08 | 16 | conduct that you found to be offensive or harassing |
| 10:35:11 | 17 | while you were working at the Tesla factory? |
| 10:35:16 | 18 | MR. ORGAN:  Objection.  Calls for |
| 10:35:16 | 19 | speculation. |
| 10:35:17 | 20 | THE WITNESS:  I don't know. |
| 10:35:20 | 21 | BY MS. ANTONUCCI: |
| 10:35:20 | 22 | Q.  Do you have any reason to believe that |
| 10:35:23 | 23 | Teshawna Stewart would have witnessed any conduct |
| 10:35:25 | 24 | you found to be offensive at the Tesla factory? |
| 10:35:30 | 25 | MR. ORGAN:  Objection.  Calls for |

Exhibit 1 Page 22

1    I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2  CCRR, certify: that the foregoing proceedings were taken

3  before me at the time and place herein set forth; at

4  which time the witness was duly sworn; and that the

5  transcript is a true record of the testimony so given.

6

7    Witness review, correction and signature was

8  (X) by code.                 (X) requested.

9  ( ) waived.                   ( ) not requested.

10 ( ) not handled by the deposition officer due to party

11 stipulation.

12

13    The dismantling or unbinding of the original

14 transcript will render the reporter's certificate null

15 and void.

16    I further certify that I am not financially

17 interested in the action, and I am not a relative or

18 employee of any attorney of the parties, nor of any of

19 the parties.

20    Dated this 7th   day of December  , 2018  .

21

22    _____

23    GINA V. CARBONE
      CSR #8249, STATE OF CALIFORNIA

24

25

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

              Plaintiffs,

vs.                                        Case No. 3:17-cv-06748-WHO

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

              Defendants.
_____/

THE VIDEOTAPED DEPOSITION OF

THE PERSON MOST KNOWLEDGEABLE OF

WEST VALLEY STAFFING GROUP

TERESA KOSSAYIAN

Wednesday, April 24, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13559

```
 1       A.    Correct.
 2       Q.    Okay.  Now, have you personally conducted
 3   any investigations relative to Mr. Di-az's complaint
 4   of race harassment?
 5       A.    I have not.
 6       Q.    Are you aware of West Valley doing any
 7   investigation into Mr. Di-az's complaint of race
 8   harassment?
 9            MR. HORTON:  Objection.  Vague as to time.
10            Are you talking about before the lawsuit
11   was filed or after?
12            MR. ORGAN:  Yes -- let me break it down.
13   That's a good point.
14       Q.    Before Mr. Di-az filed this lawsuit, were
15   you aware of any complaints of discrimination or
16   harassment relative to Demetric Di-az?
17       A.    No.
18       Q.    Once -- so you didn't do any
19   investigations, obviously, because you weren't
20   aware.
21            Is that correct?
22       A.    That is correct.
23       Q.    And then after Mr. Di-az filed his
24   complaint of race harassment --
25            MR. HORTON:  No.
```

Exhibit 3, Page 26

```
 1              CERTIFICATE OF REPORTER

 2   STATE OF              )
     CALIFORNIA            )  ss.
 3                         )
     COUNTY OF MARIN

 4

 5

         I, PATRICIA ROSINSKI, a Certified Shorthand
 6   Reporter, holding a valid and current license issued by
     the State of California, CSR No. 4555, duly authorized to
 7   administer oaths, do hereby certify:

 8       That TERESA KOSSAYIAN, the witness in the
     foregoing deposition was administered an oath to
 9   testify to the whole truth in the said within-entitled
     cause;

10

         That said deposition was taken down by me in
11   shorthand at the time and place therein stated and
     thereafter transcribed into typewriting, by computer,
12   under my direction and supervision.

13       (xx) Reading and signing was requested.

14       (  ) Reading and signing was waived.

15       (  ) Reading and signing was not requested.

16       Should the signature of the witness not be
     affixed to the deposition, the witness shall not have
17   availed himself/herself of the opportunity to sign or
     the signature has been waived.

18

         I further certify that I am not interested in
19   the outcome of said action, nor connected with, nor
     related to any of the parties in said action, nor to
20   their respective counsel.

21

22       IN WITNESS WHEREOF, I have hereunto set my hand
     this.

23
     30th day of April, 2019.

24

25           _____
```

Bridget Mattos & Associates
(415)747-8710

Exhibit 3, Page 27

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

               Plaintiffs,

                     No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

               Defendants.

_____/

DEPOSITION OF ANNALISA HEISEN

May 29, 2019

Reported by:

Bridget M. Mattos, CSR No. 11410

1    there was a man named Nordano Ramirez who said he had

2    witnessed Mr. Foster engaging in threatening conduct

3    towards Mr. Diaz; correct?

4         **A.   Correct.**

5         Q.   Other than these four issues, the July 2015,

6    the October 2015, the November 2015, and then the

7    January 2016 incidents, are you aware of any other

8    complaints or investigations relating to Owen Diaz?

9         **A.   I'm not.**

10        Q.   Are you aware of any complaints or

11   investigations regarding Demetric Diaz?

12        **A.   Not during his time on contract with Tesla.**

13        Q.   Are you aware of any complaints regarding

14   Demetric Diaz from some other time?

15        **A.   No, just as relates to this case.**

16        Q.   Oh, in terms of Mr. Demetric Diaz filing this

17   case, is that what you're saying?

18        **A.   Correct.**

19        Q.   Have we now covered the results of any

20   investigations that you're aware of relating to any of

21   the plaintiff's claims of race harassment?

22        **A.   That's my understanding.**

23        Q.   In terms of Tesla's policies and procedures

24   for Tesla contractors to ensure that your contractors

25   enforce Tesla's antiharassment policies, is there

1    State of California            )

2    County of Marin                )

3

4              I, Bridget M. Mattos, hereby certify

5    that the witness in the foregoing deposition was by me

6    duly sworn to testify to the truth, the whole truth

7    and nothing but the truth in the within entitled

8    cause; that said deposition was taken at the time and

9    place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and disinterested person, and was thereafter

13   transcribed under my direction into typewriting by

14   computer; that the witness was given an opportunity to

15   read, correct and sign the deposition.

16              I further certify that I am not

17   interested in the outcome of said action nor connected

18   with or related to any of the parties in said action

19   nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on May 29, 2019.

22           _____

23             BRIDGET M. MATTOS, CSR NO. 11410

24

25

Exhibit 4, Page 31

# EXHIBIT 5

Page 1

1                UNITED STATES DISTRICT COURT
2                NORTHERN DISTRICT OF CALIFORNIA
3                  SAN FRANCISCO DIVISION
4
5

     DEMETRIC DI-AZ, OWEN DIAZ,
6    and LAMAR PATTERSON,
7                     Plaintiffs,
8    vs.                              CASE NO.
                                      3:17-CV-06748-WHO
9    TESLA, INC., dba TESLA
     MOTORS, INC.; CITISTAFF
10   SOLUTIONS, INC.; WEST VALLEY
     STAFFING GROUP; CHARTWELL
11   STAFFING SERVICES, INC.; and
     DOES 1-50, inclusive,
12
                     Defendants.
13   _____/
14
15        DEPOSITION OF AMY OPPENHEIMER, AWI-CH
16
17

     DATE:          March 9, 2020
18
     TIME:          10:06 a.m.
19
     LOCATION:   San Francisco, California
20
21
22   REPORTED BY:  BENJAMIN GERALD, CSR
                   California CSR No. 14203
23                 Washington CSR No. 3468
24
25   JOB NO.:      177233

Page 86

1   respect to Owen Diaz that you are identifying through

2   your opinions in Subsection C is the end of his

3   employment?

4         MR. ORGAN:   Objection.   Misstates her

5   testimony.   She just testified about that.

6         THE WITNESS:   I believe I said that there was

7   further racial harassment or evidence of that in the

8   workplace.

9   BY MS. HAINES:

10        Q.   Okay.   And you discussed all of that, correct?

11        A.   You mean the basis of that being the graffiti

12   that there's a picture of and the dashboard?

13        Q.   Okay.   Can you identify for me where in your

14   report in Section C where you refer to graffiti?

15        A.   I don't in Section C.

16        Q.   Well, that's what we're discussing is your

17   opinions there.

18        A.   But you just asked me a question that's broader

19   than that, and if I don't answer, I'm not being thorough

20   in my answer.

21        Q.   And again, without reviewing your documents,

22   your notes, and the deposition summaries, you would not

23   be able to identify any basis for the adverse

24   consequences that may have been suffered by

25   Demetric Di-Az; is that correct?

Page 87

1      A.   Well, what I would say is that there is

2   evidence, that would impact any of them, of continual

3   and continued racial harassment in the workplace --

4      Q.   Okay.

5      A.   -- and that was vis-?-vis graffiti, the

6   dashboard epithet, and testimony from other individuals

7   as to how often they heard the N-word and other racial

8   epithets, and then a complaint from, I believe it was

9   December of '15, from another individual, Henry, about

10   threats and the N-word.

11      Q.   Can you -- what -- what exhibits are you

12   referring to for this, the graffiti and the dashboard,

13   and the complaints from an individual named Henry?

14      A.   Well, if you want the exhibit numbers, I'd have

15   to look for them.

