1
LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
2
NAVRUZ AVLONI (SBN 279556)
navruz@civilrightsca.com
3
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
4
CALIFORNIA CIVIL RIGHTS LAW GROUP
332 San Anselmo Avenue
5
San Anselmo, California 94960
T: (415)-453-7352 | F: (415)-785-7352
6

7
J. BERNARD ALEXANDER (SBN 128307)
8
ALEXANDER KRAKOW + GLICK LLP
1900 Avenue of the Stars, Suite 900
9
Los Angeles, California 90067
T: (310) 394-0888 | F: (310) 394-0811
10

11
Attorneys for Plaintiffs,
OWEN DIAZ
12

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
TRACEY A. KENNEDY (SBN 150782)
NAMAL TANTULA (SBN 247373)
BRETT YOUNG (SBN 305657)
333 South Hope Street, 43rd Floor
Los Angeles, California  90071-1422
T: 213.620.1780 | F: 213.620.1398
tkennedy@sheppardmullin.com
ntantula@sheppardmullin.com
byoung@sheppardmullin.com

PATRICIA M. JENG (SBN 272262)
SUSAN HAINES (SBN 224611)
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
T: 415.434.9100 | F: 415.434.3947
pjeng@sheppardmullin.com
shaines@sheppardmullin.com

Attorneys for Defendant,
TESLA, INC. dba TESLA MOTORS, INC.

13

14

15

16                     **UNITED STATES DISTRICT COURT**

17                     **NORTHERN DISTRICT OF CALIFORNIA**

18

| | |
|---|---|
| 19  DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON, | Case No. 3:17-cv-06748-WHO |
| 20 | |
| 21             Plaintiffs, | **JOINT PRETRIAL CONFERENCE STATEMENT** |
| | Date: May 11, 2020 |
| 22        v. | Time: 10:00 a.m. |
| 23  TESLA, INC. dba TESLA MOTORS, INC.; | Courtroom: 2, 17th Floor |
| CITISTAFF SOLUTIONS, INC.; WEST | Judge: Hon. William H. Orrick |
| 24  VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; | |
| and DOES 1-50, inclusive, | Trial Date: June 8, 2020 |
| 25 | Complaint filed: October 16, 2017 |
| 26            Defendants. | |

27

28

**TO THE HONORABLE COURT:**

The Parties submit this Joint Pretrial Conference Statement.

1. **THE ACTION**

   a. **Substance of the Action**

   The instant dispute arises out of Plaintiff Owen Diaz's employment with Defendant Tesla, Inc. from June 2015 to March 2016. Plaintiff brings claims against Tesla for violations of 42 U.S.C. § 1981 and a state claim for negligent hiring, retention, and supervision.

   Plaintiff contends that he was subjected to a racially hostile work environment during his employment with Tesla by repeated use of racial slurs and display of racist drawings and graffiti in the workplace. Plaintiff further contends that Tesla ratified the racial hostility by (1) failing to investigate his complaints and (2) failing to implement effective remedial measures to prevent the harassment from occurring.

   Defendant generally and specifically denies each and every cause of action and purported allegation Plaintiff alleges in this matter.  Plaintiff was not a Tesla employee.  Even if he was, he was not a victim of race-based harassment in violation of 42 U.S.C. § 1981 such that Tesla is legally responsible.  Tesla maintains proper anti-harassment policies and procedures.  Moreover, all of Plaintiff's complaints were promptly investigated and corrective action was issued, including written warnings and a suspension.  Thus, there is no underlying violation of Section 1981 and no violation of the derivative cause of action for negligent hiring, retention, and supervision.

   b. **Relief Sought**

   Plaintiff seeks to recover general and special damages according to proof, including compensatory damages for past and future emotional distress; pre- and post-judgment interest; punitive damages; injunctive relief to correct violations of 42 U.S.C. § 1981; and costs and attorneys' fees.

   Defendant seeks that Plaintiff take nothing by reason of his Complaint, that Defendant be awarded its costs of suit and reasonable attorneys' fees to the extent provided by law, and for such other and further relief as the Court may deem just and proper.

2.      **FACTUAL BASIS OF THE ACTION**

      a.   **Undisputed Facts**

Plaintiff began work at Defendant's Fremont, California facility in June of 2015 as an elevator operator. His team lead was Chartwell employee Tamotsu Kawasaki. In approximately July 2015, Plaintiff was promoted to elevator lead and started to be supervised by Tesla Contract Services Supervisor Ed Romero. Romero worked directly for Tesla as of October 12, 2015. On July 31, 2015, Plaintiff complained that a coworker, Judy Timbreza, called him racial slurs. In October 2015, Plaintiff was involved in a verbal altercation with Ramon Martinez. In January 2015, Plaintiff complained to Romero about a "racist effigy" that Ramon Martinez had drawn in the factory. Plaintiff's employment at Defendant's factory ended in March 2016.

      a.   **Disputed Factual Issues**

          i.   **Plaintiff's Position**

Shortly after Plaintiff started working at Tesla, coworker Mr. Judy Timbreza began calling him "porch monkey" and "nigger" (the n-word). This continued for several weeks. Plaintiff complained to his supervisor, Kawasaki. Kawasaki investigated and corroborated Plaintiff's complaint. Kawasaki escalated the complaint to his supervisor, Romero—including his finding that witnesses corroborated Plaintiff's complaint. Romero subsequently informed his supervisor that *no* witnesses had corroborated Plaintiff's complaint and issued Timbreza a warning for "kidding around excessively."

Harassment of Plaintiff continued. Ramon Martinez, who had the authority to direct Plaintiff's work, called Plaintiff the n-word at least 30 times, including telling Plaintiff "[n-words] are not shit" and "I hate you, [n-word]," and "go back to Africa." Robert Hurtado, another employee with the authority to direct Plaintiff's work, likewise called Plaintiff the n-word approximately 30 times and called Plaintiff "boy" when directing Plaintiff's work. A third employee, Aron Deharto, told Plaintiff, "All you [n-words] are starting to get uppity." Plaintiff saw graffiti in restroom stalls that included the n-word on his second day of work, and continued to witness similar graffiti in four different bathrooms in Defendant's factory.  Plaintiff also witnessed his son's supervisor, Javier Caballero, call his son the n-word.

Plaintiff repeatedly complained about this harassing conduct, but Defendant took no effective action to stop the harassment from continuing. Plaintiff complained to Kawasaki and Romero about use of racial slurs. Kawasaki advised him to avoid the perpetrators, and Romero took no action. Plaintiff complained to Romero about the graffiti at least three times, but Romero never investigated.

This caused the harassment to escalate. In October 2015, Martinez physically assaulted Plaintiff in an elevator while shouting the n-word, balling up his fists, and using threatening language. Plaintiff complained to Romero and Kawasaki, saying he did not feel safe around Martinez and asking them to review security footage in the elevator. Romero and Kawasaki did not conduct an investigation, did not interview any witnesses to the interaction between Martinez and Diaz, and failed to review the security footage even though Kawasaki said it was available.

Martinez continued to harass Plaintiff, culminating in his creation of a racist drawing on a bale of cardboard, and leaving it for Plaintiff to find in January 2016. Plaintiff immediately complained to supervisor Michael Wheeler. Wheeler investigated Plaintiff's complaint. Martinez admitted drawing the picture. Defendant deferred investigation of the complaint to Chartwell and nextSource. Though nextSource recommended Martinez be terminated, Defendant rejected this suggestion and instead opted to issue a tepid final written warning. At nextSource's urging, Martinez was suspended for three days. NextSource indicated that it needed to consult with Tesla HR before finalizing any discipline. No further action was taken.

