# Exhibit

# 1

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4

                                    REPORTER CERTIFIED
5    _____    TRANSCRIPT

6    DEMETRIC DI-AZ, OWEN DIAZ and
     LAMAR PATTERSON, an individual,
7                                       **CONFIDENTIAL**
             Plaintiffs,
8
     Vs.                     Case No. 3:17-cv-06748-WHO
9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CitiStaff SOLUTIONS, INC.;
     WEST VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING SERVICES, INC.
     and DOES 1-10, inclusive,
12
             Defendants.
13   _____/

14

15

                     CONFIDENTIAL
16
             VIDEOTAPED DEPOSITION OF
17
                     OWEN DIAZ
18
             SAN FRANCISCO, CALIFORNIA
19
             TUESDAY, MAY 22, 2018
20

21

22

23
     Reported By:
24   Candy Newland
     CSR No. 14256
25   File No. 18-25470

```
 1   Deposition of OWEN DIAZ, taken on behalf of Defendants

 2   at 351 California Street, Suite 200, San Francisco,

 3   California, commencing at 10:11 a.m. on Tuesday, May 15,

 4   2018, before Candy Newland, Certified Shorthand Reporter

 5   No. 14256.

 6

 7                   A P P E A R A N C E S

 8

 9   FOR THE PLAINTIFFS:

10

11           CALIFORNIA CIVIL RIGHTS LAW GROUP

12           BY:  LAWRENCE A. ORGAN, ESQ.

13           332 San Anselmo Avenue

14           San Anselmo, CA 94960

15           (415) 453-4740

16           larry@civilrightsca.com

17

18           CALIFORNIA CIVIL RIGHTS LAW GROUP

19           BY:  NAVRUZ AVLONI, ESQ.

20           332 San Anselmo Avenue

21           San Anselmo, CA 94960

22           (415) 453-4740

23           navruz@civilrightsca.com

24

25
```

**Owen Diaz-Confidential**

```
 1    APPEARANCES(CONTINUED)

 2

 3    FOR THE DEFENDANT TESLA:

 4

 5            CONSTANGY BROOKS, SMITH & PROPHETE, LLP

 6            BY:  BARBARA I. ANTONUCCI, ESQ.

 7            351 California Street, Suite 200

 8            San Francisco, CA 94104

 9            (415) 918-3000

10            bantonucci@constangy.com

11

12    FOR THE DEFENDANT WEST VALLEY STAFFING:

13

14            PAHL & MCCAY

15            BY:  FENN C. HORTON, III, ESQ.

16            225 West Santa Clara, Suite 1500

17            San Jose, CA 95113-1752

18            (408) 286-5100

19            fhorton@pahl-mccay.com

20

21    ALSO PRESENT:

22            Jaime Bodiford, Tesla

23            Rob Delantoni, Videographer

24

25
```

| | |
|---|---|
| 11:21:21 1 | BY MS. ANTONUCCI: |
| 11:21:21 2 | Q.     Had you ever seen any other drawings in the |
| 11:21:26 3 | Fremont Tesla factory? |
| 11:21:27 4 |       MR. ORGAN:  Objection.  Vague and ambiguous as |
| 11:21:29 5 | to "drawings." |
| 11:21:31 6 | A.     Yes. |
| 11:21:33 7 | BY MS. ANTONUCCI: |
| 11:21:33 8 | Q.     What other drawings have you seen? |
| 11:21:39 9 | A.     Graffiti inside the bathrooms. |
| 11:21:51 10 | Q.     And what graffiti did you see in the bathrooms? |
| 11:22:00 11 | A.     The N-word wrote inside the bathroom stalls. |
| 11:22:09 12 | Q.     Anything else? |
| 11:22:18 13 | A.     Possibly, but not that I can recall at this |
| 11:22:23 14 | moment. |
| 11:22:27 15 | Q.     How many times did you see the N-word written |
| 11:22:30 16 | inside the bathroom stall? |
| 11:22:39 17 | A.     I don't understand the question. |
| 11:22:43 18 | Q.     Did you only see the N-word written inside the |
| 11:22:47 19 | bathroom stall once or multiple times? |
| 11:22:52 20 | A.     Do you mean every time I went to the bathroom, |
| 11:22:55 21 | or wrote on the bathroom walls? |
| 11:22:58 22 | Q.     Did you go to that bathroom more than one |
| 11:23:02 23 | occasion in which you saw the N-word written on the |
| 11:23:05 24 | stall? |
| 11:23:06 25 | A.     Yes. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:23:06 | 1 | Q.      How many occasions did you go to the bathroom |
| 11:23:08 | 2 | where you saw the N-word written on the bathroom stall? |
| 11:23:16 | 3 | A.      I used the bathroom maybe four or five times a |
| 11:23:21 | 4 | day. |
| 11:23:22 | 5 | Q.      And how long was the N-word written on the |
| 11:23:25 | 6 | bathroom stall? |
| 11:23:27 | 7 |         MR. ORGAN:  Objection.  Vague and ambiguous. |
| 11:23:29 | 8 | Compound. |
| 11:23:34 | 9 |         THE WITNESS:  To my knowledge, it's still there. |
| 11:23:37 | 10 | I don't know. |
| 11:23:37 | 11 | BY MS. ANTONUCCI: |
| 11:23:38 | 12 | Q.      Did you ever report to anyone that the N-word |
| 11:23:40 | 13 | was written on the bathroom stall? |
| 11:23:43 | 14 | A.      Yes. |
| 11:23:43 | 15 | Q.      Who did you report that to? |
| 11:23:45 | 16 | A.      Ed Romero. |
| 11:23:55 | 17 | Q.      And after you reported it, did someone actually |
| 11:23:59 | 18 | paint over the N-word? |
| 11:24:01 | 19 | A.      No. |
| 11:24:01 | 20 | Q.      It was still on the stall? |
| 11:24:04 | 21 | A.      Yes. |
| 11:24:05 | 22 | Q.      At the end of your employment, it was still on |
| 11:24:08 | 23 | the stall? |
| 11:24:12 | 24 | A.      That I know.  Yes, it was. |
| 11:24:14 | 25 | Q.      Did you always go to the same bathroom in the |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:24:17 | 1 | Fremont factory? |
| 11:24:21 | 2 | A.      No. |
| 11:24:22 | 3 | Q.      Okay.  Which bathroom did you see this in? |
| 11:24:26 | 4 | A.      The bathroom that's located between the |
| 11:24:40 | 5 | conveyance and the production floor.  The other bathroom |
| 11:24:47 | 6 | is located in between the --I believe it's the battery |
| 11:24:57 | 7 | line and the production floor. |
| 11:25:03 | 8 | Q.      Just one bathroom? |
| 11:25:04 | 9 | A.      No.  There's more than one bathroom. |
| 11:25:09 | 10 | Q.      I'm sorry.  Did you see the N-word written in |
| 11:25:13 | 11 | just one bathroom? |
| 11:25:14 | 12 | A.      No. |
| 11:25:14 | 13 | Q.      You saw it in two bathrooms? |
| 11:25:17 | 14 | A.      No. |
| 11:25:18 | 15 | Q.      How many bathrooms did you see the N-word |
| 11:25:21 | 16 | written in? |
| 11:25:28 | 17 | A.      About four bathrooms. |
| 11:25:32 | 18 | Q.      So one of them was on the conveyance -- near the |
| 11:25:40 | 19 | conveyance area on the production floor; correct? |
| 11:25:44 | 20 | A.      Yes. |
| 11:25:44 | 21 | Q.      And the second one was in the battery area on |
| 11:25:49 | 22 | the production floor? |
| 11:25:50 | 23 | A.      Yes. |
| 11:25:52 | 24 | Q.      Where are the other bathrooms that you saw the |
| 11:25:57 | 25 | N-word written in? |

| | | |
|---|---|---|
| 11:26:00 | 1 | A.        There's another bathroom that I saw.   I think |
| 11:26:05 | 2 | it's called the stater line.   I'm not 100 percent sure |
| 11:26:09 | 3 | what that line was called. |
| 11:26:12 | 4 | Q.        Also on the production floor? |
| 11:26:15 | 5 | A.        All the bathrooms are used for the production |
| 11:26:19 | 6 | workers. |
| 11:26:22 | 7 | Q.        What other bathrooms did you see the N-word |
| 11:26:26 | 8 | written inside the stall? |
| 11:26:33 | 9 | A.        Can't be 100 percent sure where the bathroom was |
| 11:26:41 | 10 | located but... |
| 11:26:44 | 11 | Q.        So the first time you saw the N-word written |
| 11:26:49 | 12 | inside the bathroom stall, was that before or after you |
| 11:26:54 | 13 | saw the picture that you described that you sent to |
| 11:26:57 | 14 | CitiStaff? |
| 11:26:58 | 15 | A.        Before. |
| 11:27:00 | 16 | Q.        How long before? |
| 11:27:09 | 17 | A.        I would say my second day of employment. |
| 11:27:23 | 18 | Q.        And which bathroom was the -- which bathroom did |
| 11:27:28 | 19 | you see the N-word written in on your second day of |
| 11:27:33 | 20 | employment? |
| 11:27:35 | 21 | A.        The bathroom between conveyance and the |
| 11:27:39 | 22 | production floor. |
| 11:27:40 | 23 | Q.        And when did you see the N-word written in the |
| 11:27:46 | 24 | bathroom stall in the battery bathroom? |
| 11:27:54 | 25 | A.        I can't be sure of the time. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:27:56 | 1 | Q. How long after you had been working there? |
| 11:28:13 | 2 | A. I can't be sure. |
| 11:28:15 | 3 | Q. But the first time you saw it was on your second |
| 11:28:24 | 4 | day of employment? |
| 11:28:25 | 5 | A. Yes, ma'am. |
| 11:28:26 | 6 | Q. And what about at the stater line? Am I saying |
| 11:28:31 | 7 | that right? Stater line? |
| 11:28:32 | 8 | A. I believe that's what it is. |
| 11:28:34 | 9 | Q. When did you see that N-word written in the |
| 11:28:39 | 10 | bathroom stall in the stater line bathroom? |
| 11:28:42 | 11 | A. I can't recall. |
| 11:28:45 | 12 | Q. But it was after your second day of employment? |
| 11:28:48 | 13 | A. Yes. |
| 11:28:48 | 14 | Q. Was it before you saw the picture that you you |
| 11:28:53 | 15 | sent to CitiStaff? |
| 11:28:55 | 16 | A. Yes. |
| 11:29:06 | 17 | Q. Okay. Did you only report the N-word in any |
| 11:29:10 | 18 | bathroom stall to Romero on one occasion? |
| 11:29:14 | 19 | A. No. |
| 11:29:15 | 20 | Q. How many times did you report the N-word in the |
| 11:29:18 | 21 | bathroom stall to Romero? |
| 11:29:25 | 22 | A. Three to seven times. |
| 11:29:34 | 23 | Q. Did you tell him where it was? |
| 11:29:39 | 24 | A. Yes. |
| 11:29:42 | 25 | Q. Did you tell him about all of the different |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:32:02 | 1 | A.      Yes. |
| 11:32:03 | 2 | Q.      What did you say? |
| 11:32:06 | 3 | A.      That some of the employees were calling me the |
| 11:32:22 | 4 | N-word. |
| 11:32:24 | 5 | Q.      And how many times did you tell Ed Romero that |
| 11:32:34 | 6 | some employees were calling you the N-word? |
| 11:32:41 | 7 | A.      Probably three to seven times. |
| 11:32:49 | 8 | Q.      Was this on the same occasion that you discussed |
| 11:32:52 | 9 | the bathroom stall? |
| 11:33:00 | 10 | A.      Yes. |
| 11:33:09 | 11 | Q.      And what did -- did you say anything else to Ed |
| 11:33:13 | 12 | Romero when you discussed both the N-word on the |
| 11:33:17 | 13 | bathroom stall and employees calling you the N-word in |
| 11:33:22 | 14 | these three to seven times? |
| 11:33:24 | 15 | A.      That they were also telling me to go back to |
| 11:33:30 | 16 | Africa. |
| 11:33:30 | 17 | Q.      You told Ed Romero that? |
| 11:33:33 | 18 | A.      Yes. |
| 11:33:37 | 19 | Q.      Did you tell him who was calling you the N-word? |
| 11:33:44 | 20 | A.      I didn't know all their names. |
| 11:33:48 | 21 | Q.      So that's a "no"? |
| 11:33:59 | 22 | MR. ORGAN:  Objection.  Compound. |
| 11:34:01 | 23 | THE WITNESS:  I pointed out a couple of them. |
| 11:34:10 | 24 | BY MS. ANTONUCCI: |
| 11:34:11 | 25 | Q.      Did you tell him any names at all? |

| 11:34:14 | 1 | A. | I didn't know their names. |

11:34:14  1    A.      I didn't know their names.

11:34:18  2    Q.      Do you know their names now?

11:34:21  3    A.      No.

11:34:45  4    Q.      How many people were calling you the N-word?

11:34:52  5    A.      Two of the supervisors and a few other

11:35:02  6    employees.

11:35:12  7    Q.      Do you know the names of the supervisors?

11:35:16  8    A.      Yes.

11:35:17  9    Q.      And who are they?

11:35:19  10   A.      Robert -- I don't know his last name -- and

11:35:26  11   Ramon Martinez.

11:35:36  12   Q.      And you said a few other employees.  Do you know

11:35:38  13   their names?

11:35:42  14   A.      No.

11:35:45  15   Q.      By "few," how many employees were calling you

11:35:48  16   the N-word?

11:36:06  17   A.      I'm going to to say around -- about 8 to 10.

11:36:19  18   Q.      Okay.  How many times did Robert call you the

11:36:29  19   N-word?

11:36:32  20   A.      I can't recall.

11:36:34  21   Q.      Was it less than five?

11:36:44  22   A.      No.

11:36:44  23   Q.      Was it more than five?

11:36:46  24   A.      Yes.

11:36:46  25   Q.      Was it less than 10?

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:36:52 | 1 | A. No. |
| 11:36:54 | 2 | Q. Was it less than 15? |
| 11:37:01 | 3 | A. I can't give you an exact number. |
| 11:37:05 | 4 | Q. Was it somewhere between 10 and 15? |
| 11:37:09 | 5 | A. I can't give you an exact number. |
| 11:37:11 | 6 | Q. Okay. I don't need an exact number. I just |
| 11:37:14 | 7 | need an estimate to the best of your recollection. |
| 11:37:31 | 8 | A. I'd say other 30 times. |
| 11:37:41 | 9 | Q. And how many times did Ramon Martinez call you |
| 11:37:44 | 10 | the N-word? |
| 11:37:45 | 11 | A. More than 30 times. |
| 11:37:55 | 12 | Q. Is there anything you can describe to me about |
| 11:37:58 | 13 | the 8 to 10 employees that called you that -- called you |
| 11:38:01 | 14 | the N-word? |
| 11:38:08 | 15 | A. They were just working on the production floor, |
| 11:38:12 | 16 | the battery line. |
| 11:38:16 | 17 | Q. All 8 to 10 were working on the battery line? |
| 11:38:20 | 18 | A. Either production or the battery line. |
| 11:38:40 | 19 | Q. Were any of them in recycling? |
| 11:38:45 | 20 | A. Possible. |
| 11:39:01 | 21 | Q. What race is Robert? |
| 11:39:04 | 22 | A. Hispanic. |
| 11:39:07 | 23 | Q. And what about Ramon? |
| 11:39:09 | 24 | A. Hispanic also. |
| 11:39:12 | 25 | Q. And what about the 8 to 10 employees? |

| | | |
|---|---|---|
| 11:53:09 | 1 | before Demetric started working there? |
| 11:53:13 | 2 | A.      I can't recall. |
| 11:53:22 | 3 | Q.      Did Robert ever tell you to go back to Africa? |
| 11:53:42 | 4 | A.      I can't recall. |
| 11:53:45 | 5 | Q.      Did Ramon ever call you the N-word? |
| 11:53:51 | 6 | A.      Yes. |
| 11:53:52 | 7 | Q.      How many times? |
| 11:53:56 | 8 | A.      More than 30. |
| 11:54:12 | 9 | Q.      Can you tell me about all the different contexts |
| 11:54:16 | 10 | in which Ramon called you the N-word? |
| 11:54:19 | 11 |         MR. ORGAN:  Objection.  Compound. |
| 11:54:21 | 12 |         THE WITNESS:  I can't recall all the different |
| 11:54:25 | 13 | contexts. |
| 11:54:26 | 14 | BY MS. ANTONUCCI: |
| 11:54:27 | 15 | Q.      Can you recall any of the statements where Ramon |
| 11:54:30 | 16 | used the N-word? |
| 11:54:40 | 17 | A.      Yes. |
| 11:54:45 | 18 | Q.      Describe the statement in which Ramon used the |
| 11:54:50 | 19 | N-word. |
| 11:54:51 | 20 |         MR. ORGAN:  Objection.  Compound. |
| 11:54:57 | 21 |         THE WITNESS:  One time he told me, "I hate you" |
| 11:55:00 | 22 | and put the N on it. |
| 11:55:08 | 23 | BY MS. ANTONUCCI: |
| 11:55:08 | 24 | Q.      And that was just one time? |
| 11:55:10 | 25 | A.      It was more than one time at that particular |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:04:53 | 1 | MR. ORGAN:  Objection.  Compound.  Overbroad. |
| 01:04:58 | 2 | THE WITNESS:  That I can recall at this time. |
| 01:05:02 | 3 | BY MS. ANTONUCCI: |
| 01:05:06 | 4 | Q.    And I know you can't recall any of the names of |
| 01:05:09 | 5 | the 8 to 10 employees that used the N-word, but can you |
| 01:05:15 | 6 | recall the context in which they used it? |
| 01:05:19 | 7 | A.    Malicious. |
| 01:05:21 | 8 | Q.    Can you tell me, did they use it in a statement? |
| 01:05:32 | 9 | A.    Yes. |
| 01:05:32 | 10 | Q.    What statements can you recall that they used |
| 01:05:36 | 11 | the N-word in? |
| 01:05:53 | 12 | A.    "Hey, you, N."  That's all I can remember at |
| 01:06:11 | 13 | this time. |
| 01:06:11 | 14 | MR. ORGAN:  Counsel, can we have an agreement |
| 01:06:14 | 15 | that when he's using the initial "N," he's using that as |
| 01:06:19 | 16 | an abbreviation for the word "Nigger"? |
| 01:06:22 | 17 | BY MS. ANTONUCCI: |
| 01:06:23 | 18 | Q.    Is that how you're using that word? |
| 01:06:25 | 19 | A.    Yes. |
| 01:06:25 | 20 | Q.    "Hey, you, N."  Was there any other -- besides |
| 01:06:42 | 21 | "Hey, you N," are there any other contexts or statements |
| 01:06:42 | 22 | in which these 8 to 10 employees used the N-word? |
| 01:07:05 | 23 | A.    Not that I recall at this time. |
| 01:07:05 | 24 | Q.    On how many occasions did these 8 to 10 |
| 01:07:10 | 25 | employees use the N-word? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:29:18 | 1 | Q.    And who's Tom Kawasaki? |
| 01:29:21 | 2 | A.    Supervisor. |
| 01:29:23 | 3 | Q.    What did he supervise? |
| 01:29:29 | 4 | A.    At that time, the elevator staff. |
| 01:29:32 | 5 | Q.    Did you report to Tom Kawasaki? |
| 01:29:43 | 6 | A.    Yes. |
| 01:29:44 | 7 | Q.    For how long? |
| 01:29:47 | 8 | A.    Till he left. |
| 01:29:54 | 9 | Q.    And when was that? |
| 01:29:55 | 10 | A.    I don't recall. |
| 01:29:57 | 11 | Q.    How long after you arrived at Tesla did Tom |
| 01:30:03 | 12 | Kawasaki leave? |
| 01:30:05 | 13 | A.    I don't recall. |
| 01:30:07 | 14 | Q.    Do you recall if it was more than a couple of |
| 01:30:09 | 15 | weeks? |
| 01:30:12 | 16 | A.    It's more than a couple weeks.  He was there for |
| 01:30:22 | 17 | a while. |
| 01:30:25 | 18 | Q.    And at some point, you started reporting to |
| 01:30:28 | 19 | Ed Romero; is that right? |
| 01:30:29 | 20 | A.    Yes. |
| 01:30:30 | 21 | Q.    Did you report to anyone other than Tom Kawasaki |
| 01:30:34 | 22 | or Ed Romero while you were assigned at Tesla? |
| 01:30:39 | 23 | A.    No. |
| 01:30:48 | 24 | Q.    You said you went through an orientation at |
| 01:30:52 | 25 | Tesla? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:46:01 | 1 | THE WITNESS:  The departments overlap. |
| 01:46:01 | 2 | BY MS. ANTONUCCI: |
| 01:46:04 | 3 | Q.      How did they overlap? |
| 01:46:16 | 4 | A.      Whatever the upstairs needed, the elevator would |
| 01:46:19 | 5 | supply it.  They would bring it in from the warehouse. |
| 01:46:33 | 6 | Q.      So at the beginning of your assignment at Tesla, |
| 01:46:36 | 7 | you worked as an elevator operator; right? |
| 01:46:39 | 8 | A.      Yes. |
| 01:46:40 | 9 | Q.      And what were your responsibilities as an |
| 01:46:42 | 10 | elevator operator? |
| 01:46:47 | 11 | A.      Move material and people. |
| 01:46:58 | 12 | Q.      On the elevator? |
| 01:47:01 | 13 | A.      Yes. |
| 01:47:05 | 14 | Q.      So is it correct that it was your responsibility |
| 01:47:08 | 15 | to pick up material that was on one floor, load it into |
| 01:47:15 | 16 | the elevator, go up or down the elevator, and unload it |
| 01:47:19 | 17 | onto another floor? |
| 01:47:20 | 18 | A.      Yes. |
| 01:47:22 | 19 | Q.      Does that accurately describe your job as an |
| 01:47:26 | 20 | elevator operator? |
| 01:47:27 | 21 | A.      Yes. |
| 01:47:27 | 22 | Q.      Were there any other responsibilities involved |
| 01:47:30 | 23 | in your job as an elevator operator? |
| 01:47:34 | 24 | A.      No. |
| 01:47:39 | 25 | Q.      What kind of material were you responsible for |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 01:47:43 | 1 | loading/unloading from the elevator? |
| 01:47:54 | 2 | A.      Drive units, battery cells, vehicles. |
| 01:48:08 | 3 | Q.      Anything else? |
| 01:48:10 | 4 | A.      Boxes and crates. |
| 01:48:20 | 5 | Q.      And were these materials loaded on carts? |
| 01:48:27 | 6 | A.      I don't understand. |
| 01:48:28 | 7 | Q.      The materials that you were supposed to load and |
| 01:48:30 | 8 | unload onto the elevator, did you wheel them in, or did |
| 01:48:34 | 9 | you actually have to lift and carry them in, or both? |
| 01:48:39 | 10 | A.      Both.  Use a pallet jack, sometimes a pallet |
| 01:48:53 | 11 | rider. |
| 01:49:03 | 12 | Q.      How many elevators were there in the factory? |
| 01:49:09 | 13 | A.      Three. |
| 01:49:09 | 14 | Q.      And did you -- |
| 01:49:13 | 15 | A.      I take that back.  Four. |
| 01:49:15 | 16 | Q.      During the time you were assigned at Tesla, did |
| 01:49:18 | 17 | you only operate one elevator? |
| 01:49:23 | 18 | A.      I operated all four. |
| 01:49:32 | 19 | Q.      Who did you work with when you were an elevator |
| 01:49:36 | 20 | operator at Tesla? |
| 01:49:49 | 21 | A.      I can't remember all the guys' names now. |
| 01:49:53 | 22 | Q.      Do you remember any of the names of your |
| 01:49:56 | 23 | coworkers when you were assigned to work at Tesla? |
| 01:49:59 | 24 | A.      Lamar Patterson, Rothaj Foster.  But the rest of |
| 01:50:09 | 25 | the names escape me.  Sorry. |

| | | |
|---|---|---|
| 03:00:32 | 1 | been avoided if either of them would have used the chain |
| 03:00:35 | 2 | of command instead of creating a new one amongst |
| 03:00:39 | 3 | themselves.  Devin Burkhart." |
| 03:00:39 | 4 | Q.    Who is Devin Burkhart? |
| 03:00:41 | 5 | A.    Devin was one of the guys that I supervised in |
| 03:00:44 | 6 | the elevator. |
| 03:00:57 | 7 | Q.    And you -- when you received that e-mail from |
| 03:00:59 | 8 | Devin, you forwarded it to Tom? |
| 03:01:01 | 9 | A.    Yes. |
| 03:01:03 | 10 | Q.    Did you do anything else in response to that |
| 03:01:06 | 11 | e-mail? |
| 03:01:10 | 12 | A.    I talked to Hilda. |
| 03:01:14 | 13 | Q.    And what did you talk to Hilda about? |
| 03:01:16 | 14 | A.    I let her know that because of the slow |
| 03:01:19 | 15 | production that the elevator on that side was closed and |
| 03:01:23 | 16 | everything had to be brought to this side.  My immediate |
| 03:01:28 | 17 | supervisor at that time was Tom Kawasaki, closed the |
| 03:01:32 | 18 | elevator and told us not to operate that elevator, and |
| 03:01:38 | 19 | she got upset and went to go get this Aron guy. |
| 03:01:52 | 20 | Q.    And did you speak with Aron? |
| 03:01:55 | 21 | A.    No. |
| 03:01:57 | 22 | Q.    So she just reported it to Aron? |
| 03:01:59 | 23 | A.    No.  Her and Aron came back.  Aron said |
| 03:02:03 | 24 | something and I just walked away. |
| 03:02:04 | 25 | Q.    What did Aron say? |

| | | |
|---|---|---|
| 03:02:07 | 1 | A.      He had just started to get up in me. |
| 03:02:21 | 2 | Q.      And where were you when he said that? |
| 03:02:38 | 3 | A.      On the stairs by the bathroom.  He kept |
| 03:02:42 | 4 | following me trying to get me to open up the elevator. |
| 03:02:47 | 5 | Q.      Was anyone else present? |
| 03:02:50 | 6 | A.      I don't know.  I was on the stairs. |
| 03:02:52 | 7 | Q.      Did you respond to him? |
| 03:03:09 | 8 | A.      No.  I didn't want the situation to keep |
| 03:03:13 | 9 | escalating, so I kept going. |
| 03:03:30 | 10 | Q.      And do you know what race Aron Deharto is? |
| 03:03:33 | 11 | A.      I can't be for sure. |
| 03:03:36 | 12 | Q.      Do you know what race Jessie Leite is? |
| 03:03:41 | 13 | A.      Unless I saw a picture, I couldn't be for sure. |
| 03:03:45 | 14 | Q.      What about Hilda Navarro? |
| 03:03:47 | 15 | A.      She was Hispanic. |
| 03:03:54 | 16 | Q.      Did you report this "All you Ns are starting to |
| 03:03:59 | 17 | get uppity" comment to anyone? |
| 03:04:04 | 18 | A.      Tom Kawasaki. |
| 03:04:09 | 19 | Q.      And what did Tom say? |
| 03:04:12 | 20 | A.      "Try to avoid him." |
| 03:04:28 | 21 | Q.      Do you know if he did anything after that? |
| 03:04:37 | 22 |         MR. ORGAN:  Objection.  Vague and ambiguous as |
| 03:04:39 | 23 | to "he." |
| 03:04:39 | 24 | BY MS. ANTONUCCI: |
| 03:04:41 | 25 | Q.      Do you know if Tom did anything after that? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:23:05 | 1 | A.       My understanding is that he was a liaison. |
| 03:23:13 | 2 | Q.       Liaison with who? |
| 03:23:16 | 3 | A.       Tesla and nextSource, I believe. |
| 03:23:23 | 4 | Q.       Did you understand that you could complain to |
| 03:23:32 | 5 | Wayne Jackson if you needed to about any concerns you |
| 03:23:35 | 6 | had in the workplace? |
| 03:23:36 | 7 |           MR. ORGAN:  Objection.  Vague and ambiguous. |
| 03:23:40 | 8 |           THE WITNESS:  If he was around. |
| 03:23:40 | 9 | BY MS. ANTONUCCI: |
| 03:23:43 | 10 | Q.       And he was on-site? |
| 03:23:46 | 11 | A.       Rarely. |
| 03:23:50 | 12 | Q.       How often would you say he was on-site? |
| 03:23:58 | 13 | A.       I don't know. |
| 03:24:01 | 14 | Q.       How many times a week? |
| 03:24:03 | 15 | A.       I don't know. |
| 03:24:29 | 16 | Q.       And this incident with Ramon, you know, right |
| 03:24:33 | 17 | outside, inside of the elevator, occurred around |
| 03:24:36 | 18 | October 17, 2015? |
| 03:24:40 | 19 | A.       Yes.  That's what the date is on the -- on the |
| 03:24:44 | 20 | e-mail. |
| 03:24:45 | 21 | Q.       And was that around 4:45 a.m.? |
| 03:24:49 | 22 | A.       Yes. |
| 03:24:51 | 23 | Q.       So you sent this e-mail right after it happened? |
| 03:24:55 | 24 | A.       I sent the e-mail out at 6:08 a.m., ma'am. |
| 03:25:02 | 25 | Q.       So about an hour and a half after it happened? |

| | | |
|---|---|---|
| 04:53:06 | 1 | BY MS. ANTONUCCI: |
| 04:53:08 | 2 | Q.      You said you left because of the harassment. |
| 04:53:11 | 3 | A.      Yes. |
| 04:53:11 | 4 | Q.      You said you left because of your mom. |
| 04:53:15 | 5 | A.      Yes. |
| 04:53:15 | 6 | Q.      Are there any other reasons that you left your |
| 04:53:19 | 7 | assignment at Tesla? |
| 04:53:22 | 8 | A.      Other than two reasons.  No. |
| 04:53:29 | 9 | Q.      Exhibit 21 is an e-mail, Bates-stamped at the |
| 04:53:38 | 10 | bottom 317, and it's dated 3/2/2016.  And at the bottom |
| 04:53:50 | 11 | it says it's from Ed Romero to Wayne Jackson.  It says, |
| 04:53:54 | 12 | "Wayne, I appreciate you taking action with this |
| 04:53:56 | 13 | situation involving Owen and Troy.  I understood from |
| 04:53:59 | 14 | you that they had received a final written notice |
| 04:54:03 | 15 | informing them that any negative incident involving them |
| 04:54:07 | 16 | would lead to their immediate termination.  It is vital |
| 04:54:11 | 17 | that our elevator operators be professional, courteous, |
| 04:54:18 | 18 | responsive to our customers' needs and always provide |
| 04:54:18 | 19 | good customer service." |
| 04:54:20 | 20 |         Do you see that? |
| 04:54:20 | 21 | A.      Yes. |
| 04:54:22 | 22 | Q.      Did you, in fact, receive a final written notice |
| 04:54:25 | 23 | informing you that any negative incident would lead to |
| 04:54:30 | 24 | your termination? |
| 04:54:32 | 25 | A.      No.  I didn't receive anything. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:54:35 | 1 | Q.      Did Wayne ever speak with you about good |
| 04:54:42 | 2 | customer service and any negative incident leading to |
| 04:54:48 | 3 | your termination? |
| 04:54:50 | 4 | MR. ORGAN:  Objection.  Compound. |
| 04:54:51 | 5 | THE WITNESS:  Not that I can recall. |
| 04:54:51 | 6 | BY MS. ANTONUCCI: |
| 04:54:52 | 7 | Q.      Did Wayne ever speak to you about giving a final |
| 04:54:56 | 8 | written notice to you? |
| 04:55:00 | 9 | A.      No. |
| 04:55:09 | 10 | Q.      Did Wayne Jackson ever tell you that it was |
| 04:55:12 | 11 | critical for you to provide good customer service to |
| 04:55:15 | 12 | your customers? |
| 04:55:16 | 13 | A.      Not that I recall.  No. |
| 04:55:19 | 14 | Q.      Did Wayne ever tell you --instruct you to follow |
| 04:55:22 | 15 | direction and follow up with Ed or him if you had any |
| 04:55:29 | 16 | issues or concerns? |
| 04:55:31 | 17 | MR. ORGAN:  Objection.  Compound. |
| 04:55:33 | 18 | THE WITNESS:  I don't recall. |
| 04:55:33 | 19 | BY MS. ANTONUCCI: |
| 04:55:57 | 20 | Q.      Who is Troy Dennis? |
| 04:55:57 | 21 | A.      I don't know.  Unless I can see him or a picture |
| 04:56:04 | 22 | or something, I wouldn't know. |
| 04:56:39 | 23 | (EXHIBIT 22 was marked for identification.) |
| 04:56:39 | 24 | BY MS. ANTONUCCI: |
| 04:56:43 | 25 | Q.      Exhibit 22 is an e-mail from Monica DeLeon at |

1      I, CANDY NEWLAND, CSR No. 14256, certify that the

2   foregoing proceedings were taken before me at the time

3   and place herein set forth, at which time the witness

4   was duly sworn, and that the transcript is a true record

5   of the testimony so given.

