LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
NAVRUZ AVLONI (SBN 279556)
navruz@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:    (415)-453-7352
Facsimile:    (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
**ALEXANDER MORRISON + FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:    (310) 394-0888
Facsimile:    (310) 394-0811

Attorneys for Plaintiffs,
OWEN DIAZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON, | Case No. 3:17-cv-06748-WHO |
|---|---|
| Plaintiffs, | **DECLARATION OF CIMONE A. NUNLEY PLAINTIFF'S OPPOSITION TO DEFENDANT TESLA, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(a)** |
| v. | |
| TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive, | |
| Defendants. | Trial Date: September 27, 2020<br>Complaint filed: October 16, 2017 |

I, Cimone A. Nunley, hereby declare as follows:

1.  I am an attorney licensed to practice law in the State of California. I am an attorney with the California Civil Rights Law Group, attorneys of record for Plaintiff Owen Diaz in this action. I submit this declaration in support of Plaintiff's Opposition to Defendant Tesla, Inc.'s Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(a). I have personal knowledge of the facts stated herein and if called upon to testify, I could and would competently testify thereto, except as to those matters stated on information and belief.

2.  Attached hereto as Exhibit 1 is a true and correct copy of Plaintiff's Revised Designation of Deposition Testimony of Kevin McGinn with Defendant's Objections and/or Counterdesignations filed in this matter.

3.  Attached hereto as Exhibit 2 is a true and correct copy of excerpts of Volume 1 (September 27, 2021) trial transcript in this matter.

4.  Attached hereto as Exhibit 3 is a true and correct copy of excerpts of Volume 5 (October 1, 2021) trial transcript in this matter.

5.  Attached hereto as Exhibit 4 is a true and correct copy of excerpts of Volume 3 (September 29, 2021) trial transcript in this matter.

6.  Attached hereto as Exhibit 5 is a true and correct copy of Trial Exhibit 293, admitted into evidence on September 29, 2021 during the course of trial in this matter.

7.  Attached hereto as Exhibit 6 is a true and correct copy of Trial Exhibit 222, admitted into evidence on September 27, 2021 during the course of trial in this matter.

8.  Attached hereto as Exhibit 7 is a true and correct copy of Trial Exhibit 320, admitted into evidence on September 29, 2021 during the course of trial in this matter.

9.  Attached hereto as Exhibit 8 is a true and correct copy of Plaintiff's Revised Proposed Discovery Designations, read into evidence on September 30, 2021 during the course of trial in this matter.

10. Attached hereto as Exhibit 9 is a true and correct copy of Trial Exhibit 3, admitted into evidence on September 30, 2021 during the course of trial in this matter.

Dated:      September 27, 2021

J. Bernard Alexander
Lawrence A. Organ
Navruz Avloni
Cimone A. Nunley
Attorneys for Plaintiff
OWEN DIAZ

# Exhibit

# 1

LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
NAVRUZ AVLONI (SBN 279556)
navruz@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:     (415)-453-7352
Facsimile:     (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
**ALEXANDER KRAKOW + GLICK LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:     (310) 394-0888
Facsimile:     (310) 394-0811

Attorneys for Plaintiffs,
DEMETRIC DI-AZ and OWEN DIAZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON,<br><br>        Plaintiffs,<br><br>     v.<br><br>TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive,<br><br>        Defendants. | Case No. 3:17-cv-06748-WHO<br><br>**PLAINTIFFS' REVISED DESIGNATION OF DEPOSITION TESTIMONY OF KEVIN MCGINN WITH DEFENDANT'S OBJECTIONS AND/OR COUNTERDESIGNATIONS**<br><br>Pretrial Conference Date: 09-21-21<br>Time: 3:00 p.m.<br><br>Trial Date: September 24, 2021<br>Complaint filed: October 16, 2017 |

Plaintiff Owen Diaz hereby designates the following revised deposition transcript excerpts for Kevin McGinn, NextSource's PMK and CFO, for presentation via video as part of his case in chief and submits these with Defendant's objections and/or counter designations:

**McGinn, Kevin 6/17/19, Volume 1**

| # | Lines | Deposition Excerpt | Objection / Counterdesignation |
|---|-------|--------------------|--------------------------------|
| 1 | 7:21-7:23 | **7:21** MR. ORGAN: Q. Could you please state and<br>**22** spell your full name for the record.<br>**23** A. Kevin McGinn; K-E-V-I-N, M-C-G-I-N-N. | **8:3 Q. And did you go to college?**<br>**4** A. Yes.<br>**5 Q. Where did you go to college?**<br>**6** A. Middle Tennessee State University.<br>**7 Q. And when did you graduate?**<br>**8** A. 1992.<br>**9 Q. And what was your degree?**<br>**10** A. Master's in business administration. Well,<br>**11** that was the undergrad, in business administration. I<br>**12** also have a graduate degree as well.<br>**13 Q. From the same Middle Tennessee State**<br>**14 University?**<br>**15** A. No.<br>**16 Q. So your undergraduate degree was from Middle**<br>**17 Tennessee State university?**<br>**18** A. Yes.<br>**19 Q. And that was in 1992?**<br>**20** A. Yes.<br>**21 Q. And that was in business?**<br>**22** A. Yes.<br>**23 Q. And what was your MBA; where was that from?**<br>**24** A. Wilkes University. |
| 2 | 9:06-9:12 | **06** Q. When did you -- well, what's your current<br>**07** position for nextSource, Inc.?<br>**08** A. I'm the chief financial officer for<br>**09** nextSource, Inc.<br>**10 Q. And where are you located? Where is your**<br>**11 office?**<br>**12** A. Based in Nashville, Tennessee. | **9:13 Q. How long have you worked for nextSource?**<br>**14** A. Just under four years.<br>**15 Q. So when did you start working at nextSource?**<br>**16** A. October of 2015.<br>**17 Q. And what was your starting position with**<br>**18 nextSource, Inc.?**<br>**19** A. I joined nextSource as the |

PLAINTIFFS' REVISED DESIGNATION OF KEVIN MCGINN DEPOSITION TESTIMONY

| # | Lines | Deposition Excerpt | Objection / Counterdesignation |
|---|-------|-------------------|-------------------------------|
| | | | CFO.<br>**20 Q. So you've been the CFO since you joined**<br>**21 nextSource in October of 2015; is that right?**<br>**22 A. Yes.** |
| 3 | 10:02-10:09 | **10:02** MR. ORGAN: Q. Tell me, what are your job<br>**03** duties as the CFO for nextSource, Inc.?<br>**04** A. I'm responsible for all the accounting<br>**05** control of the company, the financial reporting of the<br>**06** company. The payroll processing for the company<br>**07** reports to me. Human resources reports to me.<br>**08 Q. How many direct reports do you have?**<br>**09** A. Approximately five direct reports. | |
| 4 | 12:15-13:09 | **12:15 Q. I'm asking you what nextSource considers.**<br>**16 And so what I'm trying to find out is, does nextSource**<br>**17 consider administrative employees to be employees of**<br>**18 nextSource?**<br>**19** A. No. The administrative -- the associates, as<br>**20** I define the associates who are -- in which we provide<br>**21** the administrative payroll, their pay rates are set by<br>**22** the clients. They act under the direction and control<br>**23** of the clients. So I would not -- nextSource would<br>**24** not consider them employees in that -- under that<br>**25** definition.<br>**13:01 Q. Okay. So nextSource considers the associates**<br>**02 to be under the direction and control of the clients**<br>**03 who you contract with; is that right?**<br>**04** A. That's correct.<br>**5 Q. Okay. And nextSource's role,** | Counterdesignation: 13:05-13:09. Rule of completeness. Fed. R. Evid. 106, Fed. R. Civ. P. 32(a)(6).<br><br>5 Q. Okay. And nextSource's role, relative to the 6 associates, is to essentially pay them their salary or 7 hourly rates and then any benefits that they're 8 entitled to; is that correct?<br>9 **A. Correct.**<br>**(NOTE: Counterdesignation is accepted by Plaintiff)** |

| # | Lines | Deposition Excerpt | Objection / Counterdesignation |
|---|-------|-------------------|-------------------------------|
| | | relative to the<br>6 associates, is to essentially pay them their salary or<br>7 hourly rates and then any benefits that they're<br>8 entitled to; is that correct?<br>9 A. Correct. | |
| 5 | 13:10-13:19 | 13:10 Q. Is there any other role that nextSource<br>11 plays, relative to the associates, in terms of their<br>12 employee, or their employment with a client?<br>13 A. So the associate works at the direction of<br>14 the client, usually on the client site. NextSource<br>15 will, if needed, take direction from the client to<br>16 discipline an employee, if the client has requested us<br>17 to. If the client has -- has wished for the person to<br>18 be removed from the site, we could facilitate that<br>19 removal. That's essentially, generally, it. | |
| 6 | 16:10-16:20 | 16:10 Q. So looking at Exhibit 166, you've been<br>11 designated as the person most knowledgeable on Topic<br>12 1, the contractual relationship between Defendant and<br>13 Tesla, Inc.; is that true, subject to your objections?<br>14 A. Yes.<br>15 Q. And you've also been designated as the person<br>16 most knowledgeable on the second topic, the<br>17 contractual relationship between Defendant and<br>18 CitiStaff Solutions, Inc., subject to your objections;<br>19 is that correct?<br>20 A. Yes. | Testimony was only provided subject to the objections to the deposition notice, and testimony does not reflect any of the objections as stated at the deposition: "Counsel, these questions are all subject to the objections that we served on your office last week. And so we would produce -- we are producing Mr. McGinn as the 30(b)(6) witness subject to all of those objections. And if you have a copy of the objections, it might be useful for you to share those with the witness as you're going down the list." Dep. 14:16-22.  Thus, it is unduly prejudicial and misleading.  Fed. R. Evid. 403. |

| # | Lines | Deposition Excerpt | Objection / Counterdesignation |
|---|---|---|---|
| 7 | 17:15-17:17 | **17:15 Q. Was there some kind of written contract**<br>**16 between Tesla and nextSource?**<br>**17 A. Yes.** | |
| 8 | 20:13-21:04 | **13 Q. So in other words, nextSource would**<br>**14 coordinate with other staffing agencies to try and**<br>**15 accommodate Tesla's demand for associates at the**<br>**16 Fremont factory?**<br>**17 MR. GELLER: Misstates his testimony.**<br>**18 Go ahead.**<br>**19** THE WITNESS: NextSource would select<br>**20** suppliers who would provide resources into the Tesla<br>**21** factory at the direction of -- day-to-day direction of<br>**22** Tesla. However, those workers were employed; in other<br>**23** words, they were recruited, onboarded and paid, and,<br>**24** if needed, you know, terminated by the supplier<br>**25** employer.<br>**21:01** MR. ORGAN: Q. And when you're referring to<br>**02** "suppliers" here, you're referring to companies that<br>**03** would supply manpower; is that correct?<br>**04** A. Yes. | Counterdesignation: 22:21-24. Rule of completeness. Fed. R. Evid. 106, Fed. R. Civ. P. 32(a).<br><br>`21 Q. In addition to that,`<br>`did nextSource provide`<br>`22 any additional services`<br>`for CitiStaff employees,`<br>`other`<br>`23 than the timekeeping`<br>`function?`<br>`24 A. No.` |
| 9 | 25:10-25:24 | **25:10 Q. So who were the -- other than CitiStaff**<br>**11 Solutions, who were the other suppliers that**<br>**12 nextSource worked with when you first onboarded in**<br>**13 October of 2015, relative to the Tesla Fremont**<br>**14 factory?**<br>**15** A. CitiStaff is one supplier. Chartwell was the<br>**16** other, primary supplier. I believe there | |

Case No. 3:17-cv-06748-WHO
PLAINTIFFS' REVISED DESIGNATION OF KEVIN MCGINN DEPOSITION TESTIMONY

| # | Lines | Deposition Excerpt | Objection / Counterdesignation |
|---|---|---|---|
| | | was a third<br>17 supplier not relevant here, but I'm happy to share the<br>18 name. Maliko, I believe, was another supplier<br>19 employer at the Tesla site.<br>**20 Q. In terms of providing sort of**<br>**21 production-associate level employees, were the primary**<br>**22 suppliers that nextSource coordinate with CitiStaff**<br>**23 and Chartwell?**<br>24 A. Yes. | |
| 10 | 36:13-36:18 | **13 Q. Okay. So with respect to CitiStaff providing**<br>**14 workers at the Tesla factory as one of nextSource's**<br>**15 suppliers, that would be pursuant to a specific**<br>**16 contract between nextSource and CitiStaff; is that**<br>**17 right?**<br>18 A. Yes. | |
| 11 | 37:20-38:01 | **37:20 Q. So in terms of the contract, though, that**<br>**21 nextSource has with CitiStaff relative to providing**<br>**22 services to or employees to the Tesla factory, that**<br>**23 contract was specific to providing employees to Tesla;**<br>**24 right?**<br>**25 MR. GELLER: Asked and answered.**<br>38:01 THE WITNESS: Yes. | |
| 12 | 97:14-97:19 | **97:14 Q. So in other words, Mr. Diaz's relationship,**<br>**15 as I understand it then, is that of -- he -- Mr. Diaz**<br>**16 was working for a contractor supplier of nextSource,**<br>**17 pursuant to nextSource's contract with Tesla; is that**<br>**18 right?**<br>19 A. Yes. | |
| 13 | 99:06-99:18 | **99:06 Q. But in terms of your suppliers, the companies** | Testimony is cumulative, wastes time and would cause undue |

Case No. 3:17-cv-06748-WHO

PLAINTIFFS' REVISED DESIGNATION OF KEVIN MCGINN DEPOSITION TESTIMONY

| # | Lines | Deposition Excerpt | Objection / Counterdesignation |
|---|-------|--------------------|-------------------------------|
| | | 07 like CitiStaff and Chartwell, they're essentially just<br>08 providing employees to Tesla to work in Tesla's<br>09 factory; is that correct?<br>10 MR. GELLER: Misstates his testimony.<br>11 Objection to the form.<br>12 MS. SWAFFORD-HARRIS: And calls for<br>13 speculation.<br>14 THE WITNESS: The supplier will, in the<br>15 course of their employment of the worker, will<br>16 recruit, onboard, and pay the worker. They place that<br>17 worker at the Tesla site, who then works under the<br>18 day-to-day direction and control of Tesla. | delay.  The same testimony was provided by designations 4, 9, 10, 14, 21, 30, 34 and 40.  Fed. R. Evid. 403. |
| 14 | 106:24-108:08 | 106:24 Q. So we were talking about the process that<br>25 Wayne Jackson was supposed to go through.<br>107:01 One thing that Mr. Jackson was supposed to do<br>02 was to act as a liaison between Tesla and CitiStaff;<br>03 is that correct?<br>04 A. Correct.<br>05 Q. And another thing that Mr. Jackson was<br>06 supposed to do was to gather information relative to<br>07 Mr. Diaz's complaint; correct?<br>08 A. When Mr. Jackson was made aware of the<br>09 complaint, he gathered facts.<br>10 Q. Okay. And then another thing Mr. Jackson was<br>11 supposed to do was to confer with his boss, Terry<br>12 Garrett, about what steps to take for -- relative to<br>13 nextSource; correct? | |

PLAINTIFFS' REVISED DESIGNATION OF KEVIN MCGINN DEPOSITION TESTIMONY

| # | Lines | Deposition Excerpt | Objection / Counterdesignation |
|---|---|---|---|
| | | **14** A. I would push back a little bit on what to do | |
| | | **15** next for nextSource. This was not deemed to be a | |
| | | **16** nextSource issue, so what Wayne was doing was -- my | |
| | | **17** understanding was gathering the facts, taking | |
| | | **18** statements, and then his disposition would be to bring | |
| | | **19** that to Tesla on the client side and then the supplier | |
| | | **20** for which the offending person would have worked. | |
| | | **21 Q. In terms of how Mr. Jackson was supposed to** | |
| | | **22 bring the issues relating to Owen Diaz's complaint and** | |
| | | **23 his investigation to Tesla, was there a particular** | |
| | | **24 person that he was supposed to bring that information** | |
| | | **25 to at Tesla?** | |
| | | **108:01** A. Yes, so concurrent with Mr. Diaz advising | |
| | | **02** Mr. Jackson, Wayne Jackson about the claim, the -- | |
| | | **03** remember I mentioned earlier, there was a series of | |
| | | **04** department managers. Well, the affected department | |
| | | **05** manager, I believe the name is Victor Quintero, | |
| | | **06** brought -- advised Wayne of the claim, complaint, and | |
| | | **07** Wayne was fact gathering and would have brought the | |
| | | **08** information back to Victor Quintero. | |

PLAINTIFFS' REVISED DESIGNATION OF KEVIN MCGINN DEPOSITION TESTIMONY

1

2     CALIFORNIA CIVIL RIGHTS LAW GROUP
      ALEXANDER KRAKOW + GLICK LLP

3     DATED:  September 20, 2021          By:     /s/ Lawrence A Organ
                                          Lawrence A. Organ, Esq.
4                                         Navruz Avloni, Esq.
                                          Cimone A. Nunley, Esq.
5                                         J. Bernard Alexander, Esq.
                                          Attorneys for Plaintiffs
6                                         DEMETRIC DI-AZ AND OWEN DIAZ

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REVISED DESIGNATION OF KEVIN MCGINN DEPOSITION TESTIMONY

# Exhibit

# **2**

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

---

2

                                          Volume 1
                                          Pages 1 - 171

              UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

         BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
                                   )
           Plaintiffs,             )
                                   )
    vs.                            ) No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   ) San Francisco, California
           Defendants.             ) Monday
                                   ) September 27, 2021
_____) 8:00 A.M.

