Volume 2

Pages 172 - 368

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND )
LAMAR PATTERSON )
                            )
                            )
        Plaintiffs,          )
                            )
  vs.                        ) No. C 17-6748 WHO
                            )
TESLA, INC., dba TESLA MOTORS, )
INC., CITISTAFF SOLUTIONS, INC., )
WEST VALLEY STAFFING GROUP,   )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,    )
                            )  San Francisco, California
        Defendants.          )  Tuesday
                            )  September 28, 2021
                            )  8:00 A.M.
_____)

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          ALEXANDER MORRISON & FEHR LLP
                          1900 Avenue of the Stars
                          Suite 900
                          Los Angeles, California 90067
                    BY:  **BERNARD ALEXANDER, ESQ.**


                          CALIFORNIA CIVIL RIGHTS LAW GROUP
                          332 San Anselmo Avenue
                          San Anselmo, California 94960
                    BY:  **LAWRENCE A. ORGAN, ESQ.**
                          **CIMONE A. NUNLEY, ESQ.**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                Official Reporter - US District Court
                Computerized Transcription By Eclipse

**APPEARANCES:   (CONTINUED)**

**For Defendants:**          SHEPPARD MULLIN RICHTER & HAMPTON LLP
333 S. Hope Street
43rd Floor
Los Angeles, California 90017
**BY:  TRACEY A. KENNEDY, ESQ.**


SHEPPARD MULLIN RICHTER & HAMPTON, LLP
379 Lytton Ave
Palo Alto, California 94301
**BY:  PATRICIA M. JENG, ESQ.**


SHEPPARD MULLIN RICHTER & HAMPTON LLP
Four Embarcadero Center
17th Floor
San Francisco, California 94111
**BY:  SUSAN Q. HAINES, ESQ.**


**Also Present:**          **JOSEPH ALM, ESQ.**
- Tesla, Inc.

**YUSUF MOHAMED, ESQ.**
- Tesla, Inc.

—  —  —

<u>**Tuesday - September 28, 2021**</u>                          **8:01 a.m.**

**P R O C E E D I N G S**

---o0o---

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  All right.  There are three things on my
mind this morning.  The first one, I saw the Marconi
designations and counterdesignations.  Did the plaintiffs
intend to respond to that, Marconi?

**MR. ORGAN:**  Yes, Your Honor.  I believe we did file
something late last night; or if not, then we're planning to
file something early this morning.

**THE COURT:**  Okay.  I didn't see it when I came in this
morning.

**MR. ORGAN:**  Okay.

**THE COURT:**  I could have missed it, so I'll go take a
look.

When do you expect -- when would you like to put that on?

**MR. ORGAN:**  I think at the earliest it would be
tomorrow, Your Honor.

**THE COURT:**  Okay.  I'll take a look; and if it's -- if
I can get at it while you're still here --

**MR. ORGAN:**  I'll check with my colleague to make sure.
I wasn't preparing it, so...

**THE COURT:**  All right.  Then the second thing is the
Demetri Di-az objections.  And I'll sustain the remaining

**PROCEEDINGS**

 1   objections to the counterdesignations.  The employment-related

 2   one on West Valley is not relevant, and 403 I think also

 3   applies because it would be confusing.  And it's just --

 4   there's not enough information, even if it was relevant, to

 5   actually get his view on who he was employed by.

 6       And the other designation, which is Designation Number 9,

 7   what happened outside of the workplace doesn't matter.  The use

 8   of the "N" word outside of the workplace doesn't matter, and I

 9   think 403 also applies.

10       So that's my ruling on those.

11       And then the final thing on my mind is I am going to post

12   at some point, when I let Ms. Davis know that she can do it and

13   she has the time to do it, draft final Jury Instructions.  So

14   I've put them in the way that I think they ought to go.  I've

15   left the sequencing in the way that you did, but I now have

16   them in a form that we can actually use on Friday.

17       So what I want you to do is, if you have any objections to

18   the instructions, any additions to the instructions, anything

19   with respect to the instructions other than the way that

20   they're currently presented, post by Thursday at 3:00 o'clock

21   what else you would like to see in the instructions.

22       And refer to the instruction by the page number.  So I've

23   paginated them.  I've left the numbers at the top blank because

24   I don't think we'll be using all of the sort of general

25   instructions that are there.

**PROCEEDINGS**

 1      But if you would do that by Thursday, to the extent that

 2   we know what should be in and out by Thursday, I would

 3   appreciate that.  And we will meet on Friday immediately after

 4   the testimony, whatever it is.

 5      Mr. Organ.

 6          **MR. ORGAN:**  Yes, Your Honor.  Could we have till 3:30?

 7          **THE COURT:**  Yes.

 8          **MR. ORGAN:**  Thank you.

 9          **THE COURT:**  All right.  Now, is there anything else

10   from the plaintiff's perspective that we ought to deal with

11   today?

12          **MR. ORGAN:**  Two things, Your Honor.

13      In line with the Court's request that we address any

14   witness issues, I had -- Ms. Heisen is coming in, the PMK --

15          **THE COURT:**  Tell me who is coming in today.  I'd like

16   to know.

17          **MR. ORGAN:**  So Heisen is coming in first.  And then

18   Mr. Romero, we'll finish his testimony after she's done.  And

19   then we have Wayne Jackson, Your Honor.

20          **THE COURT:**  Okay.

21          **MR. ORGAN:**  And I believe Delgado, Ms. Delgado.  And

22   then it's a question of whether Mr. Quintero -- whether we have

23   time for Quintero, but it's our hope to get to him.

24          **THE COURT:**  Okay.

25          **MR. ORGAN:**  And so that would -- that should fill the

```
 1    day.
 2              THE COURT:  Okay.  Great.
 3         You're going to take Heisen out of order, is that --
 4              MS. JENG:  Your Honor, could I add?  This may be
 5    relevant information, but I just spoke with Annalisa Heisen.
 6    She's supposed to testify over Zoom.  She, I think, is
 7    currently going into labor.
 8              THE COURT:  Okay.  She may not be available.
 9              MS. JENG:  Right.  So I just spoke to her, like,
10    five minutes ago.
11              THE COURT:  Okay.  All right.  Well --
12              MR. ORGAN:  I guess I'm not calling Ms. Heisen,
13    Your Honor.  I guess we'll be designating testimony then,
14    Your Honor.
15              THE COURT:  I assume that that's --
16              MS. KENNEDY:  That's perfectly fine.
17              MS. JENG:  We don't anticipate she will be available
18    the rest of the week.
19              THE COURT:  Okay.  Congratulations to her.
20              MR. ORGAN:  So we'll have those designations to
21    Your Honor this evening.
22              THE COURT:  Okay.
23              MR. ORGAN:  And okay.  Well, I guess we're going to
24    come back with Mr. Romero not out of order.
25              THE COURT:  Great.
```

PROCEEDINGS

```
1              MR. ORGAN:  I guess I do have a question, Your Honor.
2    Since we took him as an adverse witness, is there -- is the
3    defense entitled to do leading questions?  I don't want to
4    object if that's your ruling.
5              THE COURT:  No.  The defense will be doing direct
6    questioning.
7              MR. ORGAN:  Okay.  Thank you, Your Honor.
8              THE COURT:  Okay.  All right.  And, Ms. Kennedy, is
9    there anything from your perspective that we ought to talk
10   about this morning?
11             MS. KENNEDY:  No, I don't believe so.
12        I think we're starting with Mr. Romero?
13             THE COURT:  Yeah.
14             MS. KENNEDY:  Okay.
15             THE COURT:  Good.  All right.
16             MR. ORGAN:  Your Honor, just one thing.
17        So logistically now we will get to Mr. Quintero, I assume.
18   This does change our timing a little bit obviously.
19        So we'll play Mr. McGinn.  During one of the breaks, I'll
20   see if we can queue up the Demetric testimony with your
21   rulings.  I'm not sure we'll be able to do that, but this may
22   affect us at the end of the day.
23             THE COURT:  Okay.  So that's fine, and I'm not going
24   to hold it against you given Ms. Heisen's condition.
25             MR. ORGAN:  Okay.  Thank you, Your Honor.
```

1      **THE COURT:**  Okay.

2         (Whereupon there was a recess in the proceedings

3          from 8:10 a.m. until 8:28 a.m.)

4      (Proceedings were heard in the presence of the jury.)

5         **THE COURT:**  All right.  Please be seated everybody.

6      Good morning, ladies and gentlemen.  Welcome.  Thank you

7   very much for being as prompt as you've been.

8      We're now going to continue the trial and the examination

9   by the defendant of Mr. Romero.

10     We'll start.  Ms. Kennedy, good morning.

11        **MS. KENNEDY:**  Good morning, Your Honor.

12                     **EDWARD ROMERO**,

13   called as a witness for the Plaintiff, having been previously

14   duly sworn, testified further as follows:

15                   **CROSS-EXAMINATION**

16   **BY MS. KENNEDY**

17   **Q.**   Good morning, Mr. Romero.

18   **A.**   Good morning.

19   **Q.**   Good morning, Your Honor.  Good morning, counsel.

20        Mr. Romero, how are you feeling this morning?

21   **A.**   I've got diabetes and high blood pressure, but right now I

22   feel okay.

23   **Q.**   Okay.  If you need a break, just let me know, but I'll

24   make this as short as I can.  Okay?

25   **A.**   Thank you.

1  Q.   I understand from your testimony in response to

2  Mr. Organ's questions that you were a contractor for -- at the

3  Tesla facility in, say, early mid-2015; is that right?

4  A.   Yes.

5  Q.   And at some point in time you became a Tesla employee?

6  A.   Yes.

7  Q.   How long did you actually work at Tesla as an employee?

8  A.   One year.

9         THE COURT:  Ms. Kennedy, let me interrupt you.

10     A couple of folks have walked in.  I want to make sure

11 that anybody who is going to be a witness does not sit in

12 during the testimony.  So, I'm sorry, you'll have to wait

13 outside.  Thank you very much.

14     And I'd like the lawyers to be paying attention to this

15 because it's not the first time that it's happened.

16     All right.  I'm sorry.  Please go ahead.

17         MS. KENNEDY:  All right.  I didn't see anyone come in.

18 BY MS. KENNEDY

19 Q.   I'm sorry.  So, Mr. Romero, you were at Tesla as an

20 employee for about a year; is that correct?

21 A.   I was a Tesla employee for one year.

22 Q.   So let me just ask a couple questions about the "N" word.

23     When you were working there as a contractor resident

24 employee, did Mr. Owen Diaz ever tell you that he had been

25 called the "N" word?

1   A.   I don't think he told me that he had used that -- I mean,

2   that anybody had used the "N" word.  There was a picture that

3   he alluded to that was -- I think that was racial.

4   Q.   Right.  That was a cartoon or the drawing you were shown

5   yesterday?

6   A.   Yes.  Uh-huh.

7   Q.   Did you actually have any interactions with Mr. Diaz when

8   you were working there either as a contractor or as an employee

9   of Tesla?

10  A.   Other than as a contractor?

11  Q.   Yeah.

12  A.   No.

13  Q.   When you talked to Mr. Diaz, did you ever have any issues

14  with how he was interacting with you?

15  A.   No.

16  Q.   Did you ever -- did he ever complain -- did Mr. Diaz ever

17  complain to you that anyone had said to him, quote, Go back to

18  Africa?

19  A.   No.

20  Q.   Did Mr. Diaz ever tell you that anyone had ever used this

21  phrase -- and I'm sorry to say this -- the "porch monkey"?

22  A.   No.

23  Q.   Mr. Diaz has testified in this case that he reported to

24  you, at least, quote, three to seven times that other employees

25  were calling him the "N" word.  Is that true or false?

1   A.   I don't remember him ever saying that.

2   Q.   And based on your experience being either as a contractor

3   at Tesla or as an employee at Tesla, if Mr. Diaz had told you

4   that those type of racial epithets had been used, what would

5   you have done?

6   A.   I would have, you know, take note of what they were saying

7   for one thing or, you know, remembered what they would have

8   said, and then in an email -- primarily in an email and

9   sometimes verbally I'd pass it up to my supervisors.

10  Q.   And I understand you did that with respect to this issue

11  regarding this employee Troy Dennis.

12       Remember the email that Mr. Organ showed you yesterday?

13  You actually reported the exact --

14  A.   Yes, I did.

15  Q.   -- racial epithets?

16  A.   It's been going, like, six years now.  There's a lot of

17  things I don't remember.

18  Q.   Certainly.

19  A.   But the email that he alluded to or that was -- they

20  mentioned yesterday is one I just didn't remember; but after

21  looking at it, you know, you kind of make memory and say,

22  "Well.."  But I did report it.

23  Q.   Right.  And do you recall that you reported the exact

24  racial epithet that had been alleged to have been made?

25  A.   Say that again.

1   **Q.**   Do you recall in that email, which was Exhibit 106, that

2   you did actually report the actual racial epithet in that

3   email?

4   **A.**   I did.

5   **Q.**   Now, I understand approximately sometime in October of

6   2015 were you advised of any type of complaints about Mr. Diaz

7   and his interactions with his coworkers?

8   **A.**   In all fairness to Owen, you know, it was an environment

9   that is a big place.  There's thousands of people working

10  there.  There's a lot of issues that kind of irritate people.

11  You know, maybe somebody wants parts or somebody wants this, so

12  they're waiting.  And sometimes they just -- they just think

13  they're not doing their job and things like that.

14       My experience in being there, I -- my goal was to make my

15  team united, make them work together, have good customer

16  service, and so on.  So whenever I got complaints, I always

17  listened to both sides closely, you know, the complainer and so

18  on.

19       And as a rule, I tried to talk to my people, you know,

20  about, you know, what happened and when did it happen and, you

21  know, I'd want to hear their side of the story.

22       We primarily had complaints from a department, and I can't

23  remember the name of the department right now, but they had a

24  lot of movement of product on the floors.

25       The elevator service, we handled primarily the movement of

 1   product from the elevator upstairs to the -- I mean, to the

 2   second floor/first floor, first floor/second floor, and the --

 3   an area where things were stationed near the elevators.  Okay?

 4       So when I got complaints, I tried to listen to both sides.

 5   That department, I think the supervisor's name was DelaGrande

 6   or something like that.  She -- there was a rumor going around

 7   that she thought I was favoring -- favoring Owen.  Okay?  And

 8   in a way I was.  He was one of my guys.  I didn't want to jump

 9   to any conclusions.  I just wanted, you know, to be fair, as

10   fair as I could be.

11   Q.   And is that person you're talking about, is that

12   Joyce DelaGrande?

13   A.   I'm sorry?

14   Q.   Was that Joyce DelaGrande or DelaGrande that you were

15   talking about?

16   A.   Yes.

17   Q.   And was she in the materials or in the production?

18   A.   Yeah, I don't remember the name of her department, but it

19   had to do with material -- materials, yeah.

20   Q.   And in your role, say, in this October, say, December 2015

21   time period, did Owen Diaz have complaints to you about some of

22   the folks working for Joyce DelaGrande?

23   A.   Yes.

24   Q.   And did you try to listen to both sides?

25   A.   Yes.

ROMERO - CROSS / KENNEDY

1   Q.   And you said that you were favoring Owen Diaz.  What do

2   you mean by that?

3   A.   Well, that was her opinion.  Excuse me.  That was her

4   opinion.

5        To be fair to Owen, as an example, a number of times I

6   would ask him:  Well, can your guys -- can they send me an

7   email?  Can they tell me what's going on?

8        You know, it wasn't that I was looking for anything to

9   take to Owen.  It was more:  Take responsibility for your

10  actions, you know.  Don't just say that somebody is not doing

11  something.

12       So I wanted to just investigate as much as I could, but

13  more to be fair with my guys.

14  Q.   And your guys would include Owen Diaz and the other

15  elevator folks?

16  A.   Yeah.  And I can add that they complained about Owen, but

17  they complained about a lot of our people there.  It wasn't

18  just him.  It was -- you know, sometimes on another shift they

19  would complain that they're not doing their job.  They're not

20  doing.  They're not taking materials up and down.  You know,

21  things like that.  So it was kind of a stressful place to be.

22  Q.   How would you describe the importance of the elevator

23  operator position or the elevator -- the lead elevator operator

24  position in the Tesla facility when you were there?

25  A.    I guess I would say that we were somewhat key to making

1   sure production continued because if we didn't move the

2   materials in a timely manner, well, a lot of car parts weren't

3   taken down so they were waiting.  They might have to hold the

4   line for a few minutes or, you know, for a time to make sure we

5   got the materials to them.  Okay?

6        Could I add something?  We moved a lot of materials, but

7   it wasn't just car parts.  You know, we were moving recycling

8   materials, trash, other types of supplies, maybe janitorial

9   supplies going to one place, and so on.  So we would have to

10  move all that type of material.

11  **Q.**   When you were working at Tesla as an employee or as a

12  contractor, did you ever hear anyone refer to Mr. Owen Diaz

13  using the "N" word?

14  **A.**   As to him using it?

15  **Q.**   No.  As to someone else referring to Mr. Diaz using the

16  "N" word.

17  **A.**   Not that I can remember.  I don't think so.

18  **Q.**   I want to move forward to basically this issue concerning

19  the cartoon we talked about yesterday.  It was in January of

20  2016, to give you some reference.

21       Mr. Diaz sent you a copy of that cartoon and you got that

22  email?

23  **A.**   Uh-huh.

24  **Q.**   My question for you, Mr. Romero, is:  What was your first

25  reaction when you saw that?

1   A.   Umm, I was shocked.  Okay?  I was shocked that someone

2   would do that.  Okay?  By the time I got it, because I think --

3   if I remember correctly, Owen was working on the night shift,

4   if I remember correctly.  Okay?  So I understood that he had

5   already talked to two or three people before he talked to me.

6   Okay?  But when I got it, I was shocked, and I think -- I

7   think -- I thought it was important so I reported it

8   immediately.

9   Q.   And when you talked to Mr. Diaz, how did he describe how

10  he felt when he saw this cartoon?

11  A.   He was hurt.  He was very, very hurt.  And I told him:  I

12  don't blame you, you know.  That's not right, you know.  So,

13  you know, we initiated the proper steps that should be taken to

14  rectify it.

15  Q.   When you talked to Mr. Diaz after he sent you the email

16  and you talked to him, did he tell you if he had determined who

17  had written or drawn this cartoon or this --

18  A.   Yeah.

19  Q.   -- as he described it, a racist effigy?

20  A.   I think by that time he mentioned it was Ramon Martinez.

21  Okay?  He worked for the recycling team, I think.

22  Q.   And when he told you that it was Ramon Martinez, did he

23  tell you anything else at that time about Ramon Martinez, if

24  you recall?

25  A.   I can't recall anything specific at that moment, you know.

1  We were kind of focused on the drawing.

2  **Q.**   And once you got the drawing, I think you forwarded it

3  over to Victor Quintero; is that correct?

4  **A.**   Yes.

5  **Q.**   And you sent it over there because he was in charge of

6  recycling, as I understand?

7  **A.**   He was supervising -- Ramon Martinez reported to him, you

8  know, somewhere along the chain there somehow.

9  **Q.**   And at some point in time did you talk with either Wayne

10  Jackson or Victor Quintero about this drawing or this cartoon?

11  **A.**   I talked to Wayne Jackson at nextSource about it.  Okay?

12  **Q.**   Why were you talking to Wayne Jackson at nextSource

13  about it?

14  **A.**   Because he was a contract employee.  Right?

15  **Q.**   When you say "he," you mean Wayne Jackson was the contract

16  employee or Owen Diaz was the contract employee?

17  **A.**   Owen -- Owen Diaz was.  And I talked to Wayne because he

18  was like a -- like a project manager, you know, for, I guess,

19  nextSource, overseeing the activities at the plant for

20  nextSource.

21  **Q.**   Okay.  And after you reported this, I guess, up to Victor

22  Quintero and you talked to Wayne Jackson and Victor Quintero,

23  what was your involvement, if anything, with respect to this

24  drawing or this cartoon?

25  **A.**   Well, I thought it was my responsibility to report it.

ROMERO - CROSS / KENNEDY

1   Okay?  Wayne and I went over to speak with Mr. Quintero.

2       Mr. Quintero thought -- at the time he didn't understand

3   what the drawing was.  Okay?  And Wayne and I told him that it

4   was very derogatory; that it was bad.

5       I think the term I used was it's called "jigaboo" or

6   something like that, you know.  And I remember that because I

7   was raised here.  So I kind of from the '50's and '40s you

8   would see kind of those kind of cartoons and stuff like that,

9   which were very offensive, you know.

10  Q.  And did you ever talk to Ramon Martinez about this cartoon

11  drawing?

12  A.  No.  No.

13  Q.  And other than Mr. Diaz, to your knowledge, did anyone

14  else complain about this cartoon drawing to anyone, to your

15  knowledge?

16  A.  No.

17  Q.  And after Mr. Diaz's complaint, the cardboard and all that

18  was taken down and removed immediately?

19  A.  I don't know what happened to it.  I don't know if it was

20  moved and saved for a time.  I don't know.

21  Q.  Okay.  But you understand it did become part of the

22  investigation; correct?

23  A.  Yeah.  You know, sure.  People were looking at it, uh-huh.

24  Q.  And to your knowledge, do you know if Mr. Martinez

25  received any type of discipline?  Were you ever advised one way

1    or the other?

2    **A.**    I don't remember ever being told directly.  I think there

3    might have been like a rumor that he was written up or

4    something.  I don't know.

5    **Q.**    But as far as you're concerned, your part of this process,

6    once you reported it up and spoke to Wayne Jackson and Victor

7    Quintero, it was out of your hands?

8    **A.**    Correct.  I left it in their hands.

9    **Q.**    At some point in time in, say, the February 2016 time

10   period, were you ever advised by Joyce DelaGrande about any

11   issues she had with -- the folks running the elevators?

12   **A.**    Yes.

13   **Q.**    What were those issues?

14   **A.**    That product wasn't being moved; that sometimes they

15   couldn't find -- find the guys at the elevator, you know.  And

16   I -- I also tried to explain to her, well, they have to take

17   their breaks, they have to take their lunches, you know, things

18   like that; but she said it was more than that, that they just

19   were never there sometimes.  So that's her word.  That's what

20   she was saying.  Okay?

21   **Q.**    At some point in time was Ms. DelaGrande asking you to

22   remove Mr. Diaz as the lead elevator operator?

23   **A.**    I think there was an email sent that alluded to that, that

24   she wanted a change at the elevators.

25          **MS. KENNEDY:**  Okay.  Your Honor, I'd like to show

1    Exhibit 296.  It has not been admitted so I'd mark it for

2    identification only.

3        And Exhibit 296, starting at Page 3 in particular, is an

4    email from Joyce DelaGrande to Edward Romero dated

5    February 19th, 2016, at 12:49 a.m.

6        (Trial Exhibit 296 marked for identification)

7    **BY MS. KENNEDY:**

8    **Q.**   If you look at that last page of Exhibit 296, Mr. Romero,

9    it's an email string.  Read through it and let me know when

10   you're done.

11   **A.**   It's marked 12:49?  I mean, the time?

12   **Q.**   Yes.  12:49 a.m.  It's going to be on Page 3 of that

13   Exhibit 296.

14   **A.**   Yes, I see it.

15   **Q.**   Take a minute to read that and let me know when you're

16   done.

17       (Witness complied.)

18   **A.**   Okay.

19   **Q.**   And is that your email to Ms. DelaGrande?

20   **A.**   This is a copy she sent to me, right?

21   **Q.**   Yes.  Could you start on Page 3?  It's an email from

22   you -- I'm sorry, from Ms. DelaGrande to you.  Excuse me, yes.

23   **A.**   Yeah, and my response -- I was trying to get a good handle

24   about what is --

25           **THE COURT:**  Hang on.  Hang on.  Let's get the -- deal

1   with the document first.

2          MS. KENNEDY:  Yes.

3   BY MS. KENNEDY

4   Q.   Exhibit 296, Page 3, it should be the email from

5   Joyce DelaGrande to you.  Do you recognize that, February 19th,

6   2016, at 12:49 a.m.?

7   A.   Yes.

8   Q.   Okay.  And if you go to the prior page, 296.2 it's your

9   email to Ms. DelaGrande on the same day, February 19th, 2016,

10  at 1:48 a.m.  Do you see that?

11  A.   Yes.

12  Q.   And just to complete the document, if you look at the top

13  of that page of Exhibit 296 at Page 2, it's Ms. DelaGrande's

14  response email to you sent on February 19th, 2016, at

15  1:59 a.m.?

16  A.   Yes.

17  Q.   And if you go to the first page of Exhibit 296 at Page 1,

18  you see your response email -- I'm sorry.  You forwarded an

19  email to Victor Quintero, the email string -- excuse me -- at

20  4:24 a.m.?

21  A.   Yes.

22  Q.   And then Mr. Quintero responds to your email again on the

23  same day at 7:26 a.m.  Do you see that?

24  A.   Yes.

25  Q.   And the "Re" line appears to be "Elevator Team End of

1   Week."  Do you see that?

2   **A.**   Yes.

3   **Q.**   Okay.  And do you recall the content of these emails?  You

4   might not recall these exact emails.

5   **A.**   All of the emails?

6   **Q.**   Yes.  Do you recall this issue?

7   **A.**   Yeah.  Well, she had complained --

8          **THE COURT:**  Just a second.  The answer is "yes" or

9   "no."  We're trying to get this.  So go ahead.

10         **MS. KENNEDY:**  Yes, Your Honor.  I move to admit --

11         **THE COURT:**  Here we go.  Any objection?

12         **MR. ORGAN:**  No objection, Your Honor.

13         **THE COURT:**  It's admitted.  All right.

14      (Trial Exhibit 296 received in evidence)

15         **MS. KENNEDY:**  Thank you.

16      May I publish, Your Honor?

17         **THE COURT:**  You may.

18      (Document displayed.)

19   **BY MS. KENNEDY**

20   **Q.**   Let's start the last page of Exhibit 296 just so we can

21   get our bearings here.

22      This is the email from Joyce DelaGrande to you on

23   February 19th, 2016.

24      And just for reference, in that first sentence where it

25   says "PWT," does that refer to power train?

1   **A.**   Yes.   Uh-huh.

2   **Q.**   And just so we're able to understand, what is the power

3   train, if you know?

4   **A.**   Power train is a section of the facility where they

5   specifically handled certain -- certain types of materials and

6   equipment that goes in cars.   I can't tell you what they are

7   exactly.

8          **MS. KENNEDY:**   Stephanie, if you go to Exhibit 296 at

9   Page 2, Mr. Romero's email at 1:48 a.m.   I just want to ask a

10  couple questions about that.

11       (Document displayed.)

12  **BY MS. KENNEDY**

13  **Q.**   Take a look this email, Mr. Romero.   Do you recall why you

14  sent this email at this time?

15  **A.**   It was in response to her concerns.

16       And I mentioned earlier that I always try to be -- I

17  always wanted to be fair with my guys, and I just didn't want

18  somebody complaining.   Okay?   So I listed out some questions.

19  You know, be more specific.   You know, what happened?   You

20  know, what are the real concerns you have?   And, you know, and

21  so on.   And has it been going on for a time?

22       And I think I have -- like, there's five points there.

23  **Q.**   Right.   In looking at those five points, do you recall

24  ever having discussions with Joyce DelaGrande about any of

25  these five points that you made?   Again, I know it was about

1  five and a half years ago, but do you recall?

2  A.   I -- I do because I went down to her area.  What I wanted

3  was for her staff to tell us exactly what's going on.  Okay?

4       A lot of times I couldn't talk to anybody because

5  everybody was busy or, you know -- you know, taking care of

6  their activities and so on.

7       But I went down there, you know, a number of times.  You

8  know, at least three times, you know.  I'd tell her:  What's

9  going on?  Tell your guys to let me know exactly what's going

10  on so we could -- we could, you know, take care of this.

11  Q.   Was it your understanding that Ms. DelaGrande had talked

12  to Owen and his team about these issues before she brought it

13  up to you?

14  A.   That she had talked to her team?

15  Q.   No.  If she had talked to Mr. Owen Diaz's team and, you

16  know, his folks before she raised these issues with you?

17  A.   I don't remember all the specifics, but I do remember,

18  like, her saying "My people are complaining about this.  My

19  people are doing this."

20       I don't remember if she ever said that she spoke to him

21  directly.  I don't -- I don't remember.

