Volume 3

Pages 369 - 544

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND )
LAMAR PATTERSON )
  )
  )
      Plaintiffs, )
  )
  vs. ) No. C 17-6748 WHO
  )
TESLA, INC., dba TESLA MOTORS, )
INC., CITISTAFF SOLUTIONS, INC., )
WEST VALLEY STAFFING GROUP, )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive, )
  ) San Francisco, California
      Defendants. ) Wednesday
  ) September 29, 2021
_____ ) 8:00 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**        ALEXANDER MORRISON & FEHR LLP
                  1900 Avenue of the Stars
                  Suite 900
                  Los Angeles, California 90067
           BY:  **BERNARD ALEXANDER, ESQ.**


                  CALIFORNIA CIVIL RIGHTS LAW GROUP
                  332 San Anselmo Avenue
                  San Anselmo, California 94960
           BY:  **LAWRENCE A. ORGAN, ESQ.**
                  **CIMONE A. NUNLEY, ESQ.**

       **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

**APPEARANCES:   (CONTINUED)**

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                            333 S. Hope Street
                            43rd Floor
                            Los Angeles, California 90017
                BY:  **TRACEY A. KENNEDY, ESQ.**

                            SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                            379 Lytton Ave
                            Palo Alto, California 94301
                BY:  **PATRICIA M. JENG, ESQ.**

                            SHEPPARD MULLIN RICHTER & HAMPTON LLP
                            Four Embarcadero Center
                            17th Floor
                            San Francisco, California 94111
                BY:  **SUSAN Q. HAINES, ESQ.**

Also Present:             **JOSEPH ALM, ESQ.**
                            - Tesla, Inc.

                            **YUSUF MOHAMED, ESQ.**
                            - Tesla, Inc.

                            **VALERIE CAPERS WORKMAN**
                            - Tesla, Inc.

                         —  —  —

| | |
|---|---|
| 1 | <u>**Wednesday - September 29, 2021**</u>                    <u>**8:01 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **---oOo---** |
| 4 | (Proceedings were heard out of presence of the jury.) |
| 5 | **THE COURT:**  All right.  There are two things on my |
| 6 | mind this morning.  One is the counter designations and |
| 7 | objections regarding Erin Marconi.  And I think in every |
| 8 | instance I'm going to overrule the objection to the counter |
| 9 | designation and overrule the objection to the testimony.  So |
| 10 | all of the testimony can come in that the parties are |
| 11 | interested in. |
| 12 | **MR. ORGAN:**  Your Honor, just a question on that then. |
| 13 | With respect to how they are presented, do you want the |
| 14 | designations presented with the counter designations then |
| 15 | together? |
| 16 | **THE COURT:**  Yeah, I think that's the smoothest way of |
| 17 | dealing with things. |
| 18 | **MR. ORGAN:**  So we'll have one video. |
| 19 | **THE COURT:**  One video. |
| 20 | **MR. ORGAN:**  In terms of the time, Your Honor -- |
| 21 | **THE COURT:**  You time it yourself. |
| 22 | **MR. ORGAN:**  We'll produce that tonight.  So we'll -- |
| 23 | it's our intent to present it, then, tomorrow, Your Honor. |
| 24 | **THE COURT:**  Great. |
| 25 | **MR. ORGAN:**  Okay.  Thank you. |

1          **THE COURT:**  All right.  And then the other thing I

2     just wanted to mention, yesterday I allowed Wayne Jackson to

3     testify about his experience of hearing the "N" word throughout

4     the factory.  And on Monday I admitted Exhibit 106 concerning

5     Mr. Romero's credibility regarding his hearing of the "N" word.

6          I did so because it appears from Tesla's presentation of

7     the case, from the opening of the argument to the designations

8     in the depositions, that it wishes to minimize the use of the

9     "N" word in the workplace at Tesla, which is fine, but so this

10    counter evidence I think is relevant.

11         I am willing and inclined to give the jury a further

12    limiting instruction, and I can do that this morning.  It would

13    be primarily at the defendant's -- I'll let the defendant

14    decide whether this is something that you would like or not,

15    but it would be to the effect of:

16         As you know, I admitted Exhibit 106 for the limited

17    purpose of your consideration of the credibility of

18    Mr. Romero's testimony.  And yesterday I allowed Mr. Jackson to

19    testify about his experience hearing the "N" word in the Tesla

20    factory.

21         I want to remind you that this case is about Mr. Diaz and

22    the work environment that he experienced at the Tesla factory,

23    not what others in a different part of the facility

24    experienced.

25         **MS. KENNEDY:**  Yes, Your Honor, that would be

1   appropriate.

2       I guess the question you're asking is when would that

3   instruction be given.

4           **THE COURT:**  I can give it now without the jury or when

5   they come in.

6           **MR. ORGAN:**  That's our preference, Your Honor.

7           **THE COURT:**  I suspect.

8       So I could give it first thing this morning when the jury

9   comes in, or I could save it and give it at the end of the

10  case.  I might do both because there may be other evidence that

11  is similar.

12          **MS. KENNEDY:**  Your Honor, my preference would be to

13  give it now because the testimony just came in yesterday.

14          **THE COURT:**  Yeah.

15          **MS. KENNEDY:**  I think by the time you give

16  instructions, I'm assuming Friday, potentially Friday or

17  Monday, I think it would be better to do it now; and then if it

18  needs to be done again, we can discuss that at another time.

19          **THE COURT:**  Okay.

20          **MR. ORGAN:**  And we'll just note our objection for the

21  record.  We don't believe that the evidence should be limited

22  in that way based on controlling authority.  *Ellison v. Brady*,

23  *Hicks*, and the others make clear that it's the totality of the

24  circumstances that should be considered.

25      We believe that the evidence as presented is evidence of

 1    that totality of the circumstances.  And our view of the

 2    evidence is that it doesn't limit it specifically to that

 3    experience that the evidence is relevant for other issues

 4    relative to defendant's intent and to the failure to prevent

 5    cause of action, Your Honor.

 6            THE COURT:  Okay.  So I will give that instruction

 7    when the jury comes in.

 8        So is there anything else from the plaintiff's perspective

 9    that we ought to do this morning?

10            MR. ALEXANDER:  Your Honor, with regard to

11    Exhibit 108, just so it's clear --

12            THE COURT:  108?

13            MR. ALEXANDER:  I'm sorry.  109.

14            THE COURT:  109.  Which one is that?

15            MR. ALEXANDER:  That's the one that has the photograph

16    of the swastika.

17            THE COURT:  Okay.

18            MR. ORGAN:  Graffiti.

19            MR. ALEXANDER:  The graffiti.

20        I understand that that photograph comes from a time frame

21    that is slightly outside May 16.

22        However, it's our contention that that graffiti was

23    present throughout the time frame, and so the date that the

24    photograph was taken is not really relevant to the

25    circumstances of it being apparent.

1      And so it's our belief that we should have been able to

2  use that and should still be able to use that to show that this

3  was what was present during the time frame as long as someone

4  such as the plaintiff can say:  This is what I saw or this was

5  present.

6      The issue is evidence of the fact that it was there during

7  the time frame.  That's what's the key.  That's what was

8  lacking in the Motion in Limine.  And so you would need

9  evidence, you would need to establish that before you could use

10  it.

11      **MR. ORGAN:**  Your Honor, in terms of the proximity,

12  though, that document, the picture is taken at a bathroom right

13  near the elevators.  So in terms of proximity, that's there.

14      Is your concern temporal?

15      **THE COURT:**  Yes.

16      **MR. ORGAN:**  Okay.

17      **THE COURT:**  That was the whole point of the lines that

18  I tried to draw in the order on the Motions in Limine.  It's

19  got to be what Mr. Diaz experienced in the workplace, what the

20  environment was there, and so that graffiti needed to have been

21  there during the time that he was there.  And if you can

22  establish that, great.  And if you can't establish it, then it

23  doesn't come in.

24      **MR. ORGAN:**  Okay.  Thank you, Your Honor.

25      **THE COURT:**  Okay.  Anything else from the defense?

1    **MS. JENG:** Just to address that point, you know,

2    plaintiff was no longer at the factory as of early March 2016.

3    The email that they are trying to admit is from May.

4        **THE COURT:** Right. But isn't the question -- the

5    question is whether the picture that was taken, whether that

6    graffiti was there in February, and the picture was taken in

7    June, May, whenever it was.

8        **MS. JENG:** Well, it was part of an email that was

9    sent, which Mr. Diaz is not on.

10       **THE COURT:** That doesn't matter. What matters is

11   whether the graffiti was present at the time that Mr. Diaz was

12   there and that that was part of the environment in which he was

13   working. So that's the evidence that will control whether it

14   comes in or out.

15       Anything else?

16       **MS. JENG:** Yeah. We -- because of Ms. Heisen's

17   absence yesterday, we met and conferred with plaintiff about

18   the exhibit they wanted to show her, the Master Services

19   Agreement. She's someone from HR. They wanted to agree that

20   that was admissible.

21       We also had a document that was a recruiting application.

22   So Ms. Heisen was in HR. We were planning on having her

23   authenticate that.

24       We propose that the parties stipulate that both be

25   admitted, and plaintiff has not agreed to that. So we wanted

1  to raise that.

2        THE COURT:  Okay.  Well, if that's where it is, then

3  neither of those documents is coming in.

4        MS. NUNLEY:  Your Honor, may I briefly be heard

5  regarding the exhibit Tesla asked us to stipulate to?

6     So Tesla asked that we stipulate to the admissibility of

7  Exhibit 379, which is a purported application of Demetric Di-az

8  for working at Tesla.

9     Ms. Heisen doesn't have any personal knowledge about this

10  application because it was submitted in October of 2015, which

11  was about two years before she started working at Tesla.  And

12  she wasn't designated to testify about Demetric's application

13  with Tesla.

14     So it's our position that she is not -- if she was an

15  appropriate witness to get this exhibit entered, we would have

16  happily stipulated to its admissibility, but she's not a proper

17  avenue to introduce this exhibit into evidence, so we're not

18  able to stipulate to its admissibility.

19        THE COURT:  That's fine.  You all make your choices in

20  litigation.  You are where you are.  And if you can't reach

21  agreement on something or you can't establish that the document

22  should come into evidence, it won't come into evidence.

23        MS. NUNLEY:  And, Your Honor, with respect to

24  Exhibit 3, this was -- Exhibit 3 is the contract between

25  nextSource and Tesla.

1          Ms. Heisen was designated as the person most knowledgeable

2     with respect to Tesla's policies and procedures for ensuring

3     that its contractors comply with all laws and regulations and

4     rules related to racial harassment, and that's part of the

5     topic that the contract covers.  So the contract is something

6     that she could testify about and was designated on.

7               THE COURT:  Okay.  But you knew that she was going to

8     be -- what her personal circumstances were, that you were

9     setting this up for testimony by Zoom.  I don't know how you

10    were going to get the document in by Zoom.  She didn't have a

11    copy of it there.

12         And so you are where you are.  And I'm sorry, but --

13              MS. NUNLEY:  Okay.  Thank you.

14              THE COURT:  -- it's hard for me to believe that during

15    the course of your discovery, you weren't able to get that

16    document -- use that document in some way that would have made

17    it admissible here.  Apparently you didn't, so...

18              MS. NUNLEY:  Thank you, Your Honor.

19              THE COURT:  Okay.

20         All right.  I will see you when the jury is here.

21         (Whereupon there was a recess in the proceedings

22          from 8:12 a.m. until 8:31 a.m.)

23         (Proceedings were heard out of presence of the jury.)

24              THE COURT:  Are we ready for the jury?

25              MR. ALEXANDER:  We are except for one item,

**PROCEEDINGS**

```
 1   Your Honor.
 2        There's a witness who we weren't able to get him on
 3   Monday.  We're going to play video.  He maybe here by 9:00; but
 4   because we missed him twice, we would like to be able to
 5   interrupt Mr. Diaz's testimony.
 6            THE COURT:  Absolutely.
 7            MR. ALEXANDER:  Thank you.  Thank you, Your Honor.
 8            THE COURT:  All right.  Let's get the jury.
 9        (Jury enters the courtroom at 8:33 a.m.)
10            THE COURT:  All right.  Please be seated, everybody.
11        Good morning, ladies and gentlemen.  Thank you for being
12   so prompt.
13        We're about to have some video depositions played for a
14   period of time, and you should treat this testimony just as you
15   would as if people were here in open court.  It has the same
16   weight as anything else.
17        Before we get going with that, as you know, two days ago I
18   admitted Exhibit 106 for the limited purpose of your
19   consideration of the credibility of Mr. Romero's testimony, and
20   yesterday I allowed Mr. Jackson to testify about his experience
21   of hearing the "N" word in the Tesla factory.
22        I just want to remind you that this case is about Mr. Diaz
23   and the work environment that he experienced at the Tesla
24   factory, not what others in a different part of the facility
25   experienced.  So keep that in mind.
```

```
 1          And, Mr. Alexander, what's the first deposition?

 2          MR. ALEXANDER:  Your Honor, the first deposition will

 3   be of Kevin McGinn, M-c-G-I-N-N.  Kevin is K-E-V-I-N.

 4          MR. ORGAN:  Your Honor, can we stipulate that it was

 5   taken under oath?

 6          THE COURT:  This testimony should be considered by you

 7   just as if the people were testifying here today.

 8          MR. ORGAN:  Thank you, Your Honor.

 9                         KEVIN MCGINN,

10   called as a witness for the Plaintiff herein, testified via

11   videotaped deposition played in open court, not reported.)

12          THE COURT:  Does that conclude Mr. McGinn?

13          MR. ORGAN:  I think that does.

14          THE COURT:  All right.

15          MR. ORGAN:  Your Honor, just one thing.  Can you

16   explain to the jury about editing out of objections?  The video

17   had some clip, as it goes --

18          THE COURT:  Okay.  So the video, you may have noticed,

19   was edited and that's because some of it was irrelevant.  Some

20   of it -- during depositions, lawyers like to make objections

21   and they're not relevant to you.  I've ruled on all the

22   objections and directed that the -- what you saw was just the

23   base of the testimony that was relevant to you and admissible

24   in evidence.  So that's how that was put together.

25          MR. ORGAN:  Thank you, Your Honor.
```

1          **MR. ALEXANDER:**  Thank you, Your Honor.

2      The next witness will be Demetric Di-az.  D-E-M-E-T-R-I-C.

3  Diaz is D-I hyphen A-Z.

4          **THE COURT:**  All right.  And he's testifying by video.

5                        <u>**DEMETRIC DI-AZ**</u>,

6  called as a witness for the Plaintiff herein, testified via

7  videotaped deposition played in open court, not reported.)

8          **THE COURT:**  All right.  So that concludes Mr. Diaz's

9  deposition.

10     There you noticed a few times the editing wasn't quite as

11 accurate as the text that you saw underlying the video, and you

12 can consider the text in addition to what you heard because it

13 just completed the thoughts.

14     All right.  So who is next?

15         **MR. ORGAN:**  Your Honor, we would like to read some

16 discovery, and then we'll call Mr. Owen Diaz if the witness

17 doesn't get here by then.

18         **THE COURT:**  Okay.  And what are you reading?  And have

19 you discussed that with the defendant?

20         **MR. ORGAN:**  This is designated discovery already, Your

21 Honor.

22         **THE COURT:**  Well, so I don't have it, and I think you

23 ought to let the defendant know so that --

24         **MR. ORGAN:**  Okay.

25         **THE COURT:**  Why don't you discuss with the defendant

1   what it is that you're going to do and why don't you let me see

2   what you're about to do.

3          MR. ORGAN:  Okay.  I don't want to waste time in front

4   of the jury, Your Honor, so should we start with Mr. Diaz and

5   then we'll just interrupt him when the witness gets here?  And

6   I can --

7          THE COURT:  So, ladies and gentlemen, the witness that

8   the plaintiffs had been hoping to call is coming, but he's

9   going to be a little delayed.  So to keep the case moving,

10  we're going to start with Mr. Diaz's testimony.  We'll have to

11  interrupt it when the witness gets -- the other witness gets

12  here, and then we'll continue on with it.

13      So, yes, let's call Mr. Diaz.

14         MR. ORGAN:  Thank you, Your Honor.

15         THE COURT:  I don't think I have a copy of the

16  transcript of his depo.

17         MR. ORGAN:  We have some minis, Your Honor.  They

18  would have the originals.

19         THE COURT:  Okay.  I think if it's going to be -- it's

20  going to be used I suspect at some point, so I would like to

21  have a copy of it.

22         MR. ORGAN:  Sure.

23         MS. KENNEDY:  I have minis as well somewhere.

24         THE COURT:  The mini would be fine.  I can follow

25  along.

```
1            (Whereupon document was tendered to the Court.)
2                        OWEN ORAPIO DIAZ,
3    called as a witness for the Plaintiff, having been duly sworn,
4    testified as follows:
5            THE WITNESS:  Yes, ma'am.
6            THE CLERK:  Be seated, please.
7        And if you would please state your full name for the
8    record and spell it for the court reporter.
9            THE WITNESS:  My name is Owen Orapio Diaz.  It's
10   spelled O-W-E-N.
11       Excuse me for a second.  The video was kind of emotional.
12       (Brief pause.)
13           THE WITNESS:  O-R-A-P-I-O is my middle name.  My last
14   name is spelled to D-I-A-Z.
15                        DIRECT EXAMINATION
16   BY MR. ORGAN
17   Q.   Owen, could you -- Mr. Diaz, could you please tell the
18   jury what is it that's got you emotional?  Is it seeing your
19   son?
20   A.   Yes, sir.  Seeing the video of my son, and I couldn't help
21   it.
22   Q.   I'm sorry.  Could you -- your son is not here right now;
23   right?
24   A.   No, he's not.
25   Q.   He wasn't able to testify; is that right?
```

1    A.   No, he was not.

2    Q.   Okay.  And could you tell the jury, what's the reason why?

3    Could you tell the jury why your son is not able to testify

4    here in court?

5    A.   My son is not able to testify because he started to get

6    into trouble after -- after Tesla and he went to prison.

7    Q.   Okay.  And is he incarcerated somewhere right now?

8    A.   Yes.  He's in a fire camp in Soledad.

9    Q.   So he's fighting fires through the CDC then?

10   A.   Yes, he is, sir.

11   Q.   I'm sorry for playing that.  I apologize to you for that.

12        If you could, tell the jury where did you grow up?

13   A.   I grew up in the Bay Area.  I went to school in Oakland.

14   Q.   And are you married?

15   A.   Yes, I am.

16   Q.   What's your wife's name?

17   A.   My wife's name is Demetrica.

18   Q.   And how long have the two of you been together?

19   A.   We've been together 28 years.

20   Q.   And how long have you been married?

21   A.   20.

22   Q.   So eight fun years, and then 20 --

23   A.   I'm not going to say it was all fun.  I'm married.

24   Q.   Do you have any children?

25   A.   Yes, I do.  I have four kids.

```
1    Q.   Okay.  We saw Demetric.  Is he -- where is he in your
2    order of children?
3    A.   That's my baby.
4    Q.   He's your baby.  Okay.
5         Boys?  Girls?  What do you have?
6    A.   It's split even, two and two; two boys, two girls.
7    Q.   Two boys, two girls.  Do you have a daughter named
8    La'Drea?
9    A.   That's actually my stepdaughter, but that's my daughter.
10   Q.   Okay.  You do not differentiate?
11   A.   No, I do not.  I have been raising her since she was
12   two years old.
13   Q.   Tell the jury what are some of your hobbies?
14   A.   I like fishing and gardening.
15   Q.   At some point did you see a job posting at Tesla?
16   A.   Yes, I did.
17   Q.   What did the job posting say?
18   A.   It was a posting advertising positions at Tesla;
19   production, the general assembly line.  You know, I can't
20   remember all of it, but it was -- it was applying for Tesla.
21   Q.   Okay.  And can you tell the jury when is this that you're
22   applying for a job at Tesla?
23   A.   I'm going to say around the summer of 2015.
24   Q.   Okay.  Did you go -- describe for the -- describe to the
25   jury what the process was that you went through to apply to
```

 1   work at Tesla?

 2   **A.**   Well, I was on Indeed and I was looking for a job, and I

 3   had ran across a Tesla advertisement that was advertising to

 4   work at Tesla.  So I clicked the "Apply" button and filled out

 5   whatever paperwork was there, and then they sent me back an

 6   email, and then the email had directed me to contact CitiStaff.

 7   **Q.**   Could you just --

 8           **THE COURT:**  Yes, if you could pull that just a little

 9   closer.  Thank you, sir.

10           **MR. ORGAN:**  Thank you.  Thank you, Your Honor.

11   **BY MR. ORGAN**

12   **Q.**   I'd like you to look, if you could, in your -- I think

13   it's the white notebook.

14   **A.**   Yes, sir.

15   **Q.**   And Exhibit 62.

16   **A.**   I have it, sir.

17   **Q.**   Okay.  And if you look at the second page of Exhibit 62,

18   do you see there's a list -- a notion there of a job worded

19   "Indeed."  Do you see that?

20   **A.**   Yes.

21   **Q.**   And then if you go to the third page of Exhibit 62, there

22   is some information there written about Hamilton Family Center.

23   Is that information you provided to Tesla?

24   **A.**   Yes.  I used to work at a homeless shelter for vulnerable

25   women and kids.

DIAZ - DIRECT / ORGAN

1   Q.   Okay.  And where was that center?

2   A.   That was here in San Francisco.  It was actually right

3   down the street.

4   Q.   Okay.  And then what's the next -- the next job that you

5   put in there, what is that?  Cover-all Cleaning?

6   A.   Cover-All Cleaning Concept was a franchise that me and my

7   wife had owned.

8   Q.   Okay.  And then there's a high school there listed.  Do

9   you see that?  Is that the high school that you went to?

10  A.   Yes.  That was the high school I went to in Oakland, Dewey

11  High School.

12  Q.   Okay.  And then it says that -- do you know what HSD

13  stands for?

14  A.   My high school diploma.

15  Q.   Okay.  And there's a date there.  Is that when you

16  graduated from high school?

17  A.   Yeah.  I graduated in 1986.

18  Q.   Okay.  And then if you could, go to Page 4 of Exhibit 62.

19      And just so I'm clear, this is information you provided in

20  this application process to get the job at Tesla; is that

21  right?

22  A.   Yes, sir.

23  Q.   If you could go to Page 4 of Exhibit 62.

24  A.   I have it.

25  Q.   And then there's a certification there.  Do you see

DIAZ - DIRECT / ORGAN

1    that --

2    **A.**    Yes.

3    **Q.**    -- at the bottom of the page?

4    **A.**    Yes, I see it.

5    **Q.**    And the next page of Exhibit 62 it says "I agree," and

6    then it has some initials there.  Do you see that?

7    **A.**    Yes.  I see the initials "OOD."

8    **Q.**    There's a date there.  Does that refresh your recollection

9    of when you made the online application to Tesla?

10   **A.**    Yes.  The date is May 31st, 2015.

11          **MR. ORGAN:**  Your Honor, I'd move Exhibit 62 into

12   evidence.  It's stipulated as authentic.

13          **MS. KENNEDY:**  No objection, Your Honor.

14          **THE COURT:**  All right.  It's admitted.

15       (Trial Exhibit 62 received in evidence).

16          **MR. ORGAN:**  Okay.  May we publish it, Your Honor?

17          **THE COURT:**  You may.

18          **MR. ORGAN:**  Now, if we could turn to Page 4 -- well,

19   put the first page of it up first.

20       I think you just turned it off.  I think you just...  We

21   are plagued by technical difficulties.  I apologize.  No?

22          There we go.  Okay.  Now we are rolling.

23          (Document displayed.)

24   **BY MR. ORGAN**

25   **Q.**    So this is Exhibit 62.  If we could now go to Page 4, and

**DIAZ - DIRECT / ORGAN**

```
 1    if you look down at the bottom at Item No. 2 under the

 2    certification?  Do you see that?

 3        (As read):

 4            "I hereby authorize Tesla Motors or its agents to

 5        investigate my background."

 6        Do you remember letting Tesla do any kind of background

 7    check on you when you were applying for the job through Indeed?

 8    A.   That's what I had to answer, one of the questions, that I

 9    would let them do a background check, yes.

10    Q.   So these are the items that you agreed to as part of your

11    application process; is that right?

12    A.   Yes, sir.

13    Q.   Okay.  And then if you go to the next page, 5, up at the

14    top (as read):

15            "I understand and agree that if I am offered a

16        position, it will be offered on condition that my

17        employment will be at will and for no definite period

18        and that my employment may be terminated at any time

19        with or without cause or with or without prior

20        notice."

21        Did you accept that term that they were offering you?

22    A.   Yes, I did.

23    Q.   Okay.  Now --

24            MR. ALEXANDER:  Your Honor, it's not showing to the

25    jury.  It does not --
```

1          **JUROR:**  We can see it.

2          **MR. ALEXANDER:**  The jurors out here on the bench

3     cannot see it.

4          **THE COURT:**  Maybe it's not turned on.

5       (Brief pause.)

6          **MR. ORGAN:**  I can go to the next thing while they're

7     doing that or --

8          **THE COURT:**  Let's just see if this is a simple fix.

9          **MR. ORGAN:**  Okay.

10      (Brief pause.)

11         **THE COURT:**  Is the other screen working?

12    Perhaps if we tilted that screen and maybe if the jurors

13    wanted to move over to that side so that they could...

14      Make that a temporary fix, and then the audience can

15    adjust themselves accordingly.

16      (Brief pause.)

17         **THE COURT:**  If people in the audience wanted to move

18    to the other side, you're more than welcome to do that.

19         **MS. KENNEDY:**  Sorry.  Just moving all our stuff.

20         **THE COURT:**  Okay.  All right.

21         **MR. ORGAN:**  May I proceed, Your Honor?

22         **THE COURT:**  You may.

23         **MR. ORGAN:**  Thank you, Your Honor.

24    BY MR. ORGAN

25    **Q.**   So you did get the job at Tesla?

DIAZ - DIRECT / ORGAN

1   A.   Yes, I did.

2   Q.   And now I think -- did you have to go through a contractor

3   named CitiStaff?

4   A.   Yes.  I went to CitiStaff because when I clicked on the

5   link and after I filled out the everything for apply, then I

6   got the email back and the email had directed me over to

7   CitiStaff.  Once I had went to CitiStaff, that was an office in

8   Newark, and from there they directed me to fill out some more

9   papers.

