Volume 4

Pages 545 - 699

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ AND LAMAR PATTERSON | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No. C 17-6748 WHO ) |
| TESLA, INC., dba TESLA MOTORS, INC., CITISTAFF SOLUTIONS, INC., WEST VALLEY STAFFING GROUP, CHARTWELL STAFFING SERVICES, INC., and DOES 1-50, inclusive, | ) ) ) ) ) |
| Defendants. | ) San Francisco, California ) Thursday ) September 30, 2021 ) 8:00 a.m. |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          ALEXANDER MORRISON & FEHR LLP
                              1900 Avenue of the Stars
                              Suite 900
                              Los Angeles, California 90067
                    BY:  **BERNARD ALEXANDER, ESQ.**


                              CALIFORNIA CIVIL RIGHTS LAW GROUP
                              332 San Anselmo Avenue
                              San Anselmo, California 94960
                    BY:  **LAWRENCE A. ORGAN, ESQ.**
                         **CIMONE A. NUNLEY, ESQ.**

                    **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                  Official Reporter - US District Court
                  Computerized Transcription By Eclipse

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1*

**APPEARANCES:   (CONTINUED)**

For Defendants:            SHEPPARD MULLIN RICHTER & HAMPTON LLP
                           333 S. Hope Street
                           43rd Floor
                           Los Angeles, California 90017
                     BY:   **TRACEY A. KENNEDY, ESQ.**


                           SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                           379 Lytton Ave
                           Palo Alto, California 94301
                     BY:   **PATRICIA M. JENG, ESQ.**


                           SHEPPARD MULLIN RICHTER & HAMPTON LLP
                           Four Embarcadero Center
                           17th Floor
                           San Francisco, California 94111
                     BY:   **SUSAN Q. HAINES, ESQ.**


Also Present:              **JOSEPH ALM, ESQ.**
                           - Tesla, Inc.

                           **YUSUF MOHAMED, ESQ.**
                           - Tesla, Inc.

                           **VALERIE CAPERS WORKMAN**
                            - Tesla, Inc.


                           —   —   —

```
 1   Thursday - September 30, 2021                    8:01 a.m.

 2                      P R O C E E D I N G S

 3                          ---000---

 4        (Proceedings were heard out of presence of the jury:)

 5              THE CLERK:  Please come to order.

 6              THE COURT:  Please be seated.

 7        I understand that there are problems on the bridge and not

 8   only is it impacting Mr. Organ, but also at least one of the

 9   jurors.  So it will resolve when it resolves.

10        So there were just a couple of things -- two things on my

11   mind this morning.

12        One is I will give the proposed instruction on the persons

13   most knowledgeable as it was written last night and what was

14   just proposed and previously proposed and I said I was going to

15   read it.

16        And then the other issue was Mr. Organ yesterday was about

17   to read some discovery.  Do we know what that is?  And --

18              MR. ALEXANDER:  Yes, Your Honor.  I believe that we

19   submitted that documentation to you last night.  My

20   understanding is that it was going to be submitted so that

21   everyone would know what was going to be read.

22              THE COURT:  Okay.  I didn't see it this morning.

23        Ms. Kennedy, do you know what it is?

24              MS. KENNEDY:  I do not, Your Honor.

25              MR. ALEXANDER:  We should be able to provide printed
```

 1   copies of that.

 2        **THE COURT:**  Okay.  That would be great.  Why don't you

 3   provide it to Ms. Kennedy so she knows what it is that you're

 4   talking about.  And if there's no problem, then we can proceed;

 5   and if there's a problem, I'd like to know about it.

 6        (Whereupon document was tendered to the Court and

 7         counsel.)

 8        (Brief pause.)

 9        **THE COURT:**  Mr. Alexander, while we're waiting, who

10   are the witnesses today?

11        **MR. ALEXANDER:**  As I understand it, the witnesses are

12   we're going to complete Mr. Diaz.  Then we'll have La'Drea

13   Diaz.  Then we'll have Dr. Anthony Reading.  Then we'll have

14   Amy Oppenheimer.

15        **THE COURT:**  And will that complete your case?

16        **MR. ALEXANDER:**  No.  I believe that we have -- I

17   believe that we have Lamar Patterson and the Erin Marconi

18   video.  And with regard to Mr. Patterson, it's unclear where he

19   will be in the lineup.

20        **THE COURT:**  Okay.

21        **MR. ALEXANDER:**  And then there's the Heisen transcript

22   as well?

23        **THE COURT:**  The Heisen?

24        **MR. ALEXANDER:**  Yes.

25        **THE COURT:**  Okay.  All right.

1          Are you ready to discuss the discovery yet?

2          **MS. KENNEDY:**  Not yet.  We're reviewing the request

3     just to be sure.  I think some of them should be okay.  We're

4     just verifying there is not a supplemental response.

5          Your Honor, when we get done with this, we do have some

6     issues with the experts, Amy Oppenheimer, Charles Mahla, and

7     Anthony Reading.  We received this morning at about 6:15 a

8     PowerPoint which appears to be some additional information from

9     Dr. Reading in his testimony.  I need to review it.

10          Last night we received for Charles Mahla a demonstrative

11     requesting basically to talk about matters outside of his

12     expert report in 2019 in violation of the Pretrial Conference

13     Order, Docket 78, Page 7, Paragraph 7(c).

14          The same with Amy Oppenheimer.  We received a multi-page

15     PowerPoint late last night that, again, appears to have

16     information outside the report.  And, more importantly, it's

17     talking about and it has in the PowerPoint evidence that's been

18     precluded by this Court; namely, Exhibit 109, the May 21st,

19     2016, email and the photo of the graffiti.

20          Also Exhibit 107, which is involving April 2016 issues,

21     which is after Mr. Diaz was no longer working at the Tesla

22     facility.

23          And also Exhibit 108, by way of example.

24          I'll be frank, we got these late last night.  I haven't

25     really -- I haven't had a chance to study all the PowerPoints,

**PROCEEDINGS**

 1   but those were the ones that jumped out at me.  I'll look at

 2   them today, but I think I have seven witnesses today,

 3   Your Honor, so there may be other issues.

 4        Also, we're going to have to call a witness probably on

 5   Friday, Mr. Chris Reilly.  He wasn't on the Witness List.  He's

 6   got to come here to authenticate Exhibit 379, the Taleo

 7   dashboard recruiting document for Demetric Di-az.  This Court

 8   said that we could use that exhibit if Demetric Di-az's

 9   testimony was coming in, which it came in yesterday, and we

10   were able to get a stipulation.

11        Mr. Reilly is the Director of Recruiting and Work Force

12   Development.  He's just going to authenticate it as a business

13   record.  He's in Nevada.  If we can have him by Zoom, it will

14   probably take two minutes or less to lay the foundation that

15   it's a business record at the time so that it can be used.

16             THE COURT:  All right.

17             MS. KENNEDY:  We can probably do that on Friday,

18   Your Honor.

19             THE COURT:  That's fine.

20        And with respect to the experts, this is federal court and

21   you are bound by the expert reports.  Their testimony is bound

22   by their reports.

23        And you're also not able to bring in through an expert

24   what I've precluded in the Motions in Limine.  So to the extent

25   that Ms. Kennedy was accurate in her description, you better be

 1   sure that your PowerPoints don't include information that's

 2   excluded from -- or that's new.

 3          **MR. ALEXANDER:**  With regard to Amy Oppenheimer, we'll

 4   be able to address that.  I have not seen that PowerPoint, so

 5   I'll attempt to address that issue.

 6          With regard to the other expert, Mr. Mahla, he's an

 7   economist and he gave testimony based on the value of the

 8   company at that time.  The only thing that has changed is the

 9   value of the company.

10          And so, in other words, his report is exactly the same.

11   What he's done is updated it to say:  This is what the current

12   value of the company -- of Tesla is.

13          As I understand it, because there has been a delay in the

14   trial time, a delay in his deposition testimony, should not

15   prevent him from being able to testify to the value of the

16   company.  All of his other opinions remain the same, but with

17   regard to valuing the company and its current position as of

18   the date of the trial, I believe he should be able to update

19   his information in that regard.

20          **THE COURT:**  All right.  Ms. Kennedy, what do you say?

21          **MS. KENNEDY:**  I would object to that under Federal

22   Rule of Civil Procedure 26 and 37.

23          And his report was back in 2019.  If they were going to

24   update his opinion, update his report, we had two years.  He

25   could have sought leave.  He could have allowed me to at least

 1  take a 20-minute deposition for what his recent opinion is.  As

 2  of right now, I basically got ambushed last night at about 9:00

 3  o'clock with 126 pages of documents.

 4      **THE COURT:**  I could not agree more, if you were going

 5  to supplement his report.  I do think that that would be a good

 6  reason to allow that testimony, but to provide it the night

 7  before his testimony I think is unfair and prejudicial.

 8      So I am inclined -- I'm happy to look at, you know, the

 9  documentation to get a clearer picture of everything, but I

10  would exclude that.

11      **MR. ALEXANDER:**  All right.  Your Honor, we would like

12  to be able to just provide you with that.  It's all of two

13  pages.  And they know the value of their company.  It is not as

14  though it's a surprise.

15      And the information --

16      **THE COURT:**  But you knew -- Mr. Alexander, this is --

17  we're in the middle of a trial.  There are seven witnesses

18  coming today.  Your failure to provide that prior to the

19  beginning of the trial I think is -- it's just -- it's

20  improper.

21      But I will look at what you've got, and I'll make a final

22  ruling then if you would like me to look at it.

23      **MR. ALEXANDER:**  Thank you, Your Honor.

24      **MS. JENG:**  Your Honor, we have a couple of objections

25  to the designated discovery responses.

PROCEEDINGS

1      **THE COURT:**  Okay.

2      **MS. JENG:**  No. 8, this is just cumulative.  Mr. Romero

3  already testified about his position at Tesla and being a

4  former employee.  We don't think that that evidence should be

5  read again in discovery.

6      **THE COURT:**  Okay.  I'm going to overrule that because

7  I think the issue is the potential issue of bias on his

8  representation.  But I would strike the last sentence.  So the

9  first sentence could be read and not the second.

10      **MR. ALEXANDER:**  I'm sorry, Your Honor.  Could you

11  identify that again, please?

12      (Mr. Organ enters the courtroom.)

13      **MR. ALEXANDER:**  Yeah.  So in the Interrogatory No. 8

14  regarding Mr. Romero, you can read the first sentence and not

15  the second.

16      What else, Ms. Jeng?

17      **MS. JENG:**  Request For Admission No. 5.  This covers,

18  again, a period of time that's outside of the relevant time

19  period.  It's prejudicial under 403.  We don't think that

20  should come in.

21      **THE COURT:**  I agree.  So I will exclude Admission

22  No. 5 as being outside the scope.

23      **MS. JENG:**  With respect to Request For Admission

24  No. 2, we think the second sentence should be stricken given

25  that it states "our understanding."

1              **THE COURT:**  I'm not sure why that would be the case.

2              **MS. JENG:**  Well, in this -- this is -- plaintiff has

3    the burden to prove that, and there's no foundation that there

4    is actually a contract.

5              **THE COURT:**  Well, you can argue that to the jury, but

6    it was your understanding and you put it in the Request For

7    Admissions, so...

8              **MS. JENG:**  Understood.

9         For, I think -- sorry.  The last initial discovery

10   information pursuant to General Order No. 71 response, we

11   object to altering the request or the response in any way.

12             **THE COURT:**  I'm sorry.  What?

13             **MS. JENG:**  At the very last page.

14             **THE COURT:**  The last page?

15        And that objection is overruled.  It is -- I think

16   Demetric Di-az is no longer in this case, and I think it's

17   appropriate to delete plaintiffs.

18        All right.  So --

19             **MR. ALEXANDER:**  And so -- I'm sorry.

20        And so what is the Court's order with regard to changing

21   the --

22             **THE COURT:**  The last -- what is this?  I don't know

23   even what this -- what the discovery was, but the one that

24   appears on Page 4, No. 1, the request regarding Demetric Di-az

25   and Owen Diaz as supervisors, can be read as stated by the

PROCEEDINGS

```
 1   plaintiffs.

 2              MR. ALEXANDER:   Thank you, Your Honor.

 3              MR. ORGAN:   Thank you, Your Honor.

 4              THE COURT:   Are you going to do that at some point

 5   today?

 6              MR. ALEXANDER:   Yes, Your Honor.

 7              MR. ORGAN:   Assuming we have time.   Assuming we have

 8   time.

 9       So just so I'm absolutely certain, because I don't want to

10   read something incorrectly -- and I did run in, I apologize to

11   the Court, because of the bridge protest -- so on No. 8 we

12   can't read the second sentence; is that correct?

13              THE COURT:   Correct.

14              MR. ORGAN:   Okay.   And then on number -- we can't read

15   No. 5 --

16              THE COURT:   Correct.

17              MR. ORGAN:   -- of the Request For Admissions?

18              THE COURT:   Correct.

19              MR. ORGAN:   And those are the only two changes; is

20   that correct, Your Honor?

21              THE COURT:   Yes, unless are there any other objections

22   that the defendant had.

23              MR. ORGAN:   Okay.   Thank you, Your Honor.

24              THE COURT:   All right.

25              MR. ORGAN:   Did you already discuss the
```

 1   demonstratives?

 2         **THE COURT:**  The expert demonstratives?

 3         **MR. ORGAN:**  Yes.

 4         **THE COURT:**  Yes.

 5         **MR. ORGAN:**  Okay.

 6         **THE COURT:**  You can talk to Mr. Alexander about that.

 7         **MR. ORGAN:**  Okay.

 8         **THE COURT:**  All right.  Is there any other matter that

 9   needs to be addressed?

10         **MS. KENNEDY:**  From the defense, no more, Your Honor.

11         **THE COURT:**  Okay.  Mr. Alexander, anything else?

12         **MR. ALEXANDER:**  Not at this time, Your Honor.

13         **THE COURT:**  Okay.

14         **MR. ORGAN:**  One other thing, Your Honor.  I did call

15   my client this morning to let him know that I was running late.

16   So I know the Court has said we are not to contact --

17         **THE COURT:**  I said on any substantive ground.

18         **MR. ORGAN:**  Yeah.  I just wanted to clarify to the

19   Court that no substantive discussion, but I did tell him that I

20   was caught in the bridge traffic.

21         **THE COURT:**  That doesn't sound substantive, so you're

22   fine.  Thank you.

23      All right.  I will see you when we have a jury.

24         **MS. KENNEDY:**  Thank you, Your Honor.

25      (Whereupon there was a recess in the proceedings

1       from 8:24 a.m. until 8:31 a.m.)

2      (Proceedings were heard in the presence of the jury.)

3          **THE COURT:**  All right.  Please be seated, everybody.

4      Good morning, ladies and gentlemen.  I understand that

5  particular appreciation is due to those of you who were trying

6  to get across the Golden Gate Bridge this morning.  So thank

7  you all for being here so promptly.

8      We were still in the cross-examination of Mr. Diaz and so,

9  Ms. Kennedy, please proceed.

10         **MS. KENNEDY:**  Thank you, Your Honor.

11                    **OWEN ORAPIO DIAZ**,

12  called as a witness for the Plaintiff, having been previously

13  duly sworn, testified further as follows:

14                **CROSS-EXAMINATION RESUMED**

15  **BY MS. KENNEDY**

16  **Q.**  Good morning.  Good morning, Mr. Diaz.

17  **A.**  Good morning, ma'am.  I hope you slept well.

18  **Q.**  Take a look at the black notebook.

19  **A.**  Yes, ma'am.

20  **Q.**  If you go to Exhibit 204, which has only been marked for

21  identification.

22         **MS. KENNEDY:**  And, Your Honor, it has been redacted.

23      (Trial Exhibit 204 marked for identification)

24         **THE WITNESS:**  I have it, ma'am.

25

1    BY MS. KENNEDY:

2    Q.    Okay.  Do you recall this as your handwritten application

3    to CitiStaff signed on June 2nd, 2015?

4    A.    Yes.

5    Q.    And if you go to the second page, do you recognize your

6    signature on Page 2?

7    A.    Yes.

8    Q.    And is this the handwritten application you submitted to

9    someone at CitiStaff sometime in the early part of June 2015?

10   A.    Yes.  After I was directed from Indeed, yes, I did go to

11   CitiStaff and fix this.

12   Q.    And is all the handwritten information on Exhibit 204 in

13   your handwriting?

14   A.    Yes.

15           MS. KENNEDY:  Your Honor, I move to admit Exhibit 204.

16           THE COURT:  Any objection?

17           MR. ORGAN:  No objection, Your Honor.

18           THE COURT:  All right.  It's admitted.

19       (Trial Exhibit 204 received in evidence)

20   BY MS. KENNEDY

21   Q.    So take a look at Exhibit 204, Mr. Diaz.  Do you recall

22   who you provided this application, the CitiStaff Solutions

23   application to?

24       (Document displayed.)

25   A.    I don't remember her name, but it was a heavy-set Latino

1  female at the Newark office.

2  Q.   Do you recall anything about her?

3  A.   No, ma'am.

4  Q.   And was this the CitiStaff Solutions office in Newark,

5  Newark, California?

6  A.   Yes, ma'am.  It was in Newark.

7  Q.   And did you have any discussion with anyone at CitiStaff

8  about this application?

9  A.   No, ma'am.  When I was filling out the application, the

10  Latino female, as I was filling out the application, she picked

11  up the phone.  She was talking on the phone.

12      I filled it out.  I handed it to her, and then she had

13  told me at that point:  Hey, I need you to head over to Tesla

14  the next day.

15  Q.   Now, did you ever receive any type of letter from Tesla

16  offering you employment with Tesla directly?

17  A.   No, ma'am.

18  Q.   So you understood at the time you filled out the

19  CitiStaff Solutions application on June 2nd, 2015, that you

20  were going to be assigned to work at the Tesla factory if, in

21  fact, CitiStaff hired you; correct?

22  A.   That was never discussed, ma'am.

23  Q.   So that was never discussed with anyone at CitiStaff?

24  A.   Umm, you said that I had to understand that I was being

25  assigned at CitiStaff -- I mean, at Tesla.  She never said I

1    was going to be assigned at Tesla.  What she said was, is:  Can

2    you head over to Tesla tomorrow?

3    **Q.**   And when she said "Head over to Tesla tomorrow," what did

4    you think?

5    **A.**   That I got the job.

6    **Q.**   And you were going to be assigned at Tesla; correct?

7    **A.**   Again, ma'am, she never stated that I was going to be

8    assigned at Tesla.  She told me can I head over to Tesla

9    tomorrow.

10   **Q.**   Oh, I understand that.  My question is:  When she said "Go

11   over to Tesla," you just filled out a CitiStaff Solutions

12   application.  You knew you were being assigned to Tesla through

13   CitiStaff; correct?

14   **A.**   That wasn't my understanding at the time, ma'am, no.

15   **Q.**   What was your understanding?

16   **A.**   My understanding was I just got the job.

17   **Q.**   What job?

18   **A.**   The job at Tesla.

19   **Q.**   Doing what?

20   **A.**   She had sent me over there at original to be a part of the

21   sustainability group.

22   **Q.**   Is that what she told you?

23   **A.**   No.  She never said that either.

24   **Q.**   So how did you get that understanding?

25   **A.**   Because when I got over there, that's where they put me,

1    in the sustainability group.

2    **Q.**    And who is "they"?

3    **A.**    Umm --

4              **MS. KENNEDY:**  Oh, I'm sorry, Your Honor.  I don't

5    think the TV in the back is working for the jurors.

6              **THE COURT:**  Okay.

7              **MS. KENNEDY:**  Oh, there it is.

8              **THE COURT:**  Let us know when you -- is it up there?

9    There it goes.

10             **MS. KENNEDY:**  Okay.  Now I forgot where I was.

11   **BY MS. KENNEDY**

12   **Q.**    So at the time that you filled out this application and

13   you were sent over to the Tesla factory, you didn't have any

14   idea where you were going to be assigned; is that correct?

15   **A.**    No, ma'am.

16   **Q.**    So when you got over there, someone sent you over to the

17   sustainability area or department; correct?

18   **A.**    When I got to Tesla, after I finished my orientation

19   class, Jaime Salazar put me on the back of a golf cart and at

20   that point he drove me to the elevator ramp.

21   **Q.**    Mr. Diaz, did you ask anybody at Tesla:  Where am I going?

22   What job am I hired for?  What's going on?  Any questions like

23   that?

24             **MR. ORGAN:**  Objection.  Compound, Your Honor.

25             **MS. KENNEDY:**  I'll rephrase it, Your Honor.

1          THE COURT:  Sustained.

2    BY MS. KENNEDY

3    Q.   At the time that you got over to Tesla for your

4    orientation, did you ask anybody, like:  What job am I going to

5    get?  Did you ask that question?

6    A.   No, I did not, ma'am.  I was just so happy to be there, I

7    didn't ask them questions.  I'm sorry.

8    Q.   Did you ask what type of -- did they ask you what type of

9    job you wanted?

10   A.   When I had initially filled out the -- both applications,

11   yes, they did ask me what kind of work that I was looking for.

12   I said warehouse, production work, things like that.

13        Yes.  So, yes, I did ask the kind of job that I wanted.

14   Q.   When you were on the cart with Jaime Salazar, did you ask

15   him any question like:  Hey, what am I being hired for?

16   A.   No, ma'am.  Because at that point when Mr. Salazar had put

17   me on the golf cart, before that he had stated to me:  You're a

18   man that dresses for the job.  And he had gave me another

19   position.  I was just so happy I got promoted.  So, hey, I

20   didn't ask any questions.  I just followed.

21   Q.   Okay.  So you're happy you got some type of job.  You

22   didn't ask any questions, and you're ready to go start working

23   at your assignment at Tesla in early June 2015?

24          MR. ORGAN:  Objection.  Compound.  Asked and answered.

25          THE COURT:  Sustained.

**DIAZ - CROSS / KENNEDY**

1    BY MS. KENNEDY

2    Q.   Once you started working at Tesla, you were assigned to

3    work at the elevators; correct?

4    A.   Yes, ma'am.

5    Q.   All right.  Let's go to Exhibit 265, which has been marked

6    for identification yesterday.

7              MR. ORGAN:  265?

8              MS. KENNEDY:  265.

9              MR. ORGAN:  265.

10   BY MS. KENNEDY:

11   Q.   And, sir, it should be in your black book as well.

12   A.   Yes, ma'am.  I see it here.

13   Q.   And we talked about this yesterday, but I want to confirm

14   that this is an email that was forwarded to you from Lamar

15   Patterson on December 15th, 2015; correct?

16   A.   Yes.  Mr. Patterson did forward me his resume.  Yes, he

17   did.

18   Q.   And at the top of Exhibit 275 -- I'm sorry, 265, the

19   December 15th, 2015 email, that's to your email address;

20   correct, Mr. Diaz?

21   A.   Yes.  That's my name and my last -- my last JR, my birth

22   date with a 68 at gmail.com, yes, ma'am.

23             MS. KENNEDY:  And, Your Honor, I would move to admit

24   Exhibit 265.

25             MR. ORGAN:  No objection, Your Honor.

1          **THE COURT:**  It's admitted.

