Volume 5

Pages 700 - 842

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND       )
LAMAR PATTERSON                     )
                                    )
                                    )
          Plaintiffs,               )
                                    )
   vs.                              ) No. C 17-6748 WHO
                                    )
TESLA, INC., dba TESLA MOTORS,      )
INC., CITISTAFF SOLUTIONS, INC.,    )
WEST VALLEY STAFFING GROUP,         )
CHARTWELL STAFFING SERVICES, INC.,  )
and DOES 1-50, inclusive,           )
                                    )  San Francisco, California
          Defendants.               )  Friday
                                    )  October 1, 2021
_____     )  8:00 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          ALEXANDER MORRISON & FEHR LLP
                             1900 Avenue of the Stars
                             Suite 900
                             Los Angeles, California 90067
                       BY:  **BERNARD ALEXANDER, ESQ.**


                             CALIFORNIA CIVIL RIGHTS LAW GROUP
                             332 San Anselmo Avenue
                             San Anselmo, California 94960
                       BY:  **LAWRENCE A. ORGAN, ESQ.**
                             **CIMONE A. NUNLEY, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:   **Debra L. Pas, CSR 11916, CRR, RMR, RPR***
              Official Reporter - US District Court
              Computerized Transcription By Eclipse

**APPEARANCES:   (CONTINUED)**

| | |
|---|---|
| **For Defendants:** | SHEPPARD MULLIN RICHTER & HAMPTON LLP |
| | 333 S. Hope Street |
| | 43rd Floor |
| | Los Angeles, California 90017 |
| **BY:** | **TRACEY A. KENNEDY, ESQ.** |
| | |
| | SHEPPARD MULLIN RICHTER & HAMPTON, LLP |
| | 379 Lytton Ave |
| | Palo Alto, California 94301 |
| **BY:** | **PATRICIA M. JENG, ESQ.** |
| | |
| | SHEPPARD MULLIN RICHTER & HAMPTON LLP |
| | Four Embarcadero Center |
| | 17th Floor |
| | San Francisco, California 94111 |
| **BY:** | **SUSAN Q. HAINES, ESQ.** |
| | |
| **Also Present:** | **JOSEPH ALM, ESQ.** |
| | - Tesla, Inc. |
| | **YUSUF MOHAMED, ESQ.** |
| | - Tesla, Inc. |
| | **VALERIE CAPERS WORKMAN** |
| | - Tesla, Inc. |

—   —   —

PROCEEDINGS

| | |
|---|---|
| 1 | **Friday - October 1, 2021**                **8:02 a.m.** |

2                  **P R O C E E D I N G S**

3                    ---o0o---

4      (Proceedings were heard out of presence of the jury:)

5          **THE CLERK:** Please come to order.

6          **THE COURT:** Good morning, everybody. Please be

7 seated.

8      All right. I have a few things.

9      So yesterday the plaintiffs filed a couple of written

10 transcripts from the testimony of the people who have testified

11 by video for purpose of making sure the record is complete.

12      I think the way to deal with that is to identify those two

13 transcripts as exhibits and not introduce them, but have -- so

14 that the appellate record would be clear about what the jury

15 actually saw.

16          **MR. ORGAN:** Okay.

17          **THE COURT:** All right.

18          **MR. ORGAN:** You want -- I'm not -- I'm a little

19 unclear, Your Honor. So what do we do? As exhibits?

20          **THE COURT:** I think you want to have a record that you

21 can refer to in the Court of Appeals to say, you know, this was

22 the testimony.

23          **MR. ORGAN:** Yes, Your Honor.

24          **THE COURT:** I think the way to do that would be to

25 identify each of them as exhibits, which we can do at any time

PROCEEDINGS

1  before the verdict, and then they would be identified in that

2  way and you could refer to them in that way.

3      MR. ORGAN:  I see.  So they're not actually received

4  in evidence.  They're just --

5      THE COURT:  They're not going to go back to the jury,

6  but they'll just be there.

7      MR. ORGAN:  Okay.  Thanks.

8      THE COURT:  I think that's the way to do it.

9      MR. ORGAN:  Okay.  There's one other.  We still have

10 McGinn to do.  So we'll redo the two that we filed and submit

11 them to the Court as exhibits?

12     THE COURT:  All you have to do is give them an exhibit

13 number.

14     MR. ORGAN:  Oh, okay.  Okay.

15     THE COURT:  And that will be fine.  And the same thing

16 with McGinn.

17     MR. ORGAN:  Thank you, Your Honor.

18     THE COURT:  And then there's the Demetric Di-az

19 rebuttal.  Were there any objections to that?

20     MS. KENNEDY:  No.  Is it going to be rebuttal or is it

21 just going to be a supplemental?  Because --

22     THE COURT:  It sounded -- it is rebuttal.  I don't

23 care when it goes in --

24     MS. KENNEDY:  Okay.  That's fine.

25     THE COURT:  -- I think.  So the idea would be that it

 1   would come in at the end of your case.

 2          **MS. KENNEDY:**  Okay.

 3          **THE COURT:**  Heisen.  So I got the revised

 4   designations.  There are still a few objections to deal with.

 5   I think I've identified what they are.

 6       So the first one I believe is No. 17.  And I would sustain

 7   that objection.

 8       The next one, I think, is 54.  And I would overrule that

 9   objection.

10       56, I would overrule that objection.

11       So I think those were the ones that are remaining.  Is

12   there anything else that I need to address?

13          **MR. ORGAN:**  No.  We pulled a lot last night for time,

14   Your Honor.  So, yeah.

15          **THE COURT:**  Right.  So that's what I was assuming.

16          **MR. ORGAN:**  Thank you, Your Honor.

17          **THE COURT:**  Okay.  And then Ms. Davis is going to give

18   you at the end -- you don't have to do it this second, or now

19   you could -- she's going to give you two sets of revised

20   instructions for us to consider when we do the instruction

21   conference.

22       So I have seen the objections that you've made.  I've made

23   some alterations to them and tracked changes, and so we'll talk

24   about those.

25       And my idea is that when we finish the evidence today and

1    dismiss the jury, I'll give you 15 minutes to get organized and

2    then we'll start the jury instruction conference.

3            **MR. ALEXANDER:**  Thank you, Your Honor.

4            **THE COURT:**  And the final thing is that I finally

5    actually looked at the verdict form.  I'm revising that, and I

6    will give that to you hopefully at the end of the evidence

7    today, but I think it's going to be necessary to make a finding

8    with respect to joint employer.

9        And I think it's also necessary to be specific about if

10   the jury does find a hostile environment, which of the theories

11   they think the plaintiffs have proved all the elements to.

12       And so I'm revising it in that way and making references

13   to the jury instructions to help the jury and revising the

14   punitive damages so that it's clear what theory punitive

15   damages would be allowed on.  You will get that in a moment.

16       So that's my news.  Is there any other issue from the

17   plaintiff's perspective that we ought to deal with this

18   morning?

19           **MR. ORGAN:**  Your Honor, just a couple things.  In

20   terms of timing, we are running very short on time.  And I do

21   believe we have endeavored and done a reasonably good job -- of

22   course, the Court may have a different view -- of putting our

23   case in efficiently; but as the plaintiff, we have the burden

24   of proof, and so there's more evidence that we have to put in

25   relative to the defendant.  The defendant clearly has not used

1    all of their time.

2        And so we're wondering if the Court might be willing to

3    give us an additional 15 or 20 minutes so that we can fully

4    argue the case before the Court and the jury on Monday.

5        **THE COURT:**  That depends.  So how much time do you

6    want for argument?  I think this case has gone in relatively

7    efficiently.  So what's your theory about that?

8        **MR. ALEXANDER:**  Your Honor, our hope would be for the

9    closing we would have an hour and a quarter, with allowing us

10   20 minutes for rebuttal.  I don't expect to use all of that

11   time, but I don't know what I will hear in the defendant's

12   case.

13       **THE COURT:**  An hour and a quarter, including the

14   rebuttal?

15       **MR. ALEXANDER:**  Not including the rebuttal.  So an

16   hour and quarter for closing and 20 minutes for rebuttal.  If

17   we are inefficient at any time, of course, obviously the Court

18   can always stop us, but I believe throughout the time we have

19   been here we have been as efficient as we possibly could.

20       We had some issues with regard to timing at the beginning

21   with regard to technical difficulties and technical

22   difficulties during, and that kind of cut down on our time.

23   And so that is about 10, 15 minutes that I personally caused

24   the loss of.  So if we could get that back, that would make all

25   the difference.

```
 1            THE COURT:  Okay.  All right.  I am inclined to give
 2   you a chance to fully argue.  I think if you argued for more
 3   than an hour and a half total, you would be not doing a very
 4   good job for your client.  So I think I would probably allow
 5   you an hour and a half on Monday.
 6            MR. ORGAN:  And, Your Honor, that's assuming that we
 7   have run into that time; is that right?  If we have an hour and
 8   35 minutes left, can we use that?
 9            THE COURT:  Sure.  You can use whatever time you have,
10   except for the defendants have, like -- will have more than
11   four hours, and I think it would be a mistake to use all four
12   hours to close but, yeah.
13            MR. ORGAN:  Thank you, Your Honor.
14            THE COURT:  You don't need more than an hour and a
15   half to argue this, but it's up to you.
16            MR. ORGAN:  Thank you.
17            THE COURT:  All right.  Anything else from the
18   plaintiffs?
19            MR. ALEXANDER:  Nothing else, Your Honor.
20            THE COURT:  Anything from the defense?
21            MS. KENNEDY:  No.  Just to advise the Court, Joyce
22   DelaGrande is here.  She will be the first witness at 8:30.  We
23   have Ramon Martinez, who's going to be here at 9:30.
24         I believe plaintiffs have a witness they want to read,
25   Annalisa Heisen or show Annalisa Heisen's testimony after Joyce
```

PROCEEDINGS

1    DelaGrande, and that's fine.

2              **THE COURT:**  Okay.

3              **MS. KENNEDY:**  And then I think they're going to show

4    Mr. Demetric Di-az's testimony in rebuttal.

5        So I just want to make sure -- we're going to rest after

6    Ramon Martinez.  So once Ramon -- Mr. Martinez is done, we will

7    rest subject to making sure all of our exhibits are there.  I

8    think we're pretty up to date.

9              **THE COURT:**  Okay.

10             **MS. KENNEDY:**  So I think at that time, if I'm correct,

11   Mr. Organ, you will put on your rebuttal case.

12             **MR. ORGAN:**  Yes.  It's only two minutes of testimony.

13       Your Honor, there was the issue relative to Exhibit 3 and

14   Exhibit 279 I think.

15             **MS. KENNEDY:**  379.

16             **MR. ORGAN:**  379.  I just noticed in the schedule from

17   last night that those were not admitted into evidence, and I

18   believe --

19             **THE COURT:**  They were admitted into evidence.  So

20   they -- if the minutes don't reflect that, they should be.

21             **MR. ORGAN:**  So 3 and 379 are in; is that right,

22   Your Honor?

23             **THE COURT:**  Whatever the number is.

24             **MR. ORGAN:**  Yeah, okay.  Yes, Your Honor.  Whatever we

25   had agreed to.

1          **THE COURT:**  And that reminds me.  You have work to do,

2    I suspect, to make sure that the exhibits that are in evidence

3    are in a form that the jury is going to be able to get.

4          The one instruction that is not currently in the

5    instructions is the one about using the computer back in the

6    deliberation room for the review of these exhibits.  But

7    because of the sort of haphazard way in which you've identified

8    your exhibits and the numbering, you need to get together and

9    know exactly what's going onto whatever form you're going to

10   give to Ms. Davis as to the exhibits that are in the case.

11         **MS. KENNEDY:**  Your Honor, I understood that we were

12   going to put them on a thumb drive.

13         Do you want us to print out a hard copy in a notebook for

14   the jurors as well in case there's technical difficulties?  In

15   my last trial, there were technical difficulties with the thumb

16   drive with exhibits for the jury.  Whichever you think is

17   easier.

18         **THE COURT:**  I suppose that's fine.  We have not had

19   that problem, I don't think.

20         **MS. KENNEDY:**  Okay.

21         **THE COURT:**  And so I think if it came up, then

22   printing them out would be a good idea, but I'm not sure.  But

23   I'll allow Ms. Davis to figure out what the best way is to deal

24   with the exhibits to the jury.

25         **MS. KENNEDY:**  Okay.  Thank you, Your Honor.

```
 1          THE COURT:  All right.  We'll see you when the jury is
 2   here.
 3          (Whereupon there was a recess in the proceedings
 4           from 8:14 a.m. until 8:30 a.m.)
 5          (Proceedings were heard in the presence of the jury.)
 6          THE COURT:  All right.  Please be seated, everybody.
 7       Good morning, ladies and gentlemen.  Thank you again for
 8   being here as promptly as you have been.
 9       We're going to proceed with the evidence this morning, and
10   the defense is calling a witness before, just the needs of that
11   person.
12       And so, Ms. Kennedy, let's proceed.
13       Come on up to the witness stand here.
14          THE CLERK:  If you step up and remain standing, I'll
15   swear you in.
16                   JOYCE ANN DELAGRANDE,
17   called as a witness for the Defendant, having been duly sworn,
18   testified as follows:
19          THE WITNESS:  Yes.
20          THE CLERK:  Be seated.
21       And then if you'll adjust the mic as you may need to, and
22   state your full name for the record and spell it for the court
23   reporter.
24          THE WITNESS:  Joyce Ann DelaGrande; J-O-Y-C-E, A-N-N,
25   D-E-L-A-G-R-A-N-D-E.
```

```
 1              THE CLERK:  Thank you.

 2              THE COURT:  All right.  Ms. Jeng, please proceed.

 3                        DIRECT EXAMINATION

 4   BY MS. JENG:

 5   Q.   Good morning, Ms. DelaGrande.

 6   A.   Good morning.

 7   Q.   Ms. DelaGrande, where are you currently employed?

 8   A.   Rivian.

 9   Q.   Okay.  What is your current job title?

10   A.   I am the manager for production control.

11   Q.   Prior to your current job, where did you work?

12   A.   I worked at Tesla.

13   Q.   When did you start working for Tesla?

14   A.   In August of 2012.

15   Q.   Okay.  What was your job position when you first started?

16   A.   I was an inventory analyst.

17   Q.   As of June 2015, what was your position with Tesla?

18   A.   I was the supervisor for production control.

19   Q.   And as a supervisor for production control, what were your

20   job duties and responsibilities?

21   A.   I was responsible for providing all of the material to

22   general assembly so they could build the cars.

23   Q.   Okay.  Can you describe a little bit more about what your

24   day-to-day role was?

25   A.   Yes.  I had 99 employees, and what we were responsible --
```

1    each -- each person had a route that they had to deliver

2    material to, and on that route they had to make sure the

3    material was there in a timely manner so when the production

4    line went to build the cars, they could reach back, get the

5    parts, and just build.

6    Q.    Okay.  Were any of the 99 people you supervised leads?

7    A.    Three of them at the time.

8    Q.    Ms. DelaGrande, are you familiar with Mr. Owen Diaz?

9    A.    Yes, I am.

10   Q.    How do you know Mr. Diaz?

11   A.    He worked for the team that ran the elevators.

12   Q.    When did you first meet Mr. Diaz?

13   A.    We had what was called a power train drop zone, and what

14   that was is we had material that was built upstairs in the

15   power train area.  That was the batteries, the power train, and

16   modules.  And that team was responsible for taking that

17   material down the elevator and placing it into drop zone so my

18   team could then deliver it to the line.

19   Q.    What was your understanding of what Mr. Diaz's role was at

20   the elevators?

21   A.    He was the lead of the area.  So he was responsible in

22   making sure that everything that came down the elevator went to

23   the correct locations.

24   Q.    Where was the correct location?

25   A.    So they had signs at the drop zone that would tell you

1  exactly where the material was supposed to be staged based on

2  part number.

3  Q.   Okay.  And as an elevator operator, would Mr. Diaz --

4  strike that.

5       Would elevator operators moving materials up and down the

6  elevator, would they need to be physically present at the

7  elevators most of the time?

8  A.   At all times.  So they were expected to kind of copy

9  exactly what we did, so that way the material was there when

10 we -- we needed it.  So they mirrored our schedule, basically.

11 Q.   Okay.  How many elevators were there?

12 A.   There was two.

13 Q.   And once materials were taken down the elevator and

14 dropped off at the drop zone, that's when members of your team

15 would pick up the parts; is that right?

16 A.   Yes.

17 Q.   Okay.  How were the elevator operators informed of what

18 materials they needed to bring down?

19 A.   Our leads -- the leads upstairs would communicate exactly

20 what was needed downstairs.

21 Q.   Okay.  How would they communicate that information of what

22 to bring downstairs?

23 A.   They would talk to them.  So they would just go and show

24 them exactly what was needed.  So there was a drop zone

25 upstairs, and our leads would let the elevator team know

1   exactly what was needed downstairs.

2   **Q.**   Okay.  And were the materials that were needed by

3   production communicated to the elevator operators verbally or

4   via email?

5   **A.**   Oh, verbally.

6   **Q.**   Okay.

7   **A.**   They had an open line of communication.

8   **Q.**   Did it have to be communicated in real time?

9   **A.**   Yes, it did.

10  **Q.**   Why?

11  **A.**   Because the line -- it was dependent on what the line was

12  building at that time.  So if there was any issues with the

13  line needing additional material, it was taken down.  So we had

14  to talk to them at all times.

15  **Q.**   Okay.  When you first started working with Mr. Diaz, what

16  was your working relationship like with him?

17  **A.**   So when I first started working with him is when we had

18  made the determination that the elevator team was going to be

19  placing that material in the drop zones.  And I had talked to

20  him about concerns I had with the drop zones and how it wasn't

21  organized, and it was causing some down time because my team

22  would go grab the material and it was the wrong material in the

23  drop zone.  They might have it instead of being in the lane

24  where it was supposed to be, it was two lanes over.  And my

25  team would go grab it, take it to the line.  It would cause

 1   down time, and then we would have to double back and try to

 2   figure out what happened.  So Mr. Diaz was supposed to help us

 3   straighten that out.

 4   Q.   Can you explain what you mean by down time?

 5   A.   Down time is when the line goes to build the cars, they

 6   can't stop.  They have takt times for each location on the

 7   line.  You might have 30 seconds or you might have 3 minutes

 8   based on how the car is being built in that location.

 9        And any time wrong material is taken, they would have to

10   stop and -- say, the car took 6 minutes to build -- you know,

11   to go through the end of the line, that could be thousands of

12   dollars -- hundreds of thousands of dollars sometimes.

13             THE COURT:  Could you slow down just a little bit?

14             THE WITNESS:  Oh, yes.  I'm sorry.

15             THE COURT:  I'm not sure that everybody is catching

16   all of what you're saying.

17             THE WITNESS:  I'm sorry.  Yeah.

18   BY MS. JENG:

19   Q.   Just so you know, if you feel comfortable and you're fully

20   vaccinated, you can also remove your mask.

21   A.   That would be awesome.

22        Yeah.  So the parts are taken to the line.  Each area has

23   takt time that they have to do to build that particular part of

24   the line.  And if at all -- if at any time they stop, that's

25   considered down time.  And at the end of the line it's -- it's

 1  a production line, so it flows.

 2       So if you have a stop, then that means other areas aren't

 3  able to build, and that's -- it can cost thousands of dollars

 4  in down time.

 5  **Q.**   Ms. DelaGrande, did you ever have issues or difficulties

 6  working with Mr. Diaz?

 7  **A.**   Yes, I did.  We had -- he was --

 8           **THE COURT:**  Why don't you wait for the question?

 9           **THE WITNESS:**  Oh, okay.  Sorry.

10  **BY MS. JENG**

11  **Q.**   Can you describe very briefly what sort of issues you had

12  with Mr. Diaz?

13  **A.**   In the beginning he claimed that the drop zone was messy

14  because of the first shift, and he was supposed to help me work

15  with that so we could do some training on both our first shift

16  and second shift.

17  **Q.**   And did you try to do that?

18  **A.**   Yeah.  I had my leads stay.  I tried staying.  I would

19  stay two hours before, two hours after to understand what the

20  issues were.

21       I tried communicating and reaching out and telling him

22  anything they needed, we were there to help them.

23  **Q.**   And did that resolve the issues that you had?

24  **A.**   No, it didn't.

25  **Q.**   Did you at any point complain about these issues you had

1  with Mr. Diaz to anybody else?

2  **A.**   Yes.   To his supervisor.

3  **Q.**   Okay.   And who was that?

4  **A.**   Edward.

5  **Q.**   Is that Edward Romero?

6  **A.**   Yes, it was.

7  **Q.**   How often were you talking to Mr. Romero about Mr. Diaz?

8  **A.**   Quite a bit.   I sent quite a few emails about the issues I

9  was having.

10  **Q.**   And did you communicate with Mr. Romero only over email

11  only or did you also talk to him over the phone or in person?

