Volume 6

Pages 843 - 992

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND )
LAMAR PATTERSON )
 )
 )
   Plaintiffs, )
 )
  vs. ) No. C 17-6748 WHO
 )
TESLA, INC., dba TESLA MOTORS, )
INC., CITISTAFF SOLUTIONS, INC., )
WEST VALLEY STAFFING GROUP, )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive, )
 ) San Francisco, California
   Defendants. ) Monday
 ) October 4, 2021
_____) 8:00 A.M.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**  ALEXANDER MORRISON & FEHR LLP
     1900 Avenue of the Stars
     Suite 900
     Los Angeles, California 90067
   BY: **BERNARD ALEXANDER, ESQ.**


     CALIFORNIA CIVIL RIGHTS LAW GROUP
     332 San Anselmo Avenue
     San Anselmo, California 94960
   BY: **LAWRENCE A. ORGAN, ESQ.**
    **CIMONE A. NUNLEY, ESQ.**

   **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:* *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
    Official Reporter - US District Court
    Computerized Transcription By Eclipse

**APPEARANCES:   (CONTINUED)**

**For Defendants:**          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                            333 S. Hope Street
                            43rd Floor
                            Los Angeles, California 90017
                      **BY:  TRACEY A. KENNEDY, ESQ.**


                            SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                            379 Lytton Ave
                            Palo Alto, California 94301
                      **BY:  PATRICIA M. JENG, ESQ.**


                            SHEPPARD MULLIN RICHTER & HAMPTON LLP
                            Four Embarcadero Center
                            17th Floor
                            San Francisco, California 94111
                      **BY:  SUSAN Q. HAINES, ESQ.**


**Also Present:**            **JOSEPH ALM, ESQ.**
                            - Tesla, Inc.

                            **YUSUF MOHAMED, ESQ.**
                            - Tesla, Inc.

                            **VALERIE CAPERS WORKMAN**
                             - Tesla, Inc.

                            —   —   —

PROCEEDINGS

```
 1   Monday - October 4, 2021                        8:03 a.m.

 2                    P R O C E E D I N G S

 3                         ---o0o---

 4        (Proceedings held in open court, outside

 5         the presence and hearing of the jury.)

 6        THE COURT:  All right.  There were a few things filed

 7   over the weekend.  I've given to you, or Ms. Davis has, the

 8   revised verdict form.  And I basically adopted everybody's

 9   tweaks to the form that made sense to me.

10        So if there are no objections to that, that's the form

11   that we will use.

12        MS. KENNEDY:  No objections from the defense.

13        THE COURT:  Okay.

14        MR. ORGAN:  Yeah.  No objections, Your Honor.

15        THE COURT:  All right.

16        MR. ORGAN:  Thank you.

17        THE COURT:  So there are three things.

18        One, according to the minutes from Friday, there are two

19   different exhibits that went in for the Master Services

20   Agreement of Tesla/nextSource.  One was Exhibit 3 and one was

21   called in the minutes anyway Exhibit 2.  I don't know whether

22   that was just a mistake on our part, and so we'll just take the

23   2 out.

24        I want to be sure that when the exhibits go to the jury,

25   that there aren't duplicates in there.
```

1          **MS. KENNEDY:**  Yes.  Exhibit 2 is another photo of the

2    bale.  Exhibit 3 is the agreement.

3          **THE COURT:**  Okay.

4      All right.  Then there are two other motions.  One was the

5    Motion for Judgment as a Matter of Law, and I'm not going to

6    hear argument right now on that.  I'm going to deny it.

7      If there is a joint employer relationship, there's

8    certainly a contract.  And that issue is left for the jury.

9      The Third Circuit relied -- the Third Circuit case that

10   was relied on by the defendant, *Faush versus Tuesday Morning* is

11   neither controlling nor on point.

12     Here the plaintiff contends that he had a contract with

13   Tesla and was a third-party beneficiary of the

14   nextSource/Tesla contract.  Unlike the plaintiff in *Faush*, the

15   contract is partly for his benefit.  No matter what it says, he

16   couldn't have been employed at Tesla without it, so that motion

17   is going to be denied.

18     The Motion to Strike Dr. Mahla's testimony, I think, has

19   been waived.  So I'm denying.  It's too late.  I think if it

20   had been raised at the time, I would have undoubtedly admitted

21   the testimony anyway, but I think that's been waived.

22     So that takes care of the issues that are in front of me.

23   Is there anything else that we need to do from the plaintiff's

24   perspective?

25          **MR. ORGAN:**  Your Honor, we'd just like to know our

PROCEEDINGS

```
 1   time.  We have it as 1 hour and 35 minutes.  Is that what the
 2   Court has?
 3            THE COURT:  Actually, we have even more time.  I can't
 4   believe that you're going to use that amount of time.
 5            MR. ORGAN:  No.  No, we're not.
 6            THE COURT:  It would be like Fidel Castro speaking
 7   for --
 8            MR. ORGAN:  Our intent is 1 hour and 15 minutes.  I
 9   just want to make sure I know how much we have.
10            THE COURT:  You've got -- I think our log was that you
11   had an 1 and 47 minutes.
12            MR. ORGAN:  1:47.  Okay.  Thank you, Your Honor.
13            THE COURT:  I'm very hopeful that I won't be hearing
14   you that long.
15        And the defendants have, like, five hours.  So I'm really
16   hoping I don't hear that long.
17            MS. KENNEDY:  Your Honor, I may need to cut down my
18   closing then.  I'm not sure.
19            THE COURT:  So is there anything else for you,
20   Ms. Kennedy, that we need to talk about now?
21            MS. KENNEDY:  No, Your Honor.
22            THE COURT:  Okay.  So -- Mr. Organ.
23            MR. ORGAN:  I apologize, Your Honor.  There is --
24            THE COURT:  Would you pull the mic closer?
25            MR. ORGAN:  Yeah.  There was one more thing.  We, per
```

1  the Court's instructions, have just lodged Exhibits 136, which

2  is the testimony of Kevin McGinn; 137, which is the testimony

3  of Demetric Di-az; 138, the testimony of Erin Marconi; and 139,

4  the testimony of Annalisa Heisen, Your Honor.

5          THE COURT:  Okay.  And this was the agreed-to final,

6  what was presented to the jury?

7          MR. ORGAN:  That's what -- that's the text of what the

8  video was -- that was played.

9          THE COURT:  Okay.  So that's -- those have been marked

10  for identification and for purposes of the Court of Appeals.

11  Those will not go back to the jury.  They are not admitted into

12  evidence, because the videos were played.

13      All right.  So what was the thing that I was going to say

14  before -- oh, I'll tell you how this -- we're going to proceed.

15      I'll give the instructions when the jury comes in.  We'll

16  take a ten minute -- five, ten-minute break so that you can

17  organize the courtroom in the way that you want it, and then

18  the plaintiffs can proceed with their closing.

19      I want to be sure that your plan is to lay out every

20  argument you're going to be making.  No new arguments come in

21  in rebuttal to the defendants.  So make sure that you've laid

22  it out in a fair way so that the defendants get a shot at the

23  points that you're going to be making.

24      And then we'll take a break after the plaintiff's closing

25  so that the defendants can reorganize the courtroom.  And then

1  we'll just shoot through the rest it.  So do the defendants,

2  then do the rebuttal, and I'll do the closing instructions

3  after that.

4      All right?  So hopefully everybody will be here, and we'll

5  get going whether they are.

6      (Whereupon there was a recess in the proceedings

7       from 8:09 a.m. until 8:32 a.m.)

8      (Proceedings held in open court in the presence and

9       hearing of the jury.)

10     **THE COURT:**  All right.  Please be seated everybody.

11     Ladies and gentlemen, good morning, welcome.  Thank you

12  for being here as promptly as you have been.  Let me tell you

13  what we're doing today.

14     The first thing that we're going to do is I'm going to

15  give you the instructions.  You'll see them on the screen.

16  You'll have a copy of them in the jury room for your

17  deliberations.  That will take awhile for me to -- to do the

18  instructions.

19     We'll then have a short break so that the room can be set

20  up for the plaintiff's closing argument.  Plaintiff will give

21  their closing argument.

22     We'll take another break for -- again, a short break.

23  Then the defense will give their closing argument.

24     The way that the rules work the plaintiffs have the last

25  word, so they get to do sort of a final rebuttal.

```
1          And then the case goes to you -- then I'll give you a few
2    final instructions about how you're supposed to go about doing
3    your duty and deliberating, and then the case will go to you.
4          So let me start with the instructions.
5                          FINAL JURY INSTRUCTIONS
6          THE COURT:  Members of the jury, now that you've heard
7    all of the evidence, it's my duty to instruct you on the law
8    that applies to this case.  A copy of these instructions will
9    be sent to the jury room for you to consult during your
10   deliberations.
11         It's your duty to find the facts from all the evidence in
12   the case.  To those facts you will apply the law as I give it
13   to you.  You must follow the law as I give it to you whether
14   you agree with it or not.  And you must not be influenced by
15   any personal likes or dislikes, opinions, prejudices, or
16   sympathy.  That means that you must decide the case solely on
17   the evidence before you.  You will recall that you took an oath
18   to do so.
19         Please do not read into these instructions or anything
20   that I may say or do or have said or done that I have an
21   opinion regarding the evidence or what your verdict should be.
22         First, I will remind you of some of the instructions I
23   gave you at the outset on evaluating the evidence before I get
24   into the substantive instructions.
25         When a party has the burden of proving any claim or
```

1    affirmative defense by a preponderance of the evidence, it

2    means you must be persuaded by the evidence that the claim or

3    affirmative defense is more probably true than not true.

4         You should base your decision on all of the evidence,

5    regardless which have party presented it.

6         The evidence you're to consider in deciding what the facts

7    are consists of:

8         The sworn testimony of any witness;

9         The exhibits that are admitted into evidence;

10        Any facts to which the lawyers have agreed; and

11        Any facts that I have instructed you to accept as proved.

12        In reaching your verdict you may consider only the

13   testimony and exhibits received into evidence.  Certain things

14   are not evidence, and you may not consider them in deciding

15   what the facts are.  I will list them for you.

16        Number one, arguments and statements by lawyers are not

17   evidence.  The lawyers are not witnesses.  What they have said

18   in their opening statements, may say in their closing arguments

19   and at other times is and has been intended to help you

20   interpret the evidence, but it is not evidence.  If the facts

21   as you remember them differ from the way the lawyers have

22   stated them, your memory of them controls.

23        Number two, questions and objections by lawyers are not

24   evidence.  Attorneys have a duty to their clients to object

25   when they believe a question is improper under the Rules of

 1  Evidence.  You should not be influenced by the objection or by

 2  the Court's ruling on it.

 3      Number three, testimony that's excluded or stricken or

 4  that you've been instructed to disregard is not evidence and

 5  must not be considered.  In addition, some evidence was

 6  received only for a limited purpose.  When I have instructed

 7  you to consider certain evidence only for a limited purpose,

 8  you must do so, and you may not consider that evidence for any

 9  other purpose.

10      Number four, anything you may have seen or heard when the

11  Court was not in session is not evidence.  You are to decide

12  the case solely on the evidence received at trial.

13      Some evidence may be admitted only for a limited purpose.

14  When I have instructed you that an item of evidence has been

15  admitted only for a limited purpose, you must consider it only

16  for that limited purpose and not for any other purpose.

17      I admitted Exhibit 106 for the limited purpose of your

18  consideration of the credibility of Ed Romero's testimony.  And

19  I allowed Wayne Jackson to testify about his experience hearing

20  the "N" word in the Tesla factory.  I want to remind you that

21  this case is about Mr. Diaz and the work environment that he

22  experienced at the Tesla factory, not what others in a

23  different part of the factory experienced.

24      Evidence may be direct or circumstantial.  Direct evidence

25  is direct proof of a fact, such as testimony by a witness about

1   what that witness personally saw or heard or did.

2   Circumstantial evidence is proof of one or more facts from

3   which you could find another fact.  You should consider both

4   kinds of evidence.  The law makes no distinction between the

5   weight to be given to either direct or circumstantial evidence.

6   It is for you to decide how much weight to give to any

7   evidence.

8        There are Rules of Evidence that control what can be

9   received into evidence.  When a lawyer asks a question or

10  offers an exhibit into evidence and a lawyer on the other side

11  thinks that it's not permitted by the Rules of Evidence, that

12  lawyer may object.  If I overrule the objection, the question

13  may be answered or the exhibit received.  If I sustain the

14  objection, the question cannot be answered and the exhibit

15  cannot be received.  Whenever I sustain an objection to a

16  question, you must ignore the question and must not guess what

17  the answer might have been.

18       Sometimes I may order that evidence be stricken from the

19  record and that you disregard or ignore that evidence.  That

20  means when you are deciding the case, you must not consider the

21  stricken evidence for any purpose.

22       In deciding the facts in this case you may have to decide

23  which testimony to believe and which testimony not to believe.

24  You may believe everything a witness says, or part of it, or

25  none of it.

1   **A.**   In considering the testimony of any witness, you may take

2   into account:

3        The opportunity and ability of the witness to see or hear

4   or know the things testified to;

5        The witness's memory;

6        The witness's manner while testifying;

7        The witness's interest in the outcome of the case, if any;

8        The witness's bias or prejudice, if any;

9        Whether other evidence contradicted the witness's

10  testimony;

11       The reasonableness of the witness's testimony in light of

12  all the evidence; and

13       Any other factors that bear on believability.

14       Sometimes a witness may say something that's not

15  consistent with something else he or she said.  Sometimes

16  different witnesses will give different versions of what

17  happened.  People often forget things or make mistakes in what

18  they remember.  Also, two people may see the same event, but

19  remember it differently.  You may consider these differences,

20  but do not decide that that testimony is untrue just because it

21  differs from other testimony.

22       However, if you decide that a witness has deliberately

23  testified untruthfully about something important, you may

24  choose not to believe anything that witness said.  On the other

25  hand, if you think the witness testified untruthfully about

1    some things but told the truth about others, you may accept the

2    part you think is true and ignore the rest.

3         The weight of the evidence as to a fact does not

4    necessarily depend on the number of witnesses who testify.

5    What is important is how believable the witnesses were and how

6    much weight you think their testimony deserves.

7         We all have feelings, assumptions, perceptions, fears and

8    stereotypes about others.  Some biases we're aware of, and

9    others we might not be fully aware of, which is why they are

10   called implicit or unconscious biases.  No matter how unbiased

11   we think we are, our brains are hard wired to make unconscious

12   decisions.  We look at others and filter what they say through

13   our own personal experience and background.  Because we all do

14   this, we often see life and evaluate evidence in a way that

15   tends to favor people who are like ourselves, or who have had

16   live experiences like our own.

17        We can also have biases about people like ourselves.  One

18   common example is the automatic association of male with career

19   and female with family.  Bias can affect our thoughts, how we

20   remember what we see and hear, whom we believe or disbelieve,

21   and how we make important decisions.

22        As jurors, you are being asked to make an important

23   decision in the case.  You must:

24        One, take the time you need to reflect carefully and

25   thoughtfully about the evidence.

1    Two, think about why you are making the decision you're

2    making and examine it for bias.  Reconsider your first

3    impressions of the people and the evidence in this case.  If

4    the people involved in this case were from different

5    backgrounds, for example, richer or poorer, more or less

6    educated, older or younger, or of a different gender, gender

7    identity, race, religion or sexual orientation, would you still

8    view them and the evidence the same way?

9    Three, listen to each other.  You must carefully evaluate

10   the evidence and resist, and help each other resist, any urge

11   to reach a verdict influenced by bias for or against any party

12   or witness.

13   Each of you have different backgrounds and will be viewing

14   this case in light of your own insights, assumptions and

15   biases.  Listening to different perspectives may help you to

16   better identify the possible effects these hidden biases may

17   have on decision-making.

18   And four, resist jumping to conclusions based on personal

19   likes or dislikes, generalizations, gut feeling, prejudices,

20   sympathies, stereotypes, or unconscious biases.

21   The law demands that you make a fair decision based solely

22   on the evidence, your individual evaluations of that evidence,

23   your reason and common sense, and these instructions.

24   If there is any news media account or commentary about the

25   case or anything to do with it, you must ignore it.  You must

1   not read, watch or listen to any news media account or

2   commentary about the case or anything to do with it.  The case

3   must be decided by you solely and exclusively on the evidence

4   that will be received in the case and on any instructions as to

5   the law that applies.  If any juror is exposed to any outside

6   information, please notify me immediately.

7        You may have taken notes to help you remember the

8   evidence.  Whether or not you took notes, you should rely on

9   your own memory of the evidence.  Notes are only to assist your

10  memory.  You should not be overly influenced by your notes or

11  those of other jurors.

12       A deposition is the sworn testimony of a witness taken

13  before trial.  The witness is placed under oath to tell the

14  truth and the lawyers for each party may ask questions.  The

15  questions and answers are recorded.  When a person is

16  unavailable to testify at trial, the deposition of that person

17  may be used at trial.

18       The deposition of Kevin McGinn was taken on June 17, 2019.

19  The deposition of Demetric Di-az was taken on May 15, 2018.

20  The deposition of Erin Marconi was taken on October 21, 2019.

21  The deposition of Annalisa Heisen was taken on May 29, 2019.

22  Insofar as possible, you should consider deposition testimony,

23  presented to you in court in lieu of live testimony, in the

24  same way as if the witness had been present to testify.

25       The evidence that a witness lied under oath on a prior

1  occasion may be considered, along with all other evidence, in

2  deciding whether or not to believe the witness and how much

3  weight to give the testimony of the witness and for no other

4  purpose.

5      Evidence was presented to you in the form of answers of

6  one of the parties to written interrogatories submitted by the

7  other side.  These answers were given in writing and under oath

8  before the trial in response to questions that were submitted

9  under established court procedures.  You should consider the

10 answers, insofar as possible, in the same way as if they were

11 made from the witness stand.

12     Evidence was presented to you in the form of admissions to

13 the truth of certain facts.  These admissions were given in

14 writing before the trial, in response to requests that were

15 submitted under established court procedures.  You must these

16 facts as having been proved.

17     You have heard testimony from Anthony Reading, Amy

18 Oppenheimer and Charles Mahla, who testified to opinions and

19 the reasons for their opinions.  This opinion testimony is

20 allowed because of the education or experience of these

21 witnesses.  Such opinion testimony should be judged like any

22 other testimony.  You may accept it or reject it, and give it

23 as much weight as you think it deserves, considering the

24 witness's education and experience, the reasons given for the

25 opinion, and all the other evidence in the case.

1    All parties are equal before the law and a corporation is

2    entitled to the same fair and conscientious consideration by

3    you as any party.

4    Under the law a corporation is considered to be a person.

5    It can only act through its employees, agents, directors or

6    officers.  Therefore, a corporation is responsible for the acts

7    of its employees, agents, directors and officers performed

8    within the scope of authority.

9    An agent is a person who performs services for another

10   person under an express or suppressor implied agreement and who

11   is subject to the other's control or right to control the

12   manner and means of performing the services.  The other person

13   is called a principal.  One may be an agent without receiving

14   compensation for services.  The agency agreement may be oral or

15   written.

16   An agent is acting within the scope of authority if the

17   agent is engaged in the performance of duties which were

18   expressly or impliedly assigned to the agent by the principal.

19   If Tesla has intentionally or unintentionally caused the

20   plaintiff to believe that nextSource or CitiStaff or

21   Chartwell was the principal's agent, a relationship known as

22   "apparent agency" may be created, even if no actual authority

23   was ever given to the agent.  Apparent agency, however, can

24   never arise solely from the acts of the alleged agent.

25   In order to establish apparent agency, the plaintiff must

1    prove that:

2         Number one, the alleged principal caused, by preparation

3    or action, the plaintiff to believe that nextSource,

4    CitiStaff or Chartwell was the principal's agent.

5         Number two, the plaintiff relied on this representation or

6    action to his detriment; and

7         Number three, such reliance was reasonably justified.

8         If an apparent agency has been established, the principal

9    is liable for the acts of the apparent agent just as if the

10   principal had authorized the agent from the outset.

11        A purported principal who ratifies the acts of someone who

12   was purporting to act as the principal's agent will be liable

13   for the acts of that purported agent, provided that the

14   principal made a conscience and affirmative decision to approve

15   the relevant acts of the purported agent while in possession of

16   full and complete knowledge of all the relevant events.

17        Any act or omission of an agent within the scope of

18   authority is the act or omission of the principal.

19        A person can have more than one employer.  The primary

20   consideration in determining whether a defendant is an employer

21   is the extent of control that it may exercise over the details

22   of the plaintiff's work.  In making this determination, all of

23   the incidents of the relationship must be assessed and weighed

24   with no one factor being decisive.

25        Factors that you may examine include, but are not limited

1  to, the skill required; the source of the instrumentalities and

2  tools; the location of the work; the duration of the

3  relationship between the parties; whether the hiring party has

4  the right to assign additional projects to the hired party; the

5  extent of the hired party's discretion over when and how long

6  to work; the method of payment; the hired party's role in

7  hiring and paying assistants; whether the work is part of the

8  regular business of the hiring party; whether the hiring party

9  is in business; the provision of employee benefits; and the tax

10 treatment of the hired party.

11       Whenever these instructions reference "employment"

12 "employer," "employee," "employ" or "employed, they can refer

13 to a joint employment relationship if you find that one exists.

14       Plaintiff brings three separate claims.  These claims are

15 for:

16       Number one, hostile work environment based on race.

17       Number two, failure to prevent harassment from occurring.

18       Number three, negligent supervision and retention of a

19 employee.

20       These claims are described in the following instructions.

21 The first two claims are civil rights claims brought under

22 federal law, and the third claim is brought under state law.

23 Each claim involves a distinct set of elements.  Some elements

24 are common to more than one claim.  That is, there's some

25 things that a plaintiff must show to succeed on one claim that

1    plaintiff must also show to succeed on one or more other

2    claims.  Although the claims have some elements in common, you

3    should consider each claim individually.  Plaintiff can succeed

4    on any claim only if he proves all of the elements of that

5    claim.

6        The plaintiff seeks damages against the defendant for a

7    racially hostile work environment while employed by the

8    defendant.  In order to establish a racially hostile work

9    environment, the plaintiff must prove each of the following

10   elements by a preponderance of the evidence.

11       Number one, the plaintiff was subjected to slurs, insults,

12   jokes or other verbal comments or physical contact or

13   intimidation of a racial nature.

14       Number two, the conduct was unwelcome.

15       Number three, the conduct was sufficiently severe or

16   pervasive to alter the conditions of plaintiff's employment and

17   create a racially abusive or hostile work environment.

