Volume 1

Pages 1 - 171

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
                                   )
          Plaintiffs,              )
                                   )
   vs.                             ) No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   )  San Francisco, California
          Defendants.              )  Monday
                                   )  September 27, 2021
                                   )  8:00 a.m.
_____)

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**         ALEXANDER MORRISON & FEHR LLP
                            1900 Avenue of the Stars
                            Suite 900
                            Los Angeles, California 90067
                     **BY:  BERNARD ALEXANDER, ESQ.**


                            CALIFORNIA CIVIL RIGHTS LAW GROUP
                            332 San Anselmo Avenue
                            San Anselmo, California 94960
                     **BY:  LAWRENCE A. ORGAN, ESQ.**
                          **CIMONE A. NUNLEY, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR*
          Official Reporter - US District Court
          Computerized Transcription By Eclipse

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

**APPEARANCES:   (CONTINUED)**

For Defendants:                SHEPPARD MULLIN RICHTER & HAMPTON LLP
                               333 S. Hope Street
                               43rd Floor
                               Los Angeles, California 90017
                      BY:  **TRACEY A. KENNEDY, ESQ.**


                               SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                               379 Lytton Ave
                               Palo Alto, California 94301
                      BY:  **PATRICIA M. JENG, ESQ.**


                               SHEPPARD MULLIN RICHTER & HAMPTON LLP
                               Four Embarcadero Center
                               17th Floor
                               San Francisco, California 94111
                      BY:  **SUSAN Q. HAINES, ESQ.**


Also Present:                  **JOSEPH ALM, ESQ.**
                               - Tesla, Inc.

                               **YUSUF MOHAMED, ESQ.**
                               - Tesla, Inc.

                               **VALERIE CAPERS WORKMAN**
                                - Tesla, Inc.


                               —   —   —

PROCEEDINGS

| | |
|---|---|
| 1 | <u>**Monday - September 27, 2021**</u>                    <u>**8:02 A.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---oOo--- |
| 4 | (Proceedings held in open court, outside |
| 5 | the presence and hearing of the jury.) |
| 6 | **THE COURT:**  Good morning, everybody.  Be seated. |
| 7 | All right.  So there are a couple of things that were |
| 8 | filed with the McGinn.  I didn't see anything from the defense |
| 9 | on McGinn, so I'm assuming that you are in agreement that those |
| 10 | depositions -- that those objections should be overruled. |
| 11 | **MS. KENNEDY:**  Yes, Your Honor.  I believe that is |
| 12 | correct. |
| 13 | **THE COURT:**  Okay.  So I'm going to overrule the |
| 14 | objections to designations 6 and 13. |
| 15 | The next thing is the Nigel Jones motion.  Why is that |
| 16 | coming 19 months after I ruled? |
| 17 | **MR. ORGAN:**  Your Honor, I think when you ruled, it |
| 18 | was -- it was unclear to us whether or not we were going to be |
| 19 | able to use him in the case-in-chief or not, and that's the |
| 20 | issue because he did -- he was at the factory at the time that |
| 21 | Owen Diaz was there. |
| 22 | **THE COURT:**  Mr. Organ -- |
| 23 | **MR. ORGAN:**  He worked in the -- yes, Your Honor. |
| 24 | **THE COURT:**  -- did you look at the order that I made |
| 25 | with respect to Mr. Jones? |

PROCEEDINGS

1          MR. ORGAN:  Yes, I did, Your Honor.

2          THE COURT:  Given the absence of any overlap with

3    Diaz's work, work areas, or supervisors, this testimony is not

4    relevant to Diaz's case-in-chief.

5          As noted above, it could become relevant if Tesla relies

6    on the Faragher-Ellerth defense.  That determination will be

7    determined at trial.

8          MR. ORGAN:  Yes, Your Honor.

9          THE COURT:  So if it's coming in, it's coming in in

10   rebuttal.

11         MR. ORGAN:  Yes, Your Honor.

12         THE COURT:  Okay?

13         MR. ORGAN:  I understand.  Thank you.

14         THE COURT:  You filled in zero gaps that I identified

15   with respect to Mr. Jones' testimony.  Was he deposed in this

16   case?

17         MR. ORGAN:  No.  He's been a witness in two

18   arbitrations.  Defendant has cross-examined him twice.

19         THE COURT:  All right.  Well, so he's not testifying

20   unless the situation changes with respect to what Tesla does

21   with respect to his defense.

22         MR. ORGAN:  Okay.  Thank you, Your Honor.

23         THE COURT:  And let me make this suggestion, that you

24   spend your time working on your case and not trying the case in

25   the papers.  The lawyers need to focus on what happens in this

1    courtroom and not try to go out and try a case somewhere else.

2    I don't want this case to be mistried.

3        So am I making myself clear?

4            **MR. ORGAN:**  Yes, Your Honor.

5            **THE COURT:**  Thank you.

6        All right.  Is there anything else that we need to -- that

7    needs to be taken up before the jury comes?

8            **MS. KENNEDY:**  Your Honor, just one issue on mechanics

9    with exhibits.  Some of them have been stipulated to as being

10   admitted, some have not; and I want to make sure -- I want to

11   follow your procedure on the publishing and showing of

12   exhibits.  I know we've got technology here, and I am not

13   proficient at that.  So I want to make sure that we don't run

14   afoul of publishing an exhibit to the jury before we are

15   allowed to do so.

16           **THE COURT:**  Right.  So this technology allows the

17   lawyers and me to see an exhibit when the jury does not.  And

18   no exhibit should be shown to the jury unless it's been

19   admitted into evidence.  And if there's a stipulation, great.

20   Hopefully, you know exactly what you stipulated to.  So that's

21   how it works.

22           **MS. KENNEDY:**  Okay.  Thank you very much.

23           **THE COURT:**  Okay.

24           **MR. ORGAN:**  And, Your Honor, with respect to that,

25   when you do admit an exhibit, do you want us to ask you prior

1   to publishing it to the jury, or once it's admitted can we do

2   that?

3           THE COURT:  Once it's admitted, it can be published.

4           MR. ORGAN:  Okay.  And then in terms of approaching

5   the witness with their deposition transcripts, if we need to do

6   that, what's your preference relative to that, Your Honor?

7           THE COURT:  If you're going to do that, they should

8   have the transcript up at the witness stand.  If you don't have

9   enough copies, then that's a problem and we'll have to deal

10  with it; but I don't want you hovering over them and pointing

11  to the page and line.  They should be able to have that and

12  look at it and then respond to you.

13      And I should have, obviously, the certified copy up here

14  or some copy of it.

15          MR. ORGAN:  Okay.  Your Honor, I do have an issue with

16  respect to Mr. Romero, who will be testifying second today.

17  Mr. Kawasaki is testifying first.

18      We anticipate based on the time estimates his testimony

19  will take approximately an hour and 15 minutes.  Then

20  Mr. Romero will be testifying for approximately probably an

21  hour and a half, it looks like, based on our estimates.

22      But there are two exhibits that are impeachment exhibits,

23  Your Honor.  Those are exhibits that you reserved ruling on,

24  and so I wanted to bring it to your attention because I don't

25  want to be seen to be -- I don't want -- I don't want to go

```
 1   against your rulings, but I do believe that they are direct
 2   impeachment and it's cumbersome because obviously I'm not sure
 3   how the Court wants me to do this because I don't want to give
 4   a heads-up to the witness, obviously.  There should be at least
 5   some admonishment that defense counsel can't give him a
 6   heads-up about the exhibits.
 7        So I've got the parts of the testimony flagged,
 8   Your Honor.  I would be happy to have the Court read that ahead
 9   of time if you want; or if you want, I can just do it at the
10   time.
11            THE COURT:  Just do it -- I need the deposition.  I
12   need -- if there's -- if there are documents that are related
13   to the testimony, I need to have those.  I don't at the moment
14   have any documents at all up here.  So I need -- and then we'll
15   look at it and deal with it at the time.
16            MR. ORGAN:  Okay.  I just didn't want to think -- make
17   the Court think that I was trying to pull a fast one.  I wanted
18   to make sure I was at least previewing this because I do know
19   this is a sensitive area, and so --
20            THE COURT:  So, Mr. Organ, I have no idea what you're
21   talking about.
22            MR. ORGAN:  No, I understand that, Your Honor.
23            THE COURT:  So I don't know what you're expecting from
24   me, but I appreciate the fact that there may be some issues
25   that come up during Romero.  That's what I understand at the
```

PROCEEDINGS

```
 1  moment.
 2              MR. ORGAN:  Yes, Your Honor.
 3              THE COURT:  Thank you for that.
 4              MR. ORGAN:  Okay.
 5              DEFENSE COUNSEL:  Your Honor, there is one final issue
 6  that would make this a little easier.
 7          If -- we have the depositions electronically, and we also
 8  have them in hard copy.  If we want to read a portion of the
 9  deposition, we could have the witness have a copy.  We can also
10  put it on the witness's screen, if that's -- and everyone
11  else's screen, if that is amenable, assuming that there's no
12  objection to that.
13              THE COURT:  You know, as long as it's something that
14  is either proper cross-examination or admissible.  The thing
15  that I don't want for the witness is to be given a snippet of
16  testimony and not be able to look at the context of what was
17  said.
18              MS. KENNEDY:  Certainly.  Absolutely, Your Honor.
19  That's fine.
20          I have nothing else, Your Honor.
21              THE COURT:  Okay.  Anything else?
22              MR. ORGAN:  Last thing, Your Honor.  We had talked
23  Friday, I think, about at the beginning of the day advising you
24  if we thought we were taking a witness under 611(c).
25  Mr. Romero I believe would be that.  He was the plaintiff's
```

 1   supervisor, and so we believe we can take him under 611(c),

 2   Your Honor.

 3         **THE COURT:**  Okay.  Is there any objection to that,

 4   Ms. Kennedy?

 5         **MS. KENNEDY:**  Yes, that's fine.

 6         **THE COURT:**  It's okay.  So there's no objection?

 7         **MS. KENNEDY:**  No objection.

 8         **THE COURT:**  Okay.

 9      All right.  Anything else?

10      (No response.)

11         **THE COURT:**  We look forward to seeing you here at 8:30

12   when the jury is here.

13      (Whereupon there was a recess in the proceedings

14       from 8:11 a.m. until 9:01 a.m.)

15      (Jury enters the courtroom at 9:02 a.m.)

16         **THE COURT:**  All right.  Please be seated everybody.

17      Good morning, ladies and gentlemen of the jury.  Welcome.

18   Thank you for being here right at the start of this trial.

19      So what's going to happen this morning is I'm going to

20   give you some preliminary injunctions to help you think about

21   how the -- how to think about the evidence that comes before

22   you, and then the parties will give their opening statements

23   and we'll get going.

24      So you are the jury in this case, and Ms. Davis is going

25   to put the Jury Instructions on the screen so that you can

**PRELIMINARY JURY INSTRUCTIONS**

1   follow along.

2          **THE COURT:**  It's my duty to instruct you on the law.

3   It's your duty to find the facts from all the evidence in the

4   case.  To those facts you'll apply the law that I give you.

5   You must follow the law as I give it to you whether you agree

6   with it or not.  And you must not be influenced by any personal

7   likes or dislikes, opinions, prejudices, or sympathy.  That

8   means you have to decide the case solely on the evidence before

9   you.  You'll recall that you took an oath on Friday to do so.

10         At the end of the trial I'll give you my final

11   instructions.  It's the final instructions that will govern

12   your duties.

13         Please don't read into these instructions or anything I

14   may say or do that I have an opinion regarding the evidence or

15   what your verdict should be.

16         To help you follow the evidence I'll give you a brief

17   summary of the positions of the parties.

18         Plaintiff Owen Diaz claims that while working at the Tesla

19   factory in Fremont, California, he was subjected to a hostile

20   work environment based on his race, being African-American or

21   black.

22         In addition, Mr. Diaz claims that Tesla, Inc., failed to

23   take all reasonable steps to prevent race-based harassment

24   towards him, including use of the "N" word, and failed to

25   adequately remedy the harassment after Tesla received notice of

1   it.

2       Mr. Diaz also claims that Tesla, Inc., negligently

3   retained factory workers and supervisors who engaged in

4   harassing conduct towards him.

5       The plaintiff Owen Diaz has the burden of proving these

6   claims by a preponderance of the evidence.

7       The defendant Tesla, Inc., doing business as Tesla Motors,

8   Inc., denies these claims.  Tesla denies that Mr. Diaz was

9   subjected to a hostile work environment based on his race and

10  denies that it failed to take all reasonable steps to prevent

11  race-based harassment in the workplace.

12      Tesla also denies that it negligently hired, retained, or

13  supervised factory workers, employees, or contractors who

14  Mr. Diaz claims engaged in race-based harassing conduct towards

15  him.

16      When a party has the burden of proving any claim or

17  affirmative defense by a preponderance of the evidence, it

18  means you must be persuaded by the evidence that the claim or

19  affirmative defense is probably more true than not true.  You

20  should base your decision on all of the evidence regardless of

21  which party presented it.

22      The evidence you are to consider in deciding what the

23  facts are consists of the sworn testimony of any witness, the

24  exhibits that are admitted into evidence, any facts to which

25  the lawyers have agreed, and any facts that I may instruct you

**PRELIMINARY JURY INSTRUCTIONS**

1  to accept as proved.

2      In reaching your verdict, you may consider only the

3  testimony and exhibits received into evidence.  Certain things

4  are not evidence, and you may not consider them in deciding

5  what the facts are.  I will list them for you.

6      Arguments and statements by lawyers are not evidence.  I

7  will repeat that.  Arguments and statements by lawyers are not

8  evidence.  The lawyers are not witnesses.  What they may say in

9  their opening statements, closing arguments, and at other

10  times, is intended to help you interpret the evidence.  It is

11  not evidence.  If the facts as you remember them differ from

12  the way the lawyers have stated them, your memory of them

13  controls.

14      Questions and objections by lawyers are not evidence.

15  Attorneys have a duty to their clients to object when they

16  believe a question is improper under the Rules of Evidence.

17  You should not be influenced by the objection or by the Court's

18  ruling on it.

19      Testimony that's excluded or stricken or that you are

20  instructed to disregard is not evidence and must not be

21  considered.

22      In addition, some evidence may be received only for a

23  limited purpose.  When I instruct you to consider evidence only

24  for a limited purpose, you must do so and you may not consider

25  that evidence for any other purpose.

1    Anything you may see or hear when the court was not in

2    session is not evidence.  You are to decide the case solely on

3    the evidence received at trial.

4    Some evidence may be admitted only for a limited purpose.

5    When I instruct you that an item of evidence has been admitted

6    only for a limited purpose, you must consider it only for that

7    limited purpose and not for any other purpose.

8    Evidence may be direct or circumstantial.  Direct evidence

9    is direct proof of a fact, such as testimony by a witness about

10   what that witness personally saw or heard or did.

11   Circumstantial evidence is proof of one or more facts from

12   which you could find another fact.  By way of example, if you

13   make up in the morning and see that the sidewalk is wet, you

14   may find from that fact that it rained during the night.

15   However, other evidence, such as a turned on garden hose, may

16   provide a different explanation for the presence of water on

17   the sidewalk.  Therefore, before you decide that a fact has

18   been proved by circumstantial evidence, you must consider all

19   the evidence in light of reason, experience, and common sense.

20   You should consider both kinds of evidence.  The law makes

21   no distinction between the weight to be given to either direct

22   or circumstantial evidence.  It's for you to decide how much

23   weight to give to any evidence.

24   There are Rules of Evidence that control what can be

25   received into evidence.  When a lawyer asks a question or

1  offers an exhibit into evidence and a lawyer on the other side

2  thinks it's not permitted by the Rules of Evidence, that lawyer

3  may object.  If I overrule the objection, the question may be

4  answered or the exhibit received.  If I sustain the objection,

5  the question cannot be answered, and the exhibit cannot be

6  received.  Whenever I sustain an objection to a question, you

7  must ignore the question and must not guess what the answer

8  might have been.

9      Sometimes I may order that evidence be stricken from the

10  record and that you disregard or ignore that evidence.  That

11  means when you're deciding the case, you must not consider the

12  stricken evidence for any purpose.

13      In deciding the facts in this case, you may have to decide

14  which testimony to believe and which testimony not to believe.

15  You may believe everything a witness says or part of it or none

16  of it.

17      In considering the testimony of any witness, you may take

18  into account:

19      The opportunity and ability of the witness to see or hear

20  or know the things testified to;

21      The witness's memory;

22      The witness's manner while testifying;

23      The witness's interest in the outcome of the case, if any;

24      The witness's bias or prejudice, if any;

25      Whether other evidence contradicted the witness's

**PRELIMINARY JURY INSTRUCTIONS**

1    testimony.

2        The reasonableness of the witness's testimony in light of

3    all the evidence;

4        And any other factors that bear on believability.

5        Sometimes a witness may say something that is not

6    consistent with something else he or she said.  Sometimes

7    different witnesses will give different versions of what

8    happened.  People often forget things or make mistakes in what

9    they remember.  Also, two people may see the same event but

10   remember it differently.  You may consider these differences,

11   but do not decide that testimony is untrue just because it

12   differs from other testimony.

13       However, if you decide that a witness has deliberately

14   testified untruthfully about something important, you may

15   choose not to believe anything that witness said.  On the other

16   hand, if you think the witness testified untruthfully about

17   some things but told the truth about others, you may accept the

18   part you think is true and ignore the rest.

19       The weight of the evidence as to a fact does not

20   necessarily depend on the number of witnesses who testify.

21   What's important is how believable the witnesses were and how

22   much weight you think their testimony deserves.

23       We all have feelings, assumptions, perceptions, fears, and

24   stereotypes about others.  Some biases we're aware of and

25   others we may not be fully aware of, which is why they are

1  called implicit or unconscious biases.  No matter how unbiased

2  we think we are, our brains are hardwired to make unconscious

3  decisions.  We look at others and filter what they say through

4  our own personal experience and background.

5      Because we all do this, we often see life and evaluate

6  evidence in a way that tends to favor people who are like

7  ourselves or who have had life experiences like our own.

8      We can also have biases about people like ourselves.  One

9  common example is the automatic association of male with career

10  and female with family.

11      Bias can affect our thoughts, how we remember what we see

12  and hear, whom we believe or disbelieve, and how we make

13  important decisions.

14      As jurors, you're being asked to make an important

15  decision in the case.  You must, one, take the time you need to

16  reflect carefully and thoughtfully about the evidence.

17      Two, think about why you're making the decision you're

18  making and examine it for bias.  Reconsider your first

19  impressions of the people and the evidence in this case.  If

20  the people involved in this case were from different

21  backgrounds, for example, richer or poorer, more or less

22  educated, older or younger, or of a different gender, gender

23  identity, race, religion or sexual orientation, would you still

24  view them and the evidence in the same way?

25      Three, listen to one another.  You must carefully evaluate

**PRELIMINARY JURY INSTRUCTIONS**

1  the evidence and resist, and help each other resist, any urge

2  to reach a verdict influenced by bias for or against any party

3  or witness.

4       Each of you have different backgrounds and will be viewing

5  this case in light of your own insights, assumptions, and

6  biases.  Listening to different perspectives may help you to

7  better identify the possible effects these hidden biases may

8  have on decision-making.

9       And, four, resist jumping to conclusions based on personal

10 likes or dislikes, generalizations, gut feelings, prejudices,

11 sympathies, stereotypes, or unconscious biases.

12      The law demands that you make a fair decision based solely

13 on the evidence, your individual evaluations of that evidence,

14 your reason and common sense, and these instructions.

15      I'll now say a few words about your conduct as jurors.

16      First, keep an open mind throughout the trial and do not

17 decide what the verdict should be until you and your fellow

18 jurors have completed your deliberations at the end of the

19 case.

20      Second, because you must decide this case based only on

21 the evidence received in the case and on my instructions as to

22 the law that applies, you must not be exposed to any other

23 information about the case or to issues it involves during the

24 course of your jury duty.  Thus, until the end of the case or

25 until I tell you otherwise:

1    Do not communicate with anyone in any way and do not let

2  anyone else communicate with you in any way about the merits of

3  the case or anything to do with it.  This includes discussing

4  the case in person, in writing, by phone, tablet or computer,

5  or any electronic means, via email, text messaging, or any

6  internet chat room, blog, website or application, including,

7  but not limited to, Facebook, YouTube, Twitter, Instagram,

8  LinkedIn, Snapchat, TikTok, or any other forms of social media.

9    This applies to communicating with your fellow jurors

10  until I give you the case for deliberation.  And it applies to

11  communicating with everyone else, including your family

12  members, your employer, the media or press, and the people

13  involved in this trial, although you may notify your family and

14  employer that you've been seated as a juror in this case and

15  how long you expect the trial to last.  But if you're asked or

16  approached in any way about your jury service or anything about

17  this case, you must respond that you have been ordered not to

18  discuss the matter and report the contact to the Court.

19    Because you will receive all the evidence and legal

20  instructions you properly may consider to return a verdict, do

21  not read, watch, or listen to any news or media accounts or

22  commentary about the case or anything to do with it.  Do not do

23  any research, such as consulting dictionaries, searching the

24  internet, or using other reference materials.

25    And do not make any investigation or in any other way try

PRELIMINARY JURY INSTRUCTIONS

 1   to learn about the case on your own.  Do not visit or view any

 2   place discussed in this case, and do not use the internet or

 3   any other resource to search for or to view any place discussed

 4   during the trial.

 5        Also, do not do any research about this case, the law, or

 6   the people involved, including the parties, the witnesses, or

 7   the lawyers, until you've been excused as jurors.  If you

 8   happen to read or hear anything touching on this case in the

 9   media, turn away and report it to me as soon as possible.

10        These rules protect each party's right to have the case

11   decided only on evidence that's been presented here in court.

12   Witnesses here in court take an oath to tell the truth, and the

13   accuracy of their testimony is tested through the trial

14   process.  If you do any research or investigation outside the

15   courtroom or gain any information through improper

16   communications, then your verdict may be influenced by

17   inaccurate, incomplete, or misleading information that has not

18   been tested by the trial process.

19        Each of the parties is entitled to a fair trial by an

20   impartial jury, and if you decide the case based on information

21   not presented in court, you will have denied the parties a fair

22   trial.  Remember, you have taken an oath to follow the rules,

23   and it's very important that you follow these rules.

24        A juror who violates these restrictions jeopardizes the

25   fairness of the proceedings and a mistrial could result that

1   would require the entire trial process to start over.  If any

2   juror is exposed to any outside information, please notify the

3   Court immediately.

4        If there is any news media account or commentary about the

5   case or anything to do with it, you must ignore it.  You must

6   not read, watch, or listen to any news media account or

7   commentary about the case or anything to do with it.  This case

8   must be decided by you solely and exclusively on the evidence

9   that will be received in this case and on my instructions as to

10  the law that applies.  If any juror is exposed to any outside

11  information, please notify me immediately.

12       I urge you to pay close attention to the trial testimony

13  as it's given.  During deliberations, you will not have a

14  transcript of the trial testimony.

15       If you wish, you may take notes to help you remember the

16  evidence.  If you do take notes, please keep them to yourself

17  until you go to the jury room to decide the case.  Do not let

18  note taking distract you.  When you leave, leave your notes

19  behind in the jury room.  No one will read your notes.

20       Whether or not you take notes, you should rely on your own

21  memory of the evidence.  Notes are only to assist your memory.

22  You should not be overly influenced by your notes or those of

23  other jurors.

24       From time to time during the trial it may become necessary

25  for me to talk with the attorneys out of the hearing of the

1   jury either by having a conference at the bench when the jury

2   is present in the courtroom or by calling a recess.  Please

3   understand that while you're waiting, we're working.  The

4   purpose of these conferences is not to keep relevant

5   information from you, but to decide how certain evidence is to

6   be treated under the Rules of Evidence and to avoid confusion

7   and error.

8        Of course, we will do what we can to keep the number and

9   length of these conferences to a minimum.  Minimum is zero.

10  That's the number that I'm working towards in this trial.

11       I may not always grant an attorney's request for a

12  conference.  Do not consider my granting or denying a request

13  for a conference as any indication of my opinion of the case or

14  of what your verdict should be.

15       Trials proceed in the following way:

16       First, each side may make an opening statement.  An

17  opening statement is not evidence.  It's simply an outline to

18  help you understand what that party expects the evidence will

19  show.  A party is not required to make an opening statement.

20       The plaintiff will then present evidence, and counsel for

21  the defendant may cross-examine.  Then the defendant may

22  present evidence and counsel for the plaintiff may

23  cross-examine.

24       After the evidence has been presented, I will instruct you

25  on the law that applies to this case, and the attorneys will

 1    make closing arguments.

 2         And after that, you will go to the jury room to deliberate

 3    on your verdict.

 4         So, ladies and gentlemen, those are the preliminary

 5    instructions for you.  And now we'll proceed with the opening

 6    statements of the parties.

 7         Mr. Alexander?

 8              **MR. ALEXANDER:**  Thank you, Your Honor.

 9                           **OPENING STATEMENT**

10              **MR. ALEXANDER:**  If it please the Court, good morning.

11         Once again, my name is Bernard Alexander.  This is Larry

12    Organ, and this is Cimone Nunley.  Collectively we represent

13    Owen Diaz.

14         Everything I'm about to tell you is what the evidence will

15    show.

