QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Kathleen M. Sullivan (CA Bar No. 242261)
  kathleensullivan@quinnemanuel.com
  Daniel C. Posner (CA Bar No. 232009)
  danposner@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Defendant,
*TESLA, INC.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| OWEN DIAZ,<br><br>          Plaintiff,<br><br>     vs.<br><br>TESLA, INC. DBA TESLA MOTORS, INC.,<br><br>          Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**DEFENDANT TESLA INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL AND/OR REMITTITUR PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 50 AND 59**<br><br>**Date: January 19, 2022**<br>**Time: 2 p.m.**<br>**Place: Courtroom 2, 17th Floor**<br>**Judge:  Hon. William H. Orrick** |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ......................................................................................................................3

LEGAL STANDARD ...............................................................................................................6

ARGUMENT ...........................................................................................................................6

I.  TESLA IS ENTITLED TO NEW TRIAL OR JMOL ON LIABILITY ................................6

    A.  The Liability Findings Are Against The Weight Of The Evidence ..........................6

    B.  § 1981 Liability Fails For Lack Of A Tesla-Diaz Contract .................................8

    C.  State-Law Liability Fails For Lack Of A Tesla-Martinez Contract ......................10

II.  TESLA IS ENTITLED TO NEW TRIAL OR REMITTITUR ON THE $6.9
    MILLION COMPENSATORY DAMAGES AWARD ....................................................11

    A.  The Compensatory Damages Far Exceed Emotional Distress Damages
        Allowed In Comparable Cases ...........................................................................12

    B.  The Compensatory Damages Improperly Reflect Harm Tesla Did Not
        Cause ..............................................................................................................15

    C.  The Compensatory Damages Award Is Improperly Punitive ...............................17

III.  TESLA IS ENTITLED TO JMOL OR NEW TRIAL/REMITTITUR ON THE
    $130 MILLION PUNITIVE DAMAGES AWARD............................................................18

    A.  The Conduct Here Shows At Most Omission Or Negligence On Tesla's Part........18

        1.  Tesla Did Not Engage In Any, Much Less Repeated, Discriminatory
            Conduct ..............................................................................................19

        2.  Tesla's Omission Or Negligence Was Not Intentional Or Malicious..........20

    B.  The Punitive And Compensatory Damages Awards Are Grossly Disparate ..........21

    C.  The Punitive Damages Award Greatly Exceeds Comparable Civil Penalties ........24

    D.  The Punitive Damages Award Was Improperly Premised On Tesla's Wealth........25

CONCLUSION ......................................................................................................................27

APPENDIX A .......................................................................................................................28

APPENDIX B .......................................................................................................................30

APPENDIX C .......................................................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page**

## <u>Cases</u>

*Alvarado v. Fed. Express Corp.*,
  2008 WL 744819 (N.D. Cal. Mar. 18, 2008) ............................................................ 12

*Arizona v. ASARCO LLC*,
  773 F.3d 1050 (9th Cir. 2014) ................................................................................... 19

*Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*,
  405 F.3d 764 (9th Cir. 2005) ......................................................................... 24, 25, 26

*Baker v. Elmwood Distributing, Inc.*,
  940 F.2d 1013 (7th Cir. 1991) ..................................................................................... 9

*Balboa v. Hawaii Care & Cleaning, Inc.*,
  105 F. Supp. 3d 1165 (D. Haw. 2015) ....................................................................... 10

*Balsam v. Tucows Inc.*,
  627 F.3d 1158 (9th Cir. 2010) ..................................................................................... 9

*Bayer v. Neiman Marcus Grp., Inc.*,
  861 F.3d 853 (9th Cir. 2017) ..................................................................................... 16

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ............................................................................................ 24, 25

*Claiborne v. Blauser*,
  934 F.3d 885 (9th Cir. 2019) ....................................................................................... 5

*Clark v. City of Tucson*,
  2020 WL 914524 (D. Ariz. Feb. 26, 2020) ....................................................... 12, 13, 16, 17

*Cummings v. Cenergy Int'l Servs., LLC*,
  258 F. Supp. 3d 1097 (E.D. Cal. 2017) ..................................................................... 10

*Delfino v. Agilent Techs., Inc.*,
  145 Cal. App. 4th 790 (2006) ................................................................................. 7, 10

*Doe v. Capital Cities*,
  50 Cal. App. 4th 1038, 1054 (1996) ............................................................................ 7

*Domino's Pizza, Inc. v. McDonald*,
  546 U.S. 470 (2006) ............................................................................................... 7, 8

*Evans v. Port Auth. of N.Y. & N.J.*,
  273 F.3d 346 (3d Cir. 2001) ...................................................................................... 14

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
  762 F.3d 829 (9th Cir. 2014) ....................................................................................... 5

*Faush v. Tuesday Morning, Inc.*,
  808 F.3d 208 (3d Cir. 2015) ............................................................................... 9

*GECCMC 2005-C1 Plummer Street Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l
  Ass'n*,
  671 F.3d 1027 (9th Cir. 2012) ............................................................................. 9

*Hardeman v. Monsanto Co.*,
  997 F.3d 941 (9th Cir. 2021) ...................................................... 17, 18, 20, 23, 24

*Harper v. City of Los Angeles*,
  533 F.3d 1010 (9th Cir. 2008) ........................................................................... 15

*Johnson v. Albertsons LLC*,
  2020 WL 3604107 (W.D. Wash. July 2, 2020) ................................................. 14

*Johnson v. Riverside Healthcare Sys.,
  LP*, 534 F.3d 1116 (9th Cir. 2008) ..................................................................... 6

*Justice v. Rockwell Collins, Inc.*,
  117 F. Supp. 3d 1119 (D. Or. 2015) .................................................................... 9

*Khalaf v. Ford Motor Co.*,
  2019 WL 10301739 (E.D. Mich. Mar. 28, 2019) ............................................. 20

*Kortan v. Cal. Youth Auth.*,
  217 F.3d 1104 (9th Cir. 2000) ............................................................................. 6

*Longfellow v. Jackson County*,
  2007 WL 682455 (D. Or. Feb. 28, 2007) ................................................ 14, 16, 17

*MacMillan v. Millennium Broadway Hotel*,
  873 F. Supp. 2d 546 (S.D.N.Y. 2012) ............................................................... 14

*Manatt v. Bank of Am.*,
  339 F.3d 792 (9th Cir. 2003) ............................................................................... 6

*McGinest v. GTE Serv. Corp.*,
  360 F.3d 1103 (9th Cir. 2004) ............................................................................. 6

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*,
  339 F.3d 1087 (9th Cir. 2003) ............................................................................. 9

*Mendez v. Cnty. of San Bernardino*,
  540 F.3d 1109 (9th Cir. 2008) ........................................................................... 19

*Mister v. Illinois Cent. Gulf R. Co.*,
  790 F. Supp. 1411 (S.D. Ill. 1992) .................................................................... 15

*Monster Energy Co. v. Schechter*,
  7 Cal. 5th 781 (2019) .......................................................................................... 8

*Morris v. BNSF Railway Co.*,
  429 F. Supp. 3d 545 (N.D. Ill. 2019) ............................................................... 14

TESLA'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR

*Norcia v. Samsung Telecommc'ns Am., LLC*,
   845 F.3d 1279 (9th Cir. 2017)............................................................................................. 8

*Noyes v. Kelly Servs., Inc.*,
   2008 WL 2915113 (E.D. Cal. July 25, 2008) ........................................................... 22, 24

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014)................................................................................. 5, 6, 11

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
   212 F.3d 493 (9th Cir. 2000) ............................................................................................. 15

*Patterson v. McLean Credit Union*,
   491 U.S. 164 (1989) ........................................................................................................... 9

*Paul v. Asbury Automotive Group, LLC*,
   2009 WL 188592 (D. Or. Jan. 23, 2009)............................................................ 13, 19, 22, 24

*Pickard v. Holton*,
   2013 WL 5195616 (N.D. Cal. Sept. 16, 2013) .................................................................. 7

*Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*,
   422 F.3d 949 (9th Cir. 2005) ..................................................................................... 19, 21

*Prouty v. Gores Tech. Grp.*,
   121 Cal. App. 4th 1225 (2004) ......................................................................................... 9

*Roman Catholic Bishop v. Superior Court*,
   42 Cal. App. 4th 1556 (1996)........................................................................................... 7

*Shafer v. Cty. of Santa Barbara*,
   868 F.3d 1110 (9th Cir. 2017) .......................................................................................... 5

*Shaw v. United States*,
   741 F.2d 1202 (9th Cir. 1984) ........................................................................................ 12

*Smith v. City of Oakland*,
   538 F. Supp. 2d 1217 (N.D. Cal. 2008) ......................................................................... 15

*Sooroojballie v. Port Auth. of N.Y. & N.J.*,
   816 F. App'x 536 (2d Cir. 2020)............................................................................... 12, 14

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
   538 U.S. 408 (2003) .................................................. 2, 16, 18, 20, 21, 22, 23, 24, 25

*Thomas v. iStar Fin., Inc.*,
   508 F. Supp. 2d 252 (S.D.N.Y. 2007) ............................................................................ 20

*Thompson v. Memorial Hosp. of Carbondale*,
   625 F.3d 394 (7th Cir. 2010)............................................................................................ 14

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014) ..................................................................................... 22, 23

*Watson v. City of San Jose,*
    800 F.3d 1135 (9th Cir. 2015) ............................................................................ 15, 16

*Williams v. First Advantage LNS Screening Sols. Inc.*,
    947 F.3d 735 (11th Cir. 2020) .................................................................................. 26

*Zhang v. Am. Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ............................................................................ 20, 21

### **Statutory Authorities**

42 U.S.C. § 1981 ................................................................................................. *passim*

42 U.S.C. § 1981a(b)(3)(D) .......................................................................................... 24

Cal. Civ. Code § 1550 ................................................................................................... 8

### **Rules and Regulations**

Fed. R. Civ. P. 50(a) ...................................................................................................... 5

Fed. R. Civ. P. 50(b) ...................................................................................................... 5

Fed. R. Civ. P. 59 .......................................................................................................... 5

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on January 19, 2022, at 2:00 PM, in Courtroom 2, 17th Floor, United States District Court for the Northern District of California, at 450 Golden Gate Avenue, San Francisco, California, before the Honorable William H. Orrick, defendant Tesla, Inc. DBA Tesla Motors, Inc. ("Tesla") shall, and hereby does, move the Court for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), renewing Tesla's prior request pursuant to Fed. R. Civ. P. 50(a), and alternatively for a new trial and/or remittitur pursuant to Fed. R. Civ. P. 59, as to plaintiff Owen Diaz's claims for (1) racial harassment in violation of 42 U.S.C. § 1981; (2) failure to prevent harassment in violation of 42 U.S.C. § 1981; and (3) negligent supervision and retention, as more fully set forth below.

