LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
NAVRUZ AVLONI (SBN 279556)
navruz@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:     (415)-453-7352
Facsimile:     (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
**ALEXANDER MORRISON + FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:     (310) 394-0888
Facsimile:     (310) 394-0811

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
JONATHAN ROSENTHAL (SBN 329638)
jrosenthal@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Facsimile:     (415) 362-8064

Attorneys for Plaintiff OWEN DIAZ

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON,<br><br>             Plaintiffs,<br><br>    v.<br><br>TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive,<br><br>             Defendants. | Case No. 3:17-cv-06748-WHO<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT TESLA, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 50 AND 59**<br><br>Hearing Date: January 19, 2022<br>Time: 2:00 p.m.<br>Place: Courtroom 2, 17th Floor<br>The Hon. William H. Orrick |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.       FACTUAL BACKGROUND ..................................................................................... 2

III.     LEGAL STANDARDS............................................................................................... 6

  A.    Judgment as a Matter of Law (Fed. R. Civ. P. 50(b)) ............................................. 6

  B.    Motion for New Trial (Fed. R. Civ. P. 59(a)) ........................................................ 7

  C.    Motion for Remittitur (Fed. R. Civ. P. 59(a)) ........................................................ 7

IV.     LEGAL ARGUMENT ............................................................................................. 8

  A.    Tesla violated Mr. Diaz's rights under Section 1981.................................................. 8

    1.    Tesla's severe misconduct created a hostile work environment. .................................... 8

    2.    Tesla interfered with Mr. Diaz's contract rights. ......................................................... 10

      i.    Mr. Diaz worked for Tesla. ...................................................................................... 10

      ii.    Mr. Diaz also has rights as a third-party beneficiary.................................................. 11

  B.    Tesla is liable for negligent supervision........................................................................ 12

  C.    Tesla is not entitled to a new trial or remittitur on compensatory damages................... 13

    1.    Substantial evidence supports the jury's finding that Mr. Diaz suffered severe emotional distress, including loss of enjoyment of life. .......................................................... 16

      i.    Dr. Reading's unrebutted testimony firmly established significant emotional distress harm to Mr. Diaz......................................................................................................... 17

      ii.    Testimony from Mr. Diaz and his daughter establish that Tesla's hostile work environment had a profound, lifelong negative impact on Mr. Diaz................................. 18

      iii.    Tesla's hostile work environment will continue to have life-changing impacts. ... 19

    2.    The compensatory damages award was properly limited to harm caused by Tesla. ..... 20

    3.    There is no evidence that the compensatory damages are "improperly punitive."........ 21

-ii-

Case No. 3:17-cv-06748-WHO

D.    The jury's award of punitive damages is consistent with due process ........................... 23

　　1.    Tesla's conduct was shockingly reprehensible. ............................................. 24

　　2.    The 18:1 ratio between punitive and compensatory damages is warranted given the
reprehensibility of Tesla's ongoing conduct. ........................................................... 31

　　3.    Section 1981 has no damages cap. .................................................................. 33

　　4.    The jury did not improperly consider Tesla's wealth. ................................... 33

　　5.    Less drastic remedies would not achieve the goal of deterrence. ................. 34

V.    CONCLUSION .................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayissi-Etoh v. Fannie Mae,*
  712 F.3d 572 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ....................................9

*Bains LLC v. Arco Prod. Co.,*
  405 F.3d 764 (9th Cir. 2005) ..........................................................25, 32, 33, 34

*Balsam v. Tucows Inc.,*
  627 F.3d 1158 (9th Cir. 2010) ............................................................................12

*Beville v. Ford Motor Co.,*
  319 F. App'x. 525 (9th Cir. 2009) ......................................................................21

*BMW of N. Am., Inc. v. Gore,*
  517 U.S. 559 (1996)............................................................................ *passim*

*Clark v. City of Tucson,*
  2020 WL 914524 (D. Ariz. Feb. 26, 2020)..........................................................23

*Cummings v. Cenergy Int'l Servs., LLC,*
  258 F. Supp. 3d 1097 (E.D. Cal. 2017)................................................................12

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey,*
  95 F.3d 1422 (9th Cir. 1996) .......................................................................7, 23

*Domino's Pizza, Inc. v. McDonald,*
  546 U.S. 470 (2006)............................................................................................8

*EEOC v. Global Horizons, Inc.,*
  915 F.3d 631 (9th Cir. 2019) ............................................................................11

*EEOC v. Go Daddy Software, Inc.,*
  581 F.3d 951 (9th Cir. 2009) ..............................................................................7

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.,*
  762 F.3d 829 (9th Cir. 2014) ..............................................................................7

*In re Exxon Valdez,*
  270 F.3d 1215 (9th Cir. 2001) ............................................................................7

*Flores v. City of Westminster,*
  873 F.3d 739 (9th Cir. 2017) ..................................................................25, 32, 33

*Freund v. Nycomed Amersham,*
  347 F.3d 752 (9th Cir. 2003) .........................................................................7, 8

-iv-

*Hardeman v. Monsanto Co.,*
   997 F.3d 941 (9th Cir. 2021) ................................................................25, 28, 32

*Harper v. City of Los Angeles,*
   533 F.3d 1010 (9th Cir. 2008) .................................................................7, 14, 15

*Hetzel v. Prince William County, Va.,*
   523 U.S. 208 (1998) ..........................................................................................15

*Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.,*
   2017 WL 3382316 (N.D. Cal. Aug. 7, 2017), *aff'd*, 743 F. App'x 843 (9th Cir. 2018) ..................................................................................................................15

*Janes v. Wal-Mart Stores Inc.,*
   279 F.3d 883 (9th Cir. 2002) ..............................................................................7

*Johnson v. Paradise Valley Sch. Dist.,*
   251 F.3d 1222 (9th Cir. 2001) ............................................................................7

*Johnson v. Riverside Healthcare Sys., LP,*
   534 F.3d 1116 (9th Cir. 2008) .........................................................................8, 9

*Kingston v. Int.'l Business Machines Corp.,*
   2021 WL 2662216 (E.D. Wash. June 29, 2021) ..............................................14

*Lambert v. Ackerley,*
   180 F.3d 997 (9th Cir. 1999) (en banc) ...........................................................14

*Landes Constr. Co. v. Royal Bank of Can.,*
   833 F.2d 1365 (9th Cir. 1987) ............................................................................7

*Longfellow v. Jackson County,*
   2007 WL 682455 (D. Or. Feb. 28, 2007)........................................................23

*McGinest v. GTE Service Corp.,*
   360 F.3d 1103 (9th Cir. 2004) ..........................................................................27

*Monteiro v. Tempe Union H.S. Dist.,*
   158 F.3d 1022 (9th Cir. 1998) ............................................................................9

*Oracle Corp. v. SAP AG,*
   765 F.3d 1081 (9th Cir. 2014) ......................................................................7, 15

*Pavao v. Pagay,*
   307 F.3d 915 (9th Cir. 2002) ..............................................................................6

*Pavon v. Swift Transp. Co.,*
   192 F.3d 902 (9th Cir. 1999) ......................................................................25, 30

*Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*,
   422 F.3d 949 (9th Cir. 2005) ........................................................................32

*Roby v. McKesson Corp.*,
   47 Cal. 4th 686 (2009) ................................................................................26

*Rodgers v. Western-Southern Life Ins. Co.*,
   12 F.3d 668 (7th Cir. 1993) .........................................................................27

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) ..........................................................................7

*State Farm Mutual Automobile Ass'n v. Campbell*,
   535 U.S. 408 (2003)...........................................................................*passim*

*Swinton v. Potomac Corp.*,
   270 F.3d 794 (9th Cir. 2001) .............................................................*passim*

*Union Oil Co. v. Terrible Herbst, Inc.*,
   331 F.3d 735 (9th Cir. 2003) ..........................................................................7

*United States v. 4.0 Acres of Land*,
   175 F.3d 1133 (9th Cir. 1999) .........................................................................7

*Watson v. City of San Jose*,
   800 F.3d 1135 (9th Cir. 2015) ......................................................................20

*Weeks v. Angelone*,
   528 U.S. 225 (2000)......................................................................................21

*Williams v. Gaye*,
   895 F.3d 1106 (9th Cir. 2018) .........................................................................7

*Yowan Yang v. ActioNet, Inc.*,
   2017 WL 2117028 (C.D. Cal. Jan. 23, 2017) ...............................................26

*Zhang v. Am. Gem Seafoods, Inc.*,
   339 F.3d 1020 (9th Cir. 2003) ...........................................................*passim*

**Statutes**

42 U.S.C. § 1981.................................................................................*passim*

42 U.S.C. § 1981(b): (1) .....................................................................................8

42 U.S.C. § 1981a(b)(4) ...................................................................................33

**Rules and Regulations**

Fed. R. Civ. P. 35 ................................................................................................16

Fed. R. Civ. P. 50 ..................................................................................................6

Fed. R. Civ. P. 50(a) ............................................................................7, 8, 13, 24

Fed. R. Civ. P. 50(b) .........................................................................................6, 7

Fed. R. Civ. P. 59(a) ..............................................................................................7

**Other Authorities**

*Extensive Data Show Punishing Reach of Racism for Black Boys*, New York
    Times (March 19, 2018), available at
    https://www.nytimes.com/interactive/2018/03/19/upshot/race-class-white-and-
    black-men.html ................................................................................................27

## I.       INTRODUCTION

Tesla continues to insist, as it did throughout trial, that it did nothing wrong. According to Tesla, it owed no statutory or common law duties to Owen Diaz because it hired him through a staffing agency. Under Tesla's retelling, it was completely unaware that Mr. Diaz had orally complained about being called "n****r" by two supervisors more than 60 times or that he had repeatedly complained about a near-daily barrage of humiliating race-based invective and abusive conduct. Even now, Tesla claims it strictly enforced its workplace policies prohibiting racial harassment and discrimination, despite overwhelming evidence to the contrary. Tesla also insists Mr. Diaz was a "happy" worker, at least until the end, and that any physical harm or emotional distress he may have suffered was "mild," "short-lived," and "garden variety."

The jury emphatically disagreed with Tesla's self-serving, counterfactual fantasy, which was no more persuasive at trial than it is now.

Tesla does not challenge this Court's evidentiary or pre-trial rulings. It accepted all jury instructions without objection. It does not argue that it was prevented from presenting a defense or that Mr. Diaz's counsel overreached. Except for a few throwaway arguments about the elements of Mr. Diaz's Section 1981 claim (most of which Tesla has waived) and a due process argument that misstates Ninth Circuit law, Tesla mostly argues that the jury got it wrong and that more enlightened jurors would have disregarded the mountain of credible evidence and accepted Tesla's distorted version of the truth. The Court heard the same evidence, read the same documents, and evaluated the credibility of the same witnesses as the jury, which properly applied the law to the facts in evidence.

