1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Kathleen M. Sullivan (CA Bar No. 242261)
2    kathleensullivan@quinnemanuel.com
    Daniel C. Posner (CA Bar No. 232009)
3    danposner@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
4  Los Angeles, California 90017
   Telephone: (213) 443-3000
5  Facsimile: (213) 443-3100

6  Attorneys for Defendant,
   *TESLA, INC.*

7

8                    **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11

12
   OWEN DIAZ,                          Case No. 3:17-cv-06748-WHO
13
              Plaintiff,               **DEFENDANT TESLA INC.'S REPLY IN**
14                                     **SUPPORT OF MOTION FOR**
        vs.                            **JUDGMENT AS A MATTER OF LAW,**
15                                     **NEW TRIAL AND/OR REMITTITUR**
   TESLA, INC. DBA TESLA MOTORS, INC., **PURSUANT TO FEDERAL RULES OF**
16                                     **CIVIL PROCEDURE 50 AND 59**
              Defendant.
17
                                       **Date: January 19, 2022**
18                                     **Time: 2 p.m.**
                                       **Place: Courtroom 2, 17th Floor**
19                                     **Judge:  Hon. William H. Orrick**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ..........................................................................................................................3

I.   DIAZ FAILS TO REBUT TESLA'S SHOWING THAT IT IS ENTITLED TO A
     NEW TRIAL OR JMOL ON LIABILITY ..................................................................3

     A.   Diaz Cannot Show That The Weight Of The Evidence Supports The Jury's
          Liability Verdict ..............................................................................................3

     B.   Diaz Fails To Show A Tesla-Diaz Contract For Purposes Of § 1981
          Liability ...........................................................................................................4

     C.   Diaz Fails To Show A Tesla-Martinez Contract For Purposes Of State-Law
          Liability For Negligent Supervision And Retention ........................................5

II.  DIAZ FAILS TO JUSTIFY THE JURY'S GROSSLY EXCESSIVE $6.9
     MILLION COMPENSATORY DAMAGES AWARD ....................................................6

     A.   Diaz Effectively Concedes That The Compensatory Damages Award Is An
          Extreme Outlier Among Similar Cases .............................................................6

     B.   Diaz Mischaracterizes The Record Evidence, Which Does Not Support The
          Compensatory Damages Award .........................................................................9

     C.   Diaz Effectively Concedes Tesla Did Not Cause All The Compensatory
          Damages The Jury Awarded ...........................................................................11

     D.   Diaz Cannot Overcome The Improperly Punitive Component Of The
          Compensatory Damages Award ......................................................................12

III. DIAZ FAILS TO JUSTIFY THE UNCONSTITUTIONAL $130 MILLION
     PUNITIVE DAMAGES AWARD................................................................................13

     A.   Diaz Fails To Demonstrate That Tesla's Conduct Amounts To More Than
          Non-Reprehensible Omission Or Negligence .................................................13

     B.   Diaz Cannot Support The Grossly Excessive 18:1 Punitive Damages Ratio ..........17

     C.   Diaz Misstates The Relevance Of The $300,000 Title VII Damages Cap...............19

     D.   Diaz Fails To Dispel The Jury's Improper Reliance On Tesla's Wealth................20

CONCLUSION ...................................................................................................................20

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Antonick v. Elec. Arts, Inc.*,
5     841 F.3d 1062 (9th Cir. 2016) ............................................................. 6

6 *Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*,
    405 F.3d 764 (9th Cir. 2005)....................................................... 8, 17, 19
7

*Balboa v. Hawaii Care & Cleaning, Inc.*,
8     105 F. Supp. 3d 1165 (D. Haw. 2015) ................................................ 5

9 *Balsam v. Tucows Inc.*,
    627 F.3d 1158 (9th Cir. 2010).............................................................. 5
10

*Bunch v. King Cty. Dep't of Youth Servs.*,
11     155 Wash. 2d 165 (2005) ..................................................................... 9

12 *Chopra v. Gen. Elec. Co.*,
    527 F. Supp. 2d 230 (D. Conn. 2007) ............................................... 16
13

*Clark v. Chrysler Corp.*,
14     436 F.3d 594 (6th Cir. 2006)............................................................. 14

15 *Clark v. City of Tucson*,
    2020 WL 914524 (D. Ariz. Feb. 26, 2020) ......................... 8, 9, 11, 13
16

*Flores v. City of Westminster*,
17     873 F.3d 739, 763 (9th Cir. 2017)..................................................... 19

18 *Glenn-Davis v. City of Oakland*,
    2007 WL 687486 (N.D. Cal. Mar. 5, 2007) ...................................... 12
19

*Hardeman v. Monsanto Co.*,
20     997 F.3d 941 (9th Cir. 2021)................................................. 15, 18, 20

21 *Harper v. City of Los Angeles*,
    533 F.3d 1010 (9th Cir. 2008)............................................................. 9
22

*Holzhauer v. Golden Gate Bridge Highway & Transportation District*,
23     2017 WL 3382316 (N.D. Cal. Aug. 7, 2017), *aff'd*, 743 F. App'x 843 (9th Cir.
    2018)..................................................................................................... 7
24

*Irion v. US West Inc.*,
25     182 F.3d 925 (9th Cir. 1999).............................................................. 4

26 *Johnson v. Riverside Healthcare Sys., LP*,
    534 F.3d 1116 (9th Cir. 2008)............................................................. 3

27

28

*Khalaf v. Ford Motor Co.*,
    2019 WL 10301739 (E.D. Mich. Mar. 28, 2019), *rev'd on other grounds*, 973 F.3d
    469 (6th Cir. 2020) ................................................................................................. 14

*Kingston v. International Business Machines Corp.*,
    2021 WL 2662216 (W.D. Wash. June 29, 2021) ...................................................... 8

*Longfellow v. Jackson County*,
    2007 WL 682455 (D. Or. Feb. 28, 2007) ............................................................... 13

*Morse v. S. Union Co.*,
    174 F.3d 917 (8th Cir. 1999) ................................................................................. 16

*Noyes v. Kelly Services, Inc.*,
    2008 WL 2915113 (E.D. Cal. July 25, 2008), *aff'd*, 349 F. App'x 185 (9th Cir.
    2009) ....................................................................................................................... 18

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014) ............................................................................... 13

*Osterhout v. Bd. of Cty. Comm'rs of LeFlore Cty., Okla.*,
    10 F.4th 978 (10th Cir. 2021) ................................................................................ 14

*Paul v. Asbury Automotive Group, LLC*,
    2009 WL 188592 (D. Or. Jan. 23, 2009) .................................................. 7, 11, 18

*Roby v. McKesson Corp.*,
    47 Cal. 4th 686 (2009) ............................................................................. 14, 16, 18

*Sooroojballie v. Port Authority of New York and New Jersey*,
    816 F. App'x 536 (2d Cir. 2020) ................................................................... 7, 8

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ................................................................................ 13, 17, 20

*Swinton v. Potomac Corp*,
    270 F.3d 794 (9th Cir. 2001) ................................................................................. 17

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) ............................................................................ 18, 19

*Watson v. City of San Jose*,
    800 F.3d 1135 (9th Cir. 2015) ............................................................................... 11

*Yates v. GunnAllen Fin.*,
    2006 WL 1821194 (N.D. Cal. June 30, 2006) ....................................................... 19

*Yowan Yang v. ActioNet, Inc.*,
    2017 WL 2117028 (C.D. Cal. Jan. 23, 2017) ........................................................ 15

*Zhang v. Am. Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ......................................................................... 16, 19

# PRELIMINARY STATEMENT

Diaz's opposition is most notable for what it does not do.  Diaz does not deny that the jury's award is an extreme outlier that, if left to stand, would be the highest ever for a federal single-plaintiff racially hostile workplace claim.  He also virtually ignores the overwhelming legal authority Tesla cited showing that no court has ever allowed such an outsized award to stand in a comparable case—or even in any case with far more egregious facts.  Although Diaz asserts that Tesla's host of relevant precedents are "distinguishable" or "cherry-picked," he never explains how.  And Diaz does not dispute that he was "happy" for most of the seven months he worked at Tesla, that Tesla investigated and took action against workers about whom he filed complaints, or that he never sought any medical or professional care for his emotional distress at the time.

