UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OWEN DIAZ,

               Plaintiff,

     v.

TESLA, INC., et al.,

               Defendants.

Case No. 3:17-cv-06748-WHO

**ORDER ON POST-TRIAL MOTIONS**

Re: Dkt. No. 317

**INTRODUCTION**

After the trial concerning plaintiff Owen Diaz's claims that defendant Tesla, Inc. ("Tesla") discriminated against him in violation of 42 U.S.C. § 1981—a Reconstruction-era civil rights statute that prohibits discrimination in the making and enforcement of contracts—and under California state law, the jury awarded Diaz $6.9 million in compensatory damages and $130 million in punitive damages.   The evidence was disturbing.   The jury heard that the Tesla factory was saturated with racism.   Diaz faced frequent racial abuse, including the N-word and other slurs. Other employees harassed him.   His supervisors, and Tesla's broader management structure, did little or nothing to respond.   And supervisors even joined in on the abuse, one going so far as to threaten Diaz and draw a racist caricature near his workstation.

Tesla now moves for judgment as a matter of law that it is not liable.   In the alternative, it moves for a new trial and to reduce the amount of damages.

Tesla's motion for judgment as a matter of law is denied.   On the Section 1981 claim, Tesla argues that Diaz's contract of employment was with a staffing agency that Tesla contracted with, not with Tesla itself.   But the jury had a legally sufficient basis to find Tesla liable on two

grounds. First, it found in a special verdict that Tesla qualified as an employer of Diaz under the law, even if not on paper. It could have reasonably found that this employment relationship was governed by an implied-in-fact contract. Second, it could have found that Diaz was an intended beneficiary of the contract between Tesla and the staffing agency. As a result, Diaz was entitled to bring the Section 1981 claim to enforce his rights under that contract. On the remaining issues, Tesla waived its legal challenge to Diaz's state-law negligent supervision claim. And Tesla's motion for a new trial is also denied; the weight of the evidence amply supports the jury's liability findings.

Tesla's motion for a remittitur—that is, a reduction in the amount of damages—is granted in part. Great deference is owed to the jury's verdict, but after careful review of the record, I conclude that the award of compensatory damages was excessive. I will not reduce it to $300,000, as Tesla advocates. It will be remitted to $1.5 million, the highest award supported by the evidence. The punitive damages award must also be remitted under Supreme Court precedent imposing constitutional limitations on punitive damages. But again, I will not reduce it to the one-to-one ratio to compensatory damages that Tesla urges. I conclude that, on these facts, the Constitution permits a punitive-damages award of $13.5 million—nine times the amount of compensatory damages.

## BACKGROUND

### I.      PROCEDURAL BACKGROUND

Diaz filed this suit in state court in October 2017 with co-plaintiffs Lamar Patterson and Demetric Di-Az (who is Diaz's son). Dkt. No. 1-2. The suit was against Tesla, CitiStaff Solutions, Inc. ("CitiStaff"), West Valley Staffing Group ("West Valley"), and Chartwell Staffing Services, Inc. ("Chartwell") for many federal and state claims related to discrimination, harassment, retaliation, and negligence. *Id.* In November 2017, Tesla removed the case to this Court. Dkt. No. 1. The parties stipulated to, and I approved, submitting Patterson's claims to arbitration and staying them in this court; Patterson eventually settled the case and his claims were voluntarily dismissed. Dkt. Nos. 36, 139. In December 2018, the plaintiffs amended the complaint to add nextSource, Inc. ("nextSource") as a defendant. Dkt. No. 57. As a result, the

United States District Court
Northern District of California

1    pretrial and trial schedule was continued by stipulated order.  Dkt. No. 77.  In December 2019, the

2    parties stipulated to dismissing West Valley.  Dkt. No. 138.

3           The defendants moved for summary judgment in fall 2019, which I granted in part and

4    denied in part.  Dkt. No. 144.  The net effect of that order was to remove many of the claims from

5    the case.  *See id.*  In March 2020, CitiStaff and nextSource each settled with the plaintiffs, and I

6    approved their dismissal.  Dkt. Nos. 166, 169.  And in April 2020, I approved a stipulated

7    dismissal of Di-Az.  Dkt. No. 176.  That left Diaz and Tesla as the only parties to go to trial.  But

8    due to the COVID-19 pandemic, public health responses, and the parties' schedules, trial was

9    repeatedly postponed until September 2021.

10   **II.    THE EVIDENCE AT TRIAL[1]**

11          The jury heard six days of testimony, from September 27 to October 4, 2021.

12          **A.  Diaz Gets a Job at the Tesla Factory**

13          In summer 2015, Diaz saw an online job post for work at Tesla.  Tr. at 385:15–386:6; *see*

14   *also* Ex. 62 (job posting).[2]  The post used Tesla's insignia at the top and contained no indication

15   that there was another company involved.  *See* Ex. 62.  Among other things, the post required Diaz

16   to authorize "Tesla Motors or its agents" to carry out various forms of background investigations.

17   *Id.*  After Diaz filled out the application and clicked the link to apply, he received an email that

18   directed him to CitiStaff.  Tr. at 392:2–9.  He liked the idea of working at Tesla because he "was

19   going to be a part of something that was bigger than" he was.  *Id.* at 502:15–18.  He liked that he

20   would "be able to make the [E]arth a little bit better for the next generation."  *Id.*  He "believe[d]

21   in the environment" and that "we need[ed] to move away from the diesel and the fossil fuels."  *Id.*

22   at 393:15–19.  He thought that Tesla had a "vision to . . . correct some of the damage that we have

23   been doing to the [E]arth."  *Id.*  Before starting, he went to a CitiStaff office to fill out paperwork.

24   *Id.* at 391:4–19.

25   _____

26   [1] In this background section, I recount the evidence at trial in a neutral manner for clarity in the
     record.  As this Order's substantive analysis explains, the law often requires that, at this

27   procedural posture, the evidence be assessed in the light most favorable to the jury's verdict.

28   [2] The trial transcript, cited as "Tr.," appears in six volumes at (in their proper order) Dkt. Nos. 300,
     294, 295, 296, 297, and 298.  Exhibits admitted at trial are cited as "Ex."

United States District Court
Northern District of California

United States District Court
Northern District of California

Diaz began work at Tesla's factory in Fremont, California, on June 3, 2015. *Id.* at 392:5. He received a badge from Tesla that also had CitiStaff on it. Ex. 19. His checks came from CitiStaff. Tr. at 391:4–19. His job involved operating a forklift, for which he had to receive a training and certification that came from Tesla. *Id.* at 394:3–19. Tesla also provided orientations to other employees hired through staffing companies. *See id.* at 67:18–68:11. It provided employees with safety equipment. *Id.* at 70:14–16. Diaz testified that "all of [his] directions came from Tesla." *Id.* at 391:22–24. Other employees similarly testified that their "day-to-day" management did not come from the staffing companies. *See, e.g.*, *id.* at 70:2–4. When Diaz arrived, he was given a tour of the facility by one of his supervisors, Jaime Salazar, who worked for Tesla. *Id.* at 400:2–9. Another supervisor of his, Ed Romero, also worked at Tesla for most of the time during which Diaz was employed, though he had previously been a nextSource employee. *Id.* at 400:10–16. Diaz and others testified that, in terms of their interactions inside the Tesla factory, there was no difference between Tesla employees and staffing company employees. *Id.* at 400:17–24.

### B. Racist Statements and Drawings in the Factory

On Diaz's second day of work, Diaz saw the N-word scratched into a bathroom stall. *Id.* at 401:6–12. Over the course of his employment, more racist bathroom graffiti was added. *Id.* at 403:5–15. He encountered swastikas and the phrase "death to all [N-words][3]." *Id.* at 403:15–404:7. Diaz reported the N-word on the bathroom stall to a supervisor (either Romero or Tamotsu "Tom" Kawasaki). *Id.* at 401:17–23. Romero testified that the janitorial staff were instructed to take pictures of graffiti they found while cleaning and send them to personnel. *Id.* at 163:2–7.

Diaz also testified that "eight to ten" employees called him the N-word while he worked at Tesla. *Id.* at 512:25–513:9. Diaz could not identify who those employees were, or their races. *Id.* Kawasaki testified that the N-word was "thrown around" the Tesla factory "a lot." *Id.* at 99:4–11. He stated that at least some of these uses were "friendly" or in "fun." *Id.* at 99:7–11. Michael John Wheeler, a supervisor employed by Chartwell, testified that he heard the N-word used "all

---

[3] The parties' practice at trial was to usually use the letter "N" to stand in for the N-word; that is how it often appears in the transcript. I replace those in this recitation with "N-word" for clarity.

over the factory" and heard it "every day." *Id.* at 424:21–425:7.  Wheeler also testified that he

was derogatorily called the N-word, that the co-worker who said it was promoted not disciplined,

and that another co-worker spread feces on the cart he drove around the factory.  *Id.* at 431:10–

432:21.  And Wayne Jackson, who worked for nextSource liaising with Tesla employees, agreed

that the N-word was used "on a daily basis," though sometimes in a "friend[ly]" way (as in, "my

N-word").  *Id.* at 225:5–13.

### C.  Incidents with Particular Employees

#### i.   Judy Timbreza

One of Diaz's co-workers was Judy Timbreza (who is male).  *Id.* 404:10–15.  Timbreza,

who spoke Spanish and English, would call Diaz "mayate," the Spanish equivalent of the N-word.

*Id.* at 405:20–406:6.  Timbreza also called Diaz "porch monkey" in Spanish, a derogatory slur for

a Black person.  *Id.* at 406:7–15.[4]

On July 31, 2015, Diaz and Timbreza got into a "verbal altercation." *Id.* at 407:25–408:1.

Timbreza called Diaz the N-word in English and was "ranting" and "laughing." *Id.* at 407:11–22.

Kawasaki received a call about this altercation and found Diaz and Timbreza "face-to-face, . . .

arguing" and "about to fight." *Id.* at 78:13–24.  He separated them and asked other employees

around what had occurred; they reported that "some racial slurs [were] thrown" by Timbreza.  *See

id.* at 78:25–79:11.  He sent Timbreza home.  *Id.*  Diaz told Kawasaki at the time that Timbreza

had called him the N-word and a "coon." *Id.* at 79:20–24.  Timbreza did not testify.

The evidence at trial about Tesla's investigation (or lack thereof) into the incident was

somewhat muddled.  It is clear that Kawasaki wrote an email to Romero that Diaz had "brought to

[his] attention" comments that were "racist in nature" by Timbreza.  *See* Ex. 38.  It is less clear

what the response to this entailed.  When asked whether he investigated Diaz's complaints about

Timbreza, Romero responded that he "was not the direct supervisor." Tr. at 137:8–12.  But he

then testified that he "spoke with employees" and found "there was really nothing directly said

about these words." *Id.* at 137:17–20.  When pressed, he classified what he performed as a

---

[4] Tesla has never disputed that the slurs at issue in this case carry the meanings that Diaz ascribes to them.

United States District Court
Northern District of California

United States District Court
Northern District of California

"minimal investigation, I guess." *Id.* at 138:3–6.  He also admitted that he did not interview (or did not remember interviewing) Diaz about Timbreza.  *Id.* at 139:15–16.  Despite this, he emailed supervisor Victor Quintero that Diaz "says this has happened before."  Ex. 39.  He also noted that Diaz said that he could continue working with Timbreza "if he stops his remarks."  *Id.*  And he wrote that he gave Timbreza a "verbal warning."  *Id.*  Kawasaki testified that Timbreza was given a "verbal write-up" that acted as a first warning.  Tr. at 124:25–125:8.  If this write-up existed in written form, it was not placed into evidence.  Diaz testified that after he reported this, he never saw Timbreza again and was "satisfied" with the response to the complaint.  *Id.* at 510:23–511:3.

### ii.    Ramon Martinez

Ramon Martinez was another Tesla supervisor.  Diaz testified that Martinez told him to "go back to Africa," called him the N-word more than 30 times, called him "mayate," and told him "I hate you [N-word]."  *Id.* at 417:1–25.

#### 1.    October 2015 Confrontation

In October 2015, Diaz was training a new employee.  *Id.* at 451:7–10.  Martinez saw them, "rushe[d]" over, and began to curse at him.  *Id.* at 451:18–25.  Diaz testified that Martinez said that Diaz "ha[d] a problem with him."  *Id.*  Martinez called Diaz the N-word and said that "[N-words] are shit."  *Id.*  Martinez got "closer and closer," with his "fist balled up."  *Id.*  He told Diaz he was going to "beat [him] up."  *Id.*  According to Diaz, he "threw [his] hands up into the neutral position," opened them, and backed against a wall.  *Id.* at 452:1–4.  Martinez "got . . . within inches of [his] face."  *Id.* at 452:5–7.  Eventually, Diaz cursed back, telling him to "get the 'F' out of my face."  *Id.*  Diaz reminded Martinez that they were on surveillance camera and Martinez "rushed out."  *Id.* at 452:8–11.

On October 17, at approximately 6:00 a.m., Diaz wrote an email to complain that said he did not feel safe around Martinez.  *See* Ex. 235.  He identified the employee he was training as a witness and said that the surveillance system would show what happened.  *Id.*  Diaz's email did not include his assertion that Martinez used the N-word.  *See id.*  At trial, he testified that was so because "we had the surveillance system right there, you know.  I just figured Tesla would pull the -- pull the video surveillance and then come and interview me and then we can discuss all that.  I

6

just didn't put it in the email because, you know, like I said, in a workplace, that word is not supposed to be used." *Id.* at 452:15–20.  And he testified that he had often complained before to Romero about Martinez's use of the N-word.  *See id.* at 425:21–453:8.

According to Martinez, he actually "just went down and asked" Diaz why his elevator was not moving some of Martinez's team's materials.  *Id.* at 766:14–22.  He testified that Diaz and he started raising their voices and "probably . . . were yelling."  *Id.* at 766:25–767:2.  Martinez said he then ended the conversation and told Diaz he was going to send an email about Diaz's "attitude."  *Id.* at 767:8–11.  Like Diaz, Martinez wrote an email to complain about the incident; he sent his about an hour before Diaz did.  *See* Ex. 49.  In it, he wrote that Diaz was "not acting on the [sic] professional way with me."  *Id.*  Romero wrote back two hours later to say that he would "investigate this today."  *Id.*

The company concluded that it did "not need to do any formal investigation."  Ex. 76. Human resources did not interview the employee Diaz had been training at the time, *see* Tr. at 232:20–25, and there is no evidence they reviewed the surveillance footage.  Ultimately, Martinez and Diaz were both given a verbal warning for the events.  *Id.* at 231:8–15.

### 2.  January 2016 Drawing

In January 2016, someone had drawn sketches of several ghosts and a "Pac-Man" figure on a surface near the elevators at which Diaz worked.  Ex. 1.  Next to them, Martinez drew the sketch below—which appears to be a face with large lips and a bone in its hair—and wrote the word "Booo" underneath it:



United States District Court
Northern District of California

*Id.*; *see also* Tr. 774:19–775:3 (Martinez testifying that he drew it).

Diaz saw the drawing while performing his regular duties. *See* Tr. at 456:18–458:15.  He recognized it as a "picaninny." *Id.* at 458:14–15.[5]  Diaz testified that seeing it made him feel like "somebody had kicked me." *Id.* at 459:21–23.  He was reminded of a Warner Brothers cartoon from his childhood that showed the picaninny character as a "buffon" who was "running around chasing after fried chicken" and "saying 'mammy' and 'master' and stuff like that." *Id.* at 460:1–18.

According to Martinez, he saw the Pac-Man and ghosts and assumed they were drawn by employees on another shift and were making fun of his shift. *Id.* at 771:23–772:4.  He interpreted it to mean that the other shift "was doing [a] better job" than his, *id.* at 773:13–15, so he drew the picaninny as part of a "game or competition," *id.* at 774:19–24.  He said that he intended it to tell the other shift that his shift could "compete better than them" and the "booo" was meant to be "scary." *Id.* at 774:22–775:3.  He testified that the figure was from  a cartoon in his childhood called "Inki." *Id.* at 775:6–11.  When an employee later confronted him about it, he said, he did not understand what it meant and was upset and sorry. *Id.* at 775:20–776:4.  He talked with Diaz about it to try to explain that he did not understand what it meant. *Id.* at 777:17–25.  He claims that Diaz said, "[d]on't worry about it" and that he would "delete" an email about it he had been drafting. *Id.* at 778:2–5.  Diaz, on the other hand, testified that Martinez "never apologized" and said "you people can't take a joke." *Id.* at 462:15–23.

---

[5] A "picaninny" (sometimes "pickaninny" or "piccaninny") has long been a racist caricature, originally of a Black child. *See* David Pilgrim, *The Picaninny Caricature*, Jim Crow Museum of Racist Memorabilia (Oct. 2000, ed. 2012), https://www.ferris.edu/HTMLS/news/jimcrow/antiblack/picaninny/homepage.htm.

1     A picture from the "Caveman Inki" cartoon that Martinez was referencing was introduced

2  into evidence:



Ex. 133.

Diaz wrote an email to Romero about the image, calling it a "racist effigy and drawing."

Ex. 33.  He noted that Martinez admitted to drawing it.  *Id.*  Jackson (the nextSource liaison)

recommended that Martinez be fired.  *See* Tr. 249:12–20.  Quintero, in consultation with others,

decided to suspend Martinez and issue a written warning.  Exs. 272, 287.  Jackson believed there

should have been a stronger actions, and testified that he told that to Quintero.  Tr. at 251:17–20.

Quintero testified that he did not recall that.  *Id.* at 341:8–12.  He also could not recall if he had

ever seen the written warning he said that he gave.  *Id.* at 341:25–342:1.

### iii.    Robert Hurtado

Robert Hurtado was a Tesla supervisor.  Diaz testified that Hurtado called him the N-word

and "boy."  *Id.* at 414:14–16.  He also told Diaz that "[y]ou [N-words] are lazy."  *Id.* at 414:24–25.

Diaz stated that Hurtado called him the N-word more than 30 times.  *Id.* at 415:1–3.  At one point,

Hurtado interjected into a conversation that Diaz was having to use racial slurs.  *Id.* at 466:14–23.

Diaz testified that he told Hurtado, "[n]o disrespect, but if it doesn't have anything to do with this

job, don't talk to me."  *Id.* at 466:24–467:2.

Diaz informed Joyce DelaGrande, Hurtado's supervisor, about this behavior.  *Id.* at

467:14–17.  On February 16, 2016, DelaGrande wrote Romero an email.  Ex. 303.  She said that

Hurtado had approached him and Diaz told him to only talk to him if it was "related to business."

*Id.*  She noted that Diaz had complained about Hurtado's behavior but said that she "instructed my

United States District Court
Northern District of California

leads to contact me if there are any more issues with him because we are really struggling with his customer service and it was not a threat, it was us letting him know that we really need the work to be done and if he will not do this we will contact his manager." *Id.* She said that her leads felt "uncomfortable" with Diaz, that he had a "huge attitude," and that they do not feel he is "approachable." *Id.* After a back-and-forth in which Romero said he would address the situation, DelaGrande wrote that she would "prefer that [Diaz] is placed somewhere else." *Id.* Romero said he was "in the process of doing that real soon." *Id.* Several days later, DelaGrande wrote that she was "just notified" that Diaz was still working in his previous position and wanted to know when he would be replaced. *Id.*

Soon after, Diaz took bereavement leave to address the death of his mother. Tr. at 468:8–9. He testified that, after that, he "just couldn't take" coming back. *Id.* at 468:12–14. In May 2016, he was "separated" from Tesla without prior warning. *Id.* at 468:24–469:2; *see also* Ex. 68 (separation notice).

### D. Demetric Di-Az

After several months at Tesla, Diaz recommended that his son (and former plaintiff) Demetric Di-Az come to work at the Tesla facility. *See, e.g.*, Tr. at 503:8–16. He testified that he "did believe he would be in a different location" so the situation might be different for him. *Id.* at 503:11–19. He said that he could not recall whether he warned Di-Az about the racial harassment. *Id.* at 504:5–11. At one point, Diaz witnessed a white supervisor yell at Demetric that, "I can't stand all you [fucking] [N-words]." *Id.* at 419:18–24. Diaz said that it "broke" him. *Id.* at 420:1. He testified that, if he had to do it over again, he would not have recommended that Demetric work there, calling it his "biggest mistake." *Id.* at 420:2–5.

### E. Harm to Diaz

In addition to the emotional harm discussed above, Diaz, his step-daughter, and his psychological expert testified about the harm he suffered as a result of his employment at the factory. Diaz testified that the experience made him "lose . . . faith in my . . . fellow humans." *Id.* at 481:20–23. He said that it made him see things through his parents' eyes, with "dogs being sicced on them." *Id.* at 481:24–482:3. He began having "sleepless nights." *Id.* at 482:9. The

10

experience also affected his marriage. *Id.* at 482:2–13. He "couldn't eat" and lost weight. *Id.* at 482:14–17. Previously, he had been an outgoing person, but he stated that he now hesitates when meeting new people. *Id.* at 482:18–25. He testified that, "[s]ome days I would just sit on my stairs and cry." *Id.* at 483:1–3.

Diaz's step-daughter, LaDrea Jones, testified similarly. She said that, before Diaz worked at Tesla, he often told jokes, was talkative, and was an engaged father. *Id.* at 624 at 13–20. After he started at Tesla, he became "moodier" and sadder. *Id.* at 624:23–25. He stopped asking her questions about her life. *Id.* He was less exuberant and did not tell jokes. *Id.* at 625:14–24. She caught him awake at 3:00 or 4:00 am "a few times a week." *Id.* at 626:10–13. Before Diaz worked at the factory, he and Jones would talk "[l]iterally every day," but after he started, it was a few times a week and was vague and minimal. *Id.* at 627:12–15.

Diaz also testified that the effects are, in some ways, ongoing. *Id.* at 483:7–12. Jones testified that Diaz's personality changed back since he left. *Id.* at 628:10–12; 636:12–637:6.

Diaz also called a psychologist, Dr. Anthony Reading. Reading testified that he performed examinations on Diaz in 2019. *Id.* at 583:1–3. He testified that racial abuse in the workplace can be especially harmful because it is difficult to extricate from and the victims are so dependent on the employer to intervene. *See id.* at 583:24–585:4. He largely echoed Diaz's testimony about the emotional harm Diaz suffered. His interview technique was also designed to determine whether Diaz's responses were motivated by litigation. *See id.* at 583:12–18.

## III.    THE JURY'S VERDICT

On October 4, 2021, the jury returned a verdict against Tesla. *See* Verdict Form [Dkt. No. 301]. The jury, in special verdicts, found that: (1) Tesla subjected Diaz to a racially hostile work environment, (2) Tesla was a joint employer of Diaz, (3) Diaz was subject to a hostile work environment caused by a supervisor, (4) Diaz was subject to a hostile work environment caused by a non-immediate supervisor or co-worker, (5) Tesla committed a civil rights violation in a contractual relationship, (6) Tesla failed to take all reasonable steps necessary to prevent Diaz from being subject to racial harassment, and (7) Tesla negligently supervised or negligently continued to employ Ramon Martinez and that action harmed Diaz. *Id.* at 1–2. Diaz sought only

1    non-economic—that is, emotional—damages.  The jury awarded him $4,500,000 in past

2    compensatory damages; $2,400,000 in future compensatory damages; and $130,000,000 in

3    punitive damages.  *Id.* 3–4.

4         After the close of evidence but before the case went to the jury, Tesla moved for judgment

5    as a matter of law on some of the grounds it raises today.  *See* Dkt. No. 282.  I denied the motion

6    orally from the bench and issued a written opinion on it as well.  *See* Dkt. No. 303.  After the

7    verdict, Tesla brought this motion, which I heard on January 19, 2022.[6]

8                                    **LEGAL STANDARDS**

9    **I.    JUDGMENT AS A MATTER OF LAW**

10        Federal Rule of Civil Procedure ("FRCP") 50 governs judgments as a matter of law

11   ("JMOL") in jury trials.  Under Rule 50(a)(1), "[i]f a party has been fully heard on an issue during

12   a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary

13   basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and

14   (B) grant a motion for judgment as a matter of law against the party on a claim or defense that,

15   under the controlling law, can be maintained or defeated only with a favorable finding on that

16   issue."  If a party files a motion under Rule 50(a) that the court does not grant, Rule 50(b) provides

17   that "the movant may file a renewed motion for judgment as a matter of law and may include an

18   alternative or joint request for a new trial under Rule 59."  The court may then (1) allow judgment

19   on the verdict, (2) order a new trial, or (3) enter judgment as a matter of law.  Fed. R. Civ. P.

20   50(b)(1)–(3).

21        As noted, a motion for JMOL can only be granted if "the court finds that a reasonable jury

22   would not have a legally sufficient evidentiary basis to find for the party" against whom the

23   motion is brought.  Fed. R. Civ. P. 50(a).  In other words, to grant the motion, "under the

24   governing law, there can be but one reasonable conclusion as to the verdict."  *Shafer v. Cty. of*

25   *Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

26

27   ───────────────

[6] After the hearing, Diaz filed a letter brief that made a new argument.  Dkt. No. 326.  Tesla filed
one in response.  Dkt. No. 327.  I decline to consider both letters, which are improper.  *See* Civ.
28   L.R. 7-3(d) ("Once a reply is filed, no additional memoranda, papers or letters may be filed
without prior Court approval, except" for circumstances not relevant here.).

United States District Court
Northern District of California

U.S. 242, 250 (1986)) (internal quotation marks omitted).  The court must "construe the facts in the light most favorable to the jury's verdict."  *Id.* (internal quotation marks and citations omitted).  "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).  When examining the record, "the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion" *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008).  Consequently, the court "is not to make credibility determinations" and "must accept the jury's credibility findings consistent with the verdict.  It must disregard all evidence favorable to the moving party that the jury is not required to believe." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (internal quotation marks and citations omitted).

## II.      NEW TRIAL OR REMITTITUR

### A.  Generally

FRCP 59 governs motions for a new trial.  A court may grant a new trial "on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1).  "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).  "[E]ven if substantial evidence supports the jury's verdict, a trial court may grant a new trial if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (internal quotation marks and citation omitted).  Likewise, a new trial is warranted when "it is quite clear that the jury has reached a seriously erroneous result." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014).  But the court "may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage*, 251 F.3d at 819.

**B. Remittitur**

A new trial may also be granted if "the damages are excessive." *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019) (internal quotation marks and citation omitted). In determining whether damages are excessive, the court "afford[s] great deference to a jury's award of damages and will uphold the award unless it is clearly not supported by the evidence or only based on speculation or guesswork." *Williams v. Gaye*, 895 F.3d 1106, 1128 (9th Cir. 2018) (internal quotation marks and citations omitted). If damages are excessive, the court may either grant a new trial or "deny the motion conditional upon the prevailing party accepting a remittitur"—that is, a reduction in the amount of damages. *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). The remittitur "must reflect the maximum amount sustainable by the proof." *Oracle*, 765 F.3d at 1094 (internal quotation marks and citation omitted).

When assessing remittiturs of state-law claims, federal courts apply state law. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 431 (1996). California law expressly authorizes remittitur when there are "excessive damages." *See* Cal. Civ. P. Code § 662.5. Trial courts have broad discretion to remit excessive damages and sit as "independent trier[s] of fact" when doing so. *Lane v. Hughes Aircraft Co.*, 22 Cal. 4th 405, 412 (2000), *as modified* (May 10, 2000) (internal quotation marks and citation omitted).

## DISCUSSION

Tesla seeks to set aside the jury's liability findings, both by moving for judgment as a matter of law and a new trial. In the alternative, it moves for a remittitur of the compensatory and punitive damages.

## I. LIABILITY

Tesla moves for judgment as a matter of law on its liability on the Section 1981 claim for essentially the same reasons that it did at the 50(a) stage and argues for the first time that it is entitled to JMOL on the state-law claim. *See generally* Motion for Judgment as a Matter of Law, New Trial, and Remittitur ("Mot.") [Dkt. No. 317]. And it argues that the weight of the evidence was against a finding of liability, entitling it to a new trial. *See id.* I reject both arguments.

United States District Court
Northern District of California

14

1

**A.  Section 1981 Claims**

Section 1981 was originally enacted as Section 1 of the Civil Rights Act of 1866, a post-Civil War law aimed at protecting the rights of African-Americans.  Today it provides,

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The term "make and enforce contracts" is defined to "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).  Accordingly, the statute "prohibits racial discrimination in the making and enforcement of private contracts."  *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).

One theory of liability under Section 1981 is a hostile work environment claim.  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003).  To prevail on this type of claim, the plaintiff must prove that "(1) he was subjected to verbal or physical conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment."  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (internal quotation marks, alterations, and citation omitted).  The work environment must be "subjectively and objectively hostile."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004).[7]

**i.    Weight of the Evidence**

Tesla argues that the weight of the evidence is against a finding of liability under Section 1981 for two reasons.  *See* Mot. 7.

Tesla first contends that "it is undisputed that [the harassing] conduct was contrary to Tesla policy and was never condoned by Tesla" and that "Tesla took disciplinary action in response to

---

[7] *McGinest* discusses the standards for a racially hostile work environment claim brought under Title VII but the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action."  *Manatt*, 339 F.3d at 797.

1    all of the incidents Diaz reported in writing." *Id.*

2        To start, this characterization of the evidence is inaccurate and incomplete in several

3    overlapping ways.  First, even on Tesla's account, it only took action in response to incidents

4    "reported in writing."  But it has no authority—or even a rationale—for why *verbal* complaints of

5    racism in the workplace should not also be addressed.  Diaz testified that he reported the use of the

6    N-word in the bathroom stall, Tr. at 401:17–23, and that he told Romero about Martinez using the

7    N-word, *id.* at 425:21–453:8, 511:17–24.  There is no evidence that Tesla ever took any remedial

8    action in response to any of these complaints.  And despite Tesla's heavy implication that Diaz

9    may have falsely inflated these reports, *see, e.g.*, Mot. 19 (labelling the complaints

10   "uncorroborated"), it can point to no evidence for that and it did not impeach Diaz's credibility on

11   this issue.

12       Second, the "disciplinary action" that Tesla *did* take was often inadequate.  When Diaz and

13   Martinez submitted complaints against each other about the October 2015 altercation, the

14   company concluded that it did "not need to do any formal investigation," Ex. 76, and gave both

15   individuals verbal warnings, Tr. at 231:8–15.  This was so even though what Diaz reported was of

16   a different magnitude than Martinez; Martinez flagged a vague problem with professionalism

17   while Diaz reported that he was not safe.  *Compare* Ex. 235, *with* Ex. 49.  And even though Diaz's

18   email did not mention the use of the N-word, he testified that he had previously complained to

19   Romero about Martinez using it.  *See* Tr. at 425:21–453:8.  Yet the company did not bother to

20   interview a witness to the events (whom Diaz's email identified) or look at the surveillance

21   footage (which Diaz's email referenced) before giving both men the same verbal warning.

22   Martinez drawing the picaninny, too, resulted only in a brief suspension and a warning.  Exs. 272,

23   287.[8]  The jury was within its rights to conclude that, given the severity of that act, such a slight

24   _____

25   [8] Tesla does not now rely on Martinez's explanation for the drawing to minimize its impact—an
     explanation it elicited at trial and discussed in its closing argument.  In the light most favorable to

26   the jury's verdict, Martinez's explanation was entirely unconvincing.  It is implausible that he
     hoped such a particular, racially charged caricature would effectively communicate to another

27   shift that his shift was better than they were and going to move more material.  *See supra*
     Background, Section II.C.ii.2 (recounting Martinez's testimony).  But even if that testimony were

28   credited—which the jury was under no obligation to do—the drawing Martinez chose, even on his

United States District Court
Northern District of California

punishment was not a sufficiently meaningful response.  And finally, there is the discipline of Timbreza, on which Tesla hangs its hat (presumably because Diaz testified that he was satisfied with the outcome).  Even though the company was told that Timbreza had made racist remarks, it was apparently unclear to Romero, the man seemingly in charge of the company's response, that he was responsible: he first testified he was not, before backtracking and discussing what he himself called a "minimal investigation" in which he did not even speak to Diaz.  Tr. at 137:8–139:16.

More fundamentally, even if Tesla's characterization of its discipline and policies were wholly correct, Diaz would still have a viable hostile work environment claim.  He would still have been subject to (1) unwelcome (2) verbal conduct because of his race (3) that was sufficiently severe to alter his conditions of employment and create an abusive work environment.  *Johnson*, 534 F.3d at 1122.  Indeed, it is unclear why Tesla believes it should be relieved of liability on the basis of these instances of discipline.  Tesla explicitly and consciously chose not to pursue a *Faragher/Ellerth* affirmative defense, in which the employer attempts to show that it exercised reasonable care to prevent and correct the harassment.  *See Holly D. v. California Inst. of Tech.*, 339 F.3d 1158, 1168 (9th Cir. 2003).  It appears it is now attempting to use the backdoor of this motion to achieve the same result without shouldering the burden of presenting evidence or argument to the jury.

In a different vein, Tesla argues that "Diaz himself admitted at trial that he remained happy at Tesla, uninterested in reassignment, and able to continue working at his job at all times before the January 2016 drawing incident, and even encouraged his son to apply for a job at Tesla after the July 2015 Timbreza N-word incident."  Mot. 7.  The weight of the evidence is against Tesla's minimization of Diaz's emotional and psychological harm.  Diaz testified about the severe consequences he experienced during his time at the factory.  *See supra* Background, Section II.E. Jones similarly testified about the effects on her father.  *Id*.  And his psychological expert confirmed all of this, including by performing psychological evaluations to determine whether

_____

account, came from an unambiguously racist cartoon.  *See id.*  And the drawing came after Martinez used many racial slurs, undermining his assertions that he had no idea of its true import.

United States District Court
Northern District of California

1   Diaz was "overreporting" his symptoms.  *Id*.  The jury, in short, had ample basis to believe Diaz's

2   testimony that he was severely emotionally harmed.  Further, I address below in the section on

3   compensatory damages why Tesla's characterization of this evidence is inaccurate; I incorporate

4   that analysis here.  *See infra* Section II.B.

5   Tesla's terse arguments on this issue largely fail to engage with the real question in a

6   hostile work environment claim: whether the plaintiff was subjected to sufficiently severe

7   mistreatment on the basis of race.  *See, e.g.*, *McGinest*, 360 F.3d at 1113.  It never discusses the

8   dozens of examples of racial harassment to which Diaz and many other witnesses testified.  *See*

9   *supra* Background, Sections II.B–D.  Nor does it reference that many of them were not by mere

10   co-workers (which, for clarity, would still be actionable) but also supervisors—that is, those Tesla

11   empowered to act for it.  *Supra* Background, Section II.C.  And it does not contest that hearing

12   racist terms and being subject to racial slurs "every day," Tr. at 424:21–425:7, is sufficiently

13   severe and pervasive to alter the conditions of employment.

14   ### ii.    Lack of a Contract Between Diaz and Tesla

15   Tesla next argues that it is entitled to JMOL because there was no contract between Diaz

16   and Tesla.  Mot. 8–10.  Section 1981 seeks to combat discrimination in the "making and

17   enforcement of contracts."  As a result, "[a]ny claim brought under § 1981 . . . must initially

18   identify an impaired 'contractual relationship,' under which the plaintiff has rights."  *Domino's*

19   *Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (citation omitted).  As I previously explained

20   at the Rule 50(a) phase, there are two ways that the jury could reasonably have found a contractual

21   relationship sufficient to support Section 1981 liability.

22   ### 1.   Implied Employment Contract

23   First, the jury could reasonably have found that Tesla was a joint employer of Diaz and, as

24   a result, that Tesla and Diaz formed an implied employment contract.

25   In California, as a general matter, "[a] contract of employment is governed by the same

26   rules applicable to other types of contracts."  *Reynolds Elec. & Eng'g Co. v. Workmen's Comp.*

27   *Appeals Bd.*, 65 Cal. 2d 429, 433 (1966).  The four elements to create a contract under California

28   law are: (1) parties capable of contracting, (2) their consent, (3) a lawful object, and (4)

United States District Court
Northern District of California

18

consideration.  Cal. Civ. Code § 1550.  The "consent" required is the "mutual consent of the parties," which is "generally achieved through the process of offer and acceptance."  *DeLeon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012) (internal citations omitted).  Whether this consent occurred is determined under an objective standard based on the parties' "outward manifestations or expressions" and "the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings."  *Id.*  "Consideration is present when the promisee confers a benefit or suffers a prejudice."  *Prop. California SCJLW One Corp. v. Leamy*, 25 Cal. App. 5th 1155, 1165 (2018).  The consideration "must actually be bargained for as the exchange for the promise" or "have induced the promisor's promise."  *Id.* (internal quotation marks and citations omitted).

Under the law, a person can have more than one employer for present purposes.  *U.S. Equal Emp. Opportunity Comm'n v. Glob. Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019).  Two or more "entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions."  *Id.* Courts generally assess this question primarily by examining the "extent of control" exercised by the putative employer.  *Id.* at 638.  The inquiry focuses on weighing and assessing "all of the incidents of the relationship."  *Id.* (internal quotation marks and citation omitted).  Here, the jury found in a special verdict that Tesla was a joint employer of Diaz.  Verdict Form at 1.

California law recognizes—as do common-law principles of contract law—that contracts "need not be express, but may be implied in fact, arising from the parties' *conduct* evidencing their actual mutual intent to create such enforceable limitations."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 336 (2000) (some emphasis omitted); *see also* Cal. Civ. Code § 1621 (recognizing validity of implied contracts).  As the Restatement puts it, "[w]ords are not the only medium of expression. Conduct may often convey as clearly as words a promise or an assent to a proposed promise."  Restatement (Second) of Contracts § 19 comm. a; *see also id.* § 4 ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.").  Employment contracts, as others, can be implied-in-fact rather than express.  *See, e.g.*, *Guz*, 24 Cal. 4th at 336; *see also Reynolds*, 65 Cal. 2d at 433 ("A contract of employment is governed by the same rules

19

1    applicable to other types of contracts.").

2         The jury had a legally sufficient basis for concluding that Tesla was a joint employer of

3    Diaz because, weighing "all of the incidents" of Tesla and Diaz's relationship, the jury had

4    sufficient evidence to conclude that Tesla effectively controlled Diaz's work.  The work, no one

5    disputes, was in Tesla's factory and for Tesla's ultimate benefit.  When Diaz applied, the post said

6    the job was at "Tesla" and authorized "Tesla Motors" to carry out background checks.  Ex. 62.

7    Diaz only learned of the existence of CitiStaff after he applied.  Tr. at 392:2–9.  His only real

8    involvement with CitiStaff was going to its office to fill out paperwork and receiving his

9    paychecks from it.  *See supra* Background, Section II.A.  His badge said both Tesla and CitiStaff.

10   *Id.*  Tesla provided the training to contractor employees.  *See* Tr. at 394:12–15.  Tesla provided

11   forklift operators their certification.  *Id.* at 394:16–19.  On Diaz's first day, Tesla supervisor Jaime

12   Salazar gave him his orientation.  *Id.* at 395:10–14.  Tesla provided his (and others') equipment.

13   *Id.* at 395:15–19.  Tesla's policies were the only policies that Diaz was trained to follow.  *Id.* at

14   398:11–13.  Salazar dictated Diaz's initial schedule.  *Id.* at 399:23–25.[9]  There was no difference

15   between how workers with Tesla as their employer on paper and other employees interacted.  *Id.*

16   at 400:17–24.  One of Diaz's supervisors described what Diaz did—operating the freight

17   elevator—as a "key part" of the car making process.  *Id.* at 94:4–7.  And Tesla had the power to

18   fire Diaz, as demonstrated by the request for a Tesla supervisor to do so.  *See* Ex. 303.

19        Because the jury had a sufficient basis to find that Tesla was a joint employer of Diaz, it

20   also had a sufficient basis to find that Tesla and Diaz formed an implied contract.  Tesla agrees

21   that two of the elements required—capacity of the parties and lawful objective of the contract—

22   are met.  *See* Mot. 9.  It argues, however, that the jury did not have a basis to find mutual assent or

23   consideration.  *Id.*[10]  I disagree.  All of the evidence just discussed shows that the parties' entire

24

25   ───────────────
     [9] After that, Diaz cannot recall whether it was one of two Tesla supervisors or an employee of
26   another hiring entity, Chartwell, that gave him his schedule.  Tr. at 400:2–15.  But even that
     supports the jury's verdict because, in the light most favorable to it, it helps demonstrate that
27   Tesla's supervisors and the staffing companies' supervisors were operating interchangeably.

28   [10] For clarity in the record, Tesla never proposed a jury instruction on the formation of contracts or
     objected to the lack of that instruction.

course of dealings was aimed at a de facto bargain: Diaz would provide labor for Tesla and Tesla would functionally employ Diaz. Both parties' mutual assent is shown through their acceptance of the de facto conditions of employment that Tesla imposed. *See Guz*, 24 Cal. 4th at 336; *see also* Cal. Civ. Code § 1621; Restatement (Second) of Contracts § 19 ("Conduct may often convey as clearly as words a promise or an assent to a proposed promise."). It would, in fact, be anomalous for any employment relationship *not* to be governed by an express or implied contract of some sort as, in this state, "the employment relationship is fundamentally contractual." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 696 (1988).

Consider a counterfactual in which Tesla could escape liability this way. In that scenario, it would be able to control every aspect of Diaz's work life, including whether or not he was protected from racial harassment. At the same time, he would not be able to sue if it failed to live up to its responsibilities. And even though he would presumably be able to sue CitiStaff, the evidence shows that Tesla was the one with real control over Diaz's work, including the entity that could most effectively remediate harassment. Tesla's position would put any employee in an employment structure like this in a bind of never being able to hold one entity fully responsible for its legal obligations.

Tesla does not dispute most of what I have written and its brief essentially ignores all of the evidence of control it exerted over Diaz—as noted, the touchstone of the joint employment inquiry. Instead, it argues that several other pieces of evidence defeat the claim: the written contract was only with CitiStaff, not Tesla; Diaz applied to CitiStaff; and Diaz received his payments from CitiStaff. Mot. 9. While Tesla was free to make this argument to the jury, it is insufficient to show that *as a matter of law* there was no joint employment or employment contract because of the significant contrary evidence discussed above. It was the jury's role to make that highly fact-dependent determination, and it had a sufficient basis to find in Diaz's favor.

### 2. Third-Party Beneficiary

The second way that the jury reasonably could have found a contractual relationship sufficient to support liability is by finding that Diaz was a third-party beneficiary of the contract between Tesla and nextSource.

1    As noted, a claim under Section 1981 "must initially identify an impaired contractual

2    relationship under which the plaintiff has rights." *Domino's Pizza*, 546 U.S. at 476 (internal

3    quotation marks and citation omitted).  The Supreme Court has explained that "[w]e say 'under

4    which the plaintiff has rights' rather than 'to which the plaintiff is a party' because we do not

5    mean to exclude the possibility that a third-party intended beneficiary of a contract may have

6    rights under § 1981.  Neither do we mean to affirm that possibility. The issue is not before us

7    here." *Id.* at 478 n.3.  As I have previously ruled in this case—an explanation I incorporate here—

8    I conclude that a third-party beneficiary can bring a Section 1981 claim.  *See* Dkt. No. 278.  Tesla

9    does not challenge that ruling here.

10    California law recognizes—again, as do common-law principles—that "[a] third party

11    beneficiary may enforce a contract made for its benefit." *Hess v. Ford Motor Co.*, 27 Cal. 4th 516,

12    524 (2002); *see also* Restatement (Second) of Contracts § 302 (recognizing that intended

13    beneficiaries may enforce contracts).  To determine whether someone is a third-party (or intended)

14    beneficiary, courts look to the mutual intent of the parties.  *Id.*  A contract can expressly provide

15    that it benefits a party but it "need not expressly state that it is intended to benefit a third party as

16    long as such an intent is apparent through the ordinary means of contract interpretation." *Serv.*

17    *Emps. Internat. Union, Loc. 99 v. Options--A Child Care & Hum. Servs. Agency*, 200 Cal. App.

18    4th 869, 878 (2011).  The third-party beneficiary need not be the primary or sole beneficiary, but

19    he cannot be someone whose benefit is "only incidental or remote." *Id.*

20    In California, as elsewhere, contract interpretation depends on the mutual intention of the

21    parties. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g*

22    (Oct. 26, 1995).  "A written contract must be read as a whole and every part interpreted with

23    reference to the whole, with preference given to reasonable interpretations." *Pauma Band of*

24    *Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1170 (9th

25    Cir. 2015).  "An interpretation which gives effect to all provisions of the contract is preferred to

26    one which renders part of the writing superfluous, useless or inexplicable." *Id.* at 1171 (internal

27    quotation marks omitted).  "Interpretation of a contract must be fair and reasonable, not leading to

28    absurd conclusions." *ASP Properties Grp., L.P. v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1269

United States District Court
Northern District of California

(2005) (internal quotation marks omitted).

Here, the jury had a sufficient basis to conclude that Diaz was a third-party beneficiary of the contract between Tesla and nextSource.  It could have found that the contract was intended, in part, to benefit their employees—the "class of which [Diaz] is a member." *Serv. Emps.*, 200 Cal. App. 4th at 878.  That contract, after all, had a singular goal: nextSource would hire employees for work at Tesla's facility.  The jury could have found that this benefit—employment—is neither incidental nor remote.

Tesla counters, as it did previously, that the contract includes an express provision preventing third-parties from benefitting.  That provision states,

> Third Party Beneficiaries. This Agreement is entered into solely between Tesla and Supplier and, except for the Parties indemnification obligations under Section 11 (Indemnification) and the Service Recipients, will not be deemed to create any rights in any third parties or to create any obligations of either Tesla or Supplier to any third parties.

Ex. 3 ¶ 14.10.  I agree with Tesla to the extent that this clause must be considered and is significant.  But California law takes a more functional, wholistic approach to contract interpretation than ending the inquiry at the bare language of a single provision.  *See, e.g.*, *Guz*, 24 Cal. 4th at 336.  Here, the jury could have examined the entire course of dealings and concluded that, despite this clause, Tesla and nextSource intended a non-incidental benefit to employees. Indeed, even if Diaz were merely a sub-contractor and CitiStaff merely a contractor of Tesla, Diaz would be in the position of a classic intended beneficiary.  *See, e.g.*, *Outdoor Servs., Inc. v. Pabagold, Inc.*, 185 Cal. App. 3d 676, 683 (1986) (holding that a subcontractor was an intended beneficiary of the contract even when the defendant did not know of its identity because the defendant expected the contractor to enter into subcontracts to perform the work); *Superior Energy Servs., LLC v. Cabinda Gulf Oil Co.*, 635 F. App'x 375, 376 (9th Cir. 2016) (applying *Outdoor* to a situation "where the contracting parties intended for the payments to go to the third party").

Tesla relies on *Balsam v. Tucows Inc.*, which found a similar clause to bar the creation of third-party beneficiaries.  627 F.3d 1158, 1163 (9th Cir. 2010).  But as the Ninth Circuit explained there, that clause won out in "the absence of any evidence to the contrary." *Id.* at 1163.  As

United States District Court
Northern District of California

California courts have explained, "[w]hether one is an incidental or intended beneficiary of a contract is a question of construction of the document *in the light of surrounding circumstances*." *Gordon Bldg. Corp. v. Gibraltar Sav. & Loan Ass'n*, 247 Cal. App. 2d 1, 7–8 (1966) (emphasis added). In *Balsam*, the contract at issue was between a website registrar and the entity that regulates domain names. 627 F.3d at 1159–60. The plaintiff was a victim of spam and sought to enforce a provision of the contract, arguing that the registrar was hosting spam. *Id.* But in the very different—indeed, *sui generis*—situation of two joint employers (or even, on Tesla's argument, an employer and the company it is hiring for), the jury was entitled to find their contract intended to benefit their employees too despite the boilerplate phrase about beneficiaries.

Tesla also contends that the jury did not, as a factual matter, impose liability on this basis. Mot. 8 & n.2. Its argument is that because the jury found in a special verdict that Tesla was a joint employer of Diaz, it did not find liability on this alternative basis. *Id.* This argument is unpersuasive. It is perfectly possible for someone to be an employee via the joint-employer doctrine and to be a third-party beneficiary of the contract between the joint employers (and Tesla cites no authority otherwise). When the jury found Diaz to be a joint employer, it did not find or imply that it was rejecting a third-party beneficiary theory either as a matter of the verdict form itself or as a matter of law and fact.

### B. State-Law Claim

The jury also found Tesla liable on a state-law negligent supervision or retention claim about Martinez. Under California law, "[a]n employer may be liable to a third person for the employer's negligence in hiring[, supervising,] or retaining an employee who is incompetent or unfit." *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006) (internal quotation marks and citation omitted); *see also id.* (recognizing negligent *supervision* falls within the cause of action). To be found liable, the employer must have known or should have known that retaining the employee "created a particular risk or hazard and that particular harm materializes." *Id.* (internal quotation marks and citations omitted).

#### i. Weight of the Evidence

Tesla contends that the jury's finding was against the weight of the evidence because there

United States District Court
Northern District of California

was no evidence that it was negligent and because it disciplined Martinez after two racist incidents.  Mot. 8.  It argues that "the evidence shows that Tesla disciplined Martinez in response to the two incidents of his racial misconduct towards Diaz that Diaz presented to Tesla, and the two had no contact between those incidents."  *Id.*

I disagree; the weight of the evidence is not against a finding of liability on the state-law claim.  I incorporate the discussion above about the evidence supporting a Section 1981 harassment claim, much of which also bears on this negligence claim.  *See supra* Section I.A.i. Diaz produced evidence that he complained to Tesla supervisors about many more incidents than the two Tesla references, including being called the N-word by Martinez.  *See* Tr. at 511:17– 512:17, 585:24–586:4.  Then, in October 2015, Diaz testified that Martinez rushed at him, cornered him, was screaming racial abuse, and made threatening gestures.  *See id.* at 450:6– 452:11.  Both Diaz and Martinez complained about the other's behavior (Martinez's complaint was that Diaz was unprofessional), but Tesla's HR department declined to conduct a "formal investigation" and reprimanded them both.  *See* Ex. 31.  This was in spite of the fact that there was surveillance footage to examine, *see* Tr. 452:8–11, and in spite of the fact that Diaz's complaint was, even without referencing the use of a racial slur, more serious than Martinez's.

After this, Diaz presented evidence that Martinez drew a racist effigy near where Diaz worked; Diaz filed a complaint, and the companies imposed the relatively light discipline of a brief suspension.  *See* Exs. 33, 272.  From all this, the weight of the evidence supports the jury's determination that Tesla's remedial and protective measures were insufficient given the gravity of the alleged harm.  That Tesla imposed light discipline only after the last, most egregious act does not absolve it of liability.

### ii.   Lack of a Contract Between Tesla and Martinez

Tesla seeks JMOL on the state-law claim because, it argues, Tesla was not actually Martinez's employer.  Mot. 10–11.  Diaz responds that Tesla is not permitted to raise the argument for the first time at this stage and that, in any event, the evidence supports the jury's verdict. Opposition to the Mot. ("Oppo.") [Dkt. No. 321] 12–13.

"A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion.

1    Rather, it is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951,

2    961 (9th Cir. 2009). As a result, "a proper post-verdict Rule 50(b) motion is limited to the

3    grounds asserted in the pre-deliberation Rule 50(a) motion." *Id.* Tesla cannot "raise arguments in

4    its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its

5    preverdict Rule 50(a) motion." *Id.* (internal quotation marks and citations omitted). But the rule

6    is not "harsh" and should be liberally interpreted to be "satisfied by an ambiguous or inartfully

7    made motion." *Id.* (internal quotation marks and citation omitted).

8         Tesla did not—even "ambiguously or inartfully"—raise this issue in its Rule 50(a) motion

9    or, indeed, raise *any* issue with the state-law claim. That motion was laser-focused on the Section

10   1981 claim. As Tesla summarized its argument, "[s]ince no evidence was presented at trial to

11   establish a contractual relationship between *Plaintiff* and Tesla, pursuant to *42 U.S.C. section*

12   *1981*, Tesla requests that the Court enter judgment in its favor as a matter of law *as to Plaintiff's*

13   *race Section 1981 claim.*" Dkt. No. 282 at 1 (emphasis added). The substance of the motion

14   likewise argued only that there was no contract between *Diaz* and Tesla under either a joint

15   employment or a third-party beneficiary theory. In fact, the only fleeting reference to the state-law

16   claim was at the beginning of the background section when Tesla noted that Diaz brings three

17   claims, one of which is this one. *Id.* Tesla never challenged this claim, let alone provided a basis

18   for doing so. Accordingly, it may not raise this issue for the first time today.[11]

19   **II.    COMPENSATORY DAMAGES**

20        The jury awarded Diaz $6.9 million in compensatory damages: $4.5 million in past

21   damages and $2.4 million in future damages. *See* Verdict Form at 3. Diaz sought compensatory

22   damages solely for emotional harm, not economic injury. *See id.* Tesla argues for a new trial or

23   remittitur on the jury's award of compensatory damages to $300,000. For the reasons that follow,

24

25   _____

     [11] Tesla replies that it raised the issue of Martinez and Tesla's (lack of a) contract for purposes of
26   state-law negligence by challenging *Diaz* and Tesla's (lack of a) contract for Section 1981
     purposes. Reply 5–6. But those analyses are entirely distinct; each depends, in part, on the
27   specific evidence of control exercised by Tesla over the particular employee. Tesla's brief
     focused solely on the evidence of Tesla's and Chartwell's relationships to Diaz, without a single
28   snippet of evidence or argument about Martinez. In any event, given the evidence discussed in
     this Order, Tesla's argument substantively lacks merit.

1    I will grant a remittitur, but not down to the low figures that Tesla suggests.  The remitter will be

2    to $1.5 million, which I conclude is the maximum amount of compensatory damages supported by

3    the evidence.

4         In this Circuit, emotional damages awards need not be supported by "some kind of

5    'objective' evidence." *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493,

6    513 (9th Cir. 2000).  Instead, those damages can be established, among other ways, by a plaintiff's

7    testimony about his harm and the testimony of others about that harm.  *See id.*  Emotional distress

8    is "essentially subjective." *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978).  For these reasons,

9    determinations about "intangible, non-economic losses" are "peculiarly within a jury's ken."

10   *Holzhauer v. Golden Gate Bridge Highway & Transportation Dist.*, No. 13-CV-02862-JST, 2017

11   WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017), *aff'd, 743 F. App'x 843* (9th Cir. 2018) (quoting

12   *Smith v. Kmart Corp.*, 177 F.3d 19, 30 (1st Cir. 1999) (internal quotation marks omitted); *see also*

13   *Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal. 2004) (making the same point).  But

14   grossly excessive awards still may be reduced.  *Claiborne*, 934 F.3d at 894.  This is true both

15   under federal law (for the Section 1981 claims) and California law (for the negligence claim).  *See*

16   *id.*; *Lane*, 22 Cal. 4th at 412.[12]

17        **A.  The Compensatory Damages Will Be Remitted to $1.5 Million**

18        For the reasons that follow, I conclude that the jury's compensatory damages award was

19   excessive.  But, as I also explain, Diaz's emotional harm still warrants a relatively high award.  A

20   careful evaluation of the facts of this case, the legal principles underlying judicial review of

21   emotional damages, and comparable cases leads me to conclude that $1.5 million is the maximum

22   amount supported by the evidence.  *See Oracle*, 765 F.3d at 1094.

23        I begin with why Diaz is entitled to a relatively large emotional distress damages award.

24   The N-word is "perhaps the most offensive and inflammatory racial slur in English, a word

25

26   ─────────────────────

27   [12] At the hearing, Diaz's counsel argued for the first time that California law provides less leeway
     for remitting damages than federal law.  But California caselaw establishes that trial courts have
     broad discretion to remit excessive damages by carefully weighing the evidence of harm.  *See,*

28   *e.g., Lane*, 22 Cal. 4th at 412; *Pearl v. City of Los Angeles*, 36 Cal. App. 5th 475, 485–86 (2019);
     *Bullock v. Philip Morris USA, Inc.*, 159 Cal. App. 4th 655, 688–89 (2008).

United States District Court
Northern District of California

expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (internal quotation marks, alteration, and citation omitted).  It "sums up all the bitter years of insult and struggle in America." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (internal quotation marks, alteration, and citation omitted). "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment, than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (internal quotation marks and citation omitted).  Even though a single utterance can be devastating, Diaz and other employees testified that the word was used repeatedly and frequently around the Tesla factory, including by supervisors.  *See supra* Background, Section II.B–C.  And even though the many, many utterances of that word alone would also be devasting, it was far from the only racial slur that was used or hurled at Diaz.  *See id.*  He was called a "porch monkey."  *Id.*  He was told to "go back to Africa."  *Id.*  He encountered slurs and swastikas on bathroom stalls.  *Id.*  And he encountered a racist picaninny drawing near his workstation.  *Id.*  But it was not just that co-workers and supervisors slung around these slurs, it was what little Diaz's employers did to stop them.  Diaz testified that he made verbal complaints that were never addressed.  *See supra* Section I.A.i.  And even when his written complaints were "addressed," the jury could readily have concluded that the responses were thin and lackluster at best and intentionally unresponsive to the conduct at worst.  *Id.*

So it is no surprise that the emotional effects on Diaz were profound.  Being subjected to racism in the workplace—where Diaz was forced to be on penalty of not holding gainful employment—can produce severe and debilitating results.  *See, e.g.*, *Rodgers*, 12 F.3d at 675. And, as the jury found, it did here.  Before Diaz went to work at the factory, he was boisterous and jovial.  *See supra* Background, Section II.E.  After the weeks and months of racist harassment, he became withdrawn, sad, and fundamentally different.  *Id.*  He testified that "[s]ome days I would just sit on my stairs and cry."  Tr. at 483:1–3.  He stopped eating, stopped sleeping, stopped having intimate relations with his wife, and withdrew from involvement in his child's life.  *See supra* Background, Section II.E.  The experience made him feel like he was in his parents' shoes,

28

with dogs being sicced at him.  *Id.*  Legally, his testimony would be sufficient to support an emotional distress award.  *Passantino*, 212 F.3d at 513.  But the jury heard more than just his testimony; it heard the same things from his step-daughter and an expert, who testified to the severe psychological injury that workplace racism can and did inflict.  *See supra* Background, Section II.E.

All of this leads me to conclude that this is not, as Tesla attempts to frame it, a case of "garden variety" emotional distress that was "fortunately mild and short-lived."  Mot. 11.  The record roundly rejects that watered-down revisionism.  It is difficult to see how Tesla reached that interpretation of the evidence other than ignoring it.  Tesla's proffered figure of $300,000 is, accordingly, untethered to record evidence.  The jury reasonably found that this was a case of severe emotional distress.

This all said, and recognizing the great deference owed to the jury's verdict, I am left with the "firm conviction," *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987), that the jury's compensatory award was excessive.

First, the award of future damages exceeds a reasonable view of the evidence of future harm presented at trial.  There is substantial evidence that Diaz's emotional harm was greatly reduced once he stopped working at Tesla.  Diaz's step-daughter, for instance, testified that after he left the Tesla facility he was "back to being" her old father.  Tr. 636:12–14.  She testified that he resumed joking around and was the father she had "known and loved [her] entire life."  *Id.* at 636:15–637:4.  To be sure, the jury did hear some evidence about future harm, and it was entitled to credit it.  Diaz testified that the experience has made him lose faith in his "fellow humans" and that he now hesitates to trust people.  *Id.* at 481:20–23.  Consequently, the jury was entitled to award some amount in future damages, but there is no record evidence sufficient to reasonably find that what Diaz will suffer in the future is worth $2.4 million—a figure that, as explained below, is significantly larger than the mine-run of *total* damages awards.  Accordingly, a steep reduction in this figure is warranted.

A reduction to the $4.5 million in past damages, though not as comparatively steep, is also necessary.  As explained above, the jury was within its rights to award a significant sum.  But

United States District Court
Northern District of California

several factors that other courts have found significant weigh in favor of a reduction.  First, Diaz worked at the Tesla facility for nine months.  While that is not a negligible amount of time, it is also not nearly so long as some of the emotional harm discussed in cases below for which the awards were smaller.  Second, Diaz's emotional harm did not come with physical illness or injury as in many cases.  Third, a survey of comparable cases that follows convinces me that the full amount of the jury's award is not supported by substantial evidence.

I look first to the Second Circuit's decision in *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014), which is not perfectly identical to this case but, in my view, has more to teach about these facts than any other case I have found or the parties have raised.  There, the African-American plaintiff was racially harassed for roughly four years.  *See Turley*, 774 F.3d at 148–49.[13] He was the only Black employee and his "co-workers frequently subjected him to racist epithets, degrading treatment, and, from time to time, outright threats."  *Id.* at 148.  They refused to speak to him and referred to him, among other things, with the N-word.  *Id.*  The threats included spray-painting the initials "KKK" near his workstation twice and anonymous intercom announcements threatening to kill him.  *Id.* at 148–49.  Co-workers would make references to monkeys and they spread motor grease on instruments the plaintiff used.  *Id.* at 149.  At one point, he found a stuffed toy monkey hanging in his car with a noose around its neck.  *Id.*  Turley complained to management who were "not wholly unresponsive"; they removed offensive signs and graffiti.  They eventually interviewed employees and hired an attorney to investigate after the stuffed monkey incident.  *Id.*  All the same, the plaintiff's supervisors were often "unresponsive" and even sometimes "appeared to encourage some of the behavior."  *Id.*  "[O]nly two employees were disciplined" for this behavior, one for three days for painting the words "King Kong" with graffiti and the other for two days for threatening to "deal with" the plaintiff.  *Id.* at 150.

During the four years of the harassment, the plaintiff was severely affected.  He was diagnosed with an adjustment disorder, depression, a panic disorder, and PTSD.  *Id.* at 150–51.  He was taken to the hospital several times.  *Id.* at 151.  He lost 30 pounds.  *Id.*  He "did not sleep,

---

[13] That plaintiff worked at the factory for longer than that, but the court explained that the racial harassment began roughly eight years in.

struggled to relate to his children, did not socialize, and was frequently overcome by memories of his experience." *Id.* When he first started work he was "confiden[t]," "colorful," and "animated"; by the end, he was "broken and dispirited." *Id.* The Second Circuit ultimately upheld a compensatory damages verdict of $1.32 million. *Id.* at 163–64.

*Turley* is not on all fours with this case either in the underlying facts or in the emotional harm. But it is highly relevant. The emotional harm in that case, like this one, came from a workplace permeated with racial harassment. In that case, like this one, co-workers routinely mocked and verbally abused the plaintiff on account of race—often with the same or similar slurs in both cases. In that case, like this one, racialized graffiti was scrawled in the workplace, including near the plaintiff's workstation. In that case, like this one, management sometimes responded but sometimes did not. In that case, like this one, when management did respond it was (at most) with light punishments of a several-day suspension. In that case, like this one, some supervisors even joined in on the harassment. And in that case, like this one, a plaintiff who had previously been animated and colorful became dispirited, could not sleep, developed deep emotional issues, lost weight, and had trouble relating to his loved ones. There are, to be sure, meaningful differences. Turley was harassed for four years; Diaz was harassed for nine months. The involvement of Turley's direct supervisors in the harassment was more extensive than here. Some of most severe acts that happened to Turley—such as the noose and monkey—did not happen to Diaz. And Turley, unlike Diaz, was diagnosed with serious disorders and required multiple hospitalizations.

For present purposes, *Turley* helps illustrate two lessons. First, a relatively large compensatory damages award is justified on facts like these. Second, the jury's $6.9 million award here is an outlier—it is more than five times what the Second Circuit upheld in *Turley*, which had more extreme harm over a longer period.

Neither party has pointed to, and I have not found, a Ninth Circuit case that provides nearly as good guidance as *Turley*. But one helps shed light on the issue all the same. In *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493 (9th Cir. 2000), the plaintiff sued for gender-based discrimination and retaliation. The plaintiff, a woman, worked in a

company for 18 years to become "one of its most successful" managers.  *Passantino*, 212 F.3d at 499.  She received good or great performance reviews.  *Id.* at 500.  But the company used a "good old boy system" of promotion and the plaintiff came to believe that she had been passed over for promotions because of her gender.  *Id.*  Her supervisor referred to women as "PMS," "menstrual," and "dragon lady" and said most "just wanted to stay home."  *Id.*  Her co-workers were condescending to women.  *Id.*  Her supervisor told her that the company and his boss were not committed to promoting women.  *Id.*  The plaintiff and another woman complained; after that, the sexist behavior escalated.  *Id.* at 500–01.  The plaintiff began to get lower performance reviews (including about "relationship with peers"); she was "slighted when trying to speak"; and she was the subject of "derision," including eye-rolls from co-workers and conversations that excluded her. *Id.* at 501.  Opportunities in the company began to be closed to her and she was warned against filing complaints.  *Id.*  She ultimately did file a formal complaint and contact legal counsel, but her complaints were "largely not addressed."  *Id.* at 501–02.  She then experienced numerous retaliatory acts and demeaning comments.  *Id.* at 502–03.

The effects of all this on the plaintiff were "constant[] worry, cr[ying], and fe[eling] trapped and upset."  *Id.* at 503.  Because she feared unjustly losing her job, she spent less time with her family.  *Id.*  She developed "stomach problems, rashes, and headaches which required medical attention."  *Id.*  And her long advancement within the company was "brought to a halt." *Id.*  Among other damages awards, the jury awarded $1,000,000 in compensatory emotional distress damages.  *Id.* at 504.  The Ninth Circuit upheld the award.  *Id.* at 513.  It explained that she experienced "substantial anxiety" that manifested in the physical problems.  *Id.*

*Passantino* is less analogous to these facts than *Turley* in ways that cut in both directions. On the one hand, the plaintiff there had built a long career with the company that was brought crashing down by its unlawful acts; here, Diaz worked at Tesla for nine months.  The *Passantino* plaintiff also experienced a coordinated campaign of retaliation that does not resemble what happened to Diaz.  On the other hand, the frequency and severity of the racist comments against Diaz appears to be more substantial than the sexist comments against Passantino.   Diaz's emotional harm, too, appears to be at least as great as (if not greater than) Passantino's.  Both

began crying often and spent less time with their families.  But he, not she, entered essentially a depressive episode in which his entire personality changed and in which he was reminded of past racist horrors against his parents.  So again, *Passantino*'s $1 million verdict—which is somewhat close to *Turley*'s, especially considering inflation—shows that substantial damages are warranted for this type of emotional harm resulting from harassment-filled workplaces, and it shows that $6.9 million is quite high.

The parties point to other cases, but I find them less useful for various reasons.  For his part, Diaz relies on *Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008), which concerned three police officers who were wrongfully criminally investigated and prosecuted based on the tip of a corrupt officer.  The Ninth Circuit upheld $5 million compensatory verdicts for each officer.  There, however, the damages were not purely based on emotional harm, they were also based on impairment of reputation and pecuniary losses.  *Harper*, 533 F.3d at 1029.  One officer had to get a lower paying job, his house was (wrongfully) searched in front of his loved ones, he was told that he was put on a hit list, and he was unable to resume his old police job because of the publicity.  *Id.*  The second officer was also told he was on a hit list, his family broke apart, his wife left him, and his teenage stepdaughter attempted to commit suicide and was placed in a psychiatric ward.  *Id.*  The last had to file for bankruptcy, lost his career, and his "young children" suffered "significant adverse effects" from the publicity.  *Id.*  The emotional component, too, is somewhat different than here.  One of the officers developed intestinal problems, became a frequent drinker, and developed paranoia.  *Id.*  Another became suicidal in addition to physical symptoms and anxiety attacks.  *Id.*  The third gained 100 pounds, was hospitalized, developed high blood pressure, and developed anxiety.  *Id.*  And this all happened over an extended period of time in which the officers were wrongfully arrested and wrongfully prosecuted all the way to acquittal.  *See id.* at 1016–21.  The compensable harm there is simply qualitatively different than what Diaz experienced.

The parties point to district court cases from this Circuit that have taken dueling approaches.  Diaz's other case is *Kingston v. Int'l Bus. Machines Corp.*, No. C19-1488 MJP, 2021 WL 2662216 (W.D. Wash. June 29, 2021).  There, the jury awarded $6 million in emotional

compensatory damages after finding the plaintiff was wrongfully discharged and retaliated against. *Id.*, at *1. The district court upheld the award, pointing out that the plaintiff's wife testified that she was afraid he would engage in self harm and that the stress of the events "trigger[ed] a health crisis." *Id.*, at *5. The plaintiff, who was 62, also told the jury about an "extensive but fruitless" search for a new job. *Id.* Tesla, in contrast, points to *Paul v. Asbury Auto. Grp., LLC*, No. CIV.06-1603-KI, 2009 WL 188592 (D. Or. Jan. 23, 2009), which remitted two $1.9 and one $2.1 million emotional distress damages awards to $150,000 for each plaintiff on hostile work environment claims. The court concluded that, there, two of the plaintiffs testified that they became stressed, stopped doing their old activities, had strained relationships with their families, developed depression, and could not eat. *Id.*, at *8. The third lost his appetite, developed headaches, and withdrew from his family. *Id.*, at *9. The court remitted the damages because the plaintiffs were not terminated or physically abused, did not attend counseling, had no economic difficulties, and had no long-term emotional distress. *Id.* It also pointed out that the harm occurred for eleven months, which it thought short. *Id.* More than anything, then, these cases show the range of reasonable opinions about the size of damages in cases that have similarities to this one—neither compels a different conclusion than the one I reach.

Tesla highlights several other district court cases in its brief, but none is nearly as analogous as those discussed, either in the underlying facts or in the nature of the emotional distress.[14] *See Clark v. City of Tucson*, No. CV-14-02543-TUC-CKJ, 2020 WL 914524 (D. Ariz.

---

[14] Tesla relies heavily on a principle the Ninth Circuit has occasionally articulated: that, generally, "courts are required to maintain some degree of uniformity in cases involving similar losses." *Shaw v. United States*, 741 F.2d 1202, 1209 (9th Cir. 1984) (citation omitted). It is unclear whether the Ninth Circuit meant it to sweep so broadly as Tesla contends and reach remittiturs of jury awards in cases like this. That case itself was about a negligence award delivered by the court, as was the only case it relied on. It is revealing that Tesla could not locate a single Ninth Circuit case applying *Shaw* to a remittitur of a jury's award. And *Shaw* has been cited only a few times to apply to remittiturs—and never by district courts that *considered* whether it should apply or not. *See, e.g.*, *Clark v. City of Tucson*, No. CV-14-02543-TUC-CKJ, 2020 WL 914524, at *18 (D. Ariz. Feb. 26, 2020). That said, other Circuits have sometimes articulated a similar principle and expressly applied it to remittiturs. *See, e.g.*, *Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006). In all events, this Order does examine cases that shed light on this one—as other district courts and courts of appeals invariably do in these cases—and even *Shaw*

1   Feb. 26, 2020) (remitting $3,800,000 to $250,000 in a case about deprivation of lactation facilities

2   and retaliation); *Johnson v. Albertsons LLC*, No. 2:18-01678-RAJ, 2020 WL 3604107 (W.D.

3   Wash. July 2, 2020) (remitting $750,000 to $200,000 based on unspecified "humiliate[ion]" and

4   "loss of self-esteem" that was "relatively short" and "garden variety"); *Longfellow v. Jackson Cty.*,

5   No. CV 06-3043-PA, 2007 WL 682455 (D. Or. Feb. 28, 2007) (remitting $360,000 to $60,000

6   based on a termination and "being called a liar"); *Glenn-Davis v. City of Oakland*, No. C 02-

7   02257SI, 2007 WL 687486, at *1 (N.D. Cal. Mar. 5, 2007) (remitting $1.85 million to $400,000

8   based on not receiving a promotion with no indications of depression or deterioration in health).

9   Some of them also have other issues that do not exist here, such as concerns about multiple

10   recovery and the award being a punitive damages award in all but name.  *See, e.g.*, *Clark*, 2020

11   WL 914524, at *1–*3.  And some do not sufficiently elaborate on their reasoning to enable

12   meaningful comparisons.

13       Tesla also places great emphasis on several "samples" of recent federal decisions that

14   remitted non-economic damages in discrimination and retaliation cases or permitted those awards

15   to stand.  *See, e.g.*, Mot. 11–13.  It is telling that Tesla does not highlight any further examples of

16   them in its brief or elaborate on their facts in any way.  I have reviewed the decisions themselves

17   and do not find anything in them so comparable to Diaz's situation as to materially alter my

18   reasoning.  Tesla purports to have identified ranges of $25,000 to $750,000 and $50,000 to $1.75

19   million.  *See* Mot. 12 (citing appendices).  To start, it is unclear how representative this "sample"

20   is or if it skews towards decisions more favorable to Tesla.  Additionally, as explained, many of

21   the decisions in this "sample" are not comparable in terms of harm.  And, in any case, I remit the

22   award to a level that is *within* one of Tesla's ranges, even if it is toward the high-end.

23       The net result is as follows.  The jury is entitled to "great deference," *Williams*, 895 F.3d at

24   1128, and that is especially true when it comes to non-economic harm, *Holzhauer*, 2017 WL

25   3382316, at *2.  It had ample grounds to find that Diaz was severely harmed.  But its award of

26   future damages is far out of proportion to the evidence and its award of past damages must be

27   _____

28   emphasized that "[e]ach case stands on its own facts," *Shaw*, 741 F.2d at 1209, so nothing here
    turns on whether the principle is as strict as Tesla insists.

United States District Court
Northern District of California

reduced too.  The closest cases, especially *Turley* and *Passantino*, illustrate that awards of roughly $1.5 million (in today's dollars) are supported by analogous (though not identical) evidence. Accordingly, I conclude that the maximum amount supportable by proof to make Diaz whole for his emotional harm is $1.5 million.  And even though this award is on the high side for these types of cases, it is justified given the facts and the jury's findings.

### B.  Tesla's Other Counterarguments

Tesla makes three other arguments on this point that are unpersuasive and do not factor into my analysis.

First, it argues that Diaz testified that, even with the racial harassment occurring, he was "happy" to work at Tesla.  *See, e.g.*, Mot. 4.  While Diaz did, in response to a cross-examination question clarifying a separate issue, use the phrase that "[w]hile I was there, I was happy to be there," Tesla's argument ignores the context of that discrete exchange and Diaz's testimony more broadly.  In the next question, Diaz clarified what he meant by "happy": he compared it to being on a sports team and "whether I liked my team member or not, we can still get a job done."  Tr. 516:21–23.  More broadly, as the evidence recounted above shows, Diaz was far from happy at Tesla.  This one piece of testimony does not muddy the clearer, bigger picture.

Second, Tesla argues that the compensatory damages reflect harm that it did not cause. Mot. 15–16.  According to it, much of Diaz's emotional harm came from distress that his son, Demetric Di-Az, was convicted for armed robbery.  *See, e.g.*, Tr. at 572:5–20 (discussing the robbery).  It is true, as Tesla argues, that compensatory damages compensate for the harm caused by the defendant.  *See, e.g.*, *Watson v. City of San Jose*, 800 F.3d 1135, 1138 (9th Cir. 2015).  But there is no support in the record for concluding that the jury awarded damages to compensate Diaz for any harm other than that caused by Tesla.  As explained above, the hostile work environment for which Tesla is liable supports a significant damages award.  In any event, my remittitur analysis is based solely on the appropriate basis for Tesla's liability.

Third, Tesla argues that the compensatory damages are improperly punitive.  Mot. 17. Tesla, again, has the principle correct: compensatory damages serve the goal of making the plaintiff whole while punitive damages punish the defendant and deter misconduct.  *See Cooper*

United States District Court
Northern District of California

*Indus., Inc. v. Leatherman Tool Grp.*, Inc., 532 U.S. 424, 432 (2001).  But, again, there is no indication that the jury did anything improper.  To start, "[a] jury is presumed to follow its instructions," *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and the jury here was properly instructed (as Tesla does not dispute) about the different roles of punitive and compensatory damages.  Tesla has presented no evidence to overcome that presumption, which could end the analysis on its own.  But here, there is also an affirmative reason to believe that the jury was *not* improperly punitive in the compensatory award:  It separately awarded *$130 million* in punitive damages.  The presence and size of that award strongly implies that the jury poured every ounce of punishment and deterrence it believed warranted into it; there is no reason it would have snuck a few extra million in punitive damages into its compensatory award.

## III.    PUNITIVE DAMAGES

The jury awarded Diaz $130 million in punitive damages.  *See* Verdict Form at 4.  Tesla argues that it is entitled to JMOL, a new trial, or remittitur on that award.  Its argument about JMOL and a new trial, however, are essentially duplicative in substance of the reasons it seeks to reduce the award under the Constitution.  *See* Mot. 18–24.  I largely analyze them together and would not, in any event, exercise my discretion to reduce the award below the constitutionally acceptable threshold.  As a preliminary matter, to the extent that Tesla's argument is that *no* punitive damages are warranted as a matter of law, I reject it.[15]  The explanation that follows shows that the jury had a legally sufficient basis to make *an* award of punitive damages.  The size of the award here, though, is unconstitutionally large.  I will, consequently, remit it to $13.5 million, a nine-to-one ratio to the remitted compensatory damages.  But I will not reduce it further than that.[16]

The Supreme Court has held that the Fifth Amendment's Due Process Clause prohibits

---

[15] Tesla also never made that argument at the Rule 50(a) stage, waiving it.  *See Go Daddy*, 581 F.3d at 961.

[16] Diaz's request for judicial notice of media coverage of the size of the verdict (Dkt. No. 320) is DENIED.  Diaz argues that this evidence is relevant to the issue of punitive damages, but the media coverage does not affect analysis of the constitutional challenge to punitive damages, which is what is at issue.

United States District Court
Northern District of California

1    punitive damages that are "grossly excessive." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538

2    U.S. 408, 416 (2003).[17]  To determine whether an award of punitive damages is unconstitutionally

3    large, the Supreme Court has set out three "guideposts": "(1) the degree of reprehensibility of the

4    defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the

5    plaintiff and the punitive damages award; and (3) the difference between the punitive damages

6    awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at

7    418.

8          Here, the award of $130 million is grossly disproportionate under these precedents, but a

9    9:1 ratio to the size of compensatory damages is warranted and constitutional.

10         **A. Reprehensibility**

11         Reprehensibility is the "most important indicium of the reasonableness of a punitive

12   damages award." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).  The reprehensibility of

13   the defendant's conduct is judged by "considering whether: the harm caused was physical as

14   opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the

15   health or safety of others; the target of the conduct had financial vulnerability; the conduct

16   involved repeated actions or was an isolated incident; and the harm was the result of intentional

17   malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419.

18         Tesla's conduct falls high on the spectrum.  "[I]ntentional discrimination on the basis of

19   race or ethnicity is especially reprehensible and a different kind of harm, a serious affront to

20   personal liberty." *Flores v. City of Westminster*, 873 F.3d 739, 760 (9th Cir. 2017) (internal

21   quotation marks and citation omitted).  As the Ninth Circuit has explained, "[t]here can be no

22   question of the importance of our society's interest in combating discrimination; this nation fought

23   the bloodiest war in its history in part to advance the goal of racial equality, adding several

24   amendments to the Constitution to cement the battlefield victory." *Zhang v. Am. Gem Seafoods,*

25

26   _____

[17] *State Farm* and several other cases in this area discuss the Due Process Clause of the Fourteenth

27   Amendment as a limit on state-law punitive damages.  But the same principles apply to punitive
     damages under federal law due to the Fifth Amendment. *See, e.g.*, *Ramirez v. TransUnion LLC*,

28   951 F.3d 1008, 1036 (9th Cir.), *rev'd and remanded on other grounds*, 141 S. Ct. 2190 (2021)
     (applying *State Farm* to punitive damages under the federal Fair Credit Reporting Act).

United States District Court
Northern District of California

1    *Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003).  As a result, "[r]acial discrimination often results in

2    large punitive damage awards." *Id.*

3        The jury had sufficient grounds to find that Tesla's actions showed "an indifference to or a

4    reckless disregard" for Diaz's (and others') right to be safe and free from discrimination in the

5    workplace. *See State Farm*, 538 U.S. at 419.  Tesla's indifference to Diaz's complaints is striking.

6    *See supra* Section I.A.i.  The jury could have credited Diaz's testimony that he had verbally

7    complained multiple times about uses of the N-word and other slurs without anything being done.

8    *Id.*  Further, the jury could have found that the companies' responses to the written complaints

9    were so inadequate as to imply indifference to the serious problems of harassment in the

10   workplace. *See id.*  Tesla counters that it had antidiscrimination policies and did take action in

11   response to the written complaints, "if imperfectly."  Mot. 19.  But having a policy on paper and

12   effectively protecting employees from known racial harassment are different.  And Tesla's slaps

13   on the wrist—not to mention that it disciplined both Martinez *and* Diaz without viewing tape or

14   interviewing witnesses—undermine its assertions that it did enough.  And I note again that Tesla

15   did not pursue a *Faragher/Ellerth* defense on this issue, despite its attempt to frame its motion this

16   way. *See, e.g.*, Mot. 19 (arguing it "respond[ed] adequately to [the] conduct" (internal quotation

17   marks and citation omitted)).

18       Other *State Farm* factors point in the direction of a relatively high punitive damages

19   award. The harm was also not a single isolated incident, it was repeated. *See State Farm*, 538 U.S.

20   at 419.  The discriminatory slurs were constant.  Some of them came from supervisors.  But

21   Tesla's even more direct failings were also repeated.  Tesla repeatedly failed to address complaints

22   or addressed them with what the jury could have understood to be reckless disregard for Diaz's

23   rights.  The harm was also not merely economic. *State Farm*, 538 U.S. at 419.  As recounted in

24   detail above, and incorporated here, Diaz suffered grave emotional harm. *See supra* Section II.  In

25   the light most favorable to the jury's verdict, Diaz was also financially vulnerable. *State Farm*,

26   538 U.S. at 419.  As the jury found, Tesla was a joint employer of Diaz.  Diaz was dependent on it

27   for his livelihood.  He was also entirely dependent on it and its contractors to prevent

28   discrimination in the workplace. *Cf. Hardeman v. Monsanto Co.*, 997 F.3d 941, 973–74 (9th Cir.

United States District Court
Northern District of California

2021) ("It goes without saying that this is a case of a large corporation and an individual—not two corporations on equal footing.  Having said that, this factor is not particularly relevant in a mostly noneconomic damages case like this one.").

Not only does the evidence support a finding of recklessness or indifference to Diaz's health and safety, it supports a finding that Tesla intentionally built an employment structure that allowed it to take advantage of Diaz's (and others') labor for its benefit while attempting to avoid any of the obligations and responsibilities that employers owe employees.  *See supra* Section I.A.  Indeed, Tesla's strategy at trial was essentially to attempt to show that it was not Diaz's employer without much of a substantive defense of its actual employment practices.  Neither party has pointed to a Supreme Court or Ninth Circuit decision that considered similar behavior, but attempting to pawn off responsibility for a safe and discrimination-free workplace would seem to be precisely the sort of extraordinary behavior punitive damages are built for.

Some of the reprehensibility considerations, however, cut in Tesla's favor and counsel against increasing the penalty above a single-digit ratio.  The Supreme Court has "outlined what one court has termed a 'hierarchy of reprehensibility,' with acts and threats of violence at the top." *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001) (citations omitted).  Here, there is no evidence that Tesla's senior management carried out acts or threats of violence (though Martinez, a supervisor, did).  *Cf. Zhang*, 339 F.3d at 1043 (finding senior managers' discrimination especially reprehensible).  Nor is there any indication that Tesla set out with the *purpose* of discriminating or fostering a hostile work environment.  *Cf. Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 262 (S.D.N.Y. 2007) (finding the lack of such behavior warranted a reduction).

## B.  Ratio

The second guidepost is the ratio of punitive damages to "actual harm."  *Gore*, 517 U.S. at 580.  The Supreme Court has explained that it is "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award."  *State Farm*, 538 U.S. at 424.  But, it has said, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.  While "an award of more than four times the amount of compensatory damages might

40

be close to the line of constitutional impropriety," these ratios are "instructive" not "binding." *Id.* Larger ratios are more likely to be warranted when "a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (internal quotation marks and citation omitted). Conversely, when "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* In short, the punitive damages must be "reasonable and proportionate" to the harm and compensatory damages. *Id.*

As the jury originally rendered it, the punitive damages were approximately 18 times the amount of compensatory damages. Based on the remitted amount—that is, the amount I conclude reflects the "actual harm"—$130 million in punitive damages would be more than 86 times the compensatory damages. As explained above, the size of the compensatory damages here—both awarded and remitted—is an outlier on the high side. *See supra* Section II.

This large disparity between punitive and compensatory damages and the relatively large size of the compensatory damages award suggest that the punitive damages award here must be constrained. As the Supreme Court has explained, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. Because this is a discrimination case, and in light of the reprehensibility of the conduct, a ratio in the higher part of that range is more appropriate. *Cf. e.g.*, *Zhang*, 339 F.3d at 1044 (approving 7:1 ratio); *Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005) (holding that as high as a 9:1 ratio could be appropriate in a Section 1981 case). I recognize that *Turley*, on which I relied in the preceding section, concluded that a 2:1 ratio was appropriate on those facts. *See Turley*, 774 F.3d at 166. But the Ninth Circuit has often thought higher awards warranted in these cases, *see, e.g.*, *Swinton*, 270 F.3d at 818 (approving a 28:1 ratio), *Turley* did not have similar acts to Tesla's attempt to insulate itself from responsibility, and the jury's punitive damages verdict here was more than six times as large as that in *Turley*, *see* 774 F.3d at 165.

## C. Comparable Penalties

Third, courts must examine the "disparity between the punitive damages award and the

41

civil penalties authorized or imposed in comparable cases." *Id.* at 428 (internal quotation marks and citation omitted).  The Court has also permitted examining comparable criminal penalties to assess the seriousness of the actions but has warned that using criminal penalties to "determine the dollar amount of the award" is less useful.  *Id.*

The Ninth Circuit has held that "the $300,000 statutory limitation on punitive damages in Title VII cases [i]s an appropriate benchmark for reviewing § 1981 damage awards, even though the statute d[oes] not apply to § 1981 cases." *Bains*, 405 F.3d at 777.  But it has also "hasten[ed] to add that Congress has not seen fit to impose any recovery caps in cases under § 1981 (or § 1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII." *Swinton*, 270 F.3d at 820.  Because of the sheer difference between $130 million and $300,000, this factor weighs somewhat in favor of a reduction, *Bains*, 405 F.3d at 777, but given the Ninth Circuit's guidance, it is not overwhelming, *Swinton*, 270 F.3d at 820.

\* \* \*

Putting the three guideposts together, I conclude that a 9:1 ratio is appropriate.  Despite Tesla's attempts to characterize it any other way, its treatment of Diaz—and the treatment of its supervisors and employees (or contractors)—falls high on the reprehensibility scale, requiring a high ratio.  But several reprehensibility factors push the other direction and the unremitted ratio would be extremely large.  Accordingly, in line with the Ninth Circuit's guidance, a 9:1 ratio both fulfills the purposes of punitive damages, accords appropriate deference to the jury's verdict, and stays within constitutional guardrails.

Finally, a word on Tesla's argument that the punitive damages award was "improperly premised" on its wealth.  *See* Mot. 25–26.  The jury was told by Diaz's expert that Tesla had a market capitalization of $43.8 billion.  *See* Tr. 684:19–23.[18]  It was appropriate for the jury to *consider* Tesla's wealth in determining the size of punitive damages.  *See TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462 n.28 (1993) ("Under well-settled law . . . factors such as [net worth]

---

[18] This figure is from October 2019.  *See* Tr. 684:19–23.  On the eve of trial, Diaz attempted to update the measure in his expert's report to include Tesla's current valuation, which is much higher.  I disallowed that because the expert was bound by the report he gave that he never previously supplemented.  *See* Fed. R. Civ. P. 26(e)(2).

United States District Court
Northern District of California

are typically considered in assessing punitive damages."); *White v. Ford Motor Co.*, 500 F.3d 963, 976 (9th Cir. 2007) (discussing "the Supreme Court's and this circuit's longstanding recognition of the admissibility of net worth evidence" in punitive damages calculations); *Bains*, 405 F.3d at 777.  One primary purpose of punitive damages, after all, is deterrence.  An award sufficient to deter the average individual will not necessarily be the same as an award sufficient to deter a corporation with Tesla's wealth.  But there are limits: "the wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427–28.  Here, I remit the award to an amount appropriately based on that reprehensibility that brings it into the constitutional range, so Tesla's wealth will not justify an "*otherwise* "unconstitutional award. *Id.* (emphasis added).  But, by the same token, Tesla cannot use the mere fact of its wealth as an escape hatch to avoid rightful liability.

## CONCLUSION

The motion for judgment as a matter of law is DENIED.  The motion for a new trial is CONDITIONALLY DENIED based on Diaz accepting a remittitur to $1.5 million in compensatory damages and $13.5 million in punitive damages.  Diaz shall file a notice on the docket within 30 days stating whether he accepts or rejects the remittitur (and a proposed amended judgment if he accepts it).  At that point, I will, as appropriate, either enter an order granting a new trial on damages or enter a final, appealable order denying Tesla's motion and an amended judgment.

**IT IS SO ORDERED.**

Dated: April 13, 2022

William H. Orrick
United States District Judge