QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (appearance *pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Daniel C. Posner (CA Bar No. 232009)
  danposner@quinnemanuel.com
  Mari F. Henderson (CA Bar No. 307693)
  marihenderson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Asher Griffin (appearance *pro hac vice*)
  ashergriffin@quinnemanuel.com
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Defendant Tesla, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| OWEN DIAZ,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>TESLA, INC. d/b/a TESLA MOTORS, INC.,<br><br>　　　　　Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**DECLARATION OF DANIEL C. POSNER IN SUPPORT OF DEFENDANT TESLA, INC.'S MOTIONS *IN LIMINE***<br><br>Hearing Date:  February 27, 2023<br>Time:  2:00 p.m.<br>Place:  Courtroom 2, 17th Floor<br>Judge:  Hon. William H. Orrick |

## DECLARATION OF DANIEL C. POSNER

I, Daniel C. Posner, hereby declare:

1.      I am a member of the State Bar of California and of this Court and am counsel for Defendant Tesla, Inc. ("Tesla") in this matter.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness I could and would testify competently thereto.

2.      I make this declaration in support of Tesla's Motions *in Limine*.

3.      Attached hereto as Exhibit A is a true and correct copy of the transcript from the September 29, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

4.      Attached hereto as Exhibit B is a true and correct copy of the transcript from the October 4, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

5.      Attached hereto as Exhibit C is a true and correct copy of the transcript from the May 22, 2018 deposition of Owen Diaz in this matter with the relevant excerpts highlighted.

6.      Attached hereto as Exhibit D is a true and correct copy of the transcript from the October 1, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

7.      Attached hereto as Exhibit E is a true and correct copy of the transcript from the October 24, 2018 deposition of Andres Donet in this matter with the relevant excerpts highlighted.

8.      Attached hereto as Exhibit F is a true and correct copy of the transcript from the September 30, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

9.      Attached hereto as Exhibit G is a true and correct copy of trial exhibit 229.

10.     Attached hereto as Exhibit H is a true and correct copy of trial exhibit 248.

11.     Attached hereto as Exhibit I is a true and correct copy of trial exhibit 252.

12.     Attached hereto as Exhibit J is a true and correct copy of trial exhibit 254.

13.     Attached hereto as Exhibit K is a true and correct copy of the transcript from the September 30, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

14.     Attached hereto as Exhibit L is a true and correct copy of the transcript from the September 27, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

15.     Attached hereto as Exhibit M is a true and correct copy of the transcript from the June 12, 2019 deposition of Michael Wheeler in this matter with the relevant excerpts highlighted.

16.     Attached hereto as Exhibit N is a true and correct copy of trial exhibit 106.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 3rd day of February 2023 in Los Angeles, California.


                                             _/s/ Daniel C. Posner_
                                             Daniel C. Posner

# EXHIBIT A

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

Volume 3

Pages 369 - 544

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND    )
LAMAR PATTERSON                  )
                                 )
                                 )
          Plaintiffs,            )
                                 )
  vs.                            )  No. C 17-6748 WHO
                                 )
TESLA, INC., dba TESLA MOTORS,   )
INC., CITISTAFF SOLUTIONS, INC., )
WEST VALLEY STAFFING GROUP,      )
CHARTWELL STAFFING SERVICES, INC.,)
and DOES 1-50, inclusive,        )
                                 )
          Defendants.            )  San Francisco, California
                                 )  Wednesday
_____)  September 29, 2021
                                    8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                  BY:    BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                  BY:    LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:      Debra L. Pas, CSR 11916, CRR, RMR, RPR
                  Official Reporter - US District Court
                  Computerized Transcription By Eclipse

---

APPEARANCES:  (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                  BY:    TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                  BY:    PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                  BY:    SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                              -  -  -

---

371

PROCEEDINGS

1   Wednesday - September 29, 2021              8:01 a.m.
2                    P R O C E E D I N G S
3                        ---oOo---
4        (Proceedings were heard out of presence of the jury.)
5        THE COURT:  All right.  There are two things on my
6   mind this morning.  One is the counter designations and
7   objections regarding Erin Marconi.  And I think in every
8   instance I'm going to overrule the objection to the counter
9   designation and overrule the objection to the testimony.  So
10  all of the testimony can come in that the parties are
11  interested in.
12       MR. ORGAN:  Your Honor, just a question on that then.
13  With respect to how they are presented, do you want the
14  designations presented with the counter designations then
15  together?
16       THE COURT:  Yeah, I think that's the smoothest way of
17  dealing with things.
18       MR. ORGAN:  So we'll have one video.
19       THE COURT:  One video.
20       MR. ORGAN:  In terms of the time, Your Honor --
21       THE COURT:  You time it yourself.
22       MR. ORGAN:  We'll produce that tonight.  So we'll --
23  it's our intent to present it, then, tomorrow, Your Honor.
24       THE COURT:  Great.
25       MR. ORGAN:  Okay.  Thank you.

---

372

PROCEEDINGS

1        THE COURT:  All right.  And then the other thing I
2   just wanted to mention, yesterday I allowed Wayne Jackson to
3   testify about his experience of hearing the "N" word throughout
4   the factory.  And on Monday I admitted Exhibit 106 concerning
5   Mr. Romero's credibility regarding his hearing of the "N" word.
6        I did so because it appears from Tesla's presentation of
7   the case, from the opening of the argument to the designations
8   in the depositions, that it wishes to minimize the use of the
9   "N" word in the workplace at Tesla, which is fine, but so this
10  counter evidence I think is relevant.
11       I am willing and inclined to give the jury a further
12  limiting instruction, and I can do that this morning.  It would
13  be primarily at the defendant's -- I'll let the defendant
14  decide whether this is something that you would like or not,
15  but it would be to the effect of:
16       As you know, I admitted Exhibit 106 for the limited
17  purpose of your consideration of the credibility of
18  Mr. Romero's testimony.  And yesterday I allowed Mr. Jackson to
19  testify about his experience hearing the "N" word in the Tesla
20  factory.
21       I want to remind you that this case is about Mr. Diaz and
22  the work environment that he experienced at the Tesla factory,
23  not what others in a different part of the facility
24  experienced.
25       MS. KENNEDY:  Yes, Your Honor, that would be

---

409

DIAZ - DIRECT / ORGAN

1  A.   Just what I explained to you.  I had told Tom Kawasaki
2  over a period that he had been calling me a "porch monkey" and
3  I had translated it.  And then when he was leaving out the
4  elevator on that particular day after they was doing it, he
5  actually said the "N" word.  So that's what made me pretty
6  upset at that point.
7  Q.   Did you tell him about the mayate?
8  A.   I explained everything to Tom.
9  Q.   Okay.  And then did you see Tom interviewing anybody
10  around there?
11  A.   Yes.
12  Q.   And tell the jury about that.  What did he do?
13  A.   Like I said, he started interviewing people after he broke
14  us up.  He started talking to the people that was around trying
15  to find out is -- what he asked me.  He was trying to
16  corroborate what I told him what Judy Timbreza was saying.
17  Q.   Okay.  And then after that incident, did Judy Timbreza
18  call you any of those offensive terms again?
19  A.   No.  After that, I hadn't seen Judy Timbreza.
20  Q.   Okay.  Do you know what Tesla did with Judy Timbreza?
21  A.   No.  I was not privy to that, sir.  I'm sorry.
22  Q.   They didn't tell you?
23  A.   No.
24  Q.   Okay.  And then if you could, turn to Exhibit 38.
25       MR. ORGAN:  And I believe this is admitted,

410

DIAZ - DIRECT / ORGAN

1  Your Honor.
2       MS. KENNEDY:  Yes, Your Honor.  It's admitted.
3       THE COURT:  It is.
4       THE WITNESS:  I only have 33 to 39.  Unless is it in
5  this binder?
6  BY MR. ORGAN:
7  Q.   That was my fault.  I was putting this stuff together last
8  night, and I must have not put it in the binder.
9  A.   Is it the white binder or the black binder?
10       MR. ORGAN:  Can we show it to him, Your Honor, on the
11  screen?
12       Oh, can we publish it?
13       THE COURT:  You can publish it.  It's in.
14       MR. ORGAN:  Yes, let's publish it to the jury.
15  (Document displayed.)
16  BY MR. ORGAN:
17  Q.   Look on your screen, Mr. Diaz.  Can you see that?
18  A.   Yes, sir, I can see it.
19  Q.   If you look at the first line there, it says (as read):
20       "Elevator 2 employee Owen has brought to my
21       attention of comments being made towards him that are
22       racist in nature."
23       Did you consider the comments to be racist in nature?
24  A.   Yes, I did, sir.
25  Q.   Does that statement adequately describe, though, the

411

DIAZ - DIRECT / ORGAN

1  actual statements that were made?
2  A.   No, it was not.
3  Q.   But you did report, you're sure you reported to Tom
4  Kawasaki those words, the "N" word and those other words that
5  were spoken; right?
6  A.   Yes, I did report it to him.
7  Q.   Okay.  So based on what you had told Tom Kawasaki, you
8  would agree, would you not, that on July 31st you did report
9  the "N" word to your supervisor; right?
10  A.   Yes.  I verbally reported it to my supervisor.
11  Q.   Okay.  And tell me this.  Did anyone tell you, when you
12  started at Tesla, who you were to report things to?
13  A.   When I first started at Tesla -- well, before I started at
14  Tesla, I was talking to -- I can't remember her name.  She was
15  a heavy-set Latino female that was at CitiStaff, and she told
16  me to direct all my concerns to Tesla or whoever was my
17  immediate supervisor over at Tesla.
18  Q.   Okay.  And this -- so the CitiStaff person told you to
19  report anything that happened to your immediate supervisor at
20  Tesla; is that right?
21  A.   Yes, sir.
22  Q.   Did anyone at Tesla ever tell you to do it any differently
23  than that?
24  A.   No, sir.
25  Q.   And did Tesla give you any training on harassment,

412

DIAZ - DIRECT / ORGAN

1  discrimination, reporting it, that kind of stuff?
2  A.   The only training that I received from Tesla was the
3  one-hour class to be able to get the badge, sir.
4  Q.   In Exhibit 19?
5  A.   Yes.
6  Q.   Okay.  I'd like to talk to you a little bit.  You
7  mentioned in your deposition a person named Robert.  Do you
8  remember a Robert?
9  A.   Yes.  Robert Hurtado.
10  Q.   Who?  Robert Hurtado?
11  A.   Yes, sir.
12  Q.   Now, when you were deposed, you didn't know his name?
13  A.   No, I didn't know his name then.
14  Q.   And --
15  A.   Well, I knew his first name, not his last name.
16  Q.   Right.  If you could, turn to Exhibit 96.  I hope that
17  one's is in there.
18  A.   White or black binder?
19  Q.   96 is not in there?
20  A.   I'm searching for it right now.
21       THE COURT:  Here.
22  (Whereupon document was tendered to the witness.)
23       THE WITNESS:  Thank you, sir.
24  BY MR. ORGAN
25  Q.   There is a picture there of somebody.  Do you recognize

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

DIAZ - DIRECT / ORGAN                                    413

1  that picture?
2  A.  Yes.  I recognize that as Robert Hurtado, one of my
3  harassers.
4  Q.   Okay.  So that's the guy who harassed you; right?
5  A.  Yes, sir.
6  Q.   And actually I showed you that picture before during
7  discovery after your deposition was over; correct?
8  A.  Yes, you showed me.  Tesla, I had asked them to show me a
9  picture and they didn't have any.
10  Q.   In your deposition you asked them to show you a picture,
11  and they didn't show you one; right?
12  A.  They asked me if I could recognize anybody.  And I
13  actually told them if they produced a picture, then I probably
14  possibly could recognize them.
15  Q.   Okay.  Let me ask you, so this man, Robert Hurtado, did he
16  engage in any kind of harassing conduct towards you?
17  A.  Yes, sir.
18  Q.   And when did that harassing conduct towards you by
19  Mr. Hurtado, when did that start?
20  A.  I'm going to say in about the fall of 2015.
21  Q.   Okay.  You -- when is it?  You think it's fall?
22  A.  Yes.
23  Q.   Okay.  Let me ask you this:  Was it before Demetric
24  started working there?
25  A.  I have to think when Demetric started working.  I think

DIAZ - DIRECT / ORGAN                                    414

1  Demetric started working in August or something like that.
2  Q.   Yeah.  And do you think that Robert Hurtado started
3  calling you or harassing you prior to Demetric coming?
4  A.  It could have been before.  It was awhile back.  I'm not
5  100 percent sure.
6  Q.   Okay.  So perhaps in the August time frame then?
7  A.  Yes.
8  Q.   And what are the -- was the conduct, the harassment,
9  racial in nature?
10  A.  Yes, it was.
11  Q.   And if you could, tell the jury, what is the harassing
12  conduct that Robert Hurtado directed towards you based on your
13  race, what you consider to be based on your race?
14  A.  Mr. Hurtado would call me the "N" word and call me "boy."
15  Q.   Okay.  How did -- can you tell the jury how Mr. Hurtado
16  used the "N" word towards you, if you recall?
17  A.  He would pull into the elevator on pieces of equipment at
18  a time, and then he would say:  "N," hurry up and push the
19  button.
20      Or I could be working the other elevator, moving -- moving
21  batteries or something like that, and then he would say:  "N,"
22  hurry up and push the batteries into the elevator or out of the
23  elevator.
24      You know, he -- he would say things like:  You "Ns" are
25  lazy, and stuff like that.

DIAZ - DIRECT / ORGAN                                    415

1  Q.   How many times do you think Robert Hurtado used the
2  "N" word towards you?
3  A.  It was well north of 30 times.
4  Q.   Okay.  And how did -- you mentioned "boy."  Did you
5  consider that offensive to be called a "boy"?
6  A.  At that time I was in my forties so I'm a grown man.
7  Q.   Right.
8  A.  And "boy" is a term that slave masters used to use against
9  black people to let them know that they were their property.
10  Q.   Do you remember how Mr. Hurtado used the word "boy"
11  towards you?
12  A.  He would say:  Boy, hurry up and push the batteries in the
13  elevator.
14      And I would try to remind him that, you know, I'm a grown
15  man.  I'm not a boy.  If I were to walk up to you, the first
16  thing I wouldn't say is:  Hey, boy.  Hey, man.
17  Q.   So he used "boy" in a similar manner to the "N" word?
18  A.  Yes, sir.
19  Q.   Okay.  Can you remember how many times he used "boy"
20  towards you?
21  A.  No, I can't remember.
22  Q.   Did he use the "N" word more than he did "boy"?
23  A.  Yes, he did.
24  Q.   Okay.  And what was Robert Hurtado's position as far as
25  you understood it?

DIAZ - DIRECT / ORGAN                                    416

1  A.  He was the supervisor.
2  Q.   Did he work for Tesla?
3  A.  Yes, he was a Tesla employee.
4  Q.   Tesla employee and a supervisor.
5      Okay.  Let's talk about a man named Ramon Martinez.  Do
6  you know a man named Ramon Martinez?
7  A.  Yes, sir.  That was another one of my harassers.
8  Q.   And what was your understanding of Ramon Martinez's
9  role at the Tesla factory?
10  A.  He was another supervisor.
11  Q.   Okay.  Now, if you could, tell the jury, what's the
12  difference between a lead and a supervisor at the Tesla
13  factory?
14  A.  To me, it's really no difference.  So I -- except, you
15  know, one reports to the other.  You know, the supervisors
16  would come out and basically sometimes give us some orders, or
17  we would have to -- as leads, we would have to coordinate with
18  different supervisors and different -- in different departments
19  to make sure the material is being moved back and forth.
20  Q.   Okay.  And did Ramon Martinez have an ability to tell you
21  how to do anything, any part of your job?
22  A.  Yes.  To a limited capacity, yes.
23  Q.   Okay.  And what was it that -- you mentioned that he was
24  one of your harassers.  What did Ramon Martinez do to harass
25  you?  How did he do that?

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

425

WHEELER - DIRECT / ALEXANDER

1  Q.  And with regard to your hearing that, could you tell
2  whether you were hearing that from contract employees or direct
3  Tesla employees?
4  A.  Both.
5  Q.  And how often did you hear the "N" word used inside the
6  Tesla workplace?
7  A.  Every day.
8  Q.  And did you find -- when you heard the "N" word used
9  inside the Tesla workplace, did you find it offensive?
10  A.  Absolutely.
11  Q.  Did you ever hear the term "mayate"?
12  A.  Yes.
13  Q.  With regard to Ramon Diaz [sic], are you familiar with
14  him?
15  A.  Yes.
16  Q.  And with regard to Ramon Diaz [sic], did you ever hear him
17  use any racial slurs inside the Tesla workplace between 2015
18  and 2016?
19  A.  Not to my recollection.
20  Q.  While you were at Tesla, did you receive any training with
21  regard to its Anti-Handbook Handbook?
22  A.  No.
23  Q.  While you were at Tesla, did you receive any training with
24  regard to its Anti-Harassment Policy?
25  A.  No.

---

426

WHEELER - DIRECT / ALEXANDER

1  Q.  Safety training, did you receive that training at Tesla?
2  A.  Not at Tesla.
3  Q.  But you received that training before you received a
4  badge?
5  A.  Yes.
6         MS. JENG:  Objection.  Leading.
7         MR. ALEXANDER:  Happy to rephrase, Your Honor.
8         THE COURT:  Please rephrase.
9  BY MR. ALEXANDER:
10  Q.  You received a badge from Tesla; is that correct?
11  A.  Correct.
12  Q.  Did you receive any safety training before you received
13  that badge?
14  A.  From Chartwell.
15  Q.  Thank you.
16  During the time frame that you were at the company
17  between -- at Tesla between 2015 and 2016, did you ever come in
18  contact with swastikas?
19  A.  Yes.
20  Q.  Where?
21  A.  There was a gentleman walking passed the security door
22  that had a bald head and a swastika on his head.
23  Q.  Anywhere else that you saw swastikas?
24  A.  The restrooms.
25  Q.  Which restrooms?

---

427

WHEELER - DIRECT / ALEXANDER

1  A.  I know a couple.  Some on the second floor near the
2  cafeterias and then some in the downstairs bathrooms.
3  Q.  And when?  Do you recall when you saw the swastikas
4  present inside of the Tesla bathrooms?
5  A.  I do not recall approximate date.
6  Q.  Can you tell me whether it was the first half of the time
7  frame that you worked at Tesla or the last half as the time
8  that you worked at Tesla?
9  A.  I would say both.
10  Q.  Okay.  Did you see the swastika before you became a
11  supervisor?
12  A.  I would say yes.  Yes.
13  Q.  And then did you also see the swastika after the time
14  frame that you were a supervisor?
15  A.  Yes.
16  Q.  I want to talk about a drawing that was inside the
17  workplace.
18         MR. ALEXANDER:  If we could show Exhibit No. 33 and
19  the photograph.
20  BY MR. ALEXANDER
21  Q.  During the time frame that you were at the Tesla facility,
22  do you recall an occasion where you found that there was a
23  drawing found in the workplace?
24         MR. ALEXANDER:  If you could show the other version,
25  the bigger version.

---

428

WHEELER - DIRECT / ALEXANDER

1  (Photo displayed.)
2         THE WITNESS:  Yes.
3  BY MR. ALEXANDER:
4  Q.  How is it that you came to have contact with this drawing?
5  Who brought your attention to it?
6  A.  Upon coming to the factory early for my shift at 9:00, the
7  swing shift supervisor approached me.
8  Q.  The swing shift supervisor.  And ultimately did you end up
9  in front of this bale with this drawing with people?
10  A.  Yes.
11  Q.  Who was present in front of the bale with you?
12  A.  Israel and Owen.
13  Q.  And how long did you, Israel, and Owen talk about the
14  drawing on this bale before anyone else arrived?
15  A.  I would say 10 to 15 minutes.
16  Q.  Okay.  Now, during the time that you were talking about
17  this incident, did you have a conversation with Owen?
18  A.  I did.
19  Q.  And did Owen express how he felt about this?
20  A.  He did.
21  Q.  And what did Owen say?
22  A.  Owen asked me what this represents and how I felt about
23  this.
24  Q.  And how did you feel when you saw this drawing?
25  A.  Upon seeing the word "booo," I thought it referred to the

---

---

429

WHEELER - DIRECT / ALEXANDER

1  derogatory language used towards African-Americans as a spook.
2  Q.  When you observed Owen in front of this bale, how did he
3  appear to you?
4  A.  He seemed -- well, he was upset.
5  Q.  Okay.  And did he actually state that he was upset?
6  A.  No.
7  Q.  Okay.  Now, at some point did Owen Diaz join -- I'm sorry.
8      And with regard to this drawing, did you find it
9  offensive?
10 A.  The drawing, not so much.  The words with the drawing,
11 absolutely.
12 Q.  The words with the drawing?
13 A.  Correct.
14 Q.  And is there some point at which Ramon Diaz [sic] joined
15 the group of people standing there associated with that bale?
16 A.  He did.
17 Q.  And do you know who brought Ramon Diaz [sic] over?
18 A.  Myself and Israel went to go retrieve him.
19 Q.  And at the point when you retrieved him, did you have any
20 understanding that he had any involvement with this drawing?
21 A.  Not at the moment.  We went to go see who was baling.
22 Q.  And how long was Mr. Diaz [sic] there before he
23 indicated that he was involved with the drawing?
24     THE COURT:  Mr. Alexander, have you been referring to
25 Mr. Martinez or --

---

430

WHEELER - DIRECT / ALEXANDER

1      MR. ALEXANDER:  I'm sorry.  Let me fix that.
2      THE COURT:  Okay.  And you might --
3  BY MR. ALEXANDER:
4  Q.  How long was Mr. --
5      THE COURT:  -- want to go back to an earlier question
6  that you asked about "Ramon Diaz" using the "N" word, because I
7  think you meant Mr. Martinez, but I don't know.
8      MR. ALEXANDER:  I do.  I'm sorry.  Thank you.
9  BY MR. ALEXANDER
10 Q.  With regard to use of the word "mayate," did
11 Mr. Ramirez -- Ramon Martinez -- did Ramon Martinez ever use
12 the "N" word or mayate in your presence?
13 A.  Not in my presence.
14 Q.  Okay.  When Mr. Martinez was brought to this drawing, how
15 long was he in front of the drawing before he acknowledged any
16 involvement with it?
17 A.  About five minutes, five to ten minutes.
18 Q.  And ultimately what is it that he finally said after he
19 had been standing there for five minutes?
20 A.  Once he realized the severity of the situation, he said
21 he's the one that drew the drawing.
22 Q.  Now, did he say anything else?  Did Mr. Martinez say
23 anything else during that time frame while you were standing in
24 front of the bale?
25 A.  If I recall correctly, he said he thought it was a joke.

---

431

WHEELER - DIRECT / ALEXANDER

1  Q.  Did he say anything else?
2  A.  Not to my recollection.
3  Q.  Is there any point while he was standing there that
4  Mr. Martinez apologized?
5  A.  No.
6  Q.  You're sure of that?
7  A.  I am not, but I do not remember an apology.
8  Q.  Okay.  Did Owen say that he thought that it was funny?
9  A.  Owen did not find it funny at any point in time.
10 Q.  Are there any occasions that you reported racial conduct
11 inside the workplace between 2015 and 2016?
12 A.  Yes.
13 Q.  And what incident happened with you that you thought was
14 racially motivated?
15 A.  I was requesting a subordinate to delete a picture that he
16 had taken of another associate, and he refused to do so.  And
17 in leaving, he -- yeah, he said:  FU, "N" word, and then walked
18 away.
19 Q.  And so this person who said "FU" and walked away, did you
20 report it?
21 A.  I did.
22 Q.  And who did you report it to?
23 A.  To my immediate supervisors, Ramon Martinez and --
24 Q.  Ramon Martinez was your immediate supervisor?
25 A.  He was my partner, partner supervisor.  We had two

---

432

WHEELER - DIRECT / ALEXANDER

1  supervisors for the grave shift.
2  Q.  And so as a result of reporting use of the "N" word
3  towards you to Ramon Martinez, what action was taken?
4  A.  There was no action taken.
5  Q.  Okay.  And the person that had used the "N" word towards
6  you, what ultimately happened to that person in terms of his
7  position at the Tesla factory?
8  A.  That individual received a promotion and was given his own
9  section.
10 Q.  Now, is there any other incident that occurred to you
11 inside the workplace that you believed was racially motivated
12 directed towards you?
13 A.  Yes.
14 Q.  And can you describe that incident?
15 A.  There was a night I had taken -- there was a night I had
16 taken lunch, and I was on my lunch for about an hour.  And then
17 when I returned to my cart, I sat down, slid across the seat
18 like I did every night, and I felt something wet on my seat.
19 And it took me a second to process it.  I got back up and there
20 was feces all over my seat, all over my pants.  There was some
21 on my hands.
22 Q.  And did you report this incident of finding feces on your
23 cart to anyone at Tesla?
24 A.  I did.
25 Q.  Who did you report that to?

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

433

WHEELER - DIRECT / ALEXANDER

1  A.  Umm, everybody.  Security, all the supervisors, Ramon,
2  Jose Torres, Victor Quintero.
3  Q.  Ed Romero?
4  A.  Yes -- uh, I don't -- I do not recall for Ed, but...
5  Q.  So the department that you worked in, Victor Quintero was
6  ultimately over your department?
7  A.  Absolutely, yes.
8  Q.  So you reported it to numerous people in management and
9  supervision inside Tesla; right?
10  A.  I did, yes.
11  Q.  Now, the location where you found your cart with feces on
12  it, were there cameras?
13  A.  There were.
14  Q.  Can you estimate how many cameras were present?
15  A.  At least two.
16  Q.  And from where those cameras were present, would it have
17  been -- is it your belief that those cameras would have caught
18  whoever left this on your cart?
19      MS. JENG:  Objection.  Calls for speculation.
20      THE COURT:  Overruled.  You can answer.
21      THE WITNESS:  Absolutely.  I parked my cart next to
22  Elon's original roadsters where the charging stations were.
23  BY MR. ALEXANDER
24  Q.  And did you ask for Tesla to look at the video to figure
25  out who had left this feces on your cart?

434

WHEELER - CROSS / JENG

1  A.  I did.
2  Q.  And did Tesla conduct an investigation to your knowledge?
3  A.  They said there was no vision in that area.
4  Q.  They said there was no vision in that area?
5  A.  Correct.
6  Q.  Who is it that told you that?
7  A.  It just came from the security email.
8  Q.  Did anyone ever interview you?
9  A.  No.
10  Q.  Was there any retraining that occurred of the workplace to
11  indicate this was inappropriate?
12  A.  No.
13  Q.  During the time frame that you were at Tesla, did anyone
14  ever train you that Tesla had a zero tolerance policy for
15  harassment in the workplace?
16  A.  Not at all.
17      MR. ALEXANDER:  Nothing further.  Thank you.
18      THE COURT:  Ms. Jeng.
19          CROSS-EXAMINATION
20  BY MS. JENG:
21  Q.  Mr. Wheeler, you started working at the Fremont factory in
22  April of 2015; is that right?
23  A.  Yes.
24  Q.  You worked at the Fremont factory to until approximately
25  April 2016?

435

WHEELER - CROSS / JENG

1  A.  Yes.
2  Q.  You never worked as an elevator operator; right?
3  A.  No.
4  Q.  Okay.  And you were employed by Chartwell throughout your
5  entire assignment at Tesla; correct?
6  A.  Correct.
7  Q.  And you were assigned to Tesla through nextSource; is
8  that right?
9  A.  Yes.
10  Q.  After your assignment ended in April 2017, your employer
11  Chartwell actually placed you at a different assignment; is
12  that right?
13  A.  Yes.
14  Q.  At a bakery?
15  A.  DES, yes.
16  Q.  Okay.  So you were never employed directly by Tesla; is
17  that right?
18  A.  Correct.
19  Q.  Okay.  When you first started your assignment at the
20  factory through Chartwell, you actually received extensive
21  training through Chartwell; is that right?
22  A.  Not extensive but, yes, training.
23  Q.  All right.  Can I direct you to your deposition
24  transcript -- it should be in front you -- Page 47, Line 20
25  through -- one second -- 47, Line 2 -- oh, sorry.  46 -- I'm

436

WHEELER - CROSS / JENG

1  sorry.  46, Line 20 -- sorry.  I'll come back to this.
2      You received certification for harassment training;
3  correct?
4  A.  Can you repeat, please?
5  Q.  Sure.  You actually received a certification for
6  harassment training; correct?
7  A.  I received certification for all training.
8  Q.  I'm sorry.  Say that again.
9  A.  I received certification for all training.
10  Q.  Including harassment training; is that right?
11  A.  I cannot say directly.
12  Q.  Okay.  Okay.  Owen was an elevator lead, to your
13  understanding; correct?
14  A.  Correct.
15  Q.  And as a lead, you were actually Owen's superior; is that
16  right?
17  A.  Correct.
18  Q.  So you were supervising Owen when Owen was a lead;
19  correct?
20  A.  Yes.
21  Q.  Okay.  Ramon Martinez was also a lead; correct?
22  A.  No.  He was a supervisor.
23  Q.  It's your belief that Ramon was a supervisor at the time
24  that you were a supervisor --
25  A.  Yes.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

449

DIAZ - DIRECT / ORGAN

1  to set things up the way that they are, and so I appreciate
2  Ms. Kennedy asking where she can be.
3       But go wherever you can see what Mr. Organ is up to.
4            MS. KENNEDY:  Okay.  Thank you.  Thank you, Your
5  Honor.
6       And I will speak up for the court reporter.
7            THE COURT:  Mr. Organ, go ahead.
8            MR. ORGAN:  Thank you, Your Honor.
9            DIRECT EXAMINATION RESUMED
10  BY MR. ORGAN
11  Q.  Owen, if you could, turn to Exhibit 222.
12  A.  222, yes, sir.
13            MR. ORGAN:  Which I believe is admitted, Your Honor.
14  BY MR. ORGAN
15  Q.  This -- reading this email, who was it who promoted you to
16  a lead on August 17th of 2015?  Do you know?
17  A.  It was Victor Quintero.
18  Q.  Okay.  And who else told you that you had a promotion?
19  Anybody else other than Victor?
20  A.  Edward Romero.
21  Q.  Okay.  Now, what I'd like to do now is move to an incident
22  on October 17th of 2015.
23       If you look at Exhibit 235 --
24            MR. ORGAN:  And I believe this is admitted,
25  Your Honor.

450

DIAZ - DIRECT / ORGAN

1            MS. KENNEDY:  Your Honor, no objection.
2       (Document displayed.)
3  BY MR. ORGAN
4  Q.  So did you write Exhibit 235?
5  A.  Yes, I did.
6  Q.  And why did you write it?
7  A.  Because I had an interaction, a negative interaction, with
8  Mr. Martinez.
9  Q.  If you could, go back in time and take us back to that
10  point in time.  How did this interaction with Ramon Martinez
11  start?
12  A.  I -- all I can tell you, I don't know how it started.  I
13  was training a new employee, which was Rothaj Foster.
14  Q.  Are you a lead at this point in time?
15  A.  Yes, sir.
16  Q.  Okay.  And so you're -- I'm sorry.  I interrupted.  You're
17  training who was it?
18  A.  Rothaj Foster.
19  Q.  Okay.  And what happens in terms of -- between you and
20  Ramon Martinez?
21  A.  So I'm training Mr. Foster, letting him know the policies
22  of the elevator and the things that we do on the elevator,
23  telling him when he gets his breaks and stuff like that.  And
24  as I was starting to get to the point where Tom Kawasaki
25  wouldn't be our supervisor anymore, it would be Ed Romero,

451

DIAZ - DIRECT / ORGAN

1  because Tom Kawasaki was taking a training class and he was
2  about to become a certified plumber.
3  Q.  Okay.  And what happened?  What was said in terms of your
4  actions?  Does he move towards you?  Do you move towards him?
5  When you open the elevator -- strike that.  I'll start over.
6       When you -- the elevator doors open.  What happens?
7  A.  As I'm explaining this to Mr. Foster, that Thomas Kawasaki
8  wouldn't be our immediate supervisor anymore, the elevator
9  doors parted, I saw Mr. Martinez sitting there on a blue
10  tugger.  He --
11  Q.  What's a tugger?
12  A.  A tugger is a piece of equipment that Tesla uses to load
13  cardboard and other recycling materials onto.  It's like a
14  train, and you pull all this heavy stuff through the -- through
15  the factory and deliver it to its destination.
16  Q.  What does he do when the doors open?  Ramon, what does he
17  do?
18  A.  He jumps off the tugger and rushes into the elevator and
19  starts saying did I have a problem with him and starting
20  cursing and calling me the "N" word.  He was saying:  "Ns" are
21  shit.  Excuse my language.
22       But as he was saying this, you know, he was getting closer
23  and closer, and he -- he had his fist balled up and:  Do you
24  got a problem?  He was saying he was going to beat me up and
25  stuff like that.

452

DIAZ - DIRECT / ORGAN

1       So what I did was, is I immediately threw my hands up into
2  the neutral position and opened my hands.  I backed up against
3  the wall and actually ended up climbing a piece of equipment
4  that I was there with.
5       And he got so close he was within inches of my face, you
6  know.  And I'm like:  Hey, hey, man.  I even cursed back.  I
7  was telling him get the "F" out of my face.
8       And from there, it seemed like it was getting pretty
9  intense, and I pointed to the surveillance system and I'm like:
10  Hey, man, we're on surveillance.  And after I told him that, he
11  rushed out of the elevator.
12  Q.  Okay.  And you mentioned he said the "N" word.  That's not
13  in your Exhibit 235 in your statement.  Why not?  Why didn't
14  you include the "N" word in the statement if he had said it?
15  A.  Umm, reason being is because we had the surveillance
16  system right there, you know.  I just figured Tesla would pull
17  the -- pull the video surveillance and then come and interview
18  me and then we can discuss all that.
19       I just didn't put it in the email because, you know, like
20  I said, in a workplace, that word is not supposed to be used.
21  Q.  Okay.  But didn't you want Tesla to know about him using
22  the "N" word?
23  A.  Yes.  But I had complained before and, you know, it was
24  just like me complaining that I'm breathing.
25  Q.  What do you mean by that?

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

465

DIAZ - DIRECT / ORGAN

1  BY MR. ORGAN
2  Q.  If you could, sir, turn to the second page of Exhibit 245.
3      (Document displayed.)
4  A.  I'm here.
5  Q.  You mentioned Lamar Patterson.  Who is Lamar Patterson?
6  A.  Lamar Patterson was another one of the guys that I was
7  supervising.
8  Q.  Okay.  So he worked on the elevators?
9  A.  Yeah, he did.
10 Q.  Was he a friend of yours -- strike that.
11     How do you know Lamar Patterson?  How did you first learn
12 about Lamar Patterson?
13 A.  I first learned about Lamar Patterson, it was one of the
14 Tesla workers that had walked up to me, I can't remember what
15 his name was, but he had said -- he had asked me was there any
16 openings in the elevator.  And I told him, yes, you know,
17 because I was shorthanded.  Some nights I would run the
18 elevator by myself so I was shorthanded.  So I definitely could
19 use the help.
20     And he said that he had a cousin that needed a job.  And
21 what I did at that point, I told him it was open, and he asked
22 could he have his cousin send me a resume and could I forward
23 it, and I agreed to that.
24 Q.  Did you know whether Lamar was black or not?
25 A.  No, not at that time.

---

466

DIAZ - DIRECT / ORGAN

1  Q.  But was the cousin black?
2  A.  I think he was biracial.
3  Q.  Biracial, okay.
4      Did you warn Lamar Patterson about Tesla, about the --
5  about your work environment?
6  A.  Again, all I did was just forwarded a resume.
7  Q.  Okay.  So this is describing some incident, it looks like,
8  between you and Robert.  Is that Robert Hurtado?
9  A.  Yes.
10 Q.  Did you ask Lamar Patterson to write this?
11 A.  Yes, I did.
12 Q.  Okay.  And why did you ask Lamar Patterson to write this
13 page from Exhibit 245?
14 A.  Basically as protection, you know, because of the fact
15 that Mr. Hurtado was coming into the elevator.  He was calling
16 me the "N" word.  Telling me:  "N," hurry up and push the
17 button.  Or either:  "N," push the batteries onto the elevator,
18 and things like that.
19     So at this particular time we were in the elevator, and me
20 and Lamar Patterson was talking having a conversation among
21 ourselves, and Mr. Hurtado interjected.  And he had been --
22 like I said, he had been using these racial slurs towards me
23 for awhile so I just was shutting down on him.
24     So he kept going and kept asking, trying to pry in.  And I
25 walked over to him and I told him:  No disrespect, but if it

---

467

DIAZ - DIRECT / ORGAN

1  doesn't have anything to do with this job, don't talk to me.
2  You know, if it's not business related.
3      I explained to him we're not friends.  I don't know you.
4  We don't sit at each other's table and eat.  You know, the
5  things that you've been doing that I've been asking you to
6  stop, but you still won't stop.  So, you know, if it doesn't
7  have anything to do with this job, please don't talk to me.
8  Q.  Okay.  So based on our chart here, it looks like
9  Mr. Hurtado has been calling you the "N" word from August to
10 this February -- end of February time period; is that right?
11 A.  That's right, sir.
12 Q.  Okay.  Did you complain to anybody?  Well, did you
13 complain to Robert that he was using the "N" word?
14 A.  I said -- I told him to stop using it towards me.  I
15 even -- at one point I even went over to -- I believe her name
16 is Joyce, which was his immediate supervisor, and I explained
17 to Joyce what he was doing.
18     And, you know, it was -- it just seemed like everything
19 just started breaking down because in the beginning -- me and
20 Joyce had a pretty good relationship in the beginning.  She had
21 came to me one day and said:  Hey, they're going to fire me.
22 They're going to fire me.  Can you please help me get this drop
23 zone cleaned up?  So I helped her out.  I took my time and
24 cleaned out the drop zone.
25     You know, it was like when I was doing what they wanted me

---

468

DIAZ - DIRECT / ORGAN

1  to do and I never complained about it, everything was A-okay;
2  but as soon as I started complaining, I became enemy number
3  one.
4  Q.  Okay.  I want to take you now to Exhibit 68.
5      Actually, before we go to Exhibit 68, shortly after this
6  incident on February 26th, your mother passed; is that right?
7  A.  Yes, she did.
8  Q.  And you took some time off for bereavement leave; is that
9  right?
10 A.  Yes, I did.
11 Q.  After that, do you remember coming back to Tesla?
12 A.  I don't remember coming back.  Reason being is after my
13 mother had passed away, I just couldn't take it.  If I entered
14 that factory, I don't know what I would have did.
15 Q.  Okay.  Please turn to Exhibit 68.
16 A.  Thank you.
17     MR. ORGAN:  Your Honor, I believe this is stipulated
18 as admissible.
19     MS. KENNEDY:  Yes, it is.  It is stipulated.
20     THE COURT:  It's admitted and you can publish it.
21     (Trial Exhibit 68 received in evidence)
22     (Document displayed.)
23 BY MR. ORGAN
24 Q.  Now, with Exhibit 68, this has a separation date of -- or
25 end-of-your-contract date for May 4th of 2016.  Did you get any

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

509

DIAZ - CROSS / KENNEDY

1  BY MS. KENNEDY:
2  Q.  My question is:  Did he tell you that?
3  A.  No, he did not tell me that.
4  Q.  And as you sit here today, do you have any knowledge one
5  way or the other if your son Demetric Di-az ever applied to
6  work directly for Tesla, not through a staffing agency?
7        MR. ORGAN:  Objection.  Relevance, Your Honor.
8        THE COURT:  Sustained.
9        MS. KENNEDY:  Okay.
10  BY MS. KENNEDY:
11  Q.  Now, as I understand from your testimony, that starting at
12  least maybe more than two weeks and less tan a month after you
13  started your assignment at Tesla, Judy Timbreza made some
14  racially racist comments to you; correct?
15  A.  Yes.  He called me a "porch monkey" the "N" word, and a
16  "mayate," ma'am.
17  Q.  And Mr. Timbreza, do you know what his nationality is?
18        MR. ORGAN:  Objection.  Relevance, Your Honor.
19        THE COURT:  Overruled.
20        THE WITNESS:  No, I do not.
21  BY MS. KENNEDY:
22  Q.  Do you know if he speaks languages other than English?
23  A.  Spanish.
24  Q.  I'm sorry?
25  A.  Spanish.

510

DIAZ - CROSS / KENNEDY

1  Q.  And when he called you these words -- I'm sorry, I'm going
2  to use the words -- "porch monkey," was that in English or in
3  Spanish?
4  A.  He called me that in Spanish, ma'am.
5  Q.  And he used the term "mayate" to you as well; correct?
6  A.  Yes, ma'am.
7  Q.  And where did that take place?
8  A.  The elevator.
9  Q.  The elevator.  While you two were both on the elevator?
10  A.  Yes.  He was on the elevator with me, ma'am.
11  Q.  Okay.  And you agree that there is no documentation from
12  you in an email, text message, about those comments by Judy
13  Timbreza; correct?
14  A.  No, no email.  I verbally stated that to Tom Kawasaki.
15  Q.  Right.  I understand that verbally and you told it to Tom
16  Kawasaki.  And that was approximately July of 2015; correct?
17  A.  Sounds about right, ma'am.
18  Q.  And Tom Kawasaki at that time, was he a Tesla employee, to
19  your knowledge?
20  A.  At that time I didn't know if Tom was a Tesla employee,
21  but I do believe Tom was part of the sustainability --
22  environment sustainability.
23  Q.  And after you reported this to Tom, according to you, you
24  never saw Judy Timbreza again; correct?
25  A.  Correct, ma'am.

511

DIAZ - CROSS / KENNEDY

1  Q.  And once you reported it to Tom and Judy Timbreza was
2  gone, were you at least satisfied with that response?
3  A.  Yes, I was, ma'am.
4  Q.  You also testified about a variety of other racial slurs,
5  which, I'm sorry, I'm going to have to use some of the
6  language.
7        But before I get into that, my question is:  Did you ever
8  actually see anyone writing any graffiti in any of the
9  bathrooms that you said you saw?
10  A.  No.  I've never personally witnessed anybody writing it,
11  but I did see it.
12  Q.  And do you have any idea if any Tesla employee did any of
13  the writing?  Do you have any knowledge if it was a Tesla
14  employee at any time?
15  A.  No, ma'am.  As I stated, I have -- I didn't visually see
16  anybody doing it.
17  Q.  All right.  And if I understand correctly, you also
18  testified that you reported the use of the "N" word by
19  different individuals to Ed Romero at least three to seven
20  times; is that about right?
21  A.  That's about right, ma'am.
22  Q.  And you also told Mr. Romero, according to you, that Ramon
23  Martinez and Robert were calling you the "N" word; correct?
24  A.  Yes, ma'am.
25  Q.  And, again, you have nothing in writing about those

512

DIAZ - CROSS / KENNEDY

1  complaints to Mr. Romero; correct?
2  A.  You're right, ma'am.
3  Q.  And given the fact that the Judy Timbreza incident had
4  been resolved, were you at least confident that if you reported
5  things, it was ongoing to be handled?  Was that your
6  understanding?
7  A.  When I had verbally told Tom Kawasaki, yes, he did handle
8  it.  So I figured if I can verbally tell Ed Romero the same
9  thing, he would probably get the same results as Tom Kawasaki,
10  yes.
11  Q.  And so, according to you, once you told the story --
12  strike that.
13        Once you had told Mr. Romero three to seven times that
14  this was being said to you and nothing was done, why not put
15  anything in writing to someone else, is my question.
16  A.  I don't know.  At that time I didn't have access to their
17  email.  So, I mean, I don't know why I didn't do it.
18  Q.  Well, you had a Gmail account; correct?
19  A.  Yes, I have a Gmail account.
20  Q.  And you had the ability to email Mr. Romero and text
21  message Mr. Romero from your phone; correct?
22  A.  At some point Mr. Romero gave me his email and told me I
23  could write him and shoot an email to him.  And he had gave me,
24  I think it was a paper with a few more email addresses on it.
25  Q.  And you've also testified that Robert and Ramon Martinez

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

517

DIAZ - CROSS / KENNEDY

1   get done, I don't have to like you to get this goal done.
2   Q.   Okay.  So in your opinion, you could still do your job
3   despite all these other racial slurs; correct?
4   A.   Yes, ma'am.
5   Q.   And you and still continued to want to work at that
6   assignment at Tesla despite all these racial slurs; correct?
7   A.   Until at some point, yes, ma'am.
8   Q.   Understood.  And you got to that point after the drawing
9   from January of 2016, which we'll get to; is that correct?
10  A.   Yes.
11  Q.   Okay.  If you also see in Paragraph 5 of Exhibit 205.
12  A.   I've read it, ma'am.
13  Q.   You understood that even once you're on your assignment,
14  if you're dissatisfied for any reason, to contact CitiStaff and
15  inform him or her of your assignment status.  Do you see that?
16  A.   Yes.  I -- can I read it out for you, ma'am?
17  Q.   I'm sorry.  You can read it to yourself, yes.
18       Did you understand that, sir?
19  A.   I understand.  That's not how I read it, ma'am.  I'm
20  sorry.
21  Q.   No.  That's fine.
22       All right.  Let's get back to a couple other things.  So
23  if I understand correctly, the individuals who you believe --
24  I'm sorry, strike that.
25       The people who you claim made racist comments to you are

---

518

DIAZ - CROSS / KENNEDY

1   Judy Timbreza, Ramon Martinez, and Robert Hurtado; is that
2   correct?
3   A.   Yes, ma'am.
4   Q.   And given all the comments you talked about, Judy
5   Timbreza, Ramon Martinez, and Robert Hurtado, that was pretty
6   much the entire nine and a half months or so that you were
7   assigned to the Tesla location; correct?
8   A.   Can you repeat that question one more time, please?
9   Q.   Absolutely.  The individuals who made these racial slurs
10  to you -- Judy Timbreza, Ramon Martinez, and Robert Hurtado --
11  they were the individuals, the only individuals, who made those
12  comments to you during your about nine-and-a-half-month
13  assignment at the Tesla facility; correct?
14  A.   No.  Them are not the only individuals.  If you check my
15  testimony, I said it was eight to ten more people, you know.
16  Q.   Right.  But you have no idea who those people are;
17  correct?
18  A.   No.  Unless I seen a photo.  I might recognize some of
19  them, I might not.  I don't know, ma'am.  I'm sorry.
20  Q.   You don't know if -- you don't know anything about them.
21  Just eight to ten more people at some time during that time
22  period you were there; correct?
23  A.   Yes, ma'am.
24  Q.   And at any point in time did you ever go and try to point
25  out those people to anyone at the factory at the time it was

---

519

DIAZ - CROSS / KENNEDY

1   happening?
2   A.   Umm, at some point I do believe I pointed out a few of
3   them to Ed Romero, ma'am.
4   Q.   And when you pointed them out, did you go you there and
5   try to ask what their name is or what their badge was or
6   anything like that?
7   A.   No.  I wouldn't have confronted them and asked them what
8   their badge was because -- or what their name was because that
9   could have led to another confrontation, ma'am.  I'm sorry.
10  Q.   Well, during the time that you're being harassed -- and I
11  understand your testimony -- and you see people are doing this
12  to you, and you testified in response to your attorney's
13  question that you wanted to get this out, did you try to do
14  anything to stop those individuals from doing that at the time?
15  A.   No.  At the time, no, ma'am.  All I did was reported it to
16  Ed Romero and hopefully he could have stopped it.
17  Q.   At any point in time did you ever -- strike that.
18       In October of 2015 you talk about an elevator incident
19  with Ramon Martinez.
20  A.   Yes.  He accosted me in the elevator.  Yes, that's true.
21  Q.   Right.  And according to you, this started with
22  Mr. Martinez and it was unprovoked; correct?
23  A.   Yes, it was unprovoked, ma'am.
24  Q.   And during this time, you testified that Ramon Martinez
25  during this confrontation used the "N" word; correct?

---

520

DIAZ - CROSS / KENNEDY

1   A.   Yes.  He -- he was yelling at me obscenities and then he
2   just stated that:  "Ns" aren't shit.  Excuse my language again,
3   folks.
4   Q.   And as of the time of this incident, Mr. Martinez,
5   according to you, kept calling you the "N" word and telling you
6   to go back to Africa during this entire incident that was going
7   on; correct?
8   A.   No, not during the entire incident that was going on.  He
9   had did that over a period of time, ma'am.
10  Q.   Okay.  So at least for a period of time, as of the time
11  that you reported this incident in writing, according to you,
12  this has been going on for at least a month or so, at least;
13  correct?
14  A.   I -- I have to check the email, but it had been going on
15  for a while.  I don't know if -- it had been going on.
16  Q.   And then when you got the opportunity, you documented your
17  complaint against Mr. Martinez; correct?
18  A.   Yes.  When I got the opportunity, I definitely documented
19  it because when he had been saying it first, I didn't have
20  proof; but when he said it in the elevator, I did really
21  believe that their surveillance system would have captured
22  that, and then there would have been a real investigation that
23  would have went on, and then they would have came and talked to
24  me, and then I could have told them.  And then they would have
25  seen the video and they would have seen the audio or heard the

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

521

DIAZ - CROSS / KENNEDY

1  audio of what was going on in the elevator.  So, yes.
2  Q.  So at the time you were there, you told Mr. Martinez
3  "There's surveillance and basically you're caught," so to
4  speak; correct?
5  A.  Yes, ma'am.
6  Q.  And then after that incident, you then took the time to go
7  write an email about that incident; correct?
8  A.  Yes.  I wrote an email, ma'am.
9      MS. KENNEDY:  Stephanie, can we go to Exhibit 235?
10     Your Honor, which has already been admitted.
11     This is an October 17th, 2015, email.
12     (Document displayed.)
13 BY MS. KENNEDY:
14 Q.  Take a minute to read that, Mr. Diaz.
15 A.  I'm familiar with the email, ma'am.
16 Q.  I'm sorry?
17 A.  I'm familiar with the email.
18 Q.  Thank you.
19     When you wrote this email, it appears to be, like, at
20 6:08 a.m.  Do you see that?
21 A.  Yes, ma'am.  I had to write the email.  Like I said
22 earlier, some days I was overworked and I had -- I had other
23 assignments to do, and I couldn't just sit there and write the
24 email exactly when it happened.
25     So what I had to do is I had to write the email in pieces

522

DIAZ - CROSS / KENNEDY

1  as I was doing my job, and I had a little time to get it taken
2  care of.
3  Q.  Absolutely.  My question just is:  Do you recall if you
4  wrote this email while you were still on duty, like still
5  working, or did you go home or go into your car and write it?
6  That was going to be my question.
7  A.  No.  I -- I was still inside the factory.
8  Q.  And did you take your time to write this email to make
9  sure you conveyed to Ed Romero and Tom Kawasaki everything you
10 wanted to convey to them as to what this incident was about?
11 A.  Umm, what I was doing, I was writing the email to -- to
12 convey to them that an incident had occurred and could they
13 please check the surveillance system to find out what had
14 exactly happened.
15     Because, like I said before, you know, what -- I -- I can
16 sit here and I can say a few things.  I can say:  Hey, he's
17 been doing this and he's been doing that.
18     But, you know, as being a black man, a lot of them think
19 I'm pulling the race card.  So instead of me doing that, you
20 know, I figured I had definitive proof.  Please check the
21 surveillance system.
22 Q.  Mr. Diaz, you would agree the definitive proof would be if
23 you had written in the 'N' word or other things as to what you
24 claim Mr. Ramon Martinez said to you; correct?
25     MR. ORGAN:  Objection.  Argumentative.

523

DIAZ - CROSS / KENNEDY

1      THE COURT:  Yes, sustained.
2      MS. KENNEDY:  I'll rephrase.
3  BY MS. KENNEDY:
4  Q.  The surveillance, the cameras, there's no audio on the
5  surveillance, is there?
6  A.  I don't know.  I believe there was audio.  Every time I
7  done saw a camera, mostly it has audio.
8  Q.  But you had no idea there was audio in the elevator,
9  according to you; correct?  You saw there are cameras; correct?
10 A.  Yes, I did see there was cameras.
11 Q.  And you assumed there was audio; correct?
12 A.  Yes, I assumed there was audio.
13 Q.  But you didn't know; correct?
14 A.  No.  I didn't know 100 percent, but I assumed.  So at that
15 particular time, yes, I was 100 percent thinking that it was
16 audio recording going along with the video recording.
17 Q.  And according to you -- as of October 17th, 2015,
18 according to you, you have been complaining verbally about all
19 these racial slurs and nothing had been done; correct?
20 A.  Yes, ma'am.
21 Q.  You had an opportunity here on October 17th, 2015 to give
22 a written complaint about all these horrible racial slurs, and
23 you would agree you chose not to put those words in this email,
24 correct?
25 A.  Again, ma'am, I'm going to say with the audio and video,

524

DIAZ - CROSS / KENNEDY

1  all they had to do is just check it.
2  Q.  I understand, but that wasn't my question, sir.
3  My question was:  You chose, for whatever reason, not to
4  put any of the racial slurs that you are suing for in this case
5  in this email; is that correct?
6  A.  Yes, I did not put it inside the email, ma'am.
7  Q.  And that was your decision, correct, at the time?
8  A.  I wrote the email so, yes, it was my decision, ma'am.
9  Q.  And when you complained again about anyone else, you also
10 chose not to put any of these horrible racial slurs that you're
11 suing for in this lawsuit in any email; correct?
12 A.  No, ma'am.  I didn't put the word in the email.  Like I
13 stated before, you know, a lot of people don't want to put that
14 in the email.  If you notice, my supervisor, Tom Kawasaki, he
15 didn't even put it in his email.
16 Q.  Well, I understand Tom Kawasaki, but my question is not
17 about Mr. Kawasaki.  My question is about you, Mr. Diaz.
18 My question is:  You chose not to put these words in
19 writing; correct?
20 A.  Yes, ma'am, I did not put it in the email.
21 Q.  And so as of October 17th, 2015, it's your understanding
22 that your son Demetric was still working at the facility;
23 correct?  At the factory?
24 A.  Can you give me the date one more time, please?
25 Q.  Certainly.  October 17th, 2015, was it your understanding

Debra L. Pas, CRR
Official Reporter - U.S. District Court
(415) 431-1477

# EXHIBIT B

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 6

Volume 6

Pages 843 - 992

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND        )
LAMAR PATTERSON                      )
                                     )
                                     )
            Plaintiffs,              )
                                     )
     vs.                             )  No. C 17-6748 WHO
                                     )
TESLA, INC., dba TESLA MOTORS,       )
INC., CITISTAFF SOLUTIONS, INC.,     )
WEST VALLEY STAFFING GROUP,          )
CHARTWELL STAFFING SERVICES, INC.,   )
and DOES 1-50, inclusive,            )
                                     )  San Francisco, California
            Defendants.              )  Monday
_____)  October 4, 2021
                                     )  8:00 A.M.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:         ALEXANDER MORRISON & FEHR LLP
                        1900 Avenue of the Stars
                        Suite 900
                        Los Angeles, California 90067
                   BY:  BERNARD ALEXANDER, ESQ.

                        CALIFORNIA CIVIL RIGHTS LAW GROUP
                        332 San Anselmo Avenue
                        San Anselmo, California 94960
                   BY:  LAWRENCE A. ORGAN, ESQ.
                        CIMONE A. NUNLEY, ESQ.

            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

---

844

APPEARANCES:  (CONTINUED)

For Defendants:         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                        333 S. Hope Street
                        43rd Floor
                        Los Angeles, California 90017
                   BY:  TRACEY A. KENNEDY, ESQ.

                        SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                        379 Lytton Ave
                        Palo Alto, California 94301
                   BY:  PATRICIA M. JENG, ESQ.

                        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                        Four Embarcadero Center
                        17th Floor
                        San Francisco, California 94111
                   BY:  SUSAN Q. HAINES, ESQ.

Also Present:           JOSEPH ALM, ESQ.
                        - Tesla, Inc.

                        YUSUF MOHAMED, ESQ.
                        - Tesla, Inc.

                        VALERIE CAPERS WORKMAN
                        - Tesla, Inc.

                            -  -  -

---

845

PROCEEDINGS

1   Monday - October 4, 2021                    8:03 a.m.
2                    P R O C E E D I N G S
3                         ---oOo---
4        (Proceedings held in open court, outside
5        the presence and hearing of the jury.)
6        THE COURT:  All right.  There were a few things filed
7   over the weekend.  I've given to you, or Ms. Davis has, the
8   revised verdict form.  And I basically adopted everybody's
9   tweaks to the form that made sense to me.
10       So if there are no objections to that, that's the form
11  that we will use.
12       MS. KENNEDY:  No objections from the defense.
13       THE COURT:  Okay.
14       MR. ORGAN:  Yeah.  No objections, Your Honor.
15       THE COURT:  All right.
16       MR. ORGAN:  Thank you.
17       THE COURT:  So there are three things.
18       One, according to the minutes from Friday, there are two
19  different exhibits that went in for the Master Services
20  Agreement of Tesla/nextSource.  One was Exhibit 3 and one was
21  called in the minutes anyway Exhibit 2.  I don't know whether
22  that was just a mistake on our part, and so we'll just take the
23  2 out.
24       I want to be sure that when the exhibits go to the jury,
25  that there aren't duplicates in there.

---

846

PROCEEDINGS

1        MS. KENNEDY:  Yes.  Exhibit 2 is another photo of the
2   bale.  Exhibit 3 is the agreement.
3        THE COURT:  Okay.
4        All right.  Then there are two other motions.  One was
5   Motion for Judgment as a Matter of Law, and I'm not going to
6   hear argument right now on that.  I'm going to deny it.
7        If there is a joint employer relationship, there's
8   certainly a contract.  And that issue is left for the jury.
9        The Third Circuit relied -- the Third Circuit case that
10  was relied on by the defendant, Faush versus Tuesday Morning is
11  neither controlling nor on point.
12       Here the plaintiff contends that he had a contract with
13  Tesla and was a third-party beneficiary of the
14  nextSource/Tesla contract.  Unlike the plaintiff in Faush, the
15  contract is partly for his benefit.  No matter what it says, he
16  couldn't have been employed at Tesla without it, so that motion
17  is going to be denied.
18       The Motion to Strike Dr. Mahla's testimony, I think, has
19  been waived.  So I'm denying.  It's too late.  I think if it
20  had been raised at the time, I would have undoubtedly admitted
21  the testimony anyway, but I think that's been waived.
22       So that takes care of the issues that are in front of me.
23  Is there anything else that we need to do from the plaintiff's
24  perspective?
25       MR. ORGAN:  Your Honor, we'd just like to know our

887

CLOSING ARGUMENT / ALEXANDER

1   reasonable, would find it abusive.  And you've heard from at
2   least three:  Owen Diaz's son, Mr. Wheeler, and Mr. Jackson.
3       So with regard to this, let's go to severe or pervasive.
4       Severe, any one act of using of "N" word should be enough.
5   You've heard testimony that Mr. Hurtado called them the
6   "N" word at least 30 times.  You heard that Ramon Diaz [sic]
7   called him the "N" word at these 30 times.  If one was enough,
8   how about 60 times?
9       So we know that it was severe based on just the use of
10  that word, but it was pervasive.  I was everwhere.  It was
11  virtually everywhere.  And Owen Diaz heard it everywhere that
12  he went throughout -- throughout the workplace.
13      With regard to Mr. Martinez, Ramon Martinez, you know that
14  used "mayate."  You know he repeatedly used the word 30-plus
15  times.
16      So you know that it was a hostile work environment.  You
17  know it was severe.  You know it was pervasive.  And we proved
18  that it was corroborated.  It was used freely and clearly.  And
19  it was used often directed directly at Owen Diaz.
20      During this case you saw my colleague, Mr. Organ, checked
21  off the testimony as we went through the evidence.  He checked
22  it off to confirm all the times that we proved the "N" word in
23  a hostile work environment based on either the word or the
24  conduct by putting this drawing in the workplace.
25      So there is no question that throughout the Tesla

---

888

CLOSING ARGUMENT / ALEXANDER

1   workplace, the "N" word, a racially hostile work environment
2   with regard to African-Americans, was present.
3       So the answer to question Number 1, as you go through the
4   verdict form, the answer to question Number 1 is "yes."
5       And so now I'm going to skip to question 3A and B, because
6   Question 3A and B discuss a hostile work environment.  And
7   since we've already discussed the hostile work environment, we
8   can discuss it in the context of that question, and we'll come
9   back to Question 2.
10      So Question 3 is:  Did Owen Diaz prove all of the elements
11  of a hostile work environment caused by a supervisor?
12      "Supervisor" is defined as someone who has authority over
13  another employee.  It's not dependent on the title.  It's the
14  amount of authority the person can exercise over Owen Diaz.
15      And authority is the ability to demand obedience.  All
16  right?  So when Ramon Martinez was on the tugger, and the
17  elevator doors opened, and he had heard Owen Diaz referring
18  to a supervisor.  And he ran and then he said:  What are you
19  talking about?  Are you saying that I'm not a good supervisor?
20  He indicated that he was a supervisor.
21      Tom Kawasaki indicated that he was a supervisor.
22      Ed Romero indicated he was a supervisor.
23      Wayne Jackson.
24      If you look at this email, which I believe is authored by
25  Victor Quintero, you'll have the opportunity to look at Exhibit

---

889

CLOSING ARGUMENT / ALEXANDER

1   No. 272.  It says:
2       "It's very disappointing especially coming from
3   one of our team supervisors."
4       There is no question that a supervisor engaged in this
5   conduct, and Ramon Martinez is at the center of lots of
6   conduct, including this racial epithet, the drawing that was
7   left in the workplace for Owen to find.
8       With regard to Robert Hurtado.  You remember that Robert
9   Hurtado was one of the people who used the "N" word at least 30
10  times.  He was the person that said:  "'N,' hurry up and push
11  the button.  I hate you 'Nk.'"
12      Robert Hurtado was a lead.  You remember that
13  Ms. DelaGrande came into court and testified about him being a
14  lead.  And one of the issues is because Owen Diaz said, "Only
15  talk to me about work," Mr. Hurtado went back and told his
16  supervisor Owen was refusing to speak to them.
17      What's interesting if I take a step back from the
18  instruction, Mr. Hurtado did not come in to testify in front of
19  you.  Instead they brought an emissary.  They brought
20  Ms. DelaGrande so that she could vouch for him, character
21  evidence.  She could come in and say:  Oh, he's a great
22  employee.  He would never do that.
23      They had the ability to bring Mr. Hurtado in front of you.
24  And if defendant has the ability to give -- to bring in better
25  evidence, but they bring in weak evidence, you have the right

---

890

CLOSING ARGUMENT / ALEXANDER

1   to ignore that evidence or discount that evidence.
2       If Mr. Hurtado, who did this heinous conduct, did not
3   engage in it, Tesla had the ability, but failed to put it in
4   front of you.  And you are the ones who get to determine the
5   facts.  Mr. Hurtado was a supervisor.
6       So the answer to question Number 3 is "yes."  There was a
7   hostile work environment caused by a supervisor, either through
8   Ramon Diaz -- Ramon Martinez or either through Robert Hurtado.
9       Now, if by chance you do not decide that we have met our
10  burden of proof as to supervisors, there is an alternative way
11  that we can prove a hostile work environment.  If Tesla knew or
12  should have known of the conduct and they failed to take action
13  to correct the conduct, then Tesla can be found responsible for
14  that conduct.
15      This is the Jury Instruction.  That Diaz, Mr. Diaz, Owen,
16  was subjected to a racially hostile work environment -- we've
17  already proven that -- and that Tesla knew or should have known
18  and failed to take action that was reasonably calculated to end
19  that harassment.
20      Now, we have a failure to prevent claim that is it's own
21  stand-alone claim that we're going to talk about later.  But
22  just for purposes of addressing this particular instruction,
23  I'm going to say this.
24      With regard to taking immediate remedial action, Jackson,
25  Mr. Jackson, the nextSource manager, heard the "N" word

891

CLOSING ARGUMENT / ALEXANDER

1  repeatedly throughout his walk throughout the workplace, but
2  did nothing about it.  Right?
3      And the thing is, a hostile work environment, you remember
4  Ms. Marconi when she talked about, using her words, boobs being
5  placed on the door?  They had a training for 500 people.  If
6  the "N" word was occurring throughout the workplace, shouldn't
7  they have had training to let employees know that that is not
8  tolerated in the workplace at Tesla?
9      So the failure to take action such as that to correct the
10  workplace.  There is no evidence of Tesla taking any action to
11  correct the graffiti.
12      Remember, we talked about the graffiti?  And you heard --
13  I read a response to -- I read a response to an interrogatory,
14  and in the interrogatory it identified a person who worked in
15  the facilities department, a person by the name of Andres
16  Donet.  Andres Donet was responsible for cleaning up graffiti
17  inside the bathrooms.  All right?  And we put in testimony from
18  Mr. Diaz saying that the graffiti was there the entire nine
19  months that he was in the workplace.  And you heard testimony
20  from Mr. Wheeler that he saw that same graffiti.
21      Tesla had the ability to bring its employee, Mr. Donet,
22  before you to say:  It was never there; or to say:  I corrected
23  the condition.  I fixed it.  I painted over it.  Where is
24  Mr. Donet?
25      Mr. Diaz told you that that graffiti, the "N" word,

892

CLOSING ARGUMENT / ALEXANDER

1  etched, scratched, painted, swastikas was inside the restroom
2  from the second day when he saw it until the day he left.  If
3  that's not true, why didn't Tesla bring the witness before you
4  to say that it was not true; that he corrected the condition.
5      So with regard to Tesla, it knew.  It knew about the
6  hostile work environment and the workplace.  It knew because
7  the "N" word was used daily and everywhere, and you heard that
8  testimony from multiple people.
9      The racial graffiti inside the room, you know that it was
10  there, and you have no evidence from Tesla that it was ever
11  corrected.  For all you know, it's still here -- there to this
12  day.
13      With regard to Exhibit No. 106, which the Court introduced
14  for a limited purpose, without that document we would not have
15  been able to impeach Tesla.  They came in to tell you a story
16  that the "N" word was never reported, never existed and without
17  that document, we would not have been able to prove that they
18  were not telling the truth.
19      Tesla knew that the "N" word -- Tesla knew that a hostile
20  work environment existed with regard to African-Americans
21  inside of its workplace, and it did nothing.
22      It's not about -- it is not about correcting the
23  workplace.  This is not about a zero tolerance policy.  It is
24  about a zero responsibility policy.  This trial has been about
25  Tesla trying to convince you that it did what it needed to do

893

CLOSING ARGUMENT / ALEXANDER

1  inside the workplace and all the evidence keeps telling you no,
2  it did not.  It failed to create a workplace that was free of
3  discrimination and harassment based on race.
4      So with regard to the failure to investigate -- and I'm
5  going to talk about it later -- employers must make all
6  reasonable steps necessary to prevent harassment from
7  occurring.  Remedial measures are to include immediate
8  corrective action to end the conduct, to deter future conduct
9  and to make sure that it not only doesn't occur to Owen Diaz,
10  but to others.  Because the reason why you do corrective
11  conduct is to cleanse the workplace of a hostile work
12  environment.
13      So with regard to this instruction, the answer to -- to
14  this question is also "yes."  So you answer question Number 1
15  "yes," and you answer Number 3 "yes."
16      So now we're going to go back to question Number 2.
17  Because Tesla, at the beginning of this case I told you that it
18  structured its workplace so that it could try to avoid
19  liability.  And despite the fact that all this conduct occurred
20  inside of Tesla's facility, in a workplace that Tesla
21  structured in a way so that it put staffing companies between
22  itself and the employees, so that it would have the ability to
23  come to you and say it's not its responsibility.  Because Owen
24  Diaz was working for a contract company, and because the people
25  who said these words were working for contract companies, Tesla

894

CLOSING ARGUMENT / ALEXANDER

1  wanted the ability to say:  Not our fault.
2      And so now we're going to have a discussion about why
3  Tesla can be held accountable for not correcting its workplace
4  and making it free of discrimination.
5      So Tesla points the finger at everyone else.  It created
6  this structure so that it would -- so that this -- this
7  artificial structure so that it would have the ability to blame
8  it on CitiStaff, or blame it on Chartwell, or blame it on
9  nextSource.
10      Confusion is the enemy of justice.  And what you have
11  heard from the day of the opening statement from the defendant
12  is that they were going to give you evidence that was going to
13  tell you the true story.  The story that I told, that was not
14  true.  They were going to bring in evidence, testimony, and
15  tell you what the real story was.
16      They brought you two witnesses.  They brought you Ramon
17  Martinez, the person that drew that picaninny, and they brought
18  you Ms. DelaGrande, the person who came in to vouch for
19  Mr. Hurtado.  But in terms of telling you what the real
20  evidence is, they did nothing.
21      And so what they did was try to sow confusion because
22  confusion is the enemy of justice.
23      And so let's talk about why Tesla is responsible for what
24  occurred inside of its workplace.
25      So there are two ways that we can prove that Tesla is

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 6

---

903

CLOSING ARGUMENT / ALEXANDER

1  experts.  The plaintiff is the only party that brought you
2  those experts.  And if Tesla could have found a human resource
3  expert that would have told you that what they did inside the
4  workplace met the standard of care, you certainly know that
5  they would have brought one.  But as opposed to putting
6  affirmative evidence in front of you, they chose to poke at the
7  balloon.  They chose to ask a bunch of questions to make it
8  appear as though the experts were not telling you what was
9  true.  But they did not put an expert in front of you.
10     So with regard to the expert testimony you heard, you
11  treat that like all other testimony.  If it was unimpeached,
12  you have the ability and the right to accept it.
13     If it made sense with the experience of what you
14  understand in your life experience, then you have the ability
15  to accept it.
16     And so let me give you the Jury Instruction, and then let
17  me remind you of what Amy Oppenheimer testified to remotely
18  through Zoom.
19     A failure to prevent.  That Owen Diaz was an employee.  We
20  know that he was an employee providing services under a
21  contract, because we proved the contractual relationship.  Any
22  time an employee is working, there is a contract.  Whether it's
23  a verbal contract:  I'm going to hire you.  You're going to do
24  work.  I'm going to pay you.  Or an implied contract, based on
25  what occurred between Tesla writing that contract with the

---

904

CLOSING ARGUMENT / ALEXANDER

1  staffing companies and Owen being a beneficiary.  We proved
2  that he was an employee.
3     Number 2, he was subjected to harassment.  That's based on
4  the hostile work environment.
5     That Tesla failed to take all reasonable steps necessary
6  to prevent harassment.  That is what we're discussing right
7  now.
8     That Owen was harmed.  As a consequence of them failing to
9  protect the workplace, he was harmed.  He suffered because he
10  experienced the "N" word and drawings like this.
11     And it was -- the failure to take reasonable steps was a
12  substantial factor in causing Mr. Diaz harm.
13     With regard to substantial factor, the Court read an
14  instruction with regard to substantial factor.  Sometimes in
15  the law we use the word "substantial," and it sounds like
16  something different than it really is.  If you read the Jury
17  Instruction, it says, "Substantial, more than trivial, more
18  than remote."
19     Any time you see the word "substantial," you should
20  substitute "more than trivial, more than remote."
21     Let me give you an example of why the word "substantial"
22  is -- overstates what is required to show that there is a
23  relationship between failing to fix what was in the workplace
24  and the consequences, the harm, that was caused to Mr. Diaz.
25     If you had a car that was sitting on the edge of a cliff,

---

905

CLOSING ARGUMENT / ALEXANDER

1  and it was just dangling there, and the window was open, and
2  you were to take a pebble the size of a penny, and you were to
3  throw it inside the window, and it caused the car to go over
4  the cliff, that little pebble, as small as it is, would be a
5  substantial factor in causing the harm.
6     It doesn't matter -- it doesn't have to be a big bouler.
7  That little pebble was enough to cause the car to go over the
8  cliff.  So it was a substantial factor in cause the car to go
9  over the cliff.
10     And in this instance we've given substantial evidence that
11  Owen Diaz was harmed by this incident, this conduct, the
12  failure to protect him from a hostile work environment.  And so
13  with regard to meeting our burden of proof, we meet our burden
14  as to that.
15     Let's go through -- Ms. Oppenheimer gave testimony as to
16  what should occur inside of a workplace.  And she said one of
17  the things that should occur is clear policies.  Well, we know
18  that they did lip service, and they had the clear policies.
19  She said that.  But it should be distributed and accessible and
20  enforced.  It was not distributed.  It was not required like
21  their safety policy.  And it certainly was not enforced.  As
22  opposed to zero tolerance, it was really zero responsibility.
23     Training of employees, supervisors, managers.  There
24  should have been training inside the workplace to tell people
25  that if Tesla was going to claim to have a zero tolerance

---

906

CLOSING ARGUMENT / ALEXANDER

1  policy, that it was actually going to enforce the rules so it
2  was a zero tolerance policy.
3     The "N" word, as severe as it is, one time would have been
4  enough to terminate someone.  And it occurred every day.  Every
5  day, over and over and over and over and over again.
6     You would have thought that if they were firing people
7  based on a zero tolerance policy, they would bring in one
8  document, ten documents, a few documents, something that
9  confirms that someone got reprimanded, someone got fired for
10  use of the "N" word.  Right?
11     There was no training.  There was no training to tell
12  people what that zero tolerance policy was.
13     And so consistent message.  The consistent message is:
14  If you're in charge and you allow the "N" word to occur, why
15  wouldn't people keep using the "N" word?  But if you fire
16  someone in the workplace and you tell all the other employees,
17  "You use that word, you're fired," that's how it stops.  And no
18  one ever did that.  No one told the manager of nextSource
19  that he had the power to fire someone for that conduct.  No one
20  thought it was important enough to protect black employees
21  inside the workplace from that conduct.
22     An immediate response.  We know that there wasn't an
23  immediate response.
24     Immediate removal of the offensive conduct.  With regard
25  to the "N" word being inside the bathrooms, etched inside the

---

# EXHIBIT C

**provisionally filed under seal**

# EXHIBIT D

Volume 5

Pages 700 - 842

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
                                   )
          Plaintiffs,              )
                                   )
   vs.                             ) No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   )  San Francisco, California
          Defendants.              )  Friday
                                   )  October 1, 2021
_____)  8:00 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          ALEXANDER MORRISON & FEHR LLP
                             1900 Avenue of the Stars
                             Suite 900
                             Los Angeles, California 90067
                        BY:  **BERNARD ALEXANDER, ESQ.**


                             CALIFORNIA CIVIL RIGHTS LAW GROUP
                             332 San Anselmo Avenue
                             San Anselmo, California 94960
                        BY:  **LAWRENCE A. ORGAN, ESQ.**
                             **CIMONE A. NUNLEY, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

```
 1          That's what you wrote; right?

 2   A.   I wrote that.  And then I also said that his response was

 3   that he does not want anyone talking to him and he wanted

 4   everyone to go through email.

 5   Q.   And the reason he didn't want anyone talking to him is

 6   because they were calling him the "N" word; right?

 7   A.   It was never reported to me.  Devin and Robert were in

 8   there -- in the elevator at the time, and never once did anyone

 9   say anything about any derogatory terms being stated to him.

10   Q.   Let's go to the next day.  If you go to Exhibit 300.

11   A.   Uh-huh.

12   Q.   And if you look at that exhibit, it says --

13          MR. ORGAN:  Oh.  I move Exhibit --

14   BY MR. ORGAN

15   Q.   That's your email; correct?

16   A.   Yes.

17   Q.   Huh?

18   A.   Yes, that's my email.

19          MR. ORGAN:  Okay.  I would move Exhibit 300 into

20   evidence Your Honor.

21          THE COURT:  Any objection?

22          MS. JENG:  No objections.

23          THE COURT:  All right.  It's admitted.

24      (Trial Exhibit 300 received in evidence)

25
```

1     staff that worked with me, and he's the only name that I had.

2     Q.   Isn't it true that in the October to December 2015 time

3     period, Owen made complaints about your folks; right?

4     A.   Not to me.

5     Q.   Didn't Ed Romero tell you that Owen Diaz had problems with

6     your leads at that point in time?

7     A.   No.

8     Q.   Your people complained a lot about the elevators, didn't

9     they?

10    A.   Yes, they did.

11    Q.   Let me ask you just another question.  Let's assume that

12    all your testimony about Owen's performance in that February

13    time period is correct.  Do you think that would justify him

14    being called the "N" word in the workplace?

15    A.   Absolutely not.

16    Q.   And would you agree that if Mr. Diaz had to endure hearing

17    the "N" word all over the Tesla factory, that would have been a

18    hostile work environment under the policies that you heard

19    about from Tesla; right?

20              MS. JENG:  Objection.  Argumentative.

21              THE COURT:  Overruled.

22              THE WITNESS:  If that had happened, it -- somebody

23    would have said something to me.  Over half my team was

24    African-American.  If anybody had stated that -- if anybody had

25    said something like that, it would have gotten back to me.

DELAGRANDE - CROSS / ORGAN

1    They would have said something to me.

2        And during this whole time, I never was told that this had

3    had happened.   The only issues I had with Owen were based on

4    his performance.

5    BY MR. ORGAN

6    Q.   Did you work in HR?

7    A.   No, I didn't, but I worked very closely with HR.

8    Q.   Oh, you did?

9    A.   So if I had any wishes him and if I had heard that it

10   happened, I would have immediately contacted them.

11   Q.   Did HR ever tell you:   You know, we've got a lot of people

12   complaining about the "N" word?   No one --

13   A.   No, they didn't --

14   Q.   -- ever said that?

15   A.   -- tell me that at all.

16   Q.   And isn't it true, ma'am, that when you walked around the

17   factory, you could just hear the "N" word?

18   A.   No, you couldn't.   I worked there for nine years and that

19   was never an issue at Tesla.

20   Q.   You never heard the "N" word the entire time --

21   A.   Not at Tesla --

22   Q.   -- you worked there?

23   A.   -- no.   I --

24       THE COURT:   Excuse me.   Excuse me.   You're not having

25   an argument, either of you.

# EXHIBIT E

**In Re:**

*DEMETRIC DIAZ, et al. v.*
*TESLA, INC., et al.*

---

*VIDEOTAPED DEPOSITION OF ANDRES DONET*
*October 24, 2019*

---



**TORREANO**
*Reporting and Video*

(844) NOW-DEPO main/fax   (408) 371-0464 direct
www.torreano-depos.com       torreano-depos@sbcglobal.net

• *Realtime* • *Exhibit Linking* • *Video Synching* • *Transcript Repository*

1999 South Bascom Avenue, Suite 700
Campbell, CA 95008

*Min-U-Script®*

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:08:28  1          A.    Yeah.   Inside the bathrooms mostly.

17:08:32  2          Q.    And when you saw those pictures or words did

17:08:36  3     any of those words include the word "nigger,"

17:08:42  4     N-I-G-G-E-R?   Do you remember that?

17:08:45  5          A.    That word?   I know the word, but I haven't

17:08:49  6     seen graffiti including that word.

17:08:51  7          Q.    Never?

17:08:51  8          A.    Never as far as I can remember.   I'm not sure

17:08:57  9     100 percent, but I don't recall it.

17:09:00 10          Q.    But what about the word "nigga," N-I-G-G-A;

17:09:04 11     did you ever see that written in the bathroom stalls?

17:09:07 12          A.    I don't recall it.

17:09:08 13          Q.    Did you ever see a swastika written in the

17:09:15 14     bathroom stalls?

17:09:17 15          A.    Not I can recall of, no.

17:09:21 16          Q.    Okay.   But you did at some point get a picture

17:09:24 17     of such information; correct?

17:09:26 18          A.    We did receive some -- so the reports we

17:09:33 19     receive in that period of time, some of them I remember

17:09:39 20     included pictures and some not.

17:09:42 21          Q.    So you received written reports from time to

17:09:45 22     time?

17:09:46 23          A.    They were e-mails.   "By the way, I was just in

17:09:51 24     the bathroom and we found graffiti."   That's pretty

17:09:53 25     much what we received.   So a janitorial company goes

# EXHIBIT F

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 4

---

Volume 4
Pages 545 - 699

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND    )
LAMAR PATTERSON                  )
                                 )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )   No. C 17-6748 WHO
                                 )
TESLA, INC., dba TESLA MOTORS,   )
INC., CITISTAFF SOLUTIONS, INC., )
WEST VALLEY STAFFING GROUP,      )
CHARTWELL STAFFING SERVICES, INC.,)
and DOES 1-50, inclusive,        )
                                 )   San Francisco, California
          Defendants.            )   Thursday
_____)   September 30, 2021
                                     8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                    BY:  BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                    BY:  LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR
                Official Reporter - US District Court
                Computerized Transcription By Eclipse

---

546

APPEARANCES:  (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                    BY:  TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                    BY:  PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                    BY:  SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                              –  –  –

---

547

PROCEEDINGS

1   Thursday - September 30, 2021              8:01 a.m.
2                  P R O C E E D I N G S
3                     ---oOo---
4   (Proceedings were heard out of presence of the jury:)
5        THE CLERK:  Please come to order.
6        THE COURT:  Please be seated.
7        I understand that there are problems on the bridge and not
8   only is it impacting Mr. Organ, but also at least one of the
9   jurors.  So it will resolve when it resolves.
10       So there were just a couple of things -- two things on my
11  mind this morning.
12       One is I will give the proposed instruction on the persons
13  most knowledgeable as it was written last night and what was
14  just proposed and previously proposed and I said I was going to
15  read it.
16       And then the other issue was Mr. Organ yesterday was about
17  to read some discovery.  Do we know what that is?  And --
18       MR. ALEXANDER:  Yes, Your Honor.  I believe that we
19  submitted that documentation to you last night.  My
20  understanding is that it was going to be submitted so that
21  everyone would know what was going to be read.
22       THE COURT:  Okay.  I didn't see it this morning.
23  Ms. Kennedy, do you know what it is?
24       MS. KENNEDY:  I do not, Your Honor.
25       MR. ALEXANDER:  We should be able to provide printed

---

548

PROCEEDINGS

1   copies of that.
2        THE COURT:  Okay.  That would be great.  Why don't you
3   provide it to Ms. Kennedy so she knows what it is that you're
4   talking about.  And if there's no problem, then we can proceed;
5   and if there's a problem, I'd like to know about it.
6        (Whereupon document was tendered to the Court and
7        counsel.)
8        (Brief pause.)
9        THE COURT:  Mr. Alexander, while we're waiting, who
10  are the witnesses today?
11       MR. ALEXANDER:  As I understand it, the witnesses are
12  we're going to complete Mr. Diaz.  Then we'll have La'Drea
13  Diaz.  Then we'll have Dr. Anthony Reading.  Then we'll have
14  Amy Oppenheimer.
15       THE COURT:  And will that complete your case?
16       MR. ALEXANDER:  No.  I believe that we have -- I
17  believe that we have Lamar Patterson and the Erin Marconi
18  video.  And with regard to Mr. Patterson, it's unclear where he
19  will be in the lineup.
20       THE COURT:  Okay.
21       MR. ALEXANDER:  And then there's the Heisen transcript
22  as well?
23       THE COURT:  The Heisen?
24       MR. ALEXANDER:  Yes.
25       THE COURT:  Okay.  All right.

---

645

OPPENHEIMER - DIRECT / ORGAN

1   immediate past president.
2       I helped develop our materials, which is the first program
3   that provides a certificate in how to investigate.
4       And we've now done an institute since 2011, starting once
5   a year, then twice, up to now I think four or five times a
6   year, and provide a certificate to people who successfully
7   complete and pass a rather rigorous program and test.
8       I also was appointed to a task force on sexual harassment
9   in California through the Department of Fair Employment and
10  Housing, and in that capacity I was on a subcommittee that
11  wrote the Guidelines for employers on how to prevent and
12  respond.  Again, that focused on sexual harassment, but it
13  really applies to all forms of workplace harassment and there's
14  an extensive portion on investigations that I co-authored.
15      I've also been involved with national standards on
16  investigations and with -- input into those standards through
17  ANSI and have worked as a professional in this capacity since
18  the late 1980s.
19  Q.  You said the principles that apply to investigating a
20  sexual harassment complaint, those same principles would apply
21  to a workplace harassment -- a race harassment case; is that
22  right?
23  A.  Correct.  Basically any harassment based on a protected
24  category under state or federal law, it implicates the same
25  laws and the same types of prevention and response apply.  And

646

OPPENHEIMER - DIRECT / ORGAN

1   so if somebody complains about racial harassment, religious
2   harassment, whatever it is, they should be both responded to
3   and investigated in the same prompt and thorough manner.
4   Q.  Who typically hires you or your company?
5   A.  Well, as an investigator, which is mostly what we do, we
6   are hired by employers.  Employees don't have the means or the
7   access to do that.  Plus, employers are duty-bound to provide a
8   fair, thorough investigation; and so in doing that, they
9   sometimes hire outside people like me.
10      Usually they have internal people, if they're a large
11  organization especially, but there are often situations where
12  they don't have the resources or it's too high a level or
13  there's a conflict.  So we do public agencies, private
14  corporations, non-profits.
15      My -- I was one of the firms that the California
16  legislature used after the Me Too movement.
17      And most of our investigations are kept confidential under
18  the attorney-client privilege, but some have become public, and
19  including some private school investigations and ones against
20  elected officials.
21          MR. ORGAN:  Your Honor, I would move to have
22  Ms. Oppenheimer testify as an expert.
23          MS. KENNEDY:  Expert as to what?
24          MR. ORGAN:  Expert as to workplace investigations and
25  policies and prevention.

647

OPPENHEIMER - DIRECT / ORGAN

1           MS. KENNEDY:  With respect to Owen Diaz?
2           MR. ORGAN:  With respect to Tesla.
3           MS. KENNEDY:  No objection then.
4           THE COURT:  All right.  You may proceed.
5   BY MR. ORGAN
6   Q.  Now, we hired you in this case; is that right?  Plaintiff,
7   Owen Diaz did?
8   A.  True.
9   Q.  How much are we paying you an hour?
10  A.  $600.
11  Q.  Okay.  Do you have any special expertise in race
12  harassment?
13  A.  Well, I do in that my office has investigated many race
14  cases.  And I also have been doing implicit bias training for
15  the State bar, for other attorney and human resource
16  organizations for more than ten years.
17  Q.  Have you formed an opinion in this case?
18  A.  Yes.
19  Q.  What's your opinion?
20  A.  My opinion is that Tesla did not meet the standard of care
21  in preventing and responding to and investigating multiple
22  complaints of racial harassment that were articulated or
23  brought by Owen Diaz.
24  Q.  And what do you mean by the standard of care?  What is
25  that?

648

OPPENHEIMER - DIRECT / ORGAN

1   A.  Over the years, the human resource field has developed
2   standards of how a complaint of harassment should be
3   investigated, and those standards are articulated in things
4   like the book that I wrote, handbooks from the law firms, the
5   guidance that was issued by DFEH, which is the Department of
6   Fair Employment and Housing, the task force that I worked with
7   by the EEOC, the Equal Employment Opportunity Commission.
8       So there have been well-articulated standards in this
9   field for more than 20 years as to, you know, what an
10  appropriate response and prevention plan is to workplace
11  harassment based on race and other protected categories.
12  Q.  Now, we have a demonstrative up here about this.  Did you
13  prepare this?
14  A.  I did.
15  Q.  Okay.  And if you could, go through these eight steps that
16  you identify here as the standard for prevention?
17  A.  I've got nine.  But in any case, who's counting; right?
18  Q.  Yeah, there are nine.  There are eight on my sheet.  I
19  apologize.
20  A.  That's okay.  I -- I tinker with these things, so it's
21  hard to know.
22  Q.  Tell us the nine.
23  A.  That you have clear policies that are distributed,
24  accessible and then, more importantly, enforced because the
25  enforcement of policies are more important than just having

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 4

---

689

PROCEEDINGS

1  application.
2          MR. ORGAN:  Well, that would come in during their
3  case, Your Honor.
4          THE COURT:  Well, it doesn't really make any
5  difference.  They're both admitted.
6          MR. ORGAN:  Great.  Thank you, Your Honor.
7          (Trial Exhibits 3 and 379 received in evidence)
8          MR. ORGAN:  Great.
9          And then we have some discovery to read.
10         THE COURT:  Okay.  So let's get to that.
11         So, ladies and gentlemen, there's going to be a little bit
12  of the written discovery that the parties exchanged during the
13  course of the litigation that's now going to be read to you.
14  So there are going to be two different types.
15         One is interrogatories.  So evidence that is presented in
16  the form of answers to one of the parties -- to written
17  interrogatories which were submitted by the other side.  These
18  answers were given in writing and under oath before the trial
19  in response to questions that were submitted under established
20  court procedures.  You should consider the answers, insofar as
21  possible, in the same way as if they were made from the witness
22  stand.
23         And in addition to that, you're going to -- the plaintiffs
24  are going to read a few admissions, and evidence will now be
25  presented to you in the form of admissions to the truth of

---

690

PROCEEDINGS

1  certain facts.  Those admissions were given in writing before
2  the trial in response to requests that were submitted under
3  established court procedures.  You must treat these facts as
4  having been proved.
5          All right.  Mr. Alexander.
6          MR. ALEXANDER:  Thank you, Your Honor.
7          Reading Interrogatory No. 2, question (as read):
8          "Identify the business relationship between you
9  and CitiStaff Solutions, Inc."
10         THE COURT:  I think we should state that these were
11  special interrogatories that were sent to defendant Tesla, Inc.
12         All right.  Go ahead.
13         MR. ALEXANDER:  Thank you, Your Honor.
14  Response (as read):
15         "Defendant contracts with nextSource to staff
16  temporary employees at its facilities.  It is
17  defendant's understanding that nextSource contracts
18  with CitiStaff Solutions, Inc., among other third
19  parties, to secure temporary employees to work at its
20  facilities.  Discovery is ongoing and defendant
21  reserves the right to supplement its response."
22  Interrogatory No. 3 (as read):
23         "Identify the business relationship between you
24  and nextSource.
25         "Defendant contracts with nextSource to staff

---

691

PROCEEDINGS

1  temporary employees at its facilities.  It is
2  defendant's understanding that nextSource contracts
3  with CitiStaff Solutions, Inc., among other third
4  parties, to secure temporary employees to work at its
5  facilities.  Discovery is ongoing and defendant
6  reserves the right to supplement its response."
7  Interrogatory No. 8 (as read):
8          "Please provide the last best-known contact
9  information for Ed Romero. (In responding to this
10  interrogatory, the term 'contact information'
11  includes, but is not limited to, address, phone number
12  and email.)
13  Response (as read):
14         "Mr. Romero is a former Tesla employee, but he is
15  represented by counsel for Tesla in this action."
16  Interrogatory No. 17 (as read):
17         "Please describe in comprehensive detail each
18  position Victor Quintero has held during his
19  employment at the Tesla factory from 2014 to the
20  present. (For the purpose of responding to this
21  interrogatory, the term 'describe' -- within quotes --
22  "means to list for each position the job title, job
23  duties, hours worked, and the dates the position was
24  held.)
25  Response (as read):

---

692

PROCEEDINGS

1          "Victor Quintero's position is manager recycling
2  services from May 12, 2015, through the date of this
3  response."
4  Interrogatory No. 18 (as read):
5          "Please describe in comprehensive detail each
6  position Ramon Martinez held during his employment at
7  the Tesla factory. (For the purposes of responding to
8  this interrogatory, the term "described"' -- within
9  quotes -- "means to list for each position the job
10  title, job duties, hours worked, and dates the
11  position was held.)
12  Response (as read):
13         "Ramon Martinez was not employed by Tesla during
14  the time that plaintiff Owen Diaz or plaintiff
15  Demetric Di-az worked at Tesla.  Ramon Martinez's
16  position from January 14, 2019, to the date of this
17  response is lead material handler."
18  Interrogatory No. 22 (as read):
19         "Please identify the individuals and/or companies
20  that were responsible for painting over graffiti or
21  drawings or handwriting in the bathrooms at the Tesla
22  factory from January 1, 2014, to January 1, 2017.
23  Response (as read):
24         "During the time plaintiff worked at Tesla,
25  Tesla's facilities department and facilities contract

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 4

693

PROCEEDINGS

1    supervisor, including, but not limited to, Andres
2    Donet, was 'responsible' for cleaning and maintaining
3    the bathrooms at Tesla's Fremont, California,
4    facility."
5        And now I will read the request for admissions.
6    Request No. 2 --
7        THE COURT:  And, again, these were Request For
8    Admissions to defendant Tesla.
9        MR. ALEXANDER:  Thank you.
10       Request No. 2 (as read):
11           "Admit plaintiff Owen Diaz was working at the
12       Tesla factory pursuant to the contract you had with
13       defendant CitiStaff, Inc.
14       Response (as read):
15           "Defendant admits that it contracts with
16       nextSource to staff temporary workers at its
17       facilities.  It is defendant's understanding that
18       nextSource contracts with CitiStaff Solutions, Inc.,
19       among other third parties, to secure temporary workers
20       to work at its facilities."
21       Request for Admission No. 10 (as read):
22           "Admit you had no security recordings or footage
23       of any interactions between plaintiff Owen Diaz and
24       Ramon Martinez."
25       Response (as read):

694

PROCEEDINGS

1            "Admit."
2        And then the final is information pursuant to General
3    Order number 71 (as read):
4            "Request Demetric Di-az and Owen Diaz's supervisors."
5        The response (as read):
6            "During their temporary assignments to Tesla,
7        Demetric Di-az and Owen Diaz were supervised by Javier
8        Caballero as to Demetric Di-az, Ed Romero as to Owen
9        Diaz."
10       THE COURT:  All right.  Thank you.
11       MR. ORGAN:  Your Honor, at this point in time we have
12   one more witness, Ms. Heisen, but we have not received the
13   responses from the defendant as to the designations we made.
14       THE COURT:  Okay.
15       MR. ORGAN:  And so --
16       THE COURT:  All right.  So you would like to suspend
17   for the rest of the day?
18       MR. ORGAN:  Would that be possible, Your Honor?
19       THE COURT:  Yes.  Yeah.
20       MR. ORGAN:  Okay.  Thank you, Your Honor.
21       THE COURT:  All right.  So, ladies and gentlemen, this
22   case is moving right along as I had hoped.  There is still more
23   to come.
24       So come back tomorrow as you came today and the day before
25   and the day before.  I really appreciate your promptness, and I

695

PROCEEDINGS

1    will look forward to seeing you in the morning.
2        Yes.
3        JUROR:  Do you have any anticipation when -- I mean,
4    is Monday still the target?
5        THE COURT:  Monday is -- as best I can tell, the case
6    will go to the jury on Monday.
7        And so let me just -- and that will include closing
8    statements.  There may be a little more evidence, I don't know.
9    We'll see how things go tomorrow, but I'm pretty sure it's
10   going to happen on Monday.
11       And then it's going to be up to you to decide the timing
12   on how you deliberate.  So you wouldn't -- you're not -- you
13   don't have to be -- leave at 1:30.  You can choose when you
14   arrive and when you go.  I would hope that you would continue
15   at least to arrive at the same times that you have and how long
16   you stay will be up to you.
17       But, yes, I do think that everything will be to the jury
18   on Monday.
19       JUROR:  Thank you.
20       THE COURT:  All right.  Thank you all.
21       (Jury exits the courtroom at 1:11 p.m.)
22       (Proceedings were heard out of presence of the jury:)
23       THE COURT:  Okay.  Please be seated, everybody.
24       So you heard what I think.  I don't know whether that's --
25   whether I'm right as far as the timing is concerned.  If I am

696

PROCEEDINGS

1    wrong in any by your estimates, let me know so that I can tell
2    the jury; but I think that's what it seems like to me.
3        And then we'll see whether -- the evidence -- Ms. Kennedy,
4    I'll look to you.  Do you think your case will be in by 1:30
5    tomorrow?
6        MS. KENNEDY:  Oh, yes.  Absolutely.  Your Honor, we
7    are going to have Ramon Martinez -- I'm sorry -- Joyce
8    DelaGrande and then Ramon Martinez.  And that will be it.
9        THE COURT:  Okay.  All right.  Then we're going to be
10   in good shape.
11       MR. ORGAN:  My understanding is you want to have Joyce
12   testify at 8:30, and then we would play the video, and then
13   Mr. Martinez; is that right?
14       MS. KENNEDY:  The video?
15       MR. ORGAN:  I'm sorry?
16       THE COURT:  Ms. Heisen.
17       MS. KENNEDY:  Oh, I see.  Oh, sure.  If you want to do
18   that, that's fine.  Ms. DelaGrande has to catch a flight.
19       MR. ORGAN:  All right.
20       MS. KENNEDY:  Yes.  That's perfectly fine.
21       THE COURT:  Okay.
22       MR. ORGAN:  I guess that's it, Your Honor.
23       THE COURT:  I guess the issue is when am I going to
24   get the objections or counter designations or whatever is left
25   for Ms. Heisen so that I can --

# EXHIBIT G

| From: | Owen Diaz <odiazjr68@gmail.com> |
|---|---|
| To: | Tamotsu Kawasaki |
| Sent: | 9/20/2015 7:31:52 AM |
| Subject: | Fwd: Hilda/Aron |

Hey Tom we need to deal with the situation is the second time and has done this.

Sent from my iPhone

Begin forwarded message:

**From:** Devin <burkyburky93@yahoo.com>
**Date:** September 20, 2015 at 4:57:59 AM PDT
**To:** odiazjr68@gmail.com
**Subject: Hilda/Aron**

On September 20, 2015 around 1 am Hildy came to the elevator asking me (Devin Burkhart)to take down the full gondolas I explained to her the entire downstairs area was full and there was no room for the full gondolas and she had 8 empty. She then asked multiple times for me and the other operator to operate the other elevator. She then met me downstairs and called someone named Aron saying talk to him and I had asked her if he was the forklift operator who removes the material downstairs she said yes. I start to talk on the phone then he proceeded to tell me open the other elevator.So I told Aron who I was, that he needed to move the material, and that my supervisor closed the elevator down because there's nothing coming in on that side so he is the one that needs to be notified then the conversation ended. I then explained to my supervisor the unfair situation that had happened and he advised me to write an email describing the incident. I feel this situation was unfair because both Hildy and Aaron told me to undermine my supervisors authority and cause me distress at my job by causing a situation that could have been avoided if either of them would have used the chain of command instead of trying to create one amongst themselves over me.

Devin Burkhart

Sent from my iPhone

Sent from my iPhone

Sent from my iPhone

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 229**

CASE NO. 17-cv-06748-WHO
DATE ENTERED _____
BY _____
DEPUTY CLERK

TESLA-0000570
EX 229-001

# EXHIBIT H



**From:** Wayne Jackson <wajackson@teslamotors.com>
**Date:** October 26, 2015 at 6:16:43 AM PDT
**To:** Owen Diaz <odiazjr68@gmail.com>, Edward Romero <edromero@teslamotors.com>
**Subject:** RE: Rothja Foster


I will speak with him today.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com


Workforce Optimization, Business Enlightenment

-----Original Message-----
From: Owen Diaz [mailto:odiazjr68@gmail.com]
Sent: Saturday, October 24, 2015 6:58 AM
To: Edward Romero <edromero@teslamotors.com>; Wayne Jackson <wajackson@teslamotors.com>
Subject: Rothja Foster

On 10/23/15 Mr. Foster arrived to work one hour late. I counsel him and explained to him he needed to arrive to work on time. Later that night at 12:50am I sent Rothja Foster to start his 30 minute break. Before the start of his break I explained to Mr. Foster that he needed to be back at 1:20am. He said, he understood and would be back by 1:20am. At 1:30am I tried to contact Mr. Foster to let him know that his break was over and he was supposed to return From his break by 1:20am. Mr. Foster didn't answer his phone. I kept trying to contact Mr. Foster to let him know that he couldn't be gone from the elevator for long periods of time. At 2:06 am I sent Mr foster a text message letting him know I was giving him a verbal warning can he please correct this issue.
I didn't hear back from Mr. Foster till 4:33am he stated he fell asleep in his car and his phone died. I told Mr. Foster that I would have to send out a email stating what he told me and because he was gone so long he would probably receive a write- up. After I told Mr. Foster he could possibly receive a write-up. He stated, if I'm getting wrote up I'm going home. I explained to Mr. Foster that if he left, it could be considered as abandoning his Post and could possibly affect his job status. I explained to Mr. Foster if he felt that my actions in dealing with this situation was unfair to please contact Mr. Romero or Wayne Jackson. Mr. Foster returned at 5:20am stating he talked to Mr. Romero. I left Mr. Foster in elevator 1 to finish out the last 40 minutes of his shift. Mr. Foster was gone from his post a total of 4 1/2 hours before he returned to work.


Owen Diaz
Text sent to Mr. Foster

Rothja Foster your break started at 12:50 am you where supposed to be back at 1:20am. it's now 2:00am

DIAZ000204

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 248**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

EX 248-001

and you still haven't returned as of 2:06am. Mr Foster you can't be gone from the elevator for long periods of time. Mr foster this text message will serve as your verbal warning please correct this issue.

EX 248-002

# EXHIBIT I

Message

| | |
|---|---|
| **From**: | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38] |
| **Sent**: | 11/5/2015 7:10:55 PM |
| **To**: | Wayne Jackson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Wayne Jackson899] |
| **Subject**: | Fwd: Re: Elevator 1 out of service |

FYI

Sent from my Verizon 4G LTE Smartphone
---------- Forwarded message ----------
From: Edward Romero <edromero@teslamotors.com>
Date: Nov 5, 2015 5:51 AM
Subject: Re: Elevator 1 out of service
To: Owen Diaz <odiazjr68@gmail.com>
Cc: Victor Quintero <vquintero@teslamotors.com>

Thanks for.the.info.

Sent from my Verizon 4G LTE Smartphone
On Nov 5, 2015 5:25 AM, Owen Diaz <odiazjr68@gmail.com> wrote:
Yes, Mr. Foster had all the appropriate PPE. Safety glasses, bump cap, gloves and boots.  No nobody was in any danger. From what I heard it seems like he made a mistake and no Mr. Foster did not call me right after the incident. When I talked to Mr. Foster said, my cell phone died and I couldn't contact you. Mr. Romero I can't be 100% certain that Mr. Foster was following procedures unless I reviewed the surveillance video of what happened. Mr. Foster did claim he was following procedures, When the incident happened.

Sent from Owen's iPhone

On Nov 5, 2015, at 3:48 AM, Edward Romero <edromero@teslamotors.com> wrote:

> Owen,
> Please provide additional information. Was Foster wearing PPE and following procedures? Was anybody in danger? What did he do right after the incident, did he call you right away? Please respond via emal. Thanks
>
> Sent from my Verizon 4G LTE Smartphone
> On Nov 5, 2015 3:38 AM, Owen Diaz <odiazjr68@gmail.com> wrote:
> Talked to Mr. Foster he admits that on 11/5/15 around 2:00 am he hit the elevator door. Mr. Foster said, he missed judged the distance the door had risen.
> I advised Mr. Foster that he could not use any of the equipment until he has been recertified.
>
> On Nov 5, 2015, at 1:27 AM, Edward Romero <edromero@teslamotors.com> wrote:

> Please assist with this request. See request below. Please confirm receipt. Thanks

> Sent from my Verizon 4G LTE Smartphone
> ---------- Forwarded message ----------
> From: Devin Williams <devwilliams@teslamotors.com>
> Date: Nov 5, 2015 1:25 AM
> Subject: RE: Elevator 1 out of service
> To: Sarah Ficarra <sficarra@teslamotors.com>, Facilities

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 252**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

CONFIDENTIAL                                                                 TESLA-0000051

**EX 252-001**

<Facilities@teslamotors.com>, PWTFremontMaterialsHUB
<PWTFremontMaterialsHUB@teslamotors.com>
Cc: PWT-Materials <PWT-Materials@teslamotors.com>, Edward Romero
<edromero@teslamotors.com>

Warehouse,

Since elevator #1 is currently down can we have assistance in moving the pallets from elevator#1 to elevator#2

Thanks

---

**From:** Sarah Ficarra
**Sent:** Thursday, November 05, 2015 1:17 AM
**To:** Facilities
**Cc:** PWT-Materials; Edward Romero
**Subject:** Elevator 1 out of service

Facilities, please advise on Elevator 1. Out of service. Door was knocked out of place by elevator operator.

**Sarah Ficarra** | **Associate Manager, Powertrain Conveyance**
45500 Fremont Blvd | Fremont, CA 94538
p 510-299-4774 | e sficarra@teslamotors.com

# EXHIBIT J

| | |
|---|---|
| **From**: | Garrett, Terri [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TGARRETT@NEXTSOURCE58A] |
| **Sent**: | 11/6/2015 3:35:42 PM |
| **To**: | Wayne Jackson [wajackson@teslamotors.com]; Edward Romero [edromero@teslamotors.com] |
| **CC**: | Victor Quintero [vquintero@teslamotors.com]; Jaime Salazar [jsalazar@teslamotors.com]; Veronica Martinez [Veronica.Martinez@chartwellstaff.com]; Gryske, Deb [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DGryske@NextSource7b3] |
| **Subject**: | RE: Rothaj Foster |

Please ensure that we give Citistaff a heads up to cut his final check, thank you.


**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
tgarrett@nextsource.com
www.nextsource.com

---

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Friday, November 06, 2015 7:32 AM
**To:** Edward Romero <edromero@teslamotors.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>; Jaime Salazar <jsalazar@teslamotors.com>; Garrett, Terri <tgarrett@nextsource.com>; Veronica Martinez <Veronica.Martinez@chartwellstaff.com>; Gryske, Deb <DGryske@nextsource.com>
**Subject:** RE: Rothaj Foster
**Importance:** High

This will be addressed immediately.  Mr. Foster's contract will be terminated immediately and he will not be allowed back onsite.  This behavior is unacceptable and will not be tolerated.

I did contact Mr. Foster last night with regards to his accident as I needed information from him for the report.  I instructed him that he would not be allowed to drive a forklift until he was recertified and that most likely he would be moved into a sorter role until he could get his recertification.  I told him to check with his lead as to what he would be doing until he could get recertified.  Mr. Foster said he would check with Owen as to what his duties would be for the night.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com



*Workforce Optimization, Business Enlightenment*

CONFIDENTIAL                                                                                          NS000136

| |
|---|
| UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA |
| **EX 254** |
| CASE NO. 17-cv-06748-WHO |
| DATE ENTERED _____ |
| BY _____ |
| DEPUTY CLERK |

**EX 254-001**

**From:** Edward Romero
**Sent:** Friday, November 06, 2015 12:12 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>; Jaime Salazar <jsalazar@teslamotors.com>
**Subject:** Rothaj Foster

I had Rothaj Foster removed from the Tesla premises last night at 10:00 pm. The reason is that he was conducting himself in a threatening manner against Owen Diaz.

I received a call from Rothaj Foster at 6:06 pm. He said that he had spoken to Wayne Jackson and that Wayne had told him he was going to move him to a recycling sorter position tonight. I explained to him that people are not moved around like that without us first getting a replacement. I encouraged him to be patient, do his job and everything would work out. I also reminded him that we were short on staff.

I received another call from Mr. Foster at 7:47 saying that Owen wouldn't let him take his break. He said that Owen had went to cover for Froilan break. I told him to be patient and Owen would cover for him when Froilan came back. I explained that when we only have three people on we might not be able to take our breaks as we want but when we can. I told him to be patient. I then got another call from from Mr. Foster around 9:00 insinuating that Owen was being mean. I called Owen to ask him what was happening and Owen said Rothaj was being difficult and threatening, saying "you better watch your car".
I asked Owen if anyone had heard him say that, Owen said he didn't think so.

I then instructed Owen to assign Rothaj to elevator 2 as to avoid any friction between the two. When Owen approached Rothaj Foster to instruct him to go to elevator 2 he conducted himself in a threatening manner as if he wanted to fight with Owen. He also made a comment about shooting Owen. I asked him if anyone had witnessed this, at which time a Tesla material handler came forward and said he had witnessed Mr. Foster's threatening conduct. I then returned to Tesla to investigate the matter.

I then returned to Tesla and met with Yordano Ramirez, material handler from the Reman Area. He gave me his written statement and explained what happen. He said he witnessed Rothaj Foster conduct himself in a threatening manner towards Owen. I then called security explained the situation and asked that he be removed from the premises. Security informed me that they had had problems with Mr. Fosters attitude in the past. They said I could included that information in my report. I asked for his badge, which he returned to me. I informed Mr. Foster that he was suspended while we evaluated what had happen. He asked if he could call someone. I told him he could call his agency if wanted to. He asked if he could call Wayne Jackson, I told him he was free to do so if he wanted to. He was then escorted out of the building and followed to his car which he had parked illegally in a handicapped parking spot.

I could not allow anyone to be a threat to any other employee. I do not recommend he be allowed to return.

**EX 254-002**

# EXHIBIT K

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

Volume 2
Pages 172 - 368

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
            Plaintiffs,            )
                                   )
    vs.                            )  No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   )  San Francisco, California
            Defendants.            )  Tuesday
_____)  September 28, 2021
                                      8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:        ALEXANDER MORRISON & FEHR LLP
                       1900 Avenue of the Stars
                       Suite 900
                       Los Angeles, California 90067
                  BY:  BERNARD ALEXANDER, ESQ.

                       CALIFORNIA CIVIL RIGHTS LAW GROUP
                       332 San Anselmo Avenue
                       San Anselmo, California 94960
                  BY:  LAWRENCE A. ORGAN, ESQ.
                       CIMONE A. NUNLEY, ESQ.

            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:      Debra L. Pas, CSR 11916, CRR, RMR, RPR
                  Official Reporter - US District Court
                  Computerized Transcription By Eclipse

---

173

APPEARANCES:   (CONTINUED)

For Defendants:        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       333 S. Hope Street
                       43rd Floor
                       Los Angeles, California 90017
                  BY:  TRACEY A. KENNEDY, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                       379 Lytton Ave
                       Palo Alto, California 94301
                  BY:  PATRICIA M. JENG, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       Four Embarcadero Center
                       17th Floor
                       San Francisco, California 94111
                  BY:  SUSAN Q. HAINES, ESQ.

Also Present:          JOSEPH ALM, ESQ.
                       - Tesla, Inc.

                       YUSUF MOHAMED, ESQ.
                       - Tesla, Inc.
                       - - -

---

174

PROCEEDINGS

1   Tuesday - September 28, 2021                8:01 a.m.
2                   P R O C E E D I N G S
3                        ---o0o---
4       (Proceedings were heard out of presence of the jury:)
5       THE COURT:  All right.  There are three things on my
6   mind this morning.  The first one, I saw the Marconi
7   designations and counterdesignations.  Did the plaintiffs
8   intend to respond to that, Marconi?
9       MR. ORGAN:  Yes, Your Honor.  I believe we did file
10  something late last night; or if not, then we're planning to
11  file something early this morning.
12      THE COURT:  Okay.  I didn't see it when I came in this
13  morning.
14      MR. ORGAN:  Okay.
15      THE COURT:  I could have missed it, so I'll go take a
16  look.
17      When do you expect -- when would you like to put that on?
18      MR. ORGAN:  I think at the earliest it would be
19  tomorrow, Your Honor.
20      THE COURT:  Okay.  I'll take a look; and if it's -- if
21  I can get at it while you're still here --
22      MR. ORGAN:  I'll check with my colleague to make sure.
23  I wasn't preparing it, so...
24      THE COURT:  All right.  Then the second thing is the
25  Demetri Di-az objections.  And I'll sustain the remaining

---

175

PROCEEDINGS

1   objections to the counterdesignations.  The employment-related
2   one on West Valley is not relevant, and 403 I think also
3   applies because it would be confusing.  And it's just --
4   there's not enough information, even if it was relevant, to
5   actually get his view on who he was employed by.
6       And the other designation, which is Designation Number 9,
7   what happened outside of the workplace doesn't matter.  The use
8   of the "N" word outside of the workplace doesn't matter, and I
9   think 403 also applies.
10      So that's my ruling on those.
11      And then the final thing on my mind is I am going to post
12  at some point, when I let Ms. Davis know that she can do it and
13  she has the time to do it, draft final Jury Instructions.  So
14  I've put them in the way that I think they ought to go.  I've
15  left the sequencing in the way that you did, but I now have
16  them in a form that we can actually use on Friday.
17      So what I want you to do is, if you have any objections to
18  the instructions, any additions to the instructions, anything
19  with respect to the instructions other than the way that
20  they're currently presented, post by Thursday at 3:00 o'clock
21  what else you would like to see in the instructions.
22      And refer to the instruction by the page number.  So I've
23  paginated them.  I've left the numbers at the top blank because
24  I don't think we'll be using all of the sort of general
25  instructions that are there.

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

180

ROMERO - CROSS / KENNEDY

1  Q.   I understand from your testimony in response to
2  Mr. Organ's questions that you were a contractor for -- at the
3  Tesla facility in, say, early mid-2015; is that right?
4  A.   Yes.
5  Q.   And at some point in time you became a Tesla employee?
6  A.   Yes.
7  Q.   How long did you actually work at Tesla as an employee?
8  A.   One year.
9       THE COURT:   Ms. Kennedy, let me interrupt you.
10      A couple of folks have walked in.  I want to make sure
11 that anybody who is going to be a witness does not sit in
12 during the testimony.  So, I'm sorry, you'll have to wait
13 outside.  Thank you very much.
14      And I'd like the lawyers to be paying attention to this
15 because it's not the first time that it's happened.
16      All right.  I'm sorry.  Please go ahead.
17      MS. KENNEDY:   All right.  I didn't see anyone come in.
18 BY MS. KENNEDY:
19 Q.   I'm sorry.  So, Mr. Romero, you were at Tesla as an
20 employee for about a year; is that correct?
21 A.   I was a Tesla employee for one year.
22 Q.   So let me just ask a couple questions about the "N" word.
23      When you were working there as a contractor resident
24 employee, did Mr. Owen Diaz ever tell you that he had been
25 called the "N" word?

---

181

ROMERO - CROSS / KENNEDY

1  A.   I don't think he told me that he had used that -- I mean,
2  that anybody had used the "N" word.  There was a picture that
3  he alluded to that was -- I think that was factual.
4  Q.   Right.  That was a cartoon or the drawing you were shown
5  yesterday?
6  A.   Yes.  Uh-huh.
7  Q.   Did you actually have any interactions with Mr. Diaz when
8  you were working there either as a contractor or as an employee
9  of Tesla?
10 A.   Other than as a contractor?
11 Q.   Yeah.
12 A.   No.
13 Q.   When you talked to Mr. Diaz, did you ever have any issues
14 with how he was interacting with you?
15 A.   No.
16 Q.   Did you ever -- did he ever complain -- did Mr. Diaz ever
17 complain to you that anyone had said to him, quote, Go back to
18 Africa?
19 A.   No.
20 Q.   Did Mr. Diaz ever tell you that anyone had ever used this
21 phrase -- and I'm sorry to say this -- the "porch monkey"?
22 A.   No.
23 Q.   Mr. Diaz has testified in this case that he reported to
24 you, at least, quote, three to seven times that other employees
25 were calling him the "N" word.  Is that true or false?

---

182

ROMERO - CROSS / KENNEDY

1  A.   I don't remember him ever saying that.
2  Q.   And based on your experience being either as a contractor
3  at Tesla or as an employee at Tesla, if Mr. Diaz had told you
4  that those type of racial epithets had been used, what would
5  you have done?
6  A.   I would have, you know, take note of what they were saying
7  for one thing or, you know, remembered what they would have
8  said, and then in an email -- primarily in an email and
9  sometimes verbally I'd pass it up to my supervisors.
10 Q.   And I understand you did that with respect to this issue
11 regarding this employee Troy Dennis.
12      Remember the email that Mr. Organ showed you yesterday?
13 You actually reported the exact --
14 A.   Yes, I did.
15 Q.   -- racial epithets?
16 A.   It's been going, like, six years now.  There's a lot of
17 things I don't remember.
18 Q.   Certainly.
19 A.   But the email that he alluded to or that was -- they
20 mentioned yesterday is one I just didn't remember; but after
21 looking at it, you know, you kind of make memory and say,
22 "Well.." But I did report it.
23 Q.   Right.  And do you recall that you reported the exact
24 racial epithet that had been alleged to have been made?
25 A.   Say that again.

---

183

ROMERO - CROSS / KENNEDY

1  Q.   Do you recall in that email, which was Exhibit 106, that
2  you did actually report the actual racial epithet in that
3  email?
4  A.   I did.
5  Q.   Now, I understand approximately sometime in October of
6  2015 were you advised of any type of complaints about Mr. Diaz
7  and his interactions with his coworkers?
8  A.   In all fairness to Owen, you know, it was an environment
9  that is a big place.  There's thousands of people working
10 there.  There's a lot of issues that kind of irritate people.
11 You know, maybe somebody wants parts or somebody wants this, so
12 they're waiting.  And sometimes they just -- they just think
13 they're not doing their job and things like that.
14      My experience in being there, I -- my goal was to make my
15 team united, make them work together, have good customer
16 service, and so on.  So whenever I got complaints, I always
17 listened to both sides closely, you know, the complainer and so
18 on.
19      And as a rule, I tried to talk to my people, you know,
20 about, you know, what happened and when did it happen and, you
21 know, I'd want to hear their side of the story.
22      We primarily had complaints from a department, and I can't
23 remember the name of the department right now, but they had a
24 lot of movement of product on the floors.
25      The elevator service, we handled primarily the movement of

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

220

JACKSON - DIRECT / ALEXANDER

1  A.   Which binder do I go to?  There's two here.
2  Q.   Pick one and let's see if that's the one that has it.
3  A.   This is 39.  You said 29?
4  Q.   There should be an Exhibit 29.
5        THE COURT:  I think neither of these have 29.
6        THE WITNESS:  Yeah.  I don't have a 29.  I see 39.
7        MR. ALEXANDER:  Is it possible to display 29 for the
8  witness?
9        THE COURT:  Is this showing to the jury at the moment?
10       MR. ALEXANDER:  It's not, I don't believe.
11       THE CLERK:  Not yet.
12       THE COURT:  Okay.  Good.
13   All right.  Yes.  So this is fine.
14 BY MR. ALEXANDER
15  Q.   If you could look to the screen to your right, there is a
16 document displayed, Exhibit No. 29.  It is the Tesla
17 Anti-Harassment Policy.  Do you see that?
18  A.   Yes, sir.
19  Q.   Were you familiar with that policy during the time frame
20 that you were at Tesla working at nextSource?
21  A.   Yes.
22  Q.   And that policy, was that policy given to the contract
23 employees?
24       MS. JENG:  Objection.  Calls for speculation.
25       THE COURT:  Do you want to lay a foundation for that?

221

JACKSON - DIRECT / ALEXANDER

1  Lay a foundation.
2  BY MR. ALEXANDER:
3  Q.   With regard to the training that was given to employees,
4  contract employees that were working at Tesla, did you have an
5  understanding as to what they received before they were allowed
6  to work at Tesla?
7  A.   I don't remember everything but, yeah, they had a packet
8  that we were to give them.
9  Q.   Okay.  And the packet that they were given, did that
10 packet include Exhibit No. 29?
11  A.   I don't remember, but it quite possibly did.  I would
12 believe so.
13  Q.   So you don't know one way or another whether they received
14 this document, but you believe that they did?
15  A.   I believe they did.  I just -- like I said, it's been
16 quite awhile.  It's been four or five years so I can't remember
17 all that.
18  Q.   And with regard to Exhibit No. 6, which also has not
19 been -- I'm sorry.
20        With regard to Exhibit No. 29, you said that you were
21 familiar with that document?
22  A.   It looks familiar, yes.
23        MR. ALEXANDER:  May it be received into evidence, Your
24 Honor?
25        THE COURT:  Is there any objection to 29?

222

JACKSON - DIRECT / ALEXANDER

1        MS. JENG:  I think there lacks foundation from this
2  witness.
3        THE COURT:  I think that's true.  So I'll sustain the
4  objection.
5        MR. ALEXANDER:  Okay.
6        With regard to Tesla's Anti-Handbook Handbook, Exhibit
7  No. 6, which has not yet been received into evidence, but may
8  it be displayed so the witness can see it?
9        THE COURT:  Sure.
10       MR. ALEXANDER:  Your Honor, if I could, Exhibit
11 No. 368 is the same as Plaintiff's Exhibit No. 29, and the
12 defendant has stipulated to admission of that document.
13       THE COURT:  Okay.  That's why I told you to get these
14 numbers straight so that we didn't have duplicates.
15       Would you like to confirm that that's the case so that
16 this document can be admitted into evidence?
17       (Brief pause.)
18       THE COURT:  I'm going to accept the representation of
19 the plaintiffs with respect to this document, and it will be
20 admitted.
21       (Trial Exhibit 368 received in evidence)
22       THE COURT:  So go ahead, Mr. Alexander.
23       MR. ALEXANDER:  Thank you, Your Honor.
24 BY MR. ALEXANDER
25  Q.   With regard to Exhibit 6, the Anti-Handbook Handbook that

223

JACKSON - DIRECT / ALEXANDER

1  is on your screen, during the time frame that you were at
2  nextSource working for Tesla, did you have familiarity with
3  that document?
4  A.   I don't recall this particular document.
5  Q.   So the Anti-Handbook Handbook, you had never seen it while
6  performing services for Tesla; correct?
7  A.   I can't say I've never seen it.  I'm just saying I don't
8  remember this particular document.
9  Q.   Okay.
10  A.   I could very well have seen it, but I just don't remember.
11 There was a packet that we gave them so they could have very
12 well been in there.
13  Q.   And with regard to Exhibit No. 6, when you say it very
14 well could have been in there, you don't know for a fact
15 whether the Anti-Handbook Handbook was actually provided to
16 contract employees; is that correct?
17  A.   Yes, I don't recall.
18       MR. ORGAN:  May we publish -- you wanted to publish
19 the --
20       MR. ALEXANDER:  Not 6.  He doesn't remember.
21       MR. ORGAN:  Okay.  Fair enough.
22 BY MR. ALEXANDER
23  Q.   Now, with regard to use of the "N" word inside the
24 workplace, you heard the "N" word -- and you understand what I
25 mean, by the "N" word I hope -- used inside the Tesla factory;

```
                                                      224
                    JACKSON - DIRECT / ALEXANDER
 1   is that correct?
 2               MS. JENG:  Objection.  Motion in Limine.
 3               THE COURT:  Could you use a point in time?  Reference
 4   the time period that this was used; in other words, during the
 5   time that Mr. Diaz was employed in the factory.
 6               MS. JENG:  Your Honor, if I could --
 7   BY MR. ALEXANDER
 8   Q.   During the --
 9               THE COURT:  Hang on just a second.
10        Ms. Jeng?
11               MS. JENG:  Could I just direct your attention to
12   Page 7, Lines 15 to 23, of your order?
13               MR. ALEXANDER:  Your Honor, may I simply rephrase?
14               THE COURT:  I'm sorry?
15               MR. ALEXANDER:  I would simply like to rephrase the
16   question.
17               THE COURT:  Let me just look at what Ms. Jeng is
18   referring me to.
19        (Pause in proceedings.)
20               THE COURT:  I'm going to allow this general line as
21   long as you rephrase.
22               MR. ALEXANDER:  Thank you, Your Honor.
23               THE COURT:  Overruled.
24   BY MR. ALEXANDER
25   Q.   During the time frame of 2015 to 2016, did you hear the
```

```
                                                      225
                    JACKSON - DIRECT / ALEXANDER
 1   "N" word used inside the workplace at Tesla?
 2   A.   Yes, sir.
 3   Q.   And you heard it used quite a few times; right?
 4   A.   Yes, sir.
 5   Q.   And it would be fair to say that as you walked throughout
 6   the factory, you heard it on a daily basis?
 7   A.   Yes, sir.
 8   Q.   And when you say "throughout the factory," that includes
 9   the satellite cafeterias; right?
10   A.   I wouldn't -- I wouldn't limit where it was said in the
11   factory.  It was said quite often.  Not always in a derogatory
12   manner.  Sometimes as they would say "my," you know, like as in
13   friend, but it was inappropriate.
14   Q.   So you heard n-i-g-g-e-r and you heard n-i-g-g-a --
15   A.   Yes, sir.
16   Q.   -- throughout the workplace?
17   A.   Yes, sir.
18   Q.   And you heard it used by both African-Americans and
19   non-African-Americans; isn't that correct?
20               MS. JENG:  Objection.  Leading.
21               THE COURT:  Sustained.
22   BY MR. ALEXANDER
23   Q.   At the point when you were performing services for Tesla,
24   you were performing services through nextSource; correct?
25   A.   Yes, sir.
```

```
                                                      226
                    JACKSON - DIRECT / ALEXANDER
 1   Q.   And nextSource had a contract with Tesla to perform
 2   services at Tesla's behest; is that correct?
 3               MS. JENG:  Objection.  Calls for speculation.
 4               THE COURT:  Overruled.  Either he knows that or not.
 5               THE WITNESS:  I was not involved in the contract
 6   negotiations with Tesla so I'm not sure exactly what contracts
 7   nextSource and Tesla had.
 8   BY MR. ALEXANDER
 9   Q.   You understood that there was a contract between Tesla
10   and nextSource for nextSource to provide services to Tesla;
11   correct?
12   A.   Yes, I believe so.
13   Q.   And in your role at nextSource, you were performing
14   services based on direction given by Tesla; is that correct?
15   A.   I was based on nextSource.  I worked for nextSource.
16   I didn't work for Tesla.
17   Q.   Okay.  I understand that you didn't work for Tesla, but
18   isn't it correct that you performed duties at the direction of
19   Tesla?
20   A.   Yes.
21               MS. JENG:  Objection.  Leading.
22               THE COURT:  Overruled.  You can answer.  And I think
23   you did.  Was the answer "yes"?
24               THE WITNESS:  Yes.
25
```

```
                                                      227
                    JACKSON - DIRECT / ALEXANDER
 1   BY MR. ALEXANDER
 2   Q.   And so on occasion when you walked through the factory and
 3   you heard the "N" word, you mentioned to someone that that
 4   wasn't appropriate; right?
 5   A.   Yes.
 6   Q.   Okay.  But most of the time you simply ignored it; right?
 7   A.   Yes.
 8   Q.   And were you offended by use of the "N" word inside the
 9   Tesla workplace?
10   A.   Yes, I was.
11   Q.   And would it be fair to say that you didn't feel that you
12   had the power to stop the conduct inside the workplace?
13   A.   They did not work for me, sir.  I couldn't -- I had no
14   supervisory skills or anything over those individuals.
15   Q.   So even though you were at nextSource and you were
16   supervising the staffing companies that were working as
17   contract employees inside the Tesla workplace, you did not feel
18   you had the power to stop the use of the "N" word inside the
19   workplace; correct?
20   A.   I could not.  They were not my employees.
21   Q.   Okay.
22   A.   It was not my place to advise them or direct them.
23   Q.   Did you report your hearing of the "N" word to Tesla human
24   resources?
25   A.   No, I did not.
```

272

JACKSON - CROSS / JENG

1  employees, so it could have been referring to that they were
2  already -- their agency was on it or -- and/or Tesla was
3  involved because Terri would -- would cc Tesla HR on all these
4  issues or complaints.
5      Q.  And it's your understanding that both Ramon and Owen were
6  referred to be counseled?
7      A.  Yes, by their agencies.
8      Q.  That's right.  And this was after you spoke with all three
9  of them; correct?
10     A.  Yes.
11     Q.  Could I have you look at Exhibit 254?
12         MS. JENG:  This is stipulated as admissible.
13         THE WITNESS:  I don't have a 254.  Oh, here it is.
14  Okay.
15         THE COURT:  All right.  It's admitted.
16         MS. JENG:  May we publish?
17         THE COURT:  Yes.
18     (Document displayed.)
19         MR. ORGAN:  Your Honor, 254 isn't stipulated.  We had
20  an objection.
21         THE COURT:  Okay.  And so lay a foundation, please.
22         MS. JENG:  Okay.
23         THE COURT:  Let's be clear about what's agreed to be
24  admitted into evidence and what's not.  Okay.
25

273

JACKSON - CROSS / JENG

1  BY MS. JENG
2      Q.  Mr. Jackson, do you recall receiving this email from
3  Ms. Garrett?
4      A.  I don't recall this one.  I very well could have, but I
5  don't recall.
6      Q.  Okay.  Well, that's your email on there; right?
7      A.  Yes, it is.
8      Q.  Do you recall this incident between Rothaj and Owen?
9      A.  To be honest, I don't really recall the actual incident.
10  I do know that -- I do know that there were a few complaints
11  with regards to Owen and his --
12         MR. ALEXANDER:  Objection.  Move to strike.  Beyond
13  the scope of the question.
14         THE COURT:  Yeah, sustained.  The jury will disregard
15  the last statement by Mr. Jackson.
16  BY MS. JENG
17     Q.  Okay.  Well, with respect to this incident between Rothaj
18  and Owen, what do you recall happening between the two of them?
19     A.  I really don't.  I don't recall.  There were something --
20  there were a lot of incidents and accidents in the elevator
21  area where they would hit walls and things of that nature, so
22  I'm sure it had something to do with that.  I don't recall the
23  actual details, though.
24     Q.  Okay.  If you look at 254-2, you see this email where Ed
25  says (as read):

274

JACKSON - CROSS / JENG

1          "I could not allow anyone to be threatened by any
2  other employee.  I do not recommend" --
3         MR. ALEXANDER:  Objection.
4         THE COURT:  Sustained.  You need to first either get
5  this document admitted or not.  And if you have a different
6  question, you can ask a question without referring to the
7  document.
8         MS. JENG:  Okay.
9  BY MS. JENG
10     Q.  So on November 6th of 2015, there was an altercation of
11  some sort between Owen and Mr. Foster; is that correct?
12         MR. ALEXANDER:  Objection.  Leading.  Foundation.
13         THE COURT:  Sustained.
14  BY MS. JENG
15     Q.  Do you recall an incident between Mr. Foster and Owen in
16  November of 2015?
17         MR. ALEXANDER:  Objection.  Your Honor, we have the
18  document on the screen.
19         THE COURT:  Yeah, so don't look at the document.
20  Just --
21         THE WITNESS:  Oh.  Well, I thought I was supposed to.
22         THE COURT:  You previously testified that you didn't
23  remember an incident between Mr. Foster and Mr. Diaz.  Is that
24  still your testimony?
25         THE WITNESS:  Yeah.  I -- to be very honest, there

275

JACKSON - CROSS / JENG

1  were a few.  I don't know how to answer because there were a
2  few issues with Owen and other individuals.
3         THE COURT:  Well, I'm really asking about Mr. Foster.
4         THE WITNESS:  I don't recall, Your Honor.  It was
5  five, six years ago.  I can't remember each incident,
6  unfortunately --
7         THE COURT:  All right.
8         THE WITNESS:  -- but there were several.
9  BY MS. JENG
10     Q.  Okay.  So you don't remember an incident specifically
11  between Owen and Mr. Foster because there were a lot of
12  complaints; is that right?
13         MR. ALEXANDER:  Objection.  Objection.
14         THE COURT:  Sustained.
15         MR. ALEXANDER:  It's improper.
16  BY MS. JENG
17     Q.  Well, you just testified that there were a lot of
18  incidents between Owen and other workers at the factory; is
19  that right?
20         MR. ALEXANDER:  Objection.  It's inappropriate.  Move
21  to strike any reference to other issues that were nonresponsive
22  to a question posed.
23         THE COURT:  Sustained.
24  BY MS. JENG
25     Q.  Okay.  I'd like to turn to Exhibit 271 -- sorry.  We'll

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

344

QUINTERO - DIRECT / ALEXANDER

1  with no suspension?
2  A.   I -- I made recommendations based on the fact that any
3  time an incident like this happened, a corrective action had to
4  be implemented so it didn't happen again.
5       The employer of record ultimately was the one who made the
6  final call.  I felt it was my responsibility to make sure that
7  they -- whatever decision they made, that it was so that the
8  issue was addressed and that it never happened again on Tesla
9  property.
10 Q.   Were you aware that Mr. Diaz had made other complaints of
11 racial treatment inside the workplace?
12 A.   No.  No.
13 Q.   If I could show you Exhibit No. --
14      MR. ALEXANDER:  If we could show Exhibit No. 41?  If
15 you could display -- I don't know it's been received.
16      MS. KENNEDY:  I'm sorry, Bernard.  41 or 31?
17      MR. ALEXANDER:  41.
18      MS. KENNEDY:  Thank you.
19 It's admitted.  There's no objection.
20      THE COURT:  Okay.
21 (Document displayed.)
22 BY MR. ALEXANDER
23 Q.   With regard to Exhibit No. 41, it will be displayed, that
24 is a reference to Owen Diaz complaining about Judy Timbreza
25 making racially offensive remarks.

---

345

QUINTERO - DIRECT / ALEXANDER

1       And do you see where above that you say "Thank you" and it
2  says "VQ"?
3  A.   Yes.
4  Q.   And so that was an indication that you had received
5  previous information from Mr. Diaz that he had been subjected
6  to racially offensive remarks based on his report; right?
7  A.   Yeah.  Yeah.
8  Q.   Had you received information during the time frame of 2015
9  to 2016 that the "N" word was being used inside the workplace?
10 A.   No.
11 Q.   Had you received information between 2015 and 2016 that
12 graffiti was present inside the bathrooms at Tesla?
13 A.   Graffiti, yes.
14 Q.   I'm sorry?
15 A.   Graffiti, yes.
16 Q.   And what graffiti were you aware of that existed between
17 2015 and 2016 inside the bathrooms?
18 A.   Different -- different -- different types of graffiti.
19 Like --
20 Q.   Racial graffiti?
21 A.   I don't -- I don't believe it was mainly racial.  I
22 believe it was mainly --
23 Q.   I'm sorry?
24 A.   I don't believe it was mainly racial.  I believe it was,
25 like, drawings and just different -- different things.

---

346

QUINTERO - DIRECT / ALEXANDER

1  Q.   When you say not mainly, I'm not looking for mainly.  Was
2  there racial references like the "N" word inside the Tesla
3  bathrooms between 2015 and 2016?
4  A.   I don't remember if it was racial.
5  Q.   Let me -- if you could look at Exhibit No. 109.  Inside
6  the notebook next to you there should be an Exhibit 109.  It
7  should be the white notebook.
8       MR. ORGAN:  White notebook.  That one.
9  BY MR. ALEXANDER
10 Q.   That one.  Is there an Exhibit 109 in that?
11 A.   I don't see a 109.
12      MR. ALEXANDER:  If we could display it for the
13 witness, but not others?
14      MS. KENNEDY:  Your Honor, this is beyond the scope.  I
15 believe this was an issue that was brought up at a prior
16 hearing.
17      THE COURT:  I can't see it at the moment, so I have no
18 idea what it is.
19      MS. KENNEDY:  It's May of 2016.
20      THE COURT:  Okay.  That is beyond the scope then.
21      MR. ALEXANDER:  Your Honor, I'm making an inquiry to
22 find out whether he had seen information that was present
23 during the time frame of 2015 to 2016 inside the scope, the
24 day --
25      THE COURT:  You can ask it -- you can ask him whether

---

347

QUINTERO - DIRECT / ALEXANDER

1  this refreshes his recollection.
2  BY MR. ALEXANDER
3  Q.   So with regard to Exhibit No. 109, if you could look at
4  the 109-3.  Was that information -- was that what you see on
5  that page present inside the bathrooms between 2015 and 2016?
6  A.   I don't -- I don't remember.  I don't remember this.
7  Q.   Do you remember the "N" word being scrawled in the
8  bathroom between 2015 and 2016?
9  A.   Not really.  I really -- I don't remember.
10 Q.   Did you walk around the workplace during the time frame of
11 2015 to 2016?
12 A.   Occasionally.
13 Q.   Okay.  And when you say "occasionally," once a week?
14 Twice a week?
15 A.   Once a week I would say.
16 Q.   And when you walked around, did you walk around the area
17 like the elevators or the battery area or places like that?
18 A.   I would go by, yes.
19 Q.   I understand there are cafeterias.  Did you walk around
20 the cafeterias?
21 A.   Yes.
22 Q.   In walking around the facility, did you ever hear the
23 "N" word?
24 A.   No.
25 Q.   Not once?

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

348

QUINTERO - DIRECT / ALEXANDER

1    A.   Not once.
2    Q.   I just want to -- and were you generally present every
3    day, every workday in 2015-2016?
4    A.   Yeah.  I was averaging 12 hours a day, 12 to 14 hours a
5    day.
6    Q.   And the areas that you walked around, were there employees
7    working, contract workers, contract employees working in those
8    areas?
9    A.   Yeah.  My -- the people who were under me.
10   Q.   And so there is no word of the "N" word that you ever
11   heard at any time during the year 2015 to 2016?
12   A.   Absolutely not.
13   Q.   Absolutely not.
14   A.   At least not in front of me.
15   Q.   Did anyone report to you that the "N" word was being used
16   inside the workplace between 2015 and 2016?
17   A.   No.
18   Q.   So Ramon Martinez -- I'm sorry.
19        Ed Romero, he did not report the "N" word being used?
20   A.   I don't remember, no.  I would have remembered that.
21   Q.   Okay.  Wayne Jackson, you're familiar with him; right?
22   A.   Yeah.
23   Q.   Did he ever indicate to you that the "N" word was being
24   used inside the workplace?
25   A.   No.

---

349

QUINTERO - DIRECT / ALEXANDER

1    Q.   With regard to Ramon Martinez, after the discipline that
2    was issued to him, he ultimately became a direct employee of
3    Tesla; is that right?
4         MS. KENNEDY:  Objection.  Beyond the scope.
5         THE COURT:  Overruled.  You can answer.
6    BY MR. ALEXANDER
7    Q.   Mr. Martinez, he became a direct Tesla employee after this
8    discipline that was issued by you; right?
9    A.   He was -- a lot of the contract employees became Tesla
10   employees later, at a later time.
11   Q.   I'm asking for your knowledge.  Do you have knowledge that
12   after this incident regarding the racist drawing, that
13   Mr. Martinez was hired as a direct Tesla employee?
14   A.   Yes, I believe so.
15   Q.   And you approved that.  You had to approve that; right?
16   A.   It was not up to me to approve.
17   Q.   Could you turn to Exhibit No. 106, please?
18        MR. ALEXANDER:  I believe it's been received in
19   evidence.
20        MS. KENNEDY:  Yes.  No objection.
21        THE COURT:  Okay.  It can be shown.
22        (Document displayed.)
23   BY MR. ALEXANDER
24   Q.   With regard to this document, it is from Ed Romero to you
25   dated December 30, 2015.  Do you recall Mr. Romero reporting to

---

350

QUINTERO - DIRECT / ALEXANDER

1    you an incident involving Javier Temores and Troy Dennis and
2    you said the "N" word?
3         MR. ALEXANDER:  If we could display the bottom part of
4    the screen, below that.
5    BY MR. ALEXANDER:
6    Q.   Have you had an opportunity to review that document?
7    A.   Just the bottom part.  Can you make it so that I can --
8         (Document displayed.)
9    A.   Can you make it smaller?
10        I don't remember this.  I don't remember this.
11   Q.   So this report that's inside Exhibit 106 where you were
12   notified of use of the "N" word, you had forgotten that when
13   you testified a moment ago that no one had ever reported use of
14   the "N" word?
15   A.   Yes.  Yes.
16        (Brief pause.)
17   Q.   Let me have you look at...  Let me ask you, please, to
18   look at Exhibit No. 83.
19        MR. ALEXANDER:  It's being marked, but it has not been
20   received.
21        (Trial Exhibit 83 marked for identification)
22   BY MR. ALEXANDER:
23   Q.   Inside your notebook, sir, there is an Exhibit 83, I
24   believe.
25   A.   It's right here.  It's right here.

---

351

QUINTERO - DIRECT / ALEXANDER

1    Q.   Okay.  Do you recognize this as a true and correct copy of
2    an email between you and Ed Romero?
3    A.   Yes.
4         MR. ALEXANDER:  May Exhibit No. 83 be received into
5    evidence?
6         MS. KENNEDY:  No objection.
7         THE COURT:  It's admitted.
8         (Trial Exhibit 83 received in evidence)
9    BY MR. ALEXANDER:
10   Q.   And if could you go down to --
11        THE COURT:  It may be published.
12        (Document displayed)
13   BY MR. ALEXANDER:
14   Q.   -- about halfway down the page to the February 26, 2016,
15   at 1:24 a.m. entry, the second line where it says (as read):
16        "Tonight my lead approached him" -- meaning
17   Owen -- "to talk to him, and he said for my associates
18   to only talk to him if it is related to business
19   because there are so many snakes here at Tesla."
20        Do you see that reference?
21   A.   Yes.
22   Q.   And your response above at the top says (as read):
23        "From my perspective, we may need to ask Wayne to
24   give him a final warning; and if we continue to
25   receive complaints, he must be terminated."

---

# EXHIBIT L

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

---

1

Volume 1

Pages 1 - 171

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
                                   )
          Plaintiffs,              )
                                   )
   vs.                             )  No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   )  San Francisco, California
          Defendants.              )  Monday
_____)  September 27, 2021
                                      8:00 A.M.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                    BY:  BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                    BY:  LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:        Debra L. Pas, CSR 11916, CRR, RMR, RPR
                    Official Reporter - US District Court
                    Computerized Transcription By Eclipse

---

2

APPEARANCES:  (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                    BY:  TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                    BY:  PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                    BY:  SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                              -  -  -

---

3

PROCEEDINGS

1   Monday - September 27, 2021                8:02 A.m.
2                    P R O C E E D I N G S
3                         ---oOo---
4        (Proceedings held in open court, outside
5        the presence and hearing of the jury.)
6        THE COURT:  Good morning, everybody.  Be seated.
7        All right.  So there are a couple of things that were
8   filed with the McGinn.  I didn't see anything from the defense
9   on McGinn, so I'm assuming that you are in agreement that those
10  depositions -- that those objections should be overruled.
11       MS. KENNEDY:  Yes, Your Honor.  I believe that is
12  correct.
13       THE COURT:  Okay.  So I'm going to overrule the
14  objections to designations 6 and 13.
15       The next thing is the Nigel Jones motion.  Why is that
16  coming 19 months after I ruled?
17       MR. ORGAN:  Your Honor, I think when you ruled, it
18  was -- it was unclear to us whether or not we were going to be
19  able to use him in the case-in-chief or not, and that's the
20  issue because he did -- he was at the factory at the time that
21  Owen Diaz was there.
22       THE COURT:  Mr. Organ --
23       MR. ORGAN:  He worked in the -- yes, Your Honor.
24       THE COURT:  -- did you look at the order that I made
25  with respect to Mr. Jones?

---

4

PROCEEDINGS

1        MR. ORGAN:  Yes, I did, Your Honor.
2        THE COURT:  Given the absence of any overlap with
3   Diaz's work, work areas, or supervisors, this testimony is not
4   relevant to Diaz's case-in-chief.
5        As noted above, it could become relevant if Tesla relies
6   on the Faragher-Ellerth defense.  That determination will be
7   determined at trial.
8        MR. ORGAN:  Yes, Your Honor.
9        THE COURT:  So if it's coming in, it's coming in in
10  rebuttal.
11       MR. ORGAN:  Yes, Your Honor.
12       THE COURT:  Okay?
13       MR. ORGAN:  I understand.  Thank you.
14       THE COURT:  You filled in zero gaps that I identified
15  with respect to Mr. Jones' testimony.  Was he deposed in this
16  case?
17       MR. ORGAN:  No.  He's been a witness in two
18  arbitrations.  Defendant has cross-examined him twice.
19       THE COURT:  All right.  Well, so he's not testifying
20  unless the situation changes with respect to what Tesla does
21  with respect to his defense.
22       MR. ORGAN:  Okay.  Thank you, Your Honor.
23       THE COURT:  And let me make this suggestion, that you
24  spend your time working on your case and not trying the case in
25  the papers.  The lawyers need to focus on what happens in this

97

KAWASAKI - DIRECT / ORGAN

1  Q.  So, but if -- so did the surveillance system capture what
2  was on the elevators?
3  A.  So when I looked at this -- so the surveillance system, it
4  would only go back so far.  So that's only if they gave me
5  access to go back so far, to rewind the footage and go back so
6  far.
7      In this incident when he said -- I looked at the camera
8  system, and all I seen was Owen and -- Owen and Ramon face to
9  face, and then it bleeped away.
10 So I didn't know anything else, and I let Ed know about
11 that stuff as well.  I don't know if Ed had access to the
12 cameras.  I honestly do not know what he had from Tesla, so...
13 Q.  But you at least saw that there was an interaction between
14 the two of them?
15 A.  There was.  And, like I said, this was mainly towards
16 Owen.  Owen just put me in there because he knew I did have
17 access to the cameras.
18     And it did roll back.  But, like I said, when I tried to
19 roll back the footage, it only let me go back so far.  And at
20 the end of that footage, I did see them face to face.
21     And then after that, this was nothing to do with me,
22 because he sent it to Ed and Ed would take it from there.  It
23 wasn't my deal.  I wasn't there that day, so I really didn't do
24 anything with this matter.
25 Q.  So you played no role in investigating it?

98

KAWASAKI - DIRECT / ORGAN

1  A.  I played no role in this matter per se.  All I did, like I
2  said, I -- the role I played was I told Ed:  Hey, this is what
3  I seen on the camera.  And that was a verbal.
4  Q.  Now, you had -- but you did have interactions with
5  Mr Martinez, Ramon Martinez, didn't you?
6  A.  Correct.  Like I said, he was my counterpart as the day
7  shift.  We would overlap and I would let him know what needed
8  to be done and what -- how the elevator was going.  And if
9  sometimes the elevator would get backed up for whatever reason,
10 it would get backed up with batteries or whatever, they would
11 overload the front of the elevators with batteries and I would
12 just let them be aware:  Hey, this is what you guys need to
13 catch up on.  This is how the overnight shift went.
14 Q.  And did you ever hear Mr. Ramon Martinez use the word
15 mayate in Spanish?
16 A.  Umm, I heard him say mayate.  I also heard him say chongo
17 a lot.
18 Q.  So you heard mayate.  What was the other word?
19 A.  Chongo.
20 Q.  Chongo?  And, again, that's Ramon Martinez; right?
21 A.  Correct.
22 Q.  How many times did you think you heard Ramon Martinez use
23 the word mayate?
24 A.  I can't give you a real count.  I don't know.  I just know
25 I've heard them say it.  I mean, they're talking to each other

99

KAWASAKI - DIRECT / ORGAN

1  in Spanish and the words get thrown out.
2      So, I mean, I -- I mean, I know Spanish words and I know
3  curse words, sorry, in Spanish.  Don't we all?
4  Q.  Let me ask you this:  When you were walking around the
5  Tesla factory, did you ever hear the "N" word when you were
6  walking around?
7  A.  That word was thrown around a lot honestly.  It was a
8  young crew.  They hired a lot of staffing agencies, so a lot of
9  people had different backgrounds.  A lot of people threw that
10 word around casually a lot, I mean, in passing, whether it's
11 friendly or fun.
12     I mean, I didn't think nothing of it because it wasn't
13 thrown towards me, so it wasn't affecting me in any way.  I
14 can't control what other employees do that weren't under my
15 supervision, so...
16 Q.  How often would you say you heard this "N" word when you
17 were walking around?
18 A.  Daily.
19 Q.  Daily.  Could you tell whether or not these people that
20 you heard throwing the "N" word around on a daily basis,
21 whether or not they were Tesla employees or contract employees?
22 A.  No, I can't -- couldn't tell you that.  I don't know.  I
23 don't know.
24     MR. ORGAN:  No further questions, Your Honor.
25     THE COURT:  All right.

100

KAWASAKI - CROSS / JENG

1      Cross-examination.
2                   CROSS-EXAMINATION
3  BY MS. JENG
4  Q.  Good morning.
5  A.  Good morning.
6      THE COURT:  Ms. Jeng, you might want to introduce
7  yourself again to the jury.
8      MS. JENG:  Oh.  Hi, I'm Patricia Jeng.  I
9  representative Tesla in this case.
10     THE COURT:  And move the mic towards you.
11     MS. JENG:  Okay.
12 BY MS. JENG
13 Q.  All right.  I want to address the last thing you just
14 testified about, Mr. Kawasaki.  You said that you had heard the
15 "N" word in the factory, right, being used.
16     And the context in which you heard it were people saying
17 it to each other in a friendly context and not in an aggressive
18 manner; correct?
19 A.  That's correct.  I mean, that's not my conversation.  I
20 just heard the word thrown around.  It's not my conversation to
21 have.  It's not the conversation they're having with me, so I
22 just kept on pushing.
23 Q.  And you heard it when people were on their breaks or in
24 the cafeteria; is that right?
25 A.  Correct.

---

161

ROMERO - DIRECT / ORGAN

1  to doubt that he was a bad supervisor.
2  Q.  Okay.  Okay.  So you never came to a conclusion that Owen
3  Diaz was a bad supervisor.  You heard mixed things; is that
4  fair?
5  A.  Correct.
6  Q.  Okay.  Let me ask you a couple questions about the freight
7  elevators.  There are two main freight elevators at the
8  factory; is that right?
9  A.  Yes.
10  Q.  And that's how you move goods up and down; is that right?
11  A.  Yes.
12  Q.  Without the elevators, you couldn't build the cars;
13  correct?
14  A.  It would be pretty hard.
15  Q.  Okay.  Now, we saw earlier the complaint to Owen Diaz
16  where he complained to you about the racial conduct in
17  Exhibit 38, the Judy Timbreza stuff.  Do you remember that?
18  Exhibit 38?
19      So isn't it true that Owen Diaz, he actually complained to
20  you about use of the "N" word at the factory; correct?
21  A.  No.
22  Q.  Didn't Mr. Diaz complain to you about Robert Hurtado using
23  the "N" word towards him?
24  A.  I don't -- I don't remember that.
25  Q.  Okay.  Did Mr. Diaz complain to you about Ramon Martinez

---

162

ROMERO - DIRECT / ORGAN

1  using the "N" word?
2  A.  I don't recall him doing that.
3  Q.  You received a complaint about use of the "N" word by
4  Lamar Patterson, didn't you?
5  A.  I remember the name and I remember him, but I don't
6  remember him -- if he did, I don't remember at this moment.
7  Q.  Isn't it true that you claim that you never heard the
8  "N" word at the factory?  That's what you claim?
9  A.  I claim that at the factory it was never used or that I
10  never heard it?
11  Q.  That you never heard it at the factory, that you were
12  never aware of it at the factory.
13  A.  Are you asking if I heard it directly from someone?
14  Q.  I'll ask you that question first.  Did you ever hear the
15  "N" word directly from someone?
16  A.  I don't recall ever hearing anybody, not in my presence.
17  Q.  Isn't it true, though, that you did hear that -- you did
18  hear about "N" word complaints; correct?  Someone complained to
19  you about the "N" word; right?
20  A.  I don't remember anybody coming directly about that, not
21  offhand.
22      THE WITNESS:  Your Honor, could I answer in how I
23  would know of sometimes that, you know, things would come up,
24  like in the restrooms?  I was a part of the janitorial service.
25

---

163

ROMERO - DIRECT / ORGAN

1  BY MR. ORGAN
2  Q.  So you did see some racist graffiti in the restrooms?
3  A.  I never saw directly, but our people would be cleaning,
4  and they were instructed that if you see something, take a
5  picture it and -- and -- and send it to -- oh, my goodness.
6  Q.  Andres Donet?
7  A.  Send to it personnel.
8  Q.  Okay.  And so that did happen?  There was racist graffiti
9  in the bathrooms; correct?
10  A.  I never saw it and it was never said that it was racist.
11  I was just anything offensive, they were instructed just to
12  take a picture of it and send it in.
13  Q.  Okay.  Did you ever see any of the pictures?
14  A.  I don't remember specifically seeing anything like that.
15  Okay?
16  Q.  But you do know that graffiti did exist in the bathrooms
17  at the factory?
18  A.  Periodically, yes.
19  Q.  Okay.  And it's true that you contend that no one ever
20  brought to your attention use of the "N" word?  That's what you
21  contend; right?
22  A.  That's -- I'm telling you I don't remember anybody telling
23  me that.
24  Q.  Isn't it true, sir, that you -- someone actually directly
25  complained to you about the "N" word?  That's what happened

---

164

ROMERO - DIRECT / ORGAN

1  contrary to what you just said.  Isn't it true that you
2  received a complaint about the "N" word?
3  A.  I can't recall getting a complaint like that.
4  Q.  I'd like to turn your attention to Exhibit 106.
5      (Witness complied.)
6  A.  Okay.
7  Q.  If you look at the bottom, there is an email from you.
8  There's an email from you --
9      MS. KENNEDY:  Objection, Your Honor.  This is going
10  into the Motion in Limine.
11      MR. ORGAN:  This is what I mentioned this morning,
12  Your Honor.
13      THE COURT:  The objection is overruled.  You can
14  proceed.
15  BY MR. ORGAN
16  Q.  You wrote this email down at the bottom, didn't you, to
17  Wayne Jackson?
18  A.  Okay.
19  Q.  Right?
20  A.  Yes.  And your question to me was if I recall.  I didn't
21  recall at the moment.  I didn't recall that at all.  It's been
22  many years.
23  Q.  Well, does this refresh your recollection that, in fact,
24  you did receive a complaint about the "N" word from elevator
25  staff other than Mr. Diaz?

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

---

165

ROMERO - DIRECT / ORGAN

1  A.  Well, is there?
2  Q.  Yes.  And that is copied to Victor Quintero; correct?
3  A.  And Wayne Jackson and Victor Quintero.
4  Q.  And Erin Marconi from Tesla HR; correct?
5  A.  Yes.
6  Q.  Okay.
7      MR. ORGAN:  Your Honor, I would move Exhibit 106 into
8  evidence.
9      MS. KENNEDY:  Same objections, Your Honor.  Relevance
10 and me-too.
11     THE COURT:  I think a satisfactory basis has been
12 laid.  I'm going to admit Exhibit 106, but only for the purpose
13 for your assessment of credibility of Mr. Romero and the
14 testimony regarding the use of the "N" word and not for any
15 other purpose.
16     (Trial Exhibit 106 received in evidence)
17 BY MR. ORGAN
18 Q.  And isn't it true, sir --
19     THE COURT:  Do you want to publish it then?
20     MR. ORGAN:  Oh, yes, Your Honor.  I would like to
21 publish it.  Thank you.
22     (Document displayed.)
23 BY MR. ORGAN
24 Q.  So this is an interaction between a Javier Temores and
25 Troy Dennis.  These were two people who were working on the

---

166

ROMERO - DIRECT / ORGAN

1  elevators; correct?
2  A.  Yes.
3  Q.  And one of them called the other the "N" word; correct?
4  A.  According to the email.  I don't remember the
5  circumstances at the time but, yes.
6  Q.  And as a result of this -- as a result of this, did you
7  fire Troy Dennis?
8  A.  I don't remember.
9  Q.  Isn't it true, sir, that he stayed employed?  Troy Dennis
10 stayed employed after using the "N" word in the elevators;
11 correct?
12 A.  I think so, yes.  I'd like to --
13 Q.  I would like to turn your attention to --
14 A.  -- state that the emails were sent to the people
15 authorized to handle the problem.
16 Q.  Right.  You would have expected Erin Marconi from human
17 resources to have done something about it; right?
18 A.  I would have expected them to do what they needed to do.
19 Q.  And Victor Quintero, the manager of the whole department,
20 you would have expected him to do something about it; right?
21     THE COURT:  Now you've gone way beyond the scope of
22 this document.
23     MR. ORGAN:  I would like to move on to Exhibit 109.
24 BY MR. ORGAN
25 Q.  This isn't the only "N" word incident that you knew about;

---

167

PROCEEDINGS

1  correct, sir?  Look at Exhibit 109.
2  A.  Okay.
3      MS. KENNEDY:  Your Honor, this is also going beyond
4  the scope of the Motion in Limine and it's past the time that
5  Mr. Diaz was even at the Tesla facility.
6      This is now going past the Motion in Limine and this is
7  the slippery slope that we've been talking about.
8      MR. ORGAN:  It's for the same purpose, Your Honor.
9      THE COURT:  You've already established that purpose.
10 What's the timing of this?  Are we looking at --
11     MR. ORGAN:  It's April of 2016.
12     THE COURT:  Okay.  So that is beyond the scope.
13     MR. ORGAN:  Okay.  No further questions, Your Honor.
14     THE COURT:  All right.
15     Ms. Kennedy, we are at 1:30.  It depends on how much time
16 you think your redirect is going to take.  If it's ten minutes
17 or less --
18     MS. KENNEDY:  No, no.
19     THE COURT:  Okay.
20     MS. KENNEDY:  Unfortunately, it's not ten minutes or
21 less.
22     THE COURT:  All right.  So, ladies and gentlemen, we
23 will break for the day.
24     Remember two things.  One is, this is just the beginning
25 of the case.  There is a lot of information that you're going

---

168

PROCEEDINGS

1  to be receiving over the course of this week and maybe next
2  Monday, and it's just very important that you keep an open mind
3  about everything.
4      Don't discuss what has happened so far.  Don't communicate
5  about it with anybody.  Just remember that long instruction
6  that I gave you earlier because there's a lot to come in this
7  case.
8      The second thing is, really try to be on time.  Really try
9  to be here at 8:15.  We have a lot of work that we have to do
10 to get this case to you.  And I want to keep to the promise
11 that I made to you, which is that I think everything will be
12 done by a week from today and the case will go to you, but that
13 will only happen if we're all doing our part, and so the big
14 part -- a big part is being here on time.  So please come --
15 plan on being here by 8:15 so that we don't have any problems.
16     Okay?  So you are now dismissed for today, and I'll see
17 you tomorrow morning.
18     (Proceedings were heard out of presence of the jury:)
19     THE COURT:  Mr. Romero, you can step down, but I would
20 like everybody else to sit down.
21     (Witness steps down.)
22     THE COURT:  And I want to remind you that once a
23 witness takes the stand, there is no substantive conversation
24 that should go on with that witness.  So during this break,
25 besides timing and pleasantries, don't communicate with

---

# EXHIBIT M

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - -

DEMETRIC DIAZ, OWEN DIAZ, and          )

LAMAR PATTERSON,                       )

             Plaintiffs,          ) CASE NO.

vs.                                    ) 3:17-CV-06748-WHO

TESLA, INC. dba TESLA MOTORS,          )

INC.; CITISTAFF SOLUTIONS,             )

INC.; WEST VALLEY STAFFING             )

GROUP; CHARTWELL STAFFING              )

SERVICES, INC.; and DOES 1-50,         )

inclusive,                             )

             Defendants.          )

- - - - - - - - - - - - - - - - - - - -


DEPOSITION OF MICHAEL JOHN WHEELER

WEDNESDAY, JUNE 12, 2019



Reported by:

BY:  MELINDA M. SELLERS, CSR# 10686, RMR, CRC, CRR, CCRR

```
 1      A.   I feel like -- I hope I attached that in
 2   the email.
 3      Q.   Okay.  After this incident with the feces
 4   on the seat, did anything -- was there anything else
 5   other than that that happened to you, other than
 6   that and the N-word incident that you felt was --
 7   well, strike that.
 8           Do you think that the feces was put on your
 9   seat in part because you were African-American?
10      A.   I could assume that, but I can't say for
11   sure.  So I will not say that.  I will say it was an
12   act against me, but it could have been anyone.
13      Q.   What was the timing of that?  Do you
14   remember when that was?
15      A.   Timing --
16      Q.   The feces on the seat.
17      A.   It would have had to have been 2:00 a.m. to
18   3:00, in between there.  Would have been when I
19   would have taken my lunch.
20      Q.   Okay.  In terms of -- this was after you
21   became a supervisor --
22      A.   Yes.
23      Q.   -- right?
24           And you were issued the cart after you
25   became a supervisor; is that right?
```

# EXHIBIT N

**To:**     Edward Romero[edromero@teslamotors.com]
**Cc:**     Victor Quintero[vquintero@teslamotors.com]; Erin Marconi[emarconi@teslamotors.com]; Garrett,
Terri[tgarrett@nextsource.com]
**From:**   Jackson, Wayne[wjackson@nextsource.com]
**Sent:**   Wed 12/30/2015 8:01:08 PM (UTC)
**Subject:** RE: Personnel Issues

For the other situation I have called and left messages for both Troy and Javier to contact me as soon as possible.  I will let you know if I can connect with them today.  We do take this seriously and I will do an investigation into these incidents.

**From:** Edward Romero [mailto:edromero@teslamotors.com]
**Sent:** Wednesday, December 30, 2015 3:41 AM
**To:** Jackson, Wayne <wjackson@nextsource.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>; Erin Marconi <emarconi@teslamotors.com>
**Subject:** Personnel Issues

Wayne,

There are two issues that arose today that need to be dealt with.

2. Javier Temores and Troy Dennis:

I was approached by Javier with a complaint about Troy Dennis. He said that Troy Dennis had gotten upset and called him a "nigger". He said that Anthony Neely the night Lead had heard Troy use that word against Javier. I approached Anthony and asked him if he had heard Troy use that word against Javier. Although he hesitated for a moment he did admit that Troy said that against Javier. Anthony said he told Troy that he should not have used that word.  I explained to Anthony that it is unacceptable for anyone to use that type of language. I told him I was obligated to report the incident. I told him to try to keep Javier assigned to the other elevator.

Javier Temores is very hurt and feels he cannot work around or near Troy Dennis.

Please look into these two situations.

Thank You,

Edward Romero
Building Services Contract Manager
(510) 648-7393

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 106**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

CONFIDENTIAL