1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Alex Spiro (appearance *pro hac vice*)
2     alexspiro@quinnemanuel.com
    51 Madison Ave., 22nd Floor
3   New York, NY 10010
    Telephone: (212) 849-7000
4
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
5     Daniel C. Posner (CA Bar No. 232009)
      danposner@quinnemanuel.com
6     Mari F. Henderson (CA Bar No. 307693)
      marihenderson@quinnemanuel.com
7   865 S. Figueroa St., 10th Floor
    Los Angeles, California 90017
8   Telephone: (213) 443-3000
    Facsimile: (213) 443-3100
9
     QUINN EMANUEL URQUHART
10   &SULLIVAN, LLP
      Asher Griffin (appearance *pro hac vice*)
11    ashergriffin@quinnemanuel.com
    300 W. 6th St., Suite 2010
12   Austin, TX 78701
      Telephone: (737) 667-6100
13
    *Attorneys for Defendant Tesla, Inc.*
14

15              **UNITED STATES DISTRICT COURT**

16              **NORTHERN DISTRICT OF CALIFORNIA**

17                  **SAN FRANCISCO DIVISION**

18

19   OWEN DIAZ,                          Case No. 3:17-cv-06748-WHO

20              Plaintiff,               **DECLARATION OF ROBERT HURTADO**

21          v.

22   TESLA, INC. DBA TESLA MOTORS, INC.,

23              Defendant.

24

25

26

27

28

## DECLARATION OF ROBERT HURTADO

I, Robert Hurtado, hereby declare:

1. I am a Materials Supervisor employed by Tesla, Inc. I have worked at the Tesla Fremont factory since 2013. I have personal knowledge of the facts set forth in this declaration, and if called as a witness I could and would testify competently thereto.

2. I recall interacting with Owen Diaz ("Mr. Diaz") in 2015 and 2016. During that time, I was a Materials Lead, which means I handled the materials needed for assembling and producing the cars at the factory. Mr. Diaz was an Elevator Lead, which means he operated elevator two, which primarily moved batteries. When I needed to move batteries from one floor to the other floor for production, that is when I interacted with Mr. Diaz. I did not supervise or oversee Mr. Diaz – we were in different departments but we both worked the same overnight shift.

3. I interacted with Mr. Diaz multiple times a week when I needed the elevator team to bring materials up and down the elevator. He gave me his phone number to use if I needed to reach him.

4. From my recollection, we were generally cordial with each other. We engaged in small talk, including about sports. Our conversations were nothing out of the ordinary.

5. I do not recall being in the elevator alone with Mr. Diaz or having interactions with him where others were not present who would have witnessed our statements to each other.

6. The elevator Mr. Diaz operated was very busy and I needed constant support there. The elevators were critical to the flow of the production line. If there was a delay in getting materials from one floor to another, including battery packs, that delay would impact assembly and production.

7. I recall a time when Mr. Diaz got frustrated with my team members and me. Mr. Diaz wanted to run the elevator his way, but at times, elevator two, which he was responsible for, was unable to keep up with the pace of work. We had disagreements a couple of times on that issue, but nothing extreme.

8.   In the last two or three months that Mr. Diaz worked for Tesla in 2016, there were some performance issues relating to his work.  Mr. Diaz stopped being compliant with our team after we voiced our concern to Materials Supervisor Joyce Delagrande that Mr. Diaz was frequently not performing his job.  At times, I felt like he did not want to listen to us.  If he did not get his way, he would respond with a negative attitude.

9.   In approximately February 2016, my colleagues and I informed Ms. Delagrande that Mr. Diaz's performance issues were slowing down the production line.  Ms. Delagrande informed us she would speak to Contract Services supervisor, Ed Romero, about the issue.  Shortly thereafter, Mr. Diaz said that we – meaning Materials Lead Devin Williams and I – could not contact him unless we sent him an email.  Mr. Williams and I thought it was inappropriate that we had to email him to conduct business.  I remember Mr. Diaz also telling Ms. Delagrande that we cannot speak with him unless it was through email.

10. It was clear to me that Mr. Diaz telling us he would not communicate with us except via email was in response to our complaints about his performance.  My impression was that because we raised issues about his performance with his boss, he was being spiteful when he told us not to communicate with him except by email.

11. In approximately February 2016, another of my colleagues at the time, Materials Lead Hugo Gallegos, and I complained to Ms. Delagrande that Mr. Diaz was not performing his job and was instead fraternizing with female associates.  Mr. Gallegos and I further told Ms. Delagrande that we were frustrated waiting 10, 15, 20 minutes or more to use the elevator Mr. Diaz operated when there should always be someone attending to the elevator.  Mr. Diaz was irritated we had reported him.

12. When Mr. Diaz testified at trial in October 2021 that I called him the n-word more than 30 times, and that the reason he refused to communicate with me except via email was because of my alleged racist behavior, I was shocked and devastated.

13. Mr. Diaz's allegations against me of racist conduct are false. I would not use such an incredibly disrespectful term or try to demean a colleague because of the color of his skin. To have my character defamed in a public courtroom and to be branded a racist by Mr. Diaz's allegations has been devastating to me and my family.

14. While I had a general understanding after he filed his lawsuit that Mr. Diaz had accused my colleagues and me of racist behavior, I did not know the detail or the extent of Mr. Diaz's allegations against me or the scope of my involvement in his claims until he testified at trial.

15. I am not aware of Mr. Diaz ever having reported these false allegations while working at Tesla. If he had, I would have responded to them at the time and denied them.

16. I am a dark skinned Hispanic man who has been subject to discrimination and racism myself. I understand how racism can impact a person. I am not a racist. I never called Mr. Diaz the n-word or made any racist comments to him. It is my understanding that Mr. Diaz also claims that I made racist comments in Spanish. However, although I am Hispanic, I do not speak Spanish and I never made racist comments to or about him in any language.

17. I am married and have four children. My wife and children are also people of color. Neither my family nor I condone racism or use the racist terms that Mr. Diaz has accused me of using. I teach my children not to condone racism.

18. I would like the opportunity to defend myself and my character, and not be subjected yet again to more public testimony that completely misrepresents what happened and who I am. I would very much appreciate the opportunity to respond to Mr. Diaz's wrongful and harmful allegations at trial.


I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Executed on this 30 day of January, 2023 in Fremont, California.

Robert Hurtado