QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (appearance *pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Daniel C. Posner (CA Bar No. 232009)
  danposner@quinnemanuel.com
  Mari F. Henderson (CA Bar No. 307693)
  marihenderson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Asher Griffin (appearance *pro hac vice*)
  ashergriffin@quinnemanuel.com
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Defendant Tesla, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| OWEN DIAZ,<br><br>          Plaintiff,<br><br>     v.<br><br>TESLA, INC. d/b/a TESLA MOTORS, INC.,<br><br>          Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**DECLARATION OF DANIEL C. POSNER IN SUPPORT OF DEFENDANT TESLA, INC.'S OPPOSITIONS TO PLAINTIFF OWEN DIAZ'S MOTIONS *IN LIMINE***<br><br>Hearing Date:  February 27, 2023<br>Time:  2:00 p.m.<br>Place:  Courtroom 2, 17th Floor<br>Judge:  Hon. William H. Orrick |

## DECLARATION OF DANIEL C. POSNER

I, Daniel C. Posner, hereby declare:

1.      I am a member of the State Bar of California and of this Court and am counsel for Defendant Tesla, Inc. ("Tesla") in this matter.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness I could and would testify competently thereto.

2.      I make this declaration in support of Tesla's Motions *in Limine*.

3.      Attached hereto as Exhibit A is a true and correct copy of the transcript from the October 1, 2021 , trial proceedings in this matter with the relevant excerpts highlighted.

4.      Attached hereto as Exhibit B is a true and correct copy of trial exhibit 234.

5.      Attached hereto as Exhibit C is a true and correct copy of exhibit 6 to the Deposition of Owen Diaz..

6.      Attached hereto as Exhibit D is a true and correct copy of trial exhibit 235.

7.      Attached hereto as Exhibit E is a true and correct copy of the transcript from the September 28, 2021 , trial proceedings in this matter with the relevant excerpts highlighted.

8.      Attached hereto as Exhibit F is a true and correct copy trial exhibit 76.

9.      Attached hereto as Exhibit G is a true and correct copy of trial exhibit 296.

10.     Attached hereto as Exhibit H is a true and correct copy of trial exhibit 303.

11.     Attached hereto as Exhibit I is a true and correct copy of trial exhibit 245.

12.     Attached hereto as Exhibit J is a true and correct copy of trial exhibit 251.

13.     Attached hereto as Exhibit K is a true and correct copy of the transcript from the September 27, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

14.     Attached hereto as Exhibit L is a true and correct copy of the transcript from the September 29, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

15.     Attached hereto as Exhibit M is a true and correct copy of trial exhibit 265.

16.     Attached hereto as Exhibit N is a true and correct copy of the transcript from the September 30, 2021 trial proceedings in this matter with the relevant excerpts highlighted.

17.     Attached hereto as Exhibit O is a true and correct copy of the transcript from the May 22, 2018 deposition of Owen Diaz with the relevant excerpts highlighted.

1    18.    Attached hereto as Exhibit P is a true and correct copy of trial exhibit 293.

2    19.    Attached hereto as Exhibit Q is a true and correct copy of trial exhibit 379.

3         I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

4  10TH day of February 2022 in Los Angeles, California.

5

6                                                    _/s/ Daniel C. Posner_
                                                     Daniel C. Posner
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POSNER DECLARATION IN SUPPORT OF TESLA'S OPPOSITION TO MOTIONS *IN LIMINE*

# EXHIBIT A

Volume 5

Pages 700 - 842

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
                                   )
            Plaintiffs,            )
                                   )
   vs.                             ) No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   )  San Francisco, California
            Defendants.            )  Friday
                                   )  October 1, 2021
_____)  8:00 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          ALEXANDER MORRISON & FEHR LLP
                             1900 Avenue of the Stars
                             Suite 900
                             Los Angeles, California 90067
                      BY:  **BERNARD ALEXANDER, ESQ.**


                             CALIFORNIA CIVIL RIGHTS LAW GROUP
                             332 San Anselmo Avenue
                             San Anselmo, California 94960
                      BY:  **LAWRENCE A. ORGAN, ESQ.**
                           **CIMONE A. NUNLEY, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

```
 1   helped deliver material to the power train, and that's where
 2   they built the batteries, the modules and the drive units.
 3   Q.   Okay.  And did you still have to work with elevator
 4   operators in your new position?
 5   A.   Yes, I did.
 6   Q.   Did you have leads that reported to you at that time?
 7   A.   Yes, I did.
 8   Q.   Who were your leads that reported to you at that time?
 9   A.   Robert Hurtado, Hugo Gallegos, I believe his name was,
10   and -- oh, my goodness.  Umm, I'm drawing a blank right now.
11   Q.   Does Devin Williams ring a bell?
12   A.   Devin Williams, yes.
13   Q.   And when you moved upstairs to power train, did you
14   continue to have to work with Junior and Mr. Diaz?
15   A.   Yes, I did.
16   Q.   Did the issues you had with Junior and Mr. Diaz improve at
17   this time?
18   A.   No, they didn't.
19   Q.   Did any of your leads also complain to you about Junior
20   and Mr. Diaz?
21   A.   Yes, they did.
22   Q.   And what were their complaints?
23   A.   They would complain that Owen was never there.  I would
24   ask them why they weren't able to perform their jobs, and --
25           MR. ORGAN:  Objection, Your Honor.
```

DELAGRANDE - DIRECT / JENG

```
 1              THE COURT:  I'm sorry?

 2              MR. ORGAN:  Objection.  Hearsay.

 3              THE COURT:  So I'm going to overrule the objection,

 4   not that this -- you should take this for the truth of the

 5   matter asserted, because that would be hearsay, but because of

 6   what it made Ms. DelaGrande do after she was told of these

 7   alleged complaints.

 8        You may continue.

 9   BY MS. JENG

10   Q.   In response to complaints by your leads about Mr. Diaz,

11   did you relay those complaints to Mr. Romero?

12   A.   Yes, I did.

13   Q.   And what were those complaints that you relayed?

14   A.   They were that Owen was not there to support the elevator.

15   Q.   And when you say "not there," you mean not physically

16   there?

17   A.   Not physically there.

18   Q.   Okay.  Did you also personally observe that he was not

19   physically there?

20   A.   Yes, I did.  I went down looking for him at one point and

21   found him in the body-and-wait break area.

22   Q.   And did he -- would he have any reason for business to be

23   in that area?

24              MR. ORGAN:  Objection.  Leading, Your Honor.

25              THE COURT:  And it calls for speculation.  Sustained.
```

1    personal email to do that.

2        And at the time we really needed to be able to talk to him

3    to tell him exactly what product was supposed to go downstairs

4    and what product was supposed to come upstairs.

5    **BY MS. JENG**

6    Q.   Who were the leads that made you aware of this?

7    A.   Robert Hurtado and Devin Williams.

8    Q.   And did you speak with Mr. Diaz before or after you sent

9    this email to Mr. Romero?

10   A.   Yes.  It was before I spoke to Owen and he told me that my

11   leads were threatening him because they say they were going to

12   contact Mr. Romero.  And so I spoke to -- I sent this email

13   based on the fact that I needed to make him aware of the

14   issues.

15   Q.   If you look on Page 5, you see that Mr. -- I'm sorry.

16       In the middle of the page you email Mr. Romero again and

17   say that you prefer that he is placed somewhere else.  When can

18   we make this happen?

19       What were you asking Mr. Romero to do?

20   A.   I was asking Mr. Romero to replace Owen at the elevator.

21   Q.   What happened between your initial email and this email to

22   make you ask Mr. Romero to replace Mr. Diaz?

23   A.   We absolutely had to be able to communicate with the

24   elevator team, and Owen had made it clear that he did not want

25   my team speaking to him.  And so because of that, I wasn't able

1   Q.   How often did you interact with Mr. Hurtado at work?

2   A.   Every day.  Constantly.

3   Q.   Have you ever heard him say the "N" word at work?

4   A.   No.  That's not even a part of his vocabulary.  He doesn't

5   speak like that.

6   Q.   What do you mean by he doesn't speak like that?

7   A.   He would never say something like that.  That's just not

8   something that -- that's not him to talk like that.  He

9   doesn't -- he would never use that terminology.

10  Q.   And how many people worked on your team with Mr. Hurtado,

11  Devin Williams, and Hugo Gallegos?

12  A.   I believe we had about 20 people.

13  Q.   And did anybody on those teams complain to you about

14  Mr. Hurtado saying any sort of racial sure?

15  A.   Never.

16       MS. JENG:  No further questions?

17       THE COURT:  All right.

18  Mr. Organ.

19            CROSS-EXAMINATION

20  BY MR. ORGAN

21  Q.   Did you work with a Tom Kawasaki?

22  A.   I don't remember Tom.

23  Q.   On the elevators when you first were there in the fall of

24  2015?

25  A.   I don't remember his name, no.

1           That's what you wrote; right?

2    A.   I wrote that.  And then I also said that his response was

3    that he does not want anyone talking to him and he wanted

4    everyone to go through email.

5    Q.   And the reason he didn't want anyone talking to him is

6    because they were calling him the "N" word; right?

7    A.   It was never reported to me.  Devin and Robert were in

8    there -- in the elevator at the time, and never once did anyone

9    say anything about any derogatory terms being stated to him.

10   Q.   Let's go to the next day.  If you go to Exhibit 300.

11   A.   Uh-huh.

12   Q.   And if you look at that exhibit, it says --

13           MR. ORGAN:  Oh.  I move Exhibit --

14   BY MR. ORGAN

15   Q.   That's your email; correct?

16   A.   Yes.

17   Q.   Huh?

18   A.   Yes, that's my email.

19           MR. ORGAN:  Okay.  I would move Exhibit 300 into

20   evidence Your Honor.

21           THE COURT:  Any objection?

22           MS. JENG:  No objections.

23           THE COURT:  All right.  It's admitted.

24        (Trial Exhibit 300 received in evidence)

25

1   staff that worked with me, and he's the only name that I had.

2   Q.   Isn't it true that in the October to December 2015 time

3   period, Owen made complaints about your folks; right?

4   A.   Not to me.

5   Q.   Didn't Ed Romero tell you that Owen Diaz had problems with

6   your leads at that point in time?

7   A.   No.

8   Q.   Your people complained a lot about the elevators, didn't

9   they?

10  A.   Yes, they did.

11  Q.   Let me ask you just another question.  Let's assume that

12  all your testimony about Owen's performance in that February

13  time period is correct.  Do you think that would justify him

14  being called the "N" word in the workplace?

15  A.   Absolutely not.

16  Q.   And would you agree that if Mr. Diaz had to endure hearing

17  the "N" word all over the Tesla factory, that would have been a

18  hostile work environment under the policies that you heard

19  about from Tesla; right?

20          MS. JENG:   Objection.   Argumentative.

21          THE COURT:   Overruled.

22          THE WITNESS:   If that had happened, it -- somebody

23  would have said something to me.   Over half my team was

24  African-American.   If anybody had stated that -- if anybody had

25  said something like that, it would have gotten back to me.

**DELAGRANDE - CROSS / ORGAN**

1    They would have said something to me.

2         And during this whole time, I never was told that this had

3    had happened.   The only issues I had with Owen were based on

4    his performance.

5    BY MR. ORGAN

6    Q.   Did you work in HR?

7    A.   No, I didn't, but I worked very closely with HR.

8    Q.   Oh, you did?

9    A.   So if I had any wishes him and if I had heard that it

10   happened, I would have immediately contacted them.

11   Q.   Did HR ever tell you:  You know, we've got a lot of people

12   complaining about the "N" word?  No one --

13   A.   No, they didn't --

14   Q.   -- ever said that?

15   A.   -- tell me that at all.

16   Q.   And isn't it true, ma'am, that when you walked around the

17   factory, you could just hear the "N" word?

18   A.   No, you couldn't.  I worked there for nine years and that

19   was never an issue at Tesla.

20   Q.   You never heard the "N" word the entire time --

21   A.   Not at Tesla --

22   Q.   -- you worked there?

23   A.   -- no.  I --

24        THE COURT:  Excuse me.  Excuse me.  You're not having

25   an argument, either of you.

**MARTINEZ - DIRECT / KENNEDY**

1    was the lead elevator operator of that elevator.

2         So basically before he came out to the organization, we

3    were able to operate the elevator.  When he got hired, he got

4    hired as lead elevator operator of that -- those two elevators.

5    Because there were -- there is two elevators through which we

6    need to transport all the material that we collect from second

7    floor to the bottom floor at specific times are really critical

8    for -- it was critical in that moment because as soon as we get

9    to the second -- closer to the first shift, which starts at

10   6:00 o'clock in the morning, all the materials that we need for

11   second floor to build up the batteries needs to be transported

12   through the elevator.

13        So I got a call from one of my teammates saying that he

14   has -- she has so many hard time to transport, to send the

15   material down because Mr. Diaz wasn't there.  And when she was

16   trying to use the elevator, that's when Mr. Diaz show up and he

17   start yelling and being aggressive against to her.

18        So that's at the time that I went to the elevator.  When I

19   was arriving to the elevator, Mr. Diaz --

20   Q.   I'm sorry.  I'm sorry.  You need to slow down.  The court

21   reporter is taking this down, and she's giving me a look of

22   stress.

23            THE COURT:  Why don't we proceed by questions and

24   answers?

25            MS. KENNEDY:  Okay.  Yes.

MARTINEZ - DIRECT / KENNEDY

1   BY MS. KENNEDY

2   Q.   So, Mr. Martinez, you said a team member came to you with

3   some issues.  Who was that team member, if you recall?

4   A.   Hilda Navarro.

5   Q.   Navarro?

6   A.   Navarro.

7   Q.   So, Mr. Martinez, when this team member came to you with

8   concerns, what were those concerns?

9   A.   That she wasn't able to execute her job because Mr. Diaz,

10  he wasn't there.  And when he arrived and she was trying to use

11  the elevator, he was really aggressive in the way he was

12  talking to her.

13  Q.   And once you got that feedback from Ms. Navarro, what did

14  you do, if anything?

15  A.   Well, that was a phone call when she called me, so I was

16  out there helping some other team members.  So I just hopped in

17  the little cart, tugger, and drive all the way to Elevator

18  No. 1, which is the one -- the main one that he used to

19  operate.

20       And then I -- when I arrived there, he already was there.

21  So when I was -- I just go say:  What's going on?  Why we don't

22  get our material down?

23       And he was:  This is my elevator.  I do whatever.

24       And I goes:  What?  Excuse me.  This is the critical time

25  for the team to bring everything.

1          **THE COURT:**  Mr. Martinez, slow down and let's go

2     questions and answers so that we break this up a little bit.

3          **THE WITNESS:**  Sorry.

4     BY MS. KENNEDY

5     **Q.**   Is this your first time testifying?

6     **A.**   First time, yeah.

7     **Q.**   Okay.  So when you got to the Elevator No. 1 and Mr. Diaz

8     was there --

9     **A.**   Uh-huh.

10    **Q.**   -- was anyone else there that you recall?

11    **A.**   Not that I remember.

12    **Q.**   Okay.  So when you got there and you saw Mr. Diaz, tell

13    me, what did Mr. Diaz do or say?

14    **A.**   He usually standing up at the front of the elevator.  And

15    basically I just went down and asked him:  What was the

16    problem?  Why we don't have our material coming down?

17    **Q.**   And then what did he say in response?

18    **A.**   He say:  This is my elevator, and I do things in the way I

19    want it.

20         And I was like:  Okay.  Your elevator.  Well, this is a

21    critical time for us and we need all the material to come down

22    before PC starts shutting everything down.

23    **Q.**   When you were and Mr. Diaz were yelling at each other, how

24    would you describe it?

25    **A.**   Well, we both were raising the voice.  I considered that

MARTINEZ - DIRECT / KENNEDY

1    probably we were yelling maybe, yeah, because we were raising

2    our voices.

3    Q.   Would you say it was a heated -- a heated exchange of

4    words?

5    A.   No.  I -- I don't know.

6    Q.   Okay.  So after you had this discussion with Mr. Diaz,

7    what happened next?

8    A.   Well, I -- I ended the conversation since he wasn't able

9    to work for a solution for the -- to set elevator right there.

10   I just turned around and I tell him I will send an email

11   regarding his attitude against to -- to the work.

12   Q.   And when you told Mr. Diaz you were going to send an

13   email, what did he say, if anything?

14   A.   I believe he said that he would send an email as well,

15   too.

16   Q.   And did you, in fact, send an email about this incident

17   with Mr. Diaz?

18   A.   I sent it to Mr. Romero, yes.

19   Q.   And why did you feel that you needed to send this email to

20   Mr. Romero?

21   A.   Because this is -- that was not the first time that I

22   heard complaints about his attitude, about his never being on

23   the work area to execute the job and when our teammates are

24   trying to use the elevator.  Like I say, we used to use the

25   elevator.  We knew how to operate the elevator.  He was

# EXHIBIT B

| From: | Josue Torres </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JOSUE ELISEO TORRESC2B> |
|---|---|
| To: | Edward Romero; Jaime Salazar |
| Sent: | 10/17/2015 12:19:06 PM |
| Subject: | RE: Owen |

Edward,

Thanks. Please send an update when you get the chance or feel free to give me a call.

Josue

---

**From:** Edward Romero
**Sent:** Saturday, October 17, 2015 6:59 AM
**To:** Josue Torres <jotorres@teslamotors.com>; Jaime Salazar <jsalazar@teslamotors.com>
**Subject:** Fwd: Owen

Josue, I will investigate this today. Thanks

Sent from my Verizon 4G LTE Smartphone
---------- Forwarded message ----------
From: Ramon Martinez <rammartinez@teslamotors.com>
Date: Oct 17, 2015 4:56 AM
Subject: Owen
To: Edward Romero <edromero@teslamotors.com>
Cc: Josue Torres <jotorres@teslamotors.com>

Hi Mr Romero I just want to bring to your attention that the lead for the elevator (Owen) he's not acting on the professional way with me and I would like to talk to you about it if there's any situation I like to fix it please
Thank you



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 234**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

CONFIDENTIAL

EXHIBIT C

Message

| | |
|---|---|
| From: | Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR QUINTERO3A3] |
| Sent: | 10/2/2015 6:43:54 PM |
| To: | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Edward Romeroe38] |
| CC: | Jaime Salazar [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jaime Salazar6ee] |
| Subject: | RE: Owen Diaz - Verbal Warning |

Thank you for the update and good job.

vq

From: Edward Romero
Sent: Friday, October 02, 2015 8:50 AM
To: Victor Quintero <vquintero@teslamotors.com>
Cc: Jaime Salazar <jsalazar@teslamotors.com>
Subject: Owen Diaz - Verbal Warning



EXHIBIT  6
WIT:  Diaz
DATE:  5-22-18
Candy Newland, CSR #14256

Victor,

Jaime and myself met today to discuss with Owen Diaz a number of issues dealing with Owen's negative interaction with other recycle employees. We had received a number of complaints from Hilda Navarro, Aron Dehardo and Jesse Leite. They expressed their complaints regarding Owen's temper, lack of professionalism, bad communication and gossiping about them to other employees. After Jaime and me investigated what has been going on during these past 3 weeks, we felt it was necessary to discuss these serious matters with Owen directly. We met with him for approximately 45 minutes early today. We expressed the negative interaction he has had with others and the effect this has had on others. Our goal was to see if he was willing to listen, learn and change his attitude and see if he was willing to make the necessary improvements. Here is what we discussed with him:

1. We informed him that we had received complaints from Hilda, Aron and Jesse regarding his lack of professionalism, gossiping, anger issues and accusations he had made towards them. We mentioned to him that we had also given them practical counsel on how they too can improve on communication and professionalism, and that they had accepted the counsel. At first he did resist and tried to justify and minimize his actions. When we told him there were witnesses and others who had observed his actions he accepted and said that yes he probably did act that way. We mentioned to him that our goal was to have a unified group with Leads setting a good example of leadership, professionalism, leading by example.

2. He must promote a spirit of teamwork, good communication and respect towards others.

3. He must control his emotions and anger. He tried to say that we were judging him based solely on his use of gestures, and that that is the way he talks. I mentioned to him that there were witnesses to the way he talks and shows anger towards others. He then had to accept.

4. He must never allow himself to make comments regarding anyone's personal life, business or relationships. He said he understood.

5. He must avoid talking to others negatively about other Leads or other employees. We discussed the concerns Jesse Leite had regarding Owen's negative comments he has made about him to other employees. Although he first tried to deny this he finally agreed that he needs to stop this and make improvements. He said he would try to take steps to improve his relationships with others, including Jesse.

We mentioned to Owen that we wanted to see definite improvements regarding these issues and did not want to have to revisit these issues in the future. We mentioned to him that he had been promoted to lead because we had confidence that he could be a good lead, but if these problems continued then we would have to make changes. He said he understood and would make the necessary changes.

CONFIDENTIAL

CONFIDENTIAL

# EXHIBIT D



**From:** Owen Diaz <sfrednose@gmail.com>
**Date:** October 17, 2015 at 6:08:48 AM PDT
**To:** "edromero@teslamotors.com" <edromero@teslamotors.com>, "Tom @ Tesla" <tkawasaki@teslamotors.com>
**Subject:** Ramon

Mr. Romero today @ 4:45 am I was working elevator 1 with rothaj foster  training him, when the elevator doors opened  on the first floor and we saw Ramon siting there. At the time I was explaining to Rothai  what you had told me about the outside team and inside team and what his duties consisted of. I was  explaining him that Tom would no longer be his supervisor it was going to be you. For some reason Ramon jump off the tugger he was on and started yelling at me in a Threatening manner, saying you have a problem with me! why are you telling him who his supervisor is! When I did not say anything to Ramon followed me into the elevator and stood next to the forklift I was on and keep yelling at me. I thought he was going to hit me. so I asked him to please step back. because of his threatening manner and reminded Ramon we were on camera. Mr. Romero because of the way Ramon was acting I don't feel safe around him now. Can you please talk to him I don't need any problems. I just want to do my job. You can check the surveillance system to confirm. I contacted Tom for advice and he said, if you don't have excess surveillance system please contact him.

Sent from my iPhone

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 235**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

ODIAZ000003

**EX 235-001**

# EXHIBIT E

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

Volume 2
Pages 172 - 368

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           )  No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   )  San Francisco, California
          Defendants.              )  Tuesday
_____  )  September 28, 2021
                                      8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:        ALEXANDER MORRISON & FEHR LLP
                       1900 Avenue of the Stars
                       Suite 900
                       Los Angeles, California 90067
                  BY:  BERNARD ALEXANDER, ESQ.

                       CALIFORNIA CIVIL RIGHTS LAW GROUP
                       332 San Anselmo Avenue
                       San Anselmo, California 94960
                  BY:  LAWRENCE A. ORGAN, ESQ.
                       CIMONE A. NUNLEY, ESQ.

     (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:        Debra L. Pas, CSR 11916, CRR, RMR, RPR
                    Official Reporter - US District Court
                    Computerized Transcription By Eclipse

---

173

APPEARANCES:  (CONTINUED)

For Defendants:        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       333 S. Hope Street
                       43rd Floor
                       Los Angeles, California 90017
                  BY:  TRACEY A. KENNEDY, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                       379 Lytton Ave
                       Palo Alto, California 94301
                  BY:  PATRICIA M. JENG, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       Four Embarcadero Center
                       17th Floor
                       San Francisco, California 94111
                  BY:  SUSAN Q. HAINES, ESQ.

Also Present:          JOSEPH ALM, ESQ.
                       - Tesla, Inc.

                       YUSUF MOHAMED, ESQ.
                       - Tesla, Inc.
                       _  _  _

---

174

PROCEEDINGS

1   Tuesday - September 28, 2021                8:01 a.m.
2                  P R O C E E D I N G S
3                      ---oOo---
4        (Proceedings were heard out of presence of the jury:)
5        THE COURT:  All right.  There are three things on my
6   mind this morning.  The first one, I saw the Marconi
7   designations and counterdesignations.  Did the plaintiffs
8   intend to respond to that, Marconi?
9        MR. ORGAN:  Yes, Your Honor.  I believe we did file
10  something late last night; or if not, then we're planning to
11  file something early this morning.
12       THE COURT:  Okay.  I didn't see it when I came in this
13  morning.
14       MR. ORGAN:  Okay.
15       THE COURT:  I could have missed it, so I'll go take a
16  look.
17       When do you expect -- when would you like to put that on?
18       MR. ORGAN:  I think at the earliest it would be
19  tomorrow, Your Honor.
20       THE COURT:  Okay.  I'll take a look; and if it's -- if
21  I can get at it while you're still here --
22       MR. ORGAN:  I'll check with my colleague to make sure.
23  I wasn't preparing it, so...
24       THE COURT:  All right.  Then the second thing is the
25  Demetri Di-az objections.  And I'll sustain the remaining

---

175

PROCEEDINGS

1   objections to the counterdesignations.  The employment-related
2   one on West Valley is not relevant, and 403 I think also
3   applies because it would be confusing.  And it's just --
4   there's not enough information, even if it was relevant, to
5   actually get his view on who he was employed by.
6        And the other designation, which is Designation Number 9,
7   what happened outside of the workplace doesn't matter.  The use
8   of the "N" word outside of the workplace doesn't matter, and I
9   think 403 also applies.
10       So that's my ruling on those.
11       And then the final thing on my mind is I am going to post
12  at some point, when I let Ms. Davis know that she can do it and
13  she has the time to do it, draft final Jury Instructions.  So
14  I've put them in the way that I think they ought to go.  I've
15  left the sequencing in the way that you did, but I now have
16  them in a form that we can actually use on Friday.
17       So what I want you to do is, if you have any objections to
18  the instructions, any additions to the instructions, anything
19  with respect to the instructions other than the way that
20  they're currently presented, post by Thursday at 3:00 o'clock
21  what else you would like to see in the instructions.
22       And refer to the instruction by the page number.  So I've
23  paginated them.  I've left the numbers at the top blank because
24  I don't think we'll be using all of the sort of general
25  instructions that are there.

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

264

JACKSON - CROSS / JENG

1  Q.   And it appeared to you that he was forwarding an email
2  from -- an email statement from October 17, 2015, that he
3  wrote; correct?
4  A.   It looks like he initially sent this to Ed Romero, and I
5  guess that he must have forwarded it to me.
6  Q.   That's right.
7       You recall Owen telling you about this incident he had
8  with Ramon and Rothaj Foster; correct?
9  A.   Uh-huh.
10 Q.   And then higher up in the email you forward the statement
11 to Ms. Garrett and say you're waiting for Rothaj and Ramon to
12 send their statement; correct?
13 A.   Yes.
14 Q.   Is that -- when you say Ramon's statement," is that a
15 typo?  Do you mean -- do you mean this is Owen's statement?
16 A.   It could be.  I don't recall.
17 Q.   Well, the statement below looks like it's written from
18 Owen; right?
19 A.   Yes.
20 Q.   Okay.  So does that --
21 A.   It could be a typo.
22 Q.   Okay.
23 A.   I don't recall.
24 Q.   Okay.  Because in the sentence immediately after that, you
25 say you're waiting for Rothaij and Ramon "to send me theirs";

---

265

JACKSON - CROSS / JENG

1  right?
2  A.   Once again, it could have been a typo.  It's been several
3  years.
4  Q.   And so the next email on 242-8, it was your understanding
5  that Ed was planning to meet with Rothaj, Owen, and Ramon;
6  correct?
7  A.   Yes.
8  Q.   And Terri asked you why Ed is meeting with them; correct?
9  A.   Yes.
10 Q.   Are you aware that Ms. Garrett later recommends that Ed
11 not be involved?
12 A.   I don't know if I was in that email.  I can't see.
13 Q.   Okay.  And Terri was the director of operations from
14 nextSource; right?
15 A.   Yes.
16 Q.   Okay.  So after you received this email statement from
17 Owen, did you speak with Owen again to give him an opportunity
18 to tell his side of the story?
19 A.   I most likely did; or if I did not, he was directed to
20 contact his agency.
21 Q.   Do you recall Owen saying anything to you about this
22 incident in his statement?
23 A.   I don't recall, ma'am.  It's been five, six years.
24 Q.   I understand.
25 A.   Yeah.

---

266

JACKSON - CROSS / JENG

1  Q.   Do you recall testifying that Owen's verbal statement to
2  you was different from what he put down in an email?
3  A.   I don't recall.  It could be the case.  I don't recall.
4  Q.   Okay.  I'll have you look at your deposition transcript,
5  Page 65, Line 19 through Page 66, Line 2.
6  A.   Which line?
7  Q.   65, Line 19 to 66, Line 2.
8       (Brief pause.)
9  A.   Yes.
10 Q.   Does this refresh your recollection that Owen actually
11 gave you a verbal statement that was different from what he
12 emailed?
13 A.   No.  That doesn't recall -- that doesn't jar my memory at
14 all, because it really doesn't deal with anything with regards
15 to his -- yeah.  I don't -- I don't recall that, no.
16 Q.   Well, what you testified to was that even though his email
17 said that he felt he was about to be struck, he did not express
18 that when he spoke to you; is that right?
19      MR. ALEXANDER:  Objection.  Argumentative.
20      THE COURT:  And I think you're referring to a
21 different section of the deposition than you've referred the
22 witness to.  You had him start on Page 65, Line 19.
23      MS. JENG:  Oh.  I'm sorry.
24 BY MS. JENG
25 Q.   Okay.  Can you look at 64/8 through 65/15 -- or, sorry.

---

267

JACKSON - CROSS / JENG

1  Yeah, 65/15.  Sorry about that.
2  A.   Yes.
3  Q.   Okay.  So does this refresh your recollection that what
4  Owen told you verbally was different than what he emailed in
5  his statement?
6  A.   If I remember correctly, it was more of them about to
7  actually get into a physical altercation.
8  Q.   Okay.  And is that what Owen articulated to you when he
9  spoke with you?
10 A.   I believe so, yeah.  He was more or less he's not going to
11 allow someone to talk to him like that.
12 Q.   Okay.  And when you spoke with Owen, you don't recall him
13 saying that Ramon was calling him the "N" word at all, do you?
14 A.   No, I do not recall that.
15 Q.   Okay.  You don't recall when Owen spoke to you saying that
16 Ramon used any racial slurs against him; correct?
17 A.   I don't recall it being any racial slurs.  At this point I
18 can't -- yeah, I can't recall that.  I don't think the racial
19 stuff came in until the drawings.
20 Q.   That's right.
21      Okay.  And then at this point you don't recall Owen
22 mentioning that Ramon had said, quote, "I hate you," "N" word;
23 is that right?
24 A.   No, I do not recall that at all.
25 Q.   Okay.  So your recollection of Owen's complaint against

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

268

JACKSON - CROSS / JENG

1  Ramon having anything to do with race was the drawing; correct?
2  A.   Yeah.  That's when the drawing -- is when the racial
3  aspect came in.  The first time it just seemed like an
4  argument, a verbal altercation that the two got into.
5       I don't recall any racial epithets being thrown either way
6  at that point or that I was notified of.  Like I said, it
7  wasn't until the drawings came that that portion came up.
8  Q.   Thank you.
9  A.   And once those drawings came, I know Tesla was immediately
10 notified.
11 Q.   Thank you.
12      Do you recall Ed Romero forwarding you Ramon Martinez's
13 complaint against Owen at some point related to this incident?
14 A.   I don't recall, but I'm not sure he probably did.
15 Q.   Okay.  Can you look at Exhibit 49, please?
16 A.   I don't have 49.
17      THE COURT:  It's in the black binder.
18      (Brief pause.)
19 BY MS. JENG
20 Q.   Do you recall receiving this?
21 A.   I don't recall, but I'm sure I did, yeah.
22 Q.   Okay.  Does that look like your email address right there?
23 A.   Yes.  It wasn't sent direct.  It looks like it was
24 forwarded to me from others, yes.
25 Q.   So you spoke with Ramon at some point and took notes; is

---

269

JACKSON - CROSS / JENG

1  that right?
2  A.   I believe so, yes.
3  Q.   And you took these notes on a laptop -- on a nextSource
4  laptop; is that right?
5  A.   It could have been on the laptop or handwritten.  I don't
6  recall.
7  Q.   Okay.  And when you left nextSource, those notes were
8  kept with nextSource; correct?
9  A.   Yeah.  Any files I had or anything were left with the
10 company.
11 Q.   Okay.  Can you look to Exhibit 76?
12      THE COURT:  Did you want 49 in evidence?
13      MS. JENG:  Oh, yes.  Yes.  Can we move that into
14 evidence?
15      THE COURT:  Is there any objection?
16      MR. ALEXANDER:  No objection.
17      THE COURT:  Admitted.
18 (Trial Exhibit 49 received in evidence)
19      MS. JENG:  Can we publish?
20 (Document displayed.)
21 BY MS. JENG
22 Q.   Do you recall that Ramon actually made his complaint
23 against Owen before Owen's complaint against Owen in -- Owen's
24 complaint against Ramon in 2015?
25 A.   I don't believe that was the case, but it could very well

---

270

JACKSON - CROSS / JENG

1  be.
2  Q.   Okay.
3  A.   They might have been simultaneous when they made their
4  complaints.
5  Q.   I'm sorry.  Can you repeat that last part?
6  A.   It might have been simultaneous or at the same time when
7  they made their complaints.  I'm not sure.
8  Q.   Okay.  Can I have you look at Exhibit 76.
9      MS. JENG:  This has been admitted.  May we publish?
10     THE COURT:  It's in?  I don't see that it is.
11     MS. JENG:  No.
12     THE COURT:  Oh, yes, it is.  I take it back.
13     Okay.  And you may publish.
14 (Document displayed.)
15 BY MS. JENG
16 Q.   Okay.  And at some point after you talked to Owen and
17 Ramon, you and Terri also spoke; is that right?
18 A.   Yes.
19 Q.   And when you spoke with either Owen or Ramon, neither of
20 them mentioned anything about race; is that right?
21 A.   No.  If I remember correctly, once again, at this point it
22 was more of a verbal altercation and they both were kind of
23 saying that the other shouldn't speak to them like that.
24 Q.   When you testified earlier, you testified that you didn't
25 know who Rothaj Foster was; correct?

---

271

JACKSON - CROSS / JENG

1  A.   Yeah.  I don't recall that name.
2  Q.   And you don't recall whether or not he was spoken to; is
3  that right?
4  A.   He most likely was, but I don't recall that.  That
5  individual name just doesn't stick out to me.  I can't remember
6  if he was a contractor, if he was a Tesla employee.  I don't
7  recall.  That particular name doesn't stand out to me.
8  Q.   Well, if you look at page -- or Exhibit 76-1 --
9  A.   Uh-huh.
10 Q.   -- in the top email you say (as read):
11      "Yes, I have spoken with all three and will be
12 speaking with Ramon and Owen again on Friday."
13      Does that refresh your recollection of whether or not you
14 spoke with Ramon, Owen, and Rothaj?
15 A.   I probably did.  Once again, I just don't recall Rothaj,
16 that name.  If I spoke to him, it was probably once or twice.
17 I don't even recall him as far as being an actual contractor
18 with nextSource or with any of the agencies.
19      So I'm not sure if he was a -- Tesla had their own
20 elevator people as well, so...
21 Q.   Okay.  You don't know why nextSource was instructing you
22 that -- to tell -- or -- strike that.
23      You testified earlier you don't know why Terri was
24 informing you that no formal investigation was needed; right?
25 A.   I don't recall that.  Once again, they weren't our

---

# EXHIBIT F

| From: | Wayne Jackson </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WAYNE JACKSON899> |
|---|---|
| To: | Garrett, Terri |
| Sent: | 10/21/2015 10:49:35 AM |
| Subject: | RE: Employee Relations issue - Tesla |

Yes I have spoken with all 3 and will be speaking with Ramon and Owen again on Friday.  I had a conversation with Ed at Victors desk yesterday and they just want us to verbally counsel each of them with regards to appropriate behavior in the workplace.  No written warning needed right now.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com



*Workforce Optimization, Business Enlightenment*

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Wednesday, October 21, 2015 10:47 AM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** RE: Employee Relations issue - Tesla

Confirming via this email that we agree we do not need to do any formal investigation with Ramon, Owen and Rothaj.

**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
**tgarrett@nextsource.com**
**www.nextsource.com**

**From:** Wayne Jackson [mailto:wajackson@teslamotors.com]
**Sent:** Monday, October 19, 2015 5:32 PM
**To:** Garrett, Terri <tgarrett@nextsource.com>
**Subject:** RE: Employee Relations issue - Tesla

Yes I'm actually on the phone now dealing with the Owen and Ramon issue.  This issue seems to be related to this and we really are going to have to do some in depth investigation.  I'll give you a call in a few minutes to discuss.

Wayne Jackson
1040 Avenue of the Americas, 24th Floor
New York, NY 10018
Mobile: (917) 797-9984
wajackson@teslamotors.com
www.nextsource.com

CONFIDENTIAL

<table>
<tr><td>UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br><br>**EX 076**<br><br>CASE NO. 17-cv-06748-WHO<br><br>DATE ENTERED _____<br><br>BY _____<br><br>DEPUTY CLERK</td></tr>
</table>

TESLA-0000646

**EX 076-001**



*Workforce Optimization, Business Enlightenment*

**From:** Garrett, Terri [mailto:tgarrett@nextsource.com]
**Sent:** Monday, October 19, 2015 2:17 PM
**To:** Wayne Jackson <wajackson@teslamotors.com>
**Subject:** FW: Employee Relations issue - Tesla
**Importance:** High

Wayne, did you receive this from me on Friday?


**Terri Garrett**
Director of Operations
**nextSource**

**Office:** (949) 329-2581
**Mobile:** (562) 714-0552
**tgarrett@nextsource.com**
**www.nextsource.com**

CONFIDENTIAL

TESLA-0000647

**EX 076-002**

EXHIBIT G

| | |
|---|---|
| **From:** | Victor Quintero </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VICTOR QUINTERO3A3> |
| **To:** | Edward Romero |
| **Sent:** | 2/19/2016 7:26:53 AM |
| **Subject:** | RE: Elevator team end of week |

Thank you very much for coming in at the middle of the night to address the issue. You are definitely showing a lot of commitment and dedication.

Victor

---

**From:** Edward Romero
**Sent:** Friday, February 19, 2016 4:24 AM
**To:** Victor Quintero <vquintero@teslamotors.com>
**Subject:** FW: Elevator team end of week

Hello Victor,

I came in at 2:00 am because I thought this was an urgent issue that must be dealt with. Besides the email interaction with Joyce, I came in to meet with her and here leads. I met them in the bull pen where she has her office. They aired their concerns and I asked a number of questions to assure they knew we are concerned and to assure I had a clear picture of what was happening.

I then met with Owen. I explained the concerns the production staff had and at first he tried to justify his and his groups activities. I explained the seriousness of the  failure to respond with a sense of urgency, failure to keep the elevators manned at all times and his failure in wondering away from the elevators. I also emphasized his failure in adequately supervising his crew and not setting a good example to his staff.

I informed him that this would more than likely lead to a write up. I will meet with Wayne to explain the situation to him and have him prepare a write up. Owen says he will make corrections with his crew within one week. I explained that he must do everything possible to change the perception production has of him and his crew.

Thanks

ER

---

**From:** Edward Romero
**Sent:** Friday, February 19, 2016 2:36 AM
**To:** Joyce Delagrande
**Cc:** Hugo Gallegos; Devin Williams; Robert Hurtado; Victor Quintero
**Subject:** RE: Elevator team end of week

Joyce, I appreciate and value your input. Rest assured that I will deal with this issue quickly. I am here on site now and will meet with Owen. I would appreciate any input if your staff wants to email me with any concerns.

Please keep me informed of any new concerns that may come up over the weekend or in the future.

Thanks,

Edward Romero

**From:** Joyce Delagrande
**Sent:** Friday, February 19, 2016 1:59 AM
**To:** Edward Romero
**Cc:** Hugo Gallegos; Devin Williams; Robert Hurtado
**Subject:** RE: Elevator team end of week

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 296**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

TESLA-0000741

Hi Edward,

Thank you for your fast response. I only came to you because you have been so helpful in the past. My understanding is that they have had issues with the end of the week staff for a while. Like I said Troy and Ruben seem to not have any issue taking care of the area and if they need help they are quick to ask for assistance but I don't feel it is ever because they are not working hard. I really brought it up because I had the same concerns downstairs with Own and his teams. They would always tell me it was because of what they were doing with the PWT material but if they are struggling up here too and the beginning of the week team does not then I think it may be the team. I personally brought these concerns to the team tonight. I spoke to Junior first and then went and asked Owen to go over and help him. Both times it required my leads to get involved, and at one point the supervisor from the battery pack area to help as well to get caught up. I really have issues when I find out Supervisors from other areas are having to jump in and help.

My understanding is that Junior always has an excuse as to why he does not get it done but I don't believe he is disrespectful. Owen just has no sense of urgency at all. He tells me what he thinks I want to hear but I struggle getting him to actually stay on task. I have watched him driving around on the tugger talking to my female associates when he should be at the elevators assisting his team.

Team,

Please add any feedback you have as it can only help Edward assist in providing the best service.

*Joyce DelaGrande*
*Production Control Supervisor-Powertrain*
*510-600-7448 Cell*
*Email : jdelagrande@teslamotors.com*
 TESLA MOTORS
*45500 Fremont Blvd.,Fremont, CA. 94538*

---

**From:** Edward Romero
**Sent:** Friday, February 19, 2016 1:48 AM
**To:** Joyce Delagrande <jdelagrande@teslamotors.com>
**Cc:** Hugo Gallegos <HGallegos@teslamotors.com>; Devin Williams <devwilliams@teslamotors.com>; Robert Hurtado <rhurtado@teslamotors.com>
**Subject:** Re: Elevator team end of week

Hi Joyce,
I am really concerned if you are not receiving the help and service required from any of the elevator operators. If you can provide me with enough details to identify how best to make any corrections and if necessary counsel where necessary.
Please provide me with any info that would help for example:

1. Are these concerns new or has this been going on for a while?
2. Has any of these concerns been brought up directly to these operators, if so, how have they responded?
3. How would your staff describe the issues.
4. Have any of the elevator staff been disrespectful in any way to your staff?
5. You mention that your leads can provide better feedback. Please have them email me asap if they can.

We want to provide you with the best service possible. I expect that all my staff be serious and professional at all times. We try very hard to instill in them a sense of urgency when it comes to delivery of production materials. I also want them to be respectful and provide good customer service at all times.

I appreciate your comments and input. Rest assured that we will look into this and make whatever corrections are required.

Thanks,

TESLA-0000742

**EX 296-002**

Edward Romero
Building Services Contract Supervisor
1-510-648-7393

Sent from my Verizon 4G LTE Smartphone
On Feb 19, 2016 12:49 AM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
Hi Edward,

I am so sorry I have not had a chance to meet up with you. I am just learning how PWT works and adjusting to the night shift but I promise I will come in early one day to meet with you.

I do need to bring up a concern that we are having and I know we have previously discussed issues downstairs with this team as well. I am adding my leads because they have more feedback they can share with you. The beginning of the week the team is awesome! Troy and I believe his name is Ruben are really helpful. They do a great job in making sure everything is taken care of and communicate to us if they need any assistance. The later part of the week we have Junior and Owen and sadly the same issues I had with them downstairs I have upstairs. We worked with our BIW team to ensure we had coverage for the new shift in battery pack to avoid issues with downtime and it seems to be the issues are more with the elevator team the end of the week. My leads and I have had to go run the packs, enclosure carts and other product up and down ourselves tonight to ensure the line stays running. They both seem to have no sense of urgency and it is taking away from the tasks I really do need my leads to be working on. Is there anything you can do to assist us?

Team,

Please make sure to let Edward know of any issues you are having or have had with this end of week crew so Edward can help us.

Thank you!

*Joyce DelaGrande*
*Production Control Supervisor-Powertrain*
*510-600-7448 Cell*
*Email : jdelagrande@teslamotors.com*
**T E S L A** TESLA MOTORS
*45500 Fremont Blvd.,Fremont, CA. 94538*

# EXHIBIT H

| Message | |
| --- | --- |
| **From:** | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38] |
| **Sent:** | 3/4/2016 4:49:32 AM |
| **To:** | Joyce Delagrande [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jdelagrande] |
| **CC:** | Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3]; Cameron Smith [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Cameron LaHaie Smith3ab]; Jeremy Fabian [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jeremy Fabian96d] |
| **Subject:** | RE: Owen |

Hi Joyce,
I can understand your frustration. We are not ignoring your concerns. I have communicated your concerns to my manager and am working to make the changes. I want to handle this appropriately.
We are looking for a qualified person who we can put in to the lead  position. I want to replace two staff members who are currently working nights. If you feel that you want to communicate with my manager please feel free to do so. I report to Victor Quintero.
With the increased production I want to make an effective transition with minimal effect on production.

I hope you understand. The situation will be resolved very soon. I am already speaking to associates who are interested in changing shifts.

Thanks,

Edward Romero
Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Mar 3, 2016 8:28 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
Edward,

I was just notified that Owen is still working on the elevator. Can you tell me when we will be receiving a replacement for him? He made it clear last week that he does not want to have anything to do with my leads and I need to have someone working the elevator that they can communicate with.

**Joyce DelaGrande**
Production Control Supervisor-Powertrain
510-600-7448 Cell
Email : jdelagrande@teslamotors.com
**T E S L A** TESLA MOTORS
45500 Fremont Blvd.,Fremont, CA. 94538

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 303**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

**From:** Joyce Delagrande
**Sent:** Saturday, February 27, 2016 10:13 AM
**To:** Edward Romero <edromero@teslamotors.com>
**Subject:** Re: Owen

Thank you. The day before he made it clear he did not want my associates talking to him but it seems it's only the leads Robert and Hugo...and those are the two leads in charge of the elevator. I caught him talking bad about them to other associates last night and I really can not have the disrespect having within the area.

CONFIDENTIAL

Joyce

Sent from my iPhone

On Feb 27, 2016, at 6:12 AM, Edward Romero <edromero@teslamotors.com> wrote:

> Hi Joyce,
> I am in the process of doing that real soon. Working with my boss and his agency.
>
> Talk to you on Monday.
>
> Edward Romero
>
> Sent from my Verizon 4G LTE Smartphone
> On Feb 26, 2016 11:38 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
> Edward,
>
> I would really prefer that he is placed somewhere else. When can we make this happen? I think the issues have been going on long enough to show he is not improving.
>
> Joyce
>
> Sent from my iPhone
>
> On Feb 26, 2016, at 7:11 PM, Edward Romero <edromero@teslamotors.com> wrote:
>
> > Hi Joyce, I am working on this and will keep young posted.
> >
> > Sent from my Verizon 4G LTE Smartphone
> > On Feb 26, 2016 5:41 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
> > Thank you Edward! I really appreciate your support with this issue. The rest of your team is doing an awesome job-we even noticed Junior stepping up. I truly appreciate you making sure we have that teamwork atmosphere that is much needed here at Tesla.
> >
> > Joyce DelaGrande
> > Production Control Supervisor-Powertrain
> > 510-600-7448 Cell
> > Email : jdelagrande@teslamotors.com
> > <image001.jpg>  TESLA MOTORS
> > 45500 Fremont Blvd.,Fremont, CA. 94538
> >
> > **From:** Edward Romero
> > **Sent:** Friday, February 26, 2016 6:00 AM
> > **To:** Joyce Delagrande <jdelagrande@teslamotors.com>
> > **Cc:** Victor Quintero <vquintero@teslamotors.com>
> > **Subject:** Re: Owen
> >
> > Good morning Joyce,
> >
> > I am sorry to hear about this issue. I will deal with this matter and contact you if I have any questions or need  clarification. I agree that we must maintain good communication, be professional and work together as a team at all times.

**EX 303-002**

Thanks,

Edward Romero
Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Feb 26, 2016 1:24 AM, Joyce Delagrande <jdelagrande@teslamotors.com>
wrote:
Hi Edward,

So I am having a few more issues with Owen. Tonight my lead approached him to talk to
him and he said for my associates to only talk to him if it is related to business because
there are "so many snakes here at Tesla" . I guess he was having a "personal
conversation "on the elevator with someone and felt Robert saying hi to him was rude.
So my lead was coming out of the elevator and showed him a gear case rack that
needed to go downstairs. His response to my lead was he does not want anyone talking
to him, he we want him to do anything we have to email him. I do not personally have
his email and I was unaware of this process change.

Owen is now here telling me that my associate threatened him because he said was
going to contact you. I have instructed my leads to contact me if there are any more
issues with him because we are really struggling with his customer service and it was not
a threat, it was us letting him know that we really need the work to be done and if he
will not do this we will contact his manager. My leads come to me if any of our
associates have issues and since you are his boss he simply said he would contact you.
Owen just told me he does not want my leads/associates talking to him anymore, he
tried to tell me that he needs them to text him. I told him my leads should not have to
text to him. He told me the rack my leads asked him to move did not need to be moved.
He got a little loud and told my lead again to not talk to him.

My leads are telling me they feel really uncomfortable with him now, do you have
anyone else that you send up here to work the elevator? He has a huge attitude and
they do not feel at all as if he is approachable-especially now that he said not to talk to
him. I have absolutely no issues at all with the team in the beginning of the week and I
would love to be able to have a crew to work with the end of the week with the same
work ethic.

Thank you Edward!

Joyce DelaGrande
Production Control Supervisor-Powertrain
510-600-7448 Cell
Email : jdelagrande@teslamotors.com
<image001.jpg>  TESLA MOTORS
45500 Fremont Blvd.,Fremont, CA. 94538

CONFIDENTIAL

| Message | |
|---|---|
| **From**: | Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EDWARD ROMEROE38] |
| **Sent**: | 3/6/2016 11:15:06 PM |
| **To**: | Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3] |
| **Subject**: | FW: Owen |

seems this went to my outbox and was not delivered to you.

FYI

ER

**From:** Edward Romero
**Sent:** Thursday, March 03, 2016 8:49 PM
**To:** Joyce Delagrande
**Cc:** Victor Quintero; Cameron Smith; Jeremy Fabian
**Subject:** RE: Owen

Hi Joyce,
I can understand your frustration. We are not ignoring your concerns. I have communicated your concerns to my manager and am working to make the changes. I want to handle this appropriately.
We are looking for a qualified person who we can put in to the lead  position. I want to replace two staff members who are currently working nights. If you feel that you want to communicate with my manager please feel free to do so. I report to Victor Quintero.
With the increased production I want to make an effective transition with minimal effect on production.

I hope you understand. The situation will be resolved very soon. I am already speaking to associates who are interested in changing shifts.

Thanks,

Edward Romero
Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Mar 3, 2016 8:28 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
Edward,

I was just notified that Owen is still working on the elevator. Can you tell me when we will be receiving a replacement for him? He made it clear last week that he does not want to have anything to do with my leads and I need to have someone working the elevator that they can communicate with.

Joyce DelaGrande
Production Control Supervisor-Powertrain
510-600-7448 Cell
Email : jdelagrande@teslamotors.com
**T E S L A** TESLA MOTORS
45500 Fremont Blvd.,Fremont, CA. 94538

**From:** Joyce Delagrande
**Sent:** Saturday, February 27, 2016 10:13 AM

TESLA-0000324

**EX 303-004**

**To:** Edward Romero <edromero@teslamotors.com>
**Subject:** Re: Owen

Thank you. The day before he made it clear he did not want my associates talking to him but it seems it's only the leads Robert and Hugo...and those are the two leads in charge of the elevator. I caught him talking bad about them to other associates last night and I really can not have the disrespect having within the area.

Joyce

Sent from my iPhone

On Feb 27, 2016, at 6:12 AM, Edward Romero <edromero@teslamotors.com> wrote:

> Hi Joyce,
> I am in the process of doing that real soon. Working with my boss and his agency.
>
> Talk to you on Monday.
>
> Edward Romero
>
> Sent from my Verizon 4G LTE Smartphone
> On Feb 26, 2016 11:38 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
> Edward,
>
> I would really prefer that he is placed somewhere else. When can we make this happen? I think the issues have been going on long enough to show he is not improving.
>
> Joyce
>
> Sent from my iPhone
>
> On Feb 26, 2016, at 7:11 PM, Edward Romero <edromero@teslamotors.com> wrote:
>
>> Hi Joyce, I am working on this and will keep young posted.
>>
>> Sent from my Verizon 4G LTE Smartphone
>> On Feb 26, 2016 5:41 PM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
>> Thank you Edward! I really appreciate your support with this issue. The rest of your team is doing an awesome job-we even noticed Junior stepping up. I truly appreciate you making sure we have that teamwork atmosphere that is much needed here at Tesla.
>>
>> Joyce DelaGrande
>> Production Control Supervisor-Powertrain
>> 510-600-7448 Cell
>> Email : jdelagrande@teslamotors.com
>> <image001.jpg>  TESLA MOTORS
>> 45500 Fremont Blvd.,Fremont, CA. 94538
>>
>> **From:** Edward Romero
>> **Sent:** Friday, February 26, 2016 6:00 AM
>> **To:** Joyce Delagrande <jdelagrande@teslamotors.com>

CONFIDENTIAL

**Cc:** Victor Quintero <vquintero@teslamotors.com>
**Subject:** Re: Owen

Good morning Joyce,

I am sorry to hear about this issue. I will deal with this matter and contact you if I have any questions or need clarification. I agree that we must maintain good communication, be professional and work together as a team at all times.

Thanks,

Edward Romero
Building Services Contract Supervisor

Sent from my Verizon 4G LTE Smartphone
On Feb 26, 2016 1:24 AM, Joyce Delagrande <jdelagrande@teslamotors.com> wrote:
Hi Edward,

So I am having a few more issues with Owen. Tonight my lead approached him to talk to him and he said for my associates to only talk to him if it is related to business because there are "so many snakes here at Tesla" . I guess he was having a "personal conversation "on the elevator with someone and felt Robert saying hi to him was rude. So my lead was coming out of the elevator and showed him a gear case rack that needed to go downstairs. His response to my lead was he does not want anyone talking to him, he we want him to do anything we have to email him. I do not personally have his email and I was unaware of this process change.

Owen is now here telling me that my associate threatened him because he said was going to contact you. I have instructed my leads to contact me if there are any more issues with him because we are really struggling with his customer service and it was not a threat, it was us letting him know that we really need the work to be done and if he will not do this we will contact his manager. My leads come to me if any of our associates have issues and since you are his boss he simply said he would contact you. Owen just told me he does not want my leads/associates talking to him anymore, he tried to tell me that he needs them to text him. I told him my leads should not have to text to him. He told me the rack my leads asked him to move did not need to be moved. He got a little loud and told my lead again to not talk to him.

My leads are telling me they feel really uncomfortable with him now, do you have anyone else that you send up here to work the elevator? He has a huge attitude and they do not feel at all as if he is approachable-especially now that he said not to talk to him. I have absolutely no issues at all with the team in the beginning of the week and I would love to be able to have a crew to work with the end of the week with the same work ethic.

Thank you Edward!


Joyce DelaGrande
Production Control Supervisor-Powertrain
510-600-7448 Cell
Email : jdelagrande@teslamotors.com

CONFIDENTIAL

<image001.jpg>  TESLA MOTORS
45500 Fremont Blvd.,Fremont, CA. 94538

**EX 303-007**

# EXHIBIT I



**From:** Victor Quintero <vquintero@teslamotors.com>
**Date:** October 24, 2015 at 10:40:40 PM PDT
**To:** Edward Romero <edromero@teslamotors.com>
**Cc:** "odiazjr68@gmail.com" <odiazjr68@gmail.com>
**Subject: Re: Rothja Foster**

Feel free to call one of the elevator workers from an alternate shift if needed.

Victor

Sent from my iPhone

> On Oct 24, 2015, at 8:13 PM, Edward Romero <edromero@teslamotors.com> wrote:

> Owen, I received a call from Rothjan  about 30 minutes ago saying he was feeling sick and might go home. I again reminded him to communicate with you if he was going home. I asked him if he could make it if he was able take a brief break  and see if he felt better. He said he would try. Either way i instructed him to communicate with you.

> That's when I called you. Please touch base with him. You say you feel you and Froilan can handle  both elevators. Thanks for coordinating with Hilda to assist you with coverage of breaks/lunches.

> Thanks

> Sent from my Verizon 4G LTE Smartphone



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 245**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

**EX 245-001**



**From:** Lamar Patterson <lamarp28@gmail.com>
**Date:** February 26, 2016 at 6:39:56 PM PST
**To:** Owen Diaz <Odiazjr68@gmail.com>

On February 26
I can't remember the exact time, myself Owen and Robert were in the elevator going up. Owen and I were having a conversation when Robert rudely interrupted. Owen stop the conversation and turn to Robert and stated, Robert no disrespect but if this conversation doesn't have anything to do with our job, I prefer not to discuss it with you. Owen turned and started resuming talking  me, but Robert said, what's wrong with you why don't want you to talk let's discuss it. Owen told Robert he preferred to keep all conversations with him job related and if it didn't have anything to do with the job he did not want to talk about it. Robert got mad rode out of the elevator and told owen to pick up this rack and take it downstairs that's job related, Owen explain to Robert  we don't take the racks downstairs until later.  Robert  then threaten Owen by stating I'll just email Mr. Romero and tell him you're not doing your job. At no time did Owen get upset he kept calm. I don't know what going on but to me it seems like robert was the only one hostile in this encounter.

**EX 245-002**

# EXHIBIT J

| From: | Joyce Delagrande </O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JDELAGRANDE> |
|---|---|
| To: | Edward Romero |
| CC: | Victor Quintero |
| Sent: | 11/2/2015 4:02:11 AM |
| Subject: | RE: Elevators/Totes |

Hi Edward,

It was nice to meet you too…Tuesday would be great as I might be a little late Wednesday. I have been speaking with Owen lately…he is doing a great job over there!

*Joyce DelaGrande*
*Production Control Supervisor-South Dock*
*510-600-7448 Cell*
*Email : jdelagrande@teslamotors.com*

 **TESLA** MOTORS
*45500 Fremont Blvd.,Fremont, CA. 94538*

**From:** Edward Romero
**Sent:** Monday, November 02, 2015 1:25 AM
**To:** Joyce Delagrande <jdelagrande@teslamotors.com>
**Cc:** Victor Quintero <vquintero@teslamotors.com>
**Subject:** Elevators/Totes

Hi Joyce,
I was very happy to have met with you week before last. I wanted to know when we might get together for a brief time again. I have some information I would like to share  with you. A good time for me would be this week. Tuesday or Wednesday evening after 6:00 pm. Are you available then? Please let me know.
Thanks

Sent from my Verizon 4G LTE Smartphone

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 251**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

CONFIDENTIAL

# EXHIBIT K

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

---

2

Volume 1

Pages 1 - 171

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
                                   )
           Plaintiffs,             )
                                   )
    vs.                            )  No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   )  San Francisco, California
           Defendants.             )  Monday
_____)  September 27, 2021
                                      8:00 A.M.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:        ALEXANDER MORRISON & FEHR LLP
                       1900 Avenue of the Stars
                       Suite 900
                       Los Angeles, California 90067
                  BY:  BERNARD ALEXANDER, ESQ.

                       CALIFORNIA CIVIL RIGHTS LAW GROUP
                       332 San Anselmo Avenue
                       San Anselmo, California 94960
                  BY:  LAWRENCE A. ORGAN, ESQ.
                       CIMONE A. NUNLEY, ESQ.

           (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:      Debra L. Pas, CSR 11916, CRR, RMR, RPR
                  Official Reporter - US District Court
                  Computerized Transcription By Eclipse

---

2

APPEARANCES:  (CONTINUED)

For Defendants:        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       333 S. Hope Street
                       43rd Floor
                       Los Angeles, California 90017
                  BY:  TRACEY A. KENNEDY, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                       379 Lytton Ave
                       Palo Alto, California 94301
                  BY:  PATRICIA M. JENG, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       Four Embarcadero Center
                       17th Floor
                       San Francisco, California 94111
                  BY:  SUSAN Q. HAINES, ESQ.

Also Present:          JOSEPH ALM, ESQ.
                       - Tesla, Inc.

                       YUSUF MOHAMED, ESQ.
                       - Tesla, Inc.

                       VALERIE CAPERS WORKMAN
                       - Tesla, Inc.

                       -  -  -

---

3

PROCEEDINGS

1   Monday - September 27, 2021              8:02 A.m.
2                    P R O C E E D I N G S
3                        ---oOo---
4        (Proceedings held in open court, outside
5        the presence and hearing of the jury.)
6        THE COURT:  Good morning, everybody.  Be seated.
7        All right.  So there are a couple of things that were
8   filed with the McGinn.  I didn't see anything from the defense
9   on McGinn, so I'm assuming that you are in agreement that those
10  depositions -- that those objections should be overruled.
11       MS. KENNEDY:  Yes, Your Honor.  I believe that is
12  correct.
13       THE COURT:  Okay.  So I'm going to overrule the
14  objections to designations 6 and 13.
15       The next thing is the Nigel Jones motion.  Why is that
16  coming 19 months after I ruled?
17       MR. ORGAN:  Your Honor, I think when you ruled, it
18  was -- it was unclear to us whether or not we were going to be
19  able to use him in the case-in-chief or not, and that's the
20  issue because he did -- he was at the factory at the time that
21  Owen Diaz was there.
22       THE COURT:  Mr. Organ --
23       MR. ORGAN:  He worked in the -- yes, Your Honor.
24       THE COURT:  -- did you look at the order that I made
25  with respect to Mr. Jones?

---

4

PROCEEDINGS

1        MR. ORGAN:  Yes, I did, Your Honor.
2        THE COURT:  Given the absence of any overlap with
3   Diaz's work, work areas, or supervisors, this testimony is not
4   relevant to Diaz's case-in-chief.
5        As noted above, it could become relevant if Tesla relies
6   on the Faragher-Ellerth defense.  That determination will be
7   determined at trial.
8        MR. ORGAN:  Yes, Your Honor.
9        THE COURT:  So if it's coming in, it's coming in in
10  rebuttal.
11       MR. ORGAN:  Yes, Your Honor.
12       THE COURT:  Okay?
13       MR. ORGAN:  I understand.  Thank you.
14       THE COURT:  You filled in zero gaps that I identified
15  with respect to Mr. Jones' testimony.  Was he deposed in this
16  case?
17       MR. ORGAN:  No.  He's been a witness in two
18  arbitrations.  Defendant has cross-examined him twice.
19       THE COURT:  All right.  Well, so he's not testifying
20  unless the situation changes with respect to what Tesla does
21  with respect to his defense.
22       MR. ORGAN:  Okay.  Thank you, Your Honor.
23       THE COURT:  And let me make this suggestion, that you
24  spend your time working on your case and not trying the case in
25  the papers.  The lawyers need to focus on what happens in this

---

45

OPENING STATEMENT / KENNEDY

1    THE COURT:  Please.
2       MS. KENNEDY:  Good morning, ladies and gentlemen of
3    the jury.
4       May it please the Court, my name is Tracey Kennedy, and
5    I'm one of the attorneys representing Tesla, Inc. in this
6    matter.
7       I'm going to introduce you to our trial team and our
8    client representative.  It's Valerie Capers Workman.  She is
9    the Vice-President People and Human Resources.
10      You already met Yusuf Mohamed, who is the Deputy General
11   Counsel of Tesla, as well as Joseph Alm, Senior Counsel.
12      And my trial team is -- my co-counsel is Patricia Jeng,
13   Susan Haines, and my trustee trial tech is Stephanie Limbaugh.
14   We are the legal team representing Tesla in this case.
15      Let me just first start off by saying a couple things what
16   this case is about and tell you what it's not about.
17      The first thing it is not about is Tesla by any means
18   tolerating racial harassment in the workplace.  It's not about
19   Tesla not taking responsibility for racial harassment in the
20   workplace.  And it's not about Tesla being an organization
21   that's going to say:  You know what?  It is simply okay for
22   people to be racially harassed in the workplace.  That is not
23   what this case is about.
24      What this case is about is about Owen Diaz.  First and
25   foremost, Owen Diaz was never a Tesla employee at all.  He was

46

OPENING STATEMENT / KENNEDY

1    always an employee of CitiStaff and by extension nextSource.
2       This is also a case where there is no evidence that any
3    Tesla employee at any point in time engaged in any of the
4    conduct that Mr. Diaz is now testifying about and now talking
5    about after his employment with CitiStaff ended in about May of
6    2016.
7       This is not a case where at any point in time when
8    Mr. Diaz was working for CitiStaff and making complaints in
9    writing about a myriad of things, at no point in time did
10   Mr. Diaz at any time complain about everything, put in writing
11   any of these horrible words, these racial words that he is here
12   suing on.
13      At no point in time will the evidence show that Mr. Diaz
14   wrote to anyone at CitiStaff, nextSource, Chartwell, anyone at
15   Tesla, anything in writing about, quote, "awful" words, the
16   "N" word, the "porch monkey," "mayate," any of these words.
17      The evidence is going to show at the time Mr. Diaz was
18   working for CitiStaff as an elevator operator or a lead
19   elevator operator.  He had issues with coworkers.  Coworkers
20   had issues with him.  And when he did complain -- and I'll show
21   you the couple times -- the matter was resolved, people were
22   let go, people were transferred, it was handled, and it was
23   investigated.
24      So what this case is about and what the real story is a
25   different story than what you've been told.  And the evidence

47

OPENING STATEMENT / KENNEDY

1    is going to show there is another side of the story here, and
2    that side of the story is very different.  And the side of the
3    story is very different because what happened during Mr. Diaz's
4    nine-and-a-half-month assignment at the Fremont Tesla facility
5    became a different story after he left.
6       The testimony is also going to be at no point in time was
7    Tesla put on notice to take responsibility for this myriad of
8    racial slurs that, according to Mr. Diaz's testimony after he
9    hired a lawyer, was that this was happening on a daily basis;
10   20, 30, 40, 50 times, every day, a myriad of people calling him
11   all these names.
12      So why are we here and what is this case really about?
13   The case is about Owen Diaz vs. Tesla.  Owen Diaz was never an
14   employee of Tesla.  The evidence is going to show he applied
15   through CitiStaff.  He was paid by CitiStaff.  And we'll go
16   through all of that.
17      The evidence is also going to show that the Tesla Fremont
18   facility, it is a large facility, and there were many different
19   staffing agencies that were used to staff up that facility.
20   And you're going to see the relationship here.  You'll see when
21   you look at this, it's going to be -- you'll see people from
22   nextSource, which is sort of the umbrella staffing agency.
23   There was CitiStaff.  That was Mr. Diaz's employer.  There was
24   Chartwell Staffing Solutions, was some of the other people
25   you're going to see testify.  There was West Valley Staffing

48

OPENING STATEMENT / KENNEDY

1    Group, which was the staffing group that hired Mr. Diaz's son,
2    Demetric Di-az, to come work in the battery area.
3       And it's going to be importing because one of the things
4    you're going to be asked, and the evidence is going to ask you
5    to look at this, is to determine whether or not Tesla, not
6    these staffing agencies, Tesla, is responsible for the racial
7    harassment.  The evidence is going to show that not one Tesla
8    employee engaged in this harassment by Mr. Diaz.
9       So let's take a look at this Tesla facility.  It is a very
10   large facility, 5.3 million square feet, and this is where they
11   make Tesla cars.
12      Mr. Diaz's job, when he was hired, was as an elevator
13   operator.  This is in a factory.  This is not a people-mover
14   elevator.  This is a large elevator.  Usually two elevator
15   operators per shift depending on the shipment.  And basically
16   his job was to make sure that material was obtained, put into
17   the elevator, and moved from the second floor to the first
18   floor.  That material could be boxes, recycling, crates,
19   material.
20      And it's very important for the elevator operator, whoever
21   that person is, to work with the employees at the facility to
22   make sure production doesn't go down, to make sure recycling
23   can get out.  Because basically this is how you transport that
24   material up and down in the elevator in the factory.
25      It also required Mr. Diaz and other elevator operators to

141

ROMERO - DIRECT / ORGAN

1  Q.  Okay.  So now Mr. Kawasaki, he meets with you on that
2  Monday, August 3rd, right, to discuss what he has learned from
3  talking Owen Diaz?
4  A.  I don't remember that.
5  Q.  Okay.  You don't remember whether you met or not?
6  A.  I don't remember.  It's been a long time.
7  Q.  I understand.
8      And Mr. Kawasaki lets you know that Owen Diaz complained
9  about racial slurs; correct?
10  A.  Yes.
11  Q.  Yeah.  And Mr. Kawasaki tells you that he had learned from
12  the people who observed the altercation between Owen and
13  Mr. Timbreza that racial slurs -- he uses this term 'thrown;'
14  that racial slurs were thrown by Mr. Timbreza.  That's what he
15  told you; right?
16  A.  I don't remember the exact wording.
17  Q.  Okay.
18  A.  Okay.
19  Q.  But that information was at least communicated to you;
20  correct?
21  A.  I -- I knew about it, yes.
22  Q.  Yeah, okay.
23  A.  He said -- could I mention something here in answer to
24  this question?
25      THE COURT:  Is it directly related to the question?

142

ROMERO - DIRECT / ORGAN

1      THE WITNESS:  Yes.
2      THE COURT:  Okay.  Go ahead.
3  A.  Okay.  On the email you referenced here on Number 38,
4  okay --
5  BY MR. ORGAN:
6  Q.  38?
7  A.  Yeah.  Yeah, 38.
8  Q.  Well, I thought I had you at 37, but you want to go back
9  to 38?
10  A.  I thought that's the one you were referring to.
11  Q.  I think we had moved on from that, Mr. Romero.
12      THE COURT:  Okay.  So why don't you proceed,
13  Mr. Organ?
14      MR. ORGAN:  Could we go?  Keep --
15      THE COURT:  Yes.
16      MR. ORGAN:  Okay, Your Honor.
17      So then what I'd like you to do is let's look at
18  Exhibit 39, which I believe is in evidence, Your Honor.
19      THE COURT:  It is.
20  BY MR. ORGAN
21  Q.  Now, this is your email on the 4th.
22      MR. ORGAN:  And can we publish this one, Your Honor?
23      THE COURT:  Yes.
24      MR. ORGAN:  Okay.
25      (Document displayed.)

143

ROMERO - DIRECT / ORGAN

1  BY MR. ORGAN
2  Q.  This is your email on the 4th; right?  Exhibit 39.
3  A.  Okay.
4  Q.  Yeah.  You sent this to Victor Quintero; correct?
5  A.  I did.
6  Q.  And you said to Mr. Quintero that (as read):
7      "Mr. Owen says this has happened before."
8      You had information that this type of conduct had been
9  directed at Mr. Diaz before; correct?  That's why you put that
10  there.
11  A.  I was only stating what he said.
12  Q.  What Mr. Diaz said?  Did you actually talk to Mr. Diaz or
13  Mister -- you're talking about what Mr. Kawasaki told you; is
14  that correct?
15  A.  Kawasaki is the one that told me this.
16  Q.  Okay.
17  A.  That he said it had happened before.
18  Q.  Okay.  And just so we're clear, Mr. Diaz said that it had
19  happened before; correct?
20      MS. KENNEDY:  Objection.  Calls for speculation.
21      THE COURT:  Sustained.
22  BY MR. ORGAN
23  Q.  When you say here "Mr. Owen says this has happened
24  before," you're referring to Mr. Diaz has said that the conduct
25  has happened before; correct?

144

ROMERO - DIRECT / ORGAN

1  A.  No.  I'm stating what Timbreza had told me.  Okay?  He
2  said that Owen had said it had happened before.
3  Q.  I see.  Did Timbreza tell you that or did Kawasaki tell
4  you?
5  A.  Kawasaki.
6  Q.  Okay.
7  A.  Am I pronouncing that right?
8  Q.  Yeah.  Kawasaki.
9      Okay.  Now, you wrote here (as read):
10      "They did not hear the remarks."
11  Do you see that?  Do you see where you wrote that?
12  The second sentence (as read):
13      "We investigated by speaking to all witnesses
14  present, but they said they did not hear the remarks."
15  That's what you wrote; correct?
16  A.  Yes.
17  Q.  Now, it's safe to say by August 4th that Mr. Quintero
18  knows that Owen Diaz has complained about racially offensive
19  remarks; isn't that true?
20      MS. KENNEDY:  Objection.  Calls for speculation.
21      THE COURT:  Sustained.  This is not Mr. Quintero
22  testifying.
23  BY MR. ORGAN
24  Q.  Based on your emails to Mr. Quintero and the emails that
25  you saw from Mr. Kawasaki, you understood at that time that

---

145

ROMERO - DIRECT / ORGAN

1  Mr. Quintero had notice of the offensive remarks directed
2  towards Mr. Diaz; correct?
3  A.   I don't know what Mr. Quintero knew.  Okay?  All I can do
4  is respond is that -- that we sent the email about what had
5  happened at that time in -- in talking to the people who are on
6  the elevators.
7  Q.   But Victor Quintero let you know that he had at least
8  received your email; correct?
9  A.   I don't know if he let me know.  If there is an email that
10 he responded to, I need to see it.  Okay?
11 Q.   Well, if you go back to Exhibit 38.
12 A.   Okay.
13 Q.   That email was sent by Tom Kawasaki to Victor Quintero;
14 correct?
15 A.   Yes.
16 Q.   So you would agree that Mr. Kawasaki had told
17 Mr. Quintero, at least in that email, about racially offensive
18 remarks at that point in time; correct?
19 A.   Well, I'm assuming that he received the email.
20 Q.   And if you look, I'd like you to look at Exhibit 41,
21 please.
22        MR. ORGAN:  Your Honor, I'd like to move Exhibit 41
23 in.  I believe this is a stipulated admissible document.
24        MS. KENNEDY:  No objection, Your Honor.
25        THE COURT:  All right.  It's admitted.

---

146

ROMERO - DIRECT / ORGAN

1        (Trial Exhibit 41 received in evidence)
2  BY MR. ORGAN
3  Q.   Okay.  And Victor Quintero responds to your email and says
4  (as read):
5            "Thank you.  VQ."
6        Is that how he would sign things?
7  A.   Are we looking at the same email here?
8  Q.   41, Exhibit 41?
9  A.   I'm sorry.  I have the previous one.
10 Q.   That's okay.  There are a lot of them up there.
11       That email from Victor came back to you; correct?
12 A.   Okay.  I don't know if these are mixed up here or not.
13 Okay?
14 Q.   You what now?
15       THE COURT:  Just look at Exhibit 41.
16 BY MR. ORGAN
17 Q.   Exhibit 41.  Just look at Exhibit 41, please.
18 A.   Is that the one that's dated 8/4?
19 Q.   That's the one that's dated 8/4, and it's your email from
20 8/4, and then Victor Quintero's email back to you on 8/4.  Do
21 you see that?
22 A.   You might have to look at this because I'm not
23 understanding it.
24       (Brief pause.)
25       THE COURT:  It's correct.  He's referring you to --

---

147

ROMERO - DIRECT / ORGAN

1        THE WITNESS:  Oh, I'm sorry.  Sorry about that.
2        MR. ORGAN:  Can we publish this, Your Honor?
3        THE COURT:  Yes.  I think it was briefly.
4        MR. ORGAN:  Is it admitted?
5        THE COURT:  Yes.
6        (Document displayed.)
7  BY MR. ORGAN
8  Q.   So Victor Quintero responded to you thanking you for
9  keeping him informed; correct?
10 A.   Yes.
11 Q.   And you certainly have no basis to believe that Owen Diaz
12 is lying about Judy Timbreza, do you?
13       MS. KENNEDY:  Objection.  Argumentative.  Lack of
14 foundation.
15       THE COURT:  Overruled.  You can answer.
16       THE WITNESS:  Could you repeat it again, please?
17 BY MR. ORGAN
18 Q.   You have no basis to believe that Owen Diaz is lying about
19 Judy Timbreza, do you?
20 A.   No.  And I think that's why it was -- you know, attention
21 was given to it.
22 Q.   Now, Mr. Timbreza is issued with a verbal warning; is that
23 correct?
24 A.   Yes.
25 Q.   And the verbal warning was for racial incidents; correct?

---

148

ROMERO - DIRECT / ORGAN

1  A.   I don't remember.  I think the -- I got some medication
2  that makes me kind of thirsty, and I get kind of --
3  Q.   Do you need some water?  I can get you some water.
4  A.   I have some water right here.
5  Q.   You have some, okay.
6  A.   Yeah.
7        I think that the write-up was done to nextSource, if I
8  was correct.  If I remember correctly.
9  Q.   Okay.
10       Okay.  But you did come to a conclusion that Judy Timbreza
11 had not treated his fellow team members with dignity and
12 respect.  That was in there; right?  You came to that
13 conclusion?
14 A.   I came to the conclusion that nobody was saying really
15 anything about, you know, any comments that were made.
16 Q.   My question is a little different, sir.
17 A.   Okay.
18 Q.   You came to a conclusion that Mr. Timbreza was not
19 treating his fellow members, team members, with dignity and
20 respect.  That's your conclusion, wasn't it?
21 A.   That's why he was written up.
22 Q.   No.  I'm asking what you came to a conclusion of.
23 A.   I came to a conclusion that the information was given to
24 their -- to my supervisors and nextSource, and that they
25 decided what they were going to do with the write-up.

# EXHIBIT L

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

Volume 3

Pages 369 - 544

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND          )
LAMAR PATTERSON                        )
                                       )
                                       )
          Plaintiffs,                  )
                                       )
  vs.                                  ) No. C 17-6748 WHO
                                       )
TESLA, INC., dba TESLA MOTORS,         )
INC., CITISTAFF SOLUTIONS, INC.,       )
WEST VALLEY STAFFING GROUP,            )
CHARTWELL STAFFING SERVICES, INC.,     )
and DOES 1-50, inclusive,             )
                                       )
          Defendants.                  ) San Francisco, California
_____) Wednesday
                                       ) September 29, 2021
                                       ) 8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                     BY: BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                     BY: LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:     Debra L. Pas, CSR 11916, CRR, RMR, RPR
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

---

370

APPEARANCES:   (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                     BY: TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                     BY: PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                     BY: SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                            –  –  –

---

371

PROCEEDINGS

1   Wednesday - September 29, 2021              8:01 a.m.
2                    P R O C E E D I N G S
3                        ---oOo---
4        (Proceedings were heard out of presence of the jury.)
5        THE COURT:  All right.  There are two things on my
6   mind this morning.  One is the counter designations and
7   objections regarding Erin Marconi.  And I think in every
8   instance I'm going to overrule the objection to the counter
9   designation and overrule the objection to the testimony.  So
10  all of the testimony can come in that the parties are
11  interested in.
12       MR. ORGAN:  Your Honor, just a question on that then.
13  With respect to how they are presented, do you want the
14  designations presented with the counter designations then
15  together?
16       THE COURT:  Yeah, I think that's the smoothest way of
17  dealing with things.
18       MR. ORGAN:  So we'll have one video.
19       THE COURT:  One video.
20       MR. ORGAN:  In terms of the time, Your Honor --
21       THE COURT:  You time it yourself.
22       MR. ORGAN:  We'll produce that tonight.  So we'll --
23  it's our intent to present it, then, tomorrow, Your Honor.
24       THE COURT:  Great.
25       MR. ORGAN:  Okay.  Thank you.

---

372

PROCEEDINGS

1        THE COURT:  All right.  And then the other thing I
2   just wanted to mention, yesterday I allowed Wayne Jackson to
3   testify about his experience of hearing the "N" word throughout
4   the factory.  And on Monday I admitted Exhibit 106 concerning
5   Mr. Romero's credibility regarding his hearing of the "N" word.
6        I did so because it appears from Tesla's presentation of
7   the case, from the opening of the argument to the designations
8   in the depositions, that it wishes to minimize the use of the
9   "N" word in the workplace at Tesla, which is fine, but so this
10  counter evidence I think is relevant.
11       I am willing and inclined to give the jury a further
12  limiting instruction, and I can do that this morning.  It would
13  be primarily at the defendant's -- I'll let the defendant
14  decide whether this is something that you would like or not,
15  but it would be to the effect of:
16       As you know, I admitted Exhibit 106 for the limited
17  purpose of your consideration of the credibility of
18  Mr. Romero's testimony.  And yesterday I allowed Mr. Jackson to
19  testify about his experience hearing the "N" word in the Tesla
20  factory.
21       I want to remind you that this case is about Mr. Diaz and
22  the work environment that he experienced at the Tesla factory,
23  not what others in a different part of the facility
24  experienced.
25       MS. KENNEDY:  Yes, Your Honor, that would be

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

417

DIAZ - DIRECT / ORGAN

1  A.  He would tell me to go back to Africa.  He would also call
2  me the "N" word.  He told me he hated me one time.  He said:  I
3  hate you "N."  He also would call me mayate.
4  Q.  And what is -- do you know what mayate means?  It's a
5  Spanish word; right?
6  A.  I know now, yes.
7  Q.  And what does it mean?
8  A.  It -- it's the same as the "N" word.
9  Q.  It's a Spanish equivalent of the "N" word?
10  A.  Yes, sir.
11  Q.  Okay.  And how many times did Ramon Martinez call you the
12  "N" word?
13  A.  It was well north of 30 times, too, sir.
14  Q.  Okay.  Well, now, the jury is going to notice you just
15  said that Robert called you more than 30 times.  You've now
16  said Ramon called you more than 30 times.
17      Do you have an exact number in your mind as to how many
18  times you were called the "N" word by Ramon versus Robert?
19  A.  Umm, no.  I don't have an exact number.  When I said that,
20  that was because the -- the lady that was doing the desk
21  position, she was really trying to hammer a number out of me,
22  and I just told her, you know, it was 30-plus times.
23      But, you know, as long as I was in the factory and I was
24  working with these guys and we came in contact, it was said and
25  done.

418

DIAZ - DIRECT / ORGAN

1  Q.  And in terms of when Robert -- Robert -- when Ramon
2  started calling you the "N" word, where did that start relative
3  to Demetric starting?
4  A.  It was before.
5  Q.  Before, okay.
6      So both Ramon and Robert called you the "N" word prior to
7  Demetric starting?
8  A.  Yes, sir.
9  Q.  And after -- after Judy -- after the Judy Timbreza
10  incident; right, sir?
11  A.  Yes, sir.
12  Q.  So the jury has got to be wondering, why don't you tell
13  them, how is it that you brought Demetric into this workplace
14  when you had been called these words?  How did you do that?
15  A.  Well, when I first recommended my son to work for Tesla, I
16  believe because he was going through another staffing agency
17  and he would have been working in a different -- a different
18  area of the factory than I was, you know, and on a different
19  shift, maybe it not have been relevant.
20      But, you know, as in hindsight, this was the worst
21  decision I could have ever made in my life, man.  I have to
22  live with it every day.
23  Q.  So it was your hope that he would not experience it; is
24  that true?
25  A.  It was wishful thinking.  As being a parent, we just look

419

DIAZ - DIRECT / ORGAN

1  out.  We just want the best for our kids.  I thought it would
2  be a good experience for him, something that he would have, you
3  know.
4      I'm -- I'm not the most perfect person in the world, man.
5  I made a mistake putting my son in that position.
6  Q.  Okay.  Where did Demetric end up working?
7  A.  He ended up working on the -- he ended up working on the
8  battery line.  He was putting batteries together.  He was,
9  like, maybe -- it took a minute to walk through the factory.  I
10  had to use a bike to get to him.
11  Q.  And did you ever have any interaction with Demetric where
12  you observed any kind of racist conduct that went on?
13  A.  Yes.  Like I said, I -- I was hoping he wouldn't go
14  through it, but, you know, when we would ride home, he was
15  telling me that he had a supervisor that was calling him the
16  "N" word and stuff like that and him and his -- him and his
17  other coworkers.
18      And it's just one day I happened to be coming to have a
19  meal with my son.  Because I was the lead, I could take my
20  lunch when I wanted to.  And so, you know, I knew he was
21  hungry, so I went downstairs to take him something to eat.  And
22  as I was hitting the corner and I'm turning the corner, his
23  supervisor, a white man, you know, was yelling at him and
24  telling him:  I can't stand all you effing "Ns."
25  Q.  You actually heard that?

420

DIAZ - DIRECT / ORGAN

1  A.  It broke me and I think my son.
2  Q.  If you had to do it again, would you recommend Demetric to
3  come work at Tesla?
4  A.  No, I would not.  Again, I'm saying that's the biggest
5  mistake I could have ever made for my son.
6      (Brief pause.)
7      MR. ORGAN:  Your Honor, would it be possible to take
8  our break just a little early?
9      THE COURT:  All right.
10      All right.  So ladies and gentlemen, we'll take our
11  morning break.  Fifteen minutes.  We'll be back at ten past.
12      Please remember the admonitions.
13      (Jury exits the courtroom at 9:54 a.m.)
14      (Proceedings were heard out of presence of the jury:)
15      THE COURT:  You can step down, Mr. Diaz.
16      (Witness steps down.)
17      THE COURT:  It is improper to begin a question with:
18  "The jury has got to be wondering."  "The jury is thinking."
19      MR. ORGAN:  I won't do it again, Your Honor.
20      THE COURT:  You did it twice.  Don't do it ever again.
21      MR. ORGAN:  I won't do it, Your Honor.
22      THE COURT:  All right.  We'll be in recess.
23      (Whereupon there was a recess in the proceedings
24      from 9:55 a.m. until 10:16 a.m.)
25      THE COURT:  All right.  Please be seated, everybody.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

465

DIAZ - DIRECT / ORGAN

1   BY MR. ORGAN
2   Q.   If you could, sir, turn to the second page of Exhibit 245.
3        (Document displayed.)
4   A.   I'm here.
5   Q.   You mentioned Lamar Patterson.  Who is Lamar Patterson?
6   A.   Lamar Patterson was another one of the guys that I was
7   supervising.
8   Q.   Okay.  So he worked on the elevators?
9   A.   Yeah, he did.
10  Q.   Was he a friend of yours -- strike that.
11       How do you know Lamar Patterson?  How did you first learn
12  about Lamar Patterson?
13  A.   I first learned about Lamar Patterson, it was one of the
14  Tesla workers that had walked up to me, I can't remember what
15  his name was, but he had said -- he had asked me was there any
16  openings in the elevator.  And I told him, yes, you know,
17  because I was shorthanded.  Some nights I would run the
18  elevator by myself so I was shorthanded.  So I definitely could
19  use the help.
20       And he said that he had a cousin that needed a job.  And
21  what I did at that point, I told him it was open, and he asked
22  could he have his cousin send me a resume and could I forward
23  it, and I agreed to that.
24  Q.   Did you know whether Lamar was black or not?
25  A.   No, not at that time.

---

466

DIAZ - DIRECT / ORGAN

1   Q.   But was the cousin black?
2   A.   I think he was biracial.
3   Q.   Biracial, okay.
4        Did you warn Lamar Patterson about Tesla, about the --
5   about your work environment?
6   A.   Again, all I did was just forwarded a resume.
7   Q.   Okay.  So this is describing some incident, it looks like,
8   between you and Robert.  Is that Robert Hurtado?
9   A.   Yes.
10  Q.   Did you ask Lamar Patterson to write this?
11  A.   Yes, I did.
12  Q.   Okay.  And why did you ask Lamar Patterson to write this
13  page from Exhibit 245?
14  A.   Basically as protection, you know, because of the fact
15  that Mr. Hurtado was coming into the elevator.  He was calling
16  me the "N" word.  Telling me:  "N," hurry up and push the
17  button.  Or either:  "N," push the batteries onto the elevator,
18  and things like that.
19       So at this particular time we were in the elevator, and me
20  and Lamar Patterson was talking having a conversation among
21  ourselves, and Mr. Hurtado interjected.  And he had been --
22  like I said, he had been using these racial slurs towards me
23  for awhile so I just was shutting down on him.
24       So he kept going and kept asking, trying to pry in.  And I
25  walked over to him and I told him:  No disrespect, but if it

---

467

DIAZ - DIRECT / ORGAN

1   doesn't have anything to do with this job, don't talk to me.
2   You know, if it's not business related.
3        I explained to him we're not friends.  I don't know you.
4   We don't sit at each other's table and eat.  You know, the
5   things that you've been doing that I've been asking you to
6   stop, but you still won't stop.  So, you know, if it doesn't
7   have anything to do with this job, please don't talk to me.
8   Q.   Okay.  So based on our chart here, it looks like
9   Mr. Hurtado has been calling you the "N" word from August to
10  this February -- end of February time period; is that right?
11  A.   That's right, sir.
12  Q.   Okay.  Did you complain to anybody?  Well, did you
13  complain to Robert that he was using the "N" word?
14  A.   I said -- I told him to stop using it towards me.  I
15  even -- at one point I even went over to -- I believe her name
16  is Joyce, which was his immediate supervisor, and I explained
17  to Joyce what he was doing.
18       And, you know, it was -- it just seemed like everything
19  just started breaking down because in the beginning -- me and
20  Joyce had a pretty good relationship in the beginning.  She had
21  came to me one day and said:  Hey, they're going to fire me.
22  They're going to fire me.  Can you please help me get this drop
23  zone cleaned up?  So I helped her out.  I took my time and
24  cleaned out the drop zone.
25       You know, it was like when I was doing what they wanted me

---

468

DIAZ - DIRECT / ORGAN

1   to do and I never complained about it, everything was A-okay;
2   but as soon as I started complaining, I became enemy number
3   one.
4   Q.   Okay.  I want to take you now to Exhibit 68.
5        Actually, before we go to Exhibit 68, shortly after this
6   incident on February 26th, your mother passed; is that right?
7   A.   Yes, she did.
8   Q.   And you took some time off for bereavement leave; is that
9   right?
10  A.   Yes, I did.
11  Q.   After that, do you remember coming back to Tesla?
12  A.   I don't remember coming back.  Reason being is after my
13  mother had passed away, I just couldn't take it.  If I entered
14  that factory, I don't know what I would have did.
15  Q.   Okay.  Please turn to Exhibit 68.
16  A.   Thank you.
17       MR. ORGAN:  Your Honor, I believe this is stipulated
18  as admissible.
19       MS. KENNEDY:  Yes, it is.  It is stipulated.
20       THE COURT:  It's admitted and you can publish it.
21       (Trial Exhibit 68 received in evidence)
22       (Document displayed.)
23  BY MR. ORGAN
24  Q.   Now, with Exhibit 68, this has a separation date of -- or
25  end-of-your-contract date for May 4th of 2016.  Did you get any

---

473

DIAZ - DIRECT / ORGAN

1    Q.   And what's the date of the application?
2    A.   It's December 3rd, 2015.
3    Q.   Okay.  And why are you applying for a job through Indeed
4    on December 3rd of 2015?
5    A.   I was always taught by my parents to don't leave a job
6    until you had another job.
7    Q.   Okay.  Let's go to Exhibit --
8         THE COURT:  Did you want to move that into evidence?
9         MR. ORGAN:  Oh, yes, Your Honor.
10        MS. KENNEDY:  No objection.
11        THE COURT:  All right.  It's admitted.
12        MR. ORGAN:  Yes, please.  Thank you, Your Honor.
13        (Trial Exhibit 261 received in evidence)
14   BY MR. ORGAN
15   Q.   I'd like you to turn to Exhibit 293, please.
16   A.   I'm here, sir.
17   Q.   Okay.
18        MR. ORGAN:  And I believe this is stipulated,
19   Your Honor.
20        MS. KENNEDY:  Yes.  No objection.
21        THE COURT:  All right.  It's admitted.
22        (Trial Exhibit 293 received in evidence)
23   BY MR. ORGAN
24   Q.   This appears to be an email from Ed Romero to Wayne
25   Jackson, Victor Quintero and some others of a pay increase.

474

DIAZ - DIRECT / ORGAN

1    Did you get a pay increase in this end of January of 2016?
2    A.   Yes, I did.
3    Q.   Okay.  And did Ed Romero tell you about that pay increase?
4    A.   Yes, he did.
5    Q.   Did Ed Romero work for CitiStaff on this date,
6    January 28th, 2016?
7         MS. KENNEDY:  Objection.  Lack of foundation.
8         THE COURT:  If you know, you may answer.
9         THE WITNESS:  Umm, I always believed that when I met
10   Ed Romero, that he worked for Tesla.
11   BY MR. ORGAN
12   Q.   Okay.  Now, let's go to Exhibit 68.  Now, we just saw
13   that.  Do you see the date on that?
14   A.   Exhibit 68, yeah, was sent on 5/4/2016.
15   Q.   Okay.  And did CitiStaff notify you on May 4th of 2016
16   that you had been terminated from Tesla?
17   A.   Like I said before, after the first one, initial contact
18   that I had with CitiStaff, I never had contact with them again.
19   Q.   What about your paychecks?
20   A.   My paychecks, the first initial contact I picked up my
21   paycheck maybe once or twice.  Then everything else was handled
22   inside of Tesla.  I clocked in Tesla.  I had filled out
23   another piece of paper and that was, I believe, for my direct
24   deposit.
25   Q.   Okay.  If I could get you to turn to Exhibit 320.

475

DIAZ - DIRECT / ORGAN

1    A.   I'm there, sir.
2    Q.   Okay.  And...
3         (Brief pause.)
4         MR. ORGAN:  Your Honor, I would move Exhibit 320 into
5    evidence.
6         THE COURT:  Any objection?
7         MS. KENNEDY:  No.  No objection, Your Honor.  It's
8    fine.
9         THE COURT:  Okay.  It's admitted.
10        (Trial Exhibit 320 received in evidence)
11   BY MR. ORGAN
12   Q.   Were you informed -- this email here is dated March 18th
13   of 2016.  Do you see that?
14        (Document displayed.)
15   A.   Yes, I see it.
16   Q.   Okay.  So it's not dated May 4th; right?
17   A.   No, it's not.
18   Q.   Let go to Exhibit 324.
19        MR. ORGAN:  I would move Exhibit 324 into evidence,
20   Your Honor.
21        THE COURT:  Any objection?
22        MS. KENNEDY:  No objection.  It's fine.
23        THE COURT:  It's admitted.
24        (Trial Exhibit 324 received in evidence)
25

476

DIAZ - DIRECT / ORGAN

1    BY MR. ORGAN
2    Q.   Exhibit 324 is dated 5/4/2016.  Do you see that?
3    A.   Yes, sir.
4    Q.   And did Victor Quintero or anybody contact you on that
5    date relative to your email account getting terminated -- your
6    Tesla email account getting terminated at that point in time?
7    A.   No, they didn't tell me that.
8    Q.   If you look at the top it says (as read):
9         "Thank you for letting us know.  I have ended
10        Owen's contract and workday effective immediately."
11        That's from Lindsay James of Tesla HR.  Do you know who
12   that is?
13   A.   No, I do not know who Lindsay James is, sir.
14   Q.   And then if you go to Exhibit 325.
15        MR. ORGAN:  I'd like to move that in, Your Honor.
16        THE COURT:  Any objection?
17        MS. KENNEDY:  No, Your Honor.
18        THE COURT:  It's admitted.
19        (Trial Exhibit 325 received in evidence)
20        MR. ORGAN:  Sorry.  I jumped on you, Your Honor.  Did
21   you say it was admitted?
22        THE COURT:  Yes, it's admitted.
23        MR. ORGAN:  Could we publish this?
24        THE COURT:  Yes.
25        (Document displayed.)

481

DIAZ - DIRECT / ORGAN

1  and we'll be back at noon.
2       (Jury exits the courtroom at 11:41 a.m.)
3       (Proceedings were heard out of presence of the jury:)
4       THE COURT:  We'll be in recess.
5       Just as a reminder to everybody, you don't need to ask me
6  whether you can publish a document that's in.  You may not show
7  a document that is not in.
8       MR. ORGAN:  Thank you, Your Honor.
9       (Whereupon there was a recess in the proceedings
10      from 11:42 a.m. 12:01 p.m.)
11      (Proceedings were heard in the presence of the jury:)
12      THE COURT:  All right.  Please be seated, everybody.
13      Mr. Organ, please proceed.
14      MR. ORGAN:  Thank you, Your Honor.
15 BY MR. ORGAN
16 Q.  Mr. Diaz, we're about ready to talk about how this has
17 impacted you.  So let me ask a question.
18      How do you think your experience at Tesla has changed you
19 individually?
20 A.  Umm, it -- it made me lose kind of like faith in my
21 human -- in my fellow humans.  It let me see another type of
22 something that I hadn't really -- I had experienced it, but it
23 let me see through the eyes of my parents.
24      So what I mean by that is -- is, you know, when my parents
25 was back -- when they first came here, you know, the dogs being

482

DIAZ - DIRECT / ORGAN

1  sicced on them and stuff like that, you know.  It left me so
2  shaken that it even -- it even had -- it translated over into
3  my marriage.
4       I was just so devastated that I couldn't help my son, and
5  I started seeing things that he was going through.  And he had
6  started to be to the point where he was like:  If they think
7  that I'm like this, I might as well start acting like this.  He
8  started hanging with the wrong crowd.
9       I started having sleepless nights.  I couldn't -- you
10 know, me and my wife -- I am embarrassed to say this, but I
11 couldn't even perform with my wife, you know.  My wife was --
12 she needed -- needed to be, you know -- she needed things like
13 every woman, and I couldn't provide that to her.
14      It -- it just -- you know, I couldn't eat.  I was a bigger
15 guy than this.  It caused me to lose weight, which I'm not
16 going to say that's a bad thing.  I did lose weight.  It was
17 good for that.
18      But it -- it's just -- you know, when I meet people now,
19 when -- I was just more of an outward-going person.  Now when I
20 meet people of color, I've kind of got to think and wonder what
21 do they really feel about me when I never had to do that
22 before.  You know, it was just meet a person and, you know, hi,
23 and then you get to know each other, talk, see if you have the
24 same type of interests that line up and later on you guys might
25 become friends.

483

DIAZ - DIRECT / ORGAN

1       But it just got so -- so bad and so devastating.  It was
2  like I was in a shell.  I was in a cocoon.  Some days I would
3  just sit on my stairs and cry.
4       You know, if it wasn't for the gardening and my dogs and
5  stuff like that and support of my sister, I don't know if I
6  could have got through it.
7  Q.  Are you still suffering?
8  A.  Yes.  Yes, I am, because right now I still have to live
9  this moment, you know, and I still have to live with what I did
10 to my son's life.  You know, I have to -- I still just got to
11 survive.  That's the bottom Line.  I've got to survive some
12 sort of way.
13 Q.  You still are working; is that true?
14 A.  Yeah.  I got another job.  I actually like it.
15 Q.  What do you do?
16 A.  Now I drive a bus for Ac Transit.
17 Q.  Okay.
18 A.  So, you know, I deal with the public, but, you know, at
19 the same time there are a lot of things I don't have to go
20 through.  All I have to do is just be mindful and be careful
21 when I'm transporting people.  You know, and I could just stay
22 in that zone and just -- you know, just drive until I get off
23 of work, just like everything.  I wasn't behind the wheel.
24 It's just no way.
25 Q.  How often do -- how often does it come to your mind what

484

DIAZ - DIRECT / ORGAN

1  happened at Tesla?
2  A.  Lately, it's been playing in my mind every day wondering
3  what I could have done to prevent certain things.  And, you
4  know, it's just -- just self-doubt, period.  Wondering, you
5  know, if -- if I was the man I was supposed to be, if I made
6  the right decisions, you know, just within context.  I even --
7  I even doubt myself.
8  Q.  Before Tesla, would you -- were you someone who would cry
9  easily?
10 A.  Nah.
11 Q.  And you mentioned some issues with your wife.  Other than
12 that, have there been other physical ways that it's affected
13 you?  You lost weight?
14 A.  Yeah.  I couldn't eat.  You know, like I said, I couldn't
15 eat.  I would just sit up late at night.  You know, like my
16 wife would come downstairs sometimes and I would be sitting on
17 the -- on the stairs and because -- she would ask me what was
18 wrong, I wouldn't tell her.  Reason being is she used to work
19 for Brinks and her friend was killed in front of her.  So she's
20 kind of like got some issues.  She got a few issues, so...
21 Q.  Okay.  So you didn't talk to her about what was going on
22 at Tesla?
23 A.  No.
24 Q.  Did you tell your family about what was going on at Tesla?
25 A.  I talked to my sister.  I talked to my friends.  You know,

485

DIAZ - DIRECT / ORGAN

1  I couldn't -- like I said, I couldn't really get the outlet
2  that I really wanted, but I talked to a few people.
3  Q.  Okay.  You mentioned that you had talked to Demetric a
4  little bit about it; is that right?
5  A.  Yes, I did.
6  Q.  What does the future look like to you?
7  A.  I -- it is what it is, you know.  I have to just survive
8  and just keep going.  You know, we even -- even though at some
9  point, you know, I -- I just -- hopefully, I can just forget
10 and forgive, you know.  I just wish the world was better -- a
11 better place.
12 Q.  And why did you bring this lawsuit?
13 A.  For one, I worked there; and for two, I just want to get
14 it out.
15      You know, as things has been happening, like what happened
16 to Michael Wheeler, people wiping feces on the golf carts and
17 stuff like that, you know, everything has been -- been closed,
18 contained, and there's a lot of these people that want to get
19 the word out but just don't have the outlet like I have right
20 now.
21          MR. ORGAN:  No further questions, Your Honor.
22          THE COURT:  All right.
23          MS. KENNEDY:  May I have two minutes to get set up?
24          THE COURT:  Sure.
25      (Pause in proceedings.)

486

DIAZ - CROSS / KENNEDY

1          MS. KENNEDY:  May I proceed, Your Honor?
2          THE COURT:  Please.
3                    CROSS-EXAMINATION
4  BY MS. KENNEDY
5  Q.  Good afternoon, Mr. Diaz.
6  A.  Good afternoon.
7  Q.  As I understand, you applied for a position with CitiStaff
8  in about June of 2015; is that right?
9  A.  No, that's not right.  I applied for a position with Tesla
10 and I was directed to CitiStaff.
11 Q.  But you filled out a CitiStaff application, would that be
12 correct?
13 A.  First, I filled out whatever application that was on
14 Indeed, and then I was directed over to CitiStaff, and then
15 from there I filled out more application papers.
16 Q.  All right.  Will you turn in your notebook -- it should be
17 the black notebook there -- and go to Exhibit 204, which we'll
18 have marked for identification.
19      (Trial Exhibit 204 marked for identification)
20 Q.  Just for the record, it appears to be a CitiStaff
21 Solutions, Inc. application.  It appears to be two pages.
22      Take a minute to read that, Mr. Diaz.  When you're done,
23 let me know.
24      (Witness complied.)
25 A.  I'm done, ma'am.

487

DIAZ - CROSS / KENNEDY

1  Q.  And on the second page do you recognize your signature?
2  A.  Yes.  That's my signature at the bottom.
3  Q.  Okay.  And did you fill out this application --
4          MR. ORGAN:  Objection, Your Honor.  This is not the
5  agreed-to exhibit.  If you look at Page 2 --
6          THE COURT:  Oh, I see what you're saying.  Yes.
7      Do you have a document that doesn't have the second line
8  there?
9          MS. KENNEDY:  I'm sorry.  I didn't hear you.
10         THE COURT:  Did you agree to --
11         MR. ORGAN:  Yes, Your Honor.
12         THE COURT:  -- alter this document slightly in order
13 to make it admissible?
14         MS. KENNEDY:  Oh.  Yes.  Yes, it's supposed to be
15 redacted at the top.  Yes, that is correct.
16         THE COURT:  Okay.  So I'm not admitting what I've got.
17         MS. KENNEDY:  That's fine.  You're correct.  Thank
18 you.
19 BY MS. KENNEDY
20 Q.  I don't want to show it, but do you recall this
21 application for CitiStaff in June of 2015?
22 A.  Yes.  This is the second time after I was directed from
23 Indeed and I went into CitiStaff's location, they had had me
24 fill this out.
25 Q.  Correct.  My question is:  Do you recall if you filled out

488

DIAZ - CROSS / KENNEDY

1  this handwritten application before you were directed to Tesla?
2  A.  No, I did not fill it out before I was directed with the
3  application.  No.
4      Like I said before, what I did was is, on Indeed -- I
5  filled out an application on Indeed.  Then I was -- I got an
6  email and the email directed me over to CitiStaff; and when I
7  went to CitiStaff, I filled out this paper, ma'am.
8  Q.  Right.  And so once you were directed through Indeed to
9  CitiStaff, then you filled out a CitiStaff application;
10 correct?
11 A.  Yes.  I filled out would have been theirs too.
12 Q.  And then once you filled out the CitiStaff application,
13 you found out you were going to be assigned to work at the
14 Tesla facility in Fremont; is that correct?
15 A.  Yes.  At some point they did, yes, ma'am.
16 Q.  Let's go to Exhibit 62, which I don't believe it was in
17 that notebook, but it was admitted through your counsel.  Maybe
18 in the white notebook, sir.
19      (Document displayed.)
20 Q.  And do you have this in front of you?
21 A.  Yes, I do, ma'am.
22 Q.  And I think you testified that this was your application.
23 Was that your testimony?
24 A.  No, I did not specify this was the application.  This
25 looks like a document that came from Tesla that they were using

493

DIAZ - CROSS / KENNEDY

1   A.  Yes, I believe it was.
2   Q.  And in the 2015 and 2016 time period when you were
3   assigned to work at the Tesla facility, you were living with
4   your -- your son Demetric was living with you along with your
5   stepdaughter La'Drea?  There were both living with you in the
6   house along with your wife; correct?
7   A.  Yes and no.  My youngest son was living with me and my
8   wife, and I believe my oldest daughter was off at college at
9   that time.
10  Q.  And was she --
11  A.  Not my oldest, but my -- the older one than Demetric,
12  yeah.
13  Q.  Right.  And is that La'Drea?
14  A.  Yes, that's La'Drea.
15  Q.  Was she going to Dillard University at the time, in maybe
16  the summer of 2015?
17  A.  When I was working at Tesla, I believe she was at Dillard
18  at that time.
19  Q.  And during the time you worked at Tesla, did she return
20  and continue to live with you and your wife and your son
21  Demetric?
22  A.  At some point when she finished school, yes, she -- well,
23  she didn't finish Dillard.  She came back and went to
24  Holy Names, but at some point she came back, yes.
25  Q.  And sometime in June of 2015, you were hired through the

494

DIAZ - CROSS / KENNEDY

1   staffing agency CitiStaff and you were then assigned to work at
2   Tesla; is that right?
3   A.  Yes.
4   Q.  And as part of the onboarding with CitiStaff, you signed
5   some onboarding documents; correct?
6   A.  I don't know what you mean by "onboarding."  Can you
7   please be more specific?
8   Q.  Yeah.  So like new hire documents, you know, acknowledging
9   the policies or acknowledging certain duties and
10  responsibilities.  Onboarding, new hire packages.  Do you
11  recall that?
12  A.  While I was at CitiStaff, I did fill out a packet, yes.
13  Q.  Let's turn to Exhibit 205.
14          MS. KENNEDY:  Your Honor, it's marked for
15  identification only, Exhibit 205, which is a one-page document.
16          (Trial Exhibit 205 marked for identification)
17  BY MS. KENNEDY
18  Q.  It appears to be dated June 2nd, 2015.
19          Mr. Diaz, read that and let me know when you're done.
20          (Witness complied.)
21  A.  I'm done, ma'am.
22  Q.  And do you recognize this document as a document entitled
23  "Assignment Abandonment/Walk Off" that you signed on June 2nd,
24  2015?
25  A.  Yes, I did.

495

DIAZ - CROSS / KENNEDY

1   Q.  And when you signed this document, did you read this
2   document?
3   A.  If I signed it, I did read it.
4   Q.  And did you understand that this was a document from
5   CitiStaff Solutions about your employment with
6   CitiStaff Solutions as of June 2nd, 2015?
7   A.  Yes.
8           MS. KENNEDY:  Your Honor, I move to admit Exhibit 205.
9           MR. ORGAN:  No objection, Your Honor.
10          THE COURT:  It's admitted.
11          (Trial Exhibit 205 received in evidence)
12          MS. KENNEDY:  All right.
13          (Document displayed.)
14  BY MS. KENNEDY
15  Q.  So, Mr. Diaz, taking a look at Exhibit 205, take a look at
16  Paragraph 6, please.  Take a minute to read that and when
17  you're done, let me know.
18          (Witness complied.)
19  A.  Yes, I read it.
20  Q.  Now, sometime in March of 2016, did you have any
21  discussion with anyone at CitiStaff about not returning to work
22  and your assignment at Tesla?
23  A.  I don't believe so, ma'am.
24  Q.  Okay.
25          All right.  Let's take a look Paragraph 2, please, of

496

DIAZ - CROSS / KENNEDY

1   Exhibit 205.
2           Do you see Paragraph 2 is (as read):
3               "If you're not interested in the assignment,
4           please let your representative know in advance and
5           leave the opportunity to an associate that is willing
6           to work"?
7           Did you ever talk to anyone at CitiStaff about wanting to
8   leave your assignment at Tesla?
9   A.  No, I did not, ma'am.
10  Q.  Did you ever receive a paycheck from Tesla?
11  A.  No.  My paychecks did not have Tesla's name on it, no.
12  Q.  Did you ever receive a W-2 form from Tesla?
13  A.  No, ma'am.
14  Q.  You only received paychecks from CitiStaff; is that
15  correct?
16  A.  CitiStaff is who paid me, yes.
17  Q.  And, in fact, I think you testified earlier that once you
18  started, you didn't go back to CitiStaff for any type of
19  paychecks or any type of payroll; is that correct?
20  A.  No.  I didn't have to.
21          THE COURT:  I can't see you, Mr. Organ.  So if you're
22  going to make an objection, make sure you make it into the
23  microphone.
24          MR. ORGAN:  I will do that, Your Honor.
25          MS. KENNEDY:  Is that better, Your Honor?

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

505

DIAZ - CROSS / KENNEDY

1  A.   No, I did not, ma'am.
2  Q.   So in your opinion, you didn't advise your staffing
3  agency.  Why would you think your son, Demetric, would be
4  safer -- again, according to you -- with another staffing
5  agency working in the same factory?
6  A.   Like I said earlier, it's a 5-million-square-foot factory.
7  I still haven't been around the whole factory, so I don't know
8  what could happen on this floor or what could happen on this
9  floor.
10      My hopes, again, was that the area that he was in, he
11 would have been okay.
12 Q.   And you understood that your son applied to work at Tesla
13 through West Valley Staffing Agency in about August of 2015;
14 correct?
15 A.   Yes, ma'am.
16 Q.   And when he applied to work through West Valley at Tesla,
17 at the time you found out he applied, did you warn him about
18 what you were experiencing at all?
19 A.   I don't remember, ma'am.  I'm sorry.
20 Q.   But at this time you and your son were living in the same
21 house; correct?
22 A.   Yes.  He was there and I was there, yes.
23 Q.   And you would go to -- you would go to work together
24 sometimes?
25 A.   Yes.  Sometimes we would ride together.

---

506

DIAZ - CROSS / KENNEDY

1  Q.   And sometimes you worked on the same shift; correct?
2  A.   At first we did not work on the same shift.  He had a
3  different shift, and then later on what they did is they
4  transferred him to another shift.
5  Q.   Okay.  And I believe -- and if I'm wrong, correct me --
6  your son Demetric Di-az worked in the battery cell area?
7  A.   He worked in the battery casing area, which was
8  downstairs, further away by the -- I can't remember what that
9  kitchen was down there.
10      But what he was doing down there was they were putting the
11 battery casings together, and he was just -- you know, the
12 robot -- he would put the pieces in and the robot would weld
13 them.
14 Q.   And is it also your understanding that Mr. -- your son,
15 Demetric Di-az, was only with West Valley at the Tesla location
16 for about two months, from about August 11th to about
17 mid-October; is that your understanding?
18 A.   That sounds about right, ma'am.
19 Q.   And you understand that during that time, according to
20 West Valley, your son had some performance issues; correct?
21 A.   I didn't take them as performance issues.  What my son had
22 told me was, is that him and a supervisor were -- had some sort
23 of whatever.  And the supervisor told him if he didn't like it,
24 that his time at Tesla could be ending soon.
25 Q.   Well, did your son talk to you about sort of being

---

507

DIAZ - CROSS / KENNEDY

1  counseled, either verbally or in writing, about safety issues,
2  like not having safety shoes or safety glasses or pulling up
3  his pants, safety reasons, anything like that?
4      MR. ORGAN:  Objection.  Relevance.
5      THE COURT:  What is the relevance of this?
6      MS. KENNEDY:  It goes to the work environment,
7  Your Honor, and counteracting his testimony as to why -- to his
8  emotional distress issues, because I'm leading into another
9  issue in Exhibit 379.
10     THE COURT:  I'll give you a little more rope, but I'm
11 not seeing it at the moment.
12     MS. KENNEDY:  Understood, Your Honor.
13 BY MS. KENNEDY
14 Q.   Did he talk to you about those issues, Mr. Diaz?
15 A.   My son had told me one time that he was -- he had on, I
16 believe it was a bucket hat or something like that.  It had the
17 Giants on it or something.
18     And what had happened was, is I believe his supervisor
19 didn't like the Giants or something like that and told him to
20 take off the hat.  And he asked why.  And from there I believe
21 him and his supervisor was getting into it.  The supervisor
22 was -- he would tell me that the supervisor was calling him the
23 "N" word and things like that.
24 Q.   So your son told you that in relation to this hat
25 incident, this supervisor used the "N" word toward your son;

---

508

DIAZ - CROSS / KENNEDY

1  correct?
2  A.   At some point he had told me, yes.
3  Q.   And you told your son to go and report that to his
4  supervisor; correct?
5  A.   Umm, I don't know if I told him or -- I don't remember if
6  I told him or he decided, but at some point he did go up to try
7  to report it, yes, he did.
8  Q.   And it's also your understanding that at some point West
9  Valley ended Demetric Di-az's assignment at Tesla; correct?
10 A.   Yes.
11 Q.   And that was approximately on October 22nd of 2015?
12 That's your understanding?
13 A.   I don't remember the exact date.  You would have to ask
14 Demetric that, ma'am.
15 Q.   I'm sorry?
16 A.   I don't remember the exact day he was terminated.  You
17 would have to ask Demetric that, ma'am.
18 Q.   Okay.  And as I understand also, do you -- did he ever
19 tell you that he had applied for Tesla, at Tesla about three or
20 four days after his contract with West Valley ended?
21     MR. ORGAN:  Objection, Your Honor.  Hearsay.
22 Relevance.
23     THE COURT:  Overruled.  You can answer.
24     THE WITNESS:  Um, I don't believe he would have
25 applied back, no.

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

509

DIAZ - CROSS / KENNEDY

1  BY MS. KENNEDY:
2  Q.  My question is:  Did he tell you that?
3  A.  No, he did not tell me that.
4  Q.  And as you sit here today, do you have any knowledge one
5  way or the other if your son Demetric Di-az ever applied to
6  work directly for Tesla, not through a staffing agency?
7       MR. ORGAN:  Objection.  Relevance, Your Honor.
8       THE COURT:  Sustained.
9       MS. KENNEDY:  Okay.
10 BY MS. KENNEDY:
11 Q.  Now, as I understand from your testimony, that starting at
12 least maybe more than two weeks and less tan a month after you
13 started your assignment at Tesla, Judy Timbreza made some
14 racially racist comments to you; correct?
15 A.  Yes.  He called me a "porch monkey" the "N" word, and a
16 "mayate," ma'am.
17 Q.  And Mr. Timbreza, do you know what his nationality is?
18      MR. ORGAN:  Objection.  Relevance, Your Honor.
19      THE COURT:  Overruled.
20      THE WITNESS:  No, I do not.
21 BY MS. KENNEDY:
22 Q.  Do you know if he speaks languages other than English?
23 A.  Spanish.
24 Q.  I'm sorry?
25 A.  Spanish.

---

510

DIAZ - CROSS / KENNEDY

1  Q.  And when he called you these words -- I'm sorry, I'm going
2  to use the words -- "porch monkey," was that in English or in
3  Spanish?
4  A.  He called me that in Spanish, ma'am.
5  Q.  And he used the term "mayate" to you as well; correct?
6  A.  Yes, ma'am.
7  Q.  And where did that take place?
8  A.  The elevator.
9  Q.  The elevator.  While you two were both on the elevator?
10 A.  Yes.  He was on the elevator with me, ma'am.
11 Q.  Okay.  And you agree that there is no documentation from
12 you in an email, text message, about those comments by Judy
13 Timbreza; correct?
14 A.  No, no email.  I verbally stated that to Tom Kawasaki.
15 Q.  Right.  I understand that verbally and you told it to Tom
16 Kawasaki.  And that was approximately July of 2015; correct?
17 A.  Sounds about right, ma'am.
18 Q.  And Tom Kawasaki at that time, was he a Tesla employee, to
19 your knowledge?
20 A.  At that time I didn't know if Tom was a Tesla employee,
21 but I do believe Tom was part of the sustainability --
22 environment sustainability.
23 Q.  And after you reported this to Tom, according to you, you
24 never saw Judy Timbreza again; correct?
25 A.  Correct, ma'am.

---

511

DIAZ - CROSS / KENNEDY

1  Q.  And once you reported it to Tom and Judy Timbreza was
2  gone, were you at least satisfied with that response?
3  A.  Yes, I was, ma'am.
4  Q.  You also testified about a variety of other racial slurs,
5  which, I'm sorry, I'm going to have to use some of the
6  language.
7       But before I get into that, my question is:  Did you ever
8  actually see anyone writing any graffiti in any of the
9  bathrooms that you said you saw?
10 A.  No.  I've never personally witnessed anybody writing it,
11 but I did see it.
12 Q.  And do you have any idea if any Tesla employee did any of
13 the writing?  Do you have any knowledge if it was a Tesla
14 employee at any time?
15 A.  No, ma'am.  As I stated, I have -- I didn't visually see
16 anybody doing it.
17 Q.  All right.  And if I understand correctly, you also
18 testified that you reported the use of the "N" word by
19 different individuals to Ed Romero at least three to seven
20 times; is that about right?
21 A.  That's about right, ma'am.
22 Q.  And you also told Mr. Romero, according to you, that Ramon
23 Martinez and Robert were calling you the "N" word; correct?
24 A.  Yes, ma'am.
25 Q.  And, again, you have nothing in writing about those

---

512

DIAZ - CROSS / KENNEDY

1  complaints to Mr. Romero; correct?
2  A.  You're right, ma'am.
3  Q.  And given the fact that the Judy Timbreza incident had
4  been resolved, were you at least confident that if you reported
5  things, it was ongoing to be handled?  Was that your
6  understanding?
7  A.  When I had verbally told Tom Kawasaki, yes, he did handle
8  it.  So I figured if I can verbally tell Ed Romero the same
9  thing, he would probably get the same results as Tom Kawasaki,
10 yes.
11 Q.  And so, according to you, once you told the story --
12 strike that.
13      Once you had told Mr. Romero three to seven times that
14 this was being said to you and nothing was done, why not put
15 anything in writing to someone else, is my question.
16 A.  I don't know.  At that time I didn't have access to their
17 email.  So, I mean, I don't know why I didn't do it.
18 Q.  Well, you had a Gmail account; correct?
19 A.  Yes, I have a Gmail account.
20 Q.  And you had the ability to email Mr. Romero and text
21 message Mr. Romero from your phone; correct?
22 A.  At some point Mr. Romero gave me his email and told me I
23 could write him and shoot an email to him.  And he had gave me,
24 I think it was a paper with a few more email addresses on it.
25 Q.  And you've also testified that Robert and Ramon Martinez

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

525

DIAZ - CROSS / KENNEDY

1  that your son Demetric was still working at the factory?
2  A.   I don't know if my son was still working there.  I would
3  have to see his schedule.  I don't know if he was still there.
4  I'm sorry.  I apologize.
5  Q.   And in your incident with Mr. Romero, this was a pretty
6  awful incident for you; correct?
7  A.   It was an awful incident for all that was involved, yes.
8  Q.   But for you in particular, this was inappropriate conduct.
9  It was wrong conduct.  And Mr. Martinez, in your opinion,
10  should have been counseled and disciplined; correct?
11  A.   It was wrong and -- and I think I stated that Mr. Martinez
12  should have been terminated.
13  Q.   Correct.  So when you found out that Mr. Martinez had not
14  been terminated, at any point in time after that did you decide
15  to put any of these horrible racial slurs in writing to anyone
16  to let them know this is who this guy is, Mr. Martinez?
17  A.   No, ma'am, I did not.
18  Q.   After this incident with Mr. Martinez, you started looking
19  for a job outside of CitiStaff; correct?
20  A.   Yes, I did, ma'am.
21  Q.   And you were looking for jobs that paid more than what you
22  were getting at CitiStaff; correct?
23  A.   I don't know if it was more or less; but normally if a
24  person want to leave a job, they're definitely going to look
25  for more money.

526

DIAZ - CROSS / KENNEDY

1  Q.   Absolutely.  I get that.  And it's always easier to look
2  for a job if you have a job; correct, Mr. Diaz?
3  A.   That's true.  I was always taught by my parents never
4  leave a job until you have another job.
5  Q.   And in this case when you're looking for another job, did
6  you ever look through CitiStaff to place you somewhere else?
7  A.   No, I did not.  I didn't know that I can have CitiStaff
8  place me somewhere else.
9  Q.   Well, you understood that CitiStaff was a staffing agency;
10  correct?
11  A.   Yes, it is a staffing agency.
12  Q.   And in this October 2017 [sic] time period when this
13  incident was going on with Mr. Romero, did you have any contact
14  with Mr. Romero again until January of 2016?
15  A.   Can you state that again?  I think you got the first date
16  wrong.  I think you said October 2017, so...
17  Q.   I'm sorry.  I will rephrase it.
18      In October of 2015, from that time period into
19  January 21st of 2016, did you have any contact with
20  Mr. Martinez?
21  A.   After the elevator incident?
22  Q.   After the elevator incident and before the incident with
23  the drawing on the bales, did you have any contact with
24  Mr. Martinez?
25  A.   No.  I would see him around the factory, though.

527

DIAZ - CROSS / KENNEDY

1  Q.   In the -- strike that.
2      You saw him around.  No contact, no "N" word during that
3  time period; correct?
4      MR. ORGAN:  Objection.  Vague and ambiguous.
5      THE COURT:  Do you want to be more specific?
6      MS. KENNEDY:  I will rephrase.
7  BY MS. KENNEDY:
8  Q.   In the time period from October 17th, 2015, until, say,
9  January 21st, 2016, it's correct you had no contact with
10  Mr. Martinez; correct?
11  A.   I don't remember if I had contact with him or not.
12  Q.   You had --
13  A.   Sorry.
14  Q.   You're sorry.  I didn't mean to cut you off.
15  A.   I said sorry.  I don't remember.  I'm sorry.
16  Q.   During that time period, say, October 17th through
17  January 21st, you would agree that Mr. Martinez made no racial
18  slurs to you; correct?
19  A.   Not that I can remember.
20  Q.   In this time period from October of 2015 to January of
21  2016, you did facilitate an individual, Lamar Patterson, to try
22  to get a job at Tesla; correct?
23  A.   I don't remember exactly when, but, yes, I did try to help
24  Mr. Patterson.
25  Q.   All right.  Maybe I can get a document to refresh your

528

DIAZ - CROSS / KENNEDY

1  recollection.
2      Take a look in the black notebook.
3      MS. KENNEDY:  And this is just for identification,
4  Your Honor.  It's Exhibit 265.
5      (Trial Exhibit 265 marked for identification)
6  BY MS. KENNEDY:
7  Q.   Just take a minute to read that and let me know when
8  you're done, sir.
9      (Witness complied.)
10  A.   It looks like a resume from Mr. Patterson.
11  Q.   Right.  If you take a look, this is the top email, the
12  date from Lamar Patterson to you.
13  A.   Yes, ma'am.
14  Q.   Okay.  Is that your email address from Mr. Patterson?
15  A.   Yes.  That's Mr. Patterson -- that's Mr. Patterson
16  forwarding his email to me, which I forwarded it on to -- I
17  believe it was Ed Romero.
18  Q.   And so does that refresh your recollection that at some
19  point in time Mr. Patterson, in December of 2015, forwarded his
20  resume to you; correct?
21  A.   Yes.  At some point he did forward it to me, ma'am.  Yes,
22  he did.
23  Q.   And when Mr. Patterson forwarded your resume -- strike
24  that.
25      When Mr. Patterson forwarded his resume to you, did you

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

537

DIAZ - CROSS / KENNEDY

1  Q.  Okay.  Just so I can understand, when you were talking to
2  this woman, you told this woman everything that Ramon Martinez
3  had been doing to you; correct?
4  A.  Yes, ma'am.
5  Q.  So you told her at that time that Ramon Martinez had been
6  calling you the "N" word a lot or over several months; correct?
7  A.  Yes, ma'am.
8  Q.  And you told this woman that Ramon Martinez had said
9  something to the effect of:  I hate you "Ns"; correct?
10  A.  I told her everything, ma'am.
11  Q.  And you told this woman that Ramon Martinez had said
12  something to the effect of:  I hate you effing "Ns"; correct?
13  A.  He had told me he hated me specifically.  It was not "You
14  effing 'Ns.'"  He told me he hated me.
15  Q.  Okay.  So let me ask you this then.  Did you tell this
16  woman when she's calling you up about this cartoon, did you
17  tell her that Ramon Martinez said:  I hate you?  That's what
18  Ramon said?
19  A.  While we were at -- we were in the back by the recycling
20  pile --
21  Q.  No.  I'm sorry.  I'm talking about what you told this
22  woman.
23     When you were on the phone, what did you tell her about
24  Ramon Martinez?  That's what I'm asking.  Okay?
25  A.  I told her everything about Ramon Martinez.  I told her

---

538

DIAZ - CROSS / KENNEDY

1  about the incident when we was at the recycling pile and
2  Mr. Martinez had -- had told me:  I hate you.  You know what I
3  mean?  And he called me the "N" word.  I hate you "N."
4     I told her about the time when me and Mr. Martinez was
5  inside of the trailer, and Mr. Martinez and a few other people
6  was in there, and Mr. Martinez told me to go back to Africa.
7  I told her about that.
8     I told her about when we were on south dock, how
9  Mr. Martinez -- we were passing and Mr. Martinez told me he
10  wished he could get all us "Ns" fired.  I explained that to
11  her.
12     I explained to her when we were in the elevator,
13  Mr. Martinez had told me he had -- he was cursing at me and he
14  told me:  "Ns" wasn't -- "Ns" wasn't shit.  Excuse my language
15  again.
16     But these are the things that Mr. Martinez was doing,
17  ma'am.  I'm sorry.
18  Q.  You told all of that to this woman, and it's your
19  testimony that given what we're looking at here, she didn't
20  document any of that; correct?
21  A.  She did document what she wanted to document.  Because
22  when I look at this, you know, she says he mentions history
23  about this.  And then she goes on to say in that same thing
24  that the HR wasn't aware, the branch manager wasn't aware of
25  things that was going on.

---

539

DIAZ - CROSS / KENNEDY

1     When I -- when I kept going on, this is the things that
2  she was doing.  You can see when I ask -- she asked, well, what
3  did I think should happen.  I said, I don't trust him.  I think
4  he should be terminated, ma'am.
5  Q.  That wasn't my question.  My question is -- let me try it
6  a different way.
7     You don't recall the woman you were talking to, her name;
8  correct?
9  A.  No, I do not, ma'am.
10  Q.  And you don't know who she was working for; correct?
11  A.  At the time, I don't -- I don't remember if she stated it
12  or not.  She could have.  I'm just saying I don't remember it.
13  Q.  And you do recall that she was calling to talk to you
14  about this incident about this cartoon drawing and your
15  complaint; correct?  You understood that.
16  A.  Yes, I understood that, ma'am.
17  Q.  And you are testifying that you told this woman everything
18  that Ramon had done to you up until this time period of this
19  drawing; correct?
20  A.  Yes, ma'am.
21  Q.  And what you told her are all the "N" words that Ramon
22  Martinez said to you; correct?
23  A.  I don't know if I told her every last time he said it.  I
24  don't believe I did.
25     You know, I told her what I can remember at that time.  I

---

540

DIAZ - CROSS / KENNEDY

1  told her that he -- the history.  So, yes, I did tell her Ramon
2  was calling me the "N" words.
3  Q.  And at the end of that conversation, according to you,
4  when you told this woman about all the "N" words, did you ask
5  her what is she going to do about it, or did you just hang up
6  the phone?
7  A.  She asked me what did I want to see happen, and then I had
8  told her.
9     Then she asked me did I have anything else.  I told her,
10  no, because of the things that was going on at the factory, I
11  was scared that the rest of the employees or -- or some of the
12  other supervisors was going to retaliate against me.  You can
13  see that right in there.
14     You know, she said that -- you can see in the thing where
15  she said, you know, I felt the picture was a racial statement
16  of a jigaboo.  These are the things that I told her, ma'am.
17  Q.  I understand.  So you didn't -- so you told her things,
18  but you were afraid about retaliation of your coworkers?
19  A.  Yes.  I was -- I was scared that the other supervisor is
20  going to retaliate and things like that.  Because, you know, as
21  we were going around there, there was definitely rumors that,
22  you know, the black employees was getting fired and basically
23  for anything.  You know what I mean?  If they start
24  complaining, you out of here.  You know, if you do this, you're
25  out of here, you know.

541

DIAZ - CROSS / KENNEDY

1     Always, like I said, you know, once -- when you were doing
2  your job and you didn't complain, they loved you.  You know,
3  but the first time you complain, you was enemy number one.
4  Q.  But as of January of 2016, you had complained several
5  times and got a couple of pay increases.  You were still
6  concerned about retaliation; is that correct?
7  A.  But if you look at that, a lot of times --
8  Q.  Is that correct, sir?  Is that correct?
9  A.  Can you repeat the question one more time, please?
10  Q.  Sure.  As of January 2016, you complained several times.
11  You received a couple of pay increases.  Were you, Mr. Diaz,
12  still concerned about retaliation?
13  A.  Yes, I was.
14  Q.  And were you concerned about retaliation even when you
15  complained about Ramon Martinez in January of 2016?
16  A.  In January of 2016?
17  Q.  Yes.
18  A.  Yes, I was.  That's what I stated.  I was scared of the
19  retaliation.
20  Q.  And you were scared about retaliation every time you
21  reported to Ed Romero and everybody else about the "N" word and
22  the graffiti and everything else, but you continued to
23  complain; correct?
24  A.  Yes, I still continued to complain.  Yes, I was scared of
25  retaliation.  But if we go through some more of the documents,

542

DIAZ - CROSS / KENNEDY

1  you will see why.
2  Q.  Okay.
3     THE COURT:  And why don't we do that tomorrow morning?
4  So, ladies and gentlemen, we're done for today.  As you
5  can tell, there's still more to come.
6     So continue to keep an open mind.  Continue to follow my
7  admonitions:  Not talk, not research, not look at anything
8  related to the case.
9     Come back, as you did this morning, bright and early.  If
10  you can be here by 8:15, all the better, and we'll continue
11  tomorrow.
12     Thank you.  Have a good afternoon.
13     (Jury exits the courtroom at 1:30 p.m.)
14     THE COURT:  We will be in recess.
15  (Whereupon at 1:30 p.m. further proceedings
16   were adjourned until Thursday, September 30, 2021
17   at 8:00 a.m.)
18
19
20
21
22
23
24
25

543

I N D E X

Wednesday, September 29, 2021 - Volume 3

PLAINTIFF'S WITNESSES                                PAGE  VOL.

MCGINN, KEVIN
VIDEOTAPED TESTIMONY                                 380    3

DI-AZ, DEMETRIC
VIDEOTAPED TESTIMONY                                 381    3

DIAZ, OWEN ORAPIO
(SWORN)                                              383    3
Direct Examination by Mr. Organ                      383    3

WHEELER, MICHAEL JOHN
(SWORN)                                              421    3
Direct Examination by Mr. Alexander                  421    3
Cross-Examination by Ms. Jeng                        434    3
Redirect Examination by Mr. Alexander                441    3
Recross-Examination by Ms. Jeng                      443    3

DIAZ, OWEN ORAPIO (RECALLED)
(PREVIOUSLY SWORN)                                   448    3
Direct Examination Resumed by Mr. Organ              449    3
Cross-Examination by Ms. Kennedy                     486    3
                     - - -

E X H I B I T S

TRIAL EXHIBITS                                 IDEN  EVID  VOL.

1                                                    459    3

19                                                   393    3

62                                                   388    3

68                                                   468    3

544

I N D E X
E X H I B I T S

TRIAL EXHIBITS                                 IDEN  EVID  VOL.

200                                            490   491    3

204                                            486          3

205                                            494   495    3

217                                                  469    3

224                                                  471    3

245                                                  464    3

261                                                  473    3

265                                            528          3

293                                                  473    3

320                                                  475    3

324                                                  475    3

325                                                  476    3

                     - - -

# EXHIBIT M



**From:** Lamar Patterson <lamarp28@gmail.com>
**Date:** December 15, 2015 at 2:55:19 PM PST
**To:** Odiazjr68@gmail.com
**Subject:** Fwd: Re: Resume


---------- Forwarded message ----------
From: "Lamar Patterson" <lamarp28@gmail.com>
Date: Jul 23, 2015 3:24 PM
Subject: Re: Resume
To: "Ester Santamaria - San Leandro - 0029" <Ester.Santamaria@select.com>
Cc:

# Lamar Patterson

2740 California street
Berkeley, Ca 94703
5106062619 / lamarp28@gmail.com.com

**Objective**:  Hard working spirited individual seeking a professional position in a
warehouse environment with a growth oriented company.

## Experience:

2015-present Sterlin foods union city, Ca
**Santation**

- Cleaned under machines and washed hard pans.
- Mopped floors and kept water off the ground.
- Made sure everything was sanatied and clean.


2015-present Blue Apron Richmond,Ca
**Packer**

- Packed bags and packages with vegtables and other foods.
- Stacked the bags or packages in to diffrent color clear bends.
- Measured each portion before packaging.


2012-2013 Blommers chocolate Union city, Ca
**Batchmaker/Molder**

- Prepare batches with different ingredients and dump them inside one mixer.
- Use the stand up forklift to pick up the pallets of ingredients to take to each mixer.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 265**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

ODIAZ000201

- Use computer to input other ingredients the batches may need.

2005-2008 United Parcel Service (UPS) Richmond , Ca
*Unloader / Sorter*

- Unloaded 5000 Packages with in a work shift.

- Sorted a large volume of packages using a multiple belt conveyor system.

- Functioned as a team leader to assure timely production

2001-2003 Six Flags Marine World Vallejo, Ca
*Cashier / food server / lead*
- Implementing food safety standards and practices according to required regulations.
- Responsible for customer satisfaction such as resolving complaints and make recommendations
- Trained and supervised up to eight employees including duties assignment and disciplinary.

## Education:
- 2009 - Atlas Warehouse Training Program (Graduate)
- 2009 - College Of Alameda
- 2004 - Jesse Bethel High School Vallejo, Ca (Graduate)

## Certifications:
- Forklift Operator- College of Alameda
- HazMat- Brotherhood Of  Teamsters
- Professional Development- The Workforce Collaborative
- Warehouse Operations- College of Alameda

## Skills:
- Strong computer skills ( Microsoft Word, Excel ) Internet proficient
- Forklift Certified ( Electrical, Propane, Pallet Jack )
- Excellent communication skills
- Proficient In Hazardous Material Identification
- Familiar with the use of warehouse forms such as the Bill Of Lading (BOL), Purchase Order (PO) Invoice etc.

-

On Thu, Jul 9, 2015 at 2:55 PM, Ester Santamaria - San Leandro - 0029 <Ester.Santamaria@select.com> wrote:

Hello,

As previously discussed in our conversation, please reply to this email with your resume attached.

Thank you,



**Ester Santamaria**
Administrative Assistant
*Select Staffing*
1673 Industrial Park Way West

Hayward, CA  94544

510.340.1302 Cellphone

510.293.1838 ext. 198 Office • 510.293.1830 fax (On-Site)

510.618.1520 Office • 510.397.1727 Fax (Branch)

ODIAZ000202



Ester.Santamaria@Select.com

EX 265-003

# EXHIBIT N

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 4

---

```
                                    Volume 4
                                    Pages 545 - 699

              UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

          BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND    )
LAMAR PATTERSON                  )
                                 )
                                 )
            Plaintiffs,          )
                                 )
    vs.                          ) No. C 17-6748 WHO
                                 )
TESLA, INC., dba TESLA MOTORS,   )
INC., CITISTAFF SOLUTIONS, INC., )
WEST VALLEY STAFFING GROUP,      )
CHARTWELL STAFFING SERVICES, INC.,)
and DOES 1-50, inclusive,        )
                                 )  San Francisco, California
            Defendants.          )  Thursday
_____  )  September 30, 2021
                                 )  8:00 a.m.

         TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                     BY: BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                     BY: LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

         (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR
                Official Reporter - US District Court
                Computerized Transcription By Eclipse
```

---

```
                                                    546

APPEARANCES:  (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                     BY: TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                     BY: PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                     BY: SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                           -  -  -
```

---

```
                                                    547
                     PROCEEDINGS
1    Thursday - September 30, 2021          8:01 a.m.
2                   P R O C E E D I N G S
3                      ---o0o---
4       (Proceedings were heard out of presence of the jury:)
5       THE CLERK:  Please come to order.
6       THE COURT:  Please be seated.
7       I understand that there are problems on the bridge and not
8    only is it impacting Mr. Organ, but also at least one of the
9    jurors.  So it will resolve when it resolves.
10      So there were just a couple of things -- two things on my
11   mind this morning.
12      One is I will give the proposed instruction on the persons
13   most knowledgeable as it was written last night and what was
14   just proposed and previously proposed and I said I was going to
15   read it.
16      And then the other issue was Mr. Organ yesterday was about
17   to read some discovery.  Do we know what that is?  And --
18      MR. ALEXANDER:  Yes, Your Honor.  I believe that we
19   submitted that documentation to you last night.  My
20   understanding is that it was going to be submitted so that
21   everyone would know what was going to be read.
22      THE COURT:  Okay.  I didn't see it this morning.
23   Ms. Kennedy, do you know what it is?
24      MS. KENNEDY:  I do not, Your Honor.
25      MR. ALEXANDER:  We should be able to provide printed
```

---

```
                                                    548
                     PROCEEDINGS
1    copies of that.
2       THE COURT:  Okay.  That would be great.  Why don't you
3    provide it to Ms. Kennedy so she knows what it is that you're
4    talking about.  And if there's no problem, then we can proceed;
5    and if there's a problem, I'd like to know about it.
6       (Whereupon document was tendered to the Court and
7       counsel.)
8       (Brief pause.)
9       THE COURT:  Mr. Alexander, while we're waiting, who
10   are the witnesses today?
11      MR. ALEXANDER:  As I understand it, the witnesses are
12   we're going to complete Mr. Diaz.  Then we'll have La'Drea
13   Diaz.  Then we'll have Dr. Anthony Reading.  Then we'll have
14   Amy Oppenheimer.
15      THE COURT:  And will that complete your case?
16      MR. ALEXANDER:  No.  I believe that we have -- I
17   believe that we have Lamar Patterson and the Erin Marconi
18   video.  And with regard to Mr. Patterson, it's unclear where he
19   will be in the lineup.
20      THE COURT:  Okay.
21      MR. ALEXANDER:  And then there's the Heisen transcript
22   as well?
23      THE COURT:  The Heisen?
24      MR. ALEXANDER:  Yes.
25      THE COURT:  Okay.  All right.
```

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 4

561

DIAZ - CROSS / KENNEDY

1    in the sustainability group.
2    Q.   And who is "they"?
3    A.   Umm --
4         MS. KENNEDY:  Oh, I'm sorry, Your Honor.  I don't
5    think the TV in the back is working for the jurors.
6         THE COURT:  Okay.
7         MS. KENNEDY:  Oh, there it is.
8         THE COURT:  Let us know when you -- is it up there?
9    There it goes.
10        MS. KENNEDY:  Okay.  Now I forgot where I was.
11   BY MS. KENNEDY:
12   Q.   So at the time that you filled out this application and
13   you were sent over to the Tesla factory, you didn't have any
14   idea where you were going to be assigned; is that correct?
15   A.   No, ma'am.
16   Q.   So when you got over there, someone sent you over to the
17   sustainability area or department; correct?
18   A.   When I got to Tesla, after I finished my orientation
19   class, Jaime Salazar put me on the back of a golf cart and at
20   that point he drove me to the elevator ramp.
21   Q.   Mr. Diaz, did you ask anybody at Tesla:  Where am I going?
22   What job am I hired for?  What's going on?  Any questions like
23   that?
24        MR. ORGAN:  Objection.  Compound, Your Honor.
25        MS. KENNEDY:  I'll rephrase it, Your Honor.

562

DIAZ - CROSS / KENNEDY

1         THE COURT:  Sustained.
2    BY MS. KENNEDY:
3    Q.   At the time that you got over to Tesla for your
4    orientation, did you ask anybody, like:  What job am I going to
5    get?  Did you ask that question?
6    A.   No, I did not, ma'am.  I was just so happy to be there, I
7    didn't ask them questions.  I'm sorry.
8    Q.   Did you ask what type of -- did they ask you what type of
9    job you wanted?
10   A.   When I had initially filled out the -- both applications,
11   yes, they did ask me what kind of work that I was looking for.
12   I said warehouse, production work, things like that.
13        Yes.  So, yes, I did ask the kind of job that I wanted.
14   Q.   When you were on the cart with Jaime Salazar, did you ask
15   him any question like:  Hey, what am I being hired for?
16   A.   No, ma'am.  Because at that point when Mr. Salazar had put
17   me on the golf cart, before that he had stated to me:  You're a
18   man that dresses for the job.  And he had gave me another
19   position.  I was just so happy I got promoted.  So, hey, I
20   didn't ask any questions.  I just followed.
21   Q.   Okay.  So you're happy you got some type of job.  You
22   didn't ask any questions, and you're ready to go start working
23   at your assignment at Tesla in early June 2015?
24        MR. ORGAN:  Objection.  Compound.  Asked and answered.
25        THE COURT:  Sustained.

563

DIAZ - CROSS / KENNEDY

1    BY MS. KENNEDY:
2    Q.   Once you started working at Tesla, you were assigned to
3    work at the elevators; correct?
4    A.   Yes, ma'am.
5    Q.   All right.  Let's go to Exhibit 265, which has been marked
6    for identification yesterday.
7         MR. ORGAN:  265?
8         MS. KENNEDY:  265.
9         MR. ORGAN:  265.
10   BY MS. KENNEDY:
11   Q.   And, sir, it should be in your black book as well.
12   A.   Yes, ma'am.  I see it here.
13   Q.   And we talked about this yesterday, but I want to confirm
14   that this is an email that was forwarded to you from Lamar
15   Patterson on December 15th, 2015; correct?
16   A.   Yes.  Mr. Patterson did forward me his resume.  Yes, he
17   did.
18   Q.   And at the top of Exhibit 275 -- I'm sorry, 265, the
19   December 15th, 2015 email, that's to your email address;
20   correct, Mr. Diaz?
21   A.   Yes.  That's my name and my last -- my last JR, my birth
22   date with a 68 at gmail.com, yes, ma'am.
23        MS. KENNEDY:  And, Your Honor, I would move to admit
24   Exhibit 265.
25        MR. ORGAN:  No objection, Your Honor.

564

DIAZ - CROSS / KENNEDY

1         THE COURT:  It's admitted.
2         (Trial Exhibit 265 received in evidence)
3    BY MS. KENNEDY:
4    Q.   All right.  So take a look at this.  So just to reorient,
5    Lamar Patterson was someone who was referred to you by another
6    Tesla employee or contractor?  How did you get to know
7    Mr. Patterson?
8    A.   I didn't know Mr. Patterson at the time.  As I stated
9    yesterday, that another employee walked up to me and asked me
10   was there any positions over in the elevator.  And I explained
11   to him, yes, because at that time I was short staffed.  I was
12   working elevators by myself.
13        So as soon as he said that, I told him yes.  He asked me
14   could a person forward his email to me and could I forward it
15   up to somebody else, and I did just that.
16   Q.   And was it your understanding that this person was Lamar
17   Patterson's cousin?
18   A.   Yes, ma'am.
19   Q.   And Lamar Patterson's cousin worked with you at the Tesla
20   factory; correct?
21   A.   Yes.  He worked at the Tesla factory, but he did not work
22   with me directly, no.
23   Q.   And so you heard that someone was looking for a position
24   that you find out later is Lamar Patterson, and then you just
25   forwarded his resume to someone?

EXHIBIT O

1             UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4

**REPORTER CERTIFIED
TRANSCRIPT**

5  _____

6  DEMETRIC DI-AZ, OWEN DIAZ and
   LAMAR PATTERSON, an individual,

**CONFIDENTIAL**

7

8          Plaintiffs,

9  Vs.                    Case No. 3:17-cv-06748-WHO

10 TESLA, INC. DBA TESLA MOTORS,
   INC.; CitiStaff SOLUTIONS, INC.;

11 WEST VALLEY STAFFING GROUP;
   CHARTWELL STAFFING SERVICES, INC.

12 and DOES 1-10, inclusive,

13          Defendants.
   _____/

14

15

16             CONFIDENTIAL

17        VIDEOTAPED DEPOSITION OF

18             OWEN DIAZ

19        SAN FRANCISCO, CALIFORNIA

20        TUESDAY, MAY 22, 2018

21

22

23

24 Reported By:
   Candy Newland
   CSR No. 14256

25 File No. 18-25470

**CHASE**
LITIGATION SERVICES

**Owen Diaz-Confidential**

| | |
|---|---|
| 03:45:48 1 | security; correct? |
| 03:45:49 2 | A.      That's what the e-mail says.  Yes. |
| 03:46:11 3 | MR. ORGAN:  You need a break? |
| 03:46:14 4 | THE WITNESS:  We can keep going. |
| 03:46:27 5 | (EXHIBIT 13 was marked for identification.) |
| 03:46:27 6 | BY MS. ANTONUCCI: |
| 03:46:29 7 | Q.      Exhibit 13 is an e-mail dated -- a series of |
| 03:46:35 8 | e-mails, rather, dated December 15, 2015, Bates-stamped |
| 03:46:37 9 | at the bottom Tesla 43 through 46. |
| 03:46:50 10 | Did you, on December 15, 2015, forward Lamar |
| 03:46:57 11 | Patterson's resume to Ed Romero? |
| 03:46:57 12 | A.      Yes. |
| 03:47:01 13 | Q.      Why did you do that? |
| 03:47:03 14 | A.      Because he was looking for a job. |
| 03:47:07 15 | Q.      Did you recommend to Ed Romero that he be hired? |
| 03:47:16 16 | A.      Yes. |
| 03:47:18 17 | Q.      And why did you think that Lamar Patterson would |
| 03:47:21 18 | be a good fit for the elevator job? |
| 03:47:27 19 | A.      Another African-American employee told me that |
| 03:47:30 20 | his family member was looking for a job, and he told me |
| 03:47:35 21 | he was a hard worker; so I recommended him for the job. |
| 03:47:39 22 | Q.      And who was the African-American employee that |
| 03:47:41 23 | told you his family member was looking for a job? |
| 03:47:46 24 | A.      I can't recall at this time. |
| 03:47:58 25 | Q.      Did you speak to Patterson about working at the |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 03:49:25 | 1 | remember their names. |
| 03:49:26 | 2 | Q.      Had Robert by this point called you the N-word? |
| 03:49:30 | 3 | A.      Yes. |
| 03:49:39 | 4 | Q.      And Lamar Patterson is African-American; |
| 03:49:42 | 5 | correct? |
| 03:49:42 | 6 | A.      Yes. |
| 03:50:01 | 7 | (EXHIBIT 14 was marked for identification.) |
| 03:50:01 | 8 | BY MS. ANTONUCCI: |
| 03:50:19 | 9 | Q.      Exhibit 14 is an e-mail from you to Ed Romero |
| 03:50:30 | 10 | where -- Bates-stamped Tesla 5 to Tesla 8. |
| 03:50:39 | 11 | Do you see that? |
| 03:50:39 | 12 | A.      Yes. |
| 03:50:42 | 13 | Q.      Did you send this e-mail? |
| 03:50:45 | 14 | A.      Yes. |
| 03:50:45 | 15 | Q.      The e-mail is dated January 22, 2016.  Did you |
| 03:50:51 | 16 | send it on that date? |
| 03:50:53 | 17 | A.      Yes. |
| 03:51:00 | 18 | Q.      Did anybody help you write this? |
| 03:51:03 | 19 | A.      No. |
| 03:51:03 | 20 | Q.      Had you had -- had you consulted an attorney |
| 03:51:08 | 21 | prior to writing this? |
| 03:51:10 | 22 | A.      No. |
| 03:51:13 | 23 | Q.      Did you take the photographs on Tesla 6 and 7 of |
| 03:51:20 | 24 | this document, Exhibit 14? |
| 03:51:22 | 25 | A.      Yes. |

# EXHIBIT P

**From**: Edward Romero [edromero@teslamotors.com]
**Sent**: 1/28/2016 6:17:16 PM
**To**: Wayne Jackson @ Telsa [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WayneJacksonTeslaaefc3@NextSource600]
**CC**: Victor Quintero [vquintero@teslamotors.com]; Parks, Vanessa [/O=OEXCH032/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Vparks@NextSourcedc2]
**Subject**: Elevator Staf Raises

Please increase the following elevator operators pay as follows:

█████████████████████

3. Owen Diaz from $16 to $18 (lead)

██████████████████████████

All other staff has been increased already.

Thanks,

Edward Romero
Building Services Contract Supervisor
1-510-648-7393

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 293**

CASE NO. 17-cv-06748-WHO

DATE ENTERED _____

BY _____

DEPUTY CLERK

CONFIDENTIAL

NS000021

# EXHIBIT Q



[redacted]

Taleo Bus Edition ~ Premium

TESLA

5 Help Logout

Pipeline | Requisitions | Candidates | Reports | EU Talent Pools, Non-US

**Quick Search** <

Candidate Keywords

Advanced Search

Candidate First Name

Candidate Last Name

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**EX 379**

CASE NO. 17-cv-06748-WHO

DATE ENTERED ____________

BY ______________________

DEPUTY CLERK

[redacted]

EXHIBIT 9
WIT: Di-az
DATE: 8/15/18
Candy Newland, CSR #14256

## Candidate: Demetric G. Di-az

Flag Back To List Previous

Full View | Short View | Application Details | Work & Edu History | Contact Details | Roland's View

### Requisition Summary

Attach Requisition

| Req. ID | Business Title | Candidates | Status | Req. Status | Next Steps (Req) | Requisition-specific Reason for Rejection | Date Applied | Action |
|---|---|---|---|---|---|---|---|---|
| 29164 | Associate Product Excellence Engineer - Powertrain | 101 | Filled | New to Req | Approve for Onsite Interview | | 10/26/15 | Remove |
| 19536 | Production Associate, Assembly Line | 7176 | Closed | New to Req | Approve for Onsite Interview | | 10/26/15 | Remove |

### Comments

New Comment

| Last Updated | User | Comment | Action |
|---|---|---|---|
| 5/26/17 7:42 AM | Hua, Tai | not Eligible. temp at tesla for 2 months. | Edit |

### Contact Log

Send An Email | Log A Call | Log A Response

No contacts logged

Edit Send To Forms Printable View More

### Candidate Information

| | | | |
|---|---|---|---|
| ID: | 545452 | ZIP/Postal code: | 94531 |
| First Name: | Demetric | State/Province/Region: | California |
| Last Name: | Di-az | Country: | United States |
| Middle: | G. | Nationality: | |
| Preferred Name: | | Candidate Notes: | |
| Primary Phone #: | 510 6108363 | Hiring Justification Note: | |
| Alternate Phone #: | | Talent Pools: | |
| Email: | demetricdiaz@gmail.com | Civil Status: | |

https://chj.tbe.taleo.net/chj05/ats/candidates/CandidateView.jsp?act=show&id=545452&orgCode=TESLA&pipeSeparatedParamNames=%7Cact%7Cid%7CorgCode%7CpipeSeparatedParamNames%7... 1/7

Taleo Bus : Edition ~ Premium

| | |
|---|---|
| Street address: **2821 Mayflower Drive** | Age: |
| City: **Antioch** | Users: |
| State/Territory: | |

## Resume and Cover Letter

Attach resume:

Cover Letter: I plan on furthering my education in the near future to pursue a career in Engineering. I know I am a great fit for this job. I am a team player, determined, & will put forth 100% towards this jobs. I have open availability & will start immediately. I can reached at my primary phone number at anytime.

## Additional Information

Work Authorization: I am authorized to work in this country for any employer

Current Salary:

Highest Education Level:

## Tier 2 Application Data

Are you at least 18 years of age?

18+:

Can you after employment, submit verification of your legal right to work in the United States?

Proof of Work Authorization: Yes

Have you ever worked for Tesla Motors or any of its subsidiaries? If yes, please provide title, dates of employment, location, and department.

Previous Employee:

Previous Employee Details:

Have you applied to us before? If yes, please tell us when and what position you applied to?

Previous Applicant:

Previous Applicant Details:

## Source Details

| | |
|---|---|
| Sourcer: | Employee Referred By: |
| Source: **Tesla - Tesla Website** | Relationship to Referral: |
| Other (Specify Source): | Referred Department: |
| University/College: | Referred Country: |
| Other School: | |

CONFIDENTIAL

TESLA-0000147

**EX 379-002**

Taleo Bus   Edition ~ Premium

Edit    Send To    Forms    Printable View    More ⌄

## Work History Summary

| Date From | Date To | Title | Company Name | Company City State | Final Rate Of Pay | Description |
|-----------|---------|-------|--------------|-------------------|-------------------|-------------|
| August 2015 | October 2015 | Production Technician | West Valley Staffing Group (Tesla Motors) | | $18.70 | |
| July 2014 | July 2015 | Guard | UPS | | $10.25 | |

## Education History:

### Education

| | |
|---|---|
| Date From: | State/Territory: **CA** |
| Date To: | Overall GPA: |
| School Name: **School** | Type of Degree or Diploma: **High School Diploma / GED** |
| Degree Achieved: **HIGH SCHOOL GRADUATE** | Did you graduate?: **Yes** |
| City: **Pittsburg** | |

## References:

No References History

## Background & Certification

**Background**
  Valid Driver's License:
  Driving History Details:

**Certification**

**1.** I certify that all statements I have made on this application and on my resume or any other supplementary materials are true and correct. I acknowledge that any false statement or misrepresentation on this application, my resume, or supplementary materials will be cause for refusal to hire, or for immediate termination of employment at any time during the period of my employment.

**2.** I herby authorize Tesla Motors or its agents to investigate my background to obtain information concerning my abilities and desirability as an employee, and to verify the accuracy of information provided by me. In connection with this investigation, I authorize my former employers, the references listed, and all other individuals or entities to give Tesla Motors or its agents any and all information concerning my previous employment, work performance and character. I release all such persons or entities, Tesla Motors and its agents from all claims and liabilities of any kind arising from any part of the investigation, the furnishing of or use of this information.

**3.** I understand and agree that, if I am offered a position, it will be offered on condition that my employment will be at will and for no definite period, and that my employment may be terminated, at any time, with or without cause and with or without prior notice.

**4.** I understand that no supervisor or manager may alter or amend the above conditions except in writing, signed by a company officer.

CONFIDENTIAL

TESLA-0000148

**EX 379-003**

Taleo Bus    Edition ~ Premium

5. If I am offered employment, I will, as a condition of employment, be able to submit proof of my identity and legal right to work in the United States.

6. I have read and understand the foregoing statements and accept them as conditions of employment.

I Agree:✔
Initials:DGD
Today's Date:10/26/15

### History Log  Printable View | View Entire Log

| Date/Time | User | Content | Method | View |
|---|---|---|---|---|
| 5/26/17 7:42 AM | Hua, Tai | Comment updated | | |
| 5/25/17 3:11 PM | Hua, Tai | Comment added | | |
| 10/26/15 9:50 PM | | Email message **Thank you** sent to demetricdiaz@gmail.com | | View |
| 10/26/15 9:50 PM | | Candidate submitted Application Form - Full Application for Production Associate, Assembly Line - [19536]    from Employment Website | | |
| 10/26/15 9:50 PM | | Candidate requisition link updated | | |
| 10/26/15 9:50 PM | | Submitted for requisition Production Associate, Assembly Line - [19536]     with Requisition-Specific Status = New to Req | | |
| 10/26/15 9:50 PM | | Candidate data updated | Manual | |
| 10/26/15 9:44 PM | | Email message Thank you sent to demetricdiaz@gmail.com | | View |
| 10/26/15 9:44 PM | | Candidate submitted Application Form - Full Application for Product Excellence Engineer - Powertrain - [29164]    from Employment Website | | |
| 10/26/15 9:44 PM | | Candidate requisition link updated | | |
| 10/26/15 9:44 PM | | Submitted for requisition Product Excellence Engineer - Powertrain - [29164]     with Requisition-Specific Status = New to Req | | |

### Interviews  Schedule interview

No interviews created

### Interview Feedback  New Feedback

Feedback list is empty

### Reference Checks  New Reference

No reference checks created

### Background Checks  New Background

CONFIDENTIAL

TESLA-0000149

**EX 379-004**

Taleo Bus   . Edition ~ Premium

No background checks created

---

### Offer Letters  New Offer

No offer letters created

---

### Requisition Details:

---

#### Associate Product Excellence Engineer - Powertrain

Next Steps:   Approve for Onsite Interview ▼

| | |
|---|---|
| Date Applied: **10/26/15** | Starting Status: **New to Req** |
| Application Form: **Application Form - Tier 1** | Source: **Tesla - Tesla Website** |
| Resume: 📄 | Referred By: |

Cover Letter:   I plan on furthering my education in the near future to pursue a career in Engineering. I know I am a great fit for this job. I am a team player, determined, & will put forth 100% towards this jobs. I have open availability & will start immediately. I can reached at my primary phone number at anytime.

| | |
|---|---|
| Req Rank: | ACE: |
| Online Questions: | |
| eSignature: | eSignature Date: |
| | |
| Req. Status: **New to Req** | Pre-Rejection Status: |
| In Status Date: **10/26/15** | Requisition-specific Reason for Rejection: |
| | |
| Hired Date: | Start Date: |

---

#### Production Associate, Assembly Line

Next Steps:   Approve for Onsite Interview ▼

| | |
|---|---|
| Date Applied: **10/26/15** | Starting Status: **New to Req** |
| Application Form: **Application Form - Tier 1** | Source: **Tesla - Tesla Website** |
| Resume: 📄 | Referred By: |

CONFIDENTIAL

TESLA-0000150

**EX 379-005**

Taleo Bus        Edition ~ Premium

Cover Letter:   I plan on furthering my education in the near future to pursue a career in Engineering. I know I am a great fit for this job. I am a team player, determined, & will put forth 100% towards this jobs. I have open availability & will start immediately. I can reached at my primary phone number at anytime.

Req Rank:                                                          ACE:

Online Questions:

eSignature:                                                       eSignature Date:

Req. Status:  **New to Req**                                      Pre-Rejection Status:

In Status Date:  **10/26/15**                                     Requisition-specific Reason for Rejection:

Hired Date:                                                       Start Date:

---

**Attachments**  Add Attachment

No attachments added.

---

**Tracking Information**

Added to system:**10/26/15 9:44 PM**                    Start date:
Last updated:**10/26/15 9:50 PM**                       Main status:**New**

---

**TalentWise Hire**



Setup TalentWise Account

---

**Voluntary EEO Questionnaire**

Secondary Source:

---

**Contacts**  Attach

No Contacts have been associated with Demetric G. Di-az.

CONFIDENTIAL

TESLA-0000151

**EX 379-006**

Taleo Bus    Edition ~ Premium

**Users**  Attach

No Users have been associated with Demetric G. Di-az.

Copyright ©2002-2018 Taleo Corporation. All rights reserved. Privacy / Security | Terms of Use

CONFIDENTIAL

TESLA-0000152

**EX 379-007**