LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
MARQUI HOOD (SBN 214718)
marqui@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:     (415)-453-7352
Facsimile:     (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
balexander@amfllp.com
**ALEXANDER MORRISON + FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:     (310) 394-0888
Facsimile:     (310) 394-0811

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
JONATHAN ROSENTHAL (SBN 329638)
jrosenthal@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Facsimile:     (415) 362-8064

*Attorneys for Plaintiff Owen Diaz*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OWEN DIAZ,<br><br>            Plaintiff,<br><br>      v.<br><br>TESLA, INC. DBA TESLA MOTORS, INC.,<br><br>            Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**DECLARATION OF CIMONE NUNLEY IN SUPPORT OF PLAINTIFF'S BRIEF IN OPPOSITION TO TESLA, INC.'S MOTIONS *IN LIMINE* NOS. 1-4** |

I, CIMONE A. NUNLEY, hereby declare:

1. I am an attorney licensed to practice law in the State of California.  I am an attorney with the law firm of California Civil Rights Law Group, attorneys of record for Plaintiff Owen Diaz in this action.  I submit this Declaration in support of Plaintiff's Opposition to Defendant's Motions *in Limine*.  I have personal knowledge of the facts stated herein and if called upon to testify, I could and would competently testify thereto, except as to those matters that are stated upon information and belief.

2. Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the deposition of Owen Diaz.

3. Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the deposition of Demetric Di-az.

4. Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the deposition of Lamar Patterson.

5. Attached hereto as **Exhibit D** is a true and correct copy of excerpts from the deposition of Andres Donet.

6. Attached hereto as **Exhibit E** is a true and correct copy of Trial Exhibit 109.

7. Attached hereto as **Exhibit F** is a true and correct copy of excerpts from day one of the first trial in this matter.

8. Attached hereto as **Exhibit G** is a true and correct copy of excerpts from day two of the first trial in this matter.

9. Attached hereto as **Exhibit H** is a true and correct copy of excerpts from day three of the first trial in this matter.

10. Attached hereto as **Exhibit I** is a true and correct copy of excerpts from day four of the first trial in this matter.

11. Attached hereto as **Exhibit J** is a true and correct copy of excerpts from day five of the first trial in this matter.

12. Attached hereto as **Exhibit K** is a true and correct copy of excerpts from day six of the first trial in this matter.

13. Attached hereto as **Exhibit L** is a true and correct copy of Trial Exhibit 138.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 10, 2023 in San Anselmo, California.

Dated:   February 10, 2023

                               **CALIFORNIA CIVIL RIGHTS LAW GROUP**
                               **ALEXANDER MORRISON + FEHR LLP**
                               **ALTSHULER BERZON LLP**

                                    /s/ Cimone A. Nunley
                               Lawrence A. Organ
                               Cimone A. Nunley
                               J. Bernard Alexander III
                               Michael Rubin
                               Jonathan Rosenthal
                               Attorneys for Plaintiff
                               OWEN DIAZ

# Exhibit A

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4

5   _____

6   DEMETRIC DI-AZ, OWEN DIAZ and
    LAMAR PATTERSON, an individual,

7
            Plaintiffs,

8
    Vs.                    Case No. 3:17-cv-06748-WHO

9
    TESLA, INC. DBA TESLA MOTORS,

10  INC.; CitiStaff SOLUTIONS, INC.;
    WEST VALLEY STAFFING GROUP;

11  CHARTWELL STAFFING SERVICES, INC.
    and DOES 1-10, inclusive,

12
            Defendants.

13  _____/

14

15
                 CONFIDENTIAL

16
           VIDEOTAPED DEPOSITION OF

17
                  OWEN DIAZ

18
           SAN FRANCISCO, CALIFORNIA

19
            TUESDAY, MAY 22, 2018

20

21

22

23

24  Reported By:
    Candy Newland
    CSR No. 14256

25  File No. 18-25470

**REPORTER CERTIFIED TRANSCRIPT**

**CONFIDENTIAL**

**CHASE** LITIGATION SERVICES

**Owen Diaz-Confidential**

1    Deposition of OWEN DIAZ, taken on behalf of Defendants

2    at 351 California Street, Suite 200, San Francisco,

3    California, commencing at 10:11 a.m. on Tuesday, May 15,

4    2018, before Candy Newland, Certified Shorthand Reporter

5    No. 14256.

6

7                    A P P E A R A N C E S

8

9    FOR THE PLAINTIFFS:

10

11              CALIFORNIA CIVIL RIGHTS LAW GROUP

12              BY:  LAWRENCE A. ORGAN, ESQ.

13              332 San Anselmo Avenue

14              San Anselmo, CA 94960

15              (415) 453-4740

16              larry@civilrightsca.com

17

18              CALIFORNIA CIVIL RIGHTS LAW GROUP

19              BY:  NAVRUZ AVLONI, ESQ.

20              332 San Anselmo Avenue

21              San Anselmo, CA 94960

22              (415) 453-4740

23              navruz@civilrightsca.com

24

25

```
 1   APPEARANCES(CONTINUED)

 2

 3   FOR THE DEFENDANT TESLA:

 4

 5           CONSTANGY BROOKS, SMITH & PROPHETE, LLP

 6           BY:  BARBARA I. ANTONUCCI, ESQ.

 7           351 California Street, Suite 200

 8           San Francisco, CA 94104

 9           (415) 918-3000

10           bantonucci@constangy.com

11

12   FOR THE DEFENDANT WEST VALLEY STAFFING:

13

14           PAHL & MCCAY

15           BY:  FENN C. HORTON, III, ESQ.

16           225 West Santa Clara, Suite 1500

17           San Jose, CA 95113-1752

18           (408) 286-5100

19           fhorton@pahl-mccay.com

20

21   ALSO PRESENT:

22           Jaime Bodiford, Tesla

23           Rob Delantoni, Videographer

24

25
```

**Owen Diaz-Confidential**

```
11:34:14   1    A.      I didn't know their names.

11:34:18   2    Q.      Do you know their names now?

11:34:21   3    A.      No.

11:34:45   4    Q.      How many people were calling you the N-word?

11:34:52   5    A.      Two of the supervisors and a few other

11:35:02   6    employees.

11:35:12   7    Q.      Do you know the names of the supervisors?

11:35:16   8    A.      Yes.

11:35:17   9    Q.      And who are they?

11:35:19  10    A.      Robert -- I don't know his last name -- and

11:35:26  11    Ramon Martinez.

11:35:36  12    Q.      And you said a few other employees.  Do you know

11:35:38  13    their names?

11:35:42  14    A.      No.

11:35:45  15    Q.      By "few," how many employees were calling you

11:35:48  16    the N-word?

11:36:06  17    A.      I'm going to to say around -- about 8 to 10.

11:36:19  18    Q.      Okay.  How many times did Robert call you the

11:36:29  19    N-word?

11:36:32  20    A.      I can't recall.

11:36:34  21    Q.      Was it less than five?

11:36:44  22    A.      No.

11:36:44  23    Q.      Was it more than five?

11:36:46  24    A.      Yes.

11:36:46  25    Q.      Was it less than 10?
```

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:36:52 | 1 | A.      No. |
| 11:36:54 | 2 | Q.      Was it less than 15? |
| 11:37:01 | 3 | A.      I can't give you an exact number. |
| 11:37:05 | 4 | Q.      Was it somewhere between 10 and 15? |
| 11:37:09 | 5 | A.      I can't give you an exact number. |
| 11:37:11 | 6 | Q.      Okay.  I don't need an exact number.  I just |
| 11:37:14 | 7 | need an estimate to the best of your recollection. |
| 11:37:31 | 8 | A.      I'd say other 30 times. |
| 11:37:41 | 9 | Q.      And how many times did Ramon Martinez call you |
| 11:37:44 | 10 | the N-word? |
| 11:37:45 | 11 | A.      More than 30 times. |
| 11:37:55 | 12 | Q.      Is there anything you can describe to me about |
| 11:37:58 | 13 | the 8 to 10 employees that called you that -- called you |
| 11:38:01 | 14 | the N-word? |
| 11:38:08 | 15 | A.      They were just working on the production floor, |
| 11:38:12 | 16 | the battery line. |
| 11:38:16 | 17 | Q.      All 8 to 10 were working on the battery line? |
| 11:38:20 | 18 | A.      Either production or the battery line. |
| 11:38:40 | 19 | Q.      Were any of them in recycling? |
| 11:38:45 | 20 | A.      Possible. |
| 11:39:01 | 21 | Q.      What race is Robert? |
| 11:39:04 | 22 | A.      Hispanic. |
| 11:39:07 | 23 | Q.      And what about Ramon? |
| 11:39:09 | 24 | A.      Hispanic also. |
| 11:39:12 | 25 | Q.      And what about the 8 to 10 employees? |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 11:41:40 | 1 | Q.      Can you remember the first time that Robert |
| 11:41:43 | 2 | called you the N-word? |
| 11:41:50 | 3 | A.      We were in the elevator. |
| 11:41:55 | 4 | Q.      And what did she say? |
| 11:41:59 | 5 | A.      "N, hurry up and push the button." |
| 11:42:19 | 6 | Q.      And what did you say? |
| 11:42:23 | 7 | A.      Nothing. |
| 11:42:33 | 8 | Q.      And did you report that to Mr. Romero? |
| 11:42:37 | 9 | A.      No. |
| 11:42:45 | 10 | Q.      Why not? |
| 11:42:51 | 11 | A.      I wanted to keep -- I didn't want to rock the |
| 11:42:55 | 12 | boat.  I wanted to keep working. |
| 11:42:58 | 13 | Q.      Do you remember the second time that Robert used |
| 11:43:09 | 14 | the N-word? |
| 11:43:12 | 15 | A.      I can't recall. |
| 11:43:28 | 16 | Q.      Was it in the elevator? |
| 11:43:34 | 17 | A.      I can't recall. |
| 11:43:39 | 18 | Q.      Do you remember what was said exactly? |
| 11:43:46 | 19 | A.      I can't recall exactly what was said, but I -- I |
| 11:44:19 | 20 | can't recall. |
| 11:44:19 | 21 | Q.      Do you remember generally what was said? |
| 11:44:28 | 22 | A.      I can't generally, no. |
| 11:44:35 | 23 | Q.      Do you remember what was said on any of the |
| 11:44:40 | 24 | other occasions that Robert called you the N-word? |
| 11:44:49 | 25 | A.      Some of them.  Yes. |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:42:00 | 1 | that you know of? |
| 04:42:02 | 2 | A.      Possibility. |
| 04:42:07 | 3 | Q.      Do you know whether he did or not? |
| 04:42:08 | 4 | A.      I don't know. |
| 04:42:11 | 5 | Q.      Did Robert ever tell you that he was going to |
| 04:42:15 | 6 | complain to his boss about you? |
| 04:42:23 | 7 | A.      I believe so.  Yes. |
| 04:42:25 | 8 | Q.      And didn't you respond by calling him a snake? |
| 04:42:31 | 9 | A.      I don't recall. |
| 04:42:32 | 10 | Q.      Did Robert tell you what he was going to |
| 04:42:39 | 11 | complain to his boss about? |
| 04:42:42 | 12 | A.      No. |
| 04:42:45 | 13 | Q.      When did Robert tell you he was going to |
| 04:42:48 | 14 | complain to his boss about you? |
| 04:42:50 | 15 | A.      I don't recall. |
| 04:43:24 | 16 | (EXHIBIT 20 was marked for identification.) |
| 04:43:24 | 17 | BY MS. ANTONUCCI: |
| 04:43:28 | 18 | Q.      Exhibit 20 is a series of e-mails, Bates-stamped |
| 04:43:34 | 19 | at the bottom Tesla 314 to 316.  And at the bottom of |
| 04:43:55 | 20 | page 315, there's an e-mail from Joyce Dela Grande to |
| 04:44:02 | 21 | Ed Romero that says, "So I'm having a few more issues |
| 04:44:07 | 22 | with Owen.  Tonight my lead approached him to talk to |
| 04:44:12 | 23 | him, and he said for my associates to only talk to him |
| 04:44:15 | 24 | if it is related to business because there are so many |
| 04:44:19 | 25 | snakes here at Tesla." |

**Owen Diaz-Confidential**

| | | |
|---|---|---|
| 04:44:21 | 1 | Did you ever say that? |
| 04:44:24 | 2 | A. No. |
| 04:44:26 | 3 | Q. You never said, "There is so many snakes here at |
| 04:44:30 | 4 | Tesla"? |
| 04:44:31 | 5 | A. No. |
| 04:44:32 | 6 | Q. Did you ever tell anyone at Tesla to only talk |
| 04:44:42 | 7 | to you if it was related to business? |
| 04:44:45 | 8 | A. Yes. |
| 04:44:46 | 9 | Q. Who did you say that to? |
| 04:44:51 | 10 | A. Robert. |
| 04:45:08 | 11 | Q. It says, "I guess he was having a personal |
| 04:45:11 | 12 | conversation on the elevator with someone and thought |
| 04:45:14 | 13 | Robert saying hi to him was rude." |
| 04:45:17 | 14 | Were you -- did you ever feel that Robert saying |
| 04:45:20 | 15 | hi to you was rude? |
| 04:45:22 | 16 | MR. ORGAN:  Objection.  Vague and ambiguous. |
| 04:45:25 | 17 | THE WITNESS:  I felt -- I was tired of Robert |
| 04:45:30 | 18 | calling me "niggers" and "boy." |
| 04:45:30 | 19 | BY MS. ANTONUCCI: |
| 04:45:36 | 20 | Q. "His response to my lead was he does not want |
| 04:45:39 | 21 | anyone talking to him." |
| 04:45:40 | 22 | Did you ever tell anybody that you didn't want |
| 04:45:43 | 23 | anyone talking to him -- talking to you? |
| 04:45:47 | 24 | A. Yes.  Robert. |
| 04:45:48 | 25 | Q. And did you tell Robert that if he want -- if he |

1      I, CANDY NEWLAND, CSR No. 14256, certify that the

2   foregoing proceedings were taken before me at the time

3   and place herein set forth, at which time the witness

4   was duly sworn, and that the transcript is a true record

5   of the testimony so given.

6

7   Witness review, correction, and signature was

8   (X) by Code.                    (X) requested.

9   ( ) waived.                     ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13      The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificate null and void.

16      I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties nor of any of

19  the parties.

20      Dated this 29TH day of May, 2018.

21

22

23

24  _____

25      CANDY NEWLAND, CSR 14256

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    --------------------------------
                                      REPORTER CERTIFIED
5    DEMETRIC DI-AZ, OWEN DIAZ and        TRANSCRIPT
     LAMAR PATTERSON, an individual,
6

7              Plaintiffs,          **CONFIDENTIAL**

8         vs.                    No. 3:17-cv-06748-WHO
                                  VOL II, pgs 187 - 292
9
     TESLA, INC. DBA TESLA MOTORS,
10   INC.; CITISTAFF SOLUTIONS,
     INC.; WEST VALLEY STAFFING
11   GROUP; CHARTWELL STAFFING
     SERVICES, INC. and DOES 1-10,
12   inclusive,

13             Defendants.

14   --------------------------------

15

16              CONFIDENTIAL

17        VIDEOTAPED DEPOSITION OF

18              OWEN DIAZ

19        SAN FRANCISCO, CALIFORNIA

20        MONDAY, DECEMBER 3, 2018

21

22

23   Reported by:

24   GINA V. CARBONE, CSR #8249
     RPR, RMR, CRR, CCRR
25   FILE NO.:  18-27207

CHASE
LITIGATION SERVICES

1           Deposition of OWEN DIAZ, Volume II, taken

2    on behalf of Defendants at CONSTANGY, BROOKS, SMITH

3    & PROPHETE LLP, 351 California Street, Suite 200,

4    San Francisco, California 94104, commencing at

5    10:29 a.m. on Monday, December 3, 2018, before

6    Gina V. Carbone, Certified Shorthand Reporter

7    No. 8249, RPR, RMR, CRR, CCRR.

8

9              A P P E A R A N C E S

10   For the Plaintiffs:

11       CALIFORNIA CIVIL RIGHTS LAW GROUP

12       By:  LAWRENCE A. ORGAN, Esq.

13       407 San Anselmo Avenue, Suite 201

14       San Anselmo, California 94612

15       (415) 453-4740

16       larry@civilrightsca.com

17

18   For the Defendants TESLA; CITISTAFF SOLUTIONS, INC.:

19       CONSTANGY, BROOKS, SMITH & PROPHETE LLP

20       By:  BARBARA I. ANTONUCCI, Esq.

21       351 California Street, Suite 200

22       San Francisco, California 94104

23       (415) 918-3000

24       bantonucci@constangy.com

25   //

```
 1   APPEARANCES (continued)

 2

 3   For the Defendant WEST VALLEY STAFFING:

 4       PAHL & MCCAY

 5       BY: FENN C. HORTON III, ESQ.

 6       225 West Santa Clara, Suite 1500

 7       San Jose, California 95113-1752

 8       (408) 286-5100

 9       fhorton@pahl-mccay.com

10

11   ALSO PRESENT:  Teresa Kossayian,
                    West Valley Staffing Group
12
                    Frank Quirarte, videographer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

| 11:51:29 | 1 | A.  So he didn't witness the whole incident in |
| 11:51:35 | 2 | whole.  He just witnessed partial. |
| 11:51:38 | 3 | Q.  Okay.  So can you describe the incident to |
| 11:51:42 | 4 | the best of your recollection that occurred in the |
| 11:51:46 | 5 | elevator with Robert in or around February of 2016. |
| 11:51:58 | 6 | A.  Earlier -- well, can you repeat that |
| 11:52:01 | 7 | question, first of all? |
| 11:52:02 | 8 | Q.  Yeah.  Can you describe the incident with |
| 11:52:05 | 9 | Robert in or around February of 2016. |
| 11:52:17 | 10 | A.  Particular day I believe this was sent, I |
| 11:52:25 | 11 | had had a negative interaction with Robert earlier |
| 11:52:29 | 12 | in my shift being called the N-word and a boy. |
| 11:52:38 | 13 | I was pretty upset about it, so I was over |
| 11:52:45 | 14 | in the -- I had went to another elevator.  Robert, I |
| 11:52:51 | 15 | believe, showed up to this elevator over here, and |
| 11:52:54 | 16 | me and Lamar Patterson was having a conversation. |
| 11:53:02 | 17 | Robert said something.  I can't 100 percent recall |
| 11:53:06 | 18 | what he said. |
| 11:53:09 | 19 | But at that point I had turned to Robert |
| 11:53:12 | 20 | and I had relayed to Robert that I wasn't going to |
| 11:53:19 | 21 | go -- basically go back and forth with him.  If it |
| 11:53:21 | 22 | didn't have anything to do that was job related |
| 11:53:26 | 23 | about doing the job, I preferred not to talk to him |
| 11:53:30 | 24 | on a personal level.  Robert got mad. |
| 11:53:41 | 25 | That was it. |

1    I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2  CCRR, certify: that the foregoing proceedings were taken

3  before me at the time and place herein set forth; at

4  which time the witness was duly sworn; and that the

5  transcript is a true record of the testimony so given.

6

7    Witness review, correction and signature was

8  (X) by code.              (X) requested.

9  ( ) waived.                ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13    The dismantling or unbinding of the original

14  transcript will render the reporter's certificate null

15  and void.

16    I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties, nor of any of

19  the parties.

20    Dated this 7th   day of December  , 2018  .

21

22  _____

23  GINA V. CARBONE
     CSR #8249, STATE OF CALIFORNIA

24

25

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   DEMETRIC DIAZ, OWEN DIAZ, ) Case No. 3:17-CV-06748-WHO
    and LAMAR PATTERSON,      )
5                             )
                 Plaintiffs,  )
6                             )
        vs.                   )
7                             )
    TESLA, INC. dba TESLA     )
8   MOTORS, INC.; CITISTAFF   )
    SOLUTIONS, INC.; WEST     )
9   VALLEY STAFFING GROUP;    )
    CHARTWELL STAFFING        )
10  SERVICES, INC.;           )
    NEXTSOURCE, INC.;         )
11  DOES 1-50, inclusive,     )
                              )
12               Defendants.  )
    _____)

13

14

15                 Volume III

16      DEPOSITION OF OWEN ORAPIO DIAZ, JR.

17          PAGES 293 THROUGH 441

18          SAN FRANCISCO, CALIFORNIA

19               JUNE 21, 2019

20

21

22

23

24

25  REPORTED BY:  MICHAEL CUNDY, CSR 12271



1          DEPOSITION OF OWEN ORAPIO DIAZ, JR., taken

2    at One Embarcadero Center, Suite 2050, San Francisco,

3    California, on Friday, June 21, 2019, at 9:33 A.M.,

4    before Michael Cundy, Certified Shorthand Reporter, in

5    and for the State of California.

6

7    APPEARANCES:

8    FOR THE PLAINTIFF:

9                 CALIFORNIA CIVIL RIGHTS LAW GROUP
                  BY:  NAVRUZ AVLONI, ESQ.
10                332 San Anselmo Avenue
                  San Anselmo, California 94960
11                (415) 453-4740
                  navruz@civilrightsca.com
12
     FOR THE DEFENDANT, NEXTSOURCES, INC.:
13
                  FISHER & PHILLIPS
14                BY:  JUAN C. ARANEDA, ESQ.
                  One Embarcadero Center
15                Suite 2050
                  San Francisco, California 94111
16                (415) 490-9000
                  jaraneda@fisherphillips.com
17
     FOR THE DEFENDANT, TESLA, INC.:
18
                  SHEPPARD MULLIN RICHTER & HAMPTON LLP
19                BY:  PATRICIA M. JENG, ESQ.
                  Four Embarcadero Center
20                17th Floor
                  San Francisco, California 94111
21                (415) 434-9100
                  pjeng@sheppardmullin
22

23

24

25



```
 1   APPEARANCES:

 2   FOR THE DEFENDANT, WEST VALLEY STAFFING GROOP:

 3                    PAHL & McCAY
                      BY:  FENN C. HORTON, III, ESQ.
 4                    225 West Santa Clara Street
                      Suite 1500
 5                    San Jose, California 95113
                      (408) 286-5100
 6                    fhorton@pahl-mccay.com

 7   FOR THE DEFENDANT, CITISTAFF SOLUTIONS:

 8                    LAFAYETTE & KUMAGAI
                      BY:  GARY T. LAFAYETTE, ESQ.
 9                        CHERYL A. STEVENS, ESQ.
                      1300 Clay Street
10                    Suite 810
                      Oakland, California 94612
11                    (415) 357-4300
                      glafayette@lkclaw.com
12                    cstevens@klclaw.com

13   ALSO PRESENT:

14                    KEVEN McMAHON
                      VIDEOGRAPHER
15

16

17

18

19

20

21

22

23

24

25
```



| | |
|---|---|
| 1 | people that you took instruction from was Robert. | 09:43:30 |
| 2 | Is this the same Robert you are mentioning | 09:43:34 |
| 3 | now? | 09:43:36 |
| 4 | A    Yes, sir. | 09:43:38 |
| 5 | Q    Okay.  Last time your deposition was taken, | 09:43:39 |
| 6 | you couldn't recall Robert's last name. | 09:43:41 |
| 7 | Do you know it now? | 09:43:43 |
| 8 | A    No, sir. | 09:43:46 |
| 9 | Q    Do you know who employed Robert? | 09:43:50 |
| 10 | A    Tesla. | 09:43:55 |
| 11 | Q    Do you know what Robert's position was? | 09:43:57 |
| 12 | A    I believe it was a lead. | 09:44:02 |
| 13 | Q    And what department did he work? | 09:44:06 |
| 14 | A    Conveyance. | 09:44:12 |
| 15 | Q    And you testified previously that Robert, I | 09:44:20 |
| 16 | believe, also called you the N-word. | 09:44:25 |
| 17 | Is this the same Robert? | 09:44:28 |
| 18 | A    Yes, sir. | 09:44:30 |
| 19 | Q    Okay.  And you understand when I'm referring | 09:44:30 |
| 20 | to the N-word? | 09:44:32 |
| 21 | A    Yes, sir. | 09:44:33 |
| 22 | Q    Okay.  How did you come to the conclusion | 09:44:39 |
| 23 | that Robert was employed by Tesla? | 09:44:42 |
| 24 | A    The role that he provided for the company, | 09:44:52 |
| 25 | the fact that he mentioned it a few times and never | 09:44:58 |



OWEN ORAPIO DIAZ, JR. VOLUME III                    June 21, 2019
DIAZ vs TESLA, INC.                                              438

```
 1   STATE OF CALIFORNIA              )
                                      )  SS:
 2   CITY AND COUNTY OF SAN FRANCISCO )

 3

 4               I, Michael Cundy, CSR NO. 12271, a

 5   Certified Shorthand Reporter of the State of

 6   California, do hereby certify:

 7               That the foregoing proceedings were

 8   taken before me at the time and place herein set

 9   forth; that any witnesses in the foregoing

10   proceedings, prior to testifying, were placed under

11   oath; that a verbatim record of the proceedings was

12   made by me using machine shorthand which was

13   thereafter transcribed under my direction; further,

14   that the foregoing is an accurate transcription

15   thereof.

16               I further certify that I am neither

17   financially interested in the action nor a relative or

18   employee of any attorney or any of the parties.

19               IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated:  July 3, 2019

23                          _____

24                          Michael Cundy, CSR NO. 12271

25
```



# Exhibit B

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4
                                    REPORTER CERTIFIED
5   _____        TRANSCRIPT

6   DEMETRIC DI-AZ, OWEN DIAZ, and
    LAMAR PATTERSON, an individual,   CONFIDENTIAL
7
           Plaintiffs,
8
    vs.                      Case No. 3:17-cv-06748-WHO
9
    TESLA, INC. DBA TESLA MOTORS,
10  INC.; CITISTAFF SOLUTIONS, INC.;
    WEST VALLEY STAFFING GROUP;
11  CHARTWELL STAFFING SERVICES, INC.
    and DOES 1-10, inclusive,
12
           Defendants.
13  _____/

14

15

16              CONFIDENTIAL

17        VIDEOTAPED DEPOSITION OF

18            DEMETRIC DI-AZ

19       SAN FRANCISCO, CALIFORNIA

20         TUESDAY, MAY 15, 2018

21

22

23
    Reported By:
24  Candy Newland
    CSR No. 14256
25  File No. 18-25468

1    Deposition of DEMETRIC DI-AZ, taken on behalf of

2    Defendants at 351 California Street, Suite 200, San

3    Francisco, California, commencing at 10:11 a.m. on

4    Tuesday, May 15, 2018, before Candy Newland, Certified

5    Shorthand Reporter No. 14256.

6

7                    A P P E A R A N C E S

8

9    FOR THE PLAINTIFFS:

10

11              CALIFORNIA CIVIL RIGHTS LAW GROUP

12              BY:  LAWRENCE A. ORGAN, ESQ.

13              332 San Anselmo Avenue

14              San Anselmo, CA 94960

15              (415) 453-4740

16              larry@civilrightsca.com

17

18              CALIFORNIA CIVIL RIGHTS LAW GROUP

19              BY:  NAVRUZ AVLONI, ESQ.

20              332 San Anselmo Avenue

21              San Anselmo, CA 94960

22              (415) 453-4740

23              navruz@civilrightsca.com

24

25

Demetric Di-Az-Confidential

```
 1   APPEARANCES(CONTINUED)

 2

 3   FOR THE DEFENDANT TESLA:

 4

 5          CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

 6          BY:  BARBARA I. ANTONUCCI, ESQ.

 7          351 California Street, Suite 200

 8          San Francisco, CA 94104

 9          (415) 918-3000

10          bantonucci@constangy.com

11

12   FOR THE DEFENDANT WEST VALLEY STAFFING:

13

14          PAHL & MCCAY

15          BY:  FENN C. HORTON III, ESQ.

16          225 West Santa Clara, Suite 1500

17          San Jose, CA 95113-1752

18          (408) 286-5100

19          fhorton@pahl-mccay.com

20

21   ALSO PRESENT:

22          Teresa Kossayian, West Valley Staffing Group

23          Jaime Bodiford, Tesla

24          Frank Quirarte, Videographer

25
```

03:32:15  1   A.      We were getting ready to go on our meal break.

03:32:19  2   We were running a little behind.  He was, like, "All you

03:32:23  3   niggers need to hurry the fuck up."

03:32:34  4   Q.      Did you say anything back to him at the point?

03:32:37  5   A.      No.  The first time it ever happened I was kind

03:32:42  6   of stuck, like, "What?"  I really didn't know what to

03:32:45  7   do.

03:32:45  8   Q.      Was anyone else there?

03:32:48  9   A.      My team.

03:33:02 10           MS. ANTONUCCI:  Let's mark this as the next

03:33:03 11   exhibit.

03:33:14 12           (EXHIBIT 34 was marked for identification.)

03:33:14 13   BY MS. ANTONUCCI:

03:33:19 14   Q.      Exhibit 34 is a list of the individuals who were

03:33:22 15   working and photographs of the individuals who were

03:33:28 16   working at Tesla at the time you were there.

03:33:33 17           MR. ORGAN:  Why wasn't this turned over?

03:33:35 18   There's no basis.

03:33:36 19           MS. ANTONUCCI:  It wasn't requested.  It's also

03:33:42 20   not necessarily anything we would use to support if he

03:33:47 21   actually knew the names of the people that we were

03:33:50 22   talking about.

03:33:51 23           MR. ORGAN:  I see.

03:33:51 24   BY MS. ANTONUCCI:

03:33:53 25   Q.      Can you tell me, you know, having looked through

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:33:55 | 1 | these pictures who were the individuals on your team? |
| 03:35:08 | 2 | A.    Do you want my honest opinion about this paper? |
| 03:35:10 | 3 | Q.    I only want you to be truthful in this |
| 03:35:13 | 4 | deposition. |
| 03:35:13 | 5 | A.    It really looked like you all just added my |
| 03:35:17 | 6 | picture to this, and I really -- 'cause I'm the only one |
| 03:35:18 | 7 | in here that says battery.  There's nobody else that |
| 03:35:23 | 8 | says battery at all. |
| 03:35:23 | 9 | Q.    Okay.  But that's not my question. |
| 03:35:26 | 10 | A.    You asked me did I know anybody that worked on |
| 03:35:29 | 11 | my team. |
| 03:35:30 | 12 | Q.    Correct. |
| 03:35:31 | 13 | A.    It's only me that says battery. |
| 03:35:31 | 14 | Q.    So none of these -- |
| 03:35:34 | 15 | A.    There's nobody else on this paperwork that has |
| 03:35:36 | 16 | anything to do with battery. |
| 03:35:37 | 17 | Q.    So none of these individuals worked on your |
| 03:35:44 | 18 | team? |
| 03:35:44 | 19 |     MR. ORGAN:  Objection.  Misstates his |
| 03:35:45 | 20 | evidence -- his testimony. |
| 03:35:45 | 21 | BY MS. ANTONUCCI: |
| 03:35:46 | 22 | Q.    So, for example, let me turn your attention to |
| 03:35:53 | 23 | Green, Trinidad.  These are all in alphabetical order; |
| 03:35:53 | 24 | so you can just go to the G. |
| 03:35:59 | 25 | A.    I see it now. |

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:36:00 | 1 | Q. Okay. |
| 03:36:00 | 2 | A. He worked on the shift floor in the morning. |
| 03:36:04 | 3 | Q. So that individual was not on your team? |
| 03:36:07 | 4 | A. No. |
| 03:36:07 | 5 | Q. Okay. |
| 03:36:13 | 6 | A. Shift floor, shift 1. |
| 03:36:52 | 7 | Q. None of the individuals that you've seen so far |
| 03:36:57 | 8 | are on your team -- or worked on your team? |
| 03:36:59 | 9 | MR. ORGAN: Well, you need to look at the faces |
| 03:37:01 | 10 | too. I know you're looking for battery but this is an |
| 03:37:06 | 11 | extremely lengthy document that has a lot of pictures on |
| 03:37:09 | 12 | it. So see if you can -- |
| 03:37:09 | 13 | THE WITNESS: I remember working with him when I |
| 03:37:12 | 14 | was working the day shift. |
| 03:37:12 | 15 | BY MS. ANTONUCCI: |
| 03:37:12 | 16 | Q. Who's that? |
| 03:37:12 | 17 | A. Trinidad Green. |
| 03:37:25 | 18 | Q. When you worked on the night shift, do you |
| 03:37:29 | 19 | see -- |
| 03:37:29 | 20 | A. No, when I worked on the day shift. |
| 03:37:31 | 21 | Q. I heard you, but when you worked on the night |
| 03:37:31 | 22 | shift, did you work with any of these individuals? |
| 03:37:33 | 23 | A. No. |
| 03:37:33 | 24 | MR. ORGAN: Objection. Compound. Vague and |
| 03:37:45 | 25 | ambiguous. |

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:37:45 | 1 | BY MS. ANTONUCCI: |
| 03:37:46 | 2 | Q.      Can you turn your attention to Joshua Buck?  Do |
| 03:37:50 | 3 | you see that? |
| 03:37:53 | 4 | Again, if you keep them in order, they're in |
| 03:37:56 | 5 | alphabetical order so things are easier to find. |
| 03:37:59 | 6 | Otherwise, I can number them for you. |
| 03:38:11 | 7 | A.      These are the H's. |
| 03:38:17 | 8 | MR HORTON:  Was that Plot with a P? |
| 03:38:21 | 9 | THE WITNESS:  Buck. |
| 03:38:23 | 10 | MS. ANTONUCCI:  Buck. |
| 03:38:24 | 11 | MR. ORGAN:  Buck with a B. |
| 03:38:24 | 12 | MR. HORTON:  B.  Okay. |
| 03:38:40 | 13 | MR. ORGAN:  Here's his picture right here.  That |
| 03:38:45 | 14 | guy? |
| 03:38:45 | 15 | THE WITNESS:  Uh-huh. |
| 03:38:46 | 16 | MR. ORGAN:  Does that look familiar? |
| 03:38:48 | 17 | THE WITNESS:  Yeah.  I think I do remember him. |
| 03:38:48 | 18 | BY MS. ANTONUCCI: |
| 03:38:51 | 19 | Q.      Was that your shift lead when you worked the |
| 03:38:54 | 20 | night shift? |
| 03:38:54 | 21 | A.      Yes. |
| 03:38:59 | 22 | MR. HORTON:  Was that answer "yes"? |
| 03:39:01 | 23 | MS. ANTONUCCI:  Yes. |
| 03:39:32 | 24 | MR. ORGAN:  Let the record reflect that that was |
| 03:39:36 | 25 | the third page in the exhibit since the exhibit pages |

**Demetric Di-Az-Confidential**

| | | |
|---|---|---|
| 03:39:40 | 1 | are not numbered. |
| 03:39:42 | 2 | MS. ANTONUCCI:  Let's take a quick break, |
| 03:39:45 | 3 | please. |
| 03:39:46 | 4 | THE VIDEOGRAPHER:  We're going off the record. |
| 03:39:48 | 5 | The time is 3:39 p.m. |
| 03:43:41 | 6 | (Off the record:  3:39 p.m. to 3:43 p.m.) |
| 03:43:41 | 7 | THE VIDEOGRAPHER:  We're back on the record. |
| 03:43:49 | 8 | The time is 3:43 p.m. |
| 03:43:49 | 9 | BY MS. ANTONUCCI: |
| 03:43:52 | 10 | Q.    Have you had an opportunity to look through |
| 03:43:55 | 11 | Exhibit 34? |
| 03:43:55 | 12 | A.    Yes. |
| 03:43:58 | 13 | Q.    Are any of the individuals whose photographs are |
| 03:44:02 | 14 | in Exhibit 34 on your team when you worked the night |
| 03:44:06 | 15 | shift at Tesla? |
| 03:44:07 | 16 | MR. ORGAN:  Objection.  Compound. |
| 03:44:09 | 17 | THE WITNESS:  Can you restate the question, |
| 03:44:11 | 18 | please? |
| 03:44:11 | 19 | BY MS. ANTONUCCI: |
| 03:44:12 | 20 | Q.    Are any of the individuals on Exhibit 34 on your |
| 03:44:15 | 21 | team when you worked the night shift at Tesla? |
| 03:44:19 | 22 | A.    The only person I remember is Joshua Buck. |
| 03:44:47 | 23 | Q.    On page 6, is that you, Demetric Di-az?  Is that |
| 03:44:57 | 24 | a picture of you? |
| 03:44:58 | 25 | A.    Yes. |

1       I, CANDY NEWLAND, CSR No. 14256, certify that the

2   foregoing proceedings were taken before me at the time

3   and place herein set forth, at which time the witness

4   was duly sworn, and that the transcript is a true record

5   of the testimony so given.

6

7   Witness review, correction, and signature was

8   (X) by Code.                    (X) requested.

9   ( ) waived.                     ( ) not requested.

10  ( ) not handled by the deposition officer due to party

11  stipulation.

12

13      The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificate null and void.

16      I further certify that I am not financially

17  interested in the action, and I am not a relative or

18  employee of any attorney of the parties nor of any of

19  the parties.

20      Dated this 29th day of May, 2018.

21

22

23

24  _____

25          CANDY NEWLAND, CSR 14256

# Exhibit C

1           UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                                    REPORTER CERTIFIED
                                         TRANSCRIPT
4    _____

5    DEMETRIC DI-AZ, OWEN DIAZ
     and LAMAR PATTERSON, an         No. 3:17-cv-06748-WHO
     individual,
6
7              Plaintiffs,           **CONFIDENTIAL**

8          vs.

9    TESLA, INC. DBA TESLA
     MOTORS, INC.; CITISTAFF
10   SOLUTIONS, INC.; WEST
     VALLEY STAFFING GROUP;
11   CHARTWELL STAFFING
     SERVICES, INC., and DOES
12   1-10, inclusive,

13             Defendants.
     _____

14

15                  CONFIDENTIAL

16              Deposition of

17             LAMAR PATTERSON

18         San Francisco, California

19          Friday, July 26, 2019

20

21

22

23   REPORTED BY:
     Sarah Jean Seitz
     CSR No. 14175, RPR
24   FILE No: 19-29151

25

Lamar Patterson-Confidential

1           Deposition of LAMAR PATTERSON, taken on behalf

2     of Defendants at Four Embarcadero Center, 17th Floor,

3     San Francisco, California 94111, commencing at 10:12

4     a.m. on Friday, July 26, 2019, before Sarah Seitz,

5     Certified Shorthand Reporter No. 14175, RPR.

6                         APPEARANCES

7     FOR THE PLAINTIFFS AND THE WITNESS:

8           CALIFORNIA CIVIL RIGHTS LAW GROUP

9           BY:  NAVRUZ AVLONI, Attorney at Law

10          332 San Anselmo Avenue

11          San Anselmo, California 94960

12          415-453-4740

13          navruz@civilrightsca.com

14

15    FOR THE DEFENDANT NEXTSOURCE:

16          FISHER PHILLIPS

17          BY:  JUAN C. ARANEDA, Attorney at Law

18          One Embarcadero Center, Suite 2050

19          San Francisco, California 94111

20          415-490-9012

21          jaraneda@fisherphillips.com

22

23

24

25

Lamar Patterson-Confidential

```
 1                  APPEARANCES (CONTINUED)

 2    FOR THE DEFENDANT WEST VALLEY STAFFING:

 3          PAHL & MCCAY

 4          BY:  FENN C. HORTON III, Attorney at Law

 5          225 West Santa Clara Street, Suite 1500

 6          San Jose, California 95113-1752

 7          408-286-5100

 8          fhorton@pahl-mccay.com

 9

10    FOR THE DEFENDANT TESLA:

11          SHEPPARD MULLIN RICHTER & HAMPTON LLP

12          BY:  PATRICIA M. JENG, Attorney at Law

13          Four Embarcadero Center, 17th Floor

14          San Francisco, California 94111

15          415-434-9100

16          pjeng@sheppardmullin.com

17

18    FOR THE DEFENDANT CITISTAFF:

19          LAFAYETTE & KUMAGAI

20          BY:  SUSAN T. KUMAGAI, Attorney at Law

21          1300 Clay Street, Suite 810

22          Oakland, California 94612

23          415-357-1600

24          skumagai@lkclaw.com

25
```

Lamar Patterson-Confidential

```
 1                    APPEARANCES (CONTINUED)

 2      ALSO PRESENT:

 3            Jamie Bodiford - Tesla

 4

 5                         ---oOo---

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Q.  Okay.  So you actually only saw them interact

2  once?

3    A.  Yeah.

4    Q.  Okay.  What did you see --

5        MS. AVLONI:  I'm sorry.  I'm going to

6  interlineate an objection as to vague and ambiguous as

7  to "interact."

8  BY MS. JENG:

9    Q.  What was your observation of that one time you

10  saw Owen and Robert interact in the elevator?

11    A.  What was the details of it?

12    Q.  Yes.

13    A.  Him and Robert got into, like, a heated

14  argument, and he exchanged words.

15    Q.  You mean Robert exchanged words?

16    A.  Yeah.

17    Q.  Do you remember what date that was?

18    A.  No.

19    Q.  Do you remember approximately what date?

20    A.  No.

21    Q.  Was it towards the beginning of your employment

22  or towards the end or middle?

23    A.  It could have been the middle.

24    Q.  Okay.  So tell me what happened.  Were you and

25  Owen in the elevator together?

**Lamar Patterson-Confidential**

1    A.   Yes.

2    Q.   Okay.   And then -- then what happened?   How did

3  Robert start exchanging words?

4    A.   He was talking to him loud and kind of said

5  some things he shouldn't have said to him.

6    Q.   How did the argument start?

7    A.   I'm not sure exactly how it started.

8    Q.   Were you there the whole time, or did Robert

9  come into the conversation later?

10    A.   He was in the elevator with us.

11    Q.   Okay.   So the three of you were in the elevator

12  together when it started?

13    A.   Right.

14    Q.   Okay.   But you don't remember how it started?

15    A.   I don't remember how it started.

16    Q.   Okay.   Tell me what you do remember about the

17  argument.

18    A.   Just him pretty much being angry at Owen, I

19  guess, and just them exchanging words.

20    Q.   Do you remember what Robert was angry at Owen

21  about?

22    A.   I'm not sure.

23    Q.   Did he say what he was angry at Owen about?

24    A.   I don't recall.

25    Q.   Okay.   And what were the words that were

**Lamar Patterson-Confidential**

1  exchanged?

2       A.  I believe he -- he called him the N-word.  I

3  heard it.  But I'm not sure what nature the conversation

4  that made him so heated about.

5       Q.  What did Owen say to Robert?

6       A.  He didn't say much.  He didn't say much to him.

7       Q.  So you don't remember what the argument was

8  about at all?

9       A.  I'm not sure what the argument was about.

10       Q.  Okay.  And what were you doing while they were

11  in this argument?

12       A.  Just observing and trying to figure out what is

13  going on.

14       Q.  Did you say anything?

15       A.  No.

16       Q.  Were you there for the whole exchange?

17       A.  I don't know when it started, so I can't say.

18       Q.  Okay.  And what else do you remember about what

19  Robert said?

20       A.  I just remember them exchanging words, and Owen

21  was just telling him that if, you know, he couldn't talk

22  to him respectfully, then he wouldn't talk to him at

23  all.

24       Q.  Well, what else do you remember about the

25  specific words that were exchanged?

**Lamar Patterson-Confidential**

```
 1                   CERTIFICATE OF REPORTER
 2          I, SARAH J. SEITZ, CSR No. 14175, RPR, certify:
 3    That the foregoing proceedings were taken before me at
 4    the time and place herein set forth; at which time the
 5    witness was duly sworn; and that the transcript is a
 6    true record of the testimony so given.
 7          Witness review, correction, and signature was
 8    (X) By code.                  (X) Requested.
 9    ( ) Waived.                   ( ) Not requested.
10    ( ) Not handled by the deposition officer due to party
11    stipulation.
12
13          The dismantling, unsealing, or unbinding of the
14    original transcript will render the reporter's
15    certificate null and void.
16          I further certify that I am not financially
17    interested in the action, and I am not a relative or
18    employee of any attorney of the parties, nor of any of
19    the parties.
20          Dated this 6th day of August, 2019.
21
22
23    _____
24    SARAH J. SEITZ, CSR No. 14175, RPR
25
```

# Exhibit D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
DEMETRIC DIAZ, et al.,           )
                                 )
                Plaintiffs,      )
                                 )  Case No.
          v.                     )  3:17-cv-06748-WHO
                                 )
TESLA, INC., et al.,             )
                                 )
                Defendants.      )
_____ )
```

VIDEOTAPED DEPOSITION OF ANDRES DONET

DATE:              Thursday, October 24, 2019

TIME:              4:39 p.m.

LOCATION:          Sheppard, Mullin, Richter &
                   Hampton LLP
                   379 Lytton Avenue
                   Palo Alto, California  94301

REPORTED BY:       Peter Torreano, CSR, CRR
                   Certified Shorthand Reporter
                   License Number C-7623

```
1                    A P P E A R A N C E S:

2      For the Plaintiffs:

3              California Civil Rights Law Group
               By:  LAWRENCE A. ORGAN
4              larry@civilrightsca.com
               332 San Anselmo Avenue
5              San Anselmo, CA 94960
               (415) 453-4740
6
       For the Tesla Defendants and the Deponent:
7
               Sheppard, Mullin, Richter & Hampton LLP
8              By:  SAMI HASAN
               shasan@sheppardmullin.com
9              Four Embarcadero Center
               Fourteenth Floor
10             San Francisco, California  94111
               (415) 774-3286
11
       For Defendant NextSource, Inc.:
12     (Telephonically)

13             Fisher & Phillips LLP
               By:  VINCENT J. ADAMS
14             vadams@fisherphillips.com
               One Embarcadero Center
15             Suite 2050
               San Francisco, California  94111
16             (415) 490-9000


18

19

20

21

22

23

24

25
```

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:07:14  1    was really bad, I guess.

17:07:17  2    BY MR. ORGAN:

17:07:17  3        Q.    Well, you did see at least one bad picture;

17:07:21  4    right?

17:07:21  5        A.    People write things there, you know.  I came

17:07:27  6    as a supervisor.  As an example I don't remember that

17:07:30  7    happening, you know, but sometimes.  But it's not very

17:07:38  8    often in that area, not very often.

17:07:39  9        Q.    But in terms of seeing things written in the

17:07:42 10    bathrooms during your inspections of the areas around

17:07:45 11    the elevators, you did occasionally see graffiti

17:07:51 12    written in those elevators; correct -- I mean in those

17:07:54 13    bathrooms; correct?

17:07:55 14            MR. HASAN:  Same objection.  Outside the

17:07:58 15    area of the scope of the testimony.

17:08:01 16            THE DEPONENT:  I did see eventually once in a

17:08:05 17    while, not very often some inscriptions or drawings on

17:08:09 18    the wall -- on the partitions mostly, the stalls.

17:08:14 19    BY MR. ORGAN:

17:08:14 20        Q.    And when you say the partitions -- oh, the

17:08:17 21    partitions.

17:08:17 22        A.    The toilet partition, yeah.

17:08:19 23        Q.    So when you saw graffiti it was typically on

17:08:23 24    the partitions for the bathroom stalls; is that

17:08:28 25    correct?

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

| | | |
|---|---|---|
| 17:08:28 | 1 | A.   Yeah.   Inside the bathrooms mostly. |
| 17:08:32 | 2 | Q.   And when you saw those pictures or words did |
| 17:08:36 | 3 | any of those words include the word "nigger," |
| 17:08:42 | 4 | N-I-G-G-E-R?   Do you remember that? |
| 17:08:45 | 5 | A.   That word?   I know the word, but I haven't |
| 17:08:49 | 6 | seen graffiti including that word. |
| 17:08:51 | 7 | Q.   Never? |
| 17:08:51 | 8 | A.   Never as far as I can remember.   I'm not sure |
| 17:08:57 | 9 | 100 percent, but I don't recall it. |
| 17:09:00 | 10 | Q.   But what about the word "nigga," N-I-G-G-A; |
| 17:09:04 | 11 | did you ever see that written in the bathroom stalls? |
| 17:09:07 | 12 | A.   I don't recall it. |
| 17:09:08 | 13 | Q.   Did you ever see a swastika written in the |
| 17:09:15 | 14 | bathroom stalls? |
| 17:09:17 | 15 | A.   Not I can recall of, no. |
| 17:09:21 | 16 | Q.   Okay.   But you did at some point get a picture |
| 17:09:24 | 17 | of such information; correct? |
| 17:09:26 | 18 | A.   We did receive some -- so the reports we |
| 17:09:33 | 19 | receive in that period of time, some of them I remember |
| 17:09:39 | 20 | included pictures and some not. |
| 17:09:42 | 21 | Q.   So you received written reports from time to |
| 17:09:45 | 22 | time? |
| 17:09:46 | 23 | A.   They were e-mails.   "By the way, I was just in |
| 17:09:51 | 24 | the bathroom and we found graffiti."   That's pretty |
| 17:09:53 | 25 | much what we received.   So a janitorial company goes |

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:10:00  1    over and clean that thing out, off.  So that's the

17:10:05  2    whole thing.

17:10:05  3        Q.    I'm going to show you what's been marked as

17:10:08  4    Exhibit 193.  For the record Exhibit 193 is a

17:10:13  5    three-page document Bates-stamped Tesla 1003 to 1005.

17:10:23  6            Look it over and then I'll ask you some

17:10:25  7    questions.  1005.

17:10:50  8        A.    I don't remember this even though I sent an

17:10:53  9    e-mail reporting it was clean.  Yeah, that's me.  But I

17:10:59 10    don't -- are you sure these were together?

17:11:03 11        Q.    Yes.  I'm positive because that's how they

17:11:05 12    were produced to us.  And if you look at the second

17:11:08 13    page of it, the complaint from Mr. Colvin, Kevin

17:11:13 14    Colvin, you see that second page?  It says, "This is

17:11:15 15    the bathroom located by the elevator while walking

17:11:19 16    upstairs.  The writing says 'All niggers must die.'"

17:11:22 17            So that's the e-mail that was sent to three

17:11:25 18    people, Roel Kliatchko, Jonathan Baldoza and Rob Lewis.

17:11:33 19    Do you know who those people are?

17:11:34 20        A.    No.  I don't remember them.

17:11:36 21        Q.    Okay.  But at some point Roel --

17:11:39 22        A.    Kliatchko.

17:11:40 23        Q.    -- Kliatchko sent an e-mail back and then

17:11:44 24    you -- you somehow get it?

17:11:50 25        A.    Yeah.  Because I belong to the building

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

17:11:54   1   services areas.

17:11:55   2       Q.   I see.

17:11:56   3       A.   Yeah.  So that's why I -- I -- I answer.

17:12:02   4   Later I received a report back from the janitorial

17:12:06   5   company letting me know that the thing was cleaned.

17:12:10   6   But I don't recall this -- this picture, this graffiti.

17:12:14   7   It's pretty bad.

17:12:15   8       Q.   Pretty bad, yeah.

17:12:16   9       A.   Yeah.

17:12:16  10       Q.   You think the graffiti is pretty bad; right?

17:12:20  11       A.   Well, "The world will end."  Yeah, I can

17:12:26  12   understand about it.

17:12:26  13       Q.   Does the "all niggers must die," does that

17:12:30  14   bother you, too?

17:12:31  15       A.   Of course.  Nobody is supposed to die and

17:12:34  16   that's a bad word to say.  So yeah.

17:12:37  17       Q.   Were you aware -- when you were walking around

17:12:40  18   during your rounds did you ever hear the N word?

17:12:44  19       A.   No, no, no, no, no.

17:12:46  20       Q.   Never did.

17:12:47  21       A.   No, no, no.

17:12:47  22       Q.   And the swastika that's on this, that's pretty

17:12:51  23   bad, too, isn't it?

17:12:53  24       A.   It is.  But I haven't seen that before.

17:12:55  25       Q.   Okay.  Except when you received this picture?

**VIDEOTAPED DEPOSITION OF ANDRES DONET**

| | | |
|---|---|---|
| 17:12:58 | 1 | A.   No, no.   I didn't receive this picture. |
| 17:13:00 | 2 | Q.   You didn't receive the picture? |
| 17:13:02 | 3 | A.   I don't think so.   I don't remember.   I don't |
| 17:13:05 | 4 | remember.   I believe this picture -- it doesn't mention |
| 17:13:11 | 5 | here anything about this.   This is the bathroom |
| 17:13:20 | 6 | located -- you see at first meant Kevin Colvin |
| 17:13:24 | 7 | reporting to Roel Kliatchko.   We are not there. |
| 17:13:29 | 8 | Q.   But you're at building services, aren't you? |
| 17:13:32 | 9 | A.   At some point after this Roel Kliatchko sent |
| 17:13:40 | 10 | the request to several people here and copy us. |
| 17:13:44 | 11 | Q.   Who is Matt Pennington; do you know? |
| 17:13:48 | 12 | A.   No, I don't have -- I don't know.   I heard the |
| 17:13:51 | 13 | name, I guess, but I don't remember him.   I don't know. |
| 17:13:53 | 14 | Q.   Is he a manager somewhere? |
| 17:13:55 | 15 | A.   I don't know. |
| 17:13:56 | 16 | Q.   And building services, though, that e-mail |
| 17:14:00 | 17 | would have gone to you; correct? |
| 17:14:02 | 18 | A.   Yeah.   It is for three -- about ten people, |
| 17:14:09 | 19 | twelve people, fifteen people.   I don't remember how |
| 17:14:14 | 20 | many, but we received this -- I received the report |
| 17:14:23 | 21 | later on and graffiti was cleaned. |
| 17:14:28 | 22 | Q.   Right.   And it says, "Men's RR."   That's men's |
| 17:14:34 | 23 | restroom; right? |
| 17:14:35 | 24 | A.   Yes.   K-26. |
| 17:14:36 | 25 | Q.   K-26.   Where is K-26 on Exhibit 183? |

VIDEOTAPED DEPOSITION OF ANDRES DONET

17:14:41 1     A.    It should be --

17:14:43 2     Q.    Is it to the left?

17:14:44 3     A.    No.   It doesn't show up here.   It should be

17:14:49 4  around here.

17:14:49 5     Q.    You're pointing to the left of the diagram

17:14:51 6  which is 183?

17:14:53 7     A.    Yeah.   This goes up to the column 23, 24.   So

17:14:59 8  26 is a couple more columns to the left.

17:15:02 9     Q.    If I understand the diagram correctly, each

17:15:06 10  one of the letters refers to a column position in the

17:15:10 11  factory; is that correct?

17:15:10 12     A.    Yeah, yeah.   This is the K is right here and

17:15:12 13  you need to go all the way to the 26 which is right

17:15:16 14  about right here.

17:15:17 15     Q.    So the K-26 would be somewhat close to the

17:15:22 16  other elevator which is shown right there; is that

17:15:25 17  right?

17:15:25 18     A.    Yes, yes.   Yeah, it's close to the elevator.

17:15:30 19     Q.    And then I notice on here that you sent this

17:15:33 20  e-mail at the top here about the graffiti found and

17:15:39 21  cleaned up to Liza Lipson.   Do you see that?

17:15:42 22     A.    Yeah.

17:15:43 23     Q.    And Liza Lipson, she was in human resources;

17:15:50 24  correct?

17:15:50 25     A.    Yeah.

## VIDEOTAPED DEPOSITION OF ANDRES DONET

17:15:51 1      Q.   Why did you send the e-mail saying you had
17:15:56 2 cleaned up the graffiti to Liza Lipson?
17:15:56 3      A.   Well, it was the practice to send the
17:16:01 4 information to both HR and security.
17:16:10 5      Q.   So you had a practice to send -- any time you
17:16:14 6 were cleaning up offensive graffiti you would be
17:16:17 7 sending it -- your practice was to send it to HR and to
17:16:23 8 security; is that correct --
17:16:23 9           MR. HASAN:   Objection.   Compound.   Misstates
17:16:26 10 testimony.
17:16:26 11          MR. ORGAN:   I'll break it up.   In terms of --
17:16:29 12 I'll strike it and break it up.
17:16:30 13 BY MR. ORGAN:
17:16:30 14     Q.   In terms of whenever you had a picture of
17:16:36 15 graffiti involving what might be offensive content, you
17:16:43 16 would send that to HR; is that correct?
17:16:46 17          MR. HASAN:   Objection.   Misstates his prior --
17:16:48 18 BY MR. ORGAN:
17:16:48 19     Q.   -- to let them know you cleaned it up?
17:16:51 20     A.   We sent any graffiti that was found to HR and
17:17:02 21 security.
17:17:03 22     Q.   Okay.
17:17:04 23     A.   Offensive or not offensive, that was the
17:17:07 24 practice and still is.
17:17:09 25     Q.   And still is?

REPORTER'S CERTIFICATE

I, Peter Torreano, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause; that said deposition was taken at the time and place therein cited; that the testimony of the said witness was reported by me and was thereafter transcribed under my direction into typewriting; that the foregoing is a full and accurate record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe the same.

Pursuant to Federal Rule 30(e), transcript review was requested.

I further certify that I am not of counsel nor attorney for any of the parties in the foregoing deposition and caption named nor in any way interested in the outcome of the cause named in said caption.

Dated:  November 2, 2019

_____
PETER TORREANO, CSR NO. 7623

# Exhibit E

Message

| | |
|---|---|
| **From**: | Andres Donet [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ANDRES L DONETD49] |
| **Sent**: | 5/21/2016 7:59:25 PM |
| **To**: | Liza Lipson [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Liza Lipsonb7a]; Gregory Slettvet [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Gslettvet] |
| **CC**: | Andre' Lalljie [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=User8d52a49b]; Victor Quintero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Victor Quintero3a3]; Edward Romero [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Edward Romeroe38]; James Moffitt [/O=TESLA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=James Moffitt94f] |
| **Subject**: | FW: Racism writing the bathroom |
| **Attachments**: | 20160521_105018_resized.jpg |

Graffiti found and cleaned up. Men's RR K-26.

Regards,

**Andres Donet** | Facilities Contract Supervisor | **Facilities**
45500 Fremont Blvd. | Fremont, CA 94538
c: 650.730.0103| adonet@teslamotors.com



**From:** Roel Kliatchko
**Sent:** Saturday, May 21, 2016 11:13 AM
**To:** Kevin Colvin <kcolvin@tesla.com>; Jonathan Baldoza <jbaldoza@tesla.com>; Rob Lewis <kelewis@tesla.com>; Robin Aylsworth <raylsworth@tesla.com>
**Cc:** buildingservices@teslamotors.com <buildingservices@tesla.com>; Matt Pennington <mpennington@tesla.com>
**Subject:** RE: Racism writing the the bathroom

Adding Robin A.

Kevin,

Can you provide nearest column # and what floor?

Building services can we send a Team member for clean up?

Best Regards,

**Roel Kliatchko (SDI) Supervisor**
I 45500 Fremont Blvd. Fremont, CA 94538 I
I Cell: (510) 203-6146 I rkliatchko@teslamotors.com I

<table>
<tr><td>UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA</td></tr>
<tr><td>**EX 109**</td></tr>
<tr><td>CASE NO. 17-cv-06748-WHO</td></tr>
<tr><td>DATE ENTERED</td></tr>
<tr><td>BY</td></tr>
<tr><td>DEPUTY CLERK</td></tr>
</table>

CONFIDENTIAL

**From:** Kevin Colvin
**Sent:** Saturday, May 21, 2016 11:02 AM
**To:** Roel Kliatchko; Jonathan Baldoza; Rob Lewis
**Subject:** Racism writing the the bathroom

This is in the bathroom located by the elevator while walking upstairs

The writing says "All niggers must die"


Kevin Colvin
PWT SDU Inverter
Production Associate



CONFIDENTIAL

# Exhibit F

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

---

**Page 1**

Volume 1

Pages 1 - 171

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

```
DEMETRIC DI-AZ, OWEN DIAZ AND    )
LAMAR PATTERSON                  )
                                 )
            Plaintiffs,          )
                                 )
    vs.                          )  No. C 17-6748 WHO
                                 )
TESLA, INC., dba TESLA MOTORS,   )
INC., CITISTAFF SOLUTIONS, INC., )
WEST VALLEY STAFFING GROUP,      )
CHARTWELL STAFFING SERVICES, INC.,)
and DOES 1-50, inclusive,        )
                                 )  San Francisco, California
            Defendants.          )  Monday
_____)  September 27, 2021
                                    8:00 A.M.
```

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                    BY:  BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                    BY:  LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR
                Official Reporter - US District Court
                Computerized Transcription By Eclipse

---

**Page 2**

APPEARANCES: (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                    BY:  TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                    BY:  PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                    BY:  SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                         -  -  -

---

**Page 3**

PROCEEDINGS

1   Monday - September 27, 2021              8:02 A.m.
2                  P R O C E E D I N G S
3                     ---oOo---
4        (Proceedings held in open court, outside
5        the presence and hearing of the jury.)
6        THE COURT:  Good morning, everybody.  Be seated.
7        All right.  So there are a couple of things that were
8   filed with the McGinn.  I didn't see anything from the defense
9   on McGinn, so I'm assuming that you are in agreement that those
10  depositions -- that those objections should be overruled.
11       MS. KENNEDY:  Yes, Your Honor.  I believe that is
12  correct.
13       THE COURT:  Okay.  So I'm going to overrule the
14  objections to designations 6 and 13.
15       The next thing is the Nigel Jones motion.  Why is that
16  coming 19 months after I ruled?
17       MR. ORGAN:  Your Honor, I think when you ruled, it
18  was -- it was unclear to us whether or not we were going to be
19  able to use him in the case-in-chief or not, and that's the
20  issue because he did -- he was at the factory at the time that
21  Owen Diaz was there.
22       THE COURT:  Mr. Organ --
23       MR. ORGAN:  He worked in the -- yes, Your Honor.
24       THE COURT:  -- did you look at the order that I made
25  with respect to Mr. Jones?

---

**Page 4**

PROCEEDINGS

1        MR. ORGAN:  Yes, I did, Your Honor.
2        THE COURT:  Given the absence of any overlap with
3   Diaz's work, work areas, or supervisors, this testimony is not
4   relevant to Diaz's case-in-chief.
5        As noted above, it could become relevant if Tesla relies
6   on the Faragher-Ellerth defense.  That determination will be
7   determined at trial.
8        MR. ORGAN:  Yes, Your Honor.
9        THE COURT:  So if it's coming in, it's coming in in
10  rebuttal.
11       MR. ORGAN:  Yes, Your Honor.
12       THE COURT:  Okay?
13       MR. ORGAN:  I understand.  Thank you.
14       THE COURT:  You filled in zero gaps that I identified
15  with respect to Mr. Jones' testimony.  Was he deposed in this
16  case?
17       MR. ORGAN:  No.  He's been a witness in two
18  arbitrations.  Defendant has cross-examined him twice.
19       THE COURT:  All right.  Well, so he's not testifying
20  unless the situation changes with respect to what Tesla does
21  with respect to his defense.
22       MR. ORGAN:  Okay.  Thank you, Your Honor.
23       THE COURT:  And let me make this suggestion, that you
24  spend your time working on your case and not trying the case in
25  the papers.  The lawyers need to focus on what happens in this

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

---

OPENING STATEMENT / KENNEDY                                      57

1  a decision was made that they were going to talk to him about
2  becoming an elevator operator instead of an elevator operator
3  lead.  And during this time period, he's given a final written
4  warning about his interpersonal interactions with other folks.
5      It is unfortunate that Mr. Diaz's mother passed away on
6  February 27th, 2016, according to an email that he sent to
7  Mr. Romero.  He sent it about a week and a half after his
8  mother unfortunately passed away.  He sent the email on
9  March 4th, 2016, which I think is about the last day he was at
10  the Tesla facility.  And he says:  I'm going to take leave on
11  March 9th, 10th, and 11th.  I will be back to work on the 12th.
12      During this time, there are calls to Mr. Diaz about
13  whether or not he's going to take the elevator operator
14  position, no longer be the lead.  He doesn't respond, and we
15  found out in this lawsuit he was looking for other jobs
16  starting on March the 17th.  He was supposed to let Ed Romero
17  know by the 17th if he was going to become the elevator
18  operator.  No response.
19      So at some point in time Mr. Diaz submits a doctor's note
20  saying he's going to be out for three weeks.  He doesn't send
21  it to Tesla.  He sends it to Wayne Jackson of nextSource, his
22  employer.
23      He doesn't return back to work, and at some point in time
24  CitiStaff, not Tesla, terminates Mr. Diaz's employment
25  agreement/arrangement with CitiStaff.

---

OPENING STATEMENT / KENNEDY                                      58

1      So the last time that Mr. Diaz was actually at the Tesla
2  facility was early March of 2016.
3      Now, that's what occurred with his performance.  You're
4  going to hear evidence in this case and no one is going to
5  dispute that Mr. Diaz did make complaints during his
6  nine-and-a-half month assignment at the Tesla facility.
7      These are the complaints that he made.  These complaints
8  are all in writing.  He's a very smart man.  He's been around
9  the block.  At one point in time, according to his resume, he
10  actually ran his own franchise.  He knows how things work.
11      The evidence is going to show that when he felt strongly
12  about something, he had no problem documenting it in writing to
13  anyone who would listen.
14      And in July of 2015 he did make a complaint about a fellow
15  employee.  This is Judy Timbreza, and he's a male, and about
16  some altercation.  You're going to hear testimony from Tom
17  Kawasaki about that and Mr. Diaz.
18      At the time in all the recorded information no one says
19  the "N" word.  There are emails that there were comments that
20  were racial in nature.  We don't dispute that.  Absolutely.
21  That's what the documentation says.
22      The documentation is also going to say that there was an
23  investigation.  Judy Timbreza, one, did not work for Tesla.  He
24  worked for a staffing agency.  The matter was investigated.
25  Judy Timbreza was gone.  Mr. Diaz at that time never had any

---

OPENING STATEMENT / KENNEDY                                      59

1  more contact with Judy Timbreza.  He admitted that under oath
2  in his deposition.
3      So as of July of 2015, Mr. Diaz knows you make a
4  complaint, document it, it's resolved, and it's done.  At no
5  point in time as of July 31st, 2015, did Mr. Diaz put anything
6  in writing about any of these horrible racial slurs.
7      On October 17th, 2015, Ramon Martinez and Owen Diaz had an
8  argument at the elevator, absolutely.  They're arguing about
9  getting these materials in the elevator, out of the elevator,
10  and the like.
11      Mr. Ramon Martinez actually complained first about Owen
12  Diaz, and Mr. Martinez explained about being unprofessional.
13  He just wants Mr. Diaz to treat him professionally.  Those are
14  his words in his email.
15      Shortly thereafter, Mr. Diaz complains about Ramon
16  Martinez, and he complains about the same thing and also
17  accuses Ramon Martinez of threatening him.  You're going to
18  hear testimony from both of them.  You'll have to decide what
19  actually happened.
20      But what is most important and telling about this is that
21  according to the evidence, at this time on October 17th, 2015,
22  there's no negative interaction between Ramon Martinez and Owen
23  Diaz.  Ramon Martinez is going to come in and testify that when
24  Mr. Diaz first came to work at the location, they were
25  friendly.  They got along.  Mr. Diaz talked to Mr. Martinez

---

OPENING STATEMENT / KENNEDY                                      60

1  about how to get ahead, how do things work, and the like.
2  Ramon Martinez was a lead.  So was Mr. Diaz.
3      According to the testimony, after the lawsuit was filed,
4  Mr. Diaz then said that as of this time Ramon Martinez had
5  called him the "N" word and "porch monkey" and everything else
6  under the sun; but when he had the opportunity to actually
7  write a complaint to Ed Romero about the conduct of Ramon
8  Martinez, none of those words are ever in any text message,
9  email, and the like.
10      So if, in fact, it had happened and Tesla had been made
11  aware of it, they could have handled it.  If, in fact, it had
12  happened.  It didn't happen.  All of these words that according
13  to Mr. Diaz, the "I hate you 'N,'" "I hate you effing 'N,'" "I
14  wish all you 'Ns' would die," none of that was there.
15      After this October 17th, 2015, incident, both gentlemen
16  were talked to and the matter was over with.
17      A few days later, November 5th, 2015, there's an incident
18  with a contract worker, Rothaij Foster, with Mr. Diaz.  At that
19  time Mr. Diaz's testimony was that he, as a lead, was training
20  Rothaij Foster on the elevators.  According to the written
21  complaint by Mr. Diaz, Rothaij Foster was threatening him and
22  doing other things.
23      The matter was investigated.  Rothaij Foster was walked
24  out of the facility never to be seen from again.  Rothaij
25  Foster had a different perspective on it, but that was not

---

77

KAWASAKI - DIRECT / ORGAN

1  him?
2  A.  So when Ed Romero came in, Victor and Jaime said:  Hey,
3  this is your new supervisor.  This is who you report to.  You
4  cc him on every email that you send out.
5  Q.  Okay.  Were you still reporting to Jaime Salazar at that
6  point too?
7  A.  Correct.  I was reporting to all of them.  He just came
8  in.
9  Q.  And both Jaime and Ed Romero, they were both under Victor
10  Quintero; is that right?
11  A.  Correct.
12  Q.  Now, at some point you send an email regarding Owen Diaz.
13  Do you remember that?
14  A.  It's vaguely familiar.  I believe he had an altercation
15  with another employee at the elevators.
16  Q.  Why don't you look at Exhibit 38 and see if you recognize
17  it.
18       (Witness complied.)
19  A.  Yes.  This was an issue where they had a verbal
20  altercation, which they had a big altercation together.  And I
21  put Ed, Victor, and Jaime and made them aware of it, because we
22  worked an overnight shift and these guys worked the day shift.
23  So the only way to get ahold of them was through email and they
24  would respond in the mornings.
25  Q.  The people who -- the supervisor --

78

KAWASAKI - DIRECT / ORGAN

1  A.  My supervisors; correct.
2  Q.  And you worked the night shift along with Mr. Diaz and
3  Mr. Timbreza; is that right?
4  A.  Correct.
5       MR. ORGAN:  Okay.  Your Honor, I'd move Exhibit 38
6  into evidence.
7       THE COURT:  Any objection?
8       MS. JENG:  No.
9       THE COURT:  All right.  It's admitted.
10       (Trial Exhibit 38 received in evidence).
11       (Document displayed.)
12  BY MR. ORGAN:
13  Q.  And so you mentioned there was an altercation that made
14  you send the email.  So if you can, describe what happened for
15  the jury that day?  How did you become first aware of the
16  altercation?
17  A.  So at this point in Tesla, just to give a little
18  background, I was actually bumped up to the overnight shift
19  lead.  So I had a bunch of different departments that I had to
20  cover at that time.
21       I was -- got a phone call saying there was an altercation
22  at the elevators, that they were having an issue.  I show up.
23  They were actually face-to-face, looking like they were arguing
24  with each other about to fight.
25       So my immediate recourse was to push them aside, separate

79

KAWASAKI - DIRECT / ORGAN

1  them.  There was some people around, so I asked questions:
2  What happened?  What's going on?  Did anybody else see it?
3  Because I wasn't there at the time.  I was at a different
4  section of the warehouse.
5       But when I did pull up, they were really about close.
6  They didn't touch each other, but they were face-to-face like
7  they were about to fight, and I separated them.
8       And when I asked people what happened, there was some
9  racial slurs thrown in nature.  That's what I got from people.
10  So I immediately sent Judy Timbreza home because they said he
11  was saying the slurs.
12  Q.  Okay.  And did you talk to Owen Diaz?
13  A.  I did.
14  Q.  And what did -- did Owen Diaz tell you what Judy Timbreza
15  had called him?
16  A.  So I don't -- I didn't put anything in -- I just put
17  "racial in nature" because I'm not comfortable using those
18  words that were thrown.  It's just not me.  I don't throw those
19  words around lightly.
20       But, yeah, he said the "N" bomb was thrown and the --
21  called him a "coon" and things of that nature.  But I don't
22  like using those words.  It's not me.  So I just put "racial in
23  nature" in the email.  That was the best way I could phrase it
24  at that time.
25  Q.  Okay.  But you do remember then that Mr. Diaz said that

80

KAWASAKI - DIRECT / ORGAN

1  Mr. Timbreza called him the "N" word; is that right?
2  A.  He said that.  And then as, like, other people they are
3  witnesses -- like I said, this was all new to me being a
4  supervisor at the time.  I just -- I felt like I did my due
5  diligence putting it into an email and giving it to my higher
6  ups.
7  Q.  So if someone had represented to the jury that Owen Diaz
8  did not complain about the "N" word, that no "N" word was
9  reported, that would not be correct; is that accurate?
10  A.  Yes.
11  Q.  Okay.  And then you -- I believe after this happens, you
12  have a conversation -- well, strike that.
13       Do you have a conversation with Ed Romero at any time
14  about this altercation between Mr. Timbreza and Mr. Diaz?
15  A.  So this altercation happened.  I immediately sent Judy
16  home for the night.  I believe this happened close to a
17  weekend.  It could have been a Thursday or a Wednesday.  It
18  could have been a Friday.  I knew it was close.  I knew they
19  were both due back next week to work a shift together, and I
20  think I asked Ed or Victor or one of them:  Hey, what's going
21  on?  What -- are we taking -- what actions are you guys taking
22  in this?  Can they work together or can they not?  After that,
23  it was out of my hands.
24  Q.  Did you mention to Mr. Romero -- well, did Mr. Romero tell
25  you anything about receiving your email?

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 1

---

169

PROCEEDINGS
1    Mr. Romero.  And that will be the rule of the case.
2        All right.  Have a good afternoon everybody.
3        (Whereupon at 1:30 further proceedings
4        were adjourned until Tuesday, September 28, 2021
5        at 8:00 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

170

I N D E X
Monday, September 27, 2021 - Volume 1

|                                            | PAGE | VOL. |
|--------------------------------------------|------|------|
| Preliminary Jury Instructions              | 10   | 1    |
| Opening Statement by Mr. Alexander         | 22   | 1    |
| Opening Statement by Ms. Kennedy           | 44   | 1    |
| - - -                                      |      |      |

| PLAINTIFF'S WITNESSES                      | PAGE | VOL. |
|--------------------------------------------|------|------|
| KAWASAKI, TAMOTSU EDWEEN                    |      |      |
| (SWORN)                                    | 65   | 1    |
| Direct Examination by Mr. Organ            | 66   | 1    |
| Cross-Examination by Ms. Jeng              | 100  | 1    |
| Redirect Examination by Mr. Organ          | 123  | 1    |
| ROMERO, EDWARD                             |      |      |
| (SWORN)                                    | 128  | 1    |
| Direct Examination by Mr. Organ            | 129  | 1    |
| - - -                                      |      |      |

E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| 33             |      | 156  | 1    |
| 37             |      | 83   | 1    |
| 38             |      | 78   | 1    |
| 39             |      | 86   | 1    |
| 40             |      | 85   | 1    |
| 41             |      | 146  | 1    |
| 104            |      | 93   | 1    |
| 106            |      | 165  | 1    |

---

171

I N D E X
E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| 202            |      | 75   | 1    |
| 222            |      | 91   | 1    |
| 235            |      | 95   | 1    |
| 235            |      | 118  | 1    |
| 240            |      | 153  | 1    |
| 366            |      | 72   | 1    |

- - -

---

CERTIFICATE OF REPORTER


    I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.


        _____


        Debra L. Pas, CSR 11916, CRR, RMR, RPR

        Monday, September 27, 2021

---

# Exhibit G

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

Volume 2
Pages 172 - 368

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND       )
LAMAR PATTERSON                     )
                                    )
                                    )
          Plaintiffs,               )
                                    )
  vs.                               )  No. C 17-6748 WHO
                                    )
TESLA, INC., dba TESLA MOTORS,      )
INC., CITISTAFF SOLUTIONS, INC.,    )
WEST VALLEY STAFFING GROUP,         )
CHARTWELL STAFFING SERVICES, INC.,  )
and DOES 1-50, inclusive,           )
                                    )  San Francisco, California
          Defendants.               )  Tuesday
_____     )  September 28, 2021
                                       8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:        ALEXANDER MORRISON & FEHR LLP
                       1900 Avenue of the Stars
                       Suite 900
                       Los Angeles, California 90067
                  BY:  BERNARD ALEXANDER, ESQ.

                       CALIFORNIA CIVIL RIGHTS LAW GROUP
                       332 San Anselmo Avenue
                       San Anselmo, California 94960
                  BY:  LAWRENCE A. ORGAN, ESQ.
                       CIMONE A. NUNLEY, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:           Debra L. Pas, CSR 11916, CRR, RMR, RPR
                       Official Reporter - US District Court
                       Computerized Transcription By Eclipse

---

173

APPEARANCES:  (CONTINUED)

For Defendants:        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       333 S. Hope Street
                       43rd Floor
                       Los Angeles, California 90017
                  BY:  TRACEY A. KENNEDY, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                       379 Lytton Ave
                       Palo Alto, California 94301
                  BY:  PATRICIA M. JENG, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       Four Embarcadero Center
                       17th Floor
                       San Francisco, California 94111
                  BY:  SUSAN Q. HAINES, ESQ.

Also Present:          JOSEPH ALM, ESQ.
                       - Tesla, Inc.

                       YUSUF MOHAMED, ESQ.
                       - Tesla, Inc.
                       - - -

---

174

PROCEEDINGS

1   Tuesday - September 28, 2021                8:01 a.m.
2                 P R O C E E D I N G S
3                      ---oOo---
4        (Proceedings were heard out of presence of the jury:)
5        THE COURT:  All right.  There are three things on my
6   mind this morning.  The first one, I saw the Marconi
7   designations and counterdesignations.  Did the plaintiffs
8   intend to respond to that, Marconi?
9        MR. ORGAN:  Yes, Your Honor.  I believe we did file
10  something late last night; or if not, then we're planning to
11  file something early this morning.
12       THE COURT:  Okay.  I didn't see it when I came in this
13  morning.
14       MR. ORGAN:  Okay.
15       THE COURT:  I could have missed it, so I'll go take a
16  look.
17       When do you expect -- when would you like to put that on?
18       MR. ORGAN:  I think at the earliest it would be
19  tomorrow, Your Honor.
20       THE COURT:  Okay.  I'll take a look; and if it's -- if
21  I can get at it while you're still here --
22       MR. ORGAN:  I'll check with my colleague to make sure.
23  I wasn't preparing it, so...
24       THE COURT:  All right.  Then the second thing is the
25  Demetri Di-az objections.  And I'll sustain the remaining

---

175

PROCEEDINGS

1   objections to the counterdesignations.  The employment-related
2   one on West Valley is not relevant, and 403 I think also
3   applies because it would be confusing.  And it's just --
4   there's not enough information, even if it was relevant, to
5   actually get his view on who he was employed by.
6        And the other designation, which is Designation Number 9,
7   what happened outside of the workplace doesn't matter.  The use
8   of the "N" word outside of the workplace doesn't matter, and I
9   think 403 also applies.
10       So that's my ruling on those.
11       And then the final thing on my mind is I am going to post
12  at some point, when I let Ms. Davis know that she can do it and
13  she has the time to do it, draft final Jury Instructions.  So
14  I've put them in the way that I think they ought to go.  I've
15  left the sequencing in the way that you did, but I now have
16  them in a form that we can actually use on Friday.
17       So what I want you to do is, if you have any objections to
18  the instructions, any additions to the instructions, anything
19  with respect to the instructions other than the way that
20  they're currently presented, post by Thursday at 3:00 o'clock
21  what else you would like to see in the instructions.
22       And refer to the instruction by the page number.  So I've
23  paginated them.  I've left the numbers at the top blank because
24  I don't think we'll be using all of the sort of general
25  instructions that are there.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

---

220

JACKSON - DIRECT / ALEXANDER

1  A.   Which binder do I go to?  There's two here.
2  Q.   Pick one and let's see if that's the one that has it.
3  A.   This is 39.  You said 29?
4  Q.   There should be an Exhibit 29.
5       THE COURT:  I think neither of these have 29.
6       THE WITNESS:  Yeah.  I don't have a 29.  I see 39.
7       MR. ALEXANDER:  Is it possible to display 29 for the
8  witness?
9       THE COURT:  Is this showing to the jury at the moment?
10      MR. ALEXANDER:  It's not, I don't believe.
11      THE CLERK:  Not yet.
12      THE COURT:  Okay.  Good.
13      All right.  Yes.  So this is fine.
14 BY MR. ALEXANDER
15 Q.   If you could look to the screen to your right, there is a
16 document displayed, Exhibit No. 29.  It is the Tesla
17 Anti-Harassment Policy.  Do you see that?
18 A.   Yes, sir.
19 Q.   Were you familiar with that policy during the time frame
20 that you were at Tesla working at nextSource?
21 A.   Yes.
22 Q.   And that policy, was that policy given to the contract
23 employees?
24      MS. JENG:  Objection.  Calls for speculation.
25      THE COURT:  Do you want to lay a foundation for that?

---

221

JACKSON - DIRECT / ALEXANDER

1  Lay a foundation.
2  BY MR. ALEXANDER:
3  Q.   With regard to the training that was given to employees,
4  contract employees that were working at Tesla, did you have an
5  understanding as to what they received before they were allowed
6  to work at Tesla?
7  A.   I don't remember everything but, yeah, they had a packet
8  that we were to give them.
9  Q.   Okay.  And the packet that they were given, did that
10 packet include Exhibit No. 29?
11 A.   I don't remember, but it quite possibly did.  I would
12 believe so.
13 Q.   So you don't know one way or another whether they received
14 this document, but you believe that they did?
15 A.   I believe they did.  I just -- like I said, it's been
16 quite awhile.  It's been four or five years so I can't remember
17 all that.
18 Q.   And with regard to Exhibit No. 6, which also has not
19 been -- I'm sorry.
20      With regard to Exhibit No. 29, you said that you were
21 familiar with that document?
22 A.   It looks familiar, yes.
23      MR. ALEXANDER:  May it be received into evidence, Your
24 Honor?
25      THE COURT:  Is there any objection to 29?

---

222

JACKSON - DIRECT / ALEXANDER

1       MS. JENG:  I think there lacks foundation from this
2  witness.
3       THE COURT:  I think that's true.  So I'll sustain the
4  objection.
5       MR. ALEXANDER:  Okay.
6       With regard to Tesla's Anti-Handbook Handbook, Exhibit
7  No. 6, which has not yet been received into evidence, but may
8  it be displayed so the witness can see it?
9       THE COURT:  Sure.
10      MR. ALEXANDER:  Your Honor, if I could, Exhibit
11 No. 368 is the same as Plaintiff's Exhibit No. 29, and the
12 defendant has stipulated to admission of that document.
13      THE COURT:  Okay.  That's why I told you to get these
14 numbers straight so that we didn't have duplicates.
15      Would you like to confirm that that's the case so that
16 this document can be admitted into evidence?
17      (Brief pause.)
18      THE COURT:  I'm going to accept the representation of the
19 plaintiffs with respect to this document, and it will be
20 admitted.
21      (Trial Exhibit 368 received in evidence)
22      THE COURT:  So go ahead, Mr. Alexander.
23      MR. ALEXANDER:  Thank you, Your Honor.
24 BY MR. ALEXANDER
25 Q.   With regard to Exhibit 6, the Anti-Handbook Handbook that

---

223

JACKSON - DIRECT / ALEXANDER

1  is on your screen, during the time frame that you were at
2  nextSource working for Tesla, did you have familiarity with
3  that document?
4  A.   I don't recall this particular document.
5  Q.   So the Anti-Handbook Handbook, you had never seen it while
6  performing services for Tesla; correct?
7  A.   I can't say I've never seen it.  I'm just saying I don't
8  remember this particular document.
9  Q.   Okay.
10 A.   I could very well have seen it, but I just don't remember.
11 There was a packet that we gave them so they could have very
12 well been in there.
13 Q.   And with regard to Exhibit No. 6, when you say it very
14 well could have been in there, you don't know for a fact
15 whether the Anti-Handbook Handbook was actually provided to
16 contract employees; is that correct?
17 A.   Yes, I don't recall.
18      MR. ORGAN:  May we publish -- you wanted to publish
19 the --
20      MR. ALEXANDER:  Not 6.  He doesn't remember.
21      MR. ORGAN:  Okay.  Fair enough.
22 BY MR. ALEXANDER
23 Q.   Now, with regard to use of the "N" word inside the
24 workplace, you heard the "N" word -- and you understand what I
25 mean, by the "N" word I hope -- used inside the Tesla factory;

---

Debra L. Pas, CRR
Official Reporter - U.S. District Court
(415) 431-1477

224

JACKSON - DIRECT / ALEXANDER

1  is that correct?
2          MS. JENG:  Objection.  Motion in Limine.
3          THE COURT:  Could you use a point in time?  Reference
4  the time period that this was used; in other words, during the
5  time that Mr. Diaz was employed in the factory.
6          MS. JENG:  Your Honor, if I could --
7  BY MR. ALEXANDER
8  Q.   During the --
9          THE COURT:  Hang on just a second.
10         Ms. Jeng?
11         MS. JENG:  Could I just direct your attention to
12  Page 7, Lines 15 to 23, of your order?
13         MR. ALEXANDER:  Your Honor, may I simply rephrase?
14         THE COURT:  I'm sorry?
15         MR. ALEXANDER:  I would simply like to rephrase the
16  question.
17         THE COURT:  Let me just look at what Ms. Jeng is
18  referring me to.
19         (Pause in proceedings.)
20         THE COURT:  I'm going to allow this general line as
21  long as you rephrase.
22         MR. ALEXANDER:  Thank you, Your Honor.
23         THE COURT:  Overruled.
24  BY MR. ALEXANDER
25  Q.   During the time frame of 2015 to 2016, did you hear the

225

JACKSON - DIRECT / ALEXANDER

1  "N" word used inside the workplace at Tesla?
2  A.   Yes, sir.
3  Q.   And you heard it used quite a few times; right?
4  A.   Yes, sir.
5  Q.   And it would be fair to say that as you walked throughout
6  the factory, you heard it on a daily basis?
7  A.   Yes, sir.
8  Q.   And when you say "throughout the factory," that includes
9  the satellite cafeterias; right?
10  A.   I wouldn't -- I wouldn't limit where it was said in the
11  factory.  It was said quite often.  Not always in a derogatory
12  manner.  Sometimes as they would say "my," you know, like as in
13  friend, but it was inappropriate.
14  Q.   So you heard n-i-g-g-e-r and you heard n-i-g-g-a --
15  A.   Yes, sir.
16  Q.   -- throughout the workplace?
17  A.   Yes, sir.
18  Q.   And you heard it used by both African-Americans and
19  non-African-Americans; isn't that correct?
20         MS. JENG:  Objection.  Leading.
21         THE COURT:  Sustained.
22  BY MR. ALEXANDER
23  Q.   At the point when you were performing services for Tesla,
24  you were performing services through nextSource; correct?
25  A.   Yes, sir.

226

JACKSON - DIRECT / ALEXANDER

1  Q.   And nextSource had a contract with Tesla to perform
2  services at Tesla's behest; is that correct?
3         MS. JENG:  Objection.  Calls for speculation.
4         THE COURT:  Overruled.  Either he knows that or not.
5         THE WITNESS:  I was not involved in the contract
6  negotiations with Tesla so I'm not sure exactly what contracts
7  nextSource and Tesla had.
8  BY MR. ALEXANDER
9  Q.   You understood that there was a contract between Tesla
10  and nextSource for nextSource to provide services to Tesla;
11  correct?
12  A.   Yes, I believe so.
13  Q.   And in your role at nextSource, you were performing
14  services based on direction given by Tesla; is that correct?
15  A.   I was based on nextSource.  I worked for nextSource.
16  I didn't work for Tesla.
17  Q.   Okay.  I understand that you didn't work for Tesla, but
18  isn't it correct that you performed duties at the direction of
19  Tesla?
20  A.   Yes.
21         MS. JENG:  Objection.  Leading.
22         THE COURT:  Overruled.  You can answer.  And I think
23  you did.  Was the answer "yes"?
24         THE WITNESS:  Yes.
25

227

JACKSON - DIRECT / ALEXANDER

1  BY MR. ALEXANDER
2  Q.   And so on occasion when you walked through the factory and
3  you heard the "N" word, you mentioned to someone that that
4  wasn't appropriate; right?
5  A.   Yes.
6  Q.   Okay.  But most of the time you simply ignored it; right?
7  A.   Yes.
8  Q.   And were you offended by use of the "N" word inside the
9  Tesla workplace?
10  A.   Yes, I was.
11  Q.   And would it be fair to say that you didn't feel that you
12  had the power to stop the conduct inside the workplace?
13  A.   They did not work for me, sir.  I couldn't -- I had no
14  supervisory skills or anything over those individuals.
15  Q.   So even though you were at nextSource and you were
16  supervising the staffing companies that were working as
17  contract employees inside the Tesla workplace, you did not feel
18  you had the power to stop the use of the "N" word inside the
19  workplace; correct?
20  A.   I could not.  They were not my employees.
21  Q.   Okay.
22  A.   It was not my place to advise them or direct them.
23  Q.   Did you report your hearing of the "N" word to Tesla human
24  resources?
25  A.   No, I did not.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 2

368

I N D E X
E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 76 | | 242 | 2 |
| 83 | 350 | 351 | 2 |
| 92 | | 233 | 2 |
| 103 | | 238 | 2 |
| 274 | | 280 | 2 |
| 284 | | 277 | 2 |
| 287 | | 247 | 2 |
| 287 | | 302 | 2 |
| 296 | 191 | 193 | 2 |
| 301 | | 288 | 2 |
| 306 | | 201 | 2 |
| 308 | 202 | 203 | 2 |
| 312 | 204 | 205 | 2 |
| 368 | | 222 | 2 |

– – –

CERTIFICATE OF REPORTER


    I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR
Tuesday, September 28, 2021

*Debra L. Pas, CRR*
*Official Reporter - U.S. District Court*
*(415) 431-1477*

# Exhibit H

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

Volume 3

Pages 369 - 544

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND          )
LAMAR PATTERSON                        )
                                       )
                                       )
              Plaintiffs,              )
                                       )
      vs.                              ) No. C 17-6748 WHO
                                       )
TESLA, INC., dba TESLA MOTORS,         )
INC., CITISTAFF SOLUTIONS, INC.,       )
WEST VALLEY STAFFING GROUP,            )
CHARTWELL STAFFING SERVICES, INC.,     )
and DOES 1-50, inclusive,              )
                                       )
              Defendants.              ) San Francisco, California
                                       ) Wednesday
_____ ) September 29, 2021
                                         8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                    BY:  BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                    BY:  LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

             (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

---

370

APPEARANCES:  (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                    BY:  TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                    BY:  PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                    BY:  SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                               -  -  -

---

371

PROCEEDINGS

1    Wednesday - September 29, 2021              8:01 a.m.
2                    P R O C E E D I N G S
3                          ---o0o---
4         (Proceedings were heard out of presence of the jury.)
5         THE COURT:  All right.  There are two things on my
6    mind this morning.  One is the counter designations and
7    objections regarding Erin Marconi.  And I think in every
8    instance I'm going to overrule the objection to the counter
9    designation and overrule the objection to the testimony.  So
10   all of the testimony can come in that the parties are
11   interested in.
12        MR. ORGAN:  Your Honor, just a question on that then.
13   With respect to how they are presented, do you want the
14   designations presented with the counter designations then
15   together?
16        THE COURT:  Yeah, I think that's the smoothest way of
17   dealing with things.
18        MR. ORGAN:  So we'll have one video.
19        THE COURT:  One video.
20        MR. ORGAN:  In terms of the time, Your Honor --
21        THE COURT:  You time it yourself.
22        MR. ORGAN:  We'll produce that tonight.  So we'll --
23   it's our intent to present it, then, tomorrow, Your Honor.
24        THE COURT:  Great.
25        MR. ORGAN:  Okay.  Thank you.

---

372

PROCEEDINGS

1         THE COURT:  All right.  And then the other thing I
2    just wanted to mention, yesterday I allowed Wayne Jackson to
3    testify about his experience of hearing the "N" word throughout
4    the factory.  And on Monday I admitted Exhibit 106 concerning
5    Mr. Romero's credibility regarding his hearing of the "N" word.
6         I did so because it appears from Tesla's presentation of
7    the case, from the opening of the argument to the designations
8    in the depositions, that it wishes to minimize the use of the
9    "N" word in the workplace at Tesla, which is fine, but so this
10   counter evidence I think is relevant.
11        I am willing and inclined to give the jury a further
12   limiting instruction, and I can do that this morning.  It would
13   be primarily at the defendant's -- I'll let the defendant
14   decide whether this is something that you would like or not,
15   but it would be to the effect of:
16        As you know, I admitted Exhibit 106 for the limited
17   purpose of your consideration of the credibility of
18   Mr. Romero's testimony.  And yesterday I allowed Mr. Jackson to
19   testify about his experience hearing the "N" word in the Tesla
20   factory.
21        I want to remind you that this case is about Mr. Diaz and
22   the work environment that he experienced at the Tesla factory,
23   not what others in a different part of the facility
24   experienced.
25        MS. KENNEDY:  Yes, Your Honor, that would be

---

409

DIAZ - DIRECT / ORGAN

1  A.  Just what I explained to you.  I had told Tom Kawasaki
2  over a period that he had been calling me a "porch monkey" and
3  I had translated it.  And then when he was leaving out the
4  elevator on that particular day after they was doing it, he
5  actually said the "N" word.  So that's what made me pretty
6  upset at that point.
7  Q.  Did you tell him about the mayate?
8  A.  I explained everything to Tom.
9  Q.  Okay.  And then did you see Tom interviewing anybody
10  around there?
11  A.  Yes.
12  Q.  And tell the jury about that.  What did he do?
13  A.  Like I said, he started interviewing people after he broke
14  us up.  He started talking to the people that was around trying
15  to find out is -- what he asked me.  He was trying to
16  corroborate what I told him what Judy Timbreza was saying.
17  Q.  Okay.  And then after that incident, did Judy Timbreza
18  call you any of those offensive terms again?
19  A.  No.  After that, I hadn't seen Judy Timbreza.
20  Q.  Okay.  Do you know what Tesla did with Judy Timbreza?
21  A.  No.  I was not privy to that, sir.  I'm sorry.
22  Q.  They didn't tell you?
23  A.  No.
24  Q.  Okay.  And then if you could, turn to Exhibit 38.
25  MR. ORGAN:  And I believe this is admitted,

410

DIAZ - DIRECT / ORGAN

1  Your Honor.
2  MS. KENNEDY:  Yes, Your Honor.  It's admitted.
3  THE COURT:  It is.
4  THE WITNESS:  I only have 33 to 39.  Unless is it in
5  this binder?
6  BY MR. ORGAN:
7  Q.  That was my fault.  I was putting this stuff together last
8  night, and I must have not put it in there.
9  A.  Is it the white binder or the black binder?
10  MR. ORGAN:  Can we show it to him, Your Honor, on the
11  screen?
12  Oh, can we publish it?
13  THE COURT:  You can publish it.  It's in.
14  MR. ORGAN:  Yes, let's publish it to the jury.
15  (Document displayed.)
16  BY MR. ORGAN:
17  Q.  Look on your screen, Mr. Diaz.  Can you see that?
18  A.  Yes, sir, I can see it.
19  Q.  If you look at the first line there, it says (as read):
20  "Elevator 2 employee Owen has brought to my
21  attention of comments being made towards him that are
22  racist in nature."
23  Did you consider the comments to be racist in nature?
24  A.  Yes, I did, sir.
25  Q.  Does that statement adequately describe, though, the

411

DIAZ - DIRECT / ORGAN

1  actual statements that were made?
2  A.  No, it was not.
3  Q.  But you did report, you're sure you reported to Tom
4  Kawasaki those words, the "N" word and those other words that
5  were spoken; right?
6  A.  Yes, I did report it to him.
7  Q.  Okay.  So based on what you had told Tom Kawasaki, you
8  would agree, would you not, that on July 31st you did report
9  the "N" word to your supervisor; right?
10  A.  Yes.  I verbally reported it to my supervisor.
11  Q.  Okay.  And tell me this.  Did anyone tell you, when you
12  started at Tesla, who you were to report things to?
13  A.  When I first started at Tesla -- well, before I started at
14  Tesla, I was talking to -- I can't remember her name.  She was
15  a heavy-set Latino female that was at CitiStaff, and she told
16  me to direct all my concerns to Tesla or whoever was my
17  immediate supervisor over at Tesla.
18  Q.  Okay.  And this -- so the CitiStaff person told you to
19  report anything that happened to your immediate supervisor at
20  Tesla; is that right?
21  A.  Yes, sir.
22  Q.  Did anyone at Tesla ever tell you to do it any differently
23  than that?
24  A.  No, sir.
25  Q.  And did Tesla give you any training on harassment,

412

DIAZ - DIRECT / ORGAN

1  discrimination, reporting it, that kind of stuff?
2  A.  The only training that I received from Tesla was the
3  one-hour class to be able to get the badge, sir.
4  Q.  In Exhibit 19?
5  A.  Yes.
6  Q.  Okay.  I'd like to talk to you a little bit.  You
7  mentioned in your deposition a person named Robert.  Do you
8  remember a Robert?
9  A.  Yes.  Robert Hurtado.
10  Q.  Who?  Robert Hurtado?
11  A.  Yes, sir.
12  Q.  Now, when you were deposed, you didn't know his name?
13  A.  No, I didn't know his name then.
14  Q.  And --
15  A.  Well, I knew his first name, not his last name.
16  Q.  Right.  If you could, turn to Exhibit 96.  I hope that
17  one's is in there.
18  A.  White or black binder?
19  Q.  96 is not in there?
20  A.  I'm searching for it right now.
21  THE COURT:  Here.
22  (Whereupon document was tendered to the witness.)
23  THE WITNESS:  Thank you, sir.
24  BY MR. ORGAN
25  Q.  There is a picture there of somebody.  Do you recognize

413

DIAZ - DIRECT / ORGAN

1    that picture?
2    A.   Yes.  I recognize that as Robert Hurtado, one of my
3    harassers.
4    Q.   Okay.  So that's the guy who harassed you; right?
5    A.   Yes, sir.
6    Q.   And actually I showed you that picture before during
7    discovery after your deposition was over; correct?
8    A.   Yes, you showed me.  Tesla, I had asked them to show me a
9    picture and they didn't have any.
10   Q.   In your deposition you asked them to show you a picture,
11   and they didn't show you one; right?
12   A.   They asked me if I could recognize anybody.  And I
13   actually told them if they produced a picture, then I probably
14   possibly could recognize them.
15   Q.   Okay.  Let me ask you, so this man, Robert Hurtado, did he
16   engage in any kind of harassing conduct towards you?
17   A.   Yes, sir.
18   Q.   And when did that harassing conduct towards you by
19   Mr. Hurtado, when did that start?
20   A.   I'm going to say in about the fall of 2015.
21   Q.   Okay.  You -- when is it?  You think it's fall?
22   A.   Yes.
23   Q.   Okay.  Let me ask you this:  Was it before Demetric
24   started working there?
25   A.   I have to think when Demetric started working.  I think

414

DIAZ - DIRECT / ORGAN

1    Demetric started working in August or something like that.
2    Q.   Yeah.  And do you think that Robert Hurtado started
3    calling you or harassing you prior to Demetric coming?
4    A.   It could have been before.  It was awhile back.  I'm not
5    100 percent sure.
6    Q.   Okay.  So perhaps in the August time frame then?
7    A.   Yes.
8    Q.   And what are the -- was the conduct, the harassment,
9    racial in nature?
10   A.   Yes, it was.
11   Q.   And if you could, tell the jury, what is the harassing
12   conduct that Robert Hurtado directed towards you based on your
13   race, what you consider to be based on your race?
14   A.   Mr. Hurtado would call me the "N" word and call me "boy."
15   Q.   Okay.  How did -- can you tell the jury how Mr. Hurtado
16   used the "N" word towards you, if you recall?
17   A.   He would pull into the elevator on pieces of equipment at
18   a time, and then he would say:  "N," hurry up and push the
19   button.
20        Or I could be working the other elevator, moving -- moving
21   batteries or something like that, and then he would say:  "N,"
22   hurry up and push the batteries into the elevator or out of the
23   elevator.
24        You know, he -- he would say things like:  You "Ns" are
25   lazy, and stuff like that.

415

DIAZ - DIRECT / ORGAN

1    Q.   How many times do you think Robert Hurtado used the
2    "N" word towards you?
3    A.   It was well north of 30 times.
4    Q.   Okay.  And how did -- you mentioned "boy."  Did you
5    consider that offensive to be called a "boy"?
6    A.   At that time I was in my forties so I'm a grown man.
7    Q.   Right.
8    A.   And "boy" is a term that slave masters used to use against
9    black people to let them know that they were their property.
10   Q.   Do you remember how Mr. Hurtado used the word "boy"
11   towards you?
12   A.   He would say:  Boy, hurry up and push the batteries in the
13   elevator.
14        And I would try to remind him that, you know, I'm a grown
15   man.  I'm not a boy.  If I were to walk up to you, the first
16   thing I wouldn't say is:  Hey, boy.  Hey, man.
17   Q.   So he used "boy" in a similar manner to the "N" word?
18   A.   Yes, sir.
19   Q.   Okay.  Can you remember how many times he used "boy"
20   towards you?
21   A.   No, I can't remember.
22   Q.   Did he use the "N" word more than he did "boy"?
23   A.   Yes, he did.
24   Q.   Okay.  And what was Robert Hurtado's position as far as
25   you understood it?

416

DIAZ - DIRECT / ORGAN

1    A.   He was the supervisor.
2    Q.   Did he work for Tesla?
3    A.   Yes, he was a Tesla employee.
4    Q.   Tesla employee and a supervisor.
5        Okay.  Let's talk about a man named Ramon Martinez.  Do
6    you know a man named Ramon Martinez?
7    A.   Yes, sir.  That was another one of my harassers.
8    Q.   Okay.  And what was your understanding of Ramon Martinez's
9    role at the Tesla factory?
10   A.   He was another supervisor.
11   Q.   Okay.  Now, if you could, tell the jury, what's the
12   difference between a lead and a supervisor at the Tesla
13   factory?
14   A.   To me, it's really no difference.  So I -- except, you
15   know, one reports to the other.  You know, the supervisors
16   would come out and basically sometimes give us some orders, or
17   we would have to -- as leads, we would have to coordinate with
18   different supervisors and different -- in different departments
19   to make sure the material is being moved back and forth.
20   Q.   Okay.  And did Ramon Martinez have an ability to tell you
21   how to do anything, any part of your job?
22   A.   Yes.  To a limited capacity, yes.
23   Q.   Okay.  And what was it that -- you mentioned that he was
24   one of your harassers.  What did Ramon Martinez do to harass
25   you?  How did he do that?

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

429

WHEELER - DIRECT / ALEXANDER

1  derogatory language used towards African-Americans as a spook.
2  Q.  When you observed Owen in front of this bale, how did he
3  appear to you?
4  A.  He seemed -- well, he was upset.
5  Q.  Okay.  And did he actually state that he was upset?
6  A.  No.
7  Q.  Okay.  Now, at some point did Owen Diaz join -- I'm sorry.
8      And with regard to this drawing, did you find it
9  offensive?
10  A.  The drawing, not so much.  The words with the drawing,
11  absolutely.
12  Q.  The words with the drawing?
13  A.  Correct.
14  Q.  And is there some point at which Ramon Diaz [sic] joined
15  the group of people standing there associated with that bale?
16  A.  He did.
17  Q.  And do you know who brought Ramon Diaz [sic] over?
18  A.  Myself and Israel went to go retrieve him.
19  Q.  And at the point when you retrieved him, did you have any
20  understanding that he had any involvement with this drawing?
21  A.  Not at the moment.  We went to go see who was baling.
22  Q.  Okay.  And how long was Mr. Diaz [sic] there before he
23  indicated that he was involved with the drawing?
24      THE COURT:  Mr. Alexander, have you been referring to
25  Mr. Martinez or --

---

430

WHEELER - DIRECT / ALEXANDER

1      MR. ALEXANDER:  I'm sorry.  Let me fix that.
2      THE COURT:  Okay.  And you might --
3  BY MR. ALEXANDER:
4  Q.  How long was Mr. --
5      THE COURT:  -- want to go back to an earlier question
6  that you asked about "Ramon Diaz" using the "N" word, because I
7  think you meant Mr. Martinez, but I don't know.
8      MR. ALEXANDER:  I do.  I'm sorry.  Thank you.
9  BY MR. ALEXANDER
10  Q.  With regard to use of the word "mayate," did
11  Mr. Ramirez -- Ramon Martinez -- did Ramon Martinez ever use
12  the "N" word or mayate in your presence?
13  A.  Not in my presence.
14  Q.  Okay.  When Mr. Martinez was brought to this drawing, how
15  long was he in front of the drawing before he acknowledged any
16  involvement with it?
17  A.  About five minutes, five to ten minutes.
18  Q.  And ultimately what is it that he finally said after he
19  had been standing there for five minutes?
20  A.  Once he realized the severity of the situation, he said
21  he's the one that drew the drawing.
22  Q.  Now, did he say anything else?  Did Mr. Martinez say
23  anything else during that time frame while you were standing in
24  front of the bale?
25  A.  If I recall correctly, he said he thought it was a joke.

---

431

WHEELER - DIRECT / ALEXANDER

1  Q.  Did he say anything else?
2  A.  Not to my recollection.
3  Q.  Is there any point while he was standing there that
4  Mr. Martinez apologized?
5  A.  No.
6  Q.  You're sure of that?
7  A.  I am not, but I do not remember an apology.
8  Q.  Okay.  Did Owen say that he thought that it was funny?
9  A.  Owen did not find it funny at any point in time.
10  Q.  Are there any occasions that you reported racial conduct
11  inside the workplace between 2015 and 2016?
12  A.  Yes.
13  Q.  And what incident happened with you that you thought was
14  racially motivated?
15  A.  I was requesting a subordinate to delete a picture that he
16  had taken of another associate, and he refused to do so.  And
17  in leaving, he -- yeah, he said:  FU, "N" word, and then walked
18  away.
19  Q.  And so this person who said "FU" and walked away, did you
20  report it?
21  A.  I did.
22  Q.  And who did you report it to?
23  A.  To my immediate supervisors, Ramon Martinez and --
24  Q.  Ramon Martinez was your immediate supervisor?
25  A.  He was my partner, partner supervisor.  We had two

---

432

WHEELER - DIRECT / ALEXANDER

1  supervisors for the grave shift.
2  Q.  And so as a result of reporting use of the "N" word
3  towards you to Ramon Martinez, what action was taken?
4  A.  There was no action taken.
5  Q.  Okay.  And the person that had used the "N" word towards
6  you, what ultimately happened to that person in terms of his
7  position at the Tesla factory?
8  A.  That individual received a promotion and was given his own
9  section.
10  Q.  Now, is there any other incident that occurred to you
11  inside the workplace that you believed was racially motivated
12  directed towards you?
13  A.  Yes.
14  Q.  And can you describe that incident?
15  A.  There was a night I had taken -- there was a night I had
16  taken lunch, and I was on my lunch for about an hour.  And then
17  when I returned to my cart, I sat down, slid across the seat
18  like I did every night, and I felt something wet on my seat.
19  And it took me a second to process it.  I got back up and there
20  was feces all over my seat, all over my pants.  There was some
21  on my hands.
22  Q.  And did you report this incident of finding feces on your
23  cart to anyone at Tesla?
24  A.  I did.
25  Q.  Who did you report that to?

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

433

WHEELER - DIRECT / ALEXANDER

1   A.   Umm, everybody.  Security, all the supervisors, Ramon,
2   Jose Torres, Victor Quintero.
3   Q.   Ed Romero?
4   A.   Yes -- uh, I don't -- I do not recall for Ed, but...
5   Q.   So the department that you worked in, Victor Quintero was
6   ultimately over your department?
7   A.   Absolutely, yes.
8   Q.   So you reported it to numerous people in management and
9   supervision inside Tesla; right?
10  A.   I did, yes.
11  Q.   Now, the location where you found your cart with feces on
12  it, were there cameras?
13  A.   There were.
14  Q.   Can you estimate how many cameras were present?
15  A.   At least two.
16  Q.   And from where those cameras were present, would it have
17  been -- is it your belief that those cameras would have caught
18  whoever left this on your cart?
19       MS. JENG:  Objection.  Calls for speculation.
20       THE COURT:  Overruled.  You can answer.
21       THE WITNESS:  Absolutely.  I parked my cart next to
22  Elon's original roadsters where the charging stations were.
23  BY MR. ALEXANDER
24  Q.   And did you ask for Tesla to look at the video to figure
25  out who had left this feces on your cart?

434

WHEELER - CROSS / JENG

1   A.   I did.
2   Q.   And did Tesla conduct an investigation to your knowledge?
3   A.   They said there was no vision in that area.
4   Q.   They said there was no vision in that area?
5   A.   Correct.
6   Q.   Who is it that told you that?
7   A.   It just came from the security email.
8   Q.   Did anyone ever interview you?
9   A.   No.
10  Q.   Was there any retraining that occurred of the workplace to
11  indicate this was inappropriate?
12  A.   No.
13  Q.   During the time frame that you were at Tesla, did anyone
14  ever train you that Tesla had a zero tolerance policy for
15  harassment in the workplace?
16  A.   Not at all.
17       MR. ALEXANDER:  Nothing further.  Thank you.
18       THE COURT:  Ms. Jeng.
19                CROSS-EXAMINATION
20  BY MS. JENG:
21  Q.   Mr. Wheeler, you started working at the Fremont factory in
22  April of 2015; is that right?
23  A.   Yes.
24  Q.   You worked at the Fremont factory to until approximately
25  April 2016?

435

WHEELER - CROSS / JENG

1   A.   Yes.
2   Q.   You never worked as an elevator operator; right?
3   A.   No.
4   Q.   Okay.  And you were employed by Chartwell throughout your
5   entire assignment at Tesla; correct?
6   A.   Correct.
7   Q.   And you were assigned to Tesla through nextSource; is
8   that right?
9   A.   Yes.
10  Q.   After your assignment ended in April 2017, your employer
11  Chartwell actually placed you at a different assignment; is
12  that right?
13  A.   Yes.
14  Q.   At a bakery?
15  A.   DES, yes.
16  Q.   Okay.  So you were never employed directly by Tesla; is
17  that right?
18  A.   Correct.
19  Q.   Okay.  When you first started your assignment at the
20  factory through Chartwell, you actually received extensive
21  training through Chartwell; is that right?
22  A.   Not extensive but, yes, training.
23  Q.   All right.  Can I direct you to your deposition
24  transcript -- it should be in front you -- Page 47, Line 20
25  through -- one second -- 47, Line 2 -- oh, sorry.  46 -- I'm

436

WHEELER - CROSS / JENG

1   sorry.  46, Line 20 -- sorry.  I'll come back to this.
2        You received certification for harassment training;
3   correct?
4   A.   Can you repeat, please?
5   Q.   Sure.  You actually received a certification for
6   harassment training; correct?
7   A.   I received certification for all training.
8   Q.   I'm sorry.  Say that again.
9   A.   I received certification for all training.
10  Q.   Including harassment training; is that right?
11  A.   I cannot say directly.
12  Q.   Okay.  Okay.  Owen was an elevator lead, to your
13  understanding; correct?
14  A.   Correct.
15  Q.   And as a lead, you were actually Owen's superior; is that
16  right?
17  A.   Correct.
18  Q.   So you were supervising Owen when Owen was a lead;
19  correct?
20  A.   Yes.
21  Q.   Okay.  Ramon Martinez was also a lead; correct?
22  A.   No.  He was a supervisor.
23  Q.   It's your belief that Ramon was a supervisor at the time
24  that you were a supervisor --
25  A.   Yes.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

449

DIAZ - DIRECT / ORGAN

1  to set things up the way that they are, and so I appreciate
2  Ms. Kennedy asking where she can be.
3      But go wherever you can see what Mr. Organ is up to.
4          MS. KENNEDY:  Okay.  Thank you.  Thank you, Your
5  Honor.
6      And I will speak up for the court reporter.
7          THE COURT:  Mr. Organ, go ahead.
8          MR. ORGAN:  Thank you, Your Honor.
9              DIRECT EXAMINATION RESUMED
10 BY MR. ORGAN
11 Q.  Owen, if you could, turn to Exhibit 222.
12 A.  222, yes, sir.
13         MR. ORGAN:  Which I believe is admitted, Your Honor.
14 BY MR. ORGAN
15 Q.  This -- reading this email, who was it who promoted you to
16 a lead on August 17th of 2015?  Do you know?
17 A.  It was Victor Quintero.
18 Q.  Okay.  And who else told you that you had a promotion?
19 Anybody else other than Victor?
20 A.  Edward Romero.
21 Q.  Okay.  Now, what I'd like to do now is move to an incident
22 on October 17th of 2015.
23     If you look at Exhibit 235 --
24         MR. ORGAN:  And I believe this is admitted,
25 Your Honor.

450

DIAZ - DIRECT / ORGAN

1          MS. KENNEDY:  Your Honor, no objection.
2      (Document displayed.)
3  BY MR. ORGAN
4  Q.  So did you write Exhibit 235?
5  A.  Yes, I did.
6  Q.  And why did you write it?
7  A.  Because I had an interaction, a negative interaction, with
8  Mr. Martinez.
9  Q.  If you could, go back in time and take us back to that
10 point in time.  How did this interaction with Ramon Martinez
11 start?
12 A.  I -- all I can tell you, I don't know how it started.  I
13 was training a new employee, which was Rothaj Foster.
14 Q.  Are you a lead at this point in time?
15 A.  Yes, sir.
16 Q.  Okay.  And so you're -- I'm sorry.  I interrupted.  You're
17 training who was it?
18 A.  Rothaj Foster.
19 Q.  Okay.  And what happens in terms of -- between you and
20 Ramon Martinez?
21 A.  So I'm training Mr. Foster, letting him know the policies
22 of the elevator and the things that we do on the elevator,
23 telling him when he gets his breaks and stuff like that.  And
24 as I was starting to get to the point where Tom Kawasaki
25 wouldn't be our supervisor anymore, it would be Ed Romero,

451

DIAZ - DIRECT / ORGAN

1  because Tom Kawasaki was taking a training class and he was
2  about to become a certified plumber.
3  Q.  Okay.  And what happened?  What was said in terms of your
4  actions?  Does he move towards you?  Do you move towards him?
5  When you open the elevator -- strike that.  I'll start over.
6      When you -- the elevator doors open.  What happens?
7  A.  As I'm explaining this to Mr. Foster, that Thomas Kawasaki
8  wouldn't be our immediate supervisor anymore, the elevator
9  doors parted, I saw Mr. Martinez sitting there on a blue
10 tugger.  He --
11 Q.  What's a tugger?
12 A.  A tugger is a piece of equipment that Tesla uses to load
13 cardboard and other recycling materials onto.  It's like a
14 train, and you pull all this heavy stuff through the -- through
15 the factory and deliver it to its destination.
16 Q.  What does he do when the doors open?  Ramon, what does he
17 do?
18 A.  He jumps off the tugger and rushes into the elevator and
19 starts saying did I have a problem with him and starting
20 cursing and calling me the "N" word.  He was saying:  "Ns' are
21 shit.  Excuse my language.
22     But as he was saying this, you know, he was getting closer
23 and closer, and he -- he had his fist balled up and:  Do you
24 got a problem?  He was saying he was going to beat me up and
25 stuff like that.

452

DIAZ - DIRECT / ORGAN

1      So what I did was, is I immediately threw my hands up into
2  the neutral position and opened my hands.  I backed up against
3  the wall and actually ended up climbing a piece of equipment
4  that I was there with.
5      And he got so close he was within inches of my face, you
6  know.  And I'm like:  Hey, hey, man.  I even cursed back.  I
7  was telling him get the "F" out of my face.
8      And from there, it seemed like it was getting pretty
9  intense, and I pointed to the surveillance system and I'm like:
10 Hey, man, we're on surveillance.  And after I told him that, he
11 rushed out of the elevator.
12 Q.  Okay.  And you mentioned he said the "N" word.  That's not
13 in your Exhibit 235 in your statement.  Why not?  Why didn't
14 you include the "N" word in the statement if he had said it?
15 A.  Umm, reason being is because we had the surveillance
16 system right there, you know.  I just figured Tesla would pull
17 the -- pull the video surveillance and then come and interview
18 me and then we can discuss all that.
19 I just didn't put it in the email because, you know, like
20 I said, in a workplace, that word is not supposed to be used.
21 Q.  Okay.  But didn't you want Tesla to know about him using
22 the "N" word?
23 A.  Yes.  But I had complained before and, you know, it was
24 just like me complaining that I'm breathing.
25 Q.  What do you mean by that?

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

453

DIAZ - DIRECT / ORGAN

1    A.   You know, you can -- I would tell Ed Romero at times, you
2    know, because what would end up happening is, is Ed Romero
3    would come in the morning times and, you know, he would talk
4    to me.  And we would sit there at the cafeteria and have
5    breakfast and stuff like that, and then me and Mr. Ed Romero
6    would go over some of the events that happened and some of the
7    things and ways that we can improve elevator -- elevator
8    efficiency.
9    Q.   Did you -- on this date, did you have a conversation with
10   Ed Romero about what had happened between you and Ramon
11   Martinez?
12   A.   I sent out an email letting them know and I tagged -- I
13   believe I tagged Mr. Romero into the email.
14   Q.   Did you have a followup conversation with Mr. Romero?
15   A.   Afterwards?
16   Q.   Yeah.  After you sent the email.
17   A.   No.  Mr. Romero, you know, what he did was -- I believe I
18   could have talked to him, but I asked him talk to him, but
19   Mr. Morerro [sic] -- I mean, Mr. Ed Romero -- oh, I butchered
20   his name, I'm sorry.  Mr. Ed Romero, he had -- did like he
21   normally do:  Get some rest and I'll deal with the situation.
22   Q.   Okay.  So did you tell Mr. Romero about the "N" word when
23   you talked to him personally?
24   A.   Yes, I did, sir.
25   Q.   And did you talk to Tom Kawasaki, too?

454

DIAZ - DIRECT / ORGAN

1    A.   Yes, I did.  I called Mr. Kawasaki for advice on how to
2    handle the situation.
3    Q.   Okay.  And did you tell him about it, the "N" word?
4    A.   Yes.  I explained to Mr. Kawasaki about what was going on.
5    Q.   Okay.  Now, if I can, if you could turn to Exhibit 234.
6        MR. ORGAN:  That should be in your notebook,
7    Your Honor.  Yeah, okay.
8        And this is admissible, Your Honor.  I'd move it into
9    evidence.
10       MS. KENNEDY:  No objection.  It's already admitted.
11       THE COURT:  Okay.  Go ahead.
12       MR. ORGAN:  Okay.  I didn't have that, so thank you.
13   (Document displayed)
14   BY MR. ORGAN
15   Q.   This statement here is made by Mr. Martinez.  Do you see
16   that?
17   A.   Yes, I see it, sir.
18   Q.   And he says you're acting in an unprofessional way.  He
19   actually sent his about an hour and 15 minutes before you sent
20   yours -- an hour and 14 minutes before you sent -- an hour and
21   12 minutes before you sent yours.
22       Did you know that he had sent an email?
23   A.   No, I did not.
24   Q.   And you said that you had been using curse words; is that
25   correct?

455

DIAZ - DIRECT / ORGAN

1    A.   Yes, I used curse words.  I told him to get the "F" out of
2    my face.  So, you know, it was a heated argument.
3    Q.   And you would agree that that's not professional; right?
4    A.   No, that's not professional.
5    Q.   Okay.  But did you know about his email at the time that
6    you had the interaction with him?
7    A.   No, I did not.
8    Q.   Okay.  And I notice you didn't copy Ramon Martinez on your
9    complaint letter?
10   A.   No, I did not.
11   Q.   Okay.  Now, let's go forward to January, January 21st of
12   2016.
13       Oh, before we do that.  So with respect to this
14   10/17 incident, did you report the "N" word?
15   A.   Yes, I did.
16   Q.   And you reported it to both Kawasaki --
17   A.   And Ed Romero.
18   Q.   -- and Ed Romero?
19       Okay.  Did anybody at Tesla ever tell you if you
20   complained about something, you had to complain about it in
21   writing?
22   A.   No, they did not.
23   Q.   Okay.  While we have that up there, before we go to
24   January, you had an interaction -- after this 10/17 incident in
25   the elevator, you had an interaction with Rothaj Foster; is

456

DIAZ - DIRECT / ORGAN

1    that right?
2    A.   Yes, I did, sir.
3    Q.   You were supervising him?
4    A.   Yes, I did, sir.
5    Q.   And there's a date on here November 5th.  Did that
6    interaction involve the "N" word in any way?
7    A.   No.  Mr. Foster told me he was going to shoot me.  He
8    never called me the "N" word.
9    Q.   Okay.  So there was no "N" word to report on November 5th;
10   is that correct?
11   A.   That's correct, sir.
12   Q.   Okay.  Let's go to January 21st, 2016.  Tell me what you
13   were doing that night?  Were you working the night shift?
14   A.   Yes, sir.
15   Q.   And just tell the jury, what's the night shift?  What are
16   the hours for the night shift?
17   A.   From 6:00 p.m. to 6:00 a.m.
18   Q.   Okay.  And what were you doing the night of January 21st?
19   A.   The night of January 21st I was, umm, doing what I would
20   normally do.  The line had asked me to bring up a certain
21   product.  It was some plastic things that they needed to put
22   inside the batteries.  If they didn't get them up to the line
23   in enough time, the line would go down.
24       So I had got the stuff.  I had brought it upstairs, and I
25   headed over to the line.  I believe I was gone away from the

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

509

DIAZ - CROSS / KENNEDY

1  BY MS. KENNEDY:
2  Q.   My question is:  Did he tell you that?
3  A.   No, he did not tell me that.
4  Q.   And as you sit here today, do you have any knowledge one
5  way or the other if your son Demetric Di-az ever applied to
6  work directly for Tesla, not through a staffing agency?
7        MR. ORGAN:  Objection.  Relevance, Your Honor.
8        THE COURT:  Sustained.
9        MS. KENNEDY:  Okay.
10  BY MS. KENNEDY
11  Q.   Now, as I understand from your testimony, that starting at
12  least maybe more than two weeks and less tan a month after you
13  started your assignment at Tesla, Judy Timbreza made some
14  racially racist comments to you; correct?
15  A.   Yes.  He called me a "porch monkey" the "N" word, and a
16  "mayate," ma'am.
17  Q.   And Mr. Timbreza, do you know what his nationality is?
18        MR. ORGAN:  Objection.  Relevance, Your Honor.
19        THE COURT:  Overruled.
20        THE WITNESS:  No, I do not.
21  BY MS. KENNEDY:
22  Q.   Do you know if he speaks languages other than English?
23  A.   Spanish.
24  Q.   I'm sorry?
25  A.   Spanish.

510

DIAZ - CROSS / KENNEDY

1  Q.   And when he called you these words -- I'm sorry, I'm going
2  to use the words -- "porch monkey," was that in English or in
3  Spanish?
4  A.   He called me that in Spanish, ma'am.
5  Q.   And he used the term "mayate" to you as well; correct?
6  A.   Yes, ma'am.
7  Q.   And where did that take place?
8  A.   The elevator.
9  Q.   The elevator.  While you two were both on the elevator?
10  A.   Yes.  He was on the elevator with me, ma'am.
11  Q.   Okay.  And you agree that there is no documentation from
12  you in an email, text message, about those comments by Judy
13  Timbreza; correct?
14  A.   No, no email.  I verbally stated that to Tom Kawasaki.
15  Q.   Right.  I understand that verbally and you told it to Tom
16  Kawasaki.  And that was approximately July of 2015; correct?
17  A.   Sounds about right, ma'am.
18  Q.   And Tom Kawasaki at that time, was he a Tesla employee, to
19  your knowledge?
20  A.   At that time I didn't know if Tom was a Tesla employee,
21  but I do believe Tom was part of the sustainability --
22  environment sustainability.
23  Q.   And after you reported this to Tom, according to you, you
24  never saw Judy Timbreza again; correct?
25  A.   Correct, ma'am.

511

DIAZ - CROSS / KENNEDY

1  Q.   And once you reported it to Tom and Judy Timbreza was
2  gone, were you at least satisfied with that response?
3  A.   Yes, I was, ma'am.
4  Q.   You also testified about a variety of other racial slurs,
5  which, I'm sorry, I'm going to have to use some of the
6  language.
7        But before I get into that, my question is:  Did you ever
8  actually see anyone writing any graffiti in any of the
9  bathrooms that you said you saw?
10  A.   No.  I've never personally witnessed anybody writing it,
11  but I did see it.
12  Q.   And do you have any idea if any Tesla employee did any of
13  the writing?  Do you have any knowledge if it was a Tesla
14  employee at any time?
15  A.   No, ma'am.  As I stated, I have -- I didn't visually see
16  anybody doing it.
17  Q.   All right.  And if I understand correctly, you also
18  testified that you reported the use of the "N" word by
19  different individuals to Ed Romero at least three to seven
20  times; is that about right?
21  A.   That's about right, ma'am.
22  Q.   And you also told Mr. Romero, according to you, that Ramon
23  Martinez and Robert were calling you the "N" word; correct?
24  A.   Yes, ma'am.
25  Q.   And, again, you have nothing in writing about those

512

DIAZ - CROSS / KENNEDY

1  complaints to Mr. Romero; correct?
2  A.   You're right, ma'am.
3  Q.   And given the fact that the Judy Timbreza incident had
4  been resolved, were you at least confident that if you reported
5  things, it was ongoing to be handled?  Was that your
6  understanding?
7  A.   When I had verbally told Tom Kawasaki, yes, he did handle
8  it.  So I figured if I can verbally tell Ed Romero the same
9  thing, he would probably get the same results as Tom Kawasaki,
10  yes.
11  Q.   And so, according to you, once you told the story --
12  strike that.
13        Once you had told Mr. Romero three to seven times that
14  this was being said to you and nothing was done, why not put
15  anything in writing to someone else, is my question.
16  A.   I don't know.  At that time I didn't have access to their
17  email.  So, I mean, I don't know why I didn't do it.
18  Q.   Well, you had a Gmail account; correct?
19  A.   Yes, I have a Gmail account.
20  Q.   And you had the ability to email Mr. Romero and text
21  message Mr. Romero from your phone; correct?
22  A.   At some point Mr. Romero gave me his email and told me I
23  could write him and shoot an email to him.  And he had gave me,
24  I think it was a paper with a few more email addresses on it.
25  Q.   And you've also testified that Robert and Ramon Martinez

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

517

DIAZ - CROSS / KENNEDY

1 get done, I don't have to like you to get this goal done.
2 Q.   Okay.  So in your opinion, you could still do your job
3 despite all these other racial slurs; correct?
4 A.   Yes, ma'am.
5 Q.   And you and still continued to want to work at that
6 assignment at Tesla despite all these racial slurs; correct?
7 A.   Until at some point, yes, ma'am.
8 Q.   Understood.  And you got to that point after the drawing
9 from January of 2016, which we'll get to; is that correct?
10 A.   Yes.
11 Q.   Okay.  If you also see in Paragraph 5 of Exhibit 205.
12 A.   I've read it, ma'am.
13 Q.   You understood that even once you're on your assignment,
14 if you're dissatisfied for any reason, to contact CitiStaff and
15 inform him or her of your assignment status.  Do you see that?
16 A.   Yes.  I -- can I read it out for you, ma'am?
17 Q.   I'm sorry.  You can read it to yourself, yes.
18      Did you understand that, sir?
19 A.   I understand.  That's not how I read it, ma'am.  I'm
20 sorry.
21 Q.   No.  That's fine.
22      All right.  Let's get back to a couple other things.  So
23 if I understand correctly, the individuals who you believe --
24 I'm sorry, strike that.
25      The people who you claim made racist comments to you are

518

DIAZ - CROSS / KENNEDY

1 Judy Timbreza, Ramon Martinez, and Robert Hurtado; is that
2 correct?
3 A.   Yes, ma'am.
4 Q.   And given all the comments you talked about, Judy
5 Timbreza, Ramon Martinez, and Robert Hurtado, that was pretty
6 much the entire nine and a half months or so that you were
7 assigned to the Tesla location; correct?
8 A.   Can you repeat that question one more time, please?
9 Q.   Absolutely.  The individuals who made these racial slurs
10 to you -- Judy Timbreza, Ramon Martinez, and Robert Hurtado --
11 they were the individuals, the only individuals, who made those
12 comments to you during your about nine-and-a-half-month
13 assignment at the Tesla facility; correct?
14 A.   No.  Them are not the only individuals.  If you check my
15 testimony, I said it was eight to ten more people, you know.
16 Q.   Right.  But you have no idea who those people are;
17 correct?
18 A.   No.  Unless I seen a photo.  I might recognize some of
19 them, I might not.  I don't know, ma'am.  I'm sorry.
20 Q.   You don't know if -- you don't know anything about them.
21 Just eight to ten more people at some time during that time
22 period you were there; correct?
23 A.   Yes, ma'am.
24 Q.   And at any point in time did you ever go and try to point
25 out those people to anyone at the factory at the time it was

519

DIAZ - CROSS / KENNEDY

1 happening?
2 A.   Umm, at some point I do believe I pointed out a few of
3 them to Ed Romero, ma'am.
4 Q.   And when you pointed them out, did you go you there and
5 try to ask what their name is or what their badge was or
6 anything like that?
7 A.   No.  I wouldn't have confronted them and asked them what
8 their badge was because -- or what their name was because that
9 could have led to another confrontation, ma'am.  I'm sorry.
10 Q.   Well, during the time that you're being harassed -- and I
11 understand your testimony -- and you see people are doing this
12 to you, and you testified in response to your attorney's
13 question that you wanted to get this out, did you try to do
14 anything to stop those individuals from doing that at the time?
15 A.   No.  At the time, no, ma'am.  All I did was reported it to
16 Ed Romero and hopefully he could have stopped it.
17 Q.   At any point in time did you ever -- strike that.
18      In October of 2015 you talk about an elevator incident
19 with Ramon Martinez.
20 A.   Yes.  He accosted me in the elevator.  Yes, that's true.
21 Q.   Right.  And according to you, this started with
22 Mr. Martinez and it was unprovoked; correct?
23 A.   Yes, it was unprovoked, ma'am.
24 Q.   And during this time, you testified that Ramon Martinez
25 during this confrontation used the "N" word; correct?

520

DIAZ - CROSS / KENNEDY

1 A.   Yes.  He -- he was yelling at me obscenities and then he
2 just stated that: "Ns" aren't shit.  Excuse my language again,
3 folks.
4 Q.   And as of the time of this incident, Mr. Martinez,
5 according to you, kept calling you the "N" word and telling you
6 to go back to Africa during this entire incident that was going
7 on; correct?
8 A.   No, not during the entire incident that was going on.  He
9 had did that over a period of time, ma'am.
10 Q.   Okay.  So at least for a period of time, as of the time
11 that you reported this incident in writing, according to you,
12 this has been going on for at least a month or so, at least;
13 correct?
14 A.   I -- I have to check the email, but it had been going on
15 for a while.  I don't know if -- it had been going on.
16 Q.   And then when you got the opportunity, you documented your
17 complaint against Mr. Martinez; correct?
18 A.   Yes.  When I got the opportunity, I definitely documented
19 it because when he had been saying it first, I didn't have
20 proof; but when he said it in the elevator, I did really
21 believe that their surveillance system would have captured
22 that, and then there would have been a real investigation that
23 would have went on, and then they would have came and talked to
24 me, and then I could have told them.  And then they would have
25 seen the video and they would have seen the audio or heard the

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

---

521

DIAZ - CROSS / KENNEDY

1  audio of what was going on in the elevator.  So, yes.
2  Q.  So at the time you were there, you told Mr. Martinez
3  "There's surveillance and basically you're caught," so to
4  speak; correct?
5  A.  Yes, ma'am.
6  Q.  And then after that incident, you then took the time to go
7  write an email about that incident; correct?
8  A.  Yes.  I wrote an email, ma'am.
9      MS. KENNEDY:  Stephanie, can we go to Exhibit 235?
10  Your Honor, which has already been admitted.
11  This is an October 17th, 2015, email.
12      (Document displayed.)
13  BY MS. KENNEDY:
14  Q.  Take a minute to read that, Mr. Diaz.
15  A.  I'm familiar with the email, ma'am.
16  Q.  I'm sorry?
17  A.  I'm familiar with the email.
18  Q.  Thank you.
19      When you wrote this email, it appears to be, like, at
20  6:08 a.m.  Do you see that?
21  A.  Yes, ma'am.  I had to write the email.  Like I said
22  earlier, some days I was overworked and I had -- I had other
23  assignments to do, and I couldn't just sit there and write the
24  email exactly when it happened.
25      So what I had to do is I had to write the email in pieces

---

522

DIAZ - CROSS / KENNEDY

1  as I was doing my job, and I had a little time to get it taken
2  care of.
3  Q.  Absolutely.  My question just is:  Do you recall if you
4  wrote this email while you were still on duty, like still
5  working, or did you go home or go into your car and write it?
6  That was going to be my question.
7  A.  No.  I -- I was still inside the factory.
8  Q.  And did you take your time to write this email to make
9  sure you conveyed to Ed Romero and Tom Kawasaki everything you
10  wanted to convey to them as to what this incident was about?
11  A.  Umm, what I was doing, I was writing the email to -- to
12  convey to them that an incident had occurred and could they
13  please check the surveillance system to find out what had
14  exactly happened.
15      Because, like I said before, you know, what -- I -- I can
16  sit here and I can say a few things.  I can say:  Hey, he's
17  been doing this and he's been doing that.
18      But, you know, as being a black man, a lot of them think
19  I'm pulling the race card.  So instead of me doing that, you
20  know, I figured I had definitive proof.  Please check the
21  surveillance system.
22  Q.  Mr. Diaz, you would agree the definitive proof would be if
23  you had written in the 'N' word or other things as to what you
24  claim Mr. Ramon Martinez said to you; correct?
25      MR. ORGAN:  Objection.  Argumentative.

---

523

DIAZ - CROSS / KENNEDY

1      THE COURT:  Yes, sustained.
2      MS. KENNEDY:  I'll rephrase.
3  BY MS. KENNEDY:
4  Q.  The surveillance, the cameras, there's no audio on the
5  surveillance, is there?
6  A.  I don't know.  I believe there was audio.  Every time I
7  done saw a camera, mostly it has audio.
8  Q.  But you had no idea there was audio in the elevator,
9  according to you; correct?  You saw there are cameras; correct?
10  A.  Yes, I did see there was cameras.
11  Q.  And you assumed there was audio; correct?
12  A.  Yes, I assumed there was audio.
13  Q.  But you didn't know; correct?
14  A.  No.  I didn't know 100 percent, but I assumed.  So at that
15  particular time, yes, I was 100 percent thinking that it was
16  audio recording going along with the video recording.
17  Q.  And according to you -- as of October 17th, 2015,
18  according to you, you have been complaining verbally about all
19  these racial slurs and nothing had been done; correct?
20  A.  Yes, ma'am.
21  Q.  You had an opportunity here on October 17th, 2015 to give
22  a written complaint about all these horrible racial slurs, and
23  you would agree you chose not to put those words in this email,
24  correct?
25  A.  Again, ma'am, I'm going to say with the audio and video,

---

524

DIAZ - CROSS / KENNEDY

1  all they had to do is just check it.
2  Q.  I understand, but that wasn't my question, sir.
3      My question was:  You chose, for whatever reason, not to
4  put any of the racial slurs that you are suing for in this case
5  in this email; is that correct?
6  A.  Yes, I did not put it inside the email, ma'am.
7  Q.  And that was your decision, correct, at the time?
8  A.  I wrote the email so, yes, it was my decision, ma'am.
9  Q.  And when you complained again about anyone else, you also
10  chose not to put any of these horrible racial slurs that you're
11  suing for in this lawsuit in any email; correct?
12  A.  No, ma'am.  I didn't put the word in the email.  Like I
13  stated before, you know, a lot of people don't want to put that
14  in the email.  If you notice, my supervisor, Tom Kawasaki, he
15  didn't even put it in his email.
16  Q.  Well, I understand Tom Kawasaki, but my question is not
17  about Mr. Kawasaki.  My question is about you, Mr. Diaz.
18      My question is:  You chose not to put these words in
19  writing; correct?
20  A.  Yes, ma'am, I did not put it in the email.
21  Q.  And so as of October 17th, 2015, it's your understanding
22  that your son Demetric was still working at the facility;
23  correct?  At the factory?
24  A.  Can you give me the date one more time, please?
25  Q.  Certainly.  October 17th, 2015, was it your understanding

---

# Exhibit I

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 4

---

Volume 4
Pages 545 - 699

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND          )
LAMAR PATTERSON                        )
                                       )
          Plaintiffs,                  )
                                       )
    vs.                                )  No. C 17-6748 WHO
                                       )
TESLA, INC., dba TESLA MOTORS,         )
INC., CITISTAFF SOLUTIONS, INC.,       )
WEST VALLEY STAFFING GROUP,            )
CHARTWELL STAFFING SERVICES, INC.,     )
and DOES 1-50, inclusive,              )
                                       )  San Francisco, California
          Defendants.                  )  Thursday
_____)  September 30, 2021
                                          8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:          ALEXANDER MORRISON & FEHR LLP
                         1900 Avenue of the Stars
                         Suite 900
                         Los Angeles, California 90067
                    BY:  BERNARD ALEXANDER, ESQ.

                         CALIFORNIA CIVIL RIGHTS LAW GROUP
                         332 San Anselmo Avenue
                         San Anselmo, California 94960
                    BY:  LAWRENCE A. ORGAN, ESQ.
                         CIMONE A. NUNLEY, ESQ.

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

---

546

APPEARANCES:  (CONTINUED)

For Defendants:          SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         333 S. Hope Street
                         43rd Floor
                         Los Angeles, California 90017
                    BY:  TRACEY A. KENNEDY, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                         379 Lytton Ave
                         Palo Alto, California 94301
                    BY:  PATRICIA M. JENG, ESQ.

                         SHEPPARD MULLIN RICHTER & HAMPTON LLP
                         Four Embarcadero Center
                         17th Floor
                         San Francisco, California 94111
                    BY:  SUSAN Q. HAINES, ESQ.

Also Present:            JOSEPH ALM, ESQ.
                         - Tesla, Inc.

                         YUSUF MOHAMED, ESQ.
                         - Tesla, Inc.

                         VALERIE CAPERS WORKMAN
                         - Tesla, Inc.

                             - - -

---

547

PROCEEDINGS

1   Thursday - September 30, 2021              8:01 a.m.
2              P R O C E E D I N G S
3              ---oOo---
4   (Proceedings were heard out of presence of the jury:)
5        THE CLERK:  Please come to order.
6        THE COURT:  Please be seated.
7        I understand that there are problems on the bridge and not
8   only is it impacting Mr. Organ, but also at least one of the
9   jurors.  So it will resolve when it resolves.
10       So there were just a couple of things -- two things on my
11  mind this morning.
12       One is I will give the proposed instruction on the persons
13  most knowledgeable as it was written last night and what was
14  just proposed and previously proposed and I said I was going to
15  read it.
16       And then the other issue was Mr. Organ yesterday was about
17  to read some discovery.  Do we know what that is?  And --
18       MR. ALEXANDER:  Yes, Your Honor.  I believe that we
19  submitted that documentation to you last night.  My
20  understanding is that it was going to be submitted so that
21  everyone would know what was going to be read.
22       THE COURT:  Okay.  I didn't see it this morning.
23  Ms. Kennedy, do you know what it is?
24       MS. KENNEDY:  I do not, Your Honor.
25       MR. ALEXANDER:  We should be able to provide printed

---

548

PROCEEDINGS

1   copies of that.
2        THE COURT:  Okay.  That would be great.  Why don't you
3   provide it to Ms. Kennedy so she knows what it is that you're
4   talking about.  And if there's no problem, then we can proceed;
5   and if there's a problem, I'd like to know about it.
6        (Whereupon document was tendered to the Court and
7        counsel.)
8        (Brief pause.)
9        THE COURT:  Mr. Alexander, while we're waiting, who
10  are the witnesses today?
11       MR. ALEXANDER:  As I understand it, the witnesses are
12  we're going to complete Mr. Diaz.  Then we'll have La'Drea
13  Diaz.  Then we'll have Dr. Anthony Reading.  Then we'll have
14  Amy Oppenheimer.
15       THE COURT:  And will that complete your case?
16       MR. ALEXANDER:  No.  I believe that we have -- I
17  believe that we have Lamar Patterson and the Erin Marconi
18  video.  And with regard to Mr. Patterson, it's unclear where he
19  will be in the lineup.
20       THE COURT:  Okay.
21       MR. ALEXANDER:  And then there's the Heisen transcript
22  as well?
23       THE COURT:  The Heisen?
24       MR. ALEXANDER:  Yes.
25       THE COURT:  Okay.  All right.

---

649

OPPENHEIMER - DIRECT / ORGAN

1  them.  If they're not enforced, they're pretty meaningless.
2       Two, that you train people about them.  Both the employees
3  and especially supervisors and managers get additional
4  training.  There's a mandatory minimum under state law, but
5  additional training.  Especially if there are issues in a
6  specific workplace, it's very helpful and important.
7       Three, giving a consistent message.  In this case focusing
8  on racial harassment, that racial harassment will not be
9  tolerated, and then making sure that the work environment is in
10 accord with that.  Because, again, saying it is not the same as
11 enforcing it.  And so if there are open and obvious things in
12 the work environment, they should be addressed immediately to
13 send a very clear, consistent message.
14      Five is an immediate response.  If there is either a
15 complaint or there is notice of harassment, some -- it used to
16 be years ago, I don't think so much employees think that now,
17 that employers would say:  Well, I didn't get a complaint, so I
18 didn't have to do anything.  But if you see something, if
19 you're aware of it, even an anonymous complaint or the fact
20 that a supervisor hears a racial epithet, that's all things
21 that should be responded to immediately.  You don't wait for a
22 complaint and you certainly don't wait for something in writing
23 or official.
24      Six, if there is something offensive, it's removed right
25 away and then the policy is enforced by letting people know.

650

OPPENHEIMER - DIRECT / ORGAN

1  Sending a memo, giving an announcement, having a meeting:  This
2  was observed in the workplace.  This is inconsistent with our
3  policies.  It won't be tolerated.  There will be a consequence.
4  And then you, of course, have to follow through on the
5  consequence.
6       And, seven, that there are immediate adequate
7  investigations of complaints or any notice of harassment.
8       Eight, that there is progressive and meaningful
9  discipline.  So you might start with something not as
10 significant.  Of course, it depends on what the -- what the
11 harassment is.  As with anything in employment, it depends on
12 the seriousness, but it should be progressive so that it's more
13 serious if it's repeated.
14      And, lastly, that there's followup; that if somebody
15 complains about an issue, that after an investigation they're
16 told the results.  And then there's continued followup to make
17 sure that whatever it was they complained about has stopped and
18 that they can be comfortable continuing to work there.
19 Q.  Okay.  And what is the standard of care relative
20 investigations?
21 A.  Investigations should be -- and I think I have another
22 slide to help prompt me.  And I know -- I don't have control of
23 the slides, is my understanding, so somebody out there, if you
24 do.
25      Thank you.

651

OPPENHEIMER - DIRECT / ORGAN

1       Oh, okay.  I guess I was going to go to something else.
2  Q.  Yeah.
3  A.  Maybe it's the next one.
4       (Document displayed.)
5  A.  Okay.  Investigations should be initiated -- and I talked
6  about that -- with any notice.
7       I'm not sure at this point where the slide on the standard
8  for investigations is so I can talk off-the-cuff.
9  Q.  Sure.
10 A.  Investigations should be prompt, thorough, and fair.  When
11 I evaluate an investigation, I look at was the person who did
12 it experienced, not -- didn't have a bias, and appropriate
13 therefore to do that investigation, number one.
14      Number two, was it reasonably thorough?  Were the people
15 who should be interviewed interviewed?  Were the interviews
16 either done in person or on video?  So you can develop some
17 rapport, see that person.  Were documents gathered?
18      And then, lastly, did the person who did the investigation
19 come to a reasoned conclusion based on the evidence collected
20 and explain that conclusion so that it's not just arbitrary;
21 that it was consistent with whatever evidence that they
22 gathered?
23 Q.  I notice on this slide on Item 4 there's a -- you have
24 something here:  Was there appropriate remedial and followup
25 action?  What is that referring to?

652

OPPENHEIMER - DIRECT / ORGAN

1  A.  So that's an after-investigation issue.  When I'm
2  evaluating investigations done by other people, I look to the
3  first three prongs for the investigation itself, and then I
4  also look to what happened when it was done.
5       Because there are often problems with retaliation after an
6  investigation.  And if there isn't appropriate remedial action
7  and followup, too often there could be retaliation.  So it's a
8  very important element in the prevention and response plan.
9  Q.  And how did Tesla do when you analyzed the things that you
10 saw at Tesla versus the standard of care, as you call it?
11      I think this is Slide 3.
12      (Document displayed.)
13 A.  Not so well.  There are policies, but I did not see
14 evidence that they are routinely and strongly enforced.  In
15 fact, there was evidence that the "N" word is used in the
16 workplace, the full word, whether ending in an "E-R" or an "A,"
17 neither of which should be permitted.  And that supervisors
18 were aware of it, that action wasn't taken.
19 And so the policies, you know, don't mean much if they are
20 not enforced.  In fact, sometimes it -- it undermines and sends
21 the opposite message to have a policy that says one thing and
22 then everybody doing something else.
23      I didn't see evidence that people were trained adequately.
24 A number of the witnesses testified that they didn't have
25 training, both supervisors and employees.  And some of the HR

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 4

697

PROCEEDINGS

1    MS. KENNEDY:  Oh, you'll have them this afternoon.
2    THE COURT:  Okay.  Sooner rather than later --
3    MS. KENNEDY:  Yes.
4    THE COURT:  -- because you'll want to know what my
5    rulings are.
6    MR. ORGAN:  Well, we will be having a conference still
7    tomorrow?
8    THE COURT:  Yes.
9    MR. ORGAN:  So we will be doing closings on Monday?
10   THE COURT:  Correct.  And we will do the Final Jury
11   Instructions right after the evidence is finished on Friday.
12   MR. ORGAN:  I think you got my comments at least last
13   night I believe.
14   THE COURT:  On the Jury Instructions, yes.
15   MR. ORGAN:  Yes, Your Honor.
16      Okay.  And then we also -- we might have a little bit of
17   rebuttal, but it will be maybe ten minutes at the most.
18   THE COURT:  Okay.  Well, we'll see where we are.
19   MR. ORGAN:  Yes.
20   THE COURT:  Okay.
21   MR. ORGAN:  Thank you, Your Honor.
22   MS. KENNEDY:  Thank you, Your Honor.
23   (Whereupon at 1:13 p.m.further proceedings
24      were adjourned until Friday, October 1, 2021
25      at 8:00 a.m.)

698

I N D E X

Thursday, September 30, 2021 - Volume 4

PLAINTIFF'S WITNESSES                              PAGE   VOL.

DIAZ, OWEN ORAPIO (RECALLED)
(PREVIOUSLY SWORN)                                 557    4
Cross-Examination resumed by Ms. Kennedy           557    4
Redirect Examination by Mr. Organ                  574    4

READING, ANTHONY EDWARD
(SWORN)                                            577    4
Direct Examination by Mr. Alexander                577    4
Cross-Examination by Ms. Kennedy                   596    4
Redirect Examination by Mr. Alexander              613    4

JONES, LA'DREA
(SWORN)                                            622    4
Direct Examination by Ms. Nunley                   622    4
Cross-Examination by Ms. Kennedy                   632    4

MARCONI, ERIN
VIDEOTAPED TESTIMONY                               638    4

OPPENHEIMER, AMY (VIA ZOOM)
(SWORN)                                            642    4
Direct Examination by Mr. Organ                    643    4
Cross-Examination by Ms. Kennedy                   660    4
Redirect Examination by Mr. Organ                  678    4

MAHLA, CHARLES (VIA ZOOM)
(SWORN)                                            680    4
Direct Examination by Mr. Organ                    680    4
Cross-Examination by Ms. Kennedy                   685    4
                              - - -

699

I N D E X
E X H I B I T S

TRIAL EXHIBITS                        IDEN   EVID   VOL.

3                                            689    4
6                                            688    4
204                                   557    558    4
265                                          564    4
379                                          689    4

                    - - -

CERTIFICATE OF REPORTER


    I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.


    _____

    Debra L. Pas, CSR 11916, CRR, RMR, RPR
        Thursday, September 30, 2021

>

*Debra L. Pas, CRR*
*Official Reporter - U.S. District Court*
*(415) 431-1477*

# Exhibit J

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 5

---

Volume 5

Pages 700 - 842

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND        )
LAMAR PATTERSON                      )
                                     )
            Plaintiffs,              )
                                     )
    vs.                              )  No. C 17-6748 WHO
                                     )
TESLA, INC., dba TESLA MOTORS,       )
INC., CITISTAFF SOLUTIONS, INC.,     )
WEST VALLEY STAFFING GROUP,          )
CHARTWELL STAFFING SERVICES, INC.,   )
and DOES 1-50, inclusive,            )
                                     )  San Francisco, California
            Defendants.              )  Friday
_____ )  October 1, 2021
                                        8:00 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:        ALEXANDER MORRISON & FEHR LLP
                       1900 Avenue of the Stars
                       Suite 900
                       Los Angeles, California 90067
                  BY:  BERNARD ALEXANDER, ESQ.

                       CALIFORNIA CIVIL RIGHTS LAW GROUP
                       332 San Anselmo Avenue
                       San Anselmo, California 94960
                  BY:  LAWRENCE A. ORGAN, ESQ.
                       CIMONE A. NUNLEY, ESQ.

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:      Debra L. Pas, CSR 11916, CRR, RMR, RPR
                  Official Reporter - US District Court
                  Computerized Transcription By Eclipse

---

701

APPEARANCES:  (CONTINUED)

For Defendants:        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       333 S. Hope Street
                       43rd Floor
                       Los Angeles, California 90017
                  BY:  TRACEY A. KENNEDY, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                       379 Lytton Ave
                       Palo Alto, California 94301
                  BY:  PATRICIA M. JENG, ESQ.

                       SHEPPARD MULLIN RICHTER & HAMPTON LLP
                       Four Embarcadero Center
                       17th Floor
                       San Francisco, California 94111
                  BY:  SUSAN Q. HAINES, ESQ.

Also Present:          JOSEPH ALM, ESQ.
                       - Tesla, Inc.

                       YUSUF MOHAMED, ESQ.
                       - Tesla, Inc.

                       VALERIE CAPERS WORKMAN
                       - Tesla, Inc.

                           -  -  -

---

702

PROCEEDINGS

1  Friday - October 1, 2021                      8:02 a.m.
2                   P R O C E E D I N G S
3                       ---oOo---
4       (Proceedings were heard out of presence of the jury:)
5            THE CLERK:  Please come to order.
6            THE COURT:  Good morning, everybody.  Please be
7   seated.
8       All right.  I have a few things.
9       So yesterday the plaintiffs filed a couple of written
10  transcripts from the testimony of the people who have testified
11  by video for purpose of making sure the record is complete.
12      I think the way to deal with that is to identify those two
13  transcripts as exhibits and not introduce them, but have -- so
14  that the appellate record would be clear about what the jury
15  actually saw.
16           MR. ORGAN:  Okay.
17           THE COURT:  All right.
18           MR. ORGAN:  You want -- I'm not -- I'm a little
19  unclear, Your Honor.  So what do we do?  As exhibits?
20           THE COURT:  I think you want to have a record that you
21  can refer to in the Court of Appeals to say, you know, this was
22  the testimony.
23           MR. ORGAN:  Yes, Your Honor.
24           THE COURT:  I think the way to do that would be to
25  identify each of them as exhibits, which we can do at any time

---

703

PROCEEDINGS

1   before the verdict, and then they would be identified in that
2   way and you could refer to them in that way.
3            MR. ORGAN:  I see.  So they're not actually received
4   in evidence.  They're just --
5            THE COURT:  They're not going to go back to the jury,
6   but they'll just be there.
7            MR. ORGAN:  Okay.  Thanks.
8            THE COURT:  I think that's the way to do it.
9            MR. ORGAN:  Okay.  There's one other.  We still have
10  McGinn to do.  So we'll redo the two that we filed and submit
11  them to the Court as exhibits?
12           THE COURT:  All you have to do is give them an exhibit
13  number.
14           MR. ORGAN:  Oh, okay.  Okay.
15           THE COURT:  And that will be fine.  And the same thing
16  with McGinn.
17           MR. ORGAN:  Thank you, Your Honor.
18           THE COURT:  And then there's the Demetric Di-az
19  rebuttal.  Were there any objections to that?
20           MS. KENNEDY:  No.  Is it going to be rebuttal or is it
21  just going to be a supplemental?  Because --
22           THE COURT:  It sounded -- it is rebuttal.  I don't
23  care when it goes in --
24           MS. KENNEDY:  Okay.  That's fine.
25           THE COURT:  -- I think.  So the idea would be that it

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 5

732

DELAGRANDE - DIRECT / JENG

1  BY MS. JENG
2  Q.   Did you become aware of -- sorry.
3       How did you become aware of the incident in the elevator
4  with Mr. Diaz and your leads?
5  A.   My leads came and told me there was an issue about --
6            MR. ORGAN:  Hearsay.
7            THE COURT:  No.  Overruled.
8  You can continue.
9            THE WITNESS:  Okay.
10      My leads came and told me there was an issue with Owen
11 when they were asking him to take a gearheart downstairs.  They
12 told me that they were --
13           MR. ORGAN:  Objection.  Now hearsay.
14           THE COURT:  Okay.  So, ladies and gentlemen, hearsay
15 is an out-of-court statement made by somebody else.  It doesn't
16 have the same ring of authenticity as other things.
17      So the statements that Ms. DelaGrande is now talking about
18 is not admitted for the truth of what actually happened, but
19 they are going to be admitted to allow her to explain why she
20 did what she ended up doing.
21      So with that understanding, please proceed.
22           THE WITNESS:  Okay.
23      The leads came and told me they were unable to speak to
24 Owen; that he only wanted to talk to them via text or email --
25 I'm sorry, this one was email -- and they don't have his

733

DELAGRANDE - DIRECT / JENG

1  personal email to do that.
2       And at the time we really needed to be able to talk to him
3  to tell him exactly what product was supposed to go downstairs
4  and what product was supposed to come upstairs.
5  BY MS. JENG
6  Q.   Who were the leads that made you aware of this?
7  A.   Robert Hurtado and Devin Williams.
8  Q.   And did you speak with Mr. Diaz before or after you sent
9  this email to Mr. Romero?
10 A.   Yes.  It was before I spoke to Owen and he told me that my
11 leads were threatening him because they say they were going to
12 contact Mr. Romero.  And so I spoke to -- I sent this email
13 based on the fact that I needed to make him aware of the
14 issues.
15 Q.   If you look on Page 5, you see that Mr. -- I'm sorry.
16      In the middle of the page you email Mr. Romero again and
17 say that you prefer that he is placed somewhere else.  When can
18 we make this happen?
19      What were you asking Mr. Romero to do?
20 A.   I was asking Mr. Romero to replace Owen at the elevator.
21 Q.   What happened between your initial email and this email to
22 make you ask Mr. Romero to replace Mr. Diaz?
23 A.   We absolutely had to be able to communicate with the
24 elevator team, and Owen had made it clear that he did not want
25 my team speaking to him.  And so because of that, I wasn't able

734

DELAGRANDE - DIRECT / JENG

1  to have him at the elevator because we were -- we were
2  potentially going to cause the line to go down.
3  Q.   Did either Hugo Gallegos, Robert Hurtado, or Devin
4  Williams ever make you aware that any racial slurs were said
5  during this incident?
6  A.   No.
7            MR. ORGAN:  Objection.  Leading, Your Honor.
8            THE COURT:  No.  Overruled.
9            THE WITNESS:  No.  Absolutely not.
10 BY MS. JENG
11 Q.   Okay.  And what race or ethnicity do you believe
12 Mr. Gallegos to be?
13 A.   He is Hispanic.
14 Q.   What about Devin Williams?
15 A.   He's African-American.
16 Q.   Okay.  And neither of them mentioned any racial epithets
17 that were said?
18 A.   Oh, absolutely not.
19 Q.   Was it your understanding that they were present during
20 the incident?
21 A.   Yes.  They were both there.
22 Q.   And if either of them had reported any racial slurs that
23 were said, would you have reported it?
24 A.   Absolutely.  That was not tolerated in any area anywhere
25 at Tesla.

735

DELAGRANDE - CROSS / ORGAN

1  Q.   How often did you interact with Mr. Hurtado at work?
2  A.   Every day.  Constantly.
3  Q.   Have you ever heard him say the 'N' word at work?
4  A.   No.  That's not even a part of his vocabulary.  He doesn't
5  speak like that.
6  Q.   What do you mean by he doesn't speak like that?
7  A.   He would never say something like that.  That's just not
8  something that -- that's not him to talk like that.  He
9  doesn't -- he would never use that terminology.
10 Q.   And how many people worked on your team with Mr. Hurtado,
11 Devin Williams, and Hugo Gallegos?
12 A.   I believe we had about 20 people.
13 Q.   And did anybody on those teams complain to you about
14 Mr. Hurtado saying any sort of racial sure?
15 A.   Never.
16           MS. JENG:  No further questions?
17           THE COURT:  All right.
18      Mr. Organ.
19                 CROSS-EXAMINATION
20 BY MR. ORGAN
21 Q.   Did you work with a Tom Kawasaki?
22 A.   I don't remember Tom.
23 Q.   On the elevators when you first were there in the fall of
24 2015?
25 A.   I don't remember his name, no.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 5

---

740

DELAGRANDE - CROSS / ORGAN

1  supervisor.
2  Q.  Okay.
3       MR. ORGAN:  Your Honor, I would move Exhibit 298 into
4  evidence.
5       THE COURT:  Any objection?
6       MS. JENG:  No objections.
7       THE COURT:  It's admitted.
8       (Trial Exhibit 298 received in evidence)
9  BY MR. ORGAN
10 Q.  Okay.  Let's go through this real quick.
11      MR. ORGAN:  May we show this to the jury, Your Honor?
12      THE COURT:  You may.
13      MR. ORGAN:  Okay.
14      (Document displayed.)
15 BY MR. ORGAN
16 Q.  So at the top you say you're asking to have Owen replaced;
17 right?
18 A.  Yes.
19 Q.  And that's because you had the power to ask Ed Romero to
20 replace people on the elevators; right?
21 A.  Yes.
22 Q.  And Ed was Owen's supervisor at that time; right?
23 A.  Yes.
24 Q.  Okay.  And, now, you mentioned down here -- let's go down
25 to the middle bit here at the 1:25 a.m - and -- oh.  If I have

---

741

DELAGRANDE - CROSS / ORGAN

1  it right, you had just switched positions; is that correct?
2  A.  Yes.
3  Q.  So prior to this February 26 time period, you'd been
4  working days; right?
5  A.  No.  I was working downstairs in general assembly.
6  Q.  Oh, down in general assembly.  Okay.
7       So you had just switched to that particular position then;
8  is that what happened?
9  A.  Yes.
10 Q.  Okay.  And then you say here (as read):
11      "Tonight my lead approached me."
12      Do you see that?
13 A.  Yes.
14 Q.  And you mentioned earlier that Mr. Diaz would only talk to
15 your leads by text or email.  I think you switched it to email;
16 right?  That's what you said?
17 A.  That particular night.  That's why my lead approached me.
18 Prior to that, they were speaking.  They were talking to them.
19 Q.  Isn't it true, ma'am, that what Mr. Diaz said was that he
20 would only talk to your leads about issues related to business;
21 right?
22 A.  Originally, yes, he did.
23 Q.  Well, originally as of February 26 when you said --
24 A.  Yes.
25 Q.  -- that you wanted Mr. Diaz replaced; right?  That's what

---

742

DELAGRANDE - CROSS / ORGAN

1  you're saying here (as read):
2       "Tonight my lead approached him to talk to him
3       and said for my associates to only talk to him if it's
4       related to business."
5       As of February 26 --
6  A.  At 1:25 a.m.  The email that I sent to my manager and to
7  my coworker was at 2:15 a.m.
8  Q.  As of February 26 at 1:25 a.m., Mr. Diaz was just asking
9  your leads to talk to him about business; right?
10 A.  Yes.  And then after I went and spoke to Owen, he claimed
11 that because my leads went and told him that they were going to
12 go speak to his manager, that he only wanted text or email.  So
13 he told my team -- my leads that it was just email, and then he
14 told me it was text and email.
15 Q.  Owen is now -- let's go to the second paragraph.
16 A.  Yes.
17 Q.  "Owen is now telling me..."  So he talked to you?
18 A.  He did speak to me, yes.
19 Q.  Where was that conversation?
20 A.  Over at my desk.
21 Q.  Okay.  He told you that your associates had threatened
22 him; right?
23 A.  Yes.
24 Q.  And didn't you have to investigate that?
25 A.  Yes.

---

743

DELAGRANDE - CROSS / ORGAN

1  Q.  Okay.  And how did you go about investigating that?
2  A.  By speaking to Owen and seeing if what my leads said was
3  true, and that's why we were speaking.
4       The second part of the email was me talking to Owen about
5  what my leads had said, and he confirmed that he didn't want to
6  speak to them unless it was text or email.
7  Q.  About business?
8  A.  About business, yes.
9  Q.  Right.  Now -- and that was unprofessional, right, for him
10 to do that?
11 A.  Yes, because we needed to speak to him.  We didn't work
12 through emails and text.  We had to be able to openly
13 communicate with each other.
14 Q.  Isn't it true, ma'am, the height of professionalism is to
15 only ask people to talk to you about business?
16 A.  Yes.
17 Q.  Okay.  So wasn't Mr. Diaz only showing the height of
18 professionalism there by saying:  Please just talk to me about
19 business?
20 A.  He didn't want them to speak to him at all.  He wanted
21 them to ask -- all the requests he wanted to go through text or
22 email, and that's what he let us know.
23 Q.  In your email you say -- you don't say in your email he
24 wouldn't talk to him.  You say (as read):
25      "Only talk to him if it's related to business."

---

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 5

840

841

I N D E X

Friday, October 1, 2021 - Volume 5

|  | PAGE | VOL. |
|---|---|---|
| Plaintiff Rests | 754 | 5 |
| Defense Rests | 811 | 5 |

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| HEISEN, ANNALISA | | |
| VIDEOTAPED TESTIMONY | 753 | 5 |

- - -

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| DELAGRANDE, JOYCE ANN | | |
| (SWORN) | 710 | 5 |
| Direct Examination by Ms. Kennedy | 711 | 5 |
| Cross-Examination by Mr. Organ | 735 | 5 |
| Redirect Examination by Ms. Jeng | 750 | 5 |
| | | |
| MARTINEZ, RAMON | | |
| (SWORN) | 755 | 5 |
| Direct Examination by Ms. Kennedy | 755 | 5 |
| Cross-Examination by Mr. Alexander | 788 | 5 |

- - -

842

I N D E X
E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2 | 774 | | 5 |
| 133 | | 797 | 5 |
| 244 | | 718 | 5 |
| 251 | | 719 | 5 |
| 259 | 721 | 721 | 5 |
| 297 | | 727 | 5 |
| 298 | | 740 | 5 |
| 300 | | 744 | 5 |
| 303 | | 731 | 5 |

- - -

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, October 1, 2021

*Debra L. Pas, CRR*
*Official Reporter - U.S. District Court*
*(415) 431-1477*

# Exhibit K

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 6

---

```
                                Volume 6

                                Pages 843 - 992

            UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

       BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND      )
LAMAR PATTERSON                    )
                                   )
                                   )
            Plaintiffs,            )
                                   )
  vs.                              ) No. C 17-6748 WHO
                                   )
TESLA, INC., dba TESLA MOTORS,     )
INC., CITISTAFF SOLUTIONS, INC.,   )
WEST VALLEY STAFFING GROUP,        )
CHARTWELL STAFFING SERVICES, INC., )
and DOES 1-50, inclusive,          )
                                   ) San Francisco, California
            Defendants.            ) Monday
                                   ) October 4, 2021
_____    ) 8:00 A.M.

       TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiffs:        ALEXANDER MORRISON & FEHR LLP
                       1900 Avenue of the Stars
                       Suite 900
                       Los Angeles, California 90067
                   BY: BERNARD ALEXANDER, ESQ.


                       CALIFORNIA CIVIL RIGHTS LAW GROUP
                       332 San Anselmo Avenue
                       San Anselmo, California 94960
                   BY: LAWRENCE A. ORGAN, ESQ.
                       CIMONE A. NUNLEY, ESQ.

       (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:       Debra L. Pas, CSR 11916, CRR, RMR, RPR
                   Official Reporter - US District Court
                   Computerized Transcription By Eclipse
```

---

```
                                                         844

APPEARANCES:  (CONTINUED)

For Defendants:             SHEPPARD MULLIN RICHTER & HAMPTON LLP
                            333 S. Hope Street
                            43rd Floor
                            Los Angeles, California 90017
                        BY: TRACEY A. KENNEDY, ESQ.


                            SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                            379 Lytton Ave
                            Palo Alto, California 94301
                        BY: PATRICIA M. JENG, ESQ.


                            SHEPPARD MULLIN RICHTER & HAMPTON LLP
                            Four Embarcadero Center
                            17th Floor
                            San Francisco, California 94111
                        BY: SUSAN Q. HAINES, ESQ.


Also Present:               JOSEPH ALM, ESQ.
                            - Tesla, Inc.

                            YUSUF MOHAMED, ESQ.
                            - Tesla, Inc.

                            VALERIE CAPERS WORKMAN
                            - Tesla, Inc.

                              -  -  -
```

---

```
                                                         845
                        PROCEEDINGS
1   Monday - October 4, 2021               8:03 a.m.
2                   P R O C E E D I N G S
3                        ---oOo---
4        (Proceedings held in open court, outside
5        the presence and hearing of the jury.)
6        THE COURT:  All right.  There were a few things filed
7   over the weekend.  I've given to you, or Ms. Davis has, the
8   revised verdict form.  And I basically adopted everybody's
9   tweaks to the form that made sense to me.
10       So if there are no objections to that, that's the form
11  that we will use.
12       MS. KENNEDY:  No objections from the defense.
13       THE COURT:  Okay.
14       MR. ORGAN:  Yeah.  No objections, Your Honor.
15       THE COURT:  All right.
16       MR. ORGAN:  Thank you.
17       THE COURT:  So there are three things.
18       One, according to the minutes from Friday, there are two
19  different exhibits that went in for the Master Services
20  Agreement of Tesla/nextSource.  One was Exhibit 3 and one was
21  called in the minutes anyway Exhibit 2.  I don't know whether
22  that was just a mistake on our part, and so we'll just take the
23  2 out.
24       I want to be sure that when the exhibits go to the jury,
25  that there aren't duplicates in there.
```

---

```
                                                         846
                        PROCEEDINGS
1        MS. KENNEDY:  Yes.  Exhibit 2 is another photo of the
2   bale.  Exhibit 3 is the agreement.
3        THE COURT:  Okay.
4        All right.  Then there are two other motions.  One was
5   Motion for Judgment as a Matter of Law, and I'm not going to
6   hear argument right now on that.  I'm going to deny it.
7        If there is a joint employer relationship, there's
8   certainly a contract.  And that issue is left for the jury.
9        The Third Circuit relied -- the Third Circuit case that
10  was relied on by the defendant, Faush versus Tuesday Morning is
11  neither controlling nor on point.
12       Here the plaintiff contends that he had a contract with
13  Tesla and was a third-party beneficiary of the
14  nextSource/Tesla contract.  Unlike the plaintiff in Faush, the
15  contract is partly for his benefit.  No matter what it says, he
16  couldn't have been employed at Tesla without it, so that motion
17  is going to be denied.
18       The Motion to Strike Dr. Mahla's testimony, I think, has
19  been waived.  So I'm denying.  It's too late.  I think if it
20  had been raised at the time, I would have undoubtedly admitted
21  the testimony anyway, but I think that's been waived.
22       So that takes care of the issues that are in front of me.
23  Is there anything else that we need to do from the plaintiff's
24  perspective?
25       MR. ORGAN:  Your Honor, we'd just like to know our
```

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 6

927

CLOSING ARGUMENT / KENNEDY

1   much.
2                   CLOSING ARGUMENT
3           MS. KENNEDY:  Good morning, ladies and gentlemen.  I
4   want to thank you first for your service.  We know this is a
5   hardship.  And as you recall, the last time I got to actually
6   speak directly to you was a week ago today when I got to give
7   you my opening statement.
8           This is now my only opportunity to tell you what we think
9   the evidence is and the evidence as to why you should not find
10  Tesla responsible or liable in this matter.
11          I want to thank you, the jurors, the Court, the Court
12  staff, and on behalf of my litigation team and my client I want
13  to thank you for your time, your consideration, and your
14  attentiveness here.
15          This is a difficult thing to do, to sacrifice your jobs,
16  your time away from your family and your friends, so we thank
17  you for.
18          All of us here in the courtroom, this is part of our job.
19  This is what we do.  This is not your job, but it is part of
20  your civic responsibility.  We want to thank you for it.
21          So why are we here?  This is a case by Owen Diaz.
22  Mr. Diaz and only Mr. Diaz.
23          On the verdict form, as you have been shown by the Court,
24  you're being asked questions about Mr. Diaz, not about anyone
25  else.  You're asked questions about Tesla and no one else.  But

928

CLOSING ARGUMENT / KENNEDY

1   in this particular case the evidence is going to show that
2   Tesla is not responsible and not liable for all of the
3   allegations made by Mr. Diaz in this particular case.
4           So let's talk about why we are here.  You're going to be
5   asked questions on the verdict form, which is basically your
6   guide and your decision-making based on the factual
7   determinations and the law you, the nine of you, are going to
8   need to decide, collectively all nine you, to answer questions
9   in this case on the verdict form.
10          The first issue that we talked about at the beginning of
11  this trial, that Owen Diaz was not a Tesla employee, we'll talk
12  about that.  We'll talk about the issues concerning joint
13  employer, contractual relationships.  But, in fact, Mr. Diaz
14  was never a Tesla employee.
15          Second, no evidence that a Tesla employee harassed Owen
16  Diaz during the time period that he was there, and he harassed
17  Mr. Diaz as defined by the law.  And the law is what guides you
18  in this particular case.  Not your personal feelings.  Not what
19  you think should be done.  Not what you think should, "I
20  probably do the right thing because Tesla is a huge company and
21  maybe if you just give him a little bit of money, that would be
22  okay."  You're guided by the facts, you're guided by the law,
23  and you're guided by the verdict form.
24          Mr. Alexander and I, we are lawyers.  We are not part of
25  the factual determination here.  Our jobs are to advocate for

929

CLOSING ARGUMENT / KENNEDY

1   our clients, to tell you what the law is as described by the
2   Court and tell you why under the law the facts support our
3   clients.  But you are the determiners -- the determiners of
4   the facts in this case.  The facts come from that chair and
5   that chair only.
6           So based on the facts of the case, not your emotions, not
7   what you think should be the right result, but the facts; and
8   the facts are in this case that no Tesla employee harassed
9   Mr. Diaz as "harassment" is defined in the law during his nine
10  and a half months that he was at the Tesla factory.
11          It is undisputed that every time Mr. Diaz complained, he
12  took -- it was addressed, discipline was imposed.  And, in
13  fact, Tesla or Chartwell or West Valley or CitiStaff, all those
14  agencies took responsibility and Tesla took responsibility for
15  each and every one of those complaints.
16          We talked about Judy Timbreza, we talked about Rothaj
17  Foster, and we talked about Ramon Martinez.  In every single
18  incident the matter was handled.  The matter was resolved.
19  Discipline was imposed.  And that conduct did not occur again.
20  I will show you the documents to that effect.
21          And, more importantly, one of the things you're going to
22  look at in this case, you're going to look at the totality of
23  the facts, the totality of the allegations, and Mr. Diaz
24  telling you this story.
25          Mr. Diaz was at the Tesla factory for about nine and a

930

CLOSING ARGUMENT / KENNEDY

1   half months.  He was assigned there by CitiStaff.  His
2   testimony is that, according to him, every single day, and
3   according to Mr. Alexander, every single day he was called the
4   "N" word.  Every single day he was the victim of harassment.
5   Every single day it was a horror to work there.
6           Every time he complained, he had the opportunity to
7   complain in writing.  He didn't put anything in writing.
8           At the end of this, I'm going to tell you that Mr. Diaz's
9   story simply doesn't make sense.  It's not to disparage
10  Mr. Diaz, but to talk about the facts at the time.  And we need
11  to judge Mr. Diaz at the time this was going on.  You have to
12  judge Tesla at the time this was going on.  Not after the fact
13  when a bunch of lawyers get involved, including Tesla lawyers,
14  including Mr. Organ and Mr. Alexander.
15          You have to judge the facts as to what happened at the
16  factory at the time and make your determination using your
17  common sense, judgment, and knowing just how things work at
18  organizations.
19          Now, we spent a lot of time this week talking about
20  Mr. Diaz's allegations about a variety of people, but namely it
21  comes down to Judy Timbreza, Ramon Martinez, and Robert
22  Hurtado.
23          These are all of the allegations, the name calling, the
24  racial slurs that Mr. Diaz is in this court seeking to be paid
25  for.  These are the words.  These are horrible words.  I'm not

939

CLOSING ARGUMENT / KENNEDY

1  happened again.  That's about taking responsibility.
2      And what we do know is there's lots of emails.  You can
3  imagine in this case there were thousands of emails on all
4  kinds of issues, and the ones that you saw in this case are the
5  ones that you base your decision on.
6      And in this particular case when the complaint was made
7  and it went to Ed Romero, all the emails talk about racially
8  offensive remarks.  Absolutely, 100 percent correct.  We do not
9  dispute that.  But the question we're being judged on is:  Once
10 that complaint was made, what was done?  And did it stop and
11 did it ever happen again?  And, in fact, in this case it's
12 undisputed that that's what happened.
13     And, in fact, when I asked Mr. Diaz about that, his
14 response is that he was satisfied with the response.  And, in
15 fact, there was no other contact.  That's what taking
16 responsibility is about, and that is what happened in this
17 case.  And Mr. Timbreza is not a Tesla employee.
18     So at least as to that incident, nothing is there.  As to
19 that incident, there is -- it's clear that they took action to
20 prevent harassment, and it stopped and it ended for Mr. Diaz.
21     Mr. Diaz was believed.  And if you're going to hold Tesla
22 responsible for this one, Tesla believed Mr. Diaz.  Tesla made
23 sure, if you're going to believe Tesla is responsible, that
24 Mr. Timbreza was out of the workplace.  This is the way it was
25 handled in July of 2015.

940

CLOSING ARGUMENT / KENNEDY

1      According to Mr. Diaz though, he's still being called the
2  "N" word all the time.  He's still being called, and there is
3  no evidence of that.
4      Let's go to the Rothaj Foster incident, which is in
5  November of 2015.  And this is the incident.  It's a complaint
6  by Mr. Diaz, absolutely.  It's a complaint about aggressive
7  behavior, a threat, whatever you want to say it was.  And if
8  Tesla is going to be held responsible, again, took
9  responsibility, believed Mr. Diaz.  And Mr. Foster, who was
10 investigated, Mr. Foster was walked off.  Never saw Mr. Foster
11 again.
12     And that there was no "N" word here.  Mr. Alexander and
13 Mr. Organ said:  Oh, this wasn't about the "N" word.  Fair
14 enough, it wasn't.  Absolutely.  But the point is Mr. Diaz is
15 complaining again, and there's nothing in writing about all
16 this horrible sort of environment he's talking about.
17     And if you recall from the opening statement,
18 Mr. Alexander talked about threats and -- threats and violence
19 and that sort of thing.  This is the threat, one of the
20 threats, according to Mr. Alexander, and there's nothing there
21 about the "N" word.  That's what this is about.  That's why we
22 had that in the opening statement.  There is nothing in here
23 from Mr. Diaz about any type racial comments, et cetera.
24     What he's suing for are the racial comments, and that's
25 not here either.  It was investigated, immediately handled,

941

CLOSING ARGUMENT / KENNEDY

1  Foster was terminated.  That's taking responsibility.  That's
2  doing the right thing.  That's believing Mr. Diaz.
3      Now, we get to the Ramon Martinez elevator incident on
4  October 17, 2015.  This is the incident that we've spent a lot
5  of time talking about.  And this is the incident that,
6  according to Mr. Diaz, was the, quote, "prior bad act" by
7  Mr. Martinez before we get to the cartoon incident in January
8  of 2016.
9      This is the incident where, according to Mr. Diaz, there
10 is an altercation at the elevator and words are exchanged.  And
11 according to Mr. Diaz, this is when Ramon Martinez, again, his
12 nemesis since the beginning of his -- start of his assignment,
13 has been calling him the "N" word.  According to Mr. Diaz's
14 testimony, more than 30 times.
15     Mr. Diaz started at the Tesla facility in June.  We're in
16 October.  This is practically every single day.  They didn't
17 work together every day.  But every day, if you're going to
18 believe Mr. Diaz, this was being called him every single day.
19     And what we do know is on this day, October 17, 2015, Ramon
20 Martinez and Owen Diaz complained about each other.
21 Undisputed.  They also talked about this incident in the
22 elevator.
23     It's your decision, your determination as to who was
24 telling the truth:  All, some, or part.  But we do know there
25 was an interaction between them.  They both complained.  And we

942

CLOSING ARGUMENT / KENNEDY

1  do know when Mr. Diaz had the choice to complain and describe
2  what happened.  He chose not to put any racial slurs in his
3  complaints.  He chose not to talk about the prior interactions
4  he supposedly had with Mr. Martinez.  He chose not to say:  Oh,
5  by the way, he's been saying these things to me all of the
6  time.
7      What they did -- what he did decide to do is talk about
8  what occurred there.  And he did talk about Mr. Martinez
9  yelling at him.  Absolutely.  He did complain about this, hey,
10 saying you have a problem with me.  Why are you telling him who
11 his supervisor is?  And all of this.
12     He also said that there was another witness there, Rothaj
13 Foster, who, again, about a month later was let go, who is
14 supporting him.  Where is Rothaj Foster?  Another witness.  No
15 statements from Rothaj Foster.  Mr. Diaz didn't ask Mr. Foster
16 to write a statement to this one like he did with Lamar
17 Patterson.
18     But what we do know, what the facts are in this case,
19 there was an interaction.  There was a yelling match, whatever
20 you want to call it.  There was an incident between
21 Mr. Martinez and Mr. Diaz on October 17, 2015.  And what we do
22 know is that when Mr. Diaz had the opportunity to say whatever
23 he wanted about Mr. Martinez, he chose not to say any of the
24 words that he's suing for here today.  That's what we do know.
25     You have to judge Mr. Diaz at the time as to whether or

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 6

991

PROCEEDINGS

1   moment, because I want to come in to thank you personally.  But

2   at this point the trial is adjourned.

3        (Jury exits the courtroom at 4:43 p.m.)

4        THE COURT:  All right.  And if the plaintiff will

5   prepare the judgment and share it with the defense and then

6   submit it, that would be great.

7        MR. ALEXANDER:  Thank you.

8        MS. KENNEDY:  Yes, Your Honor.

9        MS. NUNLEY:  Yes, Your Honor.

10       THE COURT:  Thank you.

11       (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

992

I N D E X

Monday, October 4, 2021 - Volume 6

|                                      | PAGE | VOL. |
|--------------------------------------|------|------|
| Final Instructions                   | 850  | 6    |
| Closing Argument by Mr. Alexander    | 877  | 6    |
| Closing Argument by Ms. Kennedy      | 927  | 6    |
| Rebuttal Argument by Mr. Alexander   | 959  | 6    |

_ _ _

CERTIFICATE OF REPORTER

     I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.


     _____
     Debra L. Pas, CSR 11916, CRR, RMR, RPR
          Monday, October 4, 2021

*Debra L. Pas, CRR*
*Official Reporter - U.S. District Court*
*(415) 431-1477*

# Exhibit L

LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
NAVRUZ AVLONI (SBN 279556)
navruz@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:    (415) 453-7352
Facsimile:    (415) 785-7352

J. Bernard Alexander (SBN 128307)
balexander@amfllp.com
**ALEXANDER MORRISON + FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:    (310) 394-0888
Facsimile:    (310) 394-0811

Attorneys for Plaintiffs,
DEMETRIC DI-AZ and OWEN DIAZ

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
**TRIAL EXHIBIT** __138__

CASE No. 3:17-CV-06748-WHO

DATE ENTERED_____

BY _____
    DEPUTY CLERK

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

DEMETRIC DI-AZ, OWEN DIAZ, and
LAMAR PATTERSON,

         Plaintiffs,

    v.

TESLA, INC. dba TESLA MOTORS, INC.;
CITISTAFF SOLUTIONS, INC.; WEST
VALLEY STAFFING GROUP;
CHARTWELL STAFFING SERVICES, INC.;
and DOES 1-50, inclusive,

        Defendants.

Case No. 3:17-cv-06748-WHO

**DESIGNATION OF TESTIMONY
PRESENTED BY VIDEO OF ERIN
MARCONI**

Trial Date: September 24, 2021
Complaint filed: October 16, 2017

    To ensure a complete record, Plaintiff Owen Diaz provides the following deposition

testimony from Erin Marconi which was presented by video to the jury on September 30, 2021.

**Marconi, Erin 10/21/19, Volume 1**

| # | Lines | Deposition Excerpt |
|---|-------|-------------------|
| 1. | 13:17-14:05 | 17 What did you do after you left Volt as a<br>18 program manager?<br>**19 A I went to Tesla as an HR business partner.**<br>20 Q So that would be approximately 2013?<br>**21 A Correct.**<br>22 Q How long were you an HR business partner at<br>23 Tesla?<br>**24 A Until January 2017.**<br>25 Q And what was your job title after you – after<br>1 January 2017?<br>**2 A I took a time off work. I had been a**<br>**3 caregiver for my mother.**<br>4 Q And have you worked at Tesla since that time?<br>**5 A No.** |
| 2. | 14:09-14:21 | 9 Q Okay. What were the job duties of an HR<br>10 business partner in your role?<br>**11 A Strategic partner with the business management**<br>**12 teams from work planning, succession planning. Time to**<br>**13 time would help out if recruiting was needed, but that**<br>**14 wasn't primary.**<br>**15 A lot of HR generalist at the beginning. That**<br>**16 went away as we grew. Employee relations,**<br>**17 investigations, performance management. Employee**<br>**18 engagement.**<br>19 Q It sounds like --<br>**20 A Probably about covers it. A little bit of**<br>**21 everything.** |
| 3. | 15:03-15:05 | 3 Q Okay. So investigations were part of your job<br>4 as an HR business partner; is that right?<br>**5 A Correct.** |
| 4. | 27:12-27:15 | 12 Q But the HR business partner team that you were<br>13 part of was in charge of handling, among other things,<br>14 complaints about discrimination or harassment; right?<br>**15 A Correct.** |
| 5. | 33:17-33:20 | 17 Q Okay. But it's fair to say that you at least<br>18 understood what Tesla's policies were in terms of<br>19 anti-discrimination and anti-harassment; right?<br>**20 A Correct** |
| 6. | 35:02-35:07 | 2 Q So with that understanding of the definition<br>3 of n- -- of the n-word, is it your understanding that<br>4 Tesla's anti-harassment and anti-discrimination<br>5 zero-tolerance policies prohibit use of the n-word at<br>6 the Tesla facility?<br>**7 A Yes.** |

DESIGNATION OF TESTIMONY PRESENTED BY VIDEO OF ERIN MARCONI

| 7. | 36:05-36:13 | 5 Q Okay. And if you had known about someone<br>6 using the n-word at the Tesla factory, that would<br>7 certainly be something that you would investigate;<br>8 correct?<br>**9 A Absolutely.**<br>10 Q And the reason that you would investigate that<br>11 is use of the n-word at the Tesla factory could create a<br>12 hostile work environment for other workers; right?<br>**13 A Correct.** |
| 8. | 37:04-37:06 | 4 Do you recall ever investigating a claim where<br>5 it was alleged that the n-word was used?<br>**6 A Not specifically.** |
| 9. | 39:02-39:08 | 2 Q Was there ever any kind of meeting among HR<br>3 professionals about, like, sensitivity training or how<br>4 to address a situation where the n-word was being used<br>5 in the workplace?<br>**6 A Specifically regarding the n-word?**<br>7 Q Yeah.<br>**8 A No.** |
| 10. | 38:05-38:15 | 5 Q I see.<br>6 It's fair to say that the HR team that did<br>7 investigations would talk to each other about what was<br>8 going on in the workplace; is that true?<br>**9 A As needed.**<br>10 Q And certainly if the n-word had been used in<br>11 the workplace there, that would be a fairly big issue.<br>12 Is that true, from an HR perspective?<br>**13 A Yes, it would be a big issue, but don't know**<br>**14 that that would necessarily mean it would be discussed**<br>**15 in a group. Investigations were need-to-know** |
| 11. | 42:21-43:05 | 21 Q Okay. But under Tesla's guidelines or<br>22 policies for anti-harassment complaints, if a member of<br>23 the leadership team, supervisor, manager, director,<br>24 received a complaint of harassment, they were to at<br>25 least inform HR that they had received such a complaint;<br>1 is that true?<br>**2 A Yes.**<br>3 Q And that was true throughout the time that you<br>4 worked at Tesla; right?<br>**5 A Yes.** |

DESIGNATION OF TESTIMONY PRESENTED BY VIDEO OF ERIN MARCONI

| | | |
|---|---|---|
| 12. | 49:07-<br>49:23 | **7** Q In fact, every -- every employer has a duty to<br>**8** make sure that its workers are working in an environment<br>**9** that is harassment-free; right?<br>**10 A Correct.**<br>**11** Q And that would include harassment based on sex<br>**12** or race or any of those other prohibited categories;<br>**13** right?<br>**14 A Yes.**<br>**15** Q Similarly, every employer is -- has a duty to<br>**16** make sure that once it knows about harassment, that it<br>**17** takes some sort of corrective action to make sure that<br>**18** the harassment doesn't continue; right?<br>**19 A Yes.**<br>**20** Q And in California, every employer must take<br>**21** all reasonable steps necessary to prevent discrimination<br>**22** and harassment from occurring; right?<br>**23 A Yes.** |
| 13. | 51:02-<br>51:12 | **2** Q You would agree that it's never okay to use<br>**3** the n-word in the workplace?<br>**4 A Correct.**<br>**5** Q And you'd also agree that it's never okay to<br>**6** make offensive drawings that could be racial in nature;<br>**7** right?<br>**8 A Correct.**<br>**9** Q You'd agree that every employer has a duty to<br>**10** provide a workplace where employees are not using the<br>**11** n-word towards other employees?<br>**12 A Yes.** |
| 14. | 51:23-<br>52:10 | **23** If -- if a Tesla worker complains about<br>**24** harassment to their supervisor, that meets their at<br>**25** least initial burden under Tesla's policies for<br>**1** reporting harassment; right?<br>**2 A Yes.**<br>**3** Q And under Tesla policies, supervisors are<br>**4** supposed to report issues relating to harassment to<br>**5** their managers and to HR?<br>**6 A Yes.**<br>**7** Q Similarly, if an employee wanted to report an<br>**8** issue of harassment to a manager, that would satisfy<br>**9** Tesla's reporting requirements; right?<br>**10 A Yes.** |
| 15. | 55:23-<br>56:04 | **23** Q And in terms of the standards, the<br>**24** anti-discrimination, anti-harassment policy standards<br>**25** that applied to workers at the Tesla factory, those<br>**1** standards applied to both regular full-time Tesla<br>**2** employees and to the temporary workers who were working<br>**3** at the plant; right?<br>**4 A Yes.** |

DESIGNATION OF TESTIMONY PRESENTED BY VIDEO OF ERIN MARCONI

| | | |
|---|---|---|
| 16. | 56:22-57:07 | 22 Q A temporary worker would be doing a task that<br>23 a Tesla employee might also do; is that true?<br>**24 A Yes.**<br>25 Q And a temporary worker could also -- would at<br>1 -- there would be at least some<br>2 reporting structure to a Tesla employee, is that right,<br>3 for a temporary worker?<br>**4 A Correct**<br>5 Q And so even if they're –<br>**6 A And then a dotted line to their actual**<br>**7 employer.** |
| 17. | 58:10-58:15 | 10 Q Okay. And if someone does complain about what<br>11 they consider to be inappropriate conduct, and they feel<br>12 threatened, you would agree that as a Tesla HR person,<br>13 you would still have a responsibility to make sure that<br>14 nothing happened to them further; right?<br>**15 A Oh, absolutely** |
| 18. | 57:21-58:9 | **21 but as far as -- like I wouldn't want to investigate for**<br>**22 West Valley for their employee. I would be happy to**<br>**23 facilitate.**<br>**24 Does that make sense?**<br>25 Q So Tesla's HR role for a complaint by a<br>1 temporary worker would be to facilitate the<br>2 investigation. Is that true typically?<br>**3 A Primary first thing would be obviously,**<br>**4 depending on what that is, are they comfortable or do**<br>**5 they feel threatened. Those kind of things you want to**<br>**6 take care of in the immediate.**<br>**7 The next thing I would do is get them**<br>**8 connected with the person that would have been my role**<br>**9 for their employer.** |
| 19. | 58:16-59:5 | 16 Q And as a Tesla HR person, if someone had<br>17 complained about like threatening conduct or feeling<br>18 that they were threatened, you would at least have to<br>19 make that workplace safe for them from that point that<br>20 you find out about it on; right?<br>**21 A In the immediate, absolutely. If then it**<br>**22 was -- the investigation was conducted and it, say, only**<br>**23 involved temporary people that were all under West**<br>**24 Valley --**<br>25 Q Yeah.<br>**1 A -- if West Valley investigated it and came**<br>**2 back and said there wasn't actually an issue, I'm going**<br>**3 to believe that West Valley did their investigation**<br>**4 thoroughly and if there was something to address,**<br>**5 addressed it.** |

| | | |
|---|---|---|
| 20. | 59:8-21 | 8 You -- you typically rely on the contract --<br>9 contracting agency to do an investigation into<br>10 complaints by their employees; is that right?<br>**11 A If it is involving other of their employees.**<br>**12 If it is involving Tesla employees, then I**<br>**13 would talk to probably Tesla employees, they would talk**<br>**14 to their employees.**<br>**15 If the stars align and everyone was in the**<br>**16 building or in the same side of the country and we would**<br>**17 help -- sometimes I had been there when they were**<br>**18 interviewing their employee and vice versa. But I**<br>**19 wouldn't -- my preference would not be to interview**<br>**20 someone else's employee, and especially not without them**<br>**21 present.** |
| 21. | 59:22-<br>60:10 | 22 Q In terms of Tesla's duty, though, to all of<br>23 its employees, it has a -- it has a duty to both its<br>24 regular employees and the contractors to make sure that<br>25 all of those people work in a work environment free from<br>1 harassment or discrimination based on race; right?<br>**2 A Correct.**<br>3 Q And so if -- if Tesla HR became aware of a<br>4 problem, let's say use of the n-word or use of racial<br>5 drawings, Tesla would still have to make sure that that<br>6 conduct stopped; right?<br>**7 A Assuming that an investigation found that that**<br>**8 conduct did happen?**<br>9 Q Right.<br>**10 A Then yes.** |
| 22. | 61:10-<br>61:14 | 10 Q And if someone is complaining about conduct,<br>11 do they have to complain in writing or can they also<br>12 complain verbally about inappropriate conduct in the<br>13 workplace at Tesla?<br>**14 A Either.** |
| 23. | 62:9-13 | 9 Q And, similarly, if a person doesn't use<br>10 "discrimination" or "harassment" in their complaint,<br>11 they can still be complaining about what's<br>12 discrimination or harassment; right?<br>**13 A Correct.** |
| 24. | 64:24-<br>65:04 | 24 Q Tesla had video cameras throughout the<br>25 facility; is that true?<br>**1 A Correct.**<br>2 Q And if there was an altercation, would you<br>3 like to see if there was video footage of the incident?<br>**4 A Absolutely.** |

DESIGNATION OF TESTIMONY PRESENTED BY VIDEO OF ERIN MARCONI

| 25. | 67:08-<br>67:13 | **8** There were numerous situations where Tesla<br>**9** employees were supervising temporary workers who were<br>**10** employed by contractors; right?<br>**11 A Who were -- like a West Valley?**<br>**12** Q Yeah.<br>**13 A Yes.** |
|---|---|---|
| 26. | 69:03-<br>69:06 | **3** Q Okay. But based on the contract that you knew<br>**4** about that Volt had with Tesla, it was understood that<br>**5** the Volt temporary workers would be subject to Tesla's<br>**6** policies for working at that facility; right? |
| 27. | 69:10-<br>69:11 | **10 THE WITNESS: Yes, as well as their**<br>**11 employer's** |
| 28. | 69:22-<br>70:04 | **22** Temporary workers who were working through a<br>**23** staffing agency at a Tesla facility had to follow the<br>**24** rules and regulations of the staffing agency and of<br>**25** Tesla?<br>**1 A Yes.**<br>**2** Q And that was true throughout the time that you<br>**3** worked at Tesla; right?<br>**4 A Yes.** |
| 29. | 73:20-<br>74:08 | **20** Q Okay. Wayne Jackson was one of the nextSource<br>**21** representatives working at -- working for nextSource at<br>**22** the plant; is that right?<br>**23 A I am not completely sure. I don't recall ever**<br>**24 meeting him face to face. NextSource wasn't set up the**<br>**25 way that temporary workers were.**<br>**1** Q NextSource was actually more of a conduit for<br>**2** other staffing agencies, wasn't it?<br>**3 A My understanding is they were brought on**<br>**4 statement of work project or on a PO, but I don't**<br>**5 have -- can't confirm that.**<br>**6** Q Okay. Do you recall what the statement of<br>**7** work was about?<br>**8 A I do not.** |

| 1 | 30. | 80:21- | 21 Q Okay. Tell me about that. What was the |
|---|-----|--------|----------------------------------------------|

| | | 82:3 | |

21 Q Okay. Tell me about that. What was the
22 situation in which you did some sensitivity training for
23 a group relative -- was it relative to the n-word or was
24 it --
25 A No.
1 t was the -- tell me about the
2 situation where you did sensitivity training for a
3 group.
4 A It was an offensive drawing that we were
5 unable to determine who did the drawing. And I say
6 "offensive"; it was a sexual drawing that clearly
7 offended folks.
8 That department was, I believe, over 500
9 people. So we brought everyone together each shift,
10 went over how that was not okay; if we ever could find
11 out who it was, it wouldn't be tolerated.
12 An investigation couldn't pinpoint who it was
13 because there wasn't a camera in that particular area,
14 we addressed the whole entire team, and then did
15 sensitivity training that covered pretty much
16 everything.
17 And even if I tell you a joke about the sky
18 being blue and you think it's funny today and you don't
19 tomorrow, then I can't tell you that joke anymore.
20 Q Do you remember what department it was in?
21 A I think it was stamping.
22 Q Okay. In terms of the drawing -- I don't mean
23 to offend you or anything, but can you describe the
24 sexual drawing that you ended up having to do
25 sensitivity training for.
1 A If I recall correctly, somebody put boobs on
2 like -- you know the male/female symbols on bathrooms?
3 Somebody drew boobs.

| 31. | 84:17-<br>85:09 | **17 That sensitivity training came out of the fact**<br>**18 that there were these -- there was a visual harassment**<br>19 in this -- the boobs on the bathroom door.<br>20 Is that what caused the training to come<br>21 about?<br>22 A Yes. Someone was offended by the boobs drawn.<br>23 Q Okay. And how was the decision made as a<br>24 result of that to do a sensitivity training? Why was<br>25 that the outcome?<br>1 make sure that everyone<br>2 understood what the expectation was, and if it makes<br>3 someone uncomfortable, it's not okay.<br>4 Q Right. Okay.<br>5 And do you recall any other sensitivity<br>6 trainings that were done relative to either race or sex<br>7 issues that you were involved in?<br>8 A Not that I recall. I mean, other than your<br>9 regular annual required of supervisor and above. |

DESIGNATION OF TESTIMONY PRESENTED BY VIDEO OF ERIN MARCONI

| 32. | 85:21-87:04 | **21** Q Okay. Now, I'm going to show you what has<br>**22** been previously marked as Exhibit 37. And just so the<br>**23** record is clear, Exhibit 37 is a three-page document<br>**24** Bates-stamped Tesla 35 through 37, and it's a complaint<br>**25** by Owen Diaz about a racist drawing, or what he<br>**1** considered to be a racist drawing.<br>**2** And I'm wondering if you recall seeing this<br>**3** email, or the picture that's attached.<br>**4 A I don't recall seeing the picture, and I don't**<br>**5 specifically recall seeing it, given the time. It very**<br>**6 well could have been something that I was -- "Here's a**<br>**7 heads-up" kind of thing, and I just don't recall.**<br>**8** Q Okay. Okay.<br>**9** Based on your -- you just read the complaint<br>**10** by Mr. Diaz from January 22nd, 2016. Based on that<br>**11** complaint and in your experience as a professional HR<br>**12** person, would that be sufficient to trigger an<br>**13** investigation, in your mind, his complaint along with<br>**14** the pictures?<br>**15 A Yes.**<br>**16** Q And would -- as a trained investigator, given<br>**17** this written information and the confirming picture,<br>**18** would you expect there to be an investigation as a<br>**19** result of that?<br>**20 A Yes.**<br>**21** Q If you were conducting the investigation,<br>**22** would you interview the people that are identified in<br>**23** Mr. Diaz's email?<br>**24 A Depending on if they were Tesla employees or**<br>**25 employees of another company, either I would if they**<br>**1 were Tesla employees, or I would ask that the primary**<br>**2 employer, for lack of a better way to put it, did. And**<br>**3 if it was a combination, work together if at all**<br>**4 possible.** |
| 33. | 88:20-89:07 | **20** So if Michael Wheeler and the Israel -- the<br>**21** guy whose name is Israel in this were both Tesla<br>**22** employees, those interviews you would expect would be<br>**23** done by Tesla HR, and then the interviews -- assuming<br>**24** that Ramon Martinez and Owen Diaz are temporary<br>**25** employees working through a staffing agency, you would<br>**1** interviewed by their<br>**2** respective contracting agencies; correct?<br>**3 A Correct.**<br>**4 I have had occasion to that whoever was on**<br>**5 site for, say, West Valley wasn't well versed or**<br>**6 comfortable. So if that kind of situation came up, I**<br>**7 would assist, but would make sure that they were there.** |

DESIGNATION OF TESTIMONY PRESENTED BY VIDEO OF ERIN MARCONI

| 34. | 97:12-98:05 | **12 Q** If you look at Mr. Diaz's statement on Tesla<br>**13** 22, which is the third page of Exhibit 128, and you look<br>**14** down at the bottom of what his statement is, he says<br>**15** that:<br>**16** "As a supervisor or leads, we are held to<br>**17** a higher standard because the people we<br>**18** supervise look to us as examples."<br>**19** Is that -- is that a true statement for people<br>**20** who were acting as leads or supervisors at Tesla, that<br>**21** they were examples for other employees?<br>**22 A Absolutely for Tesla employees.**<br>**23 Q** Okay. And if a supervisor --<br>**24 A I'm not aware of anybody that was working as a**<br>**25 lead or a supervisor that wasn't a Tesla employee.**<br>**1 Q** Okay. But regardless, even if someone was a<br>**2** temporary worker through a staffing agency, if they were<br>**3** working in a lead position, they would need to adhere to<br>**4** Tesla policies; right?<br>**5 A** I believe so. |
| 35. | 99:22-100:20 | **22** You understand that this drawing that's on the<br>**23** fourth page of Exhibit 128, that that drawing is a<br>**24** drawing that could be offensive to African Americans?<br>**25 A Yes.**<br>**1 Q** Right?<br>**2 A Yes.**<br>**3 Q** And it's a caricature that historically was<br>**4** used -- it's been called a "pickaninny." Have you heard<br>**5** that expression before?<br>**6 A Yes.**<br>**7 Q** And it was historically -- this drawing with<br>**8** the bone in the hair was historically a way to put down<br>**9** African Americans; right?<br>**10 A That's my understanding.**<br>**11 Q** So if you had understood that Mr. Martinez had<br>**12** admitted to putting this poster -- to putting this<br>**13** drawing up, and also to have threatened Mr. Diaz<br>**14** previously, you would expect that Mr. Martinez would be<br>**15** fired pursuant to Tesla policy, wouldn't you?<br>**16 A Assuming all of that is true --**<br>**17 Q** Yeah.<br>**18 A -- I wouldn't presume what nextSource does,**<br>**19 but I would ask them not to have him return to an**<br>**20 assignment at Tesla.** |

DESIGNATION OF TESTIMONY PRESENTED BY VIDEO OF ERIN MARCONI

| | | |
|---|---|---|
| 36. | 100:22-101:07 | **22** Now, if you go on to Mr. Diaz's statement:<br>**23** ..."and because nothing has been done, it<br>**24** seems that his behavior is getting worse."<br>**25** That would be a concern to you as a Tesla<br>**1** it, if conduct is getting worse?<br>**2 A Absolutely.**<br>**3** Q Where Mr. Diaz then says:<br>**4** "As an employee, I'm entitled to a safe<br>**5** and harassment-free work environment,"<br>**6** that's true; right?<br>**7 A Yes.** |
| 37. | 104:15-19 | **15** Q Okay. Now, certainly if Ramon Martinez were<br>**16** yelling at him and threatening him, that would violate<br>**17** Tesla's policies; right? -- at least the threatening<br>**18** part?<br>**19 A Yes. Assuming it's Ramon Martinez.** |
| 38. | 107:23-108:02 | **23** Q Okay. So in general, you had -- sometimes you<br>**24** had to push nextSource to get you the information you<br>**25** needed so that you could evaluate –<br>**1 A And go about things the way that we had asked**<br>**2 them to go about them** |

| | | |
|---|---|---|
| 39. | 108:4-<br>109:12 | 4 Exhibit 35 for the record is a three-page<br>5 document Bates-stamped Tesla 140 to 142. And it appears<br>6 that at least in this situation with respect to Ramon<br>7 Martinez and Owen Diaz, that eventually at least it got<br>8 forwarded to you.<br>9 Do you see that?<br>10 A Yes.<br>11 Q And so at least at some point you did get 12 Mr. Diaz's statement about his<br>-- the threat that he<br>13 perceived from Ramon Martinez; correct? 14 A Owen's statement?<br>15 Q Yeah.<br>16 A Assuming this whole thread was actually<br>17 forwarded at the time?<br>18 Q Yeah.<br>19 A Yes. If it was, I can't say for sure.<br>20 Q Okay. But based on the email chain, I mean, 21 it looks like it was<br>forwarded to you. Do you see that?<br>22 A Correct.<br>23 Q Okay.<br>24 A Several days later; right? Yeah.<br>25 Q Yeah.<br>1 made on the 17th, and then<br>2 forwarded again on the 20th to Wayne Jackson, and then<br>3 it looks like Wayne Jackson forwarded it to you on that<br>4 same day, on the 20th.<br>5 A Terri.<br>6 Q I'm sorry. Terri.<br>7 A Yeah.<br>8 Q Terri forwarded it to you that same day,<br>9 October 20th of 2015; right?<br>10 A Yes. And based on that, it would appear that 11 it was all nextSource<br>employees involved, other than<br>12 Victor and Ed. |
| 40. | 109:13-<br>19 | 13 Q Okay. And it looks like maybe Ed was talking<br>14 about getting involved here, and Terri Garrett was 15 asking for your help as<br>to whether or not Mr. Romero 16 should be involved in the investigation; right?<br>17 A It looks like she wants him not to be<br>18 involved.<br>19 Q Right. |
| 41. | 116:22-<br>25 | 22 Q And the correct response to threatening 23 conduct is to remove that<br>individual from the factory;<br>24 right?<br>25 A Correct. |

DESIGNATION OF TESTIMONY PRESENTED BY VIDEO OF ERIN MARCONI

| 42. | 119:23-120:04 | 23 Q Okay. But if an allegation of racist -- of a 24 racial term, particularly if it's the n-word, is 25 confirmed, that's the kind of information that 1 supervisors and managers such as Ed Romero and Victor<br>2 Quintero were trained to at least forward to HR;<br>3 correct?<br>4 A Yes. |
|---|---|---|
| 43. | 123:09-123:18 | 9 Q But any worker who is subject -- who is<br>10 working in the Tesla factory is subject to Tesla 11 policies; correct?<br>12 A Yes.<br>13 Q And -- and any worker who is being harassed or<br>14 discriminated against, regardless of who they work for, 15 if -- if the harassment or discrimination occurs in the<br>16 Tesla factory, Tesla has a responsibility to do 17 something about it if it knows about it; right? 18 A Yes. |
| 44. | 133:16-23 | 16 Q I do understand that. I'm wondering,<br>17 though -- we've looked at some documents which showed<br>18 numerous complaints about the n-word, several complaints<br>19 about the n-word, and I'm wondering if there was any<br>20 kind of discussion in human resources that there was a<br>21 need to address the use of that word in particular in<br>22 the workplace.<br>23 A Not that I recall. |
| 45. | 134:20-135:03 | **20** Q And if there had been such an investigation by<br>**21** anybody at Tesla, there should have been at least some<br>**22** kind of written record of that; right?<br>**23 A Yes.**<br>**24** Q Because that's what Tesla policy requires is<br>**25** documentation of any kind of investigation that's done;<br>**1** right?<br>**2 A Yes. Mine, for the most part, were**<br>**3 handwritten** |

CALIFORNIA CIVIL RIGHTS LAW GROUP
ALEXANDER MORRISON + FEHR LLP

DATED:  October 4, 2021          By: /s/ Navruz Avloni_____
                                           Lawrence A. Organ, Esq.
                                           Navruz Avloni, Esq.
                                           Cimone A. Nunley, Esq.
                                           J. Bernard Alexander, Esq.
                                           Attorneys for Plaintiff OWEN DIAZ