QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (appearance *pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
  Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Daniel C. Posner (CA Bar No. 232009)
  danposner@quinnemanuel.com
  Mari F. Henderson (CA Bar No. 307693)
  marihenderson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Asher Griffin (appearance *pro hac vice*)
  ashergriffin@quinnemanuel.com
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Defendant Tesla, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| OWEN DIAZ,<br><br>             Plaintiff,<br><br>        v.<br><br>TESLA, INC. DBA TESLA MOTORS, INC.,<br><br>             Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**DEFENDANT TESLA INC'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY**<br><br>Trial Date: March 27, 2023<br>Complaint Filed: October 16, 2017 |

## PLAINTIFF'S DESIGNATIONS OF DEPOSITION TESTIMONY

Defendant Tesla, Inc. ("Tesla") provides the following objections and counterdesignations to Plaintiff Owen Diaz's Designation of Deposition Testimony.

**Di-Az, Demetric, 5/15/2018, Vol. I**:

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| 1. | 10:4-22 | 4 Q. Could you please state your full name for the<br>5 record.<br>**6 A. Demetric Jean Di-az.**<br>7 Q. Did you say Jean?<br>**8 A. Yes. That's my middle name.**<br>9 Q. Okay. And how do you spell your last name?<br>**10 A. D-I hyphen A-Z.**<br>11 Q. And is your father's name Owen Diaz?<br>**12 A. Yes.**<br>13 Q. And he spells his name with a D-I-A-Z without a<br>14 hyphen; right?<br>**15 A. Yes.**<br>16 Q. And why do you spell your name with a hyphen?<br>**17 A. As a kid it was given to me like that through**<br>**18 birth. I really don't know why it was like that.**<br>19 Q. You don't have an understanding of why your last<br>20 name is spelled with a hyphen?<br>**21 A. I was told that was the original spelling. That**<br>**22 was it.** | |
| 2. | 31:20-22 | 20 Q. How would you describe your relationship with<br>21 your father?<br>**A. My relationship with my father was good.** | |
| 3. | 40:14-16 | **14 Q. So you received a high school diploma from**<br>**15 Pittsburg's adult school in June of 2014?**<br>**16 A. Yes.** | 40:10-13<br><br>10 Q. Take your time to read Exhibit 6. It's a<br>11 document marked at the bottom as Tesla 156.<br>12 Is this a copy of your resume?<br>13 A. Yes. |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | | **40:23-41:3**<br><br>23 Q. Did you submit this as part of your application<br>24 to work at West Valley in or around August of 2015?<br>25 A. Yes.<br><br>1 Q. Did you submit this as part of your application<br>2 to work at Tesla in or around August of 2015?<br>3 A. Yes. |
| 4. | 109:2-3 | **2** Q. How many days a week did you work?<br>**3** A. Five. | |
| 5. | 159:24-160:07 | **24** Q. And who stated this phrase?<br>**25  A. Javier. I think his last name is Caballero.**<br>**1   You said his name.**<br>**2**   Q. Javier Caballero said this, quote, "All you<br>**3** fucking niggers -- I can't stand you motherfuckers"?<br>**4 A. Yes.**<br>**5** Q. And in paragraph 19 you say that it was your<br>**6** shift lead?<br>**7 A. It's my shift supervisor.** | |
| 6. | 160:15-160:25 | **15** Q. And how many other people besides you and T.J.<br>**16** were present?<br>**17 A. Me, T.J., my father, and the rest of my team**<br>**18 that was getting ready to leave.**<br>**19** Q. It was directed at your whole team?<br>**20 A. Yes.**<br>**21** Q. Sorry. Did you tell me how many people are on<br>**22** your team?<br>**23 A. I think I told you earlier.**<br>**24** Q. Can you tell me again?<br>**A. I think approximately about six.** | |
| | | **1** Q. Any people on your team not African-American?<br>**2 A. Yes.**<br>**3** Q. Who?<br>**4 A. I think it was probably about, like,** | **161:9-10**<br><br>9 Q. Is this the only time that this statement was<br>10 made? |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | three other<br>5 guys that weren't African-American.<br>6 Q. Any other people on your team African-American?<br>7 A. Me, T.J., and one other guy. I don't remember<br>8 his name. | 11 A. That statement, yes. |
| 7. | 162:2-162:7 | 2 A.    From there I went to his immediate -- to<br>3 Javier's supervisor.  They did nothing about it.  And<br>4 then from there, I went to HR, and they did nothing<br>5 about it.<br>6 Q.    Who in HR did you complain to?<br>7 A.    I don't remember the lady's name. | **72:10-18**<br><br>10 Q. Turning your attention to page 218, under<br>11 "Reporting Concerns." You understand that, if you<br>12 believe you were subjected to harassment or<br>13 discrimination of any kind or if you witness such<br>14 conduct, that you were required to immediately report<br>15 the facts of the conduct to your manager or an HR<br>16 representative so that your concern could be<br>17 investigated promptly and addressed appropriately?<br>18 A. Yes, I understand<br><br>**73:21-75:9**<br><br>21 Q. Did you understand that you could report it to<br> 22 West Valley if you suffered harassment or discrimination<br>23 at Tesla?<br>24 A. Yes.<br> Q. And who would you have reported it to if you<br>1 felt that you suffered harassment and discrimination at<br>2 Tesla?<br>3 A. I really don't know who you would report it to.<br>4 I went to talk to the people upstairs. That's it. They |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|-----|-------|--------------------|-------------------------------|
|     |       |                    | 5 didn't do anything about it, and I'm still stuck with 6 the same situation. 7 Q. What was your understanding of who you should 8 report discrimination and harassment to if you endured 9 it while you were working at Tesla? 10 A. I really didn't have an exact person to tell it 11 to. I tried to talk to the on-site staff; they didn't 12 help. And it never went further. 13 Q. Who of the on-site staff or -- strike that. 14 When you say on-site staff, are you referring to 15 West Valley's on-site staff at Tesla? 16 A. Yes. 17 Q. Did you report it to the -- did you report any 18 discrimination or harassment to West Valley's on-site 19 staff? 20 A. I went up there and we talked, and he said he 21 would look into it, and nothing ever happened. 22 Q. Who did you report it to? 23 A. If I'm not mistaken, I think his name is Samuel. 24 I don't know his last name. 25 Q. Samuel Zehner. Does Zehner sound right? 1 A. I don't know his last name. I don't know. 2 Q. Did you report any discrimination or harassment 3 that you suffered at Tesla to anyone -- |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | | 4 A. I said -- <br> 5 Q. Hold on. Let me finish -- to anyone else <br> 6 besides Samuel? <br> 7 A. I talked to my mom and my dad. <br> 8 Q. But you didn't talk to anybody else at Tesla <br> 9 about any discrimination or harassment? <br><br> **75:11-17** <br><br> 11 THE WITNESS: Not that I can recall at this <br> 12 time. <br> 13 BY MS. ANTONUCCI: <br> 14 Q. You recall that you didn't talk to anybody else <br> 15 at West Valley about any discrimination or harassment <br> 16 that you suffered at Tesla? <br> 17 A. No. <br><br> **76:21-24** <br><br> 21 Q. You never spoke with any human resources <br> 22 representative at Tesla about harassment or <br> 23 discrimination? <br> 24 A. No. <br><br> **162:13-21** <br><br> 13 Q. Did you ever put anything in writing? <br> 14 A. No. <br> 15 Q. You never complained in writing? <br> 16 A. No. I just went and verbally complained. It never went anywhere. <br> 18 Q. You never sent a text? <br> 19 A. No. <br> 20 Q. You never wrote an e-mail? |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | | 21 A. No. |
| 8. | 165:24 - 166:3 | 24 Q. Do you know whether your father heard it?<br>25 A. My father told me that he did hear it, and<br><br>1 That's the first time I seen my father, like, really<br>2 feel like he couldn't do anything for me. Like, he<br>3 didn't know what to do. | Objection: Hearsay; speculation |

**Heisen, Annalisa, 05/29/2019, Vol. I:**

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| 1. | 8:10-12 | 10 MR. ORGAN: Q. Good morning. Could you<br>11 please state your full name for the record.<br>12 A. Annalisa Heisen. | |
| 2. | 8:15-19 | 15 Q. Okay. And what's your--you currently work<br>16 for Tesla; is that right?<br>17 A. Correct.<br>18 Q. What's your current position there?<br>19 A. I'm a senior employee relations partner. | |
| 3. | 26:7- 27:3 | 7 Q. Okay. And is it true that Tesla human<br>8 resources will investigate any claim of discrimination<br>9 or harassment that is brought to its attention<br>10 relative to conduct at the factory?<br>11 A. We have a standard that an investigation will<br>12 be conducted. Whether a Tesla HR partner conducts<br>13 that or otherwise, depends case to case.<br>14 Q. What are the factors as to determining<br>15 whether a Tesla HR partner will conduct the<br>16 investigation or not?<br>17 A. One factor would be who's involved, who<br>18 complained.<br>19 Q. And why does that matter? | |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|-----|-------|--------------------|------------------------------|
| | | 20 A. We have different employment statuses for<br>21 individuals on-site.<br>22 Q. What are the different employment statuses<br>23 for individuals who work at the Fremont factory?<br>24 A. I don't have an exhaustive list of types of<br>25 roles.<br>1 Q. What are the ones you remember?<br>2 A. General direct-hire employees, contractors,<br>3 temporary employees. | |
| 4. | 33:4-8 | 4 Q. Well, you understand that you're testifying<br>5 today as the person most knowledgeable on the policies<br>6 and procedures related to race harassment in effect<br>7 from 2014 to present; right? You understand that?<br>8 A. Correct. | |
| 5. | 53:4-13 | 4 Q. In terms of "stupid stuff," that part of<br>5 Exhibit 5, that applies to all employees, whether<br>6 They're regular employees or contractors, right, at<br>7 the Tesla factory?<br>8 A. My understanding is that there's an<br>9 expectation that both contractors and employees would<br>10 adhere to it.<br>11 Q. Would adhere to that part of the policy;<br>12 correct?<br>13 A. Correct. | |
| 6. | 75:17-24 | 17 MR ORGAN: Q. What steps does Tesla take to<br>18 ensure that contractors who come into and work in the<br>19 Tesla factory in Fremont have training relative to the<br>20 topic of antiharassment and discrimination?<br>21 A. We have an expectation that agencies | |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | are<br>22 training on antiharassment and discrimination.<br>23 Q. And what is that expectation based on?<br>24 A. That they're legally compliant. | |
| 7. | 77:7-17 | 7 "QUESTION: And in terms of -- there are some<br>8 reporting and investigation procedures in Exhibit 150,<br>9 if you look down at the bottom of the page, and then<br>10 over to the second page of Exhibit 150. Those<br>11 reporting and/or investigation principles would still<br>12 apply to employees who are contractors working at the<br>13 Tesla factory; correct?")<br>14 THE WITNESS: I don't have visibility into<br>15 what the agencies advise their contractors, as far as<br>16 reporting is concerned. Those guidelines may be<br>17 different, agency to agency. | |
| 8. | 78:11-15 | 11 Q. And so that employee of Tesla would have to<br>12 then take some action once they get information about<br>13 discrimination or harassment in the workplace;<br>14 correct?<br>15 A. That's the expectation. | **78:1-10**<br><br>1 Q. In terms of if a Tesla employee – let's say<br>2 a supervisor or a manager gets information from a<br>3 contract employee about harassment or discrimination,<br>4 Tesla's antiharassment and discrimination policy would<br>5 apply, in terms of reporting an investigation;<br>6 correct?<br>7 **A. Correct. To that employee of Tesla who**<br>8 **received information?**<br>9 Q. Yes.<br>10 **A. Correct.** |
| 9. | 79:7-15 | 7 Q. So if a Tesla employee gets information about | **79:19-80:3** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 8 harassing conduct based on race in the factory, that's<br>9 occurring in the factory, regardless of how they get<br>10 that information, they then have a reporting duty, in<br>11 terms of either providing that information to a<br>12 higher-level manager or sending it to HR; is that<br>13 true?<br>14 A. There's an expectation of that, as it's<br>15 articulated in the policy. | 19 MR ORGAN: Exhibit 151, for the record, is a<br>20 six-page document Bates-stamped Tesla 819 to 824.<br>21 It's entitled "Policy Against Discrimination and<br>22 Harassment in the Workplace, U.S. Locations."<br>23 Q. Do you recognize Exhibit 151?<br>24 **A. I do.**<br>25 Q. And what is Exhibit 151?<br><br>1 **A. It's Tesla's policy against harassment and**<br>2 **discrimination in the workplace, for the U.S.**<br>3 **locations, that went into effect in July of 2018.** |
| 10. | 81:6-81:12 | 6 Q. Any information relative to a complaint of<br>7 harassment based on race at the Tesla factory, that's<br>8 investigated by HR, Tesla's HR, if it's brought to<br>9 Tesla HR attention; correct?<br>10 A. It depends.<br>11 Q. What does it depend on?<br>20 A. Who's involved in the complaint. | |
| 11. | 82:13-16 | 13 Q. Tesla has an obligation to the people who<br>14 work at the Fremont factory to ensure that they are in<br>15 a workplace free from harassment based on race; right?<br>21 A. Correct. | |
| 12. | 82:21-25; 83:3-6 | 21 Q. So in terms of ensuring that workers at the<br>22 Tesla factory are not subject to harassment based on<br>23 race, how does Tesla's HR department ensure that that<br>24 is the case, if they are delegating investigation<br>25 processes to non-Tesla employees? | **85:10-25**<br><br>10 Q. How does Tesla ensure that Tesla employees<br>11 working at the Tesla factory are protected against<br>12 harassing conduct by contractors who are also working |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 3 THE WITNESS: There's still an expectation<br>4 that these types of concerns that are brought forward<br>5 will be investigated, but it depends case by case a<br>6 to how that's approached. | 13 at the Fremont factory?<br>14 **A. When the concern is brought about a**<br>15 **contractor's behavior?**<br>16 Q. Yes.<br>17 **A. If we're informed and made aware of the**<br>18 **issue -- depends on the specific circumstances -- we**<br>19 **would either ourselves follow up and collaborating**<br>20 **with them. There are circumstances that might fall**<br>21 **outside of that. It depends, but that's one way.**<br>22 Q. Certainly, if harassing conduct were being<br>23 done by any of Tesla's supervisors against a contract<br>24 employee, Tesla would be responsible for doing any<br>25 such investigation; correct?<br><br>**86:3-11**<br><br>3 THE WITNESS: Generally in that case, Tesla<br>4 would always contact the agency of the person who was<br>5 a contractor who was involved. And Tesla may take the<br>6 lead on that, in that case.<br>7 MR ORGAN: Q. And what about in the<br>8 situation where the -- assume that the harasser is a<br>9 supervisor working for a contract agency, harassing<br>10 another contract employee at the Tesla factory.<br>11 What's Tesla's role relative to that? |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | | **86:14-20**<br><br>14 THE WITNESS: So effectively, if both parties 15 are contractors, if they're either from the same 16 agency or separate agencies, whichever agency 17 representative would need to be looped in, you know, 18 during that process, Tesla would contact them, and 19 they would collaborate with them to determine what 20 next steps needed to be taken for investigation. |
| 13. | 83:19-21; 83:24-25 | 19 Q. There are no written procedures that Tesla 20 has for coordinating investigations of allegations of 21 harassment based on race?<br><br>24 THE WITNESS: Not that outline step by step 25 for each of these cases. | |
| 14. | 83:11-18 | 11 Q. In terms of Tesla's efforts to ensure that it 12 has a workplace free from harassment based on race, 13 are there any kind of procedures that Tesla has 14 adopted for coordinating investigations into 15 allegations of harassment based on race? 16 A. It depends on the case. It varies widely. 17 There's not one fixed method that we address that 18 with. | |

**Marconi, Erin 10/21/2019, Vol. I:**

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| 1. | 13:17-13:24 | 17 What did you do after you left Volt as a 18 program manager? 19 A I went to Tesla as an HR business | **13:25-14:5**<br><br>25 **Q And what was your job title after you – after** |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | partner.<br>20 Q So that would be approximately 2013?<br>21 A Correct.<br>22 Q How long were you an HR business partner at<br>23 Tesla?<br>A Until January 2017. | 1 **January 2017?**<br>2 A I took a time off work. I had been a<br>3 caregiver for my mother.<br>**4 Q And have you worked at Tesla since that time?**<br>5 A No. |
| 2. | 14:09-14:21 | 9 Q Okay. What were the job duties of an HR<br>10 business partner in your role?<br>11 A Strategic partner with the business management<br>12 teams from work planning, succession planning. Time to<br>13 time would help out if recruiting was needed, but that<br>14 wasn't primary.<br>15 A Lot of HR generalist at the beginning. That<br>16 went away as we grew. Employee relations,<br>17 investigations, performance management. Employee<br>18 engagement.<br>19 Q It sounds like --<br>20 A Probably about covers it. A little bit of<br>21 everything. | |
| 3. | 15:03-15:05 | 3 Q Okay. So investigations were part of your job<br>4 as an HR business partner; is that right?<br>5 A Correct. | |
| 4. | 27:12-27:15 | 12 Q But the HR business partner team that you were<br>13 part of was in charge of handling, among other things,<br>14 complaints about discrimination or harassment; right?<br>15 A Correct. | **27:2-11**<br><br>**2 Q But you mentioned earlier that there were HR**<br>**3 teams.**<br>4 A There was an HR business partner team. There<br>5 were also some employee relations people that supported<br>6 us. They did a lot of administrative for the most part.<br>7 Then there was a totally different group in HR |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/<br>COUNTERDESIGNATION |
|-----|-------|--------------------|--------------------------------|
| | | | 8 that did onboarding, offboarding. I can't recall what 9 the name of that group was. 10 There was recruiting. There was just various 11 different areas.<br><br>**27:16-24**<br><br>16 **Q And approximately how many members were there** 17 **in that HR business partner team that handled** 18 **discrimination and harassment complaints in that 2015,** 19 **'16 time period?** 20 A At least ten, to the best of my recollection. 21 That was a long time ago, though. 22 **Q Okay.** 23 A Oh, 11. Sorry. I haven't thought about that 24 in a long time.<br><br>**32:11-25**<br><br>11 **Q How many employees worked in the Fremont** 12 **factory in the area for which you provided HR functions** 13 **in 2015 and '16?** 14 A I was switched around various different 15 groups, so at any -- it depends on when in 2015 and when 16 in 2016. 17 **Q Okay.** 18 A It could have been a group of 50 people; it 19 could have been over 1200. 20 **Q At one point, though, that you were handling** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | | 21 **human resources functions for up to 1200 people at** <br> 22 **the --** <br> 23 A With assistance. <br> 24 **Q With assistance, at the Fremont factory?** <br> 25 A Correct. |
| 5. | 33:17-33:20 | 17 Q Okay. But it's fair to say that you at least <br> 18 understood what Tesla's policies were in terms of <br> 19 anti-discrimination and anti-harassment; right? <br> 20 A Correct | |
| 6. | 35:02-35:07 | 2 Q So with that understanding of the definition <br> 3 of n- -- of the n-word, is it your understanding that <br> 4 Tesla's anti-harassment and anti-discrimination <br> 5 zero-tolerance policies prohibit use of the n-word at <br> 6 the Tesla facility? <br> 7 A Yes. | |
| 7. | 36:05-36:13 | 5 Q Okay. And if you had known about someone <br> 6 using the n-word at the Tesla factory, that would <br> 7 certainly be something that you would investigate; <br> 8 correct? <br> 9 A Absolutely. <br> 10 Q And the reason that you would investigate that <br> 11 is use of the n-word at the Tesla factory could create a <br> 12 hostile work environment for other workers; right? <br> 13 A Correct. | **37:4-6** <br><br> 4 **Do you recall ever investigating a claim where** <br> 5 **it was alleged that the n-word was used?** <br> 6 A Not specifically. |
| 8. | 39:02-39:08 | 2 Q Was there ever any kind of meeting among HR <br> 3 professionals about, like, sensitivity training or how <br> 4 to address a situation where the n-word was being used | **40:10-20** <br><br> 10 **Did you work with your business partners to** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 5 in the workplace?<br>6 A Specifically regarding the n-word?<br>7 Q Yeah.<br>8 A No. | **11 enforce the anti-discrimination and anti-harassment**<br>**12 policies?**<br>13 A Yes, as needed.<br>**14 Q What kind of training was there for issues**<br>**15 such as harassment at the Tesla factory?**<br>16 A There was annual training. There was<br>17 supervisor training that was developed, I don't know<br>18 when, but I think it would have been there by then. And<br>19 that would have been anything -- anyone supervisor or<br>20 above.<br><br>**41:16-42:20**<br><br>**Q So if a -- just so I'm clear, the leadership**<br>**17 training would be done for anybody who was a supervisor**<br>**18 or above that level; correct?**<br>19 A Correct.<br>**20 Q So anybody who's a supervisor or a manager or**<br>**21 a director would get the leadership training; is that**<br>**22 true? Or should get it?**<br>23 A If they started once that training had<br>24 started, because that was a -- do this at the beginning,<br>25 because just as a group, we were growing and there were<br>1 people being promoted, and so we were doing a lot of<br>2 one-off trainings.<br>**3 Q Okay. And then in terms of the leadership** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | | 4 **training, the leadership training included things --** 5 **included topics such as anti-discrimination,** 6 **anti-harassment, that kind of stuff?** 7 A It touched on it. I believe that was in 8 orientation for every employee. It would have been Beth 9 Davies again. 10 **Q So every employee was taught when they started** 11 **about the anti-discrimination, anti-harassment policies?** 12 A Yes. 13 **Q And the leadership were taught that if they** 14 **received a complaint of harassment or discrimination,** 15 **they should at least inform HR that they received such a** 16 **complaint; is that true?** 17 A When they were doing the leadership training 18 as part of onboarding, we added it to the regular 19 orientation at a certain point. I don't recall what the 20 time was. |
| 9. | 42:21- 43:05 | 21 Q Okay. But under Tesla's guidelines or 22 policies for anti-harassment complaints, if a member of 23 the leadership team, supervisor, manager, director, 24 received a complaint of harassment, they were to at 25 least inform HR that they had received such a complaint; 1 is that true? 2 A Yes. 3 Q And that was true throughout the time | |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | that you <br> 4 worked at Tesla; right? <br> 5 A Yes. | |
| 10. | 49:07-49:23 | 7 Q In fact, every -- every employer has a duty to <br> 8 make sure that its workers are working in an environment <br> 9 that is harassment-free; right? <br> 10 A Correct. <br> 11 Q And that would include harassment based on sex <br> 12 or race or any of those other prohibited categories; <br> 13 right? <br> 14 A Yes. <br> 15 Q Similarly, every employer is -- has a duty to <br> 16 make sure that once it knows about harassment, that it <br> 17 takes some sort of corrective action to make sure that <br> 18 the harassment doesn't continue; right? <br> 19 A Yes. <br> 20 Q And in California, every employer must take <br> 21 all reasonable steps necessary to prevent discrimination <br> 22 and harassment from occurring; right? <br> A Yes. | |
| 11. | 51:02-51:12 | 2 Q You would agree that it's never okay to use <br> 3 the n-word in the workplace? <br> 4 A Correct. <br> 5 Q And you'd also agree that it's never okay to <br> 6 make offensive drawings that could be racial in nature; <br> 7 right? <br> 8 A Correct. <br> 9 Q You'd agree that every employer has a duty to <br> 10 provide a workplace where employees are not using the <br> 11 n-word towards other employees? <br> 12 A Yes. | |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| 12. | 51:23-52:06 | 23 If -- if a Tesla worker complains about<br>24 harassment to their supervisor, that meets their at<br>25 least initial burden under Tesla's policies for<br>1 reporting harassment; right?<br>2 A Yes.<br>3 Q And under Tesla policies, supervisors are<br>4 supposed to report issues relating to harassment to<br>5 their managers and to HR?<br>6 A Yes. | |
| 13. | 55:23-56:04 | 23 Q And in terms of the standards, the<br>24 anti-discrimination, anti-harassment policy standards<br>25 that applied to workers at the Tesla factory, those<br>1 standards applied to both regular full-time Tesla<br>2 employees and to the temporary workers who were working<br>3 at the plant; right?<br>4 A Yes. | |
| 14. | 58:10-58:15 | 10 Q Okay. And if someone does complain about what<br>11 they consider to be inappropriate conduct, and they feel<br>12 threatened, you would agree that as a Tesla HR person,<br>13 you would still have a responsibility to make sure that<br>14 nothing happened to them further; right?<br>15 A Oh, absolutely | |
| 15. | 58:16-59:5 | 16 Q And as a Tesla HR person, if someone had<br>17 complained about like threatening conduct or feeling<br>18 that they were threatened, you would at least have to<br>19 make that workplace safe for them from that point that<br>20 you find out about it on; right?<br>21 A In the immediate, absolutely. If then it<br>22 was -- the investigation was conducted and it, say, only | |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 23 involved temporary people that were all under West 24 Valley -- 25 Q Yeah. 1 A -- if West Valley investigated it and came 2 back and said there wasn't actually an issue, I'm going 3 to believe that West Valley did their investigation 4 thoroughly and if there was something to address, 5 addressed it. | |
| 16. | 59:8-21 | 8 You -- you typically rely on the contract -- 9 contracting agency to do an investigation into 10 complaints by their employees; is that right? 11 A If it is involving other of their employees. 12 If it is involving Tesla employees, then I 13 would talk to probably Tesla employees, they would talk 14 to their employees. 15 If the stars align and everyone was in the 16 building or in the same side of the country and we would 17 help -- sometimes I had been there when they were 18 interviewing their employee and vice versa. But I 19 wouldn't -- my preference would not be to interview 20 someone else's employee, and especially not without them 21 present. | |
| 17. | 59:22-60:10 | 22 Q In terms of Tesla's duty, though, to all of 23 its employees, it has a -- it has a duty to both its 24 regular employees and the contractors to make sure that 25 all of those people work in a work environment free from 1 harassment or discrimination based on race; right? | |

CASE NO. 3:17-cv-06748-WHO
DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 2 A Correct.<br>3 Q And so if -- if Tesla HR became aware of a<br>4 problem, let's say use of the n-word or use of racial<br>5 drawings, Tesla would still have to make sure that that<br>6 conduct stopped; right?<br>7 A Assuming that an investigation found that that<br>8 conduct did happen?<br>9 Q Right.<br>  A Then yes. | |
| 18. | 61:10-61:14 | 10 Q And if someone is complaining about conduct,<br>11 do they have to complain in writing or can they also<br>12 complaint verbally about inappropriate conduct in the<br>13 workplace at Tesla?<br>14 Either. | |
| 19. | 64:24-65:04 | 24 Q Tesla had video cameras throughout the<br>25 facility; is that true?<br>1 A Correct.<br>2 Q And if there was an altercation, would you<br>3 like to see if there was video footage of the incident?<br>4 A Absolutely. | |
| 20. | 80:21-82:3 | 21 Q Okay. Tell me about that. What was the<br>22 situation in which you did some sensitivity training for<br>23 a group relative -- was it relative to the n-word or was<br>24 it --<br>25 A No.<br>1 t was the -- tell me about the<br>2 situation where you did sensitivity training for a<br>3 group.<br>4 A It was an offensive drawing that we were<br>5 unable to determine who did the drawing. And I say | **80:12-20**<br><br>**Q Okay. And do you remember having a discussion**<br>**13 among the HR business partners where there was thought**<br>**14 to be a need by them to maybe conduct some kind of**<br>**15 sensitivity training to address issues like the n-word**<br>**16 in the workplace?**<br>**17 A Specifically resulting from this?** |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 6 "offensive"; it was a sexual drawing that clearly<br>7 offended folks.<br>8 That department was, I believe, over 500<br>9 people. So we brought everyone together each shift,<br>10 went over how that was not okay; if we ever could find<br>11 out who it was, it wouldn't be tolerated.<br>12 An investigation couldn't pinpoint who it was<br>13 because there wasn't a camera in that particular area,<br>14 we addressed the whole entire team, and then did<br>15 sensitivity training that covered pretty much<br>16 everything.<br>17 And even if I tell you a joke about the sky<br>18 being blue and you think it's funny today and you don't<br>19 tomorrow, then I can't tell you that joke anymore.<br>20 Q Do you remember what department it was in?<br>21 A I think it was stamping.<br>22 Q Okay. In terms of the drawing -- I don't mean<br>23 to offend you or anything, but can you describe the<br>24 sexual drawing that you ended up having to do<br>25 sensitivity training for.<br>1 A If I recall correctly, somebody put boobs on<br>2 like -- you know the male/female symbols on bathrooms?<br>3 Somebody drew boobs. | 18 **Q No, I'm just talking about at any time.**<br>19 A Yes. I know I specifically did one with a 20 group that I had. |
| 21. | 84:17-85:09 | 17 That sensitivity training came out of the fact<br>18 that there were these -- there was a visual harassment<br>19 in this -- the boobs on the bathroom door.<br>20 Is that what caused the training to come | **85:10-20**<br><br>10 **Q Okay. Who conducted the -- the annual**<br>11 **trainings for the management team members?** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 21 about?<br>22 A Yes. Someone was offended by the boobs drawn.<br>23 Q Okay. And how was the decision made as a<br>24 result of that to do a sensitivity training? Why was<br>25 that the outcome?<br>1 make sure that everyone<br>2 understood what the expectation was, and if it makes<br>3 someone uncomfortable, it's not okay.<br>4 Q Right. Okay.<br>5 And do you recall any other sensitivity<br>6 trainings that were done relative to either race or sex<br>7 issues that you were involved in?<br>8 A Not that I recall. I mean, other than your<br>9 regular annual required of supervisor and above. | 12 A It would have been Beth Davies for the<br>13 training department. I don't know if she actually did<br>14 it. And then I know at some point I believe it moved to<br>15 online course and question and answer. I don't know if<br>16 they still do that or not.<br>17 Anything that was like corporate training<br>18 companywide would have been through Beth Davies. And<br>19 then we supplemented where we saw necessary in our<br>20 groups. |
| 22. | 85:21-87:04 | 21 Q Okay. Now, I'm going to show you what has<br>22 been previously marked as Exhibit 37. And just so the<br>23 record is clear, Exhibit 37 is a three-page document<br>24 Bates-stamped Tesla 35 through 37, and it's a complaint<br>25 by Owen Diaz about a racist drawing, or what he<br>1 considered to be a racist drawing.<br>2 And I'm wondering if you recall seeing this<br>3 email, or the picture that's attached.<br>4 A I don't recall seeing the picture, and I don't<br>5 specifically recall seeing it, given the time. It very<br>6 well could have been something that I was -- "Here's a<br>7 heads-up" kind of thing, and I just don't recall.<br>8 Q Okay. Okay.<br>9 Based on your -- you just read the complaint<br>10 by Mr. Diaz from January 22nd, 2016. | |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | Based on that 11 complaint and in your experience as a professional HR 12 person, would that be sufficient to trigger an 13 investigation, in your mind, his complaint along with 14 the pictures? 15 A Yes. 16 Q And would -- as a trained investigator, given 17 this written information and the confirming picture, 18 would you expect there to be an investigation as a 19 result of that? 20 A Yes. 21 Q If you were conducting the investigation, 22 would you interview the people that are identified in 23 Mr. Diaz's email? 24 A Depending on if they were Tesla employees or 25 employees of another company, either I would if they 1 were Tesla employees, or I would ask that the primary 2 employer, for lack of a better way to put it, did. And 3 if it was a combination, work together if at all 4 possible. | |
| 23. | 88:20-89:07 | 20 So if Michael Wheeler and the Israel -- the 21 guy whose name is Israel in this were both Tesla 22 employees, those interviews you would expect would be 23 done by Tesla HR, and then the interviews -- assuming 24 that Ramon Martinez and Owen Diaz are temporary 25 employees working through a staffing agency, you would 1 interviewed by their | **89:8-90:1** **8 Q I see.** **9 So in a situation where the staffing agency** **10 doesn't feel comfortable doing the investigation, you're** **11 aware of at least one situation where Tesla HR helped** **12 out in that situation?** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
|  |  | 2 respective contracting agencies; correct?<br>3 A Correct.<br>4 I have had occasion to that whoever was on<br>5 site for, say, West Valley wasn't well versed or<br>6 comfortable. So if that kind of situation came up, I<br>7 would assist, but would make sure that they were there. | 13 A Yeah, and I can't remember the details. They<br>14 had someone new that was there. I think it was two<br>15 people really not just -- just not getting along, and<br>16 whoever they had on site that day was newer and hadn't<br>17 done investigations.<br>**18 Q Okay. And --**<br>19 A Similar to how when we would get new people a<br>20 lot of times, we would have them come along and make<br>21 sure the person that you're speaking to is comfortable<br>22 with that, because they're learning, before just saying,<br>23 "Hey, good luck."<br>**24 Q Well, that's good.**<br>25 A Yeah. But one way or another, make sure it<br>1 gets done. |
| 24. | 99:22-100:20 | 22 You understand that this drawing that's on the<br>23 fourth page of Exhibit 128, that that drawing is a<br>24 drawing that could be offensive to African Americans?<br>25 A Yes.<br>1 Q Right?<br>2 A Yes.<br>3 Q And it's a caricature that historically was<br>4 used -- it's been called a "pickaninny." Have you heard<br>5 that expression before?<br>6 A Yes.<br>7 Q And it was historically -- this drawing with<br>8 the bone in the hair was historically a way to put down<br>9 African Americans; right?<br>10 A That's my understanding.<br>11 Q So if you had understood that Mr. Martinez had | Calls for speculation. |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 12 admitted to putting this poster -- to putting this<br>13 drawing up, and also to have threatened Mr. Diaz<br>14 previously, you would expect that Mr. Martinez would be<br>15 fired pursuant to Tesla policy, wouldn't you?<br>16 A Assuming all of that is true --<br>17 Q Yeah.<br>18 A -- I wouldn't presume what nextSource does,<br>19 but I would ask them not to have him return to an<br>20 assignment at Tesla. | |
| 25. | 100:22-101:07 | 22 Now, if you go on to Mr. Diaz's statement:<br>23 ..."and because nothing has been done, it<br>24 seems that his behavior is getting worse."<br>25 That would be a concern to you as a Tesla<br>1 it, if conduct is getting worse?<br>2 A Absolutely.<br>3 Q Where Mr. Diaz then says:<br>4 "As an employee, I'm entitled to a safe<br>5 and harassment-free work environment,"<br>6 that's true; right?<br>7 A Yes. | |
| 26. | 104:15-19 | 15 Q Okay. Now, certainly if Ramon Martinez were<br>16 yelling at him and threatening him, that would violate<br>17 Tesla's policies; right? -- at least the threatening<br>18 part?<br>19 A Yes. Assuming it's Ramon Martinez. | |
| 27. | 108:4-109:12 | 4 Exhibit 35 for the record is a three-page<br>5 document Bates-stamped Tesla 140 to 142. And it appears<br>6 that at least in this situation with respect to Ramon<br>7 Martinez and Owen Diaz, that eventually at least it got<br>8 forwarded to you.<br>9 Do you see that?<br>10 A Yes. | **105:22-106:9**<br><br>22 **Q Exhibit 155 for the record is a one-page**<br>23 **document Bates-stamped Tesla 61. We've already seen the**<br>24 **bottom part of this message. There's just an email at** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 11 Q And so at least at some point you did get 12 Mr. Diaz's statement about his -- the threat that he 13 perceived from Ramon Martinez; correct? 14 A Owen's statement? 15 Q Yeah. 16 A Assuming this whole thread was actually 17 forwarded at the time? 18 Q Yeah. 19 A Yes. If it was, I can't say for sure. 20 Q Okay. But based on the email chain, I mean, 21 it looks like it was forwarded to you. Do you see that? 22 A Correct. 23 Q Okay. 24 A Several days later; right? Yeah. 25 Q Yeah. 1 made on the 17th, and then 2 forwarded again on the 20th to Wayne Jackson, and then 3 it looks like Wayne Jackson forwarded it to you on that 4 same day, on the 20th. 5 A Terri. 6 Q I'm sorry. Terri. 7 A Yeah. 8 Q Terri forwarded it to you that same day, 9 October 20th of 2015; right? 10 A Yes. And based on that, it would appear that 11 it was all nextSource employees involved, other than 12 Victor and Ed. | 25 **the top which is from Tom Kawasaki to Wayne Jackson at** 1 **nextSource.** 2 **If I understand it correctly, Mr. Kawasaki,** 3 **assuming he's a supervisor in the area where Owen Diaz** 4 **worked, it would be his responsibility to forward any** 5 **complaints such as Mr. Diaz's complaint to the** 6 **contracting agency and to Tesla's HR; is that correct?** 7 A If he was a Tesla employee, I would expect 8 that he would go through Tesla HR to then loop in the 9 appropriate either temporary or contract company. **106:15-22** 15 **If Mr. Kawasaki wasn't a Tesla employee, then** 16 **sending it to Wayne Jackson would have been the correct** 17 **procedure; is that correct?** 18 A Assuming he worked for -- what is it, 19 nextSource that Wayne is? 20 **Q Yeah, yeah.** 21 A I believe so, but I don't know what their 22 procedures were for their supervisors. **107:5-108:02** 5 **Q Exhibit 191 for the record is a one-page** 6 **document Bates-stamped nextSource 101, and it's some** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|-----|-------|--------------------|-------------------------------|
|     |       |                    | 7 **emails from October 19th and 20th. And I'll just point** 8 **your attention to the top email.** 9 A Okay. 10 **Q So where Terri Garrett says here to Wayne** 11 **Jackson that they needed to get the employees'** 12 **statements and other witness statements to Tesla HR** 13 **today, that, again, is in line with the working** 14 **relationship between the different human resource** 15 **departments; is that correct?** 16 A Correct. And I do recall having to push on 17 behalf of Tesla to get things from -- 18 **Q From nextSource?** 19 A Yes. 20 **Q Okay. So --** 21 A Not necessarily related to this one, but just 22 in general. 23 **Q Okay. So in general, you had -- sometimes you** 24 **had to push nextSource to get you the information you** 25 **needed so that you could evaluate –** 1 A And go about things the way that we had asked 2 them to go about them. **109:13-18** 13 **Q Okay. And it looks like maybe Ed was talking** 14 **about getting involved here, and Terri Garrett was** 15 **asking for your help as to whether or not Mr. Romero** |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | | 16 **should be involved in the investigation; right?** 17 A It looks like she wants him not to be 18 involved. **110:1-6** 1 **Q So the reason you would have canceled Ed --** 2 **Ed's investigation into this is because it appeared to** 3 **you that nextSource should be doing the investigation;** 4 **right?** 5 A Yeah, I believe she said that two out of the 6 three had already been spoken to. |
| 28. | 116:22-25 | 22 Q And the correct response to threatening 23 conduct is to remove that individual from the factory; 24 right? 25 A Correct. | **115:1-21** 1 **Exhibit 65 for the record is a two-page** 2 **document Bates-stamped Tesla 127 and 128, and it's a** 3 **series of emails starting on November 6th of 2015 and --** 4 **at 12:12 a.m., and then going until 7:18 p.m. on that** 5 **same date.** 6 **Ed Romero sends the email down at the bottom** 7 **to Wayne Jackson, copied to Victor Quintero and Jaime** 8 **Salazar.** 9 **Who was Jaime Salazar? Was that another** 10 **supervisor?** 11 A I remember the name as being part of that 12 group. I can't recall if he was a supervisor or not. I 13 don't remember his job title. 14 **Q Okay. And then it appears based on** |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|-----|-------|--------------------|------------------------------|
| | | | 15 **Mr. Romero's statement that he was able to confirm** 16 **through a witness, Yordano Ramirez, if you look at the** 17 **last page of Exhibit 65, that in fact Mr. Ramirez had** 18 **witnessed Rothaj Foster conduct himself in a threatening** 19 **manner towards Owen Diaz.** 20 **Do you see that?** 21 A Yes. **116:1-21** 1 **On the first page, Ed Romero says that:** 2 **"I had Rothaj Foster removed from the** 3 **Tesla premises last night at 10:00 p.m. The** 4 **reason is that he was conducting himself in a** 5 **threatening manner against Owen Diaz."** 6 **Then if you move up a little bit, Victor** 7 **Quintero says:** 8 **"I agree that the employee should not be** 9 **allowed to return."** 10 **And then after that, it was sent to you.** 11 **Do you see that?** 12 A Yes. 13 **Q Does it appear to you that the correct** 14 **procedure, at least with respect to Rothaj Foster, was** 15 **followed?** 16 A Yes. 17 **Q It appears they investigated, they got witness** 18 **statements and then made a decision that Mr. Foster** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|-----|-------|--------------------|------------------------------|
| | | | 19 **should not be there because he was engaging in** 20 **threatening conduct; right?** 21 A Correct. |
| 29. | 119:23-120:04 | 23 Q Okay. But if an allegation of racist -- of a 24 racial term, particularly if it's the n-word, is 25 confirmed, that's the kind of information that 1 supervisors and managers such as Ed Romero and Victor 2 Quintero were trained to at least forward to HR; 3 correct? 4 A Yes. | |
| 30. | 123:09-123:18 | 9 Q But any worker who is subject -- who is 10 working in the Tesla factory is subject to Tesla 11 policies; correct? 12 A Yes. 13 Q And -- and any worker who is being harassed or 14 discriminated against, regardless of who they work for, 15 if -- if the harassment or discrimination occurs in the 16 Tesla factory, Tesla has a responsibility to do 17 something about it if it knows about it; right? 18 A Yes. | |
| 31. | 133:16-23 | 16 Q I do understand that. I'm wondering, 17 though – we've looked at some documents which showed 18 numerous complaints about the n-word, several complaints 19 about the n-word, and I'm wondering if there was any 20 kind of discussion in human resources that there was a 21 need to address the use of that word in particular in 22 the workplace. 23 A Not that I recall. | Relevance and unduly prejudicial.  The references to "numerous complaints about the n-word" relate to incidents that did not involve Mr. Diaz and about which Mr. Diaz had no personal knowledge.  Tesla also refers to and incorporates the arguments in its MIL No. 4.  If testimony allowed, counter designate:  **133:3-15**  **Q In terms of prevention of harassment based on** |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | | 4 **race, are you aware of anything in particular that Tesla** 5 **did other than have its onboard training and the annual** 6 **training you talked about for supervisors?** 7 **Was there anything other than that to prevent** 8 **racial discrimination or harassment in the workplace?** 9 A As I already mentioned, like when things came 10 up, they would be addressed. It just wasn't tolerated. 11 But I don't recall anything specific, unless 12 it was -- with 5,000 people in a building, if I had an 13 issue with a group of 30, I would definitely address it 14 with those 30 without giving an idea to the other 4,700. 15 Does that make sense? |

**McGinn, Kevin 6/17/19, Volume 1**

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| 1. | 7:21-7:23 | 21 MR. ORGAN: Q. Could you please state and 22 spell your full name for the record. 23 A. Kevin McGinn; K-E-V-I-N, M-C-G-I-N-N. | |
| 2. | 9:06-9:12 | 06 **Q. When did you -- well, what's your current** 07 **position for nextSource, Inc.?** 08 A. I'm the chief financial officer for 09 nextSource, Inc. 10 **Q. And where are you located? Where is your** 11 **office?** 12 A. Based in Nashville, Tennessee. | |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| 3. | 99:6-9; 99:14-99:18 | **06 Q. But in terms of your suppliers, the companies** <br> **07 like CitiStaff and Chartwell, they're essentially just** <br> **08 providing employees to Tesla to work in Tesla's** <br> **09 factory; is that correct?** <br><br> 14 THE WITNESS: The supplier will, in the <br> 15 course of their employment of the worker, will <br> 16 recruit, onboard, and pay the worker. They place that <br> 17 worker at the Tesla site, who then works under the <br> 18 day-to-day direction and control of Tesla. | **Objection: relevance, calls** <br><br> **for speculation,** <br><br> If allowed, <br><br> counterdesignation: <br><br> **97:14-24** <br><br> 14 Q. So in other words, Mr. Diaz's relationship, <br> 15 as I understand it then, is that of -- he -- Mr. Diaz <br> 16 was working for a contractor supplier of nextSource, <br> 17 pursuant to nextSource's contract with Tesla; is that <br> 18 right? <br> 19 **A. Yes.** <br> 20 Q. Okay. In terms of Mr. Diaz's communications <br> 21 to Wayne Jackson through this email, was that an <br> 22 appropriate way for Mr. Diaz to complain to nextSource <br> 23 relative to the race harassment he felt he was being <br> 24 exposed to? <br><br> **99:2-4** <br><br> 2 THE WITNESS: I can't speculate on the <br> 3 specifics between the employer, supplier and employer, <br> 4 and their employee. I could not speculate on that. |
| 4. | 106:24-108:08 | **24 Q. So we were talking about the process that** <br> **24 Wayne Jackson was supposed to go through.** <br><br> **01 One thing that Mr. Jackson was** | **104:18-105:10** <br><br> 18 Q. And who was the program team for nextSource <br> 19 working at Tesla in late 2015, early 2016? |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | **supposed to do** <br> **02 was to act as a liaison between Tesla and CitiStaff;** <br> **03 is that correct?** <br> 04 A. Correct. <br> **05 Q. And another thing that Mr. Jackson was** <br> **06 supposed to do was to gather information relative to 07 Mr. Diaz's complaint; correct?** <br> 08 A. When Mr. Jackson was made aware of the <br> 09 complaint, he gathered facts. <br> **10 Q. Okay. And then another thing Mr. Jackson was** <br> **11 supposed to do was to confer with his boss, Terry** <br> **12 Garrett, about what steps to take for -- relative to** <br> **13 nextSource; correct?** <br> 14 A. I would push back a little bit on what to do <br> 15 next for nextSource. This was not deemed to be a <br> 16 nextSource issue, so what Wayne was doing was -- my <br> 17 understanding was gathering the facts, taking <br> 18 statements, and then his disposition would be to bring <br> 19 that to Tesla on the client side and then the supplier <br> 20 for which the offending person would have worked. <br> **21 Q. In terms of how Mr. Jackson was supposed to** <br> **22 bring the issues relating to Owen Diaz's complaint and** <br> **23 his investigation to Tesla, was there a particular** <br> **24 person that he was supposed to bring that information** <br> **25 to at Tesla?** <br><br> 01 A. Yes, so concurrent with Mr. Diaz advising | 20 **A. Mr. Wayne Jackson.** <br> 21 Q. What was the protocol for Mr. Jackson to <br> 22 follow, in terms of keeping nextSource informed about <br> 23 his investigation of Mr. Diaz's complaint? <br> 24 **A. So as Mr. Jackson would be gathering** <br> 25 **statements -- again, fact gathering he might confer** <br><br> 1 **with his supervisor, which would be logical. He'd** <br> 2 **want to bounce ideas off his supervisor and share the** <br> 3 **facts.** <br> 4 Q. Who was Mr. Jackson's supervisor in late <br> 5 2015, early 2016? <br> 6 **A. That would have been Terry Garrett. I** <br> 7 **believe her title is director, division director,** <br> 8 **something.** <br> 9 Q. Director of operations? <br> 10 **A. Yes.** <br><br> **108:19-21** <br><br> 19 Q. And then what was -- is there anything else <br> 20 you remember about the investigation relative to <br> 21 Mr. Diaz's complaint? <br><br> **108:23-25** <br><br> 23 THE WITNESS: I mean, we're in some detailed <br> 24 fact pattern here. My understanding is he talked to <br> 25 Diaz and – <br><br> **109:1-11** <br><br> 1 MR. ORGAN: Q. Wayne Jackson? |

| NO. | LINES | DEPOSITION EXCERPT | OBJECTION/ COUNTERDESIGNATION |
|---|---|---|---|
| | | 02 Mr. Jackson, Wayne Jackson about the claim, the –<br>03 remember I mentioned earlier, there was a series of<br>04 department managers. Well, the affected department<br>05 manager, I believe the name is Victor Quintero,<br>06 brought -- advised Wayne of the claim, complaint, and<br>07 Wayne was fact gathering and would have brought the<br>08 information back to Victor Quintero. | 2 **A. Yes, sorry.**<br>3 **Wayne Jackson took a statement from Diaz. I**<br>4 **want to say talk. He took a statement from Diaz. I**<br>5 **don't know if it was in person or just, you know, via**<br>6 **phone or something. And he memorialized essentially**<br>7 **the same, you know, brushes of the complaint by Diaz.**<br>8 **So, in other words, you know, filling in details**<br>9 **around the incident. So I don't know what more**<br>10 **Mr. Jackson would have done beyond that.** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   DATED:  February 13, 2023                    QUINN EMANUEL URQUHART &
                                                 SULLIVAN, LLP

2

3

4                                                By:        */s/ Daniel C. Posner*
                                                 QUINN EMANUEL URQUHART &
5                                                SULLIVAN, LLP
                                                 Alex Spiro (appearance *pro hac vice*)
6                                                alexspiro@quinnemanuel.com
                                                 51 Madison Ave., 22nd Floor
7                                                New York, NY 10010
                                                 Telephone: (212) 849-7000
8                                                Facsimile: (213) 443-3100

9                                                Daniel C. Posner
                                                 Mari F. Henderson
10                                               865 S. Figueroa St., 10th Floor
                                                 Los Angeles, California 90017
11                                               Telephone: (213) 443-3000

12
                                                 Asher Griffin (appearance *pro hac vice*)
13                                               ashergriffin@quinnemanuel.com
                                                 300 W. 6th St., Suite 2010
14                                               Austin, TX 78701
                                                 Telephone: (737) 667-6100
15
                                                 *Attorneys for Defendant Tesla, Inc.*
16

17   09202-00012/13871833.2

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DESIGNATION OF DEPOSITION TESTIMONY