Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

```
                                                    Volume 3
                                            Pages 369 - 544

              UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

       BEFORE THE HONORABLE WILLIAM H. ORRICK

DEMETRIC DI-AZ, OWEN DIAZ AND    )
LAMAR PATTERSON                  )
                                 )
                                 )
            Plaintiffs,          )
  vs.                            ) No. C 17-6748 WHO
                                 )
TESLA, INC., dba TESLA MOTORS,   )
INC., CITISTAFF SOLUTIONS, INC., )
WEST VALLEY STAFFING GROUP,      )
CHARTWELL STAFFING SERVICES, INC.,)
and DOES 1-50, inclusive,        )
                                 ) San Francisco, California
            Defendants.          ) Wednesday
                                 ) September 29, 2021
_____) 8:00 a.m.

         TRANSCRIPT OF JURY TRIAL PROCEEDINGS
APPEARANCES:

For Plaintiffs:      ALEXANDER MORRISON & FEHR LLP
                     1900 Avenue of the Stars
                     Suite 900
                     Los Angeles, California 90067
               BY:   BERNARD ALEXANDER, ESQ.

                     CALIFORNIA CIVIL RIGHTS LAW GROUP
                     332 San Anselmo Avenue
                     San Anselmo, California 94960
               BY:   LAWRENCE A. ORGAN, ESQ.
                     CIMONE A. NUNLEY, ESQ.

       (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR
               Official Reporter - US District Court
               Computerized Transcription By Eclipse
```

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

```
                                                          370
APPEARANCES:  (CONTINUED)

For Defendants:      SHEPPARD MULLIN RICHTER & HAMPTON LLP
                     333 S. Hope Street
                     43rd Floor
                     Los Angeles, California 90017
               BY:   TRACEY A. KENNEDY, ESQ.

                     SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                     379 Lytton Ave
                     Palo Alto, California 94301
               BY:   PATRICIA M. JENG, ESQ.

                     SHEPPARD MULLIN RICHTER & HAMPTON LLP
                     Four Embarcadero Center
                     17th Floor
                     San Francisco, California 94111
               BY:   SUSAN Q. HAINES, ESQ.

Also Present:        JOSEPH ALM, ESQ.
                     - Tesla, Inc.

                     YUSUF MOHAMED, ESQ.
                     - Tesla, Inc.

                     VALERIE CAPERS WORKMAN
                     - Tesla, Inc.

                           _   _   _
```

---

371

PROCEEDINGS

1  Wednesday - September 29, 2021                   8:01 a.m.
2                P R O C E E D I N G S
3                       ---o0o---
4       (Proceedings were heard out of presence of the jury.)
5            THE COURT:  All right.  There are two things on my
6  mind this morning.  One is the counter designations and
7  objections regarding Erin Marconi.  And I think in every
8  instance I'm going to overrule the objection to the counter
9  designation and overrule the objection to the testimony.  So
10 all of the testimony can come in that the parties are
11 interested in.
12           MR. ORGAN:  Your Honor, just a question on that then.
13 With respect to how they are presented, do you want the
14 designations presented with the counter designations then
15 together?
16           THE COURT:  Yeah, I think that's the smoothest way of
17 dealing with things.
18           MR. ORGAN:  So we'll have one video.
19           THE COURT:  One video.
20           MR. ORGAN:  In terms of the time, Your Honor --
21           THE COURT:  You time it yourself.
22           MR. ORGAN:  We'll produce that tonight.  So we'll --
23 it's our intent to present it, then, tomorrow, Your Honor.
24           THE COURT:  Great.
25           MR. ORGAN:  Okay.  Thank you.

---

372

PROCEEDINGS

1       THE COURT:  All right.  And then the other thing I
2  just wanted to mention, yesterday I allowed Wayne Jackson to
3  testify about his experience of hearing the "N" word throughout
4  the factory.  And on Monday I admitted Exhibit 106 concerning
5  Mr. Romero's credibility regarding his hearing of the "N" word.
6       I did so because it appears from Tesla's presentation of
7  the case, from the opening of the argument to the designations
8  in the depositions, that it wishes to minimize the use of the
9  "N" word in the workplace at Tesla, which is fine, but so this
10 counter evidence I think is relevant.
11      I am willing and inclined to give the jury a further
12 limiting instruction, and I can do that this morning.  It would
13 be primarily at the defendant's -- I'll let the defendant
14 decide whether this is something that you would like or not,
15 but it would be to the effect of:
16      As you know, I admitted Exhibit 106 for the limited
17 purpose of your consideration of the credibility of
18 Mr. Romero's testimony.  And yesterday I allowed Mr. Jackson to
19 testify about his experience hearing the "N" word in the Tesla
20 factory.
21      I want to remind you that this case is about Mr. Diaz and
22 the work environment that he experienced at the Tesla factory,
23 not what others in a different part of the facility
24 experienced.
25           MS. KENNEDY:  Yes, Your Honor, that would be

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

429
WHEELER - DIRECT / ALEXANDER
1  derogatory language used towards African-Americans as a spook.
2  Q.   When you observed Owen in front of this bale, how did he
3  appear to you?
4  A.   He seemed -- well, he was upset.
5  Q.   Okay.  And did he actually state that he was upset?
6  A.   No.
7  Q.   Okay.  Now, at some point did Owen Diaz join -- I'm sorry.
8       And with regard to this drawing, did you find it
9  offensive?
10 A.   The drawing, not so much.  The words with the drawing,
11 absolutely.
12 Q.   The words with the drawing?
13 A.   Correct.
14 Q.   And is there some point at which Ramon Diaz [sic] joined
15 the group of people standing there associated with that bale?
16 A.   He did.
17 Q.   And do you know who brought Ramon Diaz [sic] over?
18 A.   Myself and Israel went to go retrieve him.
19 Q.   And at the point when you retrieved him, did you have any
20 understanding that he had any involvement with this drawing?
21 A.   Not at the moment.  We went to go see who was baling.
22 Q.   Okay.  And how long was Mr. Diaz [sic] there before he
23 indicated that he was involved with the drawing?
24      THE COURT:  Mr. Alexander, have you been referring to
25 Mr. Martinez or --

430
WHEELER - DIRECT / ALEXANDER
1       MR. ALEXANDER:  I'm sorry.  Let me fix that.
2       THE COURT:  Okay.  And you might --
3  BY MR. ALEXANDER:
4  Q.   How long was Mr. --
5       THE COURT:  -- want to go back to an earlier question
6  that you asked about "Ramon Diaz" using the "N" word, because I
7  think you meant Mr. Martinez, but I don't know.
8       MR. ALEXANDER:  I do.  I'm sorry.  Thank you.
9  BY MR. ALEXANDER
10 Q.   With regard to use of the word "mayate," did
11 Mr. Ramirez -- Ramon Martinez -- did Ramon Martinez ever use
12 the "N" word or mayate in your presence?
13 A.   Not in my presence.
14 Q.   Okay.  When Mr. Martinez was brought to this drawing, how
15 long was he in front of the drawing before he acknowledged any
16 involvement with it?
17 A.   About five minutes, five to ten minutes.
18 Q.   And ultimately what is it that he finally said after he
19 had been standing there for five minutes?
20 A.   Once he realized the severity of the situation, he said
21 he's the one that drew the drawing.
22 Q.   Now, did he say anything else?  Did Mr. Martinez say
23 anything else during that time frame while you were standing in
24 front of the bale?
25 A.   If I recall correctly, he said he thought it was a joke.

431
WHEELER - DIRECT / ALEXANDER
1  Q.   Did he say anything else?
2  A.   Not to my recollection.
3  Q.   Is there any point while he was standing there that
4  Mr. Martinez apologized?
5  A.   No.
6  Q.   You're sure of that?
7  A.   I am not, but I do not remember an apology.
8  Q.   Okay.  Did Owen say that he thought that it was funny?
9  A.   Owen did not find it funny at any point in time.
10 Q.   Are there any occasions that you reported racial conduct
11 inside the workplace between 2015 and 2016?
12 A.   Yes.
13 Q.   And what incident happened with you that you thought was
14 racially motivated?
15 A.   I was requesting a subordinate to delete a picture that he
16 had taken of another associate, and he refused to do so.  And
17 in leaving, he -- yeah, he said:  FU, "N" word, and then walked
18 away.
19 Q.   And so this person who said "FU" and walked away, did you
20 report it?
21 A.   I did.
22 Q.   And who did you report it to?
23 A.   To my immediate supervisors, Ramon Martinez and --
24 Q.   Ramon Martinez was your immediate supervisor?
25 A.   He was my partner, partner supervisor.  We had two

432
WHEELER - DIRECT / ALEXANDER
1  supervisors for the grave shift.
2  Q.   And so as a result of reporting use of the "N" word
3  towards you to Ramon Martinez, what action was taken?
4  A.   There was no action taken.
5  Q.   Okay.  And the person that had used the "N" word towards
6  you, what ultimately happened to that person in terms of his
7  position at the Tesla factory?
8  A.   That individual received a promotion and was given his own
9  section.
10 Q.   Now, is there any other incident that occurred to you
11 inside the workplace that you believed was racially motivated
12 directed towards you?
13 A.   Yes.
14 Q.   And can you describe that incident?
15 A.   There was a night I had taken -- there was a night I had
16 taken lunch, and I was on my lunch for about an hour.  And then
17 when I returned to my cart, I sat down, slid across the seat
18 like I did every night, and I felt something wet on my seat.
19 And it took me a second to process it.  I got back up and there
20 was feces all over my seat, all over my pants.  There was some
21 on my hands.
22 Q.   And did you report this incident of finding feces on your
23 cart to anyone at Tesla?
24 A.   I did.
25 Q.   Who did you report that to?

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

433
WHEELER - DIRECT / ALEXANDER
1  A.  Umm, everybody.  Security, all the supervisors, Ramon,
2  Jose Torres, Victor Quintero.
3  Q.  Ed Romero?
4  A.  Yes -- uh, I don't -- I do not recall for Ed, but...
5  Q.  So the department that you worked in, Victor Quintero was
6  ultimately over your department?
7  A.  Absolutely, yes.
8  Q.  So you reported it to numerous people in management and
9  supervision inside Tesla; right?
10 A.  I did, yes.
11 Q.  Now, the location where you found your cart with feces on
12 it, were there cameras?
13 A.  There were.
14 Q.  Can you estimate how many cameras were present?
15 A.  At least two.
16 Q.  And from where those cameras were present, would it have
17 been -- is it your belief that those cameras would have caught
18 whoever left this on your cart?
19         MS. JENG:  Objection.  Calls for speculation.
20         THE COURT:  Overruled.  You can answer.
21         THE WITNESS:  Absolutely.  I parked my cart next to
22 Elon's original roadsters where the charging stations were.
23 BY MR. ALEXANDER
24 Q.  And did you ask for Tesla to look at the video to figure
25 out who had left this feces on your cart?

434
WHEELER - CROSS / JENG
1  A.  I did.
2  Q.  And did Tesla conduct an investigation to your knowledge?
3  A.  They said there was no vision in that area.
4  Q.  They said there was no vision in that area?
5  A.  Correct.
6  Q.  Who is it that told you that?
7  A.  It just came from the security email.
8  Q.  Did anyone ever interview you?
9  A.  No.
10 Q.  Was there any retraining that occurred of the workplace to
11 indicate this was inappropriate?
12 A.  No.
13 Q.  During the time frame that you were at Tesla, did anyone
14 ever train you that Tesla had a zero tolerance policy for
15 harassment in the workplace?
16 A.  Not at all.
17         MR. ALEXANDER:  Nothing further.  Thank you.
18         THE COURT:  Ms. Jeng.
19                CROSS-EXAMINATION
20 BY MS. JENG:
21 Q.  Mr. Wheeler, you started working at the Fremont factory in
22 April of 2015; is that right?
23 A.  Yes.
24 Q.  You worked at the Fremont factory to until approximately
25 April 2016?

435
WHEELER - CROSS / JENG
1  A.  Yes.
2  Q.  You never worked as an elevator operator; right?
3  A.  No.
4  Q.  Okay.  And you were employed by Chartwell throughout your
5  entire assignment at Tesla; correct?
6  A.  Correct.
7  Q.  And you were assigned to Tesla through nextSource; is
8  that right?
9  A.  Yes.
10 Q.  After your assignment ended in April 2017, your employer
11 Chartwell actually placed you at a different assignment; is
12 that right?
13 A.  Yes.
14 Q.  At a bakery?
15 A.  DES, yes.
16 Q.  Okay.  So you were never employed directly by Tesla; is
17 that right?
18 A.  Correct.
19 Q.  Okay.  When you first started your assignment at the
20 factory through Chartwell, you actually received extensive
21 training through Chartwell; is that right?
22 A.  Not extensive but, yes, training.
23 Q.  All right.  Can I direct you to your deposition
24 transcript -- it should be in front you -- Page 47, Line 20
25 through -- one second -- 47, Line 2 -- oh, sorry.  46 -- I'm

436
WHEELER - CROSS / JENG
1  sorry.  46, Line 20 -- sorry.  I'll come back to this.
2        You received certification for harassment training;
3  correct?
4  A.  Can you repeat, please?
5  Q.  Sure.  You actually received a certification for
6  harassment training; correct?
7  A.  I received certification for all training.
8  Q.  I'm sorry.  Say that again.
9  A.  I received certification for all training.
10 Q.  Including harassment training; is that right?
11 A.  I cannot say directly.
12 Q.  Okay.  Okay.  Owen was an elevator lead, to your
13 understanding; correct?
14 A.  Correct.
15 Q.  And as a lead, you were actually Owen's superior; is that
16 right?
17 A.  Correct.
18 Q.  So you were supervising Owen when Owen was a lead;
19 correct?
20 A.  Yes.
21 Q.  Okay.  Ramon Martinez was also a lead; correct?
22 A.  No.  He was a supervisor.
23 Q.  It's your belief that Ramon was a supervisor at the time
24 that you were a supervisor --
25 A.  Yes.

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

485
DIAZ - DIRECT / ORGAN
1  I couldn't -- like I said, I couldn't really get the outlet
2  that I really wanted, but I talked to a few people.
3  Q.  Okay.  You mentioned that you had talked to Demetric a
4  little bit about it; is that right?
5  A.  Yes, I did.
6  Q.  What does the future look like to you?
7  A.  I -- it is what it is, you know.  I have to just survive
8  and just keep going.  You know, we even -- even though at some
9  point, you know, I -- I just -- hopefully, I can just forget
10 and forgive, you know.  I just wish the world was better -- a
11 better place.
12 Q.  And why did you bring this lawsuit?
13 A.  For one, I worked there; and for two, I just want to get
14 it out.
15     You know, as things has been happening, like what happened
16 to Michael Wheeler, people wiping feces on the golf carts and
17 stuff like that, you know, everything has been -- been closed,
18 contained, and there's a lot of these people that want to get
19 the word out but just don't have the outlet like I have right
20 now.
21         MR. ORGAN:  No further questions, Your Honor.
22         THE COURT:  All right.
23         MS. KENNEDY:  May I have two minutes to get set up?
24         THE COURT:  Sure.
25     (Pause in proceedings.)

486
DIAZ - CROSS / KENNEDY
1         MS. KENNEDY:  May I proceed, Your Honor?
2         THE COURT:  Please.
3                   CROSS-EXAMINATION
4  BY MS. KENNEDY
5  Q.  Good afternoon, Mr. Diaz.
6  A.  Good afternoon.
7  Q.  As I understand, you applied for a position with CitiStaff
8  in about June of 2015; is that right?
9  A.  No, that's not right.  I applied for a position with Tesla
10 and I was directed to CitiStaff.
11 Q.  But you filled out a CitiStaff application, would that be
12 correct?
13 A.  First, I filled out whatever application that was on
14 Indeed, and then I was directed over to CitiStaff, and then
15 from there I filled out more application papers.
16 Q.  All right.  Will you turn in your notebook -- it should be
17 the black notebook there -- and go to Exhibit 204, which we'll
18 have marked for identification.
19     (Trial Exhibit 204 marked for identification)
20 Q.  Just for the record, it appears to be a CitiStaff
21 Solutions, Inc. application.  It appears to be two pages.
22     Take a minute to read that, Mr. Diaz.  When you're done,
23 let me know.
24     (Witness complied.)
25 A.  I'm done, ma'am.

487
DIAZ - CROSS / KENNEDY
1  Q.  And on the second page do you recognize your signature?
2  A.  Yes.  That's my signature at the bottom.
3  Q.  Okay.  And did you fill out this application --
4         MR. ORGAN:  Objection, Your Honor.  This is not the
5  agreed-to exhibit.  If you look at Page 2 --
6         THE COURT:  Oh, I see what you're saying.  Yes.
7     Do you have a document that doesn't have the second line
8  there?
9         MS. KENNEDY:  I'm sorry.  I didn't hear you.
10        THE COURT:  Did you agree to --
11        MR. ORGAN:  Yes, Your Honor.
12        THE COURT:  -- alter this document slightly in order
13 to make it admissible?
14        MS. KENNEDY:  Oh.  Yes.  Yes, it's supposed to be
15 redacted at the top.  Yes, that is correct.
16        THE COURT:  Okay.  So I'm not admitting what I've got.
17        MS. KENNEDY:  That's fine.  You're correct.  Thank
18 you.
19 BY MS. KENNEDY
20 Q.  I don't want to show it, but do you recall this
21 application for CitiStaff in June of 2015?
22 A.  Yes.  This is the second time after I was directed from
23 Indeed and I went into CitiStaff's location, they had had me
24 fill this out.
25 Q.  Correct.  My question is:  Do you recall if you filled out

488
DIAZ - CROSS / KENNEDY
1  this handwritten application before you were directed to Tesla?
2  A.  No, I did not fill it out before I was directed with the
3  application.  No.
4     Like I said before, what I did was is, on Indeed -- I
5  filled out an application on Indeed.  Then I was -- I got an
6  email and the email directed me over to CitiStaff; and when I
7  went to CitiStaff, I filled out this paper, ma'am.
8  Q.  Right.  And so once you were directed through Indeed to
9  CitiStaff, then you filled out a CitiStaff application;
10 correct?
11 A.  Yes.  I filled out would have been theirs too.
12 Q.  And then once you filled out the CitiStaff application,
13 you found out you were going to be assigned to work at the
14 Tesla facility in Fremont; is that correct?
15 A.  Yes.  At some point they did, yes, ma'am.
16 Q.  Let's go to Exhibit 62, which I don't believe it was in
17 that notebook, but it was admitted through your counsel.  Maybe
18 in the white notebook, sir.
19     (Document displayed.)
20 Q.  And do you have this in front of you?
21 A.  Yes, I do, ma'am.
22 Q.  And I think you testified that this was your application.
23 Was that your testimony?
24 A.  No, I did not specify this was the application.  This
25 looks like a document that came from Tesla that they were using

Diaz vs Tesla, Inc.
C 17-6748 WHO
Volume 3

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR
Wednesday, September 29, 2021

*Debra L. Pas, CRR*
*Official Reporter - U.S. District Court*
*(415) 431-1477*