QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (appearance *pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Daniel C. Posner (CA Bar No. 232009)
  danposner@quinnemanuel.com
  Mari F. Henderson (CA Bar No. 307693)
  marihenderson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

QUINN EMANUEL URQUHART &SULLIVAN, LLP
  Asher Griffin (appearance *pro hac vice*)
  ashergriffin@quinnemanuel.com
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Defendant Tesla, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| OWEN DIAZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TESLA, INC. d/b/a TESLA MOTORS, INC.,<br><br>　　　　Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**DECLARATION OF DANIEL C. POSNER IN SUPPORT OF TESLA'S NOTICE OF EVIDENCE RE: INCIDENT INVOLVING MICHAEL WHEELER**<br><br>Trial Date: March 27, 2023<br>Time: 8:30 a.m.<br>Place: Courtroom 2, 17th Floor<br>Judge: Hon. William H. Orrick |

## DECLARATION OF DANIEL C. POSNER

I, Daniel C. Posner, hereby declare:

1. I am a member of the State Bar of California and of this Court and am counsel for Defendant Tesla, Inc. ("Tesla") in this matter. I have personal knowledge of the facts set forth in this declaration, and if called as a witness I could and would testify competently thereto.

2. I make this declaration in support of Tesla's Notice of Evidence regarding Plaintiff Owen Diaz's awareness of an alleged incident of harassment involving Michael Wheeler.

3. Attached hereto as Exhibit A is a true and correct copy of excerpted testimony from the December 3, 2018 deposition of Owen Diaz, with the relevant excerpts highlighted.

4. Attached hereto as Exhibit B is a true and correct copy of excerpted testimony from the June 12, 2019 deposition of Michael Wheeler, with the relevant excerpts highlighted.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 3rd day of March 2023 in Los Angeles, California.

*/s/ Daniel C. Posner*
Daniel C. Posner

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   ---------------------------------

 5   DEMETRIC DI-AZ, OWEN DIAZ and                CONDENSED
     LAMAR PATTERSON, an individual,
 6                                                TRANSCRIPT

 7             Plaintiffs,

 8      vs.                          No. 3:17-cv-06748-WHO
                                     VOL II, pgs 187 - 292
 9
     TESLA, INC. DBA TESLA MOTORS,               CONFIDENTIAL
10   INC.; CITISTAFF SOLUTIONS,
     INC.; WEST VALLEY STAFFING
11   GROUP; CHARTWELL STAFFING
     SERVICES, INC. and DOES 1-10,
12   inclusive,

13             Defendants.

14   ---------------------------------

15

16                  CONFIDENTIAL

17            VIDEOTAPED DEPOSITION OF

18                    OWEN DIAZ

19            SAN FRANCISCO, CALIFORNIA

20             MONDAY, DECEMBER 3, 2018

21

22

23   Reported by:

24   GINA V. CARBONE, CSR #8249
     RPR, RMR, CRR, CCRR
25   FILE NO.:  18-27207
```

```
 1  and Tom Kawasaki as people who might have
 2  information regarding the harassing, offensive, and
 3  inappropriate conduct that you experienced while you
 4  were working at the Tesla factory.  Anybody else?
 5      A.  At this particular time, I can't recall.
 6      Q.  What information do you believe Michael
 7  Wheeler has about your claims?
 8      A.  He was present when the picaninny was
 9  found.
10          Michael Wheeler, hisself, was a victim of
11  said harassment.  They had wiped feces on the cart
12  that he was using to harass him.  And you would have
13  to talk to Michael Wheeler.  He can get more in
14  detail with that.
15      Q.  So you said he was present during the,
16  quote, picaninny drawing that was found, correct?
17      A.  Yes.
18      Q.  And you said he "was a victim of said
19  harassment."  What harassment was he a victim of?
20      A.  Discriminatory racial.
21      Q.  What discriminatory or racial conduct?
22      A.  Michael Wheeler is an African-American man.
23      Q.  And what conduct do you believe that he was
24  a victim of?
25      A.  I just said that they had smeared feces
                                                Page 208
```

```
 1  over the utility cart or golf cart that he was
 2  using.  You would have to get more in detail with
 3  that with Michael Wheeler.  I don't want to speak
 4  upon his feelings.  He can relay that to you more
 5  hisself.
 6      Q.  And what other conduct do you believe he
 7  was the victim of besides the feces?
 8      A.  You would have to ask Michael Wheeler.
 9      Q.  I'm asking you, though.
10      A.  I'm just saying, reason being, is just he
11  can give you a little bit more in detail of what
12  happened to him.  I can just -- I just told you the
13  feces, the harassment.  That's basically what I know
14  what he had -- he had went through.
15          So in order to get details that you're
16  trying to get, you'd have to ask Mr. Wheeler.
17      Q.  But he discussed some conduct that you
18  believe was harassing towards him with you, correct?
19      A.  Yes.
20      Q.  Okay.  Besides the feces, what other
21  conduct that you believe was harassment did he
22  discuss with you?
23      A.  Being called the N-word.  Stuff like that.
24      Q.  Anything else?
25      A.  Not that I can recall at this particular
                                                Page 209
```

```
 1  moment.
 2      Q.  Did he tell you who had wiped feces on the
 3  cart?
 4      A.  I believe he was trying to get Ed Romero,
 5  Jaime Salazar, and Victor Quinterez (verbatim) to
 6  pull video surveillance of it.
 7      Q.  Do you know who had wiped feces on the
 8  cart?
 9      A.  No.
10      Q.  Did he ever tell you if he found out who
11  had wiped feces on the cart?
12      A.  I don't recall.
13      Q.  Did he ever tell you whether Edward Romero,
14  Victor Quintero, and Jaime Salazar had pulled the
15  video?
16      A.  He was pretty upset about them sweeping it
17  under the rug.
18      Q.  He told you that?
19      A.  Yes.
20      Q.  Do you know if he -- if the video was ever
21  pulled?
22      A.  No.  I don't know.
23      Q.  Do you know what happened as a result of
24  Mr. Wheeler having told you that feces were wiped on
25  the cart?
                                                Page 210
```

```
 1          MR. ORGAN:  Objection.  Vague and
 2  ambiguous.
 3          THE WITNESS:  You'd have to ask
 4  Mr. Wheeler.
 5  BY MS. ANTONUCCI:
 6      Q.  Do you know if any actions were taken as a
 7  result of feces being wiped on the cart?
 8      A.  I don't believe there were.
 9      Q.  Why don't you believe there were?
10      A.  He was pretty adamant about the situation.
11      Q.  What does that mean?
12      A.  It was just another incident that was swept
13  under the rug by the company.  He felt that -- well,
14  I'm saying that he felt that he was being treated
15  less than a human being.
16      Q.  Did he tell you that?
17      A.  Not in words.  No.
18      Q.  What did he tell you about the incident of
19  the feces on the cart?
20      A.  He mentioned it.
21      Q.  What did he tell you about it?
22      A.  He told me he went to go get the cart from
23  the charging station.  When he got ready to sit in
24  the cart, he noticed that it was feces and on the --
25  I believe it was the steering wheel and the seat.
                                                Page 211
```

```
 1  He kind of asked -- I believe he asked what was some
 2  of his recourses that he could take.
 3       Q.  Who did he ask what recourses he could
 4  take?
 5           MR. ORGAN:  Objection.  Calls for
 6  speculation.
 7           THE WITNESS:  I can't recall.
 8  BY MS. ANTONUCCI:
 9       Q.  Did he tell you anything else about the
10  feces on the cart?
11       A.  Not that I can recall at this time.
12       Q.  You also mentioned that Mr. Wheeler told
13  you he was called the N-word; is that right?
14       A.  I believe so.  Yes.
15       Q.  What did he tell you about that?
16       A.  I can't recall this particular one.
17       Q.  Did he tell you who called him the N-word?
18       A.  I can't recall.
19       Q.  Did he tell you whether he reported the
20  N-word?
21       A.  I can't recall.
22       Q.  Did he tell you if any actions were --
23  resulted from his report of the N-word?
24       A.  I can't recall.
25       Q.  Did he tell you if anybody witnessed him
                                              Page 212
```

```
 1  being called the N-word?
 2       A.  I can't recall.
 3       Q.  Did he tell you the context of how he was
 4  called the N-word?
 5       A.  I can't recall.
 6       Q.  Did he tell you if he witnessed someone
 7  calling him the N-word?
 8       A.  He told me someone called him, so yes.
 9       Q.  Did he tell you how many times he was
10  called the N-word?
11       A.  I don't believe that ever came up in the
12  conversation.
13       Q.  Do you know -- only know about one incident
14  in which he was called the N-word?
15       A.  I can't recall at this moment.
16       Q.  And you can't tell me anything else about
17  how the N-word was used towards Mr. Wheeler?
18       A.  I wasn't present for the situation, so no.
19       Q.  Did he tell you anything about how the
20  N-word was used?
21       A.  Not that I can recall.
22       Q.  Any other information that Michael Wheeler
23  might have about your claims?
24           MR. ORGAN:  Objection.  Vague and
25  ambiguous.  Calls for speculation.
                                              Page 213
```

```
 1           THE WITNESS:  You'd have to talk to Michael
 2  Wheeler.
 3  BY MS. ANTONUCCI:
 4       Q.  I'm asking you.
 5       A.  I don't know.  I don't know.
 6       Q.  Did you and Michael Wheeler ever discuss
 7  any other incidents of harassment or discrimination?
 8       A.  It's a possibility.
 9       Q.  Can you remember anything you discussed
10  beyond what you've told me?
11       A.  I can't recall at this particular moment.
12       Q.  Did Michael Wheeler ever witness any of the
13  incidents that you found to be offensive while you
14  were working at the Tesla factory?
15       A.  It's a possibility.
16       Q.  Which incidents do you believe he
17  witnessed?
18       A.  I don't know.
19       Q.  Did you ever report any of the incidents
20  that you found offensive while you were working at
21  the Tesla factory to Michael Wheeler?
22       A.  Yes.
23       Q.  Which incidents did you tell Michael
24  Wheeler about?
25       A.  Picaninny.
                                              Page 214
```

```
 1       Q.  Anything else?
 2       A.  I can't recall at this moment.
 3       Q.  What did you tell him about the picaninny?
 4       A.  I had called him to see if -- what are his
 5  memories because he was out on the recycling --
 6  doing the recycling at that particular point.  He
 7  had came upstairs, him and I believe it was Israel,
 8  or maybe Ishmael.  I believe it was Israel.
 9           They came upstairs.  I had explained to
10  them where I was sitting at.  I had to leave and
11  deal with the elevator staff, but yes.
12       Q.  Do you know what actions Michael Wheeler
13  took as a result of you telling him about the
14  picaninny?
15       A.  No.
16       Q.  And by "the picaninny," are you referring
17  to the drawing that was on the bale of cardboard
18  that you told me about during your last deposition?
19       A.  Yes.
20       Q.  I believe you said Tom Kawasaki also has
21  information about your claims?
22       A.  Yes.
23       Q.  What information do you believe Tom
24  Kawasaki has?
25       A.  It was the -- I complained to Tom Kawasaki
                                              Page 215
```

```
 1        I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,
 2 CCRR, certify: that the foregoing proceedings were taken
 3 before me at the time and place herein set forth; at
 4 which time the witness was duly sworn; and that the
 5 transcript is a true record of the testimony so given.
 6
 7        Witness review, correction and signature
 8 was
 9 (X) by code.            (X) requested.
10 ( ) waived.             ( ) not requested.
11 ( ) not handled by the deposition officer due to
12 party stipulation.
13
14        The dismantling or unbinding of the original
15 transcript will render the reporter's certificate null
16 and void.
17        I further certify that I am not financially
18 interested in the action, and I am not a relative or
19 employee of any attorney of the parties, nor of any of
20 the parties.
21        Dated this 7th day of December, 2018.
22
23        _____
24             GINA V. CARBONE
25        CSR #8249, STATE OF CALIFORNIA
```

Page 292

# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
-------------------
DEMETRIC DIAZ, OWEN DIAZ, and   )
LAMAR PATTERSON,                )
        Plaintiffs,   ) CASE NO.
vs.                   ) 3:17-CV-06748-WHO
TESLA, INC. dba TESLA MOTORS,   )
INC.; CITISTAFF SOLUTIONS,      )
INC.; WEST VALLEY STAFFING      )
GROUP; CHARTWELL STAFFING       )
SERVICES, INC.; and DOES 1-50,  )
inclusive,                      )
        Defendants.   )
-------------------

DEPOSITION OF MICHAEL JOHN WHEELER
WEDNESDAY, JUNE 12, 2019

Reported by:
BY: MELINDA M. SELLERS, CSR# 10686, RMR, CRC, CRR, CCRR

Page 2

9   Deposition of MICHAEL JOHN WHEELER, taken on
10  behalf of PLAINTIFFS, at 180 Grand Ave., Suite 1380,
11  Oakland, California, commencing at 12:18 p.m.,
12  WEDNESDAY, JUNE 12, 2019, before Melinda M. Sellers,
13  Certified Shorthand Reporter No. 10686, pursuant to
14  Notice.

Page 3

1   APPEARANCES OF COUNSEL:
2   FOR PLAINTIFFS:
3       CALIFORNIA CIVIL RIGHTS LAW GROUP
4       BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW
5       332 San Anselmo Avenue
6       San Anselmo, California 94960-2664
7       Telephone: (415) 453-4740
8       Email: larry@civilrightsca.com
9
10  FOR DEFENDANT TESLA, INC.:
11      SHEPPARD MULLIN RICHTER & HAMPTON LLP
12      BY:  PATRICIA M. JENG, ATTORNEY AT LAW
13      Four Embarcadero Center, 17th Floor
14      San Francisco, California 94111-4109
15      Telephone: (415) 434-9100
16      Email: pjeng@sheppardmullin.com
17
18  FOR DEFENDANT NEXTSOURCE, INC.:
19      FISHER PHILLIPS LLP
20      BY:  VINCENT J. ADAMS, ATTORNEY AT LAW
21      One Embarcadero Center, Suite 2050
22      San Francisco, California 94111
23      Telephone: (415) 490-9036
24      Email: vadams@fisherphillips.com
25

Page 4

1   APPEARANCES OF COUNSEL (CONTINUED):
2   FOR DEFENDANT CITISTAFF SOLUTIONS, INC.:
3       LAFAYETTE & KUMAGAI
4       BY:  SUSAN T. KUMAGAI, ATTORNEY AT LAW
5       1300 Clay Street, Suite 810
6       Oakland, California 94612
7       Telephone: (415) 357-4600
8       Email: skumagai@lkclaw.com
9
10  ALSO PRESENT:
11      SAJA SPEARMAN, INTERN/VIDEOGRAPHER

Page 57

1  A. I feel like -- I hope I attached that in
2  the email.
3  Q. Okay. After this incident with the feces
4  on the seat, did anything -- was there anything else
5  other than that that happened to you, other than
6  that and the N-word incident that you felt was --
7  well, strike that.
8  ==Do you think that the feces was put on your==
9  ==seat in part because you were African-American?==
10 ==A. I could assume that, but I can't say for==
11 ==sure. So I will not say that. I will say it was an==
12 ==act against me, but it could have been anyone.==
13 Q. What was the timing of that? Do you
14 remember when that was?
15 A. Timing --
16 Q. The feces on the seat.
17 A. It would have had to have been 2:00 a.m. to
18 3:00, in between there. Would have been when I
19 would have taken my lunch.
20 Q. Okay. In terms of -- this was after you
21 became a supervisor --
22 A. Yes.
23 Q. -- right?
24    And you were issued the cart after you
25 became a supervisor; is that right?

Page 58

1  A. This is the specific cart that only we use
2  in recycling, the supervisors, on morning, swing,
3  and grave. So it's the only one in the factory.
4  Very distinguishable.
5  Q. Okay.
6  MS. KUMAGAI: Counsel, when it's a good time,
7  can we take a short break?
8  MR. ORGAN: Sure.
9  MS. KUMAGAI: I just want to get some water.
10 MS. SPEARMAN: Off the record at 1:21 p.m.
11    (Recess taken.)
12 MS. SPEARMAN: We are back on the record at
13 1:29 p.m.
14 BY MR. ORGAN:
15 Q. Did you ever follow up with Victor Quintero
16 to find out if he had done anything about the feces
17 on the seat?
18 A. That would all be in the emails.
19 Q. Okay.
20 A. Any exchange back and forth, that was all
21 done through email.
22 Q. Okay. Were there any other pictures you
23 took of things that happened to you that you can
24 recall reporting?
25 A. Not that I can -- no, I don't think so.

Page 59

1  Q. Okay.
2  A. Just safety hazards around the workplace.
3  Q. Okay. Tell me about the safety hazards
4  around the workplace that you observed.
5  A. If you guys -- I'm sorry. I don't know if
6  you guys ever have driven past Tesla, but if you
7  have, a couple years ago there was a giant grim
8  reaper that they had posted outside of Tesla, some
9  workers. Because, I don't know, that place is a
10 very unsafe place to work and people get injured all
11 the time, fingers crushed, I'm not gonna say legs
12 severed, but hit by forklifts, fires. I think we
13 had a couple deaths while I was there. But yeah.
14 Q. Let me stick with the racial stuff. At
15 some point in time, Owen came to you and complained
16 about something -- about something that happened to
17 him, right?
18 A. Yes. So the specific incident is the
19 elevator incident --
20 Q. Okay.
21 A. -- involving Ramon.
22 Q. Okay.
23 A. Or --
24 Q. Ramon Martinez?
25 A. Yes.

Page 60

1  Q. Okay. I'm just gonna -- I'm gonna show you
2  what's been previously marked as --
3  A. The pictures --
4  Q. -- Exhibit 128.
5     I don't know why I only have two copies. I
6  apologize, Counsel. It's Exhibit 128.
7     So Exhibit 128, for the record, is a
8  four-page document Bates-stamped TESLA 20 to 24 --
9  or 23, and it's got some pictures at the end of the
10 email from Mr. Diaz to Ed Ramiro.
11    Did you ever see the email that was --
12 that's on page 22, the third page?
13 A. I did not see the emails --
14 Q. Okay.
15 A. -- involving this incident. But I did see
16 the bale.
17 Q. You saw the actual --
18 A. I saw the actual bale.
19 Q. So you saw the bale of cardboard that's in
20 Exhibit 128 that has the Picaninny and the "Boo"
21 underneath, correct?
22 A. Yes.
23 Q. And tell me, what were the circumstances in
24 which you happened to see the actual picture, which
25 is -- I guess a close-up of it is the fourth page of

Page 129

1     MR. ORGAN:  Okay.
2     MS. KUMAGAI:  I just wanted to go around
3  before --
4
5            FURTHER EXAMINATION
6  BY MS. KUMAGAI:
7     Q.  Just to close the loop on my prior
8  questioning, about your conversations with CitiStaff
9  now that Tesla's counsel, I guess, refreshed your
10 recollection that you got your tire assembly job
11 through CitiStaff --
12    A.  Yes.
13    Q.  -- is that right?  Okay.
14        Prior to applying to CitiStaff, did you
15 have any conversations with Owen Diaz about
16 CitiStaff?
17    A.  Not that I can recall.
18    Q.  Okay.  And after you applied to CitiStaff,
19 do you recall conversations with anybody at
20 CitiStaff regarding any incidences that you were
21 aware of at Tesla?
22    A.  None at all.
23    MS. KUMAGAI:  Okay.  That's all I have.
24    MR. ORGAN:  Okay.
25    MS. SPEARMAN:  This adjourns the deposition of

Page 130

1  Michael Wheeler.  The time is now 2:59 p.m.
2     (The deposition proceedings concluded
3  at 2:59 p.m.)
4
5
6            _____
7            MICHAEL JOHN WHEELER

Page 131

1  STATE OF CALIFORNIA   )
2                        ) ss
3  COUNTY OF CALAVERAS   )
4        I hereby certify that the witness in the
5  foregoing deposition of MICHAEL JOHN WHEELER was by
6  me duly sworn to testify to the truth, the whole
7  truth, and nothing but the truth in the
8  within-entitled cause; that said deposition was taken
9  at the time and place herein named; that the
10 deposition is a true record of the witness's
11 testimony as reported by me, a duly certified
12 shorthand reporter and a disinterested person, and
13 was thereafter transcribed into typewriting by
14 computer.
15       I further certify that I am not interested
16 in the outcome of the said action, nor connected
17 with, nor related to any of the parties in said
18 action, nor to their respective counsel.
19       IN WITNESS WHEREOF, I have hereunto set my
20 hand this 24th day of June, 2019.
21
22
23       _____
24       MELINDA M. SELLERS, CSR NO. 10686
25       STATE OF CALIFORNIA