Pages 1 - 115

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

| | | |
|---|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ AND LAMAR PATTERSON | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | No. C 17-6748 WHO |
| TESLA, INC., dba TESLA MOTORS, INC., CITISTAFF SOLUTIONS, INC., WEST VALLEY STAFFING GROUP, CHARTWELL STAFFING SERVICES, INC., and DOES 1-50, inclusive, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | San Francisco, California Friday September 24, 2021 8:00 A.M. |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:      ALEXANDER MORRISON & FEHR LLP
                     1900 Avenue of the Stars
                     Suite 900
                     Los Angeles, California 90067
                BY:  **BERNARD ALEXANDER, ESQ.**


                     CALIFORNIA CIVIL RIGHTS LAW GROUP
                     332 San Anselmo Avenue
                     San Anselmo, California 94960
                BY:  **LAWRENCE A. ORGAN, ESQ.**
                     **CIMONE A. NUNLEY, ESQ.**

         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

For Defendants:              SHEPPARD MULLIN RICHTER & HAMPTON LLP
                             333 S. Hope Street
                             43rd Floor
                             Los Angeles, California 90017
                        BY:  **TRACEY A. KENNEDY, ESQ.**


                             SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                             379 Lytton Ave
                             Palo Alto, California 94301
                        BY:  **PATRICIA M. JENG, ESQ.**


                             SHEPPARD MULLIN RICHTER & HAMPTON LLP
                             Four Embarcadero Center
                             17th Floor
                             San Francisco, California 94111
                        BY:  **SUSAN Q. HAINES, ESQ.**


Also Present:                **JOSEPH ALM, ESQ.**
                             - Tesla, Inc.

                             **YUSUF MOHAMED, ESQ.**
                             - Tesla, Inc.

                             **VALERIE CAPERS WORKMAN**
                             - Tesla, Inc.


                             —   —   —

```
 1   Friday - September 24, 2021                        8:30 a.m.

 2                    P R O C E E D I N G S

 3                        ---000---

 4        (Proceedings were heard out of presence of prospective

 5        jurors:)

 6             THE CLERK:  We are here for jury selection in Case

 7   Number 17-6748, Diaz vs. Tesla, Incorporated.

 8             MR. ALEXANDER:  Good morning, Your Honor.  Bernard

 9   Alexander on behalf of the plaintiff, along with Larry Organ

10   and Cimone Nunley.

11             THE COURT:  Good morning.

12             MS. KENNEDY:  Good morning, Your Honor.  Tracey

13   Kennedy on behalf of Tesla, along with Patty Jeng and Sue

14   Haines.

15             THE COURT:  Welcome.

16        All right.  A few things.  One is that there has been an

17   accident on the Bay Bridge that has delayed some of the jurors

18   so we'll get going when we get going.

19        There are a few things that I have that I wanted to

20   discuss, and I don't know whether the parties have anything

21   they wanted to tell me.

22        But, first, with respect to the preliminary injunctions, I

23   assume that there are no objections to them, and we'll be set

24   to go on Monday morning?

25             MS. KENNEDY:  That's correct, Your Honor.
```

1    **THE COURT:**  Okay.  Second, there is an issue raised

2  regarding the McGinn deposition, and in that deposition there

3  was an objection re the 30(b)(6) objection raised and it wasn't

4  described in the information that was provided to me so I

5  couldn't tell what the problem with that was.

6    **MR. ORGAN:**  So, Your Honor, I could at least speak to

7  it.

8    So --

9    **THE COURT:**  Could you speak into the microphone?

10    **MR. ORGAN:**  Yes, sir.

11    I could speak to it, Your Honor, as I was at the

12  deposition.  I think the confusion was they had some objections

13  as to the topics so that they produced the PMK subject to the

14  objections.  I think the topics that we listed in the

15  designation were covered, though, in terms of they were

16  producing that person on those topics subject to their

17  objection.  I can go back and check to make sure that that's

18  not misrepresenting what the witness was testifying about,

19  Your Honor --

20    **THE COURT:**  Okay.

21    **MR. ORGAN:**  -- if you'd like.

22    **THE COURT:**  Ms. Kennedy, do you know one way or

23  another?

24    **MS. KENNEDY:**  Your Honor, I don't recall the exact

25  objection.  I could take a look at it.  I just don't recall off

 1   the top of my head.

 2       **THE COURT:**  Okay.  So for the playing of the

 3   depositions, the -- I would not -- I would like to have all of

 4   the objections deleted from the tape, and they are all

 5   overruled except for the 30(b)(6) one.  I just -- I want to be

 6   sure that -- what that's about.  And I would allow the

 7   counterdesignations.  So that's -- that's with McGinn.

 8       You have now agreed with respect to the entity

 9   interrogatory responses, and so they will not come into

10   evidence.

11       With respect to Demetric Di-az's deposition, if he's in

12   Soledad, that's more than 100 miles away and his testimony I

13   think has always been anticipated.  There were several Motions

14   in Limine that we dealt with with respect to that.  His

15   deposition has been taken.

16       Even if the plaintiff had done a writ ad testificandum, I

17   doubt that he would have been able to get here during the

18   pandemic, and there's no prejudice I think to the defendant.

19   So I'm going to allow his deposition testimony to the extent

20   that it is designated by both parties.  And I'm not going to --

21   if the plaintiff is -- intends to use his deposition, the

22   defendants can use his job application.

23       And then the only other thing that I wanted to raise now,

24   and nobody has asked me to rule on this and I'm happy not to,

25   but I wonder whether you have a common understanding of how the

1   term "nigger" is going to be used in this courtroom.

2        MR. ORGAN:  Your Honor, it's our intent as counsel to

3   refer to it typically as the "N" word unless there's ambiguity,

4   and I think Mr. Alexander wants to be heard on this.

5        MR. ALEXANDER:  There might be one use of it by me,

6   but in questioning there are times when defense counsel has

7   used the term and it's being in the video.  So in the video you

8   will hear it used, but in the courtroom it will not be

9   regularly used.  It will be an exception when it is.

10       THE COURT:  Okay.

11       MS. KENNEDY:  Your Honor, I would agree with that.

12  We plan on using it as the "N" word unless it's in an

13  interrogatory response or some other testimony.

14       THE COURT:  Excellent.  Okay.  That's fine.

15     Mr. Organ.

16       MR. ORGAN:  Yes, Your Honor.  Just in terms of

17  clarification, with respect to witnesses, our view is that the

18  witness should be able to testify whatever they heard or in the

19  general "N" word term if they don't feel comfortable saying it.

20       THE COURT:  Yeah.  So the -- I'm not -- I don't

21  disagree with you, and I think the judicious manner in which

22  you've described the term will be used by the lawyers is

23  appropriate and, you know, overuse I think does -- will run

24  into 403 issues and all also be probably offensive to everybody

25  in the courtroom.  So I think you all understand that so that's

PROCEEDINGS

```
1    fine.
2        So those were the, I think, the pending issues that I'm
3    aware of.
4        Mr. Alexander or Mr. Organ, is there anything else that we
5    need to do before the jury comes in?
6            MR. ALEXANDER:  Not -- Your Honor, not -- not that
7    I'm aware of.  We have had some discussion about some jurors
8    that we've stipulated that they would be grounds for hardship,
9    and so if the Court would consider those.  I had not finished
10   speaking to Ms. Kennedy about it; but of the people that we had
11   overlap, the three that we were all able to agree on are
12   Number 3, Number 17, and Number 27.
13       So the parties are in agreement with that.  If it would be
14   the Court's pleasure, we think that there's hardship on those
15   individuals.
16           THE COURT:  All right.  They are on a list that I
17   have as tentative hardship.  If you want to stipulate to their
18   dismissal, we can let the jury office know now and then that
19   would reduce the number of people in the courtroom.
20           MS. KENNEDY:  Yes, Your Honor.
21       We also had another two as well that --
22           MR. ALEXANDER:  We should talk off the record.
23           MS. KENNEDY:  Okay.
24           MR. ALEXANDER:  But with those three, there's
25   definite agreement.
```

1      THE COURT:  Okay.  And if you have agreement on two
2  others, just let Ms. Davis know and have her come back.  I do
3  have a list of other people that might well qualify.
4      MS. KENNEDY:  Yes, Your Honor.  I want to make sure
5  that, so the ones that we stipulated to are Juror No. 3, Juror
6  No. 17, and Juror No. 27 --
7      THE COURT:  Yes.
8      MS. KENNEDY:  -- is that correct?
9      MR. ALEXANDER:  Yes.
10      THE COURT:  Mr. Organ.
11      MR. ORGAN:  Yes, Your Honor.  I can't remember
12  whether or not we brought this up with Your Honor before
13  relative to stock ownership.  Was the Court intending to ask
14  that question of jurors?
15      THE COURT:  We have -- there is a list of questions
16  regarding Tesla, and I'm happy to make sure that that's part of
17  it.
18      MR. ORGAN:  Thank you, Your Honor.
19      MS. KENNEDY:  Your Honor, one question in light of
20  your statements earlier.  Are we going to be voir diring the
21  jurors on the "N" word or is that something that we will be
22  required to do?
23      THE COURT:  You would probably like me to do that.
24      MS. KENNEDY:  That was my backhanded way to ask you
25  to do that, yes, Your Honor.

1           THE COURT:  Okay.  Are you -- Okay.  I'm happy to

2    take that on.

3         There were -- in the questions that you both provided, the

4    voir dire questions that you both provided, I'm going to use

5    most of them, I think, to -- and that should tease that issue

6    out, but I will -- I will ask that question directly.

7           MS. KENNEDY:  Thank you, Your Honor.

8           THE COURT:  Okay.  Anything else that we should do

9    before the jury comes in?

10        (No response.)

11          THE COURT:  All right.  Well, let me know about the

12   stipulation on the other two.  Thank you.

13          MR. ORGAN:  Oh, Your Honor, I don't know that you've

14   met plaintiff before, but Owen Diaz is here.

15          THE COURT:  Ah, excellent.

16          MR. DIAZ:  Good morning, Your Honor.

17          THE COURT:  Mr. Diaz, good morning.  Glad to see you.

18   We look forward to moving through.

19        And the Tesla representative I have not met either.

20          MS. KENNEDY:  We have two.  This is Joseph Alm and

21   Yusuf Mohamed.

22          THE COURT:  Great.  Welcome.

23        All right.  See you when the jury comes or when you have

24   stipulated, and I'll put that on the record.  Thank you.

25   //

**PROCEEDINGS**

 1      (Whereupon there was a recess in the proceedings

 2       from 8:41 a.m. until 9:27 a.m.)

 3      (Proceedings were heard out of presence of prospective

 4       jurors:)

 5          **THE COURT:**  So I'm about to provide you with the

 6   supplemental questionnaires.  I just -- I wanted to let you

 7   know that there have been a number of prospective jurors who

 8   have self-screened for COVID and are not here.  There are also

 9   a couple of other people who are just not here.

10      So we will end up having 21 people come down.  So that

11   should be fine, but we'll see.

12      So with that, Ms. Davis, you can hand those out and the

13   jurors will start coming down relatively soon and we'll get

14   going.

15      (Whereupon there was a recess in the proceedings

16       from 9:28 a.m. until 9:50 a.m.)

17          **THE CLERK:**  All rise.  The Honorable William H.

18   Orrick presiding.

19          **THE COURT:**  Good morning everybody.

20      All right.  Ladies and gentlemen, welcome.  I'm glad to

21   see you hear today, and thank you for being willing and able to

22   participate in one of the foundations of our democracy and

23   justice system, the jury trial.

24      I'm going to talk about that in a little bit, but first I

25   want to start by telling you that your health and safety is

 1    utmost in my mind and in the mind of the court as a whole.

 2         And I should introduce myself.  I'm Judge William Orrick

 3    and I'm fortunate enough to sit in this courtroom a lot.  So

 4    it's good to have you here.

 5         So we've put into place a comprehensive, thoughtful, and

 6    evidence-based plan for conducting the trial.  We've had public

 7    health experts analyze what we've done to make sure that it's

 8    appropriate.  You've already seen some of the policies that we

 9    have in action, such as distancing and mask wearing and

10    reduction of people in the building.

11         We've assessed our ventilation system, we've maximized the

12    intake of fresh air in the courtroom, and we have what's

13    considered a high level of filtration for office buildings.

14         So our safety protocols are designed to keep us all safe

15    and allow us to do the work that our Constitution requires.

16         The protocols require us to do some things that we don't

17    ordinarily do in court.  Social distancing in the courtroom is

18    one.  Mask wearing is another.  The exception to mask wearing

19    will be when the lawyers are speaking and during trial the

20    witnesses may choose to unmask as long as they're vaccinated.

21    I can tell you that all the lawyers and their teams and the

22    plaintiff, they're all vaccinated.  All the courtroom personnel

23    are and so am I.

24         I usually start jury selection by talking about the

25    history of the right to a trial by jury to impress upon you how

 1  important it is.  Now, it comes from the Magna Carta in 1215.

 2  It used to be that the king could just decide willy-nilly what

 3  he wanted to do with people.  Then the noblemen said, "No, we

 4  want to play too," and they were able to sit on a jury and then

 5  it was just people who had property, white people, men.  But

 6  now that right belongs to all of us, and I think you already

 7  know how important this is because you answered the call to

 8  jury service in this most unusual time in our lives.

 9        I'll just say this.  In a world where the fairness of our

10  justice system and the rule of law is questioned, the right to

11  a jury trial ensures that cases get decided by a group of

12  people who aren't appointed by a politician but selected

13  randomly from the area where the case is proceeding, and

14  they're picked not by the judge but by the parties to the

15  lawsuit.

16        Our Constitution recognizes that there are just some cases

17  where the stakes are too high to leave it up to just the Court

18  to decide, particularly a judge.  Each of you has the

19  experience to judge the facts and consider the perspectives of

20  other jurors, and it's the diverse experiences that you bring

21  to jury service that's the best protection for the right to a

22  fair trial.

23        As a juror, you'll apply the law that I give you to what

24  you learn in this courtroom about this case from the witness

25  stand and witnesses that may testify by video and you'll render

**PROCEEDINGS**

1   the verdict.

2       What you think and how you work with others will be

3   critical in deciding a matter that has real impact on our

4   society.

5       So I just want to underscore for you how important what

6   you're being called to do is.  I know a lot of people don't

7   like being called to jury service, and I know that you all have

8   important things to do in your lives and that this isn't

9   convenient and it seems like an imposition, but it is your duty

10  as a citizen and it's essential if we're to deliver the

11  promises of justice for all.

12      So with that, Ms. Davis, would you administer the oath,

13  please.

14      (Jury panel sworn.)

15          **THE CLERK:**  Thank you.  You may be seated.

16          **THE COURT:**  So let me tell you a little bit about

17  this case, how long it's going to take, what the trial days are

18  going to look like, and what's going to happen today as we pick

19  the jury.

20      So first a description of the case.  Plaintiff Owen Diaz

21  claims that while working at the Tesla factory in Fremont,

22  California, he was subjected to a hostile work environment

23  based on his race, being African-American or black.

24      In addition, Mr. Diaz claims that Tesla, Inc., failed to

25  take all reasonable steps to prevent race-based harassment

1   towards him, including the use of the "N" word, and failed to

2   adequately remedy the harassment after Tesla received notice of

3   it.

4        Mr. Diaz also claims that Tesla, Inc., negligently

5   retained factory workers and supervisors who engaged in

6   harassing conduct toward him.

7        The plaintiff Owen Diaz has the burden of proving these

8   claims by a preponderance of the evidence.

9        The defendant, Tesla, Inc., doing business as Tesla

10  Motors, Inc., denies these claims.  Tesla denies that Mr. Diaz

11  was subject -- subjected to a hostile work environment based on

12  his race and denies that it failed to take all reasonable steps

13  to prevent race-based harassment in the workplace.

14       Tesla also denies that it negligently hired, retained, or

15  supervised factory workers, employees, or contractors who

16  Mr. Diaz claims engaged in race-based harassing conduct towards

17  him.

18       So this will be a relatively short case if all goes well.

19  I'm anticipating that the evidence will be completed and the

20  case given to the jury for its deliberations by a week from

21  Monday.

22       Thank you all for filling out the questionnaires that the

23  jury office gave to you.  I'm going to take a couple of hours

24  this morning telling you about jury service and asking

25  questions that may bear on your ability to serve as a juror.

 1   Then the lawyers will ask you some more questions for about an

 2   additional 15 minutes or so each.

 3        I'm going to take a break every hour and a half or so, so

 4   we should be breaking at around 11:30 for -- for a little bit.

 5        And if my questions to you raise any personal matter that

 6   you would prefer to tell me and the lawyers privately, we can

 7   do that after a break -- during a break after I've finished all

 8   my questions, and otherwise I'm going to ask you to step to the

 9   microphone that's in the middle of the courtroom when you're

10   answering questions.

11        So it is my hope and expectation that this process will be

12   finished today and that the trial will start on Monday.

13        Our trial day will run from 8:30 a.m. to 1:30 p.m.  We

14   have a 15-minute break at about 10:00 and another at about

15   11:45.  The reason that the trial day stops at 1:30 is I have

16   other matters that are scheduled later in the afternoon.

17        I found when I was a trial lawyer it really helped to have

18   the afternoons to prepare for the next day, and I think jurors

19   also find it useful to be able to continue some of the rest of

20   their lives, work lives, errands, and those sorts of things,

21   and also to get out before the traffic rush at the end of the

22   day.

23        So -- and we'll have trial every day of the week.

24        I know that jury service asks quite a bit of you.  I want

25   to promise to be as efficient as I can be with your time.  If I

 1  need to meet with the lawyers, I do that before 8:30 or after

 2  1:30 unless there's something unusual.

 3      I'm going to be prompt.  The lawyers are going to be

 4  prompt.  I'm going to ask you to be prompt.  There are a lot of

 5  people involved in a trial and making any of us wait because

 6  one person isn't watching the clock is just discourteous.

 7      If anyone learns of COVID contact, gets sick, or has a

 8  personal emergency during trial that causes you to need to be

 9  excused from further service, please notify my Courtroom Deputy

10  Ms. Davis, who is here, and she will get in touch with me.  And

11  she'll provide everybody with contact information who's

12  selected to serve on the jury.

13      So now we're going to move to jury selection.  I'm going

14  to ask the lawyers to introduce themselves, their clients.

15  You've looked at the -- you've all seen the list of witnesses

16  who may be testifying so they don't have to repeat that.

17      After that, I'll ask you questions and talk a little bit

18  about the law that applies to your role as jurors.  And once

19  the questioning is over, I will determine whether anybody

20  should be excused for hardship or cause, and then the lawyers

21  will make their selections and we'll have the jury.

22      So, first, let's have the lawyers introduce themselves.

23  Let's start with the plaintiffs.

24          **MR. ALEXANDER:**  Thank you, Your Honor.

25      Good morning.  My name is Bernard Alexander and on the

 1  legal team Larry Organ and Simone Nunley; and also assisting

 2  us, Harry Plotkin and Sabrina Grislis and the gentleman here --

 3  if you could stand up, please -- Owen Diaz.  This is the

 4  plaintiff.

 5       Thank you.

 6            THE COURT:  Thank you, Mr. Alexander.

 7       And so I see a hand.  And so, first, could you indicate

 8  what juror number you are and then please come to the

 9  microphone and let me know what's on your mind.

10            PROSPECTIVE JUROR NO. 24:  This should be simple.

11  I'm sorry, but I'm -- I was having a hard time hearing you.  I

12  was thinking maybe you could raise your microphone.  I'm barely

13  hearing you in the back of the room.  That's all.  Sorry.

14            THE COURT:  Great.  And you are juror number?

15            PROSPECTIVE JUROR NO. 24:  Number 24.

16            THE COURT:  24.  Thank you very much.

17       (Pause in proceedings.)

18            THE COURT:  Great.  The -- thank you for raising

19  that.

20       Anybody who does have a hearing issue as we go forward --

21  the combination of masks and needing to speak into a microphone

22  is also not always what we're used to, so there can be those

23  problems, and so thank you for bringing that to our attention.

24       All right.  Let's go to the defense.  Ms. Kennedy.

25            MS. KENNEDY:  Hi.  Good morning.  My name is Tracey

1   Kennedy and I'm the lead trial lawyer for Tesla.  My legal team

2   is Patricia Jeng, Susan Haines, Stephanie Limbach.

3       And my -- also part of the team are Rohan Beeton and

4   Michelle LaRocca (phonetic spellings).

5       The representatives from Tesla are Joseph Alm and Yusuf

6   Mohamad.

7       Thank you.

8       THE COURT:  Thank you.

9       Does anybody on the jury know any of the people who were

10  just introduced by either the plaintiffs or the defendants?

11      (No response.)

12      THE COURT:  All right.  As you heard my description

13  of the case, has anybody in the jury pool heard of this case

14  from any source whatsoever before today?

15      (No response.)

16      THE COURT:  Has anybody read anything about the case?

17      (No response.)

18      THE COURT:  All right.  Has anyone talked to you

19  about the case?

20      Juror No. 24, come on up to the microphone.

21      PROSPECTIVE JUROR NO. 24:  Over the years I've read a

22  lot about Tesla and their practices.  You have innuendo and

23  rumors.  As a citizen, it's hard to tell what's true and what's

24  not true, but I have read a lot about Tesla.  In fact, I was an

25  investor in the company for a little while, and that's --

1    that's what I have to say.

2         THE COURT:  So with respect to that, will you be able

3    to set aside anything that you have read about Tesla and

4    evaluate the case based on just the information that comes in

5    in this courtroom and based on the legal instructions that I

6    make and on your evaluation of the credibility of the witnesses

7    and the facts in this case?  Will you be able to do that?

8         PROSPECTIVE JUROR NO. 24:  I can try, but I feel like

9    I have a bias against Elon Musk.  I think he walks on water and

10   he feels like he can get away with anything.

11        THE COURT:  And Mr. Musk is not on trial in this

12   case.  The -- do you understand that?

13        PROSPECTIVE JUROR NO. 24:  I understand that, but his

14   company.  He runs the company.  He sets the policies.  He sets

15   the standards, and I believe that the culture that he -- I

16   don't know -- that the culture he's developed permeates through

17   the country -- through the company.  So when I think of Tesla,

18   I think of Elon Musk.  I have a hard time separating the two.

19        THE COURT:  Okay.  All right.  Well, thank you for --

20   for your thoughts.  You can sit down.

21        All right.  So --

22        MR. ALEXANDER:  Your Honor, there --

23        THE COURT:  Oh, I'm sorry.  Is there somebody --

24   please come forward.

25        And what is your juror number?

PROCEEDINGS

1          **PROSPECTIVE JUROR NO. 23**:  Number 23.

2          **THE COURT**:  Number 23, okay.

3          **PROSPECTIVE JUROR NO. 23**:  So my son used to work at

4     Tesla, and we know quite a few senior executives there.  But in

5     terms of this case, I'll try my best, but won't be able to

6     guarantee that, you know, from my past experiences and

7     knowledge that -- I mean, I'll try to be fair, but...

8          **THE COURT**:  All right.  Well, so the -- that is --

9     that will be your duty.  I will tell you that your duty is to

10    evaluate the evidence fairly and decide the case just based on

11    what you learn about the case together with your fellow jurors

12    in this courtroom and then apply the law that I give you to the

13    facts.  Would you be able to do that?

14         **PROSPECTIVE JUROR NO. 23**:  Yeah.  I just wanted to

15    let you know.  That's all.

16         **THE COURT**:  Okay.  Thank you very much.

17         All right.  So this is a civil case.  So the jury needs to

18    include a minimum of six people.  I'm going to want to have

19    eight or nine jurors to ensure against somebody getting sick or

20    having other troubles.  We don't want you to come into court if

21    you're sick.  And everybody who is selected will participate in

22    the jury deliberations.

23         In the trial of this case, as I was just saying, each side

24    is entitled to have a fair, unbiased, and unprejudiced jury.

25    So the purpose of the questions that I'm going to be asking is

**PROCEEDINGS**

1  to enable me to determine whether anybody should be excused for

2  cause and to enable the counsel for the parties to exercise

3  their individual judgment with respect to peremptory

4  challenges.  Now, those are challenges for which no reason

5  needs to be given.

6      It's important that you disclose any reason or fact why

7  you might be biased or prejudiced in any way in answer to the

8  questions that you're asked.

9      As we go forward, sometimes I'll ask questions that call

10  for a "yes" or "no" response.  If your answer is "yes," raise

11  the card at your seat and I may follow-up immediately or ask to

12  speak individually with you.

13      And let me repeat.  If at any time you're asked a question

14  that you think calls for a personal or embarrassing response,

15  let me know if you prefer to answer it privately.  So that the

16  lawyers and court reporter can listen, but the other members of

17  the jury cannot.  No one wants to pry into your personal

18  affairs, but the question is being asked because the answer

19  could have an impact on your ability to sit as a juror in this

20  case.

21      So we just -- we just had a couple of people who were

22  aware of or had some experiences with Tesla.  Let me ask the --

23  everybody:  Have you or anyone close to you ever worked for or

24  at the Tesla Fremont facility?

25      Juror No. 12, would you step to the mic?

PROCEEDINGS

1          And what did you do at Tesla?

2          **PROSPECTIVE JUROR NO. 12**:  It was my cousin, and she

3    worked there for a few years at the Fremont facility and she

4    was in HR actually.

5          **THE COURT**:  Okay.  And did anything that you learn

6    from her, would that impact your ability to sit as a fair and

7    impartial juror in this case?

8          **PROSPECTIVE JUROR NO. 12**:  I don't think so.  She

9    was -- so she only worked there for a few years, and then she

10   ended up getting fired and I was told from her to not like

11   Tesla.  So -- but I will -- I could be impartial and unbiased

12   and all of that, so...

13         **THE COURT**:  You haven't had any personal experiences

14   with Tesla?

15         **PROSPECTIVE JUROR NO. 12**:  No.

16         **THE COURT**:  And the key for a juror is to be able to

17   sit here and listen and judge people fairly as they come in

18   about this particular experience, which obviously is not your

19   cousin's experience.  So do you think you would be able to do

20   that?

21         **PROSPECTIVE JUROR NO. 12**:  Yes.

22         **THE COURT**:  Great.  Thank you.

23      Anybody else?

24      (No response.)

25         **THE COURT**:  Okay.  Have you or anyone -- oops, I'm

PROCEEDINGS

1   sorry.  We're spread around the courtroom, so please come up to

2   the mic.

3       And what's your juror number?

4           PROSPECTIVE JUROR NO. 33:  33.

5           THE COURT:  Okay.  And so tell me about your

6   experience with Tesla.

7           PROSPECTIVE JUROR NO. 33:  I didn't personally work

8   there, but I had a good friend and my aunt actually worked

9   there.  I didn't hear any -- anything really bad too much about

10  Tesla.  And my aunt, I guess she was -- she felt like she was

11  wrongfully terminated too, but, you know, it is what it is.

12          THE COURT:  So do you think that what you have heard

13  from her and what you know from her would impact your ability

14  to evaluate the evidence fairly here and treat both sides

15  fairly?

16          PROSPECTIVE JUROR NO. 33:  I don't -- yeah, hopefully

17  I'll be able to separate it.

18          THE COURT:  Okay.  Great.  Thank you.

19      Has anyone here either owned or leased a Tesla?

20      Okay.  You don't need to step up to the mic, but it is --

21  would you raise your juror numbers just so that I know?

22      Juror No. 8 and Juror No. 20, is there anything about your

23  experience with that vehicle, that owning or leasing the Tesla,

24  that would impact your ability to sit as a fair and impartial

25  juror here?  If the answer is "yes," I'd like you to come to

1    the microphone; but if the answer is "no," you may remain

2    seated.

3         (No response.)

4              THE COURT:  Everybody's sitting.  Okay.

5         Does anybody own stock in Tesla?

6         Juror No. 20 again and Juror No. 8.  You both own stock.

7    Is there anything about that, owning stock, that would impact

8    your ability to be fair to both sides?

9         And everybody -- both of you are shaking your heads "no,"

10   and that's fine.

11        Has anybody here or anyone close to you ever worked in an

12   automotive manufacturing plant or company?

13        (No response.)

14             THE COURT:  Has anybody worked for a tech company in

15   Silicon Valley?

16        All right.  So let's start with the Juror No. 5.  Would

17   you come over to the microphone, please?

18        So where have you or do you work?

19             PROSPECTIVE JUROR NO. 5:  I'm currently working at a

20   company called Okta, O-K-T-A.

21             THE COURT:  And what do you do there.

22             PROSPECTIVE JUROR NO. 5:  I am a manager.  I manage

23   an engineering team.

24             THE COURT:  Great.

25        All right.  And have you ever had any connection with

PROCEEDINGS

1  Tesla or Elon Musk or SpaceX?

2        PROSPECTIVE JUROR NO. 5:  No.  I probably purchased

3  some stocks, but I don't own anything now.  I purchased

4  Space -- Micro Space, whatever that other one.  Yeah, but that

5  was in the past.  I don't own anything now.

6        THE COURT:  Okay.  Great.  Thank you.

7     Who else raised their -- No. 13, if you wouldn't mind

8  coming to the mic.

9        PROSPECTIVE JUROR NO. 13:  I work in Cisco Systems,

10  San Jose.

11        THE COURT:  I missed that.  I'm sorry.

12        PROSPECTIVE JUROR NO. 13:  I'm working in Cisco

13  Systems, San Jose.

14        THE COURT:  Ah.  And how long have you been working

15  there?

16        PROSPECTIVE JUROR NO. 13:  About 16 years.

17        THE COURT:  And what do you do?

18        PROSPECTIVE JUROR NO. 13:  I'm a quality assurance

19  engineer, QA engineer.

20        THE COURT:  Great.  And have you ever worked with or

21  had connection with Tesla or any -- or SpaceX or Mr. Musk?

22        PROSPECTIVE JUROR NO. 13:  No.

23        THE COURT:  Great.  Okay.  Thank you.

24     Juror No. 20, come on up.

25        PROSPECTIVE JUROR NO. 20:  I work for Infinera, it's

PROCEEDINGS

1    a telecom company, as a -- my title is director of operation.

2    We used to run the production line in Sunnyvale.

3            THE COURT:  Okay.  And the same -- the same

4    questions.  Besides what you've already said, is there -- do

5    you have any connection with Tesla or SpaceX --

6            PROSPECTIVE JUROR NO. 20:  No.

7            THE COURT:  -- or Mr. Musk?

8        Okay, thank you.

9            PROSPECTIVE JUROR NO. 20:  Thank you.

10           THE COURT:  Juror No. 23.

11           PROSPECTIVE JUROR NO. 23:  I work for PlayStation and

12   I'm a technical program manager.

13           THE COURT:  Great.  Besides what you've already told

14   us, any other connections?

15           PROSPECTIVE JUROR NO. 23:  No.

16           THE COURT:  Thank you.

17       And No. 26?

18           PROSPECTIVE JUROR NO. 26:  Good morning, Your Honor.

19           THE COURT:  I'm sorry.  I can't hear you.

20           PROSPECTIVE JUROR NO. 26:  Good morning, Your Honor.

21           THE COURT:  Good morning.

22       And so where are you -- where have you worked?

23           PROSPECTIVE JUROR NO. 26:  Previously I worked at

24   Workdek.

25           THE COURT:  And what were you doing?

PROCEEDINGS

1          **PROSPECTIVE JUROR NO. 26**:  I was interning as a
2    quality assurance associate at the time.
3          **THE COURT**:  And how long were you there?
4          **PROSPECTIVE JUROR NO. 26**:  About six months.
5          **THE COURT**:  And did you have any connection with
6    Tesla or SpaceX or Mr. Musk?
7          **PROSPECTIVE JUROR NO. 26**:  In no way, shape, or form.
8          **THE COURT**:  Okay.  Thank you very much.
9          **PROSPECTIVE JUROR NO. 26**:  You're welcome, sir.
10         **THE COURT**:  Anybody else?
11       (No response.)
12         **THE COURT**:  All right.  Has -- is anybody here --
13    have you or any members of your immediate family or close
14    friends ever worked for a judge or a lawyer or a law office?
15       Juror No. 18, step on up to the microphone, please.
16         **PROSPECTIVE JUROR NO. 18**:  Good morning.
17         **THE COURT**:  Good morning.
18       And so tell me about your experience.
19         **PROSPECTIVE JUROR NO. 18**:  My -- my first office job
20    was for patent and trademark lawyers as an administrative
21    assistant in the trademark department specifically for
22    international, and about a year.  It was a very long time ago.
23         **THE COURT**:  Was that fun?
24         **PROSPECTIVE JUROR NO. 18**:  Some days.  Some days not
25    so much.

PROCEEDINGS

```
 1        (Laughter.)
 2             PROSPECTIVE JUROR NO. 18:  They were, however,
 3   process the Ford lawsuits about the windshield wipers.
 4             THE COURT:  Okay.  Great.  Thank you very much.
 5             PROSPECTIVE JUROR NO. 18:  Sure.  Thanks.
 6        I don't know if you also want to know that my current
 7   company was working with SpaceX for a research project that was
 8   sent up a few years back to the ISS.
 9             THE COURT:  Okay.  And does -- and did you -- do you
10   have any direct relationship with them?
11             PROSPECTIVE JUROR NO. 18:  No.  No.
12             THE COURT:  Is there anything about --
13             PROSPECTIVE JUROR NO. 18:  Just that we utilized
14   their equipment to get it there.
15             THE COURT:  Is there anything about that that would
16   impact your ability to be a fair and impartial juror?
17             PROSPECTIVE JUROR NO. 18:  Not particularly.  It got
18   the things where they needed to go.
19             THE COURT:  Okay.  Great.  Thank you.  I appreciate
20   that.
21        Is there anybody else with respect to SpaceX -- who was
22   any sort of connection with SpaceX?
23        (No response.)
24             THE COURT:  All right.  Is there anyone here who
25   suffers from any mental, physical, or emotional impairment that
```

**PROCEEDINGS**

 1  would make it difficult for you to sit as a fair and impartial

 2  in this case.

 3       (No response.)

 4       **THE COURT:**  Is anybody having any trouble

 5  understanding what I've been saying today?

 6       (No response.)

 7       **THE COURT:**  So I do appreciate everybody's filling

 8  out the questionnaires and the supplemental questionnaires.  I

 9  have a number of people indicated that either they or a close

10  friend or relative had been discriminated against because of

11  race, ethnic background, gender, religion, sexual identity or

12  orientation, or economic status.  And so I wanted to ask those

13  people who were -- who indicated that they had -- that had been

14  their experience some questions about that, and I can do it

15  here in the courtroom; or if you would prefer, we can do it at

16  a break, but I'm now going to ask those folks.

17       Juror No. 2, if you would -- yes.  Thank you.

18       So I'm interested -- and you can move that down.  There

19  you go.

20       I am interested in what the experience was that you were

21  referring to.

22       **PROSPECTIVE JUROR NO. 2:**  Well, my uncle worked for a

23  company here in the city for almost about 20 years.  It got

24  bought out recently -- well, not recently, but at the time and

25  the new ownership pretty much kind of pushed everybody out on

**PROCEEDINGS**

1   the top.

2       And he worked there for about, maybe, six months until he

3   kind of noticed the changed offices.  He moved locations, and

4   then he started having meetings with the new, like, CFO I

5   guess, and he started to notice that he was feeling more, like,

6   I guess discrimination because everybody at the top was one

7   nationality.

8       And then -- yeah, so he ended up quitting before they

9   could let him go.  He really didn't get into much details.  And

10  I was working there at the time too so I would see the CFO

11  walking back and forth and he was nice to me, but it was kind

12  of hard to work there knowing he was in a lawsuit with my uncle

13  at the time.

14          THE COURT:  I'm sorry.  I missed that.

15          PROSPECTIVE JUROR NO. 2:  It was hard to see him

16  while I was still working at the company knowing he was -- he

17  had a lawsuit with my uncle at the time.

18          THE COURT:  So is there -- despite that experience,

19  would you be able to judge the -- sit and fairly evaluate the

20  evidence in this case which involves claims of discrimination

21  that are denied by Tesla?  So you would be -- you'd have to

22  weigh the evidence fairly for both sides.  Would you be able to

23  do that?

24          PROSPECTIVE JUROR NO. 2:  Yes.

25          THE COURT:  Thank you.

PROCEEDINGS

```
 1        Juror No. 7, would you mind stepping up unless -- and if
 2   you want to do this personally -- in private, it's perfectly
 3   fine.  Just let me know.
 4             PROSPECTIVE JUROR NO. 7:  Good morning.
 5             THE COURT:  Good morning.
 6        So tell me -- tell me what your -- the experience is that
 7   you're referring to here.
 8             PROSPECTIVE JUROR NO. 7:  Well, you know, I came to
 9   the United States when I was 16 years old.  I have lived here
10   for quite a few years, became a U.S. citizen.  But throughout
11   my -- my stay here in the States, you know, I have encountered
12   several cases -- several times when, you know, I feel -- I have
13   felt discriminated against, you know, based on my race.
14   Sometimes -- there has been comments directed to my person.
15        And although -- I think it has affected me in some ways,
16   but, you know, after -- after this many years living here, you
17   know, and becoming part of -- part of society here, you know, I
18   kind of -- I don't know if I have become numb or tried to,
19   like -- kind of like it aside as an isolated incidence, you
20   know, isolated people.  I try not to think of general
21   population as, you know, I've targeted by them, you know; but
22   the other -- there's been -- there's been a few -- a few times
23   where I have -- when I have felt targeted.
24             THE COURT:  And so the -- would you be able to sit
25   and fairly evaluate claims of someone who feels that he was
```

 1    discriminated against and the claim -- and the claims of the

 2    company that says that's not what -- that that's not the case?

 3    Would you be able to do that?

 4            PROSPECTIVE JUROR NO. 7:  So, yeah, I can -- I can

 5    try to put aside my personal experiences, you know, in regards

 6    to that, you know, and try to be fair and impartial and, like

 7    you said, you know, just consider just what's been presented as

 8    evidence.

 9        I know this is kind of delicate, you know, as far as

10    putting aside your personal experiences and how -- and how you

11    have felt even beforehand, but, yeah, I can -- I can try to put

12    that aside and just -- just look at what's been presented in

13    front of me.

14            THE COURT:  So you think you could be fair and

15    impartial?

16            PROSPECTIVE JUROR NO. 7:  Yes.

17            THE COURT:  Thank you.

18        Juror No. 11.  Good morning.

19            PROSPECTIVE JUROR NO. 11:  Good morning.

20            THE COURT:  So what was the experience you were

21    referring to in your supplemental questionnaire answer?

22            PROSPECTIVE JUROR NO. 11:  I'm not, like, super

23    familiar with it, but when I was younger, my mom told me at her

24    old job she was constantly passed over by her white

25    counterparts even though she was doing more work or the same

**PROCEEDINGS**

1    work as them, and every time she applied for a higher position,

2    she would always be passed up.  That was it.

3             THE COURT:  So is there anything from your mom's

4    experience that you would carry over to this courtroom so that

5    you couldn't treat each side and the evidence that came in

6    fairly?

7             PROSPECTIVE JUROR NO. 11:  I don't think so.  I think

8    I could, like, separate the two.

9             THE COURT:  Okay.  Great.  Thank you.

10        Juror No. 12, what were you referring to?

11            PROSPECTIVE JUROR NO. 12:  So both my mom's white and

12   my dad's Japanese and so they -- like, when they went down to

13   the south, they got a lot of flack for being together.  So,

14   yeah.

15            THE COURT:  And so this is a case that is claiming

16   that there is discrimination based on race that created a

17   hostile environment.  Is -- would you be able to listen to the

18   evidence and evaluate it fairly on both sides in order to be a

19   fair and impartial juror?

20            PROSPECTIVE JUROR NO. 12:  Yes.

21            THE COURT:  Thank you.

22        And Juror No. 18.  What experience were you referring to?

23            PROSPECTIVE JUROR NO. 18:  So I've had gender

24   discrimination also at work, and I think it -- anyone would be

25   hard pressed not to have experienced other forms in their life.

**PROCEEDINGS**

1    And as a working person, I've helped people communicate with HR

2    and done by standard-type intervention in the workplace, so...

3         THE COURT:  And so knowing -- having those

4    experiences, knowing what little I've told you about this case,

5    do you think you'd be able to sit as a fair and impartial

6    juror?

7         PROSPECTIVE JUROR NO. 18:  Yes, I think so.

8         THE COURT:  Okay.  Thank you.

9    Juror No. 20.

10        PROSPECTIVE JUROR NO. 20:  Good morning again.

11   So usually I don't think there's much discrimination

12   around me, but just recently I've been hearing from my friends

13   saying that they didn't -- I'm from Taiwan but looks like

14   Chinese, but some kids got called COVID because of the recent

15   pandemic.  So I think that's -- I heard that -- I heard that on

16   the news, but recently I've got friends' kids that experience

17   this.  So I think there may be discrimination still existing in

18   our society.

19        THE COURT:  Yeah.  And so with that reference, do you

20   think you'd be able as to sit as a fair and impartial on the --

21   in this case?

22        PROSPECTIVE JUROR NO. 20:  I would be fair, yes.

23        THE COURT:  Okay.  Thank you.

24   Juror No. 23.  And what experience were you referring to.

25        PROSPECTIVE JUROR NO. 23:  So I had to -- it was back

PROCEEDINGS

1    at school with one of the professors.

2              THE COURT:  I'm missing that.  I hate to --

3              PROSPECTIVE JUROR NO. 23:  Sorry.

4         I was back at school with one of the professors, there was

5    some discrimination.  This was when I was going to school in

6    Boston.

7              THE COURT:  And, again, given what you know about

8    this case, would you be able to set those experiences aside and

9    sit as a fair and impartial juror?

10             PROSPECTIVE JUROR NO. 23:  Yes.  Yes.

11             THE COURT:  Thank you.

12        Juror No. 26.  So tell me, what was the experience you

13   were referring to or experiences?

14             PROSPECTIVE JUROR NO. 26:  The experience I was

15   referring to was when I was, I believe, 17 years old.  It was

16   my first job at a grocery store, and one of the managers called

17   me the "N" word and I reported this to the shop steward.  The

18   shop steward reported this to my manager, and that was it.

19   Nothing happened after that.

20             THE COURT:  Nothing happened?

21        And so does that experience -- so that's sort of closer to

22   one of the experiences that Mr. Diaz will be describing.  Would

23   you be able to set what happened to you in a different

24   employment situation, totally different facts, aside and just

25   judge this case based on what you learn from the witnesses

1  and -- and all the -- and the documents and all the facts that

2  come into this case?

3          PROSPECTIVE JUROR NO. 26:  Absolutely.  I'll be able

4  to set my feelings aside.  It will not impair me with this --

5  this case.

6          THE COURT:  Okay.  Great.  Thank you very much.

7          PROSPECTIVE JUROR NO. 26:  Thank you.

8          THE COURT:  Juror No. 30.

9          PROSPECTIVE JUROR NO. 30:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11      What was the experience that you were referring to?

12          PROSPECTIVE JUROR NO. 30:  Your Honor, I was raised

13  in Hattiesburg, Mississippi.  My mother, she was a single mom.

14  She worked in a textile factory and often time she came home

15  and complained about her supervisor calling her the "N" word a

16  few times on the job.  Nothing ever transpired from that, but

17  she just kept on working until we eventually got out of

18  Mississippi and moved to California.

19      Whereas, as I was coming up, you know, it was kind of a

20  change in the scenery, but the -- I say the environment --

21  well, what I was feeling was still the same; whereas, there

22  was, I don't know, it felt like some kind of inequities in

23  school where the teachers weren't paying more attention to me

24  where they were paying more attention to white kids, you know.

25  It made me feel a little, I don't know, some kind of way.

1    I don't know.  Maybe deep down I kind of vowed that, you

2    know, I would like to correct this here kind of behavior, and I

3    wouldn't -- I don't want to inflict that kind of behavior

4    injustice on anyone as I got older.

5        So as regards to this case, I probably can empathize with

6    this guy's pain, but I feel at the same time I would like to be

7    involved so that I can make this decision the right way just

8    the best way I can.

9        **THE COURT:**  So the issue there would be, would

10   everybody be starting out at the same place in your mind?  That

11   despite the experiences that you've had and your desire to make

12   things right and a better world and, you know, the -- it's -- I

13   was struck by how many people have had the experience of being

14   discriminated against or having close friends be discriminated

15   against just in your answers.

16       But would you be able to put Tesla and Mr. Diaz at the

17   same starting place?  Because you don't know what happened to

18   Mr. Diaz, and he may say one thing, but there may be reasons

19   that you find that either didn't happen or it didn't rise to

20   the level of where I'm going to instruct you the law is.  Would

21   you be able to do that?

22       **PROSPECTIVE JUROR NO. 30**:  Yes, sir.  Yes,

23   Your Honor.

24       **THE COURT:**  All right.  Thank you.

25       While you're here, let me ask you.  The -- in your jury

 1   questionnaire when the question was "Is there anything else you

 2   want to tell the judge," you wrote down "Guilty."  Tell me what

 3   you were thinking about there.

 4            **PROSPECTIVE JUROR NO. 30:**  Judge, initially I did not

 5   want to come.  I did not want to come, but as -- as I started

 6   thinking about it, you know, this is an opportunity to make --

 7   right a wrong, an injustice in our society, and so I would -- I

 8   would like to experience the judicial -- the jury process; and

 9   now that I'm here, even more so.  I have the opportunity to be

10   involved in a court proceeding such as this one.  I'm more

11   motivated to be involved.  So as far as that "guilty" statement

12   that I put in there, I wish I hadn't.

13            **THE COURT:**  Okay.  Well, you know, people say things

14   all the time so I'm -- I'm always interested in that.

15       But let me just go back one more time because you've

16   mentioned a couple of times righting a wrong, and at the moment

17   there is no wrong in this courtroom.  There's an allegation

18   about it, and -- but there's no -- there's no evidence yet that

19   that did or didn't occur.

20       And it's very important that if I seat you as a juror,

21   that I have your assurance that you are going to be able to be

22   fair and unbiased and that the -- what you'll be doing is being

23   a fair and impartial juror, considering all the thoughts that

24   everybody else has about the case and the evidence, and then

25   rendering a fair verdict.  Will you be able to do that?

 1          PROSPECTIVE JUROR NO. 30:  Yes, Your Honor.

 2          THE COURT:  Okay.  All right.  Thank you.

 3          PROSPECTIVE JUROR NO. 30:  Thank you.

 4     Juror No. 31.  Good morning.

 5          PROSPECTIVE JUROR NO. 31:  Good morning, Your Honor.

 6          THE COURT:  And tell me what the experience was that

 7     you were referring to.

 8          PROSPECTIVE JUROR NO. 31:  So it's kind of irrelevant

 9     for this situation, but my mom was a paraplegic all my life.

10     So growing up and being part of her live, she was basically

11     ignored because of that.  When I was eight, people would ask me

12     questions rather than ask my mom, and I would be like lost.

13     But it's -- it wouldn't affect me in that way.

14          THE COURT:  Okay.  So you --

15          PROSPECTIVE JUROR NO. 31:  In either way.  I was just

16     answering the question.

17          THE COURT:  Great.  Okay.  Thank you very much.

18          PROSPECTIVE JUROR NO. 31:  Sure.

19          THE COURT:  And Juror No. 33.  And what was the

20     experience that you were referring to?

21          PROSPECTIVE JUROR NO. 33:  I was just referring to

22     like an experience.  My mom just moved down to South Carolina

23     about four years ago, and she was having a hard time looking

24     for jobs and stuff and, you know, the pay rate and everything

25     is, like, very different there.  So just the hiring person --

 1   the personnel was going to hire her and stuff, she heard the

 2   person utter like, you know, this "N" word or whatever.

 3        But, you know, that was my experience just hearing it.  I

 4   mean, I deal with it every day.  I'm pretty sure a lot of us

 5   do, but I was speaking more in general terms of that.

 6        **THE COURT:**  So -- and dealing -- and dealing with it

 7   every day is -- I get it.

 8        Would you be able to fairly evaluate both sides of the

 9   case?  Start everybody at the same place?  Listen to the

10   evidence?  Figure out what's true and what's not?  And render a

11   fair verdict with the jury given the experiences that you have

12   had in your life?

13        **PROSPECTIVE JUROR NO. 33:**  I believe so.  I mean,

14   because everybody is different.  So I don't take it to a whole

15   broad amount of people.  It's just that person or whatever.

16        **THE COURT:**  And I think that that's right.  Everybody

17   is different.  Every factual situation is different.

18        And the great thing about jury service is that you'll be

19   is sitting with at least, you know, five other people,

20   hopefully seven or eight, and discussing at the end of the case

21   what's real and what's not and considering their experiences as

22   well as yours and what -- what they learned through the trial

23   and trying to come to a same decision.

24        So, great.  Thank you.

25        **PROSPECTIVE JUROR NO. 33:**  Thank you.  Appreciate it.

PROCEEDINGS

```
 1        (Brief pause.)

 2        THE COURT:  So nobody needs to -- there are -- I have

 3   a number of other questions that are going to touch on some of

 4   the same issues that we've just discussed.  And so for people

 5   that have raised the issue that they had, the thing that was

 6   relevant, you don't have to come back on this, but I'm

 7   interested in knowing whether any of you or anyone close to you

 8   have worked in human resources besides the jurors who have

 9   already indicated that.

10        Juror No.s 12 and 18.

11        Okay.  Has anyone -- have you or anyone close to you ever

12   brought a complaint to human resources.

13        (No response.)

14        THE COURT:  Have any -- oh, 18.  Okay.  Same -- same

15   information, I take it.

16        Okay.

17        And 26.  All right.  Okay.

18        And has anyone here ever been accused of racial harassment

19   or discrimination?

20        Juror No. 24.  Do you want to step forward, please?

21        PROSPECTIVE JUROR NO. 24:  I was accused of sexual

22   harassment, and it wasn't racial or anything like that, but I

23   kind of put them in the same category.

24        THE COURT:  Okay.  And is there anything about the

25   way that that matter was resolved that would impact your
```

1    ability to sit as a fair and impartial juror here?

2            **PROSPECTIVE JUROR NO. 24:**  No.

3            **THE COURT:**  Okay.  Thank you.

4        Besides what I've already asked, is there anyone who has

5    worked in a work environment that you felt was racially

6    hostile?

7        All right.  And you've described that, Juror No. 26.

8        Anybody else?

9        (No response.)

10           **THE COURT:**  Okay.  Have -- besides what's already

11    been said, has anyone -- have you or anyone close to you ever

12    been accused of threatening somebody in the workplace?

13        Juror No. 12.  Come -- yeah, come and tell me about that.

14           **PROSPECTIVE JUROR NO. 12:**  It was my dad.  He was,

15    like, sticking up -- also, when I raised my number before, it

16    was my dad who works in HR too, so not just my cousin who did.

17           **THE COURT:**  Okay.

18           **PROSPECTIVE JUROR NO. 12:**  But, yeah, my dad is in HR

19    for -- I don't remember the company, but one of the tech

20    companies.  It's not Tesla.  It doesn't have to do with SpaceX

21    or anything.  And so he threatened someone at his workplace

22    when he was, like, my age-ish, and he -- because they were,

23    like, being mean to my mom and they were, like, coworkers or

24    whatever.  So he threatened to snap her skinny little neck.  So

25    that was, yeah, my experience.

**PROCEEDINGS**

1        THE COURT:  Okay.  Is there anything about that

2   experience that would make a difference to you --

3        PROSPECTIVE JUROR NO. 12:  No.

4        THE COURT:  -- in this case.

5   And with your work in HR, will that make you automatically

6   more sympathetic to any witnesses who testify from HR because

7   you know about the pressures and difficulties of the job?

8        PROSPECTIVE JUROR NO. 12:  Not really, no.  My cousin

9   was in, like, a part of HR that wasn't -- I mean, she was

10  dealing with people, but it was more so, like, turn it off,

11  then on again sort of thing.  Like -- Like, tech, IT-HR stuff.

12       THE COURT:  Okay.

13       PROSPECTIVE JUROR NO. 12:  And then my dad was, like,

14  managing and working to write stuff for qualifications for

15  people to work at the company that he's at.  So it doesn't have

16  to do with, like, a complaint against other people or anything

17  like that.

18       THE COURT:  Okay.

19       PROSPECTIVE JUROR NO. 12:  Yeah.

20       THE COURT:  Okay.  Great.  Thank you.

21  Okay.  Let me switch topics a bit.  The -- has anybody

22  here ever worked for a temporary staffing company?

23  Juror No. 4, would you come to the microphone, please?

24  Good morning.

25       PROSPECTIVE JUROR NO. 4:  Good morning.

**PROCEEDINGS**

1          THE COURT:  So tell me -- tell me who you worked for

2    and what did you do?

3          PROSPECTIVE JUROR NO. 4:  This was called -- this was

4    so long ago, probably at least 15 years ago, for a -- it was a

5    health staffing agency for nurses and phlebotomists in

6    San Bruno.

7          THE COURT:  And did -- was your experience with

8    that -- what was your experience like with that company?

9          PROSPECTIVE JUROR NO. 4:  Good experience.  I was

10   just the office manager for that company.

11          THE COURT:  Okay.  Great.  Thank you.

12      And who else?

13          PROSPECTIVE JUROR NO. 7:  I misunderstood the

14   question.

15          THE COURT:  That was Juror No. 7.  That's -- it's

16   not -- it's not relevant to you.

17          PROSPECTIVE JUROR NO. 7:  Yes.

18          THE COURT:  Okay.  Who else?  Anybody else work for a

19   temporary staffing agency?

20      (No response.)

21          THE COURT:  Has anybody worked for West Valley

22   Staffing Group, Chartwell Staffing, CitiStaff Solutions, or

23   NextSource?

24      (No response.)

25          THE COURT:  Have any of you had a job where you were

1    making personnel decisions, such as hiring and firing?

2        Okay.  So that's Jurors No. 18, 20, 23, 1, 5, 7, and your

3    number is --

4            **PROSPECTIVE JUROR NO. 31:**  31.

5            **THE COURT:**  -- 31.

6        Okay.  So I haven't spoken with you yet, Juror No. 1,

7    would you mind?

8        Good morning.

9            **PROSPECTIVE JUROR NO. 1:**  Good morning.

10       So I work for a school district, and I often, a couple

11   times at least, have been chosen to be on a panel, an interview

12   panel, but not ultimately made the final decision.

13           **THE COURT:**  Okay.  And how about on the other side?

14   Have you ever been involved in any firing decisions?

15           **PROSPECTIVE JUROR NO. 1:**  No.

16           **THE COURT:**  Okay.  Thank you.

17       And who else was there?  No. 5?  Would you mind?

18       This is a good way of getting your 10,000 steps in, so...

19       So tell me what your involvement is with hiring or firing.

20           **PROSPECTIVE JUROR NO. 5:**  As I said, I'm a manager so

21   I hire engineers on my team and I have to let go.  I have to --

22   you know, if performance is not good, I have let go one or two

23   people.

24           **THE COURT:**  And so would that experience make you

25   more sympathetic at the outset to people who are in that

1   position?  Will you be able to evaluate the evidence fairly?

2          **PROSPECTIVE JUROR NO. 5:**  Yeah.  Absolutely.

3          **THE COURT:**  Okay.  Thank you.

4          **PROSPECTIVE JUROR NO. 5:**  Yeah.

5          **THE COURT:**  Who else raised their -- Juror No. 8.

6   Would you mind stepping up to the mic?

7       Good morning.

8          **PROSPECTIVE JUROR NO. 8:**  Good morning.

9          **THE COURT:**  So --

10          **PROSPECTIVE JUROR NO. 8:**  So --

11          **THE COURT:**  Go ahead.

12          **PROSPECTIVE JUROR NO. 8:**  So I'm a solo practitioner

13   CPA so I have my own firm.  Of course, I do my own hiring and

14   firing over the years.

15          **THE COURT:**  And will you be able to look at all of

16   the witnesses and judge their credibility fairly and treat all

17   the parties in this courtroom fairly?

18          **PROSPECTIVE JUROR NO. 8:**  I can try.

19          **THE COURT:**  Is there anything that makes you think

20   that you won't be able to do that?

21          **PROSPECTIVE JUROR NO. 8:**  No, I don't think so.

22          **THE COURT:**  Okay.

23          **PROSPECTIVE JUROR No. 8:**  But there is something else

24   that I want to say, is I am facing a stressful time because

25   October 15th is my last filing deadline for the 2020 tax year,

 1   and I still have a bunch to do.

 2            THE COURT:  Okay.  All right.  And -- so -- and

 3   related to that is the fact that we're going to be going

 4   basically half days from 8:30 to 1:30, so you'll be able to be

 5   working at those other times, will that -- does that allay your

 6   stress at all?

 7            PROSPECTIVE JUROR NO. 8:  From 2:00 o'clock until

 8   12:00 o'clock?

 9            THE COURT:  And how about this being a much shorter

10   trial than the other trials that you might be called to in this

11   court?

12            PROSPECTIVE JUROR NO. 8:  Okay.  Yeah, but that's

13   still only four more weeks to go.

14            THE COURT:  All right.  Okay.  Thank you very much.

15            PROSPECTIVE JUROR NO. 8:  Thank you.

16            THE COURT:  I appreciate it.

17       All right.  Who else had their hand up?  Let's see, is

18   there -- let me -- let me ask of the people whose -- the other

19   folks, is there anything about what you have done in terms of

20   your managerial responsibilities that would make you treat

21   managers in a better -- in a different and better way than

22   anybody else who was called to testify in this case?

23       (No verbal response.)

24            THE COURT:  Okay.  Everybody says "no."

25       All right.  Has anyone seen anyone make a false accusation

1  of racism or harassment in the workplace?

2        (No response.)

3        **THE COURT:**  Have you ever seen someone overreact or

4  get offended by a harmless or joking comment in the workplace?

5        (No response.)

6        **THE COURT:**  Have you ever known someone who was

7  falsely excused of racism or discrimination?

8        (No response.)

9        **THE COURT:**  Have you ever worked in a workplace where

10  coworkers often made racial jokes or trash talk with each other

11  without being offended?

12      Okay.  So let's go first to -- is it No. 30?  Yes.  Come

13  on up.

14        **PROSPECTIVE JUROR NO. 30**:  Hi, Your Honor, again.

15      Yes, where I currently work at.  So I'm a nurse and -- and

16  some of my coworkers, they speak just casually to each other

17  but not to me, and I overhear them call each other the "N" word

18  and -- and I -- I don't argue with them, but I just tell them

19  that they can't say that word, especially I don't ever want to

20  hear them say it.

21      And so now when they greet each other, they don't actually

22  say the "N" word, but they say something sort of to it, but

23  they don't actually say it, as if that should offend me less,

24  and that's what I'm currently dealing with.  So...

25        **THE COURT:**  So there it's something that doesn't seem

**PROCEEDINGS**

1   to impact them, but it impacts you?

2         **PROSPECTIVE JUROR NO. 30**: Yes.  And I made them

3   aware of it, and so I guess they're trying to change it by

4   saying something less, but I kind of -- it's still -- it's

5   still there --

6         **THE COURT**: Okay.

7         **PROSPECTIVE JUROR NO. 30**: -- and it's just -- that's

8   just something that bothers me still.

9         **THE COURT**: Sure.  Sure.  Thank you.

10    And Juror No. 33, did you have your hand up also?

11         **PROSPECTIVE JUROR NO. 33**: Yeah.  I just wanted to

12   say that's -- that's happened at every job I ever worked.  The

13   crap talk and just the "N" word.  If you're Chinese, chink; you

14   know, Mexican, beanbag, whatever, it's always been around.

15         **THE COURT**: Okay.  And so will you be able to -- I'm

16   going to give you instructions on the law about what severe and

17   pervasive harassment is in the workplace, what kind of

18   environment is permissible and not.  Will you be able to

19   judge -- use my instructions with the evidence that you learn

20   here in order to come up with your verdict as opposed to

21   applying whatever things happened in workplaces that you've

22   been involved in before?

23         **PROSPECTIVE JUROR NO. 33**:  I believe so.

24         **THE COURT**: Okay.  Thank you.

25    Has anyone here seen or heard about someone playing the

1   race card in order to get special treatment?

2       Okay.  Let's go to No. 30 first.

3           **PROSPECTIVE JUROR NO. 30**:  So, again, I spend a lot

4   of time at work and this incident a female coworker of mine,

5   she was telling me about her experience on the freeway where

6   she was driving in a carpool lane with no license, speeding,

7   and she got pulled over and it was a white cop that pulled her

8   over.  Oh, and she didn't have her registration nor insurance,

9   nothing, And she didn't get a ticket.  The officer told her to

10  go home.

11      And I said to her, "Hey, do you really think that would

12  happen if a black person got pulled over and had no license,

13  speeding, no registration or anything, and in a car pool lane?

14  Do you think that a black person -- if that were to happen with

15  a black person, he would just go home freely?"  And she said,

16  "Well, I guess that's a privilege."

17      And that struck me as kind of like -- it just flabbergast

18  me, basically.  But I guess -- I feel like that's the world

19  we're living in and that's unfortunate.

20          **THE COURT**:  Okay.  Thank you.

21      And Juror No. 24.

22          **PROSPECTIVE JUROR NO. 24**:  This is probably going to

23  sound trivial, but I do believe in full disclosure.  And, you

24  know, we talk about the race card, you read about that in

25  politics all the time, and I just think it's inescapable.  I

 1  think it's ugly and all that, but it is what it is.  It turns

 2  me off, actually.

 3          **THE COURT:**  All right.  Good.  Thank you.

 4      So the -- as you've heard, the crux -- an important part

 5  of this case involves the -- includes Mr. Diaz's allegations

 6  that he was called a "nigger" at Tesla with some frequency.

 7  There are going to be disputes about that, the context in which

 8  it was used.

 9      Is there anyone who would be so affected by hearing that

10  term that they'd unable -- that they'd be unable to serve as a

11  fair and impartial juror?

12      (No response.)

13          **THE COURT:**  Do lawsuits that seek money for emotional

14  distress seem frivolous or wrong or rub you the wrong way?

15      Juror No. 24, come on up.

16          **PROSPECTIVE JUROR NO. 24:**  Personally I think the

17  tort system needs to be reformed.  I think the courts have a

18  lot of rulings that are outsized relative to the weight of the

19  matter.  People are all alone.  They need to be righted, if you

20  follow what I'm saying.  But I think the tort system on both

21  sides needs to be reformed; and if I were king of the world for

22  a day, I would do it, but I'm not.

23          **THE COURT:**  Okay.  Well, so I'm sort of king of the

24  day when it comes to the law in this case.  So would you be

25  able to follow my instructions on the law, whatever they are,

**PROCEEDINGS**

1   in a fair way and evaluate them in terms of the evidence that

2   comes into the courtroom and render a verdict based on the law?

3        **PROSPECTIVE JUROR NO. 24**:  I -- I can do that.

4        **THE COURT**:  Okay.  Great.  Thank you.

5        So, ladies and gentlemen, in this case you, and I hope

6   this is coming through in the comments that I'm making, you

7   will sit as the judge of the facts.  I instruct you on the law,

8   but deciding the facts is your job.  The jurors are selected as

9   the sole judges of the facts.  You're duty bound to follow the

10  law as I give it to you, but eventually you will apply that law

11  to the facts as you find them from the evidence that's

12  presented here.

13       It's your duty to treat all witnesses equally and not to

14  assume that someone is truthful or not truthful based on their

15  profession or looks or anything else.  You can't make

16  assumptions about credibility until you hear what somebody has

17  to say, and then you can evaluate that and a whole list of

18  factors that I'll instruct you about once the trial starts.

19       Just as an example, consider testimony from a law

20  enforcement officer in a criminal case.  You might have strong

21  positive or negative feelings based on your prior experience

22  with law enforcement about whether she's credible, and I'm

23  going to -- I would instruct you not to assume that she's

24  either more credible or less credible than any other human

25  being who comes into this courtroom.  You need to hear what she

1    has to say and how she says it before judging credibility.

2         The responsibility of judging the facts has to be

3    performed without bias or prejudice to any party.  The law

4    doesn't permit jurors to be governed by sympathy, prejudice, or

5    public opinion.  The parties will expect that you'll be -- that

6    you will carefully and impartially consider all the evidence,

7    follow the law as stated by me, and reach a just verdict

8    regardless of the consequences.

9         So do you know of any reason whatsoever why you could not

10   sit with absolute impartiality of both sides as a juror in this

11   case?

12        No. 31, come on up.

13             **PROSPECTIVE JUROR NO. 31:**  Can I say it privately?

14             **THE COURT:**  I'm sorry?  Yes.

15        So at the end of my questions, we'll probably take a break

16   and at that point anybody who wants to speak privately should

17   remain outside.  Ms. Davis will come get you and bring you in

18   one at a time.

19        So, yes.  Thank you.

20        So this is a civil case.  The burden of proof in a civil

21   case is different than that in a criminal case.  In a criminal

22   case, every essential element of the offense charged has to be

23   proved beyond a reasonable doubt.  But in a civil case, a fact

24   can be established by a preponderance of the evidence; that is

25   to say, by evidence that establishes that a fact is more likely

 1    true than not true.  That's the difference of the required

 2    proof in a criminal and a civil case.

 3        Are you all prepared to follow the law as given to you by

 4    me in your consideration of the evidence?

 5        (Jury panel nodding affirmatively.)

 6        **THE COURT:**  Jurors are not -- may not express or form

 7    any opinion on the merits of the case until the end of trial

 8    when it's been finally submitted to them for their verdict;

 9    that is to say, until they've had the benefit of the arguments

10    of counsel and the instructions of the Court.

11        If you're selected to sit on this case, will you be able

12    and willing to render a verdict based solely on the evidence

13    presented at trial and the law as I give it to you in my

14    instructions and disregard any ideas, notions, or beliefs about

15    the law that you may have encountered other than my

16    instructions when you reach a verdict?

17        (No response.)

18        **THE COURT:**  One of the instructions I'll give you is

19    that you should not discuss the case with anyone until your

20    jury service is concluded.  Does anybody here have any problems

21    with keeping things confidential?

22        (No response.)

23        **THE COURT:**  As I said earlier, this case is going to

24    take six or seven days, not including the time it takes to

25    deliberate.  I recognize that service on the jury is

 1   inconvenient for everybody because it requires you to do

 2   something other than what you would ordinarily be doing and it

 3   interferes with a number of your plans; but, as I said before,

 4   our system of justice depends on everyone's willingness to

 5   serve.

 6        That said, does anyone have any special disability or

 7   problem that would make serving as a member of this jury

 8   difficult or impossible?

 9        All right.  What I will do is ask each of you to wait

10   until the break and then come in one at a time and we can

11   discuss your issues.

12        If you were one of the parties in this case, do you know

13   of any reason, other than anything you may have said so far,

14   why you would not be content to have the case tried by someone

15   with your frame of mind?

16        (No response.)

17        **THE COURT:**  Can anybody think of any other matter

18   besides what you may tell us privately that may have some

19   bearing on your qualifications as a juror or that may prevent

20   your rendering a fair and impartial verdict based solely on the

21   evidence and on my instructions?

22        (No response.)

23        **THE COURT:**  All right.  So those are the questions

24   that I have.  Why don't we take a 15-minute break, and let me

25   tell you what you can and can't do while you're on the break,

1    and then we'll come back.

2        It's very important that you come back to the same seat

3    that you're in.  That's a matter of courtesy and respect for

4    other people.  We need to get you back on time.

5        While we're on -- while you're on the break, please don't

6    discuss the subject matter of the case, the questionnaire, or

7    the proceedings today with anybody.  Don't do any research

8    about it.  Don't communicate with anything -- anybody about it

9    by phone, text, social media.  Don't post anything about it

10   anywhere.  If you see the lawyers or anyone connected with the

11   case, don't speak to them.  That seems rude, but that's -- but

12   that's the order.  Don't speak to them.

13       If you're selected as a juror, I have a very long

14   instruction for you that's related to this; but for now, don't

15   communicate with anybody, including your fellow jurors, about

16   this case in any way and if you hear others communicating about

17   it, walk away from them and then let Ms. Davis know.

18       If this instruction is disregarded, I may have to start

19   this all over again.  So these rules protect everybody and

20   ensure that the verdict that's rendered in the case is based

21   solely on what the parties bring out here in court.  It assures

22   the appearance and the reality of absolute impartiality.  This

23   is what the parties and the Court expect of you.

24       So we are -- we'll now be on break until 11:30.  I will

25   tell you that on the second floor there's a cafeteria, and it's

**PROCEEDINGS**

1  a place that I frequent from time to time and the food is

2  reasonable and reasonably priced, but I want you to be back

3  here at 11:30.

4       And anybody who wants to speak privately to me may do so,

5  but I'd like you to wait outside and then Ms. Davis will come

6  and get you in just a second.

7       All right.  Thank you.

8       (Jury exits the courtroom at 11:08 a.m.)

9            THE COURT:  All right.  Everybody can be seated.

10      And, Ms. Davis, why don't you go and get the -- get the

11  first...

12      (Pause in proceedings.)

13            THE COURT:  All right.  Juror No. 31.

14            PROSPECTIVE JUROR NO. 31:  Hello.

15            THE COURT:  Hi.  What can I do for you?

16            PROSPECTIVE JUROR NO. 31:  Well, I've been party to a

17  lawsuit that went on for, like, four years and just finished

18  two weeks ago; and no offense, but I have a very low opinion of

19  attorneys.  I mean, rock bottom.

20            THE COURT:  Uh-huh.  Well, so some of my best friends

21  are lawyers, I just have to tell you.

22      But the -- there are lawyers on both sides in this case

23  so -- so does that make you think that -- that you couldn't

24  be -- you couldn't sift through the information that you're

25  getting?

1          The lawyers will always present their client's best case,

2    and it's your job to understand what happens up here in the

3    witness stand and be credible -- and judge credibility.  Do you

4    think you'd be able to do that?

5          **PROSPECTIVE JUROR NO. 31:**  I just got -- to be

6    honest, I'm not trying to get out of jury duty, but just being

7    in terms of doing it.  You've got to remember, three to four

8    years of your life is a lot of time.  I was directly involved

9    and I dealt with, like, a lot of inaccurate information that we

10   could prove was inaccurate; and even though they kept doing it,

11   they never got in trouble for giving inaccurate information.

12   They just said, "Oh, it's not right."  And just two weeks after

13   four years is not much of a gap.

14         **THE COURT:**  Okay.

15         **PROSPECTIVE JUROR NO. 31:**  I can tell just how

16   frustrated I was being in here.  It's really odd.  I didn't

17   expect this.

18         **THE COURT:**  Okay.  All right.  Well, I appreciate

19   that.  Thank you for letting me know.

20         **PROSPECTIVE JUROR NO. 31:**  Okay.

21      (Pause in proceedings.)

22         **THE COURT:**  Juror No. 18.

23         **PROSPECTIVE JUROR NO. 18:**  Yes.  Sorry for the

24   inconvenience.

25         Can you repeat for me the time frame that you mentioned

1    that's expected?

2          **THE COURT:**  Yes.  So I expect that the closing

3    arguments will occur no later than a week from Monday, and then

4    the jury will deliberate.  So it would be -- I would be -- I

5    would be quite certain that by two weeks from today the case

6    will be complete.

7          **PROSPECTIVE JUROR NO. 18**:  Okay.  I think the other

8    thing that was on my mind was some of the questions that people

9    were responding to, I didn't think were on my questionnaire.

10         **THE COURT:**  That's true.  You got the same -- I

11   assure you, you got the same questionnaire that everybody else

12   did.  So that -- so what I did was I read the questionnaire.  I

13   have a number of questions that I ask in every case, and

14   then -- then there's some other questions that are more

15   specific to the case that I wanted to ask.  So everybody -- you

16   got the same thing as everybody else.

17         **PROSPECTIVE JUROR NO. 18**:  Fair enough.  I just was a

18   little concerned.

19         **THE COURT:**  Yeah.

20         **PROSPECTIVE JUROR NO. 18**:  So -- but thank you for --

21   for clarifying that for me.

22         **THE COURT:**  Okay.  Thank you.

23         **PROSPECTIVE JUROR NO. 18**:  The timeline is a little

24   bit tough because we're fiscal yearend.  The half days might

25   help, but they only -- my employer will only subsidize about

 1    five days including today.  So that might be really hard for me

 2    financially at a point --

 3            THE COURT:  Okay.

 4            PROSPECTIVE JUROR NO. 18:  -- due to other

 5    circumstances right now, like my whole house is ripped apart.

 6    So I appreciate you repeating the time frame for me.

 7            THE COURT:  Okay.  Thank you very much.

 8        (Pause in proceedings.)

 9            THE COURT:  Remind me your juror number.

10            PROSPECTIVE JUROR NO. 11:  11.

11            THE COURT:  11.  Okay, go ahead.

12            PROSPECTIVE JUROR NO. 11:  I just want to say that

13    it's close to midterms, and I have a lot of tests coming up and

14    most of my classes are based on participation so it just would

15    be really hard for me to serve on the jury.

16            THE COURT:  Where are you going to school?

17            PROSPECTIVE JUROR NO. 11:  S.F. State.

18            THE COURT:  And what year are you?

19            PROSPECTIVE JUROR NO. 11:  This is my third year.

20            THE COURT:  And did you also say that you've got two

21    jobs?

22            PROSPECTIVE JUROR NO. 11:  Yeah.

23            THE COURT:  And what do you do at them?

24            PROSPECTIVE JUROR NO. 11:  I work at the bookstore at

25    my school and the gym at my school.

**PROCEEDINGS**

1      **THE COURT:**  Okay.  Thank you.

2          (Pause in proceedings.)

3      **THE COURT:**  Come on up to the mic.

4      What is your jury number?

5      **PROSPECTIVE JUROR NO. 25:**  25.

6      **THE COURT:**  Okay.

7      **PROSPECTIVE JUROR NO. 25:**  I actually wasn't even

8   sure this was the appropriate time to do it, but I was -- I

9   submitted a request for excusal, and I was denied and then I

10  submitted a request for postponement.  I thought that would

11  make more sense.  But it was a little bit too close to trial,

12  so I was just trying to do the right thing, show up today.

13      My wife is the primary income earner.  I spend most of my

14  time with my two-year-old son during the week.  So really being

15  here for a week is asking her to take a week off of work.  So I

16  just wanted to request a hardship for the week, maybe even just

17  postponement at a minimum.

18      **THE COURT:**  Do you have any -- do you have any family

19  in the area or friends who would be able to help out in the

20  short term?

21      **PROSPECTIVE JUROR NO. 25:**  Scrambling this last

22  minute for a week, no.  No, unfortunately.

23      **THE COURT:**  Okay.  Thank you.

24      **PROSPECTIVE JUROR NO. 25:**  Thank you.

25          (Pause in proceedings.)

PROCEEDINGS

```
 1              THE COURT:  Hello.  Remind me what juror number you
 2   are.
 3              PROSPECTIVE JUROR NO. 13:  13.
 4              THE COURT:  Which number?
 5              PROSPECTIVE JUROR NO. 13:  No. 13.
 6              THE COURT:  No. 13.  Okay.
 7              PROSPECTIVE JUROR NO. 13:  Yeah.  I've been going
 8   through some health issues this -- this year.  I've been
 9   diagnosed with diverticulitis two -- after about two days.  And
10   during July my gall bladder got removed, and right now I am
11   facing sleep apnea.  I sleep less at night and during daytime I
12   make up.  After lunch, I sleep for two hours.  So that's what
13   I'm wondering with my health.
14              THE COURT:  Right.  And so with the sleep apnea -- I
15   didn't hear everything that's going on because my hearing, but
16   with the sleeping, this trial day is 8:30 to 1:30.
17              PROSPECTIVE JUROR NO. 13:  8:30 to 1:30, so it would
18   be okay, I think.  I usually sleep after lunch.
19              THE COURT:  After lunch.  So that would be okay then?
20              PROSPECTIVE JUROR NO. 13:  Yes.
21              THE COURT:  Okay.  And are you -- I mean, are you
22   alert now?  You seem like you're following everything that's
23   going on.
24              PROSPECTIVE JUROR NO. 13:  Yeah.
25              THE COURT:  Yeah, okay.
```

PROCEEDINGS

```
 1          All right.  And -- okay.  Thank you.  I appreciate it.

 2               PROSPECTIVE JUROR NO. 13:  Thank you.

 3          (Pause in proceedings.)

 4               THE COURT:  Good morning.

 5               PROSPECTIVE JUROR NO. 9:  Hi.  I'm Juror No. 9.

 6               THE COURT:  Okay.

 7               PROSPECTIVE JUROR NO. 9:  I have a medical issue

 8     where I have a doctor's note from a fall at work.  So I need to

 9     sit and stand as needed.  Your hours seem like I could make it

10     work, but I do have a brace on so --

11               THE COURT:  Well, so the -- you are welcome to

12     stand -- in this court you can stand at any time you want.  I

13     take breaks every hour and a half so you can walk around and do

14     that.  Do you think you would be able to --

15               PROSPECTIVE JUROR NO. 9:  As long as there's

16     flexibility, for sure, yeah.  I was just wondering.  I was

17     hoping that that was an option.  So if that's in place,

18     that's -- that's fine.

19               THE COURT:  Yeah.  Okay.

20               PROSPECTIVE JUROR NO. 9:  I just need to do it when I

21     need to do it if that's not going to, you know, do anything to

22     the --

23               THE COURT:  Yeah, no.  That's perfectly fine.

24               PROSPECTIVE JUROR NO. 9:  Okay.

25               THE COURT:  Great.  Okay.  Thank you.
```

1          (Pause in proceedings.)

2              **THE COURT:**  Remind me your jury number again.

3              **PROSPECTIVE JUROR NO. 7:**  No. 7.

4              **THE COURT:**  No. 7, yes.

5              **PROSPECTIVE JUROR NO. 7:**  So, you know, when you

6    asked if there was something that would make it difficult for

7    me to serve, it's just -- just the fact I have two young

8    children that go to school -- to a school that is outside of

9    our district.  And, you know, my wife has a full-time job, and

10   we kind of work it out so where she has to take time -- time

11   away from work to go pick him from home and bring him to school

12   and I come in early enough to go and pick him up after school.

13       That will -- that's what would make it difficult, but --

14   and I also wanted to mention that three weeks ago I served jury

15   duty in Sonoma County, and I would have excused myself except I

16   kind of missed -- missed that so I just wanted to mention that.

17             **THE COURT:**  So you just served on a jury three weeks

18   ago?

19             **PROSPECTIVE JUROR NO. 7:**  Yes, in Sonoma County.

20             **THE COURT:**  Congratulations.  Not everybody gets

21   called twice in a month.

22             **PROSPECTIVE JUROR NO. 7:**  I got called at the same

23   time; but when I look at the -- it says if you have served in

24   the past 12 months, that was before I actually went and did

25   that, so I just kind of like, you know, kind of forgot --

PROCEEDINGS

```
 1  forgot about it.  I was like, "Huh, I could have just done

 2  that," you know, but I missed that so...

 3          THE COURT:  Well, I think you get an automatic

 4  excusal for the service that you've already did.  And next time

 5  if they both come at the same time, federal court is so much

 6  more important than state court.

 7          PROSPECTIVE JUROR NO. 7:  Right.

 8          THE COURT:  But if you served three weeks ago, I will

 9  excuse you now.

10          PROSPECTIVE JUROR NO. 7:  Okay.

11          THE COURT:  So thank you very much for your service

12  in Sonoma --

13          PROSPECTIVE JUROR NO. 7:  Well, thank you.

14          THE COURT:  -- and here.  I appreciate it.

15          PROSPECTIVE JUROR NO. 7:  Thank you.  So I can go?

16          THE COURT:  You can go.

17          PROSPECTIVE JUROR NO. 7:  Okay.  Thank you.

18      (Pause in proceedings.)

19          THE COURT:  Okay.  So, Mr. Alexander, it's going to

20  come to you for voir dire when we come back.

21          MR. ALEXANDER:  Thank you, Your Honor.

22      I wanted to raise one issue.

23          THE COURT:  Okay.

24          MR. ALEXANDER:  With regard to the individuals that

25  indicated that they have stock interests, there is actual
```

1  authority that says that that stock interest alone makes them

2  biased, and I think that would apply as to 8 and 15.

3          **MR. ORGAN:**  20.

4          **MR. ALEXANDER:**  8 and 20.  I'm sorry.

5      And the case that addresses that is, I believe, *Getter* --

6  G-E-T-T-E-R -- *vs. Wal-Mart Stores*, 66 F.3d 1119 at 1120.  It's

7  a Sixth Circuit case from 1995.  So I believe I want to bring

8  it to your attention now as you're considering the hardships

9  because I think that those individuals would be off the

10 panel --

11         **THE COURT:**  They may be.

12         **MR. ALEXANDER:**  -- for cause.

13         **THE COURT:**  Okay.  Well, so I'd like -- I'll be

14 interested in hearing from Ms. Kennedy, and I'll take a look at

15 that also once we're done with the voir dire.

16     So what I'm -- what I'm planning to do is letting you go

17 take care of whatever you need to take care of, and then turn

18 it over to you, Mr. Alexander, for about 15 minutes and then to

19 Ms. Kennedy for about 15 minutes, and then we'll take another

20 break and discuss cause and hardship and move on.  So we're

21 doing fine.

22     All right.  Thank you.  So we'll be back at -- come back

23 at 11:30 or as quickly thereafter as possible.

24     (Whereupon there was a recess in the proceedings

25      from 11:22 a.m. until 11:36 a.m.)

1        **THE COURT:**  All right.  So now the lawyers have the

2    opportunity to ask some questions as well.

3        Mr. Alexander, will you be taking the lead?

4        **MR. ALEXANDER:**  Yes, Your Honor.  Thank you.

5        Good morning.  I'm just going to have a few questions for

6    all of you.  If anyone can't hear me in the back, I'll speak

7    louder without yelling.

8        First, by a show of hands, is there anyone that does not

9    believe that emotional distress exists?  Is there a show of

10   hands?

11       (No response.)

12       **MR. ALEXANDER:**  I don't see any hands.

13       Is there anyone that feels that you cannot suffer

14   emotional distress as a result of things that occur inside your

15   workplace?  Is there anyone here that feels that?

16       (No response.)

17       **MR. ALEXANDER:**  No show of hands.  I see no one.

18       Is there anyone here who would not be willing to award

19   damages for emotional distress regardless of what we say in

20   terms of meeting our burden of proof?  Is there anyone here who

21   would not be willing to award emotional distress damages?

22       (No response.)

23       **MR. ALEXANDER:**  I don't see any hands.  Thank you.

24       **MR. ORGAN:**  There was --

25       **MR. ALEXANDER:**  I'm sorry?

PROCEEDINGS

```
 1        So I see your hand.  I don't remember your number.  If you
 2   could come forward.
 3             PROSPECTIVE JUROR NO. 24:  24.
 4             MR. ALEXANDER:  No. 24.
 5             PROSPECTIVE JUROR NO. 24:  I think I can award
 6   emotional distress, but I'd have to think very hard about the
 7   amount of judgment.  As I said earlier, I've got a belief in
 8   the way the court system works, the way the judgments work; and
 9   so I could do it, but it's going to take a lot in me to come
10   out with an amount.
11             MR. ALEXANDER:  And I had forgotten.  And so if
12   you -- if you were king of the world for a day, what you would
13   do is adjust emotional distress --
14             PROSPECTIVE JUROR NO. 24:  Say that again, please.
15             MR. ALEXANDER:  If you were king of the world for a
16   day, what you would do is make some adjustments so that
17   emotional distress damages could not be awarded?
18             PROSPECTIVE JUROR NO. 24:  I'd have to look at it
19   very closely.  I would look at the facts very closely, but
20   outsized judgments, that doesn't really work for me.
21             MR. ALEXANDER:  Thank you very much.
22        Are there any fans of Elon Musk?  There are some people
23   that had opinions, but are there any fans of Elon Musk?
24        (No response.)
25             MR. ALEXANDER:  How about companies that are run by
```

```
 1   or owned by Elon Musk?

 2        (No response.)

 3        MR. ALEXANDER:  Does anyone work at a company that

 4   does business with an Elon Musk company?

 5        PROSPECTIVE JUROR NO. 18:  In the past.

 6        MR. ALEXANDER:  Thank you very much.  I remember your

 7   response.  You're number?

 8        PROSPECTIVE JUROR NO. 18:  18.

 9        MR. ALEXANDER:  No. 18.  Thank you very much.

10        Are there any -- is there anyone that works at a company

11   that uses subcontractors to do work?

12        Sorry.  I see a hand from No. 1 and -- my goodness, No. 1,

13   20, 18, 24, and 23.

14        THE COURT:  And 26.

15        MS. NUNLEY:  26 as well.

16        MR. ALEXANDER:  With regard to those individuals

17   whose hands were raised, can you tell me, can you keep -- if

18   you could raise your hands now and put your hand down if you do

19   not give direction to those individuals?  In other words, if

20   you -- if you give direction to those individuals, leave your

21   hands up.

22        Juror No. 1?

23        PROSPECTIVE JUROR NO. 1:  May I ask a clarifying

24   question?

25        MR. ALEXANDER:  Sure.
```

PROCEEDINGS

1          **PROSPECTIVE JUROR NO. 1:**  So not currently, but if we

2    were to hire one, it may be someone that's placed -- like, I

3    might have.

4          **MR. ALEXANDER:**  So when your company hires

5    individuals as independent contractors?

6          **PROSPECTIVE JUROR NO. 1:**  Yes.

7          **MR. ALEXANDER:**  And what type of direction do you

8    give?

9          **PROSPECTIVE JUROR NO. 1:**  So I'm an occupational

10   therapist, and oftentimes we have shortages with OT or speech

11   therapy or psychologists; and if it's an OT need, it might be

12   someone that if it's an assistant, they might work under my

13   license.  But that's not currently happening.

14         **MR. ALEXANDER:**  All right.  Thank you very much.

15      There are some of you that raised your hand that we have

16   heard from, and so I -- I may not ask you questions and please

17   don't be offended by that.

18      No. 24 -- not 24.  No. 23, did you -- I believe you raised

19   your hand?

20         **PROSPECTIVE JUROR NO. 23:**  No.

21         **MR. ALEXANDER:**  I lost track.  The people that raised

22   their hand with regard to individual contractor, would you

23   raise your hand again?

24      No. 20.  Thank you very much.

25         **PROSPECTIVE JUROR NO. 20:**  Good morning.

**PROCEEDINGS**

1      **MR. ALEXANDER:**  With regard to your company, you use

2   independent contractors?

3      **PROSPECTIVE JUROR NO. 20:**  Used to use independent

4   contractor, but I use a lot of the contractor through the

5   staffing companies.

6      **MR. ALEXANDER:**  Through staffing companies?

7      **PROSPECTIVE JUROR NO. 20:**  Yes.

8      **MR. ALEXANDER:**  And how often does that occur?

9      **PROSPECTIVE JUROR NO. 20:**  How often?

10     **MR. ALEXANDER:**  Yes.

11     **PROSPECTIVE JUROR NO. 20:**  It's about half of my team

12  are full-time employee.  The other half are, like, contractors

13  through staffing company.

14     **MR. ALEXANDER:**  And so with regard to the people that

15  are contract employees working for the staffing company, are

16  they subject to the same rules as the people that work directly

17  for you?

18     **PROSPECTIVE JUROR NO. 20:**  Can you repeat the last

19  part of your question?

20     **MR. ORGAN:**  The people that work at the staffing

21  company, are they subject to the same rules as the people that

22  work directly for you?

23     **PROSPECTIVE JUROR NO. 20:**  In general, yes.

24     **MR. ALEXANDER:**  Thank you very much.

25     Is there anyone whose company uses staffing employees that

**PROCEEDINGS**

```
 1   are subject to different rules than the rules that apply to

 2   your direct employees?

 3        Thank you.  If you could come forward.

 4        Good morning.  Could you remind me of your number.

 5             PROSPECTIVE JUROR NO. 23:  23.

 6             MR. ALEXANDER:  And so your company uses staffing

 7   employees?

 8             PROSPECTIVE JUROR NO. 23:  They do.  And for the

 9   contractors and subcontractors outside of U.S., they have

10   different guidelines and policies for them.

11             MR. ALEXANDER:  And do you supply the policies for

12   those people that are from the staffing companies?

13             PROSPECTIVE JUROR NO. 23:  Sorry?  Say that again?

14             MR. ALEXANDER:  You said that there are different

15   policies that apply to the contract employees through the

16   staffing companies.  Do you supply those staffing employees

17   with the rules?

18             PROSPECTIVE JUROR NO. 23:  Yes.

19             MR. ALEXANDER:  All right.  So you don't rely on the

20   staffing company to do that?

21             PROSPECTIVE JUROR NO. 23:  I think it's -- it's done

22   by both.

23             MR. ALEXANDER:  And with regard to staffing contract

24   employees through the staffing companies, if there's any issue

25   with regard to those staffing employees, do you handle it
```

 1   directly or leave it to the staffing company to handle?

 2           **PROSPECTIVE JUROR NO. 23**:  I haven't run into that

 3   situation so I'm not aware of what they do.

 4           **MR. ALEXANDER:**  All right.  Thank you very much.

 5      Let me -- I'd like to talk to some people that I have not

 6   heard from.

 7      Juror No. 6, if you could -- if I could speak with you for

 8   a couple minutes.

 9      How are you doing this morning?

10      Question for you.  With regard to our judicial system as

11   opposed to the judicial system from Myanmar -- is that where

12   you were from originally?

13           **PROSPECTIVE JUROR NO. 6**:  Yes.

14           **MR. ALEXANDER:**  How do you feel about our jury system

15   in terms of jurors coming in, making a decision about the facts

16   in the case, and then awarding damages under circumstances

17   where someone has met their burden of proof?

18           **PROSPECTIVE JUROR NO. 6**:  I think it's a fair system.

19           **MR. ALEXANDER:**  I'm sorry?

20           **PROSPECTIVE JUROR NO. 6**:  Very fair.

21      I don't understand your question.

22           **THE COURT:**  "Very fair" is what he said.  A very fair

23   system is what he said.  A very fair system was what he said.

24           **MR. ALEXANDER:**  Thank you.  I'm having problems

25   hearing.  Thank you very much.

1       And in terms of -- in terms of emotional distress, do you

2   feel that emotional distress is something that you would be

3   willing to award damages for?

4           **PROSPECTIVE JUROR NO. 6**:  Yes.

5           **MR. ALEXANDER**:  Yes?

6           **PROSPECTIVE JUROR NO. 6**:  Yes.

7           **MR. ALEXANDER**:  I'm going to ask you a question about

8   punitive damages so I can ask a question generally to other

9   people.

10      If a company were to make a conscious decision to break

11  the law or to disregard the law or to lie about breaking the

12  law, would you be willing to award punitive damages, damages to

13  punish, under those circumstances?

14          **PROSPECTIVE JUROR NO. 6**:  Yes, I would.

15          **MR. ALEXANDER**:  Yes, you would?

16          **PROSPECTIVE JUROR NO. 6:**  Yes.

17          **MR. ALEXANDER**:  Thank you very much.

18      A question to everyone.  Same question.  Is there anyone

19  here who under circumstances where we met our burden of proof

20  an employer had made a decision to break the law or disregard

21  the law or didn't -- didn't follow the law as they should, is

22  there anyone here who, for whatever reason, would not be

23  willing to award punitive damages?

24      If you could come up, I'd appreciate that.  That is Juror

25  No. 5?

1        **PROSPECTIVE JUROR NO. 5**:  Yes.

2        **MR. ALEXANDER:**  With regard to punitive damages, do

3    you have any -- you said you had a follow-up question.  Go

4    ahead.

5        **PROSPECTIVE JUROR NO. 5**:  Yeah.  I would -- I would

6    award punitive damage, but where would that money go is the

7    question?

8        **MR. ALEXANDER:**  Well, the judge will give you an

9    instruction with regard to how punitive damages work.  And my

10   issue was really to find out, do you have anything personally

11   that would cause you to feel that you could not award punitive

12   damages even if the judge were to give you an instruction

13   saying that we're entitled to under the right circumstances.

14       **PROSPECTIVE JUROR NO. 5**:  I understand the question

15   very well.  My question is, like, two things here.  There are

16   two -- two parties here.  One party is suffered and we award

17   damages for that party.  Then the other party we need to award

18   a punitive damage, and I want to -- I do want to award the

19   punitive damage or -- but where does that -- what is that --

20   what are those damages and how will it be used?

21        Because this person has been compensated.  This party has

22   been compensated.  This needs to be punished and how do we

23   punish it?  And where -- if it's going to be a financial one,

24   where does it go?  Because this person has been satisfied;

25   right?  That's the question I have.  How does this thing work?

PROCEEDINGS

1          MR. ALEXANDER:  If you were picked on the jury, we

2    will give that information as part of the process.  Thank you.

3          Is there anyone who believes that the workplace or society

4    in general has become politically correct; meaning there are

5    just things you can't say for being politically correct?

6    Anyone feel that?

7          Thank you very much.  I've heard from you.

8          Thank you very much.  I've heard from you.

9          Juror No. 19, could I talk to you for a moment, please?

10   How are you doing this morning?

11         PROSPECTIVE JUROR NO. 19:  Good.  How are you?

12         MR. ALEXANDER:  Is there anything about the

13   litigation that you've been involved in, being in deposition or

14   what-have-you, that would cause you to have a bad feeling or

15   not want to participate in this litigation as a juror?

16         PROSPECTIVE JUROR NO. 19:  No.  It was completely

17   unrelated.  Basic depositions we have to do frequently.

18         MR. ALEXANDER:  Is there anything about awarding

19   damages for emotional distress that would cause you not to want

20   to be a juror in this case?

21         PROSPECTIVE JUROR NO. 19:  No.

22         MR. ALEXANDER:  Anything about awarding punitive

23   damages that would cause you not to want to be a juror in this

24   case?

25         PROSPECTIVE JUROR NO. 19:  No.

PROCEEDINGS

```
 1              MR. ALEXANDER:  Okay.  Inside of your workplace, have

 2   you ever seen or experienced discrimination occurring?

 3              PROSPECTIVE JUROR NO. 19:  No.

 4              MR. ALEXANDER:  Given that you haven't seen or

 5   experienced it, do you believe that discrimination still occurs

 6   inside the workplace?

 7              PROSPECTIVE JUROR NO. 19:  I'm sure it does.

 8              MR. ALEXANDER:  You're sure it does.  Thank you.

 9   Thank you very much.

10              PROSPECTIVE JUROR NO. 19:  Okay.

11              MR. ALEXANDER:  There are a number of people that

12   have said they did -- have experienced discrimination; but for

13   those of you who have not either experienced it or seen it, is

14   there anyone here that does not believe that discrimination

15   still occurs inside the workplace?  If I could see a show of

16   hands.

17        (No response.)

18              MR. ALEXANDER:  Thank you.

19        Juror No. 4, if I could speak with you for a moment.

20        If I recall correctly, and I -- you have been an office

21   manager?

22              PROSPECTIVE JUROR NO. 4:  Yes.

23              MR. ALEXANDER:  And have you often had the experience

24   of hiring and firing individuals?

25              PROSPECTIVE JUROR NO. 4:  No.
```

PROCEEDINGS

```
 1              MR. ALEXANDER:  And do you have any responsibility

 2    with regard to addressing human resource matters?

 3              PROSPECTIVE JUROR NO. 4:  No.

 4              MR. ALEXANDER:  Have you ever conducted a workplace

 5    investigation?

 6              PROSPECTIVE JUROR NO. 4:  No.

 7              MR. ALEXANDER:  Inside of your employer, is there

 8    someone that has that human resource responsibility?

 9              PROSPECTIVE JUROR NO. 4:  Yes.

10              MR. ALEXANDER:  And have you ever had experiences

11    with your human resource department?

12              PROSPECTIVE JUROR NO. 4:  No.

13              MR. ALEXANDER:  Any experiences at work where you

14    were dissatisfied with the way you were treated at work by

15    management?

16              PROSPECTIVE JUROR NO. 4:  Umm, yeah, I guess in the

17    form of favoritism.

18              MR. ALEXANDER:  Favoritism.  Against you?  Favoritism

19    of others?

20              PROSPECTIVE JUROR NO. 4:  Both.

21              MR. ALEXANDER:  And on that occasion, did you take

22    any action?  Did you do anything?

23              PROSPECTIVE JUROR NO. 4:  No.

24              MR. ALEXANDER:  Are there --

25              PROSPECTIVE JUROR NO. 4:  Just talking to other
```

**PROCEEDINGS**

 1  managers about it, but that's it.

 2          MR. ALEXANDER:  So you've never had occasion to have

 3  interaction with human resources to address a problem that

 4  you've had?

 5          PROSPECTIVE JUROR NO. 4:  No.

 6          MR. ALEXANDER:  In your role as a manager, have you

 7  had any individuals that have spoken to you, come to you to

 8  seek you out to -- for assistance?

 9          PROSPECTIVE JUROR NO. 4:  No.  I'm not a people

10  manager and wasn't a people manager, so different type of

11  manager.

12          MR. ALEXANDER:  With regard to emotional distress, is

13  that something that you'd feel comfortable awarding?

14          PROSPECTIVE JUROR NO. 4:  Uh-huh.

15          MR. ALEXANDER:  Yes?

16          PROSPECTIVE JUROR NO. 4:  Yes.

17          MR. ALEXANDER:  Okay.  Thank you very much.

18      (Discussion held off the record between plaintiffs'

19       counsel.)

20          THE COURT:  I'm just making sure.  You're just about

21  to finish; is that right?

22          MR. ALEXANDER:  I'm just about to finish.

23          THE COURT:  Okay.  Go ahead.

24          MR. ALEXANDER:  Thank you, Your Honor.

25      Juror No. 13, good morning.

PROCEEDINGS

1          **PROSPECTIVE JUROR NO. 13**:  Good morning.

2          **MR. ALEXANDER:**  Just to be sure, do you have -- with

3    regard to emotional distress, is that something you feel that

4    you could award damages for if we were to meet our burden of

5    proof?

6          **PROSPECTIVE JUROR NO. 13**:  Can you repeat?

7          **MR. ALEXANDER:**  Let me ask the question simpler.

8       Do you believe that emotional distress is real?

9          **PROSPECTIVE JUROR No. 13**:  Yes.

10         **MR. ALEXANDER:**  And could you award damages for it if

11   we meet our burden of proof?

12         **PROSPECTIVE JUROR NO. 13**:  Yes.

13         **MR. ALEXANDER:**  Okay.  And do you have any feelings

14   about punitive damages?  Is that something that you could award

15   if we met our burden of proof that the defendant in this case

16   had did things purposely against the law?

17         **PROSPECTIVE JUROR NO. 13**:  Yes.

18         **MR. ALEXANDER:**  Okay.  Is there anything about this

19   case that would cause you to believe that you could not be fair

20   and impartial to both sides?

21      (No response.)

22         **MR. ALEXANDER:**  Is there anything about this case

23   that would cause you to think that you might favor one side

24   over the other?

25         **PROSPECTIVE JUROR NO. 13**:  No.

PROCEEDINGS

1          MR. ALEXANDER:  All right.  Thank you very much.

2          PROSPECTIVE JUROR NO. 13:  Yeah.

3          MR. ALEXANDER:  Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Alexander.

5     Ms. Kennedy?

6          MS. KENNEDY:  Good morning still.  I have a few

7     follow-up questions.  I'm going to ask a few general questions.

8     If could you just raise your hand, and I will follow up.

9          One of the first questions I want to ask since we are here

10    and I'm representing the defendant, does anyone have a problem

11    with the fact that the defendant Tesla has to go last; in other

12    words, we have to present our evidence second?  Does anyone

13    have a problem with that concept?  In other words, the

14    plaintiff gets to go first, present his case, and then Tesla

15    has to go last.  Does anyone have a problem with that.

16         (No response.)

17         MS. KENNEDY:  Is anyone here knowing that sort of how

18    this works, are they unable to sort of wait until all the

19    evidence is submitted to make a decision?

20         (No response.)

21         MS. KENNEDY:  Given what you've heard so far from

22    Judge Orrick and just the questions from other jurors, how many

23    people of you have made up your mind as to what happened

24    already?

25         (No response.)

```
 1          MS. KENNEDY:  Does anyone here think they know what
 2   the facts are?
 3        (No response.)
 4          MS. KENNEDY:  Let me ask Juror No. -- No. 30,
 5   Mr. Naylor.
 6        In the questionnaire -- I believe you answered a question
 7   in response to Judge Orrick's questioning that you felt that
 8   you had an opportunity to make a right wrong.  Do you -- is --
 9   my question to you is:  Do you feel that's your role as a
10   juror?
11          PROSPECTIVE JUROR NO. 30:  I believe the judge
12   clarified it when he said that there is -- have been no right
13   or wrong established right now, and I'm comfortable with that.
14          MS. KENNEDY:  I'm sorry.  I did not understand you.
15          PROSPECTIVE JUROR NO. 30:  I believe there hasn't
16   been a right or wrong established right now, and so I'm
17   comfortable with that.
18          MS. KENNEDY:  I understand that, but my question was
19   a little different.  Do you feel like your role as a juror is
20   to right a wrong?
21          PROSPECTIVE JUROR NO. 30:  That's part of the justice
22   system.
23          MS. KENNEDY:  I'm sorry?
24          PROSPECTIVE JUROR NO. 30:  That's part of the justice
25   system.  Not my decision to make.
```

1        **MS. KENNEDY:**  Okay.  As a juror, do you feel that you

2  can wait until all the evidence is in before you make a

3  decision?

4        **PROSPECTIVE JUROR NO. 30:**  Yes.

5        **MS. KENNEDY:**  And in this particular case, if you

6  were sitting on this side of the table representing Tesla, do

7  you think you are the right -- you are a juror that Tesla would

8  pick?

9        **PROSPECTIVE JUROR NO. 30:**  I would hope so.

10        **MS. KENNEDY:**  And why is that?

11        **PROSPECTIVE JUROR NO. 30:**  Because I try -- I plan to

12  be pretty impartial and fair-sided.

13        **MS. KENNEDY:**  Do you think you can be a fair and

14  impartial juror despite everything that you've heard?

15        **PROSPECTIVE JUROR NO. 30:**  Yes.

16        **MS. KENNEDY:**  All right.  Thank you, Mr. Naylor.

17    In this particular matter you're going to be hearing some

18  testimony about events that happened in a workplace at the

19  Tesla facility in Fremont.  My first question is:  Has anyone

20  actually been out to that Tesla Fremont facility for any

21  reason?

22    Yes, Juror No. is it 23?  Yes.  And I know you have some

23  family that used to work there.  Is that what it's in relation

24  to?

25        **PROSPECTIVE JUROR NO. 23:**  (Nods head.)

 1          MS. KENNEDY:  Any other reason that you've been out

 2   to that facility?

 3          PROSPECTIVE JUROR NO. 23:  (Shakes head.)

 4          MS. KENNEDY:  Yes, Juror No. 30 -- oh, sorry.

 5   No. 33?  Yes?

 6          THE OFFICIAL REPORTER:  I'm sorry, Your Honor.  I

 7   can't hear him.

 8          THE COURT:  You need to come to the mic.  I'm sorry.

 9          PROSPECTIVE JUROR NO. 33:  Yes.  I've been there just

10   because I got hired by them before.  So -- but I didn't take

11   the job.  So I've been to the facility, that's it.

12          MS. KENNEDY:  I'm sorry.  I --

13          PROSPECTIVE JUROR NO. 33:  I said I've been hired by

14   them before, but I wound up not taking the job, but I've been

15   to the facility before.

16          MS. KENNEDY:  Were you actually hired by Tesla or

17   were you hired by a staffing agency and placed there?

18          PROSPECTIVE JUROR NO. 33:  It was Tesla.

19          MS. KENNEDY:  Do you recall what staffing agency that

20   was?

21          PROSPECTIVE JUROR No. 33:  I don't.

22          MS. KENNEDY:  Do you recall when that was?

23          PROSPECTIVE JUROR NO. 33:  It was about two years

24   ago, three years ago.

25          MS. KENNEDY:  And do you recall where you actually

1    worked in the facility?

2         PROSPECTIVE JUROR NO. 33:  No.

3         MS. KENNEDY:  No.  Do you remember what you did at

4    the facility?

5         PROSPECTIVE JUROR NO. 33:  I'm sorry?

6         MS. KENNEDY:  What did you do there?

7         PROSPECTIVE JUROR NO. 33:  I didn't actually work

8    there.  I was hired.

9         MS. KENNEDY:  Oh.

10        PROSPECTIVE JUROR NO. 33:  I never took the job, but

11   I -- that's me going to the facility or whatever.  I was just

12   answering that.

13        MS. KENNEDY:  Okay.  I'm sorry.  I misunderstood.

14      Did you -- were you actually offered a position there?

15        PROSPECTIVE JUROR NO. 33:  Yes, ma'am.

16        MS. KENNEDY:  And what position were you offered?

17        PROSPECTIVE JUROR NO. 33:  Shoot.  I forgot what the

18   position was.  I know it was just a nighttime position.  I

19   don't know.  I don't remember.  I don't recall.

20        MS. KENNEDY:  And any reasons why you decided not to

21   go work at the facility?

22        PROSPECTIVE JUROR NO. 33:  Just at the time I didn't

23   think it was the right move to do -- I mean, to make.  Just I

24   had -- I had other options opening as well.

25        MS. KENNEDY:  Okay.  All right.  Thank you very much,

 1  sir.

 2  **PROSPECTIVE JUROR NO. 33**:  Yes.

 3  **MS. KENNEDY**:  You've heard -- we've had some

 4  questions asked of the panel about Elon Musk.  If you are

 5  picked for this jury, one of the instructions that you may get

 6  is you can't go on the internet and do other things.  Do you

 7  think if you are picked for this jury and you see something in

 8  the news about Elon Musk, do you think that would be something

 9  you could put out of -- out of your mind?  And can you agree

10  not to read any articles or Tweets or anything else that

11  Mr. Musk may put out at any point in time?  Does anyone have a

12  problem with that?

13      (No response.)

14      **MS. KENNEDY**:  Any concern about that?

15      (No response.)

16      **MS. KENNEDY**:  Also, in this case, in a civil case,

17  the only way to sort of compensate someone for a wrong is with

18  money damages.  So my question here is:  If, in fact, Mr. Diaz

19  does not prove his case, although you may think something may

20  have happened or you may feel sorry for him or you may hear

21  some evidence that makes you feel uncomfortable and he doesn't

22  meet his burden of proof, is there anyone here who says:  You

23  know what?  I still think I should award damages because I feel

24  sorry for Mr. Diaz?  Does anyone feel that way?

25      (No response.)

 1          **MS. KENNEDY:**  Does anyone here on the venire if you

 2    were an attorney for Tesla would think:  You know what?  I'm

 3    probably not the right juror for this case for Tesla.  I just

 4    think right now I just -- there is nothing Tesla can say that

 5    would allow me to find in favor of Tesla?

 6         (No response.)

 7          **MS. KENNEDY:**  So everyone here can listen to all the

 8    evidence, wait until the end, and make a decision?

 9         (No response.)

10          **MS. KENNEDY:**  Let me ask a couple individual

11    questions then.  Ms. -- I'm sorry, Juror No. 12.  Thank you.

12         And you said -- I believe you said that your cousin was

13    fired from HR at Tesla.  Do you know if your cousin was a Tesla

14    employee or a contractor?

15          **PROSPECTIVE JUROR NO. 12:**  A Tesla employee.

16          **MS. KENNEDY:**  Okay.  And do you recall how long ago

17    that was?

18          **PROSPECTIVE JUROR NO. 12:**  Three or four years ago.

19          **MS. KENNEDY:**  So it would be sometime in 2018,

20    2019-ish?

21          **PROSPECTIVE JUROR NO. 12:**  Yes.  Yeah.

22          **MS. KENNEDY:**  Okay.  And how long did your cousin

23    work there at the time that he or she was let go?

24          **PROSPECTIVE JUROR NO. 12:**  She worked there for two

25    years I think.  It wasn't a super long time.

1          MS. KENNEDY:  And do you know, did she work at the

2     Fremont location?

3          PROSPECTIVE JUROR NO. 12:  Yes.

4          MS. KENNEDY:  And did you ever have any conversations

5     with your cousin about any type of base chart issue or

6     personnel issue or anything at the Tesla facility?

7          PROSPECTIVE JUROR NO. 12:  Not anything besides,

8     like, just annoying employees.  Not, like -- yeah, it's just,

9     you know, she's just telling me about her day or whatever.

10         MS. KENNEDY:  To your knowledge, do you know if your

11    cousin had any dealings with any of the contract companies, the

12    staffing companies, that worked at -- or provided services to

13    Tesla?

14         PROSPECTIVE JUROR NO. 12:  Not that I know of.

15         MS. KENNEDY:  Thank you very much.

16     Juror No. 18.

17     Yes.  Thank you.  I think Ms. Ellis?

18         PROSPECTIVE JUROR NO. 18:  Yes.

19         MS. KENNEDY:  A couple questions.  I wanted to follow

20    up with a couple questions that Judge Orrick asked you about.

21     You mentioned that sometimes you help employees when they

22    make complaints at work.  Are you, like, an ombudsman or an

23    employee advocate?  What is that?

24         PROSPECTIVE JUROR NO. 18:  No.  It was more they were

25    discussing an incident with me, and I am a manager there and so

PROCEEDINGS

1    my advice was to take your concern to HR, and -- because

2    sometimes people are hesitant to do so.

3              **MS. KENNEDY:**  Understood.

4         And was it -- was it your sort of training that you got

5    that if there's an employee complaint, it needs to go to HR,

6    handled by HR?

7              **PROSPECTIVE JUROR No. 18:**  I mean, it depends on what

8    kind of thing it is.

9              **MS. KENNEDY:**  Understood.

10             **PROSPECTIVE JUROR NO. 18:**  You know, but -- but,

11   yeah.  If somebody's -- you guys were asking about it in

12   relation to discrimination I believe was that questioning.  So

13   I would absolutely send them to discuss their situation.

14             **MS. KENNEDY:**  In your employment experience, did you

15   ever get any type of anti-harassment, anti-discrimination

16   training?

17             **PROSPECTIVE JUROR NO. 18:**  Well, we do -- we do our

18   typical California harassment and all of that, you know, every

19   year, and it -- it absolutely is a liability to not address

20   things if they're brought to your attention.

21             **MS. KENNEDY:**  Understood.

22        And what is your understanding as to what should be done

23   when there's a complaint of harassment or discrimination or

24   retaliation?

25             **PROSPECTIVE JUROR No. 18:**  Well, in my role, I would

1   recommend that they go to HR and they would discuss that with

2   HR; and typically at that point if there was a reason to do so,

3   HR would perform an investigation.

4         MS. KENNEDY:  And is it your understanding that when,

5   say, a complaint comes up or there's an issue that's brought to

6   HR or management and the matter is handled with discipline or

7   no discipline or separation, is it your understanding that

8   that's sort of what HR or management is supposed to do to

9   resolve any type of workplace issues?

10        PROSPECTIVE JUROR NO. 18:  Can you ask it again?

11        MS. KENNEDY:  Sure.  That was a little bit of a --

12        PROSPECTIVE JUROR NO. 18:  There's a lot in there.

13        MS. KENNEDY:  That was a lawyer-like question so I

14   apologize.  Let me ask it a better way.

15        Based on your training and just being a manager, is it

16   your understanding that when a complaint is brought, whether to

17   HR or to a manager, and the matter is dealt with and a decision

18   made, either to discipline or fire or retrain or whatever, is

19   that your understanding, based on your training and experience,

20   that that's sort of how workplace issues should be handled and

21   resolved?

22        PROSPECTIVE JUROR NO. 18:  I -- I think that it's

23   always individual, and that that -- there may be times when

24   things are handled differently depending on the situation.

25   People come to applicable agreements.  People part ways.

1    People get fired.  People sue.  I mean, there's a lot of

2    different things, and I'm -- at that point I'm not involved.

3        But, you know, I think what I was mentioning before was

4    that when I had been directly asked about "This happened to me

5    and it was discrimination," my advice was to speak to HR.

6        **MS. KENNEDY:**  Right.  And I don't want to go into

7    your personal issue about that, but did you, in fact, go to HR

8    and was the matter resolved to your satisfaction or not to your

9    satisfaction?

10       **PROSPECTIVE JUROR NO. 18:**  I'm unsure about several

11   of them.  So, you know, because, again, it's not mine to pry.

12       **MS. KENNEDY:**  Okay.  Understood.  Thank you very

13   much.  I appreciate it.

14       **PROSPECTIVE JUROR NO. 18:**  Thank you.

15       **MS. KENNEDY:**  A couple final questions to the group.

16       In looking -- just hearing what you've heard for the past

17   couple of hours and understanding that there is a dispute

18   because we're actually here, is anyone holding it against Tesla

19   or thinking that Tesla probably should have resolved this

20   before?  That there must have -- something really should have

21   happened, something truly did happen and Tesla is at fault?

22   Does anyone believe that right now or have a feeling that

23   probably something did happen because we actually ended up in a

24   trial?

25       (No response.)

**PROCEEDINGS**

1              MS. KENNEDY:  Let me ask Juror No. 26.  Mr. Hall?

2    Based upon what you've heard so far, do you have a belief one

3    way or another that something must have happened for us to have

4    made it this far to an actual trial?

5              PROSPECTIVE JUROR NO. 26:  No.

6              MS. KENNEDY:  Do you have any concerns one way or

7    another as to what the -- do you have any idea of what the true

8    facts are?

9              PROSPECTIVE JUROR NO. 26:  No.  I believe that

10   everything will be revealed should I be selected.

11             MS. KENNEDY:  All right.  Thank you very much,

12   Mr. Hall.  I appreciate that.

13        All right.  Your Honor, I think I'm just about done.  If I

14   could just take a look my notes real quick.

15             THE COURT:  Sure.

16        (Discussion held off the record amongst defense

17          counsel.)

18             MS. KENNEDY:  Your Honor, I don't have any more

19   questions.

20             THE COURT:  Great.  Thank you very much.

21        So, ladies and gentlemen, you will be thrilled to know

22   that things have been moving along very well, and the next

23   thing that I have to do is to talk with the lawyers for a

24   little bit before we get into the final actual selection

25   process.

1       So I'm going to ask you to take another break, and this

2   one just for ten minutes, and I'll ask you to just ten minutes

3   from now be outside the door and come back to the same place

4   and we'll -- we'll conclude the jury selection process.

5       Remember what I told you before about not communicating

6   with anybody about this case in any way, shape, or form, and

7   we'll see you in about ten minutes.

8       (Proceedings were heard out of presence of prospective

9   jurors:)

10          **THE COURT:**  All right.  Please be seated everybody.

11       I'm going to give you a moment to talk with each other --

12   with your teams about the hardship and cause; but, Ms. Kennedy,

13   I wondered whether you had a response on the stock question,

14   whether you agreed with --

15          **MS. KENNEDY:**  Yes, I did, Your Honor.  I took a look

16   at that case.

17          **THE COURT:**  If you'd speak into the microphone, that

18   will be a good thing.

19          **MS. KENNEDY:**  Oh, sorry.  I could do it here or --

20          **THE COURT:**  Either one.

21          **MS. KENNEDY:**  Let me do it here.  This is probably

22   better because I think I was going too fast for the court

23   reporter.

24       Yes, I did look at the case, which is *Getter v. Wal-Mart*

25   *Stores, Inc.*, 66 F.3d 1119, 1995 case.  In that particular

**PROCEEDINGS**

1  case, Your Honor, that was a personal jury case and the issue

2  was whether or not a prospective juror who not only owned --

3  advised that he owned stock, his wife was also an employee of

4  Walmart, and the issue then became whether or not the defense

5  had to use a -- I'm sorry -- the plaintiff had to use a

6  peremptory strike over cause.

7     And I think the issue presented by Mr. Alexander is that

8  two jurors, I think Juror 8 and No. 20, supposedly own stock in

9  Tesla.

10     First, I would say that the number of shares outstanding

11  in Tesla is probably a billion shares.

12     **THE COURT:**  Yes.  So this is not a question of an

13  actual.  It's a question of an appearance of a conflict.

14     **MS. KENNEDY:**  Right, and understood.  And I don't

15  know what their stock ownership is.  I'm pretty sure that

16  whatever it is, it's probably in a mutual fund or whatever.

17     But simply having a financial interest, small that it may

18  be given the market cap for Tesla, and the case that's cited

19  was more leaning toward the issue that the juror's wife was an

20  employee of Walmart.  Because if you see the cases it cited,

21  namely, the case -- I'm sorry -- the case *Gladhill*, which is

22  743 F.2d 1049, a 1984 case; and *Francone*, 145 F.2d at 732,

23  which was a Fifth Circuit 1944 case, those cases all talked

24  about prospective jurors being employed or having someone

25  employed by one of the defendants.

1        I think about here, though, in this particular case, given

2    the case that was cited by Mr. Alexander, and the fact that

3    probably anyone who has a mutual fund or some type of financial

4    instrument may have a small financial interest in one of the

5    parties, that is not automatically disqualifying.

6            THE COURT:  Mutual funds are different than direct

7    stock ownership.

8            MS. KENNEDY:  Yes.

9            THE COURT:  So maybe that's something to clarify.

10           MS. KENNEDY:  Yes.

11           THE COURT:  I mean, I know that if I knew that I

12   owned Tesla stock, I wouldn't be sitting here.  And I think

13   there's a Fourth Circuit case that we found briefly in the

14   break that is also consistent with that Tenth Circuit case on

15   the topic.

16           MS. KENNEDY:  Yes.  And, Your Honor, I don't dispute

17   that, but I think the issue then becomes really what is that

18   financial sort of interest.  And I agree it's --

19           THE COURT:  If I own one share in Tesla, I couldn't

20   be here.

21           MS. KENNEDY:  Yes, I understand, but I think that's a

22   different standard than what a juror would be talking about in

23   the case, and both said that they want -- they could be fair.

24   There's going to be biases, there's going to be interests, but

25   I think the question should be:  What is that ownership?  If

1  they own one share of Tesla stock out of a billion, that's not

2  going to be an issue, an issue of bias.

3      **THE COURT:**  I understand the substantive argument

4  that you're making and I agree with it, but the -- there is a

5  more specific conflict that I don't know whether it can be

6  waived or not.

7      Mr. Alexander, do you have --

8      **MR. ALEXANDER:**  A couple of things, Your Honor.

9  First, to compare the ownership to the number of stock that

10  Tesla has is not the issue.  It's how valuable is the stock to

11  that individual.  If that individual has stock and that's the

12  primary stock that they have and they care about it going up or

13  down, they would have some inherent bias.  It's about the value

14  to them not the value relative to the total of Tesla.

15      Also, within the case that we cited, there are cases that

16  are cited for the proposition that a stockholder in a company

17  which is a party to a lawsuit is incompetent to sit as a juror

18  is so well settled as to be black letter law that.  That's

19  quoting *Chestnut* -- C-H-E-S-T-N-U-T -- *vs. Ford Motor Company*,

20  445 F.2d 967 at 971.  That's the Fourth Circuit, a 1971 case.

21      And there's also *Vasey* -- V-A-S-E-Y -- 29 F.3d at 1460;

22  and *Gladhill* -- G-L-A-D-H-I-L-L -- 743 F.2d at 1050.

23      Also referring to Code of Civil Procedure 229(b), it

24  refers to implied bias.  It refers to relationships of stock

25  and ownership.

1          I think that to -- under the circumstances, if they have

2     an ownership in a company under circumstances where we're

3     seeking punitive damages, that just is automatic circumstances

4     where those individuals should not be sitting and basically

5     being asked to award punitive damages against a company that

6     they own stock in.  I think it's just inherent bias.

7          THE COURT:  All right.  Ms. Kennedy.

8          MS. KENNEDY:  Your Honor, just -- just so we're

9     clear, I think that the issue, the special issue, is whether or

10    not the -- the juror has a -- has a financial interest in the

11    outcome of what could possibly happen here, not just -- not

12    just sort passive stock ownership.

13         And the case that is referred to in the *Getter vs.*

14    *Wal-Mart* case is referred to as the *Vasey vs. Martin Marietta*

15    *Corporation*, 29 F.3d 1460 at 1468, Tenth Circuit 1994.  And

16    basically the standard is a direct financial interest in the

17    trial's outcome.

18         So it -- just because in this day and age in 2021 somebody

19    owned some miniscule amount of stock -- which, again, I don't

20    know what their stock ownership is, I would assume it's not

21    something that is significant -- that it's not implied that

22    there is going to be automatic bias because I think the court

23    has held that the implied bias doctrine is not to be likely

24    invoked, but must be reserved for those extreme and exceptional

25    circumstances that leave serious question whether the trial

 1    court subjected a party to manifestly unjust procedures

 2    resulting in a miscarriage of justice.  And this is referring

 3    to the case *Zia Shadows LLC vs. City of Las Crucas*.

 4        So I think that the standard here is a higher standard

 5    than simply having ownership, some passive ownership, in some

 6    publicly traded stock.  It's got to be a higher standard.

 7            THE COURT:  All right.  Mr. Organ.

 8            MR. ORGAN:  Yes, Your Honor.  Thank you.

 9        I'd just -- I would just like to bring to the Court's

10    attention, not necessarily under these statutes or the

11    authority, but I have been part of a case where punitive

12    damages were awarded and it was overturned on appeal because of

13    juror misconduct because one of the jurors, it turned out,

14    owned stock in Kroger Company, which was the parent of Ralph's,

15    which was my -- my case against.

16        And when our expert came in to give the valuation of the

17    company, in the juror deliberations, that juror said:  I know

18    the stock is worth less than that because I own the stock.  And

19    that's the problem, is that the person will have individualized

20    knowledge that can infect the jury and then we're going to be

21    back here.  So --

22            THE COURT:  I am fairly confident -- I think -- the

23    issue I think is going to be more black letter than your --

24    some of you are suggesting.

25        I will take one quick look at this again at a break when

1  we finish our discussions here, but I have a hunch I'm going to

2  need to strike them.  I will confirm, however, that they own

3  stock in Tesla as opposed to a mutual fund that might have some

4  Tesla stock in it, but I think that's going to be the

5  distinction.

6      "Passive ownership" isn't a meaningful term.  It's either

7  you've got -- either you have a direct conflict or you don't,

8  and I -- I understand sort of the pragmatism of the argument,

9  but I don't think it actually works for Tesla, but I will

10 take -- I will take a quick look at that.

11     All right.  So why don't you discuss amongst -- tell me --

12 raise your hand when you're ready to talk cause and hardship.

13     (Pause in proceedings.)

14        THE COURT:  All right.  So the counsel have had a

15 chance to look at this.

16     I am inclined to relieve for hardship Jurors 11 and 31 and

17 Jurors 24 and 30 for cause, and then inquire of Jurors 8 and 20

18 of what the -- what their stockholding is; and if it's a direct

19 holding, I think because of the case cited by Mr. Alexander and

20 the Fourth Circuit case and what seems to be fairly clear law,

21 I would remove 8 and 20.

22        MS. KENNEDY:  I'm so sorry, Your Honor.  Who were the

23 two for hardship?

24        THE COURT:  No. 11, the student; and No. 31.

25        MS. KENNEDY:  31.  Thank you, Your Honor.

1          **THE COURT:**  Okay.  So, Mr. Alexander, I'll go to you

2    first.  Do you have any comments on that or anything else you

3    would like me to look at?

4          **MR. ALEXANDER:**  Your Honor, not at this time.  When

5    we move further to other cause, I can, but at this time based

6    on the Court's inquiry --

7          **THE OFFICIAL REPORTER:**  I'm sorry, Mr. Alexander.

8    Can you use the microphone, please?

9          **THE COURT:**  Get to a mic, and -- but I want to hear

10   if you have -- if you think that there are other people who

11   should be relieved as a result of cause, I'd like to hear to

12   now.

13         **MR. ALEXANDER:**  Thank you, Your Honor.

14      With regard to No. 24, Mr. Ruchamkin -- I'm sorry.  I

15   missed that.  You removed him for cause.

16         **THE COURT:**  Yeah.

17         **MR. ALEXANDER:**  Great.

18      And then No. 31 --

19         **MR. ORGAN:**  The judge already removed him.

20         **MR. ALEXANDER:**  I guess that's it.  All right.  I'm

21   fine.

22         **THE COURT:**  Okay.  Ms. Kennedy.

23         **MS. KENNEDY:**  No, we have no other cause.

24         **THE COURT:**  Okay.  So we're in complete agreement,

25   and so we're ready -- we're going to be ready to do peremptory

 1  challenges when the jury comes back after I check on 8 and 20.

 2       And the way that that happens is you'll pass a piece of

 3  paper back and forth; and if you both pass, you're done.  If

 4  you -- if one of you passes, you don't get to save that

 5  challenge for the end.  So just be aware.

 6       All right.  Ms. Davis, let's get the jury back in.

 7       (Proceedings were heard in presence of prospective

 8        jurors:)

 9            THE COURT:  All right.  You can all be seated.  Thank

10  you.

11       Juror No. 8, I have a question for you that I should have

12  asked you earlier.  Would you mind stepping up so we can do

13  that?

14       You had indicated that you owned stock in Tesla.  Is

15  that -- do you own it specifically in Tesla?  Is it part of a

16  mutual fund or some combination of funds?

17            PROSPECTIVE JUROR NO. 8:  My -- my husband does the

18  investing, and he told me that he just bought shares.

19            THE COURT:  He just bought shares.  And is that --

20            PROSPECTIVE JUROR NO. 8:  Yes.  Tesla shares.

21            THE COURT:  Okay.  And so -- and do you hold that

22  jointly?

23            PROSPECTIVE JUROR NO. 8:  Yes.

24            THE COURT:  Okay.  Thank you.

25       And, Juror No. 20, you also -- come on up to the mic.

1        I think you indicated that you owned shares in Tesla.  Do

2   you own those directly or as part of a mutual fund?  Or how is

3   it held?

4             **PROSPECTIVE JUROR NO. 20**:  Stock.

5             **THE COURT**:  I'm sorry?

6             **PROSPECTIVE JUROR NO. 20**:  Stock.  Not part of a

7   mutual fund.  My wife -- under my wife's name.  She bought

8   stock of -- Tesla stock.

9             **THE COURT**:  Okay.  All right.  So you both -- so

10   that's family finance, family stock?

11             **PROSPECTIVE JUROR NO. 20**:  Yes.

12             **THE COURT**:  Okay.

13        All right.  So for that reason, I'll ask you to stay where

14   you are for a second, but because of that stockholding, the law

15   is clear that you can't sit on a case.  Even though you would

16   otherwise be completely impartial and it wouldn't make a

17   difference to you, it's just the way that the law works.

18        So I'm going to end up excusing you, and I'm also going to

19   excuse Juror No. 11, Juror No. 30, and Juror No. 31.  So you

20   are all -- and Juror No. 24.

21        So the six of you may now leave the courtroom and thank

22   you very much for your service.  You have done what you needed

23   to do for the country today.

24        (Prospective Jurors No. 11, 24, 30, and 31 excused.)

25             **THE COURT**:  All right.  So, ladies and gentlemen, the

1    next thing that happens here is that each side gets to excuse

2    some people from the panel.  This is called peremptory

3    challenges.  They can be made without giving any reason at all.

4    This procedure gives the parties the ability to participate

5    more fully in the selection of the jury who's going to decide

6    the case.  It's part of our system of justice.  It let's the

7    parties feel more comfortable with the jury and, therefore, be

8    more satisfied with the result since they had the opportunity

9    to select you.

10        So if you end up having to be excused, it's nothing

11   personal.  Don't let it -- don't consider it as a reflection on

12   you or the quality of your service.  You will have done your

13   job for the country.

14        The way that this is going to happen is that the parties

15   are going to quietly pass a piece of paper back and forth and

16   then give it to me.  I'm going to look at it, and then we'll

17   proceed from there.

18        So, Ms. Davis, if you would give it to Mr. Alexander.

19        (Brief pause.)

20            THE COURT:  And if you feel more comfortable standing

21   rather than sitting, please feel free to do that.

22        (Pause in proceedings.)

23            MR. ALEXANDER:  Your Honor, can we have a sidebar to

24   address this?

25            THE COURT:  Ladies and gentlemen, I'm going to ask

1  you to step outside, get a little more exercise.  Please don't

2  go away.

3      (Proceedings were heard out of presence of prospective

4      jurors:)

5          THE COURT:  All right.  Mr. Alexander.

6          MR. ALEXANDER:  Your Honor, the defendant has struck

7  Jurors No. 26 and 33, both of whom are African American, and so

8  the -- it raises a *Batson-Wheeler* issue as to whether there is

9  a basis for articulating a reason other than race to disqualify

10  those individuals.

11      In each of the cases, I believe that the information they

12  gave indicates that they could be fair and impartial; and so

13  under those circumstances, I think the onus is on the defendant

14  to indicate a nondiscriminatory reason for the selections that

15  were made.

16          THE COURT:  All right.  So your challenge is both to

17  26 and 33?

18          MR. ALEXANDER:  Yes, Your Honor.

19          THE COURT:  All right.  Ms. Kennedy.

20          MS. KENNEDY:  Yes.  May I be heard?

21      We'll talk about Juror No. 33 first because I questioned

22  him.  And if you recall, Mr. Bradford's testimony was that he

23  had heard the "N" word a lot.  His mother was in

24  South Carolina, had been mistreated.  He has a friend working

25  at Tesla, and she was paid less and -- I'm trying to read my

 1    writing here.

 2        Oh, and the friend was wrongfully terminated at Tesla.

 3    That was Mr. Bradford, No. 33.

 4        And as to Juror No. 26, my initial reaction with Mr. Hall

 5    is I could barely understand him when he was talking, and he

 6    came up, sat in the back row.  I couldn't understand him for a

 7    lot.

 8        But he also says that, I think when he was 17 years old at

 9    a grocery store, he was called the "N" word.  He's an intern,

10    quality associate -- a quality analyst, I think it's an

11    associate, for about six months.  And just from a comprehension

12    perspective, I didn't think he was a good juror to understand

13    what we're going to be talking about here based on his

14    responses to me as well as to Your Honor.

15        THE COURT:  All right.  So you know with respect to

16    the non-understanding him, he was no more soft spoken than five

17    or six of the people who spoke, and I thought he actually spoke

18    quite well.  So I'm not -- that would not be a

19    nondiscriminatory explanation.

20        Mr. Alexander, what's your response to those, to

21    Ms. Kennedy's.

22        MR. ALEXANDER:  With regard to Prospective Jurors

23    No. 2, 12 and 23, they were also victims of race discrimination

24    and the only difference why they aren't identified would appear

25    to be they aren't African American.

1          And the fact that the African American potential jurors

2    experienced the "N" word or that type of discrimination is a

3    nature of race, and so to identify those things as the basis

4    for selection is basically to identify race-based indicators

5    for why the decision was made to select them.

6          I don't think the defendant has stated a non-race

7    motivation for the selects that they've made.  I think the

8    statements have actually identified race as the factor that was

9    used in making the selection.

10         **THE COURT:**  Ms. Kennedy, would you like to respond to

11   that?

12         **MS. KENNEDY:**  Yes.  Well, I will say definitively

13   race was not an issue with respect to the responses.

14         **THE COURT:**  I'm sorry.  Say that again.

15         **MS. KENNEDY:**  I'm sorry.  Race was not an issue in

16   either one of them.  It had to do with their responses to my

17   questions as well as the Court's questions.

18         Also, as to Juror No. 26, when he talked about his grocery

19   store experience, he said that he complained and nothing -- his

20   manager did nothing.  So what I -- I would be -- more than

21   frank is what I'm looking for, I'm looking for people who have

22   an experience -- who have life experiences that they can set

23   aside to come and look at these allegations in this case.

24         As we know, there's going to be inflammatory language in

25   this case, and Mr. Hall, in particular, when he said that he --

1    he did not believe that his complaint was taken seriously,

2    that's exactly what I believe Mr. Diaz is going to be talking

3    about.  For that reason, that's one of the reasons that I

4    wanted to have him off the jury.

5          And I actually didn't think we were going to get down into

6    26 and 33, to be quite honest with you.  So because the two

7    Asian jurors were both taken off because of their investment in

8    Tesla, so if we're going to -- so my point is, though, I never

9    anticipated giving the three strikes in the 21 people that we

10   had, that we would actually get down to those jurors.

11         But race --

12         **THE COURT:**  I don't understand that as an

13   explanation, Ms. Kennedy, for your -- for striking them.

14         **MS. KENNEDY:**  Well, because, Your Honor, we're

15   looking at the number of jurors that were left.  We only have

16   nine jurors, and I had one strike left and I used the last

17   strike.  Those two jurors happened to be the last two jurors on

18   the panel, but this was not based on race.  It's based on their

19   answers to questions and how they -- and how -- and what their

20   life experiences were and their responses to those questions.

21         **THE COURT:**  So, Mr. Alexander, the one -- I don't see

22   the basis for a strike on 26.  I just don't see it.

23         33, the one thing that Ms. Kennedy indicated was the

24   connection to Tesla.  That -- that he had a friend there,

25   wrongful -- she said the friend who was -- someone who was

1   wrongfully terminated and paid less.  He did apply for a job

2   there also.

3        So why wouldn't that be a nondiscriminatory reason to

4   strike him?

5            MR. ALEXANDER:  Your Honor, in other cases that

6   address *Batson-Wheeler* objections, the court has rejected the

7   secondary reason given when the primary -- when the first

8   explanation given was a racially discriminatory reason.  In

9   other words, once you have made the statement as to your

10  explanation and then been called on it, the new explanation can

11  be ignored.

12           THE COURT:  But this was the first explanation that

13  Ms. Kennedy made with respect to 33.

14           MR. ALEXANDER:  I thought the -- I thought the

15  grocery issue was a race-based issue.

16           THE COURT:  That's 26.

17           MR. ALEXANDER:  All right.  I'm sorry.

18       (Pause in proceedings.)

19           MR. ALEXANDER:  So --

20       (Discussion held off the record between plaintiffs'

21        counsel.)

22           MR. ALEXANDER:  I thought testimony of No. 33 was

23  that he didn't have any personal knowledge of it.  He just

24  heard that she was not hired.  She was wrongfully terminated,

25  but he didn't know the circumstances, he heard it secondhand.

 1           But in terms of the job, he turned down the Tesla job.  I

 2     think that's my notes.

 3           (Pause in proceedings.)

 4           **MR. ALEXANDER:**  And others were terminated by Tesla

 5     and they were not kicked off the jury.  In other words, if you

 6     make -- if you try and follow the logic of why they picked 33,

 7     No. 12, they didn't select No. 12 to be kicked off the jury.

 8           So if you look at the -- the explanation does not match up

 9     if you compare responses given by different prospective jurors.

10           **THE COURT:**  Ms. Kennedy.

11           **MS. KENNEDY:**  Yes, I can respond.  As to Juror -- if

12     we're going to compare it to Juror No. 12, the cousin who

13     worked for HR about she's handling issues with annoying

14     employees, very different.  In HR I want to have someone --

15     I'll be honest, I want someone who has -- someone who knows

16     something about HR on this.  I have no problem with people with

17     HR.

18           Her cousin -- she said her cousin worked for Tesla in HR.

19     She also said her cousin -- or was a Tesla employee for a

20     contractor.  And she also testified, Ms. Uyeda, had a father

21     that worked in HR.  That's why she wasn't struck.

22           As to the issue concerning Mr. Bradford, Juror No. 33,

23     it's a very different life experience in a race harassment case

24     to come in and say, one, you have a friend working at the

25     defendant; two, you talked about your mother being treated

1  unfairly; and, three, that -- that he's heard the "N" word a

2  lot.

3       So regardless of the questions by the Court or anyone

4  else, there is an inherent bias there that cannot be overcome.

5  And Tesla in this type of case, given the inflammatory

6  languages -- language, that that person is going to be biased

7  against Tesla regardless of the evidence.

8       And in this particular case Mr. Bradford was unique, as I

9  recall, in his test- -- in his statements to the Court and his

10  statements to me in particular about his experiences and about

11  his relationship to Tesla.  And the idea that his friend worked

12  at Tesla and these biases make him an unsuitable juror in this

13  particular case.

14       **THE COURT:**  All right.

15       **MS. KENNEDY:**  Oh, and I'm sorry, Your Honor, you

16  asked about Juror No. 26.  My issue on Juror No. 26 is that he

17  said he worked at a grocery store and that nothing happened,

18  nothing was done.

19       In this particular case, I expect Mr. Diaz to make that

20  exact same argument over and over again about every complaint

21  that he made.  And in my notes, that is exactly what I have

22  here, that that's what the issue was.  And that nothing

23  happened, which he volunteered, is the reason that Juror 26 was

24  struck by me.

25       Because that's what I anticipate Mr. Alexander is going to

1  say in his opening statement; that Tesla did nothing, the

2  staffing agency did nothing, and Tesla was supposed to do

3  something and they didn't.  That's the reason Mr. Hall was

4  struck.

5          THE COURT:  I'm going to take a short break and I'll

6  be back here.  So don't go anywhere.  It will take me about a

7  minute or two.

8      (Whereupon there was a recess in the proceedings

9       from 12:59 p.m. until 1:03 p.m.)

10     (Proceedings were heard out of presence of prospective

11      jurors:)

12         THE COURT:  All right.  So my job in handling a

13  *Batson* challenge at step one is there a prima facie case made

14  with respect to the strike, and I think clearly there is.  The

15  two people that were struck that are under challenge are

16  African American.

17     And at step two, the burden shifts to a nondiscriminatory

18  explanation.  And I don't think with respect to Juror No. 26, a

19  nondiscriminatory explanation was made; and I think he is

20  perfectly able to be a fair and impartial juror, and so I will

21  not allow the strike with respect to Juror No. 26.

22     With respect to Juror No. 33, I do think a

23  nondiscriminatory explanation has been given.  It was somewhat

24  mixed with a race-based one, but I think -- I think there are

25  significant factors that would show a nondiscriminatory

**PROCEEDINGS**

1    explanation.

2        And then at step three the issue is:  Was it purposeful?

3    And I to do think because of the connection that he had with

4    Tesla, which I think is different than others, and his place --

5    the context of his employment, I think there's a -- there are

6    distinguishing factors with Juror No. 12.  So I would allow the

7    strike of Juror No. 33.

8        So with that, yes, I'd love to see the strikes.

9        (Whereupon document was tendered to the Court.)

10        (Brief pause.)

11        **THE COURT:**  All right.  So I am -- what I'm looking

12    at is my list is not completely accurate because the -- I

13    didn't have a couple of people who didn't show, I think.

14        So, Ms. Davis, have you been keeping up on your list?

15        (Discussion held off the record between the Court and

16        the Courtroom Deputy.)

17        **THE COURT:**  All right.  So let me confirm who the

18    jurors are period.

19        **MS. NUNLEY:**  Is it okay if Mr. Diaz runs to the

20    restroom quickly?

21        **THE COURT:**  He can listen.  Oh, and he can go to the

22    restroom too, yeah.

23        **MS. NUNLEY:**  Thank you, Your Honor.

24        (Mr. Diaz exits the courtroom.)

25        **THE COURT:**  So the jurors left after the strikes

 1   are -- Mr. Alexander, why don't you tell me who you have.

 2              **MR. ALEXANDER:**  Your Honor, we have No. 1, No. 2,

 3   No. 6, No. 9, No. 12, No. 13, No. 23, No. 25, and No. 26.

 4              **THE COURT:**  Okay.  Ms. Kennedy, do you share that?

 5              **MS. KENNEDY:**  Yes, I concur.

 6              **THE COURT:**  Okay.  Good.  So that's our jury.

 7         And let's call in the jurors, and then we'll have them

 8   sworn in.

 9              **MR. ORGAN:**  Your Honor?

10              **THE COURT:**  Yes, Mr. Organ.

11              **MR. ORGAN:**  Mr. Diaz just ran down to the restroom.

12   Could we wait for him to come back?

13              **THE COURT:**  Yeah, we should.  Yes.

14              **MR. ORGAN:**  Thank you, Your Honor.

15         (Pause in proceedings.)

16         (Jury enters the courtroom at 1:13 p.m.)

17              **THE COURT:**  All right.  Please be seated everybody.

18         All right.  So thank you all again for your patience, but

19   we're now at the conclusion of the -- of jury selection.

20         And before I tell you who has been excused, again, these

21   were challenges for which it has nothing to do with anything

22   except for the parties' selection.  You have done every --

23   you've done your jury service in the best way, and I appreciate

24   it very much.

25         But the following jurors are excused:

**PROCEEDINGS**

1        Juror No. 5, 19, 4, 18, and 33.  So you may now leave and

2   with the thanks of the judiciary.

3        (Prospective Jurors 4, 5, 18, 19, and 33 excused.)

4            THE COURT:  Then I'd like everybody else, if you

5   would, to fill in either seats in the jury box or come to the

6   first row on the left-hand side because you are going to be the

7   jury, and I'm about to swear you in.

8        (Brief pause.)

9            THE COURT:  All right.  Ms. Davis.

10           THE CLERK:  If you'd please stand again and raise

11  your right hands.

12       (Jury sworn.)

13           THE COURT:  All right please be seated for just a

14  moment.

15       So you've now been sworn in to be the jury in this case.

16  The case will start on Monday morning at 8:30.  I'd like you to

17  be here by 8:15 because I start getting nervous when the jury

18  is not all ready to go.  And we will run, as I said earlier,

19  Monday through Friday 8:30 to 1:30 with a couple of 15-minute

20  breaks.

21       Ms. Davis is going to escort you now back to the jury room

22  that we're going to be using and give you a few sort of

23  preliminary instructions on how to maneuver through the

24  courthouse to get up here.

25       And we'll look forward to seeing you bright and early on

**PROCEEDINGS**

1    Monday morning.  So thank you very much.

2         Ms. Davis.

3         Please follow Ms. Davis.

4         (Jury exits the courtroom at 1:16 p.m.)

5              **THE COURT:**  All right.  Please be seated.

6         So I will look forward to seeing all of you at

7    8:00 o'clock on Monday, and make sure you've discussed what

8    you're doing with your demonstratives and who the witnesses

9    are.

10        And I appreciate how well the parties are working together

11   to get this show on the road, and we're going to hit the road

12   on Monday morning at 8:00 o'clock.

13        Thank you all.  Have a good weekend.

14        (Proceedings adjourned at 1:17 p.m.)

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, March  10, 2023