QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (appearance *pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Daniel C. Posner (CA Bar No. 232009)
  danposner@quinnemanuel.com
  Mari F. Henderson (CA Bar No. 307693)
  marihenderson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

QUINN EMANUEL URQUHART &SULLIVAN, LLP
  Asher Griffin (appearance *pro hac vice*)
  ashergriffin@quinnemanuel.com
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Defendant Tesla, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| OWEN DIAZ,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>TESLA, INC. d/b/a TESLA MOTORS, INC.,<br><br>　　　　　Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**DEFENDANT TESLA, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Trial Date: March 27, 2023<br>Place: Courtroom 2, 17th Floor<br>Judge: Hon. William H. Orrick |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on March 31, 2023 at 10:30 AM, or as soon thereafter as this matter may be heard, in Courtroom 2 – 17th Floor of the United States Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable William H. Orrick presiding, Defendant Tesla, Inc., through its counsel, will move and hereby does move pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on the ground that there is legally insufficient evidence for a properly instructed jury to find that Plaintiff Owen Diaz is entitled to an award of punitive damages.

This motion is based upon this notice of motion and motion; the attached memorandum of points and authorities; all pleadings and papers on file in this action; such other evidence or arguments as may be presented to the Court; and such other matters of which this Court may take judicial notice.

**ISSUE TO BE DECIDED**

1. Should the Court enter judgment as a matter of law in favor of Tesla, Inc. on Plaintiff's claim for punitive damages because no reasonable jury, properly instructed on the law, could find that Tesla acted with the malice, oppression, or reckless disregard required to give rise to punitive damages?

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................................1

I. THE JURY SHOULD NOT HAVE BEEN INSTRUCTED THAT MR. DIAZ IS ENTITLED TO PUNITIVE DAMAGES ................................................................................2

II. NO REASONABLE JURY, PROPERLY INSTRUCTED, COULD AWARD ANY PUNITIVE DAMAGES AGAINST TESLA ON THE RECORD HERE ...........................3

    A. Punitive Damages Requires A Showing Of Purpose Or Reckless Indifference ........................................................................................................3

    B. The Undisputed Evidence Is Legally Insufficient To Show That Tesla Acted Purposely Or With Reckless Disregard ......................................................4

        1. The Undisputed Evidence Shows That Tesla Had And Enforced A Corporate Policy Barring Racially Hostile Conduct ......................................5

        2. The Undisputed Evidence Shows That Tesla Imposed Disciplinary Sanctions In Response To Each Of Mr. Diaz's Documented Complaints About Racially Hostile Conduct ...................................................6

        3. The Undisputed Evidence Shows That Tesla Responded To Other Racially Hostile Conduct At The Factory That Was Not The Subject Of Any Of Mr. Diaz's Documented Complaints .........................................10

        4. Mr. Diaz's Own Witnesses Admitted That Tesla's Conduct Was At Most Negligent, An Insufficient Predicate for Punitive Damages ...............12

        5. Mr. Diaz Failed To Meet His Burden Of Proving Punitive Damages Are Necessary To Deter Similar Conduct By Or Conditions At Tesla After His Departure ........................................................................................13

CONCLUSION .............................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amor Ministries v. Century Sur. Co.*,
    2016 WL 1388077 (S.D. Cal. Apr. 7, 2016) ......................................................................... 4

*Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*,
    405 F.3d 764 (9th Cir. 2005) .............................................................................................. 4

*Boyle v. United Techs. Corp*,
    487 U.S. 500 (1988) ........................................................................................................... 2

*Boyle v. United Techs. Corp.*,
    857 F.2d 1468 (4th Cir. 1988) ............................................................................................ 2

*Bridge Aina Le'a, LLC v. Land Use Comm'n*,
    950 F.3d 610 (9th Cir. 2020) ......................................................................................... 1, 2

*E.E.O.C. v. Wal-Mart Stores, Inc.*,
    156 F.3d 989 (9th Cir. 1998) .............................................................................................. 3

*Kolstad v. Am. Dental Ass'n*,
    527 U.S. 526, 538 (1999) ............................................................................................... 3, 4

*Lakeside-Scott v. Multnomah Cty.*,
    556 F.3d 797 (9th Cir. 2009) .............................................................................................. 1

*May v. Chrysler Grp., LLC*,
    716 F.3d 963 (7th Cir. 2013) .............................................................................................. 3

*Pastora v. Cnty. of San Bernardino*,
    2021 WL 8743941 (C.D. Cal. Dec. 22, 2021) .................................................................... 4

*Singleton v. Kernan*,
    851 F. App'x 737 (9th Cir. 2021) ....................................................................................... 2

*Wadler v. Bio-Rad Lab'ys, Inc.*,
    916 F.3d 1176 (9th Cir. 2019) ............................................................................................ 2

**Statutory Authorities**

42 U.S.C. § 1981 ............................................................................................................................ 3

42 U.S.C. § 1981a(b)(1) ................................................................................................................ 3

**Rules and Regulations**

Fed. R. Civ. P. 50(a) ...................................................................................................................... 2

Fed. R. Civ. P. 50(a)(1) ................................................................................................................. 1

## PRELIMINARY STATEMENT

It is Mr. Diaz's burden to prove his entitlement to punitive damages by a preponderance of the evidence. And Mr. Diaz has not come close to meeting his burden of proving that any punitive damages are justified here. Punitive damages are appropriate only when needed to punish and deter malicious, oppressive, or reckless conduct. But this is a case about at most negligence, not malice. Even if the damages jury believes everything Mr. Diaz said about what happened to him and how Tesla responded, punitive damages cannot be awarded as a matter of law because the evidence does not show that Tesla acted with purpose or conscious disregard warranting punishment as opposed to compensation. And Mr. Diaz offered no evidence of anything that has occurred at the Tesla factory since the events in question in 2015-2016 to show there is any ongoing need for deterrence. Moreover, the Court erred in its prior orders ruling that the first jury's finding that punitive damages were warranted binds the second jury. The first jury determined only liability, not damages, and punitive damages is a matter for the second jury to determine as to both predicate and amount. Tesla is therefore entitled to judgment as a matter of law on punitive damages under Rule 50(a), because no properly instructed jury could find Tesla acted with malice, oppression, or reckless disregard on the record here. The Court should accordingly strike the instructions and verdict form questions pertaining to punitive damages before it sends the case to the jury.

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(a)(1) provides that, where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Judgment as a matter of law is warranted where a party fails to present a legally sufficient basis for the jury to rule in its favor. *See Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009). Judgment as a matter of law is "properly granted" if "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 624 (9th Cir. 2020)

(reversing district court's denial of the state's motion for judgment as a matter of law); *see also Singleton v. Kernan*, 851 F. App'x 737, 738 (9th Cir. 2021) (holding "the district court properly granted judgment as a matter of law" under Rule 50(a)).

"When a district court commits instructional error," the Ninth Circuit will reverse and direct entry of judgment as a matter of law without any remand for new trial "if the evidence presented [at] trial would not suffice, as a matter of law, to support a jury verdict under the properly formulated [instruction]." *Wadler v. Bio-Rad Lab'ys, Inc.*, 916 F.3d 1176, 1187 (9th Cir. 2019); *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 513-14 (1988) (holding that, where there was instructional error as to the military contractor defense, and the evidence presented at trial "would not suffice, as a matter of law, to support a jury verdict under the properly formulated defense," judgment could "properly be entered for [the movant] at once, without a new trial"); *Boyle v. United Techs. Corp.*, 1988 WL 96122, at *1 (4th Cir. 1988) (*per curiam*) (finding on remand that "no reasonable jury could have found for the plaintiff on the facts presented" under the proper instruction and therefore directing entry of judgment as a matter of law for the defendant); *see also Bridge Aina Le'a*, 950 F.3d at 624 ("When reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury.") (reversing a denial of motion for judgment as a matter of law where, under the proper construction of the law, there was legally insufficient evidence to support the jury verdict).

**ARGUMENT**

**I.   THE JURY SHOULD NOT HAVE BEEN INSTRUCTED THAT MR. DIAZ IS ENTITLED TO PUNITIVE DAMAGES**

As previously raised and briefed, the Court erred by instructing the jury that Mr. Diaz is "entitled" to punitive damages in this retrial on damages. Because the first jury determined liability only and it is the second jury's duty to determine damages, including both the predicate and amount of any punitive damages, it is legal error to instruct the second jury that the predicate for punitive damages was already established at the first trial. Accordingly, Tesla respectfully renews and reincorporates herein its arguments on these points set forth at Dkt. 389 at 3-4, 6-7, 37-38, 46-49; Dkt. 398 at 29-34; Dkt. 408-1 at 3, 10, 13; and Dkt. 425 at 2-6.

## II. NO REASONABLE JURY, PROPERLY INSTRUCTED, COULD AWARD ANY PUNITIVE DAMAGES AGAINST TESLA ON THE RECORD HERE

The necessary predicate for any award of punitive damages is malice, oppression, or reckless disregard, but a properly instructed jury could not reasonably conclude that Tesla's conduct on this record met that exacting standard. The undisputed documentary evidence and repeated admissions by Mr. Diaz and his own fact and expert witnesses show overwhelmingly that Tesla had and enforced a policy prohibiting racially hostile conduct, that Tesla took concrete and significant steps to remedy each and every racial incident Mr. Diaz reported, and that Tesla likewise took concrete and significant steps to remedy other racially inappropriate conduct of which it was aware. Accordingly, the record is not legally sufficient to support any award of punitive damages.

### A. Punitive Damages Requires A Showing Of Purpose Or Reckless Indifference

Punitive damages may be awarded for race discrimination under or 42 U.S.C. § 1981 only where a defendant engages in racial discrimination "with malice or with reckless indifference to . . . federally protected rights." 42 U.S.C. § 1981a(b)(1) (referring to Title VII); *see Mack v. Town of Pinetop Lakeside*, 780 F. App'x 448, 450 (9th Cir. 2019) (explaining that "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action," and that the Circuit "address[es] [] Title VII and § 1981 hostile work environment claims as though they are one and the same" (first quoting *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003))).[1] To act with "malice" or "reckless indifference," an employer must act "in the face of a perceived risk that its actions will violate federal law," and so "a positive element of conscious wrongdoing is always required." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 538 (1999). Thus, as the Court instructed the jury, punitive damages may be awarded only "for Tesla's conduct that harmed Mr. Diaz which was malicious, oppressive or in reckless disregard of his rights," such as conduct that "is accompanied by ill will or spite," that was undertaken "for the purpose of injuring Mr. Diaz," or that "reflects complete indifference to" Mr. Diaz's federally protected right not to be subjected to racially hostile conduct in the workplace. Dkt. 436 at 28.

---

[1] It is undisputed that no punitive damages can be awarded in this case on the state-law claim.

It follows that "[p]unitive damages may *not* be awarded . . . where a defendant's conduct is merely negligent." *E.E.O.C. v. Wal-Mart Stores, Inc.*, 156 F.3d 989, 992 (9th Cir. 1998) (emphasis added); *see May v. Chrysler Grp., LLC*, 716 F.3d 963, 974 (7th Cir. 2013) (affirming partial judgment for defendant as a matter of law under Rule 50(b), holding that the record of corporate actions alleged to be an inadequate response in a § 1981 racially hostile work environment case could not support an award of punitive damages, reasoning that, "[w]hile Chrysler could have done more and undertaken different measures, its actions did not evince a reckless disregard for May's federally protected rights"); *Pastora v. Cnty. of San Bernardino*, 2021 WL 8743941, at *7 (C.D. Cal. Dec. 22, 2021) ("To state a claim for punitive damages, a plaintiff must allege conduct that was 'malicious, oppressive or in reckless disregard of Plaintiff's rights.' Negligence alone does not suffice." (quoting Model Civ. Jury Instr. 9th Cir. No. 5.5 (2022))).  And courts in this circuit grant judgment as a matter of law where a jury's punitive damages award is not supported by evidence of malice, oppression, or reckless disregard. *See, e.g.*, *Amor Ministries v. Century Sur. Co.*, 2016 WL 1388077, at *11 (S.D. Cal. Apr. 7, 2016) (granting judgment as a matter of law under Rule 50(b) and overturning jury award of punitive damages).

Moreover, "[w]here an employer has undertaken . . . good faith efforts at Title VII compliance," it cannot be found to have "acted in reckless disregard of federally protected rights." *Kolstad*, 527 U.S. at 544 (cleaned up); *see Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 773 (9th Cir. 2005).

**B.  <u>The Undisputed Evidence Is Legally Insufficient To Show That Tesla Acted Purposely Or With Reckless Disregard</u>**

Here the evidence is legally insufficient to show that Tesla acted with purposeful or reckless disregard for Mr. Diaz's rights under § 1981.  The documentary evidence and Mr. Diaz's and his witnesses' own admissions, even with all inferences drawn in Mr. Diaz's favor, show at most that Tesla might have taken more or different steps to rectify his complaints of racially hostile conduct than the remedial and preventive steps it undisputedly did take.  But that is at most negligence and cannot support punitive damages as a matter of law.

1.  **The Undisputed Evidence Shows That Tesla Had And Enforced A Corporate Policy Barring Racially Hostile Conduct**

It is undisputed that Tesla had clear official policies barring racially discriminatory harassment and did not condone, permit, allow, or tolerate such conduct. The documentary evidence shows that Tesla maintained a robust anti-harassment/discrimination policy for its employees that was designed to ensure "a workplace that is free of unlawful discrimination and harassment." Ex. 368 (Antidiscrimination Policy); Ex. 006 (Handbook). The policies expressly prohibited racial harassment and discrimination, and Tesla made clear in plainspoken language to Tesla employees that such "stupid" conduct is unacceptable. Ex. 006-003. Mr. Diaz's own expert witness Amy Oppenheimer expressly conceded that Tesla's anti-discrimination policies were "fine" and "adequate." Tr. 472:11 (Oppenheimer) ("Tesla's policies are fine . . . ."), 515:9-11 ("Q. And you determined that Tesla had adequate policies in place; right? A. I think the policies were fine, yes.").

Moreover, the evidence overwhelmingly shows that Tesla took consistent and active steps to implement and operationalize these policies through the supervisors and "leads" in charge of the various areas of the factory. As Mr. Diaz's own witnesses admitted, Tesla had a zero-tolerance policy for racial discrimination. Tr. 522:4-9 (Romero). Workers at the factory were subject to corrective actions and a progressive discipline system: a formal verbal warning for the first incident, a formal written warning for the second, and after three warnings: employment termination. Tr. 316:15-24 (Kawasaki). Such escalating responses are fully consistent with Ms. Oppenheimer's own testimony that zero tolerance "doesn't mean you fire everybody for anything they do," but rather that "you take some action that is based on the seriousness, and if that doesn't solve the problem, you take more serious action next time." Tr. 463:19-24 (Oppenheimer).

Finally, Mr. Diaz's own witnesses made repeated admissions showing that Tesla supervisors and leads took complaints of workplace misconduct seriously. Tr. 409:8-410:8 (Jackson) ("Q. And when you conducted your investigations, your job was to be prompt, objective, and thorough; correct? A. Yes, sir. . . . Q. And you took that job seriously; right? A. Yes, sir."); Tr. 558:21-559:1 (Romero) ("Q. And so when you ever got a complaint about the N-word, what did you do to respond? A. Any time I heard any type of that kind of complaint, we dealt with it immediately by

informing our [] managers, and by extension, they informed HR. . . . [I]t was dealt with immediately."). Mr. Kawasaki and Mr. Romero discussed conducting numerous investigations, explained that they made extra effort to write up complaints, and reported any and all complaints up the chain. Tr. 297:19-298:16 (Kawasaki) ("Q. Mr. Romero told you, in substance, to make sure you communicate with us early in a short e-mail of any situation. They wanted you to e-mail them? A. In any situation, that was a proper protocol."); Tr. 558:21-559:1 (Romero) (complaints about the N-word were "dealt with immediately," which included "informing our managers"); Tr. 273:22-274:1, 289:2-22 (Kawasaki). Mr. Romero directed Mr. Kawasaki to send him daily reports each morning when shifts changed "so nothing got left behind." Tr. 298:17-299:2 (Kawasaki). They held department-wide trainings with employees about harassment. Tr. 439:17-440:1 (Jackson). And Mr. Diaz's own witnesses admitted Tesla took corrective actions, including firing employees for workplace misconduct. Tr. 316:6-8 (Kawasaki) ("Q. And after this incident, you understood that Mr. Timbreza was laid off? A. I believe he got laid off."); Tr. 564:14-18 (Romero) ("Q. What ultimately happened to Rothaj Foster and his employment with Tesla? A. He was terminated. Q. Why was he terminated? A. Because he was being threatening."); Tr. 639:21-640:1 (Diaz).

> **2.    The Undisputed Evidence Shows That Tesla Imposed Disciplinary Sanctions In Response To Each Of Mr. Diaz's Documented Complaints About Racially Hostile Conduct**

The record fails to provide legally sufficient evidence that Tesla purposely or recklessly disregarded Mr. Diaz's complaints of racially hostile conduct by other workers. To the contrary, the undisputed evidence shows that Tesla supervisors responded to all of Mr. Diaz's documented complaints of such conduct with investigations and then serious disciplinary action against the perpetrator.

***The July 31, 2015 Judy Timbreza Incident***: It is undisputed that, during the graveyard shift on July 31, 2015, Mr. Diaz got into a heated argument with fellow elevator operator Judy Timbreza. Ex. 38; Tr. 291:2-8 (Kawasaki). During the altercation, Mr. Diaz called his team lead Tom Kawasaki, who at the time was on the other side of the warehouse. Tr. 290:17-23 (Kawasaki). Mr. Kawasaki arrived within five minutes, broke up the altercation between Mr. Diaz and Mr. Timbreza,

1  questioned witnesses as to what happened, and then sent Mr. Timbreza home.  Tr. 290:17-291:17
2  (Kawasaki).
3        It is further undisputed that Tesla promptly disciplined Mr. Timbreza for this incident to Mr.
4  Diaz's satisfaction.  Mr. Kawasaki reported in an email to his supervisor Ed Romero that Mr. Diaz
5  had complained about Mr. Timbreza's comments that were "racial in nature."  Ex. 38.  The next
6  morning, Mr. Kawasaki met with Mr. Romero who then conducted a further investigation into the
7  incident.  Tr. 273:22-274:4 (Kawasaki).  It is undisputed that Mr. Kawasaki then disciplined Mr.
8  Timbreza with a formal verbal warning for using inappropriate racial language and an admonition
9  that any further misconduct would lead to his termination.  Ex. 39; Tr. 276:19-277:5, 314:14-20
10 (Kawasaki).  It is undisputed that Mr. Timbreza and Mr. Diaz never worked together again.  Tr.
11 658:22-25 (Diaz).
12       By his own admission, Mr. Diaz was "satisfied" with Tesla's prompt response in disciplining
13 Mr. Timbreza.  Tr. 659:1-4 (Diaz) ("I was satisfied with the way Mr. Kawasaki handled the
14 response, yes. I definitely was.").  And Mr. Diaz's expert witness Ms. Oppenheimer admitted that
15 "Mr. Kawasaki did the best he could" in responding to the incident involving Mr. Timbreza.  Tr.
16 467:17-18 (Oppenheimer).  It is undisputed that Mr. Diaz did not mention the Timbreza incident in
17 his Amended Complaint or during his psychological evaluation with Dr. Reading.  Dkt. 57; Tr.
18 861:25-862:1 (Reading).
19       ***The October 17, 2015 Ramon Martinez Elevator Incident***:  It is undisputed that Mr. Diaz
20 and Ramon Martinez had a dispute at the elevator Mr. Diaz operated on October 17, 2015, in which
21 the two men confronted each other and exchanged heated words.  Tr. 579:1-581:21 (Martinez); Tr.
22 609:7-610:12, 611:13-612:7 (Diaz).  Mr. Diaz sent to Messrs. Romero and Kawasaki that day an
23 email that complained that, while Mr. Diaz was explaining to elevator operator Rothaj Foster that
24 Mr. Romero would be his new supervisor, Mr. Martinez "jump[ed] off the tugger he was on and
25 started yelling at me in a [t]hreatening manner, saying you have a problem with me!" and "why are
26 you telling him who his supervisor is!"  Ex. 92.  Mr. Diaz further complained that Mr. Martinez had
27 "followed [him] into the elevator and stood next to the forklift [he] was on and ke[pt] yelling at
28 [him]" in a "threatening manner," and that Mr. Diaz "thought [Mr. Martinez] was going to hit [him]"

before he reminded Mr. Martinez they "were on camera." *Id.* Mr. Kawasaki then forwarded Mr. Diaz's complaint to Wayne Jackson. *Id.*

The evidence is in dispute as to whether any of the words Mr. Martinez directed at Mr. Diaz during the elevator incident were racial in nature, with Mr. Diaz testifying that they were and Mr. Martinez testifying that they were not. *Compare* Tr. 584:18-585:1 (Martinez), *with* Tr. 611:13-17 (Diaz). And the email Mr. Diaz sent to Messrs. Romero and Kawasaki that day failed to mention any racial language. Ex. 92; Tr. 420:2-11 (Jackson) ("Mr. Diaz didn't write anything about any racial slurs that Mr. Martinez allegedly said against him in that elevator"); *see* Tr. 418:4-22, 426:18-427:5, 427:15-20 (Jackson). But even assuming, drawing all inferences in favor of Mr. Diaz, that Mr. Martinez did direct racially derogatory language at Mr. Diaz during the elevator incident, the undisputed evidence is that Tesla took the incident seriously, promptly investigated it, and significantly disciplined Mr. Martinez for his behavior during the incident in a manner consistent with its policies of escalating discipline for any racial harassment.

Specifically, on-site supervisor Mr. Kawasaki forwarded Mr. Diaz's report of the incident by email to Mr. Jackson, who testified that either he or his "manager at the time . . . Terri Garrett" reported the incident "up the line" to individuals at Tesla. Tr. 387:10-17 (Jackson); Ex. 92. Mr. Jackson performed a "prompt, objective, and thorough" investigation that included taking statements from both Mr. Diaz and Mr. Martinez as well as the witness to the incident Rothaj Foster. Ex. 103; Tr. 388:18-389:2 (Jackson); Tr. 422:22-423:10 (Jackson) (Mr. Jackson was "involved with this situation and [was] going through [his] steps of gathering information, being prompt, objective, and thorough"). Based on its investigation, Tesla found sufficient evidence to issue a "verbal warning" to Mr. Martinez for his conduct during the incident. Ex. 76 (email from Mr. Jackson to his supervisor stating Tesla had decided it needed to "verbally counsel [Mr. Martinez and Mr. Diaz] with regards to appropriate behavior in the workplace"). By Mr. Diaz's own admission, he and Mr. Martinez had no contact "[b]etween the elevator incident and the drawing" incident. Tr. 735:23-25 (Diaz).

***The January 22, 2016 Ramon Martinez Drawing Incident*:** It is undisputed that, on January 22, 2016, Mr. Diaz encountered a racist caricature drawn on cardboard that was part of a bale to be

transported for recycling on the elevator Mr. Diaz operated. Ex. 1 (drawing); Tr. 574:14-575:5 (Martinez).  Mr. Diaz sent an email to Mr. Romero complaining that he had confronted a "racist drawing & effigy."  Ex. 272 (email).  Either Mr. Diaz or recycling swing shift supervisor Israel Zuniga called Mr. Wheeler and asked him to come see the drawing, and Mr. Diaz alerted Mr. Jackson who arrived at the scene "immediately."  Ex. 272; Tr. 633:11-14 (Diaz); Tr. 351:14-24 (Wheeler); Tr. 398:1-4 (Jackson).  Mr. Martinez came to the area after a "few minutes" and admitted to Mr. Diaz and Mr. Wheeler that he had drawn the caricature.  Ex. 272; Tr. 582:14-17 (Martinez); Tr. 762:9-16 (Diaz).

Mr. Jackson and Mr. Romero both elevated the issue and contacted Mr. Diaz's and Mr. Martinez's manager Victor Quintero via email the same morning of the incident, in addition to pulling in Ms. Garrett from Mr. Martinez's staffing agency.  Tr. 532:11-17 (Romero); Tr. 433:8-13 (Jackson); Ex. 272; Ex. 274.  Mr. Jackson treated the incident as a "serious issue," Ex. 284; Tr. 435:23-436:1 (Jackson), and Mr. Quintero responded quickly that he was "very disappointed," Ex. 272.  The three immediately held a meeting to discuss the incident that same morning, where they all discussed various options on how to address the issue, including suspension, termination, and diversity training.  Tr. 431:5-433:20 (Jackson); Tr. 533:16-18 (Romero); Ex. 272.

It is undisputed that, within 90 minutes of Mr. Diaz's complaint, Tesla disciplined Mr. Martinez by imposing on him a three-day unpaid suspension from work and, in addition, giving him a final written warning.  Ex. 272; Tr. 432:14-16 (Jackson).  The written warning was "extremely clear [that] he has no room for further error" and that "any further issues are grounds for immediate termination."  Ex 274.  Mr. Jackson also referred the incident to Mr. Martinez's staffing agency for its own additional investigation.  Ex. 284 (email exchange with Mr. Martinez's staffing agency, whose representative stated "I was able to speak with Ramon and he is on his way to my office so we can start an investigation. I have also notified my HR director of this situation as well.").  The same day, Mr. Jackson reported by email to Mr. Quintero, Mr. Romero, and Ms. Garrett that he "spoke with Owen Diaz and he has been made aware that we are taking this issue seriously and that it will be addressed today," and that Mr. Diaz "stated he was fine with that and that he just wanted it to be addressed."  Ex. 284.

In addition to disciplining Mr. Martinez with the three-day unpaid suspension and final written warning, it is undisputed that Mr. Jackson held meetings with all members of the recycling team, informed them of the drawing, and made clear that any similar conduct was unacceptable. Specifically, Mr. Jackson gave unrebutted testimony that he went to the Tesla factory at least three times to "talk[] to everybody in the recycling team" to "inform[] them about the drawing; that it was inappropriate," and to "ma[ke] sure that they knew that this behavior was inappropriate and shouldn't happen again," and he further "tried to meet each shift [to h]ave the shift supervisor there or lead and let them know that that type of action is not acceptable." Tr. 439:17-440:1 (Jackson).

Mr. Diaz's expert Ms. Oppenheimer admitted that she did not believe that Tesla was required to terminate Mr. Martinez for this incident in order to abide by its requirements under federal law. Tr. 508:16-509:3 (Oppenheimer).

### 3. The Undisputed Evidence Shows That Tesla Responded To Other Racially Hostile Conduct At The Factory That Was Not The Subject Of Any Of Mr. Diaz's Documented Complaints

For all other alleged incidents, Mr. Diaz failed to present sufficient evidence for a reasonable jury to find either that they occurred, that they were racial in nature, that Tesla knew about them, or that Tesla failed to act in response, all of which would be required to subject Tesla to punitive damages for such incidents.

*Undocumented Reports of Graffiti***:** Mr. Diaz testified that he found racist graffiti in Tesla's bathrooms, Tr. 622:24-623:5 (Diaz), but no other witness ever testified to seeing any graffiti with the N-word, *see* Tr. 264:16-19 (Wheeler). Nor is there any documentary evidence that Mr. Diaz ever alerted Tesla to the issue. Mr. Diaz's own testimony that he made undocumented complaints on the issue is unreliable, as Mr. Diaz does not recall who he supposedly complained to and when he supposedly made the complaints. Tr. 646:23-650:23 (Diaz). Even if Mr. Diaz's uncorroborated statements are credited, however, Mr. Diaz's witness Mr. Kawasaki gave unrebutted testimony that graffiti is not unique to Tesla, scratched-on graffiti does not come off easily, and Tesla did attempt to remove it when it happened. Tr. 284:9-25 (Kawasaki) ("Tesla tried to scratch them off, but it's graffiti on plastic. Hard markers, it doesn't really come off too easily. . . . For the most part, what I've seen, they try to scratch it off the stuff when it happened. I mean, you have – the factory is over,

1  what, a hundred thousand people daily."); Tr. 332:25 (Kawasaki) ("Tesla tried to scratch them off
2  the best they could").

3  ***Undocumented Uses of the N-Word at Tesla*:**  Mr. Diaz testified about the supposedly
4  pervasive use of the N-word and other racial slurs at the factory but admitted that he never
5  documented any complaints to Tesla about use of the N-word at the Tesla factory.  *See* Tr. 632:20-
6  633:7 (Diaz) ("Q. Yeah. Well, other than the Judy Timbreza incident, are you aware of another
7  racial incident . . . that you told Mr. Kawasaki? A. . . . [T]he elevator, yes, that was another incident.
8  Q. Okay. So those two. Is there any other[]? A. Not that I can know that I tagged Mr. Kawasaki in.
9  Q. Okay. And you heard Mr. Jackson testify, and he said that the only complaint that he received
10 regarding racial harassment from you was regarding the picture on the bale; right? A. That's true.
11 The only one he received from me, yes."); Tr. 636:21-638:3 (Diaz) ("Q. Can you point to any text
12 message that you sent to Mr. Romero, Mr. Kawasaki, Mr. Jackson, or Mr. Wheeler complaining
13 about any of the incidents you told this jury about? . . . A. No, I cannot.").  Mr. Diaz did not report
14 to Mr. Jackson that Mr. Martinez used the N-word during the elevator incident.  Tr. 426:15-427:14
15 (Jackson).  And Mr. Kawasaki and Mr. Romero both testified that they do not recall ever receiving
16 a single report or complaint from Mr. Diaz about use of racial slurs in the factory, with the sole
17 exception of comments that were "racist in nature" during the Timbreza incident—an incident that
18 Tesla undisputedly redressed to Mr. Diaz's satisfaction.  Tr. 308:5-11 (Kawasaki); Tr. 551:3-13,
19 558:11-15 (Romero).  And that is so despite Mr. Diaz being given advice from Mr. Kawasaki that
20 he should put complaints in writing.  Tr. 718:17-24 (Diaz); Tr. 299:4-16 (Kawasaki) ("Q. And, sir,
21 you directed Owen Diaz to do the same? A. Correct. When he was on the elevator shift, I directed
22 him. If something happened on his shift, e-mail me, e-mail CC those two as well, and that --
23 correct.").

24      And even Mr. Diaz walked back his prior testimony that Mr. Martinez had called him the N-
25 word "well over 30 times" and "so much [he] didn't know" how many times Mr. Martinez had
26 directed it towards him.  *Compare* Tr. 604:11-20 (Diaz) ("Q. Okay. And how many times do you
27 think he -- Mr. Martinez used the N-word towards you? A. Honestly, he used it so much I didn't
28 know, but I told the examiner -- I believe her name was Antonucci. Q. Barbara Antonucci, the first

-11- Case No. 3:17-cv-06748-WHO
TESLA'S MOTION FOR JUDGMENT AS A MATTER OF LAW

1  attorney for Tesla. A. Yeah. That was the first attorney. She kept hammering, and then she started
2  using numbers, 5, 10, 15, 20, and when she got to 30, I said, well, look. Instead of us keep going up
3  in numbers, I just said, you know, it was 30-plus times because it was well over 30 times."), *with*
4  Tr. 739:5-13 (Diaz) ("So -- but this man that you are reporting here, according to you, he's been
5  calling you the N-word or words to that effect almost every day for months; is that fair? Prior to the
6  time you wrote this e-mail; right? I think you testified he had called you that word prior to the
7  incident 30 times. A. But when you say 'every day,' that's a mischaracterization because we didn't
8  work together every day. You know, I had off days. He had off days. So when you say every day,
9  that's a mischaracterization of what's going on, sir.").

10       Accordingly, the evidence fails to support any inference that Tesla management was aware
11 of any pervasive, malicious use of the N-word at the factory. In fact, Mr. Diaz's own witness Mr.
12 Kawasaki testified that he never once heard the N-word or any racial slur used in an aggressive way
13 at the Tesla factory—not once. Tr. 307:3-7 (Kawasaki). Instead, the N-word was "just thrown,"
14 "[l]ike people were just having their conversations" in the same way it is used "in every rap song
15 known today." Tr. 327:8–16 (Kawasaki). Even Mr. Diaz's witness Mr. Wheeler testified to the
16 same: "[G]enerally, other than that story, when you heard the N-word used in the factory, you did
17 not hear it generally outside of the friendly context, you heard GA instead of ER, never really
18 aggressively; isn't that fair, sir? A. Fair." Tr. 364:1-5 (Wheeler). Mr. Jackson too testified that he
19 never once heard the N-word used in its racially hostile form at the Tesla factory. Tr. 444:19-446:16
20 (Jackson).

21       **4.  Mr. Diaz's Own Witnesses Admitted That Tesla's Conduct Was At Most Negligent, An Insufficient Predicate for Punitive Damages**
22

23       Not a single witness testified at trial that Tesla acted with malice, oppression, ill will, or spite
24 warranting punitive damages. When asked point blank if he thought "Tesla should be punished"
25 for its conduct, Mr. Diaz responded only that Tesla should "take accountability for their part" and
26 that he will "take accountability in [his] part in it." Tr. 628:22-629:2 (Diaz).

27       To the contrary, Mr. Diaz's witnesses repeatedly described Tesla's conduct in the language
28 of negligence—*i.e.*, the mere failure to take the further steps a "reasonable employer should have

taken" to train its supervisors and employees, investigate any racially hostile incidents, and discipline the employees who engaged in them. Mr. Diaz's own expert witness Ms. Oppenheimer, an expert in the field of workplace antidiscrimination policy, expressly admitted that Tesla's failings in taking the steps she thought a reasonable employer should have taken amounted, in substance, merely to negligence. *See* Tr. 516:18-25 (Oppenheimer) ("Q. In this case you -- you reached the conclusion that the reasonable employer should have taken more steps to investigate and that Tesla was negligent in their conduct; correct? A. Yeah. I probably don't use the word 'negligent,' but -- but yes, what they did was subpar and was not consistent with what was acceptable practice during the period of time that these events occurred.").

Mr. Diaz's fact witnesses similarly disagreed among themselves whether Tesla "should have" taken more or different steps to discipline or prevent racially hostile conduct in the workplace, disagreement that merely confirms that the record here supports no more than an inference of negligence. For example, Mr. Diaz's own witnesses offered a range of views on whether Tesla acted adequately in imposing on Mr. Martinez a three-day unpaid suspension and formal final warning for the drawing incident. Mr. Jackson identified an unpaid suspension as one potential option and recommended that Mr. Martinez be sent to a different site, Tr. 399:4-399:20 (Jackson), while Mr. Wheeler testified that Mr. Martinez should have been merely written up, Tr. 361:6-361:10 (Wheeler), and Mr. Diaz's expert Ms. Oppenheimer admitted that while a serious sanction was appropriate, the incident likely did not warrant termination, Tr. 508:16-509:3 (Oppenheimer). Such disputed evidence about what steps Tesla reasonably should have taken precludes any inference that Tesla's decision to suspend and warn Mr. Martinez was an act of malice or oppression or reckless disregard.

### 5. Mr. Diaz Failed To Meet His Burden Of Proving Punitive Damages Are Necessary To Deter Similar Conduct By Or Conditions At Tesla After His Departure

A fundamental purpose of punitive damages is not only to punish but to ***deter*** similar purposeful or reckless conduct in the future, and it is Mr. Diaz's burden to prove the conditions for punitive damages have been met. See Dkt. 450 at 26 (Instr. No. 25). Mr. Diaz has not met his burden. The evidence Mr. Diaz presented from his time at Tesla shows the company had policies

1 in place to prevent racial harassment in the workplace, including a system of escalating sanctions
2 that were applied on those few instances it arose.  Moreover, Mr. Diaz has presented no evidence of
3 any incidents of racial harassment that occurred after he left Tesla.  Mr. Diaz has not shown that
4 punitive damages are needed to deter any conduct by Tesla because there is nothing to deter.

## CONCLUSION

6      For the foregoing reasons, Tesla respectfully requests that the Court grant judgment as a
7 matter of law that punitive damages are not available on the record here.  Accordingly, the Court
8 should strike Instruction No. 25 and the portions of Instruction No. 2 stating that Mr. Diaz is entitled
9 to punitive damages from the Final Jury Instructions.  Dkt. 450 at 3, 26.  The Court should also
10 strike Question 3 from the verdict form.  Dkt. 437.

12 DATED:  March 31, 2023      By: */s/ Daniel C. Posner*

Daniel C. Posner
Mari Henderson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Alex Spiro (appearance *pro hac vice*)
alexspiro@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

Asher Griffin (appearance *pro hac vice*)
ashergriffin@quinnemanuel.com
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Defendant Tesla, Inc.*