Volume 1

Pages 1 - 253

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

OWEN DIAZ,                       )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )     NO. C 17-06748 WHO
                                 )
TESLA, INC. dba TESLA MOTORS,    )
INC.                             )
                                 )
            Defendant.           )
_____)

San Francisco, California
Monday, March 27, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    CALIFORNIA CIVIL RIGHTS LAW GROUP
                    332 San Anselmo Avenue
                    San Anselmo, California  94960
               BY:  **LAWRENCE A. ORGAN, ATTORNEY AT LAW**

                    ALEXANDER MORRISON + FEHR LLP
                    1900 Avenue of the Stars - Suite 900
                    Los Angeles, California  90067
               BY:  **J. BERNARD ALEXANDER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

1   **APPEARANCES:**   (continued)

2   For Plaintiffs:

3                       ALTSHULER BERZON LLP
                        177 Post Street - Suite 300
                        San Francisco, California  94108
4                  BY:  **JONATHAN ROSENTHAL, ATTORNEY AT LAW**

5                       COLLIER LAW FIRM, LLP
                        240 Tamal Vista Boulevard - Suite 100
6                       Corte Madera, California  94925
                   BY:  **DUSTIN L. COLLIER, ATTORNEY AT LAW**

7
    For Defendants:

8                       QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        51 Madison Avenue - 22nd Floor
9                       New York, New York  10010
                   BY:  **ALEX SPIRO, ATTORNEY AT LAW**
10                       **STEPHANIE KELEMEN, ATTORNEY AT LAW**

11                      QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        300 West 6th Street - Suite 2010
12                      Austin, Texas  78701
                   BY:  **ASHER GRIFFIN, ATTORNEY AT LAW**

13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>I N D E X</u>**

Monday, March 27, 2023 - Volume 1

|                                         | <u>PAGE</u> | <u>VOL.</u> |
|-----------------------------------------|-------------|-------------|
| Jury Voir Dire                          | 12          | 1           |
| Preliminary Jury Instructions           | 183         | 1           |
| Opening Argument by Mr. Alexander       | 203         | 1           |
| Opening Statement by Mr. Spiro          | 235         | 1           |

PROCEEDINGS

1  <u>Monday - March 27, 2023</u>                              <u>8:33 a.m.</u>

2                        P R O C E E D I N G S

3                            ---000---

4                    (Pause in proceedings.)

5          **THE CLERK:**  All rise.  This court is now in session,

6  the Honorable William H. Orrick presiding.

7          **THE COURT:**  Good morning, everybody.  Please be

8  seated.

9                    (Pause in proceedings.)

10         **THE COURT:**  All right.  Good morning, all.  The --

11  there are a few things that I wanted to go over before we get

12  going.

13      Mr. Diaz, hello.

14         **THE WITNESS:**  How are you doing again, sir?

15         **THE COURT:**  I'm doing just fine.

16      The jury is gathering in the jury room.  The first thing

17  is the dealing with the objections to Oppenheimer slides which

18  I'm going to overrule.  The slides are consistent with her

19  prior testimony.  She has been qualified and the demonstratives

20  are acceptable.

21         **MR. SPIRO:**  Understood, Your Honor.

22         **THE COURT:**  Let's see.  I have given you revised jury

23  instructions for this morning.  The only revision is that I

24  have added 13A, which comes from the Model 4.1.  It's the fair

25  treatment of corporations instruction, and I think it's

1   appropriate to provide it.  So take a look at that.  And tell

2   me whether anyone has any problem with it.

3          **MR. SPIRO:**  No issue from the Defense, Your Honor.

4          **MR. ORGAN:**  One moment, Your Honor.

5                    (Pause in proceedings.)

6          **MR. ORGAN:**  No objection, Your Honor.

7          **THE COURT:**  All right.  So we will add that.

8       The procedure that I'm going to use for voir dire, in

9   going through the survey responses, I decided that the most --

10  the fairest way of doing it is to exclude everybody who said

11  any word at all about Tesla or Mr. Musk in their responses, and

12  when I say "exclude," I mean just stand in the hallway and then

13  we'll question them individually, but the -- that will ensure

14  that there is zero taint for -- for the pool.

15      So I'm going to do my usual voir dire questioning of

16  people who didn't register anything with respect to Mr. Musk or

17  Tesla in the surveys, and there are about 16 of them.  We'll

18  ask them questions here.  We'll take a break.  I'll ask the

19  remaining people to stay outside, and then one at a time I'll

20  ask them to come in, and we can discuss their concerns,

21  information, beliefs with respect to Tesla and anything else

22  that is appropriate to be asked at that point.

23      Mr. Organ.

24         **MR. ORGAN:**  Yes, Your Honor.

25      Just a quick question.  That doesn't change their order in

**PROCEEDINGS**

1  the random list; correct?

2     **THE COURT:**  Correct.

3     **MR. ORGAN:**  Okay.  Thank you, Your Honor.

4     **THE COURT:**  Correct.

5   So does that all make sense to everybody here?  Understand

6  that?

7     **MR. SPIRO:**  I understand, yes, Your Honor.

8     **THE COURT:**  Okay.  One question I didn't ask but

9  I'm -- so I'm going to ask it now, is everybody on your team,

10  Mr. Alexander, vaccinated and boosted?

11     **MR. ALEXANDER:**  Yes, Your Honor.

12     **THE COURT:**  And what about you, Mr. Spiro?

13     **MR. SPIRO:**  I would have to check and confer.  I don't

14  know that information off the top of my head.

15     **THE COURT:**  Okay.  Well, that's what I would like you

16  to do.  Why don't you do that now.

17     **MR. SPIRO:**  Okay.  I will take a moment.  Thank you.

18       (Pause in proceedings.)

19     **MR. SPIRO:**  Everybody present is, Your Honor.

20     **THE COURT:**  Okay.  Because I'm going to make a

21  representation to the jury that that's the case and you should

22  check with all of your witnesses.  If they are not vaccinated,

23  they should be wearing a mask when they testify.  Okay?

24     **MR. SPIRO:**  Understood.

25     **MR. ORGAN:**  Your Honor, I did check with Mr. Kawasaki,

1   who is the one witness who will likely testify today, he is

2   vaccinated, Your Honor.

3          **THE COURT:**  Okay.  Just make sure that that all

4   happens.  I'm going to be interested in knowing at the end of

5   the day who the next day's witnesses are so that I can be

6   prepared, as well as everybody else.

7          **MR. ORGAN:**  Yes, Your Honor.

8       And I will say that Mr. Spiro and I had a conversation --

9   were just having a conversation when Your Honor came in, and

10  apparently we need to meet and confer a little bit in terms of

11  his time estimates, which might be a little different than what

12  we had known before.  So that might change in terms of some of

13  the next days out, but --

14        **THE COURT:**  Okay.  That's fine.  Just let me know at

15  the end of the day who is going to be testifying tomorrow.

16        **MR. ORGAN:**  Thank you, Your Honor.

17        **MR. SPIRO:**  Yes, Your Honor, what spurred that

18  conversation, just so that the Court's is aware, is I shared a

19  concern that I appreciate that the Court is running a very

20  efficient schedule here, and we hope to, too.  I think it is

21  going to be very close this week in terms of timing.  I think,

22  you know, so razor close that a bathroom break could throw off

23  the timing estimates.

24       And when we had originally looked at the timing of the

25  schedule, we had understood we would be staying a bit later on

1    Monday and Friday.  That may have been our error.  So I do

2    think it's going to be close.

3         THE COURT:  You are staying later on Monday and

4    Friday.

5         MR. SPIRO:  Very well.  Yeah, I think we had clocked

6    in a little bit longer.  But regardless, yeah, we are aiming to

7    finish the case this week, of course, as the Court has

8    directed.

9         THE COURT:  Oh, okay.  All right.  I was thinking

10   maybe your cross-examination would be more concise than

11   Mr. Organ was anticipating, but that's fine.

12        MR. SPIRO:  I do short crosses, so I hope that

13   everybody is happy with it.

14        THE COURT:  As -- as it comes out, you know what your

15   time -- how much time you guys have and that's -- that's what

16   you have.

17        All right.  Anything -- oh, the -- the preliminary

18   instructions are essentially also going to be the final

19   instructions, I think, with the limited additional matters.

20   And we -- but we ought to have a final instruction conference,

21   and so I'm thinking we should do that on Wednesday afternoon.

22   My law and motion starts at 2:00 o'clock, and if there

23   aren't -- and I'm going to post proposed final instructions on

24   Tuesday -- at least by Tuesday, and you can tell me on

25   Wednesday morning whether we need a longer conference than --

**PROCEEDINGS**

1 than just a -- something right after trial on Wednesday.

2          **MR. SPIRO:**  Understood, Your Honor.

3          **THE COURT:**  So those were the issues that I wanted to

4 discuss.  Mr. Alexander or Organ, who should I be asking for?

5     Ms. Nunley, who should I ask for?

6          **MR. ORGAN:**  Well, I think beauty and age both go to

7 Bernard, so probably Mr. Alexander, Your Honor.

8          **THE COURT:**  All right.  Mr. Alexander, is there

9 anything?

10          **MR. ALEXANDER:**  Nothing else, Your Honor.  I think we

11 are fine.

12          **THE COURT:**  Okay.

13          **MR. SPIRO:**  Not at this time, Your Honor.  Thank you.

14          **THE COURT:**  Okay.

15          **MR. SPIRO:**  If I can have a moment to confer with my

16 colleagues across the aisle for a second on one issue.  If

17 you're more --

18          **THE COURT:**  While I'm still here?

19          **MR. SPIRO:**  It doesn't have to be while you are still

20 here.

21          **THE COURT:**  Okay.  So let me tell you at the moment

22 there are 39 jurors upstairs who have come.  Three of them have

23 some health concerns, which we'll raise, I think, when they

24 come in; and a number have failed to appear, so let me tell you

25 who those are.  At the moment Number 1, 14, 26, 33, 36, and 38.

**PROCEEDINGS**

1  At the moment they are not here.  Ms. Davis is going to tell me

2  something else.

3       **THE CLERK:**  Those three have essentially called in

4  sick, so they are not present.

5       **THE COURT:**  And then three others have called in sick.

6  They are Jurors Number 7, 34, and 12, so they are not here

7  either.

8     So, I will leave you to discuss what you need to discuss.

9  The jury should come down -- is there -- will the results of

10  your discussion need to be conveyed to me before the jury is

11  present?

12       **MR. SPIRO:**  No, Your Honor, not necessarily.  I was

13  going to suggest something that may allow everything to move

14  more efficiently.  But if there is anything, I will ask the

15  court staff to alert Your Honor.

16       **THE COURT:**  Okay.  They know where to find me.

17       **MR. SPIRO:**  Yes.  Thank you, Your Honor.

18       **THE COURT:**  All right.  So I will see you all when the

19  jury is here.

20              (Recess taken at 8:44 a.m.)

21            (Proceedings resumed at 9:21 a.m.)

22       **THE COURT:**  Please be seated for a second.

23     I understand there is a matter that you want to put on the

24  record.

25       **MR. SPIRO:**  Yes, Your Honor.  The Court asked if there

1   was anything else before the jurors came in.  Before we broke

2   at the last session, the Court had indicated it was inclined to

3   excuse the juror that served at approximately the one-year

4   mark.  We looked into that issue about whether that would

5   create an issue if this -- to avoid having to try this case a

6   third time.

7        And we looked at -- there is a California rule on the

8   subject, we think, and the issue is that it's until discharge a

9   juror is deemed to have served.  And so I just wanted to raise

10  that because I'm obviously not going to raise that in front of

11  the open panel if the Court made that decision already or not,

12  and so that was just the one issue we had left hanging from the

13  last session.

14       **THE COURT:**  Okay.  And can you remind me of what the

15  number of that juror was?

16       **MR. SPIRO:**  Juror Number 5.

17       **THE COURT:**  Okay.  At some point before -- not even

18  positive --

19                    (Pause in proceedings.)

20       **THE COURT:**  Okay.  Well, I will inquire with respect

21  to her discharge dates when we talk to her.  Anything else?

22       **MR. SPIRO:**  No, Your Honor.

23       **MR. COLLIER:**  Might I ask if Mr. Spiro would be so

24  kind as to share the rule he was referencing?

25       **THE COURT:**  Good idea.

1        **MR. SPIRO:**  Sure.  It's California Rules of Court,

2   Rule 2.1002.

3        **MR. COLLIER:**  Thank you.

4        **THE COURT:**  All right.  Ms. Davis, do you have the

5   jurors outside?

6        **THE CLERK:**  Yes, I do.

7        **THE COURT:**  And do you have -- is there a further jury

8   list from the jurors and jury office or no?

9        **THE CLERK:**  Just the one that replaced the folks who

10  have been excused for illness.

11                    (Pause in proceedings.)

12        **THE COURT:**  So this is just the list?

13        **THE CLERK:**  It should match what you have.

14        **THE COURT:**  Before 7:00 a.m. this morning.

15        **THE CLERK:**  Right.  Right.

16        **THE COURT:**  Okay.  Yeah, I don't need that.  I will

17  give this back to you.

18        **THE CLERK:**  All right.

19        **THE COURT:**  All right.  I will be back when everybody

20  is comfortably seated.

21                    (Pause in proceedings.)

22                    **JURY VOIR DIRE**

23     (Proceedings were heard in the presence of the prospective

24  jury panel:)

25        **THE CLERK:**  All rise.  This court is now in session,

1    the Honorable William H. Orrick presiding.

2         **THE COURT:**  Good morning, everybody.  Please be

3    seated.

4                        (Pause in proceedings.)

5         **THE COURT:**  Welcome to my courtroom.  I'm

6    Judge William Orrick, and I thank you for participating in this

7    trial today.  This is one of the foundations of our democracy

8    and our justice system, a jury trial.

9         And before I talk to you about that service, I want to let

10   you know about the public health rules that I'm imposing in

11   this courtroom.

12        Since your health and safety are of the utmost importance

13   to me and even though the COVID virus is at its low ebb at the

14   moment, it's still potentially dangerous and contagious.  And

15   since there are a lot of people here in the courtroom in pretty

16   close quarters, I'm requiring everyone to wear a mask except

17   when speaking in open court which is why I have my mask off

18   right now.

19        You may choose to keep your mask on even when you are

20   speaking.  If you haven't been vaccinated, I ask you to keep

21   your mask on at all times.

22        We've had -- it may not be obvious to you because it's so

23   warm in here -- and maybe, Ms. Davis, you can check with GSA --

24   but we have had our air circulation checked by public health

25   experts, and it meets all standards and all of the court's

 1   staff and the lawyers and their staff are vaccinated.

 2        Now, let me tell you why you are here and what you're

 3   going to do.  Trial by jury began in England in 1215.  Before

 4   that, the king and his cronies could do whatever they wanted to

 5   without worrying about the rule of law.  But noblemen in those

 6   days wanted to change that autocratic way of making decisions,

 7   and so the jury system grew up.

 8        First, it was just for noblemen, then male landowners, and

 9   on through history until now, the right to serve on a jury is

10   every citizen's constitutional right and responsibility.

11        There's a lot to say about the importance of juries in the

12   rule of law, but I'm just going to say this:  In a world where

13   the fairness of our justice system is questioned, the right to

14   a jury trial assures that cases get decided by a group of

15   people who are not appointed by a politician but selected

16   randomly from the area where the case is proceeding, and they

17   are picked not by the judge but by the lawyers, by the parties

18   to the lawsuit.

19        Our Constitution recognizes that there are some cases

20   where the stakes are just too high to leave it to one person to

21   decide, particularly a judge.

22        Each of you has the experience to judge the facts and

23   consider the perspectives of other jurors, and it's the diverse

24   experiences that you bring to the courtroom that is the best

25   protection for a fair trial.

 1          As a juror, you're going to apply the law that I give you

 2     to what you have learned from the witness stand, from the

 3     documents in the courtroom about this case, and you will render

 4     the verdict.  So what you think and how you work with others

 5     will be critical in deciding this case.

 6          I just want to underscore for you how important what it is

 7     that you've been called to do.  I know a lot of people don't

 8     like jury service.  You all have important things to do and --

 9     in your lives.  This is not convenient, and it seems like an

10     imposition.

11          It is your duty as a citizen, and it's essential if we're

12     to deliver the promise of equal justice to all.

13          So with that, Ms. Davis, if you would administer the oath,

14     and then maybe let's open the -- the door in the back of the

15     courtroom to get a little more air in here.

16          **THE CLERK:**  Okay.  If you can all stand, please, all

17     prospective jurors, and raise your right hand for me.

18          (Prospective jurors duly sworn.)

19          **THE CLERK:**  Thank you.  Be seated.

20          **THE COURT:**  So let me tell you just a little bit about

21     what this -- about the case, how long it's going to take, what

22     our trial days are going to look like, and what's going to

23     happen today as we pick the jury.

24          This lawsuit was brought by Plaintiff Owen Diaz who was

25     employed by Defendant Tesla at the Tesla factory in Fremont,

1   California from June 2015 to March 2016.

2       He brought a lawsuit against Tesla alleging violations of

3   state and federal law involving racial discrimination.

4       This case is being tried in two phases:  The first phase

5   for liability has already been determined.  The second for

6   damages is what you will be asked to decide.

7       This is going to be a relatively short case.  I expect

8   that all of the evidence will be in and the case will be

9   presented to you for deliberation by Friday, March 31.

10      I appreciate your having filled out the questionnaires as

11  you did.  This morning I'm going to take a couple of hours to

12  ask you questions about your responses and others that may bear

13  on your ability to serve as a juror in the case.

14      The lawyers will also have a much briefer amount of time

15  to ask you questions as well.  I'm going to take a break every

16  hour and a half or so.  If I haven't called a break, please do

17  not leave the courtroom.  The -- you all need to be here

18  when -- when I ask you to be here.

19      There are a number of people that I will want to speak to

20  individually without other jurors present today because of

21  information on the survey responses, and I'm going to describe

22  how I'm going to do that in a little bit right before the first

23  break.

24      The entire process of jury selection will be done today.

25  I'm hoping that we'll proceed then to preliminary instructions,

 1   the opening arguments of counsel, and perhaps the first

 2   witness.

 3         We'll see how the day progresses.

 4         Our trial day on Tuesday, Wednesday, and Thursday will

 5   start at 8:30 a.m., and it'll run until 1:30 p.m.  We'll have a

 6   15-minute break around 10:00 o'clock and another one at around

 7   11:45.  The reason that the trial day ends at 1:30 is I have

 8   other cases and other calendars that happen in the afternoon

 9   that I need to attend to.

10         I found when I was a lawyer it also was helpful to have

11   the afternoon to prepare for the next day.  It made things go

12   more efficiently.  And I have also found since being a judge

13   that it helps jurors because you can attend to some of the rest

14   of your life that is being crowded with jury service in the

15   morning.

16         On Friday, trial will start at 8:30, and then I want you

17   to be able to stay for the remainder of the afternoon.  It's my

18   hope that you will get the case on Friday and can begin your

19   deliberations then.  If the deliberations are not complete and

20   you go over to next week, I'll want you to plan to come in at

21   8:30 in the morning.

22         I know that jury service asks a lot of you.  So I want to

23   promise you to be efficient with your time, as efficient as I

24   can be.  If I need to meet with the lawyers or they need to

25   meet -- bring me an issue that shouldn't be heard by you, we'll

1   do that before 8:30 or after 1:30.

2        I'm going to be prompt.  The lawyers are going to be

3   prompt.  And I ask you all to be prompt.  There are a lot of

4   people involved in making a trial happen, and it's -- it's just

5   very important that everybody cooperate, pay attention to the

6   time.  It's pretty rude when you don't.

7        If anyone gets sick or has any personal emergency during

8   trial that causes you to need to be excused, please contact

9   Ms. Davis, my courtroom deputy.  She'll get in touch with me.

10  Ms. Davis will provide everybody who's selected on the jury

11  with a contact sheet.

12       So now we're going to move on to jury selection itself.

13  In a moment I'm going to ask the lawyers to introduce

14  themselves and their clients.  Then I'm going to have some

15  questions for you and talk a little bit about the law that

16  applies to your role as jurors, and the lawyers will have some

17  questions as well.

18       Once the questioning is over, I'll determine whether any

19  juror should be excused for hardship or cause, and then the

20  parties will make their selections.  And we'll have the jury.

21       So let's start with the Plaintiff's side.

22       Mr. Alexander, would you introduce your team.

23            **MR. ALEXANDER:**  Thank you, Your Honor.

24       My name is Bernard Alexander.  This is Owen Diaz, and my

25  colleagues are Larry Organ, Dustin Collier, Cimone Nunley,

1    Sabrina Grisly, and Harry Plotkin.

2         **THE COURT:**  All right.  Does anybody in the jury know

3    any -- either Mr. Diaz or any of the lawyers?

4                        (No response.)

5         **THE COURT:**  All right.  Mr. Spiro?

6         **MR. SPIRO:**  Good morning.  My name is Alex Spiro, and

7    present with me is Stephanie Kelemen, Asher Griffin.

8       Nate, can you all -- the folks from Tesla at the end here

9    are also here, but they're not going to be sitting at counsel

10   table.

11        **THE COURT:**  Okay.  If you'd like to introduce them,

12   please go ahead.

13        **MR. SPIRO:**  Okay.  Nate Smith.

14        **THE COURT:**  All right.  Does anybody on the jury know

15   any of the people who were just introduced?

16                        (No response.)

17        **THE COURT:**  All right.  Does anyone on the jury own

18   any -- or who are listed here -- that's a good reminder.  If

19   you have not turned off your cell phones, please do that.

20      Does anybody own any stock in Tesla?  Not mutual funds.

21   Mutual funds don't count, but if you do own stock; okay.

22      And so Juror Number 9, could you stand up and just go to

23   the microphone, please.

24                      (Pause in proceedings.)

25        **THE COURT:**  Good morning, how are you?

```
 1          PROSPECTIVE JUROR 9:  Good.  How are you?

 2          THE COURT:  Excellent.  Thanks.

 3      So you own actual stock in Tesla?

 4          PROSPECTIVE JUROR 9:  Yeah.  I have it on Robinhood.

 5          THE COURT:  Okay.  And that's -- that's what I need to

 6  know.  Thank you.

 7      And Juror Number 10, if you wouldn't mind going over to

 8  the same location.

 9                      (Pause in proceedings.)

10          PROSPECTIVE JUROR 10:  Good morning, Your Honor.

11          THE COURT:  Good morning.  How are you?

12          PROSPECTIVE JUROR 10:  Good, thank you.

13          THE COURT:  Good.  And so do you also own common stock

14  in Tesla?

15          PROSPECTIVE JUROR 10:  Yes, I do.

16          THE COURT:  All right.  How long have you owned it?

17          PROSPECTIVE JUROR 10:  More than two years, I think.

18          THE COURT:  Okay.  Thank you.

19      All right.  I have given you only the briefest of

20  descriptions of this case.  Has anybody heard about it?

21                      (No response.)

22          THE COURT:  All right.  So this is a civil case, which

23  means that the jury needs to include a minimum of six people.

24  I want to have eight.  I'm going to select eight jurors today

25  to ensure against jurors getting sick or having other troubles.
```

1   We don't want people coming to court if you are sick, and

2   everyone who is selected will participate in the deliberations.

3        In a trial -- in the trial of this case and every case,

4   each side is entitled to have a fair, unbiased, unprejudiced

5   jury.  The purpose of the questions that you're about to answer

6   is to enable me to determine whether any prospective juror

7   should be excused for cause and to enable counsel for the

8   parties to exercise their individual judgment with respect to

9   peremptory challenges.  Those are challenges for which no

10  reason needs to be given.

11       It's important that you disclose any reason or fact why

12  any of you might be biased or prejudiced in any way in answer

13  to the questions you are asked.

14       It's important that you disclose any reason or fact why

15  any of you might be biased or prejudiced in any way in answer

16  to the questions you are asked.

17       I'll explain that a bit more as we go along.  After I have

18  asked some questions of each of you based on the questionnaire

19  responses, I may ask some questions that call for the group to

20  give a yes or no response.  If the answer is "yes," please

21  raise the card at your seat.  I may follow up with you

22  immediately or I may call you up to the bench in a while.

23       If at any time you're asked a question that you think

24  calls for a personal or embarrassing response, please let me

25  know if you would prefer to answer the question privately so

 1   that the lawyers and court reporter can listen but other

 2   members of the jury and audience cannot.

 3        No one wants to pry into your personal affairs, but the

 4   reason the question may be asked is that it may have some

 5   impact on your ability to sit as a juror.

 6        In this case, you will be the judge of the facts.  I'll

 7   instruct you on the law but deciding the facts is your job.

 8   The jurors selected will be the sole judges of the facts.

 9   You'll be duty-bound to follow the law as stated by me and

10   eventually to apply the law to the facts as you find them from

11   all the evidence presented to you.

12        It's your duty to treat all witnesses equally and not to

13   assume someone is -- is or is not truthful based on profession

14   or looks or anything else.

15        You can't make assumptions about credibility until you

16   hear what the person has to say, and then you can evaluate that

17   and a whole list of factors that I'll instruct you about when

18   the trial starts.

19        Everyone has the right to be treated equally and fairly.

20   You must base your view of each witness' credibility on what

21   they have to say and on the evidence in this case, not on any

22   preconceived notion that you might have.

23        The responsibility of judging the facts must be performed

24   without bias or prejudice to any party.  The law doesn't permit

25   jurors to be governed by sympathy, prejudice, or public

 1    opinion.

 2        Some of you as an example have expressed views positive

 3    and negative about Mr. Musk.  Mr. Musk is not a party or a

 4    witness in this case, and whatever you think of him should have

 5    no bearing on your determination in this case.

 6        Similarly, what you have heard about Tesla or whether you

 7    like electric cars or dislike them should have no bearing on

 8    your determination in this case.  Those are not the issues that

 9    are being presented to you.

10        The parties will expect that you'll carefully and

11    impartially consider all the evidence, follow the law as stated

12    by me, and reach a just verdict regardless of the consequences.

13        This is a civil case.  The burden of proof in a civil case

14    is different from in a criminal case.  In a criminal case,

15    every essential element of an offense charged must be proven

16    beyond a reasonable doubt.

17        In a civil case, the -- a fact may be established by a

18    preponderance of the evidence.  That is to say, by evidence

19    that establishes that a fact is more likely true than not true.

20        This is the difference between the required proof in a

21    civil case and that that is required in a criminal case.

22        So those are just some basic foundations to what we're

23    going to do.  And now I'm going to ask some questions of some

24    of you, and I'm going to be going not completely in sequence.

25    And you'll see that some of you I will be asking questions

 1  individually at a different time.

 2      But right now, I would be interested in Juror Number 4.

 3  If you would step to the microphone.

 4                    (Pause in proceedings.)

 5          PROSPECTIVE JUROR 4:  Good morning, Your Honor.

 6          THE COURT:  Good morning.  How are you?

 7          PROSPECTIVE JUROR 4:  Good.  How are you?

 8          THE COURT:  I'm excellent.  Thank you.

 9      So tell me about your -- you're working with Safeway; is

10  that right?

11          PROSPECTIVE JUROR 4:  Yes.

12          THE COURT:  Tell me what you do.

13          PROSPECTIVE JUROR 4:  Courtesy clerk and cashier.

14          THE COURT:  And how long have you been doing that?

15          PROSPECTIVE JUROR 4:  One year.

16          THE COURT:  Do you enjoy it?

17          PROSPECTIVE JUROR 4:  Yes.

18          THE COURT:  And where's the store?

19          PROSPECTIVE JUROR 4:  Petaluma.

20          THE COURT:  In where?

21          PROSPECTIVE JUROR 4:  In Petaluma.

22          THE COURT:  And you -- someone living with you works

23  for a company called Gawfco.  Tell me what that is.

24          PROSPECTIVE JUROR 4:  That's my husband.  My husband

25  works -- work for that company.

 1          THE COURT:  And what is Gawfco?

 2          PROSPECTIVE JUROR 4:  Gawfco is a -- it's an

 3   enterprises, owns gas stations.

 4          THE COURT:  I got it.  Okay.

 5      So is -- are you aware as you're standing here now knowing

 6   not a lot about things, are you aware of any reason why you

 7   couldn't serve as a fair and impartial juror?

 8          PROSPECTIVE JUROR 4:  I think because English is my

 9   second language, I speak only and understand simple English,

10   not difficult one.  So if I don't understand everything --

11          THE COURT:  I mean, so --

12          PROSPECTIVE JUROR 4  -- not great, I make the wrong

13   decision.

14          THE COURT:  So have you understood everything that

15   I've said so far.

16          PROSPECTIVE JUROR 4:  Yes.

17          THE COURT:  The lawyers have that job, too.  They have

18   to be clear and explain what's going on and ask questions in a

19   way that is -- is understandable.  So I appreciate your

20   concern.  Thank you.

21          PROSPECTIVE JUROR 4:  Okay.

22          THE COURT:  And now Juror Number 6, please.

23                    (Pause in proceedings.)

24          PROSPECTIVE JUROR 6:  Hello.  Good morning.

25          THE COURT:  Good morning.  How are you?

```
 1              PROSPECTIVE JUROR 6:  Good.

 2          THE COURT:  Good.  So you work with the San Francisco

 3   Unified School District?

 4          PROSPECTIVE JUROR 6:  Yes.

 5          THE COURT:  And tell me -- tell me what you do.

 6          PROSPECTIVE JUROR 6:  I am the room monitor.  Just in

 7   the yard, watch the kids.

 8          THE COURT:  And how -- how old are the kids that

 9   you're monitoring?

10          PROSPECTIVE JUROR 6:  Elementary.  Five years and 10

11   years, yeah.

12          THE COURT:  How long have you been doing that?

13          PROSPECTIVE JUROR 6:  Five months.

14          THE COURT:  Do you like it?

15          PROSPECTIVE JUROR 6:  Yeah.

16          THE COURT:  Most of the time I think it's fun to be

17   with young kids.  It's not always fun, but most of the time.

18                          (Laughter)

19          THE COURT:  Do you agree?

20          PROSPECTIVE JUROR 6:  Sometimes.

21                          (Laughter)

22          THE COURT:  And -- and someone living with you is a

23   house decorator.

24          PROSPECTIVE JUROR 6:  Yeah.

25          THE COURT:  And is that for real estate?
```

1    **PROSPECTIVE JUROR 6:**  Just paint the wall and then do

2    the floors, and yeah.

3    **THE COURT:**  That's great.

4    And so I'll ask you that same question:  Are you aware of

5    anything so far that makes you think you could not be a fair

6    and impartial juror in this case?

7    **PROSPECTIVE JUROR 6:**  No.

8    **THE COURT:**  Okay.  Thank you.

9    Juror Number 10, please.

10                     (Pause in proceedings.)

11   **PROSPECTIVE JUROR 10:**  Hello, Your Honor.

12   **THE COURT:**  Hello.  So I will tell you that because of

13   your ownership of stock, you probably will not be able to sit

14   on this jury.  I wanted to also confirm that you've got an

15   nonrefundable vacation planned?

16   **PROSPECTIVE JUROR 10:**  Yes, Your Honor.  As a matter

17   of fact, I received the summons in January for various reason,

18   even at time, which I can explain to you, I didn't notice that

19   this is the time.  My vacation was planned last June.  I mean I

20   bought my ticket June 2020 and everything is planned.  This is

21   my 15 year anniversary and after 34 years, the first time, I'm

22   actually taking two weeks vacation.

23   **THE COURT:**  So congratulations on your anniversary.

24   I'm just -- I'm going to excuse you right now because you would

25   not be able to serve and you've got the vacation.  So you may

 1   go about your life, and thank you for coming in and doing your

 2   duty.

 3            **PROSPECTIVE JUROR 10:**  Thanks.

 4            **THE COURT:**  Juror Number 11, please.

 5                      (Pause in proceedings.)

 6            **PROSPECTIVE JUROR 11:**  Good morning, Your Honor.

 7   Hello.

 8            **THE COURT:**  Good morning.  How are you?

 9            **PROSPECTIVE JUROR 11:**  Very good.

10            **THE COURT:**  Good.  And so you're working with UPS?

11            **PROSPECTIVE JUROR 11:**  I am, I'm currently working

12   with UPS.

13            **THE COURT:**  And what are you doing?

14            **PROSPECTIVE JUROR 11:**  At the moment, customer

15   service, so I package all your packages and stuff and Amazon.

16            **THE COURT:**  Thank you.  And how are you enjoying

17   things so far?

18            **PROSPECTIVE JUROR 11:**  I very much enjoy the change.

19   I actually worked in veterinary medicine for four years, so I

20   actually enjoy working on customer service.

21            **THE COURT:**  So the customers that you were having as a

22   vet -- working in the vet's office, you didn't enjoy so much?

23            **PROSPECTIVE JUROR 11:**  Not exactly.  I truly enjoy

24   client service in general.  I very much enjoy working inside

25   the medical field and outside the medical field.

```
 1              THE COURT:  That's great.
 2         And have you -- are you aware -- oh, so you have a sibling
 3    who works at Tesla?
 4              PROSPECTIVE JUROR 11:  As of now, he has mentioned
 5    that he does work for Tesla.
 6              THE COURT:  Okay.  Have you discussed his work at
 7    Tesla with him?
 8              PROSPECTIVE JUROR 11:  To be quite honest, I haven't
 9    been in contact with my brother in a couple weeks, so no.
10              THE COURT:  And is there anything about that that
11    would make you feel more strongly inclined in the favor of
12    Tesla just because he's working there?
13              PROSPECTIVE JUROR 11:  I think for per my judgment,
14    he's an individual, I'm an individual, so both of our spaces
15    are individualistic, so by all means, no.
16              THE COURT:  Okay.  And is there anything that you're
17    aware of that makes you think you couldn't serve as a fair and
18    impartial juror?
19              PROSPECTIVE JUROR 11:  To be quite honest, I do have a
20    little bit of anxiety.  But besides that, I don't think that
21    would affect my decisions.
22              THE COURT:  Okay.  When you say that you have
23    anxiety -- and if you'd like to talk about this privately, I
24    would be happy -- we can do that.  But I'm interested in just
25    getting a little more information about what you mean.
```

 1          **PROSPECTIVE JUROR 11:**  Sure.  No worries.  I'm very

 2     open on this.  I do have a leaky urinary track, so that does

 3     kind of contribute to that, but I hope that doesn't affect any

 4     of the service here.

 5          **THE COURT:**  Okay.  So here we will be -- I'll be

 6     taking a break every hour and a half.  If you had something

 7     that you needed to attend to during -- in the middle of

 8     something, if you raised your hand, we could -- we would deal

 9     with that issue.

10          **PROSPECTIVE JUROR 11:**  I appreciate you.  Thank you.

11          **THE COURT:**  Okay.  And is there any other reason why

12     you think you couldn't be a fair and impartial juror?

13          **PROSPECTIVE JUROR 11:**  Besides what I had just

14     mentioned, no.

15          **THE COURT:**  Okay.  Great.  Thank you very much.

16        Juror Number 13.

17                    (Pause in proceedings.)

18          **PROSPECTIVE JUROR 13:**  Good morning, Your Honor.

19          **THE COURT:**  Good morning.  How are you?

20          **PROSPECTIVE JUROR 13:**  Good.

21          **THE COURT:**  Good.  So tell me -- you indicated that

22     you're a safety professional.  Tell me what that means.

23          **PROSPECTIVE JUROR 13:**  I work for a major utility

24     company such as PG&E, Virginia Dominion Power, Recurrent

25     Energy, and we build solar power plants, convection power

 1   turbine plants, billions of dollars of worth, and I kept the

 2   people from getting hurt and dying.

 3             THE COURT:  Thank you very much for that.  How long

 4   have you been doing that?

 5             PROSPECTIVE JUROR 13:  Twenty years.

 6             THE COURT:  That's fabulous.  And do you enjoy that

 7   work?

 8             PROSPECTIVE JUROR 13:  It's excellent work.

 9             THE COURT:  That's terrific.

10       I'll ask you that same question:  Is there any reason that

11   you are aware of at this point that you couldn't serve as a

12   fair and impartial juror?

13             PROSPECTIVE JUROR 13:  No, sir.

14             THE COURT:  All right.  Thank you.

15       Juror Number 16, please.

16                       (Pause in proceedings.)

17             PROSPECTIVE JUROR 16:  Good morning, Your Honor.  How

18   are you doing?

19             THE COURT:  I am very well.  How are you?

20             PROSPECTIVE JUROR 16:  Good.

21             THE COURT:  Good.  And so you're retired now.  How do

22   you enjoy that?

23             PROSPECTIVE JUROR 16:  Excuse me?

24             THE COURT:  How do you like being retired?

25             PROSPECTIVE JUROR 16:  I have my garden, so I enjoy

 1   that.

 2        THE COURT:  And tell me how you're spending most of

 3   your time.

 4        PROSPECTIVE JUROR 16:  Well, it's been -- the winter

 5   was kind of hard because it was so rainy, I cannot go really

 6   work on the garden.  But if it's a nice day, it's a great thing

 7   to do.

 8        THE COURT:  That's great.  I'm always interested as

 9   how people -- as I get older, I'm interested in how people are

10   spending their retirement.

11                          (Laughter)

12        PROSPECTIVE JUROR 16:  It's good to have a hobby.

13        THE COURT:  It is.  And what were you doing just

14   before you retired?

15        PROSPECTIVE JUROR 16:  I was selling furniture at

16   Macy's at the Concord store.

17        THE COURT:  And did you enjoy that?

18        PROSPECTIVE JUROR 16:  Yeah.  Yes.

19        THE COURT:  Let me just see.

20                     (Pause in proceedings.)

21        THE COURT:  Are you aware of any reason why you

22   couldn't serve as a fair and impartial juror in this case?

23        PROSPECTIVE JUROR 16:  Well, it was kind of scary

24   because of the COVID.  I went through that this year, beginning

25   of the year, and it was kind of hard.  And because I'm planning

1  to visit my kids in Europe, my son will be turning 50, I would

2  like to really celebrate his birthday, and I don't want to get

3  the COVID again, of course, so...

4       THE COURT:  I certainly -- I don't blame you at all.

5    I think probably a lot of us have gone through that and

6  are not interested in doing that.  And that's one of the

7  reasons why even though we are in a place where the infection

8  rate is so low, it's why I'm still requiring people in the

9  courtroom to wear masks and --

10       PROSPECTIVE JUROR 16:  I appreciate that.

11       THE COURT:  And so does -- did what I say at the

12  beginning about our public health protocols, did that -- does

13  that make you feel comfortable that you'd be able to serve as a

14  juror?

15       PROSPECTIVE JUROR 16:  Yeah, feel better if everybody

16  wearing the mask, definitely.

17       THE COURT:  Yeah, and they will be.

18       PROSPECTIVE JUROR 16:  Okay.

19       THE COURT:  Great.  Thank you.

20       PROSPECTIVE JUROR 16:  Thank you.

21       THE COURT:  Juror Number 18, please.

22            (Pause in proceedings.)

23       PROSPECTIVE JUROR 18?  Good morning, Your Honor.

24       THE COURT:  Good morning.  How are you?

25       PROSPECTIVE JUROR 18:  Good.  How are you doing?

 1          **THE COURT:**  Excellent.  So, tell me -- tell me what

 2   you do as a civil engineer.

 3          **PROSPECTIVE JUROR 18:**  Well, I work for a firm in

 4   Novato.  We do a variety of land development projects, a lot of

 5   like parking lots, kind of like people's home's drainage

 6   improvements, stuff like that.

 7          **THE COURT:**  And how long have you been doing that?

 8          **PROSPECTIVE JUROR 18:**  Just a little over two years.

 9          **THE COURT:**  And what kind of a background did you have

10   in order to become a civil engineer?

11          **PROSPECTIVE JUROR 18:**  I went to Cal Poly in San Luis

12   Obispo and studied civil engineering for four years.

13          **THE COURT:**  Great.

14      This case is a case that involved discrimination.  You

15   indicate that you had witnessed discrimination in the past.

16   Will you be able to view the evidence here as it comes in in a

17   totally fair way, unbiased way, and make a determination based

18   on what you hear here on what the -- in this case the amount of

19   damages should be that are awarded to Mr. Diaz?

20          **PROSPECTIVE JUROR 18:**  Yeah.  I can certainly do the

21   best that I can.

22          **THE COURT:**  Okay.  And do you have any question in

23   your mind that you'll be able to do that?

24          **PROSPECTIVE JUROR 18:**  No.

25          **THE COURT:**  Okay.  And is there any reason you think

 1  you couldn't serve as a fair and impartial juror?

 2          **PROSPECTIVE JUROR 18:**  No, there is not.  I will

 3  mention that I do own a little bit of Tesla stock.  I probably

 4  should have said that before.  It's about like one share.

 5                          (Laughter)

 6          **THE COURT:**  So do you -- do you know that you own that

 7  one share of stock?

 8          **PROSPECTIVE JUROR 18:**  Yes, I do know.  I'm pretty

 9  sure.

10                          (Laughter)

11          **THE COURT:**  Okay.  So there are mutual funds that own

12  a whole variety of stocks including -- and they may or may not

13  include Tesla, and those don't count for the question that I'm

14  asking.

15      I'm asking as an individual, do you know whether you own

16  a -- a -- a share or more of stock in Tesla?

17          **PROSPECTIVE JUROR 18:**  Yeah, my apologies.  I do own

18  one share, yeah, that's correct.

19          **THE COURT:**  Okay.  When did you get it?

20          **PROSPECTIVE JUROR 18:**  Probably like a little over a

21  year ago.

22          **THE COURT:**  Was it a gift, or how did it come to you?

23          **PROSPECTIVE JUROR 18:**  No.  It's, like, after I

24  started working, I, like, saved up a little bit of money, and I

25  figured I might look to investing a little bit, so yeah.

```
 1              THE COURT:  Okay.  All right.  Thank you.

 2       Juror Number 20, please.

 3                      (Pause in proceedings.)

 4              PROSPECTIVE JUROR 20:  Good morning, Your Honor.

 5              THE COURT:  Good morning.  How are you?

 6              PROSPECTIVE JUROR 20:  I'm good.  How are you?

 7              THE COURT:  Great.  And so you are a cyber security

 8     engineer?

 9              PROSPECTIVE JUROR 20:  Yeah, that's right.

10              THE COURT:  You know, when I started practicing and I

11     was asking questions of jurors, almost nobody was an engineer

12     of any sort and now almost everybody is an engineer of some

13     sort.  It's great.  So tell me -- tell me what you do as a

14     cyber security engineer.

15              PROSPECTIVE JUROR 20:  So I work for a company -- so

16     my duties are like to protect the customer data.  So we are

17     working towards that, like, we have a team, so we do that

18     teaming.  Just trying to see, like, we have to protect the data

19     from the bad guys, so that's the main course.

20              THE COURT:  And how long have you been doing that?

21              PROSPECTIVE JUROR 20:  Like ten years now.

22              THE COURT:  And you are working at Autodesk.  Do you

23     enjoy working there?

24              PROSPECTIVE JUROR 20:  Yeah, I love it.  I just had

25     ten-year anniversary last month.
```

1          THE COURT:  That's great.  Congratulations.

2      So, are you aware of any reason why you couldn't serve as

3   a fair and impartial juror in this case?

4          PROSPECTIVE JUROR 20:  Not to my knowledge.

5          THE COURT:  Great.  Thank you.

6      Juror Number 22, please.

7                      (Pause in proceedings.)

8          PROSPECTIVE JUROR 22:  Good morning.

9          THE COURT:  Good morning.  How are you?

10         PROSPECTIVE JUROR 22:  Well.

11         THE COURT:  So, I have been looking forward to asking

12   you a question, and that is I see that you work for the San

13   Francisco Seals; is that right?

14         PROSPECTIVE JUROR 22:  Yes.

15         THE COURT:  And the San Francisco Seals that I knew as

16   a kid was a minor league baseball team that used to play out at

17   Seal Stadium.

18         PROSPECTIVE JUROR 22:  That's right.

19         THE COURT:  But I'm pretty sure that you don't work

20   for them anymore?

21         PROSPECTIVE JUROR 22:  No.

22         THE COURT:  So tell me about San Francisco Seals.

23         PROSPECTIVE JUROR 22:  The San Francisco Seals is a

24   youth soccer program, and my father-in-law was -- grew up in

25   Santa Barbara, and he was a baseball player.  He went to UCSB,

1    and I think he had a little stint for like some division in

2    the -- for the Dodgers or whatever.

3         But then he came to San Francisco to study medicine, and

4    he had young children, and they became interested in playing

5    soccer.  And so he was just a dad who started coaching and

6    then -- but this -- at the time there wasn't a lot of soccer

7    opportunities like there are now.  And he just -- he started a

8    club, and based on his love for baseball, he named it the San

9    Francisco Seals.

10        THE COURT:  Oh, I love that.

11        PROSPECTIVE JUROR 22:  So my husband, it's -- it's his

12   company.  It's his business now and --

13        THE COURT:  Oh, that's great.  So I won't ask you

14   whether you enjoy it or not because you could only get in

15   trouble with the answer.

16                          (Laughter)

17        THE COURT:  So are you aware of -- of any reason why

18   you couldn't serve as a fair and impartial juror in this case?

19        PROSPECTIVE JUROR 22:  Nothing.  No, nothing I can

20   think of.

21        THE COURT:  Okay.  Thank you.

22      Juror Number 28, please.

23                   (Pause in proceedings.)

24        PROSPECTIVE JUROR 28:  Good morning.

25        THE COURT:  Good morning.  How are you?

1     **PROSPECTIVE JUROR 28:**  Good.  How about yourself?

2     **THE COURT:**  Good.  And so at the moment am I right

3  that you're retired?

4     **PROSPECTIVE JUROR 28:**  That's correct.

5     **THE COURT:**  And what are you doing?  How are you

6  spending your days?

7     **PROSPECTIVE JUROR 28:**  I do quite a bit of maintenance

8  work on various buildings and things like that.

9     **THE COURT:**  Uh-huh.  And which -- is that -- are you

10  using any of the skills that you had as an IT executive at Gap.

11     **PROSPECTIVE JUROR 28:**  No.

12                    (Laughter)

13     **THE COURT:**  Tell me about the -- tell me about your

14  work at Gap.

15     **PROSPECTIVE JUROR 28:**  Um, I designed and led the

16  teams that built most of their inventory and distribution

17  management systems.

18     **THE COURT:**  That's great.  And when did you -- how

19  long have you been retired?

20     **PROSPECTIVE JUROR 28:**  I have been retired, let's see,

21  about almost ten years.

22     **THE COURT:**  Is there -- are you aware of any reason

23  why you couldn't serve as a fair and impartial juror here?

24     **PROSPECTIVE JUROR 28:**  No, sir.

25     **THE COURT:**  Great.  Thank you.

 1          Juror Number 39, please.

 2                          (Pause in proceedings.)

 3          **PROSPECTIVE JUROR 39:**  Morning.

 4          **THE COURT:**  Good morning.  How are you?

 5          **PROSPECTIVE JUROR 39:**  Doing well.  Yourself?

 6          **THE COURT:**  I'm doing very well.  Thank you.

 7      So you are a lawyer?

 8          **PROSPECTIVE JUROR 39:**  Yes.

 9          **THE COURT:**  And how long have you been a lawyer?

10          **PROSPECTIVE JUROR 39:**  About three years now.

11          **THE COURT:**  And what is -- right now, describe what

12      you are doing for Alameda Health System?

13          **PROSPECTIVE JUROR 39:**  Yes, I'm the contracts counsel.

14      Any and all contracts coming into Alameda, whether they need

15      repairs on elevators, whether we need surgical devices, within

16      that range, all the contracts come to me and I draft them up

17      and negotiate those contracts.

18          **THE COURT:**  That's great.  Have you been -- is that

19      what you have been doing since graduating?

20          **PROSPECTIVE JUROR 39:**  No.  For two years I did family

21      law.  Got out of that rather quickly.

22          **THE COURT:**  And were you doing that in Alameda?

23          **PROSPECTIVE JUROR 39:**  No.  I was San Jose.

24          **THE COURT:**  I take it you don't know any of the -- any

25      of the lawyers here?

 1          PROSPECTIVE JUROR 39:  No.

 2          THE COURT:  The -- you have a brother who works for

 3     Tesla?

 4          PROSPECTIVE JUROR 39:  Yes.

 5          THE COURT:  And how long has he been doing that; do

 6     you know?

 7          PROSPECTIVE JUROR 39:  A guesstimate, maybe

 8     four years.

 9          THE COURT:  Is there anything about your brother's

10     work for Tesla that would make you either feel more positively

11     or negatively towards Tesla and would impact your ability to be

12     a fair and impartial juror?

13          PROSPECTIVE JUROR 39:  No.

14          THE COURT:  Is there anything you can think of that

15     would -- any reason why you would not be able to serve as a

16     fair and impartial juror?

17          PROSPECTIVE JUROR 39:  No.

18          THE COURT:  Okay.  Thank you.

19        Juror Number 43, please.

20                    (Pause in proceedings.)

21          PROSPECTIVE JUROR 43:  Good morning, Your Honor.

22          THE COURT:  Good morning.  How are you?

23          PROSPECTIVE JUROR 43:  Doing well.  How about you?

24          THE COURT:  Excellent.  So you are doing sales for

25     LinkedIn.  Tell me what -- how -- tell me what that's like.

1      **PROSPECTIVE JUROR 43:**  Yeah.  I started about

2   two years ago.  I'm selling LinkedIn Learning and LinkedIn

3   Recruiting to other businesses who need it.

4      **THE COURT:**  And are you -- and how are you doing that

5   job?

6      **PROSPECTIVE JUROR 43:**  It's a lot of, like, talking to

7   customers on Zoom and working remotely but, I also go into the

8   office, so kind of hybrid.

9      **THE COURT:**  And are you enjoying it?

10      **PROSPECTIVE JUROR 43:**  Yeah, I really like it.

11      **THE COURT:**  That's great.  Let me see.

12                    (Pause in proceedings.)

13      **THE COURT:**  Are you aware of any reason why you

14   couldn't serve as a fair and impartial juror?

15      **PROSPECTIVE JUROR 43:**  About two years ago, I was in a

16   pretty serious car accident that led to a lawsuit.

17      **THE COURT:**  Okay.  And is there anything about that

18   that would impact the way that you evaluate the evidence here.

19   This has nothing to do with a car accident.  I suspect that

20   none of the parties involved there were involved here.  So tell

21   me how you think that -- whether you think that might affect

22   you as a juror.

23      **PROSPECTIVE JUROR 43:**  Yeah, I mean, I -- I was the

24   one who sued the responsible -- the driver who was responsible.

25   But other than that, like, I would do the best of my ability to

 1  be impartial.

 2          THE COURT:  Would that -- would the fact that you were

 3  the person who did the suing, would that make at the start of

 4  the case you be more sympathetic to Mr. Diaz, who is the person

 5  doing the suing here, or would you just judge the evidence as

 6  it comes in, treating each side fairly and then making a

 7  determination based on that?

 8          PROSPECTIVE JUROR 43:  I think I would judge the

 9  evidence as it comes in.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR 43:  Yeah.

12          THE COURT:  Great.  Thank you very much.

13          PROSPECTIVE JUROR 43:  Thank you.

14          THE COURT:  Juror Number 44.

15                  (Pause in proceedings.)

16          THE COURT:  Come on up.

17                  (Pause in proceedings.)

18          PROSPECTIVE JUROR 44:  Hello.

19          THE COURT:  Good morning.  How are you?

20          PROSPECTIVE JUROR 44:  I'm well.  How about yourself?

21          THE COURT:  I'm doing so well.  And I thank everybody

22  for asking me how I'm doing --

23                  (Laughter)

24          THE COURT:  -- when I'm asking you how you're doing,

25  but I continue to do quite well so...

1              (Laughter)

2         THE COURT:  So tell me -- tell me what you do.

3         PROSPECTIVE JUROR 44:  I'm also retired like some of

4    the other individuals here.

5         THE COURT:  And how are you spending your time?

6         PROSPECTIVE JUROR 44:  I split my time between Sonoma

7    County and Yuba County.  We have a small farm up in the

8    foothills.  I go back and forth every week.

9         THE COURT:  Oh, wow.  And what are you growing?

10        PROSPECTIVE JUROR 44:  Well, just a small vegetable

11   garden, but we raise sheep and alpacas.

12        THE COURT:  Oh, wow.  How long have you been doing

13   that?

14        PROSPECTIVE JUROR 44:  About ten years.

15        THE COURT:  And how long have you been retired?

16        PROSPECTIVE JUROR 44:  12.

17        THE COURT:  And before you were a psychiatric

18   technician.  What does that mean?

19        PROSPECTIVE JUROR 44:  I worked at Sonoma

20   Developmental Center, which is a facility that provides total

21   services to the mentally disabled.

22        THE COURT:  And the technician part of things, were

23   you just working with patients, or was there something more?

24        PROSPECTIVE JUROR 44:  It was a supervisory role.

25   Being a psychiatric technician is similar to that of a LVN, but

1   where an LVN has OB service, we have a psych block instead, so

2   it's nursing.

3            THE COURT:  I see.

4            PROSPECTIVE JUROR 44:  So it's nursing.

5            THE COURT:  Are you aware of any reason you couldn't

6   serve as a fair and impartial juror?

7            PROSPECTIVE JUROR 44:  No.

8            THE COURT:  Great.  Thank you.

9        Juror Number 46, please.

10                   (Pause in proceedings.)

11           PROSPECTIVE JUROR 46:  Good morning.

12           THE COURT:  Good morning.  How are you?

13           PROSPECTIVE JUROR 46:  I'm good.  Thank you.

14           THE COURT:  Good.  So tell me what you're doing.

15           PROSPECTIVE JUROR 46:  Well, I am a chemical

16  engineering background, and I lead a manufacturing facility for

17  pharmaceutical, so we develop gene therapy products for rare

18  diseases.

19           THE COURT:  And how long have you been doing that?

20           PROSPECTIVE JUROR 46:  I've been working for 18 years.

21           THE COURT:  Okay.  At the same place?

22           PROSPECTIVE JUROR 46:  Yes.

23           THE COURT:  Good for you.

24        And you're -- you're living with someone who is a

25  statistician; is that right?

1      **PROSPECTIVE JUROR 46:**  Yes.  That's my husband.

2      **THE COURT:**  Your husband.  And where does he work?

3      **PROSPECTIVE JUROR 46:**  He works in the nonprofit

4  WestEd Educational Research Company for -- yeah, education

5  research.

6      **THE COURT:**  Okay.  And you indicated that you weren't

7  sure whether you had strong feelings about awarding money to

8  the winning party in a civil case.  Tell me -- tell me what you

9  were thinking.

10      **PROSPECTIVE JUROR 46:**  I actually don't understand

11  that question.

12      **THE COURT:**  Oh, okay.  Well, so would you be able to

13  follow my instructions on -- on how the law works and, in this

14  case, award damages based on those instructions because I will

15  instruct you that the Plaintiff is entitled to certain damages.

16  It will be the jury's determination to figure out what the fair

17  amount of damages is.

18      Would you be able to do that?

19      **PROSPECTIVE JUROR 46:**  I think so.  Yeah.

20      **THE COURT:**  Is there any reason in your mind why you

21  wouldn't be able to do it?

22      **PROSPECTIVE JUROR 46:**  No.  I think I just

23  misunderstood the question.  When I read it, I don't quite --

24  I'm not sure what it means.

25      **THE COURT:**  I appreciate that.  Okay.

1        And the same thing, the other question concerned awarding

2    money, compensation over nonfinancial harms, like mental and

3    emotional suffering.  That will be an issue in this case.

4        Would you be able to follow my instructions and -- and

5    deliberate with your fellow jurors and arrive at a -- what you

6    thought was a fair compensation for the emotional harms?

7            **PROSPECTIVE JUROR 46:**  I think so if the guidance is

8    clear.

9            **THE COURT:**  Guidance is necessary, absolutely.  And

10   you will get plenty of guidance that is not evidence from the

11   lawyers who will argue, and you'll get legal guidance from me,

12   which you need to follow, which are the -- will be the

13   instructions in the case.  All right?

14           **PROSPECTIVE JUROR 46:**  Yeah.

15           **THE COURT:**  Okay.  So besides that, is there any

16   reason why you couldn't -- you think you would not be able to

17   be a fair and impartial juror in this case?

18           **PROSPECTIVE JUROR 46:**  No.

19           **THE COURT:**  Okay.  Thank you very much.

20           **PROSPECTIVE JUROR 46:**  Thank you.

21           **THE COURT:**  Juror Number 47, please.

22                   (Pause in proceedings.)

23           **PROSPECTIVE JUROR 47:**  Good morning, Your Honor.  How

24   are you?

25           **THE COURT:**  I'm very well.  How are you?

 1              **PROSPECTIVE JUROR 47:**  Good.   Thanks.

 2              **THE COURT:**  So you are also in sales.   Tell me what

 3      you do.

 4              **PROSPECTIVE JUROR 47:**  I manage a lumberyard, sales

 5      and purchasing.  So two sides of the coin.   Probably about

 6      30 people.

 7              **THE COURT:**  And how long have you been doing that?

 8              **PROSPECTIVE JUROR 47:**  Eleven years now.

 9              **THE COURT:**  Do you enjoy it?

10              **PROSPECTIVE JUROR 47:**  I do.

11              **THE COURT:**  And what were you doing before that?

12              **PROSPECTIVE JUROR 47:**  Graduate school.

13              **THE COURT:**  And was -- was graduate school at UCLA?

14              **PROSPECTIVE JUROR 47:**  Yes.

15              **THE COURT:**  And otherwise, you were at a very fine

16      institution, Boston College?

17              **PROSPECTIVE JUROR 47:**  Yes, sir.

18                              (Laughter)

19              **THE COURT:**  Okay.  I just -- I note things that matter

20      to me, and that's one of them.

21                              (Laughter)

22              **THE COURT:**  So --

23              **PROSPECTIVE JUROR 47:**  Go Eagles.

24              **THE COURT:**  Go Eagles.   Indeed.

25          So in your -- you're in a managerial role, and you

1   indicated that you -- you've had employees accuse other

2   employees of harassment.

3       And is there anything about the experience that you've had

4   with employee disputes of any sort that would make you side

5   initially with the employer as opposed to the employee or have

6   any sort of bias one way or another with respect to an

7   employment dispute?

8       **PROSPECTIVE JUROR 47:**  I don't think so.  I've kind of

9   seen it -- I've seen the employer's obligation to do their

10  investigation, and I think I understand that the employer has

11  an obligation as well but that, you know, just because somebody

12  says one thing one time doesn't necessarily mean that you have

13  to do -- do what they would like you to which can get tricky

14  with people and -- but no.  I can definitely be objective

15  considering this matter.

16      **THE COURT:**  Okay.  Yeah.  And that's really the bottom

17  line.

18      Do you think -- is there any reason you can think of that

19  you couldn't be a fair and impartial juror in this case?

20      **PROSPECTIVE JUROR 47:**  No.

21      **THE COURT:**  Okay.  Thank you.

22      Juror Number 52, please.

23                  (Pause in proceedings.)

24      **PROSPECTIVE JUROR 52:**  Good morning.

25      **THE COURT:**  Good morning.  How are you?

 1          **PROSPECTIVE JUROR 52:**  Good.  Thank you.

 2          **THE COURT:**  Good.  And so you work with the Postal

 3   Service.

 4          **PROSPECTIVE JUROR 52:**  Yes.

 5          **THE COURT:**  And where -- what area are you a carrier

 6   in?

 7          **PROSPECTIVE JUROR 52:**  In Danville.

 8          **THE COURT:**  Have you been in Danville for the last

 9   several years?

10          **PROSPECTIVE JUROR 52:**  Yes.

11          **THE COURT:**  Good for you.  Thank you for doing what

12   you do.

13       You've not heard a lot about this case, but are you aware

14   of any reason that you couldn't serve as a fair and impartial

15   juror?

16          **PROSPECTIVE JUROR 52:**  Can you repeat me that?

17          **THE COURT:**  Yes.  Are you aware of any reason that you

18   wouldn't be able to be fair and impartial in this case?

19          **PROSPECTIVE JUROR 52:**  No.

20          **THE COURT:**  Okay.  Great.  Thank you.  I appreciate

21   it.

22       All right.  So, ladies and gentlemen, the -- if I did not

23   call you up here, it's because I am wanting to speak with you

24   individually outside the presence of the other jurors.

25       So I'm going to describe -- pay close attention now to

 1    what I'm saying.  Everybody should pay close attention to what

 2    I'm saying -- not that you haven't been so far, but even more

 3    so.

 4        Everybody who I've just called up to the microphone and

 5    asked those series of questions ending with "Could you serve as

 6    a fair and impartial juror?" I want you to come back in an

 7    hour.  Don't leave yet.  I'm going to give you an instruction.

 8        But I'd like you to look at the beautiful pictures we have

 9    in the hallways on the 17th and the 19th floor.  Use your cell

10    phones.  Do things except for what I tell you you can't do,

11    which I'll get to in a moment.  But I'd like you to be back in

12    an hour.

13        Everybody else, I would like you to stay right outside the

14    courtroom, and Ms. Davis is going to come get you individually

15    and -- and I will ask you some more questions, and then we'll

16    reconvene here hopefully at 11:30, assuming that I am done with

17    the individual questions, and we'll do a little bit more work.

18    Things are going just smoothly, but I think that's way that we

19    need to go.

20        And those people who I haven't asked questions of, you

21    should bring your number with you.  That will remind you what

22    number you have, and that's how Ms. Davis will be able to

23    escort you back in.

24        So -- and when -- when everybody is back here, it's very

25    important that you come back to the same seat that you're in.

 1    I want everybody to be punctual, so 11:30 means 11:30.  I'm the

 2    only one who can be late, and the reason I can be late is I'll

 3    be doing something that's directly related to what we're all

 4    doing here.

 5        While we're on the break, please do not discuss the

 6    subject matter of what we've been doing today.  Don't discuss

 7    the case, the questionnaire, or the proceedings with anybody.

 8    Do not do any research on the case.  So when I said you can use

 9    your cell phones, fine.  No research on the case.

10        Don't communicate with anyone about it -- about anything

11    concerning it by phone, text, social media post, or post

12    anything about it anywhere.  If you see the lawyers or anyone

13    connected with the case, don't say "hi."  I know that's kind of

14    rude, but that is the way -- there should be no communication

15    whatsoever with them.

16        If you're selected as a juror in the case, I'm going to

17    have a much longer instruction for you, but for now, no

18    communication with anybody about the case in any way.  And if

19    you hear other people communicating about it, walk away.  Let

20    Ms. Davis know.

21        If this instruction is disregarded, I might have to

22    declare a mistrial and do this all over again.  These rules

23    protect everyone and ensure that the verdict is rendered in

24    this case solely on what the parties bring out here in court.

25        It assures both the fairness and the reality of absolute

 1  impartiality, which is what the parties and the Court expect of

 2  you.

 3      So with that, I'm going to ask Juror Number 3 to remain

 4  here, and everyone else, do what I just told you.  If you've

 5  talked to me, go for an hour.  If not, stay outside and wait.

 6      (Proceedings were heard outside the presence of the

 7  prospective jury panel except for Prospective Juror 3:)

 8          **THE COURT:**  All right.  Please be seated, everybody.

 9  And Juror Number 3, if you wouldn't mind going to the mic.

10          **PROSPECTIVE JUROR 3:**  Good morning, Your Honor.

11          **THE COURT:**  Good morning.  How are you?

12          **PROSPECTIVE JUROR 3:**  I'm well.  Thank you.

13          **THE COURT:**  Good.  So tell me what you do.

14          **PROSPECTIVE JUROR 3:**  I work in the tech field.  I'm a

15  product manager, I have a team of product managers and

16  developers.  I work for Zoom, so...

17          **THE COURT:**  So you've been a very popular fellow.

18                      (Laughter)

19          **PROSPECTIVE JUROR 3:**  Yeah.

20          **THE COURT:**  And are you enjoying that work?

21          **PROSPECTIVE JUROR 3:**  I am.  Thank you.  Yeah.

22          **THE COURT:**  Good.  So the -- in answer to the question

23  about strong feelings about Mr. Musk, my copy, anyway, started

24  with -- there was an answer yes, and then it started but then I

25  lost what you were thinking.  So tell me -- tell me what your

1   perspective is on Mr. Musk.

2        **PROSPECTIVE JUROR 3:**  Well, Mr. Musk is -- I mean

3   everybody knows him.  He's, you know, extremely knowledgeable

4   in what he does, and, you know, he has strong opinions.  He's a

5   very strong person in terms of the way he works, he operates.

6        You know, part of the news on Twitter currently is the way

7   he's taken over Twitter.  But I think at that level, you've got

8   to be -- you know, you've got to have a strong opinion and a

9   strong leader, so he is definitely known as a strong leader.

10  But again, a lot of the questions that came out on Twitter,

11  there's a lot of news in the press around that, so yeah.

12       **THE COURT:**  So.  Mr. Musk, I can promise you, is not a

13  witness in this case.

14       **PROSPECTIVE JUROR 3:**  No, I understand that.  Since

15  you asked me what Mr. Musk --

16       **THE COURT:**  No.  And that's -- I did, and I appreciate

17  your answer.

18       So -- but knowing that he's not involved in any way in the

19  case, is there anything about your feelings about him that

20  would impact your ability to be fair and impartial in this

21  case?

22       **PROSPECTIVE JUROR 3:**  No, sir.

23       **THE COURT:**  Okay.  And so are you aware of any reason

24  you couldn't serve as a fair and impartial juror?

25       **PROSPECTIVE JUROR 3:**  No.

 1         **THE COURT:**  Great.  Thank you.  You may be excused and

 2   come back at 11:30.

 3         **PROSPECTIVE JUROR 3:**  11:30, okay.  I just have to

 4   grab my bag.

 5         **THE COURT:**  Yep.

 6                     (Pause in proceedings.)

 7         **THE COURT:**  Good morning.  You're Juror Number 5, I

 8   assume.  Do you have your number there?  It's over there?  It

 9   doesn't matter.  Glad to have you here.  So tell me what a

10   persistence advisor does.

11         **PROSPECTIVE JUROR 5:**  It's a really long name to

12   basically just say that I'm a college advisor for students who

13   are in their last year of high school and the first two years

14   of college.

15         **THE COURT:**  Well, what a great idea.  So the -- so you

16   continue to work with high school seniors through their first

17   two years?

18         **PROSPECTIVE JUROR 5:**  Yes.  So I work with KIPP

19   NORCAL, so their whole mission and logo and slogan is "KIPP

20   Through College," and so that's the way that they keep their

21   promise to the families and students is that they have someone

22   along the way, especially within those first two crucial years

23   of college, to help them persist along the way.

24         **THE COURT:**  That is really great.  And so do you go

25   out to the colleges to see them there in addition to -- well,

1  tell me how you do your job.

2      **PROSPECTIVE JUROR 5:**  I do.  So my job is also hybrid

3  model, so I go in person to the high school campuses at least

4  once a week.  I visit my two main partner campuses, which is

5  S of C and SFCS.  And then I contact my own case load of

6  students on my own time, whether it be in the office or at

7  home, and we mostly connect through phone, Zoom.

8      **THE COURT:**  That's a terrific job.  I'm glad you're

9  doing that.  That's great.

10     So the reason that I wanted to talk to you was you had

11 some fairly strong views on Mr. Musk, and so I wanted to

12 explore that a little bit.

13     You indicated that his social media presence was

14 laughable.  Is --

15     **PROSPECTIVE JUROR 5:**  I personally enjoy it.

16     **THE COURT:**  Oh, you do?

17     **PROSPECTIVE JUROR 5:**  Yes.

18     **THE COURT:**  So you were laughing with it?

19     **PROSPECTIVE JUROR 5:**  I think he's quite an

20 interesting man, yes.

21     **THE COURT:**  Okay.  Well, is there anything about your

22 perspective on him, either positive or negative, that would

23 impact your service as a juror?  And you've heard me say he's

24 not involved in this case.  There's nothing about Mr. Musk

25 involved in this case.  Do you think anything there would

 1    impact your ability to serve?

 2          **PROSPECTIVE JUROR 5:**  My personal feelings towards his

 3    social media presence, his beliefs, and statements he has made,

 4    would not impact this in that regard.

 5          **THE COURT:**  Okay.  And you're -- you're leaving a -- a

 6    lilt, so let me go to another answer that you gave with respect

 7    to Tesla itself, which is that you do have strong feelings

 8    about it.  So tell me about those.

 9          **PROSPECTIVE JUROR 5:**  I don't know if this is a

10    positive for the defense or the prosecution, but I'm probably

11    not the best person you want, depending on which side you're

12    on.  But unfortunately, I know people who work at Tesla where

13    they were hired by third-party employers or Tesla themselves,

14    and the people that I do know happen to be of Hispanic dissent,

15    personal close family friends.  And I just have an insight as

16    to the working conditions that are within the company.  And

17    whether it be through, like, personal anecdotes or admissions,

18    because obviously I'm not in there, I feel like I have an

19    insight that most people do not.

20          **THE COURT:**  Okay.  And would you -- what will matter

21    in this case is learning what happens here --

22          **PROSPECTIVE JUROR 5:**  Correct.

23          **THE COURT:**  -- to Mr. Diaz and -- and viewing the

24    evidence in a completely fair and unbiased way and not starting

25    with any preconceptions about --

 1          **PROSPECTIVE JUROR 5:**  Right.

 2          **THE COURT:**  -- work life at Tesla.  Do you think you

 3     would be able to divorce what you've been told about that and

 4     just focus on the evidence that's presented here?

 5          **PROSPECTIVE JUROR 5:**  I understand that we're not

 6     allowed to know too much about the case just yet, but given

 7     what you have told us about the nature, I'm assuming that

 8     there's either harassment or discrimination based on verbal

 9     identity, so obviously they're protected.  And unfortunately, I

10     have seen both my mother and father who were also laborers be

11     discriminated against.

12          **THE COURT:**  So do you think you would not -- in light

13     of that, you wouldn't be able to serve as a fair and impartial

14     juror?

15          **PROSPECTIVE JUROR 5:**  I felt as though it was

16     important to mention that.  I feel like it's important to the

17     case.  I just wanted to make sure that was out there.

18          As far as my own ability to serve as a juror and to be

19     impartial, I'm sure I could listen to the evidence.  I just --

20     I'm afraid and that's why I just felt it was relevant to let

21     everyone on the --

22          **THE COURT:**  It's totally relevant, and I very much

23     appreciate it.

24          Do you think that in light of what you know and the

25     experiences that others close to you have had, that when the

 1    evidence starts, Mr. Diaz is going to be at a slight -- at

 2    least a slight advantage given the fact that he is also an

 3    employee and he's working at Tesla and he's complaining about

 4    the way that he was treated there?

 5         **PROSPECTIVE JUROR 5:**  I'm sorry.  I didn't see the

 6    question.

 7         **THE COURT:**  So the question at the beginning was, do

 8    you think they would -- do you think Mr. Diaz would start as --

 9    with an advantage --

10         **PROSPECTIVE JUROR 5:**  In my eyes?

11         **THE COURT:**  -- in your mind?

12         **PROSPECTIVE JUROR 5:**  I wouldn't call it necessarily

13    an advantage, it's just something that I'm aware of, of my own

14    biases and understanding intersectionality [sic] and the

15    different identities that are at play here that I myself either

16    may or may not relate to or have, like, existing awareness of

17    other ways that it has played out, I'm not sure.  I can't

18    100 percent say yes or no.  In the ideal -- I would love to say

19    yes, I'd be your perfect juror.

20         **THE COURT:**  Well, I'm glad you're expressing what's

21    real for you.  And another thing that you had mentioned was

22    that -- in the question about discrimination, being young and a

23    woman has made -- has caused you to see discrimination in the

24    workplace.

25         **PROSPECTIVE JUROR 5:**  Unfortunately, yes.

1            THE COURT:  And does that fact -- would that fact

2    impact your ability to sit fairly in this case and give Tesla

3    the -- treated equally to Mr. Diaz as the -- as you learned

4    about what happened to Mr. Diaz?

5            PROSPECTIVE JUROR 5:  It depends on what happened to

6    Mr. Diaz.  I mean I feel like often times as jurors -- the way

7    that I perceive cases and the way that we see them obviously,

8    like, portrayed on TV, it's not reality but oftentimes, you at

9    home find yourself thinking what would I do, what would I say,

10   how would I feel, whether I was in the jury box or I was the

11   person -- the defendant or the claimant myself, so I don't

12   know.

13           THE COURT:  Okay.  Fair enough.

14       You also indicated that you were just in jury selection a

15   year ago; is that right?

16           PROSPECTIVE JUROR 5:  Yes.  For a few days.  And

17   apparently even if it's like a week after, it does not count.

18           THE COURT:  Okay.  So you're sure of those dates?

19           PROSPECTIVE JUROR 5:  Yeah.  No.  I sent them the

20   picture, and they were like "Hey, it was the 16th.  Sorry, your

21   case is on the 20 something."

22           THE COURT:  Okay.  All right.  Mr. Spiro, do you have

23   any questions for Juror Number 5?

24           MR. SPIRO:  Yeah.  We have to -- and good morning.

25   How are you?

 1              **PROSPECTIVE JUROR 5:**  Good morning.  Great.

 2          **MR. SPIRO:**  We have to -- I didn't hear the question

 3     asked of how long that jury service was on the 16th.

 4          **PROSPECTIVE JUROR 5:**  I didn't serve on the jury.

 5          **MR. SPIRO:**  Oh, you did not serve?

 6          **PROSPECTIVE JUROR 5:**  No.  I went to jury selection

 7     and I served.  That counted as my, like, jury service, but I

 8     was not on the jury, so I was not selected.

 9          **MR. SPIRO:**  Okay.  I heard the answers earlier.  And

10     so given the answers earlier, I don't think I need to follow

11     up, frankly.

12          **THE COURT:**  All right.  And, Mr. Alexander, or,

13     Mr. Collier, whoever?

14          **MR. ALEXANDER:**  Nothing, Your Honor.

15          **THE COURT:**  All right.  Thank you very much.  And if

16     you would come back at 11:30, please.

17          **PROSPECTIVE JUROR 5:**  Will do.

18          **THE COURT:**  Thank you.

19       You are Juror Number 8; is that right?

20          **PROSPECTIVE JUROR 8:**  Yes.

21          **THE COURT:**  It is hard for me to keep track of all

22     these things.  So good morning.

23          **PROSPECTIVE JUROR 8:**  Good morning.

24          **THE COURT:**  And tell me how long you've been in human

25     resources and what you do.

1       **PROSPECTIVE JUROR 8:**  Human resources, I want to say

2 since' 91, probably.  And I work -- but I work in the employee

3 benefits end of things, not in the line of business HR, HR-type

4 of stuff.

5       **THE COURT:**  Could you get a little closer to the

6 microphone.

7       **PROSPECTIVE JUROR 8:**  Yeah.  So I manage group health

8 plans, disability insurance, that kind of thing, on behalf of

9 employees for the employer.

10       **THE COURT:**  And how long have you been with Oracle.

11       **PROSPECTIVE JUROR 8:**  This stint, I've been there

12 twice, since 2011.

13       **THE COURT:**  That's great.

14   So the -- I wanted to ask you about the feelings that you

15 expressed regarding Mr. Musk and his products.  So tell me --

16 tell me about your -- I've told you that Mr. Musk isn't

17 involved in the case, but I'd like you to tell me what your

18 perspective is on him.

19       **PROSPECTIVE JUROR 8:**  I don't view him favorably, but

20 I understand the distinction you offered at the beginning,

21 which makes total sense, that he's not on trial.

22       **THE COURT:**  And the -- the -- Tesla as a company, do

23 you -- because of Mr. Musk, do you view it -- would you be able

24 to view it and Mr. Diaz equally starting the case and make a

25 determination fairly without prejudice based on the evidence in

1    the case?

2            **PROSPECTIVE JUROR 8:**  I think so, yes.

3            **THE COURT:**  Okay.  Is there anything in your mind that

4    makes you think you wouldn't be able to?

5            **PROSPECTIVE JUROR 8:**  Well, I mean, I have fairly

6    strong feelings about the leadership, Musk.  So would I buy a

7    Tesla, no, at this point.  I don't know.  But listening to a

8    case that's disassociated from the head of the company, that's,

9    like you said, a different thing.

10           **THE COURT:**  Yeah.  This really isn't about buying the

11   product -- whether you would boycott the product because you

12   don't like Mr. Musk or anything like that.  It is about,

13   though, being sure that you can listen to what is said about

14   the workplace that Mr. Diaz experienced and determine in this

15   case what -- the amount of damages that he's suffered.

16   Liability has been established in the case, damages have not.

17   And you have to be -- hear the evidence and be fair to both

18   sides in deliberating over the verdict.  Do you think you could

19   do that?

20           **PROSPECTIVE JUROR 8**:  Yes, I do.

21           **THE COURT:**  Okay.  Mr. Spiro, any questions?

22           **MR. SPIRO:**  Yes.

23      Good morning, sir.

24           **PROSPECTIVE JUROR 8**:  Good morning.

25           **MR. SPIRO:**  I appreciate your brutal honesty about

 1   your feelings and, you know, you've indicated on this -- you

 2   know, your forms that you have a high level of disdain and you

 3   can't separate Mr. Musk from Tesla, to such an extent that you

 4   boycott the product.

 5        So I understand that, you know, at some level, boycotting

 6   a product and deciding a case are different; right.  They are

 7   different.  But there's at least some similarities, which are

 8   because you are animus towards the person is so strong; right?

 9   It's causing you, even if you like the car better, to not pick

10   it; right?  Is that fair?

11             **PROSPECTIVE JUROR 8:**  Yes, I would not buy the car.

12             **MR. SPIRO:**  So what I'm sort of getting at is, you

13   know, here you have to start completely equal without any even,

14   you know, like a touch of leaning in either direction.  And,

15   you know, I expect that they are going to say:  Listen, this

16   issue with Tesla permeates the company, and you just said you

17   have questions about Tesla's leadership.

18        So I'm having a hard time where I need to ask you, you

19   know, can you give a hundred percent unequivocal assurance that

20   that strong feeling you have won't impact you here?

21             **PROSPECTIVE JUROR 8:**  I don't -- can anyone ever give

22   a hundred percent assurance?  You know, I'm human.

23        So I suppose -- I mean, if I can listen to the case and

24   the circumstances surrounding a case and disconnect it from

25   Elon Musk.  And I guess I just want to make sure, you know, my

1   feelings for Elon Musk are not anything going postal.  I just

2   don't -- politically don't agree with him, so.

3        **MR. SPIRO:**  No, I understand that.  And I don't -- you

4   seem like a fair person, and I'm not -- it's just if you walk

5   into a case, right, you can think in sort of the halls of

6   justice.  You would want to walk into a case with having zero

7   feelings about either side; right.  It's -- I don't ask

8   everybody for this sort of hundred percent assurance, but when

9   somebody comes in and says the leader of the company, they

10  can't stand them, right, I have to ask.

11       **PROSPECTIVE JUROR 8:**  No, of course.  I understand.

12  In fact, I was surprised.  There was a part of me that thought

13  because I said that, I probably wouldn't be called in.  That's

14  not why I said that on the questionnaire, though.

15       **MR. SPIRO:**  But then I guess I'd ask you that.  Why

16  did that -- saying that make you think that you wouldn't be

17  called in, that you wouldn't be right for this?

18       **PROSPECTIVE JUROR 8:**  Well, it didn't make me think I

19  wouldn't be right for this but for the reasons that you are now

20  bringing up.

21       **MR. SPIRO:**  So I get the point about hundred percent.

22  So what the law says is what they call an unequivocal

23  assurance, right, where you don't waiver at all, where you say

24  to yourself many moons from now when you look back, you really,

25  really were able to start even on this case and not -- even

1   though you don't -- you have feelings about the leadership of

2   one company, don't start even slightly swayed.

3      So I have to ask you, are you sure that you can give that

4   unequivocal assurance?

5          **PROSPECTIVE JUROR 8:**  Well, no.  I'm not sure I can be

6   unequivocal, I guess.  But I don't really know how anyone is

7   unequivocal.  I'm not trying to be difficult.

8          **MR. SPIRO:**  No, no, no.  You're not being difficult at

9   all.  These are fair questions.  These are complicated issues.

10         **PROSPECTIVE JUROR 8:**  We all have --

11         **MR. SPIRO:**  If you walked in a case about the dry

12  cleaner and who returned the ticket, you can say to me I don't

13  know anything about this and this is unequivocal.  I can

14  definitely -- I know nothing.  But here it's harder, which is

15  why I'm asking you that, and I understand that given what your

16  answer is.

17     So I don't have anything further.  Thank you.

18         **THE COURT:**  Mr. Alexander.

19     **MR. ALEXANDER:**  Yes, please.  Thank you, Your Honor.

20     If you are instructed that Tesla has already been found

21  liable and that you don't have to make a determination about

22  liability, just damages, could you follow the Court's

23  instructions?

24         **PROSPECTIVE JUROR 8:**  That's a good point.  Yes.

25         **MR. ALEXANDER:**  And given that, that you wouldn't have

1  to be making a determination as to liability, would that allow

2  you to say that you could make a determination without any

3  biases coming into your thought process?

4           **PROSPECTIVE JUROR 8:**  Yes.

5           **MR. ALEXANDER:**  I have nothing further, Your Honor.

6           **THE COURT:**  All right.  Thank you very much.

7           **PROSPECTIVE JUROR 8:**  That's it?

8           **THE COURT:**  That's it.  Well, it's not really if you

9  have to come back at 11:30.

10                    (Pause in the proceedings.)

11          **THE COURT:**  We are back to Juror Number 9, is that

12  right?

13          **PROSPECTIVE JUROR 9:**  Yes.

14          **THE COURT:**  And you own Tesla stock; correct?

15          **PROSPECTIVE JUROR 9:**  Yes, I do.

16          **THE COURT:**  Okay.  So the only -- there's actually

17  nothing more that I need to ask you.  We are going to have to

18  excuse you as a witness -- as a juror.  So you may go up to the

19  jury office and tell them that you're excused.  I appreciate

20  your -- your service.  You've done your duty as a citizen

21  today.

22          **PROSPECTIVE JUROR 9:**  All right.  Thank you.  Have a

23  good day.

24          **THE COURT:**  Thank you.  You, too.

25                    (Pause in proceedings.)

1          THE COURT:  Good morning.

2          PROSPECTIVE JUROR 15:  Good morning.

3          THE COURT:  You are Juror Number 15?

4          PROSPECTIVE JUROR 15:  I am.

5          THE COURT:  Okay.  And tell me what you do.

6          PROSPECTIVE JUROR 15:  I'm a designer.

7          THE COURT:  And -- so what are you designing for Love

8   Good Color PBC?  What is that?

9          PROSPECTIVE JUROR 15:  We design color material and

10  finishes for commercial products and interiors.

11         THE COURT:  And how long have you been doing that?

12         PROSPECTIVE JUROR 15:  About ten years.

13         THE COURT:  Do you like it?

14         PROSPECTIVE JUROR 15:  I love it.

15         THE COURT:  That's great.  That is great.

16     So you indicated that even though you like Tesla products,

17  you choose not to buy them because of Mr. Musk and your strong

18  views about him; is that right?

19         PROSPECTIVE JUROR 15:  Correct.

20         THE COURT:  And so I've explained to you earlier,

21  Mr. Musk isn't involved in this case at all, and the issues in

22  the case involve the workplace, and so he is just -- he is

23  not -- he is not in it.

24     Are your feelings about Mr. Musk so strong that when the

25  case begins, you would think that Mr. Diaz would have an

 1   advantage over Tesla in your mind?

 2           **PROSPECTIVE JUROR 15:**  No.

 3           **THE COURT:**  You think you could serve as a fair and

 4   impartial juror?

 5           **PROSPECTIVE JUROR 15:**  Yes.

 6           **THE COURT:**  Mr. Spiro, do you have any questions?

 7           **MR. SPIRO:**  Yes.

 8       So, good morning.  How are you?

 9       One of the things that you said on the questionnaire was

10   that, if I read it correctly, that one of the issues you have

11   with Mr. Musk is the way he treats his employees.

12           **PROSPECTIVE JUROR 15:**  Yes.

13           **MR. SPIRO:**  Okay.  So this case is about the way one

14   of his companies treats an employee, and those are the

15   allegations.

16       And so if you come into it thinking that, you know, I'm

17   having sort of a hard time figuring out how one could block

18   that from their mind and be fair and impartial.  So what the

19   Court asks is can you give an unequivocal assurance that you

20   don't sway at the start in one way or another.

21       And so I have to ask that.  It's my responsibility to ask

22   you that, too.

23           **MR. ALEXANDER:**  May I object, Your Honor.  I don't

24   believe that's the standard.

25           **THE COURT:**  It's -- I'm not sure -- I'm going to allow

 1   him to say it.  I would not instruct you on that it's

 2   unequivocal.  But I do -- it is very important that you be able

 3   to assure us that people would start at the -- on the same fair

 4   level without one side being -- having an advantage in your

 5   mind than another.  That's really the issue.

 6          PROSPECTIVE JUROR 15:  Yeah.  I think I could do that.

 7   I don't -- I mean, he doesn't work at Tesla, so, I mean.

 8          MR. SPIRO:  Sorry.  I couldn't --

 9          PROSPECTIVE JUROR 15:  I can separate that.

10          MR. SPIRO:  I didn't catch that sentence.  I

11   apologize.

12          PROSPECTIVE JUROR 15:  Well, Elon Musk doesn't work at

13   Tesla with the employees directly and from my understanding.

14   So I could separate that for sure.

15          MR. SPIRO:  Right.  So if there was an argument for

16   example, you know, listen, the -- this goes all the way to

17   Tesla leadership, you need to punish Tesla.

18          MR. ALEXANDER:  Object.  This is preconditioning,

19   asking for a determination.

20          MR. SPIRO:  It is a fair question.

21          THE COURT:  Overruled.  You can go ahead.

22          MR. SPIRO:  If they were to argue, you know, this is,

23   you know, goes all the way up, this is part of leadership, this

24   is part of the culture there, you need to punish them, I mean,

25   won't the fact that you feel that way about him and the way he

1  treats his employees impact your ability here?  It's hard to

2  imagine, from my perspective, that it wouldn't.

3          **PROSPECTIVE JUROR 15:**  I suppose that I could, but

4  I -- like you said, starting at the trial, I don't know that to

5  be true.  I wouldn't come in with that impartial --

6      **MR. SPIRO:**  Right.  But I'm saying, assuming basically

7  when they stand up, they say that.  They say this is our view

8  of the facts and this is what we're asking you to do to punish

9  Tesla for harm to employees.

10         **PROSPECTIVE JUROR 15:**  I --

11     **MR. SPIRO:**  You still think that you can --

12         **PROSPECTIVE JUROR 15:**  Without knowing all of the

13  details already, I think that I could, but I don't know.  I --

14  I don't know how to answer that except for truthfully.

15     **MR. SPIRO:**  Right.  Well, when I hear people say --

16  when I hear people come in with as strong of views as you do

17  and they say "I think," it's hard to not -- to not follow up.

18      So what happened to Mr. Diaz happened to Mr. Diaz, right.

19  You're going to be asked to look at damages, and what they're

20  going to argue to you in damages is this place needs to be

21  punished.

22      And you're coming into the case saying the leader of the

23  place and how he treats his employees I don't agree with.

24      So when they say that, aren't they speaking to an audience

25  that is receptive before -- before jump street, right, before

 1   it even begins.  And I think from your answers that has to be

 2   true.

 3       **PROSPECTIVE JUROR 15:**  The experience of the employee was,

 4   like -- was personal.  I didn't work there, but I know someone

 5   did that knew him personally.  So it's not like to Tesla at

 6   large.

 7           **MR. SPIRO:**  Oh, so I see your point.  Your point is

 8   that it was an individual experience that is relayed to you.

 9           **PROSPECTIVE JUROR 15:**  That worked with him

10   personally.

11           **MR. SPIRO:**  I see.

12           **PROSPECTIVE JUROR 15:**  So to me, it doesn't carry out

13   to Tesla the company.

14       **MR. SPIRO:**  And who was this person to you, if I may

15   ask without prying?

16           **PROSPECTIVE JUROR 15:**  It is the daughter of a close

17   friend, yeah.

18       **MR. SPIRO:**  And did you think that situation was

19   treated fairly by the company?

20           **PROSPECTIVE JUROR 15:**  It wasn't -- it didn't involve

21   the company, and that's why I don't feel it was related.  But

22   yeah.

23       **MR. SPIRO:**  I see.  Okay.  I have no further questions

24   at this time.

25           **THE COURT:**  All right.  Mr. Alexander, anything?

 1           MR. ALEXANDER:  Nothing else.

 2           THE COURT:  Okay.  Thank you very much.

 3           PROSPECTIVE JUROR 15:  Does that mean I come back at

 4   11:30?

 5           THE COURT:  Come back at 11:30.

 6           MR. SPIRO:  Can we have a brief moment before the

 7   juror comes in?

 8           THE COURT:  Ms. Davis, wait for just a sec.  Hang on

 9   just a second.

10                       (Pause in proceedings.)

11           MR. SPIRO:  Thank you, Your Honor.  So having not

12   tried cases before Your Honor before and done jury selection --

13   judges that I try cases in front of I can tell and so I will

14   talk less or more -- but one of the issues that I see that is

15   coming up is this idea that because this is a damages trial,

16   like, if the person doesn't -- seems to be that the questions

17   or the suggestions is well, if this person has strong feelings,

18   what does it really matter?  Liability has been established.

19   That's not, of course, my view.  And in fact, when you think

20   about punitive damages, these --

21           THE COURT:  Mr. Spiro, why are you making this

22   argument now while we're talking with the jurors?  Can't you

23   make this argument after the questioning is done?  I've been

24   giving you a very broad leash.

25           MR. SPIRO:  Sure.

1        THE COURT:  I haven't decided how many of your

2   15 minutes at the end I'm going to take away, but --

3        MR. SPIRO:  I will be quiet now, Judge.

4        THE COURT:  All right.  Let's get the next person.

5                 (Pause in proceedings.)

6        THE COURT:  Good morning.  You are Juror Number 17?

7        PROSPECTIVE JUROR 17:  Yes, I am.

8        THE COURT:  Great.  And so tell me what you do.

9        PROSPECTIVE JUROR 17:  I am a business license and

10  compliance specialist/paralegal.

11       THE COURT:  So tell me what that means every day.

12       PROSPECTIVE JUROR 17:  I pull business licenses for

13  AAA throughout the United States.

14       THE COURT:  And how long have you been doing that?

15       PROSPECTIVE JUROR 17:  I have been with AAA for about

16  a year and a half, but I have been doing licensing and

17  compliance for three years, four years, and I was a paralegal

18  for almost nine years.

19       THE COURT:  So the -- you indicated that you had heard

20  of -- about Elon Musk and had -- and had strong feelings about

21  him.  You've heard me say that he is not involved in this

22  case --

23       PROSPECTIVE JUROR 17:  Oh, yeah.

24       THE COURT:  -- at all.  Is there anything about your

25  feelings about Mr. Musk that make you think you couldn't be

 1  fair and impartial in this case?

 2              PROSPECTIVE JUROR 17:  No.

 3          THE COURT:  And you also have a family friend who

 4  works for Tesla?

 5              PROSPECTIVE JUROR 17:  He did.  I'm not sure if he

 6  still works there because they ended up moving to Stockton.

 7          THE COURT:  Was there anything -- did you ever talk

 8  with that person about working at Tesla?

 9              PROSPECTIVE JUROR 17:  No.  I talked to his wife.

10          THE COURT:  Is there anything that you're aware of

11  that makes you think you could not be a fair and impartial

12  juror in this case?

13              PROSPECTIVE JUROR 17:  No.

14          THE COURT:  Great.  Thank you very much.

15          PROSPECTIVE JUROR 17:  Thank you.

16                  (Pause in proceedings.)

17          THE COURT:  Good morning.  How are you?

18          PROSPECTIVE JUROR 23:  I'm great.  How are you?

19          THE COURT:  Also great.  Thank you.

20      So you are the chief accounting officer at Coinbase?

21          PROSPECTIVE JUROR 23:  Yes, I am.

22          THE COURT:  Is that a challenging position today?

23          PROSPECTIVE JUROR 23:  It is very challenging, yes.

24          THE COURT:  Are you enjoying it?

25          PROSPECTIVE JUROR 23:  I love it.  I have been doing

 1   it for years.

 2       (The court reporter asked for clarification.)

 3       **THE COURT:**  This is Juror Number 23.

 4   So you indicated strong feelings about Mr. Musk.  I have

 5   told you that he is not involved in this case.  Is there

 6   anything about those strong feelings that you think would carry

 7   over into your ability to evaluate the evidence fairly to both

 8   sides?

 9       **PROSPECTIVE JUROR 23:**  No.  I actually -- given now

10   what I know the case is about, my biggest thing is just given

11   my position at Coinbase, I'm party to these types of lawsuits

12   all the time and employment matters, and so I do feel that I

13   would have some bias, just given my position as an executive.

14       **THE COURT:**  So you --

15       **PROSPECTIVE JUROR 23:**  Not particularly related to

16   Elon.  It's just more of probably I would side more with Tesla.

17       **THE COURT:**  Okay.  So you would side -- you think you

18   would side more with Tesla just given the experience that you

19   have and the perspective that you bring to any employment case?

20       **PROSPECTIVE JUROR 23:**  Yeah.  For the most part yes,

21   that's correct.

22       **THE COURT:**  Okay.  So you think you would not be able

23   to serve as a fair and impartial juror?

24       **PROSPECTIVE JUROR 23:**  I hate to say that, but I

25   really just feel I wouldn't be able to serve as a partial [sic]

 1   juror.

 2              **THE COURT:**  Impartial.

 3              **PROSPECTIVE JUROR 23:**  Impartial.  Sorry.

 4              **THE COURT:**  Mr. Spiro, is there anything you want

 5   to --

 6              **MR. SPIRO:**  Yes.  Thank you.

 7       Good morning.  I'm assuming that in all of the cases that

 8   you have seen that sort of come across your desk, there are

 9   some that have more merit and some that have less merit; right?

10              **PROSPECTIVE JUROR 23:**  Yes.

11              **MR. SPIRO:**  I'm sure there are some that have merit;

12   is that fair?

13              **PROSPECTIVE JUROR 23:**  That's fair.

14              **MR. SPIRO:**  So in this case, it's the second phase of

15   the case.  It's just a damages case; right?  So you are not

16   going to have to be determining whether or not liability

17   exists, right, so block that from your mind.  I'm not so sure

18   anybody has a better sense of being able to call balls and

19   strikes on accounting matters and not what people -- so my

20   question is sort of knowing that liability has been

21   established, don't you think you could be fair in assessing

22   damages?

23              **PROSPECTIVE JUROR 23:**  I just know what the damages

24   do.  If I can be just completely transparent, I know what the

25   damages can do to a company and how much work it takes to --

 1   like, how much you have to put in as a company.  So if

 2   Coinbase, for example, is in a suit like this and we are having

 3   to pay damages, we spend so much money even getting to this

 4   point, and then the repercussions for the company as well.

 5        And so I mean, I'm just saying I would probably side with

 6   Tesla and award the lowest amount of damages.

 7             MR. SPIRO:  You are saying that no matter what the

 8   facts were, you would zero out the damages?

 9             PROSPECTIVE JUROR 23:  I'm sure I could be objective,

10   try my best.  I mean I am a chief accounting officer --

11             MR. SPIRO:  Right.

12             PROSPECTIVE JUROR 23 -- but it's more of I'm just

13   being honest.

14             MR. SPIRO:  Right.  Okay.  Thank you.

15             PROSPECTIVE JUROR 23:  Sorry.

16             MR. SPIRO:  Not at all.

17             THE COURT:  Mr. Alexander.

18             MR. ALEXANDER:  Thank you.

19        You had written that people have options and should just

20   get another job.  Is that an indication that you have an issue

21   with people filing lawsuits for compensation?

22             PROSPECTIVE JUROR 23:  Yes.

23             MR. ALEXANDER:  And so that would prevent you also

24   from being fair and impartial; correct?

25             PROSPECTIVE JUROR 23:  That's correct.

 1          **MR. ALEXANDER:**  Thank you very much for your time.

 2          **THE COURT:**  You come back at 11:30.  Thank you.

 3          **PROSPECTIVE JUROR 23:**  Thanks so much.

 4                    (Pause in proceedings.)

 5          **THE COURT:**  Hi.  How are you?

 6          **PROSPECTIVE JUROR 24:**  I'm doing all right.

 7          **THE COURT:**  Good.  So tell me what you do.

 8          **PROSPECTIVE JUROR 24:**  Currently, I'm a project

 9   manager for an electrical contractor.  For the last -- I just

10   changed jobs two months ago, but for the ten years prior to

11   that, I was a mechanical engineer in the aerospace and

12   automotive sectors.

13          **MR. ALEXANDER:**  Is this Number 24, Your Honor?

14          **THE COURT:**  Yes, it is Number 24.  Sorry.

15          **PROSPECTIVE JUROR 24:**  Yeah.

16          **THE COURT:**  And so do you like your current job?

17          **PROSPECTIVE JUROR 24:**  I do, yeah.

18          **THE COURT:**  Great.  The -- you worked at SpaceX.

19          **PROSPECTIVE JUROR 24:**  Yes.

20          **THE COURT:**  And you respect the leadership that

21   Mr. Musk provided for it; is that right?

22          **PROSPECTIVE JUROR 24:**  Yeah.  I acknowledge it's not

23   really relevant.  I mean, it was part of the questionnaire, so

24   I wanted to acknowledge it.  But yeah.

25          **THE COURT:**  Exactly.

 1        **PROSPECTIVE JUROR 24:**  I honestly worked with a number
 2   of engineers and manufacturing professionals that I respect,
 3   and I had positive experiences there.
 4        **THE COURT:**  So Mr. Musk isn't involved in this case.
 5   SpaceX isn't involved in the case.  Do you think despite that,
 6   because of the respect that you have for him, that Tesla would
 7   start off in this case with an advantage in your evaluation of
 8   the evidence?
 9        **PROSPECTIVE JUROR 24:**  I would -- I say as an
10   engineer, right, I think I'm very analytical and can be
11   partial -- impartial I mean.  Excuse me.  I would say that I
12   know a handful of people that work at Tesla, and I have, you
13   know, a lot of great memories of working at the company that's
14   not part of this lawsuit, a part of this lawsuit.
15        But -- so -- so I guess I -- it's hard to say that I don't
16   have any association between the two because we -- we -- kind
17   of a sister company, but I don't see that as giving Tesla like
18   a leg up or strong bias in my ability to make a decision or
19   listen and hear facts.
20        **THE COURT:**  And so the -- the job really is coming in
21   at an absolutely even place with both Mr. Diaz and Tesla and
22   not crediting one more than the other at the start and then
23   evaluating the evidence as it comes in in order to give a fair
24   verdict.
25        Do you think you would be able to treat both Mr. Diaz and

 1   Tesla equally from the start?

 2        **PROSPECTIVE JUROR 24:**  Yeah.  I think I only mentioned

 3   it.  I wanted to sort of acknowledge, you know, my experience

 4   and history but --

 5        **THE COURT:**  Okay.

 6        **PROSPECTIVE JUROR 24** -- I don't see it as inhibitive

 7   of hearing both sides.  Is that a fair --

 8        **THE COURT:**  Uh-huh.  Do you know anybody who has

 9   worked at the Tesla factory in Fremont on the floor?

10        **PROSPECTIVE JUROR 24:**  Yeah.

11        **THE COURT:**  Have you ever talked with them about their

12   experience?

13        **PROSPECTIVE JUROR 24:**  Not recently.  Like a year to

14   two ago, I had knew [sic] some individuals who worked there.

15        **THE COURT:**  And have they had a positive or a negative

16   experience that they've described to you?

17        **PROSPECTIVE JUROR 24:**  I think their -- a little bit

18   of both, right.  Its very fast-paced environment which I was --

19   sort of resonated with in my experience, but overall a positive

20   experience.

21        **THE COURT:**  Okay.  And would you be able to put all of

22   that out of your mind when evaluating the evidence that comes

23   in in this case and just focus on the experience that Mr. Diaz

24   had as explained by the witnesses?

25        **PROSPECTIVE JUROR 24:**  I think so.

 1          **THE COURT:**  Okay.

 2      Mr. Spiro, do you have any question?

 3          **MR. SPIRO:**  No, Your Honor.   Thank you.

 4          **THE COURT:**  Mr. Alexander?

 5          **MR. ALEXANDER:**  Yes, please.

 6      Good morning, have you any of your friends at Tesla told

 7  you any things about the workplace where they were treated

 8  fairly or unfairly?

 9          **PROSPECTIVE JUROR 24:**  No.  Usually not.

10          **MR. ALEXANDER:**  And in this case, the judge has

11  already indicated liability has been determined, but that would

12  mean that you would have to decide damages, punitive damages.

13      Is there anything about the fact that you might be

14  awarding a large amount of money cause you to think that you

15  might not be able to speak with your friends or that you might

16  have conflict with your friends because of that?

17          **PROSPECTIVE JUROR 24:**  No.  No.

18          **MR. ALEXANDER:**  Nothing further, Your Honor.

19          **THE COURT:**  All right.  Thank you.

20      So come back at 11:30, please.  Going to have to start

21  adjusting that time, I think.

22                  (Pause in proceedings.)

23          **THE COURT:**  Good morning.  How are you?

24          **PROSPECTIVE JUROR 25:**  Good.  How are you?

25          **THE COURT:**  Great.

1        So this is Juror Number 25.

2        And you work in construction.  Tell me what you do.

3              PROSPECTIVE JUROR 25:  I do fire sprinklers for a

4    living.

5              THE COURT:  Say it again.

6              PROSPECTIVE JUROR 25:  I'm sorry.  I do fire

7    sprinklers for a living.

8              THE COURT:  And how long have you been doing that?

9              PROSPECTIVE JUROR 25:  About 19 years.

10             THE COURT:  Wow, that -- thank you for keeping us

11   safe.

12             PROSPECTIVE JUROR 25:  Yeah.  Thank you.

13             THE COURT:  So the -- you indicated that you are a big

14   fan of Mr. Musk's, and you know a couple of coworkers who

15   worked for Tesla, I think.

16             PROSPECTIVE JUROR 25:  No.  I don't know anybody who

17   works for Tesla.

18             THE COURT:  Oh, okay.

19             PROSPECTIVE JUROR 25:  Did I say that?

20             THE COURT:  You did, but -- or at least the survey

21   that I got says that.

22             PROSPECTIVE JUROR 25:  I want to let you know when I

23   did that survey I was kind of under the influence.

24                           (Laughter)

25             PROSPECTIVE JUROR 25:  If it's a little over

1   exaggerated.

2          **THE COURT:**  Fair enough.

3          **PROSPECTIVE JUROR 25:**  Just being honest.

4          **THE COURT:**  Well, honesty is always the best policy.

5   So thank you for sharing.

6      The -- your appreciation of Mr. Musk, I've explained that

7   Mr. Musk is not involved in this case at all.

8          **PROSPECTIVE JUROR 25:**  Correct.

9          **THE COURT:**  And is there anything, though, about your

10  being a big fan of his that you think might bleed over into

11  your view of Tesla or the facts of this case?

12         **PROSPECTIVE JUROR 25:**  No.

13         **THE COURT:**  Do you think that when the evidence -- can

14  you tell me that when the evidence starts, Tesla and Mr. Diaz

15  will be at the same level in your -- in your evaluation of

16  them?

17         **PROSPECTIVE JUROR 25:**  Yes.

18         **THE COURT:**  Are you aware of anything -- well, so the

19  other thing that you mentioned is that this is creating a --

20  could create a financial hardship for you; is that right?

21         **PROSPECTIVE JUROR 25:**  Your Honor, again, I was under

22  the influence.  I was just trying to get out of it at the time.

23  I'm sorry.

24         **THE COURT:**  Well, I do -- no, I very much appreciate

25  your candor about this, and your feelings about jury service

 1   are shared by more than a few who will not mention it in quite

 2   the same way that you have.  So --

 3           **PROSPECTIVE JUROR 25:**  Every time.  This is the

 4   furthest I've ever got.

 5                         (Laughter)

 6           **THE COURT:**  Okay.  So you're not concerned -- I've

 7   described to you.

 8           **PROSPECTIVE JUROR 25:**  It's a week, so I mean, that's

 9   not bad.  I was expecting an OJ trial.

10           **THE COURT:**  Okay.  So are you aware of any reason why

11   you could not serve as a fair and impartial juror?

12           **PROSPECTIVE JUROR 25:**  No.

13           **THE COURT:**  Okay.  Mr. Spiro, any questions?

14           **MR. SPIRO:**  No, Your Honor.  Thank you.

15           **THE COURT:**  Mr. Alexander, any questions?

16           **MR. ALEXANDER:**  No questions, Your Honor.

17           **THE COURT:**  Okay.  Thank you very much.

18           **PROSPECTIVE JUROR 25:**  Thank you.

19                     (Pause in proceedings.)

20           **THE COURT:**  Number 27, I think is next.

21           **PROSPECTIVE JUROR 27:**  Hello.

22           **THE COURT:**  Hello.  Good afternoon -- good morning

23   still.  Tell me what you do.

24           **PROSPECTIVE JUROR 27:**  I'm an engineer at a materials

25   company.

1          THE COURT:  And what does that mean that you do?

2          PROSPECTIVE JUROR 27:  I was a quality engineer on a

3  manufacturing floor.  We made medical devices for endovascular

4  aneurysm repair.

5          THE COURT:  And how long have you been doing that?

6          PROSPECTIVE JUROR 27:  13 years.

7          THE COURT:  And are you enjoying it?

8          PROSPECTIVE JUROR 27:  Yeah.  It's a great company.

9          THE COURT:  Okay.  You had indicated that you've

10  heard -- you haven't heard great things about working at Tesla.

11  Who have you heard that from?

12          PROSPECTIVE JUROR 27:  So I work in a manufacturing

13  environment, and just other people who are considering other

14  companies to work for, the general impression is Tesla has a

15  high-stress working environment which is not something I'd be

16  interested in working in.

17          THE COURT:  Have you talked with anybody at Tesla

18  specifically who shared that opinion with you?

19          PROSPECTIVE JUROR 27:

20          THE COURT:  Or just reputation?

21          PROSPECTIVE JUROR 27:  Just by reputation mostly.  I

22  haven't had longer detailed conversations about working at

23  Tesla.

24          THE COURT:  Okay.  So the -- would -- this case is

25  about Mr. Diaz's experience at Tesla several years ago.

 1          Would you be able to put the reputation that you've heard

 2   about -- about from Tesla aside and treat both Tesla and

 3   Mr. Diaz equally, fairly?

 4          **PROSPECTIVE JUROR 27:**  Yes.

 5          **THE COURT:**  Okay.  Is there -- you've indicated

 6   that -- have you known anybody who worked on the -- at Tesla?

 7          **PROSPECTIVE JUROR 27:**  Yes.  After he left the company

 8   I worked for, he went to go work -- he left our company to go

 9   work at Tesla.  But maybe -- mostly stayed in touch through

10   other employees or just following him on social media.  No

11   direct conversations.

12          **THE COURT:**  Okay.  All right.

13          And you've indicated that there have been times in your

14   life that you've been -- you have been treated differently as a

15   result of your gender.  This case does involve discrimination.

16          Do you think that would give Mr. Diaz a leg up over Tesla

17   as you start the case in thinking about what the facts were in

18   what happened to him?

19          **PROSPECTIVE JUROR 27:**  No.  It would be dependent on

20   the facts of the case.

21          **THE COURT:**  You also indicated that you're generally

22   against awarding punitive damages.  In this case it has been --

23   this case has had two phases to it.  This is the second phase,

24   and it's been determined that Mr. Diaz is entitled to punitive

25   damages.  The issue is the amount.

 1          Would you be able to follow the instructions that I give

 2   you with respect to that and -- in order to deliver a fair

 3   verdict?

 4          **PROSPECTIVE JUROR 27:**  Yes.  I would do whatever you

 5   instructed us to do.

 6          **THE COURT:**  Okay.  All right.

 7      Mr. Spiro, any questions?

 8          **MR. SPIRO:**  No questions.  Thank you.

 9          **THE COURT:**  All right.  Mr. Alexander?

10          **MR. ALEXANDER:**   Thank you, Your Honor.

11          Could you share with us the reasons why you are against

12   punitive damages?

13          **PROSPECTIVE JUROR 27:**  I just don't feel like that's

14   how the court system should function that -- I mean, I'm okay

15   with awarding damages for specific causes, but assigning

16   damages to encourage companies not to do things in the future,

17   I think there is other methods to make that happen.

18          **MR. ALEXANDER:**  In this case, as the Court has

19   indicated, one of the jobs of the jurors will be determining

20   punitive damages for a company that is worth several billion

21   dollars.

22          Under those circumstances, would your personal beliefs

23   prevent you from awarding a large -- a large amount of punitive

24   damages?

25          **PROSPECTIVE JUROR 27:**  It would impact my decision,

 1   yes.

 2          MR. ALEXANDER:  So when you say it would impact your

 3   decision, do you think it would cause you to award less than

 4   you otherwise would?

 5          PROSPECTIVE JUROR 27:  Correct.

 6          MR. ALEXANDER:  So in that sense, you would be, I'm

 7   going to say, biased towards Tesla in the sense that you would

 8   favor giving less punitive damages than you otherwise would?

 9   Based on your personal beliefs for punitive damages.

10          MR. SPIRO:  I'm going to object or ask for follow-up

11   on this.

12          THE COURT:  You can ask for follow-up.  Go ahead.

13          PROSPECTIVE JUROR 27:  I think I can follow whatever

14   instruction the judge gave and follow those instructions as

15   given in spite of my personal beliefs.

16          MR. ALEXANDER:  So you could follow the Court's

17   instructions.  But with regard to figuring out a number to

18   award against a company that had billions, it would affect you

19   in terms of thinking that it should be less because of your

20   personal beliefs; is that correct?

21          PROSPECTIVE JUROR 27:  Likely, yes.

22          MR. ALEXANDER:  Likely yes.  Thank you very much,

23   Your Honor.

24          THE COURT:  Okay.  Mr. Spiro.

25          MR. SPIRO:  I don't know -- good morning.  How are

 1   you?

 2        So everybody who comes in here has personal feelings;

 3   right?  The question now is bias, basically; right?  Are you

 4   unable to follow the Court's instructions because you have a

 5   feeling so strong about one side or another?

 6        So that's the question before you, but I hear you saying

 7   you can follow the judge's instructions.

 8           PROSPECTIVE JUROR 27:  I can follow the judge's

 9   instructions.

10           MR. SPIRO:  And award a damages that you think is fair

11   like anybody else who has opinions about things?

12           PROSPECTIVE JUROR 27:  Depending -- I don't know what

13   those instructions are right now, but yes.

14           MR. SPIRO:  Okay.  Nothing further.

15           THE COURT:  The instructions will be that you award an

16   amount that is fair and reasonable in light of issues that I

17   will lay out in the instruction.

18           PROSPECTIVE JUROR 27:  Sounds good.

19           THE COURT:  Okay.  All right.  Thank you.

20                    (Pause in proceedings.)

21           PROSPECTIVE JUROR 29:  Good morning, Your Honor.

22           THE COURT:  Good morning.  How are you?

23           PROSPECTIVE JUROR 29:  I'm doing well.

24           THE COURT:  Good.  Thank you for being here.  So you

25   are an optician.  How long have you been doing that work?

1          **PROSPECTIVE JUROR 29:**  I have been doing it for

2     18 years and six months at my current job.

3          **THE COURT:**  And do you enjoy it?  I appreciate you.

4          **PROSPECTIVE JUROR 29:**  I do.  It's -- it's nice to

5     provide a service to the public that actually helps.

6          **THE COURT:**  It certainly does.  The -- your -- your

7     views regarding Mr. Musk are the ones that I wanted to ask you

8     about.

9      You have strong views about the way he is using Twitter.

10    He is not involved in this case.

11         **PROSPECTIVE JUROR 29:**  Of course.

12         **THE COURT:**  And would -- would your strong feelings

13    about him, though, bleed over into your evaluation of the

14    evidence that's presented here so that Mr. Diaz would have some

15    sort of an advantage just at the beginning in the way that you

16    were evaluating the evidence?

17         **PROSPECTIVE JUROR 29:**  Probably.  And also I am aware

18    of allegations of both racial and gender discrimination at

19    specifically Tesla, so I'm not sure that I could be neutral.

20         **THE COURT:**  Okay.  And tell me about -- tell me what

21    you have learned about that.

22         **PROSPECTIVE JUROR 29:**  I've just -- I have seen things

23    on Twitter that have led to reading articles and things like

24    that.  I'm not -- I don't remember any specifics at this point,

25    but I'm aware of the allegations.

1          **THE COURT:**  Okay.  The other thing that you had

2     mentioned was that you think that Tesla has a terrible product.

3     And --

4          **PROSPECTIVE JUROR 29:**  I do.

5          **THE COURT:**  And so just starting off, do you believe

6     that you could set -- set aside the things that you've read

7     about, your feelings about Mr. Musk, and your feelings about

8     Tesla's product, do you think you could set that aside and

9     serve as a fair and impartial juror?

10         **PROSPECTIVE JUROR 29:**  The Tesla part I most likely

11    could, but because of the specific nature of this case, I don't

12    think I can be impartial.

13         **THE COURT:**  Okay.  All right.

14       Mr. Alexander, do you have any questions?

15         **MR. ALEXANDER:**  No, Your Honor.

16         **THE COURT:**  Okay.  Thank you very much.  If you

17    would -- Ms. Davis, I think we ought to tell -- we still have a

18    number of people to go.  I'm suspecting that we need to take a

19    short break anyway.  So could you let everybody know that --

20    who has come in that we'll be back at 12:30 instead of 11:30.

21    And for the people who have not come in yet, we are going to

22    take a 15-minute break and start with Number 30 at 20 of 12:00.

23    Okay.  Is that clear?

24         **THE CLERK:**  Yes.

25         **THE COURT:**  Okay.  Thank you very much.  So please

```
 1   come back in --
 2              PROSPECTIVE JUROR 29:  12:30.
 3              THE COURT:  -- at 12:30.
 4              PROSPECTIVE JUROR 29:  Okay.  Thank you.
 5                   (Recess taken at 11:25 a.m.)
 6                (Proceedings resumed at 11:42 a.m.)
 7              THE COURT:  Be seated, everybody, please.
 8          Number 30, please.
 9              THE CLERK:  All right.
10                      (Pause in proceedings.)
11          MR. ORGAN:  Your Honor, which one did you say is next?
12              THE COURT:  I'm sorry?
13          MR. ALEXANDER:  Who's next?
14              THE COURT:  Number 30.
15          MR. ORGAN:  Thank you.
16                      (Pause in proceedings.)
17              THE COURT:  Good morning.
18              PROSPECTIVE JUROR 30:  Good morning --
19              THE COURT:  How are you?
20              PROSPECTIVE JUROR 30:  -- Judge Orrick.  How are you.
21              THE COURT:  I'm very well.  Thank you.
22          So how long have you been a dental hygienist?
23              PROSPECTIVE JUROR 30:  22 years.
24              THE COURT:  Wow.  Well, thank you.  I'm -- I'm in debt
25      to you and everybody who works as you do.
```

1      I wanted to ask you a few questions.  One was you were --

2  you mentioned that you think that Mr. Musk is a genius

3  businessman but gets his hand on too many products.

4      The -- this case does not involve Mr. Musk.  He's not a

5  witness.  He's not -- he's not in the case.  Would you be able

6  to separate your views about him from your views of Tesla and

7  what it's -- it did in this case so that at the beginning of

8  the case, both Tesla and Mr. Diaz start at an absolutely equal

9  level?

10     **PROSPECTIVE JUROR 30:**  Good to know that I'm not going

11 to see him in person, not that he's my hero.  I don't know much

12 about Tesla or the company, so I won't be too much bias.

13     **THE COURT:**  Okay.  So as far as you know from what

14 you've heard so far, both Mr. Diaz and Tesla would start at an

15 absolutely even place and then you would evaluate the evidence

16 and be able to reach a determination with your fellow jurors?

17     **PROSPECTIVE JUROR 30:**  Yes.  But my main concern at

18 the beginning when I file my questionnaire was my health --

19     **THE COURT:**  Yes.

20     **PROSPECTIVE JUROR 30:**  -- my physical condition.  But

21 after, like, today, I heard about the date for the trial and

22 that I happen to have a vacation with my son already scheduled

23 this Thursday and Friday.  And he's my only son, I'm a single

24 mom, and he has one week spring break this week, and that's why

25 I scheduled that mini trip, and I wasn't thinking about coming

 1  in short notice.

 2          THE COURT:  And so -- and where are you going to go?

 3          PROSPECTIVE JUROR 30:  To Reno.  It's an Amtrak train

 4  scenic ride.  It will be our first train ride ever.  He's 16

 5  now.  It's my first train ride with him.  So we kind of excited

 6  about that trip, but it's a bummer.

 7          THE COURT:  Well, so, tell me -- tell me about your

 8  health issues, also.

 9          PROSPECTIVE JUROR 30:  I was fighting with cancer

10  since 2021 and go through all kind of treatment, everything

11  that I have to go through.  At one point I was so scared like I

12  won't see my son's graduation from high school.  So I'm glad

13  I'm still alive.

14          THE COURT:  And -- me too, and I'm glad you're in

15  remission, but you -- and you indicated that you would need to

16  take frequent breaks.  I described what the schedule is for the

17  day.  Is that -- would that work for you, every hour and a half

18  taking a break?

19          PROSPECTIVE JUROR 30:  I hope that should be okay but

20  just my main concern now is that I have this trip.  It is

21  nonrefundable and -- oh, my gosh, what should I do?

22          THE COURT:  I heard you loud and clear on that.  I

23  appreciate that.

24          PROSPECTIVE JUROR 30:  So I don't want to be selected,

25  I know.

 1          THE COURT:  Okay.  All right.  Any questions,

 2  Mr. Spiro?

 3          MR. SPIRO:  No, Your Honor.

 4          THE COURT:  Mr. Alexander?

 5          MR. ALEXANDER:  No, Your Honor.

 6          THE COURT:  Thank you very much.  And please come back

 7  at 12:30.

 8                      (Pause in proceedings.)

 9          THE COURT:  Good morning.  You are Juror Number 32; is

10  that right?

11          PROSPECTIVE JUROR 32:  Yes.

12          THE COURT:  So tell me, you're an insurance manager,

13  what does that mean?

14          PROSPECTIVE JUROR 32:  So I'm an insurance agent.  I

15  work at, like, a small family-owned insurance agency, and I run

16  it and sell insurance, car insurance, homeowners, renters.

17          THE COURT:  How long have you been doing that?

18          PROSPECTIVE JUROR 32:  Ten years, yeah, in May.

19          THE COURT:  That's great.  Are you enjoying it?

20          PROSPECTIVE JUROR 32:  Yeah.  I stopped doing it for

21  like a year, but I'm back at it, so, yeah.

22          THE COURT:  So, the -- you indicated that you have

23  strong feelings about Mr. Musk and that you don't agree with

24  some of his views.

25      The -- you've heard me say that he is not involved in this

1    case.  He's not a witness.  He's not involved in any way in the

2    case.  Do you think that your strong feelings about him,

3    though, would bleed over to your views about Tesla so that

4    Mr. Diaz would have an advantage at the beginning of the trial

5    compared to Tesla or would you be able to start everybody at

6    the same place and just evaluate the evidence fairly as it

7    comes in?

8              **PROSPECTIVE JUROR 32:**  Somewhat, but not really.  I

9    mean, I --

10             **THE COURT:**  Tell me why.

11             **PROSPECTIVE JUROR 32:**  Just because like the car

12   problems they've had previously, Tesla, it doesn't really speak

13   highly of them.  Not that it has to do with discrimination,

14   being Hispanic.  I mean I'm not really -- I don't really agree

15   more now with his views.

16             **THE COURT:**  Okay.  So --

17             **PROSPECTIVE JUROR 32:**  And some of the stuff he does,

18   I don't know.

19             **THE COURT:**  Well, so in this case, the -- it has been

20   determined that in this instance, Tesla discriminated against

21   Mr. Diaz and the issue is going to be damages, what is the fair

22   and reasonable amount of damages that should be awarded to him.

23        Do you think that given everything else that you just

24   described, when you're looking at that issue, he's already

25   going to start with a little bit of an advantage to Tesla?

 1         **PROSPECTIVE JUROR 32:**  I believe so, yes.

 2         **THE COURT:**  Okay.  All right.  And you also wrote that

 3 you didn't feel that you were the correct candidate for this

 4 case.  Tell me -- was that the reason or was there another?

 5         **PROSPECTIVE JUROR 32:**  I just have Catholic views, and

 6 I don't really -- I'm -- yeah, I don't really feel like this is

 7 a fair case, to be honest, and I don't really feel like the

 8 appropriate person to be a juror.

 9         **THE COURT:**  Okay.

10         **PROSPECTIVE JUROR 32:**  Yeah.

11         **THE COURT:**  All right.  Mr. Spiro, any questions?

12         **MR. SPIRO:**  No, Your Honor.  Thank you.

13         **THE COURT:**  Mr. Alexander?

14         **MR. ALEXANDER:**  No questions.

15         **THE COURT:**  Okay.  Thank you very much.  Please come

16 back at 12:30.  Thank you.

17         **THE CLERK:**  37 is next.

18         **THE COURT:**  37 is next?

19                 (Pause in proceedings.)

20         **THE COURT:**  Good morning.

21         **PROSPECTIVE JUROR 37:**  Good morning.

22         **THE COURT:**  So you are a scientist for the State of

23 California.

24         **PROSPECTIVE JUROR 37:**  Yes.

25         **THE COURT:**  I want to thank you for that, but tell me

 1  what you do.

 2          **PROSPECTIVE JUROR 37:**  I am a virologist at the State

 3  virology laboratory.  We do all kinds of diagnostic testing and

 4  surveillance work.

 5          **THE COURT:**  So now I really want to thank you.  How

 6  long have you been working for the State?

 7          **PROSPECTIVE JUROR 37:**  As a State employee, 15 years.

 8  But at the State for 22ish, 24.

 9          **THE COURT:**  So the -- you indicated very strong views

10  about Mr. Musk, and I've explained that Mr. Musk is not

11  involved in the case in any way whatsoever.

12      Given the strength of your views, would that carry over to

13  the way that you think about Tesla as a company so that you

14  wouldn't be able to be a fair and impartial juror?

15          **PROSPECTIVE JUROR 37:**  Since he's not the entire

16  company, I think that that wouldn't have any bearing on my

17  ability to be fair.

18          **THE COURT:**  Okay.  And have you heard anything -- do

19  you think you would be able to be a fair and impartial juror in

20  this case?

21          **PROSPECTIVE JUROR 37:**  I do think I would be able to,

22  yes.

23          **THE COURT:**  Mr. Spiro, any questions?

24          **MR. SPIRO:**  Yes, just very briefly.  And thank you.

25      You know, when we ask jurors to come into jury service, in

 1   traditional cases, they come in and they have, you know,

 2   literally zero feelings, it's two nameless people, right, that

 3   they've never heard of and they're there to decide -- like, you

 4   know, you think on high on the scales of justice, just right or

 5   wrong; right?

 6        Here, you obviously have a very strong feeling about the

 7   person who leads one of the companies; right?

 8            PROSPECTIVE JUROR 37:  Right.

 9            MR. SPIRO:  So it's incumbent upon me, and I have to

10   follow up with you and sort of ask you if you hear them make

11   arguments saying, you know, Tesla's an improper company, the

12   leadership starts at the top, they need to be punished, they

13   need to be stopped, I mean -- I'm sort of asking you to do some

14   soul searching because you're obviously a very accomplished

15   smart person, can you be sure that that's not going to resonate

16   with you differently from the start than it would if you had no

17   feelings at all?  And that's really my question.

18            PROSPECTIVE JUROR 37:  Can you -- I'm trying to

19   think -- make sure I answer the question you just asked.  So

20   the fact that he leads the company, is that going to sway me;

21   is that what -- basically what you're asking?

22            MR. SPIRO:  Well, him leading the company would cause

23   you, given your views on him, to be more likely to be listening

24   intently to an argument that you see the company and its

25   leadership and this is problem all the way up, right, this

1    company needs to be punished, this company has issues, it

2    starts at the top?

3              **PROSPECTIVE JUROR 37:**  Oh, no, I don't see anything

4    like that.  From what my understanding of the case is, is that

5    that would have no bearing on my ability to fairly think about

6    this case.

7              **MR. SPIRO:**  Right.  Because it is the company; right?

8    You're going to hear about an issue of discrimination, but it's

9    the company that is on trial, right, so they're going to --

10   their argument to you is going to be this company has issues,

11   this company needs to be punished; right?  So I don't want you

12   to -- I want to make sure --

13             **PROSPECTIVE JUROR 37:**  No.  I -- that's not an issue

14   for me.  I mean, no, my feelings about that -- about him as a

15   person is not going to affect my ability to think about the

16   case.

17             **MR. SPIRO:**  Thank you so much.

18             **THE COURT:**  Mr. Alexander?

19             **MR. ALEXANDER:**  Nothing.

20             **THE COURT:**  Okay.  Thank you very much.  Please come

21   back at 12:30.

22                         (Pause in proceedings.)

23             **THE COURT:**  Good morning.

24       And this is Number 40.

25             **PROSPECTIVE JUROR 40:**  Good morning.

1            **THE COURT:**  So you're retired at this point?

2            **PROSPECTIVE JUROR 40:**  I am.

3            **THE COURT:**  And tell me how you're spending your days.

4            **PROSPECTIVE JUROR 40:**  Oh, I -- I'm a quilter, and I

5     belong to a couple clubs, and I do some volunteer work at

6     church.

7            **THE COURT:**  Oh, that's great.  And before you were

8     working as an accountant with Chevron.  How long were you

9     there?

10           **PROSPECTIVE JUROR 37:**  25 years.

11           **THE COURT:**  And are you -- do you wish you were back,

12    or are you glad that you're quilting and doing volunteer work?

13           **PROSPECTIVE JUROR 25:**  I have been retired now for

14    about 17 years.  I went out on a medical because of my back.

15    So I would have liked to have gone back but at the time, I was

16    waiting for artificial disks to be approved and didn't have it

17    in time on that, so it just worked out that way.  I would have

18    liked to have worked longer but at this point, I'm very happy

19    not to commute.

20           **THE COURT:**  Uh-huh, yeah.  And I wanted to ask you

21    about your back.  The schedule that -- there are two things.

22    One is that we have the schedule of taking a break every hour

23    and a half.  The other thing is that any time you need to stand

24    up in the jury box, it's fine.

25         Are those -- are those accommodations sufficient for you

 1   to -- to serve on a jury?

 2           **PROSPECTIVE JUROR 37:**  Actually, I was looking at the

 3   chairs in the jury box because the pews, as I call them, are

 4   very uncomfortable.

 5           **THE COURT:**  Very uncomfortable.

 6           **PROSPECTIVE JUROR 37:**  And so that's been difficult.

 7   I can't stand a long time and I can't sit a long time, but

 8   those chairs will accommodate me, and I should be fine.

 9           **THE COURT:**  Okay.  All right.

10           **PROSPECTIVE JUROR 37:**  And the hours are good, too.

11   It's not -- from 8:30 to 1:30 for court days?  So other than

12   commuting.

13           **THE COURT:**  Yes, the commute, but --

14           **PROSPECTIVE JUROR 37:**  Yeah.

15           **THE COURT:**  -- you can do it early.

16           **PROSPECTIVE JUROR 40:**  I can make it.

17         **THE COURT:**  The -- you indicated some negative views

18   about Elon Musk, whose opinions you think haven't been good for

19   the country.

20       The -- I've explained he is not involved --

21           **PROSPECTIVE JUROR 40:**  I understand that.

22         **THE COURT:**  -- in the case.  And -- but would

23   anything -- would your feelings about him transfer over to

24   Tesla so that you wouldn't be able to give them a fair trial as

25   well as Mr. Diaz?

1          **PROSPECTIVE JUROR 40:**  No.

2          **THE COURT:**  Okay.  And the fact that you don't like

3  the car.

4          **PROSPECTIVE JUROR 40:**  Oh.

5          **THE COURT:**  That Tesla produces.

6      Some people love them.  Some people don't.

7          **PROSPECTIVE JUROR 40:**  It's more the injuries that I

8  see, I guess, and the fires and so forth and the damages it

9  causes to families that I've really noticed.  That's probably

10  the only exception.  I mean, I don't know much about them.  I

11  haven't shopped for one.  So, just some of the accidents and so

12  forth, mostly on the automated driving systems I think.

13          **THE COURT:**  Uh-huh.  So would that -- so this case is

14  about what happened in the workplace.  It's not about the

15  product.

16      Would anything about the product, again, lead you at the

17  beginning to start this case preferring in any small way

18  Mr. Diaz to Tesla because of those things?

19          **PROSPECTIVE JUROR 40:**  No.  I see it as totally

20  different subject matters.  It's not the same at all to me.

21          **THE COURT:**  Okay.  All right.

22      Mr. Spiro, any questions?

23          **MR. SPIRO:**  Yes.  Just two brief questions.  One is

24  that you said that you had a family member's husband that

25  worked as a contractor for Tesla.

1       Did you learn anything through that that affects this?

2               **PROSPECTIVE JUROR 40:**  No.

3               **MR. SPIRO:**  Okay.  I see you indicating no.

4               **PROSPECTIVE JUROR 40:**  No.

5               **MR. SPIRO:**  And then the second question is going back

6       to the beginning, which is, you know, obviously you have strong

7       feelings about Mr. Musk, and I respect and understand the

8       feelings.

9           The question is:  They're going to be arguing in essence

10      that you may hear arguments, you know.  This is a bad company,

11      the company needs to be punished, a company that needs to

12      suffer so that it changes; right?  That's going to be some of

13      the kinds of arguments you hear.

14          So the question is:  If you go into this case not having a

15      strong, negative feeling about the leadership of the company,

16      do you think you are going to be more likely to be receptive to

17      that kind of an argument because you have some of those

18      inherent feelings?

19          That's the real question.  Did you follow?

20              **PROSPECTIVE JUROR 40:**  I think I follow you.

21          It would be based on the information that I would receive

22      from whatever arguments and documentation and so forth that you

23      provide that I would be judging it on, not preconceived

24      managerial and CEO type of judgments that I have opinions

25      about.

 1          So I think it would be based on your arguments.

 2          **MR. SPIRO:**  Okay.

 3          **PROSPECTIVE JUROR 40:**  Best I understand what you're

 4  asking me.

 5          **MR. SPIRO:**  Yeah.  That's what I'm asking.

 6          I'm asking:  Do you think that it's going to bleed into

 7  this?  When you hear an argument that triggers that thought,

 8  that, you know, the leadership of this company is rotten and

 9  they need to be punished.

10          **PROSPECTIVE JUROR 40:**  No, no.

11          **MR. SPIRO:**  Thank you very much.

12          **PROSPECTIVE JUROR 40:**  You're welcome.

13          **THE COURT:**  Mr. Alexander, any questions?

14          **MR. ALEXANDER:**  No.

15          **THE COURT:**  All right.  Thank you.  Come back at

16  12:30, please.

17                        (Pause in proceedings.)

18          **PROSPECTIVE JUROR 41:**  Good afternoon.

19          **THE COURT:**  Good afternoon.  This is Juror Number 41;

20  is that right?

21          **PROSPECTIVE JUROR 41:**  Yes.

22          **THE COURT:**  Good.  So what is DNS Dhami Corporation?

23          **PROSPECTIVE JUROR 41:**  It's a private corporation.

24  Own a liquor license under it.

25          **THE COURT:**  So is that -- you would be -- you manage a

1  liquor store, basically?

2        **PROSPECTIVE JUROR 41:**  Yes.

3        **THE COURT:**  And how long have you been doing that?

4        **PROSPECTIVE JUROR 41:**  17 years.

5        **THE COURT:**  And I will thank you for your service.

6  I'm sometimes a consumer.

7                      (Laughter)

8        **THE COURT:**  The -- the -- you indicated that you have

9  strong feelings about Mr. Musk, that he is an intelligent guy

10 but behaves irrationally and says stupid things.  Probably

11 impulsive.

12       **PROSPECTIVE JUROR 41:**  That's what I gather from the

13 media, sir.

14       **THE COURT:**  Well, you know that -- you know from being

15 here that he's got nothing to do with this case.  He's not a

16 witness.  He's not going to be involved in the case.

17     Is there anything about that that you think would impact

18 your ability to be a fair and impartial juror?

19       **PROSPECTIVE JUROR 41:**  No, sir.

20       **THE COURT:**  Now, you happen to like Tesla products.

21 You feel that they are game-changing products.

22     Would -- does your feeling about those products and Tesla,

23 would that make Tesla start with an advantage for you when you

24 are evaluating the evidence in the case?  Because you're -- you

25 like the products, you -- would your feelings about the company

 1    give them a -- some slight advantage over Mr. Diaz just at the

 2    start of the case?

 3             **PROSPECTIVE JUROR 41:**  No, sir.  Just because like you

 4    mentioned in the briefing that you will be guiding us and you

 5    will be telling the legal points, and both sides are going to

 6    put up their points, what is involved in this, and it's just

 7    going to be based on that.

 8             **THE COURT:**  So you can -- you're confident you could

 9    serve as a fair and impartial juror?

10             **PROSPECTIVE JUROR 41:**  Yes.

11             **THE COURT:**  The one other thing that you mentioned was

12    your dog.  And that you've heard what the schedule is?

13             **PROSPECTIVE JUROR 41:**  I heard that, so maybe I will

14    be able to manage it.  It's just for five days.  Like today, my

15    next-door neighbor, I handed over the house keys to them.  And

16    my wife is coming back on the 5th, so.

17             **THE COURT:**  Okay.  Great.

18        Mr. Spiro, any questions?

19             **MR. SPIRO:**  No, Your Honor.

20             **THE COURT:**  Mr. Alexander?

21             **MR. ALEXANDER:**  Yes, please.

22        In your questionnaire, you said that damages should not be

23    ridiculously excessive.

24        What did you mean by that?

25             **PROSPECTIVE JUROR 41:**  Like what you read in the

 1    media, like layman.  I've never been involved in anything like

 2    this, but when you read in the media so many hundreds of

 3    millions, you know, have been given as damages.  So to a

 4    layman, you think that these are exorbitant figures.  How can

 5    something be like 300 million or a billion dollars or whatever.

 6    That's what came to my mind, and I answered it.

 7           MR. ALEXANDER:  Well, in this case, the Court will

 8    give an instruction that the jury is supposed to determine what

 9    amount of general damages and punitive damages should be

10    awarded.  And Tesla is --

11           PROSPECTIVE JUROR 41:  The judge made it clear, sir.

12    I heard that.

13           MR. ALEXANDER:  And so given that, we will be asking

14    for millions of dollars.

15        Would you have difficulty awarding millions of dollars

16    against a company regardless of what the judge's instructions

17    were?

18           PROSPECTIVE JUROR 41:  No.  It would be based on like

19    what the judge guides us.

20           MR. ALEXANDER:  So you would be able to award millions

21    of dollars?

22           PROSPECTIVE JUROR 41:  Uh-huh.

23           MR. ALEXANDER:  Yes?

24           PROSPECTIVE JUROR 41:  Yes.

25           MR. ALEXANDER:  Thank you very much.

1          **THE COURT:**  Mr. Spiro?

2          **MR. SPIRO:**  I understood you to mean you would follow

3    the judge's instructions, correct?

4          **PROSPECTIVE JUROR 41:**  Sorry?

5          **MR. SPIRO:**  You will follow the judge's instructions?

6          **PROSPECTIVE JUROR 41:**  Yes.  The judge guides us of

7    what are the legal points and this much is allowable in this

8    case and this much is allowable for this and this is how much

9    can be allotted.  So based on that, it will be at that moment

10   because I just give a true answer how I felt because what I see

11   in the media.

12         **MR. SPIRO:**  Thank you very much.

13         **PROSPECTIVE JUROR 41:**  You're welcome.

14         **THE COURT:**  All right.  Thank you.  Come back at

15   12:30, please.

16         **PROSPECTIVE JUROR 41:**  Thank you.

17                      (Pause in proceedings.)

18         **THE COURT:**  Good afternoon.

19         **PROSPECTIVE JUROR 42:**  Good afternoon.

20         **THE COURT:**  So what do you teach?

21         **PROSPECTIVE JUROR 42:**  I teach Algebra, introduction

22   and intermediate Algebra for the first two years of college.

23         **THE COURT:**  And how long have you been doing that?

24         **PROSPECTIVE JUROR 42:**  Seven years.

25         **THE COURT:**  That's great.  Do you enjoy it?

1        **PROSPECTIVE JUROR 42:**  Oh, yeah.  It's great fun.

2        **THE COURT:**  That's terrific.  And then what are Bay

3    Area Stretcher Bars?

4        **PROSPECTIVE JUROR 42:**  So we build custom-built

5    stretcher bars, which are the frames that stretch canvas for

6    painters.

7        **THE COURT:**  Oh.

8        **PROSPECTIVE JUROR 42:**  We also make panels, so it's

9    kind of a -- a very niche industry.

10        **THE COURT:**  Uh-huh.  That's great.

11    So I wanted to -- you had mentioned that you have strong

12    views about Mr. Musk, that he's likely brilliant but also

13    grossly misuses his ego, influence, wealth, and power.

14    And I wanted to -- I said at the beginning he's not

15    involved in this case.  He is not a witness or anything like

16    that.

17    But would your feelings about him bleed over into your

18    feelings about Tesla so that it would impact your view of the

19    evidence as it comes in?

20        **PROSPECTIVE JUROR 42:**  No.

21        **THE COURT:**  Okay.  All right.

22    Is there -- have you heard anything -- is there any reason

23    why you couldn't serve as a fair and impartial juror?

24        **PROSPECTIVE JUROR 42:**  Not that I'm aware of.

25        **THE COURT:**  All right.  Any questions?

 1          **MR. SPIRO:**  Yes.  Just very briefly on another topic,

 2  and I apologize, but I have to ask you a question.  And I will

 3  sort of keep it at the surface.

 4      But I know you're a Plaintiff in a case?

 5          **PROSPECTIVE JUROR 42:**  Uh-huh.

 6          **MR. SPIRO:**  I don't know the nature, and I don't want

 7  to pry the nature of it, per se, but is that something where

 8  you responded to sort of an advertisement and you're in the

 9  case, or is that something where you're actively involved as

10  the Plaintiff in the case?

11          **PROSPECTIVE JUROR 42:**  No.  It was a case that was

12  settled, and it was against drug manufacturers.  It was DES and

13  my wife, her -- her uterus was affected by her mother taking

14  DES, so it affected the childbirth.

15          **MR. SPIRO:**  I'm sorry to hear that.

16      I -- I ask because, you know, that's obviously a very

17  upsetting thing, and I'm sorry that I even have to ask you

18  questions about this.

19      Some people that are Plaintiffs, especially in emotional

20  cases -- and that's understandably one -- start in a case

21  having been through something like with a leaning toward the

22  Plaintiff's side and think it's natural.  It's human instinct.

23      So, I have to ask you, you know:  Do you think that there

24  is a chance that that impacts your ability as you start here

25  today?

1          **PROSPECTIVE JUROR 42:**  It's a really good question.  I

2    hadn't really given it much thought in the last -- well, since

3    my wife's deceased.  But it was certainly a very emotional

4    time, which lasted about ten years.

5          So, to answer the question, I would think not.  But, you

6    know, it's -- I don't know how else to answer that.

7          **MR. SPIRO:**  Yeah.  Well, this is -- this is the part

8    of the process that's tricky, right, because it's not like

9    Algebra.  I have to ask you, and you're a very smart,

10   experienced guy, and it struck me that what you went through

11   was a very, very hard time.  I didn't know it even lasted a

12   decade.

13         But given the intensity of that experience as a Plaintiff

14   in a case like that, it's hard for me to imagine that at some

15   level that doesn't stay with you and at some level does not

16   influence the way that you enter a case when you look at a

17   Plaintiff than when you look at a corporation.

18         **PROSPECTIVE JUROR 42:**  You could be very right.  I

19   wouldn't disagree with you.

20         **MR. SPIRO:**  Okay.

21         **PROSPECTIVE JUROR 42:**  I would like to think that

22   that's not the case, but to --

23         **MR. SPIRO:**  Right.  So -- and why I ask is, again, you

24   seem like a fair person.  There may be a case that's a better

25   fit for you, but a case in which there is a Plaintiff against a

 1  corporation, given that experience, is probably not the right

 2  case for you?

 3          **PROSPECTIVE JUROR 42:**  Very likely.

 4          **MR. SPIRO:**  All right.  Thank you.

 5          **PROSPECTIVE JUROR 42:**  Thank you.

 6          **THE COURT:**  Mr. Alexander?

 7      Mr. Alexander might have some questions for you.

 8          **MR. ALEXANDER:**  With regard to the circumstances of

 9  your wife -- and I apologize for that -- you understand that is

10  a completely different company than this company; correct?

11          **PROSPECTIVE JUROR 42:**  Absolutely.

12          **MR. ALEXANDER:**  In this case there will not be -- you

13  will not be determining liability, just damages, the amount of

14  damages that would be fair for the circumstances of this case.

15      Do you believe that you could divorce your thoughts

16  regarding what happened to your wife or any other lawsuits from

17  this lawsuit and the circumstances of this lawsuit?

18          **PROSPECTIVE JUROR 42:**  I believe so.

19          **MR. ALEXANDER:**  Okay.  And when you say "I believe

20  so," you would make a conscious effort to do that; correct?

21          **PROSPECTIVE JUROR 42:**  Most definitely.

22          **MR. ALEXANDER:**  So the Court will give you

23  instructions as to what your obligation is.  And would you be

24  willing and able to follow the Court's instructions in that

25  regard.

 1           **PROSPECTIVE JUROR 42:**  Yeah, I would follow the

 2    directions.

 3           **MR. ALEXANDER:**  And up until -- up until the moment

 4    there was some questioning about your wife, there had been no

 5    thought in your mind that you would have any ability to be fair

 6    and impartial to both sides in this case; correct?

 7           **PROSPECTIVE JUROR 42:**  No.  There wouldn't have been

 8    any circumstances that the issue would never have come up.

 9           **MR. ALEXANDER:**  And now, now that you understand the

10    Court will be giving you instructions, and is there anything

11    that has changed?  You still believe you can be fair and

12    impartial?

13           **PROSPECTIVE JUROR 42:**  Yes.  I believe so.

14           **MR. ALEXANDER:**  Great.  Thank you very much.

15           **MR. SPIRO:**  Just a brief follow-up.

16           **THE COURT:**  No more follow-up.  Thank you very much.

17           **PROSPECTIVE JUROR 42:**  Thank you.

18        (The court reporter asked for clarification.)

19           **THE COURT:**  That was Number 42.

20       Ms. Davis, I think we are onto 49.

21                    (Pause in proceedings.)

22           **THE COURT:**  Good afternoon.

23           **PROSPECTIVE JUROR 49:**  Good afternoon.

24           **THE COURT:**  And so you are an IT manager?

25           **PROSPECTIVE JUROR 49:**  Yes.

1      THE COURT:  With Hitachi.  Tell me what that means.

2  What do you do every day?

3      PROSPECTIVE JUROR 49:  So I'm senior director at --

4  working for a Japanese company, and I manage the infrastructure

5  enterprise cloud and systems engineering.

6      THE COURT:  How long have you been doing that?

7      PROSPECTIVE JUROR 49:  Ten-plus years.

8      THE COURT:  Do you enjoy it?

9      PROSPECTIVE JUROR 49:  Yes.

10      THE COURT:  The -- you indicated with respect to

11  Mr. Musk that you see him as a visionary.

12      PROSPECTIVE JUROR 49:  Yes.

13      THE COURT:  And I wanted to ask you whether -- because

14  you have such a strong belief in him, whether that would impact

15  how you view Tesla itself, which you also like because you like

16  green products, whether that would impact your ability here to

17  judge the evidence equally and fairly involving the workplace

18  discrimination case that Mr. Diaz has brought?

19      PROSPECTIVE JUROR 49:  Yes.  I should be able to make

20  that judgment.

21      THE COURT:  You would be able to be fair and

22  impartial?

23      PROSPECTIVE JUROR 49:  Yes.

24      THE COURT:  You would not give Tesla just starting off

25  just a slight advantage just because you like Mr. Musk?

1              **PROSPECTIVE JUROR 49:**  No, no.  No, it's just because,

2     you know, I strongly believe in green energy and

3     sustainability.

4              **THE COURT:**  Okay.  Is there any reason that you've

5     heard that you don't think -- let me ask a better question.  Do

6     you think you would be able to be a fair and impartial juror in

7     this case?

8              **PROSPECTIVE JUROR 49:**  Yes.

9              **THE COURT:**  Mr. Alexander, any questions?

10             **MR. ALEXANDER:**  Yes.

11         In this case, as a juror, you would be asked to award

12    millions of dollars of damages against a company whose

13    leader's -- you believe is a visionary.

14         Would you have any difficulty doing that?

15             **PROSPECTIVE JUROR 49:**  No.

16             **MR. ALEXANDER:**  So you could put that out of mind --

17             **PROSPECTIVE JUROR 49:**  Yes.

18             **MR. ALEXANDER:**  -- and award millions of dollars?

19             **PROSPECTIVE JUROR 49:**  Yes.

20             **MR. ALEXANDER:**  Excellent.  Thank you.

21             **THE COURT:**  Mr. Spiro, any questions?

22             **MR. SPIRO:**  No, Your Honor.  Thank you.

23             **THE COURT:**  Okay.  Thank you very much.  Come back at

24    12:30, please.

25             **PROSPECTIVE JUROR 49:**  I just have one question.

1          THE COURT:  Yes.

2          PROSPECTIVE JUROR 49:  I had oral surgery on last week

3     on Thursday, and I have a follow-up appointment on this

4     Thursday.  You know to take out the stitches because they had

5     to, you know, tear my gum to take out the broken tooth.

6          THE COURT:  What time is the appointment?

7          PROSPECTIVE JUROR 49:  It's in the afternoon at

8     1:00 o'clock.

9          THE COURT:  Is there any chance that you would be able

10    to call them up and rearrange the time to have a later time on

11    Thursday?

12         PROSPECTIVE JUROR 49:  If I'm selected, then yes, I

13    will have to call them up.

14         THE COURT:  If you would do that, that would be great

15    if you are selected.

16         PROSPECTIVE JUROR 49:  Yes.

17         THE COURT:  Great.  Thank you very much.

18                    (Pause in proceedings.)

19         THE COURT:  Good afternoon.  This is Juror Number 50;

20    is that right?

21         PROSPECTIVE JUROR 50:  Yes.

22         THE COURT:  Excellent.  Okay.

23      So you are getting your Ph.D. at UCSF.  Tell me what it's

24    in.

25         PROSPECTIVE JUROR 50:  It's in biochemistry.

1      **THE COURT:**  And what are you doing right now in order

2    to get that doctorate?

3      **PROSPECTIVE JUROR 50:**  So right now I have been

4    working on -- so I study a protein complex called the "nuclear

5    lamina" which is a meshwork of proteins that gives the nucleus

6    in cells its structure.  So right now I'm working on kind of

7    mutating various amino acids in that protein to see if it can

8    form that meshwork.

9      **THE COURT:**  And are you -- is the ultimate result of

10    what you are doing going to come out in some written form or --

11      **PROSPECTIVE JUROR 50:**  That's the goal.  Yeah,

12    theoretically in hopefully a year or so I will have a

13    manuscript for a paper that will get published somewhere.

14      **THE COURT:**  Great.  Okay.

15      And as far as the trial schedule, is -- is this going to

16    interrupt anything that you're doing in a significant way or

17    will you be able to work around the schedule?

18      **PROSPECTIVE JUROR 50:**  Since the trial seems to be on

19    the scale of days and not weeks or months, I should be able to

20    work around that just fine, especially with the having the

21    afternoons free.  Also being done by 1:30 would be fantastic.

22      **THE COURT:**  Okay.  Great.

23      So let me then go to your view of Mr. Musk, which you have

24    a strong view that is not positive regarding him.  And I'm

25    wondering whether that would impact your ability to set -- to

1    be fair and impartial in a case involving one of his companies?

2          **PROSPECTIVE JUROR 50:**  I mean, as I think you said

3    before, the -- the actual trial contents do not involve Elon

4    Musk at all, and so I think I could be -- I would be able to

5    kind of separate that from the trial.

6          **THE COURT:**  Okay.  And Tesla itself, you also have

7    concerns about its products and the -- and so -- so this -- the

8    issue in this case involves a workplace issue and

9    discrimination, so it doesn't involve the products themselves.

10         But you have strong feelings about both of those things,

11   and I'm -- it's very important that at the beginning of the

12   case you are able to treat Tesla equally and fairly with

13   Mr. Diaz.

14         Would you be able to do that?

15         **PROSPECTIVE JUROR 50:**  I think I would be able to.  I

16   don't know if I can guarantee anything, but I would do my best

17   to make sure that those feelings are not brought into the

18   trial.

19         **THE COURT:**  Okay.  Those feelings -- I'm telling

20   you -- they have got nothing to do with the trial.  And what

21   is -- what I need to know is that if you were seated on the

22   jury, you would be able to treat Tesla just as you would any

23   human being you didn't know, any company you liked, and then go

24   on from there.

25         Would you be able to do that?

1          **PROSPECTIVE JUROR 50:**  I think I can do that, yes.

2          **THE COURT:**  Okay.  Mr. Spiro.

3          **MR. SPIRO:**  Yes.

4      Good afternoon at this point.  So thank you and thank you

5   for your honesty.  I have to ask you just sort a follow-up.

6   People say -- we know you have a strong feeling about the

7   leader of the company or the CEO of the company, and you are

8   using the words like "I think," "I hope to be."  And so it's

9   sort of incumbent upon me to follow up.

10     What I expect you to hear are arguments that this company

11  is rotten at its core, you know, all the way up to the top,

12  right, and so the question is if you come in with those

13  feelings, and I sense you wavering a little bit on the, I

14  think, issues, you know, can you give an unequivocal assurance?

15  Can you be sure that you don't come into a case with a leaning

16  at all, right, because, you know, then there may be a different

17  case that's the right case for you, and this wouldn't be it.

18  So that's really the ultimate question for you.

19         **PROSPECTIVE JUROR 50:**  I can do it.  I'm a -- I'm a

20  scientist.  I like data.  I like facts.  And so I think when it

21  comes -- when it comes down to it, I can be impartial based on

22  the facts and the data that is presented at the time.

23         **MR. SPIRO:**  Thank you very much.

24         **THE COURT:**  Mr. Alexander, anything?

25         **MR. ALEXANDER:**  Nothing, Your Honor.

1          THE COURT:  All right.  Thank you.  Please stick

2     around.

3          PROSPECTIVE JUROR 50:  Thanks.

4          THE COURT:  Thank you.

5                    (Pause in proceedings.)

6          THE COURT:  Good afternoon.  How are you?

7          PROSPECTIVE JUROR 51:  Good.  How are you?

8          THE COURT:  I'm great.  So you are an RN?

9          PROSPECTIVE JUROR 51:  Yes.

10          THE COURT:  And how long have you been doing that?

11          PROSPECTIVE JUROR 51:  About six months.

12          THE COURT:  And what were you doing before that?

13          PROSPECTIVE JUROR 51:  Working as a medical assistant

14     and admin in a hospital.

15          THE COURT:  And so you are at Kaiser, what location?

16          PROSPECTIVE JUROR 51:  Redwood City.

17          THE COURT:  Are you enjoying it so far?

18          PROSPECTIVE JUROR 51:  It has good days and bad days.

19          THE COURT:  That's life.  The -- the reason that I

20     wanted to ask you separately about things was that you had --

21     you expressed strong feelings about Mr. Musk and -- as a

22     privileged male and that you were biased against him.  You've

23     heard me say he is not involved in the case.

24          Will you -- would your feelings about Mr. Musk impact your

25     ability to treat Tesla fairly and impartially in the case?

 1        **PROSPECTIVE JUROR 51:**  After you explained that he is

 2   not involved, I don't think it will.

 3        **THE COURT:**  Okay.  You also indicated that you think

 4   Tesla is overly hyped, and given the "overhypeness" and your

 5   view of Mr. Musk, is there anything about that that is going to

 6   let Mr. Diaz start just a little bit ahead in the case, or will

 7   you be -- will both of them -- can you treat them equally and

 8   fairly and be -- let your determination be made from your

 9   evaluation of the evidence?

10        **PROSPECTIVE JUROR 51:**  I think I could try my best.

11   The only thing with, like, in my personal experience and, you

12   know, being a person of color and discrimination, I have seen

13   it in my own life and then also working in, like, the hospital

14   setting, so I'm not sure if I would be able to be, like,

15   truthfully honest where the cases are both fair on both parts.

16        **THE COURT:**  Right.  That -- I wondered about that,

17   whether your experience with discrimination and what you've

18   seen in your life would make you just at the beginning more

19   sympathetic to Mr. Diaz and maybe more likely to believe his

20   testimony about what happened than other people.

21        **PROSPECTIVE JUROR 51:**  Yes, I agree.

22        **THE COURT:**  Okay.  So -- so do you think in light of

23   that that you could not be a fair and impartial juror in this

24   case?

25        **PROSPECTIVE JUROR 51:**  I would try my best, but

1  honestly, I don't think -- yeah, I don't think I would be fair

2  and impartial, unfortunately.

3      **THE COURT:**  Okay.  Mr. Alexander, do you have any

4  questions?

5      **MR. ALEXANDER:**  Yes, please.

6      Have you ever had experiences where people pretended that

7  they were discriminated against but they were not?

8      **PROSPECTIVE JUROR 51:**  I'm trying to think.  Possibly.

9      **MR. ALEXANDER:**  And have you heard of people playing

10  the race card when it's not -- when it isn't appropriate, when

11  it's not truthful?

12      **PROSPECTIVE JUROR 51:**  Yes.

13      **MR. ALEXANDER:**  So you understand that just because

14  people claim discrimination doesn't necessarily mean it occurs?

15      **PROSPECTIVE JUROR 51:**  Yes, I understand.

16      **MR. ALEXANDER:**  And even though you may have

17  experienced discrimination, you don't automatically think that

18  someone else was discriminated against; is that correct?

19      **PROSPECTIVE JUROR 51:**  Yes.

20      **MR. ALEXANDER:**  And so in your mind, do you think you

21  can separate your experiences in terms of discrimination from

22  what you might hear in this case?

23      **PROSPECTIVE JUROR 51:**  I'm not sure.

24      **MR. ALEXANDER:**  Okay.  Well, in terms of being not

25  sure, we can only ask that you do your best.  The Court's going

1    to give an instruction as to what your duties would be as a

2    juror, and based on those instructions, would you be able to

3    give your best effort to be fair and impartial to both sides

4    regardless of your previous experience?

5            PROSPECTIVE JUROR 51:  Yes.

6        MR. ALEXANDER:  And so in that sense, could you take

7    and isolate the fact that you have experienced discrimination

8    in your own life, can you take and isolate that from the facts

9    in this case in terms of making a determination and following

10   the judge's instructions?

11           PROSPECTIVE JUROR 51:  Yes.

12       MR. ALEXANDER:  Now, let me ask you this.  In this

13   case, liability's already been determined, so you will only be

14   making a determination, if you're picked as a juror, as to the

15   amount of damages, not whether damages should be determined.

16       Would that also help you be fair and impartial in this

17   case, the fact that you wouldn't have to determine whether

18   there's discrimination, you're just determining how much money

19   for harm, how much money for punitive damages?  Can you do

20   that?

21           PROSPECTIVE JUROR 51:  Yes.

22           MR. ALEXANDER:  Nothing further, Your Honor.

23           THE COURT:  Mr. Spiro?

24           MR. SPIRO:  One of the arguments -- and thank you for

25   being so honest with your answers.  One of the arguments that

1   you're going to be getting is that because discrimination is so

2   rampant, because this company has such a problem, that there

3   should be more punishment, there should be a higher dollar

4   value; right?  So it's not really quite as it's framed as it's

5   already been determined.  They're going to say to you, but,

6   look, it's such a problem in the world.  Don't you feel it,

7   don't you see it; right?

8       And so given what you said originally, you know, it's not

9   as if damages is just completely wedded to, like, the medical

10  bill, so I just want to make sure that's clear.

11      So given that, don't some of your concerns that you

12  answered to the judge honestly still remained?

13          **PROSPECTIVE JUROR 51:**  I'm sorry.  Can you repeat

14  that?  I'm having trouble understanding.

15          **MR. SPIRO:**  Sure.  So you were asked, you know, this

16  is just about damages, does that make it easier for you.  And

17  part of the damage argument they're going to be making to you

18  is that the world is a racist place and that this is racist

19  company and that there's problems bigger than just the isolated

20  incident.

21      So what I'm asking you is:  Don't you think that given,

22  you know, your honest answers to the judge earlier that that

23  would play a part in your mind and in your decision?

24          **PROSPECTIVE JUROR 51:**  I mean it could, but I would

25  try my best to like, you know, stick with the facts and the

 1   rules of law.

 2          **MR. SPIRO:**  Okay.  And that's -- but that's the only

 3   issue -- you obviously will try your best.  But your

 4   statements, even though you know that now the damages portion

 5   is what -- the judge has told you that earlier -- is what

 6   you're going to be focused on, you still stand by your

 7   statements earlier to the Court about some concerns that you

 8   have?

 9          **PROSPECTIVE JUROR 51:**  Yes.

10          **MR. SPIRO:**  All right.  Nothing further.

11          **THE COURT:**  All right.  Thank you.  Stick around.

12      That was 51.  This is 53.

13                    (Pause in proceedings.)

14          **PROSPECTIVE JUROR 53:**  Hello.

15          **THE COURT:**  Good afternoon.  How are you?

16          **PROSPECTIVE JUROR 53:**  Very good.

17          **THE COURT:**  And so you're a physician.  What's your

18   speciality?

19          **PROSPECTIVE JUROR 53:**  Internal medicine.

20          **THE COURT:**  And how long have you been at Kaiser doing

21   general medicine?

22          **PROSPECTIVE JUROR 53:**  Since 2010.

23          **THE COURT:**  And which location are you at?

24          **PROSPECTIVE JUROR 53:**  Walnut Creek.

25          **THE COURT:**  Great.  So the -- you had indicated with

1    regard to Tesla that it picked up the behaviors of other

2    corporations and put profit before other goals.

3         And I'm wondering whether that means that you would have a

4    hard time treating them equally with Mr. Diaz, which is --

5    would be your obligation as a juror?

6         **PROSPECTIVE JUROR 53:**  Well, I think what I said was a

7    normal behavior of any corporation, so I think this case would

8    be different because it's -- it has nothing to do with profits,

9    probably.

10        **THE COURT:**  Okay.

11        **PROSPECTIVE JUROR 53:**  That's what I believe.

12        **THE COURT:**  I read it that way, too.  But I wondered

13   whether if it was any corporation who was being sued by an

14   individual, whether you would have -- whether you would start

15   when you listen to the evidence slightly favoring the

16   individual because corporations are just focused on profit?

17        **PROSPECTIVE JUROR 53:**  Well, it's hard to say.  I

18   think -- I have to know what the evidence is, what the case was

19   all about and -- but -- yeah, that's all I have to say.

20        **THE COURT:**  Okay.  Well -- and I'm going to instruct

21   you that you have to treat Tesla equally and fairly, the same

22   way you treat Mr. Diaz.  Would you be able to do that?

23        **PROSPECTIVE JUROR 53:**  I think I can, yes.

24        **THE COURT:**  And is there -- are you aware of any --

25   anything that makes you -- let me ask it again.  Do you think

 1   you could serve as a fair and impartial juror in this case?

 2          **PROSPECTIVE JUROR 53:**  Can you repeat the question?

 3          **THE COURT:**  Do you think you could be fair and

 4   impartial as a juror?

 5          **PROSPECTIVE JUROR 53:**  I think I can, yes.

 6          **THE COURT:**  Okay.  All right.

 7       Mr. Spiro, any --

 8          **MR. SPIRO:**  Just one quick follow-up question.  Thank

 9   you, Doctor.

10       One of the questions -- the main question you're going to

11   be asked to decide is damages and part of what they're going to

12   be arguing is that the corporation needs to pay a lot of

13   damages to be punished so that they learn.

14          **PROSPECTIVE JUROR 53:**  Right.

15          **MR. SPIRO:**  Right.  So it seems that you have a strong

16   opinion on a related subject, right, which is that corporations

17   put profits over people essentially, right, if I understood

18   your answer correctly?

19          **PROSPECTIVE JUROR 53:**  That's my personal

20   understanding.  I think when Tesla started 10, 15 years ago

21   everybody talked that they're -- they're doing a revolution in

22   the -- in a green industry.  But I think recently things that

23   I've heard just proved to me, at least, otherwise; that the

24   behavior is actually pretty much the same, which definitely

25   surprised me, actually.

1              **MR. SPIRO:**  Right.  But I hear your answering mean

2   specifically that you would have -- that the behavior you see

3   at Tesla is the same.  You're talking about Tesla specifically?

4              **PROSPECTIVE JUROR 53:**  Right.

5              **MR. SPIRO:**  So if you come in with that view, right,

6   doesn't that make you inherently more susceptible to the

7   arguments?  You don't come in totally even; right, Doctor?  You

8   come in slightly leaning in the other direction because you

9   have this preformed view; does that --

10             **PROSPECTIVE JUROR 53:**  In my affect, I'm not sure.  I

11  think maybe I'm in the middle of that, but it may affect.  I'm

12  not able to say that 100 percent, yeah.

13             **MR. SPIRO:**  Okay.  Thank you.

14             **THE COURT:**  All right.  Mr. Alexander, anything?

15             **MR. ALEXANDER:**  Nothing, Your Honor.

16             **THE COURT:**  All right.  Thank you.  Stick around we'll

17  be back with everybody in a moment.

18                     (Pause in proceedings.)

19             **THE COURT:**  Good afternoon.  And I don't think you're

20  the person I was expecting.  What Juror Number are you?

21             **PROSPECTIVE JUROR 55:**  55.

22             **THE COURT:**  55.  Okay.

23       And, Ms. Davis, let's get 54 next, but let's talk with

24  Juror 55 now.  Welcome.

25             **PROSPECTIVE JUROR 55:**  Thank you.

1        THE COURT:  And -- so tell me, you're retired.  What

2   are you doing?

3        PROSPECTIVE JUROR 55:  Just having fun.  Puzzling,

4   Wordle-ing.  My husband and I go up to Napa.  We have a place

5   up there as well, so we go back and forth between the two.

6   Waiting for our third daughter to graduate from college and not

7   doing as much as we had hoped to be doing in retirement.  We

8   had planned a lot of travel, but we haven't really -- we've

9   done two trips.  They were both in the last six months.  We're

10  still very, very conservative.  We've been inside a restaurant

11  twice, but -- we're COVID virgins.

12                         (Laughter)

13       PROSPECTIVE JUROR 55:  Just cautious.

14       THE COURT:  Yeah.  Everybody's got a different take,

15  you know, and I support whatever people are feeling because

16  it's just a difficult time.

17       PROSPECTIVE JUROR 55:  It is.  It's nice to finally

18  actually feel better about getting out.

19       THE COURT:  Well, I'm glad you are here.  You were

20  doing technology product management.  What was that like?

21       PROSPECTIVE JUROR 55:  Yeah.  I worked in tech almost

22  my whole career, and I was actually doing project management,

23  and then I also led some development groups.

24     I did -- I started at Visa with network architecture and

25  strategy, so I got to do a lot of different things over my

1   career, sometimes individual contributor, and then I had a team

2   of as many of 150 employees, I think, at one point.

3          THE COURT:  Do you miss it?

4          PROSPECTIVE JUROR 55:  I miss the camaraderie.  I miss

5   the people.  I do miss the social aspects of it.

6          THE COURT:  So you -- you wrote a fair amount about

7   Mr. Musk and -- which is why I wanted to ask you questions

8   about him.  And it's a -- you have something of a balanced --

9   but some positive and some very negative --

10         PROSPECTIVE JUROR 55:  Yeah.

11         THE COURT:  -- perspectives.

12     You've heard that he's not -- he's not going to be a

13   witness here.  He's not involved in this.

14     Is there -- do you think that your view of him would

15   impact your --

16         PROSPECTIVE JUROR 55:  No.

17         THE COURT:  -- view of Tesla or the evidence in this

18   case?

19         PROSPECTIVE JUROR 55:  No, I don't think that view --

20   plus a lot of it's based on hearsay; right?

21         THE COURT:  Okay.  And is there anything -- do you

22   think you would be able to serve as a fair and impartial juror

23   in this case?

24         PROSPECTIVE JUROR 55:  Yes.

25         THE COURT:  Mr. Spiro?

1          **MR. SPIRO:**  No questions.  Thank you very much.

2          **THE COURT:**  Mr. Alexander?

3          **MR. ALEXANDER:**  No questions.

4          **THE COURT:**  Thank you.

5          **PROSPECTIVE JUROR 55:**  Okay.

6          **THE COURT:**  Don't go far.

7                    (Pause in proceedings.)

8          **THE COURT:**  Let's go to 54.

9                    (Pause in proceedings.)

10         **THE COURT:**  Good afternoon.

11         **PROSPECTIVE JUROR 54:**  Good afternoon.

12         **THE COURT:**  How are you today.

13         **PROSPECTIVE JUROR 54:**  It's a beautiful day, yes, it

14    is.

15         **THE COURT:**  It is a beautiful day.

16      And so, are you still employed?

17         **PROSPECTIVE JUROR 54:**  Yes.

18         **THE COURT:**  And how long -- and you're a psychiatrist.

19    How long have you been doing that?

20         **PROSPECTIVE JUROR 54:**  I started working as a

21    psychiatrist back in 1996.

22         **THE COURT:**  So, one of the things that you wrote in

23    your questionnaire was that you can assess guilt or innocence

24    by looking at somebody's face?

25         **PROSPECTIVE JUROR 54:**  Yeah.  It's not that I have

1    special powers, but it's the expectation in our work.  For

2    example, disability evaluations, some people they have to deal

3    with the truth or lying, and part of the psychiatric evaluation

4    is to decide, make recommendations about that.

5            THE COURT:  So -- so I'm going to instruct you in this

6    case that that's not the way to judge credibility in court,

7    that what you have to do is you have to listen to -- to all of

8    the evidence, think about it, deliberate about it with other

9    people in order to form a judgment, which is a very -- it's a

10   very different process than the one that you are -- that you

11   are using.

12       Would you be able to -- to follow those instructions and

13   then deliberate with your fellow jurors when they were

14   following my instructions?

15           PROSPECTIVE JUROR 54:  I can try.

16           THE COURT:  Okay.  Well, the -- some -- there are some

17   things where when people say they can try and it's a -- it's a

18   cinch that they're going to be able to do their best.  You've

19   been professionally doing this since -- you know, for 25 -- 27,

20   28 years.  And I'm just wondering whether, in fact, you would

21   be able to -- to -- to follow those instructions with respect

22   to credibility?

23           PROSPECTIVE JUROR 54:  I will do my best to follow

24   instructions.

25           THE COURT:  All right.  The -- you've also apparently

1    had many patients who worked at Tesla?

2         **PROSPECTIVE JUROR 54:**  Yes.

3         **THE COURT:**  And I don't want to inquire into their

4    views because I don't want to get involved with doctor/patient

5    information, but this case involves one person, one employee,

6    and his experiences at Tesla.

7         Would you be able to put out of your mind all of the other

8    information that you have learned over time about working at

9    Tesla and solely judge Mr. Diaz's experience from what you

10   learned here in court on the witness stand?

11        **PROSPECTIVE JUROR 54:**  I will put all my effort.

12        **THE COURT:**  Okay.  Do you think that -- given what you

13   know, that when the case starts, one side or the other would

14   have an un- -- would have an advantage, just given the depth of

15   your experience, that either Tesla would have a slight

16   advantage or Mr. Diaz would have a slight advantage?

17        **PROSPECTIVE JUROR 54:**  I know nothing about this case,

18   so I don't know how to answer that question.  I'm -- I have to

19   say, however, that not only my training but all these years, my

20   commitment has been to be an advocate for patients and their

21   rights.  So I don't know if this is helping to answer this

22   question.

23        **THE COURT:**  So, as an advocate for individuals, the --

24   the individual here is Mr. Diaz.  The company is entitled to be

25   treated just the same way as Mr. Diaz.  They have to start at

 1   the same level.  They are treated equally and justly.

 2       Do you think you'd be able to do that?

 3           **PROSPECTIVE JUROR 54:**  I will try my best with all my

 4   effort.

 5           **THE COURT:**  Okay.  I believe you.

 6       You have -- you indicated that you've been both

 7   discriminated against and had claims of discrimination made

 8   against you.

 9           **PROSPECTIVE JUROR 54:**  Oh, yes.

10           **THE COURT:**  And so this issue involves discrimination.

11       Is there anything about your experiences that would make

12   you more likely to believe Mr. Diaz or believe Tesla, given

13   those experiences?

14           **PROSPECTIVE JUROR 54:**  I'm not sure how to answer that

15   question.  I would love to give an absolute answer.  I would

16   love to be the person to say I'm completely free of a bias, but

17   the truth is that this is my background.

18           **THE COURT:**  Okay.  All right.

19       Mr. Spiro, any questions?

20           **MR. SPIRO:**  Yeah.  I mean just one follow-up.  And

21   thank you for what you do and thank you for being so honest.

22       Given that you're advocating for folks that work at Tesla

23   or worked at Tesla in the capacity you decided, do you sort of

24   think after hearing all of these questions that this may not be

25   the right case for you?  That you might be able to be fairer in

 1  another case, but given your background, given the questions

 2  you're here answering, given your experience advocating for

 3  Tesla employees in that context, that this is probably not the

 4  right case?

 5          **PROSPECTIVE JUROR 54:**  I feel so, yeah.

 6          **MR. SPIRO:**  No further questions.

 7          **THE COURT:**  All right.  Mr. Alexander?

 8          **MR. ALEXANDER:**  You understand that as a juror, you

 9  would not be an advocate?

10          **PROSPECTIVE JUROR 54:**  Yes.

11          **MR. ALEXANDER:**  Yes.  And so could you separate what

12  you do for a living from your role as a juror and listen to the

13  facts to determine what actions to take?

14          **PROSPECTIVE JUROR 54:**  I -- I want to say yes.

15          **MR. ALEXANDER:**  Okay.  And so I understand that you

16  have treated patients that have been at Tesla.

17      Can you -- just because those patients had issues, you

18  know that there are -- you understand there are a number of

19  other employees that work at Tesla that you haven't seen that

20  likely had no issues; right?

21          **PROSPECTIVE JUROR 54:**  Yes.

22          **MR. ALEXANDER:**  So just because you treated patients

23  that had issues doesn't mean that everybody at Tesla had

24  issues; do you understand that?

25          **PROSPECTIVE JUROR 54:**  Yes.

 1          MR. ALEXANDER:  So could you isolate your experience

 2   with those limited patients and put that aside and just listen

 3   to the facts in this case to make a determination about these

 4   facts?

 5          PROSPECTIVE JUROR 54:  I will try my best.

 6          MR. ALEXANDER:  When you say you'll try your best,

 7   that means that you would listen to the Court's instructions

 8   and based on those instructions you would make a determination;

 9   is that correct?

10          PROSPECTIVE JUROR 54:  Yes.

11          MR. ALEXANDER:  All right.  Nothing further.

12          THE COURT:  All right.  Thank you.  Please wait

13   outside.

14       Number 57 now, I think.

15                    (Pause in proceedings.)

16          THE COURT:  Good afternoon.

17          PROSPECTIVE JUROR 57:  Good afternoon, Your Honor.

18          THE COURT:  So, you are a scientist.  Tell me -- tell

19   me what you do.

20          PROSPECTIVE JUROR 57:  I'm an imaging scientist, so I

21   specialize in the analysis of images of typically biological

22   samples, and I've worked for a small software company that

23   develops a software for that purpose.  We work together with

24   academic institutions and companies.

25          THE COURT:  And how long have you been doing that?

1          **PROSPECTIVE JUROR 57:**  Over 30 years overall.

2        **THE COURT:**  You must like it.

3          **PROSPECTIVE JUROR 57:**  Yes.  Yeah.  It's great work.

4        **THE COURT:**  You -- you indicated with respect to

5    Mr. Musk that you had strong feelings because while you --

6    you're sure he's brilliant; his contributions to the public

7    discourse are not so much.

8          **PROSPECTIVE JUROR 57:**  Right.  You explained very

9    clearly this morning that that's not relevant to this case, and

10   so I can set that aside.

11       **THE COURT:**  Well, you anticipated what I was going to

12   ask.

13       Is there any reason that you could not serve as a fair and

14   impartial juror?

15         **PROSPECTIVE JUROR 57:**  No, I don't think so.  The only

16   other thing, I mentioned this in the questionnaire, is I have

17   become a citizen only about two years ago, and so my exposure

18   to the jury-based judicial system is still fairly foreign.

19       **THE COURT:**  Well, so it would be such a great

20   experience.

21                         (Laughter)

22       **THE COURT:**  Because this is -- it's one of your

23   fundamental rights as a citizen and -- to -- to have a jury of

24   your peers deal with cases that involve you, and our great and

25   diverse country has all sorts of people who add value to the

 1  way that deliberative bodies can think together and come to a

 2  fair result.

 3       So I think it would be wonderful if you had that

 4  opportunity, and I'm sure you would be superb.

 5            **PROSPECTIVE JUROR 57:**  Thank you.

 6            **THE COURT:**  All right.  Mr. Spiro, any questions?

 7            **MR. SPIRO:**  No.  Thank you, sir.

 8            **THE COURT:**  Mr. Alexander?

 9            **MR. ALEXANDER:**  None.

10            **THE COURT:**  All right.  Thank you very much.  We'll be

11  coming back here in just a second.  We've got one more person,

12  which is Juror 58.

13                      (Pause in proceedings.)

14            **THE COURT:**  Then I'm going to bring everybody back in.

15  I have a few more questions for the group, and then I'm going

16  to turn it over to the lawyers for about 10 minutes each.

17            **MR. SPIRO:**  Thank you, Your Honor.

18                      (Pause in proceedings.)

19            **THE COURT:**  Please step up to the mic.

20            **PROSPECTIVE JUROR 58:**  Afternoon.

21            **THE COURT:**  Good afternoon.  So, how long -- is it

22  California Yes In My Backyard?

23            **PROSPECTIVE JUROR 58:**  Yes, that's correct,

24  Your Honor.

25            **THE COURT:**  And how long have you been the policy

 1   director?

 2          **PROSPECTIVE JUROR 58:**  Almost a year.  I started last

 3   May.

 4          **THE COURT:**  And how is it going?

 5          **PROSPECTIVE JUROR 58:**  It's going very well.  We still

 6   have a housing crisis, but we're working on it.

 7          **THE COURT:**  Well, I hope you are able to solve that

 8   soon.

 9          **PROSPECTIVE JUROR 58:**  Thank you.

10          **THE COURT:**  The -- you have indicated some pretty

11   strong views about both Mr. Musk and Tesla.  So I wanted to ask

12   you about that.

13      I'll start with Mr. Musk.  He is not in the case, as I

14   explained earlier.  He is not involved in any of the

15   proceedings.

16      Would your dislike for him bleed over into your

17   perspective on Tesla so that when the case started, you would

18   be in favor in some small or not small way to Mr. Diaz?

19          **PROSPECTIVE JUROR 58:**  Well, obviously if I were

20   selected for the jury, I would try to the best of my ability to

21   separate my feelings from Mr. Musk from the case itself.

22      Having said that, I do think it would be -- it would be

23   difficult for me.

24          **THE COURT:**  Okay.  You also -- you don't like Tesla as

25   a company?

 1          **PROSPECTIVE JUROR 58:**  That's correct.  I should also

 2   note, Your Honor, that I -- I didn't raise my hand when you

 3   asked if anyone had heard of the case before this, but I do

 4   actually think I had read news reports before the initial

 5   finding.

 6          **THE COURT:**  Okay.  And you also read Mr. Spiro's name,

 7   I guess, somewhere.  Is that true?

 8          **PROSPECTIVE JUROR 58:**  Yes.

 9          **THE COURT:**  So as you -- as you stand here now, you

10   don't think you would be able to be a fair and impartial juror?

11          **PROSPECTIVE JUROR 58:**  Like I said, I would try my

12   best.  But I mean, given my prior awareness of the case and my

13   feelings about Tesla and Mr. Musk, I do think it would be -- it

14   would be difficult for me to be totally impartial.

15          **THE COURT:**  Well, my suspicion is we don't get down to

16   you anyway.

17      But Mr. Alexander, do you have any questions?

18          **MR. ALEXANDER:**  No, Your Honor.

19          **THE COURT:**  Mr. Spiro?

20          **MR. SPIRO:**  No, Your Honor.  Thank you.

21          **THE COURT:**  Okay.  So thank you.  I'm not going to

22   release you now, but my suspicion is that soon enough you will

23   be.

24      Ms. Davis, if you can call everybody back in, I think

25   we'll just roll right into the next phase.

```
 1              (Pause in proceedings.)

 2      (Proceedings were heard in the presence of the prospective

 3   jury panel.)

 4          THE COURT:  Ms. Davis, you may want to prop that door

 5   open again just for --

 6              (Pause in proceedings.)

 7          THE COURT:  General Services Administration has not

 8   been our friend today.

 9              (Pause in proceedings.)

10          THE COURT:  Please be seated, everybody.

11          THE CLERK:  Please let me know if you notice your

12   neighbors are not here and they weren't excused in the first

13   session.

14                  (No response.)

15          THE COURT:  All right.  Ladies and gentlemen, I was

16   only an hour and 20 minutes off on my --

17                  (Laughter)

18          THE COURT:  -- estimate for how long that section of

19   this is -- was going to take, and I apologize for waiting.  I

20   can promise you, you would have felt better being out wherever

21   you were doing whatever you were doing than waiting inside here

22   that whole time.

23      I'm going to -- what's going to happen now, I have a few

24   more questions that I want to lay out for the group, then the

25   lawyers will have about 10 minutes of questioning each, and
```

1   then we'll actually get -- we will take another short break

2   that I can time and then we will get on with the actual

3   selection itself.

4        So has -- is anyone having any trouble understanding me

5   today?

6                       (No response.)

7        THE COURT:  Is everyone prepared to follow my

8   instructions on the law and the matters that have already been

9   determined in the first phase of the case?  Will you all do

10  that?

11       JURY PANEL:  Yes.

12       THE COURT:  Jurors may not express or form any

13  opinions on the merits of the case until the end of the trial

14  when it's been finally submitted to them for a verdict, that is

15  to say, until they have had the benefit of the arguments of

16  counsel and the instructions of the Court.

17       If you are selected to sit on this case, will you be able

18  to -- and willing to render a verdict based solely on the

19  evidence presented at trial and on my instructions regarding

20  the matters established already and the law and to disregard

21  any ideas, notions, or beliefs about the law that you may have

22  encountered other than my instructions in reaching your

23  verdict?

24       JURY PANEL:  Yes.

25       THE COURT:  It is a long question.  We've heard from

1   you specifically about concerns that you might have had.  Is

2   there any other concern that anybody would have about this?

3                       (No response.)

4        **THE COURT:**  None.  Okay.

5        One of the instructions that I'm going to give you is not

6   to discuss the case with anybody until your jury service has

7   been concluded.

8        Does anyone have any trouble with keeping matters

9   confidential?

10                      (No response.)

11       **THE COURT:**  The case likely will be given to you on

12  March -- on Friday, March 31.  And then you will deliberate.

13  You will take as long as you need to make a decision, and you

14  can decide then how late to deliberate once you get the case.

15  You will not be deliberating on the weekend.

16       I recognize that service on the jury is inconvenient, but

17  as I said before, our system of justice depends on everyone's

18  willingness to serve.

19       Some of you have explained reasons why this case is not

20  the right one for you.  Does anybody have -- have any special

21  disability or problem that makes serving as a member of the

22  jury difficult or impossible that you haven't told me about?

23                      (No response.)

24       **THE COURT:**  Does anyone suffer from any mental,

25  physical, or emotional impairment that would make it difficult

```
 1   for you to sit on the jury besides anything that you've told me
 2   about?

 3                       (No response.)

 4        THE COURT:  Besides anything that you've told me
 5   about, if you were one of the parties in this case, do you know
 6   of any other reason why you wouldn't be content to have this
 7   case tried by someone with your frame of mind?

 8                       (No response.)

 9        THE COURT:  So any bias that you haven't expressed,
10   one way or another.

11                       (No response.)

12        THE COURT:  Can anyone think of any other matter that
13   may have some bearing on your qualifications as a juror?

14                       (No response.)

15        THE COURT:  All right.  Mr. Alexander, do you have any
16   questions for the panel?

17        MR. ALEXANDER:  Thank you, Your Honor.

18        Good afternoon.  Because there are so many of you, I'm
19   going to be asking questions to the group to begin with.

20        So, first, by a show of hands -- and if you can keep your
21   hands up and then I will get the number from you -- how many of
22   you have ever worked in a workplace where it was common for
23   workers to make daily comments or jokes that people might find
24   racist or offensive or inappropriate without anyone openly
25   being offended or expressing that they were upset?  Anyone?
```

**JURY VOIR DIRE**

```
1        And what is your Juror Number?

2             PROSPECTIVE JUROR 5:  I'm sorry.  5.

3             MR. ALEXANDER:  What is your number, sir?

4             PROSPECTIVE JUROR 25:  25.

5             MR. ALEXANDER:  25.

6        And, ma'am?

7             PROSPECTIVE JUROR 16:  16.

8             MR. ALEXANDER:  16.  Thank you.

9        In the back I saw some hands.

10            PROSPECTIVE JUROR 44:  44.

11            MR. ALEXANDER:  44, thank you.  And Number --

12            PROSPECTIVE JUROR 4:  4.

13            MR. ALEXANDER:  Number 4.

14       Anyone that I have missed?

15       Could you repeat the question.

16            MR. ALEXANDER:  In the green shirt, can you tell me

17   what number you are?  What is your number?

18            PROSPECTIVE JUROR 41:  41.

19            MR. ALEXANDER:  I will come back to you.  And, ma'am,

20   in the --

21            PROSPECTIVE JUROR 23:  23.

22            THE COURT:  Mr. Alexander, also on the right.  Look to

23   the right.

24            MR. ALEXANDER:  I'm sorry.  Can you tell me your

25   number?
```

**JURY VOIR DIRE**

1        **PROSPECTIVE JUROR 51:**  51.

2      **MR. ALEXANDER:**  51.  And --

3        **PROSPECTIVE JUROR 50:**  50.

4      **MR. ALEXANDER:**  Thank you.  And now to repeat the

5   question, it is:  How many of you have ever worked in a

6   workplace where it was common for workers to make daily

7   comments or jokes that some people might find racist,

8   offensive, or inappropriate without anyone openly expressing

9   offense or being upset?

10      All right.  Thank you.  And Number 13.  Thank you.

11        **PROSPECTIVE JUROR 13:**  With reconsideration, yes.

12      **MR. ALEXANDER:**  Thank you.

13      Next, by show of hands, so in a civil lawsuit like this,

14   monetary compensation is the only thing that a victim of racial

15   harassment is allowed to ask for.

16      Being totally honest, do you have any objections or

17   disagreement with these kinds of lawsuits or money compensation

18   for nonfinancial or emotional stress harm like trauma,

19   humiliation, suffering from racism?  By a show of hands, who

20   has an objection to awarding damages for that type of harm?

21   Anyone?

22                    (No response.)

23      **MR. ALEXANDER:**  Thank you.

24      And now this will require individual responses.

25      Let's say that a company does a good job creating zero

 1    tolerance rules for harassment in the workplace.

 2        What are your feelings about whether or not the company

 3    has done enough at that point or whether a company should

 4    monitor and police the workplace to make sure those rules are

 5    actually being followed and enforced?  I want to ask that

 6    question of a few people starting with Juror Number 3.

 7              **THE COURT:**  If you wouldn't mind stepping to the mic.

 8                    (Pause in proceedings.)

 9              **PROSPECTIVE JUROR 3:**  Could you please elaborate what

10    you mean by "monitor"?

11              **MR. ALEXANDER:**  So what's --

12              **PROSPECTIVE JUROR 3:**  The second part of the question.

13              **MR. ALEXANDER:**  So once a company puts rules, policies

14    in place --

15              **PROSPECTIVE JUROR 3:**  Right.

16              **MR. ALEXANDER:**  -- does the company have an obligation

17    to follow up to make sure those rules are being followed, or is

18    it enough just to put the policy on the books?

19              **PROSPECTIVE JUROR 3:**  They need to have an obligation

20    to make sure THAT rules are followed.

21              **MR. ALEXANDER:**  Thank you.  That is my only question

22    of you.  Thank you very much.

23        Juror Number 11, same question for you.

24                    (Pause in proceedings.)

25              **PROSPECTIVE JUROR 11:**  My thoughts on it is as long as

1   the company is able to put in a policy, some sort of kind of

2   structure for the workers, I would like to think that the group

3   would follow that.  But if necessary, if we need a little bit

4   of discipline, again, I think it is a little necessary,

5   depending on the company, that they should imply some sort of

6   I guess you could say authority of some sort just to make sure

7   that we're all on the same page.

8           MR. ALEXANDER:  Excellent.  Thank you very much.

9       Juror Number 13.

10                      (Pause in proceedings.)

11          PROSPECTIVE JUROR 13:

12          MR. ALEXANDER:  If you could answer that question.

13          PROSPECTIVE JUROR 13:  Yes, sir.  I think it is

14   absolutely necessary.  I have worked for the Dow Chemical

15   Company, Department of Labor, Department of Defense.  We always

16   had great rules in place and people to follow up and monitor

17   them.

18                      (Pause in proceedings.)

19          MR. ALEXANDER:  Thank you very much.

20       Number 16.

21          PROSPECTIVE JUROR 16:  So I believe the company, if

22   it's putting that policy on -- and it should be, of course --

23   they should take care of cases if it's not happening the proper

24   way.

25          MR. ALEXANDER:  So you think that they should follow

1    up?

2          **PROSPECTIVE JUROR 16:**  They should follow up, yeah.

3          **MR. ALEXANDER:**  Okay.  Thank you very much.

4       Number 17.

5          **PROSPECTIVE JUROR 17:**  I believe if a company puts

6    a -- something in place, they should follow through and make

7    sure that it is being actually monitored.

8          **MR. ALEXANDER:**  Thank you.

9       Number 18?

10         **PROSPECTIVE JUROR 18:**  I also think a follow-up is

11   required.  Otherwise, I don't know how else you would know that

12   it actually worked.

13         **MR. ALEXANDER:**  Thank you.

14      Number 20.

15         **PROSPECTIVE JUROR 20:**  In my opinion, a company is

16   accountable for not only list, but also to implement those

17   policies to make sure those are implemented correctly.

18         **MR. ALEXANDER:**  Thank you.

19      Number 22.

20         **PROSPECTIVE JUROR 22:**  Yes, I think they should follow

21   up on their policies.

22         **MR. ALEXANDER:**  Thank you.

23      Number 25.

24         **PROSPECTIVE JUROR 25:**  Yeah, a company should follow

25   up on any violations.

**JURY VOIR DIRE**

```
1          MR. ALEXANDER:  Great.  Thank you.

2      Number 28.

3          PROSPECTIVE JUROR 28:  I think a policy without

4  monitoring isn't very useful, so I would agree.

5          MR. ALEXANDER:  Thank you very much.

6      And Number 37.

7          PROSPECTIVE JUROR 37:  Yes, absolutely there should be

8  follow-up.

9          MR. ALEXANDER:  Thank you.

10      And now by a show of hands, forcing a company to pay money

11  is the only power a jury has over a company that violates the

12  rights of employees.

13      Since money is the only way a jury can hold a company

14  accountable and cause it to fix harm, the question I have is:

15  Are you open to the possibility of awarding millions of dollars

16  of damages against a company if you find that they have

17  violated policy?  By a show of hands, is there anyone who would

18  not be willing to award millions of dollars for damages under

19  circumstances where a large company has violated the law?

20                         (No response.)

21          MR. ALEXANDER:  Is there anyone who would not be

22  willing to do that?

23                         (No response.)

24          MR. ALEXANDER:  If I could -- thank you for -- thank

25  you for raising your hands.  Number 27 and --
```

```
 1              PROSPECTIVE JUROR 23:  23.

 2          MR. ALEXANDER:  -- Number 23.  Thank you.

 3      There was a hand here, Number 55.  Thank you.

 4      In this case the judge will give an instruction with

 5  regard to punitive damages.  We will be seeking punitive

 6  damages in this case against a billion-dollar company.

 7      So I just want to make sure.  Is there anyone here who

 8  would feel comfortable who would not be willing to award

 9  damages of a million dollars assuming we met our burden of

10  proof?  Anyone else?

11                      (No response.)

12          MR. ALEXANDER:  Thank you.

13          THE COURT:  You are at your last question,

14  Mr. Alexander.

15          MR. ALEXANDER:  This will be my last question.

16          THE COURT:  Yes.

17          MR. ALEXANDER:  Thank you.

18      Are you open to the possibility that the larger and

19  wealthier the company, the larger the punitive damages in order

20  to hold that company accountable for their bad behavior?  By a

21  show of hands is there anyone uncomfortable with that concept?

22  So the same people as before -- anyone --

23          PROSPECTIVE JUROR:  Can you repeat the question?

24          MR. ALEXANDER:  I can repeat the question.  Thank you.

25      Are you open to the possibility that the larger and the
```

1  wealthier the company, the larger the punitive damage award

2  must be in order to hold the company accountable and change the

3  company's behavior?

4      Of the people -- if you've already answered yes to that

5  question, then you don't have to raise your hand.  Is there

6  anyone else who would answer that question?

7      Number 57.  Thank you.

8                  (Pause in proceedings.)

9      MR. ALEXANDER:  Anyone else?

10     PROSPECTIVE JUROR:  Are you asking if we're -- or

11  opposing?

12     MR. ALEXANDER:  I will ask the question more clearly.

13  Thank you very much.

14     Under circumstances where a company is larger and

15  wealthier, would you be willing to award punitive damages

16  against that company because they are larger or wealthier?

17  That's essentially the question.  If you would not, please

18  raise your hands, if you would not be willing.

19     Number 37, I did not have you before.  Thank you.

20     Anyone else who would not be willing -- thank you.

21     PROSPECTIVE JUROR 49:

22     MR. ALEXANDER:  Number 49.

23     Have I missed -- 30?  And in the back in the green shirt,

24  I missed your -- 41.

25     I don't see any other hands.

 1          Thank you very much.

 2          **THE COURT:**  All right.  Thank you.

 3          And ladies and gentlemen, I'll just let you know that the

 4    instructions on punitive damages and what's appropriate and not

 5    appropriate will come from me, and you'll get those at the end

 6    of the case.

 7          Mr. Spiro.

 8          **MR. SPIRO:**  Thank you, Your Honor.

 9          And good afternoon.  Thanks to all of you for being here

10    and for your honesty thus far.  I know when you filled out your

11    juror forms, there's an attestation that says that you declare

12    under the penalty of perjury and it's got all that language in

13    it.

14          But what we're I'm looking for -- and I'm assuming

15    everyone's answers have been honest so far.  What I'm looking

16    for in addressing you now is just brutal and complete honesty.

17    What that means is, you know, being complete and transparent in

18    your answers, not holding anything back.  If I ask a question

19    that's like basically you know what the answer is, you don't

20    kind of hide behind word choice, you just tell me, you say,

21    "This is the time I need to tell you this."  There's no coming

22    back to this moment; right?  Once the jury gets selected and

23    that door closes, it will be too late to come back and say, you

24    know, I really should have told you something, I'm having this

25    feeling that may affect my ability to serve on this jury.

1      Okay.  So something happened in this case, the Court's

2  already told you that; right?  You're here to decide damages.

3  Something happened that shouldn't have happened, period.  No

4  question about it.

5      So the question I have for all of you is:  Once you learn

6  that, now that you know that, now that I'm telling you that, is

7  that the kind of thing because it's upsetting, emotional you

8  know it happened, that's going to cause you to not now be able

9  to evaluate this separate question, which is a question of

10  damages?

11      Is there anybody who thinks knowing yourselves better than

12  I know you that knowing that something wrong happened that that

13  is going to upset you to the point where you can't now separate

14  out the damages part of this?

15      If anybody thinks that, they need to raise their hand,

16  please.

17                  (No response.)

18      **MR. SPIRO:**  Okay.  Seeing no hands.  And that's even

19  harder in this case than in almost any other case because the

20  subject matter of this case is an upsetting one.  It just is.

21  Okay?  To probably everybody in this room.

22      So the question I have for all of you is:  When you hear

23  that something happened that should not have happened and it

24  happened on a very upsetting subject matter, is that the type

25  of thing knowing yourselves as well as you do that's going to

 1  upset you to the point where you can't sort of say, okay, that

 2  happened, that was wrong, it's very upsetting, I need to

 3  separate and I need to make a determination based on law and

 4  the rule of law?

 5       Does everybody understand what I'm asking?  Because it's a

 6  very -- it's a very hard question.

 7       So does anybody think that they're going to have a problem

 8  with that?

 9                       (No response.)

10          **MR. SPIRO:**  Juror Number 15?

11          **PROSPECTIVE JUROR 15:**  Yes.

12          **MR. SPIRO:**  Any issue with that?

13          **PROSPECTIVE JUROR 15:**  No.

14          **MR. SPIRO:**  I thought you looked like you might be

15  standing or raising your hand.

16       The other thing is that when you know something happened

17  that should not have happened, there's also a human tendency to

18  think everything else must have happened; right?

19       You know, Juror Number 11, Ms. Rose, you worked in

20  customer service at the Postal Service; right?  So if somebody

21  calls up and says the package is broken, it is, they send a

22  picture in, right, but they might -- you know, they might say

23  that there was a crystal vase inside of the package; right?

24  Just because the package is broken doesn't mean everything is

25  true.  Do you agree with that?

1          **PROSPECTIVE JUROR 11:**  At the end of the day --

2          **THE COURT:**  You'll need to go to the microphone.

3    Sorry.

4          **MR. SPIRO:**  I think she's going to tell me that it's

5    customer service so the vase is broken.  I don't know if --

6          **PROSPECTIVE JUROR 11:**  Again, we want to be respectful

7    of the customer's request, obviously, and we also want to be

8    mindful of the company as well.  So at the end of the day, if

9    there's a way to compromise -- again, it's what they said

10   because they're supporting the company and as long as we're

11   able to accommodate.  And if -- by any means, if we can't be

12   there for the repairs, at least we can compensate in another

13   way so that they have some sort of satisfaction.

14         **MR. SPIRO:**  And I appreciate that -- that answer.  And

15   I totally understand and get your role and the person's going

16   to be upset because, for sure, the package was damaged.

17         **PROSPECTIVE JUROR 11:**  Of course.

18         **MR. SPIRO:**  As long as I have you up here -- it seems

19   tough to keep having people run up to the microphone.  Another

20   question sort of relatedly for everybody -- and not to pick on

21   you, Ms. Rose -- but does anybody feel that they can't -- I

22   think you all know what I'm getting at.  You're going to know

23   something wrong happened by an upsetting topic.

24        Do you think you're the kind of person that's going to be

25   just inclined to believe that anything else happened; right?

1   If, you know, something happened on the playground once, it

2   must mean it's happening every day.  Does anybody here think

3   that's going to be an issue for them?

4        Because it's the same question back to you, which is if

5   the person had an issue with their mail carrier, right, and the

6   package was broken and they called up a week later and a week

7   later, I mean, would you assume that they're telling the truth

8   because you saw the picture the first time?

9        **PROSPECTIVE JUROR 11:**  Whether it's a client that is,

10  how do you say, like current, like brand-new, or has been with

11  us with the company, at the end of the day, we want to be able

12  to meet their needs.  And if it's their say, then we want to

13  accommodate -- or at least I would like accommodate.

14       **MR. SPIRO:**  So -- but the question more broadly to the

15  jury is -- the point I'm trying to get at -- and anybody who

16  that has something they might want to share on the topic,

17  please raise your hand.  Is that there's going to be

18  allegations here in this case; right -- liability's been found.

19  It's not for you to determine.  The question is whether other

20  events happened, right, and are you going to be the type of

21  person that says, "Well, if it happened once, it probably

22  happened every day."

23       Does anybody feel that once they hear that it happened

24  once, that they're going to assume or believe that it almost

25  certainly happened on another day?

```
 1                         (No response.)

 2          THE COURT:  You'll need to step to the microphone,

 3   please.  And if you'd give your juror number also, please.

 4          PROSPECTIVE JUROR 4:  Number 4.

 5      I think if something happened -- let's say something bad

 6   happened today, that's not necessarily going to happen again

 7   and again and again.  It's just one incident.

 8          MR. SPIRO:  Correct.  And it could -- in all fairness,

 9   it could have happened again, but it also could --

10          PROSPECTIVE JUROR 4:  We can't assume that.  If I'm

11   sick today, I'm not going to be sick for the rest of my life

12   and worry, oh, I'm going to be sick for the rest of my life.

13   Like that.

14          MR. SPIRO:  Okay.  Thank you very much.

15      Is there anybody that feels differently?  Is there anybody

16   who feels if it happened once, I'm just going to assume it

17   happened, or can you each look at each incident and each

18   allegation separately?

19      And seeing no hands -- when I see no hands, I'm taking you

20   all to be committing to me -- yes, please -- that you can do

21   that.

22          PROSPECTIVE JUROR 3:  So I think --

23          THE COURT:  What's --

24          PROSPECTIVE JUROR 3:  Juror Number 3, please.

25          THE COURT:  Thank you.
```

1        **PROSPECTIVE JUROR 3:**  Yes, I think your question if an

2   incident has happened, there's -- you don't need to assume

3   that, you know, it always happens or it does happen in the

4   past; right?  But usually in the bigger companies where -- that

5   I work, usually there is -- you know, it could have happened;

6   right?  I mean that's what I'm saying.

7        **MR. SPIRO:**  I agree.

8        **PROSPECTIVE JUROR 3:**  There is usually no smoke

9   without fire, if you know what I mean.  These things -- in

10  larger organizations especially, right, these things usually --

11  if it happened once you need to look at it and say has it

12  happened before or has it not happened before.  There's no need

13  to assume that it has never happened is my point.

14       **MR. SPIRO:**  We're saying the same thing.  Agreed.

15  Agreed.  You have to look at each incident differently and sure

16  you can look and sure you assess the next incident.  It doesn't

17  mean you close your mind to the next incident, it just means

18  you evaluate it independently and make your own determination.

19     So --

20       **THE COURT:**  Mr. Spiro, will you let Juror Number 11

21  get back to her seat?

22       **MR. SPIRO:**  Yeah.  You were hiding there.  I

23  apologize.  Thank you.

24                      (Pause in proceedings.)

25       **MR. SPIRO:**  One of the ways that you're going to have

1   to make these determinations is assessing credibility and

2   that's by looking at a witness and looking at them testify and

3   asking yourself are they being -- like what I asked you at the

4   beginning -- are they being complete and transparent with you.

5        Juror Number 3, have you had that experience where you're

6   evaluating the credibility of somebody and -- and you look to

7   certain factors to see if they're telling you the truth or if

8   they're adding things on?

9        **PROSPECTIVE JUROR 3:**  Yeah.  I think you do need to

10  look at, you know, work managing teams, you know, then you

11  evaluate people that are sort of the same.  You know, you do a

12  performance review.  People are going to come to you, you need

13  to evaluate and see are they being truthful, are they not.  You

14  know, looking at facts and looking at data, I think that's

15  usually the right way to do it.

16       **MR. SPIRO:**  Right.  What other witnesses say,

17  corroboration, things like that; is that fair?

18       **PROSPECTIVE JUROR 3:**  Could you repeat that, please?

19       **MR. SPIRO:**  Sure.  You want to talk to multiple

20  witnesses, you want to look for corroboration, you want to look

21  at data; right?

22       **PROSPECTIVE JUROR 3:**  Yes.  If there's an allegation

23  or is there some -- you know, some wrong doing, you have to

24  obviously validate that with facts, you know, asking other

25  people to corroborate it without -- yeah, I would think so.

1          **MR. SPIRO:**  Thanks.  And since I have you up --

2          **PROSPECTIVE JUROR 3:**  Sure.  Go ahead.

3          **MR. SPIRO:**  You know, the other thing about this case

4    is you know that -- we've talked about that there's liability,

5    it's an upsetting subject, everything I've talked about.  The

6    plaintiff goes first; right?  They go first.  One of the parts

7    of a trial, even a short trial, you have to keep an open mind.

8    You have to keep an open mind and wait to hear both sides.

9          Does anybody here have an issue with that?

10              (No response.)

11          **MR. SPIRO:**  And part of that is cross-examination.

12    Okay?  And so lawyers, me, I'm going to have to cross-examine

13    somebody that something bad happened to.  I'm telling you that

14    something that should not have happened happened to the person,

15    I'm going to have to cross-examine him.

16          So the question is:  Do you agree that both sides should

17    be able to test credibility, that both sides should have that

18    opportunity and that you can keep an open mind while that's all

19    going on?  And can everybody give me their commitment as to

20    that, because this one I really need your commitment to?  Is

21    there anybody in the jury box on this side that cannot commit

22    to me that they will allow the test of credibility and they

23    will keep an open mind?

24              (No response.)

25          **MR. SPIRO:**  I'm looking out into the left side of the

 1   courtroom.  Can everybody give me that commitment?  And I'm

 2   seeing nods.  I'm hoping to see universal nods.

 3        And on this side of the courtroom --

 4                        (No response.)

 5        **MR. SPIRO:**  -- everyone can commit to me that?

 6        And my final question -- and Juror Number 3, I'll let

 7   you -- because I already got in question with Juror Number--

 8   you can have a seat.

 9        **PROSPECTIVE JUROR 3:**  Okay.  Thank you.

10        **MR. SPIRO:**  Thank you, sir.

11        Is that -- finally, ultimately what you're here for is to

12   assess damages.  And my colleague on the other side said that

13   it's going to be mental suffering, you know, psychological

14   injury; right?

15        And that can be a very complicated thing.  Okay?  Some

16   people might say to themselves -- and jurors say this all the

17   time in lots of cases -- I don't know what it was like walking

18   in that person's shoes.  I can't put myself in that person's

19   shoes.  Right?  I don't know what it's like to be Mr. Diaz, and

20   I don't know what it's like to be any of you.  As a juror,

21   you're required to do that.  You're required to be -- put

22   yourself in their mind and be objective and call balls and

23   strikes.  Right?

24        So you can't say to use an analogy from a different

25   situation if there was a case where somebody was discriminated

1   against -- and discrimination is everywhere.  We all know this.

2   If someone was discriminated against about their religion, and

3   they saw something, and it upset them; right.  Everybody follow

4   the fact pattern so far?

5        Just because you're not of that religion, right, if they

6   came in and said listen, I saw something.  I saw a caricature.

7   It upset me, and I want a trillion dollars.  Right?  If they

8   said that.

9        One possible response is well, I don't know what it's like

10  to walk in their shoes.  And it's true; you don't.  I don't

11  know, trillion sounds good enough.  But as a juror, that's not

12  obviously your responsibility.  You've got to call balls and

13  strikes.  You've got to follow the law.

14       Does everybody understand that?

15                      (No response.)

16       **MR. SPIRO:**  Okay.  I see some nods.

17       And so what I sort of need is a commitment from you that

18  you don't hide behind that or you don't run away from that

19  or -- you have to understand that if you take the oath as a

20  juror, that's what your responsibility is:  To stand and make a

21  decision based on facts and data and numbers and -- and fill

22  out your jury form.

23       Does everybody understand that?

24                      (No response.)

25       **MR. SPIRO:**  Does anybody think they would have a

 1  problem with that?  Can you raise your hand if you think that

 2  that would be a problem with you?  That you think you would

 3  be -- as I started and now I'm about to end -- swept up in it.

 4  Something happened, it's upsetting, and you're swept up in it.

 5  You say I can't understand a limit on this because it's

 6  upsetting and I haven't walked in their shoes.

 7       Is there anyone who feels that way?

 8                      (No response.)

 9           **DEFENSE COUNSEL:**  Okay.  I thank you all for your

10  time.

11       Thank you, Your Honor.

12           **THE COURT:**  Thank you.

13       All right, ladies and gentlemen, the questioning of you is

14  now completed, and we -- there are two different things that

15  are going to happen, and the first of them is that I'm going

16  to -- we're going to take a recess of -- until 10 of 2:00, yes?

17  To -- so that the lawyers actually can take a short break, and

18  then we're going to discuss the first round of excusals from

19  the jury.

20       After that happens, everybody will stay in their seats,

21  and the lawyers will make their peremptory challenges.  And

22  after that, we will have a jury.

23       So, for now, let's -- I would like you all to come back at

24  10 of.  I want you to remember the no communication.  Don't

25  talk about anything that's gone on in the courtroom, anything

 1   that's involved with anything.  Don't communicate with anybody.

 2        And then we will finish up the selection process in the

 3   next little bit.  All right.  Thank you.

 4        (Proceedings were heard outside the presence of the jury:)

 5                    (Recess taken at 1:24 p.m.)

 6                (Proceedings resumed at 1:38 p.m.)

 7        **THE CLERK:**  Please come to order.

 8        **THE COURT:**  We should close the door in the back.

 9   Please be seated, everybody.

10                    (Pause in proceedings.)

11        **THE COURT:**  All right.  We are moving on to the cause

12   and hardship excusals.  I'll tell you what I'm inclined to do,

13   and then I'd like to hear it from you if I have missed anybody

14   or you are concerned about anything.

15        I would excuse Juror 18.  He owns a share of stock.  And

16   then 5.  9 has been excused.  23, 29, 30, 32, 54, and 58.  Not

17   that we'll be getting that deep, I think, but...

18        So, Mr. Alexander, I'll start with you when you're ready.

19                    (Pause in proceedings.)

20        **MR. ALEXANDER:**  Your Honor, with regard to 18.

21        **THE COURT:**  You better step up to a mic.

22        **MR. ALEXANDER:**  With regard to 18, I think one that

23   share of stock is de minimis.  I would be willing to waive it,

24   and I don't think it's significant.

25        It would be -- you know, if one -- I don't know what that

**PROCEEDINGS**

 1  share would be.  I don't know that that -- I don't know that

 2  that affects anything.

 3          **THE COURT:**  Okay.  All right.

 4      Mr. Spiro.

 5          **MR. SPIRO:**  I don't disagree, frankly.

 6          **THE COURT:**  Okay.  I'm happy to leave him in the pool

 7  as long as you both waive your rights to object.  If he was a

 8  federal judge, he would have to recuse himself.

 9          **MR. ALEXANDER:**  I agree.

10          **THE COURT:**  Okay.  So 18 is in.

11          **MR. ALEXANDER:**  So now we are at the point of

12  addressing cause.

13          **THE COURT:**  We are at cause or -- 30 had, among other

14  things, a nonrefundable ticket.

15          **MR. ORGAN:**  Your Honor, was 10 on your list?

16          **THE COURT:**  Ten's gone.

17          **MR. ORGAN:**  Ten's gone.  Okay.  Just checking.  Thank

18  you.

19          **MR. SPIRO:**  Your Honor.

20          **THE COURT:**  Hang on, Mr. Spiro.  Let Mr. Alexander

21  take this on first.

22      So with respect to the ones that I listed, do you have any

23  disagreements with those?

24          **MR. ALEXANDER:**  No, Your Honor.  Well, I do with some

25  but not with regard to -- not with regard to 23, not with

1   regard to 30.  We are fine with 32.  And we are fine with --

2   the only one we're not fine with, I guess, is 5 and 29.  So

3   we're fine with 54, fine with 58.

4        **THE COURT:**  Okay.  And what's your perspective on 5?

5        **MR. ALEXANDER:**  My notes said that her feelings about

6   Musk would not impact her, that it would not be an advantage,

7   and when asked by Defendants if she had anybody [sic], she said

8   it depends on what happened to Mr. Diaz.

9        The standard that counsel was using is not the standard.

10       **THE COURT:**  I'm aware of the standard.

11       **MR. ALEXANDER:**  I'm sure that you are, but I say that

12   because she said she could be fair and impartial.  And the

13   thing is, she doesn't lose her life experience.  She said she

14   can be fair and impartial and then she hears the evidence and

15   then her life experience can come in and impact the verdict.

16   And nothing that she said contradicts that.

17       **THE COURT:**  Mr. Spiro.

18       **MR. SPIRO:**  Yes, Your Honor.  Your Honor specifically

19   asked her a question.  It was actually your questioning; it

20   wasn't the lawyers leading her.  When she says she knows about

21   things inside of Tesla, she can not unlearn them.

22       You asked her if she could be fair and impartial.  She

23   looked at the Court and said she wishes that she could, she

24   wishes that she could tell you that and she can't.  She's an

25   experienced person, and it was clear as day that she can't sit

**PROCEEDINGS**

1    on this jury.

2         **THE COURT:**  Yeah.  I'm going to excuse her.

3      Who else, Mr. Alexander?  29, I think, you had mentioned?

4         **MR. ALEXANDER:**  No objection to 29.

5         **THE COURT:**  Okay.  All right.

6      Mr. Spiro, what about you, with respect to the people that

7    I've mentioned?

8         **MR. SPIRO:**  We have no issue -- to be frank with the

9    Court, I would not excuse Juror Number 30.  I don't think --

10   Amtrak tickets are moveable and she can go this weekend with

11   her son, but I defer to the Court's experience.

12        **THE COURT:**  You're heartless.

13        **MR. SPIRO:**  What's that?

14        **THE COURT:**  You're heartless.  That's terrible.

15        **MR. SPIRO:**  Just trying to get this case done for

16   Your Honor and the judicial system within one week.

17        **THE COURT:**  No.  I appreciate your concern there.  But

18   I do think -- I do think in light of the circumstances that

19   it -- that she was describing that it makes sense.

20      And do you have any other people, Mr. Spiro, that you want

21   to have considered for cause or hardship?

22        **MR. SPIRO:**  Yes, Your Honor.  So, I -- I sort of want

23   to just frame for a second just for the Court -- I mean, first

24   of all because it's come up a couple of times, *United States*

25   *vs. Kechedzian* is the Ninth Circuit case -- I'm better on my

**PROCEEDINGS**

 1  other circuits -- but in that case, the Ninth Circuit addressed

 2  the issue which is more squarely addressed in the neighboring

 3  circuits, but the statements "I'll try; I will try to be fair"

 4  were held in that case.  You know the case, of course,

 5  Your Honor.

 6       So we can debate that I think Your Honor used the -- one

 7  of the jurors may have volunteered the hundred percent.  I used

 8  the phrase from the second circuit unequivocal assurance.  But

 9  regardless, the Court has to be quite convinced that a juror

10  can sit, and we obviously have more than enough jurors that are

11  here that are available.

12       The second thing that's particularly unusual about the

13  situation we find ourselves in is:  When is there ever a case

14  where -- and I know Your Honor is aware that I made a motion in

15  front of Judge Chen to remove the case -- a different case

16  regarding Tesla and Mr. Musk from this district.  That motion

17  was denied.

18       But at the same time, I can't think of another case, and

19  I've handled many that have had media attention, where an

20  individual and his company are as scrutinized as he is in

21  San Francisco and as poorly thought of.

22       I have never seen, even in murder trials, such strong

23  opinions about an individual.

24       Your Honor said several times -- and I appreciate you

25  saying this and I hope that it stuck -- that he has nothing --

1    "he" meaning Mr. Musk -- has nothing to do with this case.

2          It's hard for me frankly, intellectually to square a

3    punitive damages case about a corporation from the CEO.  I

4    can't do it, and it's a tall order in any judgment to ask a

5    jury to, given some the arguments that you will hear.  The fish

6    rots from the head and such.

7          So any statement that is so extreme that a juror has to

8    put of this magnitude about how they feel about the CEO, that

9    juror just shouldn't sit on this case.  That's my opinion, I

10   think that's fair, and it's what I would frankly say if I was

11   on the other side.

12         So there are a few jurors that their statements, just

13   to -- just to encapsulate them in one sentence, are so strong,

14   they hate him so much that even if they loved a Tesla, they

15   wouldn't buy it.

16         **THE COURT:**  So I've read all the statements.  I've

17   heard them testify.

18         Who are the ones that you are talking about?

19         **MR. SPIRO:**  5 you already excluded, so it would be 8,

20   42 -- 8 said that they are not sure.  That was the quote.  "Not

21   sure."

22         15, 42, and 50 -- and -- just 42.

23                         (Pause in proceedings.)

24         **MR. SPIRO:**  And 51.

25         So apologies.

 1            **THE COURT:**  8, 15, 42, and 51.

 2            **MR. SPIRO:**  Thank you.

 3                        (Pause in proceedings.)

 4            **THE COURT:**  Mr. Alexander, I will hear from you.

 5            **MR. ALEXANDER:**  Your Honor, at the end of the

 6    examination for Juror Number 8, I thought that she had said

 7    that she was able to be fair and impartial regardless of the --

 8    I think that Mr. Spiro is taking isolated statements and

 9    emphasizing those rather than the totality of what she had

10    said.

11            **THE COURT:**  I think it's a he, Mr. Schloss.

12            **MR. ALEXANDER:**  The HR person.  Yes.  I thought he was

13    unequivocal in saying yes, he could be fair and impartial.

14            **MR. ORGAN:**  Here is what he said.

15                        (Pause in proceedings.)

16            **MR. ALEXANDER:**  All my notes, everyone's notes say

17    that he could make a determination fairly and impartially.

18            **THE COURT:**  I remember him quite well.  I'm not going

19    to excuse him for cause.

20        How about 15?

21            **MR. ALEXANDER:**  All right, Number 15.

22                        (Pause in proceedings.)

23            **MR. ALEXANDER:**  So, Your Honor, it was only at the

24    point when Mr. Spiro asked a number of leading questions and

25    unprefaced all of his questions that she conceded as an

1  exception to everything else and said that.  So under

2  cross-examination, she said no, Plaintiff does not have --

3  Plaintiff does not have an advantage.  I would not come in with

4  a biased view.  I think that I could be fair.

5      Those are things that she said several different ways, and

6  so it's only the exceptional one plucked out of those where

7  there is any basis for having cause as to 15.

8      THE COURT:  Yeah.  I -- I'm not going to excuse 15.

9  At the end of the questioning, I think she indicated that the

10 treatment of employees issue was one that was completely

11 unrelated, and she was quite clear that she would be able to

12 serve as a fair and impartial juror.

13     How about 42?

14     MR. ALEXANDER:  So Juror Number 42 is the -- the

15 algebra teacher and --

16     THE COURT:  I mean, I don't think we are going to get

17 close to 42, but --

18     MR. SPIRO:  I withdraw 42.

19     THE COURT:  Great.  Do you withdraw 51 as well, even

20 later?

21     MR. SPIRO:  I will -- I don't want to withdraw that

22 because I feel strongly about the statement that I made

23 earlier, but we can hold it in abeyance --

24     THE COURT:  That's fine.

25     MR. SPIRO:  Thank you, Your Honor.

PROCEEDINGS

```
 1          THE COURT:  We will hold those two in abeyance.  All
 2   right.
 3       And, Mr. Alexander, did I get all of your suggestions for
 4   removing for cause or hardship?
 5          MR. ALEXANDER:  No.  I have others.
 6          THE COURT:  Okay.
 7          MR. ALEXANDER:  23 has been excused; correct -- or we
 8   have accepted 23 as being --
 9          THE COURT:  23 is removed -- will be removed.
10          MR. ALEXANDER:  So with regard to 27, she wrote that
11   she is against punitive damages and it would impact her
12   decision; that it would diminish the decision after the fact.
13   Her inability to be -- her limitations on awarding punitive
14   damages and that it would impact the number, that prevents her
15   from being fair and impartial.  Her response was "Likely yes,
16   it would affect my determination."
17          THE COURT:  Okay.
18          MR. ALEXANDER:  She also raised her hand with regard
19   to the questioning about awarding punitive damages.
20          THE COURT:  Mr. Spiro?
21          MR. SPIRO:  She was asked several follow-ups by the
22   Court, and she was unequivocal in her assurance that she would
23   follow your legal instructions and that her opinions have
24   nothing do with your legal instructions, and everybody comes to
25   this with opinions.
```

1      **THE COURT:**  Mr. Alexander, I'm not going -- I'm going

2   to overrule your suggestion.  I think she is somebody, if you

3   wanted to use a strike, that would be fine but she was going

4   to -- she is going to judge the case -- and she probably has a

5   different view than other jurors -- but she said she could do

6   it fairly.

7      **MR. SPIRO:**  Your Honor, one other thing that the Court

8   asked me regarding waiver of a juror earlier that I gave an

9   indication, but I actually want to correct the record.  Given

10   my learned appellate counsel and others' inputs, I can't

11   consent and I won't consent to a juror with a share remaining.

12   I know the Court earlier indicated --

13      **THE COURT:**  Okay.  Then 18 is out.  We will strike 18.

14   Because I do think it is -- it's a legal reason for cause.

15     Mr. Alexander?

16      **MR. ALEXANDER:**  Number 32, I believe that Tesla starts

17   with an advantage.  This isn't --

18      **THE COURT:**  32 is on my list.

19      **MR. ALEXANDER:**  Oh, it is.  Okay.

20      **THE COURT:**  They are struck.

21                    (Pause in proceedings.)

22      **MR. ALEXANDER:**  Now, Your Honor, with regard to

23   Question -- Question 5 and Question 4.

24      **THE COURT:**  Is it a juror?

25      **MR. ALEXANDER:**  I'm sorry.

1          **THE COURT:**  What are you asking?

2          **MR. ALEXANDER:**  With regard to -- I posed questions

3    with regard to jurors as to whether they could award punitive

4    damages and Juror 37 -- I'm sorry -- 37, 41, 49, and 57 each

5    raised their hands to indicate that they could not award

6    punitive damages.

7          **THE COURT:**  So I don't think that was precisely your

8    question, first of all.  And second of all, I don't think just

9    a hand raising is sufficient.  If you wanted to disqualify them

10   for cause, you would need to have asked them questions

11   directly, and I don't think we are getting to those folks

12   anyway.

13         **MR. ALEXANDER:**  Okay.

14         **MR. COLLIER:**  Your Honor, I would just like to briefly

15   state for the record that Mr. Spiro decided to withdraw his

16   objection -- I'm sorry -- impose his objection to 18 having the

17   single share only after it was made clear that Juror Number 27

18   would be the fourteenth in the box.  And I believe that was a

19   tactical decision, and I think he should be held to waiver for

20   having waived that.

21         **THE COURT:**  I think people are strategic all the time,

22   Mr. Collier, particularly in jury selection and I'm -- I think

23   there is a legal reason that -- and I don't think it's -- I

24   would not impose waiver.

25         **MR. COLLIER:**  Understood, Your Honor.

1          **MR. ALEXANDER:**  Nothing further, Your Honor.

2          **THE COURT:**  Okay.  So -- so just that I'm clear, we

3  are back to where we started with what -- with my list.  So the

4  jurors that are being -- that we will excuse when they come in

5  will be 18, 5, 9 is gone -- 23, 29, 30, 32, 54, and 58, and

6  then we will pass the paper back and forth, and you can make

7  your strikes and we can have a jury.

8          **MR. SPIRO:**  Thank you, Your Honor.

9          **MR. ALEXANDER:**  Thank you, Your Honor.

10         **THE COURT:**  Let's bring the band in.

11                    (Pause in proceedings.)

12     (Proceedings were heard in the presence of the prospective

13  jury panel:)

14         **THE COURT:**  All right.  Please be seated, everybody.

15      Ladies and gentlemen, since some of you I'm going to

16  excuse in a moment, I just wanted to tell you why it is that

17  everybody stands up when you come into the courtroom, and that

18  is in honor of the service that you are providing, the

19  importance of your duty as citizens to sit on a jury, and

20  that's why -- that's why everybody stands up.

21      And you are entitled, and if you are on the jury, you are

22  entitled to sit down whenever you want to.  That's your --

23  that's your business, but we honor you and we thank you for

24  your service.

25      I am -- right now I'm going to relieve some of you from

1    jury service, and you can leave the courtroom and go about your

2    life with my thanks for doing your duty.

3        And the -- everybody else will stay seated and then the --

4    the lawyers will do a selection process, which involves passing

5    a piece of paper back and forth.  So -- so let me now first

6    thank and excuse Juror Number 5, 9, 18, 23, 29, 30, 32, 54, and

7    58.

8        So if I just called your number, you can leave now and

9    thank you very much for your service today.

10       (Excused prospective jurors exited the courtroom.)

11       **THE COURT:**  So at this point Ms. Davis is going to

12   give a piece of paper probably to Mr. Alexander, and they are

13   going to proceed to pass the paper back and forth.  You can

14   stand where you are.  You can read.  This will take a little

15   bit of time but probably not a ton of time, and then we'll be

16   ready to go to the next thing.

17                   (Pause in proceedings.)

18              (Sidebar held but not reported.)

19       **THE COURT:**  All right.  Ladies and gentlemen, the

20   parties have now chosen the jury, and I would like Jurors

21   Number 3, 4, 6, 13, 16, 17, 20, and 22 to come to the jury box,

22   if you are not already there.

23       And so let's do that first.

24                   (Pause in proceedings.)

25       **THE COURT:**  Okay.  Second, Juror Number 11, thank you.

 1    You are excused.

 2          **PROSPECTIVE JUROR 11:**  Thank you.

 3          **THE COURT:**  And so who else do we have?

 4    Juror Number 8, you are excused.  Thank you.

 5       All right.  So, ladies and gentlemen, you are our jury in

 6    this matter for the week.

 7       And, Ms. Davis, why don't we swear the jury and then we

 8    can release everybody else.

 9          **THE CLERK:**  Okay.  Jurors, if you will stand, please,

10    and raise your right hand.

11                    (Jury panel duly sworn.)

12          **THE CLERK:**  Thank you.

13          **PROSPECTIVE JUROR 6:**  I don't understand what they

14    say.

15          **THE COURT:**  Okay.  So, Ms. Davis, if you would give

16    Juror Number 6 the microphone.

17                    (Pause in proceedings.)

18          **THE COURT:**  Juror Number 6, you were indicating that

19    you didn't understand what was being said?

20          **PROSPECTIVE JUROR 6:**  I -- all -- I don't understand.

21          **THE COURT:**  So during the course of the morning, have

22    you not understood what was going on?

23          **PROSPECTIVE JUROR 6:**  Yeah.

24          **THE COURT:**  You have not?  And are you having

25    trouble -- you've indicated that you understood me.  You

 1   understand --

 2        **PROSPECTIVE JUROR 6:**  I understand you -- I submit the

 3   question but the rest of the case I don't understand.

 4        **THE COURT:**  Okay.  Let me see the lawyers over here

 5   for a second, and we'll do that part off the record.  If we

 6   need to do something on the record, then we will figure out

 7   what to do.

 8        Turn on the white noise machine, please.

 9                    (Pause in proceedings.)

10                    (Sidebar held but not reported.)

11        **THE COURT:**  Juror Number 6, I appreciate the fact that

12   you spoke up now.  I wish you had spoken up earlier, but you

13   have spoken up now and that's fine.  And I -- I'm glad that you

14   did, and I'm going to excuse you from any further jury service.

15   And when you are called next time for jury service, if you are

16   still having trouble understanding, let somebody know as soon

17   as you can.  Okay?

18        **PROSPECTIVE JUROR 6:**  Okay.

19        **THE COURT:**  Okay.  Thank you.

20        So I would like to ask Juror Number 28 to come in, please.

21                    (Pause in proceedings.)

22        **THE COURT:**  And, Juror Number 28, you are now going to

23   be a member of the jury.

24        And, Ms. Davis, if you would administer the oath.

25                    (Juror Number 28 duly sworn.)

1        **THE CLERK:**  Thank you.

2        **THE COURT:**  All right.  Does anybody else have

3   anything they want to share before we move on to the next

4   moment?

5                        (No response.)

6        **THE COURT:**  All right.  So, everybody else, all the

7   other jurors who have been here, you have done your duty today

8   as citizens.  I appreciate it.  The -- this court appreciates

9   it.  The parties appreciate it.  Thank you.  You are now

10  excused.

11       (Excused prospective jurors exit the courtroom.)

12       **THE COURT:**  All right.  Please be seated, everybody.

13  So, ladies and gentlemen, the first thing that we are going to

14  do is Ms. Davis is going to take you back to the jury room and

15  get you oriented.  Meanwhile, the lawyers are going to get

16  reoriented to prepare for their opening statements.

17       What will happen today is I'm going to give you

18  preliminary instructions when you come back, and then the

19  parties will give opening statements and then we will see what

20  time it is.  We may have the first witness, and we may not.

21       So if you would follow Ms. Davis.  And then we'll be back

22  in 20 minutes.  So at 20 of.  We will be in recess.

23                   (Recess taken at 2:20 p.m.)

24              (Proceedings resumed at 2:44 p.m.)

25       (Proceedings were heard outside the presence of the jury:)

1        **THE COURT:**  Please be seated.

2        **MR. SPIRO:**  Just one quick issue, Your Honor.  It will

3   only take a second, which is I just want to be clear because

4   there was some commentary during voir dire.

5        Obviously, it's -- the jury is still here to find facts

6   and find facts regarding the incident.  They are not supposed

7   to assume that all of the facts are proven that they allege or

8   that they allege in opening.

9        I just was worried about some of the phrasing, that it is

10  going to be presented is that every fact that they opened on

11  has already been established.  What's been established has been

12  established according to the instructions and nothing more.

13       **THE COURT:**  That's correct.

14       **MR. SPIRO:**  Thank you, Your Honor.

15       **THE COURT:**  Okay.  Let's get the jury.

16       (Proceedings were heard in the presence of the jury:)

17                **PRELIMINARY JURY INSTRUCTIONS**

18       **THE COURT:**  All right.  Please be seated, everybody.

19       Members of the jury, you are now the jury in this case.

20  It's my duty to instruct you on the law.

21       It's your duty to find the facts from all the evidence in

22  the case.  To those facts, you will apply the law as I give it

23  to you.

24       You must follow the law as I give it to you, whether you

25  agree with it or not.  And you must not be influenced by any

**PRELIMINARY JURY INSTRUCTIONS**

1    personal likes or dislikes, opinions, prejudices, or sympathy.

2         That means you must decide the case solely on the evidence

3    before you.  You'll recall that you took an oath to do so.

4         At the end of the trial, I'll give you final instructions.

5    It's the final instructions that will govern your duties.

6         Please don't read into these instructions or anything I

7    may say or do that I have an opinion regarding the evidence or

8    what your verdict should be.

9         Plaintiff Owen Diaz was employed by Defendant Tesla, Inc.,

10   doing business as Tesla Motors, Inc., at the Tesla factory in

11   Fremont, California, from June 2015 to March 2016.

12        He brought a lawsuit against Tesla alleging violations of

13   state and federal law.  This case is being tried in two phases.

14   We have done the liability phase, and now we're doing the

15   damages phase.

16        It has been conclusively determined that Tesla is liable

17   to Mr. Diaz for creating a hostile work environment based on

18   race in violation of federal law, for failing to prevent racial

19   harassment in violation of federal law, and for negligently

20   retaining and supervising one or more of Mr. Diaz's supervisors

21   in violation of California state law.

22        It has also been determined that as a result of Tesla's

23   liability, Mr. Diaz is entitled to recover from Tesla any past

24   or future non-economic damages and any punitive damages that

25   you may find based on the evidence at trial.

**PRELIMINARY JURY INSTRUCTIONS**

1    Because of these determinations of Tesla's liability,

2   Mr. Diaz is entitled to recover from Tesla his past and future

3   non-economic damages and punitive damages.

4    In this trial, you must accept each of these

5   determinations as true.  It will be your job to determine the

6   amount of the damages award.

7    I will now describe the findings that led to the

8   determination of Tesla's liability in this case.  Then I will

9   describe what you should consider in awarding damages.  And

10  after that, I will give you instructions on the trial process

11  and how to consider evidence.

12    It has been determined that Mr. Diaz was subjected to a

13  racially hostile work environment while employed by Tesla.

14    That means that Mr. Diaz established, one, that he was

15  subjected to slurs, insults, jokes, or other verbal comments or

16  physical contact or intimidation of a racial nature.

17    Two, the conduct was unwelcome.

18    Three, the conduct was sufficiently severe or pervasive to

19  alter the conditions of his employment and create a racially

20  abusive or hostile work environment.

21    Severe or pervasive means conduct that altered the

22  conditions of employment and created a work environment that is

23  hostile, intimidating, offensive, oppressive, or abusive.  A

24  single incident can be sufficiently severe or pervasive to

25  constitute harassment.

1    Four, Mr. Diaz perceived the working environment to be

2    abusive or hostile.

3    And five, a reasonable African American man in his

4    circumstances would consider the working environment to be

5    abusive or hostile.

6    Whether the environment constituted a racially hostile

7    work environment was determined by looking at the totality of

8    the circumstances, including the frequency of harassing

9    conduct, the severity of the conduct, whether the conduct was

10   physically threatening or humiliating or a mere offensive

11   utterance and whether it unreasonably interfered with an

12   employee's work performance.

13   An employee may be liable when an employee supervisor

14   creates a racially hostile work environment for that employee.

15   A supervisor is someone who is empowered by the employer to

16   take tangible employment actions regarding the employee, such

17   as hiring, firing, failing to promote, reassigning with

18   significantly different responsibilities, or significantly

19   changing benefits.

20   It has been determined that Mr. Diaz was subjected to a

21   racially hostile work environment by Tesla, and that Ramon

22   Martinez or Robert Hurtado, or both were -- was his supervisor

23   and empowered by Tesla to take tangible employment actions

24   against him.

25   It has also been determined that, one, Mr. Diaz was

1   subjected to a racially hostile work environment by a

2   non-immediate supervisor or co-worker.

3        And two, Tesla or a member of its management knew or

4   should have known of the harassment and failed to take prompt,

5   effective remedial action reasonably calculated to end the

6   harassment.

7        It has been determined that Tesla failed to take all

8   reasonable steps to prevent harassment based on race.  It was

9   established, one, that Mr. Diaz was an employee of Tesla or

10  providing services under a contract with Tesla.  Two, that

11  Mr. Diaz was subjected to harassment in the course of

12  employment.  Three, that Tesla failed to take all reasonable

13  steps to prevent the harassment.  Four, that Mr. Diaz was

14  harmed.  And five, that Tesla's failure to take all reasonable

15  steps to prevent harassment was a substantial factor in causing

16  Mr. Diaz's harm.

17       It has been established that Mr. Diaz was harmed by Ramon

18  Martinez and that Tesla is responsible for that harm because

19  Tesla negligently supervised or retained Ramon Martinez.

20       Mr. Diaz has shown:  One, that Tesla employed Ramon

21  Martinez during the time that Mr. Diaz worked at Tesla;

22       Two, that Ramon Martinez was or became unfit or

23  incompetent to perform the work for which he was employed;

24       Three, that Tesla knew or should have known that Ramon

25  Martinez was or became unfit or incompetent and that this

1   unfitness or incompetence created a particular risk to others;

2        Four, that after Tesla knew or should have known of Ramon

3   Martinez's unfitness or incompetence, it retained or supervised

4   Ramon Martinez in his position at Tesla's factory;

5        Five, that Ramon Martinez's unfitness or incompetence

6   harmed Owen Diaz;

7        Six, that Tesla's negligence in supervising or retaining

8   Ramon Martinez was a substantial factor in causing Owen Diaz's

9   harm.

10       It has been determined that Tesla is liable to Mr. Diaz

11  for civil rights violations based on contractual relationship.

12       Mr. Diaz has established that he was an employee of Tesla

13  Inc., or that he showed that, one, he gained rights or was a

14  beneficiary under a contract; two, Tesla engaged in racial

15  discrimination or harassment in the enforcement of the contract

16  or Tesla failed to take reasonable steps to prevent harassment

17  from occurring in the workplace; and three, he suffered

18  injuries that he would not have suffered but for Tesla's

19  conduct.

20       Mr. Diaz did not need to have signed the contract nor have

21  been a party to the contract in order to have rights under the

22  contract.

23       He could establish his rights under the contract by

24  showing that he received benefits or privileges under the

25  contractual relationship between Tesla and NextStaff [sic] or

1    CitiStaff and the contracting parties intended that he receive

2    benefits or privileges that were not incidental or remote.

3         It has been established that Tesla's conduct harmed

4    Mr. Diaz -- that Tesla's conduct that harmed Mr. Diaz was

5    malicious, oppressive, or in reckless disregard of Mr. Diaz's

6    rights.

7         Conduct is malicious if it is accompanied by ill will or

8    spite or if it is for the purpose of injuring the plaintiff.

9         Conduct is in reckless disregard of the plaintiff's rights

10   if under the circumstances it reflects complete indifference to

11   the plaintiff's safety or rights or if the defendant acts in

12   the face of a perceived risk that its actions will violate the

13   plaintiff's rights under federal law.

14        An act or omission is oppressive.  If the defendant

15   injures or damages or otherwise violates the rights of the

16   plaintiff with unnecessary harshness or severity such as by

17   misusing or abusing authority or power or by taking advantage

18   of some weakness or disability or misfortune of the plaintiff.

19        Now that I've told you what has been established, I will

20   explain your role in this case.

21        Your role in this case is to determine the amount of

22   damages to which Mr. Diaz is entitled.  Mr. Diaz has the burden

23   of proving damages by a preponderance of the evidence.

24        This means that you must be persuaded by the evidence that

25   the claim of damages is more probably true than not true.  You

should base your decision on all the evidence regardless of which party presented it.

Compensatory damages means the amount of money that will reasonably and fairly compensate Mr. Diaz for any injury you find was caused by Tesla.  In determining the measure of these damages, you should consider the nature and extent of the injuries, the loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future, and the mental or emotional pain and suffering experienced and that with reasonable probability will be experienced in the future.

It has been established that Mr. Diaz is entitled to compensatory damages.  It is for you to determine the amount of damages that have been proved.

Your award must be based upon evidence and not upon speculation, guesswork, or conjecture.

Mr. Diaz has a duty to use reasonable efforts to mitigate damages.  To mitigate means to avoid or reduce damages.

Tesla has the burden of proving by a preponderance of the evidence, one, that Mr. Diaz failed to use reasonable efforts to mitigate damages, and two, the amount by which damages would have been mitigated.

The purposes of punitive damages are to punish a defendant and to deter similar acts in the future.

Punitive damages may not be awarded to compensate a

plaintiff.  It has been established that Mr. Diaz is entitled to punitive damages.  It is for you to determine the amount.  Mr. Diaz has the burden of proving the amount by a preponderance of the evidence.

When you consider punitive damages, you may award them for Tesla's conduct that harmed Mr. Diaz, which was malicious, oppressive, or in reckless disregard of his rights.

Conduct is malicious if it's accompanied by ill will or spite or if it's for the purpose of injuring Mr. Diaz.

Conduct is in reckless disregard of Mr. Diaz's rights if under the circumstances it reflects complete indifference to his safety or rights or if Tesla acted in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law.

An act or omission is oppressive if Tesla injures or damages or otherwise violates the rights of Mr. Diaz with unnecessary harshness or severity, such as by misusing or abusing authority or power or by taking advantage of some weakness or disability or misfortune of Mr. Diaz.

You must use reason in setting the amount.  Punitive damages should be in an amount sufficient to fulfill their purposes of punishment and deterrence but should not reflect bias, prejudice, or sympathy toward any party.

In considering the amount of any punitive damages, consider the degree of reprehensibility of Tesla's conduct,

1  including whether the conduct that harmed Mr. Diaz was

2  particularly reprehensible because it also caused actual harm

3  or posed substantial risk of harm to people who are not parties

4  to this case.

5     You may not, however, set the amount of any punitive

6  damages in order to punish Tesla for harm to anyone other than

7  the plaintiff in this case.

8     All parties are equal before the law, and Tesla is

9  entitled to the same fair and consciouses considerations by you

10  as Mr. Diaz.

11     The evidence you're to consider in deciding what the facts

12  are consists of:  The sworn testimony of any witness, the

13  exhibits that are admitted into evidence, any facts to which

14  the lawyers have agreed, and any facts that I may instruct you

15  to accept as proved.

16     In reaching your verdict, you may consider only the

17  testimony and exhibits received into evidence.  Certain things

18  are not evidence and you may consider them in deciding what the

19  facts are.

20     I will list them for you.  Number 1, arguments and

21  statements by lawyers are not evidence.  I will repeat that.

22  Arguments and statements by lawyers are not evidence.

23     The lawyers are not witnesses.  What they may say in their

24  opening statements, closing arguments, and at other times, is

25  intended to help you interpret the evidence but it is not

**PRELIMINARY JURY INSTRUCTIONS**

1  evidence.

2       If the facts as you remember them differ from the way the

3  lawyers have stated them, your memory of them controls.

4       Number 2, questions and objections by lawyers are not

5  evidence.  Attorneys have a duty to their clients to object

6  when they believe a question is improper under the rules of

7  evidence.  You should not be influenced by the objection or by

8  the Court's ruling on it.

9       Number 3, testimony that's excluded or stricken or that

10  you're instructed to disregard is not evidence and must not be

11  considered.

12       In addition, some evidence may be received only for a

13  limited purpose.  When I instruct you to consider certain

14  evidence only for a limited purpose, you must do so, and you

15  may not consider that evidence for any other purpose.

16       Number 4, anything you may see or hear when court was not

17  in session is not evidence.  You are to decide the case solely

18  on the evidence received at trial.

19       Some evidence may be admitted only for a limited purpose.

20  When I instruct you that an item of evidence has been admitted

21  only for a limited purpose, you must consider it only for that

22  limited purpose and not for any other purpose.

23       Evidence may be direct or circumstantial.  Direct evidence

24  is direct proof of a fact, such as testimony by a witness about

25  what that witness personally saw or heard or did.

**PRELIMINARY JURY INSTRUCTIONS**

1    Circumstantial evidence is proof of one or more facts from

2  which you could find another fact.  By way of example, if you

3  wake up in the morning and see that the sidewalk is wet, you

4  may find from that fact that it rained during the night.

5    However, other evidence, such as a turned on garden hose,

6  may provide a different explanation for the presence of water

7  on the sidewalk.

8    Therefore, before you decide that a fact has been proved

9  by circumstantial evidence, you must consider all the evidence

10  in the light of reason, experience, and common sense.

11    You should consider both kinds of evidence.  The law makes

12  no distinction between the weight to be given to either direct

13  or circumstantial evidence.  It's for you to decide how much

14  weight to give to any evidence.

15    There are rules of evidence that control what can be

16  received into evidence.  When a lawyer asks a question or

17  offers an exhibit into evidence and a lawyer on the other side

18  thinks that it's not permitted by the rules of evidence, that

19  lawyer may object.  If I overrule the objection, the question

20  may be answered or the exhibit received.

21    If I sustain the objection, the question cannot be

22  answered, and the exhibit cannot be received.

23    Whenever I sustain an objection to a question, you must

24  ignore the question and must not guess what the answer might

25  have been.

**PRELIMINARY JURY INSTRUCTIONS**

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you're deciding the case, you must not consider the stricken evidence for any purpose.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.

You may believe everything a witness says or a part of it or none of it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to; the witness' memory; the witness' manner while testifying; the witness' interest in the outcome of the case, if any; the witness' bias or prejudice, if any; whether other evidence contradicted the witness' testimony; the reasonableness of the witness' testimony in light of all the evidence; and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened.

People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently.

You may consider these differences but do not decide that

**PRELIMINARY JURY INSTRUCTIONS**

1  testimony is untrue just because it differs from other

2  testimony.

3      However, if you decide that a witness has deliberately

4  testified untruthfully about something important, you may

5  choose not to believe anything that witness said.  On the other

6  hand, if you think the witness testified untruthfully about

7  some things but told the truth about others, you may accept the

8  part that you think is true and ignore the rest.

9      The weight of the evidence as to a fact does not

10  necessarily depend on the number of witnesses who testify.

11  What's important is how believable the witnesses were and how

12  much weight you think their testimony deserves.

13      We all have feelings, assumptions, perceptions, fears, and

14  stereotypes about others.  Some biases we are aware of, and

15  others we may not be fully aware of, which is why they're

16  called implicit or unconscious biases.

17      No matter how unbiased we think we are, our brains are

18  hardwired to make unconscious decisions.  We look at others and

19  filter what they say through our own personal experience and

20  background.

21      Because we all do this, we often see life and evaluate

22  evidence in a way that tends to favor people who are like

23  ourselves or who have had life experiences like our own.

24      We can also have biases about people like ourselves.  One

25  common example is the automatic association of male with career

1  and female with family.

2      Bias can affect our thoughts, how we remember what we see

3  and hear, whom we believe or disbelieve, and how we make

4  important decisions.

5      As jurors, you are being asked to make an important

6  decision in this case.  You must:  One, take the time you need

7  to reflect carefully and thoughtfully about the evidence.

8      Two, think about why you are making the decision you are

9  making and examine it for bias.  Reconsider your first

10  impressions of the people and the evidence in this case.  If

11  the people involved in this case were from different

12  backgrounds -- for example, richer or poorer, more or less

13  educated, older or younger, or of a different gender, gender

14  identity, race, religion, or sexual orientation -- would you

15  still view them and the evidence the same way?

16      Three, listen to each other.  One must care- -- you must

17  carefully evaluate the evidence and resist and help each other

18  resist any urge to reach a verdict influenced by bias, for or

19  against any party or witness.

20      Each of you have different backgrounds and will be viewing

21  the case in light of your own insights, assumptions, and

22  biases.

23      Listening to different perspectives may help you to better

24  identify the possible effects these hidden biases may have on

25  decision making.

1    And four, resist jumping to conclusions based on personal

2  likes or dislikes, generalizations, gut feelings, prejudices,

3  sympathies, stereotypes, or unconscious biases.

4    The law demands that you make a fair decision based solely

5  on the evidence, your individual evaluations of that evidence,

6  your reason and common sense, and these instructions.

7    I will now say a few words about your conduct as jurors.

8  As I just said, keep -- first, keep an open mind throughout the

9  trial and do not decide what the verdict should be until you

10  and your fellow jurors have completed your deliberations at the

11  end of the case.

12    Second, because you must decide this case based only on

13  the evidence received in the case and on my instructions as to

14  the law and prior determinations that apply, you must not be

15  exposed to any other information about the case or to the

16  issues it involves during the course of your jury duty.

17    Thus, until the end of the case or unless I tell you

18  otherwise, do not communicate with anyone in any way and do not

19  let anyone else communicate with you in any way about the

20  merits of the case or anything to do with it.

21    This includes discussing the case in person, in writing,

22  by phone, tablet, or computer, or any electronic means, via

23  e-mail, text messaging, or any internet chat room, blog,

24  website, or application, including but not limited to Facebook,

25  YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any

**PRELIMINARY JURY INSTRUCTIONS**

1    other forms of social media.

2        This applies to communicating with your fellow jurors

3    until I give you the case for deliberation, and it applies to

4    communicating with everyone else, including your family

5    members, your employer, the media or press, and the people

6    involved in the trial, although you may notify your family and

7    your employer that you've been seated as a juror in this case

8    and how long you expect the trial to last.

9        But if you're asked or approached in any way about your

10   jury service or anything about this case, you must respond that

11   you've been ordered not to discuss the matter and report the

12   contact to the court.

13       Because you will receive all the evidence and legal

14   instructions you properly may consider to return a verdict, do

15   not read, watch, or listen to any news or media accounts or

16   commentary about the case or anything to do with it.

17       Do not do any research, such as consulting dictionaries,

18   searching the internet, or using other reference materials.

19   And do not make any investigation or in any other way try to

20   learn about the case on your own.

21       Do not visit or view any place discussed in the case, and

22   do not use the internet or any other research source to search

23   for or view any place discussed during the trial.

24       Also, do not do any research about the case, the law, or

25   the people involved, including the parties, the witnesses, or

**PRELIMINARY JURY INSTRUCTIONS**

1  the lawyers, until you have been excused as jurors.

2      If you happen to read or hear anything touching on this

3  case in the media, turn away and report it to me as soon as

4  possible.

5      These rules protect each party's right to have this case

6  decided only on the evidence that's been presented here in

7  court and the determinations that I've instructed you to

8  follow.

9      Witnesses here in court take an oath to tell the truth,

10  and the accuracy of their testimony is tested through the trial

11  process.

12      If you do any research or investigation outside the

13  courtroom or gain any information through improper

14  communications, then your verdict may be influenced by

15  inaccurate, incomplete, or misleading information that has not

16  been tested by the trial process.

17      Each of the parties is entitled to a fair trial by an

18  impartial jury.  And if you decide the case based on

19  information not presented in court, you will have denied the

20  parties a fair trial.

21      Remember, you've taken an oath to follow the rules, and

22  it's very important that you follow the rules.

23      A juror who violates these restrictions jeopardizes the

24  fairness of these proceedings, and a mistrial could result that

25  would require the entire trial process to start over.

1      If any juror is exposed to any outside information, please

2   notify the court immediately.

3      If there is any news media account or commentary about the

4   case or anything to do with it, you must ignore it.  You must

5   not read, watch, or listen to any news media account or

6   commentary about the case or anything to do with it.

7      The case must be decided by you solely and exclusively on

8   the evidence that will be received in the case and on my

9   instructions as to the law that applies.

10      If any juror is exposed to any outside information, please

11   notify me immediately.

12      I urge you to pay close attention to the trial testimony

13   as it's given.  During deliberations, you will not have a

14   transcript of the trial testimony.

15      If you wish, you may take notes to help you remember the

16   evidence.  If you do take notes, please keep them to yourself

17   until you go to the jury room to decide the case.

18      Don't let note-taking distract you.  When you leave for

19   the day, your notes should be left in the jury room.  No one

20   will read them.

21      Whether or not you take notes, you should rely on your own

22   memory of the evidence.  Notes are only to assist your memory.

23   You should not be overly influenced by your notes or those of

24   other jurors.

25      From time to time during the trial, it may become

1    necessary for me to talk with the attorneys out of the hearing

2    of the jury, either by having a conference at the bench when

3    the jury is present in the courtroom or by calling a recess.

4         I try to discourage these as much as possible, but if they

5    do happen, in the rare instance that it happens, please

6    understand that while you're waiting, we're working.  The

7    purpose of these conferences is not to keep relevant

8    information from you but to decide how certain evidence is to

9    be treated under the rules of evidence and to avoid confusion

10   and error.

11        Of course, we will do what we can to keep the number and

12   length of these conferences to a minimum.  I may not always

13   grant an attorney's request for a conference.  I usually don't.

14   But don't consider my granting or denying a request for a

15   conference as any indication of my opinion of the case or of

16   what your verdict should be.

17        Trials proceed in the following way:  First, each side may

18   make an opening statement.  An opening statement is not

19   evidence.  It is simply an outline to help you understand what

20   that party expects the evidence will show.  A party is not

21   required to make an opening statement.

22        The Plaintiff will then present evidence, and counsel for

23   the Defendant may cross examine.  Then the Defendant may

24   present evidence, and counsel for the Plaintiff may cross

25   examine.

1    After the evidence has been presented, I will again

2   instruct you on the law that applies in the case, and the

3   attorneys will make closing arguments.

4    After that, you will go to the jury room to deliberate on

5   your verdict.

6    So those are the preliminary instructions.

7    Now it's time for the opening statements, and I think

8   after the opening statements are done, we will rest for the day

9   and proceed on Tuesday morning with the first witness.

10    So, Mr. Alexander, please proceed.

11                    (Pause in proceedings.)

12        **THE COURT:**  Mr. Spiro, if you ever want to see what's

13   on that board, you can walk around.

14        **MR. SPIRO:**  It's fine.  Thank you.

15        **THE COURT:**  When you are ready.

16                    **OPENING STATEMENT**

17        **MR. ALEXANDER:**  Thank you, Your Honor.

18    Good afternoon.  Once again, my name is Bernard Alexander,

19   and along with my colleagues, we represent Owen Diaz.

20   Everything I'm about to tell you is what the evidence will

21   show.

22    This is a hostile work environment case based on race.

23   It's a story of two very different worlds.  On the one hand, we

24   have a futuristic company making futuristic cars.

25    On the other hand, you have a plantation mentality

 1  workplace occurring inside the Tesla factory where African

 2  American employees are subjected to the N-word on a virtual

 3  daily basis, where Owen Diaz was subjected to verbal and

 4  physical threats and attacks, and where African American

 5  employees in general are treated like second-class citizens

 6  here in San Francisco in 2015.

 7       The two worlds collide and coexist at the Fremont

 8  factory -- at the Tesla Fremont factory.

 9       In the first phase of the trial, Tesla claimed that it had

10  a zero --

11            MR. SPIRO:  Objection to this.

12            THE COURT:  Sustained.  Stick to the -- stick to the

13  instructions, Mr. Alexander.

14            MR. ALEXANDER:  In the first phase of trial, there

15  was --

16            MR. SPIRO:  Objection to this.

17            THE COURT:  So, ladies and gentlemen, the first phase

18  of this case has been determined.  And so now we are into the

19  second phase, and the manner in which we are discussing it does

20  not comport exactly with what Mr. Alexander was saying.

21       So if you could rephrase.

22            MR. ALEXANDER:  I will, Your Honor.  Thank you.

23       The Court has given you -- has indicated determinations

24  that Tesla is liable for severe and pervasive conduct.  Severe

25  and pervasive conduct with regard to racial harassment so

1    severe that a determination was made that damages were due not

2    just for compensation -- for compensatory damages but also for

3    punitive damages.

4         Punitive damages.  To punish and deter conduct.  So that

5    Tesla would not create or maintain a hostile work environment,

6    a work environment that was essentially a plantation mentality.

7         During this trial, the issue will be accountability.

8                      (Pause in proceedings.)

9         **MR. ALEXANDER:**  During this trial, Tesla will try to

10   avoid accountability for its conduct.  But in this trial, we

11   will show you that they must be held accountable, and it will

12   be your job to hold them accountable.

13        With regard to the finding -- with regard to -- excuse me,

14   I've lost a page.

15        With regard to accountability, it will be your job to

16   determine what amount of damages should be awarded, what amount

17   of monetary damages should be awarded to Owen Diaz for both the

18   past harm that he has already suffered and the future harm that

19   he will continue to suffer.

20        But it will also be your responsibility to determine what

21   amount of punitive damages should be awarded against Tesla, a

22   company that was worth billions and billions of dollars during

23   the timeframe that Owen Diaz worked there in 2015.

24        And so it's your responsibility to do two things in this

25   phase of the trial.

OPENING STATEMENT / ALEXANDER

 1          One, to determine the amount of emotional stress damages
 2     Owen Diaz should be awarded for the harm he has already
 3     suffered and will suffer in the future; and two, the amount of
 4     punitive damages that is necessary to deter a company the size
 5     of Tesla.
 6          Now, with regard to this, keep in mind that Tesla is
 7     100 percent liable for this conduct.  And Owen Diaz is not
 8     liable, responsible at all.  He did nothing to put himself in
 9     this circumstance.  So we are here to determine damages under
10     those circumstances.
11          Now I'm going to talk to you about the evidence, the
12     evidence that we are going to present to you so you understand
13     the basis for making your determination as to damages, both the
14     compensatory damages and the punitive damages.  And I want to
15     warn you that some of the facts that we are going to discuss
16     will be disturbing.
17          First, let me tell you about Owen Diaz.  Owen Diaz is
18     approximately 54 years old right now.  He started working at
19     the Tesla factory in approximately June of 2015.
20          He was hired as an elevator operator.  Saw an
21     advertisement, applied.  Was sent to a staffing company and
22     then ended up as an employee working at Tesla.
23          As an elevator operator, he was operating huge elevators,
24     freight elevators.  These elevators were the lifeblood of the
25     company because what would happen is two elevators go up and

1    down two floors.  People would leave equipment, boxes, things

2    that had to go upstairs, and then they would leave things that

3    was waste that had to go downstairs.

4        These were huge industrial elevators, and it was his job

5    to move equipment and what have you up and down, and there were

6    a number of departments that would leave things, drop things by

7    the elevator.  And so it was his job to make sure it got done.

8    Oftentimes, these departments would be upset, be yelling.  It

9    was very high stress because everybody wanted their stuff moved

10   first.

11       Now, Owen's life was on the elevator.  It was like an

12   island that he was on.  He didn't go anywhere else inside the

13   factory.  He is stuck to the island stuck to the elevators.  He

14   went up and down the elevators moving equipment, moving various

15   items, and the only other places that he would go is perhaps to

16   the cafeteria or to the restroom and then to and from work.

17       The elevator was his island, and he didn't know what was

18   going on elsewhere.

19       So let me tell you just a little bit about Owen Diaz.

20   He's got a family.  He is been married for over 26 years.  He's

21   got an adult son.  He's got an adult daughter.  He grew up in

22   Oakland, graduated from high school in Oakland, went a couple

23   of years to junior college or community college taking roofing.

24       He is just an ordinary nice guy wanting to take care of

25   his family, and that's why he got this job at Tesla because it

**OPENING STATEMENT / ALEXANDER**

1   is one of the highest paying jobs he could find in the Oakland

2   area.

3        So I'm going to tell you some of the experiences that Owen

4   Diaz had while he was at Tesla.  The first incident I'm going

5   to tell you about is regarding a person by the name of Judy

6   Timbreza.

7        So Owen had been working there -- working at the Fremont

8   factory inside the elevators going up and down, and towards the

9   end of July -- he started in early June.  Towards the end of

10   July, Mr. Timbreza starts to come into the elevator on a

11   regular basis, and he would come in with his friends.  And they

12   would be talking -- Mr. Timbreza, by the way, is male.

13        They would be talking in Spanish, and they would be

14   saying -- he would say certain things, and then he would look

15   at Owen Diaz and the other people inside the elevator would

16   also laugh while he was laughing while looking at him.

17        This happened a few times, and then Mr. Diaz finally

18   decided that he'd check -- try to figure out what they were

19   saying.  So he used Google Search to write in the names, and he

20   found out what they were saying.  And it turns out that they

21   were saying "mayate" which is the Spanish word for N.  It's the

22   N-word in Spanish.  And they were also saying "porch monkey."

23   And that had gone on for several weeks.

24        And so finally, one day after that, there was a

25   confrontation, a confrontation in the elevator and they had to

 1   be separated, Mr. Timbreza and Mr. Diaz.  And the supervisor

 2   was called over, Tom Kawasaki.

 3        And Tom Kawasaki came over, and he did an investigation.

 4   He asked what had happened, and Owen Diaz said that

 5   Mr. Timbreza was using racial language, racial slurs.

 6        And Mr. Kawasaki, his supervisor, spoke to multiple

 7   people, and all those people said yes, it was true.  He was

 8   using racial language.

 9        And so if we can show Exhibit Number 38.

10        Mr. Kawasaki -- and these exhibits are the exhibits that

11   you will see later.  Mr. Kawasaki reported to his supervisor:

12   "Employee 2, Owen, has brought to my attention of comments

13   being made towards him that are racist in nature."

14        That's what Owen Diaz reported immediately.  He reported

15   it verbally, and Mr. Kawasaki put it in writing to his

16   supervisor, Edward Romero, and CC to Victor Quintero.

17        And then Mr. Kawasaki will come and testify that he not

18   only sent Exhibit Number 38, but he actually told those

19   supervisors, he told Ed Romero that it was confirmed that

20   racist -- that racist comments were made.

21        But when the information got up the line to Mr. Romero,

22   the supervisor, a Tesla supervisor, he sanitized and minimized

23   what had occurred.

24        I'm going to show you Exhibit Number 39.  Although

25   multiple witnesses had confirmed that racial comments were

1    made, Mr. Romero, who reported up the line to his supervisor

2    who was a manager, Mr. Quintero, he reported that Owen Diaz,

3    elevator operator, complained that Judy Timbreza had made some

4    racially offensive remarks toward Mr. Owen.

5         "We investigated by speaking to all witnesses present, but

6    they said they did not hear the remarks."

7         And then he goes on to say: "More than one person agreed

8    Mr. Timbreza's tendency to kid around excessively."

9         That "around" instead of "group" is there.

10        "Mr. Owen says this happened before.  Mr. Owen still feels

11   he can work with Judy."

12        Before I talk about that, the importance of this document

13   is the sanitizing and the minimizing.  You see here that as

14   opposed to telling the truth, the statement is made that the

15   racial conduct was not confirmed.

16        And with regard to Mr. Timbreza, whether than treating

17   this like the racial incident that it should have been treated

18   as, rather than treating it with regard to a zero tolerance

19   policy, it was diluted and sanitized so that it was minimized.

20   And now instead of being a racial incident, it becomes kidding

21   around excessively in the workplace.

22        So as a consequence, rather than a zero tolerance policy

23   what was done was Mr. Timbreza was given a verbal warning, and

24   he continued to work at the factory.

25        You will not see any documentation of confirmation of the

 1  verbal warning.  So you will have no evidence to confirm that

 2  that verbal warning was actually ever given.

 3       And with return to minimizing and sanitizing, you will

 4  see, as I go through and discuss the evidence that you are

 5  going to hear, that that occurs repeatedly at Tesla inside the

 6  workplace.

 7       The next incident I'm going to tell you about involves

 8  Ramon Martinez.  Ramon Martinez was a supervisor at Tesla.  In

 9  October of -- on October 17, 2017, Owen Diaz was operating the

10  elevator.  By that point he had been working -- by that point

11  he had been promoted.  His work was so good that within two and

12  a half months he had been promoted, and now he was a lead.

13       Inside the elevator he was training another employee by

14  the name of Rothaj Foster.  They were inside the elevator.

15  Owen Diaz was talking to him, was explaining, what have you,

16  and the elevators opened up and Ramon Martinez rushed into the

17  elevator and rushed at him.  With his fists out.  Yelling at

18  him and screaming racial slurs, the N-word.

19       And Owen was inside the elevator.  He backed up, and he

20  said, "Hey, look" -- didn't fight, didn't defend.  Just put his

21  hands up and he pointed to the video because there are video

22  cameras everywhere throughout the Tesla workplace, including

23  inside the elevators.  And he pointed to the video, and he

24  said, "Look, it's being caught on video camera."

25       And then Ramon Martinez looked and walked out and walked

 1   away.

 2        Exhibit Number 235, it is an e-mail that Owen Diaz wrote

 3   on October 17, 2015, saying -- and describing the incident.

 4   And he says that Owen Diaz was yelling -- I'm sorry -- that

 5   Ramon Martinez was yelling at him and that Ramon followed him

 6   into the elevator and "I don't feel safe around him now."

 7        This is the first time that he says "I do not feel safe."

 8        "Please talk to him.  I don't need any problems."  And he

 9   says, "I just want to do my job.  You can check the

10   surveillance system to confirm."

11        And so as a consequence of this -- I'm sorry.  Before I

12   say that, Mr. Martinez is a supervisor and because he is a

13   supervisor, the company is charged with that conduct.  So when

14   Mr. Martinez attacks Owen Diaz, Tesla is attacking Owen Diaz.

15        And so an investigation should be conducted with regard to

16   this incident.

17                     (Pause in proceedings.)

18        **MR. ALEXANDER:**  And so initially this matter was

19   supposed to be investigated.

20        I want to turn to Exhibit Number 76.  At the bottom you

21   will see on October 19, Wayne Jackson -- Wayne Jackson will

22   come and testify before you.  Wayne Jackson sends an e-mail to

23   his supervisor, Terri Garrett.  He says: "Dealing with the Owen

24   and Ramon issue now.  This issue seems to be related to this,

25   and we really are going to have to do some in-depth

1   investigation."

2        As of October 19, there was supposed to be an in-depth

3   investigation.  But then you go up one e-mail two days later,

4   October 21, from Terri Garrett to Wayne Jackson:  "Confirming

5   via this e-mail that we agree we do not need to do any formal

6   investigation with regard to Ramon, Owen, and Rothaj."

7        And then if you go up further, Wayne Jackson sending an

8   e-mail to his supervisor, and it says:  "Yes, I have spoken

9   with all three and will be speaking with Ramon and Owen again

10  on Friday.  I had a conversation with Ed" -- that's the Tesla

11  supervisor, Ed Romero -- "at Victor's desk" -- that's Victor

12  Quintero, the Tesla manager -- "and they just want us to

13  verbally counsel each of them with regards to appropriate

14  behavior in the workplace.  No written warning needed right

15  now."

16       So with regard to this incident where Owen Diaz is

17  physically attacked with racial words being said inside the

18  elevator, there is no actual investigation that occurs.

19       And, in fact, you will find out that Tesla only

20  investigated Ramon Martinez's comment because Ramon Martinez

21  made a complaint in anticipation of an investigation saying

22  Owen was unprofessional.

23       So Owen complained and said, "Look, there's video."

24  Mr. Martinez realized that then went out, wrote an e-mail, and

25  said "Owen's acting in an unprofessional manner."

 1      They investigated the unprofessional complaint by Ramon

 2  Martinez but they did not investigate Owen Diaz's complaint of

 3  a racially motivated attack.

 4      With regard to the video cameras, you will not see any

 5  video footage because Tesla did not preserve it.

 6                  (Pause in proceedings.)

 7      **MR. ALEXANDER:**  With regard to the reference to Ramon

 8  Martinez has a history of -- have other complaints about him,

 9  that was completely ignored.  In other words, if a person is

10  being complained about a second time, you would have thought

11  that they would have gone and investigated.  They did not.

12                  (Pause in proceedings.)

13      **MR. ALEXANDER:**  And with regard to the complaint that

14  Ramon Martinez made where he said that Owen is being

15  unprofessional, he sent it one hour before Owen did to preempt

16  what Owen Diaz was going to say.

17                  (Pause in proceedings.)

18      **MR. ALEXANDER:**  I don't have the exhibit that I want,

19  but I want the exhibit -- there's an exhibit that talks about

20  the verbal warning, it says:  "Play nice with each other inside

21  the sandbox."

22      Mr. Jackson was instructed to give no written warning and

23  that's what they said, "play nice inside the sandbox."

24                  (Pause in proceedings.)

25      **MR. ALEXANDER:**  So with regard to this incident, there

1    were two verbal warnings given.  There was a verbal warning

2    given to Owen Diaz when all that he did was complain about

3    harassment.  So you'll find that that made no sense, the person

4    complaining about harassment getting a verbal warning.

5         And the person who complained about Mr. Diaz being

6    unprofessional, that person got a verbal warning, not for what

7    occurred but for not playing nicely in the sandbox, once again,

8    minimizing and sanitizing, because not playing well in the

9    sandbox is not at all the same as being physically attacked and

10   racial slurs being used inside of an elevator.

11        So as a consequence of having that investigation stopped,

12   there was no zero tolerance policy enforced.  They avoided an

13   investigation that would have documented discrimination and

14   harassment in the workplace.  There was no reporting of

15   specific words that were used.  There was no record made with

16   regard to that video being preserved.

17        The absence of documentation allows Tesla to have no

18   record of there being a hostile work environment inside the

19   workplace.

20        And as you will see, because Ramon Martinez was not

21   disciplined, it got worse.  The conduct got worse.

22        I indicated that Mr. Diaz worked in the elevators, he

23   worked up and down the elevators, and he would be taking heavy

24   equipment in and going downstairs into different areas.  And so

25   one day, he had left the area of the elevators and then he came

**OPENING STATEMENT / ALEXANDER**

 1    back and what he found was a jigaboo, a drawing, a racist

 2    drawing that had been left for him.

 3         If we can put up Exhibit Number 2.

 4                   (Pause in proceedings.)

 5         **MR. ALEXANDER:**  This drawing was left on a bale.  At a

 6    factory the size of Tesla, they use lots of cardboard, the

 7    cardboard gets packed up and bundled, and then it gets placed

 8    on a forklift.  And you're going to hear testimony from Owen

 9    Diaz with regard to how he walked up and found this.

10         And with regard to this jigaboo that was left, it was left

11    so it was purposely facing outward so that Owen Diaz would see

12    it.  And you're going to hear that when these operators pick up

13    these items with forks, normally when you would pick it up, you

14    would have to turn the picture towards you, towards the person

15    operating, but someone, Ramon Martinez, went to the trouble to

16    make sure it was turned outward so Owen Diaz would find it.

17    And Owen Diaz, when he found it, could not believe it, his

18    stomach dropped.  He was so upset because he recognized this

19    for what it was.

20         So he called -- he called management and they came over.

21    A person by the name of Michael Wheeler.  He will come and he

22    will testify before you as to what occurred.

23         They walked -- Michael -- I'm sorry.  Michael Wheeler is

24    also African American, and he will tell you that he was

25    offended when he saw it.

1        And another African American, a manager at the factory,

2   Mr. Jackson, Wayne Jackson, he will tell you he was offended

3   when he saw it, because every African American would be

4   offended by seeing it.  And so Mr. Wheeler and another

5   gentleman walked around to try and figure out who had left this

6   there.

7        And they walked around and they found Ramon Martinez and.

8   And initially, he denied it.  They walked him over there and he

9   stood around and then finally, finally, finally he admitted,

10  "Yes, I drew it." And the words he said are, "You people can't

11  take a joke."

12       Mr. Martinez will get onto witness stand and he will

13  explain to you why he thought that this was just a joke.  He

14  will tell you that this is a cartoon from his childhood and he

15  was only drawing it to -- to have fun.

16       But he'll also confirm -- and if we can put up Exhibit

17  Number 133 -- that Inki, Caveman Inki was what he intended to

18  draw when he drew that jigaboo.

19       He would get on the witness stand and tell you a story

20  that he didn't mean to hurt anyone.  He will tell you that he

21  had a conversation with Owen Diaz where he said to Owen Diaz "I

22  apologize.  I apologize."  And he will tell you he knew that

23  Owen Diaz was about to send out an e-mail, he claimed that Owen

24  Diaz had already prepared it.  And Owen Diaz told him because

25  of his apology, "Oh, that's okay, I won't send it."  And you

1   will conclude that that's an absolute lie.  And I don't use

2   that word in courtrooms often.

3        Ramon Martinez will tell you that he intended to draw this

4   Caveman Inki and leave it for Owen Diaz, one of the most racist

5   things, a jigaboo that you can do for an African American man.

6   It is not an accident that he left this -- this drawing that

7   had a bone in its hair and large lips for Owen Diaz.

8        With regard to this incident, which seems to me to be a

9   clear instance of racial harassment, there was an investigation

10  to be conducted.

11       By the way, the people that came over, they spoke to Owen

12  Diaz and he appeared to be visibly upset.  He confirmed that he

13  was upset.

14                    (Pause in proceedings.)

15       **MR. ALEXANDER:**  Having gotten this great job at Tesla

16  this futuristic company where he thought -- where he was

17  enjoying it, where he loved to work, to keep having these

18  things happen to him changed his whole outlook towards Tesla.

19       He felt mocked.  He felt ridiculed.  He felt helpless.  I

20  will show you momentarily the note -- the e-mail that he wrote

21  to Tesla.

22       This -- do we have 130 still?  This jigaboo, Inki the

23  Caveman, was so bad, so awful so racist that -- it was from the

24  1950s, that it was taken off the air because it was so racist.

25       You'll be surprised to learn that rather than a zero

 1   tolerance policy and Ramon Martinez being terminated, he still

 2   works at the company.  He was hired -- at that time, he was

 3   working for a staffing company at Tesla.  He was hired after

 4   this incident as a direct employee receiving all the stock and

 5   benefits of a direct Tesla employee.

 6        If we could show Exhibit Number 33, it is the e-mail that

 7   Owen Diaz prepared.

 8                      (Pause in proceedings.)

 9        **MR. ALEXANDER:**  Inside that e-mail, Owen Diaz, fourth

10   line down, refers to a cartoon depicting a black face person

11   with a bone in his hair saying "Boo" for jigaboo.  It was clear

12   that Mr. Martinez knew what he was doing.

13        And down below, about eight lines from the bottom, Ramon

14   Martinez said he had drew the picture and he was just playing.

15        "As supervisors or leads, we're held to a higher standard

16   because the people we supervise look to us as examples.  If a

17   supervisor does this kind of thing in front of employees" --

18   "employees, what kind of example are we setting?  A person

19   should be able to come to work and not be harassed and degraded

20   while they're trying to do their job."

21        "This is not the first time Ramon Martinez has been talked

22   to about this behavior and because nothing has been done, it

23   seems that his behavior is getting worse."

24        "As an employee, I'm entitled to a safe and

25   harassment-free workplace and all I ask and hope for" --

1    "that's all I ask and hope for."

2        The person who was tasked with conducting -- a person was

3    tasked to conduct an investigation associated with this

4    incident, a person associated with the subcontractor that

5    Owen -- that Mr. Ramirez was working for.  That subcontractor

6    was doing work for Tesla, so it was an investigation for them.

7    That investigation was supposed to occur, but instead, a

8    conversation occurred with Mr. Jackson.

9        Mr. Jackson e-mailed the picture of the jigaboo to Victor

10   Quintero, the manager that Ed Romero pointed to -- reported to.

11       And Mr. Quintero when he first received and saw that

12   jigaboo claimed not to know what it was.  Claimed that he

13   didn't understand that it was racist, and so Mr. Jackson had to

14   explain it to him.

15       Now, Mr. Jackson, along with his supervisor, recommended

16   that he -- Mr. Martinez be terminated, terminated.

17       Mr. Quintero didn't want that.  He wanted to give a verbal

18   warning.  And Mr. Jackson, who will testify before you, will

19   tell that he had to insist that something more had to be done,

20   and so they decided that instead of -- instead of termination,

21   he would get a three-day suspension without pay and a final

22   warning inside the file.

23       With regard to that final warning that was supposed to be

24   given, you will not see an exhibit.  You will not see any

25   confirmation that that final warning was ever given.

1          And with regard to the determination, the determination as

2     to that discipline occurred two hours, two hours, after it got

3     to Mr. Quintero.  But that determination was made before the

4     investigation was conducted.  In other words, instead of

5     conducting a good faith thorough investigation to figure out

6     exactly what was done, they skipped that process and decided

7     that it should be a three-day suspension and then that's what

8     occurred.

9          So Tesla made the decision as to this light penalty before

10    a full investigation could be conducted, before a determination

11    could be made by the subcontractor company.

12         And so once again, racist conduct was minimized and

13    sanitized.  It was minimized because instead of a zero

14    tolerance policy, he got a three-day suspension and there was

15    no thorough investigation and the fact that Owen Diaz had

16    complained about this person before was completely ignored.

17    That is the evidence that you will see.

18         Now, with regard to a hostile work environment.  One

19    incident, one single incident is enough, but here I've given

20    you three incidents and I'm going to talk to you about a couple

21    of others.

22         But what I want you to understand from these incidents is

23    these are not incidents where there is some issue as to

24    verification.  We know that they happened.

25         And based on the totality of the circumstances, just based

1   on these three incidents, you know that it was a hostile work

2   environment for Owen Diaz.

3        He will tell you how this bothered him, how this upset

4   him.  It upset him because he worked at night.  He worked

5   virtually alone going up and down the elevators.  When he was

6   doing this, there were a couple people working elevators, he

7   was alone.

8        And so now because he had had two physical threats, one,

9   the physical threat inside the elevator but then the jigaboo,

10  now he didn't feel safe because he's working around heavy

11  equipment, he's working at night, anyone could show up and do

12  harm to him.  He was subjectively afraid.

13       So Owen Diaz has a son, an adult son.  And during this

14  timeframe, 2015, 2016, his son Demetric was 19 years old.  For

15  about two months, Demetric worked at the Tesla factory that --

16  the Fremont Tesla factory.  And he worked in a different area.

17  He worked in the battery area.

18       And so one day, Owen Diaz, the father, decided to go and

19  visit his son for lunch, and he walked over to the battery area

20  and he found his son sitting with his co-workers.  But he got

21  there just in time to hear his son's supervisor call his son

22  the N-word.

23       And the thing is, when he got there and he saw that, it

24  was -- it broke him, it was heartbreaking, because he blamed

25  himself because he had allowed his son to come and work in this

 1  workplace.

 2       And the thing is a father is supposed to protect his son,

 3  and so Owen Diaz thought that he had let his son down.

 4       And so there was a fracture in the relationship that Owen

 5  Diaz has had to live with.  And so he found out for the first

 6  time when he went there that use of the N-word, it was not just

 7  with him.  Wasn't just inside that silo of the elevator.  It

 8  wasn't just on the island where he was.  It was everywhere.  It

 9  was pervasive throughout the workplace.

10       His son only worked there for two months.  You are going

11  to hear Tesla blame Owen Diaz for bringing his son inside the

12  workplace, blame him because his son was subjected to this --

13  the N-word inside the workplace as though it was Owen Diaz's

14  fault that this hostile work environment was created where the

15  N-word was used constantly.

16       But here are the facts as you will get them.  First, this

17  was a great-paying job.  Tesla is one of the -- one of the

18  biggest paying -- the best paying jobs at that time in the

19  area.

20       And his son was wanted to work there.  And Owen Diaz, when

21  he found out that his son was going to be working there,

22  thought, Hey, look, I know that bad stuff is happening on my

23  island on the elevator, but he had no idea it was happening in

24  the battery department, too.

25       And when Owen Diaz reported the Timbreza incident where

1   the N-word and mayate was used inside the elevator on that

2   occasion, they seemed to have corrected it.

3        Owen Diaz complained.  Mr. Timbreza supposedly got a

4   verbal warning, and Owen Diaz never saw him again.  So as far

5   as he knew, Owen Diaz thought that Tesla was going to do what

6   they were supposed to do.  They were going to protect him from

7   harassment inside the workplace.

8        So with regard to his son, his being there was not his

9   fault except that he believed that it was his fault.

10                 (Pause in proceedings.)

11        **MR. ALEXANDER:**  So at the point when Owen Diaz -- I'm

12   sorry.  At the point when his son started to work inside the

13   workplace, Owen Diaz did not know that Mr. Romero was going to

14   sanitize and minimize reports, such as changing the information

15   with regard to Mr. Timbreza to -- from being a racially

16   involved incident to just kidding around.  He didn't know that

17   he was going to be physically attacked three months later

18   inside the elevator.

19        At the point when his son was there, he didn't know that a

20   jigaboo was going to be left for him.

21        How could Owen Diaz know that Tesla was not going to

22   protect him inside the workplace, was not going to protect his

23   son inside the workplace, because with the zero tolerance

24   policy he had every expectation that they would fulfill their

25   legal duty.

 1       Now, it is important for to you understand that the
 2   specific acts, the specific acts that I've told you about so
 3   far, they didn't occur in isolation.  Because the N-word, the
 4   word "nigger," or the Spanish word "mayate," was used on a
 5   virtually daily basis.
 6       And they did nothing about it.  And to allow that conduct
 7   to occur inside your workplace essentially lets supervisors and
 8   rank-and-file employees know that if you can use the N-word,
 9   then you can engage in conduct like Mr. Timbreza did in using
10   mayate in front of Owen like Ramon Martinez did and threatening
11   Owen Diaz like Mr. Martinez did in leaving the pickaninny.
12       The evidence will show that the N-word was everywhere
13   throughout the workplace.
14       I am personally offended by that word, and so throughout
15   the trial I will use the N-word out of respect for you, out of
16   respect for me, and out of respect for Owen Diaz.
17       But that is why we are here because Tesla allowed a
18   hostile work environment with regard to African American
19   employees to exist and fester, and they condoned it.  Because
20   you will conclude that if you don't correct the conduct, you
21   are condoning it.
22       You will hear testimony from multiple individuals about
23   what occurred.
24       If we could show the banner.
25       Ramon Martinez started to use racial slurs regarding Owen

1    Diaz in August of 2015.

2        He used the N-word, over the time that Owen Diaz was

3    there, approximately 30 times.  And he said, "I hate you

4    N-word.  I hate you effing Ns.  Ns aren't shit.  I wish I could

5    get all of you Ns fired.  Go back to Africa."  A couple of

6    times "mayate."

7        Ramon Martinez was a supervisor.  When he stated those

8    words, Tesla was stating those words.

9        Robert Hurtado, he was a lead.  Robert Hurtado needed to

10   use the elevator, and as a lead, that makes him a supervisor.

11   He would come onto the elevator, and say, "N, hurry up, push

12   the button.  You Ns are lazy."  He would refer to Owen Diaz as

13   "boy."

14       "If you don't like it, your employment can end."  He, too,

15   used the N-word approximately 30 times during the timeframe

16   between when he started and approximately August 2015 and when

17   Owen Diaz left in approximately February of 2015.

18       And I say approximately 30 times because it happened so

19   many times that Owen Diaz couldn't count them.

20       With regard to the N-word, Tesla will try and talk about

21   how it wasn't enough that Owen did it verbally.  He knew how to

22   do written complaints.  "Why didn't you say in writing that the

23   N-word is occurring?"  Trying to blame Owen Diaz for their

24   failures.

25       But you will hear testimony from Wayne Jackson.  Wayne

 1    Jackson was a manager at the facility, and Wayne Jackson will
 2    tell you that he walked around all of the facility, and he
 3    heard the N-word constantly.
 4         But because they weren't his employees, because they
 5    weren't under his supervision, he did not feel that he had the
 6    power to do anything about it.  It was offensive to him as a
 7    black man, but they had not given him the power, the authority
 8    to say, "That's not right."
 9         You will hear testimony from another supervisor, Michael
10    Wheeler.  You can see him on your screen.  Michael Wheeler will
11    tell you that the N-word was used with regard to him.  He was
12    supervising an employee.  That employee, in response to being
13    verbally reprimanded, called him the N-word, and he complained
14    about it.
15         And nothing happened.  In fact, to the contrary, that
16    employee who used the N-word to his African American supervisor
17    was later promoted to a lead.
18         Tamotsu Kawasaki, the person who did the initial
19    investigation, he will tell you that he heard the N-word
20    constantly throughout the workplace.
21         Tesla will try and tell you that there is a friendly
22    version of the word.  This conduct did not happen in someone's
23    backyard or at a barbecue; it happened at a workplace.  And the
24    law says that employers have an obligation to make the
25    workplace free of racial harassment.  And the evidence will

1    show that despite the fact that managers and supervisors knew

2    this conduct was occurring, Tesla didn't make it stop.

3         And it was their factory, and they had the power to do so.

4         You will conclude that Tesla's conduct is not an accident.

5    It is a conscious decision not to protect African American

6    employees inside their workplace.

7         You are going to hear testimony from -- if we can put up

8    the slide -- you are going to hear testimony from Erin Marconi,

9    who is an HR partner.  Partner is like director.  She will tell

10   you that if any employee inside the Tesla workplace feels

11   uncomfortable with something, then we have to do something

12   about it.

13        And so as a result of someone drawing boobs on the stick

14   figure of the -- of the bathroom door, they stopped everything.

15   500 people had sensitivity training because it was

16   inappropriate to draw breasts on the woman on a door.  Some

17   might consider that childish conduct.  Certainly inappropriate.

18        But they stopped the workplace so that 500 people could

19   get sensitivity training.

20        But the N-word occurs day after day after day every day,

21   all day long, at night, and not once do they have sensitivity

22   training.  Not once do they stop.  To the contrary, they

23   sens- -- they sanitize and minimize.  And so regardless of the

24   fact that African American employees are working in a workplace

25   where the N-word is just rampant and pervasive, nothing is

**OPENING STATEMENT / ALEXANDER**

 1  done.

 2      It was not an accident that African American employees

 3  were hearing the N-word, and it is not an accident that Owen

 4  Diaz was subjected to this conduct because Tesla condoned it.

 5      With regard to video evidence, you will recall -- and I'm

 6  just going to go back.  Inside the elevator, Owen was attacked

 7  inside the elevator by Ramon Martinez.  And at the point when

 8  he was attacked, there was an investigation that was supposed

 9  to be conducted and then they stopped it.

10      And there were two things.  One, there was the video and

11  then there was this person Rothaj Foster.  You will not hear

12  any statement from Rothaj Foster.  No statement was obtained

13  from him.  He was not interviewed.  He was a third party

14  completely unbiased who could have confirmed that Owen Diaz was

15  yelled at using profanity, using racial slurs and that he

16  backed up.

17      You will not hear testimony from Rothaj Foster.

18      But with regard to that video where Owen Diaz said, "Check

19  the video," the video that you will not see from that incident,

20  it is not the only time.

21      With regard to Michael Wheeler, the African American

22  employee, the Tesla factory is so large that they use golf

23  carts to walk around, to get around.  And he was a person that

24  used a golf cart.  And one day, one evening he got off of his

25  cart and walked away, and then he came back and sat down, and

1   he found feces on his cart.

2      He sat in that feces.  And, of course, he was offended.

3   And he went, and he spoke to someone and reported it and said,

4   "Check the cameras," because he will tell you there were

5   cameras everywhere inside of Tesla.

6      And they got back to him, and they said there was no

7   footage.

8      With regard to Owen Diaz and you are not seeing the video

9   there, it is consistent with what occurred with Mr. Wheeler,

10  the African American man who said he sat in feces, and they

11  didn't collect the footage.

12     Now, I have given you this information out of order, so we

13  are going to show you the timeline briefly.

14     We are going to show you the timeline of events.

15     Owen -- Owen Diaz was hired June of 2015.  June of 2015

16  was his first day.  He found racist graffiti.  Racist

17  graffiti -- racist graffiti was inside the bathroom.  He got

18  there early.  He's only been there a brief period of time,

19  doesn't want to make waves, doesn't make a big deal about it.

20  But it will also be confirmed by Mr. Wheeler that it was there.

21  And it was there during the entire timeframe up until when Owen

22  Diaz left.

23     And then you have the Timbreza incident.  It happened

24  July 31, 2015.  It's the first real incident that happened to

25  Owen Diaz.  That's the timeframe when the son was also working

 1    there.

 2         And then you have the Romero misrepresentation where he

 3    says no racist conduct and it's kidding around.  And then you

 4    have the Martinez racist slurs inside the elevator.

 5         And then you have Hurtado beginning to make the racial

 6    slurs.

 7         And then you have Owen Diaz where he -- you have Owen Diaz

 8    visit his son's workplace and overhears his son being called

 9    the N-word.  That's in fall of 2015.

10         And then in October -- October 17, 2016, that's when we

11    have the attack of Owen Diaz inside the elevator where he says,

12    "I don't feel safe."

13         And then October 20 is when the Tesla HR stops the

14    investigation and says, "Let's give them both a verbal

15    warning."

16         And then next, we have the jigaboo, the pickaninny that is

17    left for Owen Diaz in January of 2016.  And then we have the

18    discipline that's decided almost instantly without an

19    investigation.

20         And then we have the Hurtado racist slurs ongoing.  With

21    regard to the Hurtado racist slurs, what occurs is Mr. Hurtado

22    gets into the elevator, and he has been using racial comments

23    with regard to Owen Diaz and harassing him.  And finally Owen

24    Diaz says, "Look, only talk to me about work.  Don't talk to me

25    about anything else."

1        So Mr. Hurtado goes over to his supervisor and says, "Owen

2   Diaz is being unprofessional."  And then as a consequence of

3   that, Victor Quintero will say, "We need to talk to Owen, and

4   maybe we need to give him a final warning and think about

5   termination."

6        So Owen Diaz, as a result of saying, "Only talk to me

7   about work," is subjected to a written warning and a threat of

8   losing his job.  But people use the N-word constantly and

9   nothing happens.

10       I want to just show the --

11                     (Pause in proceedings.)

12       **MR. ALEXANDER:**  So Tesla will try and -- try and say

13   that Owen Diaz had performance issues, but all of his

14   supervisors will say otherwise.  They will also say that Owen

15   Diaz didn't put things in writing.  They have a policy -- if we

16   go to 6.4.  They have a policy that says that.

17       You can make reports verbally or in writing, and it makes

18   no difference.

19       But if you make a report verbally, it's a trap.  Because

20   if you make a verbal report, the company doesn't document it.

21       And if you make a written report, they minimize it and

22   sanitize it as you have seen here.

23       So really, regardless of whether you make a verbal report

24   or you make a written report, the zero tolerance policy is not

25   enforced.

**OPENING STATEMENT / ALEXANDER**

1          I want to talk to you briefly about Owen Diaz and preview

2     the testimony you are going to receive.

3          Remember, there are two things that you have to do, award

4     damages to Owen Diaz for the harm that he suffered -- and you

5     are going to hear about the harm that he suffered, the

6     sleepless nights, the inability -- the headaches, the anxiety,

7     the wondering what to do.  You are going to find out that he

8     left in February of 2016 because his mother passed away.

9          And he spent that time away dealing with his mother and

10    the time came to come back.  And when the time came to come

11    back, he could not bring himself to do it.  He could not bring

12    himself to go back to this workplace that was filled with the

13    N-word and all these events.

14         And so as a consequence, he left.  And then a month later,

15    Tesla terminated him because he left his job.

16         And you're going to find out -- you're going to find out

17    what it was like for him to experience these things inside of

18    his workplace.  He had been happy to be inside the workplace

19    and then because of these events, he could not take it anymore.

20         So it wasn't just about the son, it was about everything.

21    His outlook on life changed, changed immeasurably,

22    immeasurably.

23         You will hear testimony from a psychologist, and only the

24    plaintiff will bring a psychologist to tell you what Owen Diaz

25    went through and the consequence of having something happen to

OPENING STATEMENT / ALEXANDER

1  you based on something you can't control, based on the color of

2  your skin.

3       He will tell you that it is life changing.  He will

4  confirm that from the point this happened, Owen Diaz, the way

5  he looks at the world is to be mistrustful.  Every new job, he

6  will wonder when is it going to happen here?  He does not feel

7  safe.  And now it's not -- it's not just in the words, it's not

8  just metaphorical, he does not feel safe anymore.

9       You have two jobs.  One is to give compensatory damages to

10 Owen Diaz, but the second thing is to give punitive damages to

11 punish and deter.

12      And your job will be to determine how much money does it

13 take to get the attention of a company that is worth -- was

14 worth billions and billions of dollars under circumstances

15 where they made a conscious decision not to maintain a

16 workplace free of discrimination and harassment, but instead

17 decided -- made a decision to maintain and condone a plantation

18 mentality workplace that was not safe for African American

19 employees.

20      Thank you.

21          THE COURT:  Thank you, Mr. Alexander.

22      Mr. Spiro.

23          MR. SPIRO:  Thank you, Your Honor.

24          THE COURT:  Not to steal your thunder or anything, but

25 will you be completed by 5:00 o'clock?

1      **MR. SPIRO:**  I don't know what time it is, but I'll be

2   done in 15 -- 20 minutes.

3      **THE COURT:**  Okay.  Please go ahead.

4                    <u>**OPENING STATEMENT**</u>

5      **MR. SPIRO:**  Okay.  So what this case is not about is

6   whether we think that everything that happened at the Fremont

7   factory of Tesla was defensible or right.  It was not.  There's

8   no excuse.  I'm not here to defend it.  I never defended it.

9      But that's not what this case is about.  And this case is

10  also not about harassment generally or the problems of this

11  country or the history of the world and what we all ought to

12  spend more time doing to make it better.  That's not what this

13  case is about.

14     What this case is about is Owen Diaz, what his damages

15  are, what he can prove, what he has exaggerated, lied, and what

16  he is owed under our laws.

17     And, you know, Mr. Diaz, through his counsel, has come up

18  and told you that he has been damaged by the use of the N-word.

19  It is the catalyst of their case.  Not just upset about it but

20  psychologically harmed, injured, enough injury that's caused an

21  impact in his functioning and actual real damage under our law.

22  That's what he's claiming they want millions and millions and

23  millions of dollars.

24     But there are two things at the outset I don't think they

25  fully told you.  And he said it quickly, but I want to make

1   sure you know the truth, which is that word, the N-word, which

2   is a horrible thing and can be said sometimes joking -- more

3   jokingly and sometimes in a really, really horrible way.  Never

4   once in this case, will Owen Diaz produce a single document, an

5   e-mail, anything, telling anyone he was called the N-word at

6   all.  Not once.  Let alone called it in this horrible way.  He

7   will call not one single witness that tells you he was called

8   the N-word.  Not one.

9        There is almost no evidence of anything that you just

10   heard other than a lawyer saying that it happened eight years

11   later, eight years later.

12        And second, whatever happened in this case, whatever

13   happened in the Fremont factory, after working there for

14   months, it did not prevent Owen Diaz from taking the step to

15   encourage his son to apply to Tesla.

16        He told his son, "It would be a great experience for you

17   to work at Tesla."  I don't think they told you that.  His son

18   didn't just end up there.  He told him to come work there.

19        And guess what?  He also told his daughter to work there.

20   He had his daughter working there also.

21        So let me say that again.  They made it sound as if his

22   son just happened to be there and he bumped into him one day.

23   He will tell you under oath he encouraged his son to work

24   there.  He told his daughter to work there.

25        And when his son got fired for doing something, his son

1    reapplied to work there again.  So again, that word, that

2    horrible word, was never documented in this case in any way

3    eight years ago, never once in an e-mail, never once will a

4    witness come forward and say he was called it.  Not once.  This

5    is eight years later.

6        And that action that he took, actions of telling his son,

7    "This is a great place to work" -- that's what he told his son,

8    "this is a great place to work." And his daughter also applied

9    to work at Tesla.  Actions.

10       But ultimately at the end of this case, you'll have simple

11   choices to make because I'm not here to defend everything that

12   he heard and everything that he saw.  I'm here to show you the

13   evidence, the actual evidence which will allow you to answer

14   the following questions.  One, did Owen Diaz exaggerate, lie,

15   about what he heard and what he saw and how it affected him?

16   And if he did, you should question his credibility and you

17   should give him what he deserves.

18       Two, was Owen Diaz while frustrated, upset, hurt by what

19   he experienced, fairly so, not actually psychologically

20   provably damaged so that his damages are whatever he deserves

21   for that?

22       Or three, is Owen Diaz being honest, forthright, and

23   straightforward with you about what happened and did it cause

24   psychological injury that impacted his functioning and real

25   damage under our law?  And for that, he should be awarded

1   damages consistent with what whatever that injury is, whatever

2   is fair.  And that is absolutely fine.

3       But here are the facts.  Tesla's the defendant here.

4   They're a company.  At the time in 2015, they were a relatively

5   young company.  And they're here to answer about this specific

6   man and his claims.

7       Tesla's a big place, many countries, hundreds of stores,

8   tons of offices.  This factory alone is three times the size of

9   Oracle Park.  5.3 million square feet.  There's 10,000 workers

10  there.  Some bad, some good.  Some tried to harm Tesla, some

11  try to help Tesla.  Some harm their fellow worker, some help

12  their fellow worker and everything in between.

13      The setting for this case in all of massive Tesla is one

14  specific elevator in a specific area during a specific shift

15  during a several month period in the Fremont factory about an

16  hour from this courthouse.  So you have to picture this,

17  there's thousands of workers there, it's a huge factory working

18  24/7.  People from all walks of life, minorities and

19  immigrants, blue collar, hard-working.  This was loud physical

20  high-stress work.  Everyone had to work together to get this

21  job done.

22      There were material handlers, people making parts, moving

23  the parts, elevator operators, recycling, janitors, everything

24  had to work together to make this work or the job wouldn't get

25  done.  If there was a weak link, it messed everything up.

**OPENING STATEMENT / SPIRO**

1    There were tensions, people fought, it was like a small

2    city and not everybody got along.  That's what happens

3    sometimes when you put this many people together in a

4    high-stress environment.  There were disagreements.

5        But this Fremont factory, it was a majority minority

6    workplace.  Minorities, including African Americans, women,

7    they were leads, they were supervisors, they were in charge of

8    the day-to-day operations.  African Americans were leading

9    these investigations.

10       The key person investigating everything you just heard

11   about is an African American man.  When folks got in arguments

12   and fights, he was the one deciding, he was the one making the

13   choices, and HR staff was in the factory day and night.

14       Owen Diaz began working at Tesla in the summer of 2015

15   some eight years ago.  He worked the overnight shift.  He

16   operated a heavy machine elevator.  That was his castle.

17       And one day he saw a racist drawing.  People shouldn't do

18   that.  That was wrong.  There's no excuse.  I'll never make an

19   excuse.

20       But as I told you before, Owen Diaz never really reports

21   basically anything that you heard about in this courtroom from

22   lawyers years later.

23       And the reason I come back to that -- well, it's really

24   questions, not reasons, that you need to ask yourself, which is

25   how come he never reported that?  How can you, the jury, count

1    on something that he says is so important through his lawyer

2    now but never did then?  And how was this company supposed to

3    do things about things they didn't know were happening?

4         What Mr. Diaz says now were the actual tangible events

5    that harmed him are the following, and they're very specific.

6    One, a man named Judy Timbreza coming into the elevator for a

7    few weeks with coworkers laughing and heckling him, for lack of

8    a better word, and he was saying Spanish words under his

9    breath.  Mr. Diaz resourcefully Googled the words, saw that one

10   of them, at least, was improper confronted, Timbreza.  They

11   went eye to eye, toe to toe, folks broke it up, they asked

12   questions.  They gave Timbreza a warning for using that

13   language.  They removed him from the area, and Mr. Diaz never

14   saw Judy Timbreza again.

15        There was no cover up.  There was a report, an

16   investigation, punishment, the conduct stopped, and Mr. Diaz

17   said after that event, and he will tell you under oath, he was

18   satisfied and he thought it was handled well.  He will tell you

19   that under oath.  He has testified to that under oath.

20        So let's move on to something else.  Second, Ramon

21   Martinez.  You heard a lot about the incident in the elevator

22   with Ramon Martinez.  And one day in the elevator, Mr. Martinez

23   showed up and he was angry with Mr. Diaz.  They had issues with

24   one another.

25        Diaz was by his own admission a man without a filter,

 1  confrontational.  You will hear he didn't always follow every

 2  rule, and Mr. Martinez confronted him.  They went eye to eye,

 3  toe to toe.  Folks broke it up, asked questions, gave them both

 4  warnings, and they didn't see each other and had no interaction

 5  until 2016.

 6      Diaz's own words at the time, not eight years later, at

 7  the time, confirms Martinez said nothing racist.  His statement

 8  is in front of you.

 9      The witnesses that were spoken to, they say nothing racist

10  happened.  Mr. Diaz was interviewed by Wayne Jackson, the

11  African American program manager, he said nothing racist

12  happened.  And you will soon learn this was also not a cover

13  up.

14      But you see, the evidence will show that it was easy years

15  later to say that this was based on race, very easy, and that's

16  nobody's fault but Ramon Martinez because the moment he did

17  this, it's racist and it's offensive and it shouldn't have been

18  drawn and I'm sorry that this happened.

19      So again, when Mr. Martinez showed up and he sees that

20  people are very, very upset about this, and rightfully so, he

21  apologies and he says I'm sorry.  I -- I -- I was kidding.  I

22  don't know whether he was being mean, he thought it was mean

23  funny.  I don't know what was in his mind eight years ago.

24      I know it wasn't right.  You heard about it in the jury

25  instructions.  You heard about Ramon Martinez.  Not here to

1  defend Ramon Martinez.

2      Supervisors right after this met with everybody in the

3  recycling department, all three shifts, to tell them how

4  offensive this was, to tell them that Mr. Martinez was

5  punished, and to tell them that the conduct was unacceptable in

6  the factory.  Not a cover up.

7      Again, Mr. Martinez was suspended without pay.  He was

8  issued a final written warning.  He was removed from that unit

9  and that area.  And he never saw Mr. Diaz again.  But he wasn't

10  fired.

11      You may very well feel he should have been.  Some of you

12  may think the world should give Mr. Martinez a second chance.

13  That's not what this trial's about.

14      This trial is about the harm this had on Owen Diaz.  And

15  so after this incident, Mr. Diaz will tell you of the argument

16  he had with Robert Hurtado, he will say it was a fight spurred

17  by racism.  There will be zero evidence of that.  No written

18  reports, no e-mails, no other witnesses to this alleged racism.

19      In fact, the independent eyewitness at the scene says

20  there was nothing racist about this at all.  It was just a

21  fight between two guys in a factory.

22      And so then they will stand up and they'll say, well,

23  there's these other events, other things were racist, other

24  people said other stuff at other times, other bad things.  And

25  they will do this to try to get you angry at Tesla.

1    But as the Court will instruct you, you're not here to

2    award damages for the harm to others.  And again, some of what

3    they told you, you're going to find out very soon is completely

4    untrue.

5        Again, I have to remind you what you are here to judge

6    when you hear these things is not whether an individual person

7    did something wrong -- I'm telling you Martinez did -- what you

8    are here to decide is whether Tesla did something to fail to

9    deal with this and how that act caused damage to Diaz.

10       Caused damage to Diaz and not anybody else.  So every time

11   they tell you about this unverified, unreported, unnamed,

12   unspecified something, ask yourself:  Did Tesla, about that

13   incident, do something wrong?  Did it cause damage to Diaz?

14   How should it, the company, be punished?

15       And there is something else that I have to say about this

16   because I heard of this weaponization of images of plantations

17   when I was sitting there.

18       And it's hard to hear.  It is hard to hear about a company

19   that has provided jobs and opportunity and cares about its

20   employees.  It's hard to hear.

21       And so there is a second thing I need to tell you now

22   about this unnamed, unreported, unverified somethings, and it's

23   the most important thing I'm going to tell you today.

24       Exaggerated lie reports, lies on this subject matter, they

25   harm progress.  They destroy justice.  So remember that when

 1  Owen Diaz testifies.  Remember that.

 2      Remember that when they talk about justice and what's

 3  right.  Remember that.

 4      And so at the end of this case, you will have relatively

 5  simple choices to make because I'm not here to defend

 6  everything you heard or saw.  I'm here to show you the evidence

 7  which will allow you to answer those three questions.

 8      One, did Owen Diaz exaggerate or lie about what he heard

 9  and how it affected him, in which case you should question his

10  credibility and give him what he deserves.

11      Two, was Owen Diaz, while frustrated upset or hurt by what

12  he experienced, not actually psychologically proveably damaged

13  so that his damages are just what he deserves?  Or was Owen

14  Diaz honest, forthright, and straightforward with you and what

15  happened caused psychological injury that impacted his

16  functioning and real actual damages under the law at which

17  point he should absolutely be awarded whatever damages are

18  consistent with that actual specific damage as instructed by

19  the Court.

20      But to do this, you need to get inside the mind of Owen

21  Diaz.  And to do that, you are going to need to know a thing or

22  two about Owen Diaz.

23      And he knows a thing or two about this world, and he knows

24  actions speak louder than words.  Actions speak louder than

25  words eight years later.  He knows he encouraged his kids to

 1  join because this environment was not as bad as he claims here
 2  today.  Asking for more money than he knows he deserves.  He
 3  didn't leave after any of these incidents.  He worked.  He got
 4  paid.  He got raises.  He got promoted.  He passed along an
 5  African American's friend resume to work at Tesla during this
 6  time period.

 7       These things I'm talking about, they're never going to
 8  change.  Those facts, those actions, they're never going to
 9  change.  One witness will say they were talking closer.  He got
10  more loud.  This witness should have gotten a longer
11  suspension.  That report they did, it should have been better
12  done.

13       You know you will hear these differences in testimony and
14  opinions, and you will hear a lot from lawyers.  But his son
15  and daughter being encouraged to apply there, his son working
16  there and reapplying there, his raises and promotions, his
17  passing the resume of an African American man to join him in a
18  job at Tesla, they will never change.  These actions will never
19  change.

20       And so as they told you, Owen Diaz leaves work at Tesla.
21  His mother passed away.  He e-mails and let everybody know.
22  They send their condolences.  He goes and deals with that.  It
23  was a very sad time.

24       And it is true, you know, the co-workers, his coworkers at
25  Tesla were having lots of issues with Mr. Diaz, lots of issues

1   with him, but I'm not going to talk about that right now.

2   Because as Mr. Diaz will tell you, as I agree, you are not

3   going to get over losing your mom.  And Mr. Diaz left.  He left

4   to attend to his mother's passing.  He left the Fremont factory

5   of Tesla.

6        Soon after that, he gets a higher-paying job, a better

7   job.  You know, and I'm sorry that things happen there.  I'm

8   glad he got a better job.  And some people would say that

9   should have been the end of a lot of this.

10        But Owen Diaz will tell you that a year or so after that,

11   he saw one of these lawyers on TV and he brought a lawsuit.

12        Now, the evidence will show the case you are here to

13   decide is very narrow.  It is very specific and very difficult

14   for them to prove, and it's their burden to prove it.  Was Owen

15   Diaz actually damaged by this in a way he can prove to get

16   millions and millions of dollars?  Not hurt, but real actual

17   damage?

18        And so how this works is you look at categories.  That's

19   how damages work.  Did he lose wages?  Did he get a

20   lower-paying job?  Did his employment --

21             MR. ALEXANDER:  Objection.  Relevance.

22             THE COURT:  Overruled.  You both have exceeded the

23   bounds of argument and I'm -- I'll allow Mr. Spiro to continue.

24             MR. SPIRO:  These are things he is not claiming, so

25   I'm not -- did his employment prospects get diminished?  Did he

1   have to pay money out-of-pocket costs?  Were there physical

2   damages, like he got punched in the eye?  Did he get mental

3   health treatment?  Was there documented psychological issues of

4   any kind?  No.  None.  Zero.

5         End of story.

6         But he has to prove psychological impairment, injury.  Not

7   hurt, real proveable damage.  Harm happens in life, bad things

8   happen every day.  Proveable damage is something beyond the

9   harm happening.  And to do all of this, like I said, you have

10  to get inside the mind of Owen Diaz.

11        And they have the burden -- they have the burden to prove

12  the thing that you are here to decide, the specific damages

13  that impacted his mind.

14        So three and a half years after that picture was up in the

15  Tesla factory, they sent Mr. Diaz to go meet with a

16  psychologist that they know.

17        And they told you how critical this witness is to their

18  case.  You know, many cases it's like who did what when, what

19  was the lighting like.  They told you this case is about

20  damages.  This is their damages witness.  He has to show and

21  prove that there was a psychological injury that impacted his

22  functioning.  And the psychologist met with Mr. Diaz, and he'll

23  give you his take.

24                       (Pause in proceedings.)

25          MR. SPIRO:  This is Mr. Diaz's son reapplying to come

1  back to Tesla, reapplying to multiple jobs to come back to

2  Tesla.

3      And so you saw their presentation.  You know, I just want

4  to tell you, though, these names, these are not -- this is not

5  a civil rights -- these are not civil rights social action

6  lawyers.

7          **THE COURT:**  All right.  That's too far, Mr. Spiro.

8  Why don't you go to what this case is actually about.  Finish

9  what the evidence is going to show, and let's not be talking in

10 a pejorative way about people who are in this courtroom.

11         **MR. SPIRO:**  This is the chart of the -- of the events.

12         **MR. ORGAN:**  That's our exhibit.  That wasn't --

13         **MR. SPIRO:**  This is the timeline they prevented --

14 they presented.  This is their timeline of cover-ups.  This is

15 where they say that Owen made verbal complaints, even though

16 Owen knew that it would never work to make a verbal complaint

17 at Tesla.

18     But at the end of it, there was one exhibit of the image.

19 That drawing is real, and it is the canvas upon which they

20 paint the rest of this story.

21     You see, because that drawing happened, they can try to

22 convince you that all these other things happened.  And that's

23 what they hope to do, and that's fine.

24     But they didn't show you any exhibits about damages.  They

25 didn't show you any exhibits about damages.  And neither did I

1  because there are none which is what this case is all about.

2      And that's it.  They will come back up right where they

3  started.  They will use rhetoric.  They will use emotion.  And

4  Mr. Diaz will testify, and you will get to judge his

5  credibility.

6      But all of these questions will remain the same.  I ask

7  you to listen to the evidence, find the facts, and you will get

8  this right.  Thank you.

9          **THE COURT:**  All right.  Thank you.

10  So, ladies and gentlemen, this has been a long day and I

11  appreciate your attention to everything that's gone on all day.

12      Tomorrow morning, we will start at 8:30.  I hope you will

13  be here by 8:15 because I start getting nervous.  The

14  punctuality really matters.  In this case I want to get it in

15  for you as I promised.  So please be on time.

16      I want to just remind you of a few things.  Number one,

17  when I read the preliminary instructions, I always read twice

18  the "What the lawyers say isn't evidence."  And I do that

19  because it's not.  The evidence is what's going to start

20  tomorrow morning.  And it's going to come in through the

21  witnesses, and you are going to make a determination about

22  those things.

23      Another thing that is important to know, both of the fine

24  lawyers who gave their openings used the word "I" a fair

25  amount, about I feel, I this, I that.

 1        That has nothing to do with anything.  So it just -- just

 2   focus as you promised to do during -- during the selection of

 3   the jury on what the people tell you and what you learn from

 4   the evidence and the documents.

 5        Don't talk about this with anybody.  Don't communicate

 6   with anybody about the facts.  Don't look anything up.  Really

 7   important that all of those things occur, and we will get this

 8   case in.  And I appreciate your service, and I'm now going to

 9   let Ms. Davis walk you out.

10        (Proceedings were heard outside the presence of the jury:)

11        **THE COURT:**  All right.  Please be seated, everybody.

12   I am not going to have in this trial any sort of attacks on one

13   side or another.  It's not happening on either body -- any

14   counsel's part, and I want to be just as clear as I can be

15   about that.

16        This case is, as Mr. Spiro said at one point, about

17   Mr. Diaz and what happened to Mr. Diaz and Mr. Diaz's damages.

18   That's what it's about.

19        So we will meet at 8:00 o'clock tomorrow morning.  I look

20   forward to seeing you then.

21        **MR. SPIRO:**  Your Honor, one thing is we don't have a

22   witness order from Plaintiffs.

23        **THE COURT:**  Okay.  What is the witness order tomorrow?

24        **MR. ORGAN:**  We have sent --

25        **THE COURT:**  Would you please speak into the microphone

**PROCEEDINGS**

 1  and just tell me what the witness order is, please.

 2          MR. ORGAN:  We did send -- Kawasaki, who was here this

 3  afternoon, Your Honor, he is coming back in the morning.

 4  Kawasaki, Jackson Wheeler.  We've got two videos to play,

 5  Demetric Di-Az, Erin Marconi, Ramon Martinez, Ed Romero, Amy

 6  Oppenheimer.  Did I say Michael Wheeler?  I think I did.

 7          THE COURT:  Yes, you did.

 8          MR. SPIRO:  I just want to clarify that that's the

 9  order because we have to produce some of these witnesses.

10          THE COURT:  Right.  Is that the order?

11          MR. ALEXANDER:  That's the current order.  And at the

12  end of the day tomorrow, we will confirm if there are going to

13  be changes.

14          THE COURT:  So the order for tomorrow is Kawasaki,

15  Jackson, Wheeler, and the two videos followed by Mr. Martinez?

16          MR. ALEXANDER:  Yes.

17          MR. COLLIER:  We have Wheeler and Jackson in the other

18  order.

19          THE COURT:  Oh, I'm sorry.  Wheeler goes after

20  Kawasaki.  And is -- what's your expectation with respect to

21  time?

22          MR. ORGAN:  So --

23          THE COURT:  Should Mr. Martinez, for example, be here

24  if Tesla is producing him?

25          MR. COLLIER:  Our only concern is that Mr. Spiro

**PROCEEDINGS**

 1  indicated that he might be changing some of their time

 2  estimates.  Based on our current time estimates, I don't think

 3  we get to Mr. Martinez tomorrow.

 4       **THE COURT:**  Well, it is necessary that -- that you

 5  know because I don't want you running out of time.  I would

 6  hate to have you rest.

 7       **MR. COLLIER:**  I think he should be here tomorrow just

 8  in case.

 9       **MR. SPIRO:**  We will have him tomorrow.

10       **MR. ORGAN:**  We have Kawasaki, Wheeler, Jackson,

11  Romero.

12       **MR. COLLIER:**  Marconi is the next thing after that,

13  then Romero, then Oppenheimer.

14       **MR. SPIRO:**  We are getting different orders each time.

15       **THE COURT:**  Yeah.

16       **MR. COLLIER:**  I apologize.  I have the list now of the

17  actual order, so I'm not sure what he is reading off of.

18       **MR. SPIRO:**  Want to read it one more time.

19       **MR. COLLIER:**  Yes.  Kawasaki first, Wheeler, Jackson

20  Marconi video, Romero, Oppenheimer, Demetric Di-Az video, Ramon

21  Martinez, if we get there, which I think is unlikely.

22       **MR. SPIRO:**  Then we are not going to get -- and that's

23  where he said there because the order -- I heard the order

24  wrong.  Okay.  So we are not going to get to him.  We will

25  obviously make Mr. Romero available tomorrow.

**PROCEEDINGS**

1          **MR. COLLIER:**  I think it's unlikely we will get to

2    him.

3          **MR. ALEXANDER:**  But we have the order.

4          **THE COURT:**  We have the order.  Isn't it nice.  All

5    right.  It is a long day.  Thank you all.  I will look forward

6    to seeing you in the morning.

7          **MR. ORGAN:**  Your Honor, one last thing.  It's a little

8    crowded in here with the lawyers and for us to confer.  It's a

9    little difficult to have a Tesla attorney right -- 2 feet from

10   us.

11         **THE COURT:**  Well, it is a tight courtroom.  I don't

12   know what the solution is that you are looking for, but they

13   are also going to hear you if you're -- you know, if there was

14   2 feet difference, so...

15         **MR. ORGAN:**  Okay.  Thank you, Your Honor.

16            (Proceedings adjourned at 4:43 p.m.)

17                  ---oOo---

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, March 27, 2023

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter