**Volume 2**

**Pages 254 - 481**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
OWEN DIAZ,                       )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )    NO. C 17-06748 WHO
                                 )
TESLA, INC. dba TESLA MOTORS,    )
INC.,                            )
                                 )
            Defendant.           )
_____)
```
                            San Francisco, California
                            Tuesday, March 28, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    CALIFORNIA CIVIL RIGHTS LAW GROUP
                    332 San Anselmo Avenue
                    San Anselmo, California  94960
                **BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW**

                    ALEXANDER MORRISON + FEHR LLP
                    1900 Avenue of the Stars - Suite 900
                    Los Angeles, California  90067
                **BY:  J. BERNARD ALEXANDER, ATTORNEY AT LAW**

         **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1   APPEARANCES:   (continued)

 2   For Plaintiffs:
                           ALTSHULER BERZON LLP
 3                         177 Post Street - Suite 300
                           San Francisco, California  94108
 4                 BY:  JONATHAN ROSENTHAL, ATTORNEY AT LAW

 5                         COLLIER LAW FIRM, LLP
                           240 Tamal Vista Boulevard - Suite 100
 6                         Corte Madera, California  94925
                   BY:  DUSTIN L. COLLIER, ATTORNEY AT LAW
 7
     For Defendants:
 8                         QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                           51 Madison Avenue - 22nd Floor
 9                         New York, New York  10010
                   BY:  ALEX SPIRO, ATTORNEY AT LAW
10                      STEPHANIE KELEMEN, ATTORNEY AT LAW

11                         QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                           300 West 6th Street - Suite 2010
12                         Austin, Texas  78701
                   BY:  ASHER GRIFFIN, ATTORNEY AT LAW
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

Tuesday, March 28, 2023 - Volume 2

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **KAWASAKI, TAMOTSU** | | |
| (SWORN) | 261 | 2 |
| Direct Examination by Mr. Organ | 262 | 2 |
| Cross-Examination by Mr. Spiro | 282 | 2 |
| Redirect Examination by Mr. Organ | 330 | 2 |
| Recross-Examination by Mr. Spiro | 337 | 2 |
| | | |
| **WHEELER, MICHAEL** | | |
| (SWORN) | 340 | 2 |
| Direct Examination by Mr. Collier | 340 | 2 |
| Cross-Examination by Mr. Spiro | 356 | 2 |
| Redirect Examination by Mr. Collier | 378 | 2 |
| | | |
| **JACKSON, WAYNE** | | |
| (SWORN) | 379 | 2 |
| Direct Examination by Mr. Alexander | 380 | 2 |
| Cross-Examination by Mr. Griffin | 406 | 2 |
| Redirect Examination by Mr. Alexander | 447 | 2 |
| | | |
| **OPPENHEIMER, AMY** | | |
| (SWORN) | 454 | 2 |
| Direct Examination by Mr. Collier | 454 | 2 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 38 | | 266 | 2 |
| 39 | | 274 | 2 |
| 40 | | 333 | 2 |
| 222 | | 278 | 2 |
| 235 | | 278 | 2 |

PROCEEDINGS

```
 1   Tuesday - March 28, 2023                        8:01 a.m.

 2                      P R O C E E D I N G S

 3                          ---000---

 4           THE CLERK:  Please come to order.

 5           THE COURT:  Good morning, everybody.  Please be

 6   seated.

 7                   (Pause in proceedings.)

 8           THE COURT:  All right.  With respect to the objections

 9   that were filed by the Plaintiffs to the opening statement, I

10   do -- I think they were waived, first of all.  I'm not going to

11   give an instruction that is specific to Mr. Martinez or to the

12   other specific challenges that were raised.

13       I am going to remind everybody what their role is in this

14   case.  I'm going to repeat that it is to determine the amount

15   of damages to which Mr. Diaz is entitled.  He has the burden to

16   prove that amount by the preponderance of the evidence.

17       It's been established he's entitled to both compensatory

18   and punitive damages.  It's for the jury to determine the

19   amount and remember, as I said yesterday, what the lawyers

20   argue is not evidence.  You'll be given written versions of the

21   instructions at the end of the case.  They govern the law, not

22   what the lawyers say about them.

23       So that's what I'm going to do at the start.

24           MR. SPIRO:  Just -- the Defense would like an

25   exception to that.  From our perspective, the Court has given
```

1    preliminary instructions, after we sat down, of openings.

2        The Court reminded the jury again that what lawyers say is

3    not evidence, and to then have them before the first witness be

4    instructed yet again, we think is prejudicial.  And so we're

5    going to take an exception to that.

6            **THE COURT:**  Great.  What else?

7            **MR. ORGAN:**  Yes, Your Honor.  Just to preview, as I

8    have done previously with the Court, we do have a 106 issue

9    with Mr. Romero later today.

10       106 is the e-mail that he sent to HR about hearing the

11   N-word and -- just wanted to make the Court aware of that, that

12   that will be coming up today.  106 was admitted last time which

13   is different than 109 which was the graffiti one.

14           **THE COURT:**  Okay.  And I'll look for it.

15           **MR. ORGAN:**  Okay.

16           **THE COURT:**  When it comes up.

17           **MR. ORGAN:**  Okay.

18           **MR. GRIFFIN:**  Your Honor, can we respond to that?

19           **THE COURT:**  Go.

20           **MR. GRIFFIN:**  This is the issue that was raised last

21   week by Mr. Spiro in pretrial, and Exhibit 106 was not

22   admitted.  It was admitted for impeachment purposes only, and

23   for the purpose of the deposition -- of the testimony today, we

24   think that should be -- it's only an impeachment document.

25       So they need to establish a basis for the impeachment

 1   before they can even show or use that witness -- that exhibit

 2   at all, and that's what we want to be sure of because it's our

 3   concern that they're trying to induce impeachment to put a

 4   document in the record that wasn't properly --

 5           THE COURT:  Right.  You all have prefaced what's going

 6   to be coming.  And I'm going to have to rule on it based on the

 7   context of what comes.

 8           MR. COLLIER:  Your Honor, I also just wanted to raise

 9   an issue.  Does this work?

10           THE CLERK:  Yes.

11           MR. COLLIER:  We have Amy Oppenheimer, the HR expert,

12   testifying today.  Typically, experts are exempt from the

13   witness exclusion and that's true under Your Honor's standing

14   order.  So Ms. Oppenheimer was planning to arrive and watch

15   some of the testimony before she testifies.  I just wanted to

16   make sure that Your Honor was aware of that and didn't have a

17   problem with that.

18           THE COURT:  No.  That's fine.

19       Anything else that we ought to talk about today?

20           MR. ORGAN:  Oh, there is one thing, Your Honor.

21           THE COURT:  Get to the mic, Mr. Organ.

22           MR. ORGAN:  Sorry.  Apologize, Your Honor.

23       Mr. Kawasaki texted us.  Apparently, there's an accident

24   on the Bay Bridge.  His arrival time was supposed to be 8:10,

25   so I don't think it will be a problem.  But there might be

**PROCEEDINGS**

1   issues with the jury, too, because the Bay Bridge apparently

2   has --

3        THE COURT:  There may be problems with the jury, but

4   we'll start as soon as the jury is ready.

5        MR. ORGAN:  Okay.  Thank you, Your Honor.

6        THE COURT:  Okay.  All right.  See you when everybody

7   is here.

8                  (Recess taken at 8:05 a.m.)

9               (Proceedings resumed at 8:31 a.m.)

10        THE COURT:  We have a jury.  Are you ready to proceed?

11        MR. ORGAN:  Yes, Your Honor.

12        MR. SPIRO:  Yes, Your Honor.

13        THE COURT:  Let's get the jury and get going.

14                  (Pause in proceedings.)

15   (Proceedings were heard in the presence of the jury:)

16        THE COURT:  All right.  Please be seated, everybody.

17     Good morning, ladies and gentlemen.  Thank you for being

18   so prompt this morning with the weather as it is.  So we're now

19   going to proceed with the trial.  I just want to remind you

20   that your role in this case is going to be to determine the

21   amount of damages to which Mr. Diaz is entitled.  He has the

22   burden to prove that amount by a preponderance of the evidence.

23     It's been established that he's entitled to both

24   compensatory and punitive damages.  It's for you to determine

25   the amount.  And remember, as I told you yesterday, what the

1  lawyers argue and say is not evidence.  You'll get a written

2  version of the instructions that I gave you earlier at the end

3  of the case, and they govern the law in the case.  Not what the

4  lawyers say about them.

5      So with that, Mr. Organ, who's the first witness?

6          **MR. ORGAN:**  Your Honor, the Plaintiff calls Tamotsu

7  Kawasaki.

8          **THE COURT:**  Okay.

9                  (Pause in proceedings.)

10         **THE COURT:**  Please step up, Mr. Kawasaki.

11         **THE CLERK:**  If you will step up and remain standing.

12  I'm going to take your photograph.

13         **THE WITNESS:**  Mask or no mask?

14         **THE CLERK:**  You can take your mask off if you have

15  been vaccinated.  Raise your right hand.

16                  **TAMOTSU KAWASAKI**,

17  called as a witness for the Plaintiff, having been duly sworn,

18  testified as follows:

19         **THE CLERK:**  Please state your full name for the court

20  reporter.

21         **THE WITNESS:**  Tamotsu Edwen Kawasaki.  That's

22  T-A-M-O-T-S-U, E-D-W-E-N, Kawasaki, like the motorcycle,

23  K-A-W-A-S-A-K-I.

24  \\\

25  \\\

1                          DIRECT EXAMINATION

2    BY MR. ORGAN:

3    Q.   Good morning, Mr. Kawasaki.  How are you?

4    A.   I'm good.

5    Q.   Do you go by "Tom" typically?

6    A.   Tom is easier.  It's just more American.  Tamotsu is hard

7    to pronounce, and people butcher my name all the time, so,

8    yeah, Tom is easier.

9          THE COURT:  Mr. Kawasaki, if you would slow down just

10   a little bit, that would be great.

11         THE WITNESS:  Sorry.

12   BY MR. ORGAN:

13   Q.   Where did you grow up?

14   A.   Daly City, California.

15   Q.   Are you married?

16   A.   Yes.

17   Q.   And do you have kids?

18   A.   Yes.

19   Q.   What do you do for a living now?

20   A.   I'm a plumber now.  I actually started my own plumbing

21   business here in the Bay Area.

22   Q.   At some point in time, did you work at Tesla?

23   A.   Yes.

24   Q.   In what position were you hired in Tesla?

25   A.   I was hired as a sorter.

**KAWASAKI - DIRECT / ORGAN**

1   **Q.**  And could you explain to the jury, what's a sorter?

2   **A.**  I was just pretty much just breaking down cardboard,

3   sorting cardboard from plastic, and stuff like that.  It wasn't

4   nothing fancy.  I was hired through a staffing agency.  I

5   actually just moved back from Texas and picked up any job I

6   could get.

7   **Q.**  When you were hired to work at the Tesla factory, did you

8   receive any training from Tesla on race harassment issues?

9   **A.**  There was no training.  I actually got hired through a

10  staffing agency, Chartwell.  And I actually did my paperwork in

11  Hayward, and then they sent me that day to Tesla and said,

12  "This is where you go, and somebody will meet you in the front

13  to let you in."

14  **Q.**  Okay.  And what kind of shifts were you working?

15  **A.**  In the beginning I worked the day shift, and then

16  eventually I got moved to the overnight shift, which was

17  two shifts, two 12-hour shifts.

18  **Q.**  Did you know a man named Victor Quintero?

19  **A.**  Eventually at the -- when I got put in a higher position,

20  Victor Quintero was somebody I was told to send e-mails to, and

21  that was my head lead for environmental sustainability for

22  Tesla.

23  **Q.**  So you received a promotion then?

24  **A.**  Yes.

25  **Q.**  And what was your promotion to?

1    A.   I promoted -- I was actually lead, and then I promoted to

2    running cardboard and then lead elevator operator.

3    Q.   Okay.  And could you explain to the jury, what are the

4    elevators that you were lead elevator operator?

5    A.   The elevators are where material goes up and down in the

6    production facility where -- if the elevators don't stop

7    running, production stops and money gets lost.  So, it's a

8    constant moving system.  If you don't get product up to the

9    lines or you don't get product down, the warehouse tends to get

10   put on pause or holds.

11   Q.   So would it be fair to say that the elevators are a key

12   component of the car factory?

13   A.   You would say it's a very key component because if you

14   don't have product going up or down to these lines, then stuff

15   gets stopped and production stops.

16   Q.   Okay.  Did you ever know a man named Owen Diaz?

17   A.   Yes.

18   Q.   And how did you know Mr. Diaz?

19   A.   Me and Mr. Diaz worked together, and then when I became

20   elevator lead, Victor Quintero and Jaime Salazar asked me who

21   would I feel would be a great in a position there.

22        I was working with Owen.  He was just there, and he came

23   to work every day and worked hard.  So when I became lead, I

24   said, "I want that man in the position for me to fill."

25   Q.   So Owen took over your position then?

1   **A.**   Owen took over my spot.  When I became lead of the

2   elevators, he took over my spot as an elevator operator.

3         (The reporter requested the witness to speak slower.)

4         **THE COURT:**  It's fine.  It's an unnatural thing to be

5   doing --

6         **THE WITNESS:**  Yeah.

7         **THE COURT:**  -- but just take your time, and it will

8   be --

9         **THE WITNESS:**  It's just normal talking.  I'm talking

10  normal, so I have to slow down my speech.  I'm sorry.

11  **BY MR. ORGAN:**

12  **Q.**   Okay.  And do you fix plumbing problems as fast as you

13  talk?

14  **A.**   I try to.  The faster I get in, the faster I get out is

15  the more money I make, right.  So yeah, it's one of those

16  things, right, you don't want to be in there too long.

17  **Q.**   I'm sure your customers appreciate that.

18  **A.**   Yeah.

19  **Q.**   I'd like to take you back in time to July 31 of 2015.

20  What is your role relative to Owen Diaz at the end of the

21  July 2015?

22  **A.**   July 2015, um, I could be elevator lead.  I'm not too

23  sure.  I might have been transferred over to shift lead.  I'm

24  not too sure.  You got to recollect my memory.  It's been over

25  eight years.

1    **Q.**   Okay.

2    **A.**   I do something new now, so.

3    **Q.**   I actually do.

4           **MR. ORGAN:**  So if we could show Exhibit 38.

5    Exhibit 38 is admitted, I believe, Your Honor?

6           **THE COURT:**  The --

7           **MR. SPIRO:**  There is no issue.

8           **THE COURT:**  Okay.  It's admitted and may be shown to

9    the jury.

10        (Trial Exhibit 38 received in evidence.)

11          **THE COURT:**  Let's -- are there -- is there agreement

12   on the admission of -- of all of the evidence with the

13   exception of the one that we were discussing this morning?

14          **MR. SPIRO:**  Yes.  I don't know exactly what exhibits

15   they are using, but it's in terms of what we discussed

16   previously in these proceedings.  Those exhibits no issue.

17          **THE COURT:**  Okay.  Yes.  So please go ahead.

18          **MR. ORGAN:**  I'm only using exhibits that have been

19   admitted.

20          **THE COURT:**  Please go ahead.

21          **MR. ORGAN:**  Okay.  Exhibit 38, please.  And then if

22   you can zoom in on the --

23   **BY MR. ORGAN:**

24   **Q.**   So this is an e-mail that you sent on July 31, 2015; is

25   that right?

1  A.    Yes.

2  Q.    And does this refresh your recollection as to what your

3  position was at that time?

4  A.    Yeah.  At this time I was in a position -- I was actually

5  the lead of all overnight environmental sustainability.  So I

6  was actually head of about 20, 30 people at that time.

7  Q.    And who is Ed Romero that you're sending this to?

8  A.    Ed Romero was somebody that was brought in maybe, I want

9  to say, maybe a month, month and a half prior to this.

10        Victor and Jaime said he is actually going to be the

11  person that I correlate and add on my e-mails.  So he was

12  pretty much taking over the position.  I want to say he was

13  supervisor of the whole environmental sustainability, so they

14  put it onto him, okay, I would say.

15  Q.    Okay.  And what was Victor Quintero's role at this point

16  in time?

17  A.    So Ed pretty much got put in the link of chain, right, so

18  it was -- right before, it was Jaime, Victor, and that was the

19  chain of command that I responded to.  And then Edward was

20  thrown into the mix, and they said add him onto your e-mails

21  now, and he was actually put into the mix as one of the

22  higher-ups.

23  Q.    Okay.  So if I have this right, you have above you is Ed

24  Romero.  Then Jaime --

25  A.    Salazar.

KAWASAKI - DIRECT / ORGAN

1    Q.    -- Salazar, and then Victor Quintero; is that right?

2    A.    Correct, yes.

3    Q.    Okay.  And if you read this e-mail, what's this incident

4    about?  What happened?

5    A.    So this incident was about Owen.  He was having an

6    incident with another employee -- that they actually got into

7    the elevators.  They worked together as another employee, and I

8    was actually running around the facility.  And Owen had called

9    me saying he was having an altercation with this employee, and

10   when I pulled up, they were in each other's face.

11        I spread them apart, and then I actually talked to people

12   around, and they said that the employee was throwing racial

13   slurs at him.

14   Q.    Okay.  So Owen called you up to call you over to this

15   incident?

16   A.    Yes.  Owen called me.

17   Q.    Okay.  And then when you got there, what did you see?

18   A.    I just seen them face to face.  I actually pulled up

19   because I was on the other side of the warehouse.  The

20   warehouse is pretty big, and I was just monitoring every

21   position.  Like I said, I controlled the whole -- the whole

22   warehouse overnight for the environmental sustainability.  So I

23   had to make sure that everybody was actually doing what they

24   were supposed to do and move around.

25        And then he gave me call, so I immediately went to the

1    elevators, and they were actually face to face, and I ended up

2    separating them and putting them one way or on the other side

3    of the elevators in this way and said -- there was people

4    around, obviously, looking at what was going on.  I said, "What

5    happened?" and they said he was just throwing racial slurs at

6    Owen and --

7    Q.   Okay.  Did you talk to Owen?

8    A.   Yes.  So I talked to both of them and a couple parties

9    around and said what actually -- because I wasn't there, so I

10   didn't know what happened, but I just -- like I said, when I

11   pulled up, they were face to face, actually, about to probably

12   get into a fight.  When I pulled up, they separated, so...

13   Q.   Okay.  And what did Owen tell you happened?

14   A.   Owen said he was throwing up the N-bomb and stuff like

15   that, and other people in the area said, yes, he was throwing

16   racial slurs at him.  And yeah, stuff like that.

17        So in my e-mail, I put racial in nature because that was

18   just the best professional way I could type it up in an e-mail

19   without throwing the N-word out there.

20   Q.   So July 31, 2015, there was an interaction between Owen

21   and Judy Timbreza; is that correct?

22   A.   Yes.

23   Q.   And during -- Owen told you that he had been called the

24   N-word -- or you called it the N-bomb; is that right?

25   A.   Yeah, yeah.  The N-word.  Yeah.  Just...

KAWASAKI - DIRECT / ORGAN

1  **Q.**   Okay.  Did Owen say the N-word, or did he say the N-bomb?

2  **A.**   He said the N-word.

3  **Q.**   Okay.  But you call it N-bomb; right?

4  **A.**   Yeah.  It's just -- yeah.

5  **Q.**   Okay.  And then you said that -- that the people around

6  that confirmed that racial slurs had been thrown.  That's what

7  you said; right?

8  **A.**   Yes.

9  **Q.**   So the people around confirmed that Judy Timbreza had used

10  racial slurs towards Mr. Diaz; right?

11  **A.**   Yes.

12                      (Pause in proceedings.)

13  **BY MR. ORGAN:**

14  **Q.**   So if Tesla represented that Mr. Diaz had never complained

15  about the N-word, would that be accurate?

16  **A.**   No.  Because it's in my e-mail that he was actually being

17  slurred at racially, and I put it in my e-mail.  I actually

18  sent Judy Timbreza home that night because they worked the same

19  shift, and I had nowhere else to put him.  So I sent him home

20  to de-escalate the situation.

21  **Q.**   Did you send Judy Timbreza home because he'd been using

22  racial slurs?

23  **A.**   Because he was using racial slurs, and actually, when I

24  talked to people, it was just best to send him home.  Like I

25  said, I had nowhere else to put him in the warehouse.  He was

1  actually hired to do elevators, not anything else, so I had to

2  send him home for the night.

3  **Q.**  Okay.  And if Tesla had represented that the people who

4  were around there, the witnesses, were not able to confirm

5  racial slurs, was that accurate?

6  **A.**  I -- I don't know what they confirmed or not.  Like I

7  said, I forwarded everything in the e-mail, best that I could,

8  to the higher-ups.  And what they did with it after that, I had

9  no control over.

10 **Q.**  Now, did you have some conversations with Ed Romero after

11 you sent Exhibit 38?

12 **A.**  Yes.  I believe we met, I want to say, either the next

13 morning or maybe two -- I'm not sure.  I've got to recollect my

14 memory.  I know it's all in e-mail form.  I believe he e-mailed

15 me about meeting, I believe, in one of the cafeteria locations.

16 I just can't recollect my memory of when it was.

17 **Q.**  Okay.  Let's -- let's go to Exhibit 37.

18         **MR. ORGAN:**  I believe 37 is admitted, Your Honor.

19 **BY MR. ORGAN:**

20 **Q.**  Now, if you look at Exhibit 37, just look at the first

21 part.  It says:  "As we discussed in our discussion on Friday."

22         Does that refresh your recollection --

23 **A.**  Yes.

24 **Q.**  -- about --

25 **A.**  Yes.

**KAWASAKI - DIRECT / ORGAN**

1   Q.   -- having a discussion with Ed Romero on Friday, the 31st?

2   A.   Yes.

3   Q.   Okay.

4   A.   So that was probably the morning of this because I worked

5   overnight, and we overlapped about an hour and a half, both, so

6   we can correlate with our other leads in the morning:  "Hey,

7   this is what's going on.  This is where we're behind.  This is

8   where we're at."  So we overlap shifts.

9   Q.   Okay.  But your e-mail was sent at 2:15 p.m.

10      Do you see that?

11  A.   Yeah.  It could have been me responding to him after the

12  fact.  Like I said, I don't -- I was running the shift, so I

13  don't answer my e-mails right then and there.  It was probably

14  something I responded after the fact.

15  Q.   Let's go back to Exhibit 38.  What I'm talking about is on

16  Exhibit 38, you sent the e-mail about the -- about Owen being

17  called the N-word or racist in nature, comments racist in

18  nature.  You sent that on July 31 at 2:15 p.m.  That would have

19  been after your shift was over; right?

20  A.   Yes.

21  Q.   Okay.  And I have to ask you:  Since Mr. Diaz told you

22  that he had been called the N-word, why didn't you put that,

23  the N-word, in your e-mail, Exhibit 38?

24  A.   Because I didn't -- at that time I was just new to the

25  shift.  I didn't think that was professional to throw that in

1   the e-mail, so I just put a base circumference of racial in

2   nature.  And, I mean, I think that takes care of itself; right?

3   **Q.**   Okay.  And then so if we go back to Exhibit 37 now, you

4   see this is the next morning at 8:15 a.m.  Ed is sending you an

5   e-mail where he references that he must have had a conversation

6   with you after you sent that 2:15 e-mail.

7   **A.**   I believe he gave me a call, and he came in that morning

8   and met me at the office.  Like I said, this has been over

9   eight years.  I can't -- you've got to recollect -- but he

10  actually forwarded the e-mail to me, so I'm pretty sure we met

11  in the cafeteria and discussed what happened?

12       Like I said, Ed came in, and he was actually the new

13  person that we had to talk to before we sent it up.  He

14  actually jumped into the chain of command.

15  **Q.**   Okay.  So you recall at least having a meeting physically

16  with Mr. Romero?

17  **A.**   Yes.

18  **Q.**   Is that right?

19  **A.**   I believe we met in one of the cafeterias and discussed

20  what happened and why I made the decision to send Judy Timbreza

21  home for the night.

22  **Q.**   Okay.  So when you talked to Mr. Romero, did you mention

23  to Mr. Romero that Owen Diaz had been called the N-word?

24  **A.**   Yes.  I told him that racial slurs were thrown as I talked

25  to people that were around.  It -- and he said he was going to

1    do his own investigation and figure out what happened.

2    **Q.**   So you -- you informed Mr. Romero both about the nature of

3    the racial slurs and that people had confirmed it; is that

4    correct?

5    **A.**   Yes.

6    **Q.**   Okay.  So -- so Romero knew both of those facts?

7    **A.**   Yes.

8    **Q.**   Okay.  Let's go on to Exhibit 39.

9         **MR. ORGAN:**  And, Your Honor, Exhibit 39 is admitted.

10        **THE COURT:**  All right.  And so all of the exhibits

11   that you are showing, I believe, are going to be admitted

12   with -- unless I hear an objection --

13        **MR. SPIRO:**  Yes, Your Honor.

14        **THE COURT:**  -- from the defense.

15        **MR. ORGAN:**  Thank you, Your Honor.

16        (Trial Exhibit 39 received in evidence.)

17   **BY MR. ORGAN:**

18   **Q.**   So this -- if you see, this is an e-mail on August 4.

19        Do you see that?

20   **A.**   Uh-huh.

21   **Q.**   This is from Ed Romero to Victor Quintero.

22        Do you see that?

23   **A.**   Yes.

24   **Q.**   And you're not copied on this e-mail?

25   **A.**   No.  I wasn't privy to any of this e-mail, so this is the

KAWASAKI - DIRECT / ORGAN

1    first time I'm seeing this e-mail.

2    Q.   Okay.  And if you look at this -- this statement here, the

3    second statement -- well, the first statement is:  "On July 31,

4    Owen Diaz complained that Judy Timbreza had made some racially

5    offensive remarks toward Owen."

6         That's true; correct?

7    A.   That is true.

8    Q.   It does not include the fact that Mr. Diaz had said he'd

9    been called the N-word, which you had told Mr. Romero by that

10   time?

11   A.   Yes.

12        MR. SPIRO:  Objection.  Misstates the testimony.  He

13   said not been.

14        THE COURT:  It's a leading question anyway.  So

15   sustained.

16        MR. ORGAN:  I'll rephrase it.

17   BY MR. ORGAN:

18   Q.   At this point in time, August 4, had you told Mr. Romero

19   that Owen Diaz had been called the N-word before that?

20   A.   Yes.  Because we had our conversation in the morning about

21   what happened that night.

22   Q.   Okay.

23   A.   And like I said, I wasn't privy to this e-mail.

24   Obviously, I'm not copied on it, so this is something that I'm

25   not aware of it.

1    Q.   Look at the next sentence:  "We investigated by speaking

2    to all witnesses present, but they said they did not hear the

3    remarks."

4         Is that consistent with what you had told Mr. Romero?

5    A.   Like I said, I don't know what investigation they did

6    after the fact.  Obviously, I wasn't copied on this e-mail, so

7    I wasn't privy to any of this information.

8         I don't know what investigation he did.  All I can say, I

9    never seen Mr. Edward Romero on the overnight shift, so I don't

10   know who he talked to; and I can't confirm who he did his

11   investigation with.

12   Q.   Were you ever interviewed by Mr. Romero or anyone else

13   about any additional things relating to this Timbreza incident?

14   A.   Interviewed?  You mean having a meeting with him after

15   this situation about it?

16   Q.   Yeah.

17   A.   No.  I was never interviewed after that.

18   Q.   Okay.

19   A.   I sent the information the next day we had our meeting,

20   and he did what he did, and I believe -- I believe after this,

21   he gave me some paperwork for Mr. Timbreza to sign to file with

22   nextSource staffing.

23   Q.   Okay.  Okay.

24   A.   I believe.

25   Q.   Oh, so the paperwork -- you had to give some paperwork to

**KAWASAKI - DIRECT / ORGAN**

1  Mr. Timbreza?

2  **A.**   Yeah.   So I know for a fact I had to have Mr. Timbreza

3  sign a verbal paperwork saying this is his first verbal

4  warning, and they had a rule that three verbal warnings you

5  were laid off after three offenses.

6  **Q.**   Okay.   The paperwork, was it on Tesla letterhead or was it

7  on --

8  **A.**   It was actually nextSource staffing letterhead.   It wasn't

9  Tesla.   It was nextSource.   That's who Mr. Romero worked for

10 when he first got hired was nextSource staffing.

11 **Q.**   And are you aware of any kind of warning that was given to

12 Mr. Timbreza by Tesla?

13 **A.**   No, I'm not aware of that.   I just know I had --

14 Mr. Romero had given me some paperwork from nextSource to have

15 him sign.   And it was filed with nextSource, that's what I was

16 told.

17 **Q.**   If you could, look at Exhibit 222, please.

18      This is not to you, but I'm wondering if this refreshes

19 your recollection about the time that Mr. Diaz got a promotion

20 to the lead position?

21 **A.**   Yeah.   That could be probably around the same time that I

22 had the conversation with Victor and Jaime because they asked

23 me who I wanted to run the elevator, and I said, "Owen Diaz."

24 I wanted him to run the elevators.

25 **Q.**   Okay.   And do I have to ask to be -- to have admitted,

KAWASAKI - DIRECT / ORGAN

1   Your Honor, or?

2          **THE COURT:**  It's admitted.

3          (Trial Exhibit 222 received in evidence.)

4          **MR. ORGAN:**  Okay.  Thank you.

5      And then let's go to Exhibit 235.  I would like to admit

6   235, Your Honor?

7          **THE COURT:**  It's admitted.

8          (Trial Exhibit 235 received in evidence.)

9   **BY MR. ORGAN:**

10  **Q.**   If you go to the bottom sentence, this is from October 17

11  of 2015, so jumping ahead a couple of months -- let's see

12  here -- so we had the Timbreza incident and then Romero's

13  e-mail.  And then let's go to October 17.  There is a reference

14  at the bottom here to -- it says:  "I contacted Tom for advice,

15  and he said if you don't have" -- I think he meant access to

16  the surveillance system --"please contact him."

17      Had you had a conversation with Mr. Diaz about something

18  that had happened in the elevators between him and Ramon

19  Martinez?

20  **A.**   Yeah.  I believe this was my day off.  I believe Mr. Diaz,

21  Owen, called me and said hey, he had a confrontation --

22  confrontation from Ramon, which Ramon covered my days off.  We

23  worked five days.  Ramon would cover the two days, and then

24  he'd work day shift his other three days.

25  **Q.**   Okay.

KAWASAKI - DIRECT / ORGAN

1  **A.**   So --

2  **Q.**   And at that point in time, Mr. Romero was the supervisor

3  for the elevators, and you were off the elevators; is that

4  true?

5  **A.**   I don't know if Mr. -- I know Mr. Romero supervised the

6  whole environmental sustainability, that's what he got his role

7  when they told us he was coming at.  It was his role.  He was

8  supervising the whole environmental sustainability which

9  covered the elevators.

10      I supervised the elevators, the compactor room, all the

11  cardboard going through, all the lines that needed stuff picked

12  up and brought to, that was my role overnight controlling that

13  for them because they worked the day shift.  So that was my

14  role.  So I believe he was the whole oversight of environmental

15  sustainability under those two.

16  **Q.**   There is a reference here to surveillance system.  What --

17  did you look at the surveillance system?

18  **A.**   Yeah.  So they actually gave me access to the surveillance

19  system.  Because it was a big warehouse, there was things going

20  on that I couldn't get to every area, but I can actually jump

21  onto the surveillance system.  They gave me a token so I could

22  log into their system, and I can look at the surveillance

23  cameras and see what's going on, make sure people weren't

24  messing around, not doing their job.

25      Because like I said, the warehouse is so big, I had a

1  whole one person covering the whole warehouse.  So they gave me

2  access to the surveillance cameras, yes.

3  **Q.**  And when you looked at the surveillance for this, you were

4  able to see some interaction?

5  **A.**  So when Mr. Diaz called me, I actually looked back because

6  I was at home.  I actually logged into my computer and logged

7  into my token and got on and looked at the cameras.  All I can

8  see was them face to face, not inside the elevator, but in

9  front of it when the doors opened they were right there.

10       And then the camera just stopped, so I don't know how far

11  Tesla records back or anything like that.  I didn't have

12  anything past what I could see.

13       And I told Mr. Owen just put it in e-mail and say what

14  happened, and they will be able to look at the cameras.  Like I

15  said, I only had certain access to certain footage back.

16  **Q.**  Okay.  I see.  So some people had access for the whole

17  system?

18  **A.**  I don't know if somebody had access to the system.  I just

19  know what they gave me access to.  It only let me forward back

20  so far.  So when he called me and said the time, I forwarded it

21  back and then it stopped.  I couldn't go any further back or

22  anything like that.  I just seen them face-to-face at the front

23  of the elevator.  So I can't tell you what happened.  Like I

24  said, I just seen them face-to-face.

25  **Q.**  The person who Mr. Diaz had the conflict with, Ramon

1    Martinez, had you had interactions with Ramon Martinez prior to
2    that?
3    **A.**    Yeah, I mean we -- we had to talk to reach other, right,
4    every day we talked to each other and said, "This is where
5    we're at."  We interacted and we said, "Hey, we're behind here
6    on this cardboard line.  You got to go pick this up first.  My
7    shift is over, so have your guys take care of this."  And yeah,
8    we had our interactions.
9    **Q.**    And did you ever hear Ramon Martinez use the Spanish word
10   "mayate"?
11   **A.**    I heard him use "mayate."  He also used the Spanish word
12   "chongo" a lot.
13   **Q.**    Okay.
14   **A.**    Yeah.
15   **Q.**    And you understand mayate is the N-word in Spanish?
16   **A.**    I don't know it's the N-word.  I mean, I am half Puerto
17   Rican, but I speak English.  My parents wanted me to speak
18   English.  They didn't want us to have any -- any hardship like
19   that.
20   **Q.**    When you were walking around the factory, did you ever
21   hear the N-word when you're walking around?
22   **A.**    Yeah, I've heard the N-word.  I mean, it's casual.  I
23   mean, Tesla hired a lot of staffing agency, so they hired a lot
24   of people who can't otherwise get a regular job.
25        So they go through staffing companies, and they went

1    through a lot of people.  So it was just thrown casually.  I

2    mean, you don't think nothing of it because it's thrown

3    casually day-to-day now.  So it was just --

4    Q.    So you heard the N-word all over the factory?

5    A.    Yeah.  I mean, as I was moving around, people were on

6    their lines.  I mean, people played music on their lines, so

7    they were having fun doing their job.  I mean, we were there

8    12 hours a day.  They fed us food.  Pretty much we didn't have

9    to leave, technically.

10   Q.    Okay.  And did you --

11            MR. ORGAN:  I think that's it, Your Honor.

12            THE COURT:  Okay.

13            MR. ORGAN:  Thank you.

14        Thank you, Mr. Kawasaki.

15            MR. COLLIER:  I'd like to call Michael Wheeler.

16            THE COURT:  I think maybe cross-examination might be

17   appropriate.

18            MR. COLLIER:  Sorry, Your Honor.

19            THE COURT:  That's okay.

20            MR. SPIRO:  Thank you, Judge.

21                        CROSS-EXAMINATION

22   BY MR. SPIRO:

23   Q.    Good morning.

24   A.    Morning.

25   Q.    So when you were a lead, as I understand it, you directed

**KAWASAKI - CROSS / SPIRO**

1  people that worked under you, but you wouldn't direct people

2  that worked in other units or divisions; is that fair?

3  **A.**   That is fair, yeah.  I only directed people that were

4  underneath my position.  So when I was a lead of the elevator,

5  I directed the two people, three or four people that were under

6  me at the elevator.  And when I became the overnight lead, I

7  directed everybody that was worked for environmental

8  sustainability overnight.

9       I didn't direct anybody on the lines.  I didn't direct

10  anybody that actually worked for Tesla, period.  It was just

11  the leads of who I controlled which was environmental

12  sustainability, bringing cardboard and material up and down.

13  **Q.**   And I know eight years is a long time ago.  Do you recall

14  that when you became a lead you signed some documents?

15  **A.**   I'm almost guaranteed we signed documents with Tesla when

16  I became a lead.  I can't recollect what documents I signed.  I

17  mean...

18  **Q.**   Understood.

19       And you had several people who worked for you when you

20  were a lead in the elevators?

21  **A.**   So when I became the elevator [sic], I believe I had about

22  four or five people that worked for me underneath the elevator

23  because we had two different elevators; two people covering

24  elevators, two people that were in the elevators because when

25  somebody needed to use the bathroom, somebody had to operate

**KAWASAKI - CROSS / SPIRO**

1   the elevator; it had to keep going.

2   **Q.**   And sometimes there would be two people working together

3   in the elevators; is that fair?

4   **A.**   Most of the time there was two people working together

5   because some person would run the elevator.  People would come

6   out, bring the material in the elevator and vice versa.  They

7   would hand each other and they would cover each other's breaks

8   and lunches.

9   **Q.**   While working at Tesla, you know, you also saw some

10  graffiti?

11  **A.**   Yeah.  There was -- I mean, you have a place of people.

12  People do stupid things.  So they draw on things.  Tesla tried

13  to scratch them off, but it's graffiti on plastic.  Hard

14  markers, it doesn't really come off too easily.

15  **Q.**   Right.  But there would be graffiti -- and you've seen

16  graffiti and bad words in other jobs you've had; fair?

17  **A.**   Yeah.  I'm in construction.  I mean, we see it very often.

18  Like I said, there's people that do stupid things out there.

19  **Q.**   And when Tesla would find out about this, if somebody

20  reported it, they took care of it.  They didn't have control

21  over somebody doing it, but if they reported it, then they

22  would try to take care of it and remove it?

23  **A.**   For the most part, what I've seen, they try to scratch it

24  off the stuff when it happened.  I mean, you have -- the

25  factory is over, what, a hundred thousand people daily.  I

**KAWASAKI - CROSS / SPIRO**

1   mean, yeah.

2   **Q.**   Understood.

3        So I want to move past graffiti.

4        You were Mr. Diaz's supervisor?

5   **A.**   Yes.

6   **Q.**   And he worked for you?

7   **A.**   Yes.

8   **Q.**   He was one of your people?

9   **A.**   Yes.

10  **Q.**   And he got promoted under you?

11  **A.**   Yes.

12  **Q.**   He got a raise under you?

13  **A.**   Yes.

14  **Q.**   You had a good relationship with him?

15  **A.**   Yes.

16  **Q.**   And as far as you know, he never complained about you to

17  you or to anybody else?

18  **A.**   Say that again.

19  **Q.**   As far as you know, he never complained about you, either

20  to you or to anybody else?

21  **A.**   If he complained about me, it didn't really matter; I was

22  his supervisor.  If he complained, I mean, he complained.  If

23  he said it to the higher-ups, they never told me about it.  So

24  nonetheless, yeah.

25  **Q.**   And you made yourself available to him and the other

**KAWASAKI - CROSS / SPIRO**

1   people that worked for you by phone, by e-mail.  You were

2   available to them?

3   **A.**   I was available by e-mail or by phone.  If they called me

4   even on my day off, if they called me, something was happening,

5   if I could help them with the situation, I would help.  I mean,

6   I was their supervisor, right, so.

7   **Q.**   You were at Tesla for about six, seven months after

8   Mr. Diaz got there?

9   **A.**   I can't recollect.  Like I said, six or seven months.  I

10  don't know when he actually got "hired" hired. I can

11  recollect -- I mean, I can't recollect the timeframe he got

12  hired, right.  I mean, it's over eight years ago.  You are

13  telling me to remember dates that somebody got hired?

14  **Q.**   Well, you were there through October 2017 --

15  **A.**   Yes.  Yes.  So --

16  **Q.**   You were there into November 2017?

17  **A.**   I believe partially.  I was actually -- so in November --

18  so I was actually doing work in Tesla overnight, and then I was

19  doing my union during the day.  So if something burns out -- I

20  joined Local 38 Plumbers Union here in San Francisco, and the

21  plumbers union, obviously, is a better job than working for

22  Tesla.

23  **Q.**   And I can show you some work records.  But fair to say,

24  basically, you phased out of Tesla at the end of that year,

25  2017?

**KAWASAKI - CROSS / SPIRO**

1  **A.**   If you can show me recollections of when -- I don't know

2  the exact date I left.   Like I said, I was pretty burnt out at

3  working two -- like I said, I just moved back from Texas.   I

4  had my wife, and we were here, and I had to pick up a job, so I

5  picked up Tesla.

6      And then Local 38 actually took me two years to get into

7  that because I took the test, and two years later they actually

8  called me.   And I worked both shifts, and then I burned out and

9  said, "Actually, I'm going to go and do my plumbing thing."

10         **MR. SPIRO:**   If we can just show the witness his

11  deposition testimony 13:24 to 14:2, to refresh his

12  recollection, and while that's being pulled up --

13         **THE COURT:**   Why don't I just provide him -- do you

14  have a copy?

15         **MR. SPIRO:**   There is a copy in front of him, but I put

16  it on the screen for you because it's an easy one.

17  **BY MR. SPIRO:**

18  **Q.**   So does that refresh your recollection that you were there

19  roughly six months after --

20  **A.**   Yeah.   So it was roughly six to seven months.   I mean,

21  yeah.   I don't know when this depo -- probably earlier.   The

22  depo was obviously taken earlier than now; right?   So --

23  **Q.**   Right.

24  **A.**   -- it was probably six or seven months.   I got burnt out

25  of doing both jobs.

1    Q.    Okay.  So from June until the end of the year 2015.

2         So -- and fair to say, as I think you just said, that your

3    recollection of the events eight years ago was fresher at your

4    deposition than it would be, of course, eight years later

5    today?

6    A.    Yeah.

7    Q.    Now, when you were working, you had people under you who

8    had all sorts of issues that they would come to you on because

9    people at Tesla would have interpersonal difficulties with

10   other people; fair?

11   A.    Yeah.  I mean, you don't get along with -- I was told, if

12   you don't get along with your coworkers all the time, but you

13   have to make do because you're working for a job; right?  You

14   can't -- you don't get along with everybody that you work.  I'm

15   pretty sure you don't get along with all your co-workers, you

16   know, so...

17   Q.    And some people would complain about other people for a

18   variety of reasons; right?

19   A.    More than likely, yes, they complain about variety of

20   reasons, but if it was something that, hey, you can't -- if he

21   is listening to his music or he's dancing or if he's singing

22   his music out loud, as long as he's doing his job, what --

23   Q.    And you notice some people would tell on other people to

24   try to get them in trouble because there were these sort of

25   bickerings going on, but --

1  A.   That's every day.  That's every day.  Every day situation.

2  Q.   When you showed up to investigations or when you showed up

3  to talk to people, I think you've already said a couple of

4  times that you'd show up and say, "What happened?  I don't know

5  what happened."  You'd say, "What happened?"  Right?

6  A.   Pretty much, yeah.  I'm not there, so I'm pulling up to

7  the situation.  Like I said, I ran the whole warehouse for

8  environmental sustainability.  If something happened on the

9  south side and I'm on the west, what happened?  I can't

10  recollect what happened, so people around, obviously,

11  "googling," seeing, oh, they're about to get into a fight.

12  People torn together.  I don't -- yeah.

13  Q.   Right.  You wouldn't show up and say, "I know what

14  happened," and ask leading questions.

15  A.   No.

16  Q.   You'd just show up and say, "What happened?"

17  A.   No.  "What happened?  What's going on?  How did it happen?

18  Did you guys see how it started?  What's the situation?"

19       And then I talked to both parties in the situation.  Get

20  their both sides and determine what other people had said

21  happened and go from there.

22  Q.   Because you wanted to be fair?

23  A.   Yeah.

24  Q.   Okay.  So you show up at the Timbreza incident, and before

25  that, Mr. Diaz had not told you that he had been called any

1   racial slur by Timbreza when you showed up there.  You showed

2   up there mid-incident?

3   **A.**    No.  I showed up there after he gave me a call.  Owen --

4          **THE COURT:**  Hang on just a second.

5          **MR. ORGAN:**  There were three questions in there,

6   Your Honor.

7          **THE COURT:**  Okay.  Overruled.  You can answer to the

8   extent that you recall the -- what you were --

9          **THE WITNESS:**  Can you repeat now?

10          **MR. SPIRO:**  Yeah.  And I think because we're probably

11   both talking too fast, but let's -- I'm going to try to go

12   question/answer, question/answer.

13   **BY MR. SPIRO:**

14   **Q.**    So before you showed up at the Timbreza incident, Mr. Diaz

15   had not reported to you previously that Timbreza had issued

16   racial slurs towards him?

17   **A.**    No.

18   **Q.**    Okay.  So you get the call and you show up immediately,

19   and they are in the heat of the moment?

20   **A.**    I show up within 5 minutes.  Like I said, I was on the

21   other side of the warehouse.  I had to walk to where they're at

22   and figure out what's going on.  So I showed up probably, like,

23   I can give you, roughly, 5 minutes.  Wouldn't say right after

24   he gave me the call.

25   **Q.**    And when you show up in the heat of the moment, you, sir,

KAWASAKI - CROSS / SPIRO

1   did not hear a racial slur being thrown?

2   **A.**   No.

3   **Q.**   Okay.  And when you got there, you can't really remember

4   exactly what the argument was about.  Just that Mr. Diaz said

5   Timbreza called him something?

6   **A.**   It wasn't Mr. Diaz.  It was everybody around that said

7   he's throwing racial slurs at him and they were about to fight.

8       So when I pulled up, they were face to face and they were

9   heated in the argument.  Nothing -- I didn't hear any racial

10  slurs, but when I talked to people after I separated them,

11  talked to people, they said, yes, he was throwing racial slurs

12  at Mr. Diaz.

13      So like I said, I took the initiative and said, "Timbreza,

14  you need to go home for the night.  I will contact you when you

15  can come back."

16      And that's when I sent the e-mails out and talked to the

17  higher-ups, and they made their decision on what was going to

18  happen.

19  **Q.**   And when you were first asked about this under oath, you

20  said, "I think they -- I think something.  I forget what he

21  said.  He said something" --

22          **MR. ORGAN:**   Objection, Your Honor.

23  **BY MR. SPIRO:**

24  **Q.**   -- "that he called him something.  I just forget what it

25  was, but I had it all in an e-mail."

1           THE COURT:  And the objection is?

2           MR. ORGAN:  He's reading testimony in.  If he wants to

3     refresh his recollection, he can show him the deposition.  If

4     he wants to read it, he has to tell us the line and page

5     number.

6           MR. SPIRO:  That's -- I can ask him directly, "Didn't

7     you previously recall?  Did you previously testify to this?"

8           THE COURT:  You can ask that question.

9        And you can answer, and if you don't know, then we'll go

10    through the transcript and see what -- what the story is.

11    BY MR. SPIRO:

12    Q.   Isn't it a fact, sir, that when you first testified in

13    this case in your deposition, when your memory you already said

14    was fresher, that you said, "I can't really remember what the

15    argument was about, but I think they -- I think something -- I

16    forget what he said.  He said something.  He -- that he called

17    him something.  I just forget what it was, but I have it all

18    down in an e-mail."

19       Didn't you say that?

20    A.   So if you can recollect where I'm at in the deposition,

21    more than likely I said that.  I can't recall.  When you guys

22    had my deposition, it was probably, what, four or five years

23    later I had my deposition?  So I said I wrote everything in

24    e-mail form --

25           THE COURT:  So let's --

1              THE WITNESS:  -- so it's there.  If you can recollect

2      my memory, I did not have access to Tesla.

3              THE COURT:  You're doing fine.  Let's now --

4          MR. SPIRO:  I'm just going to play it.

5              THE COURT:  No.  You're not going to just play it.

6          MR. SPIRO:  Okay.  Okay.  I'll show it to him.

7              THE COURT:  You're going to show it to him.  He's

8      going to have a chance to look at it.  I don't allow what you

9      did the first time with respect to refreshing recollection,

10     putting stuff on a screen until the witness has had a chance to

11     look at it.  That may happen in some courts.  Does not happen

12     here.

13             MR. SPIRO:  Understood, Your Honor.  So let's give --

14             THE COURT:  I thought you said that he has his

15     deposition.

16             THE WITNESS:  I only have these two binders.

17             THE COURT:  Okay.  Here.

18         Where do you want him to look?

19             MR. SPIRO:  36:20.

20             THE WITNESS:  36:20.  What page number is that?

21             THE COURT:  In the deposition?

22             MR. SPIRO:  Yes.  In the deposition.

23             THE WITNESS:  Where do I find 36:20?  I have page

24     numbers, page 13.

25             THE COURT:  Look at the bottom of the page.  They have

```
 1   the --
 2            MR. SPIRO:  It's on page 36.
 3            THE WITNESS:  Oh, page 36.  Okay.  Thank you.
 4            MR. SPIRO:  Line 20.
 5                    (Pause in proceedings.)
 6            THE WITNESS:  Okay 36:20.
 7   BY MR. SPIRO:
 8   Q.   Okay.  And I'm asking if -- what the Court is asking me to
 9   ask is:  Does this refresh your recollection that you said that
10   you forget the word that was actually said, but you have it all
11   down in an e-mail?
12   A.   So it's --
13            MR. ORGAN:  Your Honor --
14            THE COURT:  Just take -- take a moment.  Read what you
15   testified to, and then you can respond to the question.
16            MR. ORGAN:  And for completeness, Your Honor, he
17   should continue to read through page 41 -- or actually through
18   43, line 5, because --
19            THE COURT:  Mr. -- first of all, please don't make
20   long speaking objections, Mr. Organ.
21            MR. ORGAN:  Yes, Your Honor.
22            THE COURT:  Second of all, you are more than welcome
23   to redirect when that comes up.
24            MR. ORGAN:  Okay.
25            THE COURT:  There's a specific question on the table.
```

1     THE WITNESS:  Yeah.  Like it says here, I vaguely

2  remember they had an altercation.  Like I said, this was over

3  five years ago.  I was in a new job.  I wasn't really worried

4  about this because I wasn't there anymore; right?

5     So this has nothing -- so I said:  "I vaguely remember the

6  argument.  I believe I was doing my route, which I was on the

7  other side of a warehouse doing my route, and making sure

8  everybody was okay.  They didn't need any help.  Like, I, you

9  know, drove around.

10  BY MR. SPIRO:

11  Q.   I'm asking a specific question, sir.

12  A.   So yeah.  And I answered the question the best I could.

13     THE COURT:  Okay.  So one of the things about this is

14  you're not having a conversation with Mr. Spiro.  It is a

15  question and answer.

16     THE WITNESS:  Okay.

17     THE COURT:  So when he -- when you finish something,

18  he'll ask you something, and then you got to wait until he's

19  finished so you know exactly what he's asking.

20     THE WITNESS:  All right.

21     THE COURT:  Then you go.

22     THE WITNESS:  Sorry.

23  BY MR. SPIRO:

24  Q.   Yeah.  This is just an easy simple thing.  You put down --

25  you said that you wrote what you knew to your immediate

**KAWASAKI - CROSS / SPIRO**

1  supervisor; right?  And you just didn't remember exactly what

2  the word was; right?

3  **A.**   I didn't -- when I had my deposition, I said I don't

4  vaguely remember, but I know I did it in e-mail form of what it

5  was.  Like I said, this was five years ago from when I had my

6  deposition of this matter.  I had a phone call, an e-mail from

7  both parties saying:  "Hey, this is what's going on.  Can you

8  come in and recollect your memory?"

9  **Q.**   Again, sir, it's just a very easy thing which is just at

10  the deposition you just didn't remember what word you heard at

11  the scene?

12  **A.**   I said I vaguely remember what was going on.  Like I said,

13  it was five years ago.  Simple question.

14  **Q.**   Okay.  But we have a contemporaneous written record of

15  what happened, that e-mail; right?

16  **A.**   I don't understand.  I don't -- that's too big of a word

17  for me.  "Contemporaneous" is too big of a word for me.  I'm a

18  plumber.

19  **Q.**   We have a written record of, as you said in your statement

20  in the deposition, you put everything down in an e-mail, and we

21  have that e-mail.  You were just shown it; right?

22  **A.**   Yes.  I put -- correct.

23  **Q.**   Okay.  And there wasn't a recording of what happened at

24  the scene; correct?  That you know of.

25  **A.**   What do you mean?  A recording of -- audio recording?

**KAWASAKI - CROSS / SPIRO**

1   **Q.**   Yes.

2   **A.**   No.  I don't -- no.  I don't -- I didn't have access then.

3   I didn't know that there was audio on the cameras.

4   **Q.**   And it was important for you to have everything documented

5   which is why you sent that e-mail?

6   **A.**   Yes.  So I need --

7   **Q.**   I'm just -- most of these questions --

8   **A.**   Asked the question.  I was going to answer it, so...

9   **Q.**   Well, most of these questions, and I'm just -- just to

10   move it along, I appreciate your being forthright -- but are

11   just going to be yes or no.  Some of them are at least going to

12   be yes or no.

13        And you also sent that e-mail because you were directed by

14   your supervisors to send an e-mail and copy Ed Romero when

15   there was an incident; correct?

16   **A.**   Yes.

17   **Q.**   And Ed Romero told you, "Make sure you communicate with us

18   early in a short e-mail of any situation."

19   **A.**   Say that again?

20   **Q.**   Mr. Romero told you, in substance, to make sure you

21   communicate with us early in a short e-mail of any situation.

22   They wanted you to e-mail them?

23   **A.**   In any situation, that was a proper protocol.  If you had

24   a situation, you e-mailed it out to the supervisor, let them

25   know what was going on.  Because like I said, I was the only

1   person for environmental sustainability overnight, so that's

2   why they gave me access to the cameras, that's why they gave me

3   a token, that's why I have a Tesla e-mail.

4   **Q.**   Okay.  And Mr. Romero at -- when he started, it was

5   important to e-mail him also, because as you already testified,

6   he worked a different shift.

7        So to get in touch with him, you'd e-mail him?

8   **A.**   To answer your question, it is not a yes or no.  When he

9   first started, right, Victor and Jaime Salazar said Ed Romero

10  was going to take over the environmental sustainability

11  department for both overnight and day shift, right, so you need

12  to CC him on every e-mail and e-mail him first and CC us on it

13  so we're aware of what's going on.

14       He was actually working for nextSource staffing.  He

15  wasn't actually a Tesla employee, but that's who they said was

16  our next chain in command when he came on.  He came on after I

17  was already employed there and in the position.

18  **Q.**   Yes.  The only question I have is Mr. Romero, when he then

19  started, actually instituted a new policy that he wanted daily

20  reports so that he would know of anything unusual that happened

21  on a shift; correct?

22  **A.**   If you can recollect my memory, I'm pretty sure he did ask

23  for daily reports about what was going on, where you guys were

24  at so nothing got left behind.  Because like I said, if you --

25  this line has five piles of cardboard behind them, they can't

1   bring material in.  We had -- the environmental sustainability

2   was a moving chain.  If you broke a link in that chain, it did

3   not work.

4   **Q.**   Understood.

5       So what you were left with from those conversations with

6   Mr. Romero and Mr. Quintero was all that you knew was if there

7   was any issue on your shift, you should e-mail it and CC these

8   people on it; fair?

9   **A.**   Correct, fair.

10          **MR. ORGAN:**  Objection.  Objection.  Beyond the scope.

11          **THE COURT:**  Overruled.

12      You can answer.  And you did, so go ahead.

13  **BY MR. SPIRO:**

14  **Q.**   And, sir, you directed Owen Diaz to do the same?

15  **A.**   Correct.  When he was on the elevator shift, I directed

16  him.  If something happened on his shift, e-mail me, e-mail CC

17  those two as well, and that -- correct.

18  **Q.**   And you would e-mail Mr. Romero daily reports, and he

19  would say, "Good.  Good report"; right?

20  **A.**   He'd probably respond.  Honestly, the daily reports were

21  nothing that I looked back on for e-mails.  It's just a daily

22  report of what -- how everything went, how smooth the

23  transaction went overnight.

24  **Q.**   And sometimes Mr. Diaz would send you complaints about

25  things like people leaving full gondolas outside of the

1  elevators or other issues.  He would e-mail you?

2  **A.**   I'm pretty sure he would.  I don't have access to those

3  e-mails.  You've got to recollect my memory of what's going on.

4  I don't have my e-mail chain in front of me, sir.  So if he did

5  e-mail me back, I wouldn't remember.

6  **Q.**   And when you got -- okay.  When you e-mailed these things

7  to your supervisors or directed Owen to do the same, it's

8  important in these documents to be as accurate as possible;

9  fair?

10  **A.**   So -- yeah, fair.  Accurate as possible.  So like I said,

11  I didn't feel comfortable putting the N-bomb in the e-mail.  I

12  put "racial in nature," if that's what you're trying to get at

13  in as accurate as possible.

14  **Q.**   Well, you seem to be anticipating that.  Is that a topic

15  that you discussed with Mr. Diaz's lawyers?

16  **A.**   Well, I mean, you're leading to it.  I can see where

17  you're going.  I'm not a dumb person.  I can see you leading to

18  that question.

19  **Q.**   What we're going to do, if it's okay is -- I understand --

20  **A.**   I'm sorry.  I'm not used to this, so I'm answering the

21  best that I could in what you're asking.

22          **THE COURT:**  Just -- Mr. Spiro will ask you a question.

23  You just respond to the question itself.  And if there are

24  other things that need to be brought out that Mr. Organ thinks

25  is important to the case, he will do that too.

1  **BY MR. SPIRO:**

2  **Q.**   Were you prepared prior to your testimony to answer

3  questions about why you put the phrase "racist in nature" in

4  that e-mail?

5  **A.**   Prepared?  You mean know?  Like I said, that's just me

6  personally in the e-mail.  I don't put the N-bomb in there.  I

7  don't -- "racial in nature" was the circumference for me.  It

8  was just circumference, the whole situation of what happened

9  for me.

10 **Q.**   Sir, that's not my question.

11 **A.**   Okay.

12 **Q.**   My question is simply did Mr. Diaz's lawyers discuss with

13 you the fact that you used the phrase "racist in nature" in

14 that e-mail?

15 **A.**   So I got discussed that when I first had this whole

16 deposition, why did you put "racial in nature" in the

17 situation.  When I got called back here again -- why am I

18 coming back for this same situation again?  I was already here

19 for this same situation.  Why am I coming back again?

20 **Q.**   Also not my question.  It's a very simple question, which

21 is:  Did you discuss why you put the phrase "racial in

22 nature" --

23 **A.**   I answered the question.  I said, yes, I had conversations

24 with them before.

25 **Q.**   That's just -- okay.

**KAWASAKI - CROSS / SPIRO**

1   **A.**   I answered that question, I believe, so...

2   **Q.**   I didn't catch it.  And, again, just so we are clear, sir,

3   whether -- whatever word was said, if it was racial in nature,

4   can we agree it was wrong?

5   **A.**   Yes.  That's why I put "racial in nature."

6   **Q.**   Okay.  But I still have to ask questions a little bit

7   about that night.  Okay?

8   **A.**   Okay.

9   **Q.**   So the other reason to be accurate in an e-mail is because

10  memories fade; true?

11  **A.**   True.

12  **Q.**   And another reason to be accurate in e-mails when people

13  are working in different shifts is because things can get lost

14  in translation; true?

15  **A.**   Correct.  I said correct.

16  **Q.**   And the other thing that can happen is someone can say

17  something in one language, and it can get repeated; true?

18  **A.**   Sure.

19  **Q.**   And you did send an e-mail about the incident, and then

20  for you, it was out your hands; fair?

21  **A.**   For me, I sent the e-mail -- fair.  Sorry.  Yes.

22  **Q.**   And that's it.  Whatever they did from there and took it

23  from there, that was out of your hands; fair?

24  **A.**   Out of my control.  Whatever they chose to do with

25  Mr. Timbreza, whether it be writing him up, I had no control.

 1    I just -- whatever they gave me to have him sign, I gave to him

 2    to have him sign.  It was out of my control.

 3    Q.    So once you relayed whatever happened up the chain, and it

 4    was out of your hands and you were passing it off to them,

 5    there is nothing particularly unusual about you not being on

 6    every e-mail that happened the rest of the night, is there?

 7    A.    I don't know why I wasn't on every e-mail.  Like I said,

 8    if he chose to CC me on the e-mail for whatever reason, I had

 9    no control over that.  I CC'd all of them on my e-mails.  My

10    correspondence they had were CC'd on all of them.

11    Q.    Right.  But you are not CC'd on every supervisory chain

12    that goes on, obviously; right?

13    A.    I mean, like I said, the e-mail that got brought up

14    between Victor and Ed was nothing that I was aware of.  I

15    didn't know what was going on.  Like I said, Mr. Romero came to

16    me with nextSource paperwork saying, "This is what we're going

17    to do.  We're going to write Mr. Timbreza up."  I said, "Okay."

18    Q.    Right.  But again, you are the one who said to them, "This

19    is now out of my hands."  You are not on the e-mail.  Is there

20    anything unusual about that to you?

21    A.    No.  Because like I said, they are the higher-ups.

22    Whatever they choose to do, they delegate to me to pass on to

23    them.  Like if they said, "Write him up" or they said, "He is

24    being laid off," what am I going to say, "You can't lay him

25    off."  That's not my position.  I'm not that high up in the

1   chain, right, so --

2   **Q.**   So now that we have been through the mystery of not being

3   on an e-mail, I want to talk to you about the things that

4   you've talked about because you said, I think earlier in front

5   of the jury, that you thought you knew where I was going or

6   words to that effect?

7   **A.**   Yes.

8   **Q.**   Okay.  So we talked about how you didn't hear when you got

9   to the scene.  We talked about when you were first asked under

10  oath, you didn't remember the word.  We've talked about the

11  e-mail itself and the phrase that you're using, "in nature."

12  Right?

13      And can we agree that something in nature or in context

14  means that the way it's normally used is that if you use a word

15  in one context, it could be not racially offensive, and in

16  another context, it could be racially offensive?  For example,

17  the word -- and I hate to say this, but in this kind of case I

18  have to -- a word like "monkey" can be benign in one

19  circumstance and in nature, in context could be a very bad

20  word.  Is that fair that --

21  **A.**   That is fair, yes.  You can use that same word in

22  different context, right.  But if you are using that word and

23  you are angry or you are looking at the person and obviously

24  whatever you want to call it in a different thing, that's where

25  it comes.

**KAWASAKI - CROSS / SPIRO**

1  Q.   I agree with you completely.  But the reality is when this

2  document, this e-mail was first put in front of you under oath,

3  you said that you honestly could not remember the exact word

4  that was said; isn't that true?

5  A.   That is true.  And I asked you to recollect my memory of

6  my e-mail.

7  Q.   Exactly.

8  A.   Which I had no chain to; right?

9  Q.   Exactly.  So just -- and you did ask.  After you said you

10 honestly don't remember the word, you asked to see the e-mail.

11      Okay.

12                     (Pause in proceedings.)

13           MR. SPIRO:  My handwriting is not that good.

14 BY MR. SPIRO:

15 Q.   And when you spoke to the eyewitnesses, okay, you don't

16 remember any of them telling you that the N-word was used;

17 true?

18 A.   I don't remember that when I spoke with the eyewitnesses

19 that racial -- they were saying racial slurs were being thrown

20 at him.  They were arguing.  So like I said, I made that

21 decision to separate them and send him home, and I put it in

22 e-mail form that racial slurs were thrown in nature.

23 Q.   Understood.

24      Not exactly my question.  And I think you did the right

25 thing.  But my question is simply this:  The eyewitnesses who

1   were there when you first showed up on scene, none of them told

2   you that the N-word was said; correct?

3   **A.**   I can't recollect that.

4   **Q.**   Okay.  Can I show you again your deposition, 43, line 3?

5   **A.**   Forty-three, line --

6   **Q.**   3.

7   **A.**   3.  That was the question.

8   **Q.**   Yes.  So if you can just look about ten lines, does that

9   refresh your recollection that you did not have anybody else

10  saying the N-word was directed at him?

11                     (Pause in proceedings.)

12          **THE WITNESS:**  Correct.

13  **BY MR. SPIRO:**

14  **Q.**   Okay.  No eyewitness says it.

15          And importantly, until that incident you had never heard a

16  racial slur used in an aggressive manner at the Tesla factory?

17  **A.**   No, not in an aggressive --

18          **MR. ORGAN:**  Objection.  Relevance.

19          **THE COURT:**  Overruled.

20          **MR. SPIRO:**  Okay.

21          **THE WITNESS:**  Okay?

22          **THE COURT:**  Yep.

23          **THE WITNESS:**  No.  But it was thrown around casually

24  when people were just talking to each other.  They were

25  throwing around the N-bomb.  I didn't think anything of it.

1    You asked me a question, so I'm answering, sir.

2    **BY MR. SPIRO:**

3    **Q.**   I know you are trying to do your best.  My question was

4    just simply the question I asked which was I think you said the

5    answer which was no, you had never heard a racial slur used in

6    an aggressive way at the Tesla factory; true?

7    **A.**   No.  Or true, yes.

8    **Q.**   Okay.  And we had talked about earlier how you had never

9    heard Owen Diaz say anything -- so never -- by anybody, and

10   Diaz himself had never complained about Timbreza you said

11   earlier.  Okay.  So --

12           **THE COURT:**  So is there a question?

13           **THE WITNESS:**  Yeah.

14           **MR. SPIRO:**  Yeah.  It's coming.  Sorry, Your Honor.

15           **MR. ORGAN:**  I would move to strike, Your Honor.

16           **THE COURT:**  Well, I'm waiting for the question.

17   Just -- just ask questions as opposed to testifying yourself.

18   That'd be helpful.

19   **BY MR. SPIRO:**

20   **Q.**   Well, did you testify earlier in front of the jury that

21   this was the first time Diaz had ever mentioned that Timbreza

22   used a racial slur against him?

23   **A.**   To me, yeah.  The situation was that's what happened in

24   the situation.  That's like -- that's why I e-mailed the

25   situation that night, that racial slurs were thrown, in nature.

 1          Like I said, you're recollecting my memory of the

 2   conversations I had with them.  That's just what happened with

 3   me that night, and that's why I sent Judy Timbreza home that

 4   night.

 5   Q.   And even in your deposition, when you were asked in a

 6   leading question:  "Don't you remember Mr. Diaz telling you

 7   about the N-word?"

 8          You still at that point in time said:  "Honestly, I don't

 9   remember."

10          Isn't that true, sir?

11   A.   Yeah.  Honestly, I don't --

12          MR. ORGAN:  Objection.  Misstates his testimony.

13          THE COURT:  Overruled.  You can redirect.

14   BY MR. SPIRO:

15   Q.   The answer stands, and I'll move on.

16          So here we are eight years later, as we talked about, and

17   I think you mentioned that there came a point in time when you

18   began speaking with Plaintiff's counsel; correct?

19   A.   I spoke with Tesla's counsel when I first had this, and I

20   spoke with Plaintiff's counsel the same.  You both, like I

21   said, you both e-mailed me and asked me to speak my side, and I

22   spoke with both counsels.  And yes, both during the situation.

23   Q.   First of all, you and I have never met before; correct?

24   A.   There was a different counsel.  I had another lady.

25          THE COURT:  Mr. Spiro, that's -- you're just into the

**KAWASAKI - CROSS / SPIRO**

 1   case, so let's use better analogies.

 2   **BY MR. SPIRO:**

 3   **Q.**   Well, how about this:  Plaintiff's counsel met with you

 4   and spoke to you in the last few weeks about your testimony;

 5   true?

 6   **A.**   Corrective.  I had conversations with them, yes.

 7   **Q.**   And meetings?

 8   **A.**   Meetings, yes.

 9   **Q.**   Okay.  In their offices?

10   **A.**   I had meetings in -- on a Zoom meeting.

11   **Q.**   But not in their offices?

12   **A.**   Yes.

13   **Q.**   Okay.  So you had several meetings?

14   **A.**   Yes.  You guys had not reached out to me.  Like in the

15   first case when you both reached out to me, I talked to both

16   parties.  They reached out to me in this situation.  I got

17   subpoenaed for this situation.  I missed work yesterday for

18   this situation.  I'm missing work right now for this situation.

19        So if you would've did your due diligence and contacted

20   me, I would have responded to you as well.

21   **Q.**   I'm not faulting you.  I'm just asking.  Just -- these are

22   simple questions.

23   **A.**   And I answered your question "yes."  I met with them

24   because they contacted me.

25   **Q.**   Okay.  And one of the things that you discussed in the

1    meeting was the e-mail that you have discussed in trying to

2    explain why you wrote the phrase "racist in nature."  That was

3    discussed?

4    **A.**   They brought up exhibits as well, yes.  They brought up

5    the same exhibits.

6    **Q.**   Okay.  And as you sit here now, eight years later, you

7    don't actually remember yourself and can picture yourself

8    writing that e-mail; right?

9    **A.**   Picture myself writing the e-mail?  I know I wrote the

10   e-mail because, like I said, it's in the text chain.  You guys

11   are taking things vaguely.  The e-mail chain is there.  If it

12   was all written down, you will see a correspondence between all

13   parties.

14   **Q.**   That wasn't exactly my question.  The question was just

15   simply this, sir:  You don't as you sit here today have a

16   present memory of actually writing the e-mail?  We both agree

17   the e-mail exists.

18   **A.**   Do you have a present memory of you writing an e-mail

19   eight years ago?  Sorry.

20          **THE COURT:**  So --

21          **THE WITNESS:**  I get offensive because the e-mail is

22   there.  It's written down.  I wrote it to the best of my

23   knowledge at that time.  You're trying to get me to recollect a

24   memory from eight years ago.

25          **THE COURT:**  But that is really the question of

1    Mr. Spiro.

2             **THE WITNESS:**  Okay.  So no.  I don't recollect writing

3    the e-mail eight years ago.  I know it's there because we have

4    proof of it.

5    **BY MR. SPIRO:**

6    **Q.**   And we agree that it's there.  Okay?  Again, sir, nobody

7    is saying that you did anything wrong in the e-mail.  I just

8    have to ask you questions about it.  Okay?

9             So the reality is --

10                        (Pause in proceedings.)

11   **BY MR. SPIRO:**

12   **Q.**   When you were writing those e-mails, can we agree

13   sort of as a matter of course that there are at least

14   two possibilities?  One is that you wrote "racist in nature"

15   because you didn't have a clear, crisp view in your mind of the

16   word that was used.  That's one possibility.

17            If I can just finish the question --

18            And another possibility would be that you didn't want to

19   use certain language in an e-mail?

20   **A.**   Correct.  That is exactly what it is.  I don't use the

21   words that are thrown around.  I have -- my wife is Black.  My

22   kids are Black.  I wouldn't want them to be -- that word thrown

23   to them.  I put "racial in nature" to circumference the whole

24   thing.  Like I keep saying, it circumferences the whole nature.

25   It's still racist in nature.  It's still racist.  It happened.

**KAWASAKI - CROSS / SPIRO**

1    Q.   We agree it's racist.   We agree it happened.   The question

2    is:   You didn't in that e-mail write N-bomb, like you said

3    today.

4    A.   I don't -- I don't throw that word casually.   I don't

5    write it.   That was the most professional way I could feel to

6    write that situation up in the e-mail.   As a professional

7    e-mail.   Like I said, I was new to a supervisor.   It was the

8    best way I typed up a professional e-mail without throwing that

9    word in there.

10   Q.   When you met with Mr. Romero, you don't remember

11   eight years later that specific conversation, either; right?

12   A.   So -- and when you guys recollect my memory with the

13   e-mails, I remember we met in the cafeteria on the second

14   floor.   That's what I recollect.   Remember meeting Mr. Romero

15   in the morning in the cafeteria.

16       Like I said, I worked the overnight shift.   They worked

17   the day shift.   We overlapped.   He met me in the morning before

18   I had to leave for my shift.

19   Q.   Right.   My question is:   You don't have a clear memory of

20   the conversation that you had with Mr. Romero eight years

21   later, who said what and what you said back exactly, do you?

22   A.   No, no.

23   Q.   Okay.   Did anybody ever tell you that Mr. Timbreza was

24   speaking in Spanish?

25   A.   No.

**KAWASAKI - CROSS / SPIRO**

1  **Q.**   No one ever told you that?

2  **A.**   Speaking in Spanish?  No.  I don't believe Mr. Timbreza

3  was Spanish.  I believe he was maybe Filipino, maybe, after

4  having a conversation with him.

5  **Q.**   But nobody ever told you that he was using Spanish

6  language and racial slurs that were Spanish?

7  **A.**   No.  Not to my recollection.

8  **Q.**   Okay.  And when you first were asked about what you told

9  Mr. Romero in that meeting, you told him what other people had

10 told you, what the witnesses had told you about the events;

11 correct?

12 **A.**   They were saying -- yes.  They were -- I vaguely remember,

13 like, when you brought up the e-mails, it brings back a memory.

14 It clings in my head that I said, "Okay.  This is what happened

15 in that situation with Mr. Timbreza and Owen."

16 **Q.**   Right.  And Mr. Romero left that meeting with an

17 understanding that something racial had happened?

18 **A.**   Yes -- yes, sir.

19 **Q.**   Okay.  We can agree.

20 **A.**   It's in the e-mail, and he responded to it as well.

21 **Q.**   Right.  And that's why when you were asked even now on

22 direct examination by Mr. Diaz's lawyers at line -- at 16:25 to

23 17:4.  "Okay.  So when you talked to Mr. Romero, did you

24 mention to Mr. Romero that Owen Diaz had been called the

25 N-word?"

1        You responded:  "Yes.  I told him that racial slurs were

2    thrown as I talked to people around."  Right?

3    A.   I didn't say the N-bomb.  I said racial slurs were thrown

4    towards him, so I didn't confirm that the N-bomb was thrown.  I

5    never said that.  I said racial slurs were thrown at him.

6    Q.   Exactly.  And you -- Ed Romero told you that Timbreza

7    would be written up for this; correct?

8    A.   They made their decision like you see it in the e-mail.  I

9    wasn't CC'd to the decision e-mail.  I just know that I got

10   paperwork brought to me.

11            MR. SPIRO:  I object.

12            THE COURT:  Overruled.  You can continue.

13   BY MR. SPIRO:

14   Q.   Okay.  You got paperwork brought to you.  We'll skip

15   ahead.  And it said that he was being written up for a slur of

16   a racial nature; true?

17   A.   I don't know.  I don't have the paperwork.  I can't

18   recollect what was written on the nextSource paperwork.  All I

19   know is I had Mr. Timbreza sign it for a verbal write-up for

20   his first verbal write-up.

21   Q.   Okay.  Well, do you remember previously giving testimony

22   in this case?

23   A.   Saying "previously giving testimony," you can recollect my

24   memory.

25   Q.   Sure.  Well, can you turn to the other document in front

**KAWASAKI - CROSS / SPIRO**

1   of you?

2   **A.**   This is the other binder?

3   **Q.**   The trial transcript.

4   **A.**   Yep.

5   **Q.**   And in the prior proceeding, if you could go to page 125.

6   **A.**   125.  The end of the book.  Yep.

7   **Q.**   Line 9.  And just read a few lines.  And does this refresh

8   your recollection that the written write-up that Mr. Timbreza

9   got indicated that he was being written up for something racial

10  in nature?

11  **A.**   At this point I think I recollect that it did and it

12  should have, but at this point, like I said, I don't have the

13  paperwork in front of me.  I don't -- so if that was brought up

14  and you have the paperwork, I'd be more than happy to look at

15  it.

16  **Q.**   You're not taking back what you said in your sworn

17  testimony, are you?

18  **A.**   I'm not taking back what I said, no.

19  **Q.**   Okay.

20  **A.**   I'm not taking that back.  Like I said, at this point

21  right now, I don't remember what was put on it.  That was --

22  this testimony was, what, over four years ago?

23  **Q.**   Okay.  By the way, Timbreza worked for a staffing company.

24  He didn't work for Tesla?

25  **A.**   Correct, correct.  We all worked for a staffing company in

1  our department besides the higher-ups, worked for Tesla.  Ed

2  Romero also worked for a staffing company, nextSource, and

3  I believe he got put on to Tesla.

4  **Q.**   Okay.  Timbreza worked for a staffing company?

5  **A.**   Yes.

6  **Q.**   And after this incident, you understood that Mr. Timbreza

7  was laid off?

8  **A.**   I believe he got laid off.

9          **MR. ORGAN:**  Objection.  Misstates testimony.

10         **THE WITNESS:**  I don't --

11         **THE COURT:**  Overruled.

12         **THE WITNESS:**  I believe he got laid off.  I didn't

13  have -- maybe he -- yeah.  I --

14  **BY MR. SPIRO:**

15  **Q.**   Okay.  And after this incident, Mr. --

16  **A.**   I mean, so in answer to your question, not after this

17  direct incident he got laid off.  It was his first verbal

18  warning.  I believe he had other incidents after that which led

19  to his layoff.

20      Like I said, Mr. Romero said there was paperwork that

21  said, okay, just -- you get three written write-ups and then

22  you're laid off.  You get your verbal, your written, and

23  your -- whatever it was after that.  It was his paperwork from

24  nextSource.

25  **Q.**   Well, all you know -- all of those things may or may not

1   have happened.  You don't know.  Okay.  All you know is that

2   after this incident at some point soon thereafter, Judy did not

3   work for Tesla anymore; true?

4   A.   After this incident, yes.  I mean, but like I said, it

5   wasn't this incident that he got laid off because I still

6   worked there.  He did not get laid off after this specific

7   incident.

8   Q.   I didn't say.  I just said soon thereafter he was laid

9   off; true?

10  A.   Correct.

11  Q.   Now, after this incident, Mr. Diaz was promoted; correct?

12  A.   Correct.

13  Q.   And he was given a pay raise; correct?

14  A.   Correct.

15  Q.   You mentioned on direct examination Mr. Quintero as

16  someone who you went to when promoting Owen Diaz?

17  A.   Correct.  They asked me who I wanted to put in that

18  position for that place.  Mr. Diaz showed up every day.  He

19  worked hard.  That was the best person at that time for me to

20  put in that position because I knew the elevator was going to

21  get taken care of.

22  Q.   Sir, that wasn't my question.  My question is just simply:

23  Mr. -- you said that Mr. Quintero was someone you went to when

24  promoting Mr. Diaz.

25  A.   Correct Mr. Quintero was the highest up in environmental

KAWASAKI - CROSS / SPIRO

1  sustainability.

2  **Q.**   Right.  But what you didn't mention to this jury is that

3  Mr. Romero took your suggestion and promoted Owen Diaz.

4  **A.**   No.  That's not how that went.  If that's what you want to

5  read the e-mail, that's not how that went.  I ran the overnight

6  crew.  They asked me who I wanted in that position.  I had a

7  relationship with Mr. Quintero and Jaime Salazar before Ed even

8  came into the picture, so they asked me directly who I wanted

9  in that position.  Now if Ed spun that in his e-mail and made

10  it seem like it was him, that's not how it actually happened.

11  **Q.**   Okay.  At this time I would ask to play the deposition,

12  24:3 to 24:15.

13          **THE COURT:**  Hold on just a second.  Let me take a look

14  at that, Counsel.

15          **MR. SPIRO:**  Thank you, Your Honor.

16          **THE WITNESS:**  What page was that?

17          **THE COURT:**  24.

18          **MR. SPIRO:**  I'm asking to impeach at this point,

19  Your Honor.

20          **THE COURT:**  I understand.

21          **MR. SPIRO:**  Yeah.

22          **MR. ORGAN:**  3 to what, Your Honor?

23          **THE COURT:**  3 to 15.

24          **MR. ORGAN:**  That's fine.  No objection.

25          **THE COURT:**  You may proceed.

```
 1              MR. SPIRO:  Can you play that, please, sir.

 2                   (Video was played but not reported.)

 3              MR. SPIRO:  Can you turn this up a little bit?

 4                        (Pause in proceedings.)

 5                   (Video was played but not reported.)

 6              THE WITNESS:  So it wasn't Ed.

 7              THE COURT:  Hang on.  He has got to ask you a

 8    question.

 9              THE WITNESS:  Sorry.

10              THE COURT:  It's okay.

11    BY MR. SPIRO:

12    Q.   Is that the sworn testimony you gave?

13    A.   That is my sworn testimony.

14    Q.   Okay.  I can tell that you want to -- withdraw.

15              MR. ORGAN:  Objection.

16              THE WITNESS:  What does that mean?

17              THE COURT:  Strike that statement.

18         Ask questions, Mr. Spiro, please.

19    BY MR. SPIRO:

20    Q.   You remember that Mr. Diaz and Mr. Martinez, Ramon

21    Martinez did not get along; true?

22    A.   From their recollect- -- from the incident they had,

23    I believe they didn't.  Like I said, I don't control what Ramon

24    did during the shift that I wasn't there.

25    Q.   I totally get that.  That's not my question.  My question
```

**KAWASAKI - CROSS / SPIRO**

1    is just simply other than the incident, do you remember

2    generally that Mr. Diaz and Mr. Martinez didn't get along?

3    **A.**   I know vaguely Ramon didn't like that Mr. Diaz got

4    promoted to the elevator shift lead.

5    **Q.**   Okay.  And Owen told you that they didn't like each other;

6    correct?

7    **A.**   After the incident -- after the incident they had, they

8    had their beef.  Owen said, "I don't like that guy."  I said,

9    "You can't control if you are working the day where he is the

10   supervisor.  He is a supervisor."  You -- I told Owen, "You

11   just control your elevator.  That's what you're here for.

12   You're here for to take care of the elevator.  You don't got to

13   do anything else but make sure this elevator goes up and down."

14   **Q.**   Also not my question.  My question is just simply before

15   the incident, Owen had told you that he and Mr. Martinez did

16   not like each other; correct?

17   **A.**   Before the incident?

18   **Q.**   Yes.

19   **A.**   Maybe he mentioned it.

20   **Q.**   Okay.

21   **A.**   Possibly, maybe.

22   **Q.**   And you ended up talking to Mr. Diaz about the incident

23   that you are talking about in the elevator now, October 17.

24   You spoke to Mr. Diaz about that; right?

25   **A.**   Between him and Ramon?

1  Q.   Yes.

2  A.   Mr. Diaz called me when I was at home and asked me to look

3  at the cameras and did you see what happened, and I referred to

4  Mr. Diaz and said, "Put it in the e-mail form about the

5  situation that happened so you are backed up if something

6  happens.  It's an e-mail, and they can look at the cameras."  I

7  only have access so far to the cameras, like I mentioned.

8  Q.   And you, in that conversation with Mr. Diaz, understood,

9  as you said a couple of questions ago, that this had to do

10  with -- this dispute had to do with Ramon contesting Owen's --

11  how Owen was handling the elevator basically; right?

12  A.   I know he didn't like that Owen got promoted to an

13  elevator lead, that's all.  I know he didn't like it.

14  Q.   Okay.  And -- but Owen was really under your --

15  A.   Owen worked under me, like I said.  But I can't control

16  the days I wasn't there.  I was there five days a week.  Ramon

17  covered my two days that I was off and worked the day shift the

18  other three days.

19  Q.   And Exhibit 235, which is in evidence, we are going to

20  look at -- and we can put up -- you ended up looking at the

21  surveillance camera; right?

22  A.   Yes, sir.

23  Q.   And you saw them face to face?

24  A.   That's all I saw and the camera stopped.  That's why I

25  told Mr. Diaz to put it in an e-mail form about the incident

1  that happened so you back yourself in this situation, and they

2  were able to look at it and do what they have to do about it.

3  **Q.**   Right.  And you didn't, you know, destroy the video to

4  cover up anything?

5  **A.**   I only had access to look at the computer.  I didn't have

6  access to anything other than that.  Like I said, it wouldn't

7  let me play back farther than what it took me, so they only

8  gave me access to so far back in the footage.

9  **Q.**   And you got this e-mail, right, from?

10 **A.**   Yeah.  He CC'd me on it as well.

11 **Q.**   Just like you had instructed him to do?

12 **A.**   Uh-huh.

13 **Q.**   And there is obviously nothing in this e-mail that

14 mentions anything about race; true?

15 **A.**   True.  I just --

16 **Q.**   And when Mr. Diaz sent this e-mail, he was telling

17 supervisors that Mr. Martinez had done something wrong; fair?

18 **A.**   He -- he CC'd me on the e-mail.  I don't know if he told

19 any other supervisors, but I know he CC'd Edward Romero on it,

20 and that's where we go from there.

21 **Q.**   He CC'd two people higher than him on an e-mail

22 complaining about somebody to get them in trouble; right?

23 **A.**   What do you mean "complaining"?

24          **MR. ORGAN:**  Objection.  Calls for speculation.

25          **THE WITNESS:**  That's a vague question.  I can't answer

1    that.

2    **BY MR. SPIRO:**

3    **Q.**   And this e-mail, after you received it and received that

4    issue that night with Mr. Martinez, for years you weren't asked

5    about that e-mail; right?  You didn't see that e-mail in the

6    year that followed and the year that followed after that?

7    **A.**   When I left Tesla, I did not have access to the server

8    anymore.  I didn't have access to my Tesla e-mail.  This

9    situation, Ed Romero was CC'd on it.  He was the first person.

10   He was the person that should have took care of this.  It

11   wasn't on me.  Like I said, I didn't work that day.  I just

12   told Owen to CC me on it.

13   **Q.**   Understood.

14   **A.**   Because that's what -- I said, "Any e-mail that you send

15   out for the elevators, I want to be aware of it."

16   **Q.**   Understood.

17         And afterwards, years later when you were first called by

18   Mr. Diaz's lawyers, you told them that "This was years ago.  If

19   you have my e-mails, I can recollect, check the e-mails."

20   Right?

21   **A.**   Correct.

22   **Q.**   Okay.  And you were then deposed, which we talked about;

23   right?

24   **A.**   Uh-huh.

25   **Q.**   And you have that in front of you?

**KAWASAKI - CROSS / SPIRO**

1   **A.**   The deposition, yes.

2   **Q.**   If you look at the back, there is an index?

3   **A.**   Yeah.

4   **Q.**   Can you go to the back and make sure there is an index?

5   **A.**   Yes, there is an index.

6   **Q.**   Okay.  And nowhere in your deposition do you ever say that

7   Mr. Martinez ever used the word "mayate"; correct?

8        **MR. ORGAN:**  Objection.

9        **THE COURT:**  Yeah, sustained.  How could you -- unless

10  you want him to sit here and read his entire deposition while

11  you're -- as this case proceeds, then you can withdraw the

12  question.

13       **MR. SPIRO:**  Well, I would ask:  "Can you look at the

14  index to see if the word 'mayate' is ever noted in his

15  testimony."  I think it's a fair question.

16       **MR. ORGAN:**  It's compound, Your Honor.

17       **THE COURT:**  Well, it's not compound, but that still

18  doesn't answer the question of whether it's in the deposition

19  or not.  It answers the question of whether it's in an index.

20       **MR. SPIRO:**  Fair enough.

21  **BY MR. SPIRO:**

22  **Q.**   I'm asking is the word "mayate" in the index?

23  **A.**   No.

24  **Q.**   Okay.  And right at the Ms, if you are in the Ms, right,

25  Martinez is brought up 19 times in your deposition.

1          **MR. ORGAN:**  Objection.  Relevance, Your Honor.

2          **THE COURT:**  Sustained.

3     **BY MR. SPIRO:**

4     **Q.**    After your deposition, we talked about how recently you've

5     been meeting with Mr. Diaz's lawyers on Zoom, right, and in

6     their offices; right?

7     **A.**    Correct.

8     **Q.**    And at this point, you are telling this jury that at some

9     point you heard Mr. Martinez say that word at some point,

10    "mayate"?

11    **A.**    When did I say that to the jury?

12    **Q.**    I think you said it on --

13    **A.**    When did I say "mayate"?

14    **Q.**    Okay.

15    **A.**    That never came out of my mouth.

16    **Q.**    If you are not claiming that, then that's fine.

17    **A.**    I'm just asking you when I said "mayate" to the jury.  I

18    don't think I used that word; I think you guys used that word.

19    **Q.**    You're saying it was in the lawyer's question, not you

20    using it?

21    **A.**    I don't believe I said "mayate."  I said "chongo."

22    **Q.**    Okay.  So you --

23    **A.**    I didn't say "mayate."  I said "chongo" which means

24    gorilla and use emphasis on that.

25    **Q.**    You mean in the racist in nature conversation?

1    A.    No.  You said "gorilla."  You say "gorilla" yourself.

2    Q.    I'm --

3    A.    I said "chongo."  I never said "mayate."

4    Q.    Okay.  So you are saying he said "chongo."  Okay.

5          And whatever slurs were thrown around to other people, I

6    think you said on your direct that sometimes people to

7    themselves would be saying --

8    A.    They were --

9              THE COURT:  Wait for the question.

10             THE WITNESS:  Sorry.

11   BY MR. SPIRO:

12   Q.    They were saying words that were racially insensitive to

13   each other, throwing around at each other?

14   A.    Are you done?

15   Q.    Yes.

16   A.    Okay.  So yes, the word was thrown around in the Tesla

17   factory.  Like I said, you have staffing agency people; they

18   are allowed to play their music while they're working.  They're

19   having fun.  They're throwing words around casually.  I've

20   never seen it thrown where they had a fight and not my

21   recollection of what happened in that instance.

22   BY MR. SPIRO:

23   Q.    And again, other than the complaint of Timbreza, nobody

24   made a complaint to you during your time?

25   A.    About racial things, no.

**KAWASAKI - CROSS / SPIRO**

1   **Q.**   Yes.  And if they had, you would, of course, as you've

2   testified a few times, put it in an e-mail and CC'd everybody

3   like you -- correct?

4   **A.**   Correct.

5            **MR. SPIRO:**  So if we can -- where is that timeline?  I

6   will take the calendar.  Thank you so much.

7   **BY MR. SPIRO:**

8   **Q.**   And just to sort of finish off that piece, when you heard

9   this word, the N-word being thrown all over the facility, it

10  wasn't in an aggressive, argumentative tone.  It was said in a

11  non-offensive manner; right?

12  **A.**   Correct.  It was just thrown.  Like people were just

13  having their conversations.  It was just thrown around.  Like I

14  said, it's in every rap song known today.  So they are playing

15  their music, and they're copying the song.  The word is thrown

16  around.

17  **Q.**   And it wasn't hurting you.  It wasn't hurting your people

18  in doing their job; fair?

19  **A.**   Excuse me?

20  **Q.**   It wasn't hurting you, and it wasn't hurting your people

21  doing their job, so you didn't pay it much mind?

22  **A.**   I don't understand that question.

23           **THE COURT:**  What is "it"?

24  **BY MR. SPIRO:**

25  **Q.**   The N-word thrown around wasn't hurting you, and it wasn't

1   hurting your people in doing their job; true?

2           MR. ORGAN:  Objection.

3           THE COURT:  Compound.

4           THE WITNESS:  I --

5   BY MR. SPIRO:

6   Q.   The N-word being thrown around in this manner that you are

7   talking about, this non-offensive manner that you have

8   described, it wasn't hurting your people in doing their job;

9   true?

10  A.   Are you saying it wasn't bothering me?

11          THE COURT:  Hang on just a second.

12          MR. ORGAN:  Objection.  Calls for speculation,

13  your Honor.

14          THE COURT:  To the extent that you can answer that

15  question --

16          THE WITNESS:  If you are trying to ask if it wasn't

17  bothering me or it didn't affect the job being done, no, it

18  didn't affect the job being done; and it didn't bother me.  It

19  didn't bother me because I wasn't throwing the word.  I was

20  still just trying to do my job.

21      I didn't control the lines where it was being said.  If it

22  was being said by my employees, I would tell them to stop doing

23  it.  I don't control the hundred thousand people in the

24  factory.

25  \\\

1    BY MR. SPIRO:

2    Q.    Sure.  And you've said previously that you also believed

3    from your perspective that it wasn't hurting your people in

4    doing their job; true?

5    A.    It didn't affect people from stopping doing their job, no.

6    The N-word did not stop people from doing their job.

7    Q.    So, I asked you earlier -- and we talked about how your

8    time at Tesla ends -- again, five, six, seven months after

9    Mr. Diaz joins?

10   A.    Right.

11   Q.    So he joins June 3rd, as you testified on your direct, and

12   he's there for six or seven months, and the only racial

13   complaint that you received was the one regarding Timbreza?

14   A.    Yeah.  From me, from my shift, yes, that was the only time

15   that that ever happened from my recollection.

16   Q.    And at some point, Mr. Diaz's son came to work at Tesla,

17   and you congratulated him; correct?

18   A.    I congratulated him, but he didn't work under me.  He

19   worked on the line.  He didn't work for environmental

20   sustainability.  Mr. Diaz got him hired probably through one of

21   the staffing agencies.  I don't know.  I know his son came, and

22   he said his son was working on one of the lines which I had no

23   control over.

24   Q.    Okay.  And you congratulated him; right?

25   A.    Correct.  I mean, he got his son hired at Tesla.  It's his

1  son.  I mean, you are not going to congratulate somebody

2  getting a job?

3  Q.   I think you should have.  And additionally to that,

4  Mr. Diaz asked you how you would recommend people that he knew

5  to get jobs working at Tesla, and you suggested Chartwell;

6  correct?

7  A.   Chartwell Staffing, that's how I got hired, so I suggested

8  you go to Chartwell Staffing.  I applied through Indeed, and

9  Chartwell Staffing is the one that hired me.  So I said, "Okay.

10  If you want" -- at that point I thought that was the only

11  staffing agency, but when I got there, there was four or five

12  other staffing agencies working at the facility.

13        MR. SPIRO:  No further questions.  Thank you.  Thank

14  you, sir.

15        THE COURT:  Mr. Organ, let me ask you about your

16  redirect.  How long do you think it's going to be?  Short?

17        MR. ORGAN:  Five minutes, maybe seven.

18        THE COURT:  Okay.

19                    <u>REDIRECT EXAMINATION</u>

20  BY MR. ORGAN:

21  Q.   You were asked questions about stuff in your deposition.

22  Have you memorized your deposition?

23  A.   No.  No, this is vaguely the first time I'm really seeing

24  it over again.  Like when I met with you, it was just exhibits.

25  There was no deposition.

1   Q.   Mr. Spiro was keen to ask you some questions about

2   page 36:20 to 37:16.  If you can look up in your deposition

3   those pages.

4   A.   Uh-huh.

5   Q.   Okay.  Now move forward approximately five pages to

6   page 42.

7   A.   Okay.

8   Q.   And if you look at page 42 of your deposition, so this

9   would have been given shortly after the snippet that Mr. Spiro

10  talked about?

11        MR. SPIRO:  Objection.

12        MR. ORGAN:  If you look at page 42 --

13        THE COURT:  Hang on.  What's the basis of your

14  objection?

15        MR. SPIRO:  One, he is testifying; and two, this is

16  not in the same context.  It's several pages later.

17        THE COURT:  Okay.  Overruled.  Let's go to and give

18  Mr. --

19        MR. ORGAN:  42, line 24, to 43, line 5.

20              (Pause in proceedings.)

21  BY MR. ORGAN:

22  Q.   Do you see that?

23  A.   Uh-huh.

24        MR. ORGAN:  Your Honor, I would like to put it in as a

25  prior consistent statement.

1          THE COURT:  Any objection?

2          MR. SPIRO:  Yes.  Objection.  It's nothing but

3    bolstering, and it's a prior consistent statement that's --

4          THE COURT:  Overruled.  You can -- you may introduce

5    the statement.

6    BY MR. ORGAN:

7    Q.   "QUESTION:  Okay.  Okay.  So let me break that down.

8         So you do recall that Mr. Diaz at least told you that

9    Mr. Timbreza had used the N-word towards him?

10        "ANSWER:  Correct.

11        "QUESTION:  And you also recall that other people told you

12   that they had heard racial terms used; is that right?

13        "ANSWER:  Correct."

14        Those are the questions that were asked of you a few

15   minutes after the snippet that Mr. Spiro played, and those are

16   the responses you gave; correct, sir?

17   A.   Yes.

18   Q.   Okay.  Mr. Spiro asked you about some graffiti in the

19   bathrooms.  Did you see any particular graffiti that was racist

20   in nature?

21   A.   Yeah.

22   Q.   Like a swastika or anything like that?

23   A.   Yeah.  Some people would draw swastikas in markers on the

24   doors and on the bathrooms.  It happened.  But like I said

25   Tesla tried to scratch them off the best they could on the

1   plastic door without having to replace the actual doors for the

2   toilet and stuff.

3   **Q.**   Now, at some point, Mr. Spiro asked you about

4   communicating with Mr. Romero.

5          **MR. ORGAN:**   And if we could, put up Trial Exhibit

6   Number 40, please.

7                       (Pause in proceedings.)

8          **MR. ORGAN:**   And if you zoom in at the top part of

9   Exhibit 40.

10       I will move Exhibit 40 in, Your Honor.

11         **THE COURT:**   It's admitted.

12       (Trial Exhibit 40 received in evidence.)

13  **BY MR. ORGAN:**

14  **Q.**   This is an e-mail you sent to Mr. Romero.  "I tried

15  calling you, but I believe I have the wrong numbers.  Both say

16  your phone is out of service."

17       So at some time you had some problems communicating with

18  Mr. Romero; is that right?

19  **A.**   Yes.

20  **Q.**   And that's why you would meet him in person, if possible?

21  **A.**   Yes.

22  **Q.**   You were asked some questions about the staffing

23  companies.  All the people who worked in the factory, they all

24  eventually worked for Tesla ultimately; right?

25  **A.**   I don't believe so, no.  We were staffing companies.  That

1   was the main goal, right, is to get on with Tesla, to be able

2   to get stocks and have a Tesla job.  But no, Mr. Romero like I

3   said, he came in; not even I believe a month later he was put

4   into a Tesla role.

5   **Q.**   But you're all working under the Tesla roof; right?

6   **A.**   Correct.  We are all --

7   **Q.**   And you are all using Tesla equipment; right?

8   **A.**   Yeah.  So it took me a while, but I had access to the

9   safety equipment.  We all had access to the satellite food

10  kitchens and the free food that they provided.  So yes, we were

11  all under Tesla's...

12  **Q.**   Mr. Spiro asked you some questions about Mr. Timbreza

13  getting laid off.  You actually saw Mr. Timbreza working the

14  very next day after that incident on the 31st; right?

15  **A.**   I believe he --

16      **MR. SPIRO:**  Objection.  Leading every question.

17      **THE COURT:**  Sustained.

18  **BY MR. ORGAN:**

19  **Q.**   Did you see Mr. -- how soon after the July 31 event did

20  you see Mr. Timbreza working?

21  **A.**   If I recollect, I believe that was a day that Mr. Timbreza

22  worked three days, and he was off four; and then the next week

23  he worked four days, and he was off three.  So I can't

24  recollect the exact date he came back.

25  **Q.**   You -- Mr. Spiro asked you some questions about mayate.

KAWASAKI - REDIRECT / ORGAN

1  Do you remember being asked any questions about mayate in your

2  deposition?

3  **A.**   I don't believe so -- I don't know the whole deposition.

4  **Q.**   Okay.

5  **A.**   I didn't use the word "mayate," so.

6  **Q.**   You mentioned to Mr. Spiro about the video on the

7  October 17th incident.

8  **A.**   Uh-huh.

9  **Q.**   And you said, "They gave me access only so far."  Who is

10 the "they"?

11 **A.**   So Tesla.  So I had to go through Victor and Jaime because

12 they were actually working for Tesla.  They told me to stay

13 overnight, stay during the day when the actual computer guys

14 get in.  So I believe it was up front by the roasters, I can't

15 recollect, in the warehouse; but that was their computer

16 department.  You go in there, give them your phone.  They'll

17 give you a token on your phone, and they will give you a

18 computer which you will have access to the Tesla camera system.

19 **Q.**   Okay.

20         **MR. ORGAN:**  Just two more questions, Your Honor.

21 **BY MR. ORGAN:**

22 **Q.**   You said if your people were using any kind of racist

23 statements, you would tell them to stop.  Why would you do

24 that?

25 **A.**   Because that's not appropriate in the workplace.  You

1    don't use those words and terms.  And like I said, I grew up --

2    if you use those words, you get beat up, you know, so.

3    **Q.**   Mr. Spiro asked you some questions about hearing the

4    N-word thrown around while you are walking around.  How often

5    do you recall hearing the N-word thrown around?

6    **A.**   I can't give you a definite answer of how often I heard

7    it.  Like I said, people were playing their music.  They were

8    saying the words to the songs, and it was thrown around

9    casually like -- it was nothing.

10        Like I said, when you hire staffing companies, like I

11   said, those are more the people that can't apply during the

12   proper channels, so they go through staffing companies to get

13   these jobs.

14   **Q.**   Is it fair to say that -- would it be most of the time you

15   were walking around the factory you would hear it?

16   **A.**   I can say fairly regularly.  I can't -- like I said, I

17   can't give you a definite answer of how often I heard the word.

18   Like I said, people play their music.  When a song comes on,

19   it's thrown away in the songs, so.

20             **MR. ORGAN:**  Thank you so much, Mr. Kawasaki.

21             **THE COURT:**  All right.  Ladies and gentlemen, we

22   are --

23             **MR. SPIRO:**  I have one quick follow-up if that's okay.

24             **THE COURT:**  Okay.

25   \\\

<u>**RECROSS-EXAMINATION**</u>

1

2    **BY MR. SPIRO:**

3    **Q.**   Just one more quick thing --

4    **A.**   You are all good.

5    **Q.**   -- about your position.

6    **A.**   Got to get back to work, so --

7    **Q.**   So you were asked a question when Mr. Organ first stood up

8    about something that you did say in your deposition --

9          **MR. ORGAN:**  Beyond the scope, Your Honor.

10   **BY MR. SPIRO:**

11   **Q.**   -- about --

12         **THE COURT:**  We will figure out what it is.

13   **BY MR. SPIRO:**

14   **Q.**   -- about the N-word being reported to you.  And I'm going

15   to ask you to look just before that to be complete.

16   **A.**   What page?

17   **Q.**   If we can look at 41.

18   **A.**   Page 41?

19   **Q.**   Yep.

20   **A.**   Line 13.

21   **Q.**   My question, sir, is:  Isn't that true that that word was

22   suggested to you in a question, and you did not --

23         **MR. ORGAN:**  Move to strike, Your Honor.

24         **THE COURT:**  I'm striking the question.  I think we

25   have completed the examination --

PROCEEDINGS

```
 1              MR. SPIRO:  Thank you.

 2              THE COURT:  -- of Mr. Kawasaki.  Thank you very

 3    much --

 4              THE WITNESS:  No problem.

 5              THE COURT:  -- for your testimony.

 6              THE WITNESS:  That's it?

 7              THE COURT:  That's it for you.

 8         Ladies and gentlemen, we'll take our first break of the

 9    morning, and we will be back at about 10:22 by my watch.

10    Please remember the admonitions which are not to talk about the

11    case or do any research about it.

12         (Proceedings were heard outside the presence of the jury:)

13              THE COURT:  All right.  We will be in recess.

14                    (Recess taken at 10:08 a.m.)

15               (Proceedings resumed at 10:22 a.m.)

16              THE CLERK:  Please come to order.

17              THE COURT:  Are you ready to proceed?

18              MR. SPIRO:  Just one moment, Your Honor, if I can

19    address one thing.

20              THE COURT:  Come up to a live mic.

21                     (Pause in proceedings.)

22              THE COURT:  Please be seated, everybody.

23              MR. SPIRO:  Your Honor, I just think it's incumbent

24    upon me to put in the record at this point that I felt that the

25    witness was testifying in a manner to slow down the
```

1   proceedings, whether he -- he developed that in his own manner

2   or not.

3        And I have concern that if that's the way the witnesses

4   are going to testify, I'm asking for any help that the Court --

5   I looked at the Court a couple times -- can provide just

6   because we are on a clock, and at some point, maybe already, it

7   starts to impinge on the Defense's rights because I have to be

8   able to cross-examine witnesses.  When I'm on a clock and the

9   witness on the other side knows that, they can do everything in

10  their power to slow it down.

11       **THE COURT:**  I appreciate the concern.  Mr. Kawasaki

12  responded in ways that were somewhat lengthy.  He was totally

13  credible as far as I was concerned in the way that he was

14  testifying.  He was not playing games in the way that he was

15  testifying.  I think you got -- you got what you got from the

16  questions that you were asking and his responses.

17       I am aware of it.  I think when I see it with different

18  kinds of witnesses who appear to be doing something

19  intentional, I would certainly stop it, but I do not -- I think

20  he did just fine.

21       **MR. SPIRO:**  That's all I'm -- I just wanted to alert

22  the Court at this stage with Witness 1 that I will be looking

23  towards the Court for as much guidance and help as I can get in

24  just keeping this moving along.  Thank you.

25       **THE COURT:**  Okay.  Let's get the jury.

WHEELER - DIRECT / COLLIER

1                    (Pause in proceedings.)

2        (Proceedings were heard in the presence of the jury:)

3            THE COURT:  Please be seated, everybody.

4            MR. COLLIER:  Now Plaintiff will call Michael Wheeler.

5            THE COURT:  Okay.

6            THE CLERK:  If you will step up, I will take a

7    photograph of you.

8                    (Pause in proceedings.)

9            THE CLERK:  Please raise your right hand.

10                      **MICHAEL WHEELER**,

11   called as a witness for the Plaintiff, having been duly sworn,

12   testified as follows:

13           THE CLERK:  Be seated.  If you would, please state

14   your full name and spell it for the court reporter.

15           THE WITNESS:  Michael Wheeler.  M-I-C-H-A-E-L,

16   W-H-E-E-L-E-R.

17                    **DIRECT EXAMINATION**

18   BY MR. COLLIER:

19   **Q.**   Good morning, Mr. Wheeler.

20   **A.**   Good morning.

21   **Q.**   My first question to you is when did you work at Tesla?

22   **A.**   2015 to 2016.

23   **Q.**   And does April 23, 2015, to April 27, 2016, ring a bell?

24   **A.**   Yeah.  That was the date of my termination.

25   **Q.**   Now, when you left Tesla, what position did you hold?

**WHEELER - DIRECT / COLLIER**

1   **A.**   A supervisor.

2   **Q.**   And how long were you a supervisor inside the Fremont

3   factory?

4   **A.**   I want to say six to eight months.

5          **THE COURT:**   Mr. Wheeler, could you pull the mic just a

6   little closer to you.   Thank you.

7   **BY MR. COLLIER:**

8   **Q.**   How do you know Mr. Diaz?

9   **A.**   Mr. Diaz worked on elevators, ferrying objects from first

10   floor to second floor.

11   **Q.**   What about Mr. Kawasaki?   Do you know him as well?

12   **A.**   He was the individual that recommended me for my

13   promotion.

14   **Q.**   Understood.

15          What was Mr. Kawasaki's role when you began working there?

16   **A.**   He was a supervisor.

17   **Q.**   And you took over for him when he left or when he got

18   promoted?

19   **A.**   Yes.

20   **Q.**   You had an opportunity to observe Mr. Diaz's work

21   performance?

22   **A.**   Yes.

23   **Q.**   And what was your assessment of his job performance?

24   **A.**   He always got the job done.

25   **Q.**   What about his demeanor as an employee?

1  **A.**   He maintained a professional demeanor.

2  **Q.**   Professional, got the job done.

3                 (Pause in proceedings.)

4  **BY MR. COLLIER:**

5  **Q.**   So if anyone were to come in this courtroom and suggest

6  that Mr. Diaz was a poor performer while working under your

7  leadership, that would be false; correct?

8  **A.**   True.

9  **Q.**   If anyone were to come in here and suggest that he were

10  unprofessional while working under your leadership, that would

11  be false?

12  **A.**   Correct.

13  **Q.**   With regard -- I'm sorry.  While you were at Tesla, did

14  you receive any training from Tesla on their Anti-Handbook

15  Handbook?

16  **A.**   Anti --

17  **Q.**   -- Handbook Handbook.

18  **A.**   I did not.

19  **Q.**   Or any other employee handbook whether or not silly named?

20  **A.**   No.

21  **Q.**   Okay.  And while you were at Tesla, did you receive any

22  training from Tesla on their anti-harassment policy?

23  **A.**   None.

24  **Q.**   Which shift did your team work on?

25  **A.**   Graveyard.

1   Q.   I'm going to talk to you a little bit about the use of the

2   N-word on that shift.   Okay?   Mr. Diaz was also on that shift?

3   A.   Yes.

4   Q.   During the timeframe you were inside the Tesla factory

5   from 2015 to 2016, did you experience the N-word in the

6   factory?

7   A.   I did.

8   Q.   And you used a cart to drive yourself around the factory;

9   correct?

10  A.   Yes.

11  Q.   And what areas of the factory were you -- did you hear the

12  N-word used?

13  A.   Throughout the factory.   Mostly on the main lines.

14  Q.   And were you hearing it from contract employees, direct

15  Tesla employees, or both?

16  A.   I mean, it would be impossible to distinguish the

17  difference, so.

18  Q.   How often would you say you heard the N-word around the

19  factory?

20  A.   Frequent enough to where it would become just another

21  word.

22  Q.   You previously testified you heard it daily; is that

23  right?

24  A.   Yes.

25  Q.   And how did that make you feel?

**WHEELER - DIRECT / COLLIER**

1  **A.**   Not good.

2  **Q.**   And why is that?

3  **A.**   Um.  Well, the word is used to put individuals of my color

4  down.

5  **Q.**   If someone were to come in here and suggest that the

6  N-word wasn't being used on a daily basis, that would be false;

7  correct?

8  **A.**   Correct.

9  **Q.**   And you heard it used both ways; correct?

10  **A.**   In terms of?

11  **Q.**   The "A" version and the "ER" version?

12  **A.**   Yes.

13  **Q.**   And they're both unacceptable in the workplace; correct?

14  **A.**   Agreed.  Yeah.

15  **Q.**   Did you ever hear the term "mayate" used?

16  **A.**   I did.

17  **Q.**   And you understood that to be the Spanish version of the

18  N-word?

19  **A.**   Yes.

20  **Q.**   Now, are there any occasions while you were working at

21  Tesla that you notified management you had heard the N-word?

22  **A.**   Yes.

23  **Q.**   Tell us about that.

24  **A.**   The most prominent one would be the time I was called the

25  N-word directly while trying to discipline a subordinate.

**WHEELER - DIRECT / COLLIER**

1   Q.   And what had the subordinate done?

2   A.   So I had an employee that was taking his lunch break, and

3   so he was sleeping, and the associate took a picture of that

4   employee.  They brought the picture to me and told me I need to

5   discipline him.  And I told him I was aware that he was on his

6   lunch break, and then I asked the associate to delete the

7   picture.  And as he refused to delete the picture, he started

8   walking away.  And as he walked away, he used the hard R in

9   response.

10  Q.   And by hard -- go ahead.

11  A.   In response.

12  Q.   Okay.  And by "hard R," you mean the N-word with the ER at

13  the end?

14  A.   Yes.  Correct.

15  Q.   And, in fact, he said, "F you, N-word"; right?

16  A.   Yes.

17  Q.   And of course, he didn't spell it; he said it?

18  A.   He said it.

19  Q.   Who did you report this incident to?

20  A.   So I reported this to Josue Torres, a Tesla employee;

21  Victor Quintero, a Tesla employee; and Ramon Martinez.

22  Q.   And Ramon Martinez was also a supervisor; correct?

23  A.   He was.

24  Q.   As a result of your report of the N-word being used by the

25  subordinate to Ramon Martinez and Victor Quintero and Ed

1   Romero, what actions were taken by Tesla?

2   **A.**   He received a promotion.

3   **Q.**   I'm sorry.  Who received a promotion?

4   **A.**   The guy that called me the N-word.

5   **Q.**   And how did that make you feel?

6   **A.**   Not good.

7   **Q.**   That person's name was Jesus?

8   **A.**   Correct.

9   **Q.**   And Jesus was then not only disciplined -- not only was he

10  not disciplined, but he was given his own team to lead; is that

11  right?

12  **A.**   Yeah.

13  **Q.**   During your time at the Tesla Fremont factory, did you

14  ever observe -- are you okay, Michael?

15  **A.**   I'm good.

16  **Q.**   There is tissues there if you need them.  All right.

17       During your time at the Tesla factory, did you ever see

18  any swastikas?

19  **A.**   I did.

20  **Q.**   Tell us about that.

21  **A.**   You would either see them in the restrooms, or I believe I

22  saw one on the elevator, and then the most rememberable one was

23  the one on the back of the gentleman's head as he was exiting

24  the building.

25  **Q.**   You saw a swastika tattoo on the back of someone's head?

1  **A.**   Yeah.

2  **Q.**   And you said you also saw them in the restroom?

3  **A.**   Yes.

4  **Q.**   In the form of graffiti or scratched in?

5  **A.**   Yeah.

6  **Q.**   When you saw these swastikas, was that before, after, or

7  both -- sorry.  Let me rephrase that.

8       Was that before you became a supervisor, after you became

9  a supervisor, or both?

10 **A.**   I would say both.

11 **Q.**   And would it be fair to say that you saw swastikas

12 regularly throughout your employment at Tesla?

13 **A.**   I would say I saw them in the restrooms and the places I

14 mentioned.

15 **Q.**   And Mr. Diaz also reported to you that he saw the N-word

16 in the bathrooms; correct?

17 **A.**   Correct, yes.

18 **Q.**   So if anybody were to come in here and suggest that

19 Mr. Diaz never complained about the use of the N-word at Tesla,

20 that would be false; right?

21 **A.**   Correct.

22 **Q.**   I'm going to talk to you about the cart incident so you

23 know what I'm referring to.

24      There was another incident that you believe to be racially

25 motivated while you were there; correct?

1   **A.**   Yes.

2             **MR. SPIRO:**   Objection.   Leading every question.

3             **THE COURT:**   Sustained.   Rephrase.

4             **MR. COLLIER:**   Apologies.

5   **BY MR. COLLIER:**

6   **Q.**   Why don't you tell us what happened with the cart, sir?

7   **A.**   There was one evening where I went to lunch, and it was

8   about 30 minutes or so.   Came back to my cart and slid into the

9   seat in which I noticed there was a wet feeling on my pants.

10  So I got out of the seat and I had sat in feces.

11  **Q.**   And so there was feces in the chair of your cart; is that

12  what you're saying?

13  **A.**   Yes.

14  **Q.**   And what about the steering wheel?

15  **A.**   Not on the steering wheel.

16  **Q.**   Did you report this incident to anyone in management?

17  **A.**   I did.

18  **Q.**   Who did you report it to?

19  **A.**   I reached out to security.   I asked them to check the

20  cameras in which they responded they didn't have an angle on

21  the cart.   I reached out to Josue Torres, Victor Quintero, and

22  Ramon.   I sent e-mails, basically, to anyone I could think of.

23  **Q.**   Ramon, again, is Ramon Martinez?

24  **A.**   Yes.

25  **Q.**   And I think you said Ed Romero as well?

**WHEELER - DIRECT / COLLIER**

1    **A.**    I do not recall.

2    **Q.**    Don't recall Romero.  Understand.  All right.

3          Now, Victor Quintero was the top Tesla supervisor over

4    your department; correct?

5    **A.**    Correct.

6    **Q.**    So you reported it to numerous managers and supervisors?

7    **A.**    Uh-uh.

8    **Q.**    Yes?

9    **A.**    Yes.

10   **Q.**    To your knowledge, was anyone disciplined?

11   **A.**    Not to my knowledge.

12   **Q.**    To your knowledge, was there even an investigation?

13   **A.**    Not at all.

14   **Q.**    Do you still have the e-mail where you reported this

15   incident to management?

16   **A.**    I do not.  My phone with it was confiscated.

17   **Q.**    Who confiscated it?

18   **A.**    The swing shift supervisor, Israel.

19   **Q.**    For Tesla?

20   **A.**    Yes.  Yes.

21          (The court reporter asked for clarification.)

22   **BY MR. COLLIER:**

23   **Q.**    And you also took photos of the feces incident; correct?

24   **A.**    Yes.

25   **Q.**    Also stored on your phone?

WHEELER - DIRECT / COLLIER

1   A.   Correct.

2   Q.   Where were the video cameras, the surveillance cameras, in

3   the Tesla factory?

4   A.   They are everywhere.  Um, I would say my issue with this

5   incident was my vehicle was parked next to Elon's Roadsters,

6   which are his most valuable cars in that factory.  Yet there

7   was no camera watching his cars.

8   Q.   Who told you there was no camera watching the location?

9   A.   Security.

10  Q.   And did you believe them?

11  A.   I did not.

12  Q.   All right.  So bottom line is there was no video reviewed

13  of the cart incident to figure out who did it; correct?

14  A.   Correct.

15  Q.   So if anyone were to come in here and suggest that there's

16  a lack of documentation of the cart incident, that's because

17  they didn't pull the video; right?

18  A.   Correct.

19  Q.   Did anyone ever interview you about this incident?

20  A.   No.

21  Q.   Was there any retraining about it?

22  A.   No.

23  Q.   Any diversity training?

24  A.   No.

25  Q.   Any indication they were upset at all about it?

1    **A.**   No.

2    **Q.**   How did you feel about all of that?

3    **A.**   I felt like I couldn't trust anyone in the factory.

4    **Q.**   During your time at Tesla, did anybody ever tell you that

5    Tesla had a zero-tolerance policy for harassment?

6    **A.**   No.

7            **MR. COLLIER:**  I'd like to display Exhibit 33, page 3,

8    already in evidence.

9            **THE COURT:**  Turn on the camera.  They are not on.

10           **MR. COLLIER:**  There we go.

11   **BY MR. COLLIER:**

12   **Q.**   Mr. Wheeler, do you recognize this drawing?

13   **A.**   I do.

14   **Q.**   How is it that you came into contact with this drawing?

15   **A.**   So initially, I received a phone call on my way to work

16   about an incident that had taken place, and upon arriving to

17   the facility, I was picked up from the front door and driven to

18   where this picture was.

19   **Q.**   And who brought it to your attention?

20   **A.**   So I was called by -- if my memory serves correctly --

21   Israel from the swing shift.

22   **Q.**   And when Israel brought you to the bale, Mr. Diaz was

23   already there?

24   **A.**   Yes.

25   **Q.**   Did you have a discussion with Mr. Diaz and Israel about

WHEELER - DIRECT / COLLIER

1   the drawing?

2   **A.**   I did.

3         **MR. COLLIER:**   I'd like to also -- could we display 133

4   side by side?  133 also in evidence.

5   **BY MR. COLLIER:**

6   **Q.**   This is the cartoon on the right here.  You can see that?

7   **A.**   (No response.)

8   **Q.**   This is the cartoon that Mr. Martinez testified that he

9   was trying to draw.  Have you ever seen it before?

10  **A.**   No.  Not that cartoon.

11  **Q.**   During this conversation you had with Owen, how did he

12  appear?

13  **A.**   He was very upset.

14  **Q.**   And what leads you to say that?  What did you observe?

15  **A.**   Body language, tone.

16  **Q.**   And what did he say or do to lead you to the conclusion he

17  was really upset?

18  **A.**   Just like I mentioned before, it was just out of character

19  for him to be flustered.

20  **Q.**   And you testified previously about Mr. Diaz being from a

21  different generation?

22  **A.**   Yes.

23  **Q.**   What does that --

24         **MR. SPIRO:**   Objection.  Objection to the leading every

25  question.

```
 1              THE COURT:  I think that was setting up to the -- to
 2    the question.  So overruled as to that.
 3    BY MR. COLLIER:
 4    Q.   What is the significance of this cartoon for someone of an
 5    older generation like Mr. Diaz?
 6              MR. SPIRO:  Objection.  How can he testify to that?
 7              THE COURT:  Yeah.  That's called for speculation.
 8    Sustained.
 9    BY MR. COLLIER:
10    Q.   You're familiar with the fact -- well, strike that.
11         Do you know what a "jigaboo" is?
12    A.   I do.
13    Q.   What is a jigaboo?
14    A.   So a jigaboo is referring to -- well, it is another term
15    that is not equivalent to the N-word but another derogatory
16    term used to put down African Americans.
17    Q.   And it's also a term that used to be used for this kind of
18    drawing; correct?
19    A.   Yes.
20    Q.   And you're familiar with -- I take it, in your life you
21    have interacted with an older generation of African Americans?
22    A.   My mother.
23    Q.   And for the record, you are African American?
24    A.   I think so.
25                            (Laughter)
```

BY MR. COLLIER:

Q.   And so what is the significance of Mr. Diaz being from an older generation with regard to this cartoon?

A.   The significance of this from older generations would be "boo" did not have multiple meanings at that time.  It was only a racial slur.

Q.   Now, Mr. -- at some point Mr. Martinez joined you all in this conversation; correct?

A.   Correct.

Q.   And how long was it before he spoke?

A.   After he had joined us?

Q.   Uh-huh.

A.   I cannot recall the exact time.

Q.   Understood.

     Did he immediately accept responsibility?

A.   He did not.

Q.   He did not.  How long did it take him to accept responsibility for the drawing?

A.   After we -- or after I suggested that someone else was responsible for it.

Q.   And did Mr. Martinez say anything else during that timeframe?

A.   After I suggested he try to take accountability and said no one else was involved.

Q.   And did he also tell you words to the effect --

```
 1              MR. SPIRO:  Objection.  Leading.

 2              THE COURT:  Overruled at the moment.

 3   BY MR. COLLIER:

 4   Q.   Did he also say words to the effect of this is a joke or

 5   you people can't take a joke?

 6              THE COURT:  Sustained.  Can you -- try to ask him

 7   directly.

 8              MR. COLLIER:  Fair enough.

 9   BY MR. COLLIER:

10   Q.   What did he say about it being a joke, to your

11   recollection?

12   A.   He said he thought it would be funny.  Something of that

13   caliber.

14   Q.   At any point during this conversation, did he express any

15   sort of remorse?

16   A.   Never.

17   Q.   Did he apologize to Mr. Diaz?

18   A.   Not to my knowledge.

19   Q.   Tell us what Mr. Martinez did to you after you reported

20   this drawing to management?

21   A.   He did not do anything directly to me.

22   Q.   Tell us about the conversation you had with him when you

23   were let go?

24   A.   So the day I was let go -- yeah.  He said he didn't know

25   what was going on and -- yeah.  Yeah.  Um, yeah.  He was saying
```

 1   he would, like, call around and try and get to the bottom of

 2   it, even though he was the bottom of it.

 3   **Q.**   What do you mean by that?

 4   **A.**   He was the one that had me terminated.

 5   **Q.**   And what did they tell you was the reason you were being

 6   terminated?

 7   **A.**   Well, he said I was an asset to the company.  They

 8   appreciated everything that I did and they valued my services,

 9   and it was time to part ways.

10   **Q.**   And did they give you any other reason for your

11   termination?

12   **A.**   Not until I basically begged for one.

13   **Q.**   And what did they say then?

14   **A.**   They said I told one of my subordinates what to do.

15         **MR. COLLIER:**  I have no further questions at this

16   time.

17         **THE COURT:**  Mr. Spiro.

18                     <u>**CROSS-EXAMINATION**</u>

19   BY MR. SPIRO:

20   **Q.**   Good morning, Mr. Wheeler.

21   **A.**   Good morning.

22   **Q.**   Victor Quintero at the start of your time at Tesla was the

23   one who originally interviewed you and hired you; right?

24   **A.**   I do not recall.

25   **Q.**   Mr. Quintero signed off on your promotion; correct?

**WHEELER - CROSS / SPIRO**

1    **A.**    I would -- since he was in charge, I would assume so.

2    **Q.**    And when you were promoted, that was within months of you

3    being at the factory, and you had already taken on that level

4    of responsibility; right?

5    **A.**    Correct.

6    **Q.**    And you got -- you went through some training, and you got

7    some certificates.

8           Do you remember that?

9    **A.**    I have forklift certificates, yes.

10   **Q.**    Okay.  And other certificates as well, sir?

11   **A.**    No.

12   **Q.**    You don't remember any other certificates that you had at

13   this time?

14   **A.**    Not anything outside of the forklift operation.

15   **Q.**    Okay.  And under your supervision, there were 20-plus

16   employees; right?

17   **A.**    Yes.

18   **Q.**    And one of your -- one of the people that at least you had

19   some supervisor responsibility over was Owen Diaz?

20   **A.**    Yes.

21   **Q.**    Okay.  And one thing about Owen was that he was very

22   direct; true?

23   **A.**    True.

24   **Q.**    And Mr. Diaz never told you that Ramon Martinez ever used

25   the N-word with him; correct?

1  **A.**    I cannot recall.

2  **Q.**    And Mr. Diaz never told you that anyone called him the

3  N-word; correct?

4  **A.**    That's false.

5  **Q.**    Prior to the drawing that you were just shown in evidence,

6  Mr. Diaz never talked to you about the use of the N-word at the

7  factory; true?

8  **A.**    I cannot recall.

9  **Q.**    Well, you don't have any memory that you can give this

10  jury about Mr. Owen Diaz ever complaining to you about the use

11  of the N-word at the factory prior to the drawing.  True?

12         **MR. COLLIER:**  Objection.  Asked and answered.  And

13  argumentative.

14         **THE COURT:**  No.  Overruled.

15         **THE WITNESS:**  So to answer your question, lots of

16  people complained about the N-word, so for me to say that

17  Mr. Diaz did or did not would not be accurate.  It was a

18  continuous complaint that was never addressed.

19  **BY MR. SPIRO:**

20  **Q.**    You were partner supervisors in that role with Ramon

21  Martinez when you got promoted; is that a fair description?

22  **A.**    Yes.

23  **Q.**    And you described yourself as his right-hand man; right?

24  **A.**    Yes.

25  **Q.**    And you never heard Mr. Martinez use the N-word; correct?

1    **A.**    Not in English.

2    **Q.**    You never heard Mr. Martinez say the word "mayate" in your

3    presence?

4    **A.**    I can't recall.

5    **Q.**    You can't recall.

6          You worked with him every day?

7    **A.**    It's been seven years.

8    **Q.**    You never heard him use the N-word; correct?

9    **A.**    Not in English.

10   **Q.**    You never heard Mr. Martinez use any racial slurs inside

11   the Tesla workplace between 2015 and 2016; correct?

12   **A.**    I cannot recall.

13         **MR. SPIRO:**   Can we put up Exhibit 1, please?

14              (Pause in proceedings.)

15   **BY MR. SPIRO:**

16   **Q.**    You were looking earlier in your testimony about a -- this

17   drawing on this screen that's in the middle, but I wanted to

18   give you the full picture of what the cardboard bale looked

19   like.  Do you remember this?

20   **A.**    I do.

21   **Q.**    Okay.  And I don't think we've had any testimony about

22   what is in that left corner of that cardboard bale?

23   **A.**    It was a Pac-Man.

24   **Q.**    And when you first saw the drawing in this context, your

25   first reaction was not a full laugh but like a chuckle and then

1   you realized pretty quickly that Owen was upset.  Fair?

2   **A.**   Fair.

3   **Q.**   And the truth is, based on your experience with

4   Mr. Martinez up until this point in time, you didn't even

5   believe he could have done this drawing.  True?

6           **MR. COLLIER:**  Objection.  Relevance.  Speculation.

7           **THE COURT:**  Overruled.

8       You can answer.

9           **THE WITNESS:**  I wouldn't say it was a belief.  I

10  assumed someone else was in the room with him.

11  **BY MR. SPIRO:**

12  **Q.**   Well, I'm going to ask you a very direct question.  You

13  never believed that Ramon Martinez drew this drawing; is that

14  right?

15  **A.**   I did not think he drew the drawing.

16  **Q.**   But he was dead set on taking accountability for what he

17  had done.  True?

18  **A.**   Yes.

19  **Q.**   And he said something like that he was joking, or

20  something along those lines, he was only joking.  Did he say

21  something like that?

22  **A.**   Yeah.

23  **Q.**   And the truth is you're not sure as you sit here whether

24  or not he did apologize; correct?

25  **A.**   He did not apologize.

**WHEELER - CROSS / SPIRO**

1    Q.   Well, I'm asking you a specific question.

2              MR. COLLIER:  Objection.  Argumentative.

3              THE COURT:  Sustained.

4         Just ask the question.

5    BY MR. SPIRO:

6    Q.   You're not sure that Mr. Martinez ever apologized.  True?

7    A.   He did not apologize in my presence.

8    Q.   And your reaction to this was that he should receive a

9    write-up.  True?

10   A.   I believe someone should have been written up for it, yes.

11   Q.   Okay.  But Mr. Diaz was rightfully upset?

12   A.   Yes.

13   Q.   Okay.  And you were shown earlier in this matter

14   Exhibit 33, which has an indication, it's the statement by

15   Mr. Diaz, that:  "This is not the first time Ramon Martinez has

16   been spoken to about his behavior."

17        Do you remember that?

18   A.   It sounds vaguely familiar.

19   Q.   Okay.  And your reaction when seeing that was that it must

20   have been that Martinez slept on the job so much because you

21   were already covering for him, you were always covering for

22   him.

23        Do you remember that?

24   A.   I do remember covering for him.

25   Q.   But do you remember that being your reaction to the

1  statement "Martinez has done this before," that your

2  reaction -- "has been spoken to about his behavior before,"

3  that your reaction was, "His behavior must mean he was sleeping

4  on the job, and I was covering for him."

5       Do you remember that reaction?

6            MR. COLLIER:  Objection.

7            THE COURT:  I'm sorry.  The objection was compound.

8       Could you break it down because that was hard to follow?

9            MR. SPIRO:  Sure.

10  BY MR. SPIRO

11  Q.   So I had asked you earlier if you remember that you were

12  shown a document that said that Mr. Martinez had been spoken to

13  about his behavior that Mr. Diaz wrote following the drawing

14  incident, and you said you vaguely remembered.

15       So what I'm asking you now is:  Do you recall whether your

16  immediate reaction to looking at that phrase, that phrase which

17  is, "This is not the first time Ramon Martinez has been spoken

18  to about his behavior," your immediate reaction was "That must

19  be referring to the fact that Ramon Martinez slept on the job a

20  lot"?

21            MR. COLLIER:  Objection.  Vague.  Compound.  And

22  hearsay.

23            THE COURT:  Overruled.

24       You can answer if you know, if you remember.

25            THE WITNESS:  I must have misheard you earlier.  I

 1    don't even recall seeing a document for Ramon.

 2              MR. SPIRO:  Okay.  If we can put back on -- Exhibit 1

 3    up on the screen.

 4                        (Pause in proceedings.)

 5    BY MR. SPIRO:

 6    Q.   How -- how much -- how much do you think, sir, as somebody

 7    that had to observe this -- and I'm sorry that this was drawn.

 8         How much do you think that you ought to receive in damages

 9    for this?

10              MR. COLLIER:  Objection.  Relevance.

11              THE COURT:  Overruled.  The -- the objection is

12    sustained.  And move on to the next question.

13    BY MR. SPIRO:

14    Q.   The way you have described hearing the N-word at the

15    factory was that it was not outside of the friendly context, so

16    GA instead of ER but never really aggressively.  That was the

17    general impression you had of the use of the N-word at the

18    factory.  True?

19    A.   Outside of the story that I mentioned?

20    Q.   Outside of the story that you mentioned, that was the

21    general reaction you had.  True?

22    A.   That's a difficult question to answer.  I feel like that

23    story is very telling.  That is my story.

24    Q.   That story was upsetting to hear, and we will talk about

25    it.  But for now, I still have to ask you this question before

1    we get to it, which is generally, other than that story, when

2    you heard the N-word used in the factory, you did not hear it

3    generally outside of the friendly context, you heard GA instead

4    of ER, never really aggressively; isn't that fair, sir?

5    **A.**   Fair.

6    **Q.**   Okay.  And you heard everybody using it in a not

7    aggressive way; right?

8    **A.**   If we can remove the word "nonaggressive," it would be

9    more so be used in an aggressive manner.

10   **Q.**   You never -- other than the one story we're going to talk

11   about, you said that you didn't think it was used in an

12   aggressive way at all.  True?

13   **A.**   Did I write or say "at all"?

14   **Q.**   You said "at all."

15   **A.**   Well, then, if that's what I said, yes.

16   **Q.**   Okay.  And when you talked about the graffiti in the

17   bathroom, you didn't personally see, as you recall, any N words

18   in the bathroom; right?

19   **A.**   Correct.

20   **Q.**   And, in fact, when a gentleman named Hector mentioned to

21   you the graffiti in the bathroom, you, quote, didn't care.

22   True?

23   **A.**   I do not recall that.

24   **Q.**   Do you recall caring whether -- when Hector told you, or

25   you have no memory of that?

1  **A.**   I do not recall.  Hector was not a very responsible

2  individual.

3  **Q.**   And you said some testimony about somebody with a swastika

4  on their head and some swastika graffiti.  When you were first

5  asked about swastikas in the bathroom, you also didn't recall

6  seeing any; isn't that true?

7  **A.**   I do not recall.

8  **Q.**   Okay.  So after the lawsuit in this case was filed, right,

9  so that you're now gone from Tesla for a year or so or more,

10 you got a call from Mr. Diaz that your name would be given to

11 his lawyers and you may be called upon to testify.  True?

12         **MR. COLLIER:**  Objection.  Argumentative.

13         **THE COURT:**  Overruled.

14     You can answer.

15         **THE WITNESS:**  I do not remember the timeframe, but I

16 did receive a call from Owen.

17 **BY MR. SPIRO:**

18 **Q.**   Right.  But it was after you left Tesla?

19 **A.**   After I was terminated, yes.

20 **Q.**   After you were terminated.  Okay.

21     And in that phone call, he told you that one of the things

22 he wanted you to know was that there was an incident with his

23 son where his son was called a racially offensive word, too;

24 right?

25 **A.**   Yes.

**WHEELER - CROSS / SPIRO**

1   Q.   And he told you that he had -- there was video of that;

2   right?

3   A.   Yes.

4   Q.   And you then said, well, you know, you should know that

5   there was this incident that you told the jury about, the feces

6   on the car.  You told him about it.  True?

7   A.   True.

8   Q.   And you described to the jury how you sat in it; right?

9                      (No response.)

10   Q.   Is that a "yes"?

11   A.   Yes.

12   Q.   And how upsetting it was; right?

13   A.   How upsetting, yes.

14   Q.   And understandably so.  And you took a photo of it?

15   A.   Yes.

16   Q.   And you e-mailed Victor Quintero about it?

17   A.   Yes.

18   Q.   You were asked, "Didn't you e-mail Ed Romero about it?"

19   You said you didn't remember e-mailing Ed Romero; right?

20   A.   I said I did not remember.

21   Q.   Okay.  And you believed this to be, I think is your

22   testimony, a deliberate racial act; is that true?

23   A.   Yes.

24   Q.   And you give that testimony here in a case about, as you

25   know, racial discrimination; right?

WHEELER - CROSS / SPIRO

1    **A.**    Yes.

2    **Q.**    And you've told this jury about how your phone was

3    confiscated with the -- with the picture on it; right?

4    **A.**    Yes.

5    **Q.**    How nobody conducted any interviews; right?

6    **A.**    Correct.

7    **Q.**    How nobody did any training; right?

8    **A.**    Correct.

9    **Q.**    And how nobody seemed upset at all; right?

10   **A.**    Right.

11   **Q.**    And the reason for that, as you know, sir, is because this

12   was somebody that got sick and had an accident and they told

13   you that in an e-mail, sir, and this wasn't racial at all;

14   isn't that true, sir?

15            **MR. COLLIER:**  Objection.  Outside the scope of the

16   prior proceeding.

17            **THE WITNESS:**  Not true.

18            **MR. COLLIER:**  And also argumentative and speculative.

19            **THE COURT:**  Overruled.

20       You can answer to the extent that you know.

21   **BY MR. SPIRO:**

22   **Q.**    Isn't it true, sir, that they e-mailed you and told you

23   that somebody got sick and they needed to race that person to

24   get them some help because they were -- had the stomach flu and

25   they used your car, and that's why there was some substance on

1   the car; isn't that true, sir?

2              THE WITNESS:  That would be false.

3              MR. COLLIER:  Same objections, and also hearsay.

4              THE COURT:  Overruled.

5       You can answer.

6              THE WITNESS:  The reason why that would be false is

7   because it was on the driver's seat and if the individual was

8   sick, why would the poop be on my side of the seat?

9   BY MR. SPIRO:

10  Q.  I'm asking a slightly different question.  Then we can get

11  into that.

12      Isn't it true that they told you that in an e-mail?

13  A.  No.

14             MR. SPIRO:  I'd offer the e-mail into evidence,

15  Exhibit 410.

16             MR. COLLIER:  Objection, Your Honor.  This wasn't

17  introduced last time.

18             THE COURT:  Sustained.

19             MR. SPIRO:  It's impeachment.  Your Honor, can I be

20  heard on this?

21             THE COURT:  Not at this time.

22             MR. COLLIER:  It also wasn't produced in discovery.

23             THE COURT:  Okay.

24  BY MR. SPIRO:

25  Q.  Do you recall -- you testified earlier in front of the

1    jury that you recalled e-mailing --

2    **A.**    Yes.

3    **Q.**    -- Mr. Quintero?

4    **A.**    Yes.

5    **Q.**    Do you recall the substance of that e-mail?

6    **A.**    So the e-mail I sent to Security, Victor and Josue was I

7    would love to know who did this to the cart, and we need to see

8    camera footage because this is not okay.

9    **Q.**    And do you recall Victor Quintero's response to you at

10   7:41 a.m.?

11   **A.**    I recall the response from Security saying they don't have

12   the angle on the camera.

13   **Q.**    I'm not asking you about Security's response.  I'm asking

14   do you remember at 7:41 a.m. Mr. Quintero responding to your

15   upset e-mail and telling you what happened?  Do you recall

16   that?

17          **MR. COLLIER:**  Objection.  Hearsay.  He is back-dooring

18   the same exhibit.

19          **THE COURT:**  The exhibit is not coming in.

20      If you recall, you can say so; if you don't recall, you

21   can say you don't recall.

22          **THE WITNESS:**  So I can't recall because my shift ends

23   at 6:00 a.m.

24          **MR. SPIRO:**  So can I show this document to the witness

25   to see if his recollection can be refreshed?

```
 1             THE COURT:  No.

 2             THE WITNESS:  So you are saying I got an e-mail at

 3    7:41.  I got off at 6:00 a.m.

 4    BY MR. SPIRO:

 5    Q.   Yeah, I wasn't -- I apologize, sir.  I wasn't meaning when

 6    you got the e-mail.  I'm talking about when the e-mail was

 7    sent.  I'm asking you -- so maybe I should clarify my question.

 8         If you had sleep during the day, it's totally

 9    understandable.  I'm asking when you woke up and you checked

10    your e-mails, isn't it true that you had an e-mail from Victor

11    Quintero telling you that they looked into it and somebody had

12    gotten sick and --

13             MR. COLLIER:  Objection.  Hearsay.

14             MR. SPIRO:  No, it's not.  It's a question.

15    BY MR. SPIRO:

16    Q.   And that the person was sick, and that that's the reason

17    that there had been some feces on the cart?

18             MR. COLLIER:  Your Honor, you can't just read an

19    exhibit in.

20             THE COURT:  This question has been asked and answered.

21    The e-mail not produced in discovery is not coming in -- not

22    introduced in a prior proceeding is not coming in.  I have

23    allowed you to explore that issue.  It's now been explored.

24    You may move on.

25    \\\
```

WHEELER - CROSS / SPIRO

1    BY MR. SPIRO:

2    Q.   Are you sticking with your account --

3            MR. COLLIER:  Objection.  Argumentative.

4    BY MR. SPIRO:

5    Q.   -- of this incident as being related to an intentional

6    racial act, sir?

7            THE WITNESS:  Yes.  I'm sticking to the truth.

8            MR. COLLIER:  Objection.

9            THE COURT:  It's fine.

10   BY MR. SPIRO:

11   Q.   Now, there is another incident that you talked about

12   regarding the N-word being directed at you, sir, that I told

13   you we would talk about?

14   A.   Yes.

15   Q.   Okay.  And you reported that to Josue Torres, you said;

16   right?

17   A.   Correct.

18   Q.   And you know, sir, that there is no e-mail of you

19   reporting at that to Mr. Torres?

20   A.   Correct.

21   Q.   And the truth is, sir, that because that individual who

22   called you that name -- he didn't work at Tesla; right?  He

23   worked for one of the staffing agencies, as I think you said;

24   right?

25   A.   Yes.

WHEELER - CROSS / SPIRO

1   Q.   And the truth is that's Wayne Jackson at nextSource's --

2          MR. COLLIER:   Objection.   This undermines the

3   instructions and findings, Your Honor.

4          THE COURT:   Hang on just a second.

5          MR. SPIRO:   I will withdraw that question.

6          THE COURT:   All right.

7   BY MR. SPIRO:

8   Q.   So Wayne Jackson at nextSource was a program manager that

9   dealt with certain complaints and issues between different

10  staffing agencies?

11         MR. COLLIER:   Same objection.

12         THE COURT:   Overruled as to that.

13  BY MR. SPIRO:

14  Q.   Right?

15  A.   I do not know Wayne's job.   I just know he was part of HR.

16  Q.   You understood he was part of HR?

17  A.   Yes.

18  Q.   Okay.   And Mr. Jackson also never got a complaint about

19  that -- that incident in which you say that somebody -- the

20  story you mentioned earlier where somebody directly called you

21  the hard ER word; correct?

22  A.   I do not know.   My supervisor received a complaint.

23  Q.   Right.   But I'm asking did ever tell Wayne Jackson that?

24  A.   No.

25  Q.   Okay.   Now, we've talked a little bit about that

1   conversation you had with Mr. Diaz.  You had subsequent

2   conversations with him since, you know, the years -- since the

3   years since you've left Tesla; right?

4   **A.**   Actually, only two.

5   **Q.**   Only two.

6       Well, he sent you a text message saying that if you are

7   interested in jumping on this class action lawsuit or this

8   lawsuit, there is an attorney going around and his name is

9   Lawrence A. Organ from California Civil Rights Law Group.

10      He sent you that text, didn't he?

11  **A.**   Probably.

12  **Q.**   Okay.  And when that text was first shown -- and people

13  became aware of it -- there were dollar bills in the background

14  of that text, weren't there?

15  **A.**   No.  Please do not mistake my character for money.

16  **Q.**   I'm not talking about you, sir.  I'm talking about the

17  text message.

18  **A.**   No.

19  **Q.**   Okay.  It's your testimony that in the image of your phone

20  with the text message from Mr. Diaz, the text message is from

21  Mr. Diaz to you saying --

22          **MR. COLLIER:**  Mischaracterizes the document.

23          **MR. SPIRO:**  I'm sorry?

24          **MR. COLLIER:**  It mischaracterizes the document.

25          **THE COURT:**  Let him ask his questions, please.

1              MR. SPIRO:  Thank you.

2  BY MR. SPIRO:

3  Q.   I'm asking you.  I'm not talking about you, sir.  You

4  received a text.  Anybody can receive a text.  A text came into

5  your phone with the substance I just said, and in the

6  background of it was dollar bills; correct?

7  A.   I do not recall.

8  Q.   Okay.  I'm going to show --

9  A.   I have my phone in my pocket.  I could try and look for

10 the text.

11 Q.   I have a picture that I'm going to pass up and show you.

12 See if it refreshes your recollection.

13             THE COURT:  Have you shown it to the other side?

14             THE WITNESS:  Oh, you don't have to.  That's my phone

15 background for my rent money, if you count it.  That's my

16 phone's background.  That has nothing to do with Owen.

17 BY MR. SPIRO:

18 Q.   Okay.  So the -- I guess I don't have to show, the -- the

19 text messages on the screen, you're saying that the text

20 message with that background, the background is your rent

21 money.  The background isn't part of the text; is that fair?

22 A.   I have that in my photo albums.  I can pull that up right

23 now.

24 Q.   Okay.  Well, whatever the -- whatever the reason is -- and

25 I'm not questioning you or making you take out your phone --

**WHEELER - CROSS / SPIRO**

1  I'm just saying there were dollar bills when you took a picture

2  of the image on the phone; fair?

3  **A.**   Yeah.

4         **MR. COLLIER:**  It's fine.

5  **BY MR. SPIRO:**

6  **Q.**   Now when you think back to Owen Diaz, you testified a

7  little bit earlier that words in effect that he was -- you

8  know, he was very easy to get along with and whatnot.

9         Do you remember that testimony?

10 **A.**   I do not.

11 **Q.**   You don't remember that testimony?

12 **A.**   I don't.

13 **Q.**   Okay.  Because you know, sir, that one of your concerns

14 when you look back at the time at Tesla is that Mr. Diaz was

15 always going around telling on people and getting them fired;

16 isn't that true?

17 **A.**   I know he was, as you stated, direct in his actions.

18 **Q.**   And part of being direct in his actions is he would go

19 around getting your specific employees fired sometimes; right?

20 **A.**   So to my knowledge, the individual that you may be

21 referring to was the one that threatened to shoot him.

22 **Q.**   I'm not actually talking about that individual.

23 **A.**   Oh.

24 **Q.**   I'm saying generally your -- when you look back at your

25 time at Tesla, what you were concerned about was that -- that

**WHEELER - CROSS / SPIRO**

1  the guy, Owen, kept getting your workers fired.

2     Do you recall that?

3          **MR. COLLIER:**  I'm going to object.  Asked and answered

4  and also character evidence.

5          **THE COURT:**  That's all right.  You can answer.

6          **THE WITNESS:**  I do not recall.

7          **MR. SPIRO:**  Can I show the witness his deposition

8  testimony at 72:23?

9          **THE COURT:**  Sure.  Does he have the deposition?

10         **MR. SPIRO:**  He does.

11  **BY MR. SPIRO:**

12  **Q.**  Actually, given time, let me just say, is it your

13  testimony that you just don't recall one way or another --

14  forget what you said.  You don't recall, as you sit here, one

15  way or another whether or not Mr. Diaz got multiple of your

16  employees fired?

17  **A.**  I do not recall.

18  **Q.**  Okay.  Do you recall thinking in your mind years later

19  that the thing that you remember about Owen Diaz is he was

20  always saying stuff about the people that worked under you and

21  getting them fired?

22  **A.**  That actually did not cross my mind until just now.

23  **Q.**  Okay.  Now let's look at it for a second then.

24     72 -- page 72.

25          **THE COURT:**  What lines?

```
 1              MR. SPIRO:  23.  Let me just make sure I have the
 2   right...
 3              MR. COLLIER:  You said page 72?
 4              THE COURT:  I don't --
 5              MR. SPIRO:  Yeah, I don't --
 6              THE COURT:  This is the wrong --
 7              MR. SPIRO:  This is the wrong version of it.
 8              THE COURT:  Yeah.
 9   BY MR. SPIRO:
10   Q.   73, excuse me.  Lines 3 and 4.
11              MR. COLLIER:  I mean it's incomplete without the
12   question and answer.
13              MR. SPIRO:  I'm refreshing his memory.
14              MR. COLLIER:  He is just reading it to himself?
15              MR. SPIRO:  Yes.
16              MR. COLLIER:  Okay.  No objection.
17              MR. SPIRO:  Thank you.
18              THE WITNESS:  Yeah.
19   BY MR. SPIRO:
20   Q.   Does that refresh your recollection that -- that Mr. Diaz
21   was getting your employees fired?
22   A.   That reminds me that I was upset with Owen because we did
23   not have that good of a relationship.
24   Q.   And the truth is, sir, that you're very angry, as you've
25   said, about being let go by Tesla, aren't you?
```

1    A.    I'm not angry at all.

2    Q.    You're not angry?

3    A.    I'm hurt.

4    Q.    Have you testified previously that you were very angry?

5    A.    I remember if I were to have said anything, I would say

6    something to the caliber that that night I went to sleep

7    enraged and I woke up enraged, and I went to Tesla and I asked

8    them to give me a reason for my termination because at least

9    that way I could work through something because I can't work

10   through being a good employee.

11   Q.    Okay.  Just one last thing.  At a certain point in time

12   later, you applied to work at Tesla again; true?

13   A.    I did come back to work at Tesla, but I requested to be at

14   an off-site far away from the main factory.

15          MR. SPIRO:  No further questions.  Thank you.

16          THE COURT:  All right.  Any redirect?

17          MR. COLLIER:  Thank you, Your Honor.

18                    <u>REDIRECT EXAMINATION</u>

19   BY MR. COLLIER:

20   Q.    Mr. Wheeler, you mentioned that you believed Mr. Martinez

21   was covering for someone else on the drawing?

22   A.    Yes.

23   Q.    And what led you to believe that?

24   A.    Just my -- I had a hard time -- I know -- well, I know

25   other people work inside of the room that bale came from, and

1  it seemed like a more immature thing to be done.

2  **Q.**   Now, you're aware that he has now admitted to drawing it?

3  **A.**   I am aware.

4  **Q.**   And testified under oath that he drew it?

5  **A.**   Yes.

6  **Q.**   Do you still believe that he didn't draw it?

7  **A.**   I haven't given it much thought either way.

8  **Q.**   You were asked whether your incident being called the

9  N-word was ever put in an e-mail.

10     Do you recall that?

11 **A.**   I do.

12 **Q.**   Can we agree that sometimes things happen that aren't in

13 e-mails?

14 **A.**   Yes.

15         **MR. COLLIER:**  No further questions.

16         **THE COURT:**  All right.  Mr. Wheeler, thank you.  You

17 are excused.

18         **MR. ALEXANDER:**  Your Honor, the next witness would be

19 Wayne Jackson.

20         **THE COURT:**  Mr. Jackson, come on up.

21         **THE CLERK:**  If you will step up and remain standing,

22 I'm going to take your picture.  Raise your right hand, please.

23                         <u>**WAYNE JACKSON**</u>,

24 called as a witness for the Plaintiff, having been duly sworn,

25 testified as follows:

```
 1              THE CLERK:  Please be seated.  And if you would begin
 2   by stating your full name and spelling it for the court
 3   reporter.
 4              THE WITNESS:  Wayne Jackson, W-A-Y-N-E, J-A-C-K-S-O-N.
 5              MR. ALEXANDER:  Thank you, Your Honor.
 6                        DIRECT EXAMINATION
 7   BY MR. ALEXANDER:
 8   Q.   Good morning, Mr. Jackson.
 9        Can you tell me, where did you attend high school?
10   A.   Skyline High School in Oakland.
11   Q.   And you attended college?
12   A.   Yes.  Arizona.
13   Q.   And you were in the military?
14   A.   Yes.  Marine Corps.
15   Q.   And you graduate -- I'm sorry.  And you received an
16   honorable discharge?
17   A.   Yes, sir.
18   Q.   When you were discharged, what level were you at?
19   A.   E-4 corporal.
20   Q.   And for the record, what is your -- for the record what is
21   your race?
22   A.   African American.
23   Q.   When were you last employed at inside the Tesla factory?
24   A.   Back in 2015, I think it was.  Somewhere around there.
25   I'm not sure of the dates.
```

JACKSON - DIRECT / ALEXANDER

1   **Q.**   And at that time what title did you hold?

2   **A.**   Program manager.

3   **Q.**   I want to talk about the N-word inside of the workplace.

4   Did the N-word occur inside the workplace during the timeframe

5   that you were there?

6   **A.**   Yes.  Rampant.

7   **Q.**   Rampant?

8   **A.**   Yes.

9   **Q.**   And so some people might understand "rampant," on a daily

10  basis?

11  **A.**   Every day.

12  **Q.**   More than once a day?

13  **A.**   More than several times a day.

14  **Q.**   So it was -- "rampant" means every day constantly?

15  **A.**   Yes, sir.

16  **Q.**   Thank you.

17       And with regard to use of the N-word, did you ever hear

18  the word "mayate" used?

19  **A.**   Not on a regular in the plant, no.

20  **Q.**   But sometimes?

21  **A.**   Yeah.  I've heard it before.

22  **Q.**   Do you recall any individual specifically you heard it

23  from?

24  **A.**   It would usually be kind of a lot of the Hispanic males

25  would use those terms.

JACKSON - DIRECT / ALEXANDER

1   Q.   Specifically, with regard to Mr. Martinez, Ramon Martinez,

2   are you familiar with him?

3   A.   Yes.

4   Q.   And did you hear him use that word?

5   A.   Yes.  I've heard him use it before.

6   Q.   Once or more than once?

7   A.   Probably once or twice.

8   Q.   Your role as a project manager, can you tell me what your

9   role was, what you did?

10  A.   Kind of the middle man between Tesla and some staffing

11  agencies.

12  Q.   So if I understand correctly, there were a number of

13  staffing agencies that brought people inside of the Tesla

14  workplace?

15  A.   Yes, sir.

16  Q.   And you were the person essentially responsible for

17  supervising those staffing companies?

18  A.   For the most part, the individuals that were on-site

19  making sure they were getting to work on time, things like

20  that.

21  Q.   So you were the liaison between Tesla and these staffing

22  companies?

23  A.   Yes, sir.

24  Q.   But all the staffing companies were actually employed by

25  Tesla?

JACKSON - DIRECT / ALEXANDER

1  A.   Yes.

2         MR. GRIFFIN:  Objection.  Speculation.

3         THE COURT:  Overruled.

4  BY MR. ALEXANDER:

5  Q.   And so as I understand it, these staffing companies hired

6  the employees that worked inside the factory?

7  A.   Yes, sir.

8  Q.   And the staffing companies work inside of the factory --

9  I'm sorry.  These employees from the staffing companies working

10 inside the factory you were supervising?

11 A.   Yes, sir.

12 Q.   And you reported to Tesla individuals?

13 A.   Yes, sir.  Well, I reported to nextSource and to Tesla, to

14 both.

15 Q.   When you heard the N-word, did you find it offensive?

16 A.   Extremely.

17 Q.   And did it matter whether it was the A version or the

18 R version?

19 A.   It really didn't matter.  It shouldn't be said, period.

20 But I mean, it's -- for me, it's offensive.  For others, it may

21 not be, especially people of other races that aren't African

22 American or Black.  They don't know how derogatory the

23 statement can be.  In Tesla you have little Asian kids calling

24 each other "nigga."  You have Hispanics calling each other

25 "nigga."  They use it in derogatory and in brotherly, I guess

1  you could say, terms.  But it's very derogatory.  It's very

2  offensive.

3  **Q.**   Based on your understanding, do you have human resource

4  experience?

5  **A.**   Yes, sir.  I've done human resources for 20 years.

6  **Q.**   Okay.  And based on your training.  Based on your

7  experience with regard to human resources, is the N-word -- I'm

8  sorry.

9       Is it your understanding that an employer is supposed to

10  maintain a workplace free of harassment?

11  **A.**   Yes, sir.

12  **Q.**   And in your training, is the N-word one thing that should

13  not occur inside the workplace?

14  **A.**   Not occur inside the workplace.  It's not acceptable.

15  **Q.**   So if you knew that that was not supposed to occur inside

16  the workplace and you were offended by the word, why didn't you

17  do something about it?

18  **A.**   There was nothing I could do, sir.

19  **Q.**   And why is that?

20  **A.**   Because Tesla allowed it.  They didn't stop it.  I

21  couldn't talk to Tesla employees and tell them what to or not

22  to do.

23  **Q.**   So the way the workplace was constructed, you were a

24  liaison, but you didn't have any power to stop the N-word in

25  the workplace?

 1              **MR. GRIFFIN:**  Objection.  Leading.

 2              **THE WITNESS:**  Not with Tesla employees, no, I could

 3   not.

 4              **THE COURT:**  Overruled as to that.

 5              **THE WITNESS:**  I could talk to anybody that was under

 6   the nextSource umbrella and tell them that it was

 7   inappropriate, but Tesla employees I couldn't.

 8   **BY MR. ALEXANDER:**

 9   **Q.**   I want to talk about an elevator incident so that you

10   understand the framework.

11              **MR. ALEXANDER:**  If we could show Exhibit Number 92,

12   please.

13   **BY MR. ALEXANDER:**

14   **Q.**   Mr. Walker, I believe that you became aware of an incident

15   involving Owen Diaz and Mr. Martinez.  This is an October 20,

16   2015, e-mail from Owen Diaz to you.

17        Do you see that?

18   **A.**   Yes, sir.

19   **Q.**   And then -- I'm sorry.

20   **A.**   This is actually to Ed Romero.

21   **Q.**   Exactly.  I'm sorry.  Excuse me.

22        Owen Diaz to Ed Romero.  And then above that, it says --

23   above that at the top, it says Owen Diaz to Wayne Jackson.

24        Do you see that?

25   **A.**   Uh-huh.

1    **Q.**   Yes?

2    **A.**   Yes.

3    **Q.**   Thank you.

4         At this point Mr. Diaz -- I'm sorry.  With regard to

5    the -- with regard to the workplace, there are cameras inside

6    the workplace at Tesla; correct?

7    **A.**   Yes, sir.

8    **Q.**   And throughout the entire workplace; right?

9    **A.**   Yes, sir.

10   **Q.**   Including the elevators; isn't that correct?

11   **A.**   Not necessarily inside the elevators, but I believe in

12   those areas where the elevators open.

13   **Q.**   In conducting an investigation about an incident, one of

14   the things that you would want to do is to be able to access

15   the video associated with an incident; correct?

16   **A.**   Yes, sir.

17   **Q.**   Now, did you have direct access to video?

18   **A.**   No, sir.  I would have to go to Tesla.

19   **Q.**   So in order for you to review video of any incident, you

20   had to have Tesla give you access?

21   **A.**   Yes, sir.

22   **Q.**   Even though you were the person responsible for

23   supervising the subcontractors inside the workplace; correct?

24   **A.**   But I did not have access to their camera system.

25   **Q.**   And, sir, in order to get access, you had to speak to

1   Tesla personnel?

2   A.   Yes, sir.

3   Q.   And do you know who had -- who specifically had access or

4   who would provide you access?

5   A.   That would be Victor Quintero or Ed Romero would be who I

6   would usually go to.

7   Q.   Is a fight between employees considered a serious

8   incident?

9   A.   Yes, it is.

10  Q.   With regard to the incident that's identified in

11  Exhibit 92, confrontation between Mr. Diaz and Ramon Martinez,

12  did you report that incident up the line to people at Tesla?

13  A.   I had to.  Just about anything that comes through I have

14  to send to either their agency and/or Tesla HR.  If I didn't

15  send it, my manager at the time was Terri Garrett.  I would

16  make sure she was informed because she had the direct

17  relationship with Tesla's HR.

18  Q.   Now, with regard to this incident, based on the

19  information you received, it was your understanding that Owen

20  Diaz was inside an elevator with Rothaj Foster at the point

21  when this incident occurred?

22  A.   Yes, sir.

23  Q.   And it was your understanding that Mr. Ramon Martinez had

24  rushed into the elevator toward Mr. Diaz?

25  A.   He was on a golf cart, I believe.  They have little carts

1   that you drive around.

2   **Q.**   When you say "he," you are referring to who?

3   **A.**   Mr. Martinez was driving around on the cart as a lead.  He

4   would have a cart to get around the factory because it was so

5   big, and I believe he jumped off that cart, you know, and

6   approached Mr. Diaz in the elevator.

7                         (Pause in proceedings.)

8   **BY MR. ALEXANDER:**

9   **Q.**   I would like you, please, to review Exhibit 103.

10       Exhibit 103 at the bottom of the page, October 19, 2017,

11  at 2:17 p.m.:  "Wayne did you receive this from me on Friday."

12       And then you go up above and the middle of that e-mail has

13  a reference Wayne Jackson to Terri Garrett October 19:  "Yes.

14  I'm actually on the phone now dealing with the Owen and Ramon

15  issues.  This issue seems to be related to this, and we really

16  are going to have to do some in depth investigation.  I'll give

17  you a call in a few minutes to discuss."

18       When you used the term "in depth investigation," you had

19  individuals involved in the incident, three.  Did that

20  investigation mean interviewing those individuals?

21  **A.**   Yes, sir.

22  **Q.**   So that would have meant interviewing Owen Diaz, the

23  person who was supposedly attacked; right?

24  **A.**   Yes, sir.

25  **Q.**   And it would mean interviewing the attacker, Ramon

 1   Martinez?

 2   **A.**   Yes, sir.

 3   **Q.**   It would mean interviewing the witness, Rothaj Foster;

 4   correct?

 5   **A.**   I don't recall if I was able to interview Rothaj.  I'm not

 6   sure which company he was with.  I don't think he was under our

 7   umbrella, if I remember correctly.

 8   **Q.**   So just to get it straight, it sounds like you did

 9   interview Owen Diaz?

10   **A.**   Yes, sir.

11   **Q.**   And you did interview the attacker, Ramon Martinez?

12   **A.**   Yes, sir.

13   **Q.**   You were not able to interview the eyewitness, Rothaj

14   Foster?

15           **MR. GRIFFIN:**  Objection.  Leading.

16           **THE COURT:**  Overruled.

17           **THE WITNESS:**  Yes, sir, I was not -- I don't believe I

18   was able to interview Mr. Foster.  I think I started the

19   interview with Mr. Foster and that's when I found out he wasn't

20   under the nextSource umbrella.

21   **BY MR. ALEXANDER:**

22   **Q.**   And so when you had circumstance where you were trying to

23   do an investigation and you didn't have access to an important

24   witness like Rothaj Foster, what did you do?

25   **A.**   There was nothing I could do in that point other than make

1    sure that both the individuals knew that fighting on the

2    premises is unacceptable.  You know, Mr. Diaz was upset because

3    he said Mr. Martinez was really aggressive, threatening, name

4    calling, things of that nature.

5         To be honest, Mr. Diaz had some run-ins with some people

6    himself as an elevator operator, but it was more -- how do you

7    put it? -- attitude as opposed to racially motivated.

8    Q.   So there were other instances where Mr. Diaz had run-ins

9    with people associated with the elevator; right?

10   A.   Yes, sir.

11   Q.   And in those incidents, did Mr. Diaz ever play the race

12   card and say it was racial?

13   A.   No, sir, he didn't until that particular incident -- well,

14   until that particular incident happened, no.

15   Q.   All right.  And so when you say "that particular

16   incident," the incident with the elevator was the first time

17   there was any reference to race?

18   A.   Yes, sir.

19        MR. GRIFFIN:  Objection.  Misstates testimony.

20        THE COURT:  Overruled.

21   BY MR. ALEXANDER:

22   Q.   So just to be clear, Owen, as an elevator operator, was

23   dealing with lots of people that needed to have equipment go up

24   and down; right?

25   A.   Yes, sir.

JACKSON - DIRECT / ALEXANDER

1   **Q.**   And so in the stress of those circumstances, there were

2   times when there would be discussions that were disagreements;

3   correct?

4   **A.**   The elevator seemed to have a lot of issues.  They were

5   bottleneck for the organization, for Tesla.  They would get

6   damaged, wouldn't work a lot of times, very slow in getting

7   product up and down.  And I think that was where the bottleneck

8   and that's where a lot of the -- I don't know if you want to

9   call it anger or hostility or anything came, but it was because

10  things weren't getting moved around the plant in a timely

11  manner.

12  **Q.**   And so going back to Exhibit Number 103, at the top -- at

13  the top, it has a reference to:  "Thank you.  We actually need

14  to get their statements."

15      So there was an intention as of October 20 to get

16  statements of all the witnesses associated with this incident;

17  right?

18  **A.**   Yes, sir.

19  **Q.**   And so with regard to Rothaj Foster, because you weren't

20  provided access to him, you didn't get a statement from him;

21  correct?

22  **A.**   Not that I recall, no, sir.

23  **Q.**   And did anyone from Tesla get a statement from him and

24  provide it to you so that you would have a full and complete

25  investigation?

1          **MR. GRIFFIN:**  Objection.  Calls for speculation.

2          **THE COURT:**  No, it doesn't.  It's overruled.

3          **THE WITNESS:**  I never was contacted with regards to

4    Tesla as far as what they did or were going to do.

5    **BY MR. ALEXANDER:**

6    **Q.**   So with regard to Mr. Foster, no statement was ever

7    provided to you; correct?

8    **A.**   No, sir, not that I recall.

9    **Q.**   Thank you.

10         **MR. ALEXANDER:**  If we can turn, please, to Exhibit

11   Number 31.

12   **BY MR. ALEXANDER:**

13   **Q.**   This is an e-mail from -- a series of e-mails from

14   October 20, 2015.

15         **MR. ALEXANDER:**  Can we go to the bottom of the -- I'm

16   sorry.  If we would go to the second page, 31-2, and there's an

17   e-mail from 11:20 a.m. from Wayne Jackson to Terri Garrett.

18   **BY MR. ALEXANDER**

19   **Q.**   Do you see that, Mr. Jackson?

20   **A.**   Uh-huh.

21   **Q.**   "Yes"?

22   **A.**   Yes.

23   **Q.**   "Here is Ramon's statement.  I'm waiting for Rothaj and

24   Ramon to send me theirs."

25         When it says:  "Here is Ramon's statement," that should

1   actually be Owen's statement; isn't that correct?

2   **A.**   Yes.   I'm sorry.   You're correct.

3   **Q.**   Thank you.

4        I'm waiting Rothaj and Ramon to send me theirs.   Ed has a

5   meeting scheduled with them Wednesday at 6:00 p.m., and I will

6   be attending with them."

7        Do you see that reference?

8   **A.**   Yes, sir.

9   **Q.**   And then above that, at 11:56, Ms. Garret responds to you:

10  "Why is Ed meeting with them?"   Do you see that?

11  **A.**   Yes, sir.

12  **Q.**   And then above that, at 12:30, you respond:   "He was

13  instructed by Victor."   That's Victor Quintero; correct?

14  **A.**   Victor was Ed's direct manager.

15  **Q.**   Thank you.

16       And then above, at 7:41 p.m., there's a reference --

17  **A.**   I think I'm on a different slide now or something.

18  **Q.**   It's coming.

19  **A.**   Okay.

20  **Q.**   There's a reference that says:   "Erin, can I ask your help

21  on the e-mail chain below.   It looks like Victor is asking Ed

22  Romero to get involved in a temporary worker ER issue?"

23       **THE COURT:**   Page 1 needs to be put on the screen so

24  that people can follow along.

25       **MS. GRISLIS:**   I think there's a bit of a delay between

1  the iPad I'm using and...

2          MR. ALEXANDER:  Yes.  If we could go to the top of

3  page 1 For some reason we're having difficulty getting that

4  page.

5          THE COURT:  There you go.  You got it now.

6          MR. ALEXANDER:  Thank you.

7  BY MR. ALEXANDER:

8  Q.   So 7:41 p.m., from your supervisor, Ms. Garret:  "Erin,

9  can I ask for your help on e-mail chain below?  It looks like

10 Victor is asking Ed Romero to get involved in a temporary

11 worker ER issue" -- employer issue -- "my recommendation is

12 that Ed not be involved.  Can you help me sort this out?  Two

13 of the three workers have already been interviewed.  Please

14 advise."

15      Erin Marconi, can you indicate -- can you tell me who that

16 person is?

17 A.   I believe she's with Tesla HR or management.  I'm not sure

18 of her exact role.  Like I said, Terri Garrett mainly

19 interfaced with them.

20         MR. ALEXANDER:  And now, if you would turn to Exhibit

21 Number 76.

22                  (Pause in proceedings.)

23 BY MR. ALEXANDER:

24 Q.   At the bottom of the e-mail, we have your statement from

25 an earlier e-mail:  "We are really going to have to do some in

1   depth investigation."  Do you see that?

2   A.   Yes.

3   Q.   And then if you go above that, your boss, Terri Garrett,

4   to you at October 21 at 10:47:  "Confirming via this e-mail

5   that we agree we do not need to do any formal investigation

6   with Ramon, Owen, and Rothaj."

7        Do you see that?

8   A.   Yes, I do.

9   Q.   So before you could complete your investigation, your boss

10  told you stop the investigation?

11  A.   Yes, sir.

12  Q.   And then if we can go up.  At the top of this e-mail, at

13  10:49 p.m., from you to your boss:  "Yes.  I have spoken with

14  all three and will be speaking with Ramon and Owen again on

15  Friday.  I had a conversation with Ed" --

16       That's Ed Romero?

17  A.   Yes, sir.

18  Q.   -- "at Victor" --

19       That's Victor Quintero?

20  A.   Yes, sir.

21  Q.   "I had a conversation with Ed at Victor's desk yesterday

22  and they just want us to verbally counsel each of them with

23  regards to appropriate behavior in the workplace.  No written

24  warning needed right now."

25  A.   Yes, sir.

1  Q.   So this refers to "yesterday."  Before you had this e-mail

2  with Ms. Garret saying:  "We agree, we do not need to do a

3  formal investigation," before that happened, you had a

4  conversation with Ed Romero and Victor Quintero where they told

5  you let's stop the investigation, just do a verbal warning;

6  right?

7  A.   Yes, sir.

8  Q.   So in the absence of that instruction, you would have

9  finished your thorough good-faith investigation; correct?

10          MR. GRIFFIN:  Objection.  Leading.

11          THE COURT:  Yeah.  Sustained.

12  BY MR. ALEXANDER:

13  Q.   So stopping the investigation was not your decision;

14  correct?

15  A.   No, sir, it was not.

16  Q.   And with regard to the extent that you can conduct an

17  investigation, you did not have unlimited authority -- just a

18  second.

19              (Pause in proceedings.)

20          THE WITNESS:  I had very limited authority.

21              (Pause in proceedings.)

22  BY MR. ALEXANDER:

23  Q.   In terms of the way you conducted your investigation, you

24  had limited choices as to what you could do; correct?

25  A.   Yes, sir.

1    Q.    So you weren't in control of the investigation, others

2    were in control of the investigation; is that correct?

3            MR. GRIFFIN:  Objection.  Leading.

4            THE COURT:  Sustained.

5        Ask a direct question.

6    BY MR. ALEXANDER:

7    Q.    With regard to the investigation, what control did you

8    have?

9    A.    Very little, sir.  I had to go to others to get any

10   information.  Whether it was looking at video cameras, to get

11   statements, things of that nature, I had to get approval,

12   essentially.

13           MR. ALEXANDER:  Let's turn to Exhibit Number 33.

14                    (Pause in proceedings.)

15   BY MR. ALEXANDER:

16   Q.    This is the report with regard to the jigaboo that was

17   left in the workplace.

18           MR. ALEXANDER:  Can we show 33-2?

19   BY MR. ALEXANDER:

20   Q.    Do you recall -- do you recall this photograph?

21   A.    Yes, sir.

22   Q.    With regard to this incident, how did you just -- how did

23   you first become aware of the incident?

24   A.    I don't recall if it was Ed or who notified me.  I'm not

25   sure exactly who notified me.

**JACKSON - DIRECT / ALEXANDER**

1  **Q.**  But did you begin to conduct an investigation associated
2  with the incident?

3  **A.**  Yes, sir.  I went and took pictures, things of that
4  nature, immediately.

5  **Q.**  Did you have any conversation with Owen Diaz about the
6  incident?

7  **A.**  I believe I did, yes, because he was pretty upset.

8  **Q.**  Okay.  Now when you saw this, what was your reaction to
9  it?

10 **A.**  It's bullshit.

11 **Q.**  And why --

12 **A.**  It's offensive.

13 **Q.**  Go ahead.

14 **A.**  It's offensive.  It's not a joke.  And that's what Ramon
15 kept saying, "I was joking."  And I kept expressing to him how
16 could you possibly feel that was a joke?  How could you
17 possibly feel that would be funny?

18 **Q.**  And as a result of -- I'm sorry.

19     So you told us your reaction to it.  Tell us, when you
20 spoke to Mr. Diaz, what was his reaction?

21 **A.**  He was extremely offended by it.

22 **Q.**  How could you tell?

23 **A.**  He was angry.  He expressed that he was offended, and he
24 felt that he was being racially targeted.

25 **Q.**  Now, you spoke to Mr. Diaz about the incident?

JACKSON - DIRECT / ALEXANDER

1    **A.**   Yes, sir.

2    **Q.**   You spoke to Mr. Ramon Martinez about the incident?

3    **A.**   Yes, sir.

4    **Q.**   And then it was your -- did you have the ability at that

5    point to take any disciplinary action with regard to the

6    conduct of Mr. Martinez?

7    **A.**   I was not able to discipline anyone, sir.  They were not

8    my direct employees.  I could make a recommendation, and if

9    they decided not to take my recommendation, there wasn't much

10   else I could do.

11   **Q.**   With regard to --

12   **A.**   My first recommendation after seeing this was Ramon

13   Martinez did not need to be on-site anymore.

14   **Q.**   And so he should be terminated from the Tesla site?

15   **A.**   I don't know if they want to terminate him, but he should

16   not be on that site anymore.

17   **Q.**   And who did you make that recommendation to?

18   **A.**   Chartwell or Manpower.  I can't remember which agency he

19   worked for.  I told Tesla that, told Victor and Ed that yeah,

20   he should not be here anymore.

21   **Q.**   So you had a conversation with Victor Quintero where you

22   said he should not be -- he should not be allowed to stay on

23   the premises; correct?

24   **A.**   Yes, sir.

25        And they wanted to keep Mr. Martinez working, but I told

**JACKSON - DIRECT / ALEXANDER**

1  them there had to be some type of disciplinary action

2  associated this.  This just -- that's unacceptable.

3  **Q.**  Let me show you Exhibit Number 274.

4                    (Pause in proceedings.)

5  **BY MR. ALEXANDER:**

6  **Q.**  First, you had a conversation with Mr. Quintero.  When you

7  spoke to Mr. Quintero, what recommendation did you make to

8  Mr. Quintero?

9  **A.**  That he should probably get a final written warning at the

10 very least and, you know, he should probably -- he shouldn't be

11 on-site.  That was my whole recommendation was he really

12 shouldn't be on-site.

13 **Q.**  And did you use the term "He should be fired"?

14 **A.**  I don't know if I used that particular word because I

15 couldn't fire him per se.  I could send him back to his agency,

16 and they could do their own investigation and determine if they

17 were going to keep him employed or not, but I couldn't make

18 that determination.

19 **Q.**  And so when you told Mr. Quintero that he should be taken

20 off the property, did Mr. Quintero agree?

21 **A.**  No, he did not.

22 **Q.**  And what was Mr. Quintero's response?

23 **A.**  To be quite honest, if I remember correctly, they had

24 recently promoted Ramon to a lead.  They felt Ramon was a good

25 worker, good guy.  And they really didn't want to do much.

1   **Q.**   And so did Mr. Quintero indicate that he just wanted to

2   give a verbal warning?

3   **A.**   Yes.

4   **Q.**   And what was your response to Mr. Quintero saying a verbal

5   warning was sufficient?

6   **A.**   Essentially, that wasn't sufficient.  That was a mistake.

7   **Q.**   And did you have further conversation to try to convince

8   him otherwise?

9   **A.**   Yes.  I believe so.

10  **Q.**   And did it take a lot of convincing?

11  **A.**   Yeah.  It took a few conversations for him to understand

12  the severity of the situation.

13  **Q.**   And so ultimately, what did he agree to?

14  **A.**   I believe it was a three- or five-day suspension.

15       And I also even told Victor, "You probably -- even before

16  bringing him back, you might want" -- and like I said, I can't

17  remember if it was Manpower, Chartwell.  We dealt with several

18  different agencies.  But there should have been some type of

19  training, some type of sensitivity training.  Something should

20  have been conducted.  Once again, it wasn't my place, so I

21  don't know if they did or did not do that.

22          **MR. ALEXANDER:**  Let's show, please, Exhibit

23  Number 272.

24                    (Pause in proceedings.)

25  \\\

 1   BY MR. ALEXANDER:

 2   Q.   Here in the middle of the page January 22, 2016.  First,

 3   on Exhibit Number 33, the note from Owen is on January 22,

 4   2016, at 8:42 a.m.  And then this is an e-mail from Victor

 5   Quintero on January 22, at 10:20 a.m., so less than two hours

 6   after you receive Owen Diaz's e-mail notifying you of the

 7   event.

 8        Do you see that?

 9   A.   Yes.

10   Q.   So two hours later, from Victor Quintero to Wayne Jackson.

11   "Wayne, as we discussed in person, this is very disappointing,

12   especially coming from one of our team supervisors.  I agree

13   with the recommendation to suspend and issue a permanent

14   written warning."

15        That recommendation to suspend, that was after he refused

16   to accept your recommendation to kick him out off the property

17   correct?

18            MR. GRIFFIN:  Objection.  Leading.

19            THE COURT:  Overruled.  That fact has been

20   established.

21            THE WITNESS:  Yes, sir.

22   BY MR. ALEXANDER:

23   Q.   And it says:  "Also, the apology from Ramon was a good

24   starting point."  Did Ramon Martinez ever apologize in your

25   presence?

1    **A.**   He actually apologized to me saying he was sorry, that he

2    thought it was just a joke.  Once again, that's when I told him

3    it wasn't funny; it wasn't a joke.

4         I don't recall if he actually met with Owen or not.  That,

5    I do not recall, if he actually physically met with Owen and

6    apologized.

7    **Q.**   As you sit here today, you don't have any recollection of

8    that happening?  You don't know of it happening?

9    **A.**   I don't know if that occurred, sir.  I don't recall that.

10        I know, like I said, Ramon did apologize to me because I

11   told him as a Black man, I was highly offended.

12   **Q.**   And it says at the bottom:  "One additional request would

13   be if there is an opportunity to provide some type of diversity

14   training" --

15   **A.**   Uh-huh.

16   **Q.**   -- "for Ramon."

17   **A.**   That's because I told Victor there needed to be some type

18   of sensitivity training when we first talked.

19   **Q.**   And did you ever receive information that Ramon received

20   that sensitivity training?

21   **A.**   Not that I recall, no.

22   **Q.**   Now, with regard to --

23   **A.**   He couldn't have received it in three- or five-day period.

24   I don't think that would have occurred.

25   **Q.**   Now, with regard to this incident, was there ever any

1    training that occurred throughout the factory to tell people

2    this isn't appropriate?

3    **A.**    No, sir.  I do not recall Tesla ever providing any type of

4    training.  They may have provided something to their staff that

5    I wasn't aware of, but I don't recall any other training.

6    **Q.**    With regard to the subcontractors that worked at Tesla for

7    Tesla, they received safety training; right?

8    **A.**    Yes.  We had to show them a safety video, and there was an

9    onboarding-type packet with confidentiality and

10   nondisclosure-type things that were provided by Tesla to have

11   them sign.

12   **Q.**    So confidentiality and safety?

13   **A.**    Yes.

14   **Q.**    Was there a handbook provided from Tesla about its

15   policies?

16   **A.**    No, sir.

17   **Q.**    Was there anything provided from Tesla about it providing

18   a workplace free of discrimination?

19   **A.**    Not that I can recall.

20   **Q.**    Anything telling employees the protections that Tesla

21   would give them in terms of maintaining a workplace free of

22   racial harassment?

23   **A.**    No, sir.

24          **MR. ALEXANDER:**  Nothing further.

25          **THE COURT:**  All right.

1              (Pause in proceedings.)

2    BY MR. ALEXANDER:

3    Q.   Do employees -- sometime when the N-word is used, that can

4    cause confrontations; correct?

5    A.   Yes, sir.  Definitely.

6    Q.   And the use of the N-word throughout the factory with

7    African American's presence, can that cause fights?

8    A.   Yes, sir.  It did.

9    Q.   So in terms of it being a safety issue, stopping the

10   N-word from occurring inside the workplace would also be a

11   safety issue?

12   A.   Yes, sir.  I mean, I don't see why it wouldn't.  I mean,

13   you are going to have -- if you look at the -- I don't know

14   what Tesla is doing now.  I cannot speak to that.  But I mean,

15   just in recent months, not even a year ago, a gentleman was

16   killed in the Tesla parking lot over an argument.

17            MR. GRIFFIN:  Objection.

18            THE COURT:  Sustained and the statement will be

19   stricken.

20            THE WITNESS:  So I mean, what I'm saying is it does

21   cause issues.

22            MR. GRIFFIN:  Objection, Your Honor.

23   BY MR. ALEXANDER:

24   Q.   So with regard to use of the N-word inside the workplace,

25   what is your -- what is your --

1    **A.**    It has caused confrontations in the workplace.

2           **MR. ALEXANDER:**   Thank you.

3           **THE COURT:**   Cross-examination.

4                        **CROSS-EXAMINATION**

5    **BY MR. GRIFFIN:**

6    **Q.**    Good morning, Mr. Jackson.

7    **A.**    Good morning.

8    **Q.**    One of the first questions that Plaintiff counsel asked

9    you was about whether you heard the word "mayate" in the

10   factory; correct?

11   **A.**    Yes, sir.  I have heard that before.  I have heard that

12   word before, yes.

13   **Q.**    Okay.

14   **A.**    I don't even know what it means totally, to be honest.

15   I'm not Hispanic.  I don't speak Spanish, but I know it's

16   supposed to be like a mother- -- excuse the French --

17   motherfucker or something to that effect.

18   **Q.**    Okay.  And you recall testifying in a prior proceeding in

19   this matter?

20   **A.**    Yes, sir.

21   **Q.**    Okay.  And if you can go to the binders in front of you to

22   your trial testimony at page 294.

23                   (Pause in proceedings.)

24           **THE WITNESS:**   294?

25           **MR. GRIFFIN:**   294, lines 15 to 17.

**JACKSON - CROSS / GRIFFIN**

1      If it helps, Your Honor, can I approach?  I have a binder

2  with his testimony in it.

3          **THE COURT:**  Okay.  That would be helpful because I

4  think it's not in the trial testimony of what I've got.

5                    (Pause in proceedings.)

6          **THE WITNESS:**  So is it this binder?  That's my

7  question.  I'm trying to make sure I'm in the correct binder.

8          **THE COURT:**  Your guess is as good as mine.

9                    (Pause in proceedings.)

10         **MR. GRIFFIN:**  Sorry, Your Honor, for the confusion.

11  This binder has both of your trial testimony in it.

12         **THE COURT:**  Do you have a copy for me?

13         **MR. GRIFFIN:**  Don't you have your own copy of the

14  testimony?

15         **MR. ALEXANDER:**  I didn't ask.  That was the Court.

16         **MR. GRIFFIN:**  Oh, sorry.

17         **THE WITNESS:**  You said page 294?

18         **MR. GRIFFIN:**  294, lines 14.

19         **THE WITNESS:**  I do not see a 294.  Okay.  Here we go.

20  271.

21                    (Pause in proceedings.)

22  **BY MR. GRIFFIN:**

23  **Q.**   294, line 15 to 17.  Do you see that testimony,

24  Mr. Jackson?

25  **A.**   Yes, I do.

JACKSON - CROSS / GRIFFIN

1   Q.   And weren't you asked in a prior proceeding:  "With

2   regards to Ramon Martinez, did you ever hear him use the word

3   'mayate'?"

4       And your response was:  "I don't even know what that word

5   is."

6   A.   And as I just said a few minutes ago, I don't know what

7   that word is.  I was very clear with you.

8   Q.   Okay.  That was your testimony when I asked about Ramon

9   Martinez at a prior proceeding.

10  A.   Yes, sir.

11  Q.   "With regard to Ramon Martinez, did you ever hear him use

12  that word?"

13      And your response was, I don't even know what that word

14  is; correct?

15  A.   Yes, sir.

16  Q.   Now, we've heard about your role at nextSource.  You

17  worked a factory in Fremont in 2015 and 2016; correct?

18  A.   Yes, sir.

19  Q.   And during that time you had two roles:  one as a

20  recruiter and then as a liaison or program manager; correct?

21  A.   Yes, sir.

22  Q.   And in that first role as a recruiter, your job was to

23  identify folks and have them come into the factory; correct?

24  A.   Yes, sir.

25  Q.   And you did that job for about a year?

JACKSON - CROSS / GRIFFIN

1  A.    Yes, sir.

2  Q.    You brought hundreds of people into the factory; correct?

3  A.    True.

4  Q.    Okay.  And then your other role as a liaison or program

5  manager, one of the roles, one of your jobs in that role was

6  information gathering; correct?

7  A.    Yes, sir.

8  Q.    If there was a complaint of racial harassment or any type

9  of discrimination or any complaint at all, your job was to

10 gather information related to those complaints; right?

11 A.    I would gather it and give it to my boss, Terri Garrett,

12 or whoever was appropriate.

13 Q.    And then part of your job as program manager was to alert

14 Terri Garrett, your boss at nextSource; right?

15 A.    Yes, sir.

16 Q.    The staffing agency if a contractor was involved; correct?

17 A.    Yes, sir.

18 Q.    And Tesla; correct?

19 A.    Yes, sir.

20 Q.    And when you conducted your investigations, your job was

21 to be prompt, objective, and thorough; correct?

22 A.    Yes, sir.  Get the statements from the individuals so that

23 it was their words, not mine.  I wanted it exactly what they

24 said.  That's what I would get.

25 Q.    And you took that job seriously; right?

1    A.    Yes, sir.

2    Q.    Because you knew you were dealing with people's jobs;

3    right?

4    A.    Yes, sir.

5    Q.    And you wanted to make sure that any discipline that you

6    were going to recommend was consistent with the facts that you

7    gathered; right?

8    A.    Yes, sir.

9    Q.    Okay.  But you don't always get investigations right over

10   the course of your 20 year career; right?

11   A.    I wouldn't say I don't get them right, but I say that you

12   might not get all the information.

13   Q.    Okay.

14   A.    Or you might not be allowed to do a full investigation.

15   You can't say it's right or wrong.  You have to just get the

16   facts, and each person has their own facts.  So you write those

17   facts down.  You get those statements, and you present those.

18   Q.    Hindsight is 20/20 looking back on investigations you may

19   have conducted in your career; right?

20   A.    Uh-huh.

21   Q.    And luckily, in this instance, when you were at the Tesla

22   factory as a liaison, you only had to investigate one incident

23   of racial harassment of an African American; correct?

24   A.    I was probably only involved to investigate one.  I had

25   seen other incidents at the factory of racially motivated

**JACKSON - CROSS / GRIFFIN**

1  events, but they weren't my employees, so I couldn't say

2  anything.  I couldn't do anything.

3  **Q.**  Okay.  Your job at the Tesla factory was the liaison

4  between the contractors and Tesla; correct?

5  **A.**  Correct.

6  **Q.**  And there were thousands of contractors that nextSource

7  brought in and had a relationship at the factory; right?

8  **A.**  At one time or over time?

9  **Q.**  So nextSource had a relationship with Citistaff; correct?

10  **A.**  Yes, sir.

11  **Q.**  NextSource had a relationship with Chartwell; correct?

12  **A.**  Yes, sir.

13  **Q.**  NextSource had a relationship with West Valley; correct?

14  **A.**  Yes, sir.

15  **Q.**  And each of those entities had thousands of workers that

16  they brought into the factory over the course of time; correct?

17  **A.**  Yes, sir.

18  **Q.**  And your job was to be a liaison between those folks and

19  nextSource; right?

20  **A.**  Between nextSource, the agencies, and Tesla.

21  **Q.**  Okay.  And you would be involved with complaints that

22  those folks had in the resolution of the complaints and the

23  contractors in the factory; right?

24  **A.**  Not necessarily the resolution.  I would be involved in

25  them but, I didn't have the authority to resolve them.

1   Q.   Okay.  And during the entire time that you were a program

2   manager at nextSource, you were only involved with the

3   investigation of one complaint of racial harassment against an

4   African American?

5          MR. ALEXANDER:  Objection.  Asked and answered.

6          THE COURT:  Overruled.

7          THE WITNESS:  I was only involved in that complaint,

8   yes.  Did I know of other complaints?  Did I know of other

9   issues?  Did I know of other confrontations that occurred?

10  Yes, I did.

11         Was I able to investigate them or have any type of input

12  to them?  No.

13         THE COURT:  So, Mr. Jackson, just stick with the

14  question.  And if there's any follow-up, I'm sure that

15  Mr. Alexander will ask them.

16         THE WITNESS:  Okay.

17  BY MR. GRIFFIN:

18  Q.   And the only complaint that you were involved in at all

19  during your time period involving racial harassment against an

20  African American was the drawing incident that you mentioned

21  previously; correct?

22  A.   Yes, sir.

23  Q.   Okay.  And that related to the picture on the bale of

24  cardboard; correct?

25  A.   Yes, sir.

JACKSON - CROSS / GRIFFIN

1  **Q.**   Now, I want to talk to you a little bit about Mr. Diaz.

2  You had an opportunity to interact with Mr. Diaz during your

3  time at the factory; right?

4  **A.**   Yes, sir.

5  **Q.**   And during your time, it's your understanding Mr. Diaz got

6  in altercations with a lot of people in the factory; right?

7  **A.**   What do you consider "a lot"?

8  **Q.**   Okay.  What do I consider "a lot"?

9      Do you recall giving prior testimony in this matter that

10  Mr. Diaz got into altercations with a lot of people in the

11  factory?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  And he got into it with both Tesla staff and

14  contractors; right?

15  **A.**   Yes, sir.

16  **Q.**   And there were even a couple occasions where Mr. Diaz got

17  loud with you; right?

18  **A.**   No, sir.  He was respectful with me.  He could be upset,

19  but he's not -- I don't think he's ever gone off on me or

20  anything.

21  **Q.**   Okay.  Can I direct you to your deposition testimony from

22  May 17, 2019, page 110, line 21?

23          **MR. ORGAN:**  What page, Counsel?

24          **MR. GRIFFIN:**  Page 110.

25                  (Pause in the proceedings.)

1           **MR. GRIFFIN:**  Are you there, Mr. Jackson?

2           **THE WITNESS:**  Yes.

3    BY MR. GRIFFIN:

4    **Q.**   And do you see the question on line 110?  "So in terms of

5    your dealings and Owen Diaz, you didn't have difficulty with

6    him personally; is that correct?"

7           Your response was:  "On most occasions, no.  I mean I --

8    we did have a couple of cases where he and I -- Owen got a

9    little loud, and I was like, 'Owen, I'm here to try to help

10   you,' but nothing serious."

11          That was your testimony; correct?

12   **A.**   Once again, that's what I just said to you.

13   **Q.**   And your experience with Mr. Diaz was he was argumentative

14   from Day 1; correct?

15   **A.**   I wouldn't say that, no.

16   **Q.**   Can I direct you to your deposition testimony at page 36?

17   **A.**   Uh-huh.

18   **Q.**   Page 36, line 14.

19   **A.**   Page 36?

20   **Q.**   Yes.

21                         (Pause in proceedings.)

22   BY MR. GRIFFIN:

23   **Q.**   Are you there, Mr. Jackson?

24   **A.**   Yes.

25   **Q.**   And do you see line 14?

JACKSON - CROSS / GRIFFIN

1    **A.**   Yes.

2    **Q.**   And the question was:  "Now in terms of Mr. Diaz's

3    attitude or argumentativeness, did that occur after the jigaboo

4    drawing happened?"

5         And your response was:  "No, sir.  That was probably from

6    Day 1, to be honest."

7         Correct?

8    **A.**   Uh-huh.

9    **Q.**   And that was your testimony under oath?

10   **A.**   Yes.

11   **Q.**   Okay.  And you recall there were a lot of complaints about

12   Mr. Diaz; right?

13   **A.**   Uh-huh.

14   **Q.**   After seeing all this, Mr. Diaz's interactions with

15   contractors, with you, with Tesla employees, you reached a

16   conclusion that there was a pattern, that any time someone

17   complained about Mr. Diaz, he would say they were harassing

18   him; correct?

19   **A.**   I don't know if that was the case, sir.

20   **Q.**   Okay.  Can I look to your deposition?

21   **A.**   Okay.

22   **Q.**   Page 134, line 1.  Line 1 through 9, "QUESTION --

23        **THE COURT:**  Hang on.

24        **MR. GRIFFIN:**  Sorry.

25        **THE COURT:**  If you wouldn't mind waiting.

```
 1                        (Pause in proceedings.)

 2              THE COURT:  Where are you reading?

 3              MR. GRIFFIN:  134, line 1 through 9, Your Honor.

 4              MR. ORGAN:  One moment, Your Honor.

 5                        (Pause in proceedings.)

 6              THE COURT:  You can proceed.

 7    BY MR. GRIFFIN:

 8    Q.   Do you see the question, Mr. Jackson?

 9         "QUESTION:  And so you had no first-hand knowledge about

10    the issue --

11         "No, sir.

12         "-- with Joyce DelaGrande?"

13         And your response was:  "No, sir.  Other than it kind of

14    showed a pattern, to be very honest.  Any time Owen got into it

15    with someone, he would say, now they're threatening me.  And

16    that was just kind of a pattern you saw with Owen Diaz, you

17    know."

18         That was your testimony under oath; correct, Mr. Jackson?

19    A.   Yes, sir.

20    Q.   Okay.  And I want to go to this elevator incident you

21    talked about in your testimony with Plaintiff's counsel in

22    October 2017.  Okay?

23              MR. GRIFFIN:  Can we get Exhibit 92?

24                        (Pause in proceedings.)

25    \\\
```

1    BY MR. GRIFFIN:

2    Q.    So Exhibit 92 is an e-mail from Tom Kawasaki to you at

3    4:37 a.m. on October 18; correct?

4    A.    Honestly, I don't even recall who Tom Kawasaki was.

5    Q.    Okay.  But you received this e-mail from Tom Kawasaki at

6    roughly 4:30 in the morning on October 18; correct?

7    A.    Yes, sir.

8    Q.    And the bottom of the e-mail was a document you talked

9    with plaintiff's counsel, Mr. Diaz's initial complaint, about

10   his run-in with Ramon Martinez; correct?

11   A.    Yes, sir.

12   Q.    And I want to direct your testimony -- I mean, your

13   attention to the middle of this paragraph starting with the

14   word "For some reason."

15         Do you see that?

16   A.    Yes, sir.

17   Q.    And that's Mr. Diaz's complaint, the one that he wrote on

18   October 17 describing this interaction with Mr. Martinez.

19         Mr. Diaz writes:  "For some reason, Ramon jumped off the

20   tugger he was on and started yelling at me in a threatening

21   manner saying, 'You have a problem with me.  Why are you

22   telling him who his supervisor is?  When I did not say anything

23   to Ramon, followed me into the elevator and stood next to the

24   forklift I was on and keep yelling at me.  I thought he was

25   going to hit me, so I asked him to please step back because of

1    his threatening manner and reminded Ramon we are on camera.'"

2         Do you see that?

3    **A.**   Yes, sir.

4    **Q.**   And those are the words that Mr. Diaz used to describe his

5    interaction with Mr. Martinez in that elevator; correct?

6    **A.**   Yes, sir.

7    **Q.**   And in that e-mail, you don't see any mention of the

8    N-word; correct?

9    **A.**   No, sir.

10   **Q.**   You don't see any mention that Mr. Martinez allegedly

11   called him chongo or mayate, told him to go back to Africa, or

12   any other racial slur; correct?

13   **A.**   No, sir.

14   **Q.**   And that's what Mr. Diaz put in his complaint; correct?

15   **A.**   Yes, sir.

16   **Q.**   And that's what Mr. Kawasaki forwarded to you on

17   October 18; correct?

18   **A.**   Yes, sir.

19   **Q.**   So he told you that there was a verbal dispute -- or this

20   e-mail, Mr. Diaz says there was a verbal dispute between he and

21   Mr. Martinez; correct?

22   **A.**   Yes, sir.

23   **Q.**   And as part of your job as a liaison, you wanted to

24   investigate to be prompt, thorough, and impartial in doing your

25   investigation; correct?

1    **A.**    Yes, sir.

2    **Q.**    Now --

3          **THE COURT:**  Let me ask you when -- when would be a

4    good convenient time to take a break?

5          **MR. GRIFFIN:**  We're probably -- 15 minutes,

6    Your Honor.

7          **THE COURT:**  Okay.  Well, no, then we'll take a break

8    now, and we'll come back in 15 minutes.

9          **MR. GRIFFIN:**  Okay.

10         **THE COURT:**  So, ladies and gentlemen, we'll be back at

11   about 12:10, 12:11.  Please remember the admonitions:  Don't

12   talk about the case.  Don't do any research.

13      (Proceedings were heard outside the presence of the jury:)

14         **THE COURT:**  Okay.  We will be in recess.

15                    (Recess taken at 11:57 a.m.)

16              (Proceedings resumed at 12:11 p.m.)

17         **THE CLERK:**  Please come to order.

18         **THE COURT:**  Mr. Griffin, are you ready to go?

19         **MR. GRIFFIN:**  Yes, Your Honor.

20         **THE COURT:**  Okay.

21                    (Pause in proceedings.)

22      (Proceedings were heard in the presence of the jury:)

23         **THE COURT:**  All right.  Please be seated, everybody.

24      Mr. Griffin, go ahead.

25         **MR. GRIFFIN:**  Thank you, Your Honor.

JACKSON - CROSS / GRIFFIN

```
 1    BY MR. GRIFFIN:
 2    Q.   Mr. Jackson, before we broke, we were talking about this
 3    October 17, 2015, incident.  Do you recall that?
 4    A.   Yes, sir.
 5    Q.   And Mr. Diaz's written complaint; correct?
 6    A.   Yes, sir.
 7    Q.   And in that complaint, you confirmed that Mr. Diaz didn't
 8    write anything about any racial slurs that Mr. Martinez
 9    allegedly said against him in that elevator; correct?
10    A.   No, sir, he didn't write -- he didn't write, no, he did
11    not.
12    Q.   Okay.
13              MR. GRIFFIN:  And can we go to Exhibit 74.
14    BY MR. GRIFFIN:
15    Q.   And it should be on your screen, sir.
16         By the next day on, October 19, you had already started
17    your investigation into this complaint that Mr. Diaz had;
18    correct?
19    A.   Yes, sir.
20    Q.   And you e-mailed Deb Gryske that "I'm actually on the
21    phone doing the investigation of the Ramon Owen incident";
22    correct?
23    A.   Yes.
24    Q.   And you said "the Ramon Owen incident"; correct?
25    A.   Yes.
```

1  Q.   Because isn't it true that Mr. Martinez had actually

2  complained about Mr. Diaz before Mr. Diaz sent you the

3  complaint; correct?

4  A.   Well, they complained about each other.

5  Q.   Okay.  But Mr. Martinez was first in time; correct?

6  A.   I don't recall if he was first or not.  I'm not sure who

7  started complaining first.  I don't recall that.

8         MR. GRIFFIN:  It we can get Exhibits 49 and 92 on the

9  screen together.

10                  (Pause in proceedings.)

11 BY MR. GRIFFIN:

12 Q.   You'll see Ramon Martinez sent an e-mail to Ed Romero at

13 4:56 a.m.; correct?  Complaining about "Subject:  Owen."  Do

14 you see that?

15 A.   Uh-huh.

16 Q.   And Mr. Martinez said:  "Hi, Mr. Romero.  I just want to

17 bring your attention that the lead for the elevator, Owen, he's

18 not acting on professional way with me.  I would like to talk

19 to you about it.  If there's any situation, I'd like to fix it,

20 please."

21       That's what Mr. Martinez said at 4:56 a.m.; correct?

22 A.   Yes, sir.

23 Q.   Okay.  And then later on, about a little over an hour

24 later, Mr. Diaz comes up with his complaint to Mr. Romero and

25 Mr. Kawasaki; correct?

1   **A.**   Yes, sir.  I'm looking at the time.  One says 4:45 and one

2   says 4:56, so about the same time.

3   **Q.**   For the record, it's 4:56 a.m. for Mr. Martinez's e-mail

4   and 6:08 a.m. for Mr. Diaz's e-mail; correct?

5   **A.**   Yeah.  I'm just saying the time that you see the very --

6   "Mr. Romero today at 4:45 a.m.," so if I'm looking at that and

7   I'm looking at when Ramon sent his e-mail, it's after they must

8   have had the incident, the run-in.

9   **Q.**   Correct.  So Mr. Diaz even writes 4:45 a.m., so within

10   10 minutes almost --

11   **A.**   Yes, sir.

12   **Q.**   -- Mr. Martinez is letting Mr. Romero know that he had a

13   problem with Mr. Diaz; right?

14        **MR. GRIFFIN:**  Can we go to Exhibit Number 76?  Can we

15   go wide, Ray?

16               (Pause in proceedings.)

17   **BY MR. GRIFFIN:**

18   **Q.**   So Exhibit Number 76 is an e-mail that you -- an e-mail

19   chain between you and your supervisor Terri Garrett at

20   nextSource; correct?

21   **A.**   Yes.

22   **Q.**   Because you were involved with this situation and you were

23   going through your steps of gathering information, being

24   prompt, objective, and thorough; right?

25   **A.**   Yes, sir.

1   **Q.**   And so you e-mailed Ms. Garret on October 21, and you

2   state:  "Yes, I have spoken with all three, and I will be

3   speaking with Ramon and Owen again on Friday"; correct?

4   **A.**   Yes.

5   **Q.**   And "all three" means Rothaj Foster, Owen Diaz, and Ramon

6   Martinez; correct?

7   **A.**   Yes.  As I stated before, I think I spoke to Rothaj, but I

8   don't believe he was a nextSource -- under the nextSource

9   umbrella.  So at that point, I don't believe I had any more

10  contact with him after that.

11          **MR. GRIFFIN:**  And can we go to Exhibit 254?  Could you

12  blow up the bottom e-mail, Ray?

13  **BY MR. GRIFFIN:**

14  **Q.**   Now, with regard to your ability to communicate with

15  Rothaj Foster, here's an e-mail from you to Ed Romero, Victor

16  Quintero, and numerous other people about your interactions

17  with Mr. Foster on November 6th; correct?

18          **THE COURT:**  Counsel, what exhibit is this?

19          **MR. GRIFFIN:**  254.

20  **BY MR. GRIFFIN**

21  **Q.**   Oh, I'd like to refresh your recollection --

22          **MR. GRIFFIN:**  I'm sorry, Your Honor.  I made a

23  mistake.  I would like to refresh his recollection with this

24  exhibit.

25          **THE COURT:**  Okay.  So what exhibit number is that?

1          **MR. GRIFFIN:**  It's 254.

2          **THE COURT:**  So that's not a document that I have

3   either?

4          **MR. GRIFFIN:**  No, Your Honor.

5       Do we have a copy?

6                    (Pause in proceedings.)

7          **THE COURT:**  Let's have the document, please.

8       And what is the -- what's the pending question?

9          **MR. GRIFFIN:**  About whether or not he interacted with

10  Mr. Foster related to his ability to collect information from

11  Mr. Rothaj Foster, Your Honor.

12                   (Pause in proceedings.)

13         **MR. GRIFFIN:**  I think Mr. Jackson's testimony is that

14  Mr. Foster wasn't under the nextSource umbrella such that he

15  couldn't speak with him.  And I'd like to refresh his

16  recollection that he had the ability to talk to him several

17  weeks later.

18         **THE COURT:**  So that he was under the nextSource

19  umbrella?

20         **MR. GRIFFIN:**  Correct, that Mr. Jackson several weeks

21  later had an investigation involving collecting information

22  from Mr. Foster.

23         **THE COURT:**  Okay.  You can -- you can use it for that

24  purpose only.

25         **MR. GRIFFIN:**  Yes, sir.

 1   **BY MR. GRIFFIN:**

 2   **Q.**   Mr. Jackson, can you read the e-mail at the first page of

 3   Exhibit 254 from 7:32 a.m.?

 4   **A.**   It looks like --

 5            **THE COURT:**  Take it off the screen.

 6        So the rule is that any document that has been admitted

 7   into evidence already can be on the screen.

 8        Any deposition snippet that counsel wants to use cannot be

 9   on the screen unless I allow it.  Any exhibit that has not been

10   admitted previously, may not be put on the screen.  Is that

11   clear?

12   **BY MR. GRIFFIN:**

13   **Q.**   Mr. Foster, [sic] have you had an opportunity to read your

14   e-mail from November 6 at 7:32 a.m.?

15   **A.**   Excuse me?

16   **Q.**   Have you had an opportunity to read your e-mail from

17   November 6th at 7:32 a.m.?

18   **A.**   Yes.

19   **Q.**   Does that refresh your recollection that you had an

20   opportunity to speak with Mr. Foster to gather information for

21   investigations?

22   **A.**   This was -- I don't believe this was an investigation.  It

23   looks like his -- he wasn't certified to drive a forklift.  So

24   this wasn't an investigation.  It looks like he's not certified

25   to drive a forklift.

JACKSON - CROSS / GRIFFIN

1  **Q.**    Okay.

2          **MR. GRIFFIN:**  I'd like to go back to Exhibit

3  Number 72, which is admitted -- I mean 76.

4                    (Pause in proceedings.)

5  **BY MR. GRIFFIN:**

6  **Q.**    Are you there, Mr. Jackson?

7  **A.**    Yes.

8  **Q.**    It should be on the screen.

9          So you e-mailed Terri Garrett, who's your supervisor, on

10  the morning of October 21st; correct --

11  **A.**    Uh-huh.

12  **Q.**    -- to inform her about the status of your investigation

13  into the dispute between Mr. Diaz and Mr. Martinez; correct?

14  **A.**    Uh-huh.

15  **Q.**    And as a part of this incident, you state that you

16  interviewed Mr. Diaz and Mr. Martinez; right?

17  **A.**    Yes.

18  **Q.**    And when you interviewed Mr. Diaz related to this dispute

19  in the elevator in October 2015, he did not make any claim to

20  you that Mr. Martinez had ever used the N-word; isn't that

21  correct?

22  **A.**    No.  He just kept saying he was very hostile towards him.

23  **Q.**    Okay.  But no use of the N-word; correct?

24  **A.**    Not that I recall.

25  **Q.**    And, in fact, Mr. Diaz did not report to you when you were

**JACKSON - CROSS / GRIFFIN**

1  talking to him during your interview that Mr. Martinez had used

2  any offensive words.  Didn't report mayate; didn't report porch

3  monkey; didn't report that Mr. Martinez said "N-word, go back

4  to Africa;" correct?

5  **A.**   I don't recall that.

6  **Q.**   Okay.  So you have no -- and -- so as you sit here today,

7  you can't tell this jury whether -- or strike that.

8       So you don't recall Mr. Diaz making any reports at all

9  related to racial, hostile language having to do with that

10  elevator incident --

11  **A.**   Hostile language, yes.

12  **Q.**   Racially --

13  **A.**   I wouldn't call it racial, per se, but hostile,

14  definitely.

15  **Q.**   Okay.  I'm going to clarify my question, Mr. Jackson.

16       As you sit here testifying today, you don't have any

17  recollection of Mr. Diaz reporting to you any racially hostile

18  language as a part of that dispute he had with Mr. Martinez in

19  October of 2015; correct?

20  **A.**   Not to my recollection, no.

21  **Q.**   And then even with regards to the complaints of physical

22  threats, isn't it true that when Mr. Diaz talked to you, his

23  statements about physical threats were different than what he

24  put in his e-mail?

25  **A.**   What do you mean by that?

1  Q.   So he was -- his statement in his e-mail about physical

2  threats from Mr. Martinez was inconsistent with what he told

3  you when you spoke to him; correct?

4  A.   I don't agree with that, no.  I don't agree with that.  I

5  don't believe that was the case.  He was very upset that he

6  was -- he felt threatened.

7  Q.   And Mr. Diaz did not express to you that he thought

8  Mr. Martinez was going to strike him, did he?

9  A.   No.  I think he did think Mr. Diaz was going to strike

10  him.  He thought he was going to fight, they were going to get

11  into a fight.  As a matter of fact, if I remember looking at

12  the video, Mr. Diaz did this (indicating) while he was in the

13  elevator, put his hands up, after Ramon had jumped off the

14  tugger.

15  Q.   Okay.  Can I direct your attention to your deposition,

16  page 64, line 21.

17              (Pause in proceedings.)

18  BY MR. GRIFFIN:

19  Q.   Are you there, Mr. Jackson?

20  A.   Yes.

21  Q.   And the question was:  "Does that refresh your

22  recollection?  Did you actually talk to Mr. Diaz after you

23  received his written complaint here in Exhibit 126?"

24        "ANSWER:  I believe so, yes, sir."

25        "QUESTION:  And was Mr. Diaz's complaint to you verbally

1    the same as his complaint in writing?"

2         "ANSWER:  No, sir."

3         Then if you go down to line 21 --

4         "QUESTION:  There were additional things that Mr. Diaz

5    told you in the -- when he talked to you."

6         "ANSWER:  Well, what he is saying here about he thought he

7    was going to be struck.  He didn't really express that."

8         "QUESTION:  He didn't express that when you talked to

9    him?"

10        "ANSWER:  No, sir."

11        "QUESTION:  You talked to Mr. Diaz after you received a

12   copy of his e-mail complaint; is that true?"

13        "ANSWER:  Yes, sir."

14        So that was your testimony under oath in a prior

15   proceeding that when you talked to Mr. Diaz in October 2015, he

16   did not tell you that he thought he was going to be struck;

17   correct?

18   A.   You know, sir, I don't recall that.  I recall that they

19   were going to get into a fight, and I do recall Mr. Diaz doing

20   this (indicating) once again during that confrontation.

21   Q.   Okay.

22   A.   So people don't do this (indicating) if they don't think

23   something is about to happen.

24        MR. ALEXANDER:  May the record reflect that the

25   witness is holding his hands up in a defensive manner?

1          **THE COURT:**  Yes, the record shall so reflect.

2    **BY MR. GRIFFIN:**

3    **Q.**  You actually had an opportunity to collect the video and

4    review --

5    **A.**  No, I did not collect the video.

6          **THE COURT:**  Hang on, Mr. Jackson.  Let Mr. Griffin ask

7    the question.

8          **THE WITNESS:**  I'm sorry.

9    **BY MR. GRIFFIN:**

10   **Q.**  So you testified about seeing the video?

11   **A.**  Yeah, I recall that.  I'm almost positive I saw the video

12   in the recycling area with -- I think it was Owen and Victor.

13   But I didn't collect the video.  I didn't keep the video.  I

14   think it was a quick scroll through it and onto the next.

15   **Q.**  Okay.  And isn't it true that you don't recall any racial

16   issues between Mr. Martinez and Mr. Diaz until the January

17   drawing?

18   **A.**  That's when it all became that it was racial, yes.

19   **Q.**  Okay.

20   **A.**  And it was pretty obvious.

21   **Q.**  Okay.  With regard to the drawing incident, I want to put

22   your attention to Exhibit 272.

23                    (Pause in proceedings.)

24   **BY MR. GRIFFIN:**

25   **Q.**  It should be on the screen, sir.  And Exhibit 272, the

1    first -- the e-mail you received at 8:46 a.m., Mr. Diaz

2    forwards a copy of his e-mail to you complaining of this

3    incident about the drawing; correct?

4    **A.**    Yes.

5    **Q.**    And then you at 9:19 a.m. reach out to your supervisor

6    from nextSource to inform her of this complaint; correct?

7    **A.**    Yes.

8    **Q.**    And then within 14 minutes, you and Ms. Garrett, your

9    supervisor at nextSource, get on the phone and discuss this

10   serious issue and how you are going to deal with it; correct?

11   **A.**    Yes.  I believe so.

12   **Q.**    And then so Ms. Garrett responds back to you at 9:33, and

13   she says:  "Per our conversation" -- because you had spoken in

14   that 14-minute period; correct?

15   **A.**    Uh-huh.

16   **Q.**    "Per our conversation "-- you and she discussed

17   two options for Mr. Martinez; correct?

18   **A.**    Uh-huh.

19   **Q.**    And the two options that you discussed with Ms. Garrett

20   were first, a strong warning and grounds for termination if he

21   has another mishap on any level; correct?  That was Number 1;

22   right?  Correct?

23   **A.**    Yes.

24   **Q.**    And Number 2, termination due to the level of insult to

25   the workforce and zero-tolerance policy; correct?

JACKSON - CROSS / GRIFFIN

1   A.   Yes.

2   Q.   And you and Ms. Garrett had this conversation about the

3   potential discipline for Mr. Martinez before you ever spoke to

4   anybody at Tesla; correct?

5   A.   I don't know if Ms. Garrett talked to anyone at Tesla at

6   that point.  I don't know.

7   Q.   But you hadn't?

8   A.   I had not, no.

9   Q.   Okay.  And then -- but that first recommendation, the

10  suspension and -- a strong warning and a suspension, that's

11  what ultimately Mr. Martinez got; correct?

12  A.   I don't see the suspension.  I see grounds for

13  termination.

14  Q.   Okay.  Ultimately, Mr. Martinez received a three-day

15  suspension and a final written warning; correct?

16  A.   Yes.

17  Q.   Okay.

18           MR. GRIFFIN:  And can we go to the e-mail at

19  10:19 a.m., still on Exhibit 274.

20  BY MR. GRIFFIN:

21  Q.   In the hours between that initial conversation with you

22  and Miss -- Ms. Garrett, you met with Victor and you reported

23  back to Ms. Garrett about your continuing investigation, right,

24  sir?

25  A.   Uh-huh.

**JACKSON - CROSS / GRIFFIN**

1  Q.   And you said:  "I just met with Victor.  He suggested that

2  we do a final written warning for Ramon.  I told Victor I

3  didn't think that was enough.  My suggestion to him was a final

4  written warning with a three-day suspension without pay.

5  Victor thought that was an even better idea."

6       That's what you wrote to Ms. Garrett; correct?

7  A.   Yes, sir.

8  Q.   So you had a conversation with Mr. Quintero that morning;

9  right?  Yes?

10  A.   Yes.

11  Q.   And you discussed various different options; correct,

12  Mr. Jackson?

13  A.   Yes.

14  Q.   And ultimately, there was a determination that you would

15  both recommend a final written warning with a three-day

16  suspension; correct?

17  A.   Yeah.  And I know I talked to Victor and told him about

18  some training for Ramon as well.  I don't think that was in the

19  e-mail, but I did inform him there should be some type of

20  training.

21  Q.   And you don't think that Mr. Quintero was less concerned

22  about this drawing issue than you do; correct, Mr. Jackson?

23  A.   No.  I do feel he was less concerned because of the

24  statement he made to me that "Ramon is a good worker.  I don't

25  want to lose a good worker."

1  Q.   Can you go to your deposition at page 78, line 15?  Are

2  you there, Mr. Jackson?

3          THE COURT:  I'm not.

4          MR. GRIFFIN:  Sorry, Your Honor.

5          THE COURT:  I appreciate the speed with which you are

6  going, but I don't work quite as fast.  78:15?

7          MR. GRIFFIN:  Yes, Your Honor.

8          THE COURT:  Go ahead.

9  BY MR. GRIFFIN:

10  Q.   "QUESTION:  And Mr. Quintero, he was less concerned about

11  the jigaboo drawing than you are; is that" --

12       "ANSWER:  No, sir.  I would not say" --

13       "ANSWER: I would not say that at all."

14       That was your testimony under oath when you were asked if

15  Mr. Quintero was less concerned about the jigaboo drawing than

16  you were; correct, Mr. Jackson?

17  A.   Yes, sir.

18  Q.   And that deposition was two years ago -- or several years

19  ago in 2019, Mr. Jackson?

20  A.   Yes, sir.

21  Q.   Closer to the time that you were at the factory doing this

22  investigation; correct, Mr. Jackson?

23  A.   Three years after, yes, sir.

24  Q.   But much closer than we are eight years later now; right?

25  A.   Yes, sir.

JACKSON - CROSS / GRIFFIN

1   Q.   And between then and now, you've had conversations with

2   Plaintiff's counsel; correct?

3   A.   With Plaintiff's counsel, other than going over my

4   testimony, that's the only conversation I've ever had.

5   Q.   Okay.  So with --

6   A.   It's been brief conversations there.  I haven't really

7   talked to their counsel but a couple of times, to be very

8   honest.

9   Q.   Okay.  So between the time you got this report shortly

10  before 9:00 o'clock in the morning and two hours later, you had

11  spoken to Mr. -- you had spoken to your boss, Ms. Garrett;

12  correct?

13  A.   Uh-huh.

14  Q.   You spoke to Mr. Quintero; correct?

15  A.   Uh-huh.

16  Q.   And you'd come up with a recommendation for a recommended

17  discipline; correct?

18  A.   Yes.

19  Q.   Then I want to go to Exhibit 284 -- 284-2.  At 11:26 a.m.,

20  the same morning you reached out to Chartwell, which was

21  Mr. Martinez's staffing agency; correct?

22  A.   Yes.

23  Q.   And you informed Chartwell that:  "Hi Veronica, this

24  serious" -- and I think you meant to say issue -- "came up

25  today"?

**JACKSON - CROSS / GRIFFIN**

1   **A.**   Yes.

2   **Q.**   "And I believe Chartwell is its EOR.  What is your policy

3   with regards to discrimination?  Please review the e-mail below

4   and get back to me with what your policy is so I can address."

5        That's what you wrote; correct?

6   **A.**   Yes.

7   **Q.**   And then Chartwell got back to you several hours later at

8   3:18; correct?

9   **A.**   Uh-huh.

10  **Q.**   And they told you that they had already started

11  investigation and that -- and what they wrote was:  "I was able

12  to speak to Ramon, and he is on his way to my office so we can

13  start an investigation.  I have also notified my HR director of

14  the situation as well.  We will keep you updated."  Correct?

15  **A.**   Yes, sir.

16  **Q.**   So at this point in time, you were involved from

17  nextSource, Tesla had been informed, and the staffing agency

18  was doing its own investigation; correct?

19  **A.**   Yes, sir.

20       **MR. GRIFFIN:**  Then let's go to 284, your e-mail at

21  3:38 p.m.

22  **BY MR. GRIFFIN:**

23  **Q.**   And then at 3:38 time p.m., you e-mail your boss again to

24  give her a status update; correct, Mr. Jackson?

25  **A.**   Yes.

**JACKSON - CROSS / GRIFFIN**

1   Q.   And you state:  "Good afternoon.  I just got off the phone

2   with Chartwell.  They are investigating the incident and will

3   most likely, per their policy, the result will be a final

4   written warning with a three-day suspension without pay.  I'm

5   waiting for them to confirm this now."

6        That's what you wrote at the time; right, Mr. Jackson?

7   A.   Yes, sir.

8   Q.   And you continued, you said:  "I have spoken with Ramon,

9   and he has apologized for his actions and has assured me that

10  he in no way meant to offend anyone.  He said he promises

11  nothing like this will ever happen again.  He is headed over to

12  Chartwell to speak with them."  Correct?

13  A.   Yes.  That's when he apologized to me.

14  Q.   And then with regards to Mr. Diaz, you wrote:  "I also

15  spoke with Owen Diaz, and he has been made aware we are taking

16  this issue seriously, and it will be addressed today."

17       That's what you wrote; correct?

18  A.   Yes.

19  Q.   And then Mr. Diaz responded that he was fine with that,

20  and he just wanted it to be addressed; correct?

21  A.   Yes, sir.

22  Q.   That's what the -- that's what you spoke to Mr. Diaz about

23  on that day; correct?

24  A.   I believe so.

25  Q.   And there is no reference in your summary, in your

1   discussion with Mr. Diaz, that he reported any racial hostile

2   conduct related to Ramon Martinez other than this drawing.  No

3   slurs, no use of mayate, no chongo, no N-word.

4       That wasn't what Mr. Diaz told you when you talked to him

5   in January; correct?

6   **A.**   I can't remember all the conversations, but he could have

7   said that.  I don't recall right off the top of my head, no.

8   **Q.**   But you were prompt, thorough, and objective; correct,

9   Mr. Jackson?

10  **A.**   That's irrelevant, sir, if I recall a conversation.  If I

11  didn't take a statement from him, that's different than him

12  saying something or him being upset in the moment.

13      You don't even hear a lot of what people say when they're

14  upset because they can be very agitated.  They can be hostile.

15  Well, I won't say "hostile," but they can be upset.  They can

16  be -- they can feel they've been violated, and they can't get

17  words out right.

18      So it's different when you give a statement as opposed to

19  someone saying something.

20  **Q.**   Okay.  But you didn't put any of that in your e-mail to

21  Ms. Garrett that day?

22  **A.**   No, I did not.  No, I did not, sir.

23  **Q.**   And with regards to the recycling crews and making sure

24  that these folks know that this wasn't supposed to happen

25  again --

JACKSON - CROSS / GRIFFIN

1  **A.**   Yes, sir.

2  **Q.**   -- you went out to the factory three different times?

3  **A.**   Yes, sir.

4  **Q.**   Talked to everybody in the recycling team.

5  **A.**   Yes, sir.

6  **Q.**   Day shift, swing shift, and night shift; correct?

7  **A.**   Yes, sir.

8  **Q.**   And you informed them about the drawing; that it was

9  inappropriate; correct?

10  **A.**   Yes, sir.

11  **Q.**   You told them about Mr. Martinez's discipline; correct?

12  **A.**   I don't believe I told them about his discipline.  I don't

13  think I shared that.

14  **Q.**   Okay.

15  **A.**   I told them that we were looking into it.  It was

16  unacceptable behavior.  I know that, yes.

17  **Q.**   And you made sure that they knew that this behavior was

18  inappropriate and shouldn't happen again; correct?

19  **A.**   Yes, sir.

20  **Q.**   With all the people that were involved in this department;

21  correct?

22  **A.**   Yes, sir.

23  **Q.**   From the --

24  **A.**   For the most part, yeah.  I tried to meet each shift.

25  Have the shift supervisor there or lead and let them know that

1    that type of action is not acceptable.

2    **Q.**   Okay.  So we need to talk about a sensitive topic,

3    Mr. Jackson, which is the N-word.  Okay?

4    **A.**   Yes, sir.

5    **Q.**   You and I -- and you've discussed a little bit that

6    there's -- the N-word with an A is different than the N-word

7    with the ER; correct?

8    **A.**   I don't think it's different.  It's disrespectful.

9    **Q.**   And, in fact --

10   **A.**   It's just used differently.

11   **Q.**   Okay.  You understand that N-I-G-G-A is more like an

12   acknowledgment of a friend, like a "What's up, my N-I-G-G-A"?

13   **A.**   Yes, sir.

14   **Q.**   Like, "What's up, my friend" type of thing; correct?

15   **A.**   Yes, sir.  Still not appropriate.

16   **Q.**   And now when you say the N-word -- now when you hear the

17   N-word version in the factory, you honestly didn't feel like

18   the people using that word were trying to offend anybody;

19   correct?

20           **MR. ALEXANDER:**  Objection --

21           **THE WITNESS:**  I was offended.

22           **THE COURT:**  Hang on just a second, Mr. Jackson.

23   What's the objection?

24           **MR. ALEXANDER:**  Speculation.

25           **THE COURT:**  Overruled.

```
 1            THE WITNESS:  I was offended.  So for you to not be a

 2   Black man and sit here and tell me how anybody else should feel

 3   about that word is unacceptable to me.

 4            MR. GRIFFIN:  I am a Black man, sir.  My father is

 5   African American.  Don't come after me.

 6            THE WITNESS:  Then you should understand.  Then you

 7   should understand, sir.  You should understand.

 8            THE COURT:  All right.  Mr. Jackson.  Mr. Jackson,

 9   stop.

10       Let's go with the question.

11   BY MR. GRIFFIN:

12   Q.   My question to you was:  Now, when you heard the A version

13   of the N-word in the factory, you honestly didn't feel that the

14   people saying it were trying to offend anybody; correct?

15   A.   They were saying it in their manner, sir.

16   Q.   Okay.  Can I just --

17   A.   Does it offend someone?  I don't know.  It could offend

18   anyone.

19   Q.   Can you go to your deposition, line 47 -- page 147,

20   line 20.

21                       (Pause in proceedings.)

22            THE COURT:  What page again?  I'm sorry.

23            MR. GRIFFIN:  147, line 20.

24            THE COURT:  Hang on.

25                       (Pause in proceedings.)
```

1              MR. ALEXANDER:  To what line?

2              MR. GRIFFIN:  148, line 6.

3                    (Pause in proceedings.)

4         THE COURT:  Okay.

5    BY MR. GRIFFIN:

6    Q.   In your deposition, you were asked: "QUESTION:  Okay.  If

7    you can tell me as best you can recall what are the areas that

8    you recall hearing the A version of the N-word at the Tesla

9    factory?"

10        And your answer was:  "On the floor closer to some of the

11   satellite cafeterias where people would go to lunch, and they'd

12   be having just common conversations.  Like I said, I don't -- I

13   honestly don't feel like they were trying to offend anybody."

14        "It's just kind of what the culture has evolved into as of

15   late.  It's unfortunate, but I don't necessarily feel they were

16   trying to say it in an offensive way."

17             MR. ORGAN:  Objection.  He misstated the testimony,

18   Your Honor.

19             THE COURT:  I think he read it fine.  If there's a

20   problem, you can come back on redirect.

21   BY MR. GRIFFIN:

22   Q.   That was your testimony; right, Mr. Jackson?

23   A.   Yes, sir.

24   Q.   Okay.

25   A.   And it's sad that we're there.

**JACKSON - CROSS / GRIFFIN**

1  **Q.**   And, in fact, even with regards to the word N-I-G-G-A, you

2  only heard that word three or four times during the time period

3  you were at the Tesla factory; correct?

4  **A.**   No, sir.

5  **Q.**   Can you go to your deposition page 150, line 25.

6                    (Pause in proceedings.)

7           **MR. ORGAN:**  What page and line, Counsel?

8           **MR. GRIFFIN:**  Page 150, line 25.

9                    (Pause in proceedings.)

10          **MR. ALEXANDER:**  To?

11          **MR. GRIFFIN:**  151:9.

12                   (Pause in proceedings.)

13  **BY MR. GRIFFIN:**

14  **Q.**   "QUESTION:  In terms of the number of times that you heard

15  the N-word with an A at Tesla, how many times -- what's your

16  best estimate of the number of times that you heard that?"

17          "ANSWER:  Three, four times, probably."

18          "QUESTION:  And did you report that to HR?"

19          "ANSWER:  No, sir."

20          "QUESTION:  Why not?"

21          "ANSWER:  Because of a context in which it was being used.

22  It wasn't being used, at least in my opinion, to offend."

23          That was your testimony, correct, under oath, Mr. Jackson?

24  **A.**   Yes, sir.

25  **Q.**   Okay.

JACKSON - CROSS / GRIFFIN

1    **A.**    And it's probably more than that, to be very honest.

2    **Q.**    Your testimony under oath was three or four times;

3    correct, Mr. Jackson?

4    **A.**    Was the context a day, or was it -- what time period is

5    it?

6    **Q.**    Okay.  With regards to the N-I-G-G-E-R, you never heard

7    that word in the Tesla factory; correct?

8    **A.**    Not towards me.

9    **Q.**    You never heard the word, period?

10   **A.**    Not towards me.

11   **Q.**    You never heard the word --

12   **A.**    Not towards me.

13            **THE COURT:**  Mr. Jackson, you've got to wait until the

14   question is finished and then give an answer to the -- to the

15   entire question, which is not just towards you, but did you

16   ever hear it?

17            **THE WITNESS:**  Yes, sir.

18   **BY MR. GRIFFIN:**

19   **Q.**    And you never heard the word N-I-G-G-E-R at the Tesla

20   plant; correct?

21   **A.**    If that's what you would like to say, fine.

22   **Q.**    I'm asking you the question.  Mr. Jackson, you never heard

23   the word N-I-G-G-E-R at the Tesla factory?

24   **A.**    Sir, I've heard that word so many times.

25   **Q.**    I'm just asking about --

**A.**   You guys are being very specific about an ER, an A.
People pronounce it differently.  It is said there.  Has been
said there, probably continues to be said there.  I haven't
been there in years.  Okay.

When I was there, that word was used constantly.  Can I
say that to you now?  That word was used constantly.  Whether
you feel it was a bad way or a good way, it was used.  That's
what I'm telling you.  That is the truth.  That word has been
used.  I don't know if it's still used.  I don't know if
Tesla's changed that, but they allowed it.  It was allowed.

It was never directed at me personally, but do I get
offended by it?  Yes.  I don't want to see a young Asian man
calling another Asian man a nigger.  That word has significance
to me.

I have served my country.  I've been in the military.
I've been called that in the service.  So to tell me that it's
an A or ER, it doesn't matter to me.  It shouldn't be used at
all.  I can't be any clearer on that.

And you can say it's a sensitive matter, and it is for me.
It really is.

**Q.**   We had an opportunity to depose you in this case
four years ago, didn't we, Mr. Jackson?

**A.**   Yes.

**Q.**   And if you go to your deposition at line -- page 150,
line 18 to line 24.

JACKSON - CROSS / GRIFFIN

1    **A.**    Yes, sir.

2    **Q.**    And can you read --

3          **MR. GRIFFIN:**  Your Honor, are you there?

4          **THE WITNESS:**  Yes.

5          **THE COURT:**  Yeah.  Go ahead.

6    **BY MR. GRIFFIN:**

7    **Q.**    Okay.  And the question was:  "Did you hear the ER version

8    of the N-word at Tesla?"

9          And your answer was during your deposition under oath:

10   "No.  I think that's even a more disparaging version.  So a lot

11   of people are super offended by that.

12         "QUESTION:  Right.  But you didn't hear that at Tesla;

13   right?"

14         And your answer was:  "No.  I did not."

15         Under oath; correct?

16   **A.**    Yes, sir.

17         **MR. GRIFFIN:**  So I just want to wrap up.  With regards

18   to --

19         **THE COURT:**  Would you like a break?

20         **JUROR KAUR:**  For two minutes.

21         **THE COURT:**  All right.  Ladies and gentlemen, let's

22   take a pause, and the jury can go out for two minutes, and we

23   will be right back.

24         (Juror Kaur exited the courtroom.)

25   \\\

```
 1          (An off-the-record discussion was had.)

 2                   (Recess taken at 12:44 p.m.)

 3               (Proceedings resumed at 12:48 p.m.)

 4          THE COURT:  All right.  Please be seated, everybody.

 5          JUROR KAUR:  Sorry.

 6          THE COURT:  Don't worry.

 7          MR. GRIFFIN:  No more questions for Mr. Jackson,

 8  Your Honor.

 9          THE COURT:  Okay.  Any redirect?

10          MR. ALEXANDER:  Yes, please.

11      Your Honor -- excuse me -- page 141 of Mr. -- of the

12  deposition transcript of Mr. Jackson, lines 9 through 25.

13  Prior consistent testimony.

14                   (Pause in proceedings.)

15          MR. GRIFFIN:  Objection.  Improper, Your Honor.

16  What's the question on the table?

17          THE COURT:  The question is responding to one of your

18  readings of the deposition, so it's 141 --

19          MR. ALEXANDER:  -- line 9 through 25.

20          THE COURT:  You may proceed.

21          MR. ALEXANDER:  Thank you, Your Honor.

22                     REDIRECT EXAMINATION

23  BY MR. ALEXANDER:

24  Q.   "QUESTION:  I'm going to ask you about a word that has

25  been -- that's come up a few times in this case.  I don't want
```

1  you to be offended, but I have to use the word.  The word is

2  nigger."

3       "ANSWER:  Yes, sir."

4       "QUESTION:  Did you ever hear anyone use that word at

5  Tesla?"

6       "ANSWER:  Yes, sir."

7       "QUESTION:  And what circumstances did you hear that word

8  being said?"

9       "ANSWER:  There have been times where I actually walked --

10 been walking through the facility and there was -- one time in

11 particular, there was two Asian or Filipino gentlemen, and one

12 said like, 'What's up, my nigga?' -- with the A to the other

13 one.  That type of thing.  It still was offensive, but you

14 know, it wasn't my employee, so I didn't engage in it."

15      When you were walking around the workplace at Tesla and

16 you heard some version of the N-word, did it matter to you in

17 terms of your being offended whether it was the ER version or

18 the A version?

19 **A.**   Once again, sir, as I stated before, making it about a

20 letter doesn't take away the offensiveness of the word.

21 Whether it's an A or an E, it's not something I engage in, it's

22 not something I have my kids engage in.  I coach youth

23 football, I don't let them do it.  So, yes, it's offensive.

24 **Q.**   You indicated that Ramon Martinez apologized to you?

25 **A.**   Yes, sir.

1  **Q.**  At the point when he apologized, did you feel that that

2  apology was sincere?

3  **A.**  I couldn't speak to the sincerity of it.  I did tell him

4  that he thought it was a joke.  And I was very clear with him

5  it was not a joking matter, it was not funny, and that I was

6  offended.

7  **Q.**  You were referred to page 134, line 1 through 9, where you

8  had said during the deposition that:  "Any time Owen got into

9  it with someone, he would say 'now they're threatening me' and

10  that was just kind of a pattern you saw with Mr. Diaz, you

11  know."

12      With regard to Owen Diaz saying that he was threatened,

13  did you ever conduct some form of investigation to confirm that

14  he was not being threatened?

15  **A.**  I don't recall that portion at all, sir.  I think some of

16  the other incidents had occurred with Tesla staff, so that

17  wouldn't be me doing an investigation.

18  **Q.**  Okay.  So you can confirm that he said he was threatened

19  after he made complaints, yes?

20  **A.**  He felt threatened, yes.

21  **Q.**  Right.  And in terms of investigating, you're not aware of

22  anyone that investigated his statement that after he would

23  complain, he was threatened; is that right?

24  **A.**  I don't know what investigations were done in that manner,

25  no.

**JACKSON - REDIRECT / ALEXANDER**

1   Q.   You did not conduct an investigation?

2   A.   No, sir.

3   Q.   Thank you.

4        You said that there were other investigations that

5   occurred inside the Tesla workplace that were racially related;

6   is that correct?

7   A.   Yes.  I'm sure there were.  Not just racially, sexually,

8   too.

9   Q.   Well, let's just stick with the racial.  You only

10  conducted one racial investigation regarding Mr. Diaz; correct?

11  A.   Yes, sir.

12  Q.   But you were aware that there were other incidents of a

13  racial nature that occurred?

14            **MR. GRIFFIN:**  Objection.  Leading.

15            **THE COURT:**  Sustained.

16  BY MR. ALEXANDER:

17  Q.   Is it correct that there were other incidents of a racial

18  nature that occurred inside the workplace that you were aware

19  of?

20            **MR. GRIFFIN:**  Leading, You Honor.

21            **THE COURT:**  Yeah.  Sustained.

22        Just ask were there?

23  BY MR. ALEXANDER:

24  Q.   Were there other incidents of --

25  A.   I believe so, yes.

1   **Q.**   And how is it that you're aware that there were racial

2   incidents?

3   **A.**   You would hear talk.  People would talk about it.

4   **Q.**   And when you say we would hear people talk about them,

5   first, with regard to those incidents, do you know whether they

6   were investigated?

7            **MR. GRIFFIN:**  Objection.  Calls for speculation.

8            **THE WITNESS:**  I have no idea.

9            **THE COURT:**  He asked "do you know."

10           **THE WITNESS:**  Not that I'm aware of.  I don't know.

11           **MR. ALEXANDER:**   I'm going to want to split the screen.

12   If we could put up Exhibit Number 272.

13   **BY MR. ALEXANDER:**

14   **Q.**   This is the exhibit from Victor -- I'm sorry.  This is the

15   e-mail from Victor Quintero on January 22, 2016, at 10:20 a.m.

16   where he confirms:  "I agree with the recommendation to suspend

17   and issue a permanent written warning."

18        Do you see that reference?

19   **A.**   Yes, sir.

20   **Q.**   And then if we could put next to it Exhibit 284 where

21   you're having a conversation that afternoon at 3:38, and you

22   say:  "They're investigating the incident and most likely, per

23   their policy, the result will be a final written warning for

24   Ramon with a three-day suspension without pay."

25        Do you see that?

JACKSON - REDIRECT / ALEXANDER

```
 1    A.    Yes, sir.

 2    Q.    Your conversation with Victor Quintero where a

 3    determination was made of a three-day suspension occurred five

 4    hours before or so you wrote this e-mail, Exhibit Number 284;

 5    right?

 6    A.    Yes, sir.

 7    Q.    And it really was the case that Tesla dictated what the

 8    discipline was going to be, not the staffing company; isn't

 9    that correct?

10          MR. GRIFFIN:  Objection.  Leading.

11          THE COURT:  Sustained.

12    BY MR. ALEXANDER:

13    Q.    In this instance when you made this statement:  "The

14    result will be a final written warning for Ramon"; is that

15    because you knew the result?

16          MR. GRIFFIN:  Objection.  Leading.

17          THE COURT:  Sustained.

18    BY MR. ALEXANDER:

19    Q.    With regard to your communications with us, you've had a

20    couple of communications with me; correct?

21    A.    Yes, sir.

22    Q.    And in those communications, other than providing you with

23    your deposition transcript --

24          MR. GRIFFIN:  Objection.  Leading.

25          THE COURT:  Overruled.
```

1          You can continue.

2   BY MR. ALEXANDER

3   Q.   Other than providing you with your deposition transcript

4   and asking you questions, did I do anything to influence your

5   testimony?

6          MR. GRIFFIN:  Objection.  Leading.

7          THE COURT:  Overruled.

8      You can answer yes or no.

9          THE WITNESS:  No, sir.

10  BY MR. ALEXANDER:

11  Q.   My colleagues had contacted you in order to arrange for

12  you to be present, did they influence your testimony in any

13  way?

14         MR. GRIFFIN:  Objection.  Leading.

15         THE COURT:  Overruled.

16         THE WITNESS:  No, sir.

17  BY MR. ALEXANDER:

18  Q.   At any time that you've been communicated to by myself or

19  any of my colleagues, have they done anything to influence you

20  to give any testimony or change your testimony?

21         MR. GRIFFIN:  Objection.  Leading.

22         THE COURT:  Overruled.

23         THE WITNESS:  I've been here to tell the truth as best

24  as I can remember.  I don't have a dog in this fight, so...

25         MR. ALEXANDER:  Nothing further.

1          THE COURT:  Mr. Jackson, you're excused.  Thank you.

2          THE WITNESS:  Thank you.

3          MR. COLLIER:  Your Honor, Plaintiff calls Amy

4    Oppenheimer.

5          THE COURT:  Come on up, Ms. Oppenheimer.

6          THE CLERK:  Stay standing for me for just a second so

7    I can take your photograph.  Let me clear some of this also.

8                      (Pause in proceedings.)

9          THE CLERK:  If you will raise your right hand, please.

10                      **AMY OPPENHEIMER**,

11   called as a witness for the Plaintiff, having been duly sworn,

12   testified as follows:

13         THE CLERK:  Be seated.  Please begin by stating your

14   full name and spelling it for the court reporter.

15         THE WITNESS:  Sure.  Amy Oppenheimer.  A-M-Y,

16   O-P-P-E-N-H-E-I-M-E-R.  And excuse me one minute because I have

17   hearing aids, and I had turned them up, and they're now echoing

18   throughout the courtroom.  So I need to use my Bluetooth and

19   change that.

20                      (Pause in proceedings.)

21         THE WITNESS:  Okay.  Much better.

22                    **DIRECT EXAMINATION**

23   BY MR. COLLIER:

24   Q.  Good afternoon, Ms. Oppenheimer.

25   A.  Good afternoon.  Is it afternoon already?  Yeah.

1   **Q.**   It is.  It comes fast.

2        Where are you employed?

3   **A.**   I'm currently employed with Oppenheimer Investigations

4   Group which is a law office that conducts investigations, does

5   training, some other type of neutral work in the employment

6   field.

7        **MR. COLLIER:**  Can I ask you to just move the mic a

8   little bit back?  We're getting those hard Ps popping.  There

9   we go.

10       **THE WITNESS:**  Okay.

11       **MR. COLLIER:**  Much better.

12  **BY MR. COLLIER:**

13  **Q.**   I'm sorry.  Oppenheimer Investigations, what is

14  Oppenheimer Investigations?

15  **A.**   We are a law office, and we conduct workplace

16  investigations, and we do some training on how to do workplace

17  investigations for human resource professionals and attorneys.

18       We do some mediation and conflict resolution work, but

19  probably about 90 percent of what we do is actually conducting

20  investigation.

21  **Q.**   And do you train HR professionals?

22  **A.**   Yes.  I have -- myself been training HR professionals

23  since the late 1990s in how to do a workplace investigation.  I

24  also train employees and employers on harassment prevention and

25  response, on non-defensive communication, on bias,

1   understanding implicit bias and being able to talk about it in

2   a non-defensive way.

3   **Q.**   Understood.

4        And have you ever testified in court as an expert?

5   **A.**   I have.

6   **Q.**   What is your area of expertise?

7   **A.**   Preventing and responding to workplace harassment and

8   discrimination.

9   **Q.**   And what gives you -- other than what you've already told

10  us, what gives us -- what gives you expertise in that area?

11  **A.**   I am an attorney and studied as an attorney in the field.

12  I also have studied with human resource professionals and

13  written a book about investigating harassment that was

14  published by Society of Human Resource Management, SHRM.  I

15  have been working in the field for about 35 years.

16       I was on the task force through what was then called

17  Department of Fair Employment and Housing, which is now the

18  Civil Rights Agency for the State of California, working on --

19  writing and protocols and -- for an employer, guidelines to

20  respond to harassment.

21       And I founded an organization for workplace investigators

22  in 2009 and developed much of the training that was eventually

23  given ANSI, American National Standards, qualification to be --

24  to get a certificate in doing a workplace investigation.

25       So through my study and my development of curriculum, the

OPPENHEIMER - DIRECT / COLLIER

1    training that I've given, I've developed expertise in that

2    area.

3    Q.   And these --

4         (Cell phone ringing.)

5    BY MR. COLLIER:

6    Q.   All right.

7    A.   So glad it wasn't me.

8    Q.   Yes.  And I think everyone feels that except the person

9    who has it happening.

10        All right.  So the standards that you've described that

11   you helped to develop, have they been now memorialized in

12   regulations?

13   A.   There are regulations that speak to employers having

14   responsibilities to prevent and respond to workplace harassment

15   and discrimination.  A lot of the detail are in advisory rather

16   than something that's an actual regulation.

17        So EEOC has developed guidelines for employers, the DFEH

18   developed guidelines for employers.  They're not strictly

19   considered regulations.

20   Q.   And with the DFEH guidance that they've given, what was

21   your role in the development of that?

22   A.   I was on the task force of three people who developed the

23   employer guidelines for how to investigate complaints of

24   harassment.

25            MR. SPIRO:  Your Honor, we're going to object to any

1    testimony about guidelines that were passed in the last decade

2    since the incident.  I know there's some testimony that they

3    may intend to elicit that's not relevant in our judgment to

4    this.

5                THE COURT:  I would sustain that.

6                MR. COLLIER:  And I don't intend to ask about the

7    guidelines themselves.

8    BY MR. COLLIER:

9    Q.   And do you have any particular expertise on race

10   harassment?

11   A.   I have done extensive training on racial bias, and I had

12   myself investigated many cases involving race discrimination,

13   racial harassment and bias.  I've provided trainings on

14   cultural competency to investigate across racial lines.

15        And my law firm now consists of 19 attorneys of various

16   backgrounds and races, and we do investigations of all types of

17   racial and other forms of harassment and, you know, work

18   together to increase our cultural competence to be able to do

19   that.

20   Q.   And we hired you for this retention; correct?

21   A.   Correct.

22   Q.   How much are you charging for your time?

23   A.   $600 an hour.

24               MR. COLLIER:  At this time, I would tender

25   Ms. Oppenheimer as an expert on human resources and harassment

1   investigations.

2          **THE COURT:**  Any objection besides what has been done

3   pretrial?

4          **MR. SPIRO:**  I'm going to object based on relevancy.

5          **THE COURT:**  Okay.  You may proceed.

6          **MR. COLLIER:**  Thank you, Your Honor.

7          **THE COURT:**  Overruled.

8          **MR. COLLIER:**  We'd like to display the slide show at

9   this point.  Let's go to the next slide, please.

10                 (Pause in the proceedings.)

11  **BY MR. COLLIER:**

12  **Q.**   This slide here where we talk about the standard of care

13  to prevent racial harassment, my first question to you is:

14  Where did these standards come from?

15  **A.**   Well, they started with the law, 1964, the Civil Rights

16  Act was passed, and that prohibited discrimination in

17  employment, and the main focus of the law had been race.

18         Shortly after it was passed, there were cases brought

19  based on racial harassment, and the Court determined that

20  harassment is a form of discrimination.

21         And then over the years as that law developed, then sexual

22  harassment was then considered by the Supreme Court a form of

23  sexual harassment, and the EEOC started passing -- I should say

24  issuing guidance on what to do to prevent and respond to

25  harassment.

 1          And then at the same time law firms started developing

 2     protocols to advise their clients; human resource organizations

 3     started developing policies.  Some of them in some states were

 4     mandatory.

 5          In California eventually there was mandatory training that

 6     was passed, and that training includes certain things that need

 7     to be covered during the training.

 8          And so it's really evolved since 1964 over these many

 9     years.  Part of it relates to, you know, first how do you --

10     how do you prevent harassment from occurring, whether it's

11     racial or sexual or based on whatever protected category.

12          And then when it does happen, because you are not going to

13     prevent all harassment and discrimination, how do you respond?

14     And what is a reasonable and fair response, including what

15     should an investigation look like, when should they be done,

16     and what should happen afterwards to assure that there is both

17     appropriate remedial action and follow-up so that there isn't

18     ongoing problems in the workplace.

19     Q.   And so would you describe for the jury these standards

20     that you set forth here.

21     A.   Well, what I have here -- and I guess I could -- there are

22     so many places that one could look, but maybe I will just look

23     down at my own rather than try to look over here -- that first

24     of all, that employers have policies that are clear, that are

25     strongly worded, that are understandable, that set out both the

1   basic law but also examples of what harassment is, different

2   types of sexual or racial harassment, that its prohibited, how

3   you can complain, et cetera.

4       In addition to having the policies, they are supposed to

5   actually be distributed and people are supposed to be trained

6   on them, know what they are, feel secure that they can actually

7   follow those policies because having policies is just the first

8   step.

9       Certainly at this point -- these sort of standards were

10  developed in the 1990s, 2000.  By 2000, any organization of any

11  size was aware of what sort of policies they needed to have,

12  and the focus then became what are you doing with those

13  policies.

14      And so, again, by the '90s and 2000, employers were

15  delivering training.  Training became mandatory in some states,

16  as I said.  And generally, more training for supervisors than

17  for line staff.

18      So in California there is an hour mandatory training for

19  employees but two hours for supervisors who have a greater duty

20  to prevent harassment and respond.

21      In addition to that, sending a consistent message so that

22  when there are incidents of harassment, that it's responded to

23  quickly; that there is a message, and the message has to come

24  from the top because if you have the person at the top saying

25  one thing and doing another or not saying what they should be

OPPENHEIMER - DIRECT / COLLIER

1  about harassment and discrimination, then the -- the whole

2  organization isn't -- is going to follow what they say, not

3  what they are told and is not going to get that consistent

4  message of how to behave.

5       Monitoring to make sure that it's actually working.  Most

6  work environments, things happen that people are aware of and

7  yet they are not addressing.

8       So supervisors have to be trained that as you become

9  aware, that you do need to respond to those things.

10       You know, an example here are people hearing the N-word

11  shouldn't matter what context it's in.

12       Studies show that -- like if you take profanity, half of

13  employees don't mind profanity, half of employees do.  So you

14  don't say, "Well, these people don't seem to mind this

15  profanity or these racial epithets or whatever."

16       You have to assume that people are going to be offended

17  even if they aren't speaking up.  It's not so easy to be the

18  person who speaks up.

19       So supervisors are supposed to be monitoring and managing

20  and saying, "No.  We don't tolerate that here.  Find another

21  music to listen to.  Find another way to joke."

22       And that means training people.  It means teaching them

23  that that's not how to communicate that people truly are

24  offended.  Lots of people really don't want to offend but

25  aren't taught how hurtful racial epithets are and what the

1    impact is, and so you have to be able to teach people that

2    which you do through the training.

3        And then when things happen, doing a good investigation.

4    It doesn't mean every investigation has to take two weeks and

5    be a 50-page report, but you do have to find out what happened

6    and report what your findings are and have a basis for it.  And

7    then after you have completed the investigation, then you

8    decide what the action is going to be.

9        So a few informal discussions with no clarity about who is

10   responsible is not an adequate investigation.  And HR has to be

11   trained about how to do it.

12       If you don't train your HR staff on how to do an

13   investigation, they are not going to know what to do.

14       Too often employers expect their HR staff to simply do it

15   without the support and training, but they have to be given

16   training.  They have to be given authority so that they can do

17   the right thing when they want to do the right thing and the

18   tools to do it.

19       And then once the finding is made, progressive discipline.

20   Sure, in some circumstances -- zero tolerance means you pay

21   attention to everything.  It doesn't mean you fire everybody

22   for anything they do.  It means you take some action that is

23   based on the seriousness, and if that doesn't solve the

24   problem, you take more serious action next time.

25       Just like you aren't going to fire somebody for coming to

1    work five minutes late.  But if they have a "no call, no show,"

2    they might be fired.  You have to evaluate that seriousness.

3        And then once -- and generally, employers consider racial

4    epithets to be among the most serious type of harassment.

5        And so some employers will immediately fire somebody for

6    using a racial epithet.  Some will not.  I don't advocate that

7    you have to do it one way.  You just have to give a clear

8    message and have progressive discipline so that it doesn't

9    continue.

10       And then monitoring the workplace.  You can't pretend to

11   not know what's going on in your own workplace.  Again, that's

12   what your supervisors are there for.

13       And you've got to support them to do that monitoring and

14   to take that action.  And if you don't have that systemic

15   support for those ideals, the belief that people should be

16   treated respectfully and shouldn't be harassed and

17   discriminated against, then you are not going to have a

18   successful prevention program.

19       Just like a safety program, if you don't care -- if you

20   say we care about safety, but you ignore safety hazard and

21   don't train your supervisors and your managers on how to be

22   safe and just look the other way, you are not going to have a

23   safe workplace.

24       It's the same concept and, you know, I think it was

25   mentioned it is a safety issue.  It's emotional safety.

1   Sometimes it's physical safety.  But it is an aspect of safety

2   in the workplace.

3           **MR. COLLIER:**  Let's advance two slides.  I think we

4   already covered the next one.

5       Thank you.

6                   (Pause in the proceedings.)

7   **BY MR. COLLIER:**

8   **Q.**   So this is a slide you prepared to show the areas you

9   review when assessing the adequacy of an investigation?

10  **A.**    Yeah.  A lot of what I do is -- is evaluate a specific

11  investigation.  When I'm asked to do that, I'm looking at these

12  four areas.  I'm looking at first of all, was somebody assigned

13  to do this who had the basic qualifications?  Did they have

14  either experience or training or some combination of that so

15  that they knew what they were doing?

16      Again, sometimes employers don't provide that training for

17  their HR staff.  It's not that easy to just do an

18  investigation, so you have to provide the training that

19  somebody needs.

20      And then also were they impartial?  Do they have conflicts

21  of interest and -- so that's the first question.

22      The second, was it reasonably thorough and documented?  I

23  don't expect perfection but any clear -- anybody who would be a

24  witness to something that you still don't know what happened

25  about should be interviewed.  There should be a documentation

1    as to what the person said so that you don't have to five years

2    later, ten years later try to remember and figure it out.  It

3    should be right down there in your paper, this is what I did.

4    This is what I learned.

5         And then you have to make findings.  You can't say, "Oh,

6    two people disagree, so there is no other witnesses.  I don't

7    know what to do."

8         You have to determine who is more credible.  If you have

9    witnesses and corroboration, that's great.  You don't always,

10   and so then you have to go deeply into does -- whose version

11   makes more sense?  Who is more believable and why?

12        And then you make those findings and you do it on the same

13   evidentiary standard that, you know, that the jury is going to

14   use here, a preponderance of the evidence, which is just a

15   little bit more, one side or the other.

16        Did the allegation happen or not?  And that's what should

17   all be in the report.  Sometimes there will also -- internal

18   people may also make recommendations about what discipline.

19   Sometimes somebody else makes that based on the report.  Either

20   way is okay.

21        But then there does need to be that remedial action.  And

22   it should be consistent with how that institution deals with

23   those, and it should be calculated to end the wrong behavior

24   and to send that message to the workforce that it won't be

25   tolerated.

OPPENHEIMER - DIRECT / COLLIER

1   Q.   And did you have occasion to review three of the instances

2   alleged in this case?

3   A.   Yes.

4         MR. COLLIER:  Let's go to the next slide, please.

5                     (Pause in the proceedings.)

6         THE WITNESS:  We've heard a lot about them today.  I

7   got to sit in and hear some of the testimony.

8   BY MR. COLLIER:

9   Q.   That's right.  You've been here this morning listening to

10  the live witnesses; correct?

11  A.   Yes.  Up until now, I have been looking at depositions,

12  and it's nice to be able to actually hear the live witness,

13  yeah.

14  Q.   Let's talk about the July 31 incident.  What conclusions

15  did you draw about that incident?

16  A.   Well, in that incident there really was not a full

17  investigation.  I think that Mr. Kawasaki did the best he

18  could.  He wasn't somebody who was trained to investigate.  He

19  did some interviews, and then it should have been turned over

20  to somebody who really knew what they were doing who could do

21  an investigation.

22        And then he would have been one of the people they spoke

23  to since, according to him, there were people that he spoke to

24  right away who said they heard racial comments.  You know,

25  there is a lot of discussion, was it the N-word, was it not?

1    From my point of view, I -- as soon as I hear "racial," I don't

2    care if it's the N-word or something else.  I know that it's

3    something that's going to get a high priority, that I'm going

4    to be very concerned about.

5        And then the investigator would need to figure out what

6    was said by who.  And here you have this conflicting

7    information of Mr. Kawasaki saying that he was told there were

8    racial comments and then ultimately some finding that there

9    wasn't corroboration of that.  Although, as I said, even

10   without corroboration, there should be a finding based on a

11   preponderance of the evidence.

12       And there is no documentation anywhere of who did what.

13   It does not look like a real investigation, the way I would

14   expect it to look.  There are no findings.

15       And then the remedial action is based on joking, not a

16   racial epithet.

17       Obviously, you are going to discipline somebody very

18   differently for joking than you are for using a racial epithet

19   or for joking even -- if they say it's joking, if it includes

20   racial comments, that's another level of seriousness.

21       And they skirted that issue.

22   Q.   Let's talk about the October 2015 incident that's the next

23   slide.  This is the elevator incident?

24   A.   Correct.  Right, right.  And so in that incident, you have

25   some of the same issues of it not being clear who is in charge

1    of this investigation.

2         There was a possibility of getting some further video

3    footage.  I don't know whether it would have existed or not,

4    but it certainly should have been explored.

5         And again, you have -- you don't -- I think, again, you

6    had Mr. Kawasaki who initially had some involvement but passed

7    it over, it not being his place to do that.  And then,

8    ultimately, the -- the one person who might have been a witness

9    in addition to maybe getting that video footage wasn't

10   interviewed.  There was no record of what that person had to

11   say?

12        And then it looks like they both ended up with a warning

13   when the investigator should be determining who did initiate

14   that argument and if, as Mr. Jackson was saying, it appeared

15   from the video that -- that Mr. Diaz was, like, going like

16   this, and there was -- he was not the aggressor, then that's

17   going to be relevant to the finding because you do need to

18   turn -- to figure out who the aggressor was, and you do need to

19   figure out whether there were racial statements made.  So

20   they're both going to be important to your findings and then to

21   whatever disciplinary action is taken.

22        When you just throw up your hands and kind of give

23   everybody a warning, that's not sending the message that you

24   want to send.

25   Q.   And what about the third incident, the jigaboo drawing?

1   A.   Well, again, we heard of so many possible investigations,

2   and yet we don't have a report from any investigation.

3        You have Mr. Jackson doing some degree of investigation

4   but then not being empowered to do a full investigation.  I'm

5   not clear, you know, what his training and experience was.  He

6   said he did have HR experience, so he might have had the

7   qualifications to do it.

8        Ultimately, somebody else from Chartwell, I believe,

9   the -- Jackie Delgado did an investigation, but again, we don't

10  see any documentation, no witness notes, no findings.

11       There's -- the investigation that she did do, I believe,

12  was a phone call with Mr. Diaz, and we now do a lot of things

13  by phone after COVID.  But we would at least do it now by video

14  because it's good to be able to have a conversation with

15  somebody where you're seeing each other and not just do it on

16  the phone.  But then even worse than that, she sent written

17  questions to be answered by the -- the accused, Mr. Martinez.

18       And you can't evaluate information based on asking

19  somebody written questions and getting responses.  You need to

20  be able to hear how they say things, follow up, probe, see if

21  there are pauses, see if they get upset by something, or

22  respond immediately.  I mean, there are all sorts of ways you

23  have to evaluate information so that you can make those

24  credibility determinations?  And there is there's -- written

25  questions is never going to be a successful way to do that.

1    There was also confusion -- I know there was an admission

2    that he did that, and there was confusion as to did he

3    apologize?  Didn't he?  A lot of people who are on the

4    receiving end don't really want an apology anyway.  You know,

5    more importantly, did he recognize that what he had done was

6    wrong, and then why did he do it?

7         Because that's going to help you evaluate what kind of

8    action is appropriate.  The fact that there were previous

9    complaints concerning him is going to be very relevant to that,

10   and so that should have been brought in as well.

11        It looked like they were deciding all of this -- what

12   should we do with him? -- before they had even done that

13   investigation and made those findings.

14        They're debating what to do just based on seeing the image

15   which was a very offensive image, but they hadn't done an

16   investigation to determine all that other information that

17   would then help them decide what level of disciplinary action

18   would be appropriate.

19        And I'm still confused about whether he really got that

20   suspension.  I know it was in some of the e-mails, but there

21   were other e-mails that said he should just be warned and it

22   should be a verbal warning.  And so just a --

23             **MR. SPIRO:**  Objection to that.

24             **THE COURT:**  Sustained.

25   \\\

1   BY MR. COLLIER:

2   **Q.**   I'm sorry.  Setting aside --

3           **THE COURT:**  Let's move onto --

4   BY MR. COLLIER:

5   **Q.**   Setting aside the suspension issue, anything else you can

6   conclude about the third investigation we haven't talked about?

7   **A.**   No.  I think I'm good.

8   **Q.**   Let's skip ahead to the last slide, please.  This is where

9   you summarize your conclusions; correct?

10  **A.**   Okay.

11          Tesla's policies are fine, but they were not being

12  enforced.  There was not training and education.  Supervisors

13  didn't understand things like that policies applied to

14  everybody on the premises, not just to employees.  There

15  weren't clear point people who were doing investigations.  They

16  weren't looking around them and hearing what was going on and

17  responding to known racial epithets.

18          They weren't consistently doing investigations.  They

19  didn't -- there didn't appear to be a trained cadre of people

20  to do them, or if there were, I didn't see any evidence of that

21  in this case.

22          And then the remedial action was anemic.  It was not

23  taking it at the level of seriousness that it should and

24  tending to just -- to let's give everybody a warning and move

25  on, rather than really deal with the issues that -- that it

1    needed to confront, the organization needed to confront in

2    order to have an effective program to address this.

3         **MR. COLLIER:**  No further questions at this time,

4    Your Honor.

5         **THE COURT:**  All right.  Thank you.

6    So, Mr. Spiro, are you -- is your cross going to be less

7    than five minutes?

8         **MR. SPIRO:**  Not less than five minutes but brief.  I

9    don't want to set myself up with a five-minute bar that we've

10   set.

11        **THE COURT:**  Okay.  So, ladies and gentlemen, I think

12   we'll take the afternoon break for today.  Some lawyers are

13   really great at estimating how long they're going to take, but

14   usually -- and this was true of me -- I was not -- sometimes I

15   was more optimistic.

16   So I think we'll just take our break, and we'll resume

17   with Ms. Oppenheimer tomorrow morning at 8:30.

18        Please come as promptly tomorrow as you did today.  Stay

19   healthy.  Be safe.  Don't do any communicating with anybody.

20   Don't do any research and come back.

21        The trial is moving along well, and there is much more to

22   come.  So you need to keep an open mind, and I will see you

23   tomorrow morning.

24        (Proceedings were heard outside the presence of the jury:)

25        **THE COURT:**  You can step down.  You are excused for

**PROCEEDINGS**

1    today.   Please be seated, everybody.

2        So the order of witnesses tomorrow?

3        **MR. ORGAN:**   Oppenheimer, Romero, Martinez, Mr. Diaz,

4    and La'Drea.   We have two videos.

5        **THE COURT:**   I'm sorry.   Who did you say after

6    Mr. Diaz?

7        **MR. ORGAN:**   La'Drea Jones.

8        **THE COURT:**   Yep.

9        **MR. ORGAN:**   And then we've got two videos, Delgado and

10   McGinn, Heisen, and then Victor Quintero.

11       **THE COURT:**   Okay.   Great.   So let me say one thing.   I

12   want to be as clear as I can be.   I thought I was clear in

13   the -- in the motions in limine.   If you're -- step one, if

14   you're going to use a document that is not -- don't look so

15   startled, Mr. Spiro.   Make just a -- sort of a calm pose in

16   your face.

17       **MR. SPIRO:**   I apologize, Your Honor.   It's been a long

18   day.   I'm listening intently.

19       **THE COURT:**   Good.   That would be a good thing because

20   I don't want to have documents coming around the back door.   I

21   don't want -- if I excluded a document in -- particularly in a

22   motion in limine, I understand the purpose of using it.   I'm

23   not saying that it would absolutely be excluded, but I need to

24   see it.   I need to know what the purpose of it is before you

25   try and do that.

```
 1        If it's a document that has never been discussed,

 2   particularly one that's never been disclosed or wasn't

 3   disclosed in discovery, that should never happen.  That should

 4   not darken the door of this case.

 5        And I -- you may not have known how I deal with

 6   depositions before -- before you started, but it's important

 7   that when documents are disclosed to the jury, we're all on the

 8   same page as to what can go up and what can't.

 9        We don't have a separate -- typically, if a -- if there

10   was a document that nobody had seen before, it might be shown

11   to the jury -- to the witness, but not everybody else here.

12   It's disclosed everywhere.

13        We just can't do that, and that's the -- I lose control of

14   the courtroom when -- and I give it to the lawyers and their

15   very competent staff because it just makes a ton of sense to do

16   it that way.  But you have to be absolutely on track for this.

17   And so I don't want that to happen again.

18        MR. SPIRO:  It won't, Your Honor.  We apologize for

19   the display of that exhibit.  It obviously was happening in

20   real time.  I did not realize it.  I don't even have an ability

21   to sort of see.

22        I thought my colleague had said "showing just the

23   witness."  I thought I heard that, but I didn't.  I understand

24   it got put up on the screen, and we apologize.

25        Just so the Court knows, the other exhibit that you're
```

 1  referencing was not -- was not turned over in discovery because

 2  it didn't respond to anything.

 3        **THE COURT:**  It doesn't matter.

 4        **MR. SPIRO:**  I just wanted the Court to know that,

 5  though, because it's important to me, frankly, that the Court

 6  knows that.  It's not like that document was never disclosed or

 7  something.  It's just not responsive to a discovery request.

 8        **THE COURT:**  Just so that -- I know that you haven't

 9  been at all of the -- at any of the pretrial conversations that

10  we have had which is sort of not what the rules require.  They

11  require trial counsel to be here, but I get that you're a very

12  busy guy and that your client wants you to try this case.

13        But this case is about re-trying the damages.  And as you,

14  I think, are well aware, the way that I'm trying to make this

15  happen is by using the same evidence as before and to get

16  another read on the damages because of the prior verdict and

17  the remittitur and the decisions that have been made.

18        So I don't want new documents flying in here, particularly

19  that I haven't seen.

20        **MR. SPIRO:**  Understood.

21        Your Honor, the final issue that I just wanted to quickly

22  raise is one of the -- a concern was raised just that the live

23  stream is public, that just both sides inform their witnesses

24  to not access that, either.  It's just a comment that was made

25  to me that I wanted to pass along for the Court, so it's --

```
 1          THE COURT:  Thank you for doing that.

 2          MR. SPIRO:  It's not meant to be -- I don't want to

 3   belabor it.  It's just a request that everybody ask their

 4   witnesses to make sure they're not listening to the live

 5   stream.

 6          THE COURT:  That certainly should not be happening,

 7   and I didn't know that it was going out on the live stream.  So

 8   that's another issue that we ought to address, and I'll address

 9   that after court.

10          MR. SPIRO:  I didn't know, either, Your Honor.  Thank

11   you.

12          MR. COLLIER:  Your Honor, I just wanted to note from

13   the Plaintiff's perspective -- thank you.

14      Under the Federal rules, there's a voluntary disclosure

15   obligation of anything they thought was relevant to their

16   defense, and the idea that it wasn't requested in discovery is

17   a non-sequitur.  It's irrelevant.

18      The more important issue is I'm concerned with those sorts

19   of excuses being made, that this is going to happen again.

20      Do we have an affirmative assurance from Defense Counsel

21   there are no new documents coming that weren't produced in

22   discovery?  And can we get a copy of the one that they just

23   used?

24          THE COURT:  Well, you should provide a copy of what

25   was used, but I don't need further assurances.  I just got the
```

1   assurances that I need.  I have said, I think -- I think I've

2   been understood in what I said.

3            MR. COLLIER:  Understood.

4            MR. ALEXANDER:  Your Honor, two things.  First, with

5   regard to the exhibit, it was on the screen for a while, and

6   I -- the jury I hope saw that you were upset about it, but I'm

7   not sure that -- I think that they were reading it at the point

8   when you got upset and you took it off the screen.

9        And so it would be good for them to know that's not an

10  exhibit.  They should not consider anything in it.  There is

11  some subject matter that is beyond the scope -- lots of subject

12  matter, but some specific that's beyond the scope of the first

13  trial that I would -- I would be concerned with jury knowing

14  that.

15           THE COURT:  I think that that was on for about

16  two seconds, and if the jury was not aware that it was

17  inappropriate, I -- I'm not sure that they're sentient.

18       So I think that's -- I think I made myself clear enough,

19  and I don't think I need to go back into that again.

20           MR. ALEXANDER:  The next question is with regard to

21  the Court's order, the Court -- the determination, Your Honor,

22  has already been made that Tesla is liable for the conduct that

23  occurred.  And that's also based on the subcontractors.

24       A number of the questions are being asked as though Tesla

25  is not responsible because subcontractors engaged in the

1    conduct.

2         And we've objected at various points, but it hasn't been

3    clear, I think, from our objection that that is the issue.  But

4    that is the issue.  Every time they get up and ask questions

5    and suggest that, oh, but that wasn't a Tesla employer, that

6    undermines.

7         I ask that there be some instruction indicating that with

8    regard to the subcontractors, the subcontractors are agents of

9    Tesla.  And to the extent anything -- conduct occurs as to

10   subs, that is Tesla.

11        **MR. SPIRO:**  Your Honor, I can just speak for myself.

12   I'm not -- I don't think I've asked any question -- I don't --

13   I'm not making any arguments regarding that.

14        Obviously that's not how I would have tried the case if I

15   had tried it.  There's not going to be anything about that in

16   my summation.  I mean, this is just not an issue in this case.

17        If there's one or two questions that come up about the

18   flow of things or something or who talked to who, that may come

19   up because it's relevant to understanding the trajectory and

20   whether Person A passed something on to Person B, but beyond

21   that --

22        **MR. COLLIER:**  It sounds like we may be amenable to a

23   stipulation, if the subcontractors are agents of Tesla and

24   Tesla is responsible for what they do.

25        **MR. SPIRO:**  Can I just ask another question that's

1  been bothering -- it may seem like a small thing, but I've

2  never had a case where when there's one person -- there's one

3  person on each side normally that responds and during this

4  case, all three of them stand even during objections.  I've

5  never seen that before in 75 trials.

6          THE COURT:  Fair enough.

7      So the -- with respect to the substantive issue, which was

8  raised, I think it's fair to point out the different -- because

9  it's factual and some of the witnesses, like Mr. Jackson, is

10  very aware of the different relationships of the staffing

11  entities.  The instructions clearly identify Tesla as the

12  person that is -- has -- has been determined to be liable.

13      And to the extent that it's -- I'll consider a --

14  providing an instruction at the end of the case that clarifies

15  the relationships.  So if there is -- and if you want to offer

16  something and -- you can share it with the Defense and then

17  we'll deal with it.

18          MR. SPIRO:  Thank you, Your Honor.

19          MR. COLLIER:  Thank you, Your Honor.

20          THE COURT:  Great.

21          MR. ALEXANDER:  I'm sorry.  With regard -- our law

22  firms -- I think both law firms -- have the access streaming to

23  the law firms, and so you had referred to not knowing it was

24  being streamed out --

25          THE COURT:  Oh, I see.  I see.  So, you know,

**PROCEEDINGS**

1  streaming to the law firms because I suspect that people are

2  working, that's fine.  I don't know who else is getting it.

3  We'll look -- I'll look into this and see what's going on.

4       And as to -- and the point that Mr. Spiro made, the --

5  whoever's witness it is is the person who makes objections and

6  stands up.  And I appreciate that there are -- people have

7  different perspectives on -- on the Plaintiff's side on

8  different things, but it should really be one person who deals

9  with the witness.  That's who want to hear from.

10           **MR. ORGAN:**  Thank you, Your Honor.

11           **THE COURT:**  Okay.  See you tomorrow morning at

12  8:00 o'clock.

13                (Proceedings adjourned at 1:38 p.m.)

14                        ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, March 28, 2023

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
             United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25