**Volume 3**

**Pages 482 - 697**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | |
|---|---|
| OWEN DIAZ,                         ) | |
|                                    ) | |
|             Plaintiff,             ) | |
|                                    ) | |
|   VS.                              )    **NO. C 17-06748 WHO** | |
|                                    ) | |
| TESLA, INC. dba TESLA MOTORS,      ) | |
| INC.,                              ) | |
|                                    ) | |
|             Defendant.             ) | |
| _____   ) | |

San Francisco, California
Wednesday, March 29, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        CALIFORNIA CIVIL RIGHTS LAW GROUP
        332 San Anselmo Avenue
        San Anselmo, California  94960
    **BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW**

        ALEXANDER MORRISON + FEHR LLP
        1900 Avenue of the Stars - Suite 900
        Los Angeles, California  90067
    **BY:  J. BERNARD ALEXANDER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
        United States District Court - Official Reporter

```
 1   APPEARANCES:   (continued)

 2   For Plaintiffs:
                         ALTSHULER BERZON LLP
 3                       177 Post Street - Suite 300
                         San Francisco, California  94108
 4               BY:  JONATHAN ROSENTHAL, ATTORNEY AT LAW
                      MICHAEL RUBIN, ATTORNEY AT LAW
 5
                         COLLIER LAW FIRM, LLP
 6                       240 Tamal Vista Boulevard - Suite 100
                         Corte Madera, California  94925
 7               BY:  DUSTIN L. COLLIER, ATTORNEY AT LAW

 8   For Defendants:
                         QUINN, EMANUEL, URQUHART & SULLIVAN LLP
 9                       51 Madison Avenue - 22nd Floor
                         New York, New York  10010
10               BY:  ALEX SPIRO, ATTORNEY AT LAW
                      STEPHANIE KELEMEN, ATTORNEY AT LAW
11
                         QUINN, EMANUEL, URQUHART & SULLIVAN LLP
12                       865 South Figueroa Street - 10th Floor
                         Los Angeles, California  90017
13               BY:  DANIEL C. POSNER, ATTORNEY AT LAW

14                       QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                         300 West 6th Street - Suite 2010
15                       Austin, Texas  78701
                 BY:  ASHER GRIFFIN, ATTORNEY AT LAW
16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

Wednesday, March 29, 2023 - Volume 3

**PLAINTIFF'S WITNESSES**                                    **PAGE**   **VOL.**

**OPPENHEIMER, AMY (RECALLED)**
(PREVIOUSLY SWORN)                                            494       3
Cross-Examination by Mr. Spiro                                494       3
Redirect Examination by Mr. Collier                          520       3
Recross-Examination by Mr. Spiro                             527       3

**ROMERO, EDWARD**
(SWORN)                                                       528       3
Direct Examination by Mr. Organ                              528       3
Cross-Examination by Mr. Griffin                             553       3
Cross-Examination resumed by Mr. Griffin                     562       3
Redirect Examination by Mr. Organ                            566       3

**MARCONI, ERIN**
By Videotaped Deposition (not reported)                      569       3

**MARTINEZ, RAMON**
(SWORN)                                                       570       3
Direct Examination by Mr. Alexander                          571       3

**DIAZ, OWEN**
(SWORN)                                                       585       3
Direct Examination by Mr. Organ                              585       3
Direct Examination resumed by Mr. Organ                      591       3
Cross-Examination by Mr. Spiro                               630       3

**E X H I B I T S**

**TRIAL EXHIBITS**                              **IDEN**   **EVID**   **VOL.**

  106                                                      557       3

```
 1   Wednesday - March 29, 2023                        8:01 a.m.

 2                       P R O C E E D I N G S

 3                            ---oOo---

 4        (Proceedings were heard outside the presence of the jury:)

 5             THE CLERK:  Please come to order.

 6             THE COURT:  Please be seated, everybody.  Good

 7   morning.

 8                       (Pause in proceedings.)

 9             THE COURT:  All right.  The only thing on my mind is

10   the motion that was filed overnight, and I'm going to ask

11   Ms. Knox if she can give me just the roughest of roughs of

12   Mr. Wheeler's testimony from yesterday because I want to review

13   that, and then I will deal with that issue.

14        And then the only other thing is -- on my mind is to go

15   over the jury instructions at 3:00.  Should we do that by Zoom

16   or in person?  I'm having in-person law and motion at 2:00, so

17   I think I will be done around 3:00.  And I'm happy to do it

18   here, but I'm also happy to do it by Zoom.

19        What's more convenient for you all?

20             MR. ORGAN:  Your Honor, I think our preference would

21   be by Zoom so that Mr. Rubin can participate.

22             THE COURT:  Great.  Okay.

23             MR. ORGAN:  Yes.

24             THE COURT:  Okay.

25             MR. ORGAN:  Thank you, Your Honor.
```

 1       We do have a couple other issues we'd like to preview with

 2  the Court for today's testimony.

 3           **THE COURT:**  Go ahead.

 4       **MR. ORGAN:**  Um, with respect to Mr. Diaz, we intend to

 5  do a demonstration depending on the testimony of Mr. Martinez,

 6  who is testifying before him, but we might be doing a

 7  demonstration using the ELMO, and Mr. Diaz would be doing the

 8  demonstration there showing sort of the way the bale had been

 9  left for him, Your Honor.

10       And then we do have an issue relative to damages that we

11  would like to talk to the Court about in terms of presentation

12  because we don't want to run afoul of the Court's orders but --

13  and this is the issue that Mr. Rubin had asked to Zoom in on

14  this morning, Your Honor, so that he could participate in these

15  proceedings because he is way smarter than I am in terms of

16  legal issues and so -- and probably most things in life.

17       But in trying to craft questions for Mr. Diaz to talk

18  about his damages, it's -- it's a little cumbersome in terms of

19  this dealing with past and future from the -- the last trial

20  date and this trial date, that interim period, and we just

21  don't want to run afoul of the Court's orders, so we thought we

22  would preview that with you, Your Honor.

23           **THE COURT:**  Well, I'm always happy to see Mr. Rubin.

24       So, Ms. Davis, you can let him in.

25       And I still don't understand what the issue is, but...

1          **MR. ORGAN:**  I'm not sure I fully understand it,

2    although I am the one who is going to have to ask the

3    questions.  But it's really when I'm asking him questions such

4    as "Describe for the jury, you know, your feelings of emotional

5    distress since you stopped working at Tesla.  And have those

6    feelings, you know, changed?  When did those feelings change?

7    You know, they have been dissipating.  Have they been getting

8    worse?"  That kind of stuff.

9          Mr. Rubin is on now, and I think he can probably

10   articulate it better than I can, Your Honor.

11         **THE COURT:**  Mr. Rubin, good morning.  Can you hear me?

12                        (No response.)

13         **THE COURT:**  Apparently not.

14         **MR. RUBIN:**  Let's see.  I can't -- I can't hear -- I

15   don't know if you can hear me.  Let me try to put --

16         **THE CLERK:**  We can hear you, Mr. Rubin.

17         **MR. RUBIN:**  Let me see if this will help.  Hello?

18         **THE COURT:**  Mr. Rubin, can you hear us?

19         **MR. RUBIN:**  Yes, I can hear you now.  Thank you,

20   Your Honor.

21         **THE COURT:**  Okay.  Good morning.

22         **MR. RUBIN:**  Good morning.  And thank you for letting

23   me participate by Zoom today.  I appreciate that.

24         **THE COURT:**  Yeah.  So Mr. Organ was just describing --

25   were you able to hear what's been happening so far?

1          **MR. RUBIN:**  I'm on real-time, so I have been reading

2     it, yes.

3          **THE COURT:**  Go ahead.  So what would you like to tell

4     me?

5          **MR. RUBIN:**  We just want to preview an issue that will

6     arise during the questioning of Mr. Diaz later this morning

7     concerning the distinction between past and future damages.

8          The Court obviously has been clear and consistent in

9     ruling that this is the second phase of a two-part proceeding,

10    and so the evidence solicited in the second phase should be as

11    consistent as reasonably possible with the evidence presented

12    in the first trial, and we have obviously complied with that

13    ruling and will continue to do that.

14         For the emotional distress damages, the -- an issue is

15    likely to arise because of that distinction.  We want to be

16    particularly careful in our questioning of Mr. Diaz not to

17    violate the Court's rules.  And therefore, just as in the first

18    trial when the evidence was elicited about past damages, we

19    were focusing on damages, emotional distress damages that were

20    incurred before the date of that first trial while he was at

21    Tesla and up until that date.  And future damages, as Mr. Diaz

22    and the expert, Dr. Reading, testified, were damages that he is

23    likely to incur in the future.

24         We intend to proceed the same way today with Mr. Diaz.  In

25    the jury's mind, though, they may not immediately understand

1    that because of the way this trial is structured, past really

2    means prior to the date of first trial and future means from

3    that date forward.

4        Now, we have talked about this in at least two of the

5    hearings, the gasoline product hearings and the scope of trial

6    hearings.  We have talked a little bit about the difference

7    between past and future damages.

8        But as Mr. Organ indicated, as we were thinking about

9    exactly how we were going to conduct our questioning, we

10   realize that because the jury may not understand questions that

11   ask how Mr. Diaz was experiencing these incidents, not just

12   contemporaneously because that's easy, but as of October 21, we

13   thought it would be useful, when we talk about instructions

14   later this afternoon, to get an instruction that explains to

15   the jury that past means prior to the date of the first phase

16   and future means subsequent to that date.

17       We think that will clarify the issues, but we wanted to

18   alert the Court in advance to the fact that that is how we are

19   trying to comply with the Court's orders and how we intend to

20   elicit the testimony from Mr. Diaz this afternoon.

21           **THE COURT:**  Okay.  Mr. Spiro, do you have a response?

22           **MR. SPIRO:**  Maybe I'm failing to pick up on if there

23   is a real distinction here.  I mean, I haven't heard that there

24   is something that happened between the first trial and now that

25   is of any great significance.  So I assume when they ask the

1   questions, it's not really going to draw out this minor

2   temporal distinction, and I'm not going to torture that

3   situation.

4           THE COURT:  Yeah.  I think that -- that's right.  My

5   assumption is that Mr. Diaz will be testifying in a way that is

6   consistent with what he -- the way that he testified in the

7   first trial, that there is no new evidence that -- of what's

8   happened between that first trial and the second trial that is

9   inconsistent with that.  And as long as that's the case -- and

10  I think we did talk about this in at least one of the pretrial

11  hearings -- that doesn't sound like it's a problem.

12          MR. SPIRO:  As to the second -- as to the first issue,

13  I mean, it's a trial.  I'm not going to object to Mr. Diaz

14  demonstrating something.  I mean, I don't --

15          THE COURT:  Yeah.  So -- all right.  Good.  Well,

16  thank you, Mr. Rubin, and I will look forward to seeing you

17  this afternoon.

18          MR. RUBIN:  Thank you, Your Honor.

19          THE COURT:  Okay.  All right.

20      Is there any other issue that you wanted to raise,

21  Mr. Organ?

22          MR. ORGAN:  Mr. Collier has some issues, yes.

23          THE COURT:  All right.

24          MR. COLLIER:  I will approach for the mic.

25      The first issue we wanted to raise is just a scheduling

1  matter.  I -- it's no attack on Defense Counsel, but they did

2  go very much over their time estimates for the witnesses

3  yesterday.  And that's not a criticism, but it has forced us to

4  bring Ms. Oppenheimer back today.  She had to reconfigure her

5  schedule.

6       We want to try to avoid doing that with our other experts

7  who we've had scheduled for weeks to come in at 8:30 tomorrow

8  and 9:30, respectively, and so we just -- we have that

9  accommodation that they be able to come and testify out of

10  order, if need be -- because the delays are what have

11  interfered with our ability to call them at that time.

12       **THE COURT:**  Well, I think one of the critical issues

13  will be to include Mr. Diaz's testimony before they testify.

14       **MR. COLLIER:**  This is my concern is if the Defendants

15  continue with the time estimates or the time that they have now

16  used, it has now pushed Mr. Diaz's testimony where it's

17  probably going to overlap some with tomorrow.

18       Originally, we had it slated with their time estimates

19  that they submitted to the Court in a way where that wouldn't

20  have happened, but now it looks like it's going to.

21       **THE COURT:**  So Mr. Diaz's testimony will be complete

22  before the experts testify.

23       **MR. COLLIER:**  Understood.

24       Next issue, Your Honor, is with regard to Mr. Quintero and

25  Mr. Romero.  Mr. Romero will testify today, Mr. Quintero

 1   tomorrow.  The issue with the e-mail, Exhibit 410 that Tesla

 2   has filed their brief on last night, we are concerned that both

 3   of these witnesses may try to testify about that e-mail as

 4   well.

 5        And there is two reasons why we think that would be

 6   inappropriate.  One is all the reasons we set out in our brief

 7   this morning, which I'm sure Your Honor is going to take a look

 8   at later.

 9        The other reason, though, is that they didn't testify

10   about this in the first trial, so it shouldn't be coming out of

11   their testimony.  It'd be a totally new issue, a totally new

12   incident that they would be bringing in, totally new

13   explanation for the feces incident that wasn't presented in the

14   first trial.

15        So we just ask that at a minimum we have a ruling on the

16   motion before they go down that path of Mr. Romero and

17   Mr. Quintero.

18        **THE COURT:**  And what's -- Mr. Spiro, are you intending

19   to go into that incident with one of the witnesses?

20        **MR. SPIRO:**  I don't think it's relevant to -- my

21   colleagues will correct me if I'm wrong -- but I don't think it

22   is relevant to Mr. Romero.

23        Mr. Quintero it would be relevant to.  And when you say

24   "go into," they are going to cross-examine Mr. Quintero.  If

25   his honest answer is whatever his honest answer is, I'm not

1   going to tell him to answer dishonestly.

2           **THE COURT:**  That's fair enough.  So I will -- as soon

3   as I have had a chance to look at the rough, I'll make a ruling

4   on the -- the first issue and then we'll see where we are.

5           **MR. COLLIER:**  Understood, Your Honor.

6       The last issue is that -- I was going to notify you we

7   submitted a curative instruction regarding the agency and

8   staffing agency issue.

9           **MR. ORGAN:**  It hasn't been filed.

10          **MR. COLLIER:**  We will be filing it.

11          **THE COURT:**  Okay.  Yeah, try and get it well in

12  advance of 3:00 o'clock so that we can have a discussion about

13  it.  And obviously, if we need to have further discussions on

14  this tomorrow morning, we can, but I do -- I want to get -- get

15  us in shape so that we can present the case to the jury on

16  Friday.

17          **MR. COLLIER:**  Sounds good.  Thank you, Your Honor.

18          **THE COURT:**  Okay.  Mr. Spiro, do you have any issues

19  that you wanted to raise?

20          **MR. SPIRO:**  I do not, Your Honor.  Thank you.

21          **THE COURT:**  Excellent.  All right.  We will get going

22  as soon as the jury is here.

23                  (Recess taken at 8:14 a.m.)

24              (Proceedings resumed at 8:29 a.m.)

25          **THE CLERK:**  Please come to order.

1           THE COURT:  Mr. Spiro, are you ready?

2           MR. SPIRO:  Yes, Your Honor.

3           THE COURT:  Is Ms. Oppenheimer here?  Why don't you

4    bring her in?  Oh, there she is.  Come on up to the witness

5    stand, and we will get the jury.

6                    (Pause in proceedings.)

7       (Proceedings were heard in the presence of the jury:)

8           THE COURT:  Please be seated, everybody.

9       Good morning, ladies and gentlemen.  Welcome.  Thank you

10   for working through the weather to get to the court today

11   punctually, and this is great.  We are moving on now to the

12   cross-examination of Ms. Oppenheimer, who we left off with

13   yesterday afternoon.

14       Mr. Spiro, please go ahead.

15          MR. SPIRO:  Thank you, Your Honor.

16                   **AMY OPPENHEIMER**,

17   called as a witness for the Plaintiff, having been previously

18   duly sworn, testified further as follows:

19                   **CROSS-EXAMINATION**

20   BY MR. SPIRO:

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   When you looked at Complaint 2 of the three complaints,

24   there was a question mark in your mind as to whether Tesla was

25   on notice about that incident being racial; correct?

1   **A.**   I don't recall offhand if -- if you saw a question mark in

2   my materials, then there may have been.

3   **Q.**   Okay.  And if you wanted just to refresh your

4   recollection, take a look at your deposition which is to your

5   left.  And I flagged the page for you to make it easy, which is

6   page 84 into 85.

7                        (Pause in proceedings.)

8   BY MR. SPIRO:

9   **Q.**   I think you may have skipped over that.  Yep.

10  **A.**   These are all exhibits, it looks like.

11          **THE COURT:**  Yeah.  You're on the wrong --

12          **MR. SPIRO:**  On the wrong document.

13          **THE WITNESS:**  I have my report, and I have the

14  exhibits.  Apparently, I don't have -- okay.

15  BY MR. SPIRO:

16  **Q.**   I tabbed it for you.

17  **A.**   You had it marked but -- okay, 84.

18                        (Pause in proceedings.)

19  BY MR. SPIRO:

20  **Q.**   So I'm really looking at page 85.

21  **A.**   Got it.

22  **Q.**   And I'm asking -- and you put it in your notes.  I have a

23  question mark about whether there was notice that it was

24  racial.

25          Do you see that?

1  **A.**   Yes, I do.

2  **Q.**   And does that refresh your recollection that you did have

3  a question mark?

4  **A.**   Yes, it does.

5  **Q.**   Okay.  And if there's a factual issue to resolve, that's

6  ultimately for the jury; right?

7  **A.**   Well, that factual issue is to some extent a jury issue.

8  I think from an expert's point of view, what I would have

9  expected is an investigation that would determine that, that he

10  felt threatened and to find out everything about the incident.

11      And then if there had been that investigation, then I

12  would have been able to answer that question.

13  **Q.**   Well, let's talk about the question that was in your mind.

14  And if we could put up Number 2 -- Complaint Number 2, and

15  we'll -- and you see it says that there was a complaint to

16  Romero regarding Martinez.

17      Do you see how that starts?

18  **A.**   Correct.

19  **Q.**   And now let's just put up 92 that the jury has seen next

20  to it to just look at the complaint to Romero.  And you see

21  we've got the complaint to Romero, subject line:  Ramon and Ed

22  Romero at Tesla in the e-mail.

23      And in terms of Mr. Romero, in your notes and in your

24  evaluation of the case, you also noted that N-word graffiti was

25  reported to Mr. Romero?

OPPENHEIMER - CROSS / SPIRO

1   **A.**   Okay.

2   **Q.**   And that Mr. Romero handled an allegation by Mr. Diaz

3   against Mr. Foster, and Mr. Romero fired Mr. Foster.

4        Do you remember that?

5   **A.**   I recall there was an issue with Mr. Foster.  I don't

6   remember all the details.  I believe that's not part of this

7   case, so I just don't recall all the details.

8   **Q.**   Well, you didn't include that Foster incident in your

9   report as one of the incidents.  Why not?

10  **A.**   My understanding is that it was not part of the case.

11  **Q.**   Well, who instructed you to not put the Foster incident

12  in?

13  **A.**   You know, I'm informed about various decisions made by the

14  Court on evidence, so I don't recall if it was a Court decision

15  or a decision by one of the attorneys.  I don't know.

16  **Q.**   And when you say one of the attorneys, you mean the

17  attorneys that you work for, not the attorneys --

18  **A.**   The Plaintiff's counsel, sure.

19  **Q.**   Now, you were in court yesterday, and Mr. Romero's name

20  came up when you were here in court observing the testimony.

21       Do you remember that when Mr. Kawasaki was testifying

22  there was questions about how, you know, Mr. Romero took

23  Mr. Kawasaki off of an e-mail and, like, maybe there was a

24  coverup?  Do you remember those questions by Plaintiff's

25  counsel?

1   **A.**   I do.

2   **Q.**   Okay.  And do you remember on cross-examination how I

3   played a video for Mr. Kawasaki with him admitting that

4   Mr. Romero was the one who promoted Owen Diaz.

5       Do you remember me playing that video?

6   **A.**   Yeah.  I mean the way you're characterizing the evidence,

7   I wouldn't necessarily characterize it that way.  But I do

8   remember the video, and I do remember the examination, yeah.

9   **Q.**   Well, forget characterization.  But Mr. Kawasaki on video

10  under oath said Mr. Romero was the one who promoted Owen Diaz.

11  Those were the words; right?

12  **A.**   That's correct.

13  **Q.**   And you heard during Mr. Wheeler's examination questions

14  about the feces incident.

15      Did you -- were you here for that?

16  **A.**   I was here for that.

17  **Q.**   Okay.  And he said:  "I reached out to Security.  I asked

18  them to check the cameras in which they responded.  They didn't

19  have an angle on the cart.  I reached out to Josue Torres,

20  Victor Quintero, and Ramon.  I sent e-mails, basically, to

21  anyone I could think of."

22      "QUESTION:  Ramon, again, is Ramon Martinez?

23      "ANSWER:  Yes."

24      Question from plaintiff's counsel:  "I think you said Ed

25  Romero as well."

1        And Mr. Wheeler said:  "I do not recall."

2        Were you here for that testimony?

3   A.   I'm sure I was because I was -- but I don't -- I can't

4   recall specifically the detail of that testimony.  I don't have

5   the question that it happened.

6        MR. SPIRO:   Okay.  So if we could put back up

7   Complaint Number 2.

8        BY MR. SPIRO:

9   Q.   And we've talked about that e-mail where the report comes

10  in.  And Wayne Jackson then testified as to bullet number 1

11  that he did -- I'm not talking about how in depth or how

12  perfect the investigation was, but he did speak to all

13  three individuals:  Martinez, Foster, Diaz; right?

14  A.   I believe so.

15  Q.   And the next thing that you said was no attempt -- do you

16  see it says "no attempt to check surveillance" in your report?

17  A.   Correct.

18  Q.   And did you hear both Mr. Kawasaki and Mr. Jackson come

19  into court and say, yeah, they checked the video surveillance.

20       Did you hear that testimony?

21  A.   I heard they were able to check some of it but that there

22  was additional surveillance that they thought might be

23  available that they were unable to check.

24  Q.   Well, that may be true, but you wrote in your slide -- in

25  your report, no attempt.

1    Would you agree with me that based on the sworn testimony

2  in front of this jury from both Mr. Kawasaki and Mr. Jackson,

3  who were both Plaintiff's witnesses, they did attempt to check

4  the video surveillance; true?

5  **A.**   They attempted to check some of it and not what would have

6  been more dispositive in their -- if it had been available,

7  correct.

8  **Q.**   And then you say that credibility of parties should have

9  been weighed.  Do you see that?

10  **A.**   Yes.

11  **Q.**   Okay.  And you heard Mr. Jackson say that he spoke to

12  Mr. Diaz and that Mr. Jackson said, "I don't recall it being

13  any racial slurs at all."  That was Mr. Jackson's testimony

14  before this jury, that Mr. Diaz did not report anything racial

15  about this incident; true?

16  **A.**   I heard -- I think mixed evidence on that as to whether

17  who recalled what about the incident.  That's why if there had

18  been an investigation with notes from interviews, it would be

19  contemporaneous to the event and we would have a record of what

20  was said.

21  **Q.**   Well: "QUESTION:  Trial yesterday in front of you, and

22  you spoke with Owen.  You don't recall him saying that Ramon

23  was calling him the N-word at all, do you?

24    "ANSWER:  No, I do not recall that.

25    "QUESTION:  You don't recall when Owen spoke to you saying

1   that Ramon used any racial slurs against him; correct?

2        "ANSWER:  I don't recall it being any racial slurs.  I

3   don't think racial stuff came in until the drawings."

4        That was the testimony while you were sitting here in

5   court, wasn't it?

6   **A.**   That was one person's testimony.

7   **Q.**   Right.  I'm just talking about Mr. Jackson.

8   **A.**   Okay.

9   **Q.**   Okay?  I'm sorry.

10  **A.**   There are many people.

11       **THE COURT:**  No.  She answered the question.

12  **BY MR. SPIRO:**

13  **Q.**   And in assessing credibility, you also heard Mr. Jackson

14  say -- and I'm only talking about Mr. Jackson right now -- that

15  Mr. Diaz had a pattern of any time anybody made a complaint

16  about him, he would come over the top and say that that person

17  was harassing him.

18       Do you remember that testimony?

19  **A.**   Well, again, I remember -- yes.  Let's leave it there.

20  **Q.**   Okay.  And when you're assessing credibility, which is

21  important in your assessment in an investigation, do you look

22  at whether witnesses change their answers?

23  **A.**   It's one thing I look at, sure.

24  **Q.**   And do you look at when somebody says sort of

25  opportunistically, "I don't recall.  I don't recall.  I don't

1  recall," would that raise a question of credibility in your

2  mind?

3  **A.**   Well, you added "opportunistically."  I'd have to evaluate

4  whether I thought it was opportunistic.  The fact that somebody

5  can't recall something doesn't mean that they are not credible.

6  **Q.**   Sure.

7  **A.**   I have to look at the entire record, not something in

8  isolation.

9  **Q.**   Agreed.  But what about somebody that says one thing the

10 day something happens and then something completely differently

11 10 years later?  Would that cause you to have some credibility

12 concerns?

13 **A.**   I would certainly want to understand why, and that

14 certainly could be a credibility issue, but I'd need more

15 information as to are we parsing words and they are essentially

16 the same, or are they totally different?  Is it --

17 **Q.**   And the witness's interest in the outcome of an

18 investigation is something that you would consider for

19 credibility; true?

20      **MR. COLLIER:**  I'm going to object, Your Honor.  This

21 is starting to encroach on the instructions, and the jury is

22 evaluating witness credibility.

23      **THE COURT:**  Overruled.

24 **BY MR. SPIRO:**

25 **Q.**   Right.  If somebody had an interest in the outcome, right,

1   by either getting somebody in trouble or getting a lot of

2   money, some interest, that would be something that you would

3   consider in terms of credibility, of course; right?

4   **A.**   Well, again, you're sort of imposing certain things --

5   yes, of course, I look at motive and credibility, and it's one

6   of many things that I would look at.

7   **Q.**   Yeah.  For these questions, I'm just asking you, is it a

8   factor that you would consider?  Just a factor.  Not the sole

9   factor, but a factor.

10      And another factor would be that you'd be looking at

11   corroboration, whether there was corroboration from what the

12   person said; right?

13   **A.**   Yes.

14   **Q.**   And you'd be looking at how that person's testimony

15   matched up against everybody else's statements regarding the

16   incident.

17      Would you like to compare how different people saw

18   different things you would do that; right?

19   **A.**   Well, I'd have to do that in the context of their ability

20   to perceive, so I'm not going to -- I don't look at everything

21   equally.  Like if one person versus three, the one person may

22   have one more credibility because they had more availability to

23   see something.  And so -- I look at all the credibility

24   factors, and they are similar or the same as the type of

25   credibility factors that the jury is going to use in evaluating

1   this.

2   **Q.**   Agreed.  And you'd also use your common sense; right?

3   **A.**   Sure.

4   **Q.**   And you know if -- if they had lied before, if the person

5   you were interviewing had lied before, you'd look at that;

6   right?

7   **A.**   That's a hard one.  It depends on in what context.

8   **Q.**   Well, how about the context --

9             **THE COURT:**  Just please wait.

10            **MR. SPIRO:**  Oh, sorry.  I thought -- I apologize.

11            **THE WITNESS:**  No.  I hadn't.

12  **BY MR. SPIRO:**

13  **Q.**   Apology.

14  **A.**   The fact that -- one has to be very careful not to take

15  evidence that could be prejudicial but not say anything about

16  the specific event.  So you have to be careful looking at prior

17  conduct, and the fact that somebody might have been dishonest

18  in one circumstance may not shed light on what's going on in

19  that particular circumstance.

20        So I look at -- when I do an investigation, I'm looking at

21  investigating this particular incident, not investigating

22  everything about the person, you know, have they ever had an

23  affair or been arrested or things that would be highly

24  prejudicial but really wouldn't tell me much about this

25  particular instance.

1   BY MR. SPIRO:

2   **Q.**   But what about in the specific context of making reports?

3   If somebody made several false or manipulative reports and they

4   made a fifth report, would you at least consider the fact that

5   there had been prior reports that turned out to not be as that

6   person claimed?  Would you consider that?

7   **A.**   I would be very cautious about that because the facts in

8   front of me are really what I want to look at, and there are

9   certainly instances, you know, the "boy who cried wolf"

10  syndrome, that somebody's exaggerated something in the past,

11  and then something actually happens and you ignore it, thinking

12  that this is untrue or exaggerated.

13      That's a problem.  And you have to, as I said, really look

14  at each instance on its own merit.

15  **Q.**   And in terms of Complaint Number 2, if -- assume for the

16  sake of this that that question mark, where we started our

17  discussion with, turns out to be right and there was no racial

18  slur and the incident wasn't racial at all, it was just a fight

19  between two men -- you understand as a lawyer and I think from

20  your previous testimony yesterday, that Plaintiff could then

21  not receive damages for that; right?

22          **MR. COLLIER:**  Assumes facts.  Improper hypothetical.

23          **THE COURT:**  You can -- you can answer the hypothetical

24  if you can.  If you can't, don't.

25          **THE WITNESS:**  Well, what I would say is that I don't

1   presume somebody can just get damages because something is

2   racial.  If there is -- if there is a threat of violence, if

3   somebody is harmed in the workplace, I'm not going to assume

4   they can't get damages for that one way or the other.  I

5   really -- that doesn't factor into how I see things.

6        I consider a threat of violence to be very serious,

7   regardless of whether it's racial, and I don't really think

8   about whether they are going to have a cause of action

9   two years from then or something.

10  BY MR. SPIRO:

11  Q.   Well, the other thing is that incident that I asked you

12  about where Mr. Romero fired Mr. Foster, right, Mr. Foster was

13  somebody fighting with Mr. Diaz who was an African American

14  man; correct?

15  A.   Correct.

16  Q.   Right.  And so that act on Mr. Romero's part to fire him

17  you did not include in your report, like we talked about;

18  right?

19  A.   As I believe I already said, my understanding is that it

20  wasn't part of the case, and therefore, I wasn't supposed to

21  opine on it.

22  Q.   Okay.  So if we go to Complaint Number 1, you heard

23  Mr. Kawasaki say that when he arrived right at the scene and

24  spoke to the witnesses, none of them heard the N-word; right?

25  You heard that testimony?

1   **A.**   I heard him say that people said it was racial and that he

2   could not recall whether that included the N-word or not.

3   **Q.**   And there was -- he didn't know whether or not

4   Mr. Timbreza was speaking -- in what language Mr. Timbreza was

5   speaking when he uttered those words; right?  Do you remember

6   that?

7   **A.**   He thought that he was speaking in English, but when you

8   asked him a few times about whether it could have been Spanish,

9   he considered that he might not have thought about that and

10  made an assumption.

11  **Q.**   And ultimately, you know from reviewing the records in

12  this case that Mr. Diaz was satisfied with the way that that

13  incident was handled?

14  **A.**   I don't recall that he felt satisfied with how it was

15  handled.

16  **Q.**   Well, do you recall that you -- you -- your opinion was

17  that his satisfaction, whatever that may be, wasn't relevant to

18  your determination, but do you recall that he did say under

19  oath that he was satisfied with the way that was handled?

20  **A.**   Yeah.  I mean, maybe because it really isn't relevant you

21  don't look to the person who is the target of the action to say

22  yeah or nay on how you respond.  You've got to have a response

23  that is adequate, regardless.  So it's not something that I

24  give a lot of thought to.

25  **Q.**   Well, just so we have this calendar up -- and I'm not

1   going to bother with the easel right now -- about when Mr. Diaz

2   started, if there wasn't the incident in October, right, that

3   we talked about, Incident Number 2, okay, assume --

4   A.   The elevator incident is October.  The earlier one was

5   July.

6   Q.   Right.  So if the October incident didn't happen the way

7   Mr. Diaz says that it happened, right, says now that it

8   happened, the next incident is in January that you looked at,

9   Complaint Number 3; right?

10  A.   Yes.

11  Q.   And you testified yesterday that zero tolerance does not

12  mean you fire somebody.  Zero tolerance means you impose some

13  kind of discipline; true?

14  A.   Yes.  Progressive discipline that is aimed at ending the

15  behavior and gets more serious if there is continuing behavior.

16  Q.   And you don't have an opinion on whether or not the

17  punishment with Mr. Martinez met that standard?

18  A.   You mean when he drew the racist effigy?

19  Q.   Right.

20  A.   What's difficult there is that there was a prior incident

21  with him, even if it wasn't racial, and there was a warning

22  about his behavior vis-a-vis Mr. Diaz.

23       And given how serious -- if it was -- even if it was

24  isolated and there had been no history, it was a very serious

25  incident, and so I would expect it to be treated in a very

1   serious manner.  I don't like to say that has to be

2   termination.  I would say that from what I've seen, most

3   institutions would terminate somebody for that.

4        However, I do have to add that because of the prior

5   incident, that has to be factored in.  And if he got a prior

6   warning, even if it wasn't racial, if it's a threat towards

7   this person and then there is a racist effigy, you can't just

8   say, "Oh, that was just a threat, and it wasn't racial, so we

9   won't count that in determining what the appropriate action

10  is."

11  Q.   And yesterday you said that, you know, you don't even know

12  if he had been suspended without -- right -- without pay.  You

13  know that there is no dispute in this case, that he was

14  suspended without pay.

15       Do you know that?

16  A.   I saw that they made the decision.  I don't know that I

17  saw that it was actually effectuated because there were so many

18  discussions about what they were going to do.  But I -- you

19  know, I believe that it happened, so I don't mean to put that

20  in dispute.

21  Q.   Okay.  And you know that since this time and since this

22  incident in eight years, Mr. Martinez has never had another

23  incident --

24            MR. COLLIER:  Objection, Your Honor.

25            THE COURT:  Sustained.

1      **MR. COLLIER:**  Move to strike, Your Honor.

2      **THE COURT:**  Struck.

3      **THE WITNESS:**  How would I possibly know that?

4      **THE COURT:**  Okay.  Let's go to the next question.

5      **MR. SPIRO:**  Okay.

6    BY MR. SPIRO:

7    **Q.**   Mr. Jackson you heard testify that he spoke to all

8    three shifts, explained how offensive the drawing was, and told

9    everybody about what had happened, correct, you heard that

10   testimony?

11   **A.**   I'm not recalling it precisely in terms of speaking to all

12   three shifts, so I -- again, if you say that he said that

13   yesterday, I don't have a reason to question it.

14   **Q.**   In your report -- this is my final question before we turn

15   to the last little bit here -- which is:  In your report you

16   said that there were oral reports that Owen Diaz said that he

17   brought up to people, oral reports.

18        And isn't it a fact that when you reviewed all of the

19   testimony, evidence, and documents in this case, you saw no

20   corroboration for any of those oral reports; isn't that a fact?

21   **A.**   I don't know that I was given any evidence regarding the

22   oral reports that -- so I don't know how I would have seen -- I

23   mean, again, you have to have an investigation to review for me

24   to know whether there was corroboration.  Without that, you

25   have no record that you -- where you should have a record

OPPENHEIMER - CROSS / SPIRO

 1  because there should have been an investigation of these that

 2  would show what people said.  Either they corroborated or they

 3  didn't.

 4  Q.   Well, when there was an oral report regarding Timbreza

 5  that actually really happened and that really happened, there

 6  was an e-mail that corroborated the fact that it happened.

 7       But my question for you is:  In all of the other oral

 8  reports that occurred, when you looked at all of the documents

 9  and depositions and everything in this case, you saw zero

10  corroboration for any of his other oral reports; isn't that

11  true?

12  A.   But I'm a little confused by the question because going

13  back to the situation with Mr. Timbreza, there was

14  corroboration that he complained, but the corroboration that

15  I'm looking for is what people would have said if they had been

16  interviewed and somebody had done an investigation, taken

17  notes, made findings.  Then there would be a record that

18  somebody could review, and maybe we wouldn't even be here.  I

19  don't know.

20  Q.   Maybe we wouldn't even be here?

21  A.   I mean, if there had been that kind of response from the

22  get-go, then you have a record to go on.

23  Q.   And if there had been -- if all of these oral complaints

24  didn't actually happen, we'd be in the same place, wouldn't we?

25  A.   I'm not understanding that.

1   **Q.**   In any event, you were hired in this case, but you have

2   been hired by Mr. Organ in other cases against Tesla; correct?

3   **A.**   I believe one other.

4   **Q.**   Mr. -- well, you are in the process of -- you are retained

5   only on one other case that Mr. Organ has against Tesla for

6   racial harassment in the workplace, only one other?  Is that

7   your testimony?

8   **A.**   I believe so.  Is there a second?  I don't know.  I'm not

9   doing much expert witness work anymore, and I have not had a

10  lot of contact on any case.

11  **Q.**   Well, you are aware that he has more cases pending for

12  harassment against Tesla, and that would be work that could

13  come to you; true?

14          **MR. COLLIER:**   Objection.  Relevance.

15          **THE COURT:**   Yeah, particularly if it hasn't happened

16  Mr. Spiro.  Sustained.  And it's move -- and it will be struck.

17  **BY MR. SPIRO:**

18  **Q.**   In this case, just to make it very clear, the way you get

19  all of your information isn't through an independent

20  investigation.  It's provided to you by the Plaintiff's

21  lawyers; correct?

22  **A.**   Well, it's primarily the depositions that both Plaintiff

23  and Defense have taken in the case.  I'm reviewing the evidence

24  in the case.  That's one of the reasons it was great to be here

25  yesterday because then I get to hear the evidence because my

1   opinion is based on the evidence.

2   Q.   I understand that.  But you don't reach out to the other

3   side to say, "Hey, if there's anything that you could provide

4   that could give me more clarity, provide it."  The only person

5   that you interact with from either side is the Plaintiffs, and

6   they select what you review?

7   A.   Except what I'm looking at is what both sides have

8   provided in discovery.  It's not like I say, "Don't show me

9   what the defense provides."  If you gave me something that

10  wasn't in discovery, then the jury wouldn't have access to it

11  either.  I want to review what the jury reviews because that's

12  the case.

13  Q.   Right.  But you didn't review every single deposition and

14  piece of evidence in this case.  You reviewed what was provided

15  to you by the Plaintiff's lawyers, period?

16  A.   Well, except I think they gave me anything other than

17  something that was like a psychological report that wouldn't be

18  relevant to what I talk about.

19  Q.   Do you know as you sit here under oath that they gave you

20  every single deposition and piece of evidence in this case?  Is

21  that what you're telling this jury?

22  A.   No.  I can't say that.  I -- but I certainly got many,

23  many -- all the people who are going to testify, other than

24  maybe other experts, I reviewed the depositions, all of --

25  I believe all of the documents in this case.  I think I was

1    given all of the exhibits.

2         You know, I try to limit it to things that are relevant to

3    what I testify about.  And I always ask for things that would

4    tend to go either way in the case because I want to make sure

5    I'm reviewing a complete record and --

6    **Q.**   Okay.  You have never worked as a human resources

7    professional for a company; true?

8    **A.**   True.

9    **Q.**   And since you haven't worked as a human resources

10   professional, I assume you have never worked as a human

11   resources professional with 10,000 workers working overnight

12   shifts in that setting.

13        You have not done that; right?

14   **A.**   No, I haven't.

15   **Q.**   Okay.  And you've never been the supervisor of a company

16   who is tasked with handling investigations of workplace

17   harassment; correct?

18   **A.**   Well, for 20 years I was an administrative law judge and I

19   was the presiding judge, and I was in charge of dealing with

20   any complaints including sexual harassment or racial harassment

21   complaints.  And I did have some that I was tasked with

22   overseeing in that context, but in the very different milieu

23   but, nevertheless, there are issues everywhere so...

24   **Q.**   Right.  Right.  I'm just simply asking you, have you ever

25   been a supervisor and executive at a company, a corporation,

1  where you're tasked with doing this?  Correct?

2  **A.**   Well, I've supervised judges, but if you don't consider

3  that, then don't consider it.

4  **Q.**   Well, I consider it.  I don't -- I don't think it's

5  exactly the question.  I consider it on its own, but I was just

6  simply asking if at a corporation.

7  **A.**   Not a private company, no.  I worked for the State of

8  California.

9  **Q.**   And you determined that Tesla had adequate policies in

10  place; right?

11  **A.**   I think the policies were fine, yes.

12  **Q.**   And you have admitted that you do not have an opinion on

13  whether Tesla adequately trained its employees because you

14  didn't have anything necessary to make that determination;

15  true?

16  **A.**   Well, I wasn't able to review their training.  What I was

17  able to do is see that people said they didn't get training and

18  that supervisors had some serious misunderstandings.

19      So either the training was lacking or it wasn't getting

20  through, and it's hard for me to know what the problem was.

21  But clearly, people were not getting trained.

22      I think we heard yesterday people who didn't receive

23  training.  It's possible they did and they just don't remember

24  it, but one would hope that the training was strong enough so

25  they'd have some memory of it.

**OPPENHEIMER - CROSS / SPIRO**

1   **Q.**   And just like in the other Tesla case that you're handling

2   for these lawyers, you reached a conclusion that Tesla did not

3   meet the standard of care; correct?

4   **A.**   Again, I don't remember what other case you're talking

5   about, but I did conclude in this case that Tesla did not meet

6   the standard of care.

7   **Q.**   They were negligent in the way that they did this?

8   **A.**   They didn't -- they didn't have a --

9         **MR. COLLIER:**  I'm sorry.  Objection, your Honor.

10  What's the relevance?

11         **THE COURT:**  Yeah.  Sustained.

12         **MR. SPIRO:**  Of her opinion?

13         **THE COURT:**  So ask her what -- about this case.

14         **MR. SPIRO:**  Just this case.  Sorry.

15         **THE COURT:**  Just this case.

16         **MR. SPIRO:**  I apologize.

17  **BY MR. SPIRO:**

18  **Q.**   I was shifting when the witness said.  In this case you --

19  you reached the conclusion that the reasonable employer should

20  have taken more steps to investigate and that Tesla was

21  negligent in their conduct; correct?

22  **A.**   Yeah.  I probably don't use the word  "negligent," but --

23  but yes, what they did was subpar and was not consistent with

24  what was acceptable practice during the period of time that

25  these events occurred.

1   **Q.**   But I think --

2   **A.**   And long before that.

3   **Q.**   Sorry.  Okay.

4       I guess I'm making the distinction.  It's not that you are

5   saying that this is -- you know, Tesla the company should be

6   indicted and people should go to jail.  You're not saying that,

7   are you?

8           **MR. COLLIER:**  Legal conclusion.

9           **THE COURT:**  Sustained.  This is a civil case.  And

10  that would be beyond the scope of anything that she was asked

11  to testify -- to provide opinions on.  So let's move to what

12  she did give opinions on.

13  **BY MR. SPIRO:**

14  **Q.**   You agree that employers are not the guarantors of a

15  harassment-free workplace; correct?

16  **A.**   Yes.

17  **Q.**   You agree that there is no perfect workplace

18  investigation?

19  **A.**   Theoretically, I don't believe in perfection in these

20  sorts of things.  Just like I don't think there is any perfect

21  trial --

22  **Q.**   There is not.

23  **A.**   -- so...

24  **Q.**   And investigations cannot always uncover the truth; fair?

25  **A.**   That's true.

1    Q.   And sometimes a full investigation is necessary, but in

2    certain circumstances to figure out what happened quickly, an

3    initial inquiry could be sufficient in some circumstances;

4    true?

5    A.   If there are no contested facts, then an initial inquiry

6    might be sufficient as opposed to going to -- or if there's

7    either no contested facts or if the facts alleged were not so

8    serious that they wouldn't -- that they don't even violate the

9    company rules, then yes.

10   Q.   In terms of the no-contested facts, you're aware of

11   Mr. Martinez in the incident that did happen, the drawing,

12   confessed.  Said he did it.

13          MR. COLLIER:  Objection.  Argumentative.

14          THE COURT:  Overruled.  You can respond.

15   BY MR. SPIRO:

16   Q.   The third complaint that happened where the drawing was

17   made, Mr. Martinez admitted that he did that; right?

18   A.   Well, my understanding is he first denied it and then

19   admitted it, and the contested fact there is his intention why

20   he did it and the history as to whether it was targeted

21   specifically towards Mr. Diaz.

22        And I think that when you have a serious case, even if

23   somebody says, "yes, I said that word" or "I drew that image,"

24   that you need to know more to know how you're going to respond

25   to it.

1          And so when I'm -- it's not the sort of simple case where

2     you can simply say, "Okay.  He admitted it, and we can move

3     on."

4     **Q.**   Well, I don't know about move on, but he -- it was just a

5     question.  Mr. Martinez admitted that he did it?

6     **A.**   He did ultimately admit it.

7     **Q.**   Well, you said "ultimately."  He admitted it within

8     minutes of them finding it; right?

9     **A.**   I thought it was a little longer than minutes, but you

10    know, I don't want to parse -- parse minutes.

11    **Q.**   Okay.  And then he wrote out a full apology and admission.

12         You saw that, right, that written document?

13         **MR. COLLIER:**  Objection.  Assumes facts.

14    Argumentative.

15         **THE COURT:**  To the extent that you remember the

16    testimony, Ms. Oppenheimer, you can respond.

17         **THE WITNESS:**  I recall that there was something that

18    he wrote out.  There were the written questions that were given

19    to him.  It could have been part of that.  I don't think it was

20    a sufficient response to the action that he did.

21         **MR. SPIRO:**  Thank you.  No further questions.

22         **THE COURT:**  All right.

23         Mr. Collier?

24         **MR. COLLIER:**  Thank you, Your Honor.

25    \\\

1    <u>REDIRECT EXAMINATION</u>

2    BY MR. COLLIER:

3    Q.   Ms. Oppenheimer, did you know that the previous jury --

4    I'm sorry -- the previous phase of this proceeding

5    determined --

6          MR. SPIRO:  Objection.

7          THE COURT:  Yeah.  The -- I'll strike what Mr. Collier

8    has said so far.

9       And start again.

10         MR. COLLIER:  I'll rephrase.

11   BY MR. COLLIER:

12   Q.   Ms. Oppenheimer, you understand punitive damages are

13   designed not to punish negligence but intentional conduct?

14   A.   That's correct.

15   Q.   Malicious, oppressive, or reckless disregard.

16         MR. SPIRO:  Objection.

17         THE COURT:  It's outside the scope both of her report

18   and her testimony thus far.  Sustained.

19   BY MR. COLLIER:

20   Q.   You were asked about verbal reports.  Were you here

21   yesterday when Mr. Kawasaki and Mr. Wheeler both confirmed that

22   Mr. Diaz had complained about the N-word verbally to them?

23         MR. SPIRO:  Objection.  Mischaracterizes the

24   testimony.

25         THE COURT:  Overruled.

 1           **THE WITNESS:**  Mr. Kawasaki, it seemed like, became

 2   unclear at some point about whether he said "racial" or

 3   specifically the N-word.  And to me, it's -- either way, you'd

 4   respond the same way.

 5       I believe Mr. Wheeler said that he did hear a complaint

 6   directly from Mr. Diaz regarding the N-word.

 7   **BY MR. COLLIER:**

 8   **Q.**   You were asked about the Rothaj Foster incident, and you

 9   indicated you believed it was outside the scope of the case.

10       Did you know that Rothaj Foster is also Black?

11   **A.**   Yes.

12   **Q.**   And is that your understanding of why it's outside the

13   case?

14   **A.**   I'm not -- I don't -- it was a long time ago.  I don't

15   know that I can say fully why my understanding is what -- as to

16   why it's outside the case.  I try not to think about things

17   that I'm told are outside the case.

18   **Q.**   Understood.

19           **MR. SPIRO:**  Can we display Exhibit 92 already in

20   evidence, please?

21                    (Pause in proceedings.)

22           **MR. COLLIER:**  Can we blow up the complaint?

23                    (Pause in proceedings.)

24   **BY MR. COLLIER:**

25   **Q.**   Here in Exhibit 92, Mr. Diaz, when he reports the elevator

1    incident regarding Mr. Martinez, he states:  "For some reason,

2    Ramon jump off the tugger he was on and started yelling at me

3    in a threatening manner."

4        Later he goes on to say:  "I thought he was going to hit

5    me, so I asked him to step back."

6        Had these -- were these allegations sufficient to trigger

7    an investigation in your opinion?

8    **A.**   Absolutely.

9    **Q.**   And is it true that during the course of an investigation

10   you would ask questions about what he was yelling?

11   **A.**   Sure.

12   **Q.**   And you would determine if there were racial slurs

13   included?

14   **A.**   Of course.

15   **Q.**   And had this been properly investigated, it would have

16   included an analysis of whether he had used racial slurs with

17   Mr. Diaz before; correct?

18   **A.**   Correct.

19   **Q.**   Now, Wayne Jackson testified yesterday that Mr. Quintero

20   and Mr. Romero failed to preserve the surveillance footage of

21   this incident.

22       Did you hear that testimony?

23   **A.**   Yes.

24   **Q.**   All right.  And they also testified that Mr. Romero and

25   Mr. Quintero were in control of what footage he and

1    Mr. Kawasaki were able to review.

2        Did you hear that testimony?

3    A.   Yes.

4    Q.   And does that inform your opinion about the surveillance

5    footage not being reviewed?

6    A.   Well, my opinion's the same which is that any surveillance

7    footage that could have been available should have been

8    preserved and reviewed.  You know, I don't -- I don't know

9    enough about what to imply that they were destroyed by specific

10   people other than it's part of a pattern of not doing

11   investigations and not trying to find out what's really going

12   on.

13        MR. COLLIER:  Can we display Exhibit 39, speaking of

14   that pattern.

15              (Pause in proceedings.)

16   BY MR. COLLIER:

17   Q.   Exhibit 39 is a copy of Mr. Romero's e-mail to Victor

18   Quintero reporting on the results of Mr. Kawasaki's

19   investigation.  You've seen this e-mail before?

20   A.   Probably.

21   Q.   I'll give you a moment.

22   A.   Okay.

23              (Pause in proceedings.)

24   BY MR. COLLIER:

25   Q.   I want to draw your attention to the line that says:  "We

1    investigated by speaking to all witnesses present, but they

2    said they did not hear the remarks."

3          Now you were here for Mr. Kawasaki's testimony yesterday;

4    correct?

5    **A.**    Yes.

6    **Q.**    And you heard him say that not only did he confirm the

7    remarks were made with witnesses but he reported that to

8    Mr. Romero?

9          **MR. SPIRO:**   Objection.   Leading every question.   He's

10   testifying.

11         **THE COURT:**   The -- I'd be more inclined to sustain the

12   objection if this wasn't the same kind of question that you

13   were asking, so I'm --

14         **MR. SPIRO:**   I'm on cross.

15         **THE COURT:**   It is true, but this can be responded to

16   with a yes or no answer, and I'm going to overrule the

17   objection.

18         **MR. COLLIER:**   Thank you.

19   **BY MR. COLLIER:**

20   **Q.**    So sorry.

21         You were here when Mr. Kawasaki testified that not only

22   did the witnesses confirm the racial slurs, but he reported

23   that to Mr. Romero.

24   **A.**    Yeah -- no.   It's very troubling that he was not

25   interviewed because he would have been the best person to talk

1   to to find out, you know, who told him what.  And obviously,

2   you still need to go to them, but we don't know if they went to

3   the right people or if there was a contradiction, why there was

4   a contradiction.  I mean, that's a huge hole in this whole

5   investigation -- supposed investigation.

6   **Q.**   And is it fair to say that one possibility is that

7   Mr. Romero is covering it up?

8   **A.**   It's a possibility.  I mean, I -- I'm not going to assume

9   it, but it's a possibility.

10  **Q.**   And we see that Mr. Diaz isn't copied here.  Do you see

11  that?

12  **A.**   Yeah.

13  **Q.**   So to the extent Mr. Diaz previously testified he was

14  satisfied with the outcome, he didn't know about this e-mail,

15  did he?

16          **MR. SPIRO:**  Objection.

17          **THE COURT:**  Sustained.

18  **BY MR. COLLIER:**

19  **Q.**   When you're assessing someone's motive with regard to an

20  incident such as the elevator dispute, you also look at the

21  totality of circumstances and interactions between those

22  individuals; correct?

23  **A.**   Sure.

24  **Q.**   For example, if someone were to threaten violence against

25  Mr. Diaz and then three months later draw a racist effigy and

1  leave it to harass Mr. Diaz, that might support an inference

2  that the earlier threat in the elevator was also racially

3  motivated?

4         MR. SPIRO:  Objection.

5  BY MR. COLLIER:

6  Q.   Is that true?

7         MR. SPIRO:  Outside of her expertise and it's a

8  leading question.

9         THE COURT:  It is a leading question.

10                  (Pause in proceedings.)

11        THE COURT:  And I think it is -- I think we are -- we

12  are going beyond the scope of what Ms. Oppenheimer was called

13  here to do.

14        MR. COLLIER:  Fair enough.  I will ask one other

15  question.

16  BY MR. COLLIER:

17  Q.   Would it be fair to say that in a thorough investigation

18  of Mr. Martinez's conduct, either in the elevator incident or

19  in the pickaninny incident, the entire course of his conduct

20  would be considered and not any particular incident in a

21  vacuum.

22  A.   Absolutely.

23        MR. COLLIER:  No further questions.

24        MR. SPIRO:  Just very briefly, Your Honor.

25        THE COURT:  All right.

1                        <u>RECROSS-EXAMINATION</u>

2    **BY MR. SPIRO:**

3    **Q.**   You are not here to give any opinion on damages; right?

4    **A.**   No.

5    **Q.**   Okay.  And you are not offering any opinions on emotional

6    distress, psychological injury; correct?

7    **A.**   Correct.

8    **Q.**   And you don't have any opinions that any harassment

9    actually occurred; correct?

10   **A.**   Not if it's contested.  I'm -- I mean, there are things

11   that were not contested; but if something is contested, then

12   it's for the jury to determine it.

13          **MR. SPIRO:**  Okay.  Thank you.

14          **MR. COLLIER:**  Nothing further, Your Honor.

15          **THE COURT:**  Thank you, Ms. Oppenheimer.  You are

16   excused.

17          **THE WITNESS:**  Thank you.

18          **MR. ORGAN:**  Your Honor, the Plaintiff calls Ed Romero.

19                  (Pause in proceedings.)

20          **THE COURT:**  Come on up, Mr. Romero.

21          **THE CLERK:**  Step up and remain standing.  I will take

22   your photograph and then I will swear you in.

23                  (Pause in proceedings.)

24   \\\

25   \\\

```
 1                        EDWARD ROMERO,

 2   called as a witness for the Plaintiff, having been duly sworn,

 3   testified as follows:

 4              THE CLERK:  Be seated.  If you would please begin by

 5   stating your full name and spelling it for the court reporter.

 6              THE WITNESS:  Edward Romero.

 7                       DIRECT EXAMINATION

 8   BY MR. ORGAN:

 9   Q.   Good morning, Mr. Romero.  How are you?

10   A.   Good morning.

11   Q.   You started working at Tesla on approximately January 5,

12   2015?

13   A.   I started working at Tesla --

14   Q.   July 5, 2015?

15   A.   At nextSource, uh-huh.

16   Q.   You started working at Tesla on July --

17   A.   At the facility, yes.

18   Q.   Right.  And you were initially hired to work at that Tesla

19   through -- you started working there through nextSource; is

20   that right?

21   A.   Yes.

22   Q.   You were a direct employee of Tesla starting approximately

23   October 12 of 2015?

24   A.   Yes.

25   Q.   And you left Tesla in approximately August of 2017; is
```

**ROMERO - DIRECT / ORGAN**

1   that right?

2   **A.**   That's probably -- I don't remember the exact date.

3   **Q.**   Okay.  You were Mr. Owen Diaz's supervisor?

4   **A.**   Yes.

5   **Q.**   You supervised the elevators?

6   **A.**   Correct.

7   **Q.**   You also supervised the janitorial services?

8   **A.**   I did.

9   **Q.**   You reported to Victor Quintero?

10  **A.**   Yes.

11  **Q.**   Victor Quintero was the manager in charge of several

12  departments?

13  **A.**   Yes.

14  **Q.**   Those departments included recycling?

15  **A.**   Correct.

16  **Q.**   And those departments included the elevators?

17  **A.**   Yes.

18  **Q.**   Your job duties as contract services supervisor included

19  overseeing all of the cleaning contractors for the facility in

20  the powertrain and lower production?

21  **A.**   It was -- it was divided between me and another person,

22  but we both had authority over that.

23  **Q.**   And you shared some supervision oversight, at least

24  initially, of the two industrial elevators with Jaime Salazar;

25  is that correct?

 1    **A.**    Correct.

 2              **MR. ORGAN:**  Now, if we could, put up Exhibit 33.

 3                         (Pause in proceedings.)

 4    **BY MR. ORGAN:**

 5    **Q.**    And Exhibit 33, Mr. Diaz sent this e-mail to you with the

 6    racist drawing; correct?

 7    **A.**    He did.

 8    **Q.**    And when you saw the picture -- and if we could move to

 9    the second page -- third page -- when you saw this picture, you

10    were shocked that someone would do that; correct?

11    **A.**    I was.

12    **Q.**    You talked to Owen Diaz about the racist drawing; correct?

13    **A.**    I don't remember in depth how the conversation went, but

14    yes, he did talk to me and I talked to him.

15    **Q.**    When you were able to talk to him about it, you saw that

16    he was offended by it; right?

17    **A.**    Yes.

18    **Q.**    You saw that Owen Diaz was hurt; right?

19    **A.**    Yes.

20                         (Pause in proceedings.)

21    **BY MR. ORGAN:**

22    **Q.**    So offended, hurt, those were both things that you

23    observed; correct?

24    **A.**    Yes.

25    **Q.**    And, in fact, you observed that Owen Diaz was very, very

1   hurt; correct?

2   **A.**   I knew he was hurt.  I don't know what you mean by "very,

3   very hurt," but he was offended and hurt.

4         **MR. ORGAN:**  Your Honor, I would like to read from the

5   deposition -- I'm sorry -- from the first proceeding, page 187,

6   lines 9 to 12 -- 14, Your Honor.

7                         (Pause in proceedings.)

8         **MR. GRIFFIN:**  What were the pages again?

9         **MR. ORGAN:**  187, lines 9 to 14.

10        **THE COURT:**  It's fine.

11        **MR. ORGAN:**  "QUESTION:  And when you talked to

12  Mr. Diaz, how did he describe how he felt when he saw this

13  cartoon?

14      "ANSWER:  He was hurt.  He was very, very hurt.  And I

15  told him, 'I don't blame you, you know.  That's not right, you

16  know,' so, you know, we initiated the proper steps that should

17  be taken to rectify it"

18  **BY MR. ORGAN:**

19  **Q.**   Very, very hurt; right?

20  **A.**   Well, you are asking me something that happened like

21  seven or eight years ago, you know, but yes, he was very hurt.

22  **Q.**   Well, your testimony was actually just a year and a half

23  ago; right, sir?

24  **A.**   I thought you were referring to the deposition.

25  **Q.**   No.  I was referring to --

 1   **A.**   Okay.

 2   **Q.**   -- when you testified previously in court.  Do you

 3   remember that?

 4   **A.**   I remember.

 5   **Q.**   Okay.  And that's when you said "very, very hurt";

 6   correct, sir?

 7   **A.**   If that's what I said.

 8   **Q.**   Okay.  You understood that Owen Diaz was classifying the

 9   drawing as racist; right, sir?

10   **A.**   Yes.

11   **Q.**   You thought the drawing was definitely not respectful;

12   correct?

13   **A.**   Correct.

14   **Q.**   Once you received the drawing from Owen Diaz, you

15   forwarded it up to Mr. Diaz's manager, Victor Quintero;

16   correct?

17   **A.**   I did.

18   **Q.**   You forwarded Exhibit 33 --

19   **A.**   Okay.

20   **Q.**   -- which we are looking at?

21   **A.**   May I ask a question?  I want to make sure I understood.

22   When you say that I referred the picture up, is that --

23   **Q.**   Forwarded it.

24   **A.**   Forwarded.

25   **Q.**   You sent an e-mail, forwarded?

ROMERO - DIRECT / ORGAN

1    A.   An e-mail, yes.  Right.

2    Q.   You forwarded Exhibit 33 to Mr. Quintero because Ramon

3    Martinez reported to Mr. Quintero; correct?

4    A.   Correct.

5    Q.   When you were younger, you had seen cartoons with a

6    jigaboo in them; is that correct?

7    A.   I did.

8    Q.   And the drawing that Mr. Martinez drew reminded you of

9    those cartoons; correct?

10   A.   It did.

11   Q.   And those cartoons were very offensive; correct, sir?

12   A.   Yes.

13   Q.   And, in fact, you had a meeting with Wayne Jackson and

14   Victor Quintero about the picture; correct?

15   A.   Yes.

16   Q.   And you and Wayne Jackson told Mr. Quintero that the

17   picture was very derogatory and bad; correct, sir?

18   A.   We did.

19   Q.   And once you told them that, they were supposed to handle

20   the matter; correct?

21   A.   Correct.

22   Q.   You never talked to Ramon Martinez about the drawing;

23   correct?

24   A.   No, no.

25   Q.   And the three of you, you, Wayne Jackson, and

1    Mr. Quintero, all discussed that Owen Diaz was upset by what

2    had happened to him; correct, sir?

3    **A.**   We did.

4    **Q.**   You understood that Mr. Diaz felt that Mr. Martinez's

5    conduct was getting worse; right?

6    **A.**   That, I don't remember.

7    **Q.**   If you could, let's go back to 33.  And if you look at

8    that exhibit, he informed you in there that his conduct was

9    getting worse; correct?

10          **MR. ORGAN:**  Could you highlight that down at the

11   bottom.

12   **BY MR. ORGAN:**

13   **Q.**   "And because nothing -- this is not the first time Ramon

14   Martinez has been talk about his behavior and because nothing

15   has been done, it seems that his behavior is getting worse."

16        You saw that when that was sent to you; right?

17   **A.**   Yes.

18   **Q.**   And you never found out what, if any, discipline was given

19   to Martinez for the drawing or any other conduct, did you?

20   **A.**   No.

21   **Q.**   Now, prior to seeing the racist effigy or the racist

22   drawing about which Mr. Diaz had complained to you about, prior

23   to that, you had never been informed that Owen Diaz had

24   complained about anything racist or racial in the workplace;

25   correct?

1        I will rephrase it so it's clearer.  Prior to this

2   incident, had you ever received any information about whether

3   or not Mr. Diaz had been exposed to racist or racial things in

4   the workplace?

5   **A.**   I think he had -- he had -- I'm trying to remember the

6   dates, but I think that prior to this, he had -- he had

7   complained about maybe two other people using racial slurs and

8   so on.

9   **Q.**   Okay.  Well, you had your deposition taken in this case;

10  correct, sir?

11  **A.**   Yes.

12        **MR. ORGAN:**  And, Your Honor, I would like to read from

13  his deposition, page 137, line 3 to line 6 -- actually, I think

14  line 3 to line 15, Your Honor, would be more complete.  137, 3

15  to 15.

16        **THE COURT:**  Okay.  Mr. Romero, take a look at -- take

17  a look at this, too.

18        **THE WITNESS:**  Okay.

19        **MR. ORGAN:**  I think we have -- we do have his

20  testimony up there.

21        **THE COURT:**  I'm trying to speed things along for you.

22  137, line 3.

23        **MR. ORGAN:**  May I read that, Your Honor?

24        **THE COURT:**  I'd like him to take a look at it first.

25        **MR. ORGAN:**  Okay.

1          **THE COURT:**  So that he can see it.

2                       (Pause in proceedings.)

3          **THE COURT:**  All right.  I think you can proceed at

4     this point, Mr. Organ.

5          **MR. ORGAN:**  Your Honor, just for the record,

6     Exhibit 37 in his deposition is Exhibit 33 in the trial

7     transcript.

8          **THE COURT:**  Okay.

9     **BY MR. ORGAN:**

10    **Q.**   "QUESTION:  So prior to the racist effigy being identified

11    to you, had Owen Diaz ever complained to you about any kind of

12    racial conduct?

13         "ANSWER:  No."

14         And prior to your receiving the e-mail from Owen Diaz,

15    what is Exhibit, now 33, had you ever been informed that Owen

16    Diaz had complained about anything racist or racial in the

17    workplace, and your answer was "No"; correct, sir?

18    **A.**   At the time that's the way I remembered it.

19    **Q.**   Right.  So those are the answers you gave and -- those are

20    the questions that were asked of you, and those were the

21    answers you gave in your deposition.  And you said "no," and

22    that contradicts what you're saying today; correct, sir?

23    **A.**   I'm just telling you that when -- at the deposition, I was

24    trying to remember.  At that moment I didn't remember if

25    anybody else had complained.

1   **Q.**   Right.

2   **A.**   Okay.

3   **Q.**   I understand.  I just am trying to point out there's a

4   contradiction.  You recognize that; correct, sir?

5   **A.**   I could see how you could jump to that conclusion.  Okay.

6   **Q.**   Right.  And to get ready for your deposition today, you

7   met with the lawyers for Tesla; correct, sir?

8   **A.**   I did.

9   **Q.**   You did.  And you went over this testimony, didn't you,

10   sir?

11   **A.**   We went over my prior -- prior deposition, some of that,

12   and then e-mails and so on.

13   **Q.**   You went over this precise issue with them, didn't you?

14   **A.**   I don't remember if we touched about much detail, but

15   we -- we went over a lot of things in the deposition.

16   **Q.**   They told you that you had to admit to having heard this

17   racist conduct so that you wouldn't get impeached like you did

18   last time you testified; isn't that true, sir?

19   **A.**   No.  They didn't tell me that.

20   **Q.**   Well, you mentioned the Timbreza event.  So let's talk

21   about that.

22         That was back in July of 2015; correct, sir?

23   **A.**   Say that again, please?

24   **Q.**   The Judy Timbreza -- Mr. Judy Timbreza, he was a man;

25   correct?

1    **A.**   Yes.

2    **Q.**   He worked on the elevators.

3    **A.**   Yes.

4    **Q.**   And there was an incident reported in July of 2015;

5    correct?

6    **A.**   I don't remember the date, but there was an issue, yes.

7    **Q.**   Okay.  And so Tom Kawasaki, he was the elevator lead at

8    that time in July; correct?

9    **A.**   He was -- from what I remember, he was actually a lead for

10   the recycle and worked with Jaime Salazar.

11   **Q.**   But he had responsibility over the elevators at the end of

12   July of 2015; correct?

13   **A.**   That was my understanding at the time.

14   **Q.**   Yeah.  And Owen Diaz was an elevator operator back in July

15   of 2015?

16   **A.**   Yes.

17   **Q.**   Correct?  And if you received -- let's put up

18   Exhibit 38 -- you received this e-mail from Mr. Kawasaki;

19   correct?

20   **A.**   Yes.

21   **Q.**   And he informed you in this e-mail that comments were

22   being made towards Owen Diaz that were racist in nature;

23   correct?

24   **A.**   That it had been brought to their attention, yeah.

25   **Q.**   It had been brought to his attention?  And that was then

1   brought to your attention; correct, sir?

2   **A.**   Yes.

3   **Q.**   And Mr. Kawasaki, he tells you that Mr. Diaz was

4   complaining about racial slurs; correct?  He let you know that

5   when you talked to him; right?

6   **A.**   Talked with Tom Kawasaki?

7   **Q.**   Yeah.

8   **A.**   Yes.

9   **Q.**   And he let you know that Owen Diaz had complained about

10  racial slurs; correct?

11  **A.**   Through this e-mail, yes.  Uh-huh.

12  **Q.**   Okay.  And Mr. Kawasaki told you that he learned from the

13  people who observed the altercation between Owen and

14  Mr. Timbreza that racial slurs were thrown; correct?  That's

15  how he phrased it, racial slurs were thrown; right?

16  **A.**   Yes.  Yes.

17  **Q.**   So those -- so Mr. Kawasaki confirmed that people that he

18  talked to also confirmed that racial statements had been made

19  towards Mr. Diaz; right, sir?

20  **A.**   Can you ask me again, please?

21  **Q.**   Yeah.  Mr. Kawasaki confirmed to you that the people

22  around this incident had confirmed to Mr. Kawasaki that racial

23  slurs had been thrown at Mr. Diaz.

24  **A.**   I don't remember him saying that he -- it was confirmed.

25  I think they -- I'm trying to remember, but he was informing

 1   that Mr. Diaz had said that individuals had used racial slurs

 2   against him.  Okay.  And at that time I think that's where it

 3   was at.

 4          MR. ORGAN:  Your Honor, I would like to read from the

 5   first trial -- the trial, first phase, page -- Day 1,

 6   page 141 -- [audio cut out].

 7          MR. ORGAN:  My audio is off?

 8          THE CLERK:  Sorry.

 9          MR. ORGAN:  Line 8 to 21, Your Honor.

10                    (Pause in proceedings.)

11          MR. ORGAN:  May I read that, Your Honor?

12          MR. GRIFFIN:  Your Honor, there is no impeachment.  It

13   is a consistent statement to his current testimony.

14   BY MR. ORGAN:

15   Q.   "QUESTION:"

16          THE COURT:  Overruled.

17          MR. ORGAN:  I'm sorry, Your Honor.

18   BY MR. ORGAN:

19   Q.   "QUESTION:  And Mr. Kawasaki let you know that Owen Diaz

20   complained about racial slurs; correct?

21          "ANSWER:  Yes.  Yeah.  And Mr. Kawasaki tells you that he

22   had learned from the people who observed the altercation

23   between Owen and Mr. Timbreza that racial slurs" -- he uses the

24   term "thrown -- "that racial slurs were thrown by Mr. Timbreza.

25   That's what he told you; right?

1        "ANSWER:  I don't remember the exact wording.

2        "QUESTION:  Okay.

3        "ANSWER:  Okay.

4        "QUESTION:  But that information was at least communicated

5   to you; correct?

6        "ANSWER:  I -- I knew about it, yes.

7        You never conducted any kind of investigation into the

8   issues relating to Judy Timbreza using any kind of racist words

9   or racially offensive remarks towards Owen Diaz; correct?

10  A.   Okay.  I lost you here.  Okay?

11  Q.   Oh, I moved on.  I apologize.

12  A.   Yeah.

13            THE COURT:  This is a question.

14            MR. ORGAN:  New question.

15            THE WITNESS:  Oh, it's a question.  I thought he was

16  reading on.

17  BY MR. ORGAN:

18  Q.   No.  I'll try the question again, sir.  I apologize.

19       You never conducted any kind of investigation into the

20  issues relating to Judy Timbreza using any kind of racist words

21  or racially offensive remarks towards Owen Diaz; correct?

22  A.   I did not talk to any -- any of the witnesses, but it was

23  an investigation as a collaborative thing, you know, the group.

24  And Jaime Salazar was the supervisor.  Okay?

25       So him and Tom Kawasaki were the ones that were speaking

1   to the folks in the area there.

2   **Q.**   Okay.  Did you receive an e-mail from Jaime Salazar

3   talking about anything that he did to interview people?

4   **A.**   I don't recall.

5   **Q.**   So the only e-mail you ever got about what happened

6   relative to the Judy Timbreza use of the N-word or racist slurs

7   towards Mr. Owen Diaz, the only document you ever received from

8   anybody who talked to people was the document we just looked

9   at, Exhibit 38; is that correct?

10  **A.**   That's what I recall.

11  **Q.**   Okay.  Now, let's look at Exhibit 39.

12  **A.**   Okay.

13                      (Pause in proceedings.)

14  **BY MR. ORGAN:**

15  **Q.**   And so this is now four days later.  The Exhibit 38 was

16  from July 31.  This is August 4, 2015.

17       And this is an e-mail from you to the manager, Victor

18  Quintero; correct, sir?

19  **A.**   Yes.

20  **Q.**   And you sent this e-mail; right?

21  **A.**   I did.

22  **Q.**   You write in this e-mail:  "Mr. Owen says this has

23  happened before"; correct, sir?

24  **A.**   If I put it there, it's because that's what it was.

25  **Q.**   And you got that information from Mr. Kawasaki; right?

1  This has happened before.  Mr. Kawasaki told you that this had

2  happened before?

3  **A.**   I don't remember if Tom said it and Mr. Salazar said it.

4  I don't remember exactly who said it.

5  **Q.**   Okay.  But you got the information that it had happened

6  before; correct?

7  **A.**   Yes.

8  **Q.**   And you never investigated what prior racist conduct had

9  happened before; correct?

10  **A.**   I don't think at the time that I had heard of any -- any

11  prior racist remarks.  I don't remember.  Okay.

12  **Q.**   But you do note it in your e-mail; right, sir?

13  **A.**   I note that -- that they said Mr. Owen had said it

14  happened before.

15  **Q.**   Right.

16  **A.**   Yes.

17  **Q.**   Okay.  So the information you had at this point, August 4,

18  2015, was that racial conduct, racist slurs had been confirmed

19  by witnesses and thrown at Mr. Diaz by Judy Timbreza on the

20  31st; correct, sir?

21  **A.**   Well, at that time I don't know if they had -- the remarks

22  had been confirmed by anyone.  Okay?  Because if I remember

23  correctly, there was, later on, the witnesses or the people who

24  supposedly heard this said that they hadn't heard it.

25  **Q.**   To whom, sir?  Who did these people allegedly say that

1  they never heard things?  Who did they hear that -- how did you

2  get that information?

3  **A.**  I understood that Tom Kawasaki and Mr. Salazar had gone

4  back to talk to the people who supposedly heard this and that

5  they had said that they didn't hear it.

6  **Q.**  Mr. Kawasaki was just here yesterday.  He never testified

7  that he went back and talked to people and they never confirmed

8  it.  He said just the opposite, that they had confirmed it.

9  **A.**  Well, I don't know what he said, but you know...

10         **MR. GRIFFIN:**  Objection.

11         **THE COURT:**  The jury will -- I'm going to overrule the

12  objection and remind the jury that it's your memory of what the

13  evidence is that controls.  The lawyers are using throughout

14  the questioning today -- they're using their perspectives on

15  what happened yesterday.  It's your perspective that controls.

16      Go ahead, Mr. Organ.

17  **BY MR. ORGAN:**

18  **Q.**  This statement that you put in here, "We investigated by

19  speaking to all witnesses," again, the "we" does not include

20  you; right, sir?

21  **A.**  Well, it was like -- as I mentioned, you know, I was

22  not -- at that time I was not the elevator supervisor.  I was

23  coming into -- into the elevator operation.  Okay.

24      Jaime Salazar was still supervisor over the elevators.  I

25  understood Tom Kawasaki was his lead.  Okay.

1    And so when this happened, they were -- they were pretty

2    much taking the lead in talking to the people involved.

3    **Q.**   But Jaime Salazar never sent an e-mail to the manager over

4    everyone, Victor Quintero; correct?

5         **MR. GRIFFIN:**   Objection.   Calls for speculation.

6    **BY MR. ORGAN:**

7    **Q.**   As far as you know, Jaime Salazar never sent an e-mail?

8    **A.**   I have no way of knowing what he did.   I have no way of

9    knowing if he sent e-mails or not.

10   **Q.**   Right.   You never received such an e-mail; correct?

11   **A.**   No.

12   **Q.**   And so the -- and Mr. Kawasaki, you just testified that

13   Mr. Kawasaki did inform you that the witnesses had at least

14   confirmed that racial slurs had been thrown; right, sir?

15   **A.**   I don't think that he confirmed.   I think he was stating

16   the fact that people -- that Owen had complained that some

17   people had used racial slurs.   Okay.   At that moment that's

18   where it was at.

19   **Q.**   Okay.   You would admit that in terms of witnesses did not

20   hear the remarks, Mr. Kawasaki did at least communicate to you

21   that he had talked to people who had said they had heard

22   something; correct, sir?

23         **MR. GRIFFIN:**   Objection.   Asked and answered.

24         **THE COURT:**   Overruled.

25         **THE WITNESS:**   At this time when this was sent, it was

1    my understanding that Mr. Diaz had said that someone had used

2    racial slurs.  Okay.  And that supposedly these people had

3    heard this.  Okay.  Then -- then in the follow-up

4    investigation, or whatever you want to call it, they had said

5    no, that they hadn't heard that.  That was my understanding.

6    **BY MR. ORGAN:**

7    **Q.**   And was there any documentation of this follow-up

8    conversation?

9    **A.**   That at this moment that I can direct you to say this

10   e-mail or this text or whatever, I can't remember.

11   **Q.**   Let's shift gear --

12   **A.**   Okay.

13   **Q.**   -- and move ahead in time to October 17.  Okay.  So about

14   three months before the drawing, the jigaboo drawing that we

15   saw before.

16          And let's look at Exhibit 235.

17                       (Pause in proceedings.)

18   **BY MR. ORGAN:**

19   **Q.**   Do you see that?  You received this; correct?

20   **A.**   Yes.

21   **Q.**   And so -- so at this point in time, October 17, 2015, you

22   understood that Mr. Diaz was complaining about threatening

23   conduct towards him by Ramon Martinez; correct?

24   **A.**   That's what Owen said, yes.

25   **Q.**   Owen said to you in the e-mail that Ramon was in his face;

1   right?

2   **A.**   Yes.

3   **Q.**   That Owen told you that Ramon was mad and upset; correct?

4   **A.**   Yes.

5   **Q.**   And if you look at what Mr. Diaz said, he said that Ramon

6   jumped off the tugger near the elevator doors; right?

7   **A.**   That's what he said, yes.

8   **Q.**   And he said that "Ramon started yelling at me in a

9   threatening manner."  That's what he was telling you; right?

10  **A.**   Yes.

11  **Q.**   And Owen Diaz told you that Ramon said, "You have a

12  problem with me?  You have a problem with me?"

13  **A.**   That's what he said, yes.

14  **Q.**   Yeah.  And Owen told you that Ramon followed him into the

15  elevator, that's what he said, right, in the e-mail?

16  **A.**   I understood Ramon was in the elevator.

17  **Q.**   Okay.  And Mr. Diaz told you that Ramon kept yelling at

18  him; right?

19  **A.**   He did.

20  **Q.**   Yep.  And Mr. Diaz told you that he reminded Ramon that

21  they were on cameras; right?

22  **A.**   Yes.

23  **Q.**   Pointed to the camera and told you that; right?

24  **A.**   Yes.

25  **Q.**   And he said, "I don't feel safe around him now," that's

 1 | what he said in the e-mail; right?
 2 | **A.**   That's what he said.
 3 | **Q.**   And a safety issue is an important issue in a factory,
 4 | isn't it, sir?
 5 | **A.**   Safety is always important everywhere.
 6 | **Q.**   Because if there is safety conflicts in a factory where
 7 | there is dangerous machinery, that can lead to physical
 8 | injuries; right, sir?
 9 | **A.**   Yes.
10 | **Q.**   Okay.  At this time Ramon Martinez was a supervisor;
11 | correct?
12 | **A.**   I don't know if he was or not.
13 |          **MR. ORGAN:**  Your Honor, I would like to read --
14 |          **THE WITNESS:**  I can't remember.
15 |          **MR. ORGAN:**  -- from the first transcript, Day 1,
16 | page 152, lines 20 to 22.
17 |                    (Pause in proceedings.)
18 |          **THE COURT:**  You may.
19 | **BY MR. ORGAN:**
20 | **Q.**   "QUESTION:  At this point in time, Ramon Martinez, he's a
21 | supervisor; correct?
22 |          "ANSWER:  Yes."
23 |      Owen Diaz said at the end of Exhibit 235, "You can check
24 | the surveillance system to confirm" --
25 |          **THE COURT:**  If you are going to ask him a question, he

 1   wanted to check the deposition transcript, so.

 2            **MR. ORGAN:**  Oh, I'm sorry.  Yeah, we have moved on,

 3   so...

 4   **BY MR. ORGAN:**

 5   **Q.**   Let's go back to Exhibit 235.  Look at the exhibit on your

 6   monitor, sir.

 7        Owen Diaz says at the end of Exhibit 235, "Check the

 8   surveillance system to confirm"; correct?

 9   **A.**   Yes.

10   **Q.**   But you never talked to Tom Kawasaki about what was in the

11   video; is that correct?

12   **A.**   Okay.  What was the question again?

13   **Q.**   I'll change the question.  Did you check the surveillance

14   system?

15   **A.**   No.

16   **Q.**   And you would have had to talk to Mr. Quintero to get

17   access to the surveillance system; is that correct?

18   **A.**   I would have to talk to him, and then Tesla would have to

19   authorize the permission to look at the cameras.

20   **Q.**   And you didn't bother to go talk to Mr. Quintero to get

21   access to that video system; correct?

22   **A.**   I can't remember the conversation I had with -- with

23   Mr. Quintero about that at all, to be honest with you.

24   **Q.**   Erin Marconi, she was the HR person over that area at that

25   time for Tesla; correct?

1    **A.**   I don't know if it was that area or what area she was

2    over, but yes, she was with HR.

3    **Q.**   Okay.  And at some point in time, Erin Marconi sent you an

4    e-mail saying you should stop investigating; correct?

5    **A.**   I was transitioning from nextSource to Tesla as a Tesla

6    employee.  Okay.  In that period of time, okay, you know,

7    people assumed -- some people from nextSource -- janitors

8    assumed that I was their supervisor.

9         Other people were just -- I was going into the elevator

10   service supervisor.  Okay.  And so, you know, at that moment

11   that I remember they wanted me to -- Wayne Jackson said, "Well

12   this happened, and we should look into it."  Okay.

13        By then I was a Tesla employee, and that's why they said,

14   "No, now you are a Tesla employee.  It's better that you don't

15   follow up on that."  And that's where it was at.  That was the

16   reason behind that.

17   **Q.**   Owen Diaz was promoted by Victor Quintero in August of

18   2015; correct, sir?

19   **A.**   Ramon?

20   **Q.**   Owen Diaz was promoted by Victor Quintero in August of

21   2015; correct?

22   **A.**   I don't remember the date.

23   **Q.**   But Owen Diaz was promoted by Victor Quintero at some

24   point; correct?

25   **A.**   He became a lead, yes.

1   Q.   Because Victor Quintero approved that; correct?

2   A.   I'm assuming that he -- it needed his approval.

3   Q.   Okay.  It's your position, your contention, that no one

4   ever came to you with a complaint about the N-word; correct?

5                    (Pause in proceedings.)

6           THE WITNESS:  Can you ask me again, please?

7   BY MR. ORGAN:

8   Q.   Yeah.  It's your position and contention that no one ever

9   came to you with a complaint about the N-word; correct?

10  A.   From what I remember, Owen was the one that had

11  complaints.  Okay.  And I can think of, you know, of at least

12  two occasions.  Okay.  And we dealt with it immediately.  We

13  dealt with the issue immediately.

14  Q.   And who is the second person Owen lodged the N-word

15  complaint with?

16  A.   Judy Timbreza was one, I think, and -- and I think Troy

17  Dennis was the other one.

18  Q.   Troy Dennis?

19  A.   Yes.

20  Q.   I see.  Okay.

21       So you did receive a complaint from Troy Dennis about --

22  you received a complaint about Troy Dennis --

23  A.   From --

24  Q.   -- using the N-word?

25  A.   Owen complained, yes.

1   **Q.**   Okay.  So he complained to you about two people using the

2   N-word then; is that correct, sir?

3   **A.**   And -- yeah, they were dealt with each time.

4   **Q.**   I see.  And when you say, "They were dealt with," was --

5   they were dealt with under Tesla's zero-tolerance policy?

6   Well, let me rephrase that.

7       Tesla had a zero-tolerance policy for race harassment;

8   right, sir?

9   **A.**   That's what I understand, yes.

10  **Q.**   And the two people that Owen complained to you about

11  regarding use of the N-word, did -- that would have violated

12  the zero-tolerance policy, using the N-word towards Owen Diaz;

13  correct?

14  **A.**   I would assume, yes.

15  **Q.**   And under Tesla's zero-tolerance policy for using racial

16  slurs, were those people fired because they used the N-word

17  towards Mr. Diaz?

18  **A.**   I don't remember anybody being fired for that.  I would --

19  I would think that they got disciplined.

20  **Q.**   Okay.

21       **MR. ORGAN:**  No more questions.  Thank you, sir.

22       Thank you, Your Honor.

23                    (Pause in proceedings.)

24       **MR. GRIFFIN:**  May I approach and give him this,

25  Your Honor?

```
 1              THE COURT:  Please.
 2                      (Pause in proceedings.)
 3                    CROSS-EXAMINATION
 4   BY MR. GRIFFIN:
 5   Q.   Mr. Romero, let me make sure that's your deposition
 6   testimony and not your prior proceeding testimony.
 7                      (Pause in proceedings.)
 8   BY MR. GRIFFIN:
 9   Q.   Mr. Romero, can you go to -- do you remember the questions
10   from Plaintiff's counsel about your deposition testimony at
11   page 137?  Do you recall that?
12   A.   Yes.
13   Q.   And can you go to page 137 of your deposition, starting on
14   line 25 and going to page 138:11.
15                      (Pause in proceedings.)
16              THE WITNESS:  Okay.  What line?
17              MR. GRIFFIN:  Page -- line 25 on page 137 to
18   page 138:11.
19              THE WITNESS:  Starting at line 25?
20              MR. GRIFFIN:  Yeah.  I just want you to read that from
21   line 25 to 138:11.
22              THE WITNESS:  You want me to read it?
23              THE COURT:  Just to yourself.
24              MR. GRIFFIN:  To yourself.
25                      (Pause in proceedings.)
```

1    BY MR. GRIFFIN:

2    Q.   Do you recall that they were asking you about whether or

3    not -- the question that counsel asked you was on 137, line 3

4    to 137, line 15, about the racist effigy and whether or not

5    Mr. Diaz had previously complained to you, and do you see from

6    page 137:25 to 137:11 you clarified your answer?

7    A.   Yes.

8    Q.   What was your --

9         MR. GRIFFIN:   Your Honor, may I read the transcript

10   in?

11        THE COURT:   Sure.

12   BY MR. GRIFFIN:

13   Q.   So right after on the same page that counsel read to you,

14   there was a question, "So Thomas," and then you stopped him and

15   said, "Could I clarify something?"   Correct, Mr. Romero?

16   A.   Yes.   Uh-huh.

17   Q.   And your answer was:   "Before you touched on Thomas, you

18   asked a question about if I was aware of any other incidents

19   where Owen might have said there was some racial situation, and

20   there was one other situation.   When you asked me the question,

21   I kept thinking about when I was a supervisor now over the

22   elevators.   But prior to me becoming a supervisor, there was

23   one incident that he complained it had to do with a fellow

24   named Judy Timbreza or something like that."

25        Isn't that what you clarified at your deposition, sir?

1    **A.**   Yes.   Uh-huh.

2    **Q.**   And at the end of your -- at the questioning you mentioned

3    a complaint between Mr. Diaz and a man named Troy Dennis;

4    correct?

5    **A.**   Yes.

6    **Q.**   Who was Troy Dennis?

7    **A.**   I think he was also an elevator operator.

8         **MR. GRIFFIN:**   And, your Honor, I'd like to use an

9    exhibit to refresh this witness' recollection about Mr. Dennis.

10        **THE COURT:**   Well, so far there's no basis to do that,

11   and once you have that basis, I'd like to take a look at it

12   before.   You go ahead.

13   **BY MR. GRIFFIN:**

14   **Q.**   All right.   Mr. Romero, you testified about alleged

15   interaction between Mr. Dennis and Mr. Diaz; correct?

16   **A.**   Yes.

17        **MR. ORGAN:**   Objection, Your Honor, this is outside the

18   scope of the prior trial.

19        **THE COURT:**   It is, but you asked questions about it,

20   so I'm -- you may proceed.

21        **MR. GRIFFIN:**   Okay.

22   **BY MR. GRIFFIN:**

23   **Q.**   And you recall that Mr. Dennis -- there was -- do you

24   recall a situation where Mr. Dennis had made a complaint --

25   there was a complaint about Mr. Dennis?

1    **A.**    Yes.

2    **Q.**    And you're familiar with a man named Javier Temores?

3    **A.**    Yes.

4    **Q.**    And at any point in time did Mr. Temores make a complaint

5    about Mr. Dennis?

6    **A.**    He had a complaint against him.

7    **Q.**    And --

8              **THE COURT:**  We are getting a little far afield,

9    Mr. Griffin.  Let me see what you've got there.

10             **MR. ORGAN:**  Could we see it, Your Honor, so that I

11   could --

12             **MR. GRIFFIN:**  Exhibit 106.

13             **THE COURT:**  I would like to see it, if it's all right.

14                     (Pause in proceedings.)

15             **MR. GRIFFIN:**  The bottom e-mail, Your Honor.

16                     (Pause in proceedings.)

17             **THE COURT:**  Show the Plaintiff.

18             **MR. GRIFFIN:**  Counsel, do you need a copy?

19             **MR. ORGAN:**  I've got it.  Wait.  I don't think I have

20   yours -- oh, I do.  Yep.  I got it.  Thanks.

21             **THE COURT:**  Is there an objection to this?

22             **MR. ORGAN:**  There is not an objection to them

23   admitting the exhibit, Your Honor.

24             **THE COURT:**  Okay.  Well, then let's proceed.

25             **MR. ORGAN:**  All right.  It's about this incident.

```
 1              THE COURT:  I'm sorry.  Let's proceed.

 2              THE CLERK:  Do you want to publish this exhibit?

 3              MR. GRIFFIN:  I would like to publish the exhibit,

 4     Your Honor.

 5              THE COURT:  Okay.  Is there an objection to the

 6     publishing the exhibit?

 7              MR. ORGAN:  No, Your Honor.

 8              THE COURT:  Okay.  Let's move it into evidence.  So

 9     this -- what is the exhibit number here?

10              MR. GRIFFIN:  Exhibit 106, Your Honor.

11         (Trial Exhibit 106 received in evidence.)

12     BY MR. GRIFFIN:

13     Q.   You'll see Exhibit 106 is an e-mail from you on

14     December 30, 2015, Mr. Romero?

15     A.   Yes.

16     Q.   And at the bottom of the e-mail, there's -- you're

17     describing an incident between Javier Temores and Troy Dennis.

18         Do you see that?

19     A.   Uh-huh.  Yes.

20     Q.   Does that refresh your recollection that the complaint you

21     received about Mr. Dennis was actually from Mr. Temores and not

22     Mr. Diaz?

23              MR. ORGAN:  Objection.  Leading.

24              THE COURT:  Overruled.  You can answer.

25              THE WITNESS:  Okay.  Yes.  It's -- you know, it was
```

1  from Javier Temores.

2  BY MR. GRIFFIN:

3  Q.   What race, for the record, is Mr. Temores?

4       MR. ORGAN:   Objection.   Relevance, Your Honor.

5  There's no relevance to that.

6       THE COURT:   Overruled.   This -- this has opened the

7  door.   You can answer.

8  BY MR. GRIFFIN:

9  Q.   What race was Mr. Dennis?

10  A.   Black.

11  Q.   Okay.   And so in this e-mail you're writing -- you're

12  informing Wayne Jackson about a complaint that Mr. Temores had

13  made about a Black man, Troy Dennis, calling Mr. Temores the

14  N-word; correct?

15  A.   Yes.

16  Q.   And why did you want to inform Mr. Jackson about this?

17  A.   Because, you know, we didn't want to tolerate any of that

18  type of conduct.   Okay.   And being that he was working for

19  nextSource, I felt it was important that they knew what this

20  Javier was complaining about.

21  Q.   And so when you ever got a complaint about the N-word,

22  what did you do to respond?

23  A.   Any time I heard any type of that kind of complaint, we

24  dealt with it immediately by informing our -- our managers, and

25  by extension, they informed HR.   You know, that's -- but it was

 1    dealt with immediately.

 2    **Q.**   Okay.  And I just want to go back to the -- to ask some

 3    preliminary questions.  Okay, Mr. Romero?

 4         Do you still work at Tesla?

 5    **A.**   No.

 6    **Q.**   When's the last time you worked at Tesla?

 7    **A.**   2017.

 8    **Q.**   And do you own any Tesla stock?

 9    **A.**   No.

10    **Q.**   Okay.  And counsel asked you about your interactions with

11    Mr. Kawasaki related to the July 2015 incident concerning

12    Mr. Timbreza?

13    **A.**   Yes.

14    **Q.**   And do you recall at any point in time that Mr. Kawasaki

15    said to you that the N-word, N-I-G-G-E-R, was actually used in

16    that situation?

17    **A.**   No.

18    **Q.**   And Mr. Diaz reported the issue concerning Mr. Timbreza;

19    correct?  He reported -- Mr. Diaz reported the issue to

20    Mr. Kawasaki; correct?

21    **A.**   Yes.

22    **Q.**   And then after that, Mr. Kawasaki reported to you?

23    **A.**   Well, he informed me of what was going on, him and both

24    Jaime Salazar.

25    **Q.**   And then after that point in time, was Mr. Diaz ever given

 1  any discipline related to reporting that incident to you?

 2  **A.**   Was Mr. Diaz?

 3  **Q.**   Yeah.  Was he punished for reporting racial harassment?

 4  **A.**   No.

 5  **Q.**   Okay.  And I want to point your attention to Exhibit 222.

 6  It should be on the screen, Mr. Romero.

 7       This is an e-mail from August 17, 2015.  Do you see that?

 8  **A.**   Yes.

 9  **Q.**   And this is about two weeks after that incident with

10  Mr. Timbreza?

11  **A.**   Yes.

12  **Q.**   And what is this e-mail relating to?

13  **A.**   Owen Diaz being promoted to a lead elevator operator.

14  **Q.**   Okay.  And did he have a change in salary at that time as

15  well?

16  **A.**   He got an increase in salary.

17  **Q.**   Okay.  At any time prior to the incident with

18  Mr. Timbreza, did Mr. Diaz ever report any racial harassment or

19  slurs that were used -- did Mr. Diaz ever report there were any

20  slurs or racial harassment used against him?

21  **A.**   No.

22  **Q.**   Okay.  And you talked about the incident between Mr. Diaz

23  and Mr. Martinez in the elevator in October.

24       Do you remember those questions?

25  **A.**   Yes.

1  **Q.**   Between the time period in July 31 where you had the

2  Timbreza incident and the incident in the elevator, did

3  Mr. Diaz ever report any issues of racial harassment to you?

4  **A.**   No.

5  **Q.**   Okay.  With regards to your job over the elevators, when

6  did you start taking more day-to-day responsibilities for the

7  elevator?

8  **A.**   When I was still an employee of -- of nextSource, at that

9  time Mr. Quintero let it be known to me that I -- that I -- he

10  liked the way I worked and so on and that maybe in the future

11  there might be an opportunity.

12      So being that that's what he was planning, I started

13  getting introduced to the elevator operations.

14  **Q.**   Okay.  A lot of --

15          **THE COURT:**  A lot of information.  I want a little

16  information myself, Mr. Griffin.  How much longer will you be?

17          **MR. GRIFFIN:**  Less than 10 minutes.

18          **THE COURT:**  Okay.  I think I'll still take the break,

19  the morning break now.

20      Ladies and gentlemen, we'll be back at 10:15.  Please

21  remember the admonitions.  Don't discuss the case with anybody,

22  don't look up anything, and enjoy the break.

23          **THE WITNESS:**  Do I stay here for the break?

24          **THE COURT:**  You get to step down.

25      (Proceedings were heard outside the presence of the jury:)

```
 1              THE COURT:  All right.  We are in recess.

 2                   (Recess taken at 10:03 a.m.)

 3              (Proceedings resumed at 10:16 a.m.)

 4              THE CLERK:  Please come to order.

 5              THE COURT:  Mr. Griffin, are we ready for the jury?

 6              MR. GRIFFIN:  Mr. Spiro will be here in a second.

 7              THE COURT:  Well, I'm not going to wait -- you're

 8      asking the questions.

 9          Ms. Davis, let's go.

10                      (Pause in proceedings.)

11          (Proceedings were heard in the presence of the jury:)

12              THE COURT:  All right.  Please be seated, everybody.

13          Mr. Griffin, please continue.

14              MR. GRIFFIN:  Thank you, Your Honor.

15              CROSS-EXAMINATION    (resumed)

16      BY MR. GRIFFIN:

17      Q.   Mr. Romero, do you recall an elevator worker named Rothaj

18      Foster?

19      A.   Yes.

20      Q.   Okay.  And do you recall a dispute that Mr. Foster and

21      Mr. Diaz had in the fall of 2015?

22      A.   I remember they had a -- an issue.

23      Q.   What was that issue?

24      A.   Mr. Foster reported to work -- this is me going through my

25      recollection here -- reported to work thinking that he was
```

1  going to be transferred to the recycling department.  Okay?

2  That elevator operation's low on a person, so when he called

3  me, I said, "No.  You can't go over there now because we're

4  shorthanded.  We can't just have you leave like that."  Okay.

5       It's my understanding that he said that Wayne Jackson had

6  told him that he was going to move him over to the recycling

7  department.  Okay.

8       That started some issue between him and Owen.

9  **Q.**  And what happened between him and Owen?

10 **A.**  He complained that Owen was being mean to him and not

11 letting him take his breaks and things like that.  I told him,

12 "Well, look.  We're short.  I'm sure Owen, you know -- you

13 know, once things settle down, he'll let you go to break" and

14 so on.  Okay?

15      The issue kept escalating.  I received a call, like, early

16 evening, and then about 9:00 o'clock I got another call from

17 him -- I mean, from him that Owen wasn't letting him go to his

18 breaks or lunch or something.  Okay.

19      I decided to call Owen.  So I called Owen.  He said,

20 "Well, no, you know.  You know, we're busy and, you know, he'll

21 be able to take his break as soon as we can get to it or

22 whatever."  Okay?

23      But he said that Mr. Foster was -- was being kind of,

24 like, belligerent, you know, and so on.  So I decided to go.

25      Owen said that Mr. Foster had told him, "You better watch

1  out for your car" or something like that.  So I thought it was

2  very serious.  So I went back to the --

3          THE COURT:  Can we proceed by questions and answers?

4          MR. GRIFFIN:  Sure.

5  BY MR. GRIFFIN:

6  Q.  So you were talking about things escalating.  What

7  ultimately happened between Mr. Diaz and Mr. --

8  A.  Being that there were threats being made by Mr. Foster, I

9  went in and decided to ask him to go home.  You know, I didn't

10 want that to escalate to the point that they had a big issue.

11          So I asked Security to, you know, let him know that he

12 needed to leave the premise.  I told him "You are suspended.

13 We'll deal with this tomorrow."

14 Q.  What ultimately happened to Rothaj Foster and his

15 employment with Tesla?

16 A.  He was terminated.

17 Q.  Why was he terminated?

18 A.  Because he was being threatening.

19 Q.  Okay.  And then after Mr. Foster was terminated, were you

20 short people in the elevator shift?

21 A.  Yes, we were -- it was -- it was a responsibility that we

22 were always short of people.

23 Q.  And do you recall a gentleman named Lamar Patterson?

24 A.  Yes.

25 Q.  And who is Lamar Patterson?

ROMERO - CROSS / GRIFFIN

1    **A.**   He was an elevator operator.

2    **Q.**   How did he get the job at the plant?

3    **A.**   If I recall -- and I'm not -- I'm only going by memory

4    from many years ago -- I think it was related to Owen.

5    **Q.**   What do you recall from that?

6    **A.**   I think Owen had recommended him to -- you know, and he

7    was hired on.

8    **Q.**   Okay.  And I want to go back and point your attention to

9    Exhibit 235.  Exhibit 235 is the complaint that Mr. Diaz sent

10   to you in October -- October 17 of 2015; right?

11   **A.**   Uh-huh.

12   **Q.**   And you went through this document with Plaintiff's

13   counsel; correct?

14   **A.**   I think -- yes.

15   **Q.**   And is there anything in Mr. Diaz's e-mail where he makes

16   a complaint about racial harassment related to this October 17

17   incident?

18   **A.**   No.

19   **Q.**   And when -- you spoke to Mr. Diaz about this October

20   incident; correct?

21   **A.**   Yes.

22   **Q.**   And did he ever complain to you when you spoke to him

23   about Mr. Martinez using any racial slurs or racially harassing

24   language related to this incident?

25   **A.**   No.

1          MR. ORGAN:  Objection.  Leading, Your Honor.

2          THE COURT:  Overruled.

3    BY MR. GRIFFIN:

4    Q.   And so the two incidents we've talked about involving

5    racial incidents for Mr. Diaz that were reported to you were

6    the Timbreza incident and the drawing incident; correct?

7    A.   Yes.

8    Q.   Okay.

9          MR. GRIFFIN:  No more questions.

10         THE COURT:  All right.  Mr. Organ.

11         MR. ORGAN:  Just a few and we'll let you go.

12         THE WITNESS:  Okay.

13                    <u>REDIRECT EXAMINATION</u>

14   BY MR. ORGAN:

15   Q.   Okay.  Mr. Romero, you mentioned when I was asking you

16   questions earlier that you recalled that Owen Diaz --

17         MR. ORGAN:  Is that too loud, Your Honor?

18         THE COURT:  No.  You are fine.

19         MR. ORGAN:  Okay.  That -- oh -- it pulls my hearing

20   aids out when I take that out, but okay.

21   BY MR. ORGAN:

22   Q.   In response to my question that you hadn't heard the

23   N-word, you said you remember "Owen was the one that had

24   complaints.  I can think, you know, of at least two occasions,"

25   and that you dealt with it.

1          And the two occasions that you mentioned were the Timbreza

2   incident that -- that was one N-word complaint; correct.

3   **A.**   Yes.

4   **Q.**   Okay.  And then the other occasion you thought was the

5   Troy Dennis incident; right?

6   **A.**   Yes.

7   **Q.**   So -- but we just found out from that Exhibit 106 that

8   actually there was a complaint about Troy Dennis using the

9   N-word.

10          So that was a different complaint; right, sir?

11  **A.**   Yes, yes.

12  **Q.**   So the second complaint then that you remember from Owen

13  Diaz about the N-word, that had to be about Mr. Martinez;

14  right, sir?

15          **MR. GRIFFIN:**  Objection.

16          **THE COURT:**  Overruled.

17          **THE WITNESS:**  Ask it again.

18  **BY MR. ORGAN:**

19  **Q.**   That second complaint -- you said there were two --

20  **A.**   Yes.

21  **Q.**   -- about the N-word.  That second complaint, it had to be

22  about Ramon Martinez; right, sir?

23  **A.**   No.

24  **Q.**   Well, it had to be about someone other than Troy Dennis.

25  Who was the other person that Mr. Diaz complained to you about

```
 1  using the N-word?

 2  A.   When I said "two," those are the two people that came to

 3  mind.  Okay?  All right?  So there was no others.

 4  Q.   So now you are changing your testimony that it wasn't

 5  two complaints about the N-word?

 6  A.   When I answered the question, okay, those two names are

 7  the ones that in my mind, trying to remember back, came to

 8  mind; but there were no other people that I ever recall Owen

 9  ever complaining about the N-word.

10  Q.   Isn't it true, sir, you don't remember anybody complaining

11  about the N-word?  You are unclear about this whole topic,

12  aren't you, sir?

13  A.   No.  I -- we are talking about things that happened many

14  years ago.  Okay, you know.

15  Q.   Well, you gave testimony in the first phase of this

16  trial -- in the first phase of this case, a year and a half

17  ago; right, sir?

18  A.   Yes, I was here.

19  Q.   Yeah.  And isn't it true that you said that you don't

20  remember anybody coming directly about that, not offhand;

21  that's what you said, sir, a year and a half ago; right?

22  A.   I don't remember the context of how --

23  Q.   Your memory is not perfect on this, you will admit that;

24  right?

25  A.   Uh-huh.  Nobody's memory is perfect.
```

1  **Q.**   Right.   Except maybe somebody who went through it; right?

2  They have a better memory; right?

3        **MR. GRIFFIN:**   Objection.   Argumentative.

4        **THE COURT:**   Overruled.

5        **THE WITNESS:**   Okay.   I'm going to have to ask you to

6  ask me again.

7        **MR. ORGAN:**   I will withdraw that.

8        **THE WITNESS:**   Okay.

9        **MR. ORGAN:**   No more questions, Your Honor.   Thank you.

10        **THE COURT:**   Thank you, Mr. Romero.   You can step down.

11        **THE WITNESS:**   Thank you.

12        **MR. ORGAN:**   Your Honor, we're going to play the

13  Marconi video.

14        **THE COURT:**   Okay.

15        **MR. ORGAN:**   I should say Ms. Grislis will play the

16  Marconi video for us.

17        **THE COURT:**   Okay.

18        **MR. ORGAN:**   Because if I did it, it would not work.

19        **THE COURT:**   So, ladies and gentlemen, before this is

20  played, this is testimony that was given under oath.   You are

21  to give it the same weight that you would as if it was

22  happening here in court.   And there are going to be a couple of

23  these videos.

24             (Video was played but not reported.)

25        **MR. ORGAN:**   Your Honor, for the record, Exhibit 37 in

 1    the depo is Trial Exhibit 33.

 2              THE COURT:  All right.

 3                   (Video was played but not reported.)

 4              MR. ORGAN:  That's it, Your Honor.

 5              THE COURT:  So I just want the record to reflect

 6    clearly, since it wasn't at the beginning of the testimony,

 7    that the person -- the witness testifying there was Erin

 8    Marconi.

 9        What's next?

10              MR. ORGAN:  I'm sorry?

11              THE COURT:  What's next?

12              MR. ALEXANDER:  Your Honor, the next witness will be

13    Ramon Martinez.

14              THE COURT:  Step on up here, please, Mr. Martinez.

15              THE CLERK:  Remain standing.  I'm going to take your

16    picture and then I will swear you in.

17              THE WITNESS:  You want me to remove my mask?

18              THE CLERK:  Yes, if you have been vaccinated.

19                   (Pause in proceedings.)

20              THE CLERK:  Raise your hand for me, please.

21                        **RAMON MARTINEZ**,

22    called as a witness for the Plaintiff, having been duly sworn,

23    testified as follows:

24              THE CLERK:  Please be seated.  If you would please

25    begin by stating your full name and spelling it for the court

1    reporter.

2            THE WITNESS:  Ramon Martinez.  R-A-M-O-N,

3    M-A-R-T-I-N-E-Z.

4            MR. ALEXANDER:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6    BY MR. ALEXANDER:

7    Q.    During what timeframe were you employed -- were you

8    working at the Tesla Fremont factory?

9    A.    It was in the beginning of 2015, January 2015.

10   Q.    And when -- and when were you last there?

11   A.    I'm still working for the company.

12   Q.    And what position did you hold in 2015, 2016?

13   A.    I was hired as a lead supervisor for the graveyard shift.

14   Q.    The graveyard shift of what department?

15   A.    For recycling department.

16           THE COURT:  Mr. Martinez, if you could bring the mic a

17   little closer to you, that would be great.  Thank you.

18           THE WITNESS:  Not a problem.

19           MR. ALEXANDER:  Could we display, please,

20   Exhibit 33-2.

21   BY MR. ALEXANDER:

22   Q.    Do you recognize that picture, Mr. Martinez?

23   A.    Yes, I do.

24   Q.    And that picture shows a bale with a drawing on it.  Do

25   you see that?

1    **A.**   Yes.

2    **Q.**   With regard to the drawing that is on that bale, there

3    appear to be two.  One on the far left as you are facing the

4    picture has Pac-Man; is that correct?

5    **A.**   That's correct.

6    **Q.**   Did you draw those Pac-Man?

7    **A.**   No, I don't.

8    **Q.**   You did not?

9    **A.**   No.

10   **Q.**   Okay.  And then in the center there is a drawing that is

11   made there.  Did you draw that drawing?

12   **A.**   Yes, I did.

13   **Q.**   And that drawing is Inki the Caveman; correct?

14   **A.**   That's correct.

15   **Q.**   That's correct.

16          **MR. ALEXANDER:**  If we could put beside Exhibit

17   Number 33-2 Exhibit Number 133.

18                    (Pause in proceedings.)

19   **BY MR. ALEXANDER:**

20   **Q.**   And at the point when you drew what is on the bale there,

21   you intended it to be Inki the Caveman; is that correct?

22   **A.**   That's right.  Yes.

23   **Q.**   Thank you.  And then there is a red item that is in the

24   picture of Exhibit 33-2.  That red item, what is it?

25   **A.**   I'm sorry.  Can you repeat that again?

**MARTINEZ - DIRECT / ALEXANDER**

1  Q.  There is something red that is behind the -- the drawing

2  and in front of the drawing.  Is that a forklift?

3  A.  That is a forklift.

4  Q.  Okay.  And so -- and this drawing is on a bale of

5  cardboard; is that correct?

6  A.  That's correct.

7  Q.  Could you estimate -- generally, these cardboard bales,

8  how heavy are they?

9  A.  Around 1,350 to 1,400 pounds of cardboard.

10  Q.  Somewhere close to 1,400 pounds?

11  A.  Correct.

12  Q.  So they have to be lifted with a forklift?

13  A.  That's right.

14  Q.  With regard to this bale, it's your understanding that it

15  was left in a -- in a loading area; is that correct?

16  A.  Yes.

17  Q.  A loading zone; right?  And with regard to that, the bale

18  and it being left there, did you drive the bale and put it

19  there?

20  A.  No, I don't.

21  Q.  Do you know who drove the bale and put it there?

22  A.  No -- a specific person, no I don't.

23  Q.  Did you direct that person to put the bale there?

24  A.  No, I didn't.

25  Q.  So you drew the drawing.  You intended the drawing to be

1   left for Owen Diaz; correct?

2   **A.**   I'm sorry?

3   **Q.**   You intended the drawing to be left for Owen Diaz;

4   correct?

5   **A.**   No.

6   **Q.**   Well, where was the drawing made?

7   **A.**   That was a little competition between shifts to see who

8   was more productive.  If you look at the picture of Pac-Man, it

9   has a lot of names on top of the Pac-Man and two little ghosts,

10  meaning the swing shift, graveyard, and daytime shift.

11       So when I just came in, I see there were -- according to

12  the bale in the picture, they were saying that they were making

13  more bales than other shifts.  And my intent to draw the Inki,

14  that was because -- first of all, there was a memory from my

15  youngest, from my childhood, and I feel that I was -- watching

16  those Looney Tune cartoons, Daffy Duck and Bugs Bunny and other

17  characters were there.

18       So I feel -- I feel that Inki was a persistent character

19  that was always consistent to reach his goals.  There was no

20  other meaning behind that.

21  **Q.**   So the Pac-Man, that -- those characters had nothing to do

22  with the Caveman Inki; right?

23  **A.**   That's right.

24  **Q.**   All right.  So I was confused about your answer.

25       Where did you draw this?

MARTINEZ - DIRECT / ALEXANDER

1    **A.**   On the recycling area.

2    **Q.**   And so in order for this to be left in front of the

3    elevator, it had to be moved from your area.  I forgot what it

4    is.

5    **A.**   The recycling area to the elevator drop zone.

6    **Q.**   So it had to be moved from recycling over to the

7    elevators?

8    **A.**   Yes, sir.

9    **Q.**   At the point when you drew this figure on the cardboard,

10   was anyone else present?

11   **A.**   I believe there was a few more people next to me.

12   **Q.**   How many more people?

13   **A.**   I'm not sure clear for the timeframe, but I believe there

14   was two or three more people with me.

15   **Q.**   Any of them African American?

16   **A.**   No.

17   **Q.**   Okay.  And so then you drew this.  When you drew it,

18   you -- you added, if we look at the photograph, the word "boo,"

19   B-O-O.

20   **A.**   That's right.

21   **Q.**   The Caveman Inki, there was no boo reference inside the

22   Caveman Inki cartoons; right?

23   **A.**   That's correct.

24   **Q.**   And so you added the word "boo" to it; right?

25   **A.**   Yes, sir.

**MARTINEZ - DIRECT / ALEXANDER**

1   **Q.**   And so when you added the word "boo" to Inki, which had

2   nothing to do with the word "boo," you intended jigaboo; isn't

3   that; correct?

4   **A.**   No, sir.  I was -- the "boo" meaning for me was, like,

5   we -- we wasn't afraid of other shift making more bales than

6   us.

7   **Q.**   So can you tell me what about the word "boo" was going to

8   communicate to the other shift that they were -- that you were

9   somehow ahead of them making more bales than them?

10   **A.**   I just was saying -- and like I said, in that specific

11   moment, that was only to let them know that we can make more

12   bales out of whatever they were making.

13   **Q.**   All right.  So I just want to understand.  You drew this

14   figure on cardboard, yes?

15   **A.**   Yes, sir.

16   **Q.**   And that cardboard was intended to be the figure Inki;

17   right?

18   **A.**   That's right.

19   **Q.**   And the figure that you drew had a bone in it and big

20   lips; correct?

21   **A.**   That's right.

22   **Q.**   And you're saying that when it was taken over to the

23   elevator area, you didn't direct that it be left for Owen Diaz?

24   **A.**   That's correct.

25   **Q.**   And so it's just a coincidence that the figure has dark

1   skin, Inki the Caveman?

2   **A.**   Like I was saying before, there was some memory from my

3   childhood.

4   **Q.**   I understand, like, it's a memory from your childhood, but

5   you brought that memory into the workplace and drew it on the

6   bale.  So what I'm trying to figure out is:  Did you purposely

7   draw that bale -- I'm sorry -- that picture on the bale because

8   you intended it for a Black man to see it?

9   **A.**   No, sir.

10  **Q.**   Okay.  So it was a coincidence that a Black man saw it.

11  Is that what you're saying?

12  **A.**   I believe so.

13  **Q.**   Okay.  And you're using the word "boo" which is not at all

14  associated with a caveman.  You're saying that that was also a

15  coincidence that it goes with jigaboo?

16  **A.**   I believe so.  I don't have an idea how they can get

17  related.

18            **THE COURT:**  Could you bring the mic a little closer to

19  you, Mr. Martinez?  Thank you.

20                     (Pause in proceedings.)

21  **BY MR. ALEXANDER:**

22  **Q.**   So if I -- if I recall correctly, at some point,

23  Mr. Wheeler and Israel walked around to try and figure out who

24  had written -- who had drawn this -- this character.

25      Do you remember that?

1    **A.**   I remember Mr. Wheeler come looking for me because there

2    was an issue at the elevator, yes.

3    **Q.**   But the elevator area, it's separate from the area that

4    you were talking about, the recycling area?

5    **A.**   Yes, sir.

6    **Q.**   How much distance separates it?

7    **A.**   I'm assuming 150 -- 150 feet away from in distance in

8    between.

9    **Q.**   At the point when you wrote on the bale, you understood

10   that the bale was going to be thrown out; right?

11   **A.**   Not thrown out but taken to the elevator, yes.

12   **Q.**   The only way that the bale could get from your location

13   down out of the building, which was the intention, was it had

14   to be taken on a forklift and left by the elevators; right?

15   **A.**   That's correct.

16   **Q.**   So at the point when you drew this drawing, you knew for a

17   fact that it would end up in front of the elevators; right?

18   **A.**   Yes.  That's the process.  That was the process.

19   **Q.**   Now, just so that we're clear, before this incident with

20   the "pickaninny," you had had a previous incident with Mr. --

21   with Mr. Diaz associated with the elevators; right?

22   **A.**   That's correct.

23   **Q.**   And with regard to that previous incident associated with

24   the elevators, you and he had an altercation; right?

25   **A.**   Yes.

1   Q.   So before you drew this drawing of Inki the Caveman, you

2   had had a previous incident where there was a confrontation

3   with Owen Diaz?

4   A.   Yes.

5   Q.   And in that confrontation, it was a threat of a physical

6   confrontation; isn't that true?

7   A.   No.

8   Q.   Okay.  You sent --

9           MR. ALEXANDER:  Let's show Exhibit Number 31.

10                  (Pause in proceedings.)

11          MR. ALEXANDER:  Yes, 234.

12                  (Pause in proceedings.)

13  BY MR. ALEXANDER:

14  Q.   And with regard to the elevator incident, you say:  "Hi,

15  Mr. Romero.  I just want to bring to your attention that the

16  lead for the elevator, Owen, he's not acting on the

17  professional way with me, and I would like to talk to you about

18  it.  If there's any situation, I'd like to fix it, please."

19      When you say "if there's any situation, I'd like to fix

20  it, please," what is it you are referring to?

21  A.   I'm referring to about co-worker that called me that very

22  same day.  She was really crying on the phone, and she was

23  telling me that Mr. Owen comes really aggressive towards her

24  because she was trying to use the elevator because Mr. Owen

25  wasn't in his position to start doing or transporting the

1   material for second floor to bottom floor?

2       And when she tried to use the elevator because Mr.Owen

3   wasn't there, the moment that she was trying to operate it, he

4   arrived and he was really aggressive towards to her saying that

5   she should not touch his elevator and she will remove her

6   person out of the control panel.

7       So when she called me saying that she had some issues and

8   she was crying, that's the reason that I went to the elevator

9   one and looked -- started looking for Mr. Diaz and looking for

10  answers.  Why was she not be able to remove the items from

11  second floor to the first floor?

12  **Q.**   So the confrontation, you said, had inside the elevator is

13  because this woman had contacted you?

14  **A.**   Yes.

15  **Q.**   And so you rushed into the elevator to speak to Mr. Diaz

16  about that; correct?

17  **A.**   That's right.

18  **Q.**   And with regard to this incident, during the incident,

19  it's a correct statement that Owen Diaz reported to the --

20  pointed to the cameras while you were inside the elevator;

21  right?

22  **A.**   Because -- right.  He say, "Do you know we are in front of

23  the cameras?"

24      And I say, "Yes.  I'm aware of it, and I'm not worried

25  about it because I'm going to make report of this."

**MARTINEZ - DIRECT / ALEXANDER**

1   **Q.**   And at the point -- the reason why Mr. Diaz pointed to the

2   cameras is because you were aggressively moving towards him;

3   isn't that correct?

4   **A.**   No, sir.  We were up right to each other.

5   **Q.**   The reason why you -- the reason why Mr. Diaz pointed to

6   the cameras is because you had your fist raised coming towards

7   him; isn't that correct?

8   **A.**   No, sir.

9   **Q.**   The reason why you provided Exhibit -- the reason why you

10  wrote Exhibit 234 and you say:  "If there is any problem, I'd

11  like to fix it is because once he pointed to the cameras you

12  realize that you had been acting aggressively with Mr. Diaz and

13  raising your fists at him"; isn't that correct?

14  **A.**   No, sir.  The reason that I wrote that is because he is

15  being aggressive several times to our recycling department by

16  removing the items from second floor to the bottom floor.

17  **Q.**   So if I understand correctly, this incident on the

18  elevator where you said "if there's a situation, you'd like to

19  fix it," that happened before you drew Inki on that cardboard;

20  correct?

21  **A.**   That's right, sir.

22  **Q.**   Are there -- and you said there are no African American

23  people inside your workplace, so you didn't intend for an

24  African American person inside your workplace to see this

25  drawing; right?

1   **A.**   Say that again?

2   **Q.**   I will withdraw it.

3        You understood that Mr. Diaz was African American; right?

4   **A.**   Yes, sir.

5   **Q.**   So at this point when -- at the point when Mr. Wheeler and

6   Israel found you, you delayed acknowledging that you were the

7   person that drew this item on the bale; isn't that correct?

8   **A.**   No, sir.  At the moment Mr. Wheeler, he went to look for

9   me.  We both went to the elevator and looked for Mr. Diaz.

10  That's when I realized at the time that I saw him and see him

11  there, the way he was affected by what I did.  I definitely

12  understand that it was something wrong and something bad that I

13  did.

14  **Q.**   And so what you're saying is, the very instant you were

15  confronted about this drawing on there, you immediately

16  admitted that it was you?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  There was no delay?

19  **A.**   No delay.

20  **Q.**   All right.  Now, you gave a statement -- a written

21  statement; right?

22  **A.**   Yes.

23  **Q.**   And in that written statement, you said that you

24  apologized to Owen Diaz; is that correct?

25  **A.**   That's correct.

1   Q.   How many times did you apologize to Owen Diaz?

2   A.   Don't remember exactly how many times, but it was -- three

3   to four times probably at least.

4   Q.   Well, when you -- after you were confronted about this,

5   you went over to the bale that had been drawn; right?

6   A.   Yes?

7   Q.   Yes?

8   A.   Yes.

9   Q.   And when you got to that bale, Mr. Wheeler, Israel,

10  yourself, and Mr. Diaz were present; right?

11  A.   Yes.

12  Q.   And it's your testimony that when you apologized,

13  Mr. Wheeler would have been in the vicinity close enough to

14  have heard that apology assuming you made it; right?

15  A.   That's right.

16  Q.   All right.  So you would expect that if Mr. Wheeler came

17  and testified, he would have confirmed that you apologized in

18  front of him; correct?

19  A.   I'm assuming.  If he is telling the truth, I'm assuming he

20  would say that.

21  Q.   And it's also your testimony that you spoke to Mr. Diaz

22  and you apologized to him, and as a result of the apology, he

23  said that he was not going to send out an e-mail.

24  A.   That's right.

25  Q.   And at the point when you spoke with him, he had -- you

1   could see the e-mail that he was going to send out?

2   **A.**   I never saw anything on physically e-mail, but he said he

3   has the e-mail in his phone.

4   **Q.**   How did you know that he was going to send an e-mail?

5   **A.**   Because he said it.

6   **Q.**   He told you at the point when he was standing there that

7   he was going to send an e-mail?

8   **A.**   He said to me that he will send -- if he find out it was

9   me, he wouldn't -- he's not looking for any trouble for myself,

10  and he understand and will definitely delete the e-mail.

11  **Q.**   And so he said that he was going to not send an e-mail

12  about this object that you drew because you apologized?

13  **A.**   I didn't know because I apologized, but at the time that

14  he saw me, he is saying that, I believe, he understand that it

15  was -- first of all, feeling really bad.  Secondly, that I

16  was -- my intent wasn't to hurt anybody until I realized that I

17  hurt someone.

18  **Q.**   With regard to -- with regard to the N-word, did you use

19  the N-word inside the workplace?

20  **A.**   No, sir.

21  **Q.**   Did you use the word "mayate"?

22  **A.**   No, sir.

23  **Q.**   Did you use the word "chongo"?

24  **A.**   No, sir.

25  **Q.**   Did you use the word "porch monkey"?

DIAZ - DIRECT / ORGAN

```
 1  A.   No.
 2           MR. ALEXANDER:  Nothing further.
 3           THE COURT:  Mr. Spiro.
 4           MR. SPIRO:  No questions, Your Honor.
 5           THE COURT:  All right.  You are excused.  Thank you
 6  very much.
 7           THE WITNESS:  Thank you.
 8           MR. ORGAN:  Your Honor, the Plaintiff calls Owen Diaz.
 9           THE CLERK:  If you can remain standing for just a
10  moment, Mr. Diaz.
11                    (Pause in proceedings.)
12           THE CLERK:  Raise your right hand.
13                        OWEN DIAZ,
14  called as a witness for the Plaintiff, having been duly sworn,
15  testified as follows:
16           THE CLERK:  Please be seated.  If you would please
17  begin by stating your full name and spelling it for the court
18  reporter.
19           THE WITNESS:  My full name is Owen Orapio Diaz.
20  O-W-E-N, O-R-A-P-I-O, D-I-A-Z.
21                     DIRECT EXAMINATION
22  BY MR. ORGAN:
23  Q.   Good morning, Mr. Diaz.  How are you, sir?
24  A.   Good morning, sir.  How are you doing?
25  Q.   If you could, you -- I notice you are wearing a uniform.
```

DIAZ - DIRECT / ORGAN

1   Tell the jury about that.  What is that?

2   **A.**   I work for AC Transit.  I'm a bus operator.  This is the

3   job I got after Tesla.

4   **Q.**   Okay.

5          THE COURT:  Could you bring the mic just a little bit

6   closer.

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Thank you.

9   BY MR. ORGAN:

10  **Q.**   And where did you -- where were you born -- where did you

11  grow up?

12  **A.**   I grew up in Oakland, California, just across the bay.

13  **Q.**   Okay.  And how old are you?

14  **A.**   55 now.

15  **Q.**   Are you married?

16  **A.**   Yes.  I have been married for 25 years, been with the same

17  woman 30 years.  We have -- we share one kid together.  Then my

18  daughter La'Drea Jones, and my son, Owen, Jr. -- well, I should

19  say third because I'm a junior -- and my oldest daughter,

20  Laketa (phonetic).

21  **Q.**   Okay.  And where did your parents come from?

22  **A.**   My parents are from Belize.

23  **Q.**   Okay.  And so at some point in time you applied for a job

24  at Tesla; is that right?

25  **A.**   Yes.  In May I had applied for the job at Tesla, and I got

1   hired in June.

2   **Q.**   Okay.  What year?

3   **A.**   In June of 2015, June 3, to be precise.

4   **Q.**   And tell the jury why, why Tesla?

5   **A.**   Um, they were on the forefront of technology.  You know,

6   today -- or should I say now most automakers are going with the

7   electric vehicles, so at that point I thought I wanted to be on

8   the forefront of technology.

9   **Q.**   Okay.  And did the zero emission thing play any role in

10  your decision to apply for Tesla?

11  **A.**   Yes, it did.  You know, I believe in Elon Musk's vision.

12  The thing is that we do need to move away from fossil fuels.

13  We need to be able to leave the world better than we left it

14  for our kids.

15  **Q.**   Okay.  What -- what was your job when you got to Tesla in

16  June?

17  **A.**   When I first got hired on, I went -- I went to Citistaff.

18  And when they sent me over to Tesla, I was first going to be in

19  recycling, but the guy that had the position -- where was going

20  to get the position before me, he didn't have on steel-toed

21  boots.

22        And so I believe it was Jaime Salazar, he looked and sent

23  the guy home.  He looked and saw I had on steel-toed boots, and

24  he told me I was a man that dressed for the job, and he put me

25  on a golf cart and took me over to the elevators.

DIAZ - DIRECT / ORGAN

1    **Q.**    Okay.  And so you started working on the elevators?

2    **A.**    Yes.

3    **Q.**    And who was your supervisor at this point in time?

4    **A.**    It first started off as Tom Kawasaki.

5    **Q.**    Okay.  And then after Tom Kawasaki, who was your

6    supervisor?

7    **A.**    It eventually ended up being -- um, Mr. Romero.

8    **Q.**    The man who just testified?

9    **A.**    Yes, sir.

10   **Q.**    Okay.  And how did you like your job when you first

11   started as an elevator operator?

12   **A.**    You could look at my badge when I first started, I was

13   real excited I was at Tesla.  You know, at that particular

14   time, they were the first ones to mass produce electric cars.

15        **MR. ORGAN:**  Your Honor, I would like to pull up

16   Exhibit 19.

17        **THE COURT:**  Okay.

18                  (Pause in proceedings.)

19   **BY MR. ORGAN:**

20   **Q.**    Is this the badge you're talking about?

21   **A.**    Yes.  You can see me grinning for being there.

22   **Q.**    Okay.  So you look pretty happy there.  Did you need this

23   job to support your family?

24   **A.**    Yes.  You know, I really did need it.  My family was

25   living from paycheck to paycheck.

1   **Q.**   Okay.  And so what did you like about the elevator job

2   when you first started doing it?

3   **A.**   I liked it because of the fact that it was mostly how it

4   was explained to me it was an intricate part of the facility.

5        What would happen was is if we stopped moving parts, the

6   whole facility would go down.

7   **Q.**   Okay.  Now, we're going to talk about some serious things

8   here.

9   **A.**   Yes, sir.

10  **Q.**   So I would like to move a little bit forward and -- a

11  couple months after you started to July 31, 2015.

12       Who was Judy Timbreza at this point in time?

13  **A.**   He was a guy that would -- he was actually an elevator

14  operator on the other side, but he was a guy that would get on

15  the elevator with me with his friends, you know, other guys.

16  When he got on the elevator, he would say something and get me

17  to agree to it, and I would --

18  **Q.**   Like what would he say?  What were some of the things --

19  **A.**   Well, he -- I couldn't pronounce it, and I still today

20  can't, but it was "mo mo porch" something or another, and you

21  know, he would say it and "yeah, yeah, yeah," and I would

22  actually agree to it, "yes, yes, yes."  And then he and his

23  friends would leave out of the elevator laughing, and then he

24  would say at the end of it like "mayate."  Even though my last

25  name is Diaz, I don't speak a lick of Spanish.

**Q.**   Okay.  So did you ever find out what he was saying when he was laughing and getting you to agree?

**A.**   Yes.

**Q.**   How did you do that?

**A.**   After a while of him and his friends coming inside the elevator and doing it, I got pretty curious.  So I had recorded it on the phone that I had at that time.  And when I recorded it and translated it through Google, I found out -- I'm embarrassed to say I found out I was agreeing to be a porch monkey.

**Q.**   I'm sorry I have to take you back here, but you know the jury is here and has --

        **THE COURT:**  Do you want to take a break, Mr. Diaz?

        **THE WITNESS:**  It's all right.

                    (Pause in proceedings.)

        **THE WITNESS:**  I'm sorry.  It just takes me right back to that place.  It just puts me back to that --

        **THE COURT:**  Why don't we take a five-minute break.

        **MR. ORGAN:**  Thank you, Your Honor.

        **THE COURT:**  Actually, why don't we take our morning break, and then we will just come back for a little longer.  So we'll take 15 minutes, and we'll be back at 25 of.  Please remember the admonitions.

     (Proceedings were heard outside the presence of the jury:)

        **THE COURT:**  All right.  We will be in recess.

 1                MR. ORGAN:  Thank you, Your Honor.

 2                THE WITNESS:  Thank you.

 3                     (Recess taken at 11:21 a.m.)

 4                  (Proceedings resumed at 11:34 a.m.)

 5                THE CLERK:  Please come to order.

 6                THE COURT:  Are we set to go?

 7                MR. ORGAN:  Yes, Your Honor.

 8                THE COURT:  It will be nice to have Defense Counsel

 9     here.

10                     (Pause in proceedings.)

11                THE COURT:  Are you ready for the jury?

12                MR. SPIRO:  Yes.  I'm sorry.

13                THE COURT:  Okay.

14         (Proceedings were heard in the presence of the jury:)

15                THE COURT:  All right.  Please be seated, everybody.

16         Mr. Organ, please proceed.

17                MR. ORGAN:  Thank you, Your Honor.

18                     **DIRECT EXAMINATION**  **(resumed)**

19     BY MR. ORGAN:

20     Q.   Mr. Diaz?

21     A.   Yes, sir.

22     Q.   Could you please explain to the jury why you just got

23     so --

24                THE COURT:  Do you want to take off your mask?

25                MR. ORGAN:  Oh, sorry.  Thank you, Your Honor.

1    BY MR. ORGAN:

2    **Q.**   Can you please explain to the jury why it was so upsetting

3    for you to take yourself back to that time?

4    **A.**   Well, after I got hired, for several weeks, like I said,

5    they were getting on the elevator and having me agree to being

6    a racist term, so calling myself a porch monkey.  You know, it

7    really hurt.  You know, what ended up happening was -- is after

8    I had translated it, I had -- it took I'm saying maybe a day or

9    so before I saw Mr. Timbreza again, and I confronted him about

10   it.

11   **Q.**   Could you put the microphone a little closer to you there,

12   Mr. Diaz.

13   **A.**   Yes, sir.

14   **Q.**   Okay.  Is it hard to talk about this stuff?

15   **A.**   Yes, it is.  You know, it's like I'm sitting here in a

16   room full of people telling them that I agreed to something

17   that I shouldn't have been agreeing to.  Makes me feel, you

18   know, embarrassed, humiliated.

19   **Q.**   And you said he called you "porch monkey," which you

20   figured out through the Google Translate; right?

21   **A.**   Yes, sir.

22   **Q.**   And then I think you said "mayate"?

23   **A.**   Yes, sir.

24   **Q.**   And did there come a time when he said anything to you

25   that was racist in English?

1   **A.**    Yes, he did.  Um, the day I confronted him, he just

2   started in -- in it with it with his friends.  They were back

3   on the elevator again, and he started to say it, and I

4   confronted him like, "Hey, man."

5       And then from there, they started leaving out the

6   elevator.  He just called me the N-word.

7   **Q.**    And this is Mr. Timbreza; is that correct?

8   **A.**    Yes, sir.

9   **Q.**    Okay.  And then what happened next after he called you the

10  N-word?

11  **A.**    I called over my immediate supervisor at that time which

12  was Thomas Kawasaki, and he broke us up at that point.

13  **Q.**    So did the two of you get involved in some kind of -- was

14  it a physical altercation, or was it just verbal?

15  **A.**    It was verbal.  It got pretty intense.

16  **Q.**    Okay.  Now, Tesla in their opening statement talked about

17  you toe to toe.

18      What -- how were you -- were you guys facing off?

19  **A.**    We were within maybe about, I'm going to say, an arm's

20  length from each other.  Maybe a little bit more.

21  **Q.**    Okay.  And then what happened next?  Mr. Kawasaki -- you

22  called Kawasaki; correct?

23  **A.**    Yes.  I called Mr. Kawasaki over.  Mr. Kawasaki came over.

24  And after he separated both of us, Mr. Kawasaki did the first

25  initial investigation.  He talked to the people that were

1    around, and they confirmed that's what he said.

2    **Q.**   And did you talk to Mr. Kawasaki?

3    **A.**   Yes.  I talked to Mr. Kawasaki afterwards, and I told him

4    exactly what has been going on, and that's when I explained to

5    Mr. Kawasaki that it had been going on for several weeks.

6    **Q.**   Okay.  So did you tell Mr. Kawasaki about being called the

7    N-word in English that night?

8    **A.**   I believe so.

9    **Q.**   Okay.  And let me ask you this:  Had anyone ever called

10   you the N-word in the workplace before this?

11   **A.**   I have worked for several companies, and the N-word or

12   derogatory is just not used inside of the workplace.

13   **Q.**   Okay.  So -- and then what happened next?

14   **A.**   After -- like I said, after he did his initial

15   investigation, he found out that the words were being said.

16   Mr. Kawasaki sent Mr. Timbreza home.

17   **Q.**   Okay.  And did you have any more interactions with

18   Mr. Timbreza?

19   **A.**   He wasn't on the elevator anymore.  I believe Mr. Kawasaki

20   handled the situation appropriately.

21   **Q.**   Okay.  Did you ever -- did you ever get anybody from Tesla

22   that came to you and asked you questions about it?

23   **A.**   No.

24   **Q.**   So no one from Tesla HR said anything to you; is that

25   right?

1   **A.**   The initial?

2   **Q.**   About this one.

3   **A.**   No.  The initial was just Tom Kawasaki.

4   **Q.**   Okay.  What, if anything, did Ed Romero do relative to

5   this incident, if you know?

6   **A.**   Well, up until that point, I -- I didn't have contact with

7   Mr. Romero.  I only had contact with Mr. Romero after Thomas

8   Kawasaki was pushed out -- well, I'm not going to say pushed,

9   but left his position and Mr. Romero stepped in.

10  **Q.**   Mr. Kawasaki got a promotion to some other position,

11  right, on the night shift?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  And then you actually got a promotion on the night

14  shift; right?

15  **A.**   Yes, sir.

16  **Q.**   Okay.  So in terms of the Kawasaki -- Kawasaki -- in terms

17  of the Timbreza incident, you don't have any issues because

18  Timbreza's harassment of you stopped at that point; is that

19  right?

20  **A.**   His harassment had stopped at that point, yes.

21  **Q.**   But the fact that you were called these horrific words,

22  does that stay with you?

23  **A.**   Yes, it do.  It -- that's why I can say it is just, you

24  know, it is just so embarrassing.  Just think of a person

25  getting you to agree to something that -- that's racist in

 1  nature and you not knowing that you're agreeing to it.

 2  **Q.**   Okay.  Now, shortly after -- so this is the -- this is,

 3  I guess --

 4                        (Pause in proceedings.)

 5              **MR. ORGAN:**  So in this event -- I don't think he can

 6  see it.  This is cumbersome.  Move my chair.  Yeah.  Thanks.

 7  **BY MR. SPIRO:**

 8  **Q.**   Okay.  So this event, this is July 31; right?

 9  **A.**   Yes, sir.

10  **Q.**   Okay.  And then -- and then at some point after this, so

11  after this July 31 incident, did you -- were you called

12  anything by Ramon Martinez in the August time period?

13  **A.**   Well, between the -- the October and August, I didn't see

14  Mr. Martinez over the factory.  I believe one time we were

15  inside of the trailer back in the rear.

16  **Q.**   Excuse me, Mr. Diaz.  I'm actually just trying to find

17  out:  Did Mr. Martinez start calling you anything in August of

18  2015?

19              **MR. SPIRO:**  I'm going to object to the cutting off the

20  witness in the middle of the question.

21              **THE COURT:**  Overruled.  You can answer that question.

22              **THE WITNESS:**  Yes.

23  **BY MR. ORGAN:**

24  **Q.**   Okay.  And did Mr. Hurtado, Robert Hurtado call you any

25  names in that time period, August of 2015?

DIAZ - DIRECT / ORGAN

1   **A.**   Yes, he did.

2   **Q.**   In August of 2015 after the Timbreza incident had been

3   handled by Mr. Kawasaki, did you recommend to your son Demetric

4   to come to work at Tesla?

5   **A.**   Yes, I did.

6   **Q.**   And did you recommend that he come to work in the

7   elevators with you?

8   **A.**   No.  Because of the things that was going on in my

9   department, I definitely didn't want him with me.  So I

10  definitely told him to go to another place because I figured

11  that if he was on the other side of the factory in another

12  department -- well, I should say, I hoped that he would be

13  insulated from what happened.

14  **Q.**   Okay.  And did you recommend that -- Demetric is your son;

15  right?

16  **A.**   Yes, he is.  My youngest.

17  **Q.**   And how old was Demetric at this point in time?

18  **A.**   He was young.  Just -- he was 19.  It was his first --

19  basically, a year out of high school.

20  **Q.**   And it's been said in this courtroom that you thought it

21  would be a good experience for him; is that right?

22  **A.**   Well, the thing is that I thought being on the other side

23  of the factory he would be insulated and that as an experience

24  it was a good-paying job.  They offered stock options.  You

25  know, who wouldn't want their kid to be set up to be able to

 1  experience a better life.

 2  **Q.**   Did you actually like the job on the elevators?

 3  **A.**   In the beginning, yes.

 4  **Q.**   Okay.  And what was it you liked about them?

 5  **A.**   Again, it was the forefront of being green.  You know, we

 6  have these new vehicles coming out.  They were being mass

 7  produced.  I like that when I was on the street I saw a Tesla

 8  go by.  You know, basically my hands was somewhat into that

 9  product being made.

10  **Q.**   So why did you think that Demetric applying through a

11  different staffing agency, why did you think he would not be

12  exposed to similar racial harassment to what you were

13  experiencing near the elevators?

14  **A.**   Well, up until that point I hadn't been around the whole

15  factory and I didn't know how pervasive it was around the

16  factory.  Like, he started in the battery casing area, which

17  is -- actually, the factory is so, so big, it's like almost a

18  mile.

19      In order to get around the factory, you had to use

20  bicycles and golf carts to be able to get around the factory?

21  So I figured him being on the other side of the factory he

22  would be insulated.

23  **Q.**   Do you have any regrets about your son -- well, let me ask

24  you this:  Did your son get exposed to racial harassment at the

25  factory?

1    **A.**   Yes, he did.

2    **Q.**   And do you have any regrets about that?

3    **A.**   That's one of the biggest regrets in my life because me

4    and my son now have a fractured relationship.

5    **Q.**   How would you do it differently now?

6    **A.**   If I knew what I knew now, I would have never brought him

7    anywhere near that factory.

8    **Q.**   And how did that racial harassment that was directed

9    toward -- did you witness any of the racial harassment that was

10   directed towards your son?

11   **A.**   I had -- around about the time he had started, I had got

12   the promotion and I was the lead.  So it kind of afforded me a

13   little bit more leeway of when I could take my lunch.

14       So one day I was taking my meal break.  I had -- I was

15   going around into his -- into the area that he was.  As I was

16   rounding the corner, you had his Caucasian boss telling him he

17   couldn't stand all these F'ing Ns.

18                      (Pause in proceedings.)

19   BY MR. ORGAN:

20   **Q.**   And when you say "Ns," you mean N-word; right?

21   **A.**   Yes.

22   **Q.**   And how did the racial harassment that was directed at

23   your son Demetric, how did that impact your relationship with

24   your son Demetric?

25   **A.**   Well, this is a person that I raised.  I was his

1  basketball coach, football coach.  Um, me and him hung out, but

2  that day he saw his father being broke.  He didn't know what to

3  do.  I didn't know what to do.  We were in a professional

4  setting.  I couldn't go over and say nothing.  His boss had

5  seniority over me.  His boss had seniority over me.

6  **Q.**  And did you complain to -- to Demetric's boss?

7  **A.**  No, sir.

8  **Q.**  Why not?

9  **A.**  I couldn't.

10  **Q.**  Okay.  Did you suggest to Demetric to complain?

11  **A.**  Yes, I did.  My son went to HR.

12  **Q.**  Okay.  He told you that?

13  **A.**  Yes, he did.

14  **Q.**  Is it difficult having to share this experience with your

15  son in open court?

16  **A.**  Yes, it is.  I'm in an open forum telling strangers how I

17  ruined my son's life.

18  **Q.**  Let me ask you this:  Prior to -- your son, I think,

19  worked in the battery casings area; is that right?

20  **A.**  Yes.  It was downstairs.  He was placing metal parts

21  inside of a robot so it could weld them.

22  **Q.**  Prior to Demetric getting a job at Tesla in the battery

23  casings department, had you ever heard the N-word or any other

24  racist stuff in that area?

25  **A.**  No.  Nor had I been in that area prior to that.

DIAZ - DIRECT / ORGAN

1  **Q.**   Okay.  You'd never been there?

2  **A.**   No.  Not until then.

3  **Q.**   Okay.  Let me ask you this:  Did you talk about your

4  experience at Tesla with your family, how it impacted you?  Or

5  what was happening?  Let me rephrase that.

6          **MR. ORGAN:**  Sorry, Your Honor.

7  **BY MR. ORGAN:**

8  **Q.**   Did you tell your family about what was going on?

9          **THE COURT:**  While he was employed at Tesla?

10 **BY MR. ORGAN:**

11 **Q.**   When you were employed at Tesla, yeah.

12         **MR. ORGAN:**  Thank you, Your Honor.

13         **THE WITNESS:**  When I was employed at Tesla, no, I did

14 not.  Reason being is because I'm trying to leave work at work

15 and home at home.  It's like I can't take my burdens home to my

16 family and unload them on them.  I have a wife.  I have a kid.

17 Us, being males, we have to show a certain, as they say -- I

18 can't let them see that what I'm going through because at that

19 point, once they find out, it's like I'm the captain of the

20 ship.  Everything breaks down.

21 **BY MR. ORGAN:**

22 **Q.**   Okay.  At some point in time Tesla brought up that La'Drea

23 applied to Tesla for a job.

24         Did you hear that?

25 **A.**   Yes, I did.

1    **Q.**    And at the time that La'Drea applied, did you know that

2    she was applying?

3    **A.**    No, I did not.

4    **Q.**    So someone had said that you had encouraged her to apply,

5    that would have been a false statement; right?

6    **A.**    That's a false statement, sir.

7    **Q.**    Okay.  And then you know a man named Lamar Patterson; is

8    that right?

9    **A.**    Yes.  I met Lamar.

10   **Q.**    Okay.  And did you -- did you have some interaction with a

11   cousin of his who approached you?

12   **A.**    It was this guy.  He approached me while I was on the

13   elevator.  The elevator was short-staffed some days.  We only

14   had three employees.  If we only had three employees, I would

15   have to run a whole elevator by myself.

16        This guy came over and asked me to forward an e-mail.

17   **Q.**    Forward an e-mail of his cousin's resume?

18   **A.**    Yes.

19   **Q.**    And were you hoping to get another employee on the -- to

20   work on the elevators?

21   **A.**    Yes, I was -- I was shorthanded, so I needed somebody to

22   help.

23   **Q.**    And when did you first meet Mr. Patterson?

24   **A.**    I didn't meet Mr. Patterson until the first day he started

25   to work.

1  Q.   And is Mr. Patterson Black?

2  A.   Yes.  Eventually, I found that out.  Yes, he was.

3  Q.   Prior to actually meeting Mr. Patterson, did you know that

4  he was Black?

5  A.   No.  The person that asked me to forward the e-mail, he

6  e-mailed -- I don't -- it was like with Mr. Jackson and Mr. --

7  I don't believe the other guy over there -- but he was a mixed

8  race.  He was a real light guy, and he didn't look African

9  American to me, but if you tell me that's your cousin after I

10 meet you, far be it for me to say it's not.

11 Q.   Okay.  Let's talk about Ramon Martinez.  Mr. Martinez

12 started calling you racist slurs in this August time period.

13      Was he a supervisor at the Tesla factory?

14 A.   Yes.

15 Q.   And did Ramon Martinez do anything -- after he started

16 calling you racial slurs in August, did he do anything that you

17 felt was harassing based on your race after that?

18 A.   I don't understand.  Can you tell me one more time,

19 please?

20 Q.   It's a bad question.  Let me try it differently.

21      What was the -- what were some of the racist terms that

22 Mr. Martinez used towards you during your time at Tesla?

23 A.   Um, he would tell me to go back to Africa.  He would call

24 me the N-word, and one time he specifically told me, "I hate

25 you, N."

1                      (Pause in proceedings.)

2    BY MR. ORGAN:

3    Q.   You said something else.  "Go back to Africa.  I hate you,

4    Ns."  What else?

5    A.   No.  He told me he hate me specifically.

6    Q.   Oh, I see.  Okay.  And then he used the N-word with that?

7    A.   Yes, he did.

8    Q.   Did he ever use "mayate"?

9    A.   I heard it, but it -- the mayate wasn't directed towards

10   me, no.

11   Q.   Okay.  And how many times do you think he -- Mr. Martinez

12   used the N-word towards you?

13   A.   Honestly, he used it so much I didn't know, but I told the

14   examiner -- I believe her name was Antonucci.

15   Q.   Barbara Antonucci, the first attorney for Tesla.

16   A.   Yeah.  That was the first attorney.  She kept hammering,

17   and then she started using numbers, 5, 10, 15, 20, and when she

18   got to 30, I said, well, look.  Instead of us keep going up in

19   numbers, I just said, you know, it was 30-plus times because it

20   was well over 30 times.

21   Q.   Okay.  30-plus times.

22        And Mr. Hurtado, did he use the N-word toward you?

23   A.   Yes, he did.  Mr. Hurtado would come into the elevator,

24   but he would mostly be on the Elevator 2.  He would use terms

25   like "N, hurry up and push the button.  Ns are lazy."  He would

1  say that because of the fact I'm pushing a battery inside of

2  it, and we talking about these batteries weigh like

3  1,500 pounds, and I have to physically push it inside of the

4  elevator?

5       And because we wasn't getting his material down fast

6  enough, there were some racial slurs he would use.

7  **Q.**   Okay.  Did -- I want to go back to Mr. Martinez for just a

8  second.

9       Did Mr. Martinez ever say anything about how your job

10  might be in jeopardy or how he might try to get you fired?  Did

11  he ever say anything like that?

12  **A.**   We were in south dock, and we were in passing, and

13  Mr. Martinez said, "I wish I can get all of you Ns fired."

14  **Q.**   Okay.  And that was in the south dock; is that right?

15  **A.**   Yes, sir.

16  **Q.**   How many times did he say that -- did Mr. Martinez say

17  that?

18  **A.**   It was just that one time in passing.

19  **Q.**   Okay.  And then let's go back to Mr. Hurtado.

20       Did -- did Mr. Hurtado -- how many times do you think

21  Mr. Hurtado used the N-word towards you?

22  **A.**   It would go back to Miss Antonucci, their previous

23  counsel.  She went through the same thing again.

24       How many times would he say it?  How many times would he

25  say it?  And you know, 5 times, 10 times.  And I said the same

1    thing.  You know, I can tell you it was more than 30 times.

2    30-plus times.

3    **Q.**    30-plus.  Do you know the exact number?

4    **A.**    No, I do not.

5    **Q.**    Okay.  So how did it make you feel to have a second

6    supervisor using the N-word towards you?

7    **A.**    It made me feel bad.  It made me feel less than a man.  It

8    made me question my worth.

9    **Q.**    Hold on one sec because I'm going to make a lot of noise

10   here.

11                    (Pause in proceedings.)

12   **BY MR. ORGAN:**

13   **Q.**    "Question your worth.  Less than a man."  Why did you

14   stay?  Why did you stay in this place where people are saying

15   these things to you and making you feel this way?

16   **A.**    Again, sir, I was living from paycheck to paycheck.  I

17   needed the job.  I had to feed my family.

18   **Q.**    Did -- did Mr. Hurtado ever refer to you as a "boy"?

19   **A.**    Yes, he did.  That was one of the terms that he would use.

20   **Q.**    And how did that -- how did that make you feel when he

21   referred to you as a boy?  Did you say anything to him?

22   **A.**    At some particular time I did say something to him, but

23   how they made me feel, at that point I was a man in my late

24   40s.  And you know, when you meet a person, the last thing I'm

25   going to refer to as a grown man is a boy.  You know, it's

1  "hey, dude," "hey, man," or something like that.  But in order

2  for me to greet or tell another man that he's a boy, that's

3  disrespectful.

4  **Q.**   Okay.  Mr. Hurtado, at any time from when he started

5  calling you these words in August to when you left in March of

6  2016, did he ever stop calling you those terms?

7  **A.**   No.  Mr. Hurtado, he was pretty persistent.

8  **Q.**   Okay.  I just need to go back to the Demetric incident one

9  time.  Sorry about that.

10      How did it make you feel to not be able to help your son

11  in that situation?

12  **A.**   Again, this was a person that I provided his care.  I did

13  everything that I could do with him, and for him to see me at

14  my most vulnerable moment and him in the same, it fractured our

15  relationship.  Now, my son can't even look me in the eye.

16  **Q.**   Let me ask you:  When you're driving home that night after

17  that incident with your son where he had been called the N-word

18  in front of you and you couldn't do anything, what was going --

19  was Demetric in the car with you?

20  **A.**   I believe he might have got a ride from somebody else.

21  **Q.**   He got a ride from somebody else that night?

22  **A.**   I believe so.

23  **Q.**   So you had to drive home alone after that incident?

24  **A.**   Yes.

25  **Q.**   And what's going on in your mind as you're driving home

1  after your son has been called the N-word at the Tesla factory?

2  **A.**   A gambit of emotions.  I couldn't help my son.  My son, he

3  doesn't respect me anymore.  It's just --

4  **Q.**   Did he say that?

5  **A.**   My other kids told me.  He doesn't talk to me.

6  **Q.**   And then the next day or shortly after that, did you have

7  to drive back to the factory where your son had been called the

8  N-word in front of you?  Did you have to do that?

9  **A.**   Yes, I did.

10  **Q.**   And what were you thinking?  What is going on in your mind

11  as you're driving back to the place that broke the relationship

12  with your son?  What's going on in your mind?

13  **A.**   At this point he had got back in the car with me.  We were

14  driving.  We're trying to -- I'm trying to talk to him but, you

15  know, once kids get something in their mind, they don't want to

16  talk about it anymore.

17      He got to the factory and, like, I kept telling him,

18  encouraging him, to do something about it, but me personally,

19  I'm just -- I'm just running, wondering what could I have did

20  better.  How could I have protected him?

21      But there's nothing I could do.  I needed to be able to

22  pay rent.  I need to be able to put food on the table.

23  **Q.**   As these racial insults mount time and time and time

24  again, what are you thinking?  What's going on in your mind in

25  terms of your situation?

1          **THE COURT:**  I'm sorry.  You're going to have to do a

2     point in time and be a little --

3          **MR. ORGAN:**  Thank you, Your Honor.

4          **THE COURT:**  -- less dramatic and a little more direct

5     in your questions.

6     **BY MR. ORGAN:**

7     **Q.**   Let's go to October 17.

8     **A.**   Yes, sir.

9     **Q.**   That was an incident -- there was an incident between you

10    and Mr. Martinez; correct?

11    **A.**   Yes, it was.

12    **Q.**   Okay.  Why don't you tell the jury about that incident on

13    the 21st -- the 17th of October.  What's going on that day?

14    **A.**   Well, this particular day -- well, I should say evening

15    because my shift was from 6:00 at night to 6:00 in the morning.

16         I was in the elevator, so I can kind of describe to you

17    guys what the elevator was like.

18         The elevator was maybe three times the size of that jury

19    box and a little bit, maybe, over to this side.  It would take,

20    like, two or three full-size Teslas.

21         The buttons to operate the elevator, when you walked in

22    the elevator because most people think of elevators opening up

23    like this, but this elevator opened up like this.  On this side

24    was the controls, and the corner at the top it was a camera,

25    and it was some other panel on this side.  And then it had the

 1  bumper railings right there.

 2       So on this particular day, myself and Mr. Foster were

 3  inside the elevator.  We were going down in the elevator.  I

 4  was explaining to Mr. Foster his role and his job because

 5  Mr. Foster had just started, so I was training Mr. Foster.

 6       The elevator doors come open, and there's Mr. Martinez.

 7  Mr. Martinez jumped off the tugger and yelled, "Why are you

 8  telling him who his boss is?"

 9       At this point I didn't say anything to Mr. Martinez.  I

10  started to go back in the elevator.  Mr. Martinez ran inside

11  the elevator after me yelling, had his fists balled up.  I

12  thought Mr. Martinez was going to strike me.

13       I'm a bigger guy, but I do --

14           **THE COURT:**  Hang on just a second.  Let's proceed by

15  questions and answers, shall we?

16           **MR. ORGAN:**  Yes, Your Honor.

17  **BY MR. ORGAN:**

18  **Q.**   In terms of -- so you have this confrontation with

19  Mr. Martinez.  It started outside the elevator?

20  **A.**   I was -- I was basically half and half.  He was on the

21  outside.  I was on the -- basically, I was on the threshold of

22  the elevator, I should say.

23  **Q.**   And the elevator, is it bigger than the jury box here?

24  **A.**   Yes.  Like I said, it was like three times the size of the

25  jury box.

1  Q.   So back to Tesla's table; is that right?  About that far?

2  A.   I'm going to say maybe around to where the end of your

3  table is.

4  Q.   So about here.  So from here to --

5  A.   To the wall.

6  Q.   -- to the wall.  Let the record reflect I'm standing under

7  the seal so about half of the courtroom; is that about right?

8  A.   That's about right.

9  Q.   And the distance, would it be -- would it be the length of

10 the jury box?

11 A.   It was big enough to park three full-size cars in because

12 at some point it was three full-size cars in there.

13 Q.   Okay.  So Mr. Martinez comes in.  He has his fists balled

14 up.

15      Does he say anything to you?

16 A.   Um, he was asking me, did I have a problem with him; and

17 as he was yelling, he said, "You Ns aren't S-H-I-T."

18 Q.   Okay.  And what did you do?

19 A.   Like I said, I'm a bigger guy, and I do realize the

20 optics.  So I put my hands -- excuse me.  So I put my hands up

21 in a neutral position to let everybody know that I'm not trying

22 to be defensive because most people view -- when they see a

23 bigger guy pounding on a little guy, nobody ever asks why is

24 the big guy pounding on the little guy.

25      They just say, "Hey, this big guy is beating up this

1    little guy."  They don't realize sometimes the little guy might

2    have did something.  But like I said, I realize the optics of

3    that and put my hands in a neutral position as he was still

4    being irate.  In order for me to get him to back off, I had to

5    point to the camera, "Hey man.  You know we on camera.  You

6    know they can hear and see what's going on."

7         And at that point he ran up out of the elevator.

8    **Q.**    Okay.  And you sent a complaint to your boss, Mr. Romero,

9    after this happened; is that right?

10   **A.**    Not immediately after it happened because I still -- like

11   I said, I was shorthanded.  So I was still had to conduct my

12   job, and I had wrote the e-mail in pieces as it was going on.

13           **MR. ORGAN:**  Sabrina, can you please put up

14   Exhibit 235.

15                    (Pause in proceedings.)

16   **BY MR. ORGAN:**

17   **Q.**  Mr. Diaz, is this the complaint that you sent to

18   Mr. Romero?

19   **A.**    Yes, I did.

20   **Q.**    And we've seen this before with other witnesses.  It

21   doesn't have in here your, "Ns aren't S."

22        Why didn't you put that in there?  Had you complained

23   before about the N-word?

24   **A.**    Yes, I had.  To Tom Kawasaki.

25   **Q.**    And who else had you complained to about the N-word prior

1  to this incident in October of 2015?

2  **A.**    To Ed Romero.

3  **Q.**    Mr. Romero, who just testified a little earlier; right?

4  **A.**    Yes, sir.

5  **Q.**    How many times had you complained about the N-word to

6  Mr. Romero?

7  **A.**    About three to seven times.  Well, what happened is --

8  excuse me -- after Tom had left his role to me, I took over

9  with the elevator lead.  Mr. -- me and Mr. Romero in the

10  mornings -- because the shifts overlapped, Mr.and

11  Mr. Romero -- sorry for butchering his name -- but Mr. Romero

12  used to sit in the cafeteria and have breakfast in the morning,

13  and we would discuss the events of the day.  So I would tell

14  Mr. Romero at that point what was going on.

15  **Q.**    Okay.  Why didn't you put "Ns aren't S" in this e-mail?

16  **A.**    Well, to go back, that would -- I would have to talk about

17  a previous job.  I used to work right down the street for

18  Hamilton Families which is the homeless shelter.

19        One day I had put them words in an e-mail once I found out

20  that because the director had called me in, him and -- him and

21  another personnel, and they were saying, "Hey, look.  Certain

22  things you don't put in an e-mail.  What you do is you use key

23  words.  Check the surveillance.  We have an issue.  We need to

24  discuss something.  We have an issue with this individual," and

25  then at that point people would come together, and they would

1  discuss it.

2  **Q.**  Okay.  And the surveillance system, you mention that in

3  here.  Did you think that that might get -- help them -- help

4  Tesla figure out what happened?

5  **A.**  Yes.  I figured it out because I did put the key words in

6  there that I was -- I was previously trained to do.

7       "Can you check the surveillance system to confirm?"

8       If they would have pulled the surveillance system, you

9  know, it should have had audio.  It should have had the video.

10 They would have saw and heard what was going on.  They could

11 have even interviewed Mr. Foster.

12 **Q.**  And did -- did Mr. Foster ever tell you that he got

13 interviewed about this incident?

14 **A.**  No, sir.

15 **Q.**  Okay.  After this incident in the elevator, have you ever

16 had any kind of issues -- any kind of issues in elevators?

17 **A.**  Mr. Foster had threatened to shoot me at one time.  Reason

18 being is that Mr. Foster, he was taking long lunch breaks.  He

19 had took off.  We couldn't find Mr. Foster.  I had sent

20 Mr. Romero a text message to let him know that Mr. Foster

21 didn't return from lunch.

22      Mr. Romero said, "Keep trying to contact him," which I

23 did.

24      When Mr. Foster returned, I told Mr. Foster it was

25 unacceptable to be gone from the elevator at the time because

1    what I couldn't do was I couldn't relieve the other employees

2    so they can get their breaks.

3         Mr. Foster got upset.  I put that in the e-mail and --

4    well, a text message.  I saw it somewhere in -- in some of the

5    exhibits, but I don't know if they are in these exhibits, but I

6    did give him that.

7         From that point --

8    Q.   Did Mr. Foster say the N-word to you?

9    A.   No.  Mr. Foster never said the N-word.  Mr. Foster

10   threatened to kill me, sir.

11   Q.   Okay.  And Tesla got rid of him; is that right?

12   A.   Yes.

13   Q.   To your knowledge, has Tesla ever fired any of the people

14   that called you the N-word?

15   A.   No, sir.

16   Q.   Now, let me ask you this:  Since you left Tesla and the

17   elevator position there, since then, have you had any issues --

18   any feelings relative to being on an elevator?

19   A.   Well, when I'm getting in the elevator now, I always try

20   to be the last person in there.  If I don't feel comfortable

21   with the people that I see that's in the elevator, even though

22   I don't know them, if I don't feel comfortable with them, I

23   step out of the elevator and I try to wait.

24        Um, it just -- you know, being in an enclosed space and

25   not knowing.

 1   **Q.**   Let me take you back now -- let's go to Exhibit 33.   I

 2   want to take you back --

 3          **MR. ORGAN:**   Actually, let's put up Exhibits 1 and

 4   then 2.

 5   **BY MR. ORGAN:**

 6   **Q.**   Exhibit 1, do you recognize this one?

 7   **A.**   Yes, I do.   That's a jigaboo or a pickaninny, sir.

 8   **Q.**   Okay.   And how did you first come to see that?

 9   **A.**   When I first saw it, I had -- I was -- the line which was

10   the battery line, my battery line, had called me over.   They

11   needed some parts that was delivered downstairs.

12       I went downstairs to get the parts for the battery line,

13   and I brought back up the parts and I went over to the battery

14   line itself.

15       When I got to the battery line, I dropped off the parts

16   that was in the battery line.   And when I returned --

17   **Q.**   Let's do this.   Let's do this.   I've got a demonstration.

18   Why don't we demonstrate for the jury, Your Honor how this

19   happened, and we've got some models that we can do it on.

20       Is that okay?

21          **THE COURT:**   Sure.   We'll see what the models look

22   like.

23          **MR. ORGAN:**   Okay.

24                   (Pause in proceedings.)

25          **MR. ORGAN:**   Here are the models.

```
1              MR. SPIRO:  I don't care.  I heard the word "models."

2              MR. ORGAN:  Not New York models, like your -- okay.

3    Let's see.

4                      (Pause in proceedings.)

5              MR. ORGAN:  How many lawyers does it take to --

6              THE COURT:  Let's just keep going with the case.

7              MR. ORGAN:  Yes, Your Honor.

8                      (Pause in proceedings.)

9              MR. ORGAN:  Is it okay if Mr. Diaz comes down --

10             THE COURT:  Yes, Mr. Diaz, if you want to step down,

11   that would be great.

12             THE WITNESS:  Thank you.

13                     (Pause in proceedings.)

14   BY MR. ORGAN:

15   Q.   Okay.  And just if you could explain to the jury what

16   these models represent.

17                     (Pause in proceedings.)

18             THE WITNESS:  Um, I use this to represent the pallet

19   rider I was using.

20   BY MR. ORGAN:

21   Q.   Will you explain to the jury, what's a pallet rider?

22   A.   The pallet rider is a piece of equipment that -- that you

23   use to move things heavy equipment -- I mean, heavy products or

24   heavy loads.

25        It's something that you can ride on.  It's maybe -- it may
```

 1  be like, I'm going to say, 8 feet long or something.  It has

 2  the forks that stick out.  It's another part that I would stand

 3  on top of.  It has this lever that acts as a brake, and it has

 4  a throttle on the lever.

 5      So in order to operate it, the first thing you do is you

 6  push the lever down towards the floor and use the throttle, and

 7  it'll move it forward or backwards.

 8  **Q.**  Okay.  So you've got the pallet rider, this green little

 9  truck here.  You're telling the jury about how you had driven

10  off, so where would you have driven off to?

11  **A.**  So I had went down -- so I had went downstairs.  I had got

12  the product that they had requested for me to get.  It was --

13  the crate that I had was sitting on the front, so it's no way

14  that you can drive with it this way because you can't see over

15  the load.  So it's basically you're going this way.

16      So I came out the elevator.  I went around the drop zone,

17  and I went down an aisle, and I went to the battery line and

18  dropped off the parts.

19  **Q.**  Okay.  And when you come back, what do you see?

20  **A.**  When I came back, I'm going to use this to represent the

21  bale -- when I came back, there was a forklift sitting with a

22  bale on it in the aisle, which was -- which is actually a no-no

23  because it would have been blocking all the traffic, and it's a

24  no-no at Tesla.

25  **Q.**  And if you could with your finger, point to where the bale

1  should have been left?

2  **A.**   Well, the bale that they had had -- let's use the pink

3  side as where the -- where the jigaboo was and the blue side

4  that would be the reverse.  So what they were supposed to do

5  was go to the drop zone.  We're going to use this right here.

6  That's a wall.  This is -- goes up high.

7       So what they were supposed to do was take it, drop it here

8  at the drop zone, and leave.

9       I would have came back, picked it up, took it into the

10  elevator, and took it downstairs.

11  **Q.**   Would you have ever seen the jigaboo drawing if they had

12  done it like that?

13  **A.**   No.  I never would have seen it.  Reason being is because

14  how it was faced out on the forklift, it wouldn't have been

15  facing towards me.  It would have been facing towards the wall.

16  **Q.**   Okay.  So put the -- put the bundle, the Post-its, which

17  are the bundle of cardboard back on.  You come back.

18  **A.**   So I come back from dropping off the parts that the

19  battery line needed.  I come back around.  Swing back.  Because

20  of how the pallet rider is, I'm riding the pallet rider, so I

21  have to always pay attention to the forward motion.

22       So I'm headed out to the forward motion -- to the forward

23  motion.  I get into position, and I start to come in like this

24  so my forks would line up to where I can get under there and

25  take it -- go and take it and leave with it.

1   Q.   Okay.  And then you see -- and if you could -- thank you.

2   You can go back now.

3        Then you see Exhibit 1; right?

4             **MR. ORGAN:**  If you'd please put that up.

5             **THE WITNESS:**  Yes, sir.

6             **MR. ORGAN:**  Thank you, Ms. Davis.

7                       (Pause in proceedings.)

8   BY MR. ORGAN:

9   Q.   And what do you -- what do you feel or what do you think

10  when you see that?

11  A.   First thing, I felt like I was kicked in the stomach.  The

12  significance of it.  It started to remind me of the stories my

13  parents used to tell me when they got here during the civil

14  rights movements.  It reminded me of my parents being beat with

15  water hoses, having dogs sicced on them.

16  Q.   Had you ever thought about the way your parents had been

17  treated in any other workplace?

18  A.   No.

19  Q.   And how does your perspective change after this is done?

20       Well, let me ask you this:  Was this different than any of

21  the prior conduct that had been directed at you?

22  A.   It -- it was a progression of Mr. Martinez's actions that

23  I already didn't feel safe around him even after they had -- I

24  hadn't seen him around -- well, I'm not going to say I didn't

25  see him around.  It's just that I actively avoided

1    Mr. Martinez.  I would see Mr. Martinez in places.  I would

2    either hit the button, close the elevator, shoot upstairs.  But

3    he was -- the best way I could put it, he was always lurking

4    somewhere and -- prior to this incident.

5    Q.   After -- after this incident, did the conduct stop?  The

6    conduct in terms of all of the racial conduct that you were

7    being subjected to, did it stop?

8    A.   No, it did not stop.  I still had other individuals

9    telling me, "N, you're lazy.  Boy, hurry up and push the

10   button, or N, hurry up and push the button."

11        So I still had individuals harassing me, sir.

12   Q.   Okay.  And one of those was Mr. Hurtado; right?

13   A.   Yes, it was.

14   Q.   Okay.  In terms of how this conduct has impacted you,

15   let's go back before you actually experienced any harassment at

16   Tesla.  Okay?

17        What sorts of things brought you joy?

18   A.   Gardening, fishing, family, just -- period, you know.

19   It's like things was tough, but at least we can still have a

20   laugh.  You know, take the kids out fishing, what me and my

21   wife used to call "no money dates."  You know, we'd just go do

22   things.

23   Q.   And during the time that you were at Tesla, did you still

24   enjoy gardening?

25   A.   After this job started to really impact me and I had to

DIAZ - DIRECT / ORGAN

1   start to look around my shoulder and wonder what was going to

2   happen because of the fact that I was in a dangerous factory,

3   it was easy to just leave the forks up on that forklift and run

4   into me and kill me, and it was just -- it would have been

5   deemed an accident.

6   **Q.**   So you had fear?

7   **A.**   Yes.  I was fearful, sir.

8   **Q.**   And you described anxiety.  You had anxiety?

9   **A.**   I was fearful.  I had anxiety.  Mistrust.  It was -- I

10   just started to change my whole routine.  I started to really

11   put my car in the rear when other employees would leave, and I

12   tried to be around a group.  I didn't know what was going to

13   happen.

14        You know, you had one guy threaten to kill me.  I had

15   another guy in the elevator accost me saying that he wanted to

16   do me harm, and now we have this pickaninny and everything

17   else.  So, you know, after the elevator incident, I really,

18   like I said, I -- and all this accumulation of stuff, I really

19   started to -- even when I was away from work, I had to look and

20   wonder, is he in this parking lot?

21   **Q.**   If you could, tell me the top three words that describe

22   how you felt when you first saw the -- strike that.  I didn't

23   ask you that question.

24        Had you seen any racist graffiti while you were at the

25   factory?

1   **A.**    Yes, I did.  It was graffiti in the bathroom.

2   **Q.**    What kind of stuff did you see?

3   **A.**    It was stuff that was added to over a period of time.  So

4   you had the N-word, swastikas that was inside of the bathroom

5   stalls and stuff like that.

6   **Q.**    So after you -- and when did that start?

7   **A.**    Um, I started to see it after my second day at work and --

8   in the bathroom that I was using the most.

9   **Q.**    Okay.  And if you could -- and I know this is hard -- can

10  you describe your anxiety?

11  **A.**    Well, in the bathrooms over a period of time, you know,

12  like I said, these guys would use these type of markers like

13  this.  This is like what Tesla provided us to mark off parts

14  and stuff, and we had them in our pockets.

15       So you know, these are paint markers.  If anybody know

16  what a paint marker is, it's like almost impossible to get this

17  stuff off while you apply it, but over a period of time, it was

18  "Death to all Ns."  It was swastikas, and these wasn't just

19  purple.  They was in yellow, red, blue.  So you know, over a

20  period of time, they just started adding things and adding

21  things, and it gave me more anxiety, especially because I

22  don't -- I don't know who I'm dealing with.

23       We have an individual or individuals on the property that

24  already are putting swastikas and "Death to all Ns" on the

25  property.

DIAZ - DIRECT / ORGAN

1    **Q.**   Did you ever come to get a feeling of being overwhelmed by

2    all of this?

3    **A.**   Yes.  I was overwhelmed.

4    **Q.**   And how -- can you describe for the jury that feeling of

5    being overwhelmed?  How did it make you feel?

6    **A.**   It's like you're being held under water.  You know, you

7    are yelling for help; i.e., I'm telling these people what is

8    going on.  I'm talking to Ed Romero.

9         And it's like being held under water.  Nobody can hear

10   you.  Nobody cares to hear what you're saying.  It's like --

11   it's just accumulation.  It's almost like being buried under a

12   mountain.

13   **Q.**   When you -- you mentioned that the racial graffiti seemed

14   to build up over time, what -- what three words would you

15   describe -- what three words would you use to describe that?

16   **A.**   I would describe it as humiliating, fearful, degrading.

17   **Q.**   The first time that you realized that you were being

18   called the N-word, what three words would you use to describe

19   that when you were being called the N-word?

20   **A.**   Humiliating, upset.  Just -- you know, less than a human.

21   **Q.**   When you saw the pickaninny, the jigaboo, what three words

22   come to your mind in terms of your emotions when you were

23   seeing the jigaboo?

24   **A.**   Upset, disbelief, concern.

25   **Q.**   What were you concerned about?

1   **A.**   I was concerned that just somebody around here is actually

2   bold enough to just leave this in the middle of a plant floor.

3   **Q.**   When you saw your son called the N-word, what three words

4   come to your mind in terms of how you were feeling then?

5   **A.**   I was upset, demoralized, and disgusted.

6   **Q.**   With yourself?

7   **A.**   Yes, sir.

8   **Q.**   Now, when you left Tesla, did you have a job lined up?

9   **A.**   No, I did not.  I just couldn't be there anymore.

10  **Q.**   Did you try to find a job prior to March of -- mid-March

11  of 2016?

12  **A.**   Yes.  I was on Indeed actively looking for work in another

13  location.

14  **Q.**   Okay.  So why did you leave Tesla when you didn't have a

15  job lined up, even though you needed to feed your family?

16  **A.**   Initially I left Tesla because my mother died.  After I

17  had handled all the affairs with my mother and I was supposed

18  to return to the factory, I had -- let's just say a little

19  breather to be able to think.  With the combination of my

20  mother dying and the things that was going on in the factory,

21  I -- I just couldn't trust myself to be back in that factory.

22  **Q.**   And in terms of -- during the time that you were at Tesla,

23  were you able to enjoy -- I think you said gardening and your

24  family?

25  **A.**   Fishing, family.

**DIAZ - DIRECT / ORGAN**

1  **Q.**  Fishing.  Were you able to go fishing while you were at

2  Tesla?

3  **A.**  Normally, I always make time for fishing.  It's one of my

4  hobbies, that and gardening, and I always find time for it, but

5  in that time I just couldn't find the joy in life anymore.

6  **Q.**  Driving a bus for AC Transit, is that stressful like it

7  was at Tesla?

8  **A.**  No, it's not.  I get -- my driver's seat is about this

9  big.  I get to close the door, and it's just me and the road.

10  **Q.**  Has anyone called you the N-word at AC Transit on the bus?

11  Anybody call you the N-word on the bus?

12  **A.**  I've been called a lot of things.  I have been called

13  bald-headed.  I have been called fat.  I even had -- one lady

14  said my head looked like a used condom, but no.

15  **Q.**  Okay.  What are some of the physical ways the stress at

16  Tesla affected you when you were there?

17  **A.**  It -- and again, I'm embarrassed to say it translated over

18  into my family.  You know, I couldn't perform with my wife.  I

19  was so much under stress.  My wife, she needed -- she needed

20  her needs.  She needed to be attentively looked to, and because

21  of the things I was going through, it's like I felt like I

22  was -- I was demasculated.  Like I didn't have a manhood

23  anymore.

24  **Q.**  Is it fair to say that you are doing better now than you

25  were when you worked at Tesla?

DIAZ - DIRECT / ORGAN

1   **A.**   Some days.

2   **Q.**   When you have to think back about what happened to you

3   when you were working for Tesla, does that bring back the

4   emotions like we saw here today?

5   **A.**   Sometimes I will sit and stare off into space.  It brings

6   back intense emotions, and things can trigger at times, yes, it

7   can.

8   **Q.**   Do you think that you will ever be able to completely

9   forget what happened to you when you worked for Tesla?

10  **A.**   How can I?  I have to look at my -- I have to -- whenever

11  I see my son or if he is around me or when he comes to visit my

12  wife, I have to look in his face.  I have to look at him and

13  know I destroyed an individual's life with my decisions.

14  **Q.**   Now, you testified before about losing some weight because

15  of this?

16  **A.**   Yes.  I lost weight at the time.  I was a lot bigger than

17  I am now.

18  **Q.**   Okay.  And any other physical ways you felt like you had

19  been injured at Tesla?

20  **A.**   I would have sleepless nights.  I wouldn't eat.  I would

21  sit on the stairs for hours and just cry some nights because of

22  the things that I did.

23  **Q.**   How long do you think it will take to forget about these

24  things at Tesla?

25  **A.**   Honestly, I will never forget.  It's always going to be

1  ingrained in me.  It's a part of my life.  It's a memory now

2  that, you know, like some people say, when you ring a bell, you

3  can't unring it.

4  **Q.**   But if you were, let's say, given time and money, you

5  would be able to do fishing -- you fish now again; right?

6  **A.**   I fish now again, yes, I do.

7  **Q.**   And does fishing bring you joy?

8  **A.**   Yes, it brings me joy.

9  **Q.**   And gardening, you like to garden?

10  **A.**   Yes.  I love my tomatoes and squash, yes, I do.

11  **Q.**   And you are not growing tomatoes right now, are you?

12  **A.**   No.  It's too cold.  The growing season won't start until

13  June the 1st.

14  **Q.**   Okay.  I don't grow, so I don't know.  But I know that

15  tomatoes in -- tomatoes [different pronunciation], that's my

16  wife's word -- tomatoes are not so good in the store right now,

17  but okay.

18       In terms of -- if you were given time and money to do

19  those hobbies, fishing, gardening, spending time with your

20  family, would that make your life better?

21  **A.**   Yes, it would.

22  **Q.**   And let me ask you this:  Do you think -- based on what

23  happened to you, do you think that Tesla should be punished for

24  what they did?

25  **A.**   I'm going to say this:  I -- I'll take accountability in

1   my part in it.  All I ask is for Tesla to take accountability

2   for their part.

3   **Q.**   Okay.  After the -- after the first part of this case, did

4   anyone from Tesla apologize to you?

5   **A.**   No.

6   **Q.**   Why did you bring this lawsuit?

7   **A.**   To get the word out.  I don't -- the best way I can say it

8   is how everything got started is I was at home one day.  I was

9   watching a news report.  The news report was about a guy named

10  DeWitt Lambert.  DeWitt Lambert was a Tesla employee, and he

11  was working on the -- the general assembly line.

12      Some other Tesla employees had stole his cellular device

13  to his phone and made a death threat video.

14          **MR. SPIRO:**  I'm going to object to this.

15          **THE COURT:**  Yeah.  Sustained.  Let's --

16          **MR. ORGAN:**  Okay.  I will ask another question,

17  Your Honor.

18  **BY MR. ORGAN:**

19  **Q.**   Let me ask you this:  What do you think your future looks

20  like?

21          **MR. SPIRO:**  I think that's been asked.  You can ask it

22  again.  It's --

23          **MR. ORGAN:**  I will ask a different question.

24  **BY MR. ORGAN:**

25  **Q.**   Did the intensity of your anxiety lessen after you left

DIAZ - CROSS / SPIRO

1  Tesla?

2  **A.**   I can say yes to that question, yes.

3  **Q.**   Okay.  So is it fair to say that when you had to work at

4  the Tesla factory, that was when it was worse.  That was the

5  worst time; is that fair?

6  **A.**   Yes.

7  **Q.**   But is it fair to say that there's still residual impacts

8  that have come forward since then?

9  **A.**   Yes.

10  **Q.**   And like when you go on an elevator now, do you have any

11  anxiety being on an elevator?  You said that.  You said you

12  have to go to the back of the elevator.

13      When you see a Tesla, does that bring up any anxiety?

14  **A.**   It -- I will always remember when I see a Tesla on the

15  road, when I go by a Tesla building, see one of their

16  commercials, the first thing it does is it doesn't equate to me

17  as a new product.  It equates to me as what I went through.

18  **Q.**   Okay.

19          **MR. ORGAN:**  I think that's it, Your Honor.

20          **THE COURT:**  All right.

21          **MR. ORGAN:**  Thank you.

22                      **CROSS-EXAMINATION**

23  BY MR. SPIRO:

24  **Q.**   Good afternoon.

25  **A.**   Good afternoon, sir.

1  Q.   You had a positive relationship with Mr. Kawasaki, your

2  first supervisor at Tesla?

3  A.   I thought so.

4  Q.   Okay.  And you trusted him?

5  A.   Yes, I did.

6  Q.   Okay.  And he came into court just a couple days ago.  You

7  were here, and he said that you joined on June 3, and the only

8  racial complaint he received from you was the Judy Timbreza

9  incident; is that correct?

10  A.   That's mischaracterizing his statement.  He never said

11  when I was hired.  You said that.

12  Q.   Well, the record of that he says "so he joins June 3" is

13  in the record.  Mr. Kawasaki did tell the jury that the only

14  complaint he got from you was the incident with Timbreza;

15  correct?

16  A.   I complained to Mr. Kawasaki about Judy Timbreza, yes,

17  that is correct.

18  Q.   Right.  And my question is a little different.  That's

19  just the only complaint that Mr. Kawasaki could remember when

20  he testified; right?

21  A.   Can you show me that anywhere where he said that?

22  Q.   We will maybe at some point, but I'm just asking for your

23  memory.  You were here.  I was here.  The jury was here.  The

24  transcript is here.

25       Do you remember Mr. Kawasaki remembering any other

1   complaint that you had while he was with you at Tesla?

2   **A.**   I wasn't really a hundred percent paying attention, but

3   that's why I said you would have to show me what he said.

4   **Q.**   Well, you've been asked under oath previously if you ever

5   complained to Mr. Kawasaki about anything other than the Judy

6   Timbreza incident, and you said no.  Right?

7   **A.**   Can you show me that, please, sir.

8   **Q.**   Well, let me ask you this --

9          **THE COURT:**  It's a fair answer.  If you want to show

10  him, fine.  If you don't --

11         **MR. SPIRO:**  Sure.  I don't want to -- if we do too

12  much of that, we'll --

13         **THE COURT:**  Well, then don't.  Go onto where you want

14  to go.

15  **BY MR. SPIRO:**

16  **Q.**   Do you remember any other complaint that you made to

17  Mr. Kawasaki in particular?

18  **A.**   Are you talking about the sending him the e-mail what

19  happened in the elevator?

20  **Q.**   Yeah.  Well, other than the Judy Timbreza incident, are

21  you aware of another racial incident?  We'll move aside from

22  the elevator.  Okay.  We'll count the elevator.

23       Any other incident that you haven't described yet today

24  that you told Mr. Kawasaki?

25  **A.**   I just explained.  If you are talking about the elevator,

DIAZ - CROSS / SPIRO

1   yes, that was another incident.

2   **Q.**   Okay.  So those two.  Is there any others?

3   **A.**   Not that I can know that I tagged Mr. Kawasaki in.

4   **Q.**   Okay.  And you heard Mr. Jackson testify, and he said that

5   the only complaint that he received regarding racial harassment

6   from you was regarding the picture on the bale; right?

7   **A.**   That's true.  The only one he received from me, yes.

8   **Q.**   Okay.  And Mr. Wheeler was here who was somebody that you

9   worked with; correct?

10  **A.**   Yes, it is, sir.

11  **Q.**   And he was somebody who, when you saw the picture on the

12  bale, you wanted to bring over to show him what was on the

13  bale; right?  That's -- you did do that; correct?

14  **A.**   Yes, I did call Mr. Wheeler.

15  **Q.**   Right.  But as Mr. Wheeler testified in front of the jury,

16  prior to the time of the bale, you had never talked to him

17  about the use of the N-word in the Tesla factory; right?

18        **MR. ORGAN:**  Objection.  Misstates his testimony,

19  Your Honor.

20        **THE COURT:**  The jury's recollection -- these aren't

21  memory games for the witnesses, but if he recalls, he can

22  answer and go forward.

23  BY MR. SPIRO:

24  **Q.**   Do you recall that Mr. Wheeler said that the only time --

25  that he had never spoken to you about the use of the N-word at

1  the Tesla factory prior to the point in time where you brought

2  him over to the bale?  Do you remember him saying that?

3  **A.**   No.

4  **Q.**   Okay.  Do you remember this question:  "Prior to the

5  drawing that you were just shown in evidence, Mr. Diaz never

6  talked to you about the use of the N-word at the factory;

7  true?"

8       Do you remember that question?

9  **A.**   That question wasn't asked to me.  That question was asked

10  of Mr. Wheeler.

11 **Q.**  Right.  Right.  And he said he knew of no incident; right?

12  You do remember the question.  And he said he knew of no

13  incident where you had personally complained to him about the

14  use of the N-word at the Tesla factory prior to that time;

15  true?

16       **MR. ORGAN:**  It's a compound question.

17       **THE COURT:**  You can say what you remember, and then

18  we'll move onto the next thing.

19       **THE WITNESS:**  Again, even though I was in here and I

20  was hearing what Mr. Wheeler was saying, I wasn't hanging on

21  every word that Mr. Wheeler was saying.  So if you say that's

22  what he said, and you can put it in front of me, sir, I

23  definitely will review it and give you an answer.

24 **BY MR. SPIRO:**

25 **Q.**   Okay.  Well, let me ask it a different way.  Are you

1   telling this jury that you ever prior to the bale incident ever

2   complained to Mr. Wheeler about the use of the N-word at the

3   Tesla factory?

4   **A.**   Me and Mr. Wheeler had talked before, yes.

5   **Q.**   Okay.  And you mentioned something about the Mr. Foster

6   incident and how you texted Mr. Romero, and then Mr. Romero

7   came and ended up removing and firing Mr. Foster; right?

8   **A.**   No.  I never said that, sir.  You're saying that.  I

9   texted Mr. Romero.  Mr. Romero never showed up.  Mr. Romero --

10  I mean, Mr. Romero would normally be there in the daytime, and

11  then when I sent him a text, I believe he called and he said,

12  like he would normally do, is, "Mr. Diaz, get some rest, and I

13  will deal with the situation later."

14  **Q.**   And I think when you first described this to the jury you

15  said that you saw that text when you were reviewing some of the

16  discovery in this case?

17  **A.**   I saw what text?

18  **Q.**   You were talking about how you had seen stuff about the

19  Foster incident when you were reviewing discovery in this case;

20  right?  Just now.  Just about 30 minutes ago you said that.

21       Do you recall that?

22  **A.**   No, I don't recall that.  That's mischaracterizing my

23  statement.

24  **Q.**   I apologize.  Well, there's no text messages to Mr. Romero

25  about any of the other conduct that you're here complaining

1    about today; right?

2    **A.**    It was text messages.  There are exhibits, but I don't

3    know what you and my counsel may agree to.  I don't know what

4    Judge Orrick may have let in or may have not let in.

5         But there was exhibits of them text messages, sir.

6    **Q.**    Okay.  Well, I will -- I would -- I do not object to any

7    text messages coming into evidence between you and any other

8    person complaining about anything regarding racism.  Okay?

9              **THE COURT:**  Yeah.  So that will be struck.

10        Ladies and gentlemen, this case is really about the

11   damages that Mr. Diaz is entitled to as a result of the

12   instructions that I provided to you.

13        It's not about -- it's not a memory game of what's

14   happened in this courtroom so far.  You're going to be the

15   judges of that.  It is about what his memory is and what all

16   the other witnesses' memory is.  And to the extent that it

17   conflicts, those are things that you'll be able to judge

18   because you've been listening to the evidence.

19        So let's just -- let's deal with that.

20   **BY MR. SPIRO:**

21   **Q.**    Can you point to any text message that you sent to

22   Mr. Romero, Mr. Kawasaki, Mr. Jackson, or Mr. Wheeler

23   complaining about any of the incidents you told this jury

24   about?

25              **MR. ORGAN:**  Objection.  403, Your Honor.

DIAZ - CROSS / SPIRO

```
 1              THE COURT:  I could not hear that objection.  What is
 2    the objection?
 3              MR. ORGAN:  403, Your Honor.
 4              THE COURT:  Um, overruled.  If you're aware of any
 5    text messages beyond what you've already testified to,
 6    Mr. Diaz, you can say so.  Otherwise, you can say, "I'm not
 7    aware."
 8              THE WITNESS:  Other than what I sent, I'm not aware
 9    of, sir.
10    BY MR. SPIRO:
11    Q.   Okay.  Well, I mean, are you aware of any text messages
12    that you sent to any of those individuals complaining about any
13    of the racial incidents you've told this jury about?
14              MR. ORGAN:  Asked and answered.
15              THE COURT:  Overruled.
16              THE WITNESS:  Again, like I said, if you can put that
17    text message in front of me, sir, I can review that text
18    message, and I can tell you what was sent.  And until then, my
19    answer is going to be the same.  I'm sorry.  I apologize.  I
20    can't give you what you need.
21    BY MR. SPIRO:
22    Q.   Well, no, no.  I don't need anything.  I'm just simply
23    asking you if you remember as you're sitting here -- you know,
24    you spent a lot of time with this case -- if you remember,
25    sitting here, any text message that you sent to any of those
```

DIAZ - CROSS / SPIRO

1  individuals complaining about any of the things you're saying

2  now here eight years later.

3  **A.**   No, I cannot.

4  **Q.**   Okay.  And you can't tell us any friend or family member

5  that you sent a text message to complaining about any of the

6  things that you're now telling this jury about eight years

7  later, can you?

8  **A.**   A text message from eight years?  I cannot.

9  **Q.**   Okay.  Well, you also can't point to any other -- to any

10  other e-mails that you sent to any of these individuals or any

11  of the other folks that I have referenced complaining about any

12  of the other incidents that you've described here today to this

13  jury, can you?

14  **A.**   Have I sent e-mails?  Yes, I did send e-mails, sir.

15  **Q.**   The ones that the jury has seen, but you mentioned now

16  here in this courtroom a lot of other incidents, and I'm just

17  asking:  Do you have an e-mail about any of those other

18  incidents telling anybody "Hey, you can't believe what

19  happened," or words to that effect or anything to anybody?

20        **MR. ORGAN:**   Objection.  Argumentative, Your Honor.

21        **THE COURT:**   Overruled.

22    You can answer.

23        **THE WITNESS:**   All I can say is again, sir, I can't say

24  what you and my side agree to be in evidence.

25        **MR. SPIRO:**   Judge, I'm not --

DIAZ - CROSS / SPIRO

1          **THE COURT:**  That's -- you are -- you're not going to

2     get a further answer than what you've gotten, Mr. Spiro.  He's

3     testified to what his knowledge is.

4          **MR. SPIRO:**  Well, but I'm not asking you about what

5     was agreed.  What I'm asking about is if you are aware of any

6     e-mail that you sent.  If you can tell me "I remember being so

7     upset one day I e-mailed my friend," did that ever happen?

8          Can you tell me about an e-mail that you ever sent

9     complaining to anybody in real-time, not eight years later,

10    about any of the things you've told this jury about?  That's my

11    question.

12         **MR. ORGAN:**  That's argumentative, Your Honor.  It's

13    eight years later.

14         **THE COURT:**  Overruled.  If you don't remember what

15    e-mails you sent eight years ago, just say that.  If you do

16    remember that there are some other e-mails, please tell

17    Mr. Spiro.

18         **THE WITNESS:**  What I can say is I turned everything I

19    had over to my side and your side, sir.

20    **BY MR. SPIRO:**

21    **Q.**   Okay.  We talked about how Mr. Romero did ultimately fire

22    or was involved in the firing of Mr. Foster who you complained

23    about.

24         Do you remember that testimony?

25    **A.**   I never said he fired him, no.  I don't -- I know that he

1   was let go, but I don't know the dynamics of that.

2   **Q.**   All right.  But Mr. Romero stepped in, and he was let go.

3   And Mr. Romero was involved in the hiring of Mr. Patterson;

4   correct?

5   **A.**   I don't know if he would have had the last say-so.  I

6   wouldn't have been privy to that, sir.

7   **Q.**   Not the last say-so, but you forwarded Mr. Patterson's

8   resume onto Mr. Romero; correct?

9   **A.**   Yes.  I did do that.

10  **Q.**   And I think you testified to this jury that Mr. Patterson,

11  who you were recommending to be working there, was African

12  American; correct?

13  **A.**   Eventually.  When his first day of work, he showed up, I

14  found out he was African American, yes.

15  **Q.**   And I have to ask these questions in this case because of

16  the kind of case it is.  The person who recommended him was his

17  cousin; right?

18  **A.**   Yes, sir.

19  **Q.**   And his cousin, you're saying now, is biracial?

20  **A.**   I didn't say now.  I said that back in my deposition.

21  That was five, six years ago I said that.

22  **Q.**   Okay.  And when Mr. Patterson shows up first day, he's

23  African American; right?

24  **A.**   Yes, he was.

25  **Q.**   And you didn't tell Mr. Patterson, you know, "You

1   shouldn't stay around these elevators.  Get out of here," warn

2   him.  He just worked that job and worked next to you, sir;

3   right?

4   A.   I wouldn't have privity [sic] to Mr. Patterson's

5   financials.  Only thing I can say is what I did.  Yes, I did

6   forward an e-mail.  Yes, his cousin was biracial.  Just like

7   Mr. Jackson couldn't make the distinction of your colleague

8   being a Black man, I couldn't make the distinction.

9          THE COURT:  Mr. Diaz, I think the question is, once he

10  was there in the elevator, did you have any discussion with him

11  about the -- the racial incidents that have been occurring in

12  the factory.

13         THE WITNESS:  I can't recall.

14  BY MR. SPIRO:

15  Q.   When you would leave work every day from the Tesla factory

16  you had like an hour, good hour commute back home; right?

17  A.   I was living in Antioch at the time, and it was in

18  Fremont.  So it was a commute, yes.

19  Q.   A good hour; is that fair?

20  A.   It's depending on the traffic conditions, sir.

21  Q.   And you testified earlier that you never discussed

22  anything about what you have told this jury about with your

23  wife; right?

24  A.   No.  I did not discuss it with my wife, sir.

25  Q.   With your daughter?  Is that your testimony?

1    **A.**   Eventually, I did discuss something with my daughter, yes.

2    **Q.**   Okay.  What about in 2015, 2016?

3    **A.**   What I discussed with my daughter is one day my daughter

4    had told me that she had filled out an application for Tesla.

5    I had asked my daughter what the outcome of that was, and she

6    said she didn't get the job, and I said thank God.

7    **Q.**   Well, your daughter has testified previously in front of

8    you, and she says that she told you that after she filled out

9    the application and you did not dissuade her.  That's what her

10   testimony was; right?

11   **A.**   Can you show me where she said that, sir?

12   **Q.**   We will -- we can -- I'm just asking you for your memory

13   at this point, right?  If I showed you every document, I

14   wouldn't get through my examination.  So just for now, I'm

15   asking you, do you recall that your daughter testified in front

16   of you that she told you she submitted an application and that

17   you did not dissuade her?

18       Do you recall that testimony?

19   **A.**   That would be false, sir.

20   **Q.**   Okay.  You had other experiences in life that you've

21   talked about before the job at Tesla.  You had had, you know, a

22   dozen or more jobs before; right?

23   **A.**   I'm not going to say a dozen or more, but I had a few jobs

24   before.

25   **Q.**   Okay.  And you had seen racist graffiti before in your

DIAZ - CROSS / SPIRO

1    life?

2    **A.**    Yes, I have.

3    **Q.**    And you had seen fights before in your life?

4    **A.**    Yes, I have, sir.

5    **Q.**    And when you -- you know, come to the Tesla factory, you,

6    you know, talked about how your first day -- and you talked in

7    pretty vivid detail about the steel-toed shoes.

8         Do you remember that testimony?

9    **A.**    Yes.  I do remember that.

10   **Q.**    Well, when you filled out an application to work at Tesla

11   and in that application there were some statements that were

12   inaccurate; right?

13   **A.**    You would have to show me the application, sir.

14   **Q.**    Okay.  Well, why don't we put that up on the screen.  Very

15   quickly.  And we will move through this part quickly.

16        **MR. SPIRO:**  If you can put that up on the screen.

17   Thanks.  Go to the next page.

18   **BY MR. SPIRO:**

19   **Q.**    Okay.  And so if you recall, previously, you were

20   questioned about your answer to a top part of the application

21   that's redacted, and you were told -- you said that it was

22   inaccurate because you were rushing to fill out the

23   application.

24        Do you remember that testimony?

25   **A.**    I do remember rushing to fill out an application.  I do

1    remember that, sir.

2    Q.   Right.  And you remember that that was the reason you gave

3    for having an inaccuracy on the application, sir.  I don't want

4    to spend a long time on this.  But your reasoning for making

5    the mistake on the application was that you were rushing;

6    right?

7    A.   As I see this, I can see where it says:  "Have you worked

8    for Citistaff before?"  My answer was, no, I had never worked

9    for them before.

10        Can I comply with a drug test?  I don't use drugs because

11   I drive a bus.

12        May -- conditions may require for me to lift between 30

13   and 50 pounds.  I marked, yes, I can do that.

14   Q.   Sir, I actually -- that's a little different than my

15   question.

16        THE COURT:  Ask another question.

17   BY MR. SPIRO:

18   Q.   Yeah.  So I'm just asking, the question that you can't

19   see, do you recall previously that you gave testimony where you

20   said, "Yes.  That was inaccurate, but I was rushing to fill

21   this out."

22        Do you recall that testimony?

23        MR. ORGAN:  Objection.  Move to strike.  He's talking

24   about the redacted part, Your Honor.

25        THE COURT:  Okay.  Was it redacted at the time for a

DIAZ - CROSS / SPIRO

```
 1   reason?
 2            MR. ORGAN:  There was a motion in limine previously.
 3            THE COURT:  Okay.  So let's move on and if -- we can
 4   talk about it after the -- after this afternoon.
 5            MR. SPIRO:  Let me just show the witness.  If you can
 6   put Volume 1 of your deposition --
 7            MR. ORGAN:  I object, Your Honor.
 8            THE COURT:  Let's do this after 1:30.
 9            MR. SPIRO:  Okay.
10   BY MR. SPIRO:
11   Q.   Is it your testimony here under oath -- I think I heard
12   you say a few minutes ago that you recall saying that you
13   rushed on your application.
14        Do you recall that?
15   A.   I had limited time.  They had wanted me to fill out the
16   application so I can get over to the Tesla facility.
17   Q.   And you also had said that any mistakes on your
18   application were an oversight; right?  They were not
19   intentional by you?
20   A.   Oversight means that I knew what I was doing.  So if it
21   was a mistake, you know, it was a mistake.  It was a generally
22   honest mistake.
23   Q.   Okay.  And we're going to come back to this.  But for now,
24   in addition to what we were just discussing, you also put on
25   your application that you were working at that family --
```

1  Hamilton Family Center for a year plus before you started at

2  Tesla.

3       Do you remember that?

4  **A.**   In order for me to give you the accuracy, you would have

5  to put that on the screen and I would have to --

6  **Q.**   Sure.  We can put that back on the screen.

7       And you see you said that you started on January 13 and

8  you ended on February 14.  Do you see that?

9  **A.**   Yeah.  That was 13 months, sir.

10  **Q.**   Right.  So you put down over a year; right?

11  **A.**   Thirteen months, sir, yes.

12  **Q.**   Okay.  And that wasn't true; correct?

13  **A.**   How was that not true when I worked right down the street.

14  You can -- definitely could have subpoenaed them and brought in

15  my records.

16  **Q.**   Well, yeah, you -- the -- you were let go after several

17  months, and you were not eligible for re-hire; correct?

18  **A.**   Nowhere -- that's a false statement, sir.  I'm -- I hate

19  to say that.

20          **MR. ORGAN:**  Objection.  Relevance, Your Honor.

21          **THE COURT:**  Let's go to the next thing.

22  BY MR. SPIRO:

23  **Q.**   You start working and you talked about your first day.

24  The second day you were at Tesla, you -- you saw graffiti

25  sketched into the bathroom area, the N-word, and you reported

1    it to Ed Romero; correct?

2    **A.**    I didn't report it to Ed Romero my second day.  At some

3    point I did report it to Ed Romero.  And yes, they did have it

4    scratched or scrawled into the metal, and they also used these

5    paint pens, sir.

6    **BY MR. SPIRO:**

7    **Q.**    Okay.  Well, I want to -- if I can draw the Court's

8    attention to your prior proceeding testimony on page 401.

9                          (Pause in proceedings.)

10            **MR. ORGAN:**  Page 401.

11            **THE COURT:**  And where are you -- where do you want me

12   to look?

13            **MR. SPIRO:**  If you can start on line 2 and then go to

14   the question.

15            **THE COURT:**  Okay.

16            **MR. SPIRO:**  "And did you report the graffiti to

17   anyone?"

18                          (Pause in proceedings.)

19            **THE COURT:**  You can do that.  I'm not sure it's

20   inconsistent, but you can do that.

21   **BY MR. SPIRO:**

22   **Q.**    Okay.  And did you report the -- "QUESTION:  And did you

23   report this graffiti to anyone?

24        "ANSWER:  Yes, I did.  Yes, I did.  I reported it to my

25   immediate supervisor at the time which was -- I believe, it was

1   Ed Romero or maybe Tom Kawasaki.  I do believe it was Ed

2   Romero."

3        Did you give that testimony?

4   **A.**   That's what I said here, and basically that's what I just

5   told you, sir.

6   **Q.**   Okay.  And you had previously testified under oath that

7   you reported this to Ed Romero; true?

8   **A.**   At some point yes, I did report it to Ed Romero, sir.

9   **Q.**   Okay.  And in your trial testimony, since you have it up,

10  your attention is directed to that N-word scratched into the

11  metal; right?

12  **A.**   Where is that at?  Let's see here.  Can you give me the

13  line, please.

14  **Q.**   Yeah.  If you are at 401, about eight lines in.  "I went

15  down there in the bathroom.  The first thing I saw while I was

16  in the bathroom was the N-word scratched into the metal."

17  **A.**   Yes, I see that.  And it said, "There was other graffiti,

18  you know, and over a period of time the stuff was added to."

19  That's exactly what I just told you, sir.

20  **Q.**   Right.  And in -- when you were previously questioned

21  about the same graffiti that you saw on the stall, you said

22  that as soon as you got to Tesla you saw it, and you reported

23  it to Ed Romero; correct?

24            **MR. ORGAN:**  Objection.

25            **THE COURT:**  Sustained.  Not only has this been asked

1    and answered, but the entire portion of that testimony doesn't

2    say exactly the way that you asked that question.

3         So Mr. Spiro why don't you --

4         MR. SPIRO:  We can do another clip of that, if that's

5    okay with the Court.  I'm referring to a different testimony.

6         THE COURT:  Okay.  Where is that testimony?

7    BY MR. SPIRO:

8    Q.   Okay.  Let me just ask you this:  Did you report the

9    N-word of the bathroom stall that we're discussing to Ed

10   Romero?  Yes or no?

11        MR. ORGAN:  Objection.  Vague and ambiguous.

12        THE COURT:  I think it was asked and answered.

13        MR. ORGAN:  And asked and answered.

14        THE COURT:  Sustained.

15   BY MR. SPIRO:

16   Q.   You know, sir, as you sit here now, that Ed Romero did not

17   work at Tesla when you started your second day; true?

18   A.   Mr. Romero -- and again, sir, I just testified to you at

19   some point of time I reported it to Ed Romero.  What you are

20   trying to do is mischaracterize my testimony.

21   Q.   Same section, 401, I'm going to read the part before.

22   "After you start working at" --

23        THE COURT:  Hang on.

24        MR. SPIRO:  Sorry.

25        THE COURT:  Where are you?

1          **MR. SPIRO:**  Just after -- the same section I thought

2     that was fine with Your Honor.  401, line 2, "After you start

3     working at Tesla, do you see any graffiti in the factory?"

4          **THE COURT:**  Go ahead.

5     **BY MR. SPIRO:**

6     **Q.**   "QUESTION:  After you start working at Tesla, do you see

7     any graffiti in the factory?

8          "Yes, sir.

9          "And where do you see the graffiti?

10         "It was my second day of work, and I had to use the

11    restroom, so I went down the stairs.  And that was next to the

12    elevator, and I believe it was conveyance.  I went down there,

13    and I was in the bathroom, and the first thing I saw while I

14    was in the bathroom was the N-word scratched into the metal.

15    There was other graffiti, you know, and over a period of time

16    it was stuff that was added to."

17         And then it's:  "After that point in time, did you report

18    this graffiti to anybody?

19         "Yes, I did.  Yes, I did.  I reported it to my immediate

20    supervisor at that time which was -- I believe it was Ed Romero

21    or maybe Tom Kawasaki.  I do believe it was Ed Romero."

22         That was your sworn testimony; right?

23    **A.**   That's what I just said, sir.

24    **Q.**   Okay.  And when you filed your lawsuit in this case, there

25    was nothing about graffiti in it; correct?

**DIAZ - CROSS / SPIRO**

1  **A.**   Um, I don't know the parameters of what they filed.   I

2  know at some point in time Ms. Antonucci had deposed me.   These

3  are the questions that Ms. Antonucci had asked me, and these

4  are the questions I had answered.   I answered the questions

5  with me and you here.   You asking me the questions, sir.   And I

6  apologize again.   I'm really, really sorry, but these are the

7  things that I'm telling you, and it's consistent, and you are

8  proving that, what I have been saying.

9  **Q.**   Okay.   So you do -- let me just ask you this.   Your second

10  day at Tesla, did you report the graffiti?

11       **THE COURT:**   It's been asked and answered, Mr. Spiro,

12  please move on.

13       **MR. SPIRO:**   I want to --

14       **THE COURT:**   Mr. Spiro --

15       **MR. SPIRO:**   Sure.

16       **THE COURT:**   -- please move on.

17  **BY MR. SPIRO:**

18  **Q.**   The Timbreza incident that happens next.   Okay.   You go

19  into the elevator.   You hear him speaking in these words, and

20  you recorded it; correct?

21  **A.**   Yes, I did, sir.

22  **Q.**   Okay.   When you previously testified under oath in this

23  case -- and I'm going to go to Trial Testimony 406 --

24       **MR. ORGAN:**   What line?

25       **MR. SPIRO:**   5 to 15.

1              (Pause in proceedings.)

2          **THE COURT:**  Okay.  What do you want to do with it?

3          **MR. SPIRO:**  He previously testified in this case he

4   did not say he recorded it.  He said he was trying to remember

5   it when he Googled it.

6          **THE COURT:**  Okay.  Go ahead.

7   **BY MR. SPIRO:**

8   **Q.**   When you were previously asked in this case "What else did

9   he say in Spanish, if you recall" --

10  **A.**   Thank you, sir.  Appreciate that.  What line are we on,

11  sir?

12  **Q.**   406, line 5.

13  **A.**   406, line 5.  Okay.  I'm here.

14  **Q.**   "What else did he say in Spanish, if you recall," is the

15  question.

16         "ANSWER:  What -- well, what end up happening is after

17  that went for a while, I got kind of curious because they would

18  laugh every time, you know.  They would get me to say 'yeah,

19  yeah, yeah,' and they would bust up laughing and walk out.

20         "And then after that, I got kind of curious.  So you know,

21  I kind of like tried to really remember what they were saying,

22  and then from there I took Google and I translated it through

23  Google, and then that's when I found out he was calling me a

24  porch monkey."

25         Do you see that?

1   **A.**   Yes, sir, I do.  I do see that.

2   **Q.**   Okay.  So in your prior testimony, you did not say that

3   you recorded -- in this prior testimony, you did not say that

4   you recorded Mr. Timbreza; true?

5   **A.**   In this testimony I did not say it, but that's what I did.

6   I'm sorry if --

7        **THE COURT:**  It's okay.  You answered his question.

8   **BY MR. SPIRO:**

9   **Q.**   And you have -- you have used your cell phone to record

10  things that you've witnessed in other circumstances; true?

11       **MR. ORGAN:**  Objection.  Vague and ambiguous,

12  Your Honor.

13       **THE COURT:**  Overruled.

14       **MR. SPIRO:**  Thank you.

15       **THE COURT:**  At Tesla.

16       **MR. SPIRO:**  Well, I'm asking, have you -- when you've

17  seen something that was wrong, have you used your cell phone to

18  record it.

19       **THE COURT:**  So let's keep it to Tesla and ask that --

20  that would be relevant or prior to the time that he left Tesla.

21       **MR. SPIRO:**  Sure.

22  **BY MR. SPIRO:**

23  **Q.**   Prior to the time you left Tesla, had you taken out your

24  phone when you'd seen something that was wrong and recorded it

25  before?

1   **A.**   If we're talking about the pickaninny, yes, I took my

2   phone, and I took a photo; that's a form of recording.

3   **Q.**   Right.  But I'm talking -- I mean, you've posted on

4   YouTube recordings that you've made where you've recorded

5   people doing things you thought were wrong, and you posted them

6   on the internet; true?

7          **MR. ORGAN:**  Objection.  That's beyond the scope.

8          **THE COURT:**  Prior to 2017, 2016?

9          **MR. SPIRO:**  Yes, yes.

10         **MR. ORGAN:**  It's still beyond scope, Your Honor.

11         **THE COURT:**  You can answer.

12         **THE WITNESS:**  I have recorded things before, yes.

13  **BY MR. SPIRO:**

14  **Q.**   Right.  And posted them on the internet to make sure that

15  you brought attention onto the problem that you saw; correct?

16  **A.**   I -- I'm not really active on social media like that.  You

17  know, start posting a lot of things.  You know, I'm still a

18  little bit of a dinosaur at the same time.

19  **Q.**   Sure.  But you did post certain things that you saw that

20  you thought were wrong.  You would record them, and you would

21  post them on the internet for other people to see; true?  I'm

22  not asking generally, are you active or not?  I'm just saying,

23  you have done that act before.  Record something that you

24  thought was wrong.  Put it on the internet?

25  **A.**   That's a -- that has to be a false statement.  No.  I

1    haven't recorded something that I saw that was wrong and posted

2    on the internet.  That's a false statement, sir.

3    **Q.**   You didn't walk into your bank at Wells Fargo and go up to

4    the counter and record and say, "I want to see your manager.  I

5    want to see your manager" and put that on the internet?  You

6    didn't do that?

7              **MR. ORGAN:**  Objection.  Relevance.

8              **THE WITNESS:**  Do you have the recording?

9              **THE COURT:**  I'm sorry.  I'm sorry.

10             **MR. ORGAN:**  403.

11             **THE COURT:**  I should have stopped this before.  Move

12   on to something, Mr. Spiro, that is related to this case

13   please.

14             **MR. SPIRO:**  Again, I'm --

15             **THE COURT:**  Please.

16             **MR. SPIRO:**  We'll talk about it.

17   **BY MR. SPIRO:**

18   **Q.**   When you heard the recording, were you upset from the

19   Timbreza incident?

20   **A.**   Do you mean when I translated it, was I upset?

21   **Q.**   Yes.

22   **A.**   Yes, I was.

23   **Q.**   Okay.  And we would agree, I think, that the recording is

24   the best evidence for whatever was said in the elevator better

25   than your memory eight years later; correct?

1              **MR. ORGAN:**  Objection.  Argumentative.

2              **THE COURT:**  Overruled.

3              **THE WITNESS:**  I would agree.  If I still had the

4    recording, yes, I would agree that would be better.

5    **BY MR. SPIRO:**

6    **Q.**   You don't have the recording?

7    **A.**   I don't even own that phone anymore, sir.

8    **Q.**   Well, let me ask it maybe an easier way.

9         Did you tell Mr. Kawasaki that you had a recording?

10   **A.**   I don't recall.

11   **Q.**   When you hear the recording and you find out that this guy

12   is calling you these names, you confronted him; correct?

13   **A.**   Not immediately.  It was after I had found out what they

14   were saying, yes, I did confront him.

15   **Q.**   Understandably so.

16        You did not first go to Mr. Kawasaki.  You went to him and

17   confronted him?

18   **A.**   Yes.  I confronted him.  Yes, I did.

19   **Q.**   And in the middle of this confrontation, you called

20   Mr. Kawasaki on his cell phone; right?

21   **A.**   I don't know if it was his phone.  I don't know if it was

22   Tesla's phone, but yes.  A call was made, sir.

23   **Q.**   And he showed up right on the scene; right?  And you heard

24   him testify he doesn't remember the specific N-word being said;

25   true?

1  **A.**   I heard Mr. Kawasaki testify that he had interviewed the

2  people in the surrounding areas and had confirmed that

3  something was said.  Let's say that.

4  **Q.**   No dispute that something was said.  My question is a

5  little different.  Well, let me ask it a different way.

6       On the recording that you don't have anymore, on that

7  recording, can we agree the N-word was not said?

8  **A.**   I can agree that he definitely called me a porch monkey.

9  I don't remember everything that was recorded on the phone.

10  Every few years I update my phone.  I'm sorry.  I didn't keep

11  it.  I wish I would have in hindsight, but I gave that phone

12  back to AT&T and got a new phone.  I'm sorry.

13  **Q.**   Yeah.  It's okay.  You don't have to apologize, sir, to

14  your answers.  I just want truthful answers, and we'll get

15  through this.

16       The -- my point is a little different.  My point is, just

17  given that you had to go to Google Translate to figure out what

18  was being said in the recording, fair to say that it wasn't an

19  English word, the N-word that you would have recognized, on

20  that recording; isn't that fair to say?

21  **A.**   I don't -- I don't understand the question.

22  **Q.**   Well, my question is this:  Whatever was on that recording

23  required you, in your mind, to take the act to go to Google

24  Translate to see what the words meant.

25       So what I'm asking you is, doesn't that make it a fact

1  that it wouldn't have been an English word that you needed to

2  translate.   The N-word would not have needed to be translated;

3  fair?

4  **A.**   I do believe I said I translated the porch monkey.   I

5  never said I translated the N-word.   So for you to say that,

6  sir, is a mischaracterization of what I said.

7  **Q.**   I think we may be talking past each other.   I'm not saying

8  you're -- I'm not saying that.   What I'm -- I'm just asking one

9  simple question which is:   Given that you had to use Google

10  Translate, doesn't that mean that that recording did not have

11  English to English N-word on it, or you wouldn't have had to

12  use Google Translate.   That's all I'm asking.

13  **A.**   And again, you can keep asking me the same question, sir,

14  and you're going to get the same answer.

15       I recorded -- I don't -- if I had the phone still, I could

16  tell you everything, every sound that was recorded on it, but I

17  apologize again.   I gave the phone back to AT&T, sir.

18  **Q.**   Okay.   We can agree that whatever the Spanish word was

19  that you have testified about, was wrong; true?   Whatever the

20  word was.

21  **A.**   It was humiliating, yes.   I'll agree with that.

22  **Q.**   Okay.   And you didn't see Mr. Timbreza after that

23  situation was dealt with; correct?

24  **A.**   I can say he didn't work on the elevators anymore.   That's

25  what -- that's what I can say to you.

DIAZ - CROSS / SPIRO

1  Q.   Okay.  And you said that you were satisfied with the

2  response; right?

3  A.   I was satisfied the way Mr. Kawasaki handled the response,

4  yes.  I definitely was.

5  Q.   Okay.  And -- well, you don't know what all was going on

6  behind the scenes between who -- between Ed Romero and

7  Mr. Kawasaki did what when you worked around; right?

8  A.   No.  I wasn't privy.  They never tagged me into an e-mail.

9  They never interviewed me, came back and said anything, yes, I

10  will agree with that.

11  Q.   Okay.  So ultimately, Mr. Timbreza also -- you did not

12  include him in your lawsuit; correct?

13          MR. ORGAN:  Objection.  Relevance, Your Honor.

14          THE COURT:  You can answer the question.

15      When you say included in the lawsuit, are you saying that

16  he's not a party?

17          MR. SPIRO:  No, no.  The lawsuit's 30-plus pages,

18  200 paragraphs, various things and accusations --

19          THE COURT:  Then that is irrelevant and --

20          MR. ORGAN:  Move to strike.

21          THE COURT:  -- that'll be stricken.

22  BY MR. SPIRO:

23  Q.   When you were asked for initial disclosures in this case,

24  of who --

25          THE COURT:  We're not going through discovery.  We're

 1   not doing what -- what lawyers might have done.  We're doing

 2   what happened to Mr. Diaz or didn't happen to Mr. Diaz.

 3   **BY MR. SPIRO:**

 4   **Q.**   So let me ask this question --

 5          **THE COURT:**  And get to -- we're going to break pretty

 6   soon, so come to a place that you're really excited about

 7   finishing for the day.

 8          **MR. SPIRO:**  I -- it doesn't matter where we end for

 9   the day, but I would ask for five more minutes to just finish

10   this little brief part.

11          **THE COURT:**  You have got about two minutes.

12   **BY MR. SPIRO:**

13   **Q.**   Okay.  In your first deposition in this case.  Okay.  So

14   forget the lawsuit.  Forget legal responses.

15          When you were testifying under oath the first time in this

16   case and you were asked about what happened at Tesla, you never

17   mentioned the Timbreza incident; true?

18   **A.**   That, again, is a mischaracterization of my testimony,

19   sir, because if you go through my -- to my -- through my

20   deposition, his name is mentioned in the deposition, sir.

21   **Q.**   In your first deposition testimony?

22          **THE COURT:**  How is he going to remember this,

23   Mr. Spiro?  Come on.

24          **MR. SPIRO:**  It would be fair --

25          **THE COURT:**  Come on.

1          **MR. SPIRO:**  In fairness --

2          **THE COURT:**  I think we probably ought to stop for the

3     day, and then we'll pick up tomorrow morning with the resumed

4     cross-examination of Mr. Diaz.

5          So, ladies and gentlemen, please remember the admonitions

6     that I've given you.  The case is moving along at a good clip,

7     and we are -- we're on target.

8          So, as long as everybody comes in and -- as promptly as

9     you did the last two days, it will be great.

10          Meanwhile, please don't communicate about the case.  Don't

11     do any research, and we'll pick things up tomorrow morning.

12     Thank you.

13          (Proceedings were heard outside the presence of the jury:)

14          **THE COURT:**  You can step down, Mr. Diaz.

15          **THE WITNESS:**  Thank you, sir.  I appreciate it.

16          **THE COURT:**  Please be seated, everybody.

17                    (Pause in proceedings.)

18          **THE COURT:**  So, Mr. Spiro, you have that look on your

19     face again.  So -- so please express what you want to express,

20     and then we'll deal with it.

21          **MR. SPIRO:**  Yeah.  So a few things.  One is -- and

22     again, I am surprised but I will always respect the Court's

23     ruling that I can't ask a witness why they didn't say something

24     earlier or why in a lawsuit they didn't include certain

25     information.

1    I can only say that based on my experience, that's an

2    appropriate question or I wouldn't have asked it.  So that's

3    one.

4         **THE COURT:**  Let's start there.  To ask somebody

5    whether what they said in a deposition that was seven years

6    before when the deposition is being taken by the defense

7    lawyer, I have no idea what's in it.  He's going to have no

8    idea what's in it.  It is an unfair question.

9         What's in the complaint?  That's drafted by a lawyer.

10   He's not going to be the person to be answering those

11   questions, but it does prejudice -- it potentially prejudices

12   him in front of the jury when you're asking those questions and

13   he can't recall it.

14        So that's why I stopped you.  With respect to the

15   deposition that you were trying to use -- and this has

16   happened, I think, maybe three times before in the last few

17   days -- you have a particular perspective on the case and, like

18   many lawyers, when you find something that you think is a

19   "gotcha," you drill into it.

20        The thing that you were trying to get him to -- to admit

21   wasn't -- it could have said what you thought it did, and it

22   could have said at another time.  It was ambiguous, and your

23   continuing to drill into it was inappropriate which is why I

24   stopped it.

25        **MR. SPIRO:**  Yeah.  So if I can just take those in

 1   turns because I don't want to jump around too much.

 2        Again, and I can try to find a case that says this.  If

 3   you file a lawsuit, it's fair game of what you include or do

 4   not include in your lawsuit.  If you say "I was struck

 5   three times," I can say, "Isn't it true that when you filed

 6   your lawsuit you said you were struck three times, and now

 7   you're saying four times?"  That's a fair question.

 8        In my judgment, it's a fair question and, I believe, is

 9   allowed in every plaintiff's case.  If I'm wrong, I will stand

10   corrected but --

11        THE COURT:  Well, if you had brought the complaint and

12   put it down in front of him, you don't want to do that.  This

13   case is about damages.  We had the liability case.  You're

14   attempting to re-try liability, and I don't blame you for the

15   way that you're going after this, but that's what those things

16   go to, and what we are interested in right now is damages.

17        MR. SPIRO:  So -- and I thought -- candidly, I

18   actually think that that's really why Your Honor and I may be

19   talking past each other because I know that that -- the way you

20   say that is your -- and it's your courtroom and it's your view

21   on this.

22        From my perspective, if one or two incidents happened, the

23   jury is allowed to determine one or two incidents happened.

24   They don't have to interpret.  And we both agree on that --

25        THE COURT:  Yeah.

1          **MR. SPIRO:**  -- I can say.

2      Okay.  So if that's the case, then I can cross-examine him

3  on those other eight incidents just like I would in any trial.

4  And if that's true, then I can test his credibility.  And if

5  that's true, I can ask him questions in terms of the part of

6  the testimony that you thought was not as inconsistent, the

7  question before the Court -- and, you know, maybe I didn't get

8  there fast enough -- cut me off.  There is also a deposition

9  clip where he makes it clear that he reported it to Ed Romero.

10      The second point is which is both the complaint and

11  interrogatory responses, again, all I can tell the Court is

12  based on my experience and my view of the law, I can ask a

13  witness, "You didn't include in your complaint."  I don't have

14  to show him the complaint.  I can say, "As you sit here today,

15  isn't it a fact you didn't put that in your lawsuit?"

16      If he then says to me, "I don't know," I'm stuck with it.

17      But I'm allowed to ask -- in my view, I'm allowed to ask

18  that question, and I'm allowed to ask, "Isn't it true that when

19  you were served interrogatories in this case and you were asked

20  X and you said -- and you and your lawyers said Y."

21      I'm allowed to ask that, too.  So as long as this is a

22  regular trial as to the issues that are still contested, I

23  think I'm allowed to do those things.  So that's why I did

24  them.  If I didn't think I was allowed, I wouldn't have done

25  them, frankly.

PROCEEDINGS

1          **THE COURT:**  Well, I hope that that's true.  And your

2    perspective on things may be different than mine, but I'm sure

3    that you're trying to meet your professional obligations.

4          **MR. SPIRO:**  Of course.  So you are saying that

5    tomorrow if I put the complaint up there, and I say, "Isn't it

6    true that there was no complaint about Judy Timbreza in your

7    lawsuit?"  Then that's a fair question?  It's just --

8          **THE COURT:**  Yes.

9          **MR. SPIRO:**  Okay.

10          **THE COURT:**  You can do that and --

11          **MR. SPIRO:**  Okay.

12          **THE COURT:**  -- and you will have to -- I don't know

13    how long it will take him to read the complaint, and it's

14    not -- you have to figure out how -- what the best way is of

15    cross-examining him.  And you're an accomplished lawyer, so I'm

16    sure you're going to do it just the way that makes the most

17    sense to you.

18          To me, it is the factual issues of what has happened in

19    this case that's interesting and not some of the stuff that

20    you're doing.  But that's your -- it's your call, not my call.

21          **MR. SPIRO:**  And all I would ask is for the same, you

22    know, freedoms that I would get in cross-examining any case.

23          And I think that at the end of the cross-examination

24    hopefully the Court will view the case differently than it

25    views it now, and hopefully the Court will think that I got to

1    the correct issues.  That's all I can say.

2         The only other issue that I think came up is I'm obviously

3    not going to elicit anything that I'm not allowed to elicit

4    based on motions in limine.  Okay.  Of course not.

5         The exhibit was redacted, and the Court must have noticed

6    I was edging completely away from that and, in fact, stopped

7    the witness from going through any questions on the

8    application.

9         All I simply said, which he's already said under oath, is

10   you put things on the application that were incorrect.  You

11   have admitted that, and your answer to that is you were rushing

12   and that it was an oversight.  That was your testimony.  And

13   that's that.

14        **THE COURT:**  Well, if that had been that, then you

15   would have moved on.  That wasn't what you did, Mr. Spiro, I

16   don't think.  Maybe I miss- -- maybe the transcript will show

17   that I imagined things, but --

18        **MR. SPIRO:**  No, no, I think what happened was there

19   was an objection regarding something I was not going to do.

20   The Court didn't know where I was going, and so the Court told

21   me to move on.  That is exactly what I was going to do, and

22   that's what I was halfway through doing.  So that's all I'm

23   going to ask him on that tomorrow.

24        **THE COURT:**  I think you already got that -- you got

25   that the first words out of his mouth.

1          **MR. SPIRO:**  I don't think when the Court reviews -- if

2    the Court does review the transcript, you will see that I did,

3    so --

4          **THE COURT:**  I will.

5          **MR. SPIRO:**  Okay.  If it's in the transcript, I won't

6    go back.  If it is -- if it is not in the transcript and I take

7    it the Court isn't precluding me from asking those quick

8    questions, and if I think it's worthwhile, the Court doesn't

9    have a problem with me asking those questions.

10         **THE COURT:**  Well, I would view it the reverse way.  If

11   you want to ask me tomorrow morning after I've reviewed the

12   transcript of whether you can do that, I'm happy to answer that

13   question again.  But as of now, don't go back there.

14         **MR. SPIRO:**  Okay.  Well, I'm definitely -- I can just

15   tell the Court I will -- I didn't get through that part, and I

16   am going to ask to do that tomorrow.

17         **THE COURT:**  Okay.

18         **MR. SPIRO:**  And --

19         **MR. ORGAN:**  Your Honor, if we can have the citations

20   because my concern when I objected was that he was asking that

21   the mistake was made relative to Mr. Diaz's criminal history

22   which is the blacked-out part.

23         **THE COURT:**  So --

24         **MR. ORGAN:**  If the testimony was about that, it was a

25   completely improper question.  Even if it doesn't reference

 1   the -- the -- the fact of the prior conviction, the fact that

 2   he is asking a question about an improper topic and an excluded

 3   topic from the case is completely improper.

 4       THE COURT:  Was there something else?  You were saying

 5   that there was a mistake with respect to Hamilton.  Was that

 6   the -- was that the mistake you were referring to?

 7       MR. SPIRO:  We also discussed that.  There were

 8   several mistakes on it.  But the reality is I was never

 9   obviously going to say, which was why it wasn't, said that

10   you -- you can't use these things.  They're using these things.

11   They're using the motion in limine on his prior criminal

12   record.  They're using the fact that we're walled off from

13   discussing the son to elicit different testimony where they're

14   prejudicing the defense by blocking us from things.

15       If a person lies on an application to a company, and they

16   lie about a topic, and that topic is taboo, and they've

17   admitted to lying about something on their application, they

18   don't get to protect themselves by saying, "Well, one of the

19   things I lied about on the application was."  The second

20   thing --

21       THE COURT:  You are actually going in a different -- I

22   know that you're interested in something else.  You're

23   interested in credibility, which is an appropriate issue.

24       MR. SPIRO:  Correct.

25       THE COURT:  And -- but the -- the thing that he has

1  already admitted to with respect -- which I think he has

2  already admitted to with respect to the application, that's

3  all -- that's all you need.  So anyway, we'll -- I will look at

4  this.

5          MR. SPIRO:  Thank you, Your Honor.

6          THE COURT:  And we can talk about it at 8:00.

7          MR. SPIRO:  And the last thing, and I say this most

8  respectfully --

9          THE COURT:  I cringe whenever somebody says something

10  like that.

11          MR. SPIRO:  Because I feel is it necessary for me to

12  say it, I mean, which is:  I understand that the Court has

13  lived through this trial, and I understand the Court's pretrial

14  rulings, and I understand we're here to decide liability.  I

15  really do understand all of that and it's -- frustration of it

16  is probably not lost on you that I might be feeling that.

17      But at the same time what can happen in a case is because

18  everyone has seen it before and because it's a solo issue

19  that -- that a person doesn't get a proper opportunity to

20  cross-examine.

21      And so all I'm saying is I'm going to question him

22  differently than he was questioned the last time, and all I'm

23  asking for is, you know, a fair shot to do that and -- and I

24  think if the Court would give me a little bit of leeway to --

25  because I don't hear anybody telling me that the questions per

1   se are impermissible.   I think the Court will see where I'm

2   going by Question 4.   And what happened a few times is I was on

3   Question 3.   So I just say that, and I have nothing further.

4   Thank you, Judge.

5           **THE COURT:**   Okay.   I will just say I think I'm giving

6   you broad latitude, and I've allowed some questions that I

7   normally wouldn't.   But I have cut you off, and I recognize

8   that as well because I think you've gone too far.   But

9   that's -- I'll look at the transcript --

10          **MR. SPIRO:**   Thank you, sir.

11          **THE COURT:**   -- and then we can deal with the rest at

12   8:00.

13          **MR. SPIRO:**   Thank you.

14          **MR. ORGAN:**   Your Honor, just to make the record

15   complete.   First of all, the convictions were excluded, and

16   then Tesla stipulated that they would not -- they would not

17   address those things.

18      The -- with respect to Judy Timbreza and the reference to

19   him, their attorneys asked the questions the first day of

20   deposition.   In the second day of deposition, there are

21   13 references to Judy Timbreza.

22      So it's a lawyer trick.   And, in fact, most of what

23   they're doing here are lawyer tricks that are improper and

24   contrary to their prior stipulations.   That's the concern.

25   Thank you, Your Honor.

1          **MR. SPIRO:**  I think I have to respond to that very

2     quickly.  There is a -- he has asked dozens and dozens of

3     questions in his first day of deposition.

4          **THE COURT:**  You know, I actually don't want to have to

5     read the first day of his deposition eight years ago.  If you

6     want to spend the time to go through all of those questions

7     with him and then have Mr. Organ point out the 13 times that he

8     does it in the second, help yourself.  But I just don't -- I

9     just don't see it as something useful.

10         **MR. SPIRO:**  All right.  Thank you.

11         **THE COURT:**  All right.

12         **MR. ORGAN:**  Thank you, Your Honor.

13         **THE COURT:**  Thank you all.  See you at 8:00.

14         **MR. ORGAN:**  See you at 3:00, Your Honor.

15         **THE COURT:**  Oh, see you at 3:00.  That's right.

16                    (Recess taken at 1:44 p.m.)

17                 (Proceedings resumed at 3:06 p.m.)

18      (Proceedings were heard outside the presence of the jury:)

19         **THE COURT:**  So we are back -- we are back on the

20     record and having a discussion about the draft final

21     instructions, which I filed last night.  They are very similar

22     to the ones that -- the preliminary instructions.

23         And so I am interested in your comments.  I have seen --

24     and we will get to the two additional instructions that have

25     been requested by the Plaintiffs -- but first, let me start

 1    with the Plaintiffs.

 2        Are there other instructions that you think are

 3    appropriate, ones we should take out, edits?

 4        I don't know, Mr. Rubin, are you the guru here?

 5            **MR. RUBIN:**  I think I am unless someone tells me

 6    otherwise, Your Honor.

 7            **THE COURT:**  Okay.

 8            **MR. RUBIN:**  We only have two typos and one edit.

 9    Nothing substantive.

10            **THE COURT:**  Excellent.

11            **MR. RUBIN:**  No instructions to add.  None to delete.

12            **THE COURT:**  Okay.  So why don't you just give it to us

13    now.  What are the typos and the edit?

14            **MR. RUBIN:**  Instruction number 15, we would like to

15    add the name of our damages expert, Chip Mahla.

16            **THE COURT:**  Okay.

17            **MR. RUBIN:**  Instruction 19 at line 6, since you are

18    going to be giving the written instructions to the jury --

19            **THE COURT:**  I'm sorry.  Which number again?

20            **MR. RUBIN:**  Nineteen --

21            **THE COURT:**  Okay.

22            **MR. RUBIN:**  -- at about line 6, there is an extra

23    period and an end parentheses that should be deleted.

24                        (Pause in proceedings.)

25            **THE COURT:**  On number 19 -- page 19 probably?

 1          **MR. RUBIN:**  Number 19.

 2          **MR. ALEXANDER:**  Excuse me.  On number 15, it has Amy

 3     Oppenheimer.  On my version it doesn't have a reference to

 4     Dr. Reading.

 5          **MR. RUBIN:**  Oh, I'm sorry.  We should put Dr. Reading

 6     as well.  Chip Mahla, Dr. Reading, and Amy Oppenheimer.  That's

 7     right.

 8          **MR. ALEXANDER:**  Thank you.

 9          **MR. POSNER:**  Can I ask a clarifying question, Your

10     Honor -- this is Mr. Posner -- just to make sure we are all

11     talking about the same document.

12          **THE COURT:**  That's a good idea.

13          **MR. POSNER:**  Are we talking about Docket 436?  Is that

14     what we are all working from?

15          **THE COURT:**  Because my copy doesn't include that --

16     yes, we are.

17          **MR. POSNER:**  Thank you.

18          **THE COURT:**  Okay.  Again, I was confused because I

19     didn't see the extra periods and --

20          **MR. RUBIN:**  I actually don't -- that's interesting.

21     Well, let me move to the next one and I will double back and

22     find that one.

23          **THE COURT:**  Okay.

24          **MS. NUNLEY:**  Your Honor, the period and end

25     parentheses is the second paragraph of instruction number 29 on

1   page 30.  It's like about four lines down, second paragraph.

2           THE COURT:  So instruction number 29 --

3           MR. RUBIN:  There it is.  Sorry, it's 29 rather than

4   19.

5           THE COURT:  All right.  I see.

6           MR. RUBIN:  And then on instruction number 30, the

7   next one, the end of the first paragraph, I think you meant for

8   there to be a -- line 4, a comma after "involves" and "accept"

9   as part of that same sentence rather than a period and a new

10  sentence.

11          THE COURT:  Yeah.

12          MR. RUBIN:  That's it.

13          THE COURT:  Okay.  All right.  So, on -- either

14  Mr. Griffin or Mr. Posner, what -- with just the things that

15  were filed last night, do you have any comments, one way or the

16  other on them?

17          MR. POSNER:  Yes, this is Mr. Posner, Your Honor.

18  Thank you for preparing these.

19      First of all, I would like to incorporate and remind about

20  the objections that we asserted most recently in docket 425.

21  We maintain those objections.

22      The only point I want -- I would like to emphasize again

23  from them is our objection to what is now instruction 24, which

24  was previously instruction 9.

25      This is the one -- it's on page 25 -- liability for

1   malicious, oppressive or reckless conduct.  And, you know, it

2   continues to strike us, Your Honor, that this instruction is --

3   you know, even in light of our objection to instructing the

4   jury about the predicate to punitive damages -- which we have

5   certainly made and Your Honor has heard -- even, you know,

6   notwithstanding that, this one is particularly problematic

7   because it is really entirely duplicative in substance of other

8   instructions.

9        Certainly on instruction 24, the second sentence beginning

10  with "conduct" is entirely duplicative of the corresponding

11  language in instruction number 27 from page 28 other than

12  changing the references from Plaintiff to Mr. Diaz and

13  Defendant to Tesla.

14       And so this is really our most fundamental objection to

15  these instructions; and to repeat them twice, we feel, you

16  know, is doubling down on this error.

17       I don't believe anyone proposed an instruction that

18  corresponds with what is now number 24.  And so we object to

19  it -- you know, because not only for the reasons we already

20  made but also it remains duplicative and to emphasize this

21  issue, we feel is particularly prejudicial and unnecessary.

22       And the first sentence of 24 -- so the instructions

23  elsewhere say in more than one place that Mr. Diaz is entitled

24  to punitive damages.  I believe that's in an early instruction

25  and it's also in instruction 27.

1      What 24 says, that we think is even more problematic, is

2   that it's been established that Tesla's conduct that harmed

3   Mr. Diaz was malicious, oppressive or in reckless disregard of

4   Mr. Diaz's rights.

5      Now, I believe I made the argument at the pretrial

6   conference that that language is problematic because the jury

7   here is basically taking a fresh look at how harmful the

8   conduct was.  Was it harmful for compensatory damages?

9      And so we made the point that we are not aware of any case

10   that has instructed that the predicate for punitives is decided

11   when a jury is also deciding compensatory damages, but I think

12   you can see really the problem with this when you compare that

13   language, that I just read -- the first sentence from 24 -- (as

14   read:) "It's been established that Tesla's conduct that harmed

15   Mr. Diaz was malicious" -- and then you go to 27, which is the

16   punitive damages instruction, and the -- the beginning of the

17   second paragraph in 27 says "you may award" -- I'm paraphrasing

18   a bit -- "you may award punitive damages for Tesla's conduct

19   that harmed Mr. Diaz, which was malicious."

20      And so two instructions earlier the jury is being

21   instructed that the conduct that harmed him was malicious, just

22   sort of in a vacuum, untethered to any particular conduct.

23      Two instructions later it says "you may award punitives

24   for conduct that harmed Mr. Diaz, which was malicious."  And I

25   think it is at a minimum confusing.  The jury might be

1   wondering, you know, what conduct harmed him that was

2   malicious?  What conduct harmed him that was not?  And what are

3   we tasked to do here?

4        And so, I think the -- the request that we would make,

5   subject to our other objections, and really, I think, the way

6   to clean this up even, you know, given Your Honor's clear

7   understanding that the basis for punitive damage has been

8   entitled -- excuse me, has been established is to cut what is

9   now instruction 24, which is either entirely unnecessary and

10  duplicative and/or confusing to the extent it's -- it's, you

11  know, duplicative and somewhat different from the way it's

12  phrased in 27, which more accurately states what the jury's

13  task actually should be on the retrial.  So I wanted to make

14  that point.

15       **THE COURT:**  Okay.  And, you know, I think you have

16  made that point.  I understand it before -- and I understand

17  that the structure of the instructions on the -- what the prior

18  jury found includes what the law was that they had to look at

19  in order to make that finding.  That's the reason why I have

20  included that language in 24.

21       And with respect to 27, that is the -- that's the

22  operative instruction for what they are going to be considering

23  with respect to punitive damages.  And, of course, it includes,

24  you know, the final paragraph, which leads -- which really

25  tells them okay, this is what you -- this is what you need to

 1   be looking at in order to -- to make their determinations.

 2       So I appreciate the -- the objection but I think I will

 3   leave it as it is.

 4           **MR. POSNER:**  Thank you, Your Honor.

 5           **THE COURT:**  So then there are -- there were two other

 6   instructions.  One -- the first one was the direct and staffing

 7   agency employees.

 8       And let me first ask whoever drafted this, is this

 9   something that you are requesting be given now?  Is it

10   something that you are requesting be put into these

11   instructions?  And then I would like to hear from Mr. Posner or

12   Mr. Griffin on it.

13           **MR. RUBIN:**  Michael Rubin, Your Honor.  I think that

14   there is no need to give it now, and we think it probably falls

15   best after your new number 17, liability of corporation, scope

16   of authority not an issue.

17           **THE COURT:**  Mr. Posner.

18           **MR. POSNER:**  All right.  Well, we object to this

19   instruction.  We think it's unnecessary and prejudicial; and I

20   actually think -- you know, we have been -- we just got this

21   today and have been struggling a little bit about why they have

22   been asking for this.

23       You know, Your Honor understands that we are not -- Tesla

24   is not intending to raise the same defense that it raised and

25   the same position it took in the first trial about, you know,

1    essentially passing off liability to or trying to avoid

2    liability on the grounds that the conduct was committed by

3    staffers or non-employees of Tesla.

4        And I think the implication of this instruction and the

5    reason why they are trying to bring it in is because they are

6    suggesting that we are doing that, and essentially they want an

7    anchor in the closing to be able to set up a strawman that

8    we've made that argument but knock it down.

9        And there is no basis.  We think that would be improper

10   given the positions that we have taken and how we are pursuing

11   the second trial.

12       You know, they raised a little bit of testimony and said:

13   "Oh, we need this instruction because of some things that have

14   come in."

15       I think when Your Honor looks at the record so far in this

16   case, if any party has tried to draw out a distinction between

17   employees and contractors, it really has been the Plaintiff.

18   And, you know, we were looking back at some testimony -- I

19   don't think we have had a chance to fully canvass everything --

20   but, for example, I can refer Your Honor to the examination of

21   Mr. Jackson yesterday, the direct examination.

22       Mr. Alexander asked what -- Your Honor overruled a leading

23   objection but really, you know, was a leading question.  He

24   asked (as read:) "You were not able to interview the

25   eyewitness, Rothaj Foster?"

1    And the answer was -- this is at page 389 of the

2  transcript from yesterday.  Mr. Alexander asked (as read:) "You

3  were not able to interview the witness, Mr. Foster?"

4    The answer (as read:) "Yes, sir, I was not.  I don't

5  believe I was able to interview Mr. Foster.  I think I started

6  the interview with Mr. Foster and that's when I found out that

7  he wasn't under the nextSource umbrella."

8    The implication that he couldn't have done that because it

9  just wasn't within the realm of what he could do.

10    And we addressed that in the cross-examination to show,

11  for various reasons, that that was not true; but we believe

12  that that was really the Plaintiff drawing that distinction.

13    And then it struck me again today, you know, after reading

14  this instruction, that in Mr. Organ's direct examination of

15  Mr. Diaz, he -- he repeatedly said using, you know, what

16  Your Honor later referred to as maybe an overly dramatic tone,

17  you know, "Mr. Kawasaki might have done a decent investigation

18  but Tesla did not.  Tesla did not."

19    He said that more than once.  And so it occurs to us that

20  the Plaintiffs might be trying to draw out this distinction.

21  They want Tesla to be responsible for the bad conduct of the

22  contractors, but they don't want Tesla to enjoy the benefits of

23  work that contractors did.  But it's nothing that we have done,

24  we feel, to justify the need for a curative instruction.

25    And so, you know, whatever reasoning they have for trying

1    to draw out this distinction and then seek this instruction, we

2    are concerned by it; and we don't think it's appropriate.

3         We think that it might end up providing an anchor so that

4    they can set up and tell the jury again that we are making this

5    argument that we really have not.

6         And, you know, there's several reasons why we also don't

7    believe it's necessary.  This issue has been -- it's addressed

8    by other instructions.  Mr. Rubin just said:  "Well, this would

9    go nicely after the new instruction number 17."

10        I think 17 fairly covers the general issue.  To the extent

11   there is any issue about whether contractor conduct matters, I

12   would refer Your Honor to several instructions in the recent

13   set -- these numbers are from what was filed last night --

14   numbers 19, 20, Number 21, Number 22, Number 23, and Number 17.

15   They all cover this issue in some way, shape or form.

16        And then the other point I would make is this distinction

17   between, you know, liability for the conduct of -- conduct of

18   contractors as opposed to employees.  It really is a liability

19   issue, and we need to be cognizant that this jury is being

20   asked to award damages based on the liability findings that the

21   first jury made and based on the evidence and the instructions

22   in that first trial.

23        And there was a whole, you know, analytical way for the

24   jury to make these types of determinations in the first trial.

25        And if Your Honor is inclined, docket 280 is, I believe,

1    the final jury instructions.  There were a series of agency

2    instructions that -- instructions number 19, 20, 21, 22, 23,

3    and 24, from the first set that all touched on this issue to

4    some extent.

5         The parties, I believe, agreed not to include those in the

6    second set because that issue wasn't going to become a part of

7    this trial, and I believe that really remains the case.

8         But, you know, I'm concerned that giving an instruction

9    like this curative instruction that is, you know, paraphrasing

10   and combining a whole set of instructions from the first trial,

11   that was at least in some part potentially the basis for

12   liability, could be problematic because this jury is going to

13   be making potentially a determination different from what the

14   jury made on this issue.

15        So, there are several reasons why we object to this

16   instruction from it not being necessary to it potentially being

17   prejudicial to it being covered by instructions that already

18   exist in this set and in the prior trial.

19             **THE COURT:**  Okay.  Mr. Rubin, do you want to respond

20   to that?

21             **MR. RUBIN:**  Yes, please.  Mr. Spiro made a very

22   powerful argument in his opening.  Tesla cannot be held liable

23   for any damages that Tesla -- and he emphasized the word

24   "Tesla" -- didn't cause.

25        We are concerned about jury confusion.  The jurors have

 1   heard a lot of testimony so far; that some employees and some

 2   supervisors were direct employees of staffing agencies; some at

 3   Tesla; some both at different times.

 4        Our concern is that in the jury's mind it is not at all

 5   clear the extent to which a contractor is an agent of Tesla.

 6        Yes, instruction 17 does say that a corporation is

 7   responsible for the acts of its employees and agents.

 8        The reason this instruction would fit so well after number

 9   17 is it clarifies that in determining -- and this is the

10   jury's only task in determining the appropriate amount of

11   compensatory and punitive damages.  It is not affected by

12   whether any particular employee or supervisor was hired

13   directly or through a staffing agency.

14        It's as if -- we tried to phrase this in neutral terms

15   just to say that is not -- who hired them in the first instance

16   is not an issue that should affect your calculation of damages,

17   and we think that that should be enough to alleviate the

18   conclusion -- sorry, the confusion that is necessarily been

19   elicited by the testimony of witness after witness who drew the

20   distinctions because they saw distinctions for purposes of

21   their everyday worklife even though those aren't distinctions

22   that the law makes in the context of what are appropriate

23   damages here.

24            **THE COURT:**  Mr. Posner, I am -- the witnesses do make

25   those distinctions, and I think the statement is a -- is a

**PROCEEDINGS**

1   correct statement of the law; and I think it's -- I don't see

2   what would be prejudicial about it.

3        I suppose I could give it tomorrow morning and just --

4   just to clarify for their perspective if your concern is that

5   you don't want them to see it in the written instructions,

6   but -- but I -- I'm really not sure -- I don't think anybody

7   has been going after that issue, first of all.  So I agree with

8   you there.

9        I think it is -- it is potentially a question in the

10  jurors' minds because the witnesses are making -- drawing those

11  distinctions.  And for purposes of damages, those distinctions

12  shouldn't be considered.  And so I think it's worth -- I think

13  it's worth saying something on that.

14       **MR. POSNER:**  The jury made this distinction in the

15  first trial too.  I mean, it was an important part of that

16  case, and the jury was instructed and there were liability

17  findings made; and those liability instructions that led to

18  those findings have now been reproduced into the instructions

19  here to tell the jury this is how the first jury made its

20  determinations.

21       And so, you know, I agree, the instruction is not

22  particularly offensive as drafted; but I also am concerned that

23  it upsets the liability findings and the way that the jury

24  reached these determinations based on this same issue, which

25  was a much bigger issue in the first trial, and they didn't

1    have this instruction.  They had other instructions that

2    affected this issue, so --

3        THE COURT:  Okay.  Well, I appreciate the argument.  I

4    think I am going to put it in, and I will think -- and I may

5    either add it to 17 or I may make it a separate instruction,

6    and I do think -- when I was thinking about this last night,

7    that's what I was thinking about putting it there, so -- okay,

8    because I was thinking about that issue.

9        And then there was also number 32, which is the -- the

10   definition on past and future.  Mr. Posner, have you seen that

11   one?  Have you had a chance to look at that one?

12       MR. POSNER:  I might like a further opportunity.  I --

13   literally, I just took a photo of it on my phone for this

14   conversation so I could have it for this conversation.

15       THE COURT:  Okay.

16       MR. POSNER:  I can tell you my -- you asked them to

17   file it early.  I think they filed it right at 3:00.

18       You know, my very initial concern about it is it draws a

19   distinction between things that happened before October 2021

20   and things that happened afterwards, and we all know amongst

21   ourselves why that matters; but there has been no testimony to

22   the jury about why that matters, and I'm not sure there will be

23   any testimony as to why that matters.

24       I understand this is a potential source of (inaudible),

25   perhaps, for the jury and how they parse this out.  I think,

 1   you know, Dr. Reading will have to be careful; other witnesses

 2   will have to be careful; but I think it would make matters

 3   worse to send the jury back to the jury room and have to decide

 4   what happened before October 2021 and what happened after

 5   because that just hasn't been an issue in this trial.

 6        And so that's my initial concern.  I might like an

 7   opportunity to discuss it with our team if Your Honor is

 8   inclined to consider it further after this proceeding at least,

 9   but that was my initial reaction.

10        **THE COURT:**  Okay.  And what's the -- what's the

11   response there?  How is the jury going to know before I give

12   this instruction what that -- why I am using that date?

13        **MR. RUBIN:**  So far I don't see it as an issue.  The

14   principal reason we presented this is because we want the

15   instructions to be as consistent with Your Honor's prior

16   rulings as possible.

17        And as we talked about it several times, conceptually

18   that's been our understanding of the difference between past

19   damages and future damages.

20        I think, perhaps, it would be most prudent, if you don't

21   have to decide on the final jury instructions today, to defer a

22   ruling on this until we see how all the damages evidence comes

23   in and then have a final hearing or decide yourself the

24   appropriateness.

25        This is an appropriate instruction given the way the trial

 1   is proceeding.  Whether you conclude it matters for the jury or

 2   not is going to be up to you.

 3        We just wanted to make sure that there was sufficient

 4   clarity in the verdict form because there's certainly -- and we

 5   haven't gone through most of Mr. Diaz's cross-examination.  We

 6   don't know what Tesla is going to ask.  This may become an

 7   important issue.  And if so, it would be very important to

 8   clarify it for the jury.

 9        **THE COURT:**  So, I will -- I don't have to file

10   anything until I read these instructions to the jury on Friday.

11        So, let's -- let's keep it open.  I do think it would be

12   useful for somebody other than me to say -- to explain the

13   value of -- of the date of October 2021; but if that doesn't

14   make sense from the testimony and it's -- I will keep -- I will

15   keep looking at it, but I think they do have to know what the

16   difference is between past and future and when that comes.

17        So...

18        **MR. RUBIN:**  Right, Your Honor.  This last instruction

19   does explain the significance of the date.  It explains and it

20   ties right into what you said about two phases, and the jury

21   has heard over and over again there were two phases.

22        So, this is explanatory.  It is directly relevant to

23   distinctions you have drawn.  So we are not saying it for the

24   first time.  We haven't told them that the first phase -- well,

25   people have said "18 months ago, when you testified earlier" --

1   I don't think anyone has said "October 2021," but that would be

2   an easy thing to explain to the jury.

3       So there the jury does know that there was a first phase

4   proceeding in this trial roughly 18 months ago, which, in

5   fact -- and that's what we are tying this into.

6           THE COURT:  Okay.  So I think --

7           MR. ALEXANDER:  If I can just follow-up, Your Honor,

8   if you look at the point of view of the people that are doing

9   the closing argument, if we don't have the same demarcation

10  point for talking about past and future, the consequence is you

11  are going to have the Defense, perhaps, talking about one thing

12  and the Plaintiff talking about another and that creates

13  issues.

14      And so if the Court were to tell us when the past starts

15  and when the future starts, that resolves an issue.  And so

16  looking at the point of view of standing up in front of the

17  jury and making representations, it would be so much better if

18  we knew that we would comply with as opposed to accidently

19  saying something that would be out of compliance with what the

20  Court intends.

21          THE COURT:  Yeah, I think that's a very fair point.

22  Mr. Posner, did you want to say something?

23          MR. POSNER:  Well, I mean, there is a demarcation and

24  we all know about it and you have told us about it.  You know,

25  my concern -- and, again, just one minute of thinking about

**PROCEEDINGS**

1   this -- is that the jury has not, and that's not how the

2   evidence would come in.

3        And I would, frankly, be surprised if Dr. Reading, you

4   know, he did his interview of Mr. Diaz some time before

5   October 2021.  And I'm not -- I'm not sure, frankly, how that's

6   going to come in; but I just don't really see any evidence

7   coming in in this case that allows this jury to demarcate

8   between pre-October 2021 and post-October 2021.

9        I'm not saying that that's not an issue and maybe -- maybe

10  the parties can meet and confer.  Maybe we should see how -- I

11  think Dr. Reading might be examined tomorrow and re-visit this

12  in the afternoon, but I don't see this instruction being

13  helpful to the jury.  I think going back to the jury room, they

14  are going to say "What do we do with this distinction?"

15       **MR. GRIFFIN:**  Your Honor, can I add about the

16  rhetorical argument in closing?  Right now we have

17  Dr. Reading's exam in 2019.  We know he didn't talk to Mr. Diaz

18  at the time of trial; but if they can say "We are talking about

19  future damages," which is some implication there is an 18-month

20  window and that Reading is going to bolster that window, which

21  we have no idea what happened, so they are getting with this

22  instruction -- when I hear Mr. Alexander saying is you are

23  going to talk about future starting in 2021 and we can't

24  challenge anything after 2021.  So we have to assume that

25  October 21 -- 2021 until today is something that we can't touch

1   based on the Court's orders and the parties' agreements.

2        So if they are talking about future from trial to today

3   and then going on beyond that, then we are kind of hamstrung

4   with how we address that 18-month period especially because the

5   jury is going to be considering well, why didn't the Defendants

6   talk about what happened in 2022 or beginning of 2023?

7        It sets us in a position where we can't address that black

8   hole of evidence that we are not allowed to question him about,

9   and there is an assumption that he has future damages going

10  forward.

11       THE COURT:  Well, he testified today about the

12  continuing nature of his distress and -- and it's fair game

13  to -- to poke holes in that to the extent that -- you are not

14  bringing in stuff from left field.

15       But that's --

16       MR. GRIFFIN:  Well --

17       THE COURT:  That's okay.  I assume that your

18  examination -- that your examination is going to be --

19  challenging the credibility of what he said about things.

20       And it's -- you can argue that he doesn't have any --

21  that -- not only did -- he doesn't have damages of a

22  significant -- that is -- that the compensatory damages should

23  be low prior to October 2021.  You can argue they should be

24  nonexistent after October 2021.  The jury will make that

25  determination.  So as long as --

1          **MR. GRIFFIN:**  I was concerned about the opening of the

2   door question.  My understanding was we were not going to probe

3   conduct between last trial and this trial.

4          And so that's my concern about setting this demarcation.

5   If we can't ask him about his -- you know, the -- about what

6   happened in that window and they are saying -- obviously as

7   Your Honor pointed, they are pointing out the issues of, he is

8   continuing having issues today forward; and they are going to

9   want to talk about the issues from Tesla to the 20th -- until

10  October 2021, but we can't ask anything about the middle time.

11         And so this instruction leaves us in a position where

12  we -- you know, the jury will be confused about, "Well, Tesla

13  didn't ask him if he had any treatments between October 2021

14  and today.  How much counseling did he have?  What else is

15  going on in his life?"

16         And we are hamstrung because we don't want to open the

17  door because we don't have any evidence.  They haven't produced

18  anything.  There is no medical records.

19         I want to make sure that me and Mr. Spiro don't open the

20  door because our question was going to be cabined to a time

21  period that the parties had agreed upon.

22         **MR. ORGAN:**  We didn't testify as to anything in the

23  gap either today.

24         **MR. RUBIN:**  Right.  We all agree -- if I may,

25  Your Honor, no one is testifying about representing evidence

 1   about that period.  No one is precluding eliciting testimony

 2   about past damages or future damages.

 3       This is just about what you call damages for the two

 4   distinct time periods we are focused on, and the -- and how you

 5   characterize them -- past or future -- doesn't make any

 6   difference other than we want the -- the jury is going to put

 7   them in two different boxes on the verdict form, but I think

 8   the evidence would be the same both ways; and we were very

 9   careful not to introduce any evidence, as you will be, as to

10   that 18-month period.

11       **MR. GRIFFIN:**  And I agree.  Plaintiff's counsel was

12   careful but now as Mr. Posner has pointed out, we are entering

13   a new fact into the record defining something that neither side

14   has taken issue with.

15       And so we create a confusion about what's going on in this

16   time period when if the parties do what we agreed to do

17   pursuant to the Court's order, that not address this window,

18   then why do we need to address it in an order that creates

19   confusion about a window of time that -- that has not currently

20   been placed in front of the jury?

21       **THE COURT:**  So is the -- you know, I think -- you-all

22   have very fair comments about how this ought to work out.

23       The -- and maybe -- maybe the -- maybe we ratchet back the

24   date of the -- I haven't thought about this.  Maybe you either

25   rachet back the date of the past non-economic damages to, you

1  know, through the first year or -- to some -- some date that --

2  some chronological date after his -- after he left Tesla that

3  is a year after or 18 months after or something like that and

4  then make the future from there.  I don't -- I don't know how

5  to --

6          **MR. RUBIN:**  We can --

7          **MR. GRIFFIN:**  Your Honor --

8          **THE COURT:**  Hey, hey --

9          **MR. GRIFFIN:**  We haven't had a chance to talk about

10 this with our whole team.  We got this literally when we were

11 on the call.  We would hope that there would be no

12 determination made about this until we have had at least a

13 chance to talk to our team.

14         **THE COURT:**  No, I promise.  I'm just trying to help

15 sort it out.  Mr. Rubin, you were going to say something.

16         **MR. RUBIN:**  The important thing from our perspective

17 is consistency, consistency with the Court's rulings and

18 consistency in the way the remaining testimony comes in and

19 finally the consistency, as Mr. Alexander pointed out, between

20 how counsel for the respective parties present the issue of

21 damages.

22      So, we think this is the best way to resolve the issue.

23 And we leave it to the Court to make that determination.

24      If they want to give it some more thought, if they want to

25 meet and confer, that's obviously fine with us; but I think

 1  that clarity will help avoid confusion among the jurors and

 2  that's why we are requesting this.

 3      THE COURT:  So there is no doubt about that and -- and

 4  there is also no doubt that the lawyers need to know when they

 5  are arguing what they are arguing about.

 6      So, the -- tomorrow I won't have time to address this

 7  unless the parties have reached agreement by the 8:00 o'clock

 8  session, which I'm guessing won't have happened, and -- but I

 9  have got my 1:30 calendar is -- is a 1:30 calendar tomorrow.

10      So I will decide this on Friday morning at our

11  8:00 o'clock session, and we will be -- I will be very clear

12  about it; and I would like if the -- if the Defendant -- if the

13  Defendants have a different perspective or better -- just some

14  idea of how this particular issue could be resolved so that it

15  is clear that the lawyers are arguing about the same thing and

16  the jury is being presented with -- with the -- a clear

17  demarcation, talk with -- talk with your colleagues and see

18  whether agreement can be reached.  If it can't, I will just --

19  I will do what I think is the best thing under the

20  circumstances.

21      MR. GRIFFIN:  Thank you, Your Honor.

22      MR. POSNER:  Will we get a chance to argue it at

23  8:00 in the morning on Friday if we don't reach agreement

24  before?

25      THE COURT:  Yeah, sure.  I assume that -- you will be

 1  very brief in that; and if there is -- if there is something --

 2  I was thinking should -- should I ask for any briefing, but I

 3  don't think -- I don't think briefing helps here.

 4      I think it's -- I think what I'm looking for is clarity,

 5  consistency and -- and fairness in light of all the

 6  circumstances.

 7      So, I -- I will figure that out and you can appear by

 8  Zoom, Mr. Rubin.

 9      **MR. RUBIN:**  Thank you.  I appreciate that.  And just

10  one thought to throw out, I think this is the best way to do

11  it.  Another way would be to key it to the day of Dr. Reading's

12  examination.  I don't think it's as good, but it is an idea for

13  Defense Counsel to think about.

14      **MR. POSNER:**  The idea of clarity and consistency is

15  obviously important.  I think the attorneys -- that's our

16  obligation in how we present the case.  I'm still just

17  concerned about what the jury would do with this piece of

18  information if they had to try to draw this line not having

19  really heard anything about what happened before or after that

20  date.  So it's an issue and we will consider it further.

21      **THE COURT:**  Yeah.  And consider Mr. Rubin's idea just

22  now, which is a -- that's going to be the last information that

23  comes in.  I think that's actually a pretty good idea, but I

24  will let you -- I haven't decided anything.

25      I will look forward to the wisdom that you-all can

1  provide.  And other than that, is there anything else we ought

2  to talk about with respect to instructions?

3        MR. RUBIN:  Not from Plaintiff, Your Honor.

4        MR. POSNER:  Did you want to address verdict form,

5  Your Honor?

6        THE COURT:  Sure.

7        MR. POSNER:  And, I mean, the only thing I would do

8  is -- I believe this is the same verdict form that Your Honor

9  provided a few weeks ago -- and so I would renew and retain our

10  objections as stated in docket 385, which are basically to add

11  the language "if any" in front of the various forms of damages

12  and to reedit the predicate question, you know, the concern

13  being this jury -- you know, Mr. Diaz bears the burden of

14  proving his damages by a preponderance of the evidence.

15      If this jury were to find that he had not proven damages

16  by a preponderance of the evidence or any particular amount,

17  the language we have proposed would make it clear that the jury

18  can make that finding.

19      I'm not sure I understand Your Honor has determined that

20  the -- that Mr. Diaz is entitled to some amount of compensatory

21  damages, but it remains his burden to prove it.

22      So it's unclear -- you know, it still feels to us that

23  this jury -- even as instructed as Your Honor is doing -- could

24  find no damages if no damages are proven.  So that's our

25  objection.

PROCEEDINGS

1          **THE COURT:**  Yeah, well, the -- I appreciate that

2     perspective that your team brings to this trial.  That's not my

3     perspective, as you know.  And you are free to argue that the

4     compensatory damages should be minimal and based on the

5     evidence, and the jury will do with that what they do with

6     that, so...

7          **MR. POSNER:**  Thank you.

8          **THE COURT:**  With that, I think we are done.  Thank you

9     I will see you tomorrow morning.

10          **MR. GRIFFIN:**  Thank you, Your Honor.

11          **THE COURT:**  Yep.

12          **MR. ORGAN:**  Thank you.

13               (Proceedings adjourned at 3:45 p.m.)

14                    ---oOo---

1

2

3                           **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5       from the record of proceedings in the above-entitled matter.

6

7       DATE:    Wednesday, March 29, 2023

8

9

10

11       _____

12            Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
             United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25