**Volume 4**

**Pages 698 - 900**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | | |
|---|---|---|
| OWEN DIAZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 17-06748 WHO** |
| | ) | |
| TESLA, INC. dba TESLA MOTORS, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Thursday, March 30, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        CALIFORNIA CIVIL RIGHTS LAW GROUP
        332 San Anselmo Avenue
        San Anselmo, California  94960
    BY:  **LAWRENCE A. ORGAN, ATTORNEY AT LAW**

        ALEXANDER MORRISON + FEHR LLP
        1900 Avenue of the Stars - Suite 900
        Los Angeles, California  90067
    BY:  **J. BERNARD ALEXANDER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
        United States District Court - Official Reporter

```
 1   APPEARANCES:   (continued)

 2   For Plaintiffs:
                         ALTSHULER BERZON LLP
 3                       177 Post Street - Suite 300
                         San Francisco, California  94108
 4                 BY:   JONATHAN ROSENTHAL, ATTORNEY AT LAW

 5                       COLLIER LAW FIRM, LLP
                         240 Tamal Vista Boulevard - Suite 100
 6                       Corte Madera, California  94925
                   BY:   DUSTIN L. COLLIER, ATTORNEY AT LAW
 7
     For Defendants:
 8                       QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                         51 Madison Avenue - 22nd Floor
 9                       New York, New York  10010
                   BY:   ALEX SPIRO, ATTORNEY AT LAW
10                       STEPHANIE KELEMEN, ATTORNEY AT LAW

11                       QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                         300 West 6th Street - Suite 2010
12                       Austin, Texas  78701
                   BY:   ASHER GRIFFIN, ATTORNEY AT LAW
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

Thursday, March 30, 2023 - Volume 4

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|

**DIAZ, OWEN (RECALLED)**
(PREVIOUSLY SWORN)                                   713      4
Cross-Examination resumed by Mr. Spiro             713      4
Redirect Examination by Mr. Organ                  818      4

**DI-AZ, DEMETRIC**
By Videotaped Deposition (not reported)            823      4

**READING, DR. ANTHONY**
(SWORN)                                             824      4
Direct Examination by Mr. Collier                  825      4
Cross-Examination by Mr. Spiro                     849      4
Redirect Examination by Mr. Collier                878      4
Recross-Examination by Mr. Spiro                   883      4

**JONES, LA'DREA**
(SWORN)                                             886      4
Direct Examination by Ms. Nunley                   886      4
Cross-Examination by Mr. Spiro                     893      4

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 290 | | 738 | 4 |

<u>**Thursday - March 30, 2023**</u>                                    <u>**8:00 a.m.**</u>

                    P R O C E E D I N G S

                         ---oOo---

     (Proceedings were heard outside the presence of the jury:)

          **THE COURT:**  Good morning, everybody.  Please be

seated.

                    (Pause in proceedings.)

          **THE COURT:**  All right.  I have got several things that

I want to go over this morning.

     First, there's the pending motion to -- regarding

Exhibit 410 and the Wheeler cross-examination, and the defense

motion there is denied.  They've -- Tesla was aware of that

document for four years, at least.  It knew the incident would

be part of the first trial.

     It's clearly relevant with respect to Mr. Diaz's state of

mind and the punitive damages.  It was not produced.  It was

not used in the first trial, and the Defense -- currently, the

new lawyers knew they were going to use it in this case.

     Mr. Spiro, I think, exaggerated in his questioning what

the document contained, which is not nearly as conclusive as he

suggested in the question.

     I'm excluding it because it should have been produced in

discovery.  It wasn't used in the first trial.  It wasn't

provided prior to this trial, and it's 403.

     Second, I am going to give the instruction, Mr. Posner,

1   regarding the staffing agencies, which I think will clarify any

2   confusion on the staffing agency that's a distinction, among

3   other things, when I was looking at the Wheeler testimony that

4   Mr. Spiro made in his cross of Wheeler.  And I think it was a

5   perfectly appropriate distinction to make, but I think the

6   instruction will clarify if there's any confusion in the

7   relationship -- the importance of the relationship between

8   those staffing agencies and Tesla.

9        Third, the -- I was asked about the streaming.  I want to

10  confirm -- so this has been streamed and audio streaming, and I

11  want to confirm with the lawyers that they have followed the

12  instruction of the Court to sequester the witnesses so the

13  witnesses have not been listening to the streaming.

14       Can you confirm -- Mr. Organ, can you confirm that?

15            **MR. ORGAN:**  Yes, Your Honor.

16            **THE COURT:**  All right.  Mr. Spiro?

17            **MR. SPIRO:**  We can confirm that.  Thank you,

18  Your Honor.

19            **THE COURT:**  Okay.  Fourth, I am going to delete

20  Instruction 24, which Mr. Posner discussed.  I'm planning to

21  delete it from the instructions.

22       I think it was -- I think it is unnecessary for the final

23  instructions.  I think it was necessary in the preliminary

24  instructions to explain to the jury what had happened, but at

25  this point I think Instruction 27 will suffice on that.

 1        And then, finally, the objections to Mr. Diaz's

 2   cross-examination that we were discussing at the end of the day

 3   yesterday.

 4        With respect to the job application, if you want to point

 5   to specific parts of the job application that you haven't yet,

 6   that do not -- do not include the excluded material, that's

 7   fine.  Let me just finish and then -- because I'm sure you'll

 8   have things that you want to say, so just hang on, Mr. Spiro.

 9        Second of all, with respect to depositions and

10   interrogatory answers, it's fine to use them.  I want you to

11   give sufficient time to the witness to review what -- what he

12   said before -- before you launch into it.

13        So make sure he's got the stuff available and can use it

14   and not use my things because I like to look at them, too, and

15   make sure that it's appropriate.

16        And the portion with respect to reporting to Mr. Romero

17   was not inconsistent in my view, and I think that you are done

18   with, so I don't want you to go back to that.

19        And then, finally, I told you at the end of the day

20   yesterday that it would be fine to give Mr. Diaz a copy of the

21   complaint to look at it.  I'm -- I have rethought that.  I

22   think Rule 403 applies with respect to that.  I think it's a

23   time waster.  I think the questions is more prejudicial than

24   probative.

25        So that's what I think, Mr. Spiro.  Please come on up to

1   the mic.

2       **MR. SPIRO:**  Sure.  So the reason that the issue with

3   the application was, perhaps, clunky was I was intentionally

4   trying to stay away from that, and I think the Court will

5   remember that when the application was up and he was reading

6   through it, I signaled to the Court and interrupted him to take

7   it down.  What I've done is -- and that was intentional,

8   frankly.

9       What I've done is sanitized the questions.  It's hard

10  to -- again, I'm -- there's not going to be anything regarding

11  his criminal record, but I can't ask him fully the questions.

12  And so what we did is we sanitized the part of the transcript

13  that I would just ask to be able to -- and it's underneath this

14  line, but I included the top line and I'm providing a copy to.

15      And again, my position is, as I stated yesterday, is

16  there's nothing wrong with asking him if his credibility is at

17  issue here.  Simply saying, on page 26 you didn't mention this

18  point.  I had at this point.

19      And he says "I had limited time to fill it out.  They

20  wanted me to hurry and go over to Tesla.  Any other reason why

21  you didn't disclose it on the application oversight; is that

22  correct?"

23      **THE COURT:**  No.  This -- what you're intending to ask

24  goes directly to the issue that was excluded.  You may not ask

25  these questions.  Thank you for showing them, though.

PROCEEDINGS

```
 1            MR. SPIRO:  I wasn't going to do it without showing
 2   you, of course, Your Honor.
 3        Our position is that by sanitizing it, the subject matter
 4   becomes irrelevant.  It's just simply, was there an inaccuracy?
 5            THE COURT:  It is excluded.
 6            MR. SPIRO:  Okay.  And so I have put the complaint up
 7   on -- up for Mr. Diaz on the -- his podium, as you instructed
 8   yesterday at the end of the day.  But I will not ask those
 9   open-ended questions, I take it, that I was asking which is
10   "Did you ever include so and so in the complaint?"
11            THE COURT:  So yeah.  My -- my thinking on this is --
12   first, as I said yesterday, the complaint is a lawyer-driven
13   thing.
14        Second, it is not relevant to this case where we are
15   today.  Third, the jury might think that it's actually really
16   important, these -- that question, and it's more prejudicial
17   than probative to try to explain the whole situation, and it's
18   a time waster.
19            MR. SPIRO:  So -- so we -- I'm going to make a rare
20   request, if Mr. Diaz could step out while we discuss this
21   matter?
22            THE COURT:  I think that's fair.
23            MR. SPIRO:  Okay.
24            THE COURT:  Mr. Diaz, would you step out.  Thank you.
25                      (Pause in proceedings.)
```

1        **MR. SPIRO:**  I mean, the testimony that's been given on

2   what he remembers and not is what it is.  Moving forward, the

3   point from my standpoint is we're here eight years later, and

4   he was, you know, he was visibly upset about the Timbreza

5   incident; right?  It's never left his mind, in essence, these

6   things.

7        He has been very, very involved in this litigation in this

8   case.  I have lots of information that shows as much.  And so

9   18 months after the incident happening when he put down --

10  through his lawyers -- but when they put down their

11  allegations, he did not include that incident.  Question.

12  Answer.  That's it.

13       And that's a completely fair question of was it present

14  enough in his mind 18 months later to put it into his lawsuit?

15  Yes or no?  No.

16       Did he put it in his disclosures?  No.

17       And here he is eight years later, and he says that it is

18  causing him extreme suffering.  And that's a perfectly fair

19  cross-examination in my view.

20       And on -- on redirect, what typically happens is the

21  lawyer on the other side says, you know, while you were

22  involved in this process, you know, ultimately, you didn't

23  draft this document?  Correct?  Correct.

24       And that's it.  It is worth what it is worth.

25       I don't think -- I mean, again, I made this point

1    yesterday, and I'm not going to, like, you know -- Your Honor

2    is extremely experienced, and I don't have to, you know, cite

3    the principles of cross-examination seventh circuit and all

4    this stuff.  It's not a good use of time, and it's not

5    necessary with you, Your Honor.

6        So you know, I think, as I said yesterday, if you allow me

7    to get five questions, I think the Court will see where I'm

8    going.  That would be the only questions about the -- what is

9    not in the complaint on that topic.  I think they're fair

10   questions.  So that's --

11        **THE COURT:**  Okay.  So with respect to Timbreza, you

12   can ask him when the first time he's aware that it was brought

13   up with his litigation, and it sounds like the answer might be

14   his second deposition.

15        **MR. SPIRO:**  That is -- yeah.  The second day.

16        **THE COURT:**  But if he says, you know, I don't know, I

17   don't --

18        **MR. SPIRO:**  I'm --

19        **THE COURT:**  It would just take too much -- it would

20   take so much time to go through.  It's not -- it's not the

21   big -- well, I can't say because it's not my decision to say,

22   and that's fair.  That's fair enough, but it's -- it's just too

23   much of a time waster to do it.

24        **MR. SPIRO:**  But that's -- but at some level,

25   Your Honor, you know -- and I shared this concern earlier that

1   there's a -- and I actually very much appreciate how this is

2   done in the Northern District of California.  It's very

3   efficient, but there becomes a problem of time delay on the

4   witness' part; right?  I mean, he knows.

5        You know, this was -- to be honest with you, everything

6   yesterday -- the one thing that sort of left me a bit uneasy is

7   during one of our interchanges, the jury heard Your Honor say

8   something to the effect of this isn't a memory test.  And the

9   reason that that sort of struck me, you know, in a way that I

10  find I need to bring it up is because I believe fully, like in

11  every inch of things, that he, of course, knows this.

12       He knows that Timbreza is not in his lawsuit.  He's been

13  so involved with this case, I've never seen a witness quite as

14  prepped.  I mean, he's very involved in this case.  He knows

15  this wasn't a memory test.  The truthful under-oath answer from

16  Mr. Diaz on this topic is, "It wasn't in my complaint."

17       That's the truthful -- so the idea that I'm giving him a

18  memory test is just folly to me, frankly.  He knows the answer

19  to this question.

20       **THE COURT:**  You may have a perspective about --

21  obviously, you have a perspective about that, Mr. Spiro.  But

22  it's not -- it's -- just remains to me not the -- it remains to

23  me, 403, frankly, that when you have a lawyer creating a

24  complaint -- as -- I've gone through this.

25       You can ask him whether he recalls when he first

1    brought -- when Mr. Timbreza's incident was first brought up in

2    the lawsuit.  You can ask him -- you can ask him that question.

3    If he says he doesn't remember --

4          MR. SPIRO:  I mean --

5          THE COURT:  -- you can say what's the first time when

6    you were deposed, you know, a second day?  And so --

7          MR. SPIRO:  Okay.  Then I'll leave it at that and move

8    on.  And then all I would simply ask is because, you know,

9    it's -- I do worry about the things I said yesterday, the

10   things I've said this morning, but if the Court wants me -- I'm

11   good at -- certainly better than when I was younger -- at

12   taking a hint.

13         THE COURT:  You're not very good at taking a hint,

14   Mr. Spiro, but --

15         MR. SPIRO:  Well, I will take a hint today.  So if the

16   Court wants me to move on to another -- again, the reason I

17   wasn't -- I had a point.  I think if Your Honor had seen the

18   point, I think Your Honor would agree, but I guess we'll never

19   know.

20       So if the Court wants me to move on, all I would

21   respectfully ask is that the Court said something as if, you

22   know, given the time or something like that, not the statements

23   of "this isn't a memory test," things like that.  That seemed

24   to me to be active redirect from the bench.  That's how it

25   felt, anyway.

1    So, you know Your Honor is very quick, and it felt a

2  little -- you know, whereas again, I -- the Court -- I'll make

3  my arguments in summation, but I think that some of these

4  points because Your Honor is so entrenched in having seen this

5  case the first time, I think that if Your Honor had seen it,

6  you would have said that was definitely not a waste -- my

7  prediction, you would have said that was definitely not a waste

8  of time.  But I guess we'll never know.  So I have nothing

9  further on this topic.  I understand the Court's ruling, and

10  I'm ready to proceed.

11          **THE COURT:**  Thank you.

12          **MR. ORGAN:**  Your Honor, I apologize.  I just do need

13  to make a record now that I have seen Mr. Spiro's sanitized

14  version.

15          **THE COURT:**  I just sustained the objection.

16          **MR. ORGAN:**  No.  I know that, Your Honor.  They're

17  going to appeal.  I want to make it clear for the appellate

18  record that he wasn't -- it wasn't excluded for some reason

19  that wasn't actually directly to what the Court is saying.

20  What I could do is I could just lodge this as an exhibit,

21  Your Honor.  Would that be okay?

22          **THE COURT:**  That's what I would do.

23          **MR. ORGAN:**  And then I won't waste the Court's time.

24          **THE COURT:**  Just put it in the record, and then you

25  can do whatever you want to do with it.

PROCEEDINGS

1        **MR. ORGAN:**  Thank you.  Because I do think his

2   examination makes clear that he was trying to violate an order

3   that they stipulated to.  So anyway, thank you, Your Honor.

4        **MR. SPIRO:**  I just feel the need to respond to that

5   very quickly, which is an order regarding a topic that can't

6   get into.  You can't bring up that topic.

7        I can't say to him "Isn't it true that what you lied about

8   on your resume was X?"  It is not a shield to protect you

9   against cross-examination.

10       And part of the reason this concerns me so much in this

11  case, it's not just the awkward procedure in this case that

12  we're in, this posture, which is what it is.  It's also the

13  fact that he knows where the blockers are.

14       So he can look at me and go -- well, he knows I can't

15  introduce other evidence.  He knows that; right?  And so

16  they're able to stand up and say his relationship with his son

17  is fractured.  It's fractured because of Tesla when everybody

18  here knows, who knows the truth, that that's, frankly,

19  misleading.

20       And there's a lot of cases that say if you say something

21  like that on the witness stand, it absolutely opens the door to

22  what the real reason is.

23       So I have not sought to do things like that, but that

24  should not shield him from me asking questions about things

25  that are ancillary to that without bringing up the topic of

 1  exclusion, and that's -- that's typically the way -- that's why

 2  documents get sanitized.  It's why that application was in

 3  evidence with a line through the sentence.  And so there's

 4  nothing improper about testing credibility if you stay away

 5  from the hot topics.

 6          **THE COURT:**  Look.  I have --

 7          **MR. SPIRO:**  You have ruled.

 8          **THE COURT:**  I have ruled on this issue.  I -- I

 9  sustained -- well, I -- without your argument, Mr. Organ.  I am

10  excluding this.  You can make whatever arguments you want to

11  make to the Court of Appeals.

12      I want to get this trial moving, and so I'm really not

13  interested in hearing more about it.

14          **MR. ORGAN:**  Okay, Your Honor.

15          **THE COURT:**  And I appreciate the comments that

16  Mr. Spiro made about my knowledge of this case because I have

17  been living with it, and it is also informed by the motion

18  that -- that lawyers made for Tesla in the alternative to seek

19  a new trial for damages.

20      And here we are.  And I have tried to ensure that the

21  evidence that is presented and that the examinations that

22  proceed are done consistently with that.  And that's what I'm

23  going to continue to do for the next two days.

24      I'll see you when the jury is here.

25                  (Recess taken at 8:18 a.m.)

```
 1              (Proceedings resumed at 8:28 a.m.)

 2         THE CLERK:  Please come to order.

 3         THE COURT:  Please be seated, everybody.  Is there an

 4   issue that anybody wanted to discuss?

 5         MR. ORGAN:  No, Your Honor.

 6         THE COURT:  Okay.  Then let's get the jury.

 7         THE CLERK:  And Mr. Diaz on the stand; is that

 8   correct?

 9         THE COURT:  Yes.  Mr. Diaz, come on up.

10         THE WITNESS:  Yes, sir.  Thank you, Your Honor.

11         THE COURT:  Good morning.

12         THE WITNESS:  Good morning.

13                   (Pause in proceedings.)

14      (Proceedings were heard in the presence of the jury:)

15         THE COURT:  All right.  Please be seated, everybody.

16   Good morning, ladies and gentlemen.  Welcome back.  Thank you

17   for being as prompt as you have been.  We're continuing on with

18   the cross-examination of Mr. Diaz.

19      Mr. Spiro.

20         MR. SPIRO:  Thank you, Your Honor.

21                        OWEN DIAZ,

22   called as a witness for the Plaintiff, having been previously

23   duly sworn, testified further as follows:

24                CROSS-EXAMINATION   (resumed)

25   \\\
```

1   **BY MR. SPIRO:**

2   **Q.**   Good morning.

3   **A.**   Good morning, sir.

4   **Q.**   When we left off yesterday, we had talked about the

5   graffiti you saw in the bathroom your second day in the

6   Timbreza incident.

7          And I left a copy of the lawsuit you filed in this case.

8   It's at the top of your pile there.  And so I just wanted to

9   ask you, sir, when was the first time in this litigation that

10  you brought up Mr. Timbreza?

11  **A.**   So I'll have to read this, and this is a lot of stuff to

12  read, so can you give me time, please.

13              **THE COURT:**   Could you bring the mic close to you.  So

14  answer before -- just answer the question that you were asked

15  to the best of your recollection.  When was the first time that

16  you brought up the Timbreza incident in the litigation, if you

17  know?

18              **THE WITNESS:**   When they deposed me.

19              **MR. SPIRO:**   Okay.  Now, if we could put up 222-03,

20  which is in evidence.

21                         (Pause in proceedings.)

22  **BY MR. SPIRO:**

23  **Q.**   After the Timbreza incident, you were promoted, sir;

24  correct?

25  **A.**   Yes, I was.

DIAZ - CROSS / SPIRO

1   **Q.**   And you were given a pay raise; correct?

2   **A.**   Yes, I was.

3   **Q.**   Okay.  And according to you, in order to promote you,

4   Mr. Kawasaki told you that because of your race there would be

5   resistance at Tesla to promote you, and in order to push

6   through your promotion, you had to use your last name of Diaz

7   so that the people who promoted you would think you weren't

8   Black; is that your position?

9           **MR. ORGAN:**  Objection.

10          **THE WITNESS:**  Yeah.

11          **MR. ORGAN:**  Misstates the evidence, Your Honor.

12          **THE COURT:**  Overruled.  You can answer.

13          **THE WITNESS:**  That's what he explained to me, yes.

14  **BY MR. SPIRO:**

15  **Q.**   Okay.  So this act on Tesla's part promoting you and

16  giving you a raise a couple of months into you working there,

17  that act -- even that act to you, your testimony is, was only

18  accomplished through Mr. Kawasaki deceiving the supervisors at

19  Tesla by suggesting that because your last name is Diaz that

20  you were not Black, and that's why you got the promotion?

21          **MR. ORGAN:**  Objection.  Argumentative.

22          **THE COURT:**  If you know.

23          **THE WITNESS:**  I don't think he deceived them.  I

24  just -- you know, he just didn't let them know that while --

25  that I was Black.

1    BY MR. SPIRO:

2    **Q.**   But wouldn't Mr. Romero who just interacted with you in

3    the Timbreza incident know, of course, that you are African

4    American at the time he promoted you?

5              **MR. ORGAN:**   Objection.   Compound.

6              **THE COURT:**   Overruled.

7              **THE WITNESS:**   I believe earlier you said that it was

8    Quinten [sic] Quintero that promoted me, so I wouldn't have the

9    dynamics of what went on behind closed doors.   All I know is

10   what I was told.

11   BY MR. SPIRO:

12   **Q.**   Uh-huh.   Um, but Mr. Romero would have known you were

13   Black at the time.   He's on this e-mail; right?

14   **A.**   Yes.

15   **Q.**   Okay.   Now moving forward in time, you know there was some

16   testimony in this trial about -- from Mr. Wheeler about you

17   getting some of his people fired, and Mr. Jackson gave some

18   testimony about certain issues.   You would agree, sir, in your

19   own words that you are "a man without a filter."

20        Is that a characterization you've used to describe

21   yourself?

22   **A.**   You mischaracterized it, but you know, I can sometimes,

23   you know, like anybody else, if -- how can you say it?   Talking

24   to some people, you know, sometimes I could tell the truth.

25   That's all.   Sometimes people don't want to hear the truth.

DIAZ - CROSS / SPIRO

1   Q.   Well, but when you say I'm mischaracterizing it, I mean,

2   those your words "a man without a filter."  Those aren't my

3   words.

4       I'm asking you, sir, did you describe yourself that way to

5   other people?

6   A.   I don't describe myself in that way.  I'm just saying to

7   you is that sometimes, you know, the truth don't need to be

8   said, but you know, when you do say the truth, sometimes people

9   get hurt by hearing the truth.

10  Q.   And at the time of the fall at Tesla's Fremont factory,

11  you had been spoken to by people about your temper; correct?

12  A.   I don't recall because I don't -- what I can say is

13  everybody gets upset at some point in time, but that don't mean

14  that that person has a temper, as to what you're saying.  So if

15  you wasn't in the situation or what went on, how can you say

16  that person had a temper?

17  Q.   No.  I'm just asking that you had been spoken to about

18  your temper.  Not that you always have a temper.  I'm not

19  suggesting that, sir.  But at times when emotional you have a

20  temper is what you were spoken to about; true?

21  A.   I don't recall that.

22  Q.   And you were spoken to about your lack of professionalism;

23  correct?

24  A.   I don't recall that, either, sir.

25  Q.   You were talked about not making derogatory comments about

1   people's personal life?

2   **A.**   Again, I don't recall that, sir.

3   **Q.**   Martinez gets in the elevator, and he was upset, right,

4   during that incident?

5   **A.**   Um, Martinez got in the elevator, and he was threatening.

6   I can say that.

7   **Q.**   Okay.  And if we could put up Exhibit 235, can you tell

8   the jury why Mr. Martinez was so upset?

9   **A.**   Um, I don't have any idea.  All I know is I was training

10  Mr. Foster.  The doors opened up.  Mr. Martinez came in with

11  fists balled up yelling obscenities, telling me Ns weren't

12  S-H-I-T.  I had to throw my hands up in a neutral position and

13  point to the camera to be able to get him out of the elevator.

14  **Q.**   Sure.  But my question was very simple, which is, do you

15  know why Mr. Martinez was upset?  Yes or no.

16  **A.**   I just explained that, sir.

17  **Q.**   Okay.  And if you look at this exhibit, it says that you

18  sought advice from Tom, Tom Kawasaki at the bottom.

19       And isn't it true that when you sought advice from him,

20  that he told you, "Make sure you document everything"; correct?

21  **A.**   Um, he told me I should probably write something up, but

22  it wasn't them exact words, and I don't really remember exactly

23  what he said.  But I did -- as from the e-mail, you can see I

24  seeked advice from Tom.

25  **Q.**   And it's true that Mr. Martinez as we saw earlier in the

1  case complained about you first in this situation; right?

2  A.   What I saw was a person saying if he did something wrong,

3  he would like to fix it.

4  Q.   Okay.  But well, he -- he sent an e-mail before your

5  e-mail saying that there were some difficulties.  His e-mail

6  came before your e-mail; true?

7  A.   Yes.  I can say I saw it on the timestamp it was a little

8  bit before.

9  Q.   Okay.  And Mr. Foster who was in the elevator, when

10  Mr. Martinez came in, whatever he was saying to you, it is true

11  that Mr. Foster didn't do anything, react in any way; correct?

12  A.   Honestly, I don't know what Mr. Foster's reaction was.  I

13  was trying to keep an angry guy that was threatening off me, so

14  you know, at this point I didn't look to see what Mr. Foster

15  was doing.

16  Q.   Okay.  But you don't have any testimony that you can give

17  this jury here about Mr. Foster reacting in any particular way;

18  fair?

19  A.   I believe I just answered that, sir.

20  Q.   Okay.  And in your e-mail, subject line:  Ramon, you

21  obviously -- and I know we have been through this a bunch.  You

22  don't complain about any racial slur in that e-mail; true?

23  A.   Who is Ramon, sir?

24  Q.   I just said the subject line is Ramon, Ramon [different

25  pronunciation]; right?  R-A-M-O-N.

1          I'm asking you in this e-mail, after speaking to Tom

2    Kawasaki, you don't include any racial language that was used

3    or a note that this is a racially involved issue; true?

4    **A.**    Again, I'm asking who is Ramon because that person is not

5    in this e-mail, sir.

6    **Q.**    No, no.  Forget that Ramon part.  I'm just asking you, in

7    this e-mail, you don't indicate anything about racial slurs or

8    race being part of this incident; correct?

9    **A.**    In this e-mail I indicated for them to check the

10    surveillance system so they can be able to hear and see what

11    was said.

12    **Q.**    Okay.  Is that a "no"?

13    **A.**    No, I didn't indicate it.  I asked them to check the

14    surveillance system, sir.

15    **Q.**    Okay.  And when you were first deposed in this case under

16    oath and you were asked what happened in the elevator, at that

17    point you also did not indicate that it had anything to do with

18    race; true?

19    **A.**    When I was deposed in this case, sir, I told them the same

20    thing I'm telling you the same thing exact, sir.  I'm sorry.

21    I'm sorry.  I can only give you the truth.

22    **Q.**    Okay.  And that's all I want which is that -- and the

23    truth is, when you were first deposed in this case and you were

24    asked what happened in the elevator, you did not indicate that

25    it had anything to do with a racial event; correct?

 1   **A.**   When I was first deposed in this case, I told them the

 2   same thing I told you, sir.  When he was in the elevator he had

 3   his fists balled up.  He said that the "Ns weren't S-H-I-T."  I

 4   said all this same thing I'm telling you now, sir.

 5   **Q.**   Volume I of the deposition testimony, 105, line 9 to

 6   106:17, I'd ask to play that.

 7        **MR. ORGAN:**  Hold on one second.  Which line and page?

 8   Page and line?

 9        **THE COURT:**  Mr. Diaz, you have the testimony there?

10        **THE WITNESS:**  Uh-huh.

11        **THE COURT:**  So it's the first deposition.  105,

12   line --

13        **MR. SPIRO:**  Line 9 to 106, line 17.  I'm just asking

14   to play for impeachment.

15        **THE COURT:**  Okay.  Hang on.

16                  (Pause in proceedings.)

17        **THE WITNESS:**  What page again, sir?  105?

18        **THE COURT:**  105, line 9 to --

19                  (Pause in the proceedings.)

20        **THE COURT:**  All right.  You can proceed.

21        **MR. ORGAN:**  Well, Your Honor --

22        **MR. SPIRO:**  Can you please play that?

23        **MR. ORGAN:**  No, Your Honor.  There's no --

24        **MR. SPIRO:**  He can do this on redirect, Your Honor.

25        **THE COURT:**  You can't -- don't tell me "no," but what

 1   is your -- what is your objection?

 2            MR. ORGAN:   Incomplete, Your Honor.   It should at

 3   least start with a question, Your Honor.

 4            THE COURT:   You can come back to that.   Please go

 5   ahead.

 6                 (Video was played but not reported.)

 7   BY MR. SPIRO:

 8   Q.   Okay.   And after this part of your deposition, you were

 9   asked if there was anything else that you remember about this

10   that was not in that e-mail that we looked at a moment ago, and

11   you said "no."   Isn't that true, sir?

12   A.   That's kind of like a mischaracterization because they

13   keep asking if it's anything else, anything else.   But one of

14   the things is, is we probably go back deeper in just me being

15   deposed and different questions is being asked at different

16   times.

17            You know, it's like this had happened a while ago, so what

18   I was doing is, those things were becoming more and more clear

19   as I was seeing different e-mails, and it would bring back

20   different memories.   So they would show me different --

21   different -- what is it right here -- these exhibits.   They

22   would show me different exhibits.   The different exhibits that

23   they would show me would bring back different flood memories?

24            So if you probably go through this whole deposition at

25   once instead of just picking out line by line to use it, so you

 1    know, I'm just saying, just if you would go through the whole

 2    thing instead of just cherry-picking.

 3    **Q.**    Okay.  So let's look at Volume I, deposition testimony,

 4    126, line 6 to line 21 to the direct question:  "Can you

 5    remember anything other than what's in this e-mail that

 6    happened on the elevator that day?"

 7         And I would ask to play that.

 8              **THE COURT:**  Again, 126, line --

 9              **MR. SPIRO:**  6 to 21.

10              **MR. ORGAN:**  Completeness, Your Honor.  65:13 to 66:11.

11              **MR. SPIRO:**  If I may respond, Your Honor, when

12    Your Honor is ready.  But that's not the same area, and he can

13    do that on redirect is my position.

14              **THE COURT:**  Okay.

15                        (Pause in proceedings.)

16              **THE COURT:**  Yeah.  You can do that on redirect,

17    Mr. Organ, and use the deposition as you want to.  Go ahead,

18    Mr. Spiro.

19                   (Video was played but not reported.)

20    **BY MR. SPIRO:**

21    **Q.**   And in fact, later you were asked about what specific

22    language he used and even as to that question, you did not

23    include any racial slurs; isn't that the truth?

24              **MR. ORGAN:**  Objection.  Misstates the testimony,

25    Your Honor.

1          THE COURT:  Yeah.  And I do think that out of

2    fairness, you ought to read the next two questions that were

3    asked.

4          MR. SPIRO:  I'm happy to do that if somebody can hand

5    me another copy of the deposition.

6    BY MR. SPIRO:

7    Q.  And while we're doing that, you -- you said that a

8    document refreshed your memory?

9          MR. ORGAN:  Your Honor, I object.  I object because

10   for completeness it needs to be read before he continues with

11   other questions.

12         THE COURT:  Well, let's -- let's do that, and we will

13   move on.

14                    (Pause in proceedings.)

15         THE COURT:  126, line 24 to line 5, 127.

16         THE WITNESS:  What page, Your Honor, sir?

17         THE COURT:  126.

18         MR. SPIRO:  Your Honor, just can you read that again.

19         THE COURT:  126, line 24, which is where you left off

20   to 127, line 5.

21         MR. SPIRO:  Okay.  Sure.

22   BY MR. SPIRO:

23   Q.  And after that section we just played, you were asked:

24   "Does that mean he did not say anything else?  He didn't call

25   you the N-word on the elevator that day?"

 1          And then you say:  "Yes, he did.

 2          "QUESTION:  Then why didn't you mention it?

 3   **A.**   "ANSWER:  Because I didn't want -- I didn't have proof,

 4   and I didn't want them to think I was trying to pull the race

 5   card."

 6          That was the reason that you gave in your testimony for

 7   why you never mentioned the N-word; correct?

 8   **A.**   Again, sir, I said it.  I told him that.  And if you stop

 9   cherry-picking.

10          **THE COURT:**  Okay.  Just answer the questions.  Don't

11   argue with the lawyer.  Just answer the question.

12          Okay.  And I think you did.

13          **THE WITNESS:**  Yes.

14   **BY MR. SPIRO:**

15   **Q.**   And at another point when you were asked an open-ended --

16   an open question about what language did he use, and you were

17   giving just your memory's natural recitation of what happened,

18   you also did not indicate that any racial slur was used; isn't

19   that true?

20          **MR. ORGAN:**  Objection.  Vague and ambiguous.

21          What's he referring to, Your Honor?

22          **THE COURT:**  Overruled.  Do you want to point him to

23   where you're looking.

24          **MR. SPIRO:**  I'd like to ask his memory first so that

25   we can -- and if then if he asks to point to something or he

**DIAZ - CROSS / SPIRO**

1   wants his memory refreshed, I'm happy to refresh his memory.

2           **THE WITNESS:**  Did he -- "Did he call you N-word?"

3       Yes.  Yes, he did.

4   BY MR. SPIRO:

5   **Q.**   Okay.  That wasn't my question.  My question is:  When you

6   were asked the question, "What language did he use?" in an

7   open-ended format so that you could include what you wanted to,

8   you included a lot of words that he said, but you did not

9   include any racial slurs; isn't that true?

10  **A.**   I don't -- I don't understand, sir, because it's --

11  **Q.**   So if we can go to Volume II, line 227 -- page 227, excuse

12  me, line 14.

13  **A.**   Volume II, page 227, line 14.

14                      (Pause in proceedings.)

15           **MR. SPIRO:**  May I play it?

16           **THE COURT:**  Go ahead.

17               (Video was played but not reported.)

18           **MR. ORGAN:**  Incomplete, Your Honor.

19                      (Pause in proceedings.)

20  BY MR. SPIRO:

21  **Q.**   That was your truthful testimony under oath; correct?

22  **A.**   Yes, it was, sir.

23  **Q.**   And when I was talking to you earlier about interpersonal

24  difficulties that were going on leading up into this incident,

25  there was a problem that you had with people in Mr. Martinez's

DIAZ - CROSS / SPIRO

1  group; correct?

2  **A.**   No, sir.

3  **Q.**   You went up to Joyce DelaGrande, a supervisor in that

4  group, and you said to her, "You date Black guys," in a

5  sexually suggestive way to her, did you not, sir?

6  **A.**   That is a lie, sir.

7  **Q.**   So if Ms. DelaGrande comes into this courtroom and says

8  you absolutely said that to her, that would be a lie, sir?

9  **A.**   Yes, it would be, sir.

10 **Q.**   Okay.  And that's not it.  Hilda Navarro, who I think the

11 jury heard her name when Mr. Martinez was testifying.

12      Just before this incident, you were yelling at her.  You

13 were telling her who she was sleeping with at the factory, and

14 you were commenting that she couldn't understand you because

15 she was a dumb Mexican, didn't you do that, sir?

16         **MR. ORGAN:**  Your Honor, tone.  Harassing.

17         **THE COURT:**  Yeah.  Just tone it down a little bit.

18      You should answer the question, Mr. Diaz.

19         **THE WITNESS:**  Sir, everything you said is a lie.  I'm

20 sorry to say that.

21 **BY MR. SPIRO:**

22 **Q.**   In the first bit of testimony we saw, you said that you

23 didn't want to play the race card.  You have also previously

24 given -- it's your position that part of the reason why some of

25 your reports in this case that you're now telling this jury are

**DIAZ - CROSS / SPIRO**

1   not anywhere in documents, in texts, is because at the time you

2   didn't have people's e-mail addresses; is that your position?

3   **A.**   First, I'd like to say, are you okay, sir?  You're

4   shaking.

5          **MR. SPIRO:**  Can he answer my question?

6          **THE WITNESS:**  I want to know if he is okay.  Honestly.

7          **THE COURT:**  Mr. Diaz, you pay attention to your job --

8          **THE WITNESS:**  Yes, sir.

9          **THE COURT:**  -- which is answering Mr. Spiro's

10  questions truthfully and fully.

11         **THE WITNESS:**  Yes, sir.

12         **THE COURT:**  And the -- and the other comments are just

13  as inappropriate coming from you as coming from anybody else in

14  the courtroom.

15         **THE WITNESS:**  I apologize, sir.

16         **THE COURT:**  Okay.

17     **BY MR. SPIRO:**

18  **Q.**   So the question was:  Your position is that one of the

19  reasons there are not more documents and exhibits corroborating

20  your claims here before this jury is because at that time that

21  these things were happening you didn't have access to

22  everybody's e-mail accounts; correct?

23  **A.**   I never said that, sir.

24         **MR. SPIRO:**  Okay.  I'd like to read his trial

25  testimony at page 512 to 513, page 512:13 to 14.

1                    (Pause in proceedings.)

2              **THE WITNESS:**  What page would that be again, sir?

3              **MR. SPIRO:**  512, line 13.

4              **THE COURT:**  You may proceed.

5    **BY MR. SPIRO:**

6    **Q.**  "Once you had told Mr. Romero three to seven times that

7    this was being said to you and nothing was done, why not put

8    anything in writing to someone else," is my question.

9              Your answer, sir:  "I don't know.  At the time I didn't

10   have access to their e-mail.  So I mean, I don't know why I

11   didn't do it."

12             That was your sworn testimony; correct?

13   **A.**  That's mischaracterizing my testimony, sir.  But I did say

14   that.

15   **Q.**  Okay.  I mean, the words are the words; right?  I read

16   that correctly.

17   **A.**  All I can tell you is at some point in time Mr. Romero

18   gave me e-mail addresses and numbers to be able to call, but I

19   did not have access to Tesla's computers to be able to use it

20   for their e-mails.

21             Like Mr. Kawasaki had testified, in order for me to have

22   that, I would have needed a token to be able to do it.  That's

23   why if you see and look at the head of any of my e-mails, they

24   came from my personal cell phone.

25   **Q.**  Okay.  But you had their e-mails and phone numbers because

 1   you've already testified that you called Mr. Kawasaki.  You

 2   e-mailed Mr. Romero.  Right?

 3           MR. ORGAN:  Objection.  Vague as to time, Your Honor.

 4           THE COURT:  Overruled.  You can answer.

 5           THE WITNESS:  I e-mailed them.  Yes, I did.

 6   BY MR. SPIRO:

 7   Q.   Okay.  And today -- yesterday's reason that you gave for

 8   not including anything about race in this e-mail was something

 9   about how you were taught at the Family Hamilton Center that

10   certain things you don't put in e-mails, and you use a key word

11   that just is "Check the surveillance system."

12        Was that your testimony in sum and substance?

13   A.   My testimony was "Check the surveillance system.  We have

14   an issue racist in nature."  But yes.  Nobody puts that in an

15   e-mail, sir.

16   Q.   Nobody puts that in an e-mail?

17   A.   Well, I'm going to say the first time I did it, and I was

18   called in by my supervisor and his boss to say, at Hamilton

19   Family Center, we don't put them words in e-mails.  I don't

20   know why, but I relied on previous experience to draft that

21   e-mail.

22   Q.   Well, when the racial picture happens in the subject line

23   of that e-mail, you write "racial," don't you?

24   A.   That's just what I just said, sir.  I said we put in the

25   e-mail "racist material" or "racist."  You put in the e-mail,

1    "Check the surveillance system."  You put in the e-mail, "We

2    have an issue with this person."  You put in the e-mail, "Come

3    see me.  We have a problem."

4        But for whatever reason, that's what they taught me over

5    at Hamilton Family Center.

6    Q.   Okay.  So if I understand your testimony, they said to

7    you, just put "racist" in the e-mail.  In Exhibit 235 that

8    we've been looking at the e-mail in this case, you also don't

9    put there's anything racial about this incident; true?

10   A.   If they would have just checked the surveillance system,

11   that's all I could say, sir.

12   Q.   So now you're saying that if they had checked the video

13   surveillance system, what would have happened?  What --

14   withdrawn.

15       Okay.  When you were asked by Wayne Jackson, another

16   African American man at Tesla who you called in your case, when

17   you were talking to him about this incident, you also did not

18   mention any racial slur; correct?

19   A.   I don't recall what I may have or may have not told

20   Mr. Jackson at that point in time.

21       I definitely would have relayed to him what was going on

22   if we had communicated.  So that's all I can say.

23   Q.   Well, let's break that down.  You did speak to Mr. Jackson

24   after the incident; correct?  He testified about that.  Do you

25   recall that?

**DIAZ - CROSS / SPIRO**

1   **A.**   I recall him testifying, but I can't recall what I spoke

2   to Mr. Jackson about.  All I can recall is I was upset.  I sent

3   out e-mails, and I don't know -- you know, I talked to a few --

4   well, I'm not going to say talked.  I sent out e-mails to a few

5   people.  I know some people called me about, maybe, the, I'm

6   going to say, the January incident.  Some lady, I think she

7   might have called me.

8   **Q.**   Well --

9   **A.**   But it's -- it's -- it's -- I'm sorry, sir.

10  **Q.**   You don't have to say "sorry."  All I'm asking is just --

11  I just want truthful answers.

12      And I'm just going to ask my question again, which is:

13  When you spoke to Mr.  Jackson after this incident you did not

14  relay that any racial slurs had been said; correct?

15  **A.**   And again, I can't recall all of what I told Mr. Jackson,

16  sir, but I would have relayed to Mr. Jackson what was going on.

17  **Q.**   What was going on.  Okay.

18      But you don't -- you're not telling this jury under oath

19  that -- you're not affirmatively telling this jury under oath

20  that Mr. Jackson was incorrect when he says you never reported

21  racial slurs in this incident.  You're not disputing that, are

22  you?

23  **A.**   What I'm saying is what I just told you.  Again, sir, I

24  can only tell you what I just told you.

25  **Q.**   Okay.  You also didn't tell Mr. Kawasaki that any racial

1    slurs had been used in this incident; correct?

2    **A.**    Um, with the Judy Timbreza incident --

3    **Q.**    Excuse me.  With all due respect, I'm not asking about

4    that.  I'm asking about the elevator incident.  I'm just asking

5    about the elevator incident.  So you keep going to --

6              **THE COURT:**  Just --

7    **BY MR. SPIRO:**

8    **Q.**    Yeah.  Just the elevator incident, sir.

9         As to that incident, you did not tell Tom Kawasaki that

10   any racial slurs had been used; correct?

11   **A.**    I talked to Mr. Kawasaki.  I asked him his advice, so I'm

12   going to say there's a high probability that when I was asking

13   him his advice, he asked me what went on, but I can't recall

14   that whole conversation.  I can just mostly recall Mr. Kawasaki

15   saying, "If they don't have access to the surveillance system,

16   please have Ed Romero contact me.  I can give Mr. Romero access

17   to the system.  He'll be able to go back, see, and heard what

18   was said."

19   **Q.**    Okay.  Well, you heard Mr. Kawasaki testify.  Mr. Kawasaki

20   never testified that you told him anything racial about this

21   incident; correct?

22   **A.**    I don't believe you asked Mr. Kawasaki them questions,

23   sir.

24   **Q.**    Well, we did.  And your lawyer asked a lot of questions,

25   too, and nobody ever elicited from Mr. Kawasaki that you said

 1  anything racist happened in this incident; correct?

 2  **A.**   Again, Mr. Kawasaki's testimony was his.  I'm telling you

 3  what I did.

 4  **Q.**   Okay.  And in fact, other than the Judy Timbreza incident,

 5  you never complained to Mr. Kawasaki the entire time he was

 6  there about any other racial incident; correct?

 7  **A.**   The Judy Timbreza incident and the elevator incident, sir,

 8  so them were -- like you said, even though they are two

 9  separate incidents, but it's like you're -- I don't know.  I'm

10  just telling you what I've been saying.

11  **Q.**   Okay.

12        **MR. SPIRO:**  If we can play Volume II, page 223:18

13  to -- 18 to 23.

14                   (Pause in proceedings.)

15        **MR. ORGAN:**  223.

16        **MR. SPIRO:**  18 to 23.

17        **MR. ORGAN:**  Not impeachment.

18                   (Pause in proceedings.)

19        **THE WITNESS:**  What --

20        **THE COURT:**  You can go ahead.

21        **MR. SPIRO:**  Okay.  Can we play that, please.

22              (Video was played but not reported.)

23  **BY MR. SPIRO:**

24  **Q.**   Okay.  And you were asked again, line -- page 216, line 11

25  to 19.

DIAZ - CROSS / SPIRO

```
1              MR. ORGAN:  Which page?

2              THE COURT:  That's earlier.

3              MR. SPIRO:  You were asked two times.  I apologize.

4    You were asked two times, also 216, line 11 to 19.

5         Can I play that, sir?

6                        (Pause in proceedings.)

7              THE WITNESS:  Is it in the --

8              MR. SPIRO:  You can play that.

9              THE COURT:  Yeah.  Go ahead.

10                   (Video was played but not reported.)

11   BY MR. SPIRO:

12   Q.   Okay.  Are you still maintaining to this jury that on your

13   oath, sir, that Mr. Martinez called you a racial slur in that

14   incident?  Are you still maintaining that?

15   A.   Yes, I am.  You can see I said that not that I can recall

16   at this moment, sir.  So that's actually like you -- you're

17   still taking my testimony out of context.

18   Q.   Okay.  Well, that's for the jury to decide; right?

19             THE COURT:  Okay.  Let's -- we're not arguing about

20   what the jury is going to be deciding here.  You're asking

21   questions about this case.

22   BY MR. SPIRO:

23   Q.   Between the elevator incident and the drawing, you did not

24   have any contact with Mr. Martinez; correct?

25   A.   No, sir.
```

1   Q.   Okay.  And the e-mail that we've been looking at, right,

2   that describes -- has your description of the incident, at the

3   time of the drawing incident, you forwarded that same complaint

4   and said:  "This is the e-mail I sent on the first issue."

5        You forwarded that -- that e-mail; correct?

6   A.   I don't -- I don't understand the question, sir.

7   Q.   Sure.  Let me try again.

8        When the incident happened with the drawing, you told them

9   there had been a previous incident with Mr. Martinez, and you

10  forwarded this same e-mail we've been looking at of your

11  description of the event you forwarded to them?

12  A.   No.  I did not forward that e-mail, sir.  What it was is

13  you -- I gave them an e-mail of what happened on that.  It was

14  no attachment to no e-mail that was forwarded with that e-mail,

15  sir.

16  Q.   Okay.  But we can move on as long as I'm clear that you

17  did give that e-mail that we've been looking at to them again

18  and said "This is what happened"; right?

19  A.   Do you mean I gave them that e-mail twice?

20  Q.   When the drawing incident happened and you're talking to

21  folks about what Mr. Martinez did before, you provided them

22  this e-mail, 284?

23  A.   There were two separate incidents, sir.  I provided an

24  e-mail for the elevator incident at one time, and in the second

25  e-mail, I actually referenced that his -- this is not the

 1   second time that he had been talked to about his behavior and

 2   his behavior was getting worse.  So to answer your question,

 3   did I attach another e-mail with that and send it out a second

 4   time?  No.

 5            MR. SPIRO:  Well, then I would move to admit

 6   Exhibit 290 for impeachment.

 7            THE COURT:  So, I need to see the paper copy of 290.

 8            MR. SPIRO:  Sure.

 9                    (Pause in proceedings.)

10            THE COURT:  Why don't you just use it to refresh

11   recollection.

12            MR. SPIRO:  That's fine, Your Honor, if that's how

13   Your Honor wants me to proceed.

14            THE COURT:  Hang on just a second.

15            MR. SPIRO:  Yeah.  Sure.

16                    (Pause in proceedings.)

17   BY MR. SPIRO:

18   Q.   My question, sir, is just, does that refresh your

19   recollection that you did, in fact, forward the e-mail we've

20   been looking at, at the time of the drawing incident; correct?

21            MR. ORGAN:  Well, Your Honor.

22            THE COURT:  This is to refresh recollection.  He can

23   go ahead.

24            MR. ORGAN:  Okay.  It's fine.

25            THE WITNESS:  From what I see on this e-mail, sir, it

1    says --

2              THE COURT:  Well, answer the question that you are

3    being asked.  Does that refresh your recollection as to whether

4    you forwarded the e-mail?

5              THE WITNESS:  Um, I can see where I sent it.  I -- I

6    can't see where -- I can see "Subject:  Forward," but I don't

7    see in this e-mail where I -- personally, I see a bunch of

8    names on it.  I see who it was sent from, but when it says my

9    name, it says from me to Citistaff.

10             THE COURT:  Okay.  So is there any objection to

11   admitting Exhibit 290?

12                    (Pause in proceedings.)

13             THE COURT:  Mr. Organ?

14             MR. ORGAN:  No, Your Honor.

15             THE COURT:  Okay.  It's admitted.  You can display.

16        (Trial Exhibit 290 received in evidence.)

17   BY MR. SPIRO:

18   Q.   And you see it's Saturday January 23rd, and you forward

19   the e-mail on regarding the drawing incident.

20        Do you see that?

21   A.   I see that, sir.

22   Q.   Okay.  And you never altered, edited, added to, or did

23   anything to change the statement in your e-mail; correct?

24   A.   All I know is I sent this e-mail, sir, where, like I said,

25   if I forwarded it out a second time to another person, I didn't

1  remember.  I'm sorry.  You know, it's -- it's trying to get

2  everybody to let them know what happened with the situation.

3  So I'm sorry.  I was mistaken.

4  **Q.**  Oh, not -- it's fine, sir.

5      So -- but this man that you are reporting here, according

6  to you, he's been calling you the N-word or words to that

7  effect almost every day for months; is that fair?  Prior to the

8  time you wrote this e-mail; right?  I think you testified he

9  had called you that word prior to the incident 30 times.

10 **A.**  But when you say "every day," that's a mischaracterization

11 because we didn't work together every day.  You know, I had off

12 days.  He had off days.  So when you say every day, that's a

13 mischaracterization of what's going on, sir.

14 **Q.**  Okay.  Well, you agree he had called you that name many

15 times prior to, according to you, at least, prior to the

16 elevator incident; right?

17 **A.**  Yes.

18 **Q.**  In fact, in the first two months at Tesla, according to

19 you, you were having pretty horrific comments made to you

20 almost on a daily basis; correct?

21 **A.**  I can say when I was at work, sir.

22 **Q.**  Right.  I'm obviously talking about when you were at work,

23 and you agree with me that, according to you, you had undergone

24 daily, almost daily -- almost daily horrific comments prior to

25 the elevator incident; correct?

DIAZ - CROSS / SPIRO

1    **A.**   I can't say almost daily because it might be a couple days

2    where I didn't see him when I was at work, and this -- so it's

3    still a mischaracterization of what's going on.

4    **Q.**   Well, you know, sir, if you keep saying it's a

5    mischaracterization -- can we go to trial transcript 502:22?

6            **THE COURT:**   It may be confusing.   Are you asking

7    whether the testimony was with respect to Mr. Martinez or with

8    respect, in general, to hearing the N-word in the factory?

9            **MR. SPIRO:**   Let's try it that sort of broader way.

10           **BY MR. SPIRO:**

11   **Q.**   -- which is just, according to you, at the Tesla facility

12   prior to the elevator incident, these horrible words directed

13   at you, you were hearing on an almost daily basis while at

14   work; correct?

15   **A.**   But you saying they were directed at me on a daily basis,

16   which I never said that, sir.

17   **Q.**   Okay.   What is the distinction you're drawing?

18   **A.**   What you just asked me was, is -- was it directed at --

19   you're saying that it was directed at you on a daily basis.

20   And I'm saying, no, it wasn't directed at me on a daily basis,

21   sir.

22   **Q.**   You had undergone pretty horrific comments on almost a

23   daily basis; correct?

24   **A.**   Was I called the N-word?   Yes.   Was I called a boy?   Yes.

25   Was I told to go back to Africa?   Yes.

**DIAZ - CROSS / SPIRO**

1    Was -- did Mr. Ramon Martinez tell me he hated me, N?

2  Yes.  Do you want to know where it happened?  I can tell you

3  where it happened at.

4    But otherwise, I -- I really don't -- don't understand the

5  question.  I'm sorry.

6  **Q.**   Okay.  You're having trouble understanding the question?

7  **A.**   It's not that.  It's the -- you're saying that is directed

8  at you on a daily basis.  So that would mean that as I'm

9  walking through the factory everybody is just singling me out,

10  singling me out.  No.  I'm not saying that, sir.

11  **Q.**   Okay.  Let's look at your trial testimony, page 502,

12  line 22.

13                    (Pause in proceedings.)

14          **THE COURT:**  That, I don't have.  You really want to

15  make sure that as long as Mr. Organ has got it and can look at

16  it --

17          **MR. ORGAN:**  Hold on one second, Your Honor.  502:22?

18          **THE COURT:**  Oh, this from the -- oh, I'm sorry.  I do

19  have that.  I take that back.

20          **MR. SPIRO:**  Okay.

21                    (Pause in proceedings.)

22          **THE COURT:**  I'm sorry.  502.

23          **MR. SPIRO:**  22 to 503:3.

24                    (Pause in proceedings.)

25          **MR. SPIRO:**  May I proceed?

1              THE COURT:  You may.

2    BY MR. SPIRO:

3    Q.   "QUESTION:  And at least in the first two months that you

4    were there prior to your son Demetric coming to work at the

5    Tesla facility, according to you, you had undergone pretty

6    horrific comments according to you, that were made about you;

7    correct?

8         "ANSWER:  Yes, ma'am.

9         "QUESTION:  And according to you, those comments had been

10   made almost on a daily basis.

11        "ANSWER:  Yes, ma'am."

12        You gave that testimony; correct?

13   A.   If you just said when the comments was made towards me,

14   yes.  When the comments were made towards me, yes.

15   Q.   Okay.  And in fact, within 20 days of starting work, you

16   were undergoing those comments according to you; correct?

17            MR. ORGAN:  I'm sorry.  Could you repeat the question.

18            MR. SPIRO:  Sure.

19   BY MR. SPIRO:

20   Q.   And according to you, within 20 days after you started

21   work, you were hearing these comments several times a day;

22   correct?

23   A.   I never believe I gave a number or a time or within

24   20 days.  I probably said within several weeks or something

25   like that because I would have never been able to just from

1    Day 1 I walked in the factory, and they were doing this.  No.

2    I never said that, sir.

3    **Q.**   Okay.  But after this, your son -- you encouraged your son

4    to apply to Tesla; correct?

5    **A.**   Yes, I did.  That was the biggest mistake I ever made in

6    my life.

7    **Q.**   Well, we'll get to that, but in -- in 2015 when both of

8    your children are applying to work at Tesla, they are living

9    under your roof; correct?

10   **A.**   My youngest son was living under my roof.  I believe my

11   daughter, she may have been there or she may have got ready to

12   move.  But at some point, yes, the kids all lived under my

13   roof.

14   **Q.**   And you talk to your daughter almost every day; right?

15   **A.**   I talk to her a lot, yes, I do.

16   **Q.**   Okay.  And when explaining the reason why you encouraged

17   your son to come work at the Tesla factory despite what you

18   have told this jury, if I understood your testimony, it's that

19   you -- you believed he'd be assigned to a different area of the

20   facility; is that accurate?

21   **A.**   He was, and I did not bring him into where I was because I

22   didn't want him in the department that I was, so I definitely

23   told him to apply through -- I believe it's West Valley.  Like

24   I said, he'd have been on the way on the other side of the

25   factory, sir.

DIAZ - CROSS / SPIRO

1   Q.   So you were so involved in his application process that

2   it's your testimony that you told him where to put -- are you

3   saying you told him where to put on his application, you know,

4   where to work; is that your testimony?

5   A.   I wasn't involved like you're saying.  He filled it out on

6   line.  You never could say where they were going to put him,

7   but I knew at that time that West Valley Staffing Agency was

8   doing a general assembly line which was on the other side of

9   the factory.  They were doing the batteries which were on the

10  other side of the factory that I -- that I heard.

11       Like you -- like you see, Mr. Tom Kawasaki, he testified

12  that I asked him.  He told me where to do it, and I went

13  something totally different.

14  Q.   Well, you knew working the elevator that you were

15  interacting with people from different units and divisions that

16  were coming through the elevator; right?

17  A.   The shifts did overlap, sir, but at the same time I was

18  dealing with the -- the upstairs that made the batteries and

19  the downstairs by -- I believe it was the cooling tubes or

20  something they were making over there.  But them are the

21  two departments that overlap with the department I was in.

22       In order for me to get to his department, I would have to

23  get on a bicycle, ride seven minutes to the other side of the

24  factory.  In fact, it was so big we had to use bicycles and

25  golf carts.

DIAZ - CROSS / SPIRO

1   **Q.**   Right.   Okay.

2        So when you testified earlier, there -- you said there was

3   some day where you contacted your son and you were going to go

4   bring him a sandwich lunch on a day in the factory.

5        Do you remember that?

6   **A.**   I said a meal.   Yes, I did.

7   **Q.**   Okay.   And when you got there, you saw something, you

8   know, that is -- is, you know, according to you, etched in your

9   memory that you saw him be exposed to a racial slur; right?

10       Do you remember that testimony?

11  **A.**   Yes.   I came around a corner and --

12  **Q.**   It's just a simple if you remember that that happened

13  according to you; correct?

14  **A.**   Yes.   I remember that his supervisor called -- said he

15  couldn't stand all F-ing Ns.   I remember that, sir.

16  **Q.**   And you remember it vividly; right?

17  **A.**   Yes.   That's the time that me -- like I said, my son

18  didn't know what to do.   I didn't know what to do, and it

19  fractured our relationship.   So yes.   That's really vivid in my

20  mind, sir.

21  **Q.**   And it was his White supervisor, according to you?

22  **A.**   It was Caucasian supervisor, sir.

23  **Q.**   Right.   But his supervisor was not Caucasian; isn't that

24  right, sir?

25  **A.**   He appears to have been Caucasian.   To me, again, I'm

1  going to tell you, just like Mr. Wayne Jackson thought

2  Mr. Asher was not a Black man, sometimes people don't look the

3  race that they are.  You have Hispanics that can look

4  Caucasian.  You have Blacks that's mulatto that can look white.

5  You have -- because of how the race is mixed, you can have a

6  guy -- just say if he was married to an Asian woman, there's no

7  definition that your son won't look part Asian.

8  Q.   Well, Javier Caballero, your son's supervisor, doesn't

9  look White at all.  He's a Hispanic male; right?

10  A.   Again, I'm going to say again.  He appeared to be

11  Caucasian to me, sir.

12  Q.   Well, you know, your son has described him as not looking

13  like that at all; right?

14         MR. ORGAN:  Objection.

15         THE COURT:  Overruled.  You can answer if you know.

16         THE WITNESS:  I don't know what my son described him

17  as.  This is what you're characterizing.  If you can put

18  something in front of me saying what my son described, then we

19  can go from there.

20  BY MR. SPIRO:

21  Q.   Okay.  Well, you didn't -- you didn't even -- you don't

22  even know the name of the supervisor; right?  You didn't even

23  know the name at the time; true?

24  A.   I didn't really know the name until we started with these

25  Phase 1, I'm going to say, and then now Phase 2.

DIAZ - CROSS / SPIRO

```
 1  Q.   Right.  So until the litigation was, you know, five years
 2  after the events or so, approximately, sir, you didn't know the
 3  supervisor's name; correct?
 4  A.   No.
 5  Q.   Right.  So at no point after you testify that you saw your
 6  son be exposed to this, do you ever ask anybody the name of the
 7  supervisor that did this horrible act that you testified to
 8  here to your son?  You never asked anybody; correct?
 9  A.   No.  I never asked his name.  I'm sorry.  I may be -- the
10  hindsight I should have went over there, how you saying, and
11  confronted the guy.  Lost my job.  Couldn't feed my family.
12  You know, I'm sorry.  You know, I'm just a human being, sir.  I
13  make mistakes.
14  Q.   Okay.  So again, you don't have to apologize, sir.  I
15  just -- going to ask questions.
16       So as you said, you didn't confront him, obviously, or say
17  anything at that time; correct?
18  A.   He was over me.  He was a supervisor, sir, that ran a
19  department.  How can I --
20  Q.   Okay.  And your son didn't say or do anything in that
21  moment according to you; correct?
22       MR. ORGAN:  Objection.  Vague and ambiguous,
23  Your Honor.
24       THE COURT:  Overruled.  You can answer.
25       THE WITNESS:  Again, sir, it --
```

 1   BY MR. SPIRO:

 2   Q.   Is that a no?  I didn't -- I apologize if I didn't hear.

 3            THE COURT:  Wait.

 4            MR. SPIRO:  Sorry.

 5            THE WITNESS:  All I can say, sir, is, you know, this

 6   is the biggest mistake I made in my life, and you just keep

 7   making me relive it, sir.  Relive it, relive it, relive it.

 8   BY MR. SPIRO:

 9   Q.   I understand that it's an upsetting topic, sir.  But you

10   understand that I have to ask you questions about this, and I

11   know you know that and you've been sitting through the trial.

12        And so is the answer to my question then -- if we can --

13   I'm going to ask yes-or-no questions, and then we can move

14   through this.

15        Your son does not say anything or react in any way after

16   that; correct?

17   A.   What's -- my son didn't say anything, sir.

18   Q.   Okay.  And neither did any of the other people according

19   to you that were there; right?  According to you, the White

20   supervisor yelled this in this room, and nobody said or did

21   anything, according to you; correct, sir?

22   A.   Sir, the culture of Tesla was, if you said something,

23   you'd be fired.

24   Q.   Okay.  Well, you said something about Mr. Timbreza.  Okay.

25   You said something, and it was dealt with to your satisfaction,

**DIAZ - CROSS / SPIRO**

1  and you were promoted, sir; isn't that true?

2  **A.**   Mr. Timbreza wasn't a supervisor, sir.

3  **Q.**   I see.  I see.  Okay.

4      You also said -- you obviously didn't lodge a complaint

5  about this; correct?

6  **A.**   About what?

7  **Q.**   About what you claim that you saw with your son.

8  **A.**   No.  I encouraged my son to do it, sir.

9  **Q.**   Okay.  You did -- there's no records, documents, reports,

10  texts, e-mails, your social media account, nothing about this;

11  correct?

12  **A.**   Again, sir, I encouraged my son to do it.  Eventually, he

13  went over to HR, sir.

14  **Q.**   Uh-huh.  And you know, sir, right, that your wife who

15  lives in your home overheard your son saying that this conflict

16  with the boss had nothing to do with race and it was about the

17  Dodgers versus the Giants.

18      You know that, sir, don't you?

19  **A.**   Sir, I don't realize what my son may have, may have not

20  told my wife, but most likely, what you're saying, I do

21  understand that, yes, at some point my son did tell me it was

22  about a baseball team and the hat and things like that and his

23  supervisor.

24      But I don't believe he would have told that to my wife,

25  sir.  Or he may have.  May have did, may have not.  I don't

1   know.

2   Q.   Okay.  And you've said that after this -- I mean, your son

3   continued to work at Tesla for some time under these

4   circumstances; correct?

5   A.   I believe so, but as his boss had told him, if he didn't

6   like it, his time there would end.  And if he didn't like it,

7   then his time there ended.

8   Q.   Right.  And then your daughter applied to Tesla; correct?

9   A.   Again, you ask me the same question.  I told you earlier.

10  She applied.  She didn't get hired.  When she told me she

11  didn't get hired, I said, "Thank God."

12  Q.   Okay.  And then your son reapplied to work at Tesla;

13  correct?

14  A.   I don't believe my son reapplied.  I don't know what

15  happened.  I'm not privy to that when -- I know when they

16  deposed him and they asked him, did he told me -- did he

17  reapply?

18      He said, no, he didn't reapply.  I don't know.

19      MR. SPIRO:  Okay.  Well, there's an exhibit in

20  evidence with him reapplying, so we're going to put it up.

21  Exhibit 379-01.

22  BY MR. SPIRO:

23  Q.   And you testified earlier about your involvement in sort

24  of coaching your son, at least, about where you wanted him to

25  be inside of the factory.

1          Is it your testimony to this jury that you played no

2    involvement in his reapplication process?

3    **A.**   All I can say is I know -- I don't know.  I don't play any

4    involvement.  I didn't tell him to reapply.  I do see this

5    document, but I also know that my son at that time had a

6    girlfriend after he had lost his job, who would just massively

7    fill out applications for everywhere for him because we was

8    trying to get him back to work before -- how can I say this?

9          Best way I can say is, yeah, I had hands-on with my kids.

10   Always had hands-on with my kids.  Like I told you before, I

11   was his basketball coach.  I was his --

12          **THE COURT:**  Okay.

13          **THE WITNESS:**  -- soccer coach.

14          **THE COURT:**  Thank you.  I think you answered the

15   question.  Mr. Spiro?

16          **THE WITNESS:**  Okay.

17   **BY MR. SPIRO:**

18   **Q.**   So it's your testimony that perhaps what happened here was

19   that the girlfriend was just sending out a bunch of

20   applications, and this was just one of them; is that your

21   testimony?

22   **A.**   I think if you dig down into his desk [sic] -- deep into

23   his -- if you dig into his deposition, he might even told you

24   that.

25   **Q.**   Okay.  Well, you can play any part of his deposition, but

1  the reality is, sir, that he didn't just apply for one

2  position.  He applied for two different positions at Tesla;

3  correct?

4       And he applied directly to Tesla to try to get around any

5  issues he'd have going through the staffing agencies who fired

6  him; correct?

7            MR. ORGAN:  Objection, Your Honor.  403 at this point.

8            THE COURT:  And also calls for speculation.  So let's

9  move on.

10  BY MR. SPIRO:

11            MR. ORGAN:  Your Honor, could we have the exhibit

12  taken down?

13            MR. SPIRO:  It's my examination.

14            THE COURT:  Everything is -- everything is fine,

15  Mr. Spiro.

16            MR. SPIRO:  Thank you.

17            THE COURT:  Please proceed.

18  BY MR. SPIRO:

19  Q.  When you gave that testimony about this incident with your

20  son, you did so in a case also brought by your son.  Your son

21  sued Tesla too; true?

22            MR. ORGAN:  Objection, Your Honor.

23            MR. SPIRO:  It's motivation.  It's a fair question.

24            THE COURT:  Overruled.  You can answer.

25            THE WITNESS:  In the beginning, my son was a party of

DIAZ - CROSS / SPIRO

1  the lawsuit, yes, he was.

2  BY MR. SPIRO:

3  Q.    Okay.  And your son's case got dismissed; correct?

4           MR. ORGAN:  Objection.  Misstates the evidence.

5           THE COURT:  Yeah.  Over -- so the objection is

6  sustained, and conversation about what happened in the

7  procedures, in leading up to today are out.  So you should move

8  on.

9           MR. SPIRO:  Okay.  I'll move on.

10  BY MR. SPIRO:

11  Q.    You said that you -- after this incident, there was a

12  fractured relationship with your son; right?

13  A.    Yes.

14  Q.    Okay.  And after this incident you filed a lawsuit with

15  your son; right?

16  A.    No.  Me and him was a party of a lawsuit.

17  Q.    Okay.

18  A.    And he settled.

19  Q.    Well, you guys took photographs together; right?

20  A.    Yes.  We -- the reporter asked -- at this point he had

21  moved out of the house.  He was living on Lemon Street or

22  something like that at this particular time, and I believe it

23  was a Josh from -- from Bloomberg or something like that.

24  Wanted to be able to take a photo of us.  So he kind of

25  brokered a little something to where I would have to go to my

**DIAZ - CROSS / SPIRO**

1  son's house.

2  **Q.**   Right.   And you guys took, you know, photos to get --

3  multiple photos together throughout this case; right?

4           **MR. ORGAN:**   Objection.   Relevance, Your Honor.

5           **THE COURT:**   Overruled.

6  **BY MR. SPIRO:**

7  **Q.**   Right?

8  **A.**   It was -- he did want a few locations he had asked us to

9  go to besides the house, yes.

10  **Q.**   Uh-huh.   And you guys did press together; right?   You guys

11  spoke to the press; right?

12  **A.**   In the beginning, yes, we did.

13  **Q.**   Okay.   And you met at your lawyer's offices together;

14  right?   You and your son; right?

15           **MR. ORGAN:**   Objection.

16           **THE COURT:**   Overruled.

17  **BY MR. SPIRO:**

18  **Q.**   Sir?

19  **A.**   In the beginning until he lost faith in the system, yes,

20  he did.

21  **Q.**   Well, in the beginning was a year and a half after; right?

22  You don't file a suit for a year and a half after these events.

23  And a year and a half later, you're with your son meeting in

24  the lawyer's office taking pictures, filing a suit together;

25  right?

**DIAZ - CROSS / SPIRO**

 1   **A.**   Yes.  It did come a year and a half afterwards.  You know,

 2   after some other events expired -- transpired.  But yes.

 3   **Q.**   And isn't it true that the reason that your relationship

 4   with him got fractured years later was because he started

 5   hanging out with the wrong crowd?

 6   **A.**   Yes.  He started hanging with the wrong crowd after Tesla.

 7   You're right.

 8   **Q.**   And you -- you testified that in pretty -- absolute way

 9   that you told your son to report this incident; is that your

10   testimony?

11          **MR. ORGAN:**  Objection.  Asked and answered,

12   Your Honor.

13          **THE COURT:**  I think he's setting up the next question.

14          **MR. SPIRO:**  I am, Your Honor.

15          **THE WITNESS:**  I did encourage my son to report it,

16   yes, I did.

17   **BY MR. SPIRO:**

18   **Q.**   Okay.  Well, can we just look at the prior proceeding,

19   page 507, line 14.

20                     (Pause in proceedings.)

21          **MR. ORGAN:**  What line?

22          **MR. SPIRO:**  Line 14.

23          **MR. ORGAN:**  Through what?

24          **MR. SPIRO:**  508:7.  Actually, we can just do the -- we

25   can just do the last five lines.

1            THE WITNESS:  I need to find out what page we're on,

2   what book are we on.

3            MR. SPIRO:  Sir, I'm just asking to read 508:3 to 7.

4            THE COURT:  Yeah.  508 is in the --

5            THE WITNESS:  This one, sir?

6            THE COURT:  In that one, yes.

7            THE WITNESS:  508.

8            THE COURT:  Yes.  That one.

9                    (Pause in proceedings.)

10            MR. ORGAN:  It's --

11            THE COURT:  You may proceed.

12            MR. SPIRO:  Thank you, Your Honor.

13   BY MR. SPIRO:

14   Q.   "QUESTION:  And you told your son to go and report that to

15   his supervisor?  Correct.

16        "ANSWER:  Um, I don't know if I told him, or I don't

17   remember if I told him or he decided, but at some point he did

18   go up to try to report it, yes, he did."

19        That was your truthful testimony under oath; correct?

20   A.   That's what I said --

21   Q.   Okay.

22   A.   -- at that point.

23   Q.   So we are -- we talked a little bit about how in December

24   of 2015 you forwarded the resume of Lamar Patterson.  Do you

25   remember that testimony?

1   **A.**   Yes.   I -- before I met Mr. Patterson, I definitely did

2   forward his resume.

3   **Q.**   Okay.   And then, you know, end of the year, Christmas,

4   New Year's, in January is the incident with the drawing.   Okay?

5   And that shouldn't have happened.   That shouldn't have

6   happened.   And you -- you were able to sort of persevere

7   through that, and you continued to work at Tesla; fair?

8   **A.**   I never said persevere.   It definitely made my job harder,

9   looking around, not knowing if I was going to be attacked.

10  Like I said before, I was threatened to be killed inside of the

11  factory.   I was threatened inside of an elevator, and now this

12  guy is leaving things out where everybody else can do it.

13       So pretty much, sir.

14  **Q.**   You came to work the next day after the incident; correct?

15  **A.**   I can't remember if it was my off day or if I came to work

16  the next day.   I would have to see my schedule to let you know

17  that.

18  **Q.**   But during that next month, I mean, you came into work.

19  You worked your shifts; right?

20  **A.**   When I was scheduled to work, I came in and worked, sir,

21  yes.

22  **Q.**   Okay.   And in fact, after this event, you got a raise;

23  right?

24  **A.**   You would actually have to show me that paperwork, and

25  then we can go through that.

DIAZ - CROSS / SPIRO

```
 1              MR. SPIRO:  We'll put up Exhibit 293.
 2    BY MR. SPIRO:
 3    Q.   You see January 28.  "Please include the following
 4    operator's pay as follows: Owen Diaz, lead."
 5         You got increased from 16 to 18; correct?
 6    A.   I see -- I see what it says.
 7    Q.   Okay.  And then you still continued to e-mail with and
 8    communicate and request things from supervisors; right?
 9    A.   Well, what I take from this e-mail, sir, is that they were
10    increasing my pay --
11              MR. SPIRO:  I'm going to move to strike as
12    non-responsive.
13              THE WITNESS:  -- after they had increased everyone
14    else's.
15              THE COURT:  Hang on just a second.  Ask the question
16    again.  I don't have my real-time.
17              MR. SPIRO:  Sure.  You can take that down.  It's a
18    completely different time.
19    BY MR. SPIRO:
20    Q.   I'm asking at this time in January and into February, you
21    were still e-mailing people at Tesla telling them, you know, I
22    need a certificate for the equipment or we need to do something
23    differently.  You continued to send e-mails to people at Tesla;
24    right?
25    A.   You would have to show me them e-mails, sir.
```

```
 1   Q.   Well, I -- I'm asking.

 2            THE COURT:  He is asking for your memory.  Do you

 3   remember whether you were sending e-mails to other people at

 4   Tesla on various topics?

 5            THE WITNESS:  I don't recall at this time, but if you

 6   can provide me with that e-mail, it will refresh my mind, sir.

 7            MR. SPIRO:  Then I'll just show you one which is Diaz

 8   ending 187.

 9                      (Pause in proceedings.)

10            MR. SPIRO:  I can pass it up to make it easier.

11            MR. ORGAN:  Which one.

12            THE COURT:  187, I believe.

13            MR. ORGAN:  87?

14            THE COURT:  187, I believe.

15            MR. ORGAN:  Thank you, Your Honor.

16   BY MR. SPIRO:

17   Q.   I'm going to pass this up quickly just to be efficient.

18   A.   Thank you.

19   Q.   Yes.  Thank you, sir.

20        And I only have one question, which is, does this refresh

21   your recollection that you continued to, you know, send e-mails

22   to Mr. Romero and request certain things so that the

23   performance of your job could continue?

24   A.   From what this e-mail is saying, I requested for

25   Mr. Hunt -- "Mr. Romero, can you please get Mr. Hunt certified
```

**DIAZ - CROSS / SPIRO**

 1  for the equipment.  Thank you."

 2       So yes.  I was continuing to do my job, sir.

 3  **Q.**   Okay.  And you took a picture of the drawing, and you

 4  preserved it; right?

 5  **A.**   Yes, I did take a picture of that.

 6  **Q.**   And there was only one drawing.  There wasn't, like,

 7  drawings all over the factory; fair?

 8  **A.**   If you consider swastikas drew in the bathroom, not a

 9  drawing, graffiti is a drawing, too, sir.

10  **Q.**   How about this, there wasn't another cartoon drawing like

11  this, depicted African American individuals in an -- in an

12  unfair and wrong light; correct?

13  **A.**   That was the only jigaboo I found, yes.

14  **Q.**   Okay.  I'm sort of curious, you know, why in your lawsuit

15  do you say that there are drawings, multiple drawings --

16            **MR. ORGAN:**  Objection.

17            **MR. SPIRO:**  -- in the factory like this.

18            **MR. ORGAN:**  Objection.

19            **THE COURT:**  Sustained.

20            **MR. SPIRO:**  Can I direct his attention to page 8 of

21  the lawsuit?

22            **THE COURT:**  No.

23            **MR. SPIRO:**  Okay.

24  BY MR. SPIRO:

25  **Q.**   Lamar Patterson was also there with you, right, who worked

1   in the elevator with you?  When the bale got pulled around, he

2   was there and he saw the drawing too; correct?

3   **A.**   You are misstating the -- what you are saying.  You say

4   when the bale got pulled around.  The bale had never got pulled

5   around, sir.  The bale was left in the floor.  I -- I came

6   around and pulled under the bale, but when you say "the bale

7   was pulled around," that's mischaracterization in the whole

8   thing.

9   **Q.**   That one may have been.  I apologize if I got the

10  description wrong, but Mr. Patterson saw the image too, right,

11  with you?

12  **A.**   I believe so.

13  **Q.**   Well, he sued alongside you; correct?

14  **A.**   Mr. Patterson, at some point, was part of a suit, but

15  I believe he settled.

16         **MR. SPIRO:**  Okay.  And if we can put up Exhibit 33.

17                   (Pause in proceedings.)

18         **MR. SPIRO:**  And if we can blow up the top portion.

19                   (Pause in proceedings.)

20  **BY MR. SPIRO:**

21  **Q.**   You see that it says, in the subject line, "Racist effigy

22  and drawing"; right?  Correct?

23  **A.**   Yes, I see that.

24  **Q.**   No doubt about it; correct?

25  **A.**   I see that, sir.

1   Q.   Okay.  And you sent it to Mr. Romero; correct?

2   A.   Yes, sir.

3   Q.   In writing like Mr. Kawasaki directed you to do; correct?

4   A.   He didn't direct me to do it.  All Mr. Kawasaki was did --

5   was gave me advice.  Again, like I said, I don't -- all I can

6   say is, man, I sent the e-mail out.

7   Q.   Okay.

8   A.   That's just it.

9   Q.   Okay.

10         MR. SPIRO:  And if we can just put up the "he had

11  drew" language, which is Ramon Martinez said he had drew the

12  picture and he was just playing.

13                    (Pause in proceedings.)

14  BY MR. SPIRO:

15  Q.   You wrote that; right?

16  A.   Mr. Martinez admitted to drawing the picture, yes.

17  Q.   Right.  And, I mean, you did write this sentence:  "Ramon

18  Martinez said he had drew the picture and he was just playing";

19  correct?

20  A.   Yes -- I didn't say he was just playing.  I said he said

21  he was just playing.  And at some point, I said he said he was

22  joking, but the actual words he said was, "You people can't

23  take a joke."  I may have not wrote it in there, sir, but I

24  apologize for it in hindsight.  I should have looked for it.

25         I should have wrote everything down the way you wanted me

DIAZ - CROSS / SPIRO

 1    to, sir.  You know, I -- if it ever happened, I would

 2    definitely, from my experience, word -- verbatim.

 3    Q.   Okay.  And in any event, after this, you never saw

 4    Martinez again; correct?

 5    A.   Mr. Martinez was still in the factory.  I actively avoided

 6    Mr. Martinez, sir.

 7    Q.   That was not my question.  My question was:  After this,

 8    you didn't see Martinez again; correct?

 9    A.   Some days I would see him; some days I wouldn't see him,

10    sir.  I'm telling you I actively avoided Mr. Martinez, sir.  I

11    had a guy that wanted to do harm to me, so what was I supposed

12    to do.

13    Q.   Um, you certainly never worked with Mr. Martinez again in

14    any capacity; true?

15    A.   No, we never worked again together after that.  No, we did

16    not.

17    Q.   Okay.  After this incident, you spoke to some folks,

18    Mr. Romero, Mr. Jackson, and ultimately, you spoke to somebody

19    in the HR department of Tesla.  Do you remember that?

20             MR. ORGAN:  Objection.  Misstates the evidence.

21             THE COURT:  Overruled.  You can answer if you know.

22             THE WITNESS:  I never remember speaking to anyone in

23    the HR department.  I know someone called me and ask me how I

24    felt.  I know I seen a document where she wrote what she wanted

25    to write down, even though I told her some things.  If she

1  would have let me write that in my own handwriting, it would

2  have been a different thing, sir.

3  **BY MR. SPIRO:**

4  **Q.**   Um, is it your position that you told Ms. Delgado in human

5  resources that there was a long history of substantial racism

6  from Mr. Martinez towards you?  Is that your testimony?

7           **MR. ORGAN:**  Objection.  The question is argumentative,

8  Your Honor.

9           **THE COURT:**  Overruled.  You can answer.

10          **THE WITNESS:**  Again, I don't know who Ms. Delgado is.

11  I -- I heard the name a few times mentioned.  I don't remember

12  meeting a Ms. Delgado.  I don't remember talking to a

13  Ms. Delgado, but all I can say is -- this is part of the thing

14  I was talking about here.

15  **BY MR. SPIRO:**

16  **Q.**   Forget for this moment what exactly her name is.  You

17  spoke to somebody in human resources, and is it your position

18  that you told them -- okay, it's a yes-or-no question -- did

19  you tell them that there was a history of racial attacks from

20  Mr. Martinez towards you when you spoke to human resources

21  after the drawing incident?  Did you tell them that?

22  **A.**   I told -- when -- if this is the same lady, I told -- I

23  took that opportunity to tell her what was going on.  If you

24  can display the next page, you will see where she said at --

25  somewhere human resources didn't know anything about it.

**DIAZ - CROSS / SPIRO**

1  **Q.**  And you are saying -- just to get right to the point,

2  Mr. Diaz, you are saying that that was a lie on her part, that

3  you did tell her in detail about all of the racial harassment

4  that Mr. Martinez was putting you through; is that your sworn

5  testimony, sir?

6  **A.**  Again, sir, I'm going to say I don't know how I can make

7  it any clearer.  Like I said, I received a call from somebody,

8  and I took that opportunity to tell her what was going on.  If

9  you go to the other thing, she says that -- because I saw this,

10  she says that he mentions a history with Mr. Martinez.

11  **Q.**  Okay.  I'm going to ask the question a third time.  In

12  that history, did you or did you not tell Tesla human resources

13  that there was a history of racial attacks against you by

14  Mr. Martinez, yes or no?

15         **MR. ORGAN:**  Objection, misstates the evidence,

16  Your Honor.

17         **THE COURT:**  Overruled.  You can answer that question.

18         **MR. ORGAN:**  Your Honor, we need -- we need a sidebar.

19         **THE COURT:**  No.  I'm -- we are going to have a break

20  in about 12 minutes, but Mr. Diaz can answer this question.

21         **THE WITNESS:**  I took that opportunity to tell whoever

22  that was that called me what was going on.  They never brought

23  me into the office to interview me.  They did a phone interview

24  and this is -- I told them.

25         **MR. SPIRO:**  Can the Court give me some assistance on

1    this question?

2         **THE COURT:**  I think at the end of that answer, he

3    said, "I told them."

4    **BY MR. SPIRO:**

5    **Q.**   You did tell her that there was a racial history between

6    you and Mr. Martinez; that's your testimony?  Because I haven't

7    heard the answer to that question I have asked a few times.

8    **A.**   I told her it was a history between me and Mr. Martinez.

9    I took that time to explain to her what was going on between me

10   and Mr. Martinez.  I took that time to explain to her, I told

11   her everything that was going on, sir.  I can't get it no

12   clearer.

13   **Q.**   Well, it can be very clear if you can just answer that

14   question.  Is part of you told her --

15   **A.**   Yes, I told the person that interviewed me over the phone

16   what was going on.

17   **Q.**   And did you -- okay, is there a reason you don't want to

18   answer that question I'm asking?

19        **THE COURT:**  Strike that question.

20        The question is:  Did you -- when you told her the

21   history, did you mention that it was racial in character?

22        **THE WITNESS:**  I mentioned to her, when Mr. Martinez --

23   we was in the elevator when he told me that "Ns aren't

24   S-H-I-T."  I mentioned to her -- it -- but if I specifically

25   said, ma'am, this is racially motivated --

**DIAZ - CROSS / SPIRO**

1  **BY MR. SPIRO:**

2  **Q.**   No, I think --

3  **A.**   I don't know if I said them exact particular words, sir.

4  **Q.**   No, I didn't ask you about any particular words.  I think

5  we have the answer now, which is that it is your sworn

6  testimony that you told Ms. Delgado that despite the e-mail you

7  provided that we looked at, that you forwarded, that -- that

8  this history was racial in nature, that it had a -- racist

9  words used in it.  It sounds like you told her that.

10         **THE COURT:**   It is argumentative question.  Let's ask

11  another question.

12  **BY MR. SPIRO:**

13  **Q.**   So, you had never met her before; right?  You don't even

14  remember her name; right?

15  **A.**   I can't say I met her.  Maybe.  I don't know.  I can't be

16  a hundred percent sure.  Maybe if you show me a photo of her

17  right now, I can say that, yes, I met this person; but I'm not

18  going to say I'm a hundred percent definite because of the fact

19  that, unless I see a photo of this person or this person comes

20  through the door, then I can tell you if I met them or not.

21  **Q.**   Okay.  Well, you can't give this jury a reason that this

22  woman in HR would have some vendetta against you; right?

23  **A.**   I wouldn't believe she has a vendetta against me, sir.

24  **Q.**   Okay.  But if she were to come into court and testify

25  under oath that you never, ever indicated in any way, shape or

1    form that your prior interactions with Mr. Martinez were racial

2    at all, are you telling this jury that that would be a lie?

3    **A.**    I told her what was going on.  I told her the history.  I

4    told her everything that I could tell her about Mr. Martinez.

5    This is why Ms. Oppenheimer said, "You need clear records."

6    She needed for me to write it down myself.

7            **MR. SPIRO:**  Okay.  Can I have the same question read

8    back, please.

9            (Record read as requested.)

10           **THE WITNESS:**  Yes, because I told her.

11   BY MR. SPIRO:

12   **Q.**    And if she lied about that, if she doctored this paperwork

13   and lied about that, that would be a pretty horrific thing for

14   someone in human resources to do; you agree with me?

15   **A.**    I don't -- I can't speculate for her.  I'm going to say

16   if -- all I can say is this:  If accurate records were kept, we

17   would know exactly what I told her.  If she would have recorded

18   the conversation, we would know what I told her.  If she could

19   be dictating it like this woman here, she would know exactly

20   what I told her; but she decided to write in her own

21   handwriting.  That's not my handwriting, sir; that's hers.

22           And she -- and the thing, if you put it back up, she

23   mentioned that I said there is a history.  She said that she --

24   HR didn't know.

25           **MR. SPIRO:**  Okay.  We are going to go onto

1   Mr. Martinez's written statement, which is 287-0305.  If we can

2   go to the last section.  And if we could highlight --

3   **BY MR. SPIRO**

4   Q.   Israel showed up, that's true; correct?

5        You don't have to necessarily read the screen, sir.  I'm

6   just asking you --

7   A.   I have a tendency to like to read things before I start to

8   agree to anything.  I'm sorry, sir.  I need to read it if it's

9   okay with you.  Can I please read it?

10           **THE COURT:**  Take it down, though.

11           **MR. SPIRO:**  Sure.  We will take it down while we

12   highlight certain words, okay?

13   **BY MR. SPIRO:**

14   Q.   You agree with me that Israel showed up that day at the

15   drawing?

16   A.   Yes, I believe Israel was one of the people, yes.

17   Q.   And you have already testified Mr. Martinez admitted to

18   doing it; correct?

19   A.   Mr. Martinez testified that he did it.

20   Q.   Right, but you also testified that he admitted to it;

21   right?

22   A.   He admitted to it, yes, he did.  I testified to that.

23   Q.   And you were really upset; correct?

24   A.   Yes, I was upset, sir.

25   Q.   And Mike Wheeler was there; correct?

1    **A.**    Yes, he was, sir.

2    **Q.**    And --

3              **MR. SPIRO:**  Okay.  Let's put this up.

4    **BY MR. SPIRO:**

5    **Q.**    So all of the things that Mr. Martinez is saying, at least

6    as to those facts, are, from your perspective, truthful and

7    accurate; correct?

8              **MR. ORGAN:**  Objection.  Compound, Your Honor.

9              **THE COURT:**  It was -- read what's on the screen,

10   Mr. Diaz.

11                    (Pause in proceedings.)

12   **BY MR. SPIRO:**

13   **Q.**    As to the statements that I have just made, that Israel

14   showed up, he said it was me, you were upset, Mike Wheeler was

15   there, I did draw the picture, right, those statements were

16   accurate, correct, just the ones I'm asking about?

17   **A.**    Yes, those statements are accurate, sir.

18   **Q.**    Okay.  And then he says, "So I tell him, Owen, I'm sorry.

19   I did draw the picture.  I never mean nothing bad.  Explain him

20   all about it, and he tell me that white people use it for other

21   purposes."

22         Did I read that right?

23   **A.**    Mr. Martinez never told me he was sorry.  So --

24   **Q.**    I think you're jumping ahead a little bit.  I'm just

25   asking, did I read that right?

1   **A.**    Yes.  You read that right.

2   **Q.**    Okay.  And I think you anticipated the next question.

3   You're saying that that's not true.

4        Is that what your testimony is?

5   **A.**    That statement isn't true, sir.

6   **Q.**    Okay.  So we're going to move on to Exhibit 244-25902.  We

7   had talked earlier about the fall of 2015 and some issues that

8   people were having with you at Tesla.  And do you recall that

9   Mr. Jackson said that every time you'd get into it with

10  somebody, you would always come over the top and say they were

11  harassing you.

12       Do you remember that testimony from Mr. Jackson?

13  **A.**    I believe you mischaracterized Mr. Jackson's testimony and

14  injecting your own.

15  **Q.**    Okay.  Well, why don't you tell the jury your

16  characterization of Mr. Jackson's statements about your

17  attitude and how you would do that in reports.  You tell us.

18  **A.**    We have the ability to play it back so I wouldn't have to.

19  You can do that yourself, sir.

20  **Q.**    Okay.  Well, we'll pull up a couple of these exhibits, and

21  then I can read you that testimony.

22       So if you see this, this is Exhibit 244.  "Owen mentioned

23  that the shift before he comes in might just need to be trained

24  on how to place the material in DZ."

25       I read that right?

DIAZ - CROSS / SPIRO

1   **A.**   It's a snippet of what was going on, yes.

2          **THE COURT:**   Just if you can, just think about what he

3   is asking you.   He read that correctly; right?

4          **THE WITNESS:**   Yes.   You did read that correctly.

5          **MR. SPIRO:**   Okay.   Let's go to 296-0123.

6   **BY MR. SPIRO:**

7   **Q.**   "The later part of the week, we have Junior and Owen and

8   Sally, the same issues I had with them downstairs I have

9   upstairs."

10      Did I read that right?

11          **MR. ORGAN:**   Which page are you on?

12          **MR. SPIRO:**   It's 03.

13  **BY MR. SPIRO:**

14  **Q.**   Did I read that right?

15  **A.**   You read that one sentence right, yes.

16  **Q.**   Okay.   And --

17                  (Pause in proceedings.)

18  **BY MR. SPIRO:**

19  **Q.**   You asked before, question to Mr. Jackson:   "So you had no

20  first-hand knowledge about the issue with Joyce DelaGrande?"

21      And this is Joyce DelaGrande on this e-mail, you can see

22  at the top.   "ANSWER:   No, sir."

23      And your response was to Mr. Jackson -- Mr. Jackson's

24  statement was:   "No, sir.   Other than it kind of showed a

25  pattern, to be very honest.   Any time Owen got into it with

1  someone, he would say, 'Now they're threatening me.'  And that

2  was just kind of a pattern you saw with Owen Diaz, you know?"

3       **THE COURT:**  And the question that you were asking him

4  was what?

5  **BY MR. SPIRO:**

6  **Q.**   Do you think that I mischaracterized Mr. Jackson's

7  testimony?

8  **A.**   You have a tendency to do that, yes.

9  **Q.**   Okay.  Did I mischaracterize that specific testimony that

10  I just read?

11  **A.**   Until I can read a little bit further or before that, you

12  do have a tendency to mischaracterize, sir.

13       **THE COURT:**  All right.  So this might be a good time

14  for us to take our morning break.  So 15 minutes.  We'll be

15  back at 10:15.  Please remember the admonition.

16       (Proceedings were heard outside the presence of the jury:)

17       **THE COURT:**  Please be seated for a second.

18            (Pause in proceedings.)

19       **THE COURT:**  So, Mr. Diaz, if you can concentrate on

20  the questions.

21       **THE WITNESS:**  Yes, sir.

22       **THE COURT:**  And answer the questions and -- this is

23  hard -- this is hard stuff, but try not to comment back at the

24  lawyer.  Just deal with the questions.  Your lawyers are here

25  to protect against anything that's improper.  I'm here to do

 1   the same.  But otherwise, just try to focus on the question and

 2   answer the question.  Okay?

 3        **THE WITNESS:**  Yes, sir.  I apologize.

 4        **THE COURT:**  Okay.  Not a problem.  And then you can

 5   step down.

 6        **THE WITNESS:**  Thank you.

 7        **THE COURT:**  And maybe if you wouldn't mind stepping

 8   out into the hall and starting to take your break.

 9                      (Pause in proceedings.)

10        **THE COURT:**  Mr. Organ, you wanted to raise something?

11        **MR. ORGAN:**  Your Honor --

12        **THE COURT:**  Would you come up to the mic.

13        **MR. ORGAN:**  With respect to the Demetric exhibit,

14   Your Honor, we -- we only have a very short portion of Demetric

15   to play.  However, in light of their bringing that exhibit in,

16   we would like to read some more Demetric Di-Az testimony that

17   relates specifically to that exhibit.  So I wanted to alert the

18   Court to that.

19        **THE COURT:**  Okay.  Well, let the -- let the Defendants

20   know what it is that you're intending to use.

21        **MR. ORGAN:**  47:20 to 49:7, Your Honor, of Demetric's

22   deposition.

23        **THE COURT:**  47:20 to --

24        **MR. ORGAN:**  To 49:7.

25        **MR. SPIRO:**  Your Honor, this exhibit has been on the

 1  exhibits list the entire time.  Our designations have been set.

 2  We've prepared and tried our whole case around the Court's

 3  orders and the general rules even without this case, that those

 4  designations are set.  Our entire case is planned around that.

 5      We would, of course, object to any changes now to any of

 6  the deposition designations.  I assume we're not allowed to go

 7  restart, redesignate things, either, given the Court's prior

 8  orders and the decisions.

 9      **THE COURT:**  So I'll need to take a look at the

10  deposition and don't play it today.  If you -- and then I'll

11  look at it and make a call after that.

12      **MR. ORGAN:**  Thank you, Your Honor.

13      **MR. SPIRO:**  Thank you.

14      **MR. ORGAN:**  I have one other issue.

15      **THE COURT:**  Okay.

16      **MR. ORGAN:**  Mr. Spiro was commenting about -- when he

17  was -- in Exhibit 287 when he was presenting that, and he kept

18  saying Tesla HR.  It is clear that that is misleading because

19  the person who was doing that was not Tesla HR.  It was

20  Chartwell.

21      **THE COURT:**  So you both have been going back and forth

22  on this issue and, you know, when things are being charged to

23  Tesla or not.  And if you want -- I'm going to give the

24  instruction that your side wanted me to give with respect to

25  the staffing agencies because I think it's a true statement.

1          If you want to draw the distinction on redirect.

2          **MR. ORGAN:**  Okay.  Thank you, Your Honor.

3          **THE COURT:**  It's up to you.

4          **MR. ORGAN:**  Thank you, Your Honor.

5          **MR. GRIFFIN:**  Your Honor, with regards to --

6          **THE COURT:**  Mr. Griffin, come up, if you would.

7          **MR. SPIRO:**  Yeah.  I mean, the other obvious issue is

8   that what they're talking about now designating beyond all the

9   other objections, and I would have many more, it wasn't part of

10  the first trial.  Just so the Court knows.

11         **THE COURT:**  Okay.  Well, I suspect that some of the

12  questions that you were asking weren't, either, so I -- I'm

13  going to look at it, and then we can talk about it again once

14  I've had a chance to look at it.

15         **MR. ORGAN:**  One last point, Your Honor.  Defendant

16  won't give us their -- we're going to be resting soon.

17  Defendant hasn't given us their witnesses.  We asked for them

18  last night.  Haven't gotten them.  So...

19         **THE COURT:**  Okay.  Are you -- you're going to be

20  resting before the end of the day?

21         **MR. ORGAN:**  Oh, yes, Your Honor.

22         **THE COURT:**  Okay.  So who's the first witness?

23         **MR. SPIRO:**  Well, I -- what I said to them was, as

24  soon as I'm done with Mr. Diaz and at some point today, I will

25  let them know what our case is; right?

PROCEEDINGS

```
 1          THE COURT:  No.  The deal was that you would provide
 2   the witnesses 24 -- you know, by 2:00 o'clock the day before.
 3   So who's your first witness?
 4          MR. SPIRO:  Ms. DelaGrande.
 5          THE COURT:  Okay.  Who's your second witness?  Are we
 6   going to get to a second witness?
 7          MR. SPIRO:  For sure not.
 8          THE COURT:  I'm sorry?
 9          MR. SPIRO:  For sure not, Your Honor.
10          THE COURT:  Okay.
11          MR. SPIRO:  Right.  So -- and I will -- again, we will
12   get them the witness list by the Court's orders.  They haven't
13   even rested yet.
14          THE COURT:  You haven't given them -- your obligation
15   was to give it by 2:00 o'clock the day before, so I'm --
16          MR. SPIRO:  Yeah -- but that's.
17          THE COURT:  I'm looking forward to everybody following
18   the rules and playing nice and cooperating with each other and
19   being professional and doing the kinds of things that have not
20   been obvious to me, but I'm sure behind the scenes have been
21   working perfectly with you all.
22       I'll be back in -- we're going to start at 10:15, and be
23   here when it's time to start.  You may notice that you lost a
24   minute of your time.
25          MR. SPIRO:  I know, Your Honor.  We misheard the
```

 1   Court, frankly, but --

 2            THE COURT:  Well --

 3            MR. SPIRO:  I was --

 4            THE COURT:  -- you've been looking at the transcripts

 5   all the time.  It's in the transcript.

 6            MR. ORGAN:  Your Honor, I'm sorry.  My -- my

 7   co-counsel made me -- wants to bring up an issue.  There was a

 8   new issue raised that was not addressed in the prior --

 9            THE COURT:  You all can sit down if you want to, or

10   you can leave the courtroom, whatever you want to do.

11            MR. ORGAN:  There was a new issue raised that was not

12   part of the prior trial.  What was it?

13            MR. COLLIER:  Yes, Your Honor.  With regard to the

14   accusations that Mr. Diaz said something about "stupid Latina"

15   to Ms. DelaGrande or the fact that Ms. DelaGrande allegedly has

16   slept with Black men, those comments were not part of her

17   testimony in the first trial.  They weren't part of the

18   evidence at all in the first trial.

19       And I recognize they were only injected into Mr. Spiro's

20   questions, but we noted some jurors taking those questions

21   down.  So I would like to request a curative instruction that

22   it be stricken from the record and the jury instructed not to

23   consider it.

24            THE COURT:  Well, the -- the issue with respect to at

25   least one of them was raised through Mr. Jackson's testimony as

 1   to why Mr. Martinez came into the elevator; right?

 2        MR. COLLIER:  I'm sorry.  I'm not following that.  I'm

 3   sorry, Your Honor.  How did -- I'm not aware of Mr. Jackson in

 4   any way putting those two comments at issue.  This was about a

 5   separate discussion between Mr. Diaz and Ms. DelaGrande.

 6        THE COURT:  The -- I believe that the testimony was

 7   that from Mr. Jackson's perspective Mr. Martinez had

 8   received -- or somebody had received a complaint from a woman,

 9   whoever that was, and that that's what sent Mr. Martinez into

10   the elevator.

11        MR. COLLIER:  Mr. Martinez testified about receiving

12   some complaint for some woman yesterday, and that's what sent

13   him into the elevator --

14        THE COURT:  Okay.

15        MR. COLLIER:  -- he did not identify that as

16   Ms. DelaGrande, and we know from Ms. DelaGrande's testimony

17   that she was actually praising Owen's performance 10 days after

18   that incident in the elevator.  She first starts complaining

19   about him after that, after he has complained about the racist

20   effigy.

21        The only complaint she ever lodged against Mr. Diaz is

22   Exhibit 287, which was in evidence last time, and makes no

23   mention of Mr. Diaz in any way being improper towards her.  She

24   goes into great detail about him being allegedly rude and

25   unprofessional to her leads.

1      But she says nothing about him in any way attacking her.

2  Nowhere in the evidentiary record from the first trial does she

3  in any way, or her deposition, does she accuse him of calling

4  her a "stupid Latina" or in any way suggest that she slept with

5  Black men.

6      And I'm concerned, Your Honor, that these are designed to

7  subtly evoke some race-baiting, stereotype stuff that this is

8  just a conflict between Latinos and African Americans which

9  undermines the racial harassment findings that have already

10  been made in this case.

11          THE COURT:  All right.  Mr. Spiro, step up to a mic,

12  please.

13          MR. SPIRO:  Sure.  I think he should look back at the

14  testimony.  He's sort of conflating a couple of things.  He has

15  it wrong.  So I mean --

16          MR. COLLIER:  I'm happy to look at whatever he'd like

17  to say.

18          THE COURT:  Mr. Collier.

19          MR. COLLIER:  I'm sorry.  Sorry, Your Honor.

20          MR. SPIRO:  So Wayne Jackson testified, as Your Honor

21  points out, in their own questioning of Mr. Martinez.  He

22  testified that reason why he flew into the elevator that way

23  was because of this incident.  They didn't object to either.

24  In fact, they elicited it.

25      I simply asked him, "Isn't it true" -- I asked him a few

 1    times, "Why did he come into the elevator?  What is your best

 2    explanation for that?"

 3         He said he didn't know.

 4         I said, "Isn't it the truth that the reason that he did

 5    that was exactly what happened?"

 6         And he said, "No."

 7         That's how trials work.  That's it.

 8         THE COURT:  Okay.  So, I -- I am, at the moment, going

 9    to leave the evidence where it is.  You can let me know

10    afterwards with a copy of whatever and point to whatever, and I

11    will take a second look at that.

12         MR. COLLIER:  I apologize for interrupting, Mr. Spiro.

13    Thank you, Your Honor.

14         THE COURT:  All right.  So now you've got five

15    minutes.  I want you all back in five minutes, and the court

16    reporter will be back when the court reporter is back.  She

17    will control this recess.

18              (Recess taken at 10:11 a.m.)

19              (Proceedings resumed at 10:21 a.m.)

20         THE COURT:  Please go ahead, Mr. Collier.

21         MR. COLLIER:  Thank you, Your Honor.  Our esteemed

22    appellate counsel has found the citations for where this

23    allegation from Mr. Martinez about a complaint that made him

24    rush into the elevator came from.  It had nothing to do with

25    Joyce DelaGrande.

DIAZ - CROSS / SPIRO

```
 1        We see from Mr. Martinez's deposition that he accuses
 2   Mr. Diaz of, in some way, offending Hilda Navarro, totally
 3   different witness who is not a part of this trial.
 4   Ms. DelaGrande made no such allegation.  It is just now being
 5   transferred to her.
 6              THE COURT:  Okay.  So...
 7              MR. COLLIER:  And we do intend to submit something on
 8   this.
 9              THE CLERK:  I'm checking to see if you are ready for
10   the jurors.
11              THE COURT:  Yes.
12              MR. COLLIER:  We will discuss it later.  I'm sorry,
13   Your Honor.
14              THE COURT:  Thank you, Mr. Collier.
15         (Proceedings were heard in the presence of the jury:)
16              THE COURT:  All right.  Please be seated, everybody.
17   Mr. Spiro.
18              MR. SPIRO:  Thank you, Your Honor.
19   BY MR. SPIRO:
20   Q.   We were looking at Exhibit 296-01, and we don't have much
21   more to get through, Mr. Diaz.
22         And, again, Ms. DelaGrande saying that those were issues.
23   And we can go onto the next exhibit, which is the next page,
24   and she says, "I really brought it up because I had the same
25   concerns downstairs with Owen and the teams."
```

**DIAZ - CROSS / SPIRO**

1          And if we can go to the next exhibit, and this is now Ed

2     Romero to Victor Quintero, "I came in to meet with her and her

3     leads.  I met with them in the bullpen.  They aired their

4     concerns.  I asked questions.  Wanted to assure I had a clear

5     picture of what was happening."

6          Then -- and this is the part I want to bring your

7     attention -- "I then met with Owen.  I explained the concerns

8     the production staff, and at first he tried to justify his and

9     his group's activities."

10         Did I read that correctly?

11                    (Pause in proceedings.)

12    BY MR. SPIRO:

13    Q.   Sir, my question is simply:  Did I read that sentence

14    correctly?

15    A.   Yes, I had that meeting, and it says that I was stating up

16    the crew.

17    Q.   Okay.  That's all I wanted to ask you, that you had that

18    meeting with Mr. Romero about those issues with your crew;

19    right?

20    A.   I see the e-mail, yes.

21    Q.   One of those individuals in the crew was Lamar Patterson;

22    correct?

23    A.   I have to see that date to see if he was there at that

24    particular time, and I would have to see when he was hired.

25    So...

DIAZ - CROSS / SPIRO

1   Q.   Okay.  So -- well, let's just press along to the -- to the

2   elevator incident that you testified about regarding

3   Mr. Hurtado, okay, which happens just after this.

4        In the elevator with you was you, Mr. Hurtado, and

5   Mr. Patterson, right, you testified?

6   A.   Yes, at some point, he was in the elevator with us.

7   Q.   Okay.  And at this point, Mr. Diaz, do you think there is

8   anything that you could have done better with working with

9   Ms. DelaGrande and her team?

10  A.   That is not so simple in a word -- one-word answer.  I

11  would have to give a little explanation for that.

12  Q.   So the incident that happens with Mr. Hurtado, there is an

13  exhibit, 8301, where Ms. DelaGrande explains to Mr. Romero, "So

14  my lead was coming out of the elevator and showed him a gear

15  case rack that needed to go downstairs.  His response to my

16  lead was he does not want anyone talking to him.  He" --

17  meaning you -- "we want him to do anything, we have to e-mail

18  him."

19       Do you remember that you told everybody that put it in

20  writing?

21  A.   That would be a false statement.  I had -- again, in order

22  to explain that, I have to go -- because I didn't put that in

23  an e-mail.  What happened was -- is Mr. Hurtado had been, like

24  I said, calling me the N-word.  He had been telling me, "Boy,

25  hurry up and push the button.  Ns are lazy."

1        At some point, I -- me and Mr. Patterson, we were in the

2   elevator.  Mr. Hurtado -- me and Mr. Patterson were talking

3   amongst ourselves.  Mr. Hurtado got into the elevator.  He

4   interjected because of what he had been saying.  I had turned

5   to Mr. Hurtado and told him, "No disrespect, but if it doesn't

6   happen" --

7            THE COURT:  Excuse me.  Just a second.  Would you take

8   that down, please.

9                        (Pause in proceedings.)

10           THE COURT:  Go ahead.

11           THE WITNESS:  I told Mr. Hurtado, "No disrespect,

12   but" -- I turned to him and told him if it didn't have anything

13   to do with the job, please don't talk to me.  I told him, "We

14   are not friends.  You know, we don't sit at each other's table

15   and eat."  If it has something to do with the job, he can

16   definitely tell it to me, but I didn't want to sit here and

17   talk sports with a guy that's been calling me the N-word, boy.

18       So, I definitely did tell him to don't talk to me.  I went

19   over to Joyce DelaGrande's desk that was sitting in the middle

20   of the floor on the warehouse.  It had some forklifts sitting

21   in front of it.  I stopped at her desk.  I told her what he had

22   been saying to me and the things that he was doing.

23       You will see, if you go into the thing -- the transcript,

24   she said that Mr. Hurtado, which I didn't know at that time,

25   was her friend.

DIAZ - CROSS / SPIRO

1   BY MR. SPIRO:

2   Q.   Okay.  If we can look at Exhibit 8301 that's in evidence,

3   which has Ms. DelaGrande's recitation of what you told her in

4   an e-mail to Ed Romero:  "So I'm having a few more issues with

5   Owen.  His response to my lead was he does not want anyone

6   talking to him.  He -- we want him to do anything, we have to

7   e-mail him."

8        Did I read that right?  The parts of it that I read, did I

9   read those two parts right?

10  A.   That's a mischaracterization of what I said.  I actually

11  said I didn't want him talking --

12           THE COURT:  He read it correctly.

13           THE WITNESS:  Yes, he read it correctly.

14  BY MR. SPIRO:

15  Q.   It is an exhibit in evidence, Mr. Diaz, okay?  So that's

16  what -- this is the e-mail where Joyce recounts that

17  conversation, and we saw what Mr. Hurtado told Ms. DelaGrande

18  in that other e-mail we looked at a moment ago.  And why don't

19  we look at what Mr. Patterson said about this incident?

20           THE COURT:  Is there a question coming?

21           MR. SPIRO:  Yes, can we put up Exhibit 245, please.

22                      (Pause in proceedings.)

23  BY MR. SPIRO:

24  Q.   Okay.  And you asked Mr. Patterson to write out what

25  happened; right?

DIAZ - CROSS / SPIRO

1    **A.**   I asked Mr. Patterson to send something out, yes, I did.

2    **Q.**   Okay.  And so we can agree, right, that Mr. Patterson, in

3    his statement on the issue, does not say anything about a

4    racial slur being used; correct?

5    **A.**   That's what Mr. Patterson wrote.  He definitely wrote

6    that.  It seemed to him like Robert was the hostile one in the

7    encounter.

8    **Q.**   Well -- and that may very well be true, but Mr. Patterson,

9    when he gave his statement about this incident didn't note

10   anything at all about anything racial happening; correct?

11          **MR. ORGAN:**  Objection.  Calls for speculation.

12          **THE COURT:**  No.  It's -- it's the document.

13   **BY MR. SPIRO**

14   **Q.**   The document, sir, it speaks for itself; right?

15   **A.**   Well, did he put what -- I don't -- I can't speak for

16   Mr. Patterson.  I know Mr. Patterson wrote the document.  I

17   forwarded the document up.  What Mr. Patterson was willing to

18   say and what he wasn't willing to say to cover his job, I don't

19   know.

20          I can't speak for Mr. Patterson.  All I can say is this is

21   what he wrote.

22   **Q.**   What he was going to say to cover up for his job.  Weren't

23   you the guy who hired Mr. Patterson?  He worked for you, sir.

24          **MR. ORGAN:**  Objection.  Argumentative.

25          **THE WITNESS:**  I did not have the ability --

1              **MR. ORGAN:**  Objection.  Argumentative.

2              **THE WITNESS:**  -- to hire or fire anybody, sir.  I

3    didn't hire Mr. Patterson.  And you said it yourself, I

4    forwarded an e-mail up.  I received an e-mail from his cousin.

5    I forwarded the e-mail to the next chain.

6         I did not hire Mr. Patterson.  I did not recommend

7    Mr. Patterson.  All I did was -- is forward an e-mail, sir.

8    **BY MR. SPIRO:**

9    **Q.**   Well, at this point in time, you are having personal

10   conversations within the elevator.  You were working closely

11   enough for that to happen; true?

12   **A.**   Personal, no.  But if you say we were speaking in general,

13   fishing, sports, cars, about some of the things that was going

14   on, maybe; but actually having active personal conversations,

15   me and Mr. Patterson wasn't close like that, sir.  So

16   definitely, I wouldn't have been telling him my personal

17   business.

18   **Q.**   Okay.  So Mr. Patterson was, of course, an African

19   American man; correct?

20   **A.**   Yes, he is.

21   **Q.**   Okay.  And this dispute with Mr. Hurtado, you would agree

22   with me, sir, because you were here, no witness in this case

23   before you testified said a word about Mr. Hurtado doing

24   anything racist; true?

25   **A.**   What I'm going to say is, you know, what I was taught

1   is -- is let a person defend himself.  If you can bring

2   Mr. Hurtado in here, let him defend himself.  That's what I was

3   taught.

4   **Q.**   Well, but you didn't sue Mr. Hurtado, sir; right?

5   **A.**   No, I did not sue Mr. Hurtado.  I didn't even know

6   Mr. Hurtado's last name until we started going through the --

7   the dispositions and the depos.  I do believe I asked Tesla to

8   provide a photo once --

9              **THE COURT:**  I think this --

10             **MR. SPIRO:**  Objection.

11             **THE COURT:**  -- part of the questioning has gone far

12   enough.  Let's go.

13             **MR. SPIRO:**  Yeah.  Just two more questions about this.

14   BY MR. SPIRO:

15   **Q.**   In both the Martinez elevator incident and in this Hurtado

16   incident, both times, people complained about you, sir, first

17   before you complained about them; isn't that true?

18   **A.**   All I can say is, is complaints was made, yes.

19   **Q.**   Okay.  And after -- because we are now at the sort of end

20   of your time at Tesla, you leave -- your mother -- and I'm

21   sorry I have to bring this up -- but your mother passes away

22   the next day.  And you, at some point, you know, are out of

23   work a little bit from Tesla because of that; true?

24   **A.**   I don't -- I don't know what you mean by my mother passed

25   away the next day.  You would actually have to show me the

1    documents of when, and then I can explain to you, you know; but

2    you saying, "your mother passed the next day," I don't know

3    what you mean by that, sir.

4    Q.   Well, I think there is a -- there is a date on that e-mail

5    we were looking at, but assume for the sake of this that --

6    that at the end of February -- let's just leave it at this.  At

7    the end of February, your mother passes away; true?  If you

8    remember?

9    A.   It was in February, yes, in mid February, somewhere about

10   that time.

11   Q.   Okay.  So about a month after the drawing; fair?

12   A.   Yes, somewhere in that timeframe.  I didn't pinpoint the

13   exact time, but somewhere in that timeframe.

14   Q.   And you filed a suit about 18 months later.  We talked

15   about it.  And about three, four years later, you eventually

16   met with a psychologist to assess you.  Do you remember that?

17   A.   Yes, I remember.

18   Q.   And you were there to tell him anything that was wrong

19   with you and how you were damaged so that he could make a

20   report and come to court; right?

21   A.   Yes, he did.

22   Q.   And you in that conversation after four years of time, you

23   did also not mention Robert Hurtado; correct?

24   A.   I don't believe that ever came up in -- in them

25   situations.  I just know -- I can't be 100 percent sure.  All I

DIAZ - CROSS / SPIRO

1  know is that we were talking more about my feelings and -- and,

2  you know, it was more about my feelings, let's just say.

3  **Q.**   Your mother passes away, and I'm only going to ask a

4  couple of questions about this, and I genuinely apologize that

5  I have to even ask a few questions because I know this is

6  upsetting.

7      You e-mailed Mr. Romero and told him you had to go deal

8  with family affairs and you'd be out; right?

9  **A.**   Yes.  At some point I did because I did have to help deal

10 with the arrangements with my siblings for my mother.  Yes, I

11 did.

12 **Q.**   Okay.  And Mr. Romero sent you his condolences; correct?

13 **A.**   I can't remember, but possibly if you tell a person

14 something like that, that's probably their natural reaction is

15 to give you condolences.

16 **Q.**   Right.  It was the same Ed Romero who promoted you early

17 on at your time at Tesla; right?  Was involved in your

18 promotion; correct?

19 **A.**   Yes.  At some point he was involved with it, I believe.

20 **Q.**   The same Ed Romero that came to you when you were having

21 the issue with Mr. Foster and dealt with it, and Mr. Foster

22 ended up leaving Tesla; correct?  Same Ed Romero?

23 **A.**   Unless it was a different Ed Romero that we are speaking

24 upon the same person, yes, Mr. Romero, he possibly gave me

25 condolences.  I would have to see the e-mail, but he may have

1    said that.

2    **Q.**    And it's the same Ed Romero that when you forwarded a

3    resume of an African American man to work at Tesla, he -- he --

4    he showed you the respect to hire the person whose resume that

5    you forwarded; right?  He took that forward, and that's the

6    person that got hired to come into the elevator with you; true?

7    **A.**    What I can say about that is the elevator was

8    short-staffed.  We were always pretty much short-staffed.  We

9    needed a person.  Some days I would run the elevator by myself.

10   I couldn't give the other individuals that was working on the

11   other side a break.  A guy asked me to forward an e-mail, and

12   that's what I did.

13       I needed help.  We were unmanned.  I couldn't give these

14   guys their proper breaks, and that's all I did.  I did not know

15   Mr. Patterson was an African American when I forwarded up the

16   e-mail.

17   **Q.**    Well, I was going to just move on, but I mean, well?

18           **MR. SPIRO:**  Can I -- can I enter a picture of

19   Mr. Patterson?

20           **THE COURT:**  No.

21           **MR. SPIRO:**  Okay .

22   **BY MR. SPIRO:**

23   **Q.**    Let's just move on.  The passing of your mother led to

24   some depression; correct?

25   **A.**    I think the passing of one person, mother, would affect

1   him, yes, I do.

2   **Q.**   Okay.  And it led to some sleeplessness; correct?

3   **A.**   I think that would contribute to it, you know, the loss of

4   one's parent, a person that raised you, you know, nurtured you,

5   took you to your first day of school.  You know, I think that

6   would affect you.

7   **Q.**   I very much agree, sir, and I'm sorry.  I mean, fair to

8   say, and then we're going to move on, that obviously, the

9   mother -- your mother passing was very much on your mind at

10  this time; fair?

11  **A.**   At this time?  My mother is always on my mind.

12  **Q.**   Right.  I'm saying in the weeks that followed her passing,

13  and again, then I'm going to move on from this, it was

14  obviously a very hard time.  It was something that was on your

15  mind.

16  **A.**   Yes, it was.

17  **Q.**   Okay.  Just moving ahead, Exhibit 306-02, and this is now

18  mid-March:  "Were you able to speak to Owen last Friday?  If

19  not, let's resolve this issue today.  Is this about the night

20  elevator lead?"

21      I read that correctly?

22  **A.**   Yes, you did, sir.

23  **Q.**   Okay.  And then 308-02.  And you see the date is March 16?

24  **A.**   Yes.

25  **Q.**   Okay.  "If he was to accept the position as elevator

1   operator on the day shift, he never responded as he said he

2   would."

3        I read that correct; right?

4   **A.**   That's what it says.  You read that, yes.

5   **Q.**   Okay.  And they were trying to move you to the day shift,

6   sir.  They were trying to help you.  Sir, you understood that?

7            **MR. ORGAN:**  Objection.  Calls for speculation.

8            **THE COURT:**  Sustained.

9   **BY MR. SPIRO:**

10  **Q.**   The next day after the 16th you were applying to jobs.

11       Do you remember that?

12  **A.**   I was applying for jobs.

13  **Q.**   Yeah.  The next day on March 17?

14  **A.**   I was actively looking for work before that, actually, if

15  you count on, like, looking into -- I believe -- I don't know

16  if you guys stipulated it or whatever you --

17  **Q.**   Yeah.  It's not --

18  **A.**   But I -- if you look at my Indeed applications, you'll see

19  I was looking for work.

20  **Q.**   That wasn't my question.  My question is just simply, on

21  March 17, you were, in fact, sending out job applications.

22  True or false?

23  **A.**   At that time, yes.  I was sending out job applications.

24  **Q.**   Okay.  Like to Fitness Evolution?  Do you remember you

25  applied to Fitness Evolution?

DIAZ - CROSS / SPIRO

1   A.   I needed a job, and I needed to get away, so I was filling

2   out for anything I could, sir.

3   Q.   And you passed -- you know, you gave Tesla a doctor's note

4   saying that you needed time; right?

5   A.   Yes.  I did go to the doctor.

6   Q.   Okay.  Do you remember the date of that?

7   A.   Unless you show it to me --

8   Q.   Let me just pass it up because it's easier -- it's

9   Exhibit 313.  It's attached to an e-mail.  You can just have

10  that up there.

11            MR. SPIRO:  If we can put up Exhibit 320.

12  BY MR. SPIRO:

13  Q.   Right.  And this is Wayne Jackson.  Came in here and

14  testified on your behalf.  And this is 3/18 the next day;

15  right?  And he's -- he's talking about you and he says:  "He

16  did just get -- send a doctor's note, but there is no doctor's

17  signature on the note he provided."

18       Do you see that?

19  A.   Yes, I see that.

20  Q.   And you know, you testified that you saw -- you didn't get

21  any medical treatment in this case; is that correct, sir?

22  You're not alleging in this case that you got medical treatment

23  for anything that happened at Tesla; correct?

24  A.   Have I been to a licensed psychologist?  No.  Have I

25  talked to anybody?  I talked to my pastor and stuff like that

 1   because, honestly, at my pay rate, I can't afford to go to a

 2   psychologist.  I'm sorry.

 3   **Q.**   Well, I don't want to get sidetracked, but at your new

 4   position at AC Transit, you have health benefits; true?

 5   **A.**   Yes, I do.  But anybody that has a Kaiser HMO knows that

 6   Kaiser doesn't have its own mental health facilities.  You have

 7   to go outside of the network.  Once I go outside of the network

 8   it comes out of my pocket, sir.  I'm sorry.

 9   **Q.**   But why did you just tell this jury that you didn't -- why

10   did you just tell this jury that you had health insurance when

11   you answered that question?

12   **A.**   Why did I tell them I just had health insurance?

13        **MR. ORGAN:**  Objection.  Argumentative.

14        **THE COURT:**  Yeah.  And we are now beyond the scope, I

15   think.

16   **BY MR. SPIRO:**

17   **Q.**   Okay.  You -- you said that, you know -- and you've got

18   the letter with you, the doctor's note, that you saw someone on

19   March 18.

20        Does that refresh your recollection as to the date?

21   **A.**   That's what it says here, yes.

22   **Q.**   Okay.  And you saw somebody after your mother's passing

23   and spoke to them for 5 to 10 minutes tops; is that fair?

24   **A.**   I don't -- I don't see or -- I don't know who you're

25   saying that I talked to after my mother's passing.  You would

DIAZ - CROSS / SPIRO

```
 1   have to show me some documentation.  You would have to do
 2   something to rattle my memory because I talked to a lot of
 3   people after my mother's passing.  You know, I talked to the
 4   funeral director.  I talked to --
 5   Q.   Okay.
 6            THE COURT:  You have answered the question.
 7   BY MR. SPIRO:
 8   Q.   Okay.  You were asked previously, and I just want to move
 9   past this, that -- was there a triggering event that caused you
10   to go to Antioch Health Center on March 18, and you said your
11   mother's passing; is that fair?
12   A.   The -- it was an accumulation of everything, and I
13   couldn't go back to work.  So I needed time to think, sir.
14   Q.   And you said -- if you told -- you've said previously that
15   the amount of time you met with the doctor was about 5,
16   10 minutes tops; fair?
17   A.   No.  You said that, sir.
18   Q.   You're saying that you have never said that under oath?
19   A.   I don't -- you'd have to show me again where I said that
20   and show me what context it was in.
21   Q.   I'll just read --
22   A.   Sorry.
23            MR. SPIRO:  If I could just read Volume III, June 21.
24            THE COURT:  Just one second.
25                      (Pause in proceedings.)
```

1      **THE COURT:**  Volume III, June 21.  What page?

2      **MR. SPIRO:**  The page is 423:11 to 14.

3      **THE WITNESS:**  What book is that, sir?

4      **MR. SPIRO:**  We're just going to put it up.  It's just

5  one line.  We'll put it up on the screen for you.  So you got a

6  lot of --

7      **MR. ORGAN:**  That's improper to put it on the screen.

8      **MR. SPIRO:**  It's impeachment stuff.

9      **THE COURT:**  My copy of this skips between 420 and 448,

10  so I don't have that.

11  BY MR. SPIRO:

12  Q.   Okay.  Why don't we move on for a second.  You're not --

13  you're not disputing that you saw the doctor very briefly, are

14  you?

15  A.   What doctor, sir?

16  Q.   The doctor that gave the -- the doctor that -- the note

17  you passed to Tesla.  You're not saying that you spent a lot of

18  time with that doctor.  It was a very brief encounter; right?

19  A.   I don't remember how long I was inside the doctor's

20  office.  I do know Antioch Health Center is the -- is a health

21  center.  I don't know how long I spent into the doctor.  I know

22  I got there.  I made an appointment.  I got there.  I -- I was

23  in the doctor's office.

24  Q.   Okay.  And the truth is, this doctor's note that you

25  passed to Tesla is not signed by the doctor because you wrote

 1  it, and it's in your handwriting; isn't that true, sir?

 2  **A.**   That doesn't look like my handwriting, sir.

 3  **Q.**   We have your handwriting in evidence.  Why don't we put it

 4  up.

 5                    (Pause in proceedings.)

 6        **MR. SPIRO:**  We're just going to blow up a part of it.

 7  **BY MR. SPIRO:**

 8  **Q.**   Do you see how there's a slant at the top right portion of

 9  the O?

10        **MR. ORGAN:**  Objection, Your Honor.  This is

11  argumentative.

12        **THE COURT:**  Are you going to try to make him a

13  handwriting expert, Mr. Spiro?

14        **MR. SPIRO:**  No, no, no.  He doesn't need to be an

15  expert.  I'm just going to see if this doesn't refresh his

16  recollection that he wrote the doctor's note.

17        **MR. ORGAN:**  It should not be in front of the jury if

18  this is to refresh his recollection.

19        **MR. SPIRO:**  It's an exhibit in evidence.  You want me

20  to mark it with a marker?  It's an exhibit.

21        **THE COURT:**  Can I see the note.

22        **THE WITNESS:**  Here you go, sir.  Because that's not my

23  stuff.  You can see the numbers are totally different.  He's

24  just trying to cherry-pick, sir.

25        **THE COURT:**  We are not doing this.

DIAZ - CROSS / SPIRO

1          **MR. ORGAN:**  I move to strike the testimony,

2   Your Honor.

3          **THE COURT:**  Granted.

4          **MR. ORGAN:**  And the questions.

5          **MR. SPIRO:**  Well I can ask him if he passed a doctor's

6   note that was unsigned that he wrote, and I'll be stuck with

7   the answer at least.

8          **MR. ORGAN:**  No.  Asked and answered.

9          **THE COURT:**  I think that has been asked and answered.

10   Let's move on, Mr. Spiro.

11  **BY MR. SPIRO:**

12  **Q.**   Okay.  As you left Tesla, you received Exhibit 68

13   notice -- maybe we can put that up.

14                    (Pause in proceedings.)

15  **BY MR. SPIRO:**

16  **Q.**   Right.  And you received an automated response that has

17   hr@teslamotors.com.  Never sent an e-mail after you left Tesla

18   complaining about anything; correct?

19  **A.**   Can you please repeat the question, sir?

20  **Q.**   Sure.  When you -- when you received an automated exit

21   e-mail and it included hr@teslamotors.com, and you never sent

22   an e-mail complaining about anything; correct?

23  **A.**   If we're looking at the same e-mail, I see where it says

24   that.  I see where it says the separation.  I see where it says

25   it's to some -- to separation at Tesla, First Automatic Group

**DIAZ - CROSS / SPIRO**

1    and that.  I can see the subject line where it definitely says

2    my name, and I can see where it says the details.  I can see

3    where it says all that, but it does not say I was tagged in on

4    this e-mail, sir.

5    **Q.**   Okay.  By the way, Ed Romero's e-mail address was a pretty

6    easy one to remember; right?  Edromero@teslamotors.com, will

7    you agree with me that's a pretty easy e-mail to remember,

8    first name, last name at the company?

9    **A.**   If I was actively using e-mail; but over a period of time,

10   no, I wouldn't remember it.

11   **Q.**   Okay.  So you testified on direct, and it was one of your

12   first questions that you left Tesla and you started at AC

13   Transit was your next job; right?

14           **MR. ORGAN:**  Objection.  Misstates his testimony.

15           **THE COURT:**  Overruled.  You can answer.

16           **THE WITNESS:**  It was another job before that, but what

17   I can say is I got into the field.  But if you want to consider

18   a job-job, the other ones wasn't like the one I got now.  So,

19   you know -- I'm going to say that.

20   **BY MR. SPIRO:**

21   **Q.**   Okay.  But on direct examination in front of this jury --

22   and I'm going to pull up the transcript -- it is true that you

23   told this jury that the job you got after Tesla was AC Transit?

24   That is true; right?  That's what you told this jury?

25   **A.**   Well, technically, it is after Tesla.  So --

1   **Q.**   I see.

2   **A.**   -- I wouldn't be lying.  Now, if you want to ask me what

3   jobs I had in between that, then, you know, that's a whole

4   other story, sir.  But technically, any job that I get after --

5   even if I got a new job tomorrow, technically, it would be

6   after Tesla.

7   **Q.**   "I work for AC Transit.  I'm a bus operator.  This is the

8   job I got after Tesla."

9       That was your sworn testimony, correct, in front of this

10  jury?

11  **A.**   That is what I said, sir.

12  **Q.**   And now, because you saw that I was going to --

13          **MR. ORGAN:**  Your Honor, I have to make a motion

14  immediately.  I apologize, Your Honor, this is -- this is an

15  unusual circumstance.

16          **THE COURT:**  All right.

17          **MR. ORGAN:**  At least a sidebar, Your Honor.

18          **THE COURT:**  Let's go to the side.

19      (The following proceedings were heard at the sidebar:)

20          **THE COURT:**  Mr. Organ, what's the issue?

21          **MR. ORGAN:**  Your Honor, Counsel has violated the

22  Court's orders.  It just showed and was comparing the Doctor's

23  note, which is Exhibit 313.

24          **THE COURT:**  We are past that.

25          **MR. ORGAN:**  Yes, Your Honor, but the fact is I want a

**DIAZ - CROSS / SPIRO**

1   record of it.  I didn't realize, up until this point in time,

2   that they were comparing an exhibit that had not been admitted

3   in the prior trial to an exhibit in this case.

4           **THE COURT:**  Fine.  You can make that at another time.

5   Now, is there a problem with the question -- the pending

6   question?

7           **MR. ORGAN:**  No, Your Honor.  I just did not want to

8   waive the objection.  That's all.

9           **THE COURT:**  Yeah.

10      (Proceedings were heard in the presence of the jury:)

11          **THE COURT:**  Mr. Spiro.

12  **BY MR. SPIRO:**

13  **Q.**   Yes.  So as I was saying, you testified this is the job I

14  got after Tesla; right?  That was your sworn testimony in front

15  of this jury; right?

16  **A.**   And my -- I said it.  I wasn't asked by you what job I may

17  have had in between, but that's what I said, sir.

18  **Q.**   Well, do you think by telling this jury that the job you

19  got after Tesla was to work at AC Transit, a bus company, so

20  you could close the door and be away from people and just

21  drive?  Do you think that that was misleading to say to this

22  jury?

23  **A.**   No, because the job I had before Tesla was the same type

24  of job.  I was a bus driver.  I believe it could have been MV

25  Transportation.  So I was doing the same thing.  I got into the

1  transportation field, sir.  The job I have now, I improved.  It

2  is a better job.  That's what I do now.  I just close the

3  doors, just me and road.

4  **Q.**   Right.  Better pay, better job than Tesla; right?

5  **A.**   I'm going to say I -- I'll have less -- less interactions

6  with my co-workers because I can pick up the bus on the street,

7  get inside the bus, close the door, and it's just me and the

8  road, sir.

9  **Q.**   Better pay, sir?

10  **A.**   Yes, I am making more money than I was at Tesla.

11  **Q.**   Okay.  And when you first filed in this case and you had

12  to provide information, you requested $4,000 a month, which is

13  what you made at Tesla, and you requested several months pay

14  because you said you were out of work; correct?

15          **MR. ORGAN:**  Objection, Your Honor.  Relevance.

16          **THE COURT:**  Sustained.  What -- sustained.

17          **MR. SPIRO:**  Can I show the interrogatory responses,

18  Your Honor?

19          **THE COURT:**  You can show the interrogatory responses.

20  **BY MR. SPIRO:**

21  **Q.**   Is it true that in response to an interrogatory, that you

22  indicated that you were out of work for three months and, thus,

23  lost $12,000 in pay?

24          **MR. ORGAN:**  Your Honor, I move to strike.  It's

25  irrelevant.

 1          **MR. SPIRO:**  It's not irrelevant, Your Honor.

 2          **THE COURT:**  Bring the interrogatory responses up.

 3          **MR. SPIRO:**  While the Court is looking at that, I'm

 4    going to ask a different question.  Is that -- should I

 5    continue?

 6          **THE COURT:**  This case is about emotional distress

 7    damages.  It is not about anything else for compensatory

 8    damages, just to remind you.

 9          **MR. SPIRO:**  I understand, sir.  It's a credibility --

10    it's cross-examination and credibility.

11          **THE COURT:**  You know, I don't want your explanation,

12    actually, right now, Mr. Spiro.

13          **MR. SPIRO:**  Okay.

14                    (Pause in proceedings.)

15          **MR. ORGAN:**  I move to strike, Your Honor.

16          **THE COURT:**  I'm going to look at this.  Where -- what

17    were you referring to, Mr. Spiro?

18          **MR. SPIRO:**  Response to Interrogatory Number 13.

19          **MR. ORGAN:**  Which set?

20          **MR. SPIRO:**  It's the October -- for the record,

21    October 9, 2019.  October 9, 2019.

22          **MR. ORGAN:**  Which set of discovery?

23          **MR. SPIRO:**  NextSource.

24          **THE COURT:**  This is relating to --

25          **MR. ORGAN:**  I will move under 403, too, Your Honor.

1    **THE COURT:**  -- emotional distress.  So, yeah, I'm

2    going to preclude this.  It's related to -- it's not related to

3    emotional distress.

4         **MR. SPIRO:**  Okay.

5    BY MR. SPIRO:

6    **Q.**   Well, you would agree, sir, just to sort of finish this

7    topic, that you actually did work for Coca-Cola in the Ben --

8    Benecia bottling facility from May to September of 2016; true?

9    **A.**   I can remember working for Coca-Cola at some point in

10   time, but I -- I don't know when the time was.  Like I said,

11   again, sir, I was living paycheck to paycheck.  I have to --

12        **THE COURT:**  I think you have answered the question.

13   BY MR. SPIRO:

14   **Q.**   You worked at -- it is a simple question.  You worked at

15   Coca-Cola prior to working at AC Transit; correct?

16   **A.**   I haven't had a job since working for AC Transit.  So

17   anything that was prior, because I -- after AC Transit, I

18   haven't picked up any new jobs after that I'm working here.

19   **Q.**   And, in fact, AC Transit is the -- is the longest held job

20   you have had in your lifetime, correct?

21        **MR. ORGAN:**  Objection.  Relevance.

22        **THE COURT:**  No.  Overruled.

23   BY MR. SPIRO:

24   **Q.**   Right, it has been a long, steady job for you for many,

25   many years; correct?

DIAZ - CROSS / SPIRO

1  **A.**   Technically, no, because for many years, I owned my own

2  business.  And after my wife had got sick, I needed medical

3  benefits because I couldn't pay them.  And so in order for me

4  to help cover my wife's medical expenses, I had to take on a

5  paying job.  So -- like I said, again, I went -- I'm paycheck

6  to paycheck, sir.

7           **MR. SPIRO:**  I'm going to move to strike.  It's not

8  responsive.

9           **THE COURT:**  It was directly responsive.

10 **BY MR. SPIRO:**

11 **Q.**   Okay.  So, the -- it is true that the longest job you have

12 ever held in your lifetime working for somebody else, not

13 self-employed, has been this last many years at AC Transit;

14 true?

15          **MR. ORGAN:**  Objection.  Asked and answered.

16          **THE COURT:**  No.  Overruled.  You can answer.

17          **THE WITNESS:**  The longest I have worked for someone

18 besides myself, yes, it has been AC Transit.  I have been at AC

19 Transit for almost seven years now.

20 **BY MR. SPIRO:**

21 **Q.**   Okay.  And, again, it is another sensitive topic, but I

22 have to ask you.  You testified that one of the things that you

23 noticed about yourself was that you and your wife were having

24 intimacy problems.  Isn't it true that that wasn't until 2016?

25 Isn't that a fact?

1    **A.**   I can't remember exactly.  It started before that, but all

2    I can say is I had intimacy problems with my wife.  It stemmed

3    from Tesla.  It stemmed from what I was going through with my

4    son at the same time, where I couldn't provide that protection

5    for him.  That is the only kid that me and my wife share?

6         So, you know, I'm sorry, sir.  You know, I hate to bring

7    this back up, but we are putting my -- my intimacy with my wife

8    and all that on display for the world right now.  I'm sorry.

9    **Q.**   But, sir, in fairness, you know, you -- you're claiming

10   and asking this jury for money based on certain things that you

11   have reported to this jury.  So you understand that part of

12   that process, I have to ask you questions.  So I'm going to ask

13   the same question, which is --

14        **MR. ORGAN:**  Objection.  Argumentative.

15        **THE COURT:**  Overruled.

16   **BY MR. SPIRO:**

17   **Q.**   Isn't it true that those difficulties did not start until

18   2016; correct?

19   **A.**   I'm going to say they started right after my son was being

20   called the N-word.  It started then, sir.

21   **Q.**   Okay.

22        **MR. SPIRO:**  I would like to -- Volume III, page 400.

23        **THE COURT:**  Volume III of the deposition or the trial

24   testimony?

25        **MR. SPIRO:**  Yep.

DIAZ - CROSS / SPIRO

```
 1              THE COURT:  Page what?
 2              MR. SPIRO:  400, line 16 to 18.
 3                      (Pause in proceedings.)
 4              THE WITNESS:  I don't have Volume 4 here.  I only
 5     have -- maybe it might be on this one here.
 6              THE COURT:  Sixteen to 23?
 7              MR. SPIRO:  Yeah.  Just line 16 to 18, Your Honor.
 8              THE COURT:  No.  If you are going to do it, do it
 9     through 23.
10              MR. SPIRO:  Do it through 23 -- unfortunately, I don't
11     have that copy either.  Can somebody --
12              THE COURT:  Here.
13              MR. SPIRO:  My folks can.  I don't want to take
14     Your Honor's.
15     BY MR. SPIRO:
16     Q.   It's a fact, sir, that your wife has previously stated
17     that it was in '16 that you had sexual difficulties with her;
18     correct?
19     A.   I don't -- I don't know what my wife stated, sir.  I
20     just -- you know, that was her deposition -- hers and that's
21     what -- I don't know.
22     Q.   Um, okay.  After you left Tesla, there was about a year
23     and a half before you filed a lawsuit.  Is that approximately
24     right?
25     A.   I can't give you exact date, but it was sometime after I
```

1    left Tesla, yes.

2    Q.   And you have hired lawyers before in your life for auto

3    accidents, workers' comp, other things; right?

4              MR. ORGAN:   Objection.   Relevance.

5              THE COURT:   What's the relevance of that?

6              MR. SPIRO:   That he didn't seek out a lawyer when he

7    left Tesla for a year and a half.   That's one question.

8              THE COURT:   Sustained.

9              MR. SPIRO:   Okay.

10   BY MR. SPIRO:

11   Q.   You -- may I ask -- well, when you filed your lawsuit, you

12   and your son spoke to the press; correct?

13   A.   I believe I answered that question, sir.

14   Q.   Is that a "yes"?

15             THE COURT:   You need to answer it again.

16             THE WITNESS:   Yes, yes.

17   BY MR. SPIRO:

18   Q.   Okay.   And, you know, in your lawsuit and in, I think,

19   what you told the jury today, you know, the thought of even

20   bringing this up is very painful to you.   But when you filed

21   your lawsuit, you went on TV, you went to the media, you spoke

22   to reporters, over and over again; true?

23   A.   Yes, I did.   And I do believe, if you look at one of the

24   interviews, when the lady asked me what was happening, I was

25   pretty emotional.

DIAZ - CROSS / SPIRO

1   Q.   And you -- you were speaking to your sister, Sharon

2   Settle, right, at this time?

3   A.   It's Wiggins now, sir.  She is no longer married.

4   Q.   I apologize.  You were speaking to her at this time?

5   A.   Yes.  I did speak to my sister.

6   Q.   And your best friend Maurice Campbell?

7   A.   Yes.  That is my friend.

8   Q.   You told him you were excited to meet Katie Couric, the

9   reporter?

10  A.   Whatever reporter.  I could have got her name wrong, but

11  it was whatever the reporter was for that station.  I was

12  pretty excited, yes.

13  Q.   Yeah.  And you were updating them on when your -- you

14  know, when your different press articles were coming out.

15  You'd tell Maurice Campbell, "Hey, the article is coming out on

16  so and so date"; right?

17  A.   I didn't update him like you're saying, but when I talked

18  to the reporter, yes, I did tell him that they were going to

19  release the segment.

20  Q.   Right.  And there was some testimony earlier in this case,

21  I think, you know, that you don't want to use certain words or

22  in e-mails or something like that.  When you were on TV, you

23  said the N-word out loud on TV; right?  They had to bleep it

24  out; correct?

25  A.   Yes, I did, sir.  I did say it.

1   Q.   And you know, you sent -- you know, I don't want to go

2   through Mr. Wheeler's testimony right now, but you sent the

3   text message:  "Hey, if you're interested in jumping on this

4   class action lawsuit or the lawsuit, there's another attorney

5   going around, and his name is Lawrence A. Organ from California

6   Civil Rights Group."

7        You sent that text message; right?

8   A.   I don't believe I sent that text message.  I think you're

9   mischaracterizing because this is not a class action lawsuit.

10  This is an individual lawsuit, sir.

11  Q.   Well, you were trying to get other people to sue; right?

12  A.   I'm the only one sitting here, sir.

13  Q.   Okay.  Did Dr. Reading that you met with -- that was about

14  three or so years later; right?

15  A.   Um, I met with a Dr. Reading, yes, I did.

16  Q.   Okay.  And did you -- were you just as honest with him as

17  you were with this jury?

18  A.   I told Mr. Redding what he asked me, the questions that he

19  asked me.  I gave him an honest answer.  Otherwise, he couldn't

20  assess me.  So I definitely told Mr. Redding what he asked.

21  Q.   And you say you're here for accountability.  Is that what

22  you said on your direct examination?  You want accountability?

23  A.   I take accountability for the things I do, sir.  All I can

24  say is, is I just wish Tesla would take accountability for what

25  they did instead of bringing in high-priced lawyers to try to

**DIAZ - CROSS / SPIRO**

1  prove me a liar and everybody else was there and just take

2  accountability.

3  **Q.**   Yeah.   I mean, thought I said it in opening statement, but

4  the drawing was wrong.   Should never have happened, and I know

5  you were upset, and I'm sorry.   But --

6  **A.**   You did say in opening statement, and I appreciate that,

7  but you are -- I got a contractual obligation, sir.

8  **Q.**   Okay.   Well, I'm telling you I'm sorry, but we'll move on?

9          **THE COURT:**   Let's move on.

10 **BY MR. SPIRO:**

11 **Q.**   Yeah.   So in seeking accountability, is that one of the

12 reasons -- well, let me ask you this:   Did you ever go back to

13 the Tesla website and see what changes they have made and how

14 they've moved forward?   Have you ever done that?   You yourself?

15         **MR. ORGAN:**   Objection, Your Honor.   I move to strike.

16         **THE COURT:**   Sustained and struck.

17 **BY MR. SPIRO:**

18 **Q.**   Well, when you were asking for -- when your lawyer was

19 asking you those questions, like you know, this happened.   Can

20 you give me three words that best describe that in your -- you

21 know, in your feelings, do you remember those questions?

22 **A.**   Yes, I do.

23 **Q.**   Okay.   You know, you -- that wasn't -- you weren't

24 surprised by those questions.   You rehearsed those questions;

25 right?

 1          MR. ORGAN:  Objection.

 2          THE COURT:  Had you ever heard those questions before?

 3          THE WITNESS:  No, sir.  I didn't rehearse any

 4  questions.  Did my attorneys prep me?  I can say I met with my

 5  attorneys a few times.  We definitely went over the exhibits.

 6  They wanted me to refresh my mind on the exhibits.

 7      But as of my attorneys trying to put some words in my

 8  mouth, you and I both know that's illegal, sir.  They would be

 9  disbarred.

10  BY MR. SPIRO:

11  Q.   Well, no.  That wasn't my question.  His Honor's question

12  was just simply:  "Did they tell you that those would be some

13  of the questions that you would be asked?  Did they tell you

14  they were going to ask those questions?"

15          THE COURT:  That question has now been asked and

16  answered, Mr. Spiro.

17          MR. SPIRO:  Okay.

18      BY MR. SPIRO:

19  Q.   And you -- you originally were looking at the

20  interrogatories.  You know, you say you want accountability.

21  You settled your claims with nextSource and Citistaff; correct?

22          MR. ORGAN:  Objection, Your Honor.

23          THE COURT:  Sustained.  Struck.  Mr. Spiro --

24          MR. ORGAN:  I move for sanctions, Your Honor.

25          THE COURT:  Mr. Spiro, don't do that.

DIAZ - CROSS / SPIRO

1   BY MR. SPIRO:

2   Q.   Well, let me ask this question then:  I think I heard your

3   lawyer asking you if you wanted money to fish and retire.

4        Did you hear those questions?

5   A.   What my attorney asked is what would I do.

6   Q.   Well, I -- did I -- if you think I misheard -- you don't

7   recall getting asked questions?  You know, do you want money to

8   fish and retire?  You don't recall those questions?

9   A.   That's mischaracterizing what my attorneys said, sir.

10  What my attorneys said was, is what would you do?

11  Q.   Okay.  Well, how much money do you -- do you want to do

12  that?

13              MR. ORGAN:  Objection, Your Honor.

14              THE COURT:  Sustained.

15  BY MR. SPIRO:

16  Q.   Well, how about this:  All you are asking for here is to

17  get whatever amount you fairly deserve; is that fair?  You

18  don't want to get more or less than somebody else.  You want

19  what's fair?

20  A.   Do you really want to hear what I want, or are you going

21  to stop me?

22              THE COURT:  Can you answer that -- can you answer that

23  question?

24  BY MR. SPIRO:

25  Q.   I'll say the question again.  I simply asked a question.

1    I think it's a yes-or-no question which is:  Do you want what's

2    fair to happen?  Do you know want whatever is fair to this jury

3    to happen?

4    **A.**   I want the jury to see what happened, to make sure it's

5    not going to continue to happen to the countless African

6    Americans that are still inside the factory.  And it's like

7    that that's the only way that Tesla will listen is it has to be

8    something monetary attached to it.

9        So Tesla's -- they're continuing to -- I'm going to say

10   it.  So as far as I'm concerned --

11          **MR. SPIRO:**  Objection.

12          **THE COURT:**  It's -- it's a --

13       **BY MR. SPIRO:**

14   **Q.**   I Was just asking if you wanted what was fair.  That's all

15   I asked.  Do you want what's fair?

16   **A.**   All I can say is, the jury has to decide what's fair and

17   also what should be the penalties of stopping Tesla from

18   continuing the behavior that they are doing.

19          **MR. SPIRO:**  Okay.  I have nothing further at this

20   time.  Thank you.

21          **THE COURT:**  You don't want to read the testimony?

22          **MR. SPIRO:**  Oh, I can go back if you want.

23          **THE COURT:**  I think you ought to put that in because I

24   think that's clarifying.

25          **MR. SPIRO:**  Sorry.  I lost it, perhaps.

DIAZ - CROSS / SPIRO

```
 1              THE COURT:  It's page 400.

 2              THE WITNESS:  What book is it in, sir?

 3              THE COURT:  It's in Deposition Volume III.

 4              MR. SPIRO:  If Your Honor can just remind me the page,

 5   I apologize, because it's not --

 6              THE COURT:  Okay.  It was page 400, line 16.  And

 7   instead of stopping where you wanted to stop, go down to 23

 8   just so that's it's clear.

 9   BY MR. SPIRO:

10   Q.   Okay.  "QUESTION:  When was -- when did you begin

11   suffering from sexual difficulties?

12        "About, say, like 2016.

13        "Do you recall what month in 2016?

14        "No.  I do not recall the exact month.

15        "Was it before or after you stopped working at the Tesla

16   factory?

17        "During.

18        "Was it before or after your mother passed?

19        "Before."

20              THE COURT:  Okay.  That's where I wanted you to go.

21   BY MR. SPIRO:

22   Q.   And then just one quick follow-up question on this.

23        Before you ever worked at Tesla, there were times where

24   you and your wife were separated; correct?

25              MR. ORGAN:  Objection, Your Honor.  Beyond the scope.
```

1           THE COURT:  Beyond -- well, and it's also --

2    sustained.

3           MR. ORGAN:  403, Your Honor.

4           MR. SPIRO:  Okay.

5      Thank you.  Nothing further.

6                  **REDIRECT EXAMINATION**

7    BY MR. ORGAN:

8    **Q.**   I don't think you got to answer this.  Were you interested

9    in helping other Black men get justice?

10   **A.**   Yes, sir.

11   **Q.**   And now, Mr. Spiro, he played a lot of parts of your

12   deposition, like, pages around 116, later in the deposition.

13          MR. ORGAN:  Your Honor, I'd like to -- as a prior

14   consistent statement, I'd like to play page 65:13 to 19.

15          THE COURT:  This is a first deposition?

16          MR. ORGAN:  This is the first deposition.  First day

17   of deposition that Mr. Diaz gave, 60 pages before the second

18   that Mr. Spiro played.

19          MR. SPIRO:  This is --

20          THE COURT:  Hang on just a second.

21          MR. SPIRO:  Sure.

22                  (Pause in proceedings.)

23          THE COURT:  All right.

24          MR. SPIRO:  Your Honor, I'd object.  This is not

25   proper under 801(d)(1)(B), which is prior consistent statement

 1   rule.  There was no suggestion otherwise.  It is improper.

 2          THE COURT:  Yeah.  I'm going to overrule that

 3   objection.  We've been playing cat and mouse with a lot of

 4   pieces of the testimony by both sides over time.  This is --

 5   you may proceed.

 6          MR. ORGAN:  I think we have it queued up, Your Honor.

 7              (Video was played but not reported.)

 8          MR. ORGAN:  And, Your Honor, just so the record's

 9   clear, that's from page 65:13 to 19.

10   BY MR. ORGAN:

11   Q.   Okay.  Mr. Diaz, are you a little nervous today?

12   A.   Yes, sir.  I'm here, you know, putting my whole --

13   basically putting -- may not say my whole life, but pretty

14   intimate parts of my life out here for the world to hear and

15   see.

16   Q.   And you have been a bit combative with Mr. Spiro?

17          MR. SPIRO:  Objection.

18   BY MR. ORGAN:

19   Q.   Can you explain why?

20   A.   We had people that came up here and said the same thing

21   I'm saying.  And for some reason, Mr. Spiro just doesn't want

22   to believe it.  You know, but like I said, I have no ill

23   words -- ill will towards Mr. Spiro.  I know he's under a

24   contractual obligation.

25          THE COURT:  All right.  So I'm going to strike the

 1  question and the answer.  This case is not about the lawyers,

 2  ladies and gentlemen.  This case is about Mr. Diaz and the

 3  injuries that he suffered.

 4      That's what going to be determined, and you have heard a

 5  lot from both sides that -- from the lawyers' tables, but what

 6  matters is what you're hearing from the witness tables and from

 7  the exhibits that you're receiving.

 8      Now, let's go to the case.

 9          MR. ORGAN:  I just have a few more questions,

10  Your Honor.

11          THE COURT:  Okay.

12  BY MR. ORGAN:

13  Q.  About the case.

14      Prior to the elevator incident with Ramon Martinez, had he

15  called you the N-word prior to that?

16  A.  Yes, sir.  Yes.

17  Q.  And how was the elevator incident different in terms of

18  his use of the N-word?  Was there something different about

19  that incident than the times that he had been using the N-word

20  before that?

21  A.  We were in an enclosed space with -- with equipment.  This

22  guy had his fists balled up.  He was threatening to do me

23  physical violence when before he hadn't did that.

24  Q.  Is it fair to say that his physical presence, his fists

25  and all that, were actually more on your mind at that time that

1   you wrote that?

2   **A.**   Yes, it was, sir.

3   **Q.**   The person who interviewed you about the jigaboo

4   incident --

5   **A.**   Yes.

6   **Q.**   You saw that Exhibit 287?

7   **A.**   Yes.  I remember it, sir.

8          **MR. ORGAN:**  If you can pull that up, please, Sabrina.

9                    (Pause in proceedings.)

10          **MR. ORGAN:**  If you go to the first page of the

11   exhibit.

12                    (Pause in proceedings.)

13          **MR. ORGAN:**  Sorry.  Go to the second.

14   **BY MR. ORGAN:**

15   **Q.**   This Jackie Delgado, the vice president of Human

16   Resources, is she the person who interviewed you?

17   **A.**   I -- the person that interviewed me could have told me

18   their name, but I honestly don't remember.

19   **Q.**   Do you remember whether she was from Chartwell, the

20   contractor, and not Tesla HR, as Tesla has now suggested?

21          **MR. SPIRO:**  Yeah, I misspoke, Your Honor.  I

22   apologize.

23          **THE COURT:**  That's fine.  There is -- ladies and

24   gentlemen, you will get an instruction with the final

25   instructions that explains that there are these different

 1  staffing agencies with respect to liability.  It all rises up

 2  to Tesla, but there are these different entities.

 3  **BY MR. ORGAN:**

 4  **Q.**   Is your memory perfect about every incident?

 5  **A.**   Nobody's memory is perfect, sir.

 6  **Q.**   Is it fair to say, though, that certain things you do

 7  remember well in terms of what conduct happened to you?

 8  **A.**   Certain things, yes, they are pretty vivid in my mind.

 9  I'm the kind of person that, especially when I'm stressed, I

10  replay stuff over and over and over again.

11  **Q.**   And does that -- playing it over and over and over in your

12  mind, does that stress you out in any way?

13          **MR. SPIRO:**  Objection.  It's --

14          **THE COURT:**  It's leading.

15          **MR. SPIRO:**  It's leading.

16          **THE COURT:**  Sustained.

17  **BY MR. ORGAN:**

18  **Q.**   How does it impact you having to play these events over

19  and over and over in your mind?

20  **A.**   Right now I just want to run and go out.

21          **MR. ORGAN:**  Okay.  Thank you.  No more questions,

22  Your Honor.

23          **THE COURT:**  All right.

24          **MR. SPIRO:**  Nothing, Your Honor.  Thank you.

25          **THE COURT:**  All right.  Mr. Diaz, thank you.  You are

 1    excused.

 2                THE WITNESS:  Thank you, sir.

 3                THE COURT:  Who is the next witness?

 4                MR. ORGAN:  Your Honor, we would play the Demetric

 5    Di-Az video, Your Honor, the one that is already agreed to.

 6                THE COURT:  Okay.  All right.

 7                MR. ORGAN:  It includes clips from both sides.

 8                MR. COLLIER:  Your Honor, just to clarify, we are

 9    reserving on that one aspect we discussed earlier.

10                THE COURT:  All right.

11          Ladies and gentlemen, this will apparently be the

12    testimony of Demetric Di-Az.  Again, it was taken in a

13    deposition.  He was under oath.  You should consider the

14    questions and answers the same as if he was here testifying.

15                MR. ORGAN:  Your Honor, this was a deposition taken by

16    Tesla, not by the Plaintiff.

17                THE COURT:  Fine.

18                MR. SPIRO:  What was the statement?

19                THE COURT:  This is the testimony that is before the

20    Court.  And, again, whether it was taken by somebody in the

21    audience or one of the parties, makes no difference.  It is

22    taken under oath, and you should consider that testimony just

23    as if it was happening here in court.  Please go ahead.

24                (Video was played but not reported.)

25                MR. ORGAN:  That's it, Your Honor.

DIAZ - REDIRECT / ORGAN

```
 1              MR. COLLIER:  Your Honor, Plaintiff calls Dr. Anthony

 2    Reading.

 3              THE COURT:  Okay.

 4                          (Pause in proceedings.)

 5              THE COURT:  Come on up, Dr. Reading.

 6              THE WITNESS:  Thank you, Your Honor.  Thank you very

 7    much.

 8              THE CLERK:  Step up and remain standing for me, sir.

 9                          (Pause in proceedings.)

10         THE WITNESS:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12              THE CLERK:  You are welcome to remove your mask if you

13    have been vaccinated.

14         THE WITNESS:  I have four times.

15         THE CLERK:  Me too.  I'm going to take your photo, and

16    then I will swear you in.  Raise your right hand.

17                        DR. ANTHONY READING,

18    called as a witness for the Plaintiff, having been duly sworn,

19    testified as follows:

20         THE CLERK:  Thank you, sir.  Please be seated.  You

21    can be seated.

22         THE WITNESS:  Can I?

23         THE CLERK:  Yes.  And let me move this over to you.

24    If you would begin by stating your full name and spelling it

25    for the court reporter.
```

1              **THE WITNESS:**  Anthony, A-N-T-H-O-N-Y, Edward,

2      E-D-W-A-R-D, Reading, R-E-A-D-I-N-G.

3                      <u>**DIRECT EXAMINATION**</u>

4      BY MR. COLLIER:

5      **Q.**   Good morning, Dr. Reading.

6      **A.**   Good morning, sir.

7      **Q.**   Could you tell the jury what your occupation is?

8      **A.**   I can.  I am a licensed psychologist.

9      **Q.**   And how long have you been licensed in California?

10     **A.**   Since 1982, when I came here from England.

11     **Q.**   And did you receive your clinical training in England?

12     **A.**   Yes, I did.

13     **Q.**   Did you need to be retrained to get your license here in

14     California?

15     **A.**   No, I didn't.  Actually, when I came, I was granted a

16     waiver of the licensing exam, which was quite nice, owing to

17     the work I performed in England.  So no retraining.

18     **Q.**   And so can you talk to us a little bit about your

19     educational and professional background?

20     **A.**   Yes.  So I received a degree in psychology from a

21     university in South Wales.  And then I went to the Institute of

22     Psychiatry, which is one of the University of London's

23     post-graduate training institutes to receive my clinical

24     training which, in England, is a master of philosophy degree.

25          And having completed that, I went across the road to

1  King's College Hospital, which is part of the National Health

2  Service.  And I worked at King's as a clinical psychologist

3  providing care in the health service, National Health Service,

4  until 1981 for seven years.  I also received a Ph.D. while

5  there from the University of London and a faculty appointment.

6       And then in 1981, I was recruited to join the full-time

7  faculty at UCLA School of Medicine in the Department of

8  Psychiatry.  And I remained on the full-time faculty.  I was an

9  assistant professor, and then promoted to an associate

10  professor.  And I remained on the full-time faculty until 1990,

11  and I then became part of the clinical voluntary faculty and

12  was promoted while there to an associate professor.  And I

13  remained a full professor on the clinical or voluntary faculty

14  in the School of Medicine at UCLA.

15  **Q.**   While you were at UCLA, did you do any work related

16  specifically to stress at work?

17  **A.**   Yes.  So I -- while there, I was an associate director of

18  a senator funded by Mark Taper, whose mission was to look at

19  factors in the workplace that impact mental and physical

20  health.  I was instrumental in obtaining an award or grant from

21  the Carter Foundation, where we joined five other medical

22  schools, one in Sweden and four others in the United States,

23  whose mission was to look at stress.  And I conducted research

24  looking at factors in the workplace that impacted physical and

25  mental health, particularly looking at control, perception of

1  control in the workplace, and how that can enhance or reduce

2  stress.

3  **Q.**   Have you published any research?

4  **A.**   Well, for the first 20 years of my career, I was very

5  active in research, and I was fortunate enough to be funded by

6  the -- in England by the World Health Organization and the

7  Medical Research Council, and then in the United States by the

8  National institutes of Health, the American Cancer Society, the

9  Crook Foundation, who funded a program that still exists on

10  psychoneuroimmunology, which looks at the interface between

11  physical health in terms of immune function and stress or

12  psychological processes, and also the MacArthur Foundation,

13  which funded the research on workplace stress.

14  **Q.**   I noted from your CV that you have published 77 research

15  papers, 32 chapters in books, and 27 scientific abstracts; is

16  that correct?

17  **A.**   Yes, and that's a product of the research I ran when I was

18  earlier in my career.

19  **Q.**   And do you also have a clinical practice?

20  **A.**   Yes, I do.

21  **Q.**   Could you tell us about that?

22  **A.**   Well, I have had a very large clinical practice most of my

23  career until a few years ago, three or four years ago.  So over

24  half of my time was spent seeing patients, treating them

25  largely for depression, anxiety, panic, working in concert with

1    physicians, so referred by their physicians and working as a --

2    as a cognitive behavioral psychotherapist dealing with clinical

3    problems.

4    **Q.**    Okay.  And have you previously testified as an expert in

5    court?

6    **A.**    I have.

7    **Q.**    Approximately how many times?

8    **A.**    Well, over 300 times since 1989 when I first was asked to

9    testify.

10   **Q.**    Approximately, what percentage of that is for the

11   plaintiff?

12   **A.**    Well, retained by plaintiff counsel used to be about

13   70 percent of the time, 70, 75 percent of the time.  Then with

14   the pandemic, it changed.  After not doing anything for a

15   little while, it rose to about 90 percent.  And then last year,

16   it swung back to about 50 percent.  So it is time specific.

17   **Q.**    Either way, you have testified on both sides of the aisle;

18   correct?

19   **A.**    Yes.

20   **Q.**    For the plaintiff's counsel, in this particular case, it

21   is not your first time testifying for us either, is it?

22   **A.**    No.  For you, I mean, I don't know who you are; but for

23   Mr. Alexander, I know.

24   **Q.**    Fair enough.

25       And approximately how many times have you testified for

1    the Plaintiff's counsel in this case?

2    **A.**    Well, Mr. Alexander, I have been involved with him in the

3    last 25 years about 15, 20 times, something like that.

4    **Q.**    And how much are you charging for your time in this case?

5    **A.**    Well, today -- standard is half a day.  That comes out of

6    a thousand dollars an hour, 4,000.  So far, I think, sometime

7    ago, I billed about $13,000.

8    **Q.**    Right.  And did you have occasion to conduct a

9    psychological evaluation on Mr. Diaz?

10   **A.**    Yes, I did, sir.

11           **MR. COLLIER:**  At this time, Your Honor, I would like

12   to tender Dr. Reading as an expert in the field of psychology

13   and particularly workplace stress.

14           **MR. SPIRO:**  No objection to psychology.  I don't know

15   what that means, "workplace stress."  So if it's psychology, no

16   objection.

17           **THE COURT:**  Well, you might learn about it.

18           **MR. SPIRO:**  Thank you.

19           **THE COURT:**  You may proceed.

20           **MR. COLLIER:**  Thank you, Your Honor.  May we display

21   the slide show?

22       We will just go ahead to slide 2, please.

23                    (Pause in proceedings.)

24   **BY MR. COLLIER:**

25   **Q.**   And so have you formed any opinions in this matter,

1    Dr. Reading?

2    **A.**   I have.

3    **Q.**   Could you tell the topics that we will cover today?

4    **A.**   Well, they are shown here.  So I examined the

5    psychological processes that seem to be relevant in the

6    workplace of Mr. Diaz.  And then that led me to consider

7    whether there was evidence that would support the development

8    of a psychiatric illness and, if so, to drill down on the

9    nature of that.  And then, lastly, in the event there was a

10   psychiatric illness, to speak to considerations of treatment

11   and prognosis, which means how Mr. Diaz would be affected going

12   forward.

13   **Q.**   Thank you.

14         **MR. COLLIER:**  And let's go ahead and advance to the

15   next slide.  And, Sabrina, there is some animations.  Just go

16   ahead and click through those so we get the full slide.

17   **BY MR. COLLIER**

18   **Q.**   All right.  And could you tell us what you did to conduct

19   your evaluation in this case?

20   **A.**   Well, in this case, there were three categories.  These

21   are the data that I accrued and relied upon in order to develop

22   opinions.  Usually, I would also review records, but no records

23   were available.  So I relied upon my interview, which is an

24   extended face-to-face interview in which I reviewed with

25   Mr. Diaz in October 2019, which was sometime ago, his history

1  in terms of his family history, social history, educational

2  history, occupational history, marital history, and reviewed

3  with him the issues in this litigation.

4      I observed his affect, his emotions, during the interview.

5  And lastly, I administered three standard psychological tests

6  which are shown here.  The first two the MMPI-2-RF and the PAI

7  are broad-based tests.  Those tests assess an individual across

8  a range of psychological dimensions?

9      And the last, the TSI2 is a more specific test which

10  addresses symptoms distinctive to trauma or threat.  And

11  psychological testing has two main objectives:  The first

12  enables me to quantify distress should it exist, and the second

13  enables me to look at the pattern of responding which may raise

14  concerns about motivational factors.

15      And motivation in this context could pertain to someone

16  having a motivation to report more symptoms than they may

17  actually have for purposes of their defense.  So those are the

18  three categories of data that I accrued.

19  **Q.**  And let's start with your first opinion regarding his

20  alleged work experience.

21      What did you find in that regard?  This is the next slide,

22  by the way.

23                  (Pause in proceedings.)

24      **MR. SPIRO:**  I'm going to object to this.  This isn't a

25  psychological assessment.  This is him testifying to things he

1   has no personal knowledge of.

2           **THE COURT:**  Overruled.

3           **THE WITNESS:**  Thank you, Your Honor.  So I found

4   according to the extent Mr. Diaz's report comported with what

5   actually happened, he was claiming in the workplace after he

6   started work he was exposed to comments, racial comments with

7   respect to being called the N-word, being referred to as boy,

8   being told he should return to Africa, threats where he felt

9   his physical integrity was threatened.

10          He reported there were -- it was a cartoon drawn.  There

11  were feces smeared on the cart that he used.  So he reported

12  pervasive experience of what he considered to be targeted

13  racial conduct on the part of supervisors and co-workers.

14  **BY MR. COLLIER:**

15  **Q.**  Could you tell the jury what the significance is of the

16  fact that the abuse is taking place in the workplace?

17  **A.**  Well, there are a number of considerations owing to the

18  fact it was in the workplace.  The first would be the

19  protracted duration of exposure.

20          So we work for several hours, and so the exposure is much

21  greater and that also is accompanied by uncertainty.  We don't

22  know when these events are going to occur.

23          The second experience in the workplace is about the lack

24  of control.  We are relying upon our employer or other people

25  to control our environment.  If this happened in our personal

 1    life, we could remove ourselves from the -- from the person

 2    that was engaging in this conduct.  We don't have that control,

 3    the luxury of control, in the workplace so we rely on others.

 4         The third would be, if this conduct is engaged in by

 5    supervisors, then that also involves some jeopardy with respect

 6    to being able to complain.  And the last in the workplace is

 7    these kinds of comments, if they existed, remove a person's

 8    identity.

 9         And so that raises concerns about escalation of conduct to

10    include physical, acts of physical violence.  So there are a

11    number of considerations that pertain to the workplace in the

12    event this sort of conduct occurs.

13    **Q.**   So we already addressed some of the harassment that was

14    directed at Mr. Diaz himself.  Did you also discuss --

15                   (Pause in the proceedings.)

16    **BY MR. COLLIER:**

17    **Q.**   Did you also discuss with him any other adverse

18    experiences that affected him emotionally?

19    **A.**   I did, actually.  He told me about -- in the event on

20    occasion his son was working at Tesla.  He was pleased to be

21    able to have his son work there, and he told me that one day he

22    went to provide his son with his lunch, and while in the same

23    room with his son and his son's supervisor, the son used the

24    N-word and prefaced it with the F-word.

25         And at that moment they exchanged glances or established

1    eye contact, and he felt at that moment he lost his son owing

2    to his inability to act and protect his son.  His son saw him

3    as impotent in that context.  And he felt that was a change

4    that was irretrievable in terms of his relationship with his

5    son who lost his job shortly thereafter?

6         And he saw his son's trajectory changing, and the respect

7    he felt his son had for him evaporating arising from that

8    encounter which was pivotal in terms of Mr. Diaz's perception.

9    Q.   I just want to clarify.  I think you misspoke.  You meant

10   the supervisor called the son the N-word, not the other way

11   around.

12          MR. SPIRO:   Objection.  It's leading the witness.

13          THE COURT:   Overruled.

14          THE WITNESS:   Thank you, Your Honor.

15   BY MR. COLLIER:

16   Q.   I just want to clarify.  I think you misspoke.  You said

17   the son used the N-word.  You meant the other way around;

18   right?  The supervisor?

19   A.   Yes.  The supervisor.  Yes.

20          THE COURT:   Overruled.

21          MR. COLLIER:   Let's move to Slide 5, please.

22   BY MR. COLLIER:

23   Q.   And so would you explain to the jury what these

24   psychiatric illness requirements are?

25   A.   Well, so Mr. -- Mr. Diaz is describing an experience at

1   work, and in order to establish whether that experience

2   qualifies for psychiatric illness, we're looking at a

3   confluence of three factors and they are shown in this slide.

4       The first would be some change in his emotion or function.

5   So --

6   Q.   I'm sorry.

7   A.   Sorry.

8   Q.   I'm sorry.  Before we finish that, I accidentally skipped

9   a slide.

10          MR. COLLIER:  Can we go back one?

11                  (Pause in proceedings.)

12   BY MR. COLLIER:

13   Q.   I'm sorry.  What were your findings with regard to how the

14   alleged racial abuse affected Mr. Diaz?  Sorry.

15   A.   Well, Mr. Diaz reported -- and this is consistent with my

16   understanding of stress -- that while working there, he

17   experienced heightened arousal.

18       He was in a state of what we call increased vigilance.  He

19   didn't know when any of these events would occur.  He

20   experienced fear and a loss of safety while working, and this

21   was ongoing.

22   Q.   And how does that affect a person not feeling safe in the

23   workplace?

24   A.   Well, if this is transient, it may not have any enduring

25   effect and, also, if it's predictable.  So if you know on a

1    Friday morning the supervisor is coming and is not going to be

2    there the rest of the week, you have safety signals.  So you

3    can be prepared Friday morning.  The rest of the time you can

4    let down your guard.

5         But if it's unpredictable pervasive, and there's no

6    certainty.  There's no safety signal, then we see the

7    development of a high level of what we call arousal.  A person

8    is on guard, and that indicates they're in a state of

9    heightened arousal or preparedness.  And that is problematic if

10   it's enduring because we know, particularly with imaging

11   studies, that alters the way the brain works in a detrimental

12   way.

13        And there may be an inability for that arousal to be

14   discharged or released, and so what we see then are what we

15   call spillover effects onto a person's non-worklife.

16   **Q.**   And I should have mentioned this earlier, but you prepared

17   this slide show; correct?

18   **A.**   Yes, sir.

19   **Q.**   Thank you.  When you say here spillover effects, would you

20   explain what you mean by that?

21   **A.**   Well, spillover refers to what we see.  A person is under

22   stress at work, and if they are sustained, then they lose the

23   benefits of the restoration that comes from their non-worklife

24   because they come home, and they don't have an ability to

25   discharge that high level of arousal.

1    So that erodes their opportunities for recovery in terms

2  of not sleeping as well, not being present.  The arousal

3  remains if it's a product of sustained exposure.  So they don't

4  achieve that recovery, which is very important.

5  **Q.**   And with the events that Mr. Diaz alleged in his interview

6  with you.  Would those events, if true, be sufficient to set in

7  motion a psychiatric injury?

8  **A.**   Yes.  If they occurred as claimed, what we see is -- are

9  two important aspects.  First is the protracted exposure, and

10 the second is this inability to recruit assistance from an

11 employer or to establish any control.  And we know that control

12 is protected with respect to stress.  So both those elements to

13 the extent Mr. Diaz report is reliable were applicable here.

14 **Q.**   And what is the basis for your opinion that there was --

15 can we go to the next slide?

16    What is the basis for your opinion?

17 **A.**   Well, I think we started on the slide some time ago, but

18 it's sort of reminiscent but -- so we're looking at this

19 confluence -- I think I've said this -- a confluence of these

20 three factors.  So we see a change.  Mr. Diaz did not report

21 these effects prior to his work at Tesla.

22    And secondly, we see evidence, to the extent his report is

23 reliable, of events that would be sufficient to set in motion

24 the third element which is the symptoms that he claimed to

25 experience.

1          And so we see a confluence of these three factors:  "A"

2     change, a change contingent upon identifiable events that would

3     be sufficient and have the potency to set in motion the third

4     element, which is a constellation of psychiatric symptoms that

5     are ongoing and confer stress and difficulty with function.

6     **Q.**   And would you tell the jury what your findings were as far

7     as the psychiatric illness in this case?

8     **A.**   Yes.  So I found that Mr. Diaz, while working, developed

9     symptoms for filling criteria for a diagnosis of an adjustment

10    disorder with anxiety, which is a threat disorder.  It's a

11    disorder that leads to symptoms distinctive to a situation of

12    threat.

13         It's in the same category as a trauma disorder, but this

14    would not rise to that level, although it does not connote a

15    disorder of lesser severity.  I found that with his job -- when

16    he left the job, his symptoms involved to include depression

17    and at that point I've provided a diagnosis of an adjustment

18    disorder with anxiety and depressed mood.

19         Oh, it's on this slide.

20    **Q.**   I should have asked this earlier, Dr. Reading, but the

21    arousal, the spillover effects, those sorts of things you were

22    talking about, the vigilance, would those things make a person

23    more defensive and likely to feel threatened?

24              **MR. SPIRO:**  Objection.  Leading.

25              **THE COURT:**  It's perfectly acceptable.  This is an

 1   expert.  Overruled.

 2          **THE WITNESS:**  Yes.  So it's interesting.  In the

 3   context of threat, we see a shift in the way information is

 4   processed.  So there's a bias towards the negative, or there's

 5   a bias towards risk.  So certainly, what we're seeing is if a

 6   person is exposed to threat or this kind of treatment, then

 7   their mental landscape shifts in a direction where they're

 8   certainly going to be more reactive, more sensitive, and they

 9   are going to develop a perception that's based on their

10   experience because our experience alters the -- the information

11   that enters conscious awareness and the importance attached to

12   it.

13   **BY MR. COLLIER:**

14   **Q.**   Now, you saw Mr. Diaz in 2019; is that correct?

15   **A.**   I did, yes.  2019.  Seems a long time ago now.

16   **Q.**   Indeed.  At that time was he still reporting symptoms?

17   **A.**   Yes.  So at that time he still was encumbered with

18   symptoms.  Now, these disorders were what we call subclinical,

19   but he had not recovered.

20          He was still encumbered with significant symptoms, and he

21   described them to me:  difficulty with intrusive thoughts;

22   reexperiencing what had happened.  Involuntarily, these were

23   still in his mind:  the issues with his son; seeing that as a

24   fracturing experience; difficulty relaxing; being more

25   reactive, which is a -- seeing him as more irritable;

1    difficulty with sleep.

2         So he was showing a constellation of symptoms that would

3    be consistent with a person having their baseline level of

4    arousal re-set at a more problematic or higher level.  So there

5    was less of a -- of a reserve with respect to frustration

6    tolerance.

7    **Q.**    And you understand that Mr. Diaz left Tesla at some point?

8    **A.**    Yes, sir.

9    **Q.**    And then found a replacement job in approximately four to

10   six months?

11   **A.**    I do, yes.

12   **Q.**    And you, nevertheless, mention that there's continuing

13   effects even beyond that date.  Would you explain that?

14   **A.**    Well, what we see -- this is a product of protracted

15   exposure, and we see this in terms of, as I say, imaging

16   studies, people that have protracted exposure to this kind of

17   stress over which they have no control, and they have this

18   uncertainty as to what will happen when and the jeopardy that

19   arises.

20        This protracted exposure leads to arousal which resets in

21   their brain, so they're altered.  He has been altered by this

22   experience in an enduring way.

23   **Q.**    And am I correct that he is now better than when he left

24   Tesla but still subject to these effects?

25   **A.**    Correct.

1   Q.   During your interview with him, what were your

2   observations of his affect?

3   A.   Well, that was interesting.  I track affect, so he became

4   tearful.  This is some time after Tesla.  He became tearful

5   when he talked about continuing to have these involuntary

6   intrusive thoughts about his experience there.  That was one.

7        He became tearful when he talked about wishing he had

8   never got the job at Tesla or had quit early on.  He became

9   tearful regretting that he got his son a job.  He became

10  tearful when he talked about how he had always hoped he would

11  never have exposed his son to that kind of racial prejudice.

12       And the last time he became tearful was when he said that

13  he failed as a parent.  He felt a failure as a parent, and that

14  was remaining in his life in terms of how he felt his

15  relationship with his son was.

16  Q.   And you also administered the battery of psychological

17  testing that's reflected here?

18  A.   Yes, sir.

19  Q.   What did you learn from the testing?

20  A.   Testing was instructive and informative because on the

21  MMPI-2-RF, we see elevations on the two depression scales.

22  Even though he's subclinical, he is still showing depressed

23  mood and difficulty driving, pleasure.  We see an elevation on

24  self doubt, hopelessness, and ideas of persecution.

25  Q.   You also mentioned earlier that there are certain aspects

1    of this testing that is designed to show if a person is

2    exaggerating their symptoms; correct?

3    **A.**   Yes, sir.

4    **Q.**   Did you observe any -- or, I guess, what were the results

5    of that testing?

6    **A.**   Well, the three tests have what are known as "validity

7    scales," and they -- elevations on those scales can raise the

8    index of suspicion if someone is overreporting or reporting

9    symptoms they may not have.  So in the MMPI-2-RF, which is

10   perhaps the most robust test of that, showed valid profiles.

11   So it would rule out overreporting, and that was also true for

12   the other two tests.  So those scales are elevated as a result

13   of his emotional state.

14   **Q.**   And to be clear, when you say you can rule out any

15   tendency to overreport, putting that in laymen's terms, it

16   means there was no evidence he was exaggerating?

17   **A.**   Correct.

18   **Q.**   What did the elevated levels of persecution ideation tell

19   you?

20   **A.**   Well, that tells us -- that's common in -- when -- that

21   can be a product of someone having long-standing ideas or

22   thought processes where they feel subject to persecution, which

23   is not evidenced in Mr. Diaz in terms of his life history, his

24   relations with siblings, children, his proud work record.  So

25   we see that as a product of circumstances where a person feels

1   unfairly treated by -- in a situation, which was the case here.

2   **Q.**   What is -- what does normative mean?

3   **A.**   Well, normative means -- so in this case, Mr. Diaz, I

4   would see his experience as non-normative.  Normative would be

5   if we become ill or if someone older dies.  Obviously, if a

6   child is ill and dies, that's non-normative.  But here we see

7   non-normative, meaning these are not the sorts of situations

8   that we would expect.

9        And exposure to this kind of experience, non-normative,

10  raises the risk of psychiatric injury and also raises the risk

11  of future issues because it fractures the assumption of a

12  predictable relationship between cause and effect operating in

13  the workplace.

14       So very often, with these kinds of experiences, to a

15  reasonable degree of psychiatric probability, we see what we

16  call "emotional" or "psychological scarring," where even though

17  the person is removed from that workplace, they continue to

18  have this loss of safety that's enduring with respect to what

19  may happen at work.

20  **Q.**   All right.  And you also mentioned that one of the tests

21  is specific to trauma, the TSI test?

22  **A.**   Yes, sir.

23       **THE COURT:**  Before we get there, I think we need to

24  take a break at some time.  Is this a good time to do that?

25       **MR. COLLIER:**  It's as good as any, Your Honor.

1          THE COURT:  Okay.  So, ladies and gentlemen, let's

2   take our second break of the day.  We will be back at 10 past.

3   Please remember the admonitions.

4      (Proceedings were heard outside the presence of the jury:)

5          THE COURT:  All right.  We will be in recess.

6          THE WITNESS:  Thank you.

7              (Recess taken at 11:58 a.m.)

8          (Proceedings resumed at 12:10 p.m.)

9          THE CLERK:  Please come to order.

10          THE COURT:  Mr. Collier, are you ready to go?

11          MR. COLLIER:  Yes, Your Honor.

12          THE COURT:  Let's get the jury.

13                  (Pause in proceedings.)

14      (Proceedings were heard in the presence of the jury:)

15          THE COURT:  All right.  Please be seated, everybody.

16      Mr. Collier, please proceed.

17          MR. COLLIER:  Thank you, Your Honor.

18   BY MR. COLLIER:

19   Q.   Dr. Reading, before the break, we were talking a little

20   bit about the -- the fact that the -- that Mr. Diaz showed some

21   signs of irritability, feeling threatened, those sorts of the

22   things.  Is it fair to say that someone who has experienced

23   what he alleges would also be triggered and become more

24   combative if they were, for example, repeatedly accused of

25   making it up?

1   **A.**   Yes, that would be consistent.  So a person would be more

2   reactive to triggers and irritability, or irascibility is a

3   common symptom in that context.

4   **Q.**   And a sufficiently skilled cross-examiner might know and

5   exploit that fact; right?

6   **A.**   I'm not really acquainted with sufficiently skilled

7   cross-examiners; but certainly, the threshold by which anger

8   can be exhibited has changed.  With someone that is highly

9   aroused, and there is evidence that Mr. Diaz showed that, then

10   that's the -- the threshold at which irritability is reached is

11   much lower.

12        **THE COURT:**  I'm going to strike the last question and

13   answer.  I don't think that was in his expert report.

14        **MR. COLLIER:**  Fair enough.

15   **BY MR. COLLIER:**

16   **Q.**   You described --

17        **MR. COLLIER:**  Can we have the slide show back up?

18   Sorry.

19        **THE CLERK:**  One second.  It's my fault.

20              (Pause in proceedings.)

21   **BY MR. COLLIER:**

22   **Q.**   While we wait on that, we had discussed earlier the TSI

23   trauma evaluation that you performed.  And could you tell us

24   what that revealed?

25   **A.**   Well, the Trauma Symptom Inventory showed what was

1    consistent with my interview, that he was continuing to

2    describe what we call "intrusive thoughts," and these are

3    involuntary.  So he continues to have intrusive thoughts about

4    what happened, and "intrusive" means they are not necessarily

5    triggered.  So they occur spontaneously, and they have a

6    negative effect on him.

7    **Q.**   And you talk about trauma, but surely Mr. Diaz wouldn't

8    experience trauma just from words being leveled at him; is that

9    right?

10   **A.**   Well, I didn't give him a trauma diagnosis because the

11   precipitating stressor wouldn't rise to that level, but he does

12   exhibit trauma symptoms.  We know that the sort of conduct he

13   was exposed to would not be considered benign.  Studies show

14   this kind of conduct does lead to the emergence of trauma

15   symptoms.

16        We also know from imaging studies of the brain that, in

17   the context of what we call "negative social feedback," areas

18   of the brain are active that are responsible for physical pain.

19   And so, in that context, those areas responsible for physical

20   pain become active; and so these are adversive experiences that

21   have can have enduring effects.

22   **Q.**   And what about racial epithets, in particular?  Have there

23   been any studies on the effect of racial epithets on the brain?

24            **MR. SPIRO:**  Objection.

25            **THE COURT:**  Overruled.

1            **THE WITNESS:**  Yeah, I'm not familiar with any imaging

2    studies with racial epithets other than studies showing the

3    effect of such in two respects.  I'm sure there are studies.

4    But in two respects, one is the emergence of psychiatric

5    symptoms seen in the context of trauma; and the other, the

6    emergence of symptoms pertaining to threat of violence, in that

7    people are -- receiving those kinds of sentiments expressed

8    towards them of fear that this will escalate to violence.

9            **MR. COLLIER:**  Can we advance to slide number 9,

10   Miss Grisly.  Thank you.

11   **BY MR. COLLIER:**

12   **Q.**   And so just in terms of what caused his psychiatric

13   illness, what was your conclusion?

14   **A.**   Well, my conclusion, as I say here, subject to record

15   review, to the extent his report is reliable and to a

16   reasonable degree of psychiatric probability, while working, he

17   developed a threat disorder, which would be characterized as an

18   adjustment disorder with anxiety.

19            And this evolved after he left Tesla, owing to the

20   experience of Tesla and the fracturing effect on his

21   relationship with his son to an adjustment disorder with

22   anxiety and depressed mood.  At some point, with his return to

23   work, that would then become subclinical.  However, he has

24   remained encumbered over the course of time until I saw him

25   with significant residual effects.

1          **MR. COLLIER:**  And let's go to the last slide,

2     Miss Grisly.   Thank you.

3     **BY MR. COLLIER:**

4     **Q.**   What conclusions did you reach about treatment?

5     **A.**   Well, even though -- if you look at psychological test

6     results, he's clearly showing elevations on a number of scales,

7     which you wouldn't see with someone that's not impacted.  So he

8     still is a candidate for treatment at the time I saw him, and I

9     would provide treatment in the form of cognitive behavioral

10    psychotherapy at least six months, possibly longer.  And that

11    is saying that down regulating what we call "arousal" or

12    "alarm," implementing approaches such as relaxation,

13    mindfulness to alter his alarm system, to bring it down.  So

14    that's one element.

15         And then also changing or altering his -- or recalibrating

16    his risk appraisal.  So that's -- that's a challenge.  And I

17    would also make provision for treatment in the future in the

18    event of reactivation.  We know that trauma symptoms, threat

19    symptoms, will be subject to reactivation in the future.

20         And owing to the effect on relationships, and he has

21    described that, some sort of couples counseling would also be

22    part of my treatment recommendation.

23    **Q.**   And assuming that he were to receive the treatment that

24    you have recommended, what is his prognosis?

25    **A.**   Well, I rated his prognosis as fair to good.  So it would

1    be on the -- towards good in the event that he has treatment

2    and in the event that he is able to reconstitute his work

3    situation in a way that offers him a sense of safety.  So that

4    scale is poor, guarded, fair, and good.

5        So his prognosis, I rate as fair.  And the concern is the

6    duration of exposure.  We know the duration of exposure is a

7    risk factor for not recovering, so in the context of having

8    treatment and in the context of having a work situation that

9    insulates him from triggers.

10        **MR. COLLIER:**  I don't have any further questions at

11   this time, Your Honor.

12        **THE COURT:**  All right.  Thank you.

13                      **CROSS-EXAMINATION**

14   **BY MR. SPIRO:**

15   **Q.**   Good afternoon, Doctor.

16   **A.**   Good afternoon, sir.

17   **Q.**   We are going to give you some materials.  Perhaps they are

18   already up there.  Okay.  Great.

19        In 2015 and '16, you would testify in court or in hearings

20   and proceedings about 75 times a year.  Is that a fair

21   statement?

22   **A.**   Could be.  I mean, that's a long time ago.

23   **Q.**   And in litigation you have to provide a list of -- and you

24   have it in front of you -- a Rule 26 log which shows all the

25   cases that you have testified in from that time until you issue

 1   your report.

 2        So it's from 2015 until 2019, that document is in front of

 3   you.  Isn't it a fact, sir, that in the cases that are reported

 4   your -- you testify for Plaintiffs approximately 96 percent of

 5   the time from 2015 to 2019?

 6   **A.**   Retained by plaintiff counsel, yes.

 7   **Q.**   Okay.  And you don't have a degree in forensic psychology;

 8   correct?

 9   **A.**   Correct.

10   **Q.**   And of the 77 research articles on your research list,

11   there is none about harassment; correct?

12   **A.**   In terms of my peer-reviewed research papers, no, I don't

13   believe so.

14   **Q.**   Okay.  So Mr. Diaz flies to Los Angeles to meet with you

15   in your office in Beverly Hills; correct?

16   **A.**   I didn't actually ask him how he got there.  He could have

17   driven.  I'm not sure.

18   **Q.**   Okay.  When he got there -- I just want to make sure this

19   is clear for the jury -- you didn't treat him for any illness;

20   right, you just evaluated him?

21   **A.**   Yes, sir.

22   **Q.**   Okay.  And nobody asked you for a recommendation of

23   somebody to treat him or anything like that.  This was a pure

24   evaluation; fair?

25   **A.**   Well, I'm not sure what the distinction is.  I generated

1    the agenda myself, which would include usually some assessment

2    of recommendations.

3    **Q.**   Well, right, but I'm asking you, did -- did they ask you

4    for recommendations for specific counselors and things that he

5    could see back in San Francisco where he lived?  Did they ask

6    you for that list?

7    **A.**   No one asked me for anything.

8    **Q.**   So when he gets to your office, you understood that he was

9    involved in a lawsuit and wanted money; right?

10   **A.**   Well, I understood he was in a lawsuit, yes.

11   **Q.**   Okay.  And you understood that he was seeking damages, a

12   monetary award, for emotional distress; right?

13   **A.**   Yes.

14   **Q.**   Okay.  And that this case, unlike many of the other

15   cases -- I'm not going through all of them -- unlike some of

16   the other ones you have testified in, this wasn't something

17   where there was, you know, a physical injury and somebody

18   leaves work and there is that component of it and then also

19   emotional distress.  This was solely an emotional distress

20   situation.  You knew that; right?

21   **A.**   I lost you there.  But it's not unusual for there not to

22   be a physical injury in the cases in which I testify, but I did

23   know that there was no claim for a physical injury, which isn't

24   uncommon in the cases in the employment arena.

25   **Q.**   Well, you knew it was incumbent upon you to dig in and get

1   it right; is that fair?

2   **A.**   Say that again.

3   **Q.**   It was incumbent upon you to dig in and get it right.

4          **MR. COLLIER:**  Objection.  Vague.

5          **THE COURT:**  Overruled.  You can answer.

6          **THE WITNESS:**  I'm not sure what it means to "get it

7   right."  I tend to see myself as an empiricist, so I accrue

8   data and allow those data to inform my opinions.

9   **BY MR. SPIRO:**

10  **Q.**   Well, you knew -- let's just leave it at this:  You knew

11  that Mr. Diaz presumably -- and you don't know what's in his

12  mind -- had an agenda.  Would you agree with that?

13  **A.**   I would agree that --

14         **MR. COLLIER:**  Argumentative.

15         **THE COURT:**  Overruled.  You can answer.

16         **THE WITNESS:**  Thank you, Your Honor.  Thank you so

17  much.  Yeah, I would agree motivation is ubiquitous.  So, there

18  is always motivation.  It is a matter of -- and that motivation

19  could be, one, presenting more symptoms or, two, presenting a

20  version of events that's self serving.

21         So, motivation exists.  It is a matter of establishing of

22  whether it provides the best fit for the data.  So, I would

23  agree with you, sir.

24  **BY MR. SPIRO:**

25  **Q.**   Okay.  And you know that from human experience and as a

1  psychologist; right?

2  **A.**   I think so.

3  **Q.**   Okay.

4  **A.**   Thank you.

5  **Q.**   And you know that in the professional guidelines -- and

6  you are familiar, I assume, with the American Psychology

7  Association?

8  **A.**   Correct.

9  **Q.**   And you are familiar with the best practices for forensic

10 psychology; correct?

11 **A.**   Correct.

12 **Q.**   And there is a guideline that says you have to use

13 multiple sources of information and warns practitioners against

14 using only one source of data and says that you have to

15 corroborate important data whenever feasible.  You are aware?

16 **A.**   I am.

17         **MR. COLLIER:**  Objection. hearsay.  Counsel is

18 testifying and assumes facts.

19         **THE COURT:**  Overruled.

20         **THE WITNESS:**  Thank you, Your Honor.  I think I did

21 but I will say it again.  "I am" I said.

22 **BY MR. SPIRO:**

23 **Q.**   Right.  And whenever "feasible" means, right -- if

24 somebody was like caught on a mountain in a snowstorm, right,

25 and they had an experience alone and isolated, it might not be

 1  feasible, right -- word "feasible" -- to evaluate other sources

 2  because they were alone in that -- that cave or whatnot.

 3       In an employment case, though, there are other sources of

 4  information that could be available to you; fair?

 5  **A.**   I think that's fair, yes.

 6  **Q.**   And, in fact, in many cases you consult other sources of

 7  information; true?

 8  **A.**   Always con -- always either -- either consult or request,

 9  yes.

10  **Q.**   And in this case you requested additional information and

11  got none; correct?

12  **A.**   Correct.

13  **Q.**   Now.  You say multiple times in your report that it was

14  subject to -- and we can put up your conclusion page --

15  **A.**   That's not it.

16  **Q.**   "Subject to a record review."

17  **A.**   Oh, you mean -- it's not the -- I thought the report,

18  sorry.

19  **Q.**   Right, well, just -- you say it in testimony, in report,

20  everywhere.  You say in many sentences all of this is subject

21  to a record review; fair?

22  **A.**   That is correct because it is.

23  **Q.**   Right.

24  **A.**   That's a caveat.

25  **Q.**   It is a caveat.  I understand that.

1   **A.**   Yes.

2   **Q.**   And you never got the records; true?

3   **A.**   You are correct, sir.

4   **Q.**   You requested them?

5   **A.**   I believe so.  I would assume so.

6   **Q.**   And you followed up, your staff?

7   **A.**   Say it again.

8   **Q.**   Your staff, they followed up asking for records?

9   **A.**   Well, I can't say they followed up, but they -- they were

10  requested.  We don't tend to follow up aggressively.  We have a

11  lot to do.

12  **Q.**   Understood.  And when you set out to meet with Mr. Diaz,

13  you said that it was just an aspect of the evaluation because

14  you also needed to look at records; correct?

15  **A.**   Well, I think I said "component."

16  **Q.**   Okay, "component."

17  **A.**   Yeah.

18  **Q.**   Okay.  So -- and you would agree with me, sir, that you

19  can't just assume someone has a psychological injury because

20  they experienced something that's upsetting; right?

21  **A.**   Well, upsetting wouldn't usually rise to the level that

22  would set in motion a psychiatric injury; but I would -- we

23  never assume.  We are looking at data.

24  **Q.**   Right.  I mean, even if something -- if somebody

25  experiences something very, very upsetting, right, you don't

1  assume that they are psychologically injured.  You have to dig

2  in and find out; right?

3  **A.**    Yes.

4  **Q.**    And that happens, right, you can hear a bad word, see a

5  bad thing in life, and not have a psychological injury; true?

6  **A.**    Very often the case.

7  **Q.**    So he hits down with you, Mr. Diaz, and he was attentive

8  in giving you good eye contact?

9  **A.**    Yes, sir.

10 **Q.**    And you had asked him questions and he would answer?

11 **A.**    Yes, sir.

12 **Q.**    And would you try to ask open-ended questions so that you

13 wouldn't sort of suggest an answer?  Would you try to do that?

14 **A.**    Not try but that's standard.

15 **Q.**    Okay.  And part of the reason you do that is to observe

16 his cognitions and see how he is honestly answering in

17 narrative form; right?

18 **A.**    Well, I can't determine honesty, so I'm not doing it to

19 see if he is honest because that would be beyond my ability;

20 but I'm seeing if he is responding in a forthright and direct

21 manner.

22 **Q.**    And you took notes; right?

23 **A.**    Yes.

24 **Q.**    And made a report; right?

25 **A.**    Yes.

1  **Q.**   And you would agree with me -- I think you said this on

2  direct.  I just want to make sure it is clear to the jury --

3  the longer you are exposed to a bad event, the worse.  All

4  things equal for psychology.  True?

5  **A.**   All things equal.

6  **Q.**   Okay.  And Mr. Diaz looked at you and he told you, sir,

7  that he worked for Tesla for 18 months; right?

8  **A.**   He did.

9  **Q.**   Okay.  Did you believe him?

10 **A.**   It's not for me to believe.  I can't establish that

11 without any corroborating data, so I can only report what his

12 rendition was.

13 **Q.**   I see.  And were you ever provided, you know, paystubs,

14 records or anything else to find out if that representation to

15 you, sir, was accurate?

16 **A.**   No, I was not.  So I'm -- that's why I subject -- to the

17 extent his report is reliable and subject to record review,

18 this is his rendition.

19 **Q.**   And so if you had known that that statement to you was not

20 true, would that have caused you to question some of the other

21 things you were told?

22 **A.**   It's a pretty good question.  It could.  Once again, we

23 are looking at a trend and to what extent there is a robust

24 trend with respect to what we might call either inaccurate

25 information or misrepresentation.

1        It's a matter of accruing those data to see to what extent

2   they direct one in that direction.

3   **Q.**   Okay.  Well, he told you that for four or six months he

4   didn't work and then he got a job at AC Transit; true?

5   **A.**   That is correct.

6   **Q.**   And, in fact, in your prior report and testimony, you

7   testified that the fact that he was at AC Transit in a bus

8   position allowed him to not be in a big open setting and close

9   that door and drive; right?

10  **A.**   That's correct.

11  **Q.**   And you credited that and based what you were thinking

12  about his job history on that fact; true?

13  **A.**   I'm not sure what you mean, but I did indicate that that

14  would seem to be protective.

15  **Q.**   Right.  But he never told you that he worked for Coca-Cola

16  when he left Tesla well before he worked for the bus?  He never

17  told you that?

18        **MR. COLLIER:**  Objection, assumes facts.  Counsel is

19  testifying.

20        **THE COURT:**  Overruled.  If you know, you can answer.

21        **THE WITNESS:**  Thank you, Your Honor.  No, he did not.

22  Coca-Cola you are saying; right?

23  **BY MR. SPIRO:**

24  **Q.**   Yeah, Coca-Cola.

25  **A.**   I know Coca-Cola but no.

**READING - CROSS / SPIRO**

1   Q.   Okay.  And he told you he had issues with his wife; right?

2   Some, you know, interpersonal stuff with his wife; right?

3   A.   There were issues in his marriage, yes.

4   Q.   Okay.  But they never showed you what his wife said about

5   that in her deposition?  They never gave you her deposition?

6   A.   Correct.

7   Q.   You wanted that, didn't you, sir?

8   A.   Yes.

9   Q.   But they never gave it to you?

10  A.   Correct.

11  Q.   Okay.  So -- and, in fact, even in the examination, you

12  found Mr. Diaz at times to be evasive and not forthcoming;

13  true?

14  A.   Whatever I said in the report.

15  Q.   Right.  But you don't deny that?

16  A.   No.

17  Q.   Okay.  And another thing that you can do to assess their

18  reliability, is you can use logic and common sense, can't you,

19  sir?

20  A.   You would have to go further with that, but I would assume

21  so.

22  Q.   Okay.  And he told you that, you know, that there was this

23  event where he and his son caught eyes and in that moment there

24  was a loss of connection.  Do you remember testifying to that?

25  A.   I do remember that.

1   Q.   Okay.  And that -- and that he didn't report that on his

2   son's behalf; that he never reported that; right?

3   A.   Meaning reported the conduct of that supervisor?

4   Q.   Correct.

5   A.   Yes.

6   Q.   Would that have been the kind of thing that would've been

7   interesting to follow up on for you?

8   A.   Well, I wouldn't extract that as one thing that I want to

9   follow up on.  I think that's one of many that would be of

10  interest.

11  Q.   And another thing that caught your eye was that -- the

12  fact that he even encouraged his son to apply and join Tesla in

13  the first place; right?

14  A.   Yes.

15  Q.   And one could -- you say earlier, one could ask themselves

16  why he would do that if there were such treatment going on;

17  right?

18  A.   Correct.

19  Q.   Now, the other thing that Mr. Diaz told you was that he

20  was a man without a filter.  Do you remember him telling you

21  that?

22  A.   I do remember that.

23  Q.   And that was his -- those were his words; right?

24  A.   Correct, that was -- he was describing, I think, his early

25  life years.

1  Q.   Yeah.  And one of the things that you could assess is did

2  he act consistently in all situations.  That would be something

3  that you could look to, to try to determine if his

4  psychological state was as he purported it to be or something

5  different.  You can look at the consistency of his actions and

6  behavior; right?

7  A.   One is interested in inconsistency, yes.

8  Q.   And you also asked him specific things about facts in this

9  case to find out, you know, high level what he says happened;

10 right?

11 A.   Yes.

12 Q.   But you obviously don't know what happened; right?

13 A.   Correct.

14 Q.   You are solely relying on his -- his accounting; true?

15 A.   Well, at that time.  I'm not relying on it.  I'm accruing

16 those data.  Those data need to be established as to whether

17 they are reliable and comport with what actually happened.

18 Q.   And he identified Lamar Patterson as a witness?

19 A.   Say again.

20 Q.   He identified Lamar Patterson as a witness?

21 A.   He may have done that.  I don't recall that.

22 Q.   And he identified Ramon Martinez as somebody negative.

23 You remember that?

24 A.   I remember Martinez.

25 Q.   Okay.  And never in his interview with you does he ever

1  mention the names Judy Timbreza or Robert Hurtado; correct?

2  **A.**   Certainly they are not written down.  I don't recall.

3  **Q.**   Okay.  There were other things that had happened in

4  Mr. Diaz's life that could have caused this psychological

5  impact on him; true?

6  **A.**   Other factors in his life certainly would impact him

7  psychologically, yes.

8  **Q.**   And just so the jury -- I want to make sure this is clear

9  for the jury.  You know, from June 3rd, 2015, all the way into

10  October 2019, okay -- so we are going four years; right -- you

11  never met Mr. Diaz, never spoke to Mr. Diaz, never spoke to

12  anybody in his home, his friends, nothing; right?

13  **A.**   Nothing; right.

14  **Q.**   Okay.  Now, can you tell the jury what transplacement is?

15  **A.**   Well, I'm not -- I didn't use that word but that would

16  seem to be placed in a different place.  I'm not -- I have

17  never used that word.

18  **Q.**   Well, there could be multiple things affecting a person at

19  once, and a person's mind could think that it's one thing

20  upsetting them when it is really a different thing that's

21  actually psychologically upsetting them; isn't that fair?

22  **A.**   Well, I'm not sure if that's transplacement.  I have never

23  heard that but certainly there can be two possibilities.  I

24  could be affected by X but because I see a value in telling you

25  Y, I can intentionally direct or attribute what I'm feeling to

1    Y or that could be involuntary or automatic that I could

2    gravitate towards Y even though that may not be the actual

3    cause.

4    **Q.**   Exactly.

5    **A.**   Okay.

6    **Q.**   And so what you found with Mr. Diaz, to the degree you

7    even got to this analysis, was there were at least three

8    processes going on with him.

9        One was what he was reporting to you.  Two was the fact

10   that he -- he brought a legal case, and three other issues he

11   was having with his son.  Fair?

12   **A.**   Yeah, I couldn't hear the middle one because you said it

13   very quickly.  I heard the first and the third.  Sorry.

14   **Q.**   Do you agree with the first and the third?

15   **A.**   Yes, but the second was so quick.  It was --

16   **Q.**   The second was just that he was involved in a litigation;

17   can cause stress; right?

18   **A.**   Yeah, certainly.

19   **Q.**   And the third one, other issues with his son, you thought

20   that could be a great factor in your analysis; true?

21   **A.**   What factor?

22   **Q.**   That it could be -- other issues with his son unrelated to

23   this case could be a great factor in whatever was going on with

24   him; true?

25   **A.**   Right, but what was "great" or "grave" did you say?  I

1    couldn't hear that.

2    **Q.**   Great factor.

3    **A.**   Thank you, yeah.

4    **Q.**   And you agree with me; right?

5    **A.**   Yes, significant factor in his life, yes.

6    **Q.**   Okay.  And in terms of, you know, his relationship with

7    his son and whether that eye contact moment was this moment in

8    which they lost engagement, they never provided you photographs

9    of them together or, you know, outings together, any

10   information to find out whether truly in -- you know, in real

11   life whether between 2015 and 2019 his relationship with his

12   son was fractured?  They didn't provide that; right?

13   **A.**   Did you say "fractured"?

14   **Q.**   Fractured, yes.

15   **A.**   Yes.

16   **Q.**   They did not provide that; right?

17   **A.**   Correct.

18   **Q.**   Okay.  But one thing I notice that you talk about is the

19   fact that Mr. Diaz's mother passed away in 2016?

20   **A.**   Yes.

21   **Q.**   Okay.  And, in fact, he told you that it was the

22   triggering event in him quitting Tesla; true?

23   **A.**   Yes.

24   **Q.**   And I just want to talk about something on a side topic,

25   which is these test results, right, that you did.

1    **A.**    It's your choice, yes.

2    **Q.**    Okay, sure.  Thank you.

3          I just want to make sure the jury pictures this right.

4    **A.**    Right.

5    **Q.**    This isn't like an MRI or some machine that looks inside

6    of his mind; right?  A person sits at a computer and gets asked

7    a lot of questions and they --

8              **MR. COLLIER:**  Objection.  Counsel is testifying.

9              **THE COURT:**  Overruled.

10             **THE WITNESS:**  Thank you, Your Honor.

11   BY MR. SPIRO:

12   **Q.**    And they type in answers to questions; right?

13   **A.**    They just press 1 or 2.

14   **Q.**    Oh, I see.

15   **A.**    They don't type anything in.  It is not a narrative.  They

16   just simply -- each question comes on the screen one at a time,

17   so they can't see what's coming.  They can't go back and change

18   anything.  And they go 1 or 2, true or false.  And the PI has

19   four options, so slightly true and such like; but they do sit

20   at the computer.  It is all automated.

21   **Q.**    Right.  And, you know, one of the questions I think is,

22   you know, that the plants are talking to me.  So if somebody

23   said to a question like "the plants are talking to me" and said

24   "yes," and they were not otherwise, you know, psychotic in

25   presentation, you could look at that and say, "Listen that

1   sounds like the person is faking sick."  Fair?

2   **A.**   I have never heard that question.

3   **Q.**   Questions like that.  How about that?

4   **A.**   Well, "I hear voices."  How about that one?

5   **Q.**   Okay.  "I hear voices."

6   **A.**   "I hear voices."  I can read -- "I know what people are

7   thinking."

8   **Q.**   Okay.

9   **A.**   Things of that kind.

10  **Q.**   Okay.  And the other thing that the test results don't

11  show you is causation?

12  **A.**   That is correct.  There is -- so someone can have elevated

13  scores or not, but it doesn't say why they are elevated.

14  **Q.**   Right.  And in your test results in your report, you

15  indicated that Mr. Diaz has traits of antisocial personality;

16  right?

17  **A.**   I don't recall that; but if it is in the report, I did say

18  that.

19  **Q.**   Okay.  Well, I'm going to have to -- I want to show you

20  that.  Antisocial personality is somebody that has a tendency

21  to lie or put their interest above others.  Fair?

22  **A.**   The latter.  We have good examples of that these days.

23  **Q.**   Okay.

24          **THE COURT:**  Do you want to show him the report?

25          **MR. SPIRO:**  Yeah, I'm trying to find -- I see it.

```
 1                        (Pause in proceedings.)

 2            MR. SPIRO:  Page 8 of your report.

 3                        (Pause in proceedings.)

 4   BY MR. SPIRO:

 5   Q.   And you see the scores on the higher order?

 6   A.   Well, an antisocial personality score doesn't rise to

 7   above the mean.  Is that what you are referring to?

 8   Q.   Yeah.  I'm saying that on the higher order of things that

 9   you found from this test, it's also listed among the other

10   things that you testified to.  So it says "demoralization, low

11   positive emotions, antisocial behavior."

12   A.   Oh, I see.  I was looking -- on the personality -- I was

13   looking at page 9, sorry -- which says there is no elevation

14   and that would relate to his prior conduct.

15   Q.   Okay.

16   A.   Sorry.  Yeah, that's right.  So there are different

17   domains that are assessed by these scales.

18   Q.   Right.  He had not sought treatment before he saw you;

19   true?

20   A.   Correct.

21   Q.   And he told you that he wanted treatment; right?

22   A.   He said he was -- yes, he was affirmative in the

23   considering it and thought it might be helpful.

24   Q.   And as far as you know -- do you know whether he ever

25   got -- actually sought treatment or he just said that to you?
```

 1   **A.**   Well, I don't know post when I saw him in 2019, so I can't

 2   say speak to anything past that.

 3   **Q.**   Okay.  So you weren't able through medical reports or

 4   reporting to sort of assess what he was like before or after?

 5   You just saw one moment in time; fair?

 6   **A.**   Yes, I saw one moment in time in terms of observing him

 7   at -- in that office; and then I relied upon his report of how

 8   he was and the various caveats introduced with respect to that.

 9        So I looked at his longevity of marriage.  I looked at the

10   longevity of relationships with his siblings, with his

11   children, longevity of employment.  So those are all indices;

12   but once again, they are subject to his report being reliable.

13   **Q.**   Okay.  Just in terms of adjustment disorder, you know,

14   this is a diagnosis that's given out for, you know, lots of

15   different things; right, bad breakups?

16   **A.**   Well, it's not given out unless there is this confluence

17   of factors.  So you need symptoms to develop in a proximal

18   relationship to an identifiable event that gives rise to the

19   significant distress and/or difficulty in the functions.  It is

20   not just given out because someone has a, what did you say, a

21   "bad breakup"?

22   **Q.**   Yeah, bad break up.

23   **A.**   No.  You need that confluence of factors.  You need a

24   change.  You need -- the emergence of a constellation of

25   symptoms that is affecting a person.

**READING - CROSS / SPIRO**

1   **Q.**   Right.   But if you look at common things that adjustment

2   disorder is handed out for, would you agree with me that

3   milestone events like retiring, can be one that can cause

4   somebody to have adjustment disorder?

5   **A.**   I wouldn't.   So what do you see with retirement is -- it's

6   interesting.   People retire and that's elective as opposed to

7   losing a job in a non-elective way.   And if depression comes,

8   it's usually delayed.

9        The time course of onset is very interesting because a

10  person usually elects to retire, and then down the road they

11  may become depressed because there is a loss of stimulation,

12  challenge, and meaning.

13       So in this case the adjustment disorder with anxiety is

14  slightly different from what you are saying because it's a

15  diagnosis that's specific to a threat where the full criteria

16  for posttraumatic stress disorder are not met.   So it is a

17  little different?

18       In this context it is a more specific diagnosis, and it

19  does not connote a diagnosis or illness of lesser severity; and

20  it comports -- the trajectory of symptoms comport to a trauma

21  disorder, but -- so that's a qualifier.

22  **Q.**   Well, okay, so I'm going to go into that qualifier in a

23  second; but it is true -- before we go into the qualifier --

24  that adjustment disorder based on the literature, without the

25  qualifier, is diagnosed with people who have struggles at

 1  school, divorce, financial issues, issues with seasonal

 2  businesses, milestone events, work problems?

 3      This is a diagnosis that's given out for people that have

 4  that and then have the other factors of adjustment disorder;

 5  true?

 6  A.   You say they have that and the other factors.  Once again,

 7  to have a psychiatric disorder, they have to have sufficient

 8  symptoms that are giving rise to the stress or difficulty in

 9  function?

10      If you look at adjustment disorder, it does not

11  necessarily connote a disorder of lesser severity.  There can

12  be mortality attached to it.  It doesn't quantify or indicate

13  the severity, so it can be at various levels of severity.

14  Q.   Sure.  But sometimes those types of events in life will

15  lead someone to then have adjustment disorder; true?

16  A.   Events being financial downturns?

17  Q.   Yeah, things like that.

18  A.   Yes, financial downturn can certainly --

19  Q.   Okay.  You didn't go through the PTSD checklist and that

20  aspect.  You did not do that; correct?

21  A.   Well, the PTSD checklist would indicate that he does not

22  qualify for PTSD because there is not a -- criterion A requires

23  life threatening or life altering and that he would not

24  qualify; but in terms of the other criteria -- so we see the

25  next is reexperiencing -- Mr. Diaz reported that, involuntary

1  reexperiencing.  The next avoidance, he reported that.

2  Negative alterations in emotions and cognition, he reported

3  that.  And the last is alterations in arousal, he reported

4  that.  That would be the irritability.

5       And he also indicated that his symptoms gave rise to

6  ongoing distress.  He had difficulty relaxing.  He was more

7  irritable.  He had difficulty with sleep.  He was not present.

8  And those symptoms were not a product of a medical condition,

9  medication side effects, personality.

10      There is no evidence for a personality disorder.  That

11  elevation, antisocial, came from conduct as a young person or

12  substance abuse although subsequent to --

13  **Q.**   Wait.  Let me just stop you there.

14  **A.**   Thank you.

15  **Q.**   I did not mean to elicit your narrative, but it may have

16  been my fault, Doctor.

17  **A.**   It was actually.  You asked me the criteria.

18                    (Laughter)

19  **BY MR. SPIRO:**

20  **Q.**   I'm go to --

21           **THE COURT:**  Let's go on to the next question.

22  **BY MR. SPIRO:**

23  **Q.**   Okay.  So --

24           **THE WITNESS:**  Sorry about that by the way.

25           **MR. SPIRO:**  It's fine.

1    BY MR. SPIRO:

2    Q.   But one thing I want to go back to is he never told you he

3    feared for his life; true?

4    A.   That's right.

5    Q.   Right.  He never told you that?

6    A.   Correct.

7    Q.   Okay.  He never told you he was suicidal; correct?

8    A.   Correct.

9    Q.   And you talked about triggers.  Did he ever tell you --

10   you know, you thought he went from Tesla to being a bus driver;

11   right?

12   A.   I didn't think that.  He said that.

13   Q.   Okay, he said that; right?

14   A.   Yes.

15   Q.   And did he ever tell you that when he would see other

16   Teslas on road, that he would have a -- it would be a trigger

17   to him and he would have to react to that in some way?

18   A.   No.

19   Q.   I think you also said that he -- he complained of

20   irritability.  You don't know whether he was irritable before;

21   right?

22   A.   I don't know other than that's his rendition once again.

23   Q.   And I think when you went into the diagnostic criteria of

24   the sort of sub-diagnosis where you were talking earlier -- and

25   I didn't mean to stop you there.  I want to get back to that --

1   which is that the symptoms here under the sub-diagnosis, you

2   see responses within the first three months of the onset of the

3   stressor; true?

4   A.   Correct.

5   Q.   But you, sir, did not evaluate him -- we can both agree --

6   within the first three months; true?

7   A.   That's correct.  That's relying on his self report.

8   Q.   And the other thing that the DSM says that you have to do

9   is you look at other areas of functioning, right, such as

10  social, occupational and other areas of functioning?  The DSM

11  actually says that; right?

12  A.   Yes, sir.

13  Q.   So if he had gainful employment throughout the time period

14  after Tesla, right, that's one factor; right?

15  A.   Yes.

16  Q.   Two, he remained married and in a stable marriage; right?

17  And he did not feel the need to participate in psychiatric

18  treatment.  Those would all be things the DSM would require you

19  to assess; true?

20  A.   Well, they were assessed.  They wouldn't be required for

21  the diagnosis, but they were certainly indicative of his

22  function so he was able to work.

23  Q.   I can't find it in here, but I'm going to have somebody

24  help me if I can't.  He told you that his personality was no

25  different than when he was with you than it had been his whole

1  life.  He had had the same personality; true?

2  **A.**   That's correct.  And generally studies show that from

3  about 5 you can identify personality that remains.  That was --

4  those are studies from actually Stanford.

5  **Q.**   And when you said earlier -- I'm just going to have you

6  define one word and we are almost done, Doctor.

7  **A.**   Okay.

8  **Q.**   You said the word "subclinical" in talking about these

9  symptoms.  And what "subclinical" means is, quote, "not severe

10  enough to present definitive or readily observable symptoms;"

11  true?

12  **A.**   Well, "subclinical" means, in my way of thinking, that the

13  constellation of symptoms are not rising to a level to fulfill

14  criteria, which would be the psychological testing was not

15  sufficiently elevated and he is functioning.

16  **Q.**   Right.  In fact, you thought as long as he had employment

17  and some of the treatment that you -- that he had a good

18  prognosis; true?

19  **A.**   Certainly fair to good, yes.

20  **Q.**   The other thing just -- well, let me see -- your testimony

21  is, as I understand it, that when he got the new job, his

22  anxiety was reduced within that time period after he left

23  Tesla; true?

24  **A.**   My testimony was that when he got the new job, that's when

25  his symptoms are reduced to what you are calling -- and I may

1    have called -- "subclinical" in the sense he had residual

2    effects but they reduced.  There was some amelioration at that

3    point.

4    Q.    They would become quiescent?

5    A.    They would -- I would say amelioration.  There was still

6    some symptoms but they were not as active, yes.

7    Q.    Have you previously testified that they were quiescent?

8    A.    That's a word I use, so I would -- I like that word.

9    Q.    Yeah.  And "quiescent" means not active; true?

10   A.    It doesn't necessarily mean they are absent but

11   "quiescent" means they are not active, yes.

12   Q.    So as soon as he got the job, his symptoms were not

13   active.  And as you sit here today, you don't know how

14   quickly -- well, based on what he told you he didn't get the

15   job for six -- four to six months; right?

16   A.    Correct.

17   Q.    You don't know if that's true; right?

18   A.    No.

19   Q.    Okay.  And you said that he would be in, quote,

20   "remission" shortly after he returned to work; correct?

21   A.    That was my opinion, yes; that he not would be but was.

22   Q.    Okay.  And that he would at that moment have a full

23   recovery with residual symptoms; true?

24   A.    Well, full recovery with residual symptoms as shown by the

25   psychological testing and his self report.

1  Q.   Right, but your understanding is that with the job he

2  achieved, a full recovery with residential [sic] symptoms.  Do

3  you stand by that?

4  A.   Not residential, residual.  I sit by that.

5  Q.   Thank you, sir.  I will get it right one time.  A full

6  recovery with residual symptoms; fair?

7  A.   Fair.

8  Q.   Okay.  And then -- I just want to pull up the slides

9  regarding the treatment in your --

10  A.   PowerPoint.

11  Q.   PowerPoint.  See, I'm losing all words.  And so your

12  recommendations for treatment were that he would do -- I'm

13  pulling it out here -- six months of weekly cognitive

14  behavioral therapy; right?

15  A.   Yes, sir.

16  Q.   That's about 24 sessions?

17  A.   Correct.

18  Q.   Provision of four periods of weekly treatment over four

19  months.  That's four sessions?

20  A.   No, no.  Four periods of weekly treatment.  That would be

21  weekly for four months, four times.

22  Q.   Weekly for four months or four times?

23  A.   So it should say "each over four months."  It is weekly

24  treatment each over four months.  It's a provision.

25  Q.   Okay.  And then couples and family counseling, 20

1   sessions?

2   **A.**   Correct.

3   **Q.**   That's, you know, 24 at the top; 20 for couples; that's

4   44, and then the four provisions of weekly treatment.

5   **A.**   So that's four months would be 16 times 4, is that --

6   **Q.**   Okay.

7   **A.**   You agree with me?

8   **Q.**   Yeah, so it's about 100 total approximately.

9   **A.**   Your math is better than mine.

10  **Q.**   Okay.  And if he had to pay out of pocket, call it 50

11  bucks a session, would be about $5,000?

12          **MR. COLLIER:**   Objection, Your Honor, relevance, 403.

13  I move to exclude.

14          **THE COURT:**   The -- this witness is not here to testify

15  about that, so I will sustain that objection.

16  **BY MR. SPIRO:**

17  **Q.**   Okay.  And when this all ended when you wrote your

18  report -- if we can go to the conclusion page -- by the way, in

19  your report Mr. Diaz told you that the N-word and other things

20  like that started within 20 days after he started work;

21  correct?

22  **A.**   Yes, sir.  I think that was what he said "20 days."

23  **Q.**   Okay.

24  **A.**   He did say that, yes.

25  **Q.**   And ultimately you wanted to look at -- you wanted to look

1  in two places for corroborating information, which is why you

2  put "subject to a record review;" right?  And it never became

3  final is because, one, you wanted to look at work records like

4  e-mails and written documents of things that happened at work;

5  right?

6  **A.**   Correct.

7  **Q.**   And the other thing that you wanted to is -- forget the

8  sort of elevator at work -- you wanted to look at the elevator

9  of life.  You wanted to look at home and read the depositions

10  of his wife and that information; right?

11  **A.**   Yes.

12  **Q.**   And you requested that and it was never provided to you;

13  isn't that true, sir?

14  **A.**   Yes, sir.

15       **MR. SPIRO:**  No further questions.

16       **THE COURT:**  All right.  Mr. Collier.

17       **MR. COLLIER:**  Thank you, Your Honor.

18                    <u>**REDIRECT EXAMINATION**</u>

19  BY MR. COLLIER:

20  **Q.**   My colleague asked you about some of the other stressors

21  Mr. Diaz endured; things such as his situation with his wife,

22  his mother's passing, those sorts of things.  Is it fair to

23  say, Dr. Reading, that it's possible to be distressed about

24  more than one thing at a time?

25  **A.**   Yes, I think so.  I think everyone would concur with that.

1  **Q.**  And would that tend to have a compounding effect on the

2  distress suffered at work or a mitigating effect?

3  **A.**  Well, it can enhance vulnerability.  Certainly work can --

4  work, if it's benign or positive, can have a mitigating effect.

5  It can help us cope.  There's a protected benefit of work from

6  those people if it's commensurate with our identity and self

7  worth in terms of protective for mental health.

8  **Q.**  And Freud said that if you have problems at work or at

9  home, that's the biggest sources of emotional distress;

10  correct?

11  **A.**  See, I don't subscribe to anything that Freud said.  He

12  has --

13         **THE WITNESS:**  I don't think, Your Honor, you want me

14  to get into that.

15         **THE COURT:**  Not deeply, no.

16  **BY MR. COLLIER:**

17  **Q.**  We will avoid the Freudian stuff.

18      Are there cultural factors that have been shown to have a

19  correlation with whether or not a patient tends to seek

20  treatment?

21  **A.**  Yes, there are many barriers to treatment.

22         **MR. SPIRO:**  Objection.  This is outside the scope.

23  This is not in his opinion.

24         **MR. COLLIER:**  There were lots of questions about the

25  lack of treatment record. Your Honor.

1      MR. SPIRO:  That's a specific opinion and --

2      THE COURT:  If you can show me where that is in his

3  report, I'm happy to allow you to go ahead.  Otherwise, you

4  should move on.

5      MR. COLLIER:  Understood.

6  BY MR. COLLIER:

7  Q.  Dr. Reading, would you agree with me, it is hard to get

8  medical records for someone who was unable to afford treatment?

9      MR. SPIRO:  Objection.

10     THE COURT:  Overruled.

11     THE WITNESS:  Yeah, that would be fair comment, I

12  think.

13  BY MR. COLLIER:

14  Q.  Now, Mr. Spiro indicated that in your report you indicated

15  somewhere that Mr. Diaz had been evasive during his interview

16  with you.  Do you recall that question?

17  A.  I recall that question.

18     MR. SPIRO:  Objection.  Mischaracterizes and it is in

19  his testimony.

20     THE COURT:  Overruled.  You can answer.

21     THE WITNESS:  I recall his question.

22  BY MR. COLLIER:

23  Q.  And I noted he didn't actually show you that.  Do you have

24  any actual recollection of Mr. Diaz being evasive during your

25  interview?

1    **A.**    No, I don't.  He seemed to suggest he was quoting me, but

2    he didn't furnish me with that, but I don't recall that.

3    **Q.**    And I did a term search in your report for the word

4    "evasive" while we were waiting.  I didn't see anything.

5              **MR. SPIRO:**  Objection, Counsel is providing testimony.

6              **THE COURT:**  Exactly, sustained.  It's struck.

7    **BY MR. COLLIER:**

8    **Q.**    Can the type of conduct alleged by Mr. Diaz cause someone

9    to become more antisocial?

10   **A.**    Well, certainly it tends to -- when you say "antisocial,"

11   that has a specific meaning.  Asocial or socially avoidant

12   would be what I would term.  Antisocial is very specific, which

13   is not applicable to Mr. Diaz but asocial or socially avoidant.

14                        (Pause in proceedings.)

15   **BY MR. COLLIER:**

16   **Q.**    Mr. Diaz has testified in this trial that he worked at

17   Tesla for nine months as opposed to 18.  Is it possible there

18   was a miscommunication between you two?

19   **A.**    It is possible I could have misheard him.  Nine months

20   might have seemed like 18 if it was as he described.

21   **Q.**    Would the fact that he only worked there nine months

22   change any of your opinions?

23   **A.**    No.  That would still be an extended duration of exposure.

24   It wouldn't change.

25   **Q.**    Mr. Spiro suggested that you, quote, "handout diagnoses,"

1    is that --

2              MR. SPIRO:  Objection.  No, I didn't.

3              THE COURT:  Overruled.  Let's ask the question,

4    though.

5    BY MR. COLLIER:

6    Q.   Is that an accurate characterization of your work?

7    A.   Well, I don't think Mr. Spiro, if that's his name, said

8    that.

9              MR. SPIRO:  Thank you.

10             THE WITNESS:  But it's not -- I am an empiricist.  I

11   have a research background.  For 20 years I ran various

12   research programs, and there is a certainty integrity to

13   running research and that one has to let the data speak to the

14   conclusions and the same applies to my clinical work and the

15   work I do in the forensic setting.

16        It is a matter of accruing data, and then the conclusions

17   are based on those data; and there may be caveats as in this

18   case.  I can -- I applied caveats in the sense that there were

19   no records, no subject to that -- those events occurring as

20   claimed.  My conclusions follow from the data that I accrued.

21   BY MR. COLLIER:

22   Q.   Last question for me, Dr. Reading.  Do all of your

23   patients always tell you the full name of each person that has

24   harmed them?

25   A.   Well, names, no.  And also, I have trouble with names

 1  often, so very often I don't note them because it's hard --

 2  when people talking quickly, it's hard to take them down.  I

 3  find names difficult.

 4          **MR. COLLIER:**  No further questions, Your Honor.

 5          **THE COURT:**  All right.  Did --

 6          **MR. SPIRO:**  Just --

 7          **THE COURT:**  -- you want to point him to the report?

 8                         <u>**RECROSS-EXAMINATION**</u>

 9  BY MR. SPIRO:

10  Q.   Sure.  So just three things.  I mean, you did get down the

11  names Lamar Patterson.  You did get that name down and you did

12  get Ramon Martinez down.  Fair?

13  A.   Some names but, you know, you run out of steam if there

14  are a lot of names.

15  Q.   Okay.  Well, steam aside --

16  A.   If someone is saying a lot of names, one gets, you know,

17  some of them down.

18  Q.   Okay.  You had -- you took lots of handwritten notes;

19  right?

20  A.   Yes.

21  Q.   And if you could turn -- you actually wrote in your notes

22  that he said --

23          **THE COURT:**  Why don't you tell us where you are.

24          **MR. SPIRO:**  It's hard to tell him where it is in his

25  notes.

1           **THE COURT:**  Okay.  Why don't you show him?

2           **THE WITNESS:**  I don't think it's in there.

3           **MR. COLLIER:**  May I get a copy of what you are showing

4    the witness, please?

5           **THE COURT:**  Look at that first and then we will show

6    it to you.

7                       (Pause in proceedings.)

8           **THE COURT:**  Mr. Spiro, will you now bring it back and

9    show it to Mr. Collier?

10          **MR. SPIRO:**  I assume they --

11          **THE COURT:**  Don't comment.  Just do it, please.

12          **MR. SPIRO:**  Yep.

13                      (Pause in proceedings.)

14   **BY MR. SPIRO:**

15   **Q.**   In your notes it indicates clearly, as I just showed you,

16   Doctor, that it says "one-and-a-half years" for his time

17   working there; right?

18   **A.**   In my notes it says that but surely it says it in the

19   report also.  You didn't see that in the report?

20   **Q.**   No, no, I did see that in the report.  I was trying to be

21   fair to you, sir, to show that it is not only in the report, it

22   is actually in your contemporaneous handwritten notes.  True?

23   **A.**   You don't have to be fair.  I record the data and rely on

24   that.  I'm not here to suggest anything that's not recorded.

25   **Q.**   Right.  So -- and again, in your contemporaneous

1  handwritten notes when you were talking to him, that's what was

2  in your notes.  Fair?

3  **A.**   Yes.  There is no dispute there.  That's what he said.

4  **Q.**   And then I'm just going to show you page 29 of your

5  transcript, and I'm not going to ask you to read it into the

6  record at all.  I just want to make sure --

7          **MR. COLLIER:**  Your Honor, this violates a motion in

8  limine.

9          **MR. SPIRO:**  -- that you indicated that he was evasive.

10         **THE COURT:**  Hang on just a second.  So, page 29 of

11  what are we talking about?

12         **MR. COLLIER:**  Of his deposition.

13         **THE WITNESS:**  I have it.  Do you want it?

14         **MR. COLLIER:**  Lines 6 through -- excuse me -- 2

15  through 11.

16                    (Pause in proceedings.)

17         **THE COURT:**  Yeah, sustained.

18         **MR. SPIRO:**  Okay.  I have no further questions.

19         **THE COURT:**  Thank you, sir.

20         **MR. COLLIER:**  No further questions, Your Honor.

21         **THE COURT:**  All right.  Dr. Reading, you are excused.

22         **THE WITNESS:**  Thank you, Your Honor.  Thank you very

23  much.

24                    (Pause in proceedings.)

25         **MR. COLLIER:**  Plaintiff calls La'Drea Jones.

```
 1                      (Pause in proceedings.)

 2          THE COURT:  Come on up, Ms. Jones.

 3          THE CLERK:  If you will step up and remain standing.

 4   You can take off your mask if you have been vaccinated.  I'm

 5   going to take your photograph and swear you in.

 6      Raise your right hand, please.

 7                         LA'DREA JONES,

 8   called as a witness for the Plaintiff, having been duly sworn,

 9   testified as follows:

10          THE CLERK:  Be seated.  If you would please begin by

11   stating your full name and spelling it for the court reporter.

12          THE WITNESS:  My first name is La'Drea, L-A-D-R-E-A;

13   last name Jones, J-O-N-E-S.

14          THE COURT:  Ms. Nunley, please proceed.

15          MS. NUNLEY:  Thank you, Your Honor.

16                       DIRECT EXAMINATION

17   BY MS. NUNLEY:

18   Q.  Good morning, Mr. Jones.  Do you know Mr. Diaz?

19   A.  Yes.

20   Q.  How do you know him?

21   A.  He is my dad.

22   Q.  How long have you known him for?

23   A.  My whole life, so 30 years.  I'm 31.

24   Q.  Did you live with Mr. Diaz during the 2015 to 2016 time

25   period?
```

1   **A.**   Yes.

2   **Q.**   And that was while he worked at Tesla; right?

3   **A.**   Correct.

4   **Q.**   Did you ever apply to work for Tesla yourself?

5   **A.**   I did, yes.

6   **Q.**   Do you recall approximately when that was?

7   **A.**   Oh, Jesus, summer of 2015, maybe around August.

8   **Q.**   So that was after Mr. Diaz started working at Tesla; is

9   that right?

10  **A.**   Yes.

11  **Q.**   When you applied to work at Tesla, did anybody encourage

12  you to apply there?

13  **A.**   No.

14  **Q.**   Did Mr. Diaz ever suggest that you work at Tesla?

15  **A.**   No.

16  **Q.**   So if somebody said in court that Mr. Diaz told you to

17  work at Tesla or encouraged you to apply, that wouldn't be

18  true; right?

19  **A.**   No, not true.

20  **Q.**   How did you find out that Tesla was hiring?

21  **A.**   Probably through Indeed.  At that time -- well, I mean,

22  even still today, I just look at a bunch of applications and go

23  through them and apply for whatever job I find.

24          **THE COURT:**  Could you pull the mic a little closer to

25  you, Ms. Jones?

1          THE WITNESS:  Yeah.

2          THE COURT:  Great.  Thank you.

3    BY MS. NUNLEY:

4    Q.   Did you speak with Mr. Diaz about the work environment at

5    Tesla before you applied there?

6    A.   No.

7    Q.   Did you tell him that you were thinking about applying to

8    work at Tesla before you completed the application?

9    A.   No.

10   Q.   Did you tell Mr. Diaz at any point that you had applied to

11   work at Tesla?

12   A.   Yeah, after I applied.  I probably just told him, like,

13   "Oh, I applied to Target.  I applied to Tesla.  I applied to

14   Southern Glaciers," you know, out of all the applications, I

15   probably just gave him a rundown of everywhere that I did apply

16   to.

17   Q.   Did Mr. Diaz have any kind of response after you told him

18   you'd applied to work at Tesla?

19   A.   No, he just said "okay."

20   Q.   Why did you apply to work at Tesla?

21   A.   Well, I mean, I always try to have two jobs.  And at the

22   time I was working for the City of Daly City, and then that was

23   just going to be my second income.

24   Q.   Was there anything special about the position at Tesla

25   that drew you to apply there over somewhere else?

**JONES - DIRECT / NUNLEY**

1    **A.**   No.

2    **Q.**   And after you completed the application, did you get an

3    interview to work there?

4    **A.**   Yes, I did.

5    **Q.**   Did Tesla hire you after the interview?

6    **A.**   No.

7    **Q.**   How did you find out that you weren't hired?

8    **A.**   They tell you right away after your interview.

9    **Q.**   And so they told you right at the -- after the interview

10   that you weren't going to be hired?

11   **A.**   Correct.

12   **Q.**   Did you ever get a job at Tesla at any point in time?

13   **A.**   No.

14   **Q.**   So if someone was to say that you had worked at Tesla at

15   any point of time, that just wouldn't be true; right?

16   **A.**   Yeah, that's not true.

17   **Q.**   Did you tell Mr. Diaz that you failed the interview?

18   **A.**   Yeah, after the fact.

19   **Q.**   And what was his response, if any?

20   **A.**   He just said, "I'm glad you didn't get the job," but --

21   **Q.**   Thank you.  And now I want to step back a little bit in

22   time.  Could you tell me about Mr. Diaz's personality before he

23   started working at Tesla?

24   **A.**   I mean, well, he was just my regular old dad.  Um, he's

25   always joked with me.  He made sure I was okay.  He joked with

1   my friends, just, you know, regular dad.

2   **Q.**   Before Mr. Diaz started working at Tesla, did he ever talk

3   to you about work?

4   **A.**   No.

5   **Q.**   When Mr. Diaz was upset or sad prior to him getting that

6   job at Tesla, would he ever share those feelings with you?

7   **A.**   No.

8   **Q.**   But in spite of that since you lived with him and you knew

9   him well, you could observe changes to his mood; right?

10  **A.**   Yes.

11  **Q.**   After Mr. Diaz started working at Tesla, did you notice

12  any changes to his personality?

13  **A.**   Yeah, he got a lot more moodier, a bit down, but the -- a

14  lot moodier for sure.

15  **Q.**   When did you first notice Mr. Diaz becoming more moody and

16  sad?

17  **A.**   Like September 2015.

18  **Q.**   Is there any particular reason that date stands out for

19  you?

20  **A.**   Yeah, so, my best friend -- her name is Haley -- her

21  birthday is in September and with my dad, if he built a good

22  relationship with you no matter what, he changes your name.

23       So instead of you being "Your Honor," he would call you

24  "Joe" or something, and he would call her "Sam" even though her

25  name is Haley.  And she came over to the house one day and it

1    was her birthday.  I was like, "Oh, dad, it's Haley's

2    birthday."  He didn't say, "Happy birthday, Sam" or "I'm going

3    to get you guys dinner."  He just said, "Happy birthday,

4    Haley," that's all.  Nothing else.

5    **Q.**   That sounds like this more serious, less-joking behavior

6    was out of character for Mr. Diaz?

7    **A.**   Yeah.

8    **Q.**   Did you notice any changes to his sleeping habits in the

9    2015/2016 time period?

10   **A.**   Yes.

11   **Q.**   What were those changes?

12   **A.**   He would stay up really late.  It would be times that I go

13   to the bathroom in the middle of the night, and it would be

14   like 3:00 in the morning, 2:00 in the morning, 4:00 in the

15   morning; and he would just be up just watching TV.

16   **Q.**   And when did you first observe those changes to his

17   sleeping habits?

18   **A.**   Probably around the same time when I noticed that he

19   didn't, like, joke around for Haley with her birthday, so maybe

20   like end of September, early October.

21   **Q.**   And earlier you mentioned that Mr. Diaz became a little

22   less talkative in around September of 2015.  Before he started

23   working at Tesla, how often did you speak?

24   **A.**   Before he started working there, every day.

25   **Q.**   Did that change after he started working at Tesla?

1   **A.**   Yes.

2   **Q.**   And how often did you speak once he started at Tesla?

3   **A.**   Maybe like a few times a week.

4   **Q.**   And now to shift gears a little bit.  At some point you

5   moved out of your parents home and moved to Las Vegas; right?

6   **A.**   Yes, it was December or the end of 2015, December 20 --

7   no, I moved back in December 2016.  So I moved to Las Vegas in

8   January of 2016.

9   **Q.**   And after you moved to Las Vegas in 2016, was your dad

10  still less talkative?

11  **A.**   Yes.

12  **Q.**   And could you tell me a little bit about that?

13  **A.**   Well, I mean, when I moved, I would call him.  He wouldn't

14  pick up.  And if I was like, checking in with my mom, he would

15  literally just "hey, kid," and I would have to tell him, like,

16  "I'm okay, dad," and -- you know, "I'm not doing anything.  I

17  like it here," and he was just like "okay, good," but that's

18  about it.

19  **Q.**   And that was out of character for your dad?

20  **A.**   Yeah.

21  **Q.**   Is Mr. Diaz still overall less moody -- more moody and

22  less talkative like he was in 2015 and 2016?

23          **MR. SPIRO:**  Objection.

24          **THE WITNESS:**  I mean, no, he is -- he is back to

25  normal now.

 1   BY MS. NUNLEY:

 2   Q.   After you moved back from Las Vegas at the end of 2016,

 3   did you notice your dad staying up late and watching TV?

 4   A.   No.   That got better as well.

 5   Q.   And you have a brother Demetric; right?

 6   A.   Yes.

 7   Q.   Did Demetric and your father speak often before they

 8   started working at Tesla?

 9   A.   Before, yeah, they would speak every day.

10   Q.   Do they still speak?

11   A.   No, not really.

12           MR. SPIRO:   Objection, outside --

13           THE COURT:   Sustained.

14           MS. NUNLEY:   No further questions.

15           THE WITNESS:   Thank you.

16                      <u>CROSS-EXAMINATION</u>

17   BY MR. SPIRO:

18   Q.   Hi, Ms. Jones.   I just have a few questions for you.

19   Okay?

20   A.   Okay.

21   Q.   All right.   So, you said that when your dad was working at

22   Tesla and you were in the home, he was a little sleepless; is

23   that fair?

24   A.   Yes.

25   Q.   And also beyond being sleepless, he was a little moodier;

1   is that fair?

2   A.   Correct.

3   Q.   Okay.  And at the time -- you know before Tesla in 2015,

4   your dad was a supportive dad that talked to you all the time;

5   right?

6   A.   Correct.

7   Q.   So, like, for example, when you left college at Denison,

8   he didn't give you a hard time.  He said everything is going to

9   be fine; right?

10  A.   Yeah, he said it was going to be fine but he would still

11  check up on me when I left.

12  Q.   Okay.  And about your application to Tesla, he knew you

13  were applying, right, you told him -- whether it was right

14  before you submitted or right after, you did tell him you

15  applied.   True?

16  A.   After, yes.

17  Q.   Okay.  And I think your testimony is he probably said okay

18  but didn't really say anything?

19  A.   Correct.

20  Q.   And your brother could have been there during that

21  conversation between you and your father too; right?

22  A.   I don't recall him being there, no.

23  Q.   Okay.  And you told your brother after you applied too and

24  he had -- he said, "Oh, okay," that's basically it; right?

25  A.   My brother.

1   **Q.**   Yeah.

2   **A.**   I don't remember what my brother said.

3   **Q.**   Okay.  And your brother didn't have any reaction when you

4   didn't get the job.  Your brother was just like "Oh, okay,"

5   when you didn't get the job?

6   **A.**   I don't even remember how I told my brother, but I'm

7   pretty sure he was just saying okay.

8   **Q.**   And do you remember the exact date that you -- that you

9   applied; do you remember?

10  **A.**   Oh, I don't remember the exact day.  I know it was summer

11  of 2015, though.

12          **MR. SPIRO:**  Yeah.  I'm just going to show the witness

13  to see if this refreshes her recollection Exhibit 403-1 and

14  only for the witness, please, just on your screen.

15          **THE COURT:**  I don't think we can --

16          **THE CLERK:**  Yeah, we can do that.

17          **THE COURT:**  -- do that, so why don't you come on up.

18          **MR. SPIRO:**  Sorry.  I think this is easier.  Do you

19  see this?

20                        (Pause in proceedings.)

21  BY MR. SPIRO:

22  **Q.**   Do you see on the application the -- does that?

23          **MS. NUNLEY:**  Objection, Your Honor, authenticity.  We

24  have never seen this document before.

25          **MR. SPIRO:**  I'm just simply asking --

1            THE COURT:  Hang on just a second.

2                      (Pause in proceedings.)

3            THE COURT:  Well, you can ask whether it refreshes her

4    recollection as to something.

5    BY MR. SPIRO:

6    Q.   Yeah.  Do you see --

7            THE COURT:  Just ask whether it refreshes her

8    recollection for whatever you are asking.

9    BY MR. SPIRO:

10   Q.   There is just an indication on that page.  Does this

11   refresh your recollection that you -- you did your interview on

12   September 23rd?

13   A.   I don't remember what day I did my interview, no.

14   Q.   Okay.  And this document doesn't refresh your

15   recollection?

16   A.   No.

17   Q.   Okay.  After -- after you didn't -- after your interview

18   and you didn't get the job, that was an unfortunate outcome;

19   right?

20   A.   Yes.

21   Q.   Okay.  And just to be clear, your father never, during

22   that time period, told you that he experienced any

23   discrimination or racial harassment at work; right?

24   A.   Correct.  He has never told me.

25   Q.   Okay.  And, you know, you come back from Las Vegas in

1   2016, and I think -- as you said but just to make sure -- you

2   know, he is back to sleeping normal; right?

3   **A.**    Correct.

4   **Q.**    He is joking all the time again; right?

5   **A.**    Correct.

6   **Q.**    And he is back to being your dad in 2016; right?

7   **A.**    Correct.

8            **MR. SPIRO:**  Thank you.  No further questions.

9            **THE COURT:**  All right.

10           **MS. NUNLEY:**  Nothing further, Your Honor.

11           **THE COURT:**  All right.  Ms. Jones, you can step down.

12   Thank you.

13           **MR. COLLIER:**  Plaintiff calls Dr. Charles Mahla,

14   Your Honor.

15           **THE COURT:**  Okay.

16           **MR. ORGAN:**  This is a Zoom --

17           **THE COURT:**  Would it make more sense to take our break

18   for today and --

19           **MR. ORGAN:**  Then we can start --

20           **THE COURT:**  Start again in the morning.

21           **MR. ORGAN:**  That would be fine, Your Honor.  For

22   timing, I mean, I only have him for about ten minutes.

23           **THE COURT:**  I understand but it's almost 1:30.  It's

24   going to take a little while to get the technology set up, so

25   why don't we take an early break for today.

1          **MR. ORGAN:**  Okay.  That would be great.  Thank you,

2    Your Honor.

3          **THE COURT:**  Okay.  So, ladies and gentlemen, you get

4    to go home a little bit earlier.  Nobody should be excited

5    about this.  Everybody should be excited about tomorrow because

6    you are going to come at the same time that you have, and I

7    really do appreciate how prompt you have been and how attentive

8    you have been.

9          And it's -- it's really -- the things that I tell you

10   about not communicating and not researching are really

11   important because there is still more to come.

12         So you have to get the entire trial, all the evidence in

13   front of you before you start talking about what -- what

14   happened and what the right thing to do is.

15         So, tomorrow I -- I think I warned you I want you to be

16   here for -- it's going to be a pretty full day.  We are going

17   to finish -- there's still some more evidence to come in and

18   then I'm going to give you instructions about the law that

19   applies, and then the lawyers are going to give you their

20   perspectives of what happened, I suspect.

21         I will remind you again that what they say isn't evidence

22   but it is their perspective, and you will want to consider all

23   of those things when you go to deliberate.

24         So, plan on that.  And now, I have wasted a couple of your

25   minutes.  Go, enjoy the afternoon and I will see you tomorrow

1   morning at 8:30.

2       (Proceedings were heard outside the presence of the jury:)

3       **THE COURT:**  Please be seated, everybody.  So I'm not

4   sure how the timing is going to work tomorrow.  I haven't just

5   figured out how much more time everybody has.

6       My hope is that we finish the evidence and can give the

7   jury a decent break for lunch and then launch into the

8   instructions and closing.  That's -- but I don't know how

9   that's actually going to play out.

10      **MR. SPIRO:**  Yeah, my prediction is that the entire

11  remainder of the testimony is only going to be about 90

12  minutes, I would think, including our case and their case.

13  There is very little left, Your Honor.  I think we can do it

14  even faster than that.

15      **THE COURT:**  Okay, that's fabulous.  Well, you should

16  be ready for that and then only -- so we do have instructions

17  to talk about tomorrow morning at 8:00; but if -- if I have a

18  little bit more time to play with because the evidence is going

19  to be that short, we will just make sure that we have got it

20  set.

21      I'm going to do some revisions to the instructions, which

22  I will put on ECF tonight so that you can look at them, and we

23  can have a final go at them in the morning.

24      **MR. SPIRO:**  Thank you, Your Honor.

25      **THE COURT:**  All right.

**PROCEEDINGS**

1    **MR. ORGAN:**  Thank you, Your Honor.  And Mr. Rubin --

2    **THE COURT:**  Come up to the microphone, please.

3    **MR. ORGAN:**  Mr. Rubin can join us by Zoom.

4    **THE COURT:**  Mr. Rubin -- he is welcome any time.

5                         (Laughter)

6    **THE COURT:**  In any way.  Love to see Mr. Rubin.

7    **MR. ORGAN:**  Thank you.

8         (Proceedings adjourned at 1:23 p.m.)

9                      ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    __CERTIFICATE OF REPORTER__

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, March 30, 2023

8

9

10                    _Marla Knox_

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25