**Volume 5**

**Pages 901 - 1136**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | |
|---|---|
| OWEN DIAZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   **NO. C 17-06748 WHO** |
| | ) |
| TESLA, INC. dba TESLA MOTORS, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Friday, March 31, 2023

**<u>TRANSCRIPT OF TRIAL PROCEEDINGS</u>**

**<u>APPEARANCES</u>:**

For Plaintiffs:

          CALIFORNIA CIVIL RIGHTS LAW GROUP
          332 San Anselmo Avenue
          San Anselmo, California  94960
    **BY:  LAWRENCE A. ORGAN, ATTORNEY AT LAW**

          ALEXANDER MORRISON + FEHR LLP
          1900 Avenue of the Stars - Suite 900
          Los Angeles, California  90067
    **BY:  J. BERNARD ALEXANDER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
        United States District Court - Official Reporter

```
 1  APPEARANCES:  (continued)

 2  For Plaintiffs:
                        ALTSHULER BERZON LLP
 3                      177 Post Street - Suite 300
                        San Francisco, California  94108
 4             BY:  JONATHAN ROSENTHAL, ATTORNEY AT LAW
                    MICHAEL RUBIN, ATTORNEY AT LAW
 5
                        COLLIER LAW FIRM, LLP
 6                      240 Tamal Vista Boulevard - Suite 100
                        Corte Madera, California  94925
 7             BY:  DUSTIN L. COLLIER, ATTORNEY AT LAW

 8  For Defendants:
                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
 9                      51 Madison Avenue - 22nd Floor
                        New York, New York  10010
10             BY:  ALEX SPIRO, ATTORNEY AT LAW
                    STEPHANIE KELEMEN, ATTORNEY AT LAW
11
                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
12                      865 South Figueroa Street - 10th Floor
                        Los Angeles, California  90017
13             BY:  DANIEL C. POSNER, ATTORNEY AT LAW

14                      QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        300 West 6th Street - Suite 2010
15                      Austin, Texas  78701
               BY:  ASHER GRIFFIN, ATTORNEY AT LAW
16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2   Friday, March 31, 2023 - Volume 5

 3                                                PAGE   VOL.

 4   Plaintiff's Rests                             943    5
     Defense Rests                                1014    5
 5   Final Jury Instructions                      1015    5
     Closing Argument by Mr. Alexander            1037    5
 6   Closing Argument by Mr. Spiro                1081    5
     Rebuttal Argument by Mr. Alexander           1124    5
 7   Final Jury Instructions                      1128    5

 8   PLAINTIFF'S WITNESSES                         PAGE   VOL.

 9   MAHLA, CHARLES
      (SWORN)                                      936    5
10   Direct Examination by Mr. Organ               936    5
     Cross-Examination by Mr. Griffin              940    5
11
     DEFENDANT'S WITNESSES                         PAGE   VOL.
12
     DELGADO SMITH, JACKELIN
13    (SWORN)                                      944    5
     Direct Examination by Ms. Henderson           944    5
14   Cross-Examination by Ms. Nunley               958    5
     Redirect Examination by Ms. Henderson         966    5
15
     DELAGRANDE, JOYCE
16    (SWORN)                                      968    5
     Direct Examination by Ms. Henderson           968    5
17   Cross-Examination by Mr. Collier              983    5
     Redirect Examination by Ms. Henderson        1001    5
18
     DI-AZ, DEMETRIC
19   By Videotaped Deposition (not reported)      1014    5

20                        E X H I B I T S

21   TRIAL EXHIBITS                        IDEN   EVID   VOL.

22     62                                        1014    5

23    265                                        1014    5

24    368                                        1014    5

25
```

| | |
|---|---|
| 1 | <u>**Friday - March 31, 2023**</u>                                   <u>**8:01 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | (Proceedings were heard outside the presence of the jury:) |
| 5 | **THE CLERK:**  Please come to order. |
| 6 | **THE COURT:**  Good morning, everybody. |
| 7 | Please be seated, everybody. |
| 8 | (Pause in proceedings.) |
| 9 | **THE COURT:**  We have a few things to go over today. |
| 10 | First, we haven't posted the minutes yet, but the time |
| 11 | remaining when we post them will be that the Plaintiff has an |
| 12 | hour and 54 minutes left, and the Defense has two hours and |
| 13 | 5 minutes left. |
| 14 | With respect -- so I'm going to give you, because of the |
| 15 | number of things that were filed -- oh, Mr. Rubin, we probably |
| 16 | need to get on the screen. |
| 17 | **MR. ORGAN:**  Yes, Your Honor. |
| 18 | (Pause in proceedings.) |
| 19 | **THE COURT:**  Good morning, Mr. Rubin. |
| 20 | **MR. RUBIN:**  Good morning.  Thank you, Your Honor. |
| 21 | **THE COURT:**  All right.  So with respect to everything |
| 22 | that's been filed, let me tell you how I'm looking at them and |
| 23 | then I'm happy to listen to you.  And -- and the first thing |
| 24 | that I'm going to want to ask about, before I hear argument on |
| 25 | different things, are the jury instructions.  But let me -- if |

1   there are any problems with them.

2       So -- but let me tell you the tentatives.  With respect to

3   the impeachment designations, I'm inclined to deny those.  The

4   parties agree -- my understanding is that the parties agreed on

5   what was going to be used from Mr. Diaz's deposition.  You knew

6   what Owen Diaz was going to testify, so I think the time to

7   include it would be past.

8       And I'm going to give you all a chance to argue.  I'm sure

9   there's going to be lots of argument about lots of stuff, so

10  let me just go through all of this and then we will pick them

11  back up.

12      With respect to the Ms. DelaGrande and Navarro sexual

13  innuendo brief, here is how I look at it.  That is clearly

14  irrelevant to damages.  There was no objection.  There -- as

15  far as I know, there was no discovery or testimony on this from

16  the first trial, and that Mr. Jackson named Ms. Navarro in his

17  testimony, but Mr. Martinez did not.  I think that's the -- how

18  the record is.

19      What I'm inclined to do first is to say that

20  Ms. DelaGrande today may not testify regarding alleged comments

21  about her dating Black guys or any topic of a sexual nature

22  that was not adduced in the first trial.

23      Second, I'm inclined to strike and instruct the jury not

24  to consider the questions asked yesterday about Mr. Diaz's

25  alleged comments about co-workers' sex lives or calling them

1   "stupid Mexicans," which Mr. Diaz denied because they are

2   irrelevant to the jury's consideration and were brought up for

3   the first time in eight years yesterday.

4        Third, I'm also inclined to tell the jury to disregard

5   questions regarding the pretrial proceedings for Demetric Di-Az

6   because those are irrelevant to the proceedings.

7        Four, I didn't realize that when I was looking at that

8   doctor's note, that it had been put up on the screen and --

9   okay.  I'm delighted to hear that.  But in any event, I will

10  tell the jury to disregard questions and testimony regarding

11  the doctor's note because it's outside the scope and immaterial

12  to damages.

13       And then the final thing that I wanted to tell both

14  counsel who will be arguing in closing, I do not want to hear

15  any ad hominem attacks on counsel and I do not want to have any

16  vouching.

17       So just -- I'm -- I know because you are consummate

18  professionals that I won't hear, but I'm just telling you if I

19  hear it, I will come out of my chair.

20       All right.  Now, to the jury instructions first because I

21  want to make sure that we've got those right.  And...

22            **MR. POSNER:**  May I, Your Honor?

23            **THE COURT:**  Mr. Posner come on up.  And regrettably,

24  although this was the first thing I was going to take up, I

25  left my binder in chambers.  So take a deep breath.  I'm going

```
 1    to go get it, and I'll be right back.

 2                        (Pause in proceedings.)

 3            THE COURT:  My apologies.  All right.

 4        Please be seated, everybody.

 5        So I will start with Mr. Rubin.  Any comments on the final

 6    instructions -- the proposed final instructions?

 7            MR. RUBIN:  Yes.  I want to preserve two objections,

 8    and then I would like to change your mind as to one.

 9            THE COURT:  Okay.

10            MR. RUBIN:  We do believe that the description of the

11    verdict form should define past and future the way we suggested

12    the other day, and we also think that the Court should not have

13    dropped the instruction that explains what the first jury did

14    with respect to punitive liability, damages liability.

15        I know that counsel for Tesla said it was repetitive, but

16    the Court was right when it explained that those instructions

17    came at two different points in the packet of instructions and

18    were presented for two very different purposes.  The first was

19    in the section explaining what the first jury held and why.

20    The second was instructing the jury what it is supposed to do.

21        We would request that that instruction that was deleted in

22    the most recent version be reinserted so the jury has a clearer

23    idea of what the first jury found with respect to liability for

24    punitive damages which has obviously been a major issue in the

25    briefing before the Court.
```

1          Third, I want to turn to the additional language that the

2   Court added to Instruction Number 23 at Tesla's request.

3          After the language that was in the instruction at the

4   first trial and in the proposed instruction, I believe it was

5   24 in your preliminary final instructions, you added -- this

6   has been described in compensatory damages.  It's in the second

7   paragraph.

8          "In addition to the form language that states compensatory

9   damages means the amount of money that will reasonably and

10  fairly compensate Mr. Diaz for any injury you find was caused

11  by Tesla," you added the words "Tesla's conduct that has been

12  determined to have subjected Mr. Diaz to a racially hostile

13  work environment as described in Instructions 19 to 24."

14         That is both unnecessary because it's covered by

15  Instruction Number 2, and I believe that the fact that the

16  reference to punitive damages liability Instruction Number 2

17  was the reason you withdrew the prior reference to punitive

18  damages liability.

19         So first, it is already covered, but secondly and far more

20  important, it is incorrect.  While we absolutely agree that

21  Tes -- that damages are based on Tesla's conduct and inaction

22  that caused damage to Mr. Diaz, this case is not limited to

23  what Tesla did to subject Mr. Diaz to a racially hostile work

24  environment, and that's clear from Instructions Number 19 to 24

25  themselves.

1        Don't forget there is the negligent claim under state law

2   that's at issue here.  As Instruction Number 2 itself points

3   out, Tesla is liable, not -- and I'm quoting -- is liable not

4   just for creating a hostile work environment based on race in

5   violation to federal law but also failing to prevent racial

6   harassment in violation of federal law and negligently

7   retaining and supervising one of Mr. Diaz's supervisors in

8   violation of California law.

9        It goes on and covers the point that I think your

10  additional language sought to address.

11       So, we would suggest that you revert to the language that

12  was in original Instruction 38.  It was in your preliminary

13  instruction that this instruction stop after the word "Tesla,"

14  or if you want to add anything, should conduct -- Tesla's

15  conduct and inaction as described in Instruction Numbers 19

16  through 24.  This case is not limited to affirmative conduct

17  causing a racially hostile work environment.  We think that

18  would be an inaccurate and misleading instruction and would be

19  improper.

20            **THE COURT:**  Okay.  Mr. Posner.

21            **MR. POSNER:**  Sure, Your Honor.  Thank you.

22       I can take those, I guess, starting with Number 23.  This

23  is a case about a racially hostile work environment, and the

24  negligent supervision claim is in -- and largely, it's a

25  derivative claim based on the underlying conduct that caused or

 1  contributed to the racially hostile work environment.  I'm not

 2  hearing Mr. Rubin disagree that this is a case about racially

 3  hostile conduct, and what we're concerned about and what we put

 4  in our submission are all the references that we're hearing in

 5  the testimony to conduct of a non-racial nature, violent

 6  conduct.  We referenced Ms. Oppenheimer's testimony, for

 7  example, that you can award damages for any conduct that's

 8  violent.  That's not what this case is about.  That's not what

 9  these laws -- that's not what the liability findings that the

10  first jury made.  And so there's nothing improper about

11  instructing -- giving this causation instruction simply to

12  confirm that the jury's damages verdict here must be tethered

13  to conduct that gave rise to the liability verdict in the first

14  trial which was based on racially hostile conduct.

15      So nothing improper about that.  There is no causation

16  instruction in Number 2.  This is not duplicative of anything

17  else that appears elsewhere in the instructions, so we think

18  Your Honor was correct to add this here in Instruction

19  Number 23.

20          **MR. RUBIN:**  Your Honor.

21          **THE COURT:**  Hang on just a second.

22      Yeah, go ahead, Mr. Rubin.

23      **MR. RUBIN:**  What Tesla is seeking to accomplish

24  through this additional language was to negate any damages

25  resulting from the elevator incident in which Mr. Martinez came

1   in, may or may not have made racial epithets -- the testimony

2   is mixed.  Certainly had threats of violence.  The testimony is

3   that he came in with his fists balled up and that Mr. Diaz had

4   his hands in the air.  This will be the focus of an argument --

5   a closing argument by Tesla's counsel in order to exclude

6   evidence that is properly before the jury.  Mr. Martinez and

7   Mr. Hurtado were negligently supervised by Tesla with respect

8   to their treatment of Mr. Diaz.  It wasn't limited solely to

9   racial epithets.  I believe if you simply refer to the conduct

10  or inaction that's set forth in your instructions, that would

11  be adequate.  That's the way you did it the last time.  That's

12  the way the standard instruction goes.

13          **THE COURT:**  Okay.  All right.

14      I'm going to think about this one more time when I get off

15  the bench.

16          **MR. POSNER:**  Your Honor, I'd just say it's not simply

17  the elevator incident.  If the jury here were to find if it's

18  non-racial incident, then it really shouldn't contribute -- it

19  couldn't have contributed to the first jury's finding of

20  liability.

21      But our concern is based on these accusations and

22  allegations about Mr. Diaz having been threatened to be shot

23  and issues that really aren't part of this case but are --

24  contribute to a violent nature at the factory, which is the

25  story that they're trying to tell.  It would be improper for

1  this jury to award damages based on that conduct if it's not

2  found to have a racial component to it.

3      **THE COURT:**  Yeah.  But you're also arguing, I think as

4  Mr. Rubin was suggesting, you would like to argue that the

5  elevator incident with Mr. Martinez should not be considered by

6  the jury.

7      **MR. POSNER:**  The jury's free to make that

8  determination, but if it determines it's conduct of a racial

9  nature, then arguably it's fair game.  And if not, it's not

10 because that's not consistent with the instructions in the

11 liability phase of this case.

12     **THE COURT:**  Well, I do understand the -- where the

13 rubber hits the road on that.

14     **MR. POSNER:**  All right.  Thank you, Your Honor.

15     On number -- I mean, I don't know if Your Honor wants to

16 hear additional argument about adding back Number 24 that

17 Your Honor took out.

18     **THE COURT:**  I think that is -- that argument is

19 preserved.  But I'm not going to add that back.

20     **MR. POSNER:**  Thank you.  I will say for record and at

21 the risk of looking a gift horse in the mouth that we do

22 disagree with the additional language that was added to 25,

23 which I'm not sure if Mr. Rubin has focused on that.  The new

24 paragraph that essentially incorporates some of the content of

25 what was the previous instruction, in particular, we object to

 1   the language that "It has been established" -- this is Number

 2   25 from Docket 450 -- "It has been established that Mr. Diaz is

 3   entitled to punitive damages because it has been determined

 4   that at least some of Tesla's conduct that harmed him was

 5   malicious, oppressive, or in reckless disregard of its rights."

 6        We object to any -- any instruction that tells the jury

 7   that some portion of the conduct that the first jury found was

 8   found to be malicious, and we think it's prejudicial to say

 9   that at least some of it has been found untethered to any

10   particular finding.  It sets up a guessing game by the jury

11   when the jury's here to find that, you know, any specific act

12   was not malicious.  So we'll state that objection for the

13   record, but I understand Your Honor has ruled.

14           **THE COURT:**  You are looking at a gift horse.

15           **MR. POSNER:**  Thank you.  But the last issue is the

16   instruction on the verdict.  I think Mr. Rubin is sticking with

17   what he -- with what the Plaintiff put in writing.  There were

18   a couple proposals that were discussed at the conference the

19   other day.  It sounds like Mr. Rubin is sticking with the

20   proposal that the cutoff between past and future be

21   October 2021.

22        We disagree with that for the reasons we previewed at the

23   conference the other day.  There's really no way for this jury

24   to take that information back in the jury room and do anything

25   with it.  There has been no testimony that delineates any

1    emotional distress that Mr. Diaz suffered before or after

2    October 2021.

3        It might be a fair distinction to draw out for the jury,

4    but if you are going to do that, Your Honor, we say you should

5    do it the way we put it in our proposed instruction.  Past is

6    past; future is future.  If the parties have adhered to

7    Your Honor's rulings about the presentation of evidence and not

8    bringing up incidents or acts that occurred prior to

9    October 2021, at least with respect to Mr. Diaz's emotional

10   distress, then there is no risk that by the jury finding past

11   and future is going to be incorporating conduct that came in

12   from past October 2021.

13       THE COURT:  Yeah.  So, on this, I have been thinking

14   about what's going to be the clearest for the jury to

15   understand, and I don't think there has been, as Mr. Posner was

16   just saying, some distinction in the evidence, and I don't

17   think it matters for appellate review or anything else to have

18   some different date.  And I think to the contrary, it -- it

19   will raise issues because I don't know how -- how one could

20   distinguish those things.

21       So I think it will be much clearer for them to consider

22   past -- and I also look back at -- at the argument of -- the

23   closing argument in the -- in the first trial, which

24   appropriately took past damages up to the date of the argument,

25   and so we're going to do the same thing.  We are going to take

1    past damages up to the date of the argument, which is today,

2    and future damages is tomorrow.

3        So that should provide the clarity for counsel when you

4    are arguing, and that's what I intend to do.

5        **MR. RUBIN:**  Thank you, Your Honor.  We do stand by our

6    original proposal as well as the alternative we suggested, but

7    we understand.

8        **THE COURT:**  Okay.  All right.  Anything else on the

9    jury instructions?

10       **MR. POSNER:**  Nothing on the jury instructions.  I have

11   a couple other brief points, if I may.

12       **THE COURT:**  Okay.

13       **MR. POSNER:**  One is that we do intend to make a motion

14   under Federal Rule of Civil Procedure 50(a) at the close of

15   evidence today.  I wanted to alert Your Honor to that.

16       **THE COURT:**  Okay.  So I will deem that it's made.  And

17   we can deal with it after the jury goes -- after you've done

18   your closing arguments and the jury goes out.

19       **MR. POSNER:**  Thank you, Your Honor.  And the last

20   point, Your Honor, certainly recalls the issue with

21   Mr. Hurtado.  There has been a lot of motion practice about

22   whether Your Honor would allow him to testify, to come into

23   court in order to defend himself in this case; Your Honor's

24   ruling is based on choices that were made in the first trial,

25   he could not do that.

1    There has been certainly accusations about weaponizing

2  your Court's rulings.  We think this happened in a very

3  egregious way in Mr. Diaz's testimony yesterday, and I want to

4  refer Your Honor to the transcript at page 788 to 789.  It's a

5  brief excerpt, if I might read it.

6    The question to Mr. Diaz:  "And this dispute with

7  Mr. Hurtado, you would agree with me, sir, because you were

8  here, no witness in this case before you testified, said a word

9  about Mr. Hurtado doing anything racist; true?

10    "ANSWER:  What I'm going to say is, you know, what I was

11  taught is let a person defend himself.  If you can bring

12  Mr. Hurtado in here, let him defend himself, that's what I was

13  taught."

14    That was Mr. Diaz's testimony.  We're certain that was

15  made with knowledge of the Court's rulings, and it really was

16  an attempt to capitalize on the ruling that Your Honor made.

17    We would ask only that, Your Honor, we're not asking for a

18  curative instruction but prohibit them from raising the issue

19  of Mr. Hurtado's absence in the closing argument that they

20  deliver today in light of that testimony that came in

21  yesterday.

22    **THE COURT:**  Mr. Hurtado -- there was a choice that was

23  made last time with respect to Mr. Hurtado.  There was a

24  failure to disclose, as I recall, Mr. Hurtado's -- during the

25  course of discovery.

 1      There is not a ton of evidence that came in this time

 2  about Mr. Hurtado.  I'm not going to preclude Mr. Alexander

 3  from mentioning Mr. Hurtado and the fact that he did not

 4  testify.

 5      I don't expect that it's going to be a central portion

 6  of -- of Mr. Alexander's closing because there wasn't very much

 7  about him that Mr. Diaz testified about.

 8          **MR. POSNER:**  Thank you, Your Honor.

 9          **THE COURT:**  Okay.  Just one more thing.  The -- there

10  is this -- there's a pending motion for a mistrial, and I'm

11  happy to hear argument about that after the jury goes out, but

12  I'm not inclined to grant that motion.

13      So now, Mr. Spiro.

14          **MR. SPIRO:**  Thank you, sir.

15      So, just a couple --

16          **MR. RUBIN:**  Your Honor, I would also like to comment

17  on that before -- I understand that, but there are a few things

18  I would like to mention about the curative instructions in the

19  mistrial motion when Mr. Spiro is finished.

20          **THE COURT:**  Okay.

21          **MR. SPIRO:**  My colleague is going to handle that

22  motion, but I do want to point out a couple of things because,

23  you know, I take very seriously the Court's admonition about ad

24  hominems, and I think the Court is exactly right, and I would

25  of course not do that.  I'm not going to do that in summation,

1    but it struck me that a couple of the comments the Court made I

2    needed to personally address.

3         The first thing is the doctor's note never went on the

4    screen.  The second thing is, regarding Ms. Navarro, she did

5    come up at the first trial.  Mr. Martinez said she was the

6    reason he went over there.  Mr. Jackson testified; Your Honor

7    heard it.

8         Mr. Martinez testified under their questioning, without

9    objection, that "I went over there because I was upset."  The

10   entire defense to that incident is that that was the real

11   reason, that was the real reason it wasn't raised.  And you

12   want to know something that's great about that?  It's the

13   truth.  It's absolutely the truth.  I had a good-faith basis to

14   ask that question; he said no.

15        The answer stands.  I'm not going to mention it in

16   summation because there was no evidence of Ms. Navarro in this

17   case, and that should be the end of it.  And that's all I'm

18   asking.  All I'm asking is that the Court not make it

19   essentially an ad hominem attack on me.  It's in the discovery.

20   It's in the record.  It was in the record in this case

21   unobjected to.  Unobjected to, Your Honor.  I asked a single

22   question.  He said no.  I moved on.

23        So, I have -- I don't even understand, frankly, the basis

24   to do anything with that other than -- in fact, the truth is I

25   should be able to comment on his demeanor and comment on how he

1   reacted to that question.  That's the actual truth.  But that

2   doesn't matter because I'm not going to do that in summation.

3   I'm going to say, "Mr. Martinez said he was upset about

4   something else.  He went over there.  He said he wasn't going

5   over there because of a racial reason."  I'm totally free to

6   say that.

7        So Your Honor made other comments about other parts and

8   what Your Honor is -- excluding or not excluding or saying you

9   don't think is as relevant or not, and I always respect the

10  Court's ruling.  But what I'm asking the Court not to do is

11  essentially admonish me personally in front of the jury when I

12  had every good-faith basis.  It's a completely appropriate

13  question, and he said no and I moved on.  Thank you, sir.

14          **THE COURT:**  All right.  Mr. Rubin.

15          **MR. RUBIN:**  Your Honor.

16          **THE COURT:**  Let me do Mr. Rubin and then come to you,

17  Mr. Griffin.

18       Go ahead.  Go ahead, Mr. Rubin.

19          **MR. RUBIN:**  Thank you.

20       That's precisely what I want to respond to, Your Honor.

21       The record is the record.  You've -- you recall from the

22  first trial and this trial we've cited the excerpts from the

23  transcript.  We are in a very difficult situation now where the

24  jurors have in their minds and took notes -- and I'm not now

25  arguing the mistrial motion.  We can deal with that later.

1          What I'm now focusing on is the appropriateness, not only

2     of your curative instructions, but in response to Mr. Spiro's

3     statement that there should be no admonition to him and that

4     the jury shouldn't be informed that you have admonished him.

5     And I'm saying this without making an ad hominem attack.   I'm

6     saying it because I believe that there have been inappropriate

7     questions and inappropriate action that was deliberately

8     designed to prejudice the jury against Owen Diaz, to make the

9     jury believe that he called people a "dumb Mexican," that he

10    made sexually suggestive overtures to others, and that he is

11    himself a racist and not entitled to the damages that result

12    from the emotional distress that he suffered.

13         You and I and Mr. Posner and others spent months

14    determining what is the appropriate scope of this trial that

15    would be consistent with due process and the fair trial rights

16    of both parties.   You were as clear as a judge could possibly

17    be that the testimony and the questioning about the testimony

18    could not go beyond the scope of the first trial.

19         After 6:30 this morning when we filed the motions that we

20    wrote through the night, we actually went back and we found

21    that in the first trial, Ms. DelaGrande specifically testified

22    at page 749, lines 3 to 4, quote, The only issues I had with

23    Owen were based on his performance.   She said nothing about

24    whether he said to her in an accusatory voice in public "You

25    date Black guys" in a sexually suggestive way.

 1          **THE COURT:**  So --

 2          **MR. RUBIN:**  I do --

 3          **THE COURT:**  Mr. Rubin, let me interrupt you.  I didn't

 4    hear Mr. Spiro arguing about Ms. DelaGrande.  I heard him

 5    arguing about Ms. Navarro.  Do you have any insight as to what

 6    was said last time and --

 7          **MR. RUBIN:**  Absolutely.  What did Mr. Martinez say

 8    about Ms. Navarro?  First of all, he didn't use her name.  He

 9    just said there was -- it was an unidentified female.  But his

10    explanation before this Court and before this jury about why

11    he -- he rushed the elevator was there was an incident where

12    "Some woman called me" -- and this is 579 to 580.  "Some woman

13    called me the very same day.  She was crying on the phone.  She

14    was telling me that Mr. Owen comes really aggressive toward her

15    because she was trying to use the elevator."

16          We heard early on, I think Mr. Jackson said, there were

17    often disputes about priority in the elevator because people

18    had to go up and down the stairs.  And when she tried to use

19    the elevator because Mr. Owen wasn't there, the moment that she

20    tried to operate it, he was really aggressive toward her,

21    saying she should not touch his elevator and he will remove her

22    person out of the control panel.

23          That was it.  Now, Mr. Martinez is a current Tesla

24    employee.  He testified to that.  Tesla has undoubtedly had

25    ample opportunity to question him about this to determine

1    whether the accusations about calling Ms. Navarro a "dumb

2    Mexican" ever happened or not.

3        After we briefly examine Mr. Martinez, instead of asking

4    Mr. Martinez, Tesla chose not to ask the question because they

5    knew, I believe, what the answer was going to be, and they

6    decided instead to present this evidence through the improperly

7    suggestive and highly prejudicial questioning to Mr. Diaz.

8    They could not have done other than plant this idea in the

9    jury's head.

10       In a case like this, given the composition of the jury or

11   any jury, that is highly prejudicial.  And was that an

12   accident?  I contend it was not an accident.  We've gone

13   through so many instances.  Your Court has seen it.  The Court

14   has struck questions, has sustained objections where granted.

15       This is an attempt, a continued and repeated attempt to

16   skirt the judge's rules to prejudice Mr. Diaz.  It has had an

17   impact, and I believe that it's at least gone to the point

18   where the Court should make clear to the jury that it has

19   admonished Mr. Spiro for going beyond the Court's carefully

20   crafted rules because he has destroyed the opportunity for

21   Mr. Diaz to have a fair trial.

22       **THE COURT:**  All right.  Well, I'm not doing that, and

23   so thank you for your argument.

24       All right.  Mr. Griffin.

25       Do you want to respond to that, Mr. Spiro?

1          **MR. SPIRO:**  I said what the truth is, and Mr. Griffin

2     is going to handle the motion.

3          **THE COURT:**  Okay.

4          **MR. GRIFFIN:**  Your Honor, the first thing I want to

5     address is the proposed instructions concerning Mr. Demetric

6     Di-Az's testimony and impeachment.  I think Your Honor

7     mentioned the testimony from the first trial.

8          In the first trial, Mr. Diaz did not claim that he was

9     estranged from his son.  And they said there was a

10    fracturing -- they said there was an issue in the factory, and

11    it affected their relationship.  Now there was extensive

12    testimony that there is a fracturing; they don't see each other

13    anymore.  There were present tense questions asked by counsel

14    during La'Drea Jones' testimony about do they see each other

15    now.

16         There were present tense questions asked about during

17    Dr. Reading's testimony which were in violation of the Court's

18    instruction about the time.

19         And then, so we think where it's incumbent upon us to

20    respond, that was not something we had notice of before, and

21    Demetric Di-Az' testimony from his deposition in 2019 was that

22    he and his dad had a good relationship.  They see each other

23    every day.  They talk every day.  That's completely

24    inconsistent with the testimony that Mr. Diaz gave from the

25    stand.  And for them to be able to come in this Court now in a

1    second proceeding and add this new evidence of emotional

2    distress, which we've talked about there wasn't going to be new

3    evidence of emotional distress.  That was a major issue in

4    pretrial.

5        And now they're talking about estranged from his son,

6    doesn't see him anymore, crying from the witness stand.  And

7    we're going to hear that in closing.  And so for them to be

8    able to get up there unrebutted the truthful testimony of

9    Demetric Di-Az about his relationship with his father in 2019,

10   more than three years after Mr. Diaz left the factory, is

11   completely prejudicial to our side.

12           **THE COURT:**  Okay.  And I would like to hear from

13   somebody on the Plaintiffs on that.

14           **MR. ORGAN:**  Yes, Your Honor.

15           **THE COURT:**  Take off your mask, please, Mr. Organ.

16           **MR. ORGAN:**  With respect to the testimony, it was

17   ambiguous.  I was trying to make it as ambiguous as possible

18   temporally.

19       But in terms of the time period 2019, there was no

20   testimony by Mr. Diaz about what -- what he -- his relationship

21   was at that specific time, and he did -- I can't remember if he

22   actually testified to this this time, but he has testified

23   either in deposition or the last time that he has seen his son

24   but -- come to the house, but that they don't speak.  That's

25   the issue.  It's the speaking; it's not the seeing of the son.

**PROCEEDINGS**

 1   That's what the testimony said.  It's not impeachment because,

 2   first of all, it's not temporal to now and it doesn't deal with

 3   this distinction between Mr. Diaz seeing his son come to the

 4   house, which he's never denied, and talking or engaging with

 5   his son.  That's the issue.

 6          **THE COURT:**  So, Mr. --.

 7          **MR. GRIFFIN:**  Your Honor?

 8          **THE COURT:**  Yeah.  Go ahead.

 9          **MR. GRIFFIN:**  Can I point you to the actual testimony

10   from Mr. Demetric Di-Az?

11                    (Pause in proceedings.)

12          **MR. GRIFFIN:**  It goes to both --

13          **THE COURT:**  Yeah.  Mr. Diaz testified in this trial

14   that his relationship with his son was fractured immediately

15   and basically they were not speaking after that time.

16       Now, what I'd be interested in if there was a response,

17   was the testimony in the first trial because he also talked

18   about a fracturing of the relationship then, but I don't

19   remember it being the same type.

20       On the other hand, you have gotten in a fair amount of

21   evidence about the fact that they were talking with each other

22   with the press and other things.  So -- so that's -- that's

23   what I'm interested in at this point is whether is -- whether

24   this was, as Mr. Griffin says, a surprise such that the

25   impeachment evidence would be appropriate.

1      **MR. GRIFFIN:**  And Your Honor, I'd just point your --

2   point you to the excerpt from Mr. Demetric Di-Az's testimony.

3   He says:  "We have a good relationship; we talk every day."

4      And to the question about what they tried to elicit in

5   this case, the very last question to La'Drea Jones was:  "Did

6   Demetric and your father speak often before they started

7   working at Tesla."

8      "Before -- answer:  Before, yeah.  They would speak every

9   day."

10      Question:  "Do they still speak?"  Present tense.

11      We know why they don't speak every day because his son is

12   in prison.  That was a violation of the stipulation.

13   Your Honor granted the objection, but the answer was -- the --

14   you granted -- you sustained the objection, but they gave the

15   answer.  And so that was -- they're talking about our conduct

16   and violating in the stipulations.  That was a clear violation

17   of the stipulations about we can't get into Mr. Demetric

18   Di-Az's criminal history.  We haven't done that.  We haven't

19   asked about those questions.  And that was a direct question

20   from counsel about their relationship now.

21      **THE COURT:**  Okay.  I hear you.

22      **MR. ORGAN:**  Your Honor, I would point out that

23   Demetric and his mother still speak.

24      **THE COURT:**  What I'm so interested in is the answer to

25   my question on the first trial.

1    **MR. SPIRO:**  So I don't know where we left it or if the

2    Court -- on -- because I do want to be heard further on what we

3    would ask to be admonished on the other side if we're going to

4    do sort of admonishments.

5        **THE COURT:**  I'm not admon- -- I think what I tried to

6    say, I'm not going to admonish anybody.  I think what I am

7    going to do is say what's in and what's out, which I have tried

8    to do the whole time.  And that -- that I'm going to do after

9    I've finished listening to you all.

10       **MR. SPIRO:**  Right.  So, but if you're going to do that

11   for one side, I'm asking that you do it for the other side.  So

12   that -- then we would do it for that question and answer, too,

13   and several other things that they did to sort of weaponize the

14   pretrial orders by making it seem as if the son and the father

15   broke up at that moment, and other things that they did knowing

16   that we can't cross-examine the dad about certain things.

17   Those topics were taboo.

18       The opposite in cross-examination of what's taboo and what

19   the seventh amendment says is that if you -- you're allowed to

20   cross-examine a witness about anything that could be relevant

21   to the facts of the case.  That could not have been --

22   Mr. Rubin just said it.

23       The second incident, I'm not -- we didn't really dispute

24   the first.  We're not really disputing the third.  It's the

25   second incident.  So there's testimony in the first trial about

1    Ms. Navarro and that being the trigger.  There is then

2    testimony from two witnesses in this case about this issue.

3        I'm then under the rules not allowed to confront Mr. Diaz

4    about what he said to Ms. Navarro.  I asked him twice,

5    open-ended questions.  I said tell the jury what the issue was.

6    Tell me why he was there and so angry.  Your Honor saw that.  I

7    asked him twice.  After the third time, I have to just go,

8    "Okay, nevermind"?  I can't ask him a cross-examination

9    question on the seminal of a key issue in this case?  That's

10   all I'm asking.

11       I said I'm not going to sum up on it.

12       **THE COURT:**  The question is whether that question

13   is -- you know, "when did you stop beating your wife?" kind of

14   a question.

15       **MR. SPIRO:**  But it's not.  It's not being -- and I'll

16   tell you for two reasons why.  One, the "stop beating your

17   wife" is not relevant to this.  I have lots of other things I

18   could have asked Mr. Diaz about.  Lots of other things that are

19   not relevant to this case that I did not ask him about.  Lots

20   of other things.  I didn't do that.  What's relevant is what he

21   said to her in the elevator that caused her to go running and

22   why Mr. Martinez was upset.

23       Why was he so upset?  Was it just a racial attack, or was

24   he upset for a real reason?  I'm living with the answer, and if

25   I'm agreeing that I'm not even going to mention it in summation

1    or his response to it, I don't understand why that's not

2    sufficient on my one cross-examination question where there's a

3    dozen questions we've circled in the record that are directly

4    violative of Your Honor's rulings, and there's no --

5              THE COURT:  Okay.  Thank you.  I appreciate your

6    perspective on that.

7              MR. RUBIN:  Your Honor, I'd like to make a simple

8    one-sentence request.

9              THE COURT:  Go ahead.

10             MR. RUBIN:  I would like you, please, at your

11   convenience, whenever that is, to compare the question that was

12   asked regarding Ms. Navarro at page 727 to the first trial

13   testimony page 765 to 766, which is the only reference in

14   Mr. Martinez's first trial testimony to Ms. Navarro where he

15   never said anything about Mr. Diaz having called her a "dumb

16   Mexican".  This is completely beyond what Mr. Martinez said in

17   the first trial testimony, notwithstanding what Mr. Spiro is

18   representing to you today.

19             MR. SPIRO:  So.

20             THE COURT:  All right.  I -- I have heard plenty about

21   this.  So thank you.

22             MR. ORGAN:  Your Honor, I have one preview question,

23   as my practice is, with Your Honor.

24             THE COURT:  Do you have an answer for me to the

25   question that I asked you?

PROCEEDINGS

```
 1          MR. ORGAN:  I don't, Your Honor.  I'm still looking,

 2   but -- okay.

 3          THE COURT:  Okay.  What's?

 4          MR. ORGAN:  I know we're going to start with

 5   Dr. Mahla.

 6          THE COURT:  I want to finish what we started here

 7   first.

 8      And, Ms. Davis, you might want to let the jury know that

 9   this is taking a while.

10                      (Pause in proceedings.)

11          MR. SPIRO:  We don't need to take issue with the

12   other -- we're going to tell Ms. -- the only issue that I'm

13   taking with is that one point.

14          THE COURT:  I understand.

15          MR. SPIRO:  Ms. DelaGrande we were going to tell her

16   don't -- I mean, again, I don't know what they're going to

17   cross-examine her on.  We have a good-faith basis, Your Honor,

18   for her to -- we didn't -- Ms. DelaGrande will tell you under

19   oath that that happened.  Okay?  So it's not like -- this isn't

20   something that didn't happen.  So like I think we all need to

21   take a step back.

22      Your Court's -- the Court's pretrial ruling was not that

23   we had to ask only the specific questions that were asked at

24   the first trial.

25          THE COURT:  Mr. Spiro, didn't I ask you to stop on
```

 1  this?  I do -- I have -- you've given a full and clear argument

 2  with respect to that issue, which I appreciate.

 3          **MR. SPIRO:**  So we will tell -- to deal with the

 4  Ms. DelaGrande issue, we will tell her not to bring it up in

 5  testimony, which is what Your Honor is instructing.

 6          **THE COURT:**  Right.

 7          **MR. SPIRO:**  And, again, we didn't put the doctor's

 8  note on the screen.  So I -- I think I've -- we've answered all

 9  of Your Honor's questions about that.  I would want to -- and

10  I'm happy to -- you know, they still have to put on this

11  witness and rest, and then we can call witnesses.  So we can

12  deal with this one more time at break, but I urge Your Honor to

13  at least think about this over break and not when the --

14          **THE COURT:**  I'm going to be think -- I'm thinking all

15  the time, Mr. Spiro.

16          **MR. SPIRO:**  Okay.  So I will save further comment for

17  that.

18          **THE COURT:**  I'm not sure I want to hear further

19  comment on this, Mr. Spiro.

20          **MR. SPIRO:**  I understand that, Your Honor, but I know

21  quite -- I -- Your Honor, I have been through cases.  We don't

22  go back unless there's something egregious and start telling

23  the jury that all of these things are -- so.

24      In any event, I've made my point, and I'm requesting that

25  we deal with it the way that I suggested.

 1          **THE COURT:**  Okay.  All right.

 2       Mr. Organ, you had a preview question?

 3          **MR. ORGAN:**  Yes, Your Honor.  With Dr. Mahla, I was

 4    going to ask him a question.  Your opinion is limited to that

 5    time, the February 2020 time, because you're required to

 6    testify consistently with what you said in your deposition.

 7          **THE COURT:**  No.  Just -- just say -- you can say that

 8    this is your testimony as for whatever time period he was

 9    talking about.

10       You're not going back to discuss what happened on the

11    basis of the Court's rulings, the way that this case has been

12    progressing.  That's -- I have tried to make that, what is

13    appropriate for the jury to hear, as clear as possible.  I

14    think each of you in different ways has -- has not done it in

15    the way that I was hoping it was going to be done but, you

16    know, here we are.  And we're going to finish this -- this

17    trial today.

18       Is there anything else that anybody wants to raise before

19    I go back and -- and we've got Mahla, and then are you resting

20    at that point?

21          **MR. ORGAN:**  We have one discovery admission to read,

22    Your Honor.

23          **THE COURT:**  Okay.  And then DelaGrande is the next

24    witness?

25          **MR. SPIRO:**  Apparently Delgado and then DelaGrande.

1           THE COURT:  Okay.

2           MR. SPIRO:  And they should both be very brief

3   witnesses.

4           THE COURT:  Okay.  So, yeah.  So I will deal with --

5   with the issues that have been argued about after the -- at the

6   first break.

7           MR. SPIRO:  Thank you, Your Honor.

8           MR. COLLIER:  Your Honor, we found the testimony you

9   asked about.

10          THE COURT:  Okay.  And that is?

11          MR. COLLIER:  It's at 573, lines 3 to 13.

12                  (Pause in proceedings.)

13          MR. GRIFFIN:  What volume?

14          MR. COLLIER:  Four.

15                  (Pause in proceedings.)

16          MR. COLLIER:  In addition to that citation,

17  Your Honor, that's from Owen Diaz's testimony.  Dr. Reading

18  also testified about the fractured relationship and its impact

19  on Mr. Diaz psychologically.  And I can try and locate that

20  cite as well, if you'd like.

21          THE COURT:  I recognize that.

22          MR. GRIFFIN:  Can I respond to that, Your Honor?

23      This -- ten-line cite about having issues with his son is

24  completely distinct from the extensive testimony that Mr. Diaz

25  gave about not talking to his son, not seeing his son, not

 1   being able to communicate with his son for years, for an

 2   eight-year period is what the jury was left with the

 3   impression.  That's completely different than this testimony,

 4   Your Honor.

 5        **THE COURT:**  All right.  So if there's anything else

 6   that I should look at, let me know.

 7        **MR. GRIFFIN:**  And, Your Honor, in the first trial, it

 8   came in that Mr. Demetric Di-Az was in prison.  That's not in,

 9   in this case, so we can't address that, and that was a

10   stipulation from the parties, which hamstrung our ability to

11   address the concern.

12        **MR. ORGAN:**  Because they asked for it to be

13   eliminated, Your Honor.  They are the ones who approached us

14   with that stipulation.

15        **THE COURT:**  Well, I suspect that that was not

16   something that you were excited about having before the jury

17   either.

18        **MR. ORGAN:**  That's correct, Your Honor.

19        **THE COURT:**  All right.

20        **MR. COLLIER:**  Your Honor, there is some testimony from

21   Dr. Reading on this Demetric issue as well at 585:14 to 586:4.

22   I'm still looking if there's any more, but that's what we've

23   located so far.

24                    (Pause in proceedings.)

25        **THE COURT:**  I -- if you find any other things that you

 1  want to provide to me, I will look at that.  And I will look

 2  forward to talking about this more at the first break.

 3       So we will -- I'm going to take a five-minute break and

 4  then come back, and then we'll get going.

 5            **MR. ORGAN:**  Thank you, Your Honor.

 6            **MR. SPIRO:**  Thank you, Your Honor.

 7            **MR. RUBIN:**  Thank you, Your Honor.

 8            **THE COURT:**  Thank you, Mr. Rubin.  See you again.

 9                 (Recess taken at 8:47 a.m.)

10                 (Proceedings resumed at 9:05 a.m.)

11            **THE CLERK:**  Please come to order.

12            **THE COURT:**  Please be seated, everybody.  Sorry for

13  the delay.  I was -- I'm handing you the jury instructions.  I

14  changed 23 in light of the argument, and we can talk about that

15  at the break.

16       At this point are we ready to proceed, Mr. Alexander?

17            **MR. ORGAN:**  Yes, Your Honor.

18            **THE COURT:**  Okay.  Let's get the jury.

19                 (Pause in proceedings.)

20       (Proceedings were heard in the presence of the jury:)

21            **THE COURT:**  All right.  Please be seated, everybody.

22  Good morning, ladies and gentlemen.  Thank you for being

23  prompt.  I apologize that I was not.  I will tell you the last

24  day of a trial, there's always stuff that -- that happens that

25  needs to be discussed outside the presence of the jury, and so

1   that's why we are starting late, but now we are proceeding.

2       And, Mr. Organ, who is the next witness?

3           **MR. ORGAN:**  Dr. Charles Mahla, Your Honor.

4           **THE COURT:**  Okay.  So Dr. Mahla is testifying live but

5   not here in the courtroom, so again, you should consider his

6   testimony just as you would if he was here.

7       And, Ms. Davis, if you would swear in the witness, please.

8           **THE CLERK:**  Dr. Mahla, if you would raise your right

9   hand for me.

10                          **CHARLES MAHLA**,

11  called as a witness for the Plaintiff, having been duly sworn,

12  testified as follows:

13          **THE CLERK:**  If you would begin please by stating your

14  full name and spelling for the court reporter.

15          **THE WITNESS:**  Charles Robert Mahla.  C-H-A-R-L-E-S,

16  R-O-B-E-R-T, M-A-H-L-A.

17                       **DIRECT EXAMINATION**

18  BY MR. ORGAN:

19  **Q.**   Good morning, Dr. Mahla.  How are you?

20  **A.**   Good morning.  Well, it's the second day of the baseball

21  season, so all is right in the world.

22  **Q.**   What's your educational background?

23  **A.**   I have a Bachelor of Arts in economics from Lafayette

24  College, and I also have a Ph.D. in Economics from the

25  University of North Carolina, Chapel Hill in Chapel Hill, North

 1  Carolina.

 2  **Q.**   And what do you for a living?

 3  **A.**   I'm an economist.  I answer economic questions,

 4  essentially, for clients.

 5  **Q.**   And you testify in court; is that right?

 6  **A.**   I have, yes, many times.

 7  **Q.**   How many times?

 8  **A.**   In excess of 150.

 9  **Q.**   Okay.  Have you ever testified as an expert on the subject

10  of valuation of companies?

11  **A.**   I have done valuation work, yes.

12  **Q.**   And did you analyze the economic --

13          **MR. ORGAN:**  I tender Dr. Mahla as an expert,

14  Your Honor.

15          **THE COURT:**  Is there any objection?

16          **MR. GRIFFIN:**  No objection, Your Honor.

17          **THE COURT:**  You may proceed.

18  **BY MR. ORGAN:**

19  **Q.**   Did you analyze the economic value of Tesla from -- at

20  approximately February of 2020 when your deposition was taken?

21  **A.**   I did.

22  **Q.**   And what did you do to evaluate the economic value of

23  Tesla as of that date?

24  **A.**   Well, in terms of market value, because Tesla is a

25  publicly traded firm, it's a relatively straightforward

1   exercise.  The market assesses what each share of Tesla is

2   worth, and based on the number of shares outstanding, the

3   simple multiplication of those shares and the share price

4   results in what's commonly referred to as a market

5   capitalization or market cap or a market value, and that value

6   as of the 24th of February, 2020 was $151.2 billion.

7   **Q.**   And what does the market of a value company mean?  What is

8   that?

9   **A.**   It's just generally the overall value of the company.  If

10  one were to -- if one wanted to acquire it, that's what they

11  would have to pay to acquire all of those shares to acquire

12  that entire entity.

13  **Q.**   And did you notice any increase in assets as of the time

14  that you evaluated Tesla?

15  **A.**   Well, between the time of my report, which used second

16  quarter 2019 data, and the end of the year, 2019, Tesla's total

17  assets rose about 7.6 percent from 31.8 billion to

18  34.3 billion.

19  **Q.**   Okay.  And did you find any information about something

20  called "free cash flow"?

21  **A.**   Yes.  Free cash flow is essentially operate -- what's

22  called "operating cash flow."  Operating cash is the amount of

23  cash spun off through operations subtracting out capital

24  expenditures.  And that's dollars spent on investments in

25  typically long-term investments, plant equipment, things of

1  that nature.  And so free essentially indicates that that's

2  cash that's above and beyond the needs to operate the company

3  and to continue to invest in the company.

4       That figure in -- in the fourth quarter of 2019, Tesla had

5  generated just over a billion dollars in free cash flow.

6  Q.   And you created a chart for your testimony; is that right?

7  A.   I did.  It was an exhibit to my deposition.

8  Q.   Okay.

9       MR. ORGAN:  And, Your Honor, I would like to display

10  that to the jury.

11       THE COURT:  Okay.

12            (Pause in proceedings.)

13  BY MR. ORGAN:

14  Q.   And so this chart has the information that -- some of the

15  information you've been talking about; is that right?

16  A.   Sure.  Total assets that we just spoke about is the top

17  line.

18  Q.   Okay.  And those are $34 billion; is that right?

19  A.   34.3 billion, that's right.

20  Q.   Okay.  And then could you go just -- what's the next item,

21  the total revenues?

22  A.   Yeah.  That's the total revenues generated by Tesla.  They

23  grew 14 1/2 percent in -- those figures are year end 2018 and

24  year end 2019.  So Tesla's revenues grew from 21.5 billion to

25  24.6 billion, 14.5 percent increase between those two years.

1  **Q.**   Okay.  And then if you look at the free cash flow, it

2  looks like that grew, too; is that right?

3  **A.**   From second quarter to fourth quarter, free cash flow grew

4  from 614 million to 1,013,000,000.

5  **Q.**   And with free cash flow of a billion dollars, does that

6  mean that Tesla could pay something for a billion dollars and

7  not liquidate any assets?

8  **A.**   That's essentially right.  That's correct.

9  **Q.**   And so they could pay a billion dollars for something and

10  not lay off a single employee; is that right?

11  **A.**   Well --

12       **MR. GRIFFIN:**  Objection.  That's not on his report.

13       **THE COURT:**  Sustained.

14       **MR. ORGAN:**  I have no other questions, Your Honor.

15       **THE COURT:**  All right.  Mr. Griffin, go ahead.

16                    <u>CROSS-EXAMINATION</u>

17  BY MR. GRIFFIN:

18  **Q.**   Good morning, Dr. Mahla.

19  **A.**   Good morning.

20  **Q.**   With regards to the work you did in this case, isn't it

21  true that you basically looked at publicly available

22  information regarding financial stats and then just recited

23  those stats to the jury; correct?

24  **A.**   Sure.  I analyzed their financial statements and pulled

25  off relevant information.

**MAHLA - CROSS / GRIFFIN**

1  Q.   And when you're looking at the financial condition of an

2  organization, you need to look at more than just two or

3  three financial statements; correct?

4  A.   Well, it depends on what you're trying to do.  Generally,

5  you look at a series of metrics like the ones I looked at,

6  revenues, growth and revenues, growth and assets, growth and

7  income, and its market capitalization.

8  Q.   And a company could have a large amount of assets and

9  still not be profitable; correct?

10  A.   Oh, sure.  Tesla didn't turn profitable until late 2019.

11  Q.   And significant revenue does not equate to profitability;

12  correct?

13  A.   Not always, no.

14  Q.   And based on the information in the report that you

15  provided, Tesla's second quarter earnings were negative

16  $408 million; correct?

17  A.   That is true.

18  Q.   And at the time of the report you prepared to give the

19  information to the jury, Tesla had not made -- had not had a

20  profitable year during its existence; correct?

21  A.   That is true.

22  Q.   And you're not here to offer any opinions to this jury

23  about what the compensatory damages should be; correct?

24  A.   Oh, that's very true.

25  Q.   And you're not here to offer an opinion to this jury about

MAHLA - CROSS / GRIFFIN

1  whether punitive damages are appropriate in this case; correct?

2  **A.**   That is correct.

3  **Q.**   And you're not here to offer any opinion about the amount

4  of punitive damages; correct?

5  **A.**   That is also correct.

6       **MR. GRIFFIN:**  No more questions, Your Honor.

7       **THE COURT:**  Thank you.

8     Mr. Organ.

9       **MR. ORGAN:**  No redirect.

10       **THE COURT:**  All right.  Dr. Mahla.  Thank you.

11       **THE WITNESS:**  Thank you.

12       **THE COURT:**  You're excused.

13       **MR. ORGAN:**  Your Honor, we have one -- Your Honor, we

14  have one discovery response to read.

15       **THE COURT:**  All right.  Does the Defense know what --

16  where you are and what you are doing?

17       **MR. ORGAN:**  Yes, Your Honor.  This is the request for

18  admissions to Tesla Number 10.

19       **THE COURT:**  Okay.  So why don't you -- it appears

20  there may be a miscommunication, so why don't you show the

21  Defense what you're about to do.

22            (Pause in proceedings.)

23       **MR. ORGAN:**  "QUESTION:  Admit you have no security

24  recordings or footage of any interactions between Plaintiff

25  Owen Diaz and Ramon Martinez.

1    "ANSWER:  Admit."

2        With that, Your Honor, the Plaintiffs rest.

3        **THE COURT:**  All right.  Thank you.

4        So, ladies and gentlemen, with respect to what Mr. Organ

5    just read as far as admissions, the -- you are to take that

6    question and Tesla's response as evidence in this case.  It is

7    just the same as if it was in a document that you -- an exhibit

8    that was received in evidence or somebody had testified to that

9    fact.

10       All right.  So the Plaintiff has rested.  The Defense

11   would normally have a motion at this point.  I deem it made.

12       And so now the Defense case will proceed.

13       **MS. HENDERSON:**  Good morning, Your Honor.  We call

14   Jackelin Delgado to the stand.

15       **THE COURT:**  You may want to introduce yourself to the

16   jury as well, Ms. Henderson.

17       **MS. HENDERSON:**  Good morning.  My name is Mari

18   Henderson.

19       **THE COURT:**  Ms. Delgado, please come up to the witness

20   stand.

21       **THE CLERK:**  Please take off your mask if you are

22   vaccinated and you feel comfortable, but please remain standing

23   so I can take your picture.

24                     (Pause in proceedings.)

25   \\\

1          <u>JACKELIN DELGADO SMITH</u>,

2    called as a witness for the Defendant, having been duly sworn,

3    testified as follows:

4          **THE CLERK:**  Please be seated.  Please begin please by

5    stating your name and spelling it for the court reporter.

6          **THE WITNESS:**  It's Jackelin Delgado-Smith,

7    J-A-C-K-E-L-I-N, D-E-L-G-A-D-O, S-M-I-T-H.

8                  (Pause in proceedings.)

9          **THE COURT:**  Please proceed.

10         **MS. HENDERSON:**  Thank you.

11                 <u>DIRECT EXAMINATION</u>

12   BY MS. HENDERSON:

13   **Q.**   Where did you work back in January 2016?

14   **A.**   I worked for Chartwell Staffing Solutions.

15   **Q.**   And did Chartwell Staffing Solutions provide contractors

16   to work at the Tesla factory in Fremont?

17   **A.**   Yes.

18   **Q.**   What was your role at Chartwell?

19   **A.**   I was the vice president of human resources.

20   **Q.**   What were your duties as the vice president of HR?

21   **A.**   To oversee the HR processes for the entire organization,

22   both internally and externally.

23   **Q.**   Did you also conduct investigations into complaints?

24   **A.**   Yes.

25   **Q.**   Why did you want to get into HR and go into this field?

 1    **A.**   Because I wanted to help people.

 2    **Q.**   Anything about your background that brought you into this

 3    field?

 4              **MS. NUNLEY:**  Objection, Your Honor.  Relevance.

 5              **THE COURT:**  Overruled.

 6         You can answer.

 7              **THE WITNESS:**  I'm sorry.  Can you repeat the question?

 8    **BY MS. HENDERSON:**

 9    **Q.**   Anything about your background that made you want to go

10    into the field of HR?

11    **A.**   Yes.  I feel like I had a lot of patience for being able

12    to help others, whether it was learning, whether it was being

13    able to help people feel like they had a place.  Me, being a

14    woman of color and being someone who had parents who came here

15    as immigrants, I wanted to be able to help others who didn't

16    have a voice.

17    **Q.**   As of January 2016, what training and experience did you

18    have in HR investigations?

19    **A.**   Yes.  So I worked for multiple organizations prior to

20    Chartwell Staffing Solutions and received my undergrad and

21    bachelors.

22         So I had done multiple investigations prior to receiving

23    my bachelors for previous companies and also after receiving my

24    bachelors at Chartwell, during my time at Chartwell.

25    **Q.**   And what previous companies were those that you worked at

1  in HR?

2  **A.**   I worked for Smart Final, Target Corporation, and

3  Manpower.

4  **Q.**   As of January 2016, approximately how many HR

5  investigations had you conducted?

6  **A.**   Oh, anywhere from a hundred to thousands.  I mean, it

7  would happen on a weekly, maybe monthly basis in multiple

8  organizations.  So I mean, it's a lot.

9  **Q.**   And since that time, since January 2016 to the present,

10  approximately how many investigations have you conducted?

11  **A.**   Thousands and thousands of investigations.

12  **Q.**   While working for Chartwell, how did the complaints that

13  you received about or by your employees who worked at the Tesla

14  factory compare to complaints that you received when working

15  for other companies?

16       **MS. NUNLEY:**  Objection, Your Honor.  Relevance.

17  Beyond the scope.

18       **THE COURT:**  Yeah.  It's sustained.

19  **BY MS. HENDERSON:**

20  **Q.**   In January 2016, did you receive a complaint made by Owen

21  Diaz regarding a drawing at the Tesla Fremont factory?

22  **A.**   Yes.

23  **Q.**   How were you notified of his complaint?

24  **A.**   By e-mail.

25  **Q.**   And I'd like to pull up and show you Exhibit 284-01.

DELGADO SMITH - DIRECT / HENDERSON

1                    (Pause in proceedings.)

2  BY MS. HENDERSON:

3  Q.   Do you recognize this e-mail chain dated Friday,

4  January 22, 2016, at 3:23 to, among others, Jackelin Delgado at

5  Chartwellstaff.com?

6  A.   Yes.

7           MS. HENDERSON:   And I want to scroll down on the same

8  e-mail chain to Exhibit 284-02.

9                    (Pause in proceedings.)

10  BY MS. HENDERSON:

11  Q.   It's an e-mail from Owen Diaz, subject "racist effigy and

12  drawing."

13       Do you recognize this e-mail?

14  A.   Yes.

15  Q.   And this is at 8:42 a.m. on January 22; is that correct?

16  A.   Correct.

17  Q.   When were you notified of Mr. Diaz's complaint in relation

18  to when he first made it?

19  A.   I believe it was that afternoon.

20  Q.   When you received his complaint, did you review Mr. Diaz's

21  written account of what happened and the pictures that he sent?

22  A.   Yes.

23  Q.   After reviewing Mr. Diaz's written complaint, what was the

24  first step that you took in the investigation?

25  A.   Gathered my team.  Worked with the manager at the branch

1    and my job was to do an intake on next steps of the

2    investigation.

3    Q.   And what's an intake?

4    A.   It's sort of like when you gather the individuals who are

5    going to help.  Each have like a responsibility in the

6    investigation to either contact the individuals on the e-mail,

7    take statements, interview, so everyone has a role depending

8    on, like, what their interaction was with the individuals that

9    we are going to be reaching out to.

10   Q.   And what was the first step that you and your team took?

11   A.   Reached out to the alleged employee.

12   Q.   Is that Mr. Ramon Martinez?

13   A.   Correct.

14   Q.   Why did you and your team first reach out to Ramon

15   Martinez?

16   A.   Because he's our employee.

17   Q.   And when you reached out to Mr. Martinez, what was he

18   told?

19   A.   To -- he was told that he was going to be suspended

20   without pay.

21   Q.   Why did you immediately place Mr. Martinez on an unpaid

22   suspension at that point?

23   A.   Due to the information that was in the e-mail, the alleged

24   actions seemed egregious enough for us to move forward with the

25   investigation with him not being in the workplace.

1        So, the first step is to notify the employee of the

2    allegations and place him on unpaid suspension during the

3    investigation.

4    Q.    And why an unpaid suspension versus a paid suspension?

5    A.    It just depends.  There are times when we do pay.  It just

6    depends on like the issue that's happening.  This specific

7    issue was allegations of conduct versus other times there could

8    be someone who got into, like, a worker's comp accident or it

9    was not like at their fault, that we have the actual

10   information there.  So unpaid is also another form of immediate

11   disciplinary based on the allegations that were being made.

12   Q.    Was Mr. Martinez interviewed?

13   A.    Yes.

14   Q.    How do you know that he was interviewed?

15   A.    Because there was notes provided and I had instructed

16   Veronica Martinez to do an intake.

17   Q.    Who is Veronica Martinez?

18   A.    She's the staffing manager for the branch office.

19   Q.    And what was the intake, to your knowledge, that

20   Ms. Martinez did with Mr. Martinez?

21   A.    Reach out to him.  Notify him of the unpaid suspension.

22   Had him come by the office so that he can complete a statement.

23   Q.    What were you doing when Mr. Martinez was being

24   interviewed?

25   A.    I was trying to get ahold of the alleged victim's employer

1  so that we could do, also, like a statement or a conversation

2  with him.

3  **Q.**   To your knowledge, was Mr. Diaz employed by a different

4  staffing agency?

5  **A.**   Yes.

6  **Q.**   Not Chartwell?

7  **A.**   Yes.

8  **Q.**   After Ramon Martinez came into the Chartwell office and

9  spoke with your branch manager, what happened next?

10  **A.**   I'm sorry.  Can you repeat the question?

11  **Q.**   After Ramon Martinez came into the Chartwell office and

12  spoke with your branch manager, to your knowledge, what did he

13  do next?

14  **A.**   He wrote a statement on the incident.

15  **Q.**   And I understand this was seven years ago.  But typically,

16  why would he have been asked to give his statement in writing?

17  **A.**   Because we want to hear from his own point of view, like,

18  what happened.  In his own words.

19  **Q.**   At that time, did you have Mr. Diaz's statement in his own

20  words?

21  **A.**   Yes.

22  **Q.**   Showing you Exhibit 287-03 to 05.  It's a three-page

23  document.

24      Do you recognize this?

25  **A.**   Yes.

**DELGADO SMITH - DIRECT / HENDERSON**

1    **Q.**   What is this document?

2    **A.**   It's the statement.

3    **Q.**   When did you interview Mr. Owen Diaz?

4    **A.**   I believe it was the following Monday.  If I'm correct, it

5    was -- there was a weekend in between.

6    **Q.**   And I'd like to go to the bottom to 287-05 first.

7         Do you see this is dated at the bottom January 22, 2016,

8    4:30 p.m.?

9    **A.**   Yes.

10   **Q.**   And then next, I'd like to show you 287-06 to 08.

11        Do you see at the top it's dated January 25, 2016?

12   **A.**   Yes.

13   **Q.**   At 9:58 and 10:00 in the morning?

14   **A.**   Yes.

15   **Q.**   What is this document dated January 25th?  So that would

16   be three days later.

17   **A.**   That was the notes that I took from the conversation.

18   **Q.**   From your conversation with who?

19   **A.**   With Mr. Diaz.

20   **Q.**   These notes that you took from your interview with Owen

21   Diaz, did you take these notes at the time that you were

22   interviewing him or did you write them up later?

23   **A.**   No.  They were at the time that I was interviewing him.

24   **Q.**   What is your practice when you do note taking?

25   **A.**   To annotate and try to get every word as verbatim as

1    possible.  I'm human, so sometimes I don't catch everything on

2    notes.  But for the most part, I did my best to do that.

3    **Q.**  At any point during your interview with Owen Diaz, did he

4    tell you that Ramon Martinez had been calling him the N-word?

5    **A.**  No.

6    **Q.**  Did he tell you that Mr. Martinez said to him, "I hate you

7    N-words"?

8    **A.**  No.

9    **Q.**  Did he tell you that Mr. Martinez told him to go back to

10   Africa?

11   **A.**  No.

12   **Q.**  Did he tell you that Mr. Martinez said he wished he could

13   get all of us Ns fired?

14   **A.**  No.

15   **Q.**  Did he tell you Mr. Martinez said, "N-words wasn't shit"?

16   **A.**  No.

17   **Q.**  So if Mr. Diaz testified to this jury that he told you

18   these statements and that you chose not to document them --

19            **MS. NUNLEY:**  Objection, Your Honor.  Argumentative.

20            **THE COURT:**  This is a question that both sides have

21   been asking, and I'll allow it.

22   **BY MS. HENDERSON:**

23   **Q.**  If Mr. Diaz testified to this jury that he told you these

24   things and that you chose not to document them, is that true?

25   **A.**  That is not true.

1   Q.   You're being accused of intentionally burying a complaint

2   of racism?

3            MS. NUNLEY:  Objection, Your Honor.  Argumentative.

4            THE COURT:  Yeah.  Sustained.

5   BY MS. HENDERSON:

6   Q.   Hearing that Owen Diaz is saying that you heard these

7   statements and chose not to document them, what is your

8   reaction to that?

9            MS. NUNLEY:  Objection, Your Honor.  Argumentative.

10  Relevance.

11           THE COURT:  Yes.  Sustained.

12  BY MS. HENDERSON:

13  Q.   Ms. Martinez [sic], I see -- I'm sorry that you're getting

14  emotional.

15       Are you nervous right now?

16  A.   I'm sorry.

17           THE COURT:  Would you like some water?

18           THE WITNESS:  Yes, please.

19           THE COURT:  Okay.

20                    (Pause in proceedings.)

21           THE WITNESS:  I'm sorry.  Can you repeat the question,

22  please.

23  BY MS. HENDERSON:

24  Q.   How do you know that Owen Diaz didn't tell you any of

25  those things?

 1  **A.**   Because I didn't write it down and because that's not what

 2  he said.

 3  **Q.**   If he had told you those things, what would you have done?

 4           **MS. NUNLEY:**  Objection, Your Honor.  Relevance.

 5           **THE COURT:**  No.  Overruled.

 6      You can answer.

 7           **THE WITNESS:**  I would have documented it on the notes

 8  that I was taking.

 9  **BY MS. HENDERSON:**

10  **Q.**   Anything else besides documenting them?

11  **A.**    If this was something that he told me, I would have

12  documented it and I would have cross-referenced back with the

13  alleged harasser, Mr. Martinez and asked him if he had said

14  those things.

15  **Q.**   I would like to direct you to 287-07, Question Number 4 on

16  the screen.

17      You write:  "Owen mentioned history that happened in

18  elevator.  HR was not aware the e-mail was sent to Wayne

19  Jackson, supervisor."

20      When Owen mentioned a history, did he indicate the history

21  was at all of a racial nature?

22  **A.**   No, he did not.

23  **Q.**   Do you remember reviewing this e-mail that he referenced?

24  **A.**   I don't recall.

25  **Q.**   And do you know, as you sit here seven years later,

1   whether this e-mail he referenced is in the file?

2   **A.**    Like what file?

3   **Q.**    In the file for your investigation or the file for

4   Mr. Martinez.  Do you know, as you sit here seven years later,

5   one way or not whether it's there?

6   **A.**    Oh, no, I cannot speak to that.

7   **Q.**    I would like to show you Exhibit 240-03.

8                        (Pause in proceedings.)

9   **BY MS. HENDERSON:**

10  **Q.**    Do you see at the bottom this appears to be an e-mail

11  dated October 20, 2015, from Owen Diaz to Wayne Jackson?

12  **A.**    Yes, I see that.

13              **MS. HENDERSON:**  I would like to scroll to the next

14  page, 240-04.

15                        (Pause in proceedings.)

16  **BY MS. HENDERSON:**

17  **Q.**    Do you see where he writes -- and we can highlight it for

18  you -- "For some reason Ramon jumped off the tugger he was on

19  and started yelling at me in a threatening manner, saying, 'You

20  have a problem with me.  Why are you telling him who his

21  supervisor is?"

22      "When I did not say anything to Ramon, he followed me in

23  the elevator, stood next to the forklift I was on, and kept

24  yelling at me."

25      Do you see that?

1   **A.**   Yes.

2   **Q.**   Looking at this e-mail, does that change in your mind

3   anything that you would have done in your investigation in

4   January 2016?

5   **A.**   No.

6   **Q.**   Why not?

7   **A.**   Because in this e-mail it talks about a problem that

8   two individuals are having, like an altercation or

9   unprofessional conduct.   It doesn't have anything to do with

10  the allegations that I received regarding the conduct of like

11  unwelcome behavior such as like racism or conducts of unwanted

12  work.   There -- they are two different types of behavior that

13  are being exhibited here.

14  **Q.**   After Ramon Martinez and Owen Diaz were interviewed and

15  you'd collected both of their written statements, did you

16  determine whether Ramon Martinez violated any of your workplace

17  policies?

18  **A.**   Yes.

19  **Q.**   What policy?

20  **A.**   It was a zero tolerance of discrimination in the

21  workplace.

22  **Q.**   And what does "zero tolerance" mean?

23  **A.**   It means that we will always look into any forms of

24  allegations that are brought to us in regards to, like, someone

25  feeling discriminated.   And zero tolerance means is that like

1  we don't except that form of conduct, but how we handle it can

2  vary.

3       It's just giving the employee the ability to know that

4  they can come to us for any form of that that they feel is

5  being conducted.

6  **Q.**   When you say how we handle a violation of the

7  zero-tolerance policy can vary, what is the range of corrective

8  action that can be taken in response?

9  **A.**   I mean, I can't speak for every organization, and in every

10 company I've worked at it's different, the policies and, like,

11 the progressiveness of disciplinary action.

12      It could be a coaching, having a verbal conversation, a

13 note to file, meaning that you are documenting it, the

14 conversation, and then it can progress to a written warning,

15 file written warning up to and including termination.  It just

16 varies on the organization and the type of conduct that's

17 taking place.

18 **Q.**   What corrective action did you recommend for Mr. Martinez?

19 **A.**   It was a final written warning.

20 **Q.**   Where does what you recommended for him, a final written

21 warning, fall on the possible range of corrective action that

22 you could have given him?

23 **A.**   That is like the last chance you get.  So any form of

24 misconduct or any other violation of workplace conduct, then is

25 results for termination.

1   **Q.**   Why didn't you recommend Mr. Martinez be fired?

2   **A.**   Because at the time when we were doing the investigation,

3   this was the first form of conduct that had been investigated

4   by HR that had been brought to HR's attention.   And based on

5   the specifics of what the allegations were, there were no

6   previous conducts that were reported of racism or

7   discrimination in the workplace by him.

8   **Q.**   Did you make any other recommendations besides the final

9   written warning?

10  **A.**   Well, he was suspended without pay the entire

11  investigation, and he never received payment for that.   So that

12  was the initial form of disciplinary action.   And then

13  following the final written warning, I also had asked Veronica

14  Martinez, the branch manager, to have him removed from that

15  shift so that he'd no longer work with the other employees.

16  **Q.**   Were you ever made aware of any further interactions

17  between Mr. Diaz and Mr. Martinez?

18  **A.**   No.

19          **MS. HENDERSON:**   No further questions.

20          **THE COURT:**   All right.   Thank you.

21      Ms. Nunley.

22          **MS. NUNLEY:**   Thank you, Your Honor.

23                      **CROSS-EXAMINATION**

24  **BY MS. NUNLEY:**

25  **Q.**   Good morning, Ms. Martinez -- I'm sorry, Ms. Delgado

**DELGADO - CROSS / NUNLEY**

1   Smith.  I apologize.  I'm having a bad morning, clearly.

2   **A.**   That's fine.

3   **Q.**   So, Ms. Delgado-Smith, when you conducted your

4   investigation, did you write down everything that Mr. Diaz told

5   you verbatim?

6   **A.**   Yes, as best as possible.

7   **Q.**   So your testimony today is that you wrote down everything

8   he said verbatim?

9   **A.**   Yes, as best as possible.

10  **Q.**   Okay.  And you weren't paraphrasing?

11  **A.**   No.  I mean, if I don't know exactly what -- if I don't

12  understand something, then I'll reiterate and ask.

13  **Q.**   Okay.  And then you wrote it down verbatim; that's

14  correct?

15  **A.**   Yes, as best as possible.

16  **Q.**   And you previously gave a deposition in this matter;

17  right?

18  **A.**   Correct.

19  **Q.**   Do you remember that?

20  **A.**   Yes.

21  **Q.**   I would like to draw your attention to the binder right up

22  there on the stand, Ms. Delgado-Smith.  If you could turn to

23  the deposition testimony, pages marked 44:12 through lines

24  45:25.

25  **A.**   Can you repeat that?

DELGADO - CROSS / NUNLEY

1   Q.   Yes, starting at page 44, line 12, through page 45, line

2   25.

3                    (Pause in proceedings.)

4   BY MS. NUNLEY:

5   Q.   Let me know once you found it and had an opportunity to

6   read it.

7   A.   You said page 44?

8   Q.   Yes, page 44, starting at line 12 through 45, line 25.

9            MS. NUNLEY:  Do you have a copy, Your Honor?

10           THE COURT:  I do.

11           THE WITNESS:  Yes, I read it.

12           MS. NUNLEY:  Your Honor, may I read the testimony into

13  the record?

14           THE COURT:  You may.

15           MS. NUNLEY:  Thank you.

16  BY MS. NUNLEY:

17  Q.   So at deposition you testified in response to the

18  question: "Let me ask you this.  In terms of your handwriting

19  here, is that a direct quote of Mr. Diaz or is that your own

20  paraphrasing of what he said?"

21       And your response was:  "I'm paraphrasing as he's speaking

22  to me."

23       "QUESTION:  Okay.  So even though you were taking notes as

24  Mr. Diaz is talking to you, it's not an exact quote of what he

25  told you; correct?

1        "ANSWER:   No.   If it was an exact quote, I would have put

2    it in quotations.   As they are speaking to me, I'm trying to

3    get as much information on paper as possible."

4        "I see.   So your practice is if you were actually quoting

5    someone, you put it in quotation marks; is that correct?"

6        So you didn't, in fact, write down everything Mr. Diaz

7    said verbatim; right?

8    **A.**   No.

9    **Q.**   And now, if I could --

10       **MS. NUNLEY:**   Sabrina, could you please put up

11   Exhibit 287.

12                    (Pause in proceedings.)

13       **MS. NUNLEY:**   If you could please bring up page 5.

14                    (Pause in proceedings.)

15       **MS. NUNLEY:**   Could you bring up the portion of the

16   statement where it says:   "Owen mentions history that happened

17   in the elevator."

18                    (Pause in proceedings.)

19   **BY MS. NUNLEY:**

20   **Q.**   And so at the top of the page here, I see a note that

21   says:   "Owen mentions history that happened in the elevator."

22       You didn't think to ask Mr. Diaz what that history in the

23   elevator was?

24   **A.**   I don't recall.

25   **Q.**   Well, you mentioned earlier that you've -- you got a

**DELGADO - CROSS / NUNLEY**

1    degree in human resources; right?

2    **A.**   Business management.

3    **Q.**   And you've worked in human resources for quite some time

4    for a number of organizations; right?

5    **A.**   Correct.

6    **Q.**   And it sounds like you've conducted thousands and

7    thousands of investigations, haven't you?

8    **A.**   Correct.

9    **Q.**   And as a trained investigator, wouldn't you agree that it

10   would be important to find out the history of conduct between a

11   harasser and a victim?

12   **A.**   Yes.

13   **Q.**   And Mr. Diaz told you about the fact that there was a

14   history of conduct between Mr. Martinez and himself; correct?

15   **A.**   Yes.

16   **Q.**   But you didn't think to follow up and ask for any

17   information about that?

18   **A.**   I don't remember.

19   **Q.**   Well, you didn't think to -- if you did ask, you didn't

20   write it down; right?

21   **A.**   Well, I'm not asking myself questions.  I'm asking him

22   questions.  So I wouldn't write down what I'm saying, now what

23   he is saying.

24   **Q.**   That wasn't my question, Ms. Delgado-Smith.  My question

25   was you didn't think to write down what Mr. Diaz told you about

**DELGADO - CROSS / NUNLEY**

1   this history in the elevator if he told you anything; right?

2   **A.**   Well, if he told me, I would have wrote down what he said.

3   **Q.**   So then you didn't ask him about it.  Is that what you're

4   saying?

5   **A.**   No, I didn't say that.

6   **Q.**   Well, you said if you asked him, you would have written it

7   down; right?  Am I misunderstanding?

8   **A.**   I don't know.  You are confusing me.

9   **Q.**   Okay.  Let's back it up a little bit.

10       So, based on the text on this document, just that first

11  line right there.  It says:  "Owen mentioned history that

12  happened in the elevator"; correct?

13  **A.**   Correct.

14  **Q.**   As you are sitting here today, do you recall whether you

15  asked him any follow-up questions about that history in the

16  elevator?

17  **A.**   No, I don't recall.

18  **Q.**   And if you did ask him any questions about that history,

19  you didn't write down what it was; right?

20  **A.**   I would have wrote it down if he would have given me a

21  detailed explanation of what that history was.

22  **Q.**   Did you record that detailed history anywhere if you would

23  have asked him about it?

24  **A.**   No.

25  **Q.**   Why not?

 1   **A.**   I'm so confused, like what you're asking.  Like, are you

 2   asking me if I -- if he told me the history and I just didn't

 3   write it?

 4   **Q.**   I'm asking whether you recall if he told you the history

 5   first?

 6   **A.**   I don't recall he told me, and if he would have told me, I

 7   would have written the notes here of what he was saying about

 8   it.

 9   **Q.**   Okay.  So you're saying that you didn't ask him any

10   follow-up questions after he didn't tell you what this history

11   was; is that right?

12   **A.**   Yes.

13   **Q.**   So Mr. Diaz told you there was history in the elevator

14   between himself and an accused harasser, and you didn't think

15   to ask any follow-ups about it whatsoever?

16        **MS. HENDERSON:**  Objection.  Asked and answered.

17        **THE COURT:**  Yeah.  Sustained.

18        You can move on.

19   **BY MS. NUNLEY:**

20   **Q.**   Do you recall the details of your conversation with branch

21   manager Veronica Martinez as you note down here?

22   **A.**   I'm sorry.

23   **Q.**   On the second line of the document, it says:  "HR was not

24   aware nor was Veronica, branch manager."

25        Do you recall the details of your conversation with

1    Miss Martinez?

2    **A.**   About her not being aware?

3    **Q.**   Yes, that's correct.

4    **A.**   Correct.

5    **Q.**   I'm -- I asked whether or not you recalled the detail of

6    the conversation?

7    **A.**   Oh, I don't -- no.

8    **Q.**   Okay.  Do you recall whether she shared any -- you shared

9    with her any specifics about the history in the elevator?

10   **A.**   I do not recall.

11   **Q.**   And so you -- as you sit here today, you don't have any

12   actual recollection about receiving any information about the

13   elevator incident; correct?

14   **A.**   Correct.

15          **MS. NUNLEY:**  But if we could put up Exhibit 240 at

16   page 4, Sabrina.

17                    (Pause in proceedings.)

18   **BY MS. NUNLEY:**

19   **Q.**   And I'd like to draw your attention to the portion of the

20   page where it says:  "I thought he was going to hit me, so I

21   asked him to please step back."

22          That -- that is a threat of a physical assault; right?

23   **A.**   I can't make that distinction.

24   **Q.**   Well, from the text of this document, Mr. Diaz thought

25   Mr. Martinez was going to hit him; correct?

1    **A.**    That's what it says here, yes.

2    **Q.**    And as a trained investigator, regardless of whether it's

3    racial or not, wouldn't you agree that a physical assault is a

4    serious incident that you would want to investigate?

5    **A.**    Yes.

6    **Q.**    But as you sit here today, you don't recall whether you

7    sought out any information about this previous history or the

8    assault; right?

9    **A.**    No.

10           **MS. NUNLEY:**  And -- you can take the exhibit down.

11   **BY MS. NUNLEY**

12   **Q.**    And in Mr. Diaz's complaint, you've made a note that he

13   didn't feel safe.

14        Did you ask him why?

15   **A.**    I don't recall.

16   **Q.**    And on the final page of your report, you wrote that

17   Mr. Diaz was afraid of retaliation.

18        Did you ask him who he feared retaliation from?

19   **A.**    I don't recall.

20           **MS. NUNLEY:**  No further questions.

21           **THE COURT:**  Okay.  Any redirect?

22           **MS. HENDERSON:**  Just briefly, Your Honor.

23           **THE COURT:**  Okay.

24                        **REDIRECT EXAMINATION**

25   \\\

1   **BY MS. HENDERSON:**

2   **Q.**   During your interview of Mr. Diaz, did you limit his time?

3   **A.**   No, I did not.

4   **Q.**   Did you cut him off when he was trying to speak?

5   **A.**   No.

6   **Q.**   Did he ever tell you that there was any racial harassment

7   history with Ramon Martinez?

8            **MS. NUNLEY:**  Objection.  Beyond the scope, Your Honor.

9            **THE COURT:**  That's all right.  Overruled.

10           **THE WITNESS:**  No.

11           **MS. HENDERSON:**  No further questions.

12           **THE COURT:**  Okay.

13           **MS. NUNLEY:**  Nothing further, Your Honor.

14           **THE COURT:**  All right.  Thank you.  You may step down,

15   Ms. Delgado.

16           **THE WITNESS:**  Thank you.

17           **MS. HENDERSON:**  We would like to call Joyce DelaGrande

18   to the stand.

19           **THE COURT:**  Okay.

20                       (Pause in proceedings.)

21           **THE COURT:**  Please step on up, Ms. DelaGrande.

22           **THE CLERK:**  Please step up, and you can take your mask

23   off if you've been vaccinated.  I'll take your photograph and

24   then swear you in.

25                       (Pause in proceedings.)

DELAGRANDE - DIRECT / HENDERSON

1                        **JOYCE DELAGRANDE**,

2  called as a witness for the Defendant, having been duly sworn,

3  testified as follows:

4          **THE CLERK:**  Be seated.  If you would please state your

5  full name and spell it for the record.

6          **THE WITNESS:**  Joyce Ann DelaGrande.  J-O-Y-C-E, A-N-N,

7  D-E-L-A-G-R-A-N-D-E.

8                        **DIRECT EXAMINATION**

9  BY MS. HENDERSON:

10 **Q.**   Did you work at the Tesla Fremont factory in 2015 and

11 2016?

12 **A.**   Yes, I did.

13 **Q.**   What did you do at the factory in those two years?

14 **A.**   I was a production control supervisor.

15 **Q.**   What does that mean?

16 **A.**   My team's responsible for delivering material to the

17 production line.

18 **Q.**   How big was your team?

19 **A.**   When I was downstairs, I had about 99 people; and when I

20 was up stairs, I had about 15.

21 **Q.**   How many leads reported to you upstairs?

22 **A.**   Three, originally.

23 **Q.**   And which three were those?

24 **A.**   Robert Hurtado, Devin Williams, and Hugo Gallegos.

25 **Q.**   What was the racial makeup of the department that you

**DELAGRANDE - DIRECT / HENDERSON**

1  supervised in 2015 and 2016?

2  **A.**   Downstairs, it was about one-third African American; and

3  upstairs, it was about half African American.

4  **Q.**   What about the leads, those who were promoted from

5  associates to leads in 2015 and 2016, how many of those were

6  African American?

7  **A.**   Out of three, one was African American downstairs.  And

8  upstairs, the same.  Out of three, there was one African

9  American.

10  **Q.**   And who was that upstairs?

11  **A.**   Devin Williams.

12  **Q.**   What was the role of the elevator team compared to your

13  team in production control?

14  **A.**   They were responsible for taking down the finished goods

15  down the elevator to general assembly.

16  **Q.**   Did you work with elevator lead Owen Diaz?

17  **A.**   Yes, I did.

18  **Q.**   What were Mr. Diaz's duties to your knowledge as night

19  shift elevator lead?

20  **A.**   He was responsible for insuring the material that we told

21  him needed to go downstairs.  He was responsible for getting it

22  downstairs.

23  **Q.**   How frequently did you interact with Mr. Diaz?

24  **A.**   Every day.

25  **Q.**   When you were working downstairs, did you raise any

DELAGRANDE - DIRECT / HENDERSON

1    concerns about Mr. Diaz?

2    **A.**    Yes, I did.

3    **Q.**    What concerns did you raise with him?

4    **A.**    We were struggling to get the material down to --

5    downstairs and to the line on time.

6    **Q.**    What was Mr. Diaz's response when you raised concerns to

7    him?

8    **A.**    Originally, he would blame the other shifts and say that

9    they needed more training.

10   **Q.**    Showing you Exhibit 244-01.  There's an e-mail dated

11   October 23rd, 2015.  Do you see in the middle from J DelaGrande

12   at Tesla Motors to Edward:  "Owen mentioned that the shift

13   before he comes in might just need to be re-trained on how to

14   place the material in the DZ."

15        Do you see that?

16   **A.**    Yes, I do.

17   **Q.**    First, what's "DZ"?

18   **A.**    Drop zone.

19   **Q.**    And what did you mean when you wrote this?

20   **A.**    He had told me the reason why we were having so many

21   issues getting to the line.  The material to the line was

22   because the other shifts needed to be retrained on how to do

23   that.

24   **Q.**    When you were upstairs in 2016, did your leads complain to

25   you about Mr. Diaz?

DELAGRANDE - DIRECT / HENDERSON

1   **A.**   Yes, they did.

2           **MR. COLLIER:**  Objection.  Hearsay.

3           **THE COURT:**  Overruled.  This is not for the truth but

4   state of mind.

5       Go ahead.

6   **BY MS. HENDERSON:**

7   **Q.**   Who complained to you about Mr. Diaz?

8   **A.**   Robert Hurtado, Hugo Gallegos, and Devin Williams.

9   **Q.**   What were their complaints about him?

10          **MR. COLLIER:**  Same objection, Your Honor.

11          **THE COURT:**  Overruled.

12      You can answer.

13          **THE WITNESS:**  They were complaining that he wasn't

14  there, that they couldn't find him, and that he was -- they

15  were struggling to get him to take the material downstairs.

16  **BY MS. HENDERSON:**

17  **Q.**   What did you do in response to hearing these complaints

18  from your leads about Mr. Diaz?

19  **A.**   I went to talk to him and his team.

20  **Q.**   I'd like to show you Exhibit 296-03.

21      In addition to speaking to Owen, did you speak with anyone

22  else or send any other communications?

23  **A.**   Yes, I did.  I notified his manager that we were

24  struggling with this issue.

25  **Q.**   And do you recognize this e-mail sent on February 19th to

1      Edward?

2      A.    Yes, I do.

3      Q.    Why did you send this e-mail here?

4      A.    Because we were having so many issues getting the material

5      down to the line and it was causing the line to go down.

6      Q.    In your e-mail, you write:  "I know we have previously

7      discussed issues downstairs with this team.  And the later part

8      of the week, we have Junior and Owen, and sadly the same issues

9      I had with them downstairs, I have upstairs."

10           Is that accurate?

11     A.    Yes, it is.

12     Q.    You also wrote at the bottom of this e-mail:  "Team,

13     please make sure to let Edward know of any issues you are

14     having or have had with this end-of-the-week crew."

15           Which team are you referring to here?

16     A.    That was to my leads.

17     Q.    And why did you write that?

18     A.    I wanted to let them know that any time they had issues,

19     they had the ability to contact Edward to let him know what the

20     problems were with Owen and his team.

21     Q.    And who's Edward?

22     A.    Edward is Owen's manager.

23     Q.    Showing you 296-01 on this same e-mail chain.

24           Did you copy in the CC line Hugo Gallegos, and Devin

25     Williams, and Robert Hurtado on this e-mail to Edward Romero on

DELAGRANDE - DIRECT / HENDERSON

1   February 19?

2   A.   Yes, I did.

3   Q.   Why did you copy them?

4   A.   I wanted them to be a part of the e-mail so they

5   understood they could contact Edward at any time.

6   Q.   And you write in the same e-mail chain -- I'd like to go

7   to 296-02.

8        You write:  "Owen just has no sense of urgency at all.  He

9   tells me what he thinks I want to hear, but I struggle getting

10  him to actually stay on task.  I have watched him driving

11  around on the tugger, talking to my female associates when he

12  should be at the elevators assisting his team."

13       Is that accurate?

14  A.   Yes, it was.

15  Q.   You also wrote:  "I personally brought these concerns to

16  the team tonight.  I spoke to Junior first and then went and

17  asked Owen to go over and help him."

18       Did you speak to Mr. Diaz that night, February 19th?

19  A.   Yes, I did.

20  Q.   When you spoke to him that night, what did you say to him?

21  A.   I asked him to please go over and help the team make sure

22  the parts were going downstairs.

23  Q.   Did you tell him anything else when you spoke to him that

24  evening?

25  A.   I did let him know that I was going to contact his

1   manager.

2   **Q.**   What was his reaction upon finding out that you were going

3   to contact his manager about your and your leads complaints?

4   **A.**   He was upset.  He was calling them "snitches."

5   **Q.**   When you say, "He was calling them snitches," who's --

6         **MR. COLLIER:**  Objection, Your Honor.  This is new

7   evidence.  This is a new allegation.

8       It is.  It violates the prior order.

9         **THE COURT:**  I don't need to hear more from you,

10  Mr. Collier.  Thank you.

11      So I'm going to sustain the objection unless you can point

12  me to something that I should look at in the prior testimony.

13        **MR. COLLIER:**  And move to strike, Your Honor.

14                      (Pause in proceedings.)

15      **MS. HENDERSON:**  It's in the exhibit and in evidence,

16  and so she's --

17        **THE COURT:**  Okay.  So I'm going to sustain the

18  objection.

19                      (Pause in proceedings.)

20  **BY MS. HENDERSON:**

21  **Q.**   To your knowledge, in response to the complaints from

22  Mr. Hurtado and your other leads about Mr. Diaz, was Mr. Diaz

23  disciplined?

24  **A.**   I was told that he was going to receive a write-up.

25  **Q.**   What's a "write-up"?

1   **A.**   Write up is a documented -- it's documentation of the

2   issues at hand, and it's an expectation that they are going to

3   correct the behavior.

4   **Q.**   If you are written up, what impact does it have on your

5   job?

6   **A.**   It varies at different companies.  At Tesla, it was

7   six months where you wouldn't be allowed to have any sort of --

8   you couldn't advance.  You wouldn't receive any bonuses.  You

9   were just basically in limbo until you corrected your behavior.

10  **Q.**   I would like to fast-forward one week to February 26,

11  2016.

12        Did your leads again complain to you about Mr. Diaz?

13  **A.**   Yes, they did.

14  **Q.**   What did your leads tell you this time?

15           **MR. COLLIER:**  Objection.  Hearsay.

16           **THE COURT:**  Overruled.  You can answer.

17           **THE WITNESS:**  They were still struggling with Owen.

18  They were having issues.  There was a situation where Owen told

19  them that he didn't want them to talk to him to -- at anything,

20  that they would have to e-mail him with any concerns that they

21  had.

22  **BY MS. HENDERSON:**

23  **Q.**   Which leads told you this?

24  **A.**   It was Robert Hurtado and Devin Williams.

25  **Q.**   What did Robert and Devin say?  Who did they say that

 1   Mr. Diaz was refusing to speak to except via e-mail?

 2   **A.**   To anyone, any one of my team members or them.

 3   **Q.**   After finding out that Mr. Diaz was refusing to speak to

 4   your team, what did you do next?

 5   **A.**   I went over -- I sent an e-mail to Edward and let him

 6   know, and I actually went over and talked to Owen myself.

 7   **Q.**   What did Owen say when you spoke to him?

 8   **A.**   He said that he didn't want to talk to any of my team

 9   members anymore and that there was too many snakes at Tesla.

10   **Q.**   I would like to show you Exhibit 303-03.

11                     (Pause in proceedings.)

12   **BY MS. HENDERSON:**

13   **Q.**   Looking at the top here from J. Delegrande to Edward, when

14   did you send this e-mail?

15   **A.**   Right after the issue had happened.  Right after I was

16   contacted.

17   **Q.**   So is that during your shift?

18   **A.**   Yes, it was.

19   **Q.**   When did you send this e-mail in relation to speaking to

20   Mr. Diaz?

21   **A.**   Right after I spoke to Mr. Diaz.

22   **Q.**   Does this e-mail accurately reflect everything that your

23   leads told you and everything that Owen Diaz told you?

24   **A.**   Yes, it does.

25   **Q.**   In your e-mail to Mr. Romero, you write:  "He said for my

1  associates to only talk to him if it is related to business

2  because there are, quote, so many snakes here at Tesla."

3      Is that accurate?

4  **A.**   Yes, it is.

5  **Q.**   Why did you put that in quotes?

6  **A.**   Because he said those exact words.

7  **Q.**   And you put associates here plural.  Who are you referring

8  to there?

9  **A.**   All of my team members.

10 **Q.**   When Owen said, "There are so many snakes here at Tesla,"

11 what did you understand that to mean?

12 **A.**   Based on the fact that my team members and leads were

13 reporting, so the snitching.

14         **MR. COLLIER:**  Objection, Your Honor.  It's the same --

15         **THE COURT:**  No.  Here it's -- I will sustain the

16 objection.  It also calls for speculation.

17         **MR. COLLIER:**  Move to strike, Your Honor.

18         **THE COURT:**  It will be struck, question and answer.

19 **BY MS. HENDERSON:**

20 **Q.**   You write the next line:  "I guess he was having a

21 personal conversation on the elevator with someone and felt

22 that Robert saying hi to him was rude."

23      Why did you write that?

24 **A.**   He was talking to one of my associates, and Robert had

25 went up to say hi to him and that's what Robert told me.

1          **MR. COLLIER:**  This is all hearsay, Your Honor.

2   Objection.  Hearsay.

3          **THE COURT:**  Overruled.  Let's move on.

4   **BY MS. HENDERSON:**

5   **Q.**   You write:  "Owen is now here telling me that my associate

6   threatened him because he said he was going to contact you."

7          What exactly did Mr. Diaz say to you regarding any threats

8   that were made against him?

9   **A.**   He said that Robert had said that he was going to go to

10  his manager, to Owen's manager, that he was threatening that he

11  was going to go to Owen's manager.

12  **Q.**   And you also write:  "Owen just told me he does not want

13  my leads/associates talking to him anymore."  Again, who was he

14  referring to here?

15  **A.**   He was referring to my whole team.

16  **Q.**   At any point during this conversation that February 26

17  with Mr. Diaz, did he tell you he didn't want to speak to

18  Robert Hurtado in specific because Mr. Hurtado had been calling

19  him the N-word?

20  **A.**   No.

21  **Q.**   Did Mr. Diaz ever at any point in time report to you that

22  Mr. Hurtado called him the N-word?

23  **A.**   No.  He never told me that.

24  **Q.**   That Mr. Hurtado called him "mayate"?

25  **A.**   No.  He never told me.

DELAGRANDE - DIRECT / HENDERSON

1   Q.   That Mr. Hurtado made any racially insensitive name or

2   term towards him?

3   A.   No.  He never told me that.

4   Q.   If Mr. Diaz testified that he told you that Robert had

5   been saying those things to him, is that true?

6   A.   No, it's not true at all.

7   Q.   How can you be so sure?

8   A.   I would have reported that if that had been brought up to

9   me.  I would have reported that right away.

10  Q.   Reported that to who?

11  A.   HR and to his manager.

12  Q.   Were you, yourself, ever in a position to observe or

13  overhear Mr. Hurtado's interaction with Mr. Diaz?

14  A.   Oh, yes, all the time.

15  Q.   How is that?

16  A.   I was up there involved with my team fully.  I was over by

17  the elevator helping them.  It was a nightly basis I was with

18  everybody.

19  Q.   And did you, yourself, ever hear Mr. Hurtado call Mr. Diaz

20  the N-word?

21  A.   No, never.

22  Q.   To your knowledge, was Devin Williams present for the

23  interaction that night February 26 between Mr. Hurtado and

24  Mr. Diaz?

25  A.   Yes, he was.

DELAGRANDE - DIRECT / HENDERSON

```
 1              MR. COLLIER:  Objection.  Lacks foundation.  Calls for
 2   speculation.
 3              THE COURT:  If she knows, she can answer.  Overruled.
 4              THE WITNESS:  Yeah, he was there.
 5   BY MS. HENDERSON:
 6   Q.   How do you know he was there?
 7   A.   I was there with him.  I saw it.
 8   Q.   Did Devin Williams ever report to you that Robert Hurtado
 9   had used the N-word?
10   A.   No, never.
11   Q.   Did anyone, any member of your 15-person team ever report
12   to you that Mr. Hurtado used the N-word?
13   A.   No, never.
14   Q.   How frequently did you interact with Robert Hurtado?
15   A.   Every night.
16   Q.   Did you ever hear him use the N-word towards anyone?
17   A.   No, never.
18   Q.   What is your reaction on hearing the allegations that
19   Robert Hurtado used the N-word?
20   A.   I was completely surprised.
21              MR. COLLIER:  Objection, relevance.
22              THE COURT:  Sustained.  And question and answer will
23   be struck.
24              MS. HENDERSON:  I'd like to go to Exhibit 303-02.
25                        (Pause in proceedings.)
```

1   BY MS. HENDERSON:

2   Q.   You write to Mr. Romero:  "I would really prefer he's

3   placed somewhere else."  Why did you ask that Owen switch

4   shifts?

5   A.   Because we had so many problems with him, and it was

6   impacting the line.

7   Q.   And I would like to scroll up in that same e-mail chain,

8   303-01.  You write that:  "Mr. Diaz made it clear he does not

9   want my associates talking to him, but it seems it's only the

10  leads, Robert and Hugo."

11       How did you come to learn that Mr. Diaz was refusing to

12  speak to both Robert Hurtado and Hugo Gallegos?

13  A.   Because I was out there by the elevator, and he was

14  talking to Devin, and he was talking to my team members.

15  Q.   And you also write:  "I caught him talking bad about them

16  to other associates last night, and I really cannot have that

17  disrespect happening within the area."

18       Who is "them" that you are referring to here?

19  A.   He have talking to Devin and to my other team members.

20  Q.   And what did you hear Mr. Diaz saying?

21  A.   I heard him saying --

22       MR. COLLIER:  Objection, Your Honor.  This is new

23  testimony.

24       THE COURT:  Yeah.  Sustained.

25  \\\

1   BY MS. HENDERSON:

2   Q.   When you reference overhearing conversations in that last

3   e-mail.  Did you ever overhear Owen Diaz making complaints of

4   racial harassment?

5   A.   No, I didn't.

6   Q.   What did he complain about that you had heard?

7   A.   He was just complaining about their job and how he could

8   do a better job than them.

9   Q.   Do you still work for Tesla?

10  A.   No, I don't.

11  Q.   When did you stop working for Tesla?

12  A.   In March of 2021.

13  Q.   Do you own any Tesla stock?

14  A.   No, I don't.

15  Q.   Why did you leave Tesla?

16  A.   My children both --

17          MR. COLLIER:  Objection.  Relevance.

18          THE COURT:  Sustained.

19  BY MS. HENDERSON:

20  Q.   Where do you work now?

21  A.   I work at Rivian.

22  Q.   What is Rivian known as in comparison to Tesla?

23  A.   It's Tesla's competition.

24  Q.   If you don't work for Tesla anymore, you don't live here

25  anymore, and you can't be compelled to testify, why did you

1  come in here to testify?

2          **MR. COLLIER:**  Objection.  Relevance.

3          **THE COURT:**  Sustained.

4          **MS. HENDERSON:**  No further questions.

5          **THE COURT:**  All right.  Mr. Collier.

6          **MR. COLLIER:**  Thank you, Your Honor.

7                    **CROSS-EXAMINATION**

8  **BY MR. COLLIER:**

9  **Q.**   DelaGrande, is that how you say it?

10  **A.**   DelaGrande.

11  **Q.**   My name is Dustin Collier.  We haven't met.  Can you tell

12  us if Mr. Diaz was such a terrible employee, why he was

13  promoted and given two raises?

14  **A.**   I don't know.

15  **Q.**   You said that you were aware -- that you were informed he

16  was going to receive a written warning for the way he was

17  treating your associates?

18  **A.**   Yes.

19  **Q.**   Where is it?

20  **A.**   I don't know.

21          **MS. HENDERSON:**  Objection, speculation.

22  **BY MR. COLLIER:**

23  **Q.**   Have you ever seen it?

24          **THE COURT:**  Overruled.

25          **MS. HENDERSON:**  Objection, lacks --

1          **THE COURT:**  This is a question-and-answer period with

2    some interspersals.  So the question of "have you ever seen

3    that" -- the objections are going to be overruled.  But let's

4    go slowly so that we can get a good record.

5          **MR. COLLIER:**  Thank you, Your Honor.

6    **BY MR. COLLIER:**

7    Q.    Have you ever seen a written reprimand issued to Mr. Diaz?

8    A.    No.

9          **MR. COLLIER:**  Let's go to Exhibit 296, please, in

10   evidence on page 1.  Blow up the e-mail from Ed Romero about

11   two-thirds of the way down the page, please.

12                    (Pause in proceedings.)

13         **MR. COLLIER:**  Thank you.

14   **BY MR. COLLIER:**

15   Q.    We see here that in response to your complaint to

16   Mr. Romero, he e-mails you with a copy to your team; correct?

17   A.    Yes.

18   Q.    And he says:  "I would appreciate any input if your staff

19   wants to e-mail me with any concerns."  Do you see that?

20   A.    Yes.

21   Q.    Have you ever seen them respond to that e-mail with any

22   concerns?

23   A.    No.

24   Q.    Right.  Where is it?

25   A.    They told me.

DELAGRANDE - CROSS / COLLIER

1   **Q.**   And is there a reason why they're not here testifying and

2   they had to send you as their emissary?

3   **A.**   No.

4           **MS. HENDERSON:**  Objection.

5           **THE COURT:**  Sustained.  The question will be stricken.

6   The answer will be stricken.

7                         (Pause in proceedings.)

8   **BY MR. COLLIER:**

9   **Q.**   You said you were by the elevator all the time interacting

10  with them; correct?

11  **A.**   Yes.

12  **Q.**   You never went on the elevator, though, yourself?

13  **A.**   Yes, I did.

14  **Q.**   Now, isn't it true, then, until February of 2016, you

15  worked downstairs?

16  **A.**   Yes, I did.

17  **Q.**   And then Mr. Hurtado worked upstairs?

18  **A.**   Yes.

19  **Q.**   So did Hugo?

20  **A.**   Yes.

21  **Q.**   So did Owen?

22  **A.**   Yes.

23  **Q.**   So you weren't actually there to observe their

24  interactions until February of 2016; correct?

25  **A.**   Yes.

DELAGRANDE - CROSS / COLLIER

1   Q.   So for the first eight months of Mr. Diaz's employment,

2   you don't have any clue what they were saying to him, do you?

3   A.   No.

4   Q.   On a broader point, can we agree that whether someone is

5   working at your performance expectations has nothing to do with

6   whether they've been racially harassed?

7            MS. HENDERSON:  Objection.

8            THE COURT:  Overruled.

9        You can answer.

10           THE WITNESS:  I -- can you repeat the question?

11  BY MR. COLLIER:

12  Q.   Yeah.  Whether someone is meeting your performance

13  expectations has nothing to do with whether they've been

14  racially harassed, does it?

15  A.   If they were -- if I had heard that there was racial

16  harassment --

17  Q.   That's not my question.

18           THE COURT:  Excuse me.  I don't want you cutting off

19  the witness.

20           MR. COLLIER:  Sorry.

21           THE COURT:  If you would just focus on the question,

22  which is a separate -- it's a different question.  So try it

23  again.

24           MR. COLLIER:  Thank you, Your Honor.

25           THE WITNESS:  I guess I don't understand the question.

DELAGRANDE - CROSS / COLLIER

1    BY MR. COLLIER:

2    Q.    That's all right.  I'll try again.  Sorry.

3         Can we agree that whether someone is living up to your

4    performance expectations or not has nothing to do with whether

5    they have been racially harassed?

6    A.    Yeah.  I agree.

7    Q.    Okay.  And if someone is experiencing racial harassment,

8    like Mr. Diaz was in this case, the opinion of someone who is

9    not even his supervisor about their performance would be

10   completely irrelevant to his damages; wouldn't it?

11             MS. HENDERSON:  Objection.

12             THE COURT:  I'm going to sustain an objection to

13   argumentative.

14   BY MR. COLLIER:

15   Q.    You would agree, Ms. DelaGrande, that if someone's

16   performing poorly at work, that doesn't justify calling them

17   the N-word?

18   A.    I agree.

19   Q.    You would agree that that doesn't justify calling them

20   "coon"?

21   A.    I agree.

22   Q.    Or "porch monkey"?

23   A.    I agree.

24   Q.    Or "boy"?

25   A.    I agree.

1   **Q.**   And no amount of poor performance would justify being

2   threatened with violence, would it?

3   **A.**   I agree.

4   **Q.**   Or having racist drawings left behind for you to find?

5   **A.**   I agree.

6   **Q.**   Now to be clear, you testified that you had concerns about

7   Mr. Diaz's job performance; is that right?

8   **A.**   Yes.

9            **MR. COLLIER:**  Can we display Exhibit 251, please.

10   And we'll blow up the November 2, 2015, e-mail.

11  **BY MR. COLLIER**

12  **Q.**   Here is an e-mail you sent just three months before

13  Mr. Diaz left:  "It was nice to meet you.  Tuesday would be

14  great.  I have been speaking with Owen lately.  He is doing a

15  great job over there."

16   That's you speaking that?

17  **A.**   Yes.

18  **Q.**   And you said you complained to Mr. Romero about Mr. Diaz's

19  job performance; is that right?

20  **A.**   After, yes.

21  **Q.**   And you initially felt that Mr. Romero was protective of

22  Mr. Diaz?

23  **A.**   No.

24  **Q.**   I'd like to read from Ms. DelaGrande's trial testimony

25  page 721, line 24, to 722, line 6.

```
 1                      (Pause in proceedings.)

 2           THE COURT:  To 724?

 3           MR. COLLIER:  721, line 24, to 722, line 6.

 4           THE COURT:  Okay.

 5           MR. COLLIER:  Thank you, Your Honor.

 6   BY MR. COLLIER:

 7   Q.   "QUESTION:  Okay.  Did you feel that Mr. Romero was

 8   helping you resolve your issues with Mr. Diaz?

 9        "ANSWER:  No.

10        "QUESTION:  Did you feel that Mr. Romero was protective of

11   Mr. Diaz?

12        "ANSWER:  Yes.

13        "QUESTION:  Why?

14        "ANSWER:  He was his employee.  I felt that he was just

15   trying to defend his employee and they were short-staffed as

16   well."

17        That was your testimony; right?

18   A.   Okay.

19   Q.   That was your testimony; correct?

20   A.   Yes.

21   Q.   And you knew they were short-staffed at the elevators;

22   right?

23   A.   Yes, I did.

24   Q.   And some of those problems at the drop zone, things not

25   moving as quickly as you would like them to move, couldn't that
```

1   be caused by short staffing?

2   **A.**   There was the same short-staff issue earlier in the week,

3   and they didn't have the same issues.

4   **Q.**   Okay.  So I'm just asking you:  Could short staffing cause

5   problems at the elevator?

6   **A.**   It potentially could, yes.

7   **Q.**   Were you aware that at times Mr. Diaz had to cover both

8   freight elevators on his own?

9   **A.**   There were times.

10  **Q.**   Okay.  Could that explain why he might not be there at the

11  elevator you want on the times you go looking for him?

12  **A.**   The times we were looking for him he was found in the

13  break room.

14  **Q.**   Is he allowed to have breaks?

15  **A.**   It wasn't during the break time.

16  **Q.**   How do you know that?  Were you his supervisor?

17  **A.**   I was -- I was in charge of that area.

18  **Q.**   Were you his supervisor?

19          **THE COURT:**  Mr. Collier, just slow down.

20      Ms. DelaGrande, please continue with your answer.

21          **THE WITNESS:**  Their breaks went along with our breaks

22  so that we would not impact the line.

23  **BY MR. COLLIER:**

24  **Q.**   Were you his supervisor?

25  **A.**   No, I was not.

DELAGRANDE - CROSS / COLLIER

1  **Q.**  Is there a reason why we're hearing these performance

2  criticisms from you instead of his supervisor?

3          **THE COURT:**  Strike the question.

4      Let's just focus on this case and not other extraneous

5  issues, please.

6          **MR. COLLIER:**  Understood, Your Honor.

7      Exhibit 259, please.  Let's blow up her e-mail.  I think

8  it's on the next page.

9  **BY MR. COLLIER**

10  **Q.**  You indicated that you made a complaint about Mr. Diaz

11  riding a bike through the factory; correct?

12  **A.**  Yes, I did.

13  **Q.**  But he wasn't the only one, was he?

14  **A.**  No.

15  **Q.**  In fact, there were multiple employees who were riding the

16  bikes?

17  **A.**  Yes.

18  **Q.**  He's the only one you complained about?

19  **A.**  Because he was in a lead position, and I needed him to set

20  a good example for his team.

21  **Q.**  Is it your testimony that no other leads rode a bike in

22  the factory?

23  **A.**  I don't know all of those people.  I only worked with him

24  in that area.

25  **Q.**  He's the only one you complained about riding a bike.

1    **A.**   In this e-mail, yes.  But there were other e-mails to

2    other people.

3    **Q.**   Did you bring them?

4    **A.**   No, I did not.

5    **Q.**   Can we agree that Mr. Diaz is not responsible for any

6    short-staffing problems at the elevator?

7    **A.**   No.  He wasn't.

8    **Q.**   Now you're aware that in late January of 2016, Mr. Diaz

9    complained to his supervisors about a racist drawing that had

10   been left for him?

11   **A.**   I'm not aware.

12   **Q.**   So you're aware -- you do acknowledge that there are

13   things that happened at the factory you don't know?

14   **A.**   Yes.

15           **MR. COLLIER:**  Let's put up 33, please.

16                    (Pause in proceedings.)

17   **BY MR. COLLIER:**

18   **Q.**   Exhibit 33 is the e-mail complaint that Mr. Diaz made

19   about a racist drawing that had been left for him by Ramon

20   Martinez.

21       You see the date there, January 26, 2016?

22   **A.**   Yes.

23           **MS. HENDERSON:**  Objection.  Foundation and outside the

24   scope.

25           **MR. COLLIER:**  This is already in evidence, Your Honor.

1          **THE COURT:**  It may be in evidence, but if she hasn't

2    seen it, where are you going with this?

3          **MR. COLLIER:**  I'm just trying to get the date for now

4    to compare it to other things I'm going to ask her about after.

5          **THE COURT:**  Okay.  Overruled for the moment.

6    **BY MR. COLLIER:**

7    **Q.**  You see here -- I'm sorry.

8          After you complained in February of 2016, Mr. Romero

9    agreed to write Mr. Diaz up; is that right?

10   **A.**  Yes.

11   **Q.**  So after he complained about the racist pickaninny,

12   Mr. Romero's no longer protecting him; right?

13   **A.**  Mr. Romero was basing the issues -- the information off

14   the e-mails I had been sending him based on Owen's performance.

15   **Q.**  That's right.  In November you praised his performance;

16   right?

17   **A.**  Yes.

18   **Q.**  In February, after he's complained about the racist

19   drawing, you criticize him?

20   **A.**  It wasn't after that.  I didn't know anything about this.

21   **Q.**  In -- okay.  In February after -- you saw the drawing;

22   right?

23   **A.**  Yeah.

24   **Q.**  In February, after he's complained about the drawing, you

25   start complaining about his performance; right?

1  **A.**   I complained about his performance, yes.

2  **Q.**   And Mr. Romero was no longer protecting him; right?

3  **A.**   I don't know.  I had nothing to do with this e-mail.

4  **Q.**   Instead, you and Mr. Romero are actively working to get

5  him fired; right?

6  **A.**   No, absolutely not.  Everything that I sent was based off

7  his performance with my team.

8  **Q.**   Now your first complaint to Mr. Romero in February

9  indicated that Mr. Diaz didn't want to speak to your leads

10  unless it was about business; correct?

11  **A.**   Yes.

12  **Q.**   And it didn't say anything about not getting e-mails;

13  right?

14  **A.**   He said he told my lead he wanted everything through

15  e-mail.

16  **Q.**   You say he told you that verbally, but your first e-mail

17  complaint doesn't say that, does it?

18  **A.**   It does.  It's --

19       **MR. COLLIER:**  Put up the February 19th one, which is

20  296.  Second page, again.

21     Oh, it's not the right e-mail.  I'll come back to that.

22  **BY MR. COLLIER**

23  **Q.**   In any event, you would agree that asking to speak only

24  about business is the height of professionalism?

25  **A.**   Yes.

1   **Q.**   There is nothing inappropriate about that?

2   **A.**   No, there's nothing inappropriate about that.

3   **Q.**   It would make sense if someone would do that if they had

4   been racially harassed by the person they were talking to;

5   right?

6   **A.**   I don't know anything about the racism.

7            **THE COURT:**   Mr. Collier, let's stick to what

8   Ms. DelaGrande actually knows and not argue the rest of the

9   case through her.  She is not that kind of a witness.

10           **MR. COLLIER:**   Understood.

11  **BY MR. COLLIER:**

12  **Q.**   Mr. Diaz told you that the reason he didn't want to talk

13  about anything other than business with Mr. Hurtado is because

14  Mr. Hurtado had threatened him; right?

15  **A.**   He told me that Robert Hurtado had said he was going to go

16  speak to his manager about his performance.

17           **MR. COLLIER:**   I would like to read from

18  Ms. DelaGrande's prior testimony, page 742, line 21, to 743,

19  line 8.

20                    (Pause in proceedings.)

21           **MS. HENDERSON:**   Objection.  It's not inconsistent.

22           **THE COURT:**   I don't see the inconsistency either.

23  Let's move on.

24  **BY MR. COLLIER:**

25  **Q.**   In any event, you investigated his allegation that Hurtado

**DELAGRANDE - CROSS / COLLIER**

1   had threatened him; is that right?

2   **A.**   I went over and spoke to Owen, yes.

3   **Q.**   So your investigation consisted of speaking to Mr. Diaz

4   and to Mr. Hurtado?

5   **A.**   Yes.

6   **Q.**   And no one else?

7   **A.**   The threat was made that Mr. Hurtado was going to go speak

8   to report the issue to Mr. -- to Edward.

9   **Q.**   Did you interview any third party witnesses about the

10  history of interactions with Mr. Hurtado and Mr. Diaz?

11  **A.**   I did not because that wasn't the -- at that moment I was

12  just making sure what was said.  Owen's statement to me and

13  Robert's statement to me were the very same thing, that he had

14  threatened to go to Owen's manager.

15  **Q.**   What did you do to determine if that threat was racially

16  motivated?

17  **A.**   There was no racism in the conversation at all from either

18  one.  There was nothing to investigate.

19  **Q.**   I think my question may have been unclear.  What did you

20  do to determine if the threat was racially motivated?

21  **A.**   I had no reason to think it was racially motivated.  It

22  was performance based.

23  **Q.**   I think my question was unclear.  What did you do --

24          **THE COURT:**  I'm sorry.  That's been asked and

25  answered.

1    **BY MR. COLLIER:**

2    **Q.**    Did you report it to HR?

3    **A.**    I reported it to Edward.

4    **Q.**    Did you report it to HR?

5    **A.**    No, I did not.

6    **Q.**    When you spoke to Owen and he confirmed he didn't want to

7    speak to your leads unless it was about business, you deemed

8    that rude, disrespectful, and unprofessional; correct?

9    **A.**    Yes.

10   **Q.**    Even though it is the height of professionalism?

11   **A.**    I needed my team to be able to speak to him about taking

12   material down to the line, so that way we would not shut the

13   line down.  So yes, telling them they cannot communicate with

14   him was to me unprofessional.

15   **Q.**    I agree.  But that's not what he said, is it?  He said he

16   didn't want to talk about anything other than business; right?

17   **A.**    At this point he didn't want to talk to my team at all

18   unless it was via e-mail and I believe he then said text.

19   **Q.**    Would it be rude, disrespectful, and unprofessional for

20   your leads to call Mr. Diaz the N-word more than 30 times?

21   **A.**    I don't know anything about that because that was never

22   reported to me.

23   **Q.**    And would it be rude if they did?

24   **A.**    If they did, but it was never reported to me.

25   **Q.**    Would it be rude, unprofessional, and disrespectful if

**DELAGRANDE - CROSS / COLLIER**

1   they had threatened him?

2   **A.**   Absolutely.  But that was never --

3   **Q.**   Or left racist drawings for him?

4        **THE COURT:**  Please wait until she finishes her

5   testimony, and then you get to speak.  Okay?

6        **MR. COLLIER:**  Sorry, Your Honor.

7        Please go ahead.

8        **THE WITNESS:**  That was never reported to me.

9   BY MR. COLLIER:

10   **Q.**   You have testified, at least while you were there, that

11   Tesla had a zero-tolerance policy for racial slurs?

12   **A.**   Yes, they do.

13   **Q.**   And Mr. Hurtado, the lead that Owen didn't want to talk

14   to, you interacted with him on a daily basis; right?

15   **A.**   Yes.

16   **Q.**   You never heard him say the N-word?

17   **A.**   No.

18   **Q.**   You said that's not even part of his vocabulary; right?

19   **A.**   Right.

20   **Q.**   Because you have been present with all of his interactions

21   with every Black person he's ever spoken to?

22   **A.**   I was present during his employment -- when he was

23   reporting to me, I was present quite a few times.  I was there.

24   **Q.**   But you already acknowledged there were eight months of

25   interactions you weren't present for; right?

 1   **A.**   I wasn't his manager at the time.

 2   **Q.**   At the time that you were Mr. Hurtado's supervisor, you

 3   had 20 other people on that same team; right?

 4   **A.**   I had about 15 other people, yes.

 5   **Q.**   I take it you don't follow Mr. Hurtado around; that's not

 6   your sole job?

 7   **A.**   No.  But I interact with him quite a bit.

 8   **Q.**   Were you aware that three other Tesla supervisors have

 9   testified in this trial that the use of the N-word was rampant?

10   **A.**   No.

11   **Q.**   You don't have any reason to doubt their experience, do

12   you?

13   **A.**   I don't know who they are.

14           **THE COURT:**  Sustained.  The question will be stricken.

15   Let's just stick with what Ms. DelaGrande knows and did in the

16   factory.

17           **MR. COLLIER:**  Thank you.

18   **BY MR. COLLIER:**

19   **Q.**   You, yourself, would never use racial epithets; correct?

20   **A.**   Absolutely not.

21   **Q.**   It's unacceptable in the workplace?

22   **A.**   Absolutely.

23   **Q.**   Including the A version of the N-word?

24   **A.**   Absolutely.

25   **Q.**   Because it violates the zero-tolerance policy?

1   **A.**   Yes.

2   **Q.**   And your staff knew you felt that way?

3   **A.**   Yes, they did.

4   **Q.**   They knew that you wouldn't tolerate any racist behavior?

5   **A.**   Absolutely.

6   **Q.**   So they knew if they were going to use the N-word, not to

7   do it in front of you?

8   **A.**   They wouldn't do that.

9   **Q.**   Right.  If someone breaks the company rules at work, they

10  should be punished for it; right?

11  **A.**   Yes.

12  **Q.**   Including the rules against racial harassment?

13  **A.**   Yes.

14  **Q.**   And if Tesla broke its own rules against racial

15  harassment, it should also be punished; right?

16  **A.**   Yes.

17  **Q.**   You would agree that if Mr. Diaz had to endure hearing the

18  N-word all over the Tesla factory, that would be a hostile work

19  environment under Tesla's own policies?

20          **MS. HENDERSON:**  Objection.

21          **THE COURT:**  Sustained.

22          **MR. COLLIER:**  This is from her prior testimony.

23          **THE COURT:**  Well, I'm going to sustain the objection

24  here.  I think she's not here as an HR expert.

25          **MR. COLLIER:**  No further questions at this time,

1    Your Honor.

2             **THE COURT:**  All right.

3                         <u>**REDIRECT EXAMINATION**</u>

4    **BY MS. HENDERSON:**

5    **Q.**   Did you make complaints about Owen Diaz prior to

6    January 2016?

7    **A.**   Yes.

8    **Q.**   And several of the e-mails that I showed you referenced

9    complaints that were made prior to January 2016?

10   **A.**   Yes.

11   **Q.**   Did you take that zero-tolerance policy at Tesla

12   seriously?

13   **A.**   Absolutely.

14   **Q.**   Why?

15   **A.**   My husband is African American, and there is no way if

16   anybody had said anything to me that I would not have reported

17   it.  I would have went straight to HR.

18             **MS. HENDERSON:**  No further questions.

19             **THE COURT:**  Any recross?

20             **MR. COLLIER:**  No.

21             **THE COURT:**  Thank you, Ms. DelaGrande.

22             **THE WITNESS:**  Thank you.

23             **THE COURT:**  You are excused.

24             **MR. SPIRO:**  I think we have to address just the

25   deposition.

1      **THE COURT:**  Okay.  So, ladies and gentlemen, we'll

2   take our first morning break.  This may take slightly longer

3   than 15 minutes.  I don't think by much.  But please remember

4   the admonitions.  Even though we're getting extremely close to

5   the end of the evidence, there is -- there is more to come in

6   this because you're going to hear the instructions that I give

7   you and then the argument of counsel that will try to put into

8   perspective some of the things that you've learned.

9      Please just keep an open mind don't talk about the case

10  and enjoy the break.

11     (Proceedings were heard outside the presence of the jury:)

12     **THE COURT:**  All right.  Please be seated, everybody.

13     **MS. NUNLEY:**  Your Honor, can we take a bathroom break?

14  I'm so sorry.

15     **THE COURT:**  Yes, we can take -- let's take a

16  five-minute break, and then I would like the lawyers to be

17  back.

18     **MS. NUNLEY:**  Thank you so much, Your Honor.

19            (Recess taken at 10:31 a.m.)

20         (Proceedings resumed at 10:37 a.m.)

21     **THE CLERK:**  Come to order.

22     **THE COURT:**  Please be seated, everybody.  All right.

23  One instruction we need to add back in because of the

24  admissions is the form admission instruction.  So we are -- we

25  will slip that in momentarily.

**PROCEEDINGS**

 1          With respect to the impeachment designation question, is

 2   there any other trial testimony that Plaintiffs want to direct

 3   me to?

 4          **MR. COLLIER:**  Yes, Your Honor.  We found one more

 5   segment of Dr. Reading's testimony that I think is pertinent.

 6          **THE COURT:**  Okay.

 7          **MR. COLLIER:**  It's from the prior proceeding at 607:

 8   14 to 20.

 9          **MR. GRIFFIN:**  Which volume?

10          **MR. COLLIER:**  I believe that's Volume III, but let me

11   double-check.

12          **THE COURT:**  I think it's 4.  607?

13          **MR. COLLIER:**  Yes, Your Honor, 607:14 to 20.

14          **MR. ORGAN:**  Your Honor, there is also -- if this is

15   played, the Plaintiff would want to recall Mr. Diaz to testify

16   about the fact that his son is now out of prison.

17          **THE COURT:**  Prison has nothing to do with it.

18          **MR. ORGAN:**  I understand.  But his son has visited the

19   house and looks down when he sees him.

20          **THE COURT:**  We are not putting in evidence of what is

21   happening in 2023 or 2022.  The -- the issue is a different

22   issue which is that Mr. Diaz testified here that his

23   relationship with his son was fractured from the moment

24   essentially of the -- the experience at the Tesla factory.

25          And that he was not in communication -- his son wouldn't

 1   communicate with him.  The impeachment portion of the

 2   deposition is -- provides a different story and there is --

 3   given the testimony that you have pointed me to from the prior

 4   trial, that would not have put the Defense on notice of this

 5   change in Mr. Diaz's testimony.

 6       So I think it is fair for the Defense to put in the

 7   portions of Mr. Diaz -- Mr. Demetric Di-Az's testimony that --

 8   that they have asked to put in.

 9           MR. ORGAN:  We would also object, Your Honor, they did

10   not designate this testimony and they have now closed their

11   case.

12           THE COURT:  They haven't closed their case.  We did

13   reserve this issue.  And the reason they didn't designate it,

14   they said and it -- it is why I just said what I did.  They

15   didn't have a reason to designate it until Mr. Diaz provided

16   his current perspective on what happened on the stand.  So I

17   take your objection and it's overruled.

18           MR. SPIRO:  So, Your Honor, we would -- just so the

19   Court knows schedule -- so the schedule from our perspective,

20   we would play that and then just one point of clarification

21   just for housekeeping purposes.  We've sort of assumed that all

22   of the exhibits that Your Honor has said are in through the

23   last proceeding are part of the record in this case.  I'm not

24   going to move -- re-move anything into evidence.

25           THE COURT:  Everything that's been moved in today --

1   that you have used in this trial, one side or another, is in.

2        MR. SPIRO:  Right.  But when you say "this trial,"

3   just because we're in a different posture, I just want to make

4   sure that I'm correct.

5        THE COURT:  Anything that this jury has seen is what

6   goes to the jury.  If there's some other document that

7   hasn't -- has not been seen that you're going to emphasize to

8   the jury, then typically I would not allow it.  If there's --

9   if you want to tell me what it is, I'll look at it.

10        MR. SPIRO:  I think we'd have to confer on that.  We

11  had an -- we understood and that -- from the Court's earlier

12  remarks that we were just assuming that all of those exhibits

13  were in, so we didn't intentionally -- now, candidly, I'm going

14  to sum up, hopefully efficiently, and I'm not going to be

15  putting any of those exhibits on the screen, so I just --

16  that's what I understood.  And we're in a different posture,

17  but I didn't know if I had to move things in at this point, so

18  I wanted to check with the Court.

19        THE COURT:  All right.  So, the -- and I don't know

20  from the -- the clerk's perspective.  We haven't segregated

21  these documents, so it may be problematic to do that now.

22        THE CLERK:  Well, what I understand Mr. Spiro to be

23  referencing are the exhibits that came in in the earlier trial.

24        THE COURT:  Yes, exactly.

25        THE CLERK:  Okay.  And he wants those to go to the

1  jury?

2          THE COURT:  That's what he was saying.  I don't know

3  how we have -- I don't know how we're going to --

4          THE CLERK:  They went to the jury on a memory stick

5  previously.  I think we still have possession of that.

6          THE COURT:  But do we have the current exhibits that

7  have been --

8          THE CLERK:  They have not been marked or reviewed.

9          MR. ORGAN:  Your Honor --

10         THE COURT:  They're not going to go back.  They're not

11  ready to go back.

12         THE CLERK:  They can be marked during closing.

13         MR. ORGAN:  Your Honor, Ms. Grislis has separated out

14  those exhibits that have been mentioned in trial, and she

15  could -- have you put it on a memory stick yet?  Hold on.  Let

16  me --

17         THE COURT:  Okay.  So you've got those segregated out?

18     Yeah.  Mr. Spiro.

19         MR. SPIRO:  I don't think I -- as long as they've seen

20  it, I don't think there's any use of it.  I don't want to make

21  more of this than it need be.  Let us confer with the other

22  side and get back to the Court.  I was more just thinking sort

23  of aloud as to the next step of this.  But let me go back to

24  the corner and not ask the Court to do anything at this time,

25  other than the exhibits that have been introduced at trial.

1          **THE COURT:**  Okay.  So I may not have been a hundred

2  percent clear on this, which is -- so, that's fair.  But my

3  practice is that if the jury hasn't seen a document, I don't

4  have them do their own investigation that the lawyers

5  haven't --

6          **MR. SPIRO:**  Fair enough.

7          **THE COURT:**  -- given them information on.

8          **MR. SPIRO:**  Fair enough, Your Honor.  Thank you.

9      So we would then be resting after we play the designation.

10  We have to make an application, of course, which my colleague

11  will make.  And then we'll rest.  Then we're ready for

12  summations.

13          **THE COURT:**  Okay.  The -- with respect to what I'm

14  going to tell the -- that's fine.  With respect to what I'm

15  going to tell the jury with respect to not looking at

16  information, what we were discussing earlier, the -- I am -- I

17  am going to instruct them not to consider questions or

18  responses regarding co-workers -- alleged comments about

19  co-workers' sex lives and because they're irrelevant to the

20  jury's consideration and brought up for the first time eight

21  years ago.  That's what I'm going to say.

22      And it conditioned on your representation, Mr. Spiro, that

23  you're not going to mention that or anything like that in

24  closing.

25          **MR. SPIRO:**  I will not.  I would tell you my -- I

PROCEEDINGS

1    would say that he didn't know why -- he claimed he did not know

2    something to the effect of -- I don't want to -- he claims that

3    the incident in the elevator was racist.  Mr. Martinez told you

4    he was there because he was upset about a co-worker.  Nothing

5    more.  That's what Mr. Martinez testified to without objection

6    in this trial.

7              THE COURT:  Yeah.

8              MR. SPIRO:  Thank you, Your Honor.

9              THE COURT:  And then I will also tell the jury to

10   disregard the questions regarding the pretrial proceedings for

11   Demetric Di-Az as irrelevant, disregard the questions and

12   testimony regarding the doctor's note as we discussed earlier.

13             MR. SPIRO:  Thank you, Your Honor.

14             THE COURT:  Okay.  All right.

15       So I am going to get the -- I'll get you revised

16   instructions.

17       After --

18             MS. NUNLEY:  Your Honor?

19             THE COURT:  Yes.

20             MS. NUNLEY:  Do you intend to issue a limiting

21   instruction regarding Exhibit 410 and the feces incident?

22             THE COURT:  I'm sorry.  Regarding?

23             MS. NUNLEY:  Regarding Exhibit 410 that Tesla

24   proffered on the first day of testimony with Mr. Wheeler and

25   the feces incident?

1    **THE COURT:**  I think that was dealt with during the

2  course of his testimony, so -- and I think I dealt with the

3  Wheeler issues on -- at a different morning.  So I think I'm

4  not going to do anything further with that.

5    **MS. NUNLEY:**  Thank you, Your Honor.

6    **THE COURT:**  All right.  All right.

7    So, I'm going to roll right into the instructions once

8  the -- once the evidence is in.

9    **MR. COLLIER:**  Your Honor, I was just wondering if we

10  could get some sort of indication what the grounds are for the

11  judgment -- I'm sorry, the judgment notwithstanding the

12  verdict, or I forget what the term is here.

13    **THE COURT:**  The --

14    **MR. COLLIER:**  The Rule 50 motion.

15    **THE COURT:**  I'm deeming that those motions have been

16  made.  After the jury goes out to deliberate, I am happy to --

17  to have a further record made with respect to them to the

18  extent that people think it's appropriate -- necessary for the

19  record, but I'm not -- I'm not going to toss the case.

20    **MR. COLLIER:**  Got it.  Thank you, Your Honor.

21    **MR. POSNER:**  For preservation purposes, can I indulge

22  you to let me say these words, which I believe I need to do

23  with respect to --

24    **THE COURT:**  Mr. Posner, I will indulge you in that

25  respect.

1        **MR. POSNER:**  Thank you, Your Honor.

2        Your Honor, Tesla moves for judgment as a matter of law

3    under Federal Rule of Civil Procedure 50(a) on the basis that

4    no properly-instructed jury could award punitive damages in

5    favor of Mr. Diaz.

6        Punitive damages require a showing of purpose for reckless

7    indifference.  The undisputed evidence is legally insufficient

8    to show that Tesla acted purposefully or with reckless

9    indifference because it shows that Tesla had an enforced

10   corporate policy barring hostile racial conduct.

11       Tesla imposed disciplinary sanctions in response to

12   Mr. Diaz's documented complaints of racially hostile conduct,

13   and Mr. Diaz's own witnesses admitted that Tesla's conduct was,

14   at most, negligent.

15       Understanding Your Honor's preference and prior ruling,

16   that the Court will deem the motion raised rather than hear

17   oral argument on it, Tesla incorporates by reference the

18   arguments included in the written motion under Rule 50(a) that

19   we'll file concurrently.

20       Thank you.

21       **THE COURT:**  All right.  Thank you, Mr. Posner.

22       And I'll just repeat again what I said before:  You made

23   the motion for a new trial on damages, and I ended up granting

24   that motion on damages.  And the findings of the prior jury

25   with respect to damages are the ones that we're working with.

1    I understand your position, which you stated a few times

2  and I have responded to a few times, but I didn't want to let

3  this go without making that.

4    You're both here because -- and in this posture as a

5  result of decisions you have made and representations you have

6  made, and I'm just trying to get this case to the jury so this

7  jury can decide things, and then you will live on in my memory

8  and also in the appellate courts.

9                        (Laughter)

10        **MR. POSNER:**  Very good, Your Honor.  Thank you.

11        **THE COURT:**  That's where we are.

12    All right.  So I'll get you a copy of the jury

13  instructions so that you have them, but then we're going to

14  just roll right into those.  And I will --

15        **MR. SPIRO:**  Yeah.  I'm going to do the video first,

16  Your Honor.

17        **THE COURT:**  You can.  Yes.

18    So I will do the preliminary instructions, and then we

19  will break for lunch, and then we will go into the closings.

20        **MR. SPIRO:**  The only other thing, just so the Court

21  knows, I'm going to move our policies into evidence that has

22  come up, but I don't know if we move the policies in.  So that

23  would be the one Your Honor sort of asked, what is my final

24  stance on that.  I think that given what the jury's heard or

25  heard in openings and seen snippets of, I think, in their

PROCEEDINGS

 1   opening presentation, I should just put the policy --

 2          **THE COURT:**  The Tesla policies as of whenever.

 3          **MR. SPIRO:**  The same one used at the first trial.

 4          **THE COURT:**  Yeah.  Okay.

 5          **MR. SPIRO:**  Thank you.

 6          **THE COURT:**  All right.

 7                  (Recess taken at 10:51 a.m.)

 8                (Proceedings resumed at 11:02 a.m.)

 9          **THE CLERK:**  Please come to order.

10          **THE COURT:**  Please be seated, everybody.

11          **MR. GRIFFIN:**  Your Honor, I just wanted to clarify --

12          **THE COURT:**  Hang on just a second.

13                  (Pause in proceedings.)

14          **THE COURT:**  Can we have quiet, please?  Thank you.

15          **MR. GRIFFIN:**  I just want to clarify for the record

16   that we're going to put in Exhibit 368, which is a Tesla HR

17   policy; Exhibit 62, which is a second portion of Mr. Diaz's

18   application to work at Tesla; and Exhibit 65, which is the

19   e-mail forwarding Lamar Patterson's resume.

20       All were admitted in the first trial.

21          **THE COURT:**  All right.  Is there any objection to

22   that?

23                  (Pause in proceedings.)

24          **THE COURT:**  Take off your mask, if you wouldn't mind,

25   Mr. Organ.

1      **MR. ORGAN:**  Yes, Your Honor.

2      62, the second page of the Application, is the thing that

3  we had the whole spat over and the questioning that had to be

4  stricken because that's -- that's the --

5      **THE COURT:**  Isn't there a redaction?

6      **MR. ORGAN:**  I'm sorry.  It is redacted.  Yes,

7  Your Honor.

8      **THE COURT:**  Okay.  And so that was before the jury.

9  So I don't even know why we're having -- I don't know that you

10  need to move that in.  I think that's already been moved in and

11  was used.

12      **MR. SPIRO:**  We think so, too.

13      **MR. GRIFFIN:**  We wanted for the record to be clear

14  that -- we didn't know if those were made clear; that 368, 62,

15  and 265 are in.  If that's --

16      **THE COURT:**  As used in the first trial.

17      Is there any other objection?

18      **MR. ORGAN:**  I'm sorry.  62 --

19      **MR. GRIFFIN:**  368 and 265.

20      **MR. ORGAN:**  265.

21      **MR. GRIFFIN:**  As admitted in the first trial.

22      **MR. ORGAN:**  No, Your Honor.

23      **THE COURT:**  Okay.

24                  (Pause in the proceedings.)

25      **THE COURT:**  So that's fine.  You can just move those

1    after you -- whenever you want, whenever you intend to do that.

2        All right.  So now, are we ready for the jury?

3            MR. GRIFFIN:  Yes, Your Honor.

4            THE COURT:  Okay.

5        (Proceedings were heard in the presence of the jury:)

6            THE COURT:  All right.  Please be seated, everybody.

7        Mr. Griffin, what's next?

8            MR. GRIFFIN:  Your Honor, Defendants would like to

9    introduce a portion of the deposition of Demetric Di-Az from

10   May 15, 2018.

11           THE COURT:  Okay.

12               (Video was played but not reported.)

13           MR. GRIFFIN:  One additional point Defendants would

14   like to put in the record:  The Tesla HR policy Exhibit 368,

15   Mr. Diaz -- a second portion of Mr. Diaz's application is

16   Exhibit 62, and an e-mail forwarding Lamar Patterson's resume

17   at Exhibit 265.

18           THE COURT:  Okay.  They're admitted.

19       (Trial Exhibits 62, 265 and 368 received in evidence.)

20           MR. GRIFFIN:  With that, Your Honor, Defendants rest.

21           THE COURT:  Okay.  Great.  Thank you.

22       So, anything further from the Plaintiffs?

23           MR. ALEXANDER:  Nothing further, Your Honor.

24           THE COURT:  All right.  Ladies and gentlemen, the

25   evidence is in.  One thing I should tell you about the

1    exhibits, that some of them have been on the screen and I just

2    neglected to tell you, there are portions of the -- a few

3    exhibits that have redactions on them.  They had the big black

4    lines through them.  And those are -- those were determinations

5    that -- that I made for -- regarding the evidence.  They should

6    not be considered by you in any way.

7         You shouldn't guess or speculate what's there.  It's to

8    protect the privacy of people and other issues that really have

9    nothing to do with your determination.  Just so that you know

10   that.

11        And now we are going to proceed with the final

12   instructions.

13                    (Pause in proceedings.)

14        **THE COURT:**  What we are going to do is I'm going to

15   read the final instructions to you.  You will end up having a

16   copy of these back in the jury room once you start your

17   deliberations, so you don't have to take notes on them.

18        After I finish going through this, we will have our lunch

19   break, and then we will go to the closing arguments of counsel.

20                  (Pause in the proceedings.)

21                  **FINAL JURY INSTRUCTIONS**

22        **THE COURT:**  Members of the jury, now that you've heard

23   all the evidence, it's my duty to instruct you on the law.  A

24   copy of these instructions will be sent to the jury room for

25   you to consult during your deliberations.

**FINAL JURY INSTRUCTIONS**

1    It's your duty to find the facts from all the evidence in

2  the case.   To those facts you will apply the law as I give it

3  to you.   You must follow the law as I give it to you, whether

4  you agree with it or not.

5    And you must not be influenced by any personal likes or

6  dislikes, opinions, prejudices, or sympathy.

7    That means that you must decide the case solely on the

8  evidence before you.   You will recall that you took an oath to

9  do so.

10    Please don't read into these instructions or anything I

11  may say or do that I have any opinion regarding the evidence or

12  what your verdict should be.

13    First, I'll remind you of some of the instructions I gave

14  you at the outset on evaluating the evidence before I get into

15  the substantive instructions.

16    It's been conclusively determined that Tesla is liable to

17  Mr. Diaz for creating a hostile work environment based on

18  law -- in violation of federal law, for failing to prevent

19  racial harassment in violation of federal law, and for

20  negligently retaining and supervising one or more of Mr. Diaz's

21  supervisors in violation of California State law.

22    It has also been determined that as a result of Tesla's

23  liability, Mr. Diaz is entitled to recover from Tesla any past

24  or future noneconomic damages and any punitive damages that you

25  may find based on the evidence at trial.

**FINAL JURY INSTRUCTIONS**

1   In your deliberations, you must accept each of these

2   determinations as true.  It's your job to determine the amount

3   of the damages award.

4   I will now describe how to consider the evidence you have

5   heard.  Then I will describe the findings that led to the

6   determination of Tesla's liability in this case.  Then I will

7   describe what you should consider in awarding damages.

8   And after that, I will instruct you about your

9   deliberations.

10  The evidence you are to consider in deciding what the

11  facts are consists of the sworn testimony of any witness; the

12  exhibits that are admitted into evidence; any facts to which

13  the lawyers have agreed; and any facts that I have instructed

14  you to accept as proved.

15  In reaching your verdict, you may consider only the

16  testimony and exhibits received into evidence.  Certain things

17  are not evidence, and you may consider them in deciding what

18  the facts are.

19  I will list them for you:

20  Arguments and statements by lawyers are not evidence.

21  Please keep that in mind as you listen to the closing

22  statements.

23  The lawyers are not witnesses.  What they may have said in

24  their opening statements, may say in their closing arguments

25  and at other times is intended to help you interpret the

1    evidence, but it's not evidence.

2        If the facts as you remember them differ from the way the

3    lawyers have stated them, your memory of them controls.

4        Number two, questions and objections by lawyers are not

5    evidence.  I will repeat that.  Questions and objections by

6    lawyers are not evidence.

7        Attorneys have a duty to their clients to object when they

8    believe a question is improper under the rules of evidence.

9    You should not be influenced by the objection or by the Court's

10   ruling on it.

11       Number three, testimony that's excluded or stricken or

12   that you have been instructed to disregard is not evidence and

13   must not be considered.  In addition to some -- in addition,

14   some evidence was received only for a limited purpose; when I

15   have instructed you to consider certain evidence only for a

16   limited purpose, you must do so and you may not consider that

17   evidence for any other purpose.

18       Before we get there -- I would leave that one on the

19   screen, Ms. Davis -- I'm going to instruct you now with respect

20   to some of the information that went on during the trial.  I'm

21   going to instruct you not to consider -- specifically instruct

22   you not to consider the questions asked about Mr. Diaz's

23   alleged comments about co-workers' sex lives, which Mr. Diaz

24   denied.  Those are irrelevant for the jury's consideration.

25   They were brought up for the first time in eight years

 1  yesterday.

 2      The jury shall also disregard -- and I think I instructed

 3  you earlier on this -- but you'll disregard questions regarding

 4  the pretrial proceedings for Demetric Di-Az because those are

 5  irrelevant to the proceedings.

 6      The jury shall disregard the questions and testimonies

 7  regarding the doctor's note that was brought up yesterday.

 8  It's outside the scope and immaterial to damages.  So when you

 9  are deliberating, you should not consider those for any reason.

10      And going back to what is not evidence.  Anything you may

11  have seen or heard when the court was not in session is not

12  evidence.  You are to decide the case solely on the evidence

13  received at the trial.

14      Some evidence may have been admitted only for a limited

15  purpose.  If I instructed you that an item of evidence was

16  admitted only for a limited purpose, you must consider it only

17  for that limited purpose and not for any other purpose.

18      Evidence may be direct or circumstantial.  Direct evidence

19  is direct proof of a fact --

20          **MS. NUNLEY:**  Your Honor, may we have a brief sidebar

21  about the issues we raised earlier this morning?

22          **THE COURT:**  We can do that at the end of the

23  instructions.

24          **MS. NUNLEY:**  Thank you, Your Honor.

25          **THE COURT:**  Direct evidence is direct proof of a fact

1  such as testimony by a witness about what that witness

2  personally saw or heard or did.

3      Circumstantial evidence is proof of one or more facts from

4  which you could find another fact.

5      By way of example, if you wake up in the morning and see

6  that the sidewalk is wet, you may find from that fact that it

7  rained during the night.  However, other evidence such as a

8  turned on garden hose may provide a different explanation for

9  the presence of water on the sidewalk.

10      Therefore, before you decide that a fact has been proved

11  by circumstantial evidence, you must consider all the evidence

12  in light of reason, experience, and common sense.

13      You should consider both kinds of evidence.  The law makes

14  no distinction between the weight to be given to either direct

15  or circumstantial evidence.  It's for you to decide how much

16  weight to give to any of the evidence.

17      There are rules of evidence that control what can be

18  received into evidence.  When a lawyer asks a question or

19  offers an exhibit into evidence and a lawyer on the other side

20  thinks that it's not permitted by the rules of evidence, that

21  lawyer may object.

22      If I overrule the objection, the question may be answered

23  or the exhibit received.  If I sustained the objection, the

24  question cannot be answered and the exhibit cannot be received.

25      Whenever I sustained an objection to a question, you must

**FINAL JURY INSTRUCTIONS**

1  ignore the question and must not guess what the answer might

2  have been.

3      Throughout the course of the trial, I ordered that some

4  evidence be stricken from the record and that you disregard or

5  ignore that evidence.  That means when you are deciding the

6  case, you must not consider the stricken evidence for any

7  purpose.

8      In deciding the facts in this case, you may have to decide

9  which testimony to believe and which testimony not to believe.

10      You may believe everything a witness says or part of it or

11  none of it.  In considering the testimony of any witness, you

12  may take into account the opportunity and ability of the

13  witness to see or hear or know the things testified to; the

14  witness' memory; the witness' manner while testifying; the

15  witness' interest in the outcome of the case, if any; the

16  witness' bias or prejudice, if any; whether other evidence

17  contradicted the witness' testimony, the reasonableness of the

18  witness' testimony in light of all the evidence; and any other

19  factors that bear on believability.

20      Sometimes a witness may say something that's not

21  consistent with something else he or she said.  Sometimes

22  different witnesses will give different versions of what

23  happened.  People often forget things or make mistakes in what

24  they remember.  Also, two people may see the same event but

25  remember it differently.  You may consider these differences,

1   but do not decide that testimony is untrue just because it

2   differs from other testimony.

3        However, if you decide that a witness has deliberately

4   testified untruthfully about something important, you may

5   choose not to believe anything that witness said.

6        On the other hand, if you think the witness testified

7   untruthfully about some things but told the truth about others,

8   you may accept the part you think is true and ignore the rest.

9        The weight of the evidence as to a fact does not

10  necessarily depend on the number of witnesses who testify.

11  What's important is how believable the witnesses were and how

12  much weight you think their testimony deserves.

13       We all have feelings, assumptions, perceptions, fears, and

14  stereotypes about others.

15       Some biases we're aware of, and others we might not be

16  fully aware of which is why they are called implicit or

17  unconscious biases.

18       No matter how unbiased we think we are, our brains are

19  hardwired to make unconscious decisions.

20       We look at others and filter what they say through our own

21  personal experience and background.  Because we all do this, we

22  often see life and evaluate evidence in a way that tends to

23  favor people who are like ourselves, or who have had life

24  experiences like our own.

25       We can also have biases about people like ourselves.  One

common example is the automatic association of male with career
and female with family.

Bias can affect our thoughts, how we remember, what we see
and hear, whom we believe or disbelieve, and how we make
important decisions.

As jurors, you are being asked to make an important
decision in the Case.  You must one, take the time you need to
reflect carefully and thoughtfully about the evidence; two,
think about why you are making the decision you are making and
examine it for bias.  Reconsider your first impressions of the
people and the evidence in this case.  If the people involved
in this case were from different backgrounds, for example,
richer or poorer, more or less educated, older or younger or of
a different gender, gender identity, race, religion, or sexual
orientation, would you still view them and the evidence the
same way?

Three, listen to one another.  You must carefully evaluate
the evidence and resist and help each other resist any urge to
reach a verdict influenced by bias for or against any party or
witness.

Each of you have different backgrounds and will be viewing
this case in light of your own insights, assumptions, and
biases.

Listening to different perspectives may help you to better
identify the possible effects these hidden biases may have on

**FINAL JURY INSTRUCTIONS**

1  decision-making.

2      And four, resist jumping to conclusions based on personal

3  likes or dislikes, generalizations, gut feelings, prejudices,

4  sympathies, stereotypes, or unconscious biases.

5      The law demands that you make a fair decision based solely

6  on the evidence, your individual evaluations of that evidence,

7  your reason and common sense, and these instructions.

8      You may have taken notes to help you remember the

9  evidence.  Whether or not you took notes, you should rely on

10  your own memory of the evidence.  Notes are only to assist

11  you -- your memory.  You should not be overly influenced by

12  your notes or those of other jurors.

13      A deposition is the sworn testimony of a witness taken

14  before trial.  The witness is placed under oath to tell the

15  truth, and lawyers for each party may ask questions.

16      The questions and answers are recorded.  When a person is

17  unavailable to testify at trial, the deposition of that person

18  may be used at trial.

19      The deposition of Demetric Di-Az was taken on May 15,

20  2018.  The deposition of Erin Marconi was taken on October 21,

21  2019.  Insofar as possible, you should consider deposition

22  testimony presented to you in court in lieu of live testimony

23  in the same way as if the witness had been present to testify.

24      The evidence that a witness lied under oath on a prior

25  occasion may be considered along with all other evidence in

1  deciding whether or not to believe the witness and how much

2  weight to give the testimony of the witness and for no other

3  purpose.

4       Evidence was presented to you in the form of admissions to

5  the truth of certain facts.  These admissions were given in

6  writing before the trial in response to requests that were

7  submitted under established court procedures.  You must treat

8  these facts as having been proved.

9       You have heard testimony from Amy Oppenheimer, Charles

10  Mahla, Ph.D., and Anthony Reading, Ph.D. who testified to

11  opinions and the reasons for their opinions.

12       This opinion testimony is allowed because of the education

13  or experience of these witnesses.  Such opinion testimony

14  should be judged like any other testimony.  You may accept it

15  or reject it, and give it as much as weight as you think it

16  deserves considering the witness' education and experience, the

17  reasons given for the opinion, and all the other evidence in

18  the case.

19       All parties are equal before the law, and Tesla is

20  entitled to the same fair and conscientious considerations by

21  you as Mr. Diaz.

22       Under the law, a corporation is considered to be a person.

23  It can only act through its employees, agents, directors, or

24  officers.  Therefore, a corporation is responsible for the acts

25  of its employees, agents, directors, and officers performed

1    within the scope of authority.

2         You have heard evidence that some employees and

3    supervisors at the Tesla factory were hired by Tesla directly

4    and that some were hired by Tesla through staffing agencies.

5         Your determinations in this case should not be affected by

6    whether any particular employee or supervisor was hired

7    directly or through a staffing agency.

8         It has been determined that Mr. Diaz was subjected to a

9    racially hostile work environment while employed by Tesla.

10   That means that Mr. Diaz has established:  One, that he was

11   subjected to slurs, insults, jokes, or other verbal comments or

12   physical contact or intimidation of a racial nature; two, the

13   conduct was unwelcome; three, the conduct was sufficiently

14   severe or pervasive to alter the conditions of his employment

15   and create a racially abusive or hostile work environment.

16        Severe or pervasive means conduct that altered the

17   conditions of employment and created a work environment that is

18   hostile, intimidating, offensive, oppressive, or abusive.  A

19   single incident can be sufficiently severe or pervasive to

20   constitute harassment.

21        Four, Mr. Diaz perceived the working environment to be

22   abusive or hostile; and five, a reasonable African American man

23   in his circumstances would consider the working environment to

24   be abusive or hostile.

25        Whether the environment constituted a racially hostile

1   work environment was determined by looking at the totality of

2   the circumstances, including the frequency of the harassing

3   conduct, the severity of the conduct, whether the conduct was

4   physically threatening or humiliating, or a mere offensive

5   utterance, and whether it unreasonably interfered with an

6   employee's work performance.

7        An employer may be liable when an employee supervisor

8   creates a racially hostile work environment for that employee.

9        A supervisor is someone who is empowered by the employer

10  to take tangible employment actions regarding the employee such

11  as hiring, firing, failing to promote, reassigning with

12  significantly different responsibilities or significantly

13  changing benefits.

14       It has been determined that Mr. Diaz was subjected to a

15  racially hostile work environment by Tesla.

16       And that Ramon Martinez or Robert Hurtago or both were --

17  or was his supervisor empowered by Tesla to take tangible

18  employment actions against him.

19       It has also been determined that:  One, Mr. Diaz was

20  subjected to a racially hostile work environment by a

21  non-immediate supervisor or co-worker; and two, Tesla or a

22  member of its management knew or should have known of the

23  harassment and failed to take prompt, effective, remedial

24  action reasonably calculated to end the harassment.

25       It has been determined that Tesla failed to take all

1   reasonable steps to prevent harassment based on race.

2       It was established:  One, that Mr. Diaz was an employee of

3   Tesla or providing services under a contract with Tesla; two,

4   that Mr. Diaz was subjected to harassment in the course of

5   employment; three, that Tesla failed to take all reasonable

6   steps to prevent the harassment; four, that Mr. Diaz was

7   harmed; and five, that Tesla's failure to take all reasonable

8   steps to prevent harassment was a substantial factor in causing

9   Mr. Diaz's harm.

10       It has been established that Mr. Diaz was harmed by Ramon

11   Martinez and that Tesla is responsible for that harm because

12   Tesla negligently supervised or retained Ramon Martinez.

13       Mr. Diaz has shown:  One, that Tesla employed Ramon

14   Martinez during the time that Mr. Diaz worked at Tesla; two,

15   that Ramon Martinez was or became unfit or incompetent to

16   perform the work for which he was employed; three, that Tesla

17   knew or should have known that Ramon Martinez was or became

18   unfit or incompetent, and that this unfitness or incompetence

19   created a particular risk to others; four, that after Tesla

20   knew or should have known of Ramon Martinez's unfitness or

21   incompetence, it retained or supervised Ramon Martinez in his

22   position at Tesla's factory; five, that Ramon Martinez's

23   unfitness or incompetence harmed Owen Diaz; and six, that

24   Tesla's negligence in supervising or retaining Ramon Martinez

25   was a substantial factor in causing Owen Diaz's harm.

1    It has been determined that Tesla is liable to Mr. Diaz

2  for civil rights violations based on contractual relationship.

3    Mr. Diaz has established that he was an employee of Tesla,

4  Inc., or that he showed that:  One, he gained rights or was a

5  beneficiary under a contract; two, that Tesla engaged in racial

6  discrimination or harassment in the enforcement of the

7  contract, or Tesla failed to take reasonable steps to prevent

8  harassment from occurring in the workplace; and three, that he

9  suffered injuries that he would not have suffered but for --

10  but for Tesla's conduct.

11    Mr. Diaz did not need to have -- did not need to have

12  signed the contract nor have been a party to the contract in

13  order to have rights under the contract.  He could establish

14  his rights under the contract by showing that he received

15  benefits or privileges under the contractual relationship

16  between Tesla and nextSource or CitiStaff, and the contracting

17  parties intended that he received -- that he receive benefits

18  or privileges that were not incidental or remote.

19    Now that I've told you what's been established, I'll give

20  you your instructions regarding how to determine the amount of

21  damages to which Mr. Diaz is entitled.

22    Mr. Diaz has the burden of proving damages by a

23  preponderance of the evidence.  This means that you must be

24  persuaded by the evidence that the claim of damages is more

25  probably true than not true.  You should base your decision on

1   all the evidence regardless of which party presented it.

2       Compensatory damages means the amount of money that will

3   reasonably and fairly compensate Mr. Diaz for any injury you

4   find was caused by Tesla's conduct as described in Instruction

5   Numbers 18 through 23.

6       In determining the measure of these damages, you should

7   consider the nature and extent of the injuries, the loss of

8   enjoyment of life experienced and with reasonable probability

9   will be experienced in the future, and the mental or emotional

10  pain and suffering experienced and that with reasonable

11  probability will be experienced in the future.

12      It has been established that Mr. Diaz is entitled to

13  compensatory damages.  It is for you to determine the amount of

14  the damages that have been proved.

15      Your award must be based upon evidence and not upon

16  speculation, guesswork, or conjecture.

17      Mr. Diaz has a duty to use reasonable efforts to mitigate

18  damages.  To mitigate means to avoid or reduce damages.

19      Tesla has the burden of proving by a preponderance of the

20  evidence:  One, that Mr. Diaz failed to use reasonable efforts

21  to mitigate damages; and two, the amount by which damages would

22  have been mitigated.

23      The purposes of punitive damages are to punish a Defendant

24  and to deter similar acts in the future.

25      Punitive damages may not be awarded to compensate a

Plaintiff.

When you consider punitive damages, you may award them for Tesla's conduct that harmed Mr. Diaz which was malicious, oppressive, or in reckless disregard of his rights.

Conduct is malicious if it is accompanied by ill will or spite or if it is for the purpose of injuring Mr. Diaz. Conduct is in reckless disregard of Mr. Diaz's rights if under the circumstances it reflects complete indifference to his safety or rights or if Tesla acted in the face of a perceived risk that its actions will violate the Plaintiff's rights under federal law.

An act or omission is oppressive if Tesla injures or damages or otherwise violates the rights of Mr. Diaz with unnecessary harshness or severity, such as by misusing or abusing authority or power or by taking advantage of some weakness or disability or misfortune of Mr. Diaz.

It has been established that Mr. Diaz is entitled to punitive damages because it has been determined that at least some of Tesla's conduct that harmed him was malicious, oppressive, or in reckless disregard of his rights.

It is for you to determine the amount of punitive damages.

Mr. Diaz has the burden of proving the amount by a preponderance of the evidence.

You must use reason in setting the amount.  Punitive damages should be in an amount sufficient to fulfill their

1    purposes of punishment and deterrence but should not reflect

2    bias, prejudice, or sympathy toward any party.  In considering

3    the amount of any punitive damages, consider the degree of

4    reprehensibility of Tesla's conduct, including whether the

5    conduct that harmed Mr. Diaz was particularly reprehensible

6    because it also caused actual harm or posed a substantial risk

7    of harm to people who are not parties to the case.

8         You may, however, set the amount of any punitive damages

9    in order to punish Tesla for harm to anyone other than the

10   Plaintiff in this case.

11        So, at this point, I have a couple of more instructions

12   for you on how to deliberate.  I'm going to save those, because

13   I know you'll be excited to hear them, at the end of the

14   closing statements of the lawyers.

15        But I do want to show you the verdict form because these

16   are the questions that you're going to be asked to answer and

17   that the lawyers will be arguing about.

18        So the form is actually here, a very simple form.  It asks

19   first:  "What past non-economic damages did Owen Diaz sustain

20   as a result of Tesla, Inc.'s unlawful conduct."  You answer

21   that question.  Answer the second question:  "What future

22   non-economic damages is Owen Diaz likely to sustain as a result

23   of Tesla, Inc.'s unlawful conduct."

24        And the third question is:  "What amount of punitive

25   damages do you award to Owen Diaz."

1        Once you have reached a unanimous agreement on that, on

2   your answers, you'll sign the form and provide it to Ms. Davis.

3        So, I'm going to ask you to sit -- stay in your seat.

4   We're going to turn on the white noise.  I'm going to address

5   the issue that Ms. Nunley made, and then we will go to lunch.

6        (The following proceedings were heard at the sidebar:)

7        **MS. NUNLEY:**  First off, thank you, Your Honor, for

8   providing those curative instructions.  I did want to flag one

9   issue that we raised.  You indicated that you would issue a

10  curative instruction with respect to the question alleging that

11  Mr. Diaz called one of his colleagues a "dumb Mexican" or words

12  to that effect.  I didn't catch that instruction when you spoke

13  with the jury.

14       **THE COURT:**  After you made the objection, I thought

15  that's what it was, so I will -- I will indicate I will just

16  say it in that term.

17       **MR. SPIRO:**  I had understood that, when you came back

18  on the bench, that you said to me, Your Honor, that if you

19  don't -- if I do exactly this in summation -- we went back and

20  forth and had colloquy after the break.  You said this is

21  exactly what I'm going to do.  I said we have no problem with

22  that; we already did this.  That's why you said sexual comments

23  or comments about women to be covering that group, and I'm

24  going to stick with what I assured you in summation.

25       You already ruled on this.  You said that -- I mean, I --

1    I understood you to have ruled when you came back out to the

2    bench and you said the fact -- (stenographer computer

3    malfunction)

4         (Proceedings were heard in the presence of the jury:)

5              THE COURT:  We will come back at 12:30.  Thank you.

6              (Luncheon recess was taken at 11:45 a.m.)

7    AFTERNOON SESSION                                    12:30 p.m.

8              THE CLERK:  Please come to order.

9                        (Pause in proceedings.)

10             THE COURT:  Please be seated, everybody.  So

11   apparently there were some technical issues with the court

12   reporter's ability to transcribe what occurred at sidebar.

13        So I'm going to summarize what -- what happened.  If

14   anybody wants to add to it, that will be fine, and then I will

15   tell you -- I will give you the specific instruction that I'm

16   going to provide.

17        So the -- the objection was to -- that I should instruct

18   the jury not to consider questions specifically with respect to

19   the term "stupid Mexicans" which was part of the objection that

20   was raised last night.

21        The Defense objected to that, in part because I had said

22   earlier that I was going to instruct regarding the sexual

23   innuendos, and I did not mention the "stupid Mexicans," which

24   was correct, and the -- and also that phrase was used in a

25   question which was not objected to.

1    So the instruction that I'm going to provide is --

2    emphasizing that questions from lawyers are not evidence.  I'm

3    emphasizing that in this case because in this case the lawyer's

4    questions in this case involved racial slurs.  Those questions

5    aren't evidence.  The answer is the only evidence.  And if I

6    sustained an objection to the evidence, even if the witness

7    answered the question, it must be disregarded.

8        So that's the instruction I'm going to give.

9        The time that's left, the Plaintiff -- by our

10   calculations, the Plaintiffs have an hour and 19 minutes; the

11   Defense has an hour and seven minutes.  And I will be strict on

12   that, but I encourage you not to use all the time, but help

13   yourself.

14                        (Laughter)

15       **THE COURT:**  What I will do is after Mr. Alexander

16   makes his opening of the closing, I will do a ten-minute break,

17   and then we will do the Defense, the rebuttal, and get the jury

18   on its way.

19       **MR. SPIRO:**  I assume the Court has the sort of

20   standard rules that the rebuttal can't be a new summation.  It

21   has to be short and only responsive.  There's no surprise

22   attacks, no sneak attacks, no funny business.

23       **THE COURT:**  Yes.  So the opening of the closing needs

24   to encompass the argument that is being made to the jury, just

25   as Mr. Alexander has done before and probably countlessly.  And

1   new things don't come in, but rebuttal comes in so -- as

2   argument.

3        So with that, let's get the jury.

4                    (Pause in proceedings.)

5        (Proceedings were heard in the presence of the jury:)

6        **THE COURT:**  All right.  Ladies and gentlemen, please

7   be seated.  So, ladies and gentlemen, one last instruction for

8   you before the closing arguments begin.  It's just really to

9   emphasize that questions that were asked during this case from

10  the lawyers are not evidence.

11       I want to emphasize that in this case because the lawyers'

12  questions in this case involved, among other things, racial

13  slurs, those questions are not evidence.

14       What the witness responded to is evidence.  That's -- the

15  answer is the only evidence.  And if I sustained an objection

16  to the question, even if the witness answered it, you would

17  need to disregard it.

18       So with that, Mr. Alexander, are you ready?

19       **MR. ALEXANDER:**  Yes, Your Honor.  Thank you.

20       **THE COURT:**  All right.  Let me just explain to you --

21  and I think I said this -- probably said this, but I might not

22  have -- the way that closings work, Mr. Alexander will begin

23  and give his summation.  Then Mr. Spiro will give his

24  summation.  Mr. Alexander has the opportunity to rebut any

25  final -- any thoughts that Mr. Spiro provided, and then I will

1   give you closing instructions, and we will go to the -- you'll

2   start deliberating.

3        I'm going to take a break for about ten minutes after

4   Mr. Alexander gives his opening closing for everybody.

5        Mr. Alexander, please proceed.

6                       **CLOSING ARGUMENT**

7        **MR. ALEXANDER:**  Thank you, Your Honor.

8        Good afternoon.  Good afternoon to all of you.  I want to

9   thank you for your time, your patience.  I want to thank you

10  for your concentration, for spending time with us to try and

11  help us resolve the issues we have in this case.  I'm going to

12  talk to you at the beginning about the evidence and why it was

13  given to you.

14       I'm going to start from there and then we will talk about

15  damages.

16       So at the beginning of this case, Tesla made

17  representations.  They said there's almost no evidence of

18  anything that you just heard other than a lawyer saying that it

19  happened eight years later, eight years later.

20       Well, we have the burden of proof, so I'm not insulted by

21  that, but I believe that we met our burden of proof in terms of

22  demonstrating everything that I indicated inside the opening

23  statement.

24       So I'm just going to walk through that in a brief manner

25  to do an overview to remind you of what the evidence is because

1    it is the foundation for the damages that we'll be seeking in

2    this case because this is a damages case.  It's about

3    determining what amount of harm Mr. Diaz suffered and how much

4    money it would take to make him whole for the suffering, if

5    making him whole is possible.

6        And so first let's talk about Tesla misdirection.  That's

7    what the evidence has been in terms of the way it has been

8    responded to.  First, the Timbreza incident, that's the first

9    incident that Mr. -- Mr. Diaz confronted.

10       And with regard to that incident, you remember that the

11   incident occurred, Mr. Kawasaki was called over, and then he

12   confirmed with the individuals that were present that racial

13   slurs were used.

14       And Mr. Diaz has testified that the N-word and "mayate"

15   and "porch monkey" were used.

16       But then, going to the next slide, we showed you that when

17   it was reported up the line to Ed Romero, Ed Romero sanitized

18   and minimized.  He got rid of the reference to race and

19   pretended that he -- that it had not been confirmed.  And then

20   instead of treating race with the importance that it should

21   have been treated, he said that Mr. Timbreza was just kidding

22   around.

23       So as a consequence, Tesla did not take the action that it

24   should have taken in terms of addressing race inside the

25   workplace.

1    And you will recall that Mr. Diaz believed at that time

2  that the proper action was taken because he had no further

3  contact with Mr. Timbreza.  So he thought that action had been

4  taken to properly reprimand and correct the action.

5    A representation was made that an African American was in

6  charge of all the investigations that incurred inside the

7  workplace.

8    The suggestion is because an African American was involved

9  and because Mr. Diaz is African American that, of course, all

10  the details were taken care of.

11    They did the prompt, thorough and good-faith investigation

12  that they were supposed to conduct.

13    But Wayne Jackson came in and he spoke to you.  Tesla's

14  comment is the key person investigating everything you just

15  heard about is an African American man.  When folks got in

16  arguments and fights, he was the one deciding.  He was the one

17  making the choices, and HR staff was in the factory day and

18  night.

19    But then you got his testimony, and his testimony was, "I

20  couldn't fire him per se.  They could do their own

21  investigation.  I couldn't make that determination as to

22  whether a person could be terminated."

23    And then in the next slide, with regard to stopping the

24  investigation, that was the investigation with regard to both

25  the elevator and with regard to the jigaboo.

1      "Stopping the investigation was your decision?

2      "ANSWER:  No.

3      "And there was a conversation with Ed, Ed Romero, at

4  Victor Quintero's desk yesterday, and they just want us to

5  verbally counsel each of them."

6      And then we get to the elevator attack that was the

7  subject matter of that counseling of each of them.

8      And you will remember in that incident Mr. Diaz said

9  that -- that Ramon Martinez rushed into the elevator, was using

10  profanity, and cornered Mr. Diaz in the corner of the elevator,

11  and Mr. Diaz said, "Look at the video," in order to ward off a

12  fight from Ramon Martinez.

13      And you remember with regard to that, they started an

14  investigation.  Remember that Wayne Jackson said, "We need to

15  dig deep into this investigation."  And then he was called off.

16  Not his decision.

17      And remember, there was a witness to that incident, Rothaj

18  Foster, who was not interviewed because Mr. Jackson said he

19  didn't have access to that employee.

20      And with regard to that video that was there, you know

21  there are videos throughout the Tesla factory and inside the

22  elevator, you did not get to see that video, not because we

23  didn't provide it to you, but because Tesla had control of the

24  video and did not preserve the evidence.

25      So you did not get to see the confirmation of what

 1    Mr. Diaz testified to in terms of backing up against the wall

 2    because he was being attacked and racial -- and slurs were

 3    being used.

 4        And so once again with regard to the video, it was not

 5    collected.  And with regard to the investigation, it was

 6    stopped, not because Mr. Jackson wanted to stop it, not because

 7    he had the power to continue it, because someone told him,

 8    managers at Tesla, to stop the investigation.

 9        The person who could have confirmed that Mr. Diaz was the

10    person that was responding to the conduct, not the attacker,

11    that Mr. Diaz was subjected to race, Mr. Rothaj Foster, was not

12    ever spoken to, interviewed.

13        And instead the person who was harassed, Mr. Diaz, and the

14    person who was the attacker, both of them were given a verbal

15    warning.  And so once again, in terms of the process,

16    minimizing and sanitizing, they minimize the process and they

17    sanitized it because the discipline wasn't for what it should

18    have been.  And when do you punish a person for claiming about

19    harassment?

20        And remember, there was evidence with regard to video.

21    Remember, Mr. Wheeler had the incident where he was on the

22    cart, and he walked away momentarily and there was feces left.

23    And he went and sat in the cart, and then lo and behold there

24    is feces there, and he said, "Look at the video," the same as

25    Mr. Diaz.

1    And he confirmed that there is video everywhere.  He asked

2   for an investigation.  He asked them to figure out who had done

3   this because he believed it was racially motivated, and no

4   investigation was done.  The statement that was made was that

5   there was no video.

6        There's an instruction that you were given by the Court

7   that talks about direct and circumstantial evidence.

8        Direct evidence being if you look at -- if you look at

9   something and directly you can figure out that it is what it

10   is, for example, if you look at water, you can tell it's water.

11   That's direct evidence.

12        Circumstantial evidence is the inference.  The inference.

13   You see a spot on the ground, you know it's a puddle, but it's

14   dampness on the ground, you know that water was there before

15   that.  You can make that inference.

16        With regard to these cameras, this video that was not

17   present, you can make inference from the fact that twice two

18   Black men said, "Please look at the video," and it didn't

19   happen is an indication that it was no accident.

20        One incident, one incident is enough to create harassment.

21   If it's severe, one incident is enough.  And the first incident

22   with regard to Mr. Timbreza, that would have been enough.  That

23   would have been enough to cause Mr. Diaz harm.

24        The second incident on the elevator when he was attacked

25   by a supervisor.  And remember, a supervisor acts on behalf of

 1   the company.  So when Mr. Diaz was attacked by Ramon Martinez,

 2   he was being attacked by Tesla.

 3        So Tesla had an obligation to do something about it

 4   because they understand the consequences of the supervisor

 5   attacking an employee.

 6        And so that second incident, that one incident was enough

 7   to cause Mr. Diaz harm.

 8        And collectively, certainly those were enough to cause him

 9   harm.

10        And Mr. Diaz said with regard to the elevator incident

11   that race was involved.  But, of course, Tesla does not want to

12   acknowledge that verbal complaints were made with regard to

13   race.

14        But then we have the next incident that occurs with Mr. --

15   with Ramon Martinez.  Because with regard to the earlier

16   incident when he got a verbal warning, based on -- based on

17   them stopping the investigation there wasn't the appropriate

18   corrective action taken, corrective remedial action so that the

19   conduct would stop.  So as a consequence of not taking

20   affirmative action to punish people for bad conduct, worse

21   conduct occurs.

22        Then we have the jigaboo.  You heard testimony with regard

23   to -- you heard testimony with regard to this drawing that was

24   made by Ramon Martinez, and his explanation is that it was just

25   a joke.  It is, I'm going to say, a very ironic joke since the

1   character that he drew matches Inki the Caveman, as he

2   confirmed, and Inki the Caveman, like what he drew, has big

3   lips and a bone in its ear.

4       And he told you that the reference to "boo" underneath

5   there he said was not jigaboo, but there is no "boo" inside of

6   this cartoon.

7       And so when he tells you that it was a joke, I'm trying to

8   figure out why it was a joke left for Mr. Diaz in front of the

9   elevators, because you remember Mr. Diaz did a -- showed you in

10  a diagram using small lift forklifts how it was done.

11      In those aisles inside of -- inside of Tesla -- it's a

12  huge factory.  They are huge enough aisles so you can have

13  these huge forklifts go up and down, and it's like a roadway.

14  There are certain rules.  You don't just park anywhere.  There

15  are certain spots where you park and certain spots where you

16  leave things.  And in this instance, they had written on the

17  bale.

18      Now the thing is, when you write on the bale, you are on

19  the front side.  But when the forks come to pick it up, it

20  typically comes and picks it up on that side so that the

21  writing, so that Inki would be facing inward, and the person

22  driving couldn't see it.

23      But they had to go to a lot of trouble to make sure that

24  it was spun around, and they left it on the forks, and they

25  left it in the middle of the roadway.  Broke the rules so that

 1   Mr. Diaz, when he rolled up, would see it.

 2        You heard reactions to the -- this jigaboo.  It is so

 3   offensive.  It's something from the 1950s that it was so

 4   offensive at that time that it was taken off television.

 5        And it is -- the type of racial slur that Black children

 6   know of because it's passed down from family to family.

 7        It's what people did to make fun of Black people a long

 8   time ago into the 30s and 40s.  And the idea that someone would

 9   bring that into a workplace and leave it for another human

10   being is beyond the pale, especially here in San Francisco.  Or

11   just out of San Francisco at the Tesla Fremont plant.

12        So the idea that this was here inside the workplace you

13   would have thought would have resulted in greater action that

14   was -- than was taken.

15        We have the slide from Ms. Marconi.  Ms. Marconi says,

16   "Based on the facts that you've received, I would expect that

17   there would have been an investigation as a result of that."

18        And then she says:  "I would presume that what nextSource

19   does" -- that's the subcontractor -- "but I would ask them not

20   to have him return to the assignment."  In other words,

21   terminate him.

22        And you've heard an instruction from the judge that,

23   despite the fact that there were subcontractors inside the

24   Tesla factory, that was Tesla's factory.  Everything that

25   occurred under its roof, it had control of.

1        So the fact that it used subcontractors is really just

2   irrelevant.  It is a side issue.  It was Tesla's

3   responsibility, and they failed to take responsibility for it.

4        Owen Diaz was upset by it.  Reasonably upset by it.

5        Here is the testimony of Wayne Jackson, another Black man

6   who saw it, and his words are:  "Excuse me.  It's bullshit.

7   It's offensive.  It's not a joke."

8        And he told you he had a conversation with Ramon Martinez.

9   Remember Martinez tried to say it was a joke, and he emphasized

10  it.  And remember, he said that Ramon Martinez apologized, but

11  not to Owen Diaz.

12       You heard testimony from Mr. Jackson.  Mr. Diaz was

13  extremely offended by it.  He was angry.  Felt that he was

14  being racially targeted.

15       You remember what Mr. Martinez said when Mr. Martinez's

16  testimony is that he immediately acknowledged that he had

17  written it, and he claimed that someone else drove the tractor

18  over, not him.

19       Which is an interesting thing because remember, it was

20  positioned just so that Mr. Diaz would find it.  And so

21  introducing this second person into the equation so that

22  they're the ones that rode it, that means either he lied and he

23  brought it over and left it for Mr. Diaz or he invited someone

24  else to participate in this racist conduct.

25       I don't know which one is true.

 1                    (Pause in proceedings.)

 2          **MR. ALEXANDER:**  And the irony is that, with regard to

 3    this incident, Mr. Diaz, the person who was the subject of this

 4    act of heinous harassment, no longer works at the company

 5    because he couldn't return to it because it was such a hostile

 6    work environment that he could not take it anymore.  But the

 7    gentleman who created this racist epithet and put it inside the

 8    workplace, instead of being terminated under the zero-tolerance

 9    policy, he is now a direct employee of Tesla even to this day

10    from his testimony.

11          And so you have to wonder what a zero-tolerance policy

12    really means if someone can put such a racist thing inside the

13    workplace and leave it for any human being, and that human

14    being was Mr. Diaz.

15          A single incident is enough to create harassment.  A

16    single, single incident, and certainly this incident would have

17    been enough alone.  But you have collectively, based on the

18    totality of the circumstances, at least three incidents now

19    that are the basis for Owen Diaz to have suffered harm.

20          But then what you now know at the end of this case is

21    those three incidents are basically the percolation of a

22    hostile work environment that Tesla allowed all the time

23    because the N-word was present throughout the factory

24    constantly.

25          And when you don't do anything about the N-word being used

CLOSING ARGUMENT / ALEXANDER

1  constantly throughout your workplace, it encourages people, it

2  condones people to engage in that conduct more.

3       And so, you heard testimony from Mr. Kawasaki.  "So you

4  heard the N-word all over the factory?  Yeah."

5       "They were throwing around the N-bomb."

6       That was a supervisor.  Remember, there was a statement

7  that "Tesla can't do anything about what they don't know"?

8  Mr. Kawasaki was a supervisor.  He knew the N-word was being

9  used.  If he knew the N-word was being used, Tesla knew that

10  the N-word was being used.

11       From Wayne Jackson:  "Once again, sir, as I stated before,

12  making it about a letter doesn't take away the offensiveness of

13  the word.  Whether it's the -- an A or an E, it's not something

14  I engage in.  It's offensive."

15       Remember, you had some questioning about the N-word.  And

16  there were some suggestions from the way the question was asked

17  and the way the question was answered that there's a friendly

18  use of the N-word, which is telling since the question was

19  asked by -- by Tesla because it is Tesla's factory, and it

20  Tesla's workplace, and if they can control what goes on with

21  regard to building cars, then certainly you would expect that

22  they control and stop the use of the N-word.  But the

23  prevalence of the use of the word N-word inside of Tesla's

24  workplace is an indication that they did not care about how

25  their African American employees felt.  It was a complete

1    affront to every African American inside the workplace, and not

2    just them.  To make the assumption that just African Americans

3    were offended by it is really kind of presumptuous and kind of

4    small minded.  Because the fact that other people don't speak

5    up when it's rampant inside the workplace is not an indication

6    that they condone or they'd agree; it's just overwhelming.

7         And so you hear the testimony of the next Black employee

8    who was offended by it, Mr. Wheeler, where he says:  "Um, well

9    the word is used to put individuals of my color down."

10   Mr. Wheeler, an African American.  And then you heard his

11   testimony as to how often he heard it.  Frequent enough to

12   where it would become just another word.  Daily, yes.  The

13   N-word is one of the most offensive words that you will hear.

14   It basically yanks people backwards to the time where they were

15   second class citizens and where people could look down on them

16   simply because of the color of their skin.

17        There is no circumstance where that word should be used.

18   For anyone to suggest that there can be a friendly use of the

19   N-word, that is the epitome of disregard.

20        It's one thing, yes, people do hear it on music, and you

21   heard they had music going inside of Tesla and had the N-word.

22   What people do in their home, what they do in their car, what

23   they do when they go to a comedy club, what they do in the

24   backyard at a barbecue, that's just fine in their own time.

25        But the thing is, you know, back in the 30s, 20s and 30s,

**CLOSING ARGUMENT / ALEXANDER**

1  when people were working, they would be paid a certain amount

2  of money.  And when there weren't rules, basically you got

3  five, ten dollars per hour, and the employer could work you to

4  death until their rules said that now you have to get paid

5  overtime.  And that type of regulation went forward.

6      And then they decided, you know, just because they're

7  paying you money inside the workplace doesn't mean that they

8  can treat you just any way.  And so then there were rules

9  created to say there has to be a certain decorum that occurs

10  inside the workplace.  Inside the workplace, employees should

11  not be subjected to harassment.

12      And it makes the law, makes that obligation to all

13  employers.

14      And so to say that there can be a friendly use of the

15  N-word inside the workplace is really just to say we are going

16  to break the law.  We are above the law.

17      That's what Tesla is saying to you by asking the question

18  and having the audacity to think that because an employee says

19  we can still get work done, that they can justify the conduct.

20      The fact that the N-word was throughout that whole entire

21  workplace is an indication that Tesla thinks that it is above

22  the law.

23      And so you hear from Mr. Wheeler when he says it was

24  throughout the factory.  It was a continuous complaint that was

25  never addressed.

1    And so if these supervisors say that it was a continuous

2    complaint that was never addressed, I have trouble

3    understanding why Tesla spends so much time saying that Owen

4    Diaz did not complain, didn't say anything about it.

5        Everybody said something about it.  Everyone complained.

6    The issue wasn't Mr. Diaz complaining; the issue was Tesla

7    addressing it.

8        And did you ever hear Ramon Martinez use the Spanish word

9    "mayate," which is the equivalent of the N-word.  I heard him

10   use "mayate"; he also used the Spanish word "chongo."

11       And then from Mr. Diaz's son:  "All you F'ing Ns, I can't

12   stand you MFs."

13       This is the workplace.  This is the workplace that is in

14   our backyard inside the Fremont Tesla factory.

15       You heard testimony from Ms. Marconi about the N-word, and

16   I'm wondering if there was any kind of discussion in human

17   resources that there was a need to address the use of that word

18   in particular in the workplace.  "Not that I recall."

19       How is it possible that the N-word could be used every

20   day, daily, rampantly, and there would never be any action

21   taken?

22       I brought that to your attention because you remember,

23   there were breasts drawn on the bathroom stall for the women's

24   restroom on the bathroom door.  And those breasts were drawn,

25   and Ms. Marconi said if anyone is offended inside the

1    workplace, they have to do something about it because you can't

2    tolerate harassment inside the workplace.  She told us based on

3    her testimony to a tee what the law is.  They know what the law

4    is.  So one person engages in offensive and harassing conduct,

5    but some might call it childish, and they do an

6    investigation -- I'm sorry, and they can't figure out who did

7    it, and they stopped the workplace for 500 people.  So yes,

8    they do retraining because they understand what they're

9    supposed to do.  They understand that they don't have to know

10   who actually engaged in the conduct.  If they can't figure it

11   out, then they warn everybody:  This is not tolerated in our

12   workplace.

13        They know what a zero-tolerance policy is.  This is it.

14        But with regard to the N-word, with regard to them showing

15   respect to African Americans inside the workplace, it happens

16   day after day, N-word, "porch monkey," "boy;"

17        "I hate you Ns."

18        "I wish I could get all you Ns fired."

19        "I hate you fucking Ns."

20        "Push the button N."

21        "You Ns are lazy."

22        "N, hurry up and push the button."

23                    (Pause in proceedings.)

24        MR. ALEXANDER:  Another misdirection is that Owen Diaz

25   never really reported basically anything that you heard about

1  in this courtroom from lawyers years later.

2       And you have the testimony of Mr. Kawasaki:  "Owen told

3  you that he had been called the N-word or you -- called it the

4  N-bomb?"

5       Answer:  "Yeah."

6       From Mr. Wheeler:  "And Mr. Diaz also reported to you that

7  he saw the N-word in the bathroom, correct?"

8       "Yes."

9       And Mr. Wheeler confirmed that there was profanity, there

10  was swastikas inside the bathroom that Owen Diaz said was not

11  corrected, from the point he started until nine months later

12  when he left.

13       And then you hear from Ed Romero, a supervisor, who says:

14  "I think he had -- he had -- I'm trying to remember the dates,

15  but I think that prior to this, he had complained about maybe

16  two other people using racial slurs."

17       He complained to a supervisor who acknowledges it.

18       As I said, any one of those incidents, any one of those

19  incidents would have been enough to cause Owen Diaz substantial

20  harm, substantial emotional distress.  Any one.  But he was

21  subjected to successive ones.

22       And with regard to the N-word, some might suggest that it

23  is just -- just calling names, but it is not that.  It is not

24  that.

25       I liken it to Chinese water torture.  Perhaps you've heard

CLOSING ARGUMENT / ALEXANDER

 1   of this concept.  I was talking to a friend about it, and he

 2   had reminded me.  I heard about it a long time ago, but I never

 3   thought of it in this context.  You know, back in the -- I

 4   think it was 1400s, Chinese torture, they take a person and

 5   they hold him down under water, and then they pour a drop of

 6   water onto the head or onto the forehead, generally very cold

 7   water.

 8       And they drop it on, and you keep having that drop and

 9   having that drop, and finally after it's been dropped so many

10   times, finally you start to anticipate and try to figure out

11   when is it going to happen, and it drives you crazy.  It

12   literally drives you crazy.

13       And I equate the N-word with that.  That's what it's like.

14   Because the thing is, when the drop is coming down, you try and

15   figure out when it's going to happen so you can avoid it.

16   Because you don't know.  Because it's just so painful, and it

17   drives you crazy, and that is the N-word personified.

18       You are walking around the workplace, and you don't want

19   to run into it, but there is it, facing you down every day

20   everywhere you go.  You go to the bathroom and it's there.  You

21   go to the cafeteria and it's there.  You show up at your

22   elevator, and it's on a bale and it's there.  You are

23   constantly reminded that someone is trying to put you down,

24   make you a second-class citizen at work.

25       We did not show you that evidence in order to prove

1    liability.  We did not do it for that purpose.  We did it in

2    order to show a foundation so that you would be able to award

3    damages for the harm that was suffered by Mr. Diaz.

4        And in order to give you a foundation so that you can

5    determine what amount of punitive damages do you have to award

6    against a company, according to Mr. Mahla, that's worth

7    $151 billion as of February 2020?  How much money do you have

8    to award against that large of a company in order to hold it

9    accountable?

10       And so, if you look at Exhibit Number 17 -- I'm sorry.  If

11   you look at Instruction Number 17, it tells you that it has

12   been determined -- meaning already determined -- that Mr. Diaz

13   was subjected to a racially hostile work environment.  If you

14   go to the second -- the first paragraph, slurs, insults, jokes

15   or other verbal comments or physical contact or intimidation.

16   We put that evidence in front of you, not to prove it, just to

17   confirm so you would know what the facts are, so you would know

18   how to evaluate the harm that was suffered.

19       If you go to the third sentence, it says:  "Alter the

20   conditions of employment."  If you take the conditions of

21   employment as the way you would expect it where a person walks

22   around the workplace and is free of harassment, that's what you

23   would expect.  But when you offer -- when you alter the

24   conditions of employment, when a person has to walk around and

25   be afraid of the N-word, be afraid of slurs in the bathroom, be

1    afraid of swastika, that is an environment that has been

2    altered.

3        A single incident can be sufficiently severe or pervasive

4    to constitute harassment, and you have at least three specific

5    higher-level incidents, and then you have the constants, the

6    pervasiveness of the N-word inside the workplace.

7        And with regard to paragraph 5, reasonable African

8    American.  Every African American that came here in front of

9    you, every one of them eight years later was offended by it.

10       How many things can you remember from eight years ago?

11   From your employer?  That are that offensive?  That you

12   remember them eight years later?

13       Mr. Wheeler and Mr. Jackson were offended.  Mr. Kawasaki,

14   he was offended.  A reasonable Black man would be offended, and

15   that's why the filings were -- findings were made.  There is

16   also a finding made with regard to a hostile work environment.

17   If you look at the Instruction Number 18, that Mr. Diaz was

18   subjected to a racially hostile work environment by Tesla

19   through Ramon Martinez and Robert Hurtado, the other person who

20   came into Mr. Diaz and called him racial slurs on a regular

21   basis between August and approx- -- and when Mr. Diaz left.

22       And so -- I'm sorry -- and then the -- Instruction

23   Number 21, that Tesla failed to take all reasonable steps to

24   prevent the harassment.  I'm going to talk about what those

25   reasonable steps should have been, and I know that you've seen

 1   some of them.  Those findings have already been made.

 2        I say that because during -- during the examination --

 3   during the evidence, Tesla cross-examined these people as

 4   though by destroying them, by attacking them, by bullying them,

 5   by catching them in questions, by asking them questions and not

 6   showing them the deposition transcript or not showing them the

 7   document, by catching them in inconsistencies that were

 8   completely irrelevant that you would not believe them.  And by

 9   destroying those witnesses, it would destroy the foundation of

10   the evidence that went into those determinations.

11        And based on the opening statement of Tesla, which is not

12   evidence, and based on the questions that were asked, they want

13   to trick you into believing that those questions are important,

14   so we have not met our burden in order to prove that Mr. Diaz

15   has suffered harm.

16        But the instructions, if you follow them and not the

17   misdirection of Tesla, the instructions tell you the

18   determination has already been made.

19        We did not put that in front of you in order to prove

20   liability, just to show you how bad, how bad the harm is that

21   was suffered by Mr. Diaz.

22        So now that we have set aside the issue of liability and

23   now that we have set aside the issue of whether Mr. Diaz was

24   subjected to a hostile work environment based on race, I want

25   to talk to you now about damages because that is what we are

 1   here for.

 2       I skipped a page.

 3                (Pause in proceedings.)

 4       **MR. ALEXANDER:**  Tesla has suggested by their

 5   questions, by their misdirection that there are a bunch of

 6   hoops that we have to jump through in order to get to the issue

 7   of damages.

 8       If we can show the verdict form, please.

 9       With regard to the verdict form, it has three questions.

10   Three questions.

11                (Pause in proceedings.)

12       **MR. ALEXANDER:**  What are the past noneconomic damages?

13   By noneconomic damages we mean mental suffering and emotional

14   distress.

15       What are the past and then what are the future?  And then

16   what amount of damages and punitive damages do you award

17   against Tesla in order to hold it accountable, in order to

18   force it to do what it should do in order to get its attention.

19   Three questions.

20       Those things that were suggested by Tesla during the

21   opening and during the questioning, those things do not appear

22   on this form.  There are no other issues.

23       Was Mr. Diaz harmed by this hostile work environment that

24   Tesla created, maintained, and condoned?  And so your job is to

25   determine what those numbers are and nothing more, and

 1   everything that Tesla says when they get up and stand before

 2   you is more misdirection.

 3        So now I'm going to talk to you about damages.

 4        Now, in Tesla's opening, they made a reference to us

 5   asking for millions and millions of dollars.

 6        And about that, they are right.  And I am going to explain

 7   to you momentarily why Mr. Diaz should receive millions and

 8   millions of dollars for what he went through.

 9        And I'm going to explain to you why Tesla should be

10   punished by an imposition of punitive damages of a substantial

11   amount because of the conduct they engaged in.

12        But before I talk specifically about how you go about

13   calculating those damages and the why, I want to talk to you

14   about the concept of damages first.

15        Tesla seemed to suggest that it was somehow dirty, somehow

16   inappropriate for Mr. Diaz to now come here and ask you for

17   money for harm that he suffered, somehow inappropriate for us

18   as attorneys, dirty word, to be asking you for money.

19        I'm going to tell you that back during biblical times, it

20   was an eye for an eye.  That is not just a phrase.  If you

21   accidentally harmed someone and you poked out their eye, they

22   came and they poked out your eye.

23        You got caught for stealing, they cut off your arm.  If my

24   son was walking across the street in a crosswalk and an Uber

25   driver hits my son, we don't go to that Uber driver's house,

 1   grab her son, bring him outside and break his leg.  That would

 2   be barbaric.  That would be the eye for an eye.  That would be

 3   cutting off the hand.

 4        But what we do is we place a value on that harm.  We place

 5   a value on that harm.  We try and figure out how bad is the

 6   harm.  And the worse the harm, the more money we have to put on

 7   the other side of the balance in order to equalize that harm.

 8        And it's true that money does not necessarily make up for

 9   everything, but it is crude method and the only method that we

10   have.

11        Let's show --

12                    (Pause in proceedings.)

13        MR. ALEXANDER:  So I'm going to show you the Court's

14   instruction with regard to damages.

15        First -- and this is an Instruction Number 23 -- it talks

16   about damages proved.  I want to talk to you about that first

17   line first.  It's called the preponderance of the evidence,

18   more likely true than not true.

19        So we have the burden of proof.  We have to prove that

20   there is a causative effect, a causation between the hostile

21   work environment that Mr. Diaz was subjected to and the harm

22   that he suffered.

23        And the way the burden of proof works, if my hands are

24   completely equal on a scale and you were to put a feather in

25   one side and I leaned just slightly, just slightly, I would

 1   have met the burden of proof.

 2        The burden of proof is just a tiny bit, just a nose.  I

 3   like to say if I get you to lean, I have met my burden of

 4   proof.

 5        And so, if at some point there is some question as to the

 6   value or the amount, and you are thinking have we met our

 7   burden of proof, then you just ask, did Mr. Alexander get you

 8   to lean?  Are you leaning in that direction?  Because if I've

 9   gotten you to lean, I've met my burden of proof.  We have met

10   our burden of proof on behalf of Mr. Diaz.

11        And then if you look at the damages proved, it says what

12   compensatory damages mean.

13        With regard to the choices that Mr. Diaz has, he does not

14   have a choice other than money.  There is no box where it says,

15   "I would like to go back in time and have this taken -- taken

16   away from me.  I would like to have this humiliation gone.  I

17   would like to not have heard the N-word in the workplace

18   virtually every day of my nine months there.  I would like to

19   check the box that says that I don't have to have this jigaboo

20   left for me."  Specifically, there is no box that allows for

21   that.

22        There are no other options than this option.

23        And the beauty of our system here in the United States is

24   that we put a value on it based on money as opposed to the

25   biblical way.

1   And so you have this instruction that tells you how to go

2   about compensating for damages for harm, and it says the amount

3   of money that will reasonably and fairly compensate Mr. Diaz

4   for any injury.

5         The nature and extent of the injuries, the loss of

6   enjoyment of life, of experience.

7         And that with reasonable probability will be experienced

8   in the future -- the mental and emotional pain and suffering

9   experienced and that with reasonable probability will be

10  experienced in the future.  And it says he is entitled to

11  compensatory damage.

12        So now, I would like to talk to you about emotional

13  distress.

14        Each one of those incidents, any one of them could have

15  caused -- that single incident could have caused the emotional

16  distress that Mr. Diaz suffered.

17        Any one of them.

18        But you compile them, the successive amounts, and you add

19  to them the inability to protect yourself from this conduct,

20  and that makes it worse.

21        You heard testimony from Dr. Reading -- if we can skip

22  through -- thank you -- you heard testimony from Dr. Reading.

23  Dr. Reading testified difficulty with intrusive thoughts,

24  reexperiencing what had happened.  Involuntarily, these were

25  still in his head.  The issues with his son, seeing that it is

1  a fracturing experience, difficulty relaxing, being more

2  reactive, seeing him as more irritable.  I'm not going to read

3  to you everything.

4       Mr. -- Dr. Reading provided a report, and that report

5  provided a road map to the triggers for Mr. Diaz, an absolute

6  road map.

7       So you heard testimony from Mr. Diaz on the witness stand

8  on Wednesday on direct, and he was, I thought, a stellar

9  witness.  And you get to decide whether he was a stellar

10 witness, or not but I was fine, right?  And then you heard

11 testimony on cross-examination by Tesla of him, and he was

12 fine.

13      And then we got to yesterday, and Mr. Diaz was not the

14 same Mr. Diaz.  You heard him.  He was combative.  He wouldn't

15 answer the question.  He didn't seem to understand anything.

16 And remember when Dr. Reading talked about triggers?  You saw

17 what emotional stress is.

18      You saw a man watch the people that were the support for

19 his case, you saw him watch Mr. Kawasaki be attacked on the

20 witness stand.  You saw him watch Mr. Wheeler get attacked on

21 the witness stand.  You saw him watch as Mr. Jackson got

22 attacked on the witness stand.  And the battle, the

23 conversation between two men here, and he is anticipating this,

24 anticipating.

25      And finally he gets up on the witness stand and cannot

1   resist but lash out a little bit because he's angry too.  That

2   is the definition of emotional distress.

3        If you look, you remember the testimony of Mr. Kawasaki.

4   Mr. Kawasaki said within a couple of months, Mr. Diaz should be

5   promoted because Mr. Diaz was a great employee.  I think you

6   saw another document when he said, I love this -- a woman said:

7   "I love Mr. Diaz; he's a great employee.  I'm looking forward

8   to working with him."

9                        (Pause in proceedings.)

10       **MR. ALEXANDER:**  There's a statement where Mr. Diaz is

11  a good worker and is identified as a good worker.  No one, no

12  one has come in here and said that he was not enthusiastic

13  trying to do his job except for a couple of people at the end.

14       Tesla employees.

15       And so what I say to you is emotional distress is real.

16  And I think during the voir dire, you agreed that it was real.

17  And it really does affect real life.

18       And it's not like -- it's not like you get an MRI, and you

19  can see it with a test, and you can confirm it.

20       Emotional distress is the type of thing where it is

21  internal.  And so you have to figure out what you can draw a

22  correlation between what caused it and the suffering.  And you

23  heard testimony from Mr. Diaz how it has adversely affected

24  him.  "I have difficulty sleeping."  How the incident with his

25  son was a fracture in the relationship.  How he was upset that

1    he had allowed his son to come into the workplace.

2         Interesting how his son working in the workplace was

3    weaponized against him.  Remember, he brought his son into the

4    workplace -- I should say, his son decided to come into the

5    workplace because Tesla was one of the highest paying jobs

6    around, and he's a 19-year-old kid.  Gets to work in a big

7    factory.  Futuristic factory making these futuristic cars.

8         Mr. Diaz was working in the elevator.  Remember that

9    island that he worked on?  Didn't know what it was like

10   elsewhere.  And then he goes over to see his son at lunch and

11   happens to hear that supervisor call his son the N-word.

12        And from that point, there is a fracture in the

13   relationship, and from that point forward, the father who had

14   protected his son, the father who had taken his son to

15   basketball, to football, to baseball, who had brought him up.

16   Mr. Diaz is a big man, and his son has been looking up to him

17   forever.  And he's inside the workplace, and then finally his

18   son says and he sees:  "I saw my father, and he did not know

19   what to do."

20        His father was helpless in the workplace.  How could the

21   father help his son when the father couldn't help himself?

22        And he did not -- Mr. Diaz did not create the hostile work

23   environment; Tesla created the hostile work environment.

24        So the audacity of Tesla to blame Owen Diaz for bringing

25   his son into the workplace that they claim was not a hostile

 1    workplace.

 2         The fracture inside the relationship.  Sure, his son comes

 3    over.  He comes over to his mother's house.  Remember that --

 4    remember that video that was played?  He doesn't come over to

 5    his father's house.  He doesn't come over to his parent's

 6    house.  He comes over to his mother's house.  Oh, yeah, he sees

 7    his father.  They say hello in passing.  But that's not a

 8    conversation.  That's not the relationship that you've built

 9    with your son over the years.

10         That's one of the harms that Mr. Diaz carries with him.

11         You heard about sexual dysfunction, things that you

12    generally don't want to talk about in public.  But you get to a

13    certain age and you realize what life is about.  And the love

14    that you have between your wife that you can't enjoy that's

15    stolen from you as a consequence of something that happens at

16    work.

17         Dr. Reading talked about the spillover, that spillover

18    door.

19         With regard to Mr. Diaz -- with regard to every one of

20    these incidents, let me say this:  During the opening, Tesla

21    invited you to get into Mr. Diaz's mind.  And the only person

22    that was brought before you who had the capability of getting

23    inside Mr. Diaz's mind was Dr. Reading.  And there's an --

24    there is a jury instruction that talks about experts, and it

25    says what information, how you determine whether an expert is

 1   credible or not.

 2        And Dr. Reading is credible.  He told you the diagnosis:

 3   Adjustment disorder with anxiety and an anxious mood.  And he

 4   said that's what Mr. Diaz had while he was in the workplace,

 5   and then it developed into depression later.

 6        And you heard all the testimony with regard to what

 7   Mr. Diaz suffered.

 8        So with regard to all these things -- with regard to all

 9   these things, all these things that Mr. Diaz suffered, it was

10   overwhelming for him.

11        He told you it felt like he was underneath a rock, like he

12   was drowning.  That inability to control.

13        Dr. Reading talked about a lack of safety.  He was working

14   inside of a workplace, inside of an elevator.  Elevator is very

15   enclosed space.  He is working around people with heavy

16   equipment.  Accidents happen when you work around people with

17   heavy equipment and when they're using racial slurs or actually

18   threatening you with verbal or physical attack.  And when you

19   work at night, alone mostly, those are the types of

20   circumstances that cause emotional distress.  And so that

21   timeframe, those nine months when he was working in those

22   conditions, that was emotional distress.

23        And think about it.  After something like this was heard,

24   after he had to go through a night of people using the N-word

25   either towards him or passively, he gets off of work and he has

CLOSING ARGUMENT / ALEXANDER

1  this release and he has to go home, and what does he think

2  about?  He thinks about what happened at work.  And then the

3  next day when he gets up, he's got to fortify himself to be

4  able to go into work again.  See, what is going to happen to me

5  again?  What is the torture that's going to happen?  How much

6  of the N-word?  Is someone going to leave something for me?

7  When I go to the bathroom.  Ordinary things.  What am I going

8  to have to see in there?  Am I going to see swastikas on

9  people's heads on the doors?

10       That is the basis for emotional distress.

11       In terms of valuing emotional distress, emotional distress

12  is a number of different things.  It is humiliation, guilt,

13  shame, helplessness, sadness, fear and anxiety, loss of

14  employment of -- loss of enjoyment of life.

15       I'm going to give you a formula that you can use to try

16  and figure out, and this is not the exclusive list.  You might

17  call the things that you heard from Dr. Reading or that you

18  read from Mr. Diaz about how he suffered.  You might call them

19  something different, but I put them in categories so you could

20  see.

21       And the issue is:  How bad is the harm for each one of

22  those categories?  And I suggested amounts for the timeframe

23  that he was inside the workplace and then for the timeframe for

24  approximately two years up until trial.  And then from the

25  trial forward.

1       And so let's skip down to --

2                     (Pause in proceedings.)

3            **MR. ALEXANDER:**  Being called a "porch monkey," being

4       insulted inside your workplace.  And then -- certainly that is

5       a form of humiliation, being called the N-word by Tesla

6       supervisors, not just co-workers, by supervisors.  By people

7       that control your ability to get paid a salary.

8            Guilt, humiliation, and shame.  The inability to be able

9       to satisfy your wife.  The inability to have a relationship

10      with your son.  The guilt of bringing him into the workplace

11      and exposing him to the N-word.

12           Remember, within two months, first Owen Diaz is subjected

13      to it, and then his son is subjected to it.

14           And then the guilt and shame.  "I ruined my son's life."

15           The guilt and shame.  "One of the biggest regrets of my

16      life."

17           The guilt and shame.  "My son does not respect me."

18           The helplessness.  He had a job because he needed a job.

19      It was not a luxury.  And he kept the job because it paid more

20      money than others.  But Tesla was supposed to protect him

21      inside the workplace; and if they'd have protected him, he

22      could have had that job.  He could have enjoyed the job that

23      Ramon Martinez still enjoys.

24           And what is the irony of that?  The harasser is enjoying

25      the benefits of the spoils.  And Mr. Diaz has had to move on

1    elsewhere.

2        Loneliness.  Mr. Diaz -- when you have family, one of the

3    beauties of having a family is to be able to talk to them about

4    your problems, to be able to share -- not to share it to make

5    it worse; to be able to share just to share the burden.  To be

6    able to share the good and the bad in life.

7        But when you have the N-word and when you have racist

8    conduct directed at you, it is not the type of thing you want

9    to burden your family with.  You do not want them to know why

10   you are up at night in the middle of the night and can't sleep.

11   You do not want them to know why you're sitting on the stairs

12   with your hands under your head.  You do not want them to know

13   what you have to face when you go to work in the morning.

14       It's the things that you can't share.  It's that

15   loneliness that you have when you get up in the morning and in

16   your shower when you're thinking about what you're going to

17   have to face.  You ford that yourself.  That ride to work in

18   the car.

19       Remember, Dr. Reading talked about reliving it over and

20   over again?  It's like a squirrel in your mind going around a

21   tree over and over again.  Reliving what has happened?

22       That is emotional distress.  That's the loneliness that

23   we're talking about.

24       "My parents being beaten with hoses."

25       The jigaboo is not just a picture.  It is not funny.  And

1   when it's delivered to a Black man, it drags him backward in

2   time to the stories that he's been told by his parents.

3        The stories he's been told about things that we thought we

4   were past here inside this country.

5        And here he is 2015 in San Francisco in our backyard in

6   the Tesla factory.

7        The sadness of sitting on the stairs for hours and just

8   crying.  The fear and anxiety.  Degraded, upset, dehumanized

9   demoralized, disgusted.  The fear, the anger, the anxiety.

10                      (Pause in proceedings.)

11       **MR. ALEXANDER:**  I went through and I valued all of

12  those things.  And I placed a value of a hundred thousand

13  dollars on each one of those things, and then what I did was I

14  weighted it.  I figured out what, in my humble opinion, was the

15  value of each one of these categories of things.

16       **THE COURT:**  Let me just stop you for a second.  The

17  vouching for a witness isn't appropriate.  You can argue about

18  what the appropriate value is, but don't testify for yourself,

19  please.

20       **MR. ALEXANDER:**  I apologize, Your Honor.

21       I apologize to you as the jury.

22       I place these numbers here as a suggestion to you of the

23  value of emotional distress for each of these categories.  You

24  have the ability to reject any one of them or reject the

25  concept.  But this is how I come up with a suggestion for you

**CLOSING ARGUMENT / ALEXANDER**

 1   for what would be the emotional distress damages during the

 2   timeframe that Mr. Diaz was inside the workplace.

 3        And that number is 4.1 million.

 4        And then the next number is the number between the

 5   timeframe of when he left the workplace, because you remember

 6   his mother died, and he had left temporarily got leave, and the

 7   time came where he had resolved the issues with regard to his

 8   mother, and it was time to go back to work, and he could not

 9   bring himself back.  This job is one of the best jobs in the

10   area.  One of the best-paying jobs, and he decided that he

11   could not do it anymore.

12        And so for the timeframe between when he left and trial,

13   22 -- I'm sorry, $2.2 million based on the categories that I've

14   suggested.

15        And then for the future harm, you heard Dr. Reading talk

16   about future harm, saying that Mr. Diaz's outlook on the world

17   has been permanently changed.  That's what happens when you've

18   engaged in racial conduct in the workplace.

19        That's what happens when you take away a person's safety.

20        They are at a higher guard.  They're waiting for the next

21   time that something bad, something racist is going to happen to

22   them.

23        He has a heightened sensitivity and a loss of safety, and

24   it will be with him for the rest of his life.

25        And so I'm suggesting a conservative figure of $2 million

1   for the future, for the triggers, for the incidents like when

2   someone cross-examines him on the witness stand and he forgets

3   where he is and decides to lash out because that is all he can

4   do because he is triggered.

5        And so now I would like to talk -- now I would like to

6   talk about punitive damages.

7        And that --

8                      (Pause in proceedings.)

9        **MR. ALEXANDER:**  With regard to punitive damages, this

10  statement was made by Tesla during the opening, and how was

11  this company supposed to do things about things they didn't

12  know were happening?

13       How is it possible that they could deny knowing stuff when

14  their supervisors were the ones engaging in the conduct and

15  their supervisors were the ones these African American men,

16  Mr. Kawasaki -- if they knew, Tesla knew -- to claim not to

17  know something going on in your workplace.  If you can build

18  all these cars, if you can manage all of that, how can you not

19  know?

20       You heard testimony from Amy Oppenheimer.  Uncontradicted

21  evidence just like Dr. Reading.  The defense had the ability to

22  bring an expert in here to say that the diagnosis of Mr. Diaz

23  was wrong, and they did not do so.  You can hold that against

24  them.  They had the ability.

25       With regard to Ms. Oppenheimer who came and testified

1    before you, she -- they had the ability to -- Tesla had the

2    ability to bring in an expert, and they did not.  Her testimony

3    was they had adequate policies, but the issue is they did not

4    enforce them.  They did not conduct investigations, do reports

5    to get to the bottom of things, figure out who had done wrong

6    and take appropriate remedial action, action calculated to stop

7    the conduct.

8        And then you heard testimony from Ms. Marconi where she

9    said if we become aware of a problem, let's say, use of the

10   N-word or racial drawings, Tesla would still have to make sure

11   that that conduct stopped; right?

12       She knew that the rules were supposed to be followed, and

13   it still wasn't done.

14       The purpose of punitive damage is to punish and deter, to

15   punish and deter.

16       Some of you may have children.  And if you have children

17   and you do not punish them, if you do not chastise them, the

18   consequence is they will grow up to be bad children.  Petulant

19   children.

20       And that is the way I see Tesla.  Tesla is a petulant

21   child.  We can do whatever we want.  We can use the N-word in

22   the workplace.  They can play whatever music they want.  We

23   don't care.  And so you must -- you must punish and deter.

24       Degree of reprehensibility.  The degree of

25   reprehensibility, the N-word inside the workplace on a daily

**CLOSING ARGUMENT / ALEXANDER**

 1   basis constantly and no one does anything about it.  Instead of

 2   punishing a person with the zero-tolerance policy who leaves

 3   this jigaboo for him, they give him a three-day suspension and,

 4   if you recall, two hours after they received the three-day --

 5   two hours after they receive the complaint, they had already

 6   decided on the discipline, and it was Tesla decided on a

 7   three-day discipline, even though it was recommended that it be

 8   termination.

 9        And that -- if you look at the documentation, that

10   decision was made before the investigation was conducted.

11        Tesla was dictating that the investigation be short, be

12   sweet, that it be minimized and sanitized.  They decided on a

13   nominal, a nominal discipline.  That is the degree of

14   reprehensibility.

15        Because if Tesla refuses to protect Black employees inside

16   the workplace, then it is unsafe for them.  A hundred thousand

17   people working in a Fremont factory, how many of those people

18   are African American?  How many of those people not African

19   American don't want to be subjected to the N-word?

20        What amount is necessary to punish or deter a corporation?

21        I used the term "plantation mentality," and it was because

22   of the testimony solicited from Mr. Tom Kawasaki.

23        He was repeatedly questioned, "Well, were they able to do

24   the work?"  Regardless of the fact that the music was going on

25   and the N-word was surrounded by them, regardless of that

 1   stuff, could they keep doing the work?  It was about

 2   productivity.  Productivity.

 3        Money over people.  In particular, money over African

 4   American employees.

 5        I called it a "plantation mentality" because they were

 6   working as though -- they were treating the factory as though

 7   we were in the '20s and '30s where we're paying you a bunch of

 8   money.  Keep your mouth shut and just do your job, the

 9   atmosphere, we aren't going to do anything about it, and the

10   law says they had an obligation to.

11        Malice, oppression, reckless disregard for the rights of

12   Owen Diaz.

13        In order for punishment to be strong enough, hard enough,

14   it has to be significant.  We have all driven in a carpool

15   lane.  If the -- the penalty for a carpool lane, I think it's

16   about $271, but then there are penalties added on top of that.

17   So if you are caught in the carpool lane and you are one person

18   or not enough for the lane, you get a $500 fine.

19        But if it was $10, we would all jump into carpool lane,

20   and we would have a bunch of tens and just hand it to the

21   officer because there is no consequence to the punishment.

22        Prison.  People break the law.  Break the law, felony.  If

23   they go to jail because it's not supposed to be easy; it's not

24   supposed to be fun and comfortable.  But if as a consequence of

25   committing a felony you ended up at the Intercontinental or the

1   Fairmont, that certainly would not be a deterrent.

2        If an individual is making a hundred thousand dollars and

3   they do something wrong, seriously wrong, then what would be

4   the punishment that would be reasonable?  The Court has given

5   you an instruction and said that Tesla is to be treated just

6   like an individual.

7        The fiction of a corporation is just that.  It is supposed

8   to be treated just like an individual.  And if the individual

9   does something wrong and you think that a penalty of 10 percent

10  is reasonable, then a person loses $10,000, doesn't cripple it.

11  It hurts a little bit, but it hurts so they don't do it again.

12  Or you can decide 5 percent 5,000, or you can decide 1 percent.

13       You heard testimony from Mr. Mahla that Tesla as of that

14  date was worth $151 billion.

15       Billion.  And that they had what I'm going to call -- I

16  can't see it -- they had free cash flow -- they had free cash

17  flow as of that date of $1.1 billion.

18       I call that petty cash for a company that's worth

19  $151 billion.

20       And so my suggestion to you is what is enough money to

21  hold a billion, multibillion dollar company accountable to get

22  their attention, to get someone in the board room to understand

23  that you do not treat your employees -- you do not treat your

24  African American employees the way Mr. Diaz was treated?

25       And so we are going to ask you -- I ask you, based on

1   Mr. Diaz, to 15 percent because the 10 percent, this conduct is

2   worse than that.  So 15 percent of that number so that you get

3   their attention, so that they know this should not occur, this

4   should not occur inside of the workplace.  It should not occur

5   here in San Francisco.

6                      (Pause in proceedings.)

7        **MR. ALEXANDER:**  The arc of the moral universe is long,

8   but it bends towards justice.  Very optimistic phrase.  You've

9   heard it from Martin Luther King.

10       It makes it sound as though the arc moves towards justice

11  just spontaneously without any effort.

12       But you know that there were marches that occurred in

13  order to bring us to were we are now.  Even though now is not

14  equal.  When I was a child and even I like looking at the

15  pictures, the picture of marchers.  I look at the African

16  American faces, and they are determined.  They are marching in

17  their hats, in their suits, in their jeans.  They are marching

18  because they want to make life better for their family.  I look

19  and I can see it in their faces.

20       But when I look at the people that are not Black, the

21  people who are not Black that are marching with them who are

22  human shields, I wonder why are they marching?  Why do they

23  decide that they are going to march with people who are under

24  threat, who may have dogs sicced on them, who may have hoses

25  sicced on them, who may be beaten?  Why do they stand with

1    these people when they already have lives that are intact?

2        And I wonder what brings them to the thought that if there

3    is injustice anywhere, there is an injustice everywhere and

4    that if one person, if one person is not treated fairly, then

5    all of us is not treated fairly.

6                    (Pause in proceedings.)

7        **MR. ALEXANDER:**  I know that I've asked for a lot of

8    money on behalf of Mr. Diaz because I'm hoping that you will

9    value what happened to him, value the harm.  And I'm hoping

10   that you will understand that this conduct that occurred, it is

11   not nothing; it is everything.

12       When you dehumanize a person, it is everything.  I have

13   identified $6.3 million as the past economic damages and

14   $2 million as the future economic damages because it is a

15   conservative number, because representing -- being a Black man

16   and representing a Black man that's suffered through this, I'm

17   afraid to tell you what I think the value of that number is,

18   but it's at least 6.3 million in the past and at least

19   2 million in the future.

20       With regard to your duty, you have this wonderful power.

21   You show up.  You have your own lives, your own jobs.  And now

22   you are in the jury.  You have this power to do justice, this

23   power to try to make Mr. Diaz whole.  And justice is not cheap

24   the country has made it this far.  You have heard the term "all

25   are equal and some are more equal."  Inside the Tesla factory,

1   the truth is some are less equal.  The African Americans have

2   no power.

3       And so it is your job as jurors, your power to do justice.

4   Today is your day to bend the arc.

5                      (Pause in proceedings.)

6       **MR. ALEXANDER:**  Today is your day to bend the arc of

7   justice.  Thank you.

8       **THE COURT:**  All right.  Thank you, Mr. Alexander.

9       Ladies and gentlemen, we will take a break for about

10  ten minutes until 2:00 o'clock.  Please remember the

11  admonitions.  Keep an open mind.  There is still more to come.

12      (Proceedings were heard outside the presence of the jury:)

13      **THE COURT:**  Please be seated, everybody.

14  Mr. Alexander, I think by my watch you've got seven minutes

15  left.  All right.  Let's take a break.

16                   (Recess taken at 1:50 p.m.)

17                 (Proceedings resumed at 2:02 p.m.)

18      **THE CLERK:**  Please come to order.

19      **THE COURT:**  Please be seated, everybody.

20      Mr. Spiro, are you ready to proceed?

21      **MR. SPIRO:**  Yes, Your Honor.

22      **THE COURT:**  Let's get to it.

23                      (Pause in proceedings.)

24      **THE COURT:**  All right.  Please be seated, everybody.

25      Mr. Spiro, when you are ready.

1      <u>**CLOSING ARGUMENT**</u>

2          **MR. SPIRO:**  Thank you, Your Honor.

3      Some eight years ago, Owen Diaz saw a drawing that should

4  have never been drawn.  He filed a lawsuit 18 months later, and

5  now they want 150 million-plus dollars.  How did this happen?

6  How did we get here?

7      How did this drawing become the canvas they painted upon

8  for this entire case?

9      So he applies to Tesla.  There were some inaccuracies in

10 his application.  Day 1 he is wearing his steel-toed boots.  He

11 remembers it vividly on direct examination.

12     Day two he sees graffiti right away.  Right away.  He is

13 trying to extend the time that he is suffering.  Day two right

14 away.

15     So he reported it.  Of course, he reports it to his

16 immediate supervisor at that time, Ed Romero.

17     An oral report.  Ed Romero didn't work there yet.  And so

18 it begins.

19     He is in the elevators.  He says the first few weeks

20 nothing.  It's a bit strange since everybody says this is being

21 thrown around casually in this way all the time.  That's not

22 what we said; that's what all the witnesses said.

23     That was their witnesses' testimony; that there was a

24 friendly use of this, the GA/ER thing; that there was music

25 playing; that this wasn't always in an abusive way; that they

 1   heard it all the time.

 2       So that state can't cause psychological impairment of

 3   injury.  It can't because he says there is nothing going on in

 4   the first few weeks.  He has to say that.  He has to say that

 5   because he invited his son into that environment.  So he is

 6   stuck.

 7       And he said it to you.  He said, "You are saying that it

 8   was directed at me on a daily basis, like I'm walking through

 9   the factory?  No one was singling me out.  No one was singling

10   me out."  So he has to point to specific racial attacks.

11       Nonracial attacks will not cut it in this case either.

12       You know, Foster threatening him, that doesn't count.  An

13   elevator incident that had nothing to do with race, that

14   doesn't count.  People at that tattletaling and being snakes on

15   each other doesn't count.  He has to find race-based attacks.

16   So Timbreza.

17       So what actually happened, and I think you know this, but

18   Timbreza is a jerk, teasing and saying things that are racial

19   in nature.  That's wrong.  He got caught.  It's investigated.

20   He is disciplined for racial slurs.  Never happens again.  The

21   conduct stopped.

22       Diaz affirmatively seeks help.  Takes action.  Company

23   reacts.  Owen Diaz trusted Mr. Kawasaki.  And he was satisfied

24   with the response and, of course, Ed Romero was involved in

25   that too.

 1          He never sees Timbreza again.  End of this.  No damages

 2     related to this, period.

 3          But remember, we need to get inside the mind of Owen Diaz.

 4     That's what we are doing here.  Mental suffering.  Inside of

 5     his mind.

 6          So he knows that they are teasing him, so he records it.

 7     Pretty resourceful.  You've got to love cell phones.  Create an

 8     extra set of eyes and ears in the world.  And he finds that bad

 9     word that's racist in nature.  He lied about that.  In his

10     earlier testimony, he says he just remembered it.  He didn't

11     tell Kawasaki he had the recording.

12          In any event, he is not intimidated and scared and

13     nervous.  He is not going to people at Tesla.  He goes and

14     confronts Timbreza and good for him.

15          That's a window into his mind.  And you might be

16     wondering, What's this whole thing about the Spanish word, the

17     English word?  Was it the N-word?  Was it not the N-word?  Why

18     does it matter?  Both are terrible for sure, but it tells you

19     something about his mind because why did he add that?

20          In their opening statement, you know, they didn't say that

21     it was the N-word in the first incident.  They hedged.  They

22     said racial slurs.  They didn't say the N-word in first

23     instance because how is his testimony going to go.  Right?

24          So, of course, you would have to believe for weeks

25     Timbreza is saying these words in Spanish.  Right?  And then

1  Mr. Diaz confronts him, and then all of the sudden he switches

2  languages and then switches back to Spanish before Kawasaki

3  arrives at the scene.  That's what you'd have to believe.  The

4  recording disappears.  But again, chongo isn't the story; the

5  N-word is the story.

6      So again, the other reason that we have to talk about that

7  is because they said there was a cover up from Day 1.

8  Remember?  Cover up, Day 1.

9      He hides the recording.  Just him.

10     So when somebody goes to the scene four days later, and

11 Romero has just gotten there, and Salazar is on the scene, and

12 someone's trying to figure out who said what in what language,

13 and they go back down to the area where this happened, somebody

14 doesn't confirm something?  Somebody sees some higher up come

15 to the scene and doesn't want to, you know, give up their

16 colleague and doesn't say anything?  So what?  They wrote him

17 up for racial slurs.  They told you that.  Written warning,

18 racial slurs.

19     He's satisfied.  He's so satisfied with the outcome that

20 it is not mentioned in the litigation for years.

21     He is so undamaged by the event that after getting ready

22 to go meet with Dr. Reading to tell him everything, this

23 person's name doesn't even come up.

24     So again, he is promoted, he's given a raise.  And

25 remember, this promotion is a positive act on Tesla's part.

1  But no, no, no.  No, no, no.  He tells you that it wasn't.  It

2  wasn't.  What they did was they used his last name of Diaz to

3  trick Tesla into promoting him.  Do you remember that

4  testimony?

5       That's his sworn testimony on why he got promoted and why

6  it's not a sign of anything good but only more signs of bad.

7  But of course it doesn't make any sense, right?  They know his

8  race.  They're looking at him.  They know it from the incident.

9  So, you know, this is just a window into Owen Diaz.

10       But he doesn't want to say Romero promoted him.

11       So Diaz is breaking rules, fighting, fighting with people,

12  you know.  And I think you all know that he's confrontational.

13  This isn't like something that just came up in this last day.

14       Wheeler told you all that he was trying to get his

15  employees fired all the time.

16       Mr. Jackson told you that from day one -- not day two --

17  day one Owen Diaz was always like this.

18       So, you know, they're going to put up a picture of him

19  smiling in his badge photo as if he came in any different.

20  Like he told Dr. Reading at the end, he's always been like

21  this.  He's always been like this.  So, yeah, he's a fine

22  worker, but he gets in confrontations with people.  That's Owen

23  Diaz.

24       So Mr. Diaz says he's satisfied with the incident with

25  Timbreza because he knows from the beginning his son joins.  He

 1   encouraged his son to work there, unequivocally.  When you look

 2   at the son's video, not with conditions, unequivocally

 3   encouraged him, saying it would be a good experience.  And this

 4   is the first thing that's so fatal to their case.

 5        They never asked one witness:  Was anything different

 6   about Tesla before you hired Demetric and after you hired

 7   Demetric?  Nobody was asked that.  Did it get worse?  Nobody's

 8   asked that.  And it's impossible.  They can't get around it,

 9   because this environment was positive enough to invite his

10   children into.

11        And yet he's in a federal courthouse asking for damages

12   based on that environment.

13        There were other companies available.  I don't know what

14   that's all about.  There's other companies available.  His

15   daughter tells you she applied to, like, lots of other

16   companies.  When he leaves Tesla, he gets a higher-paying job.

17   This isn't the only job on planet earth.

18        Then there's the Martinez incident.  Owen Diaz upsets a

19   female employee at Tesla.  They call Mr. Martinez in tears, and

20   he confronts Owen Diaz.  And they argue, they go eye to eye,

21   toe to toe.  Makes common sense.  We know the reason for the

22   argument, just like we know with Timbreza, insult leads to

23   aggression.  Insult leads to aggression.

24        And you got to get inside the mind of Owen Diaz.  When

25   he's asked about that, he says I have no idea.  I'm just

1    standing there.  And Martinez is just, you know, charging at

2    me.  No idea what could have caused that.

3         No idea.

4         Look for the camera.  Look for the camera.  Right?  That's

5    what he says right away.  He's been around the block.  He

6    knows.  He knows that the other person was aggressive to him,

7    so a visual camera is going to show that; right?  And you know

8    this whole thing about the video there, again, there's no

9    dispute.  I'm conceding what happened on that video.  Martinez

10   charged him.  So this missing video shows nothing different

11   than what they're saying.  It shows Martinez charging him.

12   That's what happened.  Right?

13        So I couldn't believe, you know, this argument that, you

14   know, a Black man asked to have the video looked at, and it

15   wasn't.  That was the quote I just heard.

16        Kawasaki told you he looked at the video.  Wayne Jackson

17   told you he looked at the video.  They both told you they

18   looked at the video, and it said they were eye to eye, toe to

19   toe, and Martinez charged him.  There's no dispute.

20        So again, after the aggressive, heated exchange, Mr. Diaz

21   is not trying to escalate this.  One, there's nothing more to

22   it.  And two, if this gets investigated a little more, okay,

23   people are going to be asking questions about why Martinez was

24   racing into the elevator.

25        And so remember, Martinez complains first.  You don't

1  complain first if in front of two African American men you just

2  called them that word.  Right?  There's a witness there,

3  Mr. Foster.  Who does that and then goes and complains first

4  when there's two witnesses there.  It doesn't make any sense;

5  right?  None of it makes any sense.

6       Wayne Jackson, who's their witness and in their control,

7  says zero race is part of this.

8       Martinez says zero race is part of this.

9       Romero says zero race is part of this.

10      Tom Kawasaki, the man he trusts, he calls him for advice.

11 Remember that it's actually in the e-mail, I'm calling Tom for

12 advice.  Kawasaki says nothing racist about this incident.

13      Mr. Diaz's own statement says nothing is racist about this

14 incident.  When Mr. Diaz is asked under oath in his depositions

15 open-ended questions, we just let them play, nothing racist.

16 Tell me what other words were used in the elevator?  Talk shit,

17 all these words?  Nothing.  Nothing racist.

18      And so this incident, it was not about racism or implicit

19 racial bias.  This isn't like a police profiling case.  There's

20 nothing implicit about this.  This was explicit rage about what

21 he said, period.

22      And you know, there's this interesting thing about this.

23 I don't know if everybody picked up on it, but Martinez doesn't

24 say one word to Diaz from October to January or after the

25 drawing.

1      Right?

2      There was testimony about that.  So did he say anything to

3  you from October to January?  No.  Did he say anything January

4  on?  No.

5      That means that it all had to happen, whatever horror

6  happen, before Demetric; right?  Had to have.

7      And it also doesn't make any common sense; right?  People

8  that are sporadically calling out racial names don't just like

9  start and stop on a dime like that.

10      So what are they going to do?  There's no evidence that

11  there is anything racial about this.  In fact, it's

12  overwhelming, bulletproof evidence in the other direction.

13      So they start asking witnesses, you know, haven't you

14  heard the word "mayate" before?  Right?  He's like putting it

15  in people's mouths.  And the first witness when I went to cross

16  him on the mayate issue, he literally just goes no, no, no, I

17  didn't say that.  He just took it back.

18      And so eventually we asked Mr. Diaz under oath, you know,

19  do you want to be honest, do you want to just tell this jury

20  there wasn't anything racist about this incident.  It's not a

21  good incident.  Not -- there's nothing -- no, I don't want to

22  tell you that.

23      So here we are in the fall of the Fremont factory.  He's

24  got Wayne Jackson.  He's not Kawasaki.  Raise and promotion.

25  He's inviting his son to apply.  And Mr. Diaz has you believe

CLOSING ARGUMENT / SPIRO

1  that he is very involved in the son's application process,

2  right, because he has to tell the son, listen, when you're

3  applying, you don't want to be here in my area of the factory

4  around these people.  You want to try to be in another area.

5      That doesn't make any sense because everybody comes

6  through the elevator, and all these people he's fighting with

7  are in other divisions.  It doesn't make any sense.  Okay?

8  Just like straight up, no common sense, doesn't make sense.

9      But they don't put it in the application.  The son doesn't

10  say it in his recorded testimony.  But this is the story.  This

11  is the story.

12      Right?

13      He doesn't know that his son reapplied.  That doesn't make

14  sense, either.  So what does he do?  It's just like he does

15  when Martinez and Hurtado complain about him; he comes over the

16  top, right, he comes over the top.

17      So his son starts, it's the middle of the night, and he's

18  bringing him lunch.  They're texting, you know, it's time for

19  lunch.  He goes down and he hears in the middle of a loud, busy

20  factory the most horrible thing anybody could ever say to their

21  child.  And in that moment, they looked at each other, and the

22  relationship was fractured; right?

23      Fractured from that moment on.

24      Does nothing.  Says nothing.

25      Demetric does nothing.  Says nothing.

1        Demetric's video, he orally reports it.  That's it.

2        You know, he has all these people available to him this

3   whole time.  People that are his witnesses, people that he says

4   he trusts.  Doesn't tell any of them.  Never checks on his son.

5   No text message, hey, that was crazy today.  Nothing.

6        Standing there in front of that racist drawing in January

7   with Wheeler and everybody, and this issue of racism comes up,

8   and this horrible drawing happened -- and that did happen and

9   that was wrong -- it doesn't come up.

10       He doesn't say anything.  Nothing.

11       And then Mr. Diaz ads -- see, this is, he gets himself in

12  trouble with these things -- he adds "the white supervisor."

13  That sounds worse to add "the white supervisor"; right?  Well,

14  guess what, his supervisor wasn't white.

15       So, he can say all he wants, "he looked white."  They

16  didn't put any evidence of that.  The son doesn't say that.

17       You would think he would know his name, at least, that he

18  would ask who was that horrible name.  He doesn't even know his

19  name.  Never asks for his name.  This would be a man who you'd

20  never forget.  His face would be etched in your mind.  You

21  would seek vengeance for years.  He doesn't know his face; he

22  doesn't know his name.  Wasn't important enough to figure out

23  his face, figure out his name, send him a single text, or even

24  tell his wife about it.

25       But you know, if he says something real and horrible

1   happens with his son, you know, then it kind of tries to wash

2   away the fact that he's inviting his children in.  So, you

3   know.

4        But there's other reasons to doubt this, if you really

5   believe it, which is:  He wants to make money by saying that he

6   saw it.  There's motive.

7        He says to you that he told his son to report it when

8   under oath he said earlier, I don't actually remember if I told

9   my son to report it.

10       They never asked any witness or colleague to give a

11  statement.

12       Mr. Diaz knows how weak this story is, and so he tells

13  Mr. Wheeler on the phone, hey, I got video of it.  I got video

14  of it.  Just to lock Mr. Wheeler in so Mr. Wheeler thinks it's

15  real.

16       Daughter applies to Tesla.  He has no idea.  Talks to his

17  daughter every day.  You think it would come up.  You think it

18  would slip.  You would think something.

19       Son reapplies.  He's so involved with the first

20  application; right?  Doesn't know that the second application

21  goes in, even though it's applying to two different positions

22  to work around the staffing agencies to see if he can get back

23  inside of Tesla.

24       But you did hear from the wife very quickly.  The wife

25  overhears the son -- Mr. Diaz admitted this -- saying in the

1    house, "Hey, all.  I had the worst day.  I had a fight.  My

2    supervisor and I, we like different baseball teams."  That was

3    what was happening in the house.

4        And this relationship didn't fracture.  Okay?  It's the

5    most upsetting lie in this case.  He told you over and over it

6    was fractured from the start.  He was pressed on that.  He

7    continued to persist.  You know, he never talked to Reading.  I

8    asked Dr. Reading, Was he looking at you?

9        He was looking at me.

10       Was he making eye --

11       He was looking right at me.

12       And he said in that moment, in that moment we were eye to

13   eye.  We looked at each other, and from that moment, the

14   relationship was fractured.

15       His affect was perfectly flat, and then he began to sob.

16   Dr. Reading told you he cried.

17                (Video was played but not reported.)

18       **MR. SPIRO:**  So let's get back to the truth.

19       The end of the year after the elevator incident, he has

20   Lamar Patterson's resume, an African American friend at work.

21   Says my cousin wants to work here.  Forward the resume; right?

22   Kind of destroys the son's story because he's going to work

23   right there in the horrible elevator; right?  So he has him

24   come work with him in the elevator, and he's there with him

25   then.  Okay?  And his answer for that is well, he was half

 1  black.  That was the answer to that.

 2      And you see, this is a little thing but it's important

 3  because Mr. Romero was under some attack.  And, you know, he

 4  doesn't block Mr. Diaz's promotion or get tricked because his

 5  last name is Diaz, and he doesn't -- he hires this man because

 6  he respects and is trying to do right by Owen Diaz.  He invites

 7  him to work in the Fremont factory.

 8      So, we are now at the end of the year; right?  That's it.

 9  That's the year.  And all of these people were asked.  All

10  these people that had an open -- he had an open line to.  Open

11  line to.  Was there any other racial complaint?  Did he ever

12  say anything about these things?  No.  No.

13      What was he actually doing?  All of these things.  All of

14  these things.  You know, even the daughter, you know, I told

15  him after I applied.  And he was like oh, okay.  That's,

16  I guess, the testimony.  Oh, okay.  She's the one that sees him

17  closest, so she can see is he different now?  Is whatever he's

18  experiencing now during the day, do I want to be part of that?

19  Well, she sees him every day.  She told you.  She wants to be

20  part of whatever he's doing every day.

21      And who was available?  All of these people this entire

22  time, any time he needs to call them, any time he needs to talk

23  to them.  And, you know, this elevator at work is not such a

24  scary place.  He's got Foster and Patterson with him there the

25  whole time.  This whole alone and afraid -- you know, at one

1  point he told you he is the biggest guy there.  He is not alone

2  and afraid himself there.  He is charging Timbreza.

3      Doesn't talk to anyone, none of these people, and doesn't

4  complain to anybody else out in the world.  Nobody.  His wife,

5  30 years, nothing.  Not one complaint.  Where is his wife?

6      January 2016 the drawing happens.  He finds it.  It was a

7  very bad thing.  Not defending it.  There is nothing more to

8  say.  Martinez apologies.  He apologizes in writing.  His

9  explanation is he grew up in another country.  He doesn't fully

10  understand what he was doing.  That's what he says.

11      You know, but he doesn't try to get away with it.  He

12  confesses right away.  It doesn't seem like he is trying to get

13  away with it; right?  Maybe they would have never figured it

14  out.  He kind of comes clean pretty quickly.

15      Wheeler thinks it's completely out of character for

16  Martinez.  That's what Wheeler says.  Wheeler says, "I'm with

17  the guy every day.  This wasn't him."  He doesn't believe it

18  that it was him.  Mr. Diaz is upset, and genuinely so, and

19  nothing today or no cross-examination is going to change that.

20      The drawing wasn't right.

21      But Martinez says something in his statement that Diaz

22  said that I think is important for a couple of different

23  reasons.  He says, "Like, listen, man, I can let this go.  It's

24  different from -- coming from you, like minority to minority.

25  It's different coming from you."  This is what the statement

 1    reads.  It's not my opinion; it's what's in the exhibit.

 2         It's different, you know, it's not like a white guy did

 3    it.  And you know, you go back to the supervisor having to be

 4    white and not getting him in trouble.

 5         And then Mr. Diaz says this:  "Who could have done it in

 6    today's age?"  This is what he writes into that e-mail.  And

 7    that e-mail is very real and very raw, and he is copying

 8    everybody in writing, and he is not afraid to put in a subject

 9    line "racial effigy and drawing."  And he sends it right to

10    Mr. Romero, and he is very open about this; right?

11         He can't believe that this could have happened at Tesla.

12    That's what that means; right?  But despite the loose language,

13    its imperfections, the overnight shift, these investigations

14    are not, you know, of homicide TV.

15         Who could do such a thing?  Who could do such a thing is

16    not what you say if this factory is a hotbed of racial

17    violence.  It's not what you said.  This company that would be

18    so racist to Mr. Diaz from Belize but be too nice to Martinez

19    from Mexico, this racist company that's making those calls.

20         This company that did all of these horrible things that

21    never happened.

22         Who could have done this in today's age?  And when he

23    tells Romero and Jackson in those e-mails, he wants Martinez

24    spoken to; right?  And he is spoken to, and they do those

25    trainings, the sensitivity training Erin Marconi told you about

1    with the boob story.

2         Mr. Jackson told you he met with all three shifts.  The

3    same thing he did in the boob story, the same thing.  Meets

4    with everybody.  "This was wrong.  Don't ever do it again.

5    This man is now suspended without pay.  He is being penalized."

6    It's the same thing.  They're making it sounds like it's not

7    the same thing.

8         Even Mr. Diaz's own witnesses say they are not really sure

9    what should have happened to Martinez.  Wheeler says he should

10   have been written up.  I asked Mrs. Oppenheimer, "What do you

11   think should have happened?"  She wouldn't say he should have

12   been fired.

13        So the drawing was investigated.  There was consequences.

14   I'm not sure what firing would have done more to cure an -- and

15   I can't take it back.

16        And then it's the month of February.  And this is not the

17   most exciting thing I'm going to say today, but the most

18   important thing I'm going to say today because nothing happens

19   in February.  They elicit no evidence of any changes in Owen

20   Diaz in February.

21        February is the critical month.  February is when he would

22   have damage from this.  That's how trauma works.  That's what

23   Dr. Reading told you.

24        Owen Diaz shows up to work the next time.  He doesn't miss

25   a day.  He is planning for the future.  He gets a raise thanks

1    to Romero.  No one notices anything different.  Not a single

2    witness.  Ten witnesses.  Did he change?  Did he change after

3    the drawing?  Not one question to one witness.

4        Not one question.

5        It's their burden of proof.  Because it didn't impact his

6    functioning.  There is not one word of it impacting his

7    functioning.  Everybody is saying it's just the same old Diaz.

8        So at the end of February they are having these meetings,

9    and you saw those e-mails.  I went through them quickly with

10   Mr. Diaz about they are fighting, you know, Hurtado and Devin

11   Williams, who is also African American -- and I'm not saying

12   that to say it.  It's just -- it's part of this case.  Okay?

13   And they are fighting and they're tattletaling and -- but

14   Mr. Patterson is there the whole time; right?  He is not alone

15   anywhere.

16       And this is the response to the drawing incident.

17       And then this is Mr. Patterson's statement about the only

18   other incident that occurs.

19       If this is even an incident.  I don't even know if they

20   are still claiming this is an incident.  It's not in

21   Oppenheimer's thing.  It wasn't really in their summation.  I

22   didn't hear any evidence of it; right?  But they seem to have

23   started with it.

24       So again, this incident happens.  There is nothing racist

25   about this.

1    You know, use common sense.  If you want to get somebody

2  in trouble, you are going to say the worse things you can say

3  about them.  If you have been living with them for months and

4  months and months and there's been some horror going on, you

5  are going to say that.  You're trying to get them in trouble.

6  You're not saying this for any other reason.  There is not a

7  word.  There is never a word of anything.

8    Right?

9    So the next day sadly after this his mother passes away.

10    He does not leave because of any incident.  Just like

11  Dr. Reading told you, he leaves; he moves on.  Right?

12    They send him those exit notices.  He doesn't send an

13  e-mail to HR, doesn't tell anybody in his home, "I'm leaving

14  because I'm suffering."  Nothing.  Not a text message, not a

15  nothing.  He leaves for a better job, a better pay, better

16  hours, better sleep, better mood.  I mean, who wants to commute

17  an hour plus to work and work overnights.  He had worn out his

18  welcome there.  This is betterment.  He doesn't seek treatment.

19  There is no doctors.  There is no meds.  There is no anything.

20    It's the opposite of impairment.  There is no real damage

21  of any injuries.  That's the end of this.  The end.

22    But here we are.

23    So you are then going -- you heard the jury instructions,

24  and I just want to quickly talk about them.  The Judge

25  instructs you on the law, not me.  But it's been established

1   that Tesla did not take all the steps it could have to prevent

2   racial insults or jokes by its workers.  That doesn't mean

3   Tesla was racist; it does not mean Tesla condoned racial

4   attacks on anybody or tried to hurt anybody.

5        It just means that Tesla did not do enough to stop it in

6   at least one incident.  So one incident is sufficient.  That's

7   all that it means; right?

8        And we know the one incident.  But he has the burden to

9   prove damages with evidence.  Evidence in a federal courtroom.

10       You can award any amount of damages the evidence supports.

11  You can award next to nothing.  The damages are only for what

12  he experiences, not anybody else.

13       You can only give damages for what's caused by Tesla,

14  caused by them.

15       If you find that he suffered stress or distress, but it

16  wasn't caused, it can't be caused by them, he can't be awarded

17  money for that.  And the only injury is emotional distress.

18  It's not any of those other things.  Emotional distress can be

19  mild or severe, temporary, traumatic.  Extent of the injuries;

20  right?

21       They are just to compensate him for what, you know -- what

22  his pain and suffering is, that's all that it is.

23       And again, he only gets it for racial incidents, and he

24  has a duty to mitigate it.  He has a duty to see a

25  psychiatrist.  He has health insurance.  He never told you

 1   that, but he said it on cross.  He doesn't do any of the

 2   things.  He doesn't do any of the things that Dr. Reading told

 3   him to do.

 4        And punitive damages only for what you do on purpose or

 5   because you know you are hurting people and you don't care

 6   about them.

 7        It's not for what you fail to do.  It's not for

 8   negligence.  It's nor for sloppiness.

 9        It's not for not taking more reasonable steps.  The words

10   are "malice" and "oppression" which are fancy words for

11   intentional reckless disregarding kind of conduct.

12        And punitive damages must be reasonable, governed by

13   reason.  They must be in proportion to how bad.

14        And then there is the most important instruction in this

15   case which is if you decide that a witness has deliberately

16   testified untruthfully about something important, you don't

17   need to believe anything that the witness said.

18        And the reason that's the most important instruction is

19   because trials are the bedrock of the system, and the only way

20   it works is if people tell the truth.  And he lied to you.

21        He basically -- this may never -- could never happen

22   again.  He basically admitted that he lied to you.

23        He came in the first day in his AC Transit uniform, right,

24   like sort of the deception of all deceptions.  And one of the

25   first impressions, he looked right at and said, "What was the

1    job after you left Tesla?"

2       And he said, "AC Transit."  So by saying that, he can say

3    he was off from work for a few months you get it?  He can say

4    that he closes the door to the bus, and he just drives.  He is

5    not in a big factory with lots of people; right?

6       He had to stay away.  It's avoidance.  It's stress.  It's

7    trauma.  It was a lie for a very specific reason.  It was a lie

8    to deceive you.  It was a lie for more money.

9       And when he got caught in cross, he just said, "Okay.  I

10   worked at Coke.  I worked at Coke after Tesla.  I was in a

11   factory just like Tesla."

12      There were other lies.  Lots of other lies.  I can give

13   you some of them.

14      You would have to believe all of these were true.  None of

15   them are true.  You would have to believe all of them if you

16   thought any of them were lies or misleading or were not

17   forthright or were not complete answers.

18      He testified, again, the Timbreza incident; right?  He

19   testifies that that incident bothers him immensely now.  On

20   cross-examination, it's true; he forget about it for

21   four years.  Slipped his mind for four years.  But it's never

22   left his mind, but he forgot about it for four years.  He

23   testified about the Martinez incident and the N-word, that

24   didn't happen.

25      He testified that the reason he didn't put the N-word in

 1  that e-mail -- there were like several different reasons.  Let

 2  me give you a few of them.  Okay.  One was he doesn't feel

 3  comfortable writing that word in the e-mail.  Okay.  The other

 4  is that we should check the visual surveillance, and he didn't

 5  want to put the word in the e-mail because the visual

 6  surveillance would explain what happened.  That doesn't make

 7  any sense either.

 8       So he said the N-word on national TV.  He put the racial

 9  effigy in the next e-mail.  He didn't put anything in this

10  e-mail.  The truth, if you want to be just truthful, is because

11  that incident was not racial.  It's just a fight between men.

12       So you know, at one point he said, "What's with all these

13  oral reports you are claiming?"  His testimony was I didn't

14  have their e-mail addresses.  He actually said that under oath.

15  "I didn't have all their e-mail addresses."

16       He didn't know his son who lived with him reapplied.  He

17  told Wheeler on a phone call, you know, that, "Hey if you are

18  interested in jumping on this class-action lawsuit" or the

19  lawsuit text message and that phone call that happens; right,

20  tells Wheeler on the phone call that they have got the -- some

21  stuff recorded.

22       Lies about Romero telling him orally.  Lies about why

23  Martinez charged him.  Lies about Martinez and Hurtado a lot.

24       Lies about Ms. Delgado -- it's not a very nice lie --

25  saying that he told her about this whole racial history; makes

1    her come in here; that she buried it; that she covered it up.

2    The woman that you saw, you saw her demeanor; that he reported

3    this to her and she doctored the paperwork; buried it at Tesla.

4         You would have to believe that.  You'd have to believe

5    that Ms. Delgado came in here and lied to you and perjured

6    herself to believe that lie.

7         So, I can keep going.  I can keep going.  And, you know,

8    it all washes over you and I come back to the "I speak to my

9    father every day."

10        His biggest claim on direct examination -- the biggest

11   most dramatic claim he had was that that moment fractured his

12   relationship with his son.  It is a complete lie.  Not a little

13   lie.  It's a huge lie about his child.

14        "How is your relationship with your father?"

15        "It's good."

16        "How often do you see him?  How often do you speak with

17   your father on average?"

18        "ANSWER:  Probably every day."

19        This is all, you know, to get money dressed as virtue is

20   what that is; okay.

21        Don't reward that.  There's people really suffering.

22   There's people with real damages who tell the truth.  Don't

23   reward that.

24        We could talk about his demeanor on the stand if you can

25   get past the lies.  He doesn't answer any question on

1    cross-examination the same way as he does on direct.

2        Apparently the explanation for that was somewhere in

3    between Day 1 and Day 2 he became traumatized.  If that works,

4    then no one can ever cross-examine a witness in court.

5        I'm not attacking him.  I'm asking him questions.  "These

6    are the words that you said.  These are the words."

7        "You are mischaracterizing that I said that I'm -- I have

8    no filter," but "you said -- you said that.  Dr. Reading said

9    that you said it.  Those are your words."

10       You know, and we talked about the Timbreza incident; that

11   he can't remember it but now it's affecting him in this way.

12       You know, there was one point where he was very upset.

13   The court reporter, at trial 606, had to ask for a

14   clarification when he was very emotional; and he snaps right

15   out of it and just answers the question, just like that.

16       Doctor said he was able to cry many, many times and then

17   go flat in the interview.

18       He sees his daughter -- his daughter every day.  Never

19   says -- she never says she sees this emotion.  Yeah, she sees

20   him up in the middle night; sees him watching TV.  Never

21   once -- nobody hears a tear.  Nobody once hears a tear.

22       And then there were the techniques on the stand, you know,

23   the "I'm sorry.  I'm praying.  Did you believe me?"

24       "I'm sorry.  I'm praying" thing about hoping that he can

25   avoid the question.  There is the eyes going up in the air, you

 1   know, looking for if he can get out of a question.  There is

 2   the "let me see the document" to slow it down.  There is the

 3   "all I can say is the same thing I'm saying here;" right.

 4        But this is why we have trials.  We have trials in front

 5   of real people to see real things so they can call balls and

 6   strikes.

 7        So that was the first question:  Was he honest and

 8   forthright with you, completely honest and forthright with you?

 9   I think you know that.  He should get what he deserves.

10        Second question I asked in opening, while Mr. Diaz was

11   upset or frustrated hurt, frankly, about what happened that

12   picture, what does he deserve for that?

13        And this is what you have committed to do is to find this

14   damage and whatever it is and find what number that that is.

15        And that's why I talked about February.  Because even if

16   he didn't lie outright, he didn't do anything to prove his

17   burden about what specific damages he has or any material

18   damages that he has.

19        You know, as we discussed in 2015, he doesn't really have

20   a claim; right.  I mean, he is inviting his children in there.

21   I have talked about all of this.  Timbreza.  At the end of the

22   year, he is inviting Patterson in.  He is perfectly fine.

23   Romero is helping with Foster.  So there is nothing there.

24        He admits that he doesn't have intimacy issues with his

25   wife until 2016.  And you heard his daughter say that in 2016

1  he was back; back to joking all the time; back to being that

2  dad.  It was just when he was working the overnight shifts that

3  it changed.

4      To get damages he has to prove the damages they want or

5  anything -- even one-one-thousandth of it -- they have to prove

6  pain and emotional distress.

7      So their lawyers hired Dr. Reading; got him down to LA.

8  Apparently there is no good psychologist in the San Francisco

9  area.  Brought him to LA.  And you might be asking yourself

10 why?  And why wasn't Dr. Reading provided any of the documents

11 he needed?  And his diagnosis is completely conditional on

12 receiving the documents he needed to receive.  Where did those

13 go?

14     But he told you something very important, Dr. Reading,

15 which is that -- it's what you know.  Bad things happen every

16 day.  The world is an unfortunate place.  It is like an

17 elevator.  It goes up and down.  Bad things happen every day.

18 In everyone's life all the time bad things happen.

19     And so before Dr. Reading came in, I just asked Mr. Diaz,

20 I said, "Were you as honest with Dr. Reading as you were with

21 this jury."

22     And he said, "Yeah, absolutely."

23     So he lied to you both.  And I don't know if you saw the

24 first lie because it happened in direct and I didn't want to

25 bring it back up because it is just one of those moments that

1   happen in a case.

2       He reported to Dr. Reading that the feces incident, which

3   never really happened, was on his cart.  You see he took it.

4   He stole it.  He stole it from Wheeler before the Reading

5   interview.  You see what happened?

6       Do you know what that really is?  That's stealing.  Let's

7   say that was even true -- the feces incident -- he is stealing

8   the harm and damage of another person.  He is stealing that

9   from him to tell it to this psychologist so he gets more

10  damages.

11      At the beginning, you know, he doesn't want the harm to

12  happen too quickly, right, because then it's weird because he

13  hires his son.  He brings his son in.

14      So at first he tried to say that, you know, it didn't

15  start for a while.  Well, he tells Dr. Reading -- because

16  Dr. Reading, in that setting he wants the harm to be as long as

17  possible -- so he says the harm starts within 20 days; and then

18  he needs to have a break at the end to show damages, so he says

19  he didn't work for four to six months; right.

20      But time never lies.  Time never lies.  And it's very

21  important.  He says he is out of work for six months and that's

22  necessary for the diagnosis.  Do you see?

23      And this is like -- again, this is a minor diagnosis.  I

24  hope that all became clear to you, but even this diagnosis --

25  and he says that -- Dr. Reading says he really liked the bus

 1   thing because he could talk about how it shut it out from the

 2   and it shows avoidance and it shows trauma.  Again, that was a

 3   lie.

 4       He tells the story of the son locking eyes.  Lie.

 5       You know, and Dr. -- you can tell on the stand that he was

 6   sort of questioning Mr. Diaz a little bit; right.

 7       I asked him, I said, "Did you" -- "this man without a

 8   filter, in the moment with his son, did you have some concerns

 9   that he didn't bat an eye?"

10       Well, there's some things he told the truth about; right.

11   He told him nothing about Timbreza and nothing about Hurtado;

12   right.  That was his moment to tell a doctor all the people

13   that brought him harm.

14       Forget corroboration, forget evidence in a courtroom.

15   Just tell me everything.  He had lots of time to get to LA and

16   think about everything that caused him harm, four years, lots

17   of lawyers.  No Hurtado.  No Timbreza.

18       And Dr. Reading tells you, people have these motivations.

19   You know this from human experience.  You know this from

20   psychology.  And he knows that your functioning has to change.

21   And if you had a job right after, it didn't.

22       And this motivation, it has to be checked.  The symptoms

23   that he provided were different than the symptoms he told you

24   about.

25       He told you that he feared for his life.  Remember the

**CLOSING ARGUMENT / SPIRO**

1    forklift would come out of the wall and kill him in the

2    elevator.  That wasn't true.  He never told Dr. Reading that.

3        I asked Dr. Reading, "Did he ever tell you that he feared

4    for his life?"  Dr. Reading said, "Absolutely not."

5        And Dr. Reading found no signs of PTSD, nothing

6    life-altering, nothing threatening.  His symptoms were

7    subclinical, not severe enough to present readily observable

8    symptoms.

9        This diagnosis and what he saw is no different than what

10   happens in anybody's bad period in any life at most; right, a

11   pandemic, financial downturn, I think he said.

12       And Mr. Diaz slips.  He says -- I'm at trial 873 -- "I'm

13   the same I've always been."  He slipped.  Said that to the

14   doctor, "I'm the same I've always been."

15       But the testing shows us some antisocial traits; does zero

16   to show harm and the psychological damage as Dr. Reading

17   basically just told you, even if you believed everything or

18   next to nothing.

19       And Dr. Reading also told you that he couldn't tell you

20   whether it -- what caused it; right?  He didn't see him during

21   the period after Tesla.  It was four years later.

22       You have to ask yourselves -- you have to ask yourselves,

23   how come when he first files the lawsuit he has time to do all

24   these press tours and go on the roadshow but he doesn't have

25   time to see a shrink?

CLOSING ARGUMENT / SPIRO

 1       I thought he was trying to avoid all of this.  He doesn't

 2  want to see it and talk about it.  He is taking pictures and

 3  doing a press tour.  He is talking to Katie Couric and, you

 4  know, telling his friends "Hey, guess what, the article is

 5  coming out."

 6       Does that sound like somebody who's living in fear?  No

 7  time to see a psychologist.  The psychologist tells you he

 8  doesn't know what caused any of this; that there were other

 9  things going on with his son that there were a major factor.

10  Passing of his mother could have caused this.

11       The doctor says, "Ultimately no matter what I say today, I

12  can't really tell you anything because I don't have any

13  records."

14       How many times did he say that, how many times?  He told

15  you it was conditional.  It was not proven.  Conditional.  He

16  told you that.

17       And why are records so important?  Because people have

18  agendas because people will say that one experience causes one

19  thing to try to get something when it doesn't.

20       And there's other ways to tell if people are telling the

21  truth.  You saw some of it on the witness stand and the doctor

22  saw it too, but this confirmation a key.  And Reading asked and

23  he never got them.

24       He wanted to see the complaints of what happened in the

25  elevator.  He wanted to see the records.  They have been

**CLOSING ARGUMENT / SPIRO**

 1   working with this doctor, he told you, for 20 years.  He

 2   requests the records.  They didn't provide it.  Why?  Because

 3   the records would tell the truth.

 4        He wanted the deposition of his wife.  He wanted to know

 5   what was happening in the elevator at work, the elevator of his

 6   life.  They denied him both.  The doctor didn't get what he

 7   needed.  He made fair requests.

 8        When Ms. Oppenheimer, the other expert, made requests for

 9   records, she got them.  She told you that.  She was provided

10   records, whatever she needed.  They refused to do that because

11   his story doesn't check out.

12        And that's why I want to talk about for a second the

13   people they didn't call; okay.  They didn't call the people in

14   the elevator, those two men in the elevator, Lamar --

15   Mr. Foster.  They didn't call them.

16        They didn't call the wife that slept next to him in bed.

17   They didn't call her.  The kid in the car on the way to the

18   office, they don't ask him anything about the damages.

19        These are the people that could have told you about the

20   harm and damages.  These are the people that could have

21   confirmed his story.  They don't call them because they can't.

22        And a trained doctor told you that there is nothing

23   sufficient about what he is telling you without that

24   corroboration.  He told you that.  That's what the word

25   "conditional" means.  It means "I need these records and I

1    never got them."  He told you it at least five times.

2        But ultimately what he tells you is the prognosis for this

3    man, even with the lies and the "this" and the "that," even if

4    you take all of it, Reading was assuming it was true for the

5    sake of his, you know, sort of report.  He said, "This isn't

6    some long-lasting, life-altering thing."

7        Mr. Diaz's prognosis was good.  That's highest prognosis

8    on scale; okay.  All he needed was two things according to

9    Reading, a job and treatment, and he would have a good

10   prognosis.  That means he would have as good or equal to a

11   prognosis as anyone else in this room.  There is nothing higher

12   than good on the scale.

13       And guess what?  He had a job.  He just lied.  He had a

14   job right after.  That was just a lie.

15       And in terms of treatment -- remember it was a small

16   thing -- he told Dr. Reading, he said, "I'm going to go get

17   treatment."  He didn't.

18       And so all of this other stuff with these damages, you

19   know, these are the lies to Reading among others.

20       I don't even think I talked about the 18 months at Tesla;

21   right.  He doubles the time.  He doubles the time he was at

22   Tesla.  Everybody remembers that, I hope.

23       And so then it was like -- there was a question to him, it

24   was like "Could you have mistaken that?  Could you have, like,

25   written that down or something?  Could that have been like a

1  typo?"  He was like "no."

2      And then he looked at his notes and it said "1.5 years";

3  and he was like, "Yeah, I told you.  This is not a typo.  This

4  is what he told me.  I'm just telling you what he told me."

5      So he lied about that.  The 18 months is just doubling up

6  the nine, and it is just another -- he is just trying to double

7  the amount that he gets.  He is doubling the time, hoping that

8  he puts it in his report.

9      And so all these other things that don't happen in

10  Mr. Diaz's life, the loss of a marriage, the loss of, you

11  know -- you know, some sort of functioning; he is, you know,

12  having panic attacks, psych bills, psych pills, you know, none

13  of this happens; right.

14      And the absence of that evidence is evidence of absence.

15  It's an old express, but it's true.  When people really suffer,

16  things do happen.  Okay?  Things change.

17      And, you know, it's a sad day that he can't collect for

18  this, but maybe it's a good day for justice and maybe it's a

19  good day for him and it's a good day for the resilience of the

20  human spirit because people do not become functionally impaired

21  who have lived long lives with the elevator that goes up and

22  down in life when they see a drawing.  They just don't.  It's

23  just not how human beings work.  And it doesn't matter that --

24  whether Reading thinks that or anybody else thinks that.  They

25  didn't prove otherwise.

 1          They didn't prove.  They didn't prove.

 2          They didn't explain these numbers or how they got there.

 3     You know, it's like -- they're just throwing up numbers on the

 4     screen like this is some kind of game show.  They asked

 5     Mr. Diaz on the stand, okay, they asked him to do this, like,

 6     three-question thing, like -- I asked him if he rehearsed it.

 7     I think he said yes.  I think he -- or he said words to the

 8     effect of yes.

 9          They would ask him and say, well, what did that make you

10     feel like, and he would throw out three words.  Right?

11          They then took those random three rehearsed words;

12     assigned to them a random number -- 6, 7, 9; then times them by

13     a hundred thousand; and then put them on a piece of paper; and

14     then put them on the screen.

15          That's the analysis.

16          That's not Dr. Reading's analysis.  Dr. Reading said what

17     he needed.  Okay?  Dr. Reading said that the therapy bills, his

18     three-months salary, right?  He has a list of things that we

19     talked about.  He and I went through that.  We didn't do the

20     calculation, but we went through that.  And then he had the bad

21     day or whatever you think that's appropriate.  That's 10 times

22     the salary for the bad day.  His yearly salary is $48,000.

23          **MR. ALEXANDER:**  Objection.  Relevance.  It's not in

24     evidence.

25          **MR. SPIRO:**  What's not a relevance?

1          **THE COURT:**  The salary is not in evidence.  It's

2    sustained as to that.

3          **MR. SPIRO:**  He testified $4,000 --

4          **MR. ALEXANDER:**  Objection.

5          **MR. SPIRO:**  $4,000 a week.

6          **THE COURT:**  I think not.

7          **MR. SPIRO:**  You have the hourly -- the hourly rate --

8    the rate that -- I believe it is in the record that he

9    testified to $4,000 a month, but I will move on.

10        You have his hourly rate.  You know approximately what he

11   made a year.  You know what approximately he made after that.

12        There is zero for future damages.  There is zero for

13   future damages because Reading told you that if you know that

14   there's no job, there's no -- nothing future there.

15        So again, the one year's salary is just some extreme

16   number that I'm showing you.  That's not a number I'm

17   suggesting; that's an extreme number; right?  Something

18   horrible happens at work, you're out of work for a year.  Like,

19   a huge extreme number.  Like if you fall off of something.  And

20   you know that's a horrific thing.

21        You know, at one point they asked him -- they did ask him

22   one question, which was, you know, what do you want the money

23   for?  He said to retire and fish.  So ten years of salary from

24   55 to 65, that's what they want?  At one point they wanted

25   that.

1    Today they want something different.  At the beginning of

2    the case, I heard millions, not hundreds of millions.  Now I

3    see this.

4    But don't compromise.  Don't compromise.  Whatever he

5    exactly is owed under the law, that's fine.  Exactly what --

6    they have to prove specifically what that damage is.

7    Right?  You know from the exhibits that he was making 16

8    and then $18 an hour, so you know what that one day would be.

9    You can do the math if you want to extrapolate it out.  But

10   it's, you know, that was a terrible thing that he saw, and I'm

11   not trying to diminish it, but at the same time, you know, he

12   talks about the Uber driver and gives you that analogy.  Yeah,

13   people get killed.  People get beaten.  People go to jail for

14   things they never did.  There has to be fairness for everybody.

15   Punitive damages have to do with the bad intent of the

16   company.  Hyper intent.  Oppressive intent.

17   You have to decide, what was this really?

18   Listen, every company has bad people who do bad things;

19   right?  There's bad teachers, and bad nurses, bad clergy.  All

20   professions.  All companies.  Someone in this case did a bad

21   thing.

22   Their expert told you that Tesla's policies were fine.  So

23   it's not like the C-suite management had something that had no

24   bad policies.  We just entered them into evidence.  The truth

25   is they tried.  You saw them trying.  Ms. Oppenheimer doesn't

 1   contest that they weren't trying.  Wayne Jackson, Ed Romero,

 2   Tom Kawasaki.  They didn't always do a great job, but you could

 3   tell that they were trying.  They weren't completely dismissive

 4   of all of these things and didn't care about these people.

 5        Tesla did some things to investigate and stop the conduct.

 6   Timbreza was written up for racial slurs.  Diaz was satisfied.

 7   Wayne Jackson and Tom Kawasaki did review the surveillance

 8   video.  They talked to Owen Diaz and Mr. Foster.  There was no

 9   allegation that it was racial; right?

10        A company has to be on notice of things.  That's what that

11   means.  It doesn't mean that they don't know that there's

12   graffiti in the bathroom and people talk that way.  They have

13   to be on notice of specific things.

14        And one act alone is sufficient.  You don't need to find

15   all these other acts.  And so what they do is they go to this

16   Martinez, you know, acts for Tesla.  When he draws the drawing,

17   he acts for Tesla?  They emphasize this supervisor thing as if

18   he's like the head of the world.  I mean, Owen is Lamar's boss.

19   Lots of people have lots of bosses.  Okay?  Everybody's got a

20   boss' boss' boss.  These are not people in the C-suite.  It was

21   by no means perfect, this chain of command they had dealing

22   with overnight shifts and trying to investigate it and people

23   swinging out.  I'm not saying that.

24        But punishment has to be based on reason.  That's why the

25   instructions use the word "reasonable."

 1      What reason is there today for not having thrown Martinez

 2  out into the street?

 3      Companies should be treated like people.  People change.

 4  Companies grow up.  They have to prove we need to be punished.

 5  Every time somebody, you know, sees graffiti in the Tesla

 6  factory, they sue, and they repunish, they repunish.

 7      This case is about Owen Diaz.  The Court has told you that

 8  the punishment has to be about what happened to Owen Diaz.

 9  It's not about what happened to the son or Wheeler or Patterson

10  or Jackson.

11      Do they all get 150 million for seeing the drawing?  All

12  of them?  Everybody?

13      That's not justice.  That's not justice, if that's what

14  it's about.

15      If they had fired Martinez, then they wouldn't have to pay

16  the $150 million?  This company that wasn't even profitable?

17  This is their price tag for not firing Martinez?  So, and then

18  what is this?  It's 150, why not 250, why not 500.  That's my

19  point; it's not limited to anything.  They haven't shown you,

20  there's no evidence, they haven't proven anything to you, the

21  need, the anything.  It's only weighted to law.

22      You know, it concerns me a bit, the emotions of this case,

23  and that's why I asked you for that commitment to me in jury

24  selection because these are hard topics.  They are.

25      It's hard to hear that word.  It's hard to take a step

1   back and realize that as horrible as that word is, it is,

2   whether any of us like it or not, said casually sometimes.  I

3   didn't -- you know, Tesla didn't create the world.  Nobody here

4   did.  That's the world we live in.  And so what I'm concerned

5   about it is that the emotion of it drives it.  What can happen

6   is somebody says he should get $1.  And then somebody else

7   goes, I think $2.  And then the other people in the room look

8   at you and they think wow, this person is nicer than me.  They

9   just said $2; right?  And somebody goes $3.  And everybody

10  looks at that person and goes woah, this is an even nicer

11  person.  How about $70 million, trillion dollars.  Right?

12      So it can't be that runaway train.  Every dollar; right?

13  Every dollar like you would spend in your own life in your own

14  business.  From a cash register, every dollar there has to be a

15  reason for.  Reasonable.  There's 10,000 workers in this

16  factory with lots of turnovers.  How many people have worked

17  there in the last decade, do you approximate?  One should have

18  been fired who wasn't.  They should have done other things

19  right that they didn't.

20      50 percent of that guy's salary as a penalty would be very

21  severe for that one guy that they hired that they should have

22  fired, to throw Martinez out on the street; right?  So let's

23  say he makes approximately in the same ballpark; okay?  I don't

24  want to get waded into exacts here.  It's here 50 percent of

25  his salary.  Giving a person a 50 percent penalty for not

1    having terminated somebody when they should have?  You know,

2    this not firing Martinez is not some motive or ill design.

3    It's not ill will.  This company is -- you know, I think

4    they've said.  That it's this clean energy company and it's

5    liberal and, you know, the same people that want to hire people

6    from all walks of life, change the planet -- these aren't

7    death-by-execution kind of people.  They're just not.

8         The Ramon Martinez's don't get first chances in this

9    world.  Forget second.

10        And it creates this tension.

11        And you heard what Wheeler said.  Created a tension for

12   him, too.

13        And when you think about this number, you've got to

14   remember Mr. Diaz's line and that drawing and that e-mail.  He

15   was so surprised that this could happen here.  It's not what

16   you say about horrible companies.  It's not what you say.  You

17   say here we go again.  No surprise.  No surprise.  I see these

18   drawings every day.  No surprise.

19        It's not what he said.  Overall, you could tell he liked

20   it there.  You could see by the amount of e-mailing and the,

21   you know, the fiefdom that was his elevator, the elevator of

22   his job.

23        Right?

24        And he never says anything about the elevator of his life.

25   Never says it.

 1       You know, people show things.  People bleed.  People cry.

 2  People are people.  You can't bottle everything up.  They're

 3  going to say -- they're going to stand up and they say he

 4  bottled everything up.  He bottled everything up, and so that's

 5  why you didn't see it.  That's not what happens in life.  You

 6  can't bottle up avoidance.  You can't bottle up the elevator

 7  story about trying to stay out of the elevator.  Someone would

 8  have seen it.

 9       Right?

10       He understands this concept that you have to show -- you

11  have to show this fear, this staying away.  But his actions

12  don't show this fear, the media and all of this.

13       And he kind of messes it up.  He says, you know, it's this

14  fear of Tesla cars.  Right?  Driving around on the road, he

15  sees the Tesla cars.  That's what triggers him; right?  They

16  don't call any of these people.  Where's the wife?  The wife

17  could tell you better than anybody.  Was he really sleepless?

18  Was he not?  When did it change?  Where's the wife?  She can

19  tell you everything.

20       His best friend could tell you everything.  Here's a text;

21  I don't want to go to the ballgame today.  I mean, he's having

22  nightmares.  Panic attacks.  I don't want to go outside today.

23  I'm different.  I'm different.  He could have brought you his

24  wife of 30 years.

25       Didn't let Dr. Reading.

 1      Didn't let you.

 2      How could it happen here?  And you know, they're going to

 3  say accountability and shining a light and justice and all of

 4  these things, and they're going to come back to that in a

 5  minute.  They're going to come back to that in a minute.

 6      But let me tell you something:  The press tour, public

 7  trials, they're shining a light.  Okay?  Everybody knows what

 8  happens now inside that factory.  Inside the elevator at work

 9  and the elevator of his life, everybody knows now.

10      He wasn't actually meaningfully damaged.  And so they talk

11  about, you know, justice and this country and its tortured with

12  history of injustice, but the truth is what justice really is

13  is fairness.  It's that everybody that comes into this

14  courthouse is treated the same.  Fairness is the standard.

15  Ever steady, balls and strikes.

16      Somebody loses a finger; they don't get more than a person

17  losing an arm.  That's what fairness is.  That's what

18  apparently everybody here wants.

19      That's what justice is.  Justice is not lying to get an

20  advantage.  That harms justice.  That destroys justice.

21      So what we're asking is that you do this based on the

22  evidence.  That picture was wrong.  I can't take it back.  All

23  we can do now is give you the truth.  And you've given your

24  commitment to do what's right, and I know that you all will.

25      Thank you.

1     **THE COURT:**  Thank you, Mr. Spiro.

2         Mr. Alexander.

3                          **<u>REBUTTAL ARGUMENT</u>**

4     **MR. ALEXANDER:**  I have just a few minutes to speak

5     with you.  I'm going to go quickly and miss a few things.

6     **THE COURT:**  Do you want to take your mask off?  There

7     you go.

8     **MR. ALEXANDER:**  I don't want to be counted for that

9     time.

10    **THE COURT:**  You're not.

11    **MR. ALEXANDER:**  Thank you, Your Honor.

12        With regard to punitive damages, there was a statement we

13    must show malice for all intentional conduct.  Once again,

14    misdirection.  The judge read an instruction.  It has been

15    established that Mr. Diaz is entitled to punitive damages.  You

16    don't have to do anything further than determine the number.

17        With regard to the why.  The company has a billion dollars

18    in petty cash.  No one will lose a job.  No one -- nothing --

19    the company will not go out of business.  Nothing will happen.

20    It is what you do to chastise your child so they don't grow up

21    to be bad adults.  It's too late.  Tesla is an adult, petulant,

22    and you have to chastise it, and this is what we ask.  But you

23    can decide what number will get their attention.

24        Consistent with what you've heard throughout, Tesla is

25    constantly on the attack.  Zero responsibility.  Zero

 1   accountability.

 2        Everyone is at fault except for them.  Everyone is a liar.

 3   Owen Diaz is a liar.  He steals.  He is stealing the harm of

 4   other people.  It is a coverup, something, a word that we have

 5   not used.  Everyone is wrong.  Everyone is accountable except

 6   for Tesla and that is why we are here today.

 7        The comment that was made in opening is the same here.  He

 8   said, "Give him what he deserves.  Give Tesla what it

 9   deserves."

10        With regard to the plantation mentality, the 1964 -- the

11   Civil Rights Act has been in existence for 60 years since 1964.

12   There are rules in place.

13        They can make these wonderful cars that are futuristic

14   that will drive themselves and do all these wonderful things.

15   There is a blueprint for creating a workplace free of

16   discrimination, free of harassment, and they won't follow the

17   footprint -- the blueprint, and that is a conscious decision.

18        And that is why you must award punitive damages.  Because

19   if Tesla can avoid liability, avoid punitive damages, then

20   every company will hear that message.

21        And so the way that you do it is you set an example of the

22   company that is one of the richest in the world so that every

23   other company knows that they too can be held accountable.

24        On a basketball team, you punish the point guard because

25   if the other people know that the best player is going to be

1   punished, they know they will be punished.

2       I just have a few things to discuss with regard to the son

3   if we can put up the testimony.  There was testimony that was

4   shown to you that the son said.  There are two things I want to

5   point out.

6       One of them is he didn't say his parents' house; he said

7   his mother's house which is a divide that speaks volumes.  But

8   he also said "was."  He says, "I was close with my father."

9   Not I am.  I was.

10      The Defense did not hire an expert, and so they had to

11  suffer with Counsel substituting for Dr. Reading, and so he is

12  telling you how people should act.  But you know that when

13  people are subjected to trauma, they don't always react

14  logically.

15      In fact, the trauma is the reason why people can't be

16  expected to all perform according to the routine that someone

17  would want them to do.  That is completely illogical.

18      With regard to -- with regard to the argument that has

19  been made, it is jumbled.  It is disorganized.  It does not

20  seem to make sense, but I do not blame Defense Counsel for that

21  because there is no sense.  There is no logic to what Tesla

22  did.

23      They have to attack others because they cannot explain why

24  they did what they did, why they allowed this workplace to

25  exist.  How is it possible?  How is it possible to have a

1   workplace that is a plantation mentality in 2023 when there is
2   a -- when there is a blueprint --
3           **MR. SPIRO:**  Objection to that.
4           **THE COURT:**  Sustained.
5           **MR. ALEXANDER:**  I'm sorry.
6       How is it possible -- how is it possible that Tesla can
7   have a plantation mentality in 2015 when there is a blueprint
8   to create a workplace that is free of harassment and
9   discrimination?
10      Your job as jurors, your job is to do justice.  And in
11  terms -- there is an instruction -- you determine the amount of
12  damages.  I have made a suggestion and I hope that you will
13  follow that suggestion and that suggestion is conservative
14  because no Black man in 2015 should ever be subjected to the
15  circumstances of this plantation mentality workplace.
16      You, all of you, with your life's experience have
17  experienced things that give you -- that contribute to your
18  ability to determine what the value of the harm is that Owen
19  Diaz suffered.
20      You don't lose your life's experience when you come into
21  the jury box.  Your life experience is the reason that you are
22  in the jury box.
23      You are Mr. Diaz's peers.  You are his community.  You
24  represent all of us; all of us out here in the gallery; all of
25  us on the street; people at work, people at home.

1    You are the representatives of community, and it's your

2    job as representatives of the community to do justice and

3    justice is not cheap.

4    When people drag us back to -- back -- back to when

5    prejudice was just a daily ritual in life that people have to

6    go through, that is wrong.

7    The reason why laws were put in place to make the

8    workplace free of harassment is so that it would not happen --

9    so that cases like this would not happen.

10   And so if it is still happening here in the bastion of

11   liberalness, here in San Francisco, and you do not do anything

12   about it, it will send a message to the other companies that

13   they too can be like Tesla.

14   Whatever determination you make as to the past and future

15   emotional distress damages, I will shake your hand, I will

16   thank you for your service because we rely on you.  We trust

17   you to the right thing.

18   This is your day.  Bend the arc of justice.  Thank you.

19                    **FINAL JURY INSTRUCTIONS**

20        **THE COURT:**  Thank you, Mr. Alexander.

21   So, ladies and gentlemen, that concludes everything

22   that -- that you will hear in this case and now it's going to

23   be time for your deliberations.  Let me give you just a couple

24   of final instructions.

25   Before you begin your deliberations, elect one member of

**FINAL JURY INSTRUCTIONS**

1  the jury as your presiding juror.  The presiding juror will

2  preside over the deliberations and serve as the spokesperson

3  for the jury in court.

4      You shall diligently strive to reach agreement with all of

5  the other jurors if you can do so.  Your verdict must be

6  unanimous.

7      Each of you must decide the case for yourself, but you

8  should do so only after you have considered all of the

9  evidence, discussed it fully with the other jurors, and

10  listened to their views.

11      It's important that you attempt to reach a unanimous

12  verdict but, of course, only if each of you can do so after

13  having made your own conscientious decision.

14      Do not be unwilling to change your opinion if the

15  discussion persuades you that you should, but do not come to a

16  decision simply because other jurors think it's right or change

17  an honest believe about the weight and effect of the evidence

18  simply to reach a verdict.

19      Those exhibits received in evidence that are capable of

20  being displayed electronically will be provided to you in that

21  form and you will be able to view them in the jury room.

22      A computer will be available to you in the jury room.  The

23  courtroom deputy will show you how to operate the computer and

24  how to locate and view the exhibits on the computer.

25      You will also be provided with a paper list of all

1  exhibits received in evidence.

2      You may request a paper copy of any exhibit received in

3  evidence by sending a note through the clerk.

4      If you need additional equipment or supplies or if you

5  have questions about how to operate the computer, you may send

6  a note to the clerk signed by your foreperson or by one or more

7  members of the jury.

8      Do not refer to or discuss any exhibit that you were

9  attempting to view.

10     If a technical problem or question requires hands-on

11 maintenance or instruction, a court technician may enter the

12 jury room with the clerk present for the sole purpose of

13 assuring that the only matter that's discussed is the technical

14 problem.  When the court technician or non-juror is in the jury

15 room, the jury shall not deliberate.

16     No juror may say anything to the court technician or any

17 non-juror other than to describe the technical problem or to

18 seek information about the operation of the equipment.

19     Do not discuss any exhibit or any aspect of the case while

20 those people are in the room.

21     The sole purpose of providing the computer in the jury

22 room is to enable jurors to view the exhibits received in

23 evidence in this case.

24     You may not use the computer for any other purpose.  At my

25 direction technicians have taken steps to ensure that the

1    computer does not permit access to the internet or to any

2    outside website, database, directory, game, or other material.

3        Do not attempt to alter the computer to obtain access to

4    such materials.  If you discover that the computer provides or

5    allows access to such materials, you must inform the Court

6    immediately and refrain from viewing such materials.

7        Do not remove the computer or any electronic data or disk

8    from the jury room and do not copy any such data.

9        Because you must base your verdict only on the evidence

10   received in the case and on these instructions -- I will just

11   remind you of that first sentence again -- because you must

12   base your verdict only on the evidence received in the case and

13   on these instructions, I remind you that you must not be

14   exposed to any other information about the case or to the

15   issues it involves except for discussing the case with your

16   fellow jurors during your deliberations.

17       Do not communicate with anyone in any way and do not let

18   anyone else communicate with you in any way about the merits of

19   the case or anything to do with it.

20       This includes discussing the case in person, in writing,

21   by phone, tablet, computer, or any other means, via e-mail, via

22   text messaging or any internet chatroom, blog, website, or

23   application including but not limited to Facebook, You Tube,

24   Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other

25   forms of social media.

1    This applies to communicating with your family members,

2 your employer, the media or press and the people involved in

3 the trial.

4    If you are asked or approached in any way about your jury

5 service or anything about this case, you must respond that you

6 have been ordered not to discuss the matter and to report the

7 contact to the Court.

8    Do not read, watch or listen to any news or media accounts

9 or commentary about the case or anything to do with it.

10   Do not do any research such as consulting dictionaries,

11 searching the internet, or using other reference materials.

12   And do not make any investigation or in any other way try

13 to learn about the case on your own.  Do not visit or view any

14 place discussed in this case and do not use internet programs

15 or other devices to search for or view any place discussed

16 during the trial.

17   Also, do not do any research about this case, the law or

18 people involved, including the parties, the witnesses or

19 lawyers, until you have been excused as jurors.

20   If you happen to read or hear anything touching on this

21 case in the media, turn away and report it to me as soon as

22 possible.

23   These rules protect each party's right to have this case

24 decided only on the evidence that has been presented here in

25 court.

 1       Witnesses here in court take an oath to tell the truth,

 2  and the accuracy of their testimony is tested through the trial

 3  process.

 4       If you do any research or investigation outside the

 5  courtroom or gain any information through improper

 6  communication, then your verdict may be influenced by

 7  inaccurate, incomplete or misleading information that has not

 8  been tested by the trial process.

 9       Each of the parties is entitled to a fair trial by an

10  impartial jury; and if you decide the case based on information

11  not presented in court, you will have denied the parties a fair

12  trial.

13       Remember, you have taken an oath to follow the rules, and

14  it's very important that you follow these rules.

15       A juror who violates these restrictions jeopardizes the

16  fairness of the proceedings and a mistrial could result that

17  would require the entire trial process to start over.

18       If any juror is exposed to any outside information, please

19  notify the Court as soon as possible.

20       If it becomes necessary during your deliberations to

21  communicate with me, you may send a note through the deputy

22  signed by your presiding juror or by one or more members of the

23  jury.

24       No member of the jury should ever attempt to communicate

25  with me except by a signed writing.  I will communicate with

1   any member of the jury on anything concerning the case only in

2   writing or here in open court.

3        If you send out a question, I will consult with the

4   parties before answering it, which may take some time.  You may

5   continue your deliberations while waiting for the answer to any

6   question.

7        Remember, that you are not to tell anyone, including me,

8   how the jury stands, numerically or otherwise, until after you

9   have received a unanimous verdict or have been discharged.  Do

10  not disclose any vote count in any note to the Court.

11       A verdict form has been prepared for you.  I showed that

12  to you earlier.  After you have reached unanimous agreement on

13  a verdict, your foreperson should complete the verdict form

14  according to your deliberations, sign and date it, and advise

15  clerk that you are ready to return to the courtroom.

16       So those are your instructions.  Ms. Davis is going to

17  lead you into the jury room and you can finally begin to

18  discuss this case.

19    (At 3:17 p.m., the jury retired to commence deliberations.)

20       (Proceedings were heard outside the presence of the jury:)

21       **THE COURT:**  All right.  Please be seated everybody.

22  So, we will find out at some point how long they intend to

23  deliberate today.

24       The -- the rule that I impose is that you need to be

25  within 15 minutes of the -- of the courtroom, so in case there

1   are notes or anything else.  So however you figure out how to

2   do that, make sure that Ms. Davis knows who to contact and how

3   to do that when she comes back.

4        The -- this morning I told you that I wasn't going to hear

5   argument with respect to the motion for a mistrial that the

6   Plaintiff's have filed, and I'm not going to deal with that

7   issue until -- I mean, this jury is going to make its

8   determination and the Defendants can reserve and deal with that

9   issue in writing at some point depending on how things go.

10           MR. SPIRO:  Thank you, Your Honor.

11           THE COURT:  All right.  And unless there is anything

12  else, I will retreat to my chambers, and Ms. Davis will be in

13  touch with you at some point about the jury and where they are.

14           MR. SPIRO:  Thank you.

15           MR. COLLIER:  I did have one question, Your Honor.

16           THE COURT:  Mr. Collier, what can I do for you?

17           MR. COLLIER:  How long are they permitted to

18  deliberate today?

19           THE COURT:  The -- they won't deliberate past

20  6:00 o'clock, and I think we will find out soon enough whether

21  how they want to deal with things.

22           MR. COLLIER:  Thank you.  That was it.

23           THE CLERK:  That's my first instruction to them is to

24  let me know what their stop time is.  I will let you know as

25  soon as I know.

PROCEEDINGS

1          MR. COLLIER:  Thank you.

2          THE COURT:  Thanks very much.  I want to make sure

3    that Ms. Davis has the stick with the information with the

4    exhibits on it and make sure that everybody knows what's on

5    that stick.  Thank you very much.

6               (Proceedings adjourned at 3:20 p.m.)

7                       ---oOo---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Friday, March 31, 2023

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25