LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
MARQUI HOOD (SBN 214718)
marqui@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:    (415)-453-7352
Facsimile:    (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
balexander@amfllp.com
**ALEXANDER MORRISON & FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:    (310) 394-0888
Facsimile:    (310) 394-0811

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
JONATHAN ROSENTHAL (SBN 329638)
jrosenthal@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:    (415) 421-7151
Facsimile:    (415) 362-8064

DUSTIN L. COLLIER (SBN 264766)
dcollier@collierlawsf.com
V. JOSHUA SOCKS (SBN 303443)
jsocks@collierlawsf.com
ELIZABETH R. MALAY (SBN 336745)
emalay@collierlawsf.com
DREW F. TETI (SBN 267641)
drew@collierlawsf.com
**COLLIER LAW FIRM, LLP**
240 Tamal Vista Blvd. Suite 100
Corte Madera, CA 94925
Telephone:   (415) 767-0047
Facsimile:     (415) 767-0037

Attorneys for Plaintiff OWEN DIAZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

OWEN DIAZ,

     Plaintiff,

     v.

TESLA, INC. dba TESLA MOTORS, INC.;

     Defendant.

Case No. 3:17-cv-06748-WHO

**PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL**

Hearing Date: July 19, 2023
Time: 2:00 p.m.
Place: Courtroom 2, 17th Floor
The Hon. William H. Orrick

**NOTICE OF MOTION**

On July 19, 2023, at 2:00 pm in Courtroom 2, 17th Floor, U.S. District Court for the Northern District of California, at 450 Golden Gate Avenue, San Francisco, before the Honorable William H. Orrick, Plaintiff shall, and hereby does, move for a mistrial and a new damages trial under Fed. R. Civ. P. 59. As a remedy, Plaintiff requests either a renewed choice between a new damages trial and the remittitur previously determined by the Court, or a new damages trial.

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

## <u>TABLE OF CONTENTS</u>

NOTICE OF MOTION .................................................................................................i

TABLE OF CONTENTS .............................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iv

I.     INTRODUCTION ...........................................................................................1

II.    LEGAL STANDARD .......................................................................................3

III.   ARGUMENT ...................................................................................................5

      A.   Tesla's counsel's repeated, egregious misconduct requires a new trial...........5

           1.   Tesla opened the trial with ad hominem attacks on Plaintiff's counsel. ....................................................................................6

           2.   Tesla deliberately and incurably misrepresented inadmissible evidence about the Michael Wheeler feces incident and committed serious discovery misconduct. ..............................................7

           3.   Tesla purposefully elicited prejudicial, inadmissible testimony about Plaintiff's prior monetary settlement with co-defendants...........12

           4.   Tesla falsely accused Plaintiff of sexual and racial harassment without any evidence, causing devastating prejudice. .........................13

           5.   Tesla painted Mr. Diaz as evasive by purposefully asking him questions about his criminal history that Tesla knew he was forbidden from answering...............................................17

           6.   Tesla's counsel baselessly accused Mr. Diaz of forging a doctor's note. ...................................................................18

           7.   Tesla insinuated that Demetric Di-az's claims were meritless. .....................................................................19

           8.   Tesla's closing argument improperly linked Mr. Diaz's entitlement to emotional distress damages with his salary— using evidence the Court had excluded. ...............................20

           9.   Tesla's closing argument grossly misstated the law the jury was instructed to apply.........................................................22

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

B.    The jury's damages award is inadequate and requires a retrial. ......................23

1.    The damages award fails to adequately compensate Mr. Diaz. ............23

A.    Retrial evidence .........................................................................24

B.    Comparable cases.......................................................................30

2.    The punitive damages award fails to adequately punish or
deter Tesla. ...........................................................................................33

IV.    CONCLUSION.........................................................................................................35

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anheuser-Busch, Inc. v. Nat. Bev. Distributors*,
69 F.3d 337 (9th Cir. 1995) ........ *passim*

*B.K.B. v. Maui Police Dep't*,
276 F.3d 1091 (9th Cir. 2002) ........ 5, 16

*Bird v. Glacier Elec. Coop., Inc.*,
255 F.3d 1136 (9th Cir. 2001) ........ 4

*Cal. Sansome Co. v. U.S. Gypsum*,
55 F.3d 1402 (9th Cir. 1995) ........ 11

*Call Delivery Sys., LLC v. Morgan*,
2022 WL 18143363 (C.D. Cal. Sept. 20, 2022) ........ 4, 6, 16, 23

*Clanahan v. McFarland Unified Sch. Dist.*,
2007 WL 2253597 (E.D. Cal. Aug. 3, 2007) ........ 5, 7, 17

*Cones v. Cnty. of L.A.*,
2016 WL 7438817 (C.D. Cal. Sept. 28, 2016) ........ 6, 9, 16, 23

*Dickson v. Sullivan*,
849 F.2d 403 (9th Cir. 1988) ........ 4

*Dietz v. Bouldin*,
579 U.S. 40 (2016) ........ 3

*Draper v. Airco, Inc.*,
580 F.2d 91 (3d Cir. 1978) ........ 21, 22

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
762 F.3d 829 (9th Cir. 2014) ........ 24

*Fineman v. Armstrong World Indus., Inc.*,
980 F.2d 171 (3d Cir. 1992) ........ 4, 5, 7, 17

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) ........ 4

*Janich Bros. v. Am. Distilling Co.*,
570 F.2d 848 (9th Cir. 1977) ........ 22

*Jones v. Aero/Chem Corp.*,
921 F.2d 875 (9th Cir. 1990) ........ 11

*Landes Const. Co. v. Royal Bank of Canada*,
   833 F.2d 1365 (9th Cir. 1987) ........................................................................ 5, 24

*Lasar v. Ford Motor Co.*,
   399 F.3d 1101 (9th Cir. 2005) .......................................................................... 3, 9

*Link v. Wabash R. Co.*,
   370 U.S. 626 (1962) ............................................................................................. 3

*McDonough Power Equip., Inc. v. Greenwood*,
   464 U.S. 548 (1984) ............................................................................................. 6

*Minthorne v. Seeburg Corp.*,
   397 F.2d 237 (9th Cir. 1968) .............................................................................. 5

*Old Chief v. United States*,
   519 U.S. 172 (1997) ........................................................................................... 10

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014) ...................................................................... 24, 33

*Passantino v. Johnson & Johnson Consumer Prod., Inc.*,
   212 F.3d 493 (9th Cir. 2000) ....................................................................... 31, 32

*Pavemetrics Sys., Inc. v. Tetra Tech, Inc.*,
   2023 WL 1836331 (C.D. Cal. Jan. 23, 2023) ........................................... *passim*

*Ramos v. Cnty. of Suffolk*,
   707 F. Supp. 2d 421 (E.D.N.Y. 2010) ......................................................... 11, 18

*Searcy v. Jaimet*,
   332 F.3d 1081 (7th Cir. 2003) .......................................................................... 11

*Settlegoode v. Portland Pub. Sch.*,
   371 F.3d 503 (9th Cir. 2004) .............................................................................. 4

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) .................................................................... 3, 4, 35

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014).......................................................................... 31, 32

*United States v. Sanchez*,
   176 F.3d 1214 (9th Cir. 1999) ..................................................................... 10, 15

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)........................................................................................... 22

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

*Wilson v. NHB Indus., Inc.*,
   219 F. App'x 851 (11th Cir. 2007) ....................................................................... 23

**California Cases**

*Lane v. Hughes Aircraft Co.*,
   22 Cal. 4th 405 (2000) .......................................................................................... 24

*People v. Eli*,
   66 Cal. 2d 63 (1967) .............................................................................................. 15

**California Statutes**

Cal. Civ. Proc. Code § 657 ...................................................................................... 5, 24

**Rules**

Fed. R. Civ. P.
   Rule 59 ................................................................................................................ 3, 4

Fed. R. Evid.
   Rule 412 .............................................................................................................. 15, 16
   Rule 606 ................................................................................................................. 4

**Other Authorities**

Rutter Group Prac. Guide, Fed. Civ. Trials & Ev. Ch. 10-C ...................................... 15

Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2805 (3d ed.) ...................................... 3

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

I.   **INTRODUCTION**

After a jury awarded Owen Diaz $6.9 million in compensatory damages and $130 million in punitive damages, Tesla moved for a remittitur or a new damages trial. The Court ruled that $1.5 million in compensatory damages and $13.5 million in punitive damages were the maximum amounts supported by the evidence and remitted the damages awards to those amounts, conditioned on Plaintiff waiving his right to a jury verdict. Plaintiff rejected the remittitur, the only way to preserve his Seventh Amendment and appellate rights, and the Court granted Tesla's request for a new trial. When Plaintiff rejected the remittitur, though, he understood that his choice was between the remitted amounts and a *fair* retrial on damages, one not plagued by attorney misconduct and disregard for the Court's pre-trial (and mid-trial) orders.

Mr. Diaz did not receive the fair retrial to which he was entitled. Even though the Court had consistently ruled Tesla could only present facts and arguments that the first jury considered, Tesla made the strategic call that the benefits of asking its plainly improper, beyond-the-scope, bombshell questions were worth risking the Court's ire and a few cautionary instructions. In addition to violating the Court's *in limine* rulings, Tesla deliberately made highly damaging assertions about Plaintiff and his witnesses that it knew had no support in the record. From its counsel's opening statement to its closing argument, and especially in examining Plaintiff's key witnesses—two Black men who testified with great vulnerability about the abuse they suffered—Tesla repeatedly broke the rules, knowing that curative instructions could never unring the bell.

For example, Tesla's counsel Alex Spiro attacked witness Michael Wheeler by accusing him of having lied about the critical feces incident and waving around—but not showing the jury—supposed documentary "proof" of that lie. That document (not introduced in the first trial) was an email chain that turned out to *support* Mr. Wheeler's testimony, proving only that Tesla had committed gross discovery misconduct by hiding it from Plaintiff throughout discovery.

Tesla's counsel falsely impugned Mr. Diaz's character, telling the jury, without any evidentiary basis in the trial or discovery records, that Mr. Diaz was a racist and misogynist who hurled ethnic slurs against "dumb Mexicans" and sexually harassed multiple women. Tesla's counsel also told the jury that Mr. Diaz had already settled his claims against Tesla's co-defendants, implying that he had already received full compensation; made ad hominem attacks

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

against Plaintiff's counsel, accusing them of being phony civil rights lawyers; deliberately asked questions related to Mr. Diaz's criminal history that counsel knew he was forbidden to answer, forcing him to appear defensive and evasive in the jury's eyes; and told the jury that the racial harassment claims of Mr. Diaz's son had been dismissed—implying they were meritless.

In closing argument, Tesla's counsel argued—in direct contradiction to the Court's ruling just a few hours before—that Mr. Diaz could recover damages only for incidents involving race, not violence. Tesla's counsel then told the jury to calculate Mr. Diaz's emotional distress damages using information about Mr. Diaz's salary that was *not in evidence* (because the Court had ruled the previous day that his income was irrelevant to the issue of damages).

The list goes on. Each incident of misconduct damaged the integrity of the trial, and their cumulative impact on the jury was monumentally prejudicial to Plaintiff. The Court was forced to repeatedly issue curative instructions to counteract Tesla's behavior, but those instructions (while proper) necessarily highlighted Tesla's poisonous messaging. There was no meaningful way to wipe Tesla's improper accusations and suggestions from the jury's consciousness.

Tesla's misconduct unquestionably had an impact. There is no other explanation for the extraordinary gap between the first and second jury's damages verdicts, especially given the Court's efforts to tightly limit the witnesses, exhibits, and permissible questioning to what the first jury heard. While Tesla kept diverting the jury's attention to inadmissible evidence or irrelevant issues, the most crucial evidence at trial remained undisputed. Tesla's witness Ed Romero *admitted* that Mr. Diaz had made multiple complaints about the n-word. Tesla's counsel *conceded* that Judy Timbreza had hurled racial slurs at Mr. Diaz, that Ramon Martinez had attacked Mr. Diaz in the elevator, and that Mr. Martinez had drawn a racist pickaninny where Mr. Diaz would inevitably see it. It was undisputed that Mr. Diaz heard his son being called the n-word; that Mr. Wheeler sat in feces on his cart and believed the incident was racist, but Tesla never investigated the incident; and that the n-word was rampant at Tesla's factory. Numerous witnesses testified to Mr. Diaz's severe emotional distress without impeachment, and Tesla did not even try to impeach most of his damages allegations.

The impact of Tesla's misconduct on the jury's award is clear, as the second jury awarded just a tiny fraction of what the first jury found appropriate on virtually the same

1    *admissible* facts. That award is wildly out of line with the admissible evidence and what this

2    Court previously found to be the most comparable damages awards.

3          Owen Diaz is entitled to the fair retrial on compensatory and punitive damages that the

4    Court previously ordered, and that Mr. Diaz accepted in lieu of the remittitur. Plaintiff is fully

5    prepared to try damages a third time. Nonetheless, he recognizes that another trial would impose

6    significant burdens on the Court, on the parties, and especially on the Black fact witnesses who

7    were ruthlessly attacked by Tesla's counsel. A district court has broad equitable discretion

8    pursuant to its "inherent powers" to manage litigation in a manner that will ensure its just and

9    efficient resolution. *See Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). Assuming the Court agrees that

10   Tesla's misconduct requires a new trial, Plaintiff proposes that the most equitable way for the

11   Court to remedy that misconduct, consistent with the Seventh Amendment, would be for the

12   Court to offer Plaintiff a renewed choice between a new damages retrial or the same remittitur it

13   offered after the first trial, because Mr. Diaz rejected that remittitur in a good faith belief that he

14   would receive a fair retrial, and because Tesla is entirely to blame for depriving Mr. Diaz of the

15   fair retrial the Court previously offered.

16   **II.    LEGAL STANDARD**

17         A district court's power to declare a mistrial is "governed not by rule or statute but by the

18   control necessarily vested in courts to manage their own affairs so as to achieve the orderly and

19   expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630 (1962). Attorney

20   misconduct and violation of *in limine* motions are grounds for mistrial. *See, e.g.*, *Lasar v. Ford*

21   *Motor Co.*, 399 F.3d 1101, 1115 n.13 (9th Cir. 2005).

22         Rule 59(a)(1) authorizes courts to grant a new trial on "all or some of the issues … for

23   any reason for which a new trial has heretofore been granted in an action at law in federal court."

24   *See also* Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2805 (3d ed.) ("The court has the power

25   and duty to order a new trial whenever, in its judgment, this action is required in order to prevent

26   injustice."). The court may grant a new trial on a party's motion or "on its own … for any reason

27   that would justify granting one on a party's motion," including "for a reason not stated in [a

28   party's] motion." Fed. R. Civ. P. 59(d). A new trial may be ordered "even if substantial evidence

     supports the jury's verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

814, 819 (9th Cir. 2001). The question is not whether substantial evidence exists, but whether "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or [whether a new trial is required] to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Id.*

Attorney misconduct is grounds for a new trial where "the flavor of misconduct ... sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Anheuser-Busch, Inc. v. Nat. Bev. Distributors*, 69 F.3d 337, 346 (9th Cir. 1995); *see also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 (3d Cir. 1992) (new trial required where "improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements."). Because juror testimony as to the impact of misconduct on the jury's deliberations is inadmissible, *see* Fed. R. Evid. 606(b), "the question of prejudice is an objective, rather than a subjective, one" for the court to decide, *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988). To determine whether misconduct was prejudicial, courts consider "the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002).

Although parties are generally expected to make contemporaneous objections, "[c]onstant objections are certainly not required, as they could antagonize the jury." *Anheuser-Busch, Inc.*, 69 F.3d at 346 (quoting *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1984)). Even absent an objection, courts review attorney misconduct for plain error. *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 517 (9th Cir. 2004); *Call Delivery Sys., LLC v. Morgan*, 2022 WL 18143363, at *3 (C.D. Cal. Sept. 20, 2022) ("court[s] should conduct a plain error review regardless of whether a party made contemporaneous objections to counsel's misconduct"). Plain error exists when an error is "plain or obvious," the error is "prejudicial or affect[s] substantial rights," and review is "necessary to prevent a miscarriage of justice." *Settlegood*, 371 F.3d at 517; *see* Fed. R. Civ. P. 59(d). Moving for mistrial also preserves any objections. *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001) (plain error review applies "absent a contemporaneous objection or [pre-verdict] motion for a new trial").

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

An inadequate damages award is also grounds for a new trial. In assessing the damages award, "the trial judge 'is not limited to questions of law' but may 'grant a new trial when he is of the opinion the verdict is against the weight of evidence.'" *Minthorne v. Seeburg Corp.*, 397 F.2d 237, 244 (9th Cir. 1968); *see also* Cal. Civ. Proc. Code § 657(5) (authorizing new trial for inadequate damages). The district judge "can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

## III.   ARGUMENT

Plaintiff is entitled to either a mistrial or a new damages trial due to Tesla's counsel's misconduct, which severely prejudiced Plaintiff. In the alternative, Plaintiff seeks a new damages trial based on the jury's legally inadequate compensatory and punitive damages awards. As a remedy, Plaintiff requests either a renewed choice between a new trial and the remittitur previously determined by the Court prior to Tesla's misconduct, or a new damages trial.

### A.   Tesla's counsel's repeated, egregious misconduct requires a new trial.

Throughout the trial, Tesla's counsel flouted the Court's orders and committed deliberate, severe misconduct designed to gain unfair and improper advantage. Those sharp tactics, seemingly part of a pre-planned pattern of wrongdoing designed to demean, provoke, and trigger Plaintiff and to prejudice the jury, require a new damages trial. *See Fineman*, 980 F.2d at 207 ("Often … a combination of improper remarks … persuade us of prejudicial impact."); *Clanahan v. McFarland Unified Sch. Dist.*, 2007 WL 2253597, at *5 (E.D. Cal. Aug. 3, 2007) ("Repeated improprieties by one counsel severely prejudice his adversary."); *Pavemetrics Sys., Inc. v. Tetra Tech, Inc.*, 2023 WL 1836331, at *5 (C.D. Cal. Jan. 23, 2023) ("[T]he cumulative effect of … counsel's improper statements warrants a new trial.").

While the Court was repeatedly forced to give curative instructions, those instructions could not overcome the prejudice caused by Tesla's false assertions of fact and refusal to comply with the Court's carefully delineated retrial boundaries. *See, e.g.*, *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1105–06 (9th Cir. 2002) ("[N]o matter what the instruction, it was impossible to dispel the effect of [the] lurid and prejudicial testimony."); *Pavemetrics Sys., Inc.*, 2023 WL 1836331, at *5 ("[E]ven frequent curative instructions may be insufficient to immunize the jury

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

1     from the improper and inflammatory remarks."); *Cones v. Cnty. of L.A.*, 2016 WL 7438817, at

2     *9 (C.D. Cal. Sept. 28, 2016) ("Because defense counsel continued his conduct undeterred

3     despite multiple admonitions from the Court, this factor too counsels in favor of a new trial.").

4         While Mr. Diaz is not entitled to a perfect trial, he is entitled to a fair one. *McDonough*

5     *Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984). Despite the Court's considerable

6     efforts, Tesla's misconduct deprived Mr. Diaz of a fair trial and entitles him to a new trial.

7         **1.   <u>Tesla opened the trial with ad hominem attacks on Plaintiff's counsel.</u>**

8         Tesla improperly sought to prejudice the jury against Plaintiff and his lawyers from the

9     start. In his opening statement, Mr. Spiro put up a slide with the names and law firms of

10    Plaintiff's trial counsel, saying, "You know, I just want to tell you, though, these names these are

11    not – this is not a civil rights – these are not civil rights social action lawyers." Tr. 1:248:3-6. The

12    Court immediately interjected, "That's too far, Mr. Spiro." Tr. 1:248:7.

13        Plaintiff had previously asked the Court to warn Tesla against this type of ad hominem

14    slander. After learning that "attack the lawyers" was one of Mr. Spiro's common trial strategies,

15    Plaintiff moved for an *in limine* order precluding Tesla from disparaging Mr. Diaz's counsel.

16    Dkt. 382 at 13-14. The Court denied the motion but stated, "I caution Tesla that it may not

17    improperly imply that Diaz's counsel somehow affected the liability finding." Dkt. 417 at 6.

18        Although at trial the Court appropriately directed counsel to "go to what this case is

19    actually about," and not "talk[] in a pejorative way about people … in this courtroom," that

20    directive did not cure the resulting *intended* prejudice. Tr. 1:248:7-10. From the get-go, Tesla's

21    comment planted the false and improper idea in the jurors' minds that this case is about money-

22    grubbing plaintiffs' lawyers, not Mr. Diaz's civil rights.[1]

23        Ad hominem statements about opposing counsel are often grounds for a new trial. *See,*

24    *e.g.*, *Call Delivery Sys.*, 2022 WL 18143363, at *3 ("Defense Counsel's statements about …

25    Plaintiff's Counsel went beyond the fact and legal theories applicable to this case, and thus

26

27        _____

28        [1] Despite the Court's admonition, Tesla invoked this theme repeatedly throughout trial, for instance by asking expert Amy Oppenheimer, over Plaintiff's sustained objection, whether she was "aware that [Larry Organ] has more cases pending for harassment against Tesla, and that would be work that could come to you," Tr. 3.512:11-13, and by repeatedly bringing up a separate class action brought by Mr. Organ against Tesla, Tr. 2:373:6-18, 5:1103:16-21.

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

1  constitute plain error"); *Fineman*, 980 F.2d at 209 ("It has long been a rule of this court that

2  vituperative references to opposing counsel will not be tolerated."); *Clanahan*, 2007 WL

3  2253597, at *6 (noting counsel's "sneering, disparaging comments to and about … opposing

4  counsel"). Courts also grant new trials where a party "insinuated this was a trial about … greed

5  instead of [the plaintiff's claims]." *Pavemetrics Sys.*, 2023 WL 1836331, at *4. Here, there was

6  no *possible* appropriate justification for Tesla's disparagement of counsel—only bald

7  misbehavior designed to prejudice the jurors against Plaintiff.

8        **2.   Tesla deliberately and incurably misrepresented inadmissible evidence about the
         Michael Wheeler feces incident and committed serious discovery misconduct.**

9

10       Tesla's cross-examination of Michael Wheeler centered on egregiously improper

11  questions about the feces incident, which violated this Court's *in limine* rulings, rested on

12  blatantly false factual premises, and significantly but unfairly compromised Mr. Wheeler's

13  credibility. Tesla compounded the harm by insisting, in the jury's presence, that the Court should

14  admit a previously undisclosed exhibit that Tesla falsely represented would fully support that

15  improper line of questioning. All the exhibit *actually* showed was that Tesla had committed

16  gross discovery misconduct, because the exhibit entirely confirmed Mr. Wheeler's testimony and

17  proved that Tesla took steps to cover up rather than remediate his harassment.

18       On direct examination, Mr. Wheeler, a Black former Tesla supervisor, testified that

19  someone put feces on the golf cart he used at work, that he reported the incident to Tesla

20  management, and that to his knowledge, Tesla never investigated or imposed any discipline. Tr.

21  2:348:6–351:6. On cross-examination, the following exchange occurred:

22       Q. And you've told this jury about how your phone was confiscated with the -- with the
         picture [of the feces] on it; right?

23       A. Yes.
         Q. How nobody conducted any interviews; right?

24       A. Correct.
         Q. How nobody did any training; right?

25       A. Correct.
         Q. And how nobody seemed upset at all; right?

26       A. Right.

27       Q. **And the reason for that, as you know, sir, is because this was somebody that got
         sick and had an accident and they told you that in an e-mail, sir, and this wasn't
         racial at all; isn't that true, sir?**

28           MR. COLLIER: Objection. Outside the scope of the prior proceeding.
             THE WITNESS: Not true.

MR. COLLIER: And also argumentative and speculative.

THE COURT: Overruled. You can answer to the extent that you know.

BY MR. SPIRO:

Q. **Isn't it true, sir, that they e-mailed you and told you that somebody got sick and they needed to race that person to get them some help because they were -- had the stomach flu and they used your car, and that's why there was some substance on the car; isn't that true, sir?**

THE WITNESS: That would be false.

MR. COLLIER: Same objections, and also hearsay.

THE COURT: Overruled. You can answer.

THE WITNESS: The reason why that would be false is because it was on the driver's seat and if the individual was sick, why would the poop be on my side of the seat?

BY MR. SPIRO:

Q. I'm asking a slightly different question. Then we can get into that. **Isn't it true that they told you that in an e-mail?**

A. No.

Tr. 2:367:2–368:13 (emphasis added).

At that point, Tesla attempted to introduce "Exhibit 410" into evidence, but the Court sustained Plaintiff's objection that the exhibit had not been produced in discovery, introduced at the first trial, or identified to the Court and counsel before the retrial. Tr. 2:368:14-23. Tesla's counsel would not take "sustained" as an answer, asking a series of misleading "questions," over Plaintiff's objections, that essentially read the email (albeit inaccurately) into evidence. Tr. 2:368:14–371:9 ("[D]o you recall Victor Quintero's response to you at 7:41 a.m.?"; "[D]o you remember at 7:41 a.m. Mr. Quintero responding to your upset e-mail and telling you what happened?"; "Isn't it true that you had an e-mail from Victor Quintero telling you that they looked into it and somebody had gotten sick and … that the person was sick, and that that's the reason that there had been some feces on the cart?"). To drive home the impact of this questioning by ambush, Mr. Spiro asked Mr. Wheeler (over objection), "are you sticking with your account of this incident as being related to an intentional racial act, sir?" Tr. 2:371:2-6.

Tesla's conduct was improper for many reasons. First, the parties had litigated for *months* about the scope of retrial evidence, and the Court's rulings were clear. The Court expressly held that the parties were "preclude[d] from eliciting [witness] testimony that goes beyond the scope of testimony from the first trial." Dkt. 417 at 4-5; Hr'g Tr. (Jan. 17, 2023) at 11:8-14. The Court also held "[i]n general" that "new evidence, witnesses, and exhibits would be prohibited at the

second trial[.]" Dkt. 417 at 1. After losing its fight to exclude evidence of the feces incident from retrial (Dkt. 417 at 9:6-13), Tesla chose to flout the Court's orders. Mr. Spiro pretended to read a never-produced email about one of the most critical incidents in the case, thus giving the incident (as framed by his grossly misleading statements) an entirely different interpretation than the first jury considered. This stark violation of the Court's orders requires a new trial. *See Anheuser-Busch*, 69 F.3d at 347 (affirming new trial where "counsel repeatedly and impermissibly elicited testimony and made reference to matters previously ruled inadmissible with the sole purpose of bringing to the jury something it should not have heard"); *Lasar*, 399 F.3d at 1115 n.13 (affirming mistrial where counsel introduced evidence excluded by motions *in limine*); *Cones*, 2016 WL 7438817, at *8 ("Where attorneys have tried to get in the 'back-door' what they could not get into evidence, courts have protected … the opposing party by granting a new trial.").[2]

Tesla knew how significant Mr. Wheeler's testimony was to the first jury, as a Black supervisor who corroborated Mr. Diaz's testimony and suffered a particularly ugly racial hate incident; and before the trial Tesla repeatedly sought to exclude his testimony. Dkt. 381. The Court rejected those efforts. Dkt. 417 at 9. If Tesla had persuasive evidence that the feces incident was just a misunderstanding, Tesla could have presented that evidence during its pretrial briefing. Instead, knowing the Court would exclude its evidence, Tesla kept silent until it could ambush Mr. Wheeler before the jury by misrepresenting the contents of the exhibit.

Tesla's improper questioning of Mr. Wheeler also caused significant, incurable prejudice to Plaintiff because those questions grossly misrepresented the supposedly supporting evidence. Mr. Spiro hammered Mr. Wheeler to concede that, contrary to his prior testimony, he "knew" that "the reason" there was no investigation or discipline in response to the feces incident was

---

[2] Tesla's assertion that its false questioning of Mr. Wheeler and improper use of undisclosed emails was legitimate "impeachment" is preposterous. Tr. 2:368:19. The document was substantive evidence of a claimed "hate crime" by Plaintiff's coworker and should have been in produced in discovery, even if it had some impeachment value. Plus, while impeachment documents normally need not be disclosed in an exhibit list, here the parties understood that was not the rule for retrial—otherwise, documents precluded by pretrial rulings could be slipped in as "impeachment," completely undermining those rulings. Even for documents admitted in the first trial, Plaintiff took pains to identify those documents to the Court before the retrial if there was any doubt as to their admissibility. *See* Tr. 2:258:10-13. Moreover, Mr. Wheeler's testimony was no surprise, so Tesla knew well in advance how it would impeach him. Tr. 4:701:10-24.

because it was not a racial incident but rather "somebody that got sick and had an accident and they told you that in an e-mail," and thus "this wasn't racial at all; isn't that true, sir?" Tr. 2:367:11-14. Those questions asserted that Mr. Wheeler had been "told" that "they needed to race that person to get them some help because they … had the stomach flu" and "that's why" there was feces on the cart. Tr. 2:367:22–368:1; *see also* Tr. 2:370:10-17 ("they looked into it" and "somebody had gotten sick" and "that's the reason that there had been some feces"). In short, Mr. Spiro accused Mr. Wheeler of lying about being racially harassed. *See* Tr. 2:371:2-6.

Mr. Wheeler denied Mr. Spiro's assertions, and for good reason: they were utterly false. The document in question (Dkt. 440-1) contains an email from Victor Quintero responding to Mr. Wheeler's feces complaint less than an hour after Mr. Wheeler reported it. Mr. Quintero wrote that "there was a Flagship person who had the stomach flu last night and had to go home," that this person "*may* have been given a ride on the cart," and that "[w]e are investigating to confirm" and '*[i]f confirmed* this *may* not have been intentional[.]" (Emphasis added).

All that document shows is that Tesla sent a single, cursory email to Mr. Wheeler speculating that the feces in the cart may not have been a racist act, yet it apparently never conducted any investigation or followed up with Mr. Wheeler. Nothing in that email supports Mr. Spiro's assertions that any employee was "raced" anywhere, that anyone "looked into it," or that Mr. Wheeler "knew" that "the reason" for the feces was the purported sick employee, much less that "this wasn't racial at all." But the damage was done: the jury heard Mr. Spiro's confident accusations and likely assumed they were true, particularly because Plaintiff's counsel were forced to respond defensively, explaining in the jury's presence that the email should not be presented because it had not been previously disclosed—the proper response, but one many jurors would construe as Plaintiff using a technicality to prevent the jury from knowing the truth. *See Old Chief v. United States*, 519 U.S. 172, 189 (1997) ("[J]urors may well wonder what they are being kept from knowing. A party seemingly responsible for cloaking something has reason for apprehension."). Because Plaintiff's counsel had still not even seen the email, they had no meaningful opportunity to correct or cure Tesla's misrepresentations. This misconduct requires a new trial as well. *See United States v. Sanchez*, 176 F.3d 1214, 1223 (9th Cir. 1999) ("It is improper, under the guise of artful cross-examination, to tell the jury the substance of

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

1  inadmissible evidence."); *Searcy v. Jaimet*, 332 F.3d 1081, 1088 (7th Cir. 2003) ("[P]urely

2  conjectural or speculative cross-examination is neither reasonable nor appropriate."); *Ramos v.*

3  *Cnty. of Suffolk*, 707 F. Supp. 2d 421, 428 (E.D.N.Y. 2010) (party may not "directly impeach[]

4  the [witness's] credibility without any evidentiary basis" in the record).

5       The prejudice is clear and was deliberate. Tesla's counsel used these improper questions

6  to undermine the credibility of perhaps the most powerful corroborating witness to Mr. Diaz's

7  testimony about pervasive racial harassment at Tesla. The Court has already found that Mr.

8  Wheeler's testimony was important to establish the extent of Mr. Diaz's emotional harm

9  (including because Mr. Diaz knew about the feces incident) and the reprehensibility of Tesla's

10 conduct towards Mr. Diaz. Dkt. 417 at 9. Mr. Wheeler also testified about the pervasiveness of

11 the n-word at Tesla's factory, so Tesla's ugly attacks on his credibility—painting him as a person

12 who falsely cries wolf about racism—undermined that crucially important corroboration as well.

13      Tesla's failure to produce that email chain earlier is yet additional grounds for a new trial.

14 Tr. 4:701:10-24 (ruling Tesla should have disclosed those emails in discovery); *see Jones v.*

15 *Aero/Chem Corp.*, 921 F.2d 875, 879 (9th Cir. 1990) ("Failure to disclose or produce materials

16 requested in discovery can constitute 'misconduct'... The term can cover even accidental

17 omissions."); *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1405 (9th Cir. 1995) ("[F]ailure

18 to produce relevant documents in response to discovery requests" is grounds for new trial where

19 it "'substantially interfered' with the moving party's interest.").

20      Those emails would have been extremely useful for *Mr. Diaz's case* had they been

21 properly disclosed—because they show that Mr. Wheeler *was* credible and that Tesla did *not*

22 investigate a race-based hate incident. There are two emails in the chain below Mr. Quintero's.

23 The first, Mr. Wheeler's report of the feces incident, is tremendously important because it (1)

24 confirms he promptly reported the incident in writing, (2) confirms he timely asked Tesla to

25 consult the security cameras, and (3) shows he put Tesla on notice that in his view as a

26 supervisor and a Black victim, significant discipline of the perpetrator of what he characterized

27 as a "possible hate crime" was required. The second email is Mr. Wheeler's follow-up, which

28 *attaches pictures of the incident* (which Tesla tellingly did not produce to Plaintiff or the Court).

Needless to say, photographic evidence of this incident would have been extremely helpful to

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

Mr. Diaz (and would have shown where the feces was placed and that the cart was plugged in). The third email, Mr. Quintero's response, would also have been useful, as it shows that (1) Tesla received prompt written notification of the incident, which should have triggered an investigation; (2) Tesla promised to conduct that investigation, but apparently never did; and (3) Tesla's immediate response was to suggest a false and factually impossible explanation.[3]

Had Tesla properly produced this document, Plaintiff could have conducted full discovery into its sham explanation for the incident. Instead, Tesla unjustifiably withheld this critical document and then sprung it upon a key witness at a time and in a manner designed to cause maximum damage to Plaintiff's case. This was not accidental overreaching. It was deliberate misconduct that can be directly traced to Tesla's failed efforts to preclude Mr. Wheeler from testifying as he did at the first trial. Although the exhibit was not admitted, the damage done to Mr. Wheeler's credibility was irreversible. This alone is grounds for a new trial.

### 3. __Tesla purposefully elicited prejudicial, inadmissible testimony about Plaintiff's prior monetary settlement with co-defendants.__

Much of Tesla's misconduct took place in its cross-examination of Mr. Diaz. One of the most facially inappropriate and prejudicial acts of misconduct was the following exchange:

BY MR. SPIRO:
Q. And you -- you originally were looking at the interrogatories. **You know, you say you want accountability. You settled your claims with nextSource and Citistaff; correct?**
MR. ORGAN: Objection, Your Honor.
THE COURT: Sustained. Struck. Mr. Spiro --
MR. ORGAN: I move for sanctions, Your Honor.
THE COURT: Mr. Spiro, don't do that.

Tr. 4:814:18-25 (emphasis added).

This was rank misconduct. There is no universe in which Mr. Spiro, an experienced trial lawyer, thought that question permissible. His assertion masquerading as a question improperly and prejudicially informed the jury that Mr. Diaz had settled his claims with those parties. The

---

[3] Mr. Quintero's "sick employee" explanation could not have been true because Mr. Wheeler's complaint explained that the feces was placed on his cart "while it was charging" and was placed on the driver's side, where Mr. Wheeler would sit. If Mr. Quintero's speculative explanation were correct, the person who gave a sick employee a ride would have sat in the feces himself when driving the cart and then returned the cart to the charging station and plugged it in, without cleaning up the feces or alerting anyone to its presence.

assertion implies that (1) Mr. Diaz was already compensated for his injuries, so needs no further compensation; (2) Mr. Diaz's stated desire for "accountability" is insincere, because he was willing to settle with others; and (3) nextSource and Citistaff are more responsible for Mr. Diaz's harms than Tesla. None of this is proper or consistent with the boundaries the Court placed on the damages retrial. Moreover, Mr. Spiro also knew that these assertions would force Plaintiff's counsel to object, reinforcing Tesla's message that Plaintiff was hiding critical information from the jury to secure an undeserved damages award.

Mr. Spiro deepened the prejudice by concluding his cross of Mr. Diaz by asking (again over Plaintiff's objection) "how much money" Mr. Diaz needed to "fish and retire," and whether he wanted only "whatever amount you fairly deserve," not "more or less than somebody else." Tr. 4:815:2-19. These questions, immediately following Tesla's improper disclosure that Mr. Diaz had already settled his claims against the staffing agencies, reinforced the effect of that disclosure: to suggest, contrary to law, that Plaintiff had already been sufficiently compensated— i.e., got what he "deserved"—and was now trying to double-dip, to get "more … than somebody else." *See Anheuser-Busch*, 69 F.3d at 347 (new trial granted where counsel "impermissibly elicited testimony … with the sole purpose of bringing to the jury something it should not have heard") (quotation omitted); *Pavemetrics Sys.*, 2023 WL 1836331, at *4 (granting new trial where party "insinuated this was a trial about … greed instead of [the plaintiff's claims]").

### 4. Tesla falsely accused Plaintiff of sexual and racial harassment without any evidence, causing devastating prejudice.

Tesla posed a series of outrageously improper and prejudicial questions during its cross-examination of Mr. Diaz regarding his harassment by Ramon Martinez:

> Q. And when I was talking to you earlier about interpersonal difficulties that were going on leading up into this incident, there was a problem that you had with people in Mr. Martinez's group; correct?
> A. No, sir.
> Q. You went up to Joyce DelaGrande, a supervisor in that group, and **you said to her, "You date Black guys," in a sexually suggestive way to her**, did you not, sir?
> A. That is a lie, sir.
> Q. So if Ms. DelaGrande comes into this courtroom and says **you absolutely said that to her**, that would be a lie, sir?
> A. Yes, it would be, sir.
> Q. Okay. **And that's not it.** Hilda Navarro, who I think **the jury heard her name** when Mr. Martinez was testifying. **Just before this incident, you were yelling at her. You**

**were telling her who she was sleeping with at the factory, and you were commenting that she couldn't understand you because she was a dumb Mexican**, didn't you do that, sir?

Tr. 4:726:23–727:15. Once the Court dismissed the jury, Plaintiff's counsel vigorously objected, pointing out that several jurors had taken notes while Mr. Spiro was making those blockbuster accusations, and asked that the questions be stricken and a curative instruction be given—because nothing could be done to erase the accusations from the jurors' minds. Tr. 4:778:13-23.[4]

Tesla knew full well there was no evidence in the first trial or prior discovery about these alleged incidents. It also knew that accusing Mr. Diaz of racial prejudice and racial and sexual harassment with such colorful and memorable language would have a huge impact on the jury, not just on its Latina members. Tesla knew what it was doing was wrong. After all, Tesla itself had insisted that the Court preclude any testimony about any new incidents of racial harassment. *See, e.g.*, Dkt. 372 at 2, 14-15. Tesla also knew that its embedded accusations were completely irrelevant to the amount of emotional distress damages Mr. Diaz suffered, as the Court had itself ruled, Tr. 5:905:13-14 (finding the alleged incidents "clearly irrelevant")—although the jurors would likely not see it that way. The only purpose of those questions was to slander and upset Mr. Diaz to make him appear less deserving of compensation for his emotional distress.[5]

_____

[4] Strategically, Plaintiff's counsel were in a bind. Mr. Diaz denied the accusations and counsel did not want to draw further attention to them while again appearing to be hiding evidence from the jury. At the next recess, counsel made their record, pointing out that the questions were factually baseless, entirely beyond the scope of the first trial, and extraordinarily prejudicial. Plaintiff later filed a mistrial motion on this basis. *See* Dkt. 453 at 12-14.

[5] Tesla could not assert that Mr. Diaz's supposed harassment of Ms. DelaGrande pertained to accusations that she had harassed him, because he never made any such accusation. And no one other than Mr. Spiro ever mentioned Ms. Navarro. Tesla asserted its questions were justified by the testimony of Wayne Jackson and Ramon Martinez, but Jackson gave no testimony pertaining to DelaGrande or Navarro, and Martinez's only possible reference was his vague testimony about an unidentified co-worker who was upset because "she tried to use the elevator because Mr. Owen wasn't there … he arrived and he was really aggressive towards to her saying that she should not touch his elevator and she will remove her person out of the control panel." Tr. 3:579:21–580:6. Martinez did not identify Navarro as the co-worker and did not remotely suggest that Mr. Diaz had sexually or racially harassed her. Obviously, being told not to touch an elevator (potentially a proper safety communication) is not equivalent to publicly "telling her who she was sleeping with" or calling her a "dumb Mexican." Presumably, if Mr. Diaz *had* said those things, Ms. Navarro would have told Mr. Martinez, who would have told Tesla's counsel (he is still a Tesla employee), and Tesla would have sought to elicit that

Tesla's questions also grossly violated well-established rules by asserting facts for which there was no evidence in the record and for which Tesla knew no evidence could be introduced. *See Sanchez*, 176 F.3d at 1222, 1223; Rutter Group Prac. Guide, Fed. Civ. Trials & Ev. Ch. 10-C ("It is improper for a cross-examiner to ask a question that assumes as true a fact as to which *no evidence* has been introduced, or is likely to be introduced."). Worse still, counsel's questions not only assumed facts not in evidence, but assumed *shockingly prejudicial* facts that could have no other purpose or effect than provoking Mr. Diaz and making him seem less worthy of recovering damages. As this Court pointedly noted in a colloquy with Mr. Spiro, "the question is whether that question is -- you know, 'when did you stop beating your wife?' kind of a question." Tr. 5:928:12-14; *see People v. Eli*, 66 Cal. 2d 63, 79 (1967) ("Counsel must not be permitted … to ask groundless questions to waft an unwarranted innuendo into the jury box.").

When a plaintiff is seeking damages for racial harassment in the workplace, the insinuation that *the plaintiff himself* is a racist and a misogynist who contributed to the hostile work environment is even more damaging and prejudicial than if these accusations were made in a non-racial harassment case. *Cf.* Fed. R. Evid. 412(a) (forbidding evidence that a victim of sexual misconduct engaged in other sexual behavior or had sexual predispositions). As Plaintiff's counsel argued, Tesla's questions appeared "designed to subtly evoke some race-baiting, stereotype stuff that this is just a conflict between Latinos and African-Americans which undermines the racial harassment findings that have already been made in this case." Tr. 4:780:6-10. And because these allegations were totally new and not the subject of any prior discovery or trial preparation, Plaintiff was unprepared to rebut them. *See Anheuser-Busch*, 69 F.3d at 347.[6]

Tesla's improper, inflammatory questions require a new trial. *See id.* (new trial where

---

testimony on cross. But Tesla performed no cross at all—a strong indication that Martinez would *not* so testify, and that Mr. Spiro's "dumb Mexican" assertion wase invented from whole cloth.

[6] Despite the Court's rulings, Mr. Spiro continued in his closing argument to exploit the impression he had improperly created. Tr. 5:1086:21-23 ("We know the reason for the argument [between Martinez and Diaz] … insult leads to aggression. Insult leads to aggression."); Tr. 5:1087:20-24 ("Mr. Diaz is not trying to escalate this [because] … if this gets investigated a little more, okay, people are going to be asking questions about why Martinez was racing into the elevator."); Tr. 5:1103:22-23 (Mr. Diaz "[l]ies about why Martinez charged him.").

opposing party "made allegations that [plaintiff] engaged in sexist and racist behavior and mistreated and harassed her despite the fact that the district court had ruled that the evidence of business harassment … was irrelevant"); *Call Delivery Sys.*, 2022 WL 18143363, at *3 ("A new trial is warranted where an attorney's closing argument … attacked the [opposing party] … with broad racial statements and assertions of bias that 'were designed to raise prejudice and inflame the jury.'"); *Cones*, 2016 WL 7438817, at *8 (when counsel asserts "a fact apparently plucked out of thin air" that "left the jury with the unrebutted impression" that the plaintiff committed misconduct, "such inflammatory statements can provide a basis for a new trial").

Even if Tesla's damning assertions had been based in fact, their inherently prejudicial nature and utter lack of probative value would justify a new trial. In *B.K.B. v. Maui Police Department*, a police officer sued her employer for workplace sexual and racial harassment. 276 F.3d at 1098. At trial, the employer elicited testimony from a fellow officer that the plaintiff had sexually propositioned him and made explicit sexual comments. *Id.* The district court held that this testimony violated Fed. R. Evid. 412 and gave a lengthy curative instruction, but denied the plaintiff's motions for a mistrial and new trial. *Id.* The Ninth Circuit reversed, observing that the defendant "offered [the] testimony in order to impugn Plaintiff's moral character and presumably also to establish that sexual advances by [her supervisor] and sexual misconduct at the workplace were not unwelcome." *Id.* at 1105. The Court noted that "Plaintiff's alleged statements regarding her sexual habits were not probative as to the welcomeness of any harassing conduct by her coworkers," *id.*, and that any relevance was substantially outweighed by the prejudice to her, *id.* The Court concluded that the "curative instruction was neither as forceful nor as comprehensive as warranted under the circumstances," but "[f]urthermore, no matter what the instruction, it was impossible to dispel the effect of [the] lurid and prejudicial testimony." *Id.* at 1105-06.

Here, the Court recognized the impropriety of Tesla's questions. The Court instructed the jury not to consider Tesla's questions about Mr. Diaz's alleged comments on his co-workers' sex lives. Tr. 5:1018:20–1019:1. The Court later also gave a general admonition about questions involving racial slurs, without specifying the questioning at issue. Tr. 5:1036:7-17 ("[Q]uestions that were asked during this case from the lawyers are not evidence. I want to emphasize that in this case because the lawyers' questions in this case involved, among other things, racial slurs,

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

those questions are not evidence.").

The Court's instructions, while helpful, could not have cured the prejudice from Tesla's repeated efforts to poison the jury's perception of Mr. Diaz as a victim entitled to be compensated for his injuries. Given the explicit, unforgettable accusations, presented in a tone of utmost confidence that any denial by Mr. Diaz would be a lie, and magnified by Mr. Spiro's improper vouching that Ms. DelaGrande would "absolutely" confirm those accusations,[7] it would have been impossible for any juror not to seriously doubt Mr. Diaz's moral character and not to believe that Mr. Diaz contributed to the hostile work environment for which he claimed damages. That, and triggering Mr. Diaz, were the only conceivable purposes for those questions. Declaring a mistrial is the appropriate remedy when a party's wrongdoing poisons the jury's impartiality beyond the power of the Court to cure through instructions. *See Pavemetrics Sys.*, 2023 WL 1836331, at *5 ("[E]ven frequent curative instructions may be insufficient to immunize the jury from the improper and inflammatory remarks."); *Fineman*, 980 F.2d at 206 ("[T]he cautionary instructions given to the jury proved to be insufficient to immunize the jury from the improper and inflammatory remarks of … counsel."); *Clanahan*, 2007 WL 2253597, at *5 ("At times, attorney misconduct may be too prejudicial to be cured with instruction.").

**5.** **Tesla painted Mr. Diaz as evasive by purposefully asking him questions about his criminal history that Tesla knew he was forbidden from answering.**

Tesla's trial strategy was to attack Mr. Diaz's credibility and to elicit angry or defensive responses through every means possible, however improper. One particularly egregious example was Tesla's unrelenting cross-examination of Mr. Diaz regarding his job application.

In April 2020, pursuant to stipulation, the Court ruled that evidence of Mr. Diaz's past criminal convictions could not be introduced unless Plaintiff opened the door to that testimony. Dkt. 180. That is why the criminal history question on Mr. Diaz's job application (Exhibit 204) is redacted. In flagrant violation of the Court's order, Tesla asked Mr. Diaz on cross whether he had made misstatements in completing the redacted portion of the job application. Tr. 3:643:10-

---

[7] Tesla knew that Ms. Delagrande could not confirm that accusation, because she said nothing of the kind at the first trial but instead unequivocally testified that "[t]he only issues I had with Owen were based on his performance." Original Tr. 5:749:3-4.

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

24. This question forced Mr. Diaz to squirm and respond evasively—thus achieving the desired effect before the jury—because Mr. Diaz knew that if he divulged information about his criminal history, it could violate the parties' stipulation or open the door to Tesla introducing his criminal history (despite its irrelevance). Tr. 3:644:7-13. Mr. Diaz tried to respond by discussing his answers to other questions on the job application, but this response appeared evasive and would have aroused the jury's suspicion—precisely Tesla's strategy. Tesla could have had no legitimate reason to ask these questions, because the admission that Tesla sought to elicit—that Mr. Diaz had erred on his job application because he was "rushing" when completing it—would have had no possible relevance to Mr. Diaz's credibility or any other issue.

When the Court instructed Mr. Spiro to "ask another question," Mr. Spiro asked exactly the same question again. Tr. 3:644:16-21. Plaintiff's counsel objected that the questions were precluded by the Court's ruling and the Court again instructed Mr. Spiro to "move on." Tr. 3:644:23–645:4. Mr. Spiro protested, forcing the Court again to state: "Let's do this after 1:30," i.e., outside the jury's presence. Tr. 3:645:5-9. Undeterred, Mr. Spiro pressed on, continuing to ask Mr. Diaz about "mistakes" and "oversights" on his job application. Tr. 3:645:17-19. The next morning, when Tesla tried to justify its line of questioning, *see* Dkt. 453-2, the Court reiterated that the entire series of questions had been improper: "This -- what you're intending to ask goes directly to the issue that was excluded." Tr. 4:704:23-25. But the damage was done, reinforcing Tesla's efforts to depict Mr. Diaz as evasive and thus not credible.  And in spite of the Court's admonitions, Tesla again raised the supposed "inaccuracies" in Mr. Diaz's application in closing. Tr. 5:1081:9-11.

Tesla's repeated violations of the Court's pretrial rulings and its improper questioning significantly prejudiced Mr. Diaz. *See Ramos*, 707 F. Supp. 2d at 428 ("defendants may not urge the jury to disbelieve the plaintiff for *improper reasons*") (emphasis in original); *Anheuser-Busch*, 69 F.3d at 346 (new trial appropriate where party violated *in limine* rulings).

### 6.   Tesla's counsel baselessly accused Mr. Diaz of forging a doctor's note.

In yet another example of Tesla's strategy of baselessly smearing Mr. Diaz on impermissible topics that went beyond the scope of the first trial, Tesla's counsel accused Mr. Diaz of forging the doctor's note he submitted after his mother died. After pointing out that the

1   note was unsigned, Mr. Spiro asked, "And the truth is, this doctor's note that you passed to Tesla

2   is not signed by the doctor because you wrote it, and it's in your handwriting; isn't that true, sir?"

3   Tr. 4:798:24–799:1. Mr. Spiro then showed Mr. Diaz a document that *was* in Mr. Diaz's

4   handwriting for comparison, saying "Do you see how there's a slant at the top right portion of

5   the O?" Tr. 4:799:3-9. Plaintiff's counsel objected; the Court asked if Mr. Spiro was attempting

6   to certify Mr. Diaz as a handwriting expert; and Mr. Spiro asserted that he was showing Mr. Diaz

7   the document to "refresh his recollection that he wrote the doctor's note." Tr. 4:799:10-16.

8   Meanwhile, Mr. Diaz stated that "that's not my stuff. You can see the numbers are totally

9   different." Tr. 4:799:22-23. Although the Court properly cut off the inquiry, Mr. Spiro

10  nonetheless again stated (in front of the jury), "Well I can ask him if he passed a doctor's note

11  that was unsigned that he wrote, and I'll be stuck with the answer at least." Tr. 4:800:5-7.

12          The damage was done. Without any factual basis, Tesla's counsel confidently asserted

13  that Mr. Diaz was the type of person who wouldn't hesitate to forge a doctor's note on medical

14  office letterhead just after his mother's death. The Court offered another curative instruction the

15  next day, stating "[t]he jury shall disregard the questions and testimonies regarding the doctor's

16  note that was brought up yesterday. It's outside the scope and immaterial to damages. So when

17  you are deliberating, you should not consider those for any reason." Tr. 5:1019:6-9. But Mr. Diaz

18  still came across as a liar when ambushed by Mr. Spiro's improper attack; and the fact that the

19  questions were "outside the scope" and "immaterial to damages" could not have cured that

20  perception—especially in conjunction with Tesla's many other violations of this Court's orders.

21  *See Pavemetrics Sys.*, 2023 WL 1836331, at *5 ("The frequency of improper comments, and

22  corresponding objections and curative instructions, favors a new trial here.").

23          **7.   Tesla insinuated that Demetric Di-az's claims were meritless.**

24          Plaintiff's son Demetric Di-az is a former co-plaintiff whose claims were settled and

25  dismissed pursuant to stipulation. Dkt. 176. Tesla's racial harassment of Demetric was

26  nonetheless relevant because Mr. Diaz witnessed it and suffered profound emotional harm as a

27  result. Tesla's cross-examination of Mr. Diaz again misrepresented the evidence by embedding

28  inadmissible assertions in its questions that it knew would prejudice the jury.

        Tesla asked Mr. Diaz whether his son had also sued Tesla, an issue beyond the scope of

the first trial. Tr. 4:752:19-21. Plaintiff's counsel objected; Mr. Spiro represented that the question went to "motivation;" and the Court allowed the question. After Mr. Diaz answered affirmatively, Mr. Spiro stated: "And your son's case got dismissed; correct?" Again, Plaintiff's counsel objected. This time, the Court sustained the objection. Tr. 4:753:3-8.

The Court later instructed the jury to "disregard questions regarding the pretrial proceedings for Demetric Di-Az because those are irrelevant to the proceedings." Tr. 5:1019:3-5. But the jury had already heard that Demetric's case had been "dismissed," a misleading assertion that had nothing to do with Mr. Diaz's damages but suggested that a court had found the son's claims meritless—as the father's might be as well. *See Anheuser-Busch*, 69 F.3d at 347 (affirming new trial where "counsel repeatedly and impermissibly elicited testimony … with the sole purpose of bringing to the jury something it should not have heard").

**8.   Tesla's closing argument improperly linked Mr. Diaz's entitlement to emotional distress damages with his salary—using evidence the Court had excluded.**

From Tesla's opening statement through its closing argument, it sought to exploit Mr. Diaz's blue-collar job status to improperly limit his compensatory damages. In its opening statement, Tesla's counsel stated:

> Was Owen Diaz actually damaged by this in a way he can prove to get millions and millions of dollars? Not hurt, but real actual damage? **And so how this works is you look at categories. That's how damages work. Did he lose wages? Did he get a lower-paying job? Did his employment … prospects get diminished?**

Tr. 1:246:14–247:5 (emphasis added). These statements were improper because Mr. Diaz is not claiming economic damages of any kind and the absence of those damages is wholly irrelevant, as Plaintiff pointed out in an objection. Tr. 1:246:21.

Tesla's counsel returned to this theme by asking Mr. Diaz on cross whether he was paid more by AC Transit than he had been paid at Tesla—again, a prejudicial irrelevancy. Tr. 4:804:9-10. Counsel then went further by asking Mr. Diaz about his supposed $4,000 per month Tesla salary. Tr. 4:804:11-14. The Court sustained Plaintiff's objection, yet Mr. Spiro *repeated* the question. Tr. 4:804:21-23. Plaintiff again objected and moved to strike, and the Court asked to see the interrogatory on which the question was based. Tr. 4:804:24–805:2. The Court warned Mr. Spiro: "This case is about emotional distress damages. It is not about anything else for compensatory damages[.]" Tr. 4:805:6-8. The Court then reviewed the interrogatory and

sustained the objection, explaining that Mr. Diaz's wages at Tesla are "not related to emotional distress." Tr. 4:806:2-3. Thus, although the jury heard Mr. Spiro's assertion that Mr. Diaz earned $4,000 per month at Tesla, no actual evidence to that effect was ever introduced.

That did not stop Mr. Spiro from telling the jury in his closing argument that Plaintiff's "yearly salary is $48,000." Tr. 5:1115:22. Indeed, Tesla created an entire slide for the jury showing, in large print, "$48,000." The Court sustained Plaintiff's objection, stating "the salary is not in evidence." Tr. 5:1116:1. Undaunted, Mr. Spiro replied, "He testified $4,000–," after which Plaintiff again objected and the Court said, "I think not." Tr. 5:1116:3-6. Mr. Spiro insisted, stating "I believe it is in the record that he testified to $4,000 a month," Tr. 5:1116:8-9, but left that hanging while pivoting to the argument that Mr. Diaz should receive low damages based on his *hourly* wage, which was in evidence (although not for all time periods, and with no information about how many hours he worked—if that were relevant). Tr. 5:1116:10–1117:9.[8]

Tesla's conduct was improper for many reasons. Given the Court's ruling that evidence about Mr. Diaz's pay at Tesla was "not related to emotional distress," it was inappropriate and prejudicial for Tesla to argue to the jury that Mr. Diaz's compensatory damages for emotional distress should be measured by his pay. If that were the law, the emotional distress of higher-wage workers would be "worth" more than the emotional distress of lower-wage workers who suffered from the same harassment—a repugnant suggestion. The emotional distress of Elon Musk and the lowest-paid worker at Tesla are worth the same under the law. *See Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) ("[J]ustice is not dependent upon the wealth or poverty of the parties."). As reflected in the Court's decision to exclude evidence of Mr. Diaz's salary, there is also no factual connection between Mr. Diaz's emotional distress and his salary.

Tesla deepened the prejudice by explicitly basing its argument on evidence the Court had expressly excluded. Tesla decided (as it had throughout the trial) that it was worth the risk of judicial censure to put that "$48,000" number before the jury—a risk that seems to have paid off,

---

[8] The only evidence of Mr. Diaz's earnings at Tesla was an email showing he received a raise in January 2016 from "$16 to $18." The Court denied Plaintiff's motion *in limine* to exclude that evidence as irrelevant, on the ground that the "totality of Tesla's conduct towards Diaz" is relevant to *punitive* damages, Dkt. 417 at 8, yet Tesla then used that evidence primarily for the improper purpose of anchoring Mr. Diaz's compensatory damages for emotional distress.

given that the jury's award for past emotional distress was almost exactly twice that number.

Tesla's repeated violation of this Court's orders and inappropriate closing argument provide clear grounds for a new trial. *See Draper*, 580 F.2d at 95 (new trial appropriate where closing argument "prejudicially referred to facts not in evidence"); *Janich Bros. v. Am. Distilling Co.*, 570 F.2d 848, 860 (9th Cir. 1977) (It is "a well-settled rule that it is improper in closing argument to make reference, over objection, to matters not in evidence."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940) ("[A]ppeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them.").

## 9. <u>Tesla's closing argument grossly misstated the law the jury was instructed to apply.</u>

On the last day of trial, the Court discussed final jury instructions with the parties. At Tesla's request, the Court had added language to Instruction No. 24, defining compensatory damages as "the amount of money that will reasonably and fairly compensate Mr. Diaz for any injury you find was caused by … Tesla's conduct that has been determined to have subjected Mr. Diaz to a ***racially hostile work environment*** as described in Instructions 19 to 24." *See* Tr. 5:908:8-13 (emphasis added). Plaintiff's counsel objected to this instruction, because the first jury's finding of negligent hiring or supervision was *not* limited to incidents of racial harassment. Tr. 5:908:19–909:8. This was a crucial point, because Tesla's counsel had focused so much of its questioning on whether Mr. Martinez—the subject of the negligent-supervision claim—had actually used the n-word during the assault in the elevator rather than physically attacking Mr. Diaz in a "non-racial" way. *See also* Tr. 5:911:17-20. The Court agreed with Plaintiff and changed the instruction to read, "Compensatory damages means the amount of money that will reasonably and fairly compensate Mr. Diaz for any injury you find was caused by Tesla's conduct as described in Instruction Nos. 18-23." Final Jury Instructions (Dkt. 456) No. 24.

Nonetheless, at the very start of Tesla's closing argument, Mr. Spiro forcefully argued—in direct violation of the instructions the Court had just issued—that to recover damages, Mr. Diaz "has to point to specific racial attacks. Nonracial attacks will not cut it in this case either …. An elevator incident that had nothing to do with race, that doesn't count." Tr. 5:1082:10-14. Counsel hammered this legally false argument throughout his closing. *See, e.g.,* Tr. 5:1088:6-19, 5:1089:10-11, 5:1089:19-20, 5:1094:11-12, 5:1098:24-25, 5:1100:23, 5:1103:10-11, 5:1118:8-9.

This argument was highly prejudicial—wrongly telling the jury that it could only award damages for incidents that were "racial," contrary to the first jury's liability verdict and this Court's unambiguous ruling. Tesla's legal assertions in direct contradiction of the Court's instruction—given after a lengthy colloquy with counsel on this exact issue—also require a new trial. *See Call Delivery Sys., LLC*, 2022 WL 18143363, at *3 (plain error review applies "regardless of whether a party made contemporaneous objections"); *Pavemetrics Sys.*, 2023 WL 1836331, at *2 (new trial where counsel made "misstatements of law"); *Wilson v. NHB Indus., Inc.*, 219 F. App'x 851, 853–54 (11th Cir. 2007) (new trial "where the comments constituted a misstatement of the law which went directly to the very issues contested in the case").

In sum, "although, at first blush, defense counsel's conduct might be chocked up to the rough and tumble of the adversarial process, the pervasiveness, timing, and precision of the conduct—coinciding with critical facts in Plaintiff's case—suggests a more nefarious motive." *Cones*, 2016 WL 7438817, at *10. Taken together, Tesla's actions deprived Mr. Diaz of the fair damages retrial the Court had ordered, at Tesla's request, and to which Mr. Diaz was entitled.[9]

**B.  The jury's damages award is inadequate and requires a retrial.**

In significant part because of the prejudicial effects of Tesla's pervasive misconduct, the jury issued a damages award that is plainly inadequate to compensate Mr. Diaz for the emotional distress the record shows he suffered in this case or to punish Tesla and deter it from similar reprehensible conduct in the future. Because the verdict is against the clear weight of the evidence, the Court should order a new trial on damages.

**1.  The damages award fails to adequately compensate Mr. Diaz.**

After the first trial, the Court conducted "[a] careful evaluation of the facts of this case, the legal principles underlying judicial review of emotional damages, and comparable cases" to determine whether the jury's damages award was against the clear weight of the evidence. *See*

---

[9] This catalogue of Tesla's trial misconduct is not comprehensive, and merely highlights some of the most egregious misconduct. The trial record contains numerous other damaging examples. *See, e.g.*, Tr. 3:509:21-23 (Tesla telling Ms. Oppenheimer, over Plaintiff's sustained objection, "you know that since this time and since this incident in eight years, Mr. Martinez has never had another incident"—which not only went beyond the scope of the first trial and had nothing to do with the subject of her expert testimony but violated the prohibition against referring to the period of time between the two trials).

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

Dkt. 328. The Court also explained that under California law, "the trial court, in ruling on [a new trial] motion, sits ... as an independent trier of fact." *Lane v. Hughes Aircraft Co.*, 22 Cal. 4th 405, 412 (2000); Dkt. 328 at 14. The same analysis is required here. *See Landes*, 833 F.2d at 1371–72 ("If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial."); *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014) (new trial should be granted where "the jury has reached a seriously erroneous result"); *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842, 845 (9th Cir. 2014) (new trial may be granted "on any ground necessary to prevent a miscarriage of justice," and is "not required to draw all inferences in favor of the verdict"); Cal. Civ. Proc. Code § 657(5).

Here, the jury's award of $100,000 in past damages and $75,000 in future damages is patently inadequate on the factual record of this case—a record the Court kept as identical as reasonably possible to the record the Court already analyzed—as confirmed by comparison both to verdicts in similar cases and to the first jury's damages award in this case.

The Court previously concluded, after weighing the evidence for itself, that "Diaz is entitled to a relatively large emotional distress damages award," including because "the emotional effects on Diaz were profound" and because numerous witnesses had "testified to the severe psychological injury that workplace racism can and did inflict." Dkt. 328 at 27-29. The Court further concluded that "Tesla's proffered figure of $300,000 [for emotional distress] is, accordingly, untethered to record evidence." Dkt. 329 at 29.

For the same reasons, the weight of the evidence *legitimately* introduced on retrial shows that the $175,000 awarded by the jury does not comport with the evidence.

### A. Retrial evidence

Four witnesses credibly testified that at the time Mr. Diaz worked at Tesla, the n-word was used in the factory on a daily basis. *See* Tr. 2:381:3-15 (Wayne Jackson: "rampant" use of the n-word "more than several times a day"); Tr. 2:282:2-5 (Tom Kawasaki); Tr. 2:326:16-17 (similar regarding "chongo"); Tr. 2:343:4–344:19 (Michael Wheeler); Tr. 4:739:18–742:14 (Owen Diaz). *No witness contradicted* this testimony—not Ed Romero, Erin Marconi, Jackelin Delgado-Smith, or Joyce DelaGrande. Tesla itself acknowledged hearing that workers had been

called the n-word at the factory. *See* Ex. 106. Many witnesses also confirmed the racist graffiti, including swastikas and "death to all [Ns]." Tr. 2:332:18-24 (Kawasaki); Tr. 2:346:16–347:21 (Wheeler); Tr. 3:623:1-25 (Diaz). At the Tesla factory, Black workers worked in an environment in which the n-word was, in Mr. Wheeler's phrase, "just another word." Tr. 2:343:20-21.

The Court previously observed that "[t]he N-word is 'perhaps the most offensive and inflammatory racial slur in English, a word expressive of racial hatred and bigotry.'" Dkt. 328 at 27-28 (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001)). Mr. Romero and Mr. Kawasaki both confirmed that Mr. Diaz reported being personally targeted with that word. *See* Tr. 3:551:8-16 (Romero); Tr. 2:269:23-25 (Kawasaki). Although "the many, many utterances of that word alone would also be devastating, it was far from the only racial slur that was used or hurled at Diaz." Dkt. 328 at 28. Mr. Diaz testified how horrified he was upon learning he had been saying "yes, yes, yes" when co-workers were asking him in Spanish whether he was a "porch monkey." Tr. 3:589:13–590:10, 3:592:2-21. He testified that Judy Timbreza had called him "mayate" and used the n-word. Tr. 3:592:22–593:8. Supervisor Ramon Martinez said things like "go back to Africa," and "I hate you, [N]," Tr. 3:603:21-25, and "I wish I can get all of you [Ns] fired." Tr. 3:605:12-13. Supervisor Robert Hurtado repeatedly used the n-word toward him, in contexts such as "[N], hurry up and push the button," and "[Ns] are lazy" when Mr. Diaz wasn't moving Hurtado's material fast enough. Tr. 3:604:22–605:5. Mr. Hurtado also humiliatingly called him "boy." Tr. 3:606:18–607:3.

Beyond this daily abuse, the undisputed record also demonstrated many specific incidents of egregious harassment. Tesla admitted (and Mr. Kawasaki's investigation showed) that Judy Timbreza had a confrontation with Mr. Diaz in which Timbreza "was throwing racial slurs at him" in front of their co-workers. Tr. 2:268:10-13; *see* Tr. 5:927:23-24 (Mr. Spiro: "[W]e didn't really dispute the first [incident]."); Tr. 2:312:1 (Mr. Spiro: "We agree it's racist. We agree it happened."). Tesla also admitted that a Tesla supervisor placed an extremely offensive racist pickaninny drawing in Mr. Diaz's work area. Ex. 1; Tr. 1:241:17-18 (Mr. Spiro: "It's racist and it's offensive and it shouldn't have been drawn and I'm sorry that this happened.").

Tesla further admitted that Ramon Martinez, without provocation, physically attacked Mr. Diaz in the elevator, forcing Mr. Diaz to defend himself, as Wayne Jackson testified after

having viewed video footage. Tr. 2:428:9-14; Tr. 5:1087:9-19 (Mr. Spiro: "I'm conceding what happened on that video. Martinez charged him. So this missing video shows nothing different than what they're saying. … There's no dispute."). Mr. Diaz testified that an irate Martinez ran up to him threateningly in the elevator, accusing him of wrongfully instructing Rothaj Foster and saying, at one point, "You [Ns] aren't shit." Tr. 3:609:12–612:7.[10] Tesla devoted significant time at trial to attempting to prove that this incident was not "racial," but that is irrelevant to Mr. Diaz's damages (because under state law he is entitled to all damages caused by Martinez's actions towards him) and is implausible, given that Martinez was a documented racial harasser who not only drew a pickaninny but also frequently used words like "chongo" (gorilla) according to Tom Kawasaki's unimpeached testimony. *See* Tr. 2:325:21–326:3; *see also* Tr. 3:604:19-20 (Diaz testimony that Martinez used the n-word towards him at least 30 times); Tr. 2:427:8-11 (Jackson testimony that Diaz reported "hostile" language in elevator confrontation).

The record also provides no basis to doubt that Mr. Diaz witnessed his 19-year-old son Demetric being berated by a supervisor with the phrase "I can't stand all you [f-ing] [Ns]". *See* Tr. 3:599:15-17. Both Mr. Diaz and Demetric testified to this event; and no witness contradicted it (nor did Tesla call the supervisor or any other witness to rebut it).[11]

As this Court explained in previously assessing Mr. Diaz's emotional distress, "it was not just that co-workers and supervisors slung around these slurs, it was what little Diaz's employers did to stop them." Dkt. 328 at 28. Just as in the first trial (in which it was determined that Tesla was negligent and failed to prevent Mr. Diaz's harassment), the retrial record plainly showed that Tesla failed to respond adequately to the harassment Mr. Diaz experienced, as expert Amy Oppenheimer testified (without rebuttal) after examining the evidentiary record:

- <u>Timbreza incident</u>. There "really was not a full investigation." Tr. 2:467:16-17. Regardless of whether the n-word was used, a racial incident should be "something

---

[10] The only witness who contradicted this testimony was Mr. Martinez himself, whose one-word denial of a physical confrontation—"No"—was contradicted not only by Mr. Diaz, but also by Mr. Kawasaki and Mr. Jackson who each viewed video footage, and which even Tesla repudiated in its closing argument. Tr. 3:579:5-7, 2:428:9-14, 2:280:23-24, 5:1087:9-11.

[11] The only two aspects of this episode on which Tesla sought to impeach Mr. Diaz concerned Demetric's supervisor's race (whether white or Hispanic) and whether the dispute also concerned "the Dodgers versus the Giants"—neither of which are relevant or diminish Mr. Diaz's emotional pain. *See* Tr. 4:745:21–746:19, 4:749:14–750:1.

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

that's going to get a high priority." Tr. 2:468:1-3. There were no findings about what actually was said, no documentation of who investigated what, and any discipline was based on "joking" rather than racial epithets. Tr. 2:468:5-21.

- <u>Martinez elevator incident</u>. It was never clear who was in charge of investigating this incident. Tr. 2:468:24–469:1. There was never an explanation for why video footage was not obtained—although two witnesses testified that video footage existed. Tr. 2:469:24, 2:428:9-14, 2:280:23-24. The key witness, Rothaj Foster, was never interviewed. Tr. 2:469:5-11. Both Diaz and Martinez were given warnings, without any finding about who actually was the aggressor, despite Jackson's testimony that the video footage showed it was Martinez. Tr. 2:469:12-24, 2:428:9-14.

- <u>Pickaninny drawing</u>. No investigation report was ever issued—"no documentation, no witness notes, no findings." Tr. 2:470:2-10. Diaz was only interviewed over the phone, and Martinez was only given written questions to answer. Tr. 2:470:11-25. Martinez's prior history of inappropriate incidents was never clarified and his discipline was decided before the investigation was complete. Tr. 2:471:1-18.

- <u>Tesla's overall response to harassment incidents</u>. Tesla had appropriate policies but failed to enforce them. Tr. 2:472:11-12. There was no standardized training or education regarding racial harassment. Tr. 2:472:11-12. There were no point people for investigations, no trained cadre of investigators, and no one was consistently doing investigations. Tr. 2:472:14-21. The remedial actions Tesla decided upon were insufficiently serious given the nature of the incidents. Tr. 2:472:22–473:2.

As Mr. Diaz testified without impeachment regarding Tesla's failure to adequately investigate the many incidents of harassment he experienced, "You know, you are yelling for help … I'm telling these people what is going on. I'm talking to Ed Romero. … Nobody can hear you. Nobody cares to hear what you're saying." Tr. 3:624:6-10. As the Court recognized, the jury could readily have concluded that these "responses were thin and lackluster at best and intentionally unresponsive to the conduct at worst." Dkt. 328 at 28.

It is impossible to imagine that any person in Mr. Diaz's situation would *not* have been severely impacted by these experiences; and the records in both trials show that Mr. Diaz was in fact "severely emotionally harmed" as a result of Tesla's actions and inaction. Dkt. 328 at 18.

Many witnesses testified without impeachment that being targeted by the pickaninny drawing was deeply upsetting to Mr. Diaz. Tr. 2:352:11-22, 2:359:24–360:2 (Wheeler); Tr. 2:398:5-7, 19-24 (Jackson); Tr. 3:530:15–532:7 (Romero). Not even Tesla disputes the significant emotional distress he suffered from this incident. Tr. 5:1095:18-19 ("Mr. Diaz is upset, and genuinely so, and nothing today or no cross-examination is going to change that."). Similarly, regarding the elevator incident with Martinez, Wayne Jackson testified without impeachment that Owen was "very upset" and "felt threatened" afterwards. Tr. 2:428:5-14.

Mr. Diaz's daughter La'Drea testified without impeachment that Mr. Diaz's personality

1   changed significantly after he began working at Tesla. Tr. 4:889:24–892:20. Mr. Diaz went from

2   being her "regular old dad," joking with her and her friends, to becoming "a lot moodier." Tr.

3   4:889:24–4:890:14. She testified that "he would stay up really late. It would be times that I go to

4   the bathroom in the middle of the night, and it would be like 3:00 in the morning, 2:00 in the

5   morning, 4:00 in the morning; and he would just be up just watching TV." Tr. 4:891:12-15. She

6   would no longer speak to him every day as he became less talkative. Tr. 4:891:24–892:3.

7       Most importantly, Mr. Diaz testified in great detail, and almost entirely without any

8   specific impeachment, regarding the emotional distress he suffered throughout and after his time

9   at Tesla. He testified that when he saw the pickaninny, "I felt like I was kicked in the stomach."

10  Tr. 3:620:11. He felt "[t]he significance of it," which "started to remind me of the stories my

11  parents used to tell me when they got here during the civil rights movements." Tr. 3:620:12-14.

12  He said it "reminded me of my parents being beat with water hoses, having dogs sicced on

13  them." Tr. 3:620:14-15.

14      Mr. Diaz testified that Mr. Hurtado's abuse, calling him the n-word and "boy," "made me

15  feel less than a man. It made me question my worth." Tr. 3:606:7-8. As Mr. Diaz said, "I was a

16  man in my late 40s. And you know, when you meet a person, the last thing I'm going to refer to

17  as a grown man is a boy … that's disrespectful." Tr. 3:606:18–607:3.

18      Mr. Diaz testified that when he saw his 19-year-old son Demetric called the n-word, he

19  felt upset, demoralized, and disgusted with himself. Tr. 3:598:23–599:21, 3:625:5-7. From his

20  perspective, his relationship with Demetric fractured the day of the racist incident. Tr. 3:599:3-4.

21  His other children told him that Demetric doesn't respect him anymore—something that

22  Demetric wouldn't tell him. Tr. 3:608:2-5. He testified that "whenever I see my son or if he is

23  around me or when he comes to visit my wife, I have to look in his face. I have to look at him

24  and know I destroyed an individual's life with my decisions." 3:627:10-13.[12]

25      Mr. Diaz testified that he suffered the loss of pleasure and growing anxiety when

26

27  _____

28  [12] Tesla presented contrary testimony from Demetric, but also elicited additional
    testimony that the father-son relationship had deteriorated. Tr. 4:755:3-7 (Q. "And isn't it true
    that the reason that your relationship with him got fractured years later was because he started
    hanging out with the wrong crowd?" A. "Yes. He started hanging with the wrong crowd after
    Tesla. You're right.").

working at Tesla. Tr. 3:626:3-5. He testified:

> I had to start to look around my shoulder and wonder what was going to happen because of the fact that I was in a dangerous factory …. I was fearful. I had anxiety. Mistrust. It was – I just started to change my whole routine. I started to really put my car in the rear when other employees would leave, and I tried to be around a group. I didn't know what was going to happen. … all this accumulation of stuff, I really started to -- even when I was away from work, I had to look and wonder, is he in this parking lot?

Tr. 3:621:25–622:20. He testified that his anxiety was overwhelming and felt "like being held under water. Nobody can hear you. … It's like – it's just accumulation. It's almost like being buried under a mountain." Tr. 3:624:3-12.

While at Tesla, Mr. Diaz couldn't perform sexually with his wife. Tr. 3:626:15-23. He lost weight. Tr. 3:627:16-17. He "would have sleepless nights," he "wouldn't eat," and he'd "sit on the stairs for hours and just cry some nights because of the things that I did." Tr. 3:627:20-22.

Now, the pain is better "some days," but has not gone away. Tr. 3:626:24-627:1. "Sometimes I will sit and stare off into space. It brings back intense emotions, and things can trigger at times[.]" Tr. 3:627:5-6. "I will never forget. It's always going to be ingrained in me. It's a part of my life. It's a memory now that, you know, like some people say, when you ring a bell, you can't unring it." Tr. 3:627:25–628:3.

The psychiatric significance of Mr. Diaz's uncontradicted testimony was underscored by Dr. Anthony Reading, who testified that workplace harassment can cause serious psychological injuries because of the prolonged exposure associated with harassment at work, the uncertainty of when the harassment will reoccur, and the employee's inability to remove himself from that environment. Tr. 4:832:20–833:12. That trauma is heightened when the harasser is a supervisor about whom an employee cannot complain without fear of repercussions. Tr. 4:833:4-8. The unpredictability of harassment can lead to persistent heightened arousal, which can have lasting detrimental effects in the brain and spillover effects outside of work. Tr. 4:836:5-837:4.

Mr. Diaz met the criteria for a threat disorder, adjustment disorder with anxiety, and depression. Tr. 4:838:8-18.[13] Dr. Reading testified that the type of conduct Mr. Diaz experienced

---

[13] Tesla sought to discount the significance of Dr. Reading's testimony by noting that Dr. Reading relied on Mr. Diaz's description of the events and did not review documentary evidence. But Tesla offered no evidence that *any* of the crucial events in this case—including the Judy

leads to the emergence of trauma symptoms. Tr. 4:846:10-21. He also reported that Mr. Diaz was still experiencing symptoms when he was interviewed in 2019, including intrusive thoughts, reexperiencing the events, relationship problems with his son, difficulty sleeping, reactivity, irritability, "a constellation of symptoms that would be consistent with a person having their baseline level of arousal re-set at a more problematic or higher level." Tr. 4:839:17–840:6. Among the symptoms Dr. Reading observed after running tests on Mr. Diaz were "an elevation on self-doubt, hopelessness, and ideas of persecution." Tr. 4:841:23-24; *see also* Tr. 4:842:18–843:19. Those examinations, which test for overreporting and exaggeration, showed no signs Mr. Diaz was exaggerating. Tr. 4:841:25–842:17. In sum, Dr. Reading testified that Mr. Diaz "has been altered by this experience in an enduring way." Tr. 4:840:21-22.

All told, the record evidence demonstrates that Mr. Diaz was subjected to sustained and horrific racial harassment; that the injury of this harassment was magnified by Tesla's failure to protect Mr. Diaz or punish those responsible; and that Mr. Diaz as a result suffered profound emotional distress that traumatized him, poisoned his sense of self and perspective on life, interfered with his relationships with his wife, daughter, and son and created anxiety and personality symptoms that may remain with him forever. As the Court previously recognized, Tesla's characterization of Mr. Diaz's harms as "garden variety" emotional distress, "mild and short-lived"—a characterization on which Tesla doubled down at the retrial—is nothing more than "watered-down revisionism" that the "record roundly rejects." Dkt. 328 at 29. Just as a remittitur to $300,000 in damages would have been "untethered to record evidence" after the first trial, a mere $175,000 in damages is even more untethered here. *Id.*

### B.   Comparable cases

This Court has held that other cases with comparable facts are relevant to deciding whether an award of damages is contrary to the weight of the evidence and requires a new trial. *See* Dkt. 328 at 27. Here, the $175,000 compensatory damages award is far below what juries

---

Timbreza confrontation, the elevator attack by Mr. Martinez, the jigaboo drawn by Mr. Martinez, Demetric being called the n-word, the omnipresent racist graffiti, the racial slurs by Robert Hurtado, or the feces incident with Mr. Wheeler—did not occur. Nor was there any reason to think that Dr. Reading's diagnosis would have been any different had he reviewed the documents—which overwhelmingly *confirm* that these incidents occurred.

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

have determined appropriate in the most comparable cases, and a new trial is therefore required.

The "most" relevant comparator is, of course, the first jury's compensatory damages award, based on the same record *minus* the prejudicial attorney misconduct. The two juries, empaneled in the same venue less than a year-and-a-half apart, heard evidence from mostly the same witnesses about the same parties, the same incidents, and Tesla's same responses and non-responses to those incidents, placed in context by the same experts. The first jury, which was correctly instructed, and which was not subjected to any attorney misconduct, determined that Mr. Diaz's damages were $6.9 million—roughly *forty times* the damages awarded by the retrial jury. While the Court subsequently issued a remittitur after determining that the record supported an award of only $1.5 million in compensatory damages, that was still *over eight times* the damages awarded here. In other words, the retrial jury's award of damages was only a tiny fraction of the damages that a prior unanimous jury and this Court both determined were warranted by the record. The fact that Tesla's pattern of undeniable trial misconduct likely prejudiced the retrial jury against Mr. Diaz further supports the conclusion that the first jury's verdict was more reliable and tethered to admissible evidence.

The next cases to consider are the two the Court previously found, after full briefing and its own research, were the most comparable to the facts here: *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014), and *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493 (9th Cir. 2000). As the Court found, *Turley* "has more to teach about these facts than any other case I have found or the parties have raised." Dkt. 328 at 30. Like this case, *Turley* involved an African-American plaintiff who was racially harassed at work with the n-word, terms like "boy" and "gorilla," and racist graffiti—behavior that was encouraged by supervisors. 774 F.3d at 148-49. Much of the harassing conduct went unpunished, although two workers were disciplined with suspensions. *Id.* at 149-150. As a result, the plaintiff was diagnosed with an adjustment disorder and depression (like Mr. Diaz), among other diagnoses. *Id.* at 150–51. His experience had left him "broken and dispirited." *Id.* at 151. The district court and Second Circuit both upheld the jury's award of $1.32 million in compensatory damages. *Id.* at 163.

The award in *Turley* was seven-and-a-half times greater than the amount awarded by the retrial jury here—a massive disparity. That disparity is even sharper in light of inflation, since

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

the June 2012 verdict in *Turley* would be worth roughly $1,736,216 in March 2023 dollars—a nearly exact *10-to-1* ratio over the retrial jury's award. *See* U.S. Bureau of Labor Statistics, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm; *see also Turley*, 774 F.3d at 163 n.22. Although the Court previously suggested that there were some meaningful differences between the facts of *Turley* and the facts here (such as the period of harassment and the specific types of harassment), the Court found the cases highly similar in many ways, and those few differences cannot account for the extreme gulf between the damages awards (including because Mr. Diaz suffered some harms Mr. Turley did not, such as experiencing racial slurs hurled at his son). *Turley* thus continues to demonstrate that "a relatively large compensatory damages award is justified on facts like these." Dkt. 328 at 31.

*Passantino* is the other case this Court found useful. Dkt. 328 at 31–33. There, the plaintiff was subjected to sex harassment and discrimination at work. 212 F.3d at 499. She suffered demeaning and offensive comments and was passed over for promotions. *Id.* at 500-503. She suffered from constant worrying, crying, feeling trapped, stomach problems, rashes, and headaches; spent less time with her family; and had her career stalled. *Id.* at 503. The district court and Ninth Circuit upheld an award of $1 million in emotional distress damages. *Id.* at 504.

The award in *Passantino* was 5.7 times the retrial jury's award here, despite substantial similarities between the cases and many factors suggesting that Mr. Diaz suffered even more extreme harm. *See* Dkt. 328 at 32-33. Accounting for inflation, the June 1997 verdict would be worth $1,882,944 today—a more than tenfold multiplier on the retrial verdict. *See supra*. Like *Turley*, *Passantino* "shows that substantial damages are warranted for this type of emotional harm resulting from harassment-filled workplaces." Dkt. 328 at 33.

Those three cases all point to the same conclusion: the meager award of $175,000 for Mr. Diaz's harm is "far out of proportion to the evidence." Dkt. 328 at 35. Rather, "[t]he closest cases … illustrate that awards of roughly $1.5 million (in today's dollars) are supported by analogous (though not identical) evidence." Dkt. 328 at 36. Although damages for emotional distress are not subject to the same precision as economic damages, they are nonetheless damages that equally must be calculated and awarded accurately to compensate a plaintiff for his or her psychological distress. Even if the jury (absent Tesla's misconduct) could permissibly

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

1    have awarded less than the $1.5 million remittitur calculated by the Court, there is no evidentiary

2    basis for the gross disparity between the award here and in the most comparable cases.

3           Because the jury's compensatory damages verdict was "seriously erroneous," the Court

4    should grant Plaintiff's motion for a new trial on damages. *Oracle*, 765 F.3d at 1093.

5           **2.    The punitive damages award fails to adequately punish or deter Tesla.**

6           Given Tesla's prejudicial misconduct and the jury's erroneous calculation of

7    compensatory damages, it should not be surprising that the punitive damages award—a mere $3

8    million—was similarly insufficient. The undisputed record reveals an unsparing pattern of

9    malicious, oppressive, and reckless conduct by Tesla that harmed Mr. Diaz. The jury's punitive

10   damages award does not reflect the Court's instruction to calculate such damages at "an amount

11   sufficient to fulfill their purposes of punishment and deterrence." Final Jury Ins. (Dkt. 450) No.

12   25. A new trial should be granted for that reason as well.

13          A mountain of uncontradicted evidence and unimpeached testimony at trial proved the

14   contemptible nature of Tesla's conduct and the company's intractable refusal to take

15   responsibility for or correct that conduct.

16          Mr. Diaz was maliciously harassed not only by co-workers, but by Tesla supervisors—

17   *i.e.*, Tesla itself. A supervisor attacked Mr. Diaz in an elevator and later placed a racist effigy in

18   Mr. Diaz's work area. *Supra* at 25-26. A different Tesla supervisor repeatedly called him the n-

19   word and "boy." *Supra* at 25. Indeed, the n-word was in daily use at the factory. *Supra* at 24-25.

20   Racist graffiti was also pervasive. *Supra* at 25. The company knew all this yet failed to take

21   appropriate steps to protect its employees, investigate incidents of harassment, meaningfully

22   discipline those responsible, or provide suitable guidance or training. Tesla did not care. *See* Tr.

23   2:384:20 (Wayne Jackson, regarding the n-word: "Tesla allowed it. They didn't stop it.").

24          When feces was placed on Michael Wheeler's cart, he immediately reported the incident

25   to his supervisors with photographic evidence, but there was no interview of Mr. Wheeler, no

26   investigation, no discipline, and no training. Tr. 2:349:6–351:6. There were cameras everywhere,

27   but no video footage was collected, consulted, or stored. Tr. 2:350:2-18. Tesla's response in

28   some cases was even worse. When a subordinate told Mr. Wheeler, "[F] you, [N]," Tesla

     promoted that subordinate and gave him a team to lead. Tr. 2:344:20–346:12.

Tesla also did not perform a real investigation when Mr. Martinez attacked Mr. Diaz in the elevator. Tr. 2:391:23–392:8. In fact, Tesla supervisors called off the investigation that Mr. Jackson was trying to conduct. Ex. 76; Tr.2:395:3-11. Though Tesla now admits Mr. Martinez attacked Mr. Diaz, it stubbornly denied that at the time—insisting on "no written warning" and verbal counseling for *each* of them on "appropriate behavior in the workplace." Ex. 76.

When Mr. Martinez drew a racist drawing on a bale in Mr. Diaz's work area, the company did not terminate him or even move him to a different work location. Tr. 2:399:21–400:2, 2:400:19–401:14. Nor did it give him sensitivity training. Tr. 2:403:19-12.

With respect to the n-word, Wayne Jackson testified:

> When I was there, that word was used constantly. Can I say that to you now? That word was used constantly. Whether you feel it was a bad way or a good way, it was used. That's what I'm telling you. That is the truth. That word has been used. I don't know if it's still used. I don't know if Tesla's changed that, but they allowed it. It was allowed.

Tr. 2:445:5-10.

Tesla insisted throughout the first trial and in its opening statement on retrial that Mr. Diaz *never* complained about use of the n-word to anyone at Tesla. *See* Tr. 1:236:3-8 ("Never once in this case, will Owen Diaz produce a single document, an e-mail, anything, telling anyone he was called the N-word at all. … He will call not one single witness that tells you he was called the N-word. Not one."). As it turns out, that has always been a knowing lie. Tesla supervisor Ed Romero squarely admitted on direct examination that "Owen was the one that had complaints" about the n-word, Tr. 3:551:10-11, which confirmed Mr. Diaz's testimony that he complained multiple times to Romero about the n-word, as well as about racist graffiti. Tr. 3:613:5-7, 3:647:2-5. Mr. Diaz also complained about the n-word to Tom Kawasaki and Mr. Wheeler, as both confirmed. Tr. 2:270:1-2, 2:347:15-20, 2:358:2-18, 3:612:22-24.

The use of the n-word is a safety issue that can cause workplace confrontations. Tr. 2:405:3–406.1. Yet Tesla never conducted any sensitivity trainings relating to race issues, despite knowing that the n-word was being used aggressively to demean Black employees. Ex. 106; Tr. 2:451:1-3, 2:403:25–405:5, 2:358:15-18. Tesla also had no general training or handbook about workplace discrimination, Tr. 2:404:14-23, and did not terminate anyone for using the n-word, despite its purported zero tolerance policy. Tr. 3:615:13-15, 3:552:7–19.

When someone drew breasts on a bathroom sign, Tesla conducted "sensitivity training that covered pretty much everything" for the "whole entire team" of more than 500 people about how the drawing was "not okay" and "wouldn't be tolerated." Marconi Depo Tr. 81:4–82:3. Tesla never did *any* such training regarding the n-word, despite its pervasive use in the factory.

As this Court held based on the record in the first trial, "Tesla's conduct falls high on the spectrum" of reprehensibility. Dkt. 328 at 38. For that reason, the first jury awarded $130 million in punitive damages—which clearly got Tesla's attention and persuaded it, at the very least, to admit to numerous incidents of racial harassment on retrial that it had contested before. The Court's remittitur with a 9:1 ratio of punitive to compensatory damages similarly reflects the fact that Tesla deserves to be severely punished and deterred from similar conduct in the future.

The retrial jury's award of $3 million, by contrast, is a pinprick that will do nothing to punish Tesla or deter it from future misconduct. Tesla was worth upwards of $151 billion in February 2020. Tr. 5:938:6. As this Court has explained, "[a]n award sufficient to deter the average individual will not necessarily be the same as an award sufficient to deter a corporation with Tesla's wealth." Dkt. 328 at 43. The retrial jury's punitive damages award is a "miscarriage of justice" that is plainly inadequate to deter Tesla from continuing to ignore the conditions that Black workers like Mr. Diaz must face in its factory. *Silver Sage Partners, Ltd.*, 251 F.3d at 819.

## IV.   **CONCLUSION**

The Court should grant Plaintiff's motions for mistrial and a new trial and offer Plaintiff a renewed choice between the Court's previously determined remittitur and a new damages trial.

DATED: May 9, 2023                     Respectfully submitted,

CALIFORNIA CIVIL RIGHTS LAW GROUP
ALEXANDER MORRISON + FEHR LLP
ALTSHULER BERZON LLP
COLLIER LAW FIRM, LLP


/s/   *Michael Rubin*
Lawrence A. Organ
Marqui Hood
Cimone A. Nunley
J. Bernard Alexander III
Michael Rubin
Jonathan Rosenthal

PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR A NEW TRIAL

1

Dustin L. Collier

2

V. Joshua Socks

Elizabeth R. Malay

3

Drew F. Teti

4

Attorneys for Plaintiff OWEN DIAZ

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28