LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
MARQUI HOOD (SBN 214718)
marqui@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:     (415)-453-7352
Facsimile:     (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
balexander@amfllp.com
**ALEXANDER MORRISON & FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:     (310) 394-0888
Facsimile:     (310) 394-0811

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
JONATHAN ROSENTHAL (SBN 329638)
jrosenthal@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Facsimile:     (415) 362-8064

DUSTIN L. COLLIER (SBN 264766)
dcollier@collierlawsf.com
V. JOSHUA SOCKS (SBN 303443)
jsocks@collierlawsf.com
ELIZABETH R. MALAY (SBN 336745)
emalay@collierlawsf.com
DREW F. TETI (SBN 267641)
drew@collierlawsf.com
**COLLIER LAW FIRM, LLP**
240 Tamal Vista Blvd. Suite 100
Corte Madera, CA 94925
Telephone:   (415) 767-0047
Facsimile:     (415) 767-0037

Attorneys for Plaintiff OWEN DIAZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

OWEN DIAZ,

     Plaintiff,

     v.

TESLA, INC. dba TESLA MOTORS, INC.;

     Defendant.

Case No. 3:17-cv-06748-WHO

**PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT**

Hearing Date: July 19, 2023
Time: 2:00 p.m.
Place: Courtroom 2, 17th Floor
The Hon. William H. Orrick

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

I.      INTRODUCTION ...........................................................................................................1

II.     PROCEDURAL BACKGROUND....................................................................................2

III.    LEGAL STANDARD.......................................................................................................3

IV.     ARGUMENT ...................................................................................................................3

        A.  Tesla's conduct was extremely reprehensible.........................................................4

            1.  Tesla supervisors subjected Owen Diaz to horrific racist abuse.......................... 4

            2.  Tesla knew of widespread racial abuse at its factory, yet failed to take readily
                available steps to stop it. ...................................................................................6

            3.  Tesla still fails to acknowledge or accept responsibility for its failures. ..............8

            4.  All of the factors courts consider when assessing reprehensibility support the
                jury's award. .....................................................................................................9

        B.  The jury award's 17-to-1 ratio of punitive to compensatory damages is
            appropriate here. ....................................................................................................10

        C.  No comparable civil penalty requires a reduction in punitive damages. .................15

V.      CONCLUSION...............................................................................................................16

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Bains LLC v. Arco Prod. Co.*,

5
    405 F.3d 764 (9th Cir. 2005) ........................................................................ *passim*

6

*BMW of N. Am., Inc. v. Gore*,

7
    517 U.S. 559 (1996) ..................................................................................... *passim*

8

*Deters v. Equifax Credit Info. Servs., Inc.*,

9
    202 F.3d 1262 (10th Cir. 2000) ........................................................................ 14

*Flores v. City of Westminster*,

10
    873 F.3d 739 (9th Cir. 2017) ....................................................................... 5, 15

11

*McGinest v. GTE Service Corp.*,

12
    360 F.3d 1103 (9th Cir. 2004) ........................................................................... 6

13

*Nitco Holding Corp. v. Boujikian*,

14
    491 F.3d 1086 (9th Cir. 2007) ........................................................................... 1

15

*Pac. Mut. Life Ins. Co. v. Haslip*,
    499 U.S. 1 (1991) ....................................................................................... 7, 11

16

*Passantino v. Johnson & Johnson Consumer Prod., Inc.*,

17
    212 F.3d 493 (9th Cir. 2000) ........................................................................... 12

18

*Pavon v. Swift Transp. Co.*,

19
    192 F.3d 902 (9th Cir. 1999) ............................................................................. 5

20

*Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life
    Activists*,

21
    422 F.3d 949 (9th Cir. 2005) ........................................................................... 11

22

*Rodgers v. Western-Southern Life Ins. Co.*,

23
    12 F.3d 668 (7th Cir. 1993) ............................................................................... 6

24

*Romano v. U-Haul Int'l*,

25
    233 F.3d 655 (1st Cir. 2000) ........................................................................... 14

26

*S. Union Co. v. Irvin*,
    563 F.3d 788 (9th Cir. 2009) ........................................................................... 14

27

*Saunders v. Branch Banking and Tr. Co. of VA*,

28
    526 F.3d 142 (4th Cir. 2008) ........................................................................... 15

*State Farm Mutual Automobile Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) .......................................................................................................*passim*

*Swinton v. Potomac Corp.*,
    270 F.3d 794 (9th Cir. 2001) .......................................................................................*passim*

*Thomas v. iStar Fin., Inc.*,
    508 F. Supp. 2d 252 (S.D.N.Y. 2007) .................................................................................. 10

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) ................................................................................................. 12

*Turner v. Burlington N. Santa Fe R. Co.*,
    338 F.3d 1058 (9th Cir. 2003) ............................................................................................... 3

*TXO Production Corp. v. Alliance Resources Corp.*,
    509 U.S. 443 (1993) ................................................................................................. 3, 11, 15

*Wood v. Ryan*,
    759 F.3d 1117 (9th Cir. 2014) ............................................................................................... 3

*Yowan Yang v. ActioNet, Inc.*,
    2017 WL 2117028 (C.D. Cal. Jan. 23, 2017) ...................................................................... 10

*Zhang v. Am. Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ......................................................................... 2, 5, 10, 15

**California Cases**

*Roby v. McKesson Corp.*,
    47 Cal. 4th 686 (2009) ......................................................................................................... 10

**Federal Statutes**

42 U.S.C. § 1981 ......................................................................................................... 2, 4, 15

**Rules**

Federal Rules of Civil Procedure
    Rule 50 ................................................................................................................................ 1, 3
    Rule 59 ................................................................................................................................ 1, 3

# I. <u>INTRODUCTION</u>

After a damages retrial in which Tesla's counsel repeatedly engaged in highly prejudicial misconduct, the jury awarded Owen Diaz $175,000 in compensatory damages and $3 million in punitive damages—a tiny fraction of the amounts awarded in the prior liability-and-damages trial, which was untainted by Tesla's misconduct. Not content with this windfall result, Tesla now asks this Court to reduce the second jury's already inadequate punitive damages award by nearly half. Although the Court need not reach the merits of Tesla's motion—because if it grants Plaintiff's pending new trial motion under Rule 59(a), Tesla's motion to further reduce its punitive damages liability would be moot—Tesla's motion is factually and legally baseless.

As a threshold matter, Tesla does not dispute that its conduct toward Mr. Diaz supports an award of punitive damages and that the Court is fully empowered to approve punitive damages of $1,575,000, which is nine times the amount of compensatory damages awarded on retrial. *See* Motion to Alter or Amend the Judgment ("Mot."), Dkt. 479, at 1.[1] Tesla's only argument is that a punitive damages-to-compensatory damages ratio can never exceed 9 to 1. *Id.* But the ratio of punitive to compensatory damages is just one of many case-specific factors that determine the constitutionality of a punitive damage award, and it is not dispositive. On the facts of this case, if the Court does not order a new damages trial it should conclude that the second jury's $3 million punitive damages award is constitutionally proper.

First and foremost, Tesla's conduct was extraordinarily reprehensible and therefore demands severe punishment and sharp deterrence. The undisputed evidence showed that Tesla's supervisors intentionally and maliciously harassed Mr. Diaz and that other Tesla managers were aware of this harassment and failed to do anything meaningful to end it. Such severe workplace racial harassment warrants a high punitive damages award, as the Ninth Circuit has made clear. *See, e.g., Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003); *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001).

---

[1] Tesla has not filed a motion under Federal Rule of Civil Procedure 50(b) and has therefore abandoned the argument in its prior Rule 50(a) motion, Dkt. 454, that the evidence at trial was insufficient for jury to award *any* punitive damages. *See Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007) ("[A] post-verdict motion under Rule 50(b) is an absolute prerequisite to any appeal based on insufficiency of the evidence.").

Moreover, this Court already approved much higher punitive and compensatory damages awards for exactly the same conduct based on essentially the same evidence (to the extent not marred by Tesla's gross misconduct). *See* Order on Post-Trial Motions ("Post-Trial Order"), Dkt. 328, at 42-43. Although the Court's previous remittitur order resulted in a 9-to-1 punitive-to-compensatory damages ratio, that limitation largely rested upon the fact that the Court had approved *$1.5 million* in compensatory damages. On retrial, for the reasons shown in Plaintiff's pending new-trial motion, the jury awarded only $175,000 in compensatory damages—far less than Mr. Diaz had been awarded before or than other plaintiffs in comparable cases had been awarded. *See* Plaintiff's Renewed Motion for Mistrial and Motion for New Trial ("Renewed Mistrial Motion"), Dkt. 478, at 30–33. Given the low compensatory damages award in this case, a punitive-damages-to-compensatory damages ratio of more than 9-to-1 is appropriate.

A higher ratio is particularly appropriate here because $3 million is less than a pinprick to a company of Tesla's value and a smaller award will likely do little to deter Tesla going forward. Post-Trial Order at 43 ("An award sufficient to deter the average individual will not necessarily be the same as an award sufficient to deter a corporation with Tesla's wealth."). Indeed, this Court previously concluded that *$13.5 million* in punitive damages was the appropriate amount to "fulfill[] the purposes of punitive damages." *Id.* at 42. The jury's award of $3 million here is far smaller and is thus well within due process constraints.

For these reasons and those set forth below, Tesla's motion should be denied.

## II. PROCEDURAL BACKGROUND

On October 4, 2021, a jury found that: (1) Tesla subjected Owen Diaz to a racially hostile work environment in violation of 42 U.S.C. § 1981 through the actions of its supervisors as well as its non-immediate supervisors or co-workers; (2) Tesla failed to prevent that harassment in violation of federal law; and (3) Tesla negligently supervised or retained Ramon Martinez, causing harm to Mr. Diaz, in violation of California law. *See* Dkt. 301. The jury awarded Mr. Diaz $6.9 million in compensatory damages and $130 million in punitive damages. *Id.*

In ruling on Tesla's motion for new trial, the Court held that both damages awards were excessive and offered Mr. Diaz the choice between a new trial on damages or a remittitur to $1.5 million in compensatory damages and $13.5 million in punitive damages. *See* Post-Trial Order at

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT

43. To preserve his appellate and Seventh Amendment rights, Mr. Diaz rejected the remittitur, Dkt. 347, and the Court ordered a new damages-only trial. Dkt. 348.

A second trial commenced on March 27, 2023. On March 31, Plaintiff moved for a mistrial on the basis of repeated prejudicial misconduct by Tesla's counsel. Dkt. 453. The Court took that motion under submission. Tr. 5:1135:4-9. Tesla also moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law with respect to Plaintiff's claim for punitive damages, which the Court also took under submission. Dkt. 454; Tr. 5:1009:15-19. On April 3, 2023, a second jury awarded Mr. Diaz $175,000 in compensatory damages and $3 million in punitive damages. Dkt. 463.

Plaintiff filed a renewed motion for mistrial and motion for new trial based on the misconduct of Tesla's attorneys and the jury's legally inadequate compensatory and punitive damages awards. *See* Renewed Mistrial Motion. Tesla did not renew its Rule 50(a) motion, but instead filed the present motion seeking only to reduce the award of punitive damages. *See* Mot.

## III. <u>LEGAL STANDARD</u>

A motion under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014). A Rule 59(e) motion may be granted only where "1) the motion is necessary to correct manifest errors of law or fact upon which the judgment is based; 2) the moving party presents newly discovered or previously unavailable evidence; 3) the motion is necessary to prevent manifest injustice; or 4) there is an intervening change in controlling law." *Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003) (quotations and emphasis omitted). A district court has "considerable discretion when considering a motion to amend a judgment." *Id.*

## IV. <u>ARGUMENT</u>

The jury's $3 million punitive damages award is consistent with due process and should be upheld to punish and deter Tesla. The Due Process Clause precludes states from imposing "grossly excessive" punitive damages. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (quoting *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 454 (1993)). "Grossly excessive" punitive awards are prohibited because they serve no legitimate deterrent

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT

purpose and result in an "arbitrary deprivation of property." *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). To evaluate whether punitive damages violate due process, courts consider three "guideposts." *Id.* at 418. First and "most important," the court must evaluate the "degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. Next, the court considers the ratio of punitive damages to the harm inflicted. *Id.* at 580. Third, the court may compare the punitive damages to any civil or criminal penalties authorized for comparable misconduct if such parallel penalties exist. *Id.* at 583.

Under those guideposts, the jury's punitive damages award is more than justified. First, Tesla's conduct was extraordinarily reprehensible and requires a strong sanction. Second, the award's ratio of 17 times the jury's award of compensatory damages is appropriate, because the compensatory damages award is far smaller than (1) the amount the Court previously approved after the first jury's verdict, and (2) the amounts awarded and approved in the other cases this Court previously found most comparable. Given those previous awards and Tesla's prior concession that compensatory damages of $300,000 would be appropriate, Tesla also had ample notice that it could face punitive damages liability of $3 million or more for its egregious racial misconduct. *See* Dkt. 317 at 12. Third, there are no civil penalties for violations of Section 1981, so this factor is inapplicable.

**A. Tesla's conduct was extremely reprehensible.**

The reprehensibility of a defendant's conduct is "the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. As this Court already concluded, Tesla's conduct "falls high on the spectrum" of reprehensibility. Post-Trial Order at 38.

**1. Tesla supervisors subjected Owen Diaz to horrific racist abuse.**

The evidence on this point was overwhelming. Tesla conceded that its own supervisor, Ramon Martinez, placed a racist effigy in Mr. Diaz's workspace. Tr. 1:241:17-18. Mr. Diaz testified without contradiction that Mr. Martinez also said things to him like "go back to Africa," "I hate you, [N]," Tr. 3:603:21-25, and "I wish I can get all of you [Ns] fired." Tr. 3:605:12-13. Mr. Martinez used the N-word toward Mr. Diaz more than 30 times. Tr. 3:604:19-20. Mr. Martinez also physically attacked Mr. Diaz without provocation in an elevator, saying at one

point, "You [Ns] aren't shit." Tr. 3:609:12–612:7; *see also* Tr. 2:325:21–326:3 (Kawasaki testimony that Martinez frequently used the term "chongo" (gorilla)).

Another Tesla supervisor, Robert Hurtado, also repeatedly used the N-word toward Mr. Diaz, ordering him around with phrases like "[N], hurry up and push the button" and "[Ns] are lazy" when Mr. Diaz wasn't moving Hurtado's material fast enough. Tr. 3:604:22–605:6. Mr. Hurtado also regularly called Mr. Diaz "boy." Tr. 3:606:18–607:3.

Courts have repeatedly emphasized that racial discrimination and the use of racist epithets in the workplace are among the most reprehensible conduct that civil juries have the power to sanction and are "especially reprehensible" for due process purposes. *Flores v. City of Westminster*, 873 F.3d 739, 760 (9th Cir. 2017). Unlike the economic harms at issue in cases like *Gore* and *Campbell*, "intentional discrimination is a different kind of harm, a serious affront to personal liberty." *Zhang*, 339 F.3d at 1043; *see also Flores*, 873 F.3d at 760 ("[A] more substantial punitive damages award may be justified in intentional discrimination cases than in cases involving 'purely economic' harms."). "Freedom from discrimination on the basis of race or ethnicity is a fundamental human right recognized in international instruments to which the United States is a party … and the intentional deprivation of that freedom is highly reprehensible conduct." *Zhang*, 339 F.3d at 1043; *see also Swinton*, 270 F.3d at 818 ("Highly offensive [racist] language directed at [a worker], coupled by the abject failure of [the employer] to combat the harassment, constitutes highly reprehensible conduct justifying a significant punitive damages award."); *accord Bains LLC v. Arco Prod. Co.*, 405 F.3d 764, 775 (9th Cir. 2005); *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 909 (9th Cir. 1999).

Courts have singled out racial harassment of Black workers through the repeated use of the N-word as a particularly egregious form of race discrimination. The N-word is "perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry." *Swinton*, 270 F.3d at 817. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the N-word] by a supervisor in the presence of his subordinates"—even just once. *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (cleaned up). The N-word "evok[es] a history of racial violence, brutality and subordination," and its use

is a "significant exacerbating factor[] in evaluating the severity of the racial hostility." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).

This disgusting racial harassment by Tesla's own supervisors would be sufficient to require a substantial punitive damages award, but Tesla's punitive damages liability should be even greater given Tesla's abject failure to act on its knowledge of this abhorrent conduct.

### 2. Tesla knew of widespread racial abuse at its factory, yet failed to take readily available steps to stop it.

In addition to Tesla being responsible for the affirmative acts of harassment described above, the company also allowed racial slurs and harassment to continue to fester at its factory. Four separate witnesses testified, *without contradiction*, that the N-word was used on a daily basis in Tesla's factory during the time Mr. Diaz worked there. *See* Tr. 2:381:3-15 (Wayne Jackson: "rampant" use of the N-word "more than several times a day"); Tr. 2:282:2-5 (Tom Kawasaki); Tr. 2:326:16-17 (similar regarding "chongo"); Tr. 2:343:4–344:19 (Michael Wheeler); Tr. 4:739:18–742:14 (Owen Diaz). Several witnesses also confirmed the presence of pervasive racist graffiti at Tesla, including swastikas and "death to all [Ns]." Tr. 2:332:18-24 (Kawasaki); Tr. 2:346:16–347:21 (Wheeler); Tr. 3:623:1-25 (Diaz). Michael Wheeler, another Black worker, was told "Fuck you, [N]" by one of his subordinates. Tr. 2:344:20–346:12. Black workers at Tesla were forced to work in an environment in which the N-word was, as Mr. Wheeler described it, "just another word." Tr. 2:343:20-21.

Nor was the endemic use of the N-word the only toxic feature of Tesla's workplace. Mr. Diaz was called numerous other racist terms, including "porch monkey" and "mayate." Tr. 3:592:2-593:8. Feces were placed on the seat of the cart Mr. Wheeler used at the factory, which Mr. Wheeler understood to be a deliberately hateful racial act. Tr. 2:348:6–10, 366:21-23.

Tesla knew all about this racial abuse. The retrial testimony on that point was clear. For example, Tesla supervisor Ed Romero expressly admitted that Mr. Diaz had specifically complained to him about use of the N-word on multiple occasions. *See* Tr. 3:551:10-11; *compare* Original Trial Tr. 2:182:1. Mr. Diaz also complained about the N-word to supervisor Tom Kawasaki. *See* Tr. 2:269:23-25. Wayne Jackson and Michael Wheeler, both Tesla supervisors, confirmed the word's rampant use. Tr. 2:381:3-15, 343:4–344:19. These witnesses' testimony

was also confirmed by documentary evidence establishing that another employee, Javier

Temores, had reported to Tesla that a co-worker had "gotten upset and called him a [N]." Ex.

106. Mr. Wheeler similarly reported the incidents involving his subordinate's use of the N-word

and the racist incident in which feces were placed on his cart, which he supported with

photographic proof. Tr. 2:345:19-23; 348:16–349:9.

   Although Tesla knew about this racial harassment, it repeatedly failed to respond. It

never addressed the rampant use of the N-word at its factory. Tr. 2:445:5-10. When Mr. Wheeler

reported that his subordinate, Jesus, said "Fuck you, [N]" to Mr. Wheeler," Tesla did not

discipline Jesus; instead, it later promoted him and gave him a team to lead. Tr. 2:346:2-12.

When Mr. Wheeler reported the feces incident and provided photographic proof, Tesla

conducted no interviews or investigations, imposed no discipline, and provided no training. Tr.

2:349:6–351:6. It did not collect, consult, or preserve the video footage. Tr. 2:350:2-18. These

woeful responses constituted a tacit acceptance by Tesla of the pervasive harassment of its Black

employees and posed a substantial danger to all of those employees. *See Gore*, 517 U.S. at 576–

77 ("[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or

suspecting that it was unlawful would provide relevant support for an argument that strong

medicine is required to cure the defendant's disrespect for the law. … [R]epeated misconduct is

more reprehensible than an individual instance of malfeasance); *Campbell*, 538 U.S. at 419

(punitive damages may reflect whether "the conduct involved repeated actions or was an isolated

incident."); *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991) ("the existence and

frequency of similar past conduct" is a factor in assessing punitive damages).

   Tesla's inaction with respect to Mr. Diaz was particularly reprehensible. As expert Amy

Oppenheimer testified without impeachment or contradiction, Tesla failed to perform an

adequate investigation into *any* of the racist harassment incidents reported by Mr. Diaz,

including the verbal assault by Judy Timbreza, the physical assault by Ramon Martinez, and the

racist pickaninny left by Martinez. Tr. 2:467:16-17, 468:5-21, 469:12-24, 470:2-10. Tesla's

purported "investigations" of these extremely serious incidents failed to meet basic, common-

sense standards of competence. *See, e.g.*, Tr. 2:472:14-15 (no point person on investigations); Tr.

2:467:17-21, 470:3-7 (investigators not trained); Tr. 468:5-21, 469:12-24, 470:8-10 (no findings

made, no documentation); Tr. 2:468:15-16, 469:12-24, 472:22-473:2 (inadequate remedial

action); Tr. 2:469:2-4 (failure to consult or store surveillance footage); Tr. 2:469:8-10, 470:16-17

(no interviews of key witnesses or accused harassers); *see also* Renewed Mistrial Mot. at 26-27.

### 3. Tesla still fails to acknowledge or accept responsibility for its failures.

Underscoring the need for a substantial award of punitive damages, both to punish Tesla

for its past misconduct and to deter it from committing future violations, is Tesla's blindered

characterization of its shocking misconduct in this case as "amount[ing], in substance, merely to

negligence at most." Mot. at 5.[2] That is a perverse mischaracterization. Among the copious

evidence Tesla ignores is the evidence that the most atrocious abuse Mr. Diaz suffered was

inflicted by *Tesla's own supervisors*—that is, by employees who represent the company and

whose conduct is legally attributable to Tesla. That is intentional, malicious conduct for which

Tesla is legally responsible. Nor can Tesla's paltry oversight and investigations be chalked up to

mere negligence. As this Court has already found, the evidence demonstrates that "Tesla

intentionally built an employment structure that allowed it to take advantage of Diaz's (and

others') labor for its benefit while attempting to avoid any of the obligations and responsibilities

that employers owe employees …. [A]ttempting to pawn off responsibility for a safe and

discrimination-free workplace would seem to be precisely the sort of extraordinary behavior

punitive damages are built for." Post-Trial Order at 40. Indeed, in at least one instance Tesla

*called off* an ongoing investigation. Ex. 76; Tr. 2:395:3-11. And the evidence showed that Tesla

purposefully took other types of harassment more seriously than racial harassment. When

someone drew breasts on a bathroom sign, for example, Tesla conducted "sensitivity training

that covered pretty much everything" for the "whole entire team" of more than 500 people to

whom Tesla made clear that sexist drawings were "not okay" and "wouldn't be tolerated."

Marconi Depo. Tr. 81:4–82:3. Tesla never conducted any comparable training regarding the N-

word, despite its pervasive use in the factory.

---

[2] Tesla's contention that expert Amy Oppenheimer only concluded Tesla was "negligent," Mot. at 5, is groundless. The trial record clearly shows that Tesla's counsel was trying to put words (or legal conclusions) in her mouth on cross-examination, and she resisted and testified that "what they [Tesla] did was subpar and was not consistent with what was acceptable practice during the period of time that these events occurred." *See* Tr. 3:516:18-25.

1   Tesla's assertion (Mot. at 5) that it adequately disciplined its workers is also contrary to

2   the unrebutted evidence. Ms. Oppenheimer comprehensively detailed, without rebuttal, Tesla's

3   grossly inadequate approach to investigation and discipline, including for example the fact that

4   Tesla gave *Mr. Diaz* a verbal warning about the elevator assault, and completely ignored Mr.

5   Martinez's past history of racial harassment. Ex. 76; Tr. 2:469:12-24, 471:7-10. The record also

6   leaves no doubt that Tesla utterly failed to address the systemic racial harassment of Black

7   employees at its factory and never fired anyone for using the N-word, despite the company's

8   purported zero tolerance policy. Tr. 3:615:13-15, 3:552:7-19.

9   **4. All of the factors courts consider when assessing reprehensibility support the jury's award.**

10   In determining the reprehensibility of a defendant's conduct for due process purposes,

11   courts consider whether "the harm caused was physical as opposed to economic; the tortious

12   conduct evinced an indifference to or a reckless disregard of the health or safety of others; the

13   target of the conduct had financial vulnerability; the conduct involved repeated actions or was an

14   isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere

15   accident." *Campbell*, 538 U.S. at 419; *see* Post-Trial Order at 39-40. Here, Tesla's supervisors'

16   racial harassment of Mr. Diaz and others and Tesla's failure to take reasonable steps to

17   investigate and prevent ongoing harassment evinced "indifference" or "reckless disregard of the

18   health or safety of others"; Mr. Diaz, who was living paycheck-to-paycheck while working at

19   Tesla (Tr. 3:588-24-25), was financially vulnerable; and Tesla's wrongful conduct was repeated

20   rather than isolated. *See* Post-Trial Order at 39-40; *supra* at 4-8. In its prior order, the Court

21   suggested that two factors—whether the harm caused was physical and whether the conduct was

22   purposeful—may lean in Tesla's favor. *See* Post-Trial Order at 39-40. Respectfully, however, the

23   record is now even more clear that these factors cut against Tesla.

24   Unlike at the first trial, Tesla at retrial *conceded* that Ramon Martinez—a Tesla

25   supervisor, whose conduct is legally attributable to Tesla itself—physically assaulted Mr. Diaz.

26   Tr. 2:428:9-14; Tr. 5:1087:9-19; *see also* Tr. 2:428:11-14 (assault confirmed by Wayne

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT

Jackson's review of video footage).[3] Mr. Diaz also undisputedly suffered physical symptoms, including insomnia, lack of appetite, weight loss, and sexual performance issues—in addition to his other psychiatric symptoms. Tr. 3:626:15–627:22; *see also Yowan Yang v. ActioNet, Inc.*, 2017 WL 2117028 at *15 (C.D. Cal. Jan. 23, 2017) (physical harm "encompasses psychological harm"); *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 713 (2009) (physical harm includes harm to "emotional and mental health").

The Court also previously noted that unlike in *Zhang*, 339 F.3d at 1043, "Tesla's senior management" did not personally carry out threats or acts of violence against Mr. Diaz. Post-Trial Order at 40. But that does not favor Tesla; it merely reflects that unlike the corporate executive plaintiff in *Zhang*, Mr. Diaz was a low-level worker. Besides, Tesla's senior management *is* ultimately responsible for failing to prevent or address the abuse directed against Mr. Diaz. The Court's observation that Tesla's senior management did not "set out with the *purpose* of discriminating or fostering a hostile work environment," Post-Trial Order at 40, does not favor Tesla either. Unlike the employer in *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 258 (S.D.N.Y. 2007), Tesla's senior management likely had no awareness at all of Mr. Diaz, since he had no cause for interacting with C-suite executives in his position as elevator operator. Critically, though, the Tesla supervisors with whom Mr. Diaz *did* interact—those who used the N-word and drew pickaninnies—unquestionably did have the malicious purpose of racially harassing Mr. Diaz. This factor therefore also supports the jury's award.

In short, Tesla's extraordinarily reprehensible conduct—the most important guidepost for this Court to consider—fully justifies the $3 million in punitive damages awarded by the jury.

## B. The jury award's 17-to-1 ratio of punitive to compensatory damages is appropriate here.

Tesla's principal argument is that, since the Court previously determined that a 9-to-1 ratio of punitive-to-compensatory damages was appropriate with respect to the first jury's verdict, that same ratio creates a ceiling here. Mot. at 4-6. Tesla is wrong. The Court's prior

---

[3] The graffiti that numerous witnesses testified to, including swastikas and "Death to all [Ns]," plainly were also physical threats against Black workers at Tesla. *See, e.g.*, Tr. 2:332:22-24, 2:347:11-14, 3:623:18.

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT

determination was based on its evaluation of a different—and considerably higher—damages award in a case not marred by Tesla's misconduct and the awards in other comparable cases. The Court is not bound by its prior determination, and there are ample reasons to uphold the jury's $3 million award of punitive damages here.

The Supreme Court has repeatedly refused to "impose a bright-line ratio which a punitive damages award cannot exceed." *Campbell*, 538 U.S. at 425; *Gore*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award."); *TXO Prod. Corp.*, 509 U.S. at 458; *Pac. Mut. Life Ins. Co.*, 499 U.S. at 18. Thus, for example, the Supreme Court in *TXO* upheld a punitive damages award that was 526 times actual damages, reasoning that the potential damages were much higher than the actual damages and courts must consider "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." 509 U.S. at 460 (emphasis in original); *see Gore*, 517 U.S. at 581. The Court has also stated that "low awards of compensatory damages may properly support a higher ratio" and that "a higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582. Similarly, the Ninth Circuit explained in *Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists* that "in cases where there are insignificant economic damages but the behavior was particularly egregious, the single-digit ratio may not be a good proxy for constitutionality." 422 F.3d 949, 962 (9th Cir. 2005); *see also Bains*, 405 F.3d at 776 (awards exceeding single-digit ratio permitted where "particularly egregious act has resulted in only a small amount of economic damages"); *Swinton*, 270 F.3d at 818 (affirming $1 million punitive damages award with 28-to-1 ratio in racial harassment case).

Here, the jury's award of $3 million in punitive damages, representing a 17-to-1 ratio relative to the compensatory damages awarded by the jury, is well within constitutional bounds. Although the Supreme Court has counseled that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *Campbell*, 538 U.S. at 425, the jury's award here is justified in light of Tesla's extraordinarily

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT

reprehensible conduct requiring deterrence, the relatively small award of compensatory damages, the relatively modest 17-to-1 ratio, and Tesla's substantial wealth.

The jury's award of only $175,000 in compensatory damages justifies a higher-than-single-digit ratio, particularly given Tesla's highly egregious conduct. *See supra* at 4-9. This Court has already found that in the most analogous cases, the plaintiffs were awarded roughly $1.5 million in compensatory damages. Post-Trial Order at 36; *see Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014); *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493 (9th Cir. 2000). Moreover, the first jury, on virtually the same admissible evidence (i.e., with no misconduct from Tesla and its counsel), concluded that Mr. Diaz's damages were $6.9 million, and this Court concluded that a damages award of $1.5 million was fully supported by the evidence. Post-Trial Order at 27. The second jury's award of $175,000 represents only a tiny fraction of the compensation that Mr. Diaz could have recovered based on Tesla's reprehensible conduct.

Tesla argues that a 9-to-1 ratio is nonetheless the constitutional maximum because in a different case nearly two decades ago, the Ninth Circuit concluded that a $50,000 award was sufficiently "substantial" to support a 9-to-1 ratio. *See* Mot. at 5-6; *Bains*, 405 F.3d at 776. But whether an award of compensatory damages is sufficiently "substantial" cannot be a one-size-fits-all analysis; rather, the analysis necessarily depends on the facts of the case and the nature of the plaintiff's claims. *Bains* concerned a corporate plaintiff that was awarded economic damages for breach of contract, where the defendant's conduct "did not evince reckless disregard of health or safety" or the "threat of physical harm." 405 F.3d at 775. Here, by contrast, Tesla's racial abuse was particularly egregious, Tesla's conduct recklessly or maliciously threatened the health and safety of Diaz and many other Black workers, and Mr. Diaz in fact suffered severe emotional distress that continues to this day. Post-Trial Order at 39-40. In this context and on these facts, $175,000 in compensatory damages is far from "substantial."

The paucity of the award is confirmed by the massively higher compensatory damages that plaintiffs in comparable cases have been awarded. *See* Post-Trial Order at 36. The significant disparity between the jury's $175,000 award and the compensatory damages awards in the most comparable cases (including the first jury's verdict here) demonstrates that here

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT

"there is a reasonable relationship between the punitive damages award and *the harm likely to result from the defendant's conduct* as well as the harm that actually has occurred." *Gore*, 517 U.S. at 581 (quoting *TXO*, 509 U.S. at 460); *see also Campbell*, 538 U.S. at 424-25 (the ratio factor considers potential harm). Based on those prior cases (not to mention the prior jury's verdict and this Court's prior damages analysis), Tesla cannot reasonably argue that it did not "receive fair notice … of the severity of the penalty that a State may impose" for the type of malicious conduct it committed here. *Campbell*, 538 U.S. at 417.[4]

Moreover, the actual compensatory damages awarded by the retrial jury were likely substantially depressed as a result of Tesla's counsel's trial misconduct and fall far short of adequately compensating Mr. Diaz for the emotional distress he suffered. *See* Renewed Mistrial Motion at 24-30. In assessing the appropriateness of any ratio, the Court should take into account what the compensatory damages would have been without Tesla's deliberate, prejudicial misconduct—including as evidenced by the massive disparity between the first and second jury awards. *See id*. at 5-23. Granting Plaintiff's motion for a new damages trial should moot Tesla's motion, but if the court disagrees that Mr. Diaz is entitled to a retrial, the negative impact of Tesla's wrongdoing on the retrial jury's award is an independent reason that a higher ratio, and the resulting $3 million in punitive damages, is appropriate on the facts of this case.

Regardless, even considering the actual compensatory damages awarded here, rather than the harms that comparable cases show are likely to occur in these types of cases, a 17-to-1 ratio is hardly disproportionate. A ratio of 17-to-1 is nothing like the massive ratios reversed in cases like *Gore* (500-to-1), *Campbell* (145-to-1), or *Bains* (100-to-1). It is not even as large as the 28-to-1 ratio upheld in *Swinton*, 270 F.3d at 818. *See also Campbell*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process … than awards with ratios in range of

---

[4] It should have been apparent to Tesla that its conduct could easily support a compensatory damages award of far more than one-ninth of the $3 million in punitive damages awarded here. Indeed, Tesla's prior post-trial briefing *conceded that compensatory damages of $300,000 would be appropriate*, based on Tesla's review of what it considered the most analogous cases. Dkt. 317 at 12-15 (collecting cases). Moreover, given its thousands of Black workers, Tesla should have been on notice that it faced potentially enormous punitive damages liability.

*500 to 1* or… of *145 to 1*.") (citations omitted, italics added); *id.* ("[F]ew awards exceeding a single-digit ratio … *to a significant degree* will satisfy due process.") (italics added).

The nature of Mr. Diaz's emotional distress damages also supports a higher-than-single-digit ratio. That is the type of case in which "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582. Unlike economic damages, damages for psychological harm are impossible to calculate with precision, which can make a higher ratio constitutionally appropriate. *See Swinton*, 270 F.3d at 818; *see also, e.g.*, *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1273 (10th Cir. 2000) (greater ratios may be permissible in workplace harassment context "where the injury is primarily personal"); *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) (upholding 19-to-1 ratio in workplace discrimination case).

These considerations also show why the Court's prior determination that a 9-to-1 ratio was the constitutional limit for the damages awards made in the first trial is not controlling. There is a vast difference between the $175,000 compensatory damages award here and the $1.5 million compensatory damages remittitur approved in the Court's prior order. That difference should lead to a different conclusion: that a 17-to-1 ratio is appropriate here. Indeed, the Court's prior analysis considered the size of the prior $1.5 million compensatory remittitur and nonetheless concluded that a 9-to-1 ratio was appropriate. *See* Post-Trial Order at 41.

Further, the Court previously determined that the proper amount of punitive damages to punish and deter Tesla—a company of massive wealth—for its misconduct against Mr. Diaz was *$13.5 million.* That conclusion strongly supports upholding the far smaller award of $3 million in punitive damages *based on that same conduct*. While the ratio between compensatory and punitive damages is one factor to consider, the absolute amount of damages awarded obviously matters too. *See S. Union Co. v. Irvin*, 563 F.3d 788, 793 (9th Cir. 2009) (Reinhart, J. concurring) ("If punitive damages are to achieve the twin purposes of deterrence and punishment, we must consider the impact of a damage award upon the particular defendant in determining the constitutional limit. … In some cases, although the conduct may be similar, because of lower compensatory damages or the defendant's higher net worth, a higher ratio may be necessary to achieve a deterrent or punitive effect."). That is why, for example, a jury is

entitled to take a defendant's wealth into account when assessing punitive damages. *See* Post-Trial Order at 42-43 (citing *TXO Prod. Corp.*, 509 U.S. at 462 n.28, and *White v. Ford Motor Co.*, 500 F.3d 963, 976 (9th Cir. 2007)). Indeed, Tesla's gargantuan wealth lends further support to the $3 million punitive damages award—an award that will likely do little to punish and deter a company of Tesla's value but would nonetheless deliver roughly twice the deterrence of the $1.575 million punitive damages remittitur requested by Tesla. *See, e.g.*, *Saunders v. Branch Banking and Tr. Co. of VA*, 526 F.3d 142, 154 (4th Cir. 2008) (upholding 80:1 ratio because "reducing the punitive damages award … would leave little deterrent or punitive effect, particularly given [defendant's] net worth").

In sum, on the particular facts and circumstances here, a 17-to-1 ratio of punitive to compensatory damages is appropriate, and the jury's award should be upheld.

### C.  No comparable civil penalty requires a reduction in punitive damages.

The final guidepost is the "disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 428 (quotation omitted). But "[t]here are no 'civil penalties'" for racist harassment in the workplace. *Swinton*, 270 F.3d at 820.

Although Title VII, which targets some of the same conduct as Section 1981, imposes a $300,000 cap on damages, Congress expressly decided that that cap should not apply to Section 1981 cases. *See* 42 U.S.C. § 1981a(b)(4). Thus, while the Ninth Circuit has compared punitive awards to the awards available under Title VII, *see Bains*, 405 F.3d at 777, it "hasten[ed] to add that Congress has not seen fit to impose any recovery caps in cases under § 1981" despite "ample opportunity to do so." *See Swinton*, 270 F.3d at 820; *Zhang*, 339 F.3d at 1045; *Flores*, 873 F.3d at 760. The Title VII limit therefore should not be a basis for reducing punitive damages in this case.

Even if it were, the Court previously found that the "[b]ecause of the sheer difference between $130 million and $300,000, this factor weighs somewhat in favor of a reduction." Post-Trial Order at 42. However, there is no longer such a drastic difference between the Title VII cap and the $3 million punitive damages at issue. Indeed, the difference is now substantially smaller than the difference than the Court previously approved when remitting the punitive damages to

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT

$13.5 million. For that reason as well, this factor does not favor further reducing the punitive damages on retrial.

## V. CONCLUSION

For these reasons, if the Court reaches the merits of Tesla's motion, it should deny the motion and uphold the jury's award of $3 million in punitive damages.

DATED: June 7, 2023          Respectfully submitted,

CALIFORNIA CIVIL RIGHTS LAW GROUP
ALEXANDER MORRISON + FEHR LLP
ALTSHULER BERZON LLP
COLLIER LAW FIRM, LLP


/s/   *Michael Rubin*
Lawrence A. Organ
Marqui Hood
Cimone A. Nunley
J. Bernard Alexander III
Michael Rubin
Jonathan Rosenthal
Dustin L. Collier
V. Joshua Socks
Elizabeth R. Malay
Drew F. Teti

Attorneys for Plaintiff OWEN DIAZ

PLAINTIFF'S OPPOSITION TO TESLA'S MOTION TO ALTER OR AMEND THE JUDGMENT