1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Alex Spiro (appearance *pro hac vice*)
2      alexspiro@quinnemanuel.com
   51 Madison Ave., 22nd Floor
3  New York, NY 10010
   Telephone: (212) 849-7000
4

5  QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Daniel C. Posner (CA Bar No. 232009)
6      danposner@quinnemanuel.com
      Mari F. Henderson (CA Bar No. 307693)
7      marihenderson@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
8  Los Angeles, California 90017
   Telephone: (213) 443-3000
9  Facsimile: (213) 443-3100
10

11 QUINN EMANUEL URQUHART &SULLIVAN, LLP
      Asher Griffin (appearance *pro hac vice*)
12     ashergriffin@quinnemanuel.com
   300 W. 6th St., Suite 2010
13 Austin, TX 78701
   Telephone: (737) 667-6100
14

15 *Attorneys for Defendant Tesla, Inc.*

16

17                **UNITED STATES DISTRICT COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19                 **SAN FRANCISCO DIVISION**

20

21 OWEN DIAZ,                              Case No. 3:17-cv-06748-WHO

22          Plaintiff,                     **DEFENDANT TESLA, INC.'S**
                                           **OPPOSITION TO PLAINTIFF'S**
23      v.                                 **RENEWED MOTION FOR MISTRIAL**
                                           **AND MOTION FOR A NEW TRIAL**
24 TESLA, INC. d/b/a TESLA MOTORS, INC.,
                                           Hearing Date: July 19, 2023
25          Defendant.                     Hearing Time:  2 p.m.
                                           Place: Courtroom 2, 17th Floor
26                                         Judge: Hon. William H. Orrick

27

28

                                                        Case No. 3:17-cv-06748-WHO

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ............................................................................................................3

I.    THE COURT SHOULD DENY MR. DIAZ'S MOTION FOR A NEW TRIAL FOR SUPPOSED ATTORNEY MISCONDUCT ....................................................3

    A.    Legal Standard.........................................................................................3

    B.    Mr. Diaz Fails To Show Any Attorney Misconduct By Tesla...................5

        1.    Statement About Mr. Diaz's Counsel ........................................7

        2.    Questions About Feces Incident..................................................8

        3.    Reference To Settlement With Staffing Agencies .....................10

        4.    Questions About Mr. Diaz's Comments To Co-Workers ..........10

        5.    Reference To Mr. Diaz's Lies On His Employment Application ...............11

        6.    Questions On Forgery Of Doctor's Note ...................................13

        7.    Reference To Dismissal Of Demetric Di-Az's Claims ...............13

        8.    Reference In Closing To Mr. Diaz's Salary ...............................13

        9.    Reference In Closing To Legal Standard ...................................14

    C.    The Evidence Supports The Jury's Verdict Irrespective Of The Nine Isolated Incidents Of Alleged Attorney Misconduct...................................15

        1.    Mr. Diaz Offered Limited Evidence Of Short-Lived Emotional Distress ..............................................................................16

        2.    Mr. Diaz Documented And Introduced Corroborating Evidence Of Only Two Incidents Of Racial Harassment................................17

        3.    Every Other Instance Of Racial Misconducted Alleged By Mr. Diaz Was Disputed And Discredited ............................................19

        4.    The Jury Had Ample Grounds To Doubt Mr. Diaz's Credibility And Disbelieve His Testimony .................................................25

        5.    Tesla Responded To Mr. Diaz's Documented Complaints..........25

II.    THE COURT SHOULD DENY MR. DIAZ'S MOTION FOR A NEW TRIAL FOR SUPPOSED INADEQUATE DAMAGES ...................................................27

    A.    Legal Standard.........................................................................................28

    B.    The Evidence Supports The Adequacy Of The Compensatory Damages Award ......................................................................................................29

1          1.      Mr. Diaz Ignores The Evidence Supporting The Verdict ............................29

2          2.      The Jury Acted Properly Under The Court's Correct Instructions .............30

3          3.      Comparable Cases Support The Compensatory Damages Award ...............31

4     C.     The Evidence Supports The Adequacy Of The Punitive Damages Award.............34

5  CONCLUSION .........................................................................................................................35

1

# TABLE OF AUTHORITIES

2

**Page**

3

*Abromson v. Am. Pac. Corp.*,
    114 F.3d 898 (9th Cir. 1997) ................................................................................. 3

4

*Adickes v. Kress Co.*,
    398 U.S. 144 (1970) (Black, J., concurring) ........................................................... 6

5

6

*Amadeo v. Principal Mut. Life Ins. Co.*,
    290 F.3d 1152 (9th Cir. 2002) ............................................................................. 34

7

*Anheauser-Bush, Inc. v. Nat. Bev. Distributors*,
    69 F.3d 337 (9th Cir. 1995) ........................................................................ 8, 10, 11

8

9

*B.K.B. v. Maui Police Dep't*,
    276 F.3d 1091 (9th Cir. 2002), *as amended* (Feb. 20, 2002) ................................. 11

10

*Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*,
    405 F.3d 764 (9th Cir. 2005) ............................................................................... 35

11

12

*Benson Tower Condo. Owners Ass'n v. Victaulic Co.*,
    105 F. Supp. 3d 1184 (D. Or. 2015), *aff'd*, 702 F. App'x 537 (9th Cir. 2017) ........... 30, 31

13

*Boyde v. California*,
    494 U.S. 370 (1990) ........................................................................................... 15

14

*Brocklesby v. United States*,
    767 F.2d 1288 (9th Cir. 1985) ............................................................................. 10

15

16

*Call Delivery Sys., LLC v. Morgan*,
    2022 WL 18143363 (C.D. Cal. Sept. 20, 2022) ................................................ 7, 11

17

18

*Calmat Co. v. U.S. Dep't of Lab.*,
    364 F.3d 1117 (9th Cir. 2004) ............................................................................... 9

19

*Carey v. Piphus*,
    435 U.S. 247 (1978) ........................................................................................... 28

20

*Carino v. Garland*,
    997 F.3d 1053 (9th Cir. 2021) ............................................................................... 3

21

22

*Clanahan v. McFarland Unified Sch. Dist.*,
    2007 WL 2253597 (E.D. Cal. Aug. 3, 2007) .......................................................... 7

23

24

*Cones v. Cnty. of L.A.*,
    2016 WL 7438817 (C.D. Cal. Sept. 28, 2016) .................................................. 8, 11

25

*Cooper v. Firestone Tire & Rubber Co.*,
    945 F.2d 1103 (9th Cir. 1991) ............................................................................... 3

26

*Drayton v. Scallon*,
    685 F. App'x 557 (9th Cir. 2017) ................................................................... 12, 14

27

28

*Droplets, Inc. v. Yahoo! Inc.*,
   2023 WL 3296171 (N.D. Cal. Mar. 1, 2023) ........................................................ 28

*E.E.O.C. v. Wal-Mart Stores, Inc.*,
   156 F.3d 989 (9th Cir. 1998) .............................................................................. 15

*Feltner v. Columbia Pictures Television, Inc.*,
   523 U.S. 340 (1998) ........................................................................................... 3

*Fineman v. Armstrong World Indus., Inc.*,
   980 F.2d 171 (3d Cir. 1992) ................................................................................. 7

*Francis v. Franklin*,
   471 U.S. 307 (1985) ........................................................................................... 4

*Gasperini v. Center of Humanities Inc.*,
   518 U.S. 415 (1996) ......................................................................................... 28

*Greer v. Miller*,
   483 U.S. 756 (1987) ........................................................................................... 4

*Gresham v. Petro Stopping Centers, LP*,
   2011 WL 1042705 (D. Nev. Mar. 18, 2011) ....................................................... 12

*Hemmings v. Tidyman's Inc.*,
   285 F.3d 1174 (9th Cir. 2002) .............................................................................. 4

*Holt v. Pennsylvania*,
   2018 WL 5617856 (E.D. Pa. Oct. 30, 2018), *aff'd*, 778 F. App'x 123 (3d Cir.
   2019) ................................................................................................... 30, 32

*Holzhauer v. Golden Gate Bridge Highway & Transportation Dist.*,
   2017 WL 3382316 (N.D. Cal. Aug. 7, 2017) .............................................. 28, 29

*Hudspeth v. Comm'r*,
   914 F.2d 1207 (9th Cir. 1990) ............................................................................ 10

*Jones v. Aero/Chem Corp.*,
   921 F.2d 875 (9th Cir. 1990) ............................................................................... 9

*Jones v. Williams*,
   41 F. App'x 964 (9th Cir. 2002) .......................................................................... 4

*Kaiser Steel Corp. v. Frank Coluccio Const. Co.*,
   785 F.2d 656 (9th Cir. 1986) ........................................................................ 5, 11

*Kehr v. Smith Barney, Harris Upham & Co.*,
   736 F.2d 1283 (9th Cir. 1984) ................................................................ 3, 4, 5, 10

*Landes Const. Co. v. Royal Bank of Canada*,
   833 F.2d 1365 (9th Cir. 1987) ............................................................................ 29

*Langer v. Kiser*,
   495 F. Supp. 3d 904 (S.D. Cal. 2020) .................................................................. 7

*Lasar v. Ford Motor Co.*,
  399 F.3d 1101 (9th Cir. 2005) ............................................................................................. 8

*Maxwell v. Cnty. of San Diego*,
  714 F. App'x 641 (9th Cir. 2017) ......................................................................................... 4

*Cotton ex rel. McClure v. City of Eureka, Cal.*,
  860 F. Supp. 2d 999 (N.D. Cal. 2012) ................................................................................. 5

*McCord v. Maguire*,
  873 F.2d 1271 (9th Cir. 1989) ............................................................................................ 28

*McCreary v. Diaz*,
  2019 WL 6840410 (S.D. Cal. Dec. 16, 2019) ................................................................... 12

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ............................................................................................. 28

*Newton v. Equilon Enterprises, LLC*,
  411 F. Supp. 3d 856 (N.D. Cal. 2019) ................................................................... 13, 14, 15

*Oracle Corp. v. SAP AG*,
  765 F.3d 1081 (9th Cir. 2014) ............................................................................................. 3

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
  212 F.3d 493 (9th Cir. 2000) ................................................................................. 16, 33, 34

*Pavemetrics Sys., Inc. v. Tetra Tech, Inc.*,
  2023 WL 1836331 (C.D. Cal. Jan. 23, 2023) ...................................................................... 7

*Pinola v. Cambra*,
  2002 WL 1457764 (N.D. Cal. Jul. 1, 2002) ......................................................................... 7

*Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc.*,
  169 F.3d 68 (1st Cir. 1999) .................................................................................................. 4

*Ramos v. Cnty. of Suffolk*,
  707 F. Supp. 2d 421 (E.D.N.Y. 2010) .................................................................................. 8

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
  2008 WL 6873809 (C.D. Cal. Apr. 24, 2008), *aff'd*, 563 F.3d 1358 (Fed. Cir.
  2009) .................................................................................................................................. 30

*Rhoades v. Avon Prods., Inc.*,
  504 F.3d 1151 (9th Cir. 2007) ............................................................................................ 10

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
  232 F.3d 1258 (9th Cir. 2000) .............................................................................................. 4

*S.E.C. v. Jasper*,
  678 F.3d 1116 (9th Cir. 2012) .............................................................................................. 4

*Tak Sun Tan v. Runnels*,
  413 F.3d 1101 (9th Cir. 2005) .............................................................................................. 4

*Tekoh v. Cnty. of Los Angeles*,
   2018 WL 9782523 (C.D. Cal. Mar. 8, 2018) ................................................................ 4

*Est. of Tindle v. Mateu*,
   2020 WL 5760287 (N.D. Cal. Sept. 28, 2020) ........................................................... 30

*Tortu v. Las Vegas Metropolitan Police Dept.*,
   556 F.3d 1075 (9th Cir. 2009) ................................................................................. 29

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014) ............................................................................ 16, 33, 34

*TXO Production Corp. v. Alliance Resources Corp.*,
   509 U.S. 443 (1993) ................................................................................................ 35

*U.S. v. Berry*,
   627 F.2d 193 (9th Cir. 1980) ................................................................................... 11

*United States v. Medina Casteneda*,
   511 F.3d 1246 (9th Cir. 2008) ................................................................................. 15

*United States v. Sarkisian*,
   197 F.3d 966 (9th Cir. 1999) ..................................................................................... 4

*United States v. Wyner*,
   230 F.3d 1368 (9th Cir. 2000) ................................................................................. 14

*United States v. Young*,
   470 U.S. 1 (1985) .................................................................................................. 16

*Wallace v. City of San Diego*,
   479 F.3d 616 (9th Cir. 2007) ................................................................................... 28

*United States v. Sanchez*,
   176 F.3d 1214 (9th Cir. 1999) ................................................................................... 9

*Weeks v. Angelone*,
   528 U.S. 225 (2000) ............................................................................................... 15

*Williams v. Gaye*,
   895 F.3d 1106 (9th Cir. 2018) ................................................................................. 28

*Yujin Robot Co. v. Synet Elecs., Inc.*,
   744 F. App'x 338 (9th Cir. 2018) .............................................................................. 3

**Rules / Statutes**

Cal. Civ. Proc. Code § 657(5) ......................................................................................... 28

Fed. R. Civ. P. 26(a)(2)(B) .............................................................................................. 7

Fed. R. Civ. P. 59 ........................................................................................................... 28

Fed. R. Civ. P. 59(a) ................................................................................................ 1, 2, 28

Fed. R. Civ. P.  59(a)(1) ................................................................................................ 28

Federal Rule of Evidence 408 ....................................................................................... 10

Federal Rule of Evidence 412(a) ................................................................................... 11

### <u>Other Authorities</u>

Noah Kirsch, *Ex-Tesla Worker Vows to Fight on After $137M Racism Verdict Cut
to $3M*, The Daily Beast (Apr. 04, 2023), ................................................................ 2

## PRELIMINARY STATEMENT

The Court should deny Plaintiff Owen Diaz's motion (Dkt. 478 ("Mot.")) for yet a third trial on damages.  The Court conducted a fair damages retrial, holding both sides in this hotly contested case to strict standards and giving curative instructions when appropriate.  And the jury rendered a fair damages award that was supported by the evidence and by inferences and credibility assessments that were well within the province of the jury as the factfinder.  Mr. Diaz turned down a $15 million remittitur and has no basis now to complain that the $3.2 million retrial verdict resulted from attorney misconduct by Tesla or is too low.   His arguments come nowhere near to clearing the high bar for a grant of new trial under Rule 59(a), and the Court should reject them.

***First***, in conjuring baseless accusations about Tesla's supposed attorney misconduct, Mr. Diaz offers a one-sided summary of the trial evidence that overlooks that the actual and obvious reason for the second jury's lower verdict was that Mr. Diaz's credibility was destroyed when Tesla revealed through legitimate cross-examination that his claim for more than $150 million in damages was built on lie after lie.  He testified that Tesla had "fractured" his relationship with his son when his son said the opposite.  He told his own paid medical expert that he had worked at Tesla longer than he had, that he had feces placed on ***his*** cart when he hadn't, and that he was out of work for several months after he left Tesla when he in fact was not.  Mr. Diaz's own witnesses corroborated only two incidents of racially hostile conduct and could not corroborate his other claims of supposed widespread harassment.  And Mr. Diaz's own witnesses confirmed that Tesla promptly disciplined the co-workers involved and that Tesla did not intentionally disregard Mr. Diaz's civil rights.

Tesla had every right—under both the Seventh Amendment and the Court's pretrial rulings—to vigorously cross-examine Mr. Diaz on matters relevant to his allegations of emotional distress.  In a case in which Mr. Diaz was seeking more than $150 million in damages based largely on his own uncorroborated account of the racially hostile incidents he allegedly experienced and the emotional distress he purportedly suffered, his credibility was of paramount importance.  Tesla's counsel did not come close to crossing any line that would constitute grounds for new trial, as the Court already ruled in declining to grant Mr. Diaz's mistrial motion at the close of evidence.  And when the evidence undermined and contradicted many of Mr. Diaz's specific claims of racial

harassment, the jury was entitled to assess the credibility of Mr. Diaz and his supporting witnesses and to conclude that he had misrepresented and exaggerated the nature and extent of his injuries and the supposed lack of any appropriate response by Tesla.

In any event, Mr. Diaz's nine instances of supposed attorney misconduct fall far short of the level required to overturn a jury award even if they are all credited.  For the Court to order a new trial under Rule 59(a) based on attorney misconduct, it would need to find that the misconduct was so persistent and pervasive that it permeated the entire trial and **_necessarily_** caused the verdict to result from passion and prejudice.  But Mr. Diaz's nine isolated incidents amount to a mere 200 lines of transcript of the more than 28,000-line trial transcript in a five-day trial.  The Court gave appropriate admonitions and curative instructions that dispelled any possible prejudice, and the jury is strongly presumed to have followed the Court's instructions.  And the record gives ample evidentiary support for the jury's decision to award $3.2 million rather than a higher figure.

Finally, the Court should disregard Mr. Diaz's outrageous accusation that Tesla's counsel "ruthlessly attack[ed]" Black witnesses at trial.  (Mot. 3.)  If anything, it was Mr. Diaz and his witnesses who made inappropriate and racially charged remarks.  One of Mr. Diaz's witnesses told Tesla's counsel at trial that he could not ask legitimate and relevant questions about use of the "n-word" at Tesla because he was "not a Black man"—requiring Tesla's counsel to inform the witness that he is indeed a Black man.  (Tr. vol. 2, 441:1-9 (Jackson).)  And after the verdict, Mr. Diaz told the press that the second jury awarded the amount it did because it was made up of "whites and idiots."[1]  Mr. Diaz's attorney-misconduct arguments should be rejected.

**_Second_**, in arguing that the jury's $3.2 million damages award requires a new trial because it is too low, Mr. Diaz overlooks the evidence supporting that award as well as comparable cases awarding damages in a similar range.  Moreover, the ruling he seeks would be unprecedented.  Tellingly, Mr. Diaz fails to cite a single case in which a district court has ever granted a new trial under Rule 59(a) for inadequate (as opposed to excessive) damages.  And such a ruling would be

---

[1] Noah Kirsch, *Ex-Tesla Worker Vows to Fight on After $137M Racism Verdict Cut to $3M*, The Daily Beast (Apr. 04, 2023), https://www.thedailybeast.com/former-tesla-worker-owen-diaz-speaks-after-dollar137m-racism-verdict-cut-to-dollar3m.

1   especially inappropriate in a pure emotional distress damages case like this one, because it is well

2   recognized that such damages are inherently highly subjective and thus uniquely within the province

3   of the jury and not the Court.  Finally, the $3 million punitive damages award is not too low but too

4   high.  As the Court previously recognized (Dkt. 328 at 38), constitutional due process precedents

5   have long invalidated punitive damages that exceed nine times compensatory damages, and this

6   Court should so amend the judgment here (*see* Dkt. 479).

7        The Court should therefore deny Mr. Diaz's motion for new trial.  It should also reject

8   outright Mr. Diaz's waived and improper alternative request to reinstate the prior remittitur.[2]

9                                   **ARGUMENT**

10  **I.   THE COURT SHOULD DENY MR. DIAZ'S MOTION FOR A NEW TRIAL FOR**
11       **SUPPOSED ATTORNEY MISCONDUCT**

12       **A.   Legal Standard**

13       A new trial on the grounds of attorney misconduct may be granted only where the attorney

14  misconduct "so permeated the trial as to lead to the conclusion the jury was *necessarily* influenced

15  by passion and prejudice in reaching its verdict."  *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d

16  1103, 1107 (9th Cir. 1991) (emphasis added); *see Kehr v. Smith Barney, Harris Upham & Co.*, 736

17  F.2d 1283, 1286 (9th Cir. 1984) (same).  The mere possibility of prejudice is not enough.  And

18  isolated attorney remarks are not enough; a new trial is not required where "improper remarks were

19

20  ─────────────────────
    [2] It would be plain error to credit Mr. Diaz's attempt to use the $15 million that represented the
21  *maximum* damages sustainable by the proof in the first trial as the floor for the *minimum* damages
    sustainable by the proof on the retrial.  Moreover, Mr. Diaz forfeited any entitlement to the remittitur
22  when he rejected it and instead put the parties, Court, and second jury to the time and expense of a
    new damages trial (Dkt. 347) even though he knew "[t]here's no reason [the second jury] can't come
23  up with a low number" (Feb. 27, 2023 Tr. 36:7-8 (emphasis added)).  And it would raise serious
    constitutional questions under the Seventh Amendment for the Court to in effect grant Mr. Diaz an
24  impermissible additur to the jury award in the retrial, *see Feltner v. Columbia Pictures Television,
    Inc.*, 523 U.S. 340, 355 n.9 (1998); *Yujin Robot Co. v. Synet Elecs., Inc.*, 744 F. App'x 338, 341-42
25  (9th Cir. 2018), and undo the new jury trial that the Court granted to *Tesla* conditioned on Mr. Diaz's
    refusal of the remittitur, Dkt. 328 at 43; *see Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1095 (9th Cir.
26  2014).  Nor does a court have any "inherent" authority (Mot. 3) to undo a judgment to allow a *party*
    to correct a strategic error as opposed to correcting the *court's* own "clear mistake," *Carino v.
27  Garland*, 997 F.3d 1053, 1058 (9th Cir. 2021).

28

made, but not repeated, during opening statements or closing arguments." *Abromson v. Am. Pac. Corp.*, 114 F.3d 898, 903 (9th Cir. 1997); *see Cooper*, 945 F.2d at 1107 (affirming denial of motion for new trial where "remarks were isolated rather than persistent"); *see also S.E.C. v. Jasper*, 678 F.3d 1116, 1129 (9th Cir. 2012) ("A small number of isolated statements . . . [are] not of the kind or quality that would permeate the entire proceedings."); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1271 (9th Cir. 2000) ("A few sustained objections dispersed over the course of a trial, coupled with limiting jury instructions, cannot suffice to meet the high 'permeation' standard necessary to invalidate the verdict of a trial.").

In evaluating whether attorney comments necessarily prejudiced a jury, a district court must "consider 'the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself.'" *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc.*, 169 F.3d 68, 82 (1st Cir. 1999)).  The opportunity for a party to respond to challenged conduct weighs against a finding of prejudice.  *See Maxwell v. Cnty. of San Diego*, 714 F. App'x 641, 645 (9th Cir. 2017) (concluding "no such permeating influence existed" where opposing counsel had "opportunity to rebut" statements).

Moreover, there is a "strong presumption" that the jury follows any curative instructions a district court gives in response to any alleged attorney misconduct.  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000); *see Greer v. Miller*, 483 U.S. 756, 766-67 (1987) (noting that the danger of prejudice from improper questions is cured by an immediate objection and curative instructions).  Absent "extraordinary situations," courts "adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985); *see Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) ("[W]e presume jurors follow the court's instructions absent extraordinary situations.").  Further, "[w]hen an objection by an attorney is sustained before the witness answers the question, there is no prejudice." *Jones v. Williams*, 41 F. App'x 964, 966-67 (9th Cir. 2002) (citing *United States v. Sarkisian*, 197 F.3d 966, 989 (9th Cir. 1999)).

"[A] party must timely object to improper argument or live with the consequences." *Tekoh v. Cnty. of Los Angeles*, 2018 WL 9782523, at *12 (C.D. Cal. Mar. 8, 2018) (citing *Kehr*, 736 F.2d at 1286), *reversed on other grounds*, 2023 WL 3391492 (9th Cir. May 11, 2023). The contemporaneous objection rule enables a district court "to examine the alleged prejudice and to admonish [] counsel or issue a curative instruction, if warranted." *Kaiser Steel Corp. v. Frank Coluccio Const. Co.*, 785 F.2d 656, 658 (9th Cir. 1986). While constant objections are not required, a party waives if it never objects. *Kehr*, 736 F.2d at 1286. "In the absence of a timely objection, a new trial is warranted only if [movants] have shown a 'plain or fundamental error' that calls into serious question 'the integrity or fundamental fairness of the proceedings [at trial].'" *Cotton ex rel. McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1021 (N.D. Cal. 2012).

## B. Mr. Diaz Fails To Show Any Attorney Misconduct By Tesla

Mr. Diaz fails to identify any attorney misconduct by Tesla at all, let alone enough to show the verdict was necessarily prejudiced. Throughout the trial, both parties aggressively presented their cases and the Court held counsel within the bounds of professional conduct, which included sustaining objections and striking questions where appropriate on ***both sides*** and issuing clear limiting instructions. (*See, e.g.*, Tr. vol. 2, 204:9-21; 334:12-17; 353:4-8; 405:9-19; vol. 4, 881:3-6; vol. 5, 999:11-16; 1000:17-24; 1071:17-20.) Indeed, Mr. Diaz and his counsel engaged in much if not more of the same type of conduct that he now contends mandates a new trial, including by (i) eliciting testimony about Mr. Diaz's harm and events at Tesla that post-dated the first trial, in violation of the Court's orders (Tr. vol. 4, 893:7-11 (Jones) (asking whether Mr. Diaz and his son still speak), Tr. vol. 2, 405:9-16 (Jackson) (testifying that a person was killed in the Tesla parking lot over an argument "just in recent months"), *see* Feb. 23, 2023 Tr. at 12:23-13:7); (ii) making multiple improper references to the prior trial, including twice attempting to describe the proceeding just moments into opening (Tr. vol. 1, 204:9-204:21 (Opening)), and disclosing, through a ham-handed slip of the tongue, that the prior determinations were made by a jury (Tr. vol. 3, 520:3-520:18 (Oppenheimer)); (iii) having Mr. Alexander improperly offer testimony based on his own "humble opinion" of "the value" of the various categories of emotional distress that Mr. Diaz purportedly suffered (Tr. vol. 5, 1071:17-20 (Closing)); (iv) making inappropriate comments about

TESLA'S OPP. TO PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR NEW TRIAL

Tesla's lawyers (Tr. vol. 3, 603:3-10, 617:2-3, vol. 4, 745:23-746:7 (Diaz)); (v) seeking to introduce testimony beyond the scope of the first trial (Tr. vol. 5, 845:4-845:14, 879:17-880:5 (Reading)); and (vi) antagonizing Tesla over the Court's order prohibiting Mr. Hurtado from testifying, including through Mr. Diaz's testimony that "what I was taught . . . is let a person defend himself.  If you can bring Mr. Hurtado in here, let him defend himself," and by posing a series of similarly improper questions to Joyce DelaGrande (*e.g.*, Tr. vol. 5, 985:1-985:7 (DelaGrande)).

And even though Mr. Diaz's cross-examination of the two witnesses Tesla called constituted only a small fraction of the length of the trial, the Court sustained objections and intervened *sua sponte* ***nine times*** to stop Mr. Diaz's counsel from asking inappropriate questions.  (Tr. vol. 5, 964:13-18 (Delgado), 985:1-6, 987:7-13, 991:1-5, 995:3-9, 995:17-23, 996:19-25, 999:11-16, 1000:17-21 (DelaGrande).)

Moreover, Mr. Diaz repeatedly mischaracterizes the Court's orders setting the ground rules for the retrial.  The Court limited the retrial to the ***evidence and witnesses*** presented at the first trial. (Dkt. 376).  Mr. Diaz thus errs in arguing (*e.g.*, Mot. 1) that "Tesla could only present ***facts and arguments*** that the first jury considered" (emphasis added).  To the contrary, the Court expressly declined to confine the parties to "ask[ing] the same questions as they did at the first trial." (Dkt. 417 at 5; *see also* Feb. 27, 2023 Hearing Tr. at 6:17-18.)  The Court also expressly recognized that the parties' new and different questions might "bring out" new facts "from the evidence that [] existed before."  (Feb. 27, 2023 Hearing Tr. at 6:18-19.)  And the Court expressly confirmed that the parties were "***not*** bound by [] the way that the witnesses were cross-examined" in the first trial, and thus that Tesla was entitled "to show that one or another of th[e] incidents [] didn't happen the way that Mr. Diaz described it."  (*Id.* at 7:8-11) (emphasis added)).  The Court thus appropriately respected Tesla's "right to confront, cross-examine and impeach adverse witnesses," which is "one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases." *Adickes v. Kress Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring).

As Tesla shows below, every one of the nine supposed examples of attorney misconduct that Mr. Diaz identifies instead falls well within the contours of that fundamental right.

### 1.     Statement About Mr. Diaz's Counsel

Contrary to Mr. Diaz's suggestion (Mot. 6-7), Tesla properly tried to rebut the misleading impression created by Mr. Diaz's gratuitous display during his opening of a slide featuring the law firm name "California Civil Rights Law Group" (*see* Henderson Decl. ¶ 6) and Mr. Diaz's counsel's strategic display of an image of Martin Luther King, Jr. as the background on the computer screen from which they displayed slides and exhibits, which was visible to the jury multiple times (*see id.* Ex. A).  Tesla was also anticipating that it would elicit testimony that Mr. Diaz did not pursue his claims against Tesla until two years after leaving Tesla when he saw his attorney on television soliciting Tesla employees to bring race-discrimination claims (Diaz Depo. Tr. 15:11-23), a fact relevant to Mr. Diaz's motivation for bringing suit and his change in his story after interacting with his counsel.  *See Langer v. Kiser*, 495 F. Supp. 3d 904, 912 (S.D. Cal. 2020) ("[T]he trier of fact may need to consider" evidence of the plaintiff's "motive and intent in filing this lawsuit.").

Mr. Diaz points to no case where a single isolated comment about opposing counsel was found to be misconduct warranting a new trial, and this isolated remark is a far cry from his cited cases involving "repeated" and "multitudinous" comments.  *Cf. Clanahan v. McFarland Unified Sch. Dist.*, 2007 WL 2253597, at *6 (E.D. Cal. Aug. 3, 2007) (granting mistrial for "multitudinous" issues that were not corrected after repeated admonishment); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 209 (3d Cir. 1992) (granting mistrial where counsel "hammered home [] theme repeatedly"); *Call Delivery Sys., LLC v. Morgan*, 2022 WL 18143363, at *3 (C.D. Cal. Sept. 20, 2022) (granting mistrial where counsel "referred to each attorney as 'that man' and 'that woman' . . . [and] described the trial proceeding as a 'judicial mugging'"); *Pavemetrics Sys., Inc. v. Tetra Tech, Inc.*, 2023 WL 1836331, at *4 (C.D. Cal. Jan. 23, 2023) (granting mistrial where "counsel's statements extended far beyond pointing out that [plaintiff] stood to benefit financially from pursuing [defendant]).[3]  Moreover, as Mr. Diaz admits (Mot. 6), the Court "immediately" dispelled

---

[3]   Contrary to Plaintiffs suggestion (Mot. 6 n.1), Tesla was likewise entitled to cross-examine Mr. Diaz's expert witness Amy Oppenheimer as to her possible financial motivation for testifying for Mr. Diaz.  *See Pinola v. Cambra*, 2002 WL 1457764, at *6 (N.D. Cal. Jul. 1, 2002) ("Experts are routinely asked about their compensation as part of cross examination."); *see also* Fed. R. Civ. P. 26(a)(2)(B) (requiring expert witness to disclose compensation for services).

any possible prejudice by admonishing Tesla's counsel that his comment went "too far" (Tr. vol 1, 248:7) and directing him not to "talk[] in a pejorative way about people . . . in this courtroom" (Tr. vol 1, 248:7-10).  Tesla adhered to that directive, and the jury had ample opportunity to form its own impressions about Mr. Diaz's lawyers based on the evidence they elicited and how they comported themselves.

## 2.    Questions About Feces Incident

Contrary to Mr. Diaz's argument (Mot. 7-12), Tesla was also well within its rights to cross-examine Michael Wheeler on the feces incident as it did.   Mr. Wheeler testified on direct examination that he believed the incident was racially motivated and that he "sat in feces" when he "slid into the seat" of his cart and noticed a "wet feeling on [his] pants."  (Tr. vol 2, 348:6-12.) Tesla was entitled to impeach Mr. Wheeler's testimony with evidence showing that the incident was not racially motivated and that he never came into contact with the feces.  At his deposition, Mr. Wheeler testified that he could not conclude that the incident was racially motivated.  (Wheeler Depo. Tr. 57:8-12.)  And in a contemporaneous email (Ex. 410), Mr. Wheeler denied having "sat in feces," instead confirming that he "checked my person several times and there are no marks and no stains related," and Tesla advised Mr. Wheeler that the source could have been a sick co-worker.

Mr. Diaz does not identify (Mot. 7, 8-9) which "*in limine* rulings" Tesla supposedly violated by trying to impeach Mr. Wheeler with reference to Exhibit 410, and there are none.  Mr. Diaz misplaces reliance (Mot. 8) on the Court's grant of Mr. Diaz's motions *in limine* nos. 1 and 2 (Dkt. 417 at 4-5), for that ruling pertained only to Tesla's ability to elicit witness testimony from its ***own*** witnesses.  Nothing about that ruling limited Tesla's ability to cross-examine ***Mr. Diaz's*** witnesses about testimony that Mr. Diaz elicited from them.  And Mr. Diaz omits to mention that the Court did ***not*** limit the parties to the same cross-examination as before.  (Feb. 27, 2023 Hearing Tr. at 7:8-11.)[4]  Moreover, as Tesla already showed (Dkt. 440), Mr. Diaz's allegation of "gross discovery

---

[4] Because Tesla did not violate the Court's *in limine* rulings, Mr. Diaz's cases premised on such violations are all inapt.  *See Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1115 n.13 (9th Cir. 2005) ("A mistrial was appropriate because the *in limine* order prohibiting…the violation was clear." (quotations and citations omitted)); *Anheauser-Bush, Inc. v. Nat. Bev. Distributors*, 69 F.3d 337, 347 (9th Cir. 1995) ("Counsel repeatedly and impermissibly elicited testimony and made reference

misconduct" (Mot. 7) is baseless because Exhibit 410 was not responsive to any document requests based on the search terms the Court ordered.  (Dkt. 93 at 2; *see also* Dkt. 440 at 3.)  And as discussed below, because the feces incident itself—which did not involve Mr. Diaz—had little impact on Mr. Diaz's emotional distress or punitive damages, any failure to produce the email in discovery did not "substantially interfere[] with [Mr. Diaz's] ability to fully and fairly present [his] case" and cannot be grounds for a new trial.  *Cf. Jones v. Aero/Chem Corp*., 921 F.2d 875, 879 (9th Cir. 1990) (remanding to determine whether new trial was required where party's failure to produce material "may have precluded inquiry into plausible theory of liability").

Tesla's attempt to cross-examine Mr. Wheeler with the email was also well-founded.  The email shows that, when Mr. Wheeler notified his superiors of the incident, they advised him that it could have been caused by a sick co-worker.  (Ex. 410.)  When Tesla's counsel asked Mr. Wheeler about that email, he denied any knowledge of it.  (Tr. vol. 2, 367:22-368:2 (Wheeler).)  Mr. Diaz's counsel objected to the questioning, but the Court overruled the objections and permitted Mr. Wheeler to continue to deny any knowledge of this email.  (Tr. vol. 2, 368:2-13 (Wheeler).)  When Tesla requested to use Exhibit 410 to impeach Mr. Wheeler's testimony or refresh his recollection, the Court sustained Mr. Diaz's objection.  (Tr. vol. 2, 368:14-21 (Wheeler).)

Finally, Mr. Diaz fails to show how the attempted use of the email could have prejudiced the jury.  The Court excluded the email, so the jury didn't see its content.  The email went to Mr. Wheeler's credibility, not Mr. Diaz's.  And because Mr. Diaz was not directly involved in the incident or likely aware of it while at Tesla (*see* Tr. vol. 2, 365:8-366:7 (Wheeler)), the email had

_____

to matters previously ruled inadmissible."); *Cones v. Cnty. of L.A.*, 2016 WL 7438817, at *8 (C.D. Cal. Sept. 28, 2016) (granting mistrial where line of questioning was "closely related to the Court's ruling on Plaintiff's second motion in limine, where the Court expressly barred Defendants from introducing" such evidence); *Ramos v. Cnty. of Suffolk*, 707 F. Supp. 2d 421, 428 (E.D.N.Y. 2010) ("[Counsel's conduct] contradicted the Court's express ruling that evidence of drug use was not admissible on the issue of liability or credibility, and was therefore improper.").  And because the information Tesla sought to elicit from Mr. Wheeler—his knowledge of Tesla's response to his complaint about the feces—was itself admissible, *see, e.g.*, *Calmat Co. v. U.S. Dep't of Lab*., 364 F.3d 1117, 1124 (9th Cir. 2004) (holding statements introduced to show that party was on notice of certain information are not hearsay), Mr. Diaz's reliance on *United States v. Sanchez* is also unavailing.  *Cf.* 176 F.3d 1214, 1223 (9th Cir. 1999) (finding misconduct where information sought by prosecutor on cross-examination was undisputedly hearsay).

1   only an indirect relationship to Mr. Diaz's emotional distress or to punitive damages, which may

2   not be premised on harm to others.  (*See* Dkt. 456 (Instruction No. 26).)

### 3.   Reference To Settlement With Staffing Agencies

4        Mr. Diaz likewise errs in arguing (Mot. 12-13) that Tesla elicited improper testimony from

5   Mr. Diaz about his settlements with the staffing agencies nextSource and Citistaff.  The questions

6   Tesla posed to Mr. Diaz about his settlement were highly relevant to the credibility of Mr. Diaz's

7   claim that he was motivated to sue Tesla so that those responsible would "take accountability."  (Tr.

8   vol. 4, 812:21-813:2.)  Though questions related to settlements are inadmissible under Federal Rule

9   of Evidence 408 for purposes of establishing liability, the existence of a settlement is admissible for

10  the purpose of "proving a witness's bias or prejudice."  *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151,

11  1161 (9th Cir. 2007); *see Brocklesby v. United States*, 767 F.2d 1288, 1293 (9th Cir. 1985) (holding

12  settlement agreement could be used to attack the credibility of the defendant's witnesses); *Hudspeth*

13  *v. Comm'r*, 914 F.2d 1207, 1209 (9th Cir. 1990) (holding settlement evidence "should have been

14  admitted under the bias exception to Federal Rule of Evidence 408").  And even assuming the

15  question was improper (it was not), the Court sustained Mr. Diaz's objection to it and struck the

16  testimony (Tr. vol. 4, 814:22-23), so it could not have influenced the jury "by passion and

17  prejudice," *Kehr*, 736 F.2d at 1286.   Contrary to Mr. Diaz's argument (Mot. 13), Tesla was also

18  entitled to question Mr. Diaz about his desire to "fish and retire."  It was Mr. Diaz, not Tesla, who

19  brought the subject up in the first place by testifying on direct examination that his life would be

20  "better" if he had "time and money to do [his] hobbies, fishing, gardening, spending time with [his]

21  family." (Tr. vol. 3, 628:18-21.)  By revisiting that testimony on his cross-examination, Tesla did

22  not "bring[] to the jury something it should not have heard."  *Anheuser-Busch*, 69 F.3d at 347

23  (quotations omitted).

### 4.   Questions About Mr. Diaz's Comments To Co-Workers

25       Contrary to Mr. Diaz's argument (Mot. 13-17), Tesla was also well within its rights to cross-

26  examine Mr. Diaz on his comments to co-workers Joyce DelaGrande and Hilda Navarro.  These

27  questions were relevant to whether incidents like the elevator incident were racially motivated.

28  Moreover, Tesla had a good-faith basis for these questions based on its interviews with Ms.

TESLA'S OPP. TO PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR NEW TRIAL

1   DelaGrande and Ms. Navarro about their experiences working with Mr. Diaz at Tesla.  (Henderson

2   Decl. ¶ 3-4.)  Ms. DelaGrande recounted unwelcome sexually charged remarks Mr. Diaz made to

3   her, and Ms. Navarro described a derogatory racial insult that Mr. Diaz directed toward her that

4   instigated the elevator incident between Ramon Martinez and Mr. Diaz.  (*Id.*)  Tesla's legitimate

5   cross-examination thus bears no resemblance to the irrelevant questions about "sexist and racist

6   behavior" and "broad racial statements and assertions of bias" in Mr. Diaz's cited cases (Mot. 15-

7   16).  *See Anheuser-Busch*, 69 F.3d at 347 (granting new trial for "irrelevant" statements"); *Call

8   Delivery Sys.*, 2022 WL 18143363, at *3 (granting new trial for comments "designed to raise

9   prejudice and inflame the jury") (quotations omitted); *Cones*, 2016 WL 7438817, at *8 (granting

10  new trial for statement "plucked out of thin air").  And Federal Rule of Evidence 412(a) applies only

11  to "civil or criminal proceeding[s] involving alleged sexual misconduct," including workplace

12  sexual harassment, *see B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1104 (9th Cir. 2002), *as

13  amended* (Feb. 20, 2002), and Mr. Diaz does not claim to have experienced sexual harassment here.

14         Moreover, Mr. Diaz's counsel made no contemporaneous objection when Tesla posed these

15  questions, requiring him to show it was plain error to allow isolated questions about whether Mr.

16  Diaz directed unsavory language toward two female co-workers.  *See, e.g.*, *Kaiser Steel Corp.*, 785

17  F.2d at 658 (misconduct must be "egregious" to show plain error); *U.S. v. Berry*, 627 F.2d 193, 198

18  (evidence must be "highly prejudicial" to show plain error).  Mr. Diaz cannot possibly do so given

19  all the other (unrebutted) testimony about Mr. Diaz's propensity to have conflicts with co-workers

20  and his lack of any "filter." (*See, e.g.*, Tr. vol. 2, 268:5-10 (Kawasaki); Tr. vol. 4, 716:15-25 (Diaz).)

21  In any event, the Court committed no plain error in properly declining to grant Mr. Diaz's belated

22  mistrial motion (Tr. vol. 5, 1135:1-6) and giving curative instructions to the jury that "[q]uestions

23  and objections by lawyers are not evidence" (Tr. vol. 5, 1018:4-1018:6) and stating that "I want to

24  emphasize that in this case because the lawyers' questions . . . involved, among other things, racial

25  slurs, those questions are not evidence" (Tr. vol. 5, 1036:7-1036:17).

26             **5.      Reference To Mr. Diaz's Lies On His Employment Application**

27         Mr. Diaz similarly fails to establish (Mot. 17-18) any attorney misconduct in questioning

28  Mr. Diaz about untruthful statements on his Tesla job application, which is relevant to witness

credibility.  In his deposition, Mr. Diaz admitted that his application contained certain inaccuracies, including the omission of his criminal convictions.  (Diaz Dep. Tr. vol. 1, 25:22-26:11.)  When asked generally about these inaccuracies at trial, Mr. Diaz gave a misleading answer that opened the door to further questioning.  (Tr. vol. 3, 643:10-13 ("You would have to show me the application.").)

Though Tesla could not introduce evidence of Mr. Diaz's criminal convictions because the parties had stipulated to exclude evidence of them (Dkt. 180), Tesla's questioning did not violate this ruling.  Tesla merely displayed Mr. Diaz's job application with the criminal history question redacted (Ex. 204) and avoided asking questions that would elicit testimony on Mr. Diaz's criminal history (Tr. vol. 3, 643:14-22), instead asking about the reasons for the (undisputed) inaccuracies in his application (Tr. vol. 3, 644:2-9), and more specifically about an inaccuracy regarding his prior employment history (Tr. vol. 3, 645:23-646:19).  The parties' stipulation regarding Mr. Diaz's criminal convictions did not give Mr. Diaz license to lie about the existence of inaccuracies on his job application, the reason for them, or any specific inaccuracies other than his criminal convictions, nor did it restrict Tesla from properly impeaching Mr. Diaz.  *See Gresham v. Petro Stopping Centers, LP*, 2011 WL 1042705, at *4 (D. Nev. Mar. 18, 2011) (denying motion *in limine* and permitting plaintiff to question witness on cross-examination "about false statements made to immigration officers . . . so long as Plaintiff has a good-faith basis for asking the question" despite cautionary warning about impeaching the witness "with the bare fact of his alleged illegal status").

Mr. Diaz did not answer Tesla's questions truthfully, but in any event, the Court instructed Tesla to move on, and it did.  The Court subsequently acknowledged that the questioning made clear that Tesla was "interested in credibility, which is an appropriate issue."  (Tr. vol. 3, 668:21-23.)  Indeed, "impeaching [a plaintiff]'s credibility by contradiction and by questioning his memory and perception," even if "arguably inflammatory," nonetheless is "relevant to real issues before the jury" and does not support any finding of prejudice to the jury.  *Drayton v. Scallon*, 685 F. App'x 557, 561 (9th Cir. 2017).  Moreover, the "court also instructed the jury that the statements or argument of counsel is not evidence," *id.*, and Mr. Diaz has not "overcome the presumption the jury followed their instruction that argument of counsel is not evidence," *McCreary v. Diaz*, 2019 WL 6840410, at *48 (S.D. Cal. Dec. 16, 2019).

### 6.     Questions On Forgery Of Doctor's Note

Contrary to Mr. Diaz's argument (Mot. 18-19), there was also no attorney misconduct in Tesla's cross-examination of Mr. Diaz on the doctor's note, which was relevant to Mr. Diaz's credibility. Tesla had a good-faith basis to ask these questions given the apparent similarities of the handwriting on Mr. Diaz's job application (Ex. 204) and the handwriting on the unsigned doctor's note (Ex. 313). Upon this good-faith basis, Tesla attempted to challenge Mr. Diaz's credibility by asking whether he forged the doctor's note, and Mr. Diaz denied that he had. (Tr. vol 4, 798:24-799:1.) And even if the questioning had been improper, any prejudice was dispelled when the Court sustained Mr. Diaz's objection to the questions and later gave a curative instruction to the jury to "disregard the questions and testimonies regarding the doctor's note." (Tr. vol. 5, 1019:6-9.)

### 7.     Reference To Dismissal Of Demetric Di-Az's Claims

Mr. Diaz likewise fails to show (Mot. 19-20) attorney misconduct in asking about the status of Demetric's Di-Az's claims against Tesla. After Mr. Diaz testified that his supposedly "fractured" relationship with his son following that incident was a primary source of his emotional distress (Tr. vol. 4, 745:17-20 (Diaz)), Tesla had a good-faith basis to challenge whether that incident occurred and inquire about what resulted from it. Nor was there anything improper about Tesla's attempt to elicit testimony on this issue—there was no *in limine* order precluding or even relating to it. And Mr. Diaz merely speculates in suggesting that Tesla's reference to the "dismissal" of Demetric's claim caused the jury to conclude not only that Demetric's claim was "meritless" but that Mr. Diaz's claims were meritless too. In any event, the Court again dispelled any possible prejudice by sustaining Mr. Diaz's objections and giving the jury a curative instruction directing it to "disregard questions regarding the pretrial proceedings for Demetric Di-Az." (Tr. vol. 5, 1019:2-5.)

### 8.     Reference In Closing To Mr. Diaz's Salary

Mr. Diaz again errs in arguing (Mot. 20-22) that Tesla's reference in closing to Mr. Diaz's compensation at Tesla constituted attorney misconduct. "The remedy of a new trial based upon an attorney misconduct during closing arguments is available only in an extraordinary case." *Newton v. Equilon Enterprises, LLC*, 411 F. Supp. 3d 856, 878 (N.D. Cal. 2019). Tesla was well within its rights to set a realistic anchor for damages to counter Mr. Diaz's unfounded request in closing for

1    an award of $8.3 million in compensatory damages and over $150 million in punitive damages.  (*See*

2    Tr. vol. 5, 1079:17-20, 1077:14-1078:5.)  And Tesla had a good-faith basis to quantify Mr. Diaz's

3    approximate annual salary based on undisputed record evidence that he was paid $18 per hour after

4    the pay raises he received from Tesla in August 2015 and January 2016.  (Ex. 293; Tr. vol. 4, 757:22-

5    758:6.)   There  was  no  ruling  that  prohibited  Tesla  from  inviting  the  jury  to  do  the  math  to

6    approximate Mr. Diaz's annual pay and to use that as a factor in assessing Mr. Diaz's damages.  Mr.

7    Diaz objects (Mot. 21) that this confuses economic with non-economic damages, but in the absence

8    of any other way to quantify emotional distress (like medical, therapy or pharmaceutical bills), it is

9    entirely proper to use the value of lost work as a proxy for the supposed emotional damage caused

10   by a racially hostile environment.  *See Newton v. Equilon Enterprises, LLC*, 411 F. Supp. 3d 856,

11   879 (N.D. Cal. 2019) (finding "nothing improper" in arguing that lost wages could be basis for

12   determining non-economic compensatory damages in discrimination suit).

13        In any case, the Court dispelled any potential prejudice by sustaining Mr. Diaz's objection

14   on the basis that evidence of Mr. Diaz's pay was not in the record (Tr. vol. 5, 1116:2-3) and issuing

15   a curative instruction directing the jury not to treat counsel's closing arguments as evidence (Tr. vol.

16   5, 1017:23-1018:3; *see, e.g.*, *Drayton*, 685 F. App'x at 561; *United States v. Wyner*, 230 F.3d 1368

17   (9th Cir. 2000) ("[T]he court told the jury three times that arguments of counsel are not evidence,

18   and the panel must presume that the jury followed the court's instructions.").)

19             **9.        Reference In Closing To Legal Standard**

20        Finally, Mr. Diaz errs in arguing (Mot. 22-23) that Tesla misled the jury by arguing in closing

21   that Mr. Diaz can recover damages only for racially hostile conduct.  Mr. Diaz overlooks that his

22   own counsel opened the trial by telling the jury that "[t]his is a hostile work environment case ***based***

23   ***on race***."  (Tr. vol. 1, 22:16 (emphasis added).)   Mr. Diaz's section 1981 claim depended entirely

24   on proof of a racially hostile work environment.  And Mr. Diaz himself linked his state-law negligent

25   supervision claim to Tesla's supposed failure to remediate alleged ***racial harassment*** by Mr.

26   Martinez.  (*See, e.g.*, Dkt 422-1, at 6 (Ms. Oppenheimer assuming elevator incident involved "racist

27   threats").)   And because Mr. Diaz is not entitled to punitive damages for the state-law claim, *see*

28

-14-

1  *E.E.O.C. v. Wal-Mart Stores, Inc.*, 156 F.3d 989, 992 (9th Cir. 1998) (punitive damages not

2  available for negligence), punitive damages could be awarded only for racially hostile conduct.

3       In any case, Mr. Diaz made no contemporaneous objection to Tesla's purported

4  misstatement of the law, and he cannot show it was plain error to fail to strike it. *See Newton*, 411

5  F. Supp. 3d at 878. The Court gave the jury detailed instructions regarding the liability findings the

6  first jury made and how it was required to assess damages on the retrial. (Dkt. 456 (Instruction Nos.

7  18-26).) The jury is presumed to have followed those instructions. *Weeks v. Angelone*, 528 U.S.

8  225, 234 (2000). Indeed, "arguments of counsel generally carry less weight with a jury than do

9  instructions from the court . . . [which] are viewed as definitive and binding statements of the law."

10  *Boyde v. California*, 494 U.S. 370, 384 (1990) (citation omitted) (rejecting challenge to prosecutor's

11  statements about the law during closing arguments); *see also United States v. Medina Casteneda*,

12  511 F.3d 1246, 1250 (9th Cir. 2008) ("[T]he likely prejudicial effects of this misstatement of the

13  law . . . in the context of the extensive closing arguments by both sides and proper jury instructions

14  is very low."). Tesla's counsel's passing comment on a legal standard caused no prejudice here.

15      **C.**    **The Evidence Supports The Jury's Verdict Irrespective Of The Nine Isolated**

16          **Incidents Of Alleged Attorney Misconduct**

17       Even if any of the above incidents constituted attorney misconduct (and they do not), and

18  even if the Court had not dispelled any potential prejudice through sustained objections and curative

19  instructions (which it did), Mr. Diaz cannot show any persistent attorney misconduct that so

20  permeated the entire trial that it necessarily inflamed the jury with passion and prejudice against Mr.

21  Diaz, as would be required to clear the high bar necessary for grant of a new trial (*see supra* p. 3).

22  Mr. Diaz cherry-picks a handful of isolated incidents spanning a small fraction of the trial transcript

23  that generally concern issues attenuated from the core damages determination at issue. In contrast,

24  the remaining evidence in the five-day trial strongly supports the second jury's award of $175,000

25  in emotional distress damages and $3 million in punitive damages (which must be reduced to no

26  more than $1,575,000 to be constitutionally permissible—*see* Dkt. 479). Moreover, the evidence

27  undermined and contradicted many of Mr. Diaz's specific claims of racial harassment, and the jury

28  was entitled to assess the credibility of Mr. Diaz and his supporting witnesses and to conclude that

he had misrepresented and exaggerated the nature and extent of his injuries and the supposed lack of any appropriate response by Tesla.  And in any event, the jury's award to Mr. Diaz of a life-changing $3.175 million in damages is clear evidence that the jury was not inflamed by passion or prejudice against him.  *Cf. United States v. Young*, 470 U.S. 1, 18 & n.15 (1985) (finding that the fact "[t]he jury acquitted respondent of the most serious charge he faced . . . reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly.").

### 1.    Mr. Diaz Offered Limited Evidence Of Short-Lived Emotional Distress

The jury's decision to award $175,000 in compensatory damages was supported by the undisputed evidence that Mr. Diaz's psychological injuries and symptoms—whatever their cause— were mild, short-lived, and largely remediated within months of him leaving Tesla.  Unlike in other hostile work environment cases, Mr. Diaz presented no evidence that he suffered any physical trauma, sought any medical treatment, or received any therapy or pharmaceutical treatment at the time of his alleged experience of a racially hostile workplace environment.  *Cf. Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 150-51 (2d Cir. 2014) (following prolonged period of harassment plaintiff was "losing it," "suffered serious panic attacks," was diagnosed with post-traumatic stress disorder, and was hospitalized as a result of threats and harassment); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 503 (9th Cir. 2000) (plaintiff "suffered stomach problems, rashes, and headaches which required medical attention").  He did not submit any medical bills or seek reimbursement for treatment of any physical or mental malady.

Mr. Diaz also offered no testimony from his friends or family members who spent time with him during his tenure at Tesla or afterwards who could have testified about his emotional distress, except for the limited testimony of his stepdaughter La'Drea Jones.  And while Ms. Jones testified that Mr. Diaz kept irregular sleeping hours and became "more moody and less talkative" while at Tesla (Tr. vol. 4, 892:21-893:4 (Jones)), she also admitted that, just after leaving Tesla, Mr. Diaz went "back to sleeping normal," was "joking all the time again," and was "back to being [her] dad in 2016" (Tr. vol. 4, 896:25-897:7 (Jones)).

1   Mr. Diaz's paid medical expert Dr. Anthony Reading similarly testified to very limited

2   emotional distress.  He admitted that he formed his opinions after meeting with Mr. Diaz for a few

3   hours on a single day in 2019 years after Mr. Diaz left Tesla (Tr. vol. 4, 850:14-21 (Reading)), and

4   that he never received the documents he had requested from Mr. Diaz's counsel and on which his

5   diagnosis was "conditional" (Tr. vol. 4, 837:5-837:13, 855:2-11, 857:1-857:18 (Reading)).  Even if

6   the jury were to credit Dr. Reading's "conditional" testimony, his opinions of short-lived emotional

7   distress support the jury's damages award because any trauma Mr. Diaz experienced at Tesla was

8   not "life altering" and Mr. Diaz has a "fair to good" prognosis going forward.  (Tr. vol. 4, 848:4-

9   849:9, 874:16-19, 876:1-4, 870:19-871:12, 872:2-872:8 (Reading).)  Dr. Reading concluded that,

10   after finding new employment after leaving Tesla, Mr. Diaz was already "fully recovered" with

11   minor residual symptoms.  (Tr. vol. 4, 875:22-876:4 (Reading).)

12   Moreover, Dr. Reading conceded that the symptoms Mr. Diaz experienced could have been

13   caused by other factors, such as the death of his mother and issues involving his son, and that it was

14   possible that, as a litigant seeking money damages, Mr. Diaz was motivated to falsely attribute them

15   to his experience at Tesla.  (Tr. vol. 4, 862:3-864:20 (Reading).)  Indeed, one of Dr. Reading's

16   diagnoses—adjustment disorder—is often caused by normal milestone events.  (Tr. vol. 4, 869:22-

17   870:18 (Reading).)  Regardless, Dr. Reading testified that Mr. Diaz's prognosis for recovery was

18   "fair to good," provided that he maintained employment and underwent a modest course of

19   psychological treatment.  (Tr. vol. 4, 874:8-876:4, 876:11-877:9 (Reading).)  Mr. Diaz provided no

20   evidence that he was availing himself of such treatment.  (Tr. vol. 4, 795:20-796:8 (Diaz).)

21
22   **2.   Mr. Diaz Documented And Introduced Corroborating Evidence Of Only
       Two Incidents Of Racial Harassment**

23   There were only two documented racial incidents during Mr. Diaz's nine months at Tesla,

24   and the jury was entitled to factor as much into its calculation of the appropriate amount of damages.

25   ***Timbreza Incident***:  The first incident occurred on July 31, 2015, after Mr. Diaz had a heated

26   argument with fellow elevator operator Judy Timbreza.  (Ex. 38; Tr. vol. 2, 291:2-8 (Kawasaki).)

27   Mr. Diaz called his team lead Tom Kawasaki, who arrived within minutes, broke up the altercation,

28   questioned witnesses, and sent Mr. Timbreza home.  (Tr. vol. 2, 290:17-291:17 (Kawasaki).)  Mr.

Kawasaki reported in an email to his supervisor Ed Romero that Mr. Diaz had complained about Mr. Timbreza's comments that were "racial in nature" (which was never verified as the n-word and may have been a derogatory Spanish-language term).  (Ex. 38.)   It is undisputed that Mr. Timbreza and Mr. Diaz never worked together again.  (Tr. vol. 3, 658:22-25 (Diaz); *see* Tr. vol. 2, 316:6-8 (Kawasaki) ("Q. And after this incident, you understood that Mr. Timbreza was laid off?  A. I believe he got laid off.").)

Mr. Diaz admitted that he was "definitely" "satisfied" with Tesla's response to this incident. (Tr. vol. 3, 659:1-4 (Diaz).)  Mr. Diaz also did not mention the incident in his Amended Complaint in December 2018 (Dkt. 57) or during his psychological evaluation with Dr. Reading in 2019 (Tr. vol. 4, 861:25-862:1 (Reading)).  The jury was accordingly entitled to conclude that the Timbreza incident did not cause Mr. Diaz any significant emotional distress warranting damages.

***Racist Drawing Incident***:  On January 22, 2016, Mr. Diaz encountered a racist caricature drawn on cardboard that was part of a bale to be transported for recycling on the elevator Mr. Diaz operated.  (Ex. 1 (drawing); Tr. vol. 3, 574:14-575:5 (Martinez).)  Mr. Diaz sent an email to Mr. Romero complaining that he had confronted a "racist drawing & effigy." (Ex. 272.)  Mr. Martinez came to the area after a "few minutes" and admitted to Mr. Diaz and Mr. Wheeler that he had drawn the caricature and promptly apologized for doing so.  (Ex. 272; Tr. vols. 3-4, 582:14-17, 582:23-583:3 (Martinez); 762:9-16 (Diaz).)   Wayne Jackson, a nextSource program manager, and Mr. Romero both contacted Mr. Diaz's and Mr. Martinez's manager Victor Quintero via email the same morning, as well as Teri Garrett from nextSource.  (Exs. 272, 274; Tr. vol. 3, 532:11-17 (Romero); Tr. vol. 2, 433:8-13 (Jackson).)  Mr. Jackson treated the incident as a "serious issue" (Ex. 284; Tr. vol. 2, 435:23-436:1 (Jackson)), and Mr. Quintero responded quickly that he was "very disappointed" (Ex. 272).  The three met to discuss the incident that morning, considering suspension, termination, and diversity training as possible remedies.  (Tr. vol. 2, 431:5-433:20 (Jackson); Tr. vol. 3, 533:16-18 (Romero); Ex. 272.)  And within 90 minutes of Mr. Diaz's complaint, Tesla disciplined Mr. Martinez by imposing a three-day unpaid suspension and giving a final written warning that was "extremely clear [that] he has no room for further error" and that "any further issues are grounds for immediate termination."  (Ex. 274; Tr. vol. 2, 432:14-16 (Jackson).)

1    The jury was entitled to discredit Mr. Diaz's testimony that Tesla's punishment of Mr.

2  Martinez was inadequate because it failed to account for his alleged history of racial harassment.

3  While Mr. Diaz claimed he fully disclosed that history to Jackelin Delgado, the HR officer from Mr.

4  Martinez's staffing company, who investigated the incident (Tr. vol. 4, 766:5-12 (Diaz)), Ms.

5  Delgado's interview notes made no reference to any accusation that Mr. Martinez previously

6  engaged in racial misconduct or ever called Mr. Diaz the n-word (Ex. 287).  Mr. Diaz's testimony

7  failed to dispel this discrepancy.  (Tr. vol. 4, 764:16-768:24 (Diaz) ("I can't speculate for her . . . all

8  I can say is this: If accurate records were kept, we would know exactly what I told her.").)  And Ms.

9  Delgado denied that Mr. Diaz made any report that Mr. Martinez previously engaged in any racial

10  misconduct or directed any slur to him in their interview.  (Tr. vol. 4, 951:20-952:25 (Delgado).)

11
            **3.      Every Other Instance Of Racial Misconducted Alleged By Mr. Diaz Was**
12                    **Disputed And Discredited**

13    Mr. Diaz demanded "millions and millions of dollars" not just for the two documented racial

14  incidents but for an alleged constant drumbeat of racial harassment including daily exposure to racist

15  graffiti, aggressive and demeaning uses of the n-word and other racial slurs by Mr. Martinez, Robert

16  Hurtado, and others, and the destruction of his relationship with his son, Demetric, after witnessing

17  him be called the n-word by a Caucasian supervisor.  (Tr. vol. 5, 1059:8-1059:12 (Diaz Closing

18  Argument).)  But Mr. Diaz did not make any documented complaints about these alleged incidents

19  and Tesla introduced substantial evidence from which the jury could discredit Mr. Diaz's testimony

20  and decline to give any weight to these undocumented incidents in its calculation of damages.

21    ***Alleged Racist Graffiti***:  Mr. Diaz testified that almost immediately after starting work at

22  Tesla he found graffiti etched into a bathroom stall stating "Death to Ns" (Tr. vol. 3, 622:24-623:8;

23  646:23-647:5 (Diaz)), that he reported the graffiti to supervisor Romero and possibly Mr. Kawasaki

24  (Tr. vol. 3, 624:4-12), but that Tesla failed to respond and the graffiti remained and built up over

25  time (Tr. vol. 3, 623:9-624:16).  According to Mr. Diaz, this alleged build-up of graffiti and Tesla's

26  purported failure to respond caused him to feel anxiety and helplessness.  (*Id.*)

27    But Mr. Diaz's testimony about this graffiti and Tesla's indifference to it was contradicted

28  and the jury was entitled to disbelieve it and discount it as a factor warranting emotional distress

1    damages.  No other witness who worked in the factory testified to seeing any graffiti with the n-

2    word (*see* Tr. vols. 2-3, 264:16-19 (Wheeler)), despite Mr. Diaz's contention that it remained

3    throughout his employment.  And neither Mr. Romero nor Mr. Kawasaki testified that Mr. Diaz

4    reported any racist graffiti to them at all.  (*See* Tr. vol. 2, 326:23-25 (Kawasaki) (testifying that the

5    Timbreza incident was the only racial complaint made to him during his time at Tesla); vol. 3, 561:1-

6    4 (Romero) (testifying that the Timbreza incident and drawing were the only racial incidents Mr.

7    Diaz reported to him).)  In fact, Mr. Kawasaki refuted Mr. Diaz's accusation that Tesla ignored

8    reports of racist graffiti, agreeing that, "when Tesla would find out about this . . . they took care of

9    it," and testifying that Tesla tried "to scratch [] off the stuff when it happened."  (Tr. vol. 2, 284:9-

10   25, 332:25 (Kawasaki).)

11           ***The October 2015 Elevator Incident***:  While there is no dispute that, on October 17, 2015,

12   Mr. Diaz had a heated verbal dispute with Mr. Martinez in the elevator Mr. Diaz operated (Tr. vol.

13   3, 579:1-581:21 (Martinez); Tr. vol. 3, 609:7-610:12, 611:13-612:7 (Diaz)), it was heavily disputed

14   whether the incident was racially motivated so as to warrant damages for emotional distress from a

15   racially hostile environment.  Mr. Diaz testified that Mr. Martinez aggressively stormed the elevator

16   without provocation after seeing Mr. Diaz interact with co-worker Rothaj Foster.  (Tr. vol. 3, 610:6-

17   8 (Diaz).)  According to Mr. Diaz, Mr. Martinez used racist language and yelled "You Ns aren't S-

18   H-I-T," a continuation of an alleged (but undocumented) pattern of racial abuse by Mr. Martinez.

19   (Tr. vol. 3, 611:13-17 (Diaz).)

20           But the jury was entitled to conclude otherwise.  Although Mr. Diaz insisted at trial that the

21   incident was racial in nature and that Mr. Martinez called him the n-word, Mr. Diaz's email

22   complaining about Mr. Martinez to his supervisor did not mention any racial language.  (Ex. 92.)

23   And no witness testified that Mr. Diaz reported that Mr. Martinez used any racially hostile language

24   during the confrontation.  (Tr. vol. 2, 326:23-25 (Kawasaki); 427:15-427:20 (Jackson); vol. 3, 565:8-

25   25 (Romero).)  Mr. Jackson investigated the incident including by speaking to all three people who

26   were in the elevator—Mr. Diaz, Mr. Martinez, and Mr. Foster—and did not receive any reports that

27   Mr. Martinez used racially hostile language.  (Tr. vol. 2, 388:18-389:2, 426:15-427:20 (Jackson).)

28

1        At trial, Mr. Diaz's testimony about the incident was repeatedly impeached.  For example,

2   in his deposition testimony that was played to the jury, Mr. Diaz responded to the question "[w]hat

3   language did [Mr. Martinez] use?" by stating that Mr. Martinez uttered various curse words, but Mr.

4   Diaz did not mention any racial slurs even when given several chances to answer.  (Tr. vol. 4, 726:5-

5   22 (Diaz).)  And after testifying that he reported Mr. Martinez's use of racial slurs to Mr. Kawasaki,

6   Mr. Diaz was impeached with his prior testimony that he did not recall reporting any racial

7   complaint to Mr. Kawasaki besides the Timbreza incident.  (Tr. vol. 4, 734:4-735:17 (Diaz).)  Mr.

8   Diaz also gave inconsistent explanations for why he failed to document Mr. Martinez's alleged use

9   of racial slurs in his original email reporting the incident, including that he was instructed at a prior

10  job to use "check the surveillance" as a substitute for racial slurs (Tr. vol. 3, 613:15-614:1 (Diaz)),

11  and that he did not have proof and did not want Tesla to think that he was "pulling the race card"

12  (Tr. vol. 3, 724:23-725:13 (Diaz)), despite ample evidence that Mr. Diaz was willing to do this in

13  other contexts (*see*, *e.g.*, Ex. 33).

14       Witnesses at trial contradicted other aspects of Mr. Diaz's testimony about the incident.

15  While Mr. Diaz claimed that Mr. Martinez accosted him without provocation, Mr. Martinez testified

16  that he spoke to Mr. Diaz in response to a tearful complaint from a female co-worker (Ms. Navarro)

17  that Mr. Diaz was acting "really aggressive towards her."  (Tr. vol. 3, 579:14-581:16 (Martinez).)

18  Mr. Martinez also denied ever using the n-word inside the workplace.  (Tr. vol. 3, 584:18-585:1

19  (Martinez).)  And although Mr. Diaz testified that he believed Mr. Martinez was going to hit him

20  (Tr. vol. 3, 609:12-610:12 (Diaz)), the jury heard that Mr. Jackson testified in deposition that Mr.

21  Diaz did not express that concern during their interview immediately after the incident (Tr. vol. 2,

22  429:4-13 (Jackson)).  The jury was entitled to discredit Mr. Diaz's contradicted testimony.

23       ***The Alleged Use Of The N-Word At The Factory***:  Mr. Diaz placed great emphasis on the

24  allegation that workers at the majority-minority Tesla factory regularly used the n-word among

25  themselves.  Although it was undisputed that Tesla's workplace-conduct policies prohibit ***any*** use

26  of the n-word (Marconi Dep. 51:2-12, Ex. 368), the jury heard evidence that, in certain contexts, the

27  n-word can be used in a "friendly" manner that is neither intended to be nor interpreted as offensive

28  (Tr. vol. 2, 363:24-364:15 (Wheeler); 327:8-327:16 (Kawasaki); 441:12-442:23 (Jackson)).

1    The jury was entitled to credit the evidence showing that, when workers said the n-word,

2  they did so in a non-offensive manner.  (Tr. vol. 2, 327:8-327:16 (Kawasaki); 363:24-364:15

3  (Wheeler).)  Indeed, Mr. Kawasaki testified that, other than the Timbreza incident, he never heard

4  any racial slur, let alone the n-word, used in an aggressive manner at the factory.  (Tr. vol. 2, 306:15-

5  17 (Kawasaki).)  Mr. Wheeler testified similarly that, with one exception, he did not think the n-

6  word was used in an aggressive way at the factory "at all."  (Tr. vol. 2, 364:10-15 (Wheeler).)  And

7  when workers did use the n-word, it was typically while singing along to popular music playing on

8  the assembly line.  (Tr. vol. 2, 282:4-9, 326:12-21, 327:8-327:16 ("So they are playing their music,

9  and they're copying the song").)  Multiple witnesses acknowledged that this "friendly" version of

10  the n-word is "used casually day-to-day" in society and that its use at Tesla was no different.  (Tr.

11  vol. 2, 281:20-282:9, 327:8-327:16 (Kawasaki); 441:12-442:23 (Jackson) ("Its just kind of what the

12  culture has evolved into as of late").)

13    Two witnesses, Mr. Diaz and Mr. Jackson, claimed that they heard the n-word used

14  offensively or aggressively at the factory on a more regular basis.  But Mr. Jackson's testimony was

15  directly contradicted and impeached by his prior sworn testimony that he only heard the n-word

16  used at the factory "three, four times" total, and that he never heard the offensive "ER version" of

17  the word used.  (Tr. vol. 2, 443:1-443:17, 446:7-446:16 (Jackson).)  And while Mr. Diaz testified,

18  contrary to his own witnesses' testimony, that he was called the n-word in a hostile manner on an

19  almost daily basis, he denied this on cross-examination.  (Tr. vol. 4, 739:5-13, 741:6-742:11 (Diaz).)

20  Nor was there any evidence of any written or oral complaints by Mr. Diaz regarding this supposed

21  rampant use of the n-word, and his witnesses denied that he made any such complaints.  (*See, e.g.*,

22  Tr. vol. 2, 308:5-11 (Kawasaki); 358:5-8 (Wheeler); vol. 3, 636:21-638:3 (Diaz); 551:3-13, 558:11-

23  15 (Romero); 412:19-22 (Jackson).)

24    The jury was also entitled to discredit Mr. Diaz's testimony about Robert Hurtado's alleged

25  regular hostile use of the n-word toward him.   Mr. Diaz did not introduce any written

26  communications or complaints relating to Mr. Hurtado's supposed use of racist language.  And Ms.

27  DelaGrande, Mr. Hurtado's supervisor, expressly denied Mr. Diaz's claim that he reported Mr.

28  Hurtado's alleged misconduct to her.  (*Compare* Tr. vol. 4, 785:11-785:25 (Diaz) ("I told

1    [DelaGrande] what [Hurtado] had been saying to me and the things that he was doing") *with* vol. 5,

2    978:16-979:6 (DelaGrande) ("Q. Did Mr. Diaz ever at any point in time report to you that Mr.

3    Hurtado called him the N-word? A. No.  He never told me that.").)  Ms. DelaGrande also testified

4    that she personally observed Mr. Hurtado's interactions with Mr. Diaz on a nightly basis and never

5    heard him use the n-word and never received any report from anyone that he used the word.  (Tr.

6    vol. 5, 979:12-980:17 (DelaGrande).)  Moreover, Lamar Patterson's written statement, which he

7    prepared at Mr. Diaz's request following an interaction in late February 2016 in which Mr. Hurtado

8    allegedly used the n-word, made no reference to any racial slurs or Mr. Hurtado's alleged pattern of

9    abuse.  (Tr. vol. 4, 786:24-787:21 (Diaz); Ex. 245.)  Nor did Mr. Diaz mention Mr. Hurtado's name

10   during his psychological evaluation with Dr. Reading.  (Tr. vol. 4, 861:25-862:2 (Reading).)

11          Similarly, the jury was entitled to disbelieve Mr. Diaz's uncorroborated testimony about Mr.

12   Martinez's supposed use of racial slurs.  Mr. Diaz testified that, from August through October 2015,

13   Mr. Martinez called him the n-word "well over 30 times."  (Tr. vol. 3, 603:11-604:20 (Diaz).)  But

14   Mr. Diaz did not make any written complaints or otherwise document these alleged instances of

15   racial harassment, despite Mr. Kawasaki's instruction that he document everything and Mr.

16   Romero's request that his leads provide daily reports of any notable events on their shifts.  (Tr. vol.

17   2, 299:3-300:4 (Kawasaki).)  And Mr. Romero denied Mr. Diaz's assertion that he reported the use

18   of the n-word to Mr. Romero "three to seven times" (Tr. vol. 3, 561:1-4 (Romero).)  When asked

19   about his failure to document his complaints, Mr. Diaz initially offered that he did not have access

20   to his supervisor's email addresses, but he was later forced to admit that he in fact did.  (Tr. vol. 4,

21   728:18-730:5 (Diaz).)

22          No other witness testified about hearing Mr. Martinez use the n-word.  Mr. Wheeler, who

23   worked most closely with Mr. Martinez, could not recall ever hearing him use any racial slur and in

24   fact did not initially believe that Mr. Martinez had created the drawing in January 2016.  (Tr. vol. 2,

25   359:2-12, 360:12-15 (Wheeler).)  And while Mr. Diaz's counsel attempted to elicit testimony from

26   Mr. Kawasaki and Mr. Jackson that Mr. Martinez used the Spanish-language word "mayate," Mr.

27   Kawasaki denied ever making such a charge (Tr. vol. 2, 325:8-326:3 (Kawasaki)), and Mr. Jackson's

28   claim was impeached by his prior inconsistent testimony (Tr. vol. 2, 408:1-15 (Jackson)).

1      ***Mr. Diaz's Relationship With His Son***:  In the preface to one of the most shocking instances

2  of Mr. Diaz's testimony being impeached, Mr. Diaz testified that his relationship with his son was

3  "fractured" after he allegedly witnessed him being called the n-word by a Caucasian supervisor at

4  Tesla but did nothing to respond.  (Tr. vol. 3, 598:23-599:4 (Diaz).)  Mr. Diaz even told Dr. Reading

5  that he could pinpoint a specific moment during the alleged incident when he and his son made eye

6  contact and he knew their relationship was broken (Tr. vol. 4, 833:17-834:8, 864:6-864:17

7  (Reading)), and he repeatedly referred to this incident as a centerpiece of his emotional distress (Tr.

8  vol. 3, 599:2-4, 599:8-600:17, 607:8-608:22 (Diaz)).  But the jury also heard undisputed testimony

9  that Mr. Diaz and his son worked closely together to jointly promote their lawsuit, including by

10  posing for multiple photoshoots together eighteen months after Mr. Diaz left Tesla.  (Tr. vol. 4,

11  753:11-755:7 (Diaz).)  And, when pressed, Mr. Diaz admitted that the ultimate cause of the

12  purported rift in their relationship was not the incident at Tesla but that Demetric started "hanging

13  out with the wrong crowd" years later.  (Tr. vol. 4, 755:3-7 (Diaz).)  Most significantly, in an excerpt

14  from Demetric Di-Az's deposition that Mr. Diaz vehemently objected to playing for the jury (Tr.

15  vol. 5, 924:19-925:5, 1004:9-11), Demetric testified—contrary to Mr. Diaz's testimony that

16  Demetric neither respected nor spoke to him (Tr. vol. 4, 607:25-608:5 (Diaz))—that he had a "good"

17  relationship with his father, that they spoke "probably every day," and that they saw each other

18  multiple times a week (Tr. vol. 5, 1014:8-12 (playing Dkt. 451, Demetric Tr. vol. 1, 31:20-32:4)).

19      The jury also heard evidence discrediting Mr. Diaz's claims about the Demetric incident.

20  Demetric's testimony refuted Mr. Diaz's assertion that the supervisor that purportedly used the

21  racial slur was "Caucasian."  (*Id.* (playing Dkt. 451, Demetric Tr. vol. 1, 103:7-10) (describing his

22  supervisor, Javier Caballero, as a Mexican male).)  And Mr. Diaz was forced to admit on cross-

23  examination that his son had informed him that his purported dispute with Mr. Caballero was about

24  a baseball rivalry, not race.  (Tr. vol. 4, 749:14-750:1 (Diaz).)  There was no written record of the

25  incident introduced at trial, and when Mr. Diaz claimed that he encouraged his son to report Mr.

26  Caballero to Tesla management, he was impeached by his prior testimony that he did not recall

27  doing so.  (Tr. vol. 4, 755:8-756:18 (Diaz).)  The jury also learned that Mr. Diaz told Mr. Wheeler

28  that he possessed a video of the alleged incident (Tr. vol. 2, 365:20-366:3 (Wheeler)), but it was

never produced at trial.  And the jury heard that Demetric reapplied for another job at Tesla months after the alleged incident that Mr. Diaz testified destroyed their relationship.  (Ex. 379.)

### 4. The Jury Had Ample Grounds To Doubt Mr. Diaz's Credibility And Disbelieve His Testimony

Given that Mr. Diaz lied repeatedly, including about an issue as sensitive as his own relationship with his son, the jury easily could have concluded that he was likewise lying about far less sensitive issues, and thus chosen to credit little to anything Mr. Diaz said.  And indeed, the jury had many reasons to doubt Mr. Diaz's credibility based on multiple other instances of impeachment:

- Mr. Diaz misled the jury by testifying that the "job I got after Tesla" was as a bus driver at AC Transit when, in fact, he worked at a Coca Cola bottling plant shortly after he left Tesla (Tr. vol. 3, 585:25-586:3, vol. 4, 801:11-802:11 (Diaz)).

- Mr. Diaz testified that to receive his first promotion at Tesla, Mr. Kawasaki had to hide the fact that Mr. Diaz was African-American from supervisors, but Mr. Romero, who was involved in the decision to promote Mr. Diaz, already knew his race at the time (Tr. vol. 4, 714:23-716:14, 791:16-791:19 (Diaz)).

- Mr. Diaz claimed to have recordings of various incidents of racial harassment and discrimination, but they were never produced or played (Tr. vol. 3, 655:23-656:10 (Diaz)).

- Mr. Diaz encouraged his son to apply to work at Tesla even after Mr. Diaz purportedly experienced near daily instances of racial discrimination (Tr. vol. 4, 742:2-742:12 (Diaz)), and his daughter, who lived with him, applied for a job too (though Mr. Diaz said he knew nothing about this—which the jury could have disbelieved) (Tr. vol. 4, 750:8-11 (Diaz)).

- Mr. Diaz helped Lamar Patterson, an African-American, get a job as an elevator operator months after Mr. Diaz purportedly started experiencing persistent racial discrimination in the same position.  Although Mr. Diaz claimed he did not know Mr. Patterson's race at the time—despite receiving the request to assist him find employment through Mr. Patterson's cousin—he admitted that he did not warn Mr. Patterson about the alleged racial environment when he met him (Tr. vol. 3, 640:7-641:13 (Diaz)).

- Mr. Diaz repeatedly lied to Dr. Reading during his psychological examination, including by: (1) falsely representing that he had worked at Tesla for 18 months instead of 9 months (*compare* Tr. vol. 4, 857:1-857:18 (Reading) *with* Dkt. 439 (Preliminary Jury Instructions) at 3); (2) saying that he had not found employment after Tesla until he got his job at AC Transit four-to-six months later, but the undisputed evidence shows that Mr. Diaz was employed at Coca Cola in a factory job similar to the one he held at Tesla well before then (*compare* Tr. vol. 4, 858:3-858:25 (Reading) *with* 801:11-802:11 (Diaz); and (3) claiming that feces was placed on his own cart while the undisputed evidence showed it appeared on Mr. Wheeler's (*compare* Tr. vol. 4, 832:3-832:14 (Reading) *with* Tr. 348:6-13 (Wheeler)).

### 5. Tesla Responded To Mr. Diaz's Documented Complaints

The jury's damages award was also reasonably supported by the undisputed evidence that Tesla had and took steps to enforce anti-harassment policies that Mr. Diaz's own expert witness

1    deemed adequate.  (Tr. vol. 3, 515:9-11 (Oppenheimer) ("Q. And you determined that Tesla had

2    adequate policies in place; right? A. I think the policies were fine, yes.").)  Moreover, the jury was

3    entitled to credit evidence that Tesla promptly responded to Mr. Diaz's documented complaints.

4         For instance, it is undisputed that, after receiving Mr. Diaz's complaint that Mr. Timbreza

5    directed inappropriate language toward him that was "racial in nature," Mr. Kawasaki promptly

6    reported the incident to Mr. Romero who, along other supervisors, conducted a further investigation

7    the following day.  (Ex. 38, Tr. vol. 2, 273:22-274:4 (Kawasaki).)  It is undisputed that Mr. Kawasaki

8    then disciplined Mr. Timbreza with a formal verbal warning for using inappropriate racial language

9    and an admonition that any further misconduct would lead to his termination.  (Ex. 39; Tr. vol. 2,

10   276:19-277:5, 314:14-20 (Kawasaki).)  Mr. Diaz's expert witness Amy Oppenheimer admitted that

11   "Mr. Kawasaki did the best he could" in responding to the incident involving Mr. Timbreza.  (Tr.

12   vol. 2, 467:17-18 (Oppenheimer).)

13        It is also undisputed that Tesla promptly responded to the October 2015 elevator incident.

14   Mr. Martinez and Mr. Diaz reported the dispute to their supervisors, including Mr. Kawasaki and

15   Mr. Romero.  (*See* Ex. 92.)  Mr. Kawasaki forwarded Mr. Diaz's complaint to Mr. Jackson, who

16   testified that either he or his "manager at the time . . . Terri Garrett" reported the incident "up the

17   line" to individuals at Tesla.  (*Id.*; Tr. vol. 2, 387:10-17 (Jackson).)  Mr. Jackson performed a

18   "prompt, objective, and thorough" investigation that included speaking to all three witnesses and

19   reviewing surveillance footage of the incident with Mr. Diaz and Mr. Quintero.  (Ex. 103; Tr. vol.

20   2, 388:18-389:2, 422:22-423:10, 430:10-14 (Jackson).)  Tesla issued a "verbal warning" to Mr.

21   Martinez for his conduct during the incident.  (Ex. 76 (email from Mr. Jackson to his supervisor

22   stating Tesla had decided it needed to "verbally counsel [Mr. Martinez and Mr. Diaz] with regards

23   to appropriate behavior in the workplace").)  And Mr. Diaz admitted he and Mr. Martinez had no

24   contact "[b]etween the elevator incident and the drawing" incident.  (Tr. vol. 4, 735:23-25 (Diaz).)

25        As to the racist drawing incident, it is undisputed that Tesla responded in less than two hours

26   to Mr. Diaz's email reporting the drawing by placing Mr. Martinez on an unpaid suspension and

27   making disciplinary recommendations, pending a complete investigation.  (Exs. 33, 272; Tr. vol. 2,

28   432:14-16 (Jackson).)  Although Mr. Diaz and his counsel took issue with the fact that Mr. Martinez

was not terminated for the drawing, Mr. Diaz's expert Ms. Oppenheimer admitted that she did not believe that Tesla was required to terminate Mr. Martinez for this incident.  (Tr. vol. 3, 508:16-509:3 (Oppenheimer).)  And Mr. Wheeler testified that Mr. Martinez merely should have been written up.  (Tr. vol. 2, 361:6-361:10 (Wheeler).)   Mr. Jackson also referred the incident to Mr. Martinez's staffing agency for its own additional investigation.  (Ex. 284 (email exchange).)  The same day, Mr. Jackson reported by email to Mr. Quintero, Mr. Romero, and Ms. Garrett that he "spoke with Owen Diaz and he has been made aware that we are taking this issue seriously and that it will be addressed today," and that Mr. Diaz "stated he was fine with that and that he just wanted it to be addressed."  (Ex. 284.)  In addition, following the event, Mr. Jackson "talked to everybody in the recycling team" to "inform[] them about the drawing; that it was inappropriate," and to "ma[ke] sure that they knew that this behavior was inappropriate and shouldn't happen again," and he further "tried to meet each shift [to h]ave the shift supervisor there or lead and let them know that that type of action is not acceptable."  (Tr. vol. 2, 439:4-440:1 (Jackson).)

On this record, the jury could have reasonably concluded—as Ms. Oppenheimer did (Tr. vol. 3, 516:18-25 (Oppenheimer))—that Tesla's actions amounted, at most, to a negligent failure to do better and not a purposeful or reprehensible violation of Mr. Diaz's civil rights.  Mr. Diaz's nine supposed instances of attorney misconduct are vanishingly minor, and wholly insufficient to justify a new trial, when compared to the entire evidentiary record supporting the jury's decision to award $3.2 million in damages rather than the more than $150 million that Mr. Diaz sought.

## II.   THE COURT SHOULD DENY MR. DIAZ'S MOTION FOR A NEW TRIAL FOR SUPPOSED INADEQUATE DAMAGES

The Court should also reject Mr. Diaz's argument (Mot. 23-35) that the jury's award of compensatory or punitive damages was "inadequate" and requires a new trial.  While district courts often grant new trials because a jury has awarded excessive damages, as the Court properly did here (Dkt. 328), Mr. Diaz does not a single case in which a court granted a new trial on the ground that a jury's damages award was too low.  And the Court should be especially disinclined to deem the jury verdict too low in this case that turned entirely on non-economic emotional distress damages, which have long been recognized as highly subjective and thus uniquely appropriate for

1  determination by a jury and not a court.  Indeed, this Court expressly recognized as much in its prior

2  post-trial order.  (Dkt. 328 at 27 (noting that "emotional damages awards" are "essentially

3  subjective" and thus that "determinations about 'intangible, non-economic losses' are 'peculiarly

4  within a jury's ken.'" (quoting *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978), *Holzhauer v. Golden*

5  *Gate Bridge Highway & Transportation Dist.*, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017)).)

6       Here, the jury was amply entitled to award Mr. Diaz compensatory damages of $175,000,

7  and punitive damages of $3 million ($1.575 million after the constitutionally required reduction, *see*

8  Dkt. 479).  Rule 59(a) imposes a high bar to overturning a jury verdict, and Mr. Diaz offers no legal

9  or factual basis for the Court to do so on the ground that either damages component is inadequate.

10      **A.**     <u>**Legal Standard**</u>

11      Rule 59(a)(1) provides that "the court may, on motion, grant a new trial . . . for any reason

12 for which a new trial has heretofore been granted in an action at law in federal court."  "In the Ninth

13 Circuit, a court may grant a new trial under Rule 59 'only if the verdict is contrary to the clear weight

14 of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.'"

15 *Droplets, Inc. v. Yahoo! Inc.*, 2023 WL 3296171, at *10 (N.D. Cal. Mar. 1, 2023) (quoting *Molski*

16 *v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)).  The court "may not grant a new trial simply

17 because it would have arrived at a different verdict."  *Wallace v. City of San Diego*, 479 F.3d 616,

18 630 (9th Cir. 2007) (citation omitted).  When reviewing a motion for a new trial, "[i]t is not the

19 court's place to substitute [its] evaluations for those of the jurors."  *Williams v. Gaye*, 895 F.3d 1106,

20 1127 (9th Cir. 2018) (citation omitted).[5]

21

22

23

24 ──────────────────

25 [5] Cal. Civ. Proc. Code § 657(5), which provides that new trials may be granted on the basis of "excessive or inadequate damages" that "materially affect[ed] the substantial rights" of the aggrieved party, cannot apply to Mr. Diaz's federal claims under Section 1981. *See Gasperini v.*

26 *Center of Humanities Inc.*, 518 U.S. 415, 437 (1996) (holding the court could give effect to a similar New York law controlling compensation for a state, but not federal claim).  And because the verdict

27 was general and not particularized by claim, the Court has no possible basis to apply section 657(5) rather  Rule 59(a) to the jury's damages award. *McCord v. Maguire*, 873 F.2d 1271, 1274 (9th Cir.

28 1989) (no post-trial special verdicts).

**B.    The Evidence Supports The Adequacy Of The Compensatory Damages Award**

Mr. Diaz has not come close to meeting his burden to show the compensatory damages are "against the clear weight of the evidence." *Tortu v. Las Vegas Met. Pol. Dept.*, 556 F.3d 1075, 1083. Mr. Diaz must show the damages verdict is contrary to the great weight of the evidence based on a consideration of "***the entire evidence***" offered at the retrial—not simply the evidence he may believe could support a higher award. *See Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (upholding the district court's denial of new trial, despite some evidence in the movant's favor, and explaining that courts grant new trials only where, "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 48-49 (1973)); *see also Holzhauer v. Golden Gate Bridge Highway & Transportation Dist.*, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017), *aff'd,* 743 F. App'x 843 (9th Cir. 2018) (denying motion for new trial based on inadequate non-economic damages, even where there was uncontested testimony concerning significant non-economic loss, because non-economic damages are for jury to decide); *see also* Instruction No. 24 (Dkt. 456 at 25) (requiring jury to assess damages based on "on all of the evidence, regardless of which party presented it").[6]

**1.    Mr. Diaz Ignores The Evidence Supporting The Verdict**

Despite this requirement, Mr. Diaz's attempt to show that the jury's award "does not comport with the evidence" fails to address "the entire evidence," and instead largely ignores countervailing evidence, described in detail above (at pp. 15-27), that undermines the evidence on which Mr. Diaz relies.  For example, Mr. Diaz argues that "[n]o witness contradicted" testimony that the "n-word was used in the factory on a daily basis" (Mot. 24), but this elides the undisputed testimony from multiple witnesses that they never witnessed or even heard about the n-word being used in a hostile

---

[6] Mr. Diaz errs (Mot. 24) in seeking to wave off any unfavorable evidence as not "legitimately introduced on retrial."  Tesla has detailed above (at pp. 15-27) the overwhelming support for the verdict provided by evidence Mr. Diaz does not and cannot challenge—most of which is Mr. Diaz's own testimony, admissions by his own witnesses, undisputed documentary evidence, or disputed evidence whose credibility was the jury's province to evaluate.

1    (rather than friendly) manner—and thus in a manner that could support a claim that the uses created

2    a hostile work environment.  (*See supra* p. 20.)  Mr. Diaz similarly ignores undisputed testimony

3    that Tesla worked diligently to remove any "racist graffiti" that was inscribed on surfaces at the

4    factory.  (*See supra* p. 19.)  And he likewise ignores his own telling admission on cross-examination

5    that, contrary to his testimony on direct, he was not regularly harassed by uses of the n-word directed

6    to him.  (*See supra* pp. 22-23.)  Mr. Diaz also ignores ***all*** the vast evidence raising questions about

7    whether any of the alleged acts of racial harassment that he testified he endured actually occurred,

8    other than the two discrete and documented incidents involving Mr. Timbreza's use of a derogatory

9    term (which Mr. Diaz admitted Tesla responded to satisfactorily) and Mr. Martinez's racist drawing

10   (which the jury easily could have found that Tesla responded to with prompt and adequate

11   discipline). The retrial evidence thus supports the jury's calculation of the compensatory damages

12   award, and the award is not contrary to the great weight of evidence.

13                    **2.       The Jury Acted Properly Under The Court's Correct Instructions**

14           Mr. Diaz also fails to show the jury grossly erred in awarding damages because he does not

15   show, or even argue, that the jury failed to comply with the Court's legally correct jury instructions

16   on damages.[7]  It is undisputed that Mr. Diaz bore the burden to prove, by a preponderance of

17   evidence, the amount of damages on retrial.  (Dkt. 456 (Final Jury Instructions) at Nos. 24, 26.)

18   Although Tesla's liability was established, the jury was not instructed to credit any of Mr. Diaz's

19   specific allegations of harassment, except that "Mr. Diaz was harmed by Ramon Martinez."  (Dkt.

20   456, No. 22.)  Furthermore, the Court instructed the jury that "a single incident" could be sufficient

21

---

22   [7] *See, e.g.*, *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 105 F. Supp. 3d 1184, 1209 (D.
     Or. 2015), *aff'd*, 702 F. App'x 537 (9th Cir. 2017) (rejecting motion for new trial on damages and
23   noting that "the Court presumes that the jurors followed the Court's jury instructions and awarded
     damages based only upon a finding of actual liability and damages"); *Est. of Tindle v. Mateu*, 2020
24   WL 5760287, at *10 (N.D. Cal. Sept. 28, 2020) (rejecting motion for a new trial on damages because
     there is a presumption that juries follow jury instructions and the jury's award did not reflect
25   otherwise); *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 2008 WL 6873809, at *5 (C.D. Cal.
     Apr. 24, 2008), *aff'd*, 563 F.3d 1358 (Fed. Cir. 2009) (declining to grant new trial when damages
26   award was "consistent with the jury instructions"); *Holt v. Pennsylvania*, 2018 WL 5617856, at *9
     (E.D. Pa. Oct. 30, 2018), *aff'd*, 778 F. App'x 123 (3d Cir. 2019) (rejecting motion for new trial on
27   damages because "[w]e do not see any reason to suspect from this award that the jury was biased or
     prejudiced, or that it rejected or was confused by the Court's instructions").
28

"to constitute harassment" under the law.  (*Id.* at No. 18.)  Thus, it was up to the jury to decide virtually all facts in the retrial going to the existence and magnitude of any racial incidents and any resulting emotional distress.  The Court correctly instructed the jury to weigh the credibility of witness testimony to decide these facts, stating that, "if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said" or "accept the part you think is true and ignore the rest."  (*Id.* at No. 8.)

Nor is there any basis to find that the jury failed to follow the relevant damages instructions. Consistent with the law recognizing that emotional distress damages awards are "essentially subjective," Instruction No. 24 (Dkt. 456 at 25) gave the jury wide latitude to assess compensatory damages, stating that "[c]ompensatory damages means the amount of money that will reasonably and fairly compensate Mr. Diaz for any injury you find was caused by Tesla's conduct as described in" the liability instructions, and that, in determining damages, the jury should consider "[t]he nature and extent of the injuries; [t]he loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future; and [t]he mental or emotional pain and suffering experienced and that with reasonable probability will be experienced in the future."  Mr. Diaz cannot show, and so does not even argue, that the jury's award of emotional distress damages reflects its failure to follow this instruction.  This alone is reason to deny his request for a new trial based on the supposed inadequacy of the damages award.  *See, e.g.*, *Benson*, 105 F. Supp. 3d at 1209.

Moreover, Mr. Diaz ignores Instruction No. 25 regarding his duty to mitigate (*i.e.*, "avoid or reduce") his damages.  (Dkt. 456 at 26.)  Mr. Diaz thus also ignores the evidence Tesla presented showing that Mr. Diaz in fact failed to mitigate his damages, including by declining to ever seek or obtain medical treatment for his alleged emotional distress, even after Dr. Reading made specific recommendations about the treatment he should seek.  (Tr. vol. 4, 850:25-851:7 (Reading).)

### 3.   Comparable Cases Support The Compensatory Damages Award

Mr. Diaz likewise fails to show (Mot. 30-33) any inadequacy in the compensatory damages award by comparing it to (i) the first jury's award, or (ii) the supposed "most comparable cases." Contrary to Mr. Diaz's arguments, the award falls well within the range of emotional distress awards

1    in comparable discrimination cases and thus cannot possibly constitute an extreme outlier that could

2    rise to the level of "manifest injustice" required for the extraordinary relief of a new trial.

3         *First*, Mr. Diaz errs in arguing (Mot. 31) that the "'most' relevant comparator is, of course,

4    the first jury's compensatory damages award."  Mr. Diaz offers no support for his attempt to measure

5    the adequacy of a second damages award against a prior damages award that was reversed because

6    it grossly exceeded the maximum amount of damages sustainable by the proof.  (*See* Dkt. 328 at 27-

7    30.)  This has never been done before and the Court should not do it now.

8         Not only is Mr. Diaz's argument unsupported and illogical, but it is inconsistent with his

9    recognition at the pretrial conference that, indeed, ***the second jury "can come up with a low***

10   ***number.  There's no reason they can't come up with a low number***."  (Feb. 27, 2023 Hearing Tr.

11   36:6-8.)   After rejecting the remittitur and acknowledging the risk that the retrial might—

12   legitimately—result in a lower verdict than the first trial, Mr. Diaz has no basis to argue the retrial

13   verdict is improper simply because it is lower than the first.  *See Holt*, 2018 WL 5617856, at *9, n.9

14   (denying motion for second retrial on damages on the basis of inadequate damages at first retrial

15   and noting: "While we found the $50,000 [remitted damages award] to be reasonable in the

16   circumstances of the verdict returned by [the original] jury, that finding in no way limited the jury

17   hearing the testimony in [retrial].  Plaintiff took his chances when he chose to proceed with a new

18   damages trial rather than accept the remittitur.  He points to no authority suggesting that a lower

19   verdict on re-trial in these circumstances renders the verdict legally unreasonable.").

20        It also is meaningless to measure the reasonableness of the second jury's damages award

21   based on the proof in the first trial because the two trials involved the same witnesses and documents

22   but different evidentiary records.  The jury was entitled to conclude based on Tesla's legitimate

23   impeachment and cross-examination of witnesses in the second trial that Mr. Diaz had exaggerated

24   the alleged incidents of harassment he experienced and their emotional impact on his well-being.

25   (*See supra* pp. 15-27.)  For example, the second jury could have discredited Mr. Diaz's evidence of

26   emotional distress because he lied about the supposed fracturing of his relationship with his son, his

27   employment history after leaving Tesla, whether the n-word was used against him on a daily basis

28   in a hostile manner, and in much of the information he presented to Dr. Reading.  Given that all

1   these inconsistencies in his testimony (and many more) were exposed in the retrial, the record in the

2   first trial provides no valid "comparator" to measure the adequacy of the second jury's award.

3          *Second*, Mr. Diaz errs in arguing (Mot. 31-32) that the compensatory damages award is

4   contrary to the great weight of the evidence because it is lower than the awards upheld in *Turley*

5   ($1.32 million) and *Passantino* ($1 million).  *See Turley*, 774 F.3d at 163; *Passantino*, 212 F.3d at

6   504.  To begin with, Mr. Diaz's case comparisons are entirely inapt because *Turley* and *Passantino*

7   were evaluating the permissible ***maximum*** amount of damages sustainable by the proof in those

8   cases—not whether the damages awards were so low to be contrary to the great weight of the

9   evidence.  Mr. Diaz does not explain why these supposed comparators are relevant at all to whether

10  the damages here were within a permissible range supported by the evidence in this case.

11         Moreover, it is disingenuous for Mr. Diaz to compare the verdict to *Turley* and *Passantino*

12  because, as the Court will recall, he previously argued that the Court erred on a "controlling question

13  of law" because its prior "decision to reduce compensatory damages to $1.5 million . . . was

14  materially, and [Mr. Diaz] believes improperly, influenced by the Court's comparative analysis of

15  jury verdicts in" *Passantino* and *Turley*.  (Dkt. 331 at 3.)  And at the hearing on Tesla's motion for

16  new trial, Mr. Diaz urged the Court ***not*** to use *Turley* as a point of comparison because "***[t]hat case***

17  ***is different***," and the "jury has wide latitude in determining what's appropriate." (Jan. 19, 2022

18  Hearing Tr. at 49:17-20.)

19         In any case, even if the Court were to consider *Turley* and *Passantino* as relevant

20  comparators notwithstanding the distinct procedural postures of those cases, they arose on vastly

21  different records and thus do not support Mr. Diaz's argument that the damages award here is grossly

22  inadequate.  As Tesla argued before (and Mr. Diaz agreed—Jan. 19, 2022 Hearing Tr. at 49:17-18),

23  *Turley* is "different" and the egregious and protracted racial harassment in that case could reasonably

24  support a much higher compensatory damages award than does the record here.  As the Second

25  Circuit described the harrowing facts in *Turley*, it was a case of "extreme racial harassment in the

26  workplace" in which "[t]he plaintiff, a longtime steelworker at a plant in Lackawanna, New York,

27  endured an extraordinary and steadily intensifying drumbeat of racial insults, intimidation, and

28  degradation over a period of more than three years" that "included insults, slurs, evocations of the

Ku Klux Klan, statements comparing black men to apes, death threats, and the placement of a noose dangling from the plaintiff's automobile." *Turley*, 774 F.3d at 146.   Moreover, the plaintiff in *Turley* suffered and was treated at the time for "serious panic attacks," was diagnosed with post-traumatic stress disorder, and was hospitalized as a result of threats and harassment. *Id.* at 150-51. In sharp contrast, Mr. Diaz worked only nine months at Tesla, was subjected to only two documented and corroborated incidents of racial harassment which Tesla promptly and adequately remediated, sought no contemporaneous medical treatment or diagnosis, was never hospitalized, and, according to his own stepdaughter and medical expert, experienced only mild symptoms from which he quickly recovered (*see* pp. 16-17 above).

Likewise, *Passantino* supported a higher award than here because the plaintiff had worked for her employer for 18 years, suffered discrimination and retaliation for 4 years, and described serious medical symptoms like anxiety, rashes, and stomach problems.  212 F.3d at 513-14.  Thus, even if those higher awards were supported in *Turley* and *Passantino*, they do not show that the jury's award here fell so outside the bounds of the evidence that a new trial is required.

Further, as Tesla showed in support of its prior motion for new trial, a broad survey of comparable workplace racial harassment cases—not limited to the two cases on which Mr. Diaz relies now—shows that courts have limited awards of damages for emotional distress in other discrimination cases to ***an average of $188,548***.  (Dkt. 317 at 28 (Appendix A); *see also id.* Appendices B, C.)  If Mr. Diaz is now embracing a comparative analysis, then the Court should consider these additional cases too.  They show that the second jury's award of $175,000 in non-economic compensatory damages is squarely in line with what other courts have held is appropriate.

## C.   The Evidence Supports The Adequacy Of The Punitive Damages Award

Mr. Diaz likewise fails to show (Mot. 33-35) any inadequacy in the jury's significant award of $3 million in punitive damages.  "Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury."  *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1165 (9th Cir. 2002) (citation omitted)).  That is because punitive damages are "the product of numerous, and sometimes intangible, factors; a jury imposing a punitive damages award must make a qualitative assessment based on a host of facts and circumstances unique to the

particular case before it." *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 457 (1993).   Awards of new trial for inadequate punitive damages are thus exceedingly rare; tellingly, Mr. Diaz fails to cite a single one.

Here, the award of $3 million in punitive damages is not so low as to be clearly against the weight of the evidence.  The jury had ample basis to find punitive damages far more modest than Mr. Diaz's demand for more than $150 million. The undisputed evidence showed (*see* pp. 26-27 above) that Tesla had adequate policies barring racially discriminatory harassment and imposed prompt discipline in response to each of Mr. Diaz's documented complaints of racial slurs, and the jury was entitled to decide disputes of fact about Mr. Diaz's claims about use of the n-word and graffiti.  And Mr. Diaz may not rely on evidence of incidents of harm to others like Mr. Wheeler to justify a higher punitive damages award for himself (*see* Dkt. 456 (Instruction No. 26)).   Nor, contrary to Mr. Diaz's assertion (Mot. 35), may Tesla's wealth alone support increasing punitive damages above the constitutional threshold to get "Tesla's attention."  *See Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005) ("The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award, and cannot make up for the failure of other factors, such as reprehensibility, to constrain significantly an award that purports to punish a defendant's conduct." (cleaned up)).

If anything, a comparative analysis supports the adequacy of the punitive damages.  The jury awarded punitive damages in an amount ***ten times*** the $300,000 total damages cap available under Title VII.  *See Bains*, 405 F.3d at 777 ("[T]he $300,000 statutory limitation on punitive damages in Title VII cases [i]s an appropriate benchmark for reviewing § 1981 damage awards.").   And in *Turley*, the Second Circuit vacated a $5 million punitive damages award and instructed that, on remand, any such award should not exceed a 2:1 ratio to the $1.32 million compensatory damages— or $2.6 million.  The jury's $3 million punitive damages award on the much milder record here was more than adequate.

## CONCLUSION

The Court should deny Mr. Diaz's motion.

DATED:  June 7, 2023

By: */s/ Daniel C. Posner*

Alex Spiro (appearance *pro hac vice*)
alexspiro@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

Daniel C. Posner
Mari Henderson
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Asher Griffin (appearance *pro hac vice*)
ashergriffin@quinnemanuel.com
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Defendant Tesla, Inc.*

TESLA'S OPP. TO PLAINTIFF'S RENEWED MOTION FOR MISTRIAL AND MOTION FOR NEW TRIAL