QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (appearance *pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Daniel C. Posner (CA Bar No. 232009)
  danposner@quinnemanuel.com
  Mari F. Henderson (CA Bar No. 307693)
  marihenderson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

QUINN EMANUEL URQUHART &SULLIVAN, LLP
  Asher Griffin (appearance *pro hac vice*)
  ashergriffin@quinnemanuel.com
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Defendant Tesla, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| OWEN DIAZ,<br><br>              Plaintiff,<br><br>      v.<br><br>TESLA, INC. d/b/a TESLA MOTORS, INC.,<br><br>              Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**DEFENDANT TESLA, INC.'S REPLY IN SUPPORT OF MOTION UNDER RULE 59(e) TO ALTER OR AMEND THE JUDGMENT**<br><br>Hearing Date: July 19, 2023<br>Hearing Time:  2 p.m.<br>Place: Courtroom 2, 17th Floor<br>Judge: Hon. William H. Orrick |

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

I.    MR. DIAZ MISCONSTRUES SETTLED LAW CREATING A STRONG
PRESUMPTION THAT PUNITIVE DAMAGES MAY NOT EXCEED A 9:1
RATIO TO COMPENSATORY DAMAGES .................................................................2

    A.    Mr. Diaz Misconstrues The *State Farm* Reprehensibility Factor .............................2

    B.    Mr. Diaz Misconstrues The *State Farm* Proportionality Factor And The
Presumptive 9:1 Limit Set By *State Farm* .................................................................3

    C.    Mr. Diaz Misconstrues The *State Farm* Requirement To Consider The Title
VII Damages Cap Here ...............................................................................................5

II.    MR. DIAZ FAILS TO SHOW ANY LEGAL OR EVIDENTIARY BASIS FOR
AN UPWARD DEPARTURE FROM THE 9:1 RATIO HERE ...........................................5

    A.    This Is Not A "Small Amount" Case .........................................................................6

    B.    This Is Not An "Extreme Reprehensibility" Case .......................................................7

        1.    Mr. Diaz Distorts The Record As To The Incidents Of Racial
Misconduct ....................................................................................................7

        2.    Mr. Diaz Distorts The Record As To Tesla's Response ...............................8

        3.    Mr. Diaz Errs As To Tesla's Acceptance Of Responsibility ......................10

        4.    Mr. Diaz Errs In Weighing The *Hardeman* Reprehensibility Factors .........11

    C.    "Wealth" Cannot Support A Ratio Greater Than 9:1 ...............................................15

CONCLUSION ......................................................................................................................17

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Pages**

*Arizona v. ASARCO LLC*,
    773 F.3d 1050 (9th Cir. 2014) ........................................................................................... 6

*Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*,
    405 F.3d 764 (9th Cir. 2005) ................................................................................. 3, 4, 5, 6

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ........................................................................................................... 3

*Chopra v. Gen. Elec. Co.*,
    527 F. Supp. 2d 230 (D. Conn. 2007) ............................................................................. 14

*Deters v. Equifax Credit Info. Servs., Inc.*,
    202 F.3d 1262 (10th Cir. 2000) ......................................................................................... 4

*Feltner v. Columbia Pictures Television, Inc.*,
    523 U.S. 340 (1998) ........................................................................................................... 7

*Flores v. City of Westminster*,
    873 F.3d 739 (9th Cir. 2017) ............................................................................................. 4

*Hardeman v. Monsanto Co.*,
    997 F.3d 941 (9th Cir. 2021) ....................................................................................... 4, 13

*Khalaf v. Ford Motor Co.*,
    2019 WL 10301739 (E.D. Mich. Mar. 28, 2019) ........................................................... 11

*Mitri v. Walgreen Co.*,
    660 F. App'x 528 (9th Cir. 2016) .................................................................................. 4, 6

*Morse v. S. Union Co.*,
    174 F.3d 917 (8th Cir. 1999) ........................................................................................... 14

*Pac. Mut. Life Ins. Co. v. Haslip*,
    499 U.S. 1 (1991) ............................................................................................................... 3

*Paul v. Asbury Auto. Grp., LLC*,
    2009 WL 188592 (D. Or. Jan. 23, 2009) ........................................................................ 13

*Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*,
    422 F.3d 949 (9th Cir. 2005) ..................................................................................... 3, 4, 9

*Riley v. Volkswagen Grp. of Am., Inc.*,
    51 F.4th 896 (9th Cir. 2022) ..................................................................................... 3, 4, 6

*Roby v. McKesson Corp.*,
    47 Cal. 4th 686 (2009)..............................................................................11, 14

*Romano v. U-Haul Int'l*,
    233 F.3d 655 (1st Cir. 2000) ............................................................................. 4

*Saunders v. Branch Banking And Tr. Co. Of VA*,
    526 F.3d 142 (4th Cir. 2008)........................................................................... 16

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ....................................................2, 3, 4, 5, 9, 11, 15, 16

*Swinton v. Potomac Corp.*,
    270 F.3d 794 (9th Cir. 2001)........................................................................4, 5

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) .........................................................................4, 16

*TXO Production Corp. v. Alliance Resources Corp.*,
    509 U.S. 443 (1993) ....................................................................................3, 16

*Yowan Yang v. ActioNet, Inc.*,
    2017 WL 2117028 (C.D. Cal. Jan. 23, 2017)................................................. 12

*Zhang v. Am. Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ......................................................................4, 14

### Other Authorities

A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis*,
    111 Harv. L. Rev. 869 (1998) ........................................................................... 6

Bureau of Labor Statistics' CPI Inflation Calculator, available at
    https://www.bls.gov/data/inflation_calculator.htm ........................................... 6

Kenneth S. Abraham & John C. Jeffries Jr., *Punitive Damages and the Rule of
    Law: The Role of Defendant's Wealth*, 18 Journal of Legal Studies 415 (1989).................... 6

Fed. R. Civ. P. Rule 59.......................................................................................... 7

Fed. R. Civ. P. Rule 59(e) ..................................................................................... 1

1

## **PRELIMINARY STATEMENT**

2          Tesla brought this motion to enable the Court to correct a purely legal error in the judgment.

3    The jury's award of $3 million in punitive damages, which is seventeen times the $175,000

4    compensatory damages award, is unconstitutional because it exceeds the 9:1 ratio that is the

5    presumptive outermost limit for punitive damages awards.  While the 9:1 ratio is not a mathematical

6    absolute, there is no basis to make an extraordinary exception to that limit on the record here.  In

7    seeking to preserve an unconstitutional 17:1 punitive damages award, Mr. Diaz's opposition (Dkt.

8    480 ("Opp.")) misconstrues, misapplies, and outright ignores well-settled and binding Supreme

9    Court and Ninth Circuit law.

10          Notably, Mr. Diaz does not cite a single case post-dating the Supreme Court's seminal *State*

11   *Farm* decision that permits punitive damages to exceed a 9:1 ratio to non-nominal compensatory

12   damages.  Mr. Diaz argues that the Court should grant him an extraordinary exception based on the

13   amount of the compensatory damages or on Tesla's supposed reprehensibility or wealth.  But settled

14   Supreme Court and Ninth Circuit precedent bars each of those arguments as a matter of law, and the

15   record in the second jury trial refutes those arguments as a matter of fact.

16          Mr. Diaz does not dispute that Rule 59(e) is a proper procedural vehicle for the Court to

17   amend the judgment to reduce punitive damages to their constitutionally permissible maximum.

18   Tesla has agreed to accept the 9:1 ratio as the constitutional limit despite strong arguments that it is

19   too high on the record here.  Accordingly, the Court should amend the judgment to reduce the

20   punitive damages award from $3 million to $1,575,000.

21          Tesla explains below in Part I the three governing *State Farm* factors (reprehensibility,

22   proportionality, and comparable civil penalties), how Mr. Diaz erroneously misconstrues each of

23   those factors, and why a 9:1 ratio to compensatory damages is now strongly presumed to be the

24   outermost limit of a constitutional punitive damages award.  Tesla then describes in Part II how Mr.

25   Diaz fails in each of his arguments for an upward departure from the 9:1 ratio.

26

27

28

**ARGUMENT**

I.   **MR. DIAZ MISCONSTRUES SETTLED LAW CREATING A STRONG PRESUMPTION THAT PUNITIVE DAMAGES MAY NOT EXCEED A 9:1 RATIO TO COMPENSATORY DAMAGES**

When evaluating whether a punitive damages award comports with due process, courts must consider (1) "the degree of reprehensibility of the defendant's misconduct;" (2) "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award"—with the mandate that any punitive damages award be "reasonable and proportionate" to the compensatory damages; and (3) "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 426 (2003) (cleaned up). In seeking to preserve an unconstitutional punitive damages award that is seventeen times the compensatory damages award here, Mr. Diaz misconstrues Supreme Court and Ninth Circuit precedent—particularly the unbroken line of post-*State Farm* cases establishing the strong presumption that a 9:1 ratio of punitive to compensatory damages is the outermost constitutional limit for punitive damages awards—and, as a result, gets all three *State Farm* factors wrong.

A.   **Mr. Diaz Misconstrues The *State Farm* Reprehensibility Factor**

Mr. Diaz first errs in arguing (Opp. 4-8) that the supposed reprehensibility of Tesla's conduct justifies an extraordinary exception to the 9:1 ratio. It does not as a matter of law. In *State Farm*, the Court held that, "in practice, few awards exceeding *a single-digit ratio* between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 538 U.S. at 425 (emphasis added), and that a *1:1 ratio* will often be the constitutional maximum: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee," *id*. Accordingly, while relative reprehensibility is a factor in analyzing the constitutionality of a punitive damages award, it is a factor to be considered in determining where on a sliding scale *between* a 1:1 ratio and a 9:1 ratio the constitutional limit of punitive damages should fall—not as a basis to *exceed* the presumptive outermost limit of 9:1.

Tellingly, Mr. Diaz fails to cite a single post-*State Farm* case citing relative reprehensibility as a ground for awarding punitive damages in a ratio greater than 9:1.  While the Ninth Circuit has cited high reprehensibility as a ground not to limit punitive damages to a 1:1, 2:1 or 4:1 ratio, the Circuit has never cited reprehensibility as a ground to justify a ratio **higher** than 9:1.  *See, e.g.*, *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 963-64  (9th Cir. 2005) (vacating and remanding for remittitur of punitive damages to a 9:1 ratio even where the violent threats at issue were "particularly reprehensible"); *Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 776-77 (9th Cir. 2005) (vacating and remanding for remittitur of punitive damages to a ratio between 6:1 and 9:1 even where racially discriminatory conduct was "highly reprehensible"); *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 902-03 (9th Cir. 2022) (vacating and remanding for reduction of punitive damages award to an 8:1 ratio, noting that a greater than 4:1 ratio was warranted because the defendant's "reprehensibility was especially high").

Moreover, reprehensibility must be analyzed in concert with the other *State Farm* factors and cannot supersede the proportionality mandate the Supreme Court set forth in *State Farm* and the single-digit multiplier presumption that follows from it.

> **B.** **Mr. Diaz Misconstrues The *State Farm* Proportionality Factor And The Presumptive 9:1 Limit Set By *State Farm***

As to the proportionality mandate itself, Mr. Diaz simply ignores (Opp. 10-15) the path-breaking importance of the Supreme Court's seminal *State Farm* decision.  In order to erroneously assert that a 17:1 ratio of punitive damages to compensatory damages is "well within constitutional bounds" (Opp. 11), Mr. Diaz is forced to string together piecemeal and outdated quotes from the Court's pre-*State Farm* decisions in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993); and *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991) (all cited Opp. 11).  But *State Farm* is now the governing case, and *State Farm* could not have been clearer that "courts must ensure that the measure of punishment is **both reasonable and proportionate** to the amount of harm to the plaintiff and to the general damages recovered," 538 U.S. at 426 (emphasis added), and therefore that, "in practice, few awards

exceeding *a single-digit ratio* between punitive and compensatory damages, to a significant degree, will satisfy due process," *id.* at 425 (emphasis added).  Accordingly, a 9:1 ratio to compensatory damages is strongly presumed to be the outermost constitutional limit of a permissible punitive damages award.

Ninth Circuit law is in accord.  In the 20 years since *State Farm*, the Ninth Circuit has never affirmed or permitted a punitive damages award exceeding a 9:1 ratio to any non-nominal award of compensatory damages.  *See Hardeman v. Monsanto Co.*, 997 F.3d 941, 974 (9th Cir. 2021) (affirming district court's post-trial reduction of punitive damages award from a 14:1 ratio to a 3.8:1 ratio, cautioning that even a 4:1 ratio was "'close to the line of constitutional impropriety'" (quoting *State Farm*, 538 U.S. at 425)); *Bains*, 405 F.3d at 774-7 (vacating a 100:1 ratio and remanding for remittitur to between a 6:1 and 9:1 ratio); *Planned Parenthood*, 422 F.3d at 963-64 (vacating and ordering reduction of punitive damages to a 9:1 ratio); *Riley*, 51 F.4th at 903-04 (vacating and ordering reduction of punitive damages to an 8:1 ratio); *see also Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) (affirming a 7:1 ratio shortly after *State Farm* because it "is of course a single-digit ratio"); *Flores v. City of Westminster*, 873 F.3d 739, 759-60 (9th Cir. 2017) ("[T]he single-digit ratios here are in line with our precedent."); *Mitri v. Walgreen Co.*, 660 F. App'x 528, 530-31 (9th Cir. 2016) (vacating  a 13:1 ratio and ordering remittitur to a 4:1 ratio).

Mr. Diaz thus errs in repeatedly citing to pre-*State Farm* Ninth Circuit cases like *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001) (cited Opp. 1, 5, 11, 13, 14, 15), as if they were still good law.  They are not.  As the Ninth Circuit has expressly noted, "we decided *Swinton* before the Supreme Court decided *State Farm*, which limits *Swinton*."  *Bains*, 405 F.3d at 776.  *Swinton*'s approval of a 28:1 ratio is thus superseded and irrelevant here.  Mr. Diaz fares no better in citing out-of-Circuit cases that likewise pre-date *State Farm*, such as *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1273 (10th Cir. 2000) (cited Opp. 14), or *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) (cited Opp. 14), whose punitive damages ratios are likewise superseded and irrelevant here.  More relevant and recent out-of-Circuit authority strongly favors Tesla as to the proper post-*State Farm* ratio analysis.  *See, e.g.*, *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 166

(2d Cir. 2014) (vacating and ordering remittitur of punitive damages to a 2:1 ratio even in a case of racially hostile workplace misconduct that the Second Circuit labeled "extreme," *id.* at 167).

### C.   Mr. Diaz Misconstrues The *State Farm* Requirement To Consider The Title VII Damages Cap Here

Finally, Mr. Diaz is wrong to argue (Opp. 15-16) that the Court may simply ignore the fact that the $3 million punitive damages award exceeds the $300,000 damages cap set forth for in Title VII by a factor of ten. *State Farm* requires courts to consider the difference between the punitive damages award and "civil penalties authorized or imposed in *comparable* cases." *State Farm*, 538 U.S. at 418 (emphasis added). Mr. Diaz thus errs in arguing that the lack of a damages cap in §1981 itself is dispositive; Title VII is clearly a comparable civil rights statute.

Moreover, the Ninth Circuit has already considered and rejected the argument Mr. Diaz makes here, holding that "the $300,000 statutory limitation on punitive damages in Title VII cases [i]s an appropriate benchmark for reviewing § 1981 damage awards, even though the statute d[oes] not apply to § 1981 cases." *Bains*, 405 F.3d at 777 (citing *Swinton* and *Zhang*); *see id.* (remanding for remittitur of punitive damages to an amount between the Title VII cap of $300,000 and $450,000). Contrary to Mr. Diaz's suggestion (Opp. 14), *Swinton* is in accord, as it expressly held that the Title VII cap "weigh[ed] in favor of a reduction" of a § 1981 punitive damages award. *Swinton*, 270 F.3d at 820. Thus, as the Court correctly ruled in its earlier post-trial order, the Court should compare the punitive damages award to the $300,000 Title VII cap. (Dkt. 328 at 42.) Here as before, the "sheer difference" (*id.*) between the two figures weighs in favor of a reduction to the presumptive constitutional limit of 9:1.

## II.   MR. DIAZ FAILS TO SHOW ANY LEGAL OR EVIDENTIARY BASIS FOR AN UPWARD DEPARTURE FROM THE 9:1 RATIO HERE

Even if *State Farm* may be construed to allow an upward departure from the presumptive 9:1 ratio in an extraordinary case, Mr. Diaz fails to show that this is such a case or that any such departure is warranted here. Settled Ninth Circuit law precludes any argument that this is a "small amount" case, the record refutes any argument that this is an "extreme reprehensibility" case, and *State Farm* bars "gargantuan wealth" as a basis to ignore due process limits on punitive damages.

1

**A.     This Is Not A "Small Amount" Case**

2     Contrary to Mr. Diaz's contentions (Opp. 12-13), no due process exception is warranted here

3     based on the supposed "paucity" of the $175,000 award.   While *State Farm* recognized that

4     exceeding a single-digit ratio "might" be appropriate in "a case where 'a particularly egregious act

5     has resulted in only a small amount of economic damages,'" *Bains*, 405 F.3d at 776 (quoting *State*

6     *Farm*, 538 U.S. at 425), that is a "rare exception," *id*., and such an exception has never been applied

7     in a case like this one.   To the contrary, the Ninth Circuit has found this rare exception to apply only

8     when a jury awards **nominal** or negligible compensatory damages.   *See Arizona v. ASARCO LLC*,

9     773 F.3d 1050, 1055-61 (9th Cir. 2014) (en banc) (affirming district court's decision to allow a

10    $300,000 punitive damages award, reflecting a ratio higher than 9:1, to stand in a Title VII case

11    where the jury awarded only nominal compensatory damages of $1).   As the full Ninth Circuit

12    explained in *ASARCO*, "[b]ecause nominal damages measure neither damage nor severity of

13    conduct, it is not appropriate to examine the ratio of a nominal damages award to a punitive damages

14    award." *Id*. at 1058.

15    In contrast, where (as here) plaintiffs receive non-nominal compensatory damages awards—

16    for example, awards in six-figure, five-figure and even four-figure and three-figure amounts—the

17    Ninth Circuit has consistently deemed such awards "not insignificant" or "substantial," and has

18    therefore held that punitive damages remain limited to a 9:1 ratio or less.   *Riley*, 51 F.4th at 900 n.2,

19    902-03 (holding that, where plaintiffs were awarded $1,080, $952, $582, and $3,133 in

20    compensatory damages, "[t]his case does not support a punitive damages multiplier above a single

21    digit ratio because the damages were not insignificant," even though "the compensatory awards

22    were relatively low"); *Mitri*, 660 F. App'x at 530, 531 (vacating and ordering remittitur to a 4:1

23    ratio, finding that  the  $88,000 compensatory damages award was "significant"); *Bains*, 405 F.3d

24    at 776 ("This is not a 'small amount' case because the economic damages were substantial—

25    $50,000.").

26    This is not a "small amount" case either.  Mr. Diaz's $175,000 compensatory damages award

27    greatly exceeds the lower damages awards noted above that the Ninth Circuit has already found to

28    be substantial and to thus falls outside the rare "small amount" exception to the presumptive single-

digit ratio.  For example, $175,000 is more than twice the real value of the "substantial" *Bains* award expressed in current dollars ($78,142).[1]  Nor may Mr. Diaz complain that the second jury's compensatory damages award is "small" because it is less than the $1.5 million the Court found to be the maximum compensatory damages award sustainable by the proof in the first trial.  That number is now simply irrelevant.  Mr. Diaz's rejection of the remittitur triggered a second trial to a new jury that determined a different amount.  The Court had Rule 59 authority to grant remittitur of the excessive damages in the first trial but has no comparable power to grant de facto additur to the second jury's award of compensatory damages here for purposes of calculating punitive damages. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 n.9 (1998) ("[T]he Seventh Amendment bars the use of additur.").  The $175,000 the second jury awarded indisputably is "not insignificant" and is "substantial" under settled Ninth Circuit punitive damages law, and thus cannot support an exception to the uppermost 9:1 ratio.

**B.      This Is Not An "Extreme Reprehensibility" Case**

As discussed *supra* pp. 2-3, Mr. Diaz's argument that Tesla's purported reprehensibility justifies an award well outside the 9:1 ratio has no support in the law.  It also lacks factual foundation.  Substantial evidence at the second trial supports the conclusion that Tesla's conduct here did not evince any extreme reprehensibility warranting an unprecedented departure from the presumptively maximum 9:1 ratio.  Each of Mr. Diaz's factual arguments distorts the record of the second trial.

**1.      Mr. Diaz Distorts The Record As To The Incidents Of Racial Misconduct**

Mr. Diaz's first assertion (Opp. 4-6) that "Tesla supervisors subjected [him] to horrific racist abuse" rests almost entirely on Mr. Diaz's own unsupported and often contradicted and discredited testimony.  No other witness or document at trial corroborated his claims that Ramon Martinez or Robert Hurtado repeatedly called him the n-word and racial slurs or that Mr. Martinez called him the n-word during their October 2015 confrontation.  Mr. Diaz did not produce a single written

---

[1]      According to the Bureau of Labor Statistics' CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm, the buying power of $50,000 in April 2005 is equal to the buying power of $78,141.57 in May 2023.

1    complaint that either Mr. Hurtado or Mr. Martinez used these slurs at all (let alone regularly).  Mr.

2    Diaz made—or directed—four written complaints about Mr. Martinez and Mr. Hurtado and none of

3    them mentioned any racial slurs or history of racial harassment (Exs. 33, 92, 245, 286); no witness

4    testified that Mr. Diaz ever reported this alleged abuse (*see, e.g.*, Tr. vol. 2, 308:5-11 (Kawasaki);

5    358:5-8 (Wheeler); Tr. vol. 2, 412:19-22 (Jackson); Tr. vol. 3, 636:21-638:3 (Diaz); Tr. vol. 3,

6    551:3-13, 558:11-15 (Romero)); and Mr. Martinez as well as Mr. Hurtado's supervisor denied that

7    it ever happened (Tr. vol. 3, 584:18-585:1 (Martinez), Tr. vol. 5, 979:12-980:17 (DelaGrande)).

8                    **2.    Mr. Diaz Distorts The Record As To Tesla's Response**

9            Mr. Diaz similarly distorts the record at the second trial in arguing (Opp. 6-8) that "Tesla

10   knew of widespread racial abuse at its factory, yet failed to take readily available steps to stop it."

11   Mr. Diaz's argument that there was "rampant" use of the n-word at the factory relies on the

12   impeached testimony of Mr. Jackson—who previously swore under oath that he had only heard it

13   used "three, four times" total  (Tr. vol. 2, 443:1-443:17, 446:7-446:16 (Jackson))—and ignores Tom

14   Kawasaki's and Michael Wheeler's testimony that, with very rare exceptions, any use of the n-word

15   was non-aggressive and in innocuous contexts like when workers sang along to popular music

16   playing on the assembly line (Tr. vol. 2, 282:4-9, 326:12-21, 327:8-327:16).  Although Tesla's

17   policies prohibit any use of the n-word (Marconi Dep. 51:2-12, Ex. 368), Mr. Diaz disregards his

18   own witnesses' testimony that the n-word was used at Tesla no differently from how it is used

19   "casually day-to-day" in the rest of society (Tr. vol. 2, 281:20-282:9, 327:8-327:16 (Kawasaki); Tr.

20   vol. 2, 441:12-442:23 (Jackson)).

21           The evidence also overwhelmingly refutes Mr. Diaz's assertion that Tesla knew about and

22   failed to respond to racism at its factory.  Mr. Diaz suggests that Tesla ignored and allowed racist

23   graffiti to proliferate in its factory, when the undisputed evidence shows that Tesla vigilantly policed

24   such misconduct and immediately "took care of it" when it was discovered.  (Tr. vol. 2, 284:9-25,

25   332:25 (Kawasaki).)  Mr. Diaz also misleadingly asserts (Opp. 6) that "Ed Romero expressly

26   admitted that Mr. Diaz had specifically complained to him about use of the N-word on multiple

27   occasions" and that Mr. Romero did nothing in response.  But Mr. Romero clarified that he misspoke

28   and confirmed that the only time Mr. Diaz made any complaint about being called a racial slur was

the incident with Judy Timbreza, which resulted in Tesla writing up Mr. Timbreza for using inappropriate racial language.  (Tr. vol. 3, 568:4-9 (Romero).)  The other incident to which Mr. Romero referred involved an African-American worker calling a co-worker the n-word and Tesla immediately investigated it.  (Ex. 106.)

Far from establishing that Tesla ignored complaints of racial harassment, this evidence and Mr. Romero's testimony show that Tesla took these issues seriously and responded when they were reported.  And as detailed below (*see infra* at 12-13), it is undisputed that Tesla responded to, investigated, and implemented corrective action in response to two documented incidents of race-related misconduct (the Timbreza elevator incident and the Martinez drawing incident), as well as the Martinez elevator incident.

Mr. Diaz also misplaces reliance (Opp. 6, 7) on purported racial harm suffered by Mr. Wheeler.  As the Court properly instructed the jury, "You may not . . . set the amount of any punitive damages in order to punish Tesla for harm to anyone other than the plaintiff in this case."  (Dkt. 450 at 26 (Instr. 25).)  And as the Supreme Court has made clear, "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis."  *State Farm*, 538 U.S. at 423; *see also Planned Parenthood*, 422 F.3d at 956 ("[T]he [Supreme] Court made clear that [a defendant] could only be punished for conduct directed toward the [plaintiff]—not for its operations elsewhere, or for other parties' hypothetical claims against it.").

Finally, Mr. Diaz fails in his effort (Opp. 7-8 & n. 2) to walk back the damaging admissions of his own expert witness Amy Oppenheimer that Tesla's conduct was ***not*** extremely reprehensible.  Ms. Oppenheimer, an expert in the field of workplace antidiscrimination policy, expressly conceded that Tesla's anti-discrimination policies were "fine" and "adequate."  (Tr. vol. 2, 472:11 (Oppenheimer) ("Tesla's policies are fine . . ."), Tr. vol. 3, 515:9-11 ("Q. And you determined that Tesla had adequate policies in place; right?  A. I think the policies were fine, yes.").)  And while Ms. Oppenheimer testified that Tesla failed to take the steps she thought a reasonable employer should have taken, she described Tesla's shortcomings merely as "subpar" and not as purposeful, reckless or egregious.  (*See* Tr. vol. 3, 516:18-25 (Oppenheimer) ("Q. In this case you—you reached

1   the conclusion that the reasonable employer should have taken more steps to investigate and that

2   Tesla was negligent in their conduct; correct?  A. Yeah.  I probably don't use the word 'negligent,'

3   but—but yes, what they did was subpar and was not consistent with what was acceptable practice

4   during the period of time that these events occurred.").)  And contrary to Mr. Diaz's assertion (Opp.

5   9) that Tesla's discipline of Mr. Martinez following the drawing incident was "grossly inadequate,"

6   Ms. Oppenheimer testified that she did ***not*** believe that Tesla was required to terminate rather than

7   suspend Mr. Martinez for this incident.  (Tr. vol. 3, 508:16-509:3 (Oppenheimer); *see also* Tr. vol.

8   2, 463:19-24 (Oppenheimer) (a zero tolerance policy for racial harassment "doesn't mean you fire

9   everybody for anything they do," but rather that "you take some action that is based on the

10  seriousness, and if that doesn't solve the problem, you take more serious action next time").)  This

11  testimony undermines any case for an extraordinary award of punitive damages exceeding a 9:1

12  ratio.

### 3.    Mr. Diaz Errs As To Tesla's Acceptance Of Responsibility

14       Mr. Diaz errs further in arguing (Opp. 8-9) that the otherwise unconstitutional 17:1 ratio is

15  warranted because supposedly "Tesla still fails to acknowledge or accept responsibility for its

16  failures."  To begin with, the Court should disregard Mr. Diaz's inappropriate reference (Opp. 9) to

17  Tesla's argument at the first trial that any contractual obligations here rested with the staffing

18  agencies, for Tesla made no such argument at the second trial, and the punitive damages award must

19  be based only on the record from the second trial.  Moreover, as Mr. Diaz fails to note, the Court

20  limited punitive damages to a 9:1 ratio after the first trial (*see* Dkt. 328 at 42) ***despite*** its disapproval

21  of the staffing-agency argument (*see id*. at 40), and the argument cannot support any higher ratio

22  now after a second trial in which Tesla did not make that argument.  Mr. Diaz is likewise mistaken

23  in suggesting (Opp. 8) that Tesla took racial harassment less seriously than other misconduct

24  because it conducted sensitivity training following the discovery of sexually inappropriate graffiti.

25  This argument ignores the undisputed evidence that Tesla conducted ***three separate*** training

26  sessions for the recycling team after the drawing incident.  (Tr. vol. 2, 439:17-440:1 (Jackson).)

27

28

1

### 4. Mr. Diaz Errs In Weighing The *Hardeman* Reprehensibility Factors

2

Finally, contrary to Mr. Diaz's argument (Opp. 9-10), the five factors the Ninth Circuit set

3 forth in *Hardeman* for determining the degree of a defendant's reprehensibility in calculating

4 punitive damages[2] do not counsel in favor of punitive damages at an extraordinary ratio exceeding

5 9:1.

6

***Physical harm.*** The first *Hardeman* factor does not support an upward departure from the

7 9:1 maximum ratio because Mr. Diaz did not show that he suffered any "physical harm." Although

8 Mr. Diaz argues (Opp. 9) that Mr. Martinez "physically assaulted" him, the undisputed evidence

9 shows that Mr. Diaz was neither injured, battered, or even touched during his confrontation with

10 Mr. Martinez in the elevator. (*E.g.*, Ex. 235.) Moreover, Mr. Diaz's attempt to conflate his

11 emotional distress with physical injury is contrary to *State Farm*, which expressly distinguishes

12 emotional distress from physical harm. 538 U.S. at 426 (finding lower reprehensibility where the

13 plaintiffs' harm was based on "emotional distress," "not from some physical assault or trauma; there

14 were no physical injuries"). Mr. Diaz's purported psychological symptoms do not rise to the level

15 of physical harm and cannot be considered as such for purposes of the reprehensibility analysis.

16 *See, e.g.*, *Khalaf v. Ford Motor Co*., 2019 WL 10301739, at *7 (E.D. Mich. Mar. 28, 2019) (granting

17 steep remittitur where "Plaintiff claims he experienced physical manifestations of his psychological

18 harm . . . [but the Court finds] that Plaintiff did not suffer physical harm. He suffered no physical

19 assault or trauma; his harm was emotional–humiliation and outrage."), *rev'd on other grounds*, 973

20 F.3d 469 (6th Cir. 2020).

21

The nonbinding cases Mr. Diaz cites (Opp. 10) give no support for their conclusion that

22 emotional distress is physical injury, and ultimately found low punitive damages ratios in any event.

23 *See Roby v. McKesson Corp*., 47 Cal. 4th 686, 719 (2009) (reversing and remanding with

24

25

---

26 [2] To determine reprehensibility, the Ninth Circuit employs a five-factor test that considers "whether [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Hardeman*, 997 F.3d at 972-73 (internal citations and quotations omitted).

27

28

instructions to modify punitive-to-compensatory damages ratio to 1:1); *Yowan Yang v. ActioNet, Inc.*, 2017 WL 2117028, at *15 (C.D. Cal. Jan. 23, 2017) (denying post-trial motions seeking reduction of an "approximately two-to-one" punitive-to-compensatory damages ratio).

**Reckless disregard for health and safety**.  As to the second *Hardeman* factor, the record at trial belies Mr. Diaz's assertion (Opp. 9) that Tesla was indifferent to or recklessly disregarded the health and safety of Mr. Diaz and others.  It was undisputed that Tesla had clear official policies barring racially discriminatory harassment and that these policies were "fine" and "adequate." (Tr. vol. 2, 472:11; Tr. vol. 3, 515:9-11 (Oppenheimer).)  Mr. Diaz's own witnesses admitted that Tesla supervisors and leads took complaints of workplace misconduct seriously (Tr. vol. 2, 409:8-410:8 (Jackson), *see also* Tr. vol. 3, 558:21-559:1 (Romero)), and that both Mr. Diaz and his direct supervisor were instructed to send daily reports—including any complaints—to Tesla management (Tr. vol. 2, 297:19-299:2 (Kawasaki)).   Consistent with what Mr. Diaz's own expert Ms. Oppenheimer opined was correct practice, Tesla imposed a tiered system of discipline that had escalated remedial action if misconduct was severe or repeated.  (*Compare* Tr. vol. 2, 463:19-24 (Oppenheimer) *with* Tr. vol. 2, 316:15-24 (Kawasaki).)

It is also undisputed that Tesla supervisors—along with contractors like Mr. Jackson—investigated and responded to Mr. Diaz's documented complaints.  When Mr. Diaz complained to his lead, Mr. Kawasaki, about his argument with Mr. Timbreza, Mr. Kawasaki immediately broke up the altercation, questioned witnesses, and then sent Mr. Timbreza home.  (Tr. vol. 2, 290:17-291:17 (Kawasaki).)  Following an investigation after Mr. Kawasaki reported that Mr. Timbreza made comments that were "racial in nature," Tesla disciplined Mr. Timbreza with a verbal warning for using inappropriate racial language and an admonition that any further misconduct would lead to his termination.  (Ex. 39; Tr. vol. 2, 276:19-277:5, 314:14-20 (Kawasaki).)  It is undisputed that Mr. Timbreza and Mr. Diaz never worked together again and that Mr. Diaz was "satisfied" with Tesla's response.  (Tr. vol. 3, 658:22-25, 659:1-4 (Diaz).)  Tesla—through Mr. Jackson—also investigated Mr. Diaz's written complaint about his October 2015 altercation with Mr. Martinez in the elevator.  Mr. Jackson performed a "prompt, objective, and thorough" investigation that included speaking to all witnesses to the confrontation—Mr. Martinez, Mr. Diaz, and Rothaj Foster—and

reviewing surveillance video of the incident alongside Mr. Diaz and Victor Quintero.  (Ex. 103; Tr. vol. 2, 388:18-389:2, 422:22-423:10 (Jackson).)  Following the investigation, Tesla issued a "verbal warning" to Mr. Martinez, who did not have any further contact with Mr. Diaz until the drawing incident.  It is further undisputed that Tesla "immediately" investigated and responded to Mr. Diaz's written complaint about the "racist drawing & effigy" he found at his work station on January 22, 2016.  (Ex. 272; Tr. vol. 3, 633:11-14 (Diaz); Tr. vol. 2, 351:14-24 (Wheeler); Tr. vol. 2, 398:1-4 (Jackson).)  Within 90 minutes of receiving Mr. Diaz's complaint, Tesla disciplined Mr. Martinez by imposing a three-day unpaid suspension from work and giving him a final written warning that meant he would be fired for any other incident of misconduct.  (Ex. 272; Tr. vol. 2, 432:14-16 (Jackson).)  It is also undisputed that Tesla promptly responded and protected Mr. Diaz when a co-worker, Mr. Foster, made physical threats by immediately removing Mr. Foster from site and terminating him.  (Tr. vol. 3, 562:17-564:16 (Romero).)  Tesla thus was not and is not "indifferent" to Mr. Diaz's health and safety; when Mr. Diaz made a documented complaint, Tesla responded.

**Financial vulnerability**.  As to the third *Hardeman* factor, although Mr. Diaz argues that he was financially vulnerable and living paycheck to paycheck (Opp. 9), there is nothing in the record suggesting that Mr. Diaz's financial vulnerability was a factor in any of the conduct giving rise to his claims.  Moreover, this factor is "not particularly relevant in a mostly noneconomic damages case like this one."  *Hardeman*, 997 F.3d at 973-74.  And in any event, the record is undisputed that Mr. Diaz found a higher paying and "better job" shortly after leaving Tesla.  (Tr. vol. 4, 803:18-804:10 (Diaz).)

**Repeated conduct**.  As to the fourth *Hardeman* factor, the evidence at the second trial fails to show that Tesla engaged in any repeated racially discriminatory conduct.  It is undisputed that Tesla responded to, investigated, and implemented corrective action in response to two documented incidents of race-related misconduct (the Timbreza incident and the drawing), as well as the October 2015 Martinez elevator incident.  Mr. Diaz was admittedly "satisfied" with Tesla's response to the Timbreza incident (Tr. vol. 3, 659:1-4 (Diaz)), and his own expert admitted that Tesla did not violate federal law by failing to terminate Mr. Martinez after the drawing (Tr. vol. 3, 508:16-509:3 (Oppenheimer)).  Where, as here, a "defendant . . . respond[s] adequately to some conduct," a

1 reduction—not an enhancement—in punitive damages is favored.  *See, e.g.*, *Paul v. Asbury Auto.*
2 *Grp., LLC*, 2009 WL 188592, at *11 (D. Or. Jan. 23, 2009) (granting remittitur of both
3 compensatory and punitive damages to $150,000 per plaintiff in § 1981 case).  And while Mr. Diaz
4 made allegations of other racial misconduct at the Tesla factory such as the presence of racist graffiti
5 and the use of the n-word, his own witnesses testified that Tesla removed graffiti immediately upon
6 report (Tr. vol. 2, 332:25 (Kawasaki)), and that Mr. Diaz did not report additional racial misconduct
7 to his immediate supervisors (Tr. vol. 2, 329:11-15 (Kawasaki); Tr. vol. 2, 358:5-8 (Wheeler); Tr.
8 vol. 2, 452:12-20 (Jackson); Tr. vol. 3, 566:4-7 (Romero)).

9     ***Intent or purpose***.  The fifth *Hardeman* factor—whether the harm was the result of intent,
10 purpose, malice, or oppression or instead mere accident or negligence—also favors Tesla.  The
11 Court found as much in its earlier post-trial order (Dkt. 328 at 40 ("Nor is there any indication that
12 Tesla set out with the *purpose* of discriminating or fostering a hostile work environment.")), and the
13 evidence in the second trial even more strongly supports that conclusion now.

14     To begin with, in assessing "reprehensibility" for purposes of punitive damages against a
15 corporate defendant, "the focus of the . . . inquiry must be on the corporation's institutional
16 responsibility, if any, for [the] harassment." *Roby*, 47 Cal. 4th at 713-14 (applying *State Farm*
17 factors).  But this case is a far cry from cases in which high-ranking corporate officers and managers
18 were personally involved in racial or other prohibited discriminatory conduct, a fact that increases
19 the degree of reprehensibility.  *See, e.g.*, *Zhang*, 339 F.3d at 1025-28, 1044 (noting that the defendant
20 company's CEO engaged in the relevant racial discrimination and wrongful termination); *Morse v.*
21 *S. Union Co.*, 174 F.3d 917, 925 (8th Cir. 1999) (emphasizing the role of the defendant's "top
22 management" in assessing reprehensibility of corporate defendant in upholding roughly 4:1 punitive
23 damages award for employment age discrimination); *Chopra v. Gen. Elec. Co.*, 527 F. Supp. 2d
24 230, 244 (D. Conn. 2007) (emphasizing role of defendant's "high level managers" in assigning a
25 "significant degree of reprehensible conduct").

26     Here, by contrast, Mr. Diaz concedes (Opp. 10) that "Tesla's senior management likely had
27 no awareness at all of Mr. Diaz" and does not argue that any Tesla policy condoned or permitted,
28 or that any Tesla senior manager or officer ever perpetrated, any act of racial discrimination against

1   Mr. Diaz.  As the Court found in its earlier post-trial order (Dkt. 328 at 40), "there is no evidence

2   that Tesla's senior management carried out" any misconduct here.  Moreover, while the jury was

3   instructed that Messrs. Martinez or Hurtado were Mr. Diaz's "supervisors" (Dkt. 450 at 19 (Instr.

4   18)), all three men had the same job title—"lead"—and neither Mr. Hurtado nor Mr. Martinez was

5   Mr. Diaz's immediate superior in the day-to-day chain of command (Mr. Diaz operated the elevator,

6   Mr. Martinez worked in recycling, and Mr. Hurtado worked in production control) (Tr. vol. 3,

7   571:13-15 (Martinez); Tr. vol. 5, 968:13-969:17 (DelaGrande)).

8        Moreover, as detailed above (*see supra* at 8-10, 13-14), it is undisputed that Tesla responded

9   to Mr. Diaz's documented Timbreza and drawing incidents and the Martinez elevator incident; Tesla

10  tried to combat offensive graffiti; Tesla had training sessions after the drawing incident; and,

11  according to Mr. Diaz's own expert witness Ms. Oppenheimer, Tesla's escalating disciplinary

12  system was consistent with appropriate workplace antidiscrimination practices.  Tesla was not

13  required to fire Mr. Martinez for the drawing incident, and Tesla's efforts were at worst "subpar"—

14  a conclusion more consistent with negligence than malice and oppression.  Accordingly, the record

15  in the second trial fails to support any extraordinary upward departure from the 9:1 ratio based on

16  relative reprehensibility.

17        **C.    "Wealth" Cannot Support A Ratio Greater Than 9:1**

18        As the Supreme Court has expressly stated, "the wealth of a defendant cannot justify an

19  otherwise unconstitutional punitive damages award."  *State Farm*, 538 U.S. at 427-28.  The Court

20  correctly recognized this basic principle in its earlier post-trial order (Dkt. 328 at 43 ("Tesla's wealth

21  will not justify an '*otherwise*' unconstitutional award") (quoting *State Farm,* 538 U.S. at 427-28),

22  and it is equally governing now.  The Court thus should  reject Mr. Diaz's mistaken request (Opp.

23  14-15) to consider "Tesla's gargantuan wealth" as a basis to award otherwise unconstitutional

24  punitive damages exceeding the single-digit ratio benchmark.

25        Tellingly, Mr. Diaz fails to cite a single case holding that corporate wealth justifies a punitive

26  damages ratio exceeding 9:1.  Nor could he, for most of the very cases that have developed the 9:1

27  benchmark involved corporate defendants with multibillion-dollar balance sheets—including State

28  Farm, Monsanto, Volkswagen, ARCO, and Ford.  Thus, even if corporate wealth is an admissible

factor to consider *within* the *State Farm* range of permissible punitive damages awards, it provides no ground to *exceed* that range.[3]   Mr. Diaz misplaces reliance (Opp. 15) on *Saunders v. Branch Banking & Trust Co. Of Virginia*, 526 F.3d 142 (4th Cir. 2008), in which the Fourth Circuit upheld a ratio of 80:1 not because of the defendant's wealth, but rather because the jury awarded nominal compensatory damages of $1,000 so the case fit within the rare "small amount" exception to *State Farm*'s single-digit limit.  *See id.* at 153-54 (recognizing that, "when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio").

Mr. Diaz errs in arguing (Opp. 15) that imposing a greater-than-9:1 award is appropriate to "punish" a company "of Tesla's value."   That argument ignores that his is a case of purely noneconomic emotional distress damages, and the Supreme Court has noted that emotional distress damages already incorporate an element of punishment.  *See State Farm*, 538 U.S. at 426 (compensatory damages for emotional distress are "duplicated" in a punitive damages award).  Thus, as the Second Circuit noted in *Turley*, there is a danger of improper double punishment if a court stacks excessive punitive damages on top of an already significant emotional distress award.  *See Turley*, 774 F.3d at 165 ("Imposing extensive punitive damages on top of such an award stacks one attempt to monetize highly offensive behavior, which effort is necessarily to some extent visceral, upon another.").

---

[3]   Some scholars advanced powerful arguments prior to *State Farm* that corporate "wealth" is never a permissible basis on which to base punitive damages, which should correspond to the conduct and not the wealth of the defendant.  *See, e.g.*, Kenneth S. Abraham & John C. Jeffries Jr., *Punitive Damages and the Rule of Law: The Role of Defendant's Wealth*, 18 Journal of Legal Studies 415 (1989) (arguing pre-*State Farm* that corporate wealth is irrelevant to the deterrent goals of punitive damages, *see id.* at 418-421, and that basing retribution on the wealth of the defendant invites prejudice and caprice inconsistent with the rule of law, *see id.* at 421-25); A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harv. L. Rev. 869, 911 (1998) (arguing the wealth is irrelevant to ensuring internalization of social costs); *see also TXO*, 509 U.S. at 491 (O'Connor, J., dissenting) (noting that, if wealth is a permissible factor in punitive damages awards, "juries may feel privileged to correct perceived social ills stemming from unequal wealth distribution by transferring money from 'wealthy' corporations to comparatively needier plaintiffs").  But the rationality and predictability *State Farm* brought to punitive damages awards by imposing a presumptive 9:1 limit has cabined the distorting influence of corporate wealth on punitive damages awards, and thus postponed the need to resolve this issue, which the Court need not consider if it adheres to the 9:1 ratio here.

1       Nor is Mr. Diaz correct to argue (Opp. 2) that a $3 million award is needed to deter Tesla

2   from future misconduct by imposing more than a "pinprick" in punitive damages.  Mr. Diaz fails to

3   explain why such deterrence is needed, nor can he because he conspicuously failed to produce any

4   evidence of conditions at Tesla after Mr. Diaz left in February 2016.  This strategic choice by Mr.

5   Diaz forecloses any argument that Tesla needed to be deterred based on conditions at Tesla as of

6   the date of the first trial, much less today.  Accordingly, it would be wholly speculative for the Court

7   to make an unprecedented upward departure from the 9:1 ratio based on a supposed need to deter

8   Tesla from future misconduct.  Where there is no evidentiary foundation for any current need for

9   deterrence, an argument from deterrence based on Tesla's balance sheet is simply a pretext for an

10  impermissible argument from Tesla's wealth.

## CONCLUSION

11

12       For the foregoing reasons, the Court should grant the motion.

13

14  DATED:  June 30, 2023           By:     */s/ Daniel C. Posner*

15                                Alex Spiro (appearance *pro hac vice*)

16                                alexspiro@quinnemanuel.com

                                 Quinn Emanuel Urquhart & Sullivan, LLP

17                                51 Madison Ave., 22nd Floor

                                 New York, NY 10010

18                                 Telephone: (212) 849-7000

19                                  Daniel C. Posner

20                                  Mari Henderson

                                 865 S. Figueroa St., 10th Floor

21                                  Los Angeles, California 90017

                                 Telephone: (213) 443-3000

22                                  Facsimile: (213) 443-3100

23                                  Asher Griffin (appearance *pro hac vice*)

24                                  ashergriffin@quinnemanuel.com

                                 300 W. 6th St., Suite 2010

25                                  Austin, TX 78701

                                 Telephone: (737) 667-6100

26                                 *Attorneys for Defendant Tesla, Inc.*

27

28