UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>OWEN DIAZ,<br><br>    Plaintiff,<br><br>  v.<br><br>TESLA, INC., et al.,<br><br>    Defendants.</td><td>Case No. 3:17-cv-06748-WHO<br><br>**ORDER ON POST TRIAL MOTIONS**<br>Re: Dkt. Nos. 454, 478, 479, 487, 489, 490</td></tr>
</table>

For the second time, a jury has rendered a verdict regarding plaintiff Owen Diaz's experience enduring a racist and hostile work environment while employed at defendant Tesla, Inc.'s factory in Fremont, California. After a retrial on compensatory and punitive damages, the jury awarded $3.75 million to Diaz, who has filed a motion for a mistrial and new trial because of the misconduct of Tesla's counsel and because the compensatory and punitive damages awards were inadequate. The lawyer's misconduct did not so permeate the entire trial to have influenced and prejudiced the jury, and the damages award was not defective. I deny Diaz's motion. Additionally, Tesla moves to reduce the punitive damage award to a 9:1 ratio with the compensatory damages award. This was the second jury that imposed such a high ratio, and its verdict is appropriate in light of the endemic racism at the Tesla factory and Tesla's repeated failure to rectify it. Tesla's motion is also denied.

## BACKGROUND

### I. PROCEDURAL BACKGROUND

The procedural history of this case is extensive. The complaint was filed in 2017, and the first jury trial occurred in September and October 2021. The jury found that Tesla was liable for discriminating against plaintiff Owen Diaz in violation of 42 U.S.C. § 1981 and California state

law and awarded Diaz $6.9 million in compensatory damages and $130 million in punitive damages.  [Dkt. No. 301].

Tesla moved for remittitur or a new trial on damages.  [Dkt. No. 317].  I remitted the damages award to $1.5 million compensatory and $13.5 million punitive, finding that those awards were the highest supported by the evidence and the United States Constitution.  ("Order on Post-Trial Mots.") [Dkt. No. 328].  That Order gave Diaz a choice between accepting the remittitur or adopting a proposal of Tesla's to proceed with a new trial on damages only.  *Id.*  Diaz rejected the remittitur.  [Dkt. No. 347].  After extensive motion practice in which Tesla argued against a damages-only retrial—which I denied based on judicial estoppel, as Tesla moved for a damages-only retrial in the first place—I held a second damages-only trial in March 2023.[1]

I limited the second trial to the evidence and witnesses presented in the first trial.  [Dkt. No. 376].  At the close of Diaz's case in chief, Tesla moved orally for and filed a written motion for judgment as a matter of law, Trial Transcript[2] ("Tr.") 5-1010:1-20; [Dkt. No. 454], which I took under submission, Tr. 5-1009:15-25,1010:22-1011:8.  Subsequently, Diaz moved for a mistrial, [Dkt. No. 453], which I also took under submission, Tr. 5-917:9-12.

After deliberating, the jury returned an award of $100,000 for past non-economic damages, $75,000 for future non-economic damages, and $3 million for punitive damages.  [Dkt. No. 463].  I entered the judgment.  [Dkt. No. 471].

Diaz filed a renewed motion for a mistrial and for a new trial.  ("Mot. Mistr.") [Dkt. No. 478].  Tesla opposed.  ("Oppo. Mistr.") [Dkt. No. 481].  Diaz replied.  ("Repl. Mistr.") [Dkt. No. 483].  Diaz subsequently filed a notice requesting that I not rule on his motion until I considered additional evidence that his counsel discovered while litigating a separate case against Tesla in

---

[1] This case is at this procedural posture because of the choices made by the parties and counsel.  Though there was *extensive* motion practice about the scope of the second trial, it was *Tesla's* request to have a retrial on only damages in the first place, including on quantification of (not entitlement to) punitive damages.  *See* [Dkt. Nos. 348, 359, 361, 362, 365, 389, 408, 412, 417, 425, 428, 454].  And the reason there was a second jury trial at all was because Diaz rejected remittitur—which he was entitled to do.  He now brings a motion in part to ask for a second chance to accept the initial remittitur, to which he is no longer entitled.

[2] The trial transcript is cited in this Order as "Tr."  It appears in six volumes at Dkt. Nos. 458-461, 466-467.

United States District Court
Northern District of California

1  state court.  [Dkt. No. 485].  I ordered Tesla to respond.  [Dkt. No. 486].  Tesla did so and attached

2  the additional evidence.  [Dkt. No. 488].  Diaz then filed a motion for leave to file a surreply.

3  [Dkt. No. 490].

4       Tesla did not renew its motion for judgment as a matter of law but instead filed a motion to

5  alter or amend the judgment.  ("Mot. Jdgmt.") [Dkt. No. 479].  Diaz opposed.  ("Oppo. Jdgmt.")

6  [Dkt. No. 480].  Tesla replied.  ("Repl. Jdgmt.") [Dkt. No. 483].

7       I vacated the hearing on the motions under Civil Local Rule 7-1(b).  [Dkt. No. 484].

8  ## II.   EVIDENCE AT TRIAL[3]

9       Diaz began working at the Tesla factory in June 2015, Tr. 3-587:3, and ended his

10  employment about March 2016, Tr. 3-607:5-7.  He testified that he was excited to work

11  somewhere that was developing technology to help move away from fossil fuels and make the

12  world better for his kids.  Tr. 3-587:5-14, 588:12-14.  But during his time at Tesla, Diaz

13  encountered racism and hostility, including regularly being called the N-word.

14       Robert Hurtado, a supervisor at Tesla, called Diaz the N-word over 30 times, including by

15  saying "[N-word], hurry up," "[N-words] are lazy," and "I wish I can get all you [N-words] fired."

16  Tr. 3:604:23-606:8.  Ramon Martinez, another Tesla supervisor, called Diaz the N-word over

17  thirty times, said "I hate you, [N-word]," and told him "go back to Africa."  Tr. 3-603:11-

18  604:20.  Diaz's supervisor, Tamotsu "Tom" Kawasaki, testified that Martinez often used the

19  words "mayate" and "chongo,"  both racial slurs in Spanish.  Tr. 2-281:9-12.  Wayne Jackson, a

20  Black program manager at Tesla, confirmed that Martinez used the word "mayate."  Tr. 2-381:17-

21  382:7.  Martinez denied all of this.  Tr. 3-584:18-585:1.

22       Diaz testified that at one point, Martinez threatened to physically attack him at work and

23  yelled at him, "You [N-words] aren't S-H-I-T."  Tr. 3-610:2-612:7.  Diaz complained to a

24  supervisor, Ed Romero, and asked him to check the surveillance cameras, though Diaz's

25  subsequent email complaint did not specifically mention racial insults.  Tr. 3-612:8-614:23; *see*

26  *also* Tr. 3-546:25-548:2 (Romero confirming this was recounted in an email).  Tesla did not

27

28  _____

[3] In this background section, I recount the evidence at the second trial in a neutral (and consolidated) manner for clarity in the record.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    follow up, show Diaz the video, or interview witnesses after that event.  Tr. 3-546:25-548:2,

2    612:8-614:23.  Jackson testified that he interviewed Diaz and Martinez after the incident but did

3    not interview the eyewitness, Rothaj Foster, because he was told by his boss to stop the

4    investigation before it was complete.  Tr. 2-387:10-390:18, 2-394:24-395:11.  Jackson said he had

5    "[v]ery little" control over how he investigated complaints.  Tr. 2-396:8-397:12.  Jackie Delgado

6    Smith, a Human Resources representative, testified that Tesla HR was never told of the incident.

7    Tr. 5-954:15-955:6.  Subsequently, Diaz and Martinez were both given verbal warnings.  Tr. 2-

8    395:21-396:7.  Martinez still works at Tesla.  Tr. 3-571:11.

9         A male coworker, Judy Timbreza, called Diaz the N-word and "mayate" and also used

10   Spanish to call Diaz a "porch monkey."  Tr. 3-589:19-593:12.  Diaz testified that one of the times

11   Timbreza called him the N-word led to an "intense" "verbal" altercation, which was broken up by

12   Kawasaki.  Tr. 3-593:5-596:1.  Kawasaki confirmed that witnesses told him that Timbreza "was

13   throwing racial slurs."  Tr. 2-268:11-13, 270:5-10, 291:8-12.  Romero admitted that Kawasaki told

14   him that Diaz complained about this incident and about racial slurs, and that Diaz had said this had

15   happened before, Tr. 3-537:20-540:3, 542:15-543:7, though on cross he also said he did not recall

16   Kawasaki mentioning the N-word, Tr. 3-559:14-17.  Romero said that Kawasaki and another

17   employee investigated the Timbreza incident.  Tr. 3-544:3-5.  Diaz told the jury that Kawasaki

18   appropriately investigated the incident and that he did not have to work with Timbreza again.  Tr.

19   3-593:5-596:1.  Kawasaki testified that he never received any training on race harassment.  Tr. 2-

20   263:9-13.

21        Diaz also testified that he complained to Romero several times about being called the N-

22   word.  Tr. 3-613:5-14.  Romero agreed that he learned Diaz had been complaining about racist

23   conduct, *see* Tr. 3-542:22-24, 543:13-14, though Romero said Diaz did not complain directly to

24   Romero at least until the Timbreza incident, Tr. 3:561:1-4.  Romero testified that he did not

25   personally investigate Diaz's complaints and was specifically told by Tesla to not personally

26   investigate the Timbreza incident.  Tr. 3-541:22-542:1, 544:21-545:2, 549:13-550:16.  Diaz and

27   Romero both testified that Tesla never fired anyone for using the N-word.  Tr. 3-552:10-19,

28   615:13-15.

1      In addition to verbal harassment, Diaz encountered physical symbols of racism and

2   hostility throughout his time at Tesla.  On his second day at work, he saw racist graffiti in the

3   bathroom, and continued to see the N-word and swastikas in bathrooms throughout the rest of his

4   employment.  Tr. 3-623:1-8.  Another Black employee and later supervisor, Michael Wheeler,

5   testified that he regularly saw racist graffiti, including the N-word and swastikas, and that Diaz

6   reported the racist graffiti he saw to Wheeler.  Tr. 2-346:17-347:17.

7      Diaz also encountered a large drawing consisting of a face with large lips and a bone in its

8   hair with the word "Boo" underneath it, which he called a "jigaboo" or "picaninny."[4]  Tr. 3-

9   618:11-621:10.



Ex. 33.

17      Diaz testified that the picaninny was intentionally placed in his workspace so that he would

18   see it.  Tr. 3-618:11-621:10.  Wheeler told the jury that, when he was called over to the scene, he

19   saw that Diaz was "very upset" about the drawing.  Tr. 2-354:14-355:6.  Wheeler understood that

20   to Black people from older generations, like Wheeler's mother and like Diaz, jigaboos were racist

21   and highly offensive, and "boo" was "a racial slur."  *Id.*  In turn, Diaz said that seeing the

22   picaninny made him feel like he "was kicked in the stomach" and reminded him of stories about

23   his parents "being beat with water hoses, having dogs sicced on them."  Tr. 3:620:11-15.

24      Wheeler testified that Martinez admitted to drawing the picaninny and said he had drawn it

25

26

27   ───────────────────

[4] A "picaninny" (sometimes "pickaninny" or "piccaninny") has long been a racist caricature,
originally of a Black child.  *See* David Pilgrim, The Picaninny Caricature, Jim Crow Museum of
Racist Imagery (Oct. 2000, ed. 2023),
https://jimcrowmuseum.ferris.edu/antiblack/picaninny/homepage.htm.

28

United States District Court
Northern District of California

to be funny.  Tr. 2-355:12-13.  Martinez told the jury that he drew the picaninny as part of "a little competition between shifts to see who was more productive," Tr. 3-572:1-14, 574:7-10.  He intended it to represent "Inki the Caveman," a cartoon from his youth that he thought "was a persistent character that was always consistent to reach his goals."  Tr. 3-574:11-20.  A photo of Inki the Caveman was shown to the jury as an exhibit.



Ex. 133.

Martinez said he wrote "boo" to mean that his shift "wasn't afraid of other shift[s] making more bales than us."  Tr. 3-576:4-6.  He said that as soon as he was confronted about the drawing, he immediately admitted he drew it and apologized.  Tr. 3-582:8-583:15.  Wheeler testified that Martinez did not show remorse or apologize to Diaz.  Tr. 2-355:14-18.

Diaz reported the incident to Romero, who admitted that Diaz was hurt and offended.  Tr. 2:530:5-532:10.  The picaninny reminded Romero of racist and offensive jigaboo cartoons from his youth.  Tr. 2:533:5-12.  Romero and Jackson told Martinez's supervisor, Victor Quintero, that the drawing was derogatory and inappropriate, though Romero did not talk to Martinez directly.  Tr. 2:533:2-24.  Martinez was temporarily suspended without pay and received a "final written warning."  Tr. 5-949:1-11, 957:18-19.  He still works for Tesla.  Tr. 3-571:11.

Other witnesses testified to their relevant experiences at Tesla.  For example, Kawasaki testified that the N-word was used regularly and "thrown around casually" at the factory.  Tr. 2-281:22-282:9, 306:23-25.

Wheeler testified that the N-word was used frequently at the factory, that it was directed at him, that it made him feel "[n]ot good," and that its use was unacceptable at work.  Tr. 2-343:4-345:19.  Wheeler emotionally recounted that when he reported to his supervisors that someone

1    said to him, "F you, N-word," instead of disciplining the man who used the slur, Tesla promoted

2    him. Tr. 2-345:19-346:16. Additionally, Wheeler testified that he found feces on the driver's seat

3    of the cart he had to use in the factory as part of his role, and that he believed the incident was

4    race-based harassment. Tr. 2-348:7-351:3. Though he reported the incident and strongly believed

5    there were security cameras that captured the incident, he said there was no investigation, no

6    follow-up, and no punishment. *Id.*

7    Jackson testified that the use of the N-word was "[r]ampant," as in it was used "[e]very

8    day," "[m]ore than several times a day." Tr. 2-381:3-15. He found the N-word "[e]xtremely"

9    offensive and "very derogatory" when it was used, regardless of how it was said. Tr. 2-383:15-

10   384:2. He said that these words should not be used in a workplace, but that there was "nothing"

11   he could do to stop their use "[b]ecause Tesla allowed it. They didn't stop it." Tr. 2-384:12-22.

12   Diaz's expert testified to the Tesla's workplace standards, and Diaz, his daughter, and

13   another expert testified to the effects and emotional toll of the racism and harassment on Diaz, all

14   of which is addressed in detail below.

**LEGAL STANDARD**

15

16   **I.     RENEWED MOTION FOR MISTRIAL**

17       Under Federal Rule of Civil Procedure ("FRCP") 59, a court may "grant a new trial on all

18   or some of the issues" "for any reason for which a new trial has heretofore been granted in an

19   action at law in federal court." Fed. R. Civ. Proc. 59(a)(1)(A); *see also id.* 59(d) ("[T]he court, on

20   its own, may order a new trial for any reason that would justify granting one on a party's

21   motion."). On "a Rule 59 motion, the district court can weigh the evidence, make credibility

22   determinations, and grant a new trial for any reason necessary to prevent a miscarriage of justice."

23   *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 841 (9th Cir. 2014), *as*

24   *amended*; *see also Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987)

25   (same). A new trial may be granted if "the verdict is contrary to the clear weight of the evidence,

26   or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a

27   miscarriage of justice," "even if substantial evidence supports the jury's verdict." *Silver Sage*

28   *Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (citation omitted).

United States District Court
Northern District of California

But a court "may not grant a new trial simply because it would have arrived at a different verdict," *id.* (citation omitted), and a court must consider that determining damages for "intangible, non-economic-losses . . . is a matter peculiarly within a jury's ken," *Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*, No. 13-CV-02862-JST, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017), *aff'd*, 743 F. App'x 843 (9th Cir. 2018) (quoting *Smith v. Kmart Corp.*, 177 F.3d 19, 30 (1st Cir. 1999)).  For that reason, "[a] plaintiff's path towards a new trial based on inadequate damages is feasible, but formidable."  *Id.* (citation omitted).

A motion for a new trial based on attorney misconduct should only be granted "where the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict."  *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 516-17 (9th Cir. 2004) (cleaned up) (quoting *Kehr v. Smith Barney,* 736 F.2d 1283, 1286 (9th Cir. 1984)); *see also Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995) ("Where misconduct permeates the proceeding, the jury is 'necessarily prejudiced.'" (citation omitted)).  In other words, "[t]o receive a new trial because of attorney misconduct in the civil context, . . . 'the moving party must demonstrate adverse counsel's misconduct . . . "substantially interfered" with the moving party's interest.'"  *S.E.C. v. Jasper*, 678 F.3d 1116, 1129 (9th Cir. 2012) (quoting *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1405 (9th Cir. 1995)).

Where counsel failed to object to the alleged misconduct during trial, courts review conduct for plain error, which requires: "(1) an error, (2) the error is plain or obvious, (3) the error was prejudicial or effects substantial rights, and (4) review is necessary to prevent a miscarriage of justice."  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (citations omitted).  This higher threshold is warranted because when an objection is properly made, the district court can admonish counsel or issue a curative instruction, if necessary, and prevents rewarding a party for awaiting the verdict and "sit[ting] silent in the face of claimed error."  *Settlegoode*, 371 F.3d at 517 (quoting *Hemmings*, 285 F.3d at 1193).  In assessing whether the misconduct prejudiced the moving party, courts "consider 'the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner

United States District Court
Northern District of California

in which the parties and the court treated the comments, the strength of the case, and the verdict itself.'" *Hemmings*, 285 F.3d at 1193 (citation omitted).

## II.      MOTION TO ALTER OR AMEND JUDGMENT

FRCP 59(e) permits a party to file a "motion to alter or amend a judgment" within 28 days of entry of judgment.  Fed. R. Civ. Proc. 59(e).  It is an "extraordinary remedy" and "[d]istrict courts have 'considerable discretion' in deciding Rule 59(e) motions."  *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022) (first quoting *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (per curiam); and then quoting *Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003)).  "A district court may grant a Rule 59(e) motion if it 'is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.'"  *Id.* (quoting *Wood*, 759 F.3d at 1121); *see also McDowell v. Calderon*, 197 F.3d 1253, 1255 & n.1 (9th Cir. 1999) (en banc) (per curiam).

**DISCUSSION**

## I.      RENEWED MOTION FOR MISTRIAL AND MOTION FOR NEW TRIAL

Diaz makes two arguments for a mistrial and new trial: that excessive and prejudicial attorney misconduct at the second trial, including violations of my orders and motions in limine, warrant a new trial; and that the damages award was inadequate to compensate Diaz or punish Tesla and so necessitate a new trial.

### A.      Attorney Misconduct

In support of its attorney misconduct arguments, Diaz points to nine examples of apparent misconduct (and a tenth in his surreply) and argues that any individual instance is enough to declare a mistrial but all together demand a new trial.  Because the standard is whether the misconduct so "permeate[d] an *entire proceeding* to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict," *Settlegoode*, 371 F.3d at 516-17 (emphasis added), I assess the impact of the conduct on the trial as a whole as well as analyze the examples individually.  Four of those examples—the Wheeler feces incident, the accusations that Diaz harassed female coworkers, the questions about Diaz's criminal history, and the questions about the doctor's note—essentially assert that Tesla engaged in misconduct by presenting new

9

evidence and arguments that were banned by my prior orders, the other five point to statements

that Diaz says Tesla should not have made at trial for various reasons, and the one raised in

surreply discussed alleged discovery misconduct.  I address them in turn.

### 1. Ad Hominem Attacks on Counsel

First, Diaz argues that Tesla's counsel improperly engaged in ad hominem attacks on his

counsel throughout trial and emphasizes a statement made during Tesla's opening.  Diaz's counsel

had used a slide with the name of the law firm—the California Civil Rights Law Group—during

its opening statement, and Tesla's counsel responded in its opening statement, "[Y]ou saw their

presentation. . . . [T]hese are not—this is not a civil rights—these are not civil rights social action

lawyers."[5]  Tr. 1-248:3-6.  I immediately told counsel, "That's too far" and "[L]et's not be talking

in a pejorative way about people who are in this courtroom."  Tr. 1-248:7-10.  A few minutes later,

at the end of Tesla's opening statement, I reminded the jurors, "What the lawyers say isn't

evidence," that the "evidence is what's going to start tomorrow morning," and that the lawyers'

use of "I" statements and personal thoughts and feelings during openings "has nothing to do with

anything."  Tr. 1-249:16-250:4.

Jurors are presumed to follow instructions.  *Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir.

2016) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).  Given this presumption, combined

with Diaz's own improper statements during opening, *see* Tr. 1-204:9-21, any possible prejudice

was quelled.  Further, these statements are a far cry from those found in improper in other cases.

*Cf. Call Delivery Sys., LLC v. Morgan*, No. 2:20-CV-04637-CBM-PDX, 2022 WL 18143363, at

*1 (C.D. Cal. Sept. 20, 2022) (granting new trial in part because defense counsel engaged in ad

hominem attacks on plaintiff's counsel, such as counsel engaged in "active and insidious

deception"; did something "knowing . . . intentionally, and . . . deceptively to try and lie to you

people"; and carried out "deception," a wrong that "continues to be done to [the defendant] by

---

[5] Tesla's assertion that this was not a civil rights trial was blatantly incorrect—a least one claim for which Diaz established liability was brought under 28 U.S.C. § 1981, part of the 1866 *Civil Rights Act*, and obviously an individual's civil rights include employment rights and protection from racism at work—but that did not prejudice the jury for the above reasons and also because it had to determine damages only, not liability.

United States District Court
Northern District of California

counsel and his client trying to pretend"); *see also Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1140 (9th Cir. 2001) (granting new trial where "[t]he trial throughout had racial overtones that culminated [in] a closing argument by [the plaintiff] that repeatedly appealed to racial and ethnic prejudice"). Tesla's counsel later also said the name of the firm to the jury without questioning its merit, *see* Tr. 4-812:1-6, further alleviating any possible prejudice caused by Tesla's initial remarks.

It is also not entirely clear how these statements could have prejudiced Diaz. He asserts that they violated a court order and references one of his motions in limine that requested that I order Tesla to not disparage Diaz's counsel. [Dkt. No. 382]. This concern apparently arose from a previous trial conducted by Tesla's counsel in which (according to Diaz) the same attorneys made inappropriate remarks framing the case as one brought solely by "greedy" plaintiffs' attorneys. Though I denied the request as speculative, I reminded Tesla that such framing in this case—asserting that the case was substantively meritless and only brought by attorneys for financial gain—was impermissible in part because it would go to liability, which was established and not an issue in the second trial. *See* [Dkt. No. 417] at 6. Tesla made no such argument during trial. Rather, it questioned Diaz's credibility and the amount he was damaged, neither of which were out-of-bounds at a damages-only retrial, and neither of which improperly argued that Diaz's *counsel* "somehow affected the liability finding" by bringing the case strictly for their monetary benefit. *See id.*

Accordingly, Diaz was not prejudiced by this conduct, and it does not serve as a basis to grant a new trial. *See Jasper*, 678 F.3d at 1129.

### 2.     Wheeler Testimony

Next Diaz asserts a new trial is necessary because of the questioning of Michael Wheeler, a Black witness and former worker and manager at the Tesla factory, who testified that he found human feces on a cart he had to use at work and believed it was a racially motivated incident of harassment. Diaz argues that Tesla's questioning of Wheeler improperly damaged Wheeler's credibility, violated my prior orders, and rested on factual falsities. *See* Mot. Mist. 7:8-12:12.

During cross, Tesla asked Wheeler whether he knew that the feces incident was not based

on race because "somebody . . . got sick and had an accident and [Tesla] told [Wheeler] that in an e-mail, sir, and this wasn't racial at all; isn't that true, sir?"  Tr. 2-367:11-14.  Diaz objected to this question as outside the scope of the prior proceeding, argumentative, and speculative, but I permitted Wheeler to answer, and Tesla's counsel elaborated on the question by saying, "they emailed you and told you that somebody got sick and they needed to race that person to get them some help because they . . . had the stomach flu and they used your car, and that's why there was some substance on the car; isn't that true, sir?"  Tr. 2-367:22-368:1.  Again I overruled Diaz's objection and Wheeler then answered, saying that theory did not make sense because "if the individual was sick, why would the poop be on my side of the seat?"  Tr. 2-268:6-8.  Tesla attempted to introduce the email as evidence, which I denied as outside the scope of the prior trial, and Tesla continued questioning Wheeler about the email, trying to read it and then show it to Wheeler, which I rejected.  Tr. 2-368:14-370:24.

It was not improper to ask the initial impeachment questions about Wheeler's experience and the responses from Tesla.  But it was indisputably improper for Tesla to repeatedly try to enter into evidence and read into the record a piece of evidence that was disallowed by my prior orders because it had not been previously produced or admitted.  *See United States v. Sine*, 493 F.3d 1021, 1031 (9th Cir. 2007) ("[A] line of questioning that repeatedly incorporates inadmissible evidence can be . . . improper [and] . . . can violate the Federal Rules of Evidence." (citation omitted)).  This was exacerbated by the fact that the email did not say what Tesla claimed—it said that an individual "had the stomach flu last night and had to go home.  He may have been given a ride on the cart.  We are investigating to confirm."  [Dkt. No. 440-1].  It did not say anything about the investigation or ultimate conclusion.  Tesla's counsel knew better and should not have done this.

But if any party was prejudiced by this exchange, it was Tesla.  First, Wheeler's response was logical and compelling—if a sick person was being driven somewhere, the feces would be on the passenger side, not Wheeler's driver's seat—and was far more likely to bolster his credibility than detract from it, especially because the rest of Wheeler's testimony established him as highly credible.  Tesla's unsuccessful attempts to discredit this testimony by continually repeating the

12

same questions likely further bolstered Wheeler's credibility and experiences in the eyes of the jury, especially in light of my repeated rejections of Tesla's requests.  *See* Tr. 2-368:18, 23, 369:19, 370:1, 370:20-24.  Tesla's attorney's actions and statements during this exchange seemed to damage his case and his client's reputation far more than they may have caused any negative impact to Diaz's case.

While the emails should have been disclosed in discovery prior to the first trial, this is not a reason to grant a new trial; the emails are not nearly so pivotal to the case as Diaz asserts. "[W]hen discovery misconduct is alleged in a Rule 59 motion," the movant must "(1) prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct" *and* "(2) establish that the conduct complained of prevented the losing party from fully and fairly presenting his case or defense . . . [but not] that the result in the case would be altered."  *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878-79 (9th Cir. 1990) (citation omitted). Diaz cannot show that withholding the emails prevented him from fully and fairly presenting his case.  He already had vivid and compelling testimony that Wheeler experienced this horrible incident and complained to Tesla, and that Tesla failed to properly respond.  The emails merely confirm that Wheeler discovered feces on his cart and emailed Tesla, and Tesla said it would investigate; they do not show whether Tesla took further action.  Diaz asserts that "photographic evidence" would have been helpful to his case, but Wheeler was a persuasive, credible witness who emotionally recounted the feces incident and other racism he experienced at Tesla.  His testimony was relevant to show Tesla's practices and to help establish Diaz's credibility with respect to the racism he experienced, which it did.  Ultimately this lawsuit was about Diaz's experiences and Diaz's claims.  Diaz was able to use the Wheeler incident to make his case fully and fairly, even without the emails.  *See id.*

Accordingly, this exchange did not prejudice Diaz and is not a basis for granting a new trial.

### 3.    Questions About Settlements

Diaz also asserts that it was improper for Tesla's attorney to ask, "You settled your claims with [Tesla's co-defendants]; correct?" because it was beyond the scope of the first trial.  *See* Mot.

Mist. 12:13-13:18; Repl. Mist. 8:3-15; Tr. 4-814:20-21.  This was beyond the scope of the trial,

and I sustained Diaz's objection to this line of questioning, striking the question and telling

Tesla's counsel, "[D]on't do that."  Tr. 4-814:19-25.

I am not convinced by Diaz's arguments that this portrayed him to the jury as

"opportunistic" or "just looking for a huge payday," as both inferences would require quite a leap

for the jury to make from such little information—especially where there was no mention of

whether the fact of these settlements was true or how much he may have received.  *See Hemmings*,

285 F.3d at 1193 (considering the nature, frequency, and relevancy of the comments when

assessing prejudice).  The questions certainly did not prejudice the jury by showing he had

"already been sufficiently compensated," Mot. Mist. 13:13, because the second jury's verdict

ultimately resulted in much more additional compensation, *see Hemmings*, 285 F.3d at 1193

(considering "the verdict itself" in assessing prejudice (citation omitted)).  And I instructed the

jury that the question was struck from the record; "a jury is presumed to follow the trial court's

instructions."  *Deck*, 814 F.3d at 979 (citation omitted).  I do not find that the jury would have

been prejudiced from this comment, and in any event, any prejudice would be assuaged by the fact

that the jurors could not consider the question in their deliberations.  This is not a basis for

granting a new trial.

### 4.     Accusations of Harassment

Tesla's counsel improperly questioned Diaz about allegedly making inappropriate racial

and sexual comments to a woman he worked with.  *See* Tr. 4-727:3-15.  This was beyond the

scope of the first trial and so directly contravened my order.  Because Diaz's counsel did not

object on this basis,[6] I review for plain error.  *See Hemmings*, 285 F.3d at 1193.  Here, the

questions were inappropriate, irrelevant, improper, and blatant, *see id.*, as they were wholly

untethered from any evidence or documents submitted in this case in the last six years, and

---

[6] Diaz says his counsel was "in a bind" and could not object because they "did not want to draw further accusations . . . while again appearing to be hiding evidence from the jury," Mot. 14 n.4, but Diaz's counsel *did* object to this line of questioning, *see* Tr. 4-727:16, for Tesla's counsel's "[h]arassing" "tone" rather than for improper questions, which I sustained before asking Diaz to answer the question, Tr. 4-727:17-18.

certainly not within the scope of the first trial, as required by my order.

But it is not clear that the questions were prejudicial or that they "necessarily" prejudiced the jury. *See id.*; *Anheuser-Busch*, 69 F.3d at 346. The substance of the comments was serious and accusatory, but they were irrelevant to emotional distress and damages, as I later reminded the jury. *See* Tr. 5-1018:20-1019:1; *see also Hemmings*, 285 F.3d at 1193 (considering nature, relevancy, and frequency of comments in assessing prejudice). Diaz was able to deny that he harassed anyone, and I instructed Tesla's attorney to "tone it down a little bit" given his overbearing and insistent way of posing the questions, Tr. 4-727:17-18; I similarly instructed Diaz to focus on the questions and not the attorney's manner, Tr. 4-728:5-16; and I later instructed the jury to disregard the whole exchange, Tr. 5-1018:20-1019:1. I also instructed the jury many times throughout the trial that what lawyers say is not evidence. I made clear to the jury multiple times and in multiple ways that the comments were inappropriate and should be wholly disregarded. *See Hemmings*, 285 F.3d at 1193 (considering how the court treats the comments in assessing prejudice). Again, the jury is presumed to follow the court's instructions, *Deck*, 814 F.3d at 979, and again, the damages verdict ultimately favored Diaz, *see Hemmings*, 285 F.3d at 1193 (considering the verdict when assessing prejudice). Accordingly, though these questions were inflammatory and unnecessary, they did not necessarily prejudice the jury against Diaz. They are not a basis for granting a new trial.

### 5. Questions about Criminal History

Tesla's counsel stipulated, and I ordered, that Tesla would not "affirmatively introduce evidence . . . concerning Owen Diaz's past criminal convictions" unless Diaz first opened the door. [Dkt. No. 180]. Because of that, the exhibit with Diaz's job application redacted the part about his criminal history. At trial, Tesla's counsel apparently tried to impeach Diaz's credibility by asking questions about the criminal history portion of his job application to show that his responses on the application were inaccurate. *See* Tr. 3-643:19-23. It was not clear from the vague questions that was the goal, and Diaz was left clearly confused. *See* Tr. 3-644:7-13 (attempting to answer by addressing the unredacted portions of the application). At the time, so was I. I instructed Tesla's counsel to "[a]sk another question," which he ignored and instead

repeated his question, which Diaz's counsel objected to and moved to strike, resulting in me telling Tesla to "move on."  Tr. 3-644:16-645:9.

The questions violated my prior order precluding affirmative introduction of evidence about Diaz's criminal history.  But the phrasing of the questions did not reveal to the jury that they concerned criminal history, and Diaz's answers did not relate to criminal history, so it is clear that the jury was not prejudiced in a way that violated the spirit of my order (had Diaz answered the question as Tesla's counsel intended, Tesla's *counsel*, not Diaz, would have blatantly violated the text and spirit of the order).  *Cf. Anheuser-Busch*, 69 F.3d at 341 (noting the district court found that counsel violated the "spirit" of the court's order).  And though Diaz argues that these questions made him look evasive, the complicated way they were phrased and posed was far more likely to confuse the jury than prejudice it against him.  Indeed, the confusing nature of the questions themselves, their infrequency and irrelevancy to the issues, and the manner in which all parties treated the comments—including that I instructed Tesla's counsel multiple times to move on—support finding that this line of questioning did not prejudice Diaz.  *See Hemmings*, 285 F.3d at 1193; *cf. Anheuser-Busch*, 69 F.3d at 347 (affirming order for new trial given violation of the court order *and* prejudice from that violation).  They do not support granting a new trial.

### 6.    Questions about Doctor's Note

Tesla's counsel asked Diaz questions about whether he wrote a doctor's note and passed it off as written by a doctor, which Diaz asserts went beyond the scope of the first trial and violated my prior order.  Mot. 18:26-19:22; Tr. 3-798:16-800:10.  Diaz's counsel objected to these questions for being "argumentative" and "asked and answered" but not for violating my orders.  Tr. 3-798:16-800:10.  I sustained the objections and struck the testimony, instructing Tesla's counsel to "move on," which he did.  *Id.*  The following day, I issued further curative instructions that the inquiry was immaterial and irrelevant and that the jury should not consider it in deliberations.  Tr. 5-1019:6-9.

Like the questions about Diaz's alleged harassment of others, it is not clear how the jury was prejudiced by these comments.  Diaz asserts that they affected his credibility, which would make sense except that the allegations were so baseless—as I noted to Tesla's counsel, it seemed

that he was trying to portray Diaz as a handwriting expert—that any impact to *Diaz's* credibility, as opposed to that of Tesla's counsel, would be minimal at best.  And again, Diaz was able to fervently deny the accusation that he forged anything, I instructed the jury several times that what lawyers say is not evidence, and the damages verdict ultimately resulted in over three million dollars in favor of Diaz.  *See Hemmings*, 285 F.3d at 1193 (assessing these factors to determine prejudice).  Accordingly, I find that these comments did not necessarily prejudice the jury against Diaz and so are not the basis for granting a new trial.

### 7.    Questions about Diaz's Son's Lawsuit

Diaz also argues it was improper to ask him about whether his son sued Tesla for race discrimination and whether that case was dismissed.  *See* Mot. 19:23-20:11.  During that part of the trial, Tesla's counsel was explaining an incident where Diaz witnessed his son being subjected to racist harassment at Tesla, and counsel asked, "When you gave that testimony about this incident with your son, you did so in a case also brought by your son.  Your son sued Tesla too; true?"  Tr. 4-752:19-21.  Diaz's counsel objected, to which Tesla responded that the question went to motivation, and I overruled the objection on that basis—it was fair to question Diaz's credibility and motivation for providing the testimony as it was given at least partially to support his son's claims that his son experienced racism at work.  But the following question—"And your son's case got dismissed; correct?"—was not relevant or proper and was clearly made "with the sole purpose of bringing to the jury something it should not have heard."  *Anheuser-Busch*, 69 F.3d at 347 (citation omitted).  I sustained the subsequent objection, told counsel to move on, and later instructed the jury to disregard the questions, *see* Tr. 5-1019:6-9, an instruction that it is presumed to follow, *see Deck*, 814 F.3d at 979.

Unlike in *Anheuser-Busch*, it is not clear how or whether Diaz was prejudiced from this comment.  Diaz asserts that it led the jury to believe Diaz's son's claims were meritless, but that is mere speculation—and a leap of an inference from the statements that were made, given the jury would have to disregard my instruction and understand "dismissed" to be true and mean "meritless"—and at any rate the merit of his son's claims does not clearly affect the *damages* sustained by Diaz at Tesla.  Because the statement was mostly irrelevant, made once, promptly

1   treated as improper by me and the parties, and later subject to a specific instruction, and because

2   the verdict favored Diaz, the likelihood of prejudice is de minimis. *See Hemmings*, 285 F.3d at

3   1193.

### 8.      Discussion of Salary in Closing

5   Tesla's counsel pointed to evidence of Diaz's salary during trial and during closing

6   arguments, which Diaz says was improper and prejudiced the jury. *See* Mot. 20:12-22:8; Repl.

7   11:4-18. I sustained Diaz's objection to Tesla's statement during closings that he made $48,000

8   annually, *see* Tr. 5-1115:22-1116:9, and I previously precluded introduction of this evidence as

9   irrelevant to emotional distress, Tr. 4-804:11-806:3. Accordingly, there was no evidence that this

10  was his salary besides the attorney's questions, and I instructed the jury many times that the

11  attorney's questions were not evidence. The jury is presumed to follow this instruction, *see Deck*,

12  814 F.3d at 979, particularly when reminded of that specific instruction so many times.

13  Tesla's counsel did point to Diaz's hourly wage in closing, which was admitted at the

14  second trial in part because it had been admitted at the first. *See* [Dkt. No. 417] 8:3-17. Though

15  Diaz now says this was an improper reference to his hourly wage, his counsel did not object at

16  trial, so I review for plain error. *See Hemmings*, 285 F.3d at 1193. And it is not clear there was

17  plain error—Tesla did not assert that Diaz should be compensated only for lost wages, which

18  would not have been permitted because he sought emotional distress damages, not economic

19  damages or lost wages. Nor did Tesla use the hourly wage to argue, as Diaz contends, that low

20  wage workers deserve less compensation for emotional distress than do higher wage workers.

21  Rather, Tesla recognized that Diaz tied his request for compensatory damages in part to his desire

22  to "fish and retire"—relevant to the loss of enjoyment of life, as provided in the jury instructions

23  for compensatory emotional distress damages—and so offered the hourly wage as a way for the

24  jury to calculate how much he might need to do so, particularly when the jury lacked any other

25  tangible or quantifiable way to calculate his damages.

26  But even if the error was plain, it was not prejudicial to Diaz. First, his counsel had an

27  opportunity to respond in rebuttal and persuade the jury to compensate him differently. Second, I

28  instructed the jury how to calculate compensatory and punitive damages and told the jury that I,

United States District Court
Northern District of California

18

not the attorneys, was the authority on the law. *See* Tr. 5-1029:19-1032:10. To the extent that Diaz took issue with those instructions, he was permitted to and did raise those issues before the jury was instructed, and the issues were addressed. Finally, the verdict itself did not reflect that the jury even used Tesla's calculation method: it awarded Diaz $100,000 in past compensatory damages, which as Diaz concedes is over double the $48,000 figure that Tesla provided. *See* Mot. Mist. 21:23-22:1. Therefore, I do not find any prejudice or "miscarriage of justice" caused by these statements, and they are not a reason for granting a new trial. *See Experience Hendrix*, 762 F.3d at 841.

### 9. Statement of Law During Closing Arguments

Diaz asserts that Tesla repeatedly misstated the law during closing arguments because even though he was entitled to recover on his negligent supervision claim, Tesla told the jury he could recover damages only based on racial harassment. *See* Mot. 22:9-23:9; Repl. 11:19-12:7. Diaz did not object when the comment was made, and he subsequently had an opportunity to respond in his rebuttal and alleviate any misconception. Diaz did not request additional curative instructions.

Importantly, I told the jury that the source of law came from my instructions, not from the attorneys, and I properly instructed the jury on the law, including that damages should include the negligent supervision claim. *See* Tr. 5-1030:2-5. Particularly in this case, where the jury was repeatedly reminded that lawyers' questions were not evidence and the lawyers were not the source of the law, the jury is presumed to follow my instructions. At any rate, a "slight misstatement of law" by the attorney "can be rendered harmless by the court's proper instruction to the jury." *Deck*, 814 F.3d at 979 (citation omitted). Even if Tesla's counsel's statements were plain error, it is highly unlikely they were prejudicial because they were corrected by my proper instructions. *See Hemmings*, 285 F.3d at 1193.

### 10. Discovery Misconduct Alleged in Surreply

The parties filed supplemental briefs concerning recently revealed evidence that shows racist graffiti in the bathrooms at Tesla at the very end of Diaz's employment. [Dkt. Nos. 485,

488, 490[7]].

Like the emails and photos concerning the feces incident, even if these photos should have been disclosed during discovery, they do not support granting a new trial because Diaz does not show they affected his ability to "fully and fairly present[] his case." *Jones*, 921 F.2d at 879.  At least two witnesses, including Diaz, compellingly testified about the racist graffiti in the bathrooms.  *See* Tr. 2-284:11-25, 332:23-333:2; 3-623:1-25, 648:17-19.  The fact of this graffiti was well-established, and the photos merely confirm the existing testimony.  The evidence shows only that there *was* racist graffiti in the bathrooms—which was not disputed by Tesla at trial—not that Diaz saw racist graffiti at certain times—which was disputed.  The new evidence is, at best, merely cumulative of other compelling evidence.  *Cf. Jones*, 921 F.2d at 879 (finding the withheld evidence was "much more than merely corroborative or cumulative evidence").  Its lack of disclosure did not prevent Diaz from fully and fairly presenting his case.

*        *        *

None of the conduct of Tesla's counsel described above is excusable, and all of it was intentional.  But considering all of the instances addressed as well as the trial as a whole, I find Tesla's counsel's conduct did not prejudice Diaz.

As comparison, in *Jasper*, 678 F.3d at 1129, the Ninth Circuit affirmed the district court's denial of a motion for a new trial based on attorney misconduct where the district court found that the conduct "amount[ed] to a small number of isolated statements in lengthy closing and rebuttal arguments" and also reasoned that the fact that the jury found in favor of the moving party for some claims showed "the jury carefully weighed the evidence before it and did not merely presume liability."  This reasoning applies here, where the ten examples do not show that the misconduct was so pervasive as to permeate the entire proceeding.  Importantly, the proof is in the pudding: the damages verdict strongly favored Diaz.  *See id.*  As I discuss in a moment, that the jury awarded a lesser amount of damages after this trial than the first one, where the same

---

[7] The motions to file under seal, [Dkt. Nos. 487, 489], are GRANTED given the protective order in the state court case.  The motion for leave to file a reply brief, [Dkt. No. 490], is GRANTED because Diaz did not have the opportunity to provide substantive argument in the initial notice he filed given the protective order.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    evidence and exhibits were admitted but slightly different testimony and facts were elicited, does

2    not mean that any improper statements ultimately made the entire proceeding unfair.

3        Similarly, none of the allegedly improper statements came close to those in *Bird*, 255 F.3d

4    at 1140, where the court granted a new trial because "[t]he trial throughout had racial overtones

5    that culminated [in] a closing argument by [the plaintiff] that repeatedly appealed to racial and

6    ethnic prejudice," including by drawing explicit analogies between the issues of the case—alleged

7    denial of contractual and employment relationships based on bias against Indians—and the history

8    of killing and massacre of Indians and stealing of their lands.  Despite the inherently race-based

9    allegations and findings in the present case, both sides (mostly) maintained strict professionalism

10    when it came to discussing race and racism.  No comments made during trial so permeated the

11    proceedings in the way the racial undertones did in *Bird*.  *See also Settlegoode*, 371 F.3d at 518

12    ("Using some degree of emotionally charged language during closing argument in a civil case is a

13    well-accepted tactic in American courtrooms.").

14        Further, even if curative instructions are not necessarily always sufficient to cure the risk

15    of bias, *see Arizona v. Washington*, 434 U.S. 497, 513 (1978), they were sufficient in this trial,

16    based on my observations of the jurors and their reactions as well as of the attorneys and their

17    tones, *see id.* at 513-14.  I reminded the jury at least seven times that what the attorneys say is not

18    evidence, *see* Tr. 1-192:20-193:8, 202:18-19, 249:16-22; 2-260:25-261:1; 4-820:1-7; 5-1036:8-17,

19    1017:20-1018:6, and also multiple times that I was the source of the law, not the attorneys, *see* Tr.

20    1-203:1-3; 2-261:1-4, 5-1015:22-23.  I issued these repeated reminders because counsel for *both*

21    parties made statements throughout trial that implied otherwise.  *See, e.g.*, Tr. 1-246:22-23

22    (overruling Diaz's objection to Tesla's opening statement and noting, "You both have exceeded

23    the bounds of argument, and [I will] allow [Tesla's counsel] to continue.").[8]  Though Diaz argues

24    that he was prejudiced by Tesla's counsel's statements, it is much more likely that these improper

25    statements affected the jury's view of Tesla's counsel—and Diaz's too, at times—because it was

26

27    ---

[8] *See also* Tr. 4-820:1-7 ("This case is not about the lawyers, ladies and gentlemen.  This case is
about Mr. Diaz and the injuries that he suffered. . . . [Y]ou have heard a lot from both sides . . .
28    from the lawyers' tables, but what matters is what you're hearing from the witness tables and from
the exhibits that you're receiving.").

clear that the attorneys were occasionally over-aggressive and hyperbolic.

Tesla's counsel did engage in some improper conduct.  But that misconduct did not prejudice Diaz, either independently or cumulatively.  This was a retrial on damages, not a recitation of the first trial's transcript into evidence.  There were bound to be differences in how questions were asked, how evidence was framed and presented to the jury, and how witnesses testified and even remembered details two years further removed from the underlying events. While the parties were limited to the same exhibits and witnesses as the first trial and could not elicit new testimony going beyond the scope of the first trial, they were not limited to, as Diaz seems to suggest at times, an identical presentation of facts, evidence, and arguments as that presented in September 2021.

To the extent that Tesla violated any orders or made improper statements at trial, despite the number of comments and under the totality of the circumstances, the comments' nature, treatment by the court, and particularly their relevancy to the issues, supports finding that they did not prejudice Diaz.  *See Hemmings*, 285 F.3d at 1193.  And the strength of Diaz's case—as addressed further below, and particularly due to the testimony about the nature of the racism and harassment that he endured—along with the multimillion-dollar verdict in his favor, show that these comments did not necessarily prejudice the jury against him.  *See Anheuser-Busch*, 69 F.3d at 346.

### B.   Sufficiency of the Damages

Diaz also asserts he should be granted a new trial because the damages award was inadequate to compensate him or to deter or punish Tesla.  *See* Mot. Mist. 23:15-35:17.

### 1.   Compensatory Damages

The second jury awarded Diaz $100,000 in compensatory damages and $75,000 in future damages, which he says is inadequate based on the evidence and because the first jury awarded him $6.9 million on the same evidence.  After the first trial, I remitted the first jury's award to $1.5 million, finding that was the highest award supportable by the evidence.  *See* Order on Post-Trial Mots. 26:19-37:10.

To begin with, there was plenty of evidence supporting the damages verdict—evidence

22

United States District Court
Northern District of California

that was also presented in the first trial. *See* Mot. Mistr. 24:23-30:21. Diaz endured awful, pervasive racism in his workplace. As I previously explained and as still holds true, the N-word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry."[9] *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (citation omitted). A shocking amount of evidence at trial showed Diaz was regularly subjected to being called the N-word and other racial slurs, including his own testimony, Tr. 3-603:23-604:7, 604:11-606:4, and the testimony of witnesses who confirmed that Diaz reported the slurs, Tr. 2-269:13-274:7, 3-551:8-552:20. Though Tesla argues otherwise, several witnesses also corroborated Diaz's testimony that Tesla permitted the "rampant" use of N-word and racial slurs like "chongo" and "mayate" in its factories. *See, e.g.*, Tr. 2-281:20-282:7, 326:12-21, 343:4-344:14, 381:4-382:7, 383:15-384:18. Diaz also encountered racist graffiti and a racist picaninny drawing near his workstation, Tr. 3-616:6-619:25, 623:1-25, was told to "go back to Africa," Tr. 3-603:23-25, and was so deeply upset to learn that he played along when his harassers had called him "porch monkey" in Spanish that he had to take a break during his testimony to compose himself, Tr. 3-589:13-592:23.

The evidence at the second trial also showed that although Diaz complained several times, Tesla failed to adequately respond to the racism that permeated its workplace. *See* Tr. 2-387:10-390:18, 394:24-395:11; 3-537:20-540:3, 542:15-543:7, 612:22-14, 613:5-14, 615:13-15; 5-954:15-955:6. Though Tesla presented evidence that it says showed proper responses and corrective actions and that Diaz was satisfied with the outcomes, it failed to convincingly rebut Diaz's expert's testimony that the responses were inadequate. *See, e.g.*, Tr. 3-508:6-509:20 (expert explaining that Martinez should have received very serious discipline for the picaninny

---

[9] Tesla repeatedly argued at trial and reasserts in its papers that there is a difference between an offensive or aggressive use of the N-word, and an unoffensive and nonaggressive use. Tesla's attorney's lay opinion that the N-word can be used in a "friendly" way, as well as the testimony of other witnesses that they believed it could be used in an unoffensive manner—though the latter could be considered by the jury—are wholly irrelevant to how *Diaz* perceived the use of the word and how it impacted him. *See also Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 981 (9th Cir. 2023) (explaining that the use of slurs and insults alone can create a hostile work environment based on race or sex (first citing *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1202 (9th Cir. 1991); and then citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114-16 (9th Cir. 2004))).

incident).

Based on the rampant racism and lack of sufficient response from Tesla, it is unsurprising that Diaz experienced significant emotional effects. His personality changed during the months he was subjected to harassment, and he regularly felt overwhelmed, anxious, humiliated, and afraid. Tr. 3-621:25-622:20, 624:3-625:7. The enduring racism affected his sleep, appetite, involvement in his children's lives, and his intimate relations with his wife. Tr. 3-626:17-23, 627:14-22; 4-890:8-892:3. He "question[ed] [his] worth" and "fe[lt] less than a man." Tr. 3-606:7-8. This testimony alone was sufficient to establish emotional distress damages, *see Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000), and it was further bolstered by his stepdaughter's testimony, Tr. 4-889:24-892:20. Additionally, Diaz was deeply upset by the picaninny, Tr. 3-620:9-621:4, which was also corroborated by other witnesses, *see* Tr. 2-352:11-354:6, 398:5-7, 428:4-6. And an expert testified that workplace harassment, like that experienced by Diaz, can cause serious psychological injuries, adding that in 2019, Diaz met the criteria for adjustment disorder, threat disorder, and depression. Tr. 4-832:3-12, 835:13-838:18.

Taken together, Diaz clearly showed by a preponderance of the evidence that he should be awarded a high amount for noneconomic damages based on his emotional distress. And the jury did award Diaz a significant amount for noneconomic damages: $175,000 in total compensation for his past and future emotional distress.

The crux of Diaz's argument, though, is that the second jury's award is against the "clear weight of the evidence" because the first jury awarded higher damages, and according to Diaz the only possible reason for this disparity is that there was misconduct at the second trial. *See* Mot. Mistr. 30:22-33:4; *see also Silver Sage Partners*, 251 F.3d at 819. I strongly disagree. As I just discussed, any alleged misconduct did not prejudice Diaz. *See infra*, Part I.A. Moreover, there is a plethora of reasons that the jury could have reached a different result on the same evidence. To start, the makeup of the jury pool and jurors inevitably differed. So did the context: the first trial—in September 2021, during the middle of the country's racial reckoning following the murder of George Floyd—represented a unique time in American culture and history that differed from the country's experience in March 2023. And a new law firm represented Tesla, able to use

the trial testimony from the first trial to recalibrate the theories presented to the jury.  That is not to say the evidence or witnesses differed—but while the parties were limited to the same evidence and witnesses and could not go beyond the scope of the first trial, they were not limited to asking the same questions of the same people in the same ways.

At the first trial, Tesla's theory of the case was that it was not responsible for any alleged harassment.  *See, e.g.*, [Dkt. No. 298] (Transcript from First Trial) (showing Tesla's closing argument focused almost exclusively on Tesla's lack liability)[10]; *see also* Order on Post-Trial Mots. 14:22-26:18 (addressing and rejecting Tesla's arguments for a new trial based on its argument that it was not liable).  At the second trial, Tesla's theory of the case was different—as it had to be—and so its questions and framing were different.  Because Tesla could no longer focus on "no liability" arguments, it turned its attention to emphasizing the evidence about the *damage* caused to Diaz, particularly by challenging his credibility and his mitigation of damages.  Though Tesla relied on the same evidence and exhibits, it presented that evidence—as it was permitted to by my orders—differently.

All of that could have been anticipated by Diaz when he rejected the remittitur.  But perhaps the most impactful difference between the trials occurred in Tesla's impeachment of Diaz's testimony about his emotional distress related to his relationship with his son, Demetric Di-Az.  On direct examination, Diaz testified movingly that "one of the biggest regrets in my life" was encouraging Demetric to apply to Tesla, because he subsequently witnessed Demetric being called the N-word by his supervisor, but Diaz could not intervene or stand up for his son because the supervisor had seniority.  Tr. 3-599:3-600:5, 608:5.  Diaz testified that this incident "fractured

---

[10] That this was Tesla's theory of the case was made especially clear in its closing argument at the first trial, where it focused almost entirely on telling the jury that it was not liable, that it was not a joint employer, and that Diaz and his harassers were not employees but rather contractors over which Tesla had no responsibility.  *See* Transcript from First Trial ("1st Tr.") [Dkt. No. 298] 6-927:3-956:12, 958:23-59:14; *see also* Order on Post-Trial Mots. 40:8-9 ("Tesla's strategy at trial was essentially to attempt to show that it was not Diaz's employer without much of a substantive defense of its actual employment practices.").  Though Tesla spent a few minutes arguing against damages, 1st. Tr. 956:13-958:2, including that Diaz was not entitled to punitive damages, 1st Tr. 958:3-22, it never told the jury what to do should the jury find that Tesla *was* liable.  And so when the jury found that Tesla was liable for Diaz's emotional distress—a finding strongly supported by the record at that trial, *see* Order on Post-Trial Mots.—Tesla's defense collapsed and the jury was left only with Diaz's framework as a way to assess and quantify damages.

United States District Court
Northern District of California

1    our relationship," Tr. 3-745:14-20, 753:11-13, that Demetric stopped talking to him, Tr. 3-608:2-5,

2    and "can't even look [Diaz] in the eye," Tr. 3-607:10-15.   Diaz testified that he ruined Demetric's

3    life, that Demetric lost all respect for him and that whenever he looks at his son now, he "know[s]

4    I destroyed [his] life with my decisions." Tr. 3-607:12-17, 608:2-3, 627:10-13.  Diaz told the jury

5    that the racism he endured still affects him emotionally, and that he will never forget the

6    harassment he experienced at Tesla in large part because of its permanent impact on his

7    relationship with his son.  Tr. 3-627:8-13.  Dr. Reading, Diaz's expert on his emotional distress

8    claim, emphasized how Diaz felt that there was an "irretrievable" change in his relationship with

9    Demetric after the incident.  Tr. 4-833:17-834:8.

10       That testimony about Diaz's relationship with his son went well beyond what Diaz had

11   described in the first trial.  *Cf.* 1st. Tr. 3-419:11-420:5, 483:8-10; 4-570:25-573:13 (discussing the

12   incident in much less detail without mention of Demetric's loss of respect immediately after the

13   incident or the destruction of Demetric's life based on the incident).  On cross-examination,

14   Tesla's counsel elicited testimony that the argument Diaz witnessed between Demetric and his

15   supervisor was not a racist exchange but rather "was about a baseball team and the hate and things

16   like that." Tr. 4-749:14-23.  Tesla's counsel further undermined Diaz's testimony by showing that

17   Diaz and his son regularly took photos together and spoke to the press together after they sued

18   Tesla, and that any fracture in the relationship was caused by Demetric "start[ing] [to] hang[] with

19   the wrong crowd after Tesla." Tr. 4-753:11-755:7.  And jarringly, Tesla's counsel impeached

20   Diaz's testimony that his relationship with his son was fractured and that Demetric no longer

21   speaks to him by playing Demetric's video deposition testimony taken two years after the incident,

22   in which Demetric plainly—and compellingly—stated that his relationship with his father was

23   good and that they spoke regularly.  *See* Tr. 5-1014:8-12 (transcript not recorded).

24       This impeachment evidence was within the scope of evidence that could be presented at

25   the second trial.  Because Diaz's testimony about his fractured relationship with his son concerned

26   his emotional distress, the jury could have disbelieved his testimony about the extent of the harm

27   caused by this incident *and also* could have discredited his testimony about other noneconomic

28   emotional damage he endured.  Undermining Diaz's credibility about the harm he suffered was

United States District Court
Northern District of California

important because his evidence of emotional distress relied entirely on the subjective testimony of witnesses—including his daughter, who testified in part that Diaz's personality went back to normal after leaving Tesla, and Dr. Reading, a psychologist who never treated Diaz and only assessed him years after the harassment—and did not include less subjective evidence, such as medical records, diagnoses, or other contemporaneous documentation demonstrating changes to his sleep, work performance, or mood.[11]  Like Diaz's testimony on this topic, Tesla's challenge to his credibility concerning his emotional distress differed between trials, and the jury properly could have incorporated this impeachment into its determination.  And for this reason, my prior rejection of Tesla's request to remit the first jury's award to $300,000 as "untethered to record evidence," Order on Post-Trial Mots. 29:6-11, is inapplicable here, where the second trial's record includes such significant impeachment.

Diaz asserts in his papers that attacks on his credibility were often improper, but he did not contest this line of questions concerning his relationship with his son.  I will add that Diaz's credibility about his emotional distress was further undermined by the way his attorneys asked repeated questions about "what three words would [he] use to describe" his feelings about certain incidents, subsequently writing the words on a whiteboard for the jurors to see.  *See* Tr. 4-624:13-6:25:5.  On cross, Tesla's counsel asked Diaz about how rehearsed the questions and answers were, Tr. 5-813:18-814:16; even without cross-examination, these questions undermined Diaz's credibility because the testimony came across as pre-planned and inauthentic.  And while other questions at trial were asked differently, and other memories and responses shifted slightly between trials, as they were bound to, these two challenges to Diaz's testimony alone are more than enough to explain the lower compensatory damages award at the second trial.

Given the evidence, then, *see Landes*, 833 F.2d at 1371-72, the award of $100,000 for past damages and $75,000 for future damages was not against the clear weight of the evidence.  Diaz

---

[11] To be clear, I do not find that objective evidence is necessary to prove emotional distress—it is not.  *See Passantino*, 212 F.3d at 513; *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040-41 (9th Cir. 2003).  But where, as here, the evidence of emotional distress relies almost entirely on the testimony of a plaintiff who was impeached on the stand, more tangible evidence would have helped corroborate or rehabilitate the plaintiff's testimony.  Here, though, there was none.

was obviously entitled to a substantial award, and the second jury gave him a substantial award, albeit much less than the first jury awarded.  The attacks on his credibility, which went directly to the extent of his past and future emotional distress, were a valid basis on which the second jury could have found that he was not entitled to anything close to $1.5 million.  Though Diaz belatedly asserts that "the award violates" the two instructions on awarding damages, *see* Repl. Mistr. 15 n.8, his argument appears to be that the jury did not follow the instruction because it did not award a higher amount—which is circular and unpersuasive for all the reasons explained above.  And there is no reason to believe that there were flaws in the jury's deliberation process, or that the jury did not understand or follow the instructions, or that the jury failed to perform a reasoned analysis.  *See Holzhauer*, 2017 WL 3382316, at *2.

As further support for his motion for a new trial, Diaz points to comparable cases from my first post-trial order, including *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014), and *Passantino*, 212 F.3d 493.  Those were and are valid comparison cases for all the reasons outlined in my Order on Post Trial Motions and given the facts here.  But those cases and my prior order merely affirm that the maximum award of compensatory damages supported by the evidence and law was $1.5 million; they did not and do not stand for the proposition that a lower award on this record would be against the clear weight of the evidence.

Based on the facts, evidence, and legal theories, and particularly because of the challenge to Diaz's testimony about his emotional distress, I am not convinced that the jury has made any mistake, nor am I convinced that this damages award was "a miscarriage of justice" that must be ameliorated.  *Experience Hendrix*, 762 F.3d at 841-42, 845-46; *see also Holzhauer*, 2017 WL 3382316, at *2 (noting that damages for intangible, non-economic losses "is a matter peculiarly within a jury's ken" (citation omitted)).  The compensatory damages are sufficient to compensate Diaz for past and future harm, given the evidence presented.  The motion is DENIED.

### 2.    Punitive Damages

Finally, Diaz seeks a new trial because he says the punitive damages award of $3 million was insufficient to punish Tesla and deter future conduct.  As a preliminary matter, Diaz cites no case law that suggests I can grant a new trial for failure to award sufficient punitive damages.

Assuming I can do so under the same standard as addressed above concerning a miscarriage of justice, I am not persuaded by Diaz's arguments for many of the same reasons as addressed above. Tesla's conduct was reprehensible and repeated, and it failed to take responsibility or change its ways during Diaz's time at the company, *infra* Part II, but Diaz does not point to evidence (or case law) suggesting that $3 million is insufficient to fulfill the purposes of punitive damages, punish Tesla, and deter its conduct. Instead, he repeats the arguments that Tesla acted badly and needs to be punished—at it will be, by the imposition of a damages award of over $3 million for its conduct toward a single individual.

The award is not against the clear weight of the evidence. The motion is DENIED on this basis. [12]

*      *      *

Finally, Diaz's request for a choice between the original remittitur and a new trial is DENIED. If Diaz wanted the remitted amount, he should have accepted it two years ago and saved the parties, witnesses, and court time and energy. Now there is a different record and a different result. As I conclude after discussing Tesla's motion, the parties will have to live with the second verdict absent a successful appeal.

## II.    MOTION TO ALTER OR AMEND JUDGMENT

Tesla moves to alter or amend the judgment, asserting that the award of punitive damages should be reduced to $1,575,000, which is nine times the award of the compensatory damages. It argues that the judgment should be altered because I committed a clear error of law by allowing a punitive damages award greater than a 9:1 ratio. *See Kaufmann*, 32 F.4th at 850; Fed. R. Civ. Proc. 59.

---

[12] Tesla's Motion for Judgment as a Matter of Law, [Dkt. No. 454], argued that there was no evidentiary basis from which the jury could award punitive damages. [Dkt. No. 454]. I took the motion under submission and then it was not renewed. The motion argues that the jury instructions concerning punitive damages were legally incorrect, an argument I previously addressed and rejected several times. *Supra* n.1 (collecting docket entries); *see also* [Dkt. No. 432, 439]. Regardless, there was plenty of evidence presented to the jury showing that Diaz was entitled to punitive damages. And as discussed below, *infra* Part II, there was more than enough evidence supporting the jury's ultimate award of $3 million. To the extent there is any doubt, Tesla's motion for judgment as a matter of law is DENIED.

The Supreme Court has held that the Fifth Amendment's Due Process Clause prohibits punitive damages that are "grossly excessive." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citations omitted). To determine whether an award of punitive damages is unconstitutionally large, the Supreme Court has set out "three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

Following the first trial and jury award, I remitted the punitive damages to a 9:1 ratio of the compensatory damages that were supported by the record and law, finding that this ratio was appropriate to "fulfill[] the purposes of punitive damages, accord[] appropriate deference to the jury's verdict, and stay[] within constitutional grounds." Order on Post-Trial Mots. 42:14-20. After the second trial and second verdict, I find the jury's award of $3 million meets the constitutional and statutory requirements for punitive damages and need not be remitted.

## A.    Reprehensibility

Reprehensibility is the "most important indicium of the reasonableness of a punitive damages award." *State Farm*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). The reprehensibility of the defendant's conduct considers whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (citing *Gore*, 517 U.S. at 579-77); *see also Hardeman v. Monsanto Co.*, 997 F.3d 941, 972-73 (9th Cir. 2021) (same). "[I]ntentional discrimination on the basis of race or ethnicity is especially reprehensible and 'a different kind of harm, a serious affront to personal liberty.'" *Flores v. City of Westminster*, 873 F.3d 739, 760 (9th Cir. 2017) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003)). As the Ninth Circuit has explained, "[t]here can be no question of the importance of our society's interest in combating discrimination; this nation fought the bloodiest war in its history in part to advance the goal of racial equality, adding several

amendments to the Constitution to cement the battlefield victory." *Zhang*, 339 F.3d at 1043.  As a result, "[r]acial discrimination often results in large punitive damage awards." *Id.* (citation omitted).

As they did after the first trial, these factors again favor a high punitive damages award here.  First and most importantly, Tesla's actions were grievously reprehensible.  Diaz was subjected to a grossly racist workplace, with racist conduct perpetuated not only by coworkers or subordinates but also—and perhaps especially—by supervisors like Martinez, who called Diaz racist slurs and drew the racist picaninny, and Hurtado, who directed the N-word at Diaz over 30 times and informed Diaz that he wished he could get all "N-words" fired.  *Cf. Flores*, 873 F.3d at 760; *Zhang*, 339 F.3d at 1043.  Reports to authority often went unanswered and when the company responded, it often failed to interview witnesses or review security footage.  Worse yet, a supervisor who learned of Diaz's complaints subsequently failed to investigate and was in fact told by Tesla to *not* personally investigate the complaint.  Tr. 3-541:22-542:1, 544:21-545:2, 549:13-550:16.  Another supervisor was told to stop investigating before he reached a conclusion, and Diaz and his harasser ended up being reprimanded for the conduct directed at Diaz.  *See* Tr. 2-387:10-390:18, 395:21-396:7.  Martinez, a Tesla supervisor and the main perpetrator of racist conduct, *still* works at Tesla, nearly a decade after he forced Diaz to endure repeated cruelty and shame.  Not only did the company turn a blind eye to the racism, but the jury also could have interpreted the evidence to show that Tesla knew what it was supposed to do and affirmatively chose to not carry out the proper responses.  Though Tesla argues its conduct was merely negligent at best, *see* Mot. Jdgmt. 4:19-5:17 & n.2, the jury could have credited the testimony of any number of witnesses that stated otherwise and demonstrated the company's intentionality and recklessness with respect to failing to maintain a safe, harassment-free workplace.

As after the first trial, other *State Farm* factors favor a high punitive damages award.  *See State Farm*, 538 U.S. at 419.  The harm was repeated, not isolated—not only the racist conduct itself but Tesla's repeated failure to properly respond.  The harm was not merely economic as Diaz suffered grave emotional harm and experienced physical manifestations, such as inability to sleep properly or have intimate relations with his wife.  The jury also could have interpreted Diaz's

31

testimony that Martinez threatened physical violence and used racial threats as showing a threat of physical violence—which would increase reprehensibility, *cf. Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 775 (9th Cir. 2005) (finding "no threat of physical harm . . . reduces reprehensibility")—even if the jury did not credit Diaz's testimony that this altercation reported was motivated by race.  Further, the jury could have found that Diaz was financially vulnerable because he relied on the job to support his family and relied on the company to prevent discrimination at work, though this factor is less relevant for noneconomic damages cases.  *See Hardeman*, 997 F.3d at 973-74.

Finally, it is telling and relevant that two separate juries awarded Diaz punitive damages beyond a single digit ratio.  Though they reached different conclusions for the absolute number, the juries clearly agreed that the evidence showed Tesla's actions and subsequent failure to take responsibility—continuing during the trials themselves—necessitated a high award for punishment and deterrence.

Accordingly, the reprehensibility factors favor Diaz's position and do not warrant a reduction.

**B.      Ratio**

The second guidepost is the ratio of punitive damages to "actual harm."  *Gore*, 517 U.S. at 580.  The Supreme Court has explained that it is "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," but that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *State Farm*, 538 U.S. at 424-25 (citations omitted).  But the ratios are "instructive," not "binding," and there is no "bright-line" ratio for punitive damages.  *Id.* at 425.  Punitive damages must be "reasonable and proportionate" to the harm and compensatory damage, and larger ratios are more likely warranted when "a particularly egregious act has resulted in only a small amount of economic damages," while "a lesser ratio" may be warranted when "compensatory damages are substantial."  *Id.* at 425-26 (citations omitted).  And, of course, the "precise award . . .  must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."  *Id.* at 425.

United States District Court
Northern District of California

I recognize that case law generally favors punitive damages awards that are within single digit ratios of the compensatory damages, and that the Supreme Court has expressed skepticism regarding higher numbers. *See id.* But the underlying principle of the general guidance was and is to protect a tortfeasor's due process rights and prevent irrational or arbitrary deprivations of property. *See id.* at 416-17, 425, 429; *Gore*, 517 U.S. at 562. Here, due process has been provided to both parties. There have been two trials, two juries, two sets of instructions, two occasions for every witness to testify, two opportunities for the parties to present their cases and receive a fair trial. Tesla received fair notice that it could be subject to a high damages award when it received—as the evidence showed—notice of the complaints, racism, and harassment, but failed to take corrective action. In other words, it could have known that it may be on the hook for significant damages but instead ignored the problem. And while the absolute numbers differed between trials, in both cases the jury chose to award punitive damages that exceeded the 9:1 ratio that Tesla now seeks. The reason for it is not arbitrary or irrational: it is because Tesla' conduct was shocking for 2015.

Rather than making much effort to defend its conduct, in both trials Tesla employed strategies that resulted in the high punitive damages award. At the first trial, it failed to present a *Faragher*/*Ellerth* defense and instead focused almost exclusively on arguing that it was not liable because Diaz and his harassers were not its employees. At the second trial, it focused on undermining witness credibility, which was successful in some ways, *supra* Part I.B.1, but failed in others, including when it repeatedly subjected itself to chastisement for trying to ask improper questions that I instructed it not to, *supra* Part I.A. In neither trial did Tesla present actual, compelling evidence of implementing its supposedly strong anti-harassment policies. The jury likely perceived these choices as Tesla continuing its efforts to evade responsibility, particularly given Tesla's failure to present convincing evidence that it was doing what it could and should to make its workplace safe and harassment-free. *Cf. Hardeman*, 997 F.3d at 974-75 (noting that lower punitive damages were warranted where there was no evidence of defendant concealing known risk). That was the risk of pursuing the chosen strategies given the egregiousness of the underlying conduct.

That is also the reason that two juries awarded high, strikingly similar punitive damages ratios, and the reason that this case is the exception to the general reluctance to exceed a single digit multiplier for punitive damages. Two separate juries imposed a punitive damages award beyond the standard single digit ratio: that itself demonstrates the award was not arbitrary or irrational, but rather firmly rooted in the evidence of Tesla's conduct. Though the juries viewed the absolute value of the damages differently, *two* separate juries viewed the ratios consistently and sought to punish Tesla's reprehensibility *and* its failure to take responsibility for its conduct. Given this combination of Tesla's reprehensibility and failure to take responsibility, the jury's desire to punish and deter the responsible entity was understandable. And the evidence shows the higher ratio is warranted. I will not reduce it on this basis.

### C.    Comparable Penalties

Finally, courts examine "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" *State Farm*, 538 U.S. at 428 (citation omitted). The Supreme Court has also permitted examining comparable criminal penalties to assess the seriousness of the actions but has warned that using criminal penalties to "determine the dollar amount of the award" is less useful. *Id.* The Ninth Circuit has said that the "$300,000 statutory limitation on punitive damages in Title VII cases [is] an appropriate benchmark for reviewing § 1981 damage awards." *Bains*, 405 F.3d at 777 (citing *Zhang*, 339 F.3d at 1044).

I previously found that the "sheer difference" between the first jury's award of $130 million in punitive damages and Title VII's $300,000 statutory limitation to weigh "somewhat" in favor of reduction, given the award was over 400 times greater than the limitation. *See* Order on Post-Trial Mots. 42:5-12. I subsequently remitted the award to $13.5 million, or about 45 times the statutory limitation. Now, the second jury's award of $3 million is only 10 times greater than the statutory limitation. Contrary to Tesla's argument, this favors maintenance of the award rather than reduction, in that it is much more closely aligned with what the statute permits. *See also Zhang*, 339 F.3d at 1045 (finding the discrepancy between the $300,000 statutory cap and the $2.6 million award was "not nearly so great" as those "between the $10,000 fines and multimillion dollar awards at issue in *BMW* and *State Farm*" and so did not warrant remitter).

34

A final note—Tesla's wealth may properly be considered by the jury, and likely was, so long as it is not used to make up for a dearth of other *State Farm* factors.  *See Bains*, 405 F.3d at 777.  Because the *State Farm* factors justify the awarded punitive damages, the jury was entitled to consider Tesla's wealth in determining the necessary amount to punish and deter its conduct. *See id.*

\* \* \*

All in all, the jury's award is appropriate and reasonable.  The high reprehensibility of Tesla's conduct, particularly the racism of its supervisors and its repeated failure to take appropriate action, warrants a high punitive damages ratio.  There was no clear error.  *See Kaufmann*, 32 F.4th at 850.  Tesla's motion is DENIED.

## CONCLUSION

For those reasons, both parties' motions are DENIED.

**IT IS SO ORDERED.**

Dated: October 4, 2023

William H. Orrick
United States District Judge