LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
MARQUI HOOD (SBN 214718)
marqui@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:     (415)-453-7352
Facsimile:     (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
balexander@amfllp.com
**ALEXANDER MORRISON & FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:     (310) 394-0888
Facsimile:     (310) 394-0811

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
JONATHAN ROSENTHAL (SBN 329638)
jrosenthal@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Facsimile:     (415) 362-8064

DUSTIN L. COLLIER (SBN 264766)
dcollier@collierlawsf.com
V. JOSHUA SOCKS (SBN 303443)
jsocks@collierlawsf.com
ELIZABETH R. MALAY (SBN 336745)
emalay@collierlawsf.com
DREW F. TETI (SBN 267641)
drew@collierlawsf.com
**COLLIER LAW FIRM, LLP**
240 Tamal Vista Blvd. Suite 100
Corte Madera, CA 94925
Telephone:   (415) 767-0047
Facsimile:    (415) 767-0037

Attorneys for Plaintiff,
OWEN DIAZ

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OWEN DIAZ,<br><br>            Plaintiff,<br><br>   v.<br><br>TESLA, INC. dba TESLA MOTORS, INC.,<br><br>   Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND EXPENSES**<br><br><br>Hearing Date: January 10, 2024<br>Time: 2:00 PM<br><br>Trial Date: September 27, 2020<br>Complaint filed: October 16, 2017 |

<u>NOTICE OF MOTION AND MOTION FOR</u>
<u>AWARD OF STATUTORY ATTORNEYS' FEES AND EXPENSES</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on January 10, 2024 at 2:00 pm, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable William H. Orrick, Courtroom  2, 17th Floor, of the above-captioned Court, located at the San Francsico Courthouse,  450  Golden Gate Avenue, San Francisco, California 94102,  plaintiff will, and hereby does, move this Court to award Plaintiff Owen Diaz $10,413,774.25 in statutory attorneys' fees and litigation expenses of $187,145.24 pursuant to 42 U.S.C. §1988.

This motion is made on the grounds that the individual Plaintiff Owen Diaz is the prevailing party in this action, that the requested attorneys' fees award is fair, reasonable, and appropriate based on the results obtained and plaintiff's counsels' lodestar based on reasonable hours and reasonable rates, and that the litigation expenses were reasonable and actually incurred and are the same type as are customarily billed to fee-paying clients.

The motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations of Plaintiff's counsel Michael Rubin, Lawrence Organ, J. Bernard Alexnader, Dustin Collier, and additional attorneys Bryan Schwartz, David deRubertis, Christopher Whelan, and Kelly Armstrong; the files and records in this matter; any opposition or reply briefs or declarations; and such argument as may be heard on this matter.

CALIFORNIA CIVIL RIGHTS LAW GROUP
ALEXANDER MORRISON & FEHR LLP
ALTSHULER BERZON LLP
THE COLLIER LAW FIRM

Dated:  October 25, 2023                                                  /s/ Lawrence A. Organ
_____
Lawrence A. Organ
Cimone A. Nunley
J. Bernard Alexander
Michael Rubin
Dustin Collier

Attorneys for Plaintiff OWEN DIAZ

-ii-

LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
MARQUI HOOD (SBN 214718)
marqui@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:     (415)-453-7352
Facsimile:     (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
balexander@amfllp.com
**ALEXANDER MORRISON & FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:     (310) 394-0888
Facsimile:     (310) 394-0811

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
JONATHAN ROSENTHAL (SBN 329638)
jrosenthal@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Facsimile:     (415) 362-8064

DUSTIN L. COLLIER (SBN 264766)
dcollier@collierlawsf.com
V. JOSHUA SOCKS (SBN 303443)
jsocks@collierlawsf.com
ELIZABETH R. MALAY (SBN 336745)
emalay@collierlawsf.com
DREW F. TETI (SBN 267641)
drew@collierlawsf.com
**COLLIER LAW FIRM, LLP**
240 Tamal Vista Blvd. Suite 100
Corte Madera, CA 94925
Telephone:   (415) 767-0047
Facsimile:     (415) 767-0037

Attorneys for Plaintiff,
OWEN DIAZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OWEN DIAZ,<br><br>        Plaintiff,<br><br>    v.<br><br>TESLA, INC. dba TESLA MOTORS, INC.,<br><br>    Defendant. | Case No. 3:17-cv-06748-WHO<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND EXPENSES**<br><br>Hearing Date: January 10, 2024<br>Time: 2:00 PM<br><br>Trial Date: September 27, 2020<br>Complaint filed: October 16, 2017 |

## **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS AND PROCEDURAL HISTORY ............................... 6

  A.  Procedural History ......................................................................................... 6

III.  LEGAL ARGUMENT ....................................................................................... 10

  A.  Plaintiff is a Prevailing Party Entitled to Attorneys' Fees Under 42 U.S.C. § 1988. ........ 10

  B.  The Court Should Use the "Lodestar/Multiplier" Method to Calculate Fees. .................. 10

  C.  The Number of Hours Expended Were Reasonable. ....................................................... 11

    1.  The Request for Fees for the Work of Mr. Diaz's Four Law Firms was Reasonable.... 13

    2.  Counsel Should Recover Fees for Work Related to Dismissed Claims and Parties As That Work was Related and Essential to Successful Resolution of this Case. ....................... 14

    3.  Counsel's fees are appropriate in light of the success achieved. .................................. 15

    4.  Counsel Exercised Substantial Billing Judgment. ............................................................ 17

  D.  Counsel's Hourly Rates are Reasonable, Especially in Light of the Excellent Result. ...... 18

  E.  The Court Should Award a 2.0 Multiplier for Work Performed Through the First Verdict. 20

    1.  This Case Raised Novel and Significant Legal Issues, Creating New Case law and Clarity for Contract Employees Who Experience Discrimination at Work. ......................... 21

    2.  The Public Service Performed by This Litigation and the Deterrent Effect of Both Verdicts on Employers Like Tesla Support the Requested Enhancements. .......................... 22

    3.  The Undesirability of the Case Supports the Requested Enhancement. ....................... 23

  F.  Plaintiff is Entitled to Recover Reasonable Litigation Expenses. ..................................... 24

  G.  Plaintiff's Counsel is Entitled to Recover "Fees on Fees" ............................................... 25

IV.  CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Blackwell v. Foley*,
 724 F. Supp. 2d 1068 (N.D. Cal. Jul. 15, 2010) ...................................................16

*In re Bluetooth Headset Prods. Liab. Litig.*,
 654 F.3d 935 (9th Cir. 2011) ...................................................................................11

*Blum v. Stevenson*,
 465 U.S. 886 (1984).................................................................................................18

*Chalmers v. City of Los Angeles*,
 676 F. Supp. 1515 (C.D. Cal. Dec. 1, 1987)....................................................22, 23

*City of Riverside v. Rivera*,
 477 U.S. 561 (1986).................................................................................................16

*Clark v. City of Los Angeles*,
 803 F.2d 987 (9th Cir. 1986) ...................................................................................25

*Copeland v. Marshall*,
 641 F.2d 880 (D.C. Cir. 1980) (*en banc*)...............................................................11

*Dang v. Cross*,
 422 F.3d 800 (9th Cir. 2005) ...................................................................................14

*Davis v. Prison Health Svcs.*,
 No. C 09–2629, 2012 WL 4462520 (N.D. Cal. Sept. 25, 2012)........................10, 22

*DeLew v. Nevada*,
 No. 2:00-cv-00460-LRL, 2010 WL 11636127 (D. Nev. Jan. 7, 2010)
 (analyzing fee request under § 1988)........................................................................13

*Domino's Pizza, Inc. v. McDonald*,
 546 U.S. 470 (2006).................................................................................................21

*Donastorg v. City of Ontario*,
 No. EDCV 18-992 JGB, 2021 WL 6103545 (C.D. Cal. Sept. 23, 2021) ................11

*Edmo v. Idaho Dep't of Correction*,
 No. 1:17-CV-00151-BLW, 2022 WL 16860011 (D. Idaho Sept. 30, 2022) ...................15, 21

*Evon v. Law Offices of Sidney Mickell*,
 688 F.3d 1015 (9th Cir. 2012) .................................................................................15

*Faush v. Tuesday Morning, Inc.*,
  808 F.3d 208 (3d Cir. 2015) ................................................................21

*Gonzalez v. City of Maywood*,
  729 F.3d 1196 (9th Cir. 2013) ............................................................10

*Harris v. Marhoefer*,
  24 F.3d 16 (9th Cir. 1994) ...................................................................24

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ......................................................................14, 15

*In re Immune Response Sec. Litig.*,
  497 F.Supp.2d 1166 (S.D. Cal. 2007) .................................................24

*Kerr v. Screen Extras Guild, Inc.*,
  526 F.2d 67 (9th Cir. 2008) ...........................................................21, 23

*McCown v. City of Fontana*,
  565 F.3d 1097 (9th Cir. 2009) ............................................................15

*Missouri v. Jenkins*,
  491 U.S. 274 (1989) ............................................................................11

*Missouri v. Jenkins by Agyei*,
  491 U.S. 284 (1989) ............................................................................19

*Quesada v. Thomason*,
  850 F.2d 537 (9th Cir. 1988) ..............................................................16

*Sheehan v. Donlen Corp.*,
  173 F.3d 1039 (7th Cir. 1999) ............................................................12

*Thompson v. Barrett*,
  599 F. Supp. 806 (D.C. Cir. 1984) ......................................................23

*United Steelworkers v. Phelps Dodge Corp.*,
  896 F.2d 403 (9th Cir. 1990) ..............................................................18

*Van Gerwen v. Guarantee Mut. Life Co.*,
  214 F.3d 1041 (9th Cir. 2000) ............................................................11

**Federal Statutes**

42 U.S.C.
  § 1981 ............................................................................... *passim*
  § 1988 ............................................................................... *passim*
  § 1988(b) .............................................................................10

Americans with Disabilities Act ....................................................16

**Other Authorities**

Faiz Siddiqui, *Jury orders Tesla to pay more than $130 million in discrimination
    suit, which alleged racist epithets and hostile work environment*, THE
    WASHINGTON POST (October 5, 2021 1:47 AM) .......................................................6

Joe Schneider, *Tesla Hasn't Learned from $137 Million Verdict, Ex-Worker Says* .......................1

Khorri Atkinson, *Tesla Race Bias Damages Award Sets Up Another Post-Trial
    Fight* ....................................................................................................................1

## I.      <u>INTRODUCTION</u>

The April 11, 2023 judgment followed six years of litigation by Plaintiff's counsel to vindicate Owen Diaz's civil rights. The first jury, which found that Tesla had violated Mr. Diaz's civil rights under state and federal law, awarded $6.9 million in compensatory damages and $130 million in punitive damages (Dkt. 301), a verdict "believed to be one of the largest in U.S. history for an individual plaintiff in a racial discrimination case."[1] After Mr. Diaz rejected the Court's $15 million remittitur (which, if accepted, would have permitted Tesla to appeal liability *and* the remitted amounts for compensatory and punitive damages while precluding Mr. Diaz from cross-appealing either amount), the Court ordered a limited, damages-only retrial. Dkt. 348. That retrial resulted in an award of $175,000 in compensatory damages and $3 million in punitive damages (Dkt. 463)—a "substantial award," according to the Court, though less than before. Dkt. 491 27:24-28:2.[2] Those damages might have been even higher, if not for Tesla's trial counsel's repeated instances of misconduct, which this Court found to be deliberate and entirely unjustified (though not prejudicial enough, in the Court's opinion, to warrant a second retrial). *See* Pl. Motion for Mistrial, or in the Alternative, New Trial (Dkt. 478) at 23:15-35:17.

Prosecution of Mr. Diaz's civil rights claims required an extraordinary effort by Plaintiffs' counsel, particularly after Tesla replaced its initial trial counsel with a team of high-powered, highly paid litigators from four separate offices of Quinn Emanuel Urquhart & Sullivan. In the months between the first verdict and the second trial, Mr. Diaz's attorneys won motion after motion against Tesla's well-funded and aggressive litigation team, from the meaning and application of *Gasoline Products* to the permissible scope of retrial evidence to the legally required jury instructions, setting the stage for a damages retrial that sent yet another

---

[1] Joe Schneider, *Tesla Hasn't Learned from $137 Million Verdict, Ex-Worker Says*, BLOOMBERG (December 7, 2021, 7:21 PM), https://www.bloomberg.com/news/ articles/2021-12-08/tesla-hasn-t-learned-from-137-million-verdict-ex-worker-says.

[2] *See also* Khorri Atkinson, *Tesla Race Bias Damages Award Sets Up Another Post-Trial Fight*, BLOOMBERG LAW (April 7, 2023 2:15 AM), https://news.bloomberglaw.com/daily-labor-report/tesla-race-bias-damages-award-sets-up-another-post-trial-fight (characterizing second verdict as "a big victory for someone who worked at Tesla for nine months.").

powerful message to Tesla—and the world—that workplace racial harassment can never be countenanced. Throughout it all, Mr. Diaz's counsel worked tirelessly and without pay, prosecuting both trials on a purely contingent basis while devoting thousands of hours of attorney time and spending more than $200,000 in out-of-pocket expenses in their successful efforts to vindicate Mr. Diaz's civil rights. Organ Decl. ¶¶ 53-66, Alexander Decl. ¶¶ 34-36, Rubin Decl. ¶¶ 20-21, Collier Decl. ¶ 42.

The litigation demands imposed by this case have been extraordinary, initially because of the complexity of the legal and factual issues and then because of the intensity of the Tesla's unyielding efforts to negate the first jury's liability verdict. Plaintiff's counsel were forced to expend substantial efforts to this unique litigation, for many reasons. *First*, Tesla's unique workplace structure, including its use of third-party contractors to potentially shield itself from responsibility for civil rights violations on the factory floor, required Mr. Diaz's counsel to devote considerable time and resources to investigating Mr. Diaz's claims and preparing for trial. Although Tesla hired Mr. Diaz and many other workers through a series of outside contractors, 3-29-23 Trial Tr. 328:8-383:14, once inside the factory those employees worked for Tesla. *Id.* As the Court observed, Tesla's use of staffing agencies "allowed [it] to take advantage of Diaz's (and others') labor for its benefit while attempting to avoid any of the obligations and responsibilities that employers owe employees." Dkt. 328 40:4-7. That structure also made pre-trial discovery unusually time-consuming. Standard workplace procedures like investigating worker complaints and disciplining wrongdoers often involved three or more categories of supervisor, one from each agency and the final decisionmaker from Tesla. That is why, for example, the parties took *nine* depositions concerning the single "jigaboo" incident, including the victim (Mr. Diaz), two percipient witnesses (Michael Wheeler and Lamar Patterson), two Tesla employees, one nextSource employee, one CitiStaff employees, and two Chartwell employees. Organ Decl. ¶ 38. Throughout the first trial, Tesla relied on its use of outside contractors to vigorously disclaim all responsibility for anything that happened to Mr. Diaz in its factory, and repeatedly denied having possession of relevant documents and information, forcing Mr. Diaz to seek evidence from four separate contract agencies in order to prove his case.

*Second*, Tesla repeatedly refused to produce plainly discoverable information and to cooperate in routine discovery matters, requiring Mr. Diaz to file a series of discovery dispute letters regarding Tesla's most basic discovery obligations, such as witness contact information and evidence of other harassment complaints. Even after Mr. Diaz prevailed on many of these disputes, Tesla often refused to comply with the Court's orders or complied inadequately. In one particularly significant instance, Tesla forced Mr. Diaz to seek a court order requiring it to produce contact information for co-workers who may be witnesses. Dkt. 88. Although the Court ordered Tesla to produce that information for everyone who worked "with or around" Mr. Diaz, Dkt. 93 2:12-15, Tesla produced nothing. Organ Decl. ¶ 39. Yet on the eve of the second damages trial, for the first time in six years of litigation, Tesla suddenly identified serial harasser Robert Hurtado as a retrial witness, purporting to justify its failure to identify him earlier (when he could still be deposed) because, in the Court's words, "Tesla said... that Hurtado did not work with Diaz and may not be the same "Robert" as [sic] Diaz identified as the harasser." Dkt. 417 2:4-10l; *see also* Dkt. 381 1:11-5:10 (asserting that it was justified in not disclosing Mr. Hurtado earlier because he was a mere "impeachment witness"). In another instance, Tesla did not produce the Michael Wheeler email chain and accompanying photograph that documented another disputed racial "hate crime" *until the middle of the damages-only retrial*, even though Tesla had been "aware of that document for four years, at least," "knew the incident would be part of the first trial," and "should have [] produced [the document] in discovery." 3-29-23 Trial Tr. 367:11-371:9; 3-30-23 Trial Tr. 701:10-24. In yet another instance, Mr. Diaz did not learn until *after* the damages retrial that Tesla had withheld additional photographic evidence confirming Plaintiff's disputed testimony that Tesla's bathrooms were full of racist graffiti. *See* Dkt. 491 at 11:22-13:25, 19:24-20:12. Tesla's repeated refusal to comply with the Federal Rules of Civil Procedure—placed Mr. Diaz's counsel at a significant disadvantage throughout this litigation, and required considerable additional time and effort to overcome—which they did..

*Third*, this case required significant research and briefing at every stage. For example, there is little case law addressing third-party beneficiary and contract-employee standing to sue under 42 U.S.C. § 1981. While courts have long recognized that a third-party beneficiary may

have §1981 standing, no case law directly addresses the circumstances under which a worker designated (or misclassified) as an independent contractor may sue anyone other than his direct employer for racial harassment. In addition to researching and briefing this issue for trial, Mr. Diaz had to oppose Tesla's motion for mid-trial JMOL (Dkt. 282) and Tesla's post-trial motion for judgment on the pleadings (Dkt. 317), each of which argued that Mr. Diaz's claims failed because he had no direct contractual relationship with Tesla. Dkt. 282 2:25-6:14; Dkt. 317 8:12-10:15. Due to counsel's efforts, Mr. Diaz repeatedly prevailed on this issue. Dkt. 303 3:27-7:19; Dkt. 328 15:1-24:17.

*Fourth*, this case also required substantial additional work because Tesla and its counsel repeatedly sought to relitigate or circumvent the Court's previous rulings. For instance, Tesla initially filed a motion for partial summary judgment on the ground that it could not be liable for punitive damages as a matter of law. Dkt. 119-1 10:23-14:10. Tesla lost that motion but reargued it in Tesla's motion for JMOL after the first trial (Dkt. 317 18:15-21:7), then again in litigating the jury instructions on retrial (in which it also argued that the retrial jury could award nominal punitive damages) (Dkt. 398), and in its JMOL motion after the second trial as well. Dkt. 454. Tesla's relentless bop-clown approach to this litigation imposed substantial burdens on Mr. Diaz's counsel (and the Court). To cite another example, despite having sought and obtained a retrial limited to the issue of damages (Dkt. 317; Dkt. 328), Tesla and its new counsel filed a second new-trial motion, arguing that a 90-year old Supreme Court case gave Tesla a constitutional right to retry liability as well as damages. Dkt. 359. The Court appropriately denied Tesla's motion (Dkt. 365) but Tesla would not accept no for an answer. It continued to push back against the Court's ruling, requiring Mr. Diaz's trial team to re-litigate in several contexts, all while trying to prepare for a trial whose scope remained unresolved until shortly before it began. *See, e.g.,* Dkt. 389 29:9-34:9. Every time Tesla reasserted a previously resolved issue (such as Mr. Diaz's entitlement to punitive damages after the second trial, *see* Dkt. 454), it cited new cases and offered new theories to justify its position, all of which Mr. Diaz's counsel had to research, brief, and argue—as they did with great success. Organ Decl. ¶ 40.

*Fifth*, Tesla's counsel consistently rejected Mr. Diaz's counsel's reasonable efforts to cooperate or compromise on basic issues, such as trial exhibits, jury instructions, the verdict form, the proposed form of judgment, and other trial documents. Those efforts, too, forced Mr. Diaz's counsel to expend considerable time and effort litigating issues that should have been resolved through good faith meet-and-confer efforts. Organ Decl. ¶ 35.

Tesla's unusually aggressive litigation style continued throughout the retrial (as evidenced by the briefing over Plaintiff's motion for mistrial/new trial) and continues to this day. Even after the Court ruled that the first jury's liability verdict was binding, (Dkt. 348), Tesla continued to argue that Mr. Diaz did not experience severe or pervasive racial harassment; that any racial hostility he experienced at work was promptly remedied; and, even if he had established workplace harassment, Tesla was not responsible. *See, e.g.,* 3-27-23 Trial Tr.241:14-242:13, 243:5-14 ("... what you are here to decide is whether Tesla did something to fail to deal with this.... So every time [Plaintiff's counsel] tell[s] you about this unverified, unreported, unnamed, unspecified something, ask yourself: Did Tesla, about that incident, do something wrong?... How should it, the company, be punished?"). Despite two multimillion-dollar verdicts, Telsa continues to dispute the Court's rulings and the two juries' findings, insisting that its policies against racial discrimination were adequate, that it fully enforced those policies, and "that Tesla's conduct amounted, in substance, merely to negligence at most" and thus could not form the basis for a punitive damages award. Dkt. 479 4:19-5:17. Tesla's never-yield-an-inch-or-issue strategy required Mr. Diaz's counsel to be prepared for anything, and to devote far more resources to this case than *should* have been necessary (though under the circumstances they proved to be absolutely necessary).

Plaintiff's counsels' efforts were vindicated by both jury verdicts and by the many significant court orders on which Mr. Diaz prevailed.

During the first trial, the jury rejected Tesla's defenses overwhelmingly. On October 4, 2021, the jury awarded Mr. Diaz $4.5 million in past non-economic damages, $2.4 million in future non-economic damages, and $130 million in punitive damages. Dkt. 301. That verdict may have been the largest verdict ever in a single-plaintiff racial harassment case, "mark[ing] a

major punitive action taken against the company for its treatment of workers."[3] That substantial verdict was a testament to the quality of counsel's pre-trial preparation and skills they exhibited throughout the trial of this novel §1981 case. Counsel also achieved great success on retrial, winning a $3.175 million verdict that, although lower than expected, objectively stands as a substantial recovery for a single plaintiff with no economic damages.

As the prevailing party, Mr. Diaz is unquestionably entitled to reasonable attorneys' fees and expenses calculated under the lodestar/multiplier method. Plaintiff's counsels' lodestar, based on the total number of hours reasonably devoted to this novel and aggressively defended case, calculated using counsels' current hourly rates, exceeds $5 million for six years of unpaid work and unreimbursed expenses, *after* the exercise of billing judgment (including elimination of the entirety of several billers' time, *see, e.g.,* Alexander Decl. ¶ 33). On top of that, Mr. Diaz requests a staged multiplier: 2.0 through the date of the first verdict; 1.5 from the first verdict through the Court's ruling on Tesla's first remittitur motion; and 1.2 thereafter – plus "fees on fees" (with no multiplier). Mr. Diaz has tried in good faith to settle this fee motion through the meet-and-confer process. Like so many other issues, however, the process was not successful. Organ Decl. ¶ 52. If this matter does not resolve before Mr. Diaz's reply brief is due, he will also request an additional amount for the "fees on fees" incurred after the time recorded in the accompanying declaration of counsel.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   Procedural History

The facts of this case are well known to the Court and are described in detail in the Court's most recent Order. Dkt. 491 3:8-7:14. Plaintiff will briefly summarize the procedural history as it bears on the scope of work performed by counsel.

---

[3] Faiz Siddiqui, *Jury orders Tesla to pay more than $130 million in discrimination suit, which alleged racist epithets and hostile work environment*, THE WASHINGTON POST (October 5, 2021 1:47 AM), https://www.washingtonpost.com/technology/2021/10/04/tesla-discrimination-case/.

Plaintiff filed this lawsuit in California state court on October 16, 2017. Dkt. 1-1, Exh. 1. The original complaint included three plaintiffs—Mr. Diaz, his son Demetric Di-az, and his coworker Lamar Patterson, *id*. p. 1—and four defendants—Tesla, CitiStaff Solutions, Inc., West Valley Staffing Group, and Chartwell Staffing Services, Inc. *Id*. Plaintiffs alleged, among other claims, that Tesla subjected them to racial discrimination and harassment and failed to prevent racial harassment in violation of 42 U.S.C. § 1981; and that Tesla negligently hired, retained, and supervised its employees and supervisors in violation of California law. *Id.*.

Mr. Patterson's claims were later submitted to arbitration and he and defendant Chartwell were dismissed from the case. Dkt. 34, 139.

Discovery leading up to the first trial was prolonged and contentious. Tesla marked virtually every document it produced as "confidential," requiring Mr. Diaz to prepare and file voluminous administrative motions to seal to accompany each filing. *See, e.g*., Dkt. 125. The Court observed on two separate occasions that "Tesla has over-designated and should reconsider its designations" (Dkt. 136) and "very little of the information [the Court] has reviewed- if any- is sealable." Dkt. 144 27:21-23. When Mr. Diaz responded as required by redacting documents and filing exhibits under seal, as the protective order mandated, Tesla made no effort to justify (or reconsider) its improper confidentiality designations. Dkt. 144 27:14-20.

This one-sided gamesmanship continued throughout discovery. Tesla took advantage of its superior access to relevant documents and information, refusing to provide Mr. Diaz with basic discovery such as co-worker names and contact information. Tesla's stonewalling required Mr. Diaz to submit *six* discovery dispute letters, each preceded by lengthy good-faith meet and confer efforts. The first dispute concerned documents produced in an arbitration involving a Black plaintiff who experienced racial harassment during Mr. Diaz's tenure at Tesla, which Tesla had designated as confidential. Dkt. 79 pp. 3-4. The Court held that Tesla's objections "elevate[d] form over substance" and urged the parties to meet and confer after considering "whether any of the documents would ultimately be sealable in this court." Dkt. 80 1:18-2:3. (Tesla never produced those documents. Organ Decl. ¶ 39.). The second dispute concerned Mr. Diaz's request to increase the 10-deposition limit under Rule 30. Dkt. 86. The Court later granted

this request by allowing Mr. Diaz 14 hours of deposition while precluding Tesla from calling any non-deposed witnesses at trial. Dkt. 93 1:20-2:3. The third letter concerned Tesla's failure to produce coworker contact information, documents recording other complaints, and written contracts between Tesla and the staffing agencies. Dkt. 88. The Court ordered Tesla to produce the contact information and contracts. Dkt. 93 2:4-3:8. Although the Court limited the scope of "me-too" complaint evidence, it ordered Tesla to produce those documents, Dkt. 2:16-23. Organ Decl. ¶ 39. Tesla also identified only one or two co-workers, leading to Mr. Diaz's motion for sanctions (Dkt. 146) which resulted in an order prohibiting Tesla from calling undisclosed witnesses at trial. Dkt. 160. The fourth letter concerned Tesla's PMK deposition, at which Tesla's counsel "objected" to several designated topics and stated that "the PMK it produced was not designated most knowledgeable" with respect to key topics in the case (like the relationship between Tesla and the contracting agencies). With respect to other topics, Tesla claimed it designated previously-deposed witnesses as its PMKs and that Mr. Diaz was not entitled to more questioning—even though Mr. Diaz had no way of knowing that those witnesses would be designated as PMKs until a year or more after their depositions. Dkt. 110 1:17-2:16. The fifth letter concerned Plaintiff's request for a site inspection, given the size and layout of the factory and the importance of identifying what happened where. Dkt. 101, Dkt. 110 2:17-3:12. The sixth dispute concerned Mr. Diaz's request for an additional deposition of Andres Donet, whom Tesla disclosed, *after* the close of discovery, as the individual responsible for cleaning up graffiti in the restrooms. Dkt. 106, Dkt. 110 3:14-4:3. Because Tesla failed to comply with the Court's order granting that motion, Mr. Diaz sought, as a sanctions, an order precluding undisclosed witnesses from testifying. Dkt. 146, Dkt. 160. Although the Court did not grant the requested relief, that request laid the foundation for the Court's later in limine rulings pertaining to Tesla's undisclosed witnesses, including Robert Hurtado. Dkt. 381 1:11-5:10; *see* Dkt. 417 2:4-10.

Later events reinforced the reasonableness of Mr. Diaz's diligent efforts to obtain this core discovery because, despite those efforts, Tesla still failed to disclose emails and photos relating to a "racial hate crime" against witness Michael Wheeler, until it tried to blind-side Mr. Wheeler at the damages retrial, *see* Dkt. 491 at 11:22-13:25, 19:24-20:12.  And it never produced

the photographic evidence of racist graffiti in the bathroom, which Mr. Diaz's counsel did not

uncover until *after* the damages re-trial (which allowed Tesla to falsely insist that any racist

graffiti in the bathrooms was gone by the second day of Mr. Diaz's employment). *See* Dkt. 485,

486, 487, 488, 489, 490.

In January 2020, the parties attended a mandatory settlement conference before

Magistrate Judge Robert Illman where Tesla failed to engage in meaningful settlement

negotiations. Dkt. 136, 154; Alexander Decl. ¶ 49. Tesla's counsel left the conference at

lunchtime; Plaintiff and his son, Demetric, settled with the staffing agency defendants and

dismissed them from the action. Dkt. 138, 166, 169. Demetric Di-az then settled his claims

against Tesla. Dkt. 176. To further narrow the issues, Mr. Diaz stipulated to dismiss all causes of

action other than the first (violations of 42 U.S.C. § 1981) and fourteenth (negligent hiring,

supervision, and retention). Dkt. 176. In April 2020, shortly after the start of the COVID-19

pandemic, the parties stipulated to continue the trial until September 27, 2021. Dkt. 177, 206,

212, 220, 224.

The matter first came for jury trial on September 27, 2021. After presentation of evidence

concluded on October 1, 2021, Tesla filed a motion for JMOL, which the Court denied. Dkt. 282,

303. On October 4, 2021, the jury returned a verdict for Plaintiff, awarding $4.5 million in past

non-economic damages, $2.4 million in future non-economic damages, and $130 million in

punitive damages. Dkt. 301.

Tesla subsequently filed *two* motions seeking a new trial. First it sought a new trial on the

issue of damages (Dkt. 317), which the Court granted, conditioned on Mr. Diaz's acceptance of

remitted damages of $15 million. Dkt. 328. Mr. Diaz knew that if he accepted the remittitur,

Tesla could appeal liability as well as compensatory and punitive damages and that he could not

cross-appeal; and he rejected the remittitur. Months later, Tesla and its new attorneys raised for

the first time their *Gasoline Products* arguments, seeking a new trial on liability as well as

damages. Dkt. 359. After extensive briefing and argument, the Court denied the motion (Dkt.

365), yet Tesla continued to argue that its liability for compensatory *and* punitive damages was

an open issue that it had a constitutional right to retry. Dkt. 389 29:9-34:9.

The damages retrial began March 24, 2023. After the conclusion of evidence on March 31, 2023, Tesla again filed a motion for JMOL, arguing that liability for punitive damages had not been adequately proven in the damages-only retrial. Dkt. 454. On April 3, 2023, the jury awarded Plaintiff $175,000 in compensatory and $3 million in punitive damages. Dkt. 463.

Mr. Diaz's counsel's work was not done. After the verdict, Tesla sought to reduce the punitive damages award to $1.75 million, requiring further briefing. Dkt. 478, Dkt. 480. Mr. Diaz, in turn, renewed his motion for mistrial and, in two fact-intensive filings he sought a new trial based on the many documented instances of Tesla's egregious and repeated misconduct— including discovery abuse, misrepresentation to the jury of the contents of inadmissible exhibits, deliberately accusing Mr. Diaz of being a serial racial and sexual harasser while knowing that its examination was improper and unsupported by any admissible evidence, making other ad hominem attacks on Mr. Diaz, on his counsel, and on his key witnesses, and for tactical advantage asking a series of questions on cross-examination that included embedded facts that Tesla knew it could not prove. Dkt. 478. Although the Court denied Plaintiff's motion for mistrial, it concluded that none of Tesla's misconduct was "excusable, and all of it was intentional." Dkt. 491 20:14-16 (emphasis added).

## III.   LEGAL ARGUMENT

### A.   Plaintiff is a Prevailing Party Entitled to Attorneys' Fees Under 42 U.S.C. § 1988.

Mr. Diaz prevailed on his claims under the Civil Rights Act, 42 U.S.C. § 1981, as the two juries issued verdicts in his favor and awarded him millions of dollars in damages. Dkt. 301; Dkt. 463. He is therefore entitled to prevailing party fees and expenses. 42 U.S.C. § 1988(b); *Davis v. Prison Health Svcs.*, No. C 09–2629, 2012 WL 4462520 at *8 (N.D. Cal. Sept. 25, 2012), citing *Herrington v. Cty. Of Sonoma*, 883 F.2d 739, 743 (9th Cir. 1989).

### B.   The Court Should Use the "Lodestar/Multiplier" Method to Calculate Fees.

In the Ninth Circuit, courts typically use the "lodestar" method to determine statutory attorney's fees by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. *Gonzalez v. City of Maywood,* 729 F.3d 1196, 1208-9 (9th Cir. 2013). "The product of this computation—the 'lodestar figure'—is the 'presumptively reasonable fee.'"

*Donastorg v. City of Ontario*, No. EDCV 18-992 JGB, 2021 WL 6103545 at *1 (C.D. Cal. Sept. 23, 2021) (citations omitted). Once the lodestar is established, the court may adjust the number up or down using a multiplier, considering such factors as the benefits obtained, whether the results achieved were exceptional, the complexity and novelty of the issues, risks of litigation and non-payment, reasonableness of hours, and customary fees and rates for similar cases. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011); *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000). Mr. Diaz seeks a multiplier of 2.0 for legal work performed through the first verdict; 1.5 from that point through the date of the Court's remittitur order; and 1.2 thereafter, with no multiplier for "fees on fees" time.

    **C.**   <u>**The Number of Hours Expended Were Reasonable.**</u>

    Mr. Diaz is entitled to compensation for all time reasonably spent by his attorneys, law clerks, and paralegals as documented in their contemporaneous time records, just as commercial attorneys billing by the hour are compensated. *Missouri v. Jenkins*, 491 U.S. 274, 284-8 (1989). "[T]he verified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous." *Id.* at 396.

    Here, counsel's well-document lodestar hours, which have been reduced in the exercise of billing judgment, *see supra* at C.4, are reasonable.[4] The detailed, contemporaneous records document the time counsel spent on this case, including substantial efforts required to overcome Tesla's vigorous defenses. While Tesla had every right to aggressively defend itself in court (although *not* to engage in discovery and trial misconduct), a party "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C. Cir. 1980) (*en banc*). As the Seventh Circuit observed in one employment discrimination case:

> Plaintiff's attorneys did a thoroughly professional and able job in a difficult sort of case.
> We do not fault the quality of [the defendant's] representation. A case like this can go

---

[4] During the meet and confer process, counsel for Mr. Diaz asked Tesla's attorneys to disclose, *if* Tesla intended to challenge Plaintiffs' counsels' hours and rates, the number of hours billed to Tesla for this litigation by its teams of lawyers and those lawyers' hourly rates. Tesla declined. Organ Decl. ¶ 52.

-11-

either way. Nonetheless, a plaintiff risks the likelihood, given the low success rate of employment discrimination cases, of bearing his own attorney's and at least the possibility of being stuck with the employer's attorney's fees. It is, therefore, rational and so reasonable for a plaintiff to encourage his attorneys to be thorough.

*Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1048 (7th Cir. 1999).

The extensive pre-trial work undertaken by Mr. Diaz's legal team—including taking and defending depositions, propounding discovery, meeting and conferring regarding inadequate discovery responses, and other successful and necessary efforts (including extensive pre-trial motions practice)—is detailed in the contemporaneous time records attached to the declarations of attorneys Lawrence A. Organ, Bernard Alexander, Michael Rubin, and Dustin Collier. To date, counsel have expended over 8,000 hours of unpaid attorney and professional staff time litigating this case. Organ Decl. ¶ 53-61, Exh. 2, Alexander Decl. ¶¶ 34-36, Rubin Decl. ¶ 19, Collier Decl. ¶¶ 42-6. As reflected above and in counsels' declarations, this time was spent on tasks critical to vindicating Mr. Diaz's rights, including: (1) conducting pre-filing legal and factual investigation; (2) propounding and responding to written discovery, including engaging in numerous successful discovery disputes due to Tesla's vigorous defense of this case; (3) taking and defending 25 depositions of percipient and PMK witnesses; (4) successfully opposing Tesla's motion for summary judgment on the punitive damages claim; (5) successfully opposing Tesla's motions for judgment as a matter of law and motions seeking to reduce or eliminate punitive liability; (6) preparing for the original trial and damages retrial; (7) locating and interviewing essential witnesses; (8) and conducting case management, such as preparing for hearings and drafting case management statements. Organ Decl. ¶ 59, Exh. 2; Alexander Decl. ¶¶ 15-20. Counsel filed six discovery dispute letters (Dkt. 79, 86, 88, 101, 103, 105, 106), in addition to opposing a motion for summary judgment (Dkt. 126), motions for judgment as a matter of law and new trial (Dkt. 287, 321, 361), and a motion to amend the verdict, Dkt. 480, and many others, as well as researching, drafting, and arguing motions of their own. Organ Decl. ¶¶ 32-40. Tesla's over-designation of documents as "confidential" forced Mr. Diaz to prepare and file administrative motions to seal routine employment documents in connection with most filings. *See, e.g.*, Dkt. 125, Organ Decl. ¶ 40. Even in the face of Tesla's vigorous defense, Mr. Diaz's exercised substantial billing judgment, including by eliminating duplicative or

unnecessary time entries, and regularly assigned work to lower-billing clerks and associates. *See, e.g.,* Organ Decl. ¶¶ 49, 53-61; Rubin Decl. ¶¶ 10, 13, 15-16.

    1.   The Request for Fees for the Work of Mr. Diaz's Four Law Firms was Reasonable.

It is reasonable to staff "'significant, high-impact litigation with multiple attorneys'" because both plaintiff and defense attorneys commonly divide their work among a team of attorneys, though the award must reflect "'the distinct contribution of each lawyer to the case'". *DeLew v. Nevada*, No. 2:00-cv-00460-LRL, 2010 WL 11636127 (D. Nev. Jan. 7, 2010) (citations omitted) (analyzing fee request under § 1988). This is precisely what occurred here; and Tesla itself was defended by a massive team of lawyers and professional staff, first from Shappard Mullin and then from a deep bench of attorneys and staff from four separate Quinn Emanuel offices.

Mr. Diaz initially retained the California Civil Rights Law Group ("CCRLG"), a small firm that employed only three attorneys, a law clerk, and a paralegal at the time. Tesla is a well-resourced defendant, and it retained a large team of highly skilled attorneys to maintain a consistently high volume of filings throughout this action—requiring constant participation from Mr. Diaz's team. As the first trial approached and the fees and costs mounted (including the fees of three experts and the costs of 25 expert and percipient witness depositions), CCRLG realized it was not feasible to pursue the action with just one senior partner, one junior partner, and a recently barred associate. Organ Decl. ¶¶ 41-42. Before trial, they enlisted the assistance of Bernard Alexander, one of California's preeminent employment litigators. *Id.*; deRubertis Decl. ¶¶ 15-17; Collier Decl. ¶ 34; Whelan Decl. ¶ 14. After the first verdict, when Tesla replaced its trial counsel with Kathleen Sullivan and her team from Quinn Emanuel, Mr. Diaz enlisted the aid of Michael Rubin of Altshuler Berzon LLP, an expert in complex civil cases and appeals, to aid in post-trial briefing and potential appellate work. Organ Decl. ¶ 44; deRubertis Decl. ¶¶ 13-14. Before the damages retrial, to enable counsel to keep up with the rapid pace of Tesla's filings, Mr. Diaz also added the Collier Law Firm to the team. Organ Decl. ¶ 45.

Plaintiffs' counsel worked tirelessly while ensuring that the time for which Mr. Diaz seeks compensation was reasonably spent. They typically assigned the task of drafting and

preparing motions and other briefing to junior associates and law clerks who billed at lower rates. Organ Decl. ¶ 49, Rubin Decl. ¶ 13. Partner involvement in briefing was generally limited to initial strategizing followed by high-level review and close editing. *Id.* Where possible, counsel limited conferences and discussed briefing by e-mail, reserving meeting time for discussions of higher-level strategy where real-time discussions were more efficient than lengthy written exchanges. *Id.* Counsel typically only met once or twice concerning each briefing to discuss initial strategic concerns and ensure consistency across voluminous trial filings. *Id.* Though multiple partners sometimes reviewed briefings, this made sense in the context of each partner's unique skill set: Mr. Organ possessed the greatest familiarity with the discovery and trial record and coordinated the overall assignment and strategy in conjunction with his co-counsel; Mr. Alexander developed trial strategy; and after the first verdict, Mr. Rubin reviewed and edited briefs and other filings, including to ensure that they preserved or addressed potential appellate issues. *Id.* Mr. Collier was added to provide additional insights and assistance with respect to the retrial and to assist with trial preparation while Mr. Alexander was trying another case. *Id.*

       2.   Counsel Should Recover Fees for Work Related to Dismissed Claims and Parties As That Work was Related and Essential to Successful Resolution of this Case.

Courts have repeatedly held that counsel in civil rights suits are entitled to recover their full fees and costs, even where they do not prevail on every legal theory or against every party. *Dang v. Cross*, 422 F.3d 800, 812-3 (9th Cir. 2005). As the Supreme Court explained in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Id.* at 435. The Supreme Court had adopted a two-part test to determine whether a plaintiff's success on only some claims requires a reduction in fees: first, the court must determine whether the plaintiff failed on any claims wholly unrelated to her successful claims; then, the court determines whether the plaintiff failed on any claims related to her successful claims. *Id.* at 434-36. Though a prevailing plaintiff should not recover fees for work on unsuccessful, unrelated claims; he is entitled to a fully

compensable award for related but unsuccessful claims or litigation efforts. *Edmo v. Idaho Dep't of Correction*, No. 1:17-CV-00151-BLW, 2022 WL 16860011, at *4 (D. Idaho Sept. 30, 2022); *McCown v. City of Fontana*, 565 F.3d 1097, 1103 (9th Cir. 2009). In the exercise of billing judgment, Plaintiff's counsel eliminated time entries for work that pertained solely to dismissed defendants (e.g. time spent opposing the staffing agencies' motions for summary judgment) and reduced time entries that pertained to work for both Tesla and other plaintiffs and/or defendants. Organ Decl.¶¶ 53-6. But the work performed for the claim Plaintiff did not oppose on summary judgment or dismissed in advance of the first trial was fully related to his successful claims at trial: *all* of Plaintiff's claims had an identical factual predicate. Organ Decl. ¶ 55. Because these claims were based on the same set of facts, Plaintiff did not spend time investigating facts that solely related to dismissed claims. *Id.* The lodestar thus should not be reduced to account for the fact that Plaintiff did not bring all claims to trial.

Likewise, some of the work pertaining to dismissed parties was related to Plaintiff's successful claims. Plaintiff's counsel exercised billing judgment and does not seek fees for work pertaining exclusively to dismissed parties Mr. Patterson and Mr. Di-az. Organ Decl. ¶ 53-6. However, some of the work for those parties was directly related to Plaintiff's own claims: Mr. Patterson and Mr. Di-az were both percipient witnesses to Plaintiff's successful claims, and discovery directed towards both of their staffing agencies furthered Plaintiff's own case. *Id*. Therefore, Plaintiff's counsel seeks compensation for work performed on behalf of these dismissed parties that furthered Plaintiff's own case.

### 3. Counsel's fees are appropriate in light of the success achieved.

Under *Hensley*, when evaluating a requested fee, the reviewing court must consider whether the plaintiff achieved "a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award". *Hensley*, 461 U.S. at 434. The Supreme Court, "in the context of civil rights statutes, expressly rejected the proposition that fee awards must be in proportion to the amount of damages recovered." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1033 (9th Cir. 2012). Rather, in enacting Section 1988, Congress intended counsel seeking fees under Section 1988 to be paid for all time reasonably expended litigating a matter--

just as attorneys in private practice are paid by their hourly clients. *City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986). That is because a rule limiting fees under Section 1988 "to a proportion of the damages awarded would seriously undermine Congress' purpose in enacting § 1988." *Id.* at 576. "Because the victims of civil-rights violations often cannot afford to pay attorneys, Congress enacted this fee shifting statute so that lawyers would accept civil-rights cases, even if those cases would not produce large damages awards." *Quesada v. Thomason*, 850 F.2d 537, 541 (9th Cir. 1988). Reducing fee awards under Section 1988 to a proportion of damages would render it "highly unlikely that the prospect of a fee equal to a fraction of the damages respondents might recover would have been sufficient to attract competent counsel," especially because "counsel might not have found it economically feasible to expend the amount of time" required to "litigate the case properly." *City of Riverside*, 477 U.S. at 579 (1986). "Moreover, courts have recognized that limiting fee awards by the amount of damages recovered would be especially inappropriate where the amount of fees was driven up by defendants' resistance to the lawsuit." *Blackwell v. Foley*, 724 F. Supp. 2d 1068, 1077 (N.D. Cal. Jul. 15, 2010) (analyzing fee-shifting provisions in Americans with Disabilities Act).

Here, Mr. Diaz succeeded on both claims brought at trial, successfully defended against a series of JMOL motions and challenges to the liability verdict, and twice obtained multimillion-dollar damages awards. Organ Decl. ¶ 40. Although counsel's proposed fees exceed Mr. Diaz's damages in the second trial, the hours expended by counsel were reasonable, necessary to litigate the action, and comparable to the hours an attorney would bill an hourly client (and likely comparable to Tesla's time, *see supra* at n.4). Organ Decl. ¶¶ 32-40. As Mr. Diaz has explained, Tesla's counsel aggressively litigated this case, often requiring Plaintiff to brief and argue multiple issues at a time, including issues the Court had previously decided. *Id*.

Tesla made the deliberate, strategic choice to aggressively litigate this action. Without the incentive of a fee award compensating Mr. Diaz's counsel for *all* hours reasonably expended on litigation of this action, it would not have been economically feasible for them to litigate the case properly, as counsel for an hourly-paying client would have done. Organ Decl. ¶¶ 32-40. This

approach to litigation is an aggressive tactic is part of a pattern of conduct in terms of the way Tesla litigates cases. Schwartz Decl. ¶ 7.

Nor does Mr. Diaz's rejection of the remittitur change that calculus. Mr. Diaz would have no right to appeal the remittitur had he had accepted it, while Tesla could have both challenged liability on appeal and sought a one-to-one punitive-to-compensatory damages ratio. Organ Decl. ¶ 40. Any reasonable hourly-paying client might have requested, as did Mr. Diaz, that his counsel take all steps to preserve their right to appeal. *Id.* After the remittitur, Plaintiff's counsel continued to succeed on the merits in most aspects of this litigation: Plaintiff successfully fended off Tesla's motion to retry punitive liability, obtained a second multimillion-dollar verdict, and completely prevailed on Tesla's motion to reduce the verdict. Organ Decl. ¶ 40; Dkt. 491.

Here, Tesla's counsel unquestionably spent a huge amount of time on this litigation, at high corporate hourly rates, *see* deRubertis Decl. ¶ 28, even though there was *no hope* of Tesla ever obtaining any type of monetary recovery in this action and even though Tesla did not vindicate any statutory rights or public interests through its defense. It cannot be the case that Tesla's counsel are entitled to full compensation for all hours performed in vigorously litigating this case, while Plaintiff's counsel's compensation receives cut-rate compensation despite exercising substantial billing judgment in a thoroughly and aggressively litigated action that spanned six years. Reducing Plaintiff's counsel's hours here would merely frustrate the purposes of Section 1988. Competent counsel would not have been attracted to litigate this action absent the promise of a statutory fee award. deRubertis Decl. ¶¶ 31-36; Schwartz Decl. ¶ 6. Instead, based on the degree of success achieved, the Court should grant Plaintiff's requested, presumptively reasonable, lodestar hours.

4.   Counsel Exercised Substantial Billing Judgment.

Mr. Diaz's counsel spent considerably more time litigating this matter than is reflected in the time records attached to the principal attorneys' declarations. As explained in those declarations, counsel exercised billing judgment both before and after recording time, including by excluding certain time on: (1) matters related to dismissed or dropped claims; (2) all time negotiating settlements with the dismissed entities; (3) all time spent opposing the staffing

agencies' motions for summary judgment; and (4) all time spent responding to discovery on behalf of Demetric Di-az, and other matters as well. *See, e.g.,* Organ Decl. ¶¶ 53-56; Rubin Decl. ¶ 13. Because Mr. Patterson's case was compelled to arbitration shortly after filing, counsel maintained separate billing records for that action. Organ Decl. ¶ 53. Counsel also exercised billing judgment after review of the time records. Mr. Alexander (and others), for instance, routinely combine tasks that take less than one-tenth of an hour into a single time entry. Alexander Decl. ¶ 36. Counsel from all firms carefully scrutinized their time records, once compiled, to ensure that all time recorded would have been billed to an hourly-paying client, Organ Decl. ¶¶ 56-60, Alexander Decl. ¶ 36, Rubin Decl. ¶¶ 14-15. Collier Decl. ¶¶ 43-46. Altshuler Berzon, AMFLLP, and CCRLG excluded time submitted by several attorneys entirely to avoid billing time for duplicative efforts or start-up time. Alexander Decl. ¶ 33, Rubin Decl. ¶ 10, Organ ¶ 57. Plaintiff's counsel also made typical billing judgments that resulted in a reduction in total hours requested. For example, CCRLG's request was reduced by 9.96% based on billing judgments. Organ ¶ 60. Mr. Collier did not include requests for times for his three colleagues for the time they spent at trial (Collier ¶¶  to avoid any claim of overstaffing even though Tesla typically had more attorneys and staff present during the trial than Plaintiff did.

### D. <u>Counsel's Hourly Rates are Reasonable, Especially in Light of the Excellent Result.</u>

In determining what constitutes a reasonable fee in civil rights litigation, courts should consider the hourly rates that similarly skilled and experienced attorneys in private practice charge their paying clients. *Blum v. Stevenson*, 465 U.S. 886, 895 (1984); *see* Legislative History of Section 1988, S. Rep. No. 94-1011, 94th Cong. 2d Session, reprinted in 1976 U.S. Code Cong. & Ad. News 5908. Market rates may be established by declarations regarding prevailing fees and fee awards in other cases. *United Steelworkers v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). In this instance, counsel's requested hourly rates are supported by the declarations of Mr. Diaz's counsel Larry Organ, Bernard Alexander, Dustin Collier, and Michael Rubin; as well as the supporting declarations of knowledgeable employment-law practitioners David deRubertis, Christopher Whelan, and Bryan Schwartz. The hourly rates requested by Altshuler Berzon, the Collier Law Firm, CCRLG and Mr. Alexander are the rates they actually charge their

hourly paying clients. Rubin Decl. ¶ 18, Collier Decl. ¶ 21, Alexander Decl. ¶ 11, Organ Decl. ¶ 17..

For the fee award to be "reasonable," it must be based on current rather than historic rates, to account for the delay in payment resulting from the years it takes to litigate a case of this nature. *Missouri v. Jenkins by Agyei*, 491 U.S. 284, 294 (1989). Mr. Diaz's counsel are therefore entitled to compensation at their current 2023 rates (which is also when the case was retried and post-trial motions were briefed).

The experience, reputation, and ability of Mr. Diaz's counsel and other professional billers—as detailed in the accompanying declarations—fully justifies the requested hourly rates. Organ Decl. ¶¶ 15-31, Alexander Decl. ¶¶ 22-33, Rubin Decl. ¶ 17-20, Collier Decl. ¶¶ 2-31 , deRubertis Decl. ¶¶ 10-30, Whelan Decl. ¶¶ 14-19, Schwartz Decl. ¶¶ 8-14, Armstrong Decl. ¶¶ 6-7. . These rates are in nearly every instance *lower* than the rates charged by Quinn Emanuel as reflected in public filings in other cases and are consistent with, or lower than, the market rates charged by similarly skilled and experienced counsel in complex civil litigation—the governing standard. Rubin Decl. ¶¶ 16-18, deRubertis Decl. ¶¶ 23-30.

Based on experience of counsel and prevailing market rates, Mr. Diaz requests compensation for his attorneys and professional billers at the following current market rates, prior to any application of a multiplier:

| Attorney/Staff | Year | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Altshuler Berzon | | | | |
| Michael Rubin | 1977 | $1275 | 496.6 | $633,165.00 |
| Jonathan Rosenthal | 2019 | $650 | 614.65 | $399,522.50 |
| Corrine Johnson | 2012 | $825 | 196.4 | $162,030.00 |
| Sam Hull | 2022 | $550 | 15.7 | $8,635.00 |
| Altshuler Berzon Law Clerks and Paralegals | N/A | $325/350 | 91.2 | $29,661.00 |
| Alexander, Morrison, & Fehr | | | | |

-19-

| Bernard Alexander | 1986 | $1200 | 967.6 | $1,161,120.00 |
| Britt Karp | 2011 | $675 | 39 | $26,325.00 |
| Natalie Khoury | 2021 | $350 | 49.9 | $17,465.00 |
| Gus Ham (Paralegal) | N/A | $225 | 48.4 | $10,890.00 |
| <u>California Civil Rights Law Grp.</u> | | | | |
| Lawrence Organ | 1994 | $975 | 2356.4 | $2,368,372.50 |
| Marqui Hood | 2001 | $900 | 128 | $115,200.00 |
| Molly Durkin | 2006 | $750 | 46.2 | $32,340.00 |
| Navruz Avloni | 2011 | $725 | 449 | $325,525 |
| Cimone Nunley | 2018 | $500 | 1518.7 | $759,350.00 |
| Emily Kohlheim | 2021 | $425 | 75.4 | $32,045.00 |
| Noah Baron | 2015 | $600 | 21 | $12,600 |
| CCRLG Law Clerks and Paralegals | N/A | $225 | 740 | $166,500 |
| Collier Law Firm | | | | |
| Dustin Collier | 2009 | $750 | 272.93 | $204,697.50 |
| V. Joshua Socks | 2012 | $700 | 83.1 | $58,170.00 |
| Drew Teti | 2009 | $550 | 40.9 | $22,495.00 |
| Elizabeth Malay | 2013 | $400 | 187.4 | $74,960.00 |

## E. __The Court Should Award a 2.0 Multiplier for Work Performed Through the First Verdict.__

The trial court has discretion to apply a multiplier to the basic lodestar figure to reflect certain case-specific factors, including: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and

length of the professional relationship with the client, and (12) awards in similar cases. *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 2008). In light of the excellent and extraordinarily well-publicized result obtained, *see* Organ Decl. ¶ 43, as well as the novel legal issues raised by this case which expands civil rights protections for all contracted employees, and the important public benefit conferred by shedding light on a publicly traded company's unlawful practices, a multiplier of 2.0 for the work performed through the Court's remittitur is justified.

> 1.    This Case Raised Novel and Significant Legal Issues, Creating New Case law and Clarity for Contract Employees Who Experience Discrimination at Work.

One *Kerr* factor is the novelty and difficulty of the legal issues presented. *See, e.g., Edmo v. Idaho Department of Correction*, No. 1:17-cv-00151-BLW, 2022 WL 16860011 at *8 (D. Id. Sept. 30, 2022). The core issues presented here—whether a contract employee who did not receive payment from a company could sue that company for compensatory and punitive damages under Section 1981, including under a third-party beneficiary theory—were novel and vigorously litigated. In *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006), the Supreme Court recognized the *possibility* that a third-party beneficiary to a contract might have rights under Section 1981. As recently as 2015, appellate courts observed that courts had not yet "explored the possibility" of Section 1981 standing in the contract employee context. *Faush v. Tuesday Morning, Inc*., 808 F.3d 208, 220 (3d Cir. 2015). Despite a dearth of controlling case law on the issue, Mr. Diaz successfully litigated that issue, resulting in several published orders analyzing his third-party beneficiary status under the contract between Tesla and nextSource. Dkt. 134, Dkt. 303, Dkt. 328) As employers increasingly turn to contracting agencies to staff their facilities, these rulings will prove critical to other employees seeking to vindicate their rights under federal law. Because of Mr. Diaz's litigation efforts and the Court's thoughtfully reasoned rulings, contracted employees have new legal guidance that protects them from unlawful workplace discrimination.

Counsel performed most of the precedent-setting legal work relating to the issue in the first trial, which established liability. Organ Decl. ¶ 40. Once the Court upheld the first jury's

liability verdict in denying Tesla's first motion for a new trial (Dkt. 328), litigation over that issue largely came to an end (although Tesla repeatedly sought to re-open it). Because the exceptional result and novel issues factors are particularly relevant to the work performed through October 5, 2021, the date of the first jury's verdict, Mr. Diaz requests a staged multiplier of 2.0 for the work performed through that date. Counsel continued to achieve exceptional success in addressing novel issues between October 5, 2021 and February 6, 2022, when the Court upheld the first jury's liability findings, including in obtaining another published ruling on the third-party beneficiary issue. For that period, Mr. Diaz requests a multiplier of 1.5; and for the remaining work, including all of the pre-trial motions concerning *Gasoline Products* and the second trial itself, which resulted in what the Court described as a ____ result, Mr. Diaz requests a more moderate multiplier of 1.2.

      2.   <u>The Public Service Performed by This Litigation and the Deterrent Effect of Both Verdicts on Employers Like Tesla Support the Requested Enhancements.</u>

The public interests served by a case may also justify a multiplier. *Chalmers v. City of Los Angeles*, 676 F. Supp. 1515, 1522 (C.D. Cal. Dec. 1, 1987). Even when a plaintiff personally benefits from a civil rights action, this type of litigation serves the public interest in preventing unlawful racial discrimination by compelling employers to comply with anti-discrimination laws. *Davis v. Prison Health Svcs.*, No. C 09–2629, 2012 WL 4462520 at *8 (N.D. Cal. Sept. 25, 2012), citing *Herrington v. Cty. of Sonoma*, 883 F.2d 739, 743 (9th Cir. 1989).

The incentivizing effects of a large jury verdict are particularly important for companies like Tesla. As one of the world's richest publicly traded companies, Tesla should be setting an example for employers worldwide. But Tesla has structured its employment practices to avoid judicial review or public examination. Tesla routinely requires its employees, including contract employees, to agree to binding private arbitration, shielding their claims from public scrutiny. *See, e.g., Vaughn v. Tesla, pet for review denied* (allowing class action complaint to proceed in court because Tesla's arbitration agreement unlawfully prohibited public injunctive relief). By publicly—and effectively—litigating this case, Mr. Diaz drew international attention to Tesla's employment practices. Organ Decl. ¶ 43, Schwartz Decl. ¶ 13. The ongoing press coverage

continues to send a clear signal to employers and employees alike that allowing racial harassment to fester in the workplaces may result in jury awards in the millions of dollars.

The first jury's verdict–$6.9 million in compensatory and $131 million in punitive damages—sent a strong deterrent message. That historic verdict supports a multiplier of 2.0 for work performed through that verdict. Moreover, the work performed in upholding the second jury's liability findings, while less historic, still sent a compelling message that racial discrimination in the workplace is unacceptable and will be costly to the company that allows it. The requested multipliers in this case are appropriate given the exceptional results achieved throughout and the novel and difficult legal issues Mr. Diaz had to overcome—and the persistent and aggressive manner in which Tesla's two sets of litigation teams defended this case.

3.   The Undesirability of the Case Supports the Requested Enhancement.

When evaluating whether a multiplier is appropriate, a court may also consider the case's undesirability, as well as the preclusion of counsels' other work during its pendency. *Kerr v. Screen Extras Guild, Inc*., 526 F.2d 67, 70 (9th Cir. 1975), abrogated on other grounds, *City of Burlington v. Dague*, 505 U.S. 557 (1992). A case may also be undesirable where a party, while acknowledging some or all of the conduct complained of occurred, "expend[s] a seemingly unlimited amount of time and money in defense of the claims," and "seem[s] to make every conceivable motion prior to trial, make every conceivable objection during trial, and automatically appeal the verdict after the trial." *Chalmers v. City of Los Angeles*, 676 F. Supp. 1515, 1524 (C.D. Cal. 1987).

This case was not desirable on several levels. It was one of the first—if not the first—employment cases against Tesla to proceed in court because of Tesla's practice of requiring its direct employees to sign mandatory arbitration agreements. Organ Decl. ¶ 33. Plaintiff was nominally employed by a third-party contractor, and there was no guarantee he would be able to establish Tesla's liability under Section 1981. Organ Decl. ¶ 32, *see also Thompson v. Barrett*, 599 F. Supp. 806, 815 (D.C. Cir. 1984) (holding enhancement appropriate where "major legal issues" are undecided with respect to a given statute). Even if Tesla could be held jointly liable, at the outset of the case there was little hard evidence to substantiate Mr. Diaz's allegations: It

began as a "he-said, she-said" case where the only documentary evidence Mr. Diaz had was the racist pickaninny drawing. Organ Decl. ¶ 32. Even if he could establish liability, he still faced an uphill battle in proving compensatory (not to mention punitive) damages: he worked for Tesla for nine months, his lost wages were minimal, and his compensatory damages were limited to emotional distress. Alexander Decl. ¶ 48. And of course, this case was brought against an enormously well-funded and (at the time) highly esteemed company that could afford the best defense counsel money could buy. Tesla used its vast wealth to dispute every conceivable issue during discovery, throughout both trials, and following both trials, litigating some issues (such as entitlement to punitive damages) in as many as five or six separate filings. *See* Organ Decl. ¶ 40.

Given the unresolved legal questions, scarcity of documentary evidence, lack of economic damages, and an especially well-funded, aggressive defendant, many plaintiffs-side employment attorneys would have declined this case. Organ Decl. ¶¶ 32-34. It was only due to counsel's diligent litigation efforts that Mr. Diaz was able to achieve such historic success. The only reason Mr. Diaz is requesting a staged multiplier is because the case became somewhat less undesirable after the first jury's verdict and because the Court ruled following the first trial that liability was conclusively established—although it remained a significant factor while Tesla's *Gasoline Products* arguments remained in play.

### F. <u>Plaintiff is Entitled to Recover Reasonable Litigation Expenses.</u>

Mr. Diaz is also entitled to recover the reasonable litigation expenses of $208,218.20 that counsel incurred over six years of litigation. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (attorneys should recover reasonable out-of-pocket expenses of the type ordinarily billed to paying clients). The expenses for which Plaintiff seeks reimbursement are detailed in counsel's supporting declarations. Organ Decl.¶¶ 63-70, Exhs. 4, 7-10; Alexander Decl. ¶¶ 37-40; Rubin Decl. ¶ 21. As explained in the supporting declarations, these unreimbursed expenses were necessary to the litigation and of the sort normally billed to hourly-paying clients and are thus fully reimbursable. *See, e.g.*, *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166, 1177-78 (S.D. Cal. 2007).

### G.  **Plaintiff's Counsel is Entitled to Recover "Fees on Fees"**

Prevailing plaintiffs are also entitled to recover all fees and expenses reasonably incurred in litigating disputes over fee entitlement and the reasonableness of claimed fees. *Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir. 1986). In this case, Mr. Diaz's counsel is experienced in fees litigation and efficiently prepared the fees briefing (although they had to do so twice, once the Court ordered a new trial after the first verdict). Counsel also tried to obtain an agreement with Tesla regarding the reasonableness of the requested rates and hours, without success, thus necessitating this fee motion. Organ Decl. ¶ 52. In preparing this motion, Mr. Diaz's counsel were required to review six years of time entries, comprising more than 6,000 entries, Organ Decl. ¶¶ 53-56, Exh. 2, Alexander Decl. Exh. 7, and have spent more than 100 hours thus far preparing the fees motion, as reflected in counsel's time entries. If this fees dispute is not resolved before Mr. Diaz's reply papers are filed, counsel will update their fees-on-fees time and expenses to bring those records up to date. No multiplier is requested for the fees-on-fees time and those time entries were specifically excluded from the multiplier formula. See Organ Decl. Exh. 4.

### IV.  **CONCLUSION**

For the foregoing reasons, the Court should award Mr. Diaz and his counsel statutory attorney's fees of $10,413,774.25, plus expenses of $$187,145.24.

CALIFORNIA CIVIL RIGHTS LAW GROUP
ALEXANDER MORRISON & FEHR LLP
ALTSHULER BERZON LLP
THE COLLIER LAW FIRM

Dated:  October 25, 2023                    _____/s/ Lawrence A. Organ_____

Lawrence A. Organ
Cimone A. Nunley
J. Bernard Alexander
Michael Rubin
Dustin Collier

Attorneys for Plaintiff OWEN DIAZ