LAWRENCE A. ORGAN (SBN 175503)
larry@civilrightsca.com
MARQUI HOOD (SBN 214718)
marqui@civilrightsca.com
CIMONE A. NUNLEY (SBN 326915)
cimone@civilrightsca.com
**CALIFORNIA CIVIL RIGHTS LAW GROUP**
332 San Anselmo Avenue
San Anselmo, California 94960
Telephone:    (415)-453-7352
Facsimile:    (415)-785-7352

J. BERNARD ALEXANDER (SBN 128307)
balexander@amfllp.com
**ALEXANDER MORRISON & FEHR LLP**
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone:    (310) 394-0888
Facsimile:    (310) 394-0811

MICHAEL RUBIN (SBN 80618)
mrubin@altber.com
JONATHAN ROSENTHAL (SBN 329638)
jrosenthal@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:    (415) 421-7151
Facsimile:    (415) 362-8064

DUSTIN L. COLLIER (SBN 264766)
dcollier@collierlawsf.com
V. JOSHUA SOCKS (SBN 303443)
jsocks@collierlawsf.com
ELIZABETH R. MALAY (SBN 336745)
emalay@collierlawsf.com
DREW F. TETI (SBN 267641)
drew@collierlawsf.com
**COLLIER LAW FIRM, LLP**
240 Tamal Vista Blvd. Suite 100
Corte Madera, CA 94925
Telephone:   (415) 767-0047
Facsimile:    (415) 767-0037

Attorneys for Plaintiff,
OWEN DIAZ

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIC DI-AZ, OWEN DIAZ, and LAMAR PATTERSON, <br><br> Plaintiffs, <br><br> v. <br><br> TESLA, INC. dba TESLA MOTORS, INC.; CITISTAFF SOLUTIONS, INC.; WEST VALLEY STAFFING GROUP; CHARTWELL STAFFING SERVICES, INC.; and DOES 1-50, inclusive, <br><br> Defendants. | Case No. 3:17-cv-06748-WHO <br><br> **DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES** <br><br> Judge:  Hon. William Orrick III |

1

2

## DECLARATION OF J. BERNARD ALEXANDER, III

3      I, J. Bernard Alexander, III, declare:

4      1.      I am an attorney at law duly admitted to practice before all of the

5  courts of the State of California. If called as a witness, I could and would

6  competently testify to the following facts of my own personal knowledge.  I submit

7  this Declaration in support of Plaintiff's Motion for Attorney's Fees and Costs.

8      2.      I received my Bachelor of Arts degree from the University of

9  California at Los Angeles in 1983. My Juris Doctor was awarded by Southwestern

10  University School of Law in 1986, where I earned a Deans Scholarship. I was first

11  admitted to practice before the courts of the State of California in 1987 and am

12  admitted to the U.S. District Courts for the Central, Eastern and Southern Districts

13  of California and the U.S. Courts of Appeal for the Ninth Circuit, and the Northern

14  District of Illinois.

15      3.      From 1987 to 1993, I was an associate at Morris, Polich and Purdy

16  performing defense litigation, including employment, insurance coverage,

17  construction, premises and automobile liability. In 1994, I became a founding

18  partner at Alexander & Goldsby, which later became Alexander & Yong. Although

19  we initially focused on coverage and defense matters, beginning no later than

20  2001, my practice focused primarily on plaintiff's employment litigation, both in

21  state and federal court. Currently, I am a founding partner of Alexander Morrison +

22  Fehr LLP. Currently 85% of our practice consists of representing plaintiffs in

23  employment litigation, and 15% are police excessive force cases. Over 90% of the

24  firm's work is done on a contingency basis, consistent with the practice of a

25  substantial majority of plaintiff employment attorneys.

26      4.      Throughout my 30 years of practice, I have achieved numerous six,

27  seven, and eight-figure verdicts and settlements in various types of employment

28  cases, including sexual harassment, sexual orientation, race, gender, age and

1   disability discrimination and whistleblower cases. I have been lead counsel in over

2   75 trials and have successfully handled dozens of mediations and binding

3   arbitrations.

4        5.     I completed a two-year term as President of the California

5   Employment Lawyers Association ("CELA"), in October 2015. CELA is a

6   statewide organization and the largest bar association in California for lawyers

7   representing employees, with a membership of approximately 1,300 attorneys.

8        6.     In addition, I am active in the National Employment Lawyers

9   Association ("NELA"), and its regional and local affiliates. In 2016, I became an

10   elected Executive Board Member and continue in that role.

11        7.     Since 2005, I have been a member of the Los Angeles County Bar

12   Association Labor and Employment Executive Committee. I am also a lifetime

13   member of the John M. Langston Bar Association of Los Angeles.

14        8.     I am regularly invited to speak at continuing legal education seminars,

15   both in and outside the state of California, on various employment law topics

16   related to whistleblower claims, disability and various forms of discrimination,

17   discovery, trial techniques and strategies, and various other substantive areas of the

18   law within employment litigation. I have given numerous employment law

19   speeches and presentations at conferences for a variety of legal organizations,

20   including the American Bar Association ("ABA"), CELA, NELA and NELA state

21   affiliates, the Los Angeles County Bar Association ("LACBA") Labor and

22   Employment Section, the John M. Langston Bar Association of Los Angeles, the

23   Consumer Attorneys Association for Los Angeles ("CAALA"), and Consumer

24   Attorneys of California ("CAOC"). I am also a member of the Legal Eagles for

25   Truth Justice and the American Way ("LEFTJAW"), a local branch of CELA that

26   is devoted exclusively to the representation of employees.

27        9.     Most recently, in August 2017, our firm was designated one of the

28   Top 20 Boutiques (for plaintiff employment) in California by the Los Angeles

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

Daily Journal.

10.     I have received numerous professional recognitions and honors, including:

- 2022 CAALA Trial Lawyer of the Year
  - Voted Charles B. O'Reilly Memorial "Trial Lawyer of the Year" by the Consumer Attorneys Association of Los Angeles (CAALA) (2022), a membership organization of approximately three thousand members. One of only six (6) employment lawyers out of the fifty-two (52) individuals who have received this honor since 1972.
- 2022 Cover photo and article in Southern California SuperLawyer
- 2021, 2022, 2023 Top 10 Southern California SuperLawyer
- 2021 American College of Trial Lawyers Fellow
- 2020 College of Labor & Employment Lawyers Fellow
- 2020 LACBA Jim Robie Professionalism and Civility Award
  - An award given to a Los Angeles trial lawyer, active in the Los Angeles County Bar Association, acknowledging recognition from the plaintiff and defense bar, as well as the judiciary, whose career demonstrates qualities of professionalism, civility, service, enthusiasm and collegiality.
    https://lacba.org/?pg=jim-robie-professionalism-and-civility-award
- 2019-2022 Top 100 Attorneys in California
- 2016 CELA Joe Posner Award Recipient
  - Awarded the California Employment Lawyers' Association "Joe Posner Award," CELA's highest individual recognition for a career dedicated to advancing employee rights. CELA

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

is a statewide organization of over twelve hundred employee rights lawyers – the largest statewide employee rights organization in the Country.

- 2019 "Lawyer of the Year" Honoree for Employment Law, Best Lawyers Southern California (published November 2018);
- Daily Journal's Top 75 California Labor and Employment Lawyers:  2012 to present;
- American Board of Trial Advocates (ABOTA) Associate (2013)
- SuperLawyer - Employment Litigation:  2009 through 2023 (published by Los Angeles Magazine and Law & Politics)
- Top 100 Southern California Super Lawyers, by Los Angeles Magazine and Law & Politics: 2015 – 2019, 2021-2023.
- 2023 CABL (California Assoc. of Black Lawyer) Advocate for Social Justice Award
- 2024 Lawdragon 500 Leading Civil Rights & Plaintiff Employment Lawyers
- 2024 Best Lawyers Lawyer of the Year - Employment Law - Individuals in Los Angeles, August 2014 to present.

## SUMMARY OF THE WORK PERFORMED AS CO-LEAD TRIAL COUNSEL

11.     I acted as co-lead trial counsel with Mr. Organ on this matter.

12.     I was first introduced to the case by Larry Organ in approximately June 2019, when Mr. Organ described the facts of the case, provided a copy of the complaint and several supporting declarations relating to the case, and suggested that I might be interested in trying the case with him.  After more detailed discussions with Mr. Organ about the liability facts and circumstances of the case, I agreed to act as co-counsel in or about June 2019.  As is my practice, when I am

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

invited to act as lead counsel in trying a case, I tried to familiarize myself with the details of the case in order to prepare for trial.  My efforts included:

    a.  A detailed review of: (1) all the relevant deposition transcripts; (2) all relevant pleadings and particularly points and authorities in support and in opposition to summary judgment; and, (3) all pertinent rulings and orders issued by the Court.

    b.  Identification of the problems and obstacles with the case, and strategizing as to how best to minimize or resolve them;

    c.  Strategizing about case presentation in terms of visuals, demonstratives, timelines to visually present key aspects of the case, and/or frame the issues and coordinating efforts with Mr. Organs office to create effective visuals;

    d.  Determining the themes of the case and the witnesses through which those themes would be developed, and the ideal order in which to call witnesses at trial.

13.    I did not take any of the depositions in this case.  Because Larry Organ, Cimone Nunley and Navruz Avloni had the most in-depth knowledge of the facts and details of the case and had taken or defended substantially all of the depositions, I spent a significant amount of time extracting both factual information and subjective assessments, in order to assure that we could make informed, joint choices and decisions about trial strategy, both before and during trial.

14.    Based on the forgoing actions, and acting in the role of co-lead trial counsel, and with respect to the first trial, I performed voir dire and gave the opening and closing statements.  I also examined Anthony Reading, Ph.D, and examine or cross-examined key percipient witnesses, including:

    A.  <u>Wayne Jackson</u> – the nextSource manager who testified to witnessing and experiencing use of the N-word throughout the Tesla workplace, but not taking action to correct it and feeling

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

that he did not have the power to do so.  Mr. Jackson also
provided important testimony about Tesla's failure to
systematically train contract employees about Tesla's
purported "Zero Tolerance" racial harassment policy.

B. <u>Michael Wheeler</u> – a supervisor who confirmed rampant use
of the N-word, was present and confirmed the circumstances
of Plaintiff finding the "Inki" picaninny left for him, and
confirmed being subjected to race-based harassment (having
feces left on his seat), but Tesla failing to investigate by
examining and preserving video footage of the incident,
similar to the failures to investigate experienced by Plaintiff
Diaz.

C. <u>Victor Quintero</u> – a Tesla manager who denied ever having
heard the N-word inside the factory, in contradiction to
multiple other witnesses.  Mr. Quintero was established to be
a Tesla managing agent who determined Plaintiff's salary,
position and promotions.

D. <u>Ramon Martinez</u> – without the benefit of Mr. Martinez'
deposition being completed, confirmed that he was the person
who drew "Inki," the racist picaninny left for Plaintiff Diaz to
find.  Also confirmed that Mr. Martinez provided a
handwritten statement that contained details he could not have
known or included unless it had been provided to him by
Tesla or nextSource.

E. <u>Jackelin Delgado</u>.  Examined the Chartwell investigator who
(1) failed to conduct a timely, good faith, impartial
investigation; (2) failed to prepare a written report, consistent
with her normal practice or standard practices; and (3)

determined to give Ramon Martinez a day suspension and
written warning, but had no written record of the warning and
issued the discipline three days after Tesla had already
determined and approve

F.  d the proposed discipline purportedly issued to Martinez. This
testimony, when taken with Martinez's testimony, confirmed
that Tesla and/or nextSource orchestrated the outcome of the
investigation and nominal discipline received by Martinez.

15.    A substantial portion of Plaintiff's case was proven by calling and
cross-examining defendant's current or ex-employees as adverse witnesses, calling
past contract employees.

16.     In the second trial, I also performed voir dire and gave the opening
and closing statements. I also examined or cross-examined key percipient
witnesses Wayne Jackson and Ramon Martinez.

17.    The successful trial of this matter was only made possible by the
persistent pre-trial work done in the trenches, by Larry Organ, Cimone Nunley and
the Organ office as a whole.  Thorough written discovery was completed,
accompanied by equally thorough depositions.  These discovery efforts allowed us
to identify key defense witnesses, both for the purpose of determining who best to
call at trial, which witness should not be called, and which witnesses should be left
for the defendant to call and cross-examine.

18.    Following our historic victory in this matter, the Court accepted a
remittitur of the damages awarded to Plaintiff.  Subsequently, the Court granted
Plaintiff a new trial on the issue of damages only.  This entailed a great deal of
further attorney work including:

•    Meeting and conferring with defense counsel regarding the
scope of the re-trial and engaging in a settlement conference;

•    Strategizing with co-counsel regarding the issues and
presentation of evidence for re-trial;

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

- Revising and further preparing trial filings and witnesses to testify;
- Preparing opening and closing arguments and corresponding Powerpoint presentations; and
- Assisting with post-trial motions.

**HOURLY RATES**

<u>J. Bernard Alexander, III</u>

19.     My current billing rate is $1,200 per hour.  This is the rate I charge and am paid by hourly clients who hire me to advise them.  This is also the rate I am paid when I am retained as an expert witness, which has occurred several times in my career.

20.     I have obtained multiple multi-million dollar and other significant employment and civil rights jury verdicts. Among the successful civil rights cases in which I have been awarded fees in the recent past are the following:

   a.  *McCray v WestRock Services, Inc.,* Case No. 2:21−cv−09853−DMG−RAO: Jury verdict of $9,461,000, in August 2023, for retaliation, disability discrimination and failure to prevent discrimination and retaliation in favor of a 27 year African American employee. District Court Judge Dolly Gee; fee motion pending.

   b.  *Pierce/Bland v East Bay Municipal Utility District*, USDC Case No. 3:21-cv-04325-AGT: Jury verdict of $7,990,000, in June 2023, for retaliation (Section 1983 and FEHA), failure to prevent discrimination and retaliation and construction discharge, in favor of two women of color employed in the General Counsel's Office of EBMUD.  US Magistrate Judge Alex G. Tse; fee motion pending. One month after *Gallegos* trial in (c).

   c.  *Gallegos v. University of La Verne*, Los Angeles Superior Court

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

Case No. 20STCV29478: Jury verdict of $600,000 in March 2023, for retaliation due to taking a protected medical leave where Defendant's Code of Civil Procedure § 998 Offer to Compromise before trial was for $125,000. Judge Kevin C. Brazile; fee motion pending.

d. *Rios, et. al. v. City of Los Angeles*, Case No.: 2:21-cv-05341-RGK-MAA: Jury verdict of $120,000, in a police excessive force case where an African American family of three was stopped at gun point based on a "cold plate" – the vehicle license plate of the vehicle owned by them did not match the DMV issued plate, through no fault of their own. USDC Judge R. Gary Klausner approved a rate of $1,100 per hour.

e. *Asfall v. Los Angeles Unified School District,* Case No. 2:18-cv-00505-CBM (RAOx): Jury verdict of $100,000 in emotional distress damages in a Title IX retaliation case.  USDC Judge Consuelo B. Marshall approved a rate of $950 per hour with a 1.1 multiplier, in October 2020; affirmed on appeal.

f. *Carter v. Federal Express, Inc.*, Los Angeles Superior Court Case No. BC 658923: Jury verdict of $5,317,162, with a remittitur to $3,515,000, in March 2019, for Disability Discrimination – Failure to Accommodate, Failure to Engage in the Interactive Process and Retaliation, in favor of a 25 year employee. Judge Rafael Ongkeko approved a rate of $850 per hour. (*https://topverdict.com/lists/2019/california/top-10-civil-rights-verdicts*).

g. *Monterroso v. Hydraulics International, Inc.*, Case No. Case No.: BC654053: Jury verdict of $1,292,063 in April 2019, for California Family Rights Act (CFRA) retaliation and Associational

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

Discrimination – Failure to Accommodate, in favor of a 25-year employee making $19.07 on his date of termination. LASC Judge Maureen Duffy-Lewis.

h. *Kunga v. American Guard Services*, Case No. BC657320: Jury verdict of $3,000,000 in July 2018, for discrimination and retaliation under the California Family Rights Act, in favor of a $12 per hour security guard who was denied emergency leave to care for his daughter, then terminated for "job abandonment." LASC Judge Michael P. Linfield approved a rate of $815 per hour for work performed in 2018.

i. *Campbell v. Fuse LLC*: Arbitration award of $2.038 million in January 2017, in a wrongful termination case. Later, confirmed by LASC Judge Mark Mooney, based on an award of $815 per hour by Michael Latin, Judge Retired.

j. *Flores v. Office Depot*, Case No. BC 556173: Jury verdict of $10 million in January 2017, in a CFRA retaliation case. LASC Judge Daniel S Murphy awarded me a rate of $750 per hour, as lead trial counsel.

k. *Rivera v. Costco*: Jury verdict of $1,686,500 in November 2014 in a disability discrimination, defamation and wrongful termination case.

l. *Flores v. City of Westminster, USDC* Case no. 8:11-cv-00278-DOC-RNB: Jury verdict of $3.55 million in March 2014, representing three male Latino police officers in a failure to promote case based on race in Orange County. USDC Judge David O. Carter approved a rate of $750 per hour.

m. *Salinda v. DirecTV*, Case No. BC 475999: Jury verdict of $1,178,628 in 2013 in a disability discrimination case. LASC

Judge Ronald Sohigian approved my rate of $675 per hour.

21.     Through my active involvement in California Employment Lawyers Association (CELA), National Employment Lawyers Association (NELA), Legal Eagles for Truth, Justice and the American Way (LEFTJAW), Consumer Attorneys Association of Los Angeles (CAALA) and the Los Angeles County Bar Association (LACBA), I meet and confer with numerous Southern and Northern California employment lawyers on a daily basis and on a variety of employment law issues, including hourly rates. Through my own experience and through my contacts with other attorneys and organizations throughout the Los Angeles, Orange County, Inland Empire, Sacramento and San Francisco legal communities, I am very familiar with the community standards for attorney fees awards in these areas. I have been called on, in numerous instances, to provide declarations in support of fees for attorneys practicing employment law matters. It is based on this knowledge that I opine on the reasonableness of the hourly rates charged by counsel in this matter.

22.     I handled this case with some assistance from Britt Karp, a senior associate at my firm with twelve years of experience, who bills at $675 per hour; Jacqueline Gil, an associate at my firm with five years of experience, who bills at $450 per hour; and Natalie Khoury, an associate at my firm with two years of experience, who bills at $350 per hour.  I am also familiar with the rates charged for their experience levels and believe these fees to be reasonable.

23.     I am readily familiar with the rates charged by paralegals performing both plaintiff and defense employment work in California.  Based on my experience, it is reasonable that a person at the experience level of Mr. Ham would bill at an amount well in excess of $225.  Accordingly, our firm has set a rate of $225 to be charged for the paralegal work performed by Mr. Ham.

24.     In March 2023, my full 2022 rate of $1,100 per hour (for an August 2022 trial) was approved by United States District Court Judge R. Gary Klausner in *Rios v. City of Los Angeles, et al*.  A true and correct copy of the March 2, 2023 Attorney Fees ruling is attached as Exhibit "1".  At that time, Judge Klausner also

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

approved Britt Karp's 2022 below-market rate of $550 per hour and Mr. Ham's rate of $225 per hour.

25.   In October 2020, my full 2020 rate of $950 per hour was approved by United States District Court Judge Consuelo Marshall in *Asfall v. Los Angeles Unified School District*.  A true and correct copy of the October 28, 2020 Attorney Fees ruling is attached as Exhibit "2".  Mr. Ham and Ms. Karp's 2020 rates of $225 and $475, respectively, were approved at that time as well.

26.   In October 2019, my full 2019 rate of $850 was approved by Los Angeles Superior Court Judge Rafael Ongkeko in *Carter v. Federal Express Corp.* (BC658923).  A true and correct copy of the October 23, 2019 Attorney Fees ruling is attached as Exhibit "3".

27.   In January 2019, my full 2018 rate of $815 per hour was approved by Los Angeles Superior Court Judge Michael P. Linfield in *Kunga v. American Guard Services, Inc.* (BC 657320).  A true and correct copy of the January 14, 2019 ruling on Plaintiff's Motion for Attorney Fees is attached as Exhibit "4".

28.   In March 2017, I was approved at my then-current hourly rate of $815 by Judge Michael Latin (Retired), in the binding arbitration of a wrongful termination whistleblower case, *Campbell v. Fuse, LLC, et al*.  A true and correct copy of the March 23, 2017 Arbitration Award is attached as Exhibit "5," with the section pertaining to attorney fees found on pages 52-53.  Judge Latin found AKG's requested hourly rates to be reasonable and approved all rates requested, including my past rate of $815 per hour.  Judge Latin also found that every hour billed by AKG was reasonable and compensable, and awarded a 1.2 multiplier.  Though I was approved at my full hourly rate of $815 in 2017, I did not raise my rate for 2018.

29.   I was previously approved at an hourly rate of $750 in October 2014 by United States District Court Judge David O. Carter in the Central District, Orange County in *Flores v. City of Westminster*, USDC Case no. 8:11-cv-00278-DOC-RNB.  At that time, Judge Carter also approved a paralegal rate of $175 for Gustin Ham.  A true and correct copy of the October 23, 2014 Attorney Fees ruling

is attached as Exhibit "6".

## Contingency Rates Charged

30.     Given my level of experience, I am very familiar with the economics of legal practice, especially as it relates to litigation of plaintiff employment discrimination cases. The availability of current hourly rates directly influences the decisions my firm makes about whether to take or decline cases. If current hourly rates were unavailable in all or a majority of cases, we would not be able to maintain our contingent fee practice in the employment area; it would simply be financially impossible to do so.

31.     This case was taken on a contingency basis, meaning that neither my firm, Mr. Organ's firm, or our co-counsel have been paid for our legal services. With the exception of a few limited matters, e.g., pre-litigation consultation, negotiation of severance agreements and retention as an expert, my firm has a contingency-based practice.  However, we are periodically retained on an hourly basis in certain matters.  We set our rates in all matters (contingent and retained) to be comparable with those of private defense firms that litigate complex matters in our areas of expertise.  Thus, our attorneys' hourly rates are comparable with those of firms such as Loeb & Loeb, Skadden Arps, and Kirkland & Ellis, whose litigation departments often defend the types of employment and civil rights cases my office files and litigates.

32.     My partners currently bill at the following hourly rates: Tracy Fehr $750 per hour; Michael Morrison $850 per hour; and Josh Arnold $700 per hour. Current hourly billing rates for our associates range from $300 to $700 per hour for Senior Associates. Britt Karp has a rate of $675 per hour and Natalie Khoury has a billing rate of $350 per hour.

33.     There are billing entries for my long time firm partner Tracy Fehr, with eighteen years of experience, who bills at $750 per hour; and for my firm partner Joshua Arnold, with eighteen years of experience, who bills at $700 per hour.  As part of my exercise of billing judgment, I have omitted charges for Ms. Fehr, Mr. Arnold and Jacqueline Gil.

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

HOURS WORKED ON THIS CASE

34.    Attached as Exhibit "7" is a true and correct copy of redacted billing records of Alexander Morrison + Fehr LLP ("AMF") in this matter. The billing is under Demetric Diaz because he appeared first on the complaint, but the billing records submitted here are solely in relation to Owen Diaz and the prosecution of his case as I endeavored to cut any records relating solely to Demetric.  This billing statement reflects charges by myself and associates, paralegals or legal assistants under my supervision.  All of the billing reflected in Exhibit 7 was reasonably necessary to the successful prosecution of this litigation.

35.    As reflected in the billing records, I billed 960.4 hours during the pendency of this matter, as of October 20, 2023. In addition, in order to minimize attorney fees in this case, I assigned tasks to associates and law clerks inside my firm, who were able to draft matters for my review at a much cheaper rate.

36.    With respect to Exhibit 7, the AMF bill, I record my time on a daily basis, and I accurately enter my time.  I made billing decisions that resulted in the Defendant not being charged for a great deal of time.  For instance, many brief emails or calls were not billed.  Also, although my basic billing unit is one-tenth of an hour, frequently if there was a series of brief emails on a related issue between myself and someone else, i.e., my associates, my office manager, or opposing counsel, I would combine or bill the time at a greatly reduced rate.  For instance, if there was a series of eight or so emails, I might bill them at 2/10s of an hour, or some other reduced amount instead of eight-tenths of an hour (1/10 for each email).  Thus, Exhibit 7 represents only those hours for which I am requesting compensation, after the exercise of billing judgment. The hours generated in this matter are reasonable as all of my time was billed in preparing an efficient, effective trial of this racial harassment matter.

37.

| Attorney/Staff | Hourly Rate | Hours Spent | Total |
|---|---|---|---|
| J. Bernard Alexander, III | $1,200 | 967.6 | $1,161,120 |

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

| Britt L. Karp | $675 | 39 | $26,325 |
|---|---|---|---|
| Natalie Khoury | $350 | 49.9 | $17,4654 |
| Gustin Ham | $225 | 48.4 | $10,890 |
| **TOTAL** | | | **$1,215,800** |

## COSTS & EXPENSES

38.    In or about July 2019, Larry Organ contacted me to obtain my assistance in litigating this matter.  Mr. Organ was located in San Anselmo, California and was able to commute to San Francisco with far less expense. However, he viewed my previous successful trial experience in trying race discrimination matters, we believed that my addition to Mr. Organ's trial team would prove to be of value, and that the benefits of my presence of the trial team would far any additional expenses incurred as a result of my addition would experience and accomplishments as an invaluable asset to the case which reasonably would outweigh the increased cost of my travel time.

39.    Because my office is located in Southern California, out-of-town expenses were necessarily incurred in order for me to act as co-counsel in trying this matter. Courts routinely allow non-local counsel to recover out-of-town travel costs for trial. *See Genesis Merch. Partners, LP v. Nery's USA, Inc*., (S.D. Cal. Dec. 6, 2013) 2013 WL 12094825 at *10 (applying California Civil Procedure Code 1033.5); *see generally Thon v. Thompson* (1994) 29 Cal. App. 4th 1546, 1548 (deposition travel reimbursements allowed for attorneys not in the same jurisdiction as the presiding court). Additionally, I sought to be prudent with the costs I incurred, including specifically staying at the same hotel as defense counsel did for trial.

40.    Because my office is located in Southern California, the following out-of-town expenses were necessarily incurred in order for me to act as co-counsel in trying this matter.

41.    Flight expenses were incurred, which totaled <u>$3,487.76</u>:

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

| Date | Description | Expense |
|------|-------------|---------|
| December 17, 2019 | Southwest Flight - MSJ Hearing | $536.96 |
| January 16, 2020 | Southwest Flight - MSC Hearing | $535.96 |
| September 10, 2021 | Southwest Flight – 1st Trial | $262.97 |
| September 30, 2021 | Southwest Flight - 1st Trial | $54.99 |
| March 16, 2023 | Southwest Flight – 2nd Trial Prep | $753.96 |
| March 22, 2023 | Southwest Flight – 2nd Trial – Part 2 | $649.96 |
| April 2, 2023 | Southwest Flight – 2nd Trial – Part 2 | $692.96 |
| | **TOTAL** | **$3,487.76** |

42.   Hotel expenses were incurred, which totaled $13,592.55:

| Date | Description | Expenses |
|------|-------------|----------|
| December 17, 2019 | InterContinental Hotel Stay - MSJ | $266.67 |
| October 6, 2021 | InterContinental Hotel Stay 1st Trial[1] | $5,672.85 |
| March 16, 2023 | InterContinental Hotel Stay 2nd Trial | $2,826.16 |
| March 17, 2023 | Expedia Hotel Reservation: Gables Inn – Sausalito – 2nd Trial Prep[2] (3/17/23-3/23/23) | $2,084.78 |
| March 23, 2023 | InterContinental Hotel Stay 2nd Trial (3/24/23 – 4/1/23) | $2,426.94 |
| April 3, 2023 | IHG Hotel Stay – 2nd Trial (4/3/23-4/4/23) | $315.15 |
| | **TOTAL** | **$13,592.55** |

43.   Rideshare expenses were incurred, which total $784.27:

---

[1] Note that Tesla's initial defense attorneys, Tracey Kennedy and her Shepherd Mullin Los Angeles trial team, also stayed at the InterContinental Hotel.

[2] In order to prepare for the 2nd trial, I initially stayed at the Gables Inn in Sausalito for several days, a hotel in relatively close proximity to Mr. Organ's office.

| Date | Description | Expenses |
|---|---|---|
| Sept.-Oct. 2021 | Ubers - 1st Trial | $157.39 |
| March 24, 2023 | Ubers – 2nd Trial | $37.79 |
| March 24, 2023 | Ubers – 2nd Trial | $41.96 |
| March 25, 2023 | Ubers – 2nd Trial | $73.58 |
| March 26, 2023 | Ubers – 2nd Trial | $55.16 |
| March 28, 2023 | Ubers – 2nd Trial | $12.98 |
| March 29, 2023 | Ubers – 2nd Trial | $71.35 |
| March 30, 2023 | Ubers – 2nd Trial | $78.18 |
| March 30, 2023 | Ubers – 2nd Trial | $101.09 |
| March 30, 2023 | Ubers – 2nd Trial | $10.60 |
| March 31, 2023 | Ubers – 2nd Trial | $13.60 |
| April 2, 2023 | Ubers – 2nd Trial | $40.75 |
| April 4, 2023 | Ubers – 2nd Trial | $12.97 |
| April 4, 2023 | Ubers – 2nd Trial | $76.87 |
|  | **TOTALS** | **$784.27** |

## A MULTIPLIER IS WARRANTED

44.    As reflected in the attached billing records, I billed 960.4 hours during the pendency of this matter, as of October 20, 2023.

45.    As Plaintiff's counsel, we are a staggered multiplier in this case:  a 2.0 multiplier for all hours from inception through October 5, 2021, the timeframe that resulted in an initial verdict of $136.9 million; a 1.5 multiplier for the timeframe of October 6, 2021 to February 6, 2022, the timeframe for upholding a finding of liability for racial discrimination; and 1.2 for the timeframe after February 6, 2022. This multiplier recognizes the exceptional risks involved in prosecuting this case, in which very significant costs and fees were at risk during the pendency of this case. The skill, expertise, and experience exhibited by myself, my firm, and Mr. Organ and Mr. Collier's firms warrant the application of a multiplier in this case.

46.     In agreeing to accept a case on contingency, plaintiff's counsel must contemplate the prospect of carrying the expenses through final resolution, with no guarantee that expenses will be recouped.  Many contingent cases are lost, resulting in no fee to the plaintiff's attorney.  Other cases settle for amounts that result in a contingency fee far below the actual fees expended by plaintiff's counsel.  If the plaintiff's counsel can only hope to recover the actual time spent, even when a case goes all the way to trial after years of litigation and the plaintiff prevails, the risks in taking such cases would so greatly outweigh any potential "upside" that small firms like mine simply could not afford to accept such cases.  Contingency cases against large entities are fraught with peril, but typically have the benefit of a decision-maker who performs a cost-benefit analysis.  In this case, Defendant apparently ignored such an analysis and determined to force Plaintiff to try the case.

47.     As part of my practice, I am often approached to act as lead trial counsel in matters such as this.  Due to handling this trial, I was forced to reject several new matters which would have been accepted at the inception of litigation and later throughout the *Diaz* litigation.

48.     In this case, Plaintiff worked at Tesla for a brief nine (9) months, and was terminated after he was unable to return to work at Tesla, due to the hostile work environment based on race.  The limited length of Mr. Diaz' employment was used against him, as was his instance of complaining in writing about Tesla misconduct as to other matters.

49.     In this case, despite persistent efforts by the Magistrate Judge, <u>Tesla failed to make any offer of settlement</u>, and instead invested substantial resources in defending the case based on its premise of a "Zero tolerance" policy for racial harassment.

50.     And, despite the first jury awarding punitive damages of $130,000,000 for Tesla's conduct, within minutes of the verdict the Tesla Human Resource person, Valerie Capers Workman, sent out an email to employees **rejecting the verdict as unjustified and unwarranted.**

DECLARATION OF J. BERNARD ALEXANDER, III IN SUPPORT OF ATTORNEY FEES

https://www.tesla.com/blog/regarding-todays-jury-verdict.  Some of what Ms.
Workman had to say was that:

- While they all agreed that the use of the n-word was not appropriate in
  the workplace, they also agreed that most of the time they thought the
  language was used in a "friendly" manner and usually by African-
  American colleagues. They also told the jury about racist graffiti in the
  bathrooms, which was removed by our janitorial staff;

- There was no witness testimony or other evidence that anyone ever heard
  the n-word used toward Mr. Diaz.

- Mr. Diaz . . . didn't make any complaints about the n-word until after he
  was not hired full-time by Tesla – and after he hired an attorney.

- … [W]**e strongly believe that these facts don't justify the verdict
  reached by the jury** in San Francisco.

51.     This is the level of intransigence that Plaintiff's counsel faced from
Tesla throughout the pendency of this lawsuit.  A few short minutes after the
verdict, Ms. Workman's first thought was to protect the image of Tesla at the
expense of the truth.

52.     When Plaintiff's counsel takes the substantial risk involved in
representing an employee in a Title VII or California FEHA discrimination case,
Plaintiff's counsel should be rewarded not only for the legal acumen, but also for
the substantial effort and persistence necessary in order to stay the course in
seeking justice.  That principle is demonstrated by the adversity Plaintiff counsel
overcame in prevailing over the efforts of Tesla in this case.

53.     Additionally, after Plaintiff's counsel was enormously successful in
persuading the jury of Plaintiff's entitlement to damages, twice, after having his
damages award significantly reduced, Plaintiff's counsel also had to deal with
suppression of evidence by defense counsel.

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.

Executed this 24th day of October 2023, in the County of Los Angeles, State

1    of California.

2

3                                            *J. Bernard Alexander, III*
                                       _____
4                                          J. BERNARD ALEXANDER, III

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

JS6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-05341-RGK-MAA | Date | March 2, 2023 |
|---|---|---|---|
| Title | *Michael Rios, et al. v. City of Los Angeles, et al.* | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Joseph Remigio (not present) | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: | |
| Not Present | Not Present | |

**Proceedings:** **(IN CHAMBERS) Order Re: Plaintiffs' Motion for Award of Reasonable Attorneys' Fees and Costs [DE 146]**

## I.  **INTRODUCTION**

On July 1, 2021, Michael Rios ("Mr. Rios"), Senoia Rios ("Mrs. Rios"), and M.R., a minor (collectively, "Plaintiffs"), filed a Complaint against the City of Los Angeles (the "City"), Chief of the Los Angeles Police Department Michel Moore ("Moore"), and twenty Doe defendants (collectively, "Defendants"). (ECF No. 1.) Plaintiffs alleged claims under 42 U.S.C. § 1983 for violations of their Fourth Amendment rights, as well as state law claims for assault, battery, and violations of the Bane Act, Cal. Civ. Code § 52.1. Plaintiffs never amended the Complaint to identify any of the Doe defendants, so the case proceeded to trial against only the City and Moore.

Trial began on August 2, 2022. Following the four-day trial, the jury found that Mr. Rios had proved his Bane Act claim against the City and awarded him $120,000 in damages.[1] On August 26, 2022, the Court entered judgment in favor of Mr. Rios. (ECF No. 135.)

Presently before the Court is Plaintiffs' Motion for Attorneys' Fees and Costs. (ECF No. 146.) For the following reasons, the Court **GRANTS in part** the Motion.

## II.  **FACTUAL BACKGROUND**

The relevant factual background is set forth in the Court's Order at Dkt. No. 134. (*See* Order re Mots. J. Matter of Law, ECF No. 134.)

---

[1] The jury did not find in Mrs. Rios's favor on any claim. In addition, the Court *sua sponte* dismissed plaintiff M.R. and defendant Moore for insufficient evidence.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-05341-RGK-MAA | | Date | March 2, 2023 |
|---|---|---|---|---|
| Title | ***Michael Rios, et al. v. City of Los Angeles, et al.*** | | | |

### III.   JUDICIAL STANDARD

#### A.   Attorneys' Fees

In the United States, a prevailing litigant ordinarily may not collect attorneys' fees from the losing party. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). An exception to the general rule exists where a statute authorizes the prevailing party to collect such fees. *Id.* at 257. California Civil Code Section 52.1(i) ("Section 52.1(i)"), the recovery provision for the Bane Act, is one such statute. It states that "[i]n addition to any damages, injunction, or other equitable relief awarded in an action brought pursuant to subdivision (c), the court may award the petitioner or plaintiff reasonable attorney's fees." Cal. Civ. Code § 52.1(i). If such authority exists, the district court determines the reasonable fee award based on the lodestar amount and, where necessary, an appropriate award multiplier. *City of Burlington v. Dague*, 505 U.S. 557, 559 (1992); *see also Serrano v. Priest*, 20 Cal. 3d 25, 48 (1977) (holding that California law calls for lodestar analysis).

#### B.   Taxing Costs

Under Federal Rule of Civil Procedure ("Rule") 54(d)(1), costs other than attorneys' fees shall be allowed as a matter of course to the prevailing party unless the court otherwise directs. Fed. R. Civ. P. 54(d)(1). The prevailing party must file an application to tax costs with the Clerk. *Id.*; C.D. Cal L.R. 54-2.

The Clerk's determination of costs is final unless modified by the court. C.D. Cal. L.R. 54-2.4. A "[r]eview of the Clerk's taxation of costs may be obtained by a motion to re-tax costs filed and served within seven days of the Clerk's decision." C.D. Cal. L.R. 54-2.5. When reviewing the Clerk's taxation, the court's review is "limited to the record made before the clerk, and encompass[es] only those items specifically identified in the motion." *Id.*

### IV.   DISCUSSION

Mr. Rios seeks $1,291,737.00 in attorneys' fees—a $645,868.50 lodestar with a 2x multiplier—and $5,967.44 in costs as the prevailing party. Mr. Rios bases his requested attorneys' fees on the following hourly rates and hours spent:

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-05341-RGK-MAA | | Date | March 2, 2023 |
|---|---|---|---|---|
| Title | *Michael Rios, et al. v. City of Los Angeles, et al.* | | | |

| Attorney/Staff | Hourly Rate | Hours Spent | Total |
|---|---|---|---|
| J. Bernard Alexander, III ("Alexander") | $1,100 | 302.9 | $333,190 |
| Toni Jaramilla ("Jaramilla") | $800 | 211.33 | $169,064 |
| Britt L. Karp ("Karp") | $550 | 205.8 | $113,190 |
| Natalie Khoury ("Khoury") | $300 | 7 | $2,100 |
| May Mallari ("Mallari") | $700 | 0.16 | $112 |
| John Schwab ("Schwab") | $500 | 0.2 | $100 |
| Gustin Ham ("Ham") | $225 | 53.3 | $11,992.50 |
| Summer Khatib ("Khatib") | $200 | 45.6 | $9,120 |
| Sima Patel ("Patel") | $200 | 28.5 | $5,700 |
| Leilani Stacy ("Stacy") | $200 | 6.5 | $1,300 |
| **Total** | | | **$645,868.50** |

(Pls.' Mot. at 10.)

As set forth above, the Bane Act allows for recovery of reasonable attorneys' fees to the prevailing party. Here, Mr. Rios is the prevailing party on his Bane Act claim, and thus is entitled to attorneys' fees. Defendants argue that Mr. Rios's requested attorneys' fees are unreasonable because the requested hours and rates are overinflated.[2]

To determine whether a claim for attorneys' fees is reasonable, the Court uses the lodestar calculation, which is the "product of reasonable hours times a reasonable rate." *Hensley v. Eckerhart*,

---

[2] Defendants also argue that the Court should award no attorneys' fees at all because Plaintiffs' counsel failed to specify the hours that were spent on Mr. Rios's Bane Act claim—the only claim on which he was the prevailing party. This argument fails. All of Mr. Rios's claims were premised upon a common core of facts—the high-risk pullover. And "in a lawsuit where the plaintiff presents different claims for relief that involve a common core of facts the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis." *McCown v. City of Fontana*, 565 F.3d 1097, 1097 (9th Cir. 2009) (alterations omitted) (internal quotations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-05341-RGK-MAA | | Date | March 2, 2023 |
|---|---|---|---|---|
| Title | *Michael Rios, et al. v. City of Los Angeles, et al.* | | | |

461 U.S. 424, 433 (1983); *see also Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001). There is a "strong presumption" that the lodestar represents a "reasonable" fee. *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986). The fee applicant "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437. To meet his burden of production, the fee applicant must "produce satisfactory evidence . . . [which] must include proof of market rates in the relevant community (often in the form of affidavits from practitioners) and detailed documentation of the hours worked." *United States v. $28,000.00 in U.S. Currency*, 802 F.3d 1100, 1105 (9th Cir. 2015) (internal quotations omitted). "Once a fee applicant presents such evidence, the opposing party 'has a burden of rebuttal that requires submission of evidence . . . challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits.'" *Chaudhry v. City of L.A.*, 751 F.3d 1096, 1110–11 (9th Cir. 2014) (citation omitted).

For the reasons explained below, the Court finds that Mr. Rios has met his burden of production as to certain of his requested fees, but not as to others. The Court analyzes each group in turn, beginning with the former.

### A. Fee Requests Lacking Evidentiary Support

The Court first finds that Mr. Rios has failed to provide evidence that the requested rates for Mallari, Schwab, Khoury, Khatib, Patel, and Stacy are reasonable. He seeks the following rates: (1) $700 for Mallari; (2) $500 for Schwab; (3) $300 for Khoury; and (4) $200 for Khatib, Patel, and Stacy. "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—*in addition to the attorney's own affidavits*—that the requested rates are in line with those prevailing in the community." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (emphasis added). Here, Mr. Rios has failed to meet his burden because the only support provided for these requested rates are the affidavits of his own counsel.

In addition, Mr. Rios seeks 7.3 hours for Karp and 2.5 hours for Alexander for their work on the Reply Brief in support of the instant Motion. However, he failed to support these requested hours with any documentation, and a fee applicant must produce "detailed documentation of the hours worked." *$28,000.00 in U.S. Currency*, 802 F.3d at 1105.

If the fee applicant does not "discharge[] its legal obligation as to the burden of production," the Court does not "proceed[] to a factual determination as to whether the requested fee is reasonable." *Id.*; *see also Zabkowicz v. W. Bend Co.*, 789 F.2d 540, 548 n.8 (7th Cir. 1986) (stating that the "district court [does] not improperly shoulder defendants' burden of challenging the fee petition" in finding a fee applicant failed to meet its burden of production). Because Mr. Rios did not meet his evidentiary burden

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-05341-RGK-MAA | Date | March 2, 2023 |
|---|---|---|---|
| Title | ***Michael Rios, et al. v. City of Los Angeles, et al.*** | | |

as to: (1) the rates charged by the above-referenced individuals; and (2) the hours billed to the Reply Brief, the Court denies the associated fee requests. Accordingly, the Court reduces Mr. Rios's lodestar by $25,197.00, with a resulting total of $620,671.50.

**B.** <u>**Fee Requests Supported by Evidence**</u>

As to the remaining requested fees for Alexander, Jaramilla, Karp, and Ham, Mr. Rios provided sufficient evidence to satisfy his burden of production. To wit, he submitted previous fee awards from other cases, affidavits from other employment and civil rights attorneys, and Plaintiffs' counsels' detailed time entries.

Because Mr. Rios has produced satisfactory evidence as to his requested rates and hours, the Court "proceeds to a factual determination as to whether the requested [rates and hours are] reasonable." *$28,000.00 in U.S. Currency*, 802 F.3d at 1105. The determination involves "considering both the proponent's evidence and evidence submitted by the fee opponent." *Id.* When a "fee target has failed to offer either countervailing evidence or persuasive argumentation in support of its position . . . the district court's inquiry should end after it determines whether the applicant's fee request is facially reasonable." *Id.* at 1105–06 ("[W]e do not think it is the court's job either to do the target's homework or to take heroic measures aimed at salvaging the target from the predictable consequences of self-indulgent lassitude.").

**1.** <u>*Reasonableness of Hours Spent*</u>

Defendants argue that the total hours spent by Plaintiffs' attorneys are unreasonable because Plaintiffs' attorneys: (1) overstaffed the case and were generally inefficient; and (2) impermissibly billed for travel time and engaged in block-billing. The Court disagrees.

Mr. Rios provided detailed time entries for nearly all the hours billed by his attorneys. (*See* Pls.' Mot., Alexander Decl. Ex. 5, ECF No. 146-1 (timesheets for Alexander, Karp, and Ham); Pls.' Mot., Jaramilla Decl. Ex. 9, ECF No. 146-3 (timesheets for Jaramilla).) And "once the prevailing party satisfies its burden of establishing reasonable hourly rates and time entries, opposing parties must identify with particularity the billing entries that are unreasonable." *Billion Motors, Inc. v. 5 Star Auto Grp.*, 2020 WL 8373396, at *3 (C.D. Cal. Dec. 17, 2020); *accord Chaudhry v. City of L.A.*, 751 F.3d 1096, 1110–11 (9th Cir. 2014). Rather than identify any specific unreasonable time entries, Defendants vaguely aver that the billing records as a whole evidence overstaffing and inefficiency. This is insufficient to carry their burden of rebuttal. Having reviewed the billing records provided by Mr. Rios, the Court finds sparse evidence of inefficiency or overstaffing and finds the requested hours facially reasonable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-05341-RGK-MAA | Date | March 2, 2023 |
|---|---|---|---|
| Title | ***Michael Rios, et al. v. City of Los Angeles, et al.*** | | |

Defendants' remaining arguments—that the Court should exclude any travel time and that Plaintiffs' attorneys impermissibly block-billed their time—also fail. First, "[r]easonable travel time by [attorneys] is compensable, at full rates, if that is the practice in the community." *Rodriguez v. Cnty. of L.A.*, 96 F.Supp.3d 1012, 1025 (C.D. Cal. 2014). Courts in this district have allowed recovery of attorneys' fees related to travel time for hearings and trial, which is the only travel time requested by Mr. Rios. *See, e.g.*, *Bea-Mone v. Silverstein*, 2019 WL 762676, at *3 (C.D. Cal. Feb. 20, 2019). Second, block-billing is only impermissible to the extent that it obfuscates an attorney's billing practices. *See Heritage Pac. Fin. LLC v. Monroy*, 215 Cal. App. 4th 972, 1010 (2013). The time entries submitted by Plaintiffs' counsel were sufficiently detailed to allow the Court to understand how the attorneys billed their time, rendering a reduction inappropriate. *See Universal Elecs., Inc. v. Universal Rsch. Control, Inc.*, 130 F. Supp. 3d 1331, 1340 (C.D. Cal. 2015).

Defendants failed to rebut Mr. Rios's requested hours with factual specificity or persuasive legal argument. Having found the hours facially reasonable, the Court proceeds to analyze the reasonableness of the requested rates.

2.   <u>Reasonableness of Hourly Rates</u>

Mr. Rios requests an $1,100 hourly rate for Alexander, an $800 hourly rate for Jaramilla, a $550 hourly rate for Karp, and a $225 hourly rate for Ham. When determining a reasonable hourly rate, courts consider whether the requested rates "are within the range of reasonable rates charged by and judicially awarded [to] comparable attorneys for comparable work." *Children's Hosp. & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740, 783 (2002). Rate determinations in other cases, particularly those setting a rate for plaintiff's attorneys, are satisfactory evidence of the prevailing market rate. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403,407 (9th Cir. 1990).

The Court finds that Mr. Rios has sufficiently established that his requested rates are reasonable. For Alexander and Karp, Mr. Rios provided evidence of past awards, as well as the affidavits of other employment and civil rights attorneys. (*See* Pls.' Mot., Alexander Decl. Ex. 1 at 7, 11 (prior court order setting rates for Alexander at $950 and Karp at $475); Pls.' Mot., Feldman Decl. at 3–4, ECF No. 146-5 (attorney affidavit stating that $1,100 for Alexander and $550 for Karp are reasonable given prevailing market rates in Los Angeles as well as their experience and skill).) For Toni Jaramilla, Mr. Rios provides the affidavits of other employment and civil rights attorneys. (*See, e.g.*, Pls.' Mot., Dunn Decl. at 3, ECF No. 146-8 (stating that Jaramilla's $800 rate is reasonable given her experience and recognition in the legal community as well as the prevailing market rates in Southern California).) As for Ham's requested rate of $225, Mr. Rios provides evidence of rates from past awards, which ranged

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-05341-RGK-MAA | Date | March 2, 2023 |
|---|---|---|---|
| Title | *Michael Rios, et al. v. City of Los Angeles, et al.* | | |

from \$150 to \$210. (*See* Pls.' Mot., Alexander Decl. Ex. 1 at 12.) These are all satisfactory evidence that the requested rates are reasonable.

Defendants object to the sufficiency of Mr. Rios's evidence by stating that the cases provided are not relevant and that the affidavits are self-serving. But once a fee applicant meets his evidentiary burden, a fee opponent may not simply attack the applicant's evidence. Rather, a fee opponent "has a burden of rebuttal that requires submission of evidence." *Chaudhry*, 751 F.3d at 1110–11 (citation omitted). Here, Defendants fail to provide any countervailing evidence showing that the requested rates are not reasonable. And having conducted its own review of Mr. Rios's evidence and recent fee awards, the Court is satisfied that the requested rates are within the range of those judicially awarded to comparable attorneys for comparable work in this legal community. *See, e.g., Valenzuela v. City of Anaheim*, 2023 WL 2249178, at *3–4 (C.D. Cal. Feb. 23, 2023) (awarding rates of \$1,200 for lead counsel and \$650 for associate attorney in a civil rights case).

In sum, Mr. Rios's requested fees for the remaining attorneys are reasonable. Subtracting the fees that Mr. Rios failed to support with sufficient evidence, the Court determines the lodestar to be \$620,671.50.

### C.    Lodestar Multiplier

Next, Mr. Rios seeks a 2x multiplier to the lodestar due to the complexity of the case and the result obtained by Plaintiffs' counsel. Courts may adjust the original lodestar amount based on the following factors (the "*Ketchum*" factors): "(1) the novelty and difficulty of questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, and (4) the contingent nature of the fee award." *Ketchum*, 24 Cal. 4th at 1132. Courts have "broad discretion" in awarding a multiplier. *Id.* at 1138. A court should not consider the *Ketchum* factors to the extent they are already encompassed within the determination of the underlying loadstar amount. *Id.*

Considering each of the *Ketchum* factors, the Court finds that a multiplier is not justified in this case. As to the first two factors, Mr. Rios's primary argument is that Defendants' conduct rendered this case more difficult than it should have been. But this is not a valid reason for a lodestar adjustment. *See, e.g., Sarfaty v. City of L.A.*, 2021 WL 945257, at *6 (C.D. Cal. Jan. 26, 2021) ("[T]he case became protracted primarily due to the City's . . . arguments rather than the inherent complexity of the issues, [so] the matter did not require an unusual degree of skill to prosecute successfully."). Further, in considering the skill of counsel, the court must award a multiplier "only when the quality of representation far exceeds" that of the average attorney. *Ketchum*, 24 Cal. 4th at 1138. The Court finds that Plaintiffs' counsel did not "far exceed" the skill of other attorneys, particularly given that the results

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-05341-RGK-MAA | Date | March 2, 2023 |
|---|---|---|---|
| Title | *Michael Rios, et al. v. City of Los Angeles, et al.* | | |

achieved for Mr. Rios were good, but not extraordinary. *See Marlo v. United Parcel Serv., Inc.*, 2009 WL 10669458, at *14 (C.D. Cal. Aug. 12, 2009) (finding $250,000 in damages insufficient to warrant a multiplier).

As to the final two factors, Mr. Rios provides no indication that this case prevented his attorneys from taking on other matters. And the Court finds that the contingent nature of Mr. Rios's case, standing alone, is insufficient to justify a multiplier. *See Craig v. Cnty. of Orange*, 2019 WL 12378994, at *6 (C.D. Cal. Sep. 5, 2019) (denying multiplier request where only favorable factor was contingent nature of fee, in part because the "purpose of a multiplier is to approximate market-level compensation" and the "time, labor, and skill of Plaintiffs' counsel [were] already reflected in the fee award"); *cf. Rodriguez v. Cnty. of L.A.*, 96 F. Supp. 3d 1012, 1025–26 (applying 2x multiplier in contingent-fee action where counsel rendered $3.4 million of billable hours, spent 6,000 hours on the case, and was unable to accept other clients).

For these reasons, the *Ketchum* factors weigh against a lodestar multiplier and the Court will not apply one in this case.

### D.   Taxing Costs

Finally, Mr. Rios asks the Court to award certain costs that the Clerk refused to tax. While the Clerk taxed Mr. Rios's costs in the amount of $3,411.45, she did not award certain costs that, by rule, are not taxable. *See* C.D. Cal. L.R. 54-3.5; C.D. Cal. L.R. 54-3.10(b); *see also* Bill of Costs, ECF No. 156. Therefore, Mr. Rios requests that the Court award the costs not taxed by the Clerk. But "[a] party may [only] seek review of the Clerk's taxation of costs by filing and serving a motion to retax costs within seven (7) days of the Clerk's decision." C.D. Cal. L.R. 54-2.5. Mr. Rios failed to file a motion to re-tax costs within seven days of the Clerks' decision. Accordingly, the Clerk's decision is final.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-05341-RGK-MAA | | Date | March 2, 2023 |
|---|---|---|---|---|
| Title | ***Michael Rios, et al. v. City of Los Angeles, et al.*** | | | |

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS in part** Plaintiffs' Motion and **AWARDS** Mr. Rios $620,671.50 in attorneys' fees.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer                    JRE/ap

# Exhibit 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ASFALL, | Case No.: 18-cv-00505-CBM |
|     Plaintiff, | |
| vs. | **ORDER RE: DKT. NO. 233; DKT. NO. 214** |
| LOS ANGELES UNIFIED SCHOOL DISTRICT, | |
|     Defendant. | |

    The matter before the Court is Plaintiff's Motion for Relief From Late Filing of Attorney's Fees and Costs (the "Relief Motion") (Dkt. No. 233), and Motion for Attorney's Fees and Costs (the "Fee Motion") (Dkt. No. 214). The Relief Motion is fully briefed. (*See* Dkt. No. 234 (Opp.); Dkt. No. 235 (Reply).) The Fee Motion is fully briefed. (Dkt. No. 216 (Opp.); Dkt. No. 218 (Reply).)

## I. BACKGROUND

    LAUSD terminated Plaintiff from his coaching position at Harbor Teacher Preparation Academy in retaliation for complaints Plaintiff made concerning the allegedly inequitable treatment of the girls' soccer program as compared to the boys' basketball program. The case was tried to a jury. Defendant moved for judgment as a matter of law during trial, which was submitted. The jury returned a

verdict finding LAUSD liable to Plaintiff for retaliation under Title IX and awarded $100,000 in damages, but not liable for retaliation under Cal. Labor Code § 1102.5. (Dkt. No. 174 (Verdict).) Judgment was entered on February 24, 2020.

After trial, Plaintiff moved for post-verdict injunctive relief, which the Court denied on February 11, 2020. (*See* Dkt. No. 191.) Over two months later, Defendant filed a motion for renewed judgment as a matter of law or, in the alternative, a motion for new trial, which the Court denied on May 19, 2020. (*See* Dkt. No. 198.) On June 8, 2020, Defendant filed a notice of appeal of the order denying judgment as a matter of law or a new trial.

Plaintiff filed the Fee Motion on July 14, 2020. Defendant argues in Opposition that the Fee Motion is untimely. Thereafter, Plaintiff filed the Relief Motion regarding the purported untimely filing of the Fee Motion.

## II. JURISDICTION

The Court has jurisdiction over this action under 28 U.S.C. § 1331.

## III. DISCUSSION

### A. The Fee Motion Is Untimely

When a separate document embodying the judgment is not entered but is required, then "judgment is entered in the civil docket … [when] 150 days have run from the entry in the civil docket." Fed. R. Civ. P. 58(c)(2)(B). The verdict was entered on the civil docket on September 25, 2019. Therefore, judgment entered by operation of law on February 24, 2020. *See Orr v. Plumb*, 884 F.3d 923, 929 (9th Cir. 2018) ("[E]ntry of the jury special verdict started the 150-day countdown…").

A motion for attorney's fees must "be filed no later than 14 days after the entry of judgment[.]" Fed. R. Civ. P. 54(d)(2)(B)(i). The 14-day period in which a motion for attorney's fees must be filed is tolled pending the outcome of post-trial motions under Fed. R. Civ. P. 50 or 59. *See Bailey v. County of Riverside*, 414 F.3d 1023, 1024 (9th Cir. 2005). "Therefore, the Rule 54(d)(2)(B) motion for fees

1    is timely if filed no later than 14 days after the resolution of a Rule 50(b), Rule

2    52(b), or Rule 59 motion." *Id.*

3         Here, the time for filing the Fee Motion was tolled from February 24, 2020

4    to May 19, 2020, the date on which the Court denied Defendant's Rule 50 and

5    Rule 59 motions. (*See* Dkt. No. 198.) Therefore, the Fee Motion was due on June

6    2, 2020, fourteen days after May 19, 2020. Plaintiff did not file the Fee Motion

7    until July 14, 2020. (*See* Dkt. No. 214.)

8         Thus, the Court finds the Fee Motion is untimely.

9    **B.    The Relief Motion**

10        "When an act may or must be done within a specified time, the court may,

11   for good cause, extend the time … on a motion made after the time has expired if

12   the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b). To

13   determine whether Plaintiff acted with excusable neglect, the Court applies a

14   factor test set out in *Pioneer Inv. Services Co. v. Brunswick Associates Ltd.*

15   *Partnership*, 507 F.3d 380, 395 (1993). Factors to be considered are: (1) whether

16   Defendant would be prejudiced by the late filing; (2) the length of the delay and

17   impact on efficient court administration; (3) the reason for the delay, including

18   whether it was in reasonable control of the Plaintiff; and (4) whether Plaintiff and

19   his counsel acted in good faith. *Id.* at 395.

20        **1.    Prejudice to Defendant**

21        Defendant argues it will be prejudiced if Plaintiff is permitted to file his

22   motion for attorney's fees because an untimely Fee Motion deprives Defendant

23   "of the opportunity to evaluate the motion and fees sought before having to retain

24   an appellate attorney and file a notice of appeal," will result in a separate appeal

25   being filed, will result in budgeting uncertainties for the school district, has

26   required expenditure of additional money to oppose the Relief Motion, and may

27   affect the speed at which the appeal is resolved. (Dkt. No. 234 at p. 12:9-28.)

28

The Court rejects Defendant's arguments. Under Fed. R. App. 4(1)(A), Defendant was required to notice an appeal by June 19, 2020, 30 days after the Court denied Defendant's Rule 50 and Rule 59 motion on May 19, 2020. *See* Fed. R. App. 4(1)(A). As Plaintiff argues, if the Fee Motion was timely filed on June 2, 2020, the earliest hearing date for the Fee Motion would be June 30, 2020. *See* C.D. Cal. L.R. 6-1. Thus, Defendant would have been required to notice a separate appeal of a timely-filed motion for attorney's fees if that motion was granted. Moreover, the cost of defending the Relief Motion and Fee Motion cannot constitute prejudice.

### 2. Length of Delay

"Failure to comply with the time limit in Rule 54 is sufficient reason to deny a motion for fees absent some compelling showing of good cause." *In re Veritas Software Corp. Securities Litig.*, 496 F.3d 962, 972-73 (9th Cir. 2007) (citing *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 889-90 (9th Cir. 2000)).

Plaintiff delayed 28 days before filing the Fee Motion. Courts have found lengthier delays to be reasonable. *See Laurino v. Syringa General Hosp.*, 279 F.3d 750, 754 (9th Cir. 2002) (finding five-week delay not unreasonable); *see also In re Veritas*, 496 F.3d at 974 ("While the district court would not have abused its discretion in granting [an untimely] fee application, it did not abuse its discretion in denying it.").

Accordingly, the Court finds that the length of the delay was not unreasonable in this case.

### 3. Reason for the Delay and Good Faith

Plaintiff argues his counsel filed the Fee Motion late because they were confused about when the motion was due without a separate judgment, especially considering the long delay before Defendant filed their Rule 50 and Rule 59 motion. Plaintiff contends his counsel "acted promptly when he discovered there may be an issue" with the timeliness of his Fee Motion. In *Pincay v. Andrews*, 389

4

F.3d 853, 860 (9th Cir. 2004), the Ninth Circuit affirmed an order granting extension of the time to file the notice of appeal where the movant argued excusable neglect based upon a misreading of the rules of procedure.  Moreover, the Ninth Circuit has recognized the separate document requirement exists to prevent confusion for post-verdict motions and appeals.  *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1258 (9th Cir. 2004) (citation omitted).

Defendant argues the rule for automatic entry of judgement is clear, and Plaintiff does not explain the basis for his belief that the federal rules of civil procedure did not apply, nor why he did not move for attorney's fees after the denial of the post-trial motions.

The Court finds Plaintiff acted based on excusable neglect and in good faith. Plaintiff diligently filed the Fee Motion upon learning of his error and appears to have delayed in filing the Fee Motion under a mistaken belief that a separate document constituting a judgment was required before the Fee Motion could be filed.  A negligent mistake by counsel in reading a rule "represents the beginning of our inquiry as to whether the negligence is excusable, not the end of it." *Pincay*, 389 F.3d at 858-59.  Under the circumstances of this case, the prejudice Plaintiff will suffer if the Relief Motion is denied outweighs the prejudice to Defendant.

Therefore, the Court **GRANTS** the Relief Motion and consider the Motion for Fees.

**C.     The Fee Motion**

Plaintiff seeks $1,160,748 in attorney's fees, based on the total hours worked multiplied by the billing rate of the attorney, plus a lodestar multiplier of 2.0 "due to the difficult nature of this case and the outstanding result."  (Dkt. No. 214 at p. 6:3-10.)

The Court, within its discretion, may award Plaintiff attorney's fees pursuant to 42 U.S.C. § 1988.  *See also Hensley v. Eckerhart*, 461 U.S. 424, 429

1    (1983) ("The purpose of [Section] 1988 is to ensure 'effective access to the
2    judicial process' for persons with civil rights grievances."). "The Supreme Court
3    has instructed that '[t]he initial estimate of a reasonable attorney's fee is properly
4    calculated by multiplying the number of hours reasonably expended on the
5    litigation times a reasonable hourly rate,' an approach commonly known as
6    'lodestar.'" *Vargas v. Howell*, 949 F.3d 1188, 1194 (9th Cir. 2020) (citation
7    omitted). "Reasonable hourly rates 'are to be calculated according to the
8    prevailing market rates in the relevant community.'" *Id.* (citation omitted.) In
9    addition, the Ninth Circuit has "identified no fewer than 12 factors 'to be
10   considered in the balancing process.'" *Id.* (quoting *Kerr v. Screen Extras Guild,
11   Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).[1]

12        Plaintiff was the prevailing party on one of his claims and is therefore
13   entitled to attorney's fees. *See Hensley*, 461 U.S. at 434, 436.

14        **1.    Billing Rate and Hours**
15           **a.    Jay Bernard Alexander, III**
16                **i.    Billing Rate**
17        Jay Bernard Alexander, III ("Alexander") bills at a rate of $950.00 per hour.
18   (Alexander Decl. at ¶ 28.) Alexander's billing rate reflects his thirty years of
19   experience, specialty in employment cases, history of success in employment
20   litigation, and designation as a "Top 100 Southern California Super Lawyer[], by
21   Los Angeles Magazine and Law & Politics." (*See id.* at ¶¶ 3-19.) Alexander also

---

[1] The factors from *Kerr*, 526 F.2d at 69-70, are:
> (1) the time and labor required, (2) the novelty and difficulty of the
> questions involved, (3) the skill requisite to perform the
> legal services properly, (4) the preclusion of other employment by the
> attorney due to acceptance of the case, (5) the customary fee, (6)
> whether the fee is fixed or contingent, (7) time limitations imposed
> by the client or the circumstances, (8) the amount involved and the
> results obtained, (9) the experience, reputation, and ability of the
> attorneys, (10) the 'undesirability' of the case, (11) the nature and
> length of the professional relationship with the client, and (12)
> awards in similar cases.

submits declarations from experienced attorneys who practice in the civil rights and employment arenas, who attest to the experience and skill of Alexander and confirm that his billing rate is reasonable. (*See* Decl. of V. James Desimone at ¶¶ 10-11; Decl. of Lee Feldman at ¶¶ 11, 13; Decl. of Carol L. Gillam at ¶ 13.) Additionally, courts have approved Alexander's $850 per hour billing rate for 2018. (Alexander Decl. at Ex. 3, 4, 5.) Defendant argues that Alexander has limited experience in the civil rights area such that his hourly rate should be reduced, however the claims at issue in the trial were for retaliation under Title IX and California law arising from the termination of Plaintiff, where Alexander's employment specialty was transferrable.

Based on these submissions, the Court finds a billing rate of $950.00 per hour is reasonable for Alexander.

### ii.     Hours Billed

Alexander billed 323.1 hours during the pendency of this matter. (Alexander Decl. at ¶ 38.) Exhibit 2 to Alexander's declaration is an invoice reflecting the total hours he worked, as well as his associates. Defendant argues the attorney's fees claimed by Alexander should be reduced to the extent he claims work billed for the defamation claim, duplicative billing, inter-office correspondence, administrative tasks, and an appeal. (Dkt. No. 216-1 (Decl. of Vanessa Martinez) at Ex. A-F.)

Defamation

The Ninth Circuit holds "that, while hours spent on an unsuccessful claim 'that is distinct in all respects from [the plaintiff's] successful claim' should be excluded, '[w]here a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fees reduced simply because the district court did not adopt each contention raised.'" *Ibrahim v. U.S. Dep't of Homeland Security*, 912 F.3d 1147, 1174 (9th Cir. 2019) (quoting *Hensley*, 461 U.S. at 440). To determine whether claims are related, the Ninth Circuit "do[es]

not require commonality of *both* facts *and* law," but rather asks "whether the unsuccessful and successful claims arose out of the same course of conduct." *Id.* (italics in original, internal quotation marks and citations omitted).

Here, Plaintiff asserted a claim for defamation, which the Court dismissed on summary judgment. (*See* Dkt. No. 73.) Therefore, Plaintiff did not prevail on that claim. Moreover, Plaintiff's claim for defamation did not arise from the same course of conduct as his successful Title IX claim. While the Title IX claim alleged Defendant retaliated against Plaintiff for events which occurred during his employment, the defamation claim involved statements made by employees of Defendant after Plaintiff had been terminated. (*See id.* at p. 9:26-10:6.)

Therefore, the Court reduces the attorney's fee award for time spent on the defamation claim. Accordingly, the Court excludes 17.7 hours billed by Alexander for work related to the defamation claim.

Duplicative Billing

Courts "examine with skepticism claims that several lawyers were needed to perform a task, and should deny compensation for such needless duplication as when three lawyers appear for a hearing when one would do." *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1286 (9th Cir. 2004) (internal citations omitted).

Defendant identifies instances in which Alexander and others participated in the same client meetings, reviewed the same emails and documents, and prepared for and attended the same deposition and mediation. The Court finds the time billed by multiple lawyers was reasonable, except for time billed by multiple attorneys for attending the deposition of Brian Groven and the mediation. The Court awards Alexander fees for that time, but will exclude time billed by other lawyers at his firm for the same meetings.

Inter-Office Correspondence

Alexander billed 16.3 hours for services such as sending and reviewing emails, as well as discussions and meetings with lawyers and paralegals at the firm. Those activities total $15,485 at Alexander's billing rate. The Court acknowledges that interoffice communication is necessary, but an award of the total time Alexander billed for interoffice communication in this matter is unreasonable. Therefore, the Court reduces the award to $7,600, reflecting 8 hours for interoffice communication billed at $950 per hour.

Clerical Tasks

"Purely clerical or secretarial tasks should not be billed" at the rate of lawyers or paralegals, "regardless of who performs them[.]" *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989).

Here, Alexander billed 0.3 hours to review his calendar. That is not legal work, and the Court reduces the fee award by 0.3 hours.

Appeal

Although the Ninth Circuit has not addressed this issue, the Eleventh Circuit has held that a district court is not permitted to award attorney's fees rendered for an appeal because the rules of the appellate court govern the award of fees on appeal. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1356-57 (11th Cir. 2009). Because the Ninth Circuit requires litigants to apply for fees through the procedures of Fed. R. App. P. 39-1.6, the Court finds Plaintiff is precluded from obtaining fees for work performed for an appeal.

Alexander billed 1.8 hours for services related to the appeal by Defendant. Accordingly, the Court reduces the billing hours of Alexander by 1.8 hours.

Therefore, the Court finds that the lodestar for Alexander's work is $280,250, reflecting 295 hours billed at a rate of $950.00 per hour.[2]

---

[2] The attorney's fee award includes Alexander's services on this case from its inception through trial, participation in discovery, and motion practice, reduced consistently with this order.

### b.     Tracy Fehr

Tracy Fehr ("Fehr") billed 6.3 hours at a billing rate of $650 per hour.  (Fehr Decl. at ¶¶ 10, 16.)  Fehr's billing rate reflects her fifteen years of experience, specialty in employment law, and designation as a "Southern California 'Rising Star' by Super Lawyers Magazine." (*Id.* at ¶¶ 4-5, 9.)  A court approved her billing rate of $595 per hour in 2018.  (*Id.*, Ex. 4.)   Defendant does not argue Fehr's billing rate is unreasonable.  Therefore, the Court finds a billing rate of $650.00 per hour is reasonable for Fehr.

Fehr billed 3.8 hours for services rendered on this matter, including assisting with the motion for summary judgment and mediation.  (Fehr Decl. at ¶ 15; *see also* Alexander Decl., Ex. 2.)  Fehr billed 2.5 hours assisting in the pending appeal, which the Court excludes.

Accordingly, the Court finds that the lodestar for Fehr's work is $2,470, reflecting 3.8 hours billed at a rate of $650 per hour.

### c.     Jessica Choi

Jessica Choi ("Choi") billed 289 hours at an hourly rate of $350 per hour.  (*See* Fee Motion at p. 16:1-9; *see also* Alexander Decl. at Ex. 2.)  Choi has not filed a declaration in support of her motion for fees because she is no longer employed by Alexander Krakow & Glick, LLP, although the parties agree Choi would be a third-year associate if she continued with that firm.  Plaintiff submits declarations from experienced attorneys who practice in the employment and civil rights law, who declare that a billing rate of $350 per hour is reasonable for a third-year associate.  (*See* Gillam Decl. at ¶ 13; Desimone Decl. at ¶ 11; Feldman Decl. at ¶ 15.)  Plaintiff submits no evidence reflecting the specialty or experience of Choi, and Choi billed significantly while she was a first-year associate, which requires additional supervision.  Therefore, the Court finds a reduced billing rate of $250 per hour is reasonable.

The Court finds Choi billed 83.8 hours on work related to Plaintiff's unsuccessful defamation claim. Moreover, the Court finds Plaintiff's fees are duplicative regarding Choi's attendance at a client meeting at which Alexander was present, as well as multiple reviews of trial documents and emails. Duplicative fees total 2.2 hours. Additionally, the Court finds Choi billed 12.5 hours for inter-office correspondence and 0.2 hours for clerical tasks, which were unreasonable.

Accordingly, the Court finds a lodestar amount of $47,575 for Choi's work is reasonable, reflecting 190.3 hours billed at a $250 per hour billing rate.

### d.   Britt L. Karp

Britt L. Karp ("Karp") billed 311 hours for services rendered in this case at a billing rate of $475 per hour. (Karp Decl. at ¶¶ 7, 12.) Karp's billing rate reflects her nine years of experience in litigation, and significant experience in trials and arbitration. (*Id.* at ¶¶ 3, 5-6.) Moreover, Karp attaches declarations filed in support of a motion for fees in California Superior Court and the Central District, which evidence that her billing rate is within the range of other firms in the community. Defendant does not dispute the reasonableness of Karp's billing rate. Accordingly, the Court finds Karp's billing rate of $475 per hour is reasonable.

The Court finds Karp billed 2.1 hours on work related to Plaintiff's unsuccessful defamation claim. Moreover, the Court finds Karp billed 10.7 hours in duplicative work, including attendance at a deposition and mediation in which Alexander was present, and 0.7 hours on clerical tasks, which was unreasonable. Additionally, Karp billed 2.7 hours on work related to an appeal, which the Court excludes.

Accordingly, the Court finds a lodestar amount of $140,030 for Karp's work is reasonable, reflecting 294.8 hours of work billed at a rate of $475 per hour.

### e.    Gustin Ham

Gustin Ham ("Ham") is an Office Manager at Alexander Krakow & Glick, LLP, who performs paralegal work. (Ham Decl. at ¶¶ 1, 4.) Ham bills at a rate of $210 per hour for paralegal work, and his rate of $195 per hour has been approved in three cases. (*Id.* at ¶¶ 5-6.) Plaintiff submits declarations from experienced attorneys who practice in the employment and civil rights law, who declare that this billing rate is reasonable. (*See* Gillam Decl. at ¶ 13; Desimone Decl. at ¶ 11; Feldman Decl. at ¶ 15.) Defendant does not dispute that this is a reasonable billing rate for an experienced paralegal. Accordingly, the Court finds Ham's billing rate of $210 per hour is reasonable.

Although the billing record reflects that Ham billed 50.6 hours for attending trial, Ham declares that he billed only 24.7 paralegal hours in this matter. (Ham Decl. at ¶ 9.) Defendant argues that Ham performed non-paralegal tasks at trial, but Ham's declaration indicates he helped to "prepare all of Plaintiff's exhibits for use at trial, coordinated with witnesses and managed the audio-visual presentation of all exhibits, videotaped deposition testimony, and Plaintiff's closing argument PowerPoint." (*Id.* at ¶ 7.)

The Court finds that reasonable paralegal fees in this action are $5,187, reflecting 24.7 hours billed at a reasonable rate of $210 per hour.

### f.    Natalie Khoury

Natalie Khoury ("Khoury") is a "law clerk" who billed 15.91 hours at a billing rate of $225, for a total of $3,580. Khoury has not filed a declaration explaining her billing rate, although Alexander declares he "is familiar with the rates charged for law clerks" and therefore "set a reasonable rate of $225 per hour for her." (Alexander Decl. at ¶ 29.) No other evidence supports her billing rate, nor does Plaintiff provide authority in which the services of a law clerk are recoverable on a motion for attorney's fees.

1    Therefore, the Court does not award fees based on the hours billed by

2    Khoury.

3                    *     *     *     *     *     *

4        Accordingly, the Court finds $475,512 in attorney's fees is reasonable in

5    this case.

6    **D.    The Court applies a multiplier of 1.1 in this case**

7        Plaintiff moves the Court to apply a multiplier of 2.0 to the fee award.  "In

8    appropriate cases, the district court may adjust the 'presumptively reasonable'

9    lodestar figure based upon the factors listed in [*Kerr*, 526 F.2d at 69-70]."  *Cairns*

10   *v. Franklin Mint Co.*, 292 F.3d 1139, 1158 (9th Cir 2002) (citations omitted).

11   Courts "need not consider all twelve factors, but only those called into question by

12   the case at hand and necessary to support the reasonableness of the fee award."

13   *Kessler v. Assocs. Fin. Servs. Co. of Hawaii*, 639 F.2d 498, 500 n.1 (9th Cir. 1981).

14       Here, the *Kerr* factors do not support awarding Plaintiff a multiplier of 2.0.

15   Plaintiff argues a multiplier is justified because of the complexity of the claims and

16   the minimal loss suffered by Plaintiff.  The Court finds those factors are already

17   encompassed by the lodestar amount awarded to Plaintiff.  However, the Court

18   recognizes that Plaintiff's counsel worked on contingency and that the Title IX

19   retaliation claim is a novel theory on which he prevailed.

20       Accordingly, the Court applies a 1.1 multiplier to the attorney's fee award.

21   The total award in attorney's fee, including a 1.1 multiplier, is $523,063.20.

22   **E.    Plaintiff is entitled to cover costs under Fed. R. Civ. P. 54(d)**

23       "It is well established that attorney's fees under 42 U.S.C. § 1988 include

24   reasonable out-of-pocket litigation expenses that would normally be charged to a

25   fee paying client, even if the court cannot tax these expenses as 'costs' under 28

26   U.S.C. § 1920."  *Trustees of Cost. Indus. v. Redlands Ins. Co.*, 460 F.3d 1253,

27   1257 (9th Cir. 2006).

28

Plaintiff claims costs of $664.84 for fees related to service of process; $6,495.00 for depositions, and $400 for Clerk's Fees, totaling $7,559.84. Those items are taxable as costs under Local Rule 54-3, and Defendant does not dispute the costs.

Therefore, the Court awards $7,559.84 in costs.

## IV. CONCLUSION

The Court **GRANTS** Plaintiff's Relief Motion (Dkt. No. 233) and **GRANTS** Plaintiff's Fee Motion (Dkt. No. 214.) The Court awards $523,063.20 in attorney's fees and $7,559.84 in costs to Plaintiff against Defendant.

**IT IS SO ORDERED.**

DATED: October 28, 2020.

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

CC:FISCAL

# Exhibit 3

*april 24, 2017*
*march 2019*

10/23/19
Dept. 73 (Hearing held at Spring Street Courthouse, Dept. 11)
Rafael Ongkeko, Judge presiding

**HAROLD CARTER v. FEDERAL EXPRESS CORPORATION** (BC658923)

Counsel for plaintiff: J. Bernard Alexander, III (Alexander Krakow Glick, "AKG"); Natasha
Chesler (Chesler McCaffrey)
Counsel for defendant: Charles Matheis; Stephanie Stroup

**Matter:**

Plaintiff's motion for attorney and expert fees (filed 7/26/19)

**TENTATIVE RULING:**

**Plaintiff's motion for attorneys' fees**: Grant in part; deny in part. Reasonable attorneys' fees
are awarded in favor of plaintiff and plaintiff's counsel, and against defendant Federal Express
Corporation in the amount of **$957,076.50**.

**Plaintiff's motion for expert fees**: Denied as moot. These cost items were itemized in
Plaintiff's memorandum of costs (filed 5/9/19). These items and the total for such items sought
here ($38,461) are identical and have already been included in the amended judgment.
Defendant did not file a motion to tax costs and approved the amended judgment as to form.

**DISCUSSION**

After eight trial days between March 12-22, 2019, on March 25, 2019 the jury rendered its
special verdict in favor of Plaintiff, awarding compensatory damages in the amount of
$5,317,162 against Defendant. After the court ruled on Defendant's motion for new trial,
Plaintiff accepted a remittitur in lieu of a new trial on damages. On July 30, 2019, the court
entered the amended judgment in favor of Plaintiff against FedEx in the amount of $3,515,000.

Plaintiff timely[1] seeks an attorney fee award based on the following:

- Approximately 1174 hours of attorney time at four different billing rates;
- Approximately 112 hours of paralegal time at two different billing rates;
- A lodestar amount of $874,586.50;
- A requested multiplier of 2.0;
- For a total fee award requested in the amount of $1,749,173.

---

[1] Although filed before entry of the amended judgment, the motion remains timely under CRC
3.1702(b). Timeliness is not in dispute.

Plaintiff itemizes the proposed lodestar with the following table:[2]

| Attorney/Staff | Hourly Rate | Hours Spent | Total |
|---|---|---|---|
| J. Bernard Alexander, III | $850 | 360.8 | $ 306,680 |
| Natasha Chesler | $675 | 741.5 | $ 500,512.50 |
| Timothy McCaffrey | $700 | 46.9 | $ 32,830 |
| Tracy L. Fehr | $610 | 25.3 | $ 15,433 |
| Gustin Ham | $210 | 38.6 | $ 8,106 |
| Noah Longo | $150 | 73.5 | $ 11,025 |
| TOTAL | | | $874,586.50 |

Plaintiff then requests a 2.0 multiplier, or a total award of $1,749,173.

Defendant proposes $326,972.31, based entirely on the declaration of David Paige, FedEx's proffered expert "in the standards and practices of legal billing." (Opp., 2:22)

Plaintiff's reply was served by mail on 8/30/19 but does not show it has been entered in the court's register as of this date. The court considers the reply, but orders Plaintiff to contact the clerk forthwith to assure its entry for a proper record.

Entitlement to statutory attorney's fees and the lodestar method:

In this FEHA action, plaintiff's statutory entitlement to a discretionary award of reasonable fees pursuant to Govt. Code § 12965(b) is not disputed. Although discretionary in language, in the absence of special circumstances rendering a fee award unjust, a prevailing party in a FEHA action should ordinarily recover attorney's fees. (*Cummings v. Benco Bldg. Services* (1992) 11 Cal. App. 4th 1383, 1387.)

As in other fee-shifting statutes, "The objective starting point in the attorney fee analysis is the lodestar figure. (Citation omitted.) The lodestar figure is calculated using the reasonable rate for comparable legal services in *the local community* for noncontingent litigation of the same type, multiplied by the reasonable number of hours spent on the case..."[t]he reasonable hourly rate is that prevailing in the community for similar work". (Citations omitted) (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1242-1243 (Italics in original).)

---

[2] The itemized billing for Timothy McCaffrey shows erroneous totals of 50.9 hours and, at $700/hr., $35,630. (Ex. 6)  When compared to the actual numbers requested in the motion (46.9 and $32,8930, respectively), this was an obvious four-hour ($2800) error on its face, but Defendant's fee expert, David Paige, said "I am unable to determine what the $2,800 discrepancy relates to…" (Paige declaration, Ex. 3, p.3, fn.1)

The trial court "has discretion to make upward or downward adjustments" to the lodestar. *(Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 58.) "[T]he lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award...." *(Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 154.)

<u>Hours</u>.   Time records have been provided.  While it is true that the court may disregard counsel's time records if they are "padded and vague and therefore noncredible" and include "entries inflated with noncompensable hours [that] destroy an attorney's credibility with the trial court" [*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1324-1326], such is not the case here.  The work performed has been sufficiently described, particularly those offered in support of the Alexander firm.  Moreover, the court does not see evidence of padding in the Chesler billings based on the liberal use of .1 increments throughout her work.  However, "[t]he trial court is not bound by an attorney's evidence in support of his [or her] requested fee." *(Vella v. Hudgins* (1984) 151 Cal.App.3d 515, 524.)

"'[A]bsent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent'* in litigating the action to a successful conclusion. [Citation; emphasis in orig.]" *(Horsford v. Bd. Of Trustees, etc.*(2005) 132 Cal.App.4th 359, 394); see also *Vo v. Las Virgenes MWD* (2000) 79 Cal.App.4th 440, 446 ["[u]nder the lodestar method, a party who qualifies for a fee should recover for all hours reasonably spent unless special circumstances would render an award unjust"].)

Having reviewed Plaintiff's detailed time entries, the court finds that all of the hours expended by Plaintiff's counsel are reasonable and were necessary to the prosecution of this case except for the following special circumstances:

- Duplication of effort.  The court finds it would be unjust to award the full amount requested.  There was duplicate work approximating 25 hours to familiarize the AKG firm with the case in its role as lead trial counsel (such as reviewing past pleadings and motions, depositions, and the like) and earlier work summarizing depositions, for which the court deducts 8.3 hours from Chesler's work (summaries by paralegal specifically for trial preparation and use by Mr. Alexander are compensable); and
- Another is an area loosely described as requiring billing judgment, where there are various dual billings by both the Alexander firm and attorney Chesler for consulting and corresponding with each other, approximately 15 hours, to be deducted from the Chesler total (in recognition of Mr. Alexander's retention as lead trial counsel).

Plaintiff requests the Paige declaration be stricken for various reasons.  The court declines to do so.  At the same time, however, the court finds this declaration lacks even minimal persuasive weight.  There is no solid or credible evidence of Paige's personal work undertaken in California fee motions, much less contingency work in employment discrimination cases.  He applies across-the-board percentage deductions based on unfounded billing analysis and speculation: blockbilling (AKG firms clearly did not blockbill; Chesler bills are concise, but generally

3

sufficiently described; actual trial days are by nature patent and self-defining without need for repeating known trial events); administrative, clerical, overhead (yes, but minimal and not abusive); legal research over 3 hours (disability law is not cookie-cutter and can be problematic; here, entries are acceptable to the court given the issues in the case); overqualified staffing (not applicable in the court's opinion). Redactions appear generally appropriate, selective, and often self-explanatory based on context, the events in the case, and dates involved. Because the court accepts Plaintiff's hourly rates (discussed below), even if the court were to accept Paige's "Step 1" and "Step 3" analyses (Paige decl., Ex. 3, p.5-6, 21), the court calculates a lodestar at the requested hourly rates would be $653,038.94.

FedEx vigorously defended this case with at least two, and, later, three, attorneys handling the case from its inception through post-trial. As Plaintiff points out, FedEx has not submitted their own time spent conducting FedEx's defense to provide some measure of comparison to Plaintiff's own time record. Paige did not consider defense costs in his own analysis.

The adjusted lodestar hours (deducting 25 hours from AKG and 23.3 from Chesler) are 1126.2 attorney hours and 112.1 paralegal hours. These hours represent a reasonable number of hours that "an attorney might reasonably expect to spend in litigating [plaintiff's] claim." *(Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 991.) Plaintiff was a long-term employee whose 25-year employment, complicated by a serious industrial injury and several job performance reviews over time, required the kind of work that his attorneys expended in the face of a strong defense. The time spent reflects a plaintiff's case that was well-prepared and presented in an organized, efficient, and competent fashion in the face of a defense determined to proceed to trial.

Apportionment of Fees is Impractical Because Carter's Claims are Intertwined

Defendant argues fees should be reduced based on Plaintiff's losing his claims of disability discrimination, wrongful termination, and punitive damages, and the adverse finding on the same decision defense. Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units. *(Akins v. Enterprise Rent–A–Car Co. of San Francisco* (2000) 79 Cal.App.4th 1127, 1133-1134.) The court rejects FedEx's narrow view of the case and the litigation success achieved here. "[F]ees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims. *(Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 431)." *Chavez, supra,* at 989.) Whether plaintiff prevailed or not on each, or only some, of the causes of action, facts common to all of them were necessarily investigated, covered in discovery, and litigated at trial. This was not a case that had several independent moving parts, one wholly distinct and separable from the other. In this FEHA disability discrimination action, the disability and notice prongs had to be proven as predicates to the FEHA violations ultimately established, a point FedEx must necessarily concede. All the facts were relevant to plaintiff's on-the-job injury, his disability-related claims, such as the accommodation requests, FedEx's failure to engage in the interactive process, and retaliation. For example, one could not discuss Cooper's and Wipf's involvement or the progressive discipline issues without discussing all of these overlapping issues, including those on which the jury eventually ruled in favor of FedEx. True, the jury did not conclude that FedEx

discriminated against Plaintiff or wrongfully terminated him. However, Plaintiffs' counsel adroitly established the key chronological events and disability predicates through skillful use of discovery, direct testimony, exhibits, impeachment, and argument. Were it not for such effort, the FEHA violations found here would not have materialized. "…[L]itigation may involve a series of attacks on an opponent's case. The final ground of resolution may become clear only after a series of unsuccessful attacks. Compensation is ordinarily warranted even for those unsuccessful attacks, to the extent that those attacks led to a successful claim. (Citation omitted.)" *(Akins, supra,* at 1133.) Here, all of Plaintiff's claims are supported by the same underlying conduct and cannot be distinguished and apportioned. The court finds the claims are so intertwined that apportionment would be impractical, if not impossible.

Hourly rate. "The reasonable hourly rate is that prevailing in the community for similar work." *(PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095.) Having over 40 years of experience in the local legal community, the last 17 as a judge, and the last 10 in family and civil division courts deciding many attorney fee motions, the court is very familiar with hourly rates for attorneys in the local community, and particularly in employment litigation. Here, the court finds that each attorney's hourly rate is a reasonable rate for comparable legal services in the L.A. metro area for noncontingent employment litigation and is adequately supported by the evidence each provides. In particular, Plaintiff's lead trial counsel, Mr. Alexander has shown that his thorough trial preparation, coming to the case three months before trial, and superb trial advocacy merit his $850/hour rate. The court does not find the Paige hourly rate analysis realistic, helpful or credible.

Lodestar. In accordance with the hours claimed (reduced as explained above) at the hourly rates the court has found as reasonable, the court calculates the lodestar amount at **$837,609**.

Multiplier. Once a reasonable lodestar is determined, the trial court, if requested, must consider whether to increase or decrease the award through a multiplier. *(Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1134.) In the leading case of *Serrano v. Priest,* the California Supreme Court approved a multiplier based on, among other factors: (1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing lawsuits of the character here involved; and (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed." *(Serrano v. Priest* (1977) 20 Cal.3d 25, 49.)

The court finds that a multiplier of 1.5 is reasonable and should be awarded to plaintiff's counsel. However, the court limits the multiplier award to Mr. Alexander's pre-trial and trial-related work only, between 12/16/18 and 3/25/19 (i.e., 281.1 hours at $850/hr., or $238,935), resulting in an additional award of **$119,467.50**. Without duplicating the factors that are necessarily already included in the lodestar, the court finds that the following factors warrant this multiplier: the exceptional success achieved despite not prevailing on plaintiff's wrongful termination, disability discrimination and punitive damage claims; the unique complexity of explaining the

job performance issues and the disability discrimination and retaliation claims; the contingency risk, and lost opportunities from taking on other matters on short notice.  In the court's view, Mr. Alexander's trial advocacy cannot be understated and was a key factor in Plaintiff's prevailing on the three claims upon which he did prevail.  Plaintiff's success on three claims and the quality of trial representation in achieving that success are reflected in the jury's acknowledgment of Plaintiff's damages case as presented and argued by Mr. Alexander, even if ultimately reduced by accepting the court's remittitur.  The court rejects a higher multiplier given Mr. Alexander's brief involvement with the case and the absence of a complete victory.  The court also rejects a multiplier as to the balance of work performed by all counsel given the relatively short time of two years from complaint to verdict; the sufficiency of the base fee award; and only partial success (failing to persuade the jury that Plaintiff was a competent employee who should not have been terminated or that FedEx acted with malice).

The total attorneys' fee award under Government Code § 12965(b) which the court finds as reasonable is **$957,076.50**.

The clerk shall make the necessary interlineations and insertions on the amended judgment filed herein on 7/30/19.

Unless waived, notice of ruling by moving party.

# Exhibit 4

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                                    January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**           8:30 AM

Judge: Honorable Michael P. Linfield           CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro              ERM: None
Courtroom Assistant: Vanessa Galindo           Deputy Sheriff: None

---

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

---

**NATURE OF PROCEEDINGS:** Hearing on Motion for Attorney Fees; Hearing on Motion - Other for an Order Awarding Prejudgment Interest From the Date of Plaintiff's CCP Section 998 Offer to Compromise, and Corresponding Amendment of the Judgment

The Court's tentative ruling is provided to all sides via the Court's website.

The matter is called for hearing.

Pursuant to Government Code sections 68086, 70044, and California Rules of Court, rule 2.956, Justus Balentine CSR# 13859, certified shorthand reporter is appointed as an official Court reporter pro tempore in these proceedings, and is ordered to comply with the terms of the Court Reporter Agreement. The Order is signed and filed this date.

After oral argument, the Court takes the above-mentioned matters under submission.

LATER;

The Court, having taken the matter under submission earlier this date, now rules as follows:

Case Number: BC657320 Hearing Date: January 14, 2019 Dept: 34

SUBJECT: (1) Motion for Attorney's Fees and Costs

(2) Motion for an Order Awarding Prejudgment Interest

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
### Central District, Stanley Mosk Courthouse, Department 34

**BC657320**
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**

January 14, 2019
8:30 AM

Judge: Honorable Michael P. Linfield
Judicial Assistant: Reyna Navarro
Courtroom Assistant: Vanessa Galindo

CSR: Justus Balentine CSR#13859
ERM: None
Deputy Sheriff: None

Moving Party: Plaintiff Daryl Kunga

Resp. Party: Defendant American Guard Service, Inc.

The motion for attorney's fees is GRANTED in part. Plaintiff is awarded attorney's fees in the amount of $533,182,50.

The Court GRANTS costs in the amount of $30,762.03 pursuant to plaintiff's Memorandum of Costs.

The Court AWARDS prejudgment interest in the amount of $41,095.89.

BACKGROUND:

Plaintiff Daryl Kunga brought suit against his former employer, Defendant American Guard Services, Inc., on April 11, 2017, alleging causes of action for (1) Disability Discrimination; (2) Failure to Prevent Discrimination; (3) Failure to Engage in Good Faith Interactive Process; (4) Failure to Accommodate; (5) Retaliation; (6) Violation of the California Family Rights Act; (7) Retaliation in Violation of the California Family Rights Act; and (8) Wrongful Termination.

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                                     January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**          8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

On July 26, 2018, a jury returned a verdict in Plaintiff's favor, finding: (1) Defendant failed to
take reasonable steps to prevent retaliation; (2) Defendant failed to engage in the good faith
interactive process; (3) Defendant failed to provide accommodations; (4) Defendant violated the
California Family Rights Act; and (5) Defendant retaliated against Plaintiff in violation of the
California Family Rights Act. The jury awarded Plaintiff $2,000,000 in compensatory damages
and $1,000,000 in punitive damages. Judgment was entered on September 18, 2018.

On November 1, 2018, Defendant's motion for judgment notwithstanding the verdict and motion
for new trial were both denied.

An appeal was filed on November 19, 2018.

Plaintiff now seeks attorney's fees and prejudgment interest.

I. MOTION FOR ATTORNEY'S FEES

As the prevailing party on his FEHA claims, Plaintiff moves the Court for an award of attorney's
fees against Defendant American Guard Service in the amount of $758,795.00. (See Motion, p.
1:19-20.) This sum includes a lodestar figure of $379,397.50 and a 2.0 multiplier. (Id. at p. 1:17-
20.) Plaintiff also seeks an additional $13,650 in expert fees, since the Court has not yet awarded
costs. (See Id. at p. 1:20-21.)

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                                       January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**              8:30 AM

Judge: Honorable Michael P. Linfield              CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro                 ERM: None
Courtroom Assistant: Vanessa Galindo              Deputy Sheriff: None

---

ANALYSIS:

A. Relevant Law

"[A]s a general rule, attorney fees are not recoverable as costs unless they are authorized by statute or agreement." (People ex rel. Dept. of Corporations v. Speedee Oil Change Systems, Inc. (2007) 147 Cal.App.4th 424, 429.)

Attorney's fees may be recovered by a prevailing plaintiff in a FEHA action. (See Gov. Code, § 12965(b); Chavez v. City of Los Angeles (2010) 47 Cal.4th 970, 984.) "[A] prevailing plaintiff should ordinarily receive his or her costs and attorney fees unless special circumstances would render such an award unjust." (Williams v. Chino Valley Independent Fire Dist. (2015) 61 Cal.4th 97, 115 [citing Christiansburg Garment Co. v. EEOC (1978) 434 U.S. 412] [italics in original].)

The trial court has broad authority to determine the amount of a reasonable fee. (PLCM Group, Inc. v. Drexler (2000) 22 Cal.4th 1084, 1095; Ghanooni v. Super Shuttle of Los Angeles (1993) 20 Cal.App.4th 256, 262.) In determining the reasonable value of the attorney services, "the court does not need separate evidence to establish the reasonable value of whatever should be justly awarded, the theory being that the trial judge is competent from his own knowledge of legal practice to fix the amount of the fees. [Citations.]" (Spencer v. Harmon Enterprises (1965) 234 Cal.App.2d 614, 621 [internal citations omitted].)

The attorney bears the burden of proof as to "reasonableness" of any fee claim. (Code Civ. Proc.,

---

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

| | |
|---|---|
| BC657320 | January 14, 2019 |
| **DARYL KUNGA VS AMERICAN GUARD SERVICES INC** | 8:30 AM |

Judge: Honorable Michael P. Linfield            CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro              ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

§ 1033.5(c)(5).) This burden requires competent evidence as to the nature and value of the services rendered. (Martino v. Denevi (1986) 182 Cal.App.3d 553, 559.) "Testimony of an attorney as to the number of hours worked on a particular case is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records." (Martino, 182 Cal.App.3d at 559.)

A plaintiff's verified billing invoices are prima facie evidence that the costs, expenses, and services listed were necessarily incurred. (See Hadley v. Krepel (1985) 167 Cal.App.3d 677, 682.) "In challenging attorney fees as excessive because too many hours of work are claimed, it is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence. General arguments that fees claimed are excessive, duplicative, or unrelated to not suffice." (Lunada Biomedical v. Nunez (2014) 230 Cal.App.4th 459, 488, quoting Premier Med. Mgmt. Sys., Inc. v. California Ins. Guarantee Ass'n (2008) 163 Cal.App.4th 550, 564.)

In determining whether the requested attorney's fees are "reasonable," the Court's

first step involves the lodestar figure—a calculation based on the number of hours reasonably expended multiplied by the lawyer's hourly rate. The lodestar figure may then be adjusted, based on consideration of facts specific to the case, in order to fix the fee at the fair market value for the legal services provided.

(Gorman v. Tassajara Development Corp. (2008) 162 Cal.App.4th 770, 774 [internal citations omitted].) In determining whether to adjust the lodestar figure, the Court may consider the nature and difficulty of the litigation, the amount of money involved, the skill required and employed to handle the case, the attention given, the success or failure, and other circumstances in the case. (EnPalm LLC v. Teitler (2008) 162 Cal.App.4th 770, 774; PLCM Group, Inc. v. Drexler (2000) 22 Cal.4th 1084, 1095.)

---

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                          January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**            8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

---

"'The reasonable market value of the attorney's services is the measure of a reasonable hourly rate. [Citations.] This standard applies regardless of whether the attorneys claiming fees charge nothing for their services, charge at below-market or discounted rates, represent the client on a straight contingent fee basis, or are in-house counsel. [Citations.]'"

(Center For Biological Diversity v. County of San Bernardino (2010) 188 Cal.App.4th 603, 619.)

"The trial courts, of course, should be allowed the discretion to exclude from a fee award the fees incurred by a prevailing party in making frivolous procedural maneuvers, the primary concern in setting rules for attorney fee awards must be the encouragement of efficient litigation." (Presley of Southern California v. Whelan (1983) 146 Cal.App.3d 959, 963.)

At the same time, "[p]arties who litigate with no holds barred in cases such as this, in which the prevailing party is entitled to a fee award, assume the risk they will have to reimburse the excessive expenses they force upon their adversaries." (Stokus v. Marsh (1990) 217 Cal.App.3d 647, 653-654.)

B. Discussion

i. Request for Stay

---

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                                              January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**               8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

On January 4, 2019 Plaintiff's ex parte application to advance the hearing date on Plaintiff's motion for prejudgment interest to be heard with Plaintiff's motion for attorney's fees came on for hearing. Defendant did not appear to oppose the ex parte application, which was granted.

Defendant did, however, file a request for a stay that same day, asking that both the motion for attorney's fees and motion for prejudgment interest be stayed, pending the outcome of Defendant's appeal. (The request for stay also included, in the alternative, an opposition to the motion for attorney's fees. It did not address the merits of the prejudgment interest request.)

Defendant does not cite any authority requiring that the court stay the motions. On the contrary, courts often approve attorney's fee motions while appeals are pending. (Bankes v. Lucas (1992) 9 Cal.App.4th 365, 368-69 ["the filing of a notice of appeal does not deprive the trial court of jurisdiction to award attorney fees as costs post trial"]; Grant v. List & Lathrop (1992) 2 Cal.App.4th 993 [court's order setting attorney fee award entered after notice of appeal filed].)

Accordingly, Defendant's requests for stays of both motions are denied.

ii. Attorney's fees

Plaintiff seeks an award of attorney's fees in the total amount of $758,795.00. This sum consists of $177,990.00 for the services of Moon and Yang, APC, and $201,407.50 for the services of associated trial counsel, Alexander, Krakow, and Glick, LLP. The lodestar requested is $379,397.50, representing 672.6 hours spent by counsel in litigating this matter for over a year and a half. (See Motion, p. 1:17-20.) Plaintiff also seeks a 2.0 lodestar multiplier on the grounds that such an enhancement will account for the contingent nature and complexity of the litigation as well as the "'phenomenal'" result obtained despite the "challenges of the case." (Id. pp. 8:14-

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                                      January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**                     8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

11:11.)

Plaintiff has submitted declarations and detailed billing records for each of the five attorneys and the paralegal who worked on this matter. (See Compendium of Evid., Yang Decl., ¶¶ 10, 20; Garcia Decl., ¶¶ 9, 21; Marquez Decl., ¶¶ 7, 9; Alexander Decl., ¶¶ 25, 33; Fehr Decl., ¶¶ 10, 13; Ham Decl. ¶¶ 5, 13; and Exhs. 1-2, 7.) The declarations and billing records submitted by Plaintiff are sufficient to satisfy the requirement of competent evidence as to the nature and value of the services rendered. (See Martino, supra, at p. 559.)

A. Hourly Rates

Plaintiff's five attorneys billed at rates from $375 to $815 per hour. (See Motion, p. 8.) Moreover, the firm Alexander, Krakow, and Glick, LLP has a set hourly rate of $195 charged for paralegal work performed by Mr. Ham.

Defendants argue that Plaintiff did not meet his burden of proof to establish counsel's hourly rates were reasonable. Defendants particularly take issue with the fact that Mr. "Yang provides no proof that he has ever been awarded $600 an hour by any Judge or arbitrator. Moreover, Mr. Yang apparently has never tried a case, at least he did not state that he has in his Declaration. As such a rate of $600 per hour is unreasonable." (Opposition, pp. 5:5, 6:13-15.)

Plaintiff declares that Mr. Alexander's hourly rate of $815 (as well as the hourly rates of Ms. Fehr and Mr. Ham) has been approved by Judge Latin (retired) in the binding arbitration of Campbell v. Fuse, LLC, et al.. as recently as March 2017. (See Alexander Decl., ¶ 27, Exhs. 5-5a, 6.) Plaintiff also declares that Mr. Marquez's rate of $600 per hour has been court-approved "twice within the past few months." (Motion, p. 5; Marquez Decl., ¶ 7c-d.) Plaintiff has also provided three declarations from comparable local attorneys to demonstrate the reasonableness of the requested rates. (See generally George Decl.; DeSimone Decl.; Feldman Decl.)

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

BC657320                                                          January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**                    8:30 AM

Judge: Honorable Michael P. Linfield        CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro           ERM: None
Courtroom Assistant: Vanessa Galindo        Deputy Sheriff: None

In Chodos v. Borman (2014) 227 Cal.App.4th 76 the Court of Appeal upheld a jury's finding
that $1,000/hour was, in the circumstances of that case, a reasonable hourly rate. It is not clear to
the court what the limit is on an attorney's hourly rate. As of 2018, David Boies, one of the
nation's premier attorneys, charged $1,875/hour. (See "David Boies pleads Not Guilty, New
York Times, Sept. 21, 2018, available at https://www.nytimes.com/2018/09/21/business/david-
boies-pleads-not-guilty.html.)

The Court finds the hourly rates of attorneys J. Bernard Alexander ($815 per hour), Seung Yang
($600 per hour), Justin Marquez ($600 per hour), Tracy L. Fehr ($595 hour), and Christopher
Garcia ($375 hour) are reasonable considering the complexity of the issues involved in a FEHA
case, the level of experience of the particular attorneys, the contingent nature of the litigation,
and the current market rates of comparable employment attorneys in Southern California.
Moreover, the court finds that it was reasonable for counsel to reduce Plaintiff's attorney's fees
by billing at a lower rate for the services of an experienced paralegal.

B. Hours Expended

Plaintiff argues that his attorneys reasonably spent 672.6 hours working on this case over the last
year and a half. This amount of work was necessitated by the complexity of the issues,
defendant's dilatory tactics, the vast quantity of discovery, a five-day trial, and responding to
post-trial motions. (See Yang Decl., ¶¶ 10-14; see Exhs. 1, 7; see generally, Motion, p. 6-8.) For
example, multiple depositions were taken in this case by Moon and Yang, APC, which later had
to be reviewed by associated trial counsel Alexander, Krakow, and Glick, LLP in preparation for

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

BC657320
DARYL KUNGA VS AMERICAN GUARD SERVICES INC

January 14, 2019
8:30 AM

| | |
|---|---|
| Judge: Honorable Michael P. Linfield | CSR: Justus Balentine CSR#13859 |
| Judicial Assistant: Reyna Navarro | ERM: None |
| Courtroom Assistant: Vanessa Galindo | Deputy Sheriff: None |

trial.

A table of hours expended by each firm is provided below.

Moon and Yang, APC

| Attorney/Staff | Hourly Rate | Hours Spent | Total |
|---|---|---|---|
| Seung Yang | $600 | 82.4 | $49,440.00 |
| Justin Marquez | $600 | 42.5 | $25,500.00 |
| Christopher Garcia | $375 | 274.8 | $103,050.00 |
| Total | | | $177,990.00 |

Alexander, Krakow, and Glick, LLP

| Attorney/Staff | Hourly Rate | Hours Spent | Total |
|---|---|---|---|
| J. Bernard Alexander, III | $815 | 221.6 | $180,604.00 |
| Tracy L. Fehr | $595 | 27.0 | $16,065.00 |
| Gustin Ham (paralegal) | $195 | 24.3 | $4,738.50 |
| Total | | | $201,407.50 |

Defendant argues that Plaintiff's counsel engaged in unreasonable billing practices. For example, Mr. Alexander employed his partner, Tracy L. Fehr, to prepare the instant attorney's fee motion in this matter because she has 14 years' experience preparing prevailing party attorney's fee motions and would therefore minimize the expense associated with preparing the detailed motion. (Alexander Decl., ¶ 21.) Despite her years of experience, Ms. Fehr billed 27 hours for preparation of the instant motion. The Court finds this excessive considering Ms. Fehr's 14 years' experience drafting such motions. Thus, Ms. Fehr's billable hours are reduced to 10.

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

BC657320
DARYL KUNGA VS AMERICAN GUARD SERVICES INC

January 14, 2019
8:30 AM

| | |
|---|---|
| Judge: Honorable Michael P. Linfield | CSR: Justus Balentine CSR#13859 |
| Judicial Assistant: Reyna Navarro | ERM: None |
| Courtroom Assistant: Vanessa Galindo | Deputy Sheriff: None |

Defendant also argues that Plaintiff's counsel unnecessarily staffed three attorneys to attend the trial in this matter. (Opposition, pp. 5-6.) Mr. Yang associated with Mr. Alexander because he believed the case would be best served by an "expert employment trial attorney." (Motion, p. 7:6-8.) Though Mr. Alexander was lead trial counsel, Mr. Garcia and Mr. Yang billed 36.9 hours for a total of $13,800 and 29 hours for a total of $17,400, respectively. (Id. at p. 7:7; see Compendium of Evid., Exh. 1.)

The Court agrees that having a third attorney at trial was unnecessary and duplicative. Thus, Mr. Garcia's billable hours are reduced to 237.9 (representing 274.8 minus 36.9).

Next, Defendant asserts that Mr. Alexander billed for his law clerks' parking and travel expenses for attending the trial. Defendant argues such expenses were entirely unnecessary to the trial and thus Plaintiff's counsel should not be allowed to bill for them. (Id. at p., 6.) Plaintiff's counsel is not billing for these expenses. Though these expenses are itemized in counsel's billing records, they are not included in the fees requested by this motion. (See Compendium of Evid., Exh. 7; Motion, p. 8.) (The Court notes that the law clerks' parking and travel expenses were itemized in the billing records (Exh. 7) as hourly fees incurred. The total number of hours billed by Mr. Alexander's firm was 279.5. (See Exh. 7.) However, only Mr. Alexander, Ms. Fehr's and Mr. Ham's hours, totaling 272.9, were requested in the motion. Thus it appears to the Court that the additional hours were excluded.)

With the above exceptions, the Court finds the amount of hours requested to be reasonable. Therefore, the total amount requested is reduced from $379,397.50 to $355,445.00. (See Spreadsheet below.)

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
### Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                                          January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**                        8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

---

C. Apportionment

Defendant also contends that the request for attorney's fees should be apportioned between the eight causes of action, only four of which are FEHA causes of action permitting the collection of attorney's fees. (Opposition p., 3:4-11.)

The general rule is that attorney's fees must be apportioned between causes of action that allow for attorney's fees and causes of action that do not allow for attorney's fees, unless the issues in the various causes of action are too interrelated for apportionment to occur.

"When a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action. However, the joinder of causes of action should not dilute the right to attorney fees. Such fees need not be apportioned when incurred for representation of an issue common to both a cause of action for which attorney fees are permitted and one for which they are not. All expenses incurred on the common issues qualify for an award. [Citation.] When the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not, then allocation is not required. [Citation.]" (Akins v. Enterprise Rent-A-Car Co. of San Francisco (2000) 79 Cal.App.4th 1127, 1133.)

More recently, our Courts have reiterated this principal:

"'Attorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories.' [Citation.]" (Taylor v. Nabors Drilling USA, LP (2014) 222 Cal.App.4th 1228, 1251, quoting

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

BC657320                                                        January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**                    8:30 AM

Judge: Honorable Michael P. Linfield        CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro           ERM: None
Courtroom Assistant: Vanessa Galindo        Deputy Sheriff: None

Graciano v. Robinson Ford Sales, Inc. (2006) 144 Cal.App.4th 140, 158–159.)

Here, counsel represented Plaintiff regarding an issue common to all of Plaintiff's causes of action — Defendant's conduct in response to Plaintiff's request for time off to care for his daughter during a medical emergency. Reviewing the causes of action, the Court concludes liability issues for the FEHA causes of action were so interrelated with those causes of action for which fees are not permitted that it would have been impossible to sever them. Therefore, apportionment is neither necessary nor possible.

The Court therefore determines the lodestar attorney's fees as indicated below:

ATTORNEYS FEES

| Attorney's Name | Rate Requested | Hours Requested | Total Requested | Rate Granted | Hours Granted | Total Granted |
|---|---|---|---|---|---|---|
| Seung Yang | $600.00 | 82.40 | $49,440.00 | $600.00 | 82.40 | $49,440.00 |
| Justin Marquez | $600.00 | 42.50 | $25,500.00 | $600.00 | 42.50 | $25,500.00 |
| Christopher Garcia | $375.00 | 274.80 | $103,050.00 | $375.00 | 237.90 | $89,212.50 |
| J. Bernard Alexander, III | $815.00 | 221.60 | $180,604.00 | $815.00 | 221.60 | $180,604.00 |
| Tracy L. Fehr | $595.00 | 27.00 | $16,065.00 | $595.00 | 10.00 | $5,950.00 |
| Gustin Ham (paralegal) | $195.00 | 24.30 | $4,738.50 | $195.00 | 24.30 | $4,738.50 |

Total Requested...........$379,397.50...................Total Fees Granted................$355,445.00

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

BC657320                                                   January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**        8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

D. Lodestar Multiplier

"The award of a multiplier is in the end a discretionary matter largely left to the trial court."
(Hogar v. Community Development Com'n of City of Escondido (2007) 157 Cal.App.4th 1358,
1371. See also Rey v. Madera Unif. Sch. Dist. (2012) 203 Cal.App.4th 1223, 1242.) A court may
enhance the lodestar figure in appropriate cases. (Ketchum v. Moses (2001) 24 Cal.4th 1122,
1138.) The court in Ketchum provided an explanation of the rationale behind contingent fee
enhancements: "'A contingent fee must be higher than a fee for the same legal services paid as
they are performed. The contingent fee compensates the lawyer not only for the legal services he
renders but for the loan of those services. The implicit interest rate on such a loan is higher
because the risk of default (the loss of the case, which cancels the debt of the client to the
lawyer) is much higher than that of conventional loans.'" (Id. at pp. 1132-1133 [quoting Posner,
Economic Analysis of Law (4th ed. 1992) pp. 534, 567].) "A lawyer who both bears the risk of
not being paid and provides legal services is not receiving the fair market value of his work if he
is paid only for the second of these functions. If he is paid no more, competent counsel will be
reluctant to accept fee award cases." (Id. at p. 1133 [internal citations and quotations omitted].)
The following factors may be considered in deciding whether to apply a multiplier: "(1) the
novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3)
the extent to which the nature of the litigation precluded other employment by the attorneys, (4)
the contingent nature of the fee award." (Id. at p. 1032.)

Defendant argues that a negative multiplier is justified because the "extent of success and the
plaintiff's failure to disclose the hours spent on non-FEHA claims require a negative multiplier."
(Opposition, p. 8:24-25.) As previously discussed, the liability issues for the FEHA causes of
action were interrelated with and inseparable from the non-FEHA causes of action. Defendant
does not explain why it believes Plaintiff was unsuccessful. In fact, this assertion directly
contradicts defendant's position in its Motion for a New Trial, where defendants argued that
plaintiff's award of damages was excessive. (See Notice re Motion for New Trial, p. 2:1-5.)

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                                        January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**             8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

---

Plaintiff, on the other hand, contends that "an award [of $3,000,000.00] for a low-wage employee, after waiving economic damages, is extraordinary." (Motion, p. 11:7-9.)

The Court finds Defendant's request for a reduction in the lodestar figure to be without merit.

Plaintiff requests a 2.0 lodestar multiplier as compensation for the contingent risk of this case and on the grounds that this case presented difficult questions, precluded her counsel from taking on other work, and that her counsel displayed extraordinary skill in obtaining the verdict. (See Motion, pp. 8-11.) He explains that his counsel took this case on an entirely contingent basis and that "counsel has been working on this matter for almost two years without payment." (Id. at p. 10:10-11.) Even after the verdict, "Defendant has already filed a notice of appeal, indicating that payment is not forthcoming." (Id.at p. 10:11-12.)

Plaintiff also argues that a multiplier is warranted based on the "skill factor" because "Plaintiff's counsel persevered in obtaining an outstanding verdict of $3,000,000 (Exh. 4)" despite "the disparity in resources, and the challenges of the case." (Motion, p. 11:7-9.). Plaintiff asserts that this case was especially difficult, given that "(a) Mr. Kunga's wages were low, leaving him with relatively low economic damages; (b) juries often tie emotional distress damages to economic damages, resulting in lower emotional distress awards for low-wage workers; (c) Plaintiff took the risk of waiving economic damages to focus on Kunga's considerable emotional distress; (d) Mr. Kunga speaks broken English, which could have been a large disadvantage in connecting with the jury; (e) Defendants initially refused to appear for deposition and forced Plaintiff to appear ex parte to secure depositions." (Id. p. 10:15-23.) Plaintiff contends that "[s]uch an award for a low-wage employee, after waiving economic damages, is extraordinary." (Id., p. 11:7-9.)

The Court agrees that plaintiff's counsel displayed unusual skill in obtaining a substantial recovery for plaintiff. This is particularly true given the size of the jury's award compared to the economic damages suffered by Plaintiff – who, as a security guard was basically earning the minimum wage.

Minute Order                                                Page 15 of 21

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Stanley Mosk Courthouse, Department 34

BC657320
DARYL KUNGA VS AMERICAN GUARD SERVICES INC

January 14, 2019
8:30 AM

Judge: Honorable Michael P. Linfield
Judicial Assistant: Reyna Navarro
Courtroom Assistant: Vanessa Galindo

CSR: Justus Balentine CSR#13859
ERM: None
Deputy Sheriff: None

---

This case took 1½ years and some 650 hours of attorney's time. For a small firm – or even two small firms – this is a substantial commitment of time. The fact that the first devoted 650 hours to this case precluded the firms from taking other contingent clients.

Further, although defense counsel gets paid monthly, plaintiff's counsel has not been paid for the 20 months that this case has been pending. "The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. . . . '"(Amaral v. Cintas Corp. No. 2 (2008) 163 Cal.App.4th 1157, 1217-1218.)

"The market value of the services provided by [respondent's] counsel in a case of this magnitude must take into consideration that any compensation has been deferred ... from the time an hourly fee attorney would begin collecting fees from his or her client . . . " (Taylor v. Nabors Drilling USA, LP (2014) 222 Cal.App.4th 1228, 1252.)

Considering the skill shown by counsel in obtaining an extraordinary recovery for Plaintiff, the fact that plaintiff's counsel has not been paid for close to two years, and the extent to which taking this case precluded counsel from taking other cases, the Court finds that a multiplier of 1.5 is appropriate.

"The trial court is not required to issue a statement of decision regarding a fee award." (Stratton v. Beck (2019) ___ Cal.App.5th __, ___, citing Ketchum v. Moses (2001) 24 Cal.4th 1122, 1140.) Nonetheless, for purposes of completeness, the Court wishes to indicate that it considered – and rejected – a multiplier of 2.0.

This court is unaware of any empirical data as to the percentage of FEHA retaliation cases that

---

Minute Order

Page 16 of 21

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**

January 14, 2019
8:30 AM

| | |
|---|---|
| Judge: Honorable Michael P. Linfield | CSR: Justus Balentine CSR#13859 |
| Judicial Assistant: Reyna Navarro | ERM: None |
| Courtroom Assistant: Vanessa Galindo | Deputy Sheriff: None |

are won by plaintiffs. However, it is the experience of this court that approximately 50% of such cases that go to trial are won by plaintiffs and 50% are won by defendants. Further, given the lack of any empirical data to the contrary, the Court would normally assume such a 50/50 split. This would seem to indicate that a 2.0 multiplier would be appropriate, since "a contingent fee in a case with a 50 percent chance of success should be twice the amount of a non-contingent fee for the same case . . ." (Cezares v. Saenz (1989) 208 Cal.App.3d 279, 288.)

This method of applying a multiplier has been explicitly adopted by other states. For instance, the Florida Supreme Court has offered the following guidance to its courts: "If the trial court determines that success was more likely than not at the outset, it may apply a multiplier of 1 to 1.5; if the trial court determines that the likelihood of success was approximately even at the outset, the trial judge may apply a multiplier of 1.5 to 2.0; and if the trial court determines that success was unlikely at the outset, it may apply a multiplier of 2.0 to 2.5." (Standard Guar. Ins. Co. v. Quanstrom (Fla. 1990), 555 So.2d 828, 834.) The Florida Supreme Court thus recognized that "[a] 2.0 multiplier is appropriate where 'the likelihood of success was approximately even at the outset.'" (McCarthy Bros. Co. v. Tilbury Const., Inc. (Fla. Ct. App. 2003) 849 So.2d 7, 10.)

Other courts have similarly concluded that, at least in labor and employment cases, it is reasonable to assume that plaintiffs' counsel will win approximately half the time, and hence a hence "a multiplier near 2 should, in most cases, be sufficient compensation for the risk associated with contingent fees" in these cases. (Fujiwara v. Sushi Yasuda, Ltd. (S.D.N.Y. 2014) 58 F. Supp. 3d 424, 329.)

However, California courts have not been so rigid or so mathematical in their application of a multiplier. The Ketchum factors are not inflexible rules with definable boundaries, but broad classes of issues to be considered by the trial court in ascertaining a reasonable fee award. Quite simply, "there is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation. (See Center for Biological Diversity v. County of San Bernardino (2010) 185 Cal.App.4th 866, 901.) "There are numerous such factors, and their evaluation is entrusted to a trial court's sound discretion; any one of those factors may be responsible for enhancing or reducing the lodestar." (Krumme v. Mercury Ins. Co. (2004) 123 Cal.App.4th 924, 947.)

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Stanley Mosk Courthouse, Department 34

BC657320                                                          January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**              8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

The Court has not applied a 2.0 multiplier because, at least in part, the Court finds that the hourly rates the Court has found reasonable are partly based on the contingent nature of plaintiff's counsels' practice.

Applying a 1.5 multiplier to the lodestar, the Court will award attorney's fees in the amount of 1.5 x $355,445.00 = $533,182.50.

E. Conclusion

The motion is GRANTED in part. Plaintiff is awarded attorney's fees in the amount of $533,182.50.

iii. Costs

On October 1,2018, Plaintiff filed a Memorandum of Costs, seeking costs of $30,762.03, including $13,650.00 in expert witness fees. Defendant has not filed a motion to tax costs. (Cal. Rules of Court, rule 3.1700(b) [the losing party may file a motion to strike or tax costs and "[a]ny notice of motion to strike or tax costs must be served and filed 15 days after service of the cost memorandum"].)

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 34

BC657320                                                                     January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**                                8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

"If the items appear to be proper charges the verified memorandum is prima facie evidence that
the costs, expenses and services therein listed were necessarily incurred ... and the burden of
showing that an item is not properly chargeable or is unreasonable is upon the [objecting party]."
[Citations.]

"The court's first determination, therefore, is whether the statute expressly allows the particular
item, and whether it appears proper on its face. [Citation.] If so, the burden is on the objecting
party to show them to be unnecessary or unreasonable. [Citation.]" (Nelson v. Anderson (1999)
72 Cal.App.4th 111, 131.)

The costs requested appear proper and reasonable. The Court GRANTS costs in the amount of
$30,762.03 as requested by plaintiff.

II. MOTION FOR PREJUDGMENT INTEREST

Plaintiff requests an order awarding prejudgment interest of 10% per year, running from June 5,
2018 through September 18, 2018, pursuant to Civ. Code § 3291. Plaintiff does not request
prejudgment interest for the $1,000,000 punitive damages award.

A. Relevant Law

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
### Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                                      January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**          8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

Pursuant to Civ. Code § 3291:

"In any action brought to recover damages for personal injury sustained by any person resulting from or occasioned by the tort of any other person, corporation, association, or partnership, whether by negligence or by willful intent of the other person, corporation, association, or partnership, and whether the injury was fatal or otherwise, it is lawful for the plaintiff in the complaint to claim interest on the damages alleged as provided in this section.

"If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

Whether a defendant is liable for prejudgment interest under Civil Code § 3921 depends on whether the action is one "to recover damages for personal injury . . . resulting from or occasioned by the tort" of another. (Civ. Code § 3921 [emphasis added].)

B. Discussion

Plaintiff cites Bihun v. AT&T Information Systems, Inc. (1993) 13 Cal.App.4th 976, 1001-1002, for the proposition that FEHA claims are categorized as torts for purposes of prejudgment interest and therefore he is entitled to prejudgment interest. (Motion for Prejudgment Interest, p.

Exhibit "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Stanley Mosk Courthouse, Department 34

**BC657320**                                             January 14, 2019
**DARYL KUNGA VS AMERICAN GUARD SERVICES INC**                    8:30 AM

Judge: Honorable Michael P. Linfield          CSR: Justus Balentine CSR#13859
Judicial Assistant: Reyna Navarro             ERM: None
Courtroom Assistant: Vanessa Galindo          Deputy Sheriff: None

1.)

The Bihun court held a sexual harassment action brought under FEHA is "an action brought to recover damages for personal injury" within the meaning of Civil Code § 3291. (Bihun, supra, at p. 1004-1005.) The court focused on "the nature of the action" rather than the damages sought, reasoning that sexual harassment has the primary effect of impairing the personal well-being of the victim and finding that "a claim [of sexual harassment] under FEHA seeks to vindicate decidedly personal rights." (Id.)

By contrast, in Holmes v. General Dynamics Corp. (1993) 17 Cal.App.4th 1418, the Court found that a cause of action for wrongful termination in violation of public policy was not a "personal injury" within the meaning of Civ. Code § 3291. (Id. at 1436-1437, fn. 15.) Explicitly distinguishing Bihun, the Holmes court held that "it is the employer's violation of a public policy resulting in the loss of a tangible economic benefit (a job), rather than the invasion of a personal freedom interest, which primarily defines the action." (Id.)

Although this case was one for wrongful termination, not sexual harassment, the reasoning of Bihun still applies. Like Bihun and unlike Holmes, this case was a FEHA action. The purpose of FEHA is to address personal injuries to employees caused by the illegal actions of their employer. Further, in this case, Plaintiff disclaimed all recovery for economic damages; he only sought emotional distress damages, for which the jury awarded him $2,000,000.00 in compensatory damages.

Plaintiff's request for an award of prejudgment interest in GRANTED. Plaintiff made his §998 offer on July 5, 2018; judgment was entered on September 18, 2018. The Court awards prejudgment interest in the amount of $41,095.89.

Clerk is to give notice.

Certificate of Mailing is attached.

Exhibit "4"

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>01/14/2019<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ _Reyna Navarro_ , Deputy<br>Reyna Navarro |
| PLAINTIFF/PETITIONER:<br>Daryl Kunga  et al | |
| DEFENDANT/RESPONDENT:<br>American Guard Services, Inc et al | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>BC657320 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order  upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

J. Bernard Alexander
Alexander Krakow + Glick LLP
1900 Avenue Of The Stars
Suite 900
Los Angeles, CA  90067-

American Guard Services, Inc

Dawn  Cushman
Bradley & Gmelich LLP
700 N Brand Blvd Fl 10
Glendale, CA  91203

Holly R. Coates
Worldwide Sourcing Group, Inc.
1125 W. 190th Street
Gardena, CA  90248

Thomas V. Girardi
Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA  90017-

Christopher L. Garcia
Moon & Yang, APC
1055 W Seventh St
Ste 1880
Los Angeles, CA  90017-

Daryl Kunga

Esq. John M. Whelan
1125 WEST 190TH STREET
GARDENA,, CA  90248-

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: <u>01/14/2019</u>

By:  <u>Reyna Navarro</u>
Deputy Clerk

| SHORT TITLE: DARYL KUNGA VS AMERICAN GUARD SERVICES INC | CASE NUMBER: BC657320 |
|---|---|

# Exhibit 5

Honorable Michael A. Latin (Ret.)
ADR SERVICES, INC.
1900 Avenue of the Stars, Suite 250
Los Angeles, California 90067-4303
Telephone: (310) 201-0010
Fax: (310) 201-0016

IN THE MATTER OF THE ARBITRATION BETWEEN

| | |
|---|---|
| HOLLAND CAMPBELL, | ) ADRS No.: 15-7033-MAL |
| | ) |
| Claimant, | ) |
| | ) **ARBITRATION AWARD** |
| | ) |
| vs. | ) |
| | ) |
| FUSE, LLC; FUSE MEDIA, | ) |
| | ) |
| Respondents. | ) *Hon. Michael A. Latin (Ret.)* |
| | ) |

On September 6, 7, 9 and 14, 2016 a binding arbitration hearing was held at the

offices of ADR Services located at 915 Wilshire Boulevard, Suite 1900, Los Angeles,

California 90012. The Honorable Michael A. Latin, retired Judge of the Los Angeles

Superior Court served as the Neutral Arbitrator.

Claimant Holland Campbell was represented by J. Bernard Alexander, III, Esq. and

Joshua M. Arnold, Esq. of Alexander Krakow, Esq. & Glick LLP. Respondents Fuse, LLC

and Fuse Media were represented by Todd B. Scherwin, Esq. and Penny Chen, Esq. of

Fisher & Phillips LLP.

Exhibit "5"

## I.  INTRODUCTION

Respondent Fuse hired Claimant Holland Campbell to serve as Senior Vice President of Business and Legal Affairs on July 31, 2014. Less than one year later, on June 26, 2015, Fuse terminated Campbell. Campbell alleges that Fuse terminated her in retaliation for exercising protected conduct. Fuse asserts that Campbell was fired for substandard performance.

Campbell seeks damages for: (1) retaliatory discharge in violation of California Labor Code (LC) §1102.5(c); (2) wrongful termination in violation of public policy; and (3) defamation. Campbell seeks damages for past and future loss of earnings, emotional distress, and punitive damages.

## II.  EVIDENCE CONSIDERED

The following evidence, written materials and argument were considered as part of the Award:

1. Arbitration Brief of Claimant

2. Arbitration Brief of Respondents

3. Testimony of Claimant Holland Campbell

4. Testimony of Michael (Mike) Roggero

5. Testimony of Lynette Ramirez

6. Testimony of Bill Hilary

7. Testimony of Anna Erenburg (via deposition)

8. Testimony of Natalie Woloshin

9. Testimony of Jared Shemp

10. Testimony of George Greenberg

2

Exhibit "5"

11. Testimony of Yolanda Enamorado

12. Testimony of Michael Schwimmer

13. Claimant's Exhibits 1 through 71

14. Respondents' Exhibits 1000-1073

15. Claimant's Closing and Reply Briefs

16. Respondents' Closing and Reply Briefs

## III.   EVIDENCE PRESENTED

### A.    The Employment Agreement

On July 31, 2014, Fuse hired Campbell as Senior Vice President of Business and Legal Affairs. The written employment agreement provided that Campbell was to receive a $240,000 annual salary, medical, dental and vision benefits, paid sick and vacation time, participation in a 401k and eligibility to participate in bonus and other incentive plans. (Exhibit 2.) The Agreement provided for a one-year term, to be automatically extended for successive one-year periods unless either party notified the other at least thirty days prior to the end of the initial term. The Agreement contained a prevailing party attorney fee provision and specified that termination could be be with or without cause.

Campbell began work at Fuse approximately one month after NUVOtv acquired the Fuse Network. She reported to Mike Roggero, Fuse's CFO and COO, and managed five people.

### B.    The Work Environment

Campbell testified that Bill Schwimmer, Fuse's CEO, was not easy to work for. He tended to "think out loud" rather than give clear direction.

Exhibit "5"

Campbell testified that Schwimmer and Bill Hilary, Fuse's former President, battled for control. Schwimmer interfered with Hilary's deals, and Hilary did not want Schwimmer involved. As a result, Hilary would not give Campbell information until the eleventh hour because in Hilary's mind, "If Holland doesn't have the information, then she can't share it with Michael Schwimmer, and he can't insert himself into my deals."

Hilary testified that Schwimmer tried to be part of everyone else's group and took over supervision of legal to maintain control. He stated that Schwimmer was a difficult CEO. Approximately seventy percent of employees complained to Hilary about Schwimmer.[1]

Hilary testified that Schwimmer and Roggero complained about many people but this did not mean that these people were not doing their jobs. Schwimmer and Roggero complained about Campbell. They complained about Kathryn Mitchell, who argued back to them and was then terminated.

Hilary testified that upper management treated women inappropriately and paid them less than men for the same work. Hilary testified at deposition that he fought with Schwimmer to get Lynnette Ramirez, Fuse's former Senior Vice President of Programming, paid more than the man who worked for her. If women disagreed with George Greenberg, Senior Vice President of Finance and Controller, he lost his temper. If women disagreed with Roggero, he lost his temper but would stay much calmer about it.

---

[1] Hilary admitted that he and Schwimmer did not get along. The Board did not renew Hilary's contract after he told them he would not continue unless Schwimmer left.

4

Hilary testified that most lawyers have not lasted long with the company. Over the seven or eight years before Campbell, there were four or five lawyers working for the company and none lasted more than two and a half years.

Lynette Ramirez testified that Greenberg had a very intimidating and accusatory approach with her and other females. He only tried to intimidate females. He would raise his voice and yell.

Ramirez testified that when they were trying to close a particular deal Campbell said she was "not getting the direction from Michael [Schwimmer] ... to move forward" and was not getting straight answers from Michael.[2]

### C.   Campbell's Performance

#### 1.   General testimony

Ramirez testified that her overall her communication with Campbell was very positive. At times when she and Campbell worked on deals there were delays. She explained that there are always delays because you can't control the other side.[3] On at least two occasions, Campbell told her she was waiting on answers, wasn't getting clear answers or being included in meetings that would enable her to move forward. When Ramirez complained about a deal moving slowly, Bill Hilary would explain "This is not Holland's issue [or] responsibility." He attributed these delays to being in a meeting with Holland and others where "Holland didn't get the answers she needed, or he felt like... Holland was being pulled away to work on affiliate deals."

---

[2] This comment related to the Iglesias *show* deal (not the tour deal discussed below)

[3] Ramirez described Campbell's predecessor's legal department as "very efficient."

5

Hilary testified that he never had problems with Campbell's performance other than delay issues. He does not "remember a specific thing where [h]e said Ms. Campbell has not done this well."[4] Hilary complained to Roggero about delays. He never complained that Campbell was a problem or that she needed to be terminated and never thought she needed to be terminated. While Hilary had an issue with the Legal Department's delays he never personally blamed Campbell. He attributed slowdowns to the understaffing and the fact that some of their New York lawyers did not have expertise in or understand digital.

Roggero, Campbell's supervisor, could not name a single document of Campbell's that he revised. He also admitted that he can't support Fuse's claim that Campbell failed to competently oversee her department.

Greenberg could not recall any specific issues with Campbell's work or any run-ins with Campbell prior to the 2015 audit.

Anna Erenburg, Senior Counsel, testified at her deposition that Campbell was "fine" and responsive as a direct supervisor, both to her and others. Erenburg never had issues with Campbell not communicating effectively. Campbell was never unfair and was professional toward her and everyone else.

2.   The CAA Advisory Services Letter

Fuse was negotiating an agreement to hire CAA as an advisor. Schwimmer provided deal points to Campbell who was to revise the CAA letter agreement. Campbell emailed her revisions to Schwimmer on October 22, 2014 stating, "I have taken another

---

[4] Hilary testified that twenty to twenty-five percent of Campbell's work was with him.

6

pass and have inserted a couple of questions for your consideration."[5] (Exhibit 42.) On October 23, 2014, Schwimmer emailed Campbell his own finalized draft of the engagement letter. (Exhibit 1009.) His email states, "You should review and compare against the last draft you sent me." On November 3, 2014 Schwimmer asked to see Campbell to "explain the changes" he made to her draft. (Exhibit 1010.)

Schwimmer testified that the CAA revisions required more of his involvement in drafting than he would have expected. A comparison of Campbell's draft and Schwimmer's finalized version reflect that Schwimmer made substantial additions and revisions to Campbell's draft.[6] Schwimmer admitted that he did not recall how many drafts of the CAA document were created and did not look at previous edited versions to see whether Campbell or someone else created the problems.

### 3.   The Cox Renewal Proposal

Judi Lopez negotiated the business terms for amendments to an existing agreement with Cox. Lopez gave Campbell the terms so that Campbell could draft the amendments. On September 11, 2014, Campbell emailed Lopez (cc'ing Schwimmer and Roggero)

---

[5] This is the earliest draft of the revisions included in the exhibits. However, Campbell's statement that she had "taken another pass" suggests that this was at least her second attempt.

[6] Schwimmer's version added: (1) Schwimmer's title; (2) clarification that the engagement related to both of NUVOtv's operations (NUVOtv *and* Fuse); (3) the agreement's "primary goal"(for CAA to assist the Company's opportunities in "one or more new areas of strategic value to the Company's current business); (4) that initially, CAA was to analyze the Company's "current strategic position" in the cable and media marketplace; (5) deadlines for narrowing strategic priorities and selection of growth initiatives; (6) engagement renewal specifics ["only by written agreement signed by both parties"]; (7) base advisory fee payment specifics ["in arrears on a monthly basis for the Term, within 10 days from invoice receipt]; (8) bonus fee structure specifics; (9) specifics as to, and examples of, the terms "Qualifying Transaction" and "Qualifying Activity." Additionally, some minor changes were made to the letter's organization.

7

stating that the attached draft proposal was ready to be sent to Cox. (Exhibit 1007.) Minutes later Schwimmer sent an emailed stating, "don't send it. It has term through 2017. Holland – please fix and resend." Campbell admitted that the 2017 term was incorrect. She testified that she asked her subordinate, who sent it in error, to fix the term and send it back.

On November 10, 2014 Campbell emailed Schwimmer a subsequent draft that she and Judi Lopez had revised pursuant to Schwimmer's suggestions. (Exhibit 40.) The next day, he emailed Lopez (and cc'd Campbell) providing specific bullet points reflecting needed revisions and stating, "Bottom line is that I think we [sic] some basic drafting and business issues to address, and some economic modeling (if not done already)."[7] (Exhibit 39.)

Campbell testified that she was responsible for the drafting issues but some issues were for the business team to correct, such as specificity of terms.[8]

---

[7] These included:

· •"What is the deadline for launch of the 300K subs? Not clear in the document. Only thing clear is the length of free time depending on system launch date, but no deadline exists for actual launch of required subs. Need to be specific."
· •"Our proposal says that the new lower rate on existing subs only applies after ALL the discounted rate conditions are met (new system launches, channel placement and HD). How does that apply to each qualifier, including subs, channel placement and HD—how are these qualifiers "met" and "when" do they need to be met in order to qualify for discount."
· •"I thought we discussed max fee period of 18 months, not 24. Not sure how the math works here with 18 free months. Has George modeled economics of this proposal? Let's see the spreadsheet.".
· •"Channel placement language won't work. No one will accept "best efforts" standard and "best channel position" is too ambiguous for a contract."
· •"HD—doesn't seem logical to have 2 markets (LV and Phoenix by 3/31/15—4 months from now, and all others by end of 2017). Let's spread it out and get it done by end of 2016. Also, is LV or Vegas more important that California markets like SD or OC?"

[8] Later on November 12, 2014, Schwimmer sent Roggero the following email:

8

On December 22, 2014 Campbell requested that Schwimmer, Lopez and Roggero "Please review the attached Final [Cox Renewal] PDF and confirm the accuracy of its terms…." (Exhibit 1013.) Schwimmer's email response stated, "H—you are responsible for the "accuracy of its terms – not us! :-) Good luck".

Schwimmer testified that although Campbell obtained the deal information from Lopez, the "very basic drafting errors" were not Lopez's fault. The agreement included no deadline and Campbell created several inconsistencies. Although Schwimmer did not know whether Lopez had negotiated a deadline, he stated that Campbell was ultimately responsible for ensuring a date was included. Schwimmer admitted he had not looked at any prior drafts to see whether Campbell or someone else created the problems.

Schwimmer testified that Campbell's work reflected a lack of a basic understanding of how their business works. However, in his deposition Schwimmer testified that Campbell's language was not improper and that the final agreement was good.

---

"I don't want to say I told you so, but my notes below are another example of our prior conversation in which I conveyed to you my early concern with Holland based on the CAA project. It's her drafting that led to an unnecessary delay with Cox and me having to waste my time to write a fairly elementary note below about the deficiencies in her work. I'm not passing final judgment but telling you that solid work in the areas I touch has been missing. Don't defend her to me, just take my word for it based on my own background and work of hers I've seen. She is supposed to back up Judi with solid drafting and that didn't happen here. Not sure how you want to handle, but she reports to you so think about how she's going to improve in order to provide greater value to the organization." (Exhibit 39.)

According to this email, Schwimmer had previously expressed concerns to Roggero about Campbell's work product on the CAA project. He was now expressing concern about her drafting, which purportedly led to delay on the then current Cox project.

9

Schwimmer testified that Campbell should have been able to transmit business points into a contract without having to go back to the negotiator to have her proofread. He testified that it was "not necessary" and "not in my company" and that it is not the negotiator's responsibility to verify that the information was captured accurately. It's the lawyer's responsibility to capture that information accurately."

Roggero testified that Campbell confirmed that she hadn't read the underlying Cox agreement before working on the renewal proposal. He testified that she had not mastered the MFNs with respect to Cox. Schwimmer had to rewrite the proposal and was not happy, but Roggero wanted to give Campbell a chance since she was new.

Campbell denied that she told Roggero that she had not read the underlying Cox agreement. She would not negotiate a deal without looking at the underlying contract. However, she told Lopez she hadn't read the original contract before she started working on the renewal proposal.

### 4.   DirecTV Deal

Roggero and Schwimmer testified that Campbell demonstrated poor judgment by vacationing during the DirecTV negotiations at the end of December 2014. Roggero admits he may have given Campbell permission to go away and acknowledged that her absence did not hurt the deal. He did not mention this issue in her evaluation. She was only peripherally involved in the transaction.

Campbell testified Roggero approved her trip and knew she was going to work from Aspen.[9] She never told Schwimmer she was leaving, but she spoke to him on the phone shortly after she landed. She worked from the time she checked in at her hotel until January

_____

[9] Campbell testified that before she left, she offered to skip her trip to Aspen but Roggero responded, "It's not necessary. You can do everything you've been doing remotely."

1.[10] Schwimmer told her not to be present for the negotiations because they were already too "lawyer-heavy." While away, she participated in group phone calls, sent and received emails and suggested draft modifications. Heather and Judi Lopez, also on the team, handled their work remotely. Lopez's role was more direct than Campbell's.

Schwimmer testified that the DirecTV deal was nine years in the making. It is a "given" that lead counsel must be present when a major deal closes. He was shocked to learn Campbell was away. He never told her to be present but he "assumed she would be available." She was the only attorney on the deal with whom Schwimmer was familiar, and Fuse had to close its largest deal in history without senior counsel. He admitted that Campbell was not necessary for negotiations and that her absence did not affect the deal. He spoke with Campbell from Aspen and she participated in a conference call. He never told her he was critical of her absence. Lopez was also not present. Despite Campbell's absence, after negotiations concluded, Schwimmer emailed the team, including Campbell, thanking them for their hard work and adding "we came out with a strong agreement that puts us on solid footing...." (Exhibit 58.)

Natalie Woloshin, Campbell's law school friend since 1991, was with Campbell in Aspen. She testified that Campbell's priority during the trip was work. Campbell worked almost the entire vacation and Woloshin did not see her much.

5.   Campbell's Performance Evaluation

Roggero prepared Campbell's performance evaluation in late March/early April 2015. He gave Campbell a "Valued" rating, defined as "performance clearly and

---

[10] Campbell testified that Fuse has not produced documents reflecting her work during that period such as redline changes sent via email and records of phone calls.

11

consistently meets the requirements for success in the position. Knows current job well and quickly gets up to speed when taking on a new assignment." (Exhibit 4.) He testified that this review was equivalent to a "C" and was "not good" which is why Campbell was the only team member who did not get a bonus. He wanted to motivate Campbell to "step up and do a better job," rather than demotivate her by giving her a "D" or an "F." He admitted the written evaluation reflects no cause for termination.

Roggero testified that he addressed concerns about Campbell's performance in her verbal review, including her failure to review the underlying Cox agreement. He discussed that her absence during the DirecTV closing was not conducive to her professional development.

Campbell testified that she perceived the "Valued" rating as fair, not negative, because she had only been with Fuse eight months and was on track, consistently meeting her requirements and getting to know more people. She did not expect a bonus the first year. Roggero did not indicate that there was a problem and did not complain about her absence during the DirectTV deal or her performance on the Cox deal. He told her in essence to continue to do the job she was doing. She interpreted "integrate more substantially..." to mean she needed to get to know more people. Roggero told her he wanted more communication and wanted her to understand and master the MFNs. He did not communicate that her job was in danger because she had not yet mastered the MFNs.

Under Major Accomplishments and Contributions, the review states, "Analyzed and drafted majority of current deal term sheets for Fuse/Nuvo renewals." Schwimmer stated that "Clearly, Mike [Roggero] got [this] wrong."

12

The review, under "Areas in Need of Improvement" states: (1) "establish greater confidence in senior management by exhibiting sound judgment, high quality and thorough work product in order to participate more fully and drive affiliate and other business areas"; and (2) "Higher quality and timely communication on updates for key activities. Strategic and more thoughtful use of one-on-one meetings."[11] (Exhibit 4.) .

### 6.   Affiliate Notification Letters -- Verizon

In May 2015 Campbell had to prepare legal notification letters for Fuse affiliates regarding network changes. On May 25, 2015 she sent the following email: "Team: Attached please find draft Verizon rebrand amendments written in accordance with our most recent discussion...Let's try to run through these together at tomorrow's afternoon meeting."

On May 27, 2015, Campbell sent Schwimmer (and cc'd Judi Lopez) the draft Verizon rebrand amendments pursuant to the previous day's discussion.

Campbell testified that on May 28, 2015, she and Schwimmer met, he gave her changes verbally and she wrote the notes on the draft. She then revised the draft.

Schwimmer testified that the same day, he redrafted portions of Campbell's work and then sent the amendments directly to Verizon. He emailed Campbell stating, "Holland --I will get you my hand-written mark-up so you can see the items that required fixes." Schwimmer was unhappy, found typos and felt she was bogging him down with non-substantive items. Later that day, Schwimmer emailed Campbell stating: "Between us, I needed to correct some errors and implement what we had talked about on the FM

---

[11] Listed under "Development Areas for 2015" are the following:  Distribution. A critical area for the business, gain significantly greater expertise and mastery of all of the MFN components of affiliation agreements to better and quickly advise. Economics. Better understanding of the economics (and underlying budgets) driving our business deals.

13

packaging. Not sure what to say, other than you are forcing me to proof and correct your work—not the best use of my time. Let me know how I can help you improve without having to do what I did today." (Exhibit 1042.)

Campbell's email response stated: "First you should not receive a document from me that contains typos. I got my wires crossed and thus made two in the Fifth Amendment, and my eye did not catch them on review. Mea culpa." (Exhibit 1042.) She acknowledged "some slippage in communication..." and stated:

> "...I may have inferred one conclusion when, in fact, you were implying another. We certainly should be able to avoid that. When we meet going forward, I will be sure to confirm with you each instruction so we can avoid confusion and wasted time. I am truly grateful for your feedback and will do all I can to ensure your efforts are directed towards matters of substance."

Roggero testified that Schwimmer had to rewrite Campbell's Verizon amendments. There was no way to know whether the amendment errors were Campbell's or those of someone else who provided her with the information. Roggero relied on Campbell as head of legal and business affairs to ensure accuracy but admits that ultimately he was responsible for making sure the documents were right before they got to Schwimmer.

### 7.   Iglesias Tour Deal

In late June 2015, Fuse was at the early stage of a new Gabriel Iglesias tour deal. Campbell testified that on June 22, 2015, she was invited to join a call with Iglesias' team, Roggero, Hilary and Ramirez. After the call, Campbell emailed Ramirez to request that Ramirez send her "the basic terms of the deal" and stated, "I want to be sure I understand all the elements you have negotiated (or wish me to include as discussion points) in the

14

draft document." [12] (Exhibit 32.) Campbell testified that she removed Hilary and Roggero from the chain because it is Ramirez who ran the negotiations as Senior Vice President of Programming. [13]

Ramirez's June 23, 2015 email response to Campbell put Hilary and Roggero back on the email chain. [14] It stated, "to be clear I haven't negotiated any terms. So, we're starting at ground zero." (Exhibit 34.) Ramirez then outlined a summary of discussion points for Campbell. Ramirez testified that, at that time, they were at a place in the deal where she had to say to Bill "We were all on this call. What do you want me to do? Like do I need to draft these deal points?" However, Ramirez testified that the deal was very complicated because they had not done a tour deal before. She testified that it made sense that Campbell was asking her for deal points and that this was not unusual or inappropriate. [15]

An hour later Roggero emailed Campbell stating, "The whole point of including you in the conference call...was so that you could hear and understand first-hand what was

---

[12] Fuse argues that rather than preparing the document, Campbell purposefully removed Roggero and Hilary from the email chain and emailed Ramirez privately, asking her to summarize the deal terms.

[13] Ramirez later testified that she was "not responsible for the ultimate spend of the money and the contract and the deal points."

[14] Campbell explains the fact that Ramirez added Schwimmer and Roggero back in the chain by noting that Ramirez's email states, "Perhaps Bill and Mike can provide details on anything I missed."

[15] Roggero testified that he only realized Campbell passed off her work to someone else when Ramirez added him and Hilary back on the chain in her response to Campbell.

Exhibit "5"

needed to get this done. Asking Lynnette to summarize the below should not have been necessary."[16] (Exhibit 33.)

Campbell's responsive email to Roggero explained that she wanted to be sure she had a full understanding of the business points before she started drafting since time was of the essence. She stated that the phone call was her first introduction to that deal.[17]

Campbell testified that Schwimmer was very unhappy about the Iglesias deal. He called her at home, angry, and asked why he didn't know about the deal. He criticized several deal points. He then instructed Campbell to start reporting directly to him on all content deals and sent an email to Hilary and Roggero on May 11, 2015, stating:

> "[A]s of today, Holland (copied) will report to me on all matters relating to content for linear, digital, etc. Your folks will probably want to get deals to her sooner so she has sufficient time to discuss with me. In addition to the responsible business executive's approval, execution of all content related deals will require Holland's sign off...." (Exhibit 59.)

### 8.   Legal and Consulting Confirmation Letters

During the audit, Campbell had to prepare and execute legal confirmation letters for Ruth Lawanson at EY. On March 31, 2015, Campbell's executive assistant emailed these letters to EY with a cover email stating, "[a]ttached please find the executed documents you sent to Holland last evening. Holland explained that you need the originals, so please let me know when you would like to stop by and get them." (Exhibit 1022). The attached confirmation letters included company names but not contact names or addresses. Two

---

[16] Campbell testified that Roggero's June 23, 2015 email was not honest—Campbell felt it was a set-up. She stated that there was nothing wrong in trying to make sure the deal points were clear before writing the deal.

[17] Campbell testified that Roggero's June 23, 2015 email was not honest—Campbell felt it was a set-up. She stated that there was nothing wrong in trying to make sure the deal points were clear before writing the deal.

16

minutes after the letter were sent, Greenberg emailed Campbell stating that letters could not go out with missing contact / address information. Campbell responded that she would fill out the information immediately.[18]

**D.     The UMG Matter**

     **1.     Background**

SiTV (NUVOtv's parent company) acquired Fuse from Madison Square Garden Company (MSG) in July 2014. (Exhibit 2016.) Before the acquisition, from 2007-2010, Fuse had a license to use UMG's music videos. After the license expired, Fuse continued to use UMG's videos from 2010 to 2015. UMG did not request compensation or a new license.

Toward the end of 2014, Rand Levin, UMG's Senior VP of Business and Legal Affairs contacted Campbell regarding Fuse's use of UMG's videos. Campbell testified that Schwimmer wanted her to write an aggressive letter to Levin instead of using her more diplomatic approach. On January 5, 2015, Campbell emailed Schwimmer the draft which stated,"Attached for your review is a draft letter to Rand Levin of UMG... I have taken a strong tone with him while proposing a more productive way for us to proceed." (Exhibit 1016.) On January 6, 2015, Schwimmer emailed Holland a re-write of her draft, stating, "The essence and intent are the same, but the tone is firm but professional, and it is more concise and avoids the redundancy in the draft provided." (Exhibit 1016.)

---

[18] Campbell testified that Greenberg told her to "Just fill in the body of the letter and sign it." She believed that EY was going to fill in that information and that she was simply to confirm the rest of the information. Ruth Lawanson of EY had asked her to email the letters which she did. She did not believe the executed letters were the final letters. She thought EY needed the originals for their records, not to be sent out.

Exhibit "5"

Schwimmer testified that he completely rewrote Campbell's letter as it was not well drafted, too aggressive in some areas and wishy-washy in others. Her draft inappropriately informed UMG that she told her supervisors she felt UMG's position was reasonable. Schwimmer testified that this was "nuts" and that he had never seen anything like it. He stated that Campbell also inappropriately used "all caps."

On January 15, 2015 UMG responded by letter to Fuse asserting copyright infringement and demanding that Fuse cease and desist using "all unlicensed and infringing uses of UMG content." (Exhibit 14.)

Campbell testified that Schwimmer's version of the letter was much more aggressive and that she did not agree with his approach. She felt his aggressive approach caused UMG to issue the cease and desist letter.

Campbell testified that within a couple of weeks of receiving UMG's cease and desist letter, she sent out a litigation hold to the organization, including Schwimmer, Roggero, Hilary, and possibly the heads of Hilary's group.

Following the cease and desist letter, UMG made an offer of $100,000 to UMG to settle the matter. Hilary, who was part of the negotiation with UMG, testified that Fuse's goal was resolved the matter for $1,000,000.

## 2.   Audit Information Response (Audit Letter)

Campbell testified that within a few days of April 22, 2015, either April Li or Ruth Lawanson at EY asked her to prepare a letter (audit letter) disclosing all pending and threatened litigation against Fuse for the year-end audit.[19] Campbell used the prior year's letter as a template. The afternoon of April 20, 2015 she asked Anna Erenburg, Fuse's New

---

[19] No evidence was presented as to when EY originally requested the letter.

18

York counsel, to prepare and insert the UMG matter into the draft. Erenburg did so and returned the draft the morning of April 22, 2015. Campbell testified that the UMG matter was an open, threatened litigation that unquestionably needed to be disclosed.

According to Campbell, she first told Greenberg she intended to disclose the UMG matter in the audit letter in his office after she received and had a chance to think about the assignment. Greenberg disagreed and told her the UMG matter did not need to be included. When she stated that they had a cease and desist letter, he responded "that is not litigation" and did not need to be disclosed. He then asked her to prepare one draft with, and one draft without, the UMG disclosure. He said that they would first submit the one without the disclosure to see if it worked. Campbell discussed the issue with Roggero who backed Greenberg and reiterated that UMG did not need to be included.

Campbell testified that because both Greenberg and Roggero had been insistent, she reread the letter. She again determined that she had to make the disclosure and she finalized the audit letter.[20] Campbell emailed Greenberg and Roggero on April 22, 2015 at 9:32 am with her final draft attached.[21] The email stated:

> "Having reviewed the letter of last year, and the parameters for determining what to report, I...added the UMG matter to the attached. I intend to send this to Ruth first thing tomorrow when I am in a position to sign and scan. Let me know if you have any questions."[22] (Exhibit 12.)

---

[20] Campbell estimated that maybe five business days had passed between getting EY's request for the legal letter and April 22, when she was first ready to send the letter out.

[21] There was a typo on the first line and on the attention line on page 2, although this had nothing to do with the content of the UMG disclosure.

[22] Greenberg testified that he does not remember any conversations with Campbell about the contents of this letter.

19

The same day, April 22, 2015 at 1:13 pm, Roggero sent Campbell an email directing Campbell to "Please call George before sending."[23] (Exhibit 13.)

Campbell testified that she then called Greenberg who reiterated that UMG did not need to be included because it wasn't an active litigation, and a cease-and-desist letter didn't mean threatened litigation. He told her that EY already knew about the UMG matter anyway. Greenberg was more agitated and forceful than the first time they talked but still did not explain why the UMG matter should not be included.

Campbell testified that she called Roggero, who was very direct. He stated that he did not think UMG needed to be included and he told her to "look again." He suggested strongly that she not include UMG, but never directly told her not to include it.

According to Campbell, she then conducted legal research to see if there was a legitimate way to avoid making the disclosure and sought advice from a lawyer friend. She again concluded that she must disclose the UMG matter. She felt tremendous pressure from Roggero and Greenberg and did not want to go against them. She did not yet know they were trying to sell the company.

Campbell emailed Roggero and Greenberg on April 23, 2015 at 8:43 pm (Exhibit 14) detailing why she must disclose the UMG matter.[24] The email concluded:

---

[23] Roggero testified that he wanted to make sure Greenberg and Campbell were on the same page as to what needed to be disclosed.

Campbell testified that Fuse was an email intense environment. They were clever on occasion to not put things in writing. The email instructing her to "call George" before sending is an example. She testified that by putting her position in writing, she violated the practiced "code," which was to avoid leaving a paper trail on this issue.

[24] In terms of legality, Campbell testified that she was concerned of running afoul of reporting requirements of Dodd Frank and Sarbanes Oxley, accounting principles and ethical mandates.

Exhibit "5"

One of my most important functions as counsel is to protect the company from unintentionally engaging in inappropriate activities or making false representations that could negatively affect its financial condition and/or credibility. I have conducted extensive research in an effort to find a basis, legal or otherwise, to support your request that I omit UMG from the referenced disclosure letter. There is no way we can assert such a position....

I advise that we submit an accurate "Audit Information Response." Attached is my suggested response which I have executed and scanned so that it can be forwarded to Ms. Li.[25]

Greenberg emailed Campbell on April 24, 2015 at 11:53 am (Exhibit 14)

responding:

"Holland, as I've previously communicated, EY is aware of the UMG matter." We've had several discussions on the topic, its clearly an item included in the Fuse purchase agreement and the audit team (including the partner) is fully aware of it. Nothing is being hidden from them.[26]

Greenberg's email also stated that EY gets confused after speaking with Campbell

and frustrated in not getting timely information.[27] Additionally, the email states that her

memo did not adequately document the UMG issue and she needed to send the memo to

---

[25] Greenberg testified that he does not recall discussing the email's content with Campbell. Campbell testified at deposition that after she prepared Exhibit 14, she noticed a change in the way she was treated.

[26] Greenberg testified that when he wrote, "Nothing is being hidden from [EY]," he was responding to Campbell's accusation that he was doing something improper. He wanted to set Campbell straight. He was annoyed and surprised by her aggressiveness. He felt he was totally above board and her accusations were unwarranted.

Greenberg testified that the UMG matter was disclosed in the purchase agreement when the company acquired Fuse from MSG. He testified that EY and most of management were aware of the matter and that he does not recall anyone in upper management saying they wanted to keep the cease and desist confidential.

Greenberg admitted, however, that when he told Campbell that EY was aware of the UMG matter, EY did not know that UMG had sent a cease and desist letter or that Fuse had made a settlement offer to UMG.

[27] Greenberg testified that he could not recall any specific complaints from the EY auditors.

Exhibit "5"

EY, then follow up with a separate more comprehensive UMG memo.[28] The email states that he'd previously asked her to prepare this memo.[29] (Exhibit 14.)

Greenberg testified that they were "concerned that the audit was not pacing timely." He did not not recall any conversations with Campbell or Roggero about the propriety of disclosing the UMG matter. He testified that it "was not that big of a deal for the audit" and "was something Holland could have taken care of directly with Ernst & Young." He testified that Campbell did not need his or Roggero's permission to send the letter. "She had full reign to give EY whatever information she wanted.

Campbell testified that her next email response to Greenberg, dated April 24, 2015 at 2:16 pm (Exhibit 15), documented what Greenberg in fact instructed her to do (prepare two iterations of the disclosure letter to EY– one with the UMG information and one without), rather than what he claimed he asked her to do in his letter (prepare a memorandum). It states, in part:

> o   "...[Y]ou did not tell me to prepare a memorandum regarding the UMG matter. Rather, you asked that I prepare two iterations of the letter to EY— one containing reference to the UMG matter and one omitting it—which I did. Your instruction was for me to first submit to EY the letter that did not include UMG and see if that would be sufficient. As I explained in my note from last evening, I cannot not [sic] do that."[30]

---

[28] He testified that he did not remember why he told Campbell to include a "more comprehensive" memo.

[29] Campbell testified that Greenberg lied when he wrote that (1) the UMG matter has not been been adequately detailed and (2) that he previously asked her to have the document ready. Nothing in the letter's last paragraph was true. Greenberg had never previously taken such an aggressive stance with her.

Campbell testified that more detail about the UMG matter in the letter was not necessary. Neither Roggero nor EY ever asked for more detail.

[30] Greenberg never denied Campbell's claims in writing that he asked her to prepare two iterations of the letter. He states that he did not respond as her claims were inflammatory and he didn't want to deal with it. He didn't bother to read the whole thing.

22

o "...[I]t makes no difference whether or not EY is currently aware of the UMG matter....[I]t would not matter if EY verbally or in writing on numerous occasions had previously directed Fuse not to include a UMG disclosure. The clear requirements of the Audit Information Response, which necessitates my verification as an attorney, mandates the UMG inclusion."

o "EY was not confused by any of my communications ... I have collaborated with you every step of the way with respect to this audit. I have met every deadline I have been given and I do not appreciate the insinuation that I am not prepared, timely and diligent in my work when, in fact, I am all of those things while remaining focused at all times on protecting the interests of Fuse."

The last paragraph of Campbell's email provides:

"As I understand your instruction below, you are asking that I send to Ms. Li the letter I sent you last night...which includes reference to the UMG matter. **Please confirm so that I may send that letter to her immediately.** To the extent you believe I need to provide EY with more robust information regarding UMG in a supplemental writing, I will be happy to do so. To that end, please forward me the relevant documentation you have already provided EY on the UMG matter so I can reference it in my follow-up memo rather than be duplicative in my communication." [Emphasis original.]

Campbell testified that Greenberg never confirmed so that she could send the letter

to Ms. Li. Instead, three hours later (at 5:03 pm), Greenberg emailed Lawanson directly,

along with Campbell's finalized version of the audit letter. (Exhibit 16.) The email states:

"Per your request here's the letter from Holland.... I'm sorry that you once again had to come to my office to follow up on her items and I share in your frustration as you indicated. I'm very sorry that you along with April had so many frustrations and difficulties in getting what you need when you need it related to the audit from Holland. I've been...doing my best in the background to run interference to prod Holland to deliver what you require. It's pretty poor professionalism for her to make you guys jump through hoops on some things that are seemingly so simple. What more can I say."

23

Greenberg testified that he added the information about Campbell being unprofessional because he was very embarrassed for himself, Campbell and the company.[31]

Ruth Lawanson responded to Greenberg by email dated April 24, 2015 at 5:34 pm (Exhibit 17), stating: "I'm sorry for bothering you with this, it just seems so long to get items from Holland and she never really follows up."

On Friday night April 24, 2015 at 8:37 p.m., Lawanson asked Campbell to revise the audit letter to include "the previously requested MFN statement" (a statement that Fuse had not received any MFN audit notices during 2014 or through April 24, 2015). Campbell emailed Lawanson stating she never received a prior request but that she would provide the information. The next day Campbell emailed Lawanson (and cc'd Greenberg and Roggero) and attached the revised letter. However, as Greenberg correctly noted in a responsive email, Campbell's revised letter was still "missing requested language needed for 2015 to date." Campbell explained that she incorrectly read Lawanson's request alternatively instead of conjunctively. She corrected and resent the letter to Lawanson.

On May 12, 2015, Greenberg emailed Campbell to request another letter for EY to bridge the time gap between her last letter and the current date to make sure no new material legal matters had arisen. He requested that she finish the letter that day. Campbell agreed. She admitted, however, that by 10:59 pm that night (when Greenberg emailed her again) she still had not sent the letter. She explained that she needed additional information and wanted to talk to Roggero.

---

[31] Greenberg testified that he believed, in providing this letter, he "needed to provide some context as to Campbell's conduct and lack of responsiveness."

24

Greenberg admitted that Campbell did not prevent the audit from closing on time and he cannot recall any specific thing she was late on.[32] He does not have any emails from EY confirming that they complained to him about Campbell being late.

Roggero testified that Greenberg had expressed frustration about Campbell's timeliness in providing the audit letter. Roggero testified that timeliness, not the content, was the issue. The letter's content was left to Campbell's discretion.

Natalie Woloshin, Campbell's friend since law school in 1991, testified that Campbell told her that her supervisors were pressuring her to lie on a document. She was upset, torn, confused and very worried that if she did not lie as directed, she would lose her job. Campbell told her, however, that she would not lie and would always do the ethical thing. She liked her job before this, and felt that was going to change.

Anna Erenburg testified at her deposition that Campbell told her that Greenberg did not want to include the UMG matter in this letter.

---

[32] He does not recall anyone ever telling him that the information in the audit letter was confusing, incomplete, inadequate, or unintelligible.

IV.    ANALYSIS OF CLAIMS

   A.    California Labor Code § 1102.5(c) (Retaliatory Discharge)

      1.    Legal Standard

   Labor Code (LC) §1102.5(c) protects employees from retaliatory treatment for refusing to participate in an employer's violation of a state or federal statute, rule, or, regulation.[33] In enacting this statute, "the California Legislature intended 'to protect employees who refuse to act at the direction of their employer or refuse to participate in activities of an employer that would result in a violation of law.'" (*Ferretti v. Pfizer Inc.* (2012) 855 F.Supp.2d 1017, 1025.) LC §1102.5(c) provides:

> (c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

   For Campbell to prove her LC §1102.5(c) claim that Fuse terminated her in retaliation for her refusal to participate in a protected activity, she would have to demonstrate each of the following essential elements:

      1.    That Fuse was Campbell's employer;

---

[33] LC §1102.5(c) applies here as it governs claims of retaliation against an employee for *refusing to participate* in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. Campbell alleges that Fuse retaliated against her for refusing to participate in protected conduct, i.e., the omission of the UMG matter from the legal audit letter.

Although mentioned in Campbell's brief, LC §1102.5 (b) does not apply here. Section 1102.5(b) involves claims that an employee was retaliated against for *disclosing information to a government or law enforcement agency, or other specified persons* or entities, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. Campbell did not allege or present evidence that she disclosed information to a government or law enforcement agency, or other person or entity specified in the statute.

Exhibit "5"

2.    That Campbell refused to participate in omitting the UMG information from the audit letter;

3.    That Campbell's participation in omitting the UMG information would have resulted in a violation of a state or federal statute or a violation of or noncompliance with a local, state or federal rule or regulation;

4.    That Fuse discharged Campbell or engaged in other adverse employment action;

5.    That Campbell's refusal to omit the UMG matter was a contributing factor in Fuse's decision to discharge her or engage in other adverse employment action against her;

6.    That Campbell was harmed; and

7.    That Fuse's conduct was a substantial factor in causing Campbell harm.

(See CACI 4603, Whistleblower Protection—Essential Factual Elements (LC § 1102.5).)

2.    **Analysis of Retaliatory Discharge (LC §1102.5) Claim**

Campbell must prove that omission of the UMG information from the audit letter would have resulted in a violation of a state or federal statute or a violation of or noncompliance with a local, state or federal rule or regulation.

LC §1102.5(c)'s language makes clear the employee must show that the conduct—in which the employee refused to participate—was *actually illegal*, not simply that the employee had a reasonable belief of illegality.[34]

---

[34] Both parties appear to argue a reasonable belief standard. However, LC §1102.5's language makes clear that the "reasonable cause to believe" standard applies only to subsections (a) and (b) which pertain to "disclosures" of information to governmental and other specified entities. These sections do not apply here. "Disclosure" of the UMG matter to auditor EY does not fall within the ambit of these subsections.

The standard in subsection (c) (which pertains to an employee's refusal to take action) is a more difficult standard. Subsection (c) requires that the employee show the employer's conduct "*would result in a violation of or noncompliance* with a local, state, or federal rule or regulation." Subsection (c) is the appropriate subsection in this case since the allegations involve "refusal to participate" in illegal conduct.

27

Campbell testified that she believed Fuse's omission of the UMG matter from the audit letter would violate Financial Accounting Standards Board Accounting Standards Codification (FASB ASC), GAP 450. Campbell correctly admitted, however, that the ASC is not a law or regulation, but an accounting standard. She testified that she believed nondisclosure in violation of the ASC would have constituted "gross misconduct" and would have been unethical. Ethical violations and gross misconduct are insufficient to show illegality for LC §1102.5(c)'s purposes.

Campbell also testified that she was concerned that failing to disclose might run afoul of the reporting requirements of Dodd Frank and Sarbanes Oxley. (Her Amended Statement of Claims also referred to the DFA and SOX and alleged that the conduct Fuse sought to conceal commenced when Fuse was a subsidiary of MSG, a publicly-traded company. (Exhibit 1000, ¶ 29.) However, her testimony failed to meet her burden of showing that Fuse's conduct would have resulted in a violation of the DFA or SOX.

Campbell has not demonstrated that Fuse's conduct in which she refused to participate would have resulted in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." (Lab. Code §1102.5(c).) For this reason, Campbell's LC §1102.5(c) claim has not been established.[35]

---

[35] Fuse argued that Campbell cannot establish that non-disclosure would have violated the law and that there can be no "whistleblowing" where there was no wrongdoing. While Campbell did not prove Fuse's conduct would have violated the law, this does not mean there was no wrongdoing.

28

**B.**   **Wrongful Termination in Violation of Public Policy**

  **1.**   Legal Standard

  **a.**   General Law

In California, an employment contract of indefinite duration is generally terminable at either party's will. (LC § 2922) A narrow exception exists where the employee is discharged in contravention of fundamental public policy.[36] (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal. 3d 167, 172, 177.) A public policy violation occurs where the employee is discharged for "performing an act that public policy would encourage, or for refusing to do something that public policy would condemn." (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1090; *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 79-80; *Tameny, supra.*) Absent this public policy violation exception, employers could use the threat of discharge to "coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 655.)

"[W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." (*Tameny, supra,* at 170.) A policy must satisfy the following requirements to support a tortious discharge claim:

  "First, the policy must be supported by either constitutional or statutory provisions. Second, the policy must be 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the

---

[36] The California Supreme Court has interpreted the term "public policy" to mean "that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good...." ' " (*Gantt, supra,* at p. 1094, *quoting Safeway Stores v. Retail Clerks etc. Assn.* (1953) 41 Cal. 2d 567, 575.)

Exhibit "5"

discharge. Fourth, the policy must be 'fundamental' and 'substantial.'" (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890, fn. omitted.)

CACI 2430 sets forth the essential factual elements for a claim of Wrongful Discharge Violation of Public Policy:

> [*Plaintiff*] claims [she] was [discharged] from employment for reasons that violate a public policy. It is a violation of public policy [*specify claim in case, e.g., to discharge someone from employment for refusing to engage in protected conduct*]. To establish this claim, [*plaintiff*] must prove all of the following:
>
> 1. That [*plaintiff*] was employed by [*defendant*];
>
> 2. That [*defendant*] [discharged] [*plaintiff*];
>
> 3. That [*the alleged violation of public policy, e.g., "[plaintiff]'s refusal to engage in specified conduct*] was a substantial motivating reason for [*plaintiff*]'s discharge; and
>
> 4. That the discharge caused [*plaintiff*] harm.

CACI 2507 explains the meaning of "Substantial Motivating Reason":

> A "substantial motivating reason" is a reason that actually contributed to the [*adverse employment action*]. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the [*adverse employment action*].

**b.    General Dynamics Corp. v. Superior Court and Business and Professions Code § 6106**

The California Supreme Court's reasoning in *General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, is highly instructive.[37] There, the Court concluded that generally an in-house attorney could maintain "a retaliatory discharge claim against his or

---

[37] In *General Dynamics*, the issue was whether an attorney's status as an employee barred the pursuit of retaliatory discharge tort causes of action against the employer that are commonly the subject of suits by non-attorney employees who assert the same claims. The Court concluded that there is no reason inherent in the nature of an attorney's role as in-house counsel that in itself precludes the mainenance of a retaliatory discharge claim, provided it can be established without breaching the attorney-client privilege or unduly endangering the values lying at the heart of the professional relationship.

30

her employer...[if] the attorney was discharged for following a mandatory ethical obligation prescribed by professional rule or statute." (*Id.* at p. 1188.) By "professional rule", the Court referred specifically to the Rules of Professional Conduct, adopted pursuant to statute by the California State Bar with the approval of the California Supreme Court and binding on all attorneys in the state. (See Business and Professions Code (BPC) §§ 6076, 6077.)

*General Dynamics* explained that public policy wrongful discharge claims arise out of a duty implied in law on the employer's part to conduct its affairs in compliance with public policy. This public policy at issue must be fundamental and truly public in nature, i.e., it must affect a duty which inures to the benefit of the public at large rather than to a particular employer or employee." (*Id.* at 1180.) The Court noted a characteristic of retaliatory discharge claims of "surpassing significance" in the case of in-house counsel; specifically, the remedy must serve "not only to compensate the individual plaintiff for the loss of employment but as an indirect means of vindicating the underlying fundamental public policy itself." (7 Cal.4th 1180-1181.) The Court stated:

> "[D]ecisions recognizing a tort action for discharge in violation of public policy seek to protect the public, by protecting the employee who refuses to commit a crime...
>
> In other words, although the public policy served by the conduct of the aggrieved employee at issue may often be directly protective of the interest in employment itself, the doctrinal foundation of the public policy tort claim is not so much the plaintiff's continued interest in employment as the preservation of the public interest...." (7 Cal.4th 1181.)

The Court affirmed the importance of the public rationale in the case of an in-house counsel who has dual duties to both their clients and to their profession. While this attorney's highest duty is to the client's welfare and interests, this obligation is channeled by the limiting and specifically professional mandate not to transgress professional ethical norms. The Court stated at 7 Cal.4th 1181-1182:

31

Some...of these professional norms incorporate important public values. Lawyers are given wide professional license in part because of ethical restraints on their discretion designed to further (or at least not endanger) the public weal. The minimal ethical standards that distinctively define the lawyer...are...those embodied in the codes of ethics, and, in California, in the Rules of Professional Conduct. These standards are in turn linked by their nature and goals to important values affecting the public interest at large. It is through this chain of ethical duty that lawyers and their work are affected with a public interest. Out of this duality of allegiance-for the interests of the client on the one hand, but within the bounds of ethical norms on the other-a genuine moral dilemma may arise.

This is especially so in the context of the large commercially driven corporation whose essential objectives are largely defined by the desire to maximize profitability. In such a business culture, the in-house professional may be trapped between a laudable desire to further the goals of the client-employer and restrictions on conduct imposed by the ethical norms prescribed by the Rules of Professional Conduct. Of course, the potential for such a dilemma is common to outside counsel as well. But, unlike their in-house counterparts, outside lawyers enjoy a measure of professional distance and economic independence that usually serves to lessen the pressure to bend or ignore professional norms. Here again, the distinguishing feature of the in-house attorney is a virtually complete dependence on the goodwill and confidence of a single employer to provide livelihood and career success.

The Court further explained that:

"The case for shielding the in-house attorney... from retaliation by the employer for either insisting on adhering to mandatory ethical norms of the profession or for refusing to violate them is thus clear. And because their professional work is by definition affected with a public interest, in-house attorneys are even more liable to conflicts between corporate goals and professional norms than their nonattorney colleagues....[I]n-house counsel, forced to choose between the demands of the employer and the requirements of a professional code of ethics have, if anything, an even more powerful claim to judicial protection than their nonprofessional colleagues." (7 Cal.4th 1182).

Based on this reasoning, the Court determined that allowing in-house counsel to bring retaliatory discharge claims would give them greater incentive to confront their employers' improper business practices rather than remaining silent out of fear for job security. The Court stated:

32

"Granted the priest-like license to receive the most intimate and damning disclosures of the client, granted the sanctity of the professional privilege, granted the uniquely influential position attorneys occupy in our society, it is precisely because of that role that attorneys should be accorded a retaliatory discharge remedy in those instances in which mandatory ethical norms embodied in the Rules of Professional Conduct collide with illegitimate demands of the employer and the attorney insists on adhering to his or her clear professional duty." (7 Cal.4th 1186).

Every California lawyer is bound by rules regarding the duty of candor found in the Business and Professions Code, as well as the California Rules of Professional Conduct. The State Bar Act refers to the BPC *Div. 3 - Professions and Vocations Generally, Ch. 4 - Attorneys*. BPC § 6106, entitled "Moral turpitude, dishonesty or corruption irrespective of criminal conviction," sets forth actions unfit for an attorney, that may result in discipline. This section states that:

"the *commission of any act involving...dishonesty or corruption,* whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, *constitutes a cause for disbarment or suspension.*

If the act constitutes a felony or misdemeanor, conviction thereof in a criminal proceeding is not a condition precedent to disbarment or suspension from practice therefor." (Emphasis added.)

2.    **Analysis of Retaliatory Discharge in Violation of Public Policy Claim**

   a.    **Public Policy at Issue**

The public policy at issue in this case was Campbell's ethical duty to abstain from participating in conduct involving dishonesty or corruption. Campbell's retaliatory discharge claim is founded on allegations that she was terminated for refusing to violate mandatory ethical duties prescribed by rules of professional conduct and the Business & Professions Code.

33

### h.    Fuse Upper Management Tried to Keep the Cease and Desist Matter Confidential

Substantial and persuasive evidence was presented that Fuse upper management wanted to keep the UMG cease and desist matter confidential and to limit dissemination of the information even within the company itself.

Lynette Ramirez testified that the UMG cease and desist letter was raised in department meetings and was not common knowledge throughout the company.[38] Bill Hilary told Ramirez and Hilary's direct reports that this matter was to stay confidential among the executive managers, who would have some sort of say in strategy or in remedy. They were told not to share this issue with others. Hilary and Kathryn Mitchell [the head of acquisitions and scheduling] told Hilary's direct reports that this was to stay confidential and "that this was something that, until we had answers for, we weren't to share." The information was conveyed on a need to know basis, and applied also to Fuse employees that they dealt with on the East Coast. "It was on a need-to-know basis."

Ramirez testified that during the time the cease and desist was on a need-to-know basis, Fuse continued to use UMG library content. They weren't creating new content to the best of her knowledge. At the point when Holland left, the UMG cease and desist was becoming more widely known but it "was still kept quiet. Yeah."

Bill Hilary similarly testified that knowledge of the cease and desist letter was confined to "a small group of people" within senior management.[39] He testified that Roggero and Schwimmer made it clear at a meeting that they did not want this information

---

[38] Ramirez, who oversaw programming, worked at Fuse for over three years. She left the job voluntarily.

[39] Hilary is Fuse's estranged former president who lost a corporate political battle to the current CEO Michael Schwimmer.

34

disseminated. In June of 2015 Fuse was trying to sell the company so they particularly didn't want prospective purchasers to know as this would have financially burdened that sale. Fuse was also negotiating the Sony record deal and did not want Sony to know because it would have have been detrimental and hampered negotiations.

Campbell also testified that the cease and desist letter was kept confidential and known by only a select group of people. She stated that Roggero and Schwimmer made it "very clear" that they did not want the information to be widely disseminated because it would have had a big impact on Fuse's image and Fuse's pending music deals, including the Sony deal. Campbell was told that the cease and desist was to be disclosed on a need-to-know basis. She sent out the litigation hold letter to Schwimmer, Roggero and Hilary and left it to them to disseminate the information as they felt appropriate.

George Greenberg, in contrast to Ramirez, Hilary and Campbell, stated the UMG matter was common knowledge and widely known to most people in the company. He denied that he or anyone ever wanted to keep the cease and desist demand confidential. Both in his email to Campbell and at the hearing and his deposition stated that that EY was fully aware of the UMG matter.

CEO Michael Schwimmer testified that he was acquainted with the UMG cease and desist letter. He denied that he ever told upper management that he did not want the UMG matter disclosed to the company. He testified that it was well-known throughout the company and a number of people knew of the matter, including the Board of Directors. A lot of people had to know about it because Fuse had to stop using videos they were used to getting.

Exhibit "5"

c.   The UMG Cease and Desist Letter was a "Big Deal"
that had Significant Ramifications for Fuse

Fuse unpersuasively argues that the issue of including the UMG matter in the audit disclosure letter was "no big deal" and that Campbell engaged in a "conspiracy theory" over this "minor issue." However, the evidence shows that the potential consequences of the cease and desist letter were serious and could significantly have impacted Fuse financially.

Lynette Ramirez testified that the UMG cease and desist was a "big deal" at Fuse because it directly affected scheduling and more than fifty percent of Fuse's programming. After the Fuse acquisition, the majority of Fuse's music videos were hip-hop and the majority of hip-hop videos were supplied or on contract through UMG. UMG videos were more than fifty percent of their programming. This was significant because "if we weren't able to play UMG videos...we would have holes in the schedule and needed to come up with some sort of replacement for those videos." "[I]t was a big deal in discussing how we would rearrange the schedule or continue to play the videos despite the cease and desist. It affected scheduling directly."

Ramirez testified that Fuse's recent acquisition was also an issue: "Scheduling was a big topic of conversation because we were now running two channels as opposed to being two separate networks with one channel. So, yes, in terms of scheduling and how we would fill the schedule on both channels, it [was] important."

Ramirez explained the impact of the cease and desist letter on SKEE TV, which was a Fuse weekly hip-hop music show and primarily an original program. "... [F]ollowing the acquisition, the initial order was for episodes, one-hour episodes, and it's a music show. SKEE's a tastemaker, particularly known for his tastemaking in the hip-hop world."

36

Ramirez explained that many UMG artists were put on the show and the cease-and-desist letter affected the ability to have guests on SKEE TV. The show went out to artists directly and the cease and desist affected Fuse's ability to procure these artists for the show. Skee TV was already in production when Campbell was terminated.

Bill Hilary testified that the cease and desist was very damaging. First, Fuse was trying to sell the company so it would have been financially detrimental if prospective purchasers knew of the cease and desist demand. Second, Fuse is a music channel and wanted to have the biggest music network in the country in their portfolio. Third, Fuse was negotiating the Sony deal and knowledge of the cease and desist would have influenced the deal and hampered negotiations. For example, Fuse wouldn't have been allowed to use Rihanna, a huge star. Fuse would have had "to edit those out of [its] shows, which would have cost hundreds of thousands of dollars, if not millions actually." Fuse wouldn't be able to use new videos released by UMG and, even more damaging, Fuse wouldn't be able to use UMG's talent for their nonmusic programming. Fourth, loss of the use of UMG content would undermine the brand's ability. A multicultural channel must play the most recent music to be culturally relevant and if you lose the the biggest music company "that's not good." Finally, the UMG issue greatly affected the operations of the two channels.

In contrast to Ramirez and Hilary, Schwimmer testified that the cease and desist letter did not have much effect on the company. They couldn't use the videos anymore. He testified that Fuse's ratings now are higher than they were when they had the videos. They inserted replacement programming and life moved on. On recross examination he admitted that when they received the cease and desist letter they were contemplating selling Fuse

37

and there were negotiations occurring regarding Sony's licensing agreement. Additionally,

he admitted that he, Roggero and Lopez have a small equity stake in the company.

        d.      **Greenberg's Lack of Credibility Regarding the Audit Letter's Timeliness Supports Campbell's Claim that he Pressured Her to Omit the UMG Matter from the Letter**

      Fuse repeatedly argued that the only issue with Campbell's audit letter pertained to

timeliness. Both direct and circumstantial evidence contradict this claim and persuasively

establish that George Greenberg, Senior Vice President of Finance and Controller, pressured

Campbell to exclude the cease and desist demand from the audit letter.

      Greenberg was directly responsible for the 2014 audit. He repeatedly testified that

he did not recall any conversations with Campbell or Roggero about the appropriateness or

propriety of disclosing the UMG matter in the audit letter.[40] He testified that "the issue

wasn't the content of this legal audit letter; it was that [Fuse] just needed to get the

information to the Ernst & Young people as quickly as possible."[41] He stated:

> "This was something that was not that big of a deal for the audit....It was important for this thing to get done and checked off the box and [get] done on time. I remember us being concerned that the audit was not pacing timely. So when people weren't getting things done, it was very annoying that this had to be followed up upon."...[T]his was something Holland could have taken care of directly with Ernst & Young."

---

[40] Greenberg's testimony that he does not recall any conversations with Campbell about the audit letter is not credible. He almost always responds "I don't recall," I don't remember" or "I don't believe that I did" when asked whether he discussed the letter's content with Campbell or Roggero. He never unequivocally states that he did *not* discuss the appropriateness of disclosure with Campbell or Roggero.

[41] Greenberg reported to Roggero the COO / CFO. According to Roggero, Greenberg expressed concerns about Campbell's timeliness with respect to the audit letter to EY.

The heated email exchange between Campbell and Greenberg pertaining to the EY audit letter strongly suggests Campbell received significant pushback not to disclose the UMG matter. Additionally, Campbell's testimony was credible and persuasive.

Campbell testified that on a date close to April 22, 2015, EY asked her to prepare the audit letter. Fuse presented no evidence as to when EY originally requested this letter.

Campbell emailed Greenberg and Roggero on April 22, 2015 at 9:32 am stating that she had reviewed the parameters for disclosure, had determined that the UMG matter must be disclosed, and that the attached audit letter was finalized and ready to be sent to EY the first thing the next morning, on April 23.[42] Accordingly, Greenberg's first opportunity to send (or have Campbell send) the audit letter to EY was the next morning, April 23, 2015, when Campbell returned to the office. Greenberg did not do so.

Instead, Roggero instructed Campbell by email the same day, April 22 at 1:13 pm, to "please call George before sending." Campbell called Greenberg. If Greenberg had genuinely been concerned with timeliness of the letter, he would have sent (or directed Campbell to send) the audit letter to EY at this time. Instead, Greenberg repeated that the UMG matter did not need to be included since it was not an active or threatened litigation. He stated that EY already knew about it because it was in the purchase agreement.[43] His failure to send the letter at this point further supports Campbell's testimony Greenberg was insisting that the UMG matter did not need to be included. Even Roggero admitted that if

---

[42] Roggero testified that the content was accurate. The content was never changed from the time Campbell first prepared the letter until the time it was ultimately sent to EY.

[43] Campbell testified that Greenberg told her that that EY already knew about it anyway because it was in the purchase agreement. She also talked to Roggero who thought the UMG matter did not need to be included.

39

the issue was simply the audit letter's timeliness, the simple thing would have been to send this letter, which would have gotten there the same day.

The next night, April 23 at 8:43 pm, Campbell sent another email to Greenberg and Roggero stating that despite extensive research she could find no basis to support their request that she omit UMG from the audit letter. She set forth the factual and legal basis for her conclusion and stated that her "most important function" is to protect the company from "unintentionally engaging in inappropriate activities or making false representations." There is no rational explanation for sending this email absent pressure from someone to engage in conduct she felt was unethical. Campbell again attached the audit letter to the email. Again, if Greenberg had been concerned only with the letter's timeliness, there is no explanation for why he would not have sent (or directed Campbell to send) the audit letter to EY. Once again he did not do so.

Campbell credibly testified that she felt tremendous pressure and did not want to go against Greenberg and Roggero. Her testimony and her email indicate that she conducted research to ascertain whether there was any legitimate way to accommodate the request to avoid making the disclosure. She even consulted with a lawyer friend. It defies logic that after reaching her own conclusion that disclosure was necessary, and after finalizing the disclosure letter and presenting it to Greenberg and Roggero, she would undertake additional research on her own and seek advice from her own lawyer *absent* pushback and pressure from someone at Fuse.

Greenberg waited until the next day, April 24 at 11:53 am, to respond. His email (inadvertently) confirms Campbell's version of their phone conversation the previous day. Greenberg's email states that he had "*previously communicated [that] EY was aware of the*

40

*UMG matter*" and that, "We've had *several discussions* on the topic, [the UMG matter is] clearly an item *included in the Fuse purchase agreement* and the audit team ... *is fully aware of it.*" The clear import of Greenberg's statements is that Campbell had no need to disclose the matter. Greenberg's language is consistent with Campbell's testimony that she and Greenberg had in fact discussed the propriety of the UMG disclosure at least twice. Conversely, the email directly contradicts Greenberg's claims that the issue was the audit letter's timeliness and not its content and that he did not believe he had had conversations with Campbell about the appropriateness of disclosure.

Although Fuse claims that the propriety of UMG disclosure was not the issue, once Campbell became insistent that the matter must be disclosed, Greenberg -- in the same email -- suddenly did an about-face and proceeded disingenuously to criticize Campbell for failing to include *enough* substance about the UMG matter to EY:

> "You're [sic] memo as it stands does not adequately document the UMG issue. It needs to be sent to them, then followed up with a separate UMG memo that more fully and comprehensively addresses the topic....Goal is to deliver a document that makes sense and fully documents the UMG topic (including opinion on potential liability, or that one cannot be pinpointed)."

Greenberg's directive to Campbell is entirely inconsistent with Fuse's claim that the concern was timeliness. While the first part of Greenberg's email emphasizes that EY already knew about the UMG matter, the latter part chastises Campbell for not giving EY enough information about the UMG matter.[44] Either way, the entire letter pertains to content, not timeliness. This email is also instructive because it contradicts Greenberg's

---

[44] Neither Greenberg nor EY ever followed up by requesting more comprehensive information. Obviously, more comprehensive information was not necessary. In fact, when asked, Greenberg could not explain why he told Campbell to include more comprehensive information. He simply said, "I don't exactly remember." This suggests that Greenberg was at this point trying to backpedal and protect himself when it became clear that Campbell would not omit the UMG matter from the letter.

41

testimony that Campbell did not need his or Roggero's permission to send the letter to EY and that she had full reign to give EY whatever information she wanted. The email is also inconsistent with Roggero's testimony that the letter's content was left to Campbell's discretion.

Two and a half hours later, at 2:16 pm, Campbell again emailed Greenberg and Roggero. She set forth her very different version of the events and conversations, and attempted to clarify his last instruction regarding the audit letter:

"As I understand your instruction below, you are asking that I send to Ms. Li the letter I sent you last night ... which includes reference to the UMG matter. **Please confirm so that I may send that letter to her immediately.**" (Emphasis original.)

Despite Campbell's third email communication stating that the letter was ready to be sent to EY, Greenberg never confirmed. Instead, three hours later Greenberg sent Ruth Lawanson Campbell's finalized version of the audit letter without a single revision. The letter sent was identical to the letter Campbell had been ready to send out two days before on the morning of April 23, 2015.

Natalie Woloshin, a close friend from law school, testified that while these events were unfolding, Campbell told her that she was being pressured at work to lie on a document. Campbell said she was very upset and worried that if she did not lie, she would lose her job. Michael Schwimmer testified that Roggero told him there was an issue with Campbell, who felt she was being asked to do something she didn't feel comfortable with. Yolanda Enamorado, Fuse's Senior VP of Human Resources, testified that Campbell commented that she wanted to put something in a letter that she wasn't sure Mike would

42

Exhibit "5"

want in the letter.[45] This testimony is significant in that Campbell was expressing to others that she felt pressured about the propriety of doing something that Fuse executives were asking her to do.

Greenberg's testimony was not persuasive. Two full days passed between the time the audit letter could have been sent out and the time he emailed the letter to Lawanson on April 24, 2015. Although it was Greenberg, not Campbell, who was responsible for the full two day delay, Greenberg threw Campbell under the proverbial bus when he emailed Campbell's original audit letter to Lawanson and falsely attributed the delay to Campbell. Greenberg sat on the completed letter for two full days and then, without making a single revision, sent Campbell's letter to EY. This conduct casts grave doubt on his credibility.

Greenberg's testimony that EY was fully aware of the UMG matter was also not credible. He insisted that nothing was being hidden from EY since the UMG matter was disclosed in the purchase agreement and in conversations with EY auditors at the end of 2014. However, on cross examination Greenberg had to admit that at the time of the purchase agreement and conversations with the auditors, Fuse hadn't yet received the January 15, 2015 cease-and-desist letter or the offer to resolve the licensing issues. Thus, EY did not know, and could not have known, about either. These are the items Campbell insisted needed to be disclosed in the audit letter.

Greenberg claimed he did not remember any conversations with Campbell or Roggero regarding the propriety of the UMG disclosure or the content of the audit letter-related emails. He did not recall any conversation with Roggero about why Roggero

---

[45] She testified that she did not consider the comment a "complaint" because Campbell did not specifically mention UMG; however, the significance is that Campbell indicated contemporaneously that an issue was occurring and she felt Roggero did not agree with her inclusion of something in a letter.

43

wanted Campbell to contact him prior to sending the audit letter. Greenberg himself

testified that Campbell's last email was "inflammatory" yet he stated he did not remember

how he felt and did not even know if he read the entirety of that email. Given the heated

and escalating insinuations and accusations exchanged, it is difficult to believe that

Greenberg does not recall these events.[46]

Greenberg denied that he asked Campbell to do two versions of the letter to EY,

one that included the UMG matter and one that did not. This legal letter was the only way

that EY could have known about the cease and desist letter and the settlement offer.

Campbell had nothing to gain by stating that Roggero asked her to prepare two versions of

the letter.

If Greenberg was not pressuring Campbell to omit reference to the UMG matter, he

had two full days from the time the letter was executed, scanned and ready to go, until the

time he sent the letter out himself. Fuse never provided any explanation for why he did not

do so and has not offered a satisfactory explanation for the two-day delay.

One may infer retaliation by the proximity in time between protected action and the

alleged retaliatory employment decision. *Fisher v. San Pedro Peninsula Hospital* (1989)

214 Cal. App. 3d 590, 615; see also, *Colarossi v. Coty US Inc.* (2002) 97 Cal. App. 4th

1142, 1154 ["The timing of the decision may have been coincidental, but when viewed as

part of the mosaic of evidence...presented, it adds to the impression that [the employer]

possessed a retaliatory motive, not a benign one."]

Fuse argued that the timing of Campbell's termination would have remained

unchanged, as she was terminated exactly thirty days before the expiration of her

---

[46] Greenberg testified that he did not recall if anyone from EY ever told him the UMG disclosure in the letter was inadequate or confusing or needed clarification.

44

employment contract, and mere days before her contract was set to automatically renew. This, however, does not show that Fuse did not possess a retaliatory motive for her termination.

Campbell testified that the last time she tried to speak to Roggero during the heated email exchange between Campbell and Greenberg, Campbell asked him what was wrong with Greenberg. Although Roggero claimed that he merely skimmed the emails, he responded that Campbell had accused Greenberg of hiding something from EY. He told her to work it out with Greenberg. Campbell testified that prior to this conversation Roggero had treated her like a professional and a member of the senior team. She testified that during this conversation and thereafter, Roggero's tone changed toward her. He was very dismissive of her and she felt very marginalized by him.

Campbell testified that she was excluded from at least one affiliate meeting after the UMG matter. Katherine Mitchell told her she was being excluded from matters because "We don't want you sharing information." Mitchell told her that as general counsel she was bound to be honest and they didn't want to put her in the position of having to respond to things if asked and she had the information.

Campbell testified that after the UMG matter, she was also treated differently with regard to audit matters. Greenberg circumvented Campbell by asking her director to perform some audit-related functions without telling Campbell. Neither Li nor Lawanson came to her for anything. Although she had to follow up on some aspect of the original audit letter, she was removed from the process as to anything new that came up.

According to Woloshin, Campbell told her that after she had been pressured not to make the disclosure, the work climate changed and became icy. Campbell told Woloshin

that she felt disregarded, disparaged and treated rudely and dismissively. She told Woloshin she felt she would be discharged given how she was being treated.

Although Fuse presented evidence that Campbell's work was not perfect, that she made some errors and sometimes misconstrued instructions, this does not mean that Fuse did not terminate her for refusing to omit the UMG matter from the audit letter. Campbell's insistence on inclusion of the UMG matter need only be a "substantial motivating reason" for her termination. It must be more than a remote or trivial reason. It does not have to be the only reason motivating her termination.

All of the above evidence, particularly Greenberg's lack of credibility about the UMG audit letter and the two day delay, Fuse's attempt to characterize the cease and desist letter as "no big deal," Campbell's satisfactory performance review three months before she was fired, and the proximity of time between the UMG dispute and Campbell's termination supports her claim that Fuse possessed a retaliatory motive for her discharge. Campbell has proven her claim for retaliatory discharge in violation of public policy by a preponderance of the evidence.

C.   Defamation

1.   Legal Standard

Defamation is defined by Civil Code §§44, 45 and 46.

Civil Code Section 46(3) specifically concerns defamation per se affecting a person's occupational reputation. (*Washer v. Bank of America* (1943) 21 Cal.2d 822, 827.) Section 46(3) states:

> "Slander is a false and unprivileged publication [orally uttered] . . . which:
> . . . "Tends directly to injure him in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the . . . occupation peculiarly requires, or by imputing

46

something with reference to his...profession, trade, or business that has a natural tendency to lessen its profits [or earnings].

"These definitions [Civ. Code, § 46] have been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation, either generally, or with respect to his occupation...." (*Washer v. Bank of America* (1943) 21 Cal.2d 822, 827.)

"...[I]n an action for damages based on language defamatory per se, damage to the plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages." (*Contento v. Mitchell* (1972) 28 Cal.App.3d 356, 358.)

"...[S]lander per se is presumed to cause damage and plaintiff may recover for her hurt feelings, mental suffering and humiliation without proving any out of pocket loss." (*Schomer v. Smidt* (1980) 113 Cal.App.3d 828, 834.)

Civil Code §45 defines Libel as follows:
Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.

2.   Analysis of Defamation Claim

On April 24, 2015, Greenberg sent an email to Ruth Lawanson of EY criticizing Campbell and apologizing for her lack of professionalism. This email stated:

"Per your request here's the letter from Holland.... I'm sorry that you once again had to come to my office to follow up on her items and I share in your frustration as you indicated. I'm very sorry that you along with April had so many frustrations and difficulties in getting what you need when you need it related to the audit from Holland. I've been...doing my best in the background to run interference to prod Holland to deliver what you require. It's pretty poor professionalism for her to make you guys jump through hoops on some things that are seemingly so simple. What more can I say." (Exhibit 16.)

: 47

Exhibit "5"

Greenberg's statements that: (1) "I've been...doing my best in the background to run interference to prod Holland to deliver what you require" and (2) It's pretty poor professionalism for [Campbell] to make you guys jump through hoops on some things that are seemingly so simple" were patently false. Greenberg knew that Campbell had finalized the audit letter on April 22, and was ready to send the letter when she returned to the office the morning of April 23.

Greenberg admitted in his deposition that he had between ten and twenty conversations with Li and Lawanson in which he and they referred to Campbell as "unprofessional." Fuse, despite having an ongoing working relationship with EY's Ruth Lawanson and April Li, chose to not serve or call them as witnesses to appear.[47]

Greenberg testified that he was stating a fact when he referred to Campbell as unprofessional.

Campbell has established her defamation claim by a preponderance of the evidence.

## V.   DAMAGES

### A.   Economic Damages

Campbell testified and offered evidence of her diligent but unsuccessful efforts to seek employment since her termination. As noted in Campbell's response to Respondents' discovery just prior to arbitration, she lost approximately $364,000 over a year in salary and benefits from Fuse. This amount had risen to about $368,000 at the time

---

[47] Fuse submitted a letter from Lawanson shortly after his email calling Campbell unprofessional. She states, "I'm sorry for bothering you with this, it just seems so long to get items from Holland and she never really follows up." Greenberg had just thrown Campbell under the bus and this was Lawanson's response. Lawanson was not called to corroborate Fuse's claims about EY's alleged problems with Campbell.

48

of arbitration. Furthermore, it is likely to take her another two years to find substantially similar work, resulting in damages of approximately $552,000.

Campbell has lost $368,000 in total compensation to date, a number that continues to climb despite her active job search. There are limited positions available at her level and these are subject to a high degree of scrutiny. The termination has heavily tarnished her career.

Fuse's unlawful termination has cast her in an unfavorable light, causing subsequent employers to view her candidacy with skepticism. The termination was compounded by Greenberg's multiple instances of defaming Campbell's performance in communications to EY. While Greenberg claimed that these conversations were initiated by EY, no witnesses were called by Fuse to corroborate this claim. EY is influential and far-reaching within the industry. These defamatory communications did and continue to damage Campbell's efforts to find new employment.

B.    Non-Economic Damages

Fuse argues that Campbell's emotional distress witnesses are unqualified to proffer any sort of diagnosis of her alleged distress symptoms.

Natalie Woloshin and Jerad Schempp offered compelling testimony about the profound emotional impact this termination has had on Ms. Campbell. Woloshin testified that after Campbell's termination, Campbell visited her in Delaware for a couple of weeks. Woloshin observed that Campbell felt devastated and depressed. She did not eat well or sleep well. There were days that she did not leave the bedroom. She cried a lot and couldn't believe this had happened to her. Soon after her termination, Woloshin and Campbell started talking every day. Woloshin testified that she is terrified for Campbell's mental

49

health because she has made references to killing herself, so much so that in April Woloshin flew out to see her. Woloshin put her practice on hold and missed Passover with her family, because she was terrified about what Campbell might do. Woloshin has a busy law practice, yet she takes time to talk to Campbell every day. Campbell has no money, so there's not much she can do. She now has a very tough life, and Woloshin is "very afraid" for her.

Jared Schemp testified regarding the changes he has observed in Campbell. He testified that Campbell would try to put on a brave front, but the great sadness underneath pierced through. He also expressed his own concern that Campbell was not simply sad, but depressed enough that she was a danger to herself, making comments about how she had a great "run" as though her life were over. Schemp testified that Campbell has a "sunny" personality. She is still, on the surface, the same way. Below the surface, though, she has gone downhill since her termination. Time together is still the same as before. They still go out and have fun together but now Campell feels like the future is dark for her. She feels hopeless, as if she is done with life in general.

Campbell first saw the defamatory email from Greenberg to Lawanson at Greenberg's deposition. Campbell testified that she was devastated when she saw it because Greenberg went behind her back and bad-mouthed her to a third party. She felt betrayed, embarrassed and shamed. She testified that EY audits almost every major player in the entertainment industry. She feels that this email thus tarnished her reputation in the entire industry in which she works.

Campbell testified that the termination has affected her emotionally. She is very anxious, both physically and emotionally, moody and short-tempered. She is worried about

her future. Over time, it's becoming increasingly worse. She does not enjoy social interaction anymore and she also can't afford to go out like other people she's friends with. She is no longer confident. She feels discouraged because she did the right thing and got punished for it. Campbell is not taking any medication for any emotional issues.

Campbell asserts that a fair valuation of her past and future emotional distress damages is $1,000,000 a piece.

## C.    Punitive Damages

Campbell argues that Fuse's wrongful conduct was done with a conscious disregard of her rights and with the intent to vex, injure, and annoy her so as to cause her injuries, which amounts to oppression, fraud and malice, under Cal. Civ. Code §3294.

Campbell claims that Fuse sought to keep the UMG matter silent, punished her for her insistence that it be disclosed, and then falsely claimed she was terminated due to performance issues. For these reasons punitive damages are warranted.

Campbell, by insisting that the UMG matter be disclosed, was serving the public interest. In seeking to silence Campbell's disclosure of the UMG matter, and then terminating her for her efforts, Fuse engaged in conduct warranting punitive damages.

The defamation, in particular, is further indication of malice. There was no reason to defame Campbell. The defamation was an act of punishment. Fuse's "defense" of this, that the auditors thought it too, is no defense at all if true, and is clearly false given the non-appearance of the auditors at the arbitration.

Fuse's termination of Campbell was both malicious and oppressive, particularly combined with the defamation, since it maligned her professionally and limited her attempts to make a living. This has been established by clear and convincing evidence.

51

Exhibit "5"

In consideration of the evidence and findings made herein, the Arbitrator awards Campbell the following damages:

| | |
|---|---|
| Past Lost Compensation | $428,000 |
| Future Lost Compensation | $360,000 |
| Past Emotional Distress | $375,000 |
| Future Emotional Distress | $375,000 |
| Punitive Damages[48] | $500,000 |

The Award is in favor of the Claimant, Holland Campbell, and against the Respondent, Fuse, LLC. The total Award, exclusive of attorneys' fees and costs, is $2,038,000.

## VI. ATTORNEYS' FEES AND COSTS

Campbell's employment contract with Fuse contains a provision which allows for the prevailing party to recover reasonable fees and expert costs incurred for "legal proceedings in connection with [the Employment Agreement] or Executive's employment with the Company." Campbell requests an award of $588,333.75 in fees (based on a lodestar of $392,222.50 and a 1.5 multiplier) and $19,179.01 in costs pursuant to this provision. She also seeks reimbursement of $1,820.00 in expert fees.

Campbell has established by a preponderance of the evidence she is entitled to recover reasonable attorneys' fees under the employment agreement. Claimant has also

---

[48] Although the proceedings were not bifurcated on the issue of punitive damages, neither party offered evidence of Fuse's income or net worth. This Award presumes that Fuse has substantial value and that the punitive damage award is not disproportionate to Fuse's ability to pay the punitive damage Award. Should either party wish to submit additional evidence on this issue, the Arbitrator will consider it and may alter the amount of punitive damages awarded after consideration of such evidence.

Exhibit "5"

met her burden of establishing the reasonableness of the rates charged and fees incurred. She is entitled to a lodestar of $392,222.50 in attorneys' fees. The Arbitrator finds, in weighing the Ketchum factors, that Campbell is entitled to a fee enhancement, or multiplier, of 1.2. Therefore, the total award of attorneys' fees is $470,667.00. She is also entitled to reimbursement of $19,179.01 in costs. Claimant's separate request for reimbursement of expert fees of $1,820.00 is respectfully denied.

## VII. AWARD

The Award is in favor of the Claimant, Holland Campbell.

The total Award, inclusive of attorneys' fees and costs is $2,527,846.01.

Dated: March 23, 2017

Hon. Michael A. Latin (Ret.)
Arbitrator

53

# REQUEST FOR CERTIFIED MAIL

| Case Name: | *CAMPBELL v. FUSE* |
|---|---|
| Address: | J. Bernard Alexander III, Esq.<br>Joshua M. Arnold, Esq.<br>ALEXANDER KRAKOW & GLICK<br>401 Wilshire Boulevard, Suite 1000<br>Santa Monica, California 90401 |
| AFFIX LABEL HERE | 7015 1520 0001 8077 1155 |
| Case Manager: | Christie Woo |
| Date: | March 23, 2017 |

| Case Name: | *CAMPBELL v. FUSE* |
|---|---|
| Address: | Todd B. Scherwin, Esq.<br>Penny Chen, Esq.<br>FISHER & PHILLIPS<br>444 South Flower Street, Suite 1590<br>Los Angeles, California 90071 |
| AFFIX LABEL HERE | 7015 1520 0001 8077 1162 |
| Case Manager: | Christie Woo |
| Date: | March 23, 2017 |

Exhibit "5"

# PROOF OF SERVICE

**State of California**
**County of Los Angeles**

I certify that I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1900 Avenue of the Stars, Suite 250, Los Angeles, California 90067.

On March 23, 2017, I served the foregoing document described as the **ARBITRATION AWARD** on the interested parties in this action as follows:

| J. Bernard Alexander III, Esq. | Todd B. Scherwin, Esq. |
|---|---|
| Joshua M. Arnold, Esq. | Penny Chen, Esq. |
| ALEXANDER KRAKOW & GLICK | FISHER & PHILLIPS |
| 401 Wilshire Boulevard, Suite 1000 | 444 South Flower Street, Suite 1590 |
| Santa Monica, California 90401 | Los Angeles, California 90071 |
| balexander@akgllp.com | tscherwin@fisherphillips.com |
| Jarnold@akgllp.com | pchen@fisherphillips.com |

X     **BY U.S. CERTIFIED MAIL,** I placed a true copy of the document described above in a sealed envelope and caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

       **BY FACSIMILE,** I caused such to be faxed to the attorneys on March 23, 2017

X     **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address _patricia@adrservices.com_ to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

       **BY PERSONAL SERVICE,** I caused such envelope to be delivered by hand to the attorneys on March 23, 2017.

X     **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

       **FEDERAL** I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on March 23, 2017 at Los Angeles, California

_(signature)_
Patricia Taylor

_Proof of Service 2 — 9/17/13_

Exhibit "5"

# EXHIBIT 5A

Exhibit "5"

1   litigation from stifling justified claims. ... A business that can establish a
2   reputation for intransigence may end up not paying damages and not having to
3   defend all that often either, because if a prevailing party who litigates to victory
4   gets only a small award of fees the next would-be victim will see that litigation is
5   futile and the employer won't have to repeat the costly defense. That's why ...
6   hyperaggressive defendants who drive up the expense of litigation must pay the
7   full costs, even if legal fees seem excessive in retrospect.
8   The hours spent by Claimant on this matter were necessitated by the circumstances of the case.
9   Respondent cannot now claim that Claimant's hours were unreasonable when its own
10  unreasonableness caused Claimant to expend this time.
11      The lodestar, calculated by multiplying each person's reasonable hours by the hourly
12  rate, totals $386,302.50:
13
14
| Attorney/Staff | Hourly Rate | Hours Spent | Total |
| --- | --- | --- | --- |
| Bernard Alexander | $815 | 240.1 | $ 195,681.50 |
| Tracy L. Fehr | $575 | 18.8 | $ 10,810.00 |
| Joshua Arnold | $515 | 301.1 | $ 155,066.50 |
| Renee Amador | $350 | 8.8 | $ 3,080.00 |
| Gustin Ham | $195 | 111.1 | $ 21,664.50 |
| *TOTAL* | . | 679.9 | $386,302.50 |

22      . 3.    _Under California Law, a Lodestar Multiplier Should Be Awarded to_
23              _Account For the Contingent Nature and Complexity of the Litigation._
24      Once the Arbitrator establishes the lodestar amount, it should enhance that amount by
25  the application of a "multiplier" in order to make an appropriate fee award. *Ketchum*, 24 Cal.4th
26  at 1132-34; *Serrano III*, 20 Cal.3d at 48; *Press*, 34 Cal.3d 311, 321-22; *Horsford*, 132
27  Cal.App.4th at 394-95.
28

# EXHIBIT 5B

Exhibit "5"

1  an exceptional benefit."

2  Based on arguments advanced in Claimants moving papers and herein, Claimant renews

3  her request that the Arbitrator award a 1.5 multiplier on fees incurred in litigating this case.

4  **VI.   Claimant Is Entitled to Expert Fees.**

5  Claimant is also entitled to expert fees pursuant to the express terms of Employment

6  Agreement.  (Exhibit 1)  A party need not call a retained expert in order to be entitled to recover

7  fees associated with assistance provided by that expert.  (*Stearman v. Centex* Homes (2000) 78

8  Cal.App.4[th] 611 [expert fees recoverable for investigation of a claim rather than testifying].

9  Claimant leaves it to the discretion of the Arbitrator as to whether the expert fees of

10  $1,820 should be awarded.  However, no deduction should be made for the attorneys' efforts in

11  consulting with or retaining the expert.

12  **VII.   Conclusion.**

13  For the foregoing reasons, Claimant requests an award of costs in the amount of

14  $19,179.01, expert fees of $1,820, and a lodestar of $392,222.50 (based on additional reply fees

15  incurred, of $5,920), with a 1.5 multiplier, resulting in attorney fees of $588,333.75.

16  DATED:  March 9, 2017                                    Respectfully Submitted,

17                                                                          ALEXANDER KRAKOW + GLICK LLP

18

19

20  By:

21                                                                          J. BERNARD ALEXANDER, III
                                                                            TRACY L. FEHR
22                                                                          JOSHUA M. ARNOLD
                                                                            Attorneys for Claimant
23                                                                          HOLLAND CAMPBELL

24

25

26

27

28

7

CLAIMANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEY FEES

# EXHIBIT 5C

Exhibit "5"

**ALEXANDER KRAKOW + GLICK LLP**
J. Bernard Alexander, III (SBN 128307)
Joshua M. Arnold (SBN 240154)
401 Wilshire Boulevard, Suite 1000
Santa Monica, California 90401
T: 310 394 0888 | F: 310 394 0811
E: balexander@akgllp.com | jarnold@akgllp.com

Attorneys for Petitioner
HOLLAND CAMPBELL

**FILED**
Superior Court of California
County of Los Angeles

**JUL 27 2017**   REC'D

Sherri R. Carter, Executive Officer/Clerk
By_____Deputy **JUL 1 0 2017**
          Anita Williams

**FILING WINDOW**

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

HOLLAND CAMPBELL,

      Petitioner,

      v.

SiTV, INC, FUSE, LLC, FUSE MEDIA and
DOES 1 through 15,.

      Respondents.

Case No.: BS169132
*Assigned for all purposes to the*
*Honorable Mark Mooney, Dept. 68*

[Related to Case No. BS169129]

**PETITIONER CAMPBELL'S**
**[PROPOSED] JUDGEMENT**

      This matter proceeded to binding arbitration on September 6, 7, 9 and 14, 2016, before the Hon. Michael Latin, Judge Retired, through agreement of the parties upon said arbitrator. The Petitioner HOLLAND CAMPBELL appeared through her attorneys of record, J. Bernard Alexander, III and Joshua Arnold of Alexander Krakow + Glick LLP. Respondents and Cross-Petitioner SiTV, INC, FUSE, LLC, FUSE MEDIA (collectively "FUSE") appeared through their attorneys, Todd Scherwin and Penny Chen of Fisher Phillips LLP.

      Witnesses were sworn and testified. After hearing the evidence and arguments of counsel, and reviewing the post-trial briefing requested by Respondents, and the case was submitted to the arbitrator. The arbitrator reviewed the record and thereafter,

1

Exhibit "5"

1    on January 30, 2017, provided the parties with a 54-page interim award, which is

2    attached as Exhibit "1." On March 23, 2017, after hearing briefing and argument on the

3    issue of attorneys' fees, the arbitrator returned a Final Award, attached as Exhibit "2".

4        NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:

5       That Petitioner HOLLAND CAMPBELL is awarded compensatory damages in the

6    amount of $1,538,000 and $500,000 in punitive damages against Respondent FUSE;

7    along with interest at 10% per annum or $558.36 per day, from March 23, 2017 in the

8    amount of $60,861.24_____.

9

10       That Petitioner HOLLAND CAMPBELL and her counsel of record shall recover

11    attorney fees against Respondent FUSE, in the amount of $470,667.00, as ordered by

12    the Arbitrator, along with interest at 10% per annum or $128.95 per day, from March 23,

13    2017 in the amount of $14,055.55; and in the additional amount of *81,073.00*

14    based on the hours and work performed in petitioner's action here.

15

16       That Petitioner HOLLAND CAMPBELL and his counsel of record shall recover

17    costs and/or disbursements, as taxed, against Respondent FUSE, in the amount of

18    $19,170.01 as ordered by the arbitrator along with interest at 10% per annum or $5.25

19    per day, from March 23, 2017 in the amount of $572.25_____, and in the additional

20    amount of *1,382.33* based on the costs incurred in petitioner's action here.

21

22       That Judgment shall be entered accordingly, effective March 23, 2017, the date

23    the arbitrator's Final Award was entered.

24               IT IS SO ORDERED,

25

26    Dated: July 1*27*____, 2017

27

28              Honorable Mark Mooney

                     JUDGE OF THE SUPERIOR COURT

2

1

**PROOF OF SERVICE**

2

          I am over the age of 18 years, not a party to this action, and am employed
in the County of Los Angeles, State of California.  My business address is ALEXANDER
KRAKOW +GLICK LLP, 401 Wilshire Blvd., Suite 1000, Santa Monica, CA 90401.

3

4

          On, July 10, 2017, following the ordinary business practices of
ALEXANDER KRAKOW + GLICK LLP as set forth below, I served a true and correct
copy of the foregoing document described **PETITIONER CAMPBELL'S [PROPOSED]
STATEMENT OF DECISION; PETITIONER CAMPBELL'S [PROPOSED]
JUDGEMENT** in a sealed envelope, with postage fully prepaid, addressed as follows:

5

6

7

**[SEE SERVICE LIST]**

8

(X)     BY MAIL.  I am readily familiar with ALEXANDER KRAKOW +GLICK LLP's
practice for collection and processing of correspondence for mailing with the U.S.
Postal Service.  Under that practice, in the ordinary course of business,
correspondence would be deposited with the U.S. Postal Service on the same
day with postage fully prepaid at ALEXANDER KRAKOW +GLICK LLP, 401
Wilshire Blvd., Suite 1000, Santa Monica, CA 90401. The above envelope was
placed for collection and mailing on the above date following ALEXANDER
KRAKOW +GLICK's ordinary business practice.  I am aware that on motion of
the party served, service is presumed invalid if the postal cancellation date or
postage meter date is more than one day after date of deposition for mailing.

9

10

11

12

13

14

()     BY MAIL.  I deposited such envelope in the mail at 401 Wilshire Blvd., Suite
1000, Santa Monica, CA 90401.

15

()     VIA FACSIMILE. I sent said documents via facsimile.

16

()     VIA EMAIL.  I sent said document(s) via electronic mail to the addressee.

17

()     VIA UPS.  I delivered said documents via overnight delivery.

18

()     BY PERSONAL SERVICE.  I caused delivery of said envelope by hand to the
offices of the addressee(s).

19

20

(X)     (STATE)  I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct.

21

()     (FEDERAL)  I declare that I am employed in the office of a member of the bar of
this Court at whose direction the service was made.

22

23

Dated:          July 10, 2017

24                                                                      Gustin Y. Ham

25

26

27

28

SERVICE

<u>**SERVICE LIST**</u>

1

2     <u>DEFENDANTS:</u> *FUSE LLC, FUSE MEDIA*
      Si TV, Inc.
3     Attn: Mike Roggero
      700 N. Central Avenue, Suite 600
4     Glendale, California 91203
      T: 323 256  8900
5     F: 323 256 9888

6     *<u>COUNSEL FOR DEFENDANTS</u>: FUSE, LLC, FUSE MEDIA*

7     Todd B. Scherwin, Esq.
      Penny Chen, Esq.
8     FISHER & PHILLIPS, LLP
      444 S. Flower Street, Suite 1590
9     Los Angeles, California 90071
      T:     213 330 4500
10    F:     213 330 4501
      Email: tscherwin@laborlawyers.com
11            pchen@laborlawyers.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit "5"

# Exhibit 6

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No. SA CV 11-0278-DOC(RNBx)                Date:  October 23, 2014

Title: JOSE FLORES, ET AL. V. CITY OF WESTMINSTER, ET. AL.

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

| Deborah Goltz | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):  ORDER DENYING MOTION FOR NEW TRIAL [254]; DENYING  DEFENDANTS' RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW [256] [257] [258] [259] [261]; GRANTING ATTORNEY FEES [253]; DENYING MOTION TO STRIKE DECLARATION OF ROBERT M. BRUNING [274]**

Before the Court are:
- Defendant City of Westminster's Motion for New Trial ("New Trial Mot.") (Dkt. 254);
- Defendant City of Westminster's Renewed Motion for Judgment as a Matter of Law (Dkt. 256);
- Defendant Mitchell Waller's Renewed Motion for Judgment as a Matter of Law (Dkt. 257);
- Defendant Andrew Hall's Renewed Motion for Judgment as a Matter of Law (Dkt. 258);

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                    Date: October 23, 2014
                                                    Page 2

- Defendant Kevin Baker's Renewed Motion for Judgment as a Matter of Law (Dkt. 259);
- Defendant Ron Coopman's Renewed Motion for Judgment as a Matter of Law (Dkt. 261);
- Plaintiffs' Motion for Attorney Fees, Expert Fees, and Costs ("Fees Mot.") (Dkt. 253); and
- Plaintiffs' Motion to Strike the Declaration of Robert M. Bruning (Dkt. 274).

The Court finds these matters appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having considered the record and the papers, the Court DENIES the Motion for New Trial; DENIES the Renewed Motions for Judgment as a Matter of Law; and GRANTS the Motion for Attorney Fees.

## I.    BACKGROUND

This case arose from allegations by Plaintiffs Jose Flores, Ryan Reyes, and Brian Perez, three Westminster police officers of Latino descent, that the Defendant City of Westminster ("City") as well as current and former Westminster police chiefs Mitchell Waller, Andrew Hall, Ron Coopman, and Kevin Baker discriminated against them on the basis of race and national origin. Plaintiffs originally alleged causes of action against Defendants for violation of the California Fair Employment and Housing Act ("FEHA"), California Government Code § 12940, et seq.; 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Specifically, Plaintiffs allege that they were denied special assignments that could increase their chances of getting promoted. Plaintiffs Flores and Reyes also alleged that the Defendants retaliated against them for filing administrative complaints regarding the discrimination, in violation of 42 U.S.C § 1981 and Title VII. *See* Second Amended Complaint ("SAC") (Dkt. 35).

Trial began on February 20, 2014 and lasted 9 days. On March 3, 2014, Defendants filed motions for judgment as a matter of law. (Dkts. 178-182). The Court denied those motions. Order Denying Judgment as a Matter of Law, Mar. 6, 2014 (Dkt. 185).

Plaintiffs dismissed several claims before submitting the case to the jury. On March 6, 2014, after three days of deliberation, the eight-member jury unanimously found as follows on the remaining claims:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                    Date: October 23, 2014
                                                    Page 3

     (1)     the City did not racially discriminate against Plaintiffs in violation of FEHA, Cal. Gov. Code §12940(a);

     (2)     the City retaliated against Plaintiff Flores, but not Plaintiff Reyes, in violation of FEHA, Cal. Gov. Code § 12940(h);

     (3)     the City did not racially discriminate against Plaintiffs in violation of 42 U.S.C. § 1981;

     (4)     Defendants Coopman and Hall racially discriminated against all three Plaintiffs in violation of 42 U.S.C. §1981, and Defendants Waller and Baker did not racially discriminate as to any plaintiff; and

     (5)     Defendants Coopman and Waller retaliated against Plaintiffs Flores and Reyes in violation of 42 U.S.C. § 1981, Chief Hall did not retaliate against any Plaintiff, and Chief Baker retaliated against Plaintiff Flores in violation of 42 U.S.C. § 1981.

     (6)     The jury awarded compensatory and punitive damages.

Following the verdict, Plaintiffs filed a proposed final judgment (Dkt. 239). The parties then engaged in several rounds of briefing regarding Defendants' objections to the proposed final judgment based on inconsistencies in the verdict form (Dkts. 242, 244, 245, 246). After considering those objections, the Court ordered final judgment for Plaintiffs. Order on Final Judgment After Jury Verdict, Aug. 11, 2014 ("Final Judgment Order") (Dkt. 247). In its order, the Court noted that the parties' objections to inconsistencies in a verdict form are normally brought in a motion for a new trial after judgment is entered. The Court's order stated, "The parties may incorporate their objections by reference in any subsequent motions for a new trial in order to preserve those objections, but should not further brief any issues raised in their filings up to this point." Final Judgment Order, at 2.

The instant motions were filed on August 28-29, 2014.

## II.    MOTION FOR A NEW TRIAL

### A.  Legal Standard

Rule 59 provides that a new jury trial may be granted under certain conditions. Fed. R. Civ. P. 59(a).  Granting a new trial is left to the sound discretion of the trial court.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                    Date: October 23, 2014
                                                                                 Page 4

*See Browning-Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989). Bases for a new trial include: (1) a verdict against the clear weight of the evidence, *see Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987); (2) evidence, discovered after trial, that would not have been uncovered earlier through the exercise of due diligence and that is of such magnitude that its production at trial would likely have changed the outcome of the case, *see Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992-93 (9th Cir. 2001) (quoting *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 929 (9th Cir. 2000)); (3) jury misconduct, *see United States v. Romero-Avila*, 210 F.3d 1017, 1024 (9th Cir. 2000); and (4) error in law that has substantially prejudiced a party, *see Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).  Because the task of weighing conflicting evidence and making credibility determinations is the job of the jury and not the court, *Lucent Techs., Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1126 (S.D. Cal. 2011), it is expected that judges will grant motions for a new trial only when the judge has given full respect to the jury's findings but is left with the firm conviction that a mistake has been committed. *Landes*, 833 F.2d at 1371–72; *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000).

### B.  Analysis

The Court addresses each of the Defendants' arguments for a new trial in turn.

#### 1.  Irreconcilable Special Verdict Findings

The parties incorporated by reference their arguments regarding the alleged irreconcilability of the jury's special verdict findings from their briefing on the proposed final judgment (Dkts. 239, 242, 244, 245, 246). The jury verdict form, which was agreed to by both parties, was not without problems. Final Judgment Order at 9-12. However, the Court already addressed these arguments in issuing its Final Judgment Order (Dkt. 247). For the same reasons, the Court declines to order a new trial on the ground of irreconcilable verdict findings.

#### 2.  Clear Weight of the Evidence

Defendants argue that they are entitled to a new trial because the jury verdict and awards were against the clear weight of the evidence and were irreconcilably inconsistent. Specifically, Defendants challenge the jury's verdict for (a) Plaintiff Flores on his FEHA retaliation claim against the City; (b) Plaintiffs on their § 1981 race discrimination claim against Defendants Coopman and Hall; and (c) Plaintiffs Flores and Reyes on their § 1981 retaliation claim against Defendants Coopman, Waller, and Baker.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                     Date: October 23, 2014
                                                     Page 5

     Regarding the FEHA retaliation claim, Defendants argue that Flores failed to establish (1) that he suffered any adverse employment actions, (2) that his filing of an administrative complaint had anything to do with any of Defendants' actions toward him, or (3) that he was harmed. Regarding the other two claims, Defendants essentially argue that Plaintiffs' evidence regarding the individual Defendants' personal participation in racial discrimination and retaliation was too weak to justify the verdict. Relatedly, Defendants also argue that Plaintiffs failed to present evidence of malicious conduct by the individual Defendants to justify the punitive damages awards against them.

     Having heard the evidence at trial and having considered the parties' briefs, the Court is not persuaded that the verdict regarding the above-listed claims was against the clear weight of the evidence. Thus, the Court declines to order a new trial on these grounds.

### 3.    Substantial Prejudice as a Result of Errors of Law

     Defendants' third argument for a new trial is on the basis that Defendants were substantially prejudiced by errors of law, including the following:

### a.    Allowing the § 1981 claim to proceed to trial

     In their Motion to Dismiss and/or Strike Portions of Plaintiffs' Complaint, Defendants argued that, because Plaintiffs hold their employment by statute and not by contract, their § 1981 claims must fail because § 1981 does not apply to them. The Court rejected that argument in its Order Granting in Part and Denying in Part Defendants' Motion to Dismiss and to Strike Portions of Plaintiffs' Complaint, May 9, 2011 (Dkt. 13). For the same reasons outlined in its May 2011 Order, the Court finds that Defendants were not prejudiced by an error of law and declines to grant a new trial on this ground.

### b.    Allowing introduction of irrelevant and inflammatory evidence going back to 1996

     Defendants filed a number of motions in limine to preclude claims and evidence that dated back to 1996, including (1) MIL No. 1 to Preclude Claims That Occurred Outside the Relevant Statute of Limitations Periods; (2) MIL No. 2 to Preclude Stray Comments; (3) MIL No. 7 to Preclude Richard Mize's Alleged Non-Professional Emails to Women and Involvement with Bar Employee and Officer Naranjo; (4) MIL No. 14 to Preclude Officer Turner's Involvement with Bar Employee; and (5) MIL No. 16 to Preclude Prior Discrimination Claim from 1997. (Dkts. 52, 53, 58, 65, 67). Defendants

Case No. SACV 11-0278 DOC (RNBx)                     Date: October 23, 2014
                                                      Page 6

argued then that the information was irrelevant, inadmissible hearsay, character evidence, unduly prejudicial, misleading, and/or a waste of time. The Court already considered Defendants' arguments when the Court denied those motions in limine. Order on Motions in Limine, Jan. 31, 2014 (Dkt. 151). The Court is not persuaded now that the Court's denial of those motions was legally erroneous. Thus, the Court declines to grant a new trial on this ground.

        **c.**    **Providing a USERRA instruction despite the fact that there was no USERRA claim in this case**

The Court read Jury Instruction No. 22 to the jury:

<u>Military Leave</u>

The Uniformed Services Employment and Reemployment Rights Act (USERRA) is a federal law that prohibits discrimination against service members and protects their job rights while in military service.

Under USERRA, a service member has the right to reemployment in the job position that the service member would have obtained with reasonable certainty if not for absence due to uniformed service. USERRA also requires that a service member be treated the same way that the employer treats other employees on leave or furlough. The rights protected by USERRA can include the right to be notified of an open job opportunity.

There is no USERRA claim before you, and you are not deciding any questions associated with USERRA. You should consider any evidence about whether Westminster notified Plaintiff Perez of open job opportunities only in terms of the stated race discrimination claims.

Jury Instruction No. 22, Mar. 6, 2014 (Dkt. 198).

Defendants argue that this instruction was legally improper and caused substantial prejudice to the Defendants because it created the impression that the City violated Plaintiff Perez's USERRA rights and resulted in the jury awarding Perez more punitive damages than Reyes even though Reyes had a retaliation claim and Perez did not. New Trial Mot. at 14-15. The fact that the jury awarded a greater amount of punitive damages to Perez than to Reyes by itself does not show that Defendants were substantially prejudiced by the USERRA instruction. Although Reyes had a retaliation claim and Perez

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                         Date: October 23, 2014
                                                          Page 7

did not, the jury could have found that the nature of Defendants' conduct toward Perez
was more egregious than the Defendants' conduct toward Reyes for reasons other than
Perez's military background, thus justifying the higher award for Perez. Thus, the Court
declines to grant a new trial on this ground.

### 4. Punitive Damages

Defendants seek a new trial on the issue of damages on the grounds that the
punitive damages were the result of passion and prejudice, grossly excessive, and
oppressive. In the alternative, Defendants ask that the punitive damages be stricken or
reduced by remittitur. Specifically, Defendants ask that the Court grant Defendants'
motion for a new trial unless Plaintiffs accept a remittitur of all the punitive damage
awards or at least limiting Defendants Coopman and Hall's punitive damage awards to
$200,000 per Defendant (approximately one year's salary).

The Supreme Court set out three guideposts for determining whether punitive
damages are excessive in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-85
(1996). Those three guideposts are (1) reprehensibility of conduct, *id.* at 575; (2) ratio of
the punitive damages award to the compensatory damages award, *id.* at 580; and (3) the
difference between the punitive damages award to the civil penalties authorized or
imposed in comparable cases, *id.* at 583.

To the extent that Defendants' arguments regarding passion and prejudice and
reprehensibility are based on the weight of the evidence regarding each individual
Defendant's individual participation or malicious behavior against the Plaintiffs, the
Court rejects these arguments for the same reasons described above.

Regarding the ratio between punitive and compensatory damages, the jury
awarded the following:

| Defendant | Plaintiff | Punitive Damages | Compensatory Damages | Ratio |
|-----------|-----------|------------------|----------------------|-------|
| Coopman | Flores | $396,000 | $218,000 | 2:1 |
| Coopman | Reyes | $176,000 | $40,000 | 4:1 |
| Coopman | Perez | $308,000 | $50,000 | 6:1 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                          Date: October 23, 2014
                                                         Page 8

| Hall | Flores | $495,000 | $65,000 | 8:1 |
|------|--------|----------|---------|-----|
| Hall | Reyes | $220,000 | $45,000 | 5:1 |
| Hall | Perez | $385,000 | $100,000 | 4:1 |
| Baker | Flores | $49,500 | $42,000 | 1:1 |
| Baker | Reyes | $22,000[1] | N/A | N/A |
| Baker | Perez | $22,000[2] | N/A | N/A |
| Waller | Flores | $49,500 | $210,000 | 1:4 |
| Waller | Reyes | $22,000 | $185,000 | 1:8 |
| Waller | Perez | $38,500[3] | N/A | N/A |

Several of these awards are at or above a 4:1 ratio, which the Supreme Court has suggested "might be close to the line of constitutional impropriety." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). However, the Supreme Court has also stated that there is no "bright-line ratio" between punitive and compensatory damages that precisely establishes when a punitive damages award crosses the constitutional line. *Id.* This is particularly so in cases like this one, given the context-sensitive nature of employment discrimination and given that it is difficult to put a monetary value on harm to a person's dignity and liberty. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001). It bears noting that the jury was properly instructed on the standard for setting the amount of punitive damages and that Defendants did not object to this instruction. *See* Jury Instruction No. 34, Mar. 6, 2014 (Dkt. 198); Defs.' Objections to Pls.' Separate Proposed Jury Instructions (Dkt. 172); RT, 03/03/14, Vol. I, 5:8-16. In this circumstance, the Court is reluctant to disturb the jury's weighing of the evidence that they heard and their ultimate decision with regard to the punitive damages awards. Having also listened to all of the evidence, the Court does not find the awards grossly excessive such that they violate the Constitution.

---

[1] This award was stricken by the Court. *See* Final Judgment Order, at 12-15.
[2] *Id.*
[3] *Id.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                     Date: October 23, 2014
                                                                          Page 9

      With regard to oppressiveness, Defendants have cited no authority requiring the Court to consider a defendant's ability to pay in determining whether punitive damages are excessive, only an out-of-district case in which the court decided to do so. *See Kemp v. Ervin*, 651 F. Supp. 495, 506-08 (N.D. Ga. 1986). The Court is not inclined to do so here.

      Thus, the Court declines to order a new trial on the bases that punitive damages were the result of passion or prejudice, excessive, or oppressive.

### C. Conclusion

      In conclusion, the Court DENIES Defendants' motion for a new trial.

## III.    RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW

### A. Legal Standard

      If, after the evidence is closed, there is only one reasonable conclusion that a jury may reach, the Court may grant judgment as a matter of law ("JMOL") as to any claim or defense in issue. Fed. R. Civ. P. 50(a); *see also Lawson v. Umatilla County*, 139 F.3d 690, 692 (9th Cir. 1998). The standard for granting JMOL mirrors the standard for granting summary judgment. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). If there is substantial evidence to support a contention, the court may not grant a JMOL. *Watec Co. v. Liu*, 403 F.3d 645, 651 n.5 (9th Cir. 2005). Substantial evidence must be sufficient for reasonable minds to accept it as support for a conclusion, even when the evidence might also support a contrary conclusion. *George v. City of Long Beach*, 973 F.2d 706, 709 (9th Cir. 1992) (citing *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987)). In making its determination, the court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994).

      If the Court does not grant the relief and instead allows the case to go to the jury, a party may make a renewed motion for judgment as a matter of law ("RJMOL") within ten days after the entry of judgment. Fed. R. Civ. P. 50(b). A party cannot raise arguments in its RJMOL motion that it did not raise in its Rule 50(a) JMOL motion. *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                    Date: October 23, 2014
                                                    Page 10

### B.  Analysis

Defendants raise a number of arguments in their RJMOL motions that were not raised in their original JMOL motions, including: (1) that Plaintiffs failed to show that the individual Defendants acted with malice, (2) that the jury did not make a finding of racial discrimination because the jury did not find that Defendants' reasons for their conduct were pretextual, (3) that Plaintiffs' § 1981 claims fail because they are employees by statute and not by contract; and (4) that punitive damages against Defendant Waller are inappropriate because he is deceased. Because arguments that were not raised in a JMOL motion cannot be raised in an RJMOL motion, the Court denies Defendants' RJMOL motions as to these arguments.

Defendant also properly "renewed" a number of arguments, including: (1) that Plaintiffs Flores and Reyes were no subject to adverse employment actions; (2) that Plaintiffs Flores's and Reyes's complaints against the department were not a substantial motivating factor in Defendants' conduct toward them; (3) that Plaintiffs failed to demonstrate personal participation by the individual Defendants in racial discrimination or retaliation; (4) that Plaintiffs Flores and Reyes never applied to be a sergeant and Perez applied once but failed the exam; (5) that Plaintiffs failed to show that it would have been futile to apply for special assignments; (6) that Plaintiffs failed to demonstrate that Defendants' reasons for their conduct was pretextual; and (7) that Plaintiffs' § 1981 claims were barred by the statute of limitations. Having considered the evidence presented at trial, the Court finds that there was substantial evidence to support the jury's findings and verdict. Thus, the Court denies Defendants' RJMOL motions as to these arguments.

### C.  Conclusion

Therefore, Defendants' RJMOL motions are DENIED in their entirety.

## IV.    MOTION FOR ATTORNEY FEES, EXPERT FEES, AND COSTS

### A.  Legal Standard

Under 42 U.S.C. § 1988, the Court may, in its discretion, grant a reasonable attorney's fee, including expert fees, as part of the costs to the prevailing party in any action to enforce 42 U.S.C. § 1981. 42 U.S.C. § 1988(b), (c). Under California Government Code § 12965(b), the Court may, in its discretion, grant a reasonable

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                                      Date: October 23, 2014
                                                                     Page 11

attorney's fee and costs, including expert witness fees, to the prevailing party in an action
under the California Fair Employment and Housing Act.

     A plaintiff is considered the prevailing party if it succeeds on any significant issue
in litigation which gives some benefit that plaintiff sought in bringing the suit. *Hensley v.
Eckerhart*, 461 U.S. 424, 433 (1983). To satisfy this requirement, the suit must have
produced a material alteration of the legal relationship between the parties. *Buckhannon
Board & Care Home, Inc. v. W. Va. Dept. of Health & Human Res.,* 532 U.S. 598, 604
(2001). This alteration may be the result of an enforceable judgment. *Farrar v. Hobby*,
506 U.S. 103, 111 (1992).

     In the Ninth Circuit, the customary method for determining a reasonable figure for
an attorney's fees award is the lodestar formula. A lodestar figure is calculated by
"multiplying the hours spent on a case by a reasonable hourly rate of compensation for
each attorney involved." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*,
478 U.S. 546, 563 (1986). "'In setting a reasonable attorney's fee, the district court
should make specific findings as to the rate and hours it has determined to be
reasonable.'" *Gracie v. Gracie*, 217 F.3d 1060, 1070 (9th Cir. 2000) (quoting *Frank
Music Corp. v. Metro-Goldwyn Mayer, Inc.*, 886 F.2d 1545, 1557 (9th Cir. 1989))

     The lodestar figure is presumed to represent an appropriate fee, *see City of
Burlington v. Dague*, 505 U.S. 557, 562 (1992), but the Court may subsequently adjust
the figure upward or downward to take into account special factors. *Ballen v. City of
Redmond*, 466 F.3d 736, 746 (9th Cir. 2006).

    **B. Analysis**

     Plaintiffs seek attorney's fees totaling $4,863,701.25 ($3,242,467.50 lodestar x 1.5
multiplier) plus $40,028.49 in expert fees and $18,684.12 in costs. Defendants argue that
there is no justification for a multiplier and that, for various reasons, the lodestar should
be reduced to $2,523,503.50. The Court addresses each of Defendants' reasons below.

    **1. Reasonable Hourly Rate**

       **a. Legal Standard**

     It is well-established that "a reasonable hourly rate is the rate prevailing in the
community for similar work performed by attorneys of comparable skill, experience, and
reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                    Date: October 23, 2014
                                                    Page 12

and internal quotation marks omitted). "'[R]easonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The fee applicant can satisfactorily prove the prevailing rate using affidavits from the plaintiffs' attorneys and other attorneys as well as rate determinations in other cases, especially those setting a rate for the plaintiffs' attorneys. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

    **b.   Analysis**

        The parties submit that Plaintiffs' attorneys' reasonable hourly rates should be as follows:

| Attorney/Staff | Year of Bar Admittance | Hourly Rate – Proposed by Plaintiffs | Hourly Rate – Proposed by Defendants |
|---|---|---|---|
| Bernard Alexander | 1987 | $750 | $675 |
| Victor Viramontes | 2001 | $625 | $525 |
| Martha L. Gomez | 2010 | $390 | $300 |
| Matthew Barragan | 2012 | $340 | $275 |
| Tracy L. Fehr | 2005 | $475 | $350 |
| Marvin Krakow | 1978 | $750 | $550 |
| Miranda Galindo | 2012 (grad) | $435 | $200 |
| Adriana Garcia | 2012 (grad) | $250 | $200 |
| Ana Mendoza | (law clerk) | $200 | $200 |
| Gustin Ham | (paralegal) | $175 | $175 |
| Juan Rodriguez | 2011 | $340 | N/A |

Fees Mot. at 12-13; Fees Opp'n at 22 n.12; Fees Reply at 15.

        Plaintiffs support their claimed rates with declarations from each of these attorneys/staff, outlining each individual's educational background and legal work experience. *See* Dkts. 253-2 to 253-5, 253-7 to 253-9, 273-1 to 273-24. In addition, Plaintiffs filed declarations from James DeSimone, David deRubertis, Bill Lan Lee, and Carol Sobel, experienced employment law and civil rights attorneys who have practiced in Southern California. *See* Dkts. 253-10 to 253-13. Based in particular on the Sobel, DeSimone, and DeRuberis declarations and the fee awards attached as exhibits, the Court

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                                Date: October 23, 2014
                                                               Page 13

finds that Plaintiffs' claimed hourly rates are on the high end but within the range of reasonableness.

        The one exception is Galindo's rate. Like Garcia, Galindo had graduated from law school but had not yet been admitted to the bar at the time that she worked on this case. The only apparent explanation for her rate being $435/hour as opposed to $250/hour like Garcia's, is that Galindo is formally employed by Fried, Frank, Harris, Shriver & Jacobson LLP, a New York law firm. *Compare* Reply Declaration of Miranda Galindo in Support of Fees Mot. (Dkt. 273-21) *with* Reply Declaration of Adriana Garcia in Support of Fees Mot. (Dkt. 273-23). Even if $435/hour is the prevailing rate for law clerks in New York, there is no evidence that that is the prevailing rate in Southern California. The Court understands, moreover, the MALDEF Fried Frank Fellowship program in which Galindo was participating is designed to allow fellows to participate in MALDEF litigation. Thus, there is no basis here to argue that New York attorneys in general must be awarded a higher fee in order to incentivize New York attorneys to take California cases. The Court also notes that $435/hour is 30% higher than Barragan's and Rodriguez's claimed rate of $340/hour. Barragan and Rodriguez graduated from law school before Galindo and were admitted to the bar before they began working on this case. *Compare* Hallihan Declaration (Dkt. 253-6) ¶ 3 *with* Declaration of Matthew J. Barragan (Dkt. 253-5) ¶¶ 3-4 *and* Reply Decl. of Juan Rodriguez (Dkt. 273-19) ¶¶ 3-4. Thus, the Court finds that a reasonable rate for Galindo, considering her level of experience, skill, and reputation, is $250/hour.

        Defendants object that Plaintiffs' attorneys' rates are too high because Plaintiffs are comparing themselves to the most expensive and renowned lawyers in the area rather than estimating the market rate necessary to induce competent lawyers to undertake the representation. Fee Opp'n at 21. Defendants' attorney fees expert Robert Bruning opines based on his telephonic survey of seven Southern California employment law firms that Plaintiffs' attorneys' hourly rates should be between $65-$200/hour lower. Declaration of Robert M. Bruning in Opp'n to Fees Mot. (Dkt. 269) ¶ 17.[4] Although the Court

---

[4] Plaintiffs argue that Bruning's declaration should be stricken because (1) Bruning is not qualified to be an expert under Federal Rule of Evidence 702 because he has no experience in complex civil rights litigation; (2) Bruning provides erroneous legal opinions on questions of law that are reserved for the Court; and (3) Bruning's opinions lack foundation because he insufficiently describes his methodology. Although Bruning may or may not have represented plaintiffs, he has litigated civil rights cases as well as business, torts, and contracts cases for 37 years. Bruning Decl. ¶ 3. Although Bruning's declaration does interpret the legal standard for attorney's fees, that is somewhat inevitable as the legal standard impacts the methodology for calculating reasonable attorney's fees. The Court gave no weight to the portions of Bruning's declaration that appeared to be merely an extension of Defendants' brief. *E.g.*, *id.* ¶¶ 6-10. The Court also finds that Bruning has adequately described his methodology.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                    Date: October 23, 2014
                                                                             Page 14

appreciates the information provided by Bruning, the Court does not find Defendants' argument persuasive enough to reduce Plaintiffs' attorneys' rates. Overall, Bruning's survey reveals general information about the survey respondents' charged hourly rates for "partners" or "senior associates," with some references to an individual comparator's year of admittance to the bar, along with two cases in which Bruning had submitted declarations. *Id.* ¶¶ 4, 16. In contrast, the declarations submitted by Plaintiffs contain a wealth of information about each attorney, staff member, and comparator's experience, reputation, and skill. They also include numerous past fee awards which demonstrate actual rates awarded to some of the Plaintiffs' attorneys in this case and to their identified comparators. *See, e.g.*, Declaration of J. Bernard Alexander, III in Support of Fees Mot. (Dkt. 253-2) ¶¶ 41-43; Declaration of Carol Sobel in Support of Fees Mot. (Dkt. 253-13) ¶¶ 19, 21, 22, 33, 34. Although many of the cases used by Plaintiffs as comparators were class action cases while this case was not a class action, this case was also complex, involving a complicated fact pattern and with dozens of claims going to trial. Although higher than the hourly rates charged by the employment law firms surveyed by Bruning, the hourly rates proposed by Plaintiffs are on par with or below the reasonable rates awarded in those cases.

Thus, the Court finds that the Plaintiffs' claimed hourly rates are reasonable, except that Galindo's reasonable rate is $250/hour.

### 2. Reasonable Number of Hours

#### a. Legal Standard

The fee applicant carries the burden of submitting evidence in support of the claimed hours. *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1993). "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary . . . ." *Hensley*, 461 U.S. at 434. The opposing party has the burden of rebuttal, requiring submission of evidence challenging the accuracy and reasonableness of the hours charged or facts asserted. *Gates*, 987 F.2d at 1397-98.

#### b. Analysis

---

*See id.* ¶¶ 5, 16. It appears to the Court that Plaintiffs' arguments mostly go to the weight that should be given to the information in Bruning's declaration rather than to admissibility. Accordingly, the Court DENIES Plaintiffs' Motion to Strike.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                                    Date: October 23, 2014
                                                                    Page 15

     Plaintiffs submit that the following hours were reasonably expended in preparing
and litigating this case:

| Attorney/Staff | Hours | Hours Post-Trial | Total Hours[5] |
|---|---|---|---|
| Bernard Alexander | 634.8 | 2.1 | 636.9 |
| Victor Viramontes | 1341.1 | 71.6 | 1412.7 |
| Martha L. Gomez | 2856.3 | 82 | 2938.3 |
| Matthew Barragan | 1889.1 | 160.6 | 2049.7 |
| Tracy L. Fehr | 64.9 | 30.7 | 95.6 |
| Marvin Krakow | 16.4 | 0 | 16.4 |
| Miranda Galindo | 132.9 | 0 | 132.9 |
| Adriana Garcia | 115.5 | 0 | 115.5 |
| Ana Mendoza | 27.0 | 20.0 | 47.0 |
| Gustin Ham | 209.8 | 0 | 209.8 |
| Juan Rodriguez | 0 | 29.7 | 29.7 |

Defendants make a number of objections to the number of hours claimed by Plaintiffs.
The Court addresses each in turn.

### i. Clerical Tasks

     Defendants argue that Plaintiffs' attorney hours should be reduced by 7.9 hours for
clerical and administrative tasks. Plaintiff does not respond to this argument. The Court
has discretion to reduce claimed time for clerical tasks that should be part of normal
overhead. *Davis v. City & Cnty. of San Francisco*, 976 F.2d 1536, 1543 (9th Cir. 1992)
*opinion vacated in part on denial of reh'g,* 984 F.2d 345 (9th Cir. 1993). The Court
agrees with Defendants that the time entries listed in Bruning Decl. Ex. N should be cut.
Since Defendants have not cited any support for the proposition that association of
counsel is a clerical task, the Court declines to discount the time entries in Bruning Decl.
Ex. O. Thus, the Court agrees that 4.3 hours should be cut from Barragan's hours and 1.5
hours should be cut from Gomez's hours.

### ii. Time Spent on Separate State Court Matter

---

[5] This amount includes the hours spent on post-trial motions, which were claimed by Plaintiffs in their Reply. Fees
Reply at 15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                                  Date: October 23, 2014
                                                                 Page 16

Defendants argue that 0.8 hours spent by Viramontes and 6.7 hours spent by Gomez assisting Plaintiff Perez in prosecuting a state court case should be cut. Plaintiffs do not respond to this argument. The Court agrees with Defendants that this time should be cut, as it does not appear that the state court matter was directly related to this case.

### iii.    Overstaffing and Duplication of Efforts

Defendants argue that Plaintiffs' attorneys' hours should be reduced for overstaffing and duplication of efforts. Specifically, Defendants object to Plaintiffs' attorneys unnecessarily having more than one attorney attend depositions, mediation, court hearings, and trial. Defendants also object to Plaintiffs' attorneys spending excessive amounts of time preparing for mediation and drafting a mediation brief, preparing for deposition, preparing deposition summaries, and preparing demonstrative and trial exhibits. Fees Opp'n at 18.

The Court does not find it unreasonable for two attorneys to attend the same deposition, particularly in a complex case like this one. The Court also notes that Viramontes and Gomez conducted most of the depositions on their own and only served as second-chair for one another in a relatively small percentage of the total hours spent in deposition. *See* Reply Declaration of Victor Viramontes in Support of Fees Mot. ("Viramontes Reply Decl.") (Dkt. 273-8) ¶ 7.

The Court also does not find it unreasonable in this case for Gomez and Barragan to attend mediation and court hearings with Viramontes and Alexander. Given the duration of the mediation and hearings, they appeared to have been contentious. *See* Bruning Decl. Ex. H (listing, among others, time entries for two-day final pretrial conference and five-hour mediation). Since Gomez and Barragan were immersed in the case, it was reasonable for them to be in attendance at the mediation and at the hearings, particularly at the hearings immediately leading up to trial.

Regarding trial attendance, the Court does not find it unreasonable for Gomez and Barragan to attend the trial, as they had spent many pre-trial hours deposing witnesses and preparing trial exhibits and assisted Viramontes and Alexander in running the trial. The Court is not persuaded that the hours spent in court during jury deliberations should be cut. Even if hours spent during jury deliberations are uneventful in hindsight, there is no way to know at the time if the jury will have questions (as the jury did in this case, *see* Jury Notes #1-5 (Dkts. 191-195)), when the jury will reach a verdict, or any other number of events might occur that will require the attorneys to spring into action. The Court does agree with Defendants that it is unclear what role Mendoza, a law clerk, played at closing

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                         Date: October 23, 2014
                                                        Page 17

arguments. *See* Bruning Decl. ¶ 40. Thus, the Court will cut the 5 hours spent by Mendoza.

     Defendants object to the 693.5 hours spent by Plaintiffs' attorneys preparing for mediation and drafting a mediation brief. In Bruning's opinion, those hours should be reduced to no more than 80 hours by Gomez and 20 hours by Viramontes. Bruning Decl. ¶¶ 42-43. Plaintiffs respond that the hours spent on preparing the very long and comprehensive mediation brief constituted a large part of trial preparation because it involved reviewing the evidence and consolidating vast amounts of information into a single brief, which contained succinct summaries of the evidence supporting Plaintiffs' claims. Plaintiffs argue that, had they not spent those hours on the mediation brief, they would have claimed more hours for trial preparation. Viramontes Reply Decl. 8-9. Not having seen the mediation brief, the Court cannot judge for itself its comprehensiveness. However, both sides agree this was a document-heavy case. Bruning Decl. ¶ 22. The Court also notes there was no motion for summary judgment in this matter nor have Defendants identified an inordinate amount of time spent on doing a similarly comprehensive analysis of the evidence, suggesting that the time spent preparing for mediation was indeed the main period during which Plaintiffs put together their case. In this circumstance, the Court declines to reduce Plaintiffs' hours on mediation preparation.

     Defendants argue that the attorney hours spent preparing deposition summaries should be reduced to the paralegal rate because such tasks could have been done by a paralegal. Fees Opp'n at 18; Bruning Decl. ¶¶ 44-45. Plaintiffs' general response is that MALDEF does not employ paralegals and that AKG's paralegal Ham is only trained on some aspects of paralegal work. Reply at 7-8. Since Ham did 82.5 hours of deposition summaries, Bruning Decl. ¶ 44, Ham was trained to do this type of task and could have been assigned more. The Court has no desire to tell the attorneys which tasks they should and should not do or who they need to hire. However, without further explanation for why attorneys had to write the deposition summaries when they could have been done by a paralegal, it is unreasonable to charge an attorney's rate for that work, even if it was done by an attorney. Thus, the Court will reduce the rate for the 124.5 attorney hours spent on deposition summaries to the paralegal rate of $175/hour.

     Defendants argue that the 496.6 hours billed by Barragan in reviewing documents and preparing for 30 depositions was duplicative because Gomez and Viramontes, who actually took the depositions, also spent 453.1 and 226 hours, respectively, preparing for those depositions. Fees Opp'n at 18; Bruning Decl. ¶¶ 46-48. Having three attorneys collectively spend an average of 39 hours to prepare for each deposition is generous.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                         Date: October 23, 2014
                                                         Page 18

Given that MALDEF does not employ paralegals, the Court is inclined to assume that
Barragan's tasks did include tasks that a paralegal could have done or were unnecessarily
duplicative. Thus, the Court will cut Barragan's hours by 15% or 74 hours.

Defendants also argue that Plaintiffs' attorneys spent excessive amounts of time
preparing demonstrative and trial evidence. Fees Opp'n at 18. Bruning opines that Gomez
and Barragan should have spent no more than 80 hours on demonstrative and trial
evidence, respectively, although he finds the number of hours spent by lead counsel
Viramontes and Alexander and paralegal Ham to be reasonable. Bruning Decl. ¶¶ 51-53.
Given that Defendants have cited no persuasive support for their contention that 80 hours
is sufficient and given that this case involved an extensive exhibit list, the Court declines
to make the cuts requested by Defendants.

### iv.    Vague Billing

Defendants also argue that Plaintiffs' hours should be reduced for vague billing.
Plaintiffs did not respond to this argument. Fees Opp'n at 16-17. The Court agrees for the
most part, except for the entries dated 4/25/2012, 12/11/2012, 2/28/2013, 10/24/2013,
12/2/2013, and 7/17/2014. *See* Bruning Decl. Ex. M. Thus, the Court reduces Plaintiffs'
claimed hours as follows: 0.5 hour from Garcia; 0.8 hour from Barragan; 69.5 from
Gomez; and 1.1 hours from Viramontes.

### 3.    Conclusion re: Lodestar Calculation

In summary, the Court finds the following lodestar calculation appropriate:

| Attorney/Staff | Hourly Rate | Total Hours Spent[6] | Amount |
|---|---|---|---|
| Bernard Alexander | $750 | 535.9 | $401,925.00 |
|  | $175 | 101 | $17,675.00 |
| Victor Viramontes | $625 | 1411.9 | $882,437.50 |
| Martha L. Gomez | $390 | 2919.6 | $1,138,644.00 |
|  | $175 | 10.5 | $1,837.50 |
| Matthew Barragan | $340 | 1958.4 | $665,856.00 |
|  | $175 | 13 | $2,275.00 |
| Tracy L. Fehr | $475 | 95.6 | $45,410.00 |

---

[6] This amount includes the hours spent on post-trial motions, which were claimed by Plaintiffs in their Reply. Reply
at 15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                      Date: October 23, 2014
                                                       Page 19

| Marvin Krakow | $750 | 16.4 | $12,300.00 |
|---|---|---|---|
| Miranda Galindo | $250 | 132.9 | $33,225.00 |
| Adriana Garcia | $250 | 115.5 | $28,875.00 |
| Ana Mendoza | $200 | 42.0 | $8,400.00 |
| Gustin Ham | $175 | 209.8 | $36,715.00 |
| Juan Rodriguez | $340 | 29.7 | $10,098.00 |
| **TOTAL** | | | **$3,285,673.00** |

### 4. Lodestar Adjustment for Partial Success

#### a. Legal Standard

If a plaintiff achieves only partial success, the reasonable hours expended on the action as a whole multiplied by a reasonable rate may be an excessive amount. *Hensley*, 461 U.S. at 436. To determine whether the lodestar should be reduced to account for a plaintiff's only partial success, courts must apply a two-part analysis. First, a court should ask first whether the plaintiff "fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded." *Id.* at 434. To assess whether one claim is related to another, a court should consider whether the relief sought for the unsuccessful claim was "intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986) (citation and internal quotation marks omitted). Courts also consider whether the claims are based on different facts and legal theories. If the claims are related, the court should proceed to the second part of the test, which asks whether the plaintiff "achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Hensley*, 461 U.S. at 434. "There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Id.* at 436-37.

#### b. Analysis

Plaintiffs succeeded on some claims but not others, as shown in the chart below. The parties dispute whether the Court should reduce Plaintiffs' lodestar calculation because of Plaintiffs' failure on some claims.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                    Date: October 23, 2014
                                                   Page 20

|  | **Flores** | **Reyes** | **Perez** |
|---|---|---|---|
| FEHA discrimination claim against City | Failed | Failed | Failed |
| FEHA retaliation claim against City | Succeeded | Failed | N/A |
| § 1981 discrimination claim against City | Failed | Failed | Failed |
|  |  |  |  |
| § 1981 discrimination claim against Coopman | Succeeded | Succeeded | Succeeded |
| § 1981 discrimination claim against Waller | Failed | Failed | Failed |
| § 1981 discrimination claim against Hall | Succeeded | Succeeded | Succeeded |
| § 1981 discrimination claim against Baker | Failed | Failed | Failed |
|  |  |  |  |
| § 1981 retaliation claim against Coopman | Succeeded | Succeeded | N/A |
| § 1981 retaliation claim against Waller | Succeeded | Succeeded | N/A |
| § 1981 retaliation claim against Hall | Failed | Failed | N/A |
| § 1981 retaliation claim against Baker | Succeeded | Failed | N/A |

Here, the claims on which each Plaintiff failed was related to the claims on which he succeeded. Flores and Reyes both failed on their retaliation claims against some Defendants but succeeded against others. All three Plaintiffs failed on their racial discrimination claims against some Defendants but succeeded against others. The retaliation and discrimination claims have different elements; the claims against the City also have slightly different elements than the claims against the individual Defendants; and the facts regarding each of the parties were somewhat different. However, those differences are not enough to make the claims unrelated for attorney fee purposes

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                         Date: October 23, 2014
                                                         Page 21

because the claims all arose from a common core of facts and some from related legal theories.

        As to the second part of the *Hensley* test, the Court declines to reduce the lodestar on the ground of Plaintiffs' limited success. Collectively, Plaintiffs succeeded on 11 of 28 claims. Each Plaintiff succeeded against multiple Defendants. Each Defendant was found liable for at least one claim. The jury awarded Plaintiffs over $3 million in compensatory and punitive damages. Although Plaintiffs did not achieve a perfect record, they did achieve "excellent results" in their impact litigation, which justifies including their work on related successful and unsuccessful claims in the lodestar calculation. *See Thorne*, 802 F.2d at 1141.

#### 5.  **Lodestar Multiplier**

####     a.   **Legal Standard**

        Under both state and federal law, the trial court "is not *required* to . . . [but] retains discretion to" apply a multiplier to the lodestar figure after considering certain factors specific to the lawsuit. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132-34 (2001); *see also Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1158 (9th Cir. 2002) ("[I]n appropriate cases, the district court *may* adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in *Kerr v. Screen Extras Guild, Inc.* . . .") (quoting *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993)). Under both state and federal law, "the party seeking a fee enhancement bears the burden of proof." *Ketchum*, 24 Cal. 4th at 1138; *see also Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010).

        In considering whether the lodestar figure should be adjusted, the trial court considers factors specific to the case. *Ketchum*, 24 Cal. 4th at 1134; *Cairns*, 292 F.3d at 1158 (citing *Kessler v. Assocs. Fin. Servs. Co. of Hawaii*, 639 F.2d 498, 500 n.1 (9th Cir. 1981)). These factors include but are not limited to whether the litigation precluded other employment by the attorneys, the novelty and difficulty of the questions involved, the skill displayed in presenting them, the results obtained, the experience of the attorney, and the undesirability of the case. *See Ketchum*, 24 Cal. 4th at 1132; *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006) (federal courts look at twelve *Kerr* factors).

        At the same time, however, under both state and federal law, the trial court should not consider factors that have already been considered in calculating the lodestar figure. *See Ketchum*, 24 Cal. 4th at 1138; *Morales v. City of San Rafael*, 96 F.3d 359, 363-64 (9th Cir. 1996), *opinion amended on denial of reh'g,* 108 F.3d 981 (9th Cir. 1997).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SACV 11-0278 DOC (RNBx)                    Date: October 23, 2014
                                                    Page 22

Factors that are often subsumed in calculating the lodestar figure include "the novelty and complexity of a case," or "the quality of an attorney's performance," *Perdue,* 559 U.S. at 553; *Ketchum*, 24 Cal. 4th at 1138-39, and the results obtained, *see Blum v. Stenson*, 465 U.S. 886, 900 (1984). After the U.S. Supreme Court opinion *City of Burlington v. Dague*, consideration of contingency risk is still permitted under California law but are disallowed under federal fee-shifting statutes like 42 U.S.C. § 1988 because an enhancement for contingency likely duplicates factors subsumed in the lodestar. *Compare Ketchum*, 24 Cal. 4th at 1138 ("[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases as a class.") *with City of Burlington v. Dague*, 505 U.S. 557, 567 (1992) *and Davis*, 976 F.2d at 1549 (holding that *Dague* constitutes an outright rejection of contingency as a factor in calculating or adjusting the lodestar figure).

> **b.   Analysis**

Plaintiffs seek a 1.5 multiplier on their lodestar (excluding time spent on post-trial motions) based on (1) contingency risk; (2) preclusion of other work; (3) difficulty of the issues and skill displayed in presenting them; and (4) results obtained. Fees Mot. at 20-22. The Court declines to grant Plaintiffs a multiplier.

Regarding the contingency risk, the Court can only consider contingency risk as to the single state law claim on which Plaintiffs prevailed, the FEHA retaliation claim by Plaintiff Flores against the City. However, it is impossible for the Court to separate out hours spent on the state law claim versus the federal claims because the state law claim arose from the same set of facts as the federal claims and neither party treated them as distinct. Since the burden is on Plaintiffs to justify the multiplier and Plaintiffs have not identified the number of hours on which a contingency risk-based multiplier could be applied, the Court is not inclined to grant a multiplier based on contingency risk.

As to preclusion of other work, Plaintiffs have not identified other work that they gave up in order to prosecute this case.

As for the difficulty of the issues and skill displayed in presenting them, the Court already accounted for these factors in finding reasonable a higher hourly rate and a higher number of hours than would be necessary in a less complex case or a case with an untimed trial.

With regard to the results obtained, the Court found that the results obtained were excellent enough not to justify a downward adjustment on the lodestar. However, the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 11-0278 DOC (RNBx)                                  Date: October 23, 2014
                                                                 Page 23

results were not so excellent as to justify an upward adjustment. Although Plaintiffs largely accomplished their goal of making an impact on the Westminster Police Department with this impact litigation, the Court notes that Plaintiffs lost on 15 out of the 28 claims that went to trial and that the City itself was only found liable on one claim by one Plaintiff. Moreover, the jury verdict form, which was agreed to by both parties, was not without problems. Final Judgment Order at 9-12.

      For these reasons, the Court declines to grant a multiplier.

      **6.   Expert Fees and Costs**

      Plaintiffs request $40,028.49 in expert fees and $18,684.12 in costs. Defendants do not oppose these amounts. The requested fees and costs appearing reasonable, the Court grants Plaintiffs' request for expert fees and costs.

**V.     DISPOSITION**

      For the reasons stated above, the Court DENIES Defendants' Motion for a New Trial and their Renewed Motions for Judgment as a Matter of Law. The Court GRANTS the following fees and costs: $3,285,673.00 in attorney fees, $40,028.49 in expert fees, and $18,684.12 in costs.

      The Clerk shall serve this minute order on the parties.


MINUTES FORM 11
CIVIL-GEN                                          Initials of Deputy Clerk:  djg

# Exhibit 7



# Alexander Morrison + Fehr LLP - User Summary

Date Start: 10/1/2018 | Date End: 10/17/2023 | Clients: Diaz, Demetric | Cases: Diaz v. Tesla | Users: All | Account
Managers: All

| Date | Client | Case | Description | Rate/ Unit Price | Labor Time/ Quantity | Billable Time/ Cost Price | Bill Amt/ Sell Price |
|---|---|---|---|---|---|---|---|
| **Britt Karp** | | | | | | | |
| 11/11/2019 | Diaz, Demetric | Diaz v. Tesla | Reviewing opposition to CitiStaff Solutions' MSJ to learn facts of case in assisting with opposition to Tesla and NextSource's MSJs [0.4]; reviewing Tesla's MSJ for argument regarding punitive damages and vicarious liability [0.3]; researching case law cited by Tesla in support of MSJ re: punitive damages [1.9]; researching CA case law we typically rely on for recovering punitive damages against an employer [0.7] | $675.00 hr | 3.30 | 3.30 | $2,227.50 |
| 12/02/2019 | Diaz, Demetric | Diaz v. Tesla | Email to co-counsel following up on confidential documents, correspondence and attorney declaration needed for opposition for Tesla's motion for retain confidentiality [0.2]; reviewing Tesla's motion to retain confidentiality, decs and exhibits in support in order to prepare opposition [0.6]; reviewing documents Tesla seeks to keep confidential [0.9] | $675.00 hr | 1.70 | 1.70 | $1,147.50 |
| 12/03/2019 | Diaz, Demetric | Diaz v. Tesla | Continued review of documents Tesla seeks to keep confidential [1.4]; reviewing letters sent to defense counsel by co-counsel addressing issues with the documents marked as confidential [1.2]; continued review of defendant's motion to retain confidentiality in order to prepare opposition [0.7]; email sent to co-counsel seeking further clarification for opposition to motion to retain confidentiality [0.2] | $675.00 hr | 3.50 | 3.50 | $2,362.50 |

| 12/04/2019 | Diaz, Demetric | Diaz v. Tesla | Call with co-counsel to discuss basis for opposition to Tesla's motion to retain confidentiality [0.3]; researching cases analyzing standards to be applied for maintaining confidentiality of documents in federal court [1.3]; researching cases analyzing the discoverability of employment information in federal court [0.7]; preparation of opposition to motion to retain confidentiality [1.3]; researching whether courts have held that an employer's policies are confidential [0.4]; reviewing 3rd circuit case cited in defendant's motion regarding factors a district court may consider in determining good cause to make confidential [0.3]; continuing to review documents in Tesla's 1013 page production which it seeks to maintain as confidential [1.8] | $675.00 hr | 6.10 | 6.10 | $4,117.50 |
| 12/05/2019 | Diaz, Demetric | Diaz v. Tesla | Completing review of Tesla's document production and cross-referencing with chart of documents they seek to remain confidential [0.6]; obtaining case cite for definition of trade secret [0.2]; preparing argument in support of opposition to Tesla's motion to retain confidentiality regarding impropriety of Tesla's designations [2.9]; preparing argument in support of opposition to Tesla's motion addressing that Plaintiffs have properly followed the procedure for challenging Tesla's designations [0.9] | $675.00 hr | 4.60 | 4.60 | $3,105.00 |

| 12/06/2019 | Diaz, Demetric | Diaz v. Tesla | Call with co-counsel Cimone Nunley to discuss additional exhibits for the opposition to Tesla's motion to retain confidentiality and preparing a motion for filing under seal [0.3]; continued preparation of summary of argument, facts section and declaration cites in opposition to motion to retain confidentiality [1.6]; reviewing motion to file under seal prepared by co-counsel [0.2]; email to co-counsel re finalizing our opposition [0.1]; finalizing opposition to motion to retain confidentiality [0.6] | $675.00 hr | 2.80 | 2.80 | $1,890.00 |
| 12/09/2019 | Diaz, Demetric | Diaz v. Tesla | Reviewing Bernard's and co-counsel's revisions to opp to motion to retain confidentiality [0.3]; call with co-counsel to discuss finalizing opp and filing [0.1] | $675.00 hr | 0.40 | 0.40 | $270.00 |
| 04/01/2020 | Diaz, Demetric | Diaz v. Tesla | Reviewing 1981 jury instruction to revise [0.1]; reviewing sample 1981 jury instructions [0.2]; reviewing MSJ opp to understand 1981 liability of Tesla [0.2]; reviewing joint disputed legal issues [0.3]; research regarding 1981 cause of action as a third party intended beneficiary [0.8]; research regarding CA case law defining third party beneficiary [0.3]; rewriting 1981 jury instruction for liability against Tesla [0.8] | $675.00 hr | 2.70 | 2.70 | $1,822.50 |
| 07/22/2023 | Diaz, Demetric | Diaz v. Tesla | Reviewing docket to determine deadline for mtn for atty fees | $675.00 hr | 0.10 | 0.10 | $67.50 |
| 07/24/2023 | Diaz, Demetric | Diaz v. Tesla | Preparing deRubertis dec for mtn for atty fees [0.5]; email to JBA re same [0.1] | $675.00 hr | 0.60 | 0.60 | $405.00 |
| 07/25/2023 | Diaz, Demetric | Diaz v. Tesla | Responding to Bernard's email re atty fee decs | $675.00 hr | 0.10 | 0.10 | $67.50 |
| 09/13/2023 | Diaz, Demetric | Diaz v. Tesla | Revising Bernard's dec in support of mtn for atty fees including reviewing billing for case to incorporate | $675.00 hr | 1.50 | 1.50 | $1,012.50 |
| 10/09/2023 | Diaz, Demetric | Diaz v. Tesla | Reviewing and redacting JBA's billing for mtn for atty fees | $675.00 hr | 1.50 | 1.50 | $1,012.50 |

| Date | | | Description | Rate | | | Amount |
|------|---|---|-------------|------|---|---|--------|
| 10/10/2023 | Diaz, Demetric | Diaz v. Tesla | Email to Gus re further billing for atty fees motion [0.1]; further revisions to JBA's dec including incorporating Rubin's revisions and section re out of town expenses [1.2]; reviewing emails from Bernard re add'l work for atty fee mtn [0.1]; emailing him re same [0.1]; organizing exhibits for dec and further redacting [0.6] | $675.00 hr | 2.10 | 2.10 | $1,417.50 |
| 10/11/2023 | Diaz, Demetric | Diaz v. Tesla | Responding to email from JBA re amending dec [0.1]; email to Gus re costs [0.1]; further amendment to dec re trial costs [0.8] | $675.00 hr | 1.00 | 1.00 | $675.00 |
| 10/16/2023 | Diaz, Demetric | Diaz v. Tesla | Reviewing and responding to emails from Gus and JBA re mtn for atty fees | $675.00 hr | 0.10 | 0.10 | $67.50 |
| | | | **Total Labor For Britt Karp** | | 32.10 | 32.10 | **$21,667.50** |
| | | | **Total Expense For Britt Karp** | | | $0.00 | **$0.00** |
| | | | **Total For Britt Karp** | | | | **$21,667.50** |

## Gustin Ham

| Date | | | Description | Rate | | | Amount |
|------|---|---|-------------|------|---|---|--------|
| 03/20/2020 | Diaz, Demetric | Diaz v. Tesla | Draft page:line summary of Wayne Jackson for use at trial [9.2]; Email summary to JBA [.1] | $225.00 hr | 9.30 | 9.30 | $2,092.50 |
| 03/23/2020 | Diaz, Demetric | Diaz v. Tesla | Begin draft page:line summary of Erin Marconi for use at trial [5.5]. | $225.00 hr | 5.50 | 5.50 | $1,237.50 |
| 03/24/2020 | Diaz, Demetric | Diaz v. Tesla | Continue page:line summary of Erin Marconi for use at trial [4.2]; Email summary to JBA [.1] | $225.00 hr | 4.30 | 4.30 | $967.50 |
| 03/25/2020 | Diaz, Demetric | Diaz v. Tesla | Draft page:line summary of John Wheeler for use at trial [7.2]; Email same to JBA [.1] | $225.00 hr | 7.30 | 7.30 | $1,642.50 |
| 09/13/2021 | Diaz, Demetric | Diaz v. Tesla | Review page:line summary of Michael Wheeler and identify deposition testimony to create video clips to be played at trial [1.1]; Convert Wheeler raw video files to mpegs [1.8]; Upload Donet mpegs for synchronization [.6]; Create video clips of Michael Wheeler for use at trial, fine tune clips (exclude colloquy and objections) [2.1]; Send DeLeon video clips to JBA [.2]. | $225.00 hr | 5.80 | 5.80 | $1,305.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 09/17/2021 | Diaz, Demetric | Diaz v. Tesla | Review page:line summary of Monica DeLeon and identify deposition testimony to create video clips to be played at trial [.8]; Convert DeLeon raw video files to mpegs [4.1]; Upload DeLeon mpegs for synchronization [.6]; Create video clips of Monica DeLeon for use at trial, fine tune clips (exclude colloquy and objections) [2.1]; Send DeLeon video clips to JBA [.2]; Convert Donet raw video files to mpegs [.8]; Upload Donet mpegs for synchronization [.5]; Review page:line summary of Victor Quintero and identify deposition testimony to create video clips to be played at trial [.9]; Convert Donet raw video files to mpegs [3.6]; Upload Quintero mpegs for synchronization [.5]; Create video clips of Victor Quintero for use at trial, fine tune clips (exclude colloquy and objections) [1.9]; Send Quintero video clips to JBA [.2]. | $225.00 hr | 16.20 | 16.20 | $3,645.00 |

|  | | | |
|---|---|---|---|
| **Total Labor For Gustin Ham** | 48.40 | 48.40 | $10,890.00 |
| **Total Expense For Gustin Ham** | | $0.00 | $0.00 |
| **Total For Gustin Ham** | | | $10,890.00 |

## J. Bernard Alexander, III

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/03/2019 | Diaz, Demetric | Diaz v. Tesla | Diaz v Tesla (Organ): lengthy phone call re potential co-counsel case [1.3] | $1,200.00 hr | 1.30 | 1.30 | $1,560.00 |
| 06/07/2019 | Diaz, Demetric | Diaz v. Tesla | Review of complaint and supporting declarations [1.0], phone call with co-counsel re continuance of trial date, agreeing to co-counsel on case [.2] | $1,200.00 hr | 1.20 | 1.20 | $1,440.00 |
| 07/23/2019 | Diaz, Demetric | Diaz v. Tesla | Diaz v Tesla: lengthy phone call, update re case status, developments, strategizing re motions to compel [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 07/24/2019 | Diaz, Demetric | Diaz v. Tesla | Receipt of emails attaching (1) key documents, (2) case summary from co-counsel [.4]; draft litigation memorandum [.4] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 07/29/2019 | Diaz, Demetric | Diaz v. Tesla | Review of retainer agreements [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |

| 07/30/2019 | Diaz, Demetric | Diaz v. Tesla | Email exchange re fee split [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 08/05/2019 | Diaz, Demetric | Diaz v. Tesla | Extensive review of Owen Diaz depo. Vol. I [6.2]; preparation of co-counsel agreement [.3]; preparation of detailed outline of corroboration discovery to be performed [.6] | $1,200.00 hr | 7.10 | 7.10 | $8,520.00 |
| 08/08/2019 | Diaz, Demetric | Diaz v. Tesla | Email exchange re scheduling date for strategy discussion [.1]; receipt of caption, prepare notice of association [.2] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 08/15/2019 | Diaz, Demetric | Diaz v. Tesla | Review of Owen Diaz Depo. Vol. II [3.5] | $1,200.00 hr | 3.50 | 3.50 | $4,200.00 |
| 08/16/2019 | Diaz, Demetric | Diaz v. Tesla | Conference call with co-counsel re discovery strategy, extending MSJ opposition time; expanding scope of discovery beyond artificial Tesla restrictions [.6] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 08/19/2019 | Diaz, Demetric | Diaz v. Tesla | Review email summary of strategy call [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 08/20/2019 | Diaz, Demetric | Diaz v. Tesla | Extensive review of deposition transcript: Wayne Jackson [5.1] | $1,200.00 hr | 5.10 | 5.10 | $6,120.00 |
| 08/27/2019 | Diaz, Demetric | Diaz v. Tesla | Page:line summary of witness: John Wheeler [4.3] | $1,200.00 hr | 4.30 | 4.30 | $5,160.00 |
| 08/28/2019 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of M&C Letter re defense obstruction of discovery [1.0] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 09/10/2019 | Diaz, Demetric | Diaz v. Tesla | Multiple texts re status conference, availability [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 09/11/2019 | Diaz, Demetric | Diaz v. Tesla | Texts exchange confirming May 11, 2020 trial availability [.1]; review and revision of M&C letter re additional depositions [.4]; research re race expert [.4]; preparation of detailed email re rampant use of N word in workplace and approach to subjective non-offensiveness by AA EE's [1.0] | $1,200.00 hr | 1.90 | 1.90 | $2,280.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 09/12/2019 | Diaz, Demetric | Diaz v. Tesla | Review email exchanges re complaint, outstanding M&C letter exchanges, confirmation of early trial date [.4]; review of alternative proposal re additional discovery and MSJ briefing [.3] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 09/13/2019 | Diaz, Demetric | Diaz v. Tesla | Phone call re Demetric settlement [.2]; review email re opening statement blurb from Organ, amend [.3]; Phone call with Organ regarding Demetric's settlement [.1] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 09/16/2019 | Diaz, Demetric | Diaz v. Tesla | Receipt of emails re scheduling conference for settlement conference [.1]; receipt of email re same [.1] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 09/25/2019 | Diaz, Demetric | Diaz v. Tesla | Review email re expert unavailability (Robbins, Reading), agree with decision to seek delay in disclosures [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 09/25/2019 | Diaz, Demetric | Diaz v. Tesla | Review email re proposed stipulation to delay expert disclosure [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 09/27/2019 | Diaz, Demetric | Diaz v. Tesla | Phone calls re expert retention issues: psych; discussion of potential alternative workplace experts [.3]; email and message to defense counsel (Kennedy); text message to potential psych expert (Reading) [.2]; research alternative psych expert, provide curriculum vitae to co-counsel [.4]; communications with preferred psych re scheduling examination [.6] | $1,200.00 hr | 1.50 | 1.50 | $1,800.00 |
| 09/30/2019 | Diaz, Demetric | Diaz v. Tesla | Email and text exchanges attempting to get client in for examination [.4]; receipt of email attaching draft MSJ opposition [.2] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 10/01/2019 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of 2nd draft of MSJ Opposition [3.5]; phone call with co-counsel re status of draft opposition [.2]; extensive review and revision of 5th draft of opposition [2.4] | $1,200.00 hr | 5.90 | 5.90 | $7,080.00 |
| 10/02/2019 | Diaz, Demetric | Diaz v. Tesla | Review email re revised MSJ, client appearance at psych examination [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |

| Date | Name | Matter | Description | Rate | | | Amount |
|---|---|---|---|---|---|---|---|
| 10/03/2019 | Diaz, Demetric | Diaz v. Tesla | Review of order re discovery [.2]; strategy conference call with co-counsel re depositions to be completed, timing [.6]; clear calendar for depositions [.2]; email San Diego counsel re deposition location [.1]; review email re chart of depositions [.2]; coordinate scheduling [.2]; review of Di-az settlement agreement, email to co-counsel re same [.4] | $1,200.00 hr | 1.90 | 1.90 | $2,280.00 |
| 10/07/2019 | Diaz, Demetric | Diaz v. Tesla | Review of emails re upcoming depositions, Di'az settlement [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 10/08/2019 | Diaz, Demetric | Diaz v. Tesla | Conference call re discovery strategy, further meet and confer issue choices, "me too" strategy [1.3] | $1,200.00 hr | 1.30 | 1.30 | $1,560.00 |
| 10/09/2019 | Diaz, Demetric | Diaz v. Tesla | Review emails between defense counsel re upcoming depositions [.1]; email expert (Reading, Ph.D) re expert report due [.2]; initial receipt and review of expert report and materials from Dr. Reading [.6]; review of email summary of Kawasaki deposition from Organ [.2] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 10/10/2019 | Diaz, Demetric | Diaz v. Tesla | Receipt of email from co-counsel re witness (Torres) deposition off calendar [.1]; receipt of multiple emails rescheduling depositions, email to co-counsel re Marconi deposition [.2] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 10/11/2019 | Diaz, Demetric | Diaz v. Tesla | Receipt and review of plaintiff expert declaration [.2]; review of emails re depositions and scheduling meet and confer [.1]; phone call with co-counsel re expert designation, Reading report [.3] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 10/16/2019 | Diaz, Demetric | Diaz v. Tesla | Receipt of Tesla graffiti photograph [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 10/17/2019 | Diaz, Demetric | Diaz v. Tesla | Review of objection to Tesla designation of confidential documents [.2]; review of email re "common talk" treatment of comments [.2]; review of email re Supervisor Donet: responsible for removal of bathroom graffiti [.2] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |

| 10/21/2019 | Diaz, Demetric | Diaz v. Tesla | Conference with co-counsel re deposition status, new case on dual employers (Jiminez) [.1]; review of Jiminez [.4], preparation of draft cover letter to Judge re application of case to facts [.2]; review order extending discovery dispute deadline for letter [.1]; follow up discussion re Marconi deposition testimony [.3] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 10/22/2019 | Diaz, Demetric | Diaz v. Tesla | Email exchange re filing of "Recent Statement of Decision" attaching Jiminez [.2]; | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 10/23/2019 | Diaz, Demetric | Diaz v. Tesla | Review of additional Discovery order allowing 45 minute "Donet" deposition [.3]; text message exchange with co-counsel re coordinating taking of deposition [.1] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 10/24/2019 | Diaz, Demetric | Diaz v. Tesla | Review of post MSJ hearing order [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 10/28/2019 | Diaz, Demetric | Diaz v. Tesla | Initial receipt and review of electronic deposition transcript; forward to co-counsel [.1]; review of Notice of Voluntary Dismissal by stipulation of West Valley staffing Group [.1] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 11/01/2019 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re MSJ oppositions [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 11/04/2019 | Diaz, Demetric | Diaz v. Tesla | Review of Tesla MSJ [.5]; phone call with co-counsel strategizing re opposition, division of labor re same [.7] | $1,200.00 hr | 1.20 | 1.20 | $1,440.00 |
| 11/06/2019 | Diaz, Demetric | Diaz v. Tesla | Begin research of punitive damage authority [.5] extensive review of deposition transcript: Marconi [4.7]; email exchange with co-counsel re availability to defend Reading deposition [.2] | $1,200.00 hr | 5.40 | 5.40 | $6,480.00 |
| 11/08/2019 | Diaz, Demetric | Diaz v. Tesla | Page:line summary: Romero [7.2] | $1,200.00 hr | 7.20 | 7.20 | $8,640.00 |

| 11/11/2019 | Diaz, Demetric | Diaz v. Tesla | Extensive review of deposition: Kawasaki [3.4]; discussion with associate (Britt) re punitive damage research needed [.2], review of same re Kolstad [.4]; research re punitive opposition: affirmative, non-delegable duties [1.0] | $1,200.00 hr | 5.00 | 5.00 | $6,000.00 |
| 11/11/2019 | Diaz, Demetric | Diaz v. Tesla | Email exchange with co-counsel re defense proposal to delay expert designation [.1]; discussion of punitive damage opposition assignment with associate [.3]; | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 11/12/2019 | Diaz, Demetric | Diaz v. Tesla | Legal research re MSJ, punitive damages opposition [4.0]; begin fact compilation of testimony re managing agent, punitive liability [5.0] | $1,200.00 hr | 9.00 | 9.00 | $10,800.00 |
| 11/12/2019 | Diaz, Demetric | Diaz v. Tesla | Preparation: strategize re cross-examination of employer's abrogation of duty re non-regulation of use of the N-word by AA employees inside the workplace, outline cross-examination [1.0]; begin preparation of opposition to MSJ re punitive damages | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 11/13/2019 | Diaz, Demetric | Diaz v. Tesla | Preparation of opposition to MSJ (Legal research re MSJ, punitive damages opposition [4.0]; begin fact compilation of testimony re managing agent, punitive liability; organize arguments in opposition [6.0] | $1,200.00 hr | 10.00 | 10.00 | $12,000.00 |
| 11/14/2019 | Diaz, Demetric | Diaz v. Tesla | Continue preparation of MSJ opposition: continue compilation of facts argument in opposition to punitive damage motion [5.0]; initial receipt, review and revision of draft of detailed facts from co-counsel [2.5]; combine punitive opposition arguments to create combined draft opposition [3.0]; forward combined draft to co-counsel [.2] | $1,200.00 hr | 10.70 | 10.70 | $12,840.00 |
| 11/16/2019 | Diaz, Demetric | Diaz v. Tesla | Review and revision of Tesla MSJ Opposition [2.0] | $1,200.00 hr | 2.00 | 2.00 | $2,400.00 |

| Date | Name | Case | Description | Rate | | | Amount |
|---|---|---|---|---|---|---|---|
| 11/18/2019 | Diaz, Demetric | Diaz v. Tesla | Review and revise Tesla MSJ opposition after co-counsel (Organ) edits [2.0]; review and revise nextSource MSJ opposition [1.5]; multiple email communications re completion of same [.2] | $1,200.00 hr | 3.70 | 3.70 | $4,440.00 |
| 11/19/2019 | Diaz, Demetric | Diaz v. Tesla | Email exchanges re pending depositions [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 11/19/2019 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of opposition to MSJ - Final: nextSource [3.0]; Tesla [2.5] | $1,200.00 hr | 5.50 | 5.50 | $6,600.00 |
| 12/03/2019 | Diaz, Demetric | Diaz v. Tesla | Receipt of email from court, moving MSJ hearing date, re-calendar, reschedule conflicts [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 12/07/2019 | Diaz, Demetric | Diaz v. Tesla | Review and revise Oppositon to Tesla Confidentiality designation [2.0] | $1,200.00 hr | 2.00 | 2.00 | $2,400.00 |
| 12/16/2019 | Diaz, Demetric | Diaz v. Tesla | Begin Preparation for hearing on MSJ: nextSource [4.0]; Tesla [5.0]; preparation of materials for use at hearing [.5] | $1,200.00 hr | 9.50 | 12.50 | $15,000.00 |
| 12/17/2019 | Diaz, Demetric | Diaz v. Tesla | Preparation [3.0]; attendance at MSJ [1.0] travel back to LAX [2.5] | $1,200.00 hr | 4.00 | 6.50 | $7,800.00 |
| 12/18/2019 | Diaz, Demetric | Diaz v. Tesla | Review of notice of transcript purchase by defendant nextSource, Email exchange with co-counsel re agreement to obtain [.1]; review of order re dismissal of West Valley [.1] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 12/30/2019 | Diaz, Demetric | Diaz v. Tesla | Conference call with co-counsel re status post MSJ ruling, discussion of liability, valuation of case [.8] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 01/02/2020 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of MSC brief, email exchanges re same [2.0]; Final reivew and revision to whittle down to 10 pages. [.5]; conference call re MSC strategy [.6]; Telephone call with JBA and LO regarding settlement amount [.7]. | $1,200.00 hr | 3.80 | 3.80 | $4,560.00 |
| 01/03/2020 | Diaz, Demetric | Diaz v. Tesla | Review email re settlement demand to defendants [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |

| 01/14/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel (Organ) re Recorder inquiry re Sanction Motion [.3]; review email re expert (Reading) deposition notice, discussion and email exchange re covering deposition [.2] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
|---|---|---|---|---|---|---|---|
| 01/15/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation for MSC: download of pertinent documents [.4] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 01/16/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation and attendance at MSC [9.0] | $1,200.00 hr | 9.00 | 12.00 | $14,400.00 |
| 01/21/2020 | Diaz, Demetric | Diaz v. Tesla | Review of order re further status conference re settlement, calendar [.1]; review email from co-counsel re same [.1], and coordination of expert depositions [.2] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 01/27/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchange with jury consultant (Plotkin) re trial preparation [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 01/28/2020 | Diaz, Demetric | Diaz v. Tesla | Conference call with co-counsel, jury consultant (Plotkin) re focus group, upcoming trial [.6] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 01/29/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchange re availability of jury consultant for trial [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 02/05/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchanges with jury consultant re scheduling conference call [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 02/10/2020 | Diaz, Demetric | Diaz v. Tesla | Review calendar re upcoming trial preparation dates [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 02/13/2020 | Diaz, Demetric | Diaz v. Tesla | Conference call with co-counsel and Jury Consultant (Harry Plotkin) re trial strategy [1.1]; initial receipt and review of expert materials from expert: Dr. Reading, Ph.d [.2]; discussions with associate re preparation for defending deposition [.2]; discussion re production of responsive documents for deposition [.3] | $1,200.00 hr | 1.80 | 1.80 | $2,160.00 |

| 02/18/2020 | Diaz, Demetric | Diaz v. Tesla | Conference with associate re Reading deposition, comment from defense attorney (Kennedy) [.2]; email exchange with co-counsel and jury consultant re scheduling [.1]; email co-counsel re invitation to discuss settlement, from defense counsel [.2] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 02/20/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchanges re proceeding with focus group, settlement inquiry from Tracey Kennedy [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 02/23/2020 | Diaz, Demetric | Diaz v. Tesla | Initial receipt of email re amended expert (Oppenheimer) report [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 03/06/2020 | Diaz, Demetric | Diaz v. Tesla | Receipt of email from court scheduling conference call [.1]; phone call with co-counsel (Organ) re unavailability [.2]; collect trial schedule and provide to co-counsel re availability [.2] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 03/13/2020 | Diaz, Demetric | Diaz v. Tesla | Conference call re trial, jury selection, focus group in light of CV-19 issues [1.0] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 03/13/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call re coordination of pre-trial meeting [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 03/22/2020 | Diaz, Demetric | Diaz v. Tesla | Lengthy phone call re pre-trial documents, strategy re trial [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 03/23/2020 | Diaz, Demetric | Diaz v. Tesla | Review emails re trial preparation [.2]; Review of proposed jury questionnaire [.4]; email co-counsel re approval of same [.1]; extensive review and revision of MLIMs Nos. 1-7 [3.0]; email exchange re Farragher/Ellerth defense [.2]; extensive review and revision of jury instructions [2.0] and special verdict form [1.0]; review email exchanges with defense counsel coordinating pre-trial meet and confers [.4]; phone call with co-counsel re verdict form, punitive damages correlated to Negligent Hiring/Retention [.3] | $1,200.00 hr | 7.60 | 7.60 | $9,120.00 |

| Date | | | Description | Rate | | | Amount |
|---|---|---|---|---|---|---|---|
| 03/24/2020 | Diaz, Demetric | Diaz v. Tesla | Review of multiple emails re pre-trial exchange of documents [.4]; phone call with co-counsel strategizing re response to defense pre-trial service of documents [.7] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 03/25/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re pre-trial meeting with defense [.5]; extensive review and comparison of factual and legal issues in dispute in preparation for pre-trial meet and confer [2.0] | $1,200.00 hr | 2.50 | 2.50 | $3,000.00 |
| 03/26/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation for pre-trial conference call [.5]; Conference call re same [1.3]; followup call with co-counsel [.3] | $1,200.00 hr | 2.10 | 2.10 | $2,520.00 |
| 03/27/2020 | Diaz, Demetric | Diaz v. Tesla | Receipt and review of Tesla Issue brief, begin merger of plaintiff and defense arguments [5.5] | $1,200.00 hr | 5.50 | 5.50 | $6,600.00 |
| 03/30/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchange re approval of circulation of Issue Brief [.3]; circulation of same to defense counsel [.1]; lengthy conference call re further pre-trial meet and confer [1.0]; follow up phone call with co-counsel [.4] | $1,200.00 hr | 1.80 | 1.80 | $2,160.00 |
| 03/31/2020 | Diaz, Demetric | Diaz v. Tesla | Extensive review of defense revision of Issue Brief [.7]; email exchange with co-counsel (Organ) re same and stipulation to continue [.3]; begin review of Fuller v City of Oakland [1.0] | $1,200.00 hr | 2.00 | 2.00 | $2,400.00 |
| 04/01/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation for and attendance at conference call re pre-trial documents [.8]; phone call with co-counsel re same, trial strategy [.5]; email instruction to associate (Karp) re research needed on Section 1981 jury instruction [.3]; review and revise proposed jury instruction No. 10 re 1981 proof [.4]; email to co-counsel [.1]; email exchange with defense counsel (Kennedy) re settlement [.2] | $1,200.00 hr | 2.30 | 2.30 | $2,760.00 |

| 04/02/2020 | Diaz, Demetric | Diaz v. Tesla | Email to co-counsel re settlement overture [.1]; review emails from court re new trial and pre-trial dates, calendar [.2]; forward to jury consultant [.1]; phone calls with co-counsel re (1) opposition to defense MLIM re use of race-based books, delayed timing of oppositions, and settlement [.4] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 04/06/2020 | Diaz, Demetric | Diaz v. Tesla | Complete review of Fuller v City of Oakland [.5]; amend Disputed legal issue brief [.5]; email exchange with co-counsel re same [.2]; and discussion of MIL excluding evidence re termination [.2] | $1,200.00 hr | 1.40 | 1.40 | $1,680.00 |
| 04/07/2020 | Diaz, Demetric | Diaz v. Tesla | Pre- and post- conference call with co-counsel re (1) settlement discussion; (2) pre-trial documents; (3) proof of 1981 based on either joint-employer or benefits from contact entered between nextSource and Tesla [.6]; conference call with defendant re pre-trial documents [.4] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 04/10/2020 | Diaz, Demetric | Diaz v. Tesla | Conference call re strategy with co-counsel [.4] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 04/11/2020 | Diaz, Demetric | Diaz v. Tesla | Further review of version 7 or revised Disputed Statements of Law and Fact [.8]; review of related emails re same, and other pre-trial exchanges with defendant [.4]; | $1,200.00 hr | 1.20 | 1.20 | $1,440.00 |
| 04/15/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchange re trial strategy meeting [.1]; begin review of power point re joint employers [.4] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 04/16/2020 | Diaz, Demetric | Diaz v. Tesla | Conference call with defense [.6]; review and revision of Instruction No. 10 [.5]; review of proposed stipulation re appearance by zoom or phone [.2]; email exchange re MLIM to exclude evidence re non-racial investigation [.4] | $1,200.00 hr | 1.70 | 1.70 | $2,040.00 |
| 04/17/2020 | Diaz, Demetric | Diaz v. Tesla | Review of demonstrative - timeline [2.0]; lengthy strategy call with co-counsel [2.1]; review of issue outline in preparation for strategy call [.5]; review and revise MLIM re Foster [2.0] | $1,200.00 hr | 6.60 | 6.60 | $7,920.00 |

| 04/18/2020 | Diaz, Demetric | Diaz v. Tesla | Review of revised jury questionnaire from defense [.4]; forward to co-counsel for review and approval [.1] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 04/19/2020 | Diaz, Demetric | Diaz v. Tesla | Review of email re jury questionnaire, forward revisions to Jury Consultant (Plotkin) [.2]; extensive review and revision of jury instructions, verdict form [3.0]; email co-counsel re concerns [.3] | $1,200.00 hr | 3.50 | 3.50 | $4,200.00 |
| 04/20/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call re exchange of trial documents [.3]; consultation with co-counsel re settlement valuation [.3]; preparation of email to defense counsel re same [.2] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 04/21/2020 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: Kawasaki - Extensive revision, reorganization of deposition testimony for use at trial [2.0]; receipt of email from defense enclosed revised, redline jury instructions [.2]; Extensive review and revision draft JNOV | $1,200.00 hr | 4.20 | 4.20 | $5,040.00 |
| 04/22/2020 | Diaz, Demetric | Diaz v. Tesla | Review email re witness (Henry) [.1]; review email exchange re further pre-trial meet and confer [.2] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 04/25/2020 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of jury instructions, current draft [2.0]; phone call with co-counsel (Organ) re same and MIL #4 [.2]; review and revision of MLIM #4 [2.0]; email back to co-counsel with related comments [.2] | $1,200.00 hr | 4.40 | 4.40 | $5,280.00 |
| 04/26/2020 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: detailed reorganization of Jackson deposition summary for examination at trial [8.0] | $1,200.00 hr | 8.00 | 8.00 | $9,600.00 |
| 04/27/2020 | Diaz, Demetric | Diaz v. Tesla | Conference call re pre-trial documents [.4]; receipt and review of defense final drafts: jury instructions, witness list, exhibit list [.3] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 04/28/2020 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of Opposition to defense MLIMs [5.0]; email exchange with co-counsel re same [.2] | $1,200.00 hr | 5.20 | 5.20 | $6,240.00 |
| 04/29/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation of examination outline of witness: Marconi [7.0]; review of miscellaneous emails re pre-trial filings [.3] | $1,200.00 hr | 7.30 | 7.30 | $8,760.00 |

| 05/04/2020 | Diaz, Demetric | Diaz v. Tesla | Review of email exchanges re used or non-use of redacted version of Trial Exh. 3 for purposes of pre-trial motions [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 05/07/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel preparing for final pre-trial conference meeting and upcoming MLIM hearing [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 05/10/2020 | Diaz, Demetric | Diaz v. Tesla | Extensive preparation for Pre-trial hearing. Extensive review of MLIM re (1) relevance of performance issues introduced by Tesla; (2) lay opinion testimony re offensiveness of N-word; (3) exclusion of testimony from "me too" witnesses; (4) use of book "N——-" in closing [8.0] | $1,200.00 hr | 8.00 | 8.00 | $9,600.00 |
| 05/11/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation [1.0]; and attendance at Pre-trial conference, argument of Motions in Limine [1.4] post hearing discussion with co-counsel [.4] | $1,200.00 hr | 2.80 | 2.80 | $3,360.00 |
| 05/14/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re inquiry from Magistrate Illman [.2]; review of Minute Entry re settlement discussion [.2] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 05/15/2020 | Diaz, Demetric | Diaz v. Tesla | Receipt of order confirming new trial date and pretrial conference date, calendar [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 05/18/2020 | Diaz, Demetric | Diaz v. Tesla | Receipt of email requesting fees and costs to date, to forward to Magistrate Ilman [.1]; request updated information from office manager (Gustin) for forwarding; forwarding of same [.2] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 05/22/2020 | Diaz, Demetric | Diaz v. Tesla | Review of Order re MLIMs [.5]; updated trial date [.1]; lengthy phone call with co-counsel re strategy for trial preparation based on order [.7] | $1,200.00 hr | 1.30 | 1.30 | $1,560.00 |
| 06/05/2020 | Diaz, Demetric | Diaz v. Tesla | Review of email re #BLM overlay to jury selection [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 06/12/2020 | Diaz, Demetric | Diaz v. Tesla | Page:Line summary of Monica de Leon [9.0] | $1,200.00 hr | 9.00 | 9.00 | $10,800.00 |

| 06/17/2020 | Diaz, Demetric | Diaz v. Tesla | Co-counsel Strategy meeting re trial themes, focus group, witness order and time estimates [1.6]; preparation of detailed notes re trial presentation [.5] | $1,200.00 hr | 2.10 | 2.10 | $2,520.00 |
|---|---|---|---|---|---|---|---|
| 06/20/2020 | Diaz, Demetric | Diaz v. Tesla | Page:line summary of deposition: Wheeler [4.3] | $1,200.00 hr | 4.30 | 4.30 | $5,160.00 |
| 06/25/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call to Mika Hilaire re focus group [.2]; email to trial team re agreement to play defense attorney role [.2]; email exchange scheduling focus group [.2] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 06/26/2020 | Diaz, Demetric | Diaz v. Tesla | Review email re focus group, consider options [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 06/28/2020 | Diaz, Demetric | Diaz v. Tesla | Review emails re focus group planning and option to elect remote vs in person focus group and evaluate options [.5]; preparation of response re reservations about remote presentations [.3] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 06/29/2020 | Diaz, Demetric | Diaz v. Tesla | Further email exchanges with Plotkin re focus group preparation [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 07/16/2020 | Diaz, Demetric | Diaz v. Tesla | Email from expert re value of Tesla re punitive damages [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 07/16/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchange re Tesla quadrupling of net worth - punitive damages [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 07/21/2020 | Diaz, Demetric | Diaz v. Tesla | Review and response to emails re focus group [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 07/24/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchange re focus group [.2]; email to Mika Hilaire re same [.1] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 07/29/2020 | Diaz, Demetric | Diaz v. Tesla | Conference call re focus group preparation, notes re defense positions [.7] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 07/31/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchanges with co-counsel, jury consultant re focus group [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 08/01/2020 | Diaz, Demetric | Diaz v. Tesla | Receipt and review of focus group power point [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |

| Date | Name | Case | Description | Rate | Hours | Hours | Amount |
|---|---|---|---|---|---|---|---|
| 08/01/2020 | Diaz, Demetric | Diaz v. Tesla | Extensive review and re-organization of Wayne Jackson deposition re trial preparation [5.0]; strategize re focus group [1.0]; email to Mika Hilaire re N-word issue [.5] | $1,200.00 hr | 6.50 | 6.50 | $7,800.00 |
| 08/03/2020 | Diaz, Demetric | Diaz v. Tesla | Review of multiple emails re focus group [.3]; locate missing deposition summary (Wheeler) [.4] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 08/10/2020 | Diaz, Demetric | Diaz v. Tesla | Begin extensive preparation for focus group, begin outline and organization of facts for use [4.5]; email to co-counsel scheduling conference call [.1] | $1,200.00 hr | 4.60 | 4.60 | $5,520.00 |
| 08/11/2020 | Diaz, Demetric | Diaz v. Tesla | Continue extensive preparation for focus group: continue outline and organization of facts for use [2.5]; substantial review of draft power points and reorganize for use at focus group [2.0]; email exchanges with co-counsel re specialized changes needed to power point [.4]; Conference call with co-counsel strategizing, preparation for focus group [1.2]; receipt of corrected Power Point [.2] and Diaz excerpts for use at trial, edit same for video clips and forward to office manager for creation [.4] | $1,200.00 hr | 6.70 | 6.70 | $8,040.00 |
| 08/12/2020 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: extensive revision of examination testimony of Wheeler [3.5]; preparation of Wheeler excerpts to be used for focus group [.5], email exchanges with office manager and co-counsel re preparation of video excerpts [.4] | $1,200.00 hr | 4.40 | 4.40 | $5,280.00 |
| 08/13/2020 | Diaz, Demetric | Diaz v. Tesla | Focus group preparation: email exchange with office manager re video clip length, adjustments [.1]; extensive review and reorganization of video clips for use at focus group [2.0]; email office manager re same [.1]; email exchange with jury consultant [.1]; review and revision of compilation of testimony, email office manager re corrections [.5]; email team re video clips to be used [.2] | $1,200.00 hr | 3.00 | 3.00 | $3,600.00 |

| 08/14/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation for Focus Group: Extensive revision of focus group outline, preparation of argument; email exchanges with co-counsel re revision to power point, materials to be use, adoption of nextSource slide(s), coordination of arguments for presentation [10.0] | $1,200.00 hr | 10.00 | 10.00 | $12,000.00 |
| 08/15/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation [2.0]; and attendance at Focus Group [4.0]; post strategy session re results [.9] | $1,200.00 hr | 6.90 | 6.90 | $8,280.00 |
| 08/17/2020 | Diaz, Demetric | Diaz v. Tesla | Lengthy strategy call with co-counsel (Organ) re pre-trial preparation [1.7] | $1,200.00 hr | 1.70 | 1.70 | $2,040.00 |
| 08/19/2020 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: Extensive revision of examination of Wayne Jackson [2.0]; review file re trial strategy for witnesses, reorganize file accordingly [1.0]; Strategy session with co-counsel re trial themes, opening, anticipating defenses [1.6]; receipt of email scheduling client trial preparation, calendar [.1] | $1,200.00 hr | 4.70 | 4.70 | $5,640.00 |
| 08/21/2020 | Diaz, Demetric | Diaz v. Tesla | Review emails re revision to jury instructions to address Covid, fires re hardship questions [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 08/23/2020 | Diaz, Demetric | Diaz v. Tesla | Begin review and revision of examination testimony (deposition) re Owen Diaz [1.5] | $1,200.00 hr | 1.50 | 1.50 | $1,800.00 |
| 08/24/2020 | Diaz, Demetric | Diaz v. Tesla | Receipt of order vacating pre-trial confernece [.2]; phone call with client, co-counsel ████████ █████████ [.5] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 09/01/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation and attendance at trial setting conference [.6]; conference call with co-counsel re ongoing trial preparation [.1]; review of emails to expert, client re ██████████ [.1] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 09/03/2020 | Diaz, Demetric | Diaz v. Tesla | Review file re trial preparation [.2]; Receipt of email from defendant seeking MSC dates, review calendar and respond to co-counsel [.2] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 09/09/2020 | Diaz, Demetric | Diaz v. Tesla | Receipt of email re MSC scheduled, calendar [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 09/16/2020 | Diaz, Demetric | Diaz v. Tesla | Review of New Orders from Northern District re Coronavirus [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 10/23/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation for call [.4]. Zoom conference call: trial strategizing, update [.9] | $1,200.00 hr | 1.30 | 1.30 | $1,560.00 |
| 11/02/2020 | Diaz, Demetric | Diaz v. Tesla | Strategy meeting re trial, upcoming settlement conference [1.0] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 11/04/2020 | Diaz, Demetric | Diaz v. Tesla | Email exchange with jury consultant re trials proceeding in northern district [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 11/10/2020 | Diaz, Demetric | Diaz v. Tesla | Review notes of trial preparation calls [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 11/13/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation for and attendance at MSC [1.0]; post MSC conference with client ███████████ █████████ [.2]; strategy call with co-counsel, forward draft opening for review by co-counsel [.5] | $1,200.00 hr | 1.70 | 1.70 | $2,040.00 |
| 11/16/2020 | Diaz, Demetric | Diaz v. Tesla | Receipt and review of minute order confirming Mediator's proposal [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 11/16/2020 | Diaz, Demetric | Diaz v. Tesla | Review of email revision of Opening Statement [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 11/20/2020 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: Page:Line summary of Victor Quintero [3.5] | $1,200.00 hr | 3.50 | 3.50 | $4,200.00 |
| 11/20/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel (Organ) re client ████████ ████████ [.2]; receipt of email confirming same [.1] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 11/23/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re rejection of settlement proposal by defendant, strategy going forward [.2]; receipt of email from court re further settlement conference set for FSC date [.1] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 12/03/2020 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: extensive review and revision of themes and closing (opening) argument notes [3.0] | $1,200.00 hr | 3.00 | 3.00 | $3,600.00 |

| Date | Name | Case | Description | Rate | Hours | | Amount |
|---|---|---|---|---|---|---|---|
| 12/04/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation of updated trial examination of Wheeler [1.5]; begin review of examination of DeLeon [1.5] | $1,200.00 hr | 3.00 | 3.00 | $3,600.00 |
| 12/07/2020 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re continuance of trial, review calendar re availability [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 12/15/2020 | Diaz, Demetric | Diaz v. Tesla | Preparation and attendance at CMC [.8] and Settlement Conference [.5]; post conference call with co-counsel re status [.1]; calendar trial dates [.1] | $1,200.00 hr | 1.50 | 1.50 | $1,800.00 |
| 01/20/2021 | Diaz, Demetric | Diaz v. Tesla | Review of defense CMC statement [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 02/11/2021 | Diaz, Demetric | Diaz v. Tesla | Email exchange with co-counsel re ongoing Covid-19 issues adversely affect jury pool and current trial date [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 02/12/2021 | Diaz, Demetric | Diaz v. Tesla | Email exchanges confirming conference call, calendar [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 02/16/2021 | Diaz, Demetric | Diaz v. Tesla | Review calendar, conference call with defense counsel re moving trial date, mutually agreeable dates, agreement to stipulation [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 03/02/2021 | Diaz, Demetric | Diaz v. Tesla | Email to co-counsel re unavailability for for hearing {1}; receipt of order continuing trial and pre-trial dates, calendar [.2] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 04/23/2021 | Diaz, Demetric | Diaz v. Tesla | Email exchange scheduling strategy meeting [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 05/24/2021 | Diaz, Demetric | Diaz v. Tesla | Email with co-counsel re rescheduling meeting [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 06/09/2021 | Diaz, Demetric | Diaz v. Tesla | Review calendar, forward email re status availability [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 06/15/2021 | Diaz, Demetric | Diaz v. Tesla | Preparation [.2] and appearance at settlement check-in call [.2]; post-hearing conference call with co-counsel [.2] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 06/18/2021 | Diaz, Demetric | Diaz v. Tesla | Email exchange confirming strategy session date, time [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |

| 06/22/2021 | Diaz, Demetric | Diaz v. Tesla | Conference call: strategy session re trial preparation [.8] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 07/16/2021 | Diaz, Demetric | Diaz v. Tesla | Conference call with co-counsel: strategy session re trial preparation [1.1] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 07/19/2021 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel, jury consultant (Harry Plotkin) re additional focus group [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 07/27/2021 | Diaz, Demetric | Diaz v. Tesla | call with LO, CN, BA, and Harry Plotkin re focus group [.3]. | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 08/04/2021 | Diaz, Demetric | Diaz v. Tesla | Review and revise Marconi summary [1.5]; review strategy notes re focus group, forward notes to jury consultant [1.0]; email exchanges re focus group [.3] | $1,200.00 hr | 2.80 | 2.80 | $3,360.00 |
| 08/10/2021 | Diaz, Demetric | Diaz v. Tesla | Preparation and attendance at case management conference [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 08/11/2021 | Diaz, Demetric | Diaz v. Tesla | Email exchange with jury consultant, co-counsel (Larry) re trial date, scheduling [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 08/18/2021 | Diaz, Demetric | Diaz v. Tesla | Zoom conference with jury consultant [.6]; strategy session with co-counsel re trial strategy [1.0] | $1,200.00 hr | 1.60 | 1.60 | $1,920.00 |
| 09/05/2021 | Diaz, Demetric | Diaz v. Tesla | Preparation and Attendance at jury focus group (JBA's panel) [3.0] | $1,200.00 hr | 3.00 | 3.00 | $3,600.00 |
| 09/07/2021 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: Review file materials, continue extensive preparation of examination of Ramon Martinez [5.0]; review of emails to defense re pre-trial matters, i.e., exhibits [.2]; attendance at pre-trial hearing, calendar new pre-trial hearing date [.2]; post-hearing strategy session with co-counsel [.4] | $1,200.00 hr | 5.80 | 5.80 | $6,960.00 |
| 09/08/2021 | Diaz, Demetric | Diaz v. Tesla | Begin preparation of opening: review of expected testimony from witnesses re subject-matter [6.0] | $1,200.00 hr | 6.00 | 6.00 | $7,200.00 |

| 09/09/2021 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: witness preparation with Owen [4.9]; initial receipt and review of order from court re trial, calendar dates [.3]; phone call with co-counsel re strategy for addressing upcoming deadlines [.3] | $1,200.00 hr | 5.50 | 5.50 | $6,600.00 |
| 09/10/2021 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: continue preparation of Opening Statement [6.7]; Strategy call with co-counsel [1.3]; begin extensive review of jury consultant and focus group notes re incorporation into Opening [.6]; preparation of email to expert (Dr. Reading) re trial testimony [.2] | $1,200.00 hr | 8.80 | 8.80 | $10,560.00 |
| 09/11/2021 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: preparation of examination of Wayne Jackson [7.5]; email exchanges with co-counsel re witness order (Kawasaki vs Romero) [.4] | $1,200.00 hr | 7.90 | 7.90 | $9,480.00 |
| 09/12/2021 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: begin preparation of examination of Quintero [5.0] | $1,200.00 hr | 5.00 | 5.00 | $6,000.00 |
| 09/13/2021 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: email exchanges with co-counsel, staff (Gus) re video to correspond to trial examination [.4]; attendance at trial preparation of Plaintiff Owen [4.7]; review and revise Ramon Martinez Examination [2.0] | $1,200.00 hr | 7.10 | 7.10 | $8,520.00 |
| 09/14/2021 | Diaz, Demetric | Diaz v. Tesla | Join conference call with witness prep: Lamar Paterson [.8], phone call and text messages re trial strategy, options re calling Lamar [.3] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 09/15/2021 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: extensive review and revision of Wayne Jackson trial examination [2.0]; continue extensive review and revision of Quintero trial examination [4.0]; email exchange re jury selection, potential "Batson" motion [.3]; Strategy meeting with co-counsel [1.0]; email exchange re witness preparation for Wheeler [.2]; begin extensive revision of Wheeler trial testimony [1.5] | $1,200.00 hr | 9.00 | 9.00 | $10,800.00 |

| 09/16/2021 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: continue review and revision of Wheeler trial examination [2.0]; strategy phone call with co-counsel re witnesses to be called, order [1.0] | $1,200.00 hr | 3.00 | 3.00 | $3,600.00 |
|---|---|---|---|---|---|---|---|
| 09/17/2021 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: with client (Diaz) [2.5]; page:line summary of Titus McCaleb [7.0] | $1,200.00 hr | 9.50 | 9.50 | $11,400.00 |
| 09/18/2021 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: witness preparation for witness (Wheeler, Michael) [1.4]; Phone call with Organ Re opening statement, supplemental pre-trial conference statement [.2]; review and revision of Opening Statement [5.0]; review of detailed timeline re facts, witness examination [1.0]; | $1,200.00 hr | 7.60 | 7.60 | $9,120.00 |
| 09/19/2021 | Diaz, Demetric | Diaz v. Tesla | Review of time-line re Opening Power point [.5]; preparation of opening power point and timeline to correspond with Opening Statement [2.0]; Phone call with Organ re McGinn testimony, contract fact [.3]; strategy session re same with co-counsel [1.5]; prepare for Opening [6.0] | $1,200.00 hr | 10.30 | 10.30 | $12,360.00 |
| 09/20/2021 | Diaz, Demetric | Diaz v. Tesla | Continue trial preparation: continue Opening preparation [4.0]; review and revise power point to correspond to Opening revisions [2.0]; organize and pack trial materials for use at trial [1.5] | $1,200.00 hr | 7.50 | 7.50 | $9,000.00 |
| 09/20/2021 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: Opening [5.0], review and revise companion power point, version 2 [1.0], email team re further changes needed [.4] | $1,200.00 hr | 6.40 | 6.40 | $7,680.00 |
| 09/21/2021 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: continue refinement of Opening Statement [2.0]; review court order (email) advancing start trial for pre-trial conference [.1]; preparation and attendance at final trial status conference hearing [1.0]; post hearing strategy session re rulings [.9] | $1,200.00 hr | 4.00 | 4.00 | $4,800.00 |

| 09/22/2021 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: Review of jury instructions, re-organize; receipt and review of court order re written ruling post-final pre-trial conference; review and revise Opening, give mock opening, review session for critiques and begin review and revision of same [10.0] | $1,200.00 hr | 10.00 | 10.00 | $12,000.00 |
| 09/23/2021 | Diaz, Demetric | Diaz v. Tesla | Prepare for Opening, revise, refine [3.0]; Meeting with Organ, Jury consultant, NA, CN re jury selection/instructions [.6]; preparation and attendance at court to test technology; discussion with defense counsel re proposed stipulation re prospective jurors, coordinating trial witnesses [2.0]; review and revise Opening, organize subject-matter, exhibits for use with witnesses; extensive review of defense opening demonstrative, and revise opening and witness examination accordingly [6.0] | $1,200.00 hr | 11.60 | 11.60 | $13,920.00 |
| 09/24/2021 | Diaz, Demetric | Diaz v. Tesla | Pre-trial meeting with jury consultant, preparation for voir dire, travel to court [1.5]; Appearance at court, pre-trial conferences with court, jury selection [5.0]; post-trial preparation for trial [7.0] | $1,200.00 hr | 13.50 | 13.50 | $16,200.00 |
| 09/25/2021 | Diaz, Demetric | Diaz v. Tesla | Preparation for trial: revision and preparation for opening; run through of opening with focus group and review and revise [4.0]; review and revise Wheeler examination, coordinate allocation of witness time, strategize re witness order to subject-matter, help prepare Plaintiff [8.0] | $1,200.00 hr | 12.00 | 12.00 | $14,400.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 09/26/2021 | Diaz, Demetric | Diaz v. Tesla | Extensive review of Delgado deposition transcript, extensive review of exhibits 97, 34, 35, 36 re examination of adverse witness, preparation of detailed examination outline [9.0]; final practice and revision of Opening [3.0]; discussion with co-counsel (Larry) re key discrepancies in Martinez statement and Delgado workplace investigation; non-response from key witness (Wheeler) [.7] | $1,200.00 hr | 12.70 | 12.70 | $15,240.00 |
| 09/27/2021 | Diaz, Demetric | Diaz v. Tesla | Pre-trial: preparation for opening [2.0]; Trial: Opening statement and initial witnesses [5.5]; post-trial preparation for 2nd day: preparation of Delgado examination, fine tune examination of Jackson, Quintero [9.0] | $1,200.00 hr | 16.50 | 16.50 | $19,800.00 |
| 09/28/2021 | Diaz, Demetric | Diaz v. Tesla | Preparation for examination of defense witnesses [1.5]; Trial: complete examination of Romero, conduct examination of Jackson, Delgado, Quintero [5.5]; post-trial: begin closing preparation and round table re same; email Reading re limited time [.3]; review and revise outline re same [3.5] | $1,200.00 hr | 10.50 | 10.50 | $12,600.00 |
| 09/29/2021 | Diaz, Demetric | Diaz v. Tesla | Trial: examination of Demitric by video, McGuinn by video, Plaintiff: Owen Diaz [6.0]; Post trial preparation: review draft jury instructions, strategize re calling Patterson, | $1,200.00 hr | 12.00 | 12.00 | $14,400.00 |
| 09/30/2021 | Diaz, Demetric | Diaz v. Tesla | Trial: continue defense cross examination of Owen Diaz; Witness: La Drew Jones, Marconi video, Oppenheimer video, Chip Mahla [6.0]; post-trial: preparation for Ramon Martinez examination, correlate to Exhibit 287; review of draft jury instructions, strategize re witnesses, rebuttal, remaining time [6.0] | $1,200.00 hr | 12.00 | 12.00 | $14,400.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/01/2021 | Diaz, Demetric | Diaz v. Tesla | Pre-trial: preparation of draft closing [1.5]; further preparation of examination of Ramon Martinez [1.5 Review]; Trial: Witnesses: Joyce Delagrande, cross-examination of Delagrande, video of McGinn [3.5]; Post trial jury instruction conference [.8]; begin preparation of companion Closing Power Point, strategize re same [3.0]; begin review and revision of closing, strategize re same [2.0] | $1,200.00 hr | 12.30 | 12.30 | $14,760.00 |
| 10/02/2021 | Diaz, Demetric | Diaz v. Tesla | Continue preparation for closing argument: review of evidence, continue detailed review and preparation of power point | $1,200.00 hr | 10.00 | 10.00 | $12,000.00 |
| 10/03/2021 | Diaz, Demetric | Diaz v. Tesla | Continue preparation for closing argument: review of evidence; preparation of "inspiration" section; Punitive damages; Damages section revision; correlate argument to power point. [10.0] | $1,200.00 hr | 10.00 | 10.00 | $12,000.00 |
| 10/04/2021 | Diaz, Demetric | Diaz v. Tesla | Pre-trial: prepare for closing [3.0]; Trial: give Closing and Rebuttal, discussion of juror (pastor) re Tesla stock ownership through mutual fund, dismissal of juror; post-trial wait for jury [9.0] | $1,200.00 hr | 12.00 | 12.00 | $14,400.00 |
| 10/06/2021 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel strategizing re post-trial motions [.3]; search for and forward most recent and appropriate motion for attorney fees (federal court) [.1]; receipt and review of draft Judgment, review and revise [.4]; Phone call with Organ re post-trial briefing [.3]. | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 10/07/2021 | Diaz, Demetric | Diaz v. Tesla | Meeting with team re post trial motions, actions to be taken [.5]; direct bill to co-counsel [.1]; email Reading re updated billing [.2]; Phone call with Organ re appellate issues [.2]. | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 10/08/2021 | Diaz, Demetric | Diaz v. Tesla | Phone call with Organ re appellate issues [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 10/09/2021 | Diaz, Demetric | Diaz v. Tesla | Phone calls re coordination of appellate counsel, retainer [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |

| 10/11/2021 | Diaz, Demetric | Diaz v. Tesla | Receipt and review of appellate counsel retainer, sign and return [.2]; phone call with defense counsel (Kennedy) re judgment, substitution of Gibson Dunn [.3]; phone call with co-counsel re same, and retention of appellate counsel [.2] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 10/12/2021 | Diaz, Demetric | Diaz v. Tesla | Strategy call with co-counsel re post-trial motions, retention of appellate counsel [.2]; collect Fee orders and draft fee declaration and forward to co-counsel [.4]; email to defense counsel re identity of new counsel substituting in, forward same to co-counsel [.2] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 10/14/2021 | Diaz, Demetric | Diaz v. Tesla | Email exchange re fee motion and rates, input from Rubin [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 10/22/2021 | Diaz, Demetric | Diaz v. Tesla | Initial review of judgment, email re inaccurate vesting date for interest on attorney fees [.2]; review of email attaching draft MF Attorney fees [.2], review of email from appellate counsel re same [.2] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 10/24/2021 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of draft attorney fee motion [1.5] | $1,200.00 hr | 1.50 | 1.50 | $1,800.00 |
| 10/25/2021 | Diaz, Demetric | Diaz v. Tesla | Preparation of detailed fee declaration, addition of post trial quote from HR person (Workman), explain support for work performed during trial [2.5] | $1,200.00 hr | 2.50 | 2.50 | $3,000.00 |
| 10/27/2021 | Diaz, Demetric | Diaz v. Tesla | Review and respond to email re post-trial motions [.3]; email exchange re collection and forwarding of costs [.1] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 10/28/2021 | Diaz, Demetric | Diaz v. Tesla | Review email exchange with new defense counsel re stipulation to briefing schedule and terms [.2]; review calendar, email exchange with co-counsel re post-trial hearing date [.2] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 11/01/2021 | Diaz, Demetric | Diaz v. Tesla | Receipt of email from colleague (Palefsky) re case against Tesla, disclosures [.2]; forward to co-counsel re same with email exchange [.1] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/02/2021 | Diaz, Demetric | Diaz v. Tesla | Review of costs bill [.3], inquiry re absence of reference to experts (Reading, Oppenheimer, Mahla) [.2]; email exchange with officer manager (Gus), co-counsel re same [.2] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 11/12/2021 | Diaz, Demetric | Diaz v. Tesla | Review email re Epic Systems appeal to Supreme Court re ratio for punitive damages [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 11/17/2021 | Diaz, Demetric | Diaz v. Tesla | Email exchange scheduling strategy session re opposition to defense post-trial motions [.2]; draft email to colleagues, NELA, CELA listservs, seeking briefing re ED and punitive damages [.6]; review of defense renewed MF Judgment on the Pleadings, annotate with arguments, factual omissions, misstatements to be addressed [2.0] | $1,200.00 hr | 2.80 | 2.80 | $3,360.00 |
| 11/18/2021 | Diaz, Demetric | Diaz v. Tesla | Review of California legal authority re damages, punitives multiplier [.3]; review multiple emails, sources re obtaining federal authority on emotional distress damages, punitive damage ratio [.4]; phone call with co-counsel (Organ) re opposition strategy, management of opposition preparation [.3]; preparation of email to team addressing (1) factual misstatements by defense in motion; (2) mischaracterization of ED as "garden variety" and factual support to the contrary [.6]; conference call and strategy session re opposition to brief, meeting with Tracy and Natalie re coordination of efforts [1.5] | $1,200.00 hr | 3.10 | 3.10 | $3,720.00 |
| 11/23/2021 | Diaz, Demetric | Diaz v. Tesla | Review term sheet re client loan [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 11/24/2021 | Diaz, Demetric | Diaz v. Tesla | Conference call strategizing re opposition brief [1.0] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 11/27/2021 | Diaz, Demetric | Diaz v. Tesla | Begin review and revision of opposition brief [2.0], conference call with co-counsel re brief [1.0] | $1,200.00 hr | 3.00 | 3.00 | $3,600.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/28/2021 | Diaz, Demetric | Diaz v. Tesla | Complete extensive revision of draft opposition [3.2]; review email exchange from co-counsel (Rubin) re "N" reference [.1] | $1,200.00 hr | 3.10 | 3.10 | $3,720.00 |
| 11/30/2021 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of Introduction [2.5] | $1,200.00 hr | 2.50 | 2.50 | $3,000.00 |
| 12/02/2021 | Diaz, Demetric | Diaz v. Tesla | Review of email attaching new 9th circuit case [.3]; review of summary of cases re company size, valuations [.4] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 12/03/2021 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re opposition status, plan for review after Rubin edits [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 12/04/2021 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel coordinating opposition [.4], Begin extensive review and revision of opposition to defense post trial motion [4.0] | $1,200.00 hr | 4.40 | 4.40 | $5,280.00 |
| 12/05/2021 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re emphasizing impairment of life [.4], Continue Extensive review and revision of opposition [5.0], upload and forward to co-counsel [.2] | $1,200.00 hr | 5.60 | 5.60 | $6,720.00 |
| 12/07/2021 | Diaz, Demetric | Diaz v. Tesla | Extensive final revision of draft from Altshuler (Rubin) [3.5]; email response re amendment of judicial notice [.3]; email to co-counsel (Larry) re approach for post-trial filing, hearing [.2] | $1,200.00 hr | 4.00 | 4.00 | $4,800.00 |
| 01/05/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchanges re remote versus in person post-trial hearing [.2]; scheduling pre-hearing preparation [.2] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 01/12/2022 | Diaz, Demetric | Diaz v. Tesla | Preparation for post-trial hearing on MF New Trial, Remittitur [6.0] | $1,200.00 hr | 6.00 | 6.00 | $7,200.00 |
| 01/13/2022 | Diaz, Demetric | Diaz v. Tesla | Continue preparation for post-trial hearing: review of oppositions [2.0] | $1,200.00 hr | 2.00 | 2.00 | $2,400.00 |
| 01/14/2022 | Diaz, Demetric | Diaz v. Tesla | Continue preparation for post-trial hearing: review of oppositions [3.5]; attendance at preparation conference call [1.5] | $1,200.00 hr | 5.00 | 5.00 | $6,000.00 |
| 01/18/2022 | Diaz, Demetric | Diaz v. Tesla | Detailed review of cases addressing punitive damage award review by trial court, court of appeal [7.0] | $1,200.00 hr | 7.00 | 7.00 | $8,400.00 |

| Date | | | Description | Rate | Hours | | Amount |
|---|---|---|---|---|---|---|---|
| 01/19/2022 | Diaz, Demetric | Diaz v. Tesla | Detailed preparation for post-trial hearing on MF New Trial Remittitur [6.0]; attendance at hearing [2.0]; post hearing discussion with co-counsel [.3] | $1,200.00 hr | 8.30 | 8.30 | $9,960.00 |
| 01/20/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchange re need for transcript of post-trial hearing [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 01/25/2022 | Diaz, Demetric | Diaz v. Tesla | Review of email exchange with co-counsel and proposed letter brief to address defense overstatement of court obligation to consider comparable jury verdicts [.4]; responsive email [.2] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 02/11/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchanges re DFEH complaint against Tesla, LA Times and CNN coverage, as it relates to Court determination of remittitur and upcoming MF Attorney fees [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 03/04/2022 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel (Larry) re DofJ inquiry [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 04/13/2022 | Diaz, Demetric | Diaz v. Tesla | Initial receipt and review of remittitur order from court [.5]; lengthy phone call with co-counsel re same [.5]; phone call with press [.2] | $1,200.00 hr | 1.20 | 1.20 | $1,440.00 |
| 04/14/2022 | Diaz, Demetric | Diaz v. Tesla | Phone calls with co-counsel re court ruling [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 04/19/2022 | Diaz, Demetric | Diaz v. Tesla | Review of email strategy to address court reduction of judgment [.4]; lengthy zoom call with appellate team re strategy re remittitur and New Trial [.8]; Post-appellate call with co-counsel (Organ) re same and new trial strategy re emotional distress damages [.4] | $1,200.00 hr | 1.60 | 1.60 | $1,920.00 |
| 04/20/2022 | Diaz, Demetric | Diaz v. Tesla | Conference call with client ████████████████ [.3]; further call with co-counsel re same [.2] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 04/26/2022 | Diaz, Demetric | Diaz v. Tesla | Review order granting stipulation re filing of post trial fee motions [.1]; review of email from appellate team (Michael) re certification option [.3] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |

| 04/28/2022 | Diaz, Demetric | Diaz v. Tesla | Conference with co-counsel (Larry) re status of motion for certification, timing [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 05/03/2022 | Diaz, Demetric | Diaz v. Tesla | Review email re meet and confer with defense counsel [.2]; Review and revision of 1292(b) certification motion draft [1.9]; email revision [.1] | $1,200.00 hr | 2.20 | 2.20 | $2,640.00 |
| 05/11/2022 | Diaz, Demetric | Diaz v. Tesla | Receipt and review of order delaying date for Plaintiff's election or rejection of new trial [.1]; conference call with Larry and client [.2] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 05/19/2022 | Diaz, Demetric | Diaz v. Tesla | Review post by Magistrate re settlement negotiation [.1]; receipt of email re preparation of reply; email exchanges re transcript of post-trial hearing [.3] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 05/20/2022 | Diaz, Demetric | Diaz v. Tesla | Receipt of email re failed settlement discussions with Magistrate Illman, receipt of docket notice re communication [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 05/24/2022 | Diaz, Demetric | Diaz v. Tesla | Review and revise Reply brief [2.0]; email to co-counsel attaching and discussing same [.2] | $1,200.00 hr | 2.20 | 2.20 | $2,640.00 |
| 06/03/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchange re response to Court Remittitur order [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 06/07/2022 | Diaz, Demetric | Diaz v. Tesla | Review of email summarizing the Court's denial of certification [.2]; review of Court order [.4]; respond to email (Michael) re same and election to retry [.2] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 06/09/2022 | Diaz, Demetric | Diaz v. Tesla | Lengthy phone call with client (Diaz) ███████████ ███████████ [.3]; email exchange rescheduling call re response to Court order [.1] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 06/13/2022 | Diaz, Demetric | Diaz v. Tesla | Attendance at conference call re rejection of remittitur [.8] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 06/17/2022 | Diaz, Demetric | Diaz v. Tesla | Zoom meeting with client and litigation team ███████ ███████ .6] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 06/20/2022 | Diaz, Demetric | Diaz v. Tesla | Review Email exchange re rejection of remittitur, notice and filing date [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |

| 06/21/2022 | Diaz, Demetric | Diaz v. Tesla | Review of email filing: rejecting remittitur [.1] review of confirmation email to client [.1] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 06/22/2022 | Diaz, Demetric | Diaz v. Tesla | Preparation of press response to rejection of remittitur [.4] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 06/23/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchange with co-counsel (Larry) re tying Musk to Tesla inaction [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 06/27/2022 | Diaz, Demetric | Diaz v. Tesla | Review of order re trial setting conference for new trial [.1]; review of email re press inquiry, response [.2]; phone call with co-counsel re Tesla claim of attempting resolution [.2] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 07/06/2022 | Diaz, Demetric | Diaz v. Tesla | Receipt of communication from co-counsel re initiating M&C with defense counsel [.1]; email exchange with associate (Cimone) re same; review of emails re same [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 07/08/2022 | Diaz, Demetric | Diaz v. Tesla | Review calendar and trial availability in preparation for meeting [.3]; meeting with defense counsel re timing of retrial, scope of evidence [.5]; post meeting conference with co-counsel (Larry) re same [.2]; detailed email to Michael re research on limits of evidentiary proof in damages retrial [.4] | $1,200.00 hr | 1.40 | 1.40 | $1,680.00 |
| 07/12/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchange with defense counsel (QE) re proposed M&C re 'redeterination of both liability and damages' [.2]; review of research re viability of argument [.4]; preparation [.3] and attendance at scheduling conference hearing [.5]; post hearing conference with team [.2] | $1,200.00 hr | 1.60 | 1.60 | $1,920.00 |
| 07/22/2022 | Diaz, Demetric | Diaz v. Tesla | Text exchanges re need for Friday meeting; next course of action in preparing to oppose Telsa attempt to relitigate liability issues, not just damages [3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 07/25/2022 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel Organ [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |

| Date | | | Description | Rate | | | Amount |
|---|---|---|---|---|---|---|---|
| 08/23/2022 | Diaz, Demetric | Diaz v. Tesla | Email from Jonathan re need for transcript of last hearing [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 09/02/2022 | Diaz, Demetric | Diaz v. Tesla | Review of emails re pre-CMC meet and confer; coordinating same [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 09/17/2022 | Diaz, Demetric | Diaz v. Tesla | Review emails coordinating pre-CMC meeting with defense counsel [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 10/18/2022 | Diaz, Demetric | Diaz v. Tesla | Review of article re Tesla motion for new trial [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 11/01/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchanges re receipt of draft Opp to Tesla Gasoline Products retrial motion [.2]; Begin extensive review and revision of same [1.5] | $1,200.00 hr | 1.70 | 1.70 | $2,040.00 |
| 11/02/2022 | Diaz, Demetric | Diaz v. Tesla | Continue extensive review and revision of Opp to Tesla Gasoline Products retrial motion [2.3]; email to trial team re same [.1] | $1,200.00 hr | 2.40 | 2.40 | $2,880.00 |
| 11/07/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchanges re press inquiry [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 11/14/2022 | Diaz, Demetric | Diaz v. Tesla | Review of response to email inquiry from Federal Judge Dennis Hayashi [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 12/01/2022 | Diaz, Demetric | Diaz v. Tesla | Review of order rescheduling hearing time, calendar [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 12/07/2022 | Diaz, Demetric | Diaz v. Tesla | Preparation for and attendance at hearing on scope of re-trial [.8]; post hearing meeting re next steps [.4]; post hearing discussion with co-counsel (Larry) [.4]; Follow-up call re added Dustin Collier to assist with retrial [.2] | $1,200.00 hr | 1.80 | 1.80 | $2,160.00 |
| 12/12/2022 | Diaz, Demetric | Diaz v. Tesla | Lengthy Zoom Strategy Call re re-trial: preparation [.5]; attendance at [3.0]; Refine notes for pre-trial preparatin [.4] | $1,200.00 hr | 3.90 | 3.90 | $4,680.00 |
| 12/19/2022 | Diaz, Demetric | Diaz v. Tesla | Email exchange re costs and fees to be provided to Magistrate Illman [.3]; email exchange re strategizing for focus group [.1] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |

| 01/03/2023 | Diaz, Demetric | Diaz v. Tesla | Review of updated economist report re Tesla net worth [.4]; review of email exchanges re moving date for pre-conference M&C [.2]; initial review of Trial testimony annotations [.5] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 01/04/2023 | Diaz, Demetric | Diaz v. Tesla | Zoom conference call strategizing re evidence for use at re-trial [1.2] | $1,200.00 hr | 1.20 | 1.20 | $1,440.00 |
| 01/05/2023 | Diaz, Demetric | Diaz v. Tesla | Review email exchange with jury consultant re 1st Focus Group feedback [.1]; Zoom strategy session re re-trial [1.5] | $1,200.00 hr | 1.60 | 1.60 | $1,920.00 |
| 01/06/2023 | Diaz, Demetric | Diaz v. Tesla | Review of email exchanges re draft joint CMC Statement [.2]; Extensive review of Draft Joint CMC Statement; email revisions to trial team [1.2]; receipt of email re Economic expert disclosure (Mahla) [.2]; preparation [.2]; and attendance at pre-CMC meet and confer [.8]; post M&C strategy call [.8] | $1,200.00 hr | 3.40 | 3.40 | $4,080.00 |
| 01/08/2023 | Diaz, Demetric | Diaz v. Tesla | Review of Tesla proposed Joint Status Report [.4]; Review of email from co-counsel (Organ) re (1) basis for precluding designation of new HR witnesses; (2) re-contact by JBA with favorable witnesses (Wheeler; Jackson) [.3]; | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 01/09/2023 | Diaz, Demetric | Diaz v. Tesla | Pre-trial team meeting [.5]; meet and confer re upcoming CMC and document exchange [.5]; post conference team meeting [.3] | $1,200.00 hr | 1.30 | 1.30 | $1,560.00 |
| 01/10/2023 | Diaz, Demetric | Diaz v. Tesla | Multiple review and revision of Joint Statement, footnotes, email exchanges re same [.7]; review of authority re limitation of calling witnesses on retrial [.2] | $1,200.00 hr | 0.90 | 0.90 | $1,080.00 |
| 01/11/2023 | Diaz, Demetric | Diaz v. Tesla | Email exchanges with jury consultant re jury questionnaire [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 01/11/2023 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel (Organ) re upcoming Settlement Conference [.2]; new developments disclosed by ex-HR person [.2]; coordination of consultation call with jury consultant [.1] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |

| 01/12/2023 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel (Organ), in preparation for settlement conference, confirming current fees, text same [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
|---|---|---|---|---|---|---|---|
| 01/16/2023 | Diaz, Demetric | Diaz v. Tesla | Receipt and review of defense redlined jury instructions [.4]; statement of the case [.4]; review of email to defense re failure to meet and confer [.1]; and co-counsel observation we defense accusation of sandbagging [.1]; email exchanges re filings [.1] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 01/17/2023 | Diaz, Demetric | Diaz v. Tesla | Email exchange re MIL exchanges, upcoming status conference [.3]; Preparation [.3] and attendance at Status Conference [.4]; post-status conference Strategy meeting [.5] | $1,200.00 hr | 1.50 | 1.50 | $1,800.00 |
| 01/18/2023 | Diaz, Demetric | Diaz v. Tesla | Review jury consultant email re questionnaire [.2]; associative (Cimone) email re MIL call [.1]; strategy phone call with co-counsel (Larry) re damages retrial Opening & closing preparation [.4] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 01/19/2023 | Diaz, Demetric | Diaz v. Tesla | Review of email exchange with jury consultant [2]; review of draft jury questionnaire and propose changes [.4]; strategy meeting re MILs and topics for discussion at M&C with defense counsel [1.0] | $1,200.00 hr | 1.60 | 1.60 | $1,920.00 |
| 01/21/2023 | Diaz, Demetric | Diaz v. Tesla | Review and revise MIL, and accompanying explanation of update distinction re Tesla valuation [1.5]; review of White v Ford Motor Credit re defense argument to exclude incidents of harassment not experienced by Diaz [.5] | $1,200.00 hr | 2.00 | 2.00 | $2,400.00 |
| 01/23/2023 | Diaz, Demetric | Diaz v. Tesla | Review of MIL revisions by co-counsel (Organ) [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 01/30/2023 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of MLIM [2.5]; email to co-counsel explaining timing discrepancy of exhibits 287, 272, January 22 and 25 emails [.3]; review email with jury consultant re status [.1]; review and revise propose voir dire questions [.4] | $1,200.00 hr | 3.30 | 3.30 | $3,960.00 |

| 01/31/2023 | Diaz, Demetric | Diaz v. Tesla | Extensive review of jury instructions for 2nd trial, provide comments [1.0]; begin preparation of Opening, Closing statements based on proposed instructions [1.5]; phone call re "past and future" emotional distress instruction [.3]; review of multiple emails re further revisions to MLIMs [.4] | $1,200.00 hr | 3.20 | 3.20 | $3,840.00 |
|---|---|---|---|---|---|---|---|
| 02/01/2023 | Diaz, Demetric | Diaz v. Tesla | Review of defense email re omission of jury questions and voir dire from exchange [.1]; extensive review of Tesla MLIM, preparation of companion notes [1.5]; Strategy meeting re defense MLIM [1.5] | $1,200.00 hr | 3.10 | 3.10 | $3,720.00 |
| 02/02/2023 | Diaz, Demetric | Diaz v. Tesla | Preparation and attendance at M&C re MLIMs [1.5]; post M&C strategy session [.5]; preparation of initial draft of footnote to MLIM #2 to address circumvention of court order [.6] | $1,200.00 hr | 2.60 | 2.60 | $3,120.00 |
| 02/03/2023 | Diaz, Demetric | Diaz v. Tesla | Review of Rubin revised footnote [.2]; strategize, email suggesting changes [.4]; review and respond to email exchanges re insertion of F/N for MLIM 2 [.3]; receipt of defense verdict in Securities Fraud matter [.1] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 02/04/2023 | Diaz, Demetric | Diaz v. Tesla | Review of court notice re filing of matter under seal [.1]; review of email from co-counsel (Organ) to defendant re same [.1]; review email agreement to file without seal [.1]; review Hurtado impeachment testimony from Lamar Patterson [.2]; review of MT file under seal and related documents [.4]; email exchanges re contradictory actions by Tesla is failing to identify Hurtado or call at 1st trial; Review emails re Defense effort to introduce Donet and use of Exh. 109 as impeachment [.2] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |
| 02/07/2023 | Diaz, Demetric | Diaz v. Tesla | Review of defense questionnaire and comments by team [.5]; review of jury instructions, comments and related emails [.8] | $1,200.00 hr | 1.30 | 1.30 | $1,560.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 02/08/2023 | Diaz, Demetric | Diaz v. Tesla | Team Zoom conference call re defense reversal: assertion that malice must be re-proven in damages re-trial; addressing joint jury instructions [.8]; review of defendant's draft Witness [.3]; and Exhibit lists [.3] | $1,200.00 hr | 1.40 | 1.40 | $1,680.00 |
| 02/09/2023 | Diaz, Demetric | Diaz v. Tesla | Review of (1) multiple emails re meeting deadline for filing [.3]; (2) joint documents filed [.4]; phone call with co-counsel (Larry) re agreement to admit Exh. 272 and significance [.3] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 02/10/2023 | Diaz, Demetric | Diaz v. Tesla | Review of memo on nominal damages [.7]; | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 02/13/2023 | Diaz, Demetric | Diaz v. Tesla | Review email re stipulation (Mr. Diaz, no reference to convictions) [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 02/14/2023 | Diaz, Demetric | Diaz v. Tesla | Strategy call re upcoming trial [4.0] | $1,200.00 hr | 4.00 | 4.00 | $4,800.00 |
| 02/15/2023 | Diaz, Demetric | Diaz v. Tesla | M&C with Tesla counsel re stipulations, non-reference to prior jury or trial at re-trial [.7]; post M&C team call [.3] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 02/16/2023 | Diaz, Demetric | Diaz v. Tesla | Extensive review and revision of Focus Group script [1.3] | $1,200.00 hr | 1.30 | 1.30 | $1,560.00 |
| 02/17/2023 | Diaz, Demetric | Diaz v. Tesla | Strategy session re division of labor for trial; witnesses; logistics [1.2]; strategize re closing - Tesla accountability, attacks on Owen [.4] | $1,200.00 hr | 1.60 | 1.60 | $1,920.00 |
| 02/19/2023 | Diaz, Demetric | Diaz v. Tesla | Review of emails re punitive damages analogies [.3]; review of Closing in FedEx punitive damage case [.5] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 02/21/2023 | Diaz, Demetric | Diaz v. Tesla | Review of Closing Slides, suggest changes by email to Susan [.4]; review of power point openings, propose amendments of same [1.0] | $1,200.00 hr | 1.40 | 1.40 | $1,680.00 |
| 02/22/2023 | Diaz, Demetric | Diaz v. Tesla | Zoom meet and confer re pre-trial conference, disputes of trial rules [.6]; team call re trial preparation [.3] | $1,200.00 hr | 0.90 | 0.90 | $1,080.00 |

| 02/23/2023 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: review of closing power point draft, locate and propose visuals for client emotional distress (E/D) [.8] | $1,200.00 hr | 0.80 | 0.80 | $960.00 |
| 02/24/2023 | Diaz, Demetric | Diaz v. Tesla | Initial receipt of email from colleague (deRubertis) re closing used [.1] | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 02/25/2023 | Diaz, Demetric | Diaz v. Tesla | Review and revise focus group script 2.26.23 [.4] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 02/26/2023 | Diaz, Demetric | Diaz v. Tesla | Review of focus group script [.4]; review email exchange re justification for "intentional" language in jury instructions [.4]; review of brief re "prior determination" vs "jury determination" [.4] | $1,200.00 hr | 1.20 | 1.20 | $1,440.00 |
| 02/27/2023 | Diaz, Demetric | Diaz v. Tesla | Preparation: Email exchange re upcoming Final Pre-trial Conference [.3]; attendance at lengthy hearing [1.5]; follow up phone call with co-counsel (Larry) re hearing, defense exposure of defenses [.2]; review research re defense cases cited in support of nominal damages in the context of punitive damage awards [.3] | $1,200.00 hr | 2.30 | 2.30 | $2,760.00 |
| 03/01/2023 | Diaz, Demetric | Diaz v. Tesla | Review email re response to defense submission of red-lined jury instructions with argument [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 03/13/2023 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re status [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 03/15/2023 | Diaz, Demetric | Diaz v. Tesla | Review of Court Order re MLIMs [.3]; email exchange with co-counsel (Organ) re trial preparation [.1] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 03/17/2023 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: collection and sift through trial materials notebooks to retrieve materials needed for damages retrial [2.0]; team strategy meeting re defense strategy, facts for opening, review and modification of potential demonstratives [10.5] | $1,200.00 hr | 10.50 | 10.50 | $12,600.00 |

| Date | Client | Matter | Description | Rate | Hours | Billed | Amount |
|---|---|---|---|---|---|---|---|
| 03/18/2023 | Diaz, Demetric | Diaz v. Tesla | Begin extensive preparation of Opening, organize subject-matter, retrieve subject-matter from prior Opening; attend focus group re liability issues; post-focus group strategy session re incorporation of information obtained; strategy session re addressing expected defenses (attack on experts, "me-too" witnesses; Plaintiff and family members re emotional distress); strategize re proof of emotional distress [10.0] | $1,200.00 hr | 10.00 | 10.00 | $12,000.00 |
| 03/19/2023 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: Continue extensive review, revision and incorporation re Opening and Closing; begin review of trial testimony of witnesses: Kawasaki, Romero; continue discussion of trial strategy [9.0] | $1,200.00 hr | 9.00 | 9.00 | $10,800.00 |
| 03/20/2023 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: assist with client examination preparation [2.5]; review trial testimony of Jackson [2.0]; Romero [2.0]; review of draft expert examination (Reading) [.8]; phone call with expert (Reading) re trial testimony [.4]; Continue revision, refinement of Opening; recommend changes to witness order; [1.5] | $1,200.00 hr | 9.20 | 9.20 | $11,040.00 |
| 03/21/2023 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: Extensive review and revision of Opening [3.0]; review of and revision of demonstratives for use at trial [1.5]; help preparation of client for examination at trial, demonstration of picanniny left for client in workplace [2.5]; Review of demonstratives for use at trial [1.0] | $1,200.00 hr | 8.00 | 8.00 | $9,600.00 |

| 03/22/2023 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: Continue extensive review and revision of Opening, rehearse opening [6.0]; receipt and review of juror questionnaires, strategize with team and jury consultant re same; review of draft jury questions re voir dire from jury consultant [2.0]; begin review of witness (Wayne Jackson) examination outline, revise [1.0]; phone call with witness (Jackson) re same [1.0]; review and revision of demonstratives, approval of demonstratives for exchange [2.0] | $1,200.00 hr | 12.00 | 12.00 | $14,400.00 |
| 03/23/2023 | Diaz, Demetric | Diaz v. Tesla | Review emails from jury consultant re for cause challenge [.3]; revise Jackson testimony based on interview [1.5]; continue preparation for opening [3.0]; review email exchanges weigh defendant re trial exhibits [.3]; Review of closing by Spiro in "Funding secured" case; travel to Los Angeles [3.0] | $1,200.00 hr | 8.10 | 8.10 | $9,720.00 |
| 03/24/2023 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: review of jury questionnaires, preparation for final pre-trial meeting with Judge re for cause challenges; meeting with defense re for-cause challenges [4.0]; Court hearing re for cause challenges and pre-trial issues [1.5[; post hearing strategy session re trial preparation [.6]; continue review, revision, preparation for Opening [3.5[; review trial materials [1.0] | $1,200.00 hr | 10.60 | 10.60 | $12,720.00 |
| 03/25/2023 | Diaz, Demetric | Diaz v. Tesla | Trial Preparation: preparation for opening; preparation for and present at focus group; post focus group discussion to re-tool Opening. Extensive review, revision, reorganization of Opening [12.0]; review and revise updated jury voir dire from jury consultant [.8] | $1,200.00 hr | 12.80 | 12.80 | $15,360.00 |

| 03/26/2023 | Diaz, Demetric | Diaz v. Tesla | Trial preparation: review and revise Jackson examination; preparation for Opening Statement, focus group 2nd run-through, extensive review and revision and preparation; [13.5]; preparation for jury void dire [1.0] | $1,200.00 hr | 14.50 | 14.50 | $17,400.00 |
| 03/27/2023 | Diaz, Demetric | Diaz v. Tesla | Pre-trial: preparation of Opening [1.5]; Trial: jury void dire, Opening Statement, begin Examination of Kawasaki [9.0]; preparation for next day witnesses [Jackson]; 2.0] | $1,200.00 hr | 12.50 | 12.50 | $15,000.00 |
| 03/28/2023 | Diaz, Demetric | Diaz v. Tesla | Pre-Trial: preparation for examination of Wayne Jackson [1.5]; Trial: Examination of Kawasaki, Wheeler, Jackson [6.0]; Post-Trial: strategize re next day witnesses, begin review of preliminary jury instructions; begin outline of Closing argument [6.0] | $1,200.00 hr | 13.50 | 13.50 | $16,200.00 |
| 03/29/2023 | Diaz, Demetric | Diaz v. Tesla | Preparation: Preparation for Martinez examination, revise outline [1.5]; Text exchanges to client and Larry ▇▇▇▇▇ ▇▇▇▇▇▇.3]; Trial: Examination of witnesses: cross-examination of Oppenheimer; examination of Romero, Martinez, Marconi [6.0]; post-trial jury instruction hearing [1.0]; continue preparation of Closing argument; group discussion re revision of Thursday witness order; Closing braining storming re valuation, argument [7.0] | $1,200.00 hr | 15.80 | 15.80 | $18,960.00 |
| 03/30/2023 | Diaz, Demetric | Diaz v. Tesla | Pre-trial: work on Opening outline [1.5]; Trial: witness examination (Owen Diaz, Mahla) [[6.0]; post-trial: continue preparation for closing, coordinate creation, editing of power-point slides; strategize re argument re emotional distress damages, recovery from Owen breakdown [12.0] | $1,200.00 hr | 19.50 | 19.50 | $23,400.00 |
| 03/31/2023 | Diaz, Demetric | Diaz v. Tesla | Pre-trial: preparation for closing [1.0]; Trial: final witnesses and Closing Argument [9.5] | $1,200.00 hr | 10.50 | 10.50 | $12,600.00 |

| 04/01/2023 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel re pending jury verdict [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 04/02/2023 | Diaz, Demetric | Diaz v. Tesla | Zoom meeting with appellate counsel re pending MF Mistrial, options re bad jury verdict [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 04/03/2023 | Diaz, Demetric | Diaz v. Tesla | Appearance at trial, wait for jury; receive verdict, travel to and from court [9.0] | $1,200.00 hr | 8.00 | 8.00 | $9,600.00 |
| 04/05/2023 | Diaz, Demetric | Diaz v. Tesla | Zoom meeting re strategy to address verdict [1.0] | $1,200.00 hr | 1.00 | 1.00 | $1,200.00 |
| 04/06/2023 | Diaz, Demetric | Diaz v. Tesla | Review of email from clerk requesting judgment [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 04/10/2023 | Diaz, Demetric | Diaz v. Tesla | Review email exchanges re disagreement over defense language for proposed judgment [.3]; review emails re division of labor as to post-trial motions, loadstar for attorney fees [.3] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 04/11/2023 | Diaz, Demetric | Diaz v. Tesla | Review email from workplace expert (Oppenheimer) [.2]; email exchanges re preparation of fee motion, proposal to stipulate to time-table for filing [.2] | $1,200.00 hr | 0.40 | 0.40 | $480.00 |
| 04/24/2023 | Diaz, Demetric | Diaz v. Tesla | Review email re scheduling conference call to discuss replacement of Dr. Reading [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 04/30/2023 | Diaz, Demetric | Diaz v. Tesla | Review of emails re post-trial motions [.3]; phone call with co-counsel (Organ) re same [.2]; | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 05/05/2023 | Diaz, Demetric | Diaz v. Tesla | Review of email exchanges re use of juror declaration in MF Mistrial [.4]; email exchange re improper use of evidence (wages) [.2] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| 07/06/2023 | Diaz, Demetric | Diaz v. Tesla | Email exchange re future use of Reading as psych expert, strategize re same and respond [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 07/10/2023 | Diaz, Demetric | Diaz v. Tesla | Review of order taking oral argument off calendar on MF New Trial and Reinstatement of Verdict [.2]; receipt of email from Rubin responding to Court taking hearing off calendar [2]; review email from co-counsel (Cimone) re collecting materials for fee motion [.2] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |

| 07/11/2023 | Diaz, Demetric | Diaz v. Tesla | Email colleague (deRubertis) seeking supporting fee declaration [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 07/12/2023 | Diaz, Demetric | Diaz v. Tesla | Receipt and review of draft declaration from supporting declarant: DeRubertis | $1,200.00 hr | 0.10 | 0.10 | $120.00 |
| 07/17/2023 | Diaz, Demetric | Diaz v. Tesla | Preparation of draft declaration for deRubertis [1.5], forward to co-counsel (Organ, Collier, Nunley) for revision [.3] | $1,200.00 hr | 1.80 | 1.80 | $2,160.00 |
| 07/23/2023 | Diaz, Demetric | Diaz v. Tesla | Email exchange with associate (Britt) re preparation of supporting attorney fee declaration, timing [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 07/24/2023 | Diaz, Demetric | Diaz v. Tesla | Email exchange re status of Court pending ruling on post-trial motions [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 07/30/2023 | Diaz, Demetric | Diaz v. Tesla | Email exchange with co-counsel re defense podcast re retrial reduction of jury award [.3] | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 08/04/2023 | Diaz, Demetric | Diaz v. Tesla | Receipt of email to defendant addressing non-produced photographs of racist graffiti with N-word, demand for M&C with objective of notifying the Court of additional evidence of Tesla misconduct [.2] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |
| 08/06/2023 | Diaz, Demetric | Diaz v. Tesla | Review and revise draft Supplemental Briefing on MF New Trial - withheld evidence of N word graffiti in restrooms [.7]; review of email exchanges re confirmation of Plaintiff's time card evidence as to dates of employment [.2] | $1,200.00 hr | 0.90 | 0.90 | $1,080.00 |
| 08/07/2023 | Diaz, Demetric | Diaz v. Tesla | Review defense email response, deflecting re unreasonableness of deadline to meet and confer; email exchanges with co-counsel re proposing and revising response [.4]; detailed review of exchanges with defense counsel [.3]; draft filing with the Court [.8] | $1,200.00 hr | 1.50 | 1.50 | $1,800.00 |
| 08/08/2023 | Diaz, Demetric | Diaz v. Tesla | Review of Court Order for defense response to Plaintiff MF New Trial Supplement [.1]; email to trial team [.1] | $1,200.00 hr | 0.20 | 0.20 | $240.00 |

| Date | Client | Matter | Description | Rate | Hours | Billed | Amount |
|---|---|---|---|---|---|---|---|
| 10/04/2023 | Diaz, Demetric | Diaz v. Tesla | Email exchanges with co-counsel [.2]; receipt of Order on post-trial motions, detailed review of same [1.0]; team meeting re same [1.0] | $1,200.00 hr | 2.20 | 2.20 | $2,640.00 |
| 10/05/2023 | Diaz, Demetric | Diaz v. Tesla | Review and revise deRubertis declaration in support of attorney fees [.5]; email to team re same [.1]; begin extensive review and revision of JBA fee declaration: update honors, information re 2nd trial [1.5] | $1,200.00 hr | 2.10 | 2.10 | $2,520.00 |
| 10/06/2023 | Diaz, Demetric | Diaz v. Tesla | email exchange with co-counsel (Cimone) coordinating documents, declarations needed for motion (deRubertis) [.3]; receipt of further revision of deRubertis declaration from co-counsel (Rubin, Cimone) [.4] | $1,200.00 hr | 0.70 | 0.70 | $840.00 |
| 10/09/2023 | Diaz, Demetric | Diaz v. Tesla | Preparation of email to deRubertis enclosing draft declaration ISO MF Attorney fees [.3]; review and revise fee declaration [1.5] | $1,200.00 hr | 1.80 | 1.80 | $2,160.00 |
| 10/10/2023 | Diaz, Demetric | Diaz v. Tesla | Email exchange with Rubin re revision to fee declaration [.2]; extensive review and revision to address out of town costs and expenses to be added to fee declaration; address redundancies in declaration; [1.0]; emails with associate and office manager (Gus) re costs & expenses [.2] | $1,200.00 hr | 1.40 | 1.40 | $1,680.00 |
| 10/11/2023 | Diaz, Demetric | Diaz v. Tesla | Further extensive review and revision of JBA fee declaration re additional expense details: Reading, hotel, flight, uber; email to office manager (Gus) re missing expenses associated with first trial, details needed for charting of expenses; review of Reading billing [4.7]; | $1,200.00 hr | 4.70 | 4.70 | $5,640.00 |
| 10/12/2023 | Diaz, Demetric | Diaz v. Tesla | Team email exchanges re strategy for briefing fee issues, additions needed to declarations [.3]; | $1,200.00 hr | 0.30 | 0.30 | $360.00 |
| 10/13/2023 | Diaz, Demetric | Diaz v. Tesla | Meeting with co-counsel preparing for M&C with defense counsel [.6]; M&C with defense counsel re filing of MF Attorney Fees [.5] | $1,200.00 hr | 1.10 | 1.10 | $1,320.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/15/2023 | Diaz, Demetric | Diaz v. Tesla | Phone call with co-counsel (Organ) re fee motion, associate rates, waiver of fees for limited time; Whelan declaration [.5] | $1,200.00 hr | 0.50 | 0.50 | $600.00 |
| 10/16/2023 | Diaz, Demetric | Diaz v. Tesla | Phone calls with co-counsel (Larry) addressing staggered multiplier, dissension re multiplier allocation [.6] | $1,200.00 hr | 0.60 | 0.60 | $720.00 |
| | | | **Total Labor For J. Bernard Alexander, III** | | **959.10** | **967.60** | **$1,161,120.00** |
| | | | **Total Expense For J. Bernard Alexander, III** | | | **$0.00** | **$0.00** |
| | | | **Total For J. Bernard Alexander, III** | | | | **$1,161,120.00** |

### Jacqueline Gil

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 02/13/2020 | Diaz, Demetric | Diaz v. Tesla | Review of case file in prep for Reading depo; prepping responsive documents | $450.00 hr | 1.90 | 1.90 | $855.00 |
| 02/18/2020 | Diaz, Demetric | Diaz v. Tesla | Deposition of Dr. Reading | $450.00 hr | 2.10 | 2.10 | $945.00 |
| | | | **Total Labor For Jacqueline Gil** | | **4.00** | **4.00** | **$1,800.00** |
| | | | **Total Expense For Jacqueline Gil** | | | **$0.00** | **$0.00** |
| | | | **Total For Jacqueline Gil** | | | | **$1,800.00** |

### Joshua Arnold

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/06/2021 | Diaz, Demetric | Diaz v. Tesla | Conference with JBA re punitive issue. | $700.00 hr | 0.20 | 0.20 | $140.00 |
| | | | **Total Labor For Joshua Arnold** | | **0.20** | **0.20** | **$140.00** |
| | | | **Total Expense For Joshua Arnold** | | | **$0.00** | **$0.00** |
| | | | **Total For Joshua Arnold** | | | | **$140.00** |

### Natalie Khoury

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/17/2021 | Diaz, Demetric | Diaz v. Tesla | Started research on briefs/case law for the post-trial JMOL and remittitur motion. | $350.00 hr | 3.40 | 3.40 | $1,190.00 |
| 11/18/2021 | Diaz, Demetric | Diaz v. Tesla | Conducted research per TLF; attended meeting with co-counsel on zoom with TLF and JBA. | $350.00 hr | 5.30 | 5.30 | $1,855.00 |
| 11/19/2021 | Diaz, Demetric | Diaz v. Tesla | Worked on putting together research on Tesla's appendices for reply brief. | $350.00 hr | 4.70 | 4.70 | $1,645.00 |
| 11/20/2021 | Diaz, Demetric | Diaz v. Tesla | Continued working on putting together research on Tesla's appendices for reply brief. | $350.00 hr | 6.10 | 6.10 | $2,135.00 |
| 11/22/2021 | Diaz, Demetric | Diaz v. Tesla | Continued appendices research for tesla post-trial motion. | $350.00 hr | 5.40 | 5.40 | $1,890.00 |

| 11/23/2021 | Diaz, Demetric | Diaz v. Tesla | Finished appendices research for Tesla post-trial brief response. | $350.00 hr | 11.80 | 11.80 | $4,130.00 |
|---|---|---|---|---|---|---|---|
| 12/01/2021 | Diaz, Demetric | Diaz v. Tesla | Worked on compiling chart of appendices cases from post-trial motion and looking into the cases with punitive damages and researching the defendant companies' net worths/values. | $350.00 hr | 3.90 | 3.90 | $1,365.00 |
| 12/02/2021 | Diaz, Demetric | Diaz v. Tesla | Completed research for JBA on net worth of companies cited in Tesla's post-trial appendices. | $350.00 hr | 3.90 | 3.90 | $1,365.00 |
| 12/05/2021 | Diaz, Demetric | Diaz v. Tesla | Researched and updated appendices case chart from Tesla post-trial motion to see: (1) which cases were bound by the Title VII cap [9 in Appendix A / 3 in Appendix C], (2) which cases considered the cap, but were not bound by it [8 in Appendix A / 7 in Appendix C], (3) which cases involved Plaintiff/s seeking psychological counseling, and (4) which cases involved loss of enjoyment of life as part of ED. | $350.00 hr | 5.40 | 5.40 | $1,890.00 |

| | | | Total Labor For Natalie Khoury | | 49.90 | 49.90 | $17,465.00 |
|---|---|---|---|---|---|---|---|
| | | | Total Expense For Natalie Khoury | | | $0.00 | $0.00 |
| | | | Total For Natalie Khoury | | | | $17,465.00 |

**Tracy Fehr**

| 11/02/2021 | Diaz, Demetric | Diaz v. Tesla | Conference with Alexander re judgment, post-trial motions, and plan for protecting case for appeal | $750.00 hr | 0.20 | 0.20 | $150.00 |
|---|---|---|---|---|---|---|---|
| 11/17/2021 | Diaz, Demetric | Diaz v. Tesla | Emails with everyone and conference with Alexander re post-trial motion and research for same, conferences with Khoury re research | $750.00 hr | 0.70 | 0.70 | $525.00 |
| 11/18/2021 | Diaz, Demetric | Diaz v. Tesla | Conferences and emails re research for motion opposition and today's meeting, Zoom meeting with everyone re strategy and arguments for JMOL opposition and division of labor [1.8]; Review JMOL and make notes regarding opposing arguments and strategy in preparation for tomorrow's call [1.4] | $750.00 hr | 3.20 | 3.20 | $2,400.00 |

| 11/19/2021 | Diaz, Demetric | Diaz v. Tesla | Zoom meeting with Nunley re plan and arguments for JMOL opposition, emails re same, conferences with Alexander re same | $750.00 hr | 0.90 | 0.90 | $675.00 |
| 11/23/2021 | Diaz, Demetric | Diaz v. Tesla | Conference with Alexander re status of opposition draft | $750.00 hr | 0.10 | 0.10 | $75.00 |

| | | | | Total Labor For Tracy Fehr | 5.10 | 5.10 | $3,825.00 |
| | | | | Total Expense For Tracy Fehr | | $0.00 | $0.00 |
| | | | | Total For Tracy Fehr | | | $3,825.00 |

| | | | | Grand Total Labor | 1098.80 | 1107.30 | $1,216,907.50 |
| | | | | Grand Total Expenses | | $0.00 | $0.00 |
| | | | | Grand Total | | | $1,216,907.50 |

| | | | | Total Times for All Currencies: | 1098.80 | 1107.30 | |