16           MR. ORGAN:   Objection.   Compound.

17           THE WITNESS:   Well, I think that the racist

18   graffiti is Exhibit 193.   The dashboard racist statement

19   might be Exhibit 188, but I want to check to verify.

20   And the Henry complaint I believe is Exhibit 189.

21   BY MS. HAINES:

22      Q.   And those are not exhibits listed in your

23   October 11th report.

24      A.   Those might be in the amended report.

25      Q.   Okay.   So that wasn't part of your opinion for

Page 91

1    the section.  But when you ask me a broader question

2    about what would apply here --

3         Q.  Well, I haven't asked you that question.

4         A.  Okay.  But my mistake not to parse out -- the

5    questions, when I've answered them, I haven't tried to

6    remember what I knew at the different time periods; I'm

7    looking at what I know in the case generally.  It's just

8    not a way that my mind works that easily.

9         Q.  You indicated you were relying on Exhibit 193

10   in connection with the graffiti.

11        A.  Well, again, when you say rely on, I would say

12   this is the evidence that I've seen as to the basis of

13   that -- this opinion.  So sure.

14             And I believe that was correct, although I

15   didn't -- I had a note about it.  I didn't look --

16        Q.  Okay.

17        A.  -- to confirm it.

18        Q.  And if Exhibit 193 regarding graffiti occurred

19   after any plaintiff worked at Tesla, would that affect

20   your opinion?

21        A.  Well, it doesn't have a direct impact on them,

22   but it's an indication that there is ongoing racial

23   harassment in that workplace despite these many other

24   complaints of racial harassment, that it has not been

25   successfully responded to.

Page 92

1          And no, I can't put a precise date to -- they
2    did see this piece of graffiti, or this happened during
3    the moments that they were on shift.   What I can look at
4    is environmentally, there's evidence of continued racial
5    harassment.

6          Q.   And by that, you mean that you're just looking
7    at Tesla -- just this information over any period of
8    time if it occurred at Tesla?

9          A.   Well, not any period of time.   This was fairly
10   close in time to these events.

11         Q.   And would --

12         A.   And the complaint from this other individual
13   was during the period of time.

14         Q.   Okay.   Is that the co-worker of any of the
15   plaintiffs?

16         A.   I don't recall whether -- or if I know if
17   they're on the same shift.   I guess I'm not even sure
18   what you mean by "co-worker."

19         Q.   Is that someone who worked with any of the
20   plaintiffs in this case?

21         A.   I don't know.

22         Q.   Do you know if any of the plaintiffs in this
23   case knew the individual in Exhibit 189?

24         A.   I don't know.   Some of -- some of the
25   management individuals are the same.

1    Q.  And there's no information about any of the

2  plaintiffs in Exhibit 189, correct?

3    A.  That's true.

4    Q.  And then you identified Exhibit 188 as the

5  dashboard?

6    A.  Correct.

7    Q.  Okay.  And again, that's after the time frame

8  that any of the plaintiffs were at Tesla?

9    A.  That's correct.

10    Q.  Okay.  And do you --

11        MR. ORGAN:  Objection.  Misstates the evidence.

12        THE WITNESS:  Okay.  The truth is, I'm focusing

13  on Owen Diaz.  I know it's after Owen Diaz was there,

14  and it's possible that the other plaintiffs were there a

15  little bit longer.  I'd have to check their dates.

16  BY MS. HAINES:

17    Q.  But that --

18    A.  I assumed when you said that that you were

19  aware of the dates, but I shouldn't assume that.

20    Q.  Exhibit 188 was after Owen Diaz left and --

21    A.  That's true.

22    Q.  -- also after Demetric Di-Az left?

23    A.  I belive it was a month after he left.

24    Q.  And it was also after Demetric Di-Az was no

25  longer at Tesla?

Page 94

1      A.   You know, I should probably check because I

2  agreed to something else you said without my independent

3  notes, and I probably shouldn't do that.

4      Q.   Okay.  Do you have notes somewhere about this

5  time that he worked?

6      A.   Sure.  I do.

7      Q.   Okay.

8      A.   Would you like me to check?

9      Q.   Yeah.

10     A.   I'm generally happy to -- my guess is that

11 you're much more familiar with these facts than I am.

12         You know, the dates are not popping out at me,

13 so I'm just going to say I don't know.

14         MS. HAINES:  Mark an exhibit, please.

15         (Exhibit 25 was marked for identification.)

16         THE REPORTER:  Exhibit 25.

17 BY MS. HAINES:

18     Q.   This is Exhibit 3 that was identified in

19 your -- Section 2 of your report, "materials reviewed."

20     A.   Okay.

21     Q.   Does this refresh your recollection as to the

22 dates of Demetric Di-Az's work at Tesla?

23     A.   Okay.  Yes.  Thank you.

24     Q.   Okay.  And so you would agree that the

25 Exhibit 188 about the dashboard took place well after

Page 95

1    Demetric Di-Az was working at Tesla?

2        A.   Yes.

3        Q.   Okay.   And do you have any information about

4    where at the Tesla facility the dashboard incident took

5    place in connection with Owen Diaz's workplace?

6        A.   No.

7        Q.   The same thing would be true for

8    Demetric Di-Az?

9        A.   Correct.

10       Q.   Let's turn to Section D of your amended report.

11           And you didn't make any changes between your

12   October 11th report and your amended report to this

13   section, correct?

14       A.   Correct.

15       Q.   Does that mean your opinion did not change?

16       A.   Yes.

17       Q.   Okay.   Okay.

18           And your opinion in Subsection D is only

19   related to Demetric Di-Az and Lamar Patterson?

20       A.   Correct.

21       Q.   Okay.   Are you aware of the status of plaintiff

22   Lamar Patterson?

23       A.   You know, I had a memory of being told that one

24   or the other or both of them was no longer in the case,

25   but I don't -- and that the -- the primary focus that I

Page 110

1   that come to mind in addition to the plaintiffs.

2        Q.   And so that statement encompass the purported

3   use of the N-word among employees other than Owen Diaz

4   and Demetric Di-Az?

5        A.   Yes.

6        Q.   And you're just relying on the deposition

7   testimony for that information?

8            MR. ORGAN:   Vague and ambiguous.

9            THE WITNESS:   Primarily the deposition

10  testimony.   Also, there was the graffiti, which was a

11  little -- just shortly after Owen left but was certainly

12  within that time frame of '15 to '17, as was the

13  dashboard -- not dashboard.   The front of that vehicle.

14  BY MS. HAINES:

15       Q.   And when you say the term was used without

16  retribution, what was that based on?

17       A.   The testimony that, unless there was a specific

18  complaint, there was no indication anybody had looked

19  into it or even saw it as problematic by a number of

20  people who testified.   I think maybe it was Jackson who

21  said that there was friendly use of the N-word.   And I

22  believe Wheeler also said it wasn't seen as an issue.

23  Maybe it was Wheeler who said he thought it was

24  friendly.   I think they said somewhat similar things.

25           Again, I guess, you know, when you talk about

Page 111

1   being used without retribution, even though there's

2   supposedly a zero-tolerance policy, and witnesses

3   indicate it's a serious offense, potentially a

4   terminable offense.

5           I believe Quintero said that when it came to

6   racist statements or threats -- maybe this was a

7   reference to the racist effigy -- that it's important

8   for Owen Diaz to be thick-skinned and accept an apology.

9   Well, that's a way of communicating that these are not

10  very important actions, these racist epithets and

11  perceived threats, and they should be forgiven and move

12  on.

13          Q.  Anything else?

14          A.  Well, in the earlier complaint there was no

15  rigorous attempt to determine whether Timbreza had made

16  racist comments, and instead he was, you know, simply

17  warned about joking.

18          Again, if the -- there was a serious

19  zero-tolerance policy for using racial epithets and

20  making racial comments and threats, then I would expect

21  to see a rigorous investigation and findings, and expect

22  to see action taken.

23          Q.  The emails, the contemporaneous emails

24  concerning the complaint about Timbreza, did not specify

25  what language was used, correct?

1                          CERTIFICATE

2           I, BENJAMIN GERALD, Certified Shorthand Reporter,

3    Certificate No. 14203, for the State of California do

4    hereby certify:

5           That prior to being examined, the witness named in

6    the foregoing deposition was by me duly sworn to testify

7    to the truth, the whole truth, and nothing but the truth

8    in the within-entitled cause;

9           That said deposition was taken shorthand at the

10   time and place herein named;

11          That the deposition is a true record of the

12   witness's testimony as reported to the best of my

13   ability by me, and was thereafter transcribed to

14   typewriting by computer under my direction;

15          That request [ ] was [X] was not made to read and

16   correct said deposition.

17          I further certify that I am not interested in

18   the outcome of said action, nor am I connected with, nor

19   related to any of the parties in said action, nor to

20   their respective counsel.

21          Witness my hand this 12 day of March, 2020

22          _____

23          _____

24          BENJAMIN GERALD, CSR No. 14203

            STATE OF CALIFORNIA

25

# EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEMETRIC DIAZ, et al.,            )
                                  )
                Plaintiffs,       )
                                  )   Case No.
          v.                      )   3:17-cv-06748-WHO
                                  )
TESLA, INC., et al.,              )
                                  )
                Defendants.       )
_____  )


VIDEOTAPED DEPOSITION OF ANDRES DONET


DATE:                  Thursday, October 24, 2019

TIME:                  4:39 p.m.

LOCATION:              Sheppard, Mullin, Richter &
                       Hampton LLP
                       379 Lytton Avenue
                       Palo Alto, California  94301


REPORTED BY:           Peter Torreano, CSR, CRR
                       Certified Shorthand Reporter
                       License Number C-7623

Exhibit 6, Page 45

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:19:35  1    see here that he was copied here.  He's copied here.
17:19:39  2    He and Andre Llaljie is copied.
17:19:43  3        Q.    Sure.  So your practice included sending any
17:19:46  4    notices relative to cleaning up graffiti or complaints
17:19:51  5    about graffiti to your boss, Victor Quintero, when he
17:19:56  6    was your boss; is that correct?
17:19:57  7        A.    Yeah, yeah.  He was in the building services
17:20:00  8    area.  So he didn't receive the information firsthand,
17:20:06  9    same as me, but, you know, we are -- we were more in
17:20:10 10    the operations side.  So we were -- that person -- the
17:20:14 11    people who deals with the issue on cleaning properly.
17:20:20 12        Q.    I also notice there's a person here named
17:20:24 13    James Moffitt.  Do you see that name?
17:20:25 14        A.    James Moffitt, yeah.
17:20:26 15        Q.    Who was he?
17:20:27 16        A.    He was the janitorial employee, janitorial
17:20:32 17    lead at that time.
17:20:32 18        Q.    Okay.  Did you -- did you ever watch any of
17:20:37 19    the efforts to clean up the graffiti?
17:20:41 20        A.    I don't remember where, but, yeah, I believe
17:20:52 21    so.  I don't remember where, but yeah.  Yeah, for sure.
17:20:57 22    Sometime for sure I -- I maybe saw it.  It's the kind
17:21:05 23    of thing you see.  You apply a chemical and rub it and
17:21:10 24    everything is gone.
17:21:11 25        Q.    I'm going to show you what's been premarked as

Exhibit 6, Page 46

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:21:13  1    Exhibit 194.   Do you recognize --

17:21:16  2            MR. HASAN:   I'm going to object to the

17:21:18  3    questions about this exhibit.   It hasn't been produced

17:21:23  4    and discovery is closed.

17:21:24  5            MR. ORGAN:   It actually has, Counsel.   It's

17:21:27  6    been produced.

17:21:27  7            MR. HASAN:   It has been produced?

17:21:29  8            MR. ORGAN:   Yeah.

17:21:30  9            MR. HASAN:   Where?   When?

17:21:31  10           MR. ORGAN:   It's been produced in another

17:21:32  11   case.

17:21:32  12           MR. HASAN:   It hasn't been produced in this

17:21:35  13   case.

17:21:35  14           MR. ORGAN:   It doesn't have to be.

17:21:37  15   BY MR. ORGAN:

17:21:37  16      Q.   Question:   This is reportedly something that

17:21:40  17   was put up.   It was a poster that was put up in the

17:21:43  18   bathrooms and you can see faintly in the red ink the

17:21:49  19   word "nigger."   I'm wondering did you ever receive a

17:21:53  20   report about such a poster in the bathrooms?

17:21:57  21           MR. HASAN:   Objection.   Calls for speculation.

17:22:00  22   Misstates testimony.   Compound.   Outside the scope of

17:22:05  23   this ordered testimony.

17:22:10  24           THE DEPONENT:   When did this happen?

17:22:11  25           MR. ORGAN:   I don't have the exact date, but

## VIDEOTAPED DEPOSITION OF ANDRES DONET

17:22:12  1  my understanding is it happened during this time

17:22:15  2  period.

17:22:16  3          THE DEPONENT:  It was in that time period?

17:22:17  4          MR. HASAN:  Objection.

17:22:18  5          MR. ORGAN:  Yeah.

17:22:19  6          THE DEPONENT:  It might not.  This is kind

17:22:22  7  of -- using this letter it's a different kind before.

17:22:29  8  So I don't know.  But I haven't seen this.

17:22:31  9  BY MR. ORGAN:

17:22:31 10      Q.   You haven't seen this before?

17:22:32 11      A.   No, no.

17:22:33 12      Q.   This wasn't reported to you from before --

17:22:36 13      A.   Yes.  As far as I could remember, no, it

17:22:39 14  hasn't.  I've never seen it.

17:22:41 15      Q.   It had something -- this might help you in

17:22:43 16  terms of the timing.  I think there is something about

17:22:48 17  union organizing on the poster.  I don't know what time

17:22:52 18  period that was.  Do you know?

17:22:54 19          MR. HASAN:  Objection.  Calls for speculation.

17:22:56 20  Outside the scope of ordered testimony.  Compound.

17:23:00 21          THE DEPONENT:  I don't know.  Maybe 2016,

17:23:07 22  2017.

17:23:07 23          MR. HASAN:  Don't guess.

17:23:11 24  BY MR. ORGAN:

17:23:11 25      Q.   I'm entitled to your best estimate, though.

Exhibit 6, Page 48

REPORTER'S CERTIFICATE

1

2          I, Peter Torreano, duly authorized to

3    administer oaths pursuant to Section 2093(b) of the

4    California Code of Civil Procedure, do hereby certify:

5          That the witness in the foregoing deposition

6    was administered an oath to testify to the whole truth

7    in the within-entitled cause; that said deposition was

8    taken at the time and place therein cited; that the

9    testimony of the said witness was reported by me and

10   was thereafter transcribed under my direction into

11   typewriting; that the foregoing is a full and

12   accurate record of said testimony; and that the witness

13   was given an opportunity to read and correct said

14   deposition and to subscribe the same.

15         Pursuant to Federal Rule 30(e), transcript

16   review was requested.

17         I further certify that I am not of counsel nor

18   attorney for any of the parties in the foregoing

19   deposition and caption named nor in any way interested

20   in the outcome of the cause named in said caption.

21                         Dated:  November 2, 2019

22

23

24   _____
                                      PETER TORREANO, CSR NO. 7623

25

Exhibit 6, Page 49

# EXHIBIT 7

Owen Diaz-Confidential

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4
                                    REPORTER CERTIFIED
 5   _____      TRANSCRIPT

 6   DEMETRIC DI-AZ, OWEN DIAZ and
     LAMAR PATTERSON, an individual,
 7                                   CONFIDENTIAL
             Plaintiffs,
 8
     Vs.                     Case No. 3:17-cv-06748-WHO
 9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CitiStaff SOLUTIONS, INC.;
     WEST VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING SERVICES, INC.
     and DOES 1-10, inclusive,
12
             Defendants.
13   _____/

14

15

16                     CONFIDENTIAL

17               VIDEOTAPED DEPOSITION OF

18                      OWEN DIAZ

19               SAN FRANCISCO, CALIFORNIA

20               TUESDAY, MAY 22, 2018

21

22

23
     Reported By:
24   Candy Newland
     CSR No. 14256
25   File No. 18-25470
```

CHASE
LITIGATION SERVICES

Exhibit 7 Page 51

1

| | | |
|---|---|---|
| 04:54:35 | 1 | Q.     Did Wayne ever speak with you about good |
| 04:54:42 | 2 | customer service and any negative incident leading to |
| 04:54:48 | 3 | your termination? |
| 04:54:50 | 4 |         MR. ORGAN:  Objection.  Compound. |
| 04:54:51 | 5 |         THE WITNESS:  Not that I can recall. |
| 04:54:51 | 6 | BY MS. ANTONUCCI: |
| 04:54:52 | 7 | Q.     Did Wayne ever speak to you about giving a final |
| 04:54:56 | 8 | written notice to you? |
| 04:55:00 | 9 | A.     No. |
| 04:55:09 | 10 | Q.     Did Wayne Jackson ever tell you that it was |
| 04:55:12 | 11 | critical for you to provide good customer service to |
| 04:55:15 | 12 | your customers? |
| 04:55:16 | 13 | A.     Not that I recall.  No. |
| 04:55:19 | 14 | Q.     Did Wayne ever tell you --instruct you to follow |
| 04:55:22 | 15 | direction and follow up with Ed or him if you had any |
| 04:55:29 | 16 | issues or concerns? |
| 04:55:31 | 17 |         MR. ORGAN:  Objection.  Compound. |
| 04:55:33 | 18 |         THE WITNESS:  I don't recall. |
| 04:55:33 | 19 | BY MS. ANTONUCCI: |
| 04:55:57 | 20 | Q.     Who is Troy Dennis? |
| 04:55:57 | 21 | A.     I don't know.  Unless I can see him or a picture |
| 04:56:04 | 22 | or something, I wouldn't know. |
| 04:56:39 | 23 |         (EXHIBIT 22 was marked for identification.) |
| 04:56:39 | 24 | BY MS. ANTONUCCI: |
| 04:56:43 | 25 | Q.     Exhibit 22 is an e-mail from Monica DeLeon at |

1        I, CANDY NEWLAND, CSR No. 14256, certify that the

2   foregoing proceedings were taken before me at the time

3   and place herein set forth, at which time the witness

4   was duly sworn, and that the transcript is a true record

5   of the testimony so given.

6

7   Witness review, correction, and signature was

8   (X) by Code.                 (X) requested.

9   ( ) waived.                  ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13       The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificate null and void.

16       I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties nor of any of

19  the parties.

20       Dated this 29TH day of May, 2018.

21

22

23

24  _____

25          CANDY NEWLAND, CSR 14256

186

# EXHIBIT 8

```
 1                  UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5    DEMETRIC DI-AZ, OWEN DIAZ, and      )
      LAMAR PATTERSON,                    )
 6                                        )
                      Plaintiffs,         )
 7                                        )  Case No.
             vs.                          )  3:17-cv-06748-WHO
 8                                        )
      TESLA, INC. dba TESLA MOTORS,       )  Pages 1 - 142
 9    INC.; CITISTAFF SOLUTIONS, INC.;    )
      WEST VALLEY STAFFING GROUP;         )
10    CHARTWELL STAFFING SERVICES, INC.; )
      and DOES 1-50, inclusive,          )
11                                        )
                      Defendants.         )
12    _____)

13

14

15

16            VIDEO DEPOSITION OF ERIN MARCONI

17               MONDAY, OCTOBER 21, 2019

18                    11:39 A.M.

19

20

21

22

23    REPORTED BY:  LAURA J. MELLINI

24             CSR NO. 8181, RPR, CCRR

25    NDS JOB NO.:  220525
```

1

| | | |
|---|---|---|
| 1 | contract basis, but through a third party, like a West | 11:51 |
| 2 | Valley. | 11:51 |
| 3 | Q    Okay.  So there were -- in the areas that you | 11:51 |
| 4 | had responsibility for in terms of human resources, | 11:51 |
| 5 | there were both Tesla employee -- regular employees, and | 11:51 |
| 6 | also temporary workers who were working through a | 11:51 |
| 7 | contract with a company like West Valley or Citistaff; | 11:51 |
| 8 | is that right? | 11:51 |
| 9 | A    I don't recall Citistaff.  West Valley for | 11:51 |
| 10 | sure. | 11:51 |
| 11 | Q    Okay.  NextSource, was that another company | 11:51 |
| 12 | that had contract employees there? | 11:51 |
| 13 | A    I came into contact with them towards the end | 11:51 |
| 14 | of my time there.  They definitely didn't go through the | 11:51 |
| 15 | avenues that a West Valley or a Volt prior to them went | 11:51 |
| 16 | through. | 11:52 |
| 17 | Q    What do you mean by that? | 11:52 |
| 18 | A    My impression -- understanding was that they | 11:52 |
| 19 | had 1099s and then sent people out, but I don't know | 11:52 |
| 20 | because I wasn't involved in any of the contract. | 11:52 |
| 21 | Q    There was an area of the facility that dealt | 11:52 |
| 22 | with recycling at the plant.  Do you remember that? | 11:52 |
| 23 | A    Yep. | 11:52 |
| 24 | Q    Did you have anything to do with the recycling | 11:52 |
| 25 | area or those employees? | 11:52 |

18

Exhibit 8, Page 56

Erin Marconi                                              October 21, 2019

```
 1        A     Yes and no.  I worked with Aaron Phillips        11:52
 2   who -- I don't recall his title, but he was over what       11:52
 3   eventually was termed environmental sustainability and      11:52
 4   had that area.  I didn't interact directly with anyone      11:52
 5   in that area.                                               11:52
 6        Q     There was a manager -- a Tesla manager named     11:52
 7   Victor Quintero.  Did you ever work with him?              11:52
 8        A     Yes.                                             11:53
 9        Q     Okay.  And what --                               11:53
10        A     Briefly.                                         11:53
11        Q     What was your role -- what was the time period   11:53
12   during which you were working with Victor Quintero?  Do     11:53
13   you remember?                                               11:53
14        A     I believe it would have been sometime in 2015    11:53
15   to sometime in early 2016.                                  11:53
16        Q     Okay.                                            11:53
17        A     That said, it was spotty.  I was in and out a    11:53
18   lot for personal reasons.                                   11:53
19        Q     Okay.  But your best memory is that you worked   11:53
20   with Victor Quintero in 2015 and then early part of         11:53
21   2016; is that correct?                                      11:53
22        A     Yes.                                             11:53
23        Q     Okay.  And Victor Quintero was the manager       11:53
24   over what became environmental sustainability; is that      11:53
25   correct?                                                    11:53
```

                                                              19

Exhibit 8, Page 57

Erin Marconi                                                          October 21, 2019

```
 1        A    If I recall correctly, somebody put boobs on      13:43

 2   like -- you know the male/female symbols on bathrooms?      13:43

 3   Somebody drew boobs.                                        13:43

 4        Q    Okay.                                             13:43

 5        A    Yeah.  Definitely this is not the same group.     13:43

 6        Q    Okay.  This being the chassis 3 that's            13:43

 7   identified in Exhibit 189; right?                           13:44

 8        A    Correct.                                          13:44

 9        Q    So chassis 3 is different from the stamping       13:44

10   division where the boobs on the bathroom drawing was;       13:44

11   right?                                                      13:44

12        A    Uh-huh.                                           13:44

13        Q    "Yes"?                                            13:44

14        A    Correct.                                          13:44

15        Q    Okay.                                             13:44

16        A    So, similarly, if they had done something         13:44

17   here, I might not know about it if I'm not supporting       13:44

18   that group.                                                 13:44

19        Q    I see.                                            13:44

20        MR. ORGAN:  What do you guys want to do about          13:44

21   lunch?  Because we probably have to give a lunch break      13:44

22   for our videographer and court reporter, and it's           13:44

23   already 1:44.                                               13:44

24        MS. KENNEDY:  Sure.  How much longer do you            13:44

25   have?  We can go grab a quick bite.                         13:44
```

                                                                      82

Erin Marconi                                                        October 21, 2019

```
1   STATE OF CALIFORNIA         )

2                               )  ss.

3   COUNTY OF LOS ANGELES       )

4

5           I, LAURA J. MELLINI, Certified Shorthand

6   Reporter, Certificate No. 8181, for the State of

7   California, hereby certify:

8           I am the deposition officer that

9   stenographically recorded the testimony in the foregoing

10  deposition;

11          Prior to being examined the deponent was first

12  duly sworn by me;

13          The foregoing transcript is a true record of

14  the testimony given;

15          Before completion of the deposition, review of

16  the transcript [  X  ] was [    ] was not requested.  If

17  requested, any changes made by the deponent (and

18  provided to the reporter) during the period allowed are

19  appended hereto.

20

21  Dated_____.

22

23                    _____

24                          LAURA J. MELLINI

25                          CSR NO. 8181, RPR, CCRR
```

141

Exhibit 8, Page 59

# EXHIBIT 9

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                                        REPORTER CERTIFIED
                                             TRANSCRIPT
4    _____
     DEMETRIC DI-AZ, OWEN DIAZ
5    and LAMAR PATTERSON, an             No. 3:17-cv-06748-WHO
     individual,
6
              Plaintiffs,
7                                            CONFIDENTIAL
          vs.
8
     TESLA, INC. DBA TESLA
9    MOTORS, INC.; CITISTAFF
     SOLUTIONS, INC.; WEST
10   VALLEY STAFFING GROUP;
     CHARTWELL STAFFING
11   SERVICES, INC., and DOES
     1-10, inclusive,
12
              Defendants.
13   _____

14

15                  CONFIDENTIAL

16                Deposition of

17               LAMAR PATTERSON

18           San Francisco, California

19            Friday, July 26, 2019

20

21

22

23   REPORTED BY:
     Sarah Jean Seitz
     CSR No. 14175, RPR
24   FILE No:  19-29151

25

1    Department of Fair Employment and Housing?

2         A.  No.

3         Q.  Have you ever filed a charge with the Equal

4    Employment Opportunity Commission?

5         A.  No.

6         Q.  What about the Labor and Workforce Development

7    Agency?

8         A.  No.

9         Q.  Have you ever filed a formal or informal

10   complaint against any of your employers?

11        A.  No.

12        Q.  Other than this lawsuit, did you submit a

13   formal or informal complaint with anyone against Tesla?

14        A.  No.

15        Q.  And while you worked at Tesla, did you submit

16   any formal or informal complaint with anyone about --

17   against Tesla?

18        A.  No.

19        Q.  Did you ever file for bankruptcy?

20        A.  No.

21        Q.  Have you ever been convicted of a felony?

22        A.  No.

23        MS. AVLONI:  I would just like to clarify that

24   our office had filed a DFEH complaint on Mr. Patterson's

25   behalf.  He just may not have known what it was.

**Lamar Patterson-Confidential**

1    "BKG/DT."  What does that refer to?

2        A.  I don't know.

3        Q.  So at the time you applied to Chartwell, did

4    you know that you were going to be placed at Tesla?

5        A.  Yes.

6        Q.  Were you looking specifically to be placed at

7    Tesla?

8        A.  No.

9        Q.  Okay.  Do you see at that top where it says

10   "Applicant Information" and then you go down about four

11   lines and it says "Position applied for," and it says

12   "Tesla."

13           What was your understanding of what the

14   position was that you were applying for?

15       A.  What was the understanding?

16       Q.  Yeah.  What did you think you were applying

17   for?

18       A.  Just a warehouse position.

19       Q.  Okay.  You just didn't know that it was at

20   Tesla?

21       A.  No, I didn't.

22       Q.  Did you write that in where it says "Position

23   applied for"?

24       A.  No.

25       Q.  Did you care where you were placed?

Lamar Patterson-Confidential

1       A.   No.   Not at the time.

2       Q.   Okay.   Did you submit a separate resume to

3   Chartwell or just this application?

4       A.   Did I -- can you repeat that?

5       Q.   Sure.

6            Did you submit a separate resume to Chartwell

7   when you applied, or did you just fill out this

8   application?

9       A.   I believe I just filled out the application.

10       Q.   What happened after you submitted this

11   application?

12       A.   I was hired.

13       Q.   Did you interview with anybody before you were

14   hired?

15       A.   Yes.

16       Q.   Okay.   Who did you interview with?

17       A.   With Chartwell.

18       Q.   Okay.   Do you remember who it was that

19   interviewed you?

20       A.   No.

21       Q.   Do you remember when your interview was?

22       A.   No.   Not exactly.

23       Q.   Do you have an estimate of when it was?

24       A.   No.

25            MS. AVLONI:   Counsel, I'm trying to figure out

1  exactly where to draw the line, but the reality is this

2  is a deposition in the Diaz matter.  And I know some of

3  these questions are foundational, but a lot of these

4  questions are also really not relevant to the Diaz

5  matter.  So --

6          MS. JENG:  Well, I assume that he is going to

7  be testifying about his experience at Tesla.  If he is,

8  I'm entitled to ask questions about the context of his

9  anticipated testimony and his employment experience.

10         MS. AVLONI:  And that's where I'm trying to

11 draw the line.  If we are going to talk about his

12 interviews at Chartwell, I just don't see how that is

13 relevant, so if you can just be cognizant of that.  I'm

14 just raising this right now.  I haven't instructed him

15 not to respond to any questions.

16         MR. ARANEDA:  Is that a proper basis to

17 instruct him not to answer --

18         MS. AVLONI:  Relevance.  Relevance.  So . . .

19         MS. JENG:  Right.  That's just not a proper

20 basis to instruct him not to answer, which I know you

21 are not doing, but . . .

22         MS. AVLONI:  Well, okay.  If I have to go to

23 harassing or whatnot, I can do that as well.  The

24 reality is -- I will allow you to continue asking

25 questions, but I just also want you to be cognizant

1   of -- this is not Lamar's deposition for his case.   This

2   is really a deposition in the Diaz matter, and he is a

3   witness.   So . . .

4        MS. JENG:   Right.   The plaintiffs in this case

5   have -- had discovery responses saying that

6   Mr. Patterson will be testifying, not just about them,

7   but about his own experience at Tesla.   So I'm entitled

8   to questions regarding his experience at Tesla,

9   including his employment, how it began, how it ended.

10        And I assume he is going to be testifying about

11   that in this case as well.   If he'll stipulate not to,

12   then I'll reconsider, but . . .

13        MS. AVLONI:   If you'll stipulate to using this

14   deposition for his case, then we'll agree to that.   You

15   can ask him whatever you want to.   But the reality is,

16   if he is going to be called in twice for full eight-,

17   nine-hour depositions, that's just harassing.

18        MS. JENG:   Well, if he is going to be

19   testifying about the same things in his case as this

20   case, then I'm entitled to the same answers and

21   questions --

22        MS. AVLONI:   I understand that, but the

23   reality is --

24        MS. JENG:   That is the reality.   Is he going to

25   be testifying --

Lamar Patterson-Confidential

```
 1    BY MS. JENG:
 2         Q.   Do you know anybody named Judy Timbreza?
 3         A.   No.
 4         Q.   Okay.  Does that name sound familiar at all?
 5         A.   No.
 6         Q.   Have you ever heard that name?
 7         A.   Possibly.
 8         Q.   But you don't have any recollection, as you sit
 9    here today, of ever hearing that name?
10         A.   No.
11         Q.   Are you familiar with someone named Ramon
12    Martinez?
13         A.   Yes.
14         Q.   Okay.  And who is Mr. Martinez?
15         A.   He worked at Tesla.
16         Q.   When did you first meet him, if you met him?
17         A.   When did I first meet him?
18         Q.   Uh-huh.
19         A.   I don't know.
20         Q.   Did you work with him?
21         A.   No.
22         Q.   How did you know who he was?
23         A.   Just through other employers.
24         Q.   Employers?
25         A.   Well, people that worked there.  Sorry.
```

1   Q.   Okay.   Have you ever met him?

2   A.   Just briefly.

3   Q.   Okay.   Have you ever talked to him?

4   A.   Briefly.

5   Q.   How many times?

6   A.   I don't know how many times.

7   Q.   Was it under five?

8   A.   Possibly.

9   Q.   Do you -- was it over five?

10   A.   It could be about under five.   I'm not

11   positive.

12   Q.   What is your best estimate?

13   A.   Maybe two to three.

14   Q.   Okay.   What did you guys talk about when you

15   met him briefly two to three times?

16   A.   Just work-related stuff.

17   Q.   Okay.   Did you and Mr. Martinez ever talk about

18   non-work-related things?

19   A.   No.

20   Q.   Do you know what agency he worked with?

21   A.   No.

22   Q.   Have you ever witnessed Ramon and Owen

23   interacting?

24   A.   Yes.

25   Q.   Okay.   How many times?

Lamar Patterson-Confidential

1      A.   Not that many times.

2      Q.   How many would you -- how many would you

3   estimate?

4      A.   Maybe once or twice.

5      Q.   Okay.   Did you and Owen work in the same area

6   as Mr. Martinez?

7      A.   No.

8      Q.   Okay.   How -- do you know what area he was

9   working in?

10     A.   No.

11     Q.   So you saw Ramon and Owen interacting once or

12   twice.   What was their first interaction like that you

13   saw?

14     A.   I don't recall.

15     Q.   You don't recall anything about it?

16     A.   No.

17     Q.   Was it short?

18     A.   Yes.

19     Q.   Okay.   Was it work related?

20     A.   Yes.

21     Q.   Was there anybody else around?

22     A.   I don't recall.

23     Q.   Okay.   And then the second interaction between

24   Ramon and Owen that you saw, do you recall any details

25   about that?

**Lamar Patterson-Confidential**

```
 1        A.   No.

 2        Q.   Was it work related?

 3        A.   Possibly.

 4        Q.   Do you remember any interactions that they've

 5  had that are not work related?

 6        A.   No.

 7        Q.   Can you recall any other times that you heard

 8  or saw Owen and Ramon interacting with each other?

 9        A.   No.

10        Q.   Have you been told by anybody about the

11  interactions between Owen and Ramon that occurred prior

12  to you starting work at Tesla?

13            MS. AVLONI:   Objection to the extent it calls

14  for attorney-client communication.

15            Do not respond with regards to anything you

16  learned from us.

17            THE WITNESS:   No.   I don't recall.

18  BY MS. JENG:

19        Q.   Okay.   Have you ever -- has Owen ever told you

20  anything about Ramon?

21        A.   Just the situation with the drawing.

22        Q.   The drawing?

23        A.   Yes.

24        Q.   Okay.   Has Owen told you anything else about

25  Ramon?
```

```
 1        A.   No.

 2        Q.   And when did Owen tell you about the drawing?

 3        A.   What day or --

 4        Q.   When?

 5        A.   I can't say what date.   I'm not sure.

 6        Q.   Okay.   You don't have to give me a specific

 7   date, but do you recall when Owen told you about the

 8   drawing?

 9        A.   No.

10        Q.   Was it while you were still at Tesla or after?

11        A.   While I was still working there.

12        Q.   Okay.   Was it around the time of the drawing or

13   after?

14        A.   So -- okay.   Can you repeat the question?

15        Q.   Sure.

16             I'm trying to get a sense of when Owen spoke to

17   you about Ramon and the drawing.

18        A.   The day of the -- the day of.

19        Q.   The day of the drawing?

20        A.   Yes.

21        Q.   Okay.   And what did he tell you about the

22   drawing?

23        A.   How offensive it was, and that's about it.

24        Q.   Are you aware of any incident or conflicts

25   between Ramon and Owen that occurred prior to you
```

1   starting work at Tesla?

2       A.  I'm not aware.

3       Q.  How did Owen tell you about Ramon and the

4   drawing on the day that it happened?

5           MS. AVLONI:  Vague and ambiguous.

6           THE WITNESS:  How did he tell me?

7   BY MS. JENG:

8       Q.  Yeah.  Did he approach you and tell you about

9   it?

10      A.  Well, I seen the drawing.

11      Q.  Okay.  Were you there with him?

12      A.  The day of it happening?

13      Q.  When --

14      A.  Or the day --

15      Q.  Were you both present at the same time?

16          MS. AVLONI:  Vague and ambiguous.

17          THE WITNESS:  I believe he seen it before me.

18  BY MS. JENG:

19      Q.  Uh-huh.

20      A.  So I'm not going to say that I wasn't there the

21  same day, but maybe I was.  I'm not positive.

22      Q.  Okay.  So Owen saw the drawing before you, and

23  then did he tell you about it?

24      A.  Yes.

25      Q.  And then did you go look at it yourself?

**Lamar Patterson-Confidential**

1     A.   Yes.

2          Q.   And what did you observe?

3          A.   I seen a drawing.  A picture of a drawing --

4          Q.   A what drawing?

5          A.   A picture of a person colored in black with a

6     noose around it.

7          Q.   Do you remember what date it was,

8     approximately?

9          A.   No.  I don't remember the date.

10         Q.   Was it towards the beginning of your time at

11    Tesla or towards the end?

12         A.   Maybe the beginning.

13         Q.   Okay.  And where was the drawing?

14         A.   Where was it or where was it on?

15         Q.   Both.

16         A.   The drawing was inside of the elevator when I

17    saw it.

18         Q.   Okay.  Had it been moved?

19         A.   Yes.

20         Q.   By whom?

21         A.   I'm not sure.

22         Q.   Okay.  Do you know where it originally was?

23         A.   No.

24         Q.   Okay.  Did someone show you the drawing?

25         A.   Yes.

Exhibit 10 Page 72

```
 1              CERTIFICATE OF REPORTER

 2          I, SARAH J. SEITZ, CSR No. 14175, RPR, certify:

 3    That the foregoing proceedings were taken before me at

 4    the time and place herein set forth; at which time the

 5    witness was duly sworn; and that the transcript is a

 6    true record of the testimony so given.

 7          Witness review, correction, and signature was

 8    (X) By code.                 (X) Requested.

 9    ( ) Waived.                  ( ) Not requested.

10    ( ) Not handled by the deposition officer due to party

11    stipulation.

12

13          The dismantling, unsealing, or unbinding of the

14    original transcript will render the reporter's

15    certificate null and void.

16          I further certify that I am not financially

17    interested in the action, and I am not a relative or

18    employee of any attorney of the parties, nor of any of

19    the parties.

20          Dated this 6th day of August, 2019.

21

22

23    _____

24    SARAH J. SEITZ, CSR No. 14175, RPR

25
```

# EXHIBIT 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

DEMETRIC DIAZ, OWEN DIAZ AND          )
LAMAR PATTERSON,                      )
                                      )
                    Plaintiffs,       )CASE NO.
                                      )3:17-cv-06748-WHO
         vs.                          )
                                      )
TESLA, INC., DBA TESLA MOTORS,        )
INC.; CITISTAFF SOLUTIONS, INC.;      )
WEST VALLEY STAFFING GROUP;           )
CHARTWELL STAFFING SERVICES,          )
INC.; AND DOES 1-50, INCLUSIVE,       )
                                      )
                    Defendants.       )
_____)


VIDEOTAPED DEPOSITION OF TAMOTSU KAWASAKI


DATE:          OCTOBER 9, 2019

TIME:          2:05 P.M.

LOCATION:      CALIFORNIA CIVIL RIGHTS LAW GROUP
               180 GRAND AVENUE, SUITE 1380
               OAKLAND, CALIFORNIA




REPORTED BY:  ANGIE M. MATERAZZI
              Certified Shorthand Reporter
              License No. 13116

1    position at some point?

2        A.   So -- okay.  At some point, yes.  So I -- if

3    you -- if that's what you're getting at.  So I was a

4    lead for that part and then I became a lead for the

5    elevators.

6        Q.   Okay.

7        A.   And then from the lead for the elevators, I

8    became a lead of the overnight crew, which was all areas

9    in aspects of Environmental Sustainability.

10       Q.   Okay.  Let's break that down.  So after you

11   were the lead in the -- in the cardboard area, then you

12   became the led for the elevators --

13       A.   Correct.

14       Q.   -- is that right?

15            How many elevator operators were there?

16       A.   My shift, I think I rotated through five or

17   six people.

18       Q.   Okay.

19       A.   I'm not sure about the day shift.

20       Q.   Okay.  And then -- and then at some point you

21   were promoted from lead over the elevators to lead for

22   the overnight crew; is that right?

23       A.   Correct, correct.

24       Q.   At any time during the time that you worked at

25   the Tesla factory, did you ever start -- were you ever a

 1   regular Tesla employee?
 2        A.   No, never.
 3             MS. JENG:  Objection, vague and ambiguous as
 4   to regular.
 5   BY MR. ORGAN:
 6        Q.   So in terms of your job working at Tesla, you
 7   were always performing job duties in the factory but
 8   getting paid by Chartwell; is that right?
 9        A.   Correct.
10        Q.   Okay.  And were there other employees working
11   in your area who were in a similar situation, where they
12   were doing all their work at Tesla but getting paid by
13   other contract agencies -- or staffing agencies?
14        A.   So --
15             MR. ARANEDA:  Objection, calls for
16   speculation.
17             THE WITNESS:  So, yes.  I mean, Tesla, they
18   hired nothing but staffing companies, most of their
19   positions were staffing company positions.
20   BY MR. ORGAN:
21        Q.   Okay.
22        A.   I couldn't tell you how many real Tesla
23   employees there were, but I know I was there through a
24   staffing company, I know other people that were there
25   through staffing companies.

Bridget Mattos & Associates
(415)747-8710

```
1   at NextSource?

2       A.   No.   I -- what -- what do you mean by that?

3   You got to rephrase that.

4       Q.   Sure.  Was anyone at NextSource informed of

5   the incident between Mr. Ramon Martinez and Mr. Owen

6   Diaz?

7       A.   Not by me.  I don't -- I can't tell by anybody

8   else but not by me.  I didn't -- don't have -- don't

9   know anybody at NextSource or e-mail chain.

10          Like I said, my e-mails always went to Victor,

11  Jaime and Ed, when Ed came.  Before that, it was Victor

12  and Jaime.

13      Q.   You testified that you heard the N-word thrown

14  around, but you did not think anything of this.

15          What did you -- what did you mean by that?

16      A.   It -- I mean, I drive around the building,

17  people are -- whatever, they're on break, they're in the

18  cafeteria, they're joking around with each other, you

19  know, they're saying the N-word to each other, maybe in

20  a cool way or whatever to them, whatever it is.

21          I -- just -- it -- it didn't recollect to me

22  that that wasn't right or I should say something or

23  whatever.  It -- like I said, that had nothing to do

24  with me.  It wasn't hurting me, it wasn't hurting my

25  people in doing their job.  They weren't my employees.
```

Bridget Mattos & Associates
(415)747-8710

1    It didn't affect me.  So I just thought nothing of it.

2    It's like walking down the street right now hearing

3    somebody saying it.  You're not going to think twice,

4    you're not going to stop.

5        Q.   Did you -- did you -- did you think nothing of

6    it because you heard it sort of more of a greeting

7    between people?  Is that what you're saying?

8        A.   It was -- it wasn't like an argument tone, it

9    wasn't in an aggressive tone, so.

10       Q.   Did you -- did you believe it was not being

11   used in an offensive manner?

12       A.   Yes --

13            MR. ORGAN:  Objection, assume facts not in

14   evidence, calls for speculation.

15   BY MR. ARANEDA:

16       Q.   Did you ever hear Mr. Diaz use the N-word?

17       A.   No.

18       Q.   You -- you testified earlier that you spoke

19   with Mr. Organ's office, correct?

20       A.   (No audible response.)

21       Q.   How long did you -- was that in an person --

22   strike that.

23            The conversation that you had with Mr. Organ's

24   office, was that in an person conversation or over the

25   telephone?

Exhibit 10, Page 80

1                CERTIFICATE OF DEPOSITION OFFICER

2

3           I, ANGIE M. MATERAZZI, CSR No. 13116, duly

4    authorized to administer oaths Pursuant to Section

5    2093(b) of the California Code of Civil Procedure,

6    hereby certify that the witness in the foregoing

7    deposition was by me duly sworn to testify the truth,

8    the whole truth and nothing but the truth in the

9    within-entitled cause; that said deposition was taken at

10   the time and place therein stated; that the testimony of

11   the said witness was reported by me and thereafter

12   transcribed by me or under my direction into

13   typewriting; that the foregoing is a full, complete and

14   true record of said testimony; and that the witness was

15   given an opportunity to read and correct said deposition

16   and to subscribe the same.

17           I further certify that I am not of counsel nor

18   attorney for either or any of the parties in the

19   deposition and caption named, or in any way interested

20   in the outcome of the cause named in said caption.

21           I hereby certify this copy is a true and
     exact copy of the original.
22

23                          _____

24                          ANGIE M. MATERAZZI, CSR 13116

25   Date: _____

# EXHIBIT 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - -

DEMETRIC DIAZ, OWEN DIAZ, and          )

LAMAR PATTERSON,                       )

               Plaintiffs,          )   CASE NO.

vs.                                    )   3:17-CV-06748-WHO

TESLA, INC. dba TESLA MOTORS,          )

INC.; CITISTAFF SOLUTIONS,             )

INC.; WEST VALLEY STAFFING             )

GROUP; CHARTWELL STAFFING              )

SERVICES, INC.; and DOES 1-50,         )

inclusive,                             )

               Defendants.          )

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF MICHAEL JOHN WHEELER

WEDNESDAY, JUNE 12, 2019

Reported by:

BY:  MELINDA M. SELLERS, CSR# 10686, RMR, CRC, CRR, CCRR

1    that you came to work for Tesla?

2        A.    That's a great question.   I do believe I

3    was just looking for work.   No referral or anything.

4    Just ended up there.

5        Q.    Did you start working for Tesla through a

6    contracting agency, or did you start working

7    directly for Tesla?

8        A.    Through Chartwell.

9        Q.    Okay.   And how did you find out about the

10   job at Tesla through Chartwell?

11       A.    I would have to say it would have been

12   online.

13       Q.    Okay.   And when you were promoted from a --

14   what was -- strike that.

15            What was your position title when you first

16   started working at Tesla?

17       A.    I don't really -- it wasn't as formal as we

18   would want it to be.   So I would say associate

19   because they just called us, you know, recycling.

20   They did not give us a specific name.   And I think

21   Chartwell was working under NextSource at the time.

22   There was some management issues in that category as

23   well.

24       Q.    Did you ever see a job description for your

25   initial job working in recycling?

```
 1    though everyone was aware of it.
 2              I had another employee who took a picture
 3    of an associate who was sleeping during his break.
 4    That associate came and spoke to me.  I went and
 5    took -- spoke to the individual who took the
 6    picture.  He called me the N-word.  I reported it.
 7    He got a promotion.
 8              So that would be my meaning.
 9        Q.   You were called the N-word?
10        A.   Oh, yes.
11        Q.   On more than one occasion?
12        A.   This was the -- no.  This was the one that
13    stands out the most.
14        Q.   Who was the person who called you the
15    N-word?
16        A.   This was Jesus.  I cannot remember his last
17    name.
18             (Viewing cell phone.)
19        Q.   You might have it in your phone?
20        A.   Possibly.
21        Q.   Okay.
22        A.   (Viewing cell phone.)
23             I do not.
24        Q.   Okay.  So was Jesus a Chartwell employee or
25    was he an employee of Tesla?
```

1           Well, tell me, where did it occur where
2    Jesus said, "F-U, N-word"?
3       A.    This would have been on the east side of
4    the building by the back break rooms where they
5    charged the forklifts.
6       Q.    After -- what did you say, if anything, to
7    Jesus after he said, "F-U, N-word"?
8       A.    I just called -- I want to say I called
9    Ramon.
10      Q.    Okay.  And when you talked to -- this was
11   Ramon Martinez, right?
12      A.    Yes.
13      Q.    So after Jesus called you the N-word, you
14   then talked to Ramon Martinez to let him know that
15   Jesus had used the N-word towards you, correct?
16      A.    Correct.
17      Q.    And what did you tell Ramon, if you can
18   remember?
19      A.    It would have been something along the
20   lines of Jesus is -- well, "Jesus said this and he
21   needs to be removed," or something like that.
22           This was long before I was aware that there
23   was the -- I call it the inner circle, but -- so
24   there's a circle of Hispanics that were looking out
25   for, you know, other Hispanics.  And I was actually

1       Q.    Okay.  And then you sat in human feces?

2       **A.    Slid right into -- I don't know what type.**

3       Q.    Okay.

4       **A.    I didn't --**

5       Q.    Okay.  You didn't test it?

6       **A.    No.**

7       Q.    Okay.  So you sat on feces that had been

8  put on your seat; is that right?

9       **A.    Correct.**

10      Q.    Then after this happened you sent an email

11 to Victor Quintero, to security, and to others?

12      **A.    To everybody.**

13      Q.    Okay.

14      **A.    The whole management because I was -- I was**

15 **enrage -- I was so -- like, I was very upset.  I had**

16 **gone to lunch, came back.**

17           **And what upset me even more is security**

18 **said, "We can't see anything.  We can't see where**

19 **your car was parked," which I know for a fact is a**

20 **lie because at the front of the Tesla building, the**

21 **main facility, Elon has his speedsters -- his**

22 **Roadsters there, the main ones, his first cars.  My**

23 **car was parked within 10 to 15 feet of those cars at**

24 **the charging station that's right there.  So --**

25      Q.    Is it like a golf cart?  Is that what it --

1      **A.    It's not a golf cart with a top on it, but**
2   **it was a green cart with a grill and then a black**
3   **bed for the back.**
4      Q.    That you could carry things around in?
5      **A.    Yes.**
6      Q.    Okay.  After you sent the email to Victor
7   Quintero, did you ever get any kind of response from
8   him about the feces in your seat?
9      **A.    Not that I remember.  I remember security**
10  **said there's nothing -- "We can't see anything."**
11         **And I'm pretty sure I threw a stink about**
12  **that.  I don't know for how long after.  Not, like,**
13  **anything crazy.  I didn't go, "Oh.  Was it you?  Was**
14  **it you?"  No.**
15         **But I do remember trying to push more to**
16  **see what was -- like, what was going on.**
17     Q.    And you took pictures of the feces in your
18  cart?
19     **A.    I did.**
20     Q.    Right.
21     **A.    On the Tesla phone.**
22     Q.    And you sent copies of the pictures to
23  Victor Quintero?
24     **A.    Should be in the email.**
25     Q.    Okay.

Exhibit 11, Page 88

1      A.   I feel like -- I hope I attached that in

2  the email.

3      Q.   Okay.  After this incident with the feces

4  on the seat, did anything -- was there anything else

5  other than that that happened to you, other than

6  that and the N-word incident that you felt was --

7  well, strike that.

8           Do you think that the feces was put on your

9  seat in part because you were African-American?

10      A.   I could assume that, but I can't say for

11  sure.  So I will not say that.  I will say it was an

12  act against me, but it could have been anyone.

13      Q.   What was the timing of that?  Do you

14  remember when that was?

15      A.   Timing --

16      Q.   The feces on the seat.

17      A.   It would have had to have been 2:00 a.m. to

18  3:00, in between there.  Would have been when I

19  would have taken my lunch.

20      Q.   Okay.  In terms of -- this was after you

21  became a supervisor --

22      A.   Yes.

23      Q.   -- right?

24           And you were issued the cart after you

25  became a supervisor; is that right?

 1      Q.   Got it.  So you started with Securitas --
 2  if it was almost a year, then it was probably a
 3  little bit before December 22, 2017?
 4      **A.   Something like that.**
 5      Q.   Sound about right?  Okay.
 6           And you're still with Securitas, right?
 7      **A.   I am.**
 8      Q.   Okay.  And is the only reason why you
 9  switched, I guess, work contracts is because Tesla
10  switched contracts with the --
11      **A.   Security firm, yes.**
12      Q.   With the security firm, okay.
13           Was your placement with Securitas at the
14  Tesla factory?
15      **A.   Yes.**
16      Q.   Was it around the same location where you
17  worked the first time that you were at Tesla?
18      **A.   It was down the street at one of their**
19  **off-sites, which is also a factor as to why I took**
20  **the job.**
21      Q.   Mm-hmm.
22      **A.   If I had gone to the main plant, there**
23  **would have been too many familiar faces.  So working**
24  **at an off-site was --**
25      Q.   Okay.  Have you ever been a direct employee

Bridget Mattos & Associates
(415)747-8710

1    of Tesla?

2        A.    I have not.

3        Q.    So when you said that you were terminated,

4    earlier in your deposition, who was it that

5    terminated you?

6        A.    Wayne Jackson was the one that I want to

7    say filed the papers with or signed the papers.

8        Q.    Okay.  So Wayne Jackson was with Next

9    Source, right?

10       A.    Yes.

11       Q.    Were you employed by Next Source or placed

12   through Next Source?

13       A.    To my understanding, Next Source dealt with

14   all of the outside contracting agencies, as far as

15   we went, so Flagship, CitiStaff, Chartwell.

16       Q.    All right.  So when you testified earlier

17   about the call that you received telling you that

18   you were terminated, who was it that called you?

19       A.    That was from a woman.  I do not remember

20   her name.

21       Q.    Do you remember where she was from?  Was

22   she from Chartwell or Tesla or Next Source?

23       A.    Probably from Chartwell.

24       Q.    Okay.

25       A.    And if it was from Chartwell, it would have

Bridget Mattos & Associates
(415)747-8710

Exhibit 11, Page 91

```
 1      Q.    That you painted --
 2      A.    -- that I painted for the students.
 3      Q.    Okay.  So you told the students that it was
 4  a great place to work, but you really felt it was a
 5  prison?
 6      A.    I told them it's a great place to work for
 7  engineers.
 8      Q.    Okay.
 9      A.    I tell everybody that.
10      Q.    Okay.  And I -- I guess I'll circle back on
11  that.
12            Do you remember anybody who had -- anybody
13  specific who had the swastika tattoos that you were
14  testifying about?
15      A.    I don't know his name.
16      Q.    Okay.
17      A.    I remember being -- it was -- I think I
18  spoke to one of my coworkers.  I was, like, "Man, we
19  have some skinheads here."  Yeah.  But I saw him in
20  passing.  He walked by, and I was looking at his --
21  he has a full head of tattoos, not just -- not just
22  the swastika, but a full head of tattoos.  I was,
23  like, how is that even allowed here.
24      Q.    Tattoos?
25      A.    No.  Just -- well, not tattoos.  Everyone
```

Exhibit 11, Page 92

MICHAEL JOHN WHEELER
June 12, 2019

1    has tattoos, right?  But just, like, taken aback
2    that that was going unchecked.
3         Q.    The tattoos on the head?
4         A.    The vulgarity of the tattoos on the head.
5         Q.    Did you ever complain about that to
6    anybody?
7         A.    At this point, no, because I was well aware
8    of the situation I was in.
9         Q.    Did you complain about the tattoos to
10   anybody else ever?
11        A.    Not -- just conversation.  Just
12   conversation.
13        Q.    Okay.
14        A.    Not, like, "Oh, I can't believe this is
15   happening," no.
16        Q.    Do you remember who you had conversations
17   about the head tattoos with, or any tattoos?
18        A.    No.
19        Q.    Okay.  Was it someone in HR?
20        A.    No, not at all.
21        Q.    And then you also mentioned, as part of
22   your description of Tesla as a prison, that they
23   wore pants around the ankles.
24        A.    Yes.
25        Q.    Would that be a problem if someone was

Bridget Mattos & Associates
(415)747-8710

Exhibit 11, Page 93

```
 1   STATE OF CALIFORNIA      )

 2                            )    ss

 3   COUNTY OF CALAVERAS      )

 4              I hereby certify that the witness in the

 5   foregoing deposition of MICHAEL JOHN WHEELER was by

 6   me duly sworn to testify to the truth, the whole

 7   truth, and nothing but the truth in the

 8   within-entitled cause; that said deposition was taken

 9   at the time and place herein named; that the

10   deposition is a true record of the witness's

11   testimony as reported by me, a duly certified

12   shorthand reporter and a disinterested person, and

13   was thereafter transcribed into typewriting by

14   computer.

15              I further certify that I am not interested

16   in the outcome of the said action, nor connected

17   with, nor related to any of the parties in said

18   action, nor to their respective counsel.

19              IN WITNESS WHEREOF, I have hereunto set my

20   hand this 24th day of June, 2019.

21

22

23          _____

24          MELINDA M. SELLERS, CSR NO. 10686

25          STATE OF CALIFORNIA
```

Exhibit 11, Page 94

# EXHIBIT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                Plaintiffs,

                                        No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                Defendants.

_____/

DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13571

```
 1     was?
 2          A.    I don't recall, no.  It's been a few years.
 3          Q.    Yes.
 4                Director of Operations, does that sound
 5     familiar?
 6          A.    Yeah, that could be.  That could be a better
 7     title.
 8          Q.    You started working for nextSource, you think,
 9     in around 2015.
10                Is that right?
11          A.    Yeah, somewhere around there.  I'm not sure of
12     the exact date.
13          Q.    And then you worked as a recruiter for,
14     perhaps, up to a year.
15                Is that right?
16          A.    Close to a year, yes.
17          Q.    And then you started -- you kind of shifted out
18     of recruiting to do, I think it was a program
19     coordinator role.
20                Is that correct?
21          A.    Yes.
22          Q.    Or program manager --
23          A.    Manager, uh-hum.
24          Q.    -- right.
25                But I think you described the program manager
```

Bridget Mattos & Associates
(415)747-8710

1    position as more of a liaison.

2            Is that correct?

3    A.    Yes, sir.

4    Q.    In terms of a liaison, what were the things

5    that nextSource was doing for Tesla in terms of acting

6    as a liaison between Tesla and its contractors?

7            MR. ARANEDA:   To the extent that you know.

8            MR. ORGAN:   Right.

9            THE WITNESS:   Yeah.   As far as I know, it was

10   basically Tesla would say, we need so many people for

11   recycling, and we would reach out to the suppliers to

12   see if they were able to provide the individuals that

13   they needed.

14           MR. ORGAN:   Q.   And do you have any knowledge

15   as to why Tesla was using nextSource as a liaison as

16   opposed to just going directly to --

17   A.    No.

18   Q.    -- those contractors?

19   A.    No, sir, I don't.

20   Q.    Now, nextSource also fulfilled some kind of HR

21   functions for some of the contractors.

22           Is that true --

23   A.    Not really.

24   Q.    -- or not true?

25   A.    We would alert the supplier of any issues, more

Bridget Mattos & Associates
(415)747-8710

```
 1    it could have been a case where I referred it to their
 2    agency.
 3        Q.    Okay.
 4        A.    For more investigation.
 5        Q.    Now, in terms of your -- from Terri Garrett,
 6    there's an email on Page 21 -- well, actually, before
 7    that, there's an email from you to Terri Garrett where
 8    you say, "OMG.  I just would like one peaceful day
 9    around here."
10            What were you referring to that day -- relative
11    to that?
12        A.    I, honestly, had a lot on my plate at Tesla.  I
13    was helping support three shifts.  So I would some days
14    just be running around like a chicken with my head cut
15    off.
16            And you have to realize that facility is huge,
17    so -- it's 5 million square feet, so it'd take me
18    20 minutes just to get from one side to another, having
19    to walk.  So it was just -- that's what I, more or less,
20    probably was referring to.
21        Q.    Did you guys have, like, a schematic drawing of
22    the factory that showed where the different parts of it
23    were?
24        A.    Yes, sir.
25        Q.    And was that something provided by Tesla to
```

Exhibit 12, Page 99

```
 1    right?  Any version of the N word?
 2        A.    I don't like the word, period, but, you know, I
 3    understand a little more why they do it.  I just wish
 4    they wouldn't.
 5        Q.    Right.
 6              And did you ever communicate to anybody at,
 7    like, Tesla human resources or anything like that about
 8    the fact that you're hearing --
 9        A.    No, sir.
10        Q.    -- A version of the N word?
11        A.    No, sir, I did not.
12        Q.    Did you talk to the two -- the two
13    Asian-American people who you overheard where you have
14    the specific recollection about them saying, What's up,
15    my N word with an A, did you talk to them about the
16    fact --
17        A.    Yes.
18        Q.    -- that they had used it?
19        A.    Yes, sir.
20              THE REPORTER:  Wait a minute.
21              THE WITNESS:  Sorry.
22              MR. ORGAN:  Q.  And what did you tell them in
23    terms of after you heard them say -- use the A version
24    of the N word?
25        A.    I just basically let them know, you guys
```

Bridget Mattos & Associates
(415)747-8710

1        be having just common conversations.

2               Like I said, I don't -- I honestly don't feel

3        like they were trying to offend anybody.  It's just kind

4        of what the culture has evolved into as of late.

5               It's unfortunate, but I don't necessarily feel

6        they were trying to say it in an inoffensive way.

7        Q.     Right.

8               They may not have been intending to be

9        offensive, but, certainly, from your perspective --

10       A.     Can I --

11       Q.     Sure.

12       A.     She's calling me.

13              MR. HORTON:  Take a quick break?

14              MR. ORGAN:  Sure.

15              (Whereupon, a recess was held from

16              1:29 p.m. to 1:32 p.m.)

17              MR. ORGAN:  Back on the record.

18       Q.     In terms of the areas that you heard the

19       N word, you said in the floor area typically near the

20       satellite cafeterias.

21              Is that correct?

22       A.     Yes, sir, where the people would be coming for

23       lunch and they'd be walking in groups talking, things

24       like that.

25       Q.     And in terms of -- I think the question I was

WAYNE JACKSON
May 17, 2019

1    going to ask you was, you mentioned that you didn't

2    think that the workers who you overheard were intending

3    it to be offensive, but, certainly, as an

4    African-American male, any time anyone uses even -- the

5    A version of the N word, that's offensive to you, isn't

6    it?

7        A.    I wouldn't say that.  To be honest, a lot of

8    African-Americans use that word amongst each other.

9        Q.    Right.

10            But when an African-American uses that word,

11   the N word, that's different than when people who aren't

12   African-Americans use the word; right?

13       A.    Once again, it depends on which version they're

14   using.

15       Q.    Right.

16            But even the A version of the N word is

17   offensive to African-Americans if someone who's not

18   African-American is using it; right?

19       A.    It depends, once again, on the context of how

20   they're using it.

21       Q.    Okay.

22       A.    It is offensive, but, like I said, it depends

23   on how they're using it, you know.

24       Q.    Well, it's not something that should be used in

25   the workplace --

Bridget Mattos & Associates
(415)747-8710

Exhibit 12, Page 102

```
 1                    REPORTER'S CERTIFICATE

 2      STATE OF CALIFORNIA        )
                                   )  ss.
 3      COUNTY OF MARIN            )

 4            I, PATRICIA ROSINSKI, hereby certify:

 5            That I am a Certified Shorthand Reporter in the

 6      State of California.

 7            That prior to being examined, WAYNE JACKSON,

 8      the witness named in the foregoing deposition, was by me

 9      duly sworn to testify the truth, the whole truth, and

10      nothing but the truth;

11            That said deposition was taken pursuant to

12      Notice of Deposition and agreement between the parties

13      at the time and place therein set forth and was taken

14      down by me in stenotype and thereafter transcribed by me

15      by computer and that the deposition is a true record of

16      the testimony given by the witness.

17            I further certify that I am neither counsel for

18      either, nor related in any way to any party to said

19      action, nor otherwise interested in the result or

20      outcome thereof.

21            Pursuant to Federal Rules of Civil Procedure,

22      Rule 30(e), review of the transcript was not requested

23      before the completion of the deposition.
                        _____
24                       PATRICIA ROSINSKI, CSR No. 4555

25                            May 28, 2019
```

Bridget Mattos & Associates
(415)747-8710

Exhibit 12, Page 103