Plaintiff continued to experience racial harassment, from Hurtado and others, for the remaining two months he worked at Tesla's factory.

**ii. Defendant's Position**

Other than the undisputed facts above, the remaining facts of this matter are disputed.

First, Mr. Diaz was not a Tesla employee.  CitiStaff[1] admitted that Mr. Diaz was its employee, the contract between CitiStaff and Tesla explicitly states that Mr. Diaz was a CitiStaff employee and this Court already held that "there is no dispute that CitiStaff employed [Owen]

---

[1]  See Order Re Motions For Summary Judgment, (Dkt. 144) at 13.

Diaz." Further, there is no contractual relationship between Tesla and Mr. Diaz's employer, CitiStaff. Tesla did not have a contract (written or otherwise) with CitiStaff for the provision of temporary workers. Thus, Tesla was not in privity with CitiStaff, which has been dismissed from the action. The only written contract pertinent here, is one between Tesla and nextSource, Inc., which was an agreement for nextSource, Inc. to provide temporary personnel to Tesla ("nextSource Agreement"). As Tesla had no contractual relationship with Mr. Diaz, Tesla did not pay his wages, did not provide his benefits, and it is undisputed that Mr. Diaz was supervised by, and interfaced with, supervisors from CitiStaff about his placement at Tesla. Tesla was not Mr. Diaz's joint employer.

Second, even if Tesla was Mr. Diaz's joint employer, there is no evidence of a Section 1981 violation. Importantly, and as discussed in detail below, Mr. Diaz is not a third party beneficiary of any of the contracts at issue here. Indeed, the nexSource Agreement explicitly states there are no third party beneficiaries. Additionally, there is no competent evidence that Mr. Diaz was personally subjected to or targeted because of his race, or that any such conduct altered his working conditions. It is not disputed that there was a drawing made by non-employee Ramon Martinez in January 2016 that was not directed toward or about Mr. Diaz, and that Martinez immediately apologized for the drawing and was disciplined by his employer within a couple of days of the drawing. Although Mr. Diaz claims he heard the N-word on a daily basis, he never complained about it and never documented any such conduct in any of his written complaints, despite complaining about other issues in writing. And, during the timeframe he claims to have been called the N-word on a daily basis, Mr. Diaz recommended his son (Demetric Di-az) and Lamar Patterson to work at Tesla, his daughter applied for a job a Tesla (which she testified Mr. Diaz was aware of), and he claims he wanted to work at Tesla for the long haul. As a result, Mr. Diaz's Section 1981 claim fails.

Further, the evidence proves that, as explained below, Tesla exercised reasonable care to prevent harassment, but that Mr. Diaz unreasonably failed to take advantage of Tesla's opportunities to prevent harassment. Specifically, Mr. Diaz's complaint regarding Timbreza was investigated, and, thereafter, Timbreza and Mr. Diaz had no further contact. Similarly, the

evidence establishes that each time Mr. Diaz complained or had an issue at the factory (though none were related to the use of the "n-word"), Tesla or one of the staffing agencies took prompt, remedial action and all alleged complained of conduct ceased.  Further, in October 2015 Ed Romero, Tesla employee, immediately initiated an investigation into a complaint made by Martinez about Mr. Diaz, and likewise a complaint made by Mr. Diaz about Martinez. Ultimately, after conversations with both individuals, it was decided that they would each be counseled and instructed that further issues between the employees would result in additional discipline. There were no allegations by Mr. Diaz of Martinez using the "N-word" in this interaction. As to the cartoon drawing in January 2016, as explained in detail below, this drawing was immediately investigated;  Martinez and Mr. Diaz each provided a written statement, and Martinez verbally apologized and also made an apology in writing.  Martinez also admitted that the drawing was not intended for Mr. Diaz, and it was drawn in response to a Pac-Man cartoon drawing with "little ghosts" by workers on another shift.  Martinez drew the drawing as a "cannibal" eating the "little ghosts" like the Pac-Man "eats ghosts" in the video game. Thus, Mr. Diaz's complaint about the cartoon drawing was immediately responded to, investigated, and Martinez was given a final written warning and a three day suspension by his employer, Chartwell. Martinez has also undergone training and since that time has had no further disciplinary issues at the factory. Importantly, Martinez was a Chartwell employee, and not Mr. Diaz's  supervisor or even a supervisor in his chain of command.  Further, at times there may have been graffiti in the bathroom, but any such graffiti was cleaned when discovered.  Mr. Diaz never saw any swastikas in the bathroom.  Mr. Diaz testified that he saw the N-word in the men's restroom, but he never complained about seeing the alleged graffiti. Thus, Mr. Diaz's claim fails.

Lastly, Tesla and its staffing agencies communicated regularly to ensure that investigations were conducted and, in Mr. Diaz's case, each of his complaints was investigated and resolved.  In each of Mr. Diaz's complaints, when appropriate, employees were appropriately disciplined (by their respective employers) for both the drawings and use of the N-word. Thus, Mr. Diaz's Section 1981 claim as to failure to prevent race-based harassment fails.

### b. Agreed Statement

Plaintiff Owen Diaz claims that while working at the Tesla factory in Fremont, California, he was subjected to a hostile work environment based on his race being African American or Black.  In addition, Mr. Diaz claims that Tesla, Inc., failed to take all reasonable steps to prevent race-based harassment towards him, including use of the N-word, and failed to adequately remedy the harassment after Tesla received notice of it. Mr. Diaz also claims that Tesla, Inc., negligently retained factory workers and supervisors who engaged in harassing conduct towards him.  The plaintiff Owen Diaz has the burden of proving these claims by a preponderance of the evidence.

Defendant Tesla, Inc., doing business as Tesla Motors, Inc., denies these claims.  Tesla denies that Mr. Diaz was subjected to a hostile work environment based on his race and denies that it failed to take all reasonable steps to prevent race-based harassment in the work. Tesla also denies that it negligently hired, retained or supervised employees or contractors who Mr. Diaz claims engaged in race based harassing conduct toward him.

### c. Stipulations

The parties previously stipulated to dismiss numerous causes of action and former plaintiff Demetric Di-az from the action, which the Court approved. (Dkt. No. 176). The parties also stipulated to exclude certain evidence including Owen Diaz's past criminal record, his drug use, and the mental health history of Demetrica Holmes (Mr. Diaz's  spouse) that was the subject of Plaintiff's proposed motions *in limine*. (Dkt. No. 180).

Parties' agreement on sequestration of witnesses:  All fact and expert witnesses, except for party representatives, will be excluded from hearing any fact and expert testimony.

### 2. DISPUTED LEGAL ISSUES

### a. Joint Employment

An employee can have more than one "employer," as the "law recognizes that two entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions." *U.S. E.E.O.C. v. Global Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019) (citations omitted) ("*Global*

*Horizons*"); *see also, Jimenez v. U.S. Cont'l Mktg., Inc.,* 41 Cal. App. 5th 189, 197-98 (2019).[2] Federal courts use a common-law agency test to determine joint employment "when a statute does not meaningfully define terms like 'employer' and 'employee.'"  In *Global Horizons*, the Ninth Circuit held that the "common-law agency test should be applied in the" joint-employer context. *Id*. at 638. "Under the common-law test, the 'principal guidepost' is the element of control—that is, 'the extent of control that one <u>may</u> exercise over the details of the work of the other.'" *Id.*at 638 (citation omitted, emphasis added).  A non-exhaustive list of factors include:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 638 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992).

No single factor is dispositive or decisive, and the Court must look to *all* aspects of the relationship. In the context of temporary staffing, "[t]he key is that liability is predicated on the allegations of harassment or discrimination involving the terms, conditions, or privileges of employment <u>under the control of the employer</u>, and that the employment relationship exists…within the context of the control retained." *Bradley v. Department of Corrections & Rehab.*, 158. Cal. App. 4th 1612, 1629 (2008) (applying common-law "control" test to analogous California state statute).

### i.  Plaintiff:  Owen Diaz Contends that he was an Employee of Tesla

Even employing the more stringent "control" test, Tesla is still liable for the harassment Plaintiff experienced. Tesla employees controlled virtually all aspects of Plaintiff's day-to-day work: Plaintiff worked at Tesla's facility, under Tesla's supervisors, performing work for Tesla's

---

[2] *Global Horizons* addresses joint employment under Title VII. However, the  Northern District applies the principles applicable in a Title VII discrimination claim when evaluating claims under 42 U.S.C. § 1981. *Morrow v. City of Oakland*, 2012 WL 368682 at *12 (N.D. Cal. Feb. 3, 2012)

business of building cars. Tesla employees set Plaintiff's schedule. Plaintiff was required to follow Tesla's policies regarding safety equipment and procedure. Tesla employees directed Plaintiff's tasks throughout the day. Employees of Plaintiff's staffing agencies testified that they could not issue discipline, such as warnings or terminations, without Tesla's authorization and approval. Tesla employees also dictated promotions and pay raises to the staffing agencies. Though Tesla did not provide employee benefits or paychecks, it exercised absolute control over virtually every other aspect of Plaintiff's employment at its facility. Importantly, Tesla exercised the same aspect of control over Plaintiff's harassers: Romero controlled the day-to-day aspects of Martinez's day-to-day work. All of this occurred in the context of the staffing contract between Tesla and NextSource, who in turn contracted with Citistaff to hire Plaintiff to work the elevators at the Tesla factory in Fremont. Accordingly, Tesla is properly held liable for the harassment Plaintiff experienced.

### ii.   Defendant: Owen Diaz Was Not A Tesla Employee.

Tesla disputes that Owen Diaz ("Mr. Diaz" or "Plaintiff") was its employee.  The element of control is the "principal guidepost" in determining whether a joint employment relationship exists.  *Global Horizons,* 915 F.3d 631,638 (internal quotation marks omitted).

Here, Tesla does not meet any of these "employer" factors as it relates to Owen's assignment at the Tesla facility.   CitiStaff[3] already admitted that Owen was its employee, the contract between CitiStaff and Tesla explicitly states that Owen was a CitiStaff employee and this Court already held that "there is no dispute that CitiStaff employed [Owen] Diaz."  Further, there is no contractual relationship between Tesla and Owen's employer, Citistaff.  Tesla did not have a contract (written or otherwise) with Citistaff for the provision of temporary workers.  Thus, Tesla was not in privity with Citistaff, which has been dismissed from the action.  The only written contract pertinent here, is one between Tesla and nextSource, Inc., which was an agreement for nextSource, Inc. to provide temporary personnel to Tesla ("nextSource Agreement").  Moreover, Tesla did not pay Owen's wages, did not provide his benefits, and it is

---

[3]  See Order Re Motions For Summary Judgment, (Dkt. 144) at 13

1   undisputed that Owen was supervised by, and interfaced with, supervisors from CitiStaff about

2   his placement at Tesla.  Tesla was not Owen's joint employer.

3          Even if a joint-employment relationship exists, one employer is not "automatically" liable

4   for another's conduct.  *Global Horizons*, 915 F.3d at 641.  "Liability may be imposed for a co-

5   employer's discriminatory conduct only if the defendant employer knew or should have known

6   about the other employer's conduct and failed to undertake prompt corrective measures within its

7   control."  *Id.* (internal quotation marks and citation omitted).  Here, even if there was harassing

8   or discriminatory conduct, Tesla certainly did not know about it or fail to take prompt corrective

9   measures.  Indeed, once Mr. Diaz  raised any potential harassment issues, they were immediately

10  investigated, addressed, and resolved.  Accordingly, absent an employment relationship

11  Defendant cannot be liable for any of the alleged unlawful conduct.

12          **b.  Plaintiff's Contractual Right to Seek Relief Under 42 U.S.C. § 1981.**

13          42 U.S.C. § 1981 prohibits racial discrimination and harassment in the making and

14  enforcement of private contracts.  *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).  "Any claim

15  brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' §

16  1981(b), under which the plaintiff has rights."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470,

17  476 (2006).  The Supreme Court has recognized the possibility that "a third-party intended

18  beneficiary of a contract may have rights under § 1981."  *Id.* at 476 n.3.  This does *not* require

19  that plaintiff be a party to a contract.  "[A] third-party intended beneficiary of a contract may

20  have rights under § 1981." *Id*.  In order for plaintiff to prove he was subjected to discrimination

21  or harassment in the performance or making of a contract, as a third-party beneficiary, Plaintiff

22  must prove that he "has (or would have) rights under the existing (or proposed) contract that he

23  wishes 'to make and enforce.'" *Id*. at 479-80.

24          The law of the forum state determines questions of contract under Section 1981, provided

25  that it is not inconsistent with federal law.  *Judie v. Hamilton*, 872 F.2d 919, 923 (9th Cir. 1989)

26  (applying Washington law).  California courts interpret contracts "so as to give effect to the

27  mutual intention of the contracting parties at the time the contract was formed."  *Serv. Employees*

*Internat. Union, Local 99 v. Options--A Child Care & Human Servs. Agency*, 200 Cal. App. 4th 869, 879 (2011).  "A third party may enforce a contract made for his or her benefit or made for the benefit of a class of which he or she is a member."  *Serv. Employees Internat. Union, Local 99 v. Options--A Child Care & Human Servs. Agency*, 200 Cal. App. 4th 869, 878 (2011). The statute protects employees from racial discrimination and harassment in the workplace. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 450-1 (2008) (citations omitted).

### i.  Plaintiff:  Owen Diaz Holds Rights Under the Staffing Contracts.

Plaintiff was employed by Citistaff to perform work for Tesla at the Tesla Fremont facility.  [N]extSource contracted with Tesla to provide employees, from other staffing agencies like Citistaff and Chartwell, for the purpose of performing work for Tesla at the Tesla Fremont facility.  Under this contract, Plaintiff performed work for Tesla, worked at the Tesla facility and received wages in return.  In fact, the very purpose of the contract is to bring workers like Owen Diaz to work at the Tesla factory. In addition, Tesla's contract with NextSource specifically requires that any workers employed at the Tesla facility comply with Tesla policies and procedures and all applicable legal standards, including discrimination standards. The Civil Rights Act of 1991 amendments to section 1981 make clear that workers are entitled to "enjoyment of all benefits, privileges, terms and conditions of the contractual relationship. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 450 (2008). As someone who received benefits and privileges based on the contracts between Tesla and its staffing agencies, Mr. Diaz has rights under these contracts.  Accordingly, Plaintiff is entitled to maintain discrimination and harassment claims under Section 1981.

### ii.  Tesla:  Plaintiff's Section 1981 Claim Is Barred Because He was Not An Employee and, At Most, He Was A Remote Beneficiary.

If Owen's  benefit "is only incidental or remote," he will not be considered a third-party beneficiary.  *Serv. Employees Internat. Union, Local 99 v. Options--A Child Care & Human Servs. Agency*, 200 Cal. 4th 869, 878 (2011).  Owen, as a CitiStaff employee, was only an

incidental or remote beneficiary of the nextSource[4] Agreement with Tesla and cannot assert a Section 1981 claim.

In the nextSource Agreement, with Tesla to provide temporary personnel to Tesla, specifically states that there are **no** third party beneficiaries in section 14.10:

> Third Party Beneficiaries. This Agreement is entered into solely between Tesla and Supplier [nextSource, Inc.] and, except for the Parties' indemnification obligations under Section 11 (Indemnification) and the Service Recipients, **will not be deemed to create any rights in any third parties or to create any obligations of either Tesla or Supplier to any third parties.**

TESLA-0001025 (emphasis added).  The nextSource Agreement specifically eliminates the very right Owen seeks to assert.  And to the extent Plaintiff looks to any contract(s) between nextSource, Inc. and Citistaff for provision of temporary workers, Tesla was not a party or a signatory.  Thus, none of these agreements suffice to create privity between Tesla and Citistaff or any contractual benefit running to Owen.  Indeed, the only written agreement Tesla signed specifically disclaims any third party beneficiaries.  Therefore, any alleged, attenuated connection between Tesla and Citistaff is not contractual, is not in a writing signed by Tesla, and is too incidental or remote to permit Owen to assert his Section 1981 claim as a purported third-party beneficiary.

### c.  Racial Harassment Under 42 U.S.C. § 1981.

Plaintiff must prove that:  "(1) he was subjected to verbal or physical conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (internal quotation marks and formatting omitted).  This generally requires a showing of "repeated [harassing] conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 122 U.S. 101, 115 (2002).

---

[4] nextSource has been dismissed from the action.

Generally, "isolated incidents" do not rise to the level of actionable harassment unless they are "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted). The environment must be both objectively offensive to a reasonable person in the protected class and *subjectively offensive to the plaintiff. Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); see *Ellison v. Brady*, 924 F.2d 872, 878-79 (9th Cir. 1991) (analyzing sex harassment from the perspective of a reasonable woman). "Simple teasing" and "offhand comments" may not be sufficient even where the conduct is "offensive and inappropriate." *Manatt v. Bank of Am.*, NA, 339 F.3d 792, 798 (9th Cir. 2003).

Under Ninth Cir. Model Instr. No. 10.5, Owen Diaz must demonstrate that (1) he was subjected to slurs, insults, jokes or other verbal comments or physical contact or intimidation of a racial nature; (2) the conduct was unwelcome; (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create a racially abusive or hostile work environment; (4) perceived the working environment to be abusive or hostile; and (5) a reasonable African American man in his circumstances would consider the working environment to be abusive or hostile. *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1122 (9th Cir. 2008), *citing Manatt v. Bank of Am.*, 339 F.3d 792, 797 (9th Cir. 2003).

### i.   Plaintiff: Owen Diaz Contends that he was Subjected to Severe and Pervasive Harassment.

#### 1)   Plaintiff was Subjected to Severe Conduct.

Soon after Plaintiff's Tesla start date, a Tesla coworker, Judy Timbreza, laughed and called Plaintiff a "porch monkey", nigger ("the n-word"), and monkey in Spanish for several weeks, until Plaintiff confronted Timbreza on July 31, 2015.

Recycling Lead Ramon Martinez called Plaintiff the n-word at least 30 times, told Plaintiff to "Go back to Africa", and used the Spanish term "mayate" (N-Word) regularly. Tesla supervisor Robert Hurtado also called Plaintiff the n-word about 30 times, and repeatedly called Plaintiff "boy"—a derogatory slavery-era term commonly directed toward African-American men.

In October 2015, Martinez entered an elevator and rushed toward the Plaintiff in a

threatening manner with his fists balled up while hurling racial expletives, including the n-word.
Plaintiff feared for his safety and promptly complained that he did not feel safe around Martinez.
Sometime later, Martinez drew a racist pickaninny image on a bale of cardboard, for Plaintiff to
find, captioned it "Booo" a reference to "jiggaboo," a derogatory racist term used towards
African-Americans. Three African-Americans witnessed the drawing and all found it offensive.

Mr. Diaz also alleges that he was harassed by another supervisor, Robert Hurtado.  Mr.
Hurtado directed the n-word at Plaintiff while he worked at the Tesla Factory.

Coworkers also employed racial slurs against Plaintiff. Coworker Aron Deharto told
Plaintiff, "All you n-words are starting to get uppity." When Plaintiff complained to Supervisor
Kawasaki, Kawasaki advised Plaintiff to avoid Deharto.

Plaintiff also witnessed his son's supervisor call him the n-word.

Courts have observed that use of the n-word rises to the level of severe harassment. It is
not merely an offensive word, but "perhaps the most offensive and inflammatory racial slur in
English, ... a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp*., 270 F.3d
794, 817 (9th Cir. 2001). "Perhaps no single act can more quickly alter the conditions of
employment and create an abusive working environment than the use of an unambiguously racial
epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-
Southern Life Insurance Company*, 12 F.3d 668, 675 (7th Cir. 1993).

Based on the individual acts visited upon the Plaintiff as described above, including
repeated use of the N-word, a jury could reasonably conclude that the harassment visited upon
Plaintiff was "severe."

### 2)  Plaintiff was Subjected to "Pervasive" Harassment.

Harassment was pervasive and permeated the Tesla factory.  Any one of the incidents
above would qualify as severe.  Taken collectively, the above conduct reflects pervasiveness.
Plaintiff heard the N-word used throughout the facility, and observed racist graffiti—including
the N-word—scrawled in bathroom stalls alongside swastikas.  Plaintiff testified that he was
called the n-word <u>at least sixty times</u>*, by his supervisors*, over the course of the nine (9) months
he worked for Tesla, *in addition* to being called the N-word by coworkers, and seeing the word

scrawled on restroom walls.

Rampant use of the N-word seriously altered the terms, conditions and privileges of Plaintiff's employment, requiring him to submit to vitriolic racial harassment as a condition of his employment. This conduct was part of a pattern and practice of harassment and certainly rises to the level of actionable harassment cognizable under Section 1981.

> ii.   **Tesla:  There Was No Severe or Pervasive Harassment and No Subjective Belief of a Hostile Working Environment that Altered His Working Conditions.**

Tesla contends that, even if Owen Diaz could make a *prima facie* showing of a hostile work environment under section 1981, there is no competent evidence that Mr. Diaz  was personally subjected to or targeted because of his race, or that any such conduct altered his working conditions.  *If* Owen Diaz heard the N-word inside the Tesla factory, there is no competent evidence that this slur was directed at him.  Likewise, Tesla will introduce testimony that the drawing was also not directed at Owen Diaz.  Although Mr. Diaz claims he heard the N-word on a daily basis, he never complained about it and never documented any such conduct in any of his written complaints.  And, during the timeframe he claims to have been called the N-word on a daily basis, Mr. Diaz recommended his son (Demetric Di-az) and Lamar Patterson to work at Tesla, his daughter applied for a job a Tesla (and she testified that Owen was aware she applied), and he claims he wanted to work at Tesla for the long haul.  When Owen was assigned to work at the Tesla factory, his son and daughter were living with him.  As a result, Owen's Section 1981 race harassment claim fails, because Owen's actions at the time show that he did not subjectively believe that he was working in a hostile working environment.

> d.   **Affirmative Defense:  Unreasonable Failure to Take Advantage of Corrective Opportunities Offered by Tesla.**

"Remedies should be 'reasonably calculated to end the harassment." [Citation Omitted] *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (1995).  The reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment.  "The fact that harassment stops is only a test to measure the *efficacy* of a remedy.  Once an

employer knows or should know of harassment, a remedial obligation kicks in." *Id.* "That *obligation* will not be discharged until action – prompt, effective action – has been taken. Effectiveness will be measured by the twin purposes of ending the current harassment and deterring future harassment – by the same offenders or others." *Id.*, 1527-1528 [italics original]. "Title VII does not permit employers to stand idly by once they learn that [ ] harassment has occurred.  To do so amounts to a ratification of the prior harassment."

As an affirmative defense, Tesla argues that Plaintiff unreasonably failed to take advantage of preventative and corrective opportunities Tesla offered.  The *Faragher/Ellerth* defense is available where an "employer has provided a proven, effective mechanism for reporting and resolving complaints of…harassment" and the plaintiff-employee unreasonably failed to take advantage of these policies.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 806-807 (1998). In order to assert this defense, Tesla has the burden to prove that "(a) the employer exercised reasonable care to prevent and promptly correct any [racially] harassing behavior, and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 765 (1998).

### i.   Plaintiff's Contentions.

#### 1)   The *Faragher/Ellerth* Defense is Unavailable to Tesla due to Non-Dissemination of Its Policies to Plaintiff.

Tesla cannot avail itself to this defense.  In *Faragher*, the Supreme Court held the defense did not apply where the defendant-employer "entirely failed to disseminate its policy against sexual harassment" among employees of the plaintiff's class, because the employer "could not reasonably have thought that precautions against hostile work environments in any one of many departments in far-flung locations could be effective without <u>communicating</u> some formal policy against harassment, with a sensible complaint procedure." *Id*. at 808-9 (emphasis added).

Here, Tesla employees admit that Tesla's policy against harassment was *never* communicated to contractors like Plaintiff.  Rather, Tesla *assumed* that staffing companies would

comply with its policies. Tesla cannot assert a failure to take advantage of its policies where Tesla policies were never communicated to Plaintiff.  It is not unreasonable to fail to use or follow a policy that Plaintiff was never informed existed. Accordingly, because Tesla cannot demonstrate that it expressly communicated its policies to Plaintiff, in order to place Plaintiff on notice of their existence, Plaintiff cannot be determined to have "unreasonably" failed to avail himself of these undisclosed Tesla policies.

Alternatively, Tesla's affirmative defense is not available to Tesla because it contends that Martinez was not a direct supervisor of Mr. Diaz.  The defense requires a direct supervisor relationship.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998).  Defendant cannot continue to argue that Mr. Martinez was not Mr. Diaz's direct supervisor and maintain a right to claim a defense under Faragher.

### 2)   Plaintiff's Complaints Resulted in Inadequate or No Corrective Action.

Tesla's consistent response to the racial harassment reported by Plaintiff and others was to turn a blind eye toward the conduct. Tesla has consistently failed to take adequate corrective or preventative measures.  As a result, harassment towards the Plaintiff continued even after he complained.

### a)      Timbreza's Use of Racial Slurs.

Timbreza's conduct was confirmed by Plaintiff's supervisor, Kawasaki, and corroborated by witnesses. Kawasaki escalated the complaint to Romero and Tesla Custodial Program Manager Victor Quintero. A few days later, when Romero and Kawasaki met to discuss Plaintiff's complaint, Kawasaki reiterated that witnesses corroborated Plaintiff's complaint. Romero did not personally investigate the complaint.  The following day, Romero emailed Tesla manager Quintero and falsely reported that no witnesses corroborated Plaintiff's complaint. Romero issued Timbreza a written warning for "kidding around excessively" with no mention of the racial slurs. There is no writing that confirms that a written warning was ever actually issued.

### b)  Non-Investigation of Rampant Use of N-Word.

1       Plaintiff dutifully complained, initially to Kawasaki and then to Romero, on multiple

2  occasions, about use of the N-word at the Tesla factory. Neither man escalated Plaintiff's

3  complaints about the N-word to Tesla HR, in violation of Tesla's policies, and no investigation

4  was ever conducted by Tesla HR.  Plaintiff contends that Manager Victor Quintero was aware of

5  these complaints, but he undertook no investigation and he failed to take any remedial corrective

6  action to ensure that future racial conduct was deterred.

7                **c)  Martinez's Elevator Attack.**

8       After Martinez attacked Plaintiff in the elevator while shouting the N-word, Romero

9  relegated investigation of Plaintiff's complaint to nextSource. Though the entire incident was

10  witnessed by another employee and captured on security footage, no witnesses were interviewed

11  nor was the videotaped security footage reviewed. In fact, at one point Tesla HR instructed

12  Romero to stop investigating Plaintiff's first written complaint about Martinez. Instead,

13  nextSource treated the complaint like a personality conflict and counseled Plaintiff and Martinez

14  to "play nice."  Plaintiff was punished with a written warning.

15                **d)  Martinez's Racist Effigy.**

16       Plaintiff promptly complained to supervisor Michael Wheeler, who investigated and

17  confirmed that Martinez authored the racist effigy. Plaintiff then complained directly to Romero,

18  nextSource, and his staffing agency, Citistaff. [N]extSource deferred investigation of Martinez to

19  Chartwell, Martinez's staffing agency. Chartwell claims to have "investigated" the complaint,

20  but <u>spoke to no witnesses</u> other than Plaintiff and Martinez. Originally, Tesla employee

21  Quintero's tepid response was to issue Martinez a final written warning because Martinez had

22  "never" offended anyone—ignoring Plaintiff's prior complaints. At the prodding of a nextSource

23  employee, Tesla reluctantly agreed to issue Martinez a final written warning and suspend him

24  without pay for three days. NextSource made clear that it needed to consult with Tesla HR prior

25  to finalizing any investigation.

26              **e)  Bathroom Graffiti of the N-Word and Swastikas.**

27       Plaintiff testified that he complained to Romero about racist graffiti including the N-word

28  in the bathrooms, but that his complaints were dismissed. Plaintiff seeks to admit evidence of

other complaints about the N-word in the bathrooms.  In response to employee complaints, Tesla's practice was to paint over the graffiti without investigating or taking steps to prevent it from recurring. Plaintiff testified that when he left Tesla, there was still racist graffiti in the bathrooms.

### ii.   Tesla's Affirmative Defense:  Plaintiff Failed To Take Advantage of Any Preventive Opportunities

Mr. Diaz contends that he was subjected to harassing conduct during his assignment at Tesla that was racially motivated. Under Section 1981, Tesla is only liable when one of its supervisors, who had with immediate or successively higher authority over Plaintiff, creates a racially hostile work environment for him and Mr. Diaz suffered an adverse employment action. Even if he could establish as much (he cannot), Tesla has an affirmative defense under *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  However, Tesla may avail itself of the *Faragher/Ellerth* affirmative defense if it can show: (1)  Tesla exercised reasonable care to prevent and promptly correct the racially harassing behavior, and (2) Mr. Diaz  unreasonably failed to take advantage of any preventive or corrective opportunities provided by their employer or unreasonably failed to otherwise avoid harm. If Tesla proves these elements, Mr. Diaz  is not entitled to prevail on his respective claim.  <u>Faragher v. City of Boca Raton</u>, 118 S. Ct. 2275, (1998); <u>Burlington Industries, Inc. v. Ellerth</u>, 118 S. Ct. 2257 (1998).

When an employee suffers a tangible employment action resulting from a ***direct supervisor's harassment***, the employer's liability is established by proof of the harassment and a resulting tangible employment action. *See Faragher*, 524 U.S. at 807-08.  The *Ellerth/Faragher* affirmative defense is available to the employer in such a case.  When no tangible employment action has been taken, the employer may interpose an affirmative defense to defeat liability by proving that (1) the employer exercised reasonable care to prevent and correct promptly any discriminatory conduct, **and** (b) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Id.*;

*Ellerth*, 524 U.S. at 764-65; *see also Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1166-67 (9th Cir. 2003); *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001).

In *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137-38 (2004), the Supreme Court applied the framework of *Ellerth/Faragher* to a case of constructive discharge due to a hostile work environment. In such a case, the *Ellerth/Faragher* affirmative defense is available to the employer, unless an official act, i.e., a tangible employment action, of the employer precipitated the employee's decision to resign. *Id.* at 148. Here, Mr. Diaz alleges he was constructively terminated, which qualifies as an adverse employment action. Thus, the affirmative defense is available to Tesla, and the evidence proves that, as explained above Martinez was not Mr. Diaz's supervisor and Tesla exercised reasonable care to prevent harassment, but that Mr. Diaz unreasonably failed to take advantage of Tesla's opportunities to prevent harassment. Specifically, as to the following allegations, Tesla will present the following evidence:

### a) Timbreza's Alleged Use of Spanish Language Racial Slurs.

This complaint was investigated, and, thereafter, Timbreza and Mr. Diaz had no further contact. Mr. Diaz admits as much. As such, this incident does not support Mr. Diaz's position and instead reflects Tesla's commitment to investigate and address inappropriate/unlawful conduct at its factory. The purpose of an investigation is to determine what occurred and take prompt remedial action so the conduct does not reoccur. That is what happened here.

### b) Alleged Rampant Use of the N-Word.

Despite his allegations, Mr. Diaz did not complain about "rampant" use of the "n-word" at the Tesla factory. To the contrary, the evidence establishes that each time Mr. Diaz complained or had an issue at the factory (none were related to rampant use of the "n-word"), Tesla or one of the staffing agencies took prompt, remedial action. This is demonstrated by the incident involving Timbreza above and the incidents with Martinez below.

### c) Martinez Elevator Issue in October 2015.

Despite Mr. Diaz's allegations, and as he concedes above, Romero immediately initiated an investigation into both Martinez's and Plaintiff's complaints about the other individual.

Ultimately, after conversations with both individuals, it was decided that they would each be counseled and instructed that further issues between the employees would result in additional discipline.

### d)  Martinez's January 22, 2016 Cartoon Drawing.

Mr. Diaz  complained on January 22, 2016 about a drawing on a cardboard bail. Mr. Diaz and supervisor Michael Wheeler approached Ramon Martinez about the drawing, and Martinez admitted  he made the drawing.  Martinez apologized and stated that he did not intend for it to be offensive. This drawing was then immediately investigated;  Martinez and Mr. Diaz  each provided a written statement, and Martinez made an apology in writing.  Martinez also admitted that the drawing was not intended for Mr. Diaz , and it was drawn in response to a Pac-Man cartoon drawing with "little ghosts" by workers on another shift.  Martinez drew the drawing as a "cannibal" eating the "little ghosts" like the Pac-Man "eats ghosts" in the video game. Thus, Mr. Diaz's complaint about the cartoon drawing was immediately responded to, investigated, and Martinez was given a final written warning and a three day suspension by his employer, Chartwell.  Martinez has also undergone training and since that time has had no further disciplinary issues at the factory.

Finally, Martinez was a Chartwell employee, and not Mr. Diaz's  supervisor or even a supervisor in his chain of command.

### e)  Bathroom Graffiti of the N-Word, Swastikas.

If there had been graffiti in the bathroom (of any kind), any such graffiti was cleaned when discovered.  Mr. Diaz  never saw any swastikas in the bathroom.  He testified that he saw the N-word in the men's restroom, but he never complained about seeing the alleged graffiti. Thus, Mr. Diaz's claim fails because Tesla may avail itself of the *Faragher/Ellerth* affirmative defense.

### e.  Failure to Prevent Harassment (42 U.S.C. § 1981)

Employers have a duty to take all reasonable steps to prevent harassment, discrimination, and retaliation from occurring. *Gov. Code* §12940(k); *Scotch v. Art Inst. of Cal.* (2009) 173 Cal.App.4th 986, 1021. The duty to prevent discrimination and harassment is a non-delegable

duty of the company itself. *American Airlines, Inc. v. Superior Court*, 114 Cal.App.4th 881, 890 (2003) (Holding that FEHA imposes an "affirmative and mandatory duty" on employers to "take all reasonable steps necessary to prevent discrimination and harassment from occurring" in the workplace"); see also *Snyder v. Southern Cal. Edison Co.*, 44 Cal.2d 793, 800 (1955)  ("A non-delegable duty is a definite affirmative duty the law imposes on one by reason of his or her relationship with others. One cannot escape this duty by entrusting it to an independent contractor.")  In *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd*., 103 Cal.App.4th 1021, 1035-1036 (2002), the California Court of Appeal states:

"The public policy of the State of California is to protect and safeguard the civil rights of all individuals to seek, have access to, obtain, and hold employment without discrimination because of race ...." Moreover, employers must "take all reasonable steps necessary to prevent discrimination and harassment from occurring." (citations.) The employer's duty to prevent harassment and discrimination is affirmative and mandatory. (citation) Prompt investigation of a discrimination claim is a necessary step by which an employer meets its obligation to ensure a discrimination-free work environment. (citations).

The success of a claim for failure to prevent harassment or discrimination is dependent on a finding that actionable harassment or discrimination in fact occurred.  *O'Hagan v. Hartford Fire Insurance Company,* 628 Fed. Appx. 501 (2015) ("Finally, O'Hagan cannot prevail on his claim that Hartford failed to prevent age discrimination because the underlying age discrimination claim lacks merit"); *Trulson v. County of San Joaquin*, 493 F.Supp.3d 685, 694 (2014); *Adetuyi v. City and County of San Francisco,* 63 F.Supp.3d 1073, 1093 (2014); *See Trujillo v. N. Cty. Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998), *as modified* (May 12, 1998). Plaintiff must prevail on the harassment claim as a pre-requisite for prevailing on the failure to prevent claim.

When incidents of harassment occur, employers should respond in a way that is "reasonably calculated to end the harassment." *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) [internal quotation marks omitted]. "[T]he reasonableness of an employer's remedy will

depend on its ability to stop harassment by the person who engaged in harassment." *Id.*  But when "evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct." *Id.*  The *Ellison* Court noted that even in *Meritor*, the Supreme Court "stated that employers can be liable for sexual harassment without actual notice of the alleged discriminatory conduct." *Id.* at 881.

### i. Plaintiff: Tesla Failed to Investigate or Take Adequate Corrective Action.

Tesla focuses its defense on the fact that in each instance of a documented complaint, the harassing conduct stopped.  This is both legally and factually incorrect.  In addition to requiring that remedial action stop the harassing conduct at issue, the *Ellison* and *Fuller* Courts make clear that the employer's remedial action must be calculated to "deter[] future harassment—by the same offender or others." *Ellison*, 924 F.2d at 882; *Fuller*, 47 F.3d at 1528.  As indicated above, Tesla failed to communicate its employment policies to Plaintiff.  Regardless of this failure, Tesla nevertheless failed to comply with its own stated workplace policies and procedures.  And, in lieu of enforcing its own policies and procedures, Tesla relegated non-delegable duties to various staffing companies, for maintaining a Tesla workplace free of harassment and discrimination.  When corrective action was taken, it was patently ineffective, as use of the N-word never ceased and acts of harassment escalated. This fact was highlighted by Owen Diaz when he complained in January 2016 because he noted that he had complained previously and the conduct did not stop, in fact, it escalated.  See Sections IV, i. B, above.

### ii. Tesla: Tesla Provided a Workplace Free of Harassment and Took Prompt Corrective Remedial Action When Necessary.

Mr. Diaz was not a Tesla employee and notwithstanding that fact, Tesla provided a workplace free from harassment and Tesla maintains and adheres to anti-harassment policies, and acted consistently with those policies at all times.

Tesla and its staffing agencies communicated regularly to ensure that investigations were conducted and, in Mr. Diaz's case, each of his complaints was investigated and resolved.  In each

of Mr. Diaz's complaints, when appropriate, employees were appropriately disciplined (by their respective employers) for both the drawings and use of the N-word. Thus, Mr. Diaz's Section 1981 claim as to failure to prevent race based harassment fails.

As set forth above, the *Faragher/Ellerth* affirmative defense applies to this derivative claim as well.

### f.  Punitive Damages.

Mr. Diaz seeks punitive damages based on his Section 1981 claim.  To be liable for punitive damages under Section 1981, a defendant must act with "actual malice" or "'reckless disregard and callous indifference for the violation of [the plaintiff's] rights." *Woods, supra*, 925 F.2d at 1206 (1991). As the Supreme Court explained, these terms pertain not to the employer's knowledge that it may be engaging in discrimination, but rather to the employer's knowledge that it may be acting in violation of federal law.  *See U.S. ex rel. Bryant v. Williams Bldg. Corp*., 158 F. Supp. 2d 1001, 1007 (D.S.D. 2001).

Evidence that a company's corporate culture encourages or tolerates discrimination is highly probative on this point—*inter alia*, it helps to establish: (1) corporate liability for punitive damages; (2) liability on a failure to prevent claim; and/or (3) the employer's discriminatory intent.  Indeed, many cases recognize the admissibility of "corporate culture" evidence in an employment discrimination case as probative of (among other things) the employer's discriminatory or retaliatory intent. For instance, in *Pavon v. Swift Transp. Co., Inc*., the Ninth Circuit upheld an award of punitive damages, finding "the jury could have found that racial insults and slurs were a common occurrence on [the employer's] shop floor and that management was aware of this behavior and took no meaningful steps to stop it. The jury could have concluded that Swift did not believe [the plaintiff's] allegations and never seriously investigated the situation. Moreover, the jury could have found that Swift's refusal to investigate stemmed from its blame-the-victim mentality, wherein it wrongly perceived Pavon as the problem, labeled him a troublemaker, and terminated him." *Pavon v. Swift Transp. Co.*, Inc., 192 F.3d 902, 909 (9th Cir. 1999).  The court concluded that this conduct reflected sufficiently reckless disregard for employees' federally protective rights to justify an award of punitive damages.

i. **Proof of Managing Agent for Punitive Damages.**

1) **Plaintiff:   Tesla Delegated Duties to Receive, Address and Resolve Harassment Complaints to Others, Rendering them "Managing Agents" for Purpose of Assessing Punitive Damage Liability.**

Invoking state law logic, Tesla argues that Plaintiff is incapable of proving that a "managing agent" violated Plaintiff's rights for purposes of imposing punitive damages. However, Plaintiff's claims of harassment and discrimination are brought under Section 1981—a federal civil rights statute.  Damages for violations of Section 1981 are thus awarded under federal common law, not state law. *Woods v. Graphic Communications*, 925 F.2d 1195, 1204 (1991) ("*Woods*").

Federal case law provides that a "managerial" employee is vested with sufficient discretionary authority to be deemed a managing agent <u>as a matter of law</u> when the employer delegates the duty to receive reports of discrimination to them. *Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001). The *Swinton* court continued:

> "Potomac takes the position that Stewart--though designated in the employee manual as the proper recipient of harassment complaints by virtue of his position as Swinton's supervisor--was only a low-level supervisor and was thus not employed in a "managerial capacity," permitting punitive damages under *Kolstad*, 527 U.S. at 542-43, 119 S.Ct. 2118. Courts in several other circuits have addressed similar situations, where a supervisor who did not actually perpetrate the harassment but nonetheless was responsible under company policy for receiving and acting upon complaints of harassment, failed to take action to remedy the harassment. They have reached the conclusion that **the inaction of even relatively low-level supervisors may be imputed to the employer if the supervisors are made responsible, pursuant to company policy, for receiving and acting on complaints of harassment**."

*Id.* (emphasis added.)

Tesla's anti-harassment and discrimination policy—which Tesla claims applied to Plaintiff—specifically instructs employees to raise complaints of harassment and discrimination <u>with their supervisors and managers</u>.  Thus, Tesla delegated receipt of harassment complaints to managerial employees such as Romero and Quintero.  These employees were therefore charged with the Tesla duty of receiving, addressing and resolving complaints themselves, or escalating

1   the issue to Human Resources, as appropriate. Because Tesla's policies delegate the duty to

2   receive and address harassment complaints to these employees, Tesla has effectively deemed

3   these employees to be managerial employees, <u>as a matter of law</u>.

4        The same consequences apply to delegation of duties to the staffing agency employees,

5   like Kawasaki and Jackson, in fulfilling Tesla's duty to maintain a workplace free of

6   discrimination and retaliation. When Plaintiff complained to his Tesla managers, only to have

7   Tesla managers delegate the duty to investigate to the staffing agencies, Tesla explicitly vested

8   these agencies and individuals with the discretionary authority to receive, address and resolve

9   complaints of harassment.  [N]extSource and Citistaff employees were thereby elevated to the

10  status of Tesla managing agents, <u>as a matter of law</u>.

11       Like the employer in *Swift*, [N]extSource managers heard the N-word routinely used

12  throughout the Tesla facility, but took no meaningful corrective action to halt racially harassing

13  behavior. Kawasaki and Jackson, individuals tasked with receiving complaints, heard Plaintiff's

14  allegations of racial harassment and either never investigated, or conducted inadequate

15  investigations.

16       Tesla managerial employee and supervisor Ed Romero falsely reported that Plaintiff's

17  complaints of racial harassment about Timbreza were uncorroborated, thereby justifying

18  issuance of lesser punishment to the harasser.

19       Tesla deferred investigations of the picaninny investigation to staffing companies.

20  Statements obtained from Owen Diaz and Martinez by [N]extSource Program Manager Jackson

21  were forwarded so that the staffing companies could conduct their own investigation and

22  determine appropriate discipline.  Tesla was aware of the investigation, but failed to ensure that

23  it complied with its own policies and procedures and failed to conduct additional investigation to

24  ensure that appropriate remedial measures were adopted in response to the complaint. Witnesses

25  who were available to be interviewed like Lamar Patterson were not.  No known remedial

26  measures were taken to ensure that future racial harassment was deterred.

27       Quintero exercised authority to shield Martinez from termination, despite Martinez's

28  history of complaints of racial harassment associated with the Plaintiff. See *Bains LLC v. Arco*

*Products Co., Div. of Atlantic Richfield Co*., 405 F.3d 764, 773-4 (9th Cir. 2005) (if company official with sufficient authority to trigger vicarious liability supports racist employee's racially motivated conduct instead of protecting the victim, company is liable for punitive damages even if supervisor's motivation is nonracial, such as loyalty to subordinate or desire to avoid conflict within company; further, written antidiscrimination policy does not insulate company if it does not enforce that policy and, by its actions, instead supports discrimination).

The conduct of these individuals, in taking minimal or no action to halt racial harassment, were actions taken in conscious disregard of Plaintiff's right to workplace free of harassment. Tesla abrogated its responsibility to protect Plaintiff from a racially hostile work environment. Because decision-making as to Tesla's workplace was relegated to underlings and staffing companies, these individuals are deemed "managerial employees" for purposes of punitive damages. And their utter failure to conduct adequate remedial measures to deter future harassment by others constitutes reckless disregard for the plaintiff's rights.

### 2)  Tesla: Punitive Damages are Barred and There is No Evidence of Malice or Reckless Indifference Conduct.

Punitive damages are always discretionary, and a plaintiff has no "right" to punitive damages. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 US 408, 419 (2003); *Exxon Shipping Co. v. Baker*, 554 US 471, 492-493 (2008). Punitive damages are available under the Civil Rights Act against private parties for discriminatory acts that impair the civil rights of another. *See* 42 USC § 1981(c); *Johnson v. Railway Express Agency, Inc.*, 421 US 454, 461 (1975). Mr. Diaz has the burden of proving that Tesla's management engaged in discriminatory practices or acts with malice or reckless indifference to his rights.

Under Section 1981, a party may only recover punitive damages that the defendant, "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 USC § 1981a(b)(1). The terms "malice" and "reckless indifference" in 42 USCS § 1981a(b)(1) pertain to employer's knowledge that it may be acting in violation of the law, not its awareness that it is engaging in discrimination. *David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918 (C.D. Ill. 2002),

*aff'd*, 324 F.3d 851 (7th Cir. 2003); *Barber v. Nabors Drilling U.S.A.*, 130 F.3d 702 (5ᵗʰ Cir. 1997).   However, punitive damages are not warranted under 42 USCS § 1981a in a hostile work environment action where the employer has only constructive, rather than actual, knowledge of harassment.  *See, e.g.*, *Splunge v. Shoney's, Inc.*, 97 F.3d 488 (11th Cir. 1996).

Here, there is no evidence that Tesla's management engaged in any discriminatory practices or acts, let alone with the required malice or reckless indifference to Mr. Diaz's rights. Thus, punitive damages are not warranted.

### g.  Negligent Hiring, Supervision, and Retention (Cause of Action 14)

Mr. Diaz claims that Tesla negligently, hired, retained or supervised employees. An employer may be liable for injuries caused by an unfit employee if the employer knows or has reason to know that an employee hired or retained is incompetent or unfit to perform the duties required of the job, or if the employer fails to use reasonable care to discover the employee's incompetence or unfitness.  While an employer may be liable for negligently hiring or retaining an employee who poses a danger to other employees, such liability can only arise where a plaintiff demonstrates that the employer knew or had reason to know of some foreseeable harm. *Doe v. Capital Cities*, 50 Cal.App.4th 1038, 1054 (1997); *Evan F. v. Hughson United Methodist Church*, 8 Cal.App. 4th 828, 836–837 (1992) ("liability is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.")  Similarly, a claim for negligent supervision and retention hinges upon whether the employer had reason to know that an employee would act in the manner which caused the plaintiff harm.  *Id.*  An employer is not liable "merely because the one employed is incompetent, vicious, or careless."  *Federico v. Sup.Ct.*, 59 Cal.App.4th 1207, 1214 (1997), quoting Restatement Second of Agency Section 213, com. d.  "The cornerstone of a negligent hiring theory is the risk that the employee will act in a certain way and the employee does act in that way."  *Doe*, 50 Cal. App. 4th at 1055.

This state law claim for negligent hiring, retention, and supervision, provides no basis for punitive damages.  Cal. Civ. Code § 3294(c).  See, e.g., *Mock v. Michigan Millers Mut. Ins.*, 4

-28-

Cal.App.4[th] 306, 328-329 (1992); see also, *Lackner v. North*, 135 Cal. App. 4th 1188, 1210-1211 (2006).

To prevail on this claim, the plaintiff must prove all of the following: (1) The employee who caused injury must be incompetent or unfit for the job; (2) the employer must have hired or retained the unfit employee; (3) The employer must have hired or retained the employee, after the employer knew, or should have known, of the employee's incompetence or unfitness for the job; and (4) the proximate cause of injury must be the employee's incompetence or unfitness. *Roman Catholic Bishop v. Superior Court*, 42 Cal. App. 4th 1556, 1564-65 (1996) [Elements 1-3]; *Doe v. Capital Cities,* 50 Cal. App. 4th 1038, 1054-55 (1996) [Element 4].

### i. Plaintiff: A Negligent Hiring, Supervision, Retention Claim Lies.

Owen Diaz complained about Ramon Martinez threatening him on October 17, 2015, and Tesla employees Ed Romero and Victor Quintero received the complaint. Tesla failed to investigate Plaintiff's allegations with respect to Martinez's threatening conduct. On January 21, 2016,, Martinez drew and left a racist drawing for Plaintiff to find. Plaintiff immediately complained about the drawing upon seeing it.

But for Tesla's negligent failure to conduct an adequate and effective investigation of Martinez's conduct in October 2015, and its failure to institute proper and adequate corrective discipline of Martinez at that time, including termination due to his unfitness, the January 2016 events would never have occurred. Even after the January 2016 events revealed Martinez's unfitness, Tesla continued to retain him as an employee and subsequently rewarded him with a full-time direct hire position, thereby ratifying his conduct.

### ii. Tesla: No Claim for Negligent Hiring, Supervision, or Retention Claim.

Mr. Diaz claims that Ramon Martinez, a Chartwell employee, allegedly used the N-word during Mr. Diaz's tenure at the Tesla facility. Martinez was not a Tesla employee during Mr. Diaz's assignment at Tesla. Even if Martinez was a Tesla employee, there was no reason to know at the time of his hire, retention or supervision that Martinez would have used such language or made such a drawing. Any issues associated with Martinez's alleged conduct in

January 2016 about the cartoon drawing were promptly addressed.  In fact, after Martinez received a suspension and final written warning about the drawing, he has  received no other discipline.

As to Judy Timbreza, a non-Tesla employee, after Mr. Diaz's complaint, the matter was addressed.  Mr. Diaz admits that he had no further contact between with Timbreza.  Indeed, there is no evidence of prior complaints about racist language or behavior with respect to any of these individuals.  Thus, this claim fails.

### 3.  TRIAL PREPARATION

#### a.  Witnesses, Exhibits, Discovery Responses, and Further Motions

The parties have submitted their witnesses to be called, exhibits, discovery designations, and motions *in limine* at this time. The parties do not anticipate further motion practice.

#### b.  Estimate of Trial Time

Plaintiff estimates a 10 day trial based on the time for witness examinations of approximately 20 hours each and adding time for jury selection, opening and closing.

Tesla estimates a 4 to 5 day jury trial.

#### c.  Further Discovery

There is no discovery remaining at this time as discovery is closed.

### 4.  TRIAL ALTERNATIVES

#### a.  Settlement Discussion

Prior to April 7, 2020, settlement discussions had not been fruitful.  On April 7, 2020, parties attended a settlement conference with Magistrate Judge Robert M. Illman.  The parties are meeting and conferring on settlement.  On, April 20, 2020, the Plaintiff made a revised demand and Defendant indicated that it would consider this demand.  This was communicated to Judge Illman regarding status on April 20, 2020.

#### b.  Consent to Trial Before a Magistrate

The parties do not believe reference of the action to a master or magistrate is feasible.

#### c.  Dismissals

As laid out above, the parties stipulated to the dismissal of former plaintiff Demetric Di-

az and several causes of action. (Dkt. No. 176).

### d. Bifurcation

Bifurcation is not being sought.

CALIFORNIA CIVIL RIGHTS LAW GROUP

ALEXANDER KRAKOW + GLICK LLP

DATED:  April 27, 2020         By:      _____//s//_____
                                        Lawrence A. Organ, Esq.
                                        J. Bernard Alexander, Esq.
                                        Navruz Avloni, Esq.
                                        Cimone A. Nunley, Esq.

                                        Attorneys for Plaintiff OWEN DIAZ

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

DATED:  April 27, 2020         By      _//s//_____
                                        TRACEY A. KENNEDY
                                        PATRICIA M. JENG

                                        Attorneys for Defendant
                                        TESLA, INC. dba TESLA MOTORS, INC.