6

7   Witness review, correction, and signature was

8   (X) by Code.              (X) requested.

9   ( ) waived.               ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13      The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificate null and void.

16      I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties nor of any of

19  the parties.

20      Dated this 29TH day of May, 2018.

21

22

23

24  _____

25          CANDY NEWLAND, CSR 14256

# Exhibit

## 2

```
                 UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF CALIFORNIA

                         ---oOo---

DEMETRIC DI-AZ, OWEN DIAZ,
and LAMAR PATTERSON,

           Plaintiffs,

        vs.                     No. 3:17-cv-06748-WHO

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; and DOES 1-50,
inclusive,

           Defendants.

_____//



                  DEPOSITION OF EDWARD ROMERO

                    November 30, 2018
```

```
Reported by:

Bridget M. Mattos, CSR No. 11410
```

```
 1                     A P P E A R A N C E S

 2

 3   FOR PLAINTIFF:

 4               CALIFORNIA CIVIL RIGHTS LAW GROUP

 5               BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW

 6               332 San Anselmo Avenue

 7               San Anselmo, California 94960

 8               (415) 453-4740

 9

10   FOR DEFENDANT:

11               CONSTANGY, BROOKS, SMITH & PROPHETE LLP

12               BY:  BARBARA ANTONUCCI, ATTORNEY AT LAW

13               2029 Century Park East, Suite 1100

14               Los Angeles, California 90067

15               (310) 909-7775

16

17

18

19

20

21

22

23

24

25
```

```
 1       Q.   Well, you received training on what is
 2  harassing or discriminatory conduct; right?
 3       A.   Correct.
 4       Q.   And would you agree if someone used the word
 5  "nigger" or "nigga" in the workplace, that would be
 6  inappropriate conduct; right?
 7       A.   In general, yes, it would be very
 8  inappropriate.
 9       Q.   Do you find those terms offensive?
10       A.   I do.
11       Q.   So instead of using "nigger" or "nigga," I'm
12  going to use the "'N' word" okay?
13       A.   Okay.
14       Q.   Is that fair enough?
15       A.   Yeah, because the other words kind of make me
16  feel uncomfortable too.
17       Q.   Sure.  I bet they do.
18            So did you ever observe -- and I mean
19  personally observe, not be told about -- but did you
20  ever observe anyone using the "N" word at the Tesla
21  factory when you were there?
22       A.   No.
23       Q.   Did you ever -- were you ever told or
24  informed that someone was using the "N" word at the
25  factory?
```

1      **A.   I was informed that there was language that**

2  **offended someone or hurt someone's feelings, but I did**

3  **not hear it directly.**

4      Q.   And how many employees gave you

5  information -- or strike that.

6          How many employees did you hear about who

7  claimed to be offended or hurt by language at the

8  Tesla factory?

9      **A.   I can only think of one.**

10     Q.   And who is the one that you can think of?

11     **A.   Owen Diaz.**

12     Q.   And how did you know Owen Diaz?

13     **A.   After I started working for Tesla, within a**

14  **few weeks they asked me to help them with the elevator**

15  **services.**

16     Q.   So this was while you were at nextSource, or

17  this is when you were at Tesla?

18     **A.   This is when I became a Tesla employee.**

19     Q.   So that was sometime in October then of 2015?

20     **A.   I would say that in October, they were -- I**

21  **was dealing more with kind of the recycling and being**

22  **introduced into the elevator services.**

23     Q.   So sometime in October of 2015, or

24  approximately October of 2015, you started taking over

25  some responsibility for overseeing the elevators?

```
 1         A.    Yeah.  They're big, large production

 2    elevators.

 3         Q.    Where are these elevators in the plant?

 4         A.    They're on the lower floor, in the center of

 5    the production floor.

 6         Q.    And was there a contractor that was managing

 7    the elevators?

 8         A.    The elevator services to that point were

 9    being handled by Jamie Salazar.

10         Q.    By who?

11         A.    Jamie, with a J.

12         Q.    J-A-M-I-E?

13         A.    Uh-huh.

14         Q.    Salazar?

15         A.    Correct.

16         Q.    And what was Jamie Salazar's position?

17         A.    He was a -- you know what, I don't know

18    officially what his title was.  I was told that he was

19    the recycling manager or supervisor.

20         Q.    And was he a Tesla employee, or was he

21    working for --

22         A.    He was a Tesla employee.

23         Q.    And the people who were actually operating

24    the elevators, were they Tesla employees?

25         A.    They were all contract employees.
```

1      Q.   Do you know who they worked for?

2      A.   Again, I think it was through nextSource, but

3  it might have been some City Staff and other agencies

4  also.

5      Q.   And the elevators, this was the way that

6  products got from either the lower level to the upper

7  level or the upper level to the lower level; is that

8  right?

9      A.   Yes.  Moving production materials for the

10  building of cars.

11      Q.   These are, like, heavy-duty elevators, you

12  said; right?

13      A.   Yes, they're humongous, probably the size of

14  your -- half of your office here.

15      Q.   Okay.  I haven't been to the Tesla factory,

16  so tell me, pretty much, what was the role of the

17  elevators?  What were they supposed to do?

18      A.   Okay.  The elevators were there to move

19  product, and actually the primary responsibility was

20  to move material up and down for the production -- the

21  construction of cars.  Okay?

22          The group that I supervised, supervises the

23  two large elevators.  And we had forklift drivers,

24  tugger drivers, who moved this material up and down

25  the elevators all day long.  We had drop zones near

1    State of California              )

2    County of Marin                 )

3

4                I, Bridget M. Mattos, hereby certify

5    that the witness in the foregoing deposition was by me

6    duly sworn to testify to the truth, the whole truth

7    and nothing but the truth in the within entitled

8    cause; that said deposition was taken at the time and

9    place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and disinterested person, and was thereafter

13   transcribed under my direction into typewriting by

14   computer; that the witness was given an opportunity to

15   read, correct and sign the deposition.

16                I further certify that I am not

17   interested in the outcome of said action nor connected

18   with or related to any of the parties in said action

19   nor to their respective counsel.

20                IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on November 30, 2018.

22

     _____
23        BRIDGET M. MATTOS, CSR NO. 11410

24

25

# Exhibit

## 3

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4     --------------------------------

                                    REPORTER CERTIFIED
5     DEMETRIC DI-AZ, OWEN DIAZ and            TRANSCRIPT
      LAMAR PATTERSON, an individual,
6

7               Plaintiffs,          **CONFIDENTIAL**

8        vs.                    No. 3:17-cv-06748-WHO
                                VOL II, pgs 187 - 292
9
      TESLA, INC. DBA TESLA MOTORS,
10    INC.; CITISTAFF SOLUTIONS,
      INC.; WEST VALLEY STAFFING
11    GROUP; CHARTWELL STAFFING
      SERVICES, INC. and DOES 1-10,
12    inclusive,

13              Defendants.

14    --------------------------------

15

16              CONFIDENTIAL

17          VIDEOTAPED DEPOSITION OF

18              OWEN DIAZ

19          SAN FRANCISCO, CALIFORNIA

20          MONDAY, DECEMBER 3, 2018

21

22

23    Reported by:

24    GINA V. CARBONE, CSR #8249
      RPR, RMR, CRR, CCRR
25    FILE NO.:  18-27207

CHASE

LITIGATION SERVICES

```
 1              Deposition of OWEN DIAZ, Volume II, taken

 2    on behalf of Defendants at CONSTANGY, BROOKS, SMITH

 3    & PROPHETE LLP, 351 California Street, Suite 200,

 4    San Francisco, California 94104, commencing at

 5    10:29 a.m. on Monday, December 3, 2018, before

 6    Gina V. Carbone, Certified Shorthand Reporter

 7    No. 8249, RPR, RMR, CRR, CCRR.

 8

 9                 A P P E A R A N C E S

10    For the Plaintiffs:

11        CALIFORNIA CIVIL RIGHTS LAW GROUP

12        By:  LAWRENCE A. ORGAN, Esq.

13        407 San Anselmo Avenue, Suite 201

14        San Anselmo, California 94612

15        (415) 453-4740

16        larry@civilrightsca.com

17

18    For the Defendants TESLA; CITISTAFF SOLUTIONS, INC.:

19        CONSTANGY, BROOKS, SMITH & PROPHETE LLP

20        By:  BARBARA I. ANTONUCCI, Esq.

21        351 California Street, Suite 200

22        San Francisco, California 94104

23        (415) 918-3000

24        bantonucci@constangy.com

25    //
```

1    APPEARANCES (continued)

2

3    For the Defendant WEST VALLEY STAFFING:

4        PAHL & MCCAY

5        BY: FENN C. HORTON III, ESQ.

6        225 West Santa Clara, Suite 1500

7        San Jose, California 95113-1752

8        (408) 286-5100

9        fhorton@pahl-mccay.com

10

11   ALSO PRESENT:  Teresa Kossayian,
                    West Valley Staffing Group
12
                    Frank Quirarte, videographer
13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 10:50:31 | 1 | and Tom Kawasaki as people who might have |
| 10:50:34 | 2 | information regarding the harassing, offensive, and |
| 10:50:37 | 3 | inappropriate conduct that you experienced while you |
| 10:50:39 | 4 | were working at the Tesla factory.  Anybody else? |
| 10:50:54 | 5 | A.  At this particular time, I can't recall. |
| 10:51:12 | 6 | Q.  What information do you believe Michael |
| 10:51:13 | 7 | Wheeler has about your claims? |
| 10:51:21 | 8 | A.  He was present when the picaninny was |
| 10:51:32 | 9 | found. |
| 10:51:34 | 10 | Michael Wheeler, hisself, was a victim of |
| 10:51:41 | 11 | said harassment.  They had wiped feces on the cart |
| 10:51:48 | 12 | that he was using to harass him.  And you would have |
| 10:51:54 | 13 | to talk to Michael Wheeler.  He can get more in |
| 10:51:59 | 14 | detail with that. |
| 10:52:00 | 15 | Q.  So you said he was present during the, |
| 10:52:02 | 16 | quote, picaninny drawing that was found, correct? |
| 10:52:09 | 17 | A.  Yes. |
| 10:52:09 | 18 | Q.  And you said he "was a victim of said |
| 10:52:12 | 19 | harassment."  What harassment was he a victim of? |
| 10:52:22 | 20 | A.  Discriminatory racial. |
| 10:52:24 | 21 | Q.  What discriminatory or racial conduct? |
| 10:52:27 | 22 | A.  Michael Wheeler is an African-American man. |
| 10:52:30 | 23 | Q.  And what conduct do you believe that he was |
| 10:52:33 | 24 | a victim of? |
| 10:52:41 | 25 | A.  I just said that they had smeared feces |

11:03:52  1      Q.  Anything else?

11:03:56  2      A.  I can't recall at this moment.

11:04:01  3      Q.  What did you tell him about the picaninny?

11:04:08  4      A.  I had called him to see if -- what are his

11:04:18  5  memories because he was out on the recycling --

11:04:22  6  doing the recycling at that particular point.  He

11:04:24  7  had came upstairs, him and I believe it was Israel,

11:04:32  8  or maybe Ishmael.  I believe it was Israel.

11:04:37  9          They came upstairs.  I had explained to

11:04:44 10  them where I was sitting at.  I had to leave and

11:04:47 11  deal with the elevator staff, but yes.

11:04:57 12      Q.  Do you know what actions Michael Wheeler

11:04:59 13  took as a result of you telling him about the

11:05:01 14  picaninny?

11:05:08 15      A.  No.

11:05:09 16      Q.  And by "the picaninny," are you referring

11:05:11 17  to the drawing that was on the bale of cardboard

11:05:15 18  that you told me about during your last deposition?

11:05:18 19      A.  Yes.

11:05:39 20      Q.  I believe you said Tom Kawasaki also has

11:05:42 21  information about your claims?

11:05:44 22      A.  Yes.

11:05:44 23      Q.  What information do you believe Tom

11:05:46 24  Kawasaki has?

11:05:59 25      A.  It was the -- I complained to Tom Kawasaki

11:06:04  1    about a guy -- I think Judy -- Jul- -- I can't

11:06:09  2    remember his last name.  I think it started with a

11:06:12  3    T.  This guy was calling me the N-word and also a

11:06:17  4    porch monkey.

11:06:33  5        Q.  Anything else that you believe Tom Kawasaki

11:06:37  6    knows about your claims?

11:06:42  7        A.  He would know that I complained verbally to

11:06:51  8    hisself and Ed Romero.  And I believe he probably

11:06:59  9    tagged in a few of the upper management of Tesla in

11:07:10 10    his email alerting them of the situation.

11:07:15 11        Q.  When you say you complained to him and Ed

11:07:17 12    Romero, do you mean about this Judy person calling

11:07:20 13    you the N-word and a porch monkey?

11:07:24 14        A.  Yes.

11:07:25 15        Q.  Did you complain to Tom Kawasaki about

11:07:26 16    anything else?

11:07:30 17        A.  Not that I can recall at this moment.

11:07:35 18        Q.  Is that a no?

11:07:39 19        A.  Not that I can recall.

11:07:52 20        Q.  Did you provide any witnesses to Tom

11:07:56 21    Kawasaki that -- strike that.

11:08:00 22            Were there any witnesses to Judy Timbreza

11:08:04 23    calling you the N-word and a porch monkey?

11:08:11 24        A.  It was him and a few of his friends around

11:08:15 25    at that particular point.

| | | |
|---|---|---|
| 11:08:17 | 1 | Q.  Do you know the names of any of the |
| 11:08:19 | 2 | friends? |
| 11:08:19 | 3 | A.  I didn't even know that guy's name until I |
| 11:08:26 | 4 | pointed him out to Mr. Kawasaki. |
| 11:08:39 | 5 | Q.  How many friends were around him when he |
| 11:08:41 | 6 | called you the N-word and porch monkey? |
| 11:08:49 | 7 | A.  I can't recall. |
| 11:09:00 | 8 | Q.  Did you recognize any of the people around |
| 11:09:01 | 9 | him? |
| 11:09:05 | 10 | A.  I don't understand the question. |
| 11:09:07 | 11 | Q.  Can you identify any of the people that |
| 11:09:09 | 12 | were around when Mr. Timbreza called you the N-word |
| 11:09:15 | 13 | and porch monkey? |
| 11:09:18 | 14 | A.  I would have to see a photo, but it's a |
| 11:09:20 | 15 | possibility I can. |
| 11:09:22 | 16 | Q.  Can you specifically identify any of the |
| 11:09:24 | 17 | people by name? |
| 11:09:28 | 18 | A.  No, I would not know their names. |
| 11:09:38 | 19 | Q.  Why do you believe these people were his |
| 11:09:40 | 20 | friends? |
| 11:09:44 | 21 | A.  The guy had been getting into the elevator |
| 11:09:46 | 22 | with him and his guys, so they would ride up the |
| 11:09:51 | 23 | elevator.  He would say something in Spanish and |
| 11:09:59 | 24 | another thing, and I couldn't kind of catch it, so I |
| 11:10:02 | 25 | recorded it.  I do not have the recording anymore. |

11:10:07  1    I wish I would have kept it.

11:10:09  2        But -- and I had translated it through

11:10:15  3    Google because how they were doing it, he would say

11:10:17  4    it, and I would -- he was like yeah, yeah, yeah,

11:10:22  5    yeah, yeah, and I would nod like yes, yes.  And him

11:10:27  6    and his friends would just bust up laughing.

11:10:30  7        And so after a little while of this, I got

11:10:34  8    pretty curious of what they were saying.  That's why

11:10:37  9    I recorded it, and later on I had Googled the

11:10:41 10    translation and found out that they were calling me

11:10:44 11    a porch monkey and such.

11:10:51 12        Q.   Okay.  So did this -- where exactly did

11:10:56 13    this incident happen where he called you the N-word

11:10:58 14    and porch monkey?

11:11:00 15        A.   We were in the elevator.

11:11:01 16        Q.   Was the elevator closed or open?

11:11:06 17        A.   Closed.  We were -- sometimes it was open;

11:11:08 18    sometimes it was closed.

11:11:12 19        Q.   When the words were actually said, was the

11:11:15 20    elevator open or closed?

11:11:17 21        A.   Sometimes it was open; sometimes it was

11:11:19 22    closed.  We were riding up in the elevator

11:11:22 23    sometimes.  Sometimes we were loading things into

11:11:24 24    the elevator and he would say it.  And, you know, at

11:11:30 25    that point I would kind of like yeah, yeah, yeah,

12:59:31  1    supervisor?

12:59:32  2         A.   I believe so.

12:59:34  3         Q.   That's your best recollection?

12:59:35  4         A.   Yes.

12:59:37  5         Q.   What did he say about his supervisor?

12:59:45  6         A.   I know his supervisor was calling him the

12:59:47  7    N-word.

12:59:53  8         Q.   Do you recall who Demetric said called him

12:59:54  9    the N-word?

12:59:57 10         A.   Supervisor.

01:00:00 11         Q.   What supervisor?  Did he give you any more

01:00:02 12    information about the identity of his supervisor

01:00:05 13    other than just to call him his supervisor?

01:00:11 14         A.   I didn't know his name.  Only Demetric

01:00:16 15    would know his name.

01:00:18 16         Q.   How did Demetric identify the supervisor

01:00:22 17    when he --

01:00:23 18              MR. ORGAN:  It's Demetric.

01:00:24 19    BY MR. HORTON:

01:00:24 20         Q.   I'm sorry about that.  I apologize.

01:00:26 21         A.   That's okay.  It's easy to mispronounce.

01:00:30 22    Can you repeat the question, please?

01:00:31 23         Q.   Okay.  How did Demetric describe the

01:00:34 24    supervisor that he said had called him the N-word?

01:00:40 25    What words did he use when he talked to you about

01:00:43  1    that?

01:00:52  2        A.   He didn't have to describe him because I

01:00:54  3    was actually a witness to his supervisor calling him

01:00:58  4    and -- him the N-word.

01:01:00  5             MR. HORTON:  Would you please read that

01:01:01  6    back.  I had trouble understanding that.

01:01:09  7             (Record read as follows: He didn't have to

01:01:09  8             describe him because I was actually a

01:01:09  9             witness to his supervisor calling him

01:01:09  10            and -- him the N-word.)

01:01:12  11   BY MR. HORTON:

01:01:12  12       Q.   Okay.  Did you know who Demetric was

01:01:16  13   talking about when he said his supervisor was

01:01:19  14   calling him the N-word at Tesla?

01:01:27  15            MR. ORGAN:  Objection.  Vague and

01:01:29  16   ambiguous.

01:01:30  17   BY MR. HORTON:

01:01:30  18       Q.   Do you understand my question?

01:01:32  19            MR. ORGAN:  Calls for speculation.

01:01:34  20            THE WITNESS:  No, I don't understand the

01:01:35  21   question.

01:01:36  22   BY MR. HORTON:

01:01:37  23       Q.   All right.  So Demetric told you that his

01:01:43  24   supervisor at Tesla was calling him the N-word; is

01:01:46  25   that correct?

1      I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2   CCRR, certify: that the foregoing proceedings were taken

3   before me at the time and place herein set forth; at

4   which time the witness was duly sworn; and that the

5   transcript is a true record of the testimony so given.

6

7      Witness review, correction and signature was

8   (X) by code.                    (X) requested.

9   .( ) waived.                    ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13      The dismantling or unbinding of the original

14  transcript will render the reporter's certificate null

15  and void.

16      I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any of

19  the parties.

20      Dated this 7th   day of December  , 2018  .

21

22                        _____

23                        GINA V. CARBONE
                          CSR #8249, STATE OF CALIFORNIA

24

25

# Exhibit

# 4

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4   DEMETRIC DIAZ, OWEN DIAZ, ) Case No. 3:17-CV-06748-WHO
    and LAMAR PATTERSON,      )
5                             )
                  Plaintiffs, )
6                             )
        vs.                   )
7                             )
    TESLA, INC. dba TESLA     )
8   MOTORS, INC.; CITISTAFF   )
    SOLUTIONS, INC.; WEST     )
9   VALLEY STAFFING GROUP;    )
    CHARTWELL STAFFING        )
10  SERVICES, INC.;           )
    NEXTSOURCE, INC.;         )
11  DOES 1-50, inclusive,     )
                              )
12                Defendants. )
    _____)
13

14

15                 Volume III

16        DEPOSITION OF OWEN ORAPIO DIAZ, JR.

17            PAGES 293 THROUGH 441

18           SAN FRANCISCO, CALIFORNIA

19                JUNE 21, 2019

20

21

22

23

24

25  REPORTED BY:  MICHAEL CUNDY, CSR 12271



```
 1                 DEPOSITION OF OWEN ORAPIO DIAZ, JR., taken

 2     at One Embarcadero Center, Suite 2050, San Francisco,

 3     California, on Friday, June 21, 2019, at 9:33 A.M.,

 4     before Michael Cundy, Certified Shorthand Reporter, in

 5     and for the State of California.

 6

 7     APPEARANCES:

 8     FOR THE PLAINTIFF:

 9                    CALIFORNIA CIVIL RIGHTS LAW GROUP
                      BY:  NAVRUZ AVLONI, ESQ.
10                    332 San Anselmo Avenue
                      San Anselmo, California 94960
11                    (415) 453-4740
                      navruz@civilrightsca.com
12
       FOR THE DEFENDANT, NEXTSOURCES, INC.:
13
                      FISHER & PHILLIPS
14                    BY:  JUAN C. ARANEDA, ESQ.
                      One Embarcadero Center
15                    Suite 2050
                      San Francisco, California 94111
16                    (415) 490-9000
                      jaraneda@fisherphillips.com
17
       FOR THE DEFENDANT, TESLA, INC.:
18
                      SHEPPARD MULLIN RICHTER & HAMPTON LLP
19                    BY:  PATRICIA M. JENG, ESQ.
                      Four Embarcadero Center
20                    17th Floor
                      San Francisco, California 94111
21                    (415) 434-9100
                      pjeng@sheppardmullin
22

23

24

25
```



OWEN ORAPIO DIAZ, JR. VOLUME III                    June 21, 2019
DIAZ vs TESLA, INC.                                              295

```
 1   APPEARANCES:

 2   FOR THE DEFENDANT, WEST VALLEY STAFFING GROOP:

 3                      PAHL & McCAY
                        BY:  FENN C. HORTON, III, ESQ.
 4                      225 West Santa Clara Street
                        Suite 1500
 5                      San Jose, California 95113
                        (408) 286-5100
 6                      fhorton@pahl-mccay.com

 7   FOR THE DEFENDANT, CITISTAFF SOLUTIONS:

 8                      LAFAYETTE & KUMAGAI
                        BY:  GARY T. LAFAYETTE, ESQ.
 9                           CHERYL A. STEVENS, ESQ.
                        1300 Clay Street
10                      Suite 810
                        Oakland, California 94612
11                      (415) 357-4300
                        glafayette@lkclaw.com
12                      cstevens@klclaw.com

13   ALSO PRESENT:

14                      KEVEN McMAHON
                        VIDEOGRAPHER
15

16

17

18

19

20

21

22

23

24

25
```



| | | |
|---|---|---|
| 1 | Tesla was it that Robert first told you to -- used | 09:49:41 |
| 2 | these words, "boy, hurry up"? | 09:49:49 |
| 3 |    A    I can't recall. | 09:49:53 |
| 4 |    Q    Were you still an elevator operator, or were | 09:49:57 |
| 5 | you a lead operator -- elevator operator when Robert | 09:50:01 |
| 6 | used these words towards you? | 09:50:05 |
| 7 |    A    I believe I was a lead. | 09:50:10 |
| 8 |    Q    Did Robert ever stop using those words | 09:50:19 |
| 9 | towards you during your employment -- well, during the | 09:50:23 |
| 10 | time that you worked at Tesla? | 09:50:27 |
| 11 |       MS. AVLONI:  Vague and ambiguous. | 09:50:30 |
| 12 |       THE WITNESS:  No, sir. | 09:50:34 |
| 13 | BY MR. ARANEDA: | 09:50:36 |
| 14 |    Q    Did you work with Robert throughout the time | 09:50:36 |
| 15 | that you worked at the Tesla factory? | 09:50:39 |
| 16 |       MS. AVLONI:  Vague and ambiguous. | 09:50:41 |
| 17 |       THE WITNESS:  Occasionally. | 09:50:46 |
| 18 | BY MR. ARANEDA: | 09:50:51 |
| 19 |    Q    Did you ever report Robert's use of the word | 09:50:51 |
| 20 | "boy" or "hurry up" to nextSource? | 09:50:57 |
| 21 |       MS. AVLONI:  Objection to the extent it calls | 09:51:04 |
| 22 | for speculation as to who was employed by nextSource. | 09:51:05 |
| 23 |       THE WITNESS:  I don't recall. | 09:51:12 |
| 24 | BY MR. ARANEDA: | 09:51:15 |
| 25 |    Q    Do you have an understanding of the | 09:51:15 |



| 1 | MS. AVLONI: Objection to the extent it calls | 09:54:08 |
| 2 | for speculation. | 09:54:10 |
| 3 | THE WITNESS: I don't recall. | 09:54:16 |
| 4 | BY MR. ARANEDA: | 09:54:21 |
| 5 | Q    Did you ever report the use of the N-word | 09:54:21 |
| 6 | towards you by Ramon Martinez to anyone at Citistaff? | 09:54:23 |
| 7 | A    I don't recall. | 09:54:45 |
| 8 | Q    You testified earlier that you don't know how | 09:54:45 |
| 9 | you made it out alive. | 09:54:48 |
| 10 | What did you mean by that? | 09:54:50 |
| 11 | A    When a person that's been bullying you | 09:55:00 |
| 12 | corners you and accosts you inside of an elevator and | 09:55:04 |
| 13 | has a threatening demeanor, that's yelling at you, | 09:55:08 |
| 14 | threatening to do you physical harm, I believed he was | 09:55:17 |
| 15 | going to hit me, and I just know -- | 09:55:21 |
| 16 | MS. STEVENS: Mr. Diaz, can you speak up? | 09:55:26 |
| 17 | Your voice -- | 09:55:28 |
| 18 | THE WITNESS: Excuse me. | 09:55:30 |
| 19 | MS. STEVENS: Is very low. Thank you. | 09:55:32 |
| 20 | THE WITNESS: I was saying, when being | 09:55:33 |
| 21 | confronted by a person that's been bullying you for a | 09:55:35 |
| 22 | while, being accosted in an elevator, not knowing what | 09:55:37 |
| 23 | his intentions were. | 09:55:46 |
| 24 | (Mr. Lafayette exits the proceedings.) | 09:55:49 |
| 25 | \\\ | 09:55:53 |



```
 1   STATE OF CALIFORNIA              )
                                      )  SS:
 2   CITY AND COUNTY OF SAN FRANCISCO )

 3

 4                     I, Michael Cundy, CSR NO. 12271, a

 5   Certified Shorthand Reporter of the State of

 6   California, do hereby certify:

 7                     That the foregoing proceedings were

 8   taken before me at the time and place herein set

 9   forth; that any witnesses in the foregoing

10   proceedings, prior to testifying, were placed under

11   oath; that a verbatim record of the proceedings was

12   made by me using machine shorthand which was

13   thereafter transcribed under my direction; further,

14   that the foregoing is an accurate transcription

15   thereof.

16                     I further certify that I am neither

17   financially interested in the action nor a relative or

18   employee of any attorney or any of the parties.

19                     IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated:  July 3, 2019

23

24                     _____
                       Michael Cundy, CSR NO. 12271

25
```



# Exhibit

## 5

**Demetric Di-Az-Confidential**

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4
                              <span style="color:blue">REPORTER CERTIFIED</span>
5    _____          <span style="color:blue">TRANSCRIPT</span>

6    DEMETRIC DI-AZ, OWEN DIAZ, and
     LAMAR PATTERSON, an individual,     <span style="color:red">**CONFIDENTIAL**</span>
7
              Plaintiffs,
8
     vs.                        Case No. 3:17-cv-06748-WHO
9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CITISTAFF SOLUTIONS, INC.;
     WEST VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING SERVICES, INC.
     and DOES 1-10, inclusive,
12
              Defendants.
13   _____/

14

15

16                  CONFIDENTIAL

17          VIDEOTAPED DEPOSITION OF

18               DEMETRIC DI-AZ

19          SAN FRANCISCO, CALIFORNIA

20            TUESDAY, MAY 15, 2018

21

22

23
     Reported By:
24   Candy Newland
     CSR No. 14256
25   File No. 18-25468

1    Deposition of DEMETRIC DI-AZ, taken on behalf of

2    Defendants at 351 California Street, Suite 200, San

3    Francisco, California, commencing at 10:11 a.m. on

4    Tuesday, May 15, 2018, before Candy Newland, Certified

5    Shorthand Reporter No. 14256.

6

7                     A P P E A R A N C E S

8

9    FOR THE PLAINTIFFS:

10

11           CALIFORNIA CIVIL RIGHTS LAW GROUP

12           BY:  LAWRENCE A. ORGAN, ESQ.

13           332 San Anselmo Avenue

14           San Anselmo, CA 94960

15           (415) 453-4740

16           larry@civilrightsca.com

17

18           CALIFORNIA CIVIL RIGHTS LAW GROUP

19           BY:  NAVRUZ AVLONI, ESQ.

20           332 San Anselmo Avenue

21           San Anselmo, CA 94960

22           (415) 453-4740

23           navruz@civilrightsca.com

24

25

Demetric Di-Az-Confidential

```
 1   APPEARANCES(CONTINUED)

 2

 3   FOR THE DEFENDANT TESLA:

 4

 5           CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

 6           BY:  BARBARA I. ANTONUCCI, ESQ.

 7           351 California Street, Suite 200

 8           San Francisco, CA 94104

 9           (415) 918-3000

10           bantonucci@constangy.com

11

12   FOR THE DEFENDANT WEST VALLEY STAFFING:

13

14           PAHL & MCCAY

15           BY:  FENN C. HORTON III, ESQ.

16           225 West Santa Clara, Suite 1500

17           San Jose, CA 95113-1752

18           (408) 286-5100

19           fhorton@pahl-mccay.com

20

21   ALSO PRESENT:

22           Teresa Kossayian, West Valley Staffing Group

23           Jaime Bodiford, Tesla

24           Frank Quirarte, Videographer

25
```

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 11:40:45 | 1 | there I got moved to the night shift. |
| 11:40:48 | 2 | Q.      Were you ever paid by Tesla? |
| 11:40:50 | 3 | A.      No. |
| 11:41:00 | 4 | (EXHIBIT 18 was marked for identification.) |
| 11:41:11 | 5 | BY MS. ANTONUCCI: |
| 11:41:18 | 6 | Q.      Exhibit 18 is a copy of a job description for a |
| 11:41:22 | 7 | production associate on the assembly line and it's |
| 11:41:25 | 8 | Bates-stamped at the bottom WV64 to 65. |
| 11:41:34 | 9 | Do you see that? |
| 11:41:36 | 10 | A.      Yes. |
| 11:41:37 | 11 | Q.      Okay.  Did you receive a copy of this job |
| 11:41:40 | 12 | description when you were assigned to Tesla? |
| 11:41:45 | 13 | A.      I don't recall. |
| 11:41:47 | 14 | Q.      Do you remember receiving a copy of a job |
| 11:41:50 | 15 | description when you were signed to Tesla? |
| 11:41:52 | 16 | A.      I don't recall ever receiving one. |
| 11:41:52 | 17 | (Reporter clarification.) |
| 11:41:52 | 18 | THE WITNESS:  I don't recall ever seeing one, |
| 11:42:40 | 19 | yeah. |
| 11:42:40 | 20 | (EXHIBIT 19 was marked for identification.) |
| 11:42:43 | 21 | BY MS. ANTONUCCI: |
| 11:42:48 | 22 | Q.      Exhibit 19 is an e-mail from Ray Soto.  Did you |
| 11:42:53 | 23 | receive this e-mail from Ray Soto on or around |
| 11:42:57 | 24 | August 21st, 2015, when you started at Tesla? |
| 11:43:05 | 25 | A.      Yes. |

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 12:45:38 | 1 | August 24th, 2015; is that right? |
| 12:45:40 | 2 | A.      Yes. |
| 12:46:01 | 3 | Q.      Did Louis give you any work instructions when |
| 12:46:05 | 4 | you met with him? |
| 12:46:06 | 5 | A.      Not that I can recall. |
| 12:46:15 | 6 | Q.      Did Louis say anything to you when you first |
| 12:46:18 | 7 | arrived at the Tesla facility? |
| 12:46:20 | 8 | A.      He greeted us, "Good morning," and then took us |
| 12:46:24 | 9 | over to the training facility. |
| 12:46:27 | 10 | Q.      Did you ever see Louis again during your time on |
| 12:46:31 | 11 | assignment at Tesla? |
| 12:46:33 | 12 | A.      No. |
| 12:46:42 | 13 | Q.      Did you ever e-mail or otherwise communicate |
| 12:46:44 | 14 | with Louis during the time that you worked at the Tesla |
| 12:46:49 | 15 | facility other than this one occasion? |
| 12:46:52 | 16 | A.      No. |
| 12:46:58 | 17 | Q.      How were you introduced to the people you would |
| 12:47:01 | 18 | be working with at Tesla? |
| 12:47:02 | 19 |         MR. ORGAN:  Objection.  Vague and ambiguous. |
| 12:47:06 | 20 |         THE WITNESS:  Can you restate the question? |
| 12:47:06 | 21 | MS. ANTONUCCI: |
| 12:47:08 | 22 | Q.      Yeah.  At some point you started working in the |
| 12:47:11 | 23 | body in white department; right? |
| 12:47:13 | 24 | A.      I worked in the battery production part. |
| 12:47:17 | 25 | Q.      Okay.  And you worked with the battery team? |

**Demetric Di-Az-Confidential**

12:47:19  1    A.      Yes.

12:47:20  2    Q.      And who introduced you to the people that you

12:47:23  3    would be working with in the battery team?

12:47:26  4    A.      It was more of -- I was put in a group.  They

12:47:30  5    said, "This is where you're going."  Somebody walked us

12:47:34  6    over there, and then from there we just introduced

12:47:37  7    ourselves.

12:47:37  8    Q.      And was the battery team part of body in white?

12:47:40  9    A.      I really can't recall.

12:47:42  10   Q.      So do you remember who walked you over there?

12:47:46  11   A.      No.

12:47:46  12   Q.      Do you remember the first person you met once

12:47:49  13   you got there?

12:47:51  14   A.      I met the day team supervisor.  I don't remember

12:47:54  15   his name.

12:48:11  16   Q.      Do you know if his name was Robert Dominguez?

12:48:14  17   A.      No, I don't remember.

12:48:30  18   Q.      Were you -- did you meet your shift lead on the

12:48:34  19   first day that you started work?

12:48:36  20   A.      No.  The first day I started we did the training

12:48:40  21   for about a week.  So after that I ended up meeting him

12:48:44  22   probably, like, after that.

12:48:45  23   Q.      So after you finished your training, did you

12:48:49  24   meet a shift lead?

12:48:49  25   A.      I met the supervisor.  Then the next day I met

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 02:02:52 | 1 | Q.      Anything else?  Any other types of caps you |
| 02:02:56 | 2 | wore? |
| 02:02:57 | 3 | A.      A few Goorin Brother hats. |
| 02:02:57 | 4 | (Reporter clarification.) |
| 02:02:57 | 5 | THE WITNESS:  Goorin Brother. |
| 02:03:18 | 6 | BY MS. ANTONUCCI: |
| 02:03:18 | 7 | Q.      Did you argue with Javier Caballero when he told |
| 02:03:22 | 8 | you to put on the hard hat instead of the bump cap? |
| 02:03:27 | 9 | A.      No.  After I asked why, he told me I would get |
| 02:03:30 | 10 | fired.  From there, there was nothing else said. |
| 02:03:40 | 11 | Q.      Prior to this incident with the bump cap, did |
| 02:03:43 | 12 | you get along with Javier? |
| 02:03:45 | 13 | A.      I -- |
| 02:03:46 | 14 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 02:03:50 | 15 | You can answer. |
| 02:03:50 | 16 | THE WITNESS:  No. |
| 02:03:52 | 17 | BY MS. ANTONUCCI: |
| 02:03:52 | 18 | Q.      Why didn't you get along with Javier prior to |
| 02:03:55 | 19 | this incident? |
| 02:03:55 | 20 | A.      Javier was harassing me and calling me a nigger |
| 02:04:00 | 21 | every day; so, no, I didn't get along with him. |
| 02:04:05 | 22 | Q.      And that was before the incident with the bump |
| 02:04:08 | 23 | cap? |
| 02:04:09 | 24 | A.      Yes. |
| 02:04:19 | 25 | Q.      You said that he called you a nigger every day? |

**Demetric Di-Az-Confidential**

02:04:22 1   <u>A.</u>     <u>Yes.</u>

02:04:32 2   Q.     Who did you work with when you were working the

02:04:37 3   night shift?

02:04:37 4   A.     It was a few different people. I don't remember

02:04:40 5   all their names. One of the people that I worked

02:04:42 6   heavily with was T.J.

02:04:45 7   Q.     Do you know what T.J.'s last name is?

02:04:49 8   A.     No, I don't.

02:04:50 9   Q.     Any other names you can remember of the folks

02:04:52 10  that worked the night shift?

02:04:54 11  A.     No. That's who I worked heavily with.

02:05:11 12  Q.     Did anybody else at Tesla call you the N-word?

02:05:15 13  A.     No. It was just him.

02:05:19 14  Q.     And you understand what I mean when I say

02:05:23 15  N-word; right?

02:05:24 16  A.     Yes.

02:05:29 17  Q.     Did your shift lead ever call you the N-word?

02:05:33 18  A.     No.

02:05:53 19  Q.     Okay. Did anybody talk to you about not wearing

02:06:01 20  your safety glasses, pulling up your pants, or wearing

02:06:06 21  your hard hat from West Valley?

02:06:09 22        MR. ORGAN: Objection. Compound.

02:06:11 23        THE WITNESS: Can you state the question again?

02:06:13 24  BY MS. ANTONUCCI:

02:06:13 25  Q.     Did anybody from West Valley ever talk to you

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:17:01 | 1 | Q.     Any people on your team not African-American? |
| 03:17:04 | 2 | A.     Yes. |
| 03:17:05 | 3 | Q.     Who? |
| 03:17:07 | 4 | A.     I think it was probably about, like, three other |
| 03:17:10 | 5 | guys that weren't African-American. |
| 03:17:14 | 6 | Q.     Any other people on your team African-American? |
| 03:17:17 | 7 | A.     Me, T.J., and one other guy.  I don't remember |
| 03:17:20 | 8 | his name. |
| 03:17:42 | 9 | Q.     Is this the only time that this statement was |
| 03:17:45 | 10 | made? |
| 03:17:46 | 11 | A.     That statement, yes. |
| 03:17:56 | 12 | Q.     How did you feel when you heard it? |
| 03:17:58 | 13 | A.     It made me feel like less of a man, like -- |
| 03:18:04 | 14 | like, why would you do something like that.  Like, why |
| 03:18:09 | 15 | would you feel like it's okay to call us niggers and |
| 03:18:14 | 16 | tell us that you can't stand us?  Like, what makes you |
| 03:18:17 | 17 | think that that's right? |
| 03:18:18 | 18 | Q.     Did you tell him that's how it made you feel? |
| 03:18:22 | 19 | A.     Yes, I did.  And when I told him how it made me |
| 03:18:26 | 20 | feel, he pretty much told me the same thing he told me |
| 03:18:29 | 21 | before:  "You're a temp, and if you don't like it, you |
| 03:18:33 | 22 | can get fired." |
| 03:18:41 | 23 | Q.     Did you complain to anybody else about his |
| 03:18:48 | 24 | statement? |
| 03:18:48 | 25 | A.     Yes. |

03:18:49  1    Q.        Who?

03:18:49  2    A.        From there I went to his immediate -- to

03:18:54  3    Javier's supervisor.  They did nothing about it.  And

03:18:58  4    then from there, I went to HR, and they did nothing

03:19:01  5    about it.

03:19:05  6    Q.        Who in HR did you complain to?

03:19:07  7    A.        I don't remember the lady's name.

03:19:22  8    Q.        And who was Javier's supervisor?

03:19:25  9    A.        It was another male.  I don't remember his name

03:19:28  10   either.

03:19:28  11   Q.        Was it Juan Martinez?

03:19:30  12   A.        I'm not too sure.

03:19:35  13   Q.        Did you ever put anything in writing?

03:19:38  14   A.        No.

03:19:42  15   Q.        You never complained in writing?

03:19:44  16   A.        No.  I just went and verbally complained.  It

03:19:47  17   never went anywhere.

03:19:54  18   Q.        You never sent a text?

03:19:56  19   A.        No.

03:19:56  20   Q.        You never wrote an e-mail?

03:19:58  21   A.        No.

03:19:58  22   Q.        You didn't think that something like this was

03:20:01  23   important enough to put it in writing?

03:20:03  24             MR. ORGAN:  Objection.  Argumentative.

03:20:04  25             MS. ANTONUCCI:  You can answer.

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:20:05 | 1 | THE WITNESS:  I felt that, if you explain to |
| 03:20:08 | 2 | somebody the situation, no matter if I write it or not, |
| 03:20:12 | 3 | you should still handle your business. |
| 03:20:12 | 4 | BY MS. ANTONUCCI: |
| 03:20:14 | 5 | Q.    Do you have any idea if this human resources |
| 03:20:17 | 6 | person you complained to, was it a Tesla or West Valley |
| 03:20:21 | 7 | employee? |
| 03:20:21 | 8 | A.    I went to the Tesla human resources. |
| 03:20:24 | 9 | Q.    Was her name Erin Marconi? |
| 03:20:26 | 10 | A.    I don't remember what her name was. |
| 03:20:28 | 11 | Q.    What did she look like? |
| 03:20:29 | 12 | A.    She was a white lady, blond hair, but I don't |
| 03:20:32 | 13 | remember her name. |
| 03:20:34 | 14 | Q.    Where did she sit? |
| 03:20:36 | 15 | A.    The office is, like, right up the stairs.  It's |
| 03:20:40 | 16 | the same place that we would go to get our uniforms, if |
| 03:20:44 | 17 | I'm not mistaken. |
| 03:20:48 | 18 | Q.    Did you only talk to her once? |
| 03:20:50 | 19 | A.    Yes.  It didn't go anywhere after that.  That |
| 03:20:53 | 20 | was it.  She said she would look into it, and that was |
| 03:20:56 | 21 | it. |
| 03:20:57 | 22 | Q.    Did you follow back up with her to see if |
| 03:21:00 | 23 | anything had happened? |
| 03:21:01 | 24 | A.    No. |
| 03:21:02 | 25 | Q.    Do you know whether it was investigated? |

**Demetric Di-Az-Confidential**

03:21:04  1    A.       No.   I feel like it wasn't because the behavior

03:21:12  2    never stopped.

03:21:22  3    Q.       Do you know when this statement was made by

03:21:25  4    Javier?

03:21:26  5    A.       I don't have an exact date.

03:21:28  6    Q.       Did you ever keep a calendar?

03:21:31  7    A.       No.

03:21:31  8    Q.       Did you ever keep any notes?

03:21:33  9    A.       No.

03:21:33  10   Q.       Journal?

03:21:34  11   A.       No.

03:21:35  12   Q.       Have you ever put it in an e-mail?

03:21:37  13   A.       No.

03:21:54  14   Q.       What did you tell Javier about how this made you

03:21:57  15   feel?

03:21:58  16   A.       I pretty much told him, like, calling us niggers

03:22:01  17   is wrong.  That's wrong.  Regardless if you think it's

03:22:04  18   okay or not, it's wrong.  And pretty much from what he

03:22:07  19   told me is, if you don't like it, you can get fired.

03:22:28  20   Q.       And you only talked with Juan Martinez once?

03:22:32  21   A.       I'm not sure if I talked to Juan Martinez.  I

03:22:36  22   don't remember the guy's name.

03:22:38  23   Q.       Did you only talk to Javier's supervisor once?

03:22:41  24   A.       Yes.

03:22:42  25   Q.       And what did you tell him?

1    I, CANDY NEWLAND, CSR No. 14256, certify that the

2    foregoing proceedings were taken before me at the time

3    and place herein set forth, at which time the witness

4    was duly sworn, and that the transcript is a true record

5    of the testimony so given.

6

7    Witness review, correction, and signature was

8    (X) by Code.                    (X) requested.

9    ( ) waived.                     ( ) not requested.

10   ( ) not handled by the deposition officer due to party

11   stipulation.

12

13   The dismantling, unsealing, or unbinding of the

14   original transcript will render the reporter's

15   certificate null and void.

16   I further certify that I am not financially

17   interested in the action, and I am not a relative or

18   employee of any attorney of the parties nor of any of

19   the parties.

20   Dated this 29th day of May, 2018.

21

22

23

24   _____

25   CANDY NEWLAND, CSR 14256

Exhibit

**6**

Message

| From: | Veronica Martinez [veronica.martinez@chartwellstaff.com] |
|---|---|
| Sent: | 1/22/2016 11:19:24 PM |
| To: | Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899] |
| CC: | Garrett, Terri [tgarrett@nextsource.com]; Jackson, Wayne [wjackson@nextsource.com]; Jackelin Delgado [jackelin.delgado@chartwellstaff.com]; Jessy Meneses [jessy.meneses@chartwellstaff.com] |
| Subject: | RE: Racist effigy & drawing |

Wayne,

I was able to speak with Ramon and he is on his way to my office so we can start an investigation. I have also notified my HR director of this situation as well.  I will keep you updated.

Thanks
Veronica

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Friday, January 22, 2016 11:26 AM
**To:** Veronica Martinez <veronica.martinez@chartwellstaff.com>
**Cc:** Garrett, Terri <tgarrett@nextsource.com>; Jackson, Wayne <wjackson@nextsource.com>
**Subject:** FW: Racist effigy & drawing
**Importance:** High

Hi Veronica this serious came up today.  I believe Chartwell is his EOR.  What is your policy with regards to discrimination.  Please review the email below and get back with what your policy is so that I can address.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
wjackson@nextsource.com



*Workforce Optimization, Business Enlightenment*

**From:** Owen Diaz [mailto:odiazjr68@gmail.com]
**Sent:** Friday, January 22, 2016 8:46 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** Fwd: Racist effigy & drawing

CONFIDENTIAL

Begin forwarded message:

**From:** Owen Diaz <odiazjr68@gmail.com>
**Date:** January 22, 2016 at 8:42:10 AM PST
**To:** "Mr. Romero" <cdromero@teslamotors.com>
**Subject: Racist effigy & drawing**

On 1/21/16 at 9:10 pm I was working elevator one, I was removing the recycling from the 2nd floor and taking said items to be staged on the first floor for removal. As I was removing those items I came upon the first cardboard bail of the night. As I pulled the pallet rider into position to pick up the bail I noticed a drawing on the bail. It was a picture of a cartoon depicting a black face person with a bone in his hair with the caption under it saying booo. Upon seeing this my stomach dropped and I wondered who could've done this in today's age. At that time I didn't know what to do, so I call Michael Wheeler and sent a text of the picture letting him know that someone on his team had sent this bail over to the elevator with this picture. Sense Michael was the lead for the recycling team at that time. I would let him take point and get to the bottom of the problem. Michael said, he would be there in a few minutes. when Michael arrived he arrived with Israel. They both took pictures and all three of us went upstairs. I had to stop and deal with the elevator crew but Michael and Israel heading over to the upstairs recycling center. They came back a few minutes later with Ramon Martinez. While the three of us were standing there discussing what happened. Ramon Martinez said,he had drew the picture and he was just playing. As a supervisors or leads we are held to a higher standard because The people we supervise look to us as examples. if a supervisor does this kind of thing in front of the employees employees what kind of example are we setting. A person should be able to come to work and not be harassed or degraded while they're trying to do their job. This is not the first time Ramon Martinez has been talk about his behavior. And because nothing has been done, it seems that his behavior is getting worse. As an employee I'm entitled to a safe and harassment free work environment.  And that all I ask  and hope for.

TESLA-0000005



CONFIDENTIAL



CONFIDENTIAL

Sent from my iPhone

TESLA-0000008

# Exhibit

# 7

Message

| | |
|---|---|
| **From:** | Owen Diaz [sfrednose@gmail.com] |
| **Sent:** | 10/20/2015 4:54:12 PM |
| **To:** | Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899] |
| **Subject:** | Fwd: Ramon |

Sent from my iPhone

Begin forwarded message:

> **From:** Owen Diaz <sfrednose@gmail.com>
> **Date:** October 17, 2015 at 6:08:48 AM PDT
> **To:** "edromero@teslamotors.com" <edromero@teslamotors.com>, "Tom @ Tesla"
> <tkawasaki@teslamotors.com>
> **Subject: Ramon**
>
> Mr. Romero today @ 4:45 am I was working elevator 1 with rothaj foster  training him, when the
> elevator doors opened  on the first floor and we saw Ramon siting there. At the time I was
> explaining to Rothai  what you had told me about the outside team and inside team and what his
> duties consisted of. I was  explaining him that Tom would no longer be his supervisor it was
> going to be you. For some reason Ramon jump off the tugger he was on and started yelling at me
> in a Threatening manner, saying you have a problem with me! why are you telling him who his
> supervisor is! When I did not say anything to Ramon followed me into the elevator and stood
> next to the forklift I was on and keep yelling at me. I thought he was going to hit me. so I asked
> him to please step back. because of his threatening manner and reminded Ramon we were on
> camera. Mr. Romero because of the way Ramon was acting I don't feel safe around him now.
> Can you please talk to him I don't need any problems. I just want to do my job. You can check
> the surveillance system to confirm. I contacted Tom for advice and he said, if you don't have
> excess surveillance system please contact him.
>
> Sent from my iPhone

CONFIDENTIAL

# Exhibit

# 8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                    Plaintiffs,

                                   No. 3:17-cv-06748-WHO

vs.

TESLA, INC. Dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                    Defendants.
_____/

DEPOSITION OF ANNALISA HEISEN

May 29, 2019

Reported by:

Bridget M. Mattos, CSR No. 11410

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         CALIFORNIA CIVIL RIGHTS LAW GROUP
           By:  LAWRENCE A. ORGAN
 5              Attorney at Law
           332 San Anselmo Avenue
 6         San Anselmo, California 94960
           (415) 453-4740
 7         larry@civilrightsca.com

 8    ALSO PRESENT:  JEAN GER, CCRLG

 9

10    FOR THE DEFENDANT WEST VALLEY STAFFING GROUP:

11         PAHL & MCCAY
           By:  FENN C. HORTON, III
12              Attorney at Law
           225 West Santa Clara, Suite 1500
13         San Jose, California 95113
           (408) 286-5100
14         fhorton@pahl-mccay.com

15    ALSO PRESENT:
      TERESA KOSSAYIAN, WEST VALLEY STAFFING GROUP
16

17    FOR THE DEFENDANT NEXTSOURCE, INC.:

18         FISHER & PHILLIPS
           By:  JUAN C. ARANEDA
19              Attorney at Law
           One Embarcadero Center, Suite 2050
20         San Francisco, California 94111
           (415) 490-9000
21         jaraneda@fisherphillips.com

22

23

24

25
```

```
 1                A P P E A R A N C E S (continued)

 2

 3    FOR THE DEFENDANT TESLA INC. Dba TESLA MOTORS INC.:

 4         SHEPPARD, MULLIN, RICHTER & HAMPTON
           By:  PATRICIA M. JENG
 5              Attorney at Law
           Four Embarcadero Center, 17th Floor
 6         San Francisco, California 94111
           (415) 434-9100
 7         pjeng@sheppardmullin.com

 8    FOR THE DEFENDANT CHARTWELL STAFFING SERVICES, INC.:
           LAFAYETTE & KUMAGAI LLP
 9          By:  CHERYL A. STEVENS
                Attorney at Law
10         1300 Clay Street, Suite 810
           Oakland, California 94612
11         (415) 357-4600
           cstevens@lkclaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   number.   I have done investigations.

2        Q.   Have you ever done an investigation into a

3   claim of the use of the "N" word at the Tesla factory?

4        A.   Myself?

5        Q.   Yeah.

6        A.   I believe so.

7        Q.   Which part of the factory did that relate to?

8        A.   I don't recall.

9        Q.   Have you done more than one investigation

10  into use of the "N" word at the Tesla factory?

11       A.   It's possible.

12       Q.   As to the one investigation you recall, do

13  you remember when you did that investigation into use

14  of the "N" word?

15       A.   I don't recall specifics around the case.

16       Q.   Were you working as an employee relations

17  partner at that time, at the time you did the "N" word

18  investigation?

19       A.   It would have either been as an HR partner or

20  employee relations partner, somewhere in that

21  capacity.

22       Q.   Tell me about the steps that you went through

23  in that "N" word investigation.   What were the steps

24  you did?

25       A.   I don't recall the specifics around the

 1              MR ORGAN:  Q.  No.  I'm asking you to answer
 2    that question.
 3              MS. JENG:  She's already answered.
 4              THE WITNESS:  Can you repeat the question?
 5              (Record read as follows:
 6              "QUESTION:  But my question's a little
 7    different, and that is, relative to Tesla's code of
 8    conduct, which is Exhibit 149 -- this is the updated
 9    version of the code of conduct -- the policies
10    relative to discrimination and harassment that are on
11    page Tesla 811 of Exhibit 149, those apply to both
12    regular employees at the factory and contract
13    employees at the factory; right?")
14              MS. JENG:  I'll assert the same objection.
15              THE WITNESS:  My understanding is that
16    contractors who work for agencies are meant to comply
17    with legal standards.  I couldn't interpret whether
18    this specifically all applies to a contractor or not.
19              MR ORGAN:  Q.  You don't know whether the
20    code of business conduct that Tesla has applies to
21    people working at the factory as contractors?
22              MS. JENG:  Objection; asked and answered.
23              THE WITNESS:  We have an expectation that
24    they're going to be -- this standard is going to be
25    upheld by both employees and contractors.  That is the

1   expectation.

2          MR ORGAN:   Q.   This standard applies -- the

3   standard that is in the code of business conduct and

4   ethics applies to Tesla regular employees, doesn't it?

5          MS. JENG:   Objection; asked and answered.

6   And you're badgering the witness.

7          MR. ARANEDA:   It's argumentative.

8          MS. JENG:   And also outside the scope of the

9   notice, to the extent you're asking her to testify

10  about agencies -- like, what policies apply to

11  agencies.

12         MR ORGAN:  Counsel, that's not an objection.

13  You know it's improper.

14         MS. JENG:  You're asking the same question.

15         MR ORGAN:  Don't do it.  It's a different

16  question.

17         MS. JENG:  It's not a different question.

18         MR ORGAN:  It actually is, because the other

19  questions all had to do with contractors.  I'm asking

20  a specific question about employees now, regular

21  employees at Tesla.  Do you understand that?

22         I'll rephrase the question.

23     Q.   The code -- Tesla's code of business conduct

24  and ethics, which is included in Exhibit 149, that

25  applies to all Tesla employees working at the Tesla

1      Q.   In terms of if a Tesla employee -- let's say

2    a supervisor or a manager gets information from a

3    contract employee about harassment or discrimination,

4    Tesla's antiharassment and discrimination policy would

5    apply, in terms of reporting an investigation;

6    correct?

7      **A.   Correct.   To that employee of Tesla who**

8    **received information?**

9      Q.   Yes.

10     **A.   Correct.**

11     Q.   And so that employee of Tesla would have to

12   then take some action once they get information about

13   discrimination or harassment in the workplace;

14   correct?

15     **A.   That's the expectation.**

16     Q.   And that's true regardless of whether the

17   harassment or discrimination takes place in any area

18   of the Fremont factory; correct?

19     **A.   What do you mean, "area"?**

20     Q.   Well, there are different areas of the

21   Fremont factory, I understand; is that right?

22     **A.   Physical locations.**

23     Q.   Physical locations, yes.

24     **A.   That's my understanding.**

25     Q.   And in terms of the antiharassment and

1   discrimination policy that Tesla has, that policy

2   applies to all areas of the factory; right?

3        **A.    That's my understanding.**

4        Q.    There's not like an antiharassment-free zone;

5   right?

6        **A.    No.**

7        Q.    So if a Tesla employee gets information about

8   harassing conduct based on race in the factory, that's

9   occurring in the factory, regardless of how they get

10  that information, they then have a reporting duty, in

11  terms of either providing that information to a

12  higher-level manager or sending it to HR; is that

13  true?

14       **A.    There's an expectation of that, as it's**

15  **articulated in the policy.**

16            MR ORGAN:  This is 151.

17            (Whereupon Deposition Exhibit 151

18             was marked for identification.)

19            MR ORGAN:  Exhibit 151, for the record, is a

20  six-page document Bates-stamped Tesla 819 to 824.

21  It's entitled "Policy Against Discrimination and

22  Harassment in the Workplace, U.S. Locations."

23       Q.    Do you recognize Exhibit 151?

24       **A.    I do.**

25       Q.    And what is Exhibit 151?

1    anything in writing that you have seen that indicates

2    what contractors are supposed to do relative to

3    enforcing Tesla's antiharassment policies?

4        A.   Not that I've seen.

5        Q.   And other than the policies that we've talked

6    about and the investigation tool kit, which we don't

7    have, other than those policies and procedures, are

8    there any other policies or procedures for ensuring

9    that workers who are working at your Fremont factory

10   are not subjected to harassment?

11       A.   Not that I'm aware of.

12       Q.   In terms of Tesla's antiharassment complaint

13   procedures, we saw some of those in the code of

14   conduct and then also in the antiharassment policy.

15            Other than those complaint procedures, are

16   there any other complaint procedures that Tesla has

17   that we haven't gone over?

18       A.   No, I think we covered everything.

19       Q.   It's fair to say that if someone wants to

20   make a complaint to Tesla about the way they're being

21   treated, some kind of harassment, they can do that

22   either in writing or verbally; is that true?

23       A.   That's correct.

24       Q.   And if a Tesla employee wants to complain

25   about harassment in the workplace, they can do that by

1  complaining to either a lead, a supervisor, a manager,

2  or HR; is that true?

3      **A.    Correct.  Or through the integrity hotline.**

4      Q.   Or to the integrity hotline.

5          And similarly, if a contract employee who's

6  working at the Tesla factory wanted to complain about

7  harassing conduct, they could also complain to their

8  lead supervisor manager or HR; is that true?

9      **A.   The staffing agencies' HR and other people**

10  **employed through there, they would be able to speak**

11  **with them or Tesla staff, or the agency.**

12      Q.   Actually, a contract employee has more

13  avenues to complain, because they can complain either

14  to their own staffing agency or to Tesla supervisors,

15  managers, or HR people; true?

16      **A.   That's correct.**

17      Q.   Now, in terms of steps that Tesla has taken

18  to prevent the use of the "N" word at the Fremont

19  factory, are you aware of any steps that Tesla has

20  taken specifically to address that term?

21          MS. JENG:  Objection; lacks foundation.

22          THE WITNESS:  Not solely for the purpose of

23  addressing that term.

24          MR ORGAN:  Q.  You're aware that there have

25  been allegations of the use of the "N" word in

1    State of California            )

2    County of Marin               )

3

4              I, Bridget M. Mattos, hereby certify

5    that the witness in the foregoing deposition was by me

6    duly sworn to testify to the truth, the whole truth

7    and nothing but the truth in the within entitled

8    cause; that said deposition was taken at the time and

9    place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and disinterested person, and was thereafter

13   transcribed under my direction into typewriting by

14   computer; that the witness was given an opportunity to

15   read, correct and sign the deposition.

16              I further certify that I am not

17   interested in the outcome of said action nor connected

18   with or related to any of the parties in said action

19   nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on May 29, 2019.

22       _____

23            BRIDGET M. MATTOS, CSR NO. 11410

24

25

Exhibit

**9**

1                        ARBITRATION

2              BEFORE:  LYNN DURYEE, ARBITRATOR

3                         ---o0o---

4

5    DEWITT LAMBERT,

6           CLAIMANT,

7         vs.                        No.  1100088312

8    TESLA, INC. DBA TESLA MOTORS,
     INC.; AND DOES 1-10,
9    INCLUSIVE,

10          RESPONDENTS.
     _____

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                      Volume III

15                  (Pages 597 - 859)

16           Taken Before KATHLEEN WILKINS,

17        RPR-RMR-CRR-CCRR-CLR-CRC, CSR #10068

18                   March 15, 2019

19

20

21

22
                   Aiken Welch Court Reporters
23                 One Kaiser Plaza, Suite 250
                   Oakland, California 94612
24            (510) 451-1580 / (877) 451-1580
                   Fax:  (510) 451-3797
25                   www.aikenwelch.com

1      ARBITRATOR DURYEE:  If called, he would so

2    testify?

3      Okay.  Then we accept that.

4      MR. ORGAN:  One other witness, your Honor,

5    is Nathan Fraim.  And he has to do with authenticating

6    the photo in the bathroom where the N-word was in that

7    picture, and it was the third part of -- what was that

8    exhibit I did today with the pictures?  I think it's

9    107-3, your Honor.

10      He would just come in and testify that he

11    took that picture.

12      ARBITRATOR DURYEE:  When?

13      MS. AVLONI:  Let me give you that info.  I

14    have it.  One second.

15      MS. OCHS:  He worked there --

16      MS. AVLONI:  It was in 2017 the photo was

17    taken.

18      MS. OCHS:  He worked there only from January

19    until August of 2017, as a contract worker.

20      ARBITRATOR DURYEE:  Okay.  Can we agree that

21    if called to testify, he would say that he took this

22    photograph sometime during that period when he was a

23    contract worker?

24      MS. OCHS:  I don't have an objection to

25    that.  But we would also want to include that he did

1    not work on Chassis 2 in the relevant time periods and

2    that he did not know Mr. Lambert.

3              ARBITRATOR DURYEE:  Okay.  Do you accept

4    that --

5              MR. ORGAN:  And we agree with that, your

6    Honor.

7              MS. OCHS:  He has no personal knowledge of

8    the case.

9              MR. ORGAN:  Okay.

10             ARBITRATOR DURYEE:  I accept that.  I don't

11   think there's anything else we need for the record.

12             MR. ORGAN:  I think that's it, your Honor.

13             ARBITRATOR DURYEE:  Thank you.

14             (Whereupon, the proceedings adjourned at

15             4:03 p.m.)

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF REPORTER

2

3              I, KATHLEEN A. WILKINS,

4       RPR-RMR-CRR-CCRR-CLR-CRC, a Shorthand Reporter, State

5       of California, do hereby certify:

6              That said proceedings were taken before me

7       at said time and place, and was taken down in

8       shorthand by me, a Certified Shorthand Reporter of the

9       State of California, and was thereafter transcribed

10      into typewriting, and that the foregoing transcript

11      constitutes a full, true and correct report of said

12      proceedings that took place'

13             IN WITNESS WHEREOF, I have hereunder

14      subscribed my hand this 2nd day of April, 2019.

15             _____

16             KATHLEEN WILKINS, CSR 10068

17             RPR-RMR-CRR-CCRR-CLR-CRC

18             State of California

19

20

21

22

23

24

25

# Exhibit

# **10**

Lawrence A. Organ, Esq.  (SBN 175503)
Navruz Avloni, Esq. (SBN 279556)
CALIFORNIA CIVIL RIGHTS LAW GROUP
332 San Anselmo Ave.
San Anselmo, California 94960
Telephone: (415) 453-4740
Facsimile: (415) 785-7352
larry@civilrightsca.com
navruz@civilrightsca.com

Attorneys for Plaintiff,
DEMETRIC DI-AZ and OWEN DIAZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON, <br><br> Plaintiffs, <br><br> v. <br><br> TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive, <br><br> Defendants. | Case No. 3:17-cv-06748-WHO <br><br> **Plaintiffs Demetric Di-az and Owen Diaz's Supplemental Initial Disclosures Pursuant to General Order No. 71** |

Pursuant to the United States District Court, Northern District of California, General Order No. 71, Plaintiffs Demetric Di-az and Owen Diaz hereby make the following supplemental disclosures to Defendants Tesla, Inc. dba Tesla Motors, Inc.; West Valley Staffing Group; NextSource, Inc.; and Citistaff Solutions, Inc. These supplemental disclosures are based on information presently known and reasonably available to Plaintiffs and which Plaintiffs

1

reasonably believe they may use in support of their claims. Continuing investigation and discovery may cause Plaintiffs to supplement or amend these disclosures, by taking steps including (though not limited to) identifying other potential witnesses, identifying other potentially relevant documents, and by disclosing other pertinent information.

By providing these supplemental disclosures, Plaintiffs do not represent that they are identifying every document, tangible thing, or witness potentially relevant to this action. In addition, these disclosures are made without waiver of Plaintiffs' right to object to any discovery request or proceeding involving or relating to the subject matter of these disclosures on any grounds, including (though not limited to) privilege, relevancy, hearsay, undue burden, confidentiality, privacy, or any other appropriate grounds for objection.

2.    <u>Documents</u>

Copies of all unprivileged documents in the procession, custody or control of Plaintiffs that Plaintiffs may use to support their claims are being provided to defense counsel concurrently. Documents pertaining to Plaintiff Owen Diaz have been Bates stamped ODIAZ000001-000009. Documents pertaining to Plaintiff Demetric Di-az have been Bates stamped DDIAZ000001-000010. Mr. Di-az's documents have been redacted to exclude attorney-client communications.

Plaintiffs will supplement their production within the next 10 days to include additional information required by General Order No. 71.

<u>Supplemental Disclosure</u>

Plaintiffs subsequently produced additional required documents, Bates-stamped DDIAZ000011-DDIAZ000029 and ODIAZ000011-ODIAZ00391.

3(a).    <u>Witnesses</u>

The following individuals are likely to have discoverable information that Plaintiffs may

2

use to support their claims:

| Name | Contact Information | Substance of Information |
|---|---|---|
| Di-az, Demetric | Mr. Diaz can be contacted through his counsel. | Mr. Di-az has information regarding Defendants' discriminatory and retaliatory conduct towards him, as well as information regarding his damages. |
| Diaz, Owen | Mr. Diaz can be contacted through his counsel. | Mr. Diaz has information regarding Defendants' discriminatory and retaliatory conduct towards him, as well as information regarding his damages. |
| Patterson, Lamar | Mr. Patterson can be contacted through his counsel. | Mr. Patterson has information regarding Defendants' discriminatory and retaliatory conduct towards Plaintiffs. |
| Foster, Rothai | Contact information unknown. | Mr. Foster has information regarding Defendants' discriminatory and harassing behavior towards Owen Diaz. |
| Gardner, Jay | Contact information unknown. | Mr. Gardner participated in the harassment and discrimination of Owen Diaz. Additionally, as a supervisor, Mr. Gardner has knowledge of Defendants' policies and practices pertaining to racial harassment and discrimination. |
| Holmes, Demetrica | Ms. Holmes can be contacted through Plaintiff's counsel. | Ms. Holmes has information regarding Plaintiffs' emotional distress damages. |

3

Plaintiffs' Supplemental General Order No. 71 Disclosures

| Jackson, W. (First name unknown) | Contact information unknown. | Mr. Jackson has knowledge regarding Plaintiffs' complaints of discrimination and harassment to Defendants. Additionally, as a supervisor, Mr. Jackson has knowledge pertaining to Defendants' policies and procedures as they relate to racial harassment and discrimination. |
| --- | --- | --- |
| Jones, La'Drea | Ms. Jones can be contacted through Plaintiff's counsel | Ms. Jones has information regarding Plaintiffs' emotional distress damages. |
| Kawasaki, Tom | Contact information unknown. | Mr. Kawasaki has knowledge of Defendants' harassment of Plaintiffs. Additionally, as a supervisor, Mr. Kawasaki has knowledge pertaining to Defendants' policies concerning racial harassment and discrimination. |
| Oliver (Last name unknown) | Contact information unknown. | Oliver has information pertaining to Defendants' racially discriminatory and harassing treatment of Owen Diaz. |
| Paul (Last name unknown) | Contact information unknown. | Paul has information pertaining to Defendants' racially discriminatory and harassing treatment of Owen Diaz. |
| Musk, Elon | Contact information unknown. | Mr. Musk has information pertaining to Defendants' policies and procedures regarding racial harassment and discrimination. |

4

| Ramon (Last name unknown) | Contact information unknown. | Ramon participated in the harassment and discrimination against Owen Diaz. Furthermore, as a supervisor, Ramon has knowledge of Defendants' policies and procedures pertaining to racial harassment and discrimination. |
|---|---|---|
| Robert (Last name unknown) | Contact information unknown. | Robert participated in the harassment and discrimination against Owen Diaz. |
| Romero, Ed | Contact information unknown. | Mr. Romero has information pertaining to Owen Diaz's complaints of discrimination and harassment to Defendants. Additionally, as a supervisor, Mr. Romero has knowledge of Defendants' practices and policies pertaining to racial harassment and discrimination. |
| TJ (Last name unknown) | Contact information unknown. | TJ has information pertaining to Defendants' discriminatory and harassing conduct towards Demetric Di-az. |
| Wheeler, Michael | Contact information unknown. | Mr. Wheeler has knowledge of Defendants' harassing and discriminatory conduct towards Owen Diaz. Additionally, as a supervisory employee of Defendants, Mr. Wheeler has knowledge of Defendants' policies concerning racial harassment and discrimination. |

5

Plaintiffs' Supplemental General Order No. 71 Disclosures

Supplemental Response:

| Name | Contact Information | Substance of Information |
|---|---|---|
| Wheeler, Michael | Phone: (510)-938-4393 | Mr. Wheeler has knowledge of Defendants' harassing and discriminatory conduct towards Owen Diaz. Additionally, as a supervisory employee of Defendants, Mr. Wheeler has knowledge of Defendants' policies concerning racial harassment and discrimination.<br><br>Supplemental Disclosure: Mr. Wheeler is also likely to have discoverable information regarding racial harassment, racial discrimination, and the hostile working environment at Defendant Tesla's Fremont Factory. |

6

Plaintiffs' Supplemental General Order No. 71 Disclosures

| Kawasaki, Tamotsu | Phone: (650)-454-4543 | Mr. Kawasaki has knowledge of Defendants' harassment of Plaintiffs. Additionally, as a supervisor, Mr. Kawasaki has knowledge pertaining to Defendants' policies concerning racial harassment and discrimination.<br><br>Supplemental Disclosure:<br>Mr. Kawasaki is likely to have knowledge of Plaintiff Owen Diaz's complaints of racial harassment. |
|---|---|---|
| Nigel Jones | Mr. Jones may be contacted through Plaintiffs' counsel. | Mr. Jones has knowledge of the racially harassing and discriminatory environment in Tesla's Fremont factory, including racist graffiti displayed in the restrooms. |
| Melvin Berry | Contact information unknown. | Mr. Berry has knowledge of the racially harassing and discriminatory environment in Tesla's Fremont factory, Tesla's response to complaints about the use of racial slurs, and Tesla's failure to prevent a harassing and discriminatory work environment. |
| Nathan Fraim | Mr. Fraim may be contacted through Plaintiffs' counsel. | Mr. Fraim has knowledge of the racially harassing and discriminatory work environment and racist graffiti in Tesla's Fremont factory. |

Plaintiffs' Supplemental General Order No. 71 Disclosures

| Dewitt Lambert | Mr. Lambert may be contacted through Plaintiffs' counsel. | Mr. Lambert has knowledge of the racially harassing, discriminatory, and retaliatory work environment, as well as the racist graffiti displayed in Tesla's Fremont factory. |
| Tori Johnson | Mr. Johnson may be contacted through Plaintiffs' counsel. | Mr. Johnson has knowledge of the racially discriminatory and harassing work environment employees of Defendant Citistaff experienced while working in Tesla's Fremont factory, including the use of racial slurs and the display of racist graffiti. |
| Titus McCaleb | Mr. McCaleb may be contacted through Plaintiffs' counsel | Mr. McCaleb has knowledge of the racially harassing, discriminatory, and retaliatory treatment of Defendant West Valley's employees at Tesla's Fremont factory. |
| Jakel Williams | Ms. Williams may be contacted through Plaintiffs' counsel. | Ms. Williams has knowledge of the racially harassing and discriminatory working environment in Tesla's Fremont factory, as well as NextSource's handling of complaints of racial harassment and discrimination. |
| Alfonso Franco | Unknown | Mr. Franco has knowledge of the racially harassing and discriminatory working environment in Tesla's Fremont factory, as well as Tesla's failure to investigate and prevent harassment. |

3(b).    Damages

8

Plaintiffs seek the following categories of damages:

- General damages, including past and future mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation and emotional distress.

- Special damages, including past and future lost wages.

- Injunctive relief to require Defendants to better train its staff on race harassment, discrimination and retaliation, and develop effective policies and procedures to ensure that when harassment is reported, the company takes effective remedial measures;

- Civil penalties pursuant to Section 52(a), 52(b)(2), and 52.1(a) of the California Civil Code; and Section 1102.5(f) of the California Labor Code;

- Attorneys' fees and costs pursuant to sections 52(a), 52(b)(3), and 52.1(h) of the California Civil Code; section 12965(b) of the California Government Code, and any other applicable statute;

- Interest as provided by law; and

- Costs of suit.

3(c).   <u>Disability and Social Security Benefits</u>

Plaintiffs have not applied for disability or social security benefits after the adverse action.

\\

\\

9

Dated: March 11, 2019                    CALIFORNIA CIVIL RIGHTS LAW GROUP

By _____

LAWRENCE A. ORGAN

NAVRUZ AVLONI

Attorneys for Plaintiffs

DEMETRIC DI-AZ and OWEN DIAZ

10

Plaintiffs' Supplemental General Order No. 71 Disclosures

# Exhibit

# 11

Lawrence A. Organ (SBN 175503)
Navruz Avloni (SBN 279556)
CALIFORNIA CIVIL RIGHTS LAW GROUP
332 San Anselmo Avenue
San Anselmo, California 94960-2664
Telephone: (415) 453-4740
Facsimile: (415) 785-7352
larry@civilrightsca.com
navruz@civilrightsca.com

Attorneys for Plaintiffs
DEMETRIC DIAZ, OWEN DIAZ,
and LAMAR PATTERSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DIAZ, OWEN DIAZ, and LAMAR PATTERSON, <br><br> Plaintiffs, <br><br> v. <br><br> TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-10 inclusive, <br><br> Defendants. | Case No. 3:17-cv-06748-WHO <br><br> **CERTIFICATE OF SERVICE** |

1

## CERTIFICATE OF SERVICE

*Owen Diaz, Demetric Diaz, and Lamar Patterson v. Tesla, Inc., et al.*

**United States District Court, Northern Dist. California, Case No. 3:17-cv-06748-WHO**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Marin, State of California. My business address is 332 San Anselmo Avenue, San Anselmo, CA 94960. On March 11, 2019, I served true copies of the following document(s) described as:

- **PLAINTIFFS DEMETRIC DI-AZ AND OWEN DIAZ'S SUPPLEMENTAL INITIAL DISCLOSURES PURSUANT TO GENERAL ORDER NO. 71.**

    xx             by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Anselmo, addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing contained in the affidavit.

on the interested parties in this action as follows:

*Attorneys for Defendants Tesla, Inc.:*

Tracey A. Kennedy
Sheppard Mullin
333 South Hope Street
43rd Floor
Los Angeles, California 90071

*Attorneys for Defendants Citistaff Solutions:*

Gary T. Lafayette
Cheryl A. Stevens
Lafayette & Kumagai
1300 Clay Street, Ste. 810
Oakland, California 94612

\\
\\
\\

2

CERTIFICATE OF SERVICE                                    Case No. 3:17-cv-06748-WHO

1  **Attorneys for Defendant West Valley Staffing Group:**

2  Fenn C. Horton, III
   Helene Anastasia Simvoulakis
3  PAHL & MCKAY
   225 West Santa Clara St, Suite 1500
4  San Jose, CA 95113

5

6  **Attorneys for Defendant nextSource, Inc.:**

7  Jason A. Geller
8  Juan C. Araneda
   Aaron D. Langberg
9  FISHER & PHILLIPS LLP
   One Embarcadero Center, Suite 2050
10 San Francisco, California 94111

11                    **(State)** I declare under penalty of perjury under the laws of the State of
12         _____     California that the above is true and correct.

13                    **(Federal)** I declare that I am employed in the office of a member of the State
14         X          Bar of this Court at whose direction the service was made. I declare under
                      penalty of perjury under the laws of the United States of America that the
15                    above is true and correct.

16 Executed on March 11, 2019 at San Anselmo, California.

17

18

19                                             Sabrina Grislis

20

21

22

23

24

25

26

27

28

3

# Exhibit

# 12

Lawrence A. Organ, Esq.  (SBN 175503)
Navruz Avloni, Esq. (SBN 279556)
CALIFORNIA CIVIL RIGHTS LAW GROUP
332 San Anselmo Ave.
San Anselmo, California 94960
Telephone: (415) 453-4740
Facsimile: (415) 785-7352
larry@civilrightsca.com
navruz@civilrightsca.com

Attorneys for Plaintiffs,
DEMETRIC DI-AZ and OWEN DIAZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON,<br><br>        Plaintiffs,<br><br>      v.<br><br>TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive,<br><br>        Defendants. | Case No. 3:17-cv-06748-WHO<br><br>**Plaintiffs Demetric Di-az and Owen Diaz's Supplemental Initial Disclosures Pursuant to General Order No. 71** |

     Pursuant to the United States District Court, Northern District of California, General Order No. 71, Plaintiffs Demetric Di-az and Owen Diaz hereby make the following supplemental disclosures to Defendants Tesla, Inc. dba Tesla Motors, Inc.; West Valley Staffing Group; NextSource, Inc.; and Citistaff Solutions, Inc. These supplemental disclosures are based on information presently known and reasonably available to Plaintiffs and which Plaintiffs reasonably believe they may use in support of their claims. Continuing investigation and discovery may cause Plaintiffs to supplement or amend these disclosures, by taking steps including (though not limited to) identifying other potential witnesses, identifying other potentially relevant documents, and by disclosing other pertinent information.

1

By providing these supplemental disclosures, Plaintiffs do not represent that they are identifying every document, tangible thing, or witness potentially relevant to this action. In addition, these disclosures are made without waiver of Plaintiffs' right to object to any discovery request or proceeding involving or relating to the subject matter of these disclosures on any grounds, including (though not limited to) privilege, relevancy, hearsay, undue burden, confidentiality, privacy, or any other appropriate grounds for objection.

2.   <u>Documents</u>

Copies of all unprivileged documents in the procession, custody or control of Plaintiffs that Plaintiffs may use to support their claims are being provided to defense counsel concurrently. Documents pertaining to Plaintiff Owen Diaz have been Bates stamped ODIAZ000001-000009. Documents pertaining to Plaintiff Demetric Di-az have been Bates stamped DDIAZ000001-000010. Mr. Di-az's documents have been redacted to exclude attorney-client communications.

Plaintiffs will supplement their production within the next 10 days to include additional information required by General Order No. 71.

<u>Supplemental Disclosure</u>

Plaintiffs subsequently produced additional required documents, Bates-stamped DDIAZ000011-DDIAZ000029 and ODIAZ000011-ODIAZ00391.

3(a).   <u>Witnesses</u>

The following individuals are likely to have discoverable information that Plaintiffs may use to support their claims:

| Name | Contact Information | Substance of Information |
|---|---|---|
| Di-az, Demetric | Mr. Diaz can be contacted through his counsel. | Mr. Di-az has information regarding Defendants' discriminatory and retaliatory conduct towards him, as well as information regarding his damages. |

2

| Diaz, Owen | Mr. Diaz can be contacted through his counsel. | Mr. Diaz has information regarding Defendants' discriminatory and retaliatory conduct towards him, as well as information regarding his damages. |
|---|---|---|
| Patterson, Lamar | Mr. Patterson can be contacted through his counsel. | Mr. Patterson has information regarding Defendants' discriminatory and retaliatory conduct towards Plaintiffs. |
| Foster, Rothai | Contact information unknown. | Mr. Foster has information regarding Defendants' discriminatory and harassing behavior towards Owen Diaz. |
| Gardner, Jay | Contact information unknown. | Mr. Gardner participated in the harassment and discrimination of Owen Diaz. Additionally, as a supervisor, Mr. Gardner has knowledge of Defendants' policies and practices pertaining to racial harassment and discrimination. |
| Holmes, Demetrica | Ms. Holmes can be contacted through Plaintiff's counsel. | Ms. Holmes has information regarding Plaintiffs' emotional distress damages. |
| Jackson, W. (First name unknown) | Contact information unknown. | Mr. Jackson has knowledge regarding Plaintiffs' complaints of discrimination and harassment to Defendants. Additionally, as a supervisor, Mr. Jackson has knowledge pertaining to Defendants' policies and procedures as they relate to racial harassment and discrimination. |
| Jones, La'Drea | Ms. Jones can be contacted through Plaintiff's counsel | Ms. Jones has information regarding Plaintiffs' emotional distress damages. |

3

Plaintiffs' Supplemental General Order No. 71 Disclosures

| Kawasaki, Tom | Contact information unknown. | Mr. Kawasaki has knowledge of Defendants' harassment of Plaintiffs. Additionally, as a supervisor, Mr. Kawasaki has knowledge pertaining to Defendants' policies concerning racial harassment and discrimination. |
|---|---|---|
| Oliver (Last name unknown) | Contact information unknown. | Oliver has information pertaining to Defendants' racially discriminatory and harassing treatment of Owen Diaz. |
| Paul (Last name unknown) | Contact information unknown. | Paul has information pertaining to Defendants' racially discriminatory and harassing treatment of Owen Diaz. |
| Musk, Elon | Contact information unknown. | Mr. Musk has information pertaining to Defendants' policies and procedures regarding racial harassment and discrimination. |
| Ramon (Last name unknown) | Contact information unknown. | Ramon participated in the harassment and discrimination against Owen Diaz. Furthermore, as a supervisor, Ramon has knowledge of Defendants' policies and procedures pertaining to racial harassment and discrimination. |
| Robert (Last name unknown) | Contact information unknown. | Robert participated in the harassment and discrimination against Owen Diaz. |

Plaintiffs' Supplemental General Order No. 71 Disclosures

| Romero, Ed | Contact information unknown. | Mr. Romero has information pertaining to Owen Diaz's complaints of discrimination and harassment to Defendants. Additionally, as a supervisor, Mr. Romero has knowledge of Defendants' practices and policies pertaining to racial harassment and discrimination. |
| TJ (Last name unknown) | Contact information unknown. | TJ has information pertaining to Defendants' discriminatory and harassing conduct towards Demetric Di-az. |
| Wheeler, Michael | Contact information unknown. | Mr. Wheeler has knowledge of Defendants' harassing and discriminatory conduct towards Owen Diaz. Additionally, as a supervisory employee of Defendants, Mr. Wheeler has knowledge of Defendants' policies concerning racial harassment and discrimination. |

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

5

Plaintiffs' Supplemental General Order No. 71 Disclosures

Supplemental Response:

| Name | Contact Information | Substance of Information |
|---|---|---|
| Wheeler, Michael | Phone: (510)-938-4393 | Mr. Wheeler has knowledge of Defendants' harassing and discriminatory conduct towards Owen Diaz. Additionally, as a supervisory employee of Defendants, Mr. Wheeler has knowledge of Defendants' policies concerning racial harassment and discrimination.<br><br>Supplemental Disclosure: Mr. Wheeler is also likely to have discoverable information regarding racial harassment, racial discrimination, and the hostile working environment at Defendant Tesla's Fremont Factory. |
| Kawasaki, Tamotsu | Phone: (650)-454-4543 | Mr. Kawasaki has knowledge of Defendants' harassment of Plaintiffs. Additionally, as a supervisor, Mr. Kawasaki has knowledge pertaining to Defendants' policies concerning racial harassment and discrimination.<br><br>Supplemental Disclosure: Mr. Kawasaki is likely to have knowledge of Plaintiff Owen Diaz's complaints of racial harassment. |

Plaintiffs' Supplemental General Order No. 71 Disclosures

| Nigel Jones | Mr. Jones may be contacted through Plaintiffs' counsel. | Mr. Jones has knowledge of the racially harassing and discriminatory environment in Tesla's Fremont factory, including racist graffiti displayed in the restrooms. |
|---|---|---|
| Melvin Berry | Contact information unknown. | Mr. Berry has knowledge of the racially harassing and discriminatory environment in Tesla's Fremont factory, Tesla's response to complaints about the use of racial slurs, and Tesla's failure to prevent a harassing and discriminatory work environment. |
| Nathan Fraim | Mr. Fraim may be contacted through Plaintiffs' counsel. | Mr. Fraim has knowledge of the racially harassing and discriminatory work environment and racist graffiti in Tesla's Fremont factory. |
| Dewitt Lambert | Mr. Lambert may be contacted through Plaintiffs' counsel. | Mr. Lambert has knowledge of the racially harassing, discriminatory, and retaliatory work environment, as well as the racist graffiti displayed in Tesla's Fremont factory. |
| Tori Johnson | Mr. Johnson may be contacted through Plaintiffs' counsel. | Mr. Johnson has knowledge of the racially discriminatory and harassing work environment employees of Defendant Citistaff experienced while working in Tesla's Fremont factory, including the use of racial slurs and the display of racist graffiti. |

7

Plaintiffs' Supplemental General Order No. 71 Disclosures

| Titus McCaleb | Mr. McCaleb may be contacted through Plaintiffs' counsel | Mr. McCaleb has knowledge of the racially harassing, discriminatory, and retaliatory treatment of Defendant West Valley's employees at Tesla's Fremont factory. |
|---|---|---|
| Jakel Williams | Ms. Williams may be contacted through Plaintiffs' counsel. | Ms. Williams has knowledge of the racially harassing and discriminatory working environment in Tesla's Fremont factory, as well as NextSource's handling of complaints of racial harassment and discrimination. |
| Alfonso Franco | Unknown | Mr. Franco has knowledge of the racially harassing and discriminatory working environment in Tesla's Fremont factory, as well as Tesla's failure to investigate and prevent harassment. |

Further Supplemental Response:

| Name | Contact Information | Substance of Information |
|---|---|---|
| Melvin Berry | Mr. Berry may be contacted through Plaintiffs' counsel. | Mr. Berry has knowledge of the racially harassing and discriminatory environment in Tesla's Fremont factory, Tesla's response to complaints about the use of racial slurs, and Tesla's failure to prevent a harassing and discriminatory work environment. |

8

Plaintiffs' Supplemental General Order No. 71 Disclosures

| Jeff Henry | Unknown. | Mr. Henry has knowledge of the racially harassing and discriminatory working environment in Tesla's Fremont factory, as well as Tesla's failure to investigate and prevent harassment. |
|---|---|---|
| Richard Hayes | Unknown | Mr. Hayes has knowledge of the use of racial slurs, such as the "n-word", in Tesla's factory. |
| Javier Temores | Unknown | Mr. Temores has knowledge of the racially harassing and discriminatory working environment in Tesla's Fremont factory, as well as Tesla's failure to investigate and prevent harassment. |
| Kevin Colvin | Unknown | Mr. Colvin has knowledge of the racially harassing and discriminatory working environment in Tesla's Fremont factory, as well as Tesla's failure to investigate and prevent harassment. |
| Victor Contreras | Unknown | Mr. Contreras has knowledge of the racially harassing and discriminatory working environment in Tesla's Fremont factory. |
| Andres Donet | Unknown | Mr. Donet has knowledge of the racist graffiti in the restrooms of Tesla's Fremont factory. |
| Paul James | Unknown | Mr. James has knowledge of complaints of racial harassment and discrimination from employees at Tesla's Fremont factory. |

9

| Maggie Crosby | Unknown | Ms. Crosby has knowledge of complaints of racial harassment and discrimination from employees at Tesla's Fremont factory. |
|---|---|---|
| Liza Lipson | Unknown | Ms. Lipson has knowledge of complaints of racial harassment and discrimination from employees at Tesla's Fremont factory. |
| Joshua Mantz | Unknown | Mr. Mantz has knowledge of complaints of racial harassment and discrimination from employees at Tesla's Fremont factory. |

3(b).   <u>Damages</u>

Plaintiffs seek the following categories of damages:

- General damages, including past and future mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation and emotional distress.

- Special damages, including past and future lost wages.

- Injunctive relief to require Defendants to better train its staff on race harassment, discrimination and retaliation, and develop effective policies and procedures to ensure that when harassment is reported, the company takes effective remedial measures;

- Civil penalties pursuant to Section 52(a), 52(b)(2), and 52.1(a) of the California Civil Code; and Section 1102.5(f) of the California Labor Code;

- Attorneys' fees and costs pursuant to sections 52(a), 52(b)(3), and 52.1(h) of the California Civil Code; section 12965(b) of the California Government Code, and any other applicable statute;

- Interest as provided by law; and

- Costs of suit.

10

3(c).   <u>Disability and Social Security Benefits</u>

Plaintiffs have not applied for disability or social security benefits after the adverse action.

Dated: October 16, 2019                    CALIFORNIA CIVIL RIGHTS LAW GROUP

By _____
LAWRENCE A. ORGAN
NAVRUZ AVLONI
Attorneys for Plaintiffs
DEMETRIC DI-AZ and OWEN DIAZ

11

Exhibit

**13**

Lawrence A. Organ (SBN 175503)
Navruz Avloni (SBN 279556)
CALIFORNIA CIVIL RIGHTS LAW GROUP
332 San Anselmo Avenue
San Anselmo, California 94960-2664
Telephone: (415) 453-4740
Facsimile: (415) 785-7352
larry@civilrightsca.com
navruz@civilrightsca.com

Attorneys for Plaintiffs
DEMETRIC DIAZ, OWEN DIAZ,
and LAMAR PATTERSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DIAZ, OWEN DIAZ, and LAMAR PATTERSON,<br><br>          Plaintiffs,<br><br>     v.<br><br>TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-10 inclusive,<br><br>          Defendants. | Case No. 3:17-cv-06748-WHO<br><br>**CERTIFICATE OF SERVICE** |

1

**CERTIFICATE OF SERVICE**

***Owen Diaz, Demetric Diaz, and Lamar Patterson v. Tesla, Inc., et al.***

**United States District Court, Northern Dist. California, Case No. 3:17-cv-06748-WHO**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Marin, State of California. My business address is 332 San Anselmo Avenue, San Anselmo, CA 94960. On October 16, 2019, I served true copies of the following document(s) described as:

- **PLAINTIFFS DEMETRIC DI-AZ AND OWEN DIAZ'S SUPPLEMENTAL INITIAL DISCLOSURES PURSUANT TO GENERAL ORDER NO. 71.**

  xx       by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Anselmo, addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing contained in the affidavit.

on the interested parties in this action as follows:

***Attorneys for Defendants Tesla, Inc.:***

Tracey A. Kennedy
Sheppard Mullin
333 South Hope Street
43rd Floor
Los Angeles, California 90071

Reanne Swafford-Harris
Patricia Jeng
Sheppard Mullin
Four Embarcadero Center,17th Floor
San Francisco, CA 94111

\\
\\
\\
\\
\\

CERTIFICATE OF SERVICE        Case No. 3:17-cv-06748-WHO

*Attorneys for Defendants Citistaff Solutions:*

Gary T. Lafayette
Cheryl A. Stevens
Lafayette & Kumagai
1300 Clay Street, Ste. 810
Oakland, California 94612

*Attorneys for Defendant West Valley Staffing Group:*

Fenn C. Horton, III
Helene Anastasia Simvoulakis
PAHL & MCKAY
225 West Santa Clara St, Suite 1500
San Jose, CA 95113

*Attorneys for Defendant nextSource, Inc.:*

Jason A. Geller
Juan C. Araneda
Vincent J. Adams
FISHER & PHILLIPS LLP
One Embarcadero Center, Suite 2050
San Francisco, California 94111

\_\_\_\_\_    **(State)**  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

\_\_X\_\_    **(Federal)**  I declare that I am employed in the office of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on October 16, 2019 at San Anselmo, California.

_____
Sabrina Grislis

CERTIFICATE OF SERVICE                    Case No. 3:17-cv-06748-WHO

# Exhibit

# 14

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 555-2017-00881 |

| California Department Of Fair Employment & Housing | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Titus V. McCaleb | | 1976 |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| WEST VALLEY STAFFING GROUP | 500 or More | (408) 735-1420 |

| Street Address | City, State and ZIP Code |
|---|---|
| 390 Potrero Avenue, Sunnyvale, CA 94085 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 02-23-2017   Latest 06-06-2017

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by Respondent to work at TESLA on or about November 6, 2016 as a production associate and media specialist. I performed the duties of my job satisfactorily.

I am African American. On or about November 7 or 8, 2016, a non-management co-worker (non-African American) at TESLA called me a "nigger"/"nigga" while in the presence of several Leads. I expressed my offense to this word, but no action was taken. On or around March 15, 2017, another non-management co-worker called me this word again. This particular co-worker has used this word when referring to me at least three times. Finally, on or around June 2, 2017, yet another non-management co-worker referred to me as "nigga." Subsequently, I complained to my supervisor at TESLA, Ron Lardizabal, and also to the HR manager at TESLA, Brandie To about these incidents. I was told by HR that my integrity was in question and that my story did not have any merit. Another manager, Afton Zersteeh, told me that if I kept complaining that I might be terminated. I was terminated on June 6, 2017.

I believe that I have been discriminated against and harassed due to my race, in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe that I was retaliated against because of my engagement in protected activity, in violation of the same statute.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| [signature]<br>2-7-17<br>Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year)<br>RECEIVED<br>JUN 27 2017 |

EEOC - OLO

WV000397
CONFIDENTIAL

# Exhibit

# 15

*Di-Az, et al., v. Tesla, et al*
Northern District, Oakland Division:  17-cv-06748-WHO

## PROOF OF SERVICE

State of California       )
                          ) xx
County of Santa Clara     )

     I am a citizen of the United States and an employee of the County aforesaid.  I am over the age of eighteen years and not a party to the within action.  My business address is 225 West Santa Clara Street, Suite 1500, San Jose, California  95113-1752.  On the date mentioned below, I caused a true copy(ies) of the following document(s) to be served on the parties below using the method(s) checked:

- **DOCUMENTS PRODUCED BY WEST VALLEY STAFFING GROUP – BATES NOS. WV000355-WV000537 (CONFIDENTIAL)**

    On the Addressee(s) below named in said action by:

    ☒  First Class Mail.  I am familiar with the regular mail collection and processing practices of the business.  The mail will be deposited with The United States Postal Service on the same day following ordinary business practices.  I enclosed the above-mentioned document(s) in a sealed envelope with postage thereon fully prepaid in the United States Post Office mail box at San Jose, California.

    ☐  Facsimile at the fax numbers shown after each name below.

    ☐  By Federal Express pursuant to Code of Civil Procedure § 1005.

    ☐  By Electronic Mail.

**Addressee(s):**

**Attorneys for Plaintiffs Demetric Di-az,
Owen Di-az and Lamar Patterson**

Lawrence A. Organ, Esq.
Navruz Avloni, Esq.
California Civil Rights Law Group
332 San Anselmo Avnue
San Anselmo, CA 94960
larry@civilrightsca.com
navruz@civilrightsca.com

///

///

///

///

Pahl & McCay
A Professional Corp.
225 W  Santa Clara St
Suite 1500
San Jose, CA 95113
(408) 286-5100

*2814/040 -
00680134.DOCX

**PROOF OF SERVICE**

(Case No.  115CV282050)

///

1   **Attorneys for Defendant nextSource, Inc.**

2

3   Juan Carlos Araneda
    Jason Alex Geller
    Aaron Langberg
4   Fisher & Phillips, LLP
    One Embarcadero Center, Suite 2050
5   San Francisco, CA 94111

6   **Attorneys for Defendant Tesla, Inc.**

7   Tracey A. Kennedy
    Sheppard Mullin
8   333 South Hope Street
    43rd Floor
9   Los Angeles, CA 90071
    tkennedy@sheppardmullin.com
10
    Reanne Swafford-Harris
11  Sheppard Mullin
    Four Embarcadero Center, 17th Floor
12  San Francisco, CA 94111

13  Patricia Melody Jen
    Sheppard Mullin
14  379 Lytton Avenue
    Palo Alto, CA 94301
15

16  **Attorneys for CitiStaff Solutions, Inc.**

17  Cheryl A. Stevens
    Gary T. Lafayette
18  Lafayette & Kumagai
    1300 Clay Street, Suite 810
19  Oakland, CA 94612

20          I declare under penalty of perjury, under the laws of the State of California, that the

21  foregoing is true and correct. Executed on March 8, 2019, San Jose, California.

22

23                                                  _____
                                                    Michelle Garcia

**Pahl & McCay**
A Professional Corp.
225 W. Santa Clara St.24
Suite 1500
San Jose, CA 95113
(408) 286-5100    25

*2814/040 -
00680134.DOCX 26

27

28

**PROOF OF SERVICE**                              (Case No. 115CV282050)

Exhibit

16

LAWRENCE A. ORGAN (SBN 175503)
NAVRUZ AVLONI (SBN 279556)
CALIFORNIA CIVIL RIGHTS LAW GROUP
407 San Anselmo Avenue, Suite 201
San Anselmo, California 94960
Tel.:   (415) 453-4740
Fax.:   (415) 785-7352
Email: larry@civilrightsca.com
Email: navruz@civilrightsca.com

Attorneys for Plaintiff,
DEWITT LAMBERT

ENDORSED
FILED
ALAMEDA COUNTY

MAR 27 2017

CLERK OF TANIA PIERCE COURT
By _____
Deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

UNLIMITED JURISDICTION

| | |
|---|---|
| DEWITT LAMBERT, | Case No.  **RG 17 8 5 4 5 1 5** |
| Plaintiff, | COMPLAINT FOR DAMAGES |
| v. | 1.  Race Harassment (FEHA); |
| | 2.  Race Discrimination (FEHA); |
| TESLA, INC. DBA TESLA MOTORS, INC.; | 3.  Sexual Harassment (FEHA); |
| and DOES 1-10, inclusive, | 4.  Retaliation (FEHA); |
| Defendants. | 5.  Failure to Prevent Harassment, Discrimination and Retaliation (FEHA); |
| | 6.  Threats of Violence in Violation of the Ralph Act (Cal. Civ. Code § 51.7); |
| | 7.  Violation of the Bane Act (Cal. Civ. Code § 52.1); |
| | 8.  Failure to Accommodate (FEHA); |
| | 9.  Failure to Engage in Interactive Process (FEHA); |
| | 10. Assault; and |
| | 11. Battery (Cal. Civ. Code § 1708.5). |
| | JURY TRIAL DEMANDED |

COMPLAINT

## INTRODUCTION

> Nigger, we take your ass home, nigger. Shred you up in pieces, nigger.
> Cut you up, nigger. Send your ass so everyone in yo family so
> everybody can have a piece of you, nigger. Straight up, nigger. We get
> down like that, nigger.

1.      Although one may think the above statement came from a Pre-Civil Rights Era Ku Klux Klan member; this hateful, violent and racist rhetoric actually came from a Head Lead on the assembly line at Tesla, Inc. dba Tesla Motors, Inc. ("Tesla"), a 21st century company in the heart of Silicon Valley. This Head Lead, along with another Supervisor, Lead and Production Associate continue to roam the halls of Tesla today, even though Tesla is aware that they subjected Plaintiff DeWitt Lambert to repeated racist epithets for months.

2.      Mr. Lambert, who is African American, is an electrician by trade. He traveled across the country, from Alabama to California in 2012, in hopes of a brighter future. Joining Tesla in 2015 was a dream come true for Mr. Lambert, and he was excited to be building cars for a company that is at the forefront of modern day technology and innovation. Unfortunately, almost immediately after starting at Tesla, Mr. Lambert learned that although the company may be revolutionizing the world of transportation, it lagged miles behind when it came to adhering to civil rights that his ancestors fought so hard to obtain more than half a century ago.

## PARTIES

3.      Plaintiff DeWitt Lambert has been employed by Tesla as a Production Associate since approximately June 26, 2015. Plaintiff is, and at all times relevant herein was, a resident of Oakland, California.

4.      Defendant Tesla is a publicly-traded Delaware corporation with its principal place of business in Palo Alto, California. In approximately February 2017, Tesla Motors, Inc. changed its name to Tesla, Inc. Tesla designs, manufactures, and sells electric vehicles, and operates its vehicle manufacturing factory at 45500 Fremont Blvd., Fremont, California. The harassers' conduct at issue in this case took place at the Fremont factory.

5.      In addition to the Defendant named above, Plaintiff sues fictitiously Defendants DOES 1 through 10, inclusive, pursuant to Code of Civil Procedure § 474, because their names, capacities, status, or facts showing them to be liable are not presently known. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and such Defendants caused Plaintiff's damages as herein alleged. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information has been ascertained.

6.      Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each of the Defendants were acting as the partner, agent, servant, and employee of each of the remaining Defendants, and in so doing the things alleged herein was acting within the course and scope of such agency and with the knowledge of the remaining Defendants.

## JURISDICTION AND VENUE

7.      Jurisdiction and venue are proper because a substantial portion of the acts giving rise to Defendant's liability occurred in this County and pursuant to California Government Code section 12965.

8.      The amount in controversy exceeds limited jurisdiction.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      On or about October 26, 2016, Plaintiff filed a timely charge against Defendant Tesla with the Department of Fair Employment and Housing alleging harassment and discrimination based on race, color and sex; retaliation; failure to prevent harassment, discrimination and retaliation; failure to accommodate; and failure to engage in a good faith interactive process. The DFEH issued a right-to-sue letter regarding this charge on October 26, 2016.

## FACTUAL ALLEGATIONS

10.     Mr. Lambert, an African American 44-year-old, traveled across the country, from Alabama to California, in 2012, seeking gainful employment and a better future. Equipped with extensive education in the field of electrical engineering, Mr. Lambert began his career in

3

California by taking on electrician jobs. He subsequently landed a Production Associate position at Tesla's Fremont factory on June 26, 2015. Eager to succeed and grow through the ranks at a company that was revolutionizing the car industry, Mr. Lambert worked hard and put in long hours.

11.     From approximately June 26, 2015 until April 2016, Mr. Lambert was assigned to Chassis Two, where he worked with Supervisor Charles Lambert, Head Lead Christian Kramer, Lead Jose Jimenez, Production Associate Crispin Rodriguez and Production Associate Treat Doan.

12.     Almost immediately after Mr. Lambert began working on Chassis Two, Mr. Kramer, Mr. Jimenez, Mr. Rodriguez and Mr. Doan, who are all in their twenties, began targeting Mr. Lambert and engaging in unprofessional conduct, including: attaching vin number stickers on Mr. Lambert's back; filling Mr. Lambert's back pockets with gold nuts and screws; sticking tools in Mr. Lambert's pocket; hiding Mr. Lambert's tools; using adhesive tape to stick Mr. Lambert's tools to a table; stealing Mr. Lambert's phone, and taking photos and videos on it without his permission. Mr. Lambert pleaded for them to stop.

13.     A month or two into Mr. Lambert's employment, Mr. Kramer's, Mr. Jimenez's, Mr. Rodriguez's and Mr. Doan's conduct took on a racist tone. The Chassis Two employees began calling Mr. Lambert "Nigger" on a continuous basis, and making comments, such as, "Don't this nigger look just like Samuel Jackson;" "Don't he look like this nigger [referring to Samuel Jackson in Django Unchained], these two niggers are just alike;" "Don't this nigger look like Major Payne;" and "The black version of Mr. Clean Right there." This racist behavior included threats of violence. The group would flash 408 gang signs at Mr. Lambert, and one of the employees detailed how he was going to cut Mr. Lambert up into pieces and send his body parts to his family members.  The harassing conduct was part of a continuous course of conduct.

14.     The group also attacked Mr. Lambert based on his sex. For example, while Mr. Lambert was bent over working on the line, Mr. Kramer stuck a drill gun into Mr. Lambert's buttocks in front of his co-workers. Comments were also made about the size of Mr. Lambert's penis, including, "I bet you my dick is bigger than yours," and "He said you got that baby

1  dick…is that dick so small you piss on your balls." These employees would also imitate sex

2  between a man and a woman with fingers, imitate performing oral sex on a man with mouth and

3  finger in front of Mr. Lambert, and make comments to Mr. Lambert, such as, "Tell your bitch to

4  stop texting me."  This conduct was in part an attack on his identity as an older African

5  American male and on the racial and sexual stereotypes of African American males.

6      15.     It is very difficult to imagine such blatant racism and sexism permeating the

7  workplace in 21st century Bay Area and at a progressive company, such as Tesla. However,

8  these unabashed harassers went out of their way to document their racist and sexist behavior by

9  leaving several video recordings on Mr. Lambert's phone.

10      16.     Mr. Lambert begged these Chassis Two employees to stop harassing him. On

11  numerous occasions, and as early as Fall 2015, Mr. Lambert complained to Supervisor Charles

12  Lambert about the hostile work environment. He also asked, "Why do they use the N-word so

13  freely around here?" Charles Lambert's response each time was to ask Chassis Two employees

14  to stop referring to Mr. Lambert as "Nigger." In addition to complaining to his supervisor, Mr.

15  Lambert turned to the Human Resources Department for help. He complained to Human

16  Resources about being called "Nigger" in the workplace, and some of the other above-described

17  harassing conduct. He was told that Human Resources would look into it. However, the hostile

18  work environment continued and there was no evidence human resources conducted any

19  investigations into Mr. Lambert's complaints or took action to stop the harassment which

20  continued.

21      17.     Mr. Lambert then took action on his own to move out of Chassis Two by applying

22  for numerous positions in other departments. Starting in December 2015, Mr. Lambert submitted

23  numerous applications for various positions at Tesla. Unfortunately, none of them lead to a

24  transfer. Mr. Lambert pleaded with Human Resources to be moved to another line.

25      18.     Rather than promptly investigate the matter, put an end to the hostile work

26  environment and reprimand the harassers, Tesla rewarded the harassers with promotions. In

27  approximately February 2016, Mr. Kramer was promoted to Supervisor of Chassis Two, Mr.

28  Jimenez was promoted to Head Lead, and Mr. Rodriguez and Mr. Doan were both promoted to

1   Lead positions. At the same time, Supervisor Charles Lambert, who is African America, was

2   transferred to another line.

3       19.     After Supervisor Charles Lambert's transfer, the new Supervisor Christian

4   Kramer threatened Mr. DeWitt Lambert with, "Your ass is outta here now. Charles isn't here to

5   protect you anymore." Mr. Dewitt Lambert complained to Supervisor Charles Lambert about the

6   hostile statements, however, the hostile comments continued.

7       20.     Shortly after Mr. Kramer became the Supervisor of Chassis Two, the employees

8   began taking active steps to get Mr. Lambert fired. They tried to provoke Mr. Lambert by

9   intensifying the harassment. Mr. Lambert would respond with, "I'm not losing my job for one of

10  you kids." In approximately February 2016, a Lead from another line told Mr. Kramer, "You

11  trying to set that man up. That man has a family. You don't do shit like that." Mr. Kramer also

12  issued Mr. Lambert a write up for eating a snack bar on the line. Not only were other employees

13  not reprimanded for eating food on the line, but just a few days prior, donuts were passed around

14  the line and no one was reprimanded for eating the donuts on the line. Mr. Lambert complained

15  to Assistant Manager Alfonso Franco about the harassment and the retaliation. In response, Mr.

16  Franco stated, "You all need to get along."

17      21.     After enduring months of harassment, Mr. Lambert was finally transferred out of

18  Chassis Two to Station 40 in April 2016. However, the retaliatory conduct of the harassers did

19  not stop there. In approximately July 2016, one of the harassers brought up to Human Resources'

20  attention a photograph of Mr. Lambert taken inside the Tesla Fremont factory and posted on

21  Facebook. As a result, Mr. Lambert received a final written warning. Other employees, who had

22  photographs of themselves at the Tesla Fremont factory on their Facebook profiles, were not

23  reprimanded. Mr. Lambert addressed this final warning with Human Resources. During this

24  meeting, Human Resources Representative Rose Sanson observed the hateful, violent and racist

25  videos created by Chassis Two employees, including Mr. Kramer and Mr. Rodriguez. Even after

26  viewing the videos, however, Tesla failed to investigate and reprimand the harassers. Rather,

27  again, it promoted one of the harassers – Jose Jimenez – to Supervisor.

28

Complaint for Damages and Demand for Jury Trial

22.     During this time period, Tesla also continued to discriminate against Mr. Lambert by refusing to promote him. Mr. Lambert was initially turned down for a promotion because he had not met the alleged six-month requirement period, although, at least one of the harassers, who also did not meet the six-month requirement period, received a promotion. Later, Mr. Lambert was again denied a promotion because he was issued the above-described retaliatory write-ups.

23.     Tesla also retaliated against Mr. Lambert by refusing to properly rotate him, thereby causing a serious injury to his back. Because Production Associates often engage in repetitive work, Tesla's policies require that they rotate their Production Associates every two hours to avoid injuries. Tesla failed to rotate Mr. Lambert. Mr. Lambert complained on multiple occasions about not being rotated and developing pain in his lower back due to the repetitive motion. He complained to Human Resources and his Supervisor. He told them, "tell them to rotate me," "you need to rotate me," and "my back is killing me." Human Resources Representative Erin Garcia stated she would speak to Supervisor Cole Buchner about this matter. However, Mr. Lambert continued to work on the same station and was refused alternative work. In fact, employee Jared (last name unknown) told Mr. Lambert that the last employee that performed Mr. Lambert's job incurred a back injury.

24.     After working in a confined space for 12 hours a day, 6 days a week, and without being rotated for three months, Mr. Lambert suffered a lumbar back strain that caused radiating pain starting from his lower back down to his upper buttocks, and resulted in a visit to the emergency room. On July 29, 2016, the Tesla Health Center conducted a physical of Mr. Lambert and issued work restrictions, that limited lifting, pushing and pulling to 10 pounds or less, prohibited stooping and bending, and limited standing or sitting to a maximum of 4 hours per day.

25.     Despite the doctor's orders, Supervisor John Maestre refused to accommodate Mr. Lambert and instead forced Mr. Lambert to continue working 12 hours per day, and engage in the same repetitive motion that caused the back injury. Mr. Maestre refused to take Mr.

1   Lambert's injury and accommodations request seriously, and told Mr. Lambert that if he could
2   not do the work, then he should go home.

3       26.     Mr. Lambert brought Mr. Maestre a Work Status Recommendation from his
4   medical provider requiring that he perform mostly seated work and limit standing/walking to no
5   more than 10 minutes per hour. Mr. Maestre initially provided Mr. Lambert with a plastic crate
6   with no back support as an accommodation. Other employees had regular chairs with back
7   support. When Mr. Lambert asked for a chair with back support he was told that this request
8   would not be accommodated because it was not specified in the Work Status Recommendation.
9   Mr. Lambert's doctor issued a *new* Work Status Recommendation limiting Mr. Lambert to,
10  "Mostly seated with *back support.* Limit standing to no more than 10 minutes/hour." This time,
11  Mr. Maestre refused to accommodate Mr. Lambert because no chairs were allegedly allowed on
12  the line, although other employees were using chairs. Mr. Maestre ordered Mr. Lambert to go
13  home. Mr. Lambert complained to Human Resources Representative Elyse Elliott for being
14  forced to go on leave when he was more than capable of performing the job with the assistance
15  of a chair. In response, Ms. Elliott instructed Mr. Lambert to go home, and notified him that the
16  company would contact him when it had light duty available. As a result, from September 1,
17  2016 until November 22, 2016, Mr. Lambert was forced to go on leave because Tesla refused to
18  accommodate his simple request for a chair with back support.

19      27.     After Plaintiff raised his concerns, Defendant reacted by attacking Plaintiff and
20  his conduct. Defendant falsely accused Plaintiff of fighting and threatening other workers, of
21  using profanity in the workplace and investigating him for conduct in the distant past. Many of
22  these accusations originally came from the harassers. This appears to be part of a campaign to
23  threaten, bully and smear Plaintiff in an effort to victimize the victim for exercising his rights.

24      28.     As a result of the acts and omissions of Defendant, Plaintiff has suffered, and
25  continues to suffer, emotional distress and psychological damage including, but not limited to:
26  depression, anxiety, stress, insomnia, loss of confidence and self-esteem, and uncertainty
27  regarding the future. Defendant's actions have also resulted in past wage and benefit loss, and
28  are expected to result in economic loss in the future.

8

1  29.    As a result of Defendant's actions, Plaintiff hired private counsel to prosecute his

2  claims. Pursuant to California Government Code section 12965(b), and Civil Code sections

3  52(b)(3) and 52.1(h), Plaintiff is entitled to recover attorney's fees and costs associated with the

4  prosecution of these claims.

5  30.    Defendant's acts were malicious, oppressive, or fraudulent with intent to vex,

6  injure, annoy, humiliate and embarrass Plaintiff, and in conscious disregard of the rights or

7  safety of Plaintiff and other employees of Defendant. Plaintiff is informed and believes that

8  managing agents, officers or directors of Defendant ratified the wrongful conduct of the

9  employees and managers of Defendant by knowing of the conduct and failing to take immediate

10  remedial action and by retaining the errant employees in their employment with Defendant after

11  knowing of the conduct and about which Plaintiff became aware.

12  **FIRST CAUSE OF ACTION**
(Racial Harassment)
13  Cal. Govt. Code § 12940, *et seq.*

14  31.    Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs,

15  as though fully set forth herein.

16  32.    Plaintiff at all times was an employee covered by the Fair Employment and

17  Housing Act ("FEHA"), California Government Code §§ 12940(a) and (j), which prohibits an

18  employer from discriminating and harassing an employee on the basis of color and race.

19  33.    Defendant Tesla was at all times an employer defined under the FEHA as

20  explained above.

21  34.    The above described actions of Supervisor Christian Kramer, Head Lead Jose

22  Jimenez, Lead Crispin Rodriguez, Lead Treat Doan, and Defendant Tesla, in its capacity as an

23  employer, constitute racial harassment and discrimination in violation of the FEHA. Plaintiff was

24  subjected to working in a severe, persistent and/or pervasive racially hostile work environment,

25  which interfered with his work performance, denied him employment privileges, and adversely

26  affected the terms and conditions of his job on the basis of his race.

27

28

9

35.     The harassing conduct to which Plaintiff was subjected to was so severe, widespread, and/or persistent that a reasonable African American in Plaintiff's circumstances would have considered the work environment to be hostile or abusive.

36.     Plaintiff considered the work environment to be hostile and/or abusive.

37.     Supervisor Kramer, along with other Chassis Two employees, engaged in the racially harassing conduct as set forth herein. Defendant Tesla failed to take prompt, remedial and effective action to stop the harassers.

38.     Defendant's violations of the FEHA caused Plaintiff to suffer harm as set forth above.

39.     As a result of Defendant's unlawful acts, Plaintiff is entitled to damages as set forth herein.

40.     By reason of the conduct of Defendant as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

41.     Defendant did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

**SECOND CAUSE OF ACTION**
(Race Discrimination)
Cal. Govt. Code § 12940, *et seq.*

42.     Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

43.     Plaintiff at all times was an employee covered by the FEHA, California Government Code §§ 12940(a) and (j), which prohibits an employer from discriminating against an employee on the basis of color and race.

10

44.     Defendant Tesla was at all times an employer defined under the FEHA as explained above.

45.     Tesla failed to promote Plaintiff because of his color and race.

46.     Defendant's practice was a substantial factor in causing Plaintiff's harm.

47.     Defendant's violations of the FEHA caused Plaintiff to suffer harm as set forth above.

48.     As a result of Defendant's unlawful acts, Plaintiff is entitled to damages as set forth herein.

49.     By reason of the conduct of Defendant as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

50.     Defendant did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

### THIRD CAUSE OF ACTION
(Sexual Harassment)
Cal. Govt. Code § 12940, *et seq.*

51.     Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

52.     The above conduct by Plaintiff's supervisor Kramer, Rodriguez, and other Chassis Two employees, was unwelcome, severe, and/or pervasive, directed towards Plaintiff, and part of an ongoing and continuing pattern of conduct.

53.     The above conduct caused Plaintiff to perceive his work environment as intimidating, hostile, abusive, or offensive, and a reasonable person in Plaintiff's position would perceive the work environment as intimidating, hostile, abusive, or offensive.

11

54. Complaints and/or information regarding such harassing conduct were made to Defendant Tesla.

55. Defendant's violations of the FEHA caused Plaintiff to suffer harm as set forth above.

56. As a result of Defendant's unlawful acts, Plaintiff is entitled to damages as set forth herein.

57. By reason of the conduct of Defendant as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

58. Defendant did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

**FOURTH CAUSE OF ACTION**
(Retaliation)
Cal. Govt. Code 12940(h)

59. Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

60. Plaintiff complained of harassment and discrimination that violated the FEHA.

61. Defendant Tesla took no action to ensure that Plaintiff was not retaliated against or threatened for having complained. After his complaints, the harassment intensified; the harassers attempted to force Plaintiff to quit and to have his job terminated; he was unfairly written up; he was prevented from receiving promotions; he was not properly rotated, which resulted in an injury; and he was denied accommodations for his injury.

62. Defendant Tesla failed to take appropriate action to protect Plaintiff.

63. As a result of Defendant Tesla's action or inaction, Plaintiff was subject to retaliation and additional harassment.

12

64.     Plaintiff's complaint was a motivating reason for the retaliatory actions of Defendant Tesla.

65.     Defendant's violations of the FEHA caused Plaintiff to suffer harm as set forth above.

66.     As a result of Defendant Tesla's unlawful acts, Plaintiff is entitled to damages as set forth herein.

67.     By reason of the conduct of Defendant as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

68.     Defendant Tesla did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## FIFTH CAUSE OF ACTION
(Failure to Prevent Discrimination, Harassment and Retaliation)
Cal. Govt. Code § 12940, *et seq.*

69.     Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

70.     Defendant Tesla failed to take all reasonable steps to prevent the harassment, discrimination and retaliation described above. Defendant knew or should have known that Mr. Kramer, Mr. Rodriguez and others had engaged in racially offensive behavior in the past and failed to stop it.

71.     Despite being on notice of Mr. Kramer's, Mr. Rodriguez's and other employees' propensity to engage in harassing conduct, Defendant failed to act to prevent Mr. Kramer, Mr. Rodriguez and other employees from harassing Plaintiff and failed to prevent the further harassment and retaliation that occurred following Plaintiff's complaint.

13

72.     Defendant Tesla also failed to enact an anti-discrimination policy and/or failed to distribute it appropriately and failed to effectively train its employees on racial and/or sex harassment or discrimination.

73.     As a result of Defendant Tesla's violations of the FEHA, Plaintiff suffered harm as set forth above.

74.     As a result of Defendant Tesla's unlawful acts, Plaintiff is entitled to damages as set forth herein.

75.     By reason of the conduct of Defendant as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

76.     Defendant Tesla did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

### SIXTH CAUSE OF ACTION
(Threats of Violence in Violation of Cal. Civ. Code §§ 51.7, 52(b))

77.     Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

78.     Crispin Rodriguez threatened to commit violent acts against Plaintiff.

79.     A substantial motivating reason for Rodriguez's conduct was Plaintiff's race.

80.     Rodriguez interfered with Plaintiff's right to be free from discrimination or violence on the basis of race, by threatening Plaintiff.

81.     Defendant Tesla adopted the conduct, through its officers, directors, managing agents, or supervisory employees. It further ratified the conduct by failing to take appropriate prompt remedial action.

14

Complaint for Damages and Demand for Jury Trial

82.    Defendant's conduct caused Plaintiff to suffer, and continue to suffer damages as set forth above.

83.    As a result of these Defendant's unlawful acts, Plaintiff is entitled to damages set forth herein.

84.    By reason of the conduct of Defendant as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

85.    Defendant did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## SEVENTH CAUSE OF ACTION

(Interference with Constitutional Rights in Violation of Cal. Civ. Code § 52.1)

86.    Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

87.    Crispin Rodriguez interfered with Plaintiff's constitutional right entitling him to equal protection.

88.    Defendant Tesla adopted the conduct, through its officers, directors, managing agents, or supervisory employees. It further ratified the conduct by failing to take appropriate prompt remedial action.

89.    A substantial motivating reason for Defendant's conduct was Plaintiff's race.

90.    Defendant interfered with Plaintiff's right to be free from discrimination or violence on the basis of race as set forth above. Plaintiff reasonably believed that because Plaintiff exercised his right to be free from racial harassment, Rodriguez threatened to commit violence against him and/or his property and Defendant Tesla permitted working conditions that denied Plaintiff his constitutional right entitling him to equal protection.

15

91.     Defendant's conduct caused Plaintiff to suffer, and continue to suffer damages as set forth above.

92.     As a result of Defendant's unlawful acts, Plaintiff is entitled to damages set forth herein.

93.     By reason of the conduct of Defendant and each of them as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

94.     Defendant did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## EIGHTH CAUSE OF ACTION
### (Failure to Accommodate)
### Cal. Govt. Code 12940, *et seq.*

95.     Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

96.     Defendant had an affirmative duty to make a reasonable accommodation for Plaintiff's disability. The duty arises even if Plaintiff did not request an accommodation. Defendant failed to accommodate Plaintiff's disability.

97.     At all relevant times, Defendant had actual and constructive knowledge of the failure to accommodate described and alleged herein, and condoned, ratified and participated in the failure to accommodate Plaintiff's disability.

98.     Defendant's conduct caused Plaintiff to suffer, and continue to suffer damages as set forth above.

99.     As a result of Defendant's unlawful acts, Plaintiff is entitled to damages set forth herein.

16

100.     By reason of the conduct of Defendant, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

101.     Defendant did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## NINTH CAUSE OF ACTION
(Failure to Engage in the Interactive Process)
Cal. Govt. Code 12940, *et seq.*

102.     Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

103.     Defendant was required to engage in a timely, good faith interactive process to attempt to accommodate Plaintiff.  Defendant failed to engage in a timely good faith interactive process with Plaintiff and did not make any attempt to accommodate his disability.

104.     At all relevant times, Defendant had actual and constructive knowledge of the failure to engage in the interactive process described and alleged herein, and condoned, ratified and participated in the failure to engage in the interactive process.

105.     Defendant's conduct caused Plaintiff to suffer, and continue to suffer damages as set forth above.

106.     As a result of Defendant's unlawful acts, Plaintiff is entitled to damages set forth herein.

107.     By reason of the conduct of Defendant as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

17

108.    Defendant did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with the conscious disregard of the rights and safety of Plaintiff, and/or with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## TENTH CAUSE OF ACTION
(Assault)

109.    Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

110.    Plaintiff is informed and believes and thereon alleges that Defendant, by and through its principals, agents and employees, conducted itself unlawfully in violation of public policy and applicable law as described above with conscious disregard of the result or outcome of such conduct.

111.    Rodriguez, Kramer and several other Tesla employees committed an act with the intent to cause apprehension of immediate harmful or offensive contact with Plaintiff, and Plaintiff had a reasonable apprehension of a contact by these employees.  This conduct was committed during the course of and scope of employment.

112.    At all relevant times, Defendant had actual or constructive knowledge of the conduct described herein, and condoned, ratified and participated in such acts.

113.    As a result of Defendant's actions, Plaintiff was harmed as set forth above.

114.    As a result of Defendant's unlawful acts, Plaintiff is entitled to damages as set forth herein.

## ELEVENTH CAUSE OF ACTION
(Battery in Violation of Cal. Civ. Code § 1708.5)

115.    Plaintiff realleges and hereby incorporates by reference the foregoing paragraphs, as though fully set forth herein.

116.    Plaintiff is informed and believes and thereon alleges that Defendant, by and through their principals, agents and employees, conducted themselves unlawfully in violation of

18

1   public policy and applicable law as described above with conscious disregard of the result or
2   outcome of such conduct.

3       117.     Rodriguez touched Plaintiff's person with the intent to cause a harmful or
4   offensive contact with an intimate part of Plaintiff.  Plaintiff did not consent to the contact.
5   Plaintiff was harmed or offended by Rodriguez's conduct.  Rodriguez's conduct was committed
6   during the course of and scope of employment.

7       118.     At all relevant times, Defendant had actual or constructive knowledge of the
8   conduct described herein, and condoned, ratified and participated in such acts.

9       119.     As a result of Defendant's actions, Plaintiff was harmed as set forth above.

10      120.     As a result of Defendant's unlawful acts, Plaintiff is entitled to damages as set
11  forth herein.

12                          **REQUEST FOR RELIEF**

13      WHEREFORE, Plaintiff requests judgment against Defendant Tesla as follows:

14      1.       General damages according to proof, however, no less than the jurisdictional limit
15  of this court;

16      2.       Special damages in amounts according to proof, together with prejudgment
17  interest;

18      3.       Exemplary and punitive damages in amounts according to proof;

19      4.       Civil penalties pursuant to Civil Code section 51.7;

20      5.       Attorneys' fees and costs pursuant to Government Code section 12965, Civil
21  Code sections 52(b)(3) and 52.1(h), and any other applicable statute;

22      6.       Interest as provided by law;

23      7.       Costs of suit incurred herein;

24      8.       Injunctive relief to require Defendant Tesla to better train its staff on race and sex
25  harassment, discrimination, retaliation, and its duty to accommodate and engage in a good faith
26  interactive process as well as conduct more thorough investigations; and

27

28

19

1     9.      For such other and further relief as the Court deems just and proper.

2

3     Dated: March 27, 2017                          CALIFORNIA CIVIL RIGHTS LAW GROUP

4

5                                                    LAWRENCE A. ORGAN

6                                                    NAVRUZ AVLONI
                                                     Attorneys for Plaintiff
7                                                    DEWITT LAMBERT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

Complaint for Damages and Demand for Jury Trial

## DEMAND FOR JURY TRIAL

PLAINTIFF hereby demands a jury trial on all issues.

Dated: March 27, 2017

CALIFORNIA CIVIL RIGHTS LAW GROUP

LAWRENCE A. ORGAN
NAVRUZ AVLONI
Attorneys for Plaintiff
DEWITT LAMBERT

21

Complaint for Damages and Demand for Jury Trial

# Exhibit

# 17

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 555-2017-00881 |

| California Department Of Fair Employment & Housing | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Titus V. McCaleb | | 1976 |

Street Address                              City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| WEST VALLEY STAFFING GROUP | 500 or More | (408) 735-1420 |

| Street Address | City, State and ZIP Code |
|---|---|
| 390 Potrero Avenue, Sunnyvale, CA 94085 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address                              City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest  02-23-2017   Latest  06-06-2017

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by Respondent to work at TESLA on or about November 6, 2016 as a production associate and media specialist. I performed the duties of my job satisfactorily.

I am African American. On or about November 7 or 8, 2016, a non-management co-worker (non-African American) at TESLA called me a "nigger"/"nigga" while in the presence of several Leads. I expressed my offense to this word, but no action was taken. On or around March 15, 2017, another non-management co-worker called me this word again. This particular co-worker has used this word when referring to me at least three times. Finally, on or around June 2, 2017, yet another non-management co-worker referred to me as "nigga." Subsequently, I complained to my supervisor at TESLA, Ron Lardizabal, and also to the HR manager at TESLA, Brandie To about these incidents. I was told by HR that my integrity was in question and that my story did not have any merit. Another manager, Afton Zersteeh, told me that if I kept complaining that I might be terminated. I was terminated on June 6, 2017.

I believe that I have been discriminated against and harassed due to my race, in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe that I was retaliated against because of my engagement in protected activity, in violation of the same statute.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| [signature]<br>Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

RECEIVED

JUN 2 7 2017

EEOC - OLO

WV000397
CONFIDENTIAL

# Exhibit

# 18

**Helene A. Simvoulakis-Panos**

| | |
|---|---|
| **From:** | Rovilla Wetle <rwetle@tesla.com> |
| **Sent:** | Wednesday, May 2, 2018 11:44 AM |
| **To:** | Rovilla Wetle |
| **Subject:** | FW: Tiara Flynn |

**From:** Soren Baird
**Sent:** Wednesday, May 10, 2017 10:27 AM
**To:** Rovilla Wetle <rwetle@tesla.com>
**Subject:** RE: Tiara Flynn

Thank you Rovilla!

Best Regards,

**Soren Baird** | West Valley Staffing Group | On-Site Program Coordinator
P: 408.505.5342
E: sbaird@tesla.com

**From:** Rovilla Wetle
**Sent:** Wednesday, May 10, 2017 9:36 AM
**To:** Freddy Rivera <frivera@tesla.com>; David Zweig <dzweig@tesla.com>; Soren Baird <sbaird@tesla.com>; Sandeep Dhami <sdhami@tesla.com>; Liza Lipson <llipson@tesla.com>; westvalleystaffing <westvalleystaffing@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Michael Lozano <mlozano@tesla.com>; Gabrielle Montoya <gmontaya@tesla.com>; ShTawney McIntosh <smcintosh@tesla.com>; Mario De La Rosa <mdelarosa@tesla.com>
**Subject:** RE: Tiara Flynn

Hi Everyone,

Closing the loop on Jabarre Richard. After completing our investigation, it's our recommendation to keep him on assignment. Please let me know if you have any questions. Here's his last statement:

AB connected with Jabarre via telephone.
Requested Jabarre' statement in regards to the incident with Tiara.

Jabarre did not rememeber the date the incident happened. Towards the end of the day, Tiara's jacket came up missing, Jabarre and Jimmy were talking when Jimmy made a joke saying " Jabarre's girlfriend is wearing it on snapchat (joking). Jabarre said "yes, she's wearing it, again joking. Jimmy noticed that Tiara had left her backpack on the floor and asked her to pick it up and put it somewhere where it was not in the way. At that moment Tiara picked up her backpack and started to walk away and looked at Jabarre and said "Go back to the Jungle nigga". Jabarre did not hear her.say the entire thing but heard her say something about a jungle. Jimmy then asked Jabarre if he heard what Tiara just said. Jabarre said no, what did she say? And Jimmy said she said "Go back to the jungle nigga".
Jabarre did not say anything to her, instead he went to Freddy Rivera, supervisor and told him what just happened. Jabarre stated that Freddy asked him not to say anything to Tiara, keep it mutual and stated he would go and talk to Jimmy about what he witnessed.
I asked Jabarre if there has been any other interactions or altercations between him and Tiara and he said no.

1

WV000380
CONFIDENTIAL

Once Tiara was terminated, Jabarre started getting text messages from people saying that Tiara was spreading a rumor saying that he had grabbed her butt. The rumor started after she was terminated. Jabarre stated "I never touched her ass, there has been multiple people who have done that but not me".

I asked Jabarre how he know multiple people have touched her butt and he said that Tiara talked about it all the time with other girls openly and talked about how someone previous was fired because of it.

Jabarre's closing statement:

I have a bigger job now, bigger responsibility.
I wouldn't jeopardize my job over that.
I'm responsible, currently I am out because I contracted pink eye at work.

Thanks,
Rovilla

**From:** Rovilla Wetle
**Sent:** Monday, May 01, 2017 10:00 AM
**To:** Freddy Rivera <frivera@tesla.com>; David Zweig <dzweig@tesla.com>; Soren Baird <sbaird@tesla.com>; Sandeep Dhami <sdhami@tesla.com>; Liza Lipson <llipson@tesla.com>; westvalleystaffing <westvalleystaffing@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Michael Lozano <mlozano@tesla.com>; Gabrielle Montoya <gmontaya@tesla.com>; ShTawney McIntosh <smcintosh@tesla.com>; Mario De La Rosa <mdelarosa@tesla.com>
**Subject:** RE: Tiara Flynn

Hi Everyone,

Sorry for the delay. The WVSG HR department is completing the interviews to sort out multiple discrepancies in statements. We hope to have closure soon.

Thanks,
Rovilla

**From:** Freddy Rivera
**Sent:** Monday, May 01, 2017 9:57 AM
**To:** Rovilla Wetle <rwetle@tesla.com>; David Zweig <dzweig@tesla.com>; Soren Baird <sbaird@tesla.com>; Sandeep Dhami <sdhami@tesla.com>; Liza Lipson <llipson@tesla.com>; westvalleystaffing <westvalleystaffing@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Michael Lozano <mlozano@tesla.com>; Gabrielle Montoya <gmontaya@tesla.com>; ShTawney McIntosh <smcintosh@tesla.com>; Mario De La Rosa <mdelarosa@tesla.com>
**Subject:** RE: Tiara Flynn

Has Jabarre Richard been interviewed yet? I haven't heard anything regarding this case and it's been 2 weeks since the last email regarding this issue. I need this closed out ASAP so we can move forward.

**From:** Rovilla Wetle
**Sent:** Monday, April 17, 2017 2:40 PM
**To:** Freddy Rivera <frivera@tesla.com>; David Zweig <dzweig@tesla.com>; Soren Baird <sbaird@tesla.com>; Sandeep Dhami <sdhami@tesla.com>; Liza Lipson <llipson@tesla.com>; westvalleystaffing <westvalleystaffing@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Michael Lozano <mlozano@tesla.com>; Gabrielle Montoya <gmontaya@tesla.com>
**Subject:** RE: Tiara Flynn

WV000381
CONFIDENTIAL

Hi Everyone,

David and I met this morning and Tiara's assignment has been ended. Her badge has been turned in to Security.

Thanks,
Rovilla

**From:** Freddy Rivera
**Sent:** Monday, April 17, 2017 8:51 AM
**To:** David Zweig <dzweig@tesla.com>; Soren Baird <sbaird@tesla.com>; Freddy Rivera <frivera@tesla.com>; Sandeep Dhami <sdhami@tesla.com>; Liza Lipson <llipson@tesla.com>; westvalleystaffing <westvalleystaffing@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Michael Lozano <mlozano@tesla.com>; Gabrielle Montoya <gmontaya@tesla.com>
**Subject:** RE: Tiara Flynn

Team,

Tiara showed up to work this morning. Is there going to be any other follow up with her from the West Valley team? I'm in agreement with David on this issue but we cannot wait to follow up.
If we are waiting on an interview with Jabarre please take care of that this morning.

Thank you


Sent via the Samsung Galaxy S® 6, an AT&T 4G LTE smartphone


-------- Original message --------
From: David Zweig <dzweig@tesla.com>
Date: 4/15/17 12:46 PM (GMT-08:00)
To: Soren Baird <sbaird@tesla.com>, Freddy Rivera <frivera@tesla.com>, Sandeep Dhami <sdhami@tesla.com>, Liza Lipson <llipson@tesla.com>, westvalleystaffing <westvalleystaffing@tesla.com>
Cc: Ruben Baca <rbaca@tesla.com>, Michael Lozano <mlozano@tesla.com>, Gabrielle Montoya <gmontaya@tesla.com>
Subject: RE: Tiara Flynn

Adding Liza.

Hi Soren:

Please speak with Jabarre to find out the context of what happened, and what Tiara said to him. In speaking with Freddy, he said this started because Tiara misplaced her jacket and Jabarri teased her about this, which resulted in her responding the way she did.

Derogatory and racially charged comments toward co-workers are unacceptable at Tesla and will not be tolerated. If Tiara made the comments below, please move forward with ending her assignment. Additionally, Tiara has only been at Tesla for about a month, but she has already had multiple performance and attendance issues.

Please also speak with Jabarre about his need for respect and professionalism in the workplace, and please make sure he understands that even playful teasing of another co-worker is not acceptable. If you would like to speak with me to discuss this further, I can be available on Monday.

3

WV000382
CONFIDENTIAL

Thank you,
**David Zweig | HR |** Human Resources

45500 Fremont Boulevard | Fremont, CA 94538

c 510.203.5751 | dzweig@tesla.com

**⊤ ᴇ ⣎ ⌐ ᴧ**

The content of this message is the proprietary and confidential property of Tesla Motors, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

**From:** Soren Baird
**Sent:** Saturday, April 15, 2017 12:09 PM
**To:** Freddy Rivera <frivera@tesla.com>; Sandeep Dhami <sdhami@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Michael Lozano <mlozano@tesla.com>; Gabrielle Montoya
<gmontaya@tesla.com>; David Zweig <dzweig@tesla.com>
**Subject:** RE: Tiara Flynn

Hello Freddy,

Thank you for providing all of these details. I just got off the phone with Tiara Flynn. I gave her a final warning and reiterated all of expectations of her assignment, both in performance and professionalism. She said that she understood.

I left a voicemail with Jabarre, but have not had the chance to speak with him yet. I will follow up once I've been able to connect with him.

Best Regards,

**Soren Baird |** West Valley Staffing Group | On-Site Program Coordinator
**P:** 408.505.5342
**E:** sbaird@tesla.com

**From:** Freddy Rivera
**Sent:** Friday, April 14, 2017 9:24 PM
**To:** Sandeep Dhami <sdhami@tesla.com>; Soren Baird <sbaird@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Michael Lozano <mlozano@tesla.com>; Gabrielle Montoya
<gmontaya@tesla.com>; David Zweig <dzweig@tesla.com>
**Subject:** RE: Tiara Flynn

Hi Soren,

Just want to make you aware of a situation I dealt with this afternoon involving two West Valley contractors (Tiara Flynn and Jabarre Richard).

I was approached by one of our Tesla Manufacturing Technicians (Jimmy Ramirez) and was told that Tiara made a comment towards Jabarre as she walked away from him. According to Jimmy he heard her say "go back to the jungle n#$$#r".

After multiple 1:1 interviews with Jimmy, Jabarre, and Tiara she did admit to me that she said "go back to the jungle ninga."

4

WV000383
CONFIDENTIAL

Urban dictionary definition for ninga- the combination of the words Nigga and Ninja.

I explained to her that even referring to someone using a slang word with a similar meaning is totally unacceptable.

We had a long talk and I made it very clear that I would be reaching out to her agency for follow up and set my clear expectations of her.

I also gave Jabarre a warning for not focusing on the task at hand. I explained to him how critical our schedule is and these types of side bar conversations only make him and those around him less focused and this can result in poor quality and lost production.

I am requesting follow up from West Valley staffing with both individuals. The team in general is starting to come together very nicely but these types of distractions are unnecessary and will not be tolerated by me or my team.

I will leave Tiara's fate in your hands. You have already received feedback from Sandeep Dhami regarding performance concerns he has had so this situation does not help her.

Please let us know when you speak to both individuals and let us know how you would like to proceed.

Thank you for your time and support

Sent via the Samsung Galaxy S® 6, an AT&T 4G LTE smartphone

-------- Original message --------
From: Sandeep Dhami <sdhami@tesla.com>
Date: 4/14/17 8:56 PM (GMT-08:00)
To: Freddy Rivera <frivera@tesla.com>
Subject: Fwd: Tiara Flynn

Sent from my iPhone

Begin forwarded message:

> **From:** Soren Baird <sbaird@tesla.com>
> **Date:** April 14, 2017 at 2:16:36 PM PDT
> **To:** Sandeep Dhami <sdhami@tesla.com>, westvalleystaffing <westvalleystaffing@tesla.com>
> **Cc:** Ruben Baca <rbaca@tesla.com>, Gabrielle Montoya <gmontaya@tesla.com>
> **Subject: RE: Tiara Flynn**
>
> Hello Sandeep,
>
> Thank you for your email. We will reach out and counsel Tiara on her performance and let her know that Tesla needs to see immediate and sustained improvement.
>
> Can you please advise what her missing punch on Tuesday afternoon should be?

5

WV000384
CONFIDENTIAL

Best Regards,

**Soren Baird** | West Valley Staffing Group | On-Site Program Coordinator
P: 408.505.5342
E: sbaird@tesla.com

**From:** Sandeep Dhami
**Sent:** Friday, April 14, 2017 8:19 AM
**To:** westvalleystaffing <westvalleystaffing@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Gabrielle Montoya <gmontaya@tesla.com>
**Subject:** RE: Tiara Flynn

Team,

Tiara was late today 2 min also she has a missing punch on 4/11/2017 at the end of the shift.



**From:** Sandeep Dhami
**Sent:** Thursday, April 13, 2017 5:56 PM
**To:** westvalleystaffing <westvalleystaffing@tesla.com>
**Cc:** Ruben Baca <rbaca@tesla.com>; Gabrielle Montoya <gmontaya@tesla.com>; David Zweig <dzweig@tesla.com>; Freddy Rivera <frivera@tesla.com>
**Subject:** Tiara Flynn

Team,

We have been seeing a few issues with Tiara Flynn. At first she was on the QC team and the tech of the area would tell me that she would go missing without notifying an tech or process owner and they wouldn't know her whereabouts. She and another associate also had a conflict on the same team and she was asked to try another area (fasteners). On the fasteners team, the tech would tell me the same thing as she would go missing without no one knowing, the tech also stated she would be on her phone constantly as she shouldn't be on the phone during production. Tech also stated that she would tell people that the tech had sent her to do a certain task in which the tech never assigned the task so this is where she would just walk away and use this.  She was later moved to another area (UBM). On 4/13/2017 we had

6

WV000385
CONFIDENTIAL

announced to everyone at SOP that the Tech's or the Process Owners (PO's) need to know if you're leaving the area for anything. On 4/13/2017 she was on her phone 3 times reported by the tech also the same day she was nowhere to be found from 4:45pm – 5:13pm as the tech and I waited in the area. There was a break from 4:15pm to 4:30pm, she had stated she was in the bathroom after break at 4:45pm – 5:13pm. Just a few things I wanted you all to be aware about, we need to see immediate improvement especially her being on the phone during work and walking away from the process without notifying anyone. This is her 3rd team since she has started here. Let me know if you require any additional information.

Thanks,

**Sandeep Dhami| Production Supervisor, Body Center**
45500 Fremont Boulevard | Fremont, CA 94538
c 510.449.1974 | e sdhami@teslamotors.com



WV000386
CONFIDENTIAL

# Exhibit
# 19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--o0o--

DEMETRIC DI-AZ, OWEN DIAZ, and  )
LAMAR PATTERSON,                )
                                )
            Plaintiffs,          )
                                )
        vs.                      )   Case No.
                                )   3:17-cv-06748-WHO
                                )
TESLA, INC. dba TESLA MOTORS,    )
INC.; CITISTAFF SOLUTIONS,       )
INC.; WEST VALLEY STAFFING       )
GROUP; CHARTWELL STAFFING        )
SERVICES, INC.; and DOES 1-50,   )
inclusive,                       )
                                )
            Defendants.          )
_____ )


DEPOSITION OF ROVILLA WETLE

Tuesday, June 5, 2018




Reported by:

KIM Y. ROTHERHAM, CSR No. 7397

```
 1              BE IT REMEMBERED THAT, pursuant to Notice and

 2    Subpoena, on Tuesday, June 5, 2018, commencing at the

 3    hour of 10:11 a.m., thereof, at CALIFORNIA CIVIL RIGHTS

 4    LAW GROUP, 332 San Anselmo Avenue, San Anselmo,

 5    California 94960, before me, KIM Y. ROTHERHAM, CSR No.

 6    7397, State of California, personally appeared:

 7

 8                    ROVILLA WETLE,

 9    called as a witness by the Plaintiffs; who, having been

10    duly sworn by me, was thereupon examined and testified as

11    is hereinafter set forth.

12                    ---o0o---

13              A P P E A R A N C E S

14    For the Plaintiffs, DEMETRIC DI-AZ and OWEN DIAZ:

15         CALIFORNIA CIVIL RIGHTS LAW GROUP
           332 San Anselmo Avenue
16         San Anselmo, California  94960
           415-453-4740
17         415-785-7352 Fax
           navruz@civilrightsca.com
18
           By:  NAVRUZ AVLONI, ESQ.
19              LAWRENCE A. ORGAN, ESQ.

20
      For the Defendant, WEST VALLEY STAFFING GROUP:
21
           PAHL & McCAY, PLC
22         225 West Santa Clara Street, Suite 1500
           San Jose, California  95113-1752
23         408-286-5100
           408-286-5722 Fax
24         fhorton@pahl-mccay.com

25         By:  FENN C. HORTON III, ESQ.
```

```
 1              A P P E A R A N C E S -- (Cont'd)

 2

 3    For the Defendant, TESLA, INC. dba TESLA MOTORS, INC. and
      CITISTAFF SOLUTIONS, INC.:
 4
          CONSTANGY, BROOKS, SMITH & PROPHETE LLP
 5        2029 Century Park East, Suite 1100
          Los Angeles, California  90067
 6        310-909-7775
          424-465-6630 Fax
 7        arutschman@constangy.com

 8        By:  AARON M. RUTSCHMAN, ESQ.

 9

10    Also present:

11        TERESA KOSSAYIAN, Chief Financial Officer, West
                            Valley Staffing Group
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        A.      I meant yes.
 2        Q.      Okay.  Have you, during your time at West
 3   Valley Staffing Group, ever conducted an investigation
 4   into any employee complaints?
 5        A.      Yes.
 6        Q.      And how many investigations have you conducted
 7   into employee complaints?
 8        A.      I don't know.
 9        Q.      More than 10?
10        A.      Yes.
11        Q.      More than 20?
12        A.      Maybe.
13        Q.      More than 30?
14        A.      I don't know.  I guess explain "complaints"
15   because they can be really small, in my mind.
16        Q.      Just -- I'm leaving it, the first question,
17   broad to any complaints made by an employee or raised by
18   an employee.
19        A.      Oh.  Any complaints at all raised by an
20   employee?  Yes, I would say more than 30.
21        Q.      Okay.  Now, did you -- have you ever
22   investigated complaints that were related to, let's say,
23   race harassment?
24        A.      No.
25        Q.      Okay.  Did you ever investigate any complaints
```

1    related to race discrimination?

2        A.    No.

3        Q.    Did you ever investigate any complaints related

4    to retaliation?

5        A.    No.

6        Q.    Did you ever investigate any complaints related

7    to wrongful termination?

8            MR. HORTON:  Objection; vague as to "wrongful

9    termination," calls for a legal conclusion.

10           THE WITNESS:  I'm trying to think if I did or

11   not.  I can't think of a time.

12   BY MS. AVLONI:

13       Q.    Did you ever investigate any complaints related

14   to any sort of harassment complaint?  That could have

15   been, let's say, sex, gender, disability.

16       A.    You're asking me if I -- if I did that?  No.

17       Q.    Okay.  Could you -- could you list the type of

18   complaints that you do recall investigating during your

19   time at West Valley Staffing Group?

20       A.    There are a lot of payroll complaints or

21   complaints that the shift somebody was on wasn't one they

22   wanted to be on.  What other complaints?  They wanted to

23   move up into a different position.  Disagreed with the

24   reasons we gave them on why their assignment was ending.

25   That's what I'm thinking of right now.

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF CALIFORNIA  )
                          )   ss.
 3   COUNTY OF SONOMA     )

 4        I, KIM Y. ROTHERHAM, C.S.R. #7397, hereby certify

 5   that the witness in the foregoing deposition, named to

 6   wit: ROVILLA WETLE, was by me duly sworn to tell the

 7   truth, the whole truth, and nothing but the truth in the

 8   within-entitled cause;

 9        That said deposition was taken in shorthand by me, a

10   certified shorthand reporter, and a disinterested person,

11   at the time and place therein stated; and that the

12   testimony of the said witness was thereafter transcribed

13   under my direction and supervision; that the foregoing

14   transcript constitutes a full, complete, and accurate

15   transcription of my shorthand notes taken of the oral

16   proceedings.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties to the

19   said deposition, nor am I in any way interested in the

20   outcome of this cause, and that I am not related to any

21   of the parties thereto.

22        IN WITNESS WHEREOF, I have hereunto set my hand

23   this 15th day of June, 2018.

24
                         KIM Y. ROTHERHAM
25                  CERTIFIED SHORTHAND REPORTER
```

# Exhibit

# **20**

| Message | |
|---|---|
| **From:** | Arturo Esquer [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ARTURO MAYORALF37] |
| **Sent:** | 4/29/2016 4:21:01 PM |
| **To:** | Erin Marconi [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Emarconi]; Erin Garcia [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Erin Laud0a] |
| **CC:** | Josh Hedges [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Josh Hedgesf66]; Vannha Pham [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Vannha Phuoc Phamb32]; Charles Shin [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Charles Shinaca]; Jose Gomez [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JGomez]; Alfonso Franco [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Afranco] |
| **Subject:** | FW: unacceptable |
| **Attachments:** | 20160429_085145.jpg |

Hi Erin and Erin,

See enclosed (extremely offensive car name), unacceptable and concerning.  Al, Jose are trying to investigate, they might need some support.

Vannha,
Any way we can figure out when this happened?  Anything that can help this investigation you can think of?

Thank you

Arturo

---

**From:** Charles Shin
**Sent:** Friday, April 29, 2016 9:17 AM
**To:** Jose Gomez <JGomez@tesla.com>; Victor Contreras <vcontreras@tesla.com>; Assembly Supervisors <AssemblySupervisors@tesla.com>; assemblyleads <assemblyleads@tesla.com>; Alfonso Franco <afranco@tesla.com>; Saan Saephanh <ssaephanh@tesla.com>; Trey Farmer III <jfarmer@tesla.com>
**Cc:** Arturo Esquer <aesquer@tesla.com>
**Subject:** RE: uacceptable

Al/jose

Do an investigation please

1) Where in process can they add a message (I am assuming either IP or powertrain?)
2) When did that car go through that area

---

**From:** Jose Gomez
**Sent:** Friday, April 29, 2016 9:16 AM
**To:** Victor Contreras <vcontreras@tesla.com>; Assembly Supervisors <AssemblySupervisors@tesla.com>; assemblyleads <assemblyleads@tesla.com>; Alfonso Franco <afranco@tesla.com>; Charles Shin <cshin@tesla.com>; Saan Saephanh <ssaephanh@tesla.com>; Trey Farmer III <jfarmer@tesla.com>
**Cc:** Arturo Esquer <aesquer@tesla.com>
**Subject:** RE: uacceptable

Adding Arturo

CONFIDENTIAL

**From:** Victor Contreras
**Sent:** Friday, April 29, 2016 9:08 AM
**To:** Assembly Supervisors <AssemblySupervisors@tesla.com>; assemblyleads <assemblyleads@tesla.com>; Alfonso Franco <afranco@tesla.com>; Jose Gomez <JGomez@tesla.com>; Charles Shin <cshin@tesla.com>; Saan Saephanh <ssaephanh@tesla.com>; Trey Farmer III <jfarmer@tesla.com>
**Subject:** uacceptable

team,

today at final line 200 while installing our monocam, our associate noticed the Instrument Cluster in this connection. please review picture attached. some associates were offended when this was discovered. this is unacceptable.

Sent from my Verizon, Samsung Galaxy smartphone

CONFIDENTIAL

CONFIDENTIAL



TESLA-0000918

# Exhibit

# 21

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   DEMETRIC DI-AZ, OWEN DIAZ, and      )
     LAMAR PATTERSON,                    )
 6                                       )
                     Plaintiffs,         )
 7                                       )  Case No.
          vs.                            )  3:17-cv-06748-WHO
 8                                       )
     TESLA, INC. dba TESLA MOTORS,       )  Pages 1 - 142
 9   INC.; CITISTAFF SOLUTIONS, INC.;    )
     WEST VALLEY STAFFING GROUP;         )
10   CHARTWELL STAFFING SERVICES, INC.;  )
     and DOES 1-50, inclusive,           )
11                                       )
                     Defendants.         )
12   _____)

13

14

15

16            VIDEO DEPOSITION OF ERIN MARCONI

17               MONDAY, OCTOBER 21, 2019

18                    11:39 A.M.

19

20

21

22

23   REPORTED BY:  LAURA J. MELLINI

24             CSR NO. 8181, RPR, CCRR

25   NDS JOB NO.:  220525
```

1

```
1      APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFFS DEMETRIC DI-AZ AND OWEN DIAZ:

4

5              CALIFORNIA CIVIL RIGHTS LAW GROUP

6              BY:  LAWRENCE A. ORGAN, ESQ.

7              332 SAN ANSELMO AVENUE

8              SAN ANSELMO, CALIFORNIA 94960

9              415.453.4740

10             larry@civilrightsca.com

11

12   FOR DEFENDANTS TESLA, INC. dba TESLA MOTORS, INC.:

13

14             SHEPPARD MULLIN RICHTER & HAMPTON LLP

15             BY:  TRACEY A. KENNEDY, ESQ.

16             333 SOUTH HOPE STREET

17             43RD FLOOR

18             LOS ANGELES, CALIFORNIA 90071-1422

19             213.617.4249

20             tkennedy@sheppardmullin.com

21

22

23

24

25
```

3

```
1    APPEARANCES OF COUNSEL:   (Continued)

2

3    FOR DEFENDANT CITISTAFF SOLUTIONS, INC.:

4

5              (APPEARING TELEPHONICALLY)

6              LAFAYETTE & KUMAGAI LLP

7              BY:  SUSAN KUMAGI, ESQ.

8              1300 CLAY STREET

9              SUITE 810

10             OAKLAND, CALIFORNIA  94612

11             415.357.4600

12             skumagai@lkclaw.com

13

14   FOR DEFENDANT NEXTSOURCE, INC.:

15

16             (APPEARING TELEPHONICALLY)

17             FISHER PHILLIPS

18             BY:  VINCENT ADAMS, ESQ.

19             ONE EMBARCADERO CENTER

20             SUITE 2050

21             SAN FRANCISCO, CALIFORNIA  94111-3712

22             415.490.9000

23             vadams@fisherphillips.com

24

25
```

4

Erin Marconi                                                    October 21, 2019

1    (INDEX CONTINUED)

2

3    ALSO PRESENT:

4

5            GREG CLUBB, VIDEO OPERATOR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                        5

Erin Marconi                                                    October 21, 2019

```
 1        Q    You do not recall ever having investi- --   12:17
 2   strike that.                                           12:17
 3             Do you recall -- strike all that.            12:17
 4             Do you recall ever investigating a claim where   12:17
 5   it was alleged that the n-word was used?               12:17
 6        A    Not specifically.                            12:17
 7        Q    Do you know of any of your colleagues ever   12:18
 8   investigating a situation where the n-word was alleged 12:18
 9   to have been used?                                     12:18
10        A    Know of?                                     12:18
11        Q    Yes.                                         12:18
12        A    Yes.                                         12:18
13        Q    Who was it that you recall of your colleagues 12:18
14   who investigated a claim of use of the n-word?         12:18
15        A    I believe Paul James.                        12:18
16        Q    Okay.  Was Paul James also an HR partner like 12:18
17   you?                                                   12:18
18        A    Correct.                                     12:18
19        Q    Did you discuss the n-word investigation with 12:18
20   Paul James that he did?                                12:19
21        A    No.  He worked night shift, if I recall.  So 12:19
22   if it was something that I might get asked about by a  12:19
23   group that I supported, I might get a heads-up if he was 12:19
24   looking into something.                                12:19
25             And, actually, to correct what I said earlier, 12:19
```

                                                                    37

Erin Marconi                                                        October 21, 2019

```
 1    STATE OF CALIFORNIA            )

 2                                   )  ss.

 3    COUNTY OF LOS ANGELES          )

 4

 5              I, LAURA J. MELLINI, Certified Shorthand

 6    Reporter, Certificate No. 8181, for the State of

 7    California, hereby certify:

 8              I am the deposition officer that

 9    stenographically recorded the testimony in the foregoing

10    deposition;

11              Prior to being examined the deponent was first

12    duly sworn by me;

13              The foregoing transcript is a true record of

14    the testimony given;

15              Before completion of the deposition, review of

16    the transcript [  X  ] was [    ] was not requested.  If

17    requested, any changes made by the deponent (and

18    provided to the reporter) during the period allowed are

19    appended hereto.

20

21    Dated_____.

22

23                      _____

24                              LAURA J. MELLINI

25                              CSR NO. 8181, RPR, CCRR
```

                                                                        141

# Exhibit

# 22

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
       A Limited Liability Partnership
2      Including Professional Corporations
   TRACEY A. KENNEDY, Cal. Bar No. 150782
3  333 South Hope Street, 43rd Floor
   Los Angeles, California  90071-1422
4  Telephone:    213.620.1780
   Facsimile:    213.620.1398
5  Email:        tkennedy@sheppardmullin.com

6  PATRICIA M. JENG, Cal. Bar No. 272262
   REANNE SWAFFORD-HARRIS, Cal. Bar No. 305558
7  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4109
8  Telephone:    415.434.9100
   Facsimile:    415.434.3947
9  Email:        pjeng@sheppardmullin.com
                 rswafford-harris@sheppardmullin.com
10

11  Attorneys for Defendants,
    TESLA, INC. dba TESLA MOTORS, INC.
12

13

14                  UNITED STATES DISTRICT COURT

15                NORTHERN DISTRICT OF CALIFORNIA

16

17  DEMETRIC DI-AZ, OWEN DIAZ, AND       Case No. 3:17-cv-06748-WHO
    LAMAR PATTERSON,
18
                Plaintiffs,              CERTIFICATE OF SERVICE
19
          v.
20
    TESLA, INC. DBA TESLA MOTORS, INC.;
21  CITISTAFF SOLUTIONS, INC.; WEST
    VALLEY STAFFING GROUP;
22  CHARTWELL STAFFING SERVICES,
    INC.; and DOES 1-50, inclusive,,
23                                       Complaint filed:          October 16, 2017
                Defendants.              Amended Complaint Filed: December 26, 2018
24                                       Trial Date:               March 2, 2020

25

26

27

28

                                                  Case No. 3:17-cv-06748-WHO
    SMRH:4816-6198-8521.1                          CERTIFICATE OF SERVICE

**CERTIFICATE OF SERVICE**

*Demetric Di-Az, et al. v. Tesla, Inc., et al.*
USDC, Northern District of CA, Case No. 3:17-cv-06748-WHO

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On October 11, 2019, I served true copies of the following document(s) described as

**DEFENDANT TESLA, INC.'S DOCUMENT PRODUCTION BATES RANGE-STAMPED: TESLA-0000905-TESLA-0001013**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

☒ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred.

☐ **BY FAX TRANSMISSION:** I faxed a copy of the document(s) to the persons at the fax numbers listed in the Service List. The telephone number of the sending facsimile machine was 415.434.3947. The transmission was reported as complete and without error. No error was reported by the fax machine that I used. A transmission report was properly issued by the sending fax machine.

☐ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address lsegura@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ **BY OVERNIGHT DELIVERY:** I enclosed said document(s) in an envelope or package provided by the overnight service carrier and addressed to the persons at the addresses listed in the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight service carrier or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents.

☐ **BY PERSONAL SERVICE:** I personally delivered the document(s) to the person at the addresses listed in the Service List. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

-1-

SMRH:4816-6198-8521.1

Case No. 3:17-cv-06748-WHO
PROOF OF SERVICE

1      I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct.

3

4  _____

    Lucia M. Segura

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:4816-6198-8521.1

**<u>SERVICE LIST</u>**

| | |
|---|---|
| Lawrence A. Organ, Esq.<br>Navruz Avloni, Esq.<br>**CALIFORNIA CIVIL RIGHTS LAW GROUP**<br>332 San Anselmo Avenue<br>San Anselmo, CA 94960<br>Telephone:    415-453-4740<br>Facsimile:    415-785-7352]<br>Email:    larry@civiilrightsca.com<br>    navruz@civilrightsca.com | Attorneys for Plaintiffs<br>DEMETRIC DI-AZ and OWEN DIAZ |
| Gary T. Lafayette, Esq.<br>Cheryl A. Stevens, Esq.<br>**LAFAYETTE & KUMAGAI**<br>1300 Clay Street, Suite 810<br>Oakland, CA 94612<br>Telephone:    415-357-4600<br>Email:    glafayette@lkclaw.com<br>    cstevens@lkclaw.com | Attorneys for Defendant<br>CITISTAFF SOLUTIONS, INC. |
| Jason A. Geller, Esq.<br>Juan C. Araneda, Esq.<br>Aaron D. Langberg, Esq.<br>**FISHER & PHILLIPS LLP**<br>One Embarcadero Center, Suite 2050<br>San Francisco, CA 94111<br>Telephone:    415-490-9000<br>Facsimile:    415-490-9001<br>Email:    jgeller@fisherphillips.com<br>    jaraneda@fisherphillips.com<br>    alangberg@fisherphillips.com | Attorneys for Defendant<br>NEXTSOURCE, INC. |
| Fenn C. Horton III, Esq.<br>Helene Simvoulakis-Panos, Esq.<br>**PAHL & McCAY**<br>225 West Santa Clara Street, Suite 1500<br>San Jose, CA 95113<br>Telephone:    408-286-5110<br>Facsimile:    408-286-5722<br>Email:    fhorton@pahl-mccay.com<br>    hsimvoulakis@pahl-mccay.com | Attorneys for Defendant<br>WEST VALLEY STAFFING GROUP |

Roger M. Mansukhani, Esq.
Craig D. Nickerson, Esq.
Megan L. Hayati, Esq.
Nathan R. Brogden, Esq.
**GORDON REESE SCULLY MANSUKHANI, LLP**
101 W. Broadway, Suite 2000
San Diego, CA 92101
Telephone:      619-696-6700
Facsimile:      619-696-7124
Email:          rmansukhani@grsm.com
                cnickerson@grsm.com
                mhayati@grsm.com
                nbrogden@grsm.com

Attorneys for Defendant
CHARTWELL STAFFING SERVICES

# Exhibit

# 23

| Message | |
|---|---|
| **From:** | Andres Donet [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ANDRES L DONETD49] |
| **Sent:** | 5/21/2016 7:59:25 PM |
| **To:** | Liza Lipson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Liza Lipsonb7a]; Gregory Slettvet [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Gslettvet] |
| **CC:** | Andre' Lalljie [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=User8d52a49b]; Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3]; Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Edward Romeroe38]; James Moffitt [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=James Moffitt94f] |
| **Subject:** | FW: Racism writing the bathroom |
| **Attachments:** | 20160521_105018_resized.jpg |

Graffiti found and cleaned up. Men's RR K-26.

Regards,

**Andres Donet | Facilities Contract Supervisor | Facilities**
45500 Fremont Blvd. | Fremont, CA 94538
c: 650.730.0103| adonet@teslamotors.com



**From:** Roel Kliatchko
**Sent:** Saturday, May 21, 2016 11:13 AM
**To:** Kevin Colvin <kcolvin@tesla.com>; Jonathan Baldoza <jbaldoza@tesla.com>; Rob Lewis <kelewis@tesla.com>; Robin Aylsworth <raylsworth@tesla.com>
**Cc:** buildingservices@teslamotors.com <buildingservices@teslamotors.com>; Matt Pennington <mpennington@tesla.com>
**Subject:** RE: Racism writing the the bathroom

Adding Robin A.

Kevin,

Can you provide nearest column # and what floor?

Building services can we send a Team member for clean up?

Best Regards,

**Roel Kliatchko (SDI) Supervisor**
| 45500 Fremont Blvd. Fremont, CA 94538 |
| Cell: (510) 203-6146 | rkliatchko@teslamotors.com |

CONFIDENTIAL

**From:** Kevin Colvin
**Sent:** Saturday, May 21, 2016 11:02 AM
**To:** Roel Kliatchko; Jonathan Baldoza; Rob Lewis
**Subject:** Racism writing the the bathroom

This is in the bathroom located by the elevator while walking upstairs

The writing says "All niggers must die"


Kevin Colvin
PWT SDU Inverter
Production Associate

CONFIDENTIAL



CONFIDENTIAL

# Exhibit

# 24





# Exhibit

# 25

CALIFORNIA CIVIL RIGHTS LAW GROUP
Lawrence Organ (SBN 175503)
Navruz Avloni (SBN 279556)
332 San Anselmo Avenue
San Anselmo, CA 94960
Tel. (415) 453-4740
Fax (415) 785-7352
Email: larry@civilrightsca.com
        navruz@civilrightsca.com

BRYAN SCHWARTZ LAW
Bryan Schwartz (SBN 209903)
Logan Starr (SBN 305598)
1330 Broadway, Suite 1630
Oakland, California 94612
Tel. (510) 444-9300
Fax (510) 444-9301
Email: bryan@bryanschwartzlaw.com
        logan@bryanschwartzlaw.com

*Attorneys for Plaintiff Marcus Vaughn
and the Putative Class*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA – UNLIMITED JURISDICTION

| | |
|---|---|
| MARCUS VAUGHN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>   vs.<br><br>TESLA, INC. doing business in California as TESLA MOTORS, INC.; and DOES 1 THROUGH 50, INCLUSIVE,<br><br>                    Defendants. | **Case No. RG17882082**<br><br>**DECLARATION OF NATHAN JOHN FRAIM** |

I, Nathan John Fraim, declare as follows:

1.      I am over the age of 18. If called upon to testify, I could and would testify competently as to the facts set forth in this declaration.

2.      I am a Caucasion male. I was employed by Tesla, Inc. ("Tesla") at the Fremont, California Tesla Factory through the Staffing Agency Volt Workforce Solutions from January 30, 2017, until July 31, 2017, when I quit voluntarily.

3.      My job title at Tesla was Production Associate, and I worked on the production floor. I was stationed on the bottom floor near B23 and B27. My primary job duty involved removing products from boxes and delivering those products to the production line. My direct supervisor was Leigh High Gomez.

4.      On April 28, 2017, I saw the following words handwritten on a pamphlet that was posted on a bathroom stall door: "White Power Nigger!" I took a photograph of the graffiti with my cell phone, which I texted to my supervisor Mr. Gomez that same day. A true and correct copy of that photograph is attached hereto as Exhibit 1.

5.      To my knowledge, Mr. Gomez took no steps to investigate the incident, and I was never contacted again by anyone at Tesla concerning my report to Mr. Gomez.

6.      While I was working at Tesla, I frequently heard co-workers who were not African-American casually using the word "Nigga." This term was not directed at me, but I found it very offensive, as no one should have to hear that kind of language at work.


I declare under the penalty of perjury that the foregoing is true and correct.


DATED: November 16, 2017

By: _____
                Nathan John Fraim

# EXHIBIT 1



# Exhibit

# 26

Lawrence A. Organ (SBN 175503)
Navruz Avloni (SBN 279556)
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960-2664
Telephone: (415) 453-4740
Facsimile: (415) 785-7352
larry@civilrightsca.com
navruz@civilrightsca.com

Attorneys for Plaintiffs
MARCUS VAUGHN,
and all others similarly situated.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| MARCUS VAUGHN, individually and on behalf of all others similarly situated, | Case No. RG17882082 |
| Plaintiffs, | |
| v. | **PROOF OF SERVICE** |
| TESLA, INC., doing business in California as TESLA MOTORS, INC.; and DOES 1-10 inclusive, | |
| Defendants. | |

///

///

PROOF OF SERVICE

**PROOF OF SERVICE**

        I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 332 San Anselmo Avenue, San Anselmo, CA 94960.  I served the within documents on January 31, 2020:

- **PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANT'S REQUEST FOR PRODUCTON – SET ONE;**
- **PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FORM INTERROGATORIES – GENERAL;**
- **PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES – SET ONE;**
- **PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANT'S FORM INTERROGATORIES – EMPLOYMENT;**
- **PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S REQUEST FOR ADMISSION – SET ONE;**
- **CD CONTAINING PLAINTIFF'S DOCUMENT PRODUCTION BATES LABELED VAUGHN000001-VAUGHN003612.**

   __xx__         by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Anselmo, California, addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing contained in the affidavit. *[(X) with courtesy copy via electronic mail]*

**PLEASE SEE ATTACHED PROOF OF SERVICE MAILING LIST**

        I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on January 31, 2020, at San Anselmo, California.

Sabrina Grislis

# PROOF OF SERVICE MAILING LIST

*Attorneys for Defendant TESLA, INC.:*

Nancy E. Pritikin, Esq.
Paul S. Cowie, Esq.
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
379 Lytton Avenue
Palo Alto, CA 94301-1479
NPritikin@sheppardmullin.com
pcowie@sheppardmullin.com

Patricia M. Jeng, Esq.
Reanne Swafford-Harris, Esq.
Sami Hasan
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
PJeng@sheppardmullin.com
RSwafford-Harris@sheppardmullin.com
SHasan@sheppardmullin.com

# Exhibit

# 27

5/31/2017



-------- Original message --------
From: Elon Musk <erm@tesla.com>
Date: 5/31/17 4:38 AM (GMT-06:00)
To: Everybody <Everybody@tesla.com>
Subject: Doing the right thing

About four years ago, I sent out an email describing some of the core principles of Tesla. Since then, we have grown from 4,500 people to 33,000, so the vast majority of the company has never received this note. We are redoing the first day orientation and Tesla handbook to more clearly capture and emphasize these points, but I thought I should send this out in advance.

In my email below, please pay particular attention to the first point on the list. Tesla has to be hardcore and demanding, not for the hell of it, but because we are fighting for a good cause against giant, entrenched competitors who just want the status quo to continue. The list of companies that want to kill Tesla is so long, I've lost track – a week doesn't go by without some "Tesla Killer" article. The only way for a little company to prevail against those much larger companies is to work faster, smarter and harder. The passing grade at Tesla is excellence, because it has to be.

However, this does not give license to anyone to be a jerk. It is incredibly important that people look forward to coming

to work in the morning. One of the best feelings in the world is to be part of a team that is fired up to achieve what most industry experts say is impossible! For many companies out there, work is like jail – employees look forward to Friday and dread Monday. That's horrible. We never want to be like that.

Part of not being a huge jerk is considering how someone might feel who is part of an historically less represented group. They have endured difficulties that someone born or raised in a more privileged situation did not. This doesn't mean that there is a different standard of performance or that you can't give critical feedback. You should – doing anything else would be an insult to the hard work it took to get there – but don't ever intentionally allow someone to feel excluded, uncomfortable or unfairly treated. Sometimes these things happen unintentionally, in which case you should apologize.

In fairness, if someone is a jerk to you, but sincerely apologizes, it is important to be thick-skinned and accept that apology. If you are part of a less represented group, you don't get a free pass on being a jerk yourself. We have had a few cases at Tesla where someone in a less represented group was actually given a job or promoted over more qualified highly represented candidates and then decided to sue Tesla for millions of dollars because they felt they weren't promoted enough. That is obviously not cool.

What it comes down to is this: do what would make your parents proud. If you can't look someone you respect in the eye and explain what you did, don't do it.

Thanks,
Elon


**From:** Elon Musk [mailto:elon@teslamotors.com]
**Sent:** Sunday, April 21, 2013 10:18 PM
**To:** Everybody <Everybody@tesla.com>
**Subject:** RE: Communication within Tesla

In the month that followed my email about communication, I made several personnel changes within Tesla. When I say that managers will be asked to leave if they take unreasonable actions to block the free flow of information within the company, I am not kidding. Please take my emails to heart.

A few more issues have come to my attention that are also showstoppers, so let me spell out some other important principles:

1. Tesla has a strict no a* policy – don't want to offend people's sensibilities by using the full word, but I'm sure you can figure it out :) What this means is that any manager who consistently behaves like an a* will, after being given an opportunity to reform, be asked to depart Tesla. This is not to say that you have to be perfect. Almost everyone is an a* some of the time, but it is not ok to be an a* most of the time, particularly for reasons that have nothing to do with the success of our company. In order for Tesla to succeed, we have to work much harder and smarter than the big auto companies or we will not survive, so it is fine to be very demanding, but always try to do so with kindness and respect.

2. If you are a manager (at any level) within Tesla, your team is not there to serve you – you are there to serve your team and help them do the best possible job for the company. This applies to me most of all. You are also expected to work harder than those who report to you and always make sure that their needs are taken care of before yours.

3. Whenever promotions are given out or non-temp employees are let go, a manager is expected to gather the team together and explain why it happened. Your team always needs to know why someone was rewarded or punished, otherwise they don't know how they should change their behavior in the future. If promotions or job terminations are perceived as random or based on favoritism, whether they are or not, it is super demoralizing.

4. This brings me to my final point, which is that managers must always take pains to avoid playing or being perceived to play favorites. This applies to the big things as well as the little things on the job.

In the annual reviews that start next month, not only will be managers grade people on their team, but anyone at Tesla will have the opportunity to submit a review on anyone else. You can review your manager, your coworkers, someone in another dept, your VP – literally anyone. The goal is to provide feedback that makes us a better company. Moreover, you will be able to submit the review at various levels of confidentiality, so that only your manager sees it, only your dept VP or only me. There are almost 4500 people at Tesla, so please only submit a review to me if you think something is going on that really hurts the company or you believe there will be lack of action at the VP level.

The theme of the above rules is simple: just behave like the sort of person you would want as your manager. Tesla must be a fair and just company, where people look forward to coming to work in the morning. Life is too short for anything else.

Thanks,
Elon

---

**From:** Elon Musk
**Sent:** Thursday, March 21, 2013 12:26 PM
**To:** Everybody
**Subject:** Communication within Tesla

There are two schools of thought about how information should flow within companies. By far the most common way is chain of command, which means that you always flow communication through your manager. The problem with this approach is that, while it serves to enhance the power of the manager, it fails to serve the company.

Instead of a problem getting solved quickly, where a person in one dept talks to a person in another dept and makes the right thing happen, people are forced to talk to their manager who talks to their manager who talks to the manager in the other dept who talks to someone on his team. Then the info has to flow back the other way again. This is incredibly dumb. Any manager who allows this to happen, let alone encourages it, will soon find themselves working at another company. No kidding.

Anyone at Tesla can and should email/talk to anyone else according to what they think is the fastest way to solve a problem for the benefit of the whole company. You can talk to your manager's manager without his permission, you can talk directly to a VP in another dept, you can talk to me, you can talk to anyone without anyone else's permission. Moreover, you should consider yourself obligated to do so until the right thing happens. The point here is not random chitchat, but rather ensuring that we execute ultra-fast and well. We obviously cannot compete with the big car companies in size, so we must do so with intelligence and agility.

One final point is that managers should work hard to ensure that they are not creating silos within the company that create an us vs. them mentality or impede communication in any way. This is unfortunately a natural tendency and needs to be actively fought. How can it possibly help Tesla for depts to erect barriers between themselves or see their success as relative within the company instead of collective? We are all in the same boat. Always view yourself as working for the good of the company and never your dept.

Thanks,
Elon

Exhibit

28

**To:** Edward Romero[edromero@teslamotors.com]
**Cc:** Victor Quintero[vquintero@teslamotors.com]; Erin Marconi[emarconi@teslamotors.com]; Garrett, Terri[tgarrett@nextsource.com]
**From:** Jackson, Wayne[wjackson@nextsource.com]
**Sent:** Wed 12/30/2015 8:01:08 PM (UTC)
**Subject:** RE: Personnel Issues

For the other situation I have called and left messages for both Troy and Javier to contact me as soon as possible. I will let you know if I can connect with them today. We do take this seriously and I will do an investigation into these incidents.

**From:** Edward Romero [mailto:edromero@teslamotors.com]
**Sent:** Wednesday, December 30, 2015 3:41 AM
**To:** Jackson, Wayne <wjackson@nextsource.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>; Erin Marconi <emarconi@teslamotors.com>
**Subject:** Personnel Issues

Wayne,

There are two issues that arose today that need to be dealt with.

2. Javier Temores and Troy Dennis:

I was approached by Javier with a complaint about Troy Dennis. He said that Troy Dennis had gotten upset and called him a "nigger". He said that Anthony Neely the night Lead had heard Troy use that word against Javier. I approached Anthony and asked him if he had heard Troy use that word against Javier. Although he hesitated for a moment he did admit that Troy said that against Javier. Anthony said he told Troy that he should not have used that word. I explained to Anthony that it is unacceptable for anyone to use that type of language. I told him I was obligated to report the incident. I told him to try to keep Javier assigned to the other elevator.

Javier Temores is very hurt and feels he cannot work around or near Troy Dennis.

Please look into these two situations.

Thank You,

Edward Romero
Building Services Contract Manager
(510) 648-7393

CONFIDENTIAL

# Exhibit

# 29

Message

| | |
|---|---|
| **From:** | Joshua Mantz [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JOSHUA MANTZ5DC] |
| **Sent:** | 12/16/2015 2:30:58 AM |
| **To:** | Maggie Crosby [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Maggie Crosby9e8]; Paul James [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Paul James9e1] |
| **CC:** | Liza Lipson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Liza Lipsonb7a] |
| **Subject:** | RE: Jeff Henry C03/F1 co worker complaint |

Let's think about it overnight.  Paul is going to go back tonight and speak with the Lead and get his statement.  I'm sitting next to Paul right now, and I'm a bit more inclined to terminate.

**Joshua Mantz** | HR | Tesla Motors, Inc.

45500 Fremont Blvd, Fremont, CA 94538

c 785.307.2465 | jmantz@teslamotors.com

The content of this message is the proprietary and confidential property of Tesla Motors, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

**From:** Maggie Crosby
**Sent:** Tuesday, December 15, 2015 6:23 PM
**To:** Paul James
**Cc:** Joshua Mantz; Liza Lipson
**Subject:** RE: Jeff Henry C03/F1 co worker complaint

Hi Paul,
Thanks for taking this on.  I agree with you that at a minimum we need to issue a final written, but I would suggest that we not take termination off the table.  Their strength as workers is irrelevant.

Josh?

Maggie

**From:** Paul James
**Sent:** Tuesday, December 15, 2015 6:06 PM
**To:** Maggie Crosby <mcrosby@teslamotors.com>
**Cc:** Joshua Mantz <jmantz@teslamotors.com>; Liza Lipson <llipson@teslamotors.com>
**Subject:** RE: Jeff Henry C03/F1 co worker complaint

Hey Maggie,

I managed to conducted the investigation for the confrontation on Chassis 3, Dec 11 2015. Here are my findings:

Jeff Henry
1.  While working on Chassis 3, overheard offensive remarks during a conversion of co-workers using the ("N" word)

CONFIDENTIAL

    a.   Coworker Richard Hayes was speaking across the station with at high volume interjecting the Word "Nigga" while
    b.   Jeff confronted Richard and asked him to refrain from using such language
    c.   Richards responded  with " fuck you nigga you're not my boss" "I will say what I want".
    d.   Jeff then stated that it was unprofessional to use this language in the workplace.
    e.   Richard responded by walking towards Jeff and getting within inches of his face
    f.   Jeff pushed him away lightly; then Richard approached him more aggressively and Jeff pushed him away even harder
    g.   Richard then asked Jeff "do you want to fight?"
    h.   Jeff stated that he did not want to fight, he just didn't appreciate the language used
    i.   Richard then returned to his work station and no further issues occurred after that incident

Richard Hayes

1. Jeff was overreacting, this is common talk on the line and this is the first time Jeff had a problem with it
2. Jeff thinks that he is my boss because he was placed with the acting lead role but he is not.
3. I thought about my actions afterwards and understand that I acted unprofessionally and will be more conscious of my language in the work place.

Their Supervisor Aaron Padron stated that both are great workers and he really doesn't want to move forward with Termination just yet. I would recommend at minimum that we issue a Final Written warning and if this continues, move forward with termination.

Please share your opinion and let me know if you have any further questions. Never a dull moment in Tesla!

Thank you,

**Paul A. James  | HR|** Tesla Motors, Inc.
45500 Fremont Blvd.  |  Fremont, CA 94538
(510) 249-8428 |e  pajames@teslamotors.com

---

**From:** Maggie Crosby
**Sent:** Tuesday, December 15, 2015 2:37 PM
**To:** Paul James
**Subject:** FW: Jeff Henry C03/F1 co worker complaint

---

**From:** Maggie Crosby
**Sent:** Sunday, December 13, 2015 10:07 AM
**To:** Joshua Mantz <jmantz@teslamotors.com>
**Subject:** Re: Jeff Henry C03/F1 co worker complaint

Sounds good!

Sent from my iPhone

On Dec 13, 2015, at 9:53 AM, Joshua Mantz <jmantz@teslamotors.com> wrote:

    Cool- might be a term if everything checks out.  The lead and associate caught me when I was walking by on Friday afternoon, and I asked them to sumarize via email (what he sent is below).  Thanks Maggie :-)

Also- let's pull Liza into this process...it'll be good for her to start seeing the steps of how we approach this, interview people, ect.

Thanks,
Josh

Sent from my iPhone

On Dec 12, 2015, at 2:23 PM, Maggie Crosby <mcrosby@teslamotors.com> wrote:

Yikes. I'll look into this on Monday.

Maggie

On Dec 12, 2015, at 11:18 AM, Joshua Mantz <jmantz@teslamotors.com> wrote:

Thanks for pushing us this information Sergio – we will look into this and follow up on Monday when all other parties are present.  Thanks!  -Josh

**Joshua Mantz** | HR | Tesla Motors, Inc.

45500 Fremont Blvd, Fremont, CA 94538

c 785.307.2465 | jmantz@teslamotors.com

The content of this message is the proprietary and confidential property of Tesla Motors, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

**From:** Sergio Cortes
**Sent:** Friday, December 11, 2015 6:53 PM
**To:** Joshua Mantz
**Cc:** Jeffrey Henry; Alan McCoy
**Subject:** Jeff Henry C03/F1 co worker complaint

Hello my name is Jeff Henry /C03 F1  and this is my story. Today at approximately 3:40pm while working in C3 I heard someone in my work area yelling "NIGGER" within my workstation. I turned and  it was my co-worker Richard Hayes. I quickly sprang into action and calmly let Richard know that that language is not tolerated at Tesla. Richard responded with " fuck you nigger you're not my boss". I responded by reiterating that he shouldn't be yelling obscenities in the workplace. To which he responded " I'll say whatever I want". At this point I reminded Richard I didn't have anything against him but that his behavior was unprofessional. He then approached closer to me and continued to argue with me. I asked him to stop and stated that I was feeling very threatened. As I was working he continued to stand next to me and when I would turn away he would follow to stay within eye sight next to me and continue arguing with me. At that point he had taken this whole

TESLA-0001008

thing personally, and I asked him to please step away and he didn't. so I pushed him away lightly and he got angrier. Then feeling threatened I pushed him hard and told him to stay away. And he started asking if I wanted to fight and I said no, to please keep calm and he refused and then he went back to his station and worked on his car then we had break right after and when he came back he was calm.

CONFIDENTIAL

# Exhibit

# **30**

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                                      REPORTER CERTIFIED
                                           TRANSCRIPT
4    _____

5    DEMETRIC DI-AZ, OWEN DIAZ            No. 3:17-cv-06748-WHO
     and LAMAR PATTERSON, an
6    individual,

7         Plaintiffs,                     **CONFIDENTIAL**

8         vs.

9    TESLA, INC. DBA TESLA
     MOTORS, INC.; CITISTAFF
10   SOLUTIONS, INC.; WEST
     VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING
     SERVICES, INC., and DOES
12   1-10, inclusive,

13        Defendants.
     _____

14

15                CONFIDENTIAL

16              Deposition of

17             LAMAR PATTERSON

18        San Francisco, California

19          Friday, July 26, 2019

20

21

22

23   REPORTED BY:
     Sarah Jean Seitz
24   CSR No. 14175, RPR
     FILE No: 19-29151

25

**Lamar Patterson-Confidential**

```
 1            Deposition of LAMAR PATTERSON, taken on behalf

 2     of Defendants at Four Embarcadero Center, 17th Floor,

 3     San Francisco, California 94111, commencing at 10:12

 4     a.m. on Friday, July 26, 2019, before Sarah Seitz,

 5     Certified Shorthand Reporter No. 14175, RPR.

 6                          APPEARANCES

 7     FOR THE PLAINTIFFS AND THE WITNESS:

 8            CALIFORNIA CIVIL RIGHTS LAW GROUP

 9            BY:  NAVRUZ AVLONI, Attorney at Law

10            332 San Anselmo Avenue

11            San Anselmo, California 94960

12            415-453-4740

13            navruz@civilrightsca.com

14

15     FOR THE DEFENDANT NEXTSOURCE:

16            FISHER PHILLIPS

17            BY:  JUAN C. ARANEDA, Attorney at Law

18            One Embarcadero Center, Suite 2050

19            San Francisco, California 94111

20            415-490-9012

21            jaraneda@fisherphillips.com

22

23

24

25
```

```
 1              APPEARANCES (CONTINUED)
 2    FOR THE DEFENDANT WEST VALLEY STAFFING:
 3         PAHL & MCCAY
 4         BY:  FENN C. HORTON III, Attorney at Law
 5         225 West Santa Clara Street, Suite 1500
 6         San Jose, California 95113-1752
 7         408-286-5100
 8         fhorton@pahl-mccay.com
 9
10    FOR THE DEFENDANT TESLA:
11         SHEPPARD MULLIN RICHTER & HAMPTON LLP
12         BY:  PATRICIA M. JENG, Attorney at Law
13         Four Embarcadero Center, 17th Floor
14         San Francisco, California 94111
15         415-434-9100
16         pjeng@sheppardmullin.com
17
18    FOR THE DEFENDANT CITISTAFF:
19         LAFAYETTE & KUMAGAI
20         BY:  SUSAN T. KUMAGAI, Attorney at Law
21         1300 Clay Street, Suite 810
22         Oakland, California 94612
23         415-357-1600
24         skumagai@lkclaw.com
25
```

```
 1              APPEARANCES (CONTINUED)

 2    ALSO PRESENT:

 3          Jamie Bodiford - Tesla

 4

 5                    ---oOo---

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    of -- this is not Lamar's deposition for his case.  This

2    is really a deposition in the Diaz matter, and he is a

3    witness.  So . . .

4         MS. JENG:  Right.  The plaintiffs in this case

5    have -- had discovery responses saying that

6    Mr. Patterson will be testifying, not just about them,

7    but about his own experience at Tesla.  So I'm entitled

8    to questions regarding his experience at Tesla,

9    including his employment, how it began, how it ended.

10        And I assume he is going to be testifying about

11   that in this case as well.  If he'll stipulate not to,

12   then I'll reconsider, but . . .

13        MS. AVLONI:  If you'll stipulate to using this

14   deposition for his case, then we'll agree to that.  You

15   can ask him whatever you want to.  But the reality is,

16   if he is going to be called in twice for full eight-,

17   nine-hour depositions, that's just harassing.

18        MS. JENG:  Well, if he is going to be

19   testifying about the same things in his case as this

20   case, then I'm entitled to the same answers and

21   questions --

22        MS. AVLONI:  I understand that, but the

23   reality is --

24        MS. JENG:  That is the reality.  Is he going to

25   be testifying --

**Lamar Patterson-Confidential**

1      Q.  Do you recall applying again for the material

2  handler position at Tesla on November 20, 2015?

3      A.  No.

4      Q.  And November 20th, that was before you sent

5  your resume to Owen Diaz; right?

6      A.  Yes.

7      Q.  Do you recall whether you spoke with anybody

8  about the material handler position at that time in

9  November 2015?

10      A.  No.

11      Q.  Do you recall applying for a material handler

12  position with Tesla in -- on May 30th of 2017?

13      A.  No.

14      Q.  Do you have any reason to believe you did not

15  apply for the material handler position at Tesla on

16  May 30, 2017?

17      A.  No.

18      Q.  And then between November 20, 2015, and May 30,

19  2017, is actually when you worked for Chartwell and was

20  staffed at Tesla; right?

21      A.  Yes.

22      Q.  So if you were working at Tesla in 2016 through

23  Chartwell, why were you applying to Tesla again here on

24  May 30, 2017?

25          MS. AVLONI:  Assumes facts not in evidence.

1          THE WITNESS:  I'm not sure.

2   BY MS. JENG:

3       Q.  What do you mean you are not sure?

4       A.  I'm not sure why I would apply if I'm already

5   working there.

6       Q.  Well, when did you stop working at Tesla?

7       A.  Not -- I don't know the exact date.

8       Q.  Uh-huh.  Can you give me an approximate --

9   approximate date?

10      A.  About August.

11      Q.  August 2016?

12      A.  Yes.

13      Q.  Okay.  So you weren't -- you were not working

14  at Tesla as of May 30, 2017; right?

15      A.  Yes.

16      Q.  So why were you applying to work at Tesla again

17  on May 30, 2017?

18          MS. AVLONI:  Assumes facts not in evidence.

19          THE WITNESS:  I don't recall applying.

20  BY MS. JENG:

21      Q.  Okay.  Do you have any reason to believe you

22  did not apply on May 30, 2017?

23      A.  Yes.

24      Q.  What reasons do you have for that belief?

25      A.  Because I don't recall applying.

1    BY MS. JENG:

2         Q.   Do you know anybody named Judy Timbreza?

3         A.   No.

4         Q.   Okay.  Does that name sound familiar at all?

5         A.   No.

6         Q.   Have you ever heard that name?

7         A.   Possibly.

8         Q.   But you don't have any recollection, as you sit

9    here today, of ever hearing that name?

10        A.   No.

11        Q.   Are you familiar with someone named Ramon

12   Martinez?

13        A.   Yes.

14        Q.   Okay.  And who is Mr. Martinez?

15        A.   He worked at Tesla.

16        Q.   When did you first meet him, if you met him?

17        A.   When did I first meet him?

18        Q.   Uh-huh.

19        A.   I don't know.

20        Q.   Did you work with him?

21        A.   No.

22        Q.   How did you know who he was?

23        A.   Just through other employers.

24        Q.   Employers?

25        A.   Well, people that worked there.  Sorry.

Lamar Patterson-Confidential

1      Q.  Okay.  Have you ever met him?

2      A.  Just briefly.

3      Q.  Okay.  Have you ever talked to him?

4      A.  Briefly.

5      Q.  How many times?

6      A.  I don't know how many times.

7      Q.  Was it under five?

8      A.  Possibly.

9      Q.  Do you -- was it over five?

10     A.  It could be about under five.  I'm not

11  positive.

12     Q.  What is your best estimate?

13     A.  Maybe two to three.

14     Q.  Okay.  What did you guys talk about when you

15  met him briefly two to three times?

16     A.  Just work-related stuff.

17     Q.  Okay.  Did you and Mr. Martinez ever talk about

18  non-work-related things?

19     A.  No.

20     Q.  Do you know what agency he worked with?

21     A.  No.

22     Q.  Have you ever witnessed Ramon and Owen

23  interacting?

24     A.  Yes.

25     Q.  Okay.  How many times?

1      A.  Not that many times.

2      Q.  How many would you -- how many would you

3   estimate?

4      A.  Maybe once or twice.

5      Q.  Okay.  Did you and Owen work in the same area

6   as Mr. Martinez?

7      A.  No.

8      Q.  Okay.  How -- do you know what area he was

9   working in?

10      A.  No.

11      Q.  So you saw Ramon and Owen interacting once or

12   twice.  What was their first interaction like that you

13   saw?

14      A.  I don't recall.

15      Q.  You don't recall anything about it?

16      A.  No.

17      Q.  Was it short?

18      A.  Yes.

19      Q.  Okay.  Was it work related?

20      A.  Yes.

21      Q.  Was there anybody else around?

22      A.  I don't recall.

23      Q.  Okay.  And then the second interaction between

24   Ramon and Owen that you saw, do you recall any details

25   about that?

**Lamar Patterson-Confidential**

1    Q.   Okay.   So you left Ed a voicemail?

2    A.   Correct.

3    Q.   And what do you recall saying to Ed in your

4  voicemail?

5    A.   Stating that, you know, the word was used and

6  what was the next step.

7    Q.   Okay.   And did you ever get confirmation that

8  Ed received your voicemail?

9    A.   Not directly.   We never discussed it.   He knew

10  it.   We just never discussed it.

11    Q.   How do you know he knew of it?

12    A.   Well, from the conversations of him receiving

13  an email from me and --

14    Q.   An email or voicemail?

15    A.   I mean -- I'm sorry.

16    Q.   It's okay.

17    A.   A voicemail.   I'm sorry.

18    Q.   And did Ed tell you he got the voicemail?

19    A.   Yes.

20    Q.   And he never discussed anything with you after

21  he said he got the voicemail?

22    A.   No.

23    Q.   And what did you say in response to Ed when Ed

24  said he got the voicemail?

25    A.   So what were the actions going to be.

**Lamar Patterson-Confidential**

1    Q.   And what did Ed say?

2    A.   He would have to talk to his boss or manager.

3    Q.   Okay.   And then what did you say?

4    A.   I said okay.

5    Q.   And what did you say to Owen and Ed about the

6    use of the N-word?

7    A.   How freely it was used and that it wasn't

8    right.   It was very offensive.

9    Q.   Do you recall identifying any specific people

10   that used the N-word?

11   A.   No.   I don't know the exact names of people

12   that used the word, no.

13   Q.   Do you recall anybody specific that you heard

14   using that word?

15   A.   No.

16   Q.   What was the context in which you heard it

17   used?   The N-word?

18   A.   What do you mean?   Can you be more descriptive?

19   Q.   Sure.

20        So you are saying that you heard the N-word

21   used freely, but you don't recall anybody specific using

22   that word.   But how did you -- how was the word used?

23   A.   In an offensive way.

24   Q.   Can you tell me the full sentence that you

25   heard it in or . . .

**Lamar Patterson-Confidential**

1      A.   No.

2      Q.   Okay.   Let's talk about you seeing the N-word

3  written.

4           Where did you see that written?

5      A.   In bathrooms.

6      Q.   Do you recall which bathroom it was?

7      A.   The one closest to the elevator and a few

8  others.

9      Q.   Okay.   Elevator 1?

10     A.   I believe so.

11     Q.   That's where you worked; right?

12     A.   Yeah.

13     Q.   Do you remember where the other bathrooms were

14  that you saw it?

15     A.   They are located all throughout the warehouse,

16  so there's quite a few.

17     Q.   Did you use all the bathrooms in the warehouse?

18     A.   No.   Not all the time.

19     Q.   Okay.   Which ones did you use?   Do you

20  remember?

21     A.   The one that was close to the elevator and

22  downstairs.

23     Q.   So you used two bathrooms?

24     A.   Yeah.   Two, three.

25     Q.   Okay.   Do you remember where the other two were

**Lamar Patterson-Confidential**

1    Q.   Okay.  Do you remember anything else about the

2  written N-word in the bathroom closest to the elevator?

3    A.   No.

4    Q.   What did -- what did it say?  Was it just "N

5  dash word"?  Was it spelled out?

6    A.   It was spelled out.

7    Q.   How was it spelled out?

8    A.   N-I-G-G-E-R.

9    Q.   Do you remember seeing anything else in that

10  bathroom?

11         MS. AVLONI:  Vague and ambiguous.  Overbroad.

12         MS. JENG:  That was -- sorry.  Let me re-ask

13  that question.

14  BY MS. JENG:

15    Q.   Do you remember seeing anything else in the

16  bathroom closest to Elevator 1 that you found offensive?

17    A.   There was a Nazi sign.

18    Q.   Okay.  Anything else?

19    A.   That's it that I can recall.

20    Q.   Okay.  Did you see the Nazi sign the same time

21  you saw the N-word?

22    A.   Yes.

23    Q.   And do you recall generally what date that was?

24    A.   I'm not sure exactly the date.

25    Q.   Okay.  Was it towards the beginning of your

**Lamar Patterson-Confidential**

```
 1        A.   Because it is required.

 2        Q.   Was this to recertify you as a forklift driver?

 3        A.   Yes.

 4        Q.   You mentioned earlier that you got a written

 5   write-up for, I guess, driving the forklift into the

 6   elevator door; is that correct?

 7        A.   Yes.

 8        Q.   Who gave you that write-up?

 9        A.   Who gave it to me?

10        Q.   Yes.

11             MS. AVLONI:  If you know.

12             THE WITNESS:  I'm not sure exactly who gave it

13   to me.

14   BY MR. ARANEDA:

15        Q.   Did someone discuss it with you?

16        A.   Just my supervisor.

17        Q.   Who was that?

18        A.   Well, Owen is my lead, so it would be Ed.

19        Q.   Okay.  So Ed discussed the write-up with you?

20        A.   Yes.

21        Q.   Okay.  Earlier today it was asked of you if you

22   communicated with Wayne Jackson.  Did you know Wayne

23   Jackson when you worked at Tesla?

24        A.   No.

25        Q.   You never met someone by the name of Wayne
```

```
 1              CERTIFICATE OF REPORTER
 2          I, SARAH J. SEITZ, CSR No. 14175, RPR, certify:
 3    That the foregoing proceedings were taken before me at
 4    the time and place herein set forth; at which time the
 5    witness was duly sworn; and that the transcript is a
 6    true record of the testimony so given.
 7          Witness review, correction, and signature was
 8    (X) By code.                (X) Requested.
 9    ( ) Waived.                 ( ) Not requested.
10    ( ) Not handled by the deposition officer due to party
11    stipulation.
12
13          The dismantling, unsealing, or unbinding of the
14    original transcript will render the reporter's
15    certificate null and void.
16          I further certify that I am not financially
17    interested in the action, and I am not a relative or
18    employee of any attorney of the parties, nor of any of
19    the parties.
20          Dated this 6th day of August, 2019.
21
22
23    _____
24    SARAH J. SEITZ, CSR No. 14175, RPR
25
```

# Exhibit

# **31**



351 California Street, Suite 200
San Francisco, CA 94104
310.256.3083

arutschman@constangy.com

November 15, 2018

**VIA U.S. MAIL**

Lawrence A. Organ, Esq.
Navruz Avloni, Esq.
California Civil Rights Law Group
332 San Anselmo Avenue
San Anselmo, CA 94960

   **Re:** ***Demetric Di-az, et al. v. Tesla, Inc. dba Tesla Motors, Inc.***
      USDC Northern District of California Case No.: 3:17-cv-06748-WHO

Counsel:

   Enclosed, please find a notice for the deposition of Lamar Patterson in connection with the above-reference lawsuit. Please let us know at your earliest opportunity if you do not represent Mr. Patterson for purposes of this lawsuit so that we can issue a subpoena as appropriate. Please also let us know if you are not available on the noticed date of January 10, 2019 and we will meet and confer to determine a mutually agreeable date in advance of the discovery cutoff.

           Very truly yours,

           Aaron M. Rutschman

Enclosures

# Exhibit

# 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

DEMETRIC DIAZ, OWEN DIAZ AND        )
LAMAR PATTERSON,                    )
                                    )
                Plaintiffs,         )CASE NO.
                                    )3:17-cv-06748-WHO
        vs.                         )
                                    )
TESLA, INC., DBA TESLA MOTORS,      )
INC.; CITISTAFF SOLUTIONS, INC.;    )
WEST VALLEY STAFFING GROUP;         )
CHARTWELL STAFFING SERVICES,        )
INC.; AND DOES 1-50, INCLUSIVE,     )
                                    )
                Defendants.         )
_____)

VIDEOTAPED DEPOSITION OF TAMOTSU KAWASAKI

DATE:        OCTOBER 9, 2019

TIME:        2:05 P.M.

LOCATION:    CALIFORNIA CIVIL RIGHTS LAW GROUP
             180 GRAND AVENUE, SUITE 1380
             OAKLAND, CALIFORNIA

REPORTED BY:  ANGIE M. MATERAZZI
              Certified Shorthand Reporter
              License No. 13116

```
 1   APPEARANCES:
 2
         FOR THE PLAINTIFFS:
 3
             BY:  LAWRENCE A. ORGAN, ESQ.
 4           CALIFORNIA CIVIL RIGHTS LAW GROUP
             332 SAN ANSELMO AVENUE
 5           SAN ANSELMO, CALIFORNIA 94960
             (415)453-4720
 6           LARRY@CIVILRIGHTSCA.COM
 7
 8       FOR THE DEFENDANTS, TESLA MOTORS:
 9           BY:  PATRICIA M. JENG, ESQ.
             SHEPPARD MULLIN
10           FOUR EMBARCADERO CENTER, 17TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94111
11           (415)434-9100
             PJENG@SHEPPARDMULLIN.COM
12
13       FOR DEFENDANTS, CITISTAFF SOLUTIONS:
14           BY:  SUSAN T. KUMAGAI, ESQ.
             LAFAYETTE & KUMAGAI
15           1300 CLAY STREET, SUITE 810
             OAKLAND, CALIFORNIA 94612
16           (415)357-4600
             SKUMAGAI@LKCLAW.COM
17
18       FOR DEFENDANTS, NEXTSOURCE:
19           BY:  JUAN C. ARANEDA, ESQ.
             FISHER PHILLIPS
20           ONE EMBARCADERO CENTER, SUITE 2050
             SAN FRANCISCO, CALIFORNIA 94111
21           (415)490-9000
             JARANEDA@FISHERPHILLIPS.COM
22
23
24
25
```

**Page 2**

```
 1    is 3:35.
 2              (Off the record at 3:35 p.m. and back on
 3               the record at 3:37 p.m.)
 4              MR. ORGAN:  Okay.  We're back on the record.
 5    The time is 3:37.
 6    BY MR. ORGAN:
 7         Q.   Did -- when you were walking around the
 8    facility, did you ever hear anyone using the N-word,
 9    even if you can't identify them, did you hear that word?
10         A.   I mean, I heard it all the over the facility.
11    I mean, it's -- there's a bunch of staffing companies,
12    man.  I mean, you had -- you had a range of people, man.
13    Staffing companies hire -- you go to a staffing company
14    because you can't get a job, per se, like a -- I guess a
15    real person or whatever, you have a background, whatever
16    it is.  I mean, we filtered through a lot of people.
17    I'm not knocking people for what they do, but it's a
18    staffing agency, per se.  So you got a wide arrange of
19    people.
20              Like I said, in our age, that word gets thrown
21    around very causally.  Now, if you -- there is tones the
22    way you say it and what it is, but -- I mean, I've heard
23    it thrown around there, yeah.
24         Q.   How -- how often do you think you heard the
25    N-word at the Tesla factory?
```

```
 1   at NextSource?
 2        A.   No.   I -- what -- what do you mean by that?
 3   You got to rephrase that.
 4        Q.   Sure.   Was anyone at NextSource informed of
 5   the incident between Mr. Ramon Martinez and Mr. Owen
 6   Diaz?
 7        A.   Not by me.  I don't -- I can't tell by anybody
 8   else but not by me.   I didn't -- don't have -- don't
 9   know anybody at NextSource or e-mail chain.
10             Like I said, my e-mails always went to Victor,
11   Jaime and Ed, when Ed came.  Before that, it was Victor
12   and Jaime.
13        Q.   You testified that you heard the N-word thrown
14   around, but you did not think anything of this.
15             What did you -- what did you mean by that?
16        A.   It -- I mean, I drive around the building,
17   people are -- whatever, they're on break, they're in the
18   cafeteria, they're joking around with each other, you
19   know, they're saying the N-word to each other, maybe in
20   a cool way or whatever to them, whatever it is.
21             I -- just -- it -- it didn't recollect to me
22   that that wasn't right or I should say something or
23   whatever.   It -- like I said, that had nothing to do
24   with me.   It wasn't hurting me, it wasn't hurting my
25   people in doing their job.   They weren't my employees.
```

1   **It didn't affect me.  So I just thought nothing of it.**

2   **It's like walking down the street right now hearing**

3   **somebody saying it.  You're not going to think twice,**

4   **you're not going to stop.**

5       Q.   Did you -- did you -- did you think nothing of

6   it because you heard it sort of more of a greeting

7   between people?  Is that what you're saying?

8       **A.   It was -- it wasn't like an argument tone, it**

9   **wasn't in an aggressive tone, so.**

10      Q.   Did you -- did you believe it was not being

11  used in an offensive manner?

12      **A.   Yes --**

13           MR. ORGAN:  Objection, assume facts not in

14  evidence, calls for speculation.

15  BY MR. ARANEDA:

16      Q.   Did you ever hear Mr. Diaz use the N-word?

17      **A.   No.**

18      Q.   You -- you testified earlier that you spoke

19  with Mr. Organ's office, correct?

20      **A.   (No audible response.)**

21      Q.   How long did you -- was that in an person --

22  strike that.

23           The conversation that you had with Mr. Organ's

24  office, was that in an person conversation or over the

25  telephone?

1                    CERTIFICATE OF DEPOSITION OFFICER

2

3          I, ANGIE M. MATERAZZI, CSR No. 13116, duly

4    authorized to administer oaths Pursuant to Section

5    2093(b) of the California Code of Civil Procedure,

6    hereby certify that the witness in the foregoing

7    deposition was by me duly sworn to testify the truth,

8    the whole truth and nothing but the truth in the

9    within-entitled cause; that said deposition was taken at

10   the time and place therein stated; that the testimony of

11   the said witness was reported by me and thereafter

12   transcribed by me or under my direction into

13   typewriting; that the foregoing is a full, complete and

14   true record of said testimony; and that the witness was

15   given an opportunity to read and correct said deposition

16   and to subscribe the same.

17          I further certify that I am not of counsel nor

18   attorney for either or any of the parties in the

19   deposition and caption named, or in any way interested

20   in the outcome of the cause named in said caption.

21          I hereby certify this copy is a true and
     exact copy of the original.

22

23          _____

24          ANGIE M. MATERAZZI, CSR 13116

25   Date:  _____

# Exhibit

# 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - -

DEMETRIC DIAZ, OWEN DIAZ, and          )

LAMAR PATTERSON,                       )

             Plaintiffs,         )   CASE NO.

vs.                                    )   3:17-CV-06748-WHO

TESLA, INC. dba TESLA MOTORS,          )

INC.; CITISTAFF SOLUTIONS,             )

INC.; WEST VALLEY STAFFING             )

GROUP; CHARTWELL STAFFING              )

SERVICES, INC.; and DOES 1-50,         )

inclusive,                             )

             Defendants.         )

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF MICHAEL JOHN WHEELER

WEDNESDAY, JUNE 12, 2019

Reported by:

BY:  MELINDA M. SELLERS, CSR# 10686, RMR, CRC, CRR, CCRR

1

2

3

4

5

6

7

8

9     Deposition of MICHAEL JOHN WHEELER, taken on

10  behalf of PLAINTIFFS, at 180 Grand Ave., Suite 1380,

11  Oakland, California, commencing at 12:18 p.m.,

12  WEDNESDAY, JUNE 12, 2019, before Melinda M. Sellers,

13  Certified Shorthand Reporter No. 10686, pursuant to

14  Notice.

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3        CALIFORNIA CIVIL RIGHTS LAW GROUP

 4        BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW

 5        332 San Anselmo Avenue

 6        San Anselmo, California 94960-2664

 7        Telephone:  (415) 453-4740

 8        Email:  larry@civilrightsca.com

 9

10   FOR DEFENDANT TESLA, INC.:

11        SHEPPARD MULLIN RICHTER & HAMPTON LLP

12        BY:  PATRICIA M. JENG, ATTORNEY AT LAW

13        Four Embarcadero Center, 17th Floor

14        San Francisco, California 94111-4109

15        Telephone:  (415) 434-9100

16        Email:  pjeng@sheppardmullin.com

17

18   FOR DEFENDANT NEXTSOURCE, INC.:

19        FISHER PHILLIPS LLP

20        BY:  VINCENT J. ADAMS, ATTORNEY AT LAW

21        One Embarcadero Center, Suite 2050

22        San Francisco, California 94111

23        Telephone:  (415) 490-9036

24        Email:  vadams@fisherphillips.com

25
```

```
 1   APPEARANCES OF COUNSEL (CONTINUED):

 2   FOR DEFENDANT CITISTAFF SOLUTIONS, INC.:

 3       LAFAYETTE & KUMAGAI

 4       BY:  SUSAN T. KUMAGAI, ATTORNEY AT LAW

 5       1300 Clay Street, Suite 810

 6       Oakland, California 94612

 7       Telephone:  (415) 357-4600

 8       Email:  skumagai@lkclaw.com

 9

10   ALSO PRESENT:

11       SAJA SPEARMAN, INTERN/VIDEOGRAPHER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **A.    Mm-hmm.**

2    Q.   Is that right?

3    **A.    Yes.**

4    Q.   And I think we said that was in either the

5    September/October 2015 time frame that you moved up

6    to supervisor --

7    **A.    Yes.**

8    Q.   -- is that right?

9         Okay.  And when you moved up to supervisor,

10   the supervisor position wasn't necessarily an

11   employee or a direct employee of Tesla, right?

12   **A.    No.**

13   Q.   And tell me what the job duties were of the

14   supervisor position?

15   **A.    So I managed the other 22 employees that**

16   **worked graveyard with me, making sure that they were**

17   **on time, they were following the protocols, safety,**

18   **lunch times were monitored, putting together plans**

19   **and working with Tesla employees to make the**

20   **recycling process better.  And then, of course,**

21   **disciplinary.**

22   Q.   Okay.  So you would do, like, performance

23   appraisals or things like that?

24   **A.    I would do all the way up to termination.**

25   Q.   As the supervisor, did you have authority

```
 1    to terminate --

 2        A.   Yes.

 3        Q.   -- people under you?

 4        A.   Mm-hmm.   There are a few, yes, employees

 5    that I did have to ask to leave.

 6        Q.   Okay.  And when you asked people to leave,

 7    did Tesla have input on that process?

 8        A.   Josue and that circle, upper circle, yes,

 9    they could.  For the most part anyone that I asked

10    to leave was a pretty serious offense.

11        Q.   Okay.  But in terms of terminating

12    employees, you would always consult with the -- the

13    managers from Tesla; is that right?

14        A.   No.  I would talk to -- I'd send the emails

15    out to the appropriate channels, but very rarely did

16    they respond.

17        Q.   Okay.

18        A.   A lot of those cases at Tesla are

19    cut-and-dry.  We have people that bring guns to

20    Tesla.  We have people that bring cocaine to Tesla.

21    We have people fornicating at Tesla.  So it's --

22    it's usually an easy fix.

23        Q.   Okay.  In terms of the policies that you

24    were enforcing as the supervisor in the recycling --

25    is it okay if I call it recycling?
```

 1   that -- tell me what that might mean, if you know.

 2       A.   I wouldn't say the operators were

 3   recycling.

 4       Q.   Okay.

 5       A.   They literally stayed in the elevator all

 6   day, taking Tesla products and recycling products

 7   upstairs and downstairs --

 8       Q.   Okay.

 9       A.   -- but never did they need to move anything

10   other than off or onto the elevator.  So they did

11   not break down boxes or sort or anything of that

12   caliber.

13       Q.   Okay.  Did you actually supervise Owen Diaz

14   in any way?

15       A.   I was above Owen.  I never needed to do

16   more than ask him, "Hey, can you bring something

17   down?  Can you take this up?"

18       Q.   Okay.  So you had an ability to at least

19   direct Owen's work, but you didn't have

20   responsibility for his -- for -- direct supervision

21   of his work?  Or tell me what your leadership was.

22       A.   So I was technically Owen's superior.

23       Q.   Okay.

24       A.   And if I needed him to do something, that

25   would have been the chain of command.

```
 1      Q.   Okay.  And then you sat in human feces?

 2      A.   Slid right into -- I don't know what type.

 3      Q.   Okay.

 4      A.   I didn't --

 5      Q.   Okay.  You didn't test it?

 6      A.   No.

 7      Q.   Okay.  So you sat on feces that had been

 8   put on your seat; is that right?

 9      A.   Correct.

10      Q.   Then after this happened you sent an email

11   to Victor Quintero, to security, and to others?

12      A.   To everybody.

13      Q.   Okay.

14      A.   The whole management because I was -- I was

15   enrage -- I was so -- like, I was very upset.  I had

16   gone to lunch, came back.

17           And what upset me even more is security

18   said, "We can't see anything.  We can't see where

19   your car was parked," which I know for a fact is a

20   lie because at the front of the Tesla building, the

21   main facility, Elon has his speedsters -- his

22   Roadsters there, the main ones, his first cars.  My

23   car was parked within 10 to 15 feet of those cars at

24   the charging station that's right there.  So --

25      Q.   Is it like a golf cart?  Is that what it --
```

1     A.   It's not a golf cart with a top on it, but
2   it was a green cart with a grill and then a black
3   bed for the back.
4     Q.   That you could carry things around in?
5     A.   Yes.
6     Q.   Okay.  After you sent the email to Victor
7   Quintero, did you ever get any kind of response from
8   him about the feces in your seat?
9     A.   Not that I remember.  I remember security
10   said there's nothing -- "We can't see anything."
11          And I'm pretty sure I threw a stink about
12   that.  I don't know for how long after.  Not, like,
13   anything crazy.  I didn't go, "Oh.  Was it you?  Was
14   it you?"  No.
15          But I do remember trying to push more to
16   see what was -- like, what was going on.
17     Q.   And you took pictures of the feces in your
18   cart?
19     A.   I did.
20     Q.   Right.
21     A.   On the Tesla phone.
22     Q.   And you sent copies of the pictures to
23   Victor Quintero?
24     A.   Should be in the email.
25     Q.   Okay.

 1    **threatened to kill him?**

 2        Q.    Yeah.

 3        **A.    Is that the one?**

 4        Q.    Yeah.

 5        **A.    Okay.**

 6        Q.    You were aware of that --

 7        **A.    I was aware of that situation, yes.**

 8        Q.    You were also aware that Owen had

 9    complained previously that Ramon Martinez had

10    threatened him, correct?

11        **A.    I do not recall that.**

12        Q.    Okay.   Now, in addition to you, Owen also

13    had other supervisors; is that correct?

14        **A.    It would have been Ramon.**

15        Q.    Ramon Martinez?

16        **A.    And Israel, the swing shift.**

17        Q.    Okay.

18        **A.    Because I want to say Owen worked from**

19    **6:00 to 6:00.**

20        Q.    Yeah.

21        **A.    So he fell on to two different shifts.**

22        Q.    Okay.   So because Owen worked 6:00 to 6:00,

23    he had multiple supervisors; is that correct?

24        **A.    Correct.**

25        Q.    And those supervisors included yourself; is

1   STATE OF CALIFORNIA        )

2                             )       ss

3   COUNTY OF CALAVERAS        )

4           I hereby certify that the witness in the

5   foregoing deposition of MICHAEL JOHN WHEELER was by

6   me duly sworn to testify to the truth, the whole

7   truth, and nothing but the truth in the

8   within-entitled cause; that said deposition was taken

9   at the time and place herein named; that the

10  deposition is a true record of the witness's

11  testimony as reported by me, a duly certified

12  shorthand reporter and a disinterested person, and

13  was thereafter transcribed into typewriting by

14  computer.

15          I further certify that I am not interested

16  in the outcome of the said action, nor connected

17  with, nor related to any of the parties in said

18  action, nor to their respective counsel.

19          IN WITNESS WHEREOF, I have hereunto set my

20  hand this 24th day of June, 2019.

21

22

23          _____

24          MELINDA M. SELLERS, CSR NO. 10686

25          STATE OF CALIFORNIA

# Exhibit

# **34**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

                    Plaintiffs,

                                        No. 3:17-cv-06748-WHO

vs.

TESLA, INC. dba TESLA MOTORS,
INC.; CITISTAFF SOLUTIONS,
INC.; WEST VALLEY STAFFING
GROUP; CHARTWELL STAFFING
SERVICES, INC.; NEXTSOURCE,
INC.; and DOES 1-50,
inclusive,

                    Defendants.
_____/

DEPOSITION OF WAYNE JACKSON

Friday, May 17, 2019

Reported by:  Patricia Rosinski, CSR #4555

Job No. 13571

```
 1                  A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         CALIFORNIA CIVIL RIGHTS LAW GROUP
           By:  LAWRENCE A. ORGAN
 5              Attorney at Law
           332 San Anselmo Avenue
 6         San Anselmo, California 94960
           (415) 453-4740
 7         larry@civilrightsca.com

 8

 9    FOR THE DEFENDANT WEST VALLEY STAFFING GROUP:

10         PAHL & MCCAY
           By:  FENN C. HORTON, III
11              Attorney at Law
           225 West Santa Clara, Suite 1500
12         San Jose, California 95113
           (408) 286-5100
13         fhorton@pahl-mccay.com

14

15    FOR THE DEFENDANT NEXTSOURCE, INC.:

16         FISHER & PHILLIPS
           By:  JUAN C. ARANEDA
17              Attorney at Law
           One Embarcadero Center, Suite 2050
18         San Francisco, California 94111
           (415) 490-9000
19         jaraneda@fisherphillips.com

20

21    FOR THE DEFENDANT TESLA INC. dba TESLA MOTORS INC.:

22         SHEPPARD, MULLIN, RICHTER & HAMPTON
           By:  PATRICIA M. JENG
23              Attorney at Law
           Four Embarcadero Center, 17th Floor
24         San Francisco, California 94111
           (415) 434-9100
25         pjeng@sheppardmullin.com
```

```
 1              A P P E A R A N C E S (continued)

 2

 3   FOR THE DEFENDANT CHARTWELL STAFFING SERVICES, INC.:

 4        LAFAYETTE & KUMAGAI LLP
          By:  CHERYL A. STEVENS
 5             Attorney at Law
          1300 Clay Street, Suite 810
 6        Oakland, California 94612
          (415) 357-4600
 7        cstevens@lkclaw.com

 8

 9

10

11
                         ---oOo---
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

WAYNE JACKSON
May 17, 2019

```
 1     right?  Any version of the N word?
 2        A.    I don't like the word, period, but, you know, I
 3     understand a little more why they do it.  I just wish
 4     they wouldn't.
 5        Q.    Right.
 6              And did you ever communicate to anybody at,
 7     like, Tesla human resources or anything like that about
 8     the fact that you're hearing --
 9        A.    No, sir.
10        Q.    -- A version of the N word?
11        A.    No, sir, I did not.
12        Q.    Did you talk to the two -- the two
13     Asian-American people who you overheard where you have
14     the specific recollection about them saying, What's up,
15     my N word with an A, did you talk to them about the
16     fact --
17        A.    Yes.
18        Q.    -- that they had used it?
19        A.    Yes, sir.
20              THE REPORTER:  Wait a minute.
21              THE WITNESS:  Sorry.
22              MR. ORGAN:  Q.  And what did you tell them in
23     terms of after you heard them say -- use the A version
24     of the N word?
25        A.    I just basically let them know, you guys
```

Bridget Mattos & Associates
(415)747-8710

```
 1      be having just common conversations.
 2              Like I said, I don't -- I honestly don't feel
 3      like they were trying to offend anybody.  It's just kind
 4      of what the culture has evolved into as of late.
 5              It's unfortunate, but I don't necessarily feel
 6      they were trying to say it in an inoffensive way.
 7      Q.      Right.
 8              They may not have been intending to be
 9      offensive, but, certainly, from your perspective --
10      A.      Can I --
11      Q.      Sure.
12      A.      She's calling me.
13              MR. HORTON:  Take a quick break?
14              MR. ORGAN:  Sure.
15              (Whereupon, a recess was held from
16              1:29 p.m. to 1:32 p.m.)
17              MR. ORGAN:  Back on the record.
18      Q.      In terms of the areas that you heard the
19      N word, you said in the floor area typically near the
20      satellite cafeterias.
21              Is that correct?
22      A.      Yes, sir, where the people would be coming for
23      lunch and they'd be walking in groups talking, things
24      like that.
25      Q.      And in terms of -- I think the question I was
```

1    going to ask you was, you mentioned that you didn't

2    think that the workers who you overheard were intending

3    it to be offensive, but, certainly, as an

4    African-American male, any time anyone uses even -- the

5    A version of the N word, that's offensive to you, isn't

6    it?

7       **A.    I wouldn't say that.  To be honest, a lot of**

8    **African-Americans use that word amongst each other.**

9       Q.    Right.

10          But when an African-American uses that word,

11   the N word, that's different than when people who aren't

12   African-Americans use the word; right?

13      **A.    Once again, it depends on which version they're**

14   **using.**

15      Q.    Right.

16          But even the A version of the N word is

17   offensive to African-Americans if someone who's not

18   African-American is using it; right?

19      **A.    It depends, once again, on the context of how**

20   **they're using it.**

21      Q.    Okay.

22      **A.    It is offensive, but, like I said, it depends**

23   **on how they're using it, you know.**

24      Q.    Well, it's not something that should be used in

25   the workplace --

```
 1                    REPORTER'S CERTIFICATE

 2     STATE OF CALIFORNIA        )
                                  )  ss.
 3     COUNTY OF MARIN            )

 4              I, PATRICIA ROSINSKI, hereby certify:

 5              That I am a Certified Shorthand Reporter in the

 6     State of California.

 7              That prior to being examined, WAYNE JACKSON,

 8     the witness named in the foregoing deposition, was by me

 9     duly sworn to testify the truth, the whole truth, and

10     nothing but the truth;

11              That said deposition was taken pursuant to

12     Notice of Deposition and agreement between the parties

13     at the time and place therein set forth and was taken

14     down by me in stenotype and thereafter transcribed by me

15     by computer and that the deposition is a true record of

16     the testimony given by the witness.

17              I further certify that I am neither counsel for

18     either, nor related in any way to any party to said

19     action, nor otherwise interested in the result or

20     outcome thereof.

21              Pursuant to Federal Rules of Civil Procedure,

22     Rule 30(e), review of the transcript was not requested

23     before the completion of the deposition.
               _____
24               PATRICIA ROSINSKI, CSR No. 4555

25                     May 28, 2019
```

Bridget Mattos & Associates
(415)747-8710