          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:        ALEXANDER MORRISON & FEHR LLP
                       1900 Avenue of the Stars
                       Suite 900
                       Los Angeles, California 90067
                  BY:  BERNARD ALEXANDER, ESQ.

                       CALIFORNIA CIVIL RIGHTS LAW GROUP
                       332 San Anselmo Avenue
                       San Anselmo, California 94960
                  BY:  LAWRENCE A. ORGAN, ESQ.
                       CIMONE A. NUNLEY, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Debra L. Pas, CSR 11916, CRR, RMR, RPR
              Official Reporter - US District Court
              Computerized Transcription By Eclipse

---

2

APPEARANCES:  (CONTINUED)

For Defendants:        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       333 S. Hope Street
                       43rd Floor
                       Los Angeles, California 90017
                  BY:  TRACEY A. KENNEDY, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                       379 Lytton Ave
                       Palo Alto, California 94301
                  BY:  PATRICIA M. JENG, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       Four Embarcadero Center
                       17th Floor
                       San Francisco, California 94111
                  BY:  SUSAN Q. HAINES, ESQ.

Also Present:          JOSEPH ALM, ESQ.
                       - Tesla, Inc.

                       YUSUF MOHAMED, ESQ.
                       - Tesla, Inc.

                       VALERIE CAPERS WORKMAN
                       - Tesla, Inc.

                            -  -  -

---

3

PROCEEDINGS

1   Monday - September 27, 2021              8:02 A.m.
2                    P R O C E E D I N G S
3                       ---o0o---
4       (Proceedings held in open court, outside
5       the presence and hearing of the jury.)
6       THE COURT:  Good morning, everybody.  Be seated.
7       All right.  So there are a couple of things that were
8   filed with the McGinn.  I didn't see anything from the defense
9   on McGinn, so I'm assuming that you are in agreement that those
10  depositions -- that those objections should be overruled.
11      MS. KENNEDY:  Yes, Your Honor.  I believe that is
12  correct.
13      THE COURT:  Okay.  So I'm going to overrule the
14  objections to designations 6 and 13.
15      The next thing is the Nigel Jones motion.  Why is that
16  coming 19 months after I ruled?
17      MR. ORGAN:  Your Honor, I think when you ruled, it
18  was -- it was unclear to us whether or not we were going to be
19  able to use him in the case-in-chief or not, and that's the
20  issue because he did -- he was at the factory at the time that
21  Owen Diaz was there.
22      THE COURT:  Mr. Organ --
23      MR. ORGAN:  He worked in the -- yes, Your Honor.
24      THE COURT:  -- did you look at the order that I made
25  with respect to Mr. Jones?

---

4

PROCEEDINGS

1       MR. ORGAN:  Yes, I did, Your Honor.
2       THE COURT:  Given the absence of any overlap with
3   Diaz's work, work areas, or supervisors, this testimony is not
4   relevant to Diaz's case-in-chief.
5       As noted above, it could become relevant if Tesla relies
6   on the Faragher-Ellerth defense.  That determination will be
7   determined at trial.
8       MR. ORGAN:  Yes, Your Honor.
9       THE COURT:  So if it's coming in, it's coming in in
10  rebuttal.
11      MR. ORGAN:  Yes, Your Honor.
12      THE COURT:  Okay?
13      MR. ORGAN:  I understand.  Thank you.
14      THE COURT:  You filled in zero gaps that I identified
15  with respect to Mr. Jones' testimony.  Was he deposed in this
16  case?
17      MR. ORGAN:  No.  He's been a witness in two
18  arbitrations.  Defendant has cross-examined him twice.
19      THE COURT:  All right.  Well, so he's not testifying
20  unless the situation changes with respect to what Tesla does
21  with respect to his defense.
22      MR. ORGAN:  Okay.  Thank you, Your Honor.
23      THE COURT:  And let me make this suggestion, that you
24  spend your time working on your case and not trying the case in
25  the papers.  The lawyers need to focus on what happens in this

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

---

93

KAWASAKI - DIRECT / ORGAN

1   evidence.
2           THE COURT:  Any objection?
3           MS. JENG:  Your Honor, lacks foundation.
4           THE COURT:  I'm going to overrule the objection.  I
5   think he testified specifically enough with respect to the
6   placement of the elevator and the other things and the context
7   of it.
8       So overruled.  It will be admitted.
9       (Trial Exhibit 104 received in evidence)
10          MR. ORGAN:  Thank you, Your Honor.
11  BY MR. ORGAN
12  Q.   In terms of -- tell the jury, if you could, what are the
13  freight elevators?  What are those?
14  A.   So to me, from my perspective, the freight elevators were
15  the backbone of Tesla.  You had to move material up and down.
16  If you didn't bring -- I believe on the second floor, it's not
17  showing, but the battery line is up there where they made the
18  batteries for the bottom of the cars.  So if you didn't move
19  the product that they needed for that production line up and
20  down this freight elevator, they would stop production.
21      So I believe it's kind of like the backbone.  And that
22  goes for both elevators.  You had to bring material up and
23  down.
24      And then we also had to bring the recycling down.  So if
25  at any given time you had a backup on recycling or the

---

94

KAWASAKI - DIRECT / ORGAN

1   batteries or whatever product Tesla needed up at that time, you
2   would stop production and it would put a halt to everything.
3   It was like a linked chain.
4   Q.   So this is a pretty important part of the car-making
5   process, this elevator?
6   A.   It's a key part.  I mean, you don't make the batteries,
7   you don't make the car; right?
8   Q.   Right.
9       Okay.  If you could, please look at -- what I'd like to do
10  now is shift gears and fast forward to October 17th of 2015.
11  Okay?  October 17th.
12      If you could, look at Exhibit 235.  235.
13      (Witness complied.)
14  Q.   Now, as of this date, what is your position?
15  A.   At this date I believe I was, like, the same position.  I
16  was just the lead of the whole overnight environmental
17  sustainability group, recycling group.
18  Q.   And did you receive this document, Exhibit 235?
19  A.   What do you mean by "receive this"?  Like, from any of you
20  guys?  No, but --
21  Q.   No, no.
22  A.   I got this email, yes, because my name's on it, yes.
23  Q.   That's right.
24      When Owen Diaz sent this, did you receive it?
25  A.   Yes.

---

95

KAWASAKI - DIRECT / ORGAN

1   Q.   Okay.  And just to clarify, back on October 17th of 2015;
2   right?
3   A.   Correct.
4   Q.   Okay.
5           MR. ORGAN:  Your Honor, I'd move Exhibit 235 into
6   evidence.
7           MS. JENG:  No objections.
8           THE COURT:  It's admitted.
9       (Trial Exhibit 235 received in evidence).
10          MR. ORGAN:  Can we publish this, Your Honor?
11          THE COURT:  Yes.  Yes.
12          MR. ORGAN:  Okay.
13      (Document displayed.)
14  BY MR. ORGAN
15  Q.   Now, what was Ramon Martinez's role at this point in time?
16  A.   So Ramon Martinez was my counterpart, but for the day
17  shift.
18  Q.   So he was also a lead?
19  A.   Correct.  He was my counterpart for the day shift.
20  Q.   Okay.  And there are some -- there's some discussion here
21  in Exhibit 235 about an interaction between Mr. Diaz and
22  Mr. Martinez.  Do you see that?  Where he's alleging threats;
23  right?
24  A.   Correct.
25  Q.   You weren't present for that?

---

96

KAWASAKI - DIRECT / ORGAN

1   A.   I don't believe -- I might have been on vacation.  It
2   could have been one of my days off.  I could have been at home
3   at the time.  I know I got the email, but I believe I wasn't
4   present.
5       That's why Owen copied me on the email, because that's
6   what I asked him to do.  Any altercations that he had, I would
7   ask him to copy me on the email, as well and Victor and whoever
8   else on the email.
9   Q.   Okay.  And then there's a reference here about the
10  surveillance system.  Does Tesla have -- or when you were
11  there, does Tesla have a surveillance system?
12  A.   Yes, they do.
13  Q.   And what does the surveillance system consist of, if you
14  know?
15  A.   So at one point I actually got access to the surveillance
16  system.  I actually had a Tesla computer.  They gave me a token
17  to access their mainframe for their computer, for their system.
18      And I would be able to say -- if I was on break and there
19  was an altercation, I would be able to open up the computer and
20  look at the cameras and say:  Hey, what's going on?  Or see
21  what people were complaining about if I was dealing with
22  something else or at one side of the factory.
23      Like I said, it's a big factory.  So I could be over here,
24  and it could take me 10 minutes, 15 minutes to get all the way
25  over here with the altercation at that time.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

169

PROCEEDINGS
1   Mr. Romero.  And that will be the rule of the case.
2       All right.  Have a good afternoon everybody.
3       (Whereupon at 1:30 further proceedings
4       were adjourned until Tuesday, September 28, 2021
5       at 8:00 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

170

I N D E X
Monday, September 27, 2021 - Volume 1

|                                         | PAGE | VOL. |
|-----------------------------------------|------|------|
| Preliminary Jury Instructions           | 10   | 1    |
| Opening Statement by Mr. Alexander       | 22   | 1    |
| Opening Statement by Ms. Kennedy         | 44   | 1    |

- - -

|                                         | PAGE | VOL. |
|-----------------------------------------|------|------|
| PLAINTIFF'S WITNESSES                    |      |      |
| KAWASAKI, TAMOTSU EDWEEN                 |      |      |
| (SWORN)                                  | 65   | 1    |
| Direct Examination by Mr. Organ         | 66   | 1    |
| Cross-Examination by Ms. Jeng           | 100  | 1    |
| Redirect Examination by Mr. Organ       | 123  | 1    |
| ROMERO, EDWARD                          |      |      |
| (SWORN)                                  | 128  | 1    |
| Direct Examination by Mr. Organ         | 129  | 1    |

E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| 33             |      | 156  | 1    |
| 37             |      | 83   | 1    |
| 38             |      | 78   | 1    |
| 39             |      | 86   | 1    |
| 40             |      | 85   | 1    |
| 41             |      | 146  | 1    |
| 104            |      | 93   | 1    |
| 106            |      | 165  | 1    |

171

I N D E X
E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| 202            |      | 75   | 1    |
| 222            |      | 91   | 1    |
| 235            |      | 95   | 1    |
| 235            |      | 118  | 1    |
| 240            |      | 153  | 1    |
| 366            |      | 72   | 1    |

- - -

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, September 27, 2021

# Exhibit

# **3**

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 5

---

Volume 5

Pages 700 - 842

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND        )
LAMAR PATTERSON                      )
                                     )
            Plaintiffs,              )
                                     )
    vs.                              )  No. C 17-6748 WHO
                                     )
TESLA, INC., dba TESLA MOTORS,       )
INC., CITISTAFF SOLUTIONS, INC.,     )
WEST VALLEY STAFFING GROUP,          )
CHARTWELL STAFFING SERVICES, INC., ) 
and DOES 1-50, inclusive,            )
                                     )  San Francisco, California
            Defendants.              )  Friday
                                     )  October 1, 2021
_____)  8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:        ALEXANDER MORRISON & FEHR LLP
                       1900 Avenue of the Stars
                       Suite 900
                       Los Angeles, California 90067
                  BY:  BERNARD ALEXANDER, ESQ.


                       CALIFORNIA CIVIL RIGHTS LAW GROUP
                       332 San Anselmo Avenue
                       San Anselmo, California 94960
                  BY:  LAWRENCE A. ORGAN, ESQ.
                       CIMONE A. NUNLEY, ESQ.

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:     Debra L. Pas, CSR 11916, CRR, RMR, RPR
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

---

701

APPEARANCES:  (CONTINUED)

For Defendants:        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       333 S. Hope Street
                       43rd Floor
                       Los Angeles, California 90017
                  BY:  TRACEY A. KENNEDY, ESQ.


                       SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                       379 Lytton Ave
                       Palo Alto, California 94301
                  BY:  PATRICIA M. JENG, ESQ.


                       SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       Four Embarcadero Center
                       17th Floor
                       San Francisco, California 94111
                  BY:  SUSAN Q. HAINES, ESQ.


Also Present:          JOSEPH ALM, ESQ.
                       - Tesla, Inc.

                       YUSUF MOHAMED, ESQ.
                       - Tesla, Inc.

                       VALERIE CAPERS WORKMAN
                       - Tesla, Inc.

                           - - -

---

702

PROCEEDINGS

1   Friday - October 1, 2021                        8:02 a.m.
2                  P R O C E E D I N G S
3                      ---o0o---
4       (Proceedings were heard out of presence of the jury:)
5       THE CLERK:  Please come to order.
6       THE COURT:  Good morning, everybody.  Please be
7   seated.
8       All right.  I have a few things.
9       So yesterday the plaintiffs filed a couple of written
10  transcripts from the testimony of the people who have testified
11  by video for purpose of making sure the record is complete.
12      I think the way to deal with that is to identify those two
13  transcripts as exhibits and not introduce them, but have -- so
14  that the appellate record would be clear about what the jury
15  actually saw.
16      MR. ORGAN:  Okay.
17      THE COURT:  All right.
18      MR. ORGAN:  You want -- I'm not -- I'm a little
19  unclear, Your Honor.  So what do we do?  As exhibits?
20      THE COURT:  I think you want to have a record that you
21  can refer to in the Court of Appeals to say, you know, this was
22  the testimony.
23      MR. ORGAN:  Yes, Your Honor.
24      THE COURT:  I think the way to do that would be to
25  identify each of them as exhibits, which we can do at any time

---

703

PROCEEDINGS

1   before the verdict, and then they would be identified in that
2   way and you could refer to them in that way.
3       MR. ORGAN:  I see.  So they're not actually received
4   in evidence.  They're just --
5       THE COURT:  They're not going to go back to the jury,
6   but they'll just be there.
7       MR. ORGAN:  Okay.  Thanks.
8       THE COURT:  I think that's the way to do it.
9       MR. ORGAN:  Okay.  There's one other.  We still have
10  McGinn to do.  So we'll redo the two that we filed and submit
11  them to the Court as exhibits?
12      THE COURT:  All you have to do is give them an exhibit
13  number.
14      MR. ORGAN:  Oh, okay.  Okay.
15      THE COURT:  And that will be fine.  And the same thing
16  with McGinn.
17      MR. ORGAN:  Thank you, Your Honor.
18      THE COURT:  And then there's the Demetric Di-az
19  rebuttal.  Were there any objections to that?
20      MS. KENNEDY:  No.  Is it going to be rebuttal or is it
21  just going to be a supplemental?  Because --
22      THE COURT:  It sounded -- it is rebuttal.  I don't
23  care when it goes in --
24      MS. KENNEDY:  Okay.  That's fine.
25      THE COURT:  -- I think.  So the idea would be that it

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 5

---

708

PROCEEDINGS

1  DelaGrande, and that's fine.
2          THE COURT:  Okay.
3          MS. KENNEDY:  And then I think they're going to show
4  Mr. Demetric Di-az's testimony in rebuttal.
5          So I just want to make sure -- we're going to rest after
6  Ramon Martinez.  So once Ramon -- Mr. Martinez is done, we will
7  rest subject to making sure all of our exhibits are there.  I
8  think we're pretty up to date.
9          THE COURT:  Okay.
10         MS. KENNEDY:  So I think at that time, if I'm correct,
11  Mr. Organ, you will put on your rebuttal case.
12         MR. ORGAN:  Yes.  It's only two minutes of testimony.
13      Your Honor, there was the issue relative to Exhibit 3 and
14  Exhibit 279 I think.
15         MS. KENNEDY:  379.
16         MR. ORGAN:  379.  I just noticed in the schedule from
17  last night that those were not admitted into evidence, and I
18  believe --
19         THE COURT:  They were admitted into evidence.  So
20  they -- if the minutes don't reflect that, they should be.
21         MR. ORGAN:  So 3 and 379 are in; is that right,
22  Your Honor?
23         THE COURT:  Whatever the number is.
24         MR. ORGAN:  Yeah, okay.  Yes, Your Honor.  Whatever we
25  had agreed to.

---

709

PROCEEDINGS

1          THE COURT:  And that reminds me.  You have work to do,
2  I suspect, to make sure that the exhibits that are in evidence
3  are in a form that the jury is going to be able to get.
4          The one instruction that is not currently in the
5  instructions is the one about using the computer back in the
6  deliberation room for the review of these exhibits.  But
7  because of the sort of haphazard way in which you've identified
8  your exhibits and the numbering, you need to get together and
9  know exactly what's going onto whatever form you're going to
10  give to Ms. Davis as to the exhibits that are in the case.
11         MS. KENNEDY:  Your Honor, I understood that we were
12  going to put them on a thumb drive.
13         Do you want us to print out a hard copy in a notebook for
14  the jurors as well in case there's technical difficulties?  In
15  my last trial, there were technical difficulties with the thumb
16  drive with exhibits for the jury.  Whichever you think is
17  easier.
18         THE COURT:  I suppose that's fine.  We have not had
19  that problem, I don't think.
20         MS. KENNEDY:  Okay.
21         THE COURT:  And so I think if it came up, then
22  printing them out would be a good idea, but I'm not sure.  But
23  I'll allow Ms. Davis to figure out what the best way is to deal
24  with the exhibits to the jury.
25         MS. KENNEDY:  Okay.  Thank you, Your Honor.

---

710

PROCEEDINGS

1          THE COURT:  All right.  We'll see you when the jury is
2  here.
3          (Whereupon there was a recess in the proceedings
4          from 8:14 a.m. until 8:30 a.m.)
5          (Proceedings were heard in the presence of the jury.)
6          THE COURT:  All right.  Please be seated, everybody.
7          Good morning, ladies and gentlemen.  Thank you again for
8  being here as promptly as you have been.
9          We're going to proceed with the evidence this morning, and
10  the defense is calling a witness before, just the needs of that
11  person.
12         And so, Ms. Kennedy, let's proceed.
13         Come on up to the witness stand here.
14         THE CLERK:  If you step up and remain standing, I'll
15  swear you in.
16                 JOYCE ANN DELAGRANDE,
17  called as a witness for the Defendant, having been duly sworn,
18  testified as follows:
19         THE WITNESS:  Yes.
20         THE CLERK:  Be seated.
21      And then if you'll adjust the mic as you may need to, and
22  state your full name for the record and spell it for the court
23  reporter.
24         THE WITNESS:  Joyce Ann DelaGrande; J-O-Y-C-E, A-N-N,
25  D-E-L-A-G-R-A-N-D-E.

---

711

DELAGRANDE - DIRECT / JENG

1          THE CLERK:  Thank you.
2          THE COURT:  All right.  Ms. Jeng, please proceed.
3                 DIRECT EXAMINATION
4  BY MS. JENG:
5  Q.  Good morning, Ms. DelaGrande.
6  A.  Good morning.
7  Q.  Ms. DelaGrande, where are you currently employed?
8  A.  Rivian.
9  Q.  Okay.  What is your current job title?
10  A.  I am the manager for production control.
11  Q.  Prior to your current job, where did you work?
12  A.  I worked at Tesla.
13  Q.  When did you start working for Tesla?
14  A.  In August of 2012.
15  Q.  Okay.  What was your job position when you first started?
16  A.  I was an inventory analyst.
17  Q.  As of June 2015, what was your position with Tesla?
18  A.  I was the supervisor for production control.
19  Q.  And as a supervisor for production control, what were your
20  job duties and responsibilities?
21  A.  I was responsible for providing all of the material to
22  general assembly so they could build the cars.
23  Q.  Okay.  Can you describe a little bit more about what your
24  day-to-day role was?
25  A.  Yes.  I had 99 employees, and what we were responsible --

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 5

712

DELAGRANDE - DIRECT / JENG

1  each -- each person had a route that they had to deliver
2  material to, and on that route they had to make sure the
3  material was there in a timely manner so when the production
4  line went to build the cars, they could reach back, get the
5  parts, and just build.
6  Q.   Okay.  Were any of the 99 people you supervised leads?
7  A.   Three of them at the time.
8  Q.   Ms. DelaGrande, are you familiar with Mr. Owen Diaz?
9  A.   Yes, I am.
10 Q.   How do you know Mr. Diaz?
11 A.   He worked for the team that ran the elevators.
12 Q.   When did you first meet Mr. Diaz?
13 A.   We had what was called a power train drop zone, and what
14 that was is we had material that was built upstairs in the
15 power train area.  That was the batteries, the power train, and
16 modules.  And that team was responsible for taking that
17 material down the elevator and placing it into drop zone so my
18 team could then deliver it to the line.
19 Q.   What was your understanding of what Mr. Diaz's role was at
20 the elevators?
21 A.   He was the lead of the area.  So he was responsible in
22 making sure that everything that came down the elevator went to
23 the correct locations.
24 Q.   Where was the correct location?
25 A.   So they had signs at the drop zone that would tell you

713

DELAGRANDE - DIRECT / JENG

1  exactly where the material was supposed to be staged based on
2  part number.
3  Q.   Okay.  And as an elevator operator, would Mr. Diaz --
4  strike that.
5       Would elevator operators moving materials up and down the
6  elevator, would they need to be physically present at the
7  elevators most of the time?
8  A.   At all times.  So they were expected to kind of copy
9  exactly what we did, so that way the material was there when
10 we -- we needed it.  So they mirrored our schedule, basically.
11 Q.   Okay.  How many elevators were there?
12 A.   There was two.
13 Q.   And once materials were taken down the elevator and
14 dropped off at the drop zone, that's when members of your team
15 would pick up the parts; is that right?
16 A.   Yes.
17 Q.   Okay.  How were the elevator operators informed of what
18 materials they needed to bring down?
19 A.   Our leads -- the leads upstairs would communicate exactly
20 what was needed downstairs.
21 Q.   Okay.  How would they communicate that information of what
22 to bring downstairs?
23 A.   They would talk to them.  So they would just go and show
24 them exactly what was needed.  So there was a drop zone
25 upstairs, and our leads would let the elevator team know

714

DELAGRANDE - DIRECT / JENG

1  exactly what was needed downstairs.
2  Q.   Okay.  And were the materials that were needed by
3  production communicated to the elevator operators verbally or
4  via email?
5  A.   Oh, verbally.
6  Q.   Okay.
7  A.   They had an open line of communication.
8  Q.   Did it have to be communicated in real time?
9  A.   Yes, it did.
10 Q.   Why?
11 A.   Because the line -- it was dependent on what the line was
12 building at that time.  So if there was any issues with the
13 line needing additional material, it was taken down.  So we had
14 to talk to them at all times.
15 Q.   Okay.  When you first started working with Mr. Diaz, what
16 was your working relationship like with him?
17 A.   So when I first started working with him is when we had
18 made the determination that the elevator team was going to be
19 placing that material in the drop zones.  And I had talked to
20 him about concerns I had with the drop zones and how it wasn't
21 organized, and it was causing some down time because my team
22 would go grab the material and it was the wrong material in the
23 drop zone.  They might have it instead of being in the lane
24 where it was supposed to be, it was two lanes over.  And my
25 team would go grab it, take it to the line.  It would cause

715

DELAGRANDE - DIRECT / JENG

1  down time, and then we would have to double back and try to
2  figure out what happened.  So Mr. Diaz was supposed to help us
3  straighten that out.
4  Q.   Can you explain what you mean by down time?
5  A.   Down time is when the line goes to build the cars, they
6  can't stop.  They have takt times for each location on the
7  line.  You might have 30 seconds or you might have 3 minutes
8  based on how the car is being built in that location.
9       And any time wrong material is taken, they would have to
10 stop and -- say, the car took 6 minutes to build -- you know,
11 to go through the end of the line, that could be thousands of
12 dollars -- hundreds of thousands of dollars sometimes.
13      THE COURT:  Could you slow down just a little bit?
14      THE WITNESS:  Oh, yes.  I'm sorry.
15      THE COURT:  I'm not sure that everybody is catching
16 all of what you're saying.
17      THE WITNESS:  I'm sorry.  Yeah.
18 BY MS. JENG:
19 Q.   Just so you know, if you feel comfortable and you're fully
20 vaccinated, you can also remove your mask.
21 A.   That would be awesome.
22      Yeah.  So the parts are taken to the line.  Each area has
23 takt time that they have to do to build that particular part of
24 the line.  And if at all -- if at any time they stop, that's
25 considered down time.  And at the end of the line it's -- it's

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 5

```
                                                                   840
```

```
                                                                   841

                    I N D E X


          Friday, October 1, 2021 - Volume 5


                                                         PAGE   VOL.

          Plaintiff Rests                                 754     5
          Defense Rests                                   811     5


          PLAINTIFF'S WITNESSES                           PAGE   VOL.

          HEISEN, ANNALISA
          VIDEOTAPED TESTIMONY                            753     5
                                                    - - -

          DEFENDANT'S WITNESSES                           PAGE   VOL.

          DELAGRANDE, JOYCE ANN
          (SWORN)                                         710     5
          Direct Examination by Ms. Kennedy              711     5
          Cross-Examination by Mr. Organ                 735     5
          Redirect Examination by Ms. Jeng               750     5


          MARTINEZ, RAMON
          (SWORN)                                         755     5
          Direct Examination by Ms. Kennedy              755     5
          Cross-Examination by Mr. Alexander             788     5

                                                    _ _ _
```

```
                                                                   842
                    I N D E X
                  E X H I B I T S

          TRIAL EXHIBITS                  IDEN   EVID   VOL.

          2                               774            5
          133                                    797     5
          244                                    718     5
          251                                    719     5
          259                             721    721     5
          297                                    727     5
          298                                    740     5
          300                                    744     5
          303                                    731     5

                        _  _  _
```

```
                                                                   842

                       CERTIFICATE OF REPORTER



              I certify that the foregoing is a correct transcript from

          the record of proceedings in the above-entitled matter.



                        _____

                  Debra L. Pas, CSR 11916, CRR, RMR, RPR

                     Friday, October 1, 2021
```

# Exhibit

# 4

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

Volume 3

Pages 369 - 544

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND           )
LAMAR PATTERSON                          )
                                         )
                                         )
          Plaintiffs,                    )
                                         )
   vs.                                   )  No. C 17-6748 WHO
                                         )
TESLA, INC., dba TESLA MOTORS,           )
INC., CITISTAFF SOLUTIONS, INC.,         )
WEST VALLEY STAFFING GROUP,              )
CHARTWELL STAFFING SERVICES, INC.,       )
and DOES 1-50, inclusive,                )
                                         )  San Francisco, California
          Defendants.                    )  Wednesday
                                         )  September 29, 2021
_____  )  8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                    BY:  BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                    BY:  LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR
                Official Reporter - US District Court
                Computerized Transcription By Eclipse

---

370

APPEARANCES:  (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                    BY:  TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                    BY:  PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                    BY:  SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                         -  -  -

---

371

PROCEEDINGS

1   Wednesday - September 29, 2021          8:01 a.m.
2                 P R O C E E D I N G S
3                     ---oOo---
4        (Proceedings were heard out of presence of the jury.)
5        THE COURT:  All right.  There are two things on my
6   mind this morning.  One is the counter designations and
7   objections regarding Erin Marconi.  And I think in every
8   instance I'm going to overrule the objection to the counter
9   designation and overrule the objection to the testimony.  So
10  all of the testimony can come in that the parties are
11  interested in.
12       MR. ORGAN:  Your Honor, just a question on that then.
13  With respect to how they are presented, do you want the
14  designations presented with the counter designations then
15  together?
16       THE COURT:  Yeah, I think that's the smoothest way of
17  dealing with things.
18       MR. ORGAN:  So we'll have one video.
19       THE COURT:  One video.
20       MR. ORGAN:  In terms of the time, Your Honor --
21       THE COURT:  You time it yourself.
22       MR. ORGAN:  We'll produce that tonight.  So we'll --
23  it's our intent to present it, then, tomorrow, Your Honor.
24       THE COURT:  Great.
25       MR. ORGAN:  Okay.  Thank you.

---

372

PROCEEDINGS

1        THE COURT:  All right.  And then the other thing I
2   just wanted to mention, yesterday I allowed Wayne Jackson to
3   testify about his experience of hearing the "N" word throughout
4   the factory.  And on Monday I admitted Exhibit 106 concerning
5   Mr. Romero's credibility regarding his hearing of the "N" word.
6        I did so because it appears from Tesla's presentation of
7   the case, from the opening of the argument to the designations
8   in the depositions, that it wishes to minimize the use of the
9   "N" word in the workplace at Tesla, which is fine, but so this
10  counter evidence I think is relevant.
11       I am willing and inclined to give the jury a further
12  limiting instruction, and I can do that this morning.  It would
13  be primarily at the defendant's -- I'll let the defendant
14  decide whether this is something that you would like or not,
15  but it would be to the effect of:
16       As you know, I admitted Exhibit 106 for the limited
17  purpose of your consideration of the credibility of
18  Mr. Romero's testimony.  And yesterday I allowed Mr. Jackson to
19  testify about his experience hearing the "N" word in the Tesla
20  factory.
21       I want to remind you that this case is about Mr. Diaz and
22  the work environment that he experienced at the Tesla factory,
23  not what others in a different part of the facility
24  experienced.
25       MS. KENNEDY:  Yes, Your Honor, that would be

389

DIAZ - DIRECT / ORGAN

1  if you look down at the bottom at Item No. 2 under the
2  certification?  Do you see that?
3      (As read):
4      "I hereby authorize Tesla Motors or its agents to
5      investigate my background."
6      Do you remember letting Tesla do any kind of background
7  check on you when you were applying for the job through Indeed?
8  A.   That's what I had to answer, one of the questions, that I
9  would let them do a background check, yes.
10 Q.   So these are the items that you agreed to as part of your
11 application process; is that right?
12 A.   Yes, sir.
13 Q.   Okay.  And then if you go to the next page, 5, up at the
14 top (as read):
15      "I understand and agree that if I am offered a
16      position, it will be offered on condition that my
17      employment will be at will and for no definite period
18      and that my employment may be terminated at any time
19      with or without cause or with or without prior
20      notice."
21      Did you accept that term that they were offering you?
22 A.   Yes, I did.
23 Q.   Okay.  Now --
24      MR. ALEXANDER:  Your Honor, it's not showing to the
25 jury.  It does not --

390

DIAZ - DIRECT / ORGAN

1      JUROR:  We can see it.
2      MR. ALEXANDER:  The jurors out here on the bench
3  cannot see it.
4      THE COURT:  Maybe it's not turned on.
5      (Brief pause.)
6      MR. ORGAN:  I can go to the next thing while they're
7  doing that or --
8      THE COURT:  Let's just see if this is a simple fix.
9      MR. ORGAN:  Okay.
10     (Brief pause.)
11     THE COURT:  Is the other screen working?
12     Perhaps if we tilted that screen and maybe if the jurors
13 wanted to move over to that side so that they could...
14     Make that a temporary fix, and then the audience can
15 adjust themselves accordingly.
16     (Brief pause.)
17     THE COURT:  If people in the audience wanted to move
18 to the other side, you're more than welcome to do that.
19     MS. KENNEDY:  Sorry.  Just moving all our stuff.
20     THE COURT:  Okay.  All right.
21     MR. ORGAN:  May I proceed, Your Honor?
22     THE COURT:  You may.
23     MR. ORGAN:  Thank you, Your Honor.
24 BY MR. ORGAN
25 Q.   So you did get the job at Tesla?

391

DIAZ - DIRECT / ORGAN

1  A.   Yes, I did.
2  Q.   And now I think -- did you have to go through a contractor
3  named CitiStaff?
4  A.   Yes.  I went to CitiStaff because when I clicked on the
5  link and after I filled out the everything for apply, then I
6  got the email back and the email had directed me over to
7  CitiStaff.  Once I had went to CitiStaff, that was an office in
8  Newark, and from there they directed me to fill out some more
9  papers.
10 Q.   Did you fill out some paperwork for CitiStaff?
11 A.   Yes, I did.
12 Q.   And did you fill out any paperwork for Tesla?
13 A.   The initial application that was online.
14 Q.   Okay.  And then after you filled out some paperwork for
15 CitiStaff, did you ever go back to that Newark office?
16 A.   Yes.  I went once or twice to pick up a paycheck.
17 Q.   Okay.  So was CitiStaff -- in this system that they set
18 up, was CitiStaff going to pay you the paychecks?  Is that how
19 you understood it?
20 A.   That's where my checks came from, yes.
21 Q.   Okay.  But everything else was at Tesla; is that right?
22 A.   Well, I only picked up my check like two times from
23 CitiStaff.  From there it was a direct deposit, but all my
24 directions came from Tesla.
25 Q.   Okay.  And let's talk about your starting at Tesla.  What

392

DIAZ - DIRECT / ORGAN

1  I'd like you to do is, if you could, take yourself back to that
2  time.
3  Q.   In your application there it says -- it said 5/31.  How
4  soon after that did you start working at Tesla?
5  A.   My first day I worked at Tesla was on June 3rd, 2015.
6  Q.   Okay.  And if you could, turn to Exhibit 19, please.
7      And do you recognize Exhibit 19?
8  A.   Yes.
9  Q.   And does that accurately depict -- well, what was -- what
10 is Exhibit 19 for the record?
11 A.   Exhibit 19 is a badge that I received from Tesla so I can
12 be able to get in and out of the building.
13 Q.   Okay.  And does this accurately reflect what your badge
14 looked like?
15 A.   Yes, it does.
16 Q.   And then if you turn the page to the second page of
17 Exhibit 2, what is that part of the document?
18 A.   That was a different badge that they had gave me to
19 certify that I had took a safety class inside of Tesla.
20 Q.   So when you got to Tesla, they did some training for you?
21 A.   Yes, they did.
22     MR. ORGAN:  Okay.  Your Honor, I'd move Exhibit 19
23 into evidence.
24     MS. KENNEDY:  No objection.
25     THE COURT:  It's admitted.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

397

DIAZ - DIRECT / ORGAN

1    As I -- as we do that, that was pretty much the first day.
2  Q.   Okay.  If you could, turn to Exhibit 202.
3       MR. ORGAN:  And I believe this is admitted,
4  Your Honor.  May we publish it?
5       THE COURT:  I'm checking your belief, unless you tell
6  me absolutely.
7       MS. KENNEDY:  No objection, Your Honor.
8       MR. ORGAN:  Ms. Davis is shaking her head yes, so I
9  trust her, Your Honor.
10      MS. KENNEDY:  No objection from the defense.
11      THE COURT:  It's admitted.  Go ahead.
12      (Document displayed.)
13      MR. ORGAN:  Okay.  Thank you, Your Honor.
14  BY MR. ORGAN
15  Q.   Were you shown this SOP, standard operating procedure,
16  when you were trained by Tom -- was it Tom Kawasaki who trained
17  you?
18  A.   Yes, it was Tom Kawasaki.
19  Q.   Did he show you this Tesla document here?
20  A.   Yes.  This document was inside of a binder that was inside
21  of the elevator.
22  Q.   Okay.  And, well, not actually this document.  Something
23  that looked like it; right?
24  A.   This was the protocols that we were trained new elevator
25  operators on.  It may not have been this particular document

398

DIAZ - DIRECT / ORGAN

1  that's in front of me but, yes.
2  Q.   Okay.  So it was a Tesla standard operating procedure that
3  you were trained on; correct?
4  A.   Yes, sir.
5  Q.   You didn't get trained on a CitiStaff standard operating
6  procedure; right?
7       MS. KENNEDY:  Objection.  Leading.
8       MR. ORGAN:  I'll rephrase the question, Your Honor.
9       THE COURT:  Okay.
10  BY MR. ORGAN:
11  Q.   Other than Tesla's policies, did you get trained on
12  anybody else's policies relative to how to operate the
13  elevator?
14  A.   No, I did not.
15  Q.   Okay.  And if you could, turn to Exhibit 366 now.
16      MR. ORGAN:  Which I believe is admitted, Your Honor.
17      THE COURT:  It is.
18      MS. KENNEDY:  No objection.  It is admitted.
19      (Document displayed.)
20  BY MR. ORGAN
21  Q.   Then in terms of -- did you ever see a card or a poster
22  like Exhibit 366 here, the first page?
23  A.   Not this particular card or poster, no, sir.
24  Q.   Is anything on this list here PPE equipment that Tesla
25  provided to you?

399

DIAZ - DIRECT / ORGAN

1  A.   Yes, sir.
2  Q.   And could you tell the jury, what are the PPE items that
3  Tesla provided to you when you started at work there?
4  A.   They provided the glasses, a bump cap.  Either you had to
5  wear a hard hat or bump cap while you were inside of the
6  factory.  They supplied us with earplugs and face shields,
7  gloves, and the aprons and locks, if you had to be able to lock
8  out a certain piece of equipment.
9  Q.   Okay.  If you go to the second page of the Exhibit 366,
10  there's some vending machines there.  Do you see those?
11  A.   Yes, I do, sir.
12  Q.   Tell the jury, what are those vending machines?
13  A.   Those vending machines holds the PPE, which would be the
14  earplugs, glasses, gloves.
15  Q.   Okay.  So you get the items from the first page of
16  Exhibit 366 out of the vending machines; right?
17  A.   Yes, sir.
18  Q.   And those are -- are those Tesla vending machines?
19  A.   Yes, they are, sir.  In order to use the vending machines,
20  I would have to use my Tesla badge to be able to access it.
21  Your Tesla badge is, like, considered cash with the vending
22  machine.
23  Q.   Okay.  Let me ask you this:  When you start working at
24  Tesla, how do you know what schedule you're going to work?
25  A.   Jaime Salazar gave me my schedule when he had put me at

400

DIAZ - DIRECT / ORGAN

1  the back of the golf cart.
2  Q.   And who was it who gave you your schedule on a periodic
3  basis when you were working at the Tesla factory?
4  A.   First it was Jaime Salazar, and I believe after that it
5  may have been Ed Romero or it could have been Tom Kawasaki.
6  I'm not 100 percent sure.
7  Q.   Do you know who Jaime Salazar worked for?
8  A.   Yes.  Jaime Salazar was the -- I believe at that time he
9  was the manager for Tesla.
10  Q.   Okay.  And what about Ed Romero?  Do you know which
11  company Ed Romero worked for?
12  A.   Ed Romero had worked for Tesla.
13  Q.   Okay.  Do you know if Ed Romero ever worked for a
14  contractor or not?
15  A.   At that particular time, no.  I believe that Ed Romero had
16  worked with Tesla.
17  Q.   Okay.  And in terms of the workers interactions there, was
18  it different -- was there a difference between people who were
19  contract employees and people who were direct Tesla employees
20  in terms of your interactions?
21  A.   No.  We all interacted together.  It started from when we
22  first walked in the door.  We all used the door.  We went
23  inside the door, and then from there we would split and go to
24  our prospective bus stations.
25  Q.   Now, I need to ask you some questions about some of the

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

401

DIAZ - DIRECT / ORGAN

1  things that happened while you were at the factory.
2      After you start working at Tesla, do you see any graffiti
3  in the factory?
4  A.  Yes, sir.
5  Q.  And where do you see the graffiti?
6  A.  It was my second day at work, and I had to use the
7  restroom so I went down the stairs that was next to the
8  elevator and I believe was a conveyance.  I went down there and
9  I was in the bathroom, and the first thing I saw while I was in
10  the bathroom was the "N" word scratched into the -- into the
11  metal.  There was other graffiti, you know.  And over a period
12  of time, it was stuff that was added, too.
13  Q.  Okay.  So it's fair to say --
14      MR. ORGAN:  Could someone please get me an easel, if
15  that would be possible?
16  BY MR. ORGAN
17  Q.  And did you report this graffiti to anyone?
18  A.  Yes, I did.  Yes, I did.  I reported it to my immediate
19  supervisor at that time, which was -- I believe it was Ed
20  Romero or maybe Tom Kawasaki.  I do believe it was Ed Romero.
21  Q.  You think it was Ed?  Is it possible it was Tom Kawasaki
22  or are you sure?
23  A.  I'm not 100 percent sure.
24  Q.  Okay.  But you reported it to someone; is that right?
25  A.  Yes, I did.

402

DIAZ - DIRECT / ORGAN

1  Q.  Okay.
2      MS. KENNEDY:  Your Honor, I can't see the board.  Can
3  I move over there?
4      THE COURT:  Yes, please.
5      MS. KENNEDY:  Okay.
6      MR. ORGAN:  I'm going to move it back, Your Honor, if
7  that's okay with you, because I need the jurors to be able to
8  see.  Is that all right?
9      THE COURT:  Any way you want to set it up, Mr. Organ.
10      MR. ORGAN:  Thank you, Your Honor.
11  (Demonstrative displayed.)
12  BY MR. ORGAN
13  Q.  I'm going to put a big "X" there because this seems to
14  fade.
15      And if you could, tell the jury, did you see graffiti
16  after this second day of working at the Tesla factory?
17  A.  Yes, I did.
18  Q.  And where did you see -- where would you see the graffiti?
19  A.  It was -- one of the instances, like I said, was in the
20  bathroom.  And then the next time I saw the graffiti was when
21  they was sending over the effigy.
22  Q.  And from the time that you started on June 3rd of 2015
23  until you left in -- when did you leave?
24  A.  I believe it was sometime in January the following here.
25  Q.  January --

403

DIAZ - DIRECT / ORGAN

1  A.  Or maybe -- no.  I take that back.  I'm sorry.  I believe
2  mid-March to May, or something like that.
3  Q.  March to May?
4  A.  Yeah.  Somewhere up in there.
5  Q.  Did you see graffiti in the bathrooms from when you first
6  saw it here -- I guess that would have been June 4th or
7  June 5th, something like that -- did you see it from then until
8  you left?
9  A.  Yeah.  It was always in the bathroom.  You know, there was
10  stuff that was added to it over a period of time.  They used to
11  give us, like, some markers.  They wasn't really markers.  They
12  were like paint pens that we would mark parts off and stuff to
13  show that it was finished.  And some of the paint pens was like
14  different colors, like green, yellow, red, blue, even white.
15  And these guys would take these paint pens and put swastikas --
16      MS. KENNEDY:  Objection.  Calls for speculation.  Lack
17  of foundation.  Move to strike.
18      THE COURT:  Are you testifying, Mr. Diaz, that you saw
19  that in the bathroom?
20      THE WITNESS:  Yes, sir.  I saw that, the "N" word and,
21  you know, they was just -- it was --
22      THE COURT:  You mentioned about swastikas.  Did you
23  see swastikas?
24      THE WITNESS:  Yes.  It was right next to the "N" word.
25  Like I said, they would take these paint markers and they

404

DIAZ - DIRECT / ORGAN

1  would put swastikas and stuff like, you know, "Death to all
2  'Ns.'"  It was all kind of things.
3      THE COURT:  Okay.  Overruled.
4  BY MR. ORGAN
5  Q.  Okay.  So it's fair to say, then, the graffiti started
6  over here, went throughout the time that you were at the
7  factory; is that correct?
8  A.  As far as I know, sir, that stuff is still in the
9  bathroom.
10  Q.  Okay.  Now, I want to fast forward from June 4th to
11  July 31st.  Okay?
12      And do you know a man named Judy Timbreza?
13  A.  Yes, I do.
14  Q.  And tell me, how did you know Judy Timbreza?
15  A.  Me and Mr. Timbreza worked in the elevator together.
16  Q.  You did?
17  A.  Yes.
18  Q.  Okay.  So did you have some kind of interaction with
19  Mr. Timbreza on this date, July 31st?
20  A.  Yes, I did.
21  Q.  And if you could, take the jury back there and describe
22  for them what happened between you and Mr. Timbreza?
23  A.  Well, me and Timbreza, we was actually working two
24  different elevators.  He had Elevator 1, Elevator 2; but, you
25  know, because of how the kitchens were set up or the

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

473
DIAZ - DIRECT / ORGAN

1  Q.  And what's the date of the application?
2  A.  It's December 3rd, 2015.
3  Q.  Okay.  And why are you applying for a job through Indeed
4  on December 3rd of 2015?
5  A.  I was always taught by my parents to don't leave a job
6  until you had another job.
7  Q.  Okay.  Let's go to Exhibit --
8        THE COURT:  Did you want to move that into evidence?
9        MR. ORGAN:  Oh, yes, Your Honor.
10       MS. KENNEDY:  No objection.
11       THE COURT:  All right.  It's admitted.
12       MR. ORGAN:  Yes, please.  Thank you, Your Honor.
13       (Trial Exhibit 261 received in evidence)
14 BY MR. ORGAN
15 Q.  I'd like you to turn to Exhibit 293, please.
16 A.  I'm here, sir.
17 Q.  Okay.
18       MR. ORGAN:  And I believe this is stipulated,
19 Your Honor.
20       MS. KENNEDY:  Yes.  No objection.
21       THE COURT:  All right.  It's admitted.
22       (Trial Exhibit 293 received in evidence)
23 BY MR. ORGAN
24 Q.  This appears to be an email from Ed Romero to Wayne
25 Jackson, Victor Quintero and some others of a pay increase.

---

474
DIAZ - DIRECT / ORGAN

1  Did you get a pay increase in this end of January of 2016?
2  A.  Yes, I did.
3  Q.  Okay.  And did Ed Romero tell you about that pay increase?
4  A.  Yes, he did.
5  Q.  Did Ed Romero work for CitiStaff on this date,
6  January 28th, 2016?
7        MS. KENNEDY:  Objection.  Lack of foundation.
8        THE COURT:  If you know, you may answer.
9        THE WITNESS:  Umm, I always believed that when I met
10 Ed Romero, that he worked for Tesla.
11 BY MR. ORGAN
12 Q.  Okay.  Now, let's go to Exhibit 68.  Now, we just saw
13 that.  Do you see the date on that?
14 A.  Exhibit 68, yeah, was sent on 5/4/2016.
15 Q.  Okay.  And did CitiStaff notify you on May 4th of 2016
16 that you had been terminated from Tesla?
17 A.  Like I said before, after the first one, initial contact
18 that I had with CitiStaff, I never had contact with them again.
19 Q.  What about your paychecks?
20 A.  My paychecks, the first initial contact I picked up my
21 paycheck maybe once or twice.  Then everything else was handled
22 inside of Tesla.  I clocked in Tesla.  I had filled out
23 another piece of paper and that was, I believe, for my direct
24 deposit.
25 Q.  Okay.  If I could get you to turn to Exhibit 320.

---

475
DIAZ - DIRECT / ORGAN

1  A.  I'm there, sir.
2  Q.  Okay.  And...
3        (Brief pause.)
4        MR. ORGAN:  Your Honor, I would move Exhibit 320 into
5  evidence.
6        THE COURT:  Any objection?
7        MS. KENNEDY:  No.  No objection, Your Honor.  It's
8  fine.
9        THE COURT:  Okay.  It's admitted.
10       (Trial Exhibit 320 received in evidence)
11 BY MR. ORGAN
12 Q.  Were you informed -- this email here is dated March 18th
13 of 2016.  Do you see that?
14       (Document displayed.)
15 A.  Yes, I see it.
16 Q.  Okay.  So it's not dated May 4th; right?
17 A.  No, it's not.
18 Q.  Let go to Exhibit 324.
19       MR. ORGAN:  I would move Exhibit 324 into evidence,
20 Your Honor.
21       THE COURT:  Any objection?
22       MS. KENNEDY:  No objection.  It's fine.
23       THE COURT:  It's admitted.
24       (Trial Exhibit 324 received in evidence)
25

---

476
DIAZ - DIRECT / ORGAN

1  BY MR. ORGAN
2  Q.  Exhibit 324 is dated 5/4/2016.  Do you see that?
3  A.  Yes, sir.
4  Q.  And did Victor Quintero or anybody contact you on that
5  date relative to your email account getting terminated -- your
6  Tesla email account getting terminated at that point in time?
7  A.  No, they didn't tell me that.
8  Q.  If you look at the top it says (as read):
9        "Thank you for letting us know.  I have ended
10 Owen's contract and workday effective immediately."
11 That's from Lindsay James of Tesla HR.  Do you know who
12 that is?
13 A.  No, I do not know who Lindsay James is, sir.
14 Q.  And then if you go to Exhibit 325.
15       MR. ORGAN:  I'd like to move that in, Your Honor.
16       THE COURT:  Any objection?
17       MS. KENNEDY:  No, Your Honor.
18       THE COURT:  It's admitted.
19       (Trial Exhibit 325 received in evidence)
20       MR. ORGAN:  Sorry.  I jumped on you, Your Honor.  Did
21 you say it was admitted?
22       THE COURT:  Yes, it's admitted.
23       MR. ORGAN:  Could we publish this?
24       THE COURT:  Yes.
25       (Document displayed.)

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, September 29, 2021

# Exhibit

# **5**

**From**:        Edward Romero [edromero@teslamotors.com]
**Sent**:        1/28/2016 6:17:16 PM
**To**:          Wayne Jackson @ Telsa [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP
                 (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WayneJacksonTeslaaefc3@NextSource600]
**CC**:          Victor Quintero [vquintero@teslamotors.com]; Parks, Vanessa [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE
                 GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Vparks@NextSourcedc2]
**Subject**:     Elevator Staf Raises

Please increase the following elevator operators pay as follows:

███████████████████████

3. Owen Diaz from $16 to $18 (lead)

████████████████████████████████

All other staff has been increased already.

Thanks,

Edward Romero
Building Services Contract Supervisor
1-510-648-7393



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 293**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

CONFIDENTIAL                                                          NS000021

# Exhibit

# 6

| | |
|---|---|
| **From:** | Victor Quintero </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR QUINTERO3A3> |
| **To:** | Uhlenbrock, Nancy; Jaime Salazar |
| **CC:** | Edward Romero; Parks, Vanessa |
| **Sent:** | 8/17/2015 5:50:42 PM |
| **Subject:** | RE: Employee Changes |

Please be aware of the following changes effective today 8/17/15.

███████████████████████████████████████████████████

Owen Diaz, day shift elevator operator, will transfer to the compressed work week front end grave shift, as the lead elevator operator therefore please increase his salary to $16.00/hr.

Thank you,

Victor Quintero



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 222**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

TESLA-0000518

**EX 222-001**

| | |
|---|---|
| **From:** | Victor Quintero </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR QUINTERO3A3> |
| **To:** | ███████████ |
| **Sent:** | 8/17/2015 5:51:46 PM |
| **Subject:** | FW: Employee Changes |

███████████████████████████████████████████████

Thank you, Victor Quintero

**From:** Victor Quintero
**Sent:** Monday, August 17, 2015 5:51 PM
**To:** 'Uhlenbrock, Nancy'; Jaime Salazar
**Cc:** Edward Romero; Parks, Vanessa
**Subject:** RE: Employee Changes

Please be aware of the following changes effective today 8/17/15.

███████████████████████████████████████████████

Owen Diaz, day shift elevator operator, will transfer to the compressed work week front end grave shift, as the lead elevator operator therefore please increase his salary to $16.00/hr.

Thank you,

Victor Quintero

CONFIDENTIAL

| From: | Tamotsu Kawasaki </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TAMOTSU KAWASAKI766> |
|---|---|
| To: | Victor Quintero |
| Sent: | 8/17/2015 6:03:47 PM |
| Subject: | Re: Employee Changes |

Thank you victor no problem will do

Sent from my iPhone

On Aug 17, 2015, at 5:51 PM, Victor Quintero <vquintero@teslamotors.com> wrote:

███████████████████████████████████████████████████

Thank you, Victor Quintero

---

**From:** Victor Quintero
**Sent:** Monday, August 17, 2015 5:51 PM
**To:** 'Uhlenbrock, Nancy'; Jaime Salazar
**Cc:** Edward Romero; Parks, Vanessa
**Subject:** RE: Employee Changes

Please be aware of the following changes effective today 8/17/15.

███████████████████████████████████████████████████

Owen Diaz, day shift elevator operator, will transfer to the compressed work week front end grave shift, as the lead elevator operator therefore please increase his salary to $16.00/hr.

Thank you,

Victor Quintero

CONFIDENTIAL

**EX 222-003**

# Exhibit

# 7

| From: | Jackson, Wayne [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WJACKSON@NEXTSOURCEDD0] |
|---|---|
| Sent: | 3/18/2016 10:31:33 PM |
| To: | mdeleon@citistaffsolutions.com |
| CC: | Tesla [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tesla@NextSource084] |
| Subject: | Term of contract for Owen Diaz |

Unfortunately we will have to term the assignment of Owen Diaz. We have been trying to work on him with some attendance and performance issues but we have been unsuccessful. At this point a lot of the Tesla staff don't even want to work with Owen. Owen was supposed to report back to work earlier this week and didn't. He did just send a doctor's note but there is no doctor's signature on the note he provided. At this time the manager would just like to get another candidate to back fill his role as soon as possible. Please notify Owen today that his assignment here has been ended.

Wayne Jackson
Program Manager
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@nextsource.com
www.nextsource.com



*Workforce Optimization, Business Enlightenment*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 320**

CASE NO. 17-cv-06748-WHO

DATE ENTERED

BY _____

DEPUTY CLERK

CONFIDENTIAL                                      NS000037

EX 320-001

Exhibit

8

LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
NAVRUZ AVLONI (SBN 279556)
navruz@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:     (415)-453-7352
Facsimile:      (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
**ALEXANDER MORRISON + FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:     (310) 394-0888
Facsimile:      (310) 394-0811

Attorneys for Plaintiff
OWEN DIAZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON, <br><br> Plaintiffs, <br><br> v. <br><br> TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive, <br><br> Defendants. | Case No. 3:17-cv-06748-WHO <br><br> **PLAINTIFF'S REVISED PROPOSED DISCOVERY DESIGNATIONS** <br><br> Trial Date: September 27, 2021 <br> Complaint filed: October 16, 2017 |

-1-

Plaintiff Owen Diaz hereby designates the following discovery responses for use at trial, as part of his case-in-chief.

**SPECIAL INTERROGATORIES TO DEFENDANT TESLA, INC.**

**Set One: June 4, 2018 (Nos. 1-10)**

**Set Three: May 24, 2019 (14-20)**

**Set Four: October 11, 2019 (21-25)**

| No. | INTERROGATORY | RESPONSE |
|---|---|---|
| 2 | Identify the business relationship between YOU and Citistaff Solutions, Inc. | Defendant contracts with NextSource to staff temporary employees at its facilities. It is Defendant's understanding that NextSource contracts with CitiStaff, Solutions, Inc., among other third parties, to secure temporary employees to work at its facilities. Discovery is ongoing and Defendant reserves the right to supplement its response. |
| 3 | Identify the business relationship between YOU and NextSource. | Defendant contracts with NextSource to staff temporary employees at its facilities. It is Defendant's understanding that NextSource contracts with CitiStaff, Solutions, Inc., among other third parties, to secure temporary employees to work at its facilities. Discovery is ongoing and Defendant reserves the right to supplement its response. |
| 8 | Please provide the last best-known contact information for Edward Romero. (In responding to this interrogatory, the term contact information, includes, but is not limited to, address, phone number and email.) | Mr. Romero is a former Tesla employee but he is represented by counsel for Tesla in this action. ███████████████ ███████████ |
| 17 | Please DESCRIBE in comprehensive detail each position Victor Quintero has held during his employment at the TESLA FACTORY from 2014 to the present. (For the purposes of responding to this interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job duties, hours worked, and the dates the position was held. | Victor Quintero's position is Manager, Recycling Services from May 12, 2015 through the date of this response. |
| 18 | Please DESCRIBE in comprehensive | Ramon Martinez was not employed by |

2

| No. | INTERROGATORY | RESPONSE |
|-----|---------------|----------|
|     | detail each position Ramon Martinez held during his employment at the TESLA FACTORY. (For the purposes of responding to this interrogatory, the term "DESCRIBE" means to list, for each position, the job title, job duties, hours worked, and dates the position was held.) | Tesla during the time that plaintiff Owen Diaz or Plaintiff Demetric Di-az worked at Tesla. Ramon Martinez's position from January 14, 2019 to the date of this response is Lead Material Handler. |
| 22 | Please IDENTIFY the individuals and/or companies that were responsible for painting over graffiti or drawings or handwriting in the bathrooms at the TESLA FACTORY from January 1, 2014 to January 1, 2017. | During the time Plaintiff worked at Tesla, Tesla's Facilities Department and Facilities Contract Supervisor, including but not limited to Andres Donet, was "responsible" for cleaning and maintaining bathrooms at Tesla's Fremont, California facility. |

**REQUESTS FOR ADMISSIONS TO DEFENDANT TESLA:**

**Set One: May 24, 2019**

**Set Two: October 11, 2019**

| No. | REQUEST FOR ADMISSION | RESPONSE |
|-----|----------------------|----------|
| 2 | Admit Plaintiff Owen Diaz was working at the TESLA FACTORY pursuant to the contract YOU had with Defendant Citistaff, Inc. | Defendant admits that it contracts with NextSource to staff temporary workers at its facilities. It is Defendant's understanding that NextSource contracts with CitiStaff, Solutions, Inc., among other third parties, to secure temporary workers to work at its facilities. |
|  ██ | ████████████████████ | ██████ |
| 10 | Admit YOU have no security recordings or footage of any interactions between Plaintiff Owen Diaz and Ramon Martinez. | Admit. |

-3-

**DEFENDANT TESLA, INC. DBA TESLA MOTORS, INC.'S INTIAL DISCOVERY**

**INFORMATION PURSUANT TO GENERAL ORDER NO. 71**

| No. | REQUEST | RESPONSE |
|---|---|---|
| I | Demetric Di-az and Owen Diaz's[1] Supervisors | During their temporary assignments to Tesla, Demetric Di-az and Owen Diaz were supervised by:<br>A. Javier Caballero: Demetric Di-az<br>B. Ed Romero: Owen Diaz |

DATED: September 29, 2021

/s/ Cimone A. Nunley

Lawrence A. Organ, Esq.

Navruz Avloni, Esq.

J. Bernard Alexander, Esq.

Cimone A. Nunley, Esq.

Attorneys for Plaintiff

OWEN DIAZ

---

[11] To avoid prejudice to either party, references to "Plaintiff Demetric Di-az" or "Plaintiffs" have been replaced with "Demetric Di-az" or "Owen and Demetric Di-az", respectively.

-4-

# Exhibit

# 9

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

UNITED STATES DISTRICT COURT

TRIAL EXHIBIT 3

CASE No. 3:17-CV-06748-WHO

DATE ENTERED _____

BY _____
DEPUTY CLERK

T E S L A

# Tesla Motors, Inc.
# Master Services Agreement

This Services Agreement ("***Agreement***") is entered into by and between Tesla Motors Inc., a Delaware corporation with offices at 3500 Deer Creek Road, Palo Alto, California, 94304 ("***Tesla***") and the service provider identified below ("***Supplier***") effective as of October 20, 2014 ("***Effective Date***") and govern Supplier's performance, and Tesla's purchase, of services.

## 1.    THE SERVICES

**1.2**    Scope of the Services.  The *"Services"* are the following, as they may be supplemented, modified or replaced during the Term: (a) the functions described in this Agreement or in an Approved Work Order as functions for which Supplier is responsible, including the functions to be performed by *Supplier* pursuant to Schedule A (Approved Work Order for Services); (b) such additional service, functions and responsibilities as the Parties may agree from time to time through the execution of Approved Work Orders; and (c) any functions related to the foregoing that are not specifically described in this Agreement or in an Approved Work Order but are required for the provision of the Services in accordance with this Agreement.

**1.3**    Authorization of Services through Approved Work Orders.  Schedule A sets forth the Services that Supplier has been engaged to perform as of the Effective Date.  Supplier shall provide, and Tesla may purchase, additional Services pursuant to an Approved Work Order. Each Approved Work Order issued to and accepted by Supplier becomes a part of this Agreement as if fully set forth in the body of this Agreement. If there is a conflict between this Agreement and an Approved Work Order, the terms of this Agreement will prevail; except that an Approved Work Order may amend or override the terms of this Agreement if and to the extent that the Approved Work Order identifies the provision(s) of the Agreement the Approved Work Order is intended to amend or override and the executed version of the Approved Work Order has been approved by legal counsel for both Parties, as evidenced in writing on the executed version of the Approved Work Order.

**1.4**    Services Not Exclusive. Supplier is a non-exclusive provider of Services.  Tesla and its Affiliates have no obligation to order or purchase any Services. The extent and quantity of Services purchased shall be determined by Tesla. Tesla may purchase from any third party services that are identical or similar to the Services described in this Agreement. Supplier will cooperate and coordinate with Tesla or any other service providers selected by Tesla as reasonably required for Tesla or the service provider to perform services for which it is responsible.

**1.5**    Relationship of the Parties. Supplier is an independent contractor and is not an agent, servant, employee, legal representative, partner or joint venturer of Tesla or any Affiliate of Tesla. Nothing in this Agreement shall be deemed to create a joint venture or partnership between Supplier and Tesla or any of Tesla's Affiliates. Supplier has the sole right and obligation to supervise, manage, and direct all work to be performed by Supplier Personnel under this Agreement. Supplier has no authority to represent or bind Tesla.

## 2.    PERFORMANCE

**2.1**    Time of Performance. Supplier will provide the resources necessary to, and will, complete all Services diligently, in a timely manner, and in accordance with the time schedules set forth in this Agreement (or applicable Approved Work Order). Time is of the essence with respect to the provision of Services under this Agreement. Supplier will promptly notify Tesla in writing upon becoming aware of any circumstances that may reasonably be expected to jeopardize the timely completion of any Services. Supplier will use Commercially Reasonable Efforts to avoid or minimize any delays in performance and will inform Tesla of (a) the steps Supplier is taking or will take to do so and (b) the projected completion time.

**2.2**    Manner of Performance. Supplier will perform the Services at the Tesla Facilities listed or described in Schedule A or the applicable Approved Work Order. Supplier will manage and successfully perform, complete and deliver the Services in accordance with applicable Approved Work Orders. In cases where this Agreement or an

CONFIDENTIAL

TESLA-0001014

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

Approved Work Order does not prescribe or otherwise regulate the manner of Supplier's performance of the Services, Supplier will render the Services in accordance with Supplier's prevailing practices, which will not be less favorable to Tesla than the established best practices followed by the leading providers of similar services.



**2.5**    Reporting.  If required by Tesla, on or before the fifteenth (15th) day of each month during the Term, Supplier shall provide those reports requested by Tesla relative to the Supplier Personnel furnished under this Agreement and any Work Order. Real-time, online reporting will be available to Tesla in the event that Tesla agrees to deploy Supplier's Talent Acquisition Management Solution (TAMS) to support the Services.  At Tesla's request, on or before the fifteenth (15th) day of each month during the Term, Supplier shall also provide a written progress report detailing (a) Supplier's activities and performance against any Service Levels in the preceding month, (b) progress towards milestones, and (c) any actual or anticipated delays that might affect completion of Services in accordance with the project plan or timeline set forth in an Approved Work Order.

**2.6**    Compliance with Laws and Tesla Policies.

(a)    Supplier will, at its cost and expense, obtain all necessary regulatory approvals, licenses, and permits (collectively, "***Permits***") applicable to its business and comply with all Laws applicable to its business or the performance of its obligations under this Agreement, as such Laws may be revised from time to time.  Supplier shall provide copies of any such Permits at Tesla's request.

(b)    Supplier will comply with, and perform the Services in compliance with, all Laws pertaining to: (i) occupational safety and health; (ii) protection of persons and property from death, injury or damage; (iii) the environment and the use, handling, storage, labeling and disposal of toxic or hazardous materials; (iv) labor and employment conditions; (v) wages and hours; (vi) workmen's compensation and unemployment insurance; (vii) affirmative action and equal employment opportunity; and (viii) to the extent relevant to Supplier's performance of Services, Laws with respect to data privacy, data protection, and consumer privacy.

(c)    To the extent not prohibited by Law, Supplier will promptly notify Tesla in writing of any investigation or inquiry into whether Supplier (or any of its subcontractors) is charged with failing to comply with any Laws that may or will impact, or are otherwise applicable to, Supplier's performance under this Agreement.

(d)    Supplier will comply with any Tesla policies, standards, rules, and procedures (collectively, "***Tesla Policies***") applicable to performance of the Services or the Tesla Facility that are disclosed to Supplier in writing, as such Tesla Policies may be revised from time to time.  The Tesla Policies as of the Effective Date are attached hereto as Schedule B.

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



### 3.    SUPPLIER PERSONNEL AND SUBCONTRACTING

**3.1**    General Requirements for Supplier Personnel.

(a)      "**Supplier Personnel**" means any personnel furnished by Supplier to perform any part of the Services, including employees and independent contractors of Supplier, its Affiliates and subcontractors.

(b)      Supplier will assign an adequate number of Supplier Personnel to perform the Services specified by Tesla who are properly educated, trained, familiar with and fully qualified for the Services they are assigned to perform (including, without limitation, licensed in the relevant regions to provide work that requires a license). Supplier will assign sufficient program management personnel to provide adequate liaison with Tesla. Supplier will, to the extent applicable, manage, supervise, and provide direction to Supplier Personnel and cause Supplier Personnel to comply with the obligations and restrictions applicable to Supplier Personnel under this Agreement. Supplier is responsible for the negligent acts and omissions of Supplier Personnel under or relating to this Agreement. Supplier is responsible for validating the identity of and ensuring that Supplier Personnel assigned to perform Services (i) have the legal right to work in the country(ies) in which they are assigned to work, and (ii) conform to all applicable Tesla Policies (furnished to Supplier consistent with Schedule B)with respect to personal and professional conduct (including the wearing of an identification badge and adhering to general safety, dress, behavior, and security practices).

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

**4.    CHARGES**

**4.1**    <u>Charges, Generally</u>.  Each Approved Work Order sets forth (or will set forth) the unit rates and charges payable to Supplier for performing the Services and the associated invoicing and payment procedures and terms under that Work Order (collectively, the "***Charges***").  Tesla will not be required to pay Supplier any amounts under this Agreement other than the Charges payable to Supplier under, and calculated in accordance with, Approved Work Orders.

**4.2**    <u>Invoicing</u>.

(a)    Supplier shall submit invoices to Tesla on a bi-weekly basis in accordance with the method of electronic communication specified by Tesla.  All invoices must reference Tesla's Approved Work Order/release number (where applicable), contain an itemization of amounts for Services rendered during the applicable invoice period (including, if applicable and requested by Tesla, a separate break-down of charges for goods and services used by Supplier in performance of the Services, and detailed time card entries with respect to Services that are charged on a time & materials basis), and must comply with the provisions of this Agreement and such other reasonable requirements as may be prescribed by Tesla from time to time. All invoices and payments will be in United States dollars regardless of the country in which the Services are performed.  All invoices will be sent directly to Tesla's accounts payable department as follows: Tesla Motors, Inc., 45500 Fremont Blvd, Fremont, CA 94538, <u>Attn</u>: Accounts Payable.



CONFIDENTIAL                                                                      TESLA-0001017

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



## 5.    TESLA RESPONSIBILITIES

**5.1**    Tesla Responsibilities, Generally. In order to facilitate Supplier's performance of the Services, Tesla will, at its own cost and expense, perform those tasks and fulfill those responsibilities of Tesla as set forth in this Agreement ("**Tesla Responsibilities**"). Supplier's performance of the Services may be dependent in some circumstances on Tesla's timely and effective performance of the Tesla Responsibilities and timely decisions and approvals by Tesla.



CONFIDENTIAL

TESLA-0001018

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



## 6.   CONFIDENTIALITY

**6.1**   <u>Confidentiality</u>.  Tesla's mutual non-disclosure agreement as of the Effective Date or, if applicable, the signed non-disclosure *agreement then in effect* between the Parties ("***NDA***") sets forth the Parties' respective confidentiality obligations hereunder.  The NDA is hereby incorporated by reference in this Agreement, and the terms and conditions of the NDA will continue in force throughout the Term.  Tesla's Confidential Information shall be deemed, for purposes of this Agreement, to include all Intellectual Property Rights owned or separately licensed by Tesla.



## 7.   INTELLECTUAL PROPERTY RIGHTS



CONFIDENTIAL

TESLA-0001019

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



**7.5**     Open Source Code.  Supplier represents and warrants that it will not incorporate any Open Source Code into a Deliverable or other work product to be delivered to Tesla without Tesla's express, prior written consent.

**7.6**     Intellectual Property Rights Agreements with Supplier Personnel.  Supplier is responsible for having in place with all Supplier Personnel (either directly or indirectly through their respective employers) such agreements respecting Intellectual Property Rights as are necessary to comply with this Section 7 (Intellectual Property Rights).

**7.7**     Licenses and Rights Survive Bankruptcy.  All licenses and rights of Use granted under or pursuant to this Agreement shall be deemed to be licenses to rights in "intellectual property" for the purposes of Section 365(n) of the United States Bankruptcy Code.

**7.8**     No Interference.  Nothing in this Agreement will be deemed to prevent Supplier from carrying on its business or developing for itself or others materials that are similar to or competitive with those produced as a result of the Services provided they do not contain or disclose any Confidential Information or proprietary information of Tesla or otherwise infringe or constitute a misappropriation of Tesla's Intellectual Property Rights.

## 8.     TERM AND TERMINATION

**8.1**     Initial Term.  Unless terminated earlier as provided below, the term of the Agreement will be from the Effective Date until Supplier has completed performance of all of the Services and has received all payments due to Supplier under the Agreement (the "*Term*").

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

**9.     REPRESENTATIONS AND WARRANTIES OF SUPPLIER AND TESLA**

**9.1**    Performance of Services.   Supplier represents and warrants that it will perform all Services (i) in accordance with this Agreement and the Approved Work Orders; (ii) in a good, professional and workmanlike manner, free from defects in material and workmanship and in accordance with applicable industry standards; (iii) in strict accordance with Supplier's specifications, samples or other descriptions provided to Tesla or approved or adopted by Tesla; (iv) in compliance with all applicable Laws; (v) efficiently and in a cost-effective manner subject to the requirements of this Agreement; and (vi) using qualified personnel with suitable training, education, experience and skill to perform the Services in accordance with timing and other requirements of the Agreement.

**9.2**    Non-Infringement.    Supplier represents and warrants that: (a) the Services will not infringe or misappropriate any Intellectual Property Rights of any third party; (b) Supplier has all rights and licenses necessary to convey to Tesla the ownership of (or license rights to Use) as required under this Agreement or the Approved Work Order, all Intellectual Property Rights in Deliverables, Developed Materials and other materials provided to Tesla; and (c) no Deliverables or other materials provided to Tesla, nor their use by Tesla will infringe or constitute an infringement or misappropriation of any Intellectual Property Rights of any third party.

**9.3**    Malware.  Supplier represents and warrants that it will not introduce Malware into Tesla's or any of its Affiliates' systems and that Supplier will exercise Commercially Reasonable Efforts to prevent Malware from being so introduced. If Malware is found to have been introduced into Tesla's or any of its Affiliates' systems as a result of a breach of the foregoing warranty, Supplier will, at no additional charge, assist Tesla in eradicating the Malware and reversing its effects and, if the Malware causes a loss of data or operational efficiency, to assist Tesla in mitigating and reversing such losses.

**9.4**    Debarment.  For the full term of the Contract, Supplier represents and warrants that it shall not be: (i) debarred, suspended, excluded or disqualified from doing business with the United States Government; or (ii) listed on the Excluded Parties List System maintained by the General Services Administration of the United States Government (found at www.epls.gov).  Supplier agrees to immediately notify Tesla in writing in the event Supplier breaches any of its representations and warranties or has reason to believe that it will become in breach of any of such representations and warranties.

**10.    INSURANCE**

**10.1**    Types of Insurance.  During the Term of this Agreement, Supplier shall obtain and maintain at its own cost and expense (and shall cause each subcontractor to maintain) policies for the following insurance coverages:

(a)     Commercial general liability insurance with minimum coverage of at least One Million Dollars ($1,000,000) combined single limit per occurrence and Two Million Dollars ($2,000,000) general aggregate, naming Tesla as an additional insured.  This will include coverage for: bodily injury; property damage; premises and operations; products and completed operations; broad form property damage including completed operations; explosion, collapse, underground hazards; contractual liability; contractors' protective liability; and personal injury liability.

(b)     Employer's liability insurance with minimum coverage of at least One Million Dollars ($1,000,000). Supplier shall also comply with all applicable workers' compensation and/or other laws that may accrue in favor of any Supplier Personnel in all locales where Supplier Personnel perform(s) hereunder.

(c)     Automobile liability insurance on all  non-owned and/or hired vehicles with minimum coverage of at least One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage, and physical damage insurance for the actual cash value of each such vehicle.

(d)     All risk property perils insurance covering the full replacement value of Tesla property while in Supplier's care, custody, or control and naming Tesla as loss payee.

(e)     Errors and Omissions Liability Insurance covering liability for loss or damage due to an act, error, omission or negligence, with a minimum limit per event of One Million Dollars ($1,000,000).

CONFIDENTIAL                                                    TESLA-0001021

**10.2**    Insurance, Generally.    Supplier will be responsible for all deductibles and retentions with regard to its insurance. In the case of loss or damage or other event that requires notice or other action under the terms of any insurance coverage described above, Supplier will be solely responsible for taking such action. Supplier will provide Tesla with contemporaneous notice and such other reasonable and relevant information as Tesla may request regarding the event. The policies shall: (a) be primary and not contributory with any liability coverage carried by Tesla or any Affiliate of Tesla; (b) name Tesla and any other entity reasonably requested by Tesla as additional insureds; (c) provide for severability of interests; (d) provide for waiver of subrogation; (e) be with one or more insurance companies rated A minus or better (as determined by A.M. Best & Company), and licensed to do business in the locations where Services are to be performed; and (f) require the insurer to give Tesla at least 30 days' prior written notice of any restrictive change, non-renewal or cancellation that may affect Tesla's rights thereunder. Supplier will furnish to Tesla a certificate evidencing such coverage, upon request.

**11.    INDEMNIFICATION**



Master Services Agreement
Version May 28, 2013

General Terms and Conditions
Page 9

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



**12.     LIABILITY**



CONFIDENTIAL

TESLA-0001023

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

## 13.    DISPUTE RESOLUTION

**13.1**    Informal Dispute Resolution.  In the event any disputes, differences or controversies arise between the Parties, out of or in relation to or in connection with the provisions of this Agreement, the Parties shall thoroughly explore all possibilities for an amicable settlement.

**13.2**    Jurisdiction and Venue.

(a)    Any dispute arising out of or relating to the Agreement that is not resolved through negotiation will be settled exclusively by final and binding arbitration conducted in accordance with the then-current Commercial Arbitration Rules of the Judicial Arbitration and Mediation Services/Endispute ("*JAMS*").  The existence, content and result of the arbitration shall be held in confidence by the Parties, their representatives, any other participants, and the arbitrator.  The arbitration will be conducted by a single arbitrator selected by agreement of the Parties or, failing such agreement, appointed in accordance with the JAMS rules.  The arbitrator shall be experienced in agreements for services similar to the Services.  Any demand for arbitration and any counterclaim will specify in reasonable detail the facts and legal grounds forming the basis for the claimant's request for relief and will include a statement of the total amount of damages claimed, if any, and any other remedy sought by the claimant.  The arbitration will be conducted in the English language in Palo Alto, California.  Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in their discretion, award reasonable costs and fees to the prevailing Party.  The arbitrator will have full power and authority to determine issues of arbitrability and to interpret or construe the applicable provisions of this Agreement and to fashion appropriate remedies for breaches of this Agreement (including interim or permanent injunctive relief); provided that the arbitrator will not have any right or authority: (i) in excess of the authority of a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement; (ii) to award damages in excess of the types and limitation of damages found in this Agreement; or (iii) to modify the terms of this Agreement.  The award of the arbitrator will be issued within thirty (30) days of the completion of the hearing, shall be in writing, and shall state the reasoning on which the award is based.  Judgment upon the award rendered in the arbitration may be entered in any court of competent jurisdiction.  Each Party will have the right to apply at any time to a judicial authority for appropriate injunctive relief (or other interim or conservatory measures), and by doing so will not be deemed to have breached its agreement to arbitrate or to have impaired the powers reserved to the arbitrator.

(b)    Subject to Section 13.2(a), for any litigation arising out of or relating to the Agreement, regardless of the form of action or the Party that initiates it, the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of and venue in the United States District Court for the Northern District of California or, if that court does not have jurisdiction, in the Superior Court of the State of California, County of Santa Clara.  The Parties irrevocably and unconditionally waive any objection to the laying of venue of any proceeding arising out of or relating to the Agreement in such courts.  The Parties further consent to the jurisdiction of any state or federal court with subject matter jurisdiction located within a district that encompasses assets of a Party against whom a judgment (or award) has been rendered for the enforcement of the judgment (or award) against the assets of such Party.

## 14.    MISCELLANEOUS

**14.1**    Waiver.  No failure or delay by a Party in exercising any right, power or remedy will operate as a waiver of that right, power or remedy, and no waiver will be effective unless it is in writing and signed by an authorized representative of the waiving Party.  If a Party waives any right, power or remedy, the waiver will not waive any successive or other right, power or remedy that Party may have.

**14.2**    Remedies Cumulative.  All remedies provided in this Agreement are cumulative and in addition to and not in lieu of any other remedies available to a Party under this Agreement, at law, or in equity.

**14.3**    Assignment.  Supplier may not assign, transfer or otherwise convey or delegate any of its rights or duties under this Agreement to any other Party (except to the successor in a merger or acquisition of Supplier) without the prior written consent of Tesla, and any attempt to do so will be void.  This Agreement shall be binding upon the respective successors and permitted assigns of the Parties.

**14.4**    Governing Law.  This Agreement will be interpreted and construed in accordance with the substantive laws of California and the United States generally applicable therein, without regard to any provisions of its choice of law rules that would result in a different outcome.

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

**14.5**    Audits and Records.  During business hours and upon reasonable advance notice, Tesla and its agents may inspect, examine and audit the records and data of Supplier (and its subcontractors) that pertain to the Services to verify (a) the accuracy of Supplier's invoices, and (b) Supplier's compliance with this Agreement.  In support of the foregoing right, Supplier will keep and maintain (i) financial records relating to this Agreement in accordance with generally accepted accounting principles, (ii) records substantiating Supplier's invoices, (iii) records pertaining to Supplier's compliance with this Agreement and the Approved Work Orders, and (iv) such other operational records pertaining to performance of the Services as Supplier keeps in the ordinary course of its business.  Supplier will retain such records for the longer of three (3) years after the Term ends or as required by applicable Laws.  Supplier will make such records available to Tesla and its auditors for examination and copying upon request.

**14.6**    Notices.  All formal notices, requests, demands, approvals and communications under this Agreement (other than routine operational communications) (collectively, "***Notices***") will be in writing and may be served either (i) in person or (ii) by registered or certified mail with proof of delivery, addressed to the Party at the addresses set forth below.  Notices given as described in the preceding sentence will be considered received on the day of actual delivery.  A Party may change its address or designee for notification purposes by giving the other Party prior written notice of the new address or designee in the manner provided above.  The Parties may mutually agree that certain types of routine approvals and notices of a non-legal nature may be given by electronic mail.

| In the case of Tesla: | With a copy to: |
|---|---|
| Tesla Motors, Inc.<br>45500 Fremont Blvd, Fremont, CA 94538<br>Attn:  Sr. Mgr. Indirect Purchasing  & Global Capital | Tesla Motors, Inc.<br>3500 Deer Creek Road, Palo Alto, CA 94304<br>Attn:  Legal Department |
| In the case of Supplier:<br><br>nextSource Inc.<br>1040 Avenue of the Americas – 24th Floor<br><br>New York, NY    10018<br><br>Attn:  Procurement Department | |

**14.7**    Interpretation.  Section references are to sections of the document in which the reference is contained and will be deemed to refer to and include all subsections of the referenced section.  The section headings in this Agreement are for reference purposes only and may not be construed to modify or restrict any of the terms of this Agreement.  This Agreement will be deemed to have been written by both Parties.  Unless the context requires otherwise, (i) "including" (and any of its derivative forms) means including but not limited to, (ii) "may" means has the right, but not the obligation to do something and "may not" means does not have the right to do something, and (iii) "will" and "shall" are expressions of command, not merely expressions of future intent or expectation.

**14.8**    Order of Precedence.  In the event of a conflict between or among the documents comprising the Agreement, the following order of precedence will apply (documents listed in descending order of priority): General Terms; NDA; Schedule A and other Approved Work Orders; and other schedules.  In the event of a conflict between the documents comprising this Agreement as of the Effective Date and the documents comprising an Approved Work Order executed subsequent to the Effective Date, the terms of the Approved Work Order will prevail; provided, however, that an Approved Work Order may amend or override the terms and conditions set forth in these General Terms only if (and to the extent that) the Approved Work Order specifically identifies the provision(s) of the Agreement the Approved Work Order is intended to amend or override.

**14.9**    Severability.  If any provision of this Agreement or an Approved Work Order is held invalid by a court with jurisdiction over the Parties to this Agreement, such provision will be severed from the Agreement, and the remainder of this Agreement will remain in full force and effect.

**14.10**   Third Party Beneficiaries.  This Agreement is entered into solely between Tesla and Supplier and, except for the Parties' indemnification obligations under Section 11 (Indemnification) and the Service Recipients, will not be deemed to create any rights in any third parties or to create any obligations of either Tesla or Supplier to any third parties.

**14.11**   Survival.  Any provision of this Agreement that contemplates or governs performance or observance subsequent to termination or expiration of this Agreement will survive the expiration or termination of this

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

Agreement for any reason, including the following Sections: 6 (Confidentiality), 7 (Intellectual Property Rights), 9 (Representations and Warranties of Supplier), 11 (Indemnification), 12 (Liability), and 14.5 (Audits and Records).

**14.12**   Entire Agreement.  This Agreement including all Schedules constitutes the entire agreement between the Parties with respect to its subject matter and merges, integrates and supersedes all prior and contemporaneous agreements and understandings between the Parties, whether written or oral, concerning its subject matter.  Any terms and conditions on any order or written notification from either Party that purport to vary or supplement this Agreement shall not be effective or binding on the other Party.  This Agreement may be amended or modified solely in a writing signed by a duly authorized representative of each Party.

**14.13**   Defined Terms.  Terms used in this Agreement with initial capitalization have the meanings specified where used or in this Section 14.13.

(a)      *"Affiliate"* means with respect to an entity, any other entity or person controlling, controlled by, or under common control with, such entity.  For purposes of this Agreement, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

(b)      *"Change"* means any material change to the scope of, charges for, or other contractual commitments of a Party with respect to, the Services being provided by Supplier.

(c)      *"Change Order"* means a mutually agreed Change to the scope, timing, manner or cost of performing the Services pursuant to an Approved Work Order.  A change order may not modify the terms of the body of this Agreement.

(d)      *"Claim"* means any demand, or any civil, criminal, administrative or investigative claim, action or proceeding (include arbitration) asserted, commenced or threatened against an entity or person by an unaffiliated third party.  For the purposes of this definition, an employee of either Party is considered an unaffiliated third party.

(e)      *"Commercially Reasonable Efforts"* means taking all such steps and performing in such a manner as a well-managed company would undertake where it was acting in a determined, prudent and reasonable manner to achieve a particular desired result for its own benefit.

(f)      *"Deliverable"* means any work product identified as a 'Deliverable' in the Agreement or an Approved Work Order.

(g)      *"Intellectual Property Rights"* means all (i) patents, patent applications, patent disclosures and inventions (whether patentable or not), (ii) trademarks, service marks, trade dress, trade names, logos, corporate names, Internet domain names, and registrations and applications for the registration for any of them, together with all goodwill associated with any of them, (iii) copyrights and copyrightable works (including computer programs and mask works) and registrations and applications for registration, (iv) trade secrets, know-how and other confidential information, (v) waivable or assignable rights of publicity, waivable or assignable moral rights, (vi) unregistered and registered design rights and any applications for registration, and (vii) database rights and all other forms of intellectual property, such as data.

(h)      *"Law(s)"* means any statute, regulation, ordinance, rule, order, decree or governmental requirement enacted, promulgated or imposed by any governmental authority at any level (*e.g.,* municipal, county, province, state or national).

(i)      *"Malware"* means program code or programming instruction(s) or set(s) of instructions intentionally designed to disrupt, disable, harm, interfere with or otherwise adversely affect computer programs, data files or operations, or other code typically described as a virus, Trojan horse, worm, back door or other type of harmful code.

(j)      *"Open Source Code"* means software that requires as a condition of its use, modification or distribution, that it be disclosed or distributed in source code form or made available at no charge, including, without limitation, software licensed under the GNU General Public License (GPL) or the GNU Lesser/Library GPL.

(k)      *"Party"* means either Tesla or Supplier, as required by the context.

CONFIDENTIAL                                                                                     TESLA-0001026

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



(m)    "*Project*" means a group of related functions or activities that spans multiple days, weeks, or months and builds cumulatively toward the achievement of defined target outcomes or objectives.  A Project typically has multiple phases or life-cycle stages and involves written project plans with defined interim milestones and deliverables to measure progress toward the achievement of its target outcomes or objectives.  The Services provided for each Tesla Facility will be deemed a separate Project for purposes of this Agreement.

(n)    "*Service Level*" means a standard of performance with respect to the Services.

(o)    "*Service Level Credit*" means a monetary credit potentially payable to Tesla in respect of a Service Level Default.

(q)    "*Service-Related Taxes*" means, for each Project, transactional taxes in respect of the Services assessed by the tax authorities of the United States or the country in which Tesla receives the Services that Supplier is legally responsible to collect and remit to the applicable taxing authorities and for which Tesla is responsible for paying or reimbursing Supplier, and does not include any of the following:  (i) any taxes that are assessed on any goods or services used or consumed by Supplier (or its Subcontractors) in providing the Services where the tax is imposed on Supplier's (or its Subcontractor's) acquisition or use of the goods or services in its provision of the Services; or (ii) any taxes assessed by taxing authorities in countries other than the United States or the country in which Tesla receives the Services.

(r)    "*Tesla Data*" means all data and information regarding Tesla, its customers and suppliers that is either: (i) furnished, disclosed or otherwise made available to Supplier Personnel, directly or indirectly, by or on behalf of Tesla pursuant to this Agreement; or (ii) collected or created by Supplier Personnel on behalf of Tesla in the course of performing the Services.  Tesla Data will be deemed to be Confidential Information that is subject to the NDA.

(s)    "*Tesla Facility*" means, collectively, the Tesla facility or real property at which Supplier will perform Services and the reasonable office space, furniture, fixtures, equipment, hardware, software, telephones, office supplies, and other facility resources to be provided or made available by Tesla to Supplier Personnel who are assigned by Supplier to work on Tesla premises by mutual agreement of the Parties, as evidenced in the applicable Approved Work Order.

(t)    "*Use*" means the right to use, execute, display, copy, perform, distribute copies of, maintain, modify, enhance, and create derivative works of software or other copyrighted or copyrightable works.

(u)    "*Work Order*" means the form of document that will be used to authorize Supplier to perform Services by mutual agreement of the Parties.  When duly executed by the authorized representatives of both Parties, a Work Order becomes an "*Approved Work Order*."

CONFIDENTIAL

TESLA-0001027

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

Intending to be legally bound, each of the undersigned parties has caused its duly authorized representative to execute this Agreement as of the Effective Date.

**Tesla Motors, Inc.**

By: _____

Printed: PETER CARLSSON

Title: VP & GLOBAL SUPPLY CHAIN

Date: 11/3/2014

**Supplier**

By: _____
B63FA96A9A724A9...

Printed: Catherine Candland

Title: CEO

Date: Ocober 27, 2014

Company: nextSource, Inc.

Address: 1040 Avenue of Americas, Floor 24, New York, NY 10018

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

CONFIDENTIAL

TESLA-0001029

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

Schedule A
Page A-2

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

Schedule A
Page A-3

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

CONFIDENTIAL

TESLA-0001032

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



CONFIDENTIAL

TESLA-0001033

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213



Master Services Agreement

CONFIDENTIAL

TESLA-0001034

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

(c)     As a continuing condition of Supplier's use of and access to the Tesla Facility, Supplier shall ensure that no third party obtains any lien or other right in the Tesla Facility and hereby waives and relinquishes, and agrees to obtain from any third parties who might claim any such lien (including without limitation mechanic's liens) or right a written waiver and relinquishment of all rights, if any, to any lien, right, or remedy with respect to the Tesla Facility. The provisions of this Section 1.2(c) are a bargained-for consideration essential to the Contract.

**1.3** Insurance. (Not applicable to Approved Work Order No. 1 For Services)

Supplier shall also obtain and maintain at its own cost and expense (and shall cause each subcontractor to maintain) policies for the following insurance coverages in accordance with Section 10.1 of the Master Services Agreement:

(a)     If the Services include remediation of or exposure to hazardous materials (e.g., asbestos-containing materials, contaminated soil, etc.), contractor's pollution liability with minimum coverage of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate for bodily injury, personal injury and property damage.

(b)     If the Services involve use of a helicopter or other aircraft, aviation liability insurance with minimum coverage of at least Five Million Dollars ($5,000,000) per occurrence.

Master Services Agreement

CONFIDENTIAL

## ANNEX 3 – INFORMATION TECHNOLOGY SERVICES

This MSA Rider describes certain terms and conditions that apply to Supplier's performance of, and Tesla's purchase of, information technology-related Services.

**1.1** **Access to Tesla Systems and Facilities**. With reference to Section 5.3 of the General Terms, the following terms and conditions shall apply:

(a)     Tesla hereby grants Supplier a limited, non-transferable license to Use certain Systems as determined by Tesla from time to time. Each employee, agent or Subcontractor of Supplier having access to the Systems will: (i) be assigned a separate User ID by Supplier and only use that ID when logging on to the Systems; (ii) log off the Systems immediately upon completion of each session of service; (iii) not allows unauthorized individuals to access the Systems; (iv) keep strictly confidential the User ID and password and all other information that enables such access; (v) not reuse a compromised password (e.g., a password that has become known to anyone else at any time, including in an emergency); (vi) only utilize such access to the Systems to perform his or her obligations to Tesla; (vii) comply with Tesla's encryption requirements or other service policies instituted by Tesla from time to time; (viii) not perform any unauthorized exploring or mining of the Systems; and (ix) only have access to the portion of the Systems necessary to perform Supplier's obligations.

(b)     Except as set forth in an Approved Work Order, Tesla will provide to Supplier Personnel assigned to work at Tesla premises the reasonable use of Tesla Facilities. Supplier will use the Tesla Facilities in an efficient manner and for the sole purpose of providing the Services. Supplier will be responsible for any damage to the Tesla Facilities caused by Supplier Personnel. Supplier will permit Tesla and its agents and representatives to enter into those portions of Tesla premises that are occupied by Supplier Personnel at any time. When the Tesla Facilities are no longer required for performance of the Services, Supplier will return them to Tesla in substantially the same condition as they were in when Supplier began use of them, subject to reasonable wear and tear.

**1.2** **Supplier Audits**. Supplier will conduct its own Audits pertaining to the Services consistent with the audit practices of well managed companies that perform services similar to the Services. If applicable, Supplier will perform a security Audit at least annually and will cause a SSAE 16 SOC 1 Type II audit (or equivalent audit) ("*SSAE 16 Audit*") to be conducted annually for each shared services facility at or from which Services are provided. The SSAE 16 Audit will be conducted in accordance with Tesla's control requirements as communicated by Tesla. Supplier will permit Tesla to participate in the planning of each SSAE 16 Audit, will confer with Tesla as to the scope and timing of the Audit and will accommodate Tesla requirements and concerns to the extent practicable. Each SSAE 16 Audit will be scheduled so as to facilitate annual compliance reporting by Tesla and the Service Recipients under the Sarbanes-Oxley Act of 2002 and any regulations promulgated under it. Supplier will provide Tesla and its independent Auditors with a summary of the SSAE 16 Audit Findings as soon as reasonably possible, and in any event within thirty (30) days after completion of the Audit report. To the extent the resulting Audit report reveals an actual or potential adverse effect on Tesla and/or the Service Recipients, Supplier will correct any errors or problems identified in the Audit report as soon as reasonably possible.

**1.3** **Deliverables and Related Documentation**. (Not applicable to Approved Work Order No. 1 For Services)

(a)     Supplier warrants that each Deliverable will not, from the time of delivery to Tesla through the period ending one year after Tesla's final acceptance of the Deliverable, deviate in any material respect from the specifications for such Deliverable set forth or referred to in the applicable Approved Work Order. If the Deliverable is or becomes part of a System or environment for which Supplier has ongoing maintenance and support responsibility, Supplier's maintenance and support obligations for such System or environment will include providing maintenance and support for the Deliverable. If Tesla notifies Supplier of a breach of this warranty, Supplier will promptly correct and redeliver the affected Deliverable at no additional charge to Tesla within a reasonable period of time, and in any event in accordance with any applicable time period specified in the applicable Approved Work Order.

(b)     Supplier warrants that any Software or system documentation developed for Tesla by or on behalf of Supplier will (i) accurately and with reasonable comprehensiveness describe the operation, functionality and use of the Software or system, and (ii) accurately describe in terms understandable to a typical system user the functions and features of the Software or system and the procedures for exercising such functions and features. If Tesla notifies Supplier of a breach of this warranty within the applicable warranty period, Supplier will correct and redeliver the affected documentation at no additional charge to Tesla within a reasonable period of time, and in any event within thirty (30) days after receiving Tesla's notice.

CONFIDENTIAL

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

(c)      Supplier warrants that any Deliverables and other components of the Services that are intended to interact or otherwise work together as part of a functioning system as indicated in their specifications or the applicable Approved Work Order under which they are to be produced, will be compatible and will properly inter-operate and work together as components of an integrated system.

CONFIDENTIAL

TESLA-0001037

DocuSign Envelope ID: 9CF4A603-D11C-41E5-B825-00A3C7063213

## SCHEDULE B

### TESLA POLICIES

Tesla has separately provided or made available to Supplier the Tesla Policies as of the Effective Date.

CONFIDENTIAL

CONFIDENTIAL

TESLA-0001039



## Amendment No. 1 to Master Services Agreement

This Amendment No. 1 ("Amendment") to Master Services Agreement between Tesla Motors Inc. ("Tesla") and nextSource Inc. ("Supplier") is entered as of March 19, 2015 (the "Amendment Effective Date"). This Amendment shall be governed and construed in accordance with the terms and conditions of the Master Services Agreement. To the extent that there is any conflict or inconsistency between the terms and conditions of this Amendment and the terms and conditions of the Master Services Agreement, the terms and conditions of this Amendment shall govern with respect to the subject matter hereunder.

WHEREAS, Tesla and Supplier are parties to the Master Services Agreement dated October 20, 2014 ("Agreement") and now wish to amend the Agreement pursuant to the terms and conditions of this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, Tesla and Supplier agree as follows:

███████████████████████████████████████████████████████████

2.  Subparagraph 3.1(c) of the Agreement is deleted and replaced with the following:

    "3.1(c)  Prior to assigning any Supplier Personnel to perform any Services, Supplier shall perform background checks of the personnel. Such background checks may have been performed as part of Supplier's standard pre-employment screening process and will include the following, at a minimum: (i) felony and misdemeanor criminal checks (7 years prior to coming onto Tesla's site for federal and county) and (ii) social security verification. In addition, Supplier will use best efforts to perform the following additional checks: (x) education verification (highest degree obtained); and (y) prior employment verification for all employees for 7 years prior to coming on Tesla's site. In each case of (i), (ii), (x) and (y), Tesla may require Supplier to provide written evidence of successful background checks on Supplier Personnel at any time.  Unless prohibited by law, Supplier may not assign any person to perform Services for Tesla who was convicted of a crime without Tesla's prior written consent."

3.  Paragraph 3.4 of the Agreement is modified to add a new Subparagraph (c) as follows:

    "(c)     With regard to the approval requirements of Section 3.4 (a) above, Supplier will request approval in writing from any of the following Tesla contacts, as may be amended in writing, from time to time, by Tesla:

             IndirectPurchasing@teslamotors.com, jalee@teslamotors.com, or treth@teslamotors.com"

4.  The table included in Subparagraph 3 of Schedule A - Approved Work Order No. 1 for Services is deleted in its entirety and replaced with the table set forth below:

CONFIDENTIAL                                                      TESLA-0001040

| Category | Position Type | California Hourly Markup Rate | Nevada Hourly Markup Rate | Description |
|---|---|---|---|---|
| | | 25% | 21% | |
| | | 22% | 20% | |
| | | 33% | 31% | |
| | | 38% | 37% | |
| | | 48% | 47% | |
| | | 39.5% | 35% | |
| | | 37.5% | 34% | |
| | | 44% | 41% | |
| | | 49% | 46% | |
| | | 57% | 55% | |
| | | 10% | 8% | |

TESLA-0001041



CONFIDENTIAL

TESLA-0001042

## Amendment No. 2 to Master Services Agreement

This Amendment No. 2 ("Amendment") to the Master Services Agreement, dated October 20, 2014, between Tesla Motors Inc. ("Tesla") and nextSource Inc. ("Supplier"), as amended, ("Agreement") is hereby further amended, effective as of September 9, 2015 ("Amendment Effective Date"). This Amendment to the Master Services Agreement shall be governed and construed in accordance with the terms and conditions of the Master Services Agreement. To the extent that there is any conflict or inconsistency between the terms and conditions of this Amendment and the terms and conditions of the Master  Services Agreement, the terms and conditions of this Amendment shall govern with respect to the Services described in the below Schedule A.

WHEREAS, Tesla and Supplier are parties to the Master Services Agreement dated October 20, 2014 and;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Parties, Tesla and Supplier agree to amend the Master Services Agreement, *effective as* of the Amendment Effective date, as follows:

| Category | Position Type | California Hourly Markup Rate | Nevada Hourly Markup Rate | Description |
|---|---|---|---|---|
|  |  | 25% | 21% |  |
|  |  | 22% | 20% |  |
|  |  | 33% | 31% |  |
|  |  | 38% | 37% |  |
|  |  | 48% | 47% |  |
|  |  | 39.5% | 35% |  |
|  |  | 37.5% | 34% |  |
|  |  | 44% | 41% |  |
|  |  | 49% | 46% |  |
|  |  | 57% | 55% |  |
|  |  | 10% | 8% |  |

Except as provided herein, the terms and conditions of the Master Services Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective duly authorized representatives as of the Amendment Effective Date.

Tesla Motors, Inc.

By: _____

Printed
Name: _____ CHUCK SHEYMADI _____

Title: _____ Director _____

Date: _____ 9/29/15 _____

nextSource Inc.

By: _____

Printed
Name: _____ EDWARD J. REMUS _____

Title: _____ SVP _____

Date: _____ 9/29/15 _____

TESLA-0001044

## Amendment No. 3 to Master Services Agreement

This Amendment No. 3 to the Master Services Agreement dated October 20, 2014 between Tesla Motors Inc. ("Tesla") and nextSource Inc. ("Supplier") as amended is hereby further amended, effective February 16, 2016 ("Amendment Effective Date"). This Amendment No. 3 to the Master Services Agreement shall be governed and construed in accordance with the terms and conditions of the Master Services Agreement. To the extent that there is any conflict or inconsistency between the terms and conditions of this Amendment No. 3 and the terms and conditions of the Master Services Agreement, the terms and conditions of this Amendment No. 3 shall govern.

WHEREAS, Tesla and Supplier are parties to the Master Services Agreement dated October 20, 2014 and;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Parties, Tesla and Supplier agree to amend the Master Services Agreement, effective as of the Amendment Effective date, as follows:

| PAID SICK LEAVE (PSL) | | | |
|---|---|---|---|
| **Category** | **Position Type** | **California Hourly Markup Rate** | **Description** |
| | Engineering | 23% | |
| | Clerical/Professional | 20% | |
| | Cafe | 24% | |
| | Janitorial | 24% | |
| | Building Maintenance & Recycling | 24% | |
| | Light Industrial | 24% | |
| | Engineering | 24% | |
| | Clerical/Professional | 24% | |
| | Cafe | 24% | |
| | Janitorial | 24% | |
| | Building Maintenance & Recycling | 24% | |
| | Light Industrial | 24% | |



CONFIDENTIAL

TESLA-0001046

DocuSign Envelope ID: 86B23FFD-9FF1-4FA2-80B3-8A212C6ECA98



## MUTUAL NON-DISCLOSURE AGREEMENT

### Effective Date: October 17, 2014

### Name of your Tesla Contact: Touch Reth

THIS MUTUAL NON-DISCLOSURE AGREEMENT (this "Agreement") is entered into as of the date indicated above (the "Effective Date") between Tesla Motors, Inc., a Delaware corporation ("Tesla"), and nextSource, Inc, a(n) Delaware corporation (the "Company"). Tesla and Company hereby agree as follows:



2. <u>Purpose</u>. Disclosing Party and/or its Affiliates may disclose Confidential Information to the Receiving Party and/or its Affiliates for the sole purpose of (a) considering a potential business relationship with each other, and/or (b) fulfilling the objectives of such business relationship (collectively, the "Purpose").

3. <u>Non-use and Non-Disclosure Obligations</u>. Subject to Section 5 of this Agreement, Receiving Party agrees not to: (a) use Disclosing Party's Confidential Information for any reason, other than for the Purpose; and (b) disclose the Disclosing Party's Confidential Information to any third party except its employees, consultants, directors and Affiliates, and their employees, consultants and directors that have a "need to know" such Confidential Information for furtherance of the Purpose. Receiving Party shall exercise the same degree of care in protecting Disclosing Party's Confidential Information that it uses for its own confidential information of a similar nature, but in no event less than reasonable care. The Receiving Party shall be responsible for any unauthorized use or disclosure of Confidential Information by any of its employees, consultants, directors or Affiliates, and their employees,

consultants and directors.



5. <u>Exceptions</u>. The obligations of Section 3 of this Agreement shall not apply to information that: (a) is already known to the Receiving Party or its Affiliates at the time of disclosure without obligation of confidentiality to the Disclosing Party, (b) is or becomes publicly known through no wrongful act or omission of the Receiving Party or its Affiliates, (c) is rightfully received by the Receiving Party or its Affiliates from a third party without obligation of confidentiality, (d) is approved for release by written authorization of the Disclosing Party, or (e) was developed by the Receiving Party or its Affiliates independently and without the use or benefit of any of the Confidential Information. A disclosure of Confidential Information that is required to be made by the Receiving Party pursuant to any request, order or requirement of a court, administrative agency or any other governmental agency shall not be deemed a breach of this Agreement, provided that the Receiving Party has: (x) immediately notified the Disclosing Party in writing of such, request, order or requirement, (y) given the Disclosing Party an opportunity to contest disclosure or seek an appropriate protective order, and (z) cooperated with Disclosing Party to narrow the scope of such disclosure to only that portion of the Confidential Information that is necessary to fulfill the request, order or requirement.

6. <u>Ownership</u>. All Confidential Information and derivations thereof shall remain the sole and exclusive property of the Disclosing Party and no license or other right to such Confidential Information or either party's intellectual property is granted or implied hereby.

7. <u>As-Is Disclosures</u>. The Disclosing Party warrants that it has the right to disclose the Confidential Information to the Receiving Party. Except for the foregoing, (a) no other warranties are made whether express, implied or statutory, (b) all Confidential Information is provided on an "AS IS" basis, and (c) no representation, warranty,

DocuSign Envelope ID: 86B23FFD-9FF1-4FA2-80B3-8A212C6ECA98

# TESLA

assurance, or guarantee is made by the Disclosing Party with respect to the accuracy, performance, completeness, or suitability of the Confidential Information or non-infringement of third-party rights based on use of the Confidential Information by the Receiving Party.

8. _Current and Future Development_. Nothing in this Agreement will be construed as a representation or inference that Receiving Party will not develop, or have developed, products or services that, without violation of this Agreement, compete with the products or services of the Disclosing Party.



10. _Affiliate_. As used herein, "_Affiliate_" shall mean an entity which: (a) controls or is controlled by a party hereto or (b) is under common control with a party hereto: where "control" means that more than fifty percent (>50%) of the controlled entity's shares or ownership interest representing the right to make decisions for such entity are owned or controlled, directly or indirectly, by the controlling entity.

11. _Notices_. Any notice required or permitted by this Agreement shall be made in writing and be deemed delivered upon verification of delivery to the other party.

12. _Termination of this Agreement_. This Agreement shall be effective as of the Effective Date and shall expire on the third (3rd) anniversary of the Effective Date. Either party may terminate this Agreement for any or no reason upon written notice to the other party, and termination shall be effective sixty (60) calendar days after receipt of such notice. No expiration or termination shall affect either party's rights or obligations with respect to Confidential Information disclosed prior to such expiration or termination. Notwithstanding any expiration or termination of this Agreement, Sections 3–5 and 9–16, inclusive, of this Agreement shall survive for five (5) years following the date of any such expiration or termination.



15. _Entire Agreement; Severability_. This Agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof and supersedes a l prior agreements, representations and understandings, oral or written, between the parties regarding the subject matter hereof. If any provision of this Agreement is held by a court of competent jurisdiction to be illegal or unenforceable, such provision shall be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law and the remaining provisions of this Agreement shall remain in full force and effect.

16. _Waiver_. A waiver of any right hereunder shall in no way waive any other rights. No waiver, alteration, modification or amendment of this Agreement shall be effective unless in writing and signed by both parties.

17. _Counterparts_. This Agreement may be signed in duplicate originals, or in separate counterparts, which are effective as if the parties signed a single original. A facsimile of an original signature or electronically signed version transmitted to the other party is effective as if the original was sent to the other party.

*     *     *

CONFIDENTIAL                                             TESLA-0001048

DocuSign Envelope ID: 86B23FFD-9FF1-4FA2-80B3-8A212C6ECA98

# T≡5L⊓

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives and to be effective as of the Effective Date.

**COMPANY**

DocuSigned by:

8EAA786D08F4406...

_____
(SIGNATURE)

**Will Morse**_____
(PRINT NAME)

**Senior Vice President**_____
(PRINT TITLE)

**Contact Information:**

Name/Dept.: Will Morse_____

Address: 1040 Avenue of Americas, 24th Floor _____

New York, New York 10018 _____

_____

Phone: (212) 736-5870_____

Fax: (888) 663-6760_____

**TESLA MOTORS, INC.**

_____
(SIGNATURE)

_____
(PRINT NAME)

_____
(PRINT TITLE)

**Contact Information:**

Name/Dept.:    General Counsel / Legal
Address:       Tesla Motors, Inc.
               3500 Deer Creek Road
               Palo Alto, CA  94555
Phone:         (650) 681-5000
Fax:           (650) 681-5203

CONFIDENTIAL                                                                        TESLA-0001049

CONFIDENTIAL

TESLA-0001050