22  Q.   All right.  Well, let's take a look at the top of

23  Exhibit 296.2, the email from Ms. DelaGrande to you.  It

24  actually goes to Page 1, but we'll stay on Page 2.  This was

25  sent by Joyce DelaGrande at 1:59 a.m.  It starts "Hi, Edward,"

ROMERO - CROSS / KENNEDY

```
 1   at 296.2.

 2   A.   Yes.

 3   Q.   Look at that for a minute and let me know when you're

 4   done.  I wanted to ask you about the last couple of sentences

 5   there and the comments regarding Mr. Diaz's -- Mr. Diaz and his

 6   team.

 7        (Witness complied.)

 8   A.   Okay.

 9   Q.   Okay.  And taking a look at this top email from

10   Ms. DelaGrande, do you -- if you look in the middle paragraph

11   where it says, quote (as read):

12           "I really brought it up because I had the same

13        concerns downstairs with Owen and his teams.  They

14        would always tell me it was because of what they were

15        doing with the PWT material; but if they were

16        struggling up here, too, and the beginning of the week

17        team does not, then I think it may be the team.  I

18        personally brought these concerns to the team

19        tonight."

20        Do you see that?

21   A.   Yes.

22   Q.   Does that refresh your recollection as to whether or not

23   you knew at the time that Joyce DelaGrande talked to the team

24   about these issues?

25   A.   Well, you know, I asked her -- in my response first to her
```

 1  I wanted to get as much details as I could, so I guess she was
 2  responding on what she had done.
 3      In all honesty, until I see this email, I don't remember
 4  her saying that, you know; but according to the email, it
 5  sounds like she did talk to Owen about it, yeah.
 6  **Q.**   And do you recall if you actually talked to Mr. Diaz about
 7  these issues?
 8  **A.**   I think we did, yeah.  You know, I usually told the guys:
 9  I got -- I got this concern.  They're saying this.  They're
10  saying that.  And I tried to let them tell me what they felt
11  was going on.
12  **Q.**   All right.  Let's go to the first page of
13  Exhibit 196 [sic] and the email that you sent, Mr. Romero, to
14  Victor Quintero at 4:24 a.m.
15  **A.**   Uh-huh.
16  **Q.**   It's the one in the middle.
17      (Document displayed.)
18  **Q.**   And take a look that and let me know when you're done,
19  sir.
20  **A.**   Okay.
21  **Q.**   And looking at this email at 4:24 a.m., do you recall this
22  email now?
23  **A.**   Yes.
24  **Q.**   And do you recall having any conversations with Mr. Diaz
25  regarding these issues?

1    **A.**    Umm, I can't remember the details of, you know, going to

2    him and exactly the -- the exact words that were used, but I

3    did convey the concerns that they had.

4    **Q.**    And when you spoke to Mr. Diaz, he was willing and open to

5    hear, I guess, the feedback and was willing to make changes; is

6    that right?

7    **A.**    Umm, from what I can recall, and it's vague now, but I --

8    I kind of remember him, you know, trying to give some excuses:

9    Well, this and that and whatever.

10       And I was emphasizing we need to have good -- good help

11   with production to move these materials around, you know, up

12   and down and so on, and it's urgent that we provide the

13   service.

14   **Q.**    And in talking with Mr. Diaz -- and I think you said

15   earlier you want to sort of protect your team -- were you

16   trying to make sure you were going to protect Mr. Diaz sort of

17   in this issue concerning production and Joyce DelaGrande?

18   **A.**    Well, the issue with Ms. DelaGrande and her people, I

19   was -- I -- I made it a point to try to go slow.  I didn't want

20   to jump to any conclusions.  And I -- I really did want to hear

21   from my guys, and -- and I -- I didn't want to jump to

22   conclusions just because somebody complained.

23   **Q.**    Correct.

24   **A.**    Okay?  I want to hear both sides of it.  But sometimes in

25   these types of issues, you have a lot of complaints from a lot

1   of different people, well, it's a factor.  You have to think

2   about:  Well, you know, what's going on here?  It's not one

3   person complaining, it's a number of people complaining.

4        So that's why I wanted to go slow and ask as many

5   questions as I could.

6   Q.   And in your opinion, at this time you thought Mr. Diaz was

7   doing a pretty good job as an elevator -- lead elevator

8   operator; would that be accurate?

9   A.   Umm, I -- I think Owen had -- has the capability of being,

10  you know -- you know, assuming responsibilities and so on, but

11  I think there were probably issues there that I didn't know

12  about.  You know, his relationships with other people I don't

13  know.

14       But I liked Owen.  You know, I didn't want to see anything

15  happen to him, you know.  But when you get this number of

16  complaints, well, then you have to take it serious.

17  Q.   Well, in these conversations you had with Mr. Diaz, say,

18  in February of 2016 when you were talking to him about these

19  complaints, did he tell you at that point in time that, you

20  know, everyone is calling him the "N" word and all these other

21  racial slurs and that's why these -- that's why I'm not getting

22  along with these people?  Did he ever tell you that at all?

23  A.   No.  I would have reported that if he would have said

24  that.

25  Q.   At some point in time were you advised that a decision had

 1   been made that Mr. Diaz was no longer going to be the lead

 2   elevator operator?

 3   **A.**   Yeah.  All of this information was being relayed to Wayne

 4   Jackson.  Okay?  And I think he was the one that took care of

 5   the write-up, right.

 6   **Q.**   Did you know if Mr. Diaz actually got a write-up or was it

 7   just something discussed?

 8   **A.**   I don't know.  I don't know if he did or not.

 9   **Q.**   But that was handled by Wayne Jackson, nextSource, those

10   folks; correct?

11   **A.**   Right.

12   **Q.**   You understand at some time Mr. Diaz advised you that he

13   had a passing in his family and he was going to be taking some

14   time off?

15   **A.**   Yes.

16   **Q.**   And he advised you of that sometime in March of 2016; is

17   that your recollection?

18   **A.**   If I remember right, I think there was an email or

19   something he sent that said:  I'm going to be off because my

20   mother had passed away.

21        His mother had passed away a few days before that from

22   what I remember.

23   **Q.**   Right.  And after that email or that time period he told

24   you he was going to be gone, did you ever see Mr. Diaz again?

25   **A.**   No.

1   Q.   When the decision was conveyed to you that Mr. Diaz was

2   going to be made an elevator operator instead of a lead, did

3   you have any communications with Mr. Diaz about that?

4   A.   Directly with Owen?

5   Q.   Yes.

6   A.   I don't think so.

7   Q.   Did you ever try to call him at any time and let him know

8   that the decision had been made?

9   A.   I don't -- I don't think so, but I can't recall that

10  happening.

11  Q.   Let's go to Exhibit 306, please.

12        MS. KENNEDY:   And, Your Honor, 306 has been stipulated

13  to.

14        THE COURT:   All right.  It's admitted.

15      (Trial Exhibit 306 received in evidence)

16      (Document displayed.)

17  BY MS. KENNEDY

18  Q.   And, Mr. Romero, this is an email from you to Wayne

19  Jackson, copy Victor Quintero.  There's a couple emails here.

20  The first one on Page 1 is March 11th, 2016.  Take a minute to

21  read this and let me know when you're done.

22      (Witness complied.)

23  A.   Okay.

24  Q.   And if you go to Page 2 of Exhibit 306 -- we'll put these

25  in order -- Page 2 is an email from you March 10th to Wayne

1    Jackson and then Edward Romero email to Wayne Jackson on

2    March 14th.  Sorry these are a little out of order the way

3    these strings came out.

4    **A.**   You're referring to the email of March 10th, 10:57?

5    **Q.**   Yes.

6    **A.**   Okay.

7    **Q.**   And taking a look at these, do you know who made the

8    decision that Mr. Diaz was no longer going to have the lead

9    elevator operator role?

10   **A.**   I don't recall how that decision was made.

11   **Q.**   And if you take a look at your email on Exhibit 306,

12   Page 2, on March 14th, 2016, you write (as read):

13           "Wayne, I need to get this issue resolved

14       regarding Owen Diaz.  Were you able to speak to Owen

15       last Friday?  If not, let's resolve this issue today.

16       Let me know when you are available."

17   **A.**   Right.

18   **Q.**   In looking at that, do you know if anyone actually tried

19   to contact Mr. Diaz about this issue?

20   **A.**   I don't recall anybody telling me that they had made

21   contact with him.

22   **Q.**   All right.  We've got one more exhibit here, and we'll go

23   to Exhibit 308, please, and marked for identification only.  It

24   has not been admitted.

25           (Trial Exhibit 308 marked for identification)

1    BY MS. KENNEDY:

2    Q.   For identification it's the Edward Romero email to Wayne

3    Jackson on March 17, 2006, at 6:18 a.m.

4         Take a look at that, Mr. Romero, and let me know when

5    you're done.

6         (Witness complied.)

7    A.   Okay.

8    Q.   And take a look the second page.  Again, for

9    identification it's an email string between Edward Romero and

10   Wayne Jackson and Victor Quintero, March 16, 2016, email from

11   Edward Romero to Wayne Jackson at 11:18 p.m., and an email from

12   Edward Romero to Victor Quintero on March 17, 2016, at

13   6:24 a.m.

14        Do you recognize those emails, Mr. Romero?

15   A.   Yes.

16   Q.   And are these emails that you sent either to Victor

17   Quintero and/or Wayne Jackson?

18   A.   Yeah.

19             MS. KENNEDY:  Your Honor, I move to admit Exhibit 308.

20             THE COURT:  Any objection?

21             MR. ORGAN:  No, Your Honor.

22             THE COURT:  They're admitted.

23        (Trial Exhibit 308 received in evidence)

24   BY MS. KENNEDY:

25   Q.   Mr. Romero, let's start in chronological order.  Let's go

1    to Exhibit 308, Page 2, and the email at March 16 to Wayne

2    Jackson where you write (as read):

3           "Hi, Wayne.  Owen Diaz was to inform us by this

4       evening if he was to accept the position as elevator

5       operator on the day shift.  He never responded and he

6       said he would.  Because of that, I had to make other

7       arrangements to cover the elevators."

8    Does that refresh your recollection as to the timing of

9    all this?

10   A.   I remember that we were waiting for his response, but I

11   don't remember now his -- his -- who talked to him about being

12   a -- you know, not the lead, but a material handler or elevator

13   operator.  Okay?

14   Q.   All right.  And we have one last exhibit, Mr. Romero.  We

15   go to Exhibit 312.

16        MS. KENNEDY:  Exhibit 312 has not been admitted.

17   Let's mark it for identification only.

18     (Trial Exhibit 312 marked for identification)

19   BY MS. KENNEDY:

20   Q.   And Exhibit 312 is an email from Wayne Jackson to -- it's

21   like Fremont Control, Edward Romero, the subject is "Badge

22   Deactivation for Owen Diaz."  It's on Exhibit 312, Page 1.

23   A.   Uh-huh.

24   Q.   Do you see that email from Wayne Jackson at nextSource?

25   A.   Yes.

1   Q.   Okay.  Take a minute to read that and let me know when

2   you're done.

3   A.   Okay.

4   Q.   Is this an email that you received?

5   A.   I remember they stated that his badge was being

6   deactivated.

7          MS. KENNEDY:  Your Honor, I move to admit Exhibit 312.

8          THE COURT:  Any objection?

9          MR. ORGAN:  Objection 403, Your Honor, and foundation.

10         THE COURT:  Overruled.  You may proceed.  It's

11   admitted.

12      (Trial Exhibit 312 received in evidence).

13         MS. KENNEDY:  May I publish, Your Honor?

14         THE COURT:  You may.

15         MS. KENNEDY:  Thank you.

16      (Document displayed.)

17   BY MS. KENNEDY

18   Q.   So this is an email basically notifying you and some

19   other -- I guess Fremont Control Room that Mr. Diaz's badge was

20   deactivated as of March 18, 2016.

21   A.   Right.

22   Q.   And it says here from Wayne Jackson (as read):

23          "He is not eligible to return under nextSource."

24      Do you know what that means at all?  Any idea?

25   A.   Well, he was a contract employee.  So any contract

 1   employee they had to deactivate because it's their employee.

 2       I think that Tesla -- Tesla would probably deactivate if

 3   it was something really, really outrageous or they thought, you

 4   know, to secure the facility or something, they didn't want to

 5   let somebody in, but that's another issue.

 6   Q.  But that wasn't an issue with Mr. Diaz, was it?

 7   A.  No.  I guess they just told him -- I don't know what they

 8   told him.

 9       MS. KENNEDY:  Okay.  Thank you, Your Honor.  I have no

10   more questions.

11       THE COURT:  All right.  Mr. Organ.

12       MR. ORGAN:  Thank you, Your Honor.

13                   REDIRECT EXAMINATION

14   BY MR. ORGAN

15   Q.  Good morning, Mr. Romero.  How are you doing?

16   A.  Fine.  Thank you.

17   Q.  Let me ask you this:  If you could, go to 306 --

18   A.  Okay.

19   Q.  -- which we were just looking at.

20       And if you look at 306, the second page of that has an

21   email from you dated March 10th at 10:57.  Do you see that?  It

22   says (as read):

23           "Wayne, as you know, we will be replacing our

24       night shift elevator lead."

25       And then it has another --

ROMERO - REDIRECT / ORGAN

1          **MR. ORGAN:**  If you can...  Are we publishing this?

2          **THE COURT:**  You certainly should be or could be.

3          **MR. ORGAN:**  Okay.

4       (Document displayed.)

5   **BY MR. ORGAN**

6   **Q.**   And then, if you could -- now, just if you look at this,

7   you sent this on -- this is the first page.  Do you see that?

8   It says it's sent on -- are you looking at the first page of

9   306?

10  **A.**   Oh.

11  **Q.**   It says it's sent on March 11th at 6:57:06 a.m.; right?

12  **A.**   Yes.

13  **Q.**   Now, if you go to the second page, down at the bottom, 306

14  second page, and look at where you send it.  Down at the bottom

15  there it says March 10th, 10:57 p.m.

16       That's the same email, isn't it, sent at different times

17  on different dates?  Do you have any explanation?

18  **A.**   No.  I have no idea how that happened.

19  **Q.**   Okay.  But we don't know which one is the truth; right?

20          **MS. KENNEDY:**  Objection.  Argumentative.

21          **THE COURT:**  Sustained.

22  **BY MR. ORGAN**

23  **Q.**   Let's go to Exhibit 308.

24       (Document displayed.)

25  **Q.**   And if you look at the first page of 308, that says

1   March 17th at 6:18; right?

2   **A.**   Yes.

3   **Q.**   The same exact email says March -- go to the second page

4   down at the bottom.

5       The second page says March 16th at 11:18.  Do you have any

6   idea why that email also has two different dates and times?

7   **A.**   I don't have -- I don't have any idea at all.

8   **Q.**   Okay.

9   **A.**   Yeah.

10  **Q.**   Let me ask you this:  You were talking about the

11  picaninny, and you said --

12  **A.**   I didn't hear what you said.

13  **Q.**   I'm sorry.  You were talking about the picaninny, and when

14  you were testifying about it just now, you --

15  **A.**   I'm sorry.  There is one word I didn't catch.

16  **Q.**   Oh, I'm sorry.  Yeah.

17      You were talking about the picaninny a little earlier when

18  you were testifying for Tesla.  Do you remember that?

19  **A.**   Are you talking about the drawing?

20  **Q.**   Yeah, the drawing.

21  **A.**   Yeah.  I think the word that I used was --

22  **Q.**   "Jigaboo"?

23  **A.**   Yeah, right.

24  **Q.**   And you testified, though, that when you saw the

25  picture -- and when you saw the picture that you were shocked

1    that someone would do that.  I have that right; right?

2    **A.**   Yes.  I mean, everybody shows shock in a different way.  I

3    felt shocked when I saw that.

4    **Q.**   Well, you were asked about that in your deposition.  Do

5    you remember?

6    **A.**   No.

7    **Q.**   (As read):

8          "**QUESTION:**  Isn't it true, sir, that when" --

9          THE COURT:  Where are you reading from?  I'm sorry,

10   Mr. Organ.

11         MR. ORGAN:  I'm sorry?

12         THE COURT:  What page and line are you reading from?

13         MR. ORGAN:  115, Your Honor, Line 23 to 116, Line 1.

14         THE COURT:  Okay.  Why don't you let Mr. Romero have a

15   look at that.

16         THE WITNESS:  115?  Page 115?

17   BY MR. ORGAN

18   **Q.**   Yeah.  115, Line 23.

19   **A.**   Give me the page number again.

20   **Q.**   Page 115, Line 23.

21   **A.**   Okay.

22         MR. ORGAN:  May I read that, Your Honor?

23         THE COURT:  Mr. Romero, are you there?  Have you read

24   that.

25         THE WITNESS:  Yes, I see it.

ROMERO - REDIRECT / ORGAN

```
 1              THE COURT:  Yes, go ahead.
 2   BY MR. ORGAN
 3   Q.   (As read):
 4        "QUESTION:  When you saw the picture of the drawing,
 5        did you think it was a joke?
 6        "ANSWER:  I had no way of knowing if it was a joke.
 7        It was just a picture."
 8        So when I asked you about that, you didn't tell me you
 9   were shocked; right?
10              MS. KENNEDY:  Objection.  Argumentative.
11              THE COURT:  Overruled.  You can answer.
12              THE WITNESS:  Okay.  I -- can you ask me again,
13   please?  I didn't hear the whole question.
14   BY MR. ORGAN
15   Q.   When I asked you about that in your deposition when you
16   were under oath --
17   A.   Yes.
18   Q.   -- the same as you are here, you didn't say you were
19   shocked; correct?
20   A.   I think the question says if I thought it was a joke.
21   Q.   Right.
22   A.   Okay?  So I was answering if -- you know, the question if
23   it was a joke.  And I said I didn't know if it was a joke.
24   Q.   It was just a picture, sir.  That's what you told me;
25   right?
```

ROMERO - REDIRECT / ORGAN

1    **A.**    That's -- if that's what it says there.

2    **Q.**    You didn't tell me it was a shocking thing; right?

3    **A.**    I did not.  Okay?

4    **Q.**    I then asked you what you thought the "booo" meant.  Do

5    you remember what you thought the "booo" meant underneath the

6    picture?

7         Do you remember the picture?

8         **THE COURT:**  Would you ask one question at a time,

9    Mr. Organ?

10        **MR. ORGAN:**  I apologize, Your Honor.

11        **THE COURT:**  Okay.  So which question would you like

12   him to answer?

13        **MR. ORGAN:**  I think -- Your Honor, if I may, why don't

14   we show the witness Exhibit 33, the picture, so that we can

15   have it up.  Would that be okay with Your Honor?

16        **THE COURT:**  It's your examination.  I just want it to

17   go forward smoothly.

18        **MR. ORGAN:**  I apologize, Your Honor.

19        **THE COURT:**  Okay.

20        **MR. ORGAN:**  If you could pull up Exhibit 33 and the

21   picture.

22        And may we publish that, Your Honor?  It's in evidence.

23        **THE COURT:**  It's in evidence.

24        **MR. ORGAN:**  Yeah.

25        (Photograph displayed)

ROMERO - REDIRECT / ORGAN

```
 1   BY MR. ORGAN
 2   Q.   Just so we're on the page same, this is the exhibit you
 3   saw; right?
 4   A.   Yes.
 5   Q.   This is the picture Owen had complained about; right?
 6   A.   Yes.
 7   Q.   And what did you think the "booo" meant?
 8   A.   I don't remember what I said about that.
 9   Q.   Well, you testified a little earlier today when
10   Ms. Kennedy was asking you questions, you said:  I thought it
11   was a common jigaboo.  You know, cartoons when you were a kid.
12        Do you remember that testimony?
13   A.   Yes.
14   Q.   And then when I asked you this question in deposition
15   under oath, same as you were here --
16        MR. ORGAN:  I'm looking at 116, Your Honor, 11 to 16.
17        (Pause in the proceedings.)
18        MR. ORGAN:  Can I read that, Your Honor?
19        THE COURT:  Yes.
20   BY MR. ORGAN
21   Q.   (As read):
22        "QUESTION:  What did you think the 'booo' meant?
23        "ANSWER:  I had no way of knowing by looking at that
24        what the intent was.  You know, what was the motive
25        behind it.  I had no way of knowing."
```

ROMERO - REDIRECT / ORGAN

1   A.   You're referring to the portion that says "booo"?

2   Q.   Yes.

3   A.   Okay.  My -- what I recall is the picture, you know, the

4   actual facial or head or whatever it is, okay, I recognize that

5   as a jigaboo.  You're referring to "booo," and I remember -- I

6   don't remember if -- I don't remember thinking that "booo"

7   meant anything.  I don't know if it was associated.

8        When I was a young boy and I saw that picture, it never

9   had "booo" underneath.  It just had the jigaboo.  So I knew

10  that was bad.

11  Q.   Right.  Because that picture, those cartoons when you were

12  a kid, were cartoons depicting black people in demeaning

13  conditions, correct, being chased?

14  A.   Well, from where I was raised, it was not a good picture.

15  Okay?

16  Q.   Let's go to -- oh, you said something.  Ms. Kennedy asked

17  you a question about did you ever hear someone else calling

18  Owen Diaz the "N" word.  Do you remember that testimony again?

19  A.   Yes.

20  Q.   Isn't it true, sir, Owen Diaz worked the night shift;

21  right?

22  A.   Yes.

23  Q.   And you worked the day shift; right?

24  A.   Correct.

25  Q.   So it would be highly unlikely for you to ever hear anyone

1  say anything to Mr. Diaz because you worked different shifts;

2  right, sir?

3  **A.**   Well, and I think I testified that I never heard.

4  **Q.**   Okay.  If we could, go to Exhibit 296.  This is the Joyce

5  DelaGrande.

6          **MR. ORGAN:**  And can we publish this, Your Honor?

7          **THE COURT:**  Sure.

8     (Document displayed.)

9  **BY MR. ORGAN**

10 **Q.**   296, if you look here, the first page -- yep.

11        And if you could hone in on the "To" and "From" on the

12 bottom there, Sabrina, please.

13        I notice that Robert Hurtado is copied on this email.  Do

14 you see that, from Joyce DelaGrande to you?

15 **A.**   Okay.  There's --

16 **Q.**   Bottom of Page 1, 296.

17 **A.**   Okay.  Yes, I see it.

18 **Q.**   And Robert Hurtado was a supervisor working with Joyce

19 DelaGrande, correct?

20 **A.**   I don't know what his title was.

21 **Q.**   Okay.  But Robert Hurtado -- you then, subsequently to

22 this, just a few days later, you got an email from Joyce

23 DelaGrande complaining that Owen Diaz would not talk to her

24 leads or her supervisors; correct?

25 **A.**   Yes.

1    Q.   And that caused her great frustration because Owen Diaz

2    says:   I'm only going to talk to them about work.

3         That's what he said; right?

4    A.   Correct.

5    Q.   And you never asked Owen Diaz why he wasn't going to talk

6    to those people, did you?

7    A.   I don't recall having a conversation with him, but it

8    doesn't mean that it didn't happen.  I just don't recall that

9    conversation.

10        MR. ORGAN:  No more questions, Your Honor.  Thank you.

11        THE COURT:  All right.  Thank you.

12    Any redirect, Ms. Kennedy?

13        MS. KENNEDY:  No more questions, Your Honor.

14        THE COURT:  Okay.  Mr. Romero, you can step down.

15    Thank you.  You're excused.

16        THE WITNESS:  Thank you.

17    (Witness excused.)

18        THE COURT:  Who is next?

19        MR. ALEXANDER:  Your Honor, we'll call as our next

20    witness Wayne Jackson.

21        THE COURT:  All right.

22                        **WAYNE JACKSON**,

23    called as a witness for the Plaintiff, having been duly sworn,

24    testified as follows:

25        THE WITNESS:  Yes, ma'am.

```
 1               THE CLERK:  Be seated.
 2          And if you would please state your full name for the
 3     record and spell it for --
 4               THE WITNESS:  Sure.  Wayne Jackson.
 5               THE CLERK:  And would you spell it for the court
 6     reporter, please?
 7               THE WITNESS:  W-A-Y-N-E.  J-A-C-K-S-O-N.
 8               THE COURT:  Mr. Alexander, go ahead.
 9               MR. ALEXANDER:  Thank you, Your Honor.
10                         DIRECT EXAMINATION
11     BY MR. ALEXANDER:
12     Q.   Good morning, Mr. Jackson.
13     A.   Good morning.
14     Q.   A little background.  You attended Skyline High School in
15     the Oakland area; correct?
16     A.   Yes.
17     Q.   And you attended the University of Arizona, but didn't --
18     you didn't get a degree; correct?
19     A.   Uh-huh.
20     Q.   And then you served in the Armed Forces in the Marines; is
21     that correct?
22     A.   Yes, sir.
23     Q.   And that's the time frame from 1990 to 1994; right?
24     A.   Yes, sir.
25               THE COURT:  Excuse me.  Can you pull the mic closer to
```

**JACKSON - DIRECT / ALEXANDER**

1   you so that we pick up everything?

2           THE WITNESS:  Is that better?  Okay.

3   BY MR. ALEXANDER

4   Q.   And that's with an honorable discharge at an E4 corporal

5   level; correct?

6   A.   Yes, sir.

7   Q.   And you served in the Persian Gulf; correct?

8   A.   Yes, sir.

9   Q.   Thank you.

10          And for the record, you are African-American; correct?

11  A.   Yes.

12  Q.   At some point you were employed with nextSource; is that

13  right?

14  A.   Yes.

15  Q.   And during what time frame?

16  A.   Oh, 2000 -- mid-2000s; 2014, '15 I believe it was.

17  Q.   And part of your job at nextSource was to recruit

18  employees to work as contract employees inside of the Tesla

19  factory at Fremont; is that correct?

20  A.   Not approve them, but I was kind of -- we were kind of the

21  middleman.

22  Q.   And at some point you became a program manager at

23  nextSource performing functions associated with the Tesla

24  factory; correct?

25  A.   Yes.

**JACKSON - DIRECT / ALEXANDER**

1  Q.   And if I understand correctly, nextSource was

2  essentially a liaison between Tesla and staffing companies that

3  Tesla was using in order to stock its factory?

4  A.   Yes.  Like I say, we were kind of a middleman

5  organization.  We were just the middleman.

6  Q.   And the various staffing companies that were being used by

7  Tesla in order to stock its factory with contract employees was

8  CitiStaff; correct?

9  A.   Yes.  That was one of them.

10 Q.   Chartwell?

11 A.   Yes.

12 Q.   West Valley Group?

13 A.   Yes.

14 Q.   Flagstaff?

15 A.   Hmm, Manpower.  I can't remember all.  It was quite awhile

16 ago.  I can't remember all the -- they had several agencies

17 that they contracted with.

18 Q.   And you're familiar with a person by the name of Owen

19 Diaz; correct?

20 A.   A little bit.  Not a whole lot.

21 Q.   He was an employee inside the workplace that you were

22 aware of?

23 A.   Yes.  He was -- I think it was either West Valley or

24 Manpower.  I can't remember which company.

25 Q.   And so nextSource didn't actually perform contract

**JACKSON - DIRECT / ALEXANDER**

1    services such as running the elevators or doing equipment or

2    anything like that.  You were simply a facilitator to

3    essentially supervise the staffing companies; right?

4    **A.**    Yes.  Well, to, like I say, liaison between the staffing

5    companies and Tesla.

6    **Q.**    And with regard to that function, nextSource did not

7    actually perform any human resource functions; is that correct?

8    **A.**    No, sir.

9    **Q.**    No, sir, it did not?

10    **A.**    No, it did not.

11    **Q.**    Thank you.

12          And so nextSource played no role in training the

13    contract employees in terms of duties; right?

14    **A.**    No, sir.  They were trained by Tesla.

15    **Q.**    Now, with regard to the safety rules, all the employees --

16    all the contract employees that performed work inside the Tesla

17    factory had to complete a safety program, a safety rule

18    training; correct?

19    **A.**    Yes.  Tesla had us show them a video the first day.

20    **Q.**    And so Tesla was the one that provided that safety

21    training; right?

22    **A.**    Yes.

23    **Q.**    Now, I would like to have you turn to Exhibit No. 29,

24    which has been marked but has not yet been received into

25    evidence.

1    A.   Which binder do I go to?  There's two here.

2    Q.   Pick one and let's see if that's the one that has it.

3    A.   This is 39.  You said 29?

4    Q.   There should be an Exhibit 29.

5            THE COURT:  I think neither of these have 29.

6            THE WITNESS:  Yeah.  I don't have a 29.  I see 39.

7            MR. ALEXANDER:  Is it possible to display 29 for the

8    witness?

9            THE COURT:  Is this showing to the jury at the moment?

10           MR. ALEXANDER:  It's not, I don't believe.

11           THE CLERK:  Not yet.

12           THE COURT:  Okay.  Good.

13       All right.  Yes.  So this is fine.

14   BY MR. ALEXANDER

15   Q.   If you could look to the screen to your right, there is a

16   document displayed, Exhibit No. 29.  It is the Tesla

17   Anti-Harassment Policy.  Do you see that?

18   A.   Yes, sir.

19   Q.   Were you familiar with that policy during the time frame

20   that you were at Tesla working at nextSource?

21   A.   Yes.

22   Q.   And that policy, was that policy given to the contract

23   employees?

24           MS. JENG:  Objection.  Calls for speculation.

25           THE COURT:  Do you want to lay a foundation for that?

JACKSON - DIRECT / ALEXANDER

1   Lay a foundation.

2   **BY MR. ALEXANDER:**

3   **Q.**   With regard to the training that was given to employees,

4   contract employees that were working at Tesla, did you have an

5   understanding as to what they received before they were allowed

6   to work at Tesla?

7   **A.**   I don't remember everything but, yeah, they had a packet

8   that we were to give them.

9   **Q.**   Okay.  And the packet that they were given, did that

10  packet include Exhibit No. 29?

11  **A.**   I don't remember, but it quite possibly did.  I would

12  believe so.

13  **Q.**   So you don't know one way or another whether they received

14  this document, but you believe that they did?

15  **A.**   I believe they did.  I just -- like I said, it's been

16  quite awhile.  It's been four or five years so I can't remember

17  all that.

18  **Q.**   And with regard to Exhibit No. 6, which also has not

19  been -- I'm sorry.

20       With regard to Exhibit No. 29, you said that you were

21  familiar with that document?

22  **A.**   It looks familiar, yes.

23       **MR. ALEXANDER:**  May it be received into evidence, Your

24  Honor?

25       **THE COURT:**  Is there any objection to 29?

1           MS. JENG:  I think there lacks foundation from this

2    witness.

3           THE COURT:  I think that's true.  So I'll sustain the

4    objection.

5           MR. ALEXANDER:  Okay.

6        With regard to Tesla's Anti-Handbook Handbook, Exhibit

7    No. 6, which has not yet been received into evidence, but may

8    it be displayed so the witness can see it?

9           THE COURT:  Sure.

10          MR. ALEXANDER:  Your Honor, if I could, Exhibit

11   No. 368 is the same as Plaintiff's Exhibit No. 29, and the

12   defendant has stipulated to admission of that document.

13          THE COURT:  Okay.  That's why I told you to get these

14   numbers straight so that we didn't have duplicates.

15       Would you like to confirm that that's the case so that

16   this document can be admitted into evidence?

17       (Brief pause.)

18          THE COURT:  I'm going to accept the representation of

19   the plaintiffs with respect to this document, and it will be

20   admitted.

21       (Trial Exhibit 368 received in evidence)

22          THE COURT:  So go ahead, Mr. Alexander.

23          MR. ALEXANDER:  Thank you, Your Honor.

24   BY MR. ALEXANDER

25   Q.   With regard to Exhibit 6, the Anti-Handbook Handbook that

1  is on your screen, during the time frame that you were at

2  nextSource working for Tesla, did you have familiarity with

3  that document?

4  **A.**   I don't recall this particular document.

5  **Q.**   So the Anti-Handbook Handbook, you had never seen it while

6  performing services for Tesla; correct?

7  **A.**   I can't say I've never seen it.  I'm just saying I don't

8  remember this particular document.

9  **Q.**   Okay.

10 **A.**   I could very well have seen it, but I just don't remember.

11 There was a packet that we gave them so they could have very

12 well been in there.

13 **Q.**   And with regard to Exhibit No. 6, when you say it very

14 well could have been in there, you don't know for a fact

15 whether the Anti-Handbook Handbook was actually provided to

16 contract employees; is that correct?

17 **A.**   Yes, I don't recall.

18         **MR. ORGAN:**  May we publish -- you wanted to publish

19 the --

20         **MR. ALEXANDER:**  Not 6.  He doesn't remember.

21         **MR. ORGAN:**  Okay.  Fair enough.

22 **BY MR. ALEXANDER**

23 **Q.**   Now, with regard to use of the "N" word inside the

24 workplace, you heard the "N" word -- and you understand what I

25 mean, by the "N" word I hope -- used inside the Tesla factory;

```
 1    is that correct?
 2              MS. JENG:  Objection.  Motion in Limine.
 3              THE COURT:  Could you use a point in time?  Reference
 4    the time period that this was used; in other words, during the
 5    time that Mr. Diaz was employed in the factory.
 6              MS. JENG:  Your Honor, if I could --
 7    BY MR. ALEXANDER
 8    Q.   During the --
 9              THE COURT:  Hang on just a second.
10         Ms. Jeng?
11              MS. JENG:  Could I just direct your attention to
12    Page 7, Lines 15 to 23, of your order?
13              MR. ALEXANDER:  Your Honor, may I simply rephrase?
14              THE COURT:  I'm sorry?
15              MR. ALEXANDER:  I would simply like to rephrase the
16    question.
17              THE COURT:  Let me just look at what Ms. Jeng is
18    referring me to.
19         (Pause in proceedings.)
20              THE COURT:  I'm going to allow this general line as
21    long as you rephrase.
22              MR. ALEXANDER:  Thank you, Your Honor.
23              THE COURT:  Overruled.
24    BY MR. ALEXANDER
25    Q.   During the time frame of 2015 to 2016, did you hear the
```

**JACKSON - DIRECT / ALEXANDER**

1  "N" word used inside the workplace at Tesla?

2  **A.**   Yes, sir.

3  **Q.**   And you heard it used quite a few times; right?

4  **A.**   Yes, sir.

5  **Q.**   And it would be fair to say that as you walked throughout

6  the factory, you heard it on a daily basis?

7  **A.**   Yes, sir.

8  **Q.**   And when you say "throughout the factory," that includes

9  the satellite cafeterias; right?

10  **A.**   I wouldn't -- I wouldn't limit where it was said in the

11  factory.  It was said quite often.  Not always in a derogatory

12  manner.  Sometimes as they would say "my," you know, like as in

13  friend, but it was inappropriate.

14  **Q.**   So you heard n-i-g-g-e-r and you heard n-i-g-g-a --

15  **A.**   Yes, sir.

16  **Q.**   -- throughout the workplace?

17  **A.**   Yes, sir.

18  **Q.**   And you heard it used by both African-Americans and

19  non-African-Americans; isn't that correct?

20       **MS. JENG:**  Objection.  Leading.

21       **THE COURT:**  Sustained.

22  **BY MR. ALEXANDER**

23  **Q.**   At the point when you were performing services for Tesla,

24  you were performing services through nextSource; correct?

25  **A.**   Yes, sir.

1  Q.   And nextSource had a contract with Tesla to perform

2  services at Tesla's behest; is that correct?

3          MS. JENG:  Objection.  Calls for speculation.

4          THE COURT:  Overruled.  Either he knows that or not.

5          THE WITNESS:  I was not involved in the contract

6  negotiations with Tesla so I'm not sure exactly what contracts

7  nextSource and Tesla had.

8  BY MR. ALEXANDER

9  Q.   You understood that there was a contract between Tesla

10 and nextSource for nextSource to provide services to Tesla;

11 correct?

12 A.   Yes, I believe so.

13 Q.   And in your role at nextSource, you were performing

14 services based on direction given by Tesla; is that correct?

15 A.   I was based on nextSource.  I worked for nextSource.

16 I didn't work for Tesla.

17 Q.   Okay.  I understand that you didn't work for Tesla, but

18 isn't it correct that you performed duties at the direction of

19 Tesla?

20 A.   Yes.

21          MS. JENG:  Objection.  Leading.

22          THE COURT:  Overruled.  You can answer.  And I think

23 you did.  Was the answer "yes"?

24          THE WITNESS:  Yes.

25

1    BY MR. ALEXANDER

2    Q.    And so on occasion when you walked through the factory and

3    you heard the "N" word, you mentioned to someone that that

4    wasn't appropriate; right?

5    A.    Yes.

6    Q.    Okay.  But most of the time you simply ignored it; right?

7    A.    Yes.

8    Q.    And were you offended by use of the "N" word inside the

9    Tesla workplace?

10   A.    Yes, I was.

11   Q.    And would it be fair to say that you didn't feel that you

12   had the power to stop the conduct inside the workplace?

13   A.    They did not work for me, sir.  I couldn't -- I had no

14   supervisory skills or anything over those individuals.

15   Q.    So even though you were at nextSource and you were

16   supervising the staffing companies that were working as

17   contract employees inside the Tesla workplace, you did not feel

18   you had the power to stop the use of the "N" word inside the

19   workplace; correct?

20   A.    I could not.  They were not my employees.

21   Q.    Okay.

22   A.    It was not my place to advise them or direct them.

23   Q.    Did you report your hearing of the "N" word to Tesla human

24   resources?

25   A.    No, I did not.

1    **Q.**    Did you report it to nextSource?

2    **A.**    I mentioned it to my boss before, yes.

3    **Q.**    Okay.  On more than one occasion?

4    **A.**    Yes.  To be very honest, I don't know how it is now; but

5    when I was at Tesla, it was very cliquey.  And what I mean is

6    it was almost like a high school-environment where different

7    groups hung out together.

8    **Q.**    And how did that impact your ability to complain about use

9    of the "N" word?

10   **A.**    A lot of times it was the context of the use of the word.

11   I'm not a fan of the word, but I understand younger people and

12   how they utilize it sometimes.

13   **Q.**    But you also understood that the "N" word should not be

14   used inside the workplace; correct?

15   **A.**    Yes, sir.  I don't use it in the workplace so I would

16   expect others not to.

17   **Q.**    So your function as a nextSource program manager was to

18   alert Tesla of complaints of harassment or discrimination; is

19   that correct?

20   **A.**    Yes.  If I knew of them, yes.

21   **Q.**    And it was your understanding that it was up to each

22   staffing company to perform discipline if the staffing company

23   thought that discipline was appropriate?

24   **A.**    Yes, sir.  I was not in a position to discipline anyone.

25   They were not my employees.

1   Q.   But in terms of addressing some action that required

2   discipline, what you would do is provide a recommendation as to

3   what you thought would be the appropriate discipline; correct?

4   A.   Once again, I couldn't discipline them because they

5   weren't my employees.  I could tell them what the situation

6   was, and it was up to them to determine any disciplinary

7   action.

8   Q.   And when you say you could tell "them," you're referring

9   to the staffing company?

10   A.   Yes.

11   Q.   Now, it was your understanding that Owen Diaz was a

12   contract employee working through CitiStaff?

13   A.   I don't know what agency he was with.  Unfortunately, I

14   don't remember.  We had a lot of contractors.

15        If I saw Owen Diaz today, I probably would wouldn't know

16   who he is, to be very honest.

17   Q.   Well, do you recall that he was an elevator operator?

18   A.   That's quite possibly the case, yes.

19   Q.   And do you recall that the elevator operators were hired

20   through the staffing company that was CitiStaff?

21   A.   It could be CitiStaff.  It could have been any of several

22   agencies that they worked with.

23   Q.   And the elevator operators were required to be certified

24   as forklift operators; correct?

25   A.   Yes, sir.

**JACKSON - DIRECT / ALEXANDER**

1   Q.   Now, there was an incident that occurred involving

2   elevators and Ramon Martinez and Owen Diaz.  Do you recall the

3   incident I'm referring to?

4   A.   I believe so, yes.  I don't remember details but, yeah.

5   Q.   I'm going to hope to help you with that.

6        With regard to that first incident -- I apologize.

7        Before we get to there, if you could turn to Exhibit

8   No. 73.  It should be in one of those notebooks.

9            MR. ORGAN:  He's in the wrong binder.  He's got

10  Romero's binder.  It's the white binder.

11  BY MR. ALEXANDER:

12  Q.   Try the white binder.

13  A.   There.  73.

14  Q.   With regard to Exhibit No. 73, do you recognize this as an

15  email sent to you by Nancy Uhlenbrock on June 24th, 2015?

16  A.   No.  I don't really recall this email.

17  Q.   Even though you don't recall it, do you recognize this as

18  being an email that was sent to you on this date?

19  A.   I can see my name, but I don't recall this email.

20  Q.   And do you recognize the person Nancy Uhlenbrock?

21  A.   I believe she was the program manager prior to myself.

22  Q.   At nextSource?

23  A.   Yes.  At this time I would have been a recruiter with

24  nextSource.

25  Q.   And would it have been -- would it have been common for

1  the two of you to exchange emails during this time frame?

2  **A.**   Not -- not common.   Every once in a while, but not common,

3  no.

4  **Q.**   And with regard to the information contained inside this

5  document, do you recall there being a discussion about Owen

6  Diaz with regards to the content?

7  **A.**   I do not recall that, no.

8  **Q.**   Now, with regard to this incident involving Mr. Diaz and

9  Mr. Romero, there was an investigation that was conducted

10  associated with this first incident; correct?

11  **A.**   I believe so, yes.

12  **Q.**   And as a result of the incident, both employees were

13  verbally counseled to play nice in the sandbox; correct?

14  **A.**   Yes.   I -- I'm trying to remember.   I think they had

15  gotten into an argument or a disagreement.

16        **THE COURT:**   You need to speak up.

17        **MS. JENG:**   Objection.   Objection.   Leading.

18        **THE COURT:**   Well, it's overruled.

19  And bring the mic close to you so that we can hear.

20  Go ahead.

21        **THE WITNESS:**   I believe they had gotten into a

22  disagreement or an argument or something to that effect.   I

23  don't remember all the details.

24  **BY MR. ALEXANDER**

25  **Q.**   And is it correct that the reason why both of them were

**JACKSON - DIRECT / ALEXANDER**

1  given a verbal warning is because it was a he-said/she-said

2  situation where you couldn't tell which version of the facts

3  was true?

4  **A.**   I really don't recall all the details.  Like I said, I

5  think it was just a verbal altercation, and I don't recall all

6  the details unfortunately.

7  **Q.**   And if I could have you turn to Page 101, Lines 15 through

8  25, perhaps that will assist you in refreshing your

9  recollection.

10  **A.**   I don't see 101.

11  **Q.**   The deposition transcript that you picked up with your

12  left hand, that is a copy of your transcript.

13  **A.**   I still don't see a 101.  It starts at 126.

14       Oh.  Page 101, okay.

15       (Brief pause.)

16  **Q.**   Have you had an opportunity to review your transcript?

17  **A.**   Yes.

18  **Q.**   I'm sorry?

19  **A.**   Yes.

20  **Q.**   And does that refresh your recollection as to why you

21  reached the conclusion that there was no substantiation?

22  **A.**   Yeah.  I believe there were no witnesses.  It was just

23  the -- the two of them.  Like I say, they said they got into a

24  verbal altercation, but there were no witnesses to the actual

25  altercation.

JACKSON - DIRECT / ALEXANDER

1    Q.   And now if we could turn to Exhibit No. 92.

2    A.   Is that Page 92?

3    Q.   No.  That's for --

4         MR. ALEXANDER:  Back in the white, for the Court's

5    benefit.

6    A.   Oh, okay.

7    BY MR. ALEXANDER

8    Q.   And inside of your notebook, you should see an Exhibit 92

9    there.

10        Exhibit 92 is an email from Owen Diaz to you regarding

11   this incident, subject matter "Ramon."  Do you see that?

12   A.   Yes.

13   Q.   And the paragraph below that is a forward from Mr. Diaz to

14   Edward Romero that describes the incident, the first incident,

15   involving the elevator and Mr. Martinez; correct?

16   A.   Yes.

17   Q.   Okay.  And this is a document that you received associated

18   with that incident; is that correct?

19   A.   It must have been, yes.

20        MR. ALEXANDER:  May Exhibit 92 be received into

21   evidence, Your Honor?

22        THE COURT:  Any objection?

23        MS. JENG:  No objections.

24        THE COURT:  It's admitted.

25        (Trial Exhibit 92 received in evidence).

```
 1            MR. ALEXANDER:  And if we could publish, please.

 2            THE COURT:  Yes.

 3        (Document displayed.)

 4   BY MR. ALEXANDER

 5   Q.   Your indication is that this was unsubstantiated because

 6   there were no witnesses to the incident.

 7        If we could highlight the first line of this document?

 8        It makes reference to a person named Rothaj Foster being

 9   trained by Mr. Diaz inside of the elevator.  Do you see that in

10   the first line?

11   A.   Yes.  I have no recollection of who Rothaj Foster is,

12   though.

13   Q.   Okay.

14   A.   If he was a Tesla employee, I don't know.

15   Q.   With regard to there being no witnesses, in this instance

16   Rothaj Foster was not ever questioned about this incident in

17   order to confirm Mr. Diaz's version of events; is that correct?

18            MS. JENG:  Objection.  Leading.

19            THE COURT:  Overruled.

20            THE WITNESS:  I don't recall if he was questioned or

21   not.

22   BY MR. ALEXANDER

23   Q.   If we could go to the second-to-last sentence, inside this

24   document says (as read):

25            "You can check the surveillance system to confirm."
```

1   A.   I had no access to check surveillance.

2   Q.   With regard to the cameras -- I'm sorry.

3        With regard to the elevators, the elevators did have

4   surveillance cameras in them though; correct?

5   A.   I believe so.

6   Q.   Okay.

7   A.   I don't know, though, for sure.  Like I said, that was

8   Tesla's property.  I didn't have access to cameras.

9   Q.   Okay.  Thank you for that.

10       That was Tesla's property, and you didn't have access to

11  the cameras so that you could review what was on them; correct?

12  A.   Yes.

13  Q.   And do you know who did have access?

14  A.   Tesla.

15  Q.   Tesla.

16       Mr. Romero, did he have access?

17  A.   He probably did if he was a -- he wasn't a Tesla employee

18  at first, so I'm not sure when his conversion occurred.

19  Because he was initially with nextSource, and then he was

20  hired on with Tesla.

21  Q.   And Mr. Quintero, the person that Mr. Romero reported to,

22  he had the ability to access those cameras; correct?

23  A.   Yeah.  I would believe so.

24  Q.   And so with regard to confirming the version of the

25  incident that Mr. Diaz had, you did not have the ability to

 1   look at the video to determine whether Mr. Diaz's version of
 2   the truth -- version of the facts was true?
 3   A.   Yeah, I would only have that if Tesla gave it to me.
 4   Q.   And with regard to Mr. Foster, would you have had to rely
 5   on Tesla to interview Mr. Foster to find out what happened in
 6   terms of this incident?
 7   A.   One again, I don't recall who Mr. Foster is, if he was a
 8   Tesla employee.  He could have been with another contract
 9   agency on-site.  I don't know.  I don't recall that individual.
10   Q.   But the typical protocol anytime there was a serious
11   incident was to notify Tesla human resources about the
12   incident; correct?
13   A.   Yes.
14   Q.   So to the extent -- and that would have been your
15   practice.  With regard to this incident, you would have
16   notified Tesla about it?
17   A.   Uh-huh.
18   Q.   Yes?
19   A.   Yes.
20   Q.   And so in this instance if there was a need to interview
21   Mr. Foster.  If there was a need to review the surveillance
22   video, Tesla human resources had the ability to do so; correct?
23   A.   I would believe so.  I don't know what their protocol was,
24   especially since both Mr. Diaz and Mr. -- and -- not Romero,
25   Martinez were both contract employees.  I don't know if that

**JACKSON - DIRECT / ALEXANDER**

 1  was in there -- you know, if they were able to do that.

 2      And I don't know who Rothaj Foster is or if he was a

 3  contractor either.

 4  **Q.**   If I could show you Exhibit No. 74, which is being marked,

 5  but not been received.

 6      (Trial Exhibit 74 marked for identification)

 7  **Q.**   This is an email from you on October 19th.

 8  **A.**   Thank you.

 9  **Q.**   Do you recognize that as your email address and as an

10  email that would have been prepared by you associated with the

11  elevator incident?

12  **A.**   Yes.

13          **MR. ALEXANDER:**   Exhibit 74, may it be received into

14  evidence, Your Honor?

15          **THE COURT:**   Any objection?

16          **MS. JENG:**   No objection.

17          **THE COURT:**   No objection?

18          **MS. JENG:**   No objection.

19          **THE COURT:**   Okay.  It's admitted.

20      (Trial Exhibit 74 received in evidence)

21          **MR. ALEXANDER:**   If that could be published?

22      (Document displayed.)

23  **BY MR. ALEXANDER:**

24  **Q.**   Exhibit No. 103, could you review that document?

25      It makes a reference to Terri Garrett.  Who is

1    Terri Garrett?

2    **A.**    She was my director at nextSource.

3    **Q.**    So she was a director at nextSource that you reported

4    to?

5    **A.**    Yes.

6    **Q.**    And Exhibit 103 is an email exchange, several email

7    exchanges, between you and Ms. Terri Garrett; is that correct?

8    **A.**    Most likely, yes.

9              **MR. ALEXANDER:**  May Exhibit No. 103 be received?

10             **THE COURT:**  Any objection?

11             **MS. JENG:**  No objection.

12             **THE COURT:**  It's admitted.

13        (Trial Exhibit 103 received in evidence)

14   **BY MR. ALEXANDER:**

15   **Q.**    If we could start at the bottom email, that is August --

16   I'm sorry, October 19, 2015.  There's a question from Mr. Wayne

17   (as read):

18             "Did you receive this from me Friday?"

19        Do you see that, Mr. Jackson?

20   **A.**    Receive what?  I don't know what it's referring to.  It

21   just says "receive."  What was I in receipt of?

22   **Q.**    Thank you.

23        And then if we go above that, on October 19 at 5:32, you

24   respond (as read):

25             "Yes.  I'm actually on the phone now dealing with

1          the Owen and Ramon issue.  The issue seems to be

2          related to this, and we really are going to have to do

3          some in-depth investigation."

4          Do you see that reference?

5     A.   Yes.

6     Q.   So at least as of this time at 5:32, your intention was to

7     do an in-depth investigation to try and find out with regard to

8     circumstances of this incident in the elevator; right?

9     A.   Yes.

10    Q.   Thank you.

11         And then at the top (as read):

12              "Thank you.  We actually need to get their

13         statements (and any other witness statements) to Tesla

14         HR today."

15         Do you see that reference at the top?

16    A.   Uh-huh.  Yes.

17    Q.   So at least as of October 20th, there was an urgency to

18    get statements from all the people associated with this

19    incident, the first incident, on the elevator; correct?

20    A.   I don't know which case this was referring to at the time.

21    Was it the first incident or the second?  I don't know.  I

22    can't -- like I said, it's been quite a few years so I don't

23    remember.

24    Q.   And now if I could have you look at Exhibit No. 31.

25         Do you have that document in front of you?

**JACKSON - DIRECT / ALEXANDER**

1  A.   Yes.

2  Q.   I don't.  Give me a second.

3       (Brief pause.)

4  Q.   With regard to Exhibit 31, in the middle of the page there

5  is an email -- I'm sorry.  There is -- on -- the October 20th,

6  2015 reference on this document, it says -- makes a reference

7  to an email between you and Ms. Garrett making a further

8  inquiry regarding this matter.  Do you see that?

9  A.   Yes.

10  Q.   And this was an exchange and continuing with the

11  investigation associated with the first elevator incident;

12  right?

13  A.   I don't recall.  Once again, I'm not sure of the time

14  frame.  Was this the first incident or was this the second

15  incident?  I'm not sure.

16  Q.   First incident.

17  A.   Well, I would assume so then.  I don't -- once again, I

18  don't recall.  It's been quite awhile.

19       **MR. ALEXANDER:**  Exhibit No. 31, may it be received

20  into evidence?

21       **THE COURT:**  Any objection to 31?

22       **MS. KENNEDY:**  No objection, Your Honor.

23       **THE COURT:**  All right.  It's admitted.

24       (Trial Exhibit 31 received in evidence)

25

1   BY MR. ALEXANDER:

2   Q.    And if we could show the bottom of Exhibit 31, there is a

3   question from Ms. Garrett:

4            "Why is Ed meeting with them?"

5        Do you see that reference?

6   A.    Yes.

7   Q.    And that would have been Ed Romero?

8   A.    Yes.

9   Q.    And above it says (as read):

10           "He was instructed by Victor."

11  A.    Yes.

12  Q.    That would have been Victor Quintero?

13  A.    Yes.

14  Q.    And then she says -- if we could highlight the top -- this

15  is October 20, 7:41 p.m. (as read):

16           "Can I ask for your help on the email chain below?

17       It looks like Victor is asking Ed Romero to get involved

18       in a temporary worker employee situation.  My

19       recommendation is that Ed not be involved.  Can you help

20       me sort this out?  Two of the three workers have already

21       been interviewed.  Please advise."

22       With regard to those two employees that had been

23  interviewed, do you know who those employees were?

24  A.    No, sir.

25  Q.    Okay.  And did Ms. Garrett ever tell you why she wanted to

 1  stop someone from interviewing people?

 2  **A.**   I don't recall.  Like I said, I'm not sure if Ed was a

 3  Tesla employee at that time or if he was still under

 4  nextSource.  I don't know.  That would make the difference.

 5  **Q.**   And now if you could turn to Exhibit No. 76.

 6       With regard to this document, it's an email between you

 7  and Ms. Garrett on October 21, 2015.  Do you see that?

 8  **A.**   Yes.

 9  **Q.**   And you recognize this as one of the emails exchange

10  associated with the first incident?

11  **A.**   Yes.

12            **MR. ALEXANDER:**  May Exhibit No. 76 be received?

13            **MS. JENG:**  No objections.

14            **THE COURT:**  It's admitted.

15       (Trial Exhibit 76 received in evidence)

16            **MR. ALEXANDER:**  And if we could show just the top

17  portion?

18       (Document displayed)

19  **BY MR. ALEXANDER**

20  **Q.**   I'm sorry.  Let's start October 21, 10:47, from

21  Ms. Garrett to you confirming via this email that (as read):

22            "We agree we do not need to do any further formal

23       investigation with Ramon, Owen, or Rothaj."

24            **THE COURT:**  I think you misread that.  There was

25  nothing "further" about that.  Why don't you start the question

```
 1    again.
 2              MR. ALEXANDER:  I --
 3              THE COURT:  (As read):
 4                   "Confirming via this email that we agree we do
 5              not need to do any formal investigation with Ramon,
 6              Owen, and Rothaj."
 7              MR. ALEXANDER:  Okay.  Thank you, Your Honor.
 8    BY MR. ALEXANDER
 9    Q.    Did Ms. Garrett ever explain to you why there was no need
10    to do a formal investigation?
11    A.    No.
12    Q.    And then if we could go to the top email, the one at
13    10:49 a.m. from you (as read):
14                   "Yes.  I have spoken with all three and will be
15              speaking with Ramon and Owen again on Friday.  I had a
16              conversation with Ed" --
17              That would be Ed Romero?
18    A.    Yes.
19    Q.    (As read):
20                   "-- at Victor's desk" --
21              That would be Victor Quintero?
22    A.    Yes.
23    Q.    (As read):
24                   "I had a conversation with Ed at Victor's desk
25              yesterday, and they just want us to verbally counsel
```

1        each of them with regards to appropriate behavior in

2        the workplace.   No written warning needed right now."

3        So you got direction from Mr. Quintero and Mr. Romero to

4    give a verbal warning to both of them without completing the

5    investigation; right?

6    A.   It must be the case.   And I probably sent it back to their

7    agencies to do it, to be honest.

8    Q.   Thank you.

9        Let's talk about the second incident, the incident

10   involving the drawing that was made.

11            MR. ALEXANDER:   If we could put up Exhibit No. 33 and

12   show the drawing.

13        (Photograph displayed.)

14   BY MR. ALEXANDER:

15   Q.   With regard to this drawing, how did you receive this?

16   A.   I believe Ed Romero sent me the pictures.

17   Q.   And when you saw the picture, what did you think that

18   picture was?

19   A.   Honestly, I was offended.   It looks like what they used to

20   call a jigaboo, which was an old racially motivated cartoon

21   from the '50's and '60's, if I'm not mistaken, with the bone in

22   the hair and the big lips.

23   Q.   And you were offended because you were African-American or

24   for some other reason?

25   A.   Because I'm African-American.

1   Q.   And this -- I think I got a fact wrong.

2        When you received this, were you inside the factory?

3   A.   I don't remember.  I would get calls and emails all days

4   and hours of the night, so...

5   Q.   And did you meet with Mr. Diaz with regard to this

6   drawing?

7   A.   I do believe so, yes.

8   Q.   And when you met with him, did he indicate how he felt

9   about the drawing?

10  A.   I believe -- I can't recall.  I think he was offended as

11  well, but I don't remember specifics.

12  Q.   Okay.  Now, with regard to this second incident, the

13  incident involving the jigaboo, as you've referred to it, is it

14  correct there was to be an investigation with regard to the

15  jigaboo?

16  A.   Yes.

17  Q.   And typically the way it works inside of the Tesla factory

18  is the employees that are involved in an incident, the incident

19  is directed to the staffing company associated with that

20  employee; right?

21  A.   Yes, sir.

22  Q.   And so in this instance if it was Chartwell, the branch

23  manager would have been a person by the name of Veronica

24  Martinez; right?

25  A.   Yes.

 1   Q.   And Veronica Martinez sent you statements which you

 2   forwarded to Tesla and Terri Garrett; is that correct?

 3   A.   Yes, I believe so.

 4   Q.   And if we could turn to Exhibit No. 79.  Do you recognize

 5   this document as being --

 6   A.   I don't see a 79.

 7        THE COURT:  Neither of us have a 79.

 8        Maybe this is a good -- is this a good time for the

 9   morning break?

10        MR. ALEXANDER:  Yes, it would be.

11        THE COURT:  Okay.  Great.

12        So, ladies and gentlemen, let's take our 15-minute break

13   and we will be back here at 10:15.

14        Please remember don't discuss this matter with anybody.

15        (Jury exits the courtroom at 10:00 a.m.)

16        (Proceedings were heard out of presence of the jury:)

17        THE COURT:  Sit down for just a moment, please.

18        I asked this yesterday and I'm going to ask this again.

19   Please figure out where the duplicate documents are.  You've

20   each put in different documents that are the same.  You have

21   stipulations about some of the documents; and if one of you has

22   been organized enough to figure out where the duplicates are,

23   share that information with the other side.  This is creating a

24   record that is difficult and it's wasting time.

25        (Whereupon there was a recess in the proceedings

1          from 10:01 a.m. until 10:22 a.m.)

2      (Proceedings were heard in the presence of the jury:)

3          THE COURT:  All right.  Please be seated everybody.

4      Mr. Alexander, please proceed.

5          MR. ALEXANDER:  Thank you, Your Honor.

6      We initially started to discuss Exhibit No. 79.  Instead

7  I'm going to be referring to Exhibit No. 287, which has been

8  stipulated to be admissible.

9          THE COURT:  All right.  It's admitted.

10      (Trial Exhibit 287 received in evidence)

11          MR. ALEXANDER:  If we could display the first page of

12  this document.

13  BY MR. ALEXANDER

14  Q.  There is a reference on January 25, 2016, at 1:26 p.m. of

15  an email from Veronica Martinez to Wayne Jackson.

16          THE COURT:  287 is in this.

17          THE WITNESS:  In this?

18          THE COURT:  He doesn't have it.

19          MR. ALEXANDER:  If we could display 287?  287 has been

20  admitted.  If we could display this onto the screen?

21          THE COURT:  Ms. Davis, are we working on that?

22          THE CLERK:  It should be...

23  BY MR. ALEXANDER:

24  Q.  Let me -- while we're figuring that out, can you tell me,

25  Jackelin Delgado, who is she?

**JACKSON - DIRECT / ALEXANDER**

1  A.   The name sounds familiar, but I don't remember.  I don't

2  recall.

3  Q.   Do you recall her being a Chartwell -- executive of

4  Chartwell, HR person?

5  A.   She definitely could have been.  I don't recall.

6  Q.   And with regard to --

7       (Document displayed.)

8           MR. ALEXANDER:  Thank you.

9  BY MR. ALEXANDER

10 Q.   With regard to receiving statements, is it your

11 understanding that with regard to -- that on or about

12 January 25, 2015, Ms. Martinez forwarded the statements that

13 had been obtained from Mr. Diaz and Mr. Martinez with regard to

14 the jigaboo incident?

15 A.   That could very -- I don't see anything on the screen, but

16 that could very well be the case.  Because they weren't my

17 employees, so I would have to send the information back to the

18 agency for them to deal with.

19 Q.   Now, with regard to this incident, did you have

20 discussion -- I'm sorry.

21     You were concerned about this incident involving Ramon

22 Martinez because this was the second incident involving

23 Mr. Diaz, correct?

24 A.   I don't think it was because it was the second incident.

25 I think it was just my concerns were more so with the actions

1    of Mr. Martinez.

2    **Q.**   If I could have you turn to page -- on your deposition

3    transcript, Page 101, Line 4 through 9.

4    **A.**   You said Page 101?

5    **Q.**   101, Line 4 through 9.

6         Does that refresh your recollection that you were

7    concerned because with regard to this jigaboo incident, you had

8    previously had the October elevator incident?

9    **A.**   Yeah.  But, like I said, if I remember correctly, it was

10   more of the actions of Mr. Martinez this time that were more

11   concerning.

12   **Q.**   And as a result of this incident, having this drawing

13   placed in the workplace by Mr. Martinez, you thought that he

14   should be fired; correct?

15   **A.**   My personal would have been that; but, once again, he's

16   not my -- he was not my employee, so that was not my

17   determination to make.

18   **Q.**   And you also communicated that to the director of

19   operations, Terri Garrett; correct?

20   **A.**   Yes, sir.

21   **Q.**   And you also had a conversation with Mr. Quintero, the

22   manager at Tesla, about this incident; right?

23   **A.**   Yes, sir.

24   **Q.**   And you discussed the drawing you and said -- you

25   communicated to Mr. Quintero that both you and Ms. Garrett

1  believed that Mr. Martinez should be terminated; right?

2  **A.**   I don't believe -- like I said, once, again, I'm going to

3  reissue this statement.  They were not my employees so I did

4  not have the right to fire anyone.  I could make a

5  recommendation, but that is not -- it would not be up to me.

6  It would be up to their agency.

7  **Q.**   And so that's what you did?

8  **A.**   Yes.

9  **Q.**   You made a recommendation --

10  **A.**   Yes.

11  **Q.**   -- to Mr. Quintero that Mr. Martinez be fired; right?

12  **A.**   Yes, sir.  Well, not fired, but that he be removed from

13  that contract.  Maybe Chartwell or Manpower, whichever agency

14  he was with, they may have determined to move him to another

15  site.  That was not my determination.

16  **Q.**   And so Mr. Quintero, he did not want to discipline

17  Mr. Martinez; isn't that correct?

18  **A.**   No, that was not correct.  He did want to discipline

19  Mr. Martinez.

20  **Q.**   He did not want him terminated?

21  **A.**   I don't believe that was the case, no.

22  **Q.**   Okay.  Instead, Mr. Quintero wanted a stern warning to be

23  issued to Mr. Martinez; correct?

24  **A.**   I don't recall.  I believe that was the case, though.

25  **Q.**   And Chartwell followed Mr. Quintero's recommendation to

1   suspend Mr. Martinez; isn't that correct?

2   **A.**   I -- I don't know what the determining factors were for

3   Chartwell.  They did their own HR stuff and they made their

4   determination.  I don't know if it was based off of

5   Mr. Quintero or if it was based off of their policies.  I don't

6   know.

7   **Q.**   Isn't it correct that you told Mr. Quintero -- you

8   recommended to him that Mr. Martinez should at least be

9   suspended for three days as opposed to just a verbal warning;

10  right?

11  **A.**   I definitely think there should have been some type of --

12  of disciplinary action; but, once again, that was not my

13  determination to make.  I could only recommend, and they had to

14  make that determination.

15  **Q.**   I am only talking about your recommendation.

16  **A.**   Okay.

17  **Q.**   When you spoke to Mr. Quintero, he wanted to give a

18  warning and you recommended that it needed to be something

19  stronger?

20  **A.**   Yes, sir.

21  **Q.**   A three-day suspension; right?

22  **A.**   I don't know if I specifically said a three-day

23  suspension, but I did say that there should be additional

24  disciplinary action, yes.

25  **Q.**   All right.

**JACKSON - DIRECT / ALEXANDER**

1   **A.**   But, once again, that would be up to Manpower or Chartwell

2   or whichever agency he was with.

3   **Q.**   But Mr. Quintero was making a determination as to what he

4   thought should occur; right?

5   **A.**   As far as I --

6   **Q.**   It wasn't your decision.  It was his decision?

7   **A.**   Yes.  It was his department essentially so -- at Tesla.

8   **Q.**   And so just to be clear, you were only giving a

9   recommendation, but it was definitely Mr. Quintero's choice as

10   to what was occurring; right?

11   **A.**   No.  It was the agency's choice overall.  The final

12   determination would be with the agency that that individual was

13   with because that individual was their employee.  He wasn't an

14   employee of Tesla.  He wasn't an employee of nextSource.  He

15   was an employee of that particular agency.

16   **Q.**   With regard to the -- there are two statements that are

17   attached to Exhibit No. 287, a statement from Mr. Martinez and

18   the statement associated with Mr. Diaz.

19       If I understand correctly, you had not seen these

20   statements at the point when your deposition was taken in May

21   of 2019; correct?

22   **A.**   That could very well be the case, yes.

23   **Q.**   Now, with regard to the decision -- there was a decision

24   made to terminate Mr. Diaz.  You had no involvement in that

25   decision; correct?

A.   No, I did not.  That is not my -- once again, that was not

my employee so I did not have the right to terminate.

Q.   Ed Romero said that Tesla wanted Mr. Diaz not to be on

site anymore; isn't that correct?

A.   I don't recall.  That could be the case.

Q.   If I could have you turn to Page 127, Line 11 through 22.

Does that help refresh your memory that Mr. Romero had

indicated that Tesla did not want Mr. Diaz on site anymore?

A.   It says, well, basically Tesla was saying they just didn't

want.  So I'm not sure if it was specifically Mr. Romero.

Q.   Tesla decided they didn't want Mr. Diaz on site anymore?

A.   Yes.  I don't know who specifically may have said that at

that time.  And, once again, like I said, it wasn't my

determination.  They had to -- the agency determined if they

were going to terminate or transfer someone to another site.

That was up to them totally.

Q.   And it's your understanding that Mr. Quintero was involved

in that decision based on Mr. Diaz being in Mr. Quintero's

area; correct?

A.   Yes.

Q.   If you could turn briefly to Exhibit No. 3.  That is

the -- which has not been -- which is only being marked at this

time.

(Trial Exhibit 3 marked for identification)

 1   BY MR. ALEXANDER:

 2   Q.   That's a Tesla Motors, Inc. Master Service Agreement.

 3        At the time you were performing work at nextSource

 4   associated with Tesla, did you have an opportunity to review

 5   this document?

 6            MR. ALEXANDER:   I'm sorry.  If we could display

 7   Exhibit No. 3 on the witness's screen only?

 8   A.   This looks like it could be part of the packet that Tesla

 9   gave us.

10        Once again, I don't remember the specific documents.

11   We're talking five years, six years ago; but they did give us a

12   packet with certain documents for employees to review -- or

13   contractors to review on their first day.

14   BY MR. ALEXANDER:

15   Q.   Okay.  And you believe this was one of those documents?

16   A.   It could very well have been, yes, sir.

17            MR. ALEXANDER:   May Exhibit No. 3 received?

18            THE COURT:   Any objection?

19            MS. JENG:   Yes.  Lacks foundation as to this witness.

20            THE COURT:   Can you get a little more specific with

21   this witness regarding the document?

22   BY MR. ALEXANDER

23   Q.   With regard to this Master Service Agreement, you had an

24   understanding that there were agreements that existed between

25   Tesla and the staffing companies that were performing services

1    for it?

2    A.    That, I don't know.  Because, once again, I -- if I'm not

3    mistaken, the agreements were probably with nextSource and

4    the staffing company.  I don't know if they were specifically

5    with Tesla and each staffing company.

6    Q.    And if we could turn to the page that is 3-31.  That is

7    approximately four pages from the last page.

8          Does this help refresh your memory of this document?  It

9    has a signature for Tesla on September 24, 2015, and a

10   signature for nextSource by Edward Remus on September 29,

11   2015.

12   A.    No, sir.  I don't know who any of those individuals are.

13              MR. ALEXANDER:  Thank you, Your Honor.  I have nothing

14   further.

15              THE COURT:  Ms. Jeng.

16                        <u>CROSS-EXAMINATION</u>

17   BY MS. JENG

18   Q.    Good morning.

19   A.    Good morning.

20   Q.    Mr. Jackson, you started working for nextSource in 2015

21   as a contract recruiter; correct?

22   A.    Yes.

23   Q.    Your job duties as a contract recruiter included

24   recruiting employees of staffing agencies to place with

25   nextSource clients; is that correct?

**JACKSON - CROSS / JENG**

1  A.   Not just staffing agencies but, yes.

2  Q.   Okay.  Your job was to recruit employees to place with

3  nextSource clients; is that correct?

4  A.   Yes.

5  Q.   Okay.  What types of jobs did you recruit?

6  A.   It was all levels of jobs throughout Tesla.  Recycling,

7  line workers, just the whole gambit, to be quite honest.

8  Q.   Okay.  And did you recruit, for example, HVAC techs,

9  electricians, power washers?

10  A.   Yes.

11  Q.   Okay.  Were those positions placed at Tesla?

12  A.   Yes, they were.

13  Q.   Were they placed elsewhere?

14  A.   I don't recall.

15  Q.   Okay.  And you testified earlier you don't recall which

16  specific staffing agency Owen Diaz was employed by; is that

17  right?

18  A.   Yeah.  I don't recall if it was Chartwell, CitiStaff.  I

19  think Manpower was one.  We used several agencies.

20  Q.   Okay.  And that's because there are different staffing

21  agencies that nextSource recruited employees from?

22  A.   Yes.

23  Q.   For staffing agencies whose employees nextSource placed

24  at Tesla, is it your understanding that those staffing agencies

25  provided onboarding creating to their employees?

1              MR. ALEXANDER:  Objection, Your Honor.

2              THE COURT:  I'm sorry?

3              MR. ALEXANDER:  Objection.  Foundation.

4              THE COURT:  You want --

5              MR. ALEXANDER:  Objection.  Foundation.

6              THE COURT:  Third time makes the charm.

7         You want to lay a foundation, Ms. Jeng.

8              MS. JENG:  Sure.

9    BY MS. JENG

10   Q.   I believe you testified earlier that nextSource did not

11   do the training of the employees of staffing agencies that were

12   placed at Tesla; correct?

13   A.   We did not do the specific training.  Tesla did the actual

14   job duty training.

15   Q.   Okay.

16   A.   We would do the safety -- the initial first-day safety

17   review with them, but that was about it.

18   Q.   All right.  So Tesla did the safety training for the

19   contract workers that were placed at their factory; is that

20   right?

21   A.   They gave us videos and such and documentation to share

22   with the contractors on their first day.

23   Q.   Okay.  And is it your understanding that when it came to,

24   for example, anti-harassment and discrimination policies, that

25   whichever staffing agency employed the employee would do that

```
 1   training?

 2   A.    Yes.

 3              MR. ALEXANDER:  Objection.  Speculation.  Foundation.

 4              THE COURT:  Overruled.

 5   BY MS. JENG

 6   Q.    You can answer, or do you need me to repeat the question?

 7   A.    Oh.  I thought I answered it.  I said yes.

 8   Q.    Oh, okay.

 9         Okay.  So your expectation was that the employees from the

10   staffing agencies would be trained by their employers on

11   anti-harassment or discrimination; is that right?

12   A.    Yes.  They would be trained by their employers and then

13   they would be given any rules or policies that Tesla had as

14   well.

15   Q.    Okay.  You testified previously about the Tesla

16   anti-harassment and discrimination policy.  Do you recall

17   seeing that during your time at nextSource?

18   A.    I believe I did see it, yes.

19   Q.    Okay.  Do you know anything about, you know, how that

20   was -- how or if that was distributed to any of the contract

21   workers?

22   A.    Once again, I believe it was part of the initial first-day

23   packets.

24   Q.    Okay.

25   A.    I don't recall exactly what was in those packets at this
```

 1  time.  It's been quite a few years.

 2  **Q.**   When you became a program manager, when you switched from

 3  becoming a contract recruiter to a program manager, you were

 4  physically on site with the employees that nextSource placed

 5  at Tesla; correct?

 6  **A.**   Yes.

 7  **Q.**   And as the program manager, did you make yourself

 8  available to the contract workers --

 9  **A.**   Yes.

10  **Q.**   -- to come to you with any issues?

11  **A.**   Yes.

12  **Q.**   Okay.  And these issues included anything from attendance

13  issues to scheduling issues; right?

14  **A.**   Yes.  Any type of issues they would bring to my attention

15  and I would share it with their agency and/or Tesla.

16  **Q.**   Okay.  And these also included any complaints that they

17  would have; correct?

18  **A.**   Yes.

19  **Q.**   Okay.  And if someone alerted you to a complaint about

20  something or someone, you would sometimes assist the staffing

21  agency in gathering information; is that correct?

22  **A.**   Yes.

23  **Q.**   Okay.  If a contract worker brought a complaint to you as

24  the program manager and you assisted with gathering

25  information, you would provide that information to their

1   employer; correct?

2   **A.**   I would provide it to their employer and Tesla --

3   **Q.**   Okay.

4   **A.**   -- depending on the situation.

5   **Q.**   Would you always include that information to Tesla?

6   **A.**   Yes.  If I didn't, my supervisor would.

7   **Q.**   Okay.  Can I have you take a look at your deposition

8   transcript on Page 24, Line 18 through 24?  Or I guess 24/18

9   through 25/6.

10  **A.**   Yes.

11  **Q.**   And does this refresh your recollection of whether or not

12  you would necessarily provide any information from fact

13  gathering to Tesla?

14  **A.**   Like I said, it depended on the issue or the situation.

15  Of course, their employer was the first one to be notified, but

16  Tesla was almost always kept in the loop.

17  **Q.**   Okay.  So Tesla was kept in the loop on certain fact

18  gathering that you would do with respect to investigations;

19  correct?

20  **A.**   Yes.  If I didn't share it with them, my supervisor Terri

21  Garrett would share it with them.

22  **Q.**   But you wouldn't say that they were always kept in the

23  loop; right?

24  **A.**   I would say a good -- most of the time, yes.  They were --

25  they were never really in the dark about things, no.

**JACKSON - CROSS / JENG**

1   Q.   Okay.  But at your deposition did you testify in response

2   to whether or not you provided that information to Tesla, do

3   you recall saying (as read):

4        "ANSWER:  No.  I provided it to their employer"?

5   A.   I don't recall.  But I -- once again, as I am stating to

6   you now, we would provide it to their employer and Tesla would

7   be looped in, especially if it was a more severe incident.  And

8   if I didn't -- if I didn't let Tesla HR know, my supervisor

9   Terri Garrett would let them know.

10  Q.   Okay.  When it came to discipline for any reason, I think

11  you previously testified you were able to make recommendations;

12  correct?

13  A.   I would make recommendations, but they didn't -- they

14  weren't the final.  It was totally up to the employer and/or

15  whatever guidance Tesla provided.

16  Q.   Okay.  So with your recommendation and Tesla's guidance,

17  the employer, so the staffing agency, would make the decision

18  on discipline; is that right?

19  A.   They would have to make that decision because it was their

20  employee.

21  Q.   Right.  Discipline issued to the contract workers, where

22  is that kept?

23  A.   It would be with their employer.  We wouldn't -- I

24  wouldn't -- once again, I could not discipline someone that was

25  not my employee.

1    Q.   So if a contract worker were to be issued discipline, a

2    record of that would be kept with the staffing agency; correct?

3    A.   It should be, yes.  They would be the ones.

4    Q.   Okay.  At some point around October 18, 2015, you became

5    aware of a verbal altercation between Ramon Martinez and Owen;

6    correct?

7    A.   I believe so, yes.

8    Q.   Okay.  If I could have you take a look at Exhibit 103.  I

9    believe this has been admitted.

10             THE COURT:  It has.

11             MS. JENG:  May we publish?

12             THE COURT:  You may.

13        (Document displayed.)

14   BY MS. JENG

15   Q.   Okay.  You recognize this email between you and Terri

16   Garrett; correct?

17   A.   Yes.

18   Q.   Okay.  Do you see where you say to Ms. Garrett you're on

19   the phone now dealing with the Owen and Ramon issue?

20   A.   Yes.

21   Q.   Do you recall who you were on the phone with?

22   A.   I don't recall, no.  It could have been the agency or it

23   could have been Ed Romero or Victor Quintero.

24   Q.   Okay.  And you told Ms. Garrett that you would call her in

25   a few minutes to discuss; right?

1   **A.**   Yes.

2   **Q.**   And you recall speaking with Ms. Garrett about this

3   incident with Owen and Ramon; correct?

4   **A.**   Yes.  And that's when she was saying to direct it to

5   Tesla's HR as well.

6   **Q.**   Okay.  And do you recall speaking with Owen about this

7   incident?

8   **A.**   I'm pretty sure I did.  I don't recall the actual

9   conversation, though.

10  **Q.**   At some point you asked Owen to forward you a written

11  statement; is that right?

12  **A.**   I most likely did.  I needed a statement from each of them

13  with regards to what happened so that I could send it on to the

14  agency.

15  **Q.**   Could you take a look at Exhibit 242?

16          **MS. JENG:**  This has been stipulated as admissible.

17  May we publish?

18          **THE COURT:**  You may.

19      (Document displayed.)

20  **BY MS. JENG**

21  **Q.**   Okay.  If you look on 242-9, which is the

22  second-to-the-last page -- or I guess -9 and -10, so

23  second-to-last page and the last page, did you receive this

24  email on October 20th from Owen?

25  **A.**   I probably did.

**JACKSON - CROSS / JENG**

1  Q.   And it appeared to you that he was forwarding an email

2  from -- an email statement from October 17, 2015, that he

3  wrote; correct?

4  A.   It looks like he initially sent this to Ed Romero, and I

5  guess that he must have forwarded it to me.

6  Q.   That's right.

7       You recall Owen telling you about this incident he had

8  with Ramon and Rothaj Foster; correct?

9  A.   Uh-huh.

10 Q.   And then higher up in the email you forward the statement

11 to Ms. Garrett and say you're waiting for Rothaj and Ramon to

12 send their statement; correct?

13 A.   Yes.

14 Q.   Is that -- when you say Ramon's statement," is that a

15 typo?  Do you mean -- do you mean this is Owen's statement?

16 A.   It could be.  I don't recall.

17 Q.   Well, the statement below looks like it's written from

18 Owen; right?

19 A.   Yes.

20 Q.   Okay.  So does that --

21 A.   It could be a typo.

22 Q.   Okay.

23 A.   I don't recall.

24 Q.   Okay.  Because in the sentence immediately after that, you

25 say you're waiting for Rothaj and Ramon "to send me theirs";

1   right?

2   A.   Once again, it could have been a typo.  It's been several

3   years.

4   Q.   And so the next email on 242-8, it was your understanding

5   that Ed was planning to meet with Rothaj, Owen, and Ramon;

6   correct?

7   A.   Yes.

8   Q.   And Terri asked you why Ed is meeting with them; correct?

9   A.   Yes.

10  Q.   Are you aware that Ms. Garrett later recommends that Ed

11  not be involved?

12  A.   I don't know if I was in that email.  I can't see.

13  Q.   Okay.  And Terri was the director of operations from

14  nextSource; right?

15  A.   Yes.

16  Q.   Okay.  So after you received this email statement from

17  Owen, did you speak with Owen again to give him an opportunity

18  to tell his side of the story?

19  A.   I most likely did; or if I did not, he was directed to

20  contact his agency.

21  Q.   Do you recall Owen saying anything to you about this

22  incident in his statement?

23  A.   I don't recall, ma'am.  It's been five, six years.

24  Q.   I understand.

25  A.   Yeah.

1  Q.   Do you recall testifying that Owen's verbal statement to

2  you was different from what he put down in an email?

3  A.   I don't recall.  It could be the case.  I don't recall.

4  Q.   Okay.  I'll have you look at your deposition transcript,

5  Page 65, Line 19 through Page 66, Line 2.

6  A.   Which line?

7  Q.   65, Line 19 to 66, Line 2.

8       (Brief pause.)

9  A.   Yes.

10 Q.   Does this refresh your recollection that Owen actually

11 gave you a verbal statement that was different from what he

12 emailed?

13 A.   No.  That doesn't recall -- that doesn't jar my memory at

14 all, because it really doesn't deal with anything with regards

15 to his -- yeah.  I don't -- I don't recall that, no.

16 Q.   Well, what you testified to was that even though his email

17 said that he felt he was about to be struck, he did not express

18 that when he spoke to you; is that right?

19          MR. ALEXANDER:  Objection.  Argumentative.

20          THE COURT:  And I think you're referring to a

21 different section of the deposition than you've referred the

22 witness to.  You had him start on Page 65, Line 19.

23          MS. JENG:  Oh.  I'm sorry.

24 BY MS. JENG

25 Q.   Okay.  Can you look at 64/8 through 65/15 -- or, sorry.

1    Yeah, 65/15.  Sorry about that.

2    **A.**    Yes.

3    **Q.**    Okay.  So does this refresh your recollection that what

4    Owen told you verbally was different than what he emailed in

5    his statement?

6    **A.**    If I remember correctly, it was more of them about to

7    actually get into a physical altercation.

8    **Q.**    Okay.  And is that what Owen articulated to you when he

9    spoke with you?

10   **A.**    I believe so, yeah.  He was more or less he's not going to

11   allow someone to talk to him like that.

12   **Q.**    Okay.  And when you spoke with Owen, you don't recall him

13   saying that Ramon was calling him the "N" word at all, do you?

14   **A.**    No, I do not recall that.

15   **Q.**    Okay.  You don't recall when Owen spoke to you saying that

16   Ramon used any racial slurs against him; correct?

17   **A.**    I don't recall it being any racial slurs.  At this point I

18   can't -- yeah, I can't recall that.  I don't think the racial

19   stuff came in until the drawings.

20   **Q.**    That's right.

21        Okay.  And then at this point you don't recall Owen

22   mentioning that Ramon had said, quote, "I hate you," "N" word;

23   is that right?

24   **A.**    No, I do not recall that at all.

25   **Q.**    Okay.  So your recollection of Owen's complaint against

1   Ramon having anything to do with race was the drawing; correct?

2   **A.**    Yeah.   That's when the drawing -- is when the racial

3   aspect came in.   The first time it just seemed like an

4   argument, a verbal altercation that the two got into.

5       I don't recall any racial epithets being thrown either way

6   at that point or that I was notified of.   Like I said, it

7   wasn't until the drawings came that that portion came up.

8   **Q.**    Thank you.

9   **A.**    And once those drawings came, I know Tesla was immediately

10  notified.

11  **Q.**    Thank you.

12      Do you recall Ed Romero forwarding you Ramon Martinez's

13  complaint against Owen at some point related to this incident?

14  **A.**    I don't recall, but I'm not sure he probably did.

15  **Q.**    Okay.   Can you look at Exhibit 49, please?

16  **A.**    I don't have 49.

17          **THE COURT:**   It's in the black binder.

18      (Brief pause.)

19  **BY MS. JENG**

20  **Q.**    Do you recall receiving this?

21  **A.**    I don't recall, but I'm sure I did, yeah.

22  **Q.**    Okay.   Does that look like your email address right there?

23  **A.**    Yes.   It wasn't sent direct.   It looks like it was

24  forwarded to me from others, yes.

25  **Q.**    So you spoke with Ramon at some point and took notes; is

**JACKSON - CROSS / JENG**

1    that right?

2    **A.**    I believe so, yes.

3    **Q.**    And you took these notes on a laptop -- on a nextSource

4    laptop; is that right?

5    **A.**    It could have been on the laptop or handwritten.  I don't

6    recall.

7    **Q.**    Okay.  And when you left nextSource, those notes were

8    kept with nextSource; correct?

9    **A.**    Yeah.  Any files I had or anything were left with the

10   company.

11   **Q.**    Okay.  Can you look to Exhibit 76?

12          **THE COURT:**  Did you want 49 in evidence?

13          **MS. JENG:**  Oh, yes.  Yes.  Can we move that into

14   evidence?

15          **THE COURT:**  Is there any objection?

16          **MR. ALEXANDER:**  No objection.

17          **THE COURT:**  Admitted.

18       (Trial Exhibit 49 received in evidence)

19          **MS. JENG:**  Can we publish?

20       (Document displayed.)

21   **BY MS. JENG**

22   **Q.**    Do you recall that Ramon actually made his complaint

23   against Owen before Owen's complaint against Owen in -- Owen's

24   complaint against Ramon in 2015?

25   **A.**    I don't believe that was the case, but it could very well

JACKSON - CROSS / JENG

```
 1    be.

 2    Q.   Okay.

 3    A.   They might have been simultaneous when they made their

 4    complaints.

 5    Q.   I'm sorry.  Can you repeat that last part?

 6    A.   It might have been simultaneous or at the same time when

 7    they made their complaints.  I'm not sure.

 8    Q.   Okay.  Can I have you look at Exhibit 76.

 9              MS. JENG:  This has been admitted.  May we publish?

10              THE COURT:  It's in?  I don't see that it is in.

11              MS. JENG:  Oh.

12              THE COURT:  Oh, yes, it is.  I take it back.

13         Okay.  And you may publish.

14         (Document displayed.)

15    BY MS. JENG

16    Q.   Okay.  And at some point after you talked to Owen and

17    Ramon, you and Terri also spoke; is that right?

18    A.   Yes.

19    Q.   And when you spoke with either Owen or Ramon, neither of

20    them mentioned anything about race; is that right?

21    A.   No.  If I remember correctly, once again, at this point it

22    was more of a verbal altercation and they both were kind of

23    saying that the other shouldn't speak to them like that.

24    Q.   When you testified earlier, you testified that you didn't

25    know who Rothaj Foster was; correct?
```

1   **A.**   Yeah.  I don't recall that name.

2   **Q.**   And you don't recall whether or not he was spoken to; is

3   that right?

4   **A.**   He most likely was, but I don't recall that.  That

5   individual name just doesn't stick out to me.  I can't remember

6   if he was a contractor, if he was a Tesla employee.  I don't

7   recall.  That particular name doesn't stand out to me.

8   **Q.**   Well, if you look at page -- or Exhibit 76-1 --

9   **A.**   Uh-huh.

10   **Q.**   -- in the top email you say (as read):

11          "Yes, I have spoken with all three and will be

12      speaking with Ramon and Owen again on Friday."

13      Does that refresh your recollection of whether or not you

14   spoke with Ramon, Owen, and Rothaj?

15   **A.**   I probably did.  Once again, I just don't recall Rothaj,

16   that name.  If I spoke to him, it was probably once or twice.

17   I don't even recall him as far as being an actual contractor

18   with nextSource or with any of the agencies.

19      So I'm not sure if he was a -- Tesla had their own

20   elevator people as well, so...

21   **Q.**   Okay.  You don't know why nextSource was instructing you

22   that -- to tell -- or -- strike that.

23      You testified earlier you don't know why Terri was

24   informing you that no formal investigation was needed; right?

25   **A.**   I don't recall that.  Once again, they weren't our

1   employees, so it could have been referring to that they were

2   already -- their agency was on it or -- and/or Tesla was

3   involved because Terri would -- would cc Tesla HR on all these

4   issues or complaints.

5   **Q.**   And it's your understanding that both Ramon and Owen were

6   referred to be counseled?

7   **A.**   Yes, by their agencies.

8   **Q.**   That's right.  And this was after you spoke with all three

9   of them; correct?

10  **A.**   Yes.

11  **Q.**   Could I have you look at Exhibit 254?

12        **MS. JENG:**  This is stipulated as admissible.

13        **THE WITNESS:**  I don't have a 254.  Oh, here it is.

14  Okay.

15        **THE COURT:**  All right.  It's admitted.

16        **MS. JENG:**  May we publish?

17        **THE COURT:**  Yes.

18     (Document displayed.)

19        **MR. ORGAN:**  Your Honor, 254 isn't stipulated.  We had

20  an objection.

21        **THE COURT:**  Okay.  And so lay a foundation, please.

22        **MS. JENG:**  Okay.

23        **THE COURT:**  Let's be clear about what's agreed to be

24  admitted into evidence and what's not.  Okay.

25

1  BY MS. JENG

2  Q.   Mr. Jackson, do you recall receiving this email from

3  Ms. Garrett?

4  A.   I don't recall this one.  I very well could have, but I

5  don't recall.

6  Q.   Okay.  Well, that's your email on there; right?

7  A.   Yes, it is.

8  Q.   Do you recall this incident between Rothaj and Owen?

9  A.   To be honest, I don't really recall the actual incident.

10  I do know that -- I do know that there were a few complaints

11  with regards to Owen and his --

12       MR. ALEXANDER:  Objection.  Move to strike.  Beyond

13  the scope of the question.

14       THE COURT:  Yeah, sustained.  The jury will disregard

15  the last statement by Mr. Jackson.

16  BY MS. JENG

17  Q.   Okay.  Well, with respect to this incident between Rothaj

18  and Owen, what do you recall happening between the two of them?

19  A.   I really don't.  I don't recall.  There were something --

20  there were a lot of incidents and accidents in the elevator

21  area where they would hit walls and things of that nature, so

22  I'm sure it had something to do with that.  I don't recall the

23  actual details, though.

24  Q.   Okay.  If you look at 254-2, you see this email where Ed

25  says (as read):

1          "I could not allow anyone to be threatened by any

2      other employee.  I do not recommend" --

3          MR. ALEXANDER:  Objection.

4          THE COURT:  Sustained.  You need to first either get

5  this document admitted or not.  And if you have a different

6  question, you can ask a question without referring to the

7  document.

8          MS. JENG:  Okay.

9  BY MS. JENG

10  Q.  So on November 6th of 2015, there was an altercation of

11  some sort between Owen and Mr. Foster; is that correct?

12          MR. ALEXANDER:  Objection.  Leading.  Foundation.

13          THE COURT:  Sustained.

14  BY MS. JENG

15  Q.  Do you recall an incident between Mr. Foster and Owen in

16  November of 2015?

17          MR. ALEXANDER:  Objection.  Your Honor, we have the

18  document on the screen.

19          THE COURT:  Yeah, so don't look at the document.

20  Just --

21          THE WITNESS:  Oh.  Well, I thought I was supposed to.

22          THE COURT:  You previously testified that you didn't

23  remember an incident between Mr. Foster and Mr. Diaz.  Is that

24  still your testimony?

25          THE WITNESS:  Yeah.  I -- to be very honest, there

1    were a few.  I don't know how to answer because there were a

2    few issues with Owen and other individuals.

3              THE COURT:  Well, I'm really asking about Mr. Foster.

4              THE WITNESS:  I don't recall, Your Honor.  It was

5    five, six years ago.  I can't remember each incident,

6    unfortunately --

7              THE COURT:  All right.

8              THE WITNESS:  -- but there were several.

9    BY MS. JENG

10   Q.   Okay.  So you don't remember an incident specifically

11   between Owen and Mr. Foster because there were a lot of

12   complaints; is that right?

13             MR. ALEXANDER:  Objection.  Objection.

14             THE COURT:  Sustained.

15             MR. ALEXANDER:  It's improper.

16   BY MS. JENG

17   Q.   Well, you just testified that there were a lot of

18   incidents between Owen and other workers at the factory; is

19   that right?

20             MR. ALEXANDER:  Objection.  It's inappropriate.  Move

21   to strike any reference to other issues that were nonresponsive

22   to a question posed.

23             THE COURT:  Sustained.

24   BY MS. JENG

25   Q.   Okay.  I'd like to turn to Exhibit 271 -- sorry.  We'll

**JACKSON - CROSS / JENG**

1  look at 31 because I believe that's admitted.

2  **A.**   Go back to 31?

3  **Q.**   Yes.

4  **A.**   It must be in this binder.

5  **Q.**   Okay.  Do you recall receiving this email from Owen Diaz

6  on January 22nd, 2016?

7  **A.**   This email is not from Owen Diaz.

8  **Q.**   Well, if you look at the first -- the very first page, do

9  you see where Owen Diaz is forwarding the email to you?

10  **A.**   This -- from what I'm seeing, this is from Terri Garrett.

11  You said -- you said 31; correct?  Exhibit 31?

12  **Q.**   Yes.

13  **A.**   Okay.

14        **THE COURT:**  Look on the second page towards the

15  bottom.

16        **THE WITNESS:**  Oh, there is a second page.  Okay.

17     Yes, okay.

18  **BY MS. JENG:**

19  **Q.**   And here Veronica tells you that Ramon is on his way to

20  her office; correct?

21     If you scroll up, the very first email.

22  **A.**   I don't see that.  I'm lost.  I'm sorry.  The first email

23  I see is Erin -- going to Erin from Terri Garrett.

24     Then it's my saying he was instructed by Victor.  Why is

25  Ed meeting them?  So I don't -- is this part of 31?

 1   Q.   Yeah.

 2          MS. JENG:  Can you scroll up a bit?

 3   BY MS. JENG

 4   Q.   Sorry.  I'm going to have you turn to 271.  I'm sorry.  We

 5   were trying to de-dupe exhibits on the break.

 6   A.   271?

 7   Q.   Yes.

 8   A.   Yes, that's from his agency.  Once again, I directed him

 9   back to the agency with the complaint.

10   Q.   And Veronica is from Owen's agency; correct?

11   A.   Yes.

12   Q.   And did you speak with Veronica that day?

13   A.   I most likely did.

14   Q.   Okay.  I'll have you look at 284.

15          MS. JENG:  I believe this is also stipulated as

16   admissible.

17          THE COURT:  Okay.  It's admitted.

18      (Trial Exhibit 284 received in evidence)

19          MS. JENG:  Can we publish?

20          THE COURT:  Yes.

21      (Document displayed.)

22   BY MS. JENG

23   Q.   Do you recall Veronica informing you on the phone that

24   Chartwell would start an investigation?

25   A.   I believe so, yes.  Any time that I sent over stuff, they

JACKSON - CROSS / JENG

 1  would do their own investigations.

 2  **Q.**   Okay.  And by this point you have spoken with Ramon, Owen,

 3  and Chartwell; correct?

 4  **A.**   Yes.

 5  **Q.**   Okay.  By the time you received the complaint or became

 6  aware of it, you already knew at that point who had done the

 7  drawing, correct, that offended Owen?

 8  **A.**   Yes.  Ramon had admitted to it.

 9  **Q.**   Okay.  Ramon had admitted to drawing the picture; correct?

10  **A.**   Yes.

11  **Q.**   Do you recall what shift Ramon worked?

12  **A.**   I don't recall, no.

13  **Q.**   When you spoke with Owen about this drawing, what did Owen

14  express to you?

15  **A.**   If I remember correctly he was offended by it.

16  **Q.**   Okay.  Did he mention anything else he was offended other

17  than the drawing?

18  **A.**   Other than the way Ramon and him interacted.  You know,

19  they -- they seemed to have, like I said, a verbal altercation

20  prior to that.

21  **Q.**   When you say "verbal altercation," that was the

22  October 2015 incident that we just talked about; correct?

23  **A.**   I believe so, yes.

24  **Q.**   Okay.  In addition to your communications with Chartwell,

25  did you also have conversations with Victor Quintero about the

1    drawing?

2    **A.**    Yes.  Victor Quintero, Ed Romero, Jose Torres, and I can't

3    remember the person in Tesla HR that we also informed of it.

4    **Q.**    Okay.  And you recall emailing Victor to say you needed to

5    talk to him as soon as possible after you heard of this

6    complaint; correct?

7    **A.**    Yes.  I was alerted by Ed Romero so I reached out, I

8    believe, to Victor.

9    **Q.**    Okay.  And Victor had expressed to you that the drawing

10   was inappropriate; right?

11   **A.**    Yes.

12   **Q.**    Okay.  And you and Victor did discuss potential discipline

13   together; correct?

14   **A.**    Yes.  I believe so.

15   **Q.**    Do you -- okay.

16        Can you look at Exhibit 77, which has already been

17   admitted?

18   **A.**    I have a 76.  I don't see a 77.

19            **THE COURT:**  Neither do I.

20            **THE WITNESS:**  I've got 76 in both.  I don't have a 77.

21   **BY MS. JENG**

22   **Q.**    Okay.  You don't see a 77?

23   **A.**    No, ma'am.  I have two 76s; one 76 in this binder and one

24   76 in this binder.

25   **Q.**    Well, then I'll have you look at Exhibit 272.

```
 1    A.    272?

 2    Q.    Yes.

 3          And this is stipulated as admissible.

 4          Do you see 272, Page 2?  Up top in that email from Victor,

 5    in Victor's email to you, does that accurately reflect what you

 6    and Victor discussed with respect to discipline?

 7    A.    Yes, for the most part.

 8    Q.    Okay.  And was it your understanding that Jose would also

 9    be speaking with the team members about this incident?

10    A.    Yes.

11    Q.    Okay.  Could you look at Exhibit 274?

12          MS. JENG:  This has also been stipulated as

13    admissible.  We can publish it?

14          THE COURT:  All right.  It's in.

15          (Trial Exhibit 274 received in evidence)

16    BY MS. JENG

17    Q.    Okay.  If you look at 274-1, your email to Terri, do you

18    see that?

19    A.    Yes.

20    Q.    Okay.  And does this accurately reflect your discussions

21    with Victor regarding discipline?

22    A.    Somewhat.  I also -- I don't think I included here, but

23    also I -- I thought that there should be a -- there could be a

24    removal from site.  It was that serious of an issue.

25    Q.    Okay.  Well, in your email you say (as read):
```

1          "My suggestion to him was a final written warning

2      with a three-day suspension without pay."

3      Correct?

4  A.   Once again, he suggested a written warning, and I told him

5  I didn't think that was enough --

6  Q.   That's right.

7  A.   -- which is where I, once again, said that even removing

8  from site would be good.

9          At that point I believe, if I'm not mistaken, Victor

10 thought that Ramon was a good worker and he wanted to keep him

11 on, if I'm not mistaken.  And that's where the written

12 three-day suspension came up.

13 Q.   That's right.  So Victor had initially suggested a final

14 written warning; correct?

15 A.   Once again, yes.

16 Q.   Okay.  And when you suggested further discipline, you said

17 that Victor thought that was an even better idea; is that

18 right?

19 A.   Once again, I suggested that that was not enough for the

20 serious nature of the -- the infraction.

21 Q.   Okay.  But you wrote that Victor thought that your

22 suggestion was the better idea than -- a better idea than his;

23 correct?

24 A.   Yes.

25 Q.   Okay.  Terri responds to your email that (as read):

 1              "The final written warning would have to be extremely
 2       clear that there's no room for further error ."
 3       Did you personally communicate to Mr. Martinez that there
 4   is no room for further error?
 5   **A.**   No, I did not.  Once again, he was not my employee, so
 6   that would have been his agency, which was either, Chartwell,
 7   Manpower or CitiStaff.  I can't remember which exact agency he
 8   was with.
 9   **Q.**   Okay.  But you had a conversation with Mr. Martinez;
10   correct?
11   **A.**   Yes.
12   **Q.**   And in that conversation you made it clear that you
13   thought that the drawing was inappropriate; correct?
14   **A.**   Yes.
15   **Q.**   So you personally met with Mr. Martinez about the drawing;
16   is that right?
17   **A.**   Yes.
18   **Q.**   And in addition, you also referred him to his agency,
19   correct?
20   **A.**   Yes, because his agency had to make the final
21   determination.
22   **Q.**   You also met with the different crews to let them know
23   that these types of actions were unacceptable; is that right?
24   **A.**   Yes, I did.
25   **Q.**   Okay.  And so you met with the morning, the swing shift,

JACKSON - CROSS / JENG

```
 1   and the grave shift; correct?
 2   A.   Yes.
 3   Q.   To let them know that these types of actions were not
 4   acceptable; correct?
 5   A.   Yes.
 6   Q.   And during these meetings, do you recall anyone raising
 7   complaints about anything?
 8   A.   I don't recall, no.
 9   Q.   Your understanding is that Ramon also apologized to Owen;
10   is that correct?
11        MR. ALEXANDER:  Objection.  Hearsay.  Foundation.
12        THE COURT:  Sustained.
13   BY MS. JENG
14   Q.   Well, you had an understanding that Ramon apologized to
15   Owen.  That's what you were told; right?
16        MR. ALEXANDER:  Same objection.
17        THE COURT:  Yeah.  Sustained.
18   BY MS. JENG
19   Q.   Well, do you know of any apology that was given by Ramon
20   to Owen?
21        MR. ALEXANDER:  Same objection, Your Honor.
22        THE COURT:  Do you have any personal knowledge?  Were
23   you present at any apology given by anybody?
24        THE WITNESS:  Not that I recall, no.  Not that I
25   recall.
```

JACKSON - CROSS / JENG

```
 1  BY MS. JENG
 2  Q.   Okay.  You testified earlier that you had heard the
 3  "N" word at the factory; is that right?
 4  A.   Yes.
 5  Q.   Okay.  And you testified you heard it daily; is that
 6  right?
 7  A.   Yes.  It was pretty rampant throughout Tesla.
 8  Q.   So your testimony is that it was rampant and daily; is
 9  that correct?
10  A.   Once again, yes.  I heard it several times daily, weekly;
11  and it wasn't always -- it's hard for me as a black man to say,
12  but it wasn't always just a derogatory.
13       There's -- there's kind of two inflections with the word
14  so you would hear it both ways.
15  Q.   All right.
16  A.   You would hear people using it derogatory and you would
17  hear it used as camaraderie in a sense.
18  Q.   Do you recall testifying that you actually only heard it
19  three or four times?
20  A.   I don't recall that because, once again, ma'am, I would
21  hear that on a regular basis at Tesla.
22  Q.   Okay.  So you don't recall testifying that you actually
23  only heard it said three or four times?
24  A.   I don't recall that.  I may have said that; but to be very
25  honest, it was on a regular basis that you would hear it.  It
```

JACKSON - CROSS / JENG

1 was a very, like I said, a high-school-type environment, very

2 clique-ish.  And, unfortunately, there is racism in the world.

3 Q.   Now, you didn't report it -- you didn't ever report

4 hearing it because the context in which you heard it was not to

5 offend; is that correct?

6 A.   I didn't report it probably because that seemed like the

7 norm there, and I reported it to my supervisor.

8 Q.   Do you recall testifying that you didn't report it because

9 the context in which it was being used -- in which it was being

10 used was not, in your opinion, to offend?

11 A.   Once again, I heard it in both contexts.  There's a way of

12 saying the word, the inflections used with the word and what

13 statements you're making when you're using the word that you

14 could tell there's a different meaning to it.

15 Q.   Well, you heard it in the context of, quote, "What's up,

16 my 'N'"; is that right?

17 A.   I've heard it in both contexts, and I've heard it in other

18 contexts.  Like, "That stupid..."  I've heard that before

19 there.

20 Q.   Do you recall testifying that you have never heard it

21 directed in a way that was threatening or offensive?

22 A.   Ma'am, to be honest, the word can be offensive to anybody

23 of color if they hear it even if it's not used in a certain

24 context.  Depending on how you were raised and situations

25 you've been in, you could find that word very offensive.

1   Q.   But you didn't perceive it to be threatening or offensive;

2   correct?

3   A.   It was never directed at me in that sense, no.

4   Q.   Okay.  Did you ever see or hear anyone calling Owen the

5   "N" word?

6   A.   Not that I can recall, no.

7   Q.   With respect to Owen, how often do you recall speaking

8   with him?

9   A.   I actually spoke to Owen a few different occasions.  There

10  were -- like I said, there were a few different incidents with

11  altercations.

12  Q.   Okay.  What altercations can you remember Owen getting

13  into that you were aware of?

14  A.   There were several disagreements with other elevator

15  operators.

16  Q.   Okay.  Who are the other elevator operators?

17  A.   I could not tell you those names, ma'am.  They came and

18  went, you know, according to needs.  So I don't recall all

19  those names.

20  Q.   Do you recall speaking with Ed Romero about Owen's

21  altercations?

22  A.   Yes.

23  Q.   Okay.

24  A.   He would actually -- Ed would -- most of the time Ed would

25  notify me of them because of -- he was more of the supervisor

 1  for Tesla over Owen and the elevator operators, and he would

 2  notify me if there were any incidents.

 3  **Q.**  Can you look at Exhibit 301, please.

 4      Do you recall getting this email about -- I'm sorry.

 5  Strike that.

 6      Do you recall an incident between Owen and Troy Dennis?

 7  **A.**   I don't recall the -- the details of the incident, but

 8  I -- once again, there were a few incidents with Owen Diaz and

 9  others getting into altercations, there were.

10          **MR. ALEXANDER:**  Excuse me.  If there is -- there's a

11  document on the screen that has not been referenced.

12          **THE COURT:**  Is it showing to the jury at the moment?

13  Okay.

14          **MR. ALEXANDER:**  It's been shown to the witness, and

15  there's no foundation for it.

16          **THE COURT:**  Well, there can't a foundation unless he's

17  looking at it.  They have to lay that foundation.

18          **MR. ALEXANDER:**  The question is being asked based on

19  the document.  That was my issue.

20          **THE COURT:**  So lay the foundation for admitting this

21  document if you're going to use it.

22          **MS. JENG:**  Okay.

23  **BY MS. JENG**

24  **Q.**   Mr. Jackson, did you receive this email on March 2nd,

25  2016?

1    **A.**    I believe so.

2    **Q.**    On or around March 2nd, 2016?

3    **A.**    I believe so.

4    **Q.**    Okay.  And what was your understanding of the altercation

5    that happened between Troy and Owen?

6    **A.**    Once again, I don't remember the details, but I believe

7    they got into --

8            **THE COURT:**  Would you offer -- once you establish a

9    sufficient foundation, if you would offer it into evidence,

10   then we can get an objection and move forward.  Okay?

11           **MS. JENG:**  Okay.

12        Okay.  And, Your Honor, can we move this into evidence?

13           **THE COURT:**  Any objection?

14           **MR. ALEXANDER:**  No, Your Honor.

15           **MR. ORGAN:**  No, Your Honor.

16           **THE COURT:**  Okay.  It's admitted.

17        (Trial Exhibit 301 received in evidence)

18           **MS. JENG:**  May we publish?

19           **THE COURT:**  Yes.

20        (Document displayed.)

21   **BY MS. JENG**

22   **Q.**    So was it your understanding at this time that you had

23   been told to look for replacements for both Troy and Owen?

24   **A.**    I believe so, yes.

25   **Q.**    Were you aware of any other altercations that Owen had had

1    at this time with other people?

2    A.    Yes.

3    Q.    Do you recall that Owen got into a lot of altercations

4    with a lot of people at Tesla?

5    A.    Yes.

6    Q.    And you don't recall any of those altercations being about

7    race; correct?

8    A.    No.  They were more arguments or either him instructing

9    someone to do something or them instructing him to do

10   something, and they just weren't on the same page.

11   Q.    And it did seem to you that Owen was having continuous

12   verbal altercations with coworkers; correct?

13   A.    If I remember correctly, there were a few, yes.  And

14   that's not to say if he was right or wrong.  I just knew there

15   were a few disagreements.

16   Q.    Okay.  Based on the feedback that you received, you

17   perceived Owen as a difficult elevator operator; correct?

18   A.    I don't think that was my determination --

19          MR. ALEXANDER:  I'm sorry.  I was not able to hear the

20   question.  I missed a word.

21          THE COURT:  Could you ask it again?

22          MS. JENG:  Sure.

23   BY MS. JENG

24   Q.    Based on your feedback that others gave you about Owen,

25   you knew him to be a difficult elevator operator; correct?

1          **MR. ALEXANDER:**  Objection.  Hearsay.

2          **THE COURT:**  Overruled.  You can answer.

3          **THE WITNESS:**  I wouldn't say that I personally did

4    because I didn't work directly with Owen.  I know that Ed

5    Romero had alerted me of several situations.

6    **BY MS. JENG:**

7    **Q.**   Okay.

8    **A.**   But I wasn't there to witness the situations.  I would

9    find out secondhand.

10   **Q.**   Okay.  At some point you became aware that a woman named

11   Joyce DelaGrande also complained about Owen; correct?

12   **A.**   Yes.  I do recall a Joyce DelaGrande complaining with

13   regards do Owen, yes.

14   **Q.**   And her complaint was that Owen was acting

15   unprofessionally; correct?

16   **A.**   I believe it was unprofessional or rude, or something to

17   that effect.  I don't remember the details.

18   **Q.**   You do recall a couple of occasions where Owen actually

19   raised his voice with you; correct?

20   **A.**   I don't recall that, no.  I don't recall him actually

21   raising his voice with me.

22   **Q.**   Okay.

23   **A.**   He may have been upset about something, but I don't recall

24   him actually raising his voice at me, no.

25   **Q.**   Do you recall a situation where Owen Diaz was very

1    abrasive with you?

2    **A.**    Once again, I wouldn't say it was abrasive.  I would just

3    say that, you know, when sometimes you're in a situation where

4    you may be a little upset or heightened.  I don't think he was

5    more or less directing it at me.  It was more his frustration

6    probably of the situation.

7    **Q.**    Okay.  Well, it was a situation where you had to calm him

8    down; is that right?

9    **A.**    There probably has been times, as in this field you

10   sometimes do have to get people to relax for a second so they

11   can explain their side.  People can get emotional, and

12   sometimes you have to ask them to -- to kind of calm down, take

13   a woosah moment, take a breath, and just, you know, kind of

14   state the facts.

15   **Q.**    And you did have to remind Owen to calm down; correct?

16   **A.**    That could very well be the case.

17   **Q.**    At some point you and Ed discussed replacing Owen as the

18   lead operator; correct?

19   **A.**    Yes, I believe so.

20   **Q.**    And switching Owen to the daytime as an elevator operator?

21   **A.**    Yes.  I believe that was Ed's suggestion just because of

22   the incidents that had occurred with the altercations.

23   **Q.**    Okay.  And you attempted to communicate those to Owen;

24   correct?

25   **A.**    I believe so, yes.

JACKSON - CROSS / JENG

1   Q.   Okay.  What was his response?

2   A.   I don't recall.  I don't recall off the top of my head.

3   Q.   Okay.  At some point you informed CitiStaff to inform Owen

4   not to return; correct?

5   A.   I believe I probably did.  I probably informed them that

6   Tesla did not want to continue his contract on site, which

7   probably came at the direction of either Ed or Victor.

8        And, like I said, it was probably due to the various

9   incidents that were occurring; but if you notice all the

10  emails, I've always cc'd Tesla, whether it was Victor or Ed or

11  someone, so that everybody was in the loop.

12  Q.   Okay.  What do you mean by "incidents that were

13  occurring"?

14  A.   With the altercations that he had with other individuals.

15  Like you said, Joyce DelaGrande and some others that just

16  didn't feel he was acting in a professional manner with regards

17  to the elevator, which is why Ed, I believe, had tried to work

18  with him and move him to different shifts, if I remember

19  correctly, to try to alleviate any of those issues.

20  Q.   Other than the drawing that we discussed earlier, did

21  Owen [sic] ever tell you that Owen made any sort of racial

22  slurs against him?

23  A.   That Owen made slurs against --

24  Q.   I'm sorry.  That Romero made any racial slurs against

25  Owen.

 1  A.   I don't recall that.  Like I said, they were almost going

 2  to get into a physical altercation, but I don't know if anybody

 3  used any racial epithets.  I don't recall that.

 4  Q.   Okay.  You don't recall Owen ever bringing to your

 5  attention any racial epithets used; correct?

 6  A.   I don't recall.  Other than the drawing, I don't recall

 7  that.  He could have, but I don't remember that.

 8         MS. JENG:  Okay.  No further questions.

 9         THE COURT:  All right.  Mr. Alexander.

10                 <u>REDIRECT EXAMINATION</u>

11  BY MR. ALEXANDER

12  Q.   It's a correct statement that Owen Diaz and Ramon Martinez

13  did not get along; correct?

14  A.   I don't necessarily say that they didn't get along.  They

15  just had a disagreement one day.

16  Q.   Multiple disagreements; right?

17  A.   The one was the -- the big disagreement where they were

18  outside the elevator, but I don't know if per se of multiple.

19  Q.   So there was the one big disagreement outside the elevator

20  and then the jigaboo was the next incident?

21  A.   Yes, sir.

22  Q.   Okay.  So with regards to that first incident, isn't it

23  true that Mr. Diaz said to you there was racial issues involved

24  in that first incident?

25  A.   I don't recall that.  I know the second incident

1  definitely there was.

2  **Q.**   So when you say you don't recall that, that doesn't mean

3  it didn't occur.  It just means it may or may not have

4  occurred?

5  **A.**   It may have occurred, to be very honest, but I don't

6  remember him expressing that to me.  It wasn't until the

7  drawing came out that that was really the expression then.

8  **Q.**   So with regards to the drawing, at that point you

9  definitely remember; correct?

10  **A.**   Yes, yes.

11  **Q.**   But with regard to the elevator, it could have happened;

12  you don't recall one way or the other?

13  **A.**   Yeah.  The elevator was more of a disagreement, argument.

14  Like I say, it almost got physical.

15  **Q.**   With regard to Ramon Martinez, did you ever hear him use

16  the word *mayate*?

17  **A.**   I don't even know what that word is.

18  **Q.**   Okay.  Now, with regard to the staffing companies training

19  employees with regard to the workplace, did you ever see the

20  training that was received by contract employees at their

21  staffing companies?

22  **A.**   No.  I saw the training that they did on site.

23  **Q.**   All right.  And so with regard to what training contract

24  employees received from staffing companies, you don't know the

25  extent to which they were trained with regard to harassment

1    inside the workplace; right?

2    **A.**   No, but I know by law they were supposed to make sure

3    their -- their employees went through that training.

4    **Q.**   So you assumed that the staffing companies performed that

5    type of harassment training, but you don't know for a fact that

6    they did; correct?

7    **A.**   I don't know for a fact, but by law they were supposed to.

8    **Q.**   And with regard to determining whether the training that

9    they received, the contract employees, was consistent with the

10   policies that Tesla had, you don't know whether there was a

11   consistency between those policies in terms of the training;

12   correct?

13   **A.**   In the State of California they should have been

14   consistent.

15   **Q.**   They should have been, but as you sit here today, you're

16   assuming that they received that training, but you don't know

17   for a fact, do you?

18   **A.**   I don't know for a fact, but by law it should have been.

19   **Q.**   And in terms of your communicating any issues, serious

20   issues that occurred inside the workplace, that would include

21   communicating those issues to the Tesla human resources;

22   correct?

23   **A.**   It would include Tesla human resources, but it would also

24   include, like I said, Ed Romero, Victor Quintero, who were the

25   supervisors of those departments.

1  Q.   And you're familiar with Erin Marconi being an HR

2  supervisor --

3  A.   Yes.

4  Q.   -- or manager?

5  A.   Yes.

6  Q.   At Tesla?

7  A.   Yes, we would cc Erin.  If I didn't cc Erin, my boss Terri

8  Garrett would cc Erin.

9  Q.   And so with regard to the jigaboo incident, you're sure

10  that that information was communicated to Erin Marconi?

11  A.   Oh, I know it definitely was, yes.  Yes.

12  Q.   All right.  And then if we could turn briefly to

13  Exhibit 272, Page 2.

14      With regard to that document, the first sentence (as

15  read):

16          "Wayne, as we discussed in person, this is very

17      disappointing especially coming from one of our team's

18      supervisors."

19      That was a reference to Ramon Martinez as one of the team

20  supervisors; correct?

21  A.   Yes, sir.

22  Q.   With regard to Ms. DelaGrande, she was a Tesla supervisor,

23  a direct Tesla employee; correct?

24  A.   Yes, sir.

25  Q.   She was referring to unprofessional -- I'm sorry.

1      She was referring to Owen engaging in unprofessional

2   conduct; correct?

3   **A.**   Yes.  She was saying he was not being professional in the

4   workplace, was rude, and not following direction.

5   **Q.**   And the unprofessional conduct was him refusing to speak

6   with other employees other than about work; isn't that correct?

7          **MS. JENG:**  Objection.  Calls for speculation.

8          **THE WITNESS:**  I don't know.

9          **THE COURT:**  So overruled.

10  **BY MR. ALEXANDER:**

11  **Q.**   And your response was you don't know?

12  **A.**   I don't know, you know, what her thought process was in

13  regards to that.

14  **Q.**   You're familiar with a person by the name of Robert

15  Hurtado?

16  **A.**   That name does not ring a bell.

17         **MR. ALEXANDER:**  Nothing further, Your Honor.

18         **THE COURT:**  Anything else, Ms. Jeng?

19         **MS. JENG:**  No, Your Honor.

20         **THE COURT:**  You may step down, Mr. Jackson.

21         **THE WITNESS:**  Am I dismissed or do I have to come

22  back?

23         **THE COURT:**  No.  You are dismissed.

24      (Witness excused.)

25         **MR. ALEXANDER:**  Your Honor, we would call Jackelin

**DELGADO SMITH - DIRECT / ALEXANDER**

1    Delgado.

2         **THE COURT:**  All right.

3         (Brief pause.)

4         **THE COURT:**  Come up to the witness box, please.

5              **JACKELIN DELGADO SMITH**,

6    called as a witness for the Plaintiff, having been duly sworn,

7    testified as follows:

8         **THE WITNESS:**  Yes.

9         **THE CLERK:**  Adjust the microphone so it's close to

10   your mouth.

11        And please state your full name for the record and spell

12   it for the court reporter.

13        **THE WITNESS:**  Yeah.  It's Jackelin Delgado Smith.

14   J-A-C-K-E-L-I-N; Delgado, D-E-L-G-A-D-O; Smith, S-M-I-T-H.

15        **THE COURT:**  Please proceed.

16        **MR. ALEXANDER:**  Thank you, Your Honor.

17              **DIRECT EXAMINATION**

18   **BY MR. ALEXANDER**

19   **Q.**   Good morning, Ms. Delgado.

20   **A.**   Good morning.

21   **Q.**   If I understand correctly, at some point you were employed

22   with Chartwell; is that correct?

23   **A.**   That's correct.

24   **Q.**   And what is the last position that you held at Chartwell?

25   **A.**   V.P. of HR.

1  Q.   Vice-president of human resources.  How long did you hold

2  that position?

3  A.   A little bit over a year.

4  Q.   Let's go through your background for a moment.  You have a

5  Bachelor's of Science in human resources management; correct?

6  A.   Correct.

7  Q.   And at the time of your deposition, you were working on

8  your MBA.  Have you obtained your MBA?

9  A.   No.  I'm still pursuing it.

10  Q.   And you have previous experience, four years, working as a

11  field trainer at Smart & Final as a human resources person;

12  correct?  Approximately?

13  A.   I work at Target, but not as a field trainer.  I was an HR

14  team lead.

15  Q.   At Smart & Final you had human resource experience there

16  for four years; correct?

17  A.   Correct.

18  Q.   And then as a team leader at Target for approximately six

19  years?

20  A.   I wasn't an HR team lead the whole six years.  I was only

21  an HR team lead for five years.

22  Q.   And the various jobs that you have had you've received

23  human resource experience and expertise; correct?

24  A.   Correct.

25  Q.   And during that time frame, also you were a member of the

**DELGADO SMITH - DIRECT / ALEXANDER**

 1  Society of Human Resource Managers, something called SHRM;

 2  right?

 3  **A.**   Yes.

 4  **Q.**   And that organization has standards as to what should

 5  occur inside of the workplace in terms of conducting an

 6  appropriate investigation; right?

 7  **A.**   Correct.

 8  **Q.**   And it also teaches you what are appropriate standards to

 9  occur inside the workplace; correct?

10  **A.**   Correct.

11  **Q.**   And so anytime something serious inappropriate occurs

12  inside the workplace, there should be an investigation; right?

13  **A.**   Correct.

14  **Q.**   And that investigation should be prompt, thorough, and

15  impartial; correct?

16  **A.**   Correct.

17  **Q.**   And it should be an objective investigation with the

18  objective of getting at the facts; correct?

19  **A.**   Correct.

20  **Q.**   And so to the extent that there are any witnesses to

21  something that is important, you would want to interview every

22  witness possible in order to get to the facts; correct?

23  **A.**   Yeah.  It depends but, yes.

24  **Q.**   So the goal is to interview witnesses in order to get to

25  the truth; right?

DELGADO SMITH - DIRECT / ALEXANDER

1  A.   Yes, as best as possible.

2  Q.   And it was typically your practice to want to interview a

3  person in person ideally; correct?

4  A.   Ideally.

5  Q.   But if it wasn't possible to interview a person, then you

6  would at least want to interview them by phone?

7  A.   Correct.

8  Q.   And with regard to the investigation, typically you want

9  to take contemporaneous notes, take notes at the same time as

10 while you're receiving information from the individual?

11 A.   Correct.

12 Q.   And at the conclusion of your investigation, it was your

13 standard practice to prepare a written report; right?

14 A.   Yes.

15 Q.   And included in that report would be your conclusions as

16 to what happened; right?

17 A.   Sure.

18 Q.   And the purpose of conducting a workplace investigation is

19 to find out what occurred and, if appropriate, take corrective

20 action; right?

21 A.   Correct.

22 Q.   And depending on the severity of the conduct, the

23 corrective action should match that severity; correct?

24 A.   Yes.

25 Q.   And part of the reason why you want to make sure that you

DELGADO SMITH - DIRECT / ALEXANDER

1    do a thorough, prompt, and impartial investigation is so that

2    you can correct conduct in the workplace so it doesn't occur in

3    the future; right?

4    A.    Correct.

5    Q.    And if you find out that conduct has occurred, you want to

6    correct it in case it's something that's not a single incident

7    but is something that is occurring throughout the workplace;

8    right?

9    A.    Correct.

10   Q.    All right.  You're familiar with a person by the name of

11   Veronica Martinez; correct?

12   A.    Correct.

13   Q.    She is a branch -- she was a branch manager, the local

14   branch manager, associated with the Tesla location; is that

15   correct?

16   A.    Correct.

17   Q.    And she was out of the Hayward office?

18   A.    Yes.

19   Q.    With regard to Exhibit No. 287 -- which I believe we've

20   stipulated to, Your Honor --

21          THE COURT:  Okay.

22          MR. ALEXANDER:  -- I'd ask that it be received into

23   evidence.

24          THE COURT:  All right.  It's admitted.

25          (Trial Exhibit 287 received in evidence)

1          (Document displayed.)

2    BY MR. ALEXANDER

3    Q.   Exhibit 79 is an email.  If you look under January 25,

4    2016 --

5          THE COURT:  So just for clarity's sake, we have in our

6    books Exhibit 79.  You've put on the screen 287.  They are the

7    same document; is that correct?

8          MR. ALEXANDER:  That is correct.  I --

9          THE COURT:  Okay.  So --

10         MR. ALEXANDER:  I've been referring to it as 287.  I

11   apologize.

12         THE COURT:  That would be good.  Okay.

13         MR. ALEXANDER:   Thank you, Your Honor.  I apologize.

14   BY MR. ALEXANDER

15   Q.   With regard to Exhibit No. 287, there is a January 27,

16   2016 email from you to Veronica Martinez.  Do you see that?

17   A.   Yes, I see it.

18   Q.   And this is with regard to a drawing that was made inside

19   of the workplace that you came to understand was drawn by Ramon

20   Martinez; is that correct?

21   A.   Yes.

22         MR. ALEXANDER:  If we could put up Exhibit No. 33, the

23   attachment with picaninny?

24   BY MR. ALEXANDER

25   Q.   It was your understanding that Owen Diaz found the drawing

DELGADO SMITH - DIRECT / ALEXANDER

1   inside the workplace; right?

2       (Photograph displayed.)

3   A.   I'm sorry.  Can you repeat that?

4   Q.   It was your understanding that Owen Diaz found this

5   drawing inside the workplace; correct?

6   A.   Correct.

7   Q.   And you did an interview of Mr. Diaz; correct?

8   A.   Correct.

9   Q.   And your interview is a handwritten statement that is on a

10  Chartwell Staffing Solutions document; correct?

11  A.   Yes.

12  Q.   All right.  And during that interview, is it correct that

13  Mr. Diaz indicated that he was offended by the drawing?

14  A.   Yes, I believe so.

15  Q.   Now, with regard to Exhibit No. 287 -- 287 -- this

16  document, this email, is the -- strike that.

17      After you finished -- after you completed your

18  investigation, there was no report that was prepared by you;

19  isn't that correct?  In terms of a full written report, there

20  was no written report prepared by you; isn't that correct?

21  A.   Umm, yeah, I guess, if there isn't one in the email

22  thread.

23  Q.   Okay.  So in terms of your standard practice for preparing

24  a written report after you conduct an investigation, in this

25  instance you didn't follow the standard practice.  There was no

1   written report; correct?

2   **A.**   I wouldn't consider that a standard practice.  I would

3   consider that a self practice.

4   **Q.**   Best practices in terms of SHRM standards, in terms of

5   conducting a workplace investigation, is at the conclusion of

6   the investigation there should be a written report with regard

7   to your findings and conclusions; right?

8   **A.**   Yes.

9   **Q.**   And with regard to this investigation of a jigaboo, there

10  was no standard report prepared by you with your findings and

11  conclusions; right?

12  **A.**   I believe this email is a final report of the conclusion.

13  **Q.**   So Exhibit No. 287, the January 25, 2016, document, that

14  is the full extent of the report that you prepared with regard

15  to this jigaboo?

16  **A.**   Yeah, the outcome.  Like, the final outcome.

17  **Q.**   Now, at the point when you prepared Exhibit No. 79, the

18  things that you had are the statement that you --

19          **MR. ORGAN:**  You said 79.  287.

20          **MR. ALEXANDER:**  I'm sorry.

21  **BY MR. ALEXANDER**

22  **Q.**   At the point that you prepared the email that is 287, the

23  items that you had -- the universe of information that you had

24  was the email that Owen Diaz had sent you; correct?

25  **A.**   Uh-huh.

DELGADO SMITH - DIRECT / ALEXANDER

1    Q.   Yes?

2    A.   The email?

3    Q.   There's an email that Owen Diaz prepared with regard to

4    this jigaboo; right?

5    A.   Umm, I think I'm confused.

6         MR. ALEXANDER:   If I could -- with regard to Exhibit

7    No. 33, if we could put that on the screen?   I believe it has

8    been received in evidence.

9         MR. ORGAN:   Yes.

10        (Document displayed.)

11   BY MR. ALEXANDER:

12   Q.   If you look at that, that is an email from Owen Diaz that

13   attaches photographs of the jigaboo, the drawing.

14        It's a correct statement that you were provided with this

15   email from Owen Diaz; correct?

16   A.   Umm, I don't know if I was provided.   I don't see my name

17   on this email.

18   Q.   Okay.   And you interviewed Owen Diaz and you have

19   handwritten notes from your interview of Mr. Diaz?

20   A.   Yes.

21   Q.   With regard to those notes --

22        MR. ALEXANDER:   If you could display those, Exhibit

23   No. 287?

24        (Document displayed.)

25

DELGADO SMITH - DIRECT / ALEXANDER

1   BY MR. ALEXANDER

2   Q.   With regard to a workplace investigation, you typically

3   want to interview the victim or the person complaining first;

4   right?

5   A.   Not necessarily.

6   Q.   But typically that is what you want to do in an ideal

7   circumstance, because the person complaining will identify the

8   subject matter that you're investigating; correct?

9   A.   Correct.

10  Q.   And in this instance you did actually interview Mr. Diaz

11  first; right?

12  A.   I did, yes.  He was available.

13  Q.   Okay.  And these are your handwritten notes; right?

14  A.   Yes, they are.

15  Q.   Now, if we turn to the second page of the document.

16       (Document displayed.)

17  Q.   It says under Paragraph 4:

18       "How often has the offensive behavior occurred?"

19       And it says:

20       "Owen mentions history that happened in elevator.

21  HR was not aware, nor was Veronica branch manager."

22       There is an incident that he refers to in the elevator?

23  A.   Uh-huh.

24  Q.   If an incident occurred inside the elevator associated

25  with an employee that was hired through your staffing company,

 1   you would have expected there to be a record of that inside

 2   your files; right?

 3   **A.**   Yeah.  But I didn't know about it.

 4   **Q.**   Okay.  So with regard to this elevator incident, there was

 5   no record inside your file; right?

 6   **A.**   No.  This is the first time I was made aware of this

 7   incident.

 8   **Q.**   And with regard to Veronica, the branch manager, you --

 9   you spoke with her and she had no knowledge of this incident

10   involving the elevator and Owen Diaz and Mr. Martinez; correct?

11   **A.**   I don't feel comfortable speaking to that.  I -- because

12   it's so long ago that I don't even remember the conversation

13   that I had with her.

14   **Q.**   Okay.  The information that you wrote inside this note

15   where it says (as read):

16         "Owen mentioned history that happened."

17      And then it says:

18         "HR was not aware."

19      You would not have written that statement if it was not

20   true?

21   **A.**   Right.  But I didn't vocally remember speaking with her.

22   So if I wrote it on here, I must have already confirmed it with

23   her.

24   **Q.**   So once you would have found out this information,

25   assuming you didn't know, did you try and search out

DELGADO SMITH - DIRECT / ALEXANDER

1   information about this previous history?

2   A.   At the time I was not because I was focused on the

3   incident that was at hand at the time, which was the

4   investigation of the claim being made of the picture and the

5   drawing.

6   Q.   In order to determine what discipline would be

7   appropriate, wouldn't you want to know what previous

8   inappropriate conduct the employee had engaged in?

9   A.   Yes.

10  Q.   And so with regard to Mr. Martinez, once you found out

11  that there was a history, wouldn't you have wanted to know the

12  specific facts of that history?  Yes?

13  A.   Yes.

14  Q.   And in this instance at the point when you prepared

15  Exhibit No. 287, you did not have information about the

16  previous incident, the elevator incident, with Mr. Martinez;

17  right?

18  A.   No, I didn't.

19  Q.   So at the point when you recommended discipline of

20  Mr. Martinez, it did not include any consideration of the

21  elevator incident; correct?

22  A.   I don't remember, because I probably was given that

23  information during the investigation, but, like, I honestly

24  can't remember.

25  Q.   When you say you were probably given that information,

1    that's speculation.  As you sit here today, you don't have any

2    actual recollection of receiving information about the elevator

3    incident; right?

4    A.   Correct.

5    Q.   If we go down further on the page at Paragraph 6 it says

6    (as read):

7              "I don't feel safe."

8         Do you see that?

9    A.   Uh-huh.

10   Q.   By the way, in terms of this document, these are your only

11   notes of the conversation with Mr. Diaz; right?

12   A.   Yes.

13   Q.   So Mr. Diaz said he did not feel safe.  Did you ask him

14   why?

15   A.   I don't remember.  If it's on the --

16   Q.   The reason you would have wanted to ask him why, is it

17   because it would have been important to know whether he felt

18   physically unsafe or something like that; right?  Yes?

19   A.   Correct.

20   Q.   And you understood that this jigaboo was a racist type

21   drawing; right?

22   A.   You're asking me what I -- what I -- are you asking me

23   what I saw when I saw the picture, or are you assuming that I

24   think that's what that is.

25   Q.   When you looked at that picture, what did you think that

DELGADO SMITH - DIRECT / ALEXANDER

 1    it meant?

 2    **A.**   I didn't think it meant anything.   I was looking at a

 3    picture without any other information at the time when I was

 4    looking at the picture.

 5    **Q.**   So when you saw that drawing, you did not recognize it as

 6    a racist epithet?

 7    **A.**   No.   That's not what came to mind when I saw the picture.

 8    **Q.**   So when you spoke to Owen Diaz, did he tell you that he

 9    saw it as a racist epithet?

10    **A.**   Umm, I'd have to look at the notes.   Like, I don't -- I

11    mean, I'm sure that's what happened.   That's why we're here,

12    but I'd have to look at the notes.

13    **Q.**   If you could look...

14         (Brief pause.)

15    **Q.**   When Owen spoke with you, he indicated he found that

16    drawing offensive; isn't that correct?

17    **A.**   Yes.   When he -- when he did speak to me, yes.

18    **Q.**   And when he spoke with you, he indicated that it was a

19    jigaboo or a picaninny, or a racist reference to

20    African-Americans; didn't he tell you that?

21    **A.**   Yes, that's what he told me.

22    **Q.**   Okay.   So during your investigation and at the point you

23    were making a recommendation, you understood that Owen felt

24    that this was a racist epithet; right?

25    **A.**   Correct.

1  Q.   All right.  And so then if we could -- if you could turn

2  to the third page of this handwritten document, Paragraph 10,

3  you ask (as read):

4          "How would you like to see the information

5      resolved?"

6      You typically ask the person that's the victim of the

7  conduct how they would like to have the issue resolved; right?

8  A.   Yes.

9  Q.   And that's supposed to be taken into account at the point

10  when you make a recommendation; right?

11  A.   Correct.

12  Q.   And in this instance, if we could show that, Owen said (as

13  read):

14          "He should be terminated.  I do not trust him."

15      You see that reference?

16  A.   Yes.

17  Q.   And do you recall why Owen Diaz -- I'm sorry.  Did you ask

18  the question:  Why don't you trust Mr. Martinez?

19  A.   I don't recall.

20  Q.   Okay.  But that's something -- in terms of taking

21  contemporaneous notes, that is something, the type of

22  information that you would want to see inside your notes;

23  right?

24  A.   I believe so.  It depends on, like, what I'm thinking or

25  doing at that time.  I can't speak to that time.

DELGADO SMITH - DIRECT / ALEXANDER

1   Q.   If we could go down to the next line where it says "For

2   Additional Notes."

3        It says (as read):

4            "Afraid of retaliation."

5        That's your handwriting; right?

6   A.   Correct.

7   Q.   When it says "afraid of retaliation," did you ask Owen who

8   he was afraid of receiving retaliation from?

9   A.   Who he was?

10  Q.   Yes.  You wrote "afraid of retaliation," but we don't know

11  who Owen was afraid of.  Did you ask him who he was afraid of

12  receiving retaliation from?

13  A.   No, I did not.

14  Q.   So you don't know whether it was Ed Romero or Tesla or

15  coworkers?  You have no idea?

16  A.   No.  I can't speak to that.

17  Q.   Okay.  And then below that it says (as read):

18           "Feel that picture was racial statement

19      (jigaboo)."

20       You see that?

21  A.   Uh-huh.  Yes.

22  Q.   And with regard to the notes, your handwritten notes, that

23  wasn't verbatim.  You were essentially trying to write down

24  what you could as you had the conversation; right?

25  A.   Yes, correct.

DELGADO SMITH - DIRECT / ALEXANDER

1   Q.   And with regard to that telephone conversation, as you sit

2   here today, you don't have an estimate as to how long that

3   took, I take it?

4   A.   No, I don't remember.

5          THE COURT:  Mr. Alexander, would this be a convenient

6   place to break?

7          MR. ALEXANDER:  Sure, Your Honor.

8          THE COURT:  All right.  So, ladies and gentlemen,

9   let's take our second break of the day, and we'll come back at

10  about, oh, nine past.

11      (Jury exits the courtroom at 11:54 a.m.)

12         THE COURT:  All right.  We'll be in recess for the

13  next 15 minutes.

14      (Whereupon there was a recess in the proceedings

15       from 11:55 a.m. until 12:14 a.m/p.m.)

16      (Proceedings were heard in the presence of the jury.)

17         THE COURT:  All right.  Please be seated, everybody.

18      Mr. Alexander, please proceed.

19         MR. ALEXANDER:  Thank you, Your Honor.

20  BY MR. ALEXANDER

21  Q.   With regard to the statement that you had wrote based on

22  having a phone conversation with Owen Diaz, did you ever send

23  that statement to Mr. Diaz so that he could confirm the

24  accuracy?

25  A.   Not that I remember.

DELGADO SMITH - DIRECT / ALEXANDER

1   Q.   Now, let's go to the statement from Mr. Martinez.  If we

2   go to Exhibit 287, 3 through 5, that is a statement that says

3   "Alleged Harasser Investigation Question."  It's up in the

4   left-hand corner.  Do you see that?

5   A.   Yes.

6   Q.   This is a questionnaire on the Chartwell Staffing

7   Solutions for questions that are normally reviewed when you

8   interview the person who is the alleged harasser; right?

9   A.   Correct.

10   Q.   Yes?

11   A.   Correct.

12   Q.   But the handwriting on this document is not your

13   handwriting.

14   A.   No, it's not.

15   Q.   And if you turn to the last page, the document is signed

16   by Ramon Martinez; right?

17   A.   Yes.

18   Q.   Okay.  Now, typically when you conduct investigations, you

19   don't typically have the individual filling out the statement

20   on their own; right?

21   A.   It depends.

22   Q.   Well, in your experience based on the standards, based on

23   your experience as an HR person, you understand that's below

24   the standard of care for purposes of an investigation; right?

25        MS. JENG:  Objection.  Argumentative.

1    **THE COURT:**  Overruled.  You can answer if you know

2    what the standard of care is.

3    **THE WITNESS:**  Yeah.  So the standard of care -- I'm

4    not aware of what your standard of care is.  So if you can

5    explain that to me, then I can tell you what my standard of

6    care is.

7    **BY MR. ALEXANDER:**

8    **Q.**   Based on the training that you've received with regard to

9    the person who is accused of harassment, the standard practice

10   is not for them to write out their own statement, but for you

11   to interview them about the conduct; isn't that right?

12   **A.**   Not necessarily.  They --

13   **Q.**   When you say --

14   **THE COURT:**  Let her finish, please.  Go ahead.

15   **A.**   They have the ability to either write their own statement

16   or be interviewed or both.  It doesn't necessarily mean that I

17   can't interview -- I can interview him and him not write a

18   statement.

19   An employee can always write a statement about an incident

20   if they choose to do that.  He was able to write an incident so

21   he did.

22   **BY MR. ALEXANDER:**

23   **Q.**   So in this instance when you got his written statement,

24   did you interview him?

25   **A.**   No, I did not.

**DELGADO SMITH - DIRECT / ALEXANDER**

1  Q.   So you would agree that it is a standard practice with

2  regard to a workplace investigation that you interview the

3  person who created the drawing inside the workplace; right?

4  A.   Correct.

5  Q.   So in this instance, you didn't ever interview the

6  harasser, the alleged harasser, Mr. Martinez; right?

7  A.   I don't remember if I did or did not; but if he wrote this

8  out, then I probably didn't.

9  Q.   Well, if he wrote this out, that wouldn't be a reason not

10  to interview him.  You agree with that; right?

11  A.   Right.

12  Q.   If anything, this would provide additional information

13  that you could use as a basis for asking him questions to try

14  and get at the truth; right?

15  A.   Correct.

16  Q.   So I take it you did review his handwritten document?

17  A.   I did.

18  Q.   Okay.  So if we could go to the last page of the document,

19  the handwritten document, it says (as read):

20          "I tell him, Owen, I'm sorry."

21      Could we highlight that, please?

22      Did you ever make any contact with Mr. Martinez to confirm

23  or to find out when he supposedly apologized to Mr. Diaz?

24  A.   I can't -- I don't recall that.

25  Q.   So once you saw a reference to an apology, did you contact

1   Mr. Diaz to find out from him whether that was a true

2   statement, the apology?

3   **A.**   Not that I remember, no.

4   **Q.**   If you found out that Mr. Martinez had made a false

5   statement inside of this document that he wrote, that would

6   cause you to have concern about the reliability of other

7   statements made; right?

8   **A.**   Possibly.

9   **Q.**   That's the way an investigation works.  When you ask

10   questions of a person, you try and figure out whether they're

11   truthful; and if they give you information that you can confirm

12   is untruthful, that causes you to have further questions about

13   the rest of the statement that they give; right?

14   **A.**   Uh-huh.

15   **Q.**   Yes?

16   **A.**   Yes.

17   **Q.**   Okay.  So in this instance when he said he was sorry, you

18   didn't try to confirm the truth or falsity of that statement;

19   right?

20   **A.**   Correct.

21   **Q.**   Okay.  If we go further down, the last four lines, it says

22   (as read):

23           "I apologized to him again.  He also mentioned to

24       me that he was about to send an email to the office;

25       but because it was me, he understand that my meaning

DELGADO SMITH - DIRECT / ALEXANDER

 1         on the picture that I draw wasn't bad and he was or he

 2         delete the email."

 3         Do you see that reference?

 4    A.    Yes.

 5    Q.    Okay.  But Exhibit No. 33 is the email that Mr. Diaz

 6    actually sent with regard to this incident.

 7         You have Exhibit No. 33 in front of you?

 8    A.    Yes.

 9    Q.    Okay.  And you would have expected that that document, the

10    report by Mr. Diaz, would have been sent to you with regard to

11    this drawing; right?

12    A.    Possibly, yes.

13    Q.    Okay.  And so the fact that Mr. Diaz sent that email

14    indicated that this statement made by Mr. Martinez was perhaps

15    not true; right?

16         MS. JENG:  Objection.  Argumentative.  Lacks

17    foundation.

18         THE COURT:  As you sit here now, what's your response

19    to that question?

20         THE WITNESS:  I'm not sure I understood what you were

21    saying.  Can you repeat that?

22    BY MR. ALEXANDER

23    Q.    When you read this statement handwritten by Mr. Martinez

24    where he referred to Mr. Diaz supposedly deleting an email

25    reporting the incident, once you saw Exhibit No. 33, you knew

 1   that it wasn't true.  Mr. Diaz hadn't deleted it; right?

 2   A.   So you're saying the other email you just showed me,

 3   Exhibit No. 33, is the one he's referencing in that statement?

 4   Q.   Yes.

 5   A.   Okay.  I -- I mean, I'm looking at this email now, but I

 6   can't say that I looked at that email then.

 7   Q.   But once you read this statement where Mr. Martinez

 8   claimed to have had a conversation with Mr. Diaz where Mr. Diaz

 9   agreed to delete the document based on that conversation, did

10   you check with Mr. Diaz to find out if that was true?

11   A.   No.

12   Q.   So if I understand correctly, in order to enter discipline

13   against the employee accused of harassment when you've got a

14   visual picture of what he did, you didn't interview him and you

15   accepted as true everything he handwrote in this document;

16   right?

17   A.   I believe so.

18   Q.   Exhibit 287, the January 25, 2016, email, that is the

19   document where you communicated to Veronica Martinez at

20   nextSource what your final decision, your conclusion was;

21   correct?

22   A.   Yeah.  She works for Chartwell.

23   Q.   She works for?

24   A.   Veronica works for Chartwell.

25   Q.   She works for Chartwell.  You were communicating to her,

1    "This is my conclusion;" right?

2    **A.**   Yeah.

3    **Q.**   Okay.  And this is the first time that you put in writing

4    what your conclusion was; correct?

5    **A.**   I believe so.

6    **Q.**   And then Veronica Martinez forwards this on to Wayne

7    Jackson, the person at nextSource; right?

8    **A.**   Yes.  That's what it says here.

9    **Q.**   And the reason you were forwarding it to nextSource is

10   because nextSource was the staffing company that Tesla had

11   hired to kind of be the liaison between all the staffing

12   companies; right?

13   **A.**   I believe the reason why she forwarded it, although I

14   can't speak for her, was because she was the employee buying

15   that source.

16   **Q.**   You never sent this document directly to Tesla, your

17   email; right?

18   **A.**   No, I didn't have communication with Tesla.

19   **Q.**   Okay.  You did not have communication with Tesla.

20        So your email is dated January 25 at 11:07 a.m.  That's

21   about the time where you made a decision as to what you're

22   going to do with regard to recommending discipline of

23   Mr. Martinez; right?

24   **A.**   Correct.

25   **Q.**   All right.  And before you wrote this email, you did not

 1  communicate with Tesla or anyone else as to what your

 2  determination was going to be as to Mr. Martinez; correct?

 3  **A.**   I'm not understanding.  Like, what do you mean

 4  "communicated"?

 5  **Q.**   You did not speak to anyone about your decision, the

 6  discipline that you intended to give to Mr. Martinez, before

 7  you sent out this email to Veronica Martinez; right?

 8  **A.**   Well, I did speak to Jessy Meneses, which was the HR

 9  generalist.  So that was another person in the HR department.

10  **Q.**   You did not speak to anyone outside of Chartwell about

11  your determination as to what the discipline should be as to

12  Mr. Martinez; right?

13  **A.**   Right.

14  **Q.**   So this email of January 25, 2016, at 11:07 is the first

15  time you put in writing and told anyone "This is what my

16  conclusion is.  This is what should happen to Mr. Martinez";

17  right?

18  **A.**   Correct.

19  **Q.**   Okay.  If I could refer you to your deposition transcript,

20  Page 30, Line 23, through Page 31, Line 9.  There should be a

21  deposition transcript to your left.

22          **THE COURT:**  So that would be the thing that looks like

23  this (indicating).

24          **THE WITNESS:**  Oh.  This one (indicating)?

25          **THE COURT:**  Yes.

DELGADO SMITH - DIRECT / ALEXANDER

1   BY MR. ALEXANDER

2   Q.   And if you turn to Page 30, Line 23, and read down through

3   Page 31, Line 9, I think it will remind you that you had

4   received Exhibit 33, the email from Owen Diaz, reporting this

5   jigaboo.

6   A.   So I'm looking at Page 31, Line 8 -- 9?

7   Q.   Start at Line 22.

8           THE COURT:  Of Page 30.

9           MR. ALEXANDER:  Of page -- I'm sorry.  Of page 30.

10          MR. ORGAN:  And, Your Honor, for the record,

11  Exhibit 37 is Trial Exhibit 33, as noted in the Exhibit List.

12  BY MR. ALEXANDER

13  Q.   Does that help refresh your memory?

14  A.   Sorry.  I'm confused because everyone is talking.  Can you

15  tell me which page?  Page 30?

16  Q.   Page 30, start at Line 23.  Go to the next page.  Read

17  down to the next page, Line 3.

18  A.   About the picture?

19  Q.   Yes.

20  A.   And the complaint?

21  Q.   Yes.  Does that help refresh your memory that you received

22  Exhibit 33 which attached the photographs of the drawing?

23  A.   Yeah, but -- I mean, yeah, if I remember receiving the

24  complaint and that was attached to it, then it was attached to

25  it.

DELGADO SMITH - DIRECT / ALEXANDER

1   Q.   So now going back to my question before, on January 25,

2   2016 at 11:07 for the very first time you put in writing the

3   conclusion that you reached as to the discipline that should be

4   given out to Mr. Martinez; correct?

5   A.   Uh-huh, correct.

6   Q.   Yes.  On Page 37, if we could go to the last paragraph on

7   the page (as read):

8          "On our end, Ramon will be returning to the branch

9          office and he will be placed on corrective action with a

10         final warning for harassment."

11         Do you see that reference?

12  A.   Yes.

13         MR. ALEXANDER:  If we could put up now Exhibit No. 77,

14  which has been received into evidence?

15         If we could keep 287 available so we can split the screen?

16  BY MR. ALEXANDER:

17  Q.   With regard to Exhibit No. 77, there is an entry from

18  Victor Quintero on June 22nd, 2016, three days earlier.

19         THE COURT:  January 22nd?

20         MR. ALEXANDER:  Yes.

21         And if we could show below that, the top of that page.

22         (Document displayed.)

23  BY MR. ALEXANDER

24  Q.   On this document Victor Quintero emailed to Wayne Jackson

25  and says (as read):

1          "Wayne, as we discussed in person, this is a very

2      disappointing especially" -- "is very disappointing

3      especially coming from one of our team supervisors.  I

4      agree with the recommendation to suspend and issue a

5      permanent written warning."

6          MS. JENG:  Objection, Your Honor.  I don't believe

7  this exhibit is admitted.

8          MR. ORGAN:  I apologize, Your Honor.

9          THE COURT:  I believe Ms. Jeng is correct.

10  BY MR. ALEXANDER

11  Q.   Do you know of any reason -- do you have any knowledge as

12  to how Tesla or people at Tesla would have known three days

13  before your January 25, 2016 email, why they would have known

14  three days before the discipline that you were giving out to

15  Mr. Martinez?

16          MS. JENG:  Objection.  Calls for speculation.  Lacks

17  foundation.

18          THE COURT:  If you know, you may answer the question.

19          THE WITNESS:  Yeah, I don't know.

20  BY MR. ALEXANDER

21  Q.   In this instance you did not do a formal written report;

22  correct?

23  A.   Correct.

24  Q.   The harasser, the alleged harasser, gave you a handwritten

25  statement and you did not actually interview him; right?

DELGADO SMITH - DIRECT / ALEXANDER

1   A.   Correct.

2   Q.   You reached a conclusion -- reached a determination for

3   discipline without interviewing the person who engaged in the

4   offensive conduct; right?

5   A.   Correct.

6   Q.   Did someone from Tesla contact you and tell you to stop

7   the investigation?

8   A.   No.

9   Q.   Okay.  Was there some rush, some reason why you needed to

10   issue the determination on January 25th?

11   A.   No, I don't believe so.  I mean, I try to work through my

12   investigations as quickly as possible because people are out of

13   work.

14   Q.   You had the ability to interview Mr. Martinez.  Is there

15   some reason why you did not think it was important to interview

16   the person accused of harassment based on the visual drawing

17   that you had?

18   A.   I don't recall.

19   Q.   Did you have any contact with Wayne Jackson with regard to

20   this incident, the project manager with nextSource?

21   A.   Not that I recall.

22   Q.   In order to make a decision about what discipline to give

23   to Mr. Martinez, did you have any discussion with anyone at

24   Tesla in order to find out about that history of incident that

25   had occurred with Mr. Martinez inside the workplace?

DELGADO SMITH - CROSS / JENG

1    A.    No, I don't recall.

2    Q.    When you say, no, you don't recall, meaning -- that means

3    you don't recall one way or the other?

4    A.    Yes, I don't recall.

5    Q.    All right.

6          MR. ALEXANDER:  Nothing further.

7          THE COURT:  All right.  Thank you.

8          Ms. Jeng.

9                        CROSS-EXAMINATION

10   BY MS. JENG

11   Q.    Ms. Delgado, you testified about the complaint made by

12   Owen Diaz on January 22nd, 2016, earlier; correct?

13   A.    Correct.

14   Q.    How did this complaint first come to your attention?

15   A.    Through the staffing branch, Veronica Martinez.

16   Q.    After you received this complaint, you obtained statements

17   from both Owen and Ramon; correct?

18   A.    Correct.

19   Q.    If you could turn back to Exhibit 287, which has been

20   admitted.

21         (Document displayed.)

22   Q.    This -- 287, 3 through 7.  These -- sorry, 3 through 8,

23   these are the two statements from Owen and Ramon; correct?

24   A.    Correct.

25   Q.    Did you determine that Ramon had actually drawn the

**DELGADO SMITH - CROSS / JENG**

1   drawing on the cardboard bale?

2   **A.**   Yes.  He admitted to it.

3   **Q.**   And how -- I guess how did you know that he drew it?

4   **A.**   Because he admitted to it on the statement.

5   **Q.**   Okay.  And so you were able to substantiate Mr. Owen's

6   allegation that Ramon made this rawing based on Ramon's own

7   statement; correct?

8   **A.**   Correct.

9   **Q.**   Did you feel that you needed to speak with any other

10  witnesses to substantiate Mr. Diaz's allegation?

11  **A.**   No.  He told me there were no witnesses.

12  **Q.**   Mr. Owen told you there were no other witnesses?

13  **A.**   Well, yeah.  On the notes here, it says that there were no

14  witnesses.

15  **Q.**   Okay.  And you're referring to 287-7; correct?

16  **A.**   Yes.

17  **Q.**   Okay.  Can you identify where your -- which question

18  you're talking about?

19  **A.**   Yes.  Number 7 on Exhibit 287-007, it says (as read):

20          "Were there any other people present when the

21      incident occurred?

22          "No just myself."

23  **Q.**   Okay.  And from your perspective, was Ramon's statement

24  that he made the drawing consistent with Owen's statement that

25  Ramon made the drawing?

DELGADO SMITH - CROSS / JENG

1   A.   No.  I didn't -- I didn't, like, have any of my own, like,

2   thoughts in regards to the picture.  So when they each had

3   their own statement, it was what they were each feeling about

4   what they were both complaining about or what one did and the

5   other one was offended by.

6   Q.   Was there any question in your mind that Ramon had made

7   the drawing?

8   A.   I mean, only what he admitted to doing.

9   Q.   Ramon Martinez admitted to drawing it?

10  A.   Yes.

11  Q.   Correct, okay.

12       Now, you testified earlier that you didn't further

13  interview Mr. Martinez after he submitted his statement;

14  correct?

15  A.   Correct.

16  Q.   Why not?

17  A.   I don't know if it was just based on the time of

18  everything.  I did have a hard time -- I had to get permission

19  from CitiStaff even to interview the other employee.

20       And so I don't know if it had to did with timing, if it

21  had to do with the fact that he was suspended during the

22  investigation.  So just having to make this as efficient as

23  possible I -- I really can't give you, like, a firm answer as

24  to why.

25  Q.   Well, was there any reason to question Mr. Martinez if he

1  had already admitted to the drawing?

2  A.   No.

3  Q.   Now, you previously testified that you do sometimes create

4  a formal report of investigation; correct?

5  A.   Yes.

6  Q.   Okay.  And is the formal report to summarize the

7  allegations?

8  A.   It depends.  In this situation the employee admitted to

9  drawing or doodling on the cardboard.

10      Normally if there is, like, a hearsay situation -- you

11  know, in my job investigations are all different.  It just

12  depends.

13      So if there was a black-and-white answer at this point,

14  which was the employee admitted to the drawing, then that's

15  what he admitted to doing.

16  Q.   Okay.  So in your mind, this was a very black-and-white

17  answer that the -- that Mr. Martinez had actually already

18  admitted to the drawing; correct?

19  A.   Correct.

20  Q.   Is that why you didn't create a formal report?

21          MR. ALEXANDER:  Objection.  Leading.

22          THE COURT:  Overruled.  You can answer.

23          THE WITNESS:  Umm, yes.  That's why I didn't.

24  BY MS. JENG

25  Q.   Okay.  But you did summarize and attach the statements to

DELGADO SMITH - REDIRECT / ALEXANDER

1  your email to Ms. Martinez; correct?

2  **A.**   Correct.

3  **Q.**   When you spoke with Mr. Diaz, did he raise any allegation

4  to you about being called any racial epithets or slurs?

5  **A.**   Not that I can recall.

6  **Q.**   Okay.  Would you have put it in writing in your notes if

7  he did?

8  **A.**   Yes.

9  **Q.**   I think you previously testified that you were the VP of

10  HR for Chartwell Staffing; correct?

11  **A.**   Correct.

12  **Q.**   So in the 2015 to 2016 time period, were you ever employed

13  by Tesla?

14  **A.**   No.

15          **MS. JENG:**  Okay.  No further questions.

16          **THE COURT:**  All right.  Mr. Alexander, anything?  Any

17  followup?

18                 **<u>REDIRECT EXAMINATION</u>**

19  BY MR. ALEXANDER

20  **Q.**   With regard to the discipline, if discipline was issued,

21  you would have normally have that signed off by the employee,

22  Mr. Martinez?

23  **A.**   Correct.

24  **Q.**   Okay.  And so that means there should have been some

25  discipline inside of his file; right?

**DELGADO SMITH - REDIRECT / ALEXANDER**

1   **A.**   Yes.

2   **Q.**   Yes.  But as we sit here today, you haven't seen that

3   discipline?  You haven't seen a document actually signed by

4   Mr. Martinez at any time with regard to the discipline that you

5   proposed; right?

6   **A.**   Like, here today?

7   **Q.**   No.  From the point you issued this discipline up until

8   now, you've never seen a document signed by Mr. Martinez with

9   regard to the discipline that you proposed; isn't that correct?

10  **A.**   Umm, I can't speak to that because it's been five, six

11  years.  So I can't speak to something that I may have received

12  over email that I don't remember today.

13  **Q.**   So as you sit here today, you don't have any memory of

14  seeing a document signed by Mr. Martinez with regard to the

15  discipline; right?

16  **A.**   Right.

17  **Q.**   All right.  But if it existed, you would expect that your

18  company would have been able to produce it; correct?

19  **A.**   Correct.

20  **Q.**   All right.  With regard to Exhibit -- I refer to

21  Exhibit 77.  If I could refer to Exhibit No. 287, which has

22  been agreed to by the parties.

23          **MR. ALEXANDER:**  And if we could go to the top of

24  Page 272-002, which is an email from Victor Quintero to Wayne

25  Jackson, Re Racist Effigy and Drawing.

```
 1           If we could blow that up?

 2           (Document displayed.)

 3   BY MR. ALEXANDER

 4   Q.   So with respect to this reference, I'll read this second

 5   sentence (as read):

 6           "I agree with the recommendation to suspend and

 7           issue a permanent written warning."

 8       Which is dated January 22, 2016.

 9       Did you do anything to communicate information to

10   Mr. Quintero as to what the outcome of your investigation was

11   going to be before you wrote out your letter on -- your email

12   on January 25, 2016?

13   A.   No.  I don't even know who this is.  Like, I don't know

14   what this is.

15   Q.   Now, you were asked a question during the cross.  You're

16   saying that because Ramon Martinez admitted to preparing that

17   drawing, that there were no other questions that you thought

18   were appropriate to ask him?

19   A.   No.

20   Q.   Okay.  So you didn't think it was appropriate to ask him

21   why he wrote that drawing and left it for Owen Diaz?

22   A.   No.

23   Q.   Owen Diaz indicated to you that he thought it was a racist

24   drawing.  You didn't think it was important to ask Mr. Martinez

25   whether he intended it as a racial attack?
```

DELGADO SMITH - REDIRECT / ALEXANDER

1    **A.**   No, I didn't.

2    **Q.**   You didn't think it was important to find out whether it

3    was a true statement or not that Mr. Martinez had actually

4    apologized?  In other words, he might have written it, but it

5    might not be true.  You didn't think it was important to ask

6    him that?

7              **MS. JENG:**  Objection.  Beyond the scope.

8              **THE COURT:**  Yeah.  Sustained.

9    **BY MR. ALEXANDER**

10   **Q.**   When you said that there were no other questions that you

11   needed to answer once you found out that he had admitted

12   writing the document, didn't you want to ask him whether he had

13   engaged in any other similar conduct inside the workplace?

14             **MS. JENG:**  Objection.  Outside the scope.

15             **THE COURT:**  That was a question that you asked and

16   answered.  So you may answer.

17             **THE WITNESS:**  I'm not too sure.

18   **BY MR. ALEXANDER**

19   **Q.**   I'm sorry?

20   **A.**   I'm not too sure.

21   **Q.**   When you say you're not too sure --

22   **A.**   Yeah.  Can you repeat your question again, please?  I'm

23   not too sure what you're saying.

24   **Q.**   Ah.  Given that Mr. Martinez had written this drawing that

25   Mr. Diaz indicated was racist, wouldn't you have wanted to

**DELGADO SMITH - REDIRECT / ALEXANDER**

 1  inquire with Mr. Martinez whether he had engaged in any other

 2  racially offensive conduct?

 3  **A.**   Yeah, I probably should have.

 4  **Q.**   Yes.  And your notes that you wrote with regard to

 5  Mr. Diaz aren't verbatim what he said; right?

 6  **A.**   No.  I can't -- I can't write verbatim.  So, no, they're

 7  not.

 8  **Q.**   And so there are going to be some things that Owen Diaz

 9  said that were omitted from the statement; right?

10  **A.**   Possibly.

11  **Q.**   All right.  And so isn't it true that Mr. Diaz, during the

12  conversation with you, told you that this wasn't the first

13  racist incident and that the history that he was referring to

14  in the elevator was also a racial incident?

15         **MS. JENG:**  Objection.  Argumentative.

16         **THE COURT:**  And it's beyond the scope.  I think these

17  questions were all asked before, too.

18  **BY MR. ALEXANDER**

19  **Q.**   When you're conducting an investigation, in response to

20  the question once you found out that Mr. Martinez had written

21  the document, you didn't have any other further questions.

22  Wouldn't you want to follow up to find out whether this is an

23  isolated incident or whether it's a widespread conduct

24  throughout the workplace?

25         **MS. JENG:**  Objection.  Beyond the scope.

```
 1          THE COURT:  Sustained.

 2          MR. ALEXANDER:  Okay.  Nothing further.  Thank you.

 3          THE COURT:  All right.  Thank you.

 4      All right.  Anything further with this witness?

 5          MS. JENG:  No.

 6          THE COURT:  All right.

 7      Thank you.  You may step down.

 8          THE WITNESS:  Thank you.

 9      (Witness excused.)

10          THE COURT:  And who is next?

11          MR. ORGAN:  Victor Quintero, Your Honor.

12          THE COURT:  Great.

13                       VICTOR QUINTERO,

14  called as a witness for the Plaintiff, having been duly sworn,

15  testified as follows:

16          THE WITNESS:  Yes.

17          THE CLERK:  If you would please state your full name

18  for the record and spell it for the court reporter.

19          THE WITNESS:  My name is Victor Quintero; V-I-C-T-O-R,

20  Q-U-I-N-T-E-R-O.

21                     DIRECT EXAMINATION

22  BY MR. ALEXANDER

23  Q.   Good afternoon, Mr. Quintero.

24  A.   Good afternoon.

25  Q.   Is it correct that you were employed at Tesla?
```

1   **A.**   Yes.

2   **Q.**   And during what time frame were you employed at Tesla?

3   **A.**   I started in 2014, May.

4   **Q.**   And your position there at that time was program manager?

5   **A.**   Custodial program manager.

6   **Q.**   And you were in charge -- the manager of the facilities

7   department; correct?

8   **A.**   Various different services within facilities.

9   **Q.**   And then ultimately you were responsible for the recycling

10   area; correct?

11   **A.**   Yes.

12   **Q.**   And you were -- you had at least approximately 225

13   employees under your direct supervision in various groups;

14   correct?

15   **A.**   Not direct supervision, no.

16   **Q.**   Indirectly underneath your scope of supervision there were

17   approximately 225 people; right?

18   **A.**   Under my management.

19   **Q.**   And you were in charge of the contracts associated with

20   the elevator employees; right?

21   **A.**   Yes.

22   **Q.**   And all of the elevator operators were contract employees?

23   **A.**   Yes.

24   **Q.**   With regard to Exhibit No. 222 --

25          **MR. ALEXANDER:**   I believe that that's been agreed?

1           THE COURT:  I think it's in also.

2           MS. KENNEDY:  Yes.  It's already admitted, Your Honor.

3           THE COURT:  Great.

4           MR. ALEXANDER:  So with regard to this exhibit, if it

5    can be displayed.

6        (Document displayed.)

7    BY MR. ALEXANDER:

8    Q.   This is an indication that you had the ability to

9    determine the salary that was received by the elevator

10   operators such as Owen Diaz; correct?

11   A.   Say that again.

12   Q.   You had the ability to determine the salary that would be

13   received by elevator operators such as Owen Diaz; correct?

14   A.   No, I did not.

15   Q.   All right.  If we could review this document from you to

16   Nancy Uhlenbrock.  Ms. Uhlenbrock was at Chartwell.  Do you

17   recall that?

18       It says (as read):

19           "Please be aware of the following changes effective

20       today August 17, 2015.  Owen Diaz, day shift elevator

21       operator, will transfer to the compressed work week front

22       end grave shift, as the lead elevator operator.

23       Therefore, please increase his salary to $16."

24       That's an email that was prepared by you; is that correct?

25   A.   No.  That was the set rate for that position based on the

1    contract.

2    **Q.**   And so when it says please increase the salary, you're

3    determining that he would get an increase in salary; correct?

4    **A.**   Based on the lead elevator position.

5    **Q.**   Everyone who works inside of the Tesla factory has to take

6    safety training; correct?

7    **A.**   Everybody who enters the factory, yes.

8    **Q.**   Regardless of whether they're a contract employee or

9    direct Tesla employee; correct?

10   **A.**   Yes.

11   **Q.**   With regard to the zero tolerance policy that Tesla has,

12   that policy is not taught to all the contract employees who

13   enter inside the building; correct?

14   **A.**   Say that again.

15   **Q.**   The zero tolerance policy for harassment inside the

16   workplace, contract employees, they aren't trained on that

17   Tesla policy before they are allowed to enter inside the doors;

18   isn't that correct?

19   **A.**   I don't know.  I don't know.

20   **Q.**   With regard to the Anti-Handbook Handbook, contract

21   employees are not trained on that handbook as a prerequisite

22   for them to work inside of the factory; isn't that correct?

23   **A.**   I don't know that either.

24   **Q.**   Okay.

25          **MR. ALEXANDER:**  If we could show Exhibit No. 33, which

QUINTERO - DIRECT / ALEXANDER

1    has previously been received into evidence.

2        (Document displayed.)

3    **BY MR. ALEXANDER**

4    Q.    With regard to Exhibit No. 33, do you recall receiving

5    this email from Owen that had the photographs -- I'm sorry --

6    the drawing that was made by Ramon Martinez?

7    A.    Yes.  I believe it was forwarded to me by Ed Romero.

8    Q.    Okay.  And at the point when you saw this, you just

9    thought that it was a drawing; is that correct?

10   A.    Yes, the cartoon character.

11       (Photograph displayed.)

12   Q.    And at the point when you saw it, it did not offend you;

13   right?

14   A.    Not me personally, no.

15   Q.    And at the point that you received it, you had no previous

16   experience with the term "picaninny" or "jigaboo;" is that

17   correct?

18   A.    That is correct.

19   Q.    But based on your conversation with Wayne Jackson, you

20   found out that it was a derogatory cartoon; right?

21   A.    Yes.  It was explained to me, yes.  Yeah.

22   Q.    There was a statement that was obtained from Ramon

23   Martinez.  Did you ever review that statement, the statement

24   that he wrote?

25   A.    No, I don't believe so.  No.

1   **Q.**   Okay.  Now, there was a discussion that occurred between

2   you and Mr. Jackson about what discipline Ms. Martinez should

3   receive; is that correct?

4   **A.**   Yes.

5   **Q.**   And in that discussion is it a correct that Mr. Jackson

6   recommended to you that Mr. Martinez be terminated?

7   **A.**   I remember we talked about various options, yes.

8   **Q.**   I'm asking you a specific question.  Is it correct that

9   the Mr. Jackson, when he was discussing what should occur with

10  regard to Mr. Martinez, specifically recommended that

11  Mr. Martinez be terminated?

12  **A.**   I don't remember that.

13  **Q.**   The discipline that ultimately was given, three days

14  suspension without pay --

15  **A.**   And a permanent written warning.

16  **Q.**   Let's talk about the permanent written warning.  I've

17  never seen that document.

18       Have you seen the Martinez document, the permanent written

19  warning that was supposed to be given?

20       **MS. KENNEDY:**  Objection.  Relevance as to whether

21  Mr. Alexander has ever seen it.

22       **THE COURT:**  Sustained.  So strike that part of the

23  question, but you can answer the question as to whether you've

24  ever seen it.

25       **THE WITNESS:**  I don't believe I personally saw it.   I

QUINTERO - DIRECT / ALEXANDER

 1  don't remember.

 2  **BY MR. ALEXANDER**

 3  **Q.**   With regard to a written reprimand, is it your

 4  understanding that the person who receives the written

 5  reprimand should sign it and date it as confirmation that they

 6  received the reprimand?

 7  **A.**   Umm, I don't know what the employer of record's policy was

 8  in that respect.

 9  **Q.**   At the point when you made a decision with regard to what

10  to do with Mr. Martinez, it was your belief that this was the

11  first time Mr. Martinez had had an incident of this nature

12  inside the workplace; correct?

13  **A.**   Yes.

14  **Q.**   So with regard to Mr. Martinez at the point where you

15  determined discipline, you were not aware of a previous

16  incident where Owen had indicated -- reported that he had been

17  attacked inside of the elevator by Mr. Martinez; right?

18  **A.**   I did not remember any previous incident at the time.

19  **Q.**   When you say you didn't remember, are you saying as you

20  sit here today that you knew about that incident at the time of

21  the discipline but had forgotten about it?

22  **A.**   I didn't -- at the time of the -- at the time when we made

23  the decision between myself and Wayne, I -- I had no -- I

24  didn't remember any previous incidents.

25  **Q.**   Okay.   So at the time that you determined the discipline

1   for Mr. Martinez, you did not take into consideration the

2   confrontation that occurred in the elevator between Mr. Diaz

3   and Mr. Martinez; correct?

4   **A.**   I did not remember any previous incidents at the time.

5   **Q.**   As opposed to didn't remember, you weren't aware?

6   **A.**   No, I didn't remember.   No.

7   **Q.**   The reason I'm stuck is when you say you don't remember,

8   that's -- you didn't remember, it suggests that you knew it at

9   some point and had just forgotten it.

10          **MS. KENNEDY:**   I object -- I'm sorry.   Objection.

11   Argumentative.

12          **THE COURT:**   Overruled.   I think there may be a

13   communication issue going on.

14   **BY MR. ALEXANDER**

15   **Q.**   And so what I'm trying to figure out is, on the date that

16   you were having a conversation with Wayne Jackson about the

17   discipline that should be issued to Mr. Martinez, on that date

18   did you know about the elevator confrontation?

19   **A.**   No.   No, on that day I did not.

20   **Q.**   And with regard to the discipline that was actually

21   issued, is it a correct statement that you decided that it

22   should be the three-day suspension?

23   **A.**   I remember it was a joint decision between myself and

24   Wayne.   I believe he was the one who recommended, and I agreed.

25   **Q.**   Isn't it true that you wanted to give a verbal warning

 1   with no suspension?

 2   **A.**   I -- I made recommendations based on the fact that any

 3   time an incident like this happened, a corrective action had to

 4   be implemented so it didn't happen again.

 5        The employer of record ultimately was the one who made the

 6   final call.  I felt it was my responsibility to make sure that

 7   they -- whatever decision they made, that it was so that the

 8   issue was addressed and that it never happened again on Tesla

 9   property.

10   **Q.**   Were you aware that Mr. Diaz had made other complaints of

11   racial treatment inside the workplace?

12   **A.**   No.  No.

13   **Q.**   If I could show you Exhibit No. --

14        **MR. ALEXANDER:**  If we could show Exhibit No. 41?  If

15   you could display -- I don't know it's been received.

16        **MS. KENNEDY:**  I'm sorry, Bernard.  41 or 31?

17        **MR. ALEXANDER:**  41.

18        **MS. KENNEDY:**  Thank you.

19        It's admitted.  There's no objection.

20        **THE COURT:**  Okay.

21        (Document displayed.)

22   **BY MR. ALEXANDER**

23   **Q.**   With regard to Exhibit No. 41, it will be displayed, that

24   is a reference to Owen Diaz complaining about Judy Timbreza

25   making racially offensive remarks.

1      And do you see where above that you say "Thank you" and it

2  says "VQ"?

3  A.   Yes.

4  Q.   And so that was an indication that you had received

5  previous information from Mr. Diaz that he had been subjected

6  to racially offensive remarks based on his report; right?

7  A.   Yeah.  Yeah.

8  Q.   Had you received information during the time frame of 2015

9  to 2016 that the "N" word was being used inside the workplace?

10 A.   No.

11 Q.   Had you received information between 2015 and 2016 that

12 graffiti was present inside the bathrooms at Tesla?

13 A.   Graffiti, yes.

14 Q.   I'm sorry?

15 A.   Graffiti, yes.

16 Q.   And what graffiti were you aware of that existed between

17 2015 and 2016 inside the bathrooms?

18 A.   Different -- different -- different types of graffiti.

19 Like --

20 Q.   Racial graffiti?

21 A.   I don't -- I don't believe it was mainly racial.  I

22 believe it was mainly --

23 Q.   I'm sorry?

24 A.   I don't believe it was mainly racial.  I believe it was,

25 like, drawings and just different -- different things.

1   Q.   When you say not mainly, I'm not looking for mainly.   Was

2   there racial references like the "N" word inside the Tesla

3   bathrooms between 2015 and 2016?

4   A.   I don't remember if it was racial.

5   Q.   Let me -- if you could look at Exhibit No. 109.   Inside

6   the notebook next to you there should be an Exhibit 109.   It

7   should be the white notebook.

8        MR. ORGAN:   White notebook.   That one.

9   BY MR. ALEXANDER

10  Q.   That one.   Is there an Exhibit 109 in that?

11  A.   I don't see a 109.

12       MR. ALEXANDER:   If we could display it for the

13  witness, but not others?

14       MS. KENNEDY:   Your Honor, this is beyond the scope.   I

15  believe this was an issue that was brought up at a prior

16  hearing.

17       THE COURT:   I can't see it at the moment, so I have no

18  idea what it is.

19       MS. KENNEDY:   It's May of 2016.

20       THE COURT:   Okay.   That is beyond the scope then.

21       MR. ALEXANDER:   Your Honor, I'm making an inquiry to

22  find out whether he had seen information that was present

23  during the time frame of 2015 to 2016 inside the scope, the

24  day --

25       THE COURT:   You can ask it -- you can ask him whether

QUINTERO - DIRECT / ALEXANDER

1   this refreshes his recollection.

2   BY MR. ALEXANDER

3   Q.   So with regard to Exhibit No. 109, if you could look at

4   the 109-3.  Was that information -- was that what you see on

5   that page present inside the bathrooms between 2015 and 2016?

6   A.   I don't -- I don't remember.  I don't remember this.

7   Q.   Do you remember the "N" word being scrawled in the

8   bathroom between 2015 and 2016?

9   A.   Not really.  I really -- I don't remember.

10  Q.   Did you walk around the workplace during the time frame of

11  2015 to 2016?

12  A.   Occasionally.

13  Q.   Okay.  And when you say "occasionally," once a week?

14  Twice a week?

15  A.   Once a week I would say.

16  Q.   And when you walked around, did you walk around the area

17  like the elevators or the battery area or places like that?

18  A.   I would go by, yes.

19  Q.   I understand there are cafeterias.  Did you walk around

20  the cafeterias?

21  A.   Yes.

22  Q.   In walking around the facility, did you ever hear the

23  "N" word?

24  A.   No.

25  Q.   Not once?

1   A.   Not once.

2   Q.   I just want to -- and were you generally present every

3   day, every workday in 2015-2016?

4   A.   Yeah.   I was averaging 12 hours a day, 12 to 14 hours a

5   day.

6   Q.   And the areas that you walked around, were there employees

7   working, contract workers, contract employees working in those

8   areas?

9   A.   Yeah.   My -- the people who were under me.

10  Q.   And so there is no word of the "N" word that you ever

11  heard at any time during the year 2015 to 2016?

12  A.   Absolutely not.

13  Q.   Absolutely not.

14  A.   At least not in front of me.

15  Q.   Did anyone report to you that the "N" word was being used

16  inside the workplace between 2015 and 2016?

17  A.   No.

18  Q.   So Ramon Martinez -- I'm sorry.

19       Ed Romero, he did not report the "N" word being used?

20  A.   I don't remember, no.   I would have remembered that.

21  Q.   Okay.   Wayne Jackson, you're familiar with him; right?

22  A.   Yeah.

23  Q.   Did he ever indicate to you that the "N" word was being

24  used inside the workplace?

25  A.   No.

QUINTERO - DIRECT / ALEXANDER

1  Q.   With regard to Ramon Martinez, after the discipline that

2  was issued to him, he ultimately became a direct employee of

3  Tesla; is that right?

4          MS. KENNEDY:  Objection.  Beyond the scope.

5          THE COURT:  Overruled.  You can answer.

6  BY MR. ALEXANDER

7  Q.   Mr. Martinez, he became a direct Tesla employee after this

8  discipline that was issued by you; right?

9  A.   He was -- a lot of the contract employees became Tesla

10 employees later, at a later time.

11 Q.   I'm asking for your knowledge.  Do you have knowledge that

12 after this incident regarding the racist drawing, that

13 Mr. Martinez was hired as a direct Tesla employee?

14 A.   Yes, I believe so.

15 Q.   And you approved that.  You had to approve that; right?

16 A.   It was not up to me to approve.

17 Q.   Could you turn to Exhibit No. 106, please?

18         MR. ALEXANDER:  I believe it's been received in

19 evidence.

20         MS. KENNEDY:  Yes.  No objection.

21         THE COURT:  Okay.  It can be shown.

22     (Document displayed.)

23 BY MR. ALEXANDER

24 Q.   With regard to this document, it is from Ed Romero to you

25 dated December 30, 2015.  Do you recall Mr. Romero reporting to

1  you an incident involving Javier Temores and Troy Dennis and

2  you said the "N" word?

3        MR. ALEXANDER:  If we could display the bottom part of

4  the screen, below that.

5  BY MR. ALEXANDER:

6  Q.   Have you had an opportunity to review that document?

7  A.   Just the bottom part.  Can you make it so that I can --

8       (Document displayed.)

9  A.   Can you make it smaller?

10      I don't remember this.  I don't remember this.

11 Q.   So this report that's inside Exhibit 106 where you were

12 notified of use of the "N" word, you had forgotten that when

13 you testified a moment ago that no one had ever reported use of

14 the "N" word?

15 A.   Yes.  Yes.

16      (Brief pause.)

17 Q.   Let me have you look at...  Let me ask you, please, to

18 look at Exhibit No. 83.

19      MR. ALEXANDER:  It's being marked, but it has not been

20 received.

21      (Trial Exhibit 83 marked for identification)

22 BY MR. ALEXANDER:

23 Q.   Inside your notebook, sir, there is an Exhibit 83, I

24 believe.

25 A.   It's right here.  It's right here.

**QUINTERO - DIRECT / ALEXANDER**

1   Q.   Okay.  Do you recognize this as a true and correct copy of

2   an email between you and Ed Romero?

3   A.   Yes.

4         MR. ALEXANDER:  May Exhibit No. 83 be received into

5   evidence?

6         MS. KENNEDY:  No objection.

7         THE COURT:  It's admitted.

8      (Trial Exhibit 83 received in evidence)

9   BY MR. ALEXANDER:

10  Q.   And if could you go down to --

11        THE COURT:  It may be published.

12     (Document displayed)

13  BY MR. ALEXANDER:

14  Q.   -- about halfway down the page to the February 26, 2016,

15  at 1:24 a.m. entry, the second line where it says (as read):

16        "Tonight my lead approached him" -- meaning

17        Owen -- "to talk to him, and he said for my associates

18        to only talk to him if it is related to business

19        because there are so many snakes here at Tesla."

20        Do you see that reference?

21  A.   Yes.

22  Q.   And your response above at the top says (as read):

23        "From my perspective, we may need to ask Wayne to

24        give him a final warning; and if we continue to

25        receive complaints, he must be terminated."

QUINTERO - DIRECT / ALEXANDER

1           Do you see that reference?

2    A.   Yes.

3    Q.   With regard to Owen not talking to people except related

4    to business, was Owen required to have conversations with

5    people that were harassing him?

6           MS. KENNEDY:  Objection.  Lack of foundation.

7           THE COURT:  Overruled.  You can answer.

8           THE WITNESS:  Say that again.

9    BY MR. ALEXANDER

10   Q.   Was Owen required to have conversations with people that

11   were harassing him?

12   A.   I mean, it doesn't -- it doesn't say he was being

13   harassed.

14   Q.   I understand.  What I'm asking you is:  If Owen was

15   willing to talk to his coworkers about work but not willing to

16   talk to them about anything else, isn't that all that he is

17   required to do?

18   A.   I don't -- I don't understand.

19   Q.   If Owen Diaz said "Only talk to me about work," because

20   the people he was saying that to are harassing him, he had

21   every right to do that because --

22   A.   I -- I was not aware that he was being harassed at that

23   time.

24   Q.   Okay.  So you agree that he did not have to speak to his

25   harassers other than with regard to work; correct?

1    **A.**    Say that again.

2    **Q.**    You agree that Mr. Diaz only had an obligation to speak to

3    coworkers about work.  He had the right not to speak with them

4    if they were harassing him; correct?

5    **A.**    Well, if they were harassing him, then we -- we would have

6    investigated and took corrective action.

7    **Q.**    If you could answer my question.  Mr. Diaz had the right

8    to refuse to talk to his harassers about anything except for

9    work.  He only had to talk to them about work.

10    **A.**    Work related, yeah.  There is no reason to discuss

11    harassment, you know.

12    **Q.**    Okay.  And did you ever conduct any type of investigation

13    with Owen to find out why it is he made this statement only

14    talk to him if it is related to business?  You did not; right?

15    **A.**    As far as I know, it was investigated and followed up on.

16    **Q.**    If you could answer my question.  You did not ever speak

17    to Owen to find out why he said he would only speak to this

18    person about business; right?

19    **A.**    Oh, I did not speak to Owen personally myself.

20    **Q.**    And you're not aware of anyone else interviewing Owen to

21    find out why he refused to speak to these individuals about

22    anything other than business; right?

23    **A.**    I was -- I was aware that Ed Romero was addressing the

24    issue with I believe it was Wayne at the time.

25    **Q.**    If you had information that the "N" word was being used

1    inside the Tesla workplace, that should not be tolerated;

2    correct?

3    A.    Yes.

4    Q.    Okay.  And if you were made aware that the "N" word was

5    being used inside the workplace, that would be a circumstance

6    where there should be corrective action taken; right?

7    A.    Yes.

8    Q.    And so if you were to find out that the "N" word was being

9    used throughout the workplace, you would expect that there

10   would be retraining that would occur for all of the employees;

11   right?

12   A.    Or corrective action, some correction action, some form

13   of -- some form of corrective action.

14   Q.    Some form of sensitivity training or something along that

15   line would be appropriate if people were regularly using the

16   "N" word inside the workplace; right?

17   A.    Some type of corrective action, yes.

18   Q.    So the only reason that you didn't instruct there to be

19   retraining or sensitivity training is because in your dealings

20   inside the workplace, you weren't aware of the "N" word being

21   used except for that one report inside Exhibit 106; right?

22          MS. KENNEDY:  Objection to the form.  Lack of

23   foundation.  Calls for speculation.

24          THE COURT:  Sustained.

25

1   BY MR. ALEXANDER

2   Q.   If you had become aware that the "N" word was being used

3   on a daily basis inside the workplace, you agree that that

4   would warrant having retraining; yes?

5   A.   It would not be up to me to do the training.  I was not --

6   I was not involved in the training department or -- you know,

7   that would have been a decision that would have been made

8   probably by HR or, you know, somebody like that.

9   Q.   So even if you heard the "N" word, that wouldn't be

10  something that would prompt you to initiate retraining in the

11  workplace.  It would be someone else's job.

12  A.   I might recommend it, like I did in the Ramon case or

13  incident.

14       MR. ALEXANDER:  With regard to Exhibit No. 272, which

15  I believe has been received into evidence, if you could display

16  272 and go to the same spot.

17       And if we could blow that up.

18       (Document displayed.)

19  BY MR. ALEXANDER:

20  Q.   This email was written on January 22, 2016, by you.  Do

21  you see that?  Do you see that, Mr. Quintero?

22  A.   No, I don't see it.

23       MR. ALEXANDER:  Could you show him that page, please?

24       (Document displayed.)

25

1   BY MR. ALEXANDER:

2   Q.   Do you see that that email was written by you?

3   A.   Yes.  Yes.

4   Q.   And then in regard to the email, it says (as read):

5          "I agree with the recommendation to suspend and

6        issue a permanent written warning."

7        Who did you receive that recommendation from?

8   A.   Wayne.  Wayne Jackson.

9   Q.   Okay.  And at the point when you received this

10  recommendation, was that before or after you had found out what

11  the company that Mr. Martinez was working for was going to

12  determine in terms of the discipline?

13  A.   No.  I didn't know what his employer of record was

14  recommending or -- well, I'm assuming it was communicated to

15  Wayne maybe and then Wayne communicated it to me.

16  Q.   So what you're saying is at the point when you wrote this

17  email on January 22nd, it was based on a determination that had

18  already been made by the staffing company that was being

19  communicated through Mr. Jackson?  Is that your recollection?

20  A.   I don't -- I don't remember being notified from the

21  staffing company what their decision was.

22  Q.   Okay.

23  A.   I mean, I assumed it was Wayne representing the companies,

24  you know, or the company.

25  Q.   You assumed that Wayne Jackson was telling you information

 1   based on the information he had based on the investigation

 2   conducted as to the jigaboo; is that correct?

 3   **A.**   I don't -- I don't know where Wayne got his information or

 4   how he made his decision, but it was communicated to me and I

 5   agreed.  My main concern was to make sure corrective action was

 6   taken to prevent it from happening again.

 7          **MR. ALEXANDER:**  Nothing further.

 8          **THE COURT:**  All right.  Thank you, Mr. Alexander.

 9      Ms. Kennedy?

10          **MS. KENNEDY:**  Yes, Your Honor, and we will be finished

11   by 1:30.

12          **THE COURT:**  Don't make promises you can't keep.

13          **MS. KENNEDY:**  Okay.  1:35.

14                     <u>**CROSS-EXAMINATION**</u>

15   **BY MS. KENNEDY**

16   **Q.**   Good afternoon, Mr. Quintero.

17   **A.**   Good afternoon.

18   **Q.**   A few follow-up questions for you.

19      I believe you testified in response to Mr. Alexander's

20   questions that you oversee about 200 or so employees; is that

21   correct?

22   **A.**   Approximately, or more.

23   **Q.**   And are those all in the recycling and janitorial areas or

24   other areas of the facility?

25   **A.**   Other areas.

```
 1   Q.   What areas are those?

 2   A.   Like, food services, landscaping, confidential paper

 3   removal.  I think that was it.  It could have been more.

 4   Q.   Okay.  I understand that you -- you understand that

 5   Mr. Martinez became a Tesla employee at some point in time?

 6   A.   Yes.

 7   Q.   Do you know if that was in 2019 or 2020?

 8   A.   I don't remember.

 9   Q.   Did you know if it was in 2015 or '16, or do you have any

10   idea?

11   A.   It would have been later.

12   Q.   Okay.  Do you know what Mr. Martinez's role is now at

13   Tesla?

14   A.   He's a supervisor.

15   Q.   Is it your understanding that since the incident with the

16   cartoon or the drawing in January of 2016, to your knowledge

17   has Mr. Martinez had any HR issues at all?

18   A.   No.  I'm not aware of him having any HR issues.

19   Q.   Do you know if there has been any complaints about

20   Mr. Martinez's workplace behavior at any time since he became a

21   Tesla employee?

22   A.   No.  At the time I didn't remember.

23   Q.   All right.  Let's go -- quick question about the cartoon.

24   Let's go to Exhibit 272, please, which Mr. Alexander was just

25   showing you, and the emails.
```

1         **MS. KENNEDY:**  Stephanie, can we go to the last page?

2         (Photograph displayed.)

3         **MS. KENNEDY:**  There we go.

4    BY MS. KENNEDY:

5    **Q.**   Do you see -- this is 272 at Page 5.  Is this -- do you

6    recall if you actually saw the entire photo with the, as

7    Mr. Diaz calls it, the racist effigy to the right or the

8    cartoon?  Did you see the other drawings to the left?  Do you

9    recall that?

10   **A.**   No, not really.

11   **Q.**   Do you see where that square is?  It's kind of hard to

12   see.

13        (Photograph enlarged)

14   **Q.**   My question to you is:  When you got this email or had any

15   discussions, do you remember if anyone talked at all about this

16   part of it, this Pac-Man?

17   **A.**   No.  No.  It was mainly just about the other part.

18   **Q.**   And your understanding was that Mr. Diaz was upset about,

19   how he phrased it, the racist effigy, but he didn't have any

20   concerns about the Pac-Man; correct?

21   **A.**   Not that I was made aware of.

22   **Q.**   All right.  Thank you.

23        Let's go to 106, please, that was admitted for a limited

24   purpose.

25        Take a look at the bottom email.  Mr. Alexander asked you

1   some questions about it.  The bottom email, which was from Ed

2   Romero to Wayne Jackson, and you're copied on it, sir.  At the

3   bottom it talks about two employees, Troy Dennis and Javier

4   Temores.  Do you see that?

5   **A.**   Yes.

6   **Q.**   Do you know either of those employees?

7   **A.**   No.

8   **Q.**   Do you know anything about this incident other than what's

9   reported to you?

10  **A.**   Just what it shows here now that you're showing it to me.

11  **Q.**   Okay.  At some point in time, Mr. Quintero, were you

12  advised that the staffing agency CitiStaff was ending

13  Mr. Diaz's contract with CitiStaff?

14  **A.**   No.

15  **Q.**   At some point in time were you advised that Joyce

16  DelaGrande did not want to have Mr. Diaz as the lead elevator

17  operator?

18  **A.**   Yes.

19  **Q.**   And what was your understanding as to how that came about?

20  **A.**   Well, Ed Romero forwarded me the emails where she was

21  communicating the issues.

22  **Q.**   And did you have any involvement as to whether or not

23  Mr. Diaz was going to be made the non-lead elevator operator?

24  **A.**   Say that again.

25  **Q.**   Were you involved in any decision-making or conversations

1   as to Mr. Diaz no longer being the lead elevator operator?

2   **A.**   I -- I remember corresponding with Ed about the issue and

3   just basically making sure that it got resolved with -- you

4   know, between him and employer of record, which was standard

5   operating procedure.

6   **Q.**   Did you ever have any conversation at any point in time

7   with Owen Diaz about any aspects of his workplace?

8   **A.**   No.

9          **MS. KENNEDY:**  I have no more questions, Your Honor.

10         **THE COURT:**  All right.  Mr. Alexander?  Do you have

11   any redirect?

12         **MR. ALEXANDER:**  First with Exhibit No. 272, if we

13   could display that.  If we could go to the bottom, the

14   photographs.

15      Does this have the photographs?  If we could go to the

16   left and show those other drawings that are on the edge.

17      (Photograph displayed.)

18                    <u>**REDIRECT EXAMINATION**</u>

19   **BY MR. ALEXANDER:**

20   **Q.**   With regard to the drawings that are on the side, the left

21   edge of this item, is there -- did you actually try and figure

22   out what was on this?  What the writing was?

23   **A.**   I -- I -- I don't know.  I didn't -- it was not --

24   **Q.**   Did you --

25   **A.**   It was not discussed or anything.

1  Q.   Did you get any explanation as to why it was put there or

2  anything like that?

3  A.   No.

4  Q.   Okay.  Any conversation with Mr. Martinez or someone who

5  had spoken to Mr. Martinez who explained why that was there?

6  A.   No.  All the conversations was -- had to do with the

7  other, the cartoon character part.

8  Q.   Okay.  The reference to "booo" that appears in the center

9  of the screen, did you receive any information as to why the

10  "booo" was placed there?

11  A.   No.

12  Q.   Other than Exhibit 106, did you ever receive any other

13  emails that referenced the "N" word?

14  A.   Other than what you showed me here.

15  Q.   Yes.  Other than what I showed you in Exhibit 106, are

16  there any other emails that you've received that reference the

17  "N" word?

18  A.   Not that I can remember.

19  Q.   Thank you.

20        MR. ALEXANDER:  Nothing further.

21        THE COURT:  All right.  Thank you.

22     Anything else?

23        MS. KENNEDY:  No more questions, Your Honor.

24        THE COURT:  All right.  Mr. Quintero, you can step

25  down and you're excused.  Thank you very much.

PROCEEDINGS

```
 1          (Witness excused.)

 2          THE COURT:  And, ladies and gentlemen, we're going to

 3   leave three minutes early today.  That's sort of the benefit

 4   that you get from being early.

 5          So thank you for your attention to what's going on.  I

 6   just want to remind you that we are -- the trial is moving

 7   along at a good clip, and there is still a lot to come.

 8          So keep an open mind.  Don't talk about it with anybody.

 9   Don't try and do your own research.  You are learning

10   everything that you need to learn from here and from the

11   exhibits.

12          So with that, I hope you have a great afternoon and I'll

13   look forward to seeing you.  And if we can start a little early

14   again tomorrow, I think that would be great for all of us.

15          (Jury exits the courtroom at 1:28 p.m.)

16          (Proceedings were heard out of presence of the jury:)

17          THE COURT:  All right.  Have a good afternoon.

18          MS. KENNEDY:  Thank you, Your Honor.

19          MR. ORGAN:  Your Honor, in terms of tomorrow -- so

20   tomorrow I just want to -- in terms of tomorrow, we're going to

21   have Mr. Wheeler come back, so he'll start the day.

22          Then depending on how long that goes, it's our intent to

23   play Demetric's testimony, which is now down to about seven --

24   about seven minutes, Your Honor.

25          And then we will call Mr. Diaz.
```

**PROCEEDINGS**

 1        And if there's any time left, La'Drea Jones.

 2            **THE COURT:**  Okay.

 3            **MR. ORGAN:**  And based on the time estimates, that

 4    should fill it out.

 5            **THE COURT:**  Okay.

 6            **MR. ORGAN:**  We still have the McGinn testimony in our

 7    pockets, and we'll try and get Marconi, but I don't know that

 8    that gives defense enough time to respond.  So -- we've already

 9    sent a response.

10        So if you rule on that -- yeah, if you rule on that, then

11    we would have that in reserve, but I don't know that we'll need

12    it for tomorrow.

13            **THE COURT:**  Okay.  So I won't put anything out on ECF.

14    I will rule first thing in the morning on that, and then you

15    can go from there.

16            **MR. ORGAN:**  There is one issue, Your Honor, and that

17    is with respect to Exhibit 3.  Exhibit 3 is the contract

18    between -- the Master Services Agreement with Tesla and

19    nextSource.

20        And if you look at the Witness List, we had a witness

21    associated with that, Chuck Shehadi, who we pulled because they

22    agreed that this is authentic.  However, it was our intent to

23    try and bring that -- or bring him in with Annalisa Heisen, who

24    was the PMK on many topics.

25        So I'm not sure how we are going to get that piece of

**PROCEEDINGS**

1  evidence in, except it's certainly an admission of a party

2  opponent because it's a contract that they have signed.  It's

3  authentic.  We agree it's authentic.  And so it's our belief

4  that that should come into evidence.  We've lost the witness

5  that we can get it in through.

6         **THE COURT:**  So did you use it during her PMK?

7         **MR. ORGAN:**  No, we didn't, Your Honor.  We did not,

8  no.

9         **THE COURT:**  And since she's -- she was going to be

10  remote.  How were you going to arrange --

11         **MR. ORGAN:**  No.  She was coming in live, Your Honor.

12         **THE COURT:**  Oh, she was?

13         **MR. ORGAN:**  Yes.

14         **MS. JENG:**  No, she wasn't.  She was remote.

15         **MR. ORGAN:**  Who?  Heisen?

16         **MS. JENG:**  Yes.  She can't travel.

17         **MR. ORGAN:**  No, I understand she can't travel.  My

18  understanding was I was told she was coming in today.

19         **MS. JENG:**  No.  He was asking whether she's going to

20  testify by Zoom or in person.

21         **MR. ORGAN:**  In person is what I thought.

22         **MS. JENG:**  She's not cleared to travel.

23         **MR. ORGAN:**  I totally understand that.  The

24  representation to us was not a Zoom.  I thought she was going

25  to be here in person.

1        **THE COURT:**  First, I think you ought to check with

2    your team.  If it was a shock to you that she was nine months

3    pregnant and that wasn't communicated to you, then I'll think

4    about how that plays; but that would be surprising to me

5    because --

6        **MR. ORGAN:**  All I knew she was on maternity leave,

7    Your Honor.  I assumed she already had her baby.  It was news

8    to me when we came in this morning when they said she's in

9    labor.  That's the first that I heard about it.

10       **THE COURT:**  Did you know that she was going to be

11   testifying by Zoom today?

12       **MR. ORGAN:**  No.  I thought she was going to be live.

13       **THE COURT:**  Okay.  I'm going to let the lawyers

14   communicate about this specific issue.

15       And with respect to Exhibit 3, I mean, it does appear to

16   be a document that could come in.  I'm not sure what the

17   concern is.  So figure out whether this is a real issue one way

18   or another for Tesla.  And then if I need to rule on it, I'll

19   rule on it.  But I think you all ought to talk about it.

20       **MR. ORGAN:**  Thank you, Your Honor.

21       **MS. JENG:**  Thank you, Your Honor.

22       (Whereupon at 1:33 p.m. further proceedings were

23        adjourned until Wednesday, September 29, 2021 at

24        8:00 a.m.)

25

<u>**I N D E X**</u>

Tuesday, September 28, 2021 - Volume 2

<u>**PLAINTIFF'S WITNESSES**</u>                          <u>**PAGE**</u>   <u>**VOL.**</u>


<u>**ROMERO, EDWARD (RECALLED)**</u>
(PREVIOUSLY SWORN)                                179    2
Cross-Examination by Ms. Kennedy                  179    2
Redirect Examination by Mr. Organ                 206    2


<u>**JACKSON, WAYNE**</u>
(SWORN)                                           215    2
Direct Examination by Mr. Alexander               216    2
Cross-Examination by Ms. Jeng                     255    2
Redirect Examination by Mr. Alexander             293    2



<u>**DELGADO SMITH, JACKELIN**</u>
(SWORN)                                           298    2
Direct Examination by Mr. Alexander               298    2
Cross-Examination by Ms. Jeng                     327    2
Redirect Examination by Mr. Alexander             331    2



<u>**QUINTERO, VICTOR**</u>
(SWORN)                                           336    2
Direct Examination by Mr. Alexander               336    2
Cross-Examination by Ms. Kennedy                  357    2
Redirect Examination by Mr. Alexander             361    2

- - -

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 3 | 253 | | 2 |
| 31 | | 240 | 2 |
| 49 | | 269 | 2 |
| 74 | 237 | 237 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| 76 | | 242 | 2 |
| 83 | 350 | 351 | 2 |
| 92 | | 233 | 2 |
| 103 | | 238 | 2 |
| 274 | | 280 | 2 |
| 284 | | 277 | 2 |
| 287 | | 247 | 2 |
| 287 | | 302 | 2 |
| 296 | 191 | 193 | 2 |
| 301 | | 288 | 2 |
| 306 | | 201 | 2 |
| 308 | 202 | 203 | 2 |
| 312 | 204 | 205 | 2 |
| 368 | | 222 | 2 |

— — —

<u>**CERTIFICATE OF REPORTER**</u>


    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, September 28, 2021