10  Q.   Did you fill out some paperwork for CitiStaff?

11  A.   Yes, I did.

12  Q.   And did you fill out any paperwork for Tesla?

13  A.   The initial application that was online.

14  Q.   Okay.  And then after you filled out some paperwork for

15  CitiStaff, did you ever go back to that Newark office?

16  A.   Yes.  I went once or twice to pick up a paycheck.

17  Q.   Okay.  So was CitiStaff -- in this system that they set

18  up, was CitiStaff going to pay you the paychecks?  Is that how

19  you understood it?

20  A.   That's where my checks came from, yes.

21  Q.   Okay.  But everything else was at Tesla; is that right?

22  A.   Well, I only picked up my check like two times from

23  CitiStaff.  From there it was a direct deposit, but all my

24  directions came from Tesla.

25  Q.   Okay.  And let's talk about your starting at Tesla.  What

**DIAZ - DIRECT / ORGAN**

1   I'd like you to do is, if you could, take yourself back to that

2   time.

3        In your application there it says -- it said 5/31.  How

4   soon after that did you start working at Tesla?

5   **A.**   My first day I worked at Tesla was on June 3rd, 2015.

6   **Q.**   Okay.  And if you could, turn to Exhibit 19, please.

7        And do you recognize Exhibit 19?

8   **A.**   Yes.

9   **Q.**   And does that accurately depict -- well, what was -- what

10   is Exhibit 19 for the record?

11   **A.**   Exhibit 19 is a badge that I received from Tesla so I can

12   be able to get in and out of the building.

13   **Q.**   Okay.  And does this accurately reflect what your badge

14   looked like?

15   **A.**   Yes, it does.

16   **Q.**   And then if you turn the page to the second page of

17   Exhibit 2, what is that part of the document?

18   **A.**   That was a different badge that they had gave me to

19   certify that I had took a safety class inside of Tesla.

20   **Q.**   So when you got to Tesla, they did some training for you?

21   **A.**   Yes, they did.

22        **MR. ORGAN:**   Okay.  Your Honor, I'd move Exhibit 19

23   into evidence.

24        **MS. KENNEDY:**   No objection.

25        **THE COURT:**   It's admitted.

1          (Trial Exhibit 19 received in evidence)

2     BY MR. ORGAN

3     Q.   If you could, turning to the first page of Exhibit 19 --

4          MR. ORGAN:  Oh, may we publish?

5          THE COURT:  You may publish.

6     (Document displayed.)

7     BY MR. ORGAN

8     Q.   Turning to the first page of Exhibit 19, you look pretty

9     happy there.  Were you happy?

10    A.   Yes, I was.

11    Q.   And why were you happy?

12    A.   Why wouldn't I be?  I started working for Tesla.

13    Q.   Okay.  And what was it about Tesla that made you

14    interested to want to work there?

15    A.   Well, I'm the kind of person that I believe in

16    environment, and I do believe we need to move away from the

17    diesel and the fossil fuels.  And, you know, Elon Musk has a

18    vision to try to, you know, correct some of the damage that we

19    have been doing to the earth over the past 2-, 300 years.

20    Q.   Okay.  If we look at this badge, there's something on here

21    that -- I think it has a little pictograph of a forklift and

22    then "Forklift Certified."  What was that?

23    A.   That was a badge that they gave me when I completed my

24    forklift training because being an elevator operator, I had to

25    be certified to be on the equipment.

**DIAZ - DIRECT / ORGAN**

1    Q.    Okay.  And then if we go to the second page of Exhibit 19.

2    A.    Yes.

3    Q.    What is this certification of?

4    A.    What they had told me in classes was that I can be able to

5    stop production for unsafe -- unsafe -- anything that was

6    unsafe, that I felt that was unsafe, I can either call the

7    numbers that was on there for emergencies and non-emergencies

8    to be able to stop the production floor.

9    Q.    And that's for the whole Tesla factory?

10   A.    Well, wherever you were that you felt something was

11   unsafe.

12   Q.    And that was training given to you by who?  Which company

13   gave you this training?

14   A.    I initially got that training on June the 3rd.  It was

15   Tesla.

16   Q.    Tesla.

17         Okay.  So let me -- and who was it that provided you with

18   a forklift certification then?

19   A.    It was a trainer that Tesla had.

20   Q.    Okay.  What I want to do is take you back in time now to

21   that June 3rd date.

22         If you could, tell the jury about how your first day

23   starts.  So think back to that time and then explain to them

24   how does your first day start at Tesla.

25         First of all, where are you?

DIAZ - DIRECT / ORGAN

1    A.    Umm, my first day I pulled up into the parking lot

2    searching for the security office because I was directed to go

3    to the security office.  Once I got to the security office,

4    they had put us all in a line outside.  I guess all the new

5    orientation showed up.  From there they took us and they walked

6    us over to a conference room and we sat inside the conference

7    room.

8    Q.    This is all happening at the Tesla factory in Fremont?

9    A.    Yes, it is.

10   Q.    Okay.  And so who shows you around?

11   A.    Who showed me around, it was Jaime Salazar.  When I first

12   got there and I'm taking the orientation class and I finished

13   with the orientation class, I was supposed to initially I took

14   another -- I was given another position.

15         But because of the fact that when Jaime Salazar, we all

16   stood up and he was taking us out, the guy that was there

17   didn't have on the steel-toe boots that was supposed to take

18   the elevator's position.  So he sent him home and told him try

19   again.

20         And he looked at me and asked me who I was, and I told him

21   my name.  And he said -- he looked at me, saw that I had my

22   steel-toe boots on, and he said:  You're a man who dresses for

23   the job.  And I told him:  Yes.  And he took me, he put me on

24   the back of a golf cart.  We rode through the factory, toured a

25   little bit of the factory, and then he dropped me off at the

```
 1   elevator.
 2   Q.   Mr. Diaz, could you please just move your microphone a
 3   little closer so the jury can hear you?  Thank you.
 4        So he saw your boots and he drove you off?
 5   A.   Yes.
 6   Q.   And where did you go?
 7   A.   We first drove around the factory a little bit, and he
 8   showed me some of the new cars, the lines and stuff like that,
 9   but eventually we ended up at Elevator 1.
10   Q.   Okay.  And then what were you told when you got to
11   Elevator 1?
12   A.   I was told to wait there for Tom Kawasaki.
13   Q.   Now, if you could, explain to the jury what is Elevator 1.
14   A.   Elevator 1 is an industrial size elevator.  You can fit
15   two full-size cars in the elevator, and we used the elevator to
16   take freight up and down from between the first floor and the
17   second floor.
18   Q.   How many floors are there at the Tesla factory in Fremont?
19   A.   There was two.
20   Q.   Two floors.
21        Okay.  So you're taken to Elevator 1., and then what
22   happens next?
23   A.   I'm taken to Elevator 1.  I'm riding the elevator up and
24   down.  I'm learning my job.  Tom Kawasaki is explaining to me
25   what my job entails.
```

```
 1        As I -- as we do that, that was pretty much the first day.
 2   Q.   Okay.  If you could, turn to Exhibit 202.
 3            MR. ORGAN:  And I believe this is admitted,
 4   Your Honor.  May we publish it?
 5            THE COURT:  I'm checking your belief, unless you tell
 6   me absolutely.
 7            MS. KENNEDY:  No objection, Your Honor.
 8            MR. ORGAN:  Ms. Davis is shaking her head yes, so I
 9   trust her, Your Honor.
10            MS. KENNEDY:  No objection from the defense.
11            THE COURT:  It's admitted.  Go ahead.
12        (Document displayed.)
13            MR. ORGAN:  Okay.  Thank you, Your Honor.
14   BY MR. ORGAN
15   Q.   Were you shown this SOP, standard operating procedure,
16   when you were trained by Tom -- was it Tom Kawasaki who trained
17   you?
18   A.   Yes, it was Tom Kawasaki.
19   Q.   Did he show you this Tesla document here?
20   A.   Yes.  This document was inside of a binder that was inside
21   of the elevator.
22   Q.   Okay.  And, well, not actually this document.  Something
23   that looked like it; right?
24   A.   This was the protocols that we were trained new elevator
25   operators on.  It may not have been this particular document
```

DIAZ - DIRECT / ORGAN

 1   that's in front of me but, yes.

 2   **Q.**   Okay.  So it was a Tesla standard operating procedure that

 3   you were trained on; correct?

 4   **A.**   Yes, sir.

 5   **Q.**   You didn't get trained on a CitiStaff standard operating

 6   procedure; right?

 7               **MS. KENNEDY:**  Objection.  Leading.

 8               **MR. ORGAN:**  I'll rephrase the question, Your Honor.

 9               **THE COURT:**  Okay.

10   **BY MR. ORGAN:**

11   **Q.**   Other than Tesla's policies, did you get trained on

12   anybody else's policies relative to how to operate the

13   elevator?

14   **A.**   No, I did not.

15   **Q.**   Okay.  And if you could, turn to Exhibit 366 now.

16               **MR. ORGAN:**  Which I believe is admitted, Your Honor.

17               **THE COURT:**  It is.

18               **MS. KENNEDY:**  No objection.  It is admitted.

19        (Document displayed.)

20   **BY MR. ORGAN**

21   **Q.**   Then in terms of -- did you ever see a card or a poster

22   like Exhibit 366 here, the first page?

23   **A.**   Not this particular card or poster, no, sir.

24   **Q.**   Is anything on this list here PPE equipment that Tesla

25   provided to you?

**DIAZ - DIRECT / ORGAN**

1    A.    Yes, sir.

2    Q.    And could you tell the jury, what are the PPE items that

3    Tesla provided to you when you started at work there?

4    A.    They provided the glasses, a bump cap.  Either you had to

5    wear a hard hat or bump cap while you were inside of the

6    factory.  They supplied us with earplugs and face shields,

7    gloves, and the aprons and locks, if you had to be able to lock

8    out a certain piece of equipment.

9    Q.    Okay.  If you go to the second page of the Exhibit 366,

10   there's some vending machines there.  Do you see those?

11   A.    Yes, I do, sir.

12   Q.    Tell the jury, what are those vending machines?

13   A.    Those vending machines holds the PPE, which would be the

14   earplugs, glasses, gloves.

15   Q.    Okay.  So you get the items from the first page of

16   Exhibit 366 out of the vending machines; right?

17   A.    Yes, sir.

18   Q.    And those are -- are those Tesla vending machines?

19   A.    Yes, they are, sir.  In order to use the vending machines,

20   I would have to use my Tesla badge to be able to access it.

21   Your Tesla badge is, like, considered cash with the vending

22   machine.

23   Q.    Okay.  Let me ask you this:  When you start working at

24   Tesla, how do you know what schedule you're going to work?

25   A.    Jaime Salazar gave me my schedule when he had put me on

```
 1   the back of the golf cart.
 2   Q.   And who was it who gave you your schedule on a periodic
 3   basis when you were working at the Tesla factory?
 4   A.   First it was Jaime Salazar, and I believe after that it
 5   may have been Ed Romero or it could have been Tom Kawasaki.
 6   I'm not 100 percent sure.
 7   Q.   Do you know who Jaime Salazar worked for?
 8   A.   Yes.  Jaime Salazar was the -- I believe at that time he
 9   was the manager for Tesla.
10   Q.   Okay.  And what about Ed Romero?  Do you know which
11   company Ed Romero worked for?
12   A.   Ed Romero had worked for Tesla.
13   Q.   Okay.  Do you know if Ed Romero ever worked for a
14   contractor or not?
15   A.   At that particular time, no.  I believe that Ed Romero had
16   worked with Tesla.
17   Q.   Okay.  And in terms of the workers interactions there, was
18   it different -- was there a difference between people who were
19   contract employees and people who were direct Tesla employees
20   in terms of your interactions?
21   A.   No.  We all interacted together.  It started from when we
22   first walked in the door.  We all used the door.  We went
23   inside the door, and then from there we would split and go to
24   our prospective bus stations.
25   Q.   Now, I need to ask you some questions about some of the
```

 1   things that happened while you were at the factory.

 2       After you start working at Tesla, do you see any graffiti

 3   in the factory?

 4   **A.**   Yes, sir.

 5   **Q.**   And where do you see the graffiti?

 6   **A.**   It was my second day at work, and I had to use the

 7   restroom so I went down the stairs that was next to the

 8   elevator and I believe was a conveyance.  I went down there and

 9   I was in the bathroom, and the first thing I saw while I was in

10   the bathroom was the "N" word scratched into the -- into the

11   metal.  There was other graffiti, you know.  And over a period

12   of time, it was stuff that was added, too.

13   **Q.**   Okay.  So it's fair to say --

14           **MR. ORGAN:**  Could someone please get me an easel, if

15   that would be possible?

16   **BY MR. ORGAN**

17   **Q.**   And did you report this graffiti to anyone?

18   **A.**   Yes, I did.  Yes, I did.  I reported it to my immediate

19   supervisor at that time, which was -- I believe it was Ed

20   Romero or maybe Tom Kawasaki.  I do believe it was Ed Romero.

21   **Q.**   You think it was Ed?  Is it possible it was Tom Kawasaki

22   or are you sure?

23   **A.**   I'm not 100 percent sure.

24   **Q.**   Okay.  But you reported it to someone; is that right?

25   **A.**   Yes, I did.

```
 1   Q.   Okay.

 2          MS. KENNEDY:  Your Honor, I can't see the board.  Can

 3   I move over there?

 4          THE COURT:  Yes, please.

 5          MS. KENNEDY:  Okay.

 6          MR. ORGAN:  I'm going to move it back, Your Honor, if

 7   that's okay with you, because I need the jurors to be able to

 8   see.  Is that all right?

 9          THE COURT:  Any way you want to set it up, Mr. Organ.

10          MR. ORGAN:  Thank you, Your Honor.

11          (Demonstrative displayed.)

12   BY MR. ORGAN

13   Q.   I'm going to put a big "X" there because this seems to

14   fade.

15          And if you could, tell the jury, did you see graffiti

16   after this second day of working at the Tesla factory?

17   A.   Yes, I did.

18   Q.   And where did you see -- where would you see the graffiti?

19   A.   It was -- one of the instances, like I said, was in the

20   bathroom.  And then the next time I saw the graffiti was when

21   they was sending over the effigy.

22   Q.   And from the time that you started on June 3rd of 2015

23   until you left in -- when did you leave?

24   A.   I believe it was sometime in January the following here.

25   Q.   January --
```

DIAZ - DIRECT / ORGAN

1   **A.**   Or maybe -- no.  I take that back.  I'm sorry.  I believe

2   mid-March to May, or something like that.

3   **Q.**   March to May?

4   **A.**   Yeah.  Somewhere up in there.

5   **Q.**   Did you see graffiti in the bathrooms from when you first

6   saw it here -- I guess that would have been June 4th or

7   June 5th, something like that -- did you see it from then until

8   you left?

9   **A.**   Yeah.  It was always in the bathroom.  You know, there was

10  stuff that was added to it over a period of time.  They used to

11  give us, like, some markers.  They wasn't really markers.  They

12  were like paint pens that we would mark parts off and stuff to

13  show that it was finished.  And some of the paint pens was like

14  different colors, like green, yellow, red, blue, even white.

15  And these guys would take these paint pens and put swastikas --

16      **MS. KENNEDY:**  Objection.  Calls for speculation.  Lack

17  of foundation.  Move to strike.

18      **THE COURT:**  Are you testifying, Mr. Diaz, that you saw

19  that in the bathroom?

20      **THE WITNESS:**  Yes, sir.  I saw that, the "N" word and,

21  you know, they was just -- it was --

22      **THE COURT:**  You mentioned about swastikas.  Did you

23  see swastikas?

24      **THE WITNESS:**  Yes.  It was right next to the "N" word.

25      Like I said, they would take these paint markers and they

```
 1    would put swastikas and stuff like, you know, "Death to all

 2    'Ns.'"  It was all kind of things.

 3              THE COURT:  Okay.  Overruled.

 4    BY MR. ORGAN

 5    Q.   Okay.  So it's fair to say, then, the graffiti started

 6    over here, went throughout the time that you were at the

 7    factory; is that correct?

 8    A.   As far as I know, sir, that stuff is still in the

 9    bathroom.

10    Q.   Okay.  Now, I want to fast forward from June 4th to

11    July 31st.  Okay?

12         And do you know a man named Judy Timbreza?

13    A.   Yes, I do.

14    Q.   And tell me, how did you know Judy Timbreza?

15    A.   Me and Mr. Timbreza worked in the elevator together.

16    Q.   You did?

17    A.   Yes.

18    Q.   Okay.  So did you have some kind of interaction with

19    Mr. Timbreza on this date, July 31st?

20    A.   Yes, I did.

21    Q.   And if you could, take the jury back there and describe

22    for them what happened between you and Mr. Timbreza?

23    A.   Well, me and Timbreza, we was actually working two

24    different elevators.  He had Elevator 1, Elevator 2; but, you

25    know, because of how the kitchens were set up or the
```

1   cafeterias, some of the guys would come over to the elevator,

2   ride it up, and go to the different satellite kitchens and

3   stuff because they had different menus inside different

4   kitchens.

5         So as him and his friends were getting on the elevator,

6   they would say things in Spanish and stuff like that.  And, you

7   know, even though my last name is Diaz, I don't speak Spanish.

8   So, you know, they would say something and look at me and go:

9   Yeah.  Yeah.  Yeah.  Yeah.  And I would say:  Yes.  Yes.  Yes.

10  And from there they would bust up laughing, and they would

11  leave out of the elevator.

12        So this went on for several weeks, you know.  It could

13  have been a little over a month.

14  **Q.**   Is this before July 31st that this stuff that you're

15  describing went on?

16  **A.**   Yes.

17  **Q.**   Okay.  And do you remember what are the things that

18  Mr. Timbreza had said to you prior to July 31st?  What do you

19  remember?

20  **A.**   Well, they were -- they were speaking in Spanish but, you

21  know, some of the words that he was saying that I could catch

22  was *mayate* and a few other words.

23  **Q.**   Say that word again.

24  **A.**   *Mayate*.

25  **Q.**   *Mayate*?

1    **A.**   Yeah.  I can't -- like I said, I can't speak Spanish.  I

2    don't know if I'm butchering the word.

3    **Q.**   Yeah.  I took four years of Spanish, and I don't speak a

4    lick of it either.

5          Okay.  So *mayate* was one.  What else did he say in

6    Spanish, if you recall?

7    **A.**   Well, what end up happening is after that went on for

8    awhile, I got kind of curious because they would laugh every

9    time.  You know, they would get me to say "Yeah.  Yeah.  Yeah.

10   Yeah.  Yeah," and they would bust up laughing and walk out.

11         And then after that, I got kind of curious.  So, you know,

12   I kind of, like, tried to really remember what they were

13   saying, and then from there I took Google and I translated it

14   through Google, and then that's when I found out he was calling

15   me a "porch monkey."

16   **Q.**   How did that make you feel when he called you -- when you

17   found out that he was calling you a "porch monkey," how did

18   that make you feel?

19   **A.**   Like less than a human.

20   **Q.**   And what did you do in response to that?

21   **A.**   I confronted him and asked him to stop, and me and him

22   basically we got into a verbal altercation, and Tom showed up.

23   **Q.**   Okay.  And then -- so this confrontation, that happens on

24   the 31st; is that right?

25   **A.**   Around about there, yes.

**DIAZ - DIRECT / ORGAN**

1   Q.   Okay.  And describe for the jury, what's the interaction,

2   then, on this 31st?

3   A.   Umm --

4   Q.   Just so we're clear, at this point in time you Google

5   translate it and he's called you "porch monkey" in Spanish?

6   A.   Yes.  Yes, sir.

7   Q.   And then has he called you anything else other than "porch

8   monkey" in Spanish?

9   A.   It was the *mayate*.

10  Q.   *Mayate*, okay.

11       And on this day, on the 31st, did he call you anything --

12  well, did he call you "porch monkey" that day?  And I apologize

13  for saying this.

14  A.   As he was leaving out, he called me the "N" word.  And

15  that's what really -- really upset me at that point.

16  Q.   He called you the "N" word in Spanish or in English?

17  A.   No.  He called it in English.  For a while he was ranting,

18  then laughing and stuff like that.  I guess he felt more

19  emboldened to just put it out there in English.

20  Q.   Okay.  And so what happens between you and Judy Timbreza,

21  then after he calls you the "N" word on the 31st?  Is this in

22  the elevators or near the elevators?

23  A.   It was the elevators.

24  Q.   Okay.  And what happens between you?

25  A.   At that point, like I said, we had got into a verbal

**DIAZ - DIRECT / ORGAN**

1    altercation, and then Tom Kawasaki showed up to break us up.

2    Q.    Who's Tom Kawasaki at this point in time relative to you?

3    A.    Tom Kawasaki was my supervisor.

4    Q.    Okay.  And what was Ed Romero's relationship to Tom

5    Kawasaki at this point in time, July 31st, 2015?

6    A.    At that time I believed he was maybe been Tom's immediate

7    supervisor.

8    Q.    And Jaime Salazar, is he still in the picture here at this

9    time?

10   A.    Yes, he is.  Jaime Salazar would have been -- the chain

11   would have went me, Thomas Kawasaki, Jaime Salazar, Victor

12   Quintero.  And then there was somebody over Victor, but I can't

13   remember who that was.

14   Q.    Okay.  And where does Ed Romero fit in the picture there

15   in the hierarchy?

16   A.    Ed Romero is between Jaime Salazar and Thomas Kawasaki.

17   Q.    Okay.  Okay.  So then you have this interaction.  Tom

18   Kawasaki comes to break it up.  And what happens next?

19   A.    Umm, Tom got us to calm down.  And then from there he

20   started interviewing people around and talking to them trying

21   to find out what happened.

22   Q.    Okay.  And does Tom Kawasaki interview you?

23   A.    Yes, he talked to me.

24   Q.    Okay.  And what do you tell Tom Kawasaki about your

25   interactions with Judy Timbreza?

1    **A.**    Just what I explained to you.  I had told Tom Kawasaki

2    over a period that he had been calling me a "porch monkey" and

3    I had translated it.  And then when he was leaving out the

4    elevator on that particular day after they was doing it, he

5    actually said the "N" word.  So that's what made me pretty

6    upset at that point.

7    **Q.**    Did you tell him about the *mayate*?

8    **A.**    I explained everything to Tom.

9    **Q.**    Okay.  And then did you see Tom interviewing anybody

10   around there?

11   **A.**    Yes.

12   **Q.**    And tell the jury about that.  What did he do?

13   **A.**    Like I said, he started interviewing people after he broke

14   us up.  He started talking to the people that was around trying

15   to find out is -- what he asked me.  He was trying to

16   corroborate what I had told him what Judy Timbreza was saying.

17   **Q.**    Okay.  And then after that incident, did Judy Timbreza

18   call you any of those offensive terms again?

19   **A.**    No.  After that, I hadn't seen Judy Timbreza.

20   **Q.**    Okay.  Do you know what Tesla did with Judy Timbreza?

21   **A.**    No.  I was not privy to that, sir.  I'm sorry.

22   **Q.**    They didn't tell you?

23   **A.**    No.

24   **Q.**    Okay.  And then if you could, turn to Exhibit 38.

25          **MR. ORGAN:**  And I believe this is admitted,

DIAZ - DIRECT / ORGAN

```
 1    Your Honor.
 2              MS. KENNEDY:  Yes, Your Honor.  It's admitted.
 3              THE COURT:  It is.
 4              THE WITNESS:  I only have 33 to 39.  Unless is it in
 5    this binder?
 6    BY MR. ORGAN:
 7    Q.   That was my fault.  I was putting this stuff together last
 8    night, and I must have not put it in there.
 9    A.   Is it the white binder or the black binder?
10              MR. ORGAN:  Can we show it to him, Your Honor, on the
11    screen?
12         Oh, can we publish it?
13              THE COURT:  You can publish it.  It's in.
14              MR. ORGAN:  Yes, let's publish it to the jury.
15         (Document displayed.)
16    BY MR. ORGAN
17    Q.   Look on your screen, Mr. Diaz.  Can you see that?
18    A.   Yes, sir, I can see it.
19    Q.   If you look at the first line there, it says (as read):
20              "Elevator 2 employee Owen has brought to my
21         attention of comments being made towards him that are
22         racist in nature."
23         Did you consider the comments to be racist in nature?
24    A.   Yes, I did, sir.
25    Q.   Does that statement adequately describe, though, the
```

DIAZ - DIRECT / ORGAN

1  actual statements that were made?

2  **A.**   No, it was not.

3  **Q.**   But you did report, you're sure you reported to Tom

4  Kawasaki those words, the "N" word and those other words that

5  were spoken; right?

6  **A.**   Yes, I did report it to him.

7  **Q.**   Okay.  So based on what you had told Tom Kawasaki, you

8  would agree, would you not, that on July 31st you did report

9  the "N" word to your supervisor; right?

10  **A.**   Yes.  I verbally reported it to my supervisor.

11  **Q.**   Okay.  And tell me this.  Did anyone tell you, when you

12  started at Tesla, who you were to report things to?

13  **A.**   When I first started at Tesla -- well, before I started at

14  Tesla, I was talking to -- I can't remember her name.  She was

15  a heavy-set Latino female that was at CitiStaff, and she told

16  me to direct all my concerns to Tesla or whoever was my

17  immediate supervisor over at Tesla.

18  **Q.**   Okay.  And this -- so the CitiStaff person told you to

19  report anything that happened to your immediate supervisor at

20  Tesla; is that right?

21  **A.**   Yes, sir.

22  **Q.**   Did anyone at Tesla ever tell you to do it any differently

23  than that?

24  **A.**   No, sir.

25  **Q.**   And did Tesla give you any training on harassment,

DIAZ - DIRECT / ORGAN

1    discrimination, reporting it, that kind of stuff?

2    A.    The only training that I received from Tesla was the

3    one-hour class to be able to get the badge, sir.

4    Q.    In Exhibit 19?

5    A.    Yes.

6    Q.    Okay.  I'd like to talk to you a little bit.  You

7    mentioned in your deposition a person named Robert.  Do you

8    remember a Robert?

9    A.    Yes.  Robert Hurtado.

10   Q.    Who?  Robert Hurtado?

11   A.    Yes, sir.

12   Q.    Now, when you were deposed, you didn't know his name?

13   A.    No, I didn't know his name then.

14   Q.    And --

15   A.    Well, I knew his first name, not his last name.

16   Q.    Right.  If you could, turn to Exhibit 96.  I hope that

17   one's is in there.

18   A.    White or black binder?

19   Q.    96 is not in there?

20   A.    I'm searching for it right now.

21         THE COURT:  Here.

22         (Whereupon document was tendered to the witness.)

23         THE WITNESS:  Thank you, sir.

24   BY MR. ORGAN

25   Q.    There is a picture there of somebody.  Do you recognize

**DIAZ - DIRECT / ORGAN**

1   that picture?

2   **A.**   Yes.  I recognize that as Robert Hurtado, one of my

3   harassers.

4   **Q.**   Okay.  So that's the guy who harassed you; right?

5   **A.**   Yes, sir.

6   **Q.**   And actually I showed you that picture before during

7   discovery after your deposition was over; correct?

8   **A.**   Yes, you showed me.  Tesla, I had asked them to show me a

9   picture and they didn't have any.

10   **Q.**   In your deposition you asked them to show you a picture,

11   and they didn't show you one; right?

12   **A.**   They asked me if I could recognize anybody.  And I

13   actually told them if they produced a picture, then I probably

14   possibly could recognize them.

15   **Q.**   Okay.  Let me ask you, so this man, Robert Hurtado, did he

16   engage in any kind of harassing conduct towards you?

17   **A.**   Yes, sir.

18   **Q.**   And when did that harassing conduct towards you by

19   Mr. Hurtado, when did that start?

20   **A.**   I'm going to say in about the fall of 2015.

21   **Q.**   Okay.  You -- when is it?  You think it's fall?

22   **A.**   Yes.

23   **Q.**   Okay.  Let me ask you this:  Was it before Demetric

24   started working there?

25   **A.**   I have to think when Demetric started working.  I think

**DIAZ - DIRECT / ORGAN**

```
1   Demetric started working in August or something like that.

2   Q.   Yeah.  And do you think that Robert Hurtado started

3   calling you or harassing you prior to Demetric coming?

4   A.   It could have been before.  It was awhile back.  I'm not

5   100 percent sure.

6   Q.   Okay.  So perhaps in the August time frame then?

7   A.   Yes.

8   Q.   And what are the -- was the conduct, the harassment,

9   racial in nature?

10  A.   Yes, it was.

11  Q.   And if you could, tell the jury, what is the harassing

12  conduct that Robert Hurtado directed towards you based on your

13  race, what you consider to be based on your race?

14  A.   Mr. Hurtado would call me the "N" word and call me "boy."

15  Q.   Okay.  How did -- can you tell the jury how Mr. Hurtado

16  used the "N" word towards you, if you recall?

17  A.   He would pull into the elevator on pieces of equipment at

18  a time, and then he would say:  "N," hurry up and push the

19  button.

20       Or I could be working the other elevator, moving -- moving

21  batteries or something like that, and then he would say:  "N,"

22  hurry up and push the batteries into the elevator or out of the

23  elevator.

24       You know, he -- he would say things like:  You "Ns" are

25  lazy, and stuff like that.
```

**DIAZ - DIRECT / ORGAN**

1    Q.    How many times do you think Robert Hurtado used the

2    "N" word towards you?

3    A.    It was well north of 30 times.

4    Q.    Okay.  And how did -- you mentioned "boy."  Did you

5    consider that offensive to be called a "boy"?

6    A.    At that time I was in my forties so I'm a grown man.

7    Q.    Right.

8    A.    And "boy" is a term that slave masters used to use against

9    black people to let them know that they were their property.

10   Q.    Do you remember how Mr. Hurtado used the word "boy"

11   towards you?

12   A.    He would say:  Boy, hurry up and push the batteries in the

13   elevator.

14         And I would try to remind him that, you know, I'm a grown

15   man.  I'm not a boy.  If I were to walk up to you, the first

16   thing I wouldn't say is:  Hey, boy.  Hey, man.

17   Q.    So he used "boy" in a similar manner to the "N" word?

18   A.    Yes, sir.

19   Q.    Okay.  Can you remember how many times he used "boy"

20   towards you?

21   A.    No, I can't remember.

22   Q.    Did he use the "N" word more than he did "boy"?

23   A.    Yes, he did.

24   Q.    Okay.  And what was Robert Hurtado's position as far as

25   you understood it?

Case 3:17-cv-06748-WHO   Document 295   Filed 10/05/21   Page 48 of 177   416

DIAZ - DIRECT / ORGAN

1    A.    He was the supervisor.

2    Q.    Did he work for Tesla?

3    A.    Yes, he was a Tesla employee.

4    Q.    Tesla employee and a supervisor.

5          Okay.  Let's talk about a man named Ramon Martinez.  Do

6    you know a man named Ramon Martinez?

7    A.    Yes, sir.  That was another one of my harassers.

8    Q.    Okay.  And what was your understanding of Ramon Martinez's

9    role at the Tesla factory?

10   A.    He was another supervisor.

11   Q.    Okay.  Now, if you could, tell the jury, what's the

12   difference between a lead and a supervisor at the Tesla

13   factory?

14   A.    To me, it's really no difference.  So I -- except, you

15   know, one reports to the other.  You know, the supervisors

16   would come out and basically sometimes give us some orders, or

17   we would have to -- as leads, we would have to coordinate with

18   different supervisors and different -- in different departments

19   to make sure the material is being moved back and forth.

20   Q.    Okay.  And did Ramon Martinez have an ability to tell you

21   how to do anything, any part of your job?

22   A.    Yes.  To a limited capacity, yes.

23   Q.    Okay.  And what was it that -- you mentioned that he was

24   one of your harassers.  What did Ramon Martinez do to harass

25   you?  How did he do that?

*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1*

1    **A.**   He would tell me to go back to Africa.  He would also call

2    me the "N" word.  He told me he hated me one time.  He said:  I

3    hate you "N."  He also would call me *mayate*.

4    **Q.**   And what is -- do you know what *mayate* means?  It's a

5    Spanish word; right?

6    **A.**   I know now, yes.

7    **Q.**   And what does it mean?

8    **A.**   It -- it's the same as the "N" word.

9    **Q.**   It's a Spanish equivalent of the "N" word?

10   **A.**   Yes, sir.

11   **Q.**   Okay.  And how many times did Ramon Martinez call you the

12   "N" word?

13   **A.**   It was well north of 30 times, too, sir.

14   **Q.**   Okay.  Well, now, the jury is going to notice you just

15   said that Robert called you more than 30 times.  You've now

16   said Ramon called you more than 30 times.

17        Do you have an exact number in your mind as to how many

18   times you were called the "N" word by Ramon versus Robert?

19   **A.**   Umm, no.  I don't have an exact number.  When I said that,

20   that was because the -- the lady that was doing the desk

21   position, she was really trying to hammer a number out of me,

22   and I just told her, you know, it was 30-plus times.

23        But, you know, as long as I was in the factory and I was

24   working with these guys and we came in contact, it was said and

25   done.

**DIAZ - DIRECT / ORGAN**

1  Q.  And in terms of when Robert -- Robert -- when Ramon

2  started calling you the "N" word, where did that start relative

3  to Demetric starting?

4  A.  It was before.

5  Q.  Before, okay.

6     So both Ramon and Robert called you the "N" word prior to

7  Demetric starting?

8  A.  Yes, sir.

9  Q.  And after -- after Judy -- after the Judy Timbreza

10  incident; right, sir?

11  A.  Yes, sir.

12  Q.  So the jury has got to be wondering, why don't you tell

13  them, how is it that you brought Demetric into this workplace

14  when you had been called these words?  How did you do that?

15  A.  Well, when I first recommended my son to work for Tesla, I

16  believe because he was going through another staffing agency

17  and he would have been working in a different -- a different

18  area of the factory than I was, you know, and on a different

19  shift, maybe it not have been relevant.

20     But, you know, as in hindsight, this was the worst

21  decision I could have ever made in my life, man.  I have to

22  live with it every day.

23  Q.  So it was your hope that he would not experience it; is

24  that true?

25  A.  It was wishful thinking.  As being a parent, we just look

1  out.  We just want the best for our kids.  I thought it would

2  be a good experience for him, something that he would have, you

3  know.

4      I'm -- I'm not the most perfect person in the world, man.

5  I made a mistake putting my son in that position.

6  **Q.**   Okay.  Where did Demetric end up working?

7  **A.**   He ended up working on the -- he ended up working on the

8  battery line.  He was putting batteries together.  He was,

9  like, maybe -- it took a minute to walk through the factory.  I

10 had to use a bike to get to him.

11 **Q.**   And did you ever have any interaction with Demetric where

12 you observed any kind of racist conduct that went on?

13 **A.**   Yes.  Like I said, I -- I was hoping he wouldn't go

14 through it, but, you know, when we would ride home, he was

15 telling me that he had a supervisor that was calling him the

16 "N" word and stuff like that and him and his -- him and his

17 other coworkers.

18     And it's just one day I happened to be coming to have a

19 meal with my son.  Because I was the lead, I could take my

20 lunch when I wanted to.  And so, you know, I knew he was

21 hungry, so I went downstairs to take him something to eat.  And

22 as I was hitting the corner and I'm turning the corner, his

23 supervisor, a white man, you know, was yelling at him and

24 telling him:  I can't stand all you effing "Ns."

25 **Q.**   You actually heard that?

**DIAZ - DIRECT / ORGAN**

1  A.   It broke me and I think my son.

2  Q.   If you had to do it again, would you recommend Demetric to

3  come work at Tesla?

4  A.   No, I would not.  Again, I'm saying that's the biggest

5  mistake I could have ever made for my son.

6       (Brief pause.)

7            MR. ORGAN:  Your Honor, would it be possible to take

8  our break just a little early?

9            THE COURT:  All right.

10      All right.  So ladies and gentlemen, we'll take our

11 morning break.  Fifteen minutes.  We'll be back at ten past.

12      Please remember the admonitions.

13      (Jury exits the courtroom at 9:54 a.m.)

14      (Proceedings were heard out of presence of the jury:)

15           THE COURT:  You can step down, Mr. Diaz.

16      (Witness steps down.)

17           THE COURT:  It is improper to begin a question with:

18 "The jury has got to be wondering."  "The jury is thinking."

19           MR. ORGAN:  I won't do it again, Your Honor.

20           THE COURT:  You did it twice.  Don't do it ever again.

21           MR. ORGAN:  I won't do it, Your Honor.

22           THE COURT:  All right.  We'll be in recess.

23      (Whereupon there was a recess in the proceedings

24       from 9:55 a.m. until 10:16 a.m.)

25           THE COURT:  All right.  Please be seated, everybody.

WHEELER - DIRECT / ALEXANDER

1       We think we have the technology working there, but just

2   raise your hand if the screen goes off and then we'll switch

3   things around.

4       And we're going to interrupt -- as I indicated earlier,

5   we're going to interrupt Mr. Diaz's testimony because the

6   plaintiff's have another witness.

7       And, Mr. Alexander.

8           **MR. ALEXANDER:**  Thank you, Your Honor.

9       With the Court's permission, we will call Michael Wheeler

10  at this time.

11          **THE COURT:**  All right.

12              **MICHAEL JOHN WHEELER**,

13  called as a witness for the Plaintiff, having been duly sworn,

14  testified as follows:

15          **THE WITNESS:**  I do.

16          **THE CLERK:**  Be seated.

17      State your full name for the record and spell it for the

18  court reporter.

19          **THE WITNESS:**  Michael John Wheeler.

20              **DIRECT EXAMINATION**

21  BY MR. ALEXANDER

22  **Q.**  Good morning, Mr. Wheeler.  Thank you very much for being

23  here.

24      Is there some time frame that you were employed with

25  Tesla?

**WHEELER - DIRECT / ALEXANDER**

1   A.   Yes.

2   Q.   And when was that time frame?

3   A.   April 23rd, 2015, to April 27th, 2016.

4   Q.   And how is it that you came to be employed with Tesla?

5   A.   Through a staffing agency.

6   Q.   And which staffing agency were you employed through?

7   A.   Chartwell.

8   Q.   And at the point when you left Tesla, what position did

9   you hold?

10  A.   Supervisor.

11  Q.   And how long were you a supervisor working inside the

12  Tesla facility?

13  A.   I want to say seven to eight months.

14  Q.   Are you familiar with Owen Diaz?

15  A.   Vaguely but, yes.

16  Q.   Okay.  And are you familiar with Tom Kawasaki?

17  A.   Yes.

18  Q.   And how is it that you are familiar with him?

19  A.   He was my supervisor before I was promoted.

20  Q.   Okay.  And in terms of roles, what role did Mr. Kawasaki

21  have?

22  A.   He was an environmental sustainability or recycling

23  supervisor.

24  Q.   And did you ever take over his role?

25  A.   I did.

**WHEELER - DIRECT / ALEXANDER**

1  Q.   And when, approximately, did you take over Mr. Kawasaki's

2  role?

3  A.   About five to six months into my stay at Tesla.

4  Q.   And so when you took over Mr. Kawasaki's role, did you

5  have some supervision responsibility associated with Owen Diaz?

6  A.   Yes.

7  Q.   Okay.  And in performing your job duties, did you have

8  some assessment of how Owen Diaz was performing his job?

9  A.   Yes.

10  Q.   And what was your assessment of Owen Diaz?

11  A.   An excellent worker.  On time.  Stayed when he needed to.

12  Leadership.

13  Q.   And what shift did your team work?

14  A.   We worked the 9:30 to 6:00.

15  Q.   And was Mr. Diaz on that shift?

16  A.   He did overlap onto that shift, yes.

17  Q.   Thank you.

18      Now, during the time frame that you were inside the Tesla

19  factory, 2015 to 2016, did you ever experience the "N" word?

20  A.   I did.

21  Q.   And what areas -- in performing your job duties, how is it

22  that you performed your job duties inside the facility?

23  A.   My job was to supervise 22 recycling employees.

24  Q.   And did you have occasion to use a cart?

25  A.   I did.

**WHEELER - DIRECT / ALEXANDER**

1  Q.   And what did you use that cart for?

2  A.   To get around the factory.

3  Q.   And so what areas of the factory did that cart take you

4  to?

5  A.   All areas.

6  Q.   And during the time frame that you were at Tesla riding on

7  the cart around the facility, did you hear the "N" word used?

8  A.   I did not.

9  Q.   You did not hear the "N" word used?

10  A.   Not while driving.

11  Q.   I missed -- I didn't hear that.  "Not..."

12  A.   Not while driving.

13  Q.   Not directed at you?

14       **THE COURT:**  Not while driving.

15       **THE WITNESS:**  No.  Not while driving the cart.

16  BY MR. ALEXANDER:

17  Q.   Not while driving.

18       While you were not driving the cart, did you hear the

19  "N" word?

20  A.   Yes.

21  Q.   In what areas did you hear the "N" word?

22  A.   All over the factory.

23  Q.   And when you say "all over the factory," can you describe

24  the areas of the factory where you heard the "N" word?

25  A.   From the recycling to the general assembly line.

**WHEELER - DIRECT / ALEXANDER**

```
1   Q.   And with regard to your hearing that, could you tell
2   whether you were hearing that from contract employees or direct
3   Tesla employees?
4   A.   Both.
5   Q.   And how often did you hear the "N" word used inside the
6   Tesla workplace?
7   A.   Every day.
8   Q.   And did you find -- when you heard the "N" word used
9   inside the Tesla workplace, did you find it offensive?
10  A.   Absolutely.
11  Q.   Did you ever hear the term "mayate"?
12  A.   Yes.
13  Q.   With regard to Ramon Diaz [sic], are you familiar with
14  him?
15  A.   Yes.
16  Q.   And with regard to Ramon Diaz [sic], did you ever hear him
17  use any racial slurs inside the Tesla workplace between 2015
18  and 2016?
19  A.   Not to my recollection.
20  Q.   While you were at Tesla, did you receive any training with
21  regard to its Anti-Handbook Handbook?
22  A.   No.
23  Q.   While you were at Tesla, did you receive any training with
24  regard to its Anti-Harassment Policy?
25  A.   No.
```

WHEELER - DIRECT / ALEXANDER

1   Q.   Safety training, did you receive that training at Tesla?

2   A.   Not at Tesla.

3   Q.   But you received that training before you received a

4   badge?

5   A.   Yes.

6          MS. JENG:  Objection.  Leading.

7          MR. ALEXANDER:  Happy to rephrase, Your Honor.

8          THE COURT:  Please rephrase.

9   BY MR. ALEXANDER:

10  Q.   You received a badge from Tesla; is that correct?

11  A.   Correct.

12  Q.   Did you receive any safety training before you received

13  that badge?

14  A.   From Chartwell.

15  Q.   Thank you.

16       During the time frame that you were at the company

17  between -- at Tesla between 2015 and 2016, did you ever come in

18  contact with swastikas?

19  A.   Yes.

20  Q.   Where?

21  A.   There was a gentleman walking passed the security door

22  that had a bald head and a swastika on his head.

23  Q.   Anywhere else that you saw swastikas?

24  A.   The restrooms.

25  Q.   Which restrooms?

WHEELER - DIRECT / ALEXANDER

1   **A.**   I know a couple.  Some on the second floor near the

2   cafeterias and then some in the downstairs bathrooms.

3   **Q.**   And when?  Do you recall when you saw the swastikas

4   present inside of the Tesla bathrooms?

5   **A.**   I do not recall approximate date.

6   **Q.**   Can you tell me whether it was the first half of the time

7   frame that you worked at Tesla or the last half as the time

8   that you worked at Tesla?

9   **A.**   I would say both.

10  **Q.**   Okay.  Did you see the swastika before you became a

11  supervisor?

12  **A.**   I would say yes.  Yes.

13  **Q.**   And then did you also see the swastika after the time

14  frame that you were a supervisor?

15  **A.**   Yes.

16  **Q.**   I want to talk about a drawing that was inside the

17  workplace.

18          **MR. ALEXANDER:**  If we could show Exhibit No. 33 and

19  the photograph.

20  **BY MR. ALEXANDER**

21  **Q.**   During the time frame that you were at the Tesla facility,

22  do you recall an occasion where you found that there was a

23  drawing found in the workplace?

24          **MR. ALEXANDER:**  If you could show the other version,

25  the bigger version.

```
 1          (Photo displayed.)

 2              THE WITNESS:  Yes.

 3   BY MR. ALEXANDER:

 4   Q.   How is it that you came to have contact with this drawing?

 5   Who brought your attention to it?

 6   A.   Upon coming to the factory early for my shift at 9:00, the

 7   swing shift supervisor approached me.

 8   Q.   The swing shift supervisor.  And ultimately did you end up

 9   in front of this bale with this drawing with people?

10   A.   Yes.

11   Q.   Who was present in front of the bale with you?

12   A.   Israel and Owen.

13   Q.   And how long did you, Israel, and Owen talk about the

14   drawing on this bale before anyone else arrived?

15   A.   I would say 10 to 15 minutes.

16   Q.   Okay.  Now, during the time that you were talking about

17   this incident, did you have a conversation with Owen?

18   A.   I did.

19   Q.   And did Owen express how he felt about this?

20   A.   He did.

21   Q.   And what did Owen say?

22   A.   Owen asked me what this represents and how I felt about

23   this.

24   Q.   And how did you feel when you saw this drawing?

25   A.   Upon seeing the word "booo," I thought it referred to the
```

1   derogatory language used towards African-Americans as a spook.

2   **Q.**   When you observed Owen in front of this bale, how did he

3   appear to you?

4   **A.**   He seemed -- well, he was upset.

5   **Q.**   Okay.  And did he actually state that he was upset?

6   **A.**   No.

7   **Q.**   Okay.  Now, at some point did Owen Diaz join -- I'm sorry.

8        And with regard to this drawing, did you find it

9   offensive?

10  **A.**   The drawing, not so much.  The words with the drawing,

11  absolutely.

12  **Q.**   The words with the drawing?

13  **A.**   Correct.

14  **Q.**   And is there some point at which Ramon Diaz [sic] joined

15  the group of people standing there associated with that bale?

16  **A.**   He did.

17  **Q.**   And do you know who brought Ramon Diaz [sic] over?

18  **A.**   Myself and Israel went to go retrieve him.

19  **Q.**   And at the point when you retrieved him, did you have any

20  understanding that he had any involvement with this drawing?

21  **A.**   Not at the moment.  We went to go see who was baling.

22  **Q.**   Okay.  And how long was Mr. Diaz [sic] there before he

23  indicated that he was involved with the drawing?

24       **THE COURT:**  Mr. Alexander, have you been referring to

25  Mr. Martinez or --

```
 1              MR. ALEXANDER:  I'm sorry.  Let me fix that.

 2              THE COURT:  Okay.  And you might --

 3   BY MR. ALEXANDER:

 4   Q.   How long was Mr. --

 5              THE COURT:  -- want to go back to an earlier question

 6   that you asked about "Ramon Diaz" using the "N" word, because I

 7   think you meant Mr. Martinez, but I don't know.

 8              MR. ALEXANDER:  I do.  I'm sorry.  Thank you.

 9   BY MR. ALEXANDER

10   Q.   With regard to use of the word "mayate," did

11   Mr. Ramirez -- Ramon Martinez -- did Ramon Martinez ever use

12   the "N" word or mayate in your presence?

13   A.   Not in my presence.

14   Q.   Okay.  When Mr. Martinez was brought to this drawing, how

15   long was he in front of the drawing before he acknowledged any

16   involvement with it?

17   A.   About five minutes, five to ten minutes.

18   Q.   And ultimately what is it that he finally said after he

19   had been standing there for five minutes?

20   A.   Once he realized the severity of the situation, he said

21   he's the one that drew the drawing.

22   Q.   Now, did he say anything else?  Did Mr. Martinez say

23   anything else during that time frame while you were standing in

24   front of the bale?

25   A.   If I recall correctly, he said he thought it was a joke.
```

**WHEELER - DIRECT / ALEXANDER**

1   **Q.**   Did he say anything else?

2   **A.**   Not to my recollection.

3   **Q.**   Is there any point while he was standing there that

4   Mr. Martinez apologized?

5   **A.**   No.

6   **Q.**   You're sure of that?

7   **A.**   I am not, but I do not remember an apology.

8   **Q.**   Okay.  Did Owen say that he thought that it was funny?

9   **A.**   Owen did not find it funny at any point in time.

10   **Q.**   Are there any occasions that you reported racial conduct

11   inside the workplace between 2015 and 2016?

12   **A.**   Yes.

13   **Q.**   And what incident happened with you that you thought was

14   racially motivated?

15   **A.**   I was requesting a subordinate to delete a picture that he

16   had taken of another associate, and he refused to do so.  And

17   in leaving, he -- yeah, he said:  FU, "N" word, and then walked

18   away.

19   **Q.**   And so this person who said "FU" and walked away, did you

20   report it?

21   **A.**   I did.

22   **Q.**   And who did you report it to?

23   **A.**   To my immediate supervisors, Ramon Martinez and --

24   **Q.**   Ramon Martinez was your immediate supervisor?

25   **A.**   He was my partner, partner supervisor.  We had two

 1  supervisors for the grave shift.

 2  **Q.**   And so as a result of reporting use of the "N" word

 3  towards you to Ramon Martinez, what action was taken?

 4  **A.**   There was no action taken.

 5  **Q.**   Okay.  And the person that had used the "N" word towards

 6  you, what ultimately happened to that person in terms of his

 7  position at the Tesla factory?

 8  **A.**   That individual received a promotion and was given his own

 9  section.

10  **Q.**   Now, is there any other incident that occurred to you

11  inside the workplace that you believed was racially motivated

12  directed towards you?

13  **A.**   Yes.

14  **Q.**   And can you describe that incident?

15  **A.**   There was a night I had taken -- there was a night I had

16  taken lunch, and I was on my lunch for about an hour.  And then

17  when I returned to my cart, I sat down, slid across the seat

18  like I did every night, and I felt something wet on my seat.

19  And it took me a second to process it.  I got back up and there

20  was feces all over my seat, all over my pants.  There was some

21  on my hands.

22  **Q.**   And did you report this incident of finding feces on your

23  cart to anyone at Tesla?

24  **A.**   I did.

25  **Q.**   Who did you report that to?

1   **A.**   Umm, everybody.  Security, all the supervisors, Ramon,

2   Jose Torres, Victor Quintero.

3   **Q.**   Ed Romero?

4   **A.**   Yes -- uh, I don't -- I do not recall for Ed, but...

5   **Q.**   So the department that you worked in, Victor Quintero was

6   ultimately over your department?

7   **A.**   Absolutely, yes.

8   **Q.**   So you reported it to numerous people in management and

9   supervision inside Tesla; right?

10  **A.**   I did, yes.

11  **Q.**   Now, the location where you found your cart with feces on

12  it, were there cameras?

13  **A.**   There were.

14  **Q.**   Can you estimate how many cameras were present?

15  **A.**   At least two.

16  **Q.**   And from where those cameras were present, would it have

17  been -- is it your belief that those cameras would have caught

18  whoever left this on your cart?

19          **MS. JENG:**  Objection.  Calls for speculation.

20          **THE COURT:**  Overruled.  You can answer.

21          **THE WITNESS:**  Absolutely.  I parked my cart next to

22  Elon's original roadsters where the charging stations were.

23  **BY MR. ALEXANDER**

24  **Q.**   And did you ask for Tesla to look at the video to figure

25  out who had left this feces on your cart?

**WHEELER - CROSS / JENG**

1  **A.**   I did.

2  **Q.**   And did Tesla conduct an investigation to your knowledge?

3  **A.**   They said there was no vision in that area.

4  **Q.**   They said there was no vision in that area?

5  **A.**   Correct.

6  **Q.**   Who is it that told you that?

7  **A.**   It just came from the security email.

8  **Q.**   Did anyone ever interview you?

9  **A.**   No.

10 **Q.**   Was there any retraining that occurred of the workplace to

11 indicate this was inappropriate?

12 **A.**   No.

13 **Q.**   During the time frame that you were at Tesla, did anyone

14 ever train you that Tesla had a zero tolerance policy for

15 harassment in the workplace?

16 **A.**   Not at all.

17        **MR. ALEXANDER:**  Nothing further.  Thank you.

18        **THE COURT:**  Ms. Jeng.

19                    <u>**CROSS-EXAMINATION**</u>

20 BY MS. JENG:

21 **Q.**   Mr. Wheeler, you started working at the Fremont factory in

22 April of 2015; is that right?

23 **A.**   Yes.

24 **Q.**   You worked at the Fremont factory to until approximately

25 April 2016?

**WHEELER - CROSS / JENG**

 1   **A.**   Yes.

 2   **Q.**   You never worked as an elevator operator; right?

 3   **A.**   No.

 4   **Q.**   Okay.  And you were employed by Chartwell throughout your

 5   entire assignment at Tesla; correct?

 6   **A.**   Correct.

 7   **Q.**   And you were assigned to Tesla through nextSource; is

 8   that right?

 9   **A.**   Yes.

10   **Q.**   After your assignment ended in April 2017, your employer

11   Chartwell actually placed you at a different assignment; is

12   that right?

13   **A.**   Yes.

14   **Q.**   At a bakery?

15   **A.**   DES, yes.

16   **Q.**   Okay.  So you were never employed directly by Tesla; is

17   that right?

18   **A.**   Correct.

19   **Q.**   Okay.  When you first started your assignment at the

20   factory through Chartwell, you actually received extensive

21   training through Chartwell; is that right?

22   **A.**   Not extensive but, yes, training.

23   **Q.**   All right.  Can I direct you to your deposition

24   transcript -- it should be in front you -- Page 47, Line 20

25   through -- one second -- 47, Line 2 -- oh, sorry.  46 -- I'm

**WHEELER - CROSS / JENG**

```
1    sorry.  46, Line 20 -- sorry.  I'll come back to this.
2         You received certification for harassment training;
3    correct?
4    A.   Can you repeat, please?
5    Q.   Sure.  You actually received a certification for
6    harassment training; correct?
7    A.   I received certification for all training.
8    Q.   I'm sorry.  Say that again.
9    A.   I received certification for all training.
10   Q.   Including harassment training; is that right?
11   A.   I cannot say directly.
12   Q.   Okay.  Okay.  Owen was an elevator lead, to your
13   understanding; correct?
14   A.   Correct.
15   Q.   And as a lead, you were actually Owen's superior; is that
16   right?
17   A.   Correct.
18   Q.   So you were supervising Owen when Owen was a lead;
19   correct?
20   A.   Yes.
21   Q.   Okay.  Ramon Martinez was also a lead; correct?
22   A.   No.  He was a supervisor.
23   Q.   It's your belief that Ramon was a supervisor at the time
24   that you were a supervisor --
25   A.   Yes.
```

WHEELER - CROSS / JENG

1   Q.   -- is that right?

2        Okay.  With regard to the drawing in 2016, when you first

3   saw the drawing, you were trying to figure out who drew it;

4   correct?

5   A.   No.  Not upon seeing the drawing initially.

6   Q.   I'm sorry.  Say it again.

7   A.   Not upon seeing the drawing initially.

8   Q.   Okay.  Well, within a few minutes, you were trying to

9   locate who it was that would have drawn this; correct?

10  A.   Yes.

11  Q.   And Ramon Martinez said that he was the one who drew it;

12  correct?

13  A.   After he realized the severity of the situation, yes.

14  Q.   Okay.  And you never believed that Ramon Martinez drew

15  this drawing; is that right?

16  A.   Correct.

17           MR. ALEXANDER:  Objection.  Relevance.

18           THE COURT:  Overruled.  You can answer, and you did.

19      So go ahead.

20           THE WITNESS:  Yes, I did not.

21  BY MS. JENG

22  Q.   Okay.  And even though you didn't believe that Ramon had

23  drawn the drawings, he was dead-set on taking accountability

24  for it; is that right?

25  A.   Only after we were talking about disciplinary action.

**WHEELER - CROSS / JENG**

1    Q.   So after you were talking about disciplinary action, Ramon

2    actually was dead-set on taking accountability for the drawing;

3    correct?

4    A.   Yes.

5    Q.   Okay.  You testified earlier that you actually had

6    reported the use of the "N" word at the factory; correct?

7    A.   Correct.

8    Q.   And you reported someone actually -- you were reporting

9    someone named Jesus; is that right?

10   A.   No.

11   Q.   So there is no one called Jesus that called you a

12   "N" word?

13   A.   Jesus called me the "N" word.  He was not the one I was

14   reporting to.

15   Q.   Jesus is not a Tesla employee; correct?

16   A.   Correct.

17   Q.   You were deposed in this case in 2019; correct?

18   A.   To my recollection.

19   Q.   At the time of your deposition, you actually didn't recall

20   seeing any swastikas in the bathrooms; is that right?

21   A.   I cannot say.  I have not been able to read my deposition.

22   Q.   Okay.

23        MS. JENG:  Hold on one second.

24        (Discussion held off the record amongst defense

25         counsel.)

```
 1   BY MS. JENG
 2   Q.    Can you turn to Page 51, Line 18, of your deposition?
 3         It says, Lines 16 through 19 (as read):
 4         "QUESTION:  Did you ever see a swastika in the
 5         bathrooms?
 6         "ANSWER:  Not that I was looking.  I wouldn't doubt
 7         it, though."
 8         Do you remember testifying to that?
 9   A.    I do reading it.
10   Q.    Okay.  In terms of hearing the term "mayate," you couldn't
11   tell us who you heard that from; right?
12   A.    No.  I've heard that so many times, I stopped listening.
13   Q.    Okay.  Your assignment with Tesla ended in April 2016;
14   correct?
15   A.    Uh-huh.
16   Q.    And Chartwell called you to end your assignment; correct?
17   A.    Yes.
18   Q.    It was possibly someone named Veronica from Chartwell
19   called you?
20   A.    Yes.
21   Q.    And at some point after your assignment ended, you called
22   Wayne Jackson to get a reason for your assignment ending;
23   correct?
24   A.    I did.
25   Q.    And Wayne told you it was because he received a complaint
```

```
 1   from someone against you; correct?
 2   A.    No.
 3   Q.    Wayne didn't tell you that?
 4   A.    No.
 5   Q.    He received a complaint from someone named Lars?
 6   A.    Not initially.  Not from the start, no.  I had to pry -- I
 7   had to beg him to tell me something.
 8   Q.    Okay.  So you had to pry from Wayne, and Wayne eventually
 9   told you that your assignment ended because there was a
10   complaint against you?
11   A.    They just gave it to me because I asked them for it.
12   Q.    They gave you the complaint?
13   A.    They gave me a complaint.  I asked them for something that
14   I could work through --
15   Q.    Okay.
16   A.    -- and that's what they gave me.
17   Q.    Okay.  You were very angry when your assignment ended at
18   Chartwell; is that right?
19   A.    The following day, yes.  But it wasn't anger.  It was
20   hurt.
21   Q.    You -- sorry.  Strike that.
22         You don't recall Owen ever talking to you about the use of
23   the "N" word at the factory, do you?
24   A.    Not prior to that scenario.
25   Q.    Prior to the cartoon scenario; right?
```

```
 1   A.    Yes.

 2   Q.    Well, you don't recall Owen ever talking to you about the

 3   use of the "N" word at the factory; correct?

 4   A.    Correct.

 5   Q.    And you don't recall Owen complaining that Ramon Martinez

 6   threatened him; correct?

 7   A.    I do not.

 8             MS. JENG:  No further questions.

 9             THE COURT:  Redirect?

10             MR. ALEXANDER:  Very briefly, Your Honor.

11                      REDIRECT EXAMINATION

12   BY MR. ALEXANDER

13   Q.    If you could turn to -- there's a deposition transcript, I

14   believe, that you have in front of you.  If you could turn to

15   Page 50, Line 23 --

16             MS. JENG:  Objection, Your Honor.

17   BY MR. ALEXANDER

18   Q.    Page 49 Line 23, to Page 50, Line 8.

19             MS. JENG:  Objection.  There's no foundation laid.

20   BY MR. ALEXANDER

21   Q.    You were --

22             THE COURT:  I don't think there's a questioning

23   pending, so we'll wait for the question.

24   BY MR. ALEXANDER

25   Q.    You were asked if Owen Diaz ever complained about the
```

1    "N" word.

2        Having read that passage, does that refresh your memory as

3    to Owen discussing the "N" word with you?

4    **A.**    You said Page 49?

5    **Q.**    Page 49, Line 23 --

6            **THE COURT:**  Page 50.

7    **BY MR. ALEXANDER:**

8    **Q.**    -- to Page 50, Line 8.

9            **THE COURT:**  I think you gave him a different thing

10   before which was 50, Line 23, to 51, Line 8, which I think also

11   relates to what you're looking at.

12           **MR. ALEXANDER:**  Right.

13           **THE COURT:**  Okay.

14   **BY MR. ALEXANDER**

15   **Q.**    Do you have that page?

16   **A.**    "I see the writing on the restrooms"?

17   **Q.**    Right.  And so let me just ask you a question about that.

18   **A.**    Okay.

19   **Q.**    Does that refresh your recollection that Owen did make

20   complaints about the "N" word?

21   **A.**    Yes.

22   **Q.**    And what is it that you recall Owen complaining about with

23   regard to the "N" word?

24   **A.**    I do not recall directly.  I --

25   **Q.**    At the time of your deposition, you were asked -- I'll

 1   begin at Line 4 through Line 8 (as read):
 2        "QUESTION:  Who told you that?
 3        "ANSWER:  I want to say I know Owen mentioned it.
 4        "QUESTION:  Okay.  So Owen Diaz mentioned to you that
 5        he had seen the "N" word in the bathrooms?
 6        "ANSWER:  Uh-huh."
 7        You gave that testimony at the time of your deposition?
 8   A.   Uh-huh.
 9   Q.   Yes?
10   A.   Yes.
11   Q.   And at the time of your deposition, you were being
12   truthful and under oath?
13   A.   Absolutely.
14        MR. ALEXANDER:  Nothing further.  Thank you, Your
15   Honor.
16        THE COURT:  Anything further?
17        MS. JENG:  Just one question.
18                    RECROSS-EXAMINATION
19   BY MS. JENG
20   Q.   Mr. Wheeler, you testified that you don't recall Owen
21   talking to you about Ramon Martinez using the "N" word towards
22   him; correct?
23   A.   Correct.
24        MS. JENG:  Okay.  No further questions.
25        THE WITNESS:  Until he just made that correction.

```
 1   BY MS. JENG:

 2   Q.   I'm sorry.  Say that again.

 3   A.   Until the correction was just made after reading the

 4   deposition.

 5   Q.   Okay.  Can I have you look at Page 72, Line 4 through 8?

 6   It says (as read):

 7        "QUESTION:  Now" --

 8           THE COURT:  Wait.  Wait, wait, wait.

 9        (Brief pause.)

10   BY MS. JENG

11   Q.   It says (as read):

12        "QUESTION:  Okay.  Now, Owen -- Owen also talked to

13        you about the fact that Ramon Martinez had used the

14        "N" word towards him; correct?

15        "ANSWER:  If he did, I don't remember too much about

16        that."

17        That's what you said at your deposition; right?

18   A.   I did.  And then it says (as read):

19        "ANSWER:  I do remember him talking about the usage

20        toward his son."

21   BY MS. JENG

22   Q.   Okay.  I'm sorry.  You just said you recall him telling

23   you about the "N" word towards his son --

24   A.   Correct.

25   Q.   -- is that right?
```

1          Okay.  You never met Mr. Diaz's son; correct?

2    A.   I did not.

3    Q.   And the first time Owen told you that his son was called

4    the "N" word was on a phone call sometime after you both had

5    left Tesla; right?

6               MR. ALEXANDER:  Objection.  Beyond the scope of cross.

7               THE COURT:  Overruled.  You can answer.

8               THE WITNESS:  Can you repeat the question?

9    BY MS. JENG

10   Q.   Sure.  The first time Owen told you that his son was

11   called the "N" word was a phone call sometime after you both

12   had left Tesla; is that right?

13   A.   I can't say "yes" or "no," but, yeah, probably over a

14   phone call.

15   Q.   Okay.  And on the same call he told you that his lawyers

16   would be calling you; right?

17   A.   He did say his lawyers would be calling me.

18   Q.   Okay.  So when -- the first time Owen told you about his

19   son being call the "N" word, he also told you that his lawyers

20   would be calling you; right?

21   A.   I do not remember them being in tandem.  I remember Owen

22   calling me and saying:  Hey, your name was mentioned, and

23   you'll be receiving a phone call from these individuals.  And

24   that was the majority of that conversation.

25   Q.   Okay.  And that was also the call where he told you that

1   his son was being called the "N" word; right?

2   **A.**   I do not recall.

3   **Q.**   Could I have you look at Page 52, Line 25, of your

4   deposition, to Page 53, Line 19?  Question --

5          **THE COURT:**  Give him an opportunity to read the

6   section that you have just provided.  I haven't been able to

7   read it yet, for example.

8       (Brief pause.)

9          **THE WITNESS:**  Yes, I've read it.

10  **BY MS. JENG**

11  **Q.**   Okay.  Here it says (as read):

12       **"QUESTION:**  He told you that -- well, tell me what

13       Owen said about the person calling his son the

14       "N" word.  Do you remember?

15       **"ANSWER:**  Not verbatim.  It was something along the

16       lines of he asked me -- I hadn't spoken to Owen in

17       awhile, but he gave me a call and he told me that I

18       may be receiving a call from his attorney.

19       **"QUESTION:**  Attorneys?

20       **"ANSWER:**  Yeah.

21       **"QUESTION:**  When was this?  How long ago was this?

22       **"ANSWER:**  Year and a half.

23       **"QUESTION:**  Okay.

24       **"ANSWER:**  Maybe longer.

25       **"QUESTION:**  Okay.

```
 1        "ANSWER:  Two years?  It's been awhile.
 2        "QUESTION:  Okay.  So a couple of years ago you got a
 3    call from Owen Diaz saying that you -- that you had --
 4    that you might be getting a call from his lawyers; is
 5    that correct?
 6        "ANSWER:  Yes.  He told me he used my name."
 7    Your deposition --
 8           MR. ALEXANDER:  I'm sorry.  If we could complete the
 9  passage and go down to Line 22?
10           THE COURT:  Yeah.
11           MS. JENG:  Okay.
12  BY MS. JENG
13  Q.   (As read):
14       "QUESTION:  Okay.
15       "ANSWER:  So just heads-up.
16       "QUESTION:  Did he ask you to say anything that wasn't
17    the truth?
18       "ANSWER:  No.  He asked me to -- because he was aware
19    of some evidence that I have."
20    Your deposition was in June 2019; correct?
21  A.   Correct.
22  Q.   So Owen's phone call to you telling you about his
23  attorneys and his son being called the "N" word, two years
24  before that was in approximately June 2017; correct?
25  A.   Seems so.
```

1           MS. JENG:  No further questions.

2           THE WITNESS:  I wanted to state that everything I had

3    said in response to your question is what my deposition also

4    says.  It doesn't say anything about Owen mentioning his son to

5    me on this phone call.

6           MS. JENG:  Okay.

7           MR. ALEXANDER:  Nothing further, Your Honor.

8           THE COURT:  All right.  Mr. Wheeler, thank you.

9    You're excused.

10          THE WITNESS:  Thank you.

11       (Witness excused.)

12          THE COURT:  So, Mr. Diaz, I think you're back up.

13                    **OWEN ORAPIO DIAZ,**

14   called as a witness for the Plaintiff herein, having been

15   previously sworn, resumed the stand and testified further as

16   follows:

17          MS. KENNEDY:  Is there a place where I could sit so I

18   could see?

19          THE COURT:  There is a chair that you could roll over.

20          MS. KENNEDY:  Okay.  I can sit over here?

21          THE COURT:  Yes.

22          MS. KENNEDY:  I don't want to --

23          THE COURT:  Usually we have these sort of archaic

24   rules about how close people can be to jurors and, you know,

25   where you are in the courtroom; but sometimes the lawyers need

**DIAZ - DIRECT / ORGAN**

 1    to set things up the way that they are, and so I appreciate

 2    Ms. Kennedy asking where she can be.

 3        But go wherever you can see what Mr. Organ is up to.

 4        **MS. KENNEDY:**  Okay.  Thank you.  Thank you, Your

 5    Honor.

 6        And I will speak up for the court reporter.

 7        **THE COURT:**  Mr. Organ, go ahead.

 8        **MR. ORGAN:**  Thank you, Your Honor.

 9                     **DIRECT EXAMINATION RESUMED**

10    BY MR. ORGAN

11    **Q.**   Owen, if you could, turn to Exhibit 222.

12    **A.**   222, yes, sir.

13        **MR. ORGAN:**  Which I believe is admitted, Your Honor.

14    BY MR. ORGAN

15    **Q.**   This -- reading this email, who was it who promoted you to

16    a lead on August 17th of 2015?  Do you know?

17    **A.**   It was Victor Quintero.

18    **Q.**   Okay.  And who else told you that you had a promotion?

19    Anybody else other than Victor?

20    **A.**   Edward Romero.

21    **Q.**   Okay.  Now, what I'd like to do now is move to an incident

22    on October 17th of 2015.

23        If you look at Exhibit 235 --

24        **MR. ORGAN:**  And I believe this is admitted,

25    Your Honor.

DIAZ - DIRECT / ORGAN

```
 1            MS. KENNEDY:  Your Honor, no objection.
 2        (Document displayed.)
 3   BY MR. ORGAN
 4   Q.    So did you write Exhibit 235?
 5   A.    Yes, I did.
 6   Q.    And why did you write it?
 7   A.    Because I had an interaction, a negative interaction, with
 8   Mr. Martinez.
 9   Q.    If you could, go back in time and take us back to that
10   point in time.  How did this interaction with Ramon Martinez
11   start?
12   A.    I -- all I can tell you, I don't know how it started.  I
13   was training a new employee, which was Rothaj Foster.
14   Q.    Are you a lead at this point in time?
15   A.    Yes, sir.
16   Q.    Okay.  And so you're -- I'm sorry.  I interrupted.  You're
17   training who was it?
18   A.    Rothaj Foster.
19   Q.    Okay.  And what happens in terms of -- between you and
20   Ramon Martinez?
21   A.    So I'm training Mr. Foster, letting him know the policies
22   of the elevator and the things that we do on the elevator,
23   telling him when he gets his breaks and stuff like that.  And
24   as I was starting to get to the point where Tom Kawasaki
25   wouldn't be our supervisor anymore, it would be Ed Romero,
```

**DIAZ - DIRECT / ORGAN**

1    because Tom Kawasaki was taking a training class and he was

2    about to become a certified plumber.

3    **Q.**    Okay.  And what happened?  What was said in terms of your

4    actions?  Does he move towards you?  Do you move towards him?

5    When you open the elevator -- strike that.  I'll start over.

6         When you -- the elevator doors open.  What happens?

7    **A.**    As I'm explaining this to Mr. Foster, that Thomas Kawasaki

8    wouldn't be our immediate supervisor anymore, the elevator

9    doors parted, I saw Mr. Martinez sitting there on a blue

10   tugger.  He --

11   **Q.**    What's a tugger?

12   **A.**    A tugger is a piece of equipment that Tesla uses to load

13   cardboard and other recycling materials onto.  It's like a

14   train, and you pull all this heavy stuff through the -- through

15   the factory and deliver it to its destination.

16   **Q.**    What does he do when the doors open?  Ramon, what does he

17   do?

18   **A.**    He jumps off the tugger and rushes into the elevator and

19   starts saying did I have a problem with him and starting

20   cursing and calling me the "N" word.  He was saying:  "Ns" are

21   shit.  Excuse my language.

22        But as he was saying this, you know, he was getting closer

23   and closer, and he -- he had his fist balled up and:  Do you

24   got a problem?  He was saying he was going to beat me up and

25   stuff like that.

1          So what I did was, is I immediately threw my hands up into

2     the neutral position and opened my hands.  I backed up against

3     the wall and actually ended up climbing a piece of equipment

4     that I was there with.

5          And he got so close he was within inches of my face, you

6     know.  And I'm like:  Hey, hey, man.  I even cursed back.  I

7     was telling him get the "F" out of my face.

8          And from there, it seemed like it was getting pretty

9     intense, and I pointed to the surveillance system and I'm like:

10    Hey, man, we're on surveillance.  And after I told him that, he

11    rushed out of the elevator.

12    **Q.**   Okay.  And you mentioned he said the "N" word.  That's not

13    in your Exhibit 235 in your statement.  Why not?  Why didn't

14    you include the "N" word in the statement if he had said it?

15    **A.**   Umm, reason being is because we had the surveillance

16    system right there, you know.  I just figured Tesla would pull

17    the -- pull the video surveillance and then come and interview

18    me and then we can discuss all that.

19         I just didn't put it in the email because, you know, like

20    I said, in a workplace, that word is not supposed to be used.

21    **Q.**   Okay.  But didn't you want Tesla to know about him using

22    the "N" word?

23    **A.**   Yes.  But I had complained before and, you know, it was

24    just like me complaining that I'm breathing.

25    **Q.**   What do you mean by that?

**DIAZ - DIRECT / ORGAN**

1    A.    You know, you can -- I would tell Ed Romero at times, you

2    know, because what would end up happening is, is Ed Romero

3    would come in in the morning times and, you know, he would talk

4    to me.   And we would sit there at the cafeteria and have

5    breakfast and stuff like that, and then me and Mr. Ed Romero

6    would go over some of the events that happened and some of the

7    things and ways that we can improve elevator -- elevator

8    efficiency.

9    Q.    Did you -- on this date, did you have a conversation with

10   Ed Romero about what had happened between you and Ramon

11   Martinez?

12   A.    I sent out an email letting them know and I tagged -- I

13   believe I tagged Mr. Romero into the email.

14   Q.    Did you have a followup conversation with Mr. Romero?

15   A.    Afterwards?

16   Q.    Yeah.   After you sent the email.

17   A.    No.   Mr. Romero, you know, what he did was -- I believe I

18   could have talked to him, but I asked him talk to him, but

19   Mr. Morerro [sic] -- I mean, Mr. Ed Romero -- oh, I butchered

20   his name, I'm sorry.   Mr. Ed Romero, he had -- did like he

21   normally do:   Get some rest and I'll deal with the situation.

22   Q.    Okay.   So did you tell Mr. Romero about the "N" word when

23   you talked to him personally?

24   A.    Yes, I did, sir.

25   Q.    And did you talk to Tom Kawasaki, too?

```
 1   A.    Yes, I did.  I called Mr. Kawasaki for advice on how to

 2   handle the situation.

 3   Q.    Okay.  And did you tell him about it, the "N" word?

 4   A.    Yes.  I explained to Mr. Kawasaki about what was going on.

 5   Q.    Okay.  Now, if I can, if you could turn to Exhibit 234.

 6         MR. ORGAN:  That should be in your notebook,

 7   Your Honor.  Yeah, okay.

 8       And this is admissible, Your Honor.  I'd move it into

 9   evidence.

10         MS. KENNEDY:  No objection.  It's already admitted.

11         THE COURT:  Okay.  Go ahead.

12         MR. ORGAN:  Okay.  I didn't have that, so thank you.

13       (Document displayed)

14   BY MR. ORGAN

15   Q.    This statement here is made by Mr. Martinez.  Do you see

16   that?

17   A.    Yes, I see it, sir.

18   Q.    And he says you're acting in an unprofessional way.  He

19   actually sent his about an hour and 15 minutes before you sent

20   yours -- an hour and 14 minutes before you sent -- an hour and

21   12 minutes before you sent yours.

22       Did you know that he had sent an email?

23   A.    No, I did not.

24   Q.    And you said that you had been using curse words; is that

25   correct?
```

**DIAZ - DIRECT / ORGAN**

1   A.   Yes, I used curse words.  I told him to get the "F" out of

2   my face.  So, you know, it was a heated argument.

3   Q.   And you would agree that that's not professional; right?

4   A.   No, that's not professional.

5   Q.   Okay.  But did you know about his email at the time that

6   you had the interaction with him?

7   A.   No, I did not.

8   Q.   Okay.  And I notice you didn't copy Ramon Martinez on your

9   complaint letter?

10   A.   No, I did not.

11   Q.   Okay.  Now, let's go forward to January, January 21st of

12   2016.

13        Oh, before we do that.  So with respect to this

14   10/17 incident, did you report the "N" word?

15   A.   Yes, I did.

16   Q.   And you reported it to both Kawasaki --

17   A.   And Ed Romero.

18   Q.   -- and Ed Romero?

19        Okay.  Did anybody at Tesla ever tell you if you

20   complained about something, you had to complain about it in

21   writing?

22   A.   No, they did not.

23   Q.   Okay.  While we have that up there, before we go to

24   January, you had an interaction -- after this 10/17 incident in

25   the elevator, you had an interaction with Rothaj Foster; is

1    that right?

2    **A.**    Yes, I did, sir.

3    **Q.**    You were supervising him?

4    **A.**    Yes, I did, sir.

5    **Q.**    And there's a date on here November 5th.  Did that

6    interaction involve the "N" word in any way?

7    **A.**    No.  Mr. Foster told me he was going to shoot me.  He

8    never called me the "N" word.

9    **Q.**    Okay.  So there was no "N" word to report on November 5th;

10   is that correct?

11   **A.**    That's correct, sir.

12   **Q.**    Okay.  Let's go to January 21st, 2016.  Tell me what you

13   were doing that night?  Were you working the night shift?

14   **A.**    Yes, sir.

15   **Q.**    And just tell the jury, what's the night shift?  What are

16   the hours for the night shift?

17   **A.**    From 6:00 p.m. to 6:00 a.m.

18   **Q.**    Okay.  And what were you doing the night of January 21st?

19   **A.**    The night of January 21st I was, umm, doing what I would

20   normally do.  The line had asked me to bring up a certain

21   product.  It was some plastic things that they needed to put

22   inside the batteries.  If they didn't get them up to the line

23   in enough time, the line would go down.

24         So I had got the stuff.  I had brought it upstairs, and I

25   headed over to the line.  I believe I was gone away from the

DIAZ - DIRECT / ORGAN

1    elevator maybe about five minutes or so.

2         I come back to the elevator and there was a forklift

3    sitting with a cardboard bale on the forklift.  It was kind of

4    unusual because it wasn't in the drop zone.  It was just kind

5    of sitting, I'm going to say, not in the exact middle of the

6    floor, but just to the -- to the right of the floor.

7         So I jumped on the pallet rider that I would normally jump

8    on and --

9    Q.   Tell the jury, what's a pallet rider?

10   A.   A pallet rider is almost like a manual pallet jack, except

11   you can ride it and it's battery powered.  You can take that

12   and you can be able to lift things that you wouldn't normally

13   be able to lift and pull things around.  So it gave you more of

14   versatility of handling equipment -- I mean, product.

15   Q.   You mentioned a drop zone.  What's that?

16   A.   The drop zone is -- they had a designated drop zone

17   upstairs that was for products going downstairs or either

18   recycling or something that we was taking downstairs.  And then

19   they had a dedicated one on the other side where we had brought

20   the material, the raw materials, upstairs and we staged it

21   there.

22        Then they had another one that was downstairs where they

23   would stage the raw material to go up to the elevator.  And

24   then we would bring the finished products, or either the

25   recycling or garbage, whatever they had, and we would bring it

 1  downstairs and put it in another zone.

 2  **Q.**   So go back to the pallet rider.  You jumped on the pallet

 3  rider.  What do you do next?

 4  **A.**   Well, what I would normally do, I jumped on the pallet

 5  rider.  When I jumped on the pallet rider, I tried to -- I

 6  pulled out to get in position.  And when I pulled out to get in

 7  position, I drove out.  It was, like, a little lever that you

 8  press like this and, you know, it will move it.  If you press

 9  it other way, it will move the pallet rider forward, either

10  reverse or forward.

11       So I went forward to pull out so I can go ahead and get in

12  position so I can pull up the bale, get up under the bale and

13  pull it straight up.

14       So as I'm pulling in position and I look up, and that's

15  when I noticed the picaninny that was on the cardboard bale.

16  **Q.**   If you look at Exhibit 1, is that what you saw?

17  **A.**   Yes, that's what I saw.  That's the pallet rider I was on,

18  and that was my lunch inside of the -- inside of the red bucket

19  there.

20           **MR. ORGAN:**  Your Honor, I'd move Exhibit 1 into

21  evidence.

22           **MS. KENNEDY:**  Your Honor, it's already admitted.  No

23  objection.

24           **THE COURT:**  This specific picture isn't, but I will

25  admit it.

```
 1            (Trial Exhibit 1 received in evidence)

 2            MR. ORGAN:  Okay.  And can we publish this,

 3   Your Honor?

 4            THE COURT:  Yes.

 5            MR. ORGAN:  Thank you, Your Honor.

 6       (Photograph displayed.)

 7   BY MR. ORGAN

 8   Q.   So you had pulled the thing with the red bucket and your

 9   Jolly Ranchers and stuff, that's part of the pallet rider; is

10   that right?

11   A.   Yes, it's part of the pallet rider.  You can see how I

12   pulled it in.  Like the forklift, you can see a picture at the

13   top of the forklift, that's directly behind it.

14       And then, you know, the forklift is up and it was holding

15   the bale, but I can still pull the bale off the forklift.  All

16   I had to do was just -- just go slightly to the side, and I can

17   align my forks up with it and pull it away from the -- the --

18   the forklift.

19   Q.   Okay.  And so you saw it.  What's your reaction?  What's

20   going on through your head?

21   A.   The first thing is, you know, I recognized it.  My stomach

22   dropped.  It felt like, man, somebody had kicked me.  It was

23   like:  Man, really?  Really come on, man.  Not this.

24       And then from there, you know, I started to process it a

25   little bit more because, you know, I knew exactly what it is.
```

DIAZ - DIRECT / ORGAN

1    It is a cartoon that when I was a kid that -- that was

2    derogatory.  It was by Warner Brothers back in the early '40s

3    and '50's, and they pulled it in the '40s and '50's because

4    they knew it was racist.

5    **Q.**   And, you know, some of the jury might not know about this,

6    so why don't you tell them --

7              **MS. KENNEDY:**  Objection, Your Honor.

8              **THE COURT:**  Sustained.  Argumentative.  Please stop.

9              **MR. ORGAN:**  I withdraw that.  I apologize, Your Honor.

10   **BY MR. ORGAN**

11   **Q.**   If you could, please describe the cartoon in terms of how

12   it depicted -- well, strike that.

13        Did the cartoons that came into your mind depict

14   African-Americans in any position?

15   **A.**   Umm, this cartoon, when I was young, it showed that, you

16   know, this -- this particular character was running around

17   chasing after fried chicken and was a buffoon running around

18   saying "mammy" and "master" and stuff like that.

19   **Q.**   And the bone in the hair, did that have anything -- any

20   significance?

21   **A.**   If I had a picture of the cartoon right now, you couldn't

22   distinguish neither/or.  It's -- it's the same cartoon.  The

23   bone in the hair with the straight up, and, you know, it --

24   it -- it -- well, it -- it looks like, umm, like they was

25   saying.  It was calling us savages, dummies, you know.

**DIAZ - DIRECT / ORGAN**

1    **Q.**   Okay.  What happens next?  After you pull in and you see

2    this, what -- how would you describe this drawing?  What would

3    you call it?

4    **A.**   I describe it as a picaninny.

5    **Q.**   A picaninny, okay.

6        And what do you do after you pull in and you see the

7    picaninny?

8    **A.**   At that point I'm trying to get to the bottom of it.  So I

9    contact Michael Wheeler, and he was one of the supervisors.  So

10   I contact Michael Wheeler and let him know that I believe

11   somebody on his team had did it.

12       Michael Wheeler, he came over with Israel.  I still don't

13   know Israel's last name.  So him and Israel came.  While we

14   were upstairs, we were sitting there discussing it.  I'd

15   already took pictures, and they were taking pictures at the

16   same time.  I'm believing that they're going to do the same

17   thing I'm going to do, is document it.

18       So from there Michael Wheeler and Israel went to the

19   recycling center that was upstairs, which was like a satellite

20   recycling center.  You know, they had balers and stuff like

21   that.  Then they came back with Mr. Martinez.

22       So when they came back with Mr. Martinez, we're still

23   talking and then reluctantly, you know, he -- he admitted that

24   he had drew it.

25    **Q.**   Did Mr. Martinez admit that he drew it as soon as he got

DIAZ - DIRECT / ORGAN

1    there?

2    A.    No.   Umm, I believe it took Mr. Wheeler and Israel a

3    little prodding to get it up out of him.

4    Q.    Did he ever apologize to you about -- strike that.

5          At some point in time does he take -- does Ramon Martinez

6    say that he drew it?

7    A.    Well, yes.  Because of the fact that -- I believe after

8    they went over there, he was the only one that was in that

9    recycling center.

10         MS. KENNEDY:  Objection.  Move to strike as

11   nonresponsive after "no."

12         THE COURT:  Overruled.  You can proceed with this.

13         MR. ORGAN:  Okay.

14   BY MR. ORGAN

15   Q.    Tell me, in terms of what happens next after -- after

16   you're there for a bit of time, did Mr. Martinez ever apologize

17   to you during that interaction with you, Mr. Wheeler, Israel,

18   and Mr. Martinez?

19   A.    No.  He never apologized; but if you want to take -- if

20   you people can't take a joke as an apology, no.  He never

21   apologized.

22   Q.    Is that what he said?  Is that what Ramon Martinez said?

23   A.    That's what he said.

24   Q.    Okay.  And then what happens next?

25   A.    Umm, after that, umm, I had to -- I had to stop one of the

1    employees.  I believe it was Lamar Patterson, I had to stop him

2    from pulling up the bale and taking it away.  I was like:

3    Wait.  Wait.  Wait.  We've got to do what we've got to do to

4    finish the documentation.

5          Then after that, we -- we went our respectable ways.  I

6    couldn't write the email that I wanted to write right then and

7    there, reason being that because I had other duties.  So, you

8    know, over the course of the night I wrote the email and I sent

9    the email out.

10   Q.   Is that why the email is timed at 8:42 the next day?

11   A.   Yes, sir.

12   Q.   Okay.  And then what happened after you sent the email,

13   which is Exhibit 33?

14   A.   After I sent the email, first I -- I didn't really hear

15   too much back about it.  And then from there I think --

16              MR. ORGAN:  Your Honor, can I put up 33?

17              THE COURT:  Sure.

18              MR. ORGAN:  Thanks.

19        (Document displayed.)

20   BY MR. ORGAN

21   Q.   After you send this email, what happens next?

22   A.   So after I send the email, I believe it was -- I don't

23   remember her name, but someone called me and they asked me

24   what -- how did I feel and things like that and everything

25   else.

 1       So when they doing the phone interview, I had told them

 2    about the history of Ramon.  I explained to them that he had

 3    been going around calling me the "N" word, telling me to go

 4    back to Africa.

 5       I also had explained to them and mentioned the history of

 6    everything that went on, that -- what happened into the

 7    elevator.  You know, just in -- I just gave it to her in

 8    detail.

 9    Q.   Okay.  And what did she say in response to your telling

10    her about your history with Ramon?

11            MS. KENNEDY:  Objection.  Calls for hearsay.

12            THE COURT:  Overruled.

13            THE WITNESS:  Umm, she didn't say anything.  She just

14    actually went to the next question.

15    BY MR. ORGAN

16    Q.   Okay.  And how are you feeling about Tesla now in this

17    January time period?

18    A.   I was -- at that point I was done with Tesla.  I'll just

19    keep it real.  I -- even though I was still working there, my

20    heart just wasn't in it anymore.

21    Q.   Okay.  I'd like to take you to Exhibit 245.

22            MR. ORGAN:  Which I believe is stipulated to,

23    Your Honor.

24            THE COURT:  All right.  Then it's admitted.

25            (Trial Exhibit 245 received in evidence)

1  BY MR. ORGAN

2  Q.   If you could, sir, turn to the second page of Exhibit 245.

3       (Document displayed.)

4  A.   I'm here.

5  Q.   You mentioned Lamar Patterson.  Who is Lamar Patterson?

6  A.   Lamar Patterson was another one of the guys that I was

7  supervising.

8  Q.   Okay.  So he worked on the elevators?

9  A.   Yeah, he did.

10 Q.   Was he a friend of yours -- strike that.

11      How do you know Lamar Patterson?  How did you first learn

12 about Lamar Patterson?

13 A.   I first learned about Lamar Patterson, it was one of the

14 Tesla workers that had walked up to me, I can't remember what

15 his name was, but he had said -- he had asked me was there any

16 openings in the elevator.  And I told him, yes, you know,

17 because I was shorthanded.  Some nights I would run the

18 elevator by myself so I was shorthanded.  So I definitely could

19 use the help.

20      And he said that he had a cousin that needed a job.  And

21 what I did at that point, I told him it was open, and he asked

22 could he have his cousin send me a resume and could I forward

23 it, and I agreed to that.

24 Q.   Did you know whether Lamar was black or not?

25 A.   No, not at that time.

1    **Q.**    But was the cousin black?

2    **A.**    I think he was biracial.

3    **Q.**    Biracial, okay.

4          Did you warn Lamar Patterson about Tesla, about the --

5    about your work environment?

6    **A.**    Again, all I did was just forwarded a resume.

7    **Q.**    Okay.  So this is describing some incident, it looks like,

8    between you and Robert.  Is that Robert Hurtado?

9    **A.**    Yes.

10   **Q.**    Did you ask Lamar Patterson to write this?

11   **A.**    Yes, I did.

12   **Q.**    Okay.  And why did you ask Lamar Patterson to write this

13   page from Exhibit 245?

14   **A.**    Basically as protection, you know, because of the fact

15   that Mr. Hurtado was coming into the elevator.  He was calling

16   me the "N" word.  Telling me:  "N," hurry up and push the

17   button.  Or either:  "N," push the batteries onto the elevator,

18   and things like that.

19         So at this particular time we were in the elevator, and me

20   and Lamar Patterson was talking having a conversation among

21   ourselves, and Mr. Hurtado interjected.  And he had been --

22   like I said, he had been using these racial slurs towards me

23   for awhile so I just was shutting down on him.

24         So he kept going and kept asking, trying to pry in.  And I

25   walked over to him and I told him:  No disrespect, but if it

1  doesn't have anything to do with this job, don't talk to me.

2  You know, if it's not business related.

3      I explained to him we're not friends.  I don't know you.

4  We don't sit at each other's table and eat.  You know, the

5  things that you've been doing that I've been asking you to

6  stop, but you still won't stop.  So, you know, if it doesn't

7  have anything to do with this job, please don't talk to me.

8  Q.   Okay.  So based on our chart here, it looks like

9  Mr. Hurtado has been calling you the "N" word from August to

10  this February -- end of February time period; is that right?

11  A.   That's right, sir.

12  Q.   Okay.  Did you complain to anybody?  Well, did you

13  complain to Robert that he was using the "N" word?

14  A.   I said -- I told him to stop using it towards me.  I

15  even -- at one point I even went over to -- I believe her name

16  is Joyce, which was his immediate supervisor, and I explained

17  to Joyce what he was doing.

18      And, you know, it was -- it just seemed like everything

19  just started breaking down because in the beginning -- me and

20  Joyce had a pretty good relationship in the beginning.  She had

21  came to me one day and said:  Hey, they're going to fire me.

22  They're going to fire me.  Can you please help me get this drop

23  zone cleaned up?  So I helped her out.  I took my time and

24  cleaned out the drop zone.

25      You know, it was like when I was doing what they wanted me

DIAZ - DIRECT / ORGAN

 1   to do and I never complained about it, everything was A-okay;

 2   but as soon as I started complaining, I became enemy number

 3   one.

 4   Q.   Okay.  I want to take you now to Exhibit 68.

 5        Actually, before we go to Exhibit 68, shortly after this

 6   incident on February 26th, your mother passed; is that right?

 7   A.   Yes, she did.

 8   Q.   And you took some time off for bereavement leave; is that

 9   right?

10   A.   Yes, I did.

11   Q.   After that, do you remember coming back to Tesla?

12   A.   I don't remember coming back.  Reason being is after my

13   mother had passed away, I just couldn't take it.  If I entered

14   that factory, I don't know what I would have did.

15   Q.   Okay.  Please turn to Exhibit 68.

16   A.   Thank you.

17        MR. ORGAN:  Your Honor, I believe this is stipulated

18   as admissible.

19        MS. KENNEDY:  Yes, it is.  It is stipulated.

20        THE COURT:  It's admitted and you can publish it.

21        (Trial Exhibit 68 received in evidence)

22        (Document displayed.)

23   BY MR. ORGAN

24   Q.   Now, with Exhibit 68, this has a separation date of -- or

25   end-of-your-contract date for May 4th of 2016.  Did you get any

**DIAZ - DIRECT / ORGAN**

 1   kind of notice from Tesla about that?

 2   **A.**   No, sir.

 3   **Q.**   If you could please turn -- I want to dial back in time

 4   just a little bit to shortly after you started, about a month

 5   in.  And if you look at Exhibit 217, do you see that?

 6   **A.**   Yes, sir.

 7         **MR. ORGAN:**   Your Honor, it's stipulated as admitted.

 8   Can I --

 9         **THE COURT:**   All right.

10         **MS. KENNEDY:**   No objection, Your Honor.

11         **THE COURT:**   It's admitted.

12      (Trial Exhibit 217 received in evidence)

13      (Document displayed.)

14   **BY MR. ORGAN**

15   **Q.**   Now, this is actually exactly a month after you started,

16   July 3rd.  Do you see that?

17   **A.**   Yes, sir.

18   **Q.**   And turn to the third page.

19      (Photograph displayed.)

20   **Q.**   And it looks like there's something broken there.

21   **A.**   Yes.  That's a battery charger.

22   **Q.**   It's a what?

23   **A.**   It's a battery charger, what we used to use to charge up

24   forklifts and tuggers and the pallet riders and stuff like

25   that.  Any of the battery or powered equipment that you can

1   use, plugging up this and charge it.

2   Q.   Okay.  And according to this incident report, you had

3   something to do with that broken charger; is that right?

4   A.   Yes, I did.  Unfortunately, I wasn't paying attention and

5   I thought I was in reverse, but I was going in forward, and I

6   had clipped the bottom of that.

7        So after I clipped the bottom of it, the first thing

8   was -- well, the protocol was the first thing you do is report

9   it to a supervisor or somebody that was above you to let them

10  know what happened.

11  Q.   Why didn't you just drive off and blame somebody else?

12  A.   It was my responsibility, sir.

13  Q.   Okay.  I'd like to now, if we could -- if you could turn

14  to Exhibit 222.

15       (Demonstrative displayed.)

16  Q.   Exhibit 222, that's dated August 17th of 2015; correct?

17  A.   Yes, I see that.

18          MR. ORGAN:  And I believe this one has been admitted,

19  Your Honor.

20          THE COURT:  It has.

21       (Document displayed.)

22  BY MR. ORGAN

23  Q.   And I think you testified earlier that Victor Quintero and

24  Ed Romero are the ones who told you about this promotion and

25  pay raise; is that correct?

**DIAZ - DIRECT / ORGAN**

```
1    A.    Yes, sir.

2    Q.    So it wasn't CitiStaff who increased your pay, as far as

3    you knew; correct?

4    A.    After the first initial contact with filling out the

5    application stuff with CitiStaff, that was the only -- that was

6    the only contact I had with them.  After that, everything was

7    handled through Tesla.

8    Q.    Did CitiStaff call you up and say:  Hey, you're getting a

9    pay increase?

10   A.    No, they did not.

11   Q.    Okay.  Now, let's turn to -- now, this has a reference to

12   it, 224.  So let's turn to Exhibit 224.  Do you see

13   Exhibit 224?

14   A.    Yes, I have it, sir.

15   Q.    What's the date of Exhibit 224?

16         MR. ORGAN:  Your Honor, I shouldn't do that.  Can I

17   move Exhibit 224 into evidence?

18         MS. KENNEDY:  No objection.

19         THE COURT:  It's admitted.

20      (Trial Exhibit 224 received in evidence)

21      (Document displayed.)

22   BY MR. ORGAN

23   Q.    What's the date on Exhibit 224?

24   A.    The date of the email was sent 8/23/2015.

25   Q.    Okay.  So the exhibit number that's listed here, 224, that
```

DIAZ - DIRECT / ORGAN

```
 1  has a later date, right --
 2  A.   Yes, sir.
 3  Q.   -- than August 17th?
 4  A.   Yes, sir.
 5  Q.   Okay.  Does that document say anything about CitiStaff
 6  giving you a pay increase?
 7           MS. KENNEDY:  Objection.  The document speaks for
 8  itself.  Calls for speculation.
 9           THE COURT:  Sustained.
10           MR. ORGAN:  I'll withdraw it.
11  BY MR. ORGAN
12  Q.   Okay.  Let's go to Exhibit 261, if you could, sir.
13       And do you recognize Exhibit 261?
14  A.   Can you place it on the board?  I don't have Exhibit 261
15  in my binder.
16  Q.   You don't have it?
17  A.   No, sir.
18       (Whereupon exhibit binder was tendered to the
19        witness.)
20           THE WITNESS:  Thank you.  I appreciate that, sir.
21           MR. ORGAN:  I apologize.
22  BY MR. ORGAN
23  Q.   Do you recognize what Exhibit 261 is?
24  A.   Yes.  That's the Indeed -- I applied for Indeed, an
25  application.
```

**DIAZ - DIRECT / ORGAN**

1   **Q.**   And what's the date of the application?

2   **A.**   It's December 3rd, 2015.

3   **Q.**   Okay.  And why are you applying for a job through Indeed

4   on December 3rd of 2015?

5   **A.**   I was always taught by my parents to don't leave a job

6   until you had another job.

7   **Q.**   Okay.  Let's go to Exhibit --

8           **THE COURT:**  Did you want to move that into evidence?

9           **MR. ORGAN:**  Oh, yes, Your Honor.

10          **MS. KENNEDY:**  No objection.

11          **THE COURT:**  All right.  It's admitted.

12          **MR. ORGAN:**  Yes, please.  Thank you, Your Honor.

13      (Trial Exhibit 261 received in evidence)

14  **BY MR. ORGAN**

15  **Q.**   I'd like you to turn to Exhibit 293, please.

16  **A.**   I'm here, sir.

17  **Q.**   Okay.

18          **MR. ORGAN:**  And I believe this is stipulated,

19  Your Honor.

20          **MS. KENNEDY:**  Yes.  No objection.

21          **THE COURT:**  All right.  It's admitted.

22      (Trial Exhibit 293 received in evidence)

23  **BY MR. ORGAN**

24  **Q.**   This appears to be an email from Ed Romero to Wayne

25  Jackson, Victor Quintero and some others of a pay increase.

DIAZ - DIRECT / ORGAN

1    Did you get a pay increase in this end of January of 2016?

2    **A.**   Yes, I did.

3    **Q.**   Okay.  And did Ed Romero tell you about that pay increase?

4    **A.**   Yes, he did.

5    **Q.**   Did Ed Romero work for CitiStaff on this date,

6    January 28th, 2016?

7              **MS. KENNEDY:**  Objection.  Lack of foundation.

8              **THE COURT:**  If you know, you may answer.

9              **THE WITNESS:**  Umm, I always believed that when I met

10   Ed Romero, that he worked for Tesla.

11   **BY MR. ORGAN**

12   **Q.**   Okay.  Now, let's go to Exhibit 68.  Now, we just saw

13   that.  Do you see the date on that?

14   **A.**   Exhibit 68, yeah, was sent on 5/4/2016.

15   **Q.**   Okay.  And did CitiStaff notify you on May 4th of 2016

16   that you had been terminated from Tesla?

17   **A.**   Like I said before, after the first one, initial contact

18   that I had with CitiStaff, I never had contact with them again.

19   **Q.**   What about your paychecks?

20   **A.**   My paychecks, the first initial contact I picked up my

21   paycheck maybe once or twice.  Then everything else was handled

22   inside of Tesla.  I clocked in in Tesla.  I had filled out

23   another piece of paper and that was, I believe, for my direct

24   deposit.

25   **Q.**   Okay.  If I could get you to turn to Exhibit 320.

**DIAZ - DIRECT / ORGAN**

1   **A.**    I'm there, sir.

2   **Q.**    Okay.  And...

3        (Brief pause.)

4            **MR. ORGAN:**  Your Honor, I would move Exhibit 320 into

5   evidence.

6            **THE COURT:**  Any objection?

7            **MS. KENNEDY:**  No.  No objection, Your Honor.  It's

8   fine.

9            **THE COURT:**  Okay.  It's admitted.

10       (Trial Exhibit 320 received in evidence)

11  **BY MR. ORGAN**

12  **Q.**   Were you informed -- this email here is dated March 18th

13  of 2016.  Do you see that?

14       (Document displayed.)

15  **A.**    Yes, I see it.

16  **Q.**    Okay.  So it's not dated May 4th; right?

17  **A.**    No, it's not.

18  **Q.**    Let go to Exhibit 324.

19           **MR. ORGAN:**  I would move Exhibit 324 into evidence,

20  Your Honor.

21           **THE COURT:**  Any objection?

22           **MS. KENNEDY:**  No objection.  It's fine.

23           **THE COURT:**  It's admitted.

24       (Trial Exhibit 324 received in evidence)

25

1   BY MR. ORGAN

2   Q.   Exhibit 324 is dated 5/4/2016.  Do you see that?

3   A.   Yes, sir.

4   Q.   And did Victor Quintero or anybody contact you on that

5   date relative to your email account getting terminated -- your

6   Tesla email account getting terminated at that point in time?

7   A.   No, they didn't tell me that.

8   Q.   If you look at the top it says (as read):

9           "Thank you for letting us know.  I have ended

10      Owen's contract and workday effective immediately."

11      That's from Lindsay James of Tesla HR.  Do you know who

12   that is?

13   A.   No, I do not know who Lindsay James is, sir.

14   Q.   And then if you go to Exhibit 325.

15          MR. ORGAN:  I'd like to move that in, Your Honor.

16          THE COURT:  Any objection?

17          MS. KENNEDY:  No, Your Honor.

18          THE COURT:  It's admitted.

19      (Trial Exhibit 325 received in evidence)

20          MR. ORGAN:  Sorry.  I jumped on you, Your Honor.  Did

21   you say it was admitted?

22          THE COURT:  Yes, it's admitted.

23          MR. ORGAN:  Could we publish this?

24          THE COURT:  Yes.

25      (Document displayed.)

DIAZ - DIRECT / ORGAN

1  BY MR. ORGAN

2  Q.   Exhibit 325, this says that you were a contingent worker

3  with nextSource and that your Tesla email account has been

4  ended.

5       Did anyone email you to let you know that on your personal

6  email?

7  A.   No, sir.  If they had, I would have gave it to you.

8  Q.   Okay.  Now I'd like to go back to this demonstrative.

9       (Demonstrative displayed.)

10 Q.   Going back to the January 22nd event where it's noted here

11 that you didn't report the "N" word, this is in the incident

12 regarding the picaninny, the drawing.

13      Was the "N" word involved in that incident at all?

14 A.   No, sir.

15 Q.   So there was nothing to report relative to the "N" word on

16 that date?

17 A.   Not to the "N" word, but to the picaninny and the "booo,"

18 yes.

19 Q.   Okay.  And then as to 2/26/2016, that was that interaction

20 with Robert Hurtado that was documented in part by Lamar

21 Patterson; right, sir?

22 A.   Yes, sir.

23 Q.   You did actually report to Robert or complain to Robert

24 about his use of the "N" word on that occasion; correct?

25 A.   Yes.  I had told him to stop directing it towards me, but

**DIAZ - DIRECT / ORGAN**

 1   I told him that if it wasn't about the job, please don't talk

 2   to me anymore.

 3   **Q.**   Now, going back to that exhibit with Lamar, do you have

 4   any understanding as to why it didn't include the "N" word in

 5   his report?

 6         **MS. KENNEDY:**  Objection.  Calls for speculation.

 7         **THE COURT:**  Sustained.

 8   **BY MR. ORGAN:**

 9   **Q.**   You didn't tell Lamar what to write in the email to you;

10   is that correct?

11         **MS. KENNEDY:**  Objection.  Leading.

12         **THE COURT:**  Sustained.

13   **BY PLAINTIFF'S ATTORNEY**

14   **Q.**   You mentioned earlier that you asked Lamar to send you an

15   email; right?

16   **A.**   Yes, sir.

17   **Q.**   Did you say anything else to Lamar when you asked him to

18   write you an email about what it should contain?

19   **A.**   No, I didn't tell him what it should contain.

20   **Q.**   Okay.  So I'd like to ask you to look at Exhibit 109,

21   please.

22         **MR. ORGAN:**  This is not in, Your Honor.  This is

23   subject to some of your prior instructions.

24         **THE COURT:**  Okay.  I don't seem to have it, and I hope

25   it's not being shown to anybody.

1           MR. ORGAN:  It's not, Your Honor.

2           THE COURT:  All right.  It's not up here either, so...

3           MR. ORGAN:  I have another copy here.  Can I give it

4     to Madam Clerk?

5           THE COURT:  Yes.

6        (Whereupon document was tendered to the Court.)

7     BY MR. ORGAN:

8     Q.    If you look at the third page of Exhibit 109 --

9     A.    I don't have 109.

10    Q.    Oh, you don't have 109 in your book either?

11       (Whereupon document was tendered to the witness.)

12          THE WITNESS:  Thank you, sir.

13          THE COURT:  That's just for the witness and lawyers at

14    this point.

15    BY MR. ORGAN

16    Q.    In terms of the third page of Exhibit 109, there is some

17    graffiti there.  Do you see that?

18    A.    Yes, sir.

19    Q.    Can you say whether or not you have seen graffiti similar

20    to that at any time while you were at Tesla?

21    A.    Yes, sir.  This looks like the stuff that they were doing

22    that I mentioned earlier with the paint marker.

23          MR. ORGAN:  Your Honor, I would move Exhibit 109 in.

24          MS. KENNEDY:  Objection.  Lacks foundation.

25          THE COURT:  Sustained.

DIAZ - DIRECT / ORGAN

 1                MS. KENNEDY:  And beyond the scope again.

 2                THE COURT:  Sustained.

 3                MS. KENNEDY:  Thank you.

 4    BY MR. ORGAN

 5    Q.    When you left Tesla, on your last day or in your last few

 6    days, did you see any graffiti in the bathrooms then?

 7    A.    Yes, sir.

 8    Q.    And did the graffiti that you saw then resemble the

 9    graffiti that's in Exhibit 109?

10    A.    Yes, sir.  It's identical, like I said, to the stuff that

11    I was saying earlier with the swastikas and, you know, Die

12    "Ns," and We hate all "Ns," and stuff like that.

13    Q.    Okay.

14                MR. ORGAN:  Your Honor, I would move 109 in.

15                MS. KENNEDY:  Same objections, Your Honor.

16                THE COURT:  Sustained.  Same ruling.

17                MR. ORGAN:  Okay.

18    BY MR. ORGAN

19    Q.    Let's change topics.

20    A.    Yes, sir.

21    Q.    So how did it make you feel to be exposed to --

22                THE COURT:  You know, actually, let me stop you here.

23    I think this would be a good time for our second break of the

24    day before we get into that.

25          So, ladies and gentlemen, we'll take a 15-minute recess

1   and we'll be back at noon.

2         (Jury exits the courtroom at 11:41 a.m.)

3         (Proceedings were heard out of presence of the jury:)

4         **THE COURT:**  We'll be in recess.

5      Just as a reminder to everybody, you don't need to ask me

6   whether you can publish a document that's in.  You may not show

7   a document that is not in.

8         **MR. ORGAN:**  Thank you, Your Honor.

9         (Whereupon there was a recess in the proceedings

10        from 11:42 a.m. 12:01 p.m.)

11        (Proceedings were heard in the presence of the jury:)

12        **THE COURT:**  All right.  Please be seated, everybody.

13     Mr. Organ, please proceed.

14        **MR. ORGAN:**  Thank you, Your Honor.

15  **BY MR. ORGAN**

16  **Q.**   Mr. Diaz, we're about ready to talk about how this has

17  impacted you.  So let me ask a question.

18     How do you think your experience at Tesla has changed you

19  individually?

20  **A.**   Umm, it -- it made me lose kind of like faith in my

21  human -- in my fellow humans.  It let me see another type of

22  something that I hadn't really -- I had experienced it, but it

23  let me see through the eyes of my parents.

24     So what I mean by that is -- is, you know, when my parents

25  was back -- when they first came here, you know, the dogs being

1  sicced on them and stuff like that, you know.  It left me so

2  shaken that it even -- it even had -- it translated over into

3  my marriage.

4      I was just so devastated that I couldn't help my son, and

5  I started seeing things that he was going through.  And he had

6  started to be to the point where he was like:  If they think

7  that I'm like this, I might as well start acting like this.  He

8  started hanging with the wrong crowd.

9      I started having sleepless nights.  I couldn't -- you

10  know, me and my wife -- I am embarrassed to say this, but I

11  couldn't even perform with my wife, you know.  My wife was --

12  she needed -- needed to be, you know -- she needed things like

13  every woman, and I couldn't provide that to her.

14      It -- it just -- you know, I couldn't eat.  I was a bigger

15  guy than this.  It caused me to lose weight, which I'm not

16  going to say that's a bad thing.  I did lose weight.  It was

17  good for that.

18      But it -- it's just -- you know, when I meet people now,

19  when -- I was just more of an outward-going person.  Now when I

20  meet people of color, I've kind of got to think and wonder what

21  do they really feel about me when I never had to do that

22  before.  You know, it was just meet a person and, you know, hi,

23  and then you get to know each other, talk, see if you have the

24  same type of interests that line up and later on you guys might

25  become friends.

DIAZ - DIRECT / ORGAN

1          But it just got so -- so bad and so devastating.  It was

2     like I was in a shell.  I was in a cocoon.  Some days I would

3     just sit on my stairs and cry.

4          You know, if it wasn't for the gardening and my dogs and

5     stuff like that and support of my sister, I don't know if I

6     could have got through it.

7     Q.   Are you still suffering?

8     A.   Yes.  Yes, I am, because right now I still have to live

9     this moment, you know, and I still have to live with what I did

10    to my son's life.  You know, I have to -- I still just got to

11    survive.  That's the bottom Line.  I've got to survive some

12    sort of way.

13    Q.   You still are working; is that true?

14    A.   Yeah.  I got another job.  I actually like it.

15    Q.   What do you do?

16    A.   Now I drive a bus for Ac Transit.

17    Q.   Okay.

18    A.   So, you know, I deal with the public, but, you know, at

19    the same time there are a lot of things I don't have to go

20    through.  All I have to do is just be mindful and be careful

21    when I'm transporting people.  You know, and I could just stay

22    in that zone and just -- you know, just drive until I get off

23    of work, just like everything.  I wasn't behind the wheel.

24    It's just no way.

25    Q.   How often do -- how often does it come to your mind what

1   happened at Tesla?

2   A.   Lately, it's been playing in my mind every day wondering

3   what I could have done to prevent certain things.  And, you

4   know, it's just -- just self-doubt, period.  Wondering, you

5   know, if -- if I was the man I was supposed to be, if I made

6   the right decisions, you know, just within context.  I even --

7   I even doubt myself.

8   Q.   Before Tesla, would you -- were you someone who would cry

9   easily?

10   A.   Nah.

11   Q.   And you mentioned some issues with your wife.  Other than

12   that, have there been other physical ways that it's affected

13   you?  You lost weight?

14   A.   Yeah.  I couldn't eat.  You know, like I said, I couldn't

15   eat.  I would just sit up late at night.  You know, like my

16   wife would come downstairs sometimes and I would be sitting on

17   the -- on the stairs and because -- she would ask me what was

18   wrong, I wouldn't tell her.  Reason being is she used to work

19   for Brinks and her friend was killed in front of her.  So she's

20   kind of like got some issues.  She got a few issues, so...

21   Q.   Okay.  So you didn't talk to her about what was going on

22   at Tesla?

23   A.   No.

24   Q.   Did you tell your family about what was going on at Tesla?

25   A.   I talked to my sister.  I talked to my friends.  You know,

1    I couldn't -- like I said, I couldn't really get the outlet

2    that I really wanted, but I talked to a few people.

3    **Q.**    Okay.  You mentioned that you had talked to Demetric a

4    little bit about it; is that right?

5    **A.**    Yes, I did.

6    **Q.**    What does the future look like to you?

7    **A.**    I -- it is what it is, you know.  I have to just survive

8    and just keep going.  You know, we even -- even though at some

9    point, you know, I -- I just -- hopefully, I can just forget

10   and forgive, you know.  I just wish the world was better -- a

11   better place.

12   **Q.**    And why did you bring this lawsuit?

13   **A.**    For one, I worked there; and for two, I just want to get

14   it out.

15        You know, as things has been happening, like what happened

16   to Michael Wheeler, people wiping feces on the golf carts and

17   stuff like that, you know, everything has been -- been closed,

18   contained, and there's a lot of these people that want to get

19   the word out but just don't have the outlet like I have right

20   now.

21            **MR. ORGAN:**  No further questions, Your Honor.

22            **THE COURT:**  All right.

23            **MS. KENNEDY:**  May I have two minutes to get set up?

24            **THE COURT:**  Sure.

25        (Pause in proceedings.)

1          MS. KENNEDY:  May I proceed, Your Honor?

2          THE COURT:  Please.

3                        CROSS-EXAMINATION

4     BY MS. KENNEDY

5     Q.   Good afternoon, Mr. Diaz.

6     A.   Good afternoon.

7     Q.   As I understand, you applied for a position with CitiStaff

8     in about June of 2015; is that right?

9     A.   No, that's not right.  I applied for a position with Tesla

10    and I was directed to CitiStaff.

11    Q.   But you filled out a CitiStaff application, would that be

12    correct?

13    A.   First, I filled out whatever application that was on

14    Indeed, and then I was directed over to CitiStaff, and then

15    from there I filled out more application papers.

16    Q.   All right.  Will you turn in your notebook -- it should be

17    the black notebook there -- and go to Exhibit 204, which we'll

18    have marked for identification.

19         (Trial Exhibit 204 marked for identification)

20    Q.   Just for the record, it appears to be a CitiStaff

21    Solutions, Inc. application.  It appears to be two pages.

22         Take a minute to read that, Mr. Diaz.  When you're done,

23    let me know.

24         (Witness complied.)

25    A.   I'm done, ma'am.

**DIAZ - CROSS / KENNEDY**

1   Q.   And on the second page do you recognize your signature?

2   A.   Yes.  That's my signature at the bottom.

3   Q.   Okay.  And did you fill out this application --

4        MR. ORGAN:  Objection, Your Honor.  This is not the

5   agreed-to exhibit.  If you look at Page 2 --

6        THE COURT:  Oh, I see what you're saying.  Yes.

7        Do you have a document that doesn't have the second line

8   there?

9        MS. KENNEDY:  I'm sorry.  I didn't hear you.

10       THE COURT:  Did you agree to --

11       MR. ORGAN:  Yes, Your Honor.

12       THE COURT:  -- alter this document slightly in order

13  to make it admissible?

14       MS. KENNEDY:  Oh.  Yes.  Yes, it's supposed to be

15  redacted at the top.  Yes, that is correct.

16       THE COURT:  Okay.  So I'm not admitting what I've got.

17       MS. KENNEDY:  That's fine.  You're correct.  Thank

18  you.

19  BY MS. KENNEDY

20  Q.   I don't want to show it, but do you recall this

21  application for CitiStaff in June of 2015?

22  A.   Yes.  This is the second time after I was directed from

23  Indeed and I went into CitiStaff's location, they had had me

24  fill this out.

25  Q.   Correct.  My question is:  Do you recall if you filled out

1    this handwritten application before you were directed to Tesla?

2    A.    No, I did not fill it out before I was directed with the

3    application.  No.

4         Like I said before, what I did was is, on Indeed -- I

5    filled out an application on Indeed.  Then I was -- I got an

6    email and the email directed me over to CitiStaff; and when I

7    went to CitiStaff, I filled out this paper, ma'am.

8    Q.    Right.  And so once you were directed through Indeed to

9    CitiStaff, then you filled out a CitiStaff application;

10   correct?

11   A.    Yes.  I filled out would have been theirs too.

12   Q.    And then once you filled out the CitiStaff application,

13   you found out you were going to be assigned to work at the

14   Tesla facility in Fremont; is that correct?

15   A.    Yes.  At some point they did, yes, ma'am.

16   Q.    Let's go to Exhibit 62, which I don't believe it was in

17   that notebook, but it was admitted through your counsel.  Maybe

18   in the white notebook, sir.

19        (Document displayed.)

20   Q.    And do you have this in front of you?

21   A.    Yes, I do, ma'am.

22   Q.    And I think you testified that this was your application.

23   Was that your testimony?

24   A.    No, I did not specify this was the application.  This

25   looks like a document that came from Tesla that they were using

DIAZ - CROSS / KENNEDY

 1    for whatever purposes.  This is not what I received.

 2    **Q.**   Okay.  So is it your understanding in looking at this

 3    Exhibit 62 that this was the Tesla requisition from your

 4    staffing agency for your assignment?  Is that your

 5    understanding?

 6              **MR. ORGAN:**  Objection.  Foundation, Your Honor.

 7              **THE COURT:**  You can answer if you know what you're

 8    being asked.

 9              **THE WITNESS:**  I don't know what this is.

10    **BY MS. KENNEDY**

11    **Q.**   Okay.  So in Exhibit 62 you have no idea what that

12    document is?  Is that your testimony?

13    **A.**   I can read.  Yes, this document right here is telling me

14    that it has:  Full View, Short View Application, Details, Work

15    History, Contract Details, Roland's.

16        So, to me, this actually looks like it's something that

17    only Tesla would have been using, ma'am.

18    **Q.**   During your assignment at Tesla, did you ever see

19    Exhibit 62?

20    **A.**   No.  I've never seen this at my assignment at Tesla.

21    **Q.**   Is the first time you saw this Exhibit 62 was during this

22    litigation?

23    **A.**   I could have seen it before that, but I'm -- now that I've

24    really had a chance to sit here and look at the document.

25    **Q.**   Okay.  Will you go to Exhibit 200?  I'm sorry, sir.  It's

 1    going to be in the black notebook.  And it's marked for

 2    identification only.

 3        (Trial Exhibit 200 marked for identification)

 4        **THE WITNESS:**  Did you say 200, ma'am?

 5    **BY MS. KENNEDY:**

 6    **Q.**   Yes.  200 in the black notebook.

 7    **A.**   Thank you.

 8    **Q.**   And for identification, this is a four-page document and

 9    it appears to be a resume for Owen Diaz.  Let me know if you

10    recognize that and let me know when you're done.

11    **A.**   Yes, I seen this document before, ma'am.

12    **Q.**   And was that, in fact, your resume that you submitted as

13    part of your Indeed application process for either Tesla,

14    according to you, or CitiStaff?

15    **A.**   I would use a variation of this application -- I mean,

16    this -- this resume.

17    **Q.**   Do you know if this is your resume you submitted as part

18    of your application process at all?

19    **A.**   It's been so long ago, I don't remember.

20    **Q.**   Okay.  And take a look this Exhibit 200.  Let me know if

21    it was -- if it appears to be accurate to you and is, in fact,

22    your resume.

23        **MR. ORGAN:**  Objection.  Compound, Your Honor.

24        **THE COURT:**  Overruled.  You can answer those

25    questions.

DIAZ - CROSS / KENNEDY

```
 1          (Brief pause.)
 2              THE WITNESS:  This seems to be the highlights -- some
 3     of the highlights of my things, yes.
 4              MS. KENNEDY:  Your Honor, I move to admit Exhibit 204.
 5              THE COURT:  200?
 6              MS. KENNEDY:  I'm sorry.  Exhibit 200.  Excuse me,
 7     exhibit 200.
 8              THE COURT:  Any objection?
 9              MR. ORGAN:  No, Your Honor.
10              THE COURT:  It's admitted.
11          (Trial Exhibit 200 received in evidence)
12     BY MS. KENNEDY:
13     Q.   And let's take a look at the first page of your resume
14     where it says "Qualification Highlights" and "Skills and
15     Experience."
16          Mr. Diaz, do those accurately reflect what your
17     professional accomplishments were, according to this resume?
18          (Document displayed.)
19     A.   Them are my skills, yes.
20     Q.   And if you go to the second page of Exhibit 200, 200-2, it
21     talks about some of your work experience.
22          And do you see where it says:
23              "Shift Leader.  CitiStaff, Inc., LLC/Tesla
24          Motors - Newark California, May 2015 to the present"?
25          Do you see that?
```

1   **A.**   Yes, I see that.

2   **Q.**   In looking at that date, do you have an idea as to now

3   when you prepared this resume, Exhibit 200?

4   **A.**   Actually, I didn't prepare -- I didn't prepare this

5   resume.

6   **Q.**   Was this prepared for you?

7   **A.**   I believe it was my nephew that did it for me.

8   **Q.**   And you see where it says "Accomplishments"?  It says

9   (as read):

10          "Made shift leader 30 days after employment.  Help

11      set up a stage drop zone for finishing goods."

12      That was part of your assignment as the elevator operator

13   when you were assigned to Tesla; correct?

14   **A.**   Yes, but the made 30 days lead, that seems like a typo to

15   me.

16   **Q.**   Oh, okay.  So it was more about 60 days?  Sometime like

17   August of 2015-ish?

18   **A.**   It was -- it was later than that, than 30 days.

19   **Q.**   I'm sorry.  It was later than the --

20   **A.**   Than the 30 days as stated here, yes.

21   **Q.**   Okay.  So it says May 2015.  You actually started in June

22   of 2015; correct?

23   **A.**   Like I said, again, I didn't prepare this.  My nephew did.

24   **Q.**   Okay.  And this was prepared after you were assigned to

25   work at the Tesla facility by CitiStaff; correct?

 1   **A.**   Yes, I believe it was.

 2   **Q.**   And in the 2015 and 2016 time period when you were

 3   assigned to work at the Tesla facility, you were living with

 4   your -- your son Demetric was living with you along with your

 5   stepdaughter La'Drea?  There were both living with you in the

 6   house along with your wife; correct?

 7   **A.**   Yes and no.  My youngest son was living with me and my

 8   wife, and I believe my oldest daughter was off at college at

 9   that time.

10   **Q.**   And was she --

11   **A.**   Not my oldest, but my -- the older one than Demetric,

12   yeah.

13   **Q.**   Right.  And is that La'Drea?

14   **A.**   Yes, that's La'Drea.

15   **Q.**   Was she going to Dillard University at the time, in maybe

16   the summer of 2015?

17   **A.**   When I was working at Tesla, I believe she was at Dillard

18   at that time.

19   **Q.**   And during the time you worked at Tesla, did she return

20   and continue to live with you and your wife and your son

21   Demetric?

22   **A.**   At some point when she finished school, yes, she -- well,

23   she didn't finish Dillard.  She came back and went to

24   Holy Names, but at some point she came back, yes.

25   **Q.**   And sometime in June of 2015, you were hired through the

DIAZ - CROSS / KENNEDY

1    staffing agency CitiStaff and you were then assigned to work at

2    Tesla; is that right?

3    A.   Yes.

4    Q.   And as part of the onboarding with CitiStaff, you signed

5    some onboarding documents; correct?

6    A.   I don't know what you mean by "onboarding."  Can you

7    please be more specific?

8    Q.   Yeah.  So like new hire documents, you know, acknowledging

9    the policies or acknowledging certain duties and

10   responsibilities.  Onboarding, new hire packages.  Do you

11   recall that?

12   A.   While I was at CitiStaff, I did fill out a packet, yes.

13   Q.   Let's turn to Exhibit 205.

14        MS. KENNEDY:  Your Honor, it's marked for

15   identification only, Exhibit 205, which is a one-page document.

16        (Trial Exhibit 205 marked for identification)

17   BY MS. KENNEDY

18   Q.   It appears to be dated June 2nd, 2015.

19        Mr. Diaz, read that and let me know when you're done.

20        (Witness complied.)

21   A.   I'm done, ma'am.

22   Q.   And do you recognize this document as a document entitled

23   "Assignment Abandonment/Walk Off" that you signed on June 2nd,

24   2015?

25   A.   Yes, I did.

DIAZ - CROSS / KENNEDY

1  Q.   And when you signed this document, did you read this

2  document?

3  A.   If I signed it, I did read it.

4  Q.   And did you understand that this was a document from

5  CitiStaff Solutions about your employment with

6  CitiStaff Solutions as of June 2nd, 2015?

7  A.   Yes.

8       MS. KENNEDY:  Your Honor, I move to admit Exhibit 205.

9       MR. ORGAN:  No objection, Your Honor.

10      THE COURT:  It's admitted.

11      (Trial Exhibit 205 received in evidence)

12      MS. KENNEDY:  All right.

13      (Document displayed.)

14 BY MS. KENNEDY

15 Q.   So, Mr. Diaz, taking a look at Exhibit 205, take a look at

16 Paragraph 6, please.  Take a minute to read that and when

17 you're done, let me know.

18      (Witness complied.)

19 A.   Yes, I read it.

20 Q.   Now, sometime in March of 2016, did you have any

21 discussion with anyone at CitiStaff about not returning to work

22 and your assignment at Tesla?

23 A.   I don't believe so, ma'am.

24 Q.   Okay.

25      All right.  Let's take a look Paragraph 2, please, of

**DIAZ - CROSS / KENNEDY**

1    Exhibit 205.

2        Do you see Paragraph 2 is (as read):

3            "If you're not interested in the assignment,

4        please let your representative know in advance and

5        leave the opportunity to an associate that is willing

6        to work"?

7        Did you ever talk to anyone at CitiStaff about wanting to

8    leave your assignment at Tesla?

9    A.   No, I did not, ma'am.

10   Q.   Did you ever receive a paycheck from Tesla?

11   A.   No.  My paychecks did not have Tesla's name on it, no.

12   Q.   Did you ever receive a W-2 form from Tesla?

13   A.   No, ma'am.

14   Q.   You only received paychecks from CitiStaff; is that

15   correct?

16   A.   CitiStaff is who paid me, yes.

17   Q.   And, in fact, I think you testified earlier that once you

18   started, you didn't go back to CitiStaff for any type of

19   paychecks or any type of payroll; is that correct?

20   A.   No.  I didn't have to.

21       **THE COURT:**  I can't see you, Mr. Organ.  So if you're

22   going to make an objection, make sure you make it into the

23   microphone.

24       **MR. ORGAN:**  I will do that, Your Honor.

25       **MS. KENNEDY:**  Is that better, Your Honor?

DIAZ - CROSS / KENNEDY

```
 1              THE COURT:  Well, if it's better to see Mr. Organ,
 2    yes.
 3              MS. KENNEDY:  I'll move it back a little farther.
 4              MR. ORGAN:  I think he wants you to move it back.
 5              MS. KENNEDY:  I'll move it back.  That's better.
 6    BY MS. KENNEDY:
 7    Q.   Mr. Diaz, as part of your employment with CitiStaff, you
 8    actually completed a direct deposit form so you could be paid
 9    through CitiStaff; correct?
10    A.   Yes.
11    Q.   Did you ever complete any type of direct deposit forms for
12    Tesla?
13    A.   No.
14    Q.   Mr. Diaz, did you ever get my type of written contract
15    from Tesla?
16              MR. ORGAN:  Objection.  Calls for a legal conclusion,
17    Your Honor.
18              THE COURT:  You can answer that.  Any sort of a
19    written agreement from Tesla?
20              THE WITNESS:  I did get an agreement, but I don't know
21    if the NDA was part that.  So can you be a little more
22    specific, ma'am?
23    BY MS. KENNEDY
24    Q.   Sure.
25         Did you ever get any written document from Tesla saying
```

**DIAZ - CROSS / KENNEDY**

1   that you were a Tesla employee at any point in time?

2   **A.**   No, ma'am.

3   **Q.**   Lets go to Exhibit 19.

4         **MS. KENNEDY:**   19 has been admitted, Your Honor.   It's

5   the badge.

6         **THE COURT:**   Okay.

7         (Document displayed.)

8   **BY MS. KENNEDY**

9   **Q.**   Mr. Diaz, you got this badge, I think you said, around

10  your first day of employment with CitiStaff Solutions; is that

11  correct?

12  **A.**   I got that badge the first day I walked inside of Tesla.

13  **Q.**   Right.   And that was before you said you started your

14  safety trainings; correct?   Orientations and your safety

15  trainings?

16  **A.**   Yes.

17  **Q.**   And as you can see, it says "Contractor" on the left-hand

18  side of your badge.   Do you see that?

19  **A.**   Yes, I see that under the "Certified Forklift" sign,

20  ma'am.

21  **Q.**   Right.   And on top of that it says "Tesla Motors";

22  correct?

23  **A.**   Yes.

24  **Q.**   And you're required to wear this badge at all times when

25  you were in the Tesla facility; correct?

1   A.   No.  It looks beat up because it was in my wallet, ma'am.

2   Q.   Okay.  You had to have it on you at all times; correct?

3   A.   Yes.  That's the only way I can get in and out of the

4   building.

5   Q.   Right.  So this Tesla badge was to let you get entry into

6   the facility; correct?

7   A.   Yes.

8   Q.   And is it also -- do you have an understanding as to

9   whether any contractor, whether they're a contractor through a

10  staffing agency or a third-party contractor, who is coming in

11  to the factory where you worked for more than a few days, if

12  they have to go through any type of safety training to be on

13  the factory floor?

14  A.   I wouldn't have knowledge of that, ma'am.

15  Q.   So you have no idea what the safety orientation

16  requirements are for any visitors to the factory in Fremont;

17  correct?

18  A.   Correct.

19  Q.   And do you know if lawyers, for example, or accountants

20  who are coming in who have to be on the factory floor, if they

21  have to go through any type of safety training before they are

22  allowed on the Fremont factory floor?

23  A.   Can you repeat that question, please?

24  Q.   Certainly.  Do you have any knowledge one way or the other

25  if, for example, lawyers or accountants or anyone else coming

1    to the Tesla Fremont facility and they're going to be on the

2    factory floor, if they are provided any type of safety training

3    before they're allowed on the factory floor?

4    **A.**    No, I wouldn't know that.

5    **Q.**    But it's your position, according to your testimony, that

6    anyone who is there -- contractors, employees -- they were all

7    treated the same and you couldn't tell who was who; correct?

8    **A.**    You're misstating my testimony.

9    **Q.**    Well, let me ask you this.  It was your testimony that

10   when you got to Tesla, you couldn't tell who a Tesla employee

11   was or a contractor or anyone else; correct?

12   **A.**    Correct.

13   **Q.**    And I also understand that -- I believe you stated that

14   basically from almost the first day that you started working at

15   the Tesla factory in Fremont, you were being called racial

16   slurs; is that correct?

17   **A.**    No.  I never stated almost the first day, ma'am.

18   **Q.**    Was it within the first two weeks?

19   **A.**    I can't recall when it first started.

20   **Q.**    Was it before or after August of 2015?

21   **A.**    It was before.

22   **Q.**    So sometime between June and between August of 2015 is

23   when the racial slurs started; correct?

24   **A.**    Yes.

25   **Q.**    And you would agree all those racial slurs that were said

1    to you, according to you, those are all bad words, horrible

2    words, and they should not be said in the workplace; correct?

3    **A.**   Yes, ma'am.

4    **Q.**   And none of those words should be used toward anyone in a

5    negative way at any point in time; correct?

6    **A.**   Yes, ma'am.

7    **Q.**   And you saw in the bathrooms, according to your testimony,

8    you saw racial things and swastikas and the like; correct?

9    **A.**   Yes.  I saw the "N" word scrawled in the bathroom,

10   scratched in with pens and wrote.  Yes, I did see that.

11   **Q.**   And at any point in time did you take a photograph of any

12   of that graffiti in the bathrooms?

13   **A.**   No, ma'am.  I don't believe in pulling my phone out in the

14   bathroom.

15   **Q.**   It was on the walls; right?

16   **A.**   Yes, it was on the walls.

17   **Q.**   And it was on the walls outside of the stalls; correct?

18   **A.**   I saw it on the wall inside of the stall, ma'am.

19   **Q.**   Okay.  So when you're inside the stall by yourself, you

20   saw the graffiti; correct?

21   **A.**   Yes, ma'am.

22   **Q.**   And while you were in the stall by yourself and no one is

23   in the bathroom, you decided not to take any photos of the

24   graffiti that you saw; correct?

25   **A.**   Again, ma'am, no, I did not take photos.  In hindsight I

 1   wish I would have took the photos, but I believe the bathroom

 2   is a pretty nasty place with all the people, so I wouldn't have

 3   pulled my phone out in there, ma'am.  It's like the equivalent

 4   of me pulling my lunch out in the bathroom.  Sorry.

 5   **Q.**   No, no.  I'm just asking the question if you did.

 6       My question is, though, that when you saw the drawing, the

 7   cartoon, you referred to it as a picaninny, you did take a

 8   photo of that; correct?

 9   **A.**   I was on the -- yes, I did.

10   **Q.**   Now, let's go back to sort of this time period when you

11   got hired as the elevator operator.  You liked that job, didn't

12   you?

13   **A.**   At the time I was doing it, yes, I did, ma'am.

14   **Q.**   And what did you like about that job?

15   **A.**   I liked that I was working in a factory.  I liked that I

16   was going to be a part of something that was bigger than me.  I

17   liked the fact that I was able to be able to make the earth a

18   little bit better for the next generation.

19   **Q.**   And you wanted to give that opportunity to your son

20   Demetric Di-az as well; correct?

21   **A.**   Yes.  I wanted my son to have an opportunity, yes, I did.

22   **Q.**   And at least in the first two months that you were there

23   prior to your son Demetric coming to work at the Tesla

24   facility, according to you, you had undergone pretty horrific

25   comments, according to you, that were made about you; correct?

```
 1    A.    Yes, ma'am.

 2    Q.    And according to you, those comments had been made almost

 3    on a daily basis; correct?

 4    A.    Yes, ma'am.

 5    Q.    And according to you, nothing was being done about any of

 6    those racial comments being made to you; correct?

 7    A.    Yes, ma'am.

 8    Q.    And I believe your testimony was you still thought it

 9    would be a good idea for your son Demetric Di-az to come and

10    work at the Tesla facility; correct?

11    A.    I thought it would be a good work experience for my son,

12    yes, I did.

13    Q.    And you thought it would be a good work experience because

14    he'd be working in a different location from you; correct?

15    A.    Yes.  He had went through a different staffing agency, so

16    I did believe he would be in a different location.

17    Q.    So he was in a different staffing agency with a -- in a

18    different location.  You thought he would be safe, according to

19    you?

20    A.    My hopes was that he would be safe, yes.

21    Q.    I understand your hope, but my question is:  Did you think

22    because, according to you, there were a lot of staffing

23    contractors there, you had undergone a lot of, according to

24    you, racial harassment and you had seen things in the

25    bathrooms, you thought your son would be safe; correct?
```

**DIAZ - CROSS / KENNEDY**

1    A.    I thought he would be okay.

2    Q.    And you also thought because he would be working on a

3    different shift, he would be safe as well; correct?

4    A.    Yes.

5    Q.    And when he came to -- before he applied, you didn't warn

6    him about any of this racial harassment, as you termed it;

7    correct?

8    A.    I can't remember at that time what I had told Demetric.

9    Q.    But you knew, according to you, what you were experiencing

10   and, according to you, this was really awful; correct?

11   A.    It is awful.

12   Q.    Right.  And at the time you were feeling it's really awful

13   and it's some of the worst statements you've heard in your

14   life, you still thought your son should come to work at the

15   Tesla factory as long as he was with a different staffing

16   agency; correct?

17   A.    Yes.  I did bring my son into Tesla, yes.

18   Q.    And in your opinion, you thought a different staffing

19   agency would protect him; correct?

20   A.    Yes.  I thought he would be better off in another area,

21   and I thought he wouldn't experience some of the things I

22   experienced, yes.

23   Q.    And during this time before your son came to work at

24   Tesla, did you ever advise anyone at your staffing agency of

25   what was going on with you?

DIAZ - CROSS / KENNEDY

1    **A.**   No, I did not, ma'am.

2    **Q.**   So in your opinion, you didn't advise your staffing

3    agency.  Why would you think your son, Demetric, would be

4    safer -- again, according to you -- with another staffing

5    agency working in the same factory?

6    **A.**   Like I said earlier, it's a 5-million-square-foot factory.

7    I still haven't been around the whole factory, so I don't know

8    what could happen on this floor or what could happen on this

9    floor.

10        My hopes, again, was that the area that he was in, he

11   would have been okay.

12   **Q.**   And you understood that your son applied to work at Tesla

13   through West Valley Staffing Agency in about August of 2015;

14   correct?

15   **A.**   Yes, ma'am.

16   **Q.**   And when he applied to work through West Valley at Tesla,

17   at the time you found out he applied, did you warn him about

18   what you were experiencing at all?

19   **A.**   I don't remember, ma'am.  I'm sorry.

20   **Q.**   But at this time you and your son were living in the same

21   house; correct?

22   **A.**   Yes.  He was there and I was there, yes.

23   **Q.**   And you would go to -- you would go to work together

24   sometimes?

25   **A.**   Yes.  Sometimes we would ride together.

1   Q.   And sometimes you worked on the same shift; correct?

2   A.   At first we did not work on the same shift.  He had a

3   different shift, and then later on what they did is they

4   transferred him to another shift.

5   Q.   Okay.  And I believe -- and if I'm wrong, correct me --

6   your son Demetric Di-az worked in the battery cell area?

7   A.   He worked in the battery casing area, which was

8   downstairs, further away by the -- I can't remember what that

9   kitchen was down there.

10       But what he was doing down there was they were putting the

11  battery casings together, and he was just -- you know, the

12  robot -- he would put the pieces in and the robot would weld

13  them.

14  Q.   And is it also your understanding that Mr. --  your son,

15  Demetric Di-az, was only with West Valley at the Tesla location

16  for about two months, from about August 11th to about

17  mid-October; is that your understanding?

18  A.   That sounds about right, ma'am.

19  Q.   And you understand that during that time, according to

20  West Valley, your son had some performance issues; correct?

21  A.   I didn't take them as performance issues.  What my son had

22  told me was, is that him and a supervisor were -- had some sort

23  of whatever.  And the supervisor told him if he didn't like it,

24  that his time at Tesla could be ending soon.

25  Q.   Well, did your son talk to you about sort of being

1    counseled, either verbally or in writing, about safety issues,

2    like not having safety shoes or safety glasses or pulling up

3    his pants, safety reasons, anything like that?

4            **MR. ORGAN:**  Objection.  Relevance.

5            **THE COURT:**  What is the relevance of this?

6            **MS. KENNEDY:**  It goes to the work environment,

7    Your Honor, and counteracting his testimony as to why -- to his

8    emotional distress issues, because I'm leading into another

9    issue in Exhibit 379.

10           **THE COURT:**  I'll give you a little more rope, but I'm

11   not seeing it at the moment.

12           **MS. KENNEDY:**  Understood, Your Honor.

13   **BY MS. KENNEDY**

14   **Q.**   Did he talk to you about those issues, Mr. Diaz?

15   **A.**   My son had told me one time that he was -- he had on, I

16   believe it was a bucket hat or something like that.  It had the

17   Giants on it or something.

18        And what had happened was, is I believe his supervisor

19   didn't like the Giants or something like that and told him to

20   take off the hat.  And he asked why.  And from there I believe

21   him and his supervisor was getting into it.  The supervisor

22   was -- he would tell me that the supervisor was calling him the

23   "N" word and things like that.

24   **Q.**   So your son told you that in relation to this hat

25   incident, this supervisor used the "N" word toward your son;

**DIAZ - CROSS / KENNEDY**

1  correct?

2  **A.**   At some point he had told me, yes.

3  **Q.**   And you told your son to go and report that to his

4  supervisor; correct?

5  **A.**   Umm, I don't know if I told him or -- I don't remember if

6  I told him or he decided, but at some point he did go up to try

7  to report it, yes, he did.

8  **Q.**   And it's also your understanding that at some point West

9  Valley ended Demetric Di-az's assignment at Tesla; correct?

10  **A.**   Yes.

11  **Q.**   And that was approximately on October 22nd of 2015?

12  That's your understanding?

13  **A.**   I don't remember the exact date.  You would have to ask

14  Demetric that, ma'am.

15  **Q.**   I'm sorry?

16  **A.**   I don't remember the exact day he was terminated.  You

17  would have to ask Demetric that, ma'am.

18  **Q.**   Okay.  And as I understand also, do you -- did he ever

19  tell you that he had applied for Tesla, at Tesla about three or

20  four days after his contract with West Valley ended?

21         **MR. ORGAN:**  Objection, Your Honor.  Hearsay.

22  Relevance.

23         **THE COURT:**  Overruled.  You can answer.

24         **THE WITNESS:**  Um, I don't believe he would have

25  applied back, no.

DIAZ - CROSS / KENNEDY

1   BY MS. KENNEDY:

2   Q.   My question is:  Did he tell you that?

3   A.   No, he did not tell me that.

4   Q.   And as you sit here today, do you have any knowledge one

5   way or the other if your son Demetric Di-az ever applied to

6   work directly for Tesla, not through a staffing agency?

7           MR. ORGAN:  Objection.  Relevance, Your Honor.

8           THE COURT:  Sustained.

9           MS. KENNEDY:  Okay.

10  BY MS. KENNEDY

11  Q.   Now, as I understand from your testimony, that starting at

12  least maybe more than two weeks and less tan a month after you

13  started your assignment at Tesla, Judy Timbreza made some

14  racially racist comments to you; correct?

15  A.   Yes.  He called me a "porch monkey" the "N" word, and a

16  *mayate,*" ma'am.

17  Q.   And Mr. Timbreza, do you know what his nationality is?

18          MR. ORGAN:  Objection.  Relevance, Your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  No, I do not.

21  BY MS. KENNEDY:

22  Q.   Do you know if he speaks languages other than English?

23  A.   Spanish.

24  Q.   I'm sorry?

25  A.   Spanish.

**DIAZ - CROSS / KENNEDY**

1  **Q.**  And when he called you these words -- I'm sorry, I'm going

2  to use the words -- "porch monkey," was that in English or in

3  Spanish?

4  **A.**  He called me that in Spanish, ma'am.

5  **Q.**  And he used the term *"mayate"* to you as well; correct?

6  **A.**  Yes, ma'am.

7  **Q.**  And where did that take place?

8  **A.**  The elevator.

9  **Q.**  The elevator.  While you two were both on the elevator?

10  **A.**  Yes.  He was on the elevator with me, ma'am.

11  **Q.**  Okay.  And you agree that there is no documentation from

12  you in an email, text message, about those comments by Judy

13  Timbreza; correct?

14  **A.**  No, no email.  I verbally stated that to Tom Kawasaki.

15  **Q.**  Right.  I understand that verbally and you told it to Tom

16  Kawasaki.  And that was approximately July of 2015; correct?

17  **A.**  Sounds about right, ma'am.

18  **Q.**  And Tom Kawasaki at that time, was he a Tesla employee, to

19  your knowledge?

20  **A.**  At that time I didn't know if Tom was a Tesla employee,

21  but I do believe Tom was part of the sustainability --

22  environment sustainability.

23  **Q.**  And after you reported this to Tom, according to you, you

24  never saw Judy Timbreza again; correct?

25  **A.**  Correct, ma'am.

 1   Q.   And once you reported it to Tom and Judy Timbreza was

 2   gone, were you at least satisfied with that response?

 3   A.   Yes, I was, ma'am.

 4   Q.   You also testified about a variety of other racial slurs,

 5   which, I'm sorry, I'm going to have to use some of the

 6   language.

 7        But before I get into that, my question is:  Did you ever

 8   actually see anyone writing any graffiti in any of the

 9   bathrooms that you said you saw?

10   A.   No.  I've never personally witnessed anybody writing it,

11   but I did see it.

12   Q.   And do you have any idea if any Tesla employee did any of

13   the writing?  Do you have any knowledge if it was a Tesla

14   employee at any time?

15   A.   No, ma'am.  As I stated, I have -- I didn't visually see

16   anybody doing it.

17   Q.   All right.  And if I understand correctly, you also

18   testified that you reported the use of the "N" word by

19   different individuals to Ed Romero at least three to seven

20   times; is that about right?

21   A.   That's about right, ma'am.

22   Q.   And you also told Mr. Romero, according to you, that Ramon

23   Martinez and Robert were calling you the "N" word; correct?

24   A.   Yes, ma'am.

25   Q.   And, again, you have nothing in writing about those

1    complaints to Mr. Romero; correct?

2    **A.**    You're right, ma'am.

3    **Q.**    And given the fact that the Judy Timbreza incident had

4    been resolved, were you at least confident that if you reported

5    things, it was ongoing to be handled?  Was that your

6    understanding?

7    **A.**    When I had verbally told Tom Kawasaki, yes, he did handle

8    it.  So I figured if I can verbally tell Ed Romero the same

9    thing, he would probably get the same results as Tom Kawasaki,

10   yes.

11   **Q.**    And so, according to you, once you told the story --

12   strike that.

13        Once you had told Mr. Romero three to seven times that

14   this was being said to you and nothing was done, why not put

15   anything in writing to someone else, is my question.

16   **A.**    I don't know.  At that time I didn't have access to their

17   email.  So, I mean, I don't know why I didn't do it.

18   **Q.**    Well, you had a Gmail account; correct?

19   **A.**    Yes, I have a Gmail account.

20   **Q.**    And you had the ability to email Mr. Romero and text

21   message Mr. Romero from your phone; correct?

22   **A.**    At some point Mr. Romero gave me his email and told me I

23   could write him and shoot an email to him.  And he had gave me,

24   I think it was a paper with a few more email addresses on it.

25   **Q.**    And you've also testified that Robert and Ramon Martinez

 1  both called you the "N" word more than 30 times.  And, again,

 2  that's just an estimate, according to you; correct?

 3  A.   Yes, ma'am.

 4  Q.   And you also claim at least eight to ten other employees

 5  that you can't identify called you the "N" word; correct?

 6  A.   Yes, ma'am.

 7  Q.   And some of these other eight to ten employees that you

 8  don't know could be Hispanic, they could be white, and they

 9  could be black as well; correct?

10  A.   Yes, ma'am.

11  Q.   And according to you, Mr. Ramon Martinez started using

12  racial slurs about you and toward you before this incident in

13  October of 2015 in the elevator; correct?

14  A.   October 17th?

15  Q.   Yes.  Prior to the incident in the elevator on October 17,

16  2015, according to you, Mr. Martinez, Ramon Martinez, had been

17  calling you the "N" word a lot; correct?

18  A.   Yes.  He had been saying it, ma'am.

19  Q.   And before the elevator incident on October 17th, 2015,

20  according to you, Mr. Martinez had said things like, quote,

21  "Ns" aren't shit, and that he wished he could get all of us

22  "Ns" fired; correct?

23  A.   Yes, ma'am.  In the elevator when he had his fists balled

24  up and he was cursing me out, he definitely did say "'Ns'

25  aren't shit."

DIAZ - CROSS / KENNEDY

```
 1        And in respect to the other thing, yes, he told me -- I
 2   think we were on the south dock or somewhere, and he told me he
 3   wished he can get all us "Ns" fired.
 4   Q.   And that was before the elevator incident; correct?
 5   A.   Before the elevator incident, yes.
 6   Q.   And it is also before the elevator incident on
 7   October 17th, 2015 that Mr. Martinez, according you to, told
 8   you to, quote, "Go back to Africa"; correct?
 9   A.   Yeah.  We were in a trailer back by the -- some machine
10   over there.  They were baling.  But, yeah, we were in the
11   trailer when he said that to me, ma'am.
12   Q.   And he said this all in English or in Spanish?
13   A.   Mr. Martinez is pretty fluent in English.
14   Q.   Did he ever say to you anything, according to you,
15   anything racially derogatory in Spanish.
16   A.   Yes.  He called me *mayate*.
17   Q.   Now, during the time that you were assigned at this Tesla
18   facility, did you ever report the use of the "N" word to anyone
19   at CitiStaff?
20   A.   No, ma'am.
21   Q.   Did you report the use of the phrase "Go back to Africa"
22   to anyone at CitiStaff?
23   A.   No, ma'am.
24   Q.   Did you report the graffiti in the bathroom to anyone at
25   CitiStaff?
```

1    **A.**   No, ma'am.

2    **Q.**   So you would agree that you didn't place CitiStaff on

3    notice about any of these racial comments at all; correct?

4    **A.**   I was told to direct all my -- all my concerns to my

5    supervisors at Tesla.  So, yes, ma'am.  No, I did not report it

6    to CitiStaff.

7    **Q.**   And you didn't report it to CitiStaff even though they

8    were paying your paycheck because you didn't want them to take

9    you out of the Tesla facility; correct?

10   **A.**   No.  That's not the case, ma'am.

11   **Q.**   You understood if you reported all these "N" words and all

12   these horrible racist slurs to CitiStaff, they would have then

13   had to do something and take you out of the factory; correct?

14            **MR. ORGAN:**  Objection.  Calls for speculation.

15            **THE COURT:**  It's overruled.  You can answer if you had

16   that understanding.

17            **THE WITNESS:**  No, I did not have that understanding,

18   ma'am.

19   **BY MS. KENNEDY:**

20   **Q.**   Well, you understood that at the time of your hire when

21   you had your onboarding, if you didn't want to be part that

22   assignment anymore, you were to visit CitiStaff and they could

23   take you out of that assignment and place you somewhere else;

24   correct?

25   **A.**   I didn't have that understanding at that time, ma'am.  I'm

1    sorry.

2            MS. KENNEDY:  Stephanie, if we could go back to

3    Exhibit 205, please.

4        This has already been admitted, Your Honor.

5        And let's go to Paragraph 2.

6        (Document displayed.)

7    BY MS. KENNEDY

8    Q.   Take a minute.  Once you've seen that, Mr. Diaz, let me

9    know.

10   A.   Yes, ma'am.

11   Q.   And reading that, does that refresh your recollection that

12   if you didn't -- you were not interested in this assignment

13   anymore, that you should call up CitiStaff and let them know?

14   A.   What I read into this, it says if I'm not interested in

15   the assignment no more.  I was still interested.  While I was

16   there, I was happy to be there, ma'am.  Sorry.

17   Q.   Okay.  So during the time -- during this time, you still

18   felt you could do your job, and you still felt you liked

19   working there despite all these -- according to you, all these

20   racial slurs; correct?

21   A.   The best way I could put that, ma'am, is I used to play

22   sports.  As of being on a team, whether I liked my team member

23   or not, we can still get a job done.

24        Me liking them or whatever-have-you doesn't have anything

25   to do with it.  It's like when you've got one common goal to

 1   get done, I don't have to like you to get this goal done.

 2   **Q.**   Okay.  So in your opinion, you could still do your job

 3   despite all these other racial slurs; correct?

 4   **A.**   Yes, ma'am.

 5   **Q.**   And you and still continued to want to work at that

 6   assignment at Tesla despite all these racial slurs; correct?

 7   **A.**   Until at some point, yes, ma'am.

 8   **Q.**   Understood.  And you got to that point after the drawing

 9   from January of 2016, which we'll get to; is that correct?

10   **A.**   Yes.

11   **Q.**   Okay.  If you also see in Paragraph 5 of Exhibit 205.

12   **A.**   I've read it, ma'am.

13   **Q.**   You understood that even once you're on your assignment,

14   if you're dissatisfied for any reason, to contact CitiStaff and

15   inform him or her of your assignment status.  Do you see that?

16   **A.**   Yes.  I -- can I read it out for you, ma'am?

17   **Q.**   I'm sorry.  You can read it to yourself, yes.

18        Did you understand that, sir?

19   **A.**   I understand.  That's not how I read it, ma'am.  I'm

20   sorry.

21   **Q.**   No.  That's fine.

22        All right.  Let's get back to a couple other things.  So

23   if I understand correctly, the individuals who you believe --

24   I'm sorry, strike that.

25        The people who you claim made racist comments to you are

1   Judy Timbreza, Ramon Martinez, and Robert Hurtado; is that

2   correct?

3   **A.**   Yes, ma'am.

4   **Q.**   And given all the comments you talked about, Judy

5   Timbreza, Ramon Martinez, and Robert Hurtado, that was pretty

6   much the entire nine and a half months or so that you were

7   assigned to the Tesla location; correct?

8   **A.**   Can you repeat that question one more time, please?

9   **Q.**   Absolutely.  The individuals who made these racial slurs

10  to you -- Judy Timbreza, Ramon Martinez, and Robert Hurtado --

11  they were the individuals, the only individuals, who made those

12  comments to you during your about nine-and-a-half-month

13  assignment at the Tesla facility; correct?

14  **A.**   No.  Them are not the only individuals.  If you check my

15  testimony, I said it was eight to ten more people, you know.

16  **Q.**   Right.  But you have no idea who those people are;

17  correct?

18  **A.**   No.  Unless I seen a photo.  I might recognize some of

19  them, I might not.  I don't know, ma'am.  I'm sorry.

20  **Q.**   You don't know if -- you don't know anything about them.

21  Just eight to ten more people at some time during that time

22  period you were there; correct?

23  **A.**   Yes, ma'am.

24  **Q.**   And at any point in time did you ever go and try to point

25  out those people to anyone at the factory at the time it was

 1  happening?

 2  **A.**    Umm, at some point I do believe I pointed out a few of

 3  them to Ed Romero, ma'am.

 4  **Q.**    And when you pointed them out, did you go you there and

 5  try to ask what their name is or what their badge was or

 6  anything like that?

 7  **A.**    No.  I wouldn't have confronted them and asked them what

 8  their badge was because -- or what their name was because that

 9  could have led to another confrontation, ma'am.  I'm sorry.

10  **Q.**    Well, during the time that you're being harassed -- and I

11  understand your testimony -- and you see people are doing this

12  to you, and you testified in response to your attorney's

13  question that you wanted to get this out, did you try to do

14  anything to stop those individuals from doing that at the time?

15  **A.**    No.  At the time, no, ma'am.  All I did was reported it to

16  Ed Romero and hopefully he could have stopped it.

17  **Q.**    At any point in time did you ever -- strike that.

18        In October of 2015 you talk about an elevator incident

19  with Ramon Martinez.

20  **A.**    Yes.  He accosted me in the elevator.  Yes, that's true.

21  **Q.**    Right.  And according to you, this started with

22  Mr. Martinez and it was unprovoked; correct?

23  **A.**    Yes, it was unprovoked, ma'am.

24  **Q.**    And during this time, you testified that Ramon Martinez

25  during this confrontation used the "N" word; correct?

1   A.   Yes.  He -- he was yelling at me obscenities and then he

2   just stated that:  "Ns" aren't shit.  Excuse my language again,

3   folks.

4   Q.   And as of the time of this incident, Mr. Martinez,

5   according to you, kept calling you the "N" word and telling you

6   to go back to Africa during this entire incident that was going

7   on; correct?

8   A.   No, not during the entire incident that was going on.  He

9   had did that over a period of time, ma'am.

10  Q.   Okay.  So at least for a period of time, as of the time

11  that you reported this incident in writing, according to you,

12  this has been going on for at least a month or so, at least;

13  correct?

14  A.   I -- I have to check the email, but it had been going on

15  for a while.  I don't know if -- it had been going on.

16  Q.   And then when you got the opportunity, you documented your

17  complaint against Mr. Martinez; correct?

18  A.   Yes.  When I got the opportunity, I definitely documented

19  it because when he had been saying it first, I didn't have

20  proof; but when he said it in the elevator, I did really

21  believe that their surveillance system would have captured

22  that, and then there would have been a real investigation that

23  would have went on, and then they would have came and talked to

24  me, and then I could have told them.  And then they would have

25  seen the video and they would have seen the audio or heard the

1    audio of what was going on in the elevator.  So, yes.

2    **Q.**   So at the time you were there, you told Mr. Martinez

3    "There's surveillance and basically you're caught," so to

4    speak; correct?

5    **A.**   Yes, ma'am.

6    **Q.**   And then after that incident, you then took the time to go

7    write an email about that incident; correct?

8    **A.**   Yes.  I wrote an email, ma'am.

9         **MS. KENNEDY:**  Stephanie, can we go to Exhibit 235?

10        Your Honor, which has already been admitted.

11        This is an October 17th, 2015, email.

12        (Document displayed.)

13   **BY MS. KENNEDY**

14   **Q.**   Take a minute to read that, Mr. Diaz.

15   **A.**   I'm familiar with the email, ma'am.

16   **Q.**   I'm sorry?

17   **A.**   I'm familiar with the email.

18   **Q.**   Thank you.

19        When you wrote this email, it appears to be, like, at

20   6:08 a.m.  Do you see that?

21   **A.**   Yes, ma'am.  I had to write the email.  Like I said

22   earlier, some days I was overworked and I had -- I had other

23   assignments to do, and I couldn't just sit there and write the

24   email exactly when it happened.

25        So what I had to do is I had to write the email in pieces

**DIAZ - CROSS / KENNEDY**

1    as I was doing my job, and I had a little time to get it taken

2    care of.

3    **Q.**   Absolutely.  My question just is:  Do you recall if you

4    wrote this email while you were still on duty, like still

5    working, or did you go home or go into your car and write it?

6    That was going to be my question.

7    **A.**   No.  I -- I was still inside the factory.

8    **Q.**   And did you take your time to write this email to make

9    sure you conveyed to Ed Romero and Tom Kawasaki everything you

10   wanted to convey to them as to what this incident was about?

11   **A.**   Umm, what I was doing, I was writing the email to -- to

12   convey to them that an incident had occurred and could they

13   please check the surveillance system to find out what had

14   exactly happened.

15        Because, like I said before, you know, what -- I -- I can

16   sit here and I can say a few things.  I can say:  Hey, he's

17   been doing this and he's been doing that.

18        But, you know, as being a black man, a lot of them think

19   I'm pulling the race card.  So instead of me doing that, you

20   know, I figured I had definitive proof.  Please check the

21   surveillance system.

22   **Q.**   Mr. Diaz, you would agree the definitive proof would be if

23   you had written in the "N" word or other things as to what you

24   claim Mr. Ramon Martinez said to you; correct?

25        **MR. ORGAN:**  Objection.  Argumentative.

1           THE COURT:  Yes, sustained.

2           MS. KENNEDY:  I'll rephrase.

3    BY MS. KENNEDY

4    Q.    The surveillance, the cameras, there's is no audio on the

5    surveillance, is there?

6    A.    I don't know.  I believe there was audio.  Every time I

7    done saw a camera, mostly it has audio.

8    Q.    But you had no idea there was audio in the elevator,

9    according to you; correct?  You saw there are cameras; correct?

10   A.    Yes, I did see there was cameras.

11   Q.    And you assumed there was audio; correct?

12   A.    Yes, I assumed there was audio.

13   Q.    But you didn't know; correct?

14   A.    No.  I didn't know 100 percent, but I assumed.  So at that

15   particular time, yes, I was 100 percent thinking that it was

16   audio recording going along with the video recording.

17   Q.    And according to you -- as of October 17th, 2015,

18   according to you, you have been complaining verbally about all

19   these racial slurs and nothing had been done; correct?

20   A.    Yes, ma'am.

21   Q.    You had an opportunity here on October 17th, 2015 to give

22   a written complaint about all these horrible racial slurs, and

23   you would agree you chose not to put those words in this email,

24   correct?

25   A.    Again, ma'am, I'm going to say with the audio and video,

1    all they had to do is just check it.

2    Q.   I understand, but that wasn't my question, sir.

3         My question was:  You chose, for whatever reason, not to

4    put any of the racial slurs that you are suing for in this case

5    in this email; is that correct?

6    A.   Yes, I did not put it inside the email, ma'am.

7    Q.   And that was your decision, correct, at the time?

8    A.   I wrote the email so, yes, it was my decision, ma'am.

9    Q.   And when you complained again about anyone else, you also

10   chose not to put any of these horrible racial slurs that you're

11   suing for in this lawsuit in any email; correct?

12   A.   No, ma'am.  I didn't put the word in the email.  Like I

13   stated before, you know, a lot of people don't want to put that

14   in the email.  If you notice, my supervisor, Tom Kawasaki, he

15   didn't even put it in his email.

16   Q.   Well, I understand Tom Kawasaki, but my question is not

17   about Mr. Kawasaki.  My question is about you, Mr. Diaz.

18        My question is:  You chose not to put these words in

19   writing; correct?

20   A.   Yes, ma'am, I did not put it in the email.

21   Q.   And so as of October 17th, 2015, it's your understanding

22   that your son Demetric was still working at the facility;

23   correct?  At the factory?

24   A.   Can you give me the date one more time, please?

25   Q.   Certainly.  October 17th, 2015, was it your understanding

**DIAZ - CROSS / KENNEDY**

1  that your son Demetric was still working at the factory?

2  **A.**   I don't know if my son was still working there.  I would

3  have to see his schedule.  I don't know if he was still there.

4  I'm sorry.  I apologize.

5  **Q.**   And in your incident with Mr. Romero, this was a pretty

6  awful incident for you; correct?

7  **A.**   It was an awful incident for all that was involved, yes.

8  **Q.**   But for you in particular, this was inappropriate conduct.

9  It was wrong conduct.  And Mr. Martinez, in your opinion,

10  should have been counseled and disciplined; correct?

11  **A.**   It was wrong and -- and I think I stated that Mr. Martinez

12  should have been terminated.

13  **Q.**   Correct.  So when you found out that Mr. Martinez had not

14  been terminated, at any point in time after that did you decide

15  to put any of these horrible racial slurs in writing to anyone

16  to let them know this is who this guy is, Mr. Martinez?

17  **A.**   No, ma'am, I did not.

18  **Q.**   After this incident with Mr. Martinez, you started looking

19  for a job outside of CitiStaff; correct?

20  **A.**   Yes, I did, ma'am.

21  **Q.**   And you were looking for jobs that paid more than what you

22  were getting at CitiStaff; correct?

23  **A.**   I don't know if it was more or less; but normally if a

24  person want to leave a job, they're definitely going to look

25  for more money.

**DIAZ - CROSS / KENNEDY**

1    Q.    Absolutely.  I get that.  And it's always easier to look

2    for a job if you have a job; correct, Mr. Diaz?

3    A.    That's true.  I was always taught by my parents never

4    leave a job until you have another job.

5    Q.    And in this case when you're looking for another job, did

6    you ever look through CitiStaff to place you somewhere else?

7    A.    No, I did not.  I didn't know that I can have CitiStaff

8    place me somewhere else.

9    Q.    Well, you understood that CitiStaff was a staffing agency;

10   correct?

11   A.    Yes, it is a staffing agency.

12   Q.    And in this October 2017 [sic] time period when this

13   incident was going on with Mr. Romero, did you have any contact

14   with Mr. Romero again until January of 2016?

15   A.    Can you state that again?  I think you got the first date

16   wrong.  I think you said October 2017, so...

17   Q.    I'm sorry.  I will rephrase it.

18        In October of 2015, from that time period into

19   January 21st of 2016, did you have any contact with

20   Mr. Martinez?

21   A.    After the elevator incident?

22   Q.    After the elevator incident and before the incident with

23   the drawing on the bales, did you have any contact with

24   Mr. Martinez?

25   A.    No.  I would see him around the factory, though.

DIAZ - CROSS / KENNEDY

```
1    Q.    In the -- strike that.
2          You saw him around.  No contact, no "N" word during that
3    time period; correct?
4              MR. ORGAN:  Objection.  Vague and ambiguous.
5              THE COURT:  Do you want to be more specific?
6              MS. KENNEDY:  I will rephrase.
7    BY MS. KENNEDY
8    Q.    In the time period from October 17th, 2015, until, say,
9    January 21st, 2016, it's correct you had no contact with
10   Mr. Martinez; correct?
11   A.    I don't remember if I had contact with him or not.
12   Q.    You had --
13   A.    Sorry.
14   Q.    I'm sorry.  I didn't mean to cut you off.
15   A.    I said sorry.  I don't remember.  I'm sorry.
16   Q.    During that time period, say, October 17th through
17   January 21st, you would agree that Mr. Martinez made no racial
18   slurs to you; correct?
19   A.    Not that I can remember.
20   Q.    In this time period from October of 2015 to January of
21   2016, you did facilitate an individual, Lamar Patterson, to try
22   to get a job at Tesla; correct?
23   A.    I don't remember exactly when, but, yes, I did try to help
24   Mr. Patterson.
25   Q.    All right.  Maybe I can get a document to refresh your
```

**DIAZ - CROSS / KENNEDY**

```
 1   recollection.
 2        Take a look in the black notebook.
 3            MS. KENNEDY:  And this is just for identification,
 4   Your Honor.  It's Exhibit 265.
 5        (Trial Exhibit 265 marked for identification)
 6   BY MS. KENNEDY:
 7   Q.   Just take a minute to read that and let me know when
 8   you're done, sir.
 9        (Witness complied.)
10   A.   It looks like a resume from Mr. Patterson.
11   Q.   Right.  If you take a look, this is the top email, the
12   date from Lamar Patterson to you.
13   A.   Yes, ma'am.
14   Q.   Okay.  Is that your email address from Mr. Patterson?
15   A.   Yes.  That's Mr. Patterson -- that's Mr. Patterson
16   forwarding his email to me, which I forwarded it on to -- I
17   believe it was Ed Romero.
18   Q.   And so does that refresh your recollection that at some
19   point in time Mr. Patterson, in December of 2015, forwarded his
20   resume to you; correct?
21   A.   Yes.  At some point he did forward it to me, ma'am.  Yes,
22   he did.
23   Q.   And when Mr. Patterson forwarded your resume -- strike
24   that.
25        When Mr. Patterson forwarded his resume to you, did you
```

DIAZ - CROSS / KENNEDY

1   forward it off to someone at Tesla?

2   **A.**   Yes, I did.  I forwarded it to Ed Romero because I was

3   shorthanded.

4   **Q.**   Okay.  And you thought it would be a good idea to have

5   another person come in to work in your work environment that

6   you said was a very racist work environment; correct?

7              **MR. ORGAN:**  Objection.  Argumentative, Your Honor.

8              **THE COURT:**  Overruled.

9              **THE WITNESS:**  Umm, like I said before, somebody walked

10  up to me and asked me was there a position open in the

11  elevator.  And I told him yes.  And they asked if they have a

12  person forward me their resume.  So far be it from me to deny

13  somebody employment.  I'm sorry.

14  **Q.**   Well, did he -- in your personal opinion, at that time

15  given your work environment, did you think, in your personal

16  opinion, you should -- you would be inviting someone else to

17  come to work in this racist work environment, according to you?

18  **A.**   In hindsight I'm going to say I was selfish, because I

19  needed help.

20  **Q.**   So you wanted to bring someone into this work environment

21  for your own personal benefit; correct?

22  **A.**   No.  I -- the thing is, like I said before, in hindsight I

23  wish I wouldn't have did it.  But while I was there and he

24  asked me, yes, I needed help.  I was the only one running the

25  elevator sometimes.

DIAZ - CROSS / KENNEDY

1   Q.   All right.  Let's move forward to January of 2016.  Let's

2   talk about this cartoon, this drawing, that you found on

3   January 21st, 2016.

4        Take a look Exhibit 33, which has already been admitted.

5   And let's go to Exhibit 33 at Page 2 and 3.

6        (Photo played.)

7   A.   I'm there, ma'am.

8   Q.   Now, as I understand it, in looking at Exhibit 33-2,

9   that's your cart in front of it in red and in the black that's

10  your cart?

11  A.   Yes, ma'am.

12  Q.   And you saw this drawing, this "booo" drawing, and you

13  were offended by that; correct?

14  A.   Yes, I was, ma'am.

15  Q.   And at the time you saw that drawing, did you see the

16  drawing to the left a little, I'll call him the Pac-Men?  The

17  Pac-Man?  Did you see that at the time?

18  A.   Yes, I did.  That's why I took the whole picture.

19  Q.   Correct.  And you were not offended by the Pac-Man;

20  correct?

21  A.   No.  Pac-Man is a game I used to play as a kid.

22  Q.   Okay.  And the drawing, you characterized this as a racist

23  effigy and you claimed it was a picaninny or a jigaboo;

24  correct?

25  A.   Yes, ma'am.

DIAZ - CROSS / KENNEDY

1    **Q.**   And you were very upset?

2    **A.**   Yes, ma'am.

3    **Q.**   And you were so upset you and, I think, Michael Wheeler

4    went around and tried to figure out who wrote this drawing on

5    this bale of paper; correct?

6    **A.**   Michael Wheeler figured it out.  I still had work to do

7    but, yes, I was upset.  I was pretty upset.

8    **Q.**   And you took a photo of it and you sent the email with a

9    photo to Mr. Romero on January 22nd; correct?

10   **A.**   Yes, ma'am.

11   **Q.**   And, of course, this was inappropriate for the workplace;

12   right?

13   **A.**   Yes, it is inappropriate for the workplace.

14   **Q.**   And it's during this time Mr. Ramon Martinez was there,

15   and he did say he was the one who drew the drawing; correct?

16   Which is Exhibit 33-3; correct?

17   **A.**   Yes, at some point he did.

18   **Q.**   And were you there when Mr. Martinez said:  I drew that

19   cartoon or that drawing?  Did he say it in front of you?

20   **A.**   Yes, ma'am.

21   **Q.**   And when he said it in front of you, what did you say to

22   Mr. Martinez?

23   **A.**   I didn't say anything.

24   **Q.**   You said nothing?

25   **A.**   No.  I was -- I was pretty upset.  So, you know, as my

**DIAZ - CROSS / KENNEDY**

1  parents taught me, if you don't have something good to say,

2  sometimes keep your mouth shut.

3  **Q.**   So when Mr. Martinez said he drew this, you said nothing;

4  correct?

5  **A.**   I didn't say anything at that point.

6  **Q.**   And when Mr. Martinez said he drew it, was he laughing?

7  Joking around?

8  **A.**   Well, at that point he -- basically he said:  You people

9  can't take a joke?  I was pretty upset.

10  **Q.**   Did he say that he wrote this as a joke with respect to

11  the Pac Man?

12       **MR. ORGAN:**  Objection.  Speculation.  Objection.

13  Speculation.

14       **THE COURT:**  Overruled.

15       **THE WITNESS:**  Repeat the question again, ma'am,

16  please.

17  **BY MS. KENNEDY**

18  **Q.**   Yes.  Certainly.

19       When you were there with Mr. Martinez, did Mr. Martinez

20  say he drew this cartoon in Exhibit 33-3 because it was a joke

21  in relation to the Pac Man?

22  **A.**   No, he didn't say that.

23  **Q.**   Did he say anything as to why he drew this cartoon in

24  Exhibit 33-3?

25  **A.**   I didn't ask him, ma'am, why did he draw it.

DIAZ - CROSS / KENNEDY

1   **Q.**   At that point in time you didn't care why he drew it;

2   correct?

3   **A.**   No.

4   **Q.**   You were really upset and offended by this drawing;

5   correct?

6   **A.**   Yes, ma'am.

7   **Q.**   And you thought this was a racist effigy and it shouldn't

8   be in the workplace; correct?

9   **A.**   It is a racist effigy, ma'am.

10  **Q.**   And it's something that I believe you said reminded you of

11  some cartoons from the '50's and '60's; correct?

12  **A.**   No.  I said from the '30s and '40s, ma'am.

13  **Q.**   Okay.

14  **A.**   I think my statement was this is by the '50's -- it could

15  have been a little bit earlier, but Warner Brothers pulled the

16  cartoon because they knew it was racist back in the '50's.

17  **Q.**   And this got immediately reported to Chartwell; correct?

18  **A.**   Say that one more time.

19  **Q.**   This incident got immediately reported to Chartwell;

20  correct?

21  **A.**   I don't know if it was immediately --

22          **MR. ORGAN:**  Objection.  Calls for speculation.

23          **THE COURT:**  Yes.  Sustained.

24  **BY MS. KENNEDY**

25  **Q.**   Let me ask you.  You got on the phone with someone from

1    Chartwell asking you about it; correct?

2    **A.**   At some point somebody called me about it, yes.

3    **Q.**   And you don't recall who that person was; correct?

4    **A.**   It was a female.  That's all I can say.

5    **Q.**   Do you know if it was Jackelin Delgado Smith?

6    **A.**   I'm going to say again all I know is it was a female's

7    voice.

8    **Q.**   And let's go to Exhibit 287, which has already been

9    admitted.

10        And I'm not sure it's in your book.  Is it in the white

11   book?

12   **A.**   Yes.  I have it now.

13   **Q.**   Okay.  Thank you, sir.

14        (Document displayed.)

15   **Q.**   And if you go to Page 6-8 of Exhibit 287.  And what I'm

16   referring you to is the notes that appear to be from Jackelin

17   Delgado.

18        When you have had a chance to read them, let me know,

19   Mr. Diaz.

20   **A.**   Yes, I will, ma'am.  Thank you.

21   **Q.**   Okay.

22        (Brief pause.)

23   **A.**   I'm finished, ma'am.  Go ahead.

24   **Q.**   Okay.  Do you understand, at least from Ms. Delgado's

25   testimony, that that was her notes in your conversation with

**DIAZ - CROSS / KENNEDY**

1  her?

2  **A.**   I see that here, ma'am, yes.

3  **Q.**   And it's my understanding -- did you ever see those notes?

4  **A.**   Did I ever see the notes period or --

5  **Q.**   At the time did you ever see those notes?  While you were

6  still assigned at Tesla, did you ever see those notes?

7  **A.**   No, I did not, ma'am.

8  **Q.**   And when you talked to this woman, did she tell you why

9  she was talking to you?

10  **A.**   Umm, she said that she asked me about what happened

11  between me and Ramon, and I had explained to her the prior

12  history of me and Ramon, the history we had in the elevator.  I

13  explained everything to her.

14  **Q.**   Did she tell you that she would look into the incident

15  about this drawing and your complaint?  Is that what she told

16  you?

17  **A.**   Yeah.  She said she was looking into that particular

18  incident, but I took that as an opportunity to tell her about

19  everything.

20  **Q.**   So you told this woman -- you don't know if she's from

21  Chartwell or whatever.  Did you tell her about all the racial

22  slurs?

23  **A.**   I told her everything.  I sat there and, you know, I would

24  talk to her.  She asked me.  And then later on down the line

25  when I did finally see this document here, I see what she just

1    put:  He only mentions the history of the elevator.

2        She doesn't say anything else I said, and then after that

3    is her notes.

4    **Q.**   So in this call with this woman, you don't remember her

5    name, you told her that you had been called the "N" word at

6    least 30 times; correct?  You told her that?

7    **A.**   I don't know if I told her how many times.  I don't

8    believe I -- that ever came up.  Did she ask me how many times

9    did he do this, I don't believe that ever came up, ma'am.

10   **Q.**   Well, you said you told her everything.  So I'm trying to

11   find out what you told her.

12       Did you tell her that anyone at -- working at the

13   facility, whether it's Robert Hurtado, Ramon Martinez, Judy

14   Timbreza, or these eight to ten other people that you can't

15   identify, did you tell her any of these comments?  Did you tell

16   her the "Go back to Africa" comment?

17   **A.**   Yes.  I told her about the "Go back to Africa comment."  I

18   kept everything focused on what was going on right there, which

19   was me and Ramon Martinez.

20       Yeah.  Maybe in hindsight I could have told her about the

21   other incidents with Judy Timbreza or things like that, but I

22   thought that was corrected with Tom Kawasaki.

23       So what I had did was, is when she asked me, I took that

24   opportunity to tell her everything that Ramon had been doing to

25   me, ma'am.

1  Q.   Okay.  Just so I can understand, when you were talking to

2  this woman, you told this woman everything that Ramon Martinez

3  had been doing to you; correct?

4  A.   Yes, ma'am.

5  Q.   So you told her at that time that Ramon Martinez had been

6  calling you the "N" word a lot or over several months; correct?

7  A.   Yes, ma'am.

8  Q.   And you told this woman that Ramon Martinez had said

9  something to the effect of:  I hate you "Ns"; correct?

10 A.   I told her everything, ma'am.

11 Q.   And you told this woman that Ramon Martinez had said

12 something to the effect of:  I hate you effing "Ns"; correct?

13 A.   He had told me he hated me specifically.  It was not "You

14 effing 'Ns.'"  He told me he hated me.

15 Q.   Okay.  So let me ask you this then.  Did you tell this

16 woman when she's calling you up about this cartoon, did you

17 tell her that Ramon Martinez said:  I hate you?  That's what

18 Ramon said?

19 A.   While we were at -- we were in the back by the recycling

20 pile --

21 Q.   No.  I'm sorry.  I'm talking about what you told this

22 woman.

23      When you were on the phone, what did you tell her about

24 Ramon Martinez?  That's what I'm asking.  Okay?

25 A.   I told her everything about Ramon Martinez.  I told her

1   about the incident when we was at the recycling pile and

2   Mr. Martinez had -- had told me:  I hate you.  You know what I

3   mean?  And he called me the "N" word.  I hate you "N."

4        I told her about the time when me and Mr. Martinez was

5   inside of the trailer, and Mr. Martinez and a few other people

6   was in there, and Mr. Martinez told me to go back to Africa.

7   I told her about that.

8        I told her about when we were on south dock, how

9   Mr. Martinez -- we were passing and Mr. Martinez told me he

10  wished he could get all us "Ns" fired.  I explained that to

11  her.

12       I explained to her when we were in the elevator,

13  Mr. Martinez had told me he had -- he was cursing at me and he

14  told me:  "Ns" wasn't -- "Ns" wasn't shit.  Excuse my language

15  again.

16       But these are the things that Mr. Martinez was doing,

17  ma'am.  I'm sorry.

18  **Q.**   You told all of that to this woman, and it's your

19  testimony that given what we're looking at here, she didn't

20  document any of that; correct?

21  **A.**   She did document what she wanted to document.  Because

22  when I look at this, you know, she says he mentions history

23  about this.  And then she goes on to say in that same thing

24  that the HR wasn't aware, the branch manager wasn't aware of

25  things that was going on.

 1        When I -- when I kept going on, this is the things that
 2   she was doing.  You can see when I ask -- she asked, well, what
 3   did I think should happen.  I said, I don't trust him.  I think
 4   he should be terminated, ma'am.
 5   **Q.**   That wasn't my question.  My question is -- let me try it
 6   a different way.
 7        You don't recall the woman you were talking to, her name;
 8   correct?
 9   **A.**   No, I do not, ma'am.
10   **Q.**   And you don't know who she was working for; correct?
11   **A.**   At the time, I don't -- I don't remember if she stated it
12   or not.  She could have.  I'm just saying I don't remember it.
13   **Q.**   And you do recall that she was calling to talk to you
14   about this incident about this cartoon drawing and your
15   complaint; correct?  You understood that?
16   **A.**   Yes, I understood that, ma'am.
17   **Q.**   And you are testifying that you told this woman everything
18   that Ramon had done to you up until this time period of this
19   drawing; correct?
20   **A.**   Yes, ma'am.
21   **Q.**   And what you told her are all the "N" words that Ramon
22   Martinez said to you; correct?
23   **A.**   I don't know if I told her every last time he said it.  I
24   don't believe I did.
25        You know, I told her what I can remember at that time.  I

1    told her that he -- the history.  So, yes, I did tell her Ramon

2    was calling me the "N" words.

3    **Q.**   And at the end of that conversation, according to you,

4    when you told this woman about all the "N" words, did you ask

5    her what is she going to do about it, or did you just hang up

6    the phone?

7    **A.**   She asked me what did I want to see happen, and then I had

8    told her.

9         Then she asked me did I have anything else.  I told her,

10   no, because of the things that was going on at the factory, I

11   was scared that the rest of the employees or -- or some of the

12   other supervisors was going to retaliate against me.  You can

13   see that right in there.

14        You know, she said that -- you can see in the thing where

15   she said, you know, I felt the picture was a racial statement

16   of a jigaboo.  These are the things that I told her, ma'am.

17   **Q.**   I understand.  So you didn't -- so you told her things,

18   but you were afraid about retaliation of your coworkers?

19   **A.**   Yes.  I was -- I was scared that the other supervisor is

20   going to retaliate and things like that.  Because, you know, as

21   we were going around there, there was definitely rumors that,

22   you know, the black employees was getting fired and basically

23   for anything.  You know what I mean?  If they start

24   complaining, you out of here.  You know, if you do this, you're

25   out of here, you know.

1           Always, like I said, you know, once -- when you were doing

2    your job and you didn't complain, they loved you.  You know,

3    but the first time you complain, you was enemy number one.

4    Q.   But as of January of 2016, you had complained several

5    times and got a couple of pay increases.  You were still

6    concerned about retaliation; is that correct?

7    A.   But if you look at that, a lot of times --

8    Q.   Is that correct, sir?  Is that correct?

9    A.   Can you repeat the question one more time, please?

10   Q.   Sure.  As of January 2016, you complained several times.

11   You received a couple of pay increases.  Were you, Mr. Diaz,

12   still concerned about retaliation?

13   A.   Yes, I was.

14   Q.   And were you concerned about retaliation even when you

15   complained about Ramon Martinez in January of 2016?

16   A.   In January of 2016?

17   Q.   Yes.

18   A.   Yes, I was.  That's what I stated.  I was scared of the

19   retaliation.

20   Q.   And you were scared about retaliation every time you

21   reported to Ed Romero and everybody else about the "N" word and

22   the graffiti and everything else, but you continued to

23   complain; correct?

24   A.   Yes, I still continued to complain.  Yes, I was scared of

25   retaliation.  But if we go through some more of the documents,

DIAZ - CROSS / KENNEDY

1   you will see why.

2   **Q.**   Okay.

3        **THE COURT:**  And why don't we do that tomorrow morning?

4        So, ladies and gentlemen, we're done for today.  As you

5   can tell, there's still more to come.

6        So continue to keep an open mind.  Continue to follow my

7   admonitions:  Not talk, not research, not look at anything

8   related to the case.

9        Come back, as you did this morning, bright and early.  If

10  you can be here by 8:15, all the better, and we'll continue

11  tomorrow.

12       Thank you.  Have a good afternoon.

13       (Jury exits the courtroom at 1:30 p.m.)

14       **THE COURT:**  We will be in recess.

15       (Whereupon at 1:30 p.m. further proceedings

16        were adjourned until Thursday,September 30, 2021

17        at 8:00 a.m.)

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

Wednesday, September 29, 2021 - Volume 3

**<u>PLAINTIFF'S WITNESSES</u>**                                    <u>PAGE</u>   <u>VOL.</u>


**<u>MCGINN, KEVIN</u>**
VIDEOTAPED TESTIMONY                                380    3


**<u>DI-AZ, DEMETRIC</u>**
VIDEOTAPED TESTIMONY                                381    3


**<u>DIAZ, OWEN ORAPIO</u>**
(SWORN)                                             383    3
Direct Examination by Mr. Organ                     383    3



**<u>WHEELER, MICHAEL JOHN</u>**
(SWORN)                                             421    3
Direct Examination by Mr. Alexander                 421    3
Cross-Examination by Ms. Jeng                       434    3
Redirect Examination by Mr. Alexander               441    3
Recross-Examination by Ms. Jeng                     443    3


**<u>DIAZ, OWEN ORAPIO (RECALLED)</u>**
(PREVIOUSLY SWORN)                                  448    3
Direct Examination Resumed by Mr. Organ             449    3
Cross-Examination by Ms. Kennedy                    486    3
                              - - -


<u>**E X H I B I T S**</u>

**<u>TRIAL EXHIBITS</u>**                            <u>IDEN</u>   <u>EVID</u>   <u>VOL.</u>

  1                                                   459    3

  19                                                  393    3

  62                                                  388    3

  68                                                  468    3

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 200 | 490 | 491 | 3 |
| 204 | 486 |  | 3 |
| 205 | 494 | 495 | 3 |
| 217 |  | 469 | 3 |
| 224 |  | 471 | 3 |
| 245 |  | 464 | 3 |
| 261 |  | 473 | 3 |
| 265 | 528 |  | 3 |
| 293 |  | 473 | 3 |
| 320 |  | 475 | 3 |
| 324 |  | 475 | 3 |
| 325 |  | 476 | 3 |

— — —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, September 29, 2021