2      (Trial Exhibit 265 received in evidence)

3  **BY MS. KENNEDY**

4  **Q.**   All right.  So take a look at this.  So just to reorient,

5  Lamar Patterson was someone who was referred to you by another

6  Tesla employee or contractor?  How did you get to know

7  Mr. Patterson?

8  **A.**   I didn't know Mr. Patterson at the time.  As I stated

9  yesterday, that another employee walked up to me and asked me

10  was there any positions over in the elevator.  And I explained

11  to him, yes, because at that time I was short staffed.  I was

12  working elevators by myself.

13      So as soon as he said that, I told him yes.  He asked me

14  could a person forward his email to me and could I forward it

15  up to somebody else, and I did just that.

16  **Q.**   And was it your understanding that this person was Lamar

17  Patterson's cousin?

18  **A.**   Yes, ma'am.

19  **Q.**   And Lamar Patterson's cousin worked with you at the Tesla

20  factory; correct?

21  **A.**   Yes.  He worked at the Tesla factory, but he did not work

22  with me directly, no.

23  **Q.**   And so you heard that someone was looking for a position

24  that you find out later is Lamar Patterson, and then you just

25  forwarded his resume to someone?

 1  **A.**    Yes, I forwarded his resume to Edward Romero.

 2  **Q.**    And that's what's reflected here on Exhibit 265; correct?

 3  I'm sorry.  The resume sent by Lamar Patterson to you.

 4       (Interruption in the proceedings due to technical

 5        difficulties.)

 6            **THE COURT:**  All right.  Go ahead, Ms. Kennedy.

 7            **MS. KENNEDY:**  Thank you, Your Honor.

 8  **BY MS. KENNEDY**

 9  **Q.**   Mr. Diaz, I'll have you look at Exhibit 245, which I'm not

10  sure it's in your black notebook, but it was admitted

11  yesterday.  It could be in your white notebook, sir.

12       Do you have that exhibit in front of you, sir?

13  **A.**   Yes, ma'am.

14  **Q.**   And if you go to Exhibit 245 at Page 2, it's already been

15  admitted.

16       And take a look at Exhibit 245 at Page 2.

17            **MS. KENNEDY:**  Oh, Your Honor, it's not working?  I'm

18  sorry.

19            **THE COURT:**  Let's try and get that up again.

20            **MS. KENNEDY:**  Okay.

21       (Document displayed.)

22  **BY MS. KENNEDY**

23  **Q.**   All right.  Mr. Diaz, do you have Exhibit 245 at Page 2,

24  which is the Lamar Patterson email to you on February 26, 2016?

25  **A.**   Yes, I have it, ma'am.

1  Q.   And this is an email Mr. Patterson wrote to you regarding

2  the incident that you had with Robert Hurtado; is that correct?

3  A.   Yes, ma'am.  You can see where he's saying that Robert

4  Hurtado was hostile.

5  Q.   Yes.  And my understanding is this is an incident you

6  claimed that Robert Hurtado became very aggressive with you and

7  used the "N" word with you; correct?

8  A.   This is the incident where me and Mr. Hurtado and Lamar

9  Patterson was in the elevator and me and Mr. Patterson was

10  talking.  He kept trying to interject after everything had been

11  going on, he had been harassing me.  And I had told him can he

12  just stop talking to me.

13      So Mr. Patterson is saying that I asked him could he write

14  a little something witnessing what he had saw, and that's what

15  he did.

16  Q.   My question was:  Was this the incident with Mr. Hurtado

17  where you claimed Mr. Hurtado called you the "N" word?  "Yes"

18  or "no."

19  A.   It was so many incidents, I just can't remember at this

20  particular time.  Sorry.

21  Q.   Well, the incident that you referred to, we just talked

22  about, Lamar Patterson was a witness; correct?

23  A.   Yes, he was.

24  Q.   And at the time that this incident occurred, you were

25  supervising Lamar Patterson; correct?

1   A.   Yes, I was.

2   Q.   And regarding this Robert Hurtado elevator incident, you

3   asked Mr. Patterson to write down what he saw; correct?

4   A.   Yes.

5   Q.   And you told him to be truthful; correct?

6   A.   Yes, ma'am.

7   Q.   And you told him to be accurate; correct?

8   A.   I did not say be accurate, no.  Them words never came out

9   of my mouth, ma'am.

10   Q.   Well, told him to be truthful about what he said; correct?

11   A.   Umm, I'm trying to play back the conversation in my mind

12   right now.  If you can give me a second to try to put myself

13   back into the elevator with him.

14   Q.   Absolutely.  Take your time, and let me know when you're

15   ready.

16        (Brief pause.)

17   A.   I just asked him to -- could he write down what he had

18   witnessed.  That's all.  I didn't ask him to be accurate.  I

19   didn't ask him to tell the truth.  I didn't -- that never came

20   up.  I just asked him could he just write it down, what his

21   versions of the events was.

22   Q.   Did you ask Mr. Patterson to omit anything?

23   A.   Again, I just asked Mr. Patterson to write down.  I didn't

24   have nothing to do with Mr. Patterson writing the email.  I

25   didn't put any words in Mr. Patterson's mouth.  I didn't -- I

 1  just asked him to document it.  That was it.

 2  Q.   And on February 26, 2016, did you have a run-in or an

 3  argument with Robert Hurtado where Lamar Patterson was a

 4  witness where Robert Hurtado called you the "N" word?  "Yes" or

 5  "no."

 6  A.   At this moment I'm trying to play everything back in my

 7  head.  I can remember an incident in the elevator with him.  I

 8  can remember Mr. Hurtado getting upset.

 9       I probably did.  I'm will not say probably, but I'm going

10  to say most likely he did call me the "N" word.  Because at

11  that point, you know, I just didn't want him talking to me

12  anymore.  So I'm more focused on:  Hey, hey, listen here.  If

13  it doesn't have anything to do with this job, please don't talk

14  to me.

15  Q.   When you got this email from Lamar Patterson on

16  February 26, 2016, did you read it?

17  A.   No.  I just forwarded it up.

18  Q.   So you didn't make sure that Mr. Patterson -- after you

19  asked him to write a statement about this, you didn't make sure

20  it was accurate and contained these horrible sort of racial

21  slurs you claim occurred?

22            MR. ORGAN:  Objection.  Argumentative, Your Honor.

23            THE COURT:  Sustained.

24  BY MS. KENNEDY

25  Q.   When you got the email from Mr. Patterson, did you take

 1   any time, whether at the moment you got it or two or three days

 2   afterwards, to read it?

 3           MR. ORGAN:  Objection.  Asked and answered.

 4           THE COURT:  Overruled.  You can answer.

 5           THE WITNESS:  I just asked Mr. Patterson to document

 6   it, ma'am.  That was it.

 7   BY MS. KENNEDY

 8   Q.   Mr. Diaz, as of about March of 2016, you had already

 9   decided that you were not going to be returning back to work at

10   the Tesla facility; is that correct?

11   A.   Yes, ma'am.

12   Q.   And, say, in the February and March 2016 time period, you

13   had some conversations with Joyce DelaGrande about concerns she

14   had from her team about the elevator service; correct?

15           MR. ORGAN:  I'm sorry, Your Honor.  I missed the date.

16           MS. KENNEDY:  I'll rephrase, counsel.  I'll rephrase.

17   BY MS. KENNEDY

18   Q.   In February and March of 2016, did you have any

19   conversations with Joyce DelaGrande about concerns she had with

20   her team and the elevator service?

21   A.   I don't remember the exact date, ma'am, but, yes, I did

22   have a conversation with Joyce DelaGrande.  The conversation

23   that I had with Joyce DelaGrande was -- I believe it was behind

24   the incident.

25       My harasser, Mr. Hurtado, had went back over to -- and

1    told his boss something, but I had went over there, and I tried

2    to talk to her and told her that Robert had been threatening me

3    and some of the things that he had been saying to me.  That was

4    about it.

5    **Q.**   Do you have any recollection of any conversations with

6    Joyce DelaGrande about concerns her team had with the service

7    that the elevator folks, the people you were supervising, were

8    providing to the material folks?

9    **A.**   She asked me about the service, and I had told her that I

10   was still keeping up the same service like when she asked me

11   when she was going to get fired, could I go help her clean up

12   the drop zone.

13          So, you know, like I said, I was giving out the same

14   output of service from day one to day zero.  Just because I --

15   I might be in a bad mood or whatever-have-you and the things

16   that's going on in the factory is affecting me, but I shouldn't

17   let that affect my work output.

18   **Q.**   And you considered in your opinion to do the best job

19   possible despite everything; right?

20   **A.**   Under the circumstances, yes, ma'am.

21   **Q.**   In this particular case you are seeking damages for your

22   emotional upset for the things that you claim happened to you

23   at the Tesla facility or factory; is that correct?

24   **A.**   Yes, ma'am.

25   **Q.**   And part of that emotional distress you're seeking in this

1  case is about how you were affected because your son Demetric

2  was working at the factory with you and how that affected you;

3  correct?

4  A.   Yes, ma'am.

5  Q.   And you testified that watching your son made you very

6  upset.  Would that be an understatement?

7  A.   That's pretty much an understatement, yes.

8  Q.   And you said that your son got involved in some activities

9  that made you very unhappy; correct?

10  A.   Umm, his supervisor was calling him the "N" word.  Yes,

11  that made me unhappy.

12  Q.   And this was at a time when you and Mr. -- strike that,

13  you and your son Demetric Di-az were both working at the Tesla

14  factory; correct?

15  A.   It happened while me and my son was working at the factory

16  together, yes, you're right, ma'am.

17  Q.   And when you heard from your son about these words being

18  said to him, these racist words being said to him, did you

19  document any of that to anyone at the Tesla facility or to

20  CitiStaff or to West Valley?

21  A.   No, I did not, ma'am.

22  Q.   And you understood that in the summer of 2015 your

23  stepdaughter La'Drea Jones also applied for a job at Tesla;

24  correct?

25  A.   I didn't know that, ma'am.

**DIAZ - CROSS / KENNEDY**

1    Q.    So in the summer of 2015 when you're living with La'Drea

2    Jones, your wife and your son Demetric Di-az, you had no idea

3    she applied for a job in the summer of 2015; correct?

4    A.    I had no idea.

5    Q.    Now, I understand that your son Demetric Di-az has pleaded

6    guilty to three counts of robbery of a Domino's Pizza store; is

7    that correct?

8    A.    Yes, ma'am.

9    Q.    And you would agree those are serious felonies; correct?

10   A.    Yes.  He was going through mental trauma.  Yes, I do

11   believe those are serious felonies.

12   Q.    And these three counts of robbery occurred more than three

13   and a half years after he stopped working at the Tesla

14   facility; correct?

15   A.    Yes, ma'am.  After he stopped working at the Tesla

16   facility, he started hanging with the wrong people.

17   Q.    And so for that three-and-a-half-year period, he had other

18   jobs and other relationships and other things were going on

19   with his life; correct?

20   A.    I believe he could have may have had another job.

21   Q.    And he was living in your house during that time with your

22   wife and his older sister, La'Drea Jones; correct?

23   A.    No, that is not correct.  He wasn't with us all that time.

24   Q.    And, in fact, you're seeking emotional distress damages

25   because you blame Tesla for what has happened to your son

1    Demetric Di-az when he was employed by West Valley and assigned

2    to work at the Tesla facility; correct?

3    A.   Yes, ma'am.  When I was raising my son, I had a

4    hands-on -- a hands-on thing with him.  I basically before that

5    knew where my son was.  I knew what he was doing.  Me and my

6    son talked a little bit more.

7         As -- after he had left Tesla, me and him started getting

8    more and more distant because of the fact that, like I said, I

9    believe he had -- he knew that I was broken and I couldn't help

10   him.

11        So, you know, he -- he said in his testimony over there

12   that that was the first time he had ever in his life seen his

13   father that he didn't know what to do.

14   Q.   And at the time your son was working at the Tesla facility

15   he was 19 years old?

16   A.   Yes, ma'am.

17   Q.   And, in fact, it's true you do not blame CitiStaff for

18   anything that happened with Demetric Di-az; correct?

19   A.   My son was never contracted through CitiStaff.  My son was

20   contracted through West Valley, ma'am.

21   Q.   I understand that.  That wasn't my question.  My question

22   is:  Do you blame CitiStaff for the things that happened to

23   your son?

24   A.   No.  CitiStaff wasn't involved in that, ma'am.

25   Q.   Do you blame Chartwell for any of the things that happened

```
 1   with your son?

 2   A.   No, ma'am.  Chartwell wasn't involved in that, ma'am.

 3   Q.   Do you blame nextSource for anything of the things that

 4   happened with your son?

 5   A.   No, ma'am.  nextSource wasn't involved in it, ma'am.

 6   Q.   Do you blame West Valley staffing for things that happened

 7   to your son?

 8   A.   Yes, I do, ma'am.

 9   Q.   And you blame Tesla for the things that happened to your

10   son; correct?

11   A.   Yes, I do, ma'am.

12        MS. KENNEDY:  Your Honor, I have no more questions.

13        THE COURT:  All right.

14   Mr. Organ, do you have any redirect?

15        MR. ORGAN:  Just a little, Your Honor.

16                      REDIRECT EXAMINATION

17   BY MR. ORGAN

18   Q.   Good morning, Owen.  How are you?

19   A.   Good morning.

20   Q.   When you were being called the "N" word and mayate and

21   those things, did that make your job harder?

22   A.   Yes, it did.

23   Q.   And how did it make your job harder?

24        (Cell phone interruption.)

25   A.   I'm sorry.  I apologize.  I thought I had that off.
```

1   Q.   Judges usually take those if they ring, so...

2   A.   Yeah.  I definitely thought I had everything off.

3   Q.   I better check mine.

4        Okay.  I'm good.  Yes.

5   A.   Can you repeat the question, please?

6   Q.   How did it make -- how did -- being called those racial

7   words, how did that make your job harder?

8   A.   Well, it's just like somebody is holding you under water.

9   You know, even though you're trying to move and do the things

10  that you need to do, you're still being, you know, subjected

11  and degraded to something.

12       So it's like, you know, it's just -- it's just degrading

13  and demeaning.  You know what I mean?  It made my job just not

14  that enjoyable, you know.  Even though I'm going to put out the

15  same amount of output that I'm putting out, but it's like you

16  start to look on life bleakly, you know.

17  Q.   Ms. Kennedy asked you some questions about whether or not

18  Ramon Martinez engaged in any harassing conduct of you between

19  October 17 and the picaninny incident in January.  Do you

20  recall with any kind of certainty that conduct did occur or

21  didn't occur during that time period by Ramon Martinez?

22  A.   No.

23  Q.   Okay.

24  A.   No.

25  Q.   Do you remember the last time, other than the picaninny

1   incident, that Mr. Ramon Martinez used the "N" word or *mayate*

2   or any of those words towards you?

3   **A.**   No, I can't recall.  It -- it was happening so often that

4   I -- I just was losing track and trying to ignore things.

5   **Q.**   Okay.  And then my last question has to do with

6   Ms. Kennedy asked you about why you didn't put stuff in

7   writing.  Do you remember those questions?

8   **A.**   Yes, ma'am -- I mean, yes, sir.  I'm sorry.  Yes, sir.

9   **Q.**   You just tried to promote me.

10          Okay.  In terms of your written complaint about the

11   picaninny, at any time after that did you see Tesla do anything

12   to prevent harassment in your workplace like in terms of

13   training any employees about whatnot to do?

14          **MS. KENNEDY:**  Objection.  Leading.

15          **THE COURT:**  Overruled.  You can answer.

16          **THE WITNESS:**  No, sir.  Even after I complained in

17   writing about the picaninny, Mr. Hurtado was still harassing

18   me.

19          **MR. ORGAN:**  Okay.  No more questions, Your Honor.

20          **THE COURT:**  All right.  Anything else?

21          **MS. KENNEDY:**  No more questions, Your Honor.

22          **THE COURT:**  Okay, Mr. Diaz, you can step down.  Thank

23   you.

24          **THE WITNESS:**  Thank you.

25          (Witness excused.)

```
 1              THE COURT:  And who is next?

 2              MR. ORGAN:  Oh, I forgot my mask.  I apologize,

 3    Your Honor.

 4         La'Drea.  Ms. Jones.

 5         (Brief pause.)

 6              MR. ORGAN:  I think we'll do Dr. Reading, Your Honor,

 7    instead of Ms. Jones.

 8              THE COURT:  Come on up, Dr. Reading.

 9              THE WITNESS:  Thank you, Your Honor.

10              THE CLERK:  Come on up to the witness stand, remain

11    standing, and I'll swear you in.

12                     ANTHONY EDWARD READING,

13    called as a witness for the Plaintiff, having been duly sworn,

14    testified as follows:

15              THE WITNESS:  I do.

16              THE CLERK:  Please be seated.

17              THE WITNESS:  Thank you.

18              THE CLERK:  And then if you could please state your

19    full name for the record and spell it for the court reporter.

20              THE WITNESS:  Anthony, A-N-T-H-O-N-Y, Edward,

21    E-D-W-A-R-D, Reading, R-E-A-D-I-N-G.

22                      DIRECT EXAMINATION

23    BY MR. ALEXANDER

24    Q.   Good morning, Dr. Reading.

25    A.   Good morning, sir.
```

 1  Q.   We're going to be doing your testimony without the

 2  PowerPoint, so you're aware of that.

 3       Can you tell me, what is your occupation?

 4  A.   I'm a licensed psychologist.

 5  Q.   And have you been licensed in California?

 6  A.   Yes.  I've been licensed since 1982 when I came from the

 7  United Kingdom where I received my training and worked for

 8  several years before I came.

 9  Q.   And did you need to be retrained upon coming to

10  California.

11  A.   No.  When I came to California, I was granted a waiver of

12  the licensing exam in view of my prior contributions to the

13  field.  So there was no retraining and no licensing exam.

14  Q.   With regard to your curriculum vitae, since we don't have

15  a visual of it, can you describe your background, your

16  credentials?

17  A.   I received a degree in psychology from the University of

18  Wales.  And then I went to London and received my clinical

19  training, which in England is a Master of Philosophy degree.

20  And I received that training at the Institute of Psychiatry,

21  which is one of the University of London's postgraduate

22  training institutes.

23       Having completed my clinical training, I went across the

24  road to King's College Hospital, where I took up an appointment

25  as a clinical psychologist providing treatment to patients

1    within the National Health Service in England and remained

2    there for seven years.  While at King's, I received a PhD from

3    the University of London and also a faculty appointment in the

4    medical school.

5         And then in 1981 I was recruited to join the full-time

6    faculty in the Department of Psychiatry at UCLA School of

7    Medicine, where I took up an appointment as an assistant

8    professor.  And while at -- on the full-time faculty, I was

9    promoted to an associate professor and then a full professor,

10   and I remained a full professor on the clinical or voluntarily

11   faculty at U.C.L.A. School of Medicine.

12   Q.   Now, during the time frame that you were on the full-time

13   faculty at U.C.L.A., did any of your work deal with work

14   issues?

15   A.   Yes.  As of -- as of -- being there a couple of years, I

16   took up employment in the Center for Health Enhancement, which

17   had a mission to study the effects of work on mental and

18   physical health.

19        And I was also instrumental in obtaining research funding

20   from the MacArthur Foundation to collaborate with five medical

21   schools, one in Sweden and the remainder in the United States,

22   looking at the effects of stress in the workplace.

23        And I also carried out research on physicians and nurses

24   looking at the mitigating effects of control on stress in the

25   workplace.

1      So what we find is where there are high-demand jobs, the

2  ability or perception of control is protective.  So I carried

3  out research as well as academic work in the context of

4  workplace stress.

5  **Q.**   And have you published your own research?

6  **A.**   Yes.  I was fortunate enough in England to be funded by

7  the World Health Organization and the Medical Research Council.

8  And then in U.C.L.A. I was funded by the National Institutes of

9  Health, the American Cancer Society, the Kroc Foundation, who

10  funded a program that still exists, on psychoneuroimmunology,

11  which looks at the interface between stress and immune

12  function.  And I also was funded by the MacArthur Foundation,

13  and that led to research that was published in the first 20

14  years of my career.

15  **Q.**   And in reviewing your C.V., it indicates 77 research

16  papers, 32 chapters in books, and 27 scientific abstracts; is

17  that correct?

18  **A.**   Yes, sir.

19  **Q.**   And did all of those publications stem from the research

20  programs you were involved in?

21  **A.**   Yes.  Yes.  I was involved and set up a number of research

22  programs.

23  **Q.**   Now, is it correct that you have a clinical practice?

24  **A.**   Yes, I do.

25  **Q.**   And can you describe that?

 1   **A.**   Well, over my career, from 1974 I've been heavily involved

 2   in patient's care in concert with the patient's treating

 3   physician and have had extensive experience treating such

 4   issues as depression, anxiety, panic.  Until the last two or

 5   three years when I cut down my practice, I was involved with

 6   patient care more than 50 percent of my time.

 7   **Q.**   Have you previously testified as an expert at trial?

 8   **A.**   Yes, sir.

 9   **Q.**   Approximately how many times?

10   **A.**   I would estimate over 250 times since I first started in

11   1989 in this situation.

12   **Q.**   And are you always retained by the plaintiff?

13   **A.**   No.  My office handles retention and whoever contacts us,

14   we're retained.  So about 70 percent retention by plaintiff

15   counsel and the remainder by defense counsel.

16   **Q.**   And have you been retained by me or my firm in the past?

17   **A.**   I have.  I would say in the last 20 or more years,

18   anywhere from 10 to 15 times.

19   **Q.**   And with regard to your providing an opinion in this case,

20   you have been paid for your time, I take it?

21   **A.**   Yes, sir.

22   **Q.**   And approximately how much have your charges been up to

23   this date?

24   **A.**   I would estimate around $5,000.

25   **Q.**   And have you performed an evaluation of Owen Diaz in this

 1  matter?

 2  **A.**   I have.

 3       **MR. ALEXANDER:**  Your Honor, may Dr. Reading testify as

 4  an expert in this matter?

 5       **MS. KENNEDY:**  No objection, Your Honor.

 6       **THE COURT:**  You may proceed.

 7       **MR. ALEXANDER:**  Thank you.

 8  BY MR. ALEXANDER

 9  **Q.**   So in order to give an overview of what you're going to be

10  testifying to, what are the three questions you'll be

11  addressing in your testimony?

12  **A.**   Yes, the three categories on which I will render opinions

13  are:

14       What happened in the workplace from a psychological

15  standpoint, at least the allegations?

16       Did what happened, to the extent they occurred, lead to

17  any psychiatric injury, meaning a psychiatric illness?  And if

18  so, I will drill down on the nature of that.

19       And, also, in the event there is evidence for an injury or

20  psychiatric illness, is he or was he a candidate for treatment

21  and how may he be impacted going forward?

22       So those are the three categories of opinion.

23  **Q.**   Now, in order to address those issues, can you tell me

24  what steps did you take to obtain information in order to

25  inform your opinions and conclusions?

A.   In this setting, my opinions are based on an extended interview, face-to-face, with Mr. Diaz, which I conducted in October, 2019.  October 2nd, I believe.

I observed his affect, any expression of emotion during the interview, and tracked when that occurred and what was being discussed.

And I also administered psychological testing.  I administered two tests:  The MMPI-2-RF and the PAI.  And these are broad-based tests that have two objectives.

The first is to quantify the stress, should it exist, by comparing Mr. Diaz to the normal population.

And, secondly, it affords an opportunity to examine his response pattern to detect any potential problems in the way he answered the questions, which could raise the index of suspicion of what we call motivational factors, which are particularly of interest in litigation.  Is there a motivation to present more symptoms than may exist because they see some benefit?

In this case I was not able to view any records so my opinions are based on those data subject to the absence of records.

Q.   So your first opinion has to do with the alleged work experience.  What were your findings in this regard?

A.   Well, my findings are based on Mr. Diaz's report to me. So he reported shortly after joining Tesla, he was subjected to

1   various racial epithets; being called the "N" word, being

2   called "boy," being confronted by coworkers threatening to

3   shoot him, engage in a physical altercation, graffiti or a

4   picture denigrating his race, and also having feces smeared on

5   a cart he and a coworker used.

6        So these were ongoing issues that he reported to me.

7   **Q.**   Is there a difference when racial abuse occurs in the

8   workplace?

9   **A.**   Yes.  So racial abuse in the workplace is different.  It

10  has the potential to confer injury owing to the fact that we

11  spend so much time in the workplace.  So the potential exposure

12  is greater.

13       Secondly, we can't control what's happening as we can in

14  our personal life.  We can remove ourselves from the issue or

15  the people perpetrating the abuse.  That may not be possible --

16  is not possible in the workplace where we're dependent on our

17  job for our livelihood.

18       In Mr. Diaz's case, he claimed to me he reported what was

19  going on and was unable to recruit assistance.  So he's

20  dependent on others, namely his employer, to intervene, and he

21  conveyed to me he was not able to recruit that assistance.

22       And then, of course, racial abuse, particularly in the

23  workplace where it's pervasive, we are not protected.  It has

24  other connotations in terms of evoking fear, given the use of

25  such racial epithets used to describe a person, to remove their

 1  identity, and to have connotations of violence historically and

 2  also in the present context.

 3      And he -- so there were a number of factors that raised

 4  the likelihood of a psychiatric injury in the workplace.

 5  **Q.**   And what significance do you give to the fact that

 6  supervisors were using racial slurs with regard to Mr. Diaz?

 7  **A.**   That in general, I think in Mr. Diaz's sense of

 8  hopelessness in terms of a -- these were his supervisors and,

 9  indeed, the potential for bringing about some change in what

10  was happening.

11  **Q.**   Now, did Mr. Diaz report any other adverse experiences at

12  Tesla?

13  **A.**   He did.

14  **Q.**   And what did he report in that regard that contributed to

15  your opinions and conclusions?

16  **A.**   He reported an incident which he conveyed to me was a

17  turning point in terms of his relationship with his son, whom

18  he -- who also worked at Tesla in another department.

19      And Mr. Diaz conveyed to me that he went to give his son

20  his lunch and while in the presence of his son, an employee of

21  Tesla, a supervisor I believe, used the "N" word, profanity,

22  indicated his dislike, disdain for African-Americans.  And this

23  was in front of Mr. Diaz.

24      And he felt at that moment he conveyed to me he lost his

25  son, owing to the inability of a parent to protect their son

1  from such experiences, which Mr. Diaz had an agenda throughout
2  his life to protect his son from what he had experienced
3  himself earlier in his life.  And so at that moment he felt he
4  lost his son in terms of his son's respect.
5  **Q.**  And how did this alleged racial abuse affect Mr. Diaz?
6  **A.**  Mr. Diaz described to me, arising from what was going on,
7  symptoms that would be consistent with threats in the
8  workplace.  He described the onset of anxiety, fear of some
9  untoward event occurring to him.  He was in a constant state of
10 vigilance.  He was always on guard.  There was uncertainty as
11 to what might happen at work, and so he always had to be on
12 guard.  He could not relax.
13        He also described what we call spillover effects in terms
14 of his home life.  So what was going on at work eroded his
15 ability to accomplish restoration at home.
16        He described re-experiencing what was happening,
17 anticipatory anxiety at the prospect of returning to work,
18 difficulty with sleep because he was wrestling with what -- the
19 situation he was in, irritability with respect to his family,
20 spouse in particular.
21        So there were a number of symptoms that developed related
22 to what was going on at work.
23 **Q.**  So the symptoms that Mr. Diaz described to you, were they
24 sufficient to set in motion a psychiatric injury?
25 **A.**  Yes.  In my opinion, given the pervasive nature and the

 1   protracted exposure.  So this was not a day or two.  This was

 2   over several months.

 3   **Q.**   And so what -- based on that, what is the opinion that you

 4   have in terms of the diagnosis four?

 5   **A.**   So my opinion regarding diagnosis is that we see here a

 6   confluence of what is necessary to demonstrate a psychiatric

 7   injury.

 8        So we see a clear and abrupt change in emotion and

 9   function on the part of Mr. Diaz.  So he denied prior

10   psychiatric symptoms.  He denied these issues.  They erupted at

11   the time he was exposed to what was going on.

12        The second element required is what was going on.  To the

13   extent it happened as claimed would be sufficient to give rise

14   to a psychiatric illness.

15        And the third element we need is the eruption of

16   sufficient symptoms, which he described.

17        So owing to those three factors being present and in a

18   required temporal relationship, I diagnosed Mr. Diaz as

19   developing while working what we call an adjustment disorder

20   with anxiety.  And that is a psychiatric illness that develops

21   in response to an external event predominantly with symptoms of

22   anxiety.

23        And then over time when he left Tesla, owing to the

24   effects on him, that condition evolved into an adjustment

25   disorder with anxiety and depressed mood, which entered

1   remission shortly after he returned to work several months

2   later.  Although he continues to show, based on my evaluation

3   in October 2019, significant and residual symptoms.

4   Q.   Now, you understand that Mr. Diaz quit his job and

5   replaced the Tesla job and at least returned to work within

6   four to six months; is that correct?

7   A.   Yes, sir.

8   Q.   And do you have some understanding as to whether Mr. Diaz

9   has continuing effects with regard to what he suffered in the

10  workplace at Tesla?

11  A.   I do.

12  Q.   And what is your belief as to the continuing effects?

13          MS. KENNEDY:  Objection.  Lack of foundation.

14          THE COURT:  Overruled.  You can answer.

15          THE WITNESS:  Thank you, Your Honor.

16  A.   So the effects, at least when I saw him were continuing

17  were based on his affect during the interview, which was

18  instructive, and also the psychological test results that I

19  referred to earlier.

20          So both of those were instructive, in addition to his

21  self-report, in demonstrating continuing effects or residual

22  effects.

23  BY MR. ALEXANDER

24  Q.   Now, you also administered psychological testing.  What

25  did you learn from that psychological testing?

 1   A.    Psychological tests were what we call valid.  So there was

 2   no evidence of any effort by Mr. Diaz to overreport symptoms,

 3   to report more symptoms than were not present.

 4        He showed elevations on the two scales of depression, on

 5   the MMPI-2-RF, which, in spite of him working, in spite of him

 6   working in a job as a bus driver, which clearly protects him

 7   from what he experienced at Tesla because he's insulated from

 8   other people, he described depression and an elevation on a

 9   scale, which is called ideas of persecution, which is also

10   instructive in terms of Mr. Diaz's continuing feelings about

11   what happened at Tesla.

12   Q.    And why is the elevation on the persecution scale

13   noteworthy?

14   A.    That captures his explanation or attribution.  So he

15   doesn't see his symptoms as a result of an issue that we call

16   normative.  He sees it as a product of a non-normative event.

17        So normative would be getting ill.  Not pleasant, but

18   that's normative.  People get ill, unfortunately.

19        Non-normative is an event that should not have happened

20   that is attributable to the actions of others, and that event

21   has the potential to confer greater injury than a normative

22   event.

23   Q.    Now, did the testing have any other indications?

24   A.    The testing certainly demonstrated his report was

25   reliable.  The testing also showed on the PAI an elevation on

1    the traumatic subscale indicating consistent with trauma.

2          Now, I forgot to mention also I administered the TSI-2,

3    which is a scale that assesses symptoms in the context of

4    trauma.  And his scale showed elevations on what we call

5    intrusive experiences.  So it suggests that two-years-plus past

6    Tesla, he's still having intrusive or what we call

7    re-experiencing thoughts about what happened.  It's still in

8    his mind.

9    **Q.**    Now, you've used the term "trauma," but in this instance

10   the trauma consists of just words.  Does that undermine the

11   ability to be trauma?

12   **A.**    You know, it -- generally it was sort of, you know,

13   "sticks and stones hurt our bones, but words can't hurt us."

14   But there is a whole body of research from Harvard, and also

15   from U.C.L.A., showing that words not even rising to racial

16   epithets, affect the areas of the brain, activate the areas of

17   the brain shown by imaging that are active with physical pain,

18   and some people are more predisposed to that effect.

19         So words translate into changes in brain activity, which

20   activate or stimulate the areas that cause physical pain.  We

21   know that it's interesting if you give Tylenol -- which is a

22   central analgesic as most of you know, to someone -- that will

23   diminish the subjective pain from negative social feedback.  So

24   there are central effects.

25         And, also, these -- these words in this context have

 1   particular cultural, historical significance, and they are

 2   associated with the -- with physical violence.  And we know

 3   from studies these -- this sort of conduct, bullying, racial

 4   epithets in the workplace, do give rise to trauma symptoms.

 5   **Q.**   And so when you talk about people being predisposed, did

 6   you take into account Mr. Diaz being African-American?

 7   **A.**   Yes.  So he -- he's African-American.  He's had prior

 8   experience of what he kind of termed racial profiling with law

 9   enforcement many, many years ago and wanted to protect his son

10   from that.

11   **Q.**   You mentioned psychological testing also to look at how a

12   person is responding to see if there is any problematic

13   patterns.  What were your findings in that regard?

14   **A.**   Well, there are five scales on the MMPI-2-RF which assess

15   what we call infrequent responding or a person endorsing a high

16   number of low-frequency items.  These scales were all flat.

17   They were all around the mean for a normal population.

18       So what we see here, in spite of Mr. Diaz having elevation

19   on some of the clinical scales, in terms of any possibility of

20   him endorsing symptoms that -- more symptoms than exist,

21   these -- these indices were entirely flat, and so they are

22   consistent with him being a reliable reporter.

23   **Q.**   And in terms of what caused Mr. Diaz's psychiatric

24   illness, what is your conclusion in that regard?

25   **A.**   Well, we see an intact person going to work.  He has seen

1  work as protective.  He experiences this conduct.  He alleges

2  he experiences it at least.

3      If that conduct occurred, he reported symptoms that we

4  would expect in that context:  The symptoms of anxiety,

5  fearfulness at work, the spillover effects at home, the

6  denuding effects on his self-worth.  This is a father, a

7  spouse, and having -- and being exposed to that in front his

8  youngest son.

9      So to a reasonable degree of psychiatric probability, the

10 events at Tesla, subject to not reviewing records, to the

11 extent they occurred would have been sufficient to give rise to

12 the psychiatric illness of an adjustment disorder with anxiety

13 evolving to an adjustment disorder with anxiety and depressed

14 mood currently when I saw him in partial remission.

15 Q.  Now, we have the issue of his son having been convicted of

16 a felony.  Does that mean that his current distress is

17 attributable to the issues associated with his son as to the

18 felony and distinguishing that from what occurred inside the

19 workplace and his observation of that?

20 A.  Well, the chronology of onset of symptoms informs an

21 understanding of causation.  So what we do is we look at when

22 symptoms occurred and what was going on to understand

23 causation.

24     So we see the initial onset of symptoms arising from what

25 happened at Tesla.  They were certainly impacted by that event

 1   when he and his son were both in the same room and exposed to

 2   racial epithets.  So Mr. Diaz experienced anxiety and

 3   depression arising from Tesla.

 4         Subsequent to, I think, leaving Tesla, his son -- his son,

 5   first of all, was fired; secondly, got off track in a way that

 6   had not occurred previously, and then was arrested and charged.

 7   And certainly we would attribute a significant part of his

 8   distress to what's happening with his son.

 9         But, once again, his attributional framework is important.

10   He sees Tesla as instrumental in both his distress and the

11   derailment of his son.

12         And, of course, that may or may not comport with reality,

13   but that attributional framework, A, is important in

14   understanding Mr. Diaz's psychiatric condition; and, B, has

15   some basis to the extent Mr. Diaz is conveying to me what

16   actually happened.  Then his attributional framework has some

17   basis.  It's not something that's divorced from reality.

18   Q.  So now that we've talked about the diagnosis, let's talk

19   about the future.

20         Your last category of opinion has to do with mental health

21   treatment.  Is Mr. Diaz a candidate for mental health

22   treatment?

23   A.  Yes, sir.

24   Q.  And can you tell me what would be the basis of your

25   opinion in that regard?

1    **A.**    The basis -- the basis of that opinion would be his

2    residual symptoms, his psychological test results, his

3    expression of emotions during the interview.  He became tearful

4    four times while discussing events at Tesla.  Regretting having

5    his son come to Tesla.  Wishing he quit earlier, but, of

6    course, he couldn't because he needed the job.

7        The fact that he couldn't protect his son, his ambition to

8    protect his son from what he had been exposed to earlier in his

9    life in terms of racial profiling, racial abuse.  And then he

10   felt a failure as a parent.

11       So he became distressed and tearful during the discussions

12   of those four topics, not when discussing the loss of his

13   parents.  Not when discussing his own youth, but discussing

14   those issues.

15       So he -- my -- did you ask me the treatment?  I've

16   forgotten your question.  I'm so sorry.

17   **Q.**    In terms of his treatment, what did you believe is

18   necessary for future treatment?

19   **A.**    Oh.  So I would provide a six-month to a year of weekly

20   cognitive behavioral psychotherapy to deal with residual

21   symptoms, to deal with his ongoing issues re-experiencing at

22   Tesla.

23       I would provide for four additional periods of weekly

24   treatment over four weeks in the future in the event of symptom

25   reactivation.

1    And I would also provide for 20 sessions of couples

2    counseling and family counseling to deal with the family

3    dynamics and the couples because his emotional state, to the

4    extent it occurred as claimed, certainly spilled over and

5    impacted the family.

6    **Q.**   And when you say six month weekly treatment, we can do the

7    math, but can you tell me what is your understanding of the

8    rate of a therapist to provide therapy for the sessions you

9    would propose?

10        **MS. KENNEDY:**  Objection.  That's beyond the scope and

11   beyond Rule 26 in his report.

12        **THE COURT:**  Is it stated in his report?

13        **MR. ALEXANDER:**  I don't know.  I don't know that it

14   is.

15        **THE COURT:**  All right.  Let's move on.

16   **BY MR. ALEXANDER**

17   **Q.**   With regard to the prognosis, what is Mr. Diaz's prognosis

18   for the future?

19   **A.**   Well, it's fair.  He certainly has worked.  He got a job,

20   and he actually got a second job.  And work is therapeutic.

21   And he's got a job that insulates him from the potential of any

22   issues that occurred at Tesla, to the extent they occurred as

23   claimed, that impact him because he's a driver.  So he's in a

24   solitary job, which is ideal.  It's protective.

25        So it's important for someone in this situation to recover

 1  their sense of safety at work, and he's accomplished that by

 2  obtaining a job that meets those requirements.

 3        So he -- he is encumbered with exposure to depression and

 4  anxiety, and those are risk factors for the enduring effects.

 5  They can change a person because they alter the way the brain

 6  works.  So treatment is necessary.

 7        So his prognosis is improved with treatment.  However, the

 8  events at Tesla are going to continue, in my mind, regardless

 9  of his treatment to color his mental landscape and impact him

10  emotionally in the future.  So he's not going to be the person

11  he was prior to going to Tesla.

12             **MR. ALEXANDER:**  Thank you very much.  Nothing further.

13             **THE COURT:**  All right.  Ms. Kennedy.

14                       <u>**CROSS-EXAMINATION**</u>

15  **BY MS. KENNEDY**

16  **Q.**   Good morning, Dr. Reading.

17  **A.**   Good morning, Ms. Kennedy.

18  **Q.**   As I understand it, were you retained by Mr. Alexander or

19  Mr. Organ?

20  **A.**   The latter.  The latter.

21  **Q.**   Mr. Organ?

22  **A.**   Yes.  Thank you.

23  **Q.**   And how many times has Mr. Organ's law firm retained you?

24  **A.**   I think one other time.  I don't know -- I've never --

25  yeah.  One time I think.

1  Q.   And as part of your retention by Mr. Organ's firm in doing

2  your psychological evaluation, you requested records from him;

3  correct?

4  A.   That would be routine, yes, ma'am.

5  Q.   And did you receive any records or any documents?

6  A.   No.

7  Q.   And you requested those records because you wanted them to

8  make sure your opinion was as well-rounded as it could be;

9  correct?

10 A.   It would be required to request them, and they're standard

11 to -- so everything I've said is subject to his report being

12 reliable.  And I've not been able to review any records, yes.

13 Q.   So in your expert opinion, in your expert retention you

14 asked for documents.  You did not get any documents from

15 Mr. Organ.  And the purpose for requesting those documents is

16 to make sure, at least to some extent, that Mr. Diaz's report

17 to you is reliable or can be confirmed; correct?

18 A.   Yes.  Those records may or -- may, to some degree, larger

19 or smaller, provide an opportunity to assess the reliability of

20 his report.  I don't know what's in them.  Sometimes they

21 don't, but that's the intent.

22 Q.   So, but that was the intent for requesting the documents

23 that you did not get; correct?

24 A.   Yes.  Yes.

25 Q.   And as I understand, you only spoke with Mr. Diaz one time

 1 | back in October of 2019; correct?

 2 | **A.**   Correct.

 3 | **Q.**   And you have had no contact with Mr. Diaz since then;

 4 | correct?

 5 | **A.**   Correct.

 6 | **Q.**   And you have no idea as to what his current mental state

 7 | or emotional state is; correct?

 8 | **A.**   You are correct.  Everything I've said is based on his

 9 | state at that time.

10 | **Q.**   And when you met with him back in October of 2019, you

11 | talked to him for about two hours or so?  Is that about right?

12 | **A.**   I think it would be longer than that.  I can't remember

13 | precisely, but I -- whatever I said in my deposition.  But

14 | usually the interview is longer than that.

15 | **Q.**   Okay.  So two to four hours of an actual interview;

16 | correct?

17 | **A.**   That's correct.

18 | **Q.**   And you did the interview after you had him undergo

19 | psychological testings; correct?

20 | **A.**   That's unusual.  I can't remember.  Whatever I said in my

21 | deposition again, but usually it's the other way around but it

22 | could be the way you described it.  It's --

23 | **Q.**   Dr. Reading, would you like to refresh your recollection

24 | with your deposition?

25 | **A.**   Thank you.

READING - CROSS / KENNEDY

1  **Q.**   Do you have a copy up there?  If not, I can get you a

2  copy.

3  **A.**   Well, I knew.  I don't need to see it.

4  **Q.**   Dr. Reading, I want to make sure it's accurate.

5           **THE COURT:**  And if you could get me a copy.

6           **THE WITNESS:**  Thank you, Ms. Kennedy.

7           (Document tendered to the Court and the witness.)

8  **BY MS. KENNEDY**

9  **Q.**   Dr. Reading and the Court, if you can go to Page 14,

10  Lines 5 through 9 and just read them to yourself.  And let me

11  know if that refreshes your recollection.

12  **A.**   Oh, yeah.  For Mr. Diaz, that's right.  We set him up for

13  testing and then I interviewed him.  Thank you.

14  **Q.**   Okay.  So prior to meeting Dr. -- I'm sorry.

15       Dr. Reading, prior to meeting Mr. Diaz and not obtaining

16  any documents, you sent him off to psychological testing;

17  correct?

18  **A.**   Well, when you say we sent him off, it's right in my

19  office.

20  **Q.**   I understand that, sir, Doctor, but you did not administer

21  the testing; correct?

22  **A.**   Well, I presented the testing and the testing is -- I

23  don't recall what we were doing in 2019, but it's usually on

24  computer interface.  So no one does anything.  He just -- the

25  questions come one at a time on a screen and he just answers

```
 1   them.  It's self -- self-report.
 2   Q.   Understood.
 3        But you had not met him, you didn't have any documents,
 4   and you decided to have Mr. Diaz undergo three psychological
 5   tests:  MMPI-2-PF [sic], Personality Assessment Inventory, and
 6   the Trauma Symptom Inventory; correct?
 7   A.   Yes.
 8   Q.   And you had no idea about what any of the issues were in
 9   this matter; correct?
10   A.   Yes.
11   Q.   And you decided to give Mr. Diaz three psychological tests
12   why?
13   A.   Well, they's are standard.  So I'm performing an
14   evaluation.  Those would be required.  So the -- even if
15   someone has no symptoms, we still perform that, those tests to
16   check on that.
17        And, also, they provide an opportunity to assess what we
18   call motivational factors.  Do they have a pattern of
19   responding that raises concerns about their motivation?  So
20   there's a standard, so that's why.
21   Q.   You agree that, Dr. Reading, the Trauma -- the Trauma
22   Symptom Inventory, that's not a standard test?
23   A.   You are correct.  Those first two are broad-based tests.
24   That is not a standard test.  That's a test that's given where
25   there is some suspicion.
```

1          But it -- often I do give it.  If I'm -- if I'm giving

2     testing first, I give it in the interests of prudence.

3     **Q.**    So Mr. Diaz comes to your office.  You decide to give him

4     the MMPI and a PAI test and a non-standard Trauma Symptom

5     Inventory test.  And those all have questions about his

6     emotions and things that happened to him; correct?

7     **A.**    Well, not what happened to him.  Just emotions.

8     **Q.**    Just emotions.

9          And then after he fills out all of those questions, you

10    then sit down and you talk to him; correct?

11    **A.**    Correct.

12    **Q.**    You would agree that someone being retained by lawyers as

13    part of a lawsuit goes in and does testing, and one of the

14    testings is a Trauma Symptom Inventory about his emotions

15    regarding some unidentified trauma, he then goes and talks to

16    you about the events, would you agree, in your professional

17    opinion, that Mr. Diaz may have been predisposed to talk about

18    certain things in a certain way given the testing you did

19    before you even met him?

20    **A.**    I'm not sure what you're driving at.  Certainly, I would

21    be more concerned with testing after an interview than testing

22    before.  It's an empirical question.  So Mr. Diaz's report was

23    quite circumscribed in terms of the symptoms.

24         So if you look at the Trauma Symptom Inventory, none of

25    the scales were elevated other than the intrusive experiences

1   and, I think, defensive avoidance.

2       The other tests were -- the PAI -- so these tests were not

3   significantly elevated other than in specific scales.

4       And then in talking to him, usually people are concerned

5   when I talk to someone and then they do the testing than this

6   way around.

7   Q.   And you understood that when Mr. Diaz was coming to meet

8   with you, the purpose was for you to assess him so you could

9   testify on his behalf and his attorneys' behalf in this lawsuit

10  about his emotional distress; correct?

11  A.   Well, I don't want to nitpick, but I see myself as

12  providing opinions based on the data, not -- I'm not -- I don't

13  consider myself responsive to the attorneys' needs or his

14  needs.

15      But certainly he was coming to my office with the

16  potential motivation to accrue benefit from being with me.

17  Benefit in this case of litigation will be he's going to

18  present a version of events that presumably is self-serving and

19  also present himself in a way that's going to connote an

20  injury.  So I would agree with you in that respect.

21  Q.   Right.  So the purpose of Mr. Diaz coming to see you, at

22  least in this context, was to present information,

23  conversation, to present a psychiatric injury because that is

24  what he is seeking damages for in this particular case as what

25  -- as to what you understand?

1    **A.**   Well, I can't say --

2            **MR. ALEXANDER:**  Objection.  Argumentative.

3            **THE COURT:**  Sustained.

4    **BY MS. KENNEDY**

5    **Q.**   Do you understand in this particular case, Dr. Reading,

6    Mr. Diaz is seeking some type of damages for a psychiatric

7    injury; correct?

8    **A.**   I assume so.  I haven't seen that, but I'm assuming that.

9    **Q.**   And as part of your evaluation, you looked at the testing,

10   and you spent three to four hours with Mr. Diaz where he told

11   you information about his background, his employment, and in

12   his life; correct?

13   **A.**   And his life, did you say?

14   **Q.**   In his life, yes.

15   **A.**   In his life, yes.  I reviewed his whole history.  So it's

16   incumbent upon me in a situation where Mr. Diaz presumably --

17   and I don't know what was in his mind.  He has an agenda.  But

18   I expand the focus of inquiry when I meet with anyone.

19        So I'm not just drilling down on what they are electing as

20   the issue.  I expand the focus of inquiry to look at his whole

21   life, his childhood, his work history, his marital history.

22   I'm looking at whether there are other events in his life that

23   would constitute stress.  And I'm also looking at whether there

24   have been derailment or symptoms in his life at other times.

25        So we're ruling out.  So for one -- one -- when I derive

 1   these data, I then conducted what we call a differential

 2   diagnostic exercise, which is to step back and look at the data

 3   that's been accrued and see if there are other explanatory

 4   possibilities that fit the data better than the one being

 5   claimed.

 6        So are any symptoms a product of a longstanding illness?

 7   Does he have a propensity to complain?  Does he have a

 8   propensity to invoke racial abuse or abuse of other kinds

 9   throughout his career?  Are there other significant stressors

10   in his marriage and his family and such like?

11        So he may have that agenda, but it's up to me to both

12   expand the focus and, particularly with psychological testing,

13   to see if those tests show that he has an agenda to present an

14   unlikely array of symptoms, which unusually in this case the

15   testing was unequivocally consistent with an absence of

16   motivation and his elevations were quite limited and

17   circumscribed matching what was elicited in the consultation.

18   **Q.**   And you would agree that because you're retained as an

19   expert in this particular matter, if Mr. Diaz hypothetically

20   had other stressors in his life, that he, in his opinion, would

21   not benefit and did not tell you, you would not be able to

22   validate whether there were other stressors or not; correct?

23   **A.**   He didn't -- if he didn't express stressors to me, I had

24   no way of knowing.  They could exist.  I can't rule that out.

25        Certainly, if events occurred as claimed at Tesla, they

 1  would rise to a level of a significant stressor that would be

 2  capable of derailing an otherwise intact individual, but there

 3  may be other incidents and I can't speak to those.

 4  **Q.**   And at the time that you met him in October -- on

 5  October 2nd, 2019, you met with him about three to four years

 6  after the alleged events occurred at the Tesla factory;

 7  correct?

 8  **A.**   Correct.

 9  **Q.**   And do you know if Mr. Diaz has sought any type of health

10  or -- healthcare, medical care for his anxiety or his

11  depression?  Do you know?

12  **A.**   I'm not aware of that.  I think his symptoms diminished

13  with his return to work, and that's why I would see that they

14  were active until he returned to work.  Shortly thereafter they

15  diminished.

16      I think there was an uptick with this issue with his son.

17  My understanding, at least until -- up to the time I saw him,

18  that he had not availed himself of mental health treatment.

19  **Q.**   Okay.  So let me break it down.  So from the time that you

20  saw him, as of October 2nd, 2019, you have no idea if he sought

21  any type of healthcare or medical treatment for his adjustment

22  disorder; correct?

23  **A.**   You mean since?

24  **Q.**   No.  Prior to the time -- let me rephrase this.

25      So from the time he left in approximately March of 2016

1  until you saw him on October 2nd, 2019, do you have any idea as

2  to whether or not Mr. Diaz sought any type of health -- mental

3  healthcare?

4  **A.**   Yes.  I asked him that.  And to the extent his report is

5  reliable, he did not.

6  **Q.**   Right.  And -- but he did find another job with AC Transit

7  about six months later, seven months later.  Is that your

8  understanding?

9  **A.**   He found that job and then replaced it with a better job a

10  few months after that, four or six months later I believe.

11  **Q.**   Right.  And you understand he likes that job, he enjoys

12  that job, and he's getting paid more money; correct?

13  **A.**   My understanding is he likes it.  He's paid more.  It

14  protects him from the prospect or potential of a repeat of what

15  happened at Tesla.  It's a perfect job, in my opinion, and it

16  was therapeutic.

17       My understanding is that with that job he achieved a

18  partial recovery -- a full recovery with residual symptoms; and

19  there was some reactivation of symptoms, which you would expect

20  with the issues with his son.

21  **Q.**   So if I understand you your testimony correctly, once he

22  got the bus driver job six seven months later, he obtained full

23  or partial recovery.  And then because of his son's issues,

24  which are that he pled guilty to three counts of robbery of a

25  Domino's Pizza store, my question is:  You said he diminished

1   because that?

2   **A.**   Did I say "diminished"?  No.  I said "uptick."

3   **Q.**   An uptick, okay.

4   **A.**   And what we see is that is an uptick both in and of

5   itself, but also in the context of the history.  So that's a --

6   that's a composite, if you like.  It is the -- it's not just

7   the tragedy of his son engaging in at least an allegation of

8   robbery and the prospect of conviction, but also the historical

9   context of what he and his son experienced and his connection.

10      And that may be -- that's his connection.  That may be a

11  *post hoc* argument, if you follow me.  So that may be something

12  he's erected *post hoc* or it may be a product of what he and his

13  son experienced.

14      And his experience at that time while working at Tesla, as

15  well as his son, where he perceived a fracture in their

16  relationship and his son perceiving his way of operating as not

17  for him, in other words, to -- he saw his father, if you

18  like -- I don't know how to say this -- sucking it up, just

19  taking the passive response to what was an egregious experience

20  as perceived by his son.

21  **Q.**   Okay.  I understand that.  My question -- let me ask it

22  this way:  So at some point according to you, and it's your

23  opinion, Mr. Diaz obtained full or partial recovery when he got

24  this better job at -- driving a bus?

25  **A.**   So I would say shortly after.

1   Q.   Shortly after that?

2   A.   So we see him out of work for about six months.  He gets a

3   job.  So within months of getting that job, we see a

4   substantial recovery with residual features, which are ongoing.

5   Then we see an uptick.

6   Q.   Okay.  So my question is:  So assuming a few months after

7   he got into this job, so approximately a year or so after he

8   stopped working at the Tesla facility, in your opinion, a full

9   or partial recovery and then he has an uptick.

10       So my question is:  Was the uptick -- in your opinion,

11  based on when you saw Mr. Diaz on October 2nd, 2019, was the

12  uptick at the time that the robbery occurred or the time that

13  he -- that Demetric pled guilty to three counts of robbery?

14       I'm trying to just say the time frame.  If you can answer

15  that.

16  A.   Well, I didn't -- I didn't actually separate the two.  The

17  issue that he presented to me was he was pleading guilty and

18  facing incarceration.

19  Q.   Okay.  And as I understand, when you met with Mr. Diaz in

20  October of 2019, those issues with his son were still pending;

21  correct?

22  A.   They were pending in terms of definitive, but he was

23  facing a guaranteed incarceration and over an extended period.

24  He was expecting ten years, I believe.

25  Q.   And I understand if someone is diagnosed with an

1  adjustment disorder, as you've diagnosed Mr. Diaz, part of an

2  adjustment disorder, according to the DSM-5 -- you're familiar

3  with this, Dr. Reading?

4  **A.**   Yes.  Yes.

5  **Q.**   -- the DSM-5, part of the differential diagnosis, part of

6  the adjustment disorder can -- may be characterized by guilt;

7  is that correct?

8  **A.**   It's an emotion, yes, certainly.

9  **Q.**   So if Mr. Diaz feels guilty about bringing his son

10  Demetric Di-az into an environment, according to him, that is

11  very racially hostile and it's awful and there's horrible words

12  being thrown around about him and the like, and Mr. Owen Diaz

13  brings his son into that, and then his son, according to him,

14  is then mistreated, his adjustment disorder could be based upon

15  Mr Diaz's own guilt; correct?

16  **A.**   Well, that -- that presumes his adjustment disorder, the

17  symptoms qualifying occurred after those incidents with his

18  son.  The onset speaks to the symptoms erupting arising from

19  what was happening, but I would certainly agree.

20        And he became tearful when he talked about his regret of

21  bringing his son into that environment.  And he certainly -- if

22  he connects the robbery and the potential incarceration to

23  Tesla, then I would -- I subscribe to your view that there is a

24  significant element of guilt there, responsibility.  He's the

25  parent.

```
 1   Q.   Understood.
 2        And I think you also -- if I understand from your meeting
 3   with Mr. Diaz, Mr. Diaz, as you characterized him, is someone
 4   who does not have a filter when he talks; correct?
 5   A.   He characterized himself.  I didn't characterize him.
 6   Those were his -- those were his words, as I recall.
 7   Q.   Right.
 8   A.   Yeah.
 9   Q.   And Mr. Diaz characterized himself as someone who speaks
10   his mind, doesn't have a filter; correct?
11   A.   Yes.
12   Q.   And you got the impression in talking to Mr. Diaz that he
13   is someone who can stand up for himself?
14   A.   "Can" did you say?
15   Q.   Can stand up for himself.
16   A.   Yes.  Yes.
17   Q.   And Mr. Diaz is a confident man?
18   A.   Competent?
19   Q.   Confident?
20   A.   Yes, confident.  He had business, two businesses, prior to
21   going to Tesla, yes.
22   Q.   And Mr. Diaz is a highly intelligent man, good worker?
23   You found all that to be true?
24   A.   He has a strong work ethic.  He has strong relations with
25   his children.  He has longevity in his marriage.  His relations
```

 1   with his parents who are now deceased.

 2       Yes, he had problems in his younger life.  And he had, as

 3   he described to me, as a young man an epiphany.  He met an

 4   older mentor, and that person changed his life in terms of the

 5   path he was following.  And he then raised his children to

 6   follow that same path.  And that was a turning point for him at

 7   around age 24, I believe.

 8   Q.   And you would agree that based on his psychological

 9   testing and your evaluations of your -- your psychological

10   evaluation interview with Mr. Diaz on October 2nd, 2019, that

11   Mr. Diaz is someone who has a very high level of pride?  You

12   would agree?

13   A.   I would, yes.

14   Q.   And as part of that pride and part of the guilt, according

15   to him, of bringing his son into this environment, as he

16   describes it, you would agree all of that could contribute to a

17   diagnosis of an adjustment disorder with anxiety and an

18   adjustment disorder with anxiety and depressed mood; correct?

19   A.   Well, I certainly wouldn't see it as contributing to the

20   first diagnosis.  The anxiety disorder diagnosis is directly

21   attributable to a situation of threat.  So Mr. Diaz was exposed

22   to threat, verbal with a connotation of other -- prospect of

23   other actions being taken.

24       But in terms of the adjustment disorder of anxiety and

25   depressed mood, certainly that depression element conforms to

1   what you're suggesting.  Because after he left Tesla, we see

2   that his relationship with his son was never the same.  He

3   attributes that to what happened at Tesla and his

4   responsibility taking his son there, assuming that that would

5   be a way for his son to embark on a path of -- a positive path,

6   which turned out not to be the case.  But not only did the

7   employment fail, but his relationship was fractured and he

8   attributes that to Tesla.

9          And so the depression element would certainly be, in part,

10  a product of what you you're describing, I would agree.

11  **Q.**   And, now, since October 2nd of 2019, have you been

12  provided any information from Mr. Alexander or Mr. Organ as to

13  anything that is actually presently going on with Mr. Diaz in

14  his life with respect to his psychological or emotional state?

15  **A.**   No.  All of my opinions are based on that time point.

16  Since October 2019, I have no knowledge of Mr. Diaz.

17  **Q.**   So as of now, you don't even know if he's doing a lot

18  better or anything like that; correct?

19  **A.**   Correct.  My opinions are based on up to that point in

20  time.

21          **MS. KENNEDY:**  Your Honor, I have no more questions.

22          **THE COURT:**  All right.

23      Any redirect?

24          **MR. ALEXANDER:**  Yes.  Yes, please, Your Honor.  Thank

25  you.

<u>REDIRECT EXAMINATION</u>

**BY MR. ALEXANDER:**

**Q.**   First, there was a reference to Mr. Diaz's confidence and his pride.  That's the way he described himself when you did the interview?

**A.**   That, I think, is an assessment.  Was he confident?  He certainly didn't describe himself:  I'm confident and proud.

But he is a man that displayed confidence in terms of his family relations, the taking care of children, working, and such like.

**Q.**   And so when you described him having a feeling of helplessness, how does that compare to your belief that he has confidence and pride or had that at the time he was working at Tesla?

**A.**   It's antithetical to his whole being, his whole identity.  The way he was treated at Tesla is antithetical, and it echoed his prior experience before he had that epiphany of dealing with racial profiling.  It brought him back, and the helplessness, the failure to be able to recruit assistance in dealing with it.

So he was subjected to a situation that was entirely out of his control, antithetical to his identity, his sense of self-worth, his view of himself as a man, as a person that gives respect and expects to receive respect.

And so that explains not only his emotional state while

1    working, but the rumination and the spillover effects while not

2    working, because this embedded itself in his consciousness,

3    this conflict between who he considered himself and the way he

4    was allowing himself to be treated.

5    **Q.**   So then he leaves Tesla and he gets away from the

6    immediacy of that conflict, and you say that he has a partial

7    recovery when he gets a new job.

8         What I'm confused about is you also testified that it

9    changed him forever.

10   **A.**   Yeah.

11   **Q.**   So can you explain the difference between the recovery of

12   getting the job and the change of him forever?

13   **A.**   Well, there are two answers to that.  The first is, it

14   changed him forever in that there were residual effects.  He's

15   now approaching the world with a different mental landscape.

16   That mental landscape is informed by his experience at Tesla.

17   So it's a shift and that shift is permanent given the duration

18   of exposure.

19        The second explanation is given that experience and the

20   onset of what we can call a threat disorder, the anxiety

21   disorder, the threat disorder, we know the trajectory of that

22   disorder over time is one that is subject to reactivation.

23        So even though he achieves this improvement when he goes

24   to work, he's now vulnerable to reactivation of those symptoms

25   in either situations that echo or resemble what happened at

1    Tesla or other stressful events.

2         And so the threshold by which those symptoms can be

3    reactivated has changed dramatically.  So he's altered in that

4    way.

5    **Q.**   So the experience that he had at Tesla, he is

6    susceptible -- more susceptible now to having that experience

7    as he goes forward in his life; is that what you're saying?

8    **A.**   Yes.  He's been altered in that regard, and that's just

9    not psychological, but we would expect his -- imaging studies

10   show with this kind of exposure there are alterations in the

11   way the brain works in terms of the connectivity; that the

12   alarm system is more active, more easily activated.

13            **MR. ALEXANDER:**  Thank you very much.

14            **THE COURT:**  Anything else?

15            **MS. KENNEDY:**  No more questions, Your Honor.

16            **THE COURT:**  Dr. Reading, you're excused.

17            **THE WITNESS:**  Thank you, Your Honor.

18         (Witness excused.)

19            **THE COURT:**  Ladies and gentlemen, timing is excellent,

20   so why don't we take our first break for the day, and we'll be

21   back at 10:15.  Please remember the admonitions.

22         (Jury exits the courtroom at 9:59 a.m.)

23         (Proceedings were heard out of presence of the jury:)

24            **THE COURT:**  All right.  We will be in recess.

25            **MR. ORGAN:**  Your Honor?

**PROCEEDINGS**

 1          **THE COURT:**  Have a seat, everybody.

 2      Mr. Organ.

 3          **MR. ORGAN:**  Yes, Your Honor.  I intended to bring this

 4   up with the Court before I got delayed by the protest on the

 5   bridge; and that is, I was re-reading the designations of

 6   Ms. Marconi last night in preparation for reading -- of her

 7   video today, and it struck me that two of the Court's

 8   rulings -- the Court overruled all the objections and then

 9   admitted --

10          **THE COURT:**  The designations?

11          **MR. ORGAN:**  Yes, Your Honor.

12      I have a concern that perhaps the Court missed two issues,

13   and I have them highlighted, Your Honor.  If I could hand these

14   to Ms. Davis and then you could look at them?

15          **THE COURT:**  Sure.

16          **MR. ORGAN:**  They have to do with --

17          **MS. KENNEDY:**  What are they?

18          **THE COURT:**  I'll tell you once I see it.

19      (Whereupon document was tendered to the Court.)

20          **THE COURT:**  Mr. Organ has highlighted Designation 23

21   and 25.

22          **MR. ORGAN:**  Yes, Your Honor.

23          **THE COURT:**  Let me take a look at those.  And tell me

24   what your concern is.

25          **MR. ORGAN:**  So 106 is in evidence, but there is

 1  additional testimony, Your Honor, and I didn't want to run

 2  afoul -- I mean, I know you already ruled on this, but I'm not

 3  sure that you were thinking of your other rulings.

 4      106 you've only ruled as admissible for a limited purpose,

 5  and so I'm not sure you really wanted to include that

 6  discussion.

 7      And then the other one, I think, has to do with -- I

 8  believe it's 107.  I can't remember, but it's a different

 9  exhibit that the Court has not admitted.

10      And so I just want to make sure that we can play these,

11  Your Honor.

12      (Brief pause.)

13      THE COURT:  Well, I appreciate you bringing this to my

14  attention, Mr. Organ.  I have to say that I was not -- I think

15  I didn't understand the objection or the way that Tesla --

16      MR. ORGAN:  I thought that too, Your Honor.

17      THE COURT:  -- articulated it.

18      MR. ORGAN:  And the exhibit numbers are different.  So

19  to be fair, Your Honor, I can understand that you didn't see

20  that.

21      THE COURT:  So is there any -- do you want to point my

22  attention to something that you would like to have -- besides

23  the stuff that I have excluded, is there anything that you

24  think that is in these designations that would not be excluded?

25      MR. ORGAN:  No, Your Honor.  In light of the Court's

1  rulings -- obviously, I don't want to have a legal issue if

2  there is an appeal so what I would propose to, Your Honor, is

3  that we take those out over the break, because Ms. Marconi is

4  going to be played very soon after La'Drea Jones, after

5  Mr. Diaz's daughter.

6      So assuming that's okay --

7          THE COURT:  Yes.

8          MR. ORGAN:  -- I would -- it might be a little rough.

9  So if we could get just something to the jury that says it

10  might be a little rough, that would be helpful.

11     Thank you, Your Honor.

12         THE COURT:  I agree.

13     Ms. Davis, if you could hand this back to Mr. Organ.

14     (Document tendered to counsel.)

15         MR. ORGAN:  Just so it's clear, we will take those two

16  out.

17         THE COURT:  Take those two out.  And I appreciate you

18  bringing this to my attention.

19         MR. ORGAN:  Okay.  Thank you, Your Honor.

20     (Whereupon there was a recess in the proceedings

21      from 10:04 a.m. until 10:18 a.m.)

22     (Proceedings were heard out of presence of the jury:)

23         THE CLERK:  Please come to order.

24         MR. ORGAN:  Your Honor, if I may, defense counsel has

25  raised an objection to No. 39 now.  I don't believe that it

 1    runs afoul of the Court's orders, but --

 2         **THE COURT:**  You'll have to give it back to me then.

 3         **MR. ORGAN:**  Okay.  Then I'll give it to you right now.

 4    Is that okay?

 5         **THE COURT:**  Yeah.

 6       (Whereupon document was tendered to the Court.)

 7       (Brief pause.)

 8         **THE COURT:**  Yeah.  No, I'll allow this.

 9         **MR. ORGAN:**  Thank you, Your Honor.

10         **THE COURT:**  Objection overruled.

11       Ms. Davis also provided me with a sheet that the top says

12    "Tesla, Inc. Selected Financials," which I assume was part of

13    a -- is part of a demonstrative.  And my ruling is as I

14    indicated before court.

15       The quarter ending 6/30/2021 numbers would have been

16    admissible, I think, and that you could have changed that if

17    you provided it earlier, but providing it on the night before

18    testimony is improper.  So that should be deleted.

19         **MR. ORGAN:**  Okay.  And, Your Honor, we have an issue

20    with respect to -- not an issue.

21       We've got Exhibit 3 with a redacted form.  So we would

22    like to move it into evidence once the jury comes back or

23    whatever the Court prefers.

24         **THE COURT:**  So Exhibit 3 was the contract.  Is there

25    agreement on its admission?

PROCEEDINGS

1          **MS. KENNEDY:**  That was the issue in the emails we had

2     about Exhibit 379, because Annalisa Heisen was going to be the

3     person to authenticate and she can't come in so we have to

4     bring someone else in.

5          But why don't I talk to Mr. Organ about it because we have

6     to bring in another witness who is going to authenticate

7     something simply for the fact of authentication?

8          **THE COURT:**  Right.  So if you can go back to that

9     original stipulation and if the plaintiff agrees to it, then

10    the problem is solved.  If that's not what's happening, then

11    let me know.

12         **MS. KENNEDY:**  All right.  Thank you, Your Honor.

13         **MR. ORGAN:**  There was no stipulation by us that they

14    could bring in 379.

15         **THE COURT:**  Right.  And I ruled that as a result, at

16    the moment you haven't established how that document comes into

17    evidence.

18         **MR. ORGAN:**  How this document, how Exhibit 3, the

19    contract.

20         **THE COURT:**  Correct.  And as I understand it, you had

21    some conversation about the -- Exhibit 3 and the exhibit

22    involving Mr. Diaz's son's application and that both could come

23    in --

24         **MR. ORGAN:**  No.  No.  No.

25         **THE COURT:**  -- and you rejected it.

PROCEEDINGS

```
 1              MR. ORGAN:  Yes.

 2              THE COURT:  And so 3 at the moment is not coming in.

 3   That's status quo.

 4              MR. ORGAN:  Except, Your Honor, the difference is 379

 5   was never an exhibit.  They didn't put it on any Exhibit List.

 6   They brought it to trial.

 7              THE COURT:  Mr. Organ --

 8              MR. ORGAN:  They never had it.

 9              THE COURT:  Mr. Organ, you don't have a witness who

10   can authenticate that document.  You did not have one,

11   apparently, during discovery.

12        You know, at this point there seems like a pretty

13   simple -- Exhibit 3 is important.  There seems like a pretty

14   simple solution to this, but I'll leave that up to you.  I'm

15   not trying this case.

16              MR. ORGAN:  They have stipulated it's authentic,

17   Your Honor.  They just haven't stipulated it's admissible.

18              THE COURT:  Right.  And you don't have a witness who

19   can make it admissible.

20              MR. ORGAN:  Because the witness is having a baby right

21   now.

22              THE COURT:  Mr. Organ, we've had this conversation.

23   My ruling remains.

24              MR. ORGAN:  Okay.  I understand, Your Honor.

25         (Jury enters the courtroom at 10:25 a.m.)
```

```
 1              THE COURT:  All right.  Please be seated, everybody.

 2         Who's the next witness?

 3              MS. NUNLEY:  La'Drea Jones, Your Honor.

 4              THE CLERK:  If you step up and remain standing, I'll

 5    swear you in.

 6                              LA'DREA JONES,

 7    called as a witness for the Plaintiff, having been duly sworn,

 8    testified as follows:

 9              THE WITNESS:  Yes.

10              THE CLERK:  Be seated.

11         If you would state your full name for the record and spell

12    it for the court reporter.

13              THE WITNESS:  My first name is La'Drea, L-A'-D-R-E-A,

14    and my last name is Jones, J-O-N-E-S.

15              THE COURT:  Please proceed.

16                          DIRECT EXAMINATION

17    BY MS. NUNLEY:

18    Q.   Good morning, Ms. Jones.

19    A.   Good morning.

20    Q.   Do you know Owen Diaz?

21    A.   Yes.

22    Q.   How do you know Mr. Diaz?

23    A.   He's my dad.

24    Q.   And has he been your dad your whole life?

25    A.   Yeah.  Well, he's my stepdad.  So 28 years.
```

1   **Q.**   And are you close to Mr. Diaz?

2   **A.**   Yes, I am close with him.

3   **Q.**   Would it be fair to say that Mr. Diaz raised you?

4   **A.**   Yes.

5   **Q.**   Do you presently live with Mr. Diaz?

6   **A.**   Yeah, we do live together.

7   **Q.**   And how long have you lived in the same house as Mr. Diaz?

8   **A.**   My whole life basically.

9   **Q.**   And during the 2015 to 2016 time period, did you spend any

10  time living away from your family?

11  **A.**   I moved to Las Vegas in the beginning of 2016.  So

12  January 2016.

13  **Q.**   And did you return back to your family's house at some

14  point?

15  **A.**   Yeah.  I moved back in December.  So I just lived in

16  Las Vegas for one year.

17  **Q.**   Just for a clear record, when you say "December," you mean

18  December of 2016; is that right?

19  **A.**   Yes.  Sorry.  December 2016.

20  **Q.**   And while you were living at home in the 2015 to early

21  2016 time period, how often did you see Mr. Diaz?

22  **A.**   Every day.

23  **Q.**   And while you were living away from home during 2016, how

24  often did you speak with your dad?

25  **A.**   When I was living away, I spoke with him, you know, every

**JONES - DIRECT / NUNLEY**

 1  other day, check-in when I called him or my mom.

 2  **Q.**   Did you ever become aware that Mr. Diaz started working at

 3  the Tesla factory at some point?

 4  **A.**   Yes.

 5  **Q.**   Do you recall approximately when you became aware of that?

 6  **A.**   He started working at Tesla 2015.  Maybe June or July of

 7  2015.

 8  **Q.**   I see.  And were you living with your family when you

 9  started working at Tesla -- or when Mr. Diaz started working at

10  Tesla?  Pardon me.

11  **A.**   Yes, I was living at home when my dad started working at

12  Tesla.

13  **Q.**   Now, before your dad started working at Tesla, could you

14  tell me a little bit about his personality?

15  **A.**   Yeah.  Before he started working at Tesla, he was always

16  joking.  He was, you know, a typical dad.  Called -- or make

17  sure I was, like, going where I said I was going, what time I

18  was coming home, who I was going with.  He would, you know,

19  make sure I was doing okay, joking with me, very talkative, and

20  stuff like that.

21  **Q.**   And after Mr. Diaz started working at Tesla, did you

22  notice any changes to his personality?

23  **A.**   Yeah.  When he started working at Tesla, he got more

24  moodier.  He became more sad.  He stopped asking me, like,

25  those dad questions.

 1          Like, he didn't ask me, like:  Where are you going?  Who

 2     are you going with?  And I would have to, like, call him and

 3     tell him:  Hey, Dad, I made it.  I'm here at this place with

 4     this person.  Because, you know, he didn't really do that

 5     anymore.

 6     Q.   And before your dad started working at Tesla, did he ever

 7     talk to you about his job or his work?

 8     A.   No.

 9     Q.   And when did you first notice the change to your dad's

10     personality when he became moodier or sadder?

11     A.   I first noticed maybe, like, September of 2015.

12     Q.   And does the September 2015 date stand out to you for any

13     particular reason?

14     A.   I -- because -- well, that date stands out to me because

15     my dad is really joking.  He always jokes with you and with all

16     my friends, because they're my friends.  They automatically,

17     you know, become like his kids.  And he would always give my

18     friends, like, nicknames.

19          And my best friend's name is Hailey, and he called her

20     Sam, for whatever reason, because it's not the name Hailey.

21     And he would call her Sam.  And it was her birthday and she

22     came over.  And I told him, like:  Today is Sam's birthday,

23     Dad.  And he said:  Happy Birthday, Hailey.  That's all.  He

24     didn't say:  Happy Birthday, Sam.  He didn't ask her, like:

25     Hey, how's Carlson doing?  And that's her brother.  And his

 1   name is Carson.  He always called him Carlson, and he'd always

 2   joke with her.  He didn't say any of that.  Just:  Happy

 3   Birthday, Hailey.  That's all.

 4   Q.   And so it sounds like that this kind of more serious, less

 5   joking behavior, that was out of character for your dad; is

 6   that right?

 7   A.   Yes.  Correct.

 8   Q.   Did you notice any changes to Mr. Diaz's sleeping habits

 9   in the -- after he started working at Tesla?

10   A.   Yeah.  I would catch him maybe, like, a few times a week

11   staying up late, like, 3:00, 4:00 a.m.  Just downstairs

12   watching TV in the dark.  Not really doing anything, but

13   staying up.

14   Q.   And when did you first notice Mr. Diaz watching TV at 3:00

15   in the morning?

16   A.   That probably was also in September.  Because once -- you

17   know, once he just nonchalantly told Hailey Happy Birthday, I

18   would notice little things.  So maybe also in September-October

19   I noticed him really staying up lately.

20   Q.   And did this behavior of Mr. Diaz, staying up and watching

21   TV until the small hours of the morning, did that happen more

22   than once?

23   A.   Yeah.  I would notice him maybe like two times a month,

24   maybe three times a month.

25   Q.   And did that behavior continue even after you returned

1    from Las Vegas in late 2016?

2    **A.**    Umm, no.  By that time, he would sleep normal.  My mom

3    always used to go to sleep at, like, 6:00.  And then I would be

4    next and, you know, then I would get up at, like, 11:00 to use

5    the bathroom.  He would be asleep by then, so...

6    **Q.**    Does he still stay up until 3:00 in the morning watching

7    TV?

8    **A.**    No, not now.

9    **Q.**    And you said -- you mentioned earlier that your dad also

10   became less talkative after he started working at Tesla.

11   Before he started at Tesla, how often did you speak with him?

12   **A.**    We talked every day.  Literally every day we talked.  And

13   when he started working -- while he was working at Tesla, we

14   talked maybe, like, once or twice a week and it would be very

15   vague, very minimum.

16   **Q.**    And this pattern of your dad only giving you vague,

17   minimum talk, did that continue after you moved to Las Vegas in

18   early 2016?

19   **A.**    I would mostly talk to my mom because my dad wouldn't, you

20   know, answer the phone or he wouldn't, like, get on the phone

21   with my mom for the check-in.  I would, like, speak with my mom

22   and then talk with my dad for a little bit, but it was -- it

23   was kind of the same.

24   **Q.**    I see.  And this behavior of your dad not getting on the

25   phone for check-in calls, was that normal for him?

1    A.    No, it was not normal at all.  Like I said, my dad was,

2    like, always joking and if -- even if he knew the answer, he

3    would still ask me the question.  He would always, like:  Where

4    are you going?  And I would tell him:  Oh, I'm going -- I don't

5    know -- to the grocery store.  Okay.  Who are you going with?

6    I'm going with Hailey.  Okay.  How long are you guys going?

7    I'm going only for an hour.  Okay.  Who are you going with?  I

8    just said I'm going with Hailey.  It wouldn't be that.  It

9    wouldn't be that anymore.

10   Q.    And does your dad still display these moody and less

11   talkative behaviors?

12   A.    Oh, no.  He's all up in my business now.

13   Q.    And did you ever directly talk to your dad about why his

14   mood and personality seemed to change?

15   A.    No, I didn't.

16   Q.    And why not?

17   A.    Umm, because my dad is -- you know, he's a man.  He's my

18   dad.  He doesn't want me to worry.  And if he feels, like, he

19   can, you know, take that on his own, he'll, you know, take that

20   pain or whatever it is on his own and figure it out on his own

21   and not worry me about it.  I'm his daughter.

22   Q.    Did your dad ever speak about his -- to you about his

23   experiences at the Tesla factory.

24   A.    No.

25   Q.    Did he ever tell you that he had experienced racial

**JONES - DIRECT / NUNLEY**

1   discrimination or harassment?

2   **A.**   No.

3   **Q.**   Has your dad ever discussed this lawsuit with you?

4   **A.**   No.

5   **Q.**   So when you're talking about his changed personality,

6   what's that based on?

7   **A.**   Just like knowing him, him being my dad.

8   **Q.**   Now, to shift topics a little bit.  At any point in time

9   did you apply for a job at Tesla's Fremont factory?

10  **A.**   I did, yes.

11  **Q.**   Do you recall approximately when that was?

12  **A.**   Umm, 2015 also.

13  **Q.**   Was that -- did you apply before or after your dad started

14  working at Tesla?

15  **A.**   After.

16  **Q.**   And do you know anyone else who worked at Tesla?

17  **A.**   I'm sorry.  What was the question?

18  **Q.**   Do you know anybody else who worked at Tesla?

19  **A.**   Yes.  My brother.

20  **Q.**   And when you say your brother, is that Demetric Di-az?

21  **A.**   Yes.  Sorry.

22  **Q.**   And had Demetric started working at Tesla when you

23  applied?

24  **A.**   He wasn't working there yet, no.

25  **Q.**   And how long had your dad worked at Tesla before you

1  applied?

2  **A.**    Maybe, like, one or two months, one and a half months.

3  **Q.**    And when you completed the application to work at Tesla --

4  or before you completed the application to work at Tesla, did

5  anybody suggest you apply?

6  **A.**    No.

7  **Q.**    Did anybody refer you to work at Tesla?

8  **A.**    No.

9  **Q.**    Did you talk to anyone about the work environment in the

10 Tesla factory before you applied?

11 **A.**    No.

12 **Q.**    Did you speak with your dad before you applied to work at

13 Tesla?

14 **A.**    Umm, I didn't speak with him.  I probably just told him

15 like:  Hey, I applied for Tesla and Target and all the other

16 applications I did that day.

17 **Q.**    So just to make sure I'm understanding you right, you told

18 your dad you applied at Tesla, but that was after you completed

19 the application; right?

20 **A.**    Correct.

21 **Q.**    And why did you apply for a job at Tesla?

22 **A.**    Umm, I needed an extra job.

23 **Q.**    Was there anything special about the position at Tesla

24 that made you apply there over somewhere else?

25 **A.**    No.

**JONES - DIRECT / NUNLEY**

1  Q.   And at the time -- you mentioned earlier that you told

2  your dad:  I applied to Tesla and Target and some other jobs.

3      Were you applying to work for other companies at the time

4  you were applying to work at Tesla?

5  A.   Yeah.  I did, like, I don't know, maybe six applications a

6  day.  I still do that now because I'm broke.

7  Q.   And how did you find out that Tesla was hiring?

8  A.   I'm pretty sure it was, like, Indeed, Craigslist.  One of

9  those websites.

10 Q.   And you mentioned that you told your dad after you

11 completed the application that you had applied.  Did he say

12 anything in response?

13 A.   He was just probably like, "Okay."  But he didn't say

14 anything really.

15 Q.   Did you get an interview after you applied for that job at

16 Tesla?

17 A.   Yes.

18 Q.   And did you get hired after the interview?

19 A.   Unfortunately not.

20 Q.   Can you describe the format of the interview for me?

21 A.   Yeah.  It was just like a two-part interview.  The first

22 part is just like the standard, like:  Here's my resume.  This

23 is what I'm capable of.

24     And then the second part, they had, like, a -- I don't

25 even know what to call it.  Like a hands-on, like, skill test.

1  And they make you, like, I don't know, do hands-on stuff.  And

2  I am not a hands-on person.  So, yeah, I failed that part.

3  Q.  And how did you know you failed that part of the

4  interview?

5  A.  Oh, they tell you right after.

6  Q.  And is that why you weren't hired?

7  A.  Yes.

8  Q.  Did you tell your dad that you didn't get the job at

9  Tesla?

10  A.  Yes.

11  Q.  What was his response?

12  A.  He just said:  I'm glad you didn't get it.

13  Q.  And did he tell you why he was glad?

14  A.  No.

15  Q.  Did you ever apply to work at Tesla again?

16  A.  No.

17  Q.  If you had the chance, would you apply for a job at Tesla

18  again?

19          MS. KENNEDY:  Objection.  Relevance.

20          THE COURT:  Sustained.

21          MS. NUNLEY:  No further questions.

22          THE COURT:  Ms. Kennedy.

23                    CROSS-EXAMINATION

24  BY MS. KENNEDY

25  Q.  Good morning.  Ms. Jones.  How are you?

```
 1        You say you've got a really close relationship with your
 2   father, Mr. Diaz?
 3   A.    Yes.
 4   Q.    He sounds like a dad of a daughter making sure he knows
 5   where you are at all times?
 6   A.    Yeah.
 7   Q.    Would you say that's been the case your entire life with
 8   him?
 9   A.    Yeah.
10   Q.    And he's a good dad?
11   A.    Yes, a great dad.
12   Q.    A great dad.  And you would agree he must make sure you're
13   safe at all times?
14   A.    Correct.
15   Q.    And when you applied for the job at Tesla, did you tell
16   anybody in your family that you're living with, your brother or
17   your father, that you had applied?
18   A.    Prior to applying, no.  After, I just told them, like:
19   Hey, I applied to Tesla and, like I said, all the other jobs
20   that I already applied to.
21   Q.    And at the time that you applied, you knew that your
22   father was working there, but your brother had not applied;
23   correct?
24   A.    Yeah.  I knew my dad was working there and not my brother.
25   Q.    And do you recall if you applied to work at Tesla in,
```

 1   like, June or July of 2015?

 2   A.   I applied maybe August because my dad had been working

 3   there already.  So I applied in maybe August.

 4   Q.   Do you know if that's approximately the same time that

 5   your brother Demetric applied to work at Tesla?

 6   A.   Umm, I think he started, like, the end of August, maybe

 7   the beginning of September, but he hadn't been working there

 8   yet.

 9   Q.   Okay.  So you're saying he may have applied but he

10   actually hadn't started at the time that you applied?

11   A.   Oh, I don't know if he applied at the same time as me.  I

12   just know he started working there after.  I don't know if he

13   had applied already.

14   Q.   And when you applied, say, in that -- I guess that summer

15   of 2015, did you recommend to your brother that he should

16   apply, too?

17   A.   No.

18        MS. NUNLEY:  Objection, Your Honor.  Beyond the scope.

19        THE COURT:  I'm sorry?

20        MS. NUNLEY:  Beyond the scope.

21        THE COURT:  Overruled.  You can continue.

22   BY MS. KENNEDY

23   Q.   You said you saw that Mr. Diaz's, your father's, mood

24   changed when he was working at Tesla sometime around September.

25   And so from September until about December of that year, you

1  were living with your father and your brother and your mother?

2  A.   Yes.

3  Q.   And then you moved to Las Vegas in approximately January

4  of 2016?

5  A.   Yes.

6  Q.   And so after January 2016, how often did you actually see

7  your father?

8  A.   Umm, I didn't see him.  I lived in Las Vegas.

9  Q.   Right.  So, but, like, did you come home for, I don't

10  know, spring break or holidays or anything like that, if you

11  recall?  I know it's a long time ago.

12  A.   While I lived in Las Vegas, I probably came home -- I know

13  for a fact I came home once because it was my best friend's

14  little sister's birthday.  It was Hailey's little sister's

15  birthday.  So once, maybe twice I came home.  So I saw him

16  within that time.

17  Q.   So maybe once or twice in the calendar year 2016?

18  A.   Yes, but we spoke every day, like I said, when I spoke

19  with my mom.

20  Q.   And so in that time period, say from September of 2015

21  through December of 2015, is that the time period where your

22  dad was, I guess, up at 3:00 or 4:00 in the morning?  Is that

23  the time period you're talking about?

24  A.   Yes.  September 2015 to when I moved 2016, he was up.

25  Q.   Okay.  And do you know what shift he was working at the

```
 1   Tesla factory during that September through December 2015 time
 2   period?
 3   A.   No.  I don't know.
 4   Q.   Did you ever understand that he was working the 6:00 p.m.
 5   to 6:00 a.m. shift?
 6   A.   I am not sure.
 7   Q.   Okay.  Do you know how many days a week he was working at
 8   the Tesla facility?  Was it, like, five days a week?  Four days
 9   a week?  Do you have any idea?
10   A.   Umm, he was working a full -- like, full-time schedule I'm
11   sure, but I don't know which days.
12   Q.   And since he has been working at AC Transit, is he back to
13   being your dad?
14   A.   Yes, he is.
15   Q.   Is he joking all the time?
16   A.   Yeah.  Actually, he jokes all the time.  He was just
17   joking with me the other day.  He's supposed to be fixing my
18   bathroom, but he jokes about it:  Oh, I'll get to it.  And, you
19   know, still no bathroom, but...
20   Q.   Is he joking around with your through friends, like your
21   friend Hailey?  He's back to that dad?
22   A.   Yeah.  He calls Hailey "Sam" all the time now.  She was
23   just over the other day, and he was like:  Sam, you gained
24   weight.  Hailey has not gained weight since I've known her.
25   Q.   Would you say now that he's the dad you've known and loved
```

1  your entire life?

2  **A.**   Yeah.

3  **Q.**   He's back to that dad?

4  **A.**   Yeah.

5  **Q.**   All right.  Thank you.

6  **A.**   Okay.  Thank you.

7          **THE COURT:**  Ms. Nunley, anything further?

8          **MS. NUNLEY:**  No.  Nothing further, Your Honor.

9          **THE COURT:**  Okay.  Thank you.  You can step down.

10     (Witness excused.)

11         **THE COURT:**  Who is the next witness?

12         **MR. ORGAN:**  Your Honor, we would be playing the video

13  of Erin Marconi.

14         **THE COURT:**  Okay.

15         **MR. ORGAN:**  There is 26 minutes of plaintiff time and

16  4 minutes of defense time.  It's all together.

17         **THE COURT:**  Okay.  So, ladies and gentlemen, we're

18  going to have another videotaped deposition.  And, as I said

19  yesterday, when a witness has a deposition, they're sworn under

20  oath to tell the truth and you are to view this testimony just

21  as if it was being given here live in court.

22      The other thing, the deposition has been spliced up a

23  little bit, and so what's -- you should consider the words that

24  are under it, which are from the deposition transcript, even if

25  there's some problem in the editing and things get cut off a

 1    little bit as they did last time.

 2         So with that, let's hear from Ms. Marconi.

 3                        **ERIN MARCONI**,

 4    called as a witness for the Plaintiff herein, testified via

 5    videotaped deposition played in open court, not reported.)

 6              **MR. ORGAN:**  And, Your Honor, 37 is Exhibit 33, which

 7    has been admitted.

 8              **THE COURT:**  Okay.

 9         (Videotape resumed, not reported.)

10              **MR. ORGAN:**  I'm sorry, Your Honor.  Exhibit 274 is

11    Exhibit 34.  We move Exhibit 34 into evidence.

12              **THE COURT:**  Is there any objection?

13              **MS. KENNEDY:**  I don't think so, Your Honor.  Let me

14    just double check.

15              **THE COURT:**  Yeah, go ahead.

16         (Videotape resumed, not reported.)

17              **THE COURT:**  No, no.  Stop the deposition.  Please

18    stop.

19         Thank you.

20         Ms. Kennedy needs to confirm that it's okay to admit the

21    document.

22              **MS. KENNEDY:**  Your Honor, I believe it's a duplicate

23    of Exhibit 274.  That's why I was checking.  So 274 is already

24    admitted.

25              **THE COURT:**  So you have no objection to this

**PROCEEDINGS**

 1   proceeding?

 2         **MS. KENNEDY:**  No.  But I think for the record we

 3   should probably call it Exhibit 274 so it's not a duplicate.

 4         **THE COURT:**  Yeah.  Okay.  All right.

 5      You can proceed.

 6         **MR. ORGAN:**  Yes.  I apologize.

 7      (Videotape resumed, not reported.)

 8         **THE COURT:**  All right.  That concludes Ms. Marconi's

 9   testimony.

10      Who's next?

11         **MR. ORGAN:**  Our next witness is a Zoom witness.  Amy

12   Oppenheimer, Your Honor.

13         **THE COURT:**  Okay.

14         **MR. ORGAN:**  I don't know how we technically do that.

15   I'm wondering if it might make sense to have an early break so

16   we can set that up so we maximize the time?

17         **THE COURT:**  I think that's probably a good idea.

18      So, ladies and gentlemen, let's take a 15-minute break and

19   so we'll come back at about 25 of.  Please remember the

20   admonitions.

21      (Jury exits the courtroom at 11:19 a.m.)

22      (Proceedings were heard out of presence of the jury:)

23         **THE COURT:**  All right.  We'll be in recess.

24      (Whereupon there was a recess in the proceedings

25       from 11:19 a.m. until 11:37 a.m.)

```
 1        (Proceedings were heard out of presence of the jury.)

 2             THE CLERK:  Please come to order.

 3             THE COURT:  Be seated, everybody, please.  We'll get

 4   the jury.

 5             MR. ORGAN:  In terms of her demonstrative, my

 6   understanding is your ruling was that we couldn't have any

 7   reference to, I think, three exhibits in there.  Can we still

 8   use her demonstrative or not?

 9             THE COURT:  It depends.  It has to exclude the things

10   that I excluded.

11             MR. ORGAN:  Yes.

12             THE COURT:  Anything else, Ms. Kennedy?

13             MS. KENNEDY:  Yes, Your Honor.  This also goes beyond

14   the Rule 26 report, and I got this late last night.

15        So she was deposed in March of 2020.  Her report was -- I

16   got it last night, and it has other information that was beyond

17   the scope of the Rule 26 report, and it also includes exhibits

18   that are not admitted and excluded as well.

19             THE COURT:  So I don't have the document.  The order

20   from this morning is that everything that wasn't in the report

21   should be excluded, and it should be consistent with the orders

22   that I've made during the course of the trial.  And if the

23   demonstrative includes that stuff, at this point it shouldn't

24   be used.

25             MR. ORGAN:  Your Honor, with regard to the exhibits,
```

1   we've extracted the exhibits.  I have -- it is unclear to me

2   what it is that still remains inside the document that violates

3   Rule 26.  And so I -- I had believed by extracting those

4   exhibits, we had taken care of the issue.

5          THE COURT:  All right.  So read the demonstrative and

6   -- that's -- that's the job of a lawyer in the middle of a

7   trial.  So if you're going to object to things, Ms. Kennedy,

8   because they're beyond the scope of the report, you need to be

9   specific.

10      And I'll go off and tell me when you've looked at it, read

11  it, and you've conferred with the opponent.  And if you have a

12  disagreement, then bring me the demonstrative so that I can

13  make a ruling.

14         MS. KENNEDY:  Your Honor, I will do that.  I don't

15  know what they've changed in the PowerPoint.

16         THE COURT:  Now you have it.

17      (Document tendered to counsel.)

18         MS. KENNEDY:  Okay.

19      (Whereupon there was a recess in the proceedings

20       from 11:39 a.m. until 11:42 a.m.)

21      (Proceedings were heard out of presence of the jury:)

22         THE CLERK:  Please come to order.

23         THE COURT:  Be seated, everybody.

24      Is there a resolution or do I need to make a decision?

25         MR. ORGAN:  There is a resolution, Your Honor.

1          **MS. KENNEDY:**  Your Honor, I don't want to waste any

2    more of the jury's time.  We can proceed.

3          **THE COURT:**  All right.  So any objections to the

4    demonstrative at this point are moot.

5       And let's get the jury.

6       (Jury enters the courtroom at 11:43 a.m.)

7          **THE COURT:**  All right.  Please be seated, everybody.

8       Ladies and gentlemen, our next witness is going to be

9    appearing over Zoom.

10      And, Mr. Organ, who would that be?

11         **MR. ORGAN:**  Amy Oppenheimer, Your Honor.

12         **THE COURT:**  All right.  So, Ms. Davis, if you would

13   swear Ms. Oppenheimer.

14         **THE CLERK:**  Okay.  Ms. Oppenheimer, if you'll raise

15   your right hand.

16                        **<u>AMY OPPENHEIMER</u>**,

17   called as a witness for the Plaintiff, having been duly sworn,

18   testified as follows via Zoom:

19         **THE WITNESS:**  I do.

20         **THE CLERK:**  Thank you.

21         **THE COURT:**  And if you would state your full name and

22   spell it for the record, please.

23         **THE WITNESS:**  Amy Oppenheimer, O-P-P-E-N-H-E-I-M-E-R.

24         **THE COURT:**  All right.  Mr. Organ, please proceed.

25

1                    <u>DIRECT EXAMINATION</u>

2   **BY MR. ORGAN**

3   **Q.**   Where are you employed, Ms. Oppenheimer?

4   **A.**   I am a partner in a law office in the Bay Area,

5   Oppenheimer Investigations Group.

6   **Q.**   What does your office do?

7   **A.**   We do almost exclusively both workplace and school

8   investigations.  I had a sole proprietorship till last year and

9   then became a partnership as we expanded.

10       We have 15 attorneys doing about 90 percent investigations

11  in both workplaces and educational institutions.  We also do

12  training, some mediation, and expert witness work.

13  **Q.**   Do you train any HR professionals?

14  **A.**   Yes.  We train HR professionals, employees, supervisors,

15  and attorneys in how to recognize, prevent, respond,

16  investigate, and also some bias training.

17  **Q.**   What percentage of your work is expert testimony?

18  **A.**   Umm, probably less than 5 percent at this point.  I do one

19  or two cases a year.

20  **Q.**   Have you testified in court before as an expert?

21  **A.**   I have.  About a dozen times.

22  **Q.**   And in terms of -- what's your area of expertise in terms

23  of preventing harassment, discrimination, and investigating it?

24  **A.**   Well, I have been an attorney since 1980.  And in the

25  1980s I represented women who have been sexually harassed, and

 1   then got interested in prevention.

 2        I did not like litigation and wanted to see what I could

 3   do to help stop the situations before they got to that point.

 4   So I got involved in training, both -- in how to do

 5   investigations.  I was also doing some investigations in the

 6   1980s for the federal government as part of my law practice.

 7        And interested in reverse engineering, how problems got to

 8   where they were.  So started mainly with sexual harassment,

 9   expanded that to all forms of workplace harassment.

10        Then got a position as an Administrative Law Judge with

11   the State of California and for a few years was not involved in

12   that, but then started working part time with the permission of

13   the State and added back in doing investigations and training.

14        And at that point in about 2003 I authored a book for

15   SHRM, the Society of Human Resource Management, in how to do

16   investigations.  By then I was doing extensive training of

17   human resource professionals and also attorneys in how to

18   investigate.

19        And then in 2009 I founded a professional organization for

20   workplace investigators as a big-tent organization so that many

21   of our members are from human resource backgrounds rather than

22   attorneys.  Some are private investigators.

23        The organization expanded to be a worldwide organization

24   and now has about 1500 members.  I'm no longer on the Board.  I

25   was the president of the Board for three years and then the

1    immediate past president.

2        I helped develop our materials, which is the first program

3    that provides a certificate in how to investigate.

4        And we've now done an institute since 2011, starting once

5    a year, then twice, up to now I think four or five times a

6    year, and provide a certificate to people who successfully

7    complete and pass a rather rigorous program and test.

8        I also was appointed to a task force on sexual harassment

9    in California through the Department of Fair Employment and

10   Housing, and in that capacity I was on a subcommittee that

11   wrote the Guidelines for employers on how to prevent and

12   respond.  Again, that focused on sexual harassment, but it

13   really applies to all forms of workplace harassment and there's

14   an extensive portion on investigations that I co-authored.

15       I've also been involved with national standards on

16   investigations and with -- input into those standards through

17   ANSI and have worked as a professional in this capacity since

18   the late 1980s.

19   **Q.**   You said the principles that apply to investigating a

20   sexual harassment complaint, those same principles would apply

21   to a workplace harassment -- a race harassment case; is that

22   right?

23   **A.**   Correct.  Basically any harassment based on a protected

24   category under state or federal law, it implicates the same

25   laws and the same types of prevention and response apply.  And

1  so if somebody complains about racial harassment, religious

2  harassment, whatever it is, they should be both responded to

3  and investigated in the same prompt and thorough manner.

4  **Q.**   Who typically hires you or your company?

5  **A.**   Well, as an investigator, which is mostly what we do, we

6  are hired by employers.  Employees don't have the means or the

7  access to do that.  Plus, employers are duty-bound to provide a

8  fair, thorough investigation; and so in doing that, they

9  sometimes hire outside people like me.

10       Usually they have internal people, if they're a large

11  organization especially, but there are often situations where

12  they don't have the resources or it's too high a level or

13  there's a conflict.  So we do public agencies, private

14  corporations, non-profits.

15       My -- I was one of the firms that the California

16  legislature used after the Me Too movement.

17       And most of our investigations are kept confidential under

18  the attorney-client privilege, but some have become public, and

19  including some private school investigations and ones against

20  elected officials.

21            **MR. ORGAN:**  Your Honor, I would move to have

22  Ms. Oppenheimer testify as an expert.

23            **MS. KENNEDY:**  Expert as to what?

24            **MR. ORGAN:**  Expert as to workplace investigations and

25  policies and prevention.

1          MS. KENNEDY:  With respect to Owen Diaz?

2          MR. ORGAN:  With respect to Tesla.

3          MS. KENNEDY:  No objection then.

4          THE COURT:  All right.  You may proceed.

5   BY MR. ORGAN

6   Q.    Now, we hired you in this case; is that right?  Plaintiff,

7   Owen Diaz did?

8   A.    True.

9   Q.    How much are we paying you an hour?

10  A.    $600.

11  Q.    Okay.  Do you have any special expertise in race

12  harassment?

13  A.    Well, I do in that my office has investigated many race

14  cases.  And I also have been doing implicit bias training for

15  the State bar, for other attorney and human resource

16  organizations for more than ten years.

17  Q.    Have you formed an opinion in this case?

18  A.    Yes.

19  Q.    What's your opinion?

20  A.    My opinion is that Tesla did not meet the standard of care

21  in preventing and responding to and investigating multiple

22  complaints of racial harassment that were articulated or

23  brought by Owen Diaz.

24  Q.    And what do you mean by the standard of care?  What is

25  that?

 1    **A.**   Over the years, the human resource field has developed

 2    standards of how a complaint of harassment should be

 3    investigated, and those standards are articulated in things

 4    like the book that I wrote, handbooks from the law firms, the

 5    guidance that was issued by DFEH, which is the Department of

 6    Fair Employment and Housing, the task force that I worked with

 7    by the EEOC, the Equal Employment Opportunity Commission.

 8        So there have been well-articulated standards in this

 9    field for more than 20 years as to, you know, what an

10    appropriate response and prevention plan is to workplace

11    harassment based on race and other protected categories.

12    **Q.**   Now, we have a demonstrative up here about this.  Did you

13    prepare this?

14    **A.**   I did.

15    **Q.**   Okay.  And if you could, go through these eight steps that

16    you identify here as the standard for prevention?

17    **A.**   I've got nine.  But in any case, who's counting; right?

18    **Q.**   Yeah, there are nine.  There are eight on my sheet.  I

19    apologize.

20    **A.**   That's okay.  I -- I tinker with these things, so it's

21    hard to know.

22    **Q.**   Tell us the nine.

23    **A.**   That you have clear policies that are distributed,

24    accessible and then, more importantly, enforced because the

25    enforcement of policies are more important than just having

OPPENHEIMER - DIRECT / ORGAN

 1    them.  If they're not enforced, they're pretty meaningless.

 2         Two, that you train people about them.  Both the employees

 3    and especially supervisors and managers get additional

 4    training.  There's a mandatory minimum under state law, but

 5    additional training.  Especially if there are issues in a

 6    specific workplace, it's very helpful and important.

 7         Three, giving a consistent message.  In this case focusing

 8    on racial harassment, that racial harassment will not be

 9    tolerated, and then making sure that the work environment is in

10    accord with that.  Because, again, saying it is not the same as

11    enforcing it.  And so if there are open and obvious things in

12    the work environment, they should be addressed immediately to

13    send a very clear, consistent message.

14         Five is an immediate response.  If there is either a

15    complaint or there is notice of harassment, some -- it used to

16    be years ago, I don't think so much employees think that now,

17    that employers would say:  Well, I didn't get a complaint, so I

18    didn't have to do anything.  But if you see something, if

19    you're aware of it, even an anonymous complaint or the fact

20    that a supervisor hears a racial epithet, that's all things

21    that should be responded to immediately.  You don't wait for a

22    complaint and you certainly don't wait for something in writing

23    or official.

24         Six, if there is something offensive, it's removed right

25    away and then the policy is enforced by letting people know.

 1    Sending a memo, giving an announcement, having a meeting:  This

 2    was observed in the workplace.  This is inconsistent with our

 3    policies.  It won't be tolerated.  There will be a consequence.

 4    And then you, of course, have to follow through on the

 5    consequence.

 6         And, seven, that there are immediate adequate

 7    investigations of complaints or any notice of harassment.

 8         Eight, that there is progressive and meaningful

 9    discipline.  So you might start with something not as

10    significant.  Of course, it depends on what the -- what the

11    harassment is.  As with anything in employment, it depends on

12    the seriousness, but it should be progressive so that it's more

13    serious if it's repeated.

14         And, lastly, that there's followup; that if somebody

15    complains about an issue, that after an investigation they're

16    told the results.  And then there's continued followup to make

17    sure that whatever it was they complained about has stopped and

18    that they can be comfortable continuing to work there.

19    **Q.**   Okay.  And what is the standard of care relative

20    investigations?

21    **A.**   Investigations should be -- and I think I have another

22    slide to help prompt me.  And I know -- I don't have control of

23    the slides, is my understanding, so somebody out there, if you

24    do.

25         Thank you.

1          Oh, okay.  I guess I was going to go to something else.

2   **Q.**   Yeah.

3   **A.**   Maybe it's the next one.

4          (Document displayed.)

5   **A.**   Okay.  Investigations should be initiated -- and I talked

6   about that -- with any notice.

7          I'm not sure at this point where the slide on the standard

8   for investigations is so I can talk off-the-cuff.

9   **Q.**   Sure.

10  **A.**   Investigations should be prompt, thorough, and fair.  When

11  I evaluate an investigation, I look at was the person who did

12  it experienced, not -- didn't have a bias, and appropriate

13  therefore to do that investigation, number one.

14         Number two, was it reasonably thorough?  Were the people

15  who should be interviewed interviewed?  Were the interviews

16  either done in person or on video?  So you can develop some

17  rapport, see that person.  Were documents gathered?

18         And then, lastly, did the person who did the investigation

19  come to a reasoned conclusion based on the evidence collected

20  and explain that conclusion so that it's not just arbitrary;

21  that it was consistent with whatever evidence that they

22  gathered?

23  **Q.**   I notice on this slide on Item 4 there's a -- you have

24  something here:  Was there appropriate remedial and followup

25  action?  What is that referring to?

OPPENHEIMER - DIRECT / ORGAN

1  **A.**   So that's an after-investigation issue.  When I'm

2  evaluating investigations done by other people, I look to the

3  first three prongs for the investigation itself, and then I

4  also look to what happened when it was done.

5      Because there are often problems with retaliation after an

6  investigation.  And if there isn't appropriate remedial action

7  and followup, too often there could be retaliation.  So it's a

8  very important element in the prevention and response plan.

9  **Q.**   And how did Tesla do when you analyzed the things that you

10  saw at Tesla versus the standard of care, as you call it?

11      I think this is Slide 3.

12      (Document displayed.)

13  **A.**   Not so well.  There are policies, but I did not see

14  evidence that they are routinely and strongly enforced.  In

15  fact, there was evidence that the "N" word is used in the

16  workplace, the full word, whether ending in an "E-R" or an "A,"

17  neither of which should be permitted.  And that supervisors

18  were aware of it, that action wasn't taken.

19      And so the policies, you know, don't mean much if they are

20  not enforced.  In fact, sometimes it -- it undermines and sends

21  the opposite message to have a policy that says one thing and

22  then everybody doing something else.

23      I didn't see evidence that people were trained adequately.

24  A number of the witnesses testified that they didn't have

25  training, both supervisors and employees.  And some of the HR

1   people didn't have a lot of training in what to do about racial

2   epithets; how to investigate, how to take action when there

3   wasn't a formal complaint, et cetera.

4       This resulted in not having a consistent message to the

5   workforce about expectations, about racial epithets and

6   harassment.

7       There was evidence, as I said, of epithets in the

8   workplace so the work environment was not being monitored and

9   followed up on about that.

10      In terms of response, some of these responses were -- were

11  relatively quick, but some of them just never happened.  And so

12  there was selective investigations and without any clear

13  criteria on why some were and some weren't.

14      There was evidence that there were things in the workplace

15  that were not removed.

16      And then I -- I drilled down more in the investigations

17  and discipline and followup area because at that point I

18  started evaluating the three investigations that were done of

19  Ms. Diaz's complaint.

20  **Q.**   Okay.  Which slide should we go to next then?  Complaint

21  No. 1?

22  **A.**   Sure.

23  **Q.**   Okay.

24      (Document displayed.)

25  **Q.**   So that's on Page 6 -- Slide 6.

1      And tell us what -- tell us what your opinion is relative

2   to the July 31st complaint by Owen Diaz to Tom Kawasaki

3   regarding Judy Timbreza making racist comments, including the

4   "N" word.

5   **A.**   Well, there wasn't an experienced investigator assigned to

6   this.   Rather, it was done *ad hoc* by somebody whose task was

7   not to do investigations and hadn't been trained, and what

8   happened then was not a thorough investigation.   There was no

9   documentation of who was spoken to.

10      Mr. Diaz brought up the fact that there was a history and,

11   yet, that wasn't looked into.   No findings were made.

12      And it's really important that anytime you do an

13   investigation, you make a finding.   It's like taking something

14   to a jury and the jury says:   Well, we don't know.   So you just

15   spent however long on a trial, but you're not going to get an

16   answer.   The point of an investigation is you need an answer

17   and then you need to do something about it.

18      And then there was no action taken other than I think some

19   people being spoken to about joking, a verbal warning, which

20   wasn't for racial harassment because they never made a finding

21   about that, which they should have.   And that tends to

22   trivialize the complaint, and then it makes it harder for

23   people to complain if that's going to be the response that they

24   get.

25      And then I saw no evidence that there was followup.

1   Q.   Let's go to Complaint No. 2 in October 2015 and the

2   interaction between Mr. Diaz and Ramon Martinez.  What's your

3   opinion as to that investigation?

4   A.   Well, similarly there was no investigation.  In fact, the

5   emails indicated that at first there was a decision to do an

6   investigation and then they just said:  Well, supervisor should

7   just speak to the three people involved:  The complainant,

8   respondent, and the witness.

9        And what was particularly troubling here is that Mr. Diaz

10  said that he was fearful.  There were threats.  So we're

11  talking about a complaint about racial harassment, but also a

12  complaint about potential violence in the workplace.

13       And there was surveillance, apparently, that could have

14  been checked.  So there was a -- it's so rare that you get the

15  video and can really find out what happened.  So to not check

16  it when you can makes no sense at all.  And, again, especially

17  when you have somebody who might be being threatened.

18       There were some informal phone discussions.  There were no

19  findings.  Again, same issue as last time.

20       And here both of them were given a warning for not getting

21  along, and that is really a disincentive for people to

22  complain.  If somebody complains and they get a warning, then

23  they're being blamed instead of the employer doing what might

24  be hard work with sorting it out and making a finding.

25  Q.   Let's go to Complaint No. 3, the January 2016 piccaninny

1    incident by Ramon Martinez.

2        (Document displayed.)

3    **Q.**   Can you give us your opinion as to that investigation?

4    **A.**   Sure.  My understanding is that Ms. Delgado, who was the

5    vice-president HR at Chartwell, did that.  And she may well be

6    experienced, but as I believe she, herself, admitted, it didn't

7    go the way it was supposed -- the way typical investigations

8    should.

9        It wasn't thorough.  It wasn't documented.  She did a

10   phone interview with a complainant, Mr. Diaz.  She had the

11   respondent answer written questions, which is very poor

12   practice because you can't follow up.  You can't listen to how

13   somebody responds and try to gauge the genuineness of that

14   response.

15       There was this -- he said -- Martinez said that Mr. Diaz

16   had accepted his apology.  She never went back and confirmed

17   with Mr. Diaz: Did you say to Mr. Martinez, "Oh, it's okay.  I

18   understand.  It was just you.  It's fine"?  Which was

19   essentially what Mr. Diaz -- Mr. Martinez said, which, if

20   Mr. Diaz is believed, he did not say and is problematic that

21   Mr. Martinez is lying about this and not being held

22   accountable.

23       The history was not investigated.  Mr. Diaz said there's a

24   history with Mr. Martinez.  His fears about safety were not

25   investigated.  There were no findings made.

 1       And both of them then continued to work at the plant.

 2   And, again, indicative of even when you have proof of a racist

 3   effigy being drawn and a complaint against somebody who there

 4   is a history, that they were allowed to continue working there.

 5       (Document displayed)

 6   Q.   Do you have any opinions about any other known racial

 7   harassment at Tesla from the 2015-2016 time period?

 8   A.   I think I already spoke to the fact that there was

 9   evidence that multiple supervisors heard the "N" word used,

10   didn't do anything to investigate, discipline, stop the

11   behavior; that supervisors had been informed of the use of it,

12   and that the general knowledge with -- and the failure to do

13   anything was rather remarkable.

14   Q.   Okay.  And you're talking about Wayne Jackson, Michael

15   Wheeler, and Tom Kawasaki; is that correct?

16   A.   Correct.

17   Q.   Those supervisors should have taken action, in your

18   opinion?

19   A.   Any supervisor who hears a racial epithet should

20   immediately take action.

21       (Document displayed)

22   Q.   Okay.  Do you have any other concerns about prevention of

23   harassment at Tesla?

24   A.   Well, again, I think I probably mentioned it quickly

25   earlier, but some of the things that stood out is I believe

1    Mr. Quintero was pretty high in the chain of command.  Yet, in

2    his deposition said that he was unaware that the policy against

3    harassment applied to contractors.

4         Well, of course at Tesla, as in many organizations, there

5    are a lot of people who were not employees of that -- of Tesla.

6    They're employees of another entity, but they're working at

7    Tesla.  But Tesla is responsible for what happens in its

8    workplace, regardless of whether it's an employee doing it, a

9    contractor doing it, or even a client who would come in and do

10   that.  They are responsible, and to not understand that is --

11   is a big gap.

12        Mr. Kawasaki said he didn't get training, and training is

13   mandatory for supervisors under California law, and troubling

14   that he is not aware of being trained.

15        In HR Mr. Marconi [sic] said he wasn't trained about the

16   use of the "N" word.  And understanding racial epithets is an

17   important part of HR's responsibilities.  So I was very

18   surprised that he would not understand the significance of that

19   word and racial epithets in the workplace and how to manage

20   them.

21        And generally the evidence that there have been complaints

22   of the use of the "N" word that were substantiated in the

23   plant.  So that would put you on heightened alert to do

24   something about it, to watch for it and to respond.

25   Q.   And what are your conclusions then?

1        (Document displayed)

2   **A.**   That although Tesla may have policies, their employees

3   weren't adequately trained on the policies.  The policies were

4   not enforced.  They weren't responding to known racial

5   harassment.

6        Investigations were being done *ad hoc*.  Not by a trained

7   and experienced person going by a specific protocol, but rather

8   by whoever seemed to be around and know about it without

9   following typical protocol.

10        And then there wasn't a consistent strong disciplinary

11   action to send the message to the workforce or followup to make

12   sure that the conduct wasn't continuing.

13   **Q.**   And so if the workforce isn't informed of harassing

14   conduct or that harassing conduct is bad, then it doesn't

15   dissuade others from engaging in similar conduct?  Is that part

16   of your conclusions?

17        **MS. KENNEDY:**  Objection.  Leading.

18        **THE COURT:**  Overruled.

19        **THE WITNESS:**  Sure.  I mean, that if conduct is

20   condoned, it sends a message that it's okay; that it's

21   acceptable and that people can continue to engage in the

22   conduct, and that if you were a target of that conduct or

23   offended by it, there's nothing you can do.

24        I believe at one point somebody was told:  You can

25   transfer if you want.  Well, the point isn't to have the person

```
 1   who is offended by racial epithets transfer.  The point is to
 2   stop it so they can work there.  And the organization shouldn't
 3   be accommodating that behavior.  They should be enforcing their
 4   rule against that behavior.
 5   Q.   Thank you.
 6            MR. ORGAN:  No more questions, Your Honor.
 7            THE COURT:  All right.
 8        Ms. Kennedy.
 9            MS. KENNEDY:  Yes.  Thank you, Your Honor.
10                        CROSS-EXAMINATION
11   BY MS. KENNEDY
12   Q.   Good afternoon, Ms. Oppenheimer.
13   A.   Hello.  How are you?
14   Q.   Good.  How are you?
15   A.   I'm well.
16   Q.   I understand you have been hired by Mr. Organ as a
17   retained expert in this case; correct?
18   A.   Correct.
19   Q.   And how much have you charged Mr. Organ for your services
20   thus far?
21   A.   Umm, I charge 600 an hour.  I would need to add it up.
22   You probably have what it was at deposition.  I think at
23   deposition it was about $4,000, and since then I've done about
24   13 hours.
25   Q.   And the presentation, the PowerPoint that you presented,
```

 1   when was that prepared?

 2   **A.**   A few days ago and then I edited it slightly over the last

 3   couple of dates.

 4   **Q.**   Was it finalized last night?

 5   **A.**   It was actually finalized a few hours ago based on some

 6   evidentiary rulings.

 7   **Q.**   Prior to a few minutes ago was, it finalized last night?

 8   **A.**   I believe so.

 9   **Q.**   Now, I understand that you've been asked to provide an

10   opinion as to the standards of care in the human resources

11   field.  Would that be a fair statement?

12   **A.**   That I was asked to?  Correct.

13   **Q.**   And the standards of care that you were referring to refer

14   to, at least in part, to the Department of Fair Employment and

15   Housing guidance; correct?

16   **A.**   Correct.

17   **Q.**   And the events that you have been asked to opine about

18   occurred in 2015 and 2016; correct?

19   **A.**   Yes.

20   **Q.**   And the DFEH, the Department of Fair Employment and

21   Housing, guidance was not issued until 2017; correct?

22   **A.**   Yes, that's true.  I believe I said I co-authored them.

23   **Q.**   Correct.  But they were not made public.  So for Tesla or

24   any other organization, the DFEH guidance that you're referring

25   to in holding Tesla accountable to was not made public until

1   2017, but you're talking about in holding them accountable to

2   the standards of care in 2015 and 2016; correct?

3   A.   Well, I believe that everything in there was -- was well

4   known and part of the standard of care.

5        What those guidance did was pull it together and make it

6   accessible mainly to smaller employers that -- that don't

7   always have the resources to have that information, but it's

8   consistent with what had been in handbooks since the 1990's.

9   Q.   I understand.  But my question was a little more focused.

10       The standard of care in which you have in your PowerPoint,

11  that is based upon the DFEH guidance that was not issued and

12  made public until 2017; is that correct?

13  A.   That was one thing, certainly not the only thing.  That

14  was --

15  Q.   And you agree that Tesla does have an Anti-Harassment

16  Policy that in your view is adequate, correct?

17  A.   I believe so.  I looked at it at one point and nothing

18  struck me as being problematic.

19  Q.   And you also agree that you're not offering an opinion as

20  to the adequacy of any written policy regarding investigations

21  by Tesla; correct?

22  A.   That's true.

23  Q.   And you're not offering any opinion as to whether or not

24  there was any type of race-based harassment or retaliation or

25  discrimination; correct?

1    A.    That's a jury decision.  I -- I wouldn't be -- I would not

2    be the person to offer an opinion on that.

3    Q.    And you're not -- and it's correct you are not offering

4    any legal opinions?

5    A.    That's true.

6    Q.    And you're also not offering any opinions as to any legal

7    standards; correct?

8    A.    That's correct.

9    Q.    And in this particular case in coming up with your

10   opinions, you only spoke with Mr. Larry Organ, the counsel for

11   Owen Diaz, about this matter; correct?

12   A.    I don't -- I'm not sure I understand your question.  I'm

13   sorry.

14   Q.    Well, let me ask you this:  Other than reviewing

15   documentation, which we'll get to in a minute, did you talk to

16   any of the other lawyers for Mr. Diaz about any part of your

17   opinion in this case?

18   A.    There have been other people from Larry Organ's office

19   present during one or two discussions.

20   Q.    And it's your understanding that Mr. Diaz was a contractor

21   working at the Tesla facility; correct?

22   A.    Correct.

23   Q.    And it's your -- and it's your testimony, I believe your

24   opinion is that anything and everything that happened at the

25   Tesla factory in Fremont is going to be Tesla's responsibility;

 1  correct?

 2  **A.**   Well, I'm trying to think if "everything and anything"

 3  might be an overstatement.  But, I mean, I believe that they

 4  are responsible for protecting and responding to racial

 5  harassment that happens at their plant.

 6       So I -- I don't know.  I'm sure we could come up with a

 7  hypothetical or something that they were not responsible for,

 8  but -- so I don't know that I can go quite that broad.

 9  **Q.**   So as part of your opinion, you have testified that any

10  sort of personnel issues, any claims of any personnel,

11  regardless of whether they're an employee of Tesla, an employee

12  of any contracting staffing agency, Tesla is going to be

13  responsible for anything and everything in that regard; would

14  that be correct?

15  **A.**   Well, again, I don't like to say "anything and everything"

16  because it's too -- it's so broad.  The point is that they are

17  responsible for harassment that takes place at their plant.

18  **Q.**   Okay.  Now, as I understand it, some of the standard of

19  care that you've talked about is that an organization needs to

20  have strong policies regarding, I guess, anti-harassment;

21  correct?

22  **A.**   Yes.

23  **Q.**   And you would agree at least here Tesla has a strong

24  Anti-Harassment Policy; correct?

25  **A.**   I recall that it was adequate.  How strong it was, I'd

1    need to look at it again.  I didn't see that it was a problem.

2    I don't -- I'm not looking for the best policy.  I'm looking

3    for an adequate policy.

4    **Q.**    So if you're looking for an adequate policy, Tesla had an

5    adequate policy; correct?

6    **A.**    Yes.

7    **Q.**    And you also believe that as part of the standard of care,

8    workers should receive some type of training regarding

9    anti-harassment, discrimination, retaliation and the like;

10   correct?

11   **A.**    Correct.

12   **Q.**    And did you look into anything in this matter as to

13   whether or not the staffing agencies were providing any type of

14   harassment training for, say, folks who worked for CitiStaff,

15   as an example?

16   **A.**    I know that there was some evidence about it, and I -- but

17   I didn't try to -- I didn't try to determine everything that

18   each of these three organizations provided to who.

19   **Q.**    So was it important or part of your retention by Mr. Organ

20   to try to determine if any staffing agency employee -- for

21   example, Mr. Diaz -- had received any type of training from his

22   employer; correct?

23            **MR. ORGAN:**  Objection.  Argumentative.

24            **THE COURT:**  Overruled.

25            **THE WITNESS:**  I -- I think that I was mostly focused

1    on the reality of what happened with these complaints.  Because

2    I find it's very hard to evaluate training when you're not

3    there and you look at some documents.

4         So sometimes I see evidence that people say:  Gee, I

5    didn't get trained, or I did get trained.  But trying to

6    evaluate another organization's training is something that

7    is -- it's both difficult to do, and it's difficult to do it

8    based on the type of discovery that's done in a lawsuit.  So

9    it's not something I usually try to do as an expert.

10   **BY MS. KENNEDY**

11   **Q.**   Well, let me ask you this:  In this particular case, were

12   you asked to look into that at all?

13   **A.**   I was asked to look into prevention generally, and if I

14   had -- if the documents had made it very clear what training

15   was given to people, I might have been able to do that; but it

16   wasn't clear enough for me to really give an opinion about

17   that.

18   **Q.**   And the documents that you reviewed were all provided to

19   you by Mr. Organ; correct?

20   **A.**   Well, they were all provided in discovery, so they were

21   both defense and plaintiff documents.  I'm looking at the

22   defense documents provided in discovery.

23   **Q.**   I understand that, but my question was different.  The

24   documents that you had as -- that were provided, were all

25   provided, whether it's in discovery or not, by Mr. Organ's

 1  firm; correct?

 2  **A.**   Sure.  I just want to make sure it's clear that most of

 3  them come to his firm through the documents that are provided

 4  by the different entities.

 5  **Q.**   And do you know if you got every single piece of discovery

 6  information in this case?

 7  **A.**   I can't say that I got every single piece of discovery,

 8  no.

 9  **Q.**   Well, when you got the discovery documents, when you were

10  looking at the policies, did you ask Mr. Organ to provide you

11  any more training information, say, for CitiStaff, where

12  Mr. Owen Diaz applied to work, the staffing agency, and was

13  placed at Tesla?  Did you ask for that information?

14  **A.**   I don't recall whether I did or I didn't.

15  **Q.**   Would you agree that would probably be important

16  information when you're going to opine about Mr. Diaz's

17  workplace at Tesla, to know whether or not his employer

18  provided any type of harassment training?  As part of your

19  opinion, wouldn't that be important, something you would want

20  to know?

21  **A.**   Well, I'm not as concerned about whether he got training

22  as I am the supervisors who were on site.

23  **Q.**   Okay.  Let's go to that.

24       So in looking at -- did you ask for any training materials

25  or do you know if any training materials are available for any

1   of the supervisors at the site?

2   **A.**   I -- I don't recall.  I think I did look at some training

3   materials, but whether I asked for more and saw everything, I'm

4   just not sure.

5   **Q.**   So in talking about the standard of care and training, as

6   you sit here today, you don't know if you had the training

7   materials or if you looked at them or if anybody actually got

8   that training.  Would that be accurate?

9   **A.**   Well, I wasn't opining on a training program.  I was

10  opining on the fact that a number of supervisors indicated they

11  didn't get training and didn't know basic things that I would

12  expect them to know through training.  So that's a little

13  different.

14  **Q.**   Okay.  So based on the information that you were provided

15  through discovery from the defendant Tesla, as well as from the

16  plaintiff, whatever that information was, you don't know, in

17  fact, if even though folks may have said, "Hey, I got

18  training," if they actually got training or not, do you?

19  **A.**   That's true.

20  **Q.**   You would agree there is no perfect workplace

21  investigation; correct?

22  **A.**   That's true.

23  **Q.**   And you would agree that the purpose of a workplace

24  investigation is to try to find out what happened, take

25  appropriate steps, as warranted, based on the investigation and

 1   allegations, and then, if needed, issue discipline or take

 2   other type of remedial action; correct?

 3   **A.**   Yes.

 4   **Q.**   And you would agree not every investigation requires a

 5   full report; correct?

 6   **A.**   Well, I guess it depends what you mean by a "full report."

 7   Not every investigation requires the same detailed report as

 8   another one.

 9   **Q.**   You would agree, depending on the allegations, depending

10   on what these circumstances are, sometimes an investigation can

11   be conducted very quickly and a result can be made, and it

12   could be an oral report; correct?

13   **A.**   I'm not a fan of oral reports.  I think that there need to

14   be clear findings.

15         And if there is an oral report, there should be a written

16   documentation of what it was so that the findings can be

17   ascertained and the basis for them.

18         And so sometimes reports are delivered orally, but that

19   doesn't mean there isn't a written documentation of what those

20   findings are.

21   **Q.**   Well, you said you're not a fan of an oral report.  That

22   doesn't mean that an oral report doesn't meet the standard of

23   care if every other aspect of the investigation is complied

24   with; correct?

25   **A.**   I believe it doesn't if there isn't a written

1   documentation showing what the finding was and explaining the

2   basis for it.  So even if it's delivered orally, I would expect

3   to meet the standard of care that there be clarity in writing

4   about what those findings are.

5   **Q.**   And could that clarity in writing be a disciplinary action

6   explaining what was done during the investigation, what the

7   conduct was and what the result was?

8   **A.**   Well, I would expect the written documentation to say what

9   the finding was and what the reason was for the finding.  So it

10  depends on whether that memo did that or not.

11  **Q.**   Okay.  And, now, as I understand from your testimony with

12  respect to Mr. Organ, you reviewed, it looks like, three

13  complaints as part of your presentation.

14      And Complaint No. 1 involves Mr. Judy Timbreza.  I think

15  that's your Slide 6.  If you want to take a look at it in front

16  of you -- if you have it in front you.

17  **A.**   I don't, but I could probably get it.

18  **Q.**   Okay.  Well, it's Complaint No. 1.  You referred to it as

19  the July 31st, 2015 complaint to Kawasaki, Re Timbreza.

20      By question is:  In that type of -- in that instance, did

21  you understand that the complaint was made and action was

22  taken?  And you understand that Mr. Timbreza was never back at

23  the facility anymore; correct?

24  **A.**   Umm, I don't recall.  I think I knew that at some point.

25  You're saying it's a fact, and I can't remember every fact, but

 1   I don't -- I don't question that you're giving them correctly.

 2   **Q.**   Ms. Oppenheimer, on your PowerPoint you said that there

 3   was inadequate remedial action and no apparent followup.

 4       If the facts were true that Mr. Timbreza was counseled,

 5   taken away -- taken off the premises and was never seen again,

 6   that would be adequate remedial action?

 7           **MR. ORGAN:**   Objection.   Assumes facts not in evidence,

 8   Your Honor.

 9           **THE COURT:**   It's a hypothetical.   So you can answer.

10           **THE WITNESS:**   Okay.   So the hypothetical is if -- if

11   he was taken off the premises and given some sort of verbal

12   warning, was that adequate?

13   **BY MS. KENNEDY**

14   **Q.**   No.   The question was:   If he was followed up, if he was

15   counseled or disciplined and taken off the premises, never came

16   back to Tesla, no more contact with Mr. Diaz or anyone else,

17   that would be adequate remedial action, correct?

18   **A.**   Well, I think that one of my issues was that he wasn't

19   counseled or disciplined for the racist comments.   And so while

20   the result would have been adequate, I think that there's some

21   meaning behind giving the message that racial epithets are not

22   appropriate.

23   **Q.**   Well, if he was taken off the premises and never returned

24   because of, quote, "alleged racial harassment," you would agree

25   that would be adequate; correct?

1  **A.**   Well, if that is the reason and he was told that was the

2  reason as opposed to another reason.

3  **Q.**   Right.  But you don't have any idea one way or the other;

4  correct?

5  **A.**   I don't -- I don't recall.  I thought that I did recall

6  that he was not warned about using a racial epithet, that he

7  was warned about joke.

8  **Q.**   Yes.  And there's an email about that.  But do you know if

9  there's any other action that was taken that was not in the

10 email?

11        **MR. ORGAN:**  Objection.  Vague and ambiguous,

12 Your Honor.

13        **THE COURT:**  Overruled.  You can answer, if you can.

14        **THE WITNESS:**  I don't recall.

15 **BY MS. KENNEDY**

16 **Q.**   And do you know if Mr. Owen Diaz was satisfied with how

17 that complaint was handled and the fact that there was no more

18 contact with Judy Timbreza?  Do you know that one way or the

19 other?

20 **A.**   I don't.  And I don't necessarily consider that relevant

21 if it wasn't adequate.

22 **Q.**   So anything -- in your opinion, anything -- if he is

23 terminated, if Judy Timbreza is terminated, in your opinion

24 that still is not adequate; correct?

25 **A.**   If he had been terminated for making racist comments,

1    then, yes, I think that that is adequate remedial action.  It

2    was not my understanding that that's what happened.

3    Q.   Let's go to Complaint No. 2.  This is the October 2015

4    complaint to Ed Romero regarding Ramon Martinez and the alleged

5    threats in an elevator.

6         Ms. Oppenheimer, is it your understanding that only

7    Mr. Diaz complained about this incident?

8    A.   No.  My understanding is that both Mr. Martinez and

9    Mr. Diaz complained about each other.

10   Q.   And do you believe that in this particular case

11   Mr. Martinez's complaint should have been investigated as to

12   Mr. Diaz?

13   A.   Yes.

14   Q.   And you believe that Mr. --

15   A.   I'm sorry.  Well, I think that when you -- when you

16   investigate -- well, look -- I'm sorry.  I thought you said it

17   the opposite way around.

18        I think Mr. Martinez was complaining about something that

19   wasn't racial harassment or even harassment.  It was sort about

20   rudeness.

21        I think, though, that it would be impossible to

22   investigate either complaint without looking at both.  And so,

23   you know, it's -- it's going to be part and parcel.

24   Q.   So you'd agree that at least as to Complaint No. 2, an

25   investigation should have been done to look at what occurred

1   from both sides based upon what Mr. Romero and -- sorry,

2   Mr. Diaz and Mr. Martinez were complaining about; correct?

3   **A.**   Correct.

4   **Q.**   And is it your understanding that this was at least looked

5   into, but your position is that it wasn't done in a way that

6   you thought was appropriate under your determination of a

7   standard of care; correct?

8   **A.**   Well, I believe there was even witness testimony from

9   somebody in HR that it wasn't, you know, appropriate from -- or

10  maybe that was the next one.

11  **Q.**   Yeah, I think that's the wrong one?

12  **A.**   I'm sorry.  I might be conflating them.

13       Okay.  But, yes, I don't believe it was sufficient.  There

14  were no findings.  Mr. Diaz said that there has been history

15  that wasn't looked at.  There was surveillance that wasn't

16  looked at.  So I don't see how that could meet a standard of

17  thoroughness.

18  **Q.**   Well, as to the surveillance, do you know if the

19  surveillance was actually available?  Do you have any idea?

20  **A.**   My understanding was that Mr. Diaz thought it was, but

21  obviously I -- I don't know.  It has to be researched.

22  Sometimes people think it is and it isn't.

23  **Q.**   Do you know if anyone from Tesla -- any employee from

24  Tesla was charged with investigating that Complaint No. 2?

25  **A.**   I don't recall right now.

 1   Q.   Okay.  Let's go to the last complaint, Complaint No. 3,

 2   the January 21st, 2016 -- I'm sorry, the January 22nd, 2016,

 3   complaint to Ed Romero about the drawing and, as Mr. Diaz

 4   characterized it, as the, quote, "racist effigy."

 5        And one of your criticisms is that there was no access to

 6   an experienced investigator; is that correct?

 7   A.   Well, I think I said I'm really not sure how much

 8   experience Ms. Delgado had.  I said it's difficult to assess in

 9   that case, but that even she said it wasn't done according as

10   to appropriate standards.

11   Q.   Well, you also say there were no findings.  Do you know if

12   that's true or false?

13   A.   I didn't see written findings.

14   Q.   Well, did Mr. Organ provide you an email that Ms. Delgado

15   sent regarding, quote, "the witness statements and findings"?

16   A.   There were some emails.  I mean, there was -- there was no

17   question that he -- that Mr. Martinez made that racial effigy

18   because he admitted it.

19        And so when I say "findings," I'm looking for what about,

20   you know, the history that was brought up, what about the fears

21   of potential violence and retaliation that are brought up?

22        You really didn't have to make a, quote/unquote, "finding"

23   on something that's admitted, although there's certainly

24   nothing wrong with that.  But I was looking for a bit more than

25   that in a situation where somebody says:  There's a history and

 1   I'm frightened of this person.

 2   **Q.**   Ms. Oppenheimer, did Mr. Organ provide you an email from

 3   Jackelin Delgado dated January 25th, 2016?

 4   **A.**   I can look through.  I mean, there were a number of emails

 5   from late January on that complaint.  You want the one from

 6   Delgado from January 25th?

 7   **Q.**   Yes, ma'am.  It's an email January 25th, 2016.

 8   **A.**   Here is a bunch on the same date from different people.

 9   There's one from Wayne Jackson of that day.  There's one from

10   Deleon from that day.  Here is one from Quintero that day.

11        Okay.  I'm sorry.  I'm looking for the one from...

12        (Brief pause.)

13   **A.**   Tell me again who -- who's on the 25th?  Because there are

14   so many of them I've got.

15   **Q.**   Her name is Jackelin Delgado from Chartwell.

16   **A.**   Okay.  I've got -- yes.  It's just further down in the

17   email chain.

18   **Q.**   Okay.  So looking at that, do you find that that email,

19   which talks about her findings and the interviews and the fact

20   that Mr. Martinez admitted to the drawing in his statement, in

21   your opinion, that's still insufficient; correct?

22              **MR. ORGAN:**  Objection.  Vague and ambiguous.

23              **THE COURT:**  Overruled.  You can answer.

24              **THE WITNESS:**  You're talking about the one from 11:07?

25

1   BY MS. KENNEDY

2   Q.   The email dated January 25th, 2016.

3   A.   Yeah.  Is it the one that was sent at 11:07?

4   Q.   In the morning?  Yes, ma'am.

5   A.   Okay.  I see (as read):

6           "Attached are the statements.  I've reached out to

7       the manager for permission to interview.  Will be sure to

8       place him on a corrective action.  Do they work in

9       separate departments?  He's concerned for his safety.

10      Will this be a reasonable recommendation for them to work

11      apart?"

12      I don't see -- I don't see a finding in here.

13  Q.   Ms. Oppenheimer, do you agree that employers are not the

14  guarantors of a harassment-free workplace?

15  A.   Yes.

16  Q.   And do you also agree that an investigation, no matter how

17  properly conducted, cannot always uncover the truth?

18  A.   Yes.

19  Q.   And do you also agree that if an organization has all of

20  the proper policies, all of the proper training, all the proper

21  followup, have policies that are compliant with state and

22  federal law, they discipline appropriately, you can still have

23  harassment in the workplace; correct?

24  A.   Yes.

25          MS. KENNEDY:  Your Honor, I have no more questions.

 1          THE COURT:  All right.  Any redirect?

 2          MR. ORGAN:  Just a couple questions.

 3                    REDIRECT EXAMINATION

 4    BY MR. ORGAN

 5    Q.   Are good and bad employees entitled to a harassment-free

 6    workplace?

 7    A.   Sure.

 8    Q.   So their performance, how they perform, doesn't change the

 9    standards that an employer has to apply to them; is that

10    correct?

11          MS. KENNEDY:  Objection.  Beyond the scope.

12          THE COURT:  Sustained.

13    BY MR. ORGAN:

14    Q.   Is remedial action sufficient if the conduct continues?

15    A.   No.

16    Q.   Thank you.

17          MR. ORGAN:  No more questions, Your Honor.

18          THE COURT:  All right.

19          MS. KENNEDY:  No more questions, Your Honor.

20          THE COURT:  All right.  Thank you, Ms. Oppenheimer.

21          THE WITNESS:  Okay.  Thank you.

22       (Witness excused.)

23          THE COURT:  Who Is the next witness?

24          MR. ORGAN:  Mr. Mahla, Your Honor.

25          THE COURT:  Okay.

 1          (Brief pause.)

 2          **THE COURT:**  Did somebody go get the witness?

 3          **MR. ALEXANDER:**  He's testifying via Zoom.  Ms. Davis

 4  is accessing that now.

 5          **THE CLERK:**  Okay.

 6          **THE COURT:**  Ladies and gentlemen, you're always free

 7  to stand up if you need to or want to.  I've been told at

 8  different times that it's a good idea to stand up just for

 9  stuff, circulation and things.  You're free to remain sitting,

10  whatever you want to do.

11      (Brief pause.)

12          **THE CLERK:**  All right.  Good afternoon, Mr. Mahla.

13  Can you hear us?

14      (No response.)

15          **MR. ORGAN:**  I'm not sure he can hear.

16      Dr. Mahla, can you hear?

17          **THE COURT:**  You may be muted, Jean.

18          **THE CLERK:**  I am, but I'm supposed to be.  Let me make

19  sure the sound system isn't...

20      Mr. Mahla, are you able to hear us?

21          **THE WITNESS:**  I am.

22          **THE CLERK:**  Okay.  Great.

23      Do you want me to go ahead and swear him in?

24          **THE COURT:**  Yes.

25

```
1              CHARLES MAHLA,

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows via Zoom:

4              THE WITNESS:  I do.

5              THE CLERK:  Thank you, sir.

6              THE COURT:  Please proceed.

7                   DIRECT EXAMINATION

8    BY MR. ORGAN

9    Q.   Good afternoon, Dr. Mahla.  How are you?

10   A.   I'm fine.  How are you, sir?

11   Q.   Great.  Thank you for joining us.

12        Could you please talk about your educational background?

13   A.   I have an undergraduate degree, a Bachelor of Arts in

14   economics from Lafayette College.  I have a PhD in economics

15   from the University of North Carolina Chapel Hill, in Chapel

16   Hill, North Carolina.

17   Q.   And in terms of providing opinions on economic issues, why

18   don't you tell us what your experience is for that?

19   A.   Well, it runds the gamut.  I've done work in antitrust,

20   meaning looking at the competitive nature of markets.

21        I have done work in the intellectual property area of

22   valuing patents, trademarks, trade secrets, things that nature.

23        I do work in general damage analysis, lost profits for

24   firms in litigation involving two companies.

25        And I do medical malpractice and injury work, as well as
```

 1   work in the employment arena.  And I've been doing -- I've been

 2   doing this work dating back to 1994.

 3   **Q.**   Have you ever testified in court?

 4   **A.**   Many times, yes.

 5   **Q.**   And have you ever given expert opinion on valuation of

 6   companies?

 7   **A.**   I have done on a number of occasions assignments similar

 8   to the one here.

 9         **MR. ORGAN:**  Your Honor, I move that Dr. Mahla be

10   qualified as an expert.

11         **THE COURT:**  Okay.  On what topic?

12         **MR. ORGAN:**  On the issue of the economic value of

13   Tesla, Inc.

14         **MS. KENNEDY:**  As of what time period?

15         **MR. ORGAN:**  Financial condition of Tesla, Inc.

16         **THE COURT:**  As of what time period?

17         **MR. ORGAN:**  As of the date of his deposition,

18   Your Honor.

19         **THE COURT:**  Okay.  Which was in?

20         **MR. ORGAN:**  2019, Your Honor.

21         **THE WITNESS:**  February of 2020.

22         **MR. ORGAN:**  Oh, February of 2020, Your Honor.

23         **MS. KENNEDY:**  No objection.

24         **THE COURT:**  Okay.  You may proceed.

25         **MR. ORGAN:**  Thank you, Your Honor.

1    **BY MR. ORGAN**

2    **Q.**    So what did you do to come up with a value of Tesla, Inc.,

3    as of February 2020?

4    **A.**    Well, the value of Tesla is -- Tesla is a publicly-traded

5    firm.  So the value of Tesla is relatively easy to determine.

6    It's simply -- and it's sometimes referred to as the market

7    capitalization.

8        The market cap of Tesla at the time of my deposition is

9    simply determined by taking the publicly-traded shares

10   outstanding and multiplying it by the share price of those

11   shares.  And as of the day before my deposition, the estimate

12   of Tesla's market value was $151.2 billion.

13   **Q.**    $151.2 billion; is that correct?

14   **A.**    Correct.

15   **Q.**    Okay.  And in terms of the financial condition of Tesla,

16   in addition to its market capitalization of $151.2 billion, did

17   you analyze anything else in terms of the financial condition

18   of Tesla as of February 2020?

19   **A.**    Sure.  Well, generally, in looking at a firm like Tesla,

20   you look at things like revenue and revenue growth.  You look

21   at its asset base.  You can look at the amount of cash and cash

22   equivalents that it has, that it records on its balance sheets.

23   Cash equivalents are essentially investment vehicles that can

24   be converted very quickly into cash.  So they're considered

25   cash and cash equivalents.  We look at things like that.

1        We look at the amount of free cash flow.  That's a measure

2    of a firm's ability to generate cash.  Free cash flow is simply

3    the cash generated from operations minus any capital

4    expenditures that the firm has; investments, longer-term

5    investments.  You can look at things like the total amount of

6    cash above and beyond those -- those investments.

7        And, finally, you can look at the firm's ability to

8    generate income, net income; just total revenue minus total

9    costs.

10   **Q.**   I believe during your deposition you had a chart.

11   Exhibit 6 I think it was; is that correct?

12   **A.**   Yes.

13        **MR. ORGAN:**   And, Your Honor, we have that chart for

14   the jury.

15        **THE COURT:**   All right.

16        (Document displayed.)

17   **BY MR. ORGAN:**

18   **Q.**   Do you recognize this document, Dr. Mahla?

19   **A.**   I do.  This is marked as Exhibit 6 to my depo.

20   **Q.**   Okay.  So tell us, go through this, if you could, so that

21   we can understand this for those of us who are not math whizzes

22   like yourself.  Tell us what this means.

23   **A.**   Sure.  Well, there's two columns, one as of June 30th,

24   2019, and those are most of the financials that I used at the

25   time I was writing my initial report back in October.  That was

1   the last set of financials that were produced by Tesla in a

2   public forum to the SEC and also through its own publication of

3   financial information on its website.

4        The second column 12/31/2019, that's the last financial

5   reporting period that I had available prior to my deposition.

6   And so I looked at the change from the time I had done my

7   initial report until the time I was deposed.

8        And we start with total assets.  In June of 2019, Tesla

9   recorded $31.9 billion in assets.  They increased a little over

10  7 and a half percent in that interim period, the final six

11  months of 2019, to $34.3 billion.

12       Total revenues, and here we're looking at calendar years

13  2018 and 2019.  It generated $21.5 billion in revenues in 2018.

14  Revenues were up 14 and a half percent in '19 to 24.6 billion,

15  which is the 24th -- it's listed there as 24,578.  That's in

16  thousands -- or that's millions rather.  So that's

17  $24.6 billion.

18       We spoke about the market capitalization.  At the time of

19  my report, I had looked at the number of shares outstanding and

20  the closing price of Tesla on the -- on a couple of days before

21  I filed my report on October -- on October.  I looked at the

22  price on October 9th.  That gave a market capitalization or a

23  market value of 43.8 billion.

24       You can see that the market had re-evaluated Tesla and, in

25  fact, on the day before my deposition the market had more than

 1    tripled its assessment of Tesla value and it listed at

 2    $151.2 billion.

 3         Cash and cash equivalents, the next is "C" and "CE."

 4    That's the cash that we spoke of.  And in June they reported

 5    $5 billion in cash on their books.  By the end of the year,

 6    that had increased by almost 1.3 billion to 6.268 billion.

 7         Tesla reported free cash flow as 614 million in the second

 8    quarter of 2019.  In the fourth quarter it reported free cash

 9    flow of over a billion dollars, and that's just the operating

10    cash flow above expenses less capital expenditures.

11         And finally the net income.  At the time I wrote my

12    report, the second quarter earnings were reported as negative

13    408 million.  In fact, Tesla had not made -- they maybe had one

14    quarter or two quarters prior to that where they made a

15    positive net income.  Generally up through 2019 Tesla was not

16    positive.  It was not in the black in terms of net income.  The

17    last two quarters of 2019 Tesla reported 143 million in

18    positive profits in the third quarter and 105 million in

19    positive profits in the fourth quarter.

20              **MR. ORGAN:**  Okay.  No more questions, Your Honor.

21              **THE COURT:**  All right.  Ms. Kennedy.

22              **MS. KENNEDY:**  Yes, Your Honor.  A few questions.

23                        **CROSS-EXAMINATION**

24    **BY MS. KENNEDY**

25    **Q.**   Good afternoon, Mr. Mahla.

1   **A.**   Good afternoon.

2   **Q.**   I understand you've been retained to render an opinion

3   regarding the financial condition of Tesla; correct?

4   **A.**   Yes.

5   **Q.**   And basically the financial condition is basically the

6   financial stats of the organization; right?

7   **A.**   Correct.

8   **Q.**   You take a look at the asset base and the cash generation

9   profitability; correct?

10  **A.**   Yes.

11  **Q.**   When you look at asset base, that includes every nut and

12  bolt, so to speak, that Tesla owns, everything from desks to

13  chairs to laptops to all of that; correct?

14  **A.**   Sure.

15  **Q.**   And as I understand what you did, you basically just

16  looked at the publicly-traded financial -- publicly available

17  information regarding financial stats; correct?

18  **A.**   Yes.  It's a publicly-traded firm, that's right.

19  **Q.**   And then just recited what those stats were; correct?

20  **A.**   That's right.

21  **Q.**   And when you talk about net revenue, that does -- strike

22  that.

23        When we talk about revenue, that doesn't include expenses;

24  correct?

25  **A.**   No.  That's purely revenue.

MAHLA - CROSS / KENNEDY

1    Q.    And when you're looking at the financial condition of an

2    organization, you need to look at more than just one or two

3    financial statements; correct?

4    A.    Sure.

5    Q.    And you would agree Tesla would be described, in using

6    your words, as "a relatively young, fast-growth company that

7    could face risk to its business"?  Do you agree with that?

8    A.    Sure.  That was in my report.

9    Q.    Right.  And some of those risks could result in financial

10   distress to Tesla.  You agree with that; right?

11   A.    At the time I wrote that, that was certainly a risk, yes.

12   Q.    And that's despite the very large asset base that Tesla

13   has; right?

14   A.    Sure.  And its -- and its large market capitalization,

15   that's true.

16   Q.    So other than simply looking at the financial -- the

17   publicly available financial statements, you didn't do anything

18   else to determine any type of financial condition of the

19   organization; correct?

20   A.    Well, the only information that was available to me was

21   publicly available information, and this is information that

22   Tesla files with the Securities and Exchange Commission.  So

23   this is -- these are -- these figures are filed under penalty

24   of perjury, so I assume they are correct.

25   Q.    Correct.  But my question is:  So you looked at these

1  filings with the SEC and basically you recited what is on those

2  SEC filings as part of your opinion; correct?

3  **A.**    Correct.

4         **MS. KENNEDY:**  Your Honor, I have no -- strike that.

5     Did you use -- strike that.

6     Thank you.  I'm done.  Thank you, Your Honor.

7         **THE COURT:**  Okay.

8     Mr. Organ, anything further?

9         **MR. ORGAN:**  No more questions, Your Honor.

10        **THE COURT:**  All right.  Thank you, Mr. Mahla.  You're

11 excuse.

12        **THE WITNESS:**  Thank you.

13    (Witness excused.)

14        **THE COURT:**  And who is next?

15        **MR. ORGAN:**  Your Honor, we would move to put in

16 Exhibit 6, the Anti-Handbook Handbook.

17        **THE COURT:**  All right.  Is there --

18        **MR. ORGAN:**  There's an agreement.

19        **MS. KENNEDY:**  Yes, we stipulated to Exhibit 6.

20        **THE COURT:**  All right.  So Exhibit 6 is admitted.

21    (Trial Exhibit 6 received in evidence)

22        **MR. ORGAN:**  And then Exhibit 3, Your Honor, is now

23 agreed upon in its edited form.

24        **MS. KENNEDY:**  Exhibit 3 in the redacted form per the

25 agreement, as well as Exhibit 379, the Demetric Di-az

 1   application.

 2          MR. ORGAN:  Well, that would come in during their

 3   case, Your Honor.

 4          THE COURT:  Well, it doesn't really make any

 5   difference.  They're both admitted.

 6          MR. ORGAN:  Great.  Thank you, Your Honor.

 7       (Trial Exhibits 3 and 379 received in evidence)

 8          MR. ORGAN:  Great.

 9      And then we have some discovery to read.

10          THE COURT:  Okay.  So let's get to that.

11      So, ladies and gentlemen, there's going to be a little bit

12   of the written discovery that the parties exchanged during the

13   course of the litigation that's now going to be read to you.

14   So there are going to be two different types.

15      One is interrogatories.  So evidence that is presented in

16   the form of answers to one of the parties -- to written

17   interrogatories which were submitted by the other side.  These

18   answers were given in writing and under oath before the trial

19   in response to questions that were submitted under established

20   court procedures.  You should consider the answers, insofar as

21   possible, in the same way as if they were made from the witness

22   stand.

23      And in addition to that, you're going to -- the plaintiffs

24   are going to read a few admissions, and evidence will now be

25   presented to you in the form of admissions to the truth of

1    certain facts.  Those admissions were given in writing before

2    the trial in response to requests that were submitted under

3    established court procedures.  You must treat these facts as

4    having been proved.

5         All right.  Mr. Alexander.

6         **MR. ALEXANDER:**  Thank you, Your Honor.

7    Reading Interrogatory No. 2, question (as read):

8              "Identify the business relationship between you

9    and CitiStaff Solutions, Inc."

10        **THE COURT:**  I think we should state that these were

11   special interrogatories that were sent to defendant Tesla, Inc.

12        All right.  Go ahead.

13        **MR. ALEXANDER:**  Thank you, Your Honor.

14   Response (as read):

15             "Defendant contracts with nextSource to staff

16   temporary employees at its facilities.  It is

17   defendant's understanding that nextSource contracts

18   with CitiStaff Solutions, Inc., among other third

19   parties, to secure temporary employees to work at its

20   facilities.  Discovery is ongoing and defendant

21   reserves the right to supplement its response."

22   Interrogatory No. 3 (as read):

23             "Identify the business relationship between you

24   and nextSource.

25             "Defendant contracts with nextSource to staff

```
 1        temporary employees at its facilities.  It is

 2        defendant's understanding that nextSource contracts

 3        with CitiStaff Solutions, Inc., among other third

 4        parties, to secure temporary employees to work at its

 5        facilities.  Discovery is ongoing and defendant

 6        reserves the right to supplement its response."

 7        Interrogatory No. 8 (as read):

 8             "Please provide the last best-known contact

 9        information for Ed Romero. (In responding to this

10        interrogatory, the term 'contact information'

11        includes, but is not limited to, address, phone number

12        and email.)

13        Response (as read):

14             "Mr. Romero is a former Tesla employee, but he is

15        represented by counsel for Tesla in this action."

16        Interrogatory No. 17 (as read):

17             "Please describe in comprehensive detail each

18        position Victor Quintero has held during his

19        employment at the Tesla factory from 2014 to the

20        present. (For the purpose of responding to this

21        interrogatory, the term 'describe' -- within quotes --

22        "means to list for each position the job title, job

23        duties, hours worked, and the dates the position was

24        held.)

25        Response (as read):
```

1          "Victor Quintero's position is manager recycling

2     services from May 12, 2015, through the date of this

3     response."

4     Interrogatory No. 18 (as read):

5          "Please describe in comprehensive detail each

6     position Ramon Martinez held during his employment at

7     the Tesla factory. (For the purposes of responding to

8     this interrogatory, the term 'described'" -- within

9     quotes -- "means to list for each position the job

10    title, job duties, hours worked, and dates the

11    position was held.)

12    Response (as read):

13         "Ramon Martinez was not employed by Tesla during

14    the time that plaintiff Owen Diaz or plaintiff

15    Demetric Di-az worked at Tesla.  Ramon Martinez's

16    position from January 14, 2019, to the date of this

17    response is lead material handler."

18    Interrogatory No. 22 (as read):

19         "Please identify the individuals and/or companies

20    that were responsible for painting over graffiti or

21    drawings or handwriting in the bathrooms at the Tesla

22    factory from January 1, 2014, to January 1, 2017.

23    Response (as read):

24         "During the time plaintiff worked at Tesla,

25    Tesla's facilities department and facilities contract

```
 1        supervisor, including, but not limited to, Andres

 2        Donet, was 'responsible' for cleaning and maintaining

 3        the bathrooms at Tesla's Fremont, California,

 4        facility."

 5        And now I will read the request for admissions.

 6        Request No. 2 --

 7             THE COURT:  And, again, these were Request For

 8   Admissions to defendant Tesla.

 9             MR. ALEXANDER:  Thank you.

10        Request No. 2 (as read):

11             "Admit plaintiff Owen Diaz was working at the

12        Tesla factory pursuant to the contract you had with

13        defendant CitiStaff, Inc.

14        Response (as read):

15             "Defendant admits that it contracts with

16   nextSource to staff temporary workers at its

17   facilities.  It is defendant's understanding that

18   nextSource contracts with CitiStaff Solutions, Inc.,

19   among other third parties, to secure temporary workers

20        to work at its facilities."

21        Request for Admission No. 10 (as read):

22             "Admit you had no security recordings or footage

23        of any interactions between plaintiff Owen Diaz and

24        Ramon Martinez."

25        Response (as read):
```

PROCEEDINGS

```
 1              "Admit."

 2         And then the final is information pursuant to General

 3    Order number 71 (as read):

 4              "Request Demetric Di-az and Owen Diaz's supervisors."

 5         The response (as read):

 6              "During their temporary assignments to Tesla,

 7         Demetric Di-az and Owen Diaz were supervised by Javier

 8         Caballero as to Demetric Di-az, Ed Romero as to Owen

 9         Diaz."

10         THE COURT:  All right.  Thank you.

11         MR. ORGAN:  Your Honor, at this point in time we have

12    one more witness, Ms. Heisen, but we have not received the

13    responses from the defendant as to the designations we made.

14         THE COURT:  Okay.

15         MR. ORGAN:  And so --

16         THE COURT:  All right.  So you would like to suspend

17    for the rest of the day?

18         MR. ORGAN:  Would that be possible, Your Honor?

19         THE COURT:  Yes.  Yeah.

20         MR. ORGAN:  Okay.  Thank you, Your Honor.

21         THE COURT:  All right.  So, ladies and gentlemen, this

22    case is moving right along as I had hoped.  There is still more

23    to come.

24         So come back tomorrow as you came today and the day before

25    and the day before.  I really appreciate your promptness, and I
```

1   will look forward to seeing you in the morning.

2       Yes.

3           **JUROR:**  Do you have any anticipation when -- I mean,

4   is Monday still the target?

5           **THE COURT:**  Monday is -- as best I can tell, the case

6   will go to the jury on Monday.

7       And so let me just -- and that will include closing

8   statements.  There may be a little more evidence, I don't know.

9   We'll see how things go tomorrow, but I'm pretty sure it's

10  going to happen on Monday.

11      And then it's going to be up to you to decide the timing

12  on how you deliberate.  So you wouldn't -- you're not -- you

13  don't have to be -- leave at 1:30.  You can choose when you

14  arrive and when you go.  I would hope that you would continue

15  at least to arrive at the same times that you have and how long

16  you stay will be up to you.

17      But, yes, I do think that everything will be to the jury

18  on Monday.

19          **JUROR:**  Thank you.

20          **THE COURT:**  All right.  Thank you all.

21      (Jury exits the courtroom at 1:11 p.m.)

22      (Proceedings were heard out of presence of the jury:)

23          **THE COURT:**  Okay.  Please be seated, everybody.

24      So you heard what I think.  I don't know whether that's --

25  whether I'm right as far as the timing is concerned.  If I am

 1 | wrong in any by your estimates, let me know so that I can tell
 2 | the jury; but I think that's what it seems like to me.
 3 |     And then we'll see whether -- the evidence -- Ms. Kennedy,
 4 | I'll look to you.  Do you think your case will be in by 1:30
 5 | tomorrow?
 6 |     **MS. KENNEDY:**  Oh, yes.  Absolutely.  Your Honor, we
 7 | are going to have Ramon Martinez -- I'm sorry -- Joyce
 8 | DelaGrande and then Ramon Martinez.  And that will be it.
 9 |     **THE COURT:**  Okay.  All right.  Then we're going to be
10 | in good shape.
11 |     **MR. ORGAN:**  My understanding is you want to have Joyce
12 | testify at 8:30, and then we would play the video, and then
13 | Mr. Martinez; is that right?
14 |     **MS. KENNEDY:**  The video?
15 |     **MR. ORGAN:**  I'm sorry?
16 |     **THE COURT:**  Ms. Heisen.
17 |     **MS. KENNEDY:**  Oh, I see.  Oh, sure.  If you want to do
18 | that, that's fine.  Ms. DelaGrande has to catch a flight.
19 |     **MR. ORGAN:**  All right.
20 |     **MS. KENNEDY:**  Yes.  That's perfectly fine.
21 |     **THE COURT:**  Okay.
22 |     **MR. ORGAN:**  I guess that's it, Your Honor.
23 |     **THE COURT:**  I guess the issue is when am I going to
24 | get the objections or counter designations or whatever is left
25 | for Ms. Heisen so that I can --

 1          MS. KENNEDY:  Oh, you'll have them this afternoon.

 2          THE COURT:  Okay.  Sooner rather than later --

 3          MS. KENNEDY:  Yes.

 4          THE COURT:  -- because you'll want to know what my

 5   rulings are.

 6          MR. ORGAN:  Well, we will be having a conference still

 7   tomorrow?

 8          THE COURT:  Yes.

 9          MR. ORGAN:  So we will be doing closings on Monday?

10          THE COURT:  Correct.  And we will do the Final Jury

11   Instructions right after the evidence is finished on Friday.

12          MR. ORGAN:  I think you got my comments at least last

13   night I believe.

14          THE COURT:  On the Jury Instructions, yes.

15          MR. ORGAN:  Yes, Your Honor.

16      Okay.  And then we also -- we might have a little bit of

17   rebuttal, but it will be maybe ten minutes at the most.

18          THE COURT:  Okay.  Well, we'll see where we are.

19          MR. ORGAN:  Yes.

20          THE COURT:  Okay.

21          MR. ORGAN:  Thank you, Your Honor.

22          MS. KENNEDY:  Thank you, Your Honor.

23      (Whereupon at 1:13 p.m.further proceedings

24       were adjourned until Friday, October 1, 2021

25       at 8:00 a.m.)

## I N D E X


Thursday, September 30, 2021 - Volume 4

**PLAINTIFF'S WITNESSES**                                      **PAGE**  **VOL.**


**DIAZ, OWEN ORAPIO (RECALLED)**
(PREVIOUSLY SWORN)                                              557      4
Cross-Examination resumed by Ms. Kennedy                        557      4
Redirect Examination by Mr. Organ                               574      4


**READING, ANTHONY EDWARD**
(SWORN)                                                         577      4
Direct Examination by Mr. Alexander                             577      4
Cross-Examination by Ms. Kennedy                                596      4
Redirect Examination by Mr. Alexander                           613      4



**JONES, LA'DREA**
(SWORN)                                                         622      4
Direct Examination by Ms. Nunley                                622      4
Cross-Examination by Ms. Kennedy                                632      4


**MARCONI, ERIN**
VIDEOTAPED TESTIMONY                                            638      4


**OPPENHEIMER, AMY (VIA ZOOM)**
(SWORN)                                                         642      4
Direct Examination by Mr. Organ                                 643      4
Cross-Examination by Ms. Kennedy                                660      4
Redirect Examination by Mr. Organ                               678      4



**MAHLA, CHARLES (VIA ZOOM)**
(SWORN)                                                         680      4
Direct Examination by Mr. Organ                                 680      4
Cross-Examination by Ms. Kennedy                                685      4
                                    -  -  -

## I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 3 | | 689 | 4 |
| 6 | | 688 | 4 |
| 204 | 557 | 558 | 4 |
| 265 | | 564 | 4 |
| 379 | | 689 | 4 |

— — —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, September 30, 2021

>