12  **A.**   It was a mix of everything.

13  **Q.**   Okay.   When did you first meet Mr. Romero?

14  **A.**   It was when he first took the position.   They switched --

15  there was a gentleman, I think Jose was in charge of the area

16  at first; and then when Edward took over, I spoke with him

17  immediately.

18  **Q.**   Do you remember approximately when that was?

19  **A.**   No, I don't remember the dates.

20  **Q.**   So there is a black binder in front of you.   If you could

21  turn to Tab -- to Exhibit 244.

22  **A.**   Okay.

23         **MS. JENG:**   The parties have stipulated to its

24  admissibility.   May I move it into evidence and publish?

25         **THE COURT:**   Yes, you may.   And it's admitted.

1          (Trial Exhibit 244 received in evidence)

2     **BY MS. JENG**

3     **Q.**   Ms. DelaGrande, do you recognize this email?

4     **A.**   Yes, I do.

5     **Q.**   Did you send this email to Mr. Romero?

6     **A.**   Yes, I did.

7     **Q.**   Had you met Mr. Romero prior to your email of

8     October 23rd, 2015?

9     **A.**   No.  We had just spoken.

10    **Q.**   Okay.  Can you explain why you sent this email?

11    **A.**   We were having a lot of issues with the drop zone on the

12    parts being in the wrong locations, and I wanted to speak with

13    him on how we could resolve those issues.

14    **Q.**   Okay.  And what was Mr. Romero's response to you?

15    **A.**   He said he had just taken over the responsibilities of the

16    elevator and that he would look into my concerns.

17    **Q.**   Did you at any point meet with him after this?

18    **A.**   Yes, I did.

19    **Q.**   Okay.  And what did you discuss?

20    **A.**   We discussed the responsibilities that his team would have

21    with the drop zone, what my responsibilities are, what my

22    team's were, and then what his responsibilities were.

23    **Q.**   And did you feel that the issue was resolved at the time?

24    **A.**   No.  We were working towards it, but we were still

25    struggling.

1   **Q.**   Did you notice an improvement after this?

2   **A.**   There was, yes.  We did have an improvement in the

3   beginning, yes.

4   **Q.**   Can you turn to Exhibit 251?

5   **A.**   Yes.

6          **MR. ORGAN:**  I'm sorry.  What was the number?

7          **MR. ALEXANDER:**  251.

8          **MR. ORGAN:**  251.

9          **MS. JENG:**  This is also stipulated as admissible.  May

10   I move it into evidence and publish?

11          **THE COURT:**  Yes.  It's admitted.

12      (Trial Exhibit 251 received in evidence)

13   **BY MS. JENG**

14   **Q.**   Do you recall these emails between you and Mr. Romero?

15   **A.**   Yes, I do.

16   **Q.**   On the November 2nd, 2015 email, Mr. Romero is saying

17   (as read):

18          "I have some information I would like to share

19      with you."

20      Did you meet with Mr. Romero and did he share information

21   with you?

22   **A.**   Yes, he did.

23   **Q.**   What was the information that he shared with you?

24   **A.**   That was not in this email.

25      Oh.  He wanted to share with me what they were working on

 1   to be more successful in the drop zone.

 2   Q.   And in the email right above that you say (as read):

 3            "I have been speaking with Owen lately.  He is

 4        doing a great job over there."

 5        Why did you write that?

 6   A.   Because he was.  He was working with my team to try to

 7   understand how we could make it easier on the teams on getting

 8   the material to the drop zones more efficiently.

 9   Q.   Okay.  So were you satisfied with Mr. Diaz's improvement

10   at the time?

11   A.   At this point, yes, I was.

12   Q.   Okay.  Do you recall reporting any other -- or any safety

13   issues related to Mr. Diaz?

14   A.   Yes.  We had an issue with bikes in our warehouse.  And it

15   had been specified that there was no bikes on the production

16   line, and I caught Owen riding a bike in the warehouse.

17   Q.   Did you catch him riding a bike more than once?

18   A.   Yes.

19   Q.   Did you speak with him about it?

20   A.   I did speak with him.

21   Q.   Did he stop?

22   A.   No.

23   Q.   Can you turn to Exhibit 259?

24        MS. JENG:  This is not admitted, so I'll mark it for

25   identification.

 1          (Trial Exhibit 259 marked for identification)

 2   BY MS. JENG

 3   Q.   Take a look at it and let me know when you're ready.

 4   A.   Yes, I'm ready.

 5   Q.   Do you recognize these emails that you sent to Mr. Romero?

 6   A.   Yes, I do.

 7   Q.   Okay.  Why -- sorry.

 8        If you look at the email from Page 2, November 7th at

 9   6:13 a.m., why did you send this email?

10   A.   Because I had spoken with Owen numerous times about riding

11   the bike in the warehouse and he continued to ride the bike.

12   Q.   Okay.

13          MS. JENG:  Your Honor, may I move this exhibit into

14   evidence and publish?

15          THE COURT:  Any objection?

16          MR. ORGAN:  No, Your Honor.

17          THE COURT:  It's admitted.

18        (Trial Exhibit 259 received in evidence)

19        (Document displayed.)

20   BY MS. JENG

21   Q.   How many times at this point had you complained to

22   Mr. Romero about Mr. Diaz?

23   A.   At least two or three times.

24   Q.   Okay.  Did you feel that Mr. Romero was helping you

25   resolve your issues with Mr. Diaz?

 1    A.    No.

 2    Q.    Did you feel that Mr. Romero was protective of Mr. Diaz?

 3    A.    Yes.

 4    Q.    Why?

 5    A.    He was his employee.  I felt that he was just trying to

 6    defend his employee, and they were short staffed as well.

 7    Q.    Okay.  On Page 1 of this exhibit at the very bottom you

 8    say (as read):

 9              "Can we meet tomorrow morning about the PWT DZ?"

10        Is that power train drop zone?

11    A.    Yes, it is.

12    Q.    Okay.  And you were asking Mr. Romero to meet about -- to

13    discuss the power train drop zone?

14    A.    Uh-huh.  Yes.

15    Q.    Okay.  You say (as read):

16              "I am shocked at how it is kept during the day

17        shift and need help understanding how we can fix it."

18        Did you -- what did you speak about with Mr. Romero when

19    you met with him?

20    A.    I spoke with him about the fact that we continued to have

21    issues with where the parts were being placed and how they are

22    not placed in the correct location.

23    Q.    Did you speak with him specifically about Mr. Diaz at this

24    point?

25    A.    It was about the entire team at this point.

1    **Q.**   Okay.  And what was Mr. Romero's response?

2    **A.**   He said that he would take care of this.

3    **Q.**   Did you ever speak with anybody on the elevator team about

4    the issues that you were raising with Mr. Romero?

5    **A.**   Yes.  I tried to speak with them on what we could do to

6    help them.  We wanted to work together to be able to provide

7    support to the line.

8    **Q.**   And who from the elevator operator team did you speak

9    with?

10   **A.**   It was Owen and Junior.

11   **Q.**   I'm sorry?

12   **A.**   Owen and Junior.

13   **Q.**   Owen and Junior, okay.

14       And what was their response when you raised these issues

15   with Owen and Junior?

16   **A.**   Every time I brought up any issues, it would all be blamed

17   on the first shift.

18   **Q.**   At some point around early 2016 did you change job

19   positions?

20   **A.**   Yes.  I went to work -- instead of being in general

21   assembly, I went to the power train upstairs and I took control

22   of that production control team.

23   **Q.**   And what was the change in the actual role?  Like, what

24   were you doing differently?

25   **A.**   Instead of delivering material to general assembly, I

1    helped deliver material to the power train, and that's where

2    they built the batteries, the modules and the drive units.

3    **Q.**   Okay.  And did you still have to work with elevator

4    operators in your new position?

5    **A.**   Yes, I did.

6    **Q.**   Did you have leads that reported to you at that time?

7    **A.**   Yes, I did.

8    **Q.**   Who were your leads that reported to you at that time?

9    **A.**   Robert Hurtado, Hugo Gallegos, I believe his name was,

10   and -- oh, my goodness.  Umm, I'm drawing a blank right now.

11   **Q.**   Does Devin Williams ring a bell?

12   **A.**   Devin Williams, yes.

13   **Q.**   And when you moved upstairs to power train, did you

14   continue to have to work with Junior and Mr. Diaz?

15   **A.**   Yes, I did.

16   **Q.**   Did the issues you had with Junior and Mr. Diaz improve at

17   this time?

18   **A.**   No, they didn't.

19   **Q.**   Did any of your leads also complain to you about Junior

20   and Mr. Diaz?

21   **A.**   Yes, they did.

22   **Q.**   And what were their complaints?

23   **A.**   They would complain that Owen was never there.  I would

24   ask them why they weren't able to perform their jobs, and --

25           **MR. ORGAN:**  Objection, Your Honor.

DELAGRANDE - DIRECT / JENG

 1              THE COURT:  I'm sorry?

 2              MR. ORGAN:  Objection.  Hearsay.

 3              THE COURT:  So I'm going to overrule the objection,

 4     not that this -- you should take this for the truth of the

 5     matter asserted, because that would be hearsay, but because of

 6     what it made Ms. DelaGrande do after she was told of these

 7     alleged complaints.

 8         You may continue.

 9     BY MS. JENG

10     Q.   In response to complaints by your leads about Mr. Diaz,

11     did you relay those complaints to Mr. Romero?

12     A.   Yes, I did.

13     Q.   And what were those complaints that you relayed?

14     A.   They were that Owen was not there to support the elevator.

15     Q.   And when you say "not there," you mean not physically

16     there?

17     A.   Not physically there.

18     Q.   Okay.  Did you also personally observe that he was not

19     physically there?

20     A.   Yes, I did.  I went down looking for him at one point and

21     found him in the body-and-wait break area.

22     Q.   And did he -- would he have any reason for business to be

23     in that area?

24              MR. ORGAN:  Objection.  Leading, Your Honor.

25              THE COURT:  And it calls for speculation.  Sustained.

1    BY MS. JENG:

2    Q.   Okay.  Could you turn to Exhibit 297, which is not yet

3    admitted.

4         (Witness complied.)

5    A.   Okay.

6    Q.   Do you recall sending or exchanging these emails with

7    Mr. Romero around February 19th, 2016?

8    A.   Yes, I do.

9    Q.   Your first email on Page 2 is at 12:49 a.m.  Do you see

10   that?

11   A.   Yes.

12   Q.   And why did you send this email to Mr. Romero?

13   A.   So I had just transferred up to power train, and I was

14   still learning the area and the expectations of my team.  And

15   the struggle we were having is power train worked seven days a

16   week at that time, and the team that was at the beginning of

17   the week didn't seem to have the issues that the team at the

18   end of the week had.  And so my email to him was with my

19   concerns on how we could address that.

20   Q.   Okay.

21        MS. JENG:  Your Honor, may I admit this Exhibit 297

22   into evidence and publish?

23        THE COURT:  Any objection?

24        MR. ORGAN:  It's -- no, I think that's okay,

25   Your Honor.

 1            **THE COURT:**  All right.  It's admitted.

 2        (Trial Exhibit 297 received in evidence)

 3    **BY MS. JENG**

 4    **Q.**   So you mention in this email that you're adding your leads

 5    because they have more feedback.  Do you know what their

 6    feedback was?

 7    **A.**   Yes.  That they were having to run the packs and closure

 8    carts and other products up and down the elevators because the

 9    elevator team was not available.  They were not there.

10    **Q.**   Sorry.  Why was that an issue?

11    **A.**   Because they had other jobs that they were responsible for

12    and they were unable to do those jobs.

13    **Q.**   And tell me again who were your leads at this point?

14    **A.**   It was Robert Hurtado, Hugo Gallegos, and Devin Williams.

15    **Q.**   And you also mention in this email -- well, you say

16    (as read):

17            "Troy and I believe his name is Ruben are really

18        helpful.  They do a great job in making sure

19        everything is taken care of and communicate to us if

20        they need any assistance."

21        And then you reference the latter part of the week

22    (as read):

23            "We have Junior and Owen, and sadly the same issues I

24        had with them downstairs I have upstairs."

25        Why did you -- why did you mention Troy and Ruben here in

1   this email?

2   **A.**   Because the -- it was the same job just at the beginning

3   of the week, and we didn't have the same issues with that team.

4   **Q.**   You mean you didn't have the same issues as with Junior

5   and Owen?

6   **A.**   Yes.

7   **Q.**   Okay.  What was Mr. Romero's response when you raised

8   these concerns to him?

9   **A.**   He brought up concerns about how long it's been going on,

10  have I spoken to the staff directly, have they been

11  disrespectful to me, and if my leads can provide feedback to

12  him.  He actually wanted my leads to directly speak with him so

13  he could understand what their issues were.

14  **Q.**   Okay.  Were you frustrated with Mr. Romero for responding

15  the way he did?

16  **A.**   Yes, because the answer was always "I'm working on it,"

17  and I didn't seem to be getting any resolution.

18  **Q.**   Did you feel at this point that he was still protective

19  over Owen?

20  **A.**   Yes.

21  **Q.**   If you look on Page 1, you sent a second email to

22  Mr. Romero on February 19th, 2016, at 1:59 a.m.  What concerns

23  were you raising at this point?

24  **A.**   So basically when we had the other concerns downstairs,

25  they were always telling me it was because of the power train

 1   material; but the team -- I didn't feel that -- it wasn't

 2   because they're not working hard.  It was just because we were

 3   getting the same issues, the same non-response that we were

 4   getting downstairs, and I always to get my leads involved.

 5   Instead of them doing their jobs on the line, they had to do

 6   the jobs of the elevator operator.

 7   Q.   And as to the second paragraph where you say (as read):

 8         "My understanding is that Junior always has an

 9        excuse as to why he does not get it done, but I don't

10        believe he is disrespectful.  Owen just has no sense

11        of urgency at all."

12        Why did you write that?

13   A.   I wrote that because when I would go to Owen, he would

14   tell me what I wanted to hear but then not make any effort to

15   make it better.

16        And Junior always had excuses but he wasn't disrespectful

17   at any time, but I felt that Owen wasn't even trying to make it

18   better.

19   Q.   Did you feel that Mr. Diaz was being disrespectful?

20   A.   Yeah.

21   Q.   Why?

22   A.   He just didn't have any sense of urgency.  He just did

23   what he wanted to.  So he might tell me what I wanted to hear

24   and then drive off and do something completely different.

25   Q.   How were the interactions between your team and Mr. Diaz

DELAGRANDE - DIRECT / JENG

1    at this point?

2    **A.**    They were a struggle.  My team was having to stop --

3    again, stop what they were doing to do his job, and it was just

4    frustrating at the time.

5        We would catch Owen off talking to female associates

6    instead of working.  And so for my leads to have to stop what

7    they were doing because he's doing that, it did become

8    frustrating.

9    **Q.**    Would it be fair to say that there were tensions between

10   your team and Mr. Diaz at this point?

11   **A.**    Yes.  Yes, there was.

12   **Q.**    Okay.  At some point did you receive a report about an

13   incident that happened with Mr. Diaz in the elevator?

14   **A.**    Yes, I did.

15   **Q.**    Okay.  Could I have you turn to Exhibit 303?

16       (Witness complied.)

17   **Q.**    Okay.  Do you recognize this?  Did you send this email to

18   Mr. Romero on February 26, 2016?

19   **A.**    Yes, I did.

20   **Q.**    Okay.  Why did you send this to Mr. Romero?

21   **A.**    My leads had came up to me and told me that Owen told them

22   they were not allowed to speak to him, and this was because

23   there were so many snakes at Tesla because they had came to me

24   with the concern with Owen not being there.

25   **Q.**    Okay.  So your leads told you that Mr. Diaz said there

DELAGRANDE - DIRECT / JENG

```
 1   were so many snakes because your leads had come to you about

 2   issues they had with Mr. Diaz?

 3   A.    Yes.

 4            MS. JENG:   Okay.  Your Honor, may I move this

 5   Exhibit 303 into evidence and publish?

 6            THE COURT:   Any objection?

 7            MR. ORGAN:   No, Your Honor.

 8            THE COURT:   It's admitted.

 9       (Trial Exhibit 303 received in evidence)

10       (Document displayed.)

11   BY MS. JENG

12   Q.    And can you explain what your understanding is of what

13   happened in the elevator that night?

14   A.    So my understanding is Owen was having a personal

15   conversation with --

16            MR. ORGAN:   Hearsay, Your Honor.

17            THE COURT:   Sustained.

18            THE WITNESS:   Okay.

19   BY MS. JENG

20   Q.    What were you telling Mr. Romero about what had happened

21   in the elevator that night?

22            MR. ALEXANDER:   Objection.  Double hearsay.

23            MR. ORGAN:   Double hearsay, yeah.

24            THE COURT:   Sustained.

25
```

1  **BY MS. JENG**

2  **Q.**   Did you become aware of -- sorry.

3          How did you become aware of the incident in the elevator

4  with Mr. Diaz and your leads?

5  **A.**   My leads came and told me there was an issue about --

6               **MR. ORGAN:**   Hearsay.

7               **THE COURT:**   No.  Overruled.

8  You can continue.

9               **THE WITNESS:**   Okay.

10         My leads came and told me there was an issue with Owen

11 when they were asking him to take a gearheart downstairs.  They

12 told me that they were --

13              **MR. ORGAN:**   Objection.  Now hearsay.

14              **THE COURT:**   Okay.  So, ladies and gentlemen, hearsay

15 is an out-of-court statement made by somebody else.  It doesn't

16 have the same ring of authenticity as other things.

17         So the statements that Ms. DelaGrande is now talking about

18 is not admitted for the truth of what actually happened, but

19 they are going to be admitted to allow her to explain why she

20 did what she ended up doing.

21         So with that understanding, please proceed.

22              **THE WITNESS:**   Okay.

23         The leads came and told me they were unable to speak to

24 Owen; that he only wanted to talk to them via text or email --

25 I'm sorry, this one was email -- and they don't have his

DELAGRANDE - DIRECT / JENG

```
 1   personal email to do that.
 2        And at the time we really needed to be able to talk to him
 3   to tell him exactly what product was supposed to go downstairs
 4   and what product was supposed to come upstairs.
 5   BY MS. JENG
 6   Q.   Who were the leads that made you aware of this?
 7   A.   Robert Hurtado and Devin Williams.
 8   Q.   And did you speak with Mr. Diaz before or after you sent
 9   this email to Mr. Romero?
10   A.   Yes.  It was before I spoke to Owen and he told me that my
11   leads were threatening him because they say they were going to
12   contact Mr. Romero.  And so I spoke to -- I sent this email
13   based on the fact that I needed to make him aware of the
14   issues.
15   Q.   If you look on Page 5, you see that Mr. -- I'm sorry.
16        In the middle of the page you email Mr. Romero again and
17   say that you prefer that he is placed somewhere else.  When can
18   we make this happen?
19        What were you asking Mr. Romero to do?
20   A.   I was asking Mr. Romero to replace Owen at the elevator.
21   Q.   What happened between your initial email and this email to
22   make you ask Mr. Romero to replace Mr. Diaz?
23   A.   We absolutely had to be able to communicate with the
24   elevator team, and Owen had made it clear that he did not want
25   my team speaking to him.  And so because of that, I wasn't able
```

```
 1   to have him at the elevator because we were -- we were

 2   potentially going to cause the line to go down.

 3   Q.   Did either Hugo Gallegos, Robert Hurtado, or Devin

 4   Williams ever make you aware that any racial slurs were said

 5   during this incident?

 6   A.   No.

 7           MR. ORGAN:  Objection.  Leading, Your Honor.

 8           THE COURT:  No.  Overruled.

 9           THE WITNESS:  No.  Absolutely not.

10   BY MS. JENG

11   Q.   Okay.  And what race or ethnicity do you believe

12   Mr. Gallegos to be?

13   A.   He is Hispanic.

14   Q.   What about Devin Williams?

15   A.   He's African-American.

16   Q.   Okay.  And neither of them mentioned any racial epithets

17   that were said?

18   A.   Oh, absolutely not.

19   Q.   Was it your understanding that they were present during

20   the incident?

21   A.   Yes.  They were both there.

22   Q.   And if either of them had reported any racial slurs that

23   were said, would you have reported it?

24   A.   Absolutely.  That was not tolerated in any area anywhere

25   at Tesla.
```

1   Q.   How often did you interact with Mr. Hurtado at work?

2   A.   Every day.  Constantly.

3   Q.   Have you ever heard him say the "N" word at work?

4   A.   No.  That's not even a part of his vocabulary.  He doesn't

5   speak like that.

6   Q.   What do you mean by he doesn't speak like that?

7   A.   He would never say something like that.  That's just not

8   something that -- that's not him to talk like that.  He

9   doesn't -- he would never use that terminology.

10  Q.   And how many people worked on your team with Mr. Hurtado,

11  Devin Williams, and Hugo Gallegos?

12  A.   I believe we had about 20 people.

13  Q.   And did anybody on those teams complain to you about

14  Mr. Hurtado saying any sort of racial sure?

15  A.   Never.

16        MS. JENG:  No further questions?

17        THE COURT:  All right.

18      Mr. Organ.

19                    CROSS-EXAMINATION

20  BY MR. ORGAN

21  Q.   Did you work with a Tom Kawasaki?

22  A.   I don't remember Tom.

23  Q.   On the elevators when you first were there in the fall of

24  2015?

25  A.   I don't remember his name, no.

1    Q.   And you said that -- you just said this, that it's not

2    part of his vocabulary?

3    A.   Yeah.

4    Q.   The "N" word is not part of his vocabulary?

5    A.   No.  He didn't speak like that.

6    Q.   You guys were friends then; is that right?

7    A.   He was my lead, yes.

8    Q.   Now, you know -- do you speak Spanish?

9    A.   No, I don't.

10   Q.   Have you ever heard the term *"mayate"*?

11   A.   Yes, I have.

12   Q.   And you understand that *mayate* is the "N" word in Spanish;

13   right?

14   A.   Yes, I do.

15   Q.   And so if someone had testified that they heard

16   Mr. Hurtado using the word *"mayate,"* you would agree that that

17   would be Mr. Hurtado using the "N" word; right?

18   A.   I would not believe that that statement was true.  That's

19   something I would have never heard him say.  He just didn't

20   talk like that.

21   Q.   I understand that, but my question is a little different.

22        My question is:  You would agree that if someone actually

23   heard Mr. Hurtado use the word *"mayate,"* that would be

24   Mr. Hurtado using the "N" word; right?

25   A.   If that's what they had heard, yes.  But, again, I worked

 1   with Robert for years.  I've never heard him speak like that.

 2   **Q.**   Let me ask you a question.  You don't work for Tesla

 3   anymore, do you?

 4   **A.**   No, I don't.

 5   **Q.**   Do you still own Tesla stock?

 6   **A.**   No, I don't.

 7   **Q.**   Did you meet with Tesla's attorneys before you came and

 8   testified here today?

 9   **A.**   Yes, I did.

10   **Q.**   And did you go over what you were going to say here today?

11   **A.**   We talked about what the case was about.

12   **Q.**   Oh, you practiced what you were going to say in court,

13   didn't you?

14          **MS. JENG:**  Objection.  Argumentative.

15          **THE COURT:**  Overruled.  You can answer.

16          **THE WITNESS:**  We spoke about what -- we spoke about

17   what I was going -- what the court was about, yes.

18   **BY MR. ORGAN**

19   **Q.**   You practiced with them.  They asked you questions and you

20   answered them; right?

21          **MS. JENG:**  Objection.  Argumentative.

22          **THE COURT:**  Overruled.

23          **THE WITNESS:**  They asked me questions, and then I told

24   them what the answers were, but we didn't practice.

25        They asked me the questions.  They asked me if I

DELAGRANDE - CROSS / ORGAN

1  remembered the emails and then I answered them, but it wasn't a

2  practice.

3  **BY MR. ORGAN**

4  **Q.**   So they didn't ask you questions and you answered them?

5  That wasn't practicing what you were going to say here today?

6  **A.**   No.  They were asking me questions, and I answered them.

7  **Q.**   Did they tell you when some of your answers weren't

8  exactly what they wanted to hear?

9  **A.**   No.  Because everything that I'm saying here is the truth

10  of what happened --

11  **Q.**   How many times --

12  **A.**   -- so.

13  **Q.**   How many times did you meet with them?

14  **A.**   Just once.  Just yesterday -- just on Wednesday afternoon.

15  **Q.**   Who was there when you met?

16      **THE COURT:**  All right.  I think we've done enough on

17  this.  Let's move on.

18  **BY MR. ORGAN**

19  **Q.**   Let me ask you this:  You said -- we were talking about

20  Exhibit 303, and you mentioned that Robert and Devin were --

21  Robert and Devin were people who had talked to you about

22  Mr. Diaz; is that right?

23  **A.**   Yes.

24  **Q.**   Didn't you mean to say Robert and Hugo?

25  **A.**   No.  Hugo wasn't in the elevator at that moment.  Hugo was

 1  responsible for the line itself.  He wasn't responsible for

 2  telling the operators what to take down.

 3  **Q.**   And when you were asking Ed Romero to replace Mr. Diaz,

 4  you were doing that because Ed had the authority to decide who

 5  was on the elevators; right?

 6  **A.**   Yes.

 7  **Q.**   Ed was an employee of Tesla; right?

 8  **A.**   I don't know who he was an employee of because they were

 9  contractors.  So I don't remember who he was an employee of.

10  **Q.**   If he came in here and testified that he was an employee

11  of Tesla in that January, February, March time frame, you

12  wouldn't have any reason to question that; correct?

13  **A.**   Not really, no.  No.

14  **Q.**   And if you would, please turn to Exhibit -- in the white

15  binder, please turn to Exhibit 298.

16      (Witness complied.)

17  **Q.**   298, got it?

18  **A.**   Uh-huh.  Yes.

19  **Q.**   And this is an email that you're sending here -- two

20  emails that you sent to Ed Romero, and then the top one is to

21  Cameron Smith and Jay Gardner?

22  **A.**   Yes.

23  **Q.**   Who were Cameron Smith and Jay Gardner?

24  **A.**   Cameron Smith was the associate manager for the area, for

25  production control; and Jay Gardner was the day shift

```
 1    supervisor.

 2    Q.    Okay.

 3          MR. ORGAN:  Your Honor, I would move Exhibit 298 into

 4    evidence.

 5          THE COURT:  Any objection?

 6          MS. JENG:  No objections.

 7          THE COURT:  It's admitted.

 8       (Trial Exhibit 298 received in evidence)

 9    BY MR. ORGAN

10    Q.    Okay.  Let's go through this real quick.

11          MR. ORGAN:  May we show this to the jury, Your Honor?

12          THE COURT:  You may.

13          MR. ORGAN:  Okay.

14       (Document displayed.)

15    BY MR. ORGAN

16    Q.    So at the top you say you're asking to have Owen replaced;

17    right?

18    A.    Yes.

19    Q.    And that's because you had the power to ask Ed Romero to

20    replace people on the elevators; right?

21    A.    Yes.

22    Q.    And Ed was Owen's supervisor at that time; right?

23    A.    Yes.

24    Q.    Okay.  And, now, you mentioned down here -- let's go down

25    to the middle bit here at the 1:25 a.m - and -- oh.  If I have
```

1    it right, you had just switched positions; is that correct?

2    **A.**   Yes.

3    **Q.**   So prior to this February 26 time period, you'd been

4    working days; right?

5    **A.**   No.   I was working downstairs in general assembly.

6    **Q.**   Oh, down in general assembly.   Okay.

7          So you had just switched to that particular position then;

8    is that what happened?

9    **A.**   Yes.

10   **Q.**   Okay.   And then you say here (as read):

11              "Tonight my lead approached me."

12         Do you see that?

13   **A.**   Yes.

14   **Q.**   And you mentioned earlier that Mr. Diaz would only talk to

15   your leads by text or email.   I think you switched it to email;

16   right?   That's what you said?

17   **A.**   That particular night.   That's why my lead approached me.

18   Prior to that, they were speaking.   They were talking to them.

19   **Q.**   Isn't it true, ma'am, that what Mr. Diaz said was that he

20   would only talk to your leads about issues related to business;

21   right?

22   **A.**   Originally, yes, he did.

23   **Q.**   Well, originally as of February 26 when you said --

24   **A.**   Yes.

25   **Q.**   -- that you wanted Mr. Diaz replaced; right?   That's what

```
 1   you're saying here (as read):

 2          "Tonight my lead approached him to talk to him

 3       and said for my associates to only talk to him if it's

 4       related to business."

 5       As of February 26 --

 6   A.   At 1:25 a.m.  The email that I sent to my manager and to

 7   my coworker was at 2:15 a.m.

 8   Q.   As of February 26 at 1:25 a.m., Mr. Diaz was just asking

 9   your leads to talk to him about business; right?

10   A.   Yes.  And then after I went and spoke to Owen, he claimed

11   that because my leads went and told him that they were going to

12   go speak to his manager, that he only wanted text or email.  So

13   he told my team -- my leads that it was just email, and then he

14   told me it was text and email.

15   Q.   Owen is now -- let's go to the second paragraph.

16   A.   Yes.

17   Q.   "Owen is now telling me..."  So he talked to you?

18   A.   He did speak to me, yes.

19   Q.   Where was that conversation?

20   A.   Over at my desk.

21   Q.   Okay.  He told you that your associates had threatened

22   him; right?

23   A.   Yes.

24   Q.   And didn't you have to investigate that?

25   A.   Yes.
```

1  Q.   Okay.  And how did you go about investigating that?

2  A.   By speaking to Owen and seeing if what my leads said was

3  true, and that's why we were speaking.

4       The second part of the email was me talking to Owen about

5  what my leads had said, and he confirmed that he didn't want to

6  speak to them unless it was text or email.

7  Q.   About business?

8  A.   About business, yes.

9  Q.   Right.  Now -- and that was unprofessional, right, for him

10 to do that?

11 A.   Yes, because we needed to speak to him.  We didn't work

12 through emails and text.  We had to be able to openly

13 communicate with each other.

14 Q.   Isn't it true, ma'am, the height of professionalism is to

15 only ask people to talk to you about business?

16 A.   Yes.

17 Q.   Okay.  So wasn't Mr. Diaz only showing the height of

18 professionalism there by saying:  Please just talk to me about

19 business?

20 A.   He didn't want them to speak to him at all.  He wanted

21 them to ask -- all the requests he wanted to go through text or

22 email, and that's what he let us know.

23 Q.   In your email you say -- you don't say in your email he

24 wouldn't talk to him.  You say (as read):

25           "Only talk to him if it's related to business."

1          That's what you wrote; right?

2    **A.**    I wrote that.  And then I also said that his response was

3    that he does not want anyone talking to him and he wanted

4    everyone to go through email.

5    **Q.**    And the reason he didn't want anyone talking to him is

6    because they were calling him the "N" word; right?

7    **A.**    It was never reported to me.  Devin and Robert were in

8    there -- in the elevator at the time, and never once did anyone

9    say anything about any derogatory terms being stated to him.

10   **Q.**    Let's go to the next day.  If you go to Exhibit 300.

11   **A.**    Uh-huh.

12   **Q.**    And if you look at that exhibit, it says --

13           **MR. ORGAN:**  Oh.  I move Exhibit --

14   **BY MR. ORGAN**

15   **Q.**    That's your email; correct?

16   **A.**    Yes.

17   **Q.**    Huh?

18   **A.**    Yes, that's my email.

19           **MR. ORGAN:**  Okay.  I would move Exhibit 300 into

20   evidence Your Honor.

21           **THE COURT:**  Any objection?

22           **MS. JENG:**  No objections.

23           **THE COURT:**  All right.  It's admitted.

24       (Trial Exhibit 300 received in evidence)

25

1    BY MR. ORGAN

2    Q.   So if you look at the middle of that where it says "Thank

3    you"?

4            MR. ORGAN:   If we could pull that out, Sabrina?

5        No.   I'm sorry.   The middle bit where it says "Sent from

6    my Verizon."

7        A little below that.

8        (Document displayed.)

9    BY MR. ORGAN:

10   Q.   It says here (as read):

11           "Thank you.   The day before he made it clear he

12       did not want my associates talking to him, but it

13       seems it's only the leads, Robert and Hugo."

14       Right?

15   A.   Yes.

16   Q.   That's what you said.   Robert and Hugo.

17   A.   He was okay with speaking to Devin, but he was not okay

18   with speaking to Robert and Hugo.

19   Q.   Okay.

20   A.   He changed his mind and that's why that email was stated.

21   Q.   Okay.   So he told you he didn't want to talk to Robert

22   Hurtado and Hugo?

23   A.   Yes.

24   Q.   And those are your two leads in charge of the elevator;

25   right?

```
 1   A.    Yes.  Uh-huh.

 2   Q.    So Robert Hurtado was in charge of the elevator; right?

 3   A.    Yes.  And Hugo was responsible for getting the --

 4   Q.    I'm not asking you about Hugo, ma'am.  Thank you.

 5   A.    Okay.

 6   Q.    "I caught him talking bad about them."  His talking bad

 7   about them was he was saying they were saying things about him;

 8   right?  That's what he said to you?

 9   A.    No.  That's not what he was saying.

10   Q.    Okay.  Let's -- if we could, let's go to -- back to

11   Exhibit 298 a minute.

12         You said (as read):

13             "I'm asking to have Owen replaced."

14         Up at the top; right?

15   A.    Yes.

16   Q.    Now, you don't work for CitiStaff, do you?

17   A.    No, I don't.

18   Q.    You never worked for CitiStaff, did you?

19   A.    No, I didn't.

20   Q.    So if it was suggested that CitiStaff somehow forced you

21   to say "I'm asking for Owen to be replaced," that would be not

22   correct; right?

23   A.    Umm --

24   Q.    CitiStaff had nothing to do with you asking to have

25   Mr. Diaz replaced; right?
```

1          MS. JENG:  Objection --

2    A.   It didn't matter who he reported -- or who he worked for.

3    I just had an issue with him working in that area because he

4    wouldn't communicate with my team about the needs of the

5    business.

6    BY MR. ORGAN

7    Q.   But to get Mr. Owen Diaz replaced, you didn't have to go

8    to CitiStaff, did you?

9    A.   No.  I --

10   Q.   You just went to Ed Romero?

11   A.   I just went to Edward, yes.

12   Q.   Okay.  Now, let's talk about, just real quick here, as of

13   November 2nd, you said that (as read):

14          "Owen Diaz, he's doing a great job over there."

15        Right?

16   A.   He was, yes.

17   Q.   And then you said on this bicycle incident.

18   A.   Yes.

19   Q.   Isn't it true there were lots of people riding bikes

20   around?

21   A.   Yes.  There were a lot of contractors riding bikes around.

22   Q.   And the one you singled out was Owen Diaz; right?

23   A.   He's the only one that I knew.

24   Q.   He's the only one you knew?

25   A.   He's the only one that I knew.  I only knew the elevator

1    staff that worked with me, and he's the only name that I had.

2    **Q.**   Isn't it true that in the October to December 2015 time

3    period, Owen made complaints about your folks; right?

4    **A.**   Not to me.

5    **Q.**   Didn't Ed Romero tell you that Owen Diaz had problems with

6    your leads at that point in time?

7    **A.**   No.

8    **Q.**   Your people complained a lot about the elevators, didn't

9    they?

10   **A.**   Yes, they did.

11   **Q.**   Let me ask you just another question.  Let's assume that

12   all your testimony about Owen's performance in that February

13   time period is correct.  Do you think that would justify him

14   being called the "N" word in the workplace?

15   **A.**   Absolutely not.

16   **Q.**   And would you agree that if Mr. Diaz had to endure hearing

17   the "N" word all over the Tesla factory, that would have been a

18   hostile work environment under the policies that you heard

19   about from Tesla; right?

20            **MS. JENG:**  Objection.  Argumentative.

21            **THE COURT:**  Overruled.

22            **THE WITNESS:**  If that had happened, it -- somebody

23   would have said something to me.  Over half my team was

24   African-American.  If anybody had stated that -- if anybody had

25   said something like that, it would have gotten back to me.

 1   They would have said something to me.

 2        And during this whole time, I never was told that this had

 3   had happened.  The only issues I had with Owen were based on

 4   his performance.

 5   **BY MR. ORGAN**

 6   **Q.**   Did you work in HR?

 7   **A.**   No, I didn't, but I worked very closely with HR.

 8   **Q.**   Oh, you did?

 9   **A.**   So if I had any wishes him and if I had heard that it

10   happened, I would have immediately contacted them.

11   **Q.**   Did HR ever tell you:  You know, we've got a lot of people

12   complaining about the "N" word?  No one --

13   **A.**   No, they didn't --

14   **Q.**   -- ever said that?

15   **A.**   -- tell me that at all.

16   **Q.**   And isn't it true, ma'am, that when you walked around the

17   factory, you could just hear the "N" word?

18   **A.**   No, you couldn't.  I worked there for nine years and that

19   was never an issue at Tesla.

20   **Q.**   You never heard the "N" word the entire time --

21   **A.**   Not at Tesla --

22   **Q.**   -- you worked there?

23   **A.**   -- no.  I --

24        **THE COURT:**  Excuse me.  Excuse me.  You're not having

25   an argument, either of you.

```
 1          So why don't you ask a question and let Ms. DelaGrande
 2   finish her answers.
 3   BY MR. ORGAN
 4   Q.   You never heard the "N" word the entire time you were in
 5   the factory; right?
 6   A.   No, I did not.
 7   Q.   And no one ever told you that the "N" word was present in
 8   the bathrooms or on general assembly?  No one ever said that to
 9   you?
10   A.   No, they did not.
11          MR. ORGAN:  Thank you.  No more questions, Your Honor.
12          THE COURT:  All right.  Any redirect?
13                    REDIRECT EXAMINATION
14   BY MS. JENG
15   Q.   Ms. DelaGrande, you testified earlier that it was your
16   understanding that Mr. Diaz would not talk to Robert Hurtado
17   and Hugo Gallegos; correct?
18   A.   Yes.
19   Q.   When you spoke with Mr. Diaz, was he also -- did he also
20   tell you that he was refusing to speak with Devin Williams?
21   A.   No.
22          MR. ORGAN:  Objection.  Leading, Your Honor.
23          THE COURT:  Overruled.
24   BY MS. JENG
25   Q.   If someone had reported to you that the "N" word -- that
```

1  they were being called the "N" word at work, would you have

2  been personally offended?

3  **A.**    Definitely.

4         **MR. ORGAN:**  Objection.  Relevance.

5         **THE COURT:**  Sustained.

6         **MR. ORGAN:**  Move to strike, Your Honor.

7         **THE COURT:**  It's stricken.

8         **MS. JENG:**  No further questions.

9         **THE COURT:**  All right.

10         **MR. ORGAN:**  Nothing further, Your Honor.

11         **THE COURT:**  All right.  You can step down.  Thank you,

12  Ms. DelaGrande.

13         **THE WITNESS:**  Thank you.

14         **THE COURT:**  You are excused.

15      (Witness excused.)

16         **MR. ORGAN:**  We're going to play the video now I think,

17  Your Honor.

18         **THE COURT:**  Okay.

19      So, ladies and gentlemen, we have another video.  Again,

20  this is a deposition that was taken under oath, and so you

21  should accept the testimony in the same way that you have the

22  testimony of people here in court.

23      And who is the witness?

24         **MR. ORGAN:**  Oh, I'm sorry, Your Honor.  This is

25  Annalisa Heisen.

1          **THE COURT:**  Okay.  The rest of it she'll have to

2   explain in the deposition.

3          **MR. ORGAN:**  Okay.  Your Honor, just for the record,

4   Exhibit 5 is actually Exhibit 6 in the trial.

5          **THE COURT:**  Okay.  And before you go on, I should have

6   said this at the beginning; that you just heard a phrase,

7   ladies and gentlemen, the "person most knowledgeable" to

8   testify about certain facts.

9          Testimony from a witness who's been identified by a

10  corporation has a person most knowledgeable represents the

11  company's knowledge, not the individual witness's knowledge.

12  The company must prepare the person most knowledgeable to

13  testify on the designated subjects and issues based on

14  information reasonably available from documents, current or

15  past employees, or other sources.

16         Because the testimony from the person most knowledgeable

17  reflects the company's knowledge rather than the individual

18  witness's personal knowledge, if a certain fact is within the

19  collective knowledge or subjective belief of the company, the

20  person most knowledgeable is allowed to testify to that fact,

21  even though the fact isn't within the personal knowledge of the

22  witness designated as the person most knowledgeable regarding

23  that fact.

24         Thus, a witness designated as the person most

25  knowledgeable is free to testify to matters outside of his or

1    her personal knowledge as long as they were within the

2    company's collective knowledge.

3        So with that understanding, let's proceed.

4            MR. ORGAN:  Thank you, Your Honor.

5                   **ANNALISA HEISEN**,

6    called as a witness for the Plaintiff herein, testified via

7    videotaped deposition played in open court, not reported.)

8            THE COURT:  All right.  So that concludes Ms. Heisen's

9    testimony.

10       Why don't we take our morning break at this point, and

11   we'll come back at about ten past 10:00.  Please remember the

12   admonitions.

13       (Jury exits the courtroom at 9:52 a.m.)

14       (Proceedings were heard out of presence of the jury:)

15           THE COURT:  We'll be in recess.

16           MR. ORGAN:  Your Honor?

17           THE COURT:  In a moment.  Everybody sit down, please.

18           MR. ORGAN:  Just one quick thing.

19       The timing on that, 16 minutes of that video were for the

20   plaintiff and 9 minutes were for the defendant.

21           THE COURT:  Okay, great.  Thank you.

22           MR. ORGAN:  That's all I had Your Honor.

23           MS. KENNEDY:  Your Honor, I just have a question.  Is

24   the plaintiff resting now?  Because I have Ramon Martinez as

25   the next witness, unless you have another witness in your

 1   case-in-chief.

 2          **MR. ALEXANDER:**  I couldn't understand anything.

 3          **MS. KENNEDY:**  Oh, I'm sorry.  Is plaintiff resting or

 4   am I going to bring Ramon Martinez in as our first witness --

 5   or second witness?

 6          **MR. ALEXANDER:**  Yes.  We are.  We're resting.

 7          **THE COURT:**  Okay.  When we bring the jury back, let

 8   them know.  And then we'll do Mr. Martinez.

 9       Thank you.

10          **MS. KENNEDY:**  Great.  Thank you, Your Honor.

11       (Whereupon there was a recess in the proceedings

12        from 9:53 a.m. until 10:10 a.m.)

13       (Proceedings were heard in the presence of the jury:)

14          **THE COURT:**  All right.  Please be seated, everybody.

15       Who is the next witness from the plaintiffs?

16          **MR. ORGAN:**  Your Honor, the plaintiff has no more

17   witnesses.  So we rest, Your Honor.

18          **THE COURT:**  All right.  So, ladies and gentlemen, the

19   plaintiffs have now put in their case, and it's the defense's

20   turn.

21       So Ms. Kennedy.

22          **MS. KENNEDY:**  Thank you, Your Honor.

23       Your Honor, the next witness for the defense is Ramon

24   Martinez.

25          **THE COURT:**  All right.

```
 1            THE CLERK:  If you'll step up and remain standing,
 2    I'll swear you in.
 3                        RAMON MARTINEZ,
 4    called as a witness for the Defendant, having been duly sworn,
 5    testified as follows:
 6            THE WITNESS:  Yes.
 7            THE CLERK:  Be seated.
 8         And if you would, please, state your full name for the
 9    record and spell it for the court reporter.
10            THE WITNESS:  Ramon Martinez.  R-A-M-O-N,
11    M-A-R-T-I-N-E-Z.
12            THE COURT:  Please proceed.
13            MS. KENNEDY:  Thank you, Your Honor.
14                       DIRECT EXAMINATION
15    BY MS. KENNEDY
16    Q.   Good morning, Mr. Martinez.
17    A.   Good morning.
18    Q.   Mr. Martinez, when did you come to the United States?
19    A.   I came into the United States in 1990, September 15th,
20    somewhere around.
21    Q.   And where -- let's talk a little bit about your
22    background.  Are you married?  Do you have any kids?
23    A.   Right now I'm married with three kids, 25 years of
24    marriage.  I got 24 older daughter, 21 son, and my youngest 18.
25    He's a handicap.  My two other kids are in college and excited
```

 1   for their future lives.

 2   **Q.**   And before you get to your assignment at Tesla, let's talk

 3   about some of your employment once you got the United States.

 4   **A.**   When I came to the States, I came as a -- I had a job as a

 5   busboy back then in one of the chains in the East Bay, Chevy's

 6   Mexican restaurant.  That employer gave me the opportunity to

 7   grow.  And at the end of my working life with them, I ended

 8   with three years of experience as a general manager for the

 9   company.

10   **Q.**   And was that restaurant Chevy's?

11   **A.**   Chevy's.

12   **Q.**   So you started as a busboy at Chevy's?

13   **A.**   I was close to 12 years working with them.

14   **Q.**   And what other jobs have you had prior to your assignment

15   at Tesla?

16   **A.**   Well, basically I was working for other different company

17   chains.  Like, I worked for Red Robin.  I worked for Cheesecake

18   Factory.  I also worked also for Denny's.  And the last company

19   I worked with was The Habit.

20   **Q.**   And at any of those jobs -- Chevy's or Red Robin or the

21   Cheesecake Factory or The Habit -- did you ever get any kind of

22   training regarding harassment or discrimination in the

23   workplace?

24   **A.**   Yes.  Obviously, through that time everything was

25   changing.  When I was working for Chevy's, the information

 1    about harassment wasn't much of a bigger part of that; but

 2    through the time, it start changing where we start getting more

 3    training about different types of harassment, which was verbal,

 4    picture, sounds, body language, and all the different kinds

 5    that I got involved in, too, harassment.

 6    Q.   When did you first start working at the Tesla factory in

 7    Fremont?

 8    A.   That was in 2015.  I would like to believe that was close

 9    to October, September, somewhere around.

10    Q.   And were you working for a staffing agency at the factory

11    in Fremont?

12    A.   Correct.  I was working for Chartwell --

13    Q.   Chartwell.

14    A.   -- Agency, and I got a hired as a lead for the graveyard

15    shift.

16    Q.   And you were a lead at the graveyard shift.  What part of

17    the factory or what department were you working in when you

18    first started working at Chartwell?

19    A.   I was working in the recycling department, basically in

20    the beginning or a little after the beginning of the recycling

21    department inside of Tesla.  We was in the big department, so

22    we were, with 17 employees, pretty much covering the whole

23    entire factory.

24    Q.   Okay.  And how long were you the lead on the graveyard

25    shift?

1  A.   Over two years.

2  Q.   So approximately 2015 to 2017, approximately?

3  A.   Yes.

4  Q.   And at some point in time were you working under

5  nextSource at all?

6  A.   All the time before I became a full Tesla employee, we all

7  employees from nextSource got transferred to Flagship, Inc.,

8  which was another company that used to supply -- or give the

9  services for the recycling department for Tesla.

10 Q.   At some point in time did you become a Tesla employee, a

11 direct employee?

12 A.   Correct.

13 Q.   And do you recall when that was?

14 A.   That was November of 2018, I believe.

15 Q.   November 2018?

16 A.   2018.

17 Q.   Okay.  And when you became a Tesla employee, what position

18 did you have then?

19 A.   As a lead as well.

20 Q.   Lead?  And were you in the same group?

21 A.   Yes.

22 Q.   So as a lead on the graveyard, tell me about your job

23 duties and responsibilities.

24 A.   Well, basically my duties are make sure that all the

25 process and all the material that we collect from other areas,

1    we sort through.  Basically make sure that all the cardboard

2    was 100 percent clean, and that afford us to gain much of the

3    cost when we sell it to our vendors.  And the same thing with

4    other products that we used to collect and sort.

5    **Q.**   So part of your job was to make sure all the cardboard was

6    cleaned so it could be recycled and sold?

7    **A.**   That's right.

8    **Q.**   And, again, to give me an idea, how much cardboard are we

9    talking about?

10   **A.**   So each bale weighs about 1400 pounds.  So we used to do

11   probably about, I will say, 15 bales to 17 bales per shift.

12   That was pretty much about thirty-four hundred thousand pounds

13   of cardboard.

14   **Q.**   You talked about the recycling department.  What is the

15   recycling department that you worked in at Tesla?

16   **A.**   Well, basically the department, like I mentioned before,

17   is -- we are in charge to make sure that all the recycling

18   product doesn't go to the landfill, so that way our company,

19   which is a green company, continued to be a green company all

20   over the world -- all over the place.  So we don't say one

21   thing and do a different thing by tossing all the -- or

22   throwing all the cardboard and plastic into the landfill.  So

23   that's pretty much our philosophy.

24   **Q.**   The folks that you worked with in the recycling, what type

25   of jobs did they have?  In other words, other than leads, who

1  else worked in the recycling department with you?

2  **A.**   I worked with pretty much sorters, which are the people

3  who are separating the cardboard, making sure there's no

4  contamination with cardboard, plastic foam.

5       We have forklift drivers.  We have -- at one point we used

6  to have tugger drivers.  Now we have loader excavators --

7  loader drivers, excavators, and skiff drivers.

8  **Q.**   All right.  Now, let's go to Owen Diaz.  Do you recall

9  when you first met Mr. Owen Diaz?

10 **A.**   Yes.  I remember when he got hired.  I think he was also

11 on the same shift as we are, graveyard.

12      Well, like, every single time that we have a new hire, we

13 embrace them.  We met them, and basically we -- we support the

14 new employee as many as -- in different ways in order for them

15 to feel well received.  We will welcome them into our

16 organization and whatever type of needs that they might have,

17 we should be willing and able to help them out.

18 **Q.**   At the time period -- let's talk about the summer of 2015

19 through early 2016 when you were a Chartwell employee.  During

20 that time period, did you have power to hire and fire anybody?

21 **A.**   No.  I'm a lead.

22 **Q.**   Did you have any ability to make -- I guess provide

23 performance evaluations, or that sort of thing, for other

24 employees?

25 **A.**   No.  The only thing that I was okay to do is pretty much

**MARTINEZ - DIRECT / KENNEDY**

1  when there was a situation with employees regarding any type of

2  misbehave, communicate it to my supervisor, and they will --

3  they will take care of the situation.

4  **Q.**   All right.  So after you first met Mr. Diaz, how would you

5  describe your working relationship, say in the first few weeks

6  that you met him and you knew him?

7  **A.**   I feel like it was really, really well working ethic.  He

8  was expressing himself.  He had been willing to grow with the

9  company.

10      He was also saying that anything that I know he would like

11  to know, so that way he can definitely get really familiar with

12  what we do at Tesla.

13      And, like I say, his goal was to -- he was really happy to

14  have the opportunity to work with the company and grow with the

15  company.

16  **Q.**   And did you and Mr. Diaz talk about personal things -- you

17  know, kids, families, that sort of thing -- if you recall?

18  **A.**   Umm, I don't recall that properly; but if we did, it was

19  really, really minimum.

20  **Q.**   Did Mr. Diaz ever tell you or talk to you about whether or

21  not his son Demetric Di-az worked at the factory?

22  **A.**   No.  I didn't know Demetric was his son until something

23  else.

24  **Q.**   And, Mr. Diaz -- I'm sorry.

25      Mr. Martinez, I have to ask you some questions about some

1   allegations that Mr. Diaz has made.  One of the allegations

2   that Mr. Diaz has made about you is that you called him the

3   "N" word.  Do you know what I mean by the "N" word when I say

4   that?

5         I'm going to say the word and we'll be referring to it as

6   the "N" word today.  Mr. Diaz claims that you called him

7   "nigger" more than 30 times.

8   **A.**   No.

9   **Q.**   Did you ever call him the "N" word even once?

10  **A.**   No.

11  **Q.**   Did you ever call Mr. Diaz "porch monkey"?

12  **A.**   I don't know of that word until we talk about it.  So,

13  like I say, I'm Hispanic, so there are a lot of terms of

14  things, words that I don't know myself.  So, no.

15  **Q.**   Did you ever say "N" and refer to Mr. Diaz by the Spanish

16  word *"mayate"*?

17  **A.**   No.

18  **Q.**   Have you heard that word *"mayate"*?

19  **A.**   I did hear that word before, but I never referred to

20  anyone, not anyone, not only him, not anyone.

21  **Q.**   And we have a new word we heard in this trial, and I want

22  to ask you about it.  Did you ever refer to Mr. Diaz calling

23  him the Spanish word *"chongo,"* C-H-O-N-G-O?

24  **A.**   No.

25  **Q.**   Do you know what that word means, *chongo*?

1  A.   I know *chongo* means "monkey"; but when we use it, we refer

2  to the animal.   Not as a -- meaning something else for a

3  person, no.

4  Q.   Mr. Diaz has also said at times when he was in the

5  elevator, you would use the "N" word and say things like:  Hey,

6  "N" word, hurry up.   Push the button.   Did you ever say

7  anything like that?

8  A.   No.

9  Q.   Did you ever say:  I hate all -- excuse me, I hate all

10 fucking "N" words?

11 A.   No.

12 Q.   Did you ever say anything to the effect you wanted, you

13 know, all these "N" words to die?

14 A.   No.

15 Q.   Did you ever use the "N" word at any time to or about

16 Mr. Diaz?

17 A.   No, I don't.

18 Q.   Let's go to October of 2015.   I'm going to ask you some

19 questions about an incident that you had with Mr. Diaz in the

20 elevator.   Do you recall that incident?

21 A.   Yes, I do.

22 Q.   Mr. Martinez, tell me what you recall about that incident.

23 A.   Well, I recall that the time that we have the incident, it

24 was a critical time for our department to move material from

25 second floor to the bottom floor.   Mr. Diaz, in that time he

 1   was the lead elevator operator of that elevator.

 2        So basically before he came out to the organization, we

 3   were able to operate the elevator.  When he got hired, he got

 4   hired as lead elevator operator of that -- those two elevators.

 5   Because there were -- there is two elevators through which we

 6   need to transport all the material that we collect from second

 7   floor to the bottom floor at specific times are really critical

 8   for -- it was critical in that moment because as soon as we get

 9   to the second -- closer to the first shift, which starts at

10   6:00 o'clock in the morning, all the materials that we need for

11   second floor to build up the batteries needs to be transported

12   through the elevator.

13        So I got a call from one of my teammates saying that he

14   has -- she has so many hard time to transport, to send the

15   material down because Mr. Diaz wasn't there.  And when she was

16   trying to use the elevator, that's when Mr. Diaz show up and he

17   start yelling and being aggressive against to her.

18        So that's at the time that I went to the elevator.  When I

19   was arriving to the elevator, Mr. Diaz --

20   **Q.**   I'm sorry.  I'm sorry.  You need to slow down.  The court

21   reporter is taking this down, and she's giving me a look of

22   stress.

23        **THE COURT:**  Why don't we proceed by questions and

24   answers?

25        **MS. KENNEDY:**  Okay.  Yes.

MARTINEZ - DIRECT / KENNEDY

```
 1  BY MS. KENNEDY
 2  Q.   So, Mr. Martinez, you said a team member came to you with
 3  some issues.  Who was that team member, if you recall?
 4  A.   Hilda Navarro.
 5  Q.   Navarro?
 6  A.   Navarro.
 7  Q.   So, Mr. Martinez, when this team member came to you with
 8  concerns, what were those concerns?
 9  A.   That she wasn't able to execute her job because Mr. Diaz,
10  he wasn't there.  And when he arrived and she was trying to use
11  the elevator, he was really aggressive in the way he was
12  talking to her.
13  Q.   And once you got that feedback from Ms. Navarro, what did
14  you do, if anything?
15  A.   Well, that was a phone call when she called me, so I was
16  out there helping some other team members.  So I just hopped in
17  the little cart, tugger, and drive all the way to Elevator
18  No. 1, which is the one -- the main one that he used to
19  operate.
20       And then I -- when I arrived there, he already was there.
21  So when I was -- I just go say:  What's going on?  Why we don't
22  get our material down?
23       And he was:  This is my elevator.  I do whatever.
24       And I goes:  What?  Excuse me.  This is the critical time
25  for the team to bring everything.
```

```
 1            THE COURT:  Mr. Martinez, slow down and let's go
 2   questions and answers so that we break this up a little bit.
 3            THE WITNESS:  Sorry.
 4   BY MS. KENNEDY
 5   Q.   Is this your first time testifying?
 6   A.   First time, yeah.
 7   Q.   Okay.  So when you got to the Elevator No. 1 and Mr. Diaz
 8   was there --
 9   A.   Uh-huh.
10   Q.   -- was anyone else there that you recall?
11   A.   Not that I remember.
12   Q.   Okay.  So when you got there and you saw Mr. Diaz, tell
13   me, what did Mr. Diaz do or say?
14   A.   He usually standing up at the front of the elevator.  And
15   basically I just went down and asked him:  What was the
16   problem?  Why we don't have our material coming down?
17   Q.   And then what did he say in response?
18   A.   He say:  This is my elevator, and I do things in the way I
19   want it.
20        And I was like:  Okay.  Your elevator.  Well, this is a
21   critical time for us and we need all the material to come down
22   before PC starts shutting everything down.
23   Q.   When you were and Mr. Diaz were yelling at each other, how
24   would you describe it?
25   A.   Well, we both were raising the voice.  I considered that
```

MARTINEZ - DIRECT / KENNEDY

1    probably we were yelling maybe, yeah, because we were raising

2    our voices.

3    Q.   Would you say it was a heated -- a heated exchange of

4    words?

5    A.   No.  I -- I don't know.

6    Q.   Okay.  So after you had this discussion with Mr. Diaz,

7    what happened next?

8    A.   Well, I -- I ended the conversation since he wasn't able

9    to work for a solution for the -- to set elevator right there.

10   I just turned around and I tell him I will send an email

11   regarding his attitude against to -- to the work.

12   Q.   And when you told Mr. Diaz you were going to send an

13   email, what did he say, if anything?

14   A.   I believe he said that he would send an email as well,

15   too.

16   Q.   And did you, in fact, send an email about this incident

17   with Mr. Diaz?

18   A.   I sent it to Mr. Romero, yes.

19   Q.   And why did you feel that you needed to send this email to

20   Mr. Romero?

21   A.   Because this is -- that was not the first time that I

22   heard complaints about his attitude, about his never being on

23   the work area to execute the job and when our teammates are

24   trying to use the elevator.  Like I say, we used to use the

25   elevator.  We knew how to operate the elevator.  He was

**MARTINEZ - DIRECT / KENNEDY**

```
1   aggressive against to them.

2   Q.   And at this time, one of the allegations that Mr. Diaz has

3   made against you is that during this exchange or this

4   interaction that you called him the "N" word.

5   A.   No.

6   Q.   Is that true or false?

7   A.   True, I didn't call him.

8   Q.   Okay.  And at any point in time during this interaction

9   with him, were any racial comments or slurs made by you at all?

10  A.   No.

11  Q.   So let's go to Exhibit 234.  And, Mr. Martinez, if you

12  will take a look at the black notebook that's right in front of

13  you.  There should be one there.

14       MS. KENNEDY:  And Exhibit 234 has been admitted,

15  Your Honor.

16       THE COURT:  Okay.

17  BY MS. KENNEDY

18  Q.   And do you see a tab there, sir?

19       (Document displayed.)

20  Q.   Mr. Martinez, take a look at the email that it appears you

21  sent to Mr. Romero and Mr. Torres on October 17th at 4:56 a.m.

22       Is this the email that you sent after that interaction

23  with Mr. Diaz?

24  A.   That's right.

25  Q.   Okay.  And it says it's sent at 4:56 a.m.  Is that the
```

1  right time you guys are at work?

2  **A.**   No.  I think the situation happened earlier.  Like I said,

3  just moving the sign.  I was trying to figure out other things

4  because, like I say, that specific times is critical for our

5  team to make sure that we get on top of all the areas.  That's

6  the reason I believe it's after the conversation or the

7  situation that I had with him.

8  **Q.**   And when you wrote in this email, Mr. Martinez, that

9  (as read)"

10         "He's not acting on the professional way with me,

11         and I would like to talk to you about it.  If there is

12         any situation, I'd like to fix it please."

13         What were you referring to there, sir?

14  **A.**   To the fact that he was -- where he say "my fucking

15  elevator," and he was in -- he was in tone of voice that

16  being -- I feel like aggressive.

17         And obviously him and I being leads, we should be able to

18  find a solution to the situation that we have at that moment or

19  at that specific time for our jobs.

20  **Q.**   Did you understand around that time that Mr. Diaz also

21  sent an email to Mr. Romero complaining about you?

22  **A.**   Not at that specific time but, no.

23  **Q.**   At any time during this interaction with Mr. Diaz, did you

24  ever threaten him?

25  **A.**   No.

1  Q.   Do you remember if you were on a tugger at the time?

2  A.   I was on a tugger.

3  Q.   You were on a tugger, okay.

4       And did you ever threaten to hurt him?  Threaten -- in

5  anyway threaten him physically?

6  A.   No.

7  Q.   While you were in this interaction with Mr. Diaz, did

8  Mr. Diaz say anything to the effect of:  Hey, there are cameras

9  here.  You've got to watch what you're doing?  Anything like

10  that?

11  A.   Yeah, he did.  And I believe everybody, we all know that

12  there's cameras right there because of previous incidents that

13  we used to have in that specific area.  So -- but, yeah, he

14  mentioned that there is cameras there.

15  Q.   This interaction with Mr. Diaz in the elevator, how did it

16  end?

17  A.   It end like we turned around and then he went his way and

18  I went my way.

19  Q.   Did you get the materials into the elevator and continue

20  to work?

21  A.   Not at this time that we wanted, but later it was taken

22  care of.

23  Q.   Okay.  After this incident with Mr. Martinez -- strike

24  that.

25       Mr. Martinez, after this incident with Mr. Diaz, say, in

 1   October of 2015, do you remember having any other interactions

 2   with Mr. Diaz until about January of 2016?

 3   **A.**   No.

 4   **Q.**   All right.  Let's go to Exhibit 1, please.

 5           **MS. KENNEDY:**  This has been admitted, Your Honor.

 6       (Brief pause.)

 7           **MS. KENNEDY:**  No, it's not working.

 8           **THE COURT:**  Ms. Davis?

 9           **MS. KENNEDY:**  Is it Exhibit 1?  Yeah, it's not on the

10   screen.

11           **THE COURT:**  Ms. Davis, is there anything we can do

12   about Exhibit 1?

13           **THE CLERK:**  Let me see.

14       (Photo displayed.)

15           **MS. KENNEDY:**  There we go.  Thank you.

16   **BY MS. KENNEDY**

17   **Q.**   So, Mr. Martinez, do you recognize the drawings on this

18   Exhibit 1?

19   **A.**   Yes.

20   **Q.**   And the cartoon, the character, whatever you want to call

21   it, with the "booo," you drew that; right?

22   **A.**   Correct.

23   **Q.**   Okay.  Now, tell me, how did these drawings come about?

24   **A.**   Okay.  I was about to start my shift and when I walk into

25   the recycling area, I see the -- the little picture of Pac-Man

 1   and the other two ghosts; meaning, swing shift morning angry

 2   shift.

 3   Q.   I'm sorry.  You said little ghosts?

 4   A.   Yeah.  Those ghosts right there, the Pac-Man is about to

 5   eat them.

 6   Q.   Okay.  And the writing, what is the writing?  It's a

 7   little hard to see.  What is the writing in green?

 8   A.   "Grave" and "morning."  Swing shift, that's the Pac-Man.

 9   Morning and graveyard are the two ghosts.

10   Q.   And at this time you're working the graveyard shift?

11   A.   Yes.

12   Q.   And to your knowledge, do you know who drew the Pac-Men?

13   A.   Not in that moment I don't know who was the person who did

14   it, but later on I find out who it was, the person who did it.

15   Q.   And who did you find out who drew the Pac-Men?

16   A.   Because I was asking to the morning crew who was that, who

17   did that, the little drawing.

18   Q.   Okay.  So someone on the morning crew drew that?

19   A.   Yeah.

20   Q.   All right.  And so do you know who wrote the word

21   "Pac-Man"?

22   A.   No.

23   Q.   No?

24   A.   I'm assuming it's the same person.

25   Q.   Okay.  So this Pac-Man -- before you drew the drawing to

1  the right, this drawing with the Pac-Men was already on the

2  bale?

3  **A.**   It was already on the bale.

4  **Q.**   And did you ever find out what was the reason why these

5  Pac-Men and swing and graveyard shift --

6  **A.**   Yes, and that is because time for recycling department, we

7  didn't have a machine to compact the cardboard.  And this is

8  the first machine inside Tesla that we got to start compacting

9  the cardboard.  And then there was a second one, because we

10  used to transport all the cardboard to the bottom floor and

11  send it to the only small baler that we have in the whole

12  entire factory.

13       So when I working and I see the picture and -- the meaning

14  was the swing shift was doing better job than the other two by

15  compacting more bales.

16  **Q.**   So this was a competition between the swing shift and

17  morning shift about compacting all the cardboard?

18  **A.**   Between all three shifts.

19  **Q.**   It's a competition among the three shifts as to compacting

20  the cardboard?

21  **A.**   The cardboard.

22  **Q.**   All right.  And so when did this competition start, if you

23  know?

24  **A.**   It wasn't a competition that we all talk about it.  It was

25  more, like, on the reports, we put the number of bales that we

1  made.  Always you will see it.  Oh, okay.  So I'm going to make

2  more.

3       And it kind of was a competition, but never we talk like:

4  Oh, I'm going to make more than you guys.  It was just a

5  challenge that we all have.

6  Q.   Okay.  And so you saw the competition.

7            MS. KENNEDY:  And then, Stephanie, I'm sorry, if you

8  could go to Exhibit 2, please, which has already been admitted.

9            MR. ORGAN:  I don't think it has, but we don't object.

10           THE COURT:  I'm not sure 2 is --

11           MS. KENNEDY:  Okay.  Then I move to admit Exhibit 2.

12  It's a bigger picture of the -- I think you used it in opening.

13           MR. ORGAN:  No objection.

14           THE COURT:  It's admitted.

15           MS. KENNEDY:  Exhibit 2.

16       (Trial Exhibit 2 marked for identification)

17       (Photo displayed.)

18  BY MS. KENNEDY:

19  Q.   In Exhibit 2 this is the drawing that you drew on that

20  large bale.  Why did you draw this particular drawing on this

21  bale of cardboard?

22  A.   At that moment I wasn't thinking anything else.  That

23  continued to have the little, I guess, game or competition that

24  we have, and I draw the little cartoon.  The -- in order for --

25  for just kind of, like, the Pac-Man or swing shift that we

**MARTINEZ - DIRECT / KENNEDY**

1   was -- we was -- we can be able to compete better than them and

2   do better things.  And the "booo" means like boo.  Like, boo

3   scary.

4   **Q.**   I'm sorry.  The "booo" was to scare the Pac-Man?

5   **A.**   To scare Pac-Man only.

6   **Q.**   And you say this is a cartoon.  What do you mean this is a

7   cartoon?  When you drew it, what did you mean?  Where did you

8   get this cartoon from, if you know?

9   **A.**   Well, in my childhood over in Mexico there was a cartoon

10  that I didn't know what's the title in English, but I know in

11  English is that Inki is a little bear.

12       But there was a cartoon, and it was a nice beautiful

13  cartoon that we used to watch, I believe it's for a while.  And

14  I learned to do that, and that's what where I get it from.

15  **Q.**   And so some point after you drew this, did Owen Diaz

16  approach you about this cartoon?

17  **A.**   Not Owen Diaz, but it was my -- that person I have a

18  gentleman who was working with me, Michael Wheeler.

19  **Q.**   Michael Wheeler.  Okay.

20  **A.**   And he came to me and he was like:  Ramon, we have a

21  problem.  Owen is really upset because somebody draw something

22  on one of the bales, cardboards.

23       And I was like, at that moment I don't understood that

24  that it means.  I'm like:  Oh, my God.  Please don't tell me

25  that was the -- the Pac-Man and the little other cartoon.

```
 1            He goes:  Yeah.
 2            So right then I said:  Michael, it was me, man.  I'm
 3       sorry.  I didn't know that meaning something else.
 4            So we went to the elevator and looked for Mr. Owens.
 5       Q.   I'm sorry.  So is it you and Michael Wheeler went over to
 6       Owen Diaz where he was at the elevator?
 7       A.   He was working at the Elevator No. 2, yes.
 8       Q.   And when Michael Wheeler approached you, did he tell you
 9       anything about Owen Diaz complaining about this drawing?
10       A.   Yeah, he did.
11       Q.   Okay.  What did Michael Wheeler tell you, if you recall,
12       about this drawing?
13       A.   He was -- he was really upset because somebody draw a
14       picture on the bales, and he -- he say, because I believe he --
15       Owen showed him the picture, or I don't know how Michael
16       Wheeler seen it.  I'm not sure about it.  But he say something
17       like:  To me, it's nothing, but obviously he's very upset.
18       Michael Wheeler, that was his words.
19       Q.   And when you learned from Michael Wheeler that Owen Diaz
20       was very upset, how did that make you feel at that moment?
21       A.   I was feeling, like, really -- I will say really upset
22       with myself because I never have any other meaning.  And
23       obviously I -- I feel bad, and that's the reason that I went to
24       look for him to let him know about that.
25            I didn't find out what exactly was the whole thing, but to
```

1  express myself that it wasn't other meaning that what I was

2  expressing already.

3  **Q.**   Did you draw this drawing shown in Exhibit 2 with the

4  intent of Owen Diaz seeing it?

5  **A.**   No.

6  **Q.**   Did you draw Exhibit 2 for the intent of anybody seeing it

7  and doing it in a racial manner?

8  **A.**   No.

9  **Q.**   Once you and Mr. Wheeler went over to the elevator where

10  Owen Diaz was, what happened then?

11  **A.**   He was working around the elevator.  And when I approached

12  him, I was saying:  Owen, I heard that you kind of upset about

13  something.

14      He goes:  Yeah.  He started expressing that somebody wrote

15  this picture in there, and it was really a racial thing for

16  black people.

17  **Q.**   And is that the first time you heard that this was viewed

18  as a racial thing?

19  **A.**   Yes.

20  **Q.**   Okay.  And when Mr. Diaz told you this can be viewed as a

21  racial thing, what did you say, if anything?

22  **A.**   I tell him right there that it was me.  I explain him the

23  meaning of my cartoon, never being able to -- never want to

24  hurt nobody.  And I didn't know that this kind of pictures can

25  hurt somebody else feelings.

```
 1          At that moment he expressed to myself:  Oh, it was you?
 2          And I goes:  Yes.
 3          And he goes:  Oh, I know you.  Don't worry about it.  I
 4   was about to send an email; but since it was you, I'm going to
 5   delete it.
 6   Q.   And did you ever apologize to Mr. Owen Diaz?
 7   A.   If I don't make myself --
 8          (Court reporter clarification.)
 9   A.   More than a few times.
10   Q.   Did you ever say to Mr. Diaz:  You people can't take a
11   joke?
12   A.   No.
13   Q.   Did you explain to Mr. Diaz why this was drawn with the
14   Pac-Men?
15   A.   That's right.
16   Q.   After you went back and you saw Mr. Diaz with Mr. Wheeler
17   at the elevator, what happened next, if anything?
18   A.   After that, well, I just -- I thought the situation was
19   already fixed and done, and I just went to do -- to do my
20   regular duties and he was doing his duties as well.
21   Q.   And at some point in time did someone from Chartwell
22   contact you about Mr. Diaz's complaints about this drawing?
23   A.   They never tell me about the complaint until I got to the
24   office, but they call me --
25   Q.   Okay.
```

1  **A.**    -- to the office and that they want to meet me because of

2  the situation.

3  **Q.**    And was that the Chartwell office?

4  **A.**    Yes.

5  **Q.**    And when you got to the Chartwell office, what happened

6  there?

7  **A.**    Well, they explain me the complaint from Mr. Diaz and,

8  like, I repeat again my version of what happened.  And

9  basically they want me to write my statement about the

10  situation.

11 **Q.**    And did you write a statement?

12 **A.**    Yes.

13        **MS. KENNEDY:**  All right.  Now, Stephanie, can we go to

14 287, Pages 3 through 5?

15        And these have been admitted, Your Honor.

16 **BY MS. KENNEDY**

17 **Q.**    And, Mr. Martinez, it may be in your notebook if you have

18 it.  There you go.

19        And if you can go to the third page of Exhibit 287.  It's

20 basically four pages -- I'm sorry, three pages exactly.

21        (Document displayed.)

22 **Q.**    Can you take a look at those three pages?  Are those the

23 three pages of your written statement when you were at the

24 Chartwell office?

25 **A.**    This is not my writing.

```
 1   Q.   Okay.  Mr. Martinez, please read that to yourself and let
 2   me know when you're done, okay?
 3        (Witness complied.)
 4   A.   I'm done.
 5   Q.   Okay.
 6        All right.  Let's go to the first page of your statement,
 7   which is Exhibit 287 at Page 3.  You see at the very top of
 8   that exhibit it says today's date, 1/22.  Is that 2006?
 9   A.   (No response.)
10   Q.   Okay.  And I'm going to read -- I'm going to make sure
11   this is your handwriting.  I'm going to make sure it's
12   understood.
13        Is that your handwriting in the first paragraph?
14   A.   Yes.
15   Q.   And did you write (as read):
16            "I understand that what I draw it was not okay,
17        but I never tried to offend nobody"?
18        Is that what you wrote?
19   A.   That's right.
20   Q.   And do you remember when you wrote this statement, was
21   there anyone present in the room with you?
22   A.   No.
23   Q.   Did anyone tell you what to write in this statement?
24   A.   No.
25   Q.   All right.  The next paragraph, Paragraph 2, which says
```

MARTINEZ - DIRECT / KENNEDY

```
 1   (as read):
 2            "Why would the alleged victim make such claims?"
 3        Did you write, correct me if I'm wrong (as read):
 4            "I don't know, like I say" -- I think is that
 5        "what"? -- "what I draw, it never mean nothing bad."
 6        Is that what you wrote?
 7   A.   Yeah.  Umm, I don't know -- I don't know.  Like I say,
 8   when I draw, it was never meaning nothing bad.
 9   Q.   Okay.  And the next paragraph, Paragraph 3, did you write
10   (as read):
11            "Yes, a picture that I draw."
12   A.   That's right.
13   Q.   If you go to Exhibit 287 at Page 4, the next page, in
14   Paragraph 4 is the first word that "what"?  (As read):
15            "What I draw nobody was around me."
16        Is that accurate?
17   A.   Right.
18   Q.   And if we go to Paragraph 5, does it read (as read):
19            "Yes.  After Owen saw the picture, Israel Zuniga
20        and Michael Wheeler where with us"?
21   A.   "With us."
22   Q.   "With us," okay.
23        And who is Israel Zuniga?
24   A.   He was the other lead from swing shirt.
25   Q.   Okay.  And now at the bottom of the statement there is a
```

 1   paragraph that says "For Additional Notes" and it goes for

 2   about a page.

 3        I'm going to read a couple lines.  I just want to confirm

 4   what you wrote here because it's in handwriting.  Is that okay?

 5   A.   Yes.

 6   Q.   So is it (as read):

 7             "In our area at work we process cardboard and one

 8        of the coworker" --

 9        Do you know who that is?

10   A.   Wenseslaa.

11   Q.   I'm sorry?

12   A.   Wenseslaa.

13   Q.   Wenseslaa.  (As read):

14        "...he draw a picture of a Pac-Man chasing two little

15        ghosts and the Pac-Man top he draw a swing shift name

16        and in the two little ghosts he put morning and grave

17        shift because he was playing on the -- on the way and

18        his shift, it is more organized.  And I draw the

19        cannibal just to let him know that my shift,

20        graveyard, can be better than his shift."

21        Is that accurate?

22   A.   That is right.

23   Q.   Okay.  Let's go to the next page at the top of Exhibit 287

24   at 5 (as read):

25             "And I wrote" --

MARTINEZ - DIRECT / KENNEDY

```
 1        Is that "I wrong" or "I wrote"?
 2   A.   "And I wrote that," yeah.
 3   Q.   (As read):
 4            "And I wrote the word 'booo.'"
 5        And the words are cut off there.  I don't know what those
 6   words are.
 7        (As read):
 8            "I never try to offend nobody with this draw
 9        and" --
10        Is that "went"?
11   A.   "And went Israel show up."
12   Q.   (As read):
13        "...went Israel show up to the area where I was
14        Q22" --
15        What is Q22?
16   A.   That's the column number where the recycling area.  It was
17   in there.
18   Q.   (As read):
19        "...and ask me if I know who draw that on their bale
20        of cardboard.  I say it was me.  He told me that Owen
21        was really upset about it.  That I say:  Wow, I
22        never" --
23        Does that mean "I never think"?
24   A.   "I never think."
25   Q.   (As read):
```

MARTINEZ - DIRECT / KENNEDY

```
 1            "...that it can be that bad.  So I went to see Owen
 2       and he was" --
 3       And is that "was working"?
 4  A.   "Was walking," "walking with Mike Wheeler."
 5  Q.   (As read):
 6       "...was walking with Mike Wheeler."
 7  A.   "I see him."
 8  Q.   (As read):
 9       "I see him.  So I tell Owen I'm sorry, I did draw the
10       picture and never mean nothing bad."
11       Is that accurate?
12  A.   Uh-huh.
13  Q.   (As read):
14            "I explain him all about it and he tell me that
15       white people use it for other purposes, but he
16       understand that coming from me it not be bad."
17       Is that accurate?
18  A.   That's right.
19  Q.   (As read):
20            "I" --
21       What's the next word?
22  A.   "I reply please forgive me."
23  Q.   (As read):
24            "I reply please forgive me and I apologized to
25       him again.  He also mentioned to me that he was about
```

**MARTINEZ - DIRECT / KENNEDY**

```
 1          to send an email to the office, but because it was me,

 2          he understand that my meaning on the picture that I

 3          draw wasn't bad and he was" --

 4          Or "he delete"?

 5   A.     "Delete the email."

 6   Q.     (As read)

 7               "...delete the email."

 8   A.     Uh-huh.

 9   Q.     And then you sign and date this?

10   A.     Yes.

11   Q.     And it says 4:30.  Is that 4:30 in the morning?

12   A.     4:30 p.m., I believe, because that was a statement that I

13   wrote at the agency.

14   Q.     All right.  Now, after you signed this statement, were you

15   ever given any discipline by anyone from Chartwell?

16   A.     Yes.

17   Q.     What type of --

18   A.     I was suspended for three days and they give me a final

19   write-up.

20   Q.     And were you suspended without pay?

21   A.     Without pay.

22   Q.     Did you think that discipline was fair?

23   A.     At that specific moment I never thought that it was good

24   or right.  What I thought it was a situation where we hurt

25   some -- someone else feelings, it should be some type of
```

 1   consequences.  And at that moment I feel that that was part of

 2   the consequences that I have to take.

 3       Unfortunately, just for me trying to continue having

 4   little game or little fun situation with my coworkers, I did

 5   what I did.  At that moment I was taking that -- those --

 6   those -- that kind of responsibility for the -- for the -- the

 7   way that my -- at that time my agency was correcting the action

 8   that I did.

 9   Q.   How has the -- this drawing and your discipline, how has

10   that changed you as a lead?

11   A.   Definitely it's a big weight on my back because, like I

12   say, me being Hispanic and also me being dark skin color, I

13   live myself discrimination or harassment in my childhood from

14   some of the kids I was growing up with.

15       When I came to the States and learning all about

16   harassments and working for the companies that I did work

17   before and having the knowledge about that, I should definitely

18   make a mistake that I'm -- I'm still reliving at this time.

19       And I'm still at this point right now I'm not feeling

20   confident when I talk to -- in front of my teammates because I

21   just want to -- I want to make sure that every single time that

22   I say something, I don't hurt no one else.

23   Q.   Since this, have you had any other HR issues, any

24   write-ups, any discipline whatsoever?

25   A.   No.

**MARTINEZ - DIRECT / KENNEDY**

1  Q.   To your knowledge, have you had any complaints against you

2  of any type --

3  A.   Not that I know.

4  Q.   -- imperfect behavior in the workplace?

5  A.   No.

6  Q.   And as a lead, how has this -- these complaints -- I know

7  you that deny by Mr. Diaz the allegations about the racial

8  slurs and this discipline.  How has that changed you in how you

9  deal with your coworkers as a lead?

10 A.   Well, now that every single time that -- every single time

11 that I come to see or start looking some of that kind of

12 situations, because in the African community --

13 African-American community they like to call themselves like

14 that a lot.  And I -- I stop them probably in the moment

15 because when people start using those kind of comments, someone

16 else might be -- they using it, it should be okay for me to use

17 it.

18      So I approach the situation where I get on the spot and

19 put people on the side, letting them know that at our workplace

20 it's not allowed to use that kind of language or games.

21 Q.   And, finally, how has these allegations and the fact that

22 you were disciplined and suspended, how has that affected you

23 personally in how you deal with your coworkers?

24 A.   Like I say, it's a situation where, first of all, like I

25 say, I never mean nothing else to hurt no one.  My confidence

1  got a little down to interact with some -- some -- with my

2  employees.

3      And in my personal life, it's -- I'm trying to make sure

4  that noticing my kids, they're -- they're living in this

5  beautiful country, not to use that kind of language.  Not to

6  treat or mistreat nobody on the wrong ways.

7      Even last night when I was preparing myself for today, I'm

8  still feeling not -- not perfectly well.  So some part of my

9  confidence, yes, it got affected.

10         **MS. KENNEDY:**  Your Honor, I have no more questions.

11         **THE COURT:**  All right.  Mr. Alexander.

12         **MR. ALEXANDER:**  Thank you.

13                **CROSS-EXAMINATION**

14  BY MR. ALEXANDER

15  **Q.**  Good morning, Mr. Martinez.

16  **A.**  Good morning.

17  **Q.**  A couple of preliminary questions.  You said that you were

18  hired at Tesla in October of 2015?

19  **A.**  I believe so, yes.

20  **Q.**  And you said that you welcomed Mr. Diaz to the workplace

21  when he arrived?

22  **A.**  Yes.

23  **Q.**  And when you welcomed him, what kinds of things did you do

24  to welcome him to the workplace when he arrived?

25  **A.**  Well, at that moment he was -- when he arrived to our

1   workplace, and I -- he -- I got the pleasure to introduce him.

2   I tell him:  Hey, welcome aboard.  Anything you need, please

3   let me know.

4       I express him what areas I was covering and anything that

5   he needs, feel free to let me know since we were -- or I was in

6   charge on graveyard shift to operate the elevator.

7   **Q.**   I believe we've heard testimony that Mr. Diaz started in

8   June of 2015 -- June, July, August, September, October --

9   approximately four months before you.  Does that refresh your

10  memory that Mr. Diaz was there before you arrived at the

11  workplace?

12  **A.**   He was after me so --

13  **Q.**   He was after you for sure?

14  **A.**   Yeah.  Yeah.

15  **Q.**   With regard to the elevators, there were actually cameras

16  inside the elevators; is that correct?

17  **A.**   I'm sorry.  Say that again.

18  **Q.**   Inside of the elevators, there were actually cameras

19  present; is that correct?

20  **A.**   Inside of the elevators?  I don't remember in that time.

21  I'm not sure.  I want to say, no.  There was only a camera

22  outside in front of the door of the elevator.

23  **Q.**   And you are currently a supervisor; correct?

24  **A.**   No.  I was a lead.  Now current, yes.

25  **Q.**   And when did you first become a direct employee of Tesla?

```
 1   A.   That was in November 2018, I believe.
 2   Q.   Now, with regard to Exhibit No. 287-005, if we could turn
 3   to that -- if we could turn to that page?
 4        That is your signature that appears on the document,
 5   right?
 6        (Document displayed.)
 7   A.   Yeah, that's mine.
 8   Q.   Is that your signature?
 9   A.   Yes.
10   Q.   Yes.  And it says 4:30 p.m.  Is that p.m.?
11   A.   P.m.
12   Q.   So basically the next day -- this incident occurred --
13   with regard to the finding the bale, that incident occurred the
14   night before on the 21st; right?
15   A.   Yeah.
16   Q.   And the next day on the 22nd at 4:30 p.m., that's when you
17   signed this; right?
18   A.   Uh-huh.
19   Q.   Yes?
20   A.   Uh-huh.
21   Q.   You have to say "yes."
22   A.   Yes.
23   Q.   Thank you.
24        And with regard to this document, if we could turn to the
25   first page, 287-003, this Chartwell Staffing document, how did
```

1    you receive it?

2    **A.**   I went into the office, and they give me those -- all

3    those documents or those papers too.

4    **Q.**   And when you say you went into the office, was that

5    on-site at Tesla or somewhere else?

6    **A.**   On-site at Tesla.

7    **Q.**   Okay.  And who was present inside the office that gave you

8    this Chartwell document?

9    **A.**   At that moment it was my manager, Veronica.  I believe her

10   last name is Martinez as well, too.

11   **Q.**   So Veronica gave you this document to fill out?

12   **A.**   Yes.

13   **Q.**   Okay.  And did she tell you that you were supposed to fill

14   it out?

15   **A.**   I -- before she give me those to fill them out, she

16   expressed the concerns and the situation that I was going

17   through.  And after that, she told me that she needed to have

18   my statement.

19   **Q.**   And how did you know that you were supposed to go to the

20   Chartwell office to fill out this document?

21   **A.**   Like I say, they call me.  I was on my -- I was at home

22   when they call me that I need to be there.

23   **Q.**   So you went home?

24   **A.**   Yes, because I worked the night before.

25   **Q.**   Okay.  So if I understand correctly, you worked the shift

1    and then you left to go home.  What time did you leave to go

2    home?

3    A.   7:30 or so in the morning.

4    Q.   Between the point when the incident occurred and 7:30 in

5    the morning when you left, did you speak to any supervisor,

6    such as Mr. Quintero?

7    A.   Well, I think you're kind of wrong on the days because the

8    incident happened, and I did talk to -- in that specific moment

9    Jaime Salazar was the supervisor.  I did express to him what

10   happened, and he advised me I have to call Mr. Wayne Jackson,

11   which I did.  And after that, then I got called from Chartwell

12   and take care of this.

13   Q.   So you spoke to Mr. Quintero that day?

14   A.   No.  Mr. Jaime Salazar.

15   Q.   Mr. Salazar.  I missed that.

16        And Mr. Salazar, is he your supervisor?

17   A.   He was the supervisor from Tesla, yes.

18   Q.   A Tesla supervisor.

19        And when is it that you spoke to Mr. Salazar, the Tesla

20   supervisor?

21   A.   Early in the morning --

22   Q.   Was that --

23   A.   Early in the morning when the incident -- after the

24   incident happened, the -- the same morning, and next day I --

25   because he used to work at 5:00 o'clock in the morning and

1    start doing his walk-throughs, and that's when I got -- between

2    5:00 and 7:00 between -- yeah, between 5:00 and 7:00 in the

3    morning, because I don't remember the specific time that I met

4    him and I talked to him about the situation.

5    Q.   And how long was your conversation with Mr. Salazar about

6    what happened with the bale?

7    A.   That was pretty much, I would say, 10 to 15 minutes.

8    Q.   And did you speak with anyone other than Mr. Salazar about

9    the incident involving the bale before you left to go home?

10   A.   No.  Usually he advise me to talk or call Mr. Wayne

11   Jackson, and I call him the same morning as well via phone.

12   Q.   So you called Mr. Jackson the morning of this incident;

13   right?

14   A.   Uh-huh.

15   Q.   Yes?

16   A.   Yes.

17   Q.   And when you called Mr. Jackson, was that before 7:30 when

18   you left Tesla --

19   A.   Yes.

20   Q.   -- or after 7:30?

21   A.   That was before 7:30.

22   Q.   When you were at Tesla, you next talked Mr. Wayne Jackson;

23   right?

24   A.   Yes.

25   Q.   How long did you talk to Mr. Jackson?

1    **A.**   Probably between, like I say, 10 minutes or so.

2    **Q.**   Did you speak to any other people about this incident

3    between the point when the incident happened and the point when

4    you arrived home?

5    **A.**   Not that I recall.  Just the people that was involved in

6    the whole conversation or situation.

7    **Q.**   So before you left work, before you left the Tesla

8    facility, you spoke to Mr. Salazar, a Tesla employee, and you

9    spoke to Mr. Jackson, a nextSource manager; correct?

10   **A.**   Correct.  Yes.

11   **Q.**   Okay.  So then at 7:30 you went home?

12   **A.**   Yes.

13   **Q.**   And then you received a phone call from someone.  Was that

14   Monica at Chartwell?

15   **A.**   Veronica.

16   **Q.**   Veronica.

17        Between the point you left at 7:30 and the point that

18   Veronica spoke with you, did you speak with anyone else from

19   Tesla?

20   **A.**   No.

21   **Q.**   What time did you go over to the Chartwell office to write

22   out this statement that is --

23   **A.**   I believe it was between 3:30 --

24   **Q.**   Approximately 3:30?

25   **A.**   -- p.m.

1  Q.   All right.  And you filled out the form while you were at

2  Chartwell?

3  A.   Yes.

4  Q.   Did Veronica ask you any questions about the information

5  you put inside this form?

6  A.   Before the -- I wrote that statement, definitely we

7  were -- I was sharing all the whole story of the incident.  And

8  I remember that she say that if I know that the situation that

9  I was.  And I say:  Well, yes, I understand, but the -- like I

10 say, I'm saying the whole meaning of that was never to hurt

11 nobody.

12 Q.   If we could turn to Exhibit No. 287-004, Paragraph 4,

13 where it says (as read):

14            "Nobody was around me."

15      At the point when you drew on this bale, where was it

16 physically?

17 A.   When I was doing the -- I'm sorry.

18 Q.   If we could show Exhibit No. 33.

19 A.   Okay.  So I was -- okay.

20         MR. ALEXANDER:  Can we show Exhibit No. 33?

21         MR. ORGAN:  Do you want the poster?

22         MR. ALEXANDER:  No.  Let's do it on the -- if we show

23 Exhibit No. 33 or Exhibit 1, whichever is easier.

24      (Photograph displayed.)

25         MR. ALEXANDER:  Thank you.

MARTINEZ - CROSS / ALEXANDER

```
 1   BY MR. ALEXANDER:
 2   Q.   At the point when you did this, where were you physically
 3   inside the factory?
 4   A.   I was inside of the area we call Q22.  The bale was right
 5   in front of where it comes out from the compacting machine, and
 6   that's what I am approaching.
 7   Q.   Now, when you were approaching, you indicate that the --
 8   were the Pac-Men already on there?
 9   A.   Yes.  It was already there, yes.
10   Q.   And who was it you later learned had written it?  I didn't
11   understand his name.  Can you spell it?
12   A.   Inki.  It's I-N-K, and I believe it's double E.
13   Q.   The character that you drew, the name of that character is
14   Inki?
15   A.   Inki.
16   Q.   Inki.
17        In your notebook there should be an Exhibit No. 133.
18             MR. ALEXANDER:  I provided a copy of 133 to defense
19   counsel.  There should be one inside of your notebook,
20   Your Honor.
21   BY MR. ALEXANDER:
22   Q.   If you look at Exhibit No. 133, when you refer to Inki --
23   if you look in the white notebook.
24   A.   Yes, that's the one.
25   Q.   -- is that what you intended to draw?
```

MARTINEZ - CROSS / ALEXANDER

1    A.    Yes.

2    Q.    Yes.

3            MR. ALEXANDER:  Your Honor, may Exhibit No. 133 be

4    introduced into evidence.

5            MS. KENNEDY:  Objection.  Relevance.

6            THE COURT:  Overruled.  You can put it in.  It's

7    admitted.

8        (Trial Exhibit 133 received in evidence)

9        (Document displayed.)

10           MR. ALEXANDER:  If you could split the screen and put

11   Exhibit No. 1 next to Exhibit No. 133, please.

12       (Document displayed.)

13   BY MR. ALEXANDER:

14   Q.    Mr. Martinez, if I understand correctly, when you saw that

15   bale, your thought was you had seen these Pac-Men that had been

16   written by -- I'm going to call him "W," since I can't

17   pronounce his name.  "W" wrote those Pac-Men on the side;

18   right?

19   A.    Uh-huh.

20   Q.    Yes?

21   A.    Yes.

22   Q.    And when you walked up, you decided to put Inki on there?

23   A.    Yes.

24   Q.    Okay.  With regard to the Pac-Men, they indicate different

25   shifts.  In other words, the morning, the evening, the swing

MARTINEZ - CROSS / ALEXANDER

1  are both indicated on there with a name; right?

2  A.   Yes.

3  Q.   Under your Inki, you didn't put the name of a shift.  You

4  put "booo"; right?

5  A.   Yes.

6  Q.   Now, how is "booo" associated with the Caveman Inki?

7  Could you explain that?

8  A.   "Booo" used to mean we're not afraid.  We're here.  We're

9  better.  That was my meaning.

10  Q.   I'm sorry?

11  A.   I say that my meaning of the word "booo" was like:  We're

12  not scared.  We're here.  We can do better.  There was no other

13  meaning behind that.

14  Q.   So Inki was it supposed to be a ghost like the other

15  Pac-Men ghost?

16  A.   No.  Inki, as you see, it's a cartoon.

17  Q.   And you refer to inside your document -- let's pull down

18  exhibit number -- let's pull down the drawing and put up, if we

19  could, 287-04, where it says "Additional Notes."

20       You say (as read):

21           "I draw the carnival."

22       I think you meant cannibal; right?

23  A.   Yes, sir.

24  Q.   So your intention was to draw a cannibal?

25  A.   No, sir.  I use that word because, like I say, I'm

1    Hispanic.  I'm from different culture.  I don't know how to use

2    the right words.  But never meaning different -- nothing else.

3    Q.   When you drew the Inki on there, is there a reason why you

4    drew it with big lips?

5    A.   No.  It's a cartoon.  It was fun.  It was really a

6    creative cartoon.  If you ever watch it, it was really fun to

7    watch it and it was just that.

8    Q.   Is there a reason why you drew it with a bone in the hair?

9    A.   Because I remember the cartoon.  If you look at the

10   cartoon, it has a bone, too.

11   Q.   So you were just drawing the cartoon?

12   A.   I was just drawing the cartoon.  Nothing else.

13   Q.   You indicated no one was around you at the point when you

14   drew this.

15   A.   Yes.

16   Q.   After you drew it -- I'm sorry.

17        It was your testimony that when you drew this, you did not

18   intend it for Mr. Diaz.  You intended it for your coworkers?

19   A.   Yes.  Like I say, having fun of the little game.

20   Q.   So with regard to -- I should read these notes.

21        So with regard to your writing the information on the

22   bale, did you leave it there inside your department so the

23   other people who had been joining in this joke could see it?

24   A.   Umm, not really.  That never was my thinking.  I think

25   that my thinking was just to follow or just make the -- do the

1    picture and just walk away.

2         Like I say, I never thought I was going to hurt somebody.

3    The thing is, like, if I -- if you believe that I was doing

4    something wrong, you would think -- the community of our

5    African-American people in our company is big.  Do you think

6    I'm going to do something like that so everybody can see it?

7    No.

8    Q.   So when you say "so everybody can see it," how long was

9    the bale sitting inside the workplace from the point it was

10   written on by you putting the Inki to the point when it got

11   over to the elevator by Owen?

12   A.   I would say probably over a couple hours.

13   Q.   A couple hours.

14        And so that means if it was sitting there for a couple of

15   hours, your coworkers would have had an opportunity to see it?

16   A.   I'm assuming.  I'm not sure about that.

17   Q.   Well, when you drew it so your coworkers could see it, the

18   objective was for them to see it; right?

19   A.   Yeah.  Yes.

20   Q.   And so after you drew it and after it sat there for an

21   hour, did you laugh and joke with any of your employees about

22   how funny it was?

23   A.   I never laugh with them because I never see them.  As soon

24   as I make the drawing, I just went down to the bottom floor to

25   take care of my responsibilities.  So I never wait for nobody

 1  to -- to see it and laugh with me about that.

 2  **Q.**   With regard to the bale, how did it get from your

 3  department to Owen's elevator?

 4  **A.**   It got transported from our team with a forklift or

 5  working area to the elevator.

 6  **Q.**   One of your teams did it, not you?

 7  **A.**   Correct.

 8  **Q.**   If I understand correctly, the purpose of your putting the

 9  drawing next to the Pac-Men is so that the other shifts could

10  see the drawing; right?

11  **A.**   No.  My purposes in that was just they were saying -- or

12  Pac-Man swing shift was saying they can be better than morning

13  and graveyard, and the meaning of that was just:  We're here.

14  We're not afraid.  We can be better.  But never to leave it

15  there to -- for others to see it.

16  **Q.**   With regard to your reference to "booo," B-O-O-O, you had

17  never seen that reference associated with the Caveman Inki, had

18  you?

19  **A.**   No.  No, not that I recall.

20  **Q.**   So the reference to "booo" was something that you added on

21  your own?

22  **A.**   That's right.

23          **MR. ALEXANDER:**  If we could put up Exhibit No. 1?

24          **MR. ORGAN:**  Do you want them both up?

25          **MR. ALEXANDER:**  Both off.  Exhibit 1 would be great.

1              **MR. ORGAN:**  Just one.  Okay.

2         (Photograph displayed.)

3    **BY MR. ALEXANDER**

4    **Q.**   With regard to Exhibit 1, that red thing that appears at

5    the top of the picture behind the bale, can you tell me what

6    that is?

7    **A.**   That's a forklift.

8    **Q.**   A forklift.  And so the forklift is behind the bale?

9    **A.**   It's lifting it to take it to the elevator, I believe.

10   **Q.**   So the forklift is in a position so that you -- so that

11   the "booo" is facing outward so it can be seen; right?

12   **A.**   Yeah.  In that picture, yes.

13   **Q.**   You indicate that after -- I believe you indicated that

14   Mr. Wheeler walked over to you inside the workplace and made an

15   inquiry; right?

16   **A.**   Say that again.

17   **Q.**   I believe it was your testimony that Mr. Wheeler initially

18   walked over and spoke with you and made an inquiry to find

19   out -- to investigate about this bale; right?

20        (Brief pause.)

21   **Q.**   Let me ask you a different question.

22   **A.**   He never came to me and told me.  When Mr. Wheeler

23   approached me, it was because he had already been talked to by

24   Mr. Diaz and find out that he was upset about the drawing on

25   that bale.

**MARTINEZ - CROSS / ALEXANDER**

1    Q.   The first person that came over and told you there was an

2    issue with regards to the bale, who was it?  Mr. Wheeler or

3    Israel Zuniga?

4    A.   I feel it was Mr. Wheeler because I was on the first

5    floor.

6    Q.   And when Mr. Wheeler first approached you, where were you?

7    A.   I was on the -- I was in another different area kind of

8    far away from that specific area where the bale was.

9    Q.   And before you had returned to the bale, you told

10   Mr. Wheeler -- you admitted to him that you had drawn the Inki

11   man, the Inki?

12   A.   Yes.

13   Q.   So before you returned to the bale, Mr. Wheeler already

14   knew that?

15   A.   Yes.

16   Q.   And then when you got to the bale, did you make any

17   statements to Mr. Diaz at that time?

18   A.   I just apologized to him and let him know the meaning of

19   my draw, and asked him to forgive me, and continue apologizing

20   for the situation because he was really upset.  Like I say,

21   never meaning another thing.

22   Q.   So at the point when you say you apologized to Mr. Diaz,

23   Mr. Wheeler was standing there; right?

24   A.   Mr. Wheeler and I believe Mr. Zuniga, too, as well.

25   Q.   So Mr. Wheeler would have heard you apologize at the point

 1    you made that statement?

 2    **A.**    Both of those guys, yes.

 3    **Q.**    And at the point when you made that statement, you were

 4    standing in the vicinity of the bale; right?

 5    **A.**    Yeah.

 6    **Q.**    All right.  And so Mr. Diaz would have heard you make that

 7    statement at that time?

 8    **A.**    Well, he heard me, right, because I was talking to him.

 9    **Q.**    Now, it's your testimony that sometime after that you had

10    a second conversation with Mr. Diaz?

11    **A.**    I never have a second conversation with him.  I never say

12    that.

13    **Q.**    I am confused.  You're going to have to help correct me.

14         You said that you apologized a second time to Mr. Diaz.

15    **A.**    Second time in the same conversation.

16    **Q.**    Same conversation?

17    **A.**    Uh-huh.

18    **Q.**    You have to say "yes."

19    **A.**    Yes.

20    **Q.**    Same conversation.

21         Okay.  So while you were standing in front of this bale,

22    you apologized once and then after that, you had a conversation

23    with Mr. Diaz where he told you that he was going to write an

24    email?

25    **A.**    Right.  I think you're having some different mix of story.

1   This is the story.

2       When I approach Mr. Diaz to talk about the situation, we

3   never went in front of the bale.  We were in another area close

4   to the elevator.

5   **Q.**   So when you had this second conversation with Mr. Diaz --

6   **A.**   Not second conversation.  Only one conversation.

7   **Q.**   Okay.  All right.  Let me try this:  You apologized once

8   when you were in front of the bale?

9   **A.**   Yes.

10  **Q.**   How much time passed --

11  **A.**   Not in front of the bale.  We never have the conversation

12  in the bale because the bale already was removed from the area.

13      Our conversation was on the side of the elevator where I'm

14  approaching Mr. Diaz.  And I obviously apologized, first of

15  all.  Then I -- I expressed to him the meaning of my picture.

16      Again, I apologize again and I ask him to forgive me.

17  Everything happened in the same conversation.  Never second

18  conversation.  Never in front of the bale.

19  **Q.**   Okay.  The first time you said you were sorry, you were

20  not in front of the bale?

21  **A.**   No.

22  **Q.**   No?

23  **A.**   No.

24  **Q.**   Is there any time when you were standing in front of the

25  bale with you, Israel, and Mr. Wheeler, and Mr. Diaz?

**MARTINEZ - CROSS / ALEXANDER**

1    A.    No.

2    Q.    All right.  So when you apologized the second time, when

3    you were on the side of the elevator, was the bale still at the

4    spot where it had been seen?

5    A.    No.

6    Q.    Someone had moved the bale?

7    A.    It was removed already.

8    Q.    When you first came up and apologized to Mr. Diaz the

9    first time, had the bale been moved then?

10   A.    I already told yes.  The conversation was on the side of

11   the elevator and the bale was never in the middle of Mr. Diaz

12   and myself and Zuniga and Wheeler conversation.

13   Q.    Okay.  So when you apologized the second time, was

14   Mr. Wheeler still around?

15   A.    Yes.

16   Q.    And when you apologized the second time, was Israel still

17   around?

18   A.    Yes, sir.

19   Q.    So if I understand correctly, during the same conversation

20   where you apologized the first time, Mr. Diaz volunteered to

21   you that he was going to write an email; right?

22   A.    That's right.

23   Q.    Yes?

24   A.    Yes, sir.

25   Q.    And then when he said that he was going to write an email,

1    your response to that was what?

2    **A.**   When he told me that he already was about to send an

3    email, I didn't say nothing else than, A, I'm sorry.  I

4    apologize.  Please forgive me.

5         And then he says:  You know what?  Since this is you and I

6    know you, I'm going to delete this email.  That's what he said

7    to me.

8    **Q.**   Now, when you said, "Since it's you and I know you," did

9    you have some relationship with Mr. Diaz?

10   **A.**   No, sir.  Only working relationship.

11   **Q.**   So you left this Inki there and you understood that he was

12   really upset about it from Mr. Wheeler; right?

13   **A.**   Yes, sir.

14   **Q.**   But within seconds of you walking over, you apologized to

15   him once that everybody heard; right?

16   **A.**   Yes.

17   **Q.**   And then you apologized a second time that everybody

18   heard?

19   **A.**   That everybody heard, yes.

20   **Q.**   And then Mr. Diaz volunteered that he was going to write

21   an email; right?

22   **A.**   That's right.  That's right.  He say that he already has

23   an email that he was about to send and now since he find out it

24   was me, he would delete it.

25   **Q.**   Is there any point where you told Veronica that this was

1   an Inki as opposed to a cannibal?

2   **A.**   No.   What I did tell her that was -- because she asked me

3   where did I get that idea of that drawing of mine.   I tell her

4   that it was a cartoon.   And in that specific moment I don't

5   remember the name of the cartoon.   So I just tell her it was a

6   cartoon that I remembered from my childhood.   I saw it.

7   **Q.**   Did you tell anyone that this was an Inki?

8   **A.**   Well, yes.

9   **Q.**   Who?

10  **A.**   After I find out -- oh, no.   In that specific moment, no.

11  Because, like I say, I don't remember that name of the cartoon.

12          **MR. ALEXANDER:**   So if I could -- if we could put on

13  the screen Exhibit 287-0005.

14      (Document displayed.)

15  **BY MR. ALEXANDER:**

16  **Q.**   If I understand your testimony, you returned from home,

17  went to the Chartwell office at about 3:30?

18  **A.**   Yes.

19  **Q.**   And you signed this document at 4:30 p.m. inside the

20  Chartwell office; right?

21  **A.**   Yes.

22  **Q.**   And other than speaking to Mr. Walker [sic] and

23  Mr. Salazar, those are the only two people that you spoke with

24  other than Veronica at the Chartwell office; correct?

25  **A.**   Yes.

1      **MR. ALEXANDER:**  If we could split the screen and show

2   Exhibit No. 272.

3      (Document displayed.)

4   **BY MR. ALEXANDER:**

5   **Q.**   With regard to Exhibit No. 272, which has previously been

6   received, it is an email from Victor Quintero, Friday

7   January 22, 2016, at 10:20 a.m.

8      **THE COURT:**  We don't have that on the screen yet, but

9   it's in the white binder.

10      **MR. ALEXANDER:**  Thank you.

11      (Document displayed.)

12   **BY MR. ALEXANDER**

13   **Q.**   And then it says (as read):

14      "Wayne" --

15      I'm sorry.  And, by the way, just so that you understand

16   the question, you signed this at 4:30 p.m.  And approximately

17   six hours before you signed it, there is an email from

18   Mr. Quintero that says (as read):

19      "Wayne, as we discussed in person, this is very

20      disappointing, especially coming from one of our team

21      supervisors.  I agree with the recommendation to

22      suspend and issue a permanent written warning.  Also

23      the apology from Ramon was a good starting point."

24      Did you have any conversation with Wayne between the point

25   you signed the document at 4:30 -- I'm sorry, before you signed

1    the document at 4:30 to tell him that you were -- that you had

2    apologized?

3    **A.**    Before that, like I say, the morning of the incident, I

4    talk to Mr. Salazar and he recommended to talk to my manager,

5    which was Wayne.  And I call him out and I expressed to him all

6    the situation.  And I did tell him that I apologized to

7    Mr. Diaz.

8        After this, I didn't have any idea about communication

9    between Mr. Quintero and Mr. Wayne Jackson.

10   **Q.**    Did Wayne Jackson or Mr. Salazar tell you that you needed

11   to write inside this document, Exhibit 287, that you had

12   apologized?

13   **A.**    No.

14   **Q.**    Did they tell you to write inside this document that Owen

15   Diaz had said that he was going to delete the email?

16   **A.**    No.

17   **Q.**    Did they tell that if you did this, you would only receive

18   a suspension of two days without pay?

19   **A.**    No.

20   **Q.**    After this date, you were hired as a direct employee at

21   Tesla; right?

22   **A.**    A couple years later, yes.

23   **Q.**    How long have you been working for Tesla as a direct

24   employee now?

25   **A.**    It's great.  I think I have been doing good job and they

PROCEEDINGS

 1    happy with me.

 2    **Q.**   How long?  How many years?

 3    **A.**   Over two years.

 4    **Q.**   Who's your supervisor right now?

 5    **A.**   My manager -- my a.m. manager is Alejandra Gonzalez.

 6    **Q.**   And who does she report to?

 7    **A.**   She reports to Howard Lowry.

 8         **MR. ALEXANDER:**  Nothing further, Your Honor.

 9         **THE COURT:**  Okay.  Any redirect?

10         **MS. KENNEDY:**  No more, Your Honor.

11         **THE COURT:**  All right.  You can step down

12    Mr. Martinez.  Thank you.

13         **THE WITNESS:**  Thank you.

14         (Witness excused.)

15         **THE COURT:**  All right.  Ms. Kennedy, what's next?

16         **MS. KENNEDY:**  Your Honor, the defense has no more

17    witnesses.  We would rest subject to just confirming our

18    exhibits with the clerk.  But we have no more witnesses for

19    today and the defense rests.

20         **THE COURT:**  All right.  Is there any rebuttal case?

21         **MR. ALEXANDER:**  No, Your Honor.  No rebuttal.

22         **THE COURT:**  All right.  Then, ladies and gentlemen,

23    that means that the evidence for this case is in and it's

24    before you, except what comes next are going to be the

25    instructions that I give you, the legal instructions.

1        You've heard a lot of evidence and now your job is going

2   to be putting the evidence into the legal instructions and

3   following the legal instructions and figuring out what all of

4   this means.  The lawyers -- so I'm going to give that to you on

5   Monday morning.

6        And then the lawyers will give their closing statements,

7   and they will tell you what they think the evidence has shown.

8        The evidence is in.  What they tell you isn't evidence,

9   but it does tell what you their perspectives of this case are.

10  And then you'll get the case for your deliberations.  And I

11  expect that between the instructions and the closing

12  statements, that will run a lot of the regular trial day on

13  Monday.

14       But then the case will go to you, and it will be up to you

15  to figure out how you're going to proceed with this, what times

16  you're going to be working.  You are free to work all Monday if

17  you want to, if you want to come back on Tuesday.  However you

18  do it, you'll be the ones who decide it.

19       So I'll have a lot of instructions for you about how the

20  deliberations work and so on.

21       What's critical now is even though you've heard all the

22  evidence, it's still very important to keep an open mind

23  because you haven't heard what the law is and you don't know

24  how the lawyers anyway put this case together in their minds,

25  and that all of that is going to be useful to you when you

 1    start your deliberations.

 2         So follow my instructions.  Forget about this case for the

 3    weekend.  Have a good time.  And don't do any research.  Don't

 4    communicate about it.  Don't think.  Just let it go and come

 5    back Monday morning and then the case will be in your hands.

 6         So have a great weekend, and I will look forward to seeing

 7    you.

 8         Again, keep coming at 8:15 and this case will get to you

 9    as soon as possible.  Thank you.

10         (Jury exits the courtroom at 11:33 a.m.)

11              **THE COURT:**  All right.  So we'll be in recess for

12    about 15 minutes, and then we'll come back and do the jury

13    instructions.

14              **MS. KENNEDY:**  Thank you, Your Honor.

15              **MR. ORGAN:**  Thank you, Your Honor.

16         (Whereupon there was a recess in the proceedings

17          from 11:33 a.m. until 11:55 a.m.)

18              **THE CLERK:**  Please come to order.

19              **THE COURT:**  Please be seated.

20         So we have had a couple iterations of the jury

21    Instructions.  I read the objections that people made.  I've

22    provided to you objected-to jury instructions and my current

23    resolution of those things, and so now we need to go through

24    everything and make sure that objections are made and we've

25    resolved the issues.

 1           So I will start with the objected-to jury instructions,

 2     and I'm just going to go through them one by one; and if

 3     anybody has an objection or comment, let me know.

 4           And we'll start with the one that is at the top of the

 5     page says Page 6, "Evidence for a Limited Purpose."

 6           Any objection?

 7                 MS. NUNLEY:  Yes, Your Honor.  Plaintiff objects to

 8     this instruction because Tesla has now sponsored testimony from

 9     Ms. DelaGrande saying she's never heard the "N" word anywhere

10     in the Tesla factory.

11           We would request a limiting instruction with respect to

12     Mr. Wheeler and Kawasaki and Jackson's identical testimony or,

13     in the alternative, we request a limiting instruction for

14     Ms. DelaGrande's testimony because there was no evidence from

15     Tesla from the time or places that she allegedly never heard

16     the "N" word.

17                 THE COURT:  All right.  Ms. Kennedy.

18                 MS. KENNEDY:  Page 6, "Evidence for a Limited Purpose"

19     instruction?

20                 THE COURT:  Yeah.

21                 MS. KENNEDY:  My understanding was this instruction

22     was given only because of Exhibit 106.

23                 THE COURT:  Well, I gave it for 106, but I also did it

24     after Mr. Jackson's testimony.

25                 MS. KENNEDY:  Right.

1    **THE COURT:**  And the reason that I didn't strike that

2   and the consistent testimony of the other witnesses, your

3   argument, I assume, is that their testimony applies equally

4   everywhere, and it applied equally to where Mr. Diaz was; but

5   that's what you have to argue, is that the hostile environment

6   was the environment in which Mr. Diaz was working.

7    **MS. NUNLEY:**  Yes, Your Honor.

8    **THE COURT:**  So I think the limited purpose -- I'll go

9   back and look at it one more time, but I think what I said is

10   consistent with what I said for the order on the Motion in

11   Limine and what I've told the jury already, Ms. Nunley.

12    **MS. NUNLEY:**  Yes.  And may I just ask, will a similar

13   limiting instruction be provided for Ms. DelaGrande's testimony

14   that she never heard the "N" word in the factory or is that

15   just for plaintiff to argue?

16    **THE COURT:**  I think you can argue that as you will.

17   That is the consistent Tesla argument; that nobody ever heard

18   that term.  And so that's -- I think that's what it's going to

19   be up to the jury to figure out.

20    **MR. ORGAN:**  Your Honor, thank you.

21    If I understand your instruction, the instruction is just

22   going to be as it's stated here (as read):

23    "When I have instructed you that an item of evidence

24    has been admitted only for a limited purpose, you must

25    consider it only for that limited purpose and not for any

1       other purpose."

2     You're not going to list out any of those times when you

3 did that; is that correct, Your Honor?

4         **THE COURT:** No. I'm going to go back to basically

5 what I said before to the jury. So I will be adding that in.

6         **MR. ORGAN:** You'll be going back to 106 and Jackson?

7         **THE COURT:** Yeah.

8         **MR. ORGAN:** Okay.

9         **MS. NUNLEY:** Nothing further, Your Honor, for this

10 one.

11         **THE COURT:** Okay. All right.

12     Page 28 "Apparent Agency." Any objections?

13         **MS. NUNLEY:** No objection from plaintiff, Your Honor.

14         **MR. ORGAN:** There is a typo, Your Honor. It says

15 "netSource." It should be "nextSource."

16         **THE COURT:** Thank you.

17         **MS. KENNEDY:** I'm sorry, Your Honor. Our objection to

18 this is that it should be between the plaintiff and CitiStaff,

19 not nextSource or Chartwell.

20         **THE COURT:** Okay. And would the plaintiffs like to

21 make a record with respect to why those three should be

22 included?

23         **MS. NUNLEY:** Yes, Your Honor.

24     Plaintiff's claims aren't relying upon a showing of joint

25 employer. He doesn't have to show a connection between

1    CitiStaff and Tesla to show that nextSource or Chartwell

2    acted as defendant's apparent agents and harmed him because his

3    claim is based on 42 U.S.C., Section 1981, and that can be

4    demonstrated by a showing of joint employment or a showing that

5    Mr. Diaz was in some type of contractual relationship with

6    Tesla, and Tesla or its agents or apparent agents harmed him.

7            THE COURT:  And, yes.  So the objection to "Apparent

8    Agency" is overruled.

9        Then going on to "Joint Employment," Page 31.  I added the

10    sentence to that instruction to deal with what the plaintiffs

11    had tried to do with every other instruction, to refer people

12    back to the "Joint Employer" instruction.  So I did just the

13    reverse of that.

14        Are there any objections to that?

15            MS. NUNLEY:  No, Your Honor.  We think that's the

16    perfect solution.

17        But I would just add, there's some references in the

18    instructions to "employ" or "employed," so we'd propose saying

19    "Whenever these instructions reference 'employment,'

20    'employer,' 'employee,' 'employ,' or 'employed.'"

21            THE COURT:  Okay.

22            MS. KENNEDY:  I'm sorry.  Are we looking at the "Joint

23    Employer" -- "Joint Employment"?

24            THE COURT:  "Joint Employment," yeah.

25            MS. KENNEDY:  Page 31?

**PROCEEDINGS**

1          THE COURT:  Yes.

2          MS. KENNEDY:  Okay.

3          THE COURT:  Do you have any objections to that?

4          MS. KENNEDY:  So I'm just -- so the addition is going

5     to be -- the part that you redlined, Your Honor, is going to

6     be:

7               "Whenever these instructions reference

8          'employment,' 'employer' or 'employee,' it can refer

9          to joint employment relationship if you find that one

10         exists."

11        Plus this information that Ms. Nunley just advised?

12         THE COURT:  Yes.  So adding to the string of words in

13    quotes "employ" or "employed."

14         MS. KENNEDY:  Okay.  That's fine.  No objection.

15         THE COURT:  Okay.

16        All right.  Then on to Page 32, "Plaintiff's Claims."  Any

17    objection to this?

18         MS. NUNLEY:  None from plaintiff, Your Honor.

19         MS. KENNEDY:  No objection, Your Honor.

20         THE COURT:  Okay.  Page 33.  This is the "Hostile Work

21    Environment - Harassment Because of Protected Characteristics

22    Elements."  Any objections?

23         MS. NUNLEY:  No objections from plaintiff, Your Honor.

24         MS. KENNEDY:  No objections.

25         THE COURT:  Page 34, "Severe and Pervasive Explained."

1          **MS. NUNLEY:**  We do have one small objection to the

2    title of the instruction.  It says "Severe and Pervasive" and

3    the standard is severe or pervasive.

4          **THE COURT:**  Okay.  Any objection besides that?

5          **MS. KENNEDY:**  No objection, Your Honor.

6          **THE COURT:**  Okay.

7          **MS. KENNEDY:**  Sorry.  I was thinking.  No.

8          **THE COURT:**  That's all right.

9      And then I thought that the plaintiff suggested that we

10   have an explanatory instruction on the alternative theories of

11   liability here, which I thought was appropriate.  That's why I

12   added it.

13     Are there any objections to this instruction?

14         **MS. NUNLEY:**  None from plaintiff, Your Honor.

15         **MS. KENNEDY:**  No, Your Honor.  But I think you should

16   add -- you probably need to add the negligent supervision as

17   well because if you compare this to the verdict form, this

18   appears to be three claims.

19         **THE COURT:**  Okay.

20         **MS. KENNEDY:**  I take that back.  I think the purpose

21   is to talk about the two different types of liability only

22   under Title VII, Section 1981.  That's what it says at the

23   bottom.  If that's the intent, then I'm okay with it.

24         **THE COURT:**  Yes.  That is the intent.

25         **MS. KENNEDY:**  Okay.  I guess we could probably just

 1   change the title "Alternative Theories of Liability as to

 2   Claim 1."

 3           THE COURT:  Okay.

 4           MS. NUNLEY:  And we have no objection to that proposed

 5   instruction.

 6           THE COURT:  All right.  Then Page 35, the "Hostile

 7   Work Environment Caused by Supervisor."  Any objections to this

 8   one?

 9           MS. NUNLEY:  Plaintiff does have one small proposed

10   addition.  In the second paragraph it says (as read):

11              "The plaintiff claims that he was subjected to a

12         racially hostile work environment by Tesla and that Ramon

13         Martinez was his supervisor."

14         It should include reference to Mr. Hurtado as well.

15           THE COURT:  That Mr. Hurtado was his supervisor?

16           MS. NUNLEY:  Yes.

17           THE COURT:  Okay.  Is there any objection to adding?

18           MS. KENNEDY:  Oh, absolutely not.  No objection to

19   that one.

20           THE COURT:  Okay.  And are you requesting that that be

21   an "and"?

22           MS. NUNLEY:  "Or."

23           THE COURT:  Okay.  So now that sentence reads (as

24   read):

25              "The plaintiff claims that he was subjected to a

1        racially hostile work environment by Tesla and that Ramon

2        Martinez or Robert Hurtado was his supervisor empowered by

3        Tesla to take tangible employment actions against the

4        plaintiff."

5             MS. NUNLEY:  Yes, Your Honor.

6             THE COURT:  Okay.

7        Page 36, "Supervisor Defined."  Any objections?

8             MS. NUNLEY:  No, Your Honor.

9             MS. KENNEDY:  Your Honor, no objection.  I just -- my

10  main concern is when you talk about sexual acts, I know it's an

11  example in the:

12             "Tangible employment action need not be adverse,

13        such as when a supervisor coerces an employee engaging

14        in sexual acts" --

15        (Court reporter clarification.)

16             THE COURT:  I'm sorry.  Tell me where you are.

17             MS. KENNEDY:  I'm sorry.  On Page 37.

18             THE COURT:  Okay.  So I haven't gotten there yet.  Are

19  you okay with 36?

20             MS. KENNEDY:  Oh, I'm sorry.  Yes.  I'm sorry.  I got

21  ahead.

22             THE COURT:  On 37 tell me what your issue is.

23             MS. KENNEDY:  Oh, just on 30 -- Page 37 just in the

24  second paragraph, think the purpose is to explain what a

25  tangible employment action is, and it refers to sexual acts.  I

 1   don't mind that.  I think it's a way to make it -- I think it's

 2   supposed to be explanatory.

 3          **THE COURT:**  Right.

 4          **MS. KENNEDY:**  And I think it comes right out of -- it

 5   comes out of the model instruction, so I'm -- I'm okay with

 6   that, but that's just only my concern.

 7          **THE COURT:**  Okay.

 8          **MS. KENNEDY:**  But otherwise no objection to Page 37.

 9          **THE COURT:**  Okay.  Do the plaintiffs have any comment

10   with respect to that?

11          **MS. NUNLEY:**  No.  I mean, I think from the example

12   it's clear that it's just descriptive, and this case is

13   obviously not about sexual acts, nobody has alleged sexual

14   acts.  So I think the risk of confusion is pretty minimal.

15          **THE COURT:**  I think not only -- I agree with you about

16   that, and I also suspect that we wouldn't come up with language

17   that was -- that everybody would think was fair enough to get

18   any more specific to this case.  So we'll leave that as it is.

19          Then on to Page 38, which is "Hostile Work Environment by

20   a Non-immediate Supervisor or Coworker."  Any objections to

21   that one?

22          **MS. NUNLEY:**  Yes, Your Honor.  With respect to the

23   last sentence, it states (as read):

24              "If, on the other hand, the plaintiff has failed to

25          prove either of these elements, your verdict should be for

 1          the defendant."

 2      We do have two alternative theories of liability so that

 3  statement isn't quite accurate.

 4          THE COURT:  How about "on this theory," because we

 5  list it out separately?

 6          MS. NUNLEY:  That would be fine, Your Honor.

 7          MS. KENNEDY:  And, Your Honor, I would say add that to

 8  the sentence before and the sentence after, to both sentences

 9  in the last paragraph.  So it should read:  "Your verdict

10  should be for the plaintiff on this theory," or "Your verdict

11  should be for defendant on this theory."

12          THE COURT:  Okay.  All right.

13          MR. ORGAN:  Theory of liability?  Is that -- I didn't

14  quite hear what you said.  If you could...

15          THE COURT:  I said "theory."  I'm happy to add of

16  "liability" if people would like that.  That's fine.

17          MR. ORGAN:  Thank you.

18          THE COURT:  Okay.  All right.  Page 41, "Negligent

19  Supervision or Retention of Employee."  Any comments on this

20  one?

21          MS. NUNLEY:  No comment, Your Honor, but did we skip

22  No. 40?

23          THE COURT:  On my sheet I did, but let me look at 40.

24      (Brief pause.)

25          THE COURT:  Page 40 is "Failure to Prevent

 1    Harassment."  So did you have a concern about this one.

 2              MS. NUNLEY:  No.  We have no objections to No. 40.  I

 3    just wanted to make sure we're on the same literal page.

 4    Sorry.

 5              THE COURT:  Okay.  So, yeah.

 6         Were there any objections that you had?

 7              MS. KENNEDY:  No objections to No. 40 as revised.

 8              THE COURT:  Okay.  And how about 41?

 9              MS. NUNLEY:  No objections to 41, Your Honor.

10              THE COURT:  Okay.

11              MS. KENNEDY:  Your Honor, my only issue with 41 is it

12    may be something that needed some timing because Mr. Martinez

13    did become an employee of Tesla years after Mr. Diaz was gone.

14         So I think that the first one, that Tesla employed Ramon

15    Martinez during or you say 2015-2016, or however we said that,

16    because --

17              THE COURT:  Mm-hmm.  That's fair enough.  Should we

18    put "during the time that Mr. Diaz worked at Tesla"?

19              MS. KENNEDY:  Yes.  I think that's probably easier,

20    yes.

21              THE COURT:  Okay.  And then Page 43.  Any comments on

22    that one?

23              MS. NUNLEY:  No, Your Honor.

24              MS. KENNEDY:  Your Honor, the only thing I think, it's

25    going to be between Tesla and CitiStaff.  That's at the bottom

 1   to be consistent with the other instruction.  I'm referring the

 2   Court to the last line.

 3          THE COURT:  Yeah.  I see where you are.

 4      And what's the plaintiff's comment on that?

 5          MS. NUNLEY:  I'm sorry.  Could you repeat the proposed

 6   change?  I couldn't hear you.

 7          MS. KENNEDY:  Certainly.

 8      So on Page 43 the very last sentence of that instruction

 9   where it says "between Tesla and nextSource, CitiStaff," it

10   should just be "between Tesla and CitiStaff."

11          MR. ORGAN:  Your Honor, we would object to that

12   because their discovery responses state specifically that they

13   hire nextSource to hire the staffing agencies, and so that's

14   the nature of the contractual relationship.

15      And the statute doesn't require that there's a direct

16   contract.  In fact, it could even be an implied contract as

17   Your Honor has noted to us.

18      So the contractual relationship can be between those three

19   entities.  That's what the testimony in the case is.

20          THE COURT:  All right.  Ms. Kennedy.

21          MS. KENNEDY:  Well, Your Honor, the way it's written,

22   so it's written now (as read):

23          "Plaintiff can establish his rights under the

24       contract" -- which contract? -- "if he shows that he

25       received benefits or privileges under the contractual

**PROCEEDINGS**

1          relationship between Tesla, nextSource, CitiStaff."

2          It's got to be -- they're suing Tesla.  So it's got to be

3     between Tesla and an entity, and plaintiff has to be a party to

4     some kind of contract or, as it says here, "privileges under

5     the contractual relationship."  So it's -- his employer was

6     CitiStaff.

7               THE COURT:  Okay.  I understand what your point is.

8     I'm going to go back to look at the -- I've got to do some

9     research on the underlying principles of this claim because

10    it's not -- because the distinction I think is whether

11    "contract" refers to his agreement that allowed him to work

12    there and the agreements that his prospective joint employer

13    had that were by contract established the liability on the

14    three claims that are in there.

15         So I will take a look at this --

16               MR. ORGAN:  Thank you, Your Honor.

17               THE COURT:  -- when I'm off the bench.

18         And then 46.

19               MS. NUNLEY:  No objections, Your Honor.

20               MR. ORGAN:  Well, actually there is.  As I just looked

21    at this again, Your Honor, there is one concern and that is, it

22    is not sufficient that you find the defendant's conduct

23    relative to punitive damages to be only negligence.

24               THE COURT:  Well, that's all the instruction is.  It's

25    about punitive damages.

1          **MR. ORGAN:**  I understand that, Your Honor.

2      Okay.  I mean, as long as there's no argument that this

3  standard somehow applies to the others, I think we're fine.

4          **THE COURT:**  All right.  Ms. Kennedy, any objection on

5  46?

6          **MS. KENNEDY:**  No objection.  I think in the context,

7  that makes sense, Your Honor.

8          **THE COURT:**  Okay.

9      All right.  Then instructions that we don't need.  In the

10 draft Final Jury Instructions, and I'm not sure that we're all

11 going to be looking at the same pagination so I'm going to just

12 go to titles.

13     There is an instruction that I'm adding, which is

14 "Evidence in Electronic Format," and that I will give with the

15 final instructions.

16     So when I go through the instructions, I stop after the

17 substantive instructions, and then I show the jury the verdict

18 form and explain how they're going to answer the -- how they

19 need to answer the verdict form.  Then I allow you to answer.

20     So that gives them some sense of hopefully what your

21 argument -- where your argument is going to be going.

22     And then after the argument is concluded, then I will do

23 the final deliberation instructions, and the "Evidence in

24 Electronic Format" will be with those.

25     So I don't think there has been any stipulated testimony

1  or stipulations of fact or judicial notice, so I would take

2  those out.

3           MS. NUNLEY:  And, Your Honor, I think the same applies

4  to Page 22, the "Charts and Summaries."

5           THE COURT:  Yeah.  I'm getting --

6           MS. NUNLEY:  Sorry.

7           THE COURT:  I'm moving right along here.

8       Yeah, and both of the charts and summaries I would take

9  out.

10      Is there any other instruction that anybody thinks should

11  not be given?

12           MR. ORGAN:  No, Your Honor.

13           MS. KENNEDY:  I agree.  No more, Your Honor.

14           THE COURT:  Okay.  Great.  So let's go to the verdict

15  form.

16           MS. NUNLEY:  So, Your Honor, we do think that the

17  Question 1, the text underneath it is a little confusing and

18  it's not clear that the jury can still answer yes or no on

19  Section 3(c).  And what plaintiff might propose doing is moving

20  Question No. 2 to Question 1.  Making current Question 1

21  Question No. 2.  And then putting current subsections 3(a) and

22  (b) under Section 1 and then making 3(c) its own question.

23      Does that make sense?

24           THE COURT:  I wasn't following you at all.  I'm sure

25  it was very clear, Ms. Nunley, but I didn't get it.

1          **MS. NUNLEY:**  I've got a lot of errors on my paper, but

2   what I would start with is we would propose taking --

3          **MR. ALEXANDER:**  Combine 2 and 3 --

4          **MS. NUNLEY:**  No, no.

5      We would propose combining Section 1 -- Question 1 with

6   segments 3(a) and (b) because they can't find for plaintiff on

7   3(a) or (b) unless they answer "yes" to Question 1.  So we

8   would propose grouping all of those together.

9          And then we propose making current Question No. 2 Question

10  No. 1, and then making subquestion 3(c) it's own question.

11         **THE COURT:**  Okay.  So -- you would have the first

12  question to be:  Was Owen Diaz subject to a racially hostile

13  work environment?

14         **MS. NUNLEY:**  Yes, Your Honor.

15         **THE COURT:**  You would have No. 2 be:  Was Tesla the

16  joint employer of Owen Diaz?

17         **MS. NUNLEY:**  Yes, Your Honor.

18         **THE COURT:**  And then:  Did Owen Diaz prove all of the

19  elements of (a) and (b)?

20         **MS. NUNLEY:**  Yes, Your Honor.

21         **THE COURT:**  And then -- okay.  And then the next one

22  was -- would be what?

23         **MS. NUNLEY:**  The next one would be:  Did Owen Diaz

24  prove all elements of Question 3(c)?

25         **THE COURT:**  (c)?

 1          **MS. NUNLEY:**  Yes.

 2          **THE COURT:**  Okay.  Okay.

 3          **MS. NUNLEY:**  And then we don't have any objections to

 4   Questions 4, 5 or 6, but with respect -- nor do we have any

 5   objections to Question No. 7.

 6          But with respect to Question No. 8, you know, it's

 7   plaintiff's understanding that even under the negligence

 8   standard, punitive damages might be available if the jury finds

 9   that Tesla either intentionally knew -- knew about the

10   harassment that Mr. Diaz suffered and failed to take action, or

11   Tesla acted with -- knew that harassment was going on in its

12   factory and acted with conscious disregard to Mr. Diaz's

13   federal rights --

14          There's a -- in other words, there is -- a plaintiff could

15   make a showing higher than the requisite negligence showing to

16   prevail on that claim.  And if plaintiff can make that

17   heightened showing, he would be entitled to punitive damages.

18          So providing for punitive damages only under Questions

19   3(a) or (c) is not -- is not an accurate statement of the --

20   all the circumstance under which plaintiff might be able to

21   obtain punitive damages.

22          **THE COURT:**  So I guess the real question is:  Is what

23   you just stated a true statement of the law?

24          **MS. NUNLEY:**  Yes, Your Honor.  If Tesla knew about

25   the -- if Tesla knew about the harassment that Mr. Diaz was

1  experiencing, and either maliciously or oppressively failed to

2  take action or acted in conscious disregard of Mr. Diaz's

3  rights, punitive damages would be available.

4      THE COURT:  Well, so typically that's true, but you

5  would have to establish that fact that's in the jury's mind,

6  and you're making -- your claim is one that falls under

7  negligence.

8      So maybe what you're suggesting is that there needs to be

9  a specific question that lays out:  Did Tesla act, you know,

10  maliciously, oppressively?

11      MS. NUNLEY:  Yes, Your Honor.  Especially in light of

12  defendant's objections, I think that question would be -- we

13  wouldn't have any objections to that separate question.

14      THE COURT:  All right.  So that's what you think.

15  What do you think, Ms. Kennedy?

16      MS. KENNEDY:  Well, I'll respond to Ms. Nunley's

17  issues.  I just want to make sure I understand it.

18  So plaintiff wants to move the current Question 2 as

19  Question 1?

20      MS. NUNLEY:  Yes.

21      MS. KENNEDY:  And make Question 1 Question 2?

22      MS. NUNLEY:  Yes.

23      MS. KENNEDY:  Okay.  My objection is to -- first to

24  that are, if there is no joint employer.  If there's no joint

25  employer, then they have to establish who is the employer, and

 1  it's not Tesla.  If Tesla was not the joint employer, you can't

 2  get to the next question about -- under title -- under

 3  Section 1981 about a racially hostile environment by Tesla.

 4      Let me explain.  So I think what they're trying to do is

 5  have the jury answer the first question.  Okay?  And then if

 6  the next question is "no," where does the jury go?

 7          MS. NUNLEY:  May I respond, Your Honor?

 8          THE COURT:  Yeah, go ahead.

 9          MS. NUNLEY:  I mean, I think -- I think in that then

10  we could have an instruction to the jury to proceed to the end

11  of the form -- proceed to the Question 3(c) to look at the

12  other bases for liability.  And then if they answer "no" to all

13  three the questions, then they proceed to the end of the form.

14          MS. KENNEDY:  Right, which is exactly the point.

15  That's why you ask the joint employer question first.

16          MS. NUNLEY:  I'm sorry?

17          MS. KENNEDY:  That's why you ask the joint employer

18  question first.

19          MS. NUNLEY:  Yes.  You -- Ms. Kennedy, the way we had

20  proposed doing it was plaintiff doesn't have to prevail on the

21  joint employer question in order to prevail under 42 U.S.C.

22  1981.

23      When you put the joint employer question first with the

24  subtext of "You must answer 'no' to Questions 3(a) and (b),"

25  it's not -- it's not clear that the answer to 3(c) could still

PROCEEDINGS

 1    be "yes."

 2        **MS. KENNEDY:**  The issue here, Your Honor, is they're

 3    suing Tesla.  That's the point.

 4        With the joint employer, there is a factual dispute as to

 5    whether or not Tesla can even be sued under Section 1981.

 6        If the -- if the -- given the instructions about, you

 7    know, apparent agency and the contractual relations, if all of

 8    that -- again making the assumption, assuming that the jury

 9    does not find that Tesla is a joint employer with CitiStaff or

10    whoever it's going to be, they can't be sued under

11    Section 1981.

12        If they -- if the answer to that question is "yes," then

13    you can follow along.  That's the prerequisite, that it's the

14    proper party under Section 1981.

15        **THE COURT:**  All right.  I'm not -- go ahead,

16    Ms. Nunley.

17        **MS. NUNLEY:**  Section 1981 isn't an employment statute.

18    There is no requirement that a plaintiff demonstrate joint

19    employment to prevail on 1981.  The plaintiff simply has to

20    show that he was discriminated against in the performance of a

21    contract either that he made or that he had rights under.

22        So I'd say that, you know, Ms. Kennedy's version seems to

23    not comport with the law.

24        **MS. KENNEDY:**  Your Honor, I would agree; but then if

25    that's the case, then we need another question as to -- as to

1    the contractual relationship.  It could be either/or.  But if

2    you're going to have just joint employer, either -- either

3    Mr. Diaz was an employee or either Mr. Diaz was in a

4    contractual relationship.

5         The contractual relationship question isn't here.  So you

6    can have the joint employer question and the contractual

7    relationship question to establish, okay, he's entitled -- I'll

8    make it easy -- he has standing under 1981.  And then you can

9    go into if that was true, then, in fact, was he subjected to a

10   racially hostile work environment.

11        Then if "yes," what hostile work environment is it?

12   Because that goes to the issue of damages.  Was it intentional?

13   Was it a non-supervisor?  Or was it the negligence standard?

14   Because that's going to define where you go for the damages.

15        If you answer any of those questions "yes," then you can

16   go to the failure to prevent.  Because if there is -- if there

17   is no harassment, you don't get the failure to prevent.  If

18   there is harassment, then you go to failure to prevent.  It's a

19   derivative claim.  Then from there you can go to your damages.

20        But it's sort of simple.  Proper party, violation of the

21   law, what theory, and then damages.

22             MS. NUNLEY:  So can I just ask a quick question?

23             THE COURT:  Yes.  Please.  Go ahead.

24             MS. NUNLEY:  So, Ms. Kennedy, just to make sure I'm

25   understanding what you're proposing.  You're objecting because

1  there is no separate question asking whether plaintiff was in a

2  contractual relationship with Tesla before the yes/no question

3  about liability under that claim?

4      **MS. KENNEDY:**  Yes.  Because then that would comport

5  with the jury instructions we just looked at as to how you get

6  Mr. Diaz basically coverage under Section 1981.

7      **THE COURT:**  So if that's acceptable to the plaintiffs,

8  we can add that in.

9      In general, what I do is I refer people back to the

10  instructions so that they -- instead of having all of the

11  questions that you were asking on your verdict form.  I think

12  it just gets needlessly complicated.

13      So as long as we send them back -- I understand what your

14  concern is on that.  As long as we send them back, I just --

15  the reason that I added the joint employer is that it seems

16  like a fundamental issue that the jury needs to think about.

17      **MS. KENNEDY:**  Your Honor, I think we can do that.  We

18  can direct them to both of those instructions or you can

19  have -- or you can have Question 1(a) and (b):  Was Tesla a

20  joint employer of Owen Diaz?  Instruction whatever.

21      (b), was Mr. Diaz in a contractual relationship with

22  Tesla?  Instruction.  If they answer "yes" to either of those

23  questions, then they go to the next question.

24      **MS. NUNLEY:**  You know, I would say that that's -- I

25  think that's redundant.

1        One of the elements -- so Question 3 asked:  Did Owen Diaz

2   prove all of the elements of...

3        And 3(c) is "liability on a civil rights violation in a

4   contractual relationship."  One of the elements of that claim

5   is a contractual relationship.

6        So I -- we agree with your position, Your Honor.

7        **THE COURT:**  Okay.  Well, so I will take -- I hear what

8   the issue is.  I'll take one more look at it when I get off the

9   bench, but I'm inclined to adopt the switch that Ms. Nunley was

10  suggesting there.  I think that might clarify it.

11       We've gone -- I've gone back and forth with wise people on

12  this.  So I'll continue to --

13       **MR. ORGAN:**  You mean Ms. Nunley there, Your Honor?

14  Because I think she is.

15       **THE COURT:**  All right.  So then going to punitive

16  damages, Ms. Kennedy, what's your response to Ms. Nunley's

17  argument and then the suggestion that I came up with as a

18  potential?

19       **MS. KENNEDY:**  Your Honor, I'm going to -- sorry, but I

20  didn't recall what Ms. Nunley said.  I was taking notes.  I'm

21  sorry.

22       **THE COURT:**  The issue on punitive damages, I limited

23  it to the non-negligence claims.

24       Ms. Nunley's argument is they could find under those

25  instructions negligent conduct, but they could also find a

1   malicious and hostile and all those behavior.  And so that they

2   should not -- the plaintiff should not be limited in the

3   negligence claims to not being able to get punitive damages if

4   they had shown the malicious conduct.

5          MS. KENNEDY:  Your Honor, I would disagree with that

6   and refer the Court to this case called *Ngo* -- N-G-O -- *vs.*

7   *Reno Hilton Resort Corp*.  It's 140 F.3d at 1299 and the

8   pinpoint cite is 1304.  It's a Ninth Circuit 1998 case.  And

9   the language -- basically the language of Section 1981 requires

10  plaintiffs seeking punitive damages to make a showing beyond

11  the threshold level of intent required for compensatory and

12  liability.

13      And then it goes on to explain (as read):

14          "An award of punitive damages under Title VII is

15          proper where the acts of discrimination giving rise to

16          liability are willful and egregious or display a

17          reckless indifference to the plaintiff's federal

18          rights."

19      It says (as read):

20          "However, punitive damages may not be awarded where a

21          defendant's conduct is merely negligent.  Thus, to be

22          entitled to an award of punitive damages, the plaintiff

23          must demonstrate that the defendant almost certainly knew

24          that what he was doing was wrongful and subject to

25          punishment."

1          And it goes on to cite some things that are relevant.

2          **THE COURT:**  I don't think you're saying different

3    things.

4          **MS. KENNEDY:**  I guess the question is, is that then I

5    think if the -- again, if we're going to do this, if it's going

6    to direct them back to the instruction with that language, then

7    I'm probably okay with it.

8          **MS. NUNLEY:**  I think -- sorry.  To make sure I'm

9    recalling correctly, I think Your Honor had proposed putting in

10   some language about intentional conduct here.

11         **THE COURT:**  Yes.

12         **MS. NUNLEY:**  And plaintiff would have no objection to

13   that.

14         **MS. KENNEDY:**  I'm sorry.  I did not understand you,

15   Ms. Nunley.

16         **MS. NUNLEY:**  Judge Orrick said he proposed putting the

17   language from the instruction in, I think, the last sentence

18   that he had added, saying you can only award punitive damages

19   if you find the defendant's conduct was malicious, oppressive

20   or in reckless disregard to plaintiff's rights, or something to

21   that effect.

22         **MS. KENNEDY:**  Okay.  If that limitation or that

23   clarification is added, then I'm okay with that, yes.

24         **THE COURT:**  All right.

25         **MS. KENNEDY:**  I think that will satisfy the issues

 1  regarding the three different theories.

 2          THE COURT:  Okay.  All right.  So I will fuss with

 3  that.

 4      Do you have any other concerns about the verdict form,

 5  Ms. Kennedy?

 6          MS. KENNEDY:  No, I don't believe so.

 7          THE COURT:  Okay.  All right.  So then we'll try to

 8  get the final instructions and the verdict form on ECF this

 9  afternoon.

10      If you have any additional problems or concerns, raise

11  them as fast as you can on the docket so that we can deal with

12  them at 8:00 o'clock, but I'm going to assume that we've

13  resolved all of this, and I can't think of anything else that I

14  need to say.

15      Is there anything else from the plaintiffs?

16          MS. NUNLEY:  No, Your Honor.

17          THE COURT:  From the defense?

18          MS. KENNEDY:  No, Your Honor.  Thank you very much.  I

19  appreciate it.

20          THE COURT:  Okay.  Well, I will look forward to

21  Monday.

22      (Whereupon at 12:35 p.m. further proceedings

23       were adjourned until Monday, October 4, 2021

24       at 8:00 a.m.)

25

# I N D E X

Friday, October 1, 2021 - Volume 5

|  | **PAGE** | **VOL.** |
|---|---|---|
| Plaintiff Rests | 754 | 5 |
| Defense Rests | 811 | 5 |

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **HEISEN, ANNALISA** | | |
| VIDEOTAPED TESTIMONY | 753 | 5 |

- - -

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **DELAGRANDE, JOYCE ANN** | | |
| (SWORN) | 710 | 5 |
| Direct Examination by Ms. Kennedy | 711 | 5 |
| Cross-Examination by Mr. Organ | 735 | 5 |
| Redirect Examination by Ms. Jeng | 750 | 5 |
| **MARTINEZ, RAMON** | | |
| (SWORN) | 755 | 5 |
| Direct Examination by Ms. Kennedy | 755 | 5 |
| Cross-Examination by Mr. Alexander | 788 | 5 |

—  —  —

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2 | 774 | | 5 |
| 133 | | 797 | 5 |
| 244 | | 718 | 5 |
| 251 | | 719 | 5 |
| 259 | 721 | 721 | 5 |
| 297 | | 727 | 5 |
| 298 | | 740 | 5 |
| 300 | | 744 | 5 |
| 303 | | 731 | 5 |

— — —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, October 1, 2021