18       Number four, the plaintiff perceived the working

19   environment to be abusive or hostile; and

20       Number five, a reasonable African-American man in the

21   plaintiff's circumstances would consider the working

22   environment to be abusive or hostile.

23       Whether the environment constituted a racially hostile

24   work environment is determined by looking at the totality of

25   the circumstances, including the frequency of the harassing

1  conduct, the severity of the conduct, whether the conduct was

2  physically threatening or humiliating, or a mere offensive

3  utterance, and whether it unreasonably interfered with an

4  employee's work performance.

5       "Severe or persuasive" means conduct that alters the

6  conditions of employment and creates a work environment that is

7  hostile, intimidating, offensive, oppressive, or abusive.

8       In determining whether the conduct was severe or

9  pervasive, you should consider all the circumstances, including

10 any or all of the following:

11      The nature of the conduct.

12      How often and over what period of time the conduct

13 occurred.

14      The circumstances under which the conduct occurred.

15      Whether the conduct was physically threatening or

16 humiliating.

17      Mr. Diaz does not have to prove that his productivity has

18 declined.  It is sufficient to prove that a reasonable person

19 who was subjected to the harassing conduct would find that the

20 conduct so altered working conditions as to make it more

21 difficult to do the job.

22      A single incident can be sufficiently severe or pervasive

23 to constitute harassment.

24      If you find that there was a racially hostile work

25 environment, Tesla will be liable for the harm Mr. Diaz

1  suffered pursuant to this claim if plaintiff proves all of the

2  elements of any one of the following three theories of legal

3  liability.

4      One, civil rights, Title VII, hostile work environment

5  caused by supervisor.  Claim based on vicarious liability.

6  Tangible employment action.  Affirmative defense (Number 30);

7  or

8      Two, civil rights, Title VII, hostile work environment

9  caused by non-immediate supervisor or by coworker.  Claim based

10  on negligence (Number 33 ); or

11      Liability for civil rights violations based on contractual

12  relationship (Number 38).

13      Those refer to the instructions that I'll be reading in a

14  moment.

15      If you find plaintiff has proved all elements of any one

16  of these legal theories, you must find in plaintiff's favor on

17  claim number one:  Racially hostile work environment.

18      An employer by be liable when an employee's supervisor

19  creates a racially hostile work environment for that employee.

20  A "supervisor" is someone who is empowered by the employer to

21  take tangible employment actions regarding the employee, such

22  as hiring, firing, failing to promote, reassigning with

23  significantly different responsibilities, or significantly

24  changing benefits.

25      The plaintiff claims that he was subjected to a racially

1    hostile work environment by Tesla, and that Ramon Martinez or

2    Robert Hurtado was his supervisor empowered by Tesla to take

3    tangible employment actions against the plaintiff.

4         The defendant denies the plaintiff's claim.  The plaintiff

5    must prove his claim by a preponderance of the evidence.

6         A supervisor is one who exercises immediate (or

7    successively higher) authority over the employee.  Whether

8    someone is a supervisor is not dependent upon job titles or

9    formal structures within the workplace, but rather upon whether

10   a supervisor has the authority to demand obedience from an

11   employee.

12        Tangible employment actions are the means by which a

13   supervisor brings the official power of the enterprise to bear

14   on subordinates.  A tangible employment action requires an

15   official act of the enterprise, a company act.  A tangible

16   employment action consists of a significant change in

17   employment status, such as firing, failing to promote,

18   reassignment, a significant change in responsibilities,

19   undesirable reassignment, or a significant change in benefits.

20        A tangible employment action need not be adverse, such as

21   when a supervisor coerces an employee into engaging in sexual

22   acts by threats of discharge.  In such a case, an employee need

23   not actually suffer discharge or other adverse employment

24   action to demonstrate a tangible employment action.

25        The plaintiff seeks damages from the defendant for a

1   hostile work environment caused by racial harassment.  The

2   plaintiff has the burden of proving both of the following

3   elements by a preponderance of the evidence.

4        Number one, the plaintiff was subjected to a racially

5   hostile work environment by a non-immediate supervisor or

6   coworker; and

7        Number two, the defendant or a member of the defendant's

8   management knew or should have known of the harassment and

9   failed to take prompt, effect remedial action reasonably

10  calculated to end the harassment.

11       A person is a member of management if the person has

12  substantial authority and discretion to make decisions

13  concerning the terms of the harasser's employment or the

14  plaintiff's employment, such as the authority to counsel,

15  investigate, suspend, or fire the accused harasser, or to

16  change the conditions of the plaintiff's employment.  A person

17  who lacks such authority' is nevertheless part of management if

18  he or she have has an official or strong duty in fact to

19  communicate to management complaints about work conditions.

20  You should consider all the circumstances in this case in

21  determining whether a person has such a duty.

22       The defendant's remedial action must be reasonable and

23  adequate.  Whether the defendant's remedial action is

24  reasonable and adequate depends on the remedy's effectiveness

25  in stopping the individual harasser from continuing to engage

1    in such conduct and in discouraging other potential harassers

2    from engaging in similar unlawful conduct.  An effective remedy

3    should be proportionate to the seriousness of the offense.

4        If you find that the plaintiff has proved both of the

5    elements on which the plaintiff has the burden of proof, your

6    verdict should be for the plaintiff on this theory of

7    liability.  If, on the other hand, the plaintiff has failed to

8    prove either of these elements, your verdict should be for the

9    defendant on this theory of liability.

10       Employers must take all reasonable steps necessary to

11   prevent harassment from occurring.  When an employer becomes

12   aware of potentially harassing conduct, it has a duty to

13   promptly investigate and to take immediate and effective

14   corrective action should it determine that harassment has

15   occurred.  Remedial measures need to include immediate

16   corrective action that is reasonably calculated to end the

17   current harassment and to deter future harassment.  The

18   remedial actions must be designed, in part, to deter future

19   harassment by the same offender or others.

20       Some of the steps employers can take to prevent harassment

21   from occurring include such things as affirmatively raising the

22   subject, expressing strong disapproval, conducting a timely,

23   thoroughly, good faith investigation of allegations of

24   harassment, which the defendant knew or had reason to know,

25   developing appropriate sanctions, informing employees of their

1  right to raise and how to raise the issue of harassment under

2  federal law, and developing methods to sensitize all concerned.

3  　　Owen Diaz claims that Tesla, Inc. failed take all

4  reasonable steps to prevent harassment based on race.  To

5  establish this claim, Mr. Diaz must prove all of the following.

6  　　Number one, that Mr. Diaz was an employee of Tesla or

7  providing services under a contract with Tesla.

8  　　Number two, that Mr. Diaz was subjected to harassment in

9  the course of employment.

10  　　Number three, that Tesla failed to take all reasonable

11  steps to prevent harassment.

12  　　Number four, that Mr. Diaz was harmed; and

13  　　Number five, that Tesla's failure to take all reasonable

14  steps to prevent harassment was a substantial factor in causing

15  Mr. Diaz's harm.

16  　　Owen Diaz claims that he was harmed by Ramon Martinez and

17  that Tesla is responsible for that harm because Tesla

18  negligently supervised or retained Ramon Martinez.  To

19  establish this claim, Owen Diaz must prove all of the

20  following.

21  　　Number one, that Tesla employed Ramon Martinez during the

22  time that Mr. Diaz worked at Tesla;

23  　　Number two, that Ramon Martinez was or became unfit or

24  incompetent to perform the work for which he was employed;

25  　　Number three, that Tesla knew or should have known that

1  Ramon Martinez was or became unfit or incompetent and that this

2  unfitness or incompetence created a particular risk to others;

3       Number four, that after Tesla knew or should have known of

4  Ramon Martinez's unfitness or incompetence, it retained or

5  supervised Ramon Martinez in his position at Tesla's factory.

6       Number five, that Ramon Martinez's unfitness or

7  incompetence harmed Owen Diaz.

8       And number six, that Tesla's negligence in supervising or

9  retaining Ramon Martinez was a substantial factor in causing

10  Owen Diaz's harm.

11       A substantial factor in causing harm is a factor that a

12  reasonable person would consider to have contributed to the

13  harm.  It must be more than a remote or trivial factor.  It

14  does not have to be the only cause of the harm.

15       Conduct is not a substantial factor in causing harm if the

16  same harm would have occurred without that conduct.

17       Plaintiff asserts a Section 1981 civil rights claim

18  against Tesla, Inc.  Plaintiff can prove this claim by

19  establishing that he was an employee of Tesla, Inc.

20  Alternatively, plaintiff may establish liability against Tesla

21  by showing all of the following:

22       One, plaintiff gained rights or was a beneficiary under a

23  contract;

24       Two, Tesla engaged in racial discrimination or harassment

25  in the enforcement of the contract, or Tesla failed to take

1  reasonable steps to prevent harassment from occurring in the

2  workplace; and

3      Three, plaintiff suffered injuries that he would not have

4  suffered but for the defendant's conduct.

5      Plaintiff need not have signed the contract, nor have been

6  a party to the contract, in order to have rights under the

7  contract.  Plaintiff can establish his rights under the

8  contract if he shows that he received benefits or privileges

9  under the contractual relationship between Tesla and

10  nextSource or CitiStaff, and the contracting parties intended

11  that Diaz receive benefits or privileges that were not

12  incidental or remote.

13      It's the duty of the Court to instruct you about the

14  measure of damages.  By instructing you on damages, the Court

15  does not mean to suggest for which party your verdict should be

16  rendered.

17      If you find for the plaintiff, you must determine the

18  plaintiff's damages.  The plaintiff has the burden of proving

19  damages by a preponderance of the evidence.  Damages means the

20  amount of money that will reasonably and fairly compensate the

21  plaintiff for any injury you find was caused by the defendant.

22  You should consider the following.

23      In determining the measure of damages you should consider:

24      The nature and extent of the injuries;

25      The loss of enjoyment of life experienced and that with

1  reasonable probability will be experienced in the future;

2      The mental or emotional pain and suffering experienced and

3  that with reasonable probability will be experienced in the

4  future;

5      The reasonable value of necessary medical care, treatment,

6  and services that with reasonable probability will be required

7  in the future.

8      It is for you to determine what damages, if any, have been

9  proved.  Your award must be based upon evidence and not upon

10  speculation, guesswork or conjecture.

11      The plaintiff has a duty to use reasonable efforts to

12  mitigate damages.  To "mitigate" means to avoid or reduce

13  damages.

14      The defendant has the burden of proving by a preponderance

15  of the evidence:

16      One, that the plaintiff failed to use reasonable efforts

17  to mitigate damages; and

18      Two, the amount by which damages would have been

19  mitigated.

20      If you find for the plaintiff, you may, but are not

21  required to, award punitive damages.  The purposes of punitive

22  damages are to punish a defendant and to deter similar acts in

23  the future.  Punitive damages may not be awarded to compensate

24  a plaintiff.

25      The plaintiff has the burden of proving by a preponderance

1   of the evidence that punitive damages should be awarded based

2   on his hostile work environment claim or failure to prevent

3   harassment claim and, if so, the amount of any such damages.

4        You may award punitive damages only if you find that the

5   defendant's conduct that harmed the plaintiff was malicious,

6   oppressive, or in reckless disregard of the plaintiff's rights.

7   Conduct is malicious if it is accompanied by ill will, or

8   spite, or if it is for the purpose of injuring the plaintiff.

9        Conduct is in reckless disregard of the plaintiff's rights

10  if, under the circumstances, it reflects complete indifference

11  to the plaintiff's safety or rights, or if the defendant acts

12  in the case of a perceived risk that its actions will violate

13  the plaintiff's rights under federal law.

14       An act or omission is oppressive if the defendant injures

15  or damages or otherwise violates the rights of the plaintiff

16  with unnecessary harshness or severity, such as by misusing or

17  abusing authority or power or by taking advantage of some

18  weakness or disability or misfortune of the plaintiff.  It's

19  not sufficient that you find the defendant's conduct to be only

20  negligent.

21       If you find that punitive damages are appropriate, you

22  must use reason in setting the amount.  Punitive damages, if

23  any, should be in an amount sufficient to fulfill their

24  purposes, but should not reflect bias, prejudice or sympathy

25  toward any party.

1          In considering the amount of any punitive damages,

2     consider the degree of reprehensibility of the defendant's

3     conduct, including whether the conduct that harmed the

4     plaintiff was particularly reprehensible because it also caused

5     actual harm or posed a substantial risk of harm to people who

6     are not parties to the case.  You may not, however, set the

7     amount of any punitive damages in order to punish the defendant

8     for harm to anyone other than the plaintiff in this case.

9          Punitive damages may be awarded even if you award

10     plaintiff only nominal, and not compensatory, damages.

11          The law that applies to this case authorizes an award of

12     nominal damages.  If you find for the plaintiff, but you find

13     that the plaintiff has failed to prove damages as defined in

14     these instructions, you must award nominal damages.  Nominal

15     damages may not exceed one dollar.

16          So, ladies and gentlemen, those are the substantive

17     instructions that will be provided to you in writing during

18     your deliberations.

19          I want to go over what the verdict form looks like.

20     That's what I suspect the lawyers may be directing your

21     attention to as well during the argument, so just to be

22     thinking about this.

23          This is the first page of the verdict form.  The verdict

24     form asks you to answer several questions, and you'll see that

25     I've referred you to the instruction numbers that specifically

 1  relate to the questions, but in answering the question you need

 2  to consider all of the instructions.  This is just the

 3  instructions that -- the numbers that I put in here are just

 4  merely an aid to going to some of the specifics.

 5       So question Number 1:  Was Owen Diaz subjected to a

 6  racially hostile work environment by Tesla, Inc.?

 7       And you answer that question.  And if you answered "yes,"

 8  then proceed to the next question; and if no, you go to

 9  question four.

10       The second question is:  Was Tesla, Inc. a joint employer

11  of Owen Diaz?

12       And if you answer that question "yes," you go to the next

13  question.  And if "no," to question four.

14       Number 3:  Did Owen Diaz prove all of the elements of:

15       A, hostile work environment caused by the supervisor?  If

16  the answer is "yes," you check that box.  If it's "no," you

17  check that one.

18       And then, B, hostile work environment caused by a

19  non-immediate supervisor or coworker.

20       Then you go on to the next question:  Did Owen Diaz prove

21  all of the elements of liability based on civil rights

22  violation in a contractual relationship?

23       And, again, you're given instructions of where to go,

24  whether you answer "yes" or "no."

25       Number 5:  Did Tesla, Inc. fail to take all reasonable

 1   steps necessary to prevent Owen Diaz from being subject to

 2   racial harassment?

 3       Go to the next question.

 4       Number 6:  Did Tesla, Inc.'s negligent supervision or

 5   continued employment of Ramon Martinez cause harm to Owen Diaz?

 6       Follow instructions.

 7       The next question goes into damages:  What past

 8   non-economic damages did Owen Diaz sustain as a result of Tesla

 9   Inc.'s unlawful conduct?

10       And then the -- next question is:  What future

11   non-economic damages is Owen Diaz likely to sustain as a result

12   of Tesla, Inc.'s unlawful conduct.

13       And you'll see from the prior question that -- if you had

14   been answering "no" to all of the questions up until -- through

15   Number 6, then your work would be done and the foreperson --

16   you would proceed to the end of the form.  But if you answered

17   "yes" to some of those, you'll be proceeding to the damages

18   questions, which I just went through with you.

19       And then punitive damages is question Number 9:  If you

20   found that there were -- that there was liability, you would

21   answer this question.  You may only award punitive damages for

22   the reasons discussed in instruction Number 41; that is, if you

23   find that the defendant's conduct that harmed the plaintiff was

24   malicious, oppressive or in reckless disregard of the

25   plaintiff's rights.

1    Do you find by a preponderance of the evidence that Owen

2  Diaz is entitled to punitive damages against Tesla, Inc. for

3  either creating a hostile work environment based on race,

4  violating civil rights in a contractual relationship, and/or

5  failing to prevent harassment based on race in the workplace?

6    And then the final question:  If you found punitive

7  damages, then you would answer Number 10, which is to give the

8  amount of those damages.

9    And once your verdict is reached, the jury foreperson

10  would sign and date the form and contact Ms. Davis.

11    I'll tell you more about the -- sort of conducting your

12  business during deliberations, including selecting a

13  foreperson, once all of the arguments have occurred.

14    So those are all the substantive instructions, and you've

15  seen what the questions are that you're going to be asked at

16  the end of this.

17    We'll take a ten-minute break and come back at 9:30 for

18  the plaintiff's closing argument.

19    (Jury exits the courtroom at 9:17 a.m.)

20        MR. ORGAN:  Your Honor, just one minor thing.

21        THE COURT:  Speak into the microphone, if you would,

22  Mr. Organ.

23        MR. ORGAN:  Apologize, Your Honor.

24    When you were discussing the question on punitive damages

25  Number 9, you told the jury to refer to question Number 41, but

1    I know the instruction says question 40.

2        I don't know that that makes -- I just think you misspoke,

3    Your Honor.

4            MS. KENNEDY:  I think it's a correct statement.

5    Instruction Number 41 is nominal damages now.  So I think --

6            MR. ORGAN:  I just don't want there to be confusion.

7            THE COURT:  So what is there that -- oh, I see.  Got

8    you.  It does refer to 40 up top.  But when they come back, I

9    will make that correction.

10           MR. ORGAN:  Thank you, Your Honor.

11       (Whereupon there was a recess in the proceedings

12        from 9:18 a.m. until 9:37 a.m.)

13       (Proceedings held in the presence of the jury.)

14           THE COURT:  All right.  Please be seated everybody.

15       And because I can't see everybody the way the courtroom is

16   now set up, I just wanted to let you know that in the jury

17   verdict form, when I showed it to you the last -- or actually

18   Question 9 referenced the -- an incorrect Jury Instruction

19   number.  We've corrected that for you.

20       So it's instruction Number 40, which is the punitive

21   damage instruction.  So that's the only change.

22       And now, Mr. Alexander.

23           MR. ALEXANDER:  Thank you, Your Honor.

24                    CLOSING ARGUMENT

25           MR. ALEXANDER:  Good morning.

1    At the beginning of this case I made certain promises to

2    you.  I told you that we would prove that the "N" word was used

3    throughout the workplace at Tesla, not just by supervisors --

4    not just by coworkers but also by supervisors.

5    I told you that the "N" word was etched inside of the

6    bathroom, that swastikas were inside of the bathroom.

7    I told you that there would be acts of intimidation based

8    on race.  And I told you that there would be drawings that were

9    made inside of the workplace that were racial in nature.  And I

10    believe that I've -- that we have met our promise in terms of

11    proving that evidence to you.

12    This is a racial hostile work environment case.  Tesla has

13    wanted to make this about Mr. Diaz, Owen Diaz's performance;

14    but this case has been about Tesla not taking responsibility

15    for its workplace.  That is what this case has been about.

16    We want to believe that race, racial harassment, does not

17    exist any more.  We want to believe that it's something that

18    occurs somewhere else, in some other corner of the United

19    States or the world.  But who would have thought that it's

20    occurring in California, let alone in our backyard, where we

21    live in the Bay Area, let alone in one of the richest

22    corporations in the world, Tesla, a corporation that claims

23    that it is forward-looking and making the world better.

24    The fact that it's happening in one of the richest

25    corporations in the world is an indication of just how hard it

1   is to fix something that is broken.

2       That the "N" word was being used so prevalently, like it

3   was saying good morning, is just a travesty.  This case has

4   been about that travesty.

5       We have taken nine months of Owen Diaz's life and the

6   repercussions that occurred to him and compressed it into 12

7   hours.  We could have spent another day talking about a day in

8   the life of what it was like to be Owen Diaz inside the

9   workplace, to hear the "N" word virtually every day over and

10  over and over again, and to see a bathroom filled with racial

11  slurs day after day after day.  And to be confronted inside the

12  elevators with people that were rushing him, attacking him and

13  using racial slurs at the same time.  To be subjected to

14  something like this picaninny, this jigaboo inside the

15  workplace.

16      We could have spent a day talking about what it was like

17  for him to have sleepless nights.  You heard the testimony

18  about him in the middle of the night, being -- sitting on the

19  stairs.  You heard the testimony about how he felt, his

20  experience of -- of feeling helpless inside the workplace

21  and -- and making complaints and not being heard.

22      The truth is, from the testimony that you heard from the

23  various individuals who testified, is Owen Diaz told you the

24  truth about what occurred to him.  And those four individuals

25  who testified about the workplace, sometimes they told you

1    directly what he experienced because they were involved in it.

2    And sometimes they told you about other experience that they

3    had throughout the workplace.  And the echo of what they

4    experienced is some confirmation of what Owen Diaz experienced.

5        So this trial has been about shining a bright light on

6    what should never have occurred at Tesla.  Shining a bright

7    light.  Shining a disinfectant.  Shining justice on Tesla.  By

8    your verdict you have the opportunity to not only do what I

9    asked you at the beginning, to make Owen Diaz whole in terms of

10   the damage that he has been caused, the human harms and

11   suffering, but also to hold Tesla accountable.  Because nothing

12   holds someone accountable like justice, and that is what we are

13   here for.

14       So for a moment, let me take a break from the evidence to

15   first thank the Court, thank Ms. Davis, thank our court

16   reporter, Ms. Pas.  Without the Court managing this process, we

17   would be having hand-to-hand combat perhaps.  But our system of

18   justice has this jury system so that we bring our battles here

19   to court, and so we can have an organized discussion about what

20   occurred.  So that we can give our version of the facts and the

21   defense can give their version of the facts.  And organizing

22   this courtroom and making -- making it a systematic approach so

23   that you can hear the evidence and decide on the evidence, that

24   is a monumental task.

25       But I want to thank you for being here.  For taking time

1    out of your lives.  For taking time from your families.  Taking
2    time for things that are important to you to help us do justice
3    here.  Because you, as jurors, are the most important thing in
4    terms of our jury system.  The law does not self activate.
5    Someone has to bring a lawsuit, Mr. Diaz, and then someone has
6    to do justice.  And we rely on you, as jurors, to be the people
7    that actually do justice.

8        And ultimately I'm going to talk to you about damages at
9    the end of this case, but we, I, have so much confidence in the
10   jury system.  We have so much confidence in the jury system.
11   Based on your experience, collectively, you have 350, 400 years
12   of life experience that you bring to the table to help you look
13   at the facts and circumstances of this case.

14       And so what I am going to do is I am going to talk to you
15   about the facts in the case as we understand them, and I'm
16   going to connect those facts to the Jury Instructions that the
17   Court has given you so that you, as jurors, can make a decision
18   in terms of the verdict.  The verdict is how you tell us your
19   findings in this case.

20       At the end of the case one of you will be -- you will
21   select one of you to be the foreperson, and that foreperson
22   will facilitate conversation between all of you so that all
23   nine of you can collectively make a decision in this case and
24   render a verdict and do justice.

25       So what I'm going to do now, is I'm going to talk to you

CLOSING ARGUMENT / ALEXANDER

1    about the evidence and how to address that evidence.

2         You know our three claims.  The judge has identified them:

3    Racial hostile work environment, failure to prevent, and

4    negligent supervision.

5         And the first issue is the burden of proof.  With regard

6    to everything in this case, we, as the plaintiff, we have the

7    burden of proof.  And with regard to anything that's important

8    in order for you to figure out how to decide what is true and

9    what is not true, all you have to do is use the burden of

10   proof.

11        Now, the burden of proof, if -- if we had a scale, the

12   scales of justice, and we would take a feather and we would put

13   it in one hand and that feather was to get the scales of

14   justice to lean just slightly.  That's the preponderance of the

15   evidence.  More likely than not.  More likely true than not

16   true.

17        All that we have to do to meet our burden, if we start at

18   an equal point, is to put a feather on one side.  I like to say

19   that if I get you to lean, just to lean towards the direction

20   that we're trying to prove, I've met my burden of proof.  We

21   have met the burden of proof.

22        So every time you get to some -- I think the evidence is

23   going to be substantial.  I think it's going to be clear.  I

24   think the evidence that we've proven has been clear.  But if

25   there's one -- someone among you that does not believe that we

1   have met our burden of proof, just think about it.

2       Have I gotten you to lean that direction?  Have I gotten

3   you to lean towards believing what we've proven?  Because if

4   I've gotten you to lean, I've met my burden of proof.  Okay?

5       So the first question is:  Was Owen Diaz subjected to a

6   racially hostile work environment by Tesla?

7       You've had a picture of Owen Diaz that we started with,

8   and you've had the people, the four people that testified to

9   confirm what he testified to.  There was no time at which Owen

10  Diaz was impeached.  There was no time that Ms. Kennedy reached

11  for the deposition transcript and impeached him with anything

12  that he testified to.

13      You heard testimony from four other individuals.  I start

14  with Mr. Wayne Jackson.  Wayne Jackson was a nextSource

15  manager.  A nextSource manager came in and said the "N" word

16  was used constantly.

17      Mr. Kawasaki was a contract employee hired through one of

18  Tesla's staffing companies.  He came in and said that the

19  "N" word was using constantly.  He confirmed that with regard

20  to the Timbreza incident the "N" word was used and multiple

21  employees heard it.

22      You have lots of evidence of a hostile work environment

23  based on the "N" word.

24      And the Court has given you an instruction that one act

25  alone, one act alone is enough for you to find something is

 1    severe.  And the "N" word is one of those words where one act

 2    alone is enough.

 3         You've heard me say multiple times they called him a

 4    fucking "N."  They said:  These "Ns" aren't worth shit.

 5         And I used profanity specifically because as awful as that

 6    profanity is, the "N" word is so much worse.  It's the word

 7    that you don't speak, because it drags people back, back to the

 8    50's and 60's or back to slavery, back to the stories that

 9    grandparents told African-Americans about what it was like to

10    be treated like property, to be called boy.  That's the very

11    nature of a hostile work environment based on race.

12         So you heard testimony from Mr. Kawasaki where he said:

13    The "N" word was used regularly.  Daily.  That "coon" was used.

14    That *"mayate,"* the Spanish version of the "N" word.  That

15    *"chongo"* was used.

16         You heard testimony of Mr. Wheeler, that he heard the

17    "N" word used always; that he saw the graffiti inside the

18    bathroom, confirming what Owen Diaz said.

19         You heard testimony that even he was subjected to the

20    "N" word, and when he complained about it, that person was

21    promoted ultimately.

22         You heard him testify that there was feces left on the

23    seat of his cart, and when he reported it, there was no

24    corrective action taken.  There were cameras all around, just

25    like with Owen inside the elevator, and Tesla did not think it

1    was important enough to check those cameras to find out who had

2    engaged in that conduct.

3         As opposed to a zero tolerance policy, Tesla had a zero

4    responsibility policy.  It was not important to protect black

5    employees from hostile conduct inside the workplace.

6         You heard testimony from Wayne Jackson, which I've already

7    told you about.  He said that he heard the "N" word.  Sometimes

8    commented on it, but basically ignored it because he did not

9    have the power to stop it.

10        The staffing company that Tesla put into place to

11   essentially supervise all the other staffing companies, he was

12   the manager in charge, and he didn't have the power to stop the

13   "N" word from occurring inside the workplace.  It's ironic that

14   he is African-American.

15        And you heard from Owen Diaz's son; that he -- that a

16   supervisor, Mr. Caballero, referred to him as the "N" word

17   inside the workplace, and Owen Diaz happened to have heard it,

18   happened to have been bringing his son lunch at the point when

19   that occurred.

20        So you have ample evidence that it isn't just what Owen

21   Diaz says.  It is precisely because all the other people

22   corroborate what he says.

23        And so when Tesla at the beginning of this case came in

24   and told you that it's not about the "N" word, of course, it is

25   about the "N" word.  They've tried to tell you that night is

1    day.

2        The irony is with all the people that came in and said

3    that the "N" word was spoken inside the workplace, the only

4    people that said that it was not spoken was Mr. Quintero, who

5    how could he possibly come out of his office and walk through

6    the workplace and not have heard the "N" word?  In fact, if it

7    weren't for the fact that we had Exhibit No. 106 to impeach

8    him, he would have been able to deny that it was ever reported

9    to him, along with Mr. Romero.

10       So with regard to the hostile work environment, here is

11   the instruction that you've been given by the Court.  Were

12   there slurs?  Was there physical conduct?  Were there insults?

13   Were there jokes?  And the answer is yes.

14       That Diaz did not welcome the conduct.  You know that he

15   didn't welcome it because he complained.

16       That the conduct was sufficiently severe or pervasive.

17   I'm going to talk about severe or pervasive in a moment.

18       That it created a racially abusive and hostile work

19   environment.  We know that the "N" word inside the work

20   environment is inappropriate.  Anything that changes the

21   privileges and conditions of employment should not be tolerated

22   in the workplace.  And the "N" word inside the workplace should

23   not be tolerated.

24       That Owen Diaz perceived it as being hostile, abusive and

25   that a reasonable African-American would not find it to be

1    reasonable, would find it abusive.  And you've heard from at

2    least three:  Owen Diaz's son, Mr. Wheeler, and Mr. Jackson.

3        So with regard to this, let's go to severe or pervasive.

4        Severe, any one act of using of "N" word should be enough.

5    You've heard testimony that Mr. Hurtado called Owen the

6    "N" word at least 30 times.  You heard that Ramon Diaz [sic]

7    called him the "N" word at these 30 times.  If one was enough,

8    how about 60 times?

9        So we know that it was severe based on just the use of

10   that word, but it was pervasive.  I was everwhere.  It was

11   virtually everywhere.  And Owen Diaz heard it everywhere that

12   he went throughout -- throughout the workplace.

13       With regard to Mr. Martinez, Ramon Martinez, you know that

14   used *"mayate*."  You know he repeatedly used the word 30-plus

15   times.

16       So you know that it was a hostile work environment.  You

17   know it was severe.  You know it was pervasive.  And we proved

18   that it was corroborated.  It was used freely and clearly.  And

19   it was used often directed directly at Owen Diaz.

20       During this case you saw my colleague, Mr. Organ, checked

21   off the testimony as we went through the evidence.  He checked

22   it off to confirm all the times that we proved the "N" word in

23   a hostile work environment based on either the word or the

24   conduct by putting this drawing in the workplace.

25       So there is no question that throughout the Tesla

 1    workplace, the "N" word, a racially hostile work environment

 2    with regard to African-Americans, was present.

 3        So the answer to question Number 1, as you go through the

 4    verdict form, the answer to question Number 1 is "yes."

 5        And so now I'm going to skip to question 3A and B, because

 6    Question 3A and B discuss a hostile work environment.  And

 7    since we've already discussed the hostile work environment, we

 8    can discuss it in the context of that question, and we'll come

 9    back to Question 2.

10        So Question 3 is:  Did Owen Diaz prove all of the elements

11    of a hostile work environment caused by a supervisor?

12        "Supervisor" is defined as someone who has authority over

13    another employee.  It's not dependent on the title.  It's the

14    amount of authority the person can exercise over Owen Diaz.

15        And authority is the ability to demand obedience.  All

16    right?  So when Ramon Martinez was on the tugger, and the

17    elevator doors opened, and he had heard Owen Diaz referring to

18    a supervisor.  And he ran and then he said:  What are you

19    talking about?  Are you saying that I'm not a good supervisor?

20    He indicated that he was a supervisor.

21        Tom Kawasaki indicated that he was a supervisor.

22        Ed Romero indicated he was a supervisor.

23        Wayne Jackson.

24        If you look at this email, which I believe is authored by

25    Victor Quintero, you'll have the opportunity to look at Exhibit

1    No. 272.  It says:

2              "It's very disappointing especially coming from

3         one of our team supervisors."

4         There is no question that a supervisor engaged in this

5    conduct, and Ramon Martinez is at the center of lots of

6    conduct, including this racial epithet, the drawing that was

7    left in the workplace for Owen to find.

8         With regard to Robert Hurtado.  You remember that Robert

9    Hurtado was one of the people who used the "N" word at least 30

10   times.  He was the person that said:  "'N,' hurry up and push

11   the button.  I hate you 'Ns.'"

12        Robert Hurtado was a lead.  You remember that

13   Ms. DelaGrande came into court and testified about him being a

14   lead.  And one of the issues is because Owen Diaz said, "Only

15   talk to me about work," Mr. Hurtado went back and told his

16   supervisor Owen was refusing to speak to them.

17        What's interesting if I take a step back from the

18   instruction, Mr. Hurtado did not come in to testify in front of

19   you.  Instead they brought an emissary.  They brought

20   Ms. DelaGrande so that she could vouch for him, character

21   evidence.  She could come in and say:  Oh, he's a great

22   employee.  He would never do that.

23        They had the ability to bring Mr. Hurtado in front of you.

24   And if defendant has the ability to give -- to bring in better

25   evidence, but they bring in weak evidence, you have the right

 1   to ignore that evidence or discount that evidence.

 2        If Mr. Hurtado, who did this heinous conduct, did not

 3   engage in it, Tesla had the ability, but failed to put it in

 4   front of you.  And you are the ones who get to determine the

 5   facts.  Mr. Hurtado was a supervisor.

 6        So the answer to question Number 3 is "yes."  There was a

 7   hostile work environment caused by a supervisor, either through

 8   Ramon Diaz -- Ramon Martinez or either through Robert Hurtado.

 9        Now, if by chance you do not decide that we have met our

10   burden of proof as to supervisors, there is an alternative way

11   that we can prove a hostile work environment.  If Tesla knew or

12   should have known of the conduct and they failed to take action

13   to correct the conduct, then Tesla can be found responsible for

14   that conduct.

15        This is the Jury Instruction.  That Diaz, Mr. Diaz, Owen,

16   was subjected to a racially hostile work environment -- we've

17   already proven that -- and that Tesla knew or should have known

18   and failed to take action that was reasonably calculated to end

19   that harassment.

20        Now, we have a failure to prevent claim that is it's own

21   stand-alone claim that we're going to talk about later.  But

22   just for purposes of addressing this particular instruction,

23   I'm going to say this.

24        With regard to taking immediate remedial action, Jackson,

25   Mr. Jackson, the nextSource manager, heard the "N" word

1    repeatedly throughout his walk throughout the workplace, but

2    did nothing about it.  Right?

3         And the thing is, a hostile work environment, you remember

4    Ms. Marconi when she talked about, using her words, boobs being

5    placed on the door?  They had a training for 500 people.  If

6    the "N" word was occurring throughout the workplace, shouldn't

7    they have had training to let employees know that that is not

8    tolerated in the workplace at Tesla?

9         So the failure to take action such as that to correct the

10   workplace.  There is no evidence of Tesla taking any action to

11   correct the graffiti.

12        Remember, we talked about the graffiti?  And you heard --

13   I read a response to -- I read a response to an interrogatory,

14   and in the interrogatory it identified a person who worked in

15   the facilities department, a person by the name of Andres

16   Donet.  Andres Donet was responsible for cleaning up graffiti

17   inside the bathrooms.  All right?  And we put in testimony from

18   Mr. Diaz saying that the graffiti was there the entire nine

19   months that he was in the workplace.  And you heard testimony

20   from Mr. Wheeler that he saw that same graffiti.

21        Tesla had the ability to bring its employee, Mr. Donet,

22   before you to say:  It was never there; or to say:  I corrected

23   the condition.  I fixed it.  I painted over it.  Where is

24   Mr. Donet?

25        Mr. Diaz told you that that graffiti, the "N" word,

 1  etched, scratched, painted, swastikas was inside the restroom

 2  from the second day when he saw it until the day he left.  If

 3  that's not true, why didn't Tesla bring the witness before you

 4  to say that it was not true; that he corrected the condition.

 5      So with regard to Tesla, it knew.  It knew about the

 6  hostile work environment and the workplace.  It knew because

 7  the "N" word was used daily and everywhere, and you heard that

 8  testimony from multiple people.

 9      The racial graffiti inside the room, you know that it was

10  there, and you have no evidence from Tesla that it was ever

11  corrected.  For all you know, it's still here -- there to this

12  day.

13      With regard to Exhibit No. 106, which the Court introduced

14  for a limited purpose, without that document we would not have

15  been able to impeach Tesla.  They came in to tell you a story

16  that the "N" word was never reported, never existed and without

17  that document, we would not have been able to prove that they

18  were not telling the truth.

19      Tesla knew that the "N" word -- Tesla knew that a hostile

20  work environment existed with regard to African-Americans

21  inside of its workplace, and it did nothing.

22      It's not about -- it is not about correcting the

23  workplace.  This is not about a zero tolerance policy.  It is

24  about a zero responsibility policy.  This trial has been about

25  Tesla trying to convince you that it did what it needed to do

1    inside the workplace and all the evidence keeps telling you no,

2    it did not.  It failed to create a workplace that was free of

3    discrimination and harassment based on race.

4         So with regard to the failure to investigate -- and I'm

5    going to talk about it later -- employers must make all

6    reasonable steps necessary to prevent harassment from

7    occurring.  Remedial measures are to include immediate

8    corrective action to end the conduct, to deter future conduct

9    and to make sure that it not only doesn't occur to Owen Diaz,

10   but to others.  Because the reason why you do corrective

11   conduct is to cleanse the workplace of a hostile work

12   environment.

13        So with regard to this instruction, the answer to -- to

14   this question is also "yes."  So you answer question Number 1

15   "yes," and you answer Number 3 "yes."

16        So now we're going to go back to question Number 2.

17   Because Tesla, at the beginning of this case I told you that it

18   structured its workplace so that it could try to avoid

19   liability.  And despite the fact that all this conduct occurred

20   inside of Tesla's facility, in a workplace that Tesla

21   structured in a way so that it put staffing companies between

22   itself and the employees, so that it would have the ability to

23   come to you and say it's not its responsibility.  Because Owen

24   Diaz was working for a contract company, and because the people

25   who said these words were working for contract companies, Tesla

1   wanted the ability to say:  Not our fault.

2        And so now we're going to have a discussion about why

3   Tesla can be held accountable for not correcting its workplace

4   and making it free of discrimination.

5        So Tesla points the finger at everyone else.  It created

6   this structure so that it would -- so that this -- this

7   artificial structure so that it would have the ability to blame

8   it on CitiStaff, or blame it on Chartwell, or blame it on

9   nextSource.

10       Confusion is the enemy of justice.  And what you have

11  heard from the day of the opening statement from the defendant

12  is that they were going to give you evidence that was going to

13  tell you the true story.  The story that I told, that was not

14  true.  They were going to bring in evidence, testimony, and

15  tell you what the real story was.

16       They brought you two witnesses.  They brought you Ramon

17  Martinez, the person that drew that picaninny, and they brought

18  you Ms. DelaGrande, the person who came in to vouch for

19  Mr. Hurtado.  But in terms of telling you what the real

20  evidence is, they did nothing.

21       And so what they did was try to sow confusion because

22  confusion is the enemy of justice.

23       And so let's talk about why Tesla is responsible for what

24  occurred inside of its workplace.

25       So there are to ways that we can prove that Tesla is

1   responsible.  One is called joint employment.  You can be an

2   employer -- you can be an employee of more than one company

3   working inside of a workplace and from the evidence that you've

4   received, you can and should reach that conclusion.

5        The second way is a contractual relationship.  If Owen

6   Diaz was the beneficiary of a contractual relationship between

7   the staffing companies that Tesla tried to put between itself

8   and the employees, Owen Diaz is entitled and is in a

9   contractual relationship with Tesla.

10       So the question is:  Was Tesla a joint employer?  That's

11  the first we we're dealing with.

12       And the Jury Instruction says:  A person can have more

13  than one employer.  And the primary consideration is control.

14  Control over the details of the plaintiff's work.

15       Now, below that there are a number of other words, but we

16  have pulled those out and made a checklist for you.

17       Tesla controlled Owen's employment.  Virtually entirely.

18       The skills that he was required to have.

19       They trained him.  They certified him on the forklift.

20  They trained him and certified him on these heavy duty

21  elevators.  These weren't the elevators like you come up here

22  to the 17th floor.  These were high grade industrial elevators

23  that carried huge equipments, like a forklift and -- and

24  engines for cars.  This was a heavy duty elevator he was

25  certified on.

1      They certified him on safety.

2      They gave him the source -- I'm sorry.  They were the

3   source of his tools:  The forklift, the tugger that he used in

4   order to pull that heavy equipment.

5      The location, this was inside Tesla's factory.

6      They assigned him the work projects.  You remember the

7   first day that he showed up for work, he was wearing those work

8   boots.  He was just showing up for a job, and a person grabbed

9   him out of line and said:  You look like a person who is ready

10  to work.  Jump on this cart.  I'm going to take you over to the

11  elevators.  They had control over the job.  He showed up to

12  work one job, and the first day he got there someone moved him

13  to another job.  He had no control.

14     In terms of -- in terms of the assignment, they assigned

15  him the shift.  They determined the hours that he worked.  They

16  determined whether he got overtime.  They determined whether --

17  what position he had.  Remember, within two months he got a

18  promotion to lead.  Tesla is the one who determined that.

19     In terms of his salary, they gave him two promotions; one

20  ironically about a month before he found this picaninny in the

21  workplace.

22     Tesla was the one making those decisions.  The staffing

23  companies didn't make those decisions.  We gave you emails from

24  Tesla, Mr. Quintero, telling the staffing companies what salary

25  to give, what position he would hold.  Tesla was in control.

 1          You heard testimony that the elevators were a central part

 2    of Tesla.  Without those elevators, nothing gets done.  Without

 3    that heavy equipment going up and down the elevators, nothing

 4    gets done.  Owen Diaz was the person who made that happen.  Not

 5    the only one, but one of the integral ones in making that

 6    elevator operation work.

 7          You heard testimony from Mr. Quintero from the witness

 8    stand saying how important the elevators were, how important

 9    his area of responsibility was.

10          And then the equipment and the means provided.  Remember,

11    those vending machines?  You wondered why we spent time showing

12    you a picture of vending machines inside of Tesla?  They got

13    the equipment.  They got their masks, their badges -- their

14    gloves.  They got their gloves.  They got their equipment from

15    Tesla.  Tesla provided that equipment to them.  And so that

16    helps you find that they are a joint employer.

17          But that's not all.  Owen applied to work at Tesla.  He

18    found the job.  Remember, I told you in opening statement what

19    we would prove.  Owen applied for a job with Tesla, not with

20    CitySource -- CitiStaff.  Not with some other company.  With

21    Tesla.  And you will have his application, Exhibit No. 62.

22          Exhibit 62 is a document that was populated based on what

23    Owen filled out online.  And he applied through Indeed.  It

24    said Tesla.  He applied to Tesla.  And then he filled out this

25    document and it confirms, he did it on May 31st, 2015.  And

 1   inside the document, the first document associated with Owen,

 2   it says.  "If I'm offered employment."  And it says:  "I

 3   agree."

 4        And when you get that document, when you review Exhibit

 5   No. 62, look closely.  Nowhere does this make reference to a

 6   staffing company anywhere.  Everywhere inside that document

 7   it's talking about the -- his responsibility as an employee to

 8   Tesla.  It is not Owen Diaz's fault that Tesla structured its

 9   workplace by trying to put these staffing companies between him

10   and Tesla.  He applied to Tesla.  That is an artifice of Tesla

11   to try and avoid liability for your benefit.

12        But that is not all.  We also brought you testimony from

13   the Chief Financial Officer of nextSource.  nextSource, the

14   company that was supposed to manage all the other staffing

15   companies.  And this is what he said in terms of what occurred:

16   That the employees are hired through the staffing company, but

17   everything important, all the direction, all the control, Tesla

18   has the power.

19        (Videotape played in open court, not reported.)

20        The evidence shows regardless of Tesla's attempts to avoid

21   liability, Tesla is a joint employer.  Tesla is responsible for

22   what occurred inside of its workplace to Owen Diaz.

23        So the answer to question Number 2 is yes.  So when you

24   get to that question, you should check answer "yes."

25        And so next I'm going to talk about contractual liability,

 1   question Number 4:  Did Owen Diaz prove all of the elements of

 2   liability based on civil rights violation in a contractual

 3   relationship?

 4        Now, the Jury Instruction says Owen has to have been a

 5   beneficiary under the contract; that Tesla engaged in racial

 6   discrimination or harassment; or Tesla failed to take

 7   reasonable steps to prevent harassment from occurring in its

 8   workplace; and Owen Diaz would not have suffered the injuries

 9   that he suffered were it not for the relationship in this

10   contract.

11        There is a second instruction.

12        Mr. Diaz need not be a signatory.  He didn't have to sign

13   the contract for him to be a beneficiary of that contract.  As

14   long as he received the benefits and privileges of the

15   contract, the relationship that exists between Tesla and

16   nextSource and CitiStaff, because he was a beneficiary of that

17   contract, that relationship, he is a party to that contract.

18        I read to you special interrogatory Number 2.  And it

19   said -- I read:

20             "Defendant contracts with nextSource to staff

21        primary employees at Tesla's facilities."

22             "It is defendant's understanding" --

23        This is the response that Tesla gave.

24             "It is defendant's understanding that

25        nextSource contracts with CitiStaff Solutions, Inc.,

1          among other third parties, to secure temporary

2          employees to work at the Tesla facilities."

3          That's what Tesla admitted to in its responses to

4    interrogatories.

5          But you not only have that.  You have Exhibit No. 3, the

6    master service contract.  We showed you three ways

7    contractually that Tesla is responsible for having this

8    relationship that put Owen inside of its workplace.  And so

9    once again the answer to question Number 4 is Tesla is

10   responsible.  Tesla is responsible for what occurred inside its

11   workplace.

12         So the bottom line is, Owen Diaz could not have been

13   employed inside the Tesla factory were it not for these

14   contracts that Tesla entered with nextSource, CitiStaff.  The

15   contracts that Tesla entered, those are the -- that is the

16   reason that Owen Diaz was present.

17         So we have shown you through two different methods,

18   through joint employment and through the contractual

19   relationship, that Tesla is responsible for the conduct that

20   occurred inside the workplace.

21         So you should answer in order:

22         Question 1, yes.

23         Question 2, yes; joint employment.

24         Question 3, yes; hostile work environment based on either

25   supervisor finding or based on what Tesla knew or should have

1    known.

2        Question 4, yes.  Liability for -- on a contractual basis

3    because Owen was only present inside the workplace because of

4    the contracts that Tesla entered in order to stock its factory

5    with employees.  And the fact that they tried to use an

6    artifice to avoid liability is not true.  We have proven that

7    based on joint employment and the contractual relationship.

8        So the next issue that we're going to talk about is the

9    failure to prevent -- failure to take all reasonable steps

10   necessary to prevent Owen Diaz from being subject to racial

11   harassment.

12       This is the primary way that Tesla failed to protect Owen

13   Diaz from a hostile work environment.  Because employers, once

14   they find out, once they are on notice that they have a

15   condition inside the workplace that fails to make it free of

16   discrimination and harassment in the workplace, once they have

17   that information, they have an affirmative duty to do something

18   to fix it.  All right?

19       At the beginning of the case during opening statement, I

20   told you that before an employee gets a badge from Tesla, they

21   have to go through a safety training.  Everybody goes through

22   safety training.  Everybody, regardless of the staffing

23   company.  Tesla says you must go through safety training.

24   Tesla had the ability to train every employee that we have a

25   zero tolerance policy.

1        The Anti-Handbook Handbook, as disrespectful as it is of

2    the workplace in terms of making fun of saying that stupid

3    stuff, when it refers to harassment and discrimination, as

4    disrespectful as it is, if Tesla cared, shouldn't they have

5    required that their Anti-Handbook Handbook be given to all of

6    its employees?

7        The Anti-Harassment handbook, shouldn't they have required

8    it be given to all employees, the same as the safety training?

9    If Tesla could require that everyone receive the safety

10   training to make sure that everyone knew that Tesla had a zero

11   tolerance policy, to make sure that Tesla knew -- I'm sorry, to

12   make sure of that one knew that Tesla was not going to tolerate

13   a hostile work environment inside the workplace, shouldn't they

14   have made sure that every employee got the written

15   documentation, or was that just lip service?

16       We brought you two experts -- I'm sorry, three experts,

17   and one of them was Amy Oppenheimer, she is the human resource

18   expert who talked to you about what is expected of an employer

19   inside the workplace.

20       We also brought you another expert, Anthony Reading, who

21   I'll talk about later, a psychologist, to talk to you about the

22   harm, the diagnosis for the harm that was suffered by Mr. Diaz.

23       And we brought you a third expert, Chuck Mahla -- Chip

24   Mahla, to talk to you about the value of Tesla in 2019.

25       Those experts -- both parties have the ability to bring in

```
 1    experts.  The plaintiff is the only party that brought you
 2    those experts.  And if Tesla could have found a human resource
 3    expert that would have told you that what they did inside the
 4    workplace met the standard of care, you certainly know that
 5    they would have brought one.  But as opposed to putting
 6    affirmative evidence in front of you, they chose to poke at the
 7    balloon.  They chose to ask a bunch of questions to make it
 8    appear as though the experts were not telling you what was
 9    true.  But they did not put an expert in front of you.
10         So with regard to the expert testimony you heard, you
11    treat that like all other testimony.  If it was unimpeached,
12    you have the ability and the right to accept it.
13         If it made sense with the experience of what you
14    understand in your life experience, then you have the ability
15    to accept it.
16         And so let me give you the Jury Instruction, and then let
17    me remind you of what Amy Oppenheimer testified to remotely
18    through Zoom.
19         A failure to prevent.  That Owen Diaz was an employee.  We
20    know that he was an employee providing services under a
21    contract, because we proved the contractual relationship.  Any
22    time an employee is working, there is a contract.  Whether it's
23    a verbal contract:  I'm going to hire you.  You're going to do
24    work.  I'm going to pay you.  Or an implied contract, based on
25    what occurred between Tesla writing that contract with the
```

1   staffing companies and Owen being a beneficiary.  We proved

2   that he was an employee.

3        Number 2, he was subjected to harassment.  That's based on

4   the hostile work environment.

5        That Tesla failed to take all reasonable steps necessary

6   to prevent harassment.  That is what we're discussing right

7   now.

8        That Owen was harmed.  As a consequence of them failing to

9   protect the workplace, he was harmed.  He suffered because he

10  experienced the "N" word and drawings like this.

11       And it was -- the failure to take reasonable steps was a

12  substantial factor in causing Mr. Diaz harm.

13       With regard to substantial factor, the Court read an

14  instruction with regard to substantial factor.  Sometimes in

15  the law we use the word "substantial," and it sounds like

16  something different than it really is.  If you read the Jury

17  Instruction, it says, "Substantial, more than trivial, more

18  than remote."

19       Any time you see the word "substantial," you should

20  substitute "more than trivial, more than remote."

21       Let me give you an example of why the word "substantial"

22  is -- overstates what is required to show that there is a

23  relationship between failing to fix what was in the workplace

24  and the consequences, the harm, that was caused to Mr. Diaz.

25       If you had a car that was sitting on the edge of a cliff,

1    and it was just dangling there, and the window was open, and

2    you were to take a pebble the size of a penny, and you were to

3    throw it inside the window, and it caused the car to go over

4    the cliff, that little pebble, as small as it is, would be a

5    substantial factor in causing the harm.

6         It doesn't matter -- it doesn't have to be a big bouler.

7    That little pebble was enough to cause the car to go over the

8    cliff.  So it was a substantial factor in cause the car to go

9    over the cliff.

10        And in this instance we've given substantial evidence that

11   Owen Diaz was harmed by this incident, this conduct, the

12   failure to protect him from a hostile work environment.  And so

13   with regard to meeting our burden of proof, we meet our burden

14   as to that.

15        Let's go through -- Ms. Oppenheimer gave testimony as to

16   what should occur inside of a workplace.  And she said one of

17   the things that should occur is clear policies.  Well, we know

18   that they did lip service, and they had the clear policies.

19   She said that.  But it should be distributed and accessible and

20   enforced.  It was not distributed.  It was not required like

21   their safety policy.  And it certainly was not enforced.  As

22   opposed to zero tolerance, it was really zero responsibility.

23        Training of employees, supervisors, managers.  There

24   should have been training inside the workplace to tell people

25   that if Tesla was going to claim to have a zero tolerance

1    policy, that it was actually going to enforce the rules so it

2    was a zero tolerance policy.

3         The "N" word, as severe as it is, one time would have been

4    enough to terminate someone.  And it occurred every day.  Every

5    day, over and over and over and over and over again.

6         You would have thought that if they were firing people

7    based on a zero tolerance policy, they would bring in one

8    document, ten documents, a few documents, something that

9    confirms that someone got reprimanded, someone got fired for

10   use of the "N" word.  Right?

11        There was no training.  There was no training to tell

12   people what that zero tolerance policy was.

13        And so consistent message.  The consistent message is:

14   If you're in charge and you allow the "N" word to occur, why

15   wouldn't people keep using the "N" word?  But if you fire

16   someone in the workplace and you tell all the other employees,

17   "You use that word, you're fired," that's how it stops.  And no

18   one ever did that.  No one told the manager of nextSource

19   that he had the power to fire someone for that conduct.  No one

20   thought it was important enough to protect black employees

21   inside the workplace from that conduct.

22        An immediate response.  We know that there wasn't an

23   immediate response.

24        Immediate removal of the offensive conduct.  With regard

25   to the "N" word being inside the bathrooms, etched inside the

1   walls, etched there.  They brought you no one to tell you that

2   it was corrected.  Not immediate, not timely.

3        Immediate and adequate investigation.  I'm going to talk

4   to you specifically about how bad the investigations were in a

5   moment with subsequent slides.

6        Progressive and meaningful discipline.  Every time the

7   "N" word was used, there was a -- something else used.

8   Something that minimized it.  As opposed to saying it was

9   because of race, they said something else.  Kidding around in

10  the workplace.  A joke.  "Play nice in the sand box."

11       There was no progressive discipline.  They did not let

12  people know that what was happening would not be tolerated.

13  And that's why, it festered inside the workplace.

14       So let's talk about what supervisors knew.  Ed Romero was

15  not truthful.  Remember I told you at the beginning, they had

16  the elevator incident with Timbreza.  All right?  And Owen Diaz

17  said that Timbreza had used racial slurs towards him.  And

18  people, Mr. Kawasaki, came and broke up what was about to be a

19  fight.  And Owen said that this was -- racial slurs were used

20  towards him by Mr. Timbreza.  And Mr. Kawasaki did what a

21  supervisor should do.  He asked the witnesses around, and they

22  confirmed that racial slurs were used.  And then Mr. Kawasaki

23  did what he was supposed to do.  He put in writing that racial

24  slurs were used.

25       And he did something that's interesting.  He didn't say

1   what the racial slurs were.  That is the common practice at

2   Tesla.  They don't specifically identify what it was -- what it

3   is.  They use ambiguous terms so that word never appears in

4   documentation.  But he confirmed that witnesses said that

5   racial slurs were used and he passed that along to Ed Romero.

6       So Ed Romero knew that it was confirmed.  But what did Ed

7   Romero do?  He said -- he said that the "N" word was not

8   confirmed; that there was no corroboration.

9       And so as a consequence, instead of there being an actual

10  verbal warning or something in writing to Timbreza, he got a

11  verbal warning for a tendency to kid around excessively.  That

12  is what the "N" word -- that is how the "N" word is treated at

13  Tesla.  They find these euphemisms, rather than to address it

14  directly, so that they can pretend that it doesn't exist.  And

15  that is for your benefit as a juror.

16      Ed Romero claimed that he had never heard the "N" word

17  inside the factory.  And given the testimony that you heard

18  from the other four individuals, for him to say he never heard

19  it is not plausible.

20      And if you find a witness false as to one part of the

21  testimony, you have the ability to find him false as to all of

22  the testimony.

23      He said he did not recall anyone complaining directly

24  about the "N" word.  And like I said, Exhibit 106 proves that

25  he is wrong.  Proves that he was not truthful with you.  Proves

1   that Tesla knew.  And the fact that they screwed up and had

2   this piece of documentation and had to produce it proves that

3   they knew.

4        And I want you to keep track of August 4th, because that

5   is the first time that this happened in the workplace.  And if

6   Tesla would have taken action on that date, all of the other

7   events that happened after that would not have occurred.  If

8   they had taken affirmative action to fix the workplace that

9   day, the consequences would have been that Owen would have

10  never experienced what he experienced.

11       Timbreza, no meaningful discipline.

12       The racial slurs occurred.  He gets a verbal warning.  He

13  gets basically a slap on the wrist.  Not for slurs, but for a

14  tendency to kid around.

15       The elevator incident.  We're going to talk now about

16  investigations.  So with regard to the elevator incident, you

17  remember that.  Owen was inside the elevator.  He was training

18  Rothaj Foster.  He was going up and down the elevator, and then

19  Ramon Diaz -- Ramon Martinez rushed in and attacked him.  And

20  Owen backed up into a corner, and Owen says that they were --

21  that racial slurs were used at the same time.

22       And then he said:  Look, there is surveillance cameras

23  there.  You're going to get caught.  And you heard Ramon

24  Martinez say from the witness stand:  Yes, he did say that.

25       So the interesting thing is with regard to this, Ramon

1    Martinez acknowledges that Owen is the one who said that.  And

2    the attacker is the one who was being told to stop.  Otherwise,

3    he would have said:  No, I said that.

4         So with regard to this incident, what did they do?  You

5    had a witness who was not interviewed, Rothaj Foster, who could

6    have confirmed that Owen was the one attacked.

7         You had a video that Mr. Kawasaki reviewed a portion of.

8    And he said:  I don't have full access, but Tesla had the

9    ability to preserve that.

10   The reason you don't have video of the incident, of Owen

11   being attacked is because Tesla did not collect it.  A good

12   faith investigation means that you look at all the

13   circumstances.  You interview all the witnesses.  You collect

14   all the information in an impartial way so that you can get at

15   the truth, and then you take corrective action based on that

16   truth.

17        But what did they do?  Wayne Jackson initially says on

18   October 19th:  This needs an in-depth investigation.  And he

19   was about to do an in-depth investigation.  But then HR

20   manager, Ms. Marconi, stopped everything.  She said:  Ed will

21   cancel his meeting to conduct an investigation.

22        And then on October 21, Exhibit 76:

23             "Confirming we agree we do not need to do any

24        formal investigation with Ramon, Owen and Rothaj."

25        Someone stopped the investigation.  And instead, they gave

1  lip service to zero tolerance, and they said -- they gave a

2  verbal warning to the person who was attacked, Owen Diaz, and

3  to the person that was the attacker, Ramon Martinez.  And both

4  of them got a verbal warning to "play nice in the sand box."

5  They minimize something that was a racial attack, a physical

6  attack on Owen.

7       But it's not the only time that they stopped an

8  investigation.  It's not the only time that they made sure that

9  there was no documentation.

10      Because you'll remember that Amy Oppenheimer said that

11  when you conduct an investigation, at the end of the

12  investigation there should be a written report.  It should make

13  findings, the facts of what occurred.  And then it should

14  determine based on the circumstances what discipline should be

15  imposed.

16      And that discipline is not just to stop that one incident,

17  but to stop it for other people in the workplace so that other

18  people, in addition to Owen, won't be subjected to the same

19  thing.  So that report is very important, because that's how

20  you cleanse the workplace of a hostile work environment, and

21  Tesla stopped that cleansing.

22      Ramon Diaz [sic] came into court and talked to you about

23  the incident of this drawing that he left inside the workplace.

24  And from the moment he got on the witness stand, I seldom -- I

25  seldom like to say that someone lied.  I like for you, as the

1    jurors, to reach the conclusion that someone lied, because you

2    are the finders of fact.  And I don't want to, but I just don't

3    have another way of describing what he did.

4         He got up on to the witness stand and he said:  When I got

5    to the workplace, I welcomed Owen to the workplace.  I told him

6    how it worked.  And he went through a long story.  I waited for

7    perhaps two minutes while he went through the story.  And it

8    turns out he was hired in October.  Owen started in June.

9    Mr. Martinez started months after.  How could he have been

10   welcoming Owen into the workplace?

11        He confirmed that this incident occurred; that he drew

12   this Caveman.  And with regard to this incident, they failed to

13   interview him.

14        Remember, Ms. Delgado is the one who conducted the

15   interview.  She was the one who was responsible for conducting

16   it.  She failed to interview Ramon or to address the

17   inconsistencies inside of his statement.  She failed interview

18   witnesses.  Mr. Wheeler, the person that was there.  Israel,

19   the person that was there.  This person named Werseslaa, the

20   person who supposedly drew the Pac-Men in the corner.  All

21   those people could have confirmed the version of the story that

22   Mr. Martinez told.

23        There was a cursory review of Owen's statement, and they

24   failed to follow up on things that he said.  He said that there

25   was a history of conduct inside the elevator based on the

 1   written complaint, and they did nothing.  She did nothing to

 2   follow up to find out.

 3        The discipline that was issued was supposed to be based on

 4   all the facts and at the point when the -- when Ms. Delgado

 5   wrote her email, she didn't have half the facts.  And the

 6   question is why.

 7        Ms. Marconi testified, when we played her video, that

 8   Mr. Martinez should have been fired.

 9        Now, Exhibit No. 33 is the statement that Owen -- that

10   Owen wrote, that he typed out.  And I want to stop for just a

11   second and talk about this statement, because Ms. Kennedy said

12   that Owen Diaz did not come up with this stuff about having a

13   hostile work environment until he found the attorneys, and then

14   he came up with the story.

15        I want you to read Exhibit No. 33, because this is the

16   statement that -- this is the statement that he made, that he

17   wrote to Tesla two years before he could find attorneys that

18   were willing to take on Tesla.

19        Inside this statement he says:

20             "A person should be able to come to work and not

21        be harassed or degraded."

22             "This is not the first time," the history.

23             "Because nothing has been done, it seems that

24        this behavior is getting worse."

25        And isn't that true?

1          "I'm entitled to a safe and harassment-free work
2      environment."
3          That is before he talked to any attorneys.
4          So when Tesla tries to blame the victim, do not be
5   persuaded.
6          So Owen made this complaint.
7          And now I want to talk about something that I probably did
8   not do as an effective job while we were -- while we were
9   giving the evidence.
10         So Owen complains.  He sends out this email on
11  January 22nd, 2016 at 8:42.  He's working between midnight,
12  between 9:00 p.m. the night before and the next morning.  So he
13  can't type this out right away.  So in between he's typing it
14  out, and finally at 8:42 in the morning he sends it out.
15         And you can look at Exhibit No. 33 and see who he sent it
16  to.  And then what should occur is it goes to the company.  And
17  then Mr. Martinez, he wrote his statement at 4:30 p.m. the same
18  day.
19         Now, with regard to Mr. Martinez, you can't believe that
20  he -- his version of the facts is, I'm going to say suspect at
21  best.  He says that he had a conversation with Owen where he
22  apologized twice.  And we have witnesses that say that that
23  never occurred.
24         He says that when he apologized the second time, Owen said
25  that because it was him, that Owen would not send the email;

1    that he deleted the email.  Look closely at his statement.

2         But the thing is, there is no way that Mr. Martinez could

3    know that Owen was going to be writing an email because Owen

4    hadn't written it yet.  When he was looking at this, this

5    drawing, he had not started to write that email.  He wrote that

6    email later and sent it the next morning.

7         So how is it that Mr. Martinez could write his statement

8    about an email that did not exist yet, about a conversation

9    that did not occur.

10        So Mr. Martinez writes his email the same day at 4:50 p.m.

11   And then what should occur is, based on Tesla's view of the

12   world, the Chartwell, the employer for Mr. Martinez, should

13   conduct an investigation, and then they are supposed to

14   determine what happens to the employee.  That's the story that

15   Tesla told you.

16        But look what actually happened.  On January 22, less than

17   two hours after Owen sent the email reporting this conduct,

18   there is an email from Tesla, from Mr. Quintero, talking about

19   an apology that never happened.  Talking about the actual

20   discipline that is supposed to be found out three days later.

21   They already know what the discipline is.  And they know that

22   it's going to be a written warning.

23        How is it possible that two hours later they can know the

24   outcome before the person conducting the investigation three

25   days later?  They can know that because Tesla is the one that

 1    stopped the investigation, made sure that there wasn't a

 2    thorough investigation.  Tesla is the one that determined what

 3    the discipline was going to be.  Tesla sat with Mr. Martinez

 4    and told him what to put inside of his statement.  That is why

 5    they never interviewed him about his handwritten statement.

 6         Please, please spend time with those exhibits.  Those

 7    exhibits prove that Tesla is steering this ship.

 8         With regard to everything that we proved, if you look at

 9    the dots, the purple dots tell you all the times that a Tesla

10    supervisor was involved in the incident.  But the orange dots

11    tell you when HR was involved.  Tesla was involved from the

12    inception.  They knew what was going on.

13         Now, inside -- you heard testimony from Ms. Marconi about

14    what they do.  What they are supposed to do when something

15    infects the workplace.  When a hostile work environment comes

16    into existence.  You heard testimony from her saying that

17    someone drew breasts on this stick figure.  And when someone

18    drew breasts on the stick figure, if one person is affected by

19    it, then we have to do sensitivity training.

20         And so Tesla stopped the entire workplace.  500 people

21    came into a room.  Production stopped on the line as to those

22    people, and they talked about how inappropriate it was to

23    sexually harass, to have this conduct in the workplace.  They

24    had training for 500 employees for, as she said it, boobs drawn

25    on a door.  But the "N" word occurs over and over and over, and

1    it's not worth stopping the workplace for a minute to address

2    it.

3         So the answer to question Number 5 is "yes."  They failed

4    to prevent -- they failed to take reasonable steps to stop

5    harassment from occurring inside the workplace.

6         I'm going to rush through, because I'm a couple minutes

7    behind:  Did Tesla's negligent supervision or continued

8    employment of Ramon Martinez cause harm to Owen Diaz?

9         Well, remember, you'll have the instruction, and you can

10   review it, but what it boils down to is this.  Once Tesla was

11   on notice of that conduct, they had the ability to stop it.

12   They had the ability to reprimand Mr. Martinez.  They had the

13   ability to fire him.  And the failure to take prompt, remedial

14   action is what caused subsequent action to occur.

15        With regard to that first incident in the elevator where

16   they stopped the investigation, if they'd have taken action

17   then, the second action with regard to this bale would not have

18   occurred.

19        And so now let me talk to you about -- I'm about to talk

20   to you about damages.  Our Constitution, when it was created,

21   did not recognize African-Americans.  Our Constitution is a

22   living document.  It moves forward.  We created laws that said

23   that African-Americans have the same rights as everyone else.

24   And the thing is those laws are not self effectuating.

25        As I said before, someone has to file a lawsuit, come

1   forward, and then present it to you as jurors.  You, as jurors,

2   have this tremendous power.  This tremendous power to help do

3   justice.

4        You come in, and you're a taxpayer.  You're on the roles.

5   You've got a driver's license, and you end up on a jury.  And

6   then suddenly you have the ability, with your verdict, to do

7   justice.  Not only to make Owen Diaz whole, but also to hold

8   Tesla accountable.

9        The word "verdict" is a derivation of a French word that

10  says to speak the truth.  And you, with your verdict, have the

11  ability to speak the truth.  And we are here to talk about

12  justice.

13       Our whole -- the whole purpose of this trial was to get to

14  this point so that you could do justice.  And part of doing

15  justice is to award damages.

16       So with regard to damages, damages mean the amount to

17  reasonably, fairly compensate.  With regard to damages, if my

18  son is inside a crosswalk and someone hits my son and breaks

19  his leg, we don't go to that Uber driver's house, grab that

20  person's son or daughter and break their leg.  That would be

21  barbaric.

22       What we do in our country, in our judicial system, is we

23  place a value on that harm.  However bad that harm is, however

24  bad the harm is, we put money on the other side of the scale to

25  balance out that harm.  The more severe the harm, the more

1    money you have to put on the other side to balance out the

2    harm.

3        And so in this instance we brought testimony from several

4    people.  You heard what Owen Diaz said with regard to what

5    occurred to him.  You heard him talk about the misery of having

6    this occur inside the workplace constantly.  The nine months of

7    every day hearing the "N" word.  Not just generally, not just

8    in the environment, but directed towards him.  You heard him.

9        You heard his daughter talk about finding him in the

10   middle of the night sitting on the stairs.  You heard that she

11   said that Owen was joking, laughing.  That was who he was.  And

12   suddenly he was not that any more.

13       You heard testimony from Dr. Reading, the only expert on

14   psychology that came to testify before you.  And he said that

15   Owen had an adjustment disorder with anxiety and depressed

16   mood.  Sleeplessness.  Lack of appetite.  Significant residual

17   symptoms.

18       He said that when something like race occurs in the

19   workplace, something that you cannot control, it is different

20   than other things.  If you work inside of a store and you break

21   a dish and you get fired for breaking a dish or something

22   happens, you understand that you can do something to fix that.

23   But when something happens to you because of the color of your

24   skin, there is nothing you can do about it.

25       You heard Owen talk about being inside the workplace

 1    and -- and the emasculation of not being able to take care of

 2    himself.  But walking over and hearing his son being heard the

 3    "N" word by a supervisor and not being able to protect his son,

 4    not being able to be a man inside the workplace, not being able

 5    to protect himself.  You heard Dr. Reading talk about his pride

 6    and how he thought of himself as a strong person.  He is a big

 7    strong man.  And to be able to be brought to the point of not

 8    being able to feel that you are yourself, that is emotional

 9    distress.

10        It's not like a broken leg.  It's not something that heals

11    easily.  You heard Dr. Reading say that he is broken.  He is

12    changed forever.  I'd like to liken it to a vase.  A vase

13    breaks -- perhaps you have had this experience -- and the big

14    pieces stay together.  And you take the pieces to the vase, and

15    you take glue, and you put it together.  But the vase has

16    little breaks, little tears in it.  So when you put water in

17    it, it holds most of the water, but a little water leaks out.

18    If you put too much water, it will burst.  Too much pressure.

19    That's Owen Diaz.  He's that vase.  He's damaged.  You heard

20    Dr. Reading.  And he is susceptible for the future.

21        And so with regard to emotional distress, from the date,

22    from the date that they could have corrected the conduct, we're

23    asking you for a million dollars for every month, every month

24    that he was there inside the workplace that they failed to

25    protect him from the "N" word.

1        The "N" word, this racist thing that drags you back to

2    slavery.  Drags you back to the stories of your grandparents.

3    For every month, for all six months.

4        That's the question that you -- when you get to Question 7

5    with regard to damages, the first question is as to past

6    damages.  Damages that gets you from the nine months that he

7    was there to now at trial.

8        And then for the future damages, I don't know how long it

9    will take for him to recover from this.  With your verdict,

10   with your verdict in his favor so that you tell him that Tesla

11   was wrong, he was right, that will soften the blow.  That will

12   allow him to heal.

13       So I think two, three, four years out.  That's how long

14   it's going to take for him to get back to equilibrium, back to

15   where he started.  And so I leave it to you, but I would

16   suggest a million dollars for how many years you think it will

17   take for him to go into the future.

18       But now I want to talk to you briefly about punitive

19   damages; malice, oppression and reckless disregard.  You have

20   the Jury Instruction there.  When an employer creates a hostile

21   work environment or fails to prevent it from existing, they can

22   be held accountable.

23       Tesla is one of the richest companies in the world.  And

24   they claim to be a forward-looking company.  And here we have

25   racist conduct occurring inside of its workplace.

1    They had the ability to come in front of you and show you

2    a video of them saying:  I get it.  I understand.  We have

3    fixed it.  Here is training.  Let us show you pictures of us

4    training our workplace.  Let me show you pictures of us

5    actually doing what we say.  Zero tolerance.

6    They had the ability to come in front you, but instead of

7    coming in front of you, they brought this story of:  What we do

8    is just fine.  We do follow our policies.  It's not our

9    responsibility.  It's the staffing company's responsibility.

10   That is the story that they brought to you.

11   During -- at the beginning of this case you heard

12   information from Ms. Kennedy, where she went through and she

13   made a list.  And we went through and proved the list.  We went

14   through the list and found that everything she claims she was

15   going to prove, she did not prove.

16   With regard to Timbreza, she said that there was no

17   reference to the "N" word, but that wasn't true.  We confirmed

18   that there was; right?

19   With regard to Ramon Diaz [sic] we confirmed that -- when

20   he claimed it was unprofessional, it wasn't.  That was a racial

21   incident.

22   With regard to Rothaij Foster, yes, they fired him, but

23   that was not a racial incident.  That was a red herring for

24   your benefit.

25   With regard to the cartoon, that was a racist incident.

1        And with regard to the complaints, you know that Owen

2   complained because he said he did.  He was never impeached as

3   to that.

4        Ms. Kennedy represented those things.  That was a promise

5   to you of what the evidence would show.

6        But I don't blame Ms. Kennedy.  Tesla got one of the best

7   defense attorneys in the state, if not the country, to come in

8   and try and spin a story so that you would believe that night

9   is day.  So that you would believe that Tesla had fulfilled its

10  responsibility.

11       I don't blame Ms. Kennedy for trying to tell this story

12  and trying to do magic.  I blame Tesla, because Tesla is

13  steering this ship.

14       Tesla came before you to tell this story because they

15  believe that they are above the law; that they don't have to

16  make sure that African-Americans are protected inside the

17  workplace from a hostile work environment.

18       And so -- so let's talk about this.  The judge has read an

19  instruction, a corporation is the same as a person.  They are

20  to be treated as the same as a person; right?  You will see

21  that Jury Instruction.

22       So -- so in terms of punishment, the punishment has to be

23  enough to stop the conduct; right?

24       So we all drive the freeway.  When you drive the freeway,

25  if you pull into the carpool lane, it costs you $471.  If we

 1   reduce that amount to $5, wouldn't we all pull into the carpool

 2   lane?  Because $5, we could hand the cop $5 and just -- and if

 3   it was $20.  So the punishment has to be big enough to stop us;

 4   right?

 5        And with jail, when someone engages in conduct that's

 6   really bad, we send them to a really bad place.  But if jail

 7   was the Holiday Inn, the Ramada Inn, if it was anything, we

 8   would do the conduct because it wasn't going to punish.

 9        And so the question is with regard to an individual, we're

10   supposed to treat the corporation like an individual.  If an

11   individual made $100,000, you would perhaps think:  Okay,

12   10 percent.  That's not going to cripple them.  It's not going

13   to make them -- completely devastate them, but it's going to do

14   harm.

15        Or maybe you want to be light.  Maybe the conduct isn't so

16   bad, and so you want to do 5 percent.  That would be 5,000.  Or

17   maybe you think ahh, no big deal, 1 percent.  That's a thousand

18   dollars.

19        So with regard to the expert, our expert came in and told

20   you that Tesla in 2019 was worth just over $1 billion.  So if

21   Tesla is supposed to be treated like an individual -- Tesla has

22   just over a billion dollars of cash available.  And so in order

23   to stop the conduct, in order to stop them for doing what they

24   are doing, in order to get their attention, if you give a -- if

25   you give a person a penalty of $10,000 and they made 100,000,

1   wouldn't 10 percent be about right, if you thought that

2   10 percent was the penalty enough, or 5 percent or 1 percent?

3       But given that Tesla is worth -- I'm sorry.  Given that

4   the cash is $1 billion, the question I have -- given everything

5   that they have done.  They have come into court and tried to

6   tell you that everything they did was just fine.  They've come

7   to court and they tried to tell you that they have a zero

8   tolerance policy, when you've seen that they have nothing close

9   to a zero tolerance policy.

10       My question is:  If you punish them by 10 percent, is that

11  enough to get their attention?  I frankly don't think that it

12  is.

13       I think that there are no circumstances under which -- I

14  think it's going to be difficult to get their attention.  We,

15  we, in fighting this battle, we have tried to get their

16  attention.  But you, as the jury, with your verdict, if your

17  determination that Tesla violated the law in conscious

18  disregard, you with your verdict have the ability to get their

19  attention.

20       I don't know what the number is that will get their

21  attention, but I know that you, as jurors, have the ability and

22  will award a number that does get their attention.

23       Thank you very much.

24       **THE COURT:**  All right.  Ladies and gentlemen, you've

25  heard the plaintiff's closing statement.  You're about to hear

1   the defendant's.

2       And we'll take a 10-minute break and come back at about

3   ten past.  Please remember the admonitions.

4       (Jury exits the courtroom at 10:57 a.m.)

5           THE COURT:  All right.  We'll be in recess.

6       (Whereupon there was a recess in the proceedings

7        from 10:57 a.m. until 11:12 a.m.)

8       (Proceedings were heard in the presence of the jury.)

9           THE COURT:  Please be seated everybody.

10      Before we get going, I have just learned over the weekend

11  that one of the jurors looked at a mutual fund that he has and

12  found that the mutual fund includes stock from Tesla.  That is

13  not a reason, I think, to conflict that person out, but I'm

14  happy to discuss it now or later.

15          MR. ALEXANDER:  Later sounds fine.

16          THE COURT:  Okay.  Well, I'm not sure you want him

17  deliberating if you have an actual concern about this.

18          MR. ALEXANDER:  All right.

19          THE COURT:  Ready?

20          MS. KENNEDY:  Yes, Your Honor.

21          THE COURT:  Okay.  Let's get the jury.

22      (Jury enters the courtroom at 11:15 a.m.)

23          THE COURT:  All right.  Please be seated everybody.

24      Ms. Kennedy, when you're ready.

25          MS. KENNEDY:  Thank you, Your Honor.  Thank you very

 1   much.

 2                    **CLOSING ARGUMENT**

 3        **MS. KENNEDY:**  Good morning, ladies and gentlemen.  I

 4   want to thank you first for your service.  We know this is a

 5   hardship.  And as you recall, the last time I got to actually

 6   speak directly to you was a week ago today when I got to give

 7   you my opening statement.

 8        This is now my only opportunity to tell you what we think

 9   the evidence is and the evidence as to why you should not find

10   Tesla responsible or liable in this matter.

11        I want to thank you, the jurors, the Court, the Court

12   staff, and on behalf of my litigation team and my client I want

13   to thank you for your time, your consideration, and your

14   attentiveness here.

15        This is a difficult thing to do, to sacrifice your jobs,

16   your time away from your family and your friends, so we thank

17   you for.

18        All of us here in the courtroom, this is part of our job.

19   This is what we do.  This is not your job, but it is part of

20   your civic responsibility.  We want to thank you for it.

21        So why are we here?  This is a case by Owen Diaz.

22   Mr. Diaz and only Mr. Diaz.

23        On the verdict form, as you have been shown by the Court,

24   you're being asked questions about Mr. Diaz, not about anyone

25   else.  You're asked questions about Tesla and no one else.  But

1    in this particular case the evidence is going to show that

2    Tesla is not responsible and not liable for all of the

3    allegations made by Mr. Diaz in this particular case.

4         So let's talk about why we are here.  You're going to be

5    asked questions on the verdict form, which is basically your

6    guide and your decision-making based on the factual

7    determinations and the law you, the nine of you, are going to

8    need to decide, collectively all nine you, to answer questions

9    in this case on the verdict form.

10        The first issue that we talked about at the beginning of

11   this trial, that Owen Diaz was not a Tesla employee, we'll talk

12   about that.  We'll talk about the issues concerning joint

13   employer, contractual relationships.  But, in fact, Mr. Diaz

14   was never a Tesla employee.

15        Second, no evidence that a Tesla employee harassed Owen

16   Diaz during the time period that he was there, and he harassed

17   Mr. Diaz as defined by the law.  And the law is what guides you

18   in this particular case.  Not your personal feelings.  Not what

19   you think should be done.  Not what you think should, "I

20   probably do the right thing because Tesla is a huge company and

21   maybe if you just give him a little bit of money, that would be

22   okay."  You're guided by the facts, you're guided by the law,

23   and you're guided by the verdict form.

24        Mr. Alexander and I, we are lawyers.  We are not part of

25   the factual determination here.  Our jobs are to advocate for

1  our clients, to tell you what the law is as described by the

2  Court and tell you why under the law the facts support our

3  clients.  But you are the determination -- the determiners of

4  the facts in this case.  The facts come from that chair and

5  that chair only.

6      So based on the facts of the case, not your emotions, not

7  what you think should be the right result, but the facts; and

8  the facts are in this case that no Tesla employee harassed

9  Mr. Diaz as "harassment" is defined in the law during his nine

10  and a half months that he was at the Tesla factory.

11      It is undisputed that every time Mr. Diaz complained, he

12  took -- it was addressed, discipline was imposed.  And, in

13  fact, Tesla or Chartwell or West Valley or CitiStaff, all those

14  agencies took responsibility and Tesla took responsibility for

15  each and every one of those complaints.

16      We talked about Judy Timbreza, we talked about Rothaj

17  Foster, and we talked about Ramon Martinez.  In every single

18  incident the matter was handled.  The matter was resolved.

19  Discipline was imposed.  And that conduct did not occur again.

20  I will show you the documents to that effect.

21      And, more importantly, one of the things you're going to

22  look at in this case, you're going to look at the totality of

23  the facts, the totality of the allegations, and Mr. Diaz

24  telling you this story.

25      Mr. Diaz was at the Tesla factory for about nine and a

 1   half months.  He was assigned there by CitiStaff.  His

 2   testimony is that, according to him, every single day, and

 3   according to Mr. Alexander, every single day he was called the

 4   "N" word.  Every single day he was the victim of harassment.

 5   Every single day it was a horror to work there.

 6       Every time he complained, he had the opportunity to

 7   complain in writing.  He didn't put anything in writing.

 8       At the end of this, I'm going to tell you that Mr. Diaz's

 9   story simply doesn't make sense.  It's not to disparage

10   Mr. Diaz, but to talk about the facts at the time.  And we need

11   to judge Mr. Diaz at the time this was going on.  You have to

12   judge Tesla at the time this was going on.  Not after the fact

13   when a bunch of lawyers get involved, including Tesla lawyers,

14   including Mr. Organ and Mr. Alexander.

15       You have to judge the facts as to what happened at the

16   factory at the time and make your determination using your

17   common sense, judgment, and knowing just how things work at

18   organizations.

19       Now, we spent a lot of time this week talking about

20   Mr. Diaz's allegations about a variety of people, but namely it

21   comes down to Judy Timbreza, Ramon Martinez, and Robert

22   Hurtado.

23       These are all of the allegations, the name calling, the

24   racial slurs that Mr. Diaz is in this court seeking to be paid

25   for.  These are the words.  These are horrible words.  I'm not

1  going to disagree.  These are horrible words.

2      Mr. Diaz is coming to this Court asking for millions --

3  hundreds of millions of dollars for the words on this form, on

4  this PowerPoint slide, when at the time he had the opportunity

5  to complain about everything, and he did, and none of these

6  words appear anywhere.

7      And the three people that he is complaining about:  Judy

8  Timbreza, not a Tesla employee.  Ramon Martinez at the time,

9  not a Tesla employee.  Robert Hurtado, he was a Tesla employee.

10  But what's the evidence going to show about Robert Hurtado?

11      I'm going to get to this, but if you recall, they were

12  going to call Lamar Patterson as the witness to the Hurtado

13  incident.  He never showed up in court.  And the only writing

14  from Lamar Patterson, the witness, according to Mr. Diaz was

15  there, and he asked Mr. Patterson to:  Write down what you saw

16  and be truthful.  Nothing from Mr. Patterson, and you have to

17  wonder why.

18      If Mr. Patterson is that one witness to the Robert Hurtado

19  incident, why not write it down?  According to Mr. Diaz, he

20  told Mr. Patterson to write down what he saw, and it wasn't

21  there.

22      So the reason we have been taking this position, Tesla, as

23  to things that are not in writing and it wasn't reported is

24  that is factually what happened.

25      All of these words, it's very inflammatory, and I get it.

1   And none of these words are proper words.  None of these words

2   are words people should be saying in the workplace.

3       Tesla takes responsibility for this.  We're not saying

4   this is right.  What we're saying is that in this particular

5   case with this particular evidence, they have not proved their

6   case in this case.

7       And we're not saying that words like this are not said out

8   in the street and said in the workplace.  We're not saying that

9   at all.  We're also not saying that people are not the victim

10  of race-based harassment.  It happens.  It does happen in the

11  workplace.  It does happen in circumstances.

12      The question for you in this particular case is whether or

13  not Mr. Diaz has proved his case under Title VII with evidence

14  and which puts Tesla on notice of these particular facts which

15  then would require Tesla to be held responsible to the tune of

16  hundreds of millions of dollars, as Mr. Alexander is asking

17  for.  That's what this case is about.

18      The verdict form is the form you're each going to get the

19  chance to take a look at and read and decide on your own.

20      The second question -- I'm going to go through the joint

21  employer first because it kind of makes sense to figure this

22  issue out.

23      Joint employer, you'll get the instruction about the joint

24  employer.  And Mr. Alexander went through that instruction.

25  It's Instruction 24 and it talks about someone can't have one

1    or more employers.  We don't disagree with that.

2         But in this particular case, Mr. Alexander and Mr. Diaz

3    have to prove by a preponderance of the evidence that Mr. Diaz

4    was, in fact, a joint employee of Tesla in this set of

5    circumstances.

6         Now, in this instruction it talks about a variety of

7    things you may consider, but what you need to think about is

8    what actually was proven in this case.

9         In this case Mr. Diaz does not dispute the fact that he

10   applied and was hired by CitiStaff.  It's undisputed that he

11   got his W-2 form from CitiStaff.  It is undisputed that he

12   filled out an application for CitiStaff.  It's undisputed that

13   he got direct deposit for CitiStaff.  It's undisputed that

14   through CitiStaff he was assigned to work at the Tesla factory

15   as an elevator operator.

16        If you look at the jury instruction, it talks about the

17   type of things that are required.  One of the important things

18   is whether or not Mr. Diaz was actually engaged in the very

19   product that Tesla was selling.  He was an elevator operator.

20   He was not making cars.

21        One of the other elements is the tax treatment of his

22   wages, but I leave it to you.  Read Instruction 24 and make

23   your own determination.

24        One of the other things we talked about with the joint

25   employer is the control.  Absolutely, part of it is control.

1    When you work for a staffing agency and you're assigned

2    somewhere to work at that location, there are going to be Tesla

3    employees that you're working with.  That does not then make

4    you automatically a joint employee.  You're working at that

5    location.  You have supervisors and managers from other

6    agencies.  You have supervisors and managers with Tesla.

7        The issue here is whether or not Mr. Diaz has proved in

8    fact that all of these elements of a joint employer make him a

9    de facto employee of Tesla.  And the evidence here, we believe,

10   shows that he was not a joint employee of Tesla.  So we believe

11   this question should be answered no.

12       But even if you answered that question yes, that doesn't

13   mean that Tesla is responsible, liable under Title VII.  Not

14   responsible for the race-based harassment that he is alleging.

15       We look here.  If, in fact -- this is his badge.  He's a

16   contractor.  Identified as a contractor, CitiStaff Solutions.

17   Mr. Diaz testified this was the badge he used to get into the

18   facility.

19       In this particular case, it's undisputed there were lots

20   of staffing agencies.  It is not the evidence in this case that

21   Tesla set up this, quote, "way of doing business to avoid

22   liability."

23       According to Mr. Diaz and his lawyers, Tesla decided that

24   it needed to hire thousands of employees with the various

25   staffing agencies in order to avoid liability.  If that were

1    the case, you wouldn't have these badges.  So the idea that

2    somehow Tesla has this structure to purposely avoid liability

3    makes no sense.

4          Tesla set up this process because it had to hire thousands

5    of employees for its factory.  Tesla is in the business of

6    making cars.  Staffing agencies are in the business of hiring

7    people to staff that factory, the 5.3 million square feet.

8    This was not a structure purposefully to avoid liability.

9          nextSource.  According to Wayne Jackson, talks about who

10   he works for and what his role is.  He's basically the manager

11   over nextSource Staffing employees to make sure that they are

12   there when they are supposed to be.

13         So in this particular case we believe the evidence is, he

14   is not a joint employee of Tesla.  In fact, if he wanted to be

15   an employee of Tesla, he could have directly applied to Tesla,

16   just like his son Demetric Di-az did.  But that's not what

17   happened here.  He went through the staffing agency.

18         So let's get to the meat of what this case is about.  This

19   is the case about these allegations by Mr. Diaz and whether or

20   not he was subjected to a racially hostile work environment by

21   Tesla.  The question is not at Tesla.  The question is by

22   Tesla.  So when you're looking at the evidence, you have to

23   determine whether or not Tesla, by Tesla not at Tesla, is the

24   question.

25         And this is part of what the judge has advised is the law

 1   and what you're required to follow.  So when you're looking at
 2   who did the racially harassing environment, the racially
 3   harassing comments, you have to ask your question:  Was this by
 4   Tesla?  Not at the factory.
 5        So if you look at this, the question is going to be --
 6   we'll go through the evidence.  The answer is no.  Ramon
 7   Martinez, Judy Timbreza, Robert Hurtado, and then according to
 8   Mr. Diaz eight to ten other people, he doesn't know who they
 9   are or where they work for.
10        So if you're going to find against Tesla, you've got to
11   find that Tesla employees during this entire time period, the
12   nine and a half months, were engaged in all this racially
13   hostile environment, and it was so severe that Tesla employees
14   did it because Tesla is the one that's being held responsible,
15   and that they violated the law.
16        And the evidence is going to show that no Tesla employee
17   violated the law as is set forth by the courts and as set forth
18   by the law under Title VII.
19        Next, Question Number 4:  Did Mr. Diaz prove all of the
20   elements of liability on the civil rights violation in the
21   contractual relationship?
22        5:  Did Tesla fail to take all reasonable steps necessary
23   to prevent Mr. Diaz from being subject to racial harassment?
24        I put all three of these together because they should be
25   determined sort of in the same way because -- we're going to go

 1   through the evidence, and all of these questions should be

 2   answered no.  They should be answered no because that is what

 3   the law requires in this case, regardless of your feelings,

 4   regardless of whether or not you think other people may have

 5   heard the "N" word, like Michael Wheeler or anyone else,

 6   because that is not what you're being asked to decide.

 7       You will see in this verdict form Michael Wheeler's name

 8   is nowhere in the verdict form.  Wayne Jackson's name is

 9   nowhere in the verdict form.  That's not what you're being

10   asked to determine.

11       And, in fact, the evidence in this case showed neither

12   Michael Wheeler nor Wayne Jackson ever said they heard any of

13   these racial slurs against Mr. Diaz.  Mr. Diaz never testified

14   that he was in the presence of Michael Wheeler or Wayne Jackson

15   when they heard these other sort of "N" word in the workplace.

16       No one from Tesla got up and said:  You know what?

17   Mr. Wheeler and Mr. Jackson, we heard all this and we just

18   ignored it.  That's not the evidence at all.

19       You're not being asked to determine any kind of Tesla

20   liability because of what Mr. Wheeler said or Mr. Jackson said,

21   because that's not what's part of the verdict form.

22       So when you look at the verdict form, you're going to make

23   decisions and part of the decision is going to be these two

24   theories of liability, 3A and 3B.  And looking at Questions 1,

25   4, 5 and 3A and B, the evidence is all going to be the same.

1    And those questions, the answers are no, and I'm going to tell

2    you why.

3         Mr. Diaz has testified with no one supporting his claims

4    at all that the "N" word was said to him constantly every day

5    and every other racial sure under the world for nine and a half

6    months.

7         What we do know is that when he complained about things,

8    they were responded to.  And the Judy Timbreza incident was the

9    first one.  And according to Tom Kawasaki, Tom Kawasaki

10   testified that it was the "N" word.  That's what he testified

11   to.

12        And if you believe that, that is perfectly fine.  Because

13   if that is the case and he said that and it was racially --

14   racist language was in the email, you can still answer the

15   questions no.  And you have to answer the questions no because

16   at that point in time, when the complaint is made, and if you

17   believe Tom Kawasaki's testimony in the court, as opposed to

18   what he wrote at the time, you can believe both.

19        At the time there was nothing in writing about the

20   "N" word.  At the time there was a comment about racist

21   comments, absolutely.  That's what the email says.

22        What we do know, though, is that when that complaint was

23   made, and Tom Kawasaki made -- did the right thing when it went

24   up the flagpole, so to speak.  When it was made, it was

25   addressed.  Mr. Diaz was happy with the result, and it never

1    happened again.  That's about taking responsibility.

2         And what we do know is there's lots of emails.  You can

3    imagine in this case there were thousands of emails on all

4    kinds of issues, and the ones that you saw in this case are the

5    ones that you base your decision on.

6         And in this particular case when the complaint was made

7    and it went to Ed Romero, all the emails talk about racially

8    offensive remarks.  Absolutely, 100 percent correct.  We do not

9    dispute that.  But the question we're being judged on is:  Once

10   that complaint was made, what was done?  And did it stop and

11   did it ever happen again?  And, in fact, in this case it's

12   undisputed that that's what happened.

13        And, in fact, when I asked Mr. Diaz about that, his

14   response is that he was satisfied with this response.  And, in

15   fact, there was no other contact.  That's what taking

16   responsibility is about, and that is what happened in this

17   case.  And Mr. Timbreza is not a Tesla employee.

18        So at least as to that incident, nothing is there.  As to

19   that incident, there is -- it's clear that they took action to

20   prevent harassment, and it stopped and it ended for Mr. Diaz.

21        Mr. Diaz was believed.  And if you're going to hold Tesla

22   responsible for this one, Tesla believed Mr. Diaz.  Tesla made

23   sure, if you're going to believe Tesla is responsible, that

24   Mr. Timbreza was out of the workplace.  This is the way it was

25   handled in July of 2015.

 1          According to Mr. Diaz though, he's still being called the

 2     "N" word all the time.  He's still being called, and there is

 3     no evidence of that.

 4          Let's go to the Rothaj Foster incident, which is in

 5     November of 2015.  And this is the incident.  It's a complaint

 6     by Mr. Diaz, absolutely.  It's a complaint about aggressive

 7     behavior, a threat, whatever you want to say it was.  And if

 8     Tesla is going to be held responsible, again, took

 9     responsibility, believed Mr. Diaz.  And Mr. Foster, who was

10     investigated, Mr. Foster was walked off.  Never saw Mr. Foster

11     again.

12          And that there was no "N" word here.  Mr. Alexander and

13     Mr. Organ said:  Oh, this wasn't about the "N" word.  Fair

14     enough, it wasn't.  Absolutely.  But the point is Mr. Diaz is

15     complaining again, and there's nothing in writing about all

16     this horrible sort of environment he's talking about.

17          And if you recall from the opening statement,

18     Mr. Alexander talked about threats and -- threats and violence

19     and that sort of thing.  This is the threat, one of the

20     threats, according to Mr. Alexander, and there's nothing there

21     about the "N" word.  That's what this is about.  That's why we

22     had that in the opening statement.  There is nothing in here

23     from Mr. Diaz about any type racial comments, et cetera.

24          What he's suing for are the racial comments, and that's

25     not here either.  It was investigated, immediately handled,

1    Foster was terminated.  That's taking responsibility.  That's

2    doing the right thing.  That's believing Mr. Diaz.

3         Now, we get to the Ramon Martinez elevator incident on

4    October 17, 2015.  This is the incident that we've spent a lot

5    of time talking about.  And this is the incident that,

6    according to Mr. Diaz, was the, quote, "prior bad act" by

7    Mr. Martinez before we get to the cartoon incident in January

8    of 2016.

9         This is the incident where, according to Mr. Diaz, there

10   is an altercation at the elevator and words are exchanged.  And

11   according to Mr. Diaz, this is when Ramon Martinez, again, his

12   nemesis since the beginning of his -- start of his assignment,

13   has been calling him the "N" word.  According to Mr. Diaz's

14   testimony, more than 30 times.

15        Mr. Diaz started at the Tesla facility in June.  We're in

16   October.  This is practically every single day.  They didn't

17   work together every day.  But every day, if you're going to

18   believe Mr. Diaz, this was being called him every single day.

19        What we do know is on this day, October 17, 2015, Ramon

20   Martinez and Owen Diaz complained about each other.

21   Undisputed.  They also talked about this incident in the

22   elevator.

23        It's your decision, your determination as to who was

24   telling the truth:  All, some, or part.  But we do know there

25   was an interaction between them.  They both complained.  And we

1   do know when Mr. Diaz had the choice to complain and describe

2   what happened.  He chose not to put any racial slurs in his

3   complaints.  He chose not to talk about the prior interactions

4   he supposedly had with Mr. Martinez.  He chose not to say:  Oh,

5   by the way, he's been saying these things to me all of the

6   time.

7        What they did -- what he did decide to do is talk about

8   what occurred there.  And he did talk about Mr. Martinez

9   yelling at him.  Absolutely.  He did complain about this, hey,

10  saying you have a problem with me.  Why are you telling him who

11  his supervisor is?  And all of this.

12       He also said that there was another witness there, Rothaj

13  Foster, who, again, about a month later was let go, who is

14  supporting him.  Where is Rothaj Foster?  Another witness.  No

15  statements from Rothaj Foster.  Mr. Diaz didn't ask Mr. Foster

16  to write a statement to this one like he did with Lamar

17  Patterson.

18       But what we do know, what the facts are in this case,

19  there was an interaction.  There was a yelling match, whatever

20  you want to call it.  There was an incident between

21  Mr. Martinez and Mr. Diaz on October 17, 2015.  And what we do

22  know is that when Mr. Diaz had the opportunity to say whatever

23  he wanted about Mr. Martinez, he chose not to say any of the

24  words that he's suing for here today.  That's what we do know.

25       You have to judge Mr. Diaz at the time as to whether or

1    not he's -- that we, Tesla, violate the law.  So what he did at

2    the time.

3        And what we do know is that after this elevator incident,

4    they were both verbally counseled.  In other words:  Both

5    behave.  No more yelling.  They agreed to do that, apparently,

6    because they had no contact until January of 2016.

7        That's Tesla taking responsibility.  That's addressing it.

8    That's taking action.  That's making sure that this type of

9    conduct, if you can even call this harassing conduct, does not

10   happen again.

11       Now, we get to the cartoon incident, the drawing incident.

12   As Mr. Alexander and Mr. Diaz talk about it, the jigaboo or the

13   picaninny.

14       This is not appropriate for the workplace, absolutely.

15   Regardless of the intent, it was not -- should not be part of

16   the workplace.  And you heard testimony as to the context for

17   this drawing, this Inki drawing from the '40s, '50's and '60's.

18   You heard context from Mr. Martinez as to how it got there,

19   about this competition between or among the shifts.

20       Look, people shouldn't be fooling around and drawing

21   cartoons on bales.  100 percent agree.  The question then

22   becomes, because what Mr. Alexander said in opening is that

23   Mr. Martinez purposely wrote this cartoon and intended for Owen

24   Diaz and no one else to find this cartoon.  And that is simply

25   untrue.

1        What's remarkable is that when Ramon Martinez got up to

2   testify and explain what he did and why he drew it and the

3   context of that all, Mr. Diaz had a chance to get back up here

4   and rebut that and he failed to do that.

5        Mr. Martinez at least explained the context of this

6   ridiculousness of writing cartoons to each other.

7   Mr. Diaz [sic] explained where he got this cartoon and why he

8   wrote "booo."

9        Sitting here in 2021, and if you're from the United States

10  or not from the United States and not appreciating what this

11  can mean, people are going to take it differently at times.

12  I'm not justifying folks writing cartoons at work, but you have

13  to look at to whether or not in the context of everything and

14  what Mr. Diaz is saying, that this was left for him

15  intentionally and purposely and racially to harm him.  The

16  evidence there is simply not there.

17       Was this cartoon stupid?  Absolutely.  Absolutely.  Was

18  writing the Pac-Man and everything else on the bale stupid?

19  Absolutely.  It should not have been done.

20       The question is whether or not Mr. Martinez, who was a

21  Chartwell employee, who was doing this cartoon, intended to be

22  racially insensitive to Mr. Diaz in particular, and that's

23  simply not true.

24       At the time this occurred, Ramon Martinez, according to

25  him -- again not rebutted by Mr. Diaz -- this is what he did.

1    He apologized, didn't understand it, and wrote his own

2    statement.  If you take a look at his statement, which is

3    Exhibit 287, read it for yourself.

4        The argument that somehow Tesla got ahold of Ramon

5    Martinez in Materials and told him to write a statement in his

6    own words admitting to the very conduct for the reason that

7    we're here makes no sense.  That argument makes no sense.

8        Chartwell handled this.  He wrote it.  He admitted it.  He

9    explained what it was.  He was counseled.  He was suspended.

10   Final written warning.  And nothing ever happened again.

11       And you saw Mr. Martinez's testimony.  You can take it for

12   what it is, but he clearly testified unrebutted that this has

13   changed him, this allegation, what he did, not understanding

14   what it was.

15       If you look at Mr. Diaz's -- I'm sorry, Mr. Martinez's

16   statement, the line in there that says, quote (as read):

17           "I believe he see me so I tell him, 'Owen, I'm

18       sorry.  I did draw the picture and never mean nothing

19       bad.'  I explain him all about it and he tell me that

20       white people use it for other purposes."

21       That's not something that Tesla or anyone else would tell

22   someone to write.  This comes from Mr. Martinez.  That's the

23   way he writes, that's the way he reads, and that's who he is.

24   Tesla was not behind this type of apology or this type of

25   explanation.

1        And what we do know is that once this was done, Mr. Diaz

2   gave his side of the story.  He complained, properly

3   complained.  He had every right to complain, and he was

4   supposed to complain, and he did.  And as soon as he

5   complained, it was responded to and dealt with.  And after

6   this, Mr. Martinez, suspended, final written warning, training.

7   He never had any contact with Mr. Diaz again.

8        So if you're going to talk about Tesla or an organization

9   taking responsibility, responsibility is always addressing the

10  issue, taking discipline, making sure it ends.  In this

11  particular case, Mr. Diaz is talking about three different

12  individuals over a nine-month period of time who engaged in

13  conduct he felt was inappropriate, and he has every right to

14  complain and those were handled.

15       But what he's suing here for is not about any of these

16  incidents, other than the Ramon Martinez one.  What I mean by

17  that is, he's here talking about all the comments, all of the

18  horrible racial slurs.  That's what we're here to talk about.

19       So what we do know is that at least as of January 2016, in

20  this instance alone when Mr. Diaz has another opportunity to

21  complain about Ramon Diaz -- I'm sorry, Ramon Martinez,

22  Mr. Diaz wrote a long complaint letter, a proper complaint,

23  properly done.  Nothing about the "N" word or these other

24  horrible slurs, and nothing about anything else, although this

25  is wrong.  Ramon Martinez was counseled.  Mr. Diaz was not

 1   counseled with respect to this.  There's an apology and there

 2   were no other HR issues at all.

 3         So if we go to the question on the verdict form,

 4   Question 6, this is the negligent supervision or continued

 5   employment of Ramon Martinez, and what this talks about when

 6   you're looking at the jury instructions, it talks about the

 7   unfitness of an individual.  It's not simply making a complaint

 8   about someone.  It's about the unfitness.  And Instruction

 9   Number 35 gives you the law as to what you need to decide only

10   with respect to Mr. Ramon Martinez.  No one else is at issue

11   here.

12         And if you take a look at that instruction, it talks about

13   whether or not Ramon Martinez was employed by Tesla during the

14   time that Mr. Diaz worked for Tesla.  The answer to that

15   question is no.

16         Question Number 2, another element, whether Ramon Martinez

17   was or became unfit or incompetent to perform the work for

18   which he was employed.  No.

19         Question 3:  That Tesla knew or should have known that

20   Ramon Martinez was or became unfit or incompetent and that the

21   unfitness or incompetence created a particular risk to others.

22   The answer to that question is no as well.

23         That after Tesla knew or should have known of Ramon

24   Martinez's unfitness or incompetence, it retained or supervised

25   Ramon Martinez in his position at Tesla's factory.

1    So if you look at all of these, this question has to be

2  answered no given Instruction 35.

3    So finally we get to the Robert Hurtado incident in

4  February of 2016.  This is an incident in the elevator yet

5  again.  According to Mr. Diaz, Robert Hurtado has been calling

6  him the "N" word for months.  According to Mr. Diaz, just like

7  Mr. Martinez, the "N" word more than 30 times.  No evidence of

8  anyone hearing any of that at any point in time during

9  Mr. Diaz's nine and a half months at the facility.

10    What we do know from Mr. Diaz's testimony is that during

11  this time, February of 2016, that he had an argument, a run-in

12  with Mr. Hurtado.

13    You heard testimony from Joyce DelaGrande about the issues

14  that some of her leads and other folks in material were having

15  with Mr. Diaz.  You heard from Mr. Diaz and you heard from his

16  lawyers that he was behaving this way:  Don't talk to me except

17  about business because of all the racial slurs.

18    You, the jurors, can decide what was the actual truth.

19  And the truth you should look at as to what was going on at the

20  time, does Joyce DelaGrande have any reason to say anything

21  other than the emails that she sent to Ed Romero, getting

22  complaints from various other people unrelated to any of this,

23  from Hilda, from other folks.  You can look at all of those

24  emails.  At this point in time other folks, who have no idea of

25  what's going on between -- according to Mr. Diaz, between

1   Mr. Diaz and Mr. Martinez or anyone else.

2        What we do know is that they had this altercation, this

3   argument at the elevators.  What we do know from Mr. Diaz is

4   that the witness was Lamar Patterson.  And what we know is that

5   Mr. Patterson wrote this email February 26th and sent it to

6   Owen Diaz.  What's remarkable is that Mr. Diaz never testified

7   he sent this email to anyone, that anything was done.

8        What we also don't know is that Mr. Patterson didn't come

9   here and testify and explain what this email was.

10       What we do know is the absence of facts as asserted by

11  Mr. Diaz as to what happened with Mr. Hurtado.  Mr. Diaz claims

12  that Mr. Hurtado during this incident called him the "N" word.

13  And if you recall, on cross examination I asked Mr. Diaz what

14  was actually said.  I asked him:  Was this the time that the

15  "N" word was said?  Do you remember what his testimony was?  He

16  said he didn't recall.

17       And this is important because if you look at the context

18  of what was going on here, complaints about him, he was still

19  doing his job.  He testified he was still doing his job, but

20  there were issues about those complaints, and that's only

21  important in the context of his complaint about being called

22  the "N" word at this time.  Otherwise, it's kind of irrelevant.

23       But at this time he is talking about his fellow coworkers.

24  They're talking about him.  And now he's claiming that during

25  this time period Mr. Hurtado, a Tesla employee, has called him

1  the "N" word, and there's no evidence of that.  And that's what

2  he's suing and trying to hold Tesla responsible for.

3       And this is what he said on cross-examination when I asked

4  him, in particular, for this incident (as read):

5       "QUESTION:  "Did Mr. Hurtado call you the "N" word?

6       "ANSWER:  I just can't remember at this particular

7       time."

8       Then when I showed him the email from Lamar Patterson

9  where it wasn't in there, he couldn't explain it.

10      Mr. Diaz says:  I asked him to write a statement.  I told

11 him to be truthful.

12      So at the time there is no "N" word, and that's what he's

13 suing Tesla for now.  You cannot hold Tesla liable for

14 something that just didn't happen.

15      You also heard testimony from Joyce DelaGrande about

16 Robert Hurtado.  Mr. Diaz never got up to rebut Joyce

17 DelaGrande's testimony.  So you know what?  That's just not

18 true.  He never said that.  He had an opportunity to do that.

19 It would take him two minutes to say:  You know what?  I sat

20 right here.  What Joyce DelaGrande said wasn't true.  He didn't

21 do that because he knows it was true.  It was an opportunity

22 for Mr. Diaz and he chose not to.

23      So in this particular case where Mr. Diaz is claiming and

24 seeking millions of dollars, hundreds of millions of dollars,

25 there is no evidence on this particular incident that it

1    actually occurred as he claims.  There is no "N" word.  No

2    witnesses.  He can't remember.  This issue was addressed.

3         Now, from looking at all of this, you have to sort of look

4    at all of the facts in a -- you can't look at them in a vacuum.

5    You have to look at everything that happened at the time.

6         And one of the things that happens in a trial when you're

7    on the defense, you only get one opportunity.  Mr. Alexander

8    gets to get back up here and say whatever he wants to say about

9    what I have presented.  So this part of my presentation, which

10   is getting to -- coming to an end, I'm going to talk to you

11   about why I think his story doesn't make sense and why they

12   have not proved their case and why no damages should be imposed

13   in this particular case for Mr. Diaz.

14        So looking at this, Mr. Diaz's story just doesn't make

15   sense.  If you look at what he was talking about regarding the

16   graffiti, we've talked about this graffiti in the bathroom.

17   There probably was graffiti in the bathroom at some point in

18   time.  Mr. Alexander and Mr. Organ read testimony about -- or

19   some discovery about Andres Donet about the graffiti being

20   there and being cleaned up.

21        Mr. Diaz said:  I saw it in there.  I didn't take a

22   picture.  I didn't want to take a picture in there.

23        He was in there by himself.  You take a picture.  Say:

24   This is what I saw.  He took pictures of the bale.  He took

25   pictures of that when he thought it was important.

1        Was there graffiti in the bathroom?  We don't have any

2   evidence there was, other than what Mr. Diaz said and a couple

3   other folks said there was graffiti in the bathroom.  One

4   bathroom?  Two bathrooms?  900 bathrooms?  They say "a

5   bathroom."  It's got to be the men's bathroom.  Maybe one men's

6   bathroom at Tesla had graffiti in it.

7        But that's not what this case is about.  The case is about

8   what Mr. Diaz is seeking damages for and his environment at the

9   time.

10       So if, in fact, you're going to believe Mr. Diaz in this

11  case from the opening statement and through his testimony about

12  all of these racial slurs that were said, all the time on a

13  daily basis, that Mr. Alexander said in his closing:  Every

14  day, every day, there are racial slurs.  Every single day.

15  Horrible environment.  I cannot believe he survived it.  Caused

16  emotional distress.

17       You don't go home and you recommend to your youngest son

18  to come and work in this environment because it's going to be a

19  good place to work.  You don't do that.  If it is true, you

20  protect your son and you don't say:  You know what?  I thought

21  it was going to be another part of the factory.  I thought it

22  was going to be with another staffing agency.

23       Mr. Diaz testified that he encouraged his son to come work

24  in the very place where he's claiming they're all snakes, and

25  he's claiming this was done every single day.

1          According to Dr. Reading, Dr. Reading said Mr. Diaz said

2    the first 20 days.  So in June of 2015.  His son does not come

3    to work there until August of 2015.  It doesn't make any sense.

4          Also, his daughter applied to Tesla.  And no one is

5    talking about any of this.  It doesn't make sense if, in fact,

6    you are working at a place where these slurs are being said all

7    of the time.

8          And when Mr. Diaz was asked about whether he warned his

9    son:  I don't remember.

10         You remember that, and you remember that because that's

11   what you're supposed to do if, in fact, what he's claiming is

12   true is actually occurring.  And then if it's true, you don't

13   have him work there, and you warn him not to work there.

14         But that's not what happened here.  You don't have your

15   son come to a workplace where you know he's going to be

16   racially abused.  You don't do that.  And if you find it

17   happens, them you complain on his behalf.

18         And remember what Mr. Diaz said:  I didn't do anything

19   about it.  I told my son Demetric to go talk to a supervisor.

20   That's all I did.  It doesn't make sense.

21         More importantly, in this case it doesn't make sense.

22   This is Exhibit 379.  This is about Demetric Di-az.  According

23   to Owen Diaz, his son worked through West Valley from about

24   August to early October of 2015 and then was let go by

25   West Valley.

1    According to Mr. Diaz, this is the worst experience ever.

2 According to Mr. Diaz, he saw his son Demetric Di-az being

3 called the "N" word, and it broke his heart.  According to

4 Demetric Di-az, this is a horrible thing.  He was told -- he

5 was called these words.

6    If you're going to believe that, how do you explain that

7 living in the same house with Mr. Diaz, Owen Diaz, and the

8 sister La'Drea Jones, does Demetric Di-az then apply directly

9 through Tesla; not going through the staffing agency that let

10 him go, applied on October 25th, 2015, when he was let go three

11 days before?  This doesn't make sense.  If you're going to

12 believe Mr. Diaz, you can't explain this.

13    Mr. Diaz's daughter, La'Drea, lived in the same household,

14 applies for Tesla.  This is a family affair.  What was

15 remarkable is that when -- after she applied, she told her

16 father: Hey, I applied for a job at Tesla.  Again, the summer

17 of 2015.  He was probably like: Oh, okay.  But didn't say

18 anything else.

19    If you're going to believe Mr. Diaz, you're going to

20 believe he said:  Come on, Daughter, come work at this horrible

21 place.  Hey, Son, come on, work at this horrible place.  It's

22 all good.  It doesn't make any sense.  You can't believe

23 Mr. Diaz's story that this is what occurred, and this is

24 testimony from his son and his daughter.

25    You also can't believe Mr. Diaz's story because at this

1  time going on he refers another individual to come work at the

2  Tesla factory.   That was Lamar Patterson, who became his

3  subordinate according to Mr. Diaz.   He forwarded the email, the

4  resume, so Lamar Patterson could get an assignment at Tesla.

5       And what's remarkable about this testimony is that

6  remember on cross Mr. Diaz, I asked him about this.   Like, why

7  would you do on this?   Because, he said, he was shorthanded.

8  He wanted to get someone else in there.   "I was selfish and

9  because I needed help."

10      Remember at the beginning in Mr. Diaz's testimony he said

11 he wanted to do this case, wanted to make sure no one else got

12 harmed?   Mr. Diaz allowed, according to him, if you're going to

13 believe his story, Lamar Patterson to come into this

14 environment.   His son and his daughter to come into this

15 environment.   So you've got to believe one or the other.   It

16 doesn't make any sense.

17      Mr. Diaz's attorneys talked about Tesla is using all this

18 nice language, racist comments and not willing to use the

19 "N" word in documents.   It's a horrible word.   I'm going to

20 tell you, it's a horrible word.   It shouldn't be used.

21      But the fact that Ed Romero did, in fact, put it in an

22 email and did, in fact, report it in quotes in December of 2015

23 is proof that Ed Romero, regardless of whatever he remembered

24 at the time, he did put it in writing.   If you remember, this

25 was an exhibit that was admitted for a limited purpose only.

 1   It had to do with the credibility of Mr. Romero, according to

 2   the judge.

 3        But the purpose of this email, to look at it, is to show

 4   that when Ed Romero was told about a complaint using that word,

 5   he obviously wasn't afraid to put it in writing.  This is from

 6   Ed Romero to Wayne Jackson and to HR.

 7        So like I said before, I'm the defense.  I only get one

 8   opportunity to talk to you, and so this is the part of the

 9   evidence where I hope you don't get to this part.  I don't

10   think the evidence substantiates it, but you need to -- I need

11   to talk to you about the damages, because that's part of what

12   they are seeking in this particular case.

13        In this case, as I understand, Mr. Diaz is not looking for

14   any economic damages.  He's only seeking emotional distress

15   damages.  And when looking at this, when it says "past

16   non-economic," that means past emotional distress damages.  So

17   it's in the past.  Future non-economic damages are future

18   emotional distress damages going into the future.

19        And I believe, if I understood it correctly, Mr. Alexander

20   is asking for basically a million dollars a month for emotional

21   distress damages in the past.  There is no evidence to

22   support -- if you're going to believe Mr. Diaz's testimony,

23   there's no evidence to support an award of $6- to $9 million of

24   emotional distress damages.

25        The testimony in this case is that Mr. Diaz did talk about

1    sleepless nights and the like.  And Ms. Jones, his daughter,

2    testified about finding her father up at 3:00 or 4:00 in the

3    morning watching TV.  He testified to that.  That's not worth

4    $6- to $9 million.

5         There's also evidence from Dr. Reading.  He testified

6    after about six or eight months, maybe a year from when he got

7    his new job, he was basically back to normal.  You heard from

8    the daughter, La'Drea Jones:  Yeah, he's back to normal.

9         If, in fact, you find that there is some type of an award

10   for emotional distress, it is not in the seven-figure range in

11   this particular case.  The evidence is simply not there.

12   Mr. Diaz did not testify to have a severe emotional upset that

13   would warrant an award of up to approximately $10 million,

14   according to Mr. Alexander.

15        We don't believe that he's actually entitled to any

16   emotional distress damages, past or future, based upon the

17   evidence in this case.

18        And you can take a look at the jury instructions as to --

19   Jury Instruction 38, that emotional distress damages should not

20   be based on speculation, guesswork, or conjecture.  And those

21   numbers are all of that.  And there's no way in this particular

22   case do emotional distress damages in this case, in this

23   particular case, make any sense, especially given that Mr. Diaz

24   is looking to be compensated, primarily, according to

25   Dr. Reading and according Mr. Diaz, for what he claims is the

 1  injuries that occurred to his son Demetric Di-az and which he

 2  could not stop and the guilt he's associated with that.

 3       Finally, I need to talk about the one last element of

 4  damages here, which are Questions 9 and 10, and these are

 5  punitive damages.  Punitive damages are damages that go to

 6  Mr. Diaz.  So in this particular case Mr. Alexander is asking

 7  that Mr. Diaz be awarded, depending on the number, somewhere

 8  between $100 million and $10 million to Mr. Diaz as punitive

 9  damages.

10       This is not a punitive damages case.  All the conduct that

11  he complained about was stopped.  He testified that the time

12  period between October 17th and January 21st of 2016 with

13  Mr. Martinez, no contact.

14       There's no evidence that the cartoon was, in fact,

15  directed to Mr. Diaz.

16       The issues with Mr. Martinez in October 17th, 2015 were

17  handled and responded to.  No "N" word there.

18       The issues with Judy Timbreza in July of 2015 were

19  handled.

20       This is not a punitive damages case.  There is no reason

21  here to punish Tesla on behalf of Mr. Diaz in light of the

22  facts of this case.

23       This is a case where at the time Mr. Diaz was working at

24  the Tesla facility.  He has a story that he tells now that was

25  different from the story that he told then.  You have to judge

1   the facts in this case as to what happened at the time, what

2   the evidence is, and what you can discern at the time.

3        Mr. Diaz is seeking to hold Tesla responsible for

4   everything that occurred to him and to which there is very

5   little evidence.  And in particular, the words he is seeking to

6   have you determine are Tesla's responsibility, there's no

7   evidence this happened like he said it happened.  And because

8   of that, he has not carried his burden of proof.

9        Although you may feel that Mr. Diaz should get some money,

10  that is not the standard.  The standard is following the law.

11  And in this particular case under these set of circumstances

12  with these set of facts, we ask that you return a verdict on

13  behalf of Tesla and answer no to all the questions on the

14  verdict form.

15       Thank you very much.

16       **THE COURT:**  Thank you, Ms. Kennedy.

17       Plaintiffs, do you have a rebuttal?

18                    **REBUTTAL ARGUMENT**

19       **MR. ALEXANDER:**  Thank you for your patience.  Thank

20  you for your attention.  Let me just address a few of the

21  issues that were raised by Ms. Kennedy.

22       First, blaming the victim.  You heard testimony from

23  Mr. Diaz that with regard to his son, he regretted allowing his

24  son to come into the workplace.

25       With regard to his daughter, he was happy that she ended

1    up not coming into the workplace.

2        But it would appear that Tesla is blaming -- acknowledging

3    that a hostile work environment exists in its workplace and

4    blaming Owen for allowing his son to be inside that workplace.

5    It seems slightly backward to me.

6        It is undisputed that Tesla structured the workplace to

7    avoid liability.  I'm not sure what the logic is.  Because they

8    issued badges, that doesn't mean that they intended to avoid

9    liability?  I don't quite understand the logic of that.

10       We referred you to Exhibit No. 62.  When Mr. Diaz applied

11   to work at Tesla, he did not apply to work at a staffing

12   company.  He found out after the fact that he was being

13   redirected to another company.  So when he applied, he was

14   intending to apply for Tesla.

15       And so when you look at the evidence and when you look at

16   the evidence that I've shown you and look at the documentation,

17   he is a joint employee.

18       And in terms of him being a beneficiary of the contract,

19   every employee that they hire through those contract companies

20   was a contract employee.  They were all Tesla's employees.  So

21   when the "N" word was used, it was being used by one of Tesla's

22   employees.

23       And so when Tesla tries to convince you that they did not

24   structure the workplace as a means of avoiding liability, that

25   is absolutely not true.

1    So with regard to there being no witnesses to use of the

2    "N" word, apparently Ms. Kennedy forgot the testimony from

3    Mr. Kawasaki.  Mr. Kawasaki confirmed that Owen Diaz did, in

4    fact, confirm that the "N" word was used and Owen complained

5    about it.  And in terms of the "N" word and whether it's

6    recorded, he made oral complaints about the "N" word.

7    Play the video associated with the "N" word.

8    An employer cannot rely on the fact that a person didn't

9    place something in writing.  An employer has an obligation to

10   address even oral statements.  Because to say because Owen did

11   not place it in writing, we had no obligation, we can ignore

12   it, that's simply a deflection because that's what normal

13   people do.  They make an oral complaint.  They say:  This is

14   wrong.  Is what occurred.

15   (Videotape played in open court, not reported.)

16   So the fact that Tesla can point to things not being in

17   writing is just an excuse to say that they had no

18   responsibility.

19   With regard to the bale, this bale that was placed there,

20   if you remember when I went through the testimony, Ramon

21   Martinez claims that he didn't bring the bale there.  But if

22   you walk through the logic of it, in order to draw this on the

23   bale, you had to be able to have access to it.

24   And then when you bring forklifts, what you would have

25   normally done is you would have to bring the forklifts, stick

1    them underneath the bale, and then lift it in order to carry

2    it.  And then at that point the bale would be facing the other

3    way so that the person who walked up to it would not see it.

4         Ms. Kennedy is basically saying:  Accept what Mr. Martinez

5    says in terms of his intention.  He didn't intend it to be bad.

6    Based on his upbringing, he just thought this was a cartoon.

7         And the reason he wrote a cartoon associated with those

8    Pac-Men, but didn't refer to the shifts like the others and put

9    "booo" on it is not because he intended racism, it's because of

10   his culture.  That is the version of the facts that Ms. Kennedy

11   would like for you to believe.

12        But if you look at the law, the law says you don't look at

13   it from the point of view of Mr. Martinez and what he said, if

14   you want to believe what he said, if you think that what he

15   said is credible.  You look at it from the point of view of the

16   victim, Mr. Diaz.  And it's what Mr. Diaz thought when he saw

17   it.  It's what Mr. Wheeler thought when he saw it.  It's what

18   Mr. Jackson thought when he saw it.  Those three black men saw

19   it and recognized it for what it was, a racist epithet.

20        And to say that there's no connection between the person

21   who attacked Mr. Diaz in the elevator and used the "N" word and

22   the fact that this racist epithet was left for him is really

23   just silly.

24        And the fact that it was facing this way, that someone

25   went to the trouble to face it this way, suggests to me that

1   Mr. Martinez is the one that put it there, not someone else.

2   Because logically when it was picked up and brought over, given

3   that the forklift -- you can see it behind the photograph.

4   Someone went to a lot of trouble to make sure that the

5   photograph was facing the person that was going to receive it.

6        With regard to the evidence, we did not call Mr. Patterson

7   because we already addressed that testimony.  In other words,

8   there was no impeachment of Mr. Diaz.  There was no reason to

9   call Mr. Diaz to repeat what he had previously testified to.

10  If they thought -- if the defendant thought that they needed to

11  have Mr. Patterson, they had the ability to bring him.

12       There was a reference to Exhibit No. 254.  There is no 254

13  in evidence.  So you should be able to -- you should ignore

14  that information.

15       With regard to Owen Diaz and working inside the workplace,

16  there was no point after he started working there where he had

17  any other contact with CitiStaff.  From the moment he got

18  there, all of his direction came from Tesla inside the factory.

19  And so with regard to the issue of contract and joint employer,

20  I believe, based on what I argued before and what I'm

21  expressing to you now, that that is the evidence.

22       And so we get to the issue of damages, and so what I've

23  done is I've proposed a number to you of value, and I've

24  proposed that value based on the harm that Mr. Diaz suffered

25  and also based on the severity of having an "N" word used

1    inside the workplace under these circumstances.

2        There is never a circumstance when I argue for justice and

3    put a value where the defendant agrees with the value of

4    justice.  Justice is not cheap.

5        And Ms. Kennedy's job is to seek a discount on justice, to

6    convince you that the value of emotional distress when the

7    "N" word is used inside the workplace is trivial.

8        When we experience emotional distress in our lives, from

9    your experience, from your life, we understand how emotional

10   distress occurs.  I asked a question during the voir dire:  Do

11   you believe that emotional distress can occur from the

12   workplace?  Do you believe it can?  And how is it expressed in

13   your lives?  It's expressed through sleeplessness, anxiety.

14   It's expressed in not being able to sleep, being up in the

15   middle of the night.  It's expressed in not being able to have

16   clear thoughts, being distracted in your regular life by the

17   conduct.

18       But some words, some conduct has more impact than others.

19   And so in terms of the discount Ms. Kennedy seeks for emotional

20   distress, I leave it to you, because we trust the jury system.

21   I have every confidence in you that based on what you've heard

22   in terms of the evidence, that you'll be able to reach the

23   right conclusion in this case.

24       And she wants to point to the fact as to where the money

25   is going as a way to say don't award the money.

 1        But remember, we asked for one number as to Mr. Diaz and

 2   another number in order to get Tesla's attention.  Tesla has

 3   come in and they have told you a story and tried to chop up the

 4   facts so that you look at things in isolation, but it's about

 5   the totality of the circumstances.

 6        If you remember the burden of proof:  Is it more likely

 7   than not that we proved that harassment occurred inside the

 8   workplace?  Did I get you to lean?  It is more likely than not

 9   that Tesla is a joint employer and a contractual employer and

10   responsible not just for Mr. Diaz, but for every employee that

11   it stocked its workplace with?  Is it more likely than not?

12        Is it more likely than not that Mr. Diaz suffered

13   emotional distress as a result of being in this environment and

14   Tesla not taking responsibility for it?

15        It is up to you to decide the damages.  I only suggest a

16   number; but whatever number you decide with regard to the

17   emotional distress value, we'll trust your judgment because you

18   have the ability to determine what is fair, what is right, what

19   will make Mr. Diaz whole.

20        A couple years from now you'll be looking back at this

21   trial and you'll be thinking about your service on the trial,

22   and at that point Mr. Diaz won't be able to tell you:  I still

23   have fear.  I still have anxiety.  In my new job I'm afraid for

24   the next time this is going to happen.  He's not going to come

25   back to you -- be able to come back to you a couple years from

**REBUTTAL ARGUMENT / ALEXANDER**

1  now and say:  I still worry.  I still fret.  I still have

2  anxiety.  I still wake up every once in a while and get up in

3  the middle of the night.

4       So when you are determining your number, when you're

5  figuring out what that number is, be fair and be full.

6       There is a final comment.  Amanda Gorman wrote a poem:

7  Being American is more than a pride that we inherit.  It's the

8  past we step into and how we repair it.

9       This trial has been about the past.  It's been about what

10 happened to Owen Diaz in the nine months that he worked at this

11 company where they didn't take responsibility, and you have

12 stepped into that past with Owen so that we can tell the story.

13 But in terms of repairing it and moving forward, you have the

14 power to help Owen repair his life.

15      And you also have the power to fix Tesla, because the

16 number that I asked for was not so that Owen would be rich.  It

17 was so that Tesla would take responsibility.  So you would get

18 their attention because we have not been able to get their

19 attention.  With Owen's complaints, he was not able to get

20 their attention.

21      But you, as jurors, you speak not just on behalf of

22 yourselves.  As jurors, you speak on behalf of society.  You

23 speak on behalf of all of us and all the people outside this

24 courtroom.  You are the ones that can hold Tesla accountable

25 for what they have failed to do, for them taking zero

1   responsibility for this workplace.

2        So that number that Ms. Kennedy tried to distract you with

3   by saying "Owen is going to get all that money," that is not so

4   that he becomes rich.  That is so Tesla will take

5   responsibility, so they will finally have a light shed on the

6   workplace, and so that you can render by your verdict a

7   cleansing effect so that Tesla will have no choice but to know

8   that they have to take responsibility for their workplace.

9        We trust you as the jury.  I look forward to you

10  determining the amount damages that are due Owen Diaz.  I look

11  forward for you determining how much money it will take to get

12  the attention of Tesla.  And whatever your number is, because

13  we trust the jury verdict system, because we trust you, because

14  we know that you have been paying attention, because we know

15  that you understand, whatever number you determine, I'll shake

16  your hand and thank you for your service.

17        Thank you.

18        **THE COURT:**  All right.  Ladies and gentlemen, that

19  concludes the argument.

20        Now, you've heard for the last two and a half hours the

21  lawyers describe their perspectives on what you have learned

22  and how they hope you have learned it.  I want to remind you of

23  the thing that I underscored a couple of times in the opening

24  instruction and I gave it again.  What the lawyers say isn't

25  evidence.  You are the arbitrators of the facts, and you are

1  the ones -- and your duty is to follow the instructions that I

2  have provided.  So I think those things are very important.

3       With respect, Mr. Alexander did mention Exhibit 254, and

4  it's also my understanding that that exhibit was never

5  introduced into evidence.  And so I would -- if you see it back

6  there, then you can consider what Ms. Kennedy described about

7  it, but I don't believe that you will see it.

8       In any event, let me now go to the concluding

9  instructions.

10                **CONCLUDING JURY INSTRUCTIONS**

11       **THE COURT:**  Before you begin your deliberations, elect

12  one member of the jury as your presiding juror.  The presiding

13  juror will preside over the deliberations and serve as the

14  spokesperson for the jury in court.

15       You shall diligently strive to reach agreement with all of

16  the other jurors if you can do so.  Your verdict must be

17  unanimous.

18       Each of you must decide the case for yourself, but you

19  should also do so only after you have considered all of the

20  evidence, discussed it fully with the other jurors, and

21  listened to their views.

22       It is important that you attempt to reach a unanimous

23  verdict, but, of course, only if each of you can do so after

24  having made your own conscientious decision.  Do not be

25  unwilling to change your opinion if the discussion persuades

 1    you that you should, but do not come to a decision simply

 2    because other jurors think that it's right or change an honest

 3    belief about the weight and effect of the evidence simply to

 4    reach a verdict.

 5         Those exhibits received in evidence that are capable of

 6    being displayed electronically will be provided to you in that

 7    form, and you will be able to view them in the jury room.  A

 8    computer will be available to you in the jury room.  The

 9    Courtroom Deputy will show you how to operate the computer and

10    how to locate and view the exhibits on the computer.

11         You will also be provided with a paper list of all

12    exhibits received in evidence.  You may request a paper copy of

13    any exhibit received in evidence by sending a note through the

14    clerk.  If you need additional equipment or supplies or if you

15    have questions about how to operate the computer, you may send

16    a note to the Clerk signed by your foreperson, or the presiding

17    juror as described in the previous instruction, or by one or

18    more members of the jury.  Do not refer to or discuss any

19    exhibit you were attempting to view.

20         If a technical problem or question requires hands-on

21    maintenance or instruction, a court technician may enter the

22    jury room with the Clerk present for the sole purpose of

23    assuring that the only matter that's discussed is the technical

24    problem.

25         When the court technician or any non-juror is in the jury

**CONCLUDING JURY INSTRUCTIONS**

1    room, the jury shall not deliberate.  No juror may say anything

2    to the court technician or any non-juror other than to describe

3    the technical problem or to seek information about the

4    operation of the equipment.  Do not discuss any exhibit or any

5    aspect of the case.

6        The sole purpose of providing the computer in the jury

7    room is to enable jurors to view the exhibits received in

8    evidence in this case.  You may not use the computer for any

9    other purpose.

10       At my direction technicians have taken steps to ensure

11   that the computer does not permit access to the internet or to

12   any outside website, database, directory, game, or other

13   material.  Do not attempt to alter the computer to obtain

14   access to such materials.

15       If you discover that the computer provides or allows

16   access to such materials, you must inform the Court immediately

17   and refrain from viewing such materials.

18       Do not remove the computer or any electronic data from the

19   jury room and do not copy any such data.

20       Because you must base your verdict only on the evidence

21   received in the case and on these instructions, I remind you

22   that you must not be exposed to any other information about the

23   case or to the issues it involves.

24       Except for discussing the case with your fellow jurors

25   during your deliberations:

1    Do not communicate with anyone in any way and do not let

2  anyone else communicate with you in any way about the merits of

3  the case or anything to do with it.  This includes discussing

4  the case in person, in writing, by phone, tablet, computer, or

5  any other means, via email, via text messaging, or any internet

6  chat room, blog, website or application, including, but not

7  limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn,

8  Snapchat, TikTok, or any other forms of social media.  This

9  applies to communicating with your family members, your

10  employer, the media or press, and the people involved in the

11  trial.

12    If you're asked and/or approached in any way about your

13  jury service or anything about this case, you must respond that

14  you've been ordered not to discuss the matter and to report the

15  contact to the Court.

16    Do not read, watch, or listen to any news or media

17  accounts or commentary about the case or anything to do with

18  it.  Do not do any research, such as consulting dictionaries,

19  searching the internet, or using other reference materials; and

20  do not make any investigation or in any other way try to learn

21  about the case on your own.  Do not visit or view any place

22  discussed in this case, and do not use internet programs or

23  other devices to search for or view any place discussed during

24  the trial.

25    Also, do not do any research about this case, the law, or

1    the people involved, including the parties, the witnesses, or

2    the lawyers until you've been excused as jurors.  If you happen

3    to read or hear anything touching on this case in the media,

4    turn away and report it to me as soon as possible.

5        These rules protect each party's right to have this case

6    decided only on evidence that's presented here in court.

7    Witnesses hear in court take an oath to tell the truth and the

8    accuracy of their testimony is tested through the trial

9    process.

10       If you do any research or investigation outside the

11   courtroom or gain any information through improper

12   communications, then your verdict may be influenced by

13   inaccurate, incomplete, or misleading information that has not

14   been tested by the trial process.

15       Each of the parties is entitled to a fair trial by an

16   impartial jury, and if you decide the case based on information

17   not presented in court, you will have denied the parties a fair

18   trial.  Remember, you've taken an oath to follow the rules, and

19   it's very important that you follow these rules.

20       A juror who violates these restrictions jeopardizes the

21   fairness of these proceedings, and a mistrial could result that

22   would require the entire trial process to start over.  If any

23   juror is exposed to any outside information, please notify the

24   Court immediately.

25       If it becomes necessary during your deliberations to

 1   communicate with me, you may send a note through the deputy,

 2   signed by any one or more of you.  No member of the jury should

 3   ever attempt to communicate with me except by a signed writing.

 4   I will not communicate with any member of the jury on anything

 5   concerning the case except in writing or here in open court.

 6        If you send out a question, I will consult with the

 7   lawyers before answering it, which may take some time.  You may

 8   continue your deliberations while waiting for the answer to any

 9   question.

10        Remember that you're not to tell anyone, including the

11   Court, how the jury stands, whether in terms of vote count or

12   otherwise, until you've reached a unanimous verdict or have

13   been discharged.

14        A verdict form has been prepared for you, which I went

15   over with you earlier.  After you've reached unanimous

16   agreement on a verdict, your foreperson should complete the

17   verdict form according to your deliberations, sign, and date

18   it, and advise the deputy that you're ready to return to the

19   courtroom.

20        So that, ladies and gentlemen, are -- those are the

21   instructions.  You now are free to discuss the case amongst

22   yourselves and deliberate on this matter.

23        I told you earlier that time that you deliberate, when you

24   come in in the morning, when you leave in the afternoon, will

25   be your decision.  I'd like you to communicate that decision to

1    Ms. Davis so that the people will know when you're working here

2    and when you're home thinking about working here, and so I will

3    leave that to you.

4          And I think at this point -- Ms. Davis, I think if you

5    would take the jury to the deliberation room.  Thank you.

6          (Jury exits the courtroom at 12:33 p.m.)

7              **THE COURT:**  All right.  Please be seated, everybody.

8          First, in the future if -- I could not find Exhibit 254

9    because it was unfamiliar to me when you were going through it,

10   Ms. Kennedy.

11         In the future, if somebody introduces something that's not

12   in evidence, please object so that it doesn't come up before

13   the jury.  And if I'm wrong that 254 was introduced, then I

14   apologize for saying what I said; but I don't see it, and I

15   think that's a problem.

16         The second thing is with the juror and owning a mutual

17   fund.  I would be happy to bring the juror in to see whether

18   learning that fact over the weekend makes any difference in his

19   or her ability to assess the matter fairly.  So that would be

20   what I would do, but I will do what anybody else wants me to

21   do.

22             **MR. ALEXANDER:**  Your Honor, that inquiry would be

23   helpful.  It would be helpful to find out why he was looking

24   over the weekend, why he happened to be checking whether or not

25   he has Tesla shares.  So that would be helpful.  I appreciate

PROCEEDINGS

 1    that.

 2            THE COURT:  All right.  So we'll get him.  So don't go

 3    away.

 4        (Brief pause.)

 5        (Juror Ralph Araya enters courtroom.)

 6            THE COURT:  So good afternoon.

 7            JUROR ARAYA:  I have to do this in front of everybody,

 8    huh?

 9            THE COURT:  Yes, you've got everybody here.

10        Remind me what juror number you are.

11            JUROR ARAYA:  25, I believe.

12            THE COURT:  Okay.  So Ms. Davis indicated that you had

13    told her that you figured out over the weekend that you had --

14    you might have stock in a mutual fund that holds some Tesla

15    stock; is that right?

16            JUROR ARAYA:  Yeah.  I wasn't aware of it when you

17    asked the original question on Monday.  It's just never

18    anything that I thought about, you know, beforehand.  I'm sure

19    anybody who holds a mutual fund, you know, doesn't always know

20    what's actually in there.

21        But, yeah, I was just made aware that I do own Tesla stock

22    in that mutual fund.

23            THE COURT:  And so how did you learn about that?

24            JUROR ARAYA:  I -- to be honest with you, the question

25    popped into my head just recently because you had asked it on

**PROCEEDINGS**

1   last Monday, but I haven't had a moment to think at all during

2   the week.  It's just been a very hectic, busy weekend.  I

3   shared that with you earlier before trial the started.

4        But, anyway, I just Googled my mutual fund ticker number

5   or, you know, what I'm referring to.

6        **THE COURT:**  Yeah.  Yeah.

7        **JUROR ARAYA:**  I don't remember what it's called.

8        And just out of curiosity, does this particular mutual

9   fund hold Tesla, and it popped right up and says it's in there.

10       **THE COURT:**  And so does that make any difference --

11  did learning that make any difference to you in the way that

12  you think about the evidence in the case?

13       **JUROR ARAYA:**  The evidence, no.  It -- I will be

14  completely honest with you, the thought popped into my head,

15  this whole notion of punitive damages, and the scope became

16  much bigger, as I understand it.  Does that make sense?

17       **THE COURT:**  Uh-huh.

18       **JUROR ARAYA:**  To be honest with you, before the trial

19  even started, I don't know that I even fully understood what

20  that term meant and what the implication was and what the

21  result was of something like that.

22       But after hearing both arguments today, after hearing what

23  the intent of that would be and after understanding now the

24  scope of something that punitive damages could -- maybe how far

25  reaching that might be, the thought crossed my mind, yeah.

**PROCEEDINGS**

1  **THE COURT:** Okay. So you -- it hasn't -- had an

2  impact on you. The argument today and knowing that you own

3  some Tesla stock, those two things had some impact.

4  **JUROR ARAYA:** It all came into my mind, yeah. So

5  listening -- listening, being educated today, now understanding

6  much more today. And then that's why I felt the need to share

7  it because, well, one, again just trying to do the right thing,

8  right, and understanding that I should have told you the first

9  time around. I wasn't aware, but now that I am aware and now

10  understanding the scope of what we are really here to do today,

11  it all came -- it all came full circle.

12  **THE COURT:** All right. Well, so what I'd like is --

13  is there -- you look like there's something else that you

14  wanted to say.

15  **JUROR ARAYA:** No. Just thinking, yeah.

16  **THE COURT:** Well, so I appreciate your bringing this

17  to our attention. And what I'm going to ask you to do is just

18  stand outside for a moment. I want to talk to the lawyers for

19  a minute or two --

20  **JUROR ARAYA:** Okay.

21  **THE COURT:** -- and then I'm going to ask you to come

22  back.

23  **JUROR ARAYA:** Sounds good.

24  **THE COURT:** I will ask Ms. Davis to go out and stand

25  with you.

**PROCEEDINGS**

1          **JUROR ARAYA:**  Okay.

2          **THE COURT:**  Enjoy the beauty of our hallway back

3    there.

4          **JUROR ARAYA:**  That sounds good.

5       Yeah, I guess my hope is just that anything that I've done

6    or withheld or anything as a result affects those guys, I would

7    feel terrible if that was case.

8          **THE COURT:**  Because you brought it up when you did and

9    became aware of it when you did, you have had zero impact --

10         **JUROR ARAYA:**  Okay.

11         **THE COURT:**  -- on that.

12      So you should feel like you have done the responsible,

13   appropriate thing.  And I really -- I very much appreciate what

14   you've done.

15         **JUROR ARAYA:**  Okay.  Well, thank you for saying that.

16   That makes me feel better.  I appreciate it.

17      (Juror Araya exits courtroom.)

18         **THE COURT:**  So I am inclined to let him go.

19      Okay.  Let's bring him back in.

20      (Juror Araya enters courtroom.)

21         **JUROR ARAYA:**  That was fast.

22         **THE COURT:**  Well, I just -- again, I wanted to thank

23   you for jury service.  And I remember that this was something

24   that was going to be hard for you before because of your

25   responsibilities with your family.

 1          And I'm going to excuse you from further service on the

 2     jury and thank you for serving and for bringing this issue to

 3     our attention.

 4          **JUROR ARAYA:**  A whole week, huh?  I appreciate it.   I

 5     appreciate it.

 6          **THE COURT:**  So what you should do at this point is

 7     collect whatever belongings that you have back there.  Don't

 8     communicate with your fellow jurors.  You can find out what

 9     happens through Ms. Davis.  She will let you know.  But,

10     otherwise, whatever you do, don't communicate with your fellow

11     jurors while they are in the course of deliberation.

12          **JUROR ARAYA:**  Okay.

13          **THE COURT:**  And if you have any other questions, you

14     can ask Ms. Davis as you're walking back towards the jury room.

15          **JUROR ARAYA:**  Okay.  Thank you.

16          **THE COURT:**  Thank you very much.  I really appreciate

17     it:

18          (Juror Araya exits courtroom.)

19          **THE COURT:**  And with that, we're adjourned.

20          I want everybody to be within 15 minutes of this

21     courtroom.  Once we learn what the -- how the jury intends to

22     deliberate time-wise, Ms. Davis will let you know so that you

23     have that, and otherwise we'll see where it goes.

24          Thank you.

25          **MR. ORGAN:**  Your Honor, can we work here in the

**PROCEEDINGS**

```
 1   courtroom?

 2            THE COURT:  So, everybody, you can go.  This is sort

 3   OF a non-question -- or stay -- whatever you want to do.  You

 4   can stay now.

 5        I think in general the 18th floor is a beautiful place to

 6   go.  There's a great Attorney Lounge up there, and I think

 7   that's where you ought to go.  You should clean up your stuff,

 8   and then tomorrow you should be working somewhere not in this

 9   courtroom.

10            MR. ORGAN:  Okay.

11            MS. KENNEDY:  Your Honor, do we know how long they're

12   going to stay today yet?

13            THE COURT:  No.

14            MS. KENNEDY:  Okay.  Thank you very much.

15            THE COURT:  They're going to figure that out when they

16   figure it out.

17        (Whereupon there was a recess in the proceedings

18         from 12:46 p.m. until 2:40 p.m.)

19        (Proceedings held in open court, outside

20         the presence and hearing of the jury.)

21            THE COURT:  Please be seated everybody.

22        So tell me what the issue is.

23            MS. NUNLEY:  When we were putting the Exhibit List and

24   binder to go to the jury room, we realized an exhibit that was

25   not admitted into evidence was inadvertently submitted to the
```

1   jury on the thumb drive.

2          THE COURT:  Okay.

3          MS. NUNLEY:  We're not sure at this point if the

4   jurors saw it, but we did know the thumb drive did go back to

5   the jury room.  So we would appreciate if the jury receive an

6   admonishment if they did look at Exhibit 206, to completely

7   disregard it as it was not admitted into evidence.

8          THE COURT:  All right.  What is 206?

9          MS. NUNLEY:  Exhibit 206 is -- it's a packet of

10  several documents from the staffing company that plaintiff

11  worked for CitiStaff.  With -- it's like their policies on, I

12  think, sexual harassment and not job abandonment.

13         MS. JENG:  It's like the Orientation Sign-Off Sheet,

14  Assignment Abandonment, Safety Quiz, General Code of Safe

15  Practices, Weapons-Free Workplace, Sexual Harassment Policy,

16  Drugs and Alcohol Policy, and Meals and Breaks Policy.

17     One of the pages, I think, was admitted as part of another

18  exhibit.

19         THE COURT:  All right.  So you want me to bring the

20  jury in and tell them if you looked at 206, don't.

21     Has it been removed now from the --

22         MS. NUNLEY:  Yes, Your Honor.  It's been removed from

23  the thumb drive, from the Exhibit List, and from the binder to

24  be submitted to the jury.

25         THE COURT:  And can you confirm for me that the

1    exhibit that Ms. Kennedy referred to during closing, 254, was

2    not admitted?

3         **MS. NUNLEY:**  Yes, Your Honor.  Exhibit 254, according

4    to our notes and our review transcript, was not admitted into

5    evidence.

6         **THE COURT:**  Right, Ms. Jeng?

7         **MS. JENG:**  That's right.

8         **THE COURT:**  All right.  Ms. Davis, would you be so

9    kind as to get the jury.

10       (Brief pause.)

11       **THE COURT:**  Supposedly the jury is working on a

12   question.  So we'll wait until we get the question and then

13   we'll do this all at once.

14       (Brief pause.)

15       **THE COURT:**  All right.  We have had our first note

16   from the jury, and I don't think it's one that we can answer

17   directly.  I think it was one that was asked during voir dire.

18       My inclination is to refer them back to the instruction

19   and tell them that that's -- that the things they need to

20   consider are held within that instruction and they shouldn't be

21   thinking about anything else.

22       So that's my -- that's my inclination.  Is there anything

23   from either side that would differ from that?

24       **MR. ALEXANDER:**  No, Your Honor.  I think that's

25   correct.

PROCEEDINGS

```
 1              THE COURT:  Ms. Jeng?

 2              MS. JENG:  No.

 3              THE COURT:  All right.  Let's get the jury.

 4              MS. JENG:  And, Your Honor, Ms. Kennedy is on her way

 5     back.

 6              THE COURT:  From here?

 7              MS. JENG:  Around the courthouse.

 8              THE COURT:  Do you want me to wait for her?

 9              MS. JENG:  Yeah, if we could.  I think she's close.

10              THE COURT:  Okay.

11         (Brief pause.)

12         (Enter Ms. Kennedy.)

13              THE COURT:  All right.  Get the jury.

14         (Jury enters the courtroom at 2:55 p.m.)

15              THE COURT:  All right.  Please be seated everybody.

16         Ladies and gentlemen, you sent -- you received a note, and

17     I wanted to respond to it and then tell you two other things.

18         So with respect to the note itself, the only things that

19     you are to consider are in the Jury Instruction.  I can't

20     answer the question that you asked directly to me.  You should

21     read the entire instruction, No. 40, as a whole and make your

22     determination based on that instruction and that instruction

23     alone.

24         In addition, the hard drive or whatever went back to you

25     with all of the exhibits included an exhibit which had not been
```

1   admitted into evidence, and that was Exhibit No. 206.  If you

2   happened to have looked at it, disregard anything that you

3   looked at.

4        And the other thing that I wanted to say, at the end of

5   the argument there was a question as to whether one of the

6   exhibits that Ms. Kennedy referred to, which was Exhibit 254,

7   which related to Mr. Hurtado, whether that had been admitted

8   into evidence.  It hadn't.  It's not back with you.  You should

9   disregard what she said about that and -- and disregard the

10  portion of the exhibit that was on the screen.

11       So, thank you.  You can now continue your deliberations

12  and we'll see you when we see you.

13       (Jury exits the courtroom at 2:57 p.m.)

14       THE COURT:  All right.  See you again sometime.

15  (Whereupon there was a recess in the proceedings

16       from 2:57 p.m. until 4:22 p.m.)

17  (Proceedings held outside the presence of the jury.)

18       THE COURT:  Be seated everybody, please.

19  We have received the second question:

20       "Do we have to come up with a dollar amount for

21   No. 10?  If yes, we have a verdict."

22  I'm not sure what the jury is asking, but I thought I

23  would send back a note to say:

24       "Yes, your verdict must be unanimous on each

25       question.  If you have decided unanimously to award

PROCEEDINGS

```
 1        punitive damages, you must also agree unanimously on

 2        the amount."

 3            MS. KENNEDY:  No objection from the defense.

 4            MR. ALEXANDER:  No objection.

 5            THE COURT:  Okay.  So I'm going to write that out, and

 6   I'll send Ms. Davis back, and that might save us a little time.

 7        (Brief pause.)

 8            THE COURT:  Okay.  So that's what I've written:

 9             "Yes, your verdict must be unanimous on each

10        question.  If you have decided unanimously to award

11        punitive damages, you must also agree unanimously on

12        the amount."

13        Ms. Davis, please get that to the jury.

14        See you again.

15        (Whereupon there was a recess in the proceedings

16         from 4:25 p.m. until 4:32 p.m.)

17            THE COURT:  So it appears we have a verdict.  So are

18   you all ready?  Let's get the jury.

19        (Jury enters the courtroom at 4:35 p.m.)

20            THE COURT:  All right.  Please be seated everybody.

21        Ms. Davis, can you confirm that all the jurors are

22   present?

23            THE CLERK:  Yes.  The eight who began deliberating are

24   here.

25            THE COURT:  All right.  Ladies and gentlemen of the
```

1   jury, have you arrived at your verdict?

2        (Jury panel responding affirmatively.)

3        **THE COURT:**  Would the presiding juror please hand the

4   jury verdict to Ms. Davis, who will hand to it me.

5        (Whereupon document was tendered to the Court.)

6        (Brief pause.)

7        **THE COURT:**  Ms. Davis, please read the verdict into

8   the record.

9        **THE CLERK:**  In the United States District Court for

10  the Northern District of California.  In the matter of Owen

11  Diaz versus Tesla, Incorporated, et al, Case No. 17-4748, we

12  the jury find as follows.

13       One:  Was Owen Diaz subjected to a racially hostile work

14  environment by Tesla incorporated?  Yes.

15       Two:  Was Tesla, Incorporated a joint employer of Owen

16  Diaz?  Yes.

17       Three:  Did Owen Diaz prove all of the elements of:

18       A, hostile work environment caused by a supervisor?  Yes.

19       B, hostile work environment caused by a non-immediate

20  supervisor or coworker?  Yes.

21       Four:  Did Owen Diaz prove all the elements of liability

22  based on civil rights violation in a contractual relationship?

23  Yes.

24       Five:  Did Tesla, Incorporated fail to take all reasonable

25  steps to prevent Owen Diaz from being subject to racial

1    harassment?  Yes.

2         Six:  Did Tesla, Incorporated's negative -- or, I'm sorry.

3    Did Tesla, Incorporated's negligent supervision or continued

4    employment of Ramon Martinez cause harm to Owen Diaz?  Yes.

5         Seven:  What past non-economic damages did Owen Diaz

6    sustain as a result of Tesla, Incorporated's unlawful conduct?

7    $4,500,000.

8         Eight:  What future non-economic damages is Owen Diaz

9    likely to sustain as a result of Tesla, Incorporated's unlawful

10   conduct?  $2,400,000.

11        Nine:  You may only award punitive damages for the reasons

12   discussed in Instruction No. 40; that is, if you find the

13   defendant's conduct that harmed the plaintiff was malicious,

14   oppressive or in reckless disregard of the plaintiff's rights.

15        Do you find by a preponderance of the evidence that Owen

16   Diaz is entitled to punitive damages against Tesla,

17   Incorporated for either creating a hostile work environment

18   based on race or violating civil rights in a contractual

19   relationship and/or failing to prevent harassment based on race

20   in the workplace?  Yes.

21        Ten:  What amount of punitive damages do you award to Owen

22   Diaz?  $130 million.

23        This is dated October 4th and signed by the foreperson.

24            **THE COURT:**  Ladies and gentlemen of the jury, is that

25   your verdict?

```
1           (Jury panel responding affirmatively.)

2               THE COURT:  The verdict will be received and accepted.

3        Do the parties wish the jury to be polled?

4               MR. ALEXANDER:  No, Your Honor.

5               MS. KENNEDY:  Yes, Your Honor.

6               THE COURT:  All right.

7               THE CLERK:  Juror No. 1, Kerry Page, is this your

8    verdict?

9               JUROR PAGE:  Yes.

10              THE CLERK:  Juror No. 2, Melissa Fernandez, is this

11   your verdict?

12              JUROR FERNANDEZ:  Yes.

13              THE CLERK:  Juror No. 3, Peter Chu, is this your

14   verdict?

15              JUROR CHU:  Yes.

16              THE CLERK:  Juror 4, Deborah Maye, is this your

17   verdict?

18              JUROR MAYE:  Yes.

19              THE CLERK:  Juror No. 5, Brianne Uyeda, is this your

20   verdict?

21              JUROR UYEDA:  Yes.

22              THE CLERK:  Juror No. 6, Malleswaran Viswanathan, is

23   this your verdict?

24              JUROR VISWANATHAN:  Yes.

25              THE CLERK:  And Juror No. 7, Maninder Johar, is this
```

1    your verdict?

2              **JUROR JOHAR:**  Yes.

3              **THE CLERK:**  And Juror No, 9 -- Juror No. 8 having been

4    excused before deliberations -- Darian Hall, is this your

5    verdict?

6              **JUROR HALL:**  Yes.

7              **THE COURT:**  All right.  The Clerk will record the

8    verdict.

9         Ladies and gentlemen, before I discharge you as jurors, I

10   want to thank you again for your service in this case.  There

11   is no greater public trust than to be chosen as a juror to try

12   a case, to sit in judgment on the acts and the motives of

13   others.

14        The law, which is my duty to declare, is relatively easy

15   to find.  It's found in statutes and in prior cases, but the

16   facts of this case, of which you've been the exclusive judges,

17   aren't written down anywhere.  They are usually very much in

18   dispute.  And they are found only after you've determined the

19   truth from the evidence before you.

20        Trial by jury is of the utmost importance in our system of

21   Government.  It's embedded in Article III of the Constitution

22   and in the Sixth and Seventh Amendments.  It's a right that

23   every citizen of the United States has.  It stands as the

24   keystone of our system of justice.  It's the connecting link

25   between the courts and the people.

1    You've demonstrated the willingness of citizens in our

2  district to make personal sacrifices to ensure that all parties

3  who appear in these courts have a full and fair hearing of

4  their disputes by their peers, and you've shown the rather

5  amazing ability of conscientious jurors to understand and

6  respond to sometimes complicated legal concepts and factual

7  situations.  I suspect that this success results from the

8  diversity of backgrounds and experiences that you brought to

9  the jury room and from your ability to listen to the viewpoints

10  of your fellow jurors.

11    Now, counsel and members of the press may wish to ask you

12  questions concerning what went on in the jury room during your

13  deliberations.  You need not discuss your jury service with the

14  lawyers, with the press or even with me.  It may well be that

15  you'll decide simply to keep your own counsel.  You're under no

16  obligation to answer any questions.  If you do answer

17  questions, please respect the privacy of the views of your

18  fellow jurors and use good sense and good judgment in

19  responding.

20    I do know from my days as a trial lawyer that I was eager

21  to hear the perspectives of jurors on how I presented my case.

22  It was very helpful to my trial practice.  But whether you

23  decide to speak with them or not is up to you.

24    So I'm now going to discharge you from the jury service.

25  I'm going to ask you to wait in the deliberation room for a

**PROCEEDINGS**

 1   moment, because I want to come in to thank you personally.  But

 2   at this point the trial is adjourned.

 3        (Jury exits the courtroom at 4:43 p.m.)

 4          **THE COURT:**  All right.  And if the plaintiff will

 5   prepare the judgment and share it with the defense and then

 6   submit it, that would be great.

 7          **MR. ALEXANDER:**  Thank you.

 8          **MS. KENNEDY:**  Yes, Your Honor.

 9          **MS. NUNLEY:**  Yes, Your Honor.

10          **THE COURT:**  Thank you.

11        (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

Monday, October 4, 2021 - Volume 6

|                                          | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| Final Instructions                       | 850      | 6        |
| Closing Argument by Mr. Alexander        | 877      | 6        |
| Closing Argument by Ms. Kennedy          | 927      | 6        |
| Rebuttal Argument by Mr. Alexander       | 959      | 6        |

— — —

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, October 4, 2021