16         This is a hostile work environment case based on race.

17    Tesla will tell you that it has a zero tolerance policy for

18    racial harassment inside the workplace, but the evidence will

19    show exactly the opposite.  It will show that Owen Diaz

20    throughout the entire time he was working at Tesla was

21    subjected to a hostile work environment based on race.

22         The "N" word was used repeatedly inside of the workplace.

23    Not just by coworkers, but by supervisors, multiple

24    supervisors.  The "N" word was inside the bathrooms.  It was

25    scratched.  It was painted.  It was scrawled.  He saw a

 1    swastika inside the bathroom.

 2         And it wasn't just words.  It was physical intimidation

 3    and attacks.  When people attacked him, they used racial slurs.

 4    They used the "N" word.  And because Tesla failed to take

 5    direct and full responsibility for making sure that the

 6    workplace was free of racial harassment, it got worse.

 7    Employees were emboldened.

 8         One day a supervisor drew a racial epithet, a drawing, and

 9    left it for Owen to find.  Something that my mother called a

10    jigaboo or a pickaninny, a racist drawing meant to demean

11    African-Americans, something from the '40s and '50's in

12    cartoons, where, before it was politically correct, they drew

13    black people as having big lips and a bone in their hair and

14    demeaning them and saying that African-Americans were not

15    intelligent.

16         All of this conduct occurred because Tesla delegated

17    responsibility for the workplace to staffing companies.  And so

18    as a consequence, the evidence will show that while Tesla

19    claims that it has a zero tolerance policy, Tesla could not

20    care less about the "N" word being used repeatedly inside of

21    its workplace.  It could not care less about making sure that

22    employees are properly disciplined so that the conduct stops.

23    It could not care less about making sure that black,

24    African-American employees within its workplace feel safe and

25    don't hear the "N" word or racial slurs.

OPENING STATEMENT / ALEXANDER

1       Now, you are here and we are here because Owen Diaz was

2  called a "nigger" repeatedly inside the workplace.

3       Out of respect for you, out of respect for me as a black

4  man, out of respect for Owen as a black man, I will not repeat

5  that word every time it was directed towards him; but you

6  should know when I say the "N" word or "N," that is exactly

7  what I'm referring to.

8       And I will not distinguish between N-I-G-G-E-R and

9  N-I-G-G-A.  Because this conduct, the use of these words did

10  not occur in someone's backyard or in someone's living room or

11  at a barbecue.  It occurred inside the Tesla workplace.  And

12  there is no version of the "N" word that should be welcome or

13  tolerated inside of a workplace, and we will prove that in this

14  case.

15       So the evidence will show that as opposed to what Tesla

16  says, that it is a zero tolerance policy, the evidence will

17  show that it is a zero responsibility policy.

18       I'm going to talk to you now about how Tesla set up the

19  workplace so that it could avoid liability and not take

20  responsibility for the workplace.

21       Tesla has something called an Anti-Handbook Handbook.  It

22  is not the traditional --

23       Your Honor, if I could have the screen?  Thank you.

24       (Brief pause.)

25       **MR. ALEXANDER:**  Are we just delaying?

1          **THE COURT:**  We're seeing whether it's working.

2          **MR. ALEXANDER:**  I can't tell whether it's our machine

3     or --

4          **THE COURT:**  I don't think it's you.

5          **MR. ALEXANDER:**  Thank you, Your Honor.

6          **MR. ORGAN:**  I brought them.  We can put them on the

7     Elmo.

8          **THE COURT:**  Let's turn on the Elmo.

9          (Brief pause.)

10         **MR. ALEXANDER:**  So Tesla has something called an

11    Anti-Handbook Handbook.  You will see it inside of evidence.

12    It is not the typical handbook that you would expect to see

13    inside the workplace.  It goes through and does not describe

14    the conduct that would violate its policy.  Instead it refers

15    to "stupid stuff."

16         This case, we are here in part with regard to "stupid

17    stuff."  And you will see when you see that Anti-Handbook

18    Handbook, that it treats very serious conduct lightly.  And

19    you're going to find out based on the evidence that in real

20    life Tesla treated serious conduct lightly.

21         One of the things that the Anti-Handbook Handbook does

22    actually say is with regard to this "stupid stuff," harassing

23    conduct and threatening conduct will not be tolerated and will

24    be acted on.

25         Tesla also has an Anti-Harassment Policy, and inside that

 1  Anti-Harassment Policy it says that -- Tesla says that with

 2  regard to an individual and a protected class of race, they

 3  will not be subjected to harassment.  And with regard to

 4  harassment, sexual harassment, racial harassment, they will not

 5  be treated any differently.  And with regard to harassment,

 6  with regard to use of cartoons or caricatures or things of that

 7  nature, drawings, that will not be tolerated.

 8       And if an employee makes a report or the company becomes

 9  aware of this improper racially harassing conduct, it will

10  conduct a prompt, thorough, and impartial investigation; and as

11  a result of that investigation, they will take appropriate

12  corrective action.  That is the commitment that Tesla makes to

13  all of its employees.

14       Now, Tesla has a factory that is 5.3 million square feet.

15  Oracle stadium, where the Giants play, is 1.8 square feet.  The

16  Tesla factory in Fremont is three times larger than that

17  stadium.  Tesla stocks its factory with approximately

18  10,000-plus employees.  Primarily they're contract employees

19  hired through staffing companies.

20       What Tesla does is it advertises for employees, and then

21  contract employees are hired through the staffing companies,

22  and then they work at the Tesla factory.  And that is an

23  artifice to put an entity, staffing companies, in between Tesla

24  and the workplace so that it can attempt to avoid liability.

25       Now, with regard to Tesla, in order for employees to work

1    inside of the workplace, the employees have to go through a

2    safety training.  Tesla will not issue them a badge until

3    they've gone through the safety training.  Every employee,

4    regardless of whether it's a contract employee or a direct

5    Tesla employee, has to go through that training before they get

6    a badge that will get them through the red doors that everybody

7    goes through.

8         But with regard to those employees, while Tesla requires

9    them to do the safety training, they do not receive training on

10   the purported zero tolerance policy.  With regard to the

11   Anti-Handbook Handbook Tesla does not make sure that all those

12   employees get the Anti-Handbook Handbook so that they know that

13   Tesla does not allow discrimination in the workplace.

14        In terms of the Anti-Harassment Policy, Tesla does not

15   make sure that all those employees receive the Anti-Harassment

16   Policy so that they know that Tesla has a zero tolerance

17   policy.

18        And with regard to the "N" word, they do not make sure

19   that everyone knows that the "N" word is not welcome there.

20        To the contrary, you'll hear testimony from a manager at

21   nextSource, Wayne Jackson, a manager who is responsible based

22   on Tesla directing him to kind of supervise all of the other

23   staffing companies.  They have half a dozen staffing companies

24   that Tesla used.

25        And Wayne Jackson will tell you -- Wayne Jackson is an

1   African-American man -- that he walked around the workplace and

2   he heard the "N" word.  And sometimes he'd say something about

3   it to people, but he didn't do anything about it.  He didn't

4   report it to Tesla.  He did not do anything because Tesla did

5   not tell him that he should stop the "N" word from occurring

6   inside the workplace.

7        You'll hear from another supervisor, Michael Wheeler, who

8   also was subjected to racial discrimination inside the

9   workplace, and he will tell you that Tesla did not put a

10  priority on stopping the use of the "N" word inside the

11  workplace.

12       And so as a consequence of Tesla hiring staffing companies

13  to hire contract employees and as a consequence of having

14  multiple staffing companies inside the workplace, there was a

15  patchwork, a fragmented workplace in terms of -- in terms of

16  the policies that applied.

17       So with regard to incidents that occurred, important

18  incidents, serious incidents, a violation of the purported

19  Tesla policy, the nextSource person would send out an email

20  asking:  What policy applies with regard to discrimination

21  against -- I'm sorry, in your company?  It was unclear what

22  policy applied because Tesla did not make sure that there was a

23  uniform policy that applied to all conduct, all violations, all

24  racial harassment.

25       So with regard to employees -- so before employees went

1 inside of the workplace, they were hired by these staffing

2 companies; but once they got inside the workplace, they were

3 indistinguishable from anyone else. You could not tell the

4 difference between a contract employee and a direct Tesla

5 employee. They were all mixed in together, rowing together to

6 do the same thing, to create Tesla cars.

7 And so regardless of the fact that Tesla tried to create

8 this patchwork and put staffing companies between Tesla and its

9 responsibility to its employees, the evidence will show that

10 Tesla was responsible for everything that occurred inside of

11 its workplace, regardless of the fact that they hired staffing

12 companies to hire the contract employees that did the work.

13 And you'll hear testimony that most of the employees inside of

14 the workplace were contract employees, not direct employees.

15 So now I'm going to introduce you to Owen Diaz. Owen Diaz

16 was born in 1968. He's 53 years old. He is a product of the

17 Bay Area. He grew up in Oakland, went to Dewey High School,

18 graduated from there. Went to trade school. At trade school

19 he learned construction, how to deal with roofs.

20 Owen has a family. He's been married -- I believe he's

21 been -- he's been with his wife for about 28 years and married

22 for 20 years. He's got four kids; two boys, two girls.

23 Owen saw an advertisement to work at Tesla. He was on

24 Indeed and there was an ad for Tesla there, and so he clicked

25 on and he filled out information. And then instead of being

1    directed to Tesla, he was redirected to CitiStaff.  That was

2    the staffing company that ultimately hired him.  And consistent

3    with the policy, Owen had to receive safety training before he

4    got the badge that would get him inside the door.

5         And Owen was trained to be an elevator operator.  Now, he

6    operated elevators inside the plant, carrying heavy equipment

7    up and down between two floors.  These were industrial

8    elevators, industrial equipment.  Before he could do any work,

9    he had to be trained on how to run the elevator.  Sophisticated

10   switching.

11        So they trained him how to do that sophisticated

12   switching.  They trained him on how to use the equipment.  He

13   used forklifts and tuggers.  He had to be certified on the

14   elevator, certified on the forklifts, certified on all the

15   equipment.

16        Tesla provided him with all the equipment that he used.

17   Tesla determined how much his pay would be, what his hours

18   were, whether he got to work overtime.  When he got a

19   promotion, Tesla decided that he'd get a promotion.  Virtually

20   everything that was important to his job, Tesla controlled it.

21        You're going to hear testimony from two of his

22   supervisors, Tom Kawasaki, who will be the first witness, and

23   Michael Wheeler, who you will hear at the end of the day.  They

24   will both tell you that Owen Diaz was a very good employee.  In

25   fact, after two months of being with the company, he was

1   promoted to a lead.  And you'll see emails that refer to him as

2   being discussed as being considered for a supervisor.

3       And the only time, the only time Owen ever had any issues

4   inside the workplace is when people were using racial slurs and

5   racially harassing him.  All of the incidents associated with

6   any performance issues are associated with that.

7       So now that I've told you about how Tesla structured the

8   workplace and now that I've introduced you to a snippet of who

9   Owen Diaz is, I want to talk to you about what he experienced

10  inside the workplace that caused it to be a hostile work

11  environment based on race.

12      MS. KENNEDY:  Your Honor, this last incident,

13  May 21st, is supposed to be off of the graphic --

14      MR. ORGAN:  Oh, I apologize.  That's the order.  Let

15  me pull that up.

16      MS. KENNEDY:  -- per the Court's order.

17      MR. ALEXANDER:  Because we don't have an electronic

18  copy, the hard copy --

19      THE COURT:  No, I understand.

20      MR. ALEXANDER:  I apologize.

21      MR. ORGAN:  I apologize, Your Honor.

22      MR. ALEXANDER:  So Owen was hired in June of 2015.

23  And in July of 2015, he found the "N" word scrawled, scratched,

24  painted inside the bathroom, and at some point he saw a

25  swastika in there.  And he didn't report it the first day

 1   because he didn't want to make waves right away, but he did

 2   report it to Ed Romero, a supervisor inside the workplace.

 3       And nine months later, when he left the company in

 4   approximately May of 2016, that graffiti, that racist graffiti

 5   was still there.  It had not been corrected.

 6       **MS. KENNEDY:**  Objection.  That was part of the order,

 7   Your Honor.

 8       **THE COURT:**  So, ladies and gentlemen, what I want to

 9   remind you of at this point is that what you're hearing is not

10   evidence.  It is simply what the parties assume that the case

11   is going to show.

12       I think Ms. Kennedy is correct with respect to her

13   objection, and so you should disregard that for the moment.

14       And, Mr. Alexander, please proceed.

15       **MR. ALEXANDER:**  Thank you.

16       And so with regard to that gravity that was --

17       (Interruption in the proceedings due to technical

18        difficulties.)

19       **THE COURT:**  So we're set with the court reporter.

20   Let's see whether we can get the evidence presentation set up.

21       (Brief pause.)

22       **THE COURT:**  So when I started practicing law, the way

23   that we would demonstrate things is by flip charts and then

24   you'd write something and flip the thing.  It wasn't nearly as

25   effective as what we have, but it always worked.  You could

 1   always change from one page to the next.

 2       So my apologies for this, and I think we're ready to roll

 3   again.

 4           **MR. ALEXANDER:**  Thank you very much, Your Honor.

 5           **THE COURT:**  Go ahead, Mr. Alexander.

 6           **MR. ALEXANDER:**  It will not be the worst thing that

 7   happens to me ever.

 8           **THE COURT:**  No, or in this trial.

 9           **MR. ALEXANDER:**  Thanks.

10       So there is a person by the name of Judy Timbreza.  And

11   with regard to Judy Timbreza, an incident occurred associated

12   with Owen Diaz.  Mr. Timbreza worked inside the workplace,

13   spoke Spanish.  He used to come inside the elevator with his

14   buddies and they would be laughing and joking and saying stuff,

15   and they would laugh, and then they would look over at Owen,

16   and this went on for weeks.

17       So after awhile Owen decided, "I'm going to figure out

18   what they're saying.  Why are they laughing and looking at me?"

19       And then he figured out what they were saying kind of and

20   imitated inside of a Google Translate.  And after he -- after

21   he did that and found out what it said inside Google Translate,

22   he found out that they were referring to him as a "porch

23   monkey."  They were using the word *mayate*, which is the

24   "N" word in Spanish.

25       And ultimately Mr. Timbreza was bold enough to use the

1   "N" word in English.  So one day Owen had had enough and there

2   was a confrontation.  And people, coworkers, were around and

3   they called over the supervisor Tom Kawasaki, and Mr. Kawasaki

4   showed up and separated people.  And he looked at Owen and he

5   asked Owen what happened?  And Owen said Timbreza had used

6   racial slurs towards him, had used the "N" word.

7       And Tom Kawasaki did what you would expect a supervisor to

8   do.  He conducted the beginnings of an investigation.  He asked

9   the coworkers what had happened, and they confirmed what Owen

10  Diaz said; that he had -- that Timbreza had been using racial

11  slurs.

12      And so Mr. Kawasaki did what you'd expect, what you would

13  hope a supervisor would do.  He passed the information up the

14  line to a person named Romero.  And Mr. Romero did something

15  that would surprise you.  He told Mr. Quintero, Victor

16  Quintero, a manager at Tesla, that there had not been any

17  confirmation of racial slurs.  He lied about racial slurs being

18  confirmed inside the workplace.

19      So as a consequence of that, instead of getting a written

20  reprimand or a strong verbal warning or instead of the zero

21  tolerance policy, he received a verbal reprimand for kidding

22  around excessively.

23      The next thing that occurred inside the workplace is a

24  person named Robert Hurtado having interactions with Owen.

25  Robert Hurtado is a supervisor.  He manages leads.  He had the

1  ability to tell Owen what to do and how to do his job.

2      Mr. Hurtado for months throughout the entire time that

3  Owen was there, beginning in approximately August of 2015,

4  Hurtado used the "N" word, Owen will testify, at least 30

5  times.  And not just the "N" word.  He would say:  You "Ns" are

6  lazy.  "N," hurry up and push the button.  And he would refer

7  to Owen as "boy."

8      One day Owen had had enough and with regard to Mr. Hurtado

9  he said:  Look, don't talk to me any more.  Don't talk to me

10  about anything personal.  Only talk about work.

11      Mr. Hurtado went to a person named dela Grande, a Tesla

12  supervisor, and twisted the story.  And so the way she said it

13  was:  The leads are very uncomfortable with Owen.  And she

14  reported that up the line to Victor Quintero, the Tesla

15  manager.  And his response, without any investigation, based on

16  just that information, said:  Well, let's find out what Owen

17  has to say, but maybe we'll need to give him a final warning or

18  maybe we need to terminate him.

19      That was the response, just because Owen refused to speak

20  to his harasser except about work.

21      The next thing that occurred is with regard to a person by

22  the name of Ramon Martinez.  Ramon Martinez was also a

23  supervisor.  Ramon Martinez -- I apologize, I skipped over

24  something.

25      So before I talk about Mr. Martinez, let me talk about

OPENING STATEMENT / ALEXANDER

1   Owen's son.  Owen has a son by the name of Demetri.  And

2   Demetri worked at a Tesla factory for about two months, from

3   August of 2015 to October of 2015.  And with regard to Demetri,

4   he had heard a little bit about what his father has gone

5   through, but not everything.  And based on what little bit he

6   knew, he was willing to work at the Tesla factory.

7        Tesla was advertising.  Tesla was saying it was going to

8   change the world, was making these wonderful cars, paying a

9   good rate and paying a rate better than other locations he

10  could find in the Bay Area, and so why wouldn't he want to get

11  a job at Tesla.

12       And Owen, with regard to his son, was hopeful that because

13  his son was going to work through a different staffing company,

14  West Valley Group, and because his son was not going to work in

15  the elevators but was going to work in the battery area, Owen

16  was helpful that things would be better for his son inside the

17  workplace.

18       One day Owen decided to walk over and bring his son lunch.

19  And his son was inside the department with his other coworkers

20  sitting there, and Owen arrived just in time to hear his son

21  being called the "N" word by his supervisor by the name of

22  Mr. Caballero.

23       So Owen's hope that things would be better for his son was

24  dashed.  It turns out that use of the "N" word was pervasive.

25  It was everywhere that Owen went.

1      So now let's go back and talk about Ramon Martinez.  So

2  Ramon Martinez during the same time frame that Mr. Hurtado was

3  using the "N" word and using racial epithets towards Owen,

4  Ramon Martinez was also using racial epithets towards Owen.  He

5  would say:  I hate you "Ns."  I hate you fucking "Ns."  "Ns"

6  aren't shit."  "I wish I could get all you "Ns" fired."  "Go

7  back to Africa."  *"Mayate."*

8      This supervisor, Mr. Martinez, used those terms repeatedly

9  when he came in contact with Owen Diaz.

10     One day Owen was training an employee, a new employee,

11 Rothaij Foster, and he was going up and down the elevator and

12 showing Rothaij, Mr. Foster, how to perform his job duties.

13 And as he was going down and the doors were opening, he said

14 something to the effect of:  You're going to have a new

15 supervisor now.  The supervisor, Mr. Kawasaki, is leaving.

16     Now, when the doors opened, Ramon Martinez was sitting on

17 a tugger.  It's like a boat.  It pulls heavy items.  And for

18 some reason Martinez was upset, and he jumped up and ran at

19 Owen.  And he ran at him, and his fists were out, and he was

20 aggressive, and he was yelling, and he was using profanity,

21 racial slurs, and he was using the "N" word.

22     And Owen backed up.  And with this barrage he said:  Look,

23 there are cameras.  There is video surveillance.  You're being

24 recorded.  And in Owen's mind he thought that that was not just

25 visual, that that was -- words, that the words were actually

 1   being recorded as well.

 2       And so Martinez hearing that backed up.  Owen wrote an

 3   email, described the incident.  He said:  Look, look at the

 4   video.  Look at the video to confirm this incident.  He said:

 5   I feel uncomfortable with him now.  In anticipation of it being

 6   reported, Ramon Martinez went and said that Owen was being

 7   unprofessional.

 8       With regard to this incident, they investigated the

 9   unprofessional, but they did nothing to investigate Owen's

10   version of the facts that it was a racial incident.

11       You will not see the video that was controlled by Tesla

12   that shows Ramon Martinez rushing Owen.  You will not see that

13   video because Tesla did not take the time to look at the video

14   or preserve the video so that you as jurors could see it.

15       There was a witness there, Mr. Foster.  You will not hear

16   a statement that was taken from him because they did not take a

17   statement from the witness.

18       You will not see Owen's statement other than the email

19   that he sent, because despite their claiming a zero tolerance

20   policy, they did not engage in the investigation that they

21   promised inside of their Anti-Handbook Handbook or inside their

22   Anti-Harassment Policy.

23       Because Tesla did not take appropriate corrective

24   action -- I'm sorry.

25       And so as a consequence, I should say, of that incident

 1   and despite Owen saying that he did not feel safe, there was no

 2   verbal warning.  There was just a verbal counseling to both of

 3   them, as though Owen being unprofessional was the same as the

 4   conduct of using racial slurs.

 5       So let's -- so because Mr. Martinez was emboldened,

 6   because the conduct did not stop, because Tesla didn't take

 7   action, the next incident that occurred is Owen was inside the

 8   workplace.  He walked away from his area for five minutes.

 9   When he came back, he found a drawing that had been left there

10   by a supervisor.  And he took a picture and he sent an email to

11   Wayne Jackson, the African-American manager with nextSource.

12   And he sent an email and got Michael Wheeler, another

13   supervisor, to come over.  And he brought over a person named

14   Israel.

15       And so the four of them -- Wheeler, Wayne Jackson, and

16   Owen, who are all African-American, and Israel -- they sat and

17   they talked about it and stood there in front of this racist

18   drawing.

19       And then for some reason someone summoned Ramon Martinez

20   over to try and figure out who had written this.  And then

21   Ramon Martinez came over.  And about 5 to 15 minutes passed,

22   and then finally Ramon Martinez said:  I drew this.  And then

23   he said something to the effect of:  What?  You people can't

24   take a joke?

25       So as a consequence of that incident, there was something

 1   of an investigation, but you will conclude that it was not the

 2   investigation that Tesla promised, and it did not comport with

 3   the law.

 4        With regard to Owen, he sent a statement and said, once

 5   again, he did not feel safe inside the workplace.

 6        He was interviewed by a person named Ms. Delgado, and she

 7   filled out a form.  She had to get permission from CitiStaff in

 8   order to interview Owen.  And with regard to that interview, it

 9   was brief.  And you'll see the statement that was there, but

10   with regard to Mr. Martinez, Mr. Martinez was never

11   interviewed.  Mr. Martinez got favored treatment.  He wrote out

12   his own statement.

13        And even after he provided the statement, no one

14   interviewed him to find out whether the information he put

15   inside the statement was true.  And when you look at that

16   statement, and we may process down to him, and Ms. Delgado, the

17   person who should have interviewed him, you will see that there

18   are a number of factual statements that must be false.

19        One of those statements is that Mr. Martinez apologized,

20   but you'll hear testimony from the witnesses there that he did

21   not apologize at the scene.  And you'll hear information that

22   there was no time in between when the incident occurred and

23   when Mr. Martinez wrote his statement claiming to have

24   apologized where he had any further interaction with Owen Diaz.

25   And Owen will tell you that there is no point at which he

 1   ever -- that Martinez ever apologized.

 2        And so with regard to the zero tolerance policy, instead

 3   of -- you'll hear testimony from Wayne Jackson where he will

 4   say that he spoke to his manager, and they both agreed that --

 5   with regard to this incident, Wayne Jackson wanted to recommend

 6   termination.  And Wayne Jackson's supervisor agreed that it

 7   should either be termination or serious reprimand.  And so

 8   you'll hear testimony that Wayne Jackson told the person at

 9   Tesla it should be a termination.

10        But Mr. Quintero, the manager there, will say that when he

11   first saw the picture, he thought it was a joke.  He didn't

12   realize it was serious.  He had to be told that it was serious.

13        And initially when Wayne Jackson wanted to give severe --

14   a termination, his reaction was:  No, we should just give a

15   verbal warning.

16        And so Wayne Jackson had to insist that it be something

17   more, a suspension at least for three days.  And so ultimately

18   that's what occurred.

19        But I want you to pay close attention to the timing.  This

20   incident occurred on January 21, 2016.  Owen worked the night

21   shift.  He worked between two shifts, from 6:00 at night until

22   approximately 6:00 in the morning.  And he couldn't stop

23   because he had to do his job on the elevators, so he didn't

24   write out this email until the next morning at about 8:42.

25        So he wrote out an email to management saying that this

1   incident occurred.  And you're going to see inside of -- you're

2   going to see that that date and the timing is very important to

3   the investigation.

4       So as a consequence of this incident, Ramon Martinez did

5   not get terminated.  It was not a zero tolerance policy.  And

6   you're going to find out that Tesla cared so much about use of

7   the "N" word, that with regard to Ramon Martinez, he was

8   working for a staffing company before, he became a direct Tesla

9   employee.

10      At the end of this case -- I'm sorry.

11      Before we get there, in February of 2016 Owen's mother

12  passed away.  And so he left the workplace because of that, and

13  he went and he addressed the issues with regard to his mother,

14  and then it came time for him to return to work at Tesla.

15      Now, there's some documentation that indicates that he

16  came back for a day, and Owen does not recall actually coming

17  back.  But really the issue was he could not face coming back

18  to a hostile work environment where he faced the "N" word

19  constantly.

20      You're going to hear testimony from a person by the name

21  of Erin Marconi.  She is an HR director.  She is going to come

22  and tell you that any time people are faced with something that

23  makes them uncomfortable in the workplace, you have to do

24  something about it.

25      So one day inside the workplace -- so one day inside the

1   workplace something happened.  You know how restrooms have a

2   stick figure?  They have a man and a woman.  Someone drew

3   breasts on the female figure.  And because someone felt

4   uncomfortable -- Ms. Marconi is going to tell you if anyone

5   feels uncomfortable with conduct, then we have to do something

6   about it.  That's the way harassment should be treated inside

7   the workplace.

8       So as a consequence of someone drawing breasts on this

9   stick figure, 500 people went to training.  500 people at Tesla

10  stopped what they were doing and went to training because this

11  had occurred.

12      So with regard to a breast being placed on a stick figure,

13  there was training.  But with regard to the "N" word being used

14  over and over and over inside the workplace, there is never a

15  point that training occurred inside the workplace.

16      And so now with regard to Owen after his mother passed

17  away, he had the opportunity to return to work, but he could

18  not return to work because he could not face the "N" word any

19  more.  He could not face the emasculation of not being able to

20  defend himself inside the workplace.

21      He could not take the inability to protect his son from

22  the same conduct inside the workplace and the consequences that

23  flowed to his son from those incidents, which he will testify

24  to during his examination.

25      He will testify, and we will ask you for damages for --

 1   substantial damages for emotional distress based on the harm

 2   that he suffered associated with the harm to his marriage from

 3   what occurred inside the workplace.

 4        You will hear testimony from a psychologist,

 5   Anthony Reading, who will explain to you the diagnosis that

 6   occurs when someone is subjected to discrimination inside the

 7   workplace because of their skin color, because of something

 8   they cannot control.

 9        But you will not have to just rely on that diagnosis.  The

10   testimony from Owen Diaz, from his testimony you will know that

11   he suffered substantial emotional distress, and we will ask you

12   for substantial damages for that.

13        But at the end of the case we'll also ask you for

14   substantial punitive damages, punitive damages for Tesla

15   refusing to take responsibility for its workplace, refusing to

16   assure that the "N" word did not occur repeatedly inside the

17   workplace.  We'll ask you for substantial punitive damages so

18   that other companies will know and so that Tesla will know that

19   Tesla is not above the law.

20        Tesla will say that it's a zero tolerance policy, but you

21   will find that it's a zero responsibility policy.

22        Thank you.

23            THE COURT:  All right.  Ms. Kennedy.

24                    OPENING STATEMENT

25            MS. KENNEDY:  May it please the Court.

 1          THE COURT:  Please.

 2          MS. KENNEDY:  Good morning, ladies and gentlemen of

 3   the jury.

 4          May it please the Court, my name is Tracey Kennedy, and

 5   I'm one of the attorneys representing Tesla, Inc. in this

 6   matter.

 7          I'm going to introduce you to our trial team and our

 8   client representative.  It's Valerie Capers Workman.  She is

 9   the Vice-President People and Human Resources.

10          You already met Yusuf Mohamed, who is the Deputy General

11   Counsel of Tesla, as well as Joseph Alm, Senior Counsel.

12          And my trial team is -- my co-counsel is Patricia Jeng,

13   Susan Haines, and my trustee trial tech is Stephanie Limbaugh.

14   We are the legal team representing Tesla in this case.

15          Let me just first start off by saying a couple things what

16   this case is about and tell you what it's not about.

17          The first thing it is not about is Tesla by any means

18   tolerating racial harassment in the workplace.  It's not about

19   Tesla not taking responsibility for racial harassment in the

20   workplace.  And it's not about Tesla being an organization

21   that's going to say:  You know what?  It is simply okay for

22   people to be racially harassed in the workplace.  That is not

23   what this case is about.

24          What this case is about is about Owen Diaz.  First and

25   foremost, Owen Diaz was never a Tesla employee at all.  He was

1   always an employee of CitiStaff and by extension nextSource.

2        This is also a case where there is no evidence that any

3   Tesla employee at any point in time engaged in any of the

4   conduct that Mr. Diaz is now testifying about and now talking

5   about after his employment with CitiStaff ended in about May of

6   2016.

7        This is not a case where at any point in time when

8   Mr. Diaz was working for CitiStaff and making complaints in

9   writing about a myriad of things, at no point in time did

10  Mr. Diaz at any time complain about everything, put in writing

11  any of these horrible words, these racial words that he is here

12  suing on.

13       At no point in time will the evidence show that Mr. Diaz

14  wrote to anyone at CitiStaff, nextSource, Chartwell, anyone at

15  Tesla, anything in writing about, quote, "awful" words, the

16  "N" word, the "porch monkey," *mayate*," any of these words.

17       The evidence is going to show at the time Mr. Diaz was

18  working for CitiStaff as an elevator operator or a lead

19  elevator operator.  He had issues with coworkers.  Coworkers

20  had issues with him.  And when he did complain -- and I'll show

21  you the couple times -- the matter was resolved, people were

22  let go, people were transferred, it was handled, and it was

23  investigated.

24       So what this case is about and what the real story is is a

25  different story than what you've been told.  And the evidence

 1   is going to show there is another side of the story here, and

 2   that side of the story is very different.  And the side of the

 3   story is very different because what happened during Mr. Diaz's

 4   nine-and-a-half-month assignment at the Fremont Tesla facility

 5   became a different story after he left.

 6        The testimony is also going to be at no point in time was

 7   Tesla put on notice to take responsibility for this myriad of

 8   racial slurs that, according to Mr. Diaz's testimony after he

 9   hired a lawyer, was that this was happening on a daily basis;

10   20, 30, 40, 50 times, every day, a myriad of people calling him

11   all these names.

12        So why are we here and what is this case really about?

13   The case is about Owen Diaz vs. Tesla.  Owen Diaz was never an

14   employee of Tesla.  The evidence is going to show he applied

15   through CitiStaff.  He was paid by CitiStaff.  And we'll go

16   through all of that.

17        The evidence is also going to show that the Tesla Fremont

18   facility, it is a large facility, and there were many different

19   staffing agencies that were used to staff up that facility.

20   And you're going to see the relationship here.  You'll see when

21   you look at this, it's going to be -- you'll see people from

22   nextSource, which is sort of the umbrella staffing agency.

23   There was CitiStaff.  That was Mr. Diaz's employer.  There was

24   Chartwell Staffing Solutions, was some of the other people

25   you're going to see testify.  There was West Valley Staffing

1   Group, which was the staffing group that hired Mr. Diaz's son,

2   Demetric Di-az, to come work in the battery area.

3        And it's going to be importing because one of the things

4   you're going to be asked, and the evidence is going to ask you

5   to look at this, is to determine whether or not Tesla, not

6   these staffing agencies, Tesla, is responsible for the racial

7   harassment.  The evidence is going to show that not one Tesla

8   employee engaged in this harassment by Mr. Diaz.

9        So let's take a look at this Tesla facility.  It is a very

10  large facility, 5.3 million square feet, and this is where they

11  make Tesla cars.

12       Mr. Diaz's job, when he was hired, was as an elevator

13  operator.  This is in a factory.  This is not a people-mover

14  elevator.  This is a large elevator.  Usually two elevator

15  operators per shift depending on the shipment.  And basically

16  his job was to make sure that material was obtained, put into

17  the elevator, and moved from the second floor to the first

18  floor.  That material could be boxes, recycling, crates,

19  material.

20       And it's very important for the elevator operator, whoever

21  that person is, to work with the employees at the facility to

22  make sure production doesn't go down, to make sure recycling

23  can get out.  Because basically this is how you transport that

24  material up and down in the elevator in the factory.

25       It also required Mr. Diaz and other elevator operators to

 1    use a forklift and to move material.  So that was the job.

 2    It's a customer service job inside the factory.  You've got to

 3    work with people, with production and material to make sure

 4    things keep flowing.

 5         At this Tesla facility in the 2015-2016 time period, which

 6    is only the time period we're talking about -- just so you

 7    understand it, Mr. Diaz started working through CitiStaff in

 8    June of 2015.  His last day actually working at the facility

 9    was approximately March 3rd or 4th of 2016.  So approximately

10    nine and a half months.

11         And during that time in the facility working 24/7 there

12    are about 10,000 workers.  Some are Tesla employees.  Some are

13    staffing employees.  And the evidence is also going to show

14    that everyone in the facility knew who everyone was because

15    they have a badge, and the badge says "Contractor."  So you

16    know who are the contractors and you know who the Tesla

17    employees are.

18         So the evidence is going to show that there was a

19    different story here.  There is a real story that's been going

20    on here.  It's a very different story from what Mr. Diaz is

21    going to tell you.

22         And at the end of this case the judge is going to provide

23    more Jury Instructions and a verdict form, and you're going to

24    be asked to decide based on the evidence what really happened

25    at the time in 2015 and 2016, who said what, who said anything,

1    whether the story is true, whether the evidence is what it is,

2    and that also whether or not Mr. Diaz proved his case by a

3    preponderance of the evidence as to Tesla.

4        So who are some people that you're going to see?  I'm

5    going to give you a chart here of some of the folks that you're

6    going to see.  It's important to know who is who because

7    despite the fact that there are several staffing agencies

8    involved, this case is about Owen Diaz against Tesla, his

9    non-employer.

10       The evidence is also going to show from Mr. Diaz's own

11   testimony that at no point in time did he ever report any of

12   this alleged racial harassment to anyone at his employer,

13   CitiStaff.

14       So let's take a look at some of these folks, some of these

15   names, to get an idea of who is going to be coming to testify.

16       We look at first Owen Diaz.  He worked for CitiStaff.  He

17   worked for nextSource.  That's what his -- that was his

18   employer.  He was an elevator operator.  And about three weeks

19   or so into it, by all accounts according to his employer,

20   nextSource and CitiStaff, he was doing a good job as an

21   elevator operator.  He was made a lead elevator operator

22   shortly into it.  He became a lead, like some of these other

23   people you're going to see.

24       Ramon Martinez, you're going to hear testimony from him

25   probably on Thursday or Friday of this week.  Ramon Martinez is

OPENING STATEMENT / KENNEDY

 1  going to testify about all of his interactions with Mr. Diaz,

 2  and they are -- they are the polar opposite of what Mr. Diaz

 3  has testified to.

 4       Mr. Ramon Diaz [sic] was not a supervisor.  He was another

 5  lead, and he worked for Chartwell and nextSource.  He was a

 6  material handler at best.  He was not Mr. Diaz's supervisor at

 7  any point in time.

 8       You're also going to hear from the first witness, Mr. Tom

 9  Kawasaki.  He worked for Chartwell.  He was an elevator lead.

10       You'll hear some other people.  Edward Romero, who worked

11  for nextSource and in about October of 2015 he did become a

12  Tesla employee.  At the time that he's working for nextSource,

13  he was working in the janitorial -- he's the janitorial

14  supervisor for nextSource.  He was not Mr. Diaz's supervisor.

15       He then became a Tesla employee and worked in contract

16  services.  And that's a different role.  He wasn't supervising

17  anybody, but that was his job title, contract services.

18       You're going to hear today, I believe, from Wayne Jackson.

19  He worked for nextSource, and he was basically the on-site

20  program manager for the contract, for the staffing employees.

21       You're also going to hear probably some testimony read

22  from a deposition from Demetric Di-az.  Demetric Di-az is

23  Mr. Owen Diaz's son.  He came to work through West Valley in

24  about August of 2015 to come work in the battery area of the

25  Tesla facility.

 1          The evidence is going to show that Mr. Diaz in August of

 2    2015, approximately, after being at the facility for two months

 3    or so, recommended to his youngest son, who at the time was

 4    about 19 years old, to come work at the Tesla facility.  Go

 5    apply with the staffing agency.  Come work for the facility.

 6          The evidence is going to show that despite that

 7    recommendation to his youngest son, according to Mr. Diaz's

 8    testimony, after he stopped working there and without telling

 9    anyone at the Tesla facility about all these horrible words,

10    that he was being called the "N" word multiple times, but still

11    thought it would be a good idea to recommend that his

12    19-year-old son come work in this environment.

13          The evidence is going to show that he also recommended

14    other folks come and work at this facility, despite the fact

15    that, according to him now, after he's hired a lawyer and the

16    like, that this was the most racially hostile environment he's

17    ever seen, that there's graffiti in the bathrooms, and it was

18    so horrible for him that he did not want to return to work.

19          The evidence is going to show that during this time when

20    he's suffering from all this, he's recommending for other folks

21    to come to this Tesla facility to actually work.

22          The evidence is also going to show, you're going to hear

23    some testimony from some Tesla employees:

24          Victor Quintero, who worked in recycling.  You're probably

25    going to hear from him tomorrow.

1    Joyce dela Grande, and she worked as a production control

2  supervisor, making sure the production was going.  The evidence

3  is going to show that part of the real story in this case is

4  that Joyce dela Grande was working with Mr. Diaz, and at the

5  beginning was doing a good job.  He had no problems; but over

6  time, once he became a lead, things changed.

7    You're going to hear testimony from Joyce dela Grande as

8  to her issues with Mr. Diaz and his job performance with folks

9  in the facility that led to the decision that -- probably from

10  CitiStaff/nextSource, Mr. Diaz should probably not be in the

11  lead elevator operator role any more.  And that's one of the

12  reasons why he decided not to return back to working for

13  CitiStaff at the Tesla facility.

14    And finally you're going to hear from Annalisa Heisen.

15  She's in HR and she will be testifying about policies and

16  procedures.

17    So this is just sort of an overview about some of the

18  evidence that you're going to hear.  But the one thing you're

19  going to see in this case is at no point in time did any Tesla

20  employee engage in the harassing conduct that Mr. Diaz claims

21  occurred.  No Tesla employee used the "N" word or any other

22  vile, horrible words.

23    All my questions in this case and my co-counsel's

24  questions in this case, we're never going to use the full word.

25  It's going to be the "N" word.  It's going to be in writings.

OPENING STATEMENT / KENNEDY

1    It's going to be in -- I'm sorry.  It's going to be in how we

2    speak, but you're not going to see it in writings anywhere.

3         And we ask you to take a look at all the writings in this

4    case and, in particular, look at the writings of Mr. Diaz at

5    the time when things are going on and what he is suing for

6    today.  Because the real story is very different; that what

7    happened at the time is a very different story as to what he's

8    telling us now.

9         So let's talk about what the real story is in this case,

10   and the real story is Mr. Diaz had a nine-and-a-half month

11   assignment at the Tesla facility.

12        In June of 20- -- I'm sorry -- June of 2015, he applies to

13   work as an elevator operator.  He fills out an application,

14   submits his resume, completes all the onboarding documents

15   through CitiStaff, fills out the appropriate tax forms, all for

16   CitiStaff, and he gets placed at the Tesla facility as an

17   elevator operator.

18        And by all accounts, the next two to three weeks he's

19   doing a good job.  You'll see an email from representatives of

20   nextSource basically saying that, you know, he's doing a good

21   job.  And he gets promoted to lead elevator operator very

22   quickly.  He also gets a commensurate pay increase by

23   CitiStaff.

24        And around this time, according -- at the time he does

25   recommend that his son Demetric come and work at the Tesla

1    factory.

2        The evidence is going to show that at no point in time

3    before he recommends his son to come has he ever put anyone at

4    Tesla on notice about all this horrific racial conduct that he

5    is here in this court asking for substantial damages for.

6        But, nonetheless, he recommends that Demetric Di-az come

7    and work.  He applies through West Valley, and he is hired by

8    West Valley to work in the battery area of the factory.

9        Demetric Di-az only lasts a few weeks there, and his

10   contract is terminated with West Valley in about October of

11   2015.

12       You're going to hear evidence in this case that three days

13   after his contract was terminated by West Valley, Demetric

14   Di-az applies directly to Tesla to go back to work at the

15   facility.

16       During this time in 2015, Mr. Owen Diaz is living in the

17   same household with Demetric Di-az.  They're living together.

18   They're a family.

19       In December of 2015, Mr. Diaz goes and he's looking for

20   other jobs on Indeed.com.  And during this time period, he's

21   not looking for other assignments through CitiStaff.  He's

22   going to look for other jobs.  This is going to be important

23   because as part of the storytelling in this case and what

24   actually really happened, what the real story is is different

25   than what he is claiming here in this courtroom.

 1          Despite what he's going to testify here in this courtroom

 2     and after the time he got hired -- he hired a lawyer and

 3     claiming all this racial harassment, he's still getting pay

 4     increases by CitiStaff.  He's still doing his job as a lead

 5     elevator operator for CitiStaff.

 6          But sometime in June -- I'm sorry -- January-February of

 7     2016, he starts having conflicts with other employees of other

 8     staffing agencies.  None of these other individuals has he

 9     accused of making any type of racial comments to him.  All

10     these interactions have to do with how he's doing his job as

11     the elevator operator and how he's basically customer service,

12     which means dealing with other workers in the factory about

13     getting materials in -- in and up and down the elevator.

14          And there are complaints to Joyce dela Grande and other

15     people about how Mr. Diaz is not being cooperative in those

16     areas, and they are complaining to folks, and there's

17     conversations about this.  And at some point in time Joyce

18     dela Grande says her leads, who have to get material up and

19     down the elevator, can no longer work with Mr. Owen Diaz.

20          And Joyce dela Grande is going to testify that she asked

21     Ed Romero that, we've got to do something about this.  The

22     decision is made not to have Owen Diaz sent back to the

23     staffing agency.  The decision is made, well, maybe he can just

24     become an elevator operator again and not a lead.

25          So there's discussion about that in February of 2016, and

 1    a decision was made that they were going to talk to him about

 2    becoming an elevator operator instead of an elevator operator

 3    lead.  And during this time period, he's given a final written

 4    warning about his interpersonal interactions with other folks.

 5         It is unfortunate that Mr. Diaz's mother passed away on

 6    February 27th, 2016, according to an email that he sent to

 7    Mr. Romero.  He sent it about a week and a half after his

 8    mother unfortunately passed away.  He sent the email on

 9    March 4th, 2016, which I think is about the last day he was at

10    the Tesla facility.  And he says:  I'm going to take leave on

11    March 9th, 10th, and 11th.  I will be back to work on the 12th.

12         During this time, there are calls to Mr. Diaz about

13    whether or not he's going to take the elevator operator

14    position, no longer be the lead.  He doesn't respond, and we

15    found out in this lawsuit he was looking for other jobs

16    starting on March the 17th.  He was supposed to let Ed Romero

17    know by the 17th if he was going to become the elevator

18    operator.  No response.

19         So at some point in time Mr. Diaz submits a doctor's note

20    saying he's going to be out for three weeks.  He doesn't send

21    it to Tesla.  He sends it to Wayne Jackson of nextSource, his

22    employer.

23         He doesn't return back to work, and at some point in time

24    CitiStaff, not Tesla, terminates Mr. Diaz's employment

25    agreement/arrangement with CitiStaff.

1     So the last time that Mr. Diaz was actually at the Tesla

2   facility was early March of 2016.

3     Now, that's what occurred with his performance.  You're

4   going to hear evidence in this case and no one is going to

5   dispute that Mr. Diaz did make complaints during his

6   nine-and-a-half month assignment at the Tesla facility.

7     These are the complaints that he made.  These complaints

8   are all in writing.  He's a very smart man.  He's been around

9   the block.  At one point in time, according to his resume, he

10  actually ran his own franchise.  He knows how things work.

11     The evidence is going to show that when he felt strongly

12  about something, he had no problem documenting it in writing to

13  anyone who would listen.

14     And in July of 2015 he did make a complaint about a fellow

15  employee.  This is Judy Timbreza, and he's a male, and about

16  some altercation.  You're going to hear testimony from Tom

17  Kawasaki about that and Mr. Diaz.

18     At the time in all the recorded information no one says

19  the "N" word.  There are emails that there were comments that

20  were racial in nature.  We don't dispute that.  Absolutely.

21  That's what the documentation says.

22     The documentation is also going to say that there was an

23  investigation.  Judy Timbreza, one, did not work for Tesla.  He

24  worked for a staffing agency.  The matter was investigated.

25  Judy Timbreza was gone.  Mr. Diaz at that time never had any

 1   more contact with Judy Timbreza.  He admitted that under oath

 2   in his deposition.

 3        So as of July of 2015, Mr. Diaz knows you make a

 4   complaint, document it, it's resolved, and it's done.  At no

 5   point in time as of July 31st, 2015, did Mr. Diaz put anything

 6   in writing about any of these horrible racial slurs.

 7        On October 17th, 2015, Ramon Martinez and Owen Diaz had an

 8   argument at the elevator, absolutely.  They're arguing about

 9   getting these materials in the elevator, out of the elevator,

10   and the like.

11        Mr. Ramon Martinez actually complained first about Owen

12   Diaz, and Mr. Martinez explained about being unprofessional.

13   He just wants Mr. Diaz to treat him professionally.  Those are

14   his words in his email.

15        Shortly thereafter, Mr. Diaz complains about Ramon

16   Martinez, and he complains about the same thing and also

17   accuses Ramon Martinez of threatening him.  You're going to

18   hear testimony from both of them.  You'll have to decide what

19   actually happened.

20        But what is most important and telling about this is that

21   according to the evidence, at this time on October 17th, 2015,

22   there's no negative interaction between Ramon Martinez and Owen

23   Diaz.  Ramon Martinez is going to come in and testify that when

24   Mr. Diaz first came to work at the location, they were

25   friendly.  They got along.  Mr. Diaz talked to Mr. Martinez

1  about how to get ahead, how do things work, and the like.

2  Ramon Martinez was a lead.  So was Mr. Diaz.

3      According to the testimony, after the lawsuit was filed,

4  Mr. Diaz then said that as of this time Ramon Martinez had

5  called him the "N" word and "porch monkey" and everything else

6  under the sun; but when he had the opportunity to actually

7  write a complaint to Ed Romero about the conduct of Ramon

8  Martinez, none of those words are ever in any text message,

9  email, and the like.

10      So if, in fact, it had happened and Tesla had been made

11 aware of it, they could have handled it.  If, in fact, it had

12 happened.  It didn't happen.  All of these words that according

13 to Mr. Diaz, the "I hate you 'N,'" "I hate you effing 'N,'" "I

14 wish all you 'Ns' would die," none of that was there.

15      After this October 17th, 2015, incident, both gentlemen

16 were talked to and the matter was over with.

17      A few days later, November 5th, 2015, there's an incident

18 with a contract worker, Rothaij Foster, with Mr. Diaz.  At that

19 time Mr. Diaz's testimony was that he, as a lead, was training

20 Rothaij Foster on the elevators.  According to the written

21 complaint by Mr. Diaz, Rothaij Foster was threatening him and

22 doing other things.

23      The matter was investigated.  Rothaij Foster was walked

24 out of the facility never to be seen from again.  Rothaij

25 Foster had a different perspective on it, but that was not

 1  taken into account.  CitiStaff/nextSource believed Owen Diaz's

 2  version of events.  It was handled.  It was done.

 3      Again, as of November of 2015, Mr. Diaz knows you make a

 4  written complaint, you state what happens, it's investigated,

 5  and it's handled.

 6      If, in fact, the evidence is going to show, again,

 7  virulent racial harassment had been going on, he was putting it

 8  in writing, documented it somewhere, it would have been

 9  handled.  Not one piece of paper.

10      Now, we do get to January 2016 and the incident about this

11  cartoon, this drawing, on the bale.  It was January 21st, 2016.

12  Mr. Diaz did complain about the drawing.  Undisputed.  The

13  evidence is also going to show that's not the whole story.

14      Mr. Diaz provided a picture of that cartoon to Ed Romero.

15  The problem is that was part of the cartoon that was drawn.

16  There was a cartoon that Mr. Martinez did admit drawing, and

17  he'll explain to you what it meant and why he did it.

18      There is another part that's on a bale, which you'll see

19  in evidence.  It's Exhibits 1 and 2.  You're going to see this.

20  It's a Pac-Man.

21      Remember the Pac-Man?  And part of the Pac-Man there is a

22  little ghost.  And, apparently, on these shifts in this area

23  the workers were having a competition who could do more work,

24  whether it was the graveyard shift, the swing shift or the

25  morning shift.  So someone drew a Pac-Man, and then for the

 1   morning shift they drew a little ghost.  You know, Pac-Man eats

 2   the ghost.  For the swing shift, the same thing.  And for

 3   the -- another ghost on the graveyard shift or the day shift.

 4        Mr. Martinez will testify that he was part of this, and he

 5   drew this cartoon that he recalls from his childhood in Mexico

 6   as this cartoon, and he said it was a ghost, and the ghost was

 7   going to eat all of the other little ghosts.  This sounds

 8   ridiculous, but this is what the story was.

 9        Looking at that cartoon, we don't dispute this is not an

10   appropriate cartoon at all.  Once this occurred, once this

11   cartoon was there, Mr. Diaz saw the cartoon, took a picture,

12   wrote out his email about this, and reported it to Ed Romero.

13        Ed Romero is going to testify that when he gets the email,

14   he looked at it.  This was an offensive cartoon.  There's no

15   dispute.  The evidence is also going to show that it was looked

16   into immediately, and that Mr. Martinez was approached by Owen

17   Diaz and said:  Who wrote -- who drew this?  He said:  I drew

18   it.

19        And according to Mr. Martinez's testimony, he's going to

20   testify that he saw it, saw Owen was upset, explained it wasn't

21   intended for him.  Didn't know Mr. Diaz was around.  It was a

22   cartoon, and he apologized.  Mr. Martinez is also going to

23   testify as to how he felt when he saw Mr. Diaz and how upset he

24   was at the time.

25        The evidence is going to show that he did write a

 1   statement as part of the investigation.  He apologized

 2   immediately.  He felt bad about it, didn't understand the

 3   racial significance of this.  He was then given a three-day

 4   suspension, which he will tell you was fair.  He will tell you

 5   that this has affected him adversely.  He didn't think that

 6   this was something that was going to be from Mr. Diaz or

 7   anything else.

 8        Again, at this point in time in January 2016 when Mr. Diaz

 9   complained that this was Ramon Martinez, nothing in writing

10   about these horrible racial slurs.

11        Next we have several complaints about Mr. Diaz from people

12   unrelated to all these other individuals about work performance

13   that sort of lead to this February 2016 time period and events

14   with his mother passing away and then deciding not to return to

15   work.

16        So that's the real story.  And the real story is going to

17   be that at all points in time, every complaint that he made was

18   handled and responded to, and no evidence of any type of racial

19   epithets, and, more important, no racial conduct by any Tesla

20   employee whatsoever.

21        So why are we here?  There are two claims in this case.

22   As part of the way the evidence comes in you, the jurors,

23   decide what the facts are.  The judge provides the law.  And

24   here there are two basic claims you're being asked to decide.

25        And the first one is called basically violation of 42

1    U.S.C. 1981.  It's basically a federal civil rights statute.

2    And the questions you're going to be asked to determine is

3    whether or not Tesla is liable for race-based harassment toward

4    Mr. Diaz, whether Tesla is responsible for failing to prevent

5    race-based harassment in the workplace.

6        And then you're also going to be asked whether or not

7    Tesla negligently supervised or retained Ramon Martinez, who in

8    2015-2016 was never a Tesla employee.

9        So the evidence is going to show in this case that there

10   were two very different stories.  And your job is to determine

11   what is the real story.  And the real story in this case is

12   that Tesla is simply not responsible for the race-based

13   harassment that Mr. Diaz claims after he stopped working for

14   CitiStaff occurred to him.

15       Thank you.

16       **THE COURT:**  Ladies and gentlemen, why don't we take

17   our first break of the morning.  We will be back here at five

18   of.

19       And just remember the admonitions, and I will tell you

20   this constantly throughout the trial.  You are free to talk

21   with each other about all manner of things except for anything

22   having to do what you're learning in the courtroom.  That you

23   need to just keep your own counsel until it's time to

24   deliberate at the end of the case.

25       So let's take our 15-minute break, and then we'll be back

 1   with the first witness.

 2         (Whereupon there was a recess in the proceedings

 3         from 10:40 a.m. until 11:00 a.m)

 4         THE COURT:  All right.  Please be seated.

 5       Ladies and gentlemen, I will tell you why it is that

 6   people stand up when you come into the courtroom.  It's in

 7   honor of the service that you are providing.  And so you are

 8   very free to sit down when you get to your seats, and we stay

 9   standing until everybody else is in the courtroom.  So I just

10   wanted to let you know that.

11         THE CLERK:  I believe we are missing somebody.

12         THE COURT:  We are missing somebody.  I was just

13   noticing that.  Thank you.

14       (Juror enters courtroom.)

15         THE COURT:  We weren't going to start without you.

16         JUROR:  I appreciate that.  Thank you.

17         THE COURT:  Mr. Organ, who is your first witness?

18         MR. ORGAN:  Our first witness is Tom Kawasaki,

19   Your Honor.

20         THE COURT:  All right.

21               TAMOTSU EDWEEN KAWASAKI,

22   called as a witness for the Plaintiff, having been duly sworn,

23   testified as follows:

24         THE WITNESS:  I do.

25         THE CLERK:  Be seated.

 1        And then if you would please state your full name for the

 2   record and spell it for the court reporter.

 3        **THE WITNESS:**  Tamotsu Edween Kawasaki.  T-A-M-O-T-S-U,

 4   middle name E-D-W-E-E-N, last name Kawasaki, K-A-W-A-S-A-K-I.

 5        **THE COURT:**  Mr. Kawasaki, I just want you to know that

 6   it is your choice, if you're vaccinated, to remove your mask

 7   while you're testifying.  If you want to keep it on --

 8        **THE WITNESS:**  I will keep my mask on.  We're in a

 9   confined spot.  I am vaccinated though.

10        **THE COURT:**  Excellent.

11     Okay.  Please proceed.

12        **MR. ORGAN:**  Thank you, Your Honor.

13                        **DIRECT EXAMINATION**

14   BY MR. ORGAN:

15   **Q.**   Mr. Kawasaki, do you also go by Tom?

16   **A.**   Tom is easier.  It's just more American.  I don't like

17   when people butcher my real name.

18   **Q.**   Good morning.  How are you?

19   **A.**   I'm good.

20   **Q.**   Where did you grow up?

21   **A.**   I grew up in Daly City, California.

22   **Q.**   And are you married?

23   **A.**   I am married.

24   **Q.**   Do you have any children?

25   **A.**   I do.

1   **Q.**   At some point in time have you worked at Tesla?

2   **A.**   Yes, I did.

3   **Q.**   And how did you hear about a job being available at Tesla?

4   **A.**   I applied on an online website, Indeed.com.

5   **Q.**   And how did you actually go about applying for the

6   position?   What was that process?

7   **A.**   My resume was on Indeed.   I just hit "Apply."   I got a

8   response back, and it ended up being a staffing agency,

9   Chartwell Staffing.

10  **Q.**   Okay.   And what position were you hired for at Tesla?

11  **A.**   They hired me, it was in the environmental sustainability

12  group, and it was for moving recycling from one part of the

13  plant to another.

14  **Q.**   Okay.

15  **A.**   Sorter.   I think it was called sorter.

16  **Q.**   And this was at the Fremont plant in --

17  **A.**   In Fremont.   The old Toyota factory, yes.

18  **Q.**   When you started working at the Fremont plant, did you go

19  through any kind of orientation?

20  **A.**   So first I went to Chartwell Staffing in Hayward, and they

21  verified my information and all that.   And then they sent me to

22  Tesla, to go to Tesla security to get a badge.

23  **Q.**   And when you got to Tesla to get the badge, did you do

24  anything else with Chartwell after that?

25  **A.**   No.   What do you mean by "anything else"?

**KAWASAKI - DIRECT / ORGAN**

1  Q.   That's a good point.  Did you go to a Chartwell facility

2  again after that --

3  A.   No.

4  Q.   -- relative to your job at Tesla?

5  A.   No, I did not.

6  Q.   And in terms of the orientation that was conducted at

7  Tesla, what was that?

8  A.   It was just orientation of, okay, you're here from

9  Chartwell.  Okay.  You're a staffing agency.  You need to go

10  through security.  So I gave them my I.D.  And that's about it,

11  and they gave me a security badge.

12  Q.   Were there any other contract employees working at Tesla

13  when you started?

14  A.   From my knowledge, my first day I didn't know anything

15  else.  I didn't know there was other contractors or anything

16  like that.

17       Working there, I realized, yeah, there was other

18  contractors, other groups, other staffing agencies that hired

19  other employees at Tesla.

20  Q.   From your perspective, was there a difference between the

21  people who were contractor employees and those who were direct

22  Tesla employees?

23  A.   The difference to me was Tesla just -- I mean, we had

24  access to the same amenities that the Tesla employees had,

25  other than food and stuff like that.

```
 1            We were working 12-hour shifts at that time, but there
 2   was -- I didn't -- really, the only difference was they were
 3   Tesla.  They had opportunity to get stocks in Tesla and stuff,
 4   and we were just a staffing agency.
 5   Q.   Who told you -- who told you what your schedule was going
 6   to be?
 7   A.   My schedule, Victor Quintero and Jaime Salazar were my
 8   immediate people that I reported to.
 9   Q.   Tell the jury who Jaime Salazar was.  Who was he?
10   A.   I believe Jaime Salazar was right under Victor Quintero at
11   Tesla.
12   Q.   And was Victor Quintero the manager then?
13   A.   To my knowledge, he was the head of environmental
14   sustainability from what I knew, from my recollection.  So I
15   don't know.  That's just who the people I reported to.
16   Q.   And you said you reported to Jaime Salazar.  Do you know
17   what his position was?
18   A.   I don't know what his actual title was.  No, I do not.
19   Q.   Okay.  Do you know if Jaime was a Tesla employee, direct
20   Tesla employee, or a contract employee?
21   A.   To my knowledge, he was a direct Tesla employee.
22   Q.   Okay.  And so during the time that you were working at
23   Tesla, did you receive your paychecks from Tesla or from
24   Chartwell?
25   A.   Chartwell Staffing.  My checks came directly from
```

**KAWASAKI - DIRECT / ORGAN**

1    Chartwell.

2    **Q.**   And other than providing your paychecks, what role did

3    Chartwell play in your day-to-day aspects of your job at Tesla?

4    **A.**   None.

5    **Q.**   Now, you mentioned something, I think, about breakfast.

6    Did Tesla provide breakfast?

7    **A.**   So we have the same access to the amenities that Tesla

8    provided.  They had a bunch of satellite areas where you can

9    eat breakfast.  They had cereal bars, milk, soda machines, and

10   stuff like that.  So they were just locations where you can

11   eat.

12       Like I said, we were working 12-hour shifts.  We were

13   there for 12 hours every day so they provided food.

14   **Q.**   And which company provided you with safety equipment?  Was

15   it Chartwell or was it Tesla?

16   **A.**   Tesla.

17   **Q.**   I'd like you to look at -- you've got a little notebook

18   there.  If you could look at Exhibit 366 in it, the white one.

19       The little -- yeah, that.  And if you could look at

20   Exhibit 366.

21            **THE COURT:**  This should not be displayed at the moment

22   except for to the lawyers.

23            **MR. ORGAN:**  Okay.  So is this visible to just the

24   lawyers?

25            **THE CLERK:**  At this point, yes.

KAWASAKI - DIRECT / ORGAN

```
 1   BY MR. ORGAN:
 2   Q.   Okay.  So she can show you --
 3            THE COURT:  Some of us don't have it at all.
 4            MR. ORGAN:  Yeah.  Can you show the exhibit now,
 5   Sabrina, because it won't show to the jury?
 6       (Document displayed.)
 7   BY MR. ORGAN:
 8   Q.   Do you recognize Exhibit 366, the stuff that's on that
 9   list there?  Was that the type of things you got from Tesla?
10   A.   So we got gloves and safety glasses.  We didn't get a bump
11   hat, safety shield.
12   Q.   If you go to the next page, you see some vending machines.
13   Do you see that?
14   A.   Yeah.
15   Q.   Could you get things out -- safety equipment out of those
16   vending machines?
17   A.   In the beginning when I worked for Tesla, we did not have
18   access.  Our security badges did not have access to the vending
19   machines.  We had to go through a Tesla employee to get this
20   safety equipment.
21   Q.   But did you get safety equipment out of that if a Tesla
22   employee helped you?
23   A.   Yes.
24   Q.   And then eventually did you get access to the vending
25   machines?
```

1   **A.**   Eventually I did, as I got further with the company -- or

2   with Chartwell and getting higher up.

3   **Q.**   Okay.

4           **MR. ORGAN:**   Your Honor, I would move Exhibit 366 into

5   evidence.

6           **THE COURT:**   Any objection?

7           **MS. JENG:**   No, Your Honor.

8           **THE COURT:**   All right.   It's admitted.

9       (Trial Exhibit 366 received in evidence)

10          **THE COURT:**   Which means it can be displayed to the

11  jury, if you would like to do that.

12          **MR. ORGAN:**   Yes.   Could we display that to the jury?

13      (Document displayed.)

14  **BY MR. ORGAN:**

15  **Q.**   Okay.   So you mentioned some safety gloves.   There are

16  some gloves on this.   Were those the kind of gloves that you

17  got access to?

18  **A.**   Yes.

19  **Q.**   And what else could you get from Tesla?

20  **A.**   The safety glasses.

21  **Q.**   The safety glasses, those were provided by Tesla; is that

22  right?

23  **A.**   Correct.

24  **Q.**   Now, relative to the elevators and recycling, do you know

25  what Victor Quintero's role was?

1    **A.**   To my knowledge, he was the head of environmental

2    sustainability.  So, to me, it was just all of the recycling

3    department.  I don't know what his actual role was day-to-day

4    after that.

5    **Q.**   And at some point in time you actually had some

6    responsibility for the elevators; is that true?

7    **A.**   Correct.

8    **Q.**   Tell the jury, what was your job relative to the

9    elevators?

10   **A.**   So I started off as a sorter.  I was a sorter.  So I was

11   pretty much just moving recycling, going to the bundles,

12   putting cardboard in a bundler and loading it onto a forklift.

13        I moved to the elevators, was working at the elevators.

14   Got a little experience there, and then eventually became an

15   elevator lead.  So I pretty much ran the crew at the elevators.

16   **Q.**   So when you were an elevator lead, you had a crew of

17   people who worked the elevator?

18   **A.**   Correct.  I had about four to six people under me at any

19   given time pretty much just working their shifts, coordinating

20   shifts.  If somebody called off, I would cover their shift.

21   Things like that, in that nature.

22   **Q.**   Who promoted you to the lead position?

23   **A.**   Jaime Salazar did.

24   **Q.**   And Jaime Salazar worked for which company?

25   **A.**   He worked for Tesla.

1   Q.   And how many of the regular elevator employees, the

2   operators, were contract employees, if you know?

3   A.   To my knowledge, all of us were.

4   Q.   Okay.  And at this point in time when you were working on

5   the elevators, did you ever perform any duties directly for

6   Chartwell at that time?

7   A.   I don't understand that question, "directly for

8   Chartwell."  I worked for Chartwell.  I was just at Tesla.

9   Q.   Okay.

10  A.   So...

11  Q.   And in terms of what was your role, you know -- do you

12  know who Owen Diaz is?

13  A.   Owen Diaz was actually under -- he came in when I was at

14  the elevators.  So he was --

15  Q.   And what was your role relative to Mr. Diaz?

16  A.   I was his supervisor.

17  Q.   Okay.

18  A.   Or lead, if you want to call it.

19  Q.   Now, if you could, look at Exhibit 202.

20       (Witness complied.)

21  A.   Okay.

22  Q.   Do you recognize Exhibit 202?

23  A.   Yes.  This was the standard operating procedure that Tesla

24  gave us -- that Jaime and Victor gave me when I had to train a

25  new employee and we had them sign it.

**KAWASAKI - DIRECT / ORGAN**

1    Q.   And was that standard operating procedure something that

2    you used relative to the elevators at Tesla?

3    A.   Correct.

4    Q.   So you had to follow that standard operating procedure; is

5    that correct?

6    A.   Correct.

7            MR. ORGAN:   Your Honor, I'd move Exhibit 202 into

8    evidence.

9            THE COURT:   Any objection?

10           MS. JENG:   No objections.

11           THE COURT:   All right.   It's admitted.

12       (Trial Exhibit 202 received in evidence).

13       (Document displayed.)

14   BY MR. ORGAN

15   Q.   Did you play any role at all in training Owen Diaz?

16   A.   Yes.   So when Owen Diaz and any new employee came in, I

17   would show them what the actual responsibilities and the work

18   at the elevator, what we were expected to do and what our

19   expectations were.

20   Q.   And were those expectations and guidelines outlined by

21   what's in Exhibit 202, this Tesla policy?

22   A.   Correct.   This is the actual guidelines that we had to

23   train them on.   Well, I did.   This is what they gave me to give

24   them to read, to understand.   If they had any questions -- I

25   would ask if they had any questions and then will give them

**KAWASAKI - DIRECT / ORGAN**

1  knowledge of:  Hey, this is what the operating procedures are.

2  I can't control.  This is what we do.

3  **Q.**   Okay.  I'd like to take you back now in time to July 31st

4  of 2015.

5       At this point in time July 31st, 2015, what's your role

6  relative to Mr. Diaz?

7  **A.**   July 31st, I believe I was his supervisor at that time.

8  **Q.**   Okay.  And your supervisor at that time was?  Who was it?

9  **A.**   Jaime Salazar and Victor Quintero.  Ed Romero might have

10  been.

11       There, you guys are asking me something six, seven years

12  ago now.  I mean, he -- Ed might have been in the picture at

13  that time.  He might have came in a little after.  At some

14  point Ed came in as well.

15          **MR. ORGAN:**  I forgot to have the clerk publish that.

16  If we could have 202 published.

17       (Document displayed.)

18  **BY MR. ORGAN:**

19  **Q.**   And, again, this is the policy for the elevators; correct?

20  **A.**   Correct.

21  **Q.**   So Jaime was -- and, again, Jaime was a Tesla employee; is

22  that correct?

23  **A.**   Correct.

24  **Q.**   Okay.  And in terms of Ed Romero, at that point in time

25  would you say that you had sort of a dotted line reporting to

**KAWASAKI - DIRECT / ORGAN**

1   him?

2   **A.**   So when Ed Romero came in, Victor and Jaime said: Hey,

3   this is your new supervisor.  This is who you report to.  You

4   cc him on every email that you send out.

5   **Q.**   Okay.  Were you still reporting to Jaime Salazar at that

6   point too?

7   **A.**   Correct.  I was reporting to all of them.  He just came

8   in.

9   **Q.**   And both Jaime and Ed Romero, they were both under Victor

10   Quintero; is that right?

11   **A.**   Correct.

12   **Q.**   Now, at some point you send an email regarding Owen Diaz.

13   Do you remember that?

14   **A.**   It's vaguely familiar.  I believe he had an altercation

15   with another employee at the elevators.

16   **Q.**   Why don't you look at Exhibit 38 and see if you recognize

17   it.

18       (Witness complied.)

19   **A.**   Yes.  This was an issue where they had a verbal

20   altercation, which they had a big altercation together.  And I

21   put Ed, Victor, and Jaime and made them aware of it, because we

22   worked an overnight shift and these guys worked the day shift.

23   So the only way to get ahold of them was through email and they

24   would respond in the mornings.

25   **Q.**   The people who -- the supervisor --

1  A.   My supervisors; correct.

2  Q.   And you worked the night shift along with Mr. Diaz and

3  Mr. Timbreza; is that right?

4  A.   Correct.

5           MR. ORGAN:  Okay.  Your Honor, I'd move Exhibit 38

6  into evidence.

7           THE COURT:  Any objection?

8           MS. JENG:  No.

9           THE COURT:  All right.  It's admitted.

10     (Trial Exhibit 38 received in evidence).

11     (Document displayed.)

12  BY MR. ORGAN:

13  Q.   And so you mentioned there was an altercation that made

14  you send the email.  So if you can, describe what happened for

15  the jury that day?  How did you become first aware of the

16  altercation?

17  A.   So at this point in Tesla, just to give a little

18  background, I was actually bumped up to the overnight shift

19  lead.  So I had a bunch of different departments that I had to

20  cover at that time.

21     I was -- got a phone call saying there was an altercation

22  at the elevators, that they were having an issue.  I show up.

23  They were actually face-to-face, looking like they were arguing

24  with each other about to fight.

25     So my immediate recourse was to push them aside, separate

1   them.  There was some people around, so I asked questions:

2   What happened?  What's going on?  Did anybody else see it?

3   Because I wasn't there at the time.  I was at a different

4   section of the warehouse.

5       But when I did pull up, they were really about close.

6   They didn't touch each other, but they were face-to-face like

7   they were about to fight, and I separated them.

8       And when I asked people what happened, there was some

9   racial slurs thrown in nature.  That's what I got from people.

10  So I immediately sent Judy Timbreza home because they said he

11  was saying the slurs.

12  Q.   Okay.  And did you talk to Owen Diaz?

13  A.   I did.

14  Q.   And what did -- did Owen Diaz tell you what Judy Timbreza

15  had called him?

16  A.   So I don't -- I didn't put anything in -- I just put

17  "racial in nature" because I'm not comfortable using those

18  words that were thrown.  It's just not me.  I don't throw those

19  words around lightly.

20      But, yeah, he said the "N" bomb was thrown and the --

21  called him a "coon" and things of that nature.  But I don't

22  like using those words.  It's not me.  So I just put "racial in

23  nature" in the email.  That was the best way I could phrase it

24  at that time.

25  Q.   Okay.  But you do remember then that Mr. Diaz said that

1    Mr. Timbreza called him the "N" word; is that right?

2    **A.**   He said that.  And then as, like, other people they are

3    witnesses -- like I said, this was all new to me being a

4    supervisor at the time.  I just -- I felt like I did my due

5    diligence putting it into an email and giving it to my higher

6    ups.

7    **Q.**   So if someone had represented to the jury that Owen Diaz

8    did not complain about the "N" word, that no "N" word was

9    reported, that would not be correct; is that accurate?

10   **A.**   Yes.

11   **Q.**   Okay.  And then you -- I believe after this happens, you

12   have a conversation -- well, strike that.

13       Do you have a conversation with Ed Romero at any time

14   about this altercation between Mr. Timbreza and Mr. Diaz?

15   **A.**   So this altercation happened.  I immediately sent Judy

16   home for the night.  I believe this happened close to a

17   weekend.  It could have been a Thursday or a Wednesday.  It

18   could have been a Friday.  I knew it was close.  I knew they

19   were both due back next week to work a shift together, and I

20   think I asked Ed or Victor or one of them:  Hey, what's going

21   on?  What -- are we taking -- what actions are you guys taking

22   in this?  Can they work together or can they not?  After that,

23   it was out of my hands.

24   **Q.**   Did you mention to Mr. Romero -- well, did Mr. Romero tell

25   you anything about receiving your email?

1   A.   I think he replied.  I'm not sure.  I don't have access to

2   Tesla's emails anymore.  Like I said, everything is in the

3   email chain.  I had an actual Tesla email, so I don't have

4   access to any of that stuff anymore.

5   Q.   Okay.  And so once -- once you sort of passed this up the

6   chain of command, you didn't have any further role in

7   investigating; is that right?

8   A.   No, I did not.

9   Q.   Okay.  But in terms of -- in terms of whether the incident

10  actually occurred or not, based on what you were told by the

11  witnesses and by Mr. Diaz, did you come to some conclusion as

12  to whether or not racial insults were tossed, I think, as you

13  said?

14  A.   So it just -- just from getting a few people that said:

15  Hey, racial words were thrown.  This is what was thrown.  Like

16  I said, my immediate thing was I had to separate them, and I

17  sent the party home that said the slurs.

18  Q.   So it would be fair to say that you reached a conclusion

19  that Mr. Timbreza had directed racist remarks towards Mr. Diaz;

20  is that right?

21  A.   Yes.

22  Q.   Okay.  And it's fair to say at that point in time, as far

23  as you knew, those included the "N" word; right?

24  A.   At that point in time, that's what was said.  And like I

25  said, I made the immediate assumption to send Judy home for the

```
 1   night.
 2   Q.   And when did you conduct these interviews with the
 3   witnesses?
 4   A.   That was the people that were around at that time, and
 5   those are what the people had stated.  And, like I said, to
 6   just defuse the situation, one of them had to go home.
 7           MR. ORGAN:  Is this published to the jury?
 8           THE CLERK:  Yes.
 9           MR. ORGAN:  It is.  I just want to make sure they can
10   see it.
11   BY MR. ORGAN
12   Q.   You also sent this to Victor Quintero, the guy who was
13   head of recycling; is that right?
14   A.   Yes.  They were all cc'd on the email.  You can see their
15   names are cc'd on the email.
16   Q.   And why did you send it to him?
17   A.   Because that's what I was told to do.  I was told to cc
18   Victor, Jaime and Ed, because Ed came in at the time.
19   Q.   Okay.  And then, if you could, turn to Exhibit 37.  And
20   this looks like it's an email to you from Mr. Romero.  Do you
21   recognize that?
22   A.   That is an email to me, correct.
23   Q.   Okay.
24           MR. ORGAN:  Your Honor, I'd move Exhibit 37 into
25   evidence.
```

1      **THE COURT:**  Any objection?

2      **MS. JENG:**  No.

3      **THE COURT:**  It's admitted.

4      (Trial Exhibit 37 received in evidence).

5      **MR. ORGAN:**  And then can we publish this one?

6      **THE COURT:**  Yes, you may.

7      **MR. ORGAN:**  Okay.  I'm getting better.

8      (Document displayed.)

9   **BY MR. ORGAN**

10  **Q.**   In terms of Exhibit 37, he says that (as read):

11          "I'm following up with a discussion with Jaime on

12      Monday."

13      Do you see that?

14  **A.**   Yes.

15  **Q.**   Do you know if a discussion with Jaime actually occurred?

16  **A.**   That -- that's what he said he was doing.

17  **Q.**   Okay.

18  **A.**   I wasn't privy to that meeting or anything like that.

19  Like I said, I worked the overnight shift.  There would be

20  sometimes that Victor or Jaime would ask me to stay a little

21  past my shift to meet with them in the morning.

22      Like I said, I worked the overnight shift.  They worked

23  the day shift.  Sometimes they would come in at 6:00 a.m. to

24  discuss what happened or what was going on and how the night

25  shift went.

1  Q.   Did you -- in your discussion -- I believe you said that

2  you had a discussion with Ed Romero where you told him what

3  happened; is that right?

4  A.   Correct.

5  Q.   When you were talking to Mr. Romero, do you recall whether

6  or not you actually told him the "N" word had been used?

7  A.   Yes, I believe I did.  I believe that -- I'm just trying

8  to remember this.  I believe this was that following either

9  Monday or Tuesday --

10  Q.   Uh-huh.

11  A.   -- after the incident happened.

12  Q.   Okay.

13  A.   I believe we had a discussion, and that's where Ed came

14  with some paperwork, some document saying:  Hey, this is --

15  this is what happened.  This is what we're putting in the

16  documents.  And Judy needs to sign this, and you need to make

17  him aware that, hey, this is the steps.  We're actually writing

18  you up for this situation.  And make him aware that three

19  write-ups is a layoff.

20  Q.   Okay.  And in terms of -- regardless of what you actually

21  told him about what was said, did you tell Mr. Romero whether

22  or not the witnesses had corroborated the story or confirmed

23  that the racial things had been tossed?

24  A.   Yes, I did.  And I said that's why I made the decision to

25  send Judy home for the night.

1  Q.   Okay.  Now, I'd like you to turn, if you could, to

2  Exhibit 40.

3       (Witness complied.)

4  Q.   If you go up to -- at the bottom of this there is some

5  back and forth between you on August 3rd.  Do you see that?

6  A.   Correct.

7  Q.   And between you and Ed Romero.

8  A.   Correct.

9  Q.   And then Ed sends you another email on the 4th; is that

10  right?

11  A.   Correct.

12       MR. ORGAN:  Your Honor, I would move Exhibit 40 into

13  evidence.

14       THE COURT:  Any objection?

15       MS. JENG:  No objection.

16       THE COURT:  Okay.  It's admitted.

17       (Trial Exhibit 40 received in evidence).

18       THE COURT:  And it should be published.

19       MR. ORGAN:  Yes.  Can we please publish that?

20       (Document displayed.)

21  BY MR. ORGAN

22  Q.   Okay.  Now, I guess you were having some difficulty

23  getting in touch with Mr. Romero; is that right?

24  A.   Yes.

25  Q.   But you did have that meeting with -- do you remember

1   where the meeting was?

2   **A.**   It was -- I believe it was on the second floor at the

3   break room.

4   **Q.**   Okay.  Did you guys have breakfast together or what --

5   **A.**   I probably had breakfast.  I believe I ate.

6   **Q.**   Okay.

7   **A.**   I don't know if he might have had a glass of juice or

8   something.  I don't know.  I honestly don't know.

9   **Q.**   So now I'd like you, if you would, turn to Exhibit 43.

10  **A.**   You said 43?

11  **Q.**   Oh, wait.  What am I talking about?  39.  39.

12  **A.**   Okay.

13       (Witness complied.)

14  **Q.**   Now, this is not copied to you, but there's a statement

15  here.

16       **MR. ORGAN:**  And, Your Honor, I would move Exhibit --

17  this is a stipulated document, Exhibit 39.  I'd like to move it

18  into evidence.

19       **THE COURT:**  All right.  If it's stipulated, it's

20  admitted and can be published.

21       (Trial Exhibit 39 received in evidence)

22       **MR. ORGAN:**  Yes.  If we could publish it, please.

23       (Document displayed.)

24  **BY MR. ORGAN:**

25  **Q.**   Now, there are two things in here I'd like to go over.

 1           If you look about midway in, it says -- this is, again,

 2    Mr. Romero's words not yours, but he says here (as read):

 3              "Mr. Owen says this has happened before."

 4           **MR. ORGAN:**  Can you pull that out so the jury can see

 5    that better?

 6         (Document enlarged)

 7    **BY MR. ORGAN:**

 8    **Q.**   Okay.  Had Owen told you that Mr. Timbreza had been

 9    engaging in harassing conduct towards him prior to this

10    July 31st event?

11    **A.**   I believe he said they were having altercations.  He

12    didn't say anything like -- I mean, maybe they were arguing

13    about something.  I don't recall him saying anything, like,

14    racial in nature from that sense or source, but I know they

15    were having altercations.

16    **Q.**   Did you communicate the fact that this had been a pattern

17    of conduct to Mr. Romero?

18    **A.**   I believe -- I don't know where this email came.  Like I

19    said, I don't have any -- this was not sent to me, so I don't

20    have any recollection of this email or anything that this email

21    states.

22    **Q.**   Sure.

23    **A.**   I know there was a bunch of altercations at the elevator.

24    I know people were having issues.  I did my best to separate

25    them during those altercations or move them to different

 1  shifts.  I didn't have the power to lay people off or anything

 2  of that nature, so I would just do my best.

 3      Like I said, not everybody gets along.  You don't get

 4  along with your coworkers at all times, but you have to deal;

 5  right?  We all need to check, so...

 6  Q.  Okay.  But if you go up to the second sentence in this

 7  document, it says -- do you see where it says (as read):

 8          "We investigated by speaking to all witnesses

 9      present, but they did not hear the remarks"?

10      Now, based on your investigation, is that a true

11  statement?

12  A.  That is not.

13  Q.  So based on what you knew about this event, you knew that

14  actually people had heard racial remarks; correct?

15  A.  Correct.

16  Q.  And based on what you had told Mr. Romero at that point in

17  time, Mr. Romero knew that there had been witnesses to the

18  racial remarks; right?

19  A.  Correct.

20          MS. JENG:  Objection.  Calls for speculation.

21          THE COURT:  The answer is out, so I will overrule the

22  objection.

23  BY MR. ORGAN

24  Q.  Now, do you know why Mr. Romero didn't copy you on this

25  email?

1          **MS. JENG:**  Objection.  Calls for speculation.

2          **THE COURT:**  Sustained.

3          **THE WITNESS:**  Do I answer that?

4          **THE COURT:**  No.  So wait until I say "overruled" and

5    then you can answer.

6          **THE WITNESS:**  All right.  Sorry.

7    BY MR. ORGAN

8    Q.    Let me ask you this:  Did you have a chance to observe

9    Mr. Diaz's performance when you supervised him?

10   A.    Yes.  Yes, I did.

11   Q.    How would you say he performed his duties?

12   A.    Owen was a great worker.  He showed up on time every day.

13   He wanted to work.  He came in.  He stayed after.  He covered

14   people's shifts.  He gave people breaks.  He -- he pretty much

15   did anything that I asked him to do at the time in what he was

16   capable of doing.

17   Q.    Now, at some point in time counsel mentioned that he

18   received a promotion in her opening.  Did you play any role in

19   a promotion of Owen Diaz?

20   A.    Yes.  So as I moved up with the company, I guess, or

21   Chartwell or at Tesla, they had asked me:  Who would you like

22   to cover your -- who would you want to be your leads?

23         Because, like I said, I was running the whole overnight

24   crew for environmental sustainability at that time.  They said:

25   Who do you want in the higher positions?  Who do you think is

1    comfortable?

2        And Owen was one of the persons that -- he knew the

3    elevator.  He showed up every day.  He wanted to work.  So he

4    was a key candidate to put him in a position to cover that

5    shift.

6        So I put him in that.  I told Victor and Jaime and Ed:

7    Hey, I want Owen to run my elevators.

8    Q.   So --

9    A.   It kind of took some -- it alleviated off of me that I

10   knew the elevators were going to be covered the right way,

11   so...

12   Q.   So you actually recommended Owen for a promotion?

13   A.   Correct.

14   Q.   And who approved that promotion, do you know?

15   A.   I believe Victor, Jaime.  One of them approved it.  Like I

16   said, I was the one running the overnight crew, and that's who

17   I felt I wanted in that position.  I just gave my two cents.

18       Now, they can choose to say "no" or they could say "yes,"

19   and they ended up saying "yes" and he got promoted.

20   Q.   So as far as you know, Tesla is the one that approved it;

21   is that right?

22   A.   Correct.  Yes, that's correct.

23   Q.   All right.  So if it had been represented to this jury

24   that Owen's pay is increased by CitiStaff, as far as you knew,

25   that actually happened from Tesla; is that right?

 1   A.   Correct.  I mean, I got a pay increase as well when I got

 2   bumped up to the people.  And they just said -- Victor and

 3   Jaime said they were going to contact my staffing agency and

 4   tell them to give me more money, so...

 5          MR. ORGAN:  Your Honor, I'd also --

 6   BY MR. ORGAN

 7   Q.   If you could, look at Exhibit 222.

 8          MR. ORGAN:  And, Your Honor, I believe this is a

 9   stipulated admissible exhibit.

10          THE COURT:  All right.  Hearing nothing, I agree.  So

11   it's admitted.

12      (Trial Exhibit 222 received in evidence)

13          THE COURT:  And it can be published.

14          MR. ALEXANDER:  We can publish it, great.

15      (Document displayed.)

16   BY MR. ORGAN:

17   Q.   And so you can see here that it's Victor Quintero is

18   letting Jaime know and somebody named Nancy Uhlenbrock that

19   Owen is getting this pay raise; is that correct?

20   A.   That is correct.  That's what the email says.

21   Q.   And as of this date, 8/17/2015, do you know who Victor

22   Quintero is working for then?

23   A.   Tesla.

24   Q.   Tesla.

25          Okay.  Let me ask you, in terms of -- in terms of the

**KAWASAKI - DIRECT / ORGAN**

1    factory, is this a big factory?

2    **A.**    Half a million square feet.   I believe that's pretty --

3    pretty damn big to me.

4    **Q.**    Okay.   If you could -- if you could go to Exhibit 104,

5    please?

6         (Witness complied.)

7    **Q.**    Now, do you recognize this layout that's here on Exhibit

8    '4?

9    **A.**    I vaguely remember.   Like I said, I mean, I'm pretty sure

10   this is just a blueprint, but it looks like the production

11   line of the factory.

12   **Q.**    Okay.   And do you see sort of in the middle on the left

13   side there's something there?   "Elevators," do you see that?

14   **A.**    Yes.

15   **Q.**    Does that fairly and accurately represent where the

16   elevators were relative to the production floor, at least

17   whatever part of it is showing here?

18   **A.**    Yeah.   This was, like, showing the lower floor.   Not the

19   upper floor.   But, yes, that is.

20   **Q.**    This isn't the whole lower floor.   It's just part of it;

21   is that right?

22   **A.**    This is just -- this is just part of the warehouse, and

23   this is showing the first floor I believe, not the second

24   floor.

25             **MR. ORGAN:**   Your Honor, I would move Exhibit 104 into

```
 1  evidence.

 2           THE COURT:  Any objection?

 3           MS. JENG:  Your Honor, lacks foundation.

 4           THE COURT:  I'm going to overrule the objection.  I

 5  think he testified specifically enough with respect to the

 6  placement of the elevator and the other things and the context

 7  of it.

 8      So overruled.  It will be admitted.

 9      (Trial Exhibit 104 received in evidence)

10           MR. ORGAN:  Thank you, Your Honor.

11  BY MR. ORGAN

12  Q.   In terms of -- tell the jury, if you could, what are the

13  freight elevators?  What are those?

14  A.   So to me, from my perspective, the freight elevators were

15  the backbone of Tesla.  You had to move material up and down.

16  If you didn't bring -- I believe on the second floor, it's not

17  showing, but the battery line is up there where they made the

18  batteries for the bottom of the cars.  So if you didn't move

19  the product that they needed for that production line up and

20  down this freight elevator, they would stop production.

21      So I believe it's kind of like the backbone.  And that

22  goes for both elevators.  You had to bring material up and

23  down.

24      And then we also had to bring the recycling down.  So if

25  at any given time you had a backup on recycling or the
```

1    batteries or whatever product Tesla needed up at that time, you

2    would stop production and it would put a halt to everything.

3    It was like a linked chain.

4    **Q.**   So this is a pretty important part of the car-making

5    process, this elevator?

6    **A.**   It's a key part.  I mean, you don't make the batteries,

7    you don't make the car; right?

8    **Q.**   Right.

9          Okay.  If you could, please look at -- what I'd like to do

10   now is shift gears and fast forward to October 17th of 2015.

11   Okay?  October 17th.

12         If you could, look at Exhibit 235.  235.

13         (Witness complied.)

14   **Q.**   Now, as of this date, what is your position?

15   **A.**   At this date I believe I was, like, the same position.  I

16   was just the lead of the whole overnight environmental

17   sustainability group, recycling group.

18   **Q.**   And did you receive this document, Exhibit 235?

19   **A.**   What do you mean by "receive this"?  Like, from any of you

20   guys?  No, but --

21   **Q.**   No, no.

22   **A.**   I got this email, yes, because my name's on it, yes.

23   **Q.**   That's right.

24         When Owen Diaz sent this, did you receive it?

25   **A.**   Yes.

```
 1   Q.    Okay.  And just to clarify, back on October 17th of 2015;
 2   right?
 3   A.    Correct.
 4   Q.    Okay.
 5         MR. ORGAN:  Your Honor, I'd move Exhibit 235 into
 6   evidence.
 7         MS. JENG:  No objections.
 8         THE COURT:  It's admitted.
 9      (Trial Exhibit 235 received in evidence).
10         MR. ORGAN:  Can we publish this, Your Honor?
11         THE COURT:  Yes.  Yes.
12         MR. ORGAN:  Okay.
13      (Document displayed.)
14   BY MR. ORGAN
15   Q.    Now, what was Ramon Martinez's role at this point in time?
16   A.    So Ramon Martinez was my counterpart, but for the day
17   shift.
18   Q.    So he was also a lead?
19   A.    Correct.  He was my counterpart for the day shift.
20   Q.    Okay.  And there are some -- there's some discussion here
21   in Exhibit 235 about an interaction between Mr. Diaz and
22   Mr. Martinez.  Do you see that?  Where he's alleging threats;
23   right?
24   A.    Correct.
25   Q.    You weren't present for that?
```

**KAWASAKI - DIRECT / ORGAN**

1   **A.**   I don't believe -- I might have been on vacation.  It

2   could have been one of my days off.  I could have been at home

3   at the time.  I know I got the email, but I believe I wasn't

4   present.

5         That's why Owen copied me on the email, because that's

6   what I asked him to do.  Any altercations that he had, I would

7   ask him to copy me on the email, as well and Victor and whoever

8   else on the email.

9   **Q.**   Okay.  And then there's a reference here about the

10  surveillance system.  Does Tesla have -- or when you were

11  there, does Tesla have a surveillance system?

12  **A.**   Yes, they do.

13  **Q.**   And what does the surveillance system consist of, if you

14  know?

15  **A.**   So at one point I actually got access to the surveillance

16  system.  I actually had a Tesla computer.  They gave me a token

17  to access their mainframe for their computer, for their system.

18        And I would be able to say -- if I was on break and there

19  was an altercation, I would be able to open up the computer and

20  look at the cameras and say:  Hey, what's going on?  Or see

21  what people were complaining about if I was dealing with

22  something else or at one side of the factory.

23        Like I said, it's a big factory.  So I could be over here,

24  and it could take me 10 minutes, 15 minutes to get all the way

25  over here with the altercation at that time.

**KAWASAKI - DIRECT / ORGAN**

1   Q.   So, but if -- so did the surveillance system capture what

2   was on the elevators?

3   A.   So when I looked at this -- so the surveillance system, it

4   would only go back so far.  So that's only if they gave me

5   access to go back so far, to rewind the footage and go back so

6   far.

7        In this incident when he said -- I looked at the camera

8   system, and all I seen was Owen and -- Owen and Ramon face to

9   face, and then it bleeped away.

10       So I didn't know anything else, and I let Ed know about

11  that stuff as well.  I don't know if Ed had access to the

12  cameras.  I honestly do not know what he had from Tesla, so...

13  Q.   But you at least saw that there was an interaction between

14  the two of them?

15  A.   There was.  And, like I said, this was mainly towards

16  Owen.  Owen just put me in there because he knew I did have

17  access to the cameras.

18       And it did roll back.  But, like I said, when I tried to

19  roll back the footage, it only let me go back so far.  And at

20  the end of that footage, I did see them face to face.

21       And then after that, this was nothing to do with me,

22  because he sent it to Ed and Ed would take it from there.  It

23  wasn't my deal.  I wasn't there that day, so I really didn't do

24  anything with this matter.

25  Q.   So you played no role in investigating it?

1    A.   I played no role in this matter per se.  All I did, like I

2    said, I -- the role I played was I told Ed:  Hey, this is what

3    I seen on the camera.  And that was a verbal.

4    Q.   Now, you had -- but you did have interactions with

5    Mr Martinez, Ramon Martinez, didn't you?

6    A.   Correct.  Like I said, he was my counterpart as the day

7    shift.  We would overlap and I would let him know what needed

8    to be done and what -- how the elevator was going.  And if

9    sometimes the elevator would get backed up for whatever reason,

10   it would get backed up with batteries or whatever, they would

11   overload the front of the elevators with batteries and I would

12   just let them be aware:  Hey, this is what you guys need to

13   catch up on.  This is how the overnight shift went.

14   Q.   And did you ever hear Mr. Ramon Martinez use the word

15   *mayate* in Spanish?

16   A.   Umm, I heard him say *mayate*.  I also heard him say *chongo*

17   a lot.

18   Q.   So you heard *mayate*.  What was the other word?

19   A.   *Chongo*.

20   Q.   *Chongo*?  And, again, that's Ramon Martinez; right?

21   A.   Correct.

22   Q.   How many times did you think you heard Ramon Martinez use

23   the word *mayate*?

24   A.   I can't give you a real count.  I don't know.  I just know

25   I've heard them say it.  I mean, they're talking to each other

**KAWASAKI - DIRECT / ORGAN**

1    in Spanish and the words get thrown out.

2        So, I mean, I -- I mean, I know Spanish words and I know

3    curse words, sorry, in Spanish.  Don't we all?

4    **Q.**    Let me ask you this:  When you were walking around the

5    Tesla factory, did you ever hear the "N" word when you were

6    walking around?

7    **A.**    That word was thrown around a lot honestly.  It was a

8    young crew.  They hired a lot of staffing agencies, so a lot of

9    people had different backgrounds.  A lot of people threw that

10   word around casually a lot, I mean, in passing, whether it's

11   friendly or fun.

12       I mean, I didn't think nothing of it because it wasn't

13   thrown towards me, so it wasn't affecting me in any way.  I

14   can't control what other employees do that weren't under my

15   supervision, so...

16   **Q.**    How often would you say you heard this "N" word when you

17   were walking around?

18   **A.**    Daily.

19   **Q.**    Daily.  Could you tell whether or not these people that

20   you heard throwing the "N" word around on a daily basis,

21   whether or not they were Tesla employees or contract employees?

22   **A.**    No, I can't -- couldn't tell you that.  I don't know.  I

23   don't know.

24           **MR. ORGAN:**  No further questions, Your Honor.

25           **THE COURT:**  All right.

```
 1        Cross-examination.

 2                        CROSS-EXAMINATION

 3   BY MS. JENG

 4   Q.   Good morning.

 5   A.   Good morning.

 6            THE COURT:  Ms. Jeng, you might want to introduce

 7   yourself again to the jury.

 8            MS. JENG:  Oh.  Hi, I'm Patricia Jeng.  I

 9   representative Tesla in this case.

10            THE COURT:  And move the mic towards you.

11            MS. JENG:  Okay.

12   BY MS. JENG

13   Q.   All right.  I want to address the last thing you just

14   testified about, Mr. Kawasaki.  You said that you had heard the

15   "N" word in the factory, right, being used.

16        And the context in which you heard it were people saying

17   it to each other in a friendly context and not in an aggressive

18   manner; correct?

19   A.   That's correct.  I mean, that's not my conversation.  I

20   just heard the word thrown around.  It's not my conversation to

21   have.  It's not the conversation they're having with me, so I

22   just kept on pushing.

23   Q.   And you heard it when people were on their breaks or in

24   the cafeteria; is that right?

25   A.   Correct.
```

1   Q.   And you didn't ever hear it used in an offensive or as a

2   slur; correct?

3   A.   Like I said, it's not my conversation.  I don't know

4   what -- if somebody took offense to it or not.  It just wasn't

5   directed towards me.  It wasn't at me.  I just hear it in

6   passing, I just keep going.  I have my own things to take care

7   of, so...

8   Q.   But you did -- did you believe it was not -- sorry.

9        You didn't believe it was being used in an offensive

10  manner any time you heard it; is that right?

11  A.   Like I said, it was just heard in passing.  I didn't

12  really think nothing twice of it or anything like that.  It

13  wasn't thrown towards me.  It wasn't -- nobody -- I didn't see

14  anybody getting into an altercation or if -- I just kept going.

15       Like I said, I had a lot on my plate at that time.  At

16  that time, I probably had about 15, 20, 25 people under me.  I

17  mean, I had no time to stop or whatever.

18       It's not even my conversation.  Do you stop on the street

19  when somebody is saying it or anything like that and say, "Oh"?

20  Get in their conversation?  No, right?

21  Q.   My question is a little bit different.  When you heard

22  that word being used, you did not hear it ever being used in a

23  way that you felt was offensive or --

24            MR. ORGAN:  Objection.  Relevance.

25            THE COURT:  Overruled.  You can answer.

1            THE WITNESS:  I can answer?

2            THE COURT:  Yes.

3            THE WITNESS:  Yeah.  I mean, it wasn't -- the word is

4    not proper to use anyway, so it's like -- I mean, like I said,

5    it didn't affect me or anything like that, so I didn't take

6    offense to that.

7    BY MS. JENG:

8    Q.   Okay.  And for those people who you testified you have

9    heard using the "N" word in the break room or in the cafeteria,

10   you don't recall who they were; right?

11   A.   I don't know everybody.  We had -- I don't know how many

12   employees Tesla had at that time or staffing agencies, so...

13   Q.   Okay.  And so you don't know who their employer was;

14   right?

15   A.   I do not.  I mean, I said I don't know if you're Tesla or

16   not.

17   Q.   Okay.  And in those times that you heard the "N" word

18   being used, you know, in a non-offensive manner, do you -- so

19   no one complained to you about any of those instances; is that

20   right?

21   A.   In those of me overhearing it?  No.

22   Q.   Okay.  And you don't know whether any complaints were

23   brought by someone else and immediately addressed; right?

24   A.   No.  I don't know.  Like I said, if it didn't have

25   anything to do with me or my group, no.  I don't know anything

1    else that any other part of Tesla did.

2    Q.   Okay.  So if there was another worker at the factory who

3    was offended hearing that word, they could have reported it;

4    correct?

5    A.   Correct.

6    Q.   But you wouldn't have known about that; right?

7    A.   No.

8    Q.   Okay.

9    A.   There's not a Tesla newsletter saying every case that

10   somebody reports.

11   Q.   That's right.

12        Okay.  I want to talk about the incident with Judy

13   Timbreza.  You testified earlier I think that as of July 31st,

14   2015, you were Owen's supervisor; is that right?

15   A.   Correct.  I was the lead of elevator, correct.

16   Q.   Are you aware that Owen was actually a lead at that point

17   already?

18   A.   Vaguely.  If he was, he was.  I don't -- I don't remember.

19   Q.   So if Owen was a lead already and you were a lead, were

20   you still his supervisor at that point?

21   A.   Correct.  Correct.

22   Q.   Okay.  You guys were in the same position, though?

23   A.   Correct.  I could have been the elevator lead.  At that

24   time I could have already been bumped up to overnight shift

25   lead.  I believe if he was a lead at that time, then I was

**KAWASAKI - CROSS / JENG**

1    already bumped up to the overnight shift lead.

2    **Q.**   Okay.  So if Owen was a lead at that time, you would have

3    been on a different shift; correct?

4    **A.**   I would have been on a different shift, but we would

5    overlap.  Shifts would overlap.

6    **Q.**   So you guys were both leads, but just on different shifts

7    that overlapped; correct?

8    **A.**   Like I said, I could have been the overnight shift lead at

9    that time of the whole environmental sustainability group.

10   Like I said, if he was already bumped up to lead at that time,

11   then I was already bumped up to the overnight shift lead.

12   **Q.**   All right.

13        Okay.  So in June 2015, you became aware of the verbal

14   altercation between Judy and Owen; correct?

15   **A.**   Correct.

16   **Q.**   And you became aware of this incident when someone called

17   you; is that right?

18   **A.**   Correct.

19   **Q.**   At that time you were driving around in another area; is

20   that right?

21   **A.**   Yeah, more than likely.  I think I was on a different

22   location, correct.

23   **Q.**   And when you got this call, you came to the area where

24   Owen and Judy were; right?

25   **A.**   Correct.  I immediately came to the elevators.

**KAWASAKI - CROSS / JENG**

1  Q.   Okay.  So you came after the altercation; is that right?

2  A.   Correct.

3  Q.   I'm sorry?

4  A.   Correct.

5  Q.   Okay.  So you didn't actually hear any racial slurs being

6  said; correct?

7  A.   I did not hear any racial slurs from me, but I didn't hear

8  it my personal self.  Is that what you're asking?

9  Q.   Okay.  And what you did was immediately separate the two

10 men; right?

11 A.   Correct.

12 Q.   And then you previously testified you wrote an email to Ed

13 Romero about the incident; is that right?

14 A.   Correct.

15 Q.   Okay.  And the email that you wrote to Ed was based on

16 what you were told happened between Judy and Owen, not based on

17 what you witnessed; correct?

18 A.   Correct.

19 Q.   Okay.  And then I think you previously testified that

20 after you sent the email to Ed about Judy and Owen, it was out

21 of your hands; is that right?

22 A.   Correct.  It was to the higher ups above me.

23 Q.   Now, you testified a little bit earlier about your

24 investigation into Owen's allegations about Judy's comments; is

25 that right?

1    A.    I don't understand the question.

2    Q.    Were you testifying earlier that you investigated Owen's

3    complaint about Judy?

4    A.    I said I talked to witnesses around.  I didn't do any,

5    like -- I mean, if you want to call that investigation, I

6    guess.  I talked to the witnesses that were around.

7    Q.    Right.  It wasn't your job to do the investigation; is

8    that right?

9    A.    It was my job to separate the people in the altercation.

10   It was my job to make sure nothing happened or anybody got

11   hurt.

12   Q.    Okay.  So it was your job to separate the two men, but it

13   wasn't your job to investigate or look into what actually

14   happened; is that right?

15   A.    I don't -- I mean, like, I -- I don't -- I'm having,

16   sorry, a tough time understanding your question right now.

17   Q.    Well, it wasn't your role to do an investigation into what

18   had happened between Mr. Diaz and Mr. Timbreza --

19   A.    So my --

20   Q.    -- that correct?

21   A.    -- role was the overnight --

22        THE COURT:  Mr. Kawasaki, if you wait for Ms. Jeng to

23   finish her question, then that will help you formulate your

24   answer.

25        THE WITNESS:  Okay.

KAWASAKI - CROSS / JENG

1  BY MS. JENG

2  **Q.**   Well, is it your belief that an investigation into

3  incidents like this is above your pay grade?

4  **A.**   Not at that time, no.

5  **Q.**   It was not above your pay grade?

6  **A.**   Who else was going to figure out what happened that night

7  besides me; right?  I was the overnight shift lead.  There was

8  nobody else higher than me for our group there for

9  environmental sustainability.

10 **Q.**   So it's your testimony that it was your -- it was not

11 above your pay grade and it was your role to do the

12 investigation?

13          **MR. ORGAN:**  Objection.  Compound, Your Honor.

14          **THE COURT:**  Overruled.  You can answer, if you can.

15          **THE WITNESS:**  So can you ask that question again?

16 Sorry.  I got lost and it was confusing.

17 BY MS. JENG

18 **Q.**   Sure.  It's your testimony that it was your role to do the

19 investigation into what had happened between the two men?

20 **A.**   It's my testimony to say that it was my job to figure out

21 what happened that night and make a decision on how I was going

22 to separate these people or send one home.

23 **Q.**   I understand that, but was it your role to do the

24 investigation?

25 **A.**   At that night?  Yes.

1    Q.    Okay.

2          MS. JENG:  If I could direct the Court and the witness

3    to his deposition testimony Page 50, Line 7 through 18.

4          THE COURT:  60?

5          MS. JENG:  50.

6          THE COURT:  I'm sorry.  And what lines?

7          MS. JENG:  Lines 7 through 18.

8          MR. ORGAN:  It's unclear, Your Honor.  Vague and

9    ambiguous.

10         THE COURT:  Overruled.  That's a question that can be

11   answered.

12      So right at the moment you've directed the -- your

13   attention, Mr. Kawasaki, is directed to that page and

14   line numbers.

15         THE WITNESS:  I see.

16         THE COURT:  Go ahead, Ms. Jeng.

17         MS. JENG:  May I read the transcript, Your Honor?

18         MR. ORGAN:  For context can we have down to Line 21,

19   Your Honor?

20         MS. JENG:  Sure.

21         THE COURT:  Yes, that's fine.

22         MS. JENG:  No objections.

23   BY MS. JENG

24   Q.    (As read):

25         "QUESTION:  You mentioned earlier that it wasn't your

**KAWASAKI - CROSS / JENG**

1      role to do an investigation into what had happened

2      between Mr. Diaz and Mr. Timbreza; is that correct?

3      "ANSWER:  Correct.  That's not -- that's above my pay

4      grade.  That wasn't me, so --

5      "QUESTION:  And when you say above your pay grade, you

6      expected Ed Romero and Jaime and maybe Victor to do

7      any investigation into what happened; is that correct?

8      "ANSWER:  That's their job, is it not?  That's not my

9      job.  Like I said, I don't have the ability to

10     reprimand or do an investigation on people.  That's

11     not --

12     "QUESTION:  Sure.

13     "ANSWER:  -- my position.  My position was just to

14     make sure the night shift ran smoothly, we had enough

15     staffing."

16         Mr. Kawasaki, you don't know whether Ed Romero or anyone

17     else spoke with the witnesses; correct?

18  **A.**  I do not.

19  **Q.**  Okay.  You don't know what steps they took to conduct any

20     investigation; is that correct?

21  **A.**  I do not.

22  **Q.**  Okay.  I think you testified earlier that the incident

23     between Judy and Owen was on a Friday; correct?

24  **A.**  I don't remember if it was a Friday.  I can look in the

25     calendar.  It could have been a Thursday or Friday.  That's

1   what I said.  I don't -- it could have been.

2   Q.   Well, you sent the email to Ed Romero on the same day as

3   the incident; is that right?

4   A.   Correct.

5   Q.   Okay.  If I could have you look at Exhibit 218.  I believe

6   this is previously admitted; or if not, it's stipulated.

7   A.   218?

8   Q.   Yes?

9   A.   I don't have 218.

10        MS. JENG:  Could I show the witness a copy of 218?

11        THE COURT:  It's a stipulated exhibit?

12        MS. JENG:  Yes.

13        THE COURT:  So if you have it, you can show it.

14   (Document displayed.)

15   BY MS. JENG:

16   Q.   Mr. Kawasaki, do you see that the email that you sent to

17   Ed is dated July 31st, 2015; correct?

18   A.   Correct.

19   Q.   And do you see that it was sent on a Friday?

20   A.   I see that, yeah.

21   Q.   Okay.  So does this refresh your recollection as to when

22   the incident between Judy and Owen occurred?

23   A.   So it was a Friday.

24   Q.   Okay.  And so if July 31st was a Friday, Monday would be,

25   what, August 3rd?

```
 1    A.    The 3rd or 4th.  One of those.  Probably, yeah, 2nd or
 2    3rd.
 3    Q.    Now, in your email you didn't specify any specific remarks
 4    that were racial in nature; is that right?
 5    A.    I put "racial in nature," correct.
 6    Q.    Okay.  And then you testified that you spoke -- the next
 7    time you spoke with Ed was that following Monday; is that
 8    right?
 9    A.    Correct.
10    Q.    Okay.  So that would be August 3rd; is that right?
11    A.    That is correct.
12    Q.    Okay.  So August 3rd is the date you met with Ed in the
13    morning; is that accurate?
14    A.    That is correct.
15    Q.    Okay.  And your testimony today is that you told Ed more
16    specifically about the comments that Owen told you were being
17    made --
18    A.    Correct.
19    Q.    -- on that Monday; is that right?
20    A.    That's correct.
21    Q.    So prior to Monday, you had not spoken to Ed?
22    A.    No.  Other than this email out to all of them, yes, I did
23    not.
24    Q.    Okay.  So the first day that Ed -- you would have told Ed
25    about any specific remarks would have been August 3rd on that
```

1   Monday; correct?

2   **A.**   So it could have been.  Ed could have gave me a call.  I'm

3   not too sure what -- over the weekend what happened.  Ed could

4   have called me.  We could have talked about it before then.  I

5   know we had a meeting Monday.

6   **Q.**   Okay.  But you don't have any specific recollection of

7   talking to Ed between your email and that Monday; correct?

8   **A.**   Not from seven years ago, no.

9   **Q.**   Okay.  And August 3rd, the day -- the first time you

10  talked to Ed after you sent the email, you recall Ed telling

11  you that a decision had been made regarding the next steps as

12  to the Judy incident; correct?

13  **A.**   That's what Ed said, yes, correct.

14  **Q.**   Ed told you that a decision had been made; correct?

15  **A.**   Yeah, from him and Jaime and Victor.

16  **Q.**   Okay.  And that Monday, which is the day you talked to Ed,

17  you had been told that Judy's position would be filled;

18  correct?

19  **A.**   What do you mean?  No, I wasn't told that it would be

20  filled.  I was told that they made a decision and the decision

21  was that Ed came with a paper stating that they were going to

22  write Judy up.  I don't know what you mean by "filled."

23  **Q.**   Well, did someone ask you on that Monday that you would

24  need to fill Judy's position, that he would be replaced?

25  **A.**   I believe -- I'm not sure.  Maybe Judy was coming back

1    that Tuesday.

2         I believe I sent emails out stating that:  Hey, what --

3    what is going to happen?  What are you guys doing?  What

4    recourses are you guys taking in this matter?

5         I believe they were due to come back and work the same

6    shift together at that time, Owen and Judy, so...

7    Q.   Okay.  So Mr. Timbreza actually was off of work Monday and

8    Tuesday; right?

9    A.   I -- I don't -- I can't answer that question because I

10   don't remember.

11   Q.   Okay.

12        MS. JENG:  Can I show the witness his deposition

13   transcript, Page 92, Line 4 through 20?

14        THE WITNESS:  You said page what?

15        MS. JENG:  Page 92, Line 4 through 20.

16        THE WITNESS:  Okay.  94, Line 2 through 20.

17   BY MS. JENG

18   Q.   Are you there?

19   A.   I'm there.

20   Q.   So that Monday is when you were told that Judy was not

21   coming back; correct?

22   A.   You said the deposition Line 2 through 4, Page 94?

23   Q.   Sorry.  Page 92, Lines 4 through 20.

24   A.   Okay.  All right.  I asked you Page 90- -- yeah.

25        Okay.  Can you ask your question again?

1   Q.   Sorry.  I missed that.

2   A.   Can you ask your question again?

3   Q.   Yes.  So Monday is when you were told that Judy was

4   actually not coming back; is that right?

5   A.   I believe -- what do you mean by "not coming back"?  Like

6   not working for us?  Not working for his staffing company

7   anymore?  Like, they laid him off?

8   Q.   Just not coming back.

9   A.   I don't think he was scheduled to work that Monday.  I

10  believe he was scheduled to work that Tuesday.  Maybe.  I don't

11  know.  I believe -- I couldn't tell you what the schedules were

12  from seven years ago.  I don't have a record of schedules.

13  Q.   Well, you were deposed in this case a couple of years ago;

14  right?

15  A.   Correct.

16  Q.   And so at the time of your deposition, that was closer in

17  time to the events of this case than it is now; right?

18  A.   Yeah.  Five years from the event you guys gave me a

19  deposition, yeah.  Sure.

20  Q.   So your memory would be better then than it is now of the

21  events from 2015; correct?

22  A.   Possibly.  I mean, this is what you guys gave me.

23  Q.   So if you testified in 2019 that you were told Judy is not

24  coming back, do you have any reason to believe that that wasn't

25  true?

1    A.    Like, I believe he's not coming back.  Like, he could have

2    been off the next two days.  I -- I don't understand your

3    question.

4         Like, you're saying "not coming back."  Like, what do you

5    mean by "not coming back"?  He wasn't laid off at this

6    situation at this point in time.  He wasn't laid off from

7    coming back to Tesla.  Nobody --

8    Q.    Well, you had assumed -- well, you were told that -- you

9    were told to fill the elevator position, and so you had assumed

10   that Judy is not coming back; correct?

11   A.    Maybe for the night, yeah.  Fill the elevator position.

12   I'm sure he wasn't coming back for the night.  I sent him home.

13        Maybe Ed called him and said, hey, he wasn't coming the

14   next day.  I don't -- I don't remember that.

15   Q.    So if he was off Monday and Tuesday, you also said he

16   didn't come back that following Wednesday; correct?

17   A.    I believe he worked Wednesday through Sunday.  I believe.

18   I mean, I don't know.

19        Like I said, I can't give you an accurate schedule what

20   his schedule was.  I can't give you that answer if I don't know

21   it.

22             MS. JENG:  All right.  Your Honor, can I read the

23   portion of the transcript that I have shown the witness?

24             THE COURT:  You may.  I'm not sure there is a question

25   at the end of it.

1              MS. JENG:  Okay.

2     BY MS. JENG

3     Q.   (As read)

4          "QUESTION:  Okay.  Did you work Sunday?

5          "ANSWER:  I did work Sunday.

6          "QUESTION:  Did Mr. Timbreza work that day?

7          "ANSWER:  I believe so, yeah.  Yeah.  He worked up

8     until Monday the last day I seen him.  He -- so he had

9     Monday, Tuesday off.

10         "QUESTION:  Okay.

11         "ANSWER:  Right.  So he worked Wednesday, Thursday,

12    Friday, Saturday, Sunday.  He had Monday, Tuesday off.

13    He didn't come back.  They -- that's on Monday.  They

14    told me that he's not coming back.

15         "QUESTION:  Okay.  And that's --

16         "ANSWER:  Or they told me to fill the elevator

17    position, so I assumed he's not coming back.  They

18    told me:  You need to find somebody on your shift that

19    can cover the elevator.  And that's where I assumed

20    he's not coming back.  And then he didn't come back

21    that following Wednesday."

22    Do you remember testifying to this at your deposition?

23    A.   I did if it's at my deposition, yeah.  I see it.

24    Q.   Okay.

25             THE COURT:  Is there anything that's inconsistent

1   between what you said here and what you've already said in your

2   testimony?

3         **THE WITNESS:**  Like I said, the days -- these could be

4   the right days.  Like I said, they would have more accurate

5   schedule of the days that he actually worked from his paychecks

6   from his company.  Like I said, I had so many people under me.

7         Yeah, I probably ended up working that Sunday because we

8   sent him home that Friday.  And maybe Ed made the decision to

9   say:  Hey, he's not coming back until the investigation is

10  done.  So I ended up probably having to cover that shift

11  Sunday.

12        I cannot really tell you the true answer because it was

13  from seven years ago.  So, like I said, I was overnight shift.

14  If we didn't have somebody, if the staffing agencies didn't

15  send us anybody in that short manner, I would have to cover the

16  shifts.  That was a part of my job as well.  So, say, somebody

17  called in sick, I would have to fill that position.

18  **Q.**  So you really have no personal knowledge about what

19  happened to Judy Timbreza; is that right?

20  **A.**  Other than the recollection of him getting written up from

21  whatever Ed brought from his company.  I know eventually he got

22  laid off; but other than that, that's not -- no, I don't.  Like

23  I said, I know he got written up because of this incident and

24  that came straight directly from Ed Romero and nextSource.  It

25  was the nextSource paperwork that they had him sign.

KAWASAKI - CROSS / JENG

1   Q.   Okay.  So nextSource had Judy sign some discipline; is

2   that correct?

3   A.   Sorry.  That was Ed.  That is correct.  That was Ed and Ed

4   worked for nextSource at that time.

5   Q.   Okay.  Ed Romero --

6   A.   Ed Romero, yes.

7   Q.   -- worked for nextSource at that time; right?

8        So I'll turn your attention again to Exhibit 235.

9   Actually, I think this is Plaintiff's Exhibit 30 so it was

10  previously admitted.

11  A.   Exhibit 30?

12  Q.   Yes.

13  A.   I don't have that.

14  Q.   Well, we'll show it on the screen.

15  A.   Okay.

16        THE COURT:  And that's a stipulated exhibit?

17        MS. JENG:  Yes.  It was previously admitted, I

18  believe.

19        THE COURT:  It hasn't been previously admitted.  But

20  if it's stipulated, it will be admitted now.

21     (Trial Exhibit 235 received in evidence).

22        MR. ORGAN:  Which exhibit is coming in?

23        THE COURT:  235.

24        MR. ORGAN:  I think we already admitted that.

25        MS. JENG:  They are duplicates, so...

1      **MR. ORGAN:**  Okay.

2          (Document displayed.)

3   **BY MS. JENG:**

4   **Q.**   You recall receiving this email on or around October 17,

5   correct, in 2015?

6   **A.**   Yeah.  I got the email because my name's on it, so I did

7   get the email.

8   **Q.**   So did you understand that Owen was claiming Ramon to be

9   yelling at him saying things like:  You have a problem with me?

10  Why are you telling me who his supervisor is?

11  **A.**   That's -- that's what it says in the email, yeah.

12  **Q.**   And in this email Owen doesn't mention any racial slurs

13  that Ramon directed at him; correct?

14  **A.**   Correct.

15  **Q.**   Okay.  And you mentioned you did check the surveillance of

16  this incident; is that right?

17  **A.**   I did, yes.

18  **Q.**   Okay.  And you mentioned that it didn't go back that far?

19  **A.**   It only went back a certain amount of time.  So, like I

20  said, maybe I didn't have full access with my token or what

21  they gave me, what Tesla had given me.

22          Maybe they could have went back farther, but from my

23  access advantage, it only went back a certain amount of time.

24  I can't give you as much time as it went back, but it only went

25  back a certain amount of time and then the feed stopped.

1    Q.   Okay.  And you don't know how much access Tesla had to the

2    surveillance; right?

3    A.   It's not my surveillance.  I just know what I had access

4    to.

5    Q.   Okay.  And you also previously testified that, you know,

6    you were off of work at the time you got this email; correct?

7    A.   Yeah.  I --

8    Q.   And so it was Ed Romero that, you know, handled this

9    email?

10   A.   This was directed to Mr. Romero.  I was just cc'd on it at

11   the time, like I said.

12        And if you look at the bottom of the email, Owen is

13   telling Ed that I have access to the cameras.  I don't know if

14   Ed had access to the cameras.  I don't know what they actually

15   gave Ed access-wise.

16   Q.   So you had no role in this matter?

17   A.   I forwarded -- I told Mr. Romero.  I believe I talked to

18   him.  He called me on this, and I believe I talked to him and

19   said:  Hey, I just seen him face to face.  That's all the

20   camera shows me is them face to face.

21        Since the cameras don't have any audio, I don't know what

22   altercation happened before that or how it happened.

23   Q.   So because you weren't involved in this, you weren't aware

24   that Ramon had actually complained about Owen first; is that

25   right?

**KAWASAKI - CROSS / JENG**

1   A.   No.  I don't know anything about that.

2   Q.   And you never heard Ramon -- Ramon Martinez's side of the

3   story; is that right?

4   A.   No.  I was -- this knowledge is nothing to me.  This was

5   just like I said.  I was added onto the email saying:  Hey, Tom

6   has access to the cameras if you want to look.  And I looked.

7   And that's all I seen and that's all I told Ed, was all I seen

8   was them face to face.  That's all the camera showed me.

9        It didn't show me how the altercation happened before

10  that.  It didn't show me what happened, what events led up to

11  that or any of that.  It just showed me that they were face to

12  face within close proximity of each other and then the cameras

13  cut off.

14  Q.   Okay.

15  A.   So --

16  Q.   Okay.

17  A.   -- other than that, I have no knowledge of what happened

18  after this or what they did with this situation.

19  Q.   You were employed by Chartwell while assigned to Tesla; is

20  that right?

21  A.   Correct.

22  Q.   And you were still employed by Chartwell when you became a

23  lead at Tesla; is that right?

24  A.   Correct.

25  Q.   And so as a lead for Chartwell, you were able to recommend

**KAWASAKI - CROSS / JENG**

 1   a promotion for Owen; is that right?

 2   **A.**   Correct.

 3   **Q.**   Now, it was Ed Romero who took your suggestion and

 4   promoted Owen to the lead position; is that right?

 5   **A.**   I sent the -- I actually talked to Victor, Jaime and Ed in

 6   that situation.  They all asked me who did you want?

 7   **Q.**   Okay.  And do you remember Ed promoting Owen to the lead

 8   position?

 9   **A.**   If it was Ed, it was Ed.  Like I said, it was a decision

10   they all made because they asked me who I wanted in my lead

11   positions.

12   **Q.**   And you testified that Ed was a nextSource employee; is

13   that right?

14   **A.**   Ed was a nextSource employee, to my knowledge.  I know he

15   eventually became a full-time Tesla employee.  I just don't

16   know when.

17   **Q.**   Okay.  And, also, as a lead employed by Chartwell you were

18   able to train Owen Diaz; is that right?

19   **A.**   Correct.

20   **Q.**   Last question.  You were never employed by Tesla; is that

21   right?

22   **A.**   Never.

23          **MS. JENG:**  No further questions.

24          **THE COURT:**  Any redirect?

25          **MR. ORGAN:**  Just a couple, Your Honor.

```
 1        If you could pull up Exhibit 38?
 2        And, Your Honor, I think Exhibit 218 got put in.  It's a
 3   duplicate of Exhibit 38.  I don't know if you -- but I'd like
 4   Exhibit 38.
 5             THE COURT:  Well, why don't we use -- I don't want to
 6   have duplicate exhibits.
 7             MR. ORGAN:  38 is already in.  Ms. Jeng brought in a
 8   new exhibit, which is identical to the one that had already
 9   been admitted.
10             THE COURT:  Okay.  So this is -- this is Exhibit --
11   what's the exhibit that's already in?
12             MR. ORGAN:  38, Your Honor.
13             THE COURT:  Okay.
14             MR. ORGAN:  And if we can show this to the jury?
15             THE COURT:  Yeah.
16        (Document displayed.)
17                     REDIRECT EXAMINATION
18   BY MR. ORGAN:
19   Q.   So the date on that Exhibit 38, this is the altercation
20   between Timbreza and Mr. Diaz, is July 31st; correct?
21   A.   Correct.
22   Q.   Now, Ms. Jeng on cross asked you whether -- she suggested
23   to you that Mr. Diaz was a lead at that point in time.  Do you
24   remember that?
25   A.   Yes.
```

1  Q.   If you look at Exhibit 222.

2           MR. ORGAN:  Also in evidence, Your Honor, if we could

3  show that to the jury.

4       (Document displayed.)

5  BY MR. ORGAN

6  Q.   And Exhibit 222 is from Victor Quintero from Tesla

7  manager.  And he says (as read):

8           "Be aware of the following changes effective

9       today 8/17/15."

10      Correct?

11 A.   Correct.

12 Q.   So the change of Mr. Diaz becoming a lead didn't take

13 effect until 8/17/15; correct?

14 A.   That is correct.

15 Q.   So that would be misleading to the jury if someone were to

16 suggest that on July 31st Mr. Diaz was a lead; correct?

17 A.   Correct.

18          MS. JENG:  Objection.  Argumentative.

19          THE COURT:  Sustained.

20 BY MR. ORGAN

21 Q.   You mentioned something about you saw the write-up for

22 Mr. Timbreza.

23 A.   Uh-huh.

24 Q.   Was that a write-up that said "You're terminated"?

25 A.   No.  That was a write-up saying that he had -- they had

 1    given him a verbal write-up.  So Ed came with nextSource

 2    paperwork and said:  Hey, three write-ups and then you're

 3    terminated.  That was the standard for him.

 4         So they wrote him up for this situation, which was his

 5    first verbal warning.  I believe the second one was a minor

 6    suspension, or something like that, a couple days off, or

 7    whatever it was, if he had another altercation.  And then the

 8    third one was automatic termination.

 9    Q.   And the write-up, did that say something about the racial

10    nature of the --

11    A.   Yes.  I believe it had in it a racial slur of a racial

12    nature in that write-up and Judy signed it.

13    Q.   So Mr. Romero, did he sign the write-up?

14    A.   I believe so.

15    Q.   So Mr. Romero, when he signed the write-up, knew that

16    there were -- there was a racial component; correct?

17    A.   Correct.

18    Q.   And they took action against Mr. Timbreza based on that;

19    right?

20    A.   Correct.

21             MS. JENG:  Objection.  Calls for speculation.

22             MR. ORGAN:  He saw the write-up, Your Honor.

23             THE COURT:  Are you referring to that write-up?

24             MR. ORGAN:  Yeah.

25             THE COURT:  All right.

| | |
|---|---|
| 1 | **MR. ORGAN:**  Yeah. |
| 2 | **THE COURT:**  All right.  So let's be specific. |
| 3 | **MR. ORGAN:**  Took action in the form of a write-up. |
| 4 | **THE COURT:**  Okay.  You can answer that question. |
| 5 | **THE WITNESS:**  Correct. |
| 6 | BY MR. ORGAN |
| 7 | **Q.**   So when Mr. Romero said that the racial things were not |
| 8 | corroborated, that was false, wasn't it? |
| 9 | **MS. JENG:**  Objection.  Objection.  Calls for |
| 10 | speculation.  Lacks foundation. |
| 11 | **THE COURT:**  Sustained. |
| 12 | **MR. ORGAN:**  No more questions, Your Honor. |
| 13 | **THE COURT:**  Anything else?  Ms. Jeng? |
| 14 | **MS. JENG:**  No, Your Honor. |
| 15 | **THE COURT:**  Mr. Kawasaki, you can step down.  You're |
| 16 | excused. |
| 17 | **THE WITNESS:**  Do I need to stay here or can I go? |
| 18 | **THE COURT:**  You get to go. |
| 19 | **THE WITNESS:**  Okay.  Perfect.  Thank you. |
| 20 | (Witness excused.) |
| 21 | **THE COURT:**  Ladies and gentlemen, why don't we take |
| 22 | our second break of the morning and we'll be back at 12:30. |
| 23 | (Proceedings were heard out of presence of the jury:) |
| 24 | **THE COURT:**  Please be seated for a second. |
| 25 | Just a couple of things before we go further in this |

PROCEEDINGS

 1    trial.

 2         First, Mr. Organ, you're wandering a fair amount from the

 3    podium and that may be a natural thing for you, but don't,

 4    please.  I don't want you as close to the jury as you have

 5    been.  So stay within arm's length of the podium.  You can

 6    wander behind if you want to walk backwards, but don't walk

 7    forwards, please.

 8         **MR. ORGAN:**  Okay.

 9         **THE COURT:**  Second of all, if you haven't figured out

10    the exhibits yet and what's duplicate and what's not, sort that

11    out because the record -- I think, Ms. Jeng, you referred to

12    Exhibit 30, which was the same as another exhibit, 235 or

13    something.  And the record is going to be unclear to the Court

14    of Appeals.  It's going to be confusing to the jury.  So use

15    just one exhibit that expresses whatever it is you want not to.

16         And, third, when you're using a deposition, if you're

17    going to -- if what you want to do is refresh somebody's

18    recollection as to what they said, let him read it and ask him

19    whether it refreshes his recollection.  If you're trying to

20    attack his credibility and it's a direct attack, ask him at the

21    end of it which is true and which isn't.

22         I'm not sure that -- I think both of those were more in

23    the line of refreshing recollection.  Ask that question.  You

24    can read the testimony of a party to them in the way that you

25    were doing and not ask any questions; but as to regular

**PROCEEDINGS**

```
 1   witnesses, you need to ask a question at the end of it.

 2        All right.  See you in ten minutes.

 3        (Whereupon there was a recess in the proceedings

 4         from 12:17 p.m. until 12:33 p.m.)

 5        (Proceedings were heard in the presence of the jury.)

 6             THE COURT:  All right.  Please be seated everybody.

 7             MR. ORGAN:  We can take our masks off if we're

 8   vaccinated if we're talking; is that right?

 9             THE COURT:  That is the rule, Mr. Organ.

10        And who is the next witness?

11             MR. ORGAN:  Ed Romero, Your Honor.

12             THE COURT:  All right.  Ms. Davis, could you swear the

13   witness, please.

14                           EDWARD ROMERO,

15   called as a witness for the Plaintiff, having been duly sworn,

16   testified as follows:

17             THE WITNESS:  I do.

18             THE CLERK:  Thank you.

19             THE COURT:  So, Mr. Romero, if you would state your

20   name and then spell it for the court reporter, please.

21             THE WITNESS:  Can I lower the mask?

22             THE COURT:  If you're vaccinated, you may take off

23   your mask, yes.

24             THE WITNESS:  Edward Romero.  E-D-W-A-R-D, last name

25   R-O-M-E-R-O.
```

ROMERO - DIRECT / ORGAN

1    **THE COURT:**  Thank you.

2        Mr. Organ, you may proceed.

3                    <u>**DIRECT EXAMINATION**</u>

4    BY MR. ORGAN

5    **Q.**   Good afternoon, Mr. Romero.  I wrote down "good morning,"

6    but we're a little behind.

7        So good afternoon, Mr. Romero.  How are you doing?

8    **A.**   Well, I'm okay.  Physically I've got some issues.

9    **Q.**   You started working at Tesla on July 5th of 2015; is that

10   correct?

11   **A.**   That sounds correct.

12   **Q.**   And you worked at the Tesla factory as a direct employee

13   of Tesla from approximately October 12th of 2015 until August

14   of 2017; is that right?

15   **A.**   That sounds correct.

16   **Q.**   You were a supervisor for Tesla; correct?

17   **A.**   During that -- I think since December -- I mean, December

18   of '15, I worked for Tesla.

19   **Q.**   Well, you were -- and you were a supervisor of Owen Diaz,

20   weren't you?

21   **A.**   Yeah.  I got hired as a contract employee through

22   nextSource when I started at Tesla.  I got interviewed by

23   Tesla, and I started as an employee of Tesla in October.

24   **Q.**   Okay.  So first you were a contract employee through which

25   company?

1    A.   nextSource.

2    Q.   nextSource.  So you were a contract employee through

3    nextSource, and then you became a direct employee of Tesla;

4    is that correct?

5    A.   Correct.

6    Q.   And that transition took place in October; correct?

7    A.   Correct.

8    Q.   Okay.  So as of October of 2015, you were a direct

9    employee of Tesla; right?

10   A.   From October, yes.

11   Q.   You were Mr. Owen Diaz's supervisor; correct?

12   A.   Uh-huh.  Yes.

13   Q.   You were supervising the elevators; right?

14   A.   And I was also supervising the janitorial service.

15   Q.   And the janitorial services?

16   A.   Right.

17   Q.   Okay.  Let's go back just a little bit.  When you started,

18   Victor Quintero -- you interviewed with Victor Quintero; is

19   that correct?

20   A.   Yes.

21   Q.   And he told you that your working through nextSource

22   could lead to a permanent job with Tesla; right?

23   A.   He said that many, many employees -- many people went in

24   through agencies and some got hired, you know, to work at

25   Tesla.

 1   Q.   When you were a contract employee at Tesla -- at the Tesla

 2   factory working through nextSource, you reported to Victor

 3   Quintero; correct?

 4   A.   I reported to nextSource.

 5   Q.   But your manager at the plant was actually Victor

 6   Quintero; correct?

 7   A.   Well, we looked at him like the manager over everybody,

 8   you know, because he was in charge of that department.

 9   Q.   He was in charge of everybody, including you, in that

10   department; right?  And that was true even when you were a

11   contract employee for nextSource; right?

12   A.   Well, we looked at him as the man in charge of those

13   departments, so...

14   Q.   So Victor Quintero was in charge; right?

15   A.   He was in charge of his departments, yes.

16   Q.   Yes.

17   A.   Uh-huh.  Yes.

18   Q.   And that department is where you worked; right?

19   A.   Yes.

20   Q.   Your job duties as contract services supervisor included

21   overseeing all the cleaning contractors for the facility in the

22   power train and lower production; correct?

23   A.   Correct.

24   Q.   And as the contract services supervisor, you had oversight

25   functions over the entire factory; correct?

1   **A.**   You're talking about when I was a Tesla employee?

2   **Q.**   When you were a Tesla employee, yes.

3   **A.**   Yeah.

4   **Q.**   A direct Tesla employee.

5   **A.**   Yeah.  Yeah.  The assignments were divided up.  Okay?

6   When I was -- when I was working for Tesla, there was two of us

7   overseeing the cleaning of the factory.  Okay?

8   **Q.**   Okay.

9   **A.**   And I was overseeing the two -- two industrial elevators.

10  **Q.**   Okay.  And even when you were a contract employee for

11  nextSource working for Tesla, even then you had some

12  oversight function relative to the elevators; correct?

13  **A.**   It was minimal.  When I got hired in October, they told me

14  that they wanted to train me to help in the elevator service.

15  Okay?

16  **Q.**   Yeah.

17  **A.**   All right.  And there was another person in charge.  Jaime

18  Salazar was really the direct supervisor of the elevators

19  during that transition time.  So I was working with him.

20  **Q.**   Jaime Salazar was sort of people's direct supervisor, and

21  then you had sort of a dotted-line supervisor role; is that

22  right?

23  **A.**   Yes.  Yes.

24  **Q.**   Okay.  And I want to turn your attention back now to

25  July 31st of 2015.  Okay?

1   **A.**   Okay.

2   **Q.**   Judy Timbreza, he's working with the elevators at that

3   point; is that correct?

4   **A.**   That's what I remember, yes.

5   **Q.**   And just so we're clear for the jury here, Judy Timbreza

6   is a male; correct?

7   **A.**   Yes.

8   **Q.**   And Tom Kawasaki is an elevator lead at that point?

9   **A.**   From what I remember, yes.

10  **Q.**   And Owen Diaz is an elevator operator; right?

11  **A.**   I'm not sure if he had already been promoted to a lead at

12  that time.  I don't remember.

13  **Q.**   Okay.  But at some point in time you were informed that he

14  was being promoted by Victor Quintero; correct?

15  **A.**   I don't remember being informed directly.

16  **Q.**   Okay.  Did you receive an email from Victor Quintero

17  saying that Owen Diaz was getting a promotion to elevator lead?

18  **A.**   I don't remember that email.  If you have it there, I

19  could see it.

20  **Q.**   Okay.  Well, I'll pull it up.

21       Let's go back to Judy Timbreza.  At some point in time you

22  get an email from Tom Kawasaki, correct, about an incident

23  between Judy Timbreza and Owen Diaz; right?

24  **A.**   I think I recall that -- that Owen had complained about --

25  about some remarks that were made or something.

**ROMERO - DIRECT / ORGAN**

1   Q.   Right.

2   A.   I remember -- I remember seeing an email from Timbreza.

3   Q.   And if you turn to Exhibit 38 in that notebook there?

4   Yeah, turn to 38.

5         MR. ORGAN:  And, Your Honor, I believe this is in

6   evidence.

7         THE COURT:  It is.

8      (Document displayed.)

9         MR. ORGAN:  Is it published?

10  BY MR. ORGAN

11  Q.   Exhibit 38, this is the email you got from Tom Kawasaki;

12  correct?

13  A.   I think so, yes.

14  Q.   And in it he says (as read):

15         "Comments being made towards him, Owen Diaz, that

16      are racist in nature."

17      Do you see that?

18  A.   I do.

19  Q.   And also, if you look at that, it says "Elevator 2

20  employee Owen."  It doesn't say "elevator lead," does it?

21  A.   It doesn't.

22  Q.   And isn't it true that Owen actually didn't get the

23  promotion until later in August?  Do you remember that?

24  A.   No.  I don't remember the date.

25  Q.   Okay.

1          **MR. ORGAN:**  If we could show Exhibit 222, Your Honor,

2     which has been admitted?

3          **THE COURT:**  Okay.

4       (Document displayed)

5  **BY MR. ORGAN**

6  **Q.**   And, unfortunately, you have to see it on the screen

7     because I did not do as good a job anticipating as I thought I

8     would have.

9          So if you see on your screen, can you see Exhibit 222?

10 **A.**   Yes.

11 **Q.**   Okay.  And do you see there it says "Victor Quintero,"

12    from him to Nancy Uhlenbrock and Jaime Salazar, and then cc'd

13    to you?  Do you see that?

14 **A.**   Yes.

15 **Q.**   And so that was informing you that Owen Diaz was getting a

16    change today to an elevator -- from a -- to a shift elevator --

17    from a shift elevator operator to a lead; correct?

18 **A.**   Yes.

19 **Q.**   Okay.  So you now know that as of August -- as of

20    July 31st, 2015, Owen Diaz was not a lead; correct?

21 **A.**   Can you repeat the question again, please?

22 **Q.**   As of July 31st, going back to Exhibit 38, we know that

23    Owen Diaz is just an elevator operator, not a lead; correct?

24 **A.**   I -- I can't remember why it was worded that way.  You

25    know, it's -- it was just identifying him, that's all.

ROMERO - DIRECT / ORGAN

1   Q.   Okay.  So, anyway, this issue is brought to your attention

2   by Tom Kawasaki; correct?

3   A.   Yes.

4   Q.   Okay.  And he informs you that Owen Diaz brought to his

5   attention that comments were being made towards Mr. Diaz that

6   were racist in nature; right?

7   A.   Correct.

8   Q.   And he also tells you that he was bringing Owen Diaz's

9   complaint to your attention and the attention of Jaime Salazar;

10  right?

11  A.   Yes.  Jaime Salazar was the supervisor.

12  Q.   Right.  But Mr. Diaz, if you look at it, it says:  To

13  attention of my supervisor Edward and Jaime.

14       So it's at least -- it's at least understood, isn't it, by

15  you, that you have some supervisor role at this point in time?

16  A.   I can't speak for him, why he wrote it that way.  Okay?  I

17  received the email.  I was learning the elevator processes at

18  the time and Jaime Salazar and Victor Quintero were the

19  supervisors, the direct supervisors, over the department.

20  Q.   Okay.  You do know that Mr. Kawasaki brings to your

21  attention that we are in the process of reviewing all

22  statements made in the situation.  He told you that; right?

23  That's in the email?

24  A.   Okay.  Let me look at it.  Oh, this one here?

25  Q.   Yeah.  Yeah.  No.  It's in your notebook again.  I'm

 1  sorry.  Exhibit 38.

 2  **A.**   38.

 3  **Q.**   Yeah.  (As read):

 4        "We are in the process of reviewing all statements

 5        made in this situation."

 6        That's what he told you; right?

 7  **A.**   Yes.

 8  **Q.**   Okay.  And then at this time you never conduct any kind of

 9  investigation into Owen Diaz's complaints about Judy Timbreza;

10  correct?

11  **A.**   I was not the direct supervisor.  Okay?  I was working

12  with the elevator people at that time.

13        **MR. ORGAN:**  Objection.  Nonresponsive.

14        **THE COURT:**  The question to you was whether you had

15  conducted any investigation into this.  Did you?  "Yes" or

16  "no."

17        **THE WITNESS:**  Yeah, we spoke with the employees who

18  were on the elevator services.  Okay?  And from what I

19  remember, there was really nothing directly said about these

20  words were used or anything like that.  It was just...

21  **BY MR. ORGAN**

22  **Q.**   So is it your testimony now that you did conduct some kind

23  of investigation?

24  **A.**   We asked -- as I mentioned, we asked some of the

25  employees:  What's going on?  You know -- you know, Owen is

 1   hurt or whatever.  I can't remember the words.  And nobody had

 2   anything to say.

 3   **Q.**   My question is:  Is it your position now that you did

 4   conduct some kind of investigation?

 5   **A.**   It's probably a -- it's fair to say it was a minimal

 6   investigation, I guess.  Yeah.

 7            **MR. ORGAN:**  Your Honor, I would like to read from the

 8   deposition 155/8 to 155/16.

 9            **THE COURT:**  Okay.  Mr. Romero, do you have your

10   deposition in front of you?

11            **THE WITNESS:**  Is that this one here?

12            **THE COURT:**  Yes.

13       Take a look at the pages that Mr. Organ just described for

14   you.

15            **THE WITNESS:**  What are the pages again, sir?

16   **BY MR. ORGAN**

17   **Q.**   155, 8 to 16?

18   **A.**   155?

19   **Q.**   Yep, 8 to 16.

20   **A.**   Okay.

21       (Brief pause.)

22            **THE COURT:**  You can proceed.  Go ahead.

23            **MR. ORGAN:**  Can I read it, Your Honor?

24            **THE COURT:**  Yes.

25

1   BY MR. ORGAN

2   Q.   (As read)

3        "QUESTION:  And you never conducted any kind of

4        investigation into this issue relating to Judy

5        Timbreza using any kind of racist words or racially

6        offensive remarks towards Owen Diaz; correct?

7        "ANSWER:  I don't remember.  I don't think I made that

8        type of investigation.  It was kind of -- Tom did

9        something.  Jaime did something.  They were talking to

10       these people, and we were informed that the people

11       denied hearing those remarks."

12       Those are the answers -- that's a question that was asked

13   of you and that was the answer you gave; correct?

14   A.   That's the answer I gave, yes.

15   Q.   You never interviewed Owen Diaz about Judy Timbreza, did

16   you?

17   A.   I don't remember doing that.

18   Q.   Okay.  In fact, you claim that you weren't even Tom

19   Kawasaki's supervisor; correct?  That's your claim, that you

20   were not his supervisor; right?

21   A.   Because at the time I was not his direct supervisor.

22   Okay?

23       Could I mention something?  I think that --

24       THE COURT:  Mr. Romero, if you wait for the question,

25   you can answer the question.

 1              THE WITNESS:  Okay.

 2              THE COURT:  If the lawyers on the other side want to

 3     ask you some questions, they can do that, too.

 4              THE WITNESS:  All right.

 5     BY MR. ORGAN

 6     Q.   And so if I have this right, Jaime Salazar, he's the

 7     supervisor over the elevators, the direct supervisor; correct?

 8     Right?

 9     A.   Yes.

10     Q.   And Tom Kawasaki and Jaime Salazar take the lead on the

11     investigation; correct?

12     A.   Yes.

13     Q.   And on August 1st you sent an email to Mr. Kawasaki that

14     you were following up on his discussion -- on a discussion you

15     had with Jaime Salazar, that you were following up on that on

16     Monday.  That's what you told him; right?

17     A.   Yes.

18     Q.   And if you look at Exhibit 37.

19              MR. ORGAN:  I think that one was admitted, Your Honor.

20     Yes.

21              THE COURT:  Yes, it was.

22     BY MR. ORGAN

23     Q.   If you look at Exhibit 37, that's where you say that

24     you're following up.  Do you see that?

25     A.   Yes.

ROMERO - DIRECT / ORGAN

1    **Q.**    Okay.  So now Mr. Kawasaki, he meets with you on that

2    Monday, August 3rd, right, to discuss what he has learned from

3    talking Owen Diaz?

4    **A.**    I don't remember that.

5    **Q.**    Okay.  You don't remember whether you met or not?

6    **A.**    I don't remember.  It's been a long time.

7    **Q.**    I understand.

8        And Mr. Kawasaki lets you know that Owen Diaz complained

9    about racial slurs; correct?

10   **A.**    Yes.

11   **Q.**    Yeah.  And Mr. Kawasaki tells you that he had learned from

12   the people who observed the altercation between Owen and

13   Mr. Timbreza that racial slurs -- he uses this term "thrown;"

14   that racial slurs were thrown by Mr. Timbreza.  That's what he

15   told you; right?

16   **A.**    I don't remember the exact wording.

17   **Q.**    Okay.

18   **A.**    Okay.

19   **Q.**    But that information was at least communicated to you;

20   correct?

21   **A.**    I -- I knew about it, yes.

22   **Q.**    Yeah, okay.

23   **A.**    He said -- could I mention something here in answer to

24   this question?

25           **THE COURT:**  Is it directly related to the question?

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  Okay.  Go ahead.

 3   A.   Okay.  On the email you referenced here on Number 38,

 4   okay --

 5   BY MR. ORGAN:

 6   Q.   38?

 7   A.   Yeah.  Yeah, 38.

 8   Q.   Well, I thought I had you at 37, but you want to go back

 9   to 38?

10   A.   I thought that's the one you were referring to.

11   Q.   I think we had moved on from that, Mr. Romero.

12              THE COURT:  Okay.  So why don't you proceed,

13   Mr. Organ?

14              MR. ORGAN:  Could we go?  Keep --

15              THE COURT:  Yes.

16              MR. ORGAN:  Okay, Your Honor.

17        So then what I'd like you to do is let's look at

18   Exhibit 39, which I believe is in evidence, Your Honor.

19              THE COURT:  It is.

20   BY MR. ORGAN

21   Q.   Now, this is your email on the 4th.

22              MR. ORGAN:  And can we publish this one, Your Honor?

23              THE COURT:  Yes.

24              MR. ORGAN:  Okay.

25        (Document displayed.)
```

ROMERO - DIRECT / ORGAN

1    BY MR. ORGAN

2    Q.   This is your email on the 4th; right?  Exhibit 39.

3    A.   Okay.

4    Q.   Yeah.  You sent this to Victor Quintero; correct?

5    A.   I did.

6    Q.   And you said to Mr. Quintero that (as read):

7            "Mr. Owen says this has happened before."

8        You had information that this type of conduct had been

9    directed at Mr. Diaz before; correct?  That's why you put that

10   there.

11   A.   I was only stating what he said.

12   Q.   What Mr. Diaz said?  Did you actually talk to Mr. Diaz or

13   Mister -- you're talking about what Mr. Kawasaki told you; is

14   that correct?

15   A.   Kawasaki is the one that told me this.

16   Q.   Okay.

17   A.   That he said it had happened before.

18   Q.   Okay.  And just so we're clear, Mr. Diaz said that it had

19   happened before; correct?

20           MS. KENNEDY:  Objection.  Calls for speculation.

21           THE COURT:  Sustained.

22   BY MR. ORGAN

23   Q.   When you say here "Mr. Owen says this has happened

24   before," you're referring to Mr. Diaz has said that the conduct

25   has happened before; correct?

1    **A.**    No.  I'm stating what Timbreza had told me.  Okay?  He

2    said that Owen had said it had happened before.

3    **Q.**    I see.  Did Timbreza tell you that or did Kawasaki tell

4    you?

5    **A.**    Kawasaki.

6    **Q.**    Okay.

7    **A.**    Am I pronouncing that right?

8    **Q.**    Yeah.  Kawasaki.

9          Okay.  Now, you wrote here (as read):

10             "They did not hear the remarks."

11         Do you see that?  Do you see where you wrote that?

12         The second sentence (as read):

13             "We investigated by speaking to all witnesses

14         present, but they said they did not hear the remarks."

15         That's what you wrote; correct?

16   **A.**    Yes.

17   **Q.**    Now, it's safe to say by August 4th that Mr. Quintero

18   knows that Owen Diaz has complained about racially offensive

19   remarks; isn't that true?

20             **MS. KENNEDY:**  Objection.  Calls for speculation.

21             **THE COURT:**  Sustained.  This is not Mr. Quintero

22   testifying.

23   **BY MR. ORGAN**

24   **Q.**    Based on your emails to Mr. Quintero and the emails that

25   you saw from Mr. Kawasaki, you understood at that time that

**ROMERO - DIRECT / ORGAN**

1  Mr. Quintero had notice of the offensive remarks directed

2  towards Mr. Diaz; correct?

3  **A.**   I don't know what Mr. Quintero knew.  Okay?  All I can do

4  is respond is that -- that we sent the email about what had

5  happened at that time in -- in talking to the people who are on

6  the elevators.

7  **Q.**   But Victor Quintero let you know that he had at least

8  received your email; correct?

9  **A.**   I don't know if he let me know.  If there is an email that

10  he responded to, I need to see it.  Okay?

11  **Q.**   Well, if you go back to Exhibit 38.

12  **A.**   Okay.

13  **Q.**   That email was sent by Tom Kawasaki to Victor Quintero;

14  correct?

15  **A.**   Yes.

16  **Q.**   So you would agree that Mr. Kawasaki had told

17  Mr. Quintero, at least in that email, about racially offensive

18  remarks at that point in time; correct?

19  **A.**   Well, I'm assuming that he received the email.

20  **Q.**   And if you look, I'd like you to look at Exhibit 41,

21  please.

22         **MR. ORGAN:**  Your Honor, I'd like to move Exhibit 41

23  in.  I believe this is a stipulated admissible document.

24         **MS. KENNEDY:**  No objection, Your Honor.

25         **THE COURT:**  All right.  It's admitted.

```
 1           (Trial Exhibit 41 received in evidence)

 2    BY MR. ORGAN

 3    Q.    Okay.  And Victor Quintero responds to your email and says

 4    (as read):

 5               "Thank you.  VQ."

 6          Is that how he would sign things?

 7    A.    Are we looking at the same email here?

 8    Q.    41, Exhibit 41?

 9    A.    I'm sorry.  I have the previous one.

10    Q.    That's okay.  There are a lot of them up there.

11          That email from Victor came back to you; correct?

12    A.    Okay.  I don't know if these are mixed up here or not.

13    Okay?

14    Q.    You what now?

15             THE COURT:  Just look at Exhibit 41.

16    BY MR. ORGAN

17    Q.    Exhibit 41.  Just look at Exhibit 41, please.

18    A.    Is that the one that's dated 8/4?

19    Q.    That's the one that's dated 8/4, and it's your email from

20    8/4, and then Victor Quintero's email back to you on 8/4.  Do

21    you see that?

22    A.    You might have to look at this because I'm not

23    understanding it.

24          (Brief pause.)

25             THE COURT:  It's correct.  He's referring you to --
```

 1             THE WITNESS:  Oh, I'm sorry.  Sorry about that.

 2             MR. ORGAN:  Can we publish this, Your Honor?

 3             THE COURT:  Yes.  I think it was briefly.

 4             MR. ORGAN:  Is it admitted?

 5             THE COURT:  Yes.

 6        (Document displayed.)

 7  BY MR. ORGAN

 8  Q.   So Victor Quintero responded to you thanking you for

 9  keeping him informed; correct?

10  A.   Yes.

11  Q.   And you certainly have no basis to believe that Owen Diaz

12  is lying about Judy Timbreza, do you?

13             MS. KENNEDY:  Objection.  Argumentative.  Lack of

14  foundation.

15             THE COURT:  Overruled.  You can answer.

16             THE WITNESS:  Could you repeat it again, please?

17  BY MR. ORGAN

18  Q.   You have no basis to believe that Owen Diaz is lying about

19  Judy Timbreza, do you?

20  A.   No.  And I think that's why it was -- you know, attention

21  was given to it.

22  Q.   Now, Mr. Timbreza is issued with a verbal warning; is that

23  correct?

24  A.   Yes.

25  Q.   And the verbal warning was for racial incidents; correct?

ROMERO - DIRECT / ORGAN

```
 1   A.    I don't remember.  I think the -- I got some medication
 2   that makes me kind of thirsty, and I get kind of --
 3   Q.    Do you need some water?  I can get you some water.
 4   A.    I have some water right here.
 5   Q.    You have some, okay.
 6   A.    Yeah.
 7         I think that the write-up was done to nextSource, if I
 8   was correct.  If I remember correctly.
 9   Q.    Okay.
10         Okay.  But you did come to a conclusion that Judy Timbreza
11   had not treated his fellow team members with dignity and
12   respect.  That was in there; right?  You came to that
13   conclusion?
14   A.    I came to the conclusion that nobody was saying really
15   anything about, you know, any comments that were made.
16   Q.    My question is a little different, sir.
17   A.    Okay.
18   Q.    You came to a conclusion that Mr. Timbreza was not
19   treating his fellow members, team members, with dignity and
20   respect.  That's your conclusion, wasn't it?
21   A.    That's why he was written up.
22   Q.    No.  I'm asking what you came to a conclusion of.
23   A.    I came to a conclusion that the information was given to
24   their -- to my supervisors and nextSource, and that they
25   decided what they were going to do with the write-up.
```

**ROMERO - DIRECT / ORGAN**

1    Q.    I'd like you to go back to Exhibit 41.

2    A.    Okay.

3    Q.    Okay?  And if you see in Exhibit 41, your write-up down at

4    the bottom, do you see that?

5          And it says (as read):

6              "We have given Mr. Timbreza a verbal warning..."

7          Do you see that?

8    A.    Uh-huh.

9    Q.    (As read)

10             "... and explained his need to treat his fellow

11         team members with dignity and respect."

12         Right?

13   A.    Uh-huh.

14   Q.    And the reason that you had to bring up dignity and

15   respect is because Mr. Timbreza had used offensive racial

16   terms; right?

17   A.    No.  I don't remember anybody saying any specific racial

18   remarks that he had made.  They talked about him being

19   offensive in the way he talked and things like that; but -- and

20   that's what -- because we had -- you know, he was -- he was a

21   guy who was kind of just offensive in the way he did things.

22   Okay?  So he needed to be told:  You can't be acting that way,

23   you know, in your job.  Okay?

24   Q.    Okay.  Let's talk about Ramon Martinez.  You know who that

25   is; right?

1  **A.**    I do.

2  **Q.**    I want to fast forward to October 17th of 2015.  Okay?

3       Now, at this point in time, October 17th of 2015, you have

4  taken over at least some of the responsibility for overseeing

5  the elevators in this October 2015 time period; correct?

6  **A.**    Yes.

7  **Q.**    And you're Owen Diaz's supervisor as of this date,

8  October 17th; correct?

9  **A.**    Well, I can't affirm knowing the exact date that they --

10  they hired -- I can't even remember.  It was during October.

11  Okay?  And I think you alluded to that at the beginning when I

12  got hired.  Okay?  I just can't remember the exact date right

13  now.  Okay?

14  **Q.**    Okay.  But you think it was at the beginning of October

15  that you made the transition; correct?

16  **A.**    No.  It was more like towards the middle of October.

17  **Q.**    So the middle being around October 15th; right?

18  **A.**    I don't -- I don't remember the date.  Okay?

19  **Q.**    Okay.  But you certainly played a role in investigating

20  Owen Diaz's complaint that Ramon Martinez had threatened him in

21  the elevator on October 17th.  You did that; right?

22  **A.**    Are you referring to a specific email?  No?

23  **Q.**    I'm just asking you for your memory.  Do you remember

24  investigating or playing a role in Owen Diaz's complaints that

25  Ramon Martinez threatened him in the elevator on October 17th?

1   A.   I don't remember.  If there is an email there, then it

2   would probably help me to remember.

3   Q.   Let's go to Exhibit 235.

4   A.   Okay.

5   Q.   Okay.  And I think this one is in.  Yep.

6        So you see 235?

7   A.   I do.

8   Q.   That's an email from Owen Diaz; correct?

9   A.   Uh-huh.

10  Q.   And you received that email; right?

11  A.   Well, the email has my name there.

12  Q.   Yes.

13  A.   Uh-huh.

14  Q.   Now, there's a reference in this email about Mr. Diaz

15  contacting Tom Kawasaki for advice.  Do you remember whether

16  you had any conversation with Tom Kawasaki about this incident

17  between Ramon Martinez and Owen Diaz?

18  A.   Okay.  Let me read it through.  Okay?

19  Q.   Sure.

20  A.   Okay.

21       (Brief pause.)

22  A.   Okay.

23  Q.   So at this point in time you understood that Mr. Diaz was

24  complaining about threatening conduct towards him by Ramon

25  Martinez; correct?

```
 1   A.   I think so.

 2   Q.   And my question before that was:  Do you remember whether

 3   you talked to Tom Kawasaki or not in relation to this?

 4   A.   I don't remember.

 5   Q.   You have no memory of a conversation?

 6   A.   I don't remember, no.

 7   Q.   Okay.  There is a -- there's a reference here that it was

 8   captured on video.  Do you see that?

 9   A.   Yes.

10   Q.   Okay.  Did you look at any videotape of the interaction

11   between Ramon Martinez and Owen Diaz?

12   A.   No.

13   Q.   Okay.  And why didn't you look at any --

14   A.   Okay.

15   Q.   Why didn't you look at any videotape about an interaction

16   between Ramon Martinez and Mr. Diaz?

17   A.   Okay.  I -- at that time I did not have access to videos,

18   to even be allowed to look at any videos.  If we needed to see

19   something, I would refer it to Mr. Quintero or Jaime Salazar.

20   Q.   At this point in time Ramon Martinez, he's a supervisor;

21   correct?

22   A.   Yes.

23   Q.   And then initially you started to do an investigation; is

24   that correct?

25        It's not mentioned in Exhibit 235 --
```

 1   **A.**   I don't remember.

 2   **Q.**   -- but I believe you did start to do an investigation.

 3   **A.**   I don't remember.

 4   **Q.**   Let me see.  If you go to Exhibit 240 --

 5          **MR. ORGAN:**  And, Your Honor, this has been stipulated

 6   to.  I'd like to move Exhibit 240 into evidence.

 7          **THE COURT:**  All right.

 8          **MS. KENNEDY:**  No objection.

 9          **THE COURT:**  It's admitted.

10      (Trial Exhibit 240 received in evidence)

11   **BY MS. JENG:**

12   **Q.**   So if you look at Exhibit 240 -- do you have that?

13   **A.**   240, yes.

14   **Q.**   It starts with Owen Diaz's complaint.  If you turn to the

15   third and fourth page of the document, you see there it starts

16   with that complaint that we just --

17   **A.**   Yes.

18   **Q.**   -- we just looked at.

19      Okay.  And then it looks like Wayne Jackson gets involved.

20   Who's Wayne Jackson at this point in time?

21   **A.**   I think he was the -- let me see if I remember the title

22   he had.  He was, like, the project manager for nextSource.

23   **Q.**   Okay.

24   **A.**   I might be wrong in that.

25   **Q.**   He was like a liaison between nextSource and Tesla

 1  people and the contract employees; is that right?

 2  A.   Well, I don't know exactly what his job was.  I didn't

 3  hire him, but -- but I think that he was the guy in charge, the

 4  go-to guy for any issues having to do with nextSource.

 5  Q.   Okay.  If you look at the top of Page 3 -- again, we're

 6  still in Exhibit 240 -- there is an email from Sherrie Garrett

 7  to Wayne Jackson that says:

 8         "Why is Ed meeting with them?"

 9       Okay.  Do you see that?

10  A.   Yes.

11  Q.   And then if you go to the next page forward, so Page 2,

12  then Wayne responds (as read):

13         "He was instructed by Victor."

14       Did Victor Quintero instruct you to conduct an

15  investigation into the incident between Ramon Martinez and Owen

16  Diaz?

17  A.   I think that he -- I can't answer for him.  I don't know,

18  but he didn't -- I don't remember him telling me anything

19  directly.

20  Q.   Okay.  So you don't have a recollection of Victor Quintero

21  telling you to get involved?

22  A.   I do not.  Not directly.

23  Q.   Okay.  Now, if you look at this, there's an email from --

24  let's go to the first page.  There's an email from an Erin

25  Marconi.  Do you see that?  About midway down the first page of

```
 1   Exhibit 240.
 2   A.   I see it.
 3   Q.   And Erin Marconi was the HR person from Tesla that you
 4   would work with; is that correct?
 5   A.   Erin?
 6   Q.   Erin Marconi.
 7   A.   She was -- I know she was from personnel or something,
 8   right.
 9   Q.   Okay.  So at least as of this point in time, as we see in
10   the email, it looks like Erin Marconi was involved in this
11   incident.  Is that what it looks like to you?
12   A.   It looks like -- I assumed it was personnel and they were
13   going to deal with it.
14   Q.   Okay.  So you basically stopped investigating and let
15   Tesla HR take over; is that right?
16   A.   That's what I recall.
17   Q.   Okay.  And now if we go to Exhibit -- let's go to
18   Exhibit -- let's go to Exhibit 33, please.  I want to now go to
19   another Ramon Martinez incident.
20   A.   Say the number again, please.
21   Q.   Exhibit 33.
22   A.   Okay.
23        MR. ORGAN:  And I believe Exhibit 33 is stipulated as
24   admissible.
25        MS. KENNEDY:  Yes.  No objection, Your Honor.
```

1           **THE COURT:**  Okay.  It's admitted.

2        (Trial Exhibit 33 received in evidence)

3           **MR. ORGAN:**  Okay.  And may we publish this,

4   Your Honor?

5           **THE COURT:**  You may.

6           **MR. ORGAN:**  Okay.

7        (Document displayed.)

8   **BY MR. ORGAN**

9   **Q.**   So Exhibit 33 is a three-page document.  Do you remember

10  receiving this?

11  **A.**   I did get the email, I think, yeah, because it's got my

12  name on it.

13  **Q.**   Right.  And do you remember seeing the pictures?  Do you

14  see the two pictures that are attached here?

15  **A.**   I only remember seeing one of the pictures --

16  **Q.**   Okay.

17  **A.**   -- which is --

18  **Q.**   Which one?

19  **A.**   This one here.

20  **Q.**   The close-up?

21  **A.**   Yes.

22  **Q.**   Okay.  Do you think that somehow the email you received

23  didn't include the other one?

24  **A.**   I don't remember.  But going by memory, I don't remember

25  seeing the other -- the other picture.

1   Q.   Okay.  So let's go back to the first page, Mr. Diaz's

2   complaint.

3        At this point in time you are Owen Diaz's supervisor,

4   direct supervisor, as of that date, January 21st, 2016;

5   correct?

6   A.   Yes.

7   Q.   And you understood that Mr. Diaz was classifying the

8   drawing -- if you can just quickly go to the second page,

9   Mr. Diaz was classifying this drawing as racist in nature;

10  correct?

11  A.   According to his email, that's what it sounds like, yeah.

12  Q.   Okay.  And after Mr. Diaz texted or sent you this

13  complaint about Ramon Martinez, you and he had a phone call

14  about his concerns; correct?

15  A.   With Owen?

16  Q.   Yeah.

17  A.   I don't remember having a phone call, but it could have

18  been that I had had a phone call.

19  Q.   Okay.  Did you ever have a conversation with Ramon

20  Martinez to find out what he was intending when he drew that?

21  A.   No.

22  Q.   And in terms of what Mr. Diaz did in sending you

23  Exhibit 33, that was all he was supposed to do under Tesla's

24  reporting policies; correct?

25  A.   I didn't understand the question.

1  Q.   Yeah.  In terms of -- every employee who works at Tesla is

2  supposed to report racist conduct if they see it; correct?

3  A.   Well, I can't speak for Tesla in the sense that I don't

4  know, you know, how they got all this out to everybody.  Okay?

5  But in all the meetings -- and I was fairly new with the

6  company at the time.  Okay?

7       So, but in our meetings with supervisors and other

8  managers and so on, they would always bring up about that we

9  wanted to instill in everybody to be respectful to one another,

10 to treat everybody with respect, and those types of things.

11 Okay?

12 Q.   Right.

13 A.   I can't -- I can't remember that they said specifically

14 anything about racist remarks; but -- but as a professional,

15 you always know that there are some things that people are just

16 not supposed to do.

17 Q.   But you would agree that sending someone this picture,

18 this picaninny, that's not showing respect; correct?

19 A.   I -- I didn't look at it as being respectful.  It was not

20 respectful.

21 Q.   Right.  And now after you received Mr. Diaz's complaint in

22 Exhibit 33, you had a meeting with your manager, Victor

23 Quintero, and also with Wayne Jackson from nextSource, the

24 three of you; correct?

25 A.   Yes, yes.

1   Q.   Okay.  And you discussed the fact that Owen Diaz was upset

2   by what had happened towards him; correct?

3   A.   Yes.

4   Q.   Okay.  And you knew as of that time that Owen Diaz felt as

5   if he -- that the conduct towards him by Ramon Martinez was

6   getting worse; correct?  You knew that?

7   A.   I don't remember any remarks being made about that, about

8   things getting worse.  Okay?  I was just -- if you're referring

9   to this email, he brought up -- he brought up --

10  Q.   Yeah.

11  A.   -- you know, the points -- you know, how his feelings

12  were.  And then what I did is I reported it to Quintero.  Okay?

13  Q.   Right.  But in his email, if you look down near the

14  bottom, it says (as read):

15          "And because nothing has been done, it seems that

16      his behavior is getting worse."

17      That's something you knew as of January 22nd, 2016, when

18  you got it; right?

19  A.   Well, I got -- I got what he said --

20  Q.   Yes.

21  A.   -- yes.

22  Q.   And you didn't talk to Ramon, so you don't know what he

23  thought; right?

24  A.   He was not my employee.  I reported it to his supervisor.

25  Q.   Did you have any further involvement in investigating this

 1   drawing, this racist effigy and drawing?  Did you have any

 2   further role in investigating that once you brought it to

 3   Victor Quintero's attention?

 4   **A.**   No.

 5   **Q.**   Okay.  Now let's turn to Owen Diaz's promotion.  He was

 6   promoted to a lead elevator operator, correct, in August of

 7   2015?

 8   **A.**   When I started working the elevator service, I was

 9   informed that he was a lead.  I don't know what date he got the

10   promotion or anything else.

11   **Q.**   Okay.  If you -- in terms of Owen Diaz's performance on at

12   least -- you're aware that on at least one occasion, Owen Diaz

13   had to man the elevators by himself; correct?  You're aware of

14   that?

15   **A.**   That would happen periodically with all the leads.

16   **Q.**   Okay.  And now it's your position that you never received

17   any information that Owen Diaz was a good supervisor; is that

18   correct?

19   **A.**   Are you asking me if I ever heard that he was a good

20   supervisor?

21   **Q.**   Yeah.  Did anyone ever tell you:  Owen Diaz is a great

22   supervisor?  Did anybody inform you of that?

23   **A.**   I had -- I had heard comments that, you know, he -- he was

24   good, and there are other times that he had problems, and that

25   he was good and, you know, back and forth; but I had no reason

 1  to doubt that he was a bad supervisor.

 2  Q.   Okay.  Okay.  So you never came to a conclusion that Owen

 3  Diaz was a bad supervisor.  You heard mixed things; is that

 4  fair?

 5  A.   Correct.

 6  Q.   Okay.  Let me ask you a couple questions about the freight

 7  elevators.  There are two main freight elevators at the

 8  factory; is that right?

 9  A.   Yes.

10  Q.   And that's how you move goods up and down; is that right?

11  A.   Yes.

12  Q.   Without the elevators, you couldn't build the cars;

13  correct?

14  A.   It would be pretty hard.

15  Q.   Okay.  Now, we saw earlier the complaint to Owen Diaz

16  where he complained to you about the racial conduct in

17  Exhibit 38, the Judy Timbreza stuff.  Do you remember that?

18  Exhibit 38?

19       So isn't it true that Owen Diaz, he actually complained to

20  you about use of the "N" word at the factory; correct?

21  A.   No.

22  Q.   Didn't Mr. Diaz complain to you about Robert Hurtado using

23  the "N" word towards him?

24  A.   I don't -- I don't remember that.

25  Q.   Okay.  Did Mr. Diaz complain to you about Ramon Martinez

1   using the "N" word?

2   **A.**   I don't recall him doing that.

3   **Q.**   You received a complaint about use of the "N" word by

4   Lamar Patterson, didn't you?

5   **A.**   I remember the name and I remember him, but I don't

6   remember him -- if he did, I don't remember at this moment.

7   **Q.**   Isn't it true that you claim that you never heard the

8   "N" word at the factory?  That's what you claim; correct?

9   **A.**   I claim that at the factory it was never used or that I

10  never heard it?

11  **Q.**   That you never heard it at the factory, that you were

12  never aware of it at the factory.

13  **A.**   Are you asking if I heard it directly from someone?

14  **Q.**   I'll ask you that question first.  Did you ever hear the

15  "N" word directly from someone?

16  **A.**   I don't recall ever hearing anybody, not in my presence.

17  **Q.**   Isn't it true, though, that you did hear that -- you did

18  hear about "N" word complaints; correct?  Someone complained to

19  you about the "N" word; right?

20  **A.**   I don't remember anybody coming directly about that, not

21  offhand.

22          **THE WITNESS:**  Your Honor, could I answer in how I

23  would know of sometimes that, you know, things would come up,

24  like in the restrooms?  I was a part of the janitorial service.

25

1   BY MR. ORGAN

2   Q.   So you did see some racist graffiti in the restrooms?

3   A.   I never saw directly, but our people would be cleaning,

4   and they were instructed that if you see something, take a

5   picture it and -- and -- and send it to -- oh, my goodness.

6   Q.   Andres Donet?

7   A.   Send to it personnel.

8   Q.   Okay.  And so that did happen?  There was racist graffiti

9   in the bathrooms; correct?

10  A.   I never saw it and it was never said that it was racist.

11  I was just anything offensive, they were instructed just to

12  take a picture of it and send it in.

13  Q.   Okay.  Did you ever see any of the pictures?

14  A.   I don't remember specifically seeing anything like that.

15  Okay?

16  Q.   But you do know that graffiti did exist in the bathrooms

17  at the factory?

18  A.   Periodically, yes.

19  Q.   Okay.  And it's true that you contend that no one ever

20  brought to your attention use of the "N" word?  That's what you

21  contend; right?

22  A.   That's -- I'm telling you I don't remember anybody telling

23  me that.

24  Q.   Isn't it true, sir, that you -- someone actually directly

25  complained to you about the "N" word?  That's what happened

ROMERO - DIRECT / ORGAN

 1   contrary to what you just said.  Isn't it true that you

 2   received a complaint about the "N" word?

 3   A.   I can't recall getting a complaint like that.

 4   Q.   I'd like to turn your attention to Exhibit 106.

 5        (Witness complied.)

 6   A.   Okay.

 7   Q.   If you look at the bottom, there is an email from you.

 8   There's an email from you --

 9        MS. KENNEDY:  Objection, Your Honor.  This is going

10   into the Motion in Limine.

11        MR. ORGAN:  This is what I mentioned this morning,

12   Your Honor.

13        THE COURT:  The objection is overruled.  You can

14   proceed.

15   BY MR. ORGAN

16   Q.   You wrote this email down at the bottom, didn't you, to

17   Wayne Jackson?

18   A.   Okay.

19   Q.   Right?

20   A.   Yes.  And your question to me was if I recall.  I didn't

21   recall at the moment.  I didn't recall that at all.  It's been

22   many years.

23   Q.   Well, does this refresh your recollection that, in fact,

24   you did receive a complaint about the "N" word from elevator

25   staff other than Mr. Diaz?

1    **A.**    Well, is there?

2    **Q.**    Yes.  And that is copied to Victor Quintero; correct?

3    **A.**    And Wayne Jackson and Victor Quintero.

4    **Q.**    And Erin Marconi from Tesla HR; correct?

5    **A.**    Yes.

6    **Q.**    Okay.

7             **MR. ORGAN:**  Your Honor, I would move Exhibit 106 into

8    evidence.

9             **MS. KENNEDY:**  Same objections, Your Honor.  Relevance

10   and me-too.

11            **THE COURT:**  I think a satisfactory basis has been

12   laid.  I'm going to admit Exhibit 106, but only for the purpose

13   for your assessment of credibility of Mr. Romero and the

14   testimony regarding the use of the "N" word and not for any

15   other purpose.

16        (Trial Exhibit 106 received in evidence)

17   **BY MR. ORGAN**

18   **Q.**   And isn't it true, sir --

19            **THE COURT:**  Do you want to publish it then?

20            **MR. ORGAN:**  Oh, yes, Your Honor.  I would like to

21   publish it.  Thank you.

22        (Document displayed.)

23   **BY MR. ORGAN**

24   **Q.**   So this is an interaction between a Javier Temores and

25   Troy Dennis.  These were two people who were working on the

```
 1  elevators; correct?

 2  A.    Yes.

 3  Q.    And one of them called the other the "N" word; correct?

 4  A.    According to the email.  I don't remember the

 5  circumstances at the time but, yes.

 6  Q.    And as a result of this -- as a result of this, did you

 7  fire Troy Dennis?

 8  A.    I don't remember.

 9  Q.    Isn't it true, sir, that he stayed employed?  Troy Dennis

10  stayed employed after using the "N" word in the elevators;

11  correct?

12  A.    I think so, yes.  I'd like to --

13  Q.    I would like to turn your attention to --

14  A.    -- state that the emails were sent to the people

15  authorized to handle the problem.

16  Q.    Right.  You would have expected Erin Marconi from human

17  resources to have done something about it; right?

18  A.    I would have expected them to do what they needed to do.

19  Q.    And Victor Quintero, the manager of the whole department,

20  you would have expected him to do something about it; right?

21        THE COURT:  Now you've gone way beyond the scope of

22  this document.

23        MR. ORGAN:  I would like to move on to Exhibit 109.

24  BY MR. ORGAN

25  Q.   This isn't the only "N" word incident that you knew about;
```

**PROCEEDINGS**

 1   correct, sir?  Look at Exhibit 109.

 2   **A.**   Okay.

 3           **MS. KENNEDY:**  Your Honor, this is also going beyond

 4   the scope of the Motion in Limine and it's past the time that

 5   Mr. Diaz was even at the Tesla facility.

 6       This is now going past the Motion in Limine and this is

 7   the slippery slope that we've been talking about.

 8           **MR. ORGAN:**  It's for the same purpose, Your Honor.

 9           **THE COURT:**  You've already established that purpose.

10   What's the timing of this?  Are we looking at --

11           **MR. ORGAN:**  It's April of 2016.

12           **THE COURT:**  Okay.  So that is beyond the scope.

13           **MR. ORGAN:**  Okay.  No further questions, Your Honor.

14           **THE COURT:**  All right.

15       Ms. Kennedy, we are at 1:30.  It depends on how much time

16   you think your redirect is going to take.  If it's ten minutes

17   or less --

18           **MS. KENNEDY:**  No, no.

19           **THE COURT:**  Okay.

20           **MS. KENNEDY:**  Unfortunately, it's not ten minutes or

21   less.

22           **THE COURT:**  All right.  So, ladies and gentlemen, we

23   will break for the day.

24       Remember two things.  One is, this is just the beginning

25   of the case.  There is a lot of information that you're going

1   to be receiving over the course of this week and maybe next

2   Monday, and it's just very important that you keep an open mind

3   about everything.

4        Don't discuss what has happened so far.  Don't communicate

5   about it with anybody.  Just remember that long instruction

6   that I gave you earlier because there's a lot to come in this

7   case.

8        The second thing is, really try to be on time.  Really try

9   to be here at 8:15.  We have a lot of work that we have to do

10  to get this case to you.  And I want to keep to the promise

11  that I made to you, which is that I think everything will be

12  done by a week from today and the case will go to you, but that

13  will only happen if we're all doing our part, and so the big

14  part -- a big part is being here on time.  So please come --

15  plan on being here by 8:15 so that we don't have any problems.

16       Okay?  So you are now dismissed for today, and I'll see

17  you tomorrow morning.

18       (Proceedings were heard out of presence of the jury:)

19       **THE COURT:**  Mr. Romero, you can step down, but I would

20  like everybody else to sit down.

21       (Witness steps down.)

22       **THE COURT:**  And I want to remind you that once a

23  witness takes the stand, there is no substantive conversation

24  that should go on with that witness.  So during this break,

25  besides timing and pleasantries, don't communicate with

269

**PROCEEDINGS**

1    Mr. Romero.  And that will be the rule of the case.

2         All right.  Have a good afternoon everybody.

3         (Whereupon at 1:30 further proceedings

4          were adjourned until Tuesday, September 28, 2021

5          at 8:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

<u>**I N D E X**</u>

Monday, September 27, 2021 - Volume 1

|                                          | PAGE | VOL. |
|------------------------------------------|------|------|
| Preliminary Jury Instructions            | 10   | 1    |
| Opening Statement by Mr. Alexander       | 22   | 1    |
| Opening Statement by Ms. Kennedy         | 44   | 1    |

- - -

| **PLAINTIFF'S WITNESSES**                | PAGE | VOL. |
|------------------------------------------|------|------|

**KAWASAKI, TAMOTSU EDWEEN**
| (SWORN)                                  | 65   | 1    |
| Direct Examination by Mr. Organ          | 66   | 1    |
| Cross-Examination by Ms. Jeng            | 100  | 1    |
| Redirect Examination by Mr. Organ        | 123  | 1    |

**ROMERO, EDWARD**
| (SWORN)                                  | 128  | 1    |
| Direct Examination by Mr. Organ          | 129  | 1    |

—  —  —

<u>**E X H I B I T S**</u>

| **TRIAL EXHIBITS** | IDEN | EVID | VOL. |
|--------------------|------|------|------|
| 33                 |      | 156  | 1    |
| 37                 |      | 83   | 1    |
| 38                 |      | 78   | 1    |
| 39                 |      | 86   | 1    |
| 40                 |      | 85   | 1    |
| 41                 |      | 146  | 1    |
| 104                |      | 93   | 1    |
| 106                |      | 165  | 1    |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 202 | | 75 | 1 |
| 222 | | 91 | 1 |
| 235 | | 95 | 1 |
| 235 | | 118 | 1 |
| 240 | | 153 | 1 |
| 366 | | 72 | 1 |

—  —  —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, September 27, 2021