This motion is based on the memorandum of points and authorities below, the trial record, all pleadings and papers on file in this action, such matters as are subject to judicial notice, and all other matters or arguments that may be presented in connection with this motion.

## RELIEF REQUESTED

Tesla requests judgment as a matter of law as to each of Diaz's claims.  In the alternative, Tesla requests a new trial as to each of Diaz's claims.  Further in the alternative, Tesla requests a new trial or remittitur with respect to the jury's damages award.

## PRELIMINARY STATEMENT

Tesla abhors and condemns the use of all racial slurs, including the N-word. They are deeply offensive, utterly unacceptable, and have no place in Tesla's workplaces. Tesla's policies prohibit racial discrimination and harassment of any kind. And that includes a zero-tolerance policy for the N-word. Thus, when former contract worker Owen Diaz filed complaints that his fellow contractors racially disparaged him in 2015 and 2016, Tesla disciplined them each time.

Indeed, at trial, Tesla presented evidence that, working closely with the staffing agencies that ultimately employed them, Tesla investigated and took action against the workers about whom Diaz filed complaints. Those actions included sending one contractor home and giving him a final written warning, and counseling and disciplining another for his racist conduct. Diaz testified at trial to numerous other incidents that allegedly went unaddressed, involving racially disparaging comments and racist graffiti, which he claimed to have reported orally. But these complaints were uncorroborated, and Tesla's witnesses either could not recall them or testified they did not happen. In short, Tesla vigorously disputed Diaz's factual claims and believed they were defective as a matter of law.

But the jury spoke. It was undisputed that Tesla, as a company, did not intentionally perpetrate a single act of racist conduct against Diaz (or anyone else). Based on the verdict, however, the jury believed Tesla could and should have done more to root out alleged racism at the factory.[1]

Nevertheless, the jury award here, a staggering $136.9 million, simply cannot stand. It is an award without precedent in U.S. antidiscrimination law. It dwarfs awards in similar—and even in

---

[1] And since the events in question, it has. Tesla is a different company than in 2015-2016, when it had net losses of nearly $900 million and was fighting long odds to achieve its mission of building sustainable electric vehicles for the mass-market. Five years later, Tesla is one of the most valuable companies in the world, and it has scaled up its antidiscrimination efforts too. Tesla now has a dedicated Employee Relations team, charged with investigating complaints, and a Diversity, Equity & Inclusion team, with a mandate to ensure all employees have an equal chance to excel at Tesla. Tesla continues to focus on ways to ensure employees from all backgrounds can contribute to its mission and thrive.

TESLA'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND REMITTITUR

1    the most egregious—cases.  And it bears no relationship to the actual evidence at trial.  Thus, even

2    if liability stands (and it should not), the Court must grant a new trial or steep remittitur.

3    The jury awarded Diaz $6.9 million in compensatory damages for emotional distress—more

4    than 35 times the average that courts have allowed to stand after remittitur in similar cases.  (*See*

5    **Appendix A**.)  No evidence justifies such an award.  Diaz was at Tesla for only nine months, and

6    encouraged his son to work at Tesla.  Diaz was happy at Tesla for all but his last two months, when

7    a fellow contract worker made a racist drawing, which affected him emotionally—causing short-

8    lived anxiety, loss of sleep and appetite, and depression.  Tesla addressed the incident immediately,

9    and fortunately, Diaz experienced no physical or economic harm, and did not need medical

10   treatment or counseling. And as his own psychology expert admitted, Diaz "fully recovered" when

11   he got a new job a few months after leaving Tesla; his depression is "in remission" and he has only

12   "residual symptoms," mostly due to unfortunate (and unrelated) events in his son's life.

13   The $6.9 million award thus was unmoored from the evidence of Diaz's mild and short-lived

14   emotional distress.  And Diaz's sole damages expert testified only that, by 2019, Tesla supposedly

15   was a big company with a lot of money.  (Tr. 682:2-685:19.)  Diaz's counsel then urged the jury, in

16   closing, to award Diaz "a million dollars for every month, every month that he was there inside the

17   workplace" plus "a million dollars" for each of the "two, three, four years" it might take him in the

18   future to "get back to equilibrium."  (Tr. 920:21-25, 921:8-17.)  The jury apparently took that

19   invitation, which was not a sound or lawful basis on which to award damages.

20   In recent comparable workplace racial harassment cases, courts have limited emotional

21   distress damages to $100,000 to $250,000 per plaintiff.  (*See* **Appendix B**.)  Even in a case involving

22   prolonged and egregious workplace racial harassment on facts that are a far cry from the facts here,

23   a sister court allowed compensatory damages of only $1.3 million.  (*Id.*)  Accordingly, the Court

24   should order a new trial on damages unless Diaz agrees to a remittitur of compensatory damages to

25   at most $300,000, which is the maximum award sustainable by the proof.

26   The Court should also grant judgment or remittitur correcting the jury award of $130 million

27   in punitive damages, which is grossly excessive and blatantly unconstitutional.  Since *State Farm*

28   *Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), the Ninth Circuit has never

upheld a punitive damages award exceeding a 9:1 ratio to compensatory damages.  And in all but the most severe cases—those involving physical harm and threats to health and safety—courts have enforced a constitutional maximum ratio of 1:1, 2:1, or 4:1, at most.  The 18:1 ratio the jury awarded here is thus unsustainable.  This is not a case about physical harm, health, or safety.  Tesla had strong antidiscrimination policies, and undisputedly took corrective action when Diaz formally complained.  And there is no evidence that Tesla's management or any high-level employees condoned or even knew about the racist conduct by Diaz's co-workers at the factory.  Thus, while the jury felt strongly that Tesla should have done more, this is at most a case of omission or negligence, not malice or intent.

Courts in comparable cases have reduced punitive awards to a 1:1 ratio or at most a 2:1 ratio to compensatory damages, yielding punitive damages of $150,000 to $4 million—the latter even in an extreme case involving egregious facts (including PTSD and hospitalization) not present here. (*See* **Appendix B**.)  In contrast, the facts here support a 1:1 ratio at most, and the Court should reduce the punitive damages accordingly.

## BACKGROUND

The case proceeded to trial on Diaz's claims that Tesla violated his rights under 42 U.S.C. § 1981, which protects the right of all persons to make and enforce contracts regardless of race, and under state law barring negligent supervision and retention of an employee.

*Liability*.  The liability testimony centered on verbal altercations between Diaz and one Tesla employee (Robert Hurtado) and two contractors (Judy Timbreza and Ramon Martinez) at the Tesla factory where Diaz worked from June 2015 to March 2016.  Tesla took prompt disciplinary action after several of these incidents: (1) Tesla disciplined Timbreza after a July 2015 shouting match with use of the N-word by immediately sending Timbreza home from the factory and giving him a formal written warning (Tr. 78:12-79:11, 117:18-25, 124:21-125:12); (2) Tesla counseled Martinez after an October 2015 verbal altercation with Diaz (Tr. 231:8-15, 243:12-244:7); and (3) Tesla disciplined Martinez for a January 2016 incident involving a racist drawing, suspending Martinez without pay for three days and giving him a final written warning (Tr. 341:9-15).

1    Diaz also testified that Hurtado and other workers at the plant directed racial insults at him

2    that Tesla did not remediate.  (Tr. 415:1-23, 518:9-23.)  But there was no written record of any

3    complaint involving that conduct.  (Tr. 524:3-20.)  Diaz also testified he orally reported unaddressed

4    incidents of offensive graffiti at the factory, though he never saw that graffiti being drawn, did not

5    make a written or photographic record of it, and does not know whether any Tesla employees were

6    involved.  (Tr. 401:2-25, 501:11-502:4, 511:4-16, 514:24-515:1.)  And although Diaz testified that

7    the graffiti he recalled seeing was not removed, it was undisputed that Tesla policy required cleaning

8    staff to photograph and report any offensive graffiti they identified.  (Tr. 163:2-15.)

9    Diaz admitted that he was satisfied with Tesla's handling of the Timbreza incident (Tr.

10   510:23-511:3), and even after that incident he encouraged his son to seek a job at the Tesla factory

11   in around August 2015.  (Tr. 503:8- 504:8.)  Until the turning point of the January 2016 drawing

12   incident, he remained happy in his job at Tesla, did not seek reassignment by his staffing agency,

13   and felt he "could still do [his] job despite all these other racial slurs."  (Tr. 516:11-517:10.)

14   ***Damages***.  Diaz offered no evidence of physical or economic harm and relied for damages

15   solely on emotional distress.  Three witnesses testified about his emotional symptoms:  (1) Diaz

16   testified that, after the January 2016 turning point, he was "in a shell," became no longer "an

17   outward-going person," had "sleepless nights," and lost weight and the ability to engage in marital

18   relations (Tr. 481:16-485:11); (2) Diaz's stepdaughter LaDrea Jones testified that Diaz got

19   "moodier," "more sad," and stopped asking "those dad questions" (Tr. 624:21-625:5); and (3) Diaz's

20   psychology expert Dr. Anthony Reading testified (based on a 2019 examination) that Diaz's

21   experience was consistent with "an adjustment disorder with anxiety and depressed mood" (Tr.

22   592:9-14).  Diaz presented no evidence that he sought any medical treatment, counseling, or

23   medication for these symptoms.  And Diaz, Ms. Jones, and Dr. Reading all admitted that these

24   symptoms abated a few months after Diaz left Tesla and took a new job as a bus driver for AC

25   Transit in summer 2016.  Diaz testified he was happy in the new job.  (Tr. 483:13-16, 636:7-19.)

26   Ms. Jones testified that Diaz again became talkative and involved in her life.  (Tr. 627:24-628:12,

27   636:12-637:4.)  And Dr. Reading testified that Diaz's "symptoms entered remission shortly after he

28

1   returned to work several months later," and stated only that he might be a "candidate" for future

2   treatment.  (Tr. 587:23-588:3, 593:20-23, 606:6-20.)

3       The record shows that much of Diaz's distress stems from his son's conviction for armed

4   robbery, three and a half years after Diaz left Tesla.  Diaz told the jury that he was "devastated that

5   [he] couldn't help [his] son" (Tr. 482:4-8, 483:7-484:7), and he "blame[d] Tesla" for what happened

6   to his son (Tr. 572:12-573:13).  Dr. Reading testified that Diaz's emotional distress could be

7   attributed largely "to what's happening with his son" (Tr. 593:4-8), but agreed that Diaz's efforts to

8   blame Tesla for that distress "may or may not comport with reality" (Tr. 593:4-17).

9       Diaz also presented a damages expert, Dr. Charles Mahla, who testified exclusively about

10  Tesla's size and finances, including that, in 2019 (more than three years after the incidents in

11  question), Tesla had a market capitalization of $151.2 billion, $34.3 billion in assets, $24.6 billion

12  in revenues, and $6.3 billion in cash.  (Tr. 682:2-685:19.)  Dr. Mahla did not testify about Tesla's

13  far more precarious financial position back in 2015-16, when the incidents at issue occurred.

14      In closing, Diaz's counsel asked the jury to award Diaz past emotional distress damages of

15  "a million dollars for every month ... that he was there inside the workplace that they failed to protect

16  him from the N' word" (Tr. 920:21-25), and to award Diaz future emotional distress damages of "a

17  million dollars" for each of the "two, three, four years out" that "it's going to take for him to get

18  back to equilibrium, back to where he started" (Tr. 921:8-17).  Diaz's counsel made no effort to tie

19  these multiple, round million-dollar figures to any record evidence concerning Diaz's harm.  Diaz's

20  counsel also argued in closing that "Tesla is one of the richest companies in the world" (Tr. 921:23-

21  25), and urged the jury to award Diaz between 1% and 10% of what he asserted was the "$1 billion"

22  Tesla had available at the end of 2019 (Tr. 924:19-925:22).

23      The jury entered a verdict finding liability and awarding Diaz $6.9 million in compensatory

24  damages ($4.5 million for past damages and $2.4 million for future damages), and $130 million in

25  punitive damages.  (Dkt. 301.)

26      After the close of evidence, Tesla moved for JMOL under Fed. R. Civ. Pro. 50(a).  (Dkt.

27  282; Tr. 754:3-20.)  The Court denied Tesla's motion on the record (Tr. 846:4-21), and later issued

28  a written order denying the motion (Dkt. 303 at 3-7).

-5-

TESLA'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND REMITTITUR

**LEGAL STANDARD**

The Court may grant a renewed motion for JMOL under Fed. R. Civ. P. 50(b) where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (citation omitted).

The Court may order a new trial under Fed. R. Civ. P. 59 "where 'the verdict is against the weight of the evidence,' 'the damages are excessive' or, 'for other reasons, the trial was not fair to the moving party.'" *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019) (citation and alteration omitted).  A new trial may also be granted where "the jury has reached a seriously erroneous result," *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014) (citation omitted), or "on any ground necessary to prevent a miscarriage of justice," *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 845-46 (9th Cir. 2014).  Where a damages verdict is excessive, the Court may grant a new trial unless the plaintiff accepts a remittitur, which "must reflect 'the maximum amount sustainable by the proof.'"  *Oracle*, 765 F.3d at 1094 (citation omitted).

**ARGUMENT**

**I.    TESLA IS ENTITLED TO NEW TRIAL OR JMOL ON LIABILITY**

**A.    The Liability Findings Are Against The Weight Of The Evidence**

***Section 1981***.  To establish a hostile work environment under § 1981, a plaintiff must show "(1) [he] was subjected to verbal or physical conduct because of [his] race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (alterations in original) (quoting *Manatt v. Bank of Am.*, 339 F.3d 792, 797 (9th Cir. 2003)).  "In considering whether the discriminatory conduct was 'severe or pervasive,' we look to 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (internal quotation marks omitted) (quoting *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000)).  "A

plaintiff must show that the work environment was both subjectively and objectively hostile." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004).

The jury's finding of liability here is against the great weight of the evidence under those settled standards.  While the jury was entitled to credit Diaz's testimony that low-level co-workers directed the N-word and other racially derogatory insults at him, it is undisputed that such conduct was contrary to Tesla policy and was never condoned by Tesla.  Moreover, Diaz himself admitted at trial that he remained happy at Tesla, uninterested in reassignment, and able to continue working at his job at all times before the January 2016 drawing incident, and even encouraged his son to apply for a job at Tesla after the July 2015 Timbreza N-word incident.  (*See supra* p. 3.)  Further, Tesla took disciplinary action in response to all of the incidents Diaz reported in writing, including by sending Timbreza home for the July 2015 shouting match and suspending Martinez for the January 2016 drawing incident.  (*See supra* p. 3.).  On such undisputed facts, inferences of "severe or pervasive" discriminatory conduct or "unreasonabl[e] interference" with Diaz's work performance are against the great weight of the evidence.  Accordingly,  a new trial is warranted under Rule 59.

**State-law negligent supervision or retention**.  "An employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit." *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006) (quoting *Roman Catholic Bishop v. Superior Court*, 42 Cal. App. 4th 1556, 1564-65 (1996)).  "Negligence liability will be imposed upon the employer if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.'"  *Id.* (quoting *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996)).  Thus, "[t]o prevail on this claim, Plaintiff must prove the following elements: (1) that an employee of [the defendant] was unfit or incompetent to perform the work for which he was hired; (2) [the defendant] knew or should have known that the employee was unfit or incompetent and that this unfitness or incompetence created a particular risk to others; (3) that the employee's unfitness or incompetence harmed [the plaintiff]; and, (4) [the defendant's] negligence in hiring, training, retaining, supervising or controlling the employee was a substantial

factor in causing Plaintiff's harm." *Pickard v. Holton*, 2013 WL 5195616, at \*7 (N.D. Cal. Sept. 16, 2013).

The jury's finding of liability on the state-law claim, which was expressly limited to Tesla's supervision or retention of Martinez (*see* Dkt. 301 (Question 6); Dkt. 280 (Instruction No. 35)), is against the great weight of the evidence.  There is no evidence that Tesla was negligent in hiring or training Martinez, who was a contractor and not a Tesla employee.  And as noted, the evidence shows that Tesla disciplined Martinez in response to the two incidents of his racial misconduct towards Diaz that Diaz presented to Tesla, and the two had no contact between those incidents.  (*See supra* p. 3.).  The evidence thus shows diligence, not negligence, by Tesla in its handling of Martinez's wrongful acts, and fails to show that Tesla's handling of Martinez substantially caused Diaz's harms.  Accordingly, new trial on this claim too is warranted under Rule 59.

**B.    § 1981 Liability Fails For Lack Of A Tesla-Diaz Contract**

A plaintiff's claim under 42 U.S.C. § 1981 fails "unless he has ... rights under [a] contract that he wishes 'to make and enforce.'"  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 (2006) (quoting 42 U.S.C. § 1981).  Tesla respectfully renews under Rule 50(b) its Rule 50(a) motion for JMOL on the ground that there is no such requisite contract here.

The evidence is legally insufficient to show that Tesla had a contractual relationship with Diaz as his supposed "joint employer," which is now the only relevant § 1981 contract theory.  While there might have been an alternative "third party beneficiary" contract theory before the verdict, as the Court found at the Rule 50(a) stage (*see* Dkt. 303 at 3-6; Tr. 846:4-21), the jury necessarily elected the "joint employer" theory in the way it answered the verdict form.[2]  Either way, there is no legally sufficient basis in the record to support Diaz's contract theory.

---

[2]  Specifically, in response to question 2 on the verdict form, the jury answered "Yes" as to whether Tesla was Diaz's "joint employer."  (Dkt. 301 at 1 (question 2).)  Thus, when the jury got to question 4 (Dkt. 301 at 2), it necessarily found the requisite contractual relationship for § 1981 liability based on the "joint employer" theory and not the "third-party beneficiary" theory.  Had the jury wished to find that Diaz had § 1981 rights on the third-party beneficiary theory, it would have had to answer "No" to question 2 before proceeding to question 4, which at that point would have allowed it to choose third party beneficiary as a basis for § 1981 liability (*see* Dkt. 301 at 2 (referring jury to Dkt. 280 at 38 (Instruction No. 37))).

***Joint employer***.  Simply put, Tesla is not liable because there is no basis in the record to conclude that Tesla had an employment contract with Diaz, joint or otherwise.  While there is no doubt Tesla and Diaz are "parties capable of contracting," and employment is "a lawful object," the record fails to show their mutual "consent" or "consideration."  *Norcia v. Samsung Telecommc'ns Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (citing Cal. Civ. Code § 1550); *see also Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 788 (2019) ("Consent is not mutual, unless the parties all agree upon the same thing in the same sense." (citation omitted)).

Diaz had an employment contract solely with CitiStaff, not Tesla.  It is undisputed that Tesla had no written employment contract with Diaz and that Tesla never paid Diaz or issued him a W-2. (Tr. 496:10-16, Tr. 497:25-498:2.)  Diaz applied for his position through CitiStaff and received payments from CitiStaff.  (Tr. 488:8-15, 496:10-16, 497:7-13.)  And even conceding that contracts need not be written and consent can be manifested by actions (*see* Dkt. 303 at 5), the mere facts that Diaz worked at Tesla with Tesla employees and was sometimes supervised by them (Tr. 392:3-21, Tr. 713:17-22) fall far short of showing that Tesla was his "joint employer" when he contracted with and was paid by a staffing firm.  *See Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 219-20 (3d Cir. 2015); *Justice v. Rockwell Collins, Inc.*, 117 F. Supp. 3d 1119, 1124, 1142 (D. Or. 2015).[3]  In ruling that, for § 1981 purposes, Tesla can be a "joint employer" of a worker placed and paid by a staffing agency, the Court's Rule 50(a) ruling makes new law that warrants the Court's reconsideration.

***Third-party beneficiary***.  Even if the issue were not foreclosed by the jury form (and it is, as noted above), the evidence is legally insufficient to show that Diaz has a § 1981 right as a third-

---

[3]   The Seventh Circuit's decision in *Baker v. Elmwood Distributing, Inc.*, 940 F.2d 1013 (7th Cir. 1991) does not compel a contrary conclusion.  There, after the defendant acquired a portion of a beer distribution franchise, the plaintiffs asked the defendant's general manager if they would have jobs the following week.  *Id.* at 1014.  The general manager said they were hired, and the plaintiffs showed up for work and were paid by the defendant.  *Id.* at 1014-15.  To avoid the application of now-abrogated *Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989)—which excluded from the scope of § 1981 liability conduct occurring after the formation of an employment contract—the plaintiffs argued that they were not hired at all.  *Id.* at 1016.  The Seventh Circuit, applying Illinois law, rejected this argument and concluded that the drivers had been hired by the defendant.  *Id.* at 1018.  Thus, *Baker* involved affirmative representations of employment to prior employees of the business, as well as wages paid directly by the defendant to those employees. Those facts are a far cry from the present case.

party beneficiary of the contract between Tesla and nextSource.   "A third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party and the terms of the contract make that intent evident," *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010) (citation omitted), which is generally an issue "of law that [courts may] resolve independently," *Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225, 1233 (2004).

The Court ruled at the Rule 50(a) stage that Tesla's contract with nextSource might be found to confer such third-party beneficiary rights on Diaz (Dkt. 303 at 6-8), reasoning that it was intended in part to benefit the class of employees like Diaz, and dismissing the contract's express disclaimer of third-party beneficiary obligations (Tr. Ex. 3, ¶ 14.10) as merely "afactual boilerplate" (Dkt. 303 at 7).  That ruling conflicts with Ninth Circuit precedent treating such clauses as "unambiguously manifesting an intent *not* to create any obligations to third parties."  *Balsam*, 627 F.3d at 1163; *see also McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091-92 (9th Cir. 2003) (same under Delaware law); *GECCMC 2005-C1 Plummer Street Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027, 1035 (9th Cir. 2012) (same under federal common law); *Balboa v. Hawaii Care & Cleaning, Inc.*, 105 F. Supp. 3d 1165, 1167-68, 1171 (D. Haw. 2015); *Cummings v. Cenergy Int'l Servs., LLC*, 258 F. Supp. 3d 1097, 1110 (E.D. Cal. 2017).

Because the joint employer theory is unsupported by the record, and the third party beneficiary theory is both foreclosed by the verdict form and unsupported by the record, the Court should enter JMOL for Tesla on § 1981 liability.

### C.     State-Law Liability Fails For Lack Of A Tesla-Martinez Contract

For liability on the state-law claim for negligent supervision and retention of Martinez (*see* Dkt. 301 at 2 (question 6)), Tesla must have been Martinez's employer.  On such a claim, "[a]n *employer* may be liable to a third person for the employer's negligence in hiring or retaining *an employee* who is incompetent or unfit." *Delfino*, 145 Cal. App. 4th at 815 (emphasis added) (citation omitted)).  Thus, as the final jury instructions correctly required, Diaz had to show that Tesla "*employed* Ramon Martinez during the time that Mr. Diaz worked at Tesla." (Dkt. 280 at 36 (emphasis added).)

But the record cannot support that finding as a matter of law, for Tesla did not employ Martinez during the relevant time period.  To the contrary, during the time when Diaz worked at Tesla's factory, Martinez was instead an employee solely of the Chartwell staffing agency.  (Tr. 757:6-15.)  The undisputed evidence shows that Martinez did not ultimately become an employee of Tesla until November 2018, long after Diaz's departure.  (Tr. 758:10-16.)  Therefore, Tesla was not Martinez's employer for purposes of the state-law claim, and Tesla is entitled to JMOL.[4]

## II.  TESLA IS ENTITLED TO NEW TRIAL OR REMITTITUR ON THE $6.9 MILLION COMPENSATORY DAMAGES AWARD

The jury's $6.9 million compensatory damages award is grossly excessive and requires a grant of new trial or remittitur by the Court.  If left to stand, it would be an extreme outlier.  It would represent by orders of magnitude the highest amount ever awarded to an individual discrimination plaintiff in compensatory damages for purely emotional distress.  It would dwarf the awards allowed in comparable discrimination cases.  **Appendix A** sets forth a representative sample of recent federal decisions ordering remittitur of jury awards for non-economic compensatory damages in cases involving federal claims for discrimination and/or retaliation.  As the Court can see, those awards range from $25,000 to $750,000, and average around $189,000.  On the record here, there is no justification for an outsized compensatory damages award more than 36 times that average.

While no one should be subjected to emotional distress at work, Diaz's emotional distress was fortunately mild and short-lived, as the record evidence summarized above makes clear (*see supra* p. 4).  Diaz worked at the Tesla factory for only nine months.  He suffered no physical harm or threat of physical harm.  He experienced sadness, anxiety, and sleeplessness, but sought no medical treatment or psychological counseling.  He continued working at Tesla and remained happy to keep doing so until his last two months there, following the January 2016 racist cartoon incident.  He was not fired; he left Tesla by choice.  He found a new job as a bus driver at AC Transit just a few months after leaving Tesla.  He, his daughter, and his psychological expert all testified that he was happy in his new job, returned to his old self, and made a "full recovery."

---

[4] No evidence was submitted at trial on any purported joint employer relationship between Tesla and Martinez, and any such argument suffers from the same defects noted at p. 6-7, *supra*.

In comparable cases, courts have allowed emotional distress damages to stand after remittitur only in amounts on the order of $25,000 to $750,000, a fraction of the amount awarded here. (*See* **Appendix A**.) Moreover, even in cases where jury compensatory awards for non-economic damages have been allowed to stand in federal discrimination and/or retaliation cases, a broad and representative sample of such awards shows that the amounts range from $50,000 to $1.75 million, and average $322,000, confirming that the $6.9 million compensatory award here is an extreme outlier. (*See* **Appendix C**.)

The disconnect between the jury's $6.9 million award and the record as well as the awards in comparable cases makes clear that the award here likely reflects the jury's sympathy for Diaz or desire to send a message to Tesla. Those are improper bases for compensatory damages, which must be limited to making Diaz whole for any actual harm he experienced. For these reasons, as explained further below, the Court should grant new trial under Rule 59 unless Diaz accepts a remittitur to $300,000, which is the "maximum amount sustainable by the proof," *Oracle*, 765 F.3d at 1093.

### A.   The Compensatory Damages Far Exceed Emotional Distress Damages Allowed In Comparable Cases

"Generally, 'courts are required to maintain some degree of uniformity in cases involving similar losses.'" *Clark v. City of Tucson*, 2020 WL 914524, at *18 (D. Ariz. Feb. 26, 2020) (granting new trial/remittitur based on comparison to analogous cases) (quoting *Shaw v. United States*, 741 F.2d 1202, 1209 (9th Cir. 1984); *see Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536, 545-48 (2d Cir. 2020) (ordering new trial/remittitur based on survey of comparable cases). The $6.9 million compensatory damages award here represents an extreme departure from the ranges of awards allowed in comparable cases. (*See* **Appendix A** (showing a range of awards from $25,000 to $750,000 and averaging around $189,000 in a representative sample of recent federal decisions in cases involving federal claims for discrimination and/or retaliation in which the courts ordered remittitur of jury awards for non-economic compensatory damages); **Appendix C** (showing a range of awards from $50,000 to $1.75 million in a representative sample of recent federal decisions allowing to stand jury awards for non-economic compensatory damages in cases involving federal

1  claims for discrimination and/or retaliation.)  Those ranges show the compensatory award here to

2  be grossly excessive, as does the undisputed evidence in the record.

3      In assessing whether a jury award for non-economic compensatory damages is excessive,

4  "the Court must focus on evidence of the qualitative harm suffered" by the plaintiff.  *Alvarado v.*

5  *Fed. Express Corp.*, 2008 WL 744819, at *3 (N.D. Cal. Mar. 18, 2008) (granting remittitur from

6  $500,000 to $300,000). "The severity or pervasiveness of the conduct is relevant insofar as it

7  provides probative evidence from which a jury may infer the nature and degree of emotional injury

8  suffered, but direct evidence of the injury is still the primary proof." *Id.* (citation omitted).  Some

9  courts have utilized a sliding scale identifying "three categories of damages for emotional distress:

10  (1) garden variety; (2) significant; and (3) egregious." *Sooroojballie*, 816 F. App'x at 546.

11      Based on the undisputed record, this is at most a "garden variety" emotional distress case.

12  Diaz's symptoms were mild and short-lived and required no medical treatment.  In discrimination

13  cases involving emotional distress of comparable severity and duration, district courts in the Ninth

14  Circuit have routinely granted motions for new trial or remittitur, and the Court should do the same

15  here.

16      *Paul v. Asbury Automotive Group, LLC*, is directly on point.  2009 WL 188592 (D. Or. Jan.

17  23, 2009).  There, the district court granted remittitur of compensatory damages for non-economic

18  damages for emotional distress in a racially hostile work environment case from amounts of $1.9

19  and $2.1 million per plaintiff to **$150,000** per plaintiff. *Id.* at *8-9.  As here, the case involved racial

20  slurs by co-workers including the repeated use of the N-word.  But the court regarded the steep

21  remittitur as appropriate because the hostile work environment was short-lived—only 11 months,

22  which is longer than Diaz's time at Tesla—the plaintiffs experienced no physical abuse, sought no

23  short-term or ongoing counseling, were able to continue working, and did not suffer economic harm

24  after leaving.  *Id.* at *9.  All those same factors counsel a steep remittitur here.

25      There are numerous other examples.  In *Clark v. City of Tucson*, the district court granted

26  remittitur of a $1.9 million emotional distress compensatory damages award in a Title VII/FLSA

27  sex discrimination case to **$250,000**.  2020 WL 914524 (D. Ariz. Feb. 26, 2020).  The court reasoned

28  that, even though the plaintiff "clearly suffered emotionally," sought counseling, and suffered

relationship issues that nearly culminated in her divorce, "the jury verdict was staggering in comparison to other similar cases" and thus warranted steep remittitur.  *Id*. at *15, 19-20.

Likewise, in *Glenn-Davis v. City of Oakland*, a sex and pregnancy discrimination case, the district court granted remittitur of the compensatory damages award for emotional distress from $1.85 million to **$400,000**.  2007 WL 687486 (N.D. Cal. Mar. 5, 2007).  On a record that showed only "a 'garden variety' emotional distress case," *id*. at *2, the court concluded that the jury award was "wildly excessive," and that there was "no basis" to support it, even though the plaintiff described feelings of humiliation, extreme stress, and betrayal, and her husband testified that she was "shattered" and torn apart, and that this lasted roughly a year, *id*. at *2 & n.2.  The court nevertheless ordered new trial or remittitur, reasoning that the plaintiff was still able to perform her job, did not seek psychological or medical treatment, experienced no physical ailments, and was able to find a new job.  *Id*. at 2.

In *Longfellow v. Jackson County*, the district court remitted an award of emotional distress damages for a First Amendment retaliation claim from $360,000 to **$60,000.**  2007 WL 682455 (D. Or. Feb. 28, 2007).  The court reasoned that, even though the plaintiff experienced anxiety and panic attacks, and was "upset and despondent," she did not require medication or hospitalization, her injuries were "comparatively mild and transient with no long-term damage," she was employed only for a short time, and she found other employment soon after her firing.  *Id*. at *2-3.

And in *Johnson v. Albertsons LLC*, a gender discrimination case brought under Title VII and state law, the district court granted remittitur of a $750,000 compensatory emotional distress award to **$200,000**.  2020 WL 3604107 (W.D. Wash. July 2, 2020).  The court reasoned that, even though the plaintiff was described as "humiliated" and "broken," the period of conduct was "relatively short" and the plaintiff described only "'garden variety' emotional distress." *Id*. at *5.

Remittiturs of grossly excessive emotional distress awards are routinely granted in race discrimination cases outside the Ninth Circuit as well.  *See, e.g.*, *Sorooojballie*, 816 F. App'x at 545-48 (remitting compensatory damages award from $2.16 million to **$250,000** in Title VII/§ 1981 racially hostile workplace environment case, reasoning that awards even for "significant" emotional distress usually do not exceed **$200,000**, and collecting comparable cases); *Evans v. Port Auth. of*

1   *N.Y. & N.J.*, 273 F.3d 346, 353-56 (3d Cir. 2001) (remitting compensatory damages award from

2   $1.15 million to **$375,000** in Title VII/§ 1981 gender discrimination case, and collecting comparable

3   cases); *Thompson v. Memorial Hosp. of Carbondale*, 625 F.3d 394, 408-10 (7th Cir. 2010)

4   (remitting from $500,000 to **$250,000** in § 1981 race discrimination case); *Morris v. BNSF Railway*

5   *Co.*, 429 F. Supp. 3d 545, 558-60 (N.D. Ill. 2019) (remitting from $375,000 to **$250,000** in Title

6   VII/§ 1981 race discrimination case); *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d

7   546, 559-63 (S.D.N.Y. 2012) (remitting from $125,000 to **$30,000** in Title VII/state-law race

8   discrimination case, and collecting comparable cases).

9        For similar reasons, Diaz's mild and temporary past emotional distress plus his expert's mere

10   speculation about future distress cannot sustain a compensatory award of $6.9 million, and the proof

11   supports an award no greater than $300,000.[5]

12   **B.   The Compensatory Damages Improperly Reflect Harm Tesla Did Not Cause**

13        Compensatory damages are limited to "compensation for the injuries actually caused by the

14   [defendant]" and not "for distress they did not cause." *Watson v. City of San Jose*, 800 F.3d 1135,

15   1138, 1140-42 (9th Cir. 2015) (affirming grant of new damages trial in § 1983 case); *see also Mister*

16   *v. Illinois Cent. Gulf R. Co.*, 790 F. Supp. 1411, 1419 (S.D. Ill. 1992) (§ 1981 damages require

17   "some reasonable connection" or "proximate cause" between "the wrongful act and the damages

18   suffered"). But here, there was extensive testimony about Diaz's distress over his son's criminal

19   conviction and imprisonment for armed robbery, which occurred long after Diaz left Tesla, and

20

21   ───────────────

22   [5]   This case bears no resemblance to the rare cases in which courts have declined to reduce
      compensatory damages awards exceeding $500,000 for any individual plaintiff in federal
23   discrimination cases based on evidence of egregious emotional distress. In *Passantino v. Johnson
      & Johnson Consumer Prods., Inc.*, 212 F.3d 493 (9th Cir. 2000), the plaintiff who was awarded $1
24   million had worked for her employer for 18 years, suffered discrimination and retaliation for 4 years,
      and described anxiety, rashes, and stomach problems. *Id.* at 513-14. And in *Harper v. City of Los
25   Angeles*, 533 F.3d 1010 (9th Cir. 2008), where police officers who were falsely arrested in violation
      of the Fourth Amendment—and were each awarded $5 million in compensatory damages—
26   developed severe adverse physical effects, became suicidal, and had their lives jeopardized and
      careers destroyed. *Id.* at 1029-30; *see also Smith v. City of Oakland*, 538 F. Supp. 2d 1217, 1241-
27   43 (N.D. Cal. 2008) (reducing emotional distress award from $5 million to $3 million where plaintiff
      was wrongfully incarcerated for 4.5 months, was falsely charged with a crime based on planted
      evidence, lost his home, and had his relationship destroyed), *aff'd*, 379 F. App'x 647 (9th Cir. 2010).
28   This case is a far cry from *Passantino*, *Harper* or *Smith*.

1  which Tesla obviously did not cause.  This causal disconnect may reflect the jury's sympathy for

2  Diaz's distress about his son's incarceration, presenting additional grounds for a steep remittitur.

3    Specifically, Diaz's son's armed robbery, conviction, and imprisonment occurred some

4  three and a half years after Diaz stopped working at the Tesla factory, and had nothing to do with

5  Tesla or any of Tesla's employees.  (Tr. 572:5-20.)  Nonetheless, Diaz testified extensively about

6  his distress at his son's situation, and said he "blamed Tesla" for that situation.  (Tr. 483:7-12,

7  483:25-484:7; 572:24-573:6.)  Diaz's expert Dr. Reading acknowledged one would "attribute a

8  significant part of [Diaz's] distress to what's happening with his son."  (Tr. 593:4-8.)

9    But the record fails to connect Diaz's emotional distress from his experience at Tesla to the

10  later events relating to his son.  Diaz made a complete recovery within a few months after his leaving

11  Tesla and starting a new job at AC Transit.  (Tr. 587:23-588:3, 627:24-628:12, 636:12-637:4.)  And

12  Diaz's argument that his son's incident "reactivat[ed]" his emotional distress caused by Tesla (Tr.

13  606:17-20) fails the test of proximate cause; were the law otherwise, a defendant would be

14  responsible for all future emotional distress the plaintiff might ever experience from any cause.

15  Even Diaz's own psychological expert testified that Diaz's attribution of fault to Tesla "may or may

16  not comport with reality."  (Tr. 593:4-17.)

17    Where a plaintiff's emotional distress is attributable to causes other than the defendant's

18  conduct, courts have treated that lack of causation as additional ground for remittitur.  For example,

19  in *Clark*, the court acknowledged that the plaintiff had experienced marital problems and negative

20  internet publicity but reasoned in granting remittitur that, "[w]hile these experiences were traumatic

21  and undoubtedly contributed to [her] distress, the evidence [did] not establish that [the] [d]efendant

22  directly caused them."  2020 WL 914524, at *17; *see also id.* at *15; *Longfellow*, 2007 WL 68455,

23  at *3 (noting concern about jury awarding "damages out of sympathy" based on testimony about

24  plaintiff's prior bout with cancer, and fears of its return); *cf. Watson*, 800 F.3d at 1141-42 (affirming

25  grant of new trial where jury may have awarded damages that were not caused by police officers'

26  violation of procedural due process rights).

27    There is no basis for the testimony about Diaz's son to factor into the compensatory damages

28  at all.  This warrants steep reduction of the past damages award of $4.5 million, and elimination of

the $2.4 million future damages award, for Diaz's testimony about his son's conviction was virtually the only basis for finding any ongoing (or potential future) emotional distress (*see* Tr. 607:21-608:18), as opposed to the temporary distress that indisputably abated in 2016.

### C.     The Compensatory Damages Award Is Improperly Punitive

The purpose of compensatory damages is not to punish the defendant but "to return the plaintiff to the position he or she would have occupied had the harm not occurred." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 872 (9th Cir. 2017) (citation omitted); *see also State Farm*, 538 U.S. at 416 ("Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" (quotation omitted)).

The jury's compensatory damages verdict plainly reflected a desire to punish Tesla rather than compensate Diaz.  And Diaz's counsel invited it.  Diaz's damages expert Dr. Mahla testified exclusively about Tesla's value and performance as a company.  (Tr. 682:2-685:19 (stating that in 2019, Tesla had a market capitalization of $151.2 billion, assets of $34.3 billion, revenues of $24.6 billion, and $6.268 billion in cash).)  And in closing, Diaz's counsel asked the jury to award Diaz past emotional distress damages based not on testimony about his emotional distress, but rather on the arbitrary round figures of "a million dollars for every month ... that he was there inside the workplace," and "a million dollars" for each of the "two, three, four years out" that "it's going to take for him" to "heal," and to help send a message that "Tesla was wrong."  (Tr. 920:21-25, 921:8-17.)  Diaz's attorneys also invited the jury to punish Tesla for its wealth, arguing that "Tesla is one of the richest companies in the world" (Tr. 921:23-25) and asking the jury to award Diaz 1% to 10% of the $1 billion they asserted Tesla had at the end of 2019 (Tr. 924:19-925:22).

Compensatory damages should be reduced if they reflect the jury's passion, sympathy, or desire to punish the defendant, rather than compensate the plaintiff for actual injury.  *See, e.g.*, *Clark*, 2020 WL 914524, at *18 ("Given Plaintiff's rhetoric at closing and the actual verdict amount, the jury's award was most certainly for punitive and not compensatory damages."); *Longfellow*, 2007 WL 682455, at *3 (concluding that "the great disparity between the amount awarded and the injuries sustained" made it "seem[] very likely that the jury silently went beyond merely compensating the plaintiff").  That plainly happened here, and is a further reason to order a new trial or remittitur.

1  **III.    TESLA IS ENTITLED TO JMOL OR NEW TRIAL/REMITTITUR ON THE $130**
2  **MILLION PUNITIVE DAMAGES AWARD**

The Court should also grant JMOL or new trial/remittitur to reduce the jury's blatantly
unconstitutional award of $130 million in punitive damages on the § 1981 claim.[6]  "When punitive
damages are 'grossly excessive,' they violate the Due Process Clause."  *Hardeman v. Monsanto
Co.*, 997 F.3d 941, 972 (9th Cir. 2021) (quoting *State Farm*, 538 U.S. at 416).  "Whether punitive
damages are 'grossly excessive' depends on three factors: '(1) the degree of reprehensibility of the
defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the
plaintiff and the punitive damages award; and (3) the difference between the punitive damages
awarded by the jury and the civil penalties authorized or imposed in comparable cases.'"  *Id.*
(quoting *State Farm*, 538 U.S. at 418).  Here, every one of these *State Farm* factors shows that $130
million in punitive damages must be drastically reduced.

**A.    The Conduct Here Shows At Most Omission Or Negligence On Tesla's Part**

The Ninth Circuit assesses a defendant's conduct for punitive damages purposes along a
hierarchy that places intentional and malicious conduct and risks of physical harm at the highest
level, and omission and negligence at the lowest.  Specifically, the Circuit employs a five-factor test
based on *State Farm* that considers "whether '[1] the harm caused was physical as opposed to
economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health
or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved
repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice,
trickery, or deceit, or mere accident.'"  *Hardeman*, 997 F.3d at 972-73 (alteration in original)
(quoting *State Farm*, 538 U.S. at 419).

Factors 1 and 2 need little discussion: Tesla's conduct involves no physical harm and did not
jeopardize the health or safety of Diaz or any other workers at the Tesla factory.  Factor 3 also favors
Tesla, as Diaz made no showing of financial vulnerability, and successfully found another job within

---

[6]  Under the Court's correct instructions, the jury was not permitted to award any punitive damages
on the state-law negligent supervision/retention claim.  (*See* Dkt. 301 at 3 (question 9).)

a few months of voluntarily leaving Tesla.  Thus, key to the analysis here are factors 4 and 5, neither of which merits a finding of reprehensibility on the part of Tesla.

        1.    <u>Tesla Did Not Engage In Any, Much Less Repeated, Discriminatory Conduct</u>

With respect to factor 4, Diaz testified to multiple instances of racial slurs directed at him by his *co-workers*, most of whom were not Tesla employees.  As noted (*see supra* at pp. 3-4), the record shows that Tesla attempted, if imperfectly, to root out that conduct.  It is undisputed that Tesla had corporate policies in place forbidding racial discrimination and harassment in the workplace.  And when it learned of Diaz's allegations of racism, Tesla imposed disciplinary sanctions in response to each documented complaint that Diaz made.

Specifically, in response to Diaz's complaint about the July 2015 shouting match with use of the N-word by contractor Judy Timbreza, Tesla sent Timbreza home from the factory and gave him a formal written warning about his conduct.  (Tr. 78:12-79:11; 117:18-25; 124:21-125:12.)  Diaz acknowledged that, after he reported the altercation with Timbreza, he never saw Timbreza again, and he was satisfied with Tesla's response.  (Tr. 510:23-511:3.)  After Diaz reported the altercation with Ramon Martinez in October 2015, Tesla ensured that Martinez was separated from Diaz.  (Tr. 526:18-25; 527:16-19.)  And Tesla gave a final written warning and suspended Martinez without pay after learning about Martinez's racist cartoon in January 2016.  (Tr. 785:14-21.)

Diaz also testified that he made (uncorroborated) oral complaints that were not addressed, such as about Hurtado's use of the N-word and racist graffiti in the workplace, which Tesla disputed, but which the jury was entitled to believe.  (Tr. 415:1-23; 518:9-23; 524:3-20.)  Even so, the evidence at trial showed at most that Tesla missed these complaints, not that it turned a blind eye to Diaz's concerns.  Where, as here, a "defendant . . . respond[s] adequately to some conduct," this too favors a reduction in punitive damages. *See, e.g.*, *Paul*, 2009 WL 188592, at *11 (granting remittitur of both compensatory and punitive damages to $150,000 per plaintiff in § 1981 case involving co-workers' racist comments).  Tesla's repeated and good-faith remedial efforts undermine any significant award of punitive damages.

2.   Tesla's Omission Or Negligence Was Not Intentional Or Malicious

Turning to factor 5, the Ninth Circuit has long made clear that "[r]eprehensibility falls along a scale, [where] 'acts and threats of violence [are] at the top, followed by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence.'" *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1120 (9th Cir. 2008) (citation omitted), *overruled on other grounds by Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (en banc); *see Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 959 (9th Cir. 2005) (noting that on the "high side of reprehensibility" are "true threats of violence" perpetrated with "the intent to intimidate").

This case plainly falls at the lowest end of that scale, involving at most "acts of omission and mere negligence" by Tesla.  The racially harassing conduct here was perpetrated by low-level workers, including contractors over whom Tesla had limited control and did not hire directly. Importantly, this is *not* a case where any high-level supervisors or officers committed egregious discriminatory acts.  *See, e.g.*, *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003) (allowing substantial punitive damages award against corporate defendant where the president and CEO committed "intentional discrimination on the basis of race or ethnicity").

Instead, at the corporate level, Tesla and its high-level management had and enforced policies against co-workers' racial insults toward Diaz, as noted above, which counts strongly against reprehensibility warranting punitive damages.  *See, e.g.*, *Khalaf v. Ford Motor Co.*, 2019 WL 10301739, at *4-7 (E.D. Mich. Mar. 28, 2019) (granting remittitur of punitive damages from $15 million to $300,000 where Ford's corporate level policies prohibited racial/ethnic harassment directed at plaintiff by co-workers), *reversed on other grounds*, 973 F.3d 469 (6th Cir. 2020) (directing JMOL of no liability for Ford); *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 262 (S.D.N.Y. 2007) (remitting a $1.6 million punitive damages award in a racial discrimination and retaliation case to $190,000 in part because there was no finding that the defendant's "top management" or "ultimate decision maker[s]" themselves intentionally discriminated or retaliated against the plaintiff).

To be clear, any racial discrimination in the workplace is reprehensible.  But the relevant constitutional consideration here is the *degree* of reprehensibility on the part of Tesla.  Tesla as a company did not take racist actions against Diaz, and undisputedly responded to the complaints that were written (and thus corroborated).  On the jury's view of the evidence, Tesla should have done more to address Diaz's complaints, as well as conduct at the factory more broadly.  But this is not a case of intent or malice, and instead falls on the lowest rung of the reprehensibility ladder, if at all.  This factor, too, shows that the punitive damages award cannot stand.

### B.      The Punitive And Compensatory Damages Awards Are Grossly Disparate

The Ninth Circuit examines the disparity between compensation for actual harm and punitive damages award "by looking to the Supreme Court's guidelines on appropriate ratios." *Hardeman*, 997 F.3d at 974 (citing *State Farm*, 538 U.S. at 424).  As *State Farm* explains, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." 538 U.S. at 425.  "[A]n award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id*.  And "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *Id*.  Thus, as a practical matter, constitutionally permissible punitive damages can never exceed compensatory damages by a ratio or more than 9:1, can almost never exceed a ratio of 4:1, and often (as here) must be reduced to a ratio of 1:1 or 2:1 at most.

The ratio of the $130 million punitive damages award to the jury's $6.9 million compensatory damages award is more than 18:1:  But a single-digit ratio of 9:1 is effectively the absolute constitutional limit; since *State Farm*, the Ninth Circuit has never approved a punitive damages award greater than 9:1 in a case involving actual compensatory damages.  And this case is a far cry from the rare egregious cases where a 9:1 ratio was found constitutional, to punish and deter actual or threatened serious injury or death.  *See, e.g.*, *Planned Parenthood of Columbia/Willamette*, 422 F.3d at 963 (ordering remittitur of punitive damages from a 100:1 ratio to a 9:1 ratio where defendant intended to intimidate doctors who provided abortions with true threats of serious injury or death).  Nor does this case come close to the kind of intentional discrimination by high-level corporate management that supported affirmance of the 7:1 ratio in

1    *Zhang*, 339 F.3d at 1044.

2          Accordingly, the Court should reduce the punitive damages to an amount in a 1:1, 2:1 or at

3    most a 4:1, ratio to any compensatory damages left after the Court's remittitur of those damages.

4          ***1:1 ratio***.  This case warrants the reduction of punitive damages to, at most, a 1:1 ratio with

5    the post-remittitur compensatory damages.  *State Farm* itself endorsed a 1:1 ratio where there were

6    substantial compensatory damages that "already contain [a] punitive element."  538 U.S. at 426; *see*

7    *id*. at 429.  There, the plaintiffs were awarded both compensatory emotional distress damages and a

8    sizeable punitive damages award.  But the Court found that "[m]uch of the distress" underlying the

9    plaintiffs' compensatory damages "was caused by the outrage and humiliation [they] suffered at the

10   actions of [the defendant]."  *Id*. at 426.  Because it is "a major role of punitive damages to condemn

11   such conduct," the compensatory damages "likely were based on a component which was duplicated

12   in the punitive award."  *Id*.  The Court therefore reduced the punitive award to a 1:1 ratio.

13         Other similar cases confirm the appropriateness of a 1:1 ratio in cases involving outsized

14   emotional distress awards, to prevent compounding of punitives on punitives.  For example, in *Paul*,

15   a racially hostile environment case like this one (*see supra* p. 13), the district court remitted the

16   compensatory damages to $150,000 per plaintiff and then remitted the punitive damages to an equal

17   amount.  2009 WL 188592, at *8-9, *11.  Heeding *State Farm*'s caution "that if the compensatory

18   damages are substantial, a lesser ratio, 'perhaps only equal to compensatory damages, can reach the

19   outermost limit of the due process guarantee,'" the court concluded that a 1:1 ratio was appropriate

20   because it "consider[ed] $150,000 in compensatory damages to be substantial, particularly in light

21   of the fact that plaintiffs suffered no long-term effects and the damages are based on emotional

22   harm, something not easily quantified."  *Id*. at *11 (quoting *State Farm*, 538 U.S. at 425); *see also*

23   *Noyes v. Kelly Servs., Inc.*, 2008 WL 2915113, at *10-14 (E.D. Cal. July 25, 2008) (reducing $5.9

24   million punitive damages award to a 1:1 ratio to the $647,174 in compensatory damages award in

25   religious discrimination case under Title VII and California state law), *aff'd*, 349 F. App'x 185 (9th

26   Cir. 2009).

27         The Court should enforce a 1:1 ratio here for the same reasons given in *Paul*.  Diaz's $6.9

28   million compensatory award was based solely on non-economic damages for purely emotional

1    distress.  But the actual evidence at trial supported nothing close to that amount.  This disconnect

2    strongly suggests that the jury based the award on a desire to punish Tesla, rather than to compensate

3    Diaz for harm he actually suffered.  (*See supra* at pp. 16-17.)   As in *Paul*, the Court should limit

4    punitive damages to a 1:1 ratio to ensure that the punitive element is not improperly compounded.

5         ***2:1 ratio***.  Even in a truly egregious racially hostile environment case involving substantial

6    actual damages from severe medical consequences not present here, one closely relevant decision

7    applied a 2:1 ratio as the constitutional limit.  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d

8    Cir. 2014), was a case of "extreme racial harassment in the workplace" in which "[t]he plaintiff, a

9    longtime steelworker at a plant in Lackawanna, New York, endured an extraordinary and steadily

10   intensifying drumbeat of racial insults, intimidation, and degradation over a period of more than

11   three years" that "included insults, slurs, evocations of the Ku Klux Klan, statements comparing

12   black men to apes, death threats, and the placement of a noose dangling from the plaintiff's

13   automobile."  *Id.* at 146.  Despite these horrific facts, the Second Circuit held that the district court's

14   remittitur of punitive damages to a 4:1 ratio with the $1.2 million in compensatory damages was

15   required to be reduced still further to a 2:1 ratio.  *Id.* at 165-66.

16        The Second Circuit recognized in *Turley* that (as here) the underlying compensation was

17   "for intangible—and therefore immeasurable—emotional damages," and thus that "[i]mposing

18   extensive punitive damages on top of such an award would "stack[] one attempt to monetize highly

19   offensive behavior, which effort is necessarily to some extent visceral, upon another."  *Id*.  *Turley*

20   also concluded that a lower ratio was necessary "to bring the punitive damages in this case into

21   alignment with comparable awards in other cases, noting that "it appears that punitive awards for

22   workplace discrimination rarely exceed $1.5 million."  *Id.* at 166.  Accordingly, the court wrote,

23   "we conclude that a roughly 2:1 ratio of punitive damages to what, by its nature, is necessarily a

24   largely arbitrary compensatory award, constitutes the maximum allowable in these circumstances."

25   *Id.*  Here, Diaz endured much less severe conduct over a much shorter time period, so the ratio

26   should not exceed *Turley*'s 2:1.

27        ***4:1 ratio***.  The Court should, at the very most, impose a 4:1 ratio of punitive to compensatory

28   damages.  As the Supreme Court noted in *State Farm*, "an award of more than four times the amount

-23-

of compensatory damages might be close to the line of constitutional impropriety," citing the centuries-old practice of allowing "double, treble, or quadruple damages to deter and punish." *State Farm*, 538 U.S. at 425.  And since *State Farm*, the Ninth Circuit has treated the 4:1 ratio as "a good proxy for the limits of constitutionality" in cases where (as here) there are significant compensatory damages and "behavior is not particularly egregious." *Hardeman*, 997 F.3d at 975; *see id.* at 976.

*Hardeman* itself affirmed a punitive damages remittitur to a 4:1 ratio in a product liability case where the herbicide Roundup was found to have caused the plaintiff's cancer.  The Ninth Circuit reasoned that the evidence justified a damages ratio higher than 1:1 because "[e]ven though 'substantial' compensatory damages were awarded," the plaintiff suffered physical damage from cancer and the defendant had "intentionally downplayed and ignored calls to test Roundup's carcinogenic risks." *Id.* at 975.  No physical harm or intentional conduct occurred here, so a 1:1 ratio is far more appropriate.  But if 4:1 was the absolute limit in *Hardeman*, it is surely the limit here.

### C. The Punitive Damages Award Greatly Exceeds Comparable Civil Penalties

The punitive damages also should be reduced because they grossly exceed comparable civil penalties.  "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996) (quotation marks and citation omitted).  Under Title VII of the Civil Rights Act of 1964, Congress has capped at **$300,000** the total amount of compensatory and punitive damages recoverable on claims for racial discrimination in employment (including racially hostile environment claims).  *See* 42 U.S.C. § 1981a(b)(3)(D).  Yet the total damages awarded here for a single violation of § 1981 against a single plaintiff is $136.9 million, more than 456 times the maximum $300,000 penalty.

Even though the Title VII damages cap does not apply to § 1981 cases, it provides "an appropriate benchmark for reviewing § 1981 damage awards." *Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005).  In *Bains*, a § 1981 case involving race-based harassment in employment, the Ninth Circuit vacated a $5 million punitive damages award, noting that the civil penalty authorized in Title VII "suggests that Congress regards $300,000 as the

highest appropriate amount in somewhat comparable cases," and concluding that "the district court must, to comply with *State Farm* . . . , reduce the amount of punitive damages to a figure somewhere between $300,000 and $450,000."  *Id.*

Since *Bains*, district courts in the Ninth Circuit have repeatedly cited the Title VII damages cap in remitting punitive damage awards from million-dollar amounts to amounts closer to $300,000.  *See, e.g.*, *Noyes*, 2008 WL 2915113, at *14 (basing remittitur of $5.9 million punitive damages award to a 1:1 ratio with $647,174 compensatory damages award in part on the fact that "the $5.9 million punitive damages award dwarfs the [$300,000] Title VII cap and the 1 to 1 ratio is more than double it"); *Paul*, 2009 WL 188592, at *11 (relying in part on the $300,000 Title VII cap in granting remittitur of a $2.75 million punitive damages award to a 1:1 ratio with the $150,000 compensatory damages remaining after the court's remittitur of that award).

The Court should reduce the punitive damages award dramatically closer to the Title VII cap of $300,000.  It would upend Congress's considered judgment if claims for racial discrimination in employment under § 1981 could result in runaway punitive damages awards far greater than the maximum damages available for employment discrimination based on race, sex, religion, sexual orientation, and national origin under Title VII—Congress's primary and direct employment antidiscrimination scheme.  Lowering the punitive damages here to closer to the Title VII cap would help avoid that incongruous result.

### D.    The Punitive Damages Award Was Improperly Premised On Tesla's Wealth

As a final reason to reduce the punitive damages award, the Supreme Court has cautioned against permitting outsized jury awards based on improper bias against big businesses.  *See State Farm*, 538 U.S. at 417 (noting that "the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses" (citation omitted)); *Gore*, 517 U.S. at 585 ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business.").  "The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award, and cannot make up for the failure of other

factors, such as reprehensibility, to constrain significantly an award that purports to punish a defendant's conduct." *Bains*, 405 F.3d at 777 (quotation marks and citation omitted).

Because the jury's massive $130 million punitive damages award bears no "'reasonable relationship' to compensatory damages," *Gore*, 517 U.S. at 580, there is a strong risk that it arose from the jury's improper consideration of Tesla's size and assets.  Indeed, as referenced above, Diaz's expert, Dr. Mahla testified solely about Tesla's corporate size and wealth as of 2019, as measured by market capitalization, assets, revenues, and cash.  (*See supra* p. 4-5.)  Dr. Mahla's testimony had no relevance to Diaz's claims, because in 2015-2016 when the events at issue occurred, Tesla was not a wealthy or profitable company (it lost about $900 million dollars in 2015 alone).  Nonetheless Diaz's attorneys argued in closing that "Tesla is one of the richest companies in the world . . . . [a]nd here we have racist conduct occurring inside of its workplace" (Tr. 921:23-25), and asked the jury to award Diaz an amount in excess of 10% of what they asserted was the cash Tesla had available in late 2019 (Tr. 924:19-925:22).

But as a matter of law, Tesla's size and assets cannot justify a punitive damages award untethered to due process limits.  Indeed, while "juries are often left to pick a number out of the sky, tethered to nothing more than the jury's emotional reaction to the misdeed of a corporation with deep pockets," courts are "obliged" to ensure that punitive damages conform to constitutional guidelines.  *Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 762 (11th Cir. 2020); *see Bains*, 405 F.3d at 777 (affirming "there are limits" to how much a jury may be "permitted to consider a defendant's assets in determining" a punitive damages award).

The same is true here.  Tesla's supposed size and wealth cannot justify a blatantly unconstitutional award of punitive damages.  Accordingly, the Court should grant JMOL or new trial/remittitur reducing the punitive damages award to within constitutional limits, which here dictate a 1:1, 2:1, or at the very outermost, a 4:1 ratio to compensatory damages after remittitur.

1

**CONCLUSION**

2

For the foregoing reasons, the Court should grant the motion.

3

4    DATED:  November 16, 2021                 QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
5

6

7                                       By_____*/s/ Kathleen M. Sullivan*_____
                                             Kathleen M. Sullivan
8                                            Daniel C. Posner
                                             QUINN EMANUEL URQUHART &
9                                            SULLIVAN, LLP
                                             865 S. Figueroa St., 10th Floor
10                                           Los Angeles, California 90017
                                             Telephone: (213) 443-3000
11                                           Facsimile: (213) 443-3100

12

13                                           *Attorneys for Defendant Tesla Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TESLA'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND REMITTITUR

**APPENDIX A**

| Case | Jury Award of Non-Economic Compensatory Damages | Remittitur | Case Type |
|---|---|---|---|
| *Miller v. Bd. of Regents of Univ. of Minn*, 402 F. Supp. 3d 568 (D. Minn. 2019) | $3,000,000 | $750,000 | Sex discrimination, retaliation |
| *Small v. N.Y. State Dep't of Corrections & Cmty. Supervision*, 2019 WL 1593923 (W.D.N.Y. Apr. 15, 2019), *aff'd*, 812 F. App'x 45 (2d Cir. 2020) | $1,550,000 | $500,000 | Sex discrimination, hostile work environment, retaliation |
| *Glenn-Davis v. City of Oakland*, 2007 WL 687486 (N.D. Cal. Mar. 5, 2007) | $1,850,000 | $400,000 | Sex discrimination |
| *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346 (3d Cir. 2001) | $1,150,000 | $375,000 | Race discrimination |
| *Alvarado v. Fed. Express Corp.*, 2008 WL 744819 (N.D. Cal. Mar. 18, 2008) | $500,000 | $300,000 | Race discrimination |
| *Morris v. BNSF Ry. Co.*, 429 F. Supp. 3d 545 (N.D. Ill. 2019) | $375,000 | $275,000 | Race discrimination |
| *Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454 (M.D. Pa. 2016) | $415,000 | $250,000 | Due process |
| *Cosby v. AutoZone, Inc.*, 2012 WL 78260 (E.D. Cal. Jan. 10, 2012), *vacated in part on other grounds*, 2012 WL 1435024 (E.D. Cal. Apr. 25, 2012) | $1,326,000 | $250,000 | Disability discrimination |
| *Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536 (2d Cir. 2020) | $2,160,000 | $250,000 | Race discrimination, hostile work environment |
| *Thompson v. Memorial Hosp. of Carbondale*, 625 F.3d 394 (7th Cir. 2010) | $500,000 | $250,000 | Race discrimination |
| *Jennings v. Town of Stratford*, 263 F. Supp. 3d 391 (D. Conn. 2017) | $1,000,000 | $230,000 | Retaliation |
| *Miniex v. Houston Hous. Auth.*, 400 F. Supp. 3d 620 (S.D. Tex. 2019) | $317,750 | $217,070 | Retaliation |
| *Clark v. City of Tucson*, 2020 WL 914524 (D. Ariz. Feb. 26, 2020) | $1,850,000 | $200,000 | Sex discrimination, retaliation |
| *Johnson v. Albertsons LLC*, 2020 WL 3604107 (W.D. Wash. July 2, 2020) | $750,000 | $200,000 | Retaliation |
| *Rosas v. Balter Sales Co. Inc.*, 2018 WL 3199253 (S.D.N.Y. June 29, 2018) | $800,000 | $180,000 | Race discrimination, hostile work environment, retaliation |
| *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280 (S.D.N.Y. 2016) | $500,000 | $150,000 | Sex discrimination, retaliation |
| *Nieves v. Municipality of Aguadilla*, 2015 WL 3932461 (D.P.R. June 26, 2015) | $3,000,000 | $150,000 | Disability discrimination, retaliation |
| *Paul v. Asbury Auto. Grp., LLC*, 2009 WL 188592 (D. Or. Jan. 23, 2009) | $2,100,000 or $1,900,000 to each plaintiff | $150,000 to each plaintiff | Race discrimination, hostile work environment |

| | | | |
|---|---|---|---|
| *Smith v. Rosebud Farmstand*, 2017 WL 3008095 (N.D. Ill. July 14, 2017) | $500,000 | $140,000 | Race and sex discrimination |
| *Barham v. Wal-Mart Stores, Inc.*, 2017 WL 3736702 (D. Conn. Aug. 30, 2017) | $550,000 | $125,000 | Retaliation |
| *MacCluskey v. Univ. of Conn. Health Ctr.*, 2017 WL 684440 (D. Conn. Feb. 21, 2017) | $200,000 | $125,000 | Sex discrimination, hostile work environment |
| *Saber v. N.Y. State Dep't of Fin. Servs.*, 2018 WL 3491695 (S.D.N.Y. July 20, 2018) | $2,500,000 | $125,000 | Race discrimination, retaliation |
| *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360 (D. Conn. 2016) | $500,000 | $125,000 | Retaliation |
| *Burns v. Nielsen*, 506 F. Supp. 3d 448 (W.D. Tex. 2020) | $125,000 | $90,000 | Disability discrimination |
| *Legg v. Ulster Cty.*, 2017 WL 3668777 (N.D.N.Y. Aug. 24, 2017) *vacated in part on other grounds*, 979 F.3d 101 (2d. Cir. 2020) | $200,000 | $75,000 | Sex discrimination, hostile work environment |
| *Pickett v. Miss. Bd. of Animal Health*, 2021 WL 3373806 (S.D. Miss. Aug. 3, 2021) | $100,000 | $75,000 | Retaliation |
| *Longfellow v. Jackson Cty.*, 2007 WL 682455 (D. Or. Feb. 28, 2007) | $360,000 | $60,000 | Retaliation |
| *Holt v. Pennsylvania*, 2015 WL 4944032 (E.D. Pa. Aug. 19, 2015), *rev'd in part on other grounds*, 683 F. App'x 151 (3d Cir. 2017) | $250,000 | $50,000 | Race discrimination, retaliation |
| *Travers v. Flight Serv. & Sys., Inc.*, 808 F.3d 525 (1st Cir. 2015) | $400,000 | $50,000 | Retaliation |
| *White v. N.Y. State Office of Children & Family Servs.*, 2021 WL 282561 (N.D.N.Y. Jan. 28, 2021) | $1,500,000 | $50,000 | Race discrimination |
| *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546 (S.D.N.Y. 2012) | $125,000 | $30,000 | Race discrimination |
| *Austin v. FL Hud Rosewood LLC*, 2018 WL 10509898 (N.D. Fla. Feb. 15, 2018) | $125,000 | $25,000 | Age discrimination, retaliation |
| *Taylor v. N.C. Dep't of Revenue*, 2015 WL 4414844 (W.D.N.C. July 20, 2015) | $225,000 | $0 | Sex discrimination |
| **AVERAGE:** | $930,417 | $188,548 | |

TESLA'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND REMITTITUR

**APPENDIX B**

| Case | Jury's Total Award | Jury's Emotional Distress Award | Jury's Punitive Award | Emotional Distress Award After Remittitur | Punitive Award After Remittitur | Total Award After Remittitur |
|---|---|---|---|---|---|---|
| *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014) | $25.32M[7] | $1.32M | $24M | $1.32M | $2.64M[8] | $3.96M |
| *Khalaf v. Ford Motor Co.*, 2019 WL 10301739 (E.D. Mich. Mar. 28, 2019)[9] | $16.7M | $100,000<br><br>Total with economic: $1.7M | $15M | $100,000<br><br>Total with economic: $300,000 | $300,000 | $600,000 |
| *Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536 (2d Cir. 2020) | $2.31M | $2.16M | $150,000 | $250,000 | $150,000 | $400,000 |
| *Paul v. Asbury Auto. Grp., LLC*, 2009 WL 188592 (D. Or. Jan. 23, 2009) | $4.65M or $4.85M to each plaintiff | $1.9M or $2.1M to each plaintiff | $2.75M to each plaintiff | $150,000 to each plaintiff | $150,000 to each plaintiff | $300,000 to each plaintiff |

[7] Excluded from the total is the $5,000 awarded against the individual defendant.

[8] The district court remitted the punitive damages award to roughly $5 million.  On appeal, the Second Circuit vacated that award as excessive and remanded, but opined that a 2:1 ratio would be the maximum constitutionally permissible.  *Turley*, 774 F.3d at 167-68.

[9] The Sixth Circuit ultimately reversed on other grounds, finding no liability against Ford for the hostile workplace at all.  *Khalaf v. Ford Motor Co.*, 973 F.3d 469 (6th Cir. 2020).

**APPENDIX C**

| Case | Jury Award of Non-Economic Compensatory Damages | Case Type |
|------|------------------------------------------------|-----------|
| *Goldstine v. FedEx Freight Inc.*, 2021 WL 952354 (W.D. Wash. Mar. 11, 2021) | $1,750,000 | Disability discrimination |
| *Turley v. ISG Lackwanna, Inc.*, 774 F.3d 140 (2d Cir. 2014) | $1,320,000 | Race discrimination, hostile work environment |
| *Arnold v. Pfizer, Inc.*, 2015 WL 268967 (D. Or. Jan. 21, 2015) | $500,000 | Disability discrimination, retaliation |
| *Kitazi v. Sellen Constr. Co.*, 2018 WL 646885 (W.D. Wash. Jan. 30, 2018) | $500,000 | Race discrimination, hostile work environment, retaliation |
| *Varlesi v. Wayne State Univ.*, 643 F. App'x 507 (6th Cir. 2016) | $500,000 | Pregnancy discrimination |
| *Wooten v. BNSF Ry. Co.*, 387 F. Supp. 3d 1078 (D. Mont. 2019) | $500,000 | Retaliation |
| *Briggs v. Temple Univ.*, 339 F. Supp. 3d 466 (E.D. Pa. 2018) | $350,000 | Age and gender discrimination, hostile work environment, retaliation |
| *Aboubaker v. Cty. of Washtenaw*, 2015 WL 1245755 (E.D. Mich. Mar. 18, 2015) | $300,000 | Race, religion, and national origin discrimination |
| *Davis v. Fla. Agency for Health Care Admin.*, 612 F. App'x 983 (11th Cir. 2015) | $300,000 | Race discrimination, hostile work environment, retaliation |
| *Lensing v. Potter*, 2015 WL 10892072 (W.D. Mich. May 11, 2015) | $300,000 | Race discrimination, retaliation |
| *Velez v. Roche*, 335 F. Supp. 2d 1022 (N.D. Cal. 2004) | $300,000[10] | Sex discrimination, hostile work environment |
| *Clemens v. Qwest Corp.*, 2015 WL 13686810 (W.D. Wash. Feb. 10, 2015), *vacated in part on other grounds*, *Clemens v. Centurylink Inc.*, 874 F.3d 1113 (9th Cir. 2017) | $275,963 | Retaliation |
| *EEOC v. Dolgencorp, LLC*, 277 F. Supp. 3d 932 (E.D. Tenn. 2017) | $250,000 | Disability discrimination |
| *Jones v. Pa. State Police*, 794 F. App'x 177 (3d Cir. 2019) | $250,000 | Sex discrimination, hostile work environment |
| *Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112 (D. Kan. 2017) | $230,000 | Sex discrimination, hostile work environment |
| *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003) | $223,155 | Race discrimination |
| *Sanchez v. Catholic Bishop of Chi.*, 2018 WL 6192205 (N.D. Ill. Nov. 27, 2018) | $200,000 | Sex discrimination, retaliation |
| *Eisenhour v. Weber Cty.*, 2016 WL 3647855 (D. Utah July 1, 2016) | $184,444 | Sex discrimination, retaliation |
| *Hardin v. Dadlani*, 221 F. Supp. 3d 87 (D.D.C. 2016) | $175,000 | Race discrimination |
| *Burnett v. Ocean Props., Ltd.*, 422 F. Supp. 3d 400 (D. Me. 2019) | $150,000 | Disability discrimination |

---

[10]   The jury's award of $505,623 was reduced to $300,000 to reflect Title VII's statutory cap.  The district court denied further remittitur.

| | | |
|---|---|---|
| *U.S. EEOC v. CONSOL Energy, Inc.*, 2016 WL 538478 (N.D. W. Va. Feb. 9, 2016) | $150,000 | Religion discrimination |
| *Monette v. Cty of Nassau*, 2015 WL 1469982 (E.D.N.Y. Mar. 31, 2015) | $150,000 | Retaliation |
| *Idom v. Natchez-Adams Sch. Dist.*, 178 F. Supp. 3d 426 (S.D. Miss. 2016) | $100,000 | Race discrimination, hostile work environment |
| *Khalaf v. Ford Motor Co.*, 2019 WL 10301739 (E.D. Mich. Mar. 28, 2019), *rev'd on other grounds*, 973 F.3d 469 (6th Cir. 2020) | $100,000 | Race and national origin discrimination, hostile work environment, retaliation |
| *Wilhite v. Shelby Cty. Gov't*, 2015 WL 11017959 (W.D. Tenn. Dec. 28, 2015) | $85,000 | Disability discrimination |
| *Lambert v. Ackerley*, 180 F.3d 997 (9th Cir. 1999) (en banc) | $75,000 to each plaintiff | Retaliation |
| *Sheils v. Gatehouse Media, Inc.*, 2015 WL 6501203 (N.D. Ill. Oct. 27, 2015) | $60,000 | Retaliation |
| *Roberts v. United Parcel Serv., Inc.*, 115 F. Supp. 3d 344 (E.D.N.Y. 2015) | $50,000 | Sex discrimination, hostile work environment, retaliation |
| *Chandler v. Meetings & Events Int'l, Inc.*, 2016 WL 233650 (S.D. Ind. Jan. 20, 2016) | $24,530 | Age discrimination, retaliation |
| **AVERAGE:** | $322,520 | |