To be sure, an award of $130 million in punitive damages is substantial, notwithstanding Tesla's riches. But the Court properly instructed the jury on the governing standards without objection and the jury had ample grounds for concluding, after five days of testimony about Tesla's festering workplace culture and its ostrich-like response to Owen Diaz's pleas for help, that Tesla's conduct was malicious and reprehensible. The jury saw through Tesla's efforts to redirect blame for the almost-daily barrage of harassment onto Mr. Diaz's co-workers, onto his son Demetric Di-az ("Demetric"), onto the staffing agencies through which Tesla operated, and onto Mr. Diaz

himself, while pretending to have no idea any harassment was happening. That is not plausible deniability, it is deliberate falsification. Unless the Court holds Tesla fully accountable for its conduct, including by accepting the jury's deterrent punitive damages award, Tesla will continue to engage in the same reprehensible conduct.

Tesla's post-trial briefing shows that it has still not learned its lesson. Tesla continues to present the same tired excuses, denials, and blame-shifting that it did throughout trial, while offering nothing of substance to warrant rejection of the jury's carefully considered special verdict. For these reasons and as further set forth below, the Court should deny Tesla's motion.

## II.    FACTUAL BACKGROUND

Owen Diaz is a 53-year-old Black man. Before he began working at Tesla, Mr. Diaz was known to be confident and proud. Tr. 613:6-10. His daughter described him as a "typical dad" who "was always joking." Tr. 624:15-16. He was not someone who cried. Tr. 484:8-10. Expert psychologist Dr. Reading testified that before working at Tesla, Mr. Diaz had no psychological issues or difficulties. Tr. 587:9-10.

Mr. Diaz was thrilled to have the opportunity to work for Tesla, beginning in June 2015. Tr. 385:15-386:6, 387:8-10, 394:20-395:7; Ex. 62. He thought it would be a great job and was excited to join a team of workers dedicated "to mak[ing] the earth a little bit better for the next generation." Tr. 502:10-18. But the reality was as ugly as could be. As Mr. Diaz quickly learned, Tesla's Fremont factory was a hotbed of unrelenting racial hostility, which Tesla condoned at its highest levels. Only two days into the job, Mr. Diaz saw the racial slur "n****r" scrawled throughout the bathroom stalls. Tr. 401:2-12. Those detestable epithets remained throughout his employment, as did equally demeaning graffiti such as swastikas and statements like "Death to all [n****rs]." Tr. 403:5-404:9. Mr. Diaz complained about this graffiti on multiple occasions. But Tesla did nothing about it, as Mr. Diaz was reminded every time he needed to relieve himself. Tr. 401:17-25. Tesla now asks the Court to disbelieve this evidence, claiming it had a strict policy of requiring HR staff to photograph and report all offensive graffiti. Mot. at 4; Tr. 163:2-15. There is no evidence in the record of that supposed policy or its enforcement.

Within about a month after Mr. Diaz started, for a period of at least several weeks, Mr.

-2-

Diaz's co-worker Judy Timbreza repeatedly assailed Mr. Diaz in Spanish with such epithets as "porch monkey" (in Spanish) and "n****r" (in Spanish and English), making Mr. Diaz feel "less than human." Tr. 405:5-407:19. Diaz complained to supervisor Tom Kawasaki, who spoke to witnesses who confirmed Timbreza's use of these slurs. Tr. 78:13-79:24, 408:17-409:16. Tesla then put Ed Romero, a higher-level supervisor, in charge of the investigation.

At trial, Romero initially insisted he had personally investigated but was unable to find a corroborating witness. Tr. 137:8-138:6. On cross, Romero acknowledged having previously admitted *not* conducting an investigation. Tr. 139:3-17; *see* Ex. 41. His own emails confirmed that "Mr. Owen [sic] says this has happened before." Ex. 39; *see* Tr. 137:8-138:6, 139:3-17, 141:8-21. Romero rejected Mr. Diaz's complaint on the false basis that it was uncorroborated, Ex. 39, even though he later admitted that Kawasaki had confirmed Timbreza's racist slurs, Tr. 141:8-21. While Romero claims to have given Timbreza a warning (which the jury never saw) for "kidding around," such a warning would have dramatically understated the severity of Timbreza's abuse and sent a clear message that such conduct was condoned, not condemned. Ex. 39.

Mr. Diaz's co-workers joined in the racial abuse, with 8-10 of them repeatedly calling Mr. Diaz "n****r," again without intervention from Tesla management. Tr. 513:4-10. It was not just co-workers. Beginning in August 2015, Tesla supervisor Robert Hurtado started calling Mr. Diaz "n****r" and "boy," not once, not twice, but more than 30 times, sometimes coupled with demeaning race-based comments, like "You n****rs are lazy." Tr. 414:15-415:3. Supervisor Ramon Martinez called Mr. Diaz "n****r" to his face more than 30 times. Tr. 416:23-418:11. Five witnesses corroborated Mr. Diaz's testimony about widespread use of "n****r" at Tesla. Wheeler, Jackson, and Kawasaki testified that they heard "n****r" almost every day. Tr. 424:18-425:7, 224:25-225:17, 99:4-23. Martinez admitted that "n****r" was *still* being used up to the date of trial. Tr. 787:6-20. Kawasaki confirmed that Martinez regularly used the Spanish words "mayate" and "chongo." Tr. 98:14-99:3. One day, when Mr. Diaz was bringing lunch to his son Demetric—who worked in a different part of the factory (where Mr. Diaz thought his son would be safe from abuse—Mr. Diaz witnessed Demetric's white supervisor yelling at him, "I can't stand all you [fucking] [n****rs]." Tr. 419:18-24. Demetric later complained, but Tesla did

nothing. Ex. 137 at 162:2-10. Mr. Diaz testified that this gutting event "broke me and I think my son." Tr. 420:1. According to Demetric, "that's the first time I seen my father, like, really feel like he couldn't do anything for me. Like, he didn't know what to do." Ex. 137 at 166:1-3. Dr. Reading testified that Mr. Diaz's inability to protect his son from such racist abuse led to a permanent break in their relationship. Tr. 585:24-586:4.[1]

Tesla asks this Court to ignore the evidence, insisting it was only aware of three complaints of harassment from Mr. Diaz (which is three too many). Yet the record shows Mr. Diaz complained to Romero about the restroom graffiti and use of racial slurs on many occasions (and complained as many as seven times about Hurtado, Martinez, and co-workers calling him "n****r"). Tr. 511:17-24, 512:11-17. No one in a position of responsibility at Tesla took corrective action, Ex. 240, 272, Ex. 137 at 162:2-7, Tr. 433:24-434:16, Ex. 138 at 85:5-9, which heightened Mr. Diaz's sense of helplessness while emboldening his harassers. Romero insisted he did not know of any complaints of racial taunting—until the jury learned that Romero had emailed Tesla's liaison at nextSource (Wayne Jackson) in December 2015, copying Tesla's HR Department and its custodial program manager, Victor Quintero, acknowledging that Romero had received complaints about use of the word "n****r" in the area near the elevators (where Mr. Diaz was stationed). Ex. 106.

Mr. Diaz found his supervisors' racial abuse dehumanizing, describing Hurtado's reference

---

[1] Mr. Diaz was not the only Black worker at Tesla to experience racial harassment. Michael Wheeler corroborated Mr. Diaz's experiences by describing two similar instances. In one, a subordinate called Wheeler "n****r," yet supervisors Romero, Quintero, and Martinez took no action but instead promoted the harasser. Tr. 431:10-432:9. In the other, a co-worker placed feces on the seat of Wheeler's cart. Tr. 432:10-21. Wheeler complained to Quintero and Martinez and demanded that Tesla investigate by checking the security cameras. Tr. 432:11-433:10. Tesla's security staff responded that the culprit was not visible on the video, but at least two security cameras were focused on the area. Tr. 433:11-22. To Wheeler's knowledge, no action was taken in response to his complaint. Tr. 433:24-434:12. Like Mr. Diaz, Wheeler also reported seeing swastikas in the bathrooms and tattooed on a co-worker's forehead. Tr. 426:16-427:15.

The only witnesses who denied that racial harassment and the word "n****r" were rife at Tesla were three former Tesla managers: Quintero, Romero, and DeLaGrande. Tr. 162:7-21, 347:22-348:1, 750:4-10. Quintero and Romero were directly impeached by Exhibit 106, the e-mail Romero copied to Quintero that described a previous complaint about the use of the word "n****r"—and of course, Romero was impeached multiple times. *See supra* at 3. The jury was free to reject all testimony from these impeached witnesses.

---

to Mr. Diaz as "boy"—"a term that slave masters used to use against black people to let them know that they were [the slaveowners'] property"—even though "I'm a grown man." Tr. 415:4-9. Dr. Reading testified that use of racial slurs in the workplace creates a high risk of psychiatric injury, because they can erase a victim's identity and carry "connotations of violence historically and also in the present context." Tr. 584:7-585:2. The supervisors' use of slurs heightened these negative impacts and deepened Mr. Diaz's "sense of hopelessness." Mr. Diaz could not stop the harassment because his Tesla supervisors were among the worst offenders. Tr. 585:5-10; Ex. 39.

In October 2015, Ramon Martinez's harassment of Mr. Diaz turned physical. After Martinez overheard the end of a work-related conversation between Mr. Diaz and new hire Rothaj Foster, Martinez aggressively rushed toward Mr. Diaz, cornering him inside the elevator, screaming racial slurs and yelling "[n****rs] aren't shit," and bringing his balled-up fists within inches of Mr. Diaz's face. Tr. 450:6-452:11, 513:19-25. Backed up against a wall, Mr. Diaz was forced to climb over a piece of equipment to avoid being hit. Tr. 452:1-4. Martinez did not back down until Mr. Diaz pointed to the elevator's surveillance camera system recording their encounter. Tr. 452:8-11. Mr. Diaz promptly complained that Martinez had violently assaulted him, telling supervisor Romero, "I don't feel safe around [Martinez] now… I don't need any problems. I just want to do my job," and identifying Rothaj Foster as a witness. Ex. 235. Martinez pre-emptively complained that *Mr. Diaz* had acted unprofessionally—ironically, one of the few complaints that Tesla actually investigated. Ex. 49. For four days, Tesla ignored Mr. Diaz's complaint (in distinct contrast to its quick response to Martinez's complaint *against* Mr. Diaz), until a member of the HR Department acknowledged Mr. Diaz's complaint only to conclude that "we do not need to do any formal investigation" because it was a "he-said, she-said" situation. Exs. 31, 76. No one interviewed eyewitness Rothaj Foster or reviewed the surveillance video. Tr. 232:10-25; Ex. 76 at 1. Despite Martinez's clear violation of Tesla's purported workplace safety and anti-discrimination policies, Romero issued a mere verbal warning for inadequate professionalism to Martinez *and* Mr. Diaz. Tr. 231:8-15.

Martinez was not done harassing Mr. Diaz. In January 2016, Martinez drew a racist effigy and left it for Mr. Diaz in front of the elevator doors. Tr. 456:18-457:6, 458:2-19; Ex. 1. Mr. Diaz

immediately recognized the cartoon and its racist message. His "stomach dropped" as though someone had kicked him. Tr. 459:19-25. Martinez acknowledged that his effigy was a rendition of "Inki the Caveman," a midcentury racist caricature that Warner Brothers pulled from television in the 1950s as too racist, in which the principal character chased "after fried chicken and was a buffoon running around saying 'mammy' and 'master.'" Tr. 775:6-14, 459:19-460:4, 796:10-797:11, 799:3-12; Ex. 133.

Mr. Diaz again complained. Ex. 33. Recognizing the seriousness of this offense, nextSource manager Wayne Jackson recommended that Martinez be fired. Tr. 249:24-250:15. Tesla manager Victor Quintero rejected that recommendation and decided to issue just a written warning, although he eventually imposed a three-day suspension after Jackson insisted on more serious discipline. Tr. 250:16-251:24; Ex. 272 at 2; Ex. 287 at 1. Soon, Martinez was back on the job; but again, there is no evidence any warning was actually given. Tr. 341:16-342:1. Moreover, Quintero decided against more severe discipline without even waiting for results of an investigation. *See* Ex. 272 at 1–2 (discipline determined Jan. 22), Ex. 287 at 1 (investigation completed Jan. 25). Martinez claimed to have apologized to Mr. Diaz, but what he said was, "You people [i.e. Black people] can't take a joke." Tr. 462:15-23, 431:3-7.

In February 2016, Mr. Diaz was near the breaking point. When supervisor Hurtado resumed his racist invectives, Mr. Diaz complained to Tesla manager Joyce DeLaGrande. Tr. 467:12-468:3. This time, Mr. Diaz's complaint was not ignored, but it completely backfired. DeLaGrande listened to Mr. Diaz's detailed narrative of racial abuse but decided not to investigate. Instead, she asked Romero to fire Mr. Diaz for being "unprofessional"—an outrageous response to an employee's efforts to protect his dignity and emotional health by complaining about racial harassment. Ex. 303. Shortly thereafter, Mr. Diaz requested bereavement leave and then realized he could not bring himself to return to the harassing atmosphere at Tesla. Tr. 468:5-14.

## III.   LEGAL STANDARDS

### A.  Judgment as a Matter of Law (Fed. R. Civ. P. 50(b))

A court may only grant a Rule 50 motion where "the evidence … permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307

F.3d 915, 918 (9th Cir. 2002). The court must view all evidence in the light most favorable to the nonmovant. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008). "A jury's verdict must be upheld if it is supported by substantial evidence" or adequate evidence to support its conclusion, even if the evidence also supports a conflicting inference. *Johnson v. Paradise Valley Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).

A Rule 50(b) motion is not a "freestanding motion," but a renewed Rule 50(a) motion. *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Thus, a "party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003); *Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 888 (9th Cir. 2002).

**B. Motion for New Trial (Fed. R. Civ. P. 59(a))**

A court may grant a new trial under Rule 59(a) "if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999). It "may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001); *see also Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371–72 (9th Cir. 1987); *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). When reviewing a motion for a new trial, "[i]t is not the court's place to substitute [its] evaluations for those of the jurors." *Union Oil Co. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003).

**C. Motion for Remittitur (Fed. R. Civ. P. 59(a))**

Generally, a court reviews a jury's damage award for substantial evidence, *see In re Exxon Valdez*, 270 F.3d 1215, 1247-48 (9th Cir. 2001), and must give "great deference" to the jury's determination of damages. *Williams v. Gaye*, 895 F.3d 1106, 1128 (9th Cir. 2018) (cleaned up). The court "must uphold the jury's finding unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). Any remittitur "must reflect the maximum amount sustainable by proof." *Oracle Corp. v. SAP AG*, 765 F.3d

1081, 1093-94 (9th Cir. 2014).

## IV.   <u>LEGAL ARGUMENT</u>

### A.  Tesla violated Mr. Diaz's rights under Section 1981.

The Civil Rights Act of 1866, 42 U.S.C. § 1981, protects the equal right of "[a]ll persons" to "make and enforce contracts" without regard to race. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006). The jury found that Tesla violated Mr. Diaz's rights under Section 1981, by (1) subjecting him to a racially hostile work environment, *see* Verdict Form Qs. 1, 3A, 3B, 4; and (2) failing to prevent his racial harassment, *see* Verdict Form Q. 5. The jury found that Tesla was liable for the hostile environment caused by Mr. Diaz's supervisors, *see* Verdict Form Q. 3A, and by Mr. Diaz's co-workers, *see* Verdict Form Q. 3B. The jury also determined that two contractual relationships existed for purposes of Section 1981, *see* 42 U.S.C. § 1981(b): (1) Tesla's employment relationship with Mr. Diaz, *see* Verdict Form Q. 2; and (2) Tesla's contracts with its staffing agencies, to which Mr. Diaz was a third-party beneficiary, *see* Verdict Form Q. 4.

Tesla contends that the jury got it wrong, because (1) its misconduct was not severe and (2) it had no contract with Mr. Diaz. But there was overwhelming evidence that Tesla's supervisors and employees viciously harassed and intimidated Mr. Diaz for months, while Tesla did nothing about it. And Tesla offers no new argument to support its no-contract theory, which was rejected on summary judgment, rejected at the Rule 50(a) stage, and rejected by the jury.

### 1.   <u>Tesla's severe misconduct created a hostile work environment.</u>

Tesla failed to raise its first argument—that its misconduct was not sufficiently severe to support a finding of Section 1981 liability—in its Rule 50(a) motion. *See* Mot. at 6–7. That is why it only seeks a new trial (not JMOL) on this ground. *Id.* at 7; *Freund*, 347 F.3d at 761.

To prevail on a Section 1981 hostile work environment claim, a plaintiff must show that (1) he was subjected to offensive conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the terms and conditions of his employment. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008); Jury Ins. No. 26. Tesla now concedes that Mr. Diaz was subjected to offensive and unwelcome racial harassment but insists that the "great weight of the evidence" shows its misconduct was not so

severe as to affect Mr. Diaz's job conditions. Mot. at 7. That could hardly be more incorrect.

Jury Instruction No. 27 defined "severe or pervasive" misconduct and required the jury to "consider all the circumstances" in determining whether "a reasonable person who was subjected to the harassing conduct would find that the conduct so altered working conditions as to make it more difficult to do the job." *Accord Johnson*, 534 F.3d at 1122. While even a single incident would be sufficient to meet this burden, *see* Jury Ins. No. 27, the jury heard far more than that. Witness after witness confirmed that Tesla's factory was a festering breeding ground for racial hostility. Supervisors and employees alike used the most disgusting racial slurs imaginable against Black employees like Mr. Diaz. Tesla management responded with nothing more than an occasional slap on the wrist.

Mr. Diaz was subjected to egregious verbal abuse beginning on his second day, when co-worker Judy Timbreza started calling him "n****r" and "porch monkey," first in Spanish, Tr. 405:5-407:19, and then when he complained, in English too. Tr. 407:1-408:1. Eight to ten other co-workers also started calling Mr. Diaz "n****r," Tr. 513:4-10, and direct supervisors Martinez and Hurtado called him "n****r" over 60 times. Tr. 414:15-415:3, 416:23-417:13.

The word "n****r" is not a mere "offensive utterance." The Ninth Circuit has stated that "n****r" is "perhaps the most offensive and inflammatory racial slur in English, … a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (quoting *Merriam–Webster's Collegiate Dictionary* 784 (10th ed. 1993)), *see also Monteiro v. Tempe Union H.S. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998) (describing "n****r" as "the most noxious racial epithet in the contemporary American lexicon."). The word "sums up … all the bitter years of insult and struggle in America, [is] pure anathema to African-Americans, and [is] probably the most offensive word in English." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (cleaned up). Dr. Reading observed that slurs like "n****r" are particularly damaging in the workplace given the amount of time employees must spend at work, the economic forces that require employees to remain under abusive work conditions, and the workers' reliance on their *employers* for protection from harassment. Tr. 584:7-585:4.

The racist conduct of Tesla's supervisors was not limited to that epithet. Hurtado called

Mr. Diaz "boy," while Martinez told him to "Go back to Africa" and left Mr. Diaz a racist caricature in the workplace. Tr. 415:4-18, 416:24-417:3, 451:16-25, 461:12-462:9. Mr. Diaz also continuously experienced racist graffiti in the bathroom, including "n****r" and phrases like "Death to all [n****rs]." Tr. 401:2-12, 403:5-404:2. Nor was the abuse purely verbal: as the jury heard, Martinez joined racist epithets with physical threats, leading Mr. Diaz to fear for his safety. *See supra* at 5. The harassment made Mr. Diaz's job harder and his life more bleak. Tr. 575:6-16.

Tesla seeks to rewrite reality, asking this Court to believe that the racial harassment of Owen Diaz "was never condoned by Tesla" and that Tesla took appropriate "disciplinary action in response to all of the incidents" of which it was aware. Mot. at 7. The truth—that Tesla willfully and maliciously ignored the extensive evidence of pervasive harassment of Mr. Diaz—is likely one of the reasons the jury imposed substantial punitive damages. The jury saw Tesla's Anti-Handbook Handbook with its joking reference to racist harassment as "stupid stuff." It heard many witnesses testify that Tesla repeatedly ignored complaints of harassment. It knew that Tesla issued minimal discipline, if any, to serial harassers—even after a physical assault. *See supra* at 4–5. It also knew that Tesla supervisors falsely denied having received complaints, quashed investigations without making even token efforts to question witnesses or review security video, and were impeached by their own emails. *See supra* at 3–5. All of this constitutes severe misconduct.

### 2. Tesla interfered with Mr. Diaz's contract rights.

Tesla also contends that the jury erred in holding it liable under Section 1981 because it had no contractual relationship with Mr. Diaz. The Court has repeatedly rejected Tesla's argument that Mr. Diaz had no Section 1981-protected contract rights, and the properly instructed jury had ample basis for concluding that Mr. Diaz had such rights, both as a Tesla employee (on a joint-employer theory) and as a third-party beneficiary of Tesla's staffing agency contracts.

#### i. *Mr. Diaz worked for Tesla.*

The Court instructed the jury that Mr. Diaz could satisfy Section 1981's contract-interference requirement by establishing either that he was a Tesla employee, Jury Ins. Nos. 29, 32, or that he "gained rights or was a beneficiary" under a Tesla contract, Jury Ins. No. 37. By answering "yes" to Verdict Form Qs. 3A, 3B, and 4, the jury concluded that Mr. Diaz had met his

burden. Considerable evidence in the record supports that finding, under both theories.

First, the "Joint Employment" instruction listed the relevant factors for determining whether Tesla (along with one or more staffing agencies) was Mr. Diaz's "employer," emphasizing that "the primary consideration" was "the extent of control that [Tesla] may exercise over the details of the plaintiff's work." Jury Ins. No. 24; *accord EEOC v. Global Horizons, Inc.*, 915 F.3d 631, 638–39 (9th Cir. 2019). nextSources's McGinn testified about this. Ex. 136 at 13-20, 99. The jury found that Tesla was Mr. Diaz's joint "employer" under this test. Verdict Form Q. 2.

This finding should not be surprising, because Tesla exercised the same control over Mr. Diaz that it exercised over its "own" employees. Mr. Diaz worked at Tesla's direction, in Tesla's factory, for Tesla's benefit. Tesla trained him in safety and forklift certification. Tr. 394:2-19. Tesla provided his protective equipment and tools, and its supervisors directed his work and assigned him to different positions. Tr. 395:10-396:1, 398:24-399:22. Tesla also directed its staffing agencies to promote him and give him raises. Ex. 222; Ex. 293; Tr. 401:17-25. Further, Tesla set Mr. Diaz's hours on a schedule that mirrored Tesla's "own" employees' schedules, Tr. 400:2-16, Tesla also assigned him to perform work that was a "key part" of its car manufacturing business, Tr. 94:4-7, and critically, Tesla had the power to fire Mr. Diaz and was about to do so before he quit. *See supra* at 6. While CitiStaff may have signed Mr. Diaz's paychecks, no CitiStaff employee controlled any aspect of Mr. Diaz's day-to-day work.

Tesla argues there was no mutual consent or consideration. But Mr. Diaz agreed to perform services for Tesla, in its factory and under its control, while Tesla agreed to accept and pay for his services. *See also* Summary Judgment Order (Dkt. 144) at 17–18; JMOL Order (Dkt. 303) at 3–6. The Court's prior rulings did not "make new law." Mot. at 9. Even if they did, Tesla accepted the jury instructions and special verdict form without objection, waiving any argument that the Court misstated the law. Besides, "it makes perfect sense" that, despite Tesla's use of intermediaries, "an employment contract would exist between Diaz and Tesla too." JMOL Order at 6.

### ii.   Mr. Diaz also has rights as a third-party beneficiary.

This Court has twice ruled that Mr. Diaz also has rights under Section 1981 as a third-party beneficiary to the contract between Tesla and nextSource. *See* Order Explaining Jury Instructions

at 1-3; JMOL Order at 6–7. Nonetheless, Tesla suggests in a footnote that, because the jury determined that Tesla was Mr. Diaz's joint employer, it could not also have found Tesla liable on a third-party beneficiary theory. *See* Mot. at 8 & n.2. That is nonsense. If Tesla wanted a specific jury finding on the third-party beneficiary theory, it should have asked for modification of the Special Verdict Form, which directed the jury to determine whether "Owen Diaz prove[d] all of the elements of liability based on civil rights violations in a contractual relationship," but did *not* ask whether the jury found that a joint employment relationship *and* a third-party beneficiary relationship both existed. The jury instructions allowed the jury to adopt either or both theories of Section 1981 liability, and those theories are not mutually exclusive. *See* Verdict Form Q. 4; Jury Ins. No. 37.

Tesla also renews its argument that Mr. Diaz could not be a third-party beneficiary of its contract with nextSource because that contract includes a "no-third-party-beneficiaries" clause. This Court has previously rejected that argument, as well as Tesla's misplaced reliance on *Balsam v. Tucows Inc.*, 627 F.3d 1158 (9th Cir. 2010). *See* JMOL Motion at 6–7. Only one of Tesla's other cited cases applies the governing California law, and it does not support Tesla's assertion that circumstances and context are irrelevant to determining what weight, if any, to give a "no-third-party-beneficiary" clause. *See Cummings v. Cenergy Int'l Servs., LLC*, 258 F. Supp. 3d 1097, 1110 (E.D. Cal. 2017) ("Whether a third party is an intended beneficiary … is predicated on the parties' intent, which is gleaned from reading the contract as a whole in light of the circumstances under which it was entered."). Tesla also fails to engage with the actual trial evidence, which demonstrated for example that under its contract with nextSource, Tesla determined the pay rates for the employees placed in its factory and had "day-to-day direction and control" over those employees. *See* Ex. 222, Ex. 136 at 99:6-18. Tesla thus provides no ground for revisiting the Court's and jury's determination that Mr. Diaz enjoyed third-party contract rights.

**B. Tesla is liable for negligent supervision.**

Tesla waived its right to seek a JMOL on Mr. Diaz's California state-law negligent supervision claim by failing to raise its challenge in its previous Rule 50(a) motion; and Tesla's arguments also fail on the merits.

Substantial evidence supported the jury's finding on Verdict Form Q. 6. While Tesla contends there was no evidence that it directly "employed" Martinez, the jury had ample grounds for concluding that Tesla was Martinez's joint employer, as it was Mr. Diaz's. Martinez, like Mr. Diaz, initially worked at the Tesla factory through a staffing agency, Chartwell. Tr. 757:10-15. Kawasaki, another Chartwell contract employee, testified that Martinez was his "counterpart," Tr. 95:15-19, and that except for preparing paychecks, Chartwell did nothing to control his day-to-day duties. Tr. 67:23-68:5, 70:2-4. Kawasaki also explained that he and other Chartwell contractors "had access to the same amenities that the Tesla employees had," received safety equipment and standard operating procedures from Tesla, and that the only difference between contractors and Tesla employees was Tesla employees' ability to obtain Tesla stock. Tr. 68:20-69:4, 70:5-13, 14-16, 71:8-72:3. Moreover, Tesla reserved for itself all hiring, firing, and promotion decisions. For example, it was Tesla, through its supervisor Jaime Salazar, that made the decision to promote Kawasaki, just as it was Tesla that made the earlier decision to promote Mr. Diaz. Tr. 73:22-25. At trial, Tesla offered no rebuttal evidence regarding its joint employer status, except to assert that Chartwell handled employee payroll—which is entirely consistent with the jury's determination that Tesla and Chartwell were *joint* employers.

Tesla does not dispute that substantial evidence supports all other elements of this California law negligent supervision or retention tort. Mr. Diaz testified that Martinez called him racial slurs over 30 times. Tr. 416:23-417:13. Kawasaki corroborated Martinez's use of racial slurs. Tr. 98:14-21. Tesla ignored Mr. Diaz's verbal complaints about racial slurs, punished *Mr. Diaz* for being "unprofessional," and imposed the mildest of disciplines on Martinez for his racist effigy without ever conducting an investigation—while later hiring Martinez as its own direct employee. Tr. 692:4-18. The jury had ample basis to conclude that Tesla's retention of Martinez in the face of Mr. Diaz's repeated complaints was negligent at best and malicious at worst.

**C. Tesla is not entitled to a new trial or remittitur on compensatory damages.**

After ruling in Mr. Diaz's favor on liability, the jury awarded $4.5 million in past non-economic damages and $2.4 million in future non-economic damages. Verdict Form Qs. 7–8. Tesla claims these awards are "grossly excessive" and an "extreme outlier" compared to the

-13-

readily distinguishable decisions from other jurisdictions cited in its Appendices. Mot. at 11. But the properly instructed jury's compensatory damages award in this case is fully supported by the evidence and was well within the jury's discretion. *See Kingston v. Int.'l Business Machines Corp.,* 2021 WL 2662216 at *5 (E.D. Wash. June 29, 2021) (denying motions for JMOL, new trial, and remittitur where award of $6 million in emotional distress damages plus past and future economic loss in wrongful termination case was not "the product of passion and prejudice").[2]

A district court must uphold the jury's calculation of damages unless that amount is "grossly excessive or monstrous," clearly not supported by the evidence, or based only on speculation or guesswork. *Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999) (en banc);

---

[2] Tesla prepared three appendices that purport to present a "broad and representative" sample of "federal discrimination and/or retaliation cases," which Tesla urges as the outer bounds of a permissible damages award. Mot at 12. Tesla never explains the methodology by which it selected these supposedly "representative" cases, but they are far from representative. Tesla's cherry-picked cases are particularly easy to distinguish from this case, which involved an unrelenting nine-month barrage of despicable, race-based abuse, causing Mr. Diaz enormous emotional pain, and compounded by Tesla's persistent refusal to protect its vulnerable employee by acknowledging, investigating, and reforming a workplace that had become a vipers den of racism.

Most of Tesla's cases are from other states and circuits. Of the 33 cases in Appendix A (cases in which remittitur was granted, meaning they are the outlier cases in which a jury's verdict was least defensible), only three are from California. None of the cases in Appendix B (supposedly "comparable" workplace harassment cases) is from California. Of the 30 cases in Appendix C (cases in which a jury awarded compensatory damages), only one is from California. Moreover, many of the cases in Tesla's appendices are Title VII cases, and involve the application of Title VII's statutory $300,000 cap on damages, which significantly skews the results. Different statutes and different states' laws appropriately yield different results.

This is a Section 1981 race harassment and California negligent supervision and retention case. Tesla does not bother to explain or analogize its undifferentiated mass of "federal claims for discrimination and/or retaliation," all of which have wildly varying facts and none of which, for example, involves comparable pervasive use of word "n****r." The only Ninth Circuit Section 1981 race harassment case included by Tesla is *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003). But the *Zhang* jury *rejected* the plaintiff's hostile work environment claim.

A more relevant sampling of cases would include those in which courts upheld large compensatory damage awards, none of which Tesla includes in its appendices. *See, e.g.*, *Harper v. City of Los Angeles,* 533 F.3d 1010 (9th Cir. 2008) (affirming compensatory damages award of $5 million under 42 U.S.C. §1983, which is analogous in history and purpose to Section 1981, as both statutes were enacted in the Reconstruction era to halt widespread discrimination against former slaves, with one applying to private actors and the other to state actors, *see Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 721–24 (1989)).

*Harper*, 533 F.3d at 1028. Testimony from a plaintiff or other lay witness is sufficient to support an award of emotional distress damages. *Zhang*, 339 F.3d at 1040. Although a court may conditionally deny a new trial upon the plaintiff's willingness to accept a reduction in damages, *Hetzel v. Prince William County, Va.*, 523 U.S. 208, 211 (1998), a new trial or remittitur is only warranted where "the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *Oracle*, 765 F.3d at 1093 (cleaned up).

At the close of trial, this Court instructed the jury that any damages must be limited to the amount that Mr. Diaz proved "by a preponderance of the evidence ... will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant." Jury Ins. No. 38. The Court further instructed that in making any such determination, it could only consider the "nature and extent" of Mr. Diaz's injuries, his previous loss of enjoyment of life and the "reasonabl[y] probab[le]" future loss, his past and reasonably probable future mental and emotional suffering, and the reasonable value of necessary medical care. *Id*. The jury was cautioned to award damages based only on the evidence and *not* "upon speculation, guesswork or conjecture." *Id*. The Court had also previously instructed the jury that it could only consider the effects of Tesla's conduct on Mr. Diaz directly: "I want to remind you that this case is about Mr. Diaz and the work environment that he experienced at the Tesla factory, not what others in a different part of the factory experienced." Jury Ins. No. 5; *see also* Tr. 372:21-24.

Tesla does not contend that any aspect of these instructions was improper, that Mr. Diaz's counsel misled the jury or misstated the facts or law, or that there is any evidence of jury misconduct. Instead, Tesla asks this Court to second-guess the jury's calculation of damages—a particularly inappropriate request in a case involving exclusively noneconomic damages. *See, e.g.*, *Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017), *aff'd*, 743 F. App'x 843 (9th Cir. 2018) ("The intangible nature of [noneconomic damages] makes it difficult for any court to reach a 'firm conviction' that a jury made a mistake evaluating such questions. That is why, when evaluating intangibles such as these, courts recognize the process is a matter 'peculiarly within a jury's ken.'") (cleaned up).

In this case, the harm to Mr. Diaz was severe and unrelenting. Even harasser Martinez acknowledged that Mr. Diaz was upset by what he experienced. Tr. 777:9-16, Ex. 1. The award of compensatory damages was well within the jury's discretion and fully supported by the evidence.

1. Substantial evidence supports the jury's finding that Mr. Diaz suffered severe emotional distress, including loss of enjoyment of life.

Contrary to Tesla's self-serving revisionism, Mr. Diaz was severely impacted emotionally and physically by his experiences at Tesla. He endured a daily barrage of racist vitriol and hatred, suffering the vilest racial slurs imaginable, day in and day out. Although Tesla, as Mr. Diaz's employer, was legally obligated to protect him from on-the-job harassment, it repeatedly breached that obligation. Indeed, by deliberately ignoring his complaints and never meting out more than an occasional slap-on-the-wrist warning (if that), Tesla encouraged Mr. Diaz's harassers to double down on their racist conduct. Nine months of horror at Tesla left Mr. Diaz's mental health in shambles and his enjoyment of life—including his personal relationships with his wife, his daughter, and his son—severely damaged.

Tesla failed to rebut any of this compensatory-damage evidence. It chose not to require Mr. Diaz to submit to its own medical expert's Rule 35 evaluation. It presented no expert testimony in response to Dr. Reading. Tesla asks the Court to accept its dismissive characterization of Mr. Diaz's emotional distress as "garden-variety" and "mild and short-lived." Mot. at 13. Yet when Tesla offered those same callous characterizations to the jury, the jury emphatically rejected them, just as this Court should reject them now. *See* Tr. 957:5-17.

Tesla's motion entirely fails to discuss the loss-of-enjoyment component of Mr. Diaz's noneconomic injuries. Without objection, the Court instructed the jury that it could award damages to Mr. Diaz for "[t]he loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future." Jury Ins. No. 38. The sorts of intangible but massively consequential injuries that Mr. Diaz suffered—including damage to his marriage and ruptured relationships with his children—independently support an award in the millions of dollars. Tellingly, Tesla cites no authority for overturning the jury's calculation of these injuries.

The jury's award of $4.5 million in past non-economic damages and $2.4 million in future non-economic damages was deeply rooted in the essentially unrebutted evidentiary record, which

established Mr. Diaz's ongoing emotional pain, his fractured personal relationships, and his clearly diagnosed psychiatric injury and loss of enjoyment of life.

> i.   *Dr. Reading's unrebutted testimony firmly established significant emotional distress harm to Mr. Diaz.*

Plaintiff presented unrebutted expert testimony to substantiate the nature and extent of the emotional and physical harm he suffered due to being racially harassed at Tesla. Based on a comprehensive in-person evaluation and psychological testing, Tr. 582:23-583:21, Dr. Reading concluded that Mr. Diaz experienced "symptoms of anxiety, fearfulness at work, the spillover effects at home, [and] the denuding effects on his self-worth," sleepless nights and loss of appetite, and "depression arising from Tesla." Tr. 482:9-17, 592:4-6, 593:2-3. Dr. Reading concluded that Mr. Diaz's psychiatric injury resulted from "protracted exposure" to the "pervasive conduct" of racial abuse at Tesla. Tr. 586:23-587:7. Mr. Diaz's anxiety was "directly attributable to a situation of threat," Tr. 611:20-23, causing Mr. Diaz to "always [be] on guard [and unable to] relax," Tr. 586:5-12. Tesla did not challenge Dr. Reading's credentials or the foundation for his testimony, and it offered no rebuttal expert or evidence. Tr. 582:3-6.

Dr. Reading also identified a deep sense of helplessness arising from Mr. Diaz having been "subjected to a situation that was entirely out of his control, antithetical to his identity, his sense of self-wor[th], his view of himself as a man, as a person that gives respect and expects to receive respect." Tr. 613:21-24. This "conflict between who he considered himself and the way he was allowing himself to be treated ... embedded itself in his consciousness." Tr. 613:25-614:4. As Dr. Reading testified, being the target of racial abuse in the workplace, where the employee is captive and has no ability to protect himself (especially in a case like this, where the abuse was relentless and the employer refused to intercede) reinforced Mr. Diaz's feelings of powerlessness, "evok[ed] fear," stripped him of his identity, and rekindled "connotations of violence historically and also in the present context." Tr. 584:13-585:2.

Dr. Reading diagnosed Mr. Diaz with the "psychiatric illness of an adjustment disorder with anxiety evolving to an adjustment disorder with anxiety and depressed mood currently when I saw him in partial remission." Tr. 592:12-14. Notwithstanding the partial remission (when evaluated four years after the critical events), Dr. Reading concluded that Mr. Diaz continued to

exhibit "significant and residual symptoms," Tr. 587:3-588:3, concluding that "the events at Tesla are going to continue, in my mind, regardless of [future] treatment to color [Mr. Diaz's] mental landscape and impact him emotionally in the future. So he's not going to be the person he was prior to going to Tesla." Tr. 596:7-11. Dr. Reading continued: "[Mr. Diaz] is encumbered with exposure to depression and anxiety, and those are risk factors for the enduring effects. They can change a person because they alter the way the brain works. So treatment is necessary." Tr. 596:3-6. The record evidence thus fully supports the jury's verdict.

> ii.  *Testimony from Mr. Diaz and his daughter establish that Tesla's hostile work environment had a profound, lifelong negative impact on Mr. Diaz.*

La'Drea Jones described her father before his days at Tesla as a "typical dad" who "was always joking," "very talkative," and took a fatherly interest in comings and goings. Tr. 624:13-20. During his time at Tesla, Mr. Diaz stopped asking about her whereabouts and became moody and sad. Tr. 624:21-625:11. Before, he would invent clever nicknames for her friends and make inside jokes with them. Around September 2015, his jokes and sociability abruptly ended. Tr. 625:9-11. Ms. Jones vividly remembered an incident where her best friend visited the Diaz residence on the friend's birthday. Instead of chatting and using the friend's nickname, Mr. Diaz mumbled a cursory happy birthday and was distracted and inattentive. Tr. 625:12-626:3. Mr. Diaz went from speaking to his daughter every day to having "very vague, very minimum" conversations once or twice per week. Tr. 627:9-15. When his daughter moved to Las Vegas in early 2016, Mr. Diaz often did not answer her calls. Tr. 627:16-628:23. This was "not normal at all" for her formerly loving and caring father. Tr. 627:24-628:9.

Mr. Diaz acknowledged at trial that the harassment he experienced at Tesla disrupted his personal relationships and damaged his marriage, stating "I am embarrassed to say this, but I couldn't even perform with my wife, you know." Tr. 482:1-3, 10-11. "She needed things like every woman, and I couldn't provide that to her." Tr. 482:9-13.

The Court instructed the jury that it may award compensatory damages to Mr. Diaz for "loss of enjoyment of life experienced." Jury Ins. No. 38. Loss of conjugal intimacy between a husband and his wife, damaged relations between a father and his children, loss of the ability to be jovial and to interact comfortably with family, friends, and colleagues without being plagued by

-18-

self-doubt and anxiety—all deprive a man of "enjoyment of life." The jury had ample discretion to award substantial damages for these past, current, and future intrusions on Mr. Diaz's ability to enjoy the life he had before Tesla destroyed him.

Before the racial abuse at Tesla, Mr. Diaz rarely cried. Tr. 484:8-10. Yet he painfully broke down in front of the jury after watching his son's testimony about the racial harassment they experienced. Tr. 383:9-21. At trial, Mr. Diaz sheepishly admitted that after he began experiencing racial taunting, he felt "so bad and so devastat[ed]" that sometimes he would just sit on his stairs and cry. Tr. 483:1-3. This normally stoic man cried four times while being examined by Dr. Reading, even while recounting an ordeal that had occurred four years earlier. Tr. 593:24-594:14.

Tesla's assertion that Mr. Diaz remained a "happy" man during most of his time at Tesla is as offensive as it is unsupported. To make this assertion, Tesla takes out of context Mr. Diaz' analogy to how he soldiered on despite the obstacles Tesla placed in his path. Tr. 516:11-23. Mr. Diaz explained that whether he liked his coworkers or their treatment of him did not "have anything to do with it," because he could still "get [the] job done" for the team when he was needed. Tr. 516:21-517:1. In retrospect, Mr. Diaz wished that he had been able to quit his job earlier, but as Dr. Reading testified, "of course, he couldn't because he needed the job." Tr. 594:1-6.

> *iii. Tesla's hostile work environment will continue to have life-changing impacts.*

Mr. Diaz testified that while working at Tesla he felt demeaned and degraded, like being held underwater. He began "to look at life bleakly." Tr. 575:6-16. Martinez's verbal and physical confrontation in October 2015 was particularly upsetting, Tr. 451:16-25; 513:19-25; 531:1-7; Ex. 235, causing Mr. Diaz to beg his supervisor Romero for help. Tr. 451:16-25; 513:19-25; 531:1-7; Exs. 235, 240. Nothing can be more humiliating and dehumanizing than having to beg and plead with your supervisor for protection from physical assault at work—and to have those pleas ignored.

The racial harassment Mr. Diaz experienced at Tesla caused him to "lose faith … in my fellow human[s]." Tr. 481:18-21. When he meets new people, Mr. Diaz is plagued by self-doubt and questions their feelings towards him—something he never did before. Tr. 482:18-25. Dr. Reading confirmed that Tesla's harassment of Mr. Diaz "changed him forever." He is "now approaching the world with a different mental landscape"—one that is far harder to navigate. Tr.

-19-

614:8-15. This different perspective marked "a shift and that shift is permanent given the duration of exposure." Tr. 614:16-18. While Dr. Reading agreed that some symptoms of Mr. Diaz's distress were in remission by 2019, he warned that those symptoms were "vulnerable to reactivation" whenever Mr. Diaz is exposed to racial harassment in the future. Tr. 614:23-615:4.

Mr. Diaz's experience of racial harassment at Tesla has also caused him to see the world "through the eyes of [his] parents" who, decades earlier, experienced "dogs being sicced on them and stuff like that." Tr. 481:22-482:1. At trial, Mr. Diaz testified that "lately it's been playing in my mind every day wondering what I could have done to prevent certain things," essentially blaming himself for what was done to him by Tesla. Tr. 484:2-3. He confessed, "I even doubt myself." Tr. 484:7. His testimony reflects the "continuing effects or residual effects" of workplace harassment Dr. Reading warned about. Tr. 588:8-22.

2. <u>The compensatory damages award was properly limited to harm caused by Tesla.</u>

Tesla is correct that compensatory damages should be limited to harms caused by the tortfeasor. *Watson v. City of San Jose*, 800 F.3d 1135, 1138, 1140-42 (9th Cir. 2015). But Tesla is plainly mistaken in asserting that the jury, contrary to the Court's instructions, awarded damages for the distress to Mr. Diaz caused by Demetric's criminal conviction. Mot. at 15–17.

The Court instructed the jury only to award damages "for any injury you find was caused by the defendant." Jury Ins. No. 38. The Court cautioned that the award must be limited to "the amount of money that will reasonably and fairly compensate the plaintiff," and that "Your award must be based upon evidence and not upon speculation, guesswork, or conjecture." *Id*. The jury is presumed to have followed these instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *see also Beville v. Ford Motor Co*., 319 F. App'x. 525, 528 (9th Cir. 2009). While Tesla speculates that the compensatory damages award "*may* reflect the jury's sympathy for Diaz's distress about his son's incarceration," that conjecture is unsupported by any evidence of juror misconduct. Mot. at 16 (emphasis added).

Mr. Diaz testified that the distress he suffered based on his son's experience was based on his guilt about having brought his son into a racially hostile work environment in the mistaken hope that his son's experiences would be different from his own. On cross-examination, Mr. Diaz

-20-

confirmed that what made him most "unhappy" was Demetric's supervisor "calling hi[s son] the 'N' word," not his son's much later incarceration. Tr. 570:25-571:16. Demetric confirmed his father's stunned reaction to that abuse, describing that incident as "the first time he had ever in his life seen his father that he didn't know what to do." Tr. 573:12-13. This event "fracture[d]" the father-son relationship, as Demetric watched his formerly self-assured father "sucking it up, just taking the passive response to what was an egregious experience as perceived by his son." Tr. 607:14-20. Mr. Diaz testified that hearing a supervisor call Demetric a "n****r" "broke me and I think [broke] my son." Tr. 419:18-420:1.

Dr. Reading testified that Mr. Diaz's "anxiety disorder diagnosis" was independent of Demetric's personal issues and was "directly attributable to a situation of threat." Tr. 611:19-23. While Mr. Diaz felt enormous guilt over "bringing his son into that environment," that happened long before Demetric's arrest. Tr. 609:20-21. Dr. Reading acknowledged that Mr. Diaz's guilt over his son's later incarceration *could* have contributed to Mr. Diaz's adjustment disorder. But he also clarified that it would be entirely appropriate for Mr. Diaz to attribute that guilt to Tesla's conduct. Tr. 609:22-25. The turning point was what happened at Tesla, for after that (and long before Demetric began having legal issues), Mr. Diaz's "relationship with his son was never the same. He attributes that to what happened at Tesla and his responsibility taking his son there ...." Tr. 612:1-4. Dr. Reading further clarified that, from a psychological perspective, causation is typically analyzed from the onset of the symptoms, which "speak to the symptoms erupting ... from what was happening." Tr. 609:9-25. The relationship between Mr. Diaz and his son ruptured in the fall of 2015—three years before Demetric's 2018 arrest.

3. <u>There is no evidence that the compensatory damages are "improperly punitive."</u>

Tesla asserts that the award of compensatory damages is "improperly punitive," based on Tesla's baseless argument that the damages award "plainly reflected a desire to punish Tesla rather than compensate Diaz." Mot. at 17. This argument ignores the evidence and the jury instructions.

During closing arguments, Plaintiff's counsel valued Mr. Diaz's emotional distress damages at $1 million for every month Mr. Diaz worked at Tesla, and $1 million per year for the two to four years it would take Mr. Diaz to recover. Tr. 920:21-25, 921:8-17. During the discussion

of compensatory damages, Plaintiff's counsel never asked the jury to punish Tesla, only to appropriately value the full extent of Mr. Diaz's emotional distress damages. Regardless, the jury did not accept counsel's recommended valuation, awarding less than the requested amount for both past and future emotional distress damages.

Straining to convince the Court that the jury's award of compensatory damages included a punitive component at the urging of Mr. Diaz's counsel, Tesla confuses two very distinct parts of counsel's closing statement. The only reference to Tesla's financial condition occurred *after* counsel completed his discussion of the evidence supporting compensatory damages. Plaintiff's counsel prefaced his discussion of punitive damages by starting anew, explaining, "But now I want to talk to you briefly about punitive damages…." Tr. 921:18-22. Counsel appropriately separated the compensatory and punitive damages segments of his closing statement, and Tesla did not make any objections. Nor did Tesla's concern about the potential for confusion prompt it to seek bifurcation of the punitive damages phase of trial.

The Court instructed the jury to consider Tesla's financial condition and the potentially deterrent or punitive effect of damages *only* when determining the appropriateness and amount of punitive damages. Jury Ins. No. 40. Instruction 38, regarding compensatory damages, makes no mention of punishment; and Tesla offers no evidence that the jury disregarded its instructions when calculating the appropriate amount necessary to compensate Mr. Diaz for his past, present, and future emotional distress and loss of enjoyment of life.

Tesla's cases are readily distinguishable. *Clark v. City of Tucson*, 2020 WL 914524 (D. Ariz. Feb. 26, 2020) and *Longfellow v. Jackson County*, 2007 WL 682455 (D. Or. Feb. 28, 2007), were lawsuits against public entities where punitive damages were unavailable. Because the juries had no authority to award punitive damages in those cases, the courts drew inferences (having closely observed the evidence at trial and having formed their own opinions) that a sizeable portion of the jury's compensatory damages awards was improperly intended to punish. *See Clark*, 2020 WL 914524 at *18; *Longfellow*, 2007 WL 682455 at *3. None of the damages described in those cases were remotely comparable to the damages suffered by Mr. Diaz. The wrongfully terminated plaintiff in *Longfellow* suffered injuries that were "comparatively mild and transient,

-22-

with no long-term damage," and the plaintiff was "confident" and "upbeat" within four months after being terminated. 2007 WL 682455 at *2. The plaintiff in *Clark,* who sued her government employer for failing to provide a suitable space to express breast milk and for retaliation did not offer any expert testimony to support her claimed damages. 2020 WL 914524 at *15, *18. While she complained of experiencing marital difficulties, she acknowledged that those difficulties were "not due solely to actions by [the employer]." *Id*. at *15. Moreover, in *Clark,* plaintiff's counsel argued that the jury could "warn" other departments by its verdict, effectively advocating for punitive damages in a municipality case where such punishment was not available. *Id*. at *17.

Here, by contrast, the Court properly instructed the jury on the different legal principles governing awards of compensatory and punitive damages. Tesla does not challenge those instructions or identify any jury misconduct. Nor are the compensatory damages "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes*, 95 F.3d at 1435. Like the jury, the Court heard substantial, unrebutted evidence regarding Mr. Diaz's emotional distress, including testimony from experts and from the family members who knew him best. Given the extensive evidence of the racial harassment of Mr. Diaz and its long-term impacts, the jury's compensatory damages award was well within its discretion.

**D. The jury's award of punitive damages is consistent with due process.**

Tesla waived any right to argue for the elimination of punitive damages in its JMOL motion by failing to preserve that challenge in its Rule 50(a) motion. Tesla is therefore limited to seeking a new trial as to punitive damages liability or a remittitur as to amount.

There is no basis for a new punitive damages trial. The Court and jury heard considerable evidence that Tesla allowed the vilest racist conduct imaginable, including odious slurs, racist caricatures, and physical threats, to persist in its factory for months on end, including through the time of trial. *See supra* at 2–6. Given this evidence and Tesla's evident lack of remorse, the jury appropriately imposed a substantial award of punitive damages. Tesla still refuses to listen, acknowledging in one breath that "the jury spoke," Mot. at 1, while continuing to take "Zero Responsibility" for its wrongdoing.

The Court instructed the jury to award punitive damages to "punish a defendant and to deter similar acts in the future." Jury Ins. No. 40. The Court cautioned that the jury could not award punitive damages for negligent conduct, only for conduct that was "malicious, oppressive or in reckless disregard of the plaintiff's rights." *Id*. The Court also cautioned that punitive damages "should not reflect bias, prejudice, or sympathy toward any party" and could not be awarded "to punish the defendant for harm to anyone other than the plaintiff in this case." *Id*. Tesla does not contend that the jury disregarded these instructions or that the evidence does not support the punitive damages award. Its principal argument is that the award violates due process and should be subject to remittitur. But that argument rests on what Tesla *wishes* the law would be, not what the governing Ninth Circuit case law actually provides.

The Due Process Clause precludes states from imposing "grossly excessive" punitive damages. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (quoting *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 454 (1993)). "Grossly excessive" punitive awards are prohibited because they do not serve a legitimate deterrent purpose and result in an "arbitrary deprivation of property." *State Farm Mutual Automobile Ass'n v. Campbell*, 535 U.S. 408, 417 (2003). To evaluate whether punitive damages violate due process, courts consider three "guideposts." First and "most important[ly]," the court must evaluate the "degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. Next, the court must consider the ratio of punitive damages to the harm inflicted, as measured by the compensatory damages award. *Id*. at 580. Third, the court may compare the punitive damages to any civil or criminal penalties authorized for comparable misconduct if such parallel penalties exist. *Id*. at 583. Here, the first two guideposts support the jury's award and the third is inapplicable (because Section 1981 has no parallel penalties provision).

### 1. Tesla's conduct was shockingly reprehensible.

When evaluating a due process challenge to punitive damages, reprehensibility of the defendant's conduct is the most important consideration. *Gore*, 517 U.S. at 575; *State Farm*, 538 U.S. at 419; *Hardeman v. Monsanto Co.*, 997 F.3d 941, 972 (9th Cir. 2021). In the Ninth Circuit, it is well-established that race discrimination in the workplace is "especially reprehensible" for

due process purposes. *Flores v. City of Westminster*, 873 F.3d 739, 760 (9th Cir. 2017). In this context, the Ninth Circuit has explained that "this nation fought the bloodiest war in its history in part to advance the goal of racial equality, adding several amendments to the Constitution to cement the battlefield victory." *Zhang*, 339 F.3d at 1043. "Freedom from discrimination on the basis of race or ethnicity is a fundamental human right recognized in international instruments to which the United States is a party … and the intentional deprivation of that freedom is highly reprehensible conduct." *Id.* Race discrimination cases are unlike cases involving purely economic harm, because intentional discrimination is "a serious affront to personal liberty." *Flores*, 873 F.3d at 760. Therefore, as the Ninth Circuit has held time and again, "highly offensive language directed at [a worker], coupled by the abject failure of [the employer] to combat the harassment, constitutes highly reprehensible conduct justifying a significant punitive damages award." *Swinton*, 270 F.3d at 818; *accord Bains LLC v. Arco Prod. Co.*, 405 F.3d 764, 775 (9th Cir. 2005); *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 909 (9th Cir. 1999).

Beyond this specific case law regarding the reprehensibility of workplace race discrimination, the Supreme Court has identified five factors courts may consider when evaluating reprehensibility: whether (1) "the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419 (2003). Tesla's brief recites these factors but ignores most of them. Instead, it argues (in direct conflict with the jury's special verdict) that it "did not engage in any, much less repeated, discriminatory conduct" and that if it did, its misconduct amounts only to "omission or negligence." Mot. at 19–20. In fact, as the trial record shows and the jury properly found, all five reprehensibility factors weigh sharply against Tesla.

The first factor relates to the nature of the harm. *See State Farm*, 538 U.S. at 419 (asking whether "the harm caused was physical as opposed to economic"). Tesla blithely asserts that this factor "need[s] little discussion" because Tesla's conduct "involves no physical harm and did not jeopardize the health or safety of Diaz or any other workers at the Tesla factory." Mot. at 18. While

Tesla elects to ignore inconvenient trial evidence, the jury did not; it heard compelling evidence that Mr. Diaz was subjected to a physical assault when supervisor Martinez rushed into the freight elevator towards Mr. Diaz with his fists balled up, screaming racial slurs. Tr. 451:16-25; 513:19-25; Ex. 235. Mr. Diaz suffered physical symptoms: crying at night on the stairs (Tr. 483:1-3) and insomnia (Tr. 482:9-17), weight loss (*id.*); and being unable to perform sexually with his wife (Tr. 482:10-11). Moreover, physical harm "encompasses psychological harm." *Yowan Yang v. ActioNet, Inc.*, 2017 WL 2117028 at *15 (C.D. Cal. Jan. 23, 2017); *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 713 (2009).

Mr. Diaz was subjected to the most opprobrious racial slurs on a near-daily basis. Tr. 414:15-415:3, 416:23-417:13, 513:4-10. Coupled with the physical attack, the abuse he suffered led to a diagnosed psychiatric injury of adjustment order with symptoms of depression and anxiety. Tr. 587:15-22. Substantial trial evidence, and the unanimous jury verdict, contradict Tesla's wishful insistence that its misconduct caused no physical harm.

It bears emphasis that the type of harm suffered here was particularly egregious, and far from merely "economic." Racism against Black people is among the oldest and most pernicious evils in American society, with a history extending back to chattel slavery and Jim Crow. *See Zhang*, 339 F.3d at 1043. Racism not only demeans and degrades individuals, but also prevents economic mobility and entrenches inequality. *See Extensive Data Show Punishing Reach of Racism for Black Boys*, New York Times (March 19, 2018), available at https://www.nytimes.com/interactive/2018/03/19/upshot/race-class-white-and-black-men.html. Mr. Diaz's experience was excruciating and intolerable. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n[****]r' by a supervisor in the presence of his subordinates"—even just once. *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (cleaned up). The word "n****r" "evok[es] a history of racial violence, brutality and subordination," … and its use is a "significant exacerbating factor[] in evaluating the severity of racial hostility." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004). Tesla wishes to ignore the true nature of

1    its misconduct like failing to correct two supervisors use of the word n****r toward Mr. Diaz over
2    30 times each and open display of a racist effigy. The jury looked the truth straight in the eye.

3            For an employer to allow its Black workers to be subjected to violent threats and racial
4    slurs is reprehensible enough. But that reprehensibility is even greater when the employer responds
5    to known incidents with calculated indifference. Tesla knew full well that it should not have
6    allowed its employees to attack Mr. Diaz using racial slurs and offensive racial imagery. But
7    instead of taking prompt, effective remedial action, Tesla deliberately allowed the racial abuse to
8    continue, shutting its eyes to its employees' and supervisors' concerted abuse and refusing to act
9    when Mr. Diaz and others complained. At best, it issued half-hearted warnings (or so it said) that
10   had no impact on its serial tormentors. At worst, Tesla allowed managers like DeLaGrande, after
11   listening to Mr. Diaz recite in comprehensive detail the abuse he suffered, to punish rather than
12   protect Mr. Diaz for his objecting to those vituperative racial attacks. No conduct could be more
13   intentional, or more reprehensible.

14           The second *State Farm* factor, to which Tesla gives the same "nothing-to-see-here"
15   treatment, is whether "the tortious conduct evinced an indifference to or a reckless disregard of the
16   health or safety of others." *State Farm*, 538 U.S. at 419; Mot. at 18. As discussed above, despite
17   never-ending racist abuse in its workplace, Tesla demonstrated a complete unwillingness to
18   address the conduct, even after Mr. Diaz reasonably expressed fear for his safety. *See* Ex. 240.

19           The trial evidence made clear that Tesla's attitude was, at the very least, one of malicious
20   disregard of Mr. Diaz's health and safety. Tesla's own supervisors were Mr. Diaz's tormentors,
21   but Tesla never saw fit to punish any of them. Nor did it ever take seriously any of Mr. Diaz's
22   clearly expressed concerns. For example, it undertook no investigation or other action in response
23   to his plea for protection from supervisor Martinez. *See* Ex. 76. Instead, it gave a warning to *Mr.*
24   *Diaz* for unprofessionalism. *Id.*, Tr. 231:8-15. When Martinez followed up the physical threat to
25   Mr. Diaz's safety with a racist effigy, Tesla's manager Quintero purported not to understand why
26   the effigy was offensive, Tr. 189:2-9, 340:12-21, ignored Mr. Diaz's previous complaints about
27   Martinez's racist aggression and Timbreza's slurs, and made up his mind about how to deal with
28   the situation even before beginning his inquiry. *See* Exs. 272, 287; Tr. 342:9–343:19, 344:23–

345:7. Other examples of Tesla's wrongful indifference abound. *See, e.g., supra* at 2 (bathroom graffiti not removed), 3–6 (complaints about Hurtado and Martinez not addressed), 3–6 (Timbreza and others not disciplined), 4 n.1 (similar complaints from other Black employees ignored). Tesla, including its HR Department, was aware of much of this conduct, but Tesla did not take remedial action to deter future racist conduct. Ex. 240, Ex. 274, Ex. 137 at 162:2-7, Tr. 433:24-434:16, Ex. 138 at 85:5-9. Tesla was clearly "indifferent" and "recklessly disregarded" Mr. Diaz's health, safety, and emotional well-being.

The third factor, whether Mr. Diaz was "financially vulnerable," is "not particularly relevant in a mostly noneconomic damages case like this one." *Hardeman*, 997 F.3d at 973–74 (citing *Lompe v. Sunridge Partners*, LLC, 818 F.3d 1041, 1066 (10th Cir. 2016) (financial vulnerability "does not have particular relevance" where the harm was not "a reprehensible exploitation of financial vulnerability ... through financial misconduct")). It "goes without saying that this is a case of a large corporation and an individual—not two corporations on equal footing." *Id.* at 973. The enormous power imbalance between Mr. Diaz and Tesla made Mr. Diaz exceedingly vulnerable to bullying, as he had no meaningful way to protect himself—which makes Tesla's abuse of power that much more reprehensible.

Nevertheless, Mr. Diaz did present evidence of financial vulnerability. Dr. Reading opined that Mr. Diaz's emotional distress was caused by the fact that he wished he had "quit [working at Tesla] earlier, but, of course, he couldn't because he needed the job." Tr. 593:24-594:10. Even when Mr. Diaz was promoted to a lead position in August 2017, he was only making $16 an hour. Ex. 222. Given the Bay Area cost of living, that low wage clearly made Mr. Diaz financially vulnerable and those economic pressures made it exceedingly difficult for him to quit his job in order to avoid further harassment. That Mr. Diaz had the good fortune to find a union job several months after being forced to quit Tesla does not lessen the reprehensibility of Tesla's conduct.

The fourth factor is whether the jury's verdict was based on a single isolated incident or repeated acts of misconduct. Here again, Tesla seeks to re-write reality. Tesla denies it engaged in "any, much less repeated, discriminatory conduct" and asserts that its "repeated and good-faith remedial efforts undermine any award of punitive damages." Mot. at 19. But of course, the jury

heard overwhelming evidence of Tesla's consistent refusal to protect Mr. Diaz from racist abuse—including from Tesla's own supervisors.

Mr. Diaz testified that Martinez and Hurtado called him "n****r" a combined 60 times or more, and that his complaints about being called slurs and witnessing racist graffiti went ignored. Tr. 415:1-3, 417:11-13, 511:17-21, 512:11-17. Even the bathroom was not an escape: Mr. Diaz confronted swastikas and other noxious racial slurs in the stalls every single day. Tr. 403:9-404:9, 480:5-12. The barrage of racially harassing conduct continued unabated until Mr. Diaz finally broke and had to quit. Every day Mr. Diaz walked into the Tesla factory, he faced new incidents of traumatizing racial harassment. Tesla implicitly condoned that abuse by repeatedly ignoring Mr. Diaz's complaints and failing to discipline the harassers.

The best evidence Tesla offers for its supposed "repeated and good-faith remedial efforts" is the written warning it says it gave Timbreza for "kidding around" and the written warning it purportedly gave to Martinez along with his three-day suspension. Mot. at 19. Tesla failed to place either written warning into evidence, raising the reasonable inference that it never actually issued those warnings (thus further undermining Tesla's credibility). Tesla's professed good faith is also contradicted by its decision to suspend Martinez for only three days (and later to hire him as a direct employee) despite his extensive history of racist verbal and physical harassment and notwithstanding a staffing agency manager's recommendation that he be fired. *See supra* at 7. Tesla asks the Court to believe that it simply "missed [Mr. Diaz's] complaints." Mot. at 19. The Court, like the jury, may find that excuse not credible. In any evident, Tesla is vicariously liable for its supervisors' wrongdoing, whether it knew about it or not. *See Swinton*, 270 F.3d at 803.

Tesla's proclamation of innocence also ignores the testimony of Tesla employees who confirmed that racial slurs were ubiquitous. Moreover, its failure to investigate and discipline racial harassment was *not* limited to Mr. Diaz's complaints. Michael Wheeler also heard "n****r" daily (Tr. 425:5-7) "all over the factory" (Tr. 424:21-22) and reported finding feces on the seat of his work cart (Tr. 432:10-21). Jackson heard "n****r" on a daily basis from 2015 to 2016. Tr. 224:25-225:17. Kawasaki heard "n****r" on a daily basis when "walking around the Tesla Factory." Tr. 99:4-23. The person who called Wheeler "n****r" was not punished, and Tesla failed to

investigate the feces incident. Tr. 431:10-434:16. While the jury understood that it could only punish Tesla for its conduct towards Mr. Diaz, *see* Jury Ins. No. 40, it could consider Tesla's consistent conduct toward others in assessing reprehensibility. *See State Farm*, 538 U.S. at 423. Moreover, Wheeler and Mr. Diaz complained to the same managers, supporting Mr. Diaz's contention that Tesla intentionally failed to acknowledge and document harassment complaints. On these facts, the jury imposed an appropriate amount of punitive damages.

In a belated attempt to redeem itself, Tesla clumsily attempts to introduce evidence outside the record and after-the-fact to suggest that "Tesla is a different company than in 2015-2016" and "has scaled up its antidiscrimination efforts." Mot. at 1 n.1. The self-serving arguments in Tesla's brief about how it perceived and dealt with the pervasive racism in its workplace during the relevant time period casts doubt on Tesla's protestations of reform. What is relevant is what the jury saw and heard at the time of trial, including Martinez's testimony that the word "n****r" was still being used in the workplace at the time he testified. Tr. 787:6-20.

The fifth and final reprehensibility factor concerns whether the harm was the result of intentional malice or was accidental. *State Farm*, 538 U.S. at 419. Tesla claims its conduct demonstrates, at most, "acts of omission and negligence," Mot. at 20, which is contrary to the jury's verdict, which held Tesla vicariously liable for the intentional racist abuse inflicted by Tesla supervisors. *See* Jury Ins. No. 29; Verdict Form Q. 3A. Liability under Section 1981 requires *intentional* discrimination. *See Pavon*, 192 F.3d at 908. As the trial evidence showed, the pervasive use of "n****r" and other racist invectives towards Mr. Diaz, by supervisors and co-workers inside the workplace, was no accident. That conduct intentionally demeaned and degraded Mr. Diaz as a Black man. For instance, when describing Hurtado's use of the word "boy," Mr. Diaz compared the term to language used by "slave masters" to let Black people know they were property. Tr. 415:8-9. Witnesses heard "n****r" on a daily basis. Throughout trial, Tesla sought to diminish the impact of the term "n****r" by suggesting it was used in a "friendly" manner. *See, e.g.*, Tr. 100:13-22. Tesla presented no evidence that "n****r" was ever used towards Mr. Diaz in a "friendly" manner or that he ever perceived it that way. And of course, the jury verdict reflects that the jury

squarely rejected this assertion and found that the harassment experienced by Mr. Diaz to be "'undesirable and offensive,'—not a 'joke.'" *Swinton*, 270 F.3d at 817.

The evidence entitled the jury to find that Tesla's inaction was no accident. In instance after instance, Tesla managers minimized or ignored Mr. Diaz's repeated complaints, by not interviewing witnesses or reviewing readily available security video evidence. *See supra* at 3–6. The jury plainly saw through Tesla's feigned deniability, and the most important *State Farm* factor weighs strongly in favor of a large punitive damages award.

2. <u>The 18:1 ratio between punitive and compensatory damages is warranted given the reprehensibility of Tesla's ongoing conduct.</u>

The Supreme Court has long rejected the proposition that constitutionally permissible punitive damages can be determined by "a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore*, 517 U.S. at 582; *State Farm*, 538 U.S. at 425 (declining to impose a "bright-line ratio which a punitive damages award cannot exceed"). Rather, the "precise award in any case … must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at 425.

Tesla's assertion that punitive damages can "never" exceed a 9:1 ratio, "almost never" exceed a 4:1 ratio, and must "often" be reduced to a ratio of 1:1 or 2:1 flatly misstates the law. In a case Tesla relies on to support its position, the Ninth Circuit observed:

> In cases where there are significant economic damages and punitive damages are warranted but behavior is not particularly egregious, a ratio of up to 4 to 1 serves as a good proxy for the limits of constitutionality. *See, e.g., State Farm*, 538 U.S. at 425, (acts of bad faith and fraud warranted something closer to a 1 to 1 ratio). In cases with significant economic damages and more egregious behavior, a single-digit ratio greater than 4 to 1 might be constitutional. *See, e.g., Zhang*, 339 F.3d at 1043–44 (post-*State Farm* case upholding 7 to 1 ratio where the wrongful conduct involved significant racial discrimination); *Bains*, 405 F.3d at 776–77 (post-*State Farm* case indicating that ratio between 6 to 1 and 9 to 1 would be constitutional where underlying wrongful conduct was racial discrimination). And in cases where there are insignificant economic damages but the behavior was particularly egregious, the single-digit ratio may not be a good proxy for constitutionality. *See, e.g., Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (upholding a punitive damage award with a 37 to 1 ratio of punitive damages to compensatory damages as constitutional because "defendant's behavior was outrageous but the compensable harm" was nominal and difficult to quantify).

*Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005). The circumstances here are not comparable to *State Farm*, where the Supreme Court suggested that purely economic harms warranted a punitive-to-compensatory damages ratio of four-to-one or less. Cases involving intentional racial discrimination are "especially reprehensible," justifying "a more substantial punitive damages award." *Flores*, 873 F.3d at 760 (upholding punitive damages awards with ratios as high as eight-to-one).

Tesla argues that the highest permissible ratio in this case would be 4:1. Mot. at 23–24.[3] Ninth Circuit precedent states otherwise. In the decision cited by Tesla, the Ninth Circuit found a 4:1 ratio appropriate where the defendant's conduct "was not 'particularly egregious' as to warrant a damages ratio above the single-digit range." *Hardeman*, 997 F.3d at 974 (internal quotation omitted). That is far from the *especially* egregious misconduct that caused severe noneconomic harm to Mr. Diaz. Moreover, the Ninth Circuit has consistently upheld significantly higher ratios in cases involving workplace race discrimination, recognizing the law's strong interest in punishing and deterring that particular type of conduct. In *Zhang*, the court upheld a 7:1 ratio under Section 1981. *See* 339 F.3d at 1026. In *Bains*, another Section 1981 case, it held that a ratio of up to 9:1 would be appropriate. *See* 405 F.3d at 777. In *Flores*, yet another race discrimination case, the court upheld ratios as high as 8:1. *See* 873 F.3d at 763. In *Swinton*, the ratio was 26:1. *See* 270 F.3d at 818.

In most significant respects, the facts of Mr. Diaz's case support a higher ratio than the Ninth Circuit approved in the cited cases. None of those cases involved physical threats and safety fears. The *Zhang* jury returned a mixed verdict that rejected the plaintiff's hostile work environment claim. While the plaintiff in *Zhang* was wrongfully terminated, he did not experience the extreme racist abuse at issue here. *See* 339 F.3d at 1026. In *Bains*, the plaintiffs sought and

---

[3] Tesla's categorical arguments for even lower ratios are meritless. It suggests that "[n]o physical harm or intentional conduct occurred here, so a 1:1 ratio is … appropriate." Mot. at 24. But in fact, Mr. Diaz suffered physical harm based on Martinez's intentional, egregious misconduct. Tesla's argument for a 2:1 ratio rests on a single case from outside the Ninth Circuit, not the governing Ninth Circuit case law. *See* Mot. at 23. Tesla also fails to acknowledge that each award must be evaluated based on its own unique facts; the Supreme Court has time and again "reiterate[d] [its] rejection of a categorical approach." *See Gore*, 517 U.S. at 582.

obtained economic damages only, and the defendant's conduct "did not evince reckless disregard of health or safety" or "threat of physical harm." *Bains*, 405 F.3d at 775. In *Flores*, although one plaintiff was "[a]t times" subjected to racial slurs, none of the plaintiffs were subjected to the exceptionally outrageous degree of racist abuse present here. *See* 873 F.3d at 746.

Tesla's conduct displays an unusually high degree of reprehensibility with respect to every *State Farm* factor. Such intentional, repeated misconduct makes this an appropriate case for departure from the traditional guidepost of a single-digit ratio, which is fully warranted, and critical, if the twin principles of deterrence and punishment are to be achieved.

### 3. Section 1981 has no damages cap.

The third *Gore* guidepost allows courts to compare the award of punitive damages to the civil or criminal penalties authorized for comparable misconduct. *Gore*, 517 U.S. at 583. But "[t]here are no 'civil penalties'" for racist harassment in the workplace. *Swinton*, 270 F.3d at 820. While Title VII, which targets some of the same conduct, imposes a $300,000 cap on damages, Congress expressly decided that that cap should *not* apply to Section 1981 cases. *See* 42 U.S.C. § 1981a(b)(4). Thus, while the Ninth Circuit has compared punitive awards to the awards available under Title VII, *see Bains*, 405 F.3d at 777, it "hasten[ed] to add that Congress has not seen fit to impose any recovery caps in cases under § 1981" despite "ample opportunity to do so." *See Swinton*, 270 F.3d at 820; *Zhang*, 339 F.3d at 1045; *Flores*, 873 F.3d at 760.

### 4. The jury did not improperly consider Tesla's wealth.

A defendant's wealth "cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427. At the same time, "[a] punitive damages award is supposed to sting so as to deter a defendant's reprehensible conduct, and juries have traditionally been permitted to consider a defendant's assets in determining an award that will carry the right degree of sting." *Bains LLC*, 405 F.3d at 777.

Here, the jury spent over a week listening to testimony about Tesla's extraordinary misconduct, its toleration—and resulting implicit encouragement—of vile racial slurs and graffiti in the workplace, its selective deafness to complaints about harassment, and its stunning treatment of Mr. Diaz as the wrongdoer rather than an exceptionally aggrieved employee in need of

-33-

protection. *See* Tr. 467:25-468:3. At trial, Tesla persisted in minimizing or denying the existence of the racially harassment environment, just as it still persists in its post-trial motion.

Tesla tries to shift the blame for the jury's high punitive damages award by criticizing Mr. Diaz's counsel's closing statement. But it ignores its own willful disregard for its workers' humanity, which was the theme of that closing statement. Mr. Diaz's counsel appropriately urged the jury, based on Tesla's arguments and evidence at trial, to impose a punishment large enough to get Tesla's attention and "big enough to stop" its unlawful behavior. Tr. 923:22-924:8. While economic expert Charles Mahla testified without objection that Tesla had $6.628 billion "in cash on their books" and "free cash flow of over a billion dollars" in 2019, Tr. 685:3-10, Mr. Diaz's counsel *conservatively* encouraged the jury, without objection from Tesla, to base its punishment on the *lesser* amount of "free cash" of $1.1 billion.[4] That Tesla is a valuable company does not create the inference that the jury's award was based on anything other than its assessment of Tesla's misconduct.

Mr. Diaz's counsel encouraged the jury to treat Tesla "like an individual," and consider what percentage would appropriately punish Tesla for its continuing, wrongful, unrepentant conduct. Tr. 924:9-18. Counsel focused not on Tesla's wealth but on its *conduct*, explaining that "[Tesla has] come into court and tried to tell you everything they did was just fine… My question is, if you punish them by [awarding punitive damages equal to 10% of Tesla's $1 billion cash on hand], is that enough to get their attention?" Tr. 925:3-12. Ultimately, the jury relied on its own judgment and perception of the evidence in awarding $130 million in punitive damages. Nothing in the record suggests that the jury overreached in the face of Tesla's unrepentant conduct.

5.   <u>Less drastic remedies would not achieve the goal of deterrence.</u>

Finally, the Court may also evaluate whether less drastic remedies could achieve the goals of punishment and deterrence. *Gore*, 517 U.S. at 584. The answer is a resounding "no." The jury could reasonably have concluded that Tesla intervened to *help* Martinez avoid a serious

---

[4] Tesla claims it was "not a wealthy or profitable company" in 2015–16. Mot. at 26. The jury was aware of this. Mr. Diaz's expert testified, "Generally up through 2019, Tesla was not positive. It was not in the black in terms of net income." Tr. 685:3-19.

investigation and discipline and that it later rewarded him with a coveted direct-hire position, *after commencement of this litigation*. Given the six-year duration of Tesla's reprehensible conduct, which Martinez confirmed was still ongoing by the time of trial; Tesla's gargantuan size as compared to other companies against which punitive damages have been imposed; the jury's duty to impose punitive damages commensurate with the evidence presented and consistent with the goals of punishment and deterrence; and the deference owed to the jury's wisdom, the singularly reprehensible nature of Tesla's conduct fully justifies the jury's punitive damages award.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Tesla's motion in its entirety.

California Civil Rights Law Group

Alexander Morrison + Fehr LLP

Altshuler Berzon LLP


Dated:   December 7, 2021                        /s/ *Lawrence Organ*

                                        Lawrence A. Organ
                                        Cimone A. Nunley
                                        J. Bernard Alexander III
                                        Michael Rubin
                                        Jonathan Rosenthal
                                        Attorneys for Plaintiff
                                          OWEN DIAZ