Instead of disputing any of this, Diaz seeks to distract the Court with straw men.  He makes a brazen proclamation that Tesla insists it "did nothing wrong," but that is flatly not true.  To the contrary, Tesla strongly condemned any use of racial insults in its workplaces, and Diaz does not dispute that Tesla disciplined Diaz's co-workers for their use of racial slurs or symbols each and every time Diaz made a written complaint about them.  And while Diaz now makes inflammatory accusations of intentional discrimination by Tesla—claims neither Diaz nor his counsel ever made to the jury at trial—the record here cannot support them.  The evidence shows that, at most, Tesla missed or inadequately responded to oral complaints about graffiti and racial insults among Diaz's co-workers—which amounts to non-reprehensible negligence at most, not intentional malice.

Diaz further errs in urging the Court to abdicate any role in reviewing the jury's verdict, arguing that such review is precluded if the jury was properly instructed.  That, of course, is not the law.  Courts regularly exercise their authority under Rules 50 and 59 to ensure a verdict is supported by the evidence and the damages are not grossly excessive—even where the jury was properly instructed.  Diaz conspicuously ignores the host of cases Tesla cited where courts have accordingly granted drastic remittiturs of jury awards in comparable cases.

Tellingly, Diaz relegates to a mere footnote his discussion of Tesla's exhaustive appendices collecting ***more than 60*** federal decisions involving comparable claims for discrimination—all of which involved awards much smaller than the award here.  In **Appendix A**, Tesla showed that courts

TESLA'S REPLY RE: MOT. FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR

have ordered remittitur of compensatory damages in similar cases involving (as here) only non-economic damages to amounts ranging from $25,000 to $750,000, with an average of $189,000.  In **Appendix C**, Tesla showed that, where courts let stand non-economic compensatory damages awards in such cases, the awards ranged from $50,000 to $1.75 million, with an average of $322,000.   Strikingly, Diaz makes no attempt to distinguish these cases—because he cannot—and cites no countervailing authority suggesting a comparable award in a similar case.  Diaz's silence confirms that a compensatory damages award of $6.9 million would be an extreme aberration.

Diaz also defies clear precedent by standing by the jury's outsized award of punitive damages in a ratio of *18 to 1* to the awarded compensatory damages, even though such an award would more than double the single-digit ratio the Supreme Court and Ninth Circuit have set as the presumptive outer limit of constitutionality in the two decades since *State Farm*.  Diaz again turns to a familiar refrain—the jury was "properly instructed"—but that is not the relevant inquiry.  Grossly excessive punitive damages violate due process, even where a jury is properly instructed.

Unable to overcome these fatal legal problems with the excessive damages verdict, Diaz emphasizes a blinkered view of the facts, pretending that some do not exist at all, while deliberately overstating others.  For instance, he states that he "repeatedly complained about a near-daily barrage of humiliating race-based invective and abusive conduct."   But even under the most charitable reading of the record, such a statement cannot be supported.  Though Diaz now seeks to distance himself from his prior testimony, he clearly testified that he was generally happy at the Tesla facility, and wanted to be there, until January 2016, only a few months before he resigned from his position, and months after the discrimination he complains of began.  He encouraged his son to apply, did not discourage his daughter from doing the same, and helped others get a job at Tesla as late as October 2015.  Diaz also incorrectly asserts that Tesla seeks to shift the blame for any racial harassment onto Diaz's son.  Tesla does not "blame" Demetric Diaz for anything.  Rather, Tesla argued that, although the jury understandably sympathized with Diaz's distress regarding his son's plight, Diaz did not (and cannot) demonstrate that this distress was caused by the purportedly hostile work environment at Tesla.

1    After the rhetoric and hyperbole are stripped away, Diaz's opposition fails to show that the

2    jury award can possibly stand.  Diaz cannot justify the jury's unprecedented award of ***$6.9 million***

3    for his mild and short-lived emotional distress by deflecting attention to what Tesla supposedly

4    did—not ***how it affected Diaz***, which is the appropriate inquiry.  Nor can he possibly justify a ***$130***

5    ***million*** punitive damages award, with its blatantly unconstitutional ratio of ***18 to 1*** to the jury's

6    compensatory damages award.  The Court should order a new trial on damages unless Diaz agrees

7    to a remittitur to $300,000 in compensatory damages plus punitive damages in a ratio of no more

8    than 1:1 in relation to the compensatory damages remaining after remittitur.

9    **ARGUMENT**

10   **I.    DIAZ FAILS TO REBUT TESLA'S SHOWING THAT IT IS ENTITLED TO A NEW
        TRIAL OR JMOL ON LIABILITY**

11
        **A.    Diaz Cannot Show That The Weight Of The Evidence Supports The Jury's
12         Liability Verdict**

13   ***Section 1981***.  Diaz's opposition misses the mark in emphasizing (Dkt. 321 ("Opp.") 8-10)

14   the indisputably offensive nature of the N-word.  Tesla of course agrees that such racist insults are

15   repugnant and have no place at Tesla.  But Diaz does not grapple with the undisputed facts that this

16   conduct was expressly prohibited by Tesla's policies, Tesla took disciplinary action in response to

17   all incidents Diaz reported in writing, and Diaz was satisfied with Tesla's response for most of his

18   brief tenure.   (Tr. 78:12-79:11, 117:18-25, 124:21-125:12, 231:8-15, 243:12-244:7, 341:9-15.)

19   Indeed, Diaz fails to account for his own clear admission that he was generally happy at Tesla and

20   able to continue working at his job until the "drawing" incident in January 2016.  (Tr. 503:8-504:8,

21   510:23-511:3, 516:11-517:19.)  Such facts belie any finding that Tesla's conduct was "severe or

22   pervasive," or that it "unreasonably interfere[d]" with Diaz's work, as required to establish a hostile

23   work environment under § 1981.  *See Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116,

24   1122 (9th Cir. 2008); *Johnson v. Impala Bob's Inc.*, 2007 WL 9724871, at *11 (D. Ariz. Mar. 23,

25   2007) (granting summary judgment on hostile work environment claim where the plaintiff "testified

26   that she enjoyed working at Impala Bob's and always performed her job to the best of her ability").

27   Diaz's only response on this point is to cite (Opp. 10) his testimony that the challenged

28   conduct "made [his] job just not enjoyable," even though he "put out the same amount of output."

(Tr. 575:6-16.)  But a mere lack of enjoyment in the workplace is not legally sufficient to support a finding of liability on Diaz's hostile work environment claim.  *See Irion v. US West Inc.*, 182 F.3d 925, at *1 (9th Cir. 1999) (unpublished) (finding no unreasonable interference with work performance where the plaintiff continued to work through period of harassment).  Thus, the jury's finding was against the great weight of evidence, and a new trial is warranted on this claim.

   ***State-law negligent supervision or retention***.  In attempting to overcome the lack of any evidence that Martinez (the alleged supervisor) was a Tesla employee, Diaz grasps at irrelevant testimony from Tesla contractor Tom Kawasaki.  (*See* Opp. 13 (citing Kawasaki's testimony that Martinez was Kawasaki's day-shift counterpart and that Kawasaki received safety equipment from Tesla).)  But evidence about Kawasaki is not evidence about Martinez.  Diaz cites no evidence sufficient to support the jury's finding that Martinez was an employee of Tesla.  And Tesla's decision to promote ***Kawasaki*** is not relevant to ***Martinez's*** employment status.  (Tr. 73:22-25 (description of Kawasaki's promotion).)  Diaz also asserts (Opp. 13) that Tesla reserved all hiring, firing, and promotion decisions for itself, but cites no evidence for this proposition.  At a minimum, this failure of proof of Martinez's employment status warrants a new trial.

   **B.      Diaz Fails To Show A Tesla-Diaz Contract For Purposes Of § 1981 Liability**

   ***Joint employer***.  Diaz focuses (Opp. 11) on ancillary facts purportedly showing that Diaz "worked at Tesla's direction, in Tesla's factory, for Tesla's benefit."  But if this were sufficient to establish an employment contract, nearly any worker who performed services at a company's direction and on its premises would be deemed an employee of that company.  That is precisely why Diaz was required to advance evidence showing the existence of a ***contract***, as the Court recognized.  (*See* Dkt. 303 at 3-4.)  But Diaz does not—and cannot—identify any facts showing the existence of mutual consent or consideration, and instead simply refers (Opp. 11) to the Court's prior orders and the vague generalization that Diaz agreed to perform services for Tesla while Tesla agreed to pay for those services.  As Tesla's cited cases make clear (Dkt. 317 ("Mot.") 9), this is not enough.  Diaz makes no attempt to address Tesla's authorities and offers none of his own.

   ***Third-party beneficiary***.  Diaz states that the jury found both a direct employment contract between Diaz and Tesla, ***and*** that Diaz was a third-party beneficiary of the contract between Tesla

TESLA'S REPLY RE: MOT. FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR

and nextSource.  (Opp. 11.)  This is wrong.  In the verdict form, Question 4 is expressly tied to Instruction No. 37, which articulates the two theories of liability in the alternative.  (Dkt. 301 at 2; Dkt. 280 at 38.)  Because the jury answered Question 2 of the verdict form in the affirmative, it found for Diaz on one of the two alternative forms of liability (employment contract), and it therefore cannot have also found the alternative form of liability (third-party beneficiary).  (*Id*.) Diaz urges the Court to disregard this unavoidable conclusion as "nonsense," and attempts to shift the blame to Tesla, arguing that ***Tesla*** should have sought to modify the verdict form to explicitly address each of ***Diaz's*** theories.  (Opp. 12.)  But Tesla is not obligated to tailor the verdict form to accommodate Diaz's preferences in presenting his various theories of liability.

Diaz also suggests that Tesla argued a "no third-party beneficiaries" clause is, by itself, determinative.  (Opp. 12.)  Not so.  Tesla merely explained that express disclaimers of a third-party beneficiary relationship may not be easily tossed aside, as they manifest "an intent *not* to create any obligations to third parties."  *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1163 (9th Cir. 2010).  Diaz fails to engage with Tesla's cited authority on this issue (Mot. 10), does not muster any authority of his own, and instead only parrots the legal standard for the third-party beneficiary inquiry.  The cases Diaz summarily brushes off, however—*e.g.*, *Balboa v. Hawaii Care & Cleaning, Inc.*, 105 F. Supp. 3d 1165, 1167-68, 1171 (D. Haw. 2015)—involve strikingly similar factual circumstances, and establish that workers are not deemed third-party beneficiaries of contracts between their employers and other entities, even where some benefits flow to those workers, ***unless*** the contract as a whole manifests an intent to create obligations to third parties.  Accordingly, Diaz's third-party beneficiary theory is foreclosed by the jury's verdict and unsupported by the record.

### C. Diaz Fails To Show A Tesla-Martinez Contract For Purposes Of State-Law Liability For Negligent Supervision And Retention

Contrary to Diaz's assertion (Opp. 12)—made without any support or citation to authority— that Tesla waived its right to seek JMOL on the state-law negligent supervision and retention claim, Tesla adequately raised this issue in its Rule 50(a) motion.  Tesla's motion identified Diaz's state-law claim (Dkt. 282 at 1) and the key issue of whether a staffing agency employee may be deemed an employee of Tesla (*id*. at 4-5), and sought JMOL on all claims (*id*. at 6).  Rule 50(b) "may be

1    satisfied by an ambiguous or inartfully made motion" under Rule 50(a).  *Antonick v. Elec. Arts, Inc.*,

2    841 F.3d 1062, 1068 (9th Cir. 2016) (citation omitted).  Accordingly, JMOL as to the existence of

3    a contract for Diaz's state-law claim is encompassed within Tesla's Rule 50(a) motion.

4         On the merits, although Diaz contends that the jury had "ample grounds" to find that Tesla

5    was Martinez's employer during the relevant time period (Opp. 13), Diaz does not identify ***any***

6    evidence for that proposition.  Instead, he relies on irrelevant testimony from Kawasaki that

7    Martinez was his day-shift counterpart, and that Kawasaki had access to the same amenities as Tesla

8    employees and received safety equipment from Tesla.  (Tr. 68:20-69:4, 70:14-16, 71:8-72:3.)

9    Because the jury lacked any basis to find that Martinez was employed by Tesla, Diaz's state-law

10   claim fails as a matter of law, and Tesla is entitled to JMOL.  (*See also* Mot. 10-11.)

11   **II.   DIAZ FAILS TO JUSTIFY THE JURY'S GROSSLY EXCESSIVE $6.9 MILLION
         COMPENSATORY DAMAGES AWARD**

12
13        **A.   Diaz Effectively Concedes That The Compensatory Damages Award Is An
              Extreme Outlier Among Similar Cases**

14        Notably absent from Diaz's opposition is a single citation to any comparable compensatory

15   damages award on similar facts.  Also absent is a response to any of the cases discussed at length in

16   Tesla's Motion (Mot. 13-15), as well as the more-than ***60 cases*** collected in Appendices A-C of

17   Tesla's Motion.  Diaz's silence speaks volumes, and the Court should treat as established Tesla's

18   argument that the compensatory damages award here is unprecedented.

19        Without any analogous cases that support the grossly excessive damages, Diaz retreats to

20   broad statements that the jury was properly instructed, and that courts should not overturn damages

21   verdicts.  (Opp. 15-16.)  Diaz thus suggests that proper instructions may immunize a damages

22   award—no matter how excessive—from review under Rule 59.  But if this were so, then no damages

23   award by a properly instructed jury could ever be scrutinized—a result contrary to the plain language

24   and purpose of Rule 59, and also belied by numerous remittitur cases where the adequacy of a jury

25   instruction was not the basis for granting or denying remittitur.  (*See* Mot. 12-15; *id*. Appx. A.)

26        Diaz also argues (Opp. 15) that it is "particularly inappropriate" to analyze the excessiveness

27   of a jury's verdict in a case involving non-economic damages, citing *Holzhauer v. Golden Gate*

28   *Bridge Highway & Transportation District*, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017),

*aff'd*, 743 F. App'x 843 (9th Cir. 2018).  *Holzhauer* was not a remittitur case, but instead involved a ***plaintiff's*** motion for new trial because the jury awarded no damages to the adult sons of a father who had been killed in an accident.  *Id.*  There, the claim of non-economic damages was premised solely on the loss of "love, companionship . . . training and guidance," and the court concluded that, under the facts presented, the jury's finding that the sons failed to prove damages was not contrary to the great weight of the evidence.  *Id.*  The fact that intangible damages may be difficult to measure only underscores the need for meaningful review, especially in extreme outlier cases like this one.

Diaz further attempts to dismiss Tesla's meticulous survey of cases for supposedly being "far from representative" and "cherry-picked."  (Opp. 14 n.2.)  But if the cases were "cherry-picked" or unrepresentative, then Diaz should have identified at least ***some*** comparable cases, with better results for himself, that Tesla wrongly excluded.  Diaz does not do this, because he cannot.

Similarly, Diaz incorrectly states that Tesla does not explain its methodology for selecting the cases.  But Tesla ***did*** explain its criteria for the cases collected in Appendices A and C (*see* Mot. 11-12), and noted that Appendix B consisted of a selection of comparable cases (*see id*. at 2-3).  And of course, the significance of the cases is apparent from Tesla's descriptions of them—and from actually reviewing them.  Diaz's attempt to distract from what the cases say is telling.

To take two obvious examples, in *Paul v. Asbury Automotive Group, LLC*, a § 1981 hostile work environment case based on race, the court remitted emotional distress damages of $2.1 million and $1.9 million per plaintiff to $150,000 per plaintiff, where the plaintiffs were subjected to racist abuse, including the frequent use of the N-word.  2009 WL 188592, at \*8-9 (D. Or. Jan. 23, 2009).  The plaintiffs suffered from problems in their relationships, as well as feelings of depression and loss of appetite, and they became more "quiet and reserved."  *Id.* at \*8.  And in *Sooroojballie v. Port Authority of New York and New Jersey*, a § 1981 and Title VII hostile work environment case based on race and national origin, the court remitted emotional distress damages of $2.16 million to $250,000, where the plaintiff suffered from anxiety, depression, and insomnia, for which he was prescribed medication upon seeking medical treatment.  816 F. App'x 536, 545-48 (2d Cir. 2020).  The plaintiff also experienced strain in his family relationships and began excessively drinking.  *Id.* at 547.  Yet the Second Circuit concluded that the award "far surpass[ed] the upper limit of the

TESLA'S REPLY RE: MOT. FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR

1   reasonable range" and shocked the judicial conscience, particularly because the plaintiff, like Diaz,

2   advanced no "evidence of lasting psychological effects."  *Id.* at 547-48.

3        Diaz also states that the Appendices cases are "particularly easy to distinguish from this

4   case."  (Opp. 14 n.2.)  Yet he makes almost no attempt to do so.  Instead, he leans on bare rhetoric,

5   remarking that this case involved "an unrelenting nine-month barrage of despicable, race-based

6   abuse, causing Mr. Diaz enormous emotional pain."  (*Id.*)  This unsupported statement is neither a

7   fair characterization of this case nor a basis to distinguish the dozens of cases Tesla cited, which

8   conclusively establish the damages award here as a clear outlier.

9        Diaz's other half-hearted objections to Tesla's cases are likewise meritless.  He argues that

10  most are from "other states and circuits," but does not dispute that the cited cases, like this case,

11  involved ***federal*** claims under ***federal*** law.  Tesla cited all the relevant Ninth Circuit authorities it

12  located; presumably, if Diaz had located others (or any that helped him), he would have cited them.

13       Diaz also argues that Tesla's results are "skewed" by Title VII's statutory damages cap, but

14  that is a red herring.  Though some cases in the Appendices arose under Title VII, that cap was

15  determinative in few, if any, of those cases.  Indeed, courts often found that the maximum amount

16  of damages sustainable by the proof was ***less than*** Title VII's statutory cap.  *See, e.g.*, *Clark v. City

17  of Tucson*, 2020 WL 914524, at *18-19 (D. Ariz. Feb. 26, 2020) (concluding that, even after a

18  reduction due to Title VII's statutory cap, jury's verdict was clearly excessive); *see also Bains LLC

19  v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005) (noting, in punitive

20  damages context, that the Title VII cap "was an appropriate benchmark for reviewing § 1981

21  damage awards, even though the statute [does] not apply to § 1981 cases").

22       Ultimately, in response to Tesla's reliance on dozens of cases, Diaz identifies (Opp. 14 &

23  n.2) only ***two*** supposedly contrary authorities but both are plainly inapposite.  ***First***, in *Kingston v.

24  International Business Machines Corp.*, the district court applied a standard that, under Washington

25  state law, unlike federal law applicable here, asked whether the verdict was the result of "passion

26  and prejudice."  2021 WL 2662216, at *5 (W.D. Wash. June 29, 2021) (noting that a verdict must

27  be "so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and

28  outrageous" (quoting *Bunch v. King Cty. Dep't of Youth Servs.*, 155 Wash. 2d 165, 179, 183

(2005))).  Moreover, the facts in *Kingston* are markedly distinct from this case.  There, the plaintiff's wife feared her husband would harm himself after his termination, and testified that the stress of his termination—which resulted in "extensive but fruitless efforts to find a new job"—triggered a mental health crisis.  *Id.*  Here, Diaz was not terminated, quickly found a new job, and presented no evidence about self-harm or a mental health crisis during or after his time at the Tesla facility.

**Second**, and similarly unavailing, is Diaz's reliance on *Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008), which Tesla addressed (Mot. 15 n.5).  Diaz suggests this § 1983 case would be included in a "more relevant" sampling of cases—a "sample" for which Diaz has identified no other cases—because it upheld a $5 million damages award.  (Opp. 14 n.2.)  Diaz strains to characterize this case as comparable, arguing that § 1983 is "analogous in history and purpose to section 1981, as both statutes were enacted in the Reconstruction era to halt widespread discrimination against former slaves."  *Id.*  But *Harper* was not a discrimination case at all.  There, the plaintiff police officers raised a § 1983 claim based on the Fourth Amendment after being falsely implicated in the Rampart corruption scandal.  *Harper*, 533 F.3d at 1015.  The officers developed severe physical symptoms, became suicidal, were put on gang hit-lists, lost their careers, and had their families destroyed.  *Id.* at 1028-29.  By contrast, Diaz developed no physical symptoms, did not seek any medical treatment, and easily found work after leaving Tesla.  (Mot. 4-5); *see Clark*, 2020 WL 914524, at *15-16 (distinguishing *Harper*).

### B.   Diaz Mischaracterizes The Record Evidence, Which Does Not Support The Compensatory Damages Award

To attempt to justify the jury's extraordinary and excessive compensatory damages award, Diaz ignores the actual evidence of harm that was advanced at trial, in favor of hyperbole.  For example, he states—without citation—that he endured "[n]ine months of horror" that left his "mental health in shambles and his enjoyment of life . . . severely damaged."  (Opp. 16.)  This and other statements by Diaz cannot be squared with the evidence.

To support his plain overstatement of the evidence, Diaz leans most heavily on the testimony of his expert Dr. Reading.  But Diaz neglects to mention that, until litigation arose, he never sought medical treatment for any supposed emotional distress resulting from his experience at Tesla, and

1   must concede that Dr. Reading examined Diaz only once, four years after the events at issue.  (Tr.

2   612:11-20.)  Further, Diaz dismisses out of hand Dr. Reading's conclusion that Diaz's "symptoms

3   entered remission shortly after [Diaz] returned to work several months" after resigning from Tesla.

4   (Tr. 587:23-588:3, 592:15-23, 606:6-20.)  Diaz also devotes much attention to the testimony of his

5   stepdaughter LaDrea Jones (Opp. 18), but ignores her testimony that Diaz returned to his old self

6   shortly after he left Tesla (Tr. 627:24-628:12, 636:12-637:4).

7         Diaz also ignores his own testimony that he was "happy to be [at Tesla]," and "continued to

8   want to work . . . at Tesla," until January 2016 (Tr. 516:11-517:10)—seven months into his supposed

9   "nine months of horror," and after the vast majority of the alleged discrimination occurred.  And it

10  is undisputed that Diaz encouraged his son to work at Tesla even after he says he was subject to

11  racial slurs and exposed to racist graffiti.  (*See* Tr. 401:5-12, 405:17-408:1, 500:13-24, 502:22-

12  504:8.)  To attempt to avoid his own, first-hand testimony, Diaz points to Dr. Reading's second-

13  hand (and years-later) observation that Diaz wanted to quit earlier but needed the job.  (Opp. 19

14  (citing Tr. 594:1-6).)  But even if Dr. Reading formed this impression, it does not negate Diaz's own

15  testimony that he was happy and wanted to remain at Tesla during most of his tenure.[1]

16        Diaz also repeatedly contends he was "severely impacted emotionally ***and physically***" (Opp.

17  16), and that he suffered "***physical harm***" as a result of "being racially harassed" (*id.* at 17 (emphasis

18  added)).  This is misleading.  Diaz does not cite any evidence for this alleged "physical" harm—and

19  the examples he provides elsewhere in his brief (crying in a stairwell, losing his sex-drive—*see* Opp.

20  19, 26)—reflect emotional harm.  Although Diaz refers to his testimony that he climbed over a piece

21  of equipment to "avoid being hit" by Martinez (Opp. 5 (citing Tr. 452:1-4)), this statement

22  embellishes the record.  Kawasaki testified that the surveillance footage only showed Diaz and

23  Martinez facing each other.  (Tr. 97:1-24.)  Moreover, Diaz never testified that his actions were

24  taken to "avoid being hit," and there is no evidence that anyone ever touched or struck Diaz.  Diaz's

25

26  _____

    [1] Diaz accuses Tesla of taking Diaz's testimony about his "happy" times at Tesla out of context, and
    asserts that Tesla's doing so is "as offensive as it is unsupported."  (Opp. 19.)  But Diaz's testimony

27  is clear: "I was still interested.  While I was there, I was happy to be there."  (Tr. 516:14-16.)  "Q.
    And you still continued to want to work at that assignment at Tesla despite all these racial slurs;

28  correct?  A.  Until at some point, yes, ma'am.  Q.  Understood.  And you got to that point after the
    drawing from January of 2016 . . .; is that correct?  A.  Yes."  (Tr. 517:5-10.)

need to "spin the evidence" to attempt to make this showing only confirms that the excessive compensatory damages award cannot be supported by the evidence actually introduced at trial.

### C.   Diaz Effectively Concedes Tesla Did Not Cause All The Compensatory Damages The Jury Awarded

Diaz concedes that "compensatory damages should be limited to harms caused by the tortfeasor."  (Opp. 20 (citing *Watson v. City of San Jose*, 800 F.3d 1135 (9th Cir. 2015).)  But he tries to distance himself from his own testimony which shows that much of his emotional distress was not caused by any racial discrimination he endured at Tesla, but rather by ***his son's*** subsequent incarceration, which allegedly resulted (at least in part) from discrimination that ***his son*** suffered at Tesla.  (*See* Opp. 20-21; *see also* Tr. 572:12-573:13 (discussing son's incarceration); Tr. 574:9-11 (confirming that Diaz "blame[s] Tesla for the things that happened to [his] son").)  Diaz now argues that "what made him most 'unhappy'" was Demetric's supervisor calling his son the N-word, "not his son's much later incarceration" (Opp. 20-21 (quoting Tr. 570:25-571:16)), but in doing so, he ignores his trial testimony to the contrary.  And in any case, Diaz's son Demetric was not a plaintiff at trial, so damages from any harm he suffered at Tesla are not recoverable by Diaz.

Diaz also argues, again, that the jury could not have awarded compensatory damages for harms not causally related to Tesla's discrimination against him because the jury was properly instructed on compensatory damages, and there was no evidence of juror misconduct.  (Opp. 20.)  This misses the point.  Tesla is not arguing that the jury was improperly instructed, but rather that the jury reached a grossly excessive verdict that may be partly explained by the jury's sympathy for Diaz's concern about his son's incarceration—a situation that was not caused by Tesla, and not a proper basis to award Diaz millions in damages.  *See, e.g.*, *Clark*, 2020 WL 914524, at *17 (noting that while experiences were traumatic and contributed to distress, "the evidence [did] not establish that [the] [d]efendant directly caused them"); *Paul*, 2009 WL 188592, at *9 (discounting evidence of distress where it occurred during period after plaintiff had left the hostile work environment and when plaintiff was dealing with unrelated issues).

**D.      Diaz Cannot Overcome The Improperly Punitive Component Of The Compensatory Damages Award**

Diaz does not dispute that Tesla's conduct is relevant to compensatory damages only insofar as it is probative of "the nature and degree of emotional injury suffered" by Diaz, *Glenn-Davis v. City of Oakland*, 2007 WL 687486, at *2 (N.D. Cal. Mar. 5, 2007) (remitting emotional distress award from $1.85 million to $400,000), yet he tips his hand by focusing on ***Tesla's conduct***—not his resulting harm—in seeking to justify the compensatory damages award (*e.g.*, Opp. 14, 16-17, 21).   He asserts, falsely, that Tesla "encouraged" his harassers to "double down" on their racist conduct.  (Opp. 16.)  But this shocking accusation, made without citation, would be of no relevance to Diaz's harm, even if it were true (which it is not).  Likewise, Diaz asserts that he "beg[ged] his supervisor Romero for help," and that Tesla ignored those pleas.  (Opp. 19.)  But the portions of the transcript Diaz cites (Tr. 451:16-25, 513:19-25, 531:1-7) do not mention or relate to Romero at all.  As to the exhibits, Exhibit 235 shows an email where Diaz requested that Romero "please talk to [Martinez]."  It is undisputed that, after this email, Martinez was counseled by Tesla, and that Diaz did not have any interaction with Martinez again until January 2016.  (Tr. 231:8-15, 243:12-244:7.)  And Exhibit 240 shows Tesla working with nextSource to ensure that Diaz's complaint was addressed.  Diaz's references to the record are thus both irrelevant and misleading.

Diaz also argues that Tesla "confuses two very distinct parts of counsel's closing statement," and that any discussion of punishment did not arise in the context of compensatory damages.  (Opp. 21-22.)  But Diaz concedes that his counsel asked the jury to award $1 million for every month Diaz worked at Tesla, and $1 million per year for the years it would purportedly take Diaz to recover.  (Tr. 920:21-25, 921:8-17.)   This "methodology" is untethered from any evidence of emotional distress actually experienced by Diaz.  (*See* Mot. 2.)  Indeed, because Diaz did not suffer distress for much of his time at Tesla (Tr. 516:11-517:10), it is nonsensical that damages would be awarded for ***every month*** he was there.  And because whatever psychological distress he experienced has abated (Tr. 587:23-588:3, 593:20-23, 606:6-20), it makes no sense that the damages are justified because it "would take" Diaz "two to four years . . . to recover."  (Opp. 21.)  Because Diaz's requests

for damages (and the resulting compensatory damages award) were not tied to any actual evidence of injury—past or future—their only possible purpose is to punish Tesla, which is improper.

Finally, Diaz fails to distinguish *Clark*, 2020 WL 914524, and *Longfellow v. Jackson County*, 2007 WL 682455 (D. Or. Feb. 28, 2007), which show that compensatory damages should be reduced where they improperly reflect a jury's desire to punish the defendant, rather than compensate the plaintiff. He argues that punitive damages were unavailable in these cases, but does not explain why this should make any difference. (Opp. 22-23.) And it does not. Whether or not a jury separately awards punitive damages is immaterial to whether a compensatory damages award is improperly punitive. Indeed, the concern that a compensatory damages award is improperly "punitive" is heightened where, as here, a jury also awards punitive damages, raising concerns about duplication of the punitive award. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003) (noting concern about duplicative punitive damages award where emotional distress "[c]ompensatory damages . . . contain [a] punitive element").

Accordingly, the Court should grant a new trial under Rule 59 unless Diaz accepts a remittitur to $300,000, which reflects the maximum amount sustainable by the proof. *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094-95 (9th Cir. 2014).

## III. DIAZ FAILS TO JUSTIFY THE UNCONSTITUTIONAL $130 MILLION PUNITIVE DAMAGES AWARD

Tesla showed (Mot. 18-26) that the jury's award of $130 million in punitive damages is grossly and unconstitutionally excessive—and indeed is at least twice as much as the constitutional limit in a case of this sort. In response, Diaz provides no authority that justifies anything close to the 18:1 ratio of punitive-to-compensatory damages the jury awarded here, and there is no such authority. The punitive damages are unconstitutional and must be drastically reduced.

### A. Diaz Fails To Demonstrate That Tesla's Conduct Amounts To More Than Non-Reprehensible Omission Or Negligence

Diaz fails to show that any of the five "*State Farm* factors" that determine the degree of reprehensibility support the jury's grossly excessive punitive damages award.

***First***, Diaz fails to show he actually suffered "physical" harm. *See State Farm*, 538 U.S. at 426 (finding lower reprehensibility where the plaintiffs' harm was based on "emotional distress,"

"not from some physical assault or trauma; there were no physical injuries").  The true function of this factor is to underscore the severity of extreme physical assault, *see Osterhout v. Bd. of Cty. Comm'rs of LeFlore Cty., Okla.*, 10 F.4th 978, 998, 1002 (10th Cir. 2021) (finding that "physical harm" from a police officer's assault in an excessive force case that caused "extensive facial bruising, a bleeding laceration on the face, and a deformity and swelling of the nose" "support[ed] heavy punitive damages"), or even loss of life, *see Clark v. Chrysler Corp.*, 436 F.3d 594, 601 (6th Cir. 2006) (finding the negligent design of a truck that caused the driver's death "was reprehensible because the loss of life evidenced a greater disregard for the rights and safety of others than the economic damage sustained in *Gore*").

Diaz did not suffer any such "physical harm" from the discriminatory conduct at issue. While he complains of a supposedly ***near***-physical assault (Opp. 26), it is undisputed that no actual physical conduct was ever made; Diaz was never touched, or injured (*see supra* at 10-11). Recognizing this, Diaz argues that the emotional trauma he experienced resulted in "physical symptoms"—crying, weight loss, and loss of his sexual drive.  (Opp. 26.)  Such symptoms are not "physical harm."  The sole medical evidence Diaz introduced was his retained expert's diagnosis four years later of "psychiatric injury of adjustment order with symptoms of depression and anxiety."  (*Id.*)  He sought no medical treatment or counseling at the time, and cannot convert emotional harm into "physical harm" for purposes of the reprehensibility analysis.  *See, e.g.*, *Khalaf v. Ford Motor Co.*, 2019 WL 10301739, at *7 (E.D. Mich. Mar. 28, 2019) (granting steep remittitur where "Plaintiff claims he experienced physical manifestations of his psychological harm, . . . [but the Court finds] that Plaintiff did not suffer physical harm.  He suffered no physical assault or trauma; his harm was emotional–humiliation and outrage."), *rev'd on other grounds*, 973 F.3d 469 (6th Cir. 2020) (directing JMOL of no liability for Ford).[2]

---

[2]  Diaz's assertion that psychological harm should be considered physical harm is contrary to *State Farm*, which expressly found that the plaintiffs' emotional distress was not physical harm. 538 U.S. at 426.  The cases Diaz cites that are purportedly to the contrary (Opp. 26) are inconsistent with *State Farm* on this issue and do not cite any support for their conclusion.  In any event, the court in Diaz's authority *Roby* ultimately found low reprehensibility, *see Roby v. McKesson Corp.*, 47 Cal. 4th 686, 719 (2009) (remitting punitive-to-compensatory damages ratio to 1:1), and the jury in

1     **Second**, Diaz resorts to hyperbole and mischaracterizations of the record in arguing that

2     Tesla evinced indifference or reckless disregard for Diaz's health or safety.  (Opp. 27.)  The record

3     shows that Tesla took action after each documented incident of discrimination that Diaz reported.

4     (Mot. 3.)  In particular, in response to the only alleged incident in which Diaz argues his health or

5     safety was threatened—the supposed October 2015 threatened assault by Martinez—Tesla

6     reprimanded Martinez and separated him from Diaz, to the point that Diaz had no contact with

7     Martinez for three months after the incident.  (Tr. 526:18-25; 527:16-19.)  Diaz seemed satisfied

8     with Tesla's response at the time, as he soon thereafter assisted Lamar Patterson in applying to the

9     factory to work alongside Martinez, and testified he was "happy to be there" and still "want[ed] to

10    work [at Tesla]" for months after the incident with Martinez.  (Tr. 516:14-16; 517:5-10; 527:20-24.)

11          Moreover, it is undisputed that, as a matter of company policy, Tesla does not condone

12    physical altercations between its employees: Tesla had and retains an anti-harassment racial

13    discrimination policy that states that "Tesla prohibits any verbal physical, or visual harassment of

14    an employee because of that person's race . . . ."  (Ex. 368.)[3]  Tesla is not and was not "indifferent"

15    to Diaz's health or safety.  This factor too supports a reduction in punitive damages.

16          **Third**, nothing in the record suggests that Diaz's financial vulnerability was a factor in any

17    of the conduct cited at the trial.  Diaz himself acknowledges this factor is "not particularly relevant

18    in a mostly" (here, entirely) "noneconomic damages case like this one."  (Opp. 28 (quoting

19    *Hardeman v. Monsanto Co.*, 997 F.3d 941, 973-74 (9th Cir. 2021)).)  Diaz comments on his "low

20    wage" and high "Bay Area cost of living," (*id.*), but does nothing to connect those factors to the

21    discrimination or harm he suffered, and there is no connection.

22          As to the **fourth** and **fifth** factors—whether the conduct involved repeated actions and

23    whether the harm was the result of Tesla's intentional malice, trickery or deceit, *State Farm*, 538

24    _____

25    Diaz's authority *Yowan Yang* awarded a comparatively low 2:1 punitive-to-compensatory damages
       ratio, suggesting the plaintiff's emotional harm did not warrant extreme punitive damages, *see*

26    *Yowan Yang v. ActioNet, Inc.*, 2017 WL 2117028, at *15 (C.D. Cal. Jan. 23, 2017).

27    [3]   Diaz again mischaracterizes the record in suggesting that Tesla's anti-discrimination handbook
       "joking[ly]" minimizes racial discrimination as "stupid stuff."  In fact, the handbook, which was
       admitted in evidence, makes clear that Tesla strongly condemns "[h]arass[ment]" or physical

28    altercations among workers and may fire workers for such offenses.  (Ex. 6 at 3.)

1    U.S. at 419—Diaz attempts to conflate the actions of Diaz's coworkers (often contract workers

2    themselves, or, rarely, low-level Tesla employees) with Tesla's own conduct.  But here, the jury

3    never found, and could not have found on this record, that any Tesla policy condoned or permitted,

4    or that any Tesla upper-level manager or officer ever perpetrated, any act of racial discrimination

5    against Diaz (or others).  Diaz's suggestion that "Tesla condoned" discrimination "at its highest

6    levels" (Opp. 2), is flatly false, and Diaz cites not a single line in the record to support it.  The record

7    contains no evidence that Tesla—at a corporate or management level—conducted or condoned any

8    act of discrimination against Diaz (or others)—let alone any repeated, intentional, or malicious acts.

9    To the contrary, it is undisputed that Tesla has a robust racial anti-discrimination policy and that it

10   imposed disciplinary sanctions in response to each act of discrimination that Diaz recorded.

11       In assessing "reprehensibility" for purposes of punitive damages, "the focus of the . . .

12   inquiry must be on the corporation's institutional responsibility, if any, for [the] harassment."  *Roby*,

13   47 Cal. 4th at 713-14 (applying *State Farm* factors); *cf., e.g.*, *Zhang v. Am. Gem Seafoods, Inc.*, 339

14   F.3d 1020, 1025-28, 1044 (9th Cir. 2003) (noting that  the defendant company's CEO engaged in

15   the relevant racial discrimination and wrongful termination);  *Morse v. S. Union Co.*, 174 F.3d 917,

16   925 (8th Cir. 1999) (emphasizing the role of the defendant's "top management" in assessing

17   reprehensibility of corporate defendant in upholding roughly 4:1 punitive damages award for

18   employment age discrimination); *Chopra v. Gen. Elec. Co.*, 527 F. Supp. 2d 230, 244 (D. Conn.

19   2007) (emphasizing role of defendant's "high level managers" in assigning a "significant degree of

20   reprehensible conduct").  Here, there is no evidence that Tesla "at its highest levels," or as a matter

21   of company policy, participated in or condoned racial discrimination against Diaz.

22       Moreover, Diaz cites no evidence corroborating his testimony that he orally reported racial

23   epithets and incidents to his supervisors.  (*See* Opp. 4, 29-30; Mot. 4; *see also, e.g.*, Tr. 511:25-

24   512:2, 512:11-17, 524:3-20.)  For the incidents Diaz did report in writing, it is undisputed that Tesla

25   disciplined the perpetrators, as Diaz admitted.  (*See* Tr. 510:23-511:3, 526:18-25, 527:16-19.)  In

26   any event, missing oral reports is at most classic negligence, not intentional malice, trickery, or

27   deceit.  Conspicuously, Diaz's opposition goes much further than Diaz or his counsel was willing

28   to go at trial—where they never accused Tesla of intentionally inflicting harm on Diaz.

B.      **Diaz Cannot Support The Grossly Excessive 18:1 Punitive Damages Ratio**

Diaz does not and cannot show that a punitive damages ratio of ***18 times*** the amount of the compensatory damages award is constitutionally permissible (it is not), or otherwise appropriate under the facts here.  To the contrary, as Tesla established (Mot. 21-24), the appropriate ratio here is ***at most*** 1:1, and in no event more than 4:1.  Diaz fails to show otherwise.

Diaz flatly errs in suggesting (Opp. 31) that a punitive damages award in excess of 9:1 in relation to compensatory damages is ever constitutionally permissible.  Diaz fails to point to a single post-*State Farm* decision that has upheld a punitive damages ratio in excess of 9:1, which *State Farm* identified as the outer limit of due process.  At 18:1, the punitive damages award here is double that.  The only case Diaz cites that applied a ratio greater than 9:1, *Swinton v. Potomac Corp*, 270 F.3d 794 (9th Cir. 2001), predated and was abrogated by the Supreme Court's decision in *State Farm*.  As the Ninth Circuit later stated: "[W]e decided *Swinton* before the Supreme Court decided *State Farm*, which limits *Swinton*.  *State Farm* emphasizes and supplements the *BMW* limitation by holding that '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'"  *Bains*, 405 F.3d at 776 (citation omitted).  Diaz's reliance on *Swinton* is thus unfounded, and a decision to uphold a ratio in excess of 9:1 would be the first of its kind since *State Farm*.

***1:1 ratio***.  Diaz further fails to distinguish the comparable cases Tesla cited showing that a ratio no greater than 1:1 is the proper limit of punitive damages here, in light of the substantial compensatory damages that will be awarded to Diaz even if the Court grant's Tesla's request for remittitur of those damages.  *See, e.g.*, *State Farm*, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.").  Moreover, where (as here) the compensatory damages are solely noneconomic damages for emotional distress "caused by the outrage and humiliation the [plaintiffs] suffered at the actions of [the defendant]," those damages "already contain [a] punitive element" that should not be "duplicated in the punitive award," a factor further favoring a 1:1 ratio at most.  *State Farm*, 538 U.S. at 426.  Thus, this is a classic case where the Court should find a 1:1 ratio the outer constitutional limit of punitive damages.

1    Diaz fails to acknowledge or distinguish Tesla's cases that did just that.  In *Noyes v. Kelly*

2 *Services, Inc.*, 2008 WL 2915113 (E.D. Cal. July 25, 2008), *aff'd*, 349 F. App'x 185 (9th Cir. 2009),

3 for example, the court reduced a ***$5.9 million*** award of punitive damages to about ***$645,000*** in a

4 religious discrimination case because the "significant" emotional distress compensatory damages

5 were "likely . . . based on a component which [was] duplicated in the punitive award," so that "a

6 ratio of 1 to 1 is the constitutional limit in this case."  *Id.* at *14 (citation omitted).

7    Likewise, even Diaz's own authority *Roby* (cited Opp. 26) "conclude[d] that a one-to-one

8 ratio between compensatory and punitive damages is the federal constitutional limit" where there is

9 a "substantial compensatory damages verdict, which included a substantial award of noneconomic

10 damages," 47 Cal. 4th at 719, that "may have reflected the jury's indignation at [the defendant's]

11 conduct, thus including a punitive component," *id.* at 718.

12    Diaz also notably ignores *Paul*, which remitted a ***$2.75 million*** punitive damages award to

13 ***$150,000*** on similar facts in a § 1981 racially hostile workplace environment case (*see supra* at 7).

14 The court there too concluded that a 1:1 ratio was the outermost limit given the plaintiff's

15 "substantial" compensatory damages, which were "based on emotional harm."  *Paul*, 2009 WL

16 188592 at *11.  These cases support a similar reduction here.

17    ***2:1 ratio***.  As Diaz likewise fails to note, the rare cases allowing punitive damages in a ratio

18 greater than 1:1 involved circumstances far more egregious than those here.  For example, the Ninth

19 Circuit allowed a 2:1 ratio in a product liability case about a herbicide found to cause life-threatening

20 risks of cancer.  *See Hardeman*, 997 F.3d at 975.  And in a highly relevant racially hostile workplace

21 environment case that Diaz ignores, *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014),

22 the jury awarded $1.32 million in compensatory damages and $24 million in punitive damages, the

23 district court remitted the punitive damages to $5 million, and the Second Circuit nonetheless

24 vacated and remanded for a further remittitur of punitive damages to at most a 2:1 ratio, *id.* at 166-

25 67, even though the court found the reprehensibility of the three-year racially degrading conduct

26 there "egregious in the extreme," *id.* at 165.  *Turley* cited as one reason for this further reduction of

27 the punitive damages the fact that the $1.32 million compensatory damages award for emotional

28 distress was "already sizable."  *Id.* at 165.

1   *4:1 ratio*.  Diaz's cherry-picked handful of cases allowing a ratio higher than 4:1 (Opp. 31-

2   33) bears no resemblance to this case.  In *Zhang*, which allowed a 7:1 ratio, the plaintiff suffered

3   racial discrimination and wrongful termination ***directly at the hands of the defendant company's***

4   ***CEO***.  339 F.3d at 1025-28, 1044.  Here, no Tesla mid- or upper-level manager—let alone the

5   company's CEO—remotely engaged in any racial discrimination whatsoever.  And in *Bains*, where

6   the court opined that a 6:1 ratio might be permissible, the plaintiff was awarded just $50,000 in

7   compensatory damages.  405 F.3d at 776-77.  Similarly, *Flores v. City of Westminster* allowed a

8   ratio greater than 2:1 only as to those claims where the compensatory damages were insubstantial,

9   averaging only $60,000.  873 F.3d 739, 763 (9th Cir. 2017). Where, in contrast, the compensatory

10  damages are already "sizable" or "substantial" even after remittitur, no such outsized punitive-to-

11  compensatory ratio can possibly find support.  *See, e.g.*, *Yates v. GunnAllen Fin.*, 2006 WL 1821194,

12  at *2 (N.D. Cal. June 30, 2006) (reducing punitive damages ratio from 6:1 to 3:1 because 6:1 "is

13  higher than the [4:1] ratio suggested by the Supreme Court and the Ninth Circuit for cases in which

14  plaintiff has received substantial compensatory damages"); *Turley*, 774 F.3d at 165-67 (same but

15  limiting ratio to 2:1).

16      **C.      Diaz Misstates The Relevance Of The $300,000 Title VII Damages Cap**

17          Contrary to Diaz's mistaken suggestion (Opp. 33), the Ninth Circuit ***requires*** a comparison

18  between a § 1981 racial harassment punitive damages award and the Title VII $300,000 damages

19  cap.  As the Ninth Circuit has recognized, "[b]oth pre-*State Farm* in *Swinton*, and post-*State Farm*

20  in *Zhang*, we noted that the $300,000 statutory limitation on punitive damages in Title VII cases

21  was an appropriate benchmark for reviewing § 1981 damage awards, even though the statute did

22  not apply to § 1981 cases." *Bains*, 405 F.3d at 777.  *Bains* concluded that the Title VII $300,000

23  damages cap "restrains the permissible amount" of punitive damages awarded in a § 1981 racial

24  discrimination case.  *Id.*  Thus, that cap is highly relevant to the *State Farm* analysis here.  There is

25  no basis to suppose that Congress intended to authorize punitive damages under § 1981 of more

26  than ***456 times*** the maximum award for comparable racially hostile environment claims under Title

27  VII—Congress's primary statutory scheme for addressing racial employment discrimination.

28

**D.    Diaz Fails To Dispel The Jury's Improper Reliance On Tesla's Wealth**

Diaz admits (Opp. 33-34) that his counsel at closing encouraged the jury to tie the punitive damages it awarded to a specific percentage of Tesla's wealth.  (*See* Tr. 925:3-12 ("But given that Tesla is worth . . .  Given that the cash is $1 billion, . . . [m]y question is: If you punish them by 10 percent, is that enough to get their attention? I frankly don't think that it is.").)  Comments like this underscore that the punitive damages awarded here (approximately 10% of Tesla's supposed free cash) are not "reasonable nor proportionate to the wrong committed," *State Farm*, 538 U.S. 429, but instead were assessed based on Tesla's wealth.  As a matter of law, however, the "wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."  *Id.* at 427.

Nor can Diaz defend such improper reliance on Tesla's wealth by suggesting it is needed for deterrence.  (Opp. 34-35.)[4]  Although punitive damages can serve the legitimate purposes of deterrence and punishment, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property."  *State Farm*, 538 U.S. at 417.  "[T]he Supreme Court has instructed us to go no further if a more modest punishment for the reprehensible conduct at issue could have satisfied the State's legitimate objectives of punishing and deterring future misconduct."  *Hardeman*, 997 F.3d at 976 (internal quotation marks and citations omitted).  Under the facts here, no "deterrent" is needed at all to ensure Tesla treats discrimination in the workplace seriously.  Tesla has already taken serious steps, before the jury's verdict, to prevent race discrimination in its workplace.  And that work continues, with or without an unconstitutional punitive damages award of $130 million.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion.

---

[4]   The Court should strike or disregard Plaintiff's Request for Judicial Notice (Dkt. 320).  Such a separate motion is not permitted by Civil L.R. 7-1(a) and extra-record newspaper clippings as to publicity given to the jury's verdict are not an "adjudicative fact" suitable for judicial notice under Fed. R. Evid. 201.  In any event, these materials are irrelevant to the issue before the Court, which is to assess whether the punitive damages award was "grossly excessive or arbitrary."  *State Farm*, 538 U.S. at 416.  The Supreme Court has "instructed courts reviewing punitive damages to consider three guideposts," none of which is whether the jury's verdict will receive significant media attention.  *Id.* at 418.  Nor can the clippings establish that a less extreme punitive damages award would not be similarly capable of serving as harsh deterrence.

1   DATED:  December 21, 2021            QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
2

3

4                                       By_____/s/ Kathleen M. Sullivan_____
                                            Kathleen M. Sullivan
5                                           Daniel C. Posner
                                            QUINN EMANUEL URQUHART &
6                                           SULLIVAN, LLP
                                            865 S. Figueroa St., 10th Floor
7                                           Los Angeles, California 90017
                                            Telephone: (213) 443-3000
8                                           Facsimile: (213) 443-3100

9
                                            *Attorneys for Defendant Tesla Inc.*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TESLA'S REPLY RE: MOT. FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR