# Exhibit

## A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OWEN DIAZ,

               Plaintiff,

      v.

TESLA, INC., et al.,

               Defendants.

Case No.  3:17-cv-06748-WHO

**ORDER ON POST-TRIAL MOTIONS**

Re: Dkt. No. 317

## INTRODUCTION

After the trial concerning plaintiff Owen Diaz's claims that defendant Tesla, Inc. ("Tesla") discriminated against him in violation of 42 U.S.C. § 1981—a Reconstruction-era civil rights statute that prohibits discrimination in the making and enforcement of contracts—and under California state law, the jury awarded Diaz $6.9 million in compensatory damages and $130 million in punitive damages.   The evidence was disturbing.   The jury heard that the Tesla factory was saturated with racism.   Diaz faced frequent racial abuse, including the N-word and other slurs. Other employees harassed him.   His supervisors, and Tesla's broader management structure, did little or nothing to respond.   And supervisors even joined in on the abuse, one going so far as to threaten Diaz and draw a racist caricature near his workstation.

Tesla now moves for judgment as a matter of law that it is not liable.   In the alternative, it moves for a new trial and to reduce the amount of damages.

Tesla's motion for judgment as a matter of law is denied.   On the Section 1981 claim, Tesla argues that Diaz's contract of employment was with a staffing agency that Tesla contracted with, not with Tesla itself.   But the jury had a legally sufficient basis to find Tesla liable on two

grounds. First, it found in a special verdict that Tesla qualified as an employer of Diaz under the law, even if not on paper. It could have reasonably found that this employment relationship was governed by an implied-in-fact contract. Second, it could have found that Diaz was an intended beneficiary of the contract between Tesla and the staffing agency. As a result, Diaz was entitled to bring the Section 1981 claim to enforce his rights under that contract. On the remaining issues, Tesla waived its legal challenge to Diaz's state-law negligent supervision claim. And Tesla's motion for a new trial is also denied; the weight of the evidence amply supports the jury's liability findings.

Tesla's motion for a remittitur—that is, a reduction in the amount of damages—is granted in part. Great deference is owed to the jury's verdict, but after careful review of the record, I conclude that the award of compensatory damages was excessive. I will not reduce it to $300,000, as Tesla advocates. It will be remitted to $1.5 million, the highest award supported by the evidence. The punitive damages award must also be remitted under Supreme Court precedent imposing constitutional limitations on punitive damages. But again, I will not reduce it to the one-to-one ratio to compensatory damages that Tesla urges. I conclude that, on these facts, the Constitution permits a punitive-damages award of $13.5 million—nine times the amount of compensatory damages.

## BACKGROUND

### I.      PROCEDURAL BACKGROUND

Diaz filed this suit in state court in October 2017 with co-plaintiffs Lamar Patterson and Demetric Di-Az (who is Diaz's son). Dkt. No. 1-2. The suit was against Tesla, CitiStaff Solutions, Inc. ("CitiStaff"), West Valley Staffing Group ("West Valley"), and Chartwell Staffing Services, Inc. ("Chartwell") for many federal and state claims related to discrimination, harassment, retaliation, and negligence. *Id.* In November 2017, Tesla removed the case to this Court. Dkt. No. 1. The parties stipulated to, and I approved, submitting Patterson's claims to arbitration and staying them in this court; Patterson eventually settled the case and his claims were voluntarily dismissed. Dkt. Nos. 36, 139. In December 2018, the plaintiffs amended the complaint to add nextSource, Inc. ("nextSource") as a defendant. Dkt. No. 57. As a result, the

2

pretrial and trial schedule was continued by stipulated order.  Dkt. No. 77.  In December 2019, the parties stipulated to dismissing West Valley.  Dkt. No. 138.

The defendants moved for summary judgment in fall 2019, which I granted in part and denied in part.  Dkt. No. 144.  The net effect of that order was to remove many of the claims from the case.  *See id.*  In March 2020, CitiStaff and nextSource each settled with the plaintiffs, and I approved their dismissal.  Dkt. Nos. 166, 169.  And in April 2020, I approved a stipulated dismissal of Di-Az.  Dkt. No. 176.  That left Diaz and Tesla as the only parties to go to trial.  But due to the COVID-19 pandemic, public health responses, and the parties' schedules, trial was repeatedly postponed until September 2021.

## II.     THE EVIDENCE AT TRIAL[1]

The jury heard six days of testimony, from September 27 to October 4, 2021.

### A.  Diaz Gets a Job at the Tesla Factory

In summer 2015, Diaz saw an online job post for work at Tesla.  Tr. at 385:15–386:6; *see also* Ex. 62 (job posting).[2]  The post used Tesla's insignia at the top and contained no indication that there was another company involved.  *See* Ex. 62.  Among other things, the post required Diaz to authorize "Tesla Motors or its agents" to carry out various forms of background investigations.  *Id.*  After Diaz filled out the application and clicked the link to apply, he received an email that directed him to CitiStaff.  Tr. at 392:2–9.  He liked the idea of working at Tesla because he "was going to be a part of something that was bigger than" he was.  *Id.* at 502:15–18.  He liked that he would "be able to make the [E]arth a little bit better for the next generation."  *Id.*  He "believe[d] in the environment" and that "we need[ed] to move away from the diesel and the fossil fuels."  *Id.* at 393:15–19.  He thought that Tesla had a "vision to . . . correct some of the damage that we have been doing to the [E]arth."  *Id.*  Before starting, he went to a CitiStaff office to fill out paperwork.  *Id.* at 391:4–19.

---

[1] In this background section, I recount the evidence at trial in a neutral manner for clarity in the record.  As this Order's substantive analysis explains, the law often requires that, at this procedural posture, the evidence be assessed in the light most favorable to the jury's verdict.

[2] The trial transcript, cited as "Tr.," appears in six volumes at (in their proper order) Dkt. Nos. 300, 294, 295, 296, 297, and 298.  Exhibits admitted at trial are cited as "Ex."

United States District Court
Northern District of California

Diaz began work at Tesla's factory in Fremont, California, on June 3, 2015. *Id.* at 392:5. He received a badge from Tesla that also had CitiStaff on it. Ex. 19. His checks came from CitiStaff. Tr. at 391:4–19. His job involved operating a forklift, for which he had to receive a training and certification that came from Tesla. *Id.* at 394:3–19. Tesla also provided orientations to other employees hired through staffing companies. *See id.* at 67:18–68:11. It provided employees with safety equipment. *Id.* at 70:14–16. Diaz testified that "all of [his] directions came from Tesla." *Id.* at 391:22–24. Other employees similarly testified that their "day-to-day" management did not come from the staffing companies. *See, e.g.*, *id.* at 70:2–4. When Diaz arrived, he was given a tour of the facility by one of his supervisors, Jaime Salazar, who worked for Tesla. *Id.* at 400:2–9. Another supervisor of his, Ed Romero, also worked at Tesla for most of the time during which Diaz was employed, though he had previously been a nextSource employee. *Id.* at 400:10–16. Diaz and others testified that, in terms of their interactions inside the Tesla factory, there was no difference between Tesla employees and staffing company employees. *Id.* at 400:17–24.

## B. Racist Statements and Drawings in the Factory

On Diaz's second day of work, Diaz saw the N-word scratched into a bathroom stall. *Id.* at 401:6–12. Over the course of his employment, more racist bathroom graffiti was added. *Id.* at 403:5–15. He encountered swastikas and the phrase "death to all [N-words][3]." *Id.* at 403:15–404:7. Diaz reported the N-word on the bathroom stall to a supervisor (either Romero or Tamotsu "Tom" Kawasaki). *Id.* at 401:17–23. Romero testified that the janitorial staff were instructed to take pictures of graffiti they found while cleaning and send them to personnel. *Id.* at 163:2–7.

Diaz also testified that "eight to ten" employees called him the N-word while he worked at Tesla. *Id.* at 512:25–513:9. Diaz could not identify who those employees were, or their races. *Id.* Kawasaki testified that the N-word was "thrown around" the Tesla factory "a lot." *Id.* at 99:4–11. He stated that at least some of these uses were "friendly" or in "fun." *Id.* at 99:7–11. Michael John Wheeler, a supervisor employed by Chartwell, testified that he heard the N-word used "all

---

[3] The parties' practice at trial was to usually use the letter "N" to stand in for the N-word; that is how it often appears in the transcript. I replace those in this recitation with "N-word" for clarity.

over the factory" and heard it "every day." *Id.* at 424:21–425:7. Wheeler also testified that he was derogatorily called the N-word, that the co-worker who said it was promoted not disciplined, and that another co-worker spread feces on the cart he drove around the factory. *Id.* at 431:10–432:21. And Wayne Jackson, who worked for nextSource liaising with Tesla employees, agreed that the N-word was used "on a daily basis," though sometimes in a "friend[ly]" way (as in, "my N-word"). *Id.* at 225:5–13.

### C. Incidents with Particular Employees

#### i. Judy Timbreza

One of Diaz's co-workers was Judy Timbreza (who is male). *Id.* 404:10–15. Timbreza, who spoke Spanish and English, would call Diaz "mayate," the Spanish equivalent of the N-word. *Id.* at 405:20–406:6. Timbreza also called Diaz "porch monkey" in Spanish, a derogatory slur for a Black person. *Id.* at 406:7–15.[4]

On July 31, 2015, Diaz and Timbreza got into a "verbal altercation." *Id.* at 407:25–408:1. Timbreza called Diaz the N-word in English and was "ranting" and "laughing." *Id.* at 407:11–22. Kawasaki received a call about this altercation and found Diaz and Timbreza "face-to-face, . . . arguing" and "about to fight." *Id.* at 78:13–24. He separated them and asked other employees around what had occurred; they reported that "some racial slurs [were] thrown" by Timbreza. *See id.* at 78:25–79:11. He sent Timbreza home. *Id.* Diaz told Kawasaki at the time that Timbreza had called him the N-word and a "coon." *Id.* at 79:20–24. Timbreza did not testify.

The evidence at trial about Tesla's investigation (or lack thereof) into the incident was somewhat muddled. It is clear that Kawasaki wrote an email to Romero that Diaz had "brought to [his] attention" comments that were "racist in nature" by Timbreza. *See* Ex. 38. It is less clear what the response to this entailed. When asked whether he investigated Diaz's complaints about Timbreza, Romero responded that he "was not the direct supervisor." Tr. at 137:8–12. But he then testified that he "spoke with employees" and found "there was really nothing directly said about these words." *Id.* at 137:17–20. When pressed, he classified what he performed as a

---

[4] Tesla has never disputed that the slurs at issue in this case carry the meanings that Diaz ascribes to them.

"minimal investigation, I guess." *Id.* at 138:3–6. He also admitted that he did not interview (or did not remember interviewing) Diaz about Timbreza. *Id.* at 139:15–16. Despite this, he emailed supervisor Victor Quintero that Diaz "says this has happened before." Ex. 39. He also noted that Diaz said that he could continue working with Timbreza "if he stops his remarks." *Id.* And he wrote that he gave Timbreza a "verbal warning." *Id.* Kawasaki testified that Timbreza was given a "verbal write-up" that acted as a first warning. Tr. at 124:25–125:8. If this write-up existed in written form, it was not placed into evidence. Diaz testified that after he reported this, he never saw Timbreza again and was "satisfied" with the response to the complaint. *Id.* at 510:23–511:3.

### ii.   Ramon Martinez

Ramon Martinez was another Tesla supervisor. Diaz testified that Martinez told him to "go back to Africa," called him the N-word more than 30 times, called him "mayate," and told him "I hate you [N-word]." *Id.* at 417:1–25.

#### 1.   October 2015 Confrontation

In October 2015, Diaz was training a new employee. *Id.* at 451:7–10. Martinez saw them, "rushe[d]" over, and began to curse at him. *Id.* at 451:18–25. Diaz testified that Martinez said that Diaz "ha[d] a problem with him." *Id.* Martinez called Diaz the N-word and said that "[N-words] are shit." *Id.* Martinez got "closer and closer," with his "fist balled up." *Id.* He told Diaz he was going to "beat [him] up." *Id.* According to Diaz, he "threw [his] hands up into the neutral position," opened them, and backed against a wall. *Id.* at 452:1–4. Martinez "got . . . within inches of [his] face." *Id.* at 452:5–7. Eventually, Diaz cursed back, telling him to "get the 'F' out of my face." *Id.* Diaz reminded Martinez that they were on surveillance camera and Martinez "rushed out." *Id.* at 452:8–11.

On October 17, at approximately 6:00 a.m., Diaz wrote an email to complain that said he did not feel safe around Martinez. *See* Ex. 235. He identified the employee he was training as a witness and said that the surveillance system would show what happened. *Id.* Diaz's email did not include his assertion that Martinez used the N-word. *See id.* At trial, he testified that was so because "we had the surveillance system right there, you know. I just figured Tesla would pull the -- pull the video surveillance and then come and interview me and then we can discuss all that. I

6

just didn't put it in the email because, you know, like I said, in a workplace, that word is not supposed to be used." *Id.* at 452:15–20.  And he testified that he had often complained before to Romero about Martinez's use of the N-word.  *See id.* at 425:21–453:8.

According to Martinez, he actually "just went down and asked" Diaz why his elevator was not moving some of Martinez's team's materials.  *Id.* at 766:14–22.  He testified that Diaz and he started raising their voices and "probably . . . were yelling."  *Id.* at 766:25–767:2.  Martinez said he then ended the conversation and told Diaz he was going to send an email about Diaz's "attitude."  *Id.* at 767:8–11.  Like Diaz, Martinez wrote an email to complain about the incident; he sent his about an hour before Diaz did.  *See* Ex. 49.  In it, he wrote that Diaz was "not acting on the [sic] professional way with me."  *Id.*  Romero wrote back two hours later to say that he would "investigate this today."  *Id.*

The company concluded that it did "not need to do any formal investigation."  Ex. 76.  Human resources did not interview the employee Diaz had been training at the time, *see* Tr. at 232:20–25, and there is no evidence they reviewed the surveillance footage.  Ultimately, Martinez and Diaz were both given a verbal warning for the events.  *Id.* at 231:8–15.

### 2. January 2016 Drawing

In January 2016, someone had drawn sketches of several ghosts and a "Pac-Man" figure on a surface near the elevators at which Diaz worked.  Ex. 1.  Next to them, Martinez drew the sketch below—which appears to be a face with large lips and a bone in its hair—and wrote the word "Booo" underneath it:



*Id.*; *see also* Tr. 774:19–775:3 (Martinez testifying that he drew it).

Diaz saw the drawing while performing his regular duties. *See* Tr. at 456:18–458:15. He recognized it as a "picaninny." *Id.* at 458:14–15.[5] Diaz testified that seeing it made him feel like "somebody had kicked me." *Id.* at 459:21–23. He was reminded of a Warner Brothers cartoon from his childhood that showed the picaninny character as a "buffoon" who was "running around chasing after fried chicken" and "saying 'mammy' and 'master' and stuff like that." *Id.* at 460:1–18.

According to Martinez, he saw the Pac-Man and ghosts and assumed they were drawn by employees on another shift and were making fun of his shift. *Id.* at 771:23–772:4. He interpreted it to mean that the other shift "was doing [a] better job" than his, *id.* at 773:13–15, so he drew the picaninny as part of a "game or competition," *id.* at 774:19–24. He said that he intended it to tell the other shift that his shift could "compete better than them" and the "booo" was meant to be "scary." *Id.* at 774:22–775:3. He testified that the figure was from a cartoon in his childhood called "Inki." *Id.* at 775:6–11. When an employee later confronted him about it, he said, he did not understand what it meant and was upset and sorry. *Id.* at 775:20–776:4. He talked with Diaz about it to try to explain that he did not understand what it meant. *Id.* at 777:17–25. He claims that Diaz said, "[d]on't worry about it" and that he would "delete" an email about it he had been drafting. *Id.* at 778:2–5. Diaz, on the other hand, testified that Martinez "never apologized" and said "you people can't take a joke." *Id.* at 462:15–23.

---

[5] A "picaninny" (sometimes "pickaninny" or "piccaninny") has long been a racist caricature, originally of a Black child. *See* David Pilgrim, *The Picaninny Caricature*, Jim Crow Museum of Racist Memorabilia (Oct. 2000, ed. 2012), https://www.ferris.edu/HTMLS/news/jimcrow/antiblack/picaninny/homepage.htm.

A picture from the "Caveman Inki" cartoon that Martinez was referencing was introduced into evidence:



Ex. 133.

Diaz wrote an email to Romero about the image, calling it a "racist effigy and drawing." Ex. 33. He noted that Martinez admitted to drawing it. *Id.* Jackson (the nextSource liaison) recommended that Martinez be fired. *See* Tr. 249:12–20. Quintero, in consultation with others, decided to suspend Martinez and issue a written warning. Exs. 272, 287. Jackson believed there should have been a stronger actions, and testified that he told that to Quintero. Tr. at 251:17–20. Quintero testified that he did not recall that. *Id.* at 341:8–12. He also could not recall if he had ever seen the written warning he said that he gave. *Id.* at 341:25–342:1.

### iii. Robert Hurtado

Robert Hurtado was a Tesla supervisor. Diaz testified that Hurtado called him the N-word and "boy." *Id.* at 414:14–16. He also told Diaz that "[y]ou [N-words] are lazy." *Id.* at 414:24–25. Diaz stated that Hurtado called him the N-word more than 30 times. *Id.* at 415:1–3. At one point, Hurtado interjected into a conversation that Diaz was having to use racial slurs. *Id.* at 466:14–23. Diaz testified that he told Hurtado, "[n]o disrespect, but if it doesn't have anything to do with this job, don't talk to me." *Id.* at 466:24–467:2.

Diaz informed Joyce DelaGrande, Hurtado's supervisor, about this behavior. *Id.* at 467:14–17. On February 16, 2016, DelaGrande wrote Romero an email. Ex. 303. She said that Hurtado had approached him and Diaz told him to only talk to him if it was "related to business." *Id.* She noted that Diaz had complained about Hurtado's behavior but said that she "instructed my

United States District Court
Northern District of California

leads to contact me if there are any more issues with him because we are really struggling with his customer service and it was not a threat, it was us letting him know that we really need the work to be done and if he will not do this we will contact his manager." *Id.* She said that her leads felt "uncomfortable" with Diaz, that he had a "huge attitude," and that they do not feel he is "approachable." *Id.* After a back-and-forth in which Romero said he would address the situation, DelaGrande wrote that she would "prefer that [Diaz] is placed somewhere else." *Id.* Romero said he was "in the process of doing that real soon." *Id.* Several days later, DelaGrande wrote that she was "just notified" that Diaz was still working in his previous position and wanted to know when he would be replaced. *Id.*

Soon after, Diaz took bereavement leave to address the death of his mother. Tr. at 468:8–9. He testified that, after that, he "just couldn't take" coming back. *Id.* at 468:12–14. In May 2016, he was "separated" from Tesla without prior warning. *Id.* at 468:24–469:2; *see also* Ex. 68 (separation notice).

**D. Demetric Di-Az**

After several months at Tesla, Diaz recommended that his son (and former plaintiff) Demetric Di-Az come to work at the Tesla facility. *See, e.g.*, Tr. at 503:8–16. He testified that he "did believe he would be in a different location" so the situation might be different for him. *Id.* at 503:11–19. He said that he could not recall whether he warned Di-Az about the racial harassment. *Id.* at 504:5–11. At one point, Diaz witnessed a white supervisor yell at Demetric that, "I can't stand all you [fucking] [N-words]." *Id.* at 419:18–24. Diaz said that it "broke" him. *Id.* at 420:1. He testified that, if he had to do it over again, he would not have recommended that Demetric work there, calling it his "biggest mistake." *Id.* at 420:2–5.

**E. Harm to Diaz**

In addition to the emotional harm discussed above, Diaz, his step-daughter, and his psychological expert testified about the harm he suffered as a result of his employment at the factory. Diaz testified that the experience made him "lose . . . faith in my . . . fellow humans." *Id.* at 481:20–23. He said that it made him see things through his parents' eyes, with "dogs being sicced on them." *Id.* at 481:24–482:3. He began having "sleepless nights." *Id.* at 482:9. The

United States District Court
Northern District of California

1    experience also affected his marriage. *Id.* at 482:2–13. He "couldn't eat" and lost weight. *Id.* at

2    482:14–17. Previously, he had been an outgoing person, but he stated that he now hesitates when

3    meeting new people. *Id.* at 482:18–25. He testified that, "[s]ome days I would just sit on my

4    stairs and cry." *Id.* at 483:1–3.

5          Diaz's step-daughter, LaDrea Jones, testified similarly. She said that, before Diaz worked

6    at Tesla, he often told jokes, was talkative, and was an engaged father. *Id.* at 624 at 13–20. After

7    he started at Tesla, he became "moodier" and sadder. *Id.* at 624:23–25. He stopped asking her

8    questions about her life. *Id.* He was less exuberant and did not tell jokes. *Id.* at 625:14–24. She

9    caught him awake at 3:00 or 4:00 am "a few times a week." *Id.* at 626:10–13. Before Diaz

10   worked at the factory, he and Jones would talk "[l]iterally every day," but after he started, it was a

11   few times a week and was vague and minimal. *Id.* at 627:12–15.

12         Diaz also testified that the effects are, in some ways, ongoing. *Id.* at 483:7–12. Jones

13   testified that Diaz's personality changed back since he left. *Id.* at 628:10–12; 636:12–637:6.

14         Diaz also called a psychologist, Dr. Anthony Reading. Reading testified that he performed

15   examinations on Diaz in 2019. *Id.* at 583:1–3. He testified that racial abuse in the workplace can

16   be especially harmful because it is difficult to extricate from and the victims are so dependent on

17   the employer to intervene. *See id.* at 583:24–585:4. He largely echoed Diaz's testimony about the

18   emotional harm Diaz suffered. His interview technique was also designed to determine whether

19   Diaz's responses were motivated by litigation. *See id.* at 583:12–18.

20   **III.    THE JURY'S VERDICT**

21         On October 4, 2021, the jury returned a verdict against Tesla. *See* Verdict Form [Dkt. No.

22   301]. The jury, in special verdicts, found that: (1) Tesla subjected Diaz to a racially hostile work

23   environment, (2) Tesla was a joint employer of Diaz, (3) Diaz was subject to a hostile work

24   environment caused by a supervisor, (4) Diaz was subject to a hostile work environment caused by

25   a non-immediate supervisor or co-worker, (5) Tesla committed a civil rights violation in a

26   contractual relationship, (6) Tesla failed to take all reasonable steps necessary to prevent Diaz

27   from being subject to racial harassment, and (7) Tesla negligently supervised or negligently

28   continued to employ Ramon Martinez and that action harmed Diaz. *Id.* at 1–2. Diaz sought only

11

non-economic—that is, emotional—damages.  The jury awarded him $4,500,000 in past

compensatory damages; $2,400,000 in future compensatory damages; and $130,000,000 in

punitive damages.  *Id.* 3–4.

After the close of evidence but before the case went to the jury, Tesla moved for judgment

as a matter of law on some of the grounds it raises today.  *See* Dkt. No. 282.  I denied the motion

orally from the bench and issued a written opinion on it as well.  *See* Dkt. No. 303.  After the

verdict, Tesla brought this motion, which I heard on January 19, 2022.[6]

## LEGAL STANDARDS

### I.    JUDGMENT AS A MATTER OF LAW

Federal Rule of Civil Procedure ("FRCP") 50 governs judgments as a matter of law

("JMOL") in jury trials.  Under Rule 50(a)(1), "[i]f a party has been fully heard on an issue during

a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary

basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that,

under the controlling law, can be maintained or defeated only with a favorable finding on that

issue."  If a party files a motion under Rule 50(a) that the court does not grant, Rule 50(b) provides

that "the movant may file a renewed motion for judgment as a matter of law and may include an

alternative or joint request for a new trial under Rule 59."  The court may then (1) allow judgment

on the verdict, (2) order a new trial, or (3) enter judgment as a matter of law.  Fed. R. Civ. P.

50(b)(1)–(3).

As noted, a motion for JMOL can only be granted if "the court finds that a reasonable jury

would not have a legally sufficient evidentiary basis to find for the party" against whom the

motion is brought.  Fed. R. Civ. P. 50(a).  In other words, to grant the motion, "under the

governing law, there can be but one reasonable conclusion as to the verdict."  *Shafer v. Cty. of*

*Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

---

[6] After the hearing, Diaz filed a letter brief that made a new argument.  Dkt. No. 326.  Tesla filed
one in response.  Dkt. No. 327.  I decline to consider both letters, which are improper.  *See* Civ.
L.R. 7-3(d) ("Once a reply is filed, no additional memoranda, papers or letters may be filed
without prior Court approval, except" for circumstances not relevant here.).

United States District Court
Northern District of California

1  U.S. 242, 250 (1986)) (internal quotation marks omitted).  The court must "construe the facts in

2  the light most favorable to the jury's verdict."  *Id.* (internal quotation marks and citations omitted).

3  "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence

4  adequate to support the jury's conclusion, even if it is also possible to draw a contrary

5  conclusion."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).  When examining the record,

6  "the court must not weigh the evidence, but should simply ask whether the plaintiff has presented

7  sufficient evidence to support the jury's conclusion"  *Harper v. City of Los Angeles*, 533 F.3d

8  1010, 1021 (9th Cir. 2008).  Consequently, the court "is not to make credibility determinations"

9  and "must accept the jury's credibility findings consistent with the verdict.  It must disregard all

10  evidence favorable to the moving party that the jury is not required to believe."  *Winarto v.*

11  *Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (internal quotation

12  marks and citations omitted).

## II.      NEW TRIAL OR REMITTITUR

### A.  Generally

15  FRCP 59 governs motions for a new trial.  A court may grant a new trial "on all or some of

16  the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in

17  an action at law in federal court."  Fed. R. Civ. P. 59(a)(1).  "The authority to grant a new trial . . .

18  is confided almost entirely to the exercise of discretion on the part of the trial court."  *Allied Chem.*

19  *Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).  "[E]ven if substantial evidence supports the jury's

20  verdict, a trial court may grant a new trial if the verdict is contrary to the clear weight of the

21  evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the

22  trial court, a miscarriage of justice."  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251

23  F.3d 814, 819 (9th Cir. 2001) (internal quotation marks and citation omitted).  Likewise, a new

24  trial is warranted when "it is quite clear that the jury has reached a seriously erroneous result."

25  *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014).  But the court "may not grant a

26  new trial simply because it would have arrived at a different verdict."  *Silver Sage*, 251 F.3d at

27  819.

28

United States District Court
Northern District of California

**B. Remittitur**

A new trial may also be granted if "the damages are excessive." *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019) (internal quotation marks and citation omitted). In determining whether damages are excessive, the court "afford[s] great deference to a jury's award of damages and will uphold the award unless it is clearly not supported by the evidence or only based on speculation or guesswork." *Williams v. Gaye*, 895 F.3d 1106, 1128 (9th Cir. 2018) (internal quotation marks and citations omitted). If damages are excessive, the court may either grant a new trial or "deny the motion conditional upon the prevailing party accepting a remittitur"—that is, a reduction in the amount of damages. *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). The remittitur "must reflect the maximum amount sustainable by the proof." *Oracle*, 765 F.3d at 1094 (internal quotation marks and citation omitted).

When assessing remittiturs of state-law claims, federal courts apply state law. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 431 (1996). California law expressly authorizes remittitur when there are "excessive damages." *See* Cal. Civ. P. Code § 662.5. Trial courts have broad discretion to remit excessive damages and sit as "independent trier[s] of fact" when doing so. *Lane v. Hughes Aircraft Co.*, 22 Cal. 4th 405, 412 (2000), *as modified* (May 10, 2000) (internal quotation marks and citation omitted).

## DISCUSSION

Tesla seeks to set aside the jury's liability findings, both by moving for judgment as a matter of law and a new trial. In the alternative, it moves for a remittitur of the compensatory and punitive damages.

## I.    LIABILITY

Tesla moves for judgment as a matter of law on its liability on the Section 1981 claim for essentially the same reasons that it did at the 50(a) stage and argues for the first time that it is entitled to JMOL on the state-law claim. *See generally* Motion for Judgment as a Matter of Law, New Trial, and Remittitur ("Mot.") [Dkt. No. 317]. And it argues that the weight of the evidence was against a finding of liability, entitling it to a new trial. *See id.* I reject both arguments.

United States District Court
Northern District of California

**A. Section 1981 Claims**

Section 1981 was originally enacted as Section 1 of the Civil Rights Act of 1866, a post-Civil War law aimed at protecting the rights of African-Americans. Today it provides,

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The term "make and enforce contracts" is defined to "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). Accordingly, the statute "prohibits racial discrimination in the making and enforcement of private contracts." *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).

One theory of liability under Section 1981 is a hostile work environment claim. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003). To prevail on this type of claim, the plaintiff must prove that "(1) he was subjected to verbal or physical conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (internal quotation marks, alterations, and citation omitted). The work environment must be "subjectively and objectively hostile." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004).[7]

**i. Weight of the Evidence**

Tesla argues that the weight of the evidence is against a finding of liability under Section 1981 for two reasons. *See* Mot. 7.

Tesla first contends that "it is undisputed that [the harassing] conduct was contrary to Tesla policy and was never condoned by Tesla" and that "Tesla took disciplinary action in response to

---

[7] *McGinest* discusses the standards for a racially hostile work environment claim brought under Title VII but the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Manatt*, 339 F.3d at 797.

United States District Court
Northern District of California

all of the incidents Diaz reported in writing." *Id.*

To start, this characterization of the evidence is inaccurate and incomplete in several overlapping ways. First, even on Tesla's account, it only took action in response to incidents "reported in writing." But it has no authority—or even a rationale—for why *verbal* complaints of racism in the workplace should not also be addressed. Diaz testified that he reported the use of the N-word in the bathroom stall, Tr. at 401:17–23, and that he told Romero about Martinez using the N-word, *id.* at 425:21–453:8, 511:17–24. There is no evidence that Tesla ever took any remedial action in response to any of these complaints. And despite Tesla's heavy implication that Diaz may have falsely inflated these reports, *see, e.g.*, Mot. 19 (labelling the complaints "uncorroborated"), it can point to no evidence for that and it did not impeach Diaz's credibility on this issue.

Second, the "disciplinary action" that Tesla *did* take was often inadequate. When Diaz and Martinez submitted complaints against each other about the October 2015 altercation, the company concluded that it did "not need to do any formal investigation," Ex. 76, and gave both individuals verbal warnings, Tr. at 231:8–15. This was so even though what Diaz reported was of a different magnitude than Martinez; Martinez flagged a vague problem with professionalism while Diaz reported that he was not safe. *Compare* Ex. 235, *with* Ex. 49. And even though Diaz's email did not mention the use of the N-word, he testified that he had previously complained to Romero about Martinez using it. *See* Tr. at 425:21–453:8. Yet the company did not bother to interview a witness to the events (whom Diaz's email identified) or look at the surveillance footage (which Diaz's email referenced) before giving both men the same verbal warning. Martinez drawing the picaninny, too, resulted only in a brief suspension and a warning. Exs. 272, 287.[8] The jury was within its rights to conclude that, given the severity of that act, such a slight

---

[8] Tesla does not now rely on Martinez's explanation for the drawing to minimize its impact—an explanation it elicited at trial and discussed in its closing argument. In the light most favorable to the jury's verdict, Martinez's explanation was entirely unconvincing. It is implausible that he hoped such a particular, racially charged caricature would effectively communicate to another shift that his shift was better than they were and going to move more material. *See supra* Background, Section II.C.ii.2 (recounting Martinez's testimony). But even if that testimony were credited—which the jury was under no obligation to do—the drawing Martinez chose, even on his

punishment was not a sufficiently meaningful response.  And finally, there is the discipline of

Timbreza, on which Tesla hangs its hat (presumably because Diaz testified that he was satisfied

with the outcome).  Even though the company was told that Timbreza had made racist remarks, it

was apparently unclear to Romero, the man seemingly in charge of the company's response, that

he was responsible: he first testified he was not, before backtracking and discussing what he

himself called a "minimal investigation" in which he did not even speak to Diaz.  Tr. at 137:8–

139:16.

More fundamentally, even if Tesla's characterization of its discipline and policies were

wholly correct, Diaz would still have a viable hostile work environment claim.  He would still

have been subject to (1) unwelcome (2) verbal conduct because of his race (3) that was sufficiently

severe to alter his conditions of employment and create an abusive work environment.  *Johnson*,

534 F.3d at 1122.  Indeed, it is unclear why Tesla believes it should be relieved of liability on the

basis of these instances of discipline.  Tesla explicitly and consciously chose not to pursue a

*Faragher/Ellerth* affirmative defense, in which the employer attempts to show that it exercised

reasonable care to prevent and correct the harassment.  *See Holly D. v. California Inst. of Tech.*,

339 F.3d 1158, 1168 (9th Cir. 2003).  It appears it is now attempting to use the backdoor of this

motion to achieve the same result without shouldering the burden of presenting evidence or

argument to the jury.

In a different vein, Tesla argues that "Diaz himself admitted at trial that he remained happy

at Tesla, uninterested in reassignment, and able to continue working at his job at all times before

the January 2016 drawing incident, and even encouraged his son to apply for a job at Tesla after

the July 2015 Timbreza N-word incident."  Mot. 7.  The weight of the evidence is against Tesla's

minimization of Diaz's emotional and psychological harm.  Diaz testified about the severe

consequences he experienced during his time at the factory.  *See supra* Background, Section II.E.

Jones similarly testified about the effects on her father.  *Id*.  And his psychological expert

confirmed all of this, including by performing psychological evaluations to determine whether

_____

account, came from an unambiguously racist cartoon.  *See id.*  And the drawing came after
Martinez used many racial slurs, undermining his assertions that he had no idea of its true import.

Diaz was "overreporting" his symptoms. *Id.* The jury, in short, had ample basis to believe Diaz's testimony that he was severely emotionally harmed. Further, I address below in the section on compensatory damages why Tesla's characterization of this evidence is inaccurate; I incorporate that analysis here. *See infra* Section II.B.

Tesla's terse arguments on this issue largely fail to engage with the real question in a hostile work environment claim: whether the plaintiff was subjected to sufficiently severe mistreatment on the basis of race. *See, e.g.*, *McGinest*, 360 F.3d at 1113. It never discusses the dozens of examples of racial harassment to which Diaz and many other witnesses testified. *See supra* Background, Sections II.B–D. Nor does it reference that many of them were not by mere co-workers (which, for clarity, would still be actionable) but also supervisors—that is, those Tesla empowered to act for it. *Supra* Background, Section II.C. And it does not contest that hearing racist terms and being subject to racial slurs "every day," Tr. at 424:21–425:7, is sufficiently severe and pervasive to alter the conditions of employment.

### ii. Lack of a Contract Between Diaz and Tesla

Tesla next argues that it is entitled to JMOL because there was no contract between Diaz and Tesla. Mot. 8–10. Section 1981 seeks to combat discrimination in the "making and enforcement of contracts." As a result, "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (citation omitted). As I previously explained at the Rule 50(a) phase, there are two ways that the jury could reasonably have found a contractual relationship sufficient to support Section 1981 liability.

#### 1. Implied Employment Contract

First, the jury could reasonably have found that Tesla was a joint employer of Diaz and, as a result, that Tesla and Diaz formed an implied employment contract.

In California, as a general matter, "[a] contract of employment is governed by the same rules applicable to other types of contracts." *Reynolds Elec. & Eng'g Co. v. Workmen's Comp. Appeals Bd.*, 65 Cal. 2d 429, 433 (1966). The four elements to create a contract under California law are: (1) parties capable of contracting, (2) their consent, (3) a lawful object, and (4)

United States District Court
Northern District of California

United States District Court
Northern District of California

consideration.  Cal. Civ. Code § 1550.  The "consent" required is the "mutual consent of the parties," which is "generally achieved through the process of offer and acceptance."  *DeLeon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012) (internal citations omitted).  Whether this consent occurred is determined under an objective standard based on the parties' "outward manifestations or expressions" and "the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings."  *Id.*  "Consideration is present when the promisee confers a benefit or suffers a prejudice."  *Prop. California SCJLW One Corp. v. Leamy*, 25 Cal. App. 5th 1155, 1165 (2018).  The consideration "must actually be bargained for as the exchange for the promise" or "have induced the promisor's promise."  *Id.* (internal quotation marks and citations omitted).

Under the law, a person can have more than one employer for present purposes.  *U.S. Equal Emp. Opportunity Comm'n v. Glob. Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019).  Two or more "entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions."  *Id.*  Courts generally assess this question primarily by examining the "extent of control" exercised by the putative employer.  *Id.* at 638.  The inquiry focuses on weighing and assessing "all of the incidents of the relationship."  *Id.* (internal quotation marks and citation omitted).  Here, the jury found in a special verdict that Tesla was a joint employer of Diaz.  Verdict Form at 1.

California law recognizes—as do common-law principles of contract law—that contracts "need not be express, but may be implied in fact, arising from the parties' *conduct* evidencing their actual mutual intent to create such enforceable limitations."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 336 (2000) (some emphasis omitted); *see also* Cal. Civ. Code § 1621 (recognizing validity of implied contracts).  As the Restatement puts it, "[w]ords are not the only medium of expression. Conduct may often convey as clearly as words a promise or an assent to a proposed promise."  Restatement (Second) of Contracts § 19 comm. a; *see also id.* § 4 ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.").  Employment contracts, as others, can be implied-in-fact rather than express.  *See, e.g.*, *Guz*, 24 Cal. 4th at 336; *see also Reynolds*, 65 Cal. 2d at 433 ("A contract of employment is governed by the same rules

19

1    applicable to other types of contracts.").

2         The jury had a legally sufficient basis for concluding that Tesla was a joint employer of

3    Diaz because, weighing "all of the incidents" of Tesla and Diaz's relationship, the jury had

4    sufficient evidence to conclude that Tesla effectively controlled Diaz's work. The work, no one

5    disputes, was in Tesla's factory and for Tesla's ultimate benefit. When Diaz applied, the post said

6    the job was at "Tesla" and authorized "Tesla Motors" to carry out background checks. Ex. 62.

7    Diaz only learned of the existence of CitiStaff after he applied. Tr. at 392:2–9. His only real

8    involvement with CitiStaff was going to its office to fill out paperwork and receiving his

9    paychecks from it. *See supra* Background, Section II.A. His badge said both Tesla and CitiStaff.

10   *Id.* Tesla provided the training to contractor employees. *See* Tr. at 394:12–15. Tesla provided

11   forklift operators their certification. *Id.* at 394:16–19. On Diaz's first day, Tesla supervisor Jaime

12   Salazar gave him his orientation. *Id.* at 395:10–14. Tesla provided his (and others') equipment.

13   *Id.* at 395:15–19. Tesla's policies were the only policies that Diaz was trained to follow. *Id.* at

14   398:11–13. Salazar dictated Diaz's initial schedule. *Id.* at 399:23–25.[9] There was no difference

15   between how workers with Tesla as their employer on paper and other employees interacted. *Id.*

16   at 400:17–24. One of Diaz's supervisors described what Diaz did—operating the freight

17   elevator—as a "key part" of the car making process. *Id.* at 94:4–7. And Tesla had the power to

18   fire Diaz, as demonstrated by the request for a Tesla supervisor to do so. *See* Ex. 303.

19        Because the jury had a sufficient basis to find that Tesla was a joint employer of Diaz, it

20   also had a sufficient basis to find that Tesla and Diaz formed an implied contract. Tesla agrees

21   that two of the elements required—capacity of the parties and lawful objective of the contract—

22   are met. *See* Mot. 9. It argues, however, that the jury did not have a basis to find mutual assent or

23   consideration. *Id.*[10] I disagree. All of the evidence just discussed shows that the parties' entire

24

25   ─────────────────
     [9] After that, Diaz cannot recall whether it was one of two Tesla supervisors or an employee of
26   another hiring entity, Chartwell, that gave him his schedule. Tr. at 400:2–15. But even that
     supports the jury's verdict because, in the light most favorable to it, it helps demonstrate that
27   Tesla's supervisors and the staffing companies' supervisors were operating interchangeably.

28   [10] For clarity in the record, Tesla never proposed a jury instruction on the formation of contracts or
     objected to the lack of that instruction.

course of dealings was aimed at a de facto bargain:  Diaz would provide labor for Tesla and Tesla would functionally employ Diaz.  Both parties' mutual assent is shown through their acceptance of the de facto conditions of employment that Tesla imposed.  *See Guz*, 24 Cal. 4th at 336; *see also* Cal. Civ. Code § 1621; Restatement (Second) of Contracts § 19 ("Conduct may often convey as clearly as words a promise or an assent to a proposed promise.").  It would, in fact, be anomalous for any employment relationship *not* to be governed by an express or implied contract of some sort as, in this state, "the employment relationship is fundamentally contractual."  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 696 (1988).

Consider a counterfactual in which Tesla could escape liability this way.  In that scenario, it would be able to control every aspect of Diaz's work life, including whether or not he was protected from racial harassment.  At the same time, he would not be able to sue if it failed to live up to its responsibilities.  And even though he would presumably be able to sue CitiStaff, the evidence shows that Tesla was the one with real control over Diaz's work, including the entity that could most effectively remediate harassment.  Tesla's position would put any employee in an employment structure like this in a bind of never being able to hold one entity fully responsible for its legal obligations.

Tesla does not dispute most of what I have written and its brief essentially ignores all of the evidence of control it exerted over Diaz—as noted, the touchstone of the joint employment inquiry.  Instead, it argues that several other pieces of evidence defeat the claim: the written contract was only with CitiStaff, not Tesla; Diaz applied to CitiStaff; and Diaz received his payments from CitiStaff.  Mot. 9.  While Tesla was free to make this argument to the jury, it is insufficient to show that *as a matter of law* there was no joint employment or employment contract because of the significant contrary evidence discussed above.  It was the jury's role to make that highly fact-dependent determination, and it had a sufficient basis to find in Diaz's favor.

### 2.  Third-Party Beneficiary

The second way that the jury reasonably could have found a contractual relationship sufficient to support liability is by finding that Diaz was a third-party beneficiary of the contract between Tesla and nextSource.

As noted, a claim under Section 1981 "must initially identify an impaired contractual relationship under which the plaintiff has rights." *Domino's Pizza*, 546 U.S. at 476 (internal quotation marks and citation omitted). The Supreme Court has explained that "[w]e say 'under which the plaintiff has rights' rather than 'to which the plaintiff is a party' because we do not mean to exclude the possibility that a third-party intended beneficiary of a contract may have rights under § 1981. Neither do we mean to affirm that possibility. The issue is not before us here." *Id.* at 478 n.3. As I have previously ruled in this case—an explanation I incorporate here—I conclude that a third-party beneficiary can bring a Section 1981 claim. *See* Dkt. No. 278. Tesla does not challenge that ruling here.

California law recognizes—again, as do common-law principles—that "[a] third party beneficiary may enforce a contract made for its benefit." *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (2002); *see also* Restatement (Second) of Contracts § 302 (recognizing that intended beneficiaries may enforce contracts). To determine whether someone is a third-party (or intended) beneficiary, courts look to the mutual intent of the parties. *Id.* A contract can expressly provide that it benefits a party but it "need not expressly state that it is intended to benefit a third party as long as such an intent is apparent through the ordinary means of contract interpretation." *Serv. Emps. Internat. Union, Loc. 99 v. Options--A Child Care & Hum. Servs. Agency*, 200 Cal. App. 4th 869, 878 (2011). The third-party beneficiary need not be the primary or sole beneficiary, but he cannot be someone whose benefit is "only incidental or remote." *Id.*

In California, as elsewhere, contract interpretation depends on the mutual intention of the parties. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (Oct. 26, 1995). "A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1170 (9th Cir. 2015). "An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." *Id.* at 1171 (internal quotation marks omitted). "Interpretation of a contract must be fair and reasonable, not leading to absurd conclusions." *ASP Properties Grp., L.P. v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1269

United States District Court
Northern District of California

(2005) (internal quotation marks omitted).

Here, the jury had a sufficient basis to conclude that Diaz was a third-party beneficiary of the contract between Tesla and nextSource. It could have found that the contract was intended, in part, to benefit their employees—the "class of which [Diaz] is a member." *Serv. Emps.*, 200 Cal. App. 4th at 878. That contract, after all, had a singular goal: nextSource would hire employees for work at Tesla's facility. The jury could have found that this benefit—employment—is neither incidental nor remote.

Tesla counters, as it did previously, that the contract includes an express provision preventing third-parties from benefitting. That provision states,

> Third Party Beneficiaries. This Agreement is entered into solely between Tesla and Supplier and, except for the Parties indemnification obligations under Section 11 (Indemnification) and the Service Recipients, will not be deemed to create any rights in any third parties or to create any obligations of either Tesla or Supplier to any third parties.

Ex. 3 ¶ 14.10. I agree with Tesla to the extent that this clause must be considered and is significant. But California law takes a more functional, wholistic approach to contract interpretation than ending the inquiry at the bare language of a single provision. *See, e.g.*, *Guz*, 24 Cal. 4th at 336. Here, the jury could have examined the entire course of dealings and concluded that, despite this clause, Tesla and nextSource intended a non-incidental benefit to employees. Indeed, even if Diaz were merely a sub-contractor and CitiStaff merely a contractor of Tesla, Diaz would be in the position of a classic intended beneficiary. *See, e.g.*, *Outdoor Servs., Inc. v. Pabagold, Inc.*, 185 Cal. App. 3d 676, 683 (1986) (holding that a subcontractor was an intended beneficiary of the contract even when the defendant did not know of its identity because the defendant expected the contractor to enter into subcontracts to perform the work); *Superior Energy Servs., LLC v. Cabinda Gulf Oil Co.*, 635 F. App'x 375, 376 (9th Cir. 2016) (applying *Outdoor* to a situation "where the contracting parties intended for the payments to go to the third party").

Tesla relies on *Balsam v. Tucows Inc.*, which found a similar clause to bar the creation of third-party beneficiaries. 627 F.3d 1158, 1163 (9th Cir. 2010). But as the Ninth Circuit explained there, that clause won out in "the absence of any evidence to the contrary." *Id.* at 1163. As

23

California courts have explained, "[w]hether one is an incidental or intended beneficiary of a contract is a question of construction of the document *in the light of surrounding circumstances*." *Gordon Bldg. Corp. v. Gibraltar Sav. & Loan Ass'n*, 247 Cal. App. 2d 1, 7–8 (1966) (emphasis added). In *Balsam*, the contract at issue was between a website registrar and the entity that regulates domain names. 627 F.3d at 1159–60. The plaintiff was a victim of spam and sought to enforce a provision of the contract, arguing that the registrar was hosting spam. *Id.* But in the very different—indeed, *sui generis*—situation of two joint employers (or even, on Tesla's argument, an employer and the company it is hiring for), the jury was entitled to find their contract intended to benefit their employees too despite the boilerplate phrase about beneficiaries.

Tesla also contends that the jury did not, as a factual matter, impose liability on this basis. Mot. 8 & n.2. Its argument is that because the jury found in a special verdict that Tesla was a joint employer of Diaz, it did not find liability on this alternative basis. *Id.* This argument is unpersuasive. It is perfectly possible for someone to be an employee via the joint-employer doctrine and to be a third-party beneficiary of the contract between the joint employers (and Tesla cites no authority otherwise). When the jury found Diaz to be a joint employer, it did not find or imply that it was rejecting a third-party beneficiary theory either as a matter of the verdict form itself or as a matter of law and fact.

### B. State-Law Claim

The jury also found Tesla liable on a state-law negligent supervision or retention claim about Martinez. Under California law, "[a]n employer may be liable to a third person for the employer's negligence in hiring[, supervising,] or retaining an employee who is incompetent or unfit." *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006) (internal quotation marks and citation omitted); *see also id.* (recognizing negligent *supervision* falls within the cause of action). To be found liable, the employer must have known or should have known that retaining the employee "created a particular risk or hazard and that particular harm materializes." *Id.* (internal quotation marks and citations omitted).

#### i. Weight of the Evidence

Tesla contends that the jury's finding was against the weight of the evidence because there

was no evidence that it was negligent and because it disciplined Martinez after two racist incidents.  Mot. 8.  It argues that "the evidence shows that Tesla disciplined Martinez in response to the two incidents of his racial misconduct towards Diaz that Diaz presented to Tesla, and the two had no contact between those incidents."  *Id.*

I disagree; the weight of the evidence is not against a finding of liability on the state-law claim.  I incorporate the discussion above about the evidence supporting a Section 1981 harassment claim, much of which also bears on this negligence claim.  *See supra* Section I.A.i.  Diaz produced evidence that he complained to Tesla supervisors about many more incidents than the two Tesla references, including being called the N-word by Martinez.  *See* Tr. at 511:17–512:17, 585:24–586:4.  Then, in October 2015, Diaz testified that Martinez rushed at him, cornered him, was screaming racial abuse, and made threatening gestures.  *See id.* at 450:6–452:11.  Both Diaz and Martinez complained about the other's behavior (Martinez's complaint was that Diaz was unprofessional), but Tesla's HR department declined to conduct a "formal investigation" and reprimanded them both.  *See* Ex. 31.  This was in spite of the fact that there was surveillance footage to examine, *see* Tr. 452:8–11, and in spite of the fact that Diaz's complaint was, even without referencing the use of a racial slur, more serious than Martinez's.

After this, Diaz presented evidence that Martinez drew a racist effigy near where Diaz worked; Diaz filed a complaint, and the companies imposed the relatively light discipline of a brief suspension.  *See* Exs. 33, 272.  From all this, the weight of the evidence supports the jury's determination that Tesla's remedial and protective measures were insufficient given the gravity of the alleged harm.  That Tesla imposed light discipline only after the last, most egregious act does not absolve it of liability.

### ii.    Lack of a Contract Between Tesla and Martinez

Tesla seeks JMOL on the state-law claim because, it argues, Tesla was not actually Martinez's employer.  Mot. 10–11.  Diaz responds that Tesla is not permitted to raise the argument for the first time at this stage and that, in any event, the evidence supports the jury's verdict.  Opposition to the Mot. ("Oppo.") [Dkt. No. 321] 12–13.

"A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion.

United States District Court
Northern District of California

Rather, it is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). As a result, "a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *Id.* Tesla cannot "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Id.* (internal quotation marks and citations omitted). But the rule is not "harsh" and should be liberally interpreted to be "satisfied by an ambiguous or inartfully made motion." *Id.* (internal quotation marks and citation omitted).

Tesla did not—even "ambiguously or inartfully"—raise this issue in its Rule 50(a) motion or, indeed, raise *any* issue with the state-law claim. That motion was laser-focused on the Section 1981 claim. As Tesla summarized its argument, "[s]ince no evidence was presented at trial to establish a contractual relationship between *Plaintiff* and Tesla, pursuant to *42 U.S.C. section 1981*, Tesla requests that the Court enter judgment in its favor as a matter of law *as to Plaintiff's race Section 1981 claim*." Dkt. No. 282 at 1 (emphasis added). The substance of the motion likewise argued only that there was no contract between *Diaz* and Tesla under either a joint employment or a third-party beneficiary theory. In fact, the only fleeting reference to the state-law claim was at the beginning of the background section when Tesla noted that Diaz brings three claims, one of which is this one. *Id.* Tesla never challenged this claim, let alone provided a basis for doing so. Accordingly, it may not raise this issue for the first time today.[11]

## II.  COMPENSATORY DAMAGES

The jury awarded Diaz $6.9 million in compensatory damages: $4.5 million in past damages and $2.4 million in future damages. *See* Verdict Form at 3. Diaz sought compensatory damages solely for emotional harm, not economic injury. *See id.* Tesla argues for a new trial or remittitur on the jury's award of compensatory damages to $300,000. For the reasons that follow,

---

[11] Tesla replies that it raised the issue of Martinez and Tesla's (lack of a) contract for purposes of state-law negligence by challenging *Diaz* and Tesla's (lack of a) contract for Section 1981 purposes. Reply 5–6. But those analyses are entirely distinct; each depends, in part, on the specific evidence of control exercised by Tesla over the particular employee. Tesla's brief focused solely on the evidence of Tesla's and Chartwell's relationships to Diaz, without a single snippet of evidence or argument about Martinez. In any event, given the evidence discussed in this Order, Tesla's argument substantively lacks merit.

26

I will grant a remittitur, but not down to the low figures that Tesla suggests.  The remitter will be to $1.5 million, which I conclude is the maximum amount of compensatory damages supported by the evidence.

In this Circuit, emotional damages awards need not be supported by "some kind of 'objective' evidence." *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000).  Instead, those damages can be established, among other ways, by a plaintiff's testimony about his harm and the testimony of others about that harm.  *See id.*  Emotional distress is "essentially subjective." *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978).  For these reasons, determinations about "intangible, non-economic losses" are "peculiarly within a jury's ken." *Holzhauer v. Golden Gate Bridge Highway & Transportation Dist.*, No. 13-CV-02862-JST, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017), *aff'd, 743 F. App'x 843* (9th Cir. 2018) (quoting *Smith v. Kmart Corp.*, 177 F.3d 19, 30 (1st Cir. 1999) (internal quotation marks omitted); *see also Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal. 2004) (making the same point).  But grossly excessive awards still may be reduced.  *Claiborne*, 934 F.3d at 894.  This is true both under federal law (for the Section 1981 claims) and California law (for the negligence claim).  *See id.*; *Lane*, 22 Cal. 4th at 412.[12]

**A.  The Compensatory Damages Will Be Remitted to $1.5 Million**

For the reasons that follow, I conclude that the jury's compensatory damages award was excessive.  But, as I also explain, Diaz's emotional harm still warrants a relatively high award.  A careful evaluation of the facts of this case, the legal principles underlying judicial review of emotional damages, and comparable cases leads me to conclude that $1.5 million is the maximum amount supported by the evidence.  *See Oracle*, 765 F.3d at 1094.

I begin with why Diaz is entitled to a relatively large emotional distress damages award.  The N-word is "perhaps the most offensive and inflammatory racial slur in English, a word

---

[12] At the hearing, Diaz's counsel argued for the first time that California law provides less leeway for remitting damages than federal law.  But California caselaw establishes that trial courts have broad discretion to remit excessive damages by carefully weighing the evidence of harm.  *See, e.g.*, *Lane*, 22 Cal. 4th at 412; *Pearl v. City of Los Angeles*, 36 Cal. App. 5th 475, 485–86 (2019); *Bullock v. Philip Morris USA, Inc.*, 159 Cal. App. 4th 655, 688–89 (2008).

United States District Court
Northern District of California

expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (internal quotation marks, alteration, and citation omitted).  It "sums up all the bitter years of insult and struggle in America." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (internal quotation marks, alteration, and citation omitted). "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment, than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (internal quotation marks and citation omitted).  Even though a single utterance can be devastating, Diaz and other employees testified that the word was used repeatedly and frequently around the Tesla factory, including by supervisors.  *See supra* Background, Section II.B–C.  And even though the many, many utterances of that word alone would also be devasting, it was far from the only racial slur that was used or hurled at Diaz.  *See id.*  He was called a "porch monkey."  *Id.*  He was told to "go back to Africa."  *Id.*  He encountered slurs and swastikas on bathroom stalls.  *Id.*  And he encountered a racist picaninny drawing near his workstation.  *Id.*  But it was not just that co-workers and supervisors slung around these slurs, it was what little Diaz's employers did to stop them.  Diaz testified that he made verbal complaints that were never addressed.  *See supra* Section I.A.i.  And even when his written complaints were "addressed," the jury could readily have concluded that the responses were thin and lackluster at best and intentionally unresponsive to the conduct at worst.  *Id.*

So it is no surprise that the emotional effects on Diaz were profound.  Being subjected to racism in the workplace—where Diaz was forced to be on penalty of not holding gainful employment—can produce severe and debilitating results.  *See, e.g.*, *Rodgers*, 12 F.3d at 675. And, as the jury found, it did here.  Before Diaz went to work at the factory, he was boisterous and jovial.  *See supra* Background, Section II.E.  After the weeks and months of racist harassment, he became withdrawn, sad, and fundamentally different.  *Id.*  He testified that "[s]ome days I would just sit on my stairs and cry."  Tr. at 483:1–3.  He stopped eating, stopped sleeping, stopped having intimate relations with his wife, and withdrew from involvement in his child's life.  *See supra* Background, Section II.E.  The experience made him feel like he was in his parents' shoes,

United States District Court
Northern District of California

1    with dogs being sicced at him.  *Id.*  Legally, his testimony would be sufficient to support an

2    emotional distress award.  *Passantino*, 212 F.3d at 513.  But the jury heard more than just his

3    testimony; it heard the same things from his step-daughter and an expert, who testified to the

4    severe psychological injury that workplace racism can and did inflict.  *See supra* Background,

5    Section II.E.

6         All of this leads me to conclude that this is not, as Tesla attempts to frame it, a case of

7    "garden variety" emotional distress that was "fortunately mild and short-lived."  Mot. 11.  The

8    record roundly rejects that watered-down revisionism.  It is difficult to see how Tesla reached that

9    interpretation of the evidence other than ignoring it.  Tesla's proffered figure of $300,000 is,

10   accordingly, untethered to record evidence.  The jury reasonably found that this was a case of

11   severe emotional distress.

12        This all said, and recognizing the great deference owed to the jury's verdict, I am left with

13   the "firm conviction," *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir.

14   1987), that the jury's compensatory award was excessive.

15        First, the award of future damages exceeds a reasonable view of the evidence of future

16   harm presented at trial.  There is substantial evidence that Diaz's emotional harm was greatly

17   reduced once he stopped working at Tesla.  Diaz's step-daughter, for instance, testified that after

18   he left the Tesla facility he was "back to being" her old father.  Tr. 636:12–14.  She testified that

19   he resumed joking around and was the father she had "known and loved [her] entire life."  *Id.* at

20   636:15–637:4.  To be sure, the jury did hear some evidence about future harm, and it was entitled

21   to credit it.  Diaz testified that the experience has made him lose faith in his "fellow humans" and

22   that he now hesitates to trust people.  *Id.* at 481:20–23.  Consequently, the jury was entitled to

23   award some amount in future damages, but there is no record evidence sufficient to reasonably

24   find that what Diaz will suffer in the future is worth $2.4 million—a figure that, as explained

25   below, is significantly larger than the mine-run of *total* damages awards.  Accordingly, a steep

26   reduction in this figure is warranted.

27        A reduction to the $4.5 million in past damages, though not as comparatively steep, is also

28   necessary.  As explained above, the jury was within its rights to award a significant sum.  But

29

several factors that other courts have found significant weigh in favor of a reduction.  First, Diaz

worked at the Tesla facility for nine months.  While that is not a negligible amount of time, it is

also not nearly so long as some of the emotional harm discussed in cases below for which the

awards were smaller.  Second, Diaz's emotional harm did not come with physical illness or injury

as in many cases.  Third, a survey of comparable cases that follows convinces me that the full

amount of the jury's award is not supported by substantial evidence.

I look first to the Second Circuit's decision in *Turley v. ISG Lackawanna, Inc.*, 774 F.3d

140 (2d Cir. 2014), which is not perfectly identical to this case but, in my view, has more to teach

about these facts than any other case I have found or the parties have raised.  There, the African-

American plaintiff was racially harassed for roughly four years.  *See Turley*, 774 F.3d at 148–49.[13]

He was the only Black employee and his "co-workers frequently subjected him to racist epithets,

degrading treatment, and, from time to time, outright threats."  *Id.* at 148.  They refused to speak

to him and referred to him, among other things, with the N-word.  *Id.*  The threats included spray-

painting the initials "KKK" near his workstation twice and anonymous intercom announcements

threatening to kill him.  *Id.* at 148–49.  Co-workers would make references to monkeys and they

spread motor grease on instruments the plaintiff used.  *Id.* at 149.  At one point, he found a stuffed

toy monkey hanging in his car with a noose around its neck.  *Id.*  Turley complained to

management who were "not wholly unresponsive"; they removed offensive signs and graffiti.

They eventually interviewed employees and hired an attorney to investigate after the stuffed

monkey incident.  *Id.*  All the same, the plaintiff's supervisors were often "unresponsive" and even

sometimes "appeared to encourage some of the behavior."  *Id.*  "[O]nly two employees were

disciplined" for this behavior, one for three days for painting the words "King Kong" with graffiti

and the other for two days for threatening to "deal with" the plaintiff.  *Id.* at 150.

During the four years of the harassment, the plaintiff was severely affected.  He was

diagnosed with an adjustment disorder, depression, a panic disorder, and PTSD.  *Id.* at 150–51.

He was taken to the hospital several times.  *Id.* at 151.  He lost 30 pounds.  *Id.*  He "did not sleep,

---

[13] That plaintiff worked at the factory for longer than that, but the court explained that the racial harassment began roughly eight years in.

United States District Court
Northern District of California

struggled to relate to his children, did not socialize, and was frequently overcome by memories of his experience." *Id.* When he first started work he was "confiden[t]," "colorful," and "animated"; by the end, he was "broken and dispirited." *Id.* The Second Circuit ultimately upheld a compensatory damages verdict of $1.32 million. *Id.* at 163–64.

*Turley* is not on all fours with this case either in the underlying facts or in the emotional harm. But it is highly relevant. The emotional harm in that case, like this one, came from a workplace permeated with racial harassment. In that case, like this one, co-workers routinely mocked and verbally abused the plaintiff on account of race—often with the same or similar slurs in both cases. In that case, like this one, racialized graffiti was scrawled in the workplace, including near the plaintiff's workstation. In that case, like this one, management sometimes responded but sometimes did not. In that case, like this one, when management did respond it was (at most) with light punishments of a several-day suspension. In that case, like this one, some supervisors even joined in on the harassment. And in that case, like this one, a plaintiff who had previously been animated and colorful became dispirited, could not sleep, developed deep emotional issues, lost weight, and had trouble relating to his loved ones. There are, to be sure, meaningful differences. Turley was harassed for four years; Diaz was harassed for nine months. The involvement of Turley's direct supervisors in the harassment was more extensive than here. Some of most severe acts that happened to Turley—such as the noose and monkey—did not happen to Diaz. And Turley, unlike Diaz, was diagnosed with serious disorders and required multiple hospitalizations.

For present purposes, *Turley* helps illustrate two lessons. First, a relatively large compensatory damages award is justified on facts like these. Second, the jury's $6.9 million award here is an outlier—it is more than five times what the Second Circuit upheld in *Turley*, which had more extreme harm over a longer period.

Neither party has pointed to, and I have not found, a Ninth Circuit case that provides nearly as good guidance as *Turley*. But one helps shed light on the issue all the same. In *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493 (9th Cir. 2000), the plaintiff sued for gender-based discrimination and retaliation. The plaintiff, a woman, worked in a

31

United States District Court
Northern District of California

company for 18 years to become "one of its most successful" managers. *Passantino*, 212 F.3d at 499. She received good or great performance reviews. *Id.* at 500. But the company used a "good old boy system" of promotion and the plaintiff came to believe that she had been passed over for promotions because of her gender. *Id.* Her supervisor referred to women as "PMS," "menstrual," and "dragon lady" and said most "just wanted to stay home." *Id.* Her co-workers were condescending to women. *Id.* Her supervisor told her that the company and his boss were not committed to promoting women. *Id.* The plaintiff and another woman complained; after that, the sexist behavior escalated. *Id.* at 500–01. The plaintiff began to get lower performance reviews (including about "relationship with peers"); she was "slighted when trying to speak"; and she was the subject of "derision," including eye-rolls from co-workers and conversations that excluded her. *Id.* at 501. Opportunities in the company began to be closed to her and she was warned against filing complaints. *Id.* She ultimately did file a formal complaint and contact legal counsel, but her complaints were "largely not addressed." *Id.* at 501–02. She then experienced numerous retaliatory acts and demeaning comments. *Id.* at 502–03.

The effects of all this on the plaintiff were "constant[] worry, cr[ying], and fe[eling] trapped and upset." *Id.* at 503. Because she feared unjustly losing her job, she spent less time with her family. *Id.* She developed "stomach problems, rashes, and headaches which required medical attention." *Id.* And her long advancement within the company was "brought to a halt." *Id.* Among other damages awards, the jury awarded $1,000,000 in compensatory emotional distress damages. *Id.* at 504. The Ninth Circuit upheld the award. *Id.* at 513. It explained that she experienced "substantial anxiety" that manifested in the physical problems. *Id.*

*Passantino* is less analogous to these facts than *Turley* in ways that cut in both directions. On the one hand, the plaintiff there had built a long career with the company that was brought crashing down by its unlawful acts; here, Diaz worked at Tesla for nine months. The *Passantino* plaintiff also experienced a coordinated campaign of retaliation that does not resemble what happened to Diaz. On the other hand, the frequency and severity of the racist comments against Diaz appears to be more substantial than the sexist comments against Passantino. Diaz's emotional harm, too, appears to be at least as great as (if not greater than) Passantino's. Both

began crying often and spent less time with their families.  But he, not she, entered essentially a depressive episode in which his entire personality changed and in which he was reminded of past racist horrors against his parents.  So again, *Passantino*'s $1 million verdict—which is somewhat close to *Turley*'s, especially considering inflation—shows that substantial damages are warranted for this type of emotional harm resulting from harassment-filled workplaces, and it shows that $6.9 million is quite high.

The parties point to other cases, but I find them less useful for various reasons.  For his part, Diaz relies on *Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008), which concerned three police officers who were wrongfully criminally investigated and prosecuted based on the tip of a corrupt officer.  The Ninth Circuit upheld $5 million compensatory verdicts for each officer.  There, however, the damages were not purely based on emotional harm, they were also based on impairment of reputation and pecuniary losses.  *Harper*, 533 F.3d at 1029.  One officer had to get a lower paying job, his house was (wrongfully) searched in front of his loved ones, he was told that he was put on a hit list, and he was unable to resume his old police job because of the publicity.  *Id.*  The second officer was also told he was on a hit list, his family broke apart, his wife left him, and his teenage stepdaughter attempted to commit suicide and was placed in a psychiatric ward.  *Id.*  The last had to file for bankruptcy, lost his career, and his "young children" suffered "significant adverse effects" from the publicity.  *Id.*  The emotional component, too, is somewhat different than here.  One of the officers developed intestinal problems, became a frequent drinker, and developed paranoia.  *Id.*  Another became suicidal in addition to physical symptoms and anxiety attacks.  *Id.*  The third gained 100 pounds, was hospitalized, developed high blood pressure, and developed anxiety.  *Id.*  And this all happened over an extended period of time in which the officers were wrongfully arrested and wrongfully prosecuted all the way to acquittal.  *See id.* at 1016–21.  The compensable harm there is simply qualitatively different than what Diaz experienced.

The parties point to district court cases from this Circuit that have taken dueling approaches.  Diaz's other case is *Kingston v. Int'l Bus. Machines Corp.*, No. C19-1488 MJP, 2021 WL 2662216 (W.D. Wash. June 29, 2021).  There, the jury awarded $6 million in emotional

United States District Court
Northern District of California

33

United States District Court
Northern District of California

compensatory damages after finding the plaintiff was wrongfully discharged and retaliated against. *Id.*, at *1. The district court upheld the award, pointing out that the plaintiff's wife testified that she was afraid he would engage in self harm and that the stress of the events "trigger[ed] a health crisis." *Id.*, at *5. The plaintiff, who was 62, also told the jury about an "extensive but fruitless" search for a new job. *Id.* Tesla, in contrast, points to *Paul v. Asbury Auto. Grp., LLC*, No. CIV.06-1603-KI, 2009 WL 188592 (D. Or. Jan. 23, 2009), which remitted two $1.9 and one $2.1 million emotional distress damages awards to $150,000 for each plaintiff on hostile work environment claims. The court concluded that, there, two of the plaintiffs testified that they became stressed, stopped doing their old activities, had strained relationships with their families, developed depression, and could not eat. *Id.*, at *8. The third lost his appetite, developed headaches, and withdrew from his family. *Id.*, at *9. The court remitted the damages because the plaintiffs were not terminated or physically abused, did not attend counseling, had no economic difficulties, and had no long-term emotional distress. *Id.* It also pointed out that the harm occurred for eleven months, which it thought short. *Id.* More than anything, then, these cases show the range of reasonable opinions about the size of damages in cases that have similarities to this one—neither compels a different conclusion than the one I reach.

Tesla highlights several other district court cases in its brief, but none is nearly as analogous as those discussed, either in the underlying facts or in the nature of the emotional distress.[14] *See Clark v. City of Tucson*, No. CV-14-02543-TUC-CKJ, 2020 WL 914524 (D. Ariz.

---

[14] Tesla relies heavily on a principle the Ninth Circuit has occasionally articulated: that, generally, "courts are required to maintain some degree of uniformity in cases involving similar losses." *Shaw v. United States*, 741 F.2d 1202, 1209 (9th Cir. 1984) (citation omitted). It is unclear whether the Ninth Circuit meant it to sweep so broadly as Tesla contends and reach remittiturs of jury awards in cases like this. That case itself was about a negligence award delivered by the court, as was the only case it relied on. It is revealing that Tesla could not locate a single Ninth Circuit case applying *Shaw* to a remittitur of a jury's award. And *Shaw* has been cited only a few times to apply to remittiturs—and never by district courts that *considered* whether it should apply or not. *See, e.g.*, *Clark v. City of Tucson*, No. CV-14-02543-TUC-CKJ, 2020 WL 914524, at *18 (D. Ariz. Feb. 26, 2020). That said, other Circuits have sometimes articulated a similar principle and expressly applied it to remittiturs. *See, e.g.*, *Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006). In all events, this Order does examine cases that shed light on this one—as other district courts and courts of appeals invariably do in these cases—and even *Shaw*

Feb. 26, 2020) (remitting $3,800,000 to $250,000 in a case about deprivation of lactation facilities and retaliation); *Johnson v. Albertsons LLC*, No. 2:18-01678-RAJ, 2020 WL 3604107 (W.D. Wash. July 2, 2020) (remitting $750,000 to $200,000 based on unspecified "humiliate[ion]" and "loss of self-esteem" that was "relatively short" and "garden variety"); *Longfellow v. Jackson Cty.*, No. CV 06-3043-PA, 2007 WL 682455 (D. Or. Feb. 28, 2007) (remitting $360,000 to $60,000 based on a termination and "being called a liar"); *Glenn-Davis v. City of Oakland*, No. C 02-02257SI, 2007 WL 687486, at *1 (N.D. Cal. Mar. 5, 2007) (remitting $1.85 million to $400,000 based on not receiving a promotion with no indications of depression or deterioration in health). Some of them also have other issues that do not exist here, such as concerns about multiple recovery and the award being a punitive damages award in all but name. *See, e.g.*, *Clark*, 2020 WL 914524, at *1–*3. And some do not sufficiently elaborate on their reasoning to enable meaningful comparisons.

Tesla also places great emphasis on several "samples" of recent federal decisions that remitted non-economic damages in discrimination and retaliation cases or permitted those awards to stand. *See, e.g.*, Mot. 11–13. It is telling that Tesla does not highlight any further examples of them in its brief or elaborate on their facts in any way. I have reviewed the decisions themselves and do not find anything in them so comparable to Diaz's situation as to materially alter my reasoning. Tesla purports to have identified ranges of $25,000 to $750,000 and $50,000 to $1.75 million. *See* Mot. 12 (citing appendices). To start, it is unclear how representative this "sample" is or if it skews towards decisions more favorable to Tesla. Additionally, as explained, many of the decisions in this "sample" are not comparable in terms of harm. And, in any case, I remit the award to a level that is *within* one of Tesla's ranges, even if it is toward the high-end.

The net result is as follows. The jury is entitled to "great deference," *Williams*, 895 F.3d at 1128, and that is especially true when it comes to non-economic harm, *Holzhauer*, 2017 WL 3382316, at *2. It had ample grounds to find that Diaz was severely harmed. But its award of future damages is far out of proportion to the evidence and its award of past damages must be

_____

emphasized that "[e]ach case stands on its own facts," *Shaw*, 741 F.2d at 1209, so nothing here turns on whether the principle is as strict as Tesla insists.

35

1    reduced too.  The closest cases, especially *Turley* and *Passantino*, illustrate that awards of roughly

2    $1.5 million (in today's dollars) are supported by analogous (though not identical) evidence.

3    Accordingly, I conclude that the maximum amount supportable by proof to make Diaz whole for

4    his emotional harm is $1.5 million.  And even though this award is on the high side for these types

5    of cases, it is justified given the facts and the jury's findings.

6        **B.  Tesla's Other Counterarguments**

7        Tesla makes three other arguments on this point that are unpersuasive and do not factor

8    into my analysis.

9        First, it argues that Diaz testified that, even with the racial harassment occurring, he was

10   "happy" to work at Tesla.  *See, e.g.*, Mot. 4.  While Diaz did, in response to a cross-examination

11   question clarifying a separate issue, use the phrase that "[w]hile I was there, I was happy to be

12   there," Tesla's argument ignores the context of that discrete exchange and Diaz's testimony more

13   broadly.  In the next question, Diaz clarified what he meant by "happy": he compared it to being

14   on a sports team and "whether I liked my team member or not, we can still get a job done."  Tr.

15   516:21–23.  More broadly, as the evidence recounted above shows, Diaz was far from happy at

16   Tesla.  This one piece of testimony does not muddy the clearer, bigger picture.

17       Second, Tesla argues that the compensatory damages reflect harm that it did not cause.

18   Mot. 15–16.  According to it, much of Diaz's emotional harm came from distress that his son,

19   Demetric Di-Az, was convicted for armed robbery.  *See, e.g.*, Tr. at 572:5–20 (discussing the

20   robbery).  It is true, as Tesla argues, that compensatory damages compensate for the harm caused

21   by the defendant.  *See, e.g.*, *Watson v. City of San Jose*, 800 F.3d 1135, 1138 (9th Cir. 2015).  But

22   there is no support in the record for concluding that the jury awarded damages to compensate Diaz

23   for any harm other than that caused by Tesla.  As explained above, the hostile work environment

24   for which Tesla is liable supports a significant damages award.  In any event, my remittitur

25   analysis is based solely on the appropriate basis for Tesla's liability.

26       Third, Tesla argues that the compensatory damages are improperly punitive.  Mot. 17.

27   Tesla, again, has the principle correct: compensatory damages serve the goal of making the

28   plaintiff whole while punitive damages punish the defendant and deter misconduct.  *See Cooper*

36

1    *Indus., Inc. v. Leatherman Tool Grp.*, Inc., 532 U.S. 424, 432 (2001). But, again, there is no

2    indication that the jury did anything improper. To start, "[a] jury is presumed to follow its

3    instructions," *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and the jury here was properly

4    instructed (as Tesla does not dispute) about the different roles of punitive and compensatory

5    damages. Tesla has presented no evidence to overcome that presumption, which could end the

6    analysis on its own. But here, there is also an affirmative reason to believe that the jury was *not*

7    improperly punitive in the compensatory award: It separately awarded *$130 million* in punitive

8    damages. The presence and size of that award strongly implies that the jury poured every ounce of

9    punishment and deterrence it believed warranted into it; there is no reason it would have snuck a

10   few extra million in punitive damages into its compensatory award.

## III.    PUNITIVE DAMAGES

12          The jury awarded Diaz $130 million in punitive damages. *See* Verdict Form at 4. Tesla

13   argues that it is entitled to JMOL, a new trial, or remittitur on that award. Its argument about

14   JMOL and a new trial, however, are essentially duplicative in substance of the reasons it seeks to

15   reduce the award under the Constitution. *See* Mot. 18–24. I largely analyze them together and

16   would not, in any event, exercise my discretion to reduce the award below the constitutionally

17   acceptable threshold. As a preliminary matter, to the extent that Tesla's argument is that *no*

18   punitive damages are warranted as a matter of law, I reject it.[15] The explanation that follows

19   shows that the jury had a legally sufficient basis to make *an* award of punitive damages. The size

20   of the award here, though, is unconstitutionally large. I will, consequently, remit it to $13.5

21   million, a nine-to-one ratio to the remitted compensatory damages. But I will not reduce it further

22   than that.[16]

23          The Supreme Court has held that the Fifth Amendment's Due Process Clause prohibits

---

[15] Tesla also never made that argument at the Rule 50(a) stage, waiving it. *See Go Daddy*, 581
F.3d at 961.

[16] Diaz's request for judicial notice of media coverage of the size of the verdict (Dkt. No. 320) is
DENIED. Diaz argues that this evidence is relevant to the issue of punitive damages, but the
media coverage does not affect analysis of the constitutional challenge to punitive damages, which
is what is at issue.

United States District Court
Northern District of California

1   punitive damages that are "grossly excessive." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538

2   U.S. 408, 416 (2003).[17]  To determine whether an award of punitive damages is unconstitutionally

3   large, the Supreme Court has set out three "guideposts": "(1) the degree of reprehensibility of the

4   defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the

5   plaintiff and the punitive damages award; and (3) the difference between the punitive damages

6   awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at

7   418.

8          Here, the award of $130 million is grossly disproportionate under these precedents, but a

9   9:1 ratio to the size of compensatory damages is warranted and constitutional.

10         **A.  Reprehensibility**

11         Reprehensibility is the "most important indicium of the reasonableness of a punitive

12   damages award." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).  The reprehensibility of

13   the defendant's conduct is judged by "considering whether: the harm caused was physical as

14   opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the

15   health or safety of others; the target of the conduct had financial vulnerability; the conduct

16   involved repeated actions or was an isolated incident; and the harm was the result of intentional

17   malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419.

18         Tesla's conduct falls high on the spectrum.  "[I]ntentional discrimination on the basis of

19   race or ethnicity is especially reprehensible and a different kind of harm, a serious affront to

20   personal liberty." *Flores v. City of Westminster*, 873 F.3d 739, 760 (9th Cir. 2017) (internal

21   quotation marks and citation omitted).  As the Ninth Circuit has explained, "[t]here can be no

22   question of the importance of our society's interest in combating discrimination; this nation fought

23   the bloodiest war in its history in part to advance the goal of racial equality, adding several

24   amendments to the Constitution to cement the battlefield victory." *Zhang v. Am. Gem Seafoods,*

25

26   ---

   [17] *State Farm* and several other cases in this area discuss the Due Process Clause of the Fourteenth
27   Amendment as a limit on state-law punitive damages.  But the same principles apply to punitive
   damages under federal law due to the Fifth Amendment. *See, e.g.*, *Ramirez v. TransUnion LLC*,
28   951 F.3d 1008, 1036 (9th Cir.), *rev'd and remanded on other grounds*, 141 S. Ct. 2190 (2021)
   (applying *State Farm* to punitive damages under the federal Fair Credit Reporting Act).

*Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003).  As a result, "[r]acial discrimination often results in large punitive damage awards."  *Id.*

The jury had sufficient grounds to find that Tesla's actions showed "an indifference to or a reckless disregard" for Diaz's (and others') right to be safe and free from discrimination in the workplace.  *See State Farm*, 538 U.S. at 419.  Tesla's indifference to Diaz's complaints is striking. *See supra* Section I.A.i.  The jury could have credited Diaz's testimony that he had verbally complained multiple times about uses of the N-word and other slurs without anything being done. *Id.*  Further, the jury could have found that the companies' responses to the written complaints were so inadequate as to imply indifference to the serious problems of harassment in the workplace.  *See id.*  Tesla counters that it had antidiscrimination policies and did take action in response to the written complaints, "if imperfectly."  Mot. 19.  But having a policy on paper and effectively protecting employees from known racial harassment are different.  And Tesla's slaps on the wrist—not to mention that it disciplined both Martinez *and* Diaz without viewing tape or interviewing witnesses—undermine its assertions that it did enough.  And I note again that Tesla did not pursue a *Faragher/Ellerth* defense on this issue, despite its attempt to frame its motion this way.  *See, e.g.*, Mot. 19 (arguing it "respond[ed] adequately to [the] conduct" (internal quotation marks and citation omitted)).

Other *State Farm* factors point in the direction of a relatively high punitive damages award. The harm was also not a single isolated incident, it was repeated.  *See State Farm*, 538 U.S. at 419.  The discriminatory slurs were constant.  Some of them came from supervisors.  But Tesla's even more direct failings were also repeated.  Tesla repeatedly failed to address complaints or addressed them with what the jury could have understood to be reckless disregard for Diaz's rights.  The harm was also not merely economic.  *State Farm*, 538 U.S. at 419.  As recounted in detail above, and incorporated here, Diaz suffered grave emotional harm.  *See supra* Section II.  In the light most favorable to the jury's verdict, Diaz was also financially vulnerable.  *State Farm*, 538 U.S. at 419.  As the jury found, Tesla was a joint employer of Diaz.  Diaz was dependent on it for his livelihood.  He was also entirely dependent on it and its contractors to prevent discrimination in the workplace.  *Cf. Hardeman v. Monsanto Co.*, 997 F.3d 941, 973–74 (9th Cir.

39

1   2021) ("It goes without saying that this is a case of a large corporation and an individual—not two

2   corporations on equal footing.  Having said that, this factor is not particularly relevant in a mostly

3   noneconomic damages case like this one.").

4          Not only does the evidence support a finding of recklessness or indifference to Diaz's

5   health and safety, it supports a finding that Tesla intentionally built an employment structure that

6   allowed it to take advantage of Diaz's (and others') labor for its benefit while attempting to avoid

7   any of the obligations and responsibilities that employers owe employees.  *See supra* Section I.A.

8   Indeed, Tesla's strategy at trial was essentially to attempt to show that it was not Diaz's employer

9   without much of a substantive defense of its actual employment practices.  Neither party has

10  pointed to a Supreme Court or Ninth Circuit decision that considered similar behavior, but

11  attempting to pawn off responsibility for a safe and discrimination-free workplace would seem to

12  be precisely the sort of extraordinary behavior punitive damages are built for.

13         Some of the reprehensibility considerations, however, cut in Tesla's favor and counsel

14  against increasing the penalty above a single-digit ratio.  The Supreme Court has "outlined what

15  one court has termed a 'hierarchy of reprehensibility,' with acts and threats of violence at the top."

16  *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001) (citations omitted).  Here, there is no

17  evidence that Tesla's senior management carried out acts or threats of violence (though Martinez,

18  a supervisor, did).  *Cf. Zhang*, 339 F.3d at 1043 (finding senior managers' discrimination

19  especially reprehensible).  Nor is there any indication that Tesla set out with the *purpose* of

20  discriminating or fostering a hostile work environment.  *Cf. Thomas v. iStar Fin., Inc.*, 508 F.

21  Supp. 2d 252, 262 (S.D.N.Y. 2007) (finding the lack of such behavior warranted a reduction).

22         **B.  Ratio**

23         The second guidepost is the ratio of punitive damages to "actual harm."  *Gore*, 517 U.S. at

24  580.  The Supreme Court has explained that it is "reluctant to identify concrete constitutional

25  limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages

26  award."  *State Farm*, 538 U.S. at 424.  But, it has said, "few awards exceeding a single-digit ratio

27  between punitive and compensatory damages, to a significant degree, will satisfy due process."

28  *Id.* at 425.  While "an award of more than four times the amount of compensatory damages might

United States District Court
Northern District of California

40

be close to the line of constitutional impropriety," these ratios are "instructive" not "binding." *Id.* Larger ratios are more likely to be warranted when "a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (internal quotation marks and citation omitted). Conversely, when "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* In short, the punitive damages must be "reasonable and proportionate" to the harm and compensatory damages. *Id.*

As the jury originally rendered it, the punitive damages were approximately 18 times the amount of compensatory damages. Based on the remitted amount—that is, the amount I conclude reflects the "actual harm"—$130 million in punitive damages would be more than 86 times the compensatory damages. As explained above, the size of the compensatory damages here—both awarded and remitted—is an outlier on the high side. *See supra* Section II.

This large disparity between punitive and compensatory damages and the relatively large size of the compensatory damages award suggest that the punitive damages award here must be constrained. As the Supreme Court has explained, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. Because this is a discrimination case, and in light of the reprehensibility of the conduct, a ratio in the higher part of that range is more appropriate. *Cf. e.g.*, *Zhang*, 339 F.3d at 1044 (approving 7:1 ratio); *Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005) (holding that as high as a 9:1 ratio could be appropriate in a Section 1981 case). I recognize that *Turley*, on which I relied in the preceding section, concluded that a 2:1 ratio was appropriate on those facts. *See Turley*, 774 F.3d at 166. But the Ninth Circuit has often thought higher awards warranted in these cases, *see, e.g.*, *Swinton*, 270 F.3d at 818 (approving a 28:1 ratio), *Turley* did not have similar acts to Tesla's attempt to insulate itself from responsibility, and the jury's punitive damages verdict here was more than six times as large as that in *Turley*, *see* 774 F.3d at 165.

### C. Comparable Penalties

Third, courts must examine the "disparity between the punitive damages award and the

civil penalties authorized or imposed in comparable cases." *Id.* at 428 (internal quotation marks and citation omitted). The Court has also permitted examining comparable criminal penalties to assess the seriousness of the actions but has warned that using criminal penalties to "determine the dollar amount of the award" is less useful. *Id.*

The Ninth Circuit has held that "the $300,000 statutory limitation on punitive damages in Title VII cases [i]s an appropriate benchmark for reviewing § 1981 damage awards, even though the statute d[oes] not apply to § 1981 cases." *Bains*, 405 F.3d at 777. But it has also "hasten[ed] to add that Congress has not seen fit to impose any recovery caps in cases under § 1981 (or § 1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII." *Swinton*, 270 F.3d at 820. Because of the sheer difference between $130 million and $300,000, this factor weighs somewhat in favor of a reduction, *Bains*, 405 F.3d at 777, but given the Ninth Circuit's guidance, it is not overwhelming, *Swinton*, 270 F.3d at 820.

* * *

Putting the three guideposts together, I conclude that a 9:1 ratio is appropriate. Despite Tesla's attempts to characterize it any other way, its treatment of Diaz—and the treatment of its supervisors and employees (or contractors)—falls high on the reprehensibility scale, requiring a high ratio. But several reprehensibility factors push the other direction and the unremitted ratio would be extremely large. Accordingly, in line with the Ninth Circuit's guidance, a 9:1 ratio both fulfills the purposes of punitive damages, accords appropriate deference to the jury's verdict, and stays within constitutional guardrails.

Finally, a word on Tesla's argument that the punitive damages award was "improperly premised" on its wealth. *See* Mot. 25–26. The jury was told by Diaz's expert that Tesla had a market capitalization of $43.8 billion. *See* Tr. 684:19–23.[18] It was appropriate for the jury to *consider* Tesla's wealth in determining the size of punitive damages. *See TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462 n.28 (1993) ("Under well-settled law . . . factors such as [net worth]

---

[18] This figure is from October 2019. *See* Tr. 684:19–23. On the eve of trial, Diaz attempted to update the measure in his expert's report to include Tesla's current valuation, which is much higher. I disallowed that because the expert was bound by the report he gave that he never previously supplemented. *See* Fed. R. Civ. P. 26(e)(2).

United States District Court
Northern District of California

are typically considered in assessing punitive damages."); *White v. Ford Motor Co.*, 500 F.3d 963, 976 (9th Cir. 2007) (discussing "the Supreme Court's and this circuit's longstanding recognition of the admissibility of net worth evidence" in punitive damages calculations); *Bains*, 405 F.3d at 777. One primary purpose of punitive damages, after all, is deterrence. An award sufficient to deter the average individual will not necessarily be the same as an award sufficient to deter a corporation with Tesla's wealth. But there are limits: "the wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427–28. Here, I remit the award to an amount appropriately based on that reprehensibility that brings it into the constitutional range, so Tesla's wealth will not justify an "*otherwise* "unconstitutional award. *Id.* (emphasis added). But, by the same token, Tesla cannot use the mere fact of its wealth as an escape hatch to avoid rightful liability.

## CONCLUSION

The motion for judgment as a matter of law is DENIED. The motion for a new trial is CONDITIONALLY DENIED based on Diaz accepting a remittitur to $1.5 million in compensatory damages and $13.5 million in punitive damages. Diaz shall file a notice on the docket within 30 days stating whether he accepts or rejects the remittitur (and a proposed amended judgment if he accepts it). At that point, I will, as appropriate, either enter an order granting a new trial on damages or enter a final, appealable order denying Tesla's motion and an amended judgment.

**IT IS SO ORDERED.**

Dated: April 13, 2022

William H. Orrick
United States District Judge

Exhibit

**B**

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OWEN DIAZ, | Case No. 3:17-cv-06748-WHO |
| Plaintiff, | |
| v. | **JUDGMENT** |
| TESLA, INC., et al., | |
| Defendants. | |

On September 27, 2021, this matter came on for jury trial before the Hon. William H. Orrick. After a six-day jury trial, on October 4, 2021, the jury rendered a unanimous verdict in favor of plaintiff Owen Diaz and against defendant Tesla, Inc. and awarding Mr. Diaz Six Million, Nine Hundred Thousand dollars ($6,900,000) in compensatory damages and One Hundred Thirty Million dollars ($130,000,000) in punitive damages, for a total amount of One Hundred Thirty-Six Million, Nine Hundred Thousand dollars ($136,900,000) in damages. [Dkt. No. 301]. The Court entered judgment in accordance with the jury's verdict. [Dkt. No. 307].

On November 16, 2021, Defendant Tesla, Inc. moved for judgment as a matter of law, moved in the alternative for a new trial as to liability, and moved in the further alternative for remittitur or new trial as to damages. [Dkt. No. 317].

On April 12, 2022, the Court denied Tesla's motion for new trial as to damages conditioned on Mr. Diaz accepting a remittitur to One Million, Five Hundred Thousand dollars ($1,500,000) in compensatory damages and Thirteen Million, Five Hundred Thousand dollars ($13,500,000) in punitive damages, for a total amount of Fifteen Million dollars ($15,000,000). [Dkt. No. 328].

On June 21, 2022, Mr. Diaz rejected the remittitur. [Dkt. No. 347].

On June 27, 2022, the Court accordingly granted Tesla a new trial on damages. [Dkt. No. 348].

On March 27, 2023, this matter came on for jury trial on damages before the Hon. William H. Orrick. The action was tried for five days from March 27, 2023 to March 31, 2023. On April 3, 2023, the jury rendered a unanimous verdict. [Dkt. No. 463].

The jury awarded Mr. Diaz past non-economic damages of One Hundred Thousand dollars ($100,000), future non-economic damages of Seventy-Five Thousand dollars ($75,000), and punitive damages of Three Million dollars ($3,000,000), for a total amount of Three Million One Hundred Seventy-Five Thousand dollars ($3,175,000).

Judgment is hereby entered in accordance with the jury's verdict of October 4, 2021 as to liability, and the jury's verdict of April 3, 2023 as to damages.

Post-trial motions, if any, shall be due within 28 days of entry of this judgment, and the time for filing any notice of appeal and any motion for stay of judgment pending appeal shall run from the date of the Court's decision on any such post-trial motions or the expiration of the 28-day period for filing such motions, whichever is later. The Court shall retain jurisdiction thereafter to determine the additional amounts that Tesla shall be required to pay to Mr. Diaz as reasonable statutory attorneys' fees and costs.

Post-judgment interest at the rate provided by law shall accrue on the award of damages commencing from the date of entry of this Judgment and shall accrue on the award of fees, expenses, and costs, commencing from the date such amounts are awarded.

**IT IS SO ORDERED.**

Dated: April 11, 2023

William H. Orrick
United States District Judge

# Exhibit

# C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OWEN DIAZ,

              Plaintiff,

      v.

TESLA, INC., et al.,

              Defendants.

Case No. 3:17-cv-06748-WHO

**ORDER ON POST TRIAL MOTIONS**

Re: Dkt. Nos. 454, 478, 479, 487, 489, 490

For the second time, a jury has rendered a verdict regarding plaintiff Owen Diaz's experience enduring a racist and hostile work environment while employed at defendant Tesla, Inc.'s factory in Fremont, California. After a retrial on compensatory and punitive damages, the jury awarded $3.75 million to Diaz, who has filed a motion for a mistrial and new trial because of the misconduct of Tesla's counsel and because the compensatory and punitive damages awards were inadequate. The lawyer's misconduct did not so permeate the entire trial to have influenced and prejudiced the jury, and the damages award was not defective. I deny Diaz's motion. Additionally, Tesla moves to reduce the punitive damage award to a 9:1 ratio with the compensatory damages award. This was the second jury that imposed such a high ratio, and its verdict is appropriate in light of the endemic racism at the Tesla factory and Tesla's repeated failure to rectify it. Tesla's motion is also denied.

**BACKGROUND**

**I. PROCEDURAL BACKGROUND**

The procedural history of this case is extensive. The complaint was filed in 2017, and the first jury trial occurred in September and October 2021. The jury found that Tesla was liable for discriminating against plaintiff Owen Diaz in violation of 42 U.S.C. § 1981 and California state

1    law and awarded Diaz $6.9 million in compensatory damages and $130 million in punitive

2    damages.  [Dkt. No. 301].

3         Tesla moved for remittitur or a new trial on damages.  [Dkt. No. 317].  I remitted the

4    damages award to $1.5 million compensatory and $13.5 million punitive, finding that those

5    awards were the highest supported by the evidence and the United States Constitution.  ("Order on

6    Post-Trial Mots.") [Dkt. No. 328].  That Order gave Diaz a choice between accepting the

7    remittitur or adopting a proposal of Tesla's to proceed with a new trial on damages only.  *Id.*  Diaz

8    rejected the remittitur.  [Dkt. No. 347].  After extensive motion practice in which Tesla argued

9    against a damages-only retrial—which I denied based on judicial estoppel, as Tesla moved for a

10   damages-only retrial in the first place—I held a second damages-only trial in March 2023.[1]

11        I limited the second trial to the evidence and witnesses presented in the first trial.  [Dkt.

12   No. 376].  At the close of Diaz's case in chief, Tesla moved orally for and filed a written motion

13   for judgment as a matter of law, Trial Transcript[2] ("Tr.") 5-1010:1-20; [Dkt. No. 454], which I

14   took under submission, Tr. 5-1009:15-25,1010:22-1011:8.  Subsequently, Diaz moved for a

15   mistrial, [Dkt. No. 453], which I also took under submission, Tr. 5-917:9-12.

16        After deliberating, the jury returned an award of $100,000 for past non-economic damages,

17   $75,000 for future non-economic damages, and $3 million for punitive damages.  [Dkt. No. 463].

18   I entered the judgment.  [Dkt. No. 471].

19        Diaz filed a renewed motion for a mistrial and for a new trial.  ("Mot. Mistr.") [Dkt. No.

20   478].  Tesla opposed.  ("Oppo. Mistr.") [Dkt. No. 481].  Diaz replied.  ("Repl. Mistr.") [Dkt. No.

21   483].  Diaz subsequently filed a notice requesting that I not rule on his motion until I considered

22   additional evidence that his counsel discovered while litigating a separate case against Tesla in

---

[1] This case is at this procedural posture because of the choices made by the parties and counsel. Though there was *extensive* motion practice about the scope of the second trial, it was *Tesla's* request to have a retrial on only damages in the first place, including on quantification of (not entitlement to) punitive damages.  *See* [Dkt. Nos. 348, 359, 361, 362, 365, 389, 408, 412, 417, 425, 428, 454].  And the reason there was a second jury trial at all was because Diaz rejected remittitur—which he was entitled to do.  He now brings a motion in part to ask for a second chance to accept the initial remittitur, to which he is no longer entitled.

[2] The trial transcript is cited in this Order as "Tr."  It appears in six volumes at Dkt. Nos. 458-461, 466-467.

1    state court. [Dkt. No. 485]. I ordered Tesla to respond. [Dkt. No. 486]. Tesla did so and attached

2    the additional evidence. [Dkt. No. 488]. Diaz then filed a motion for leave to file a surreply.

3    [Dkt. No. 490].

4          Tesla did not renew its motion for judgment as a matter of law but instead filed a motion to

5    alter or amend the judgment. ("Mot. Jdgmt.") [Dkt. No. 479]. Diaz opposed. ("Oppo. Jdgmt.")

6    [Dkt. No. 480]. Tesla replied. ("Repl. Jdgmt.") [Dkt. No. 483].

7          I vacated the hearing on the motions under Civil Local Rule 7-1(b). [Dkt. No. 484].

8    **II.    EVIDENCE AT TRIAL[3]**

9          Diaz began working at the Tesla factory in June 2015, Tr. 3-587:3, and ended his

10   employment about March 2016, Tr. 3-607:5-7. He testified that he was excited to work

11   somewhere that was developing technology to help move away from fossil fuels and make the

12   world better for his kids. Tr. 3-587:5-14, 588:12-14. But during his time at Tesla, Diaz

13   encountered racism and hostility, including regularly being called the N-word.

14         Robert Hurtado, a supervisor at Tesla, called Diaz the N-word over 30 times, including by

15   saying "[N-word], hurry up," "[N-words] are lazy," and "I wish I can get all you [N-words] fired."

16   Tr. 3:604:23-606:8. Ramon Martinez, another Tesla supervisor, called Diaz the N-word over

17   thirty times, said "I hate you, [N-word]," and told him "to go back to Africa." Tr. 3-603:11-

18   604:20. Diaz's supervisor, Tamotsu "Tom" Kawasaki, testified that Martinez often used the

19   words "mayate" and "chongo," both racial slurs in Spanish. Tr. 2-281:9-12. Wayne Jackson, a

20   Black program manager at Tesla, confirmed that Martinez used the word "mayate." Tr. 2-381:17-

21   382:7. Martinez denied all of this. Tr. 3-584:18-585:1.

22         Diaz testified that at one point, Martinez threatened to physically attack him at work and

23   yelled at him, "You [N-words] aren't S-H-I-T." Tr. 3-610:2-612:7. Diaz complained to a

24   supervisor, Ed Romero, and asked him to check the surveillance cameras, though Diaz's

25   subsequent email complaint did not specifically mention racial insults. Tr. 3-612:8-614:23; *see*

26   *also* Tr. 3-546:25-548:2 (Romero confirming this was recounted in an email). Tesla did not

27

28   _____

[3] In this background section, I recount the evidence at the second trial in a neutral (and consolidated) manner for clarity in the record.

United States District Court
Northern District of California

1    follow up, show Diaz the video, or interview witnesses after that event.  Tr. 3-546:25-548:2,

2    612:8-614:23.  Jackson testified that he interviewed Diaz and Martinez after the incident but did

3    not interview the eyewitness, Rothaj Foster, because he was told by his boss to stop the

4    investigation before it was complete.  Tr. 2-387:10-390:18, 2-394:24-395:11.  Jackson said he had

5    "[v]ery little" control over how he investigated complaints.  Tr. 2-396:8-397:12.  Jackie Delgado

6    Smith, a Human Resources representative, testified that Tesla HR was never told of the incident.

7    Tr. 5-954:15-955:6.  Subsequently, Diaz and Martinez were both given verbal warnings.  Tr. 2-

8    395:21-396:7.  Martinez still works at Tesla.  Tr. 3-571:11.

9         A male coworker, Judy Timbreza, called Diaz the N-word and "mayate" and also used

10   Spanish to call Diaz a "porch monkey."  Tr. 3-589:19-593:12.  Diaz testified that one of the times

11   Timbreza called him the N-word led to an "intense" "verbal" altercation, which was broken up by

12   Kawasaki.  Tr. 3-593:5-596:1.  Kawasaki confirmed that witnesses told him that Timbreza "was

13   throwing racial slurs."  Tr. 2-268:11-13, 270:5-10, 291:8-12.  Romero admitted that Kawasaki told

14   him that Diaz complained about this incident and about racial slurs, and that Diaz had said this had

15   happened before, Tr. 3-537:20-540:3, 542:15-543:7, though on cross he also said he did not recall

16   Kawasaki mentioning the N-word, Tr. 3-559:14-17.  Romero said that Kawasaki and another

17   employee investigated the Timbreza incident.  Tr. 3-544:3-5.  Diaz told the jury that Kawasaki

18   appropriately investigated the incident and that he did not have to work with Timbreza again.  Tr.

19   3-593:5-596:1.  Kawasaki testified that he never received any training on race harassment.  Tr. 2-

20   263:9-13.

21        Diaz also testified that he complained to Romero several times about being called the N-

22   word.  Tr. 3-613:5-14.  Romero agreed that he learned Diaz had been complaining about racist

23   conduct, *see* Tr. 3-542:22-24, 543:13-14, though Romero said Diaz did not complain directly to

24   Romero at least until the Timbreza incident, Tr. 3:561:1-4.  Romero testified that he did not

25   personally investigate Diaz's complaints and was specifically told by Tesla to not personally

26   investigate the Timbreza incident.  Tr. 3-541:22-542:1, 544:21-545:2, 549:13-550:16.  Diaz and

27   Romero both testified that Tesla never fired anyone for using the N-word.  Tr. 3-552:10-19,

28   615:13-15.

In addition to verbal harassment, Diaz encountered physical symbols of racism and hostility throughout his time at Tesla. On his second day at work, he saw racist graffiti in the bathroom, and continued to see the N-word and swastikas in bathrooms throughout the rest of his employment. Tr. 3-623:1-8. Another Black employee and later supervisor, Michael Wheeler, testified that he regularly saw racist graffiti, including the N-word and swastikas, and that Diaz reported the racist graffiti he saw to Wheeler. Tr. 2-346:17-347:17.

Diaz also encountered a large drawing consisting of a face with large lips and a bone in its hair with the word "Boo" underneath it, which he called a "jigaboo" or "picaninny."[4] Tr. 3-618:11-621:10.



Ex. 33.

Diaz testified that the picaninny was intentionally placed in his workspace so that he would see it. Tr. 3-618:11-621:10. Wheeler told the jury that, when he was called over to the scene, he saw that Diaz was "very upset" about the drawing. Tr. 2-354:14-355:6. Wheeler understood that to Black people from older generations, like Wheeler's mother and like Diaz, jigaboos were racist and highly offensive, and "boo" was "a racial slur." *Id.* In turn, Diaz said that seeing the picaninny made him feel like he "was kicked in the stomach" and reminded him of stories about his parents "being beat with water hoses, having dogs sicced on them." Tr. 3:620:11-15.

Wheeler testified that Martinez admitted to drawing the picaninny and said he had drawn it

---

[4] A "picaninny" (sometimes "pickaninny" or "piccaninny") has long been a racist caricature, originally of a Black child. *See* David Pilgrim, The Picaninny Caricature, Jim Crow Museum of Racist Imagery (Oct. 2000, ed. 2023), https://jimcrowmuseum.ferris.edu/antiblack/picaninny/homepage.htm.

to be funny. Tr. 2-355:12-13. Martinez told the jury that he drew the picaninny as part of "a little competition between shifts to see who was more productive," Tr. 3-572:1-14, 574:7-10. He intended it to represent "Inki the Caveman," a cartoon from his youth that he thought "was a persistent character that was always consistent to reach his goals." Tr. 3-574:11-20. A photo of Inki the Caveman was shown to the jury as an exhibit.



Ex. 133.

Martinez said he wrote "boo" to mean that his shift "wasn't afraid of other shift[s] making more bales than us." Tr. 3-576:4-6. He said that as soon as he was confronted about the drawing, he immediately admitted he drew it and apologized. Tr. 3-582:8-583:15. Wheeler testified that Martinez did not show remorse or apologize to Diaz. Tr. 2-355:14-18.

Diaz reported the incident to Romero, who admitted that Diaz was hurt and offended. Tr. 2:530:5-532:10. The picaninny reminded Romero of racist and offensive jigaboo cartoons from his youth. Tr. 2:533:5-12. Romero and Jackson told Martinez's supervisor, Victor Quintero, that the drawing was derogatory and inappropriate, though Romero did not talk to Martinez directly. Tr. 2:533:2-24. Martinez was temporarily suspended without pay and received a "final written warning." Tr. 5-949:1-11, 957:18-19. He still works for Tesla. Tr. 3-571:11.

Other witnesses testified to their relevant experiences at Tesla. For example, Kawasaki testified that the N-word was used regularly and "thrown around casually" at the factory. Tr. 2-281:22-282:9, 306:23-25.

Wheeler testified that the N-word was used frequently at the factory, that it was directed at him, that it made him feel "[n]ot good," and that its use was unacceptable at work. Tr. 2-343:4-345:19. Wheeler emotionally recounted that when he reported to his supervisors that someone

said to him, "F you, N-word," instead of disciplining the man who used the slur, Tesla promoted him. Tr. 2-345:19-346:16. Additionally, Wheeler testified that he found feces on the driver's seat of the cart he had to use in the factory as part of his role, and that he believed the incident was race-based harassment. Tr. 2-348:7-351:3. Though he reported the incident and strongly believed there were security cameras that captured the incident, he said there was no investigation, no follow-up, and no punishment. *Id.*

Jackson testified that the use of the N-word was "[r]ampant," as in it was used "[e]very day," "[m]ore than several times a day." Tr. 2-381:3-15. He found the N-word "[e]xtremely" offensive and "very derogatory" when it was used, regardless of how it was said. Tr. 2-383:15-384:2. He said that these words should not be used in a workplace, but that there was "nothing" he could do to stop their use "[b]ecause Tesla allowed it. They didn't stop it." Tr. 2-384:12-22.

Diaz's expert testified to the Tesla's workplace standards, and Diaz, his daughter, and another expert testified to the effects and emotional toll of the racism and harassment on Diaz, all of which is addressed in detail below.

## LEGAL STANDARD

### I. RENEWED MOTION FOR MISTRIAL

Under Federal Rule of Civil Procedure ("FRCP") 59, a court may "grant a new trial on all or some of the issues" "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. Proc. 59(a)(1)(A); *see also id.* 59(d) ("[T]he court, on its own, may order a new trial for any reason that would justify granting one on a party's motion."). On "a Rule 59 motion, the district court can weigh the evidence, make credibility determinations, and grant a new trial for any reason necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 841 (9th Cir. 2014), *as amended*; *see also Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987) (same). A new trial may be granted if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice," "even if substantial evidence supports the jury's verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (citation omitted).

United States District Court
Northern District of California

7

United States District Court
Northern District of California

But a court "may not grant a new trial simply because it would have arrived at a different verdict," *id.* (citation omitted), and a court must consider that determining damages for "intangible, non-economic-losses . . . is a matter peculiarly within a jury's ken," *Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*, No. 13-CV-02862-JST, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017), *aff'd*, 743 F. App'x 843 (9th Cir. 2018) (quoting *Smith v. Kmart Corp.*, 177 F.3d 19, 30 (1st Cir. 1999)). For that reason, "[a] plaintiff's path towards a new trial based on inadequate damages is feasible, but formidable." *Id.* (citation omitted).

A motion for a new trial based on attorney misconduct should only be granted "where the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 516-17 (9th Cir. 2004) (cleaned up) (quoting *Kehr v. Smith Barney,* 736 F.2d 1283, 1286 (9th Cir. 1984)); *see also Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995) ("Where misconduct permeates the proceeding, the jury is 'necessarily prejudiced.'" (citation omitted)). In other words, "[t]o receive a new trial because of attorney misconduct in the civil context, . . . 'the moving party must demonstrate adverse counsel's misconduct . . . "substantially interfered" with the moving party's interest.'" *S.E.C. v. Jasper*, 678 F.3d 1116, 1129 (9th Cir. 2012) (quoting *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1405 (9th Cir. 1995)).

Where counsel failed to object to the alleged misconduct during trial, courts review conduct for plain error, which requires: "(1) an error, (2) the error is plain or obvious, (3) the error was prejudicial or effects substantial rights, and (4) review is necessary to prevent a miscarriage of justice." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (citations omitted). This higher threshold is warranted because when an objection is properly made, the district court can admonish counsel or issue a curative instruction, if necessary, and prevents rewarding a party for awaiting the verdict and "sit[ting] silent in the face of claimed error." *Settlegoode*, 371 F.3d at 517 (quoting *Hemmings*, 285 F.3d at 1193). In assessing whether the misconduct prejudiced the moving party, courts "consider 'the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner

in which the parties and the court treated the comments, the strength of the case, and the verdict itself.'" *Hemmings*, 285 F.3d at 1193 (citation omitted).

## II.     MOTION TO ALTER OR AMEND JUDGMENT

FRCP 59(e) permits a party to file a "motion to alter or amend a judgment" within 28 days of entry of judgment.  Fed. R. Civ. Proc. 59(e).  It is an "extraordinary remedy" and "[d]istrict courts have 'considerable discretion' in deciding Rule 59(e) motions."  *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022) (first quoting *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (per curiam); and then quoting *Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003)).  "A district court may grant a Rule 59(e) motion if it 'is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.'"  *Id.* (quoting *Wood*, 759 F.3d at 1121); *see also McDowell v. Calderon*, 197 F.3d 1253, 1255 & n.1 (9th Cir. 1999) (en banc) (per curiam).

<div align="center">

**DISCUSSION**

</div>

## I.     RENEWED MOTION FOR MISTRIAL AND MOTION FOR NEW TRIAL

Diaz makes two arguments for a mistrial and new trial: that excessive and prejudicial attorney misconduct at the second trial, including violations of my orders and motions in limine, warrant a new trial; and that the damages award was inadequate to compensate Diaz or punish Tesla and so necessitate a new trial.

### A.     Attorney Misconduct

In support of its attorney misconduct arguments, Diaz points to nine examples of apparent misconduct (and a tenth in his surreply) and argues that any individual instance is enough to declare a mistrial but all together demand a new trial.  Because the standard is whether the misconduct so "permeate[d] an *entire proceeding* to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict," *Settlegoode*, 371 F.3d at 516-17 (emphasis added), I assess the impact of the conduct on the trial as a whole as well as analyze the examples individually.  Four of those examples—the Wheeler feces incident, the accusations that Diaz harassed female coworkers, the questions about Diaz's criminal history, and the questions about the doctor's note—essentially assert that Tesla engaged in misconduct by presenting new

<div style="writing-mode: vertical-lr;">United States District Court<br>Northern District of California</div>

<div align="center">9</div>

United States District Court
Northern District of California

1    evidence and arguments that were banned by my prior orders, the other five point to statements

2    that Diaz says Tesla should not have made at trial for various reasons, and the one raised in

3    surreply discussed alleged discovery misconduct.  I address them in turn.

### 1.    Ad Hominem Attacks on Counsel

5         First, Diaz argues that Tesla's counsel improperly engaged in ad hominem attacks on his

6    counsel throughout trial and emphasizes a statement made during Tesla's opening.  Diaz's counsel

7    had used a slide with the name of the law firm—the California Civil Rights Law Group—during

8    its opening statement, and Tesla's counsel responded in its opening statement, "[Y]ou saw their

9    presentation. . . . [T]hese are not—this is not a civil rights—these are not civil rights social action

10   lawyers."[5]  Tr. 1-248:3-6.  I immediately told counsel, "That's too far" and "[L]et's not be talking

11   in a pejorative way about people who are in this courtroom."  Tr. 1-248:7-10.  A few minutes later,

12   at the end of Tesla's opening statement, I reminded the jurors, "What the lawyers say isn't

13   evidence," that the "evidence is what's going to start tomorrow morning," and that the lawyers'

14   use of "I" statements and personal thoughts and feelings during openings "has nothing to do with

15   anything."  Tr. 1-249:16-250:4.

16        Jurors are presumed to follow instructions.  *Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir.

17   2016) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).  Given this presumption, combined

18   with Diaz's own improper statements during opening, *see* Tr. 1-204:9-21, any possible prejudice

19   was quelled.  Further, these statements are a far cry from those found in improper in other cases.

20   *Cf. Call Delivery Sys., LLC v. Morgan*, No. 2:20-CV-04637-CBM-PDX, 2022 WL 18143363, at

21   *1 (C.D. Cal. Sept. 20, 2022) (granting new trial in part because defense counsel engaged in ad

22   hominem attacks on plaintiff's counsel, such as counsel engaged in "active and insidious

23   deception"; did something "knowing . . . intentionally, and . . . deceptively to try and lie to you

24   people"; and carried out "deception," a wrong that "continues to be done to [the defendant] by

25

26   _____

27   [5] Tesla's assertion that this was not a civil rights trial was blatantly incorrect—a least one claim
     for which Diaz established liability was brought under 28 U.S.C. § 1981, part of the 1866 *Civil*
     *Rights Act*, and obviously an individual's civil rights include employment rights and protection
28   from racism at work—but that did not prejudice the jury for the above reasons and also because it
     had to determine damages only, not liability.

10

counsel and his client trying to pretend"); *see also Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1140 (9th Cir. 2001) (granting new trial where "[t]he trial throughout had racial overtones that culminated [in] a closing argument by [the plaintiff] that repeatedly appealed to racial and ethnic prejudice"). Tesla's counsel later also said the name of the firm to the jury without questioning its merit, *see* Tr. 4-812:1-6, further alleviating any possible prejudice caused by Tesla's initial remarks.

It is also not entirely clear how these statements could have prejudiced Diaz. He asserts that they violated a court order and references one of his motions in limine that requested that I order Tesla to not disparage Diaz's counsel. [Dkt. No. 382]. This concern apparently arose from a previous trial conducted by Tesla's counsel in which (according to Diaz) the same attorneys made inappropriate remarks framing the case as one brought solely by "greedy" plaintiffs' attorneys. Though I denied the request as speculative, I reminded Tesla that such framing in this case—asserting that the case was substantively meritless and only brought by attorneys for financial gain—was impermissible in part because it would go to liability, which was established and not an issue in the second trial. *See* [Dkt. No. 417] at 6. Tesla made no such argument during trial. Rather, it questioned Diaz's credibility and the amount he was damaged, neither of which were out-of-bounds at a damages-only retrial, and neither of which improperly argued that Diaz's *counsel* "somehow affected the liability finding" by bringing the case strictly for their monetary benefit. *See id.*

Accordingly, Diaz was not prejudiced by this conduct, and it does not serve as a basis to grant a new trial. *See Jasper*, 678 F.3d at 1129.

## 2. Wheeler Testimony

Next Diaz asserts a new trial is necessary because of the questioning of Michael Wheeler, a Black witness and former worker and manager at the Tesla factory, who testified that he found human feces on a cart he had to use at work and believed it was a racially motivated incident of harassment. Diaz argues that Tesla's questioning of Wheeler improperly damaged Wheeler's credibility, violated my prior orders, and rested on factual falsities. *See* Mot. Mist. 7:8-12:12.

During cross, Tesla asked Wheeler whether he knew that the feces incident was not based

11

United States District Court
Northern District of California

on race because "somebody . . . got sick and had an accident and [Tesla] told [Wheeler] that in an e-mail, sir, and this wasn't racial at all; isn't that true, sir?"  Tr. 2-367:11-14.  Diaz objected to this question as outside the scope of the prior proceeding, argumentative, and speculative, but I permitted Wheeler to answer, and Tesla's counsel elaborated on the question by saying, "they emailed you and told you that somebody got sick and they needed to race that person to get them some help because they . . . had the stomach flu and they used your car, and that's why there was some substance on the car; isn't that true, sir?"  Tr. 2-367:22-368:1.  Again I overruled Diaz's objection and Wheeler then answered, saying that theory did not make sense because "if the individual was sick, why would the poop be on my side of the seat?"  Tr. 2-268:6-8.  Tesla attempted to introduce the email as evidence, which I denied as outside the scope of the prior trial, and Tesla continued questioning Wheeler about the email, trying to read it and then show it to Wheeler, which I rejected.  Tr. 2-368:14-370:24.

It was not improper to ask the initial impeachment questions about Wheeler's experience and the responses from Tesla.  But it was indisputably improper for Tesla to repeatedly try to enter into evidence and read into the record a piece of evidence that was disallowed by my prior orders because it had not been previously produced or admitted.  *See United States v. Sine*, 493 F.3d 1021, 1031 (9th Cir. 2007) ("[A] line of questioning that repeatedly incorporates inadmissible evidence can be . . . improper [and] . . . can violate the Federal Rules of Evidence." (citation omitted)).  This was exacerbated by the fact that the email did not say what Tesla claimed—it said that an individual "had the stomach flu last night and had to go home.  He may have been given a ride on the cart.  We are investigating to confirm."  [Dkt. No. 440-1].  It did not say anything about the investigation or ultimate conclusion.  Tesla's counsel knew better and should not have done this.

But if any party was prejudiced by this exchange, it was Tesla.  First, Wheeler's response was logical and compelling—if a sick person was being driven somewhere, the feces would be on the passenger side, not Wheeler's driver's seat—and was far more likely to bolster his credibility than detract from it, especially because the rest of Wheeler's testimony established him as highly credible.  Tesla's unsuccessful attempts to discredit this testimony by continually repeating the

1    same questions likely further bolstered Wheeler's credibility and experiences in the eyes of the

2    jury, especially in light of my repeated rejections of Tesla's requests. *See* Tr. 2-368:18, 23,

3    369:19, 370:1, 370:20-24. Tesla's attorney's actions and statements during this exchange seemed

4    to damage his case and his client's reputation far more than they may have caused any negative

5    impact to Diaz's case.

6         While the emails should have been disclosed in discovery prior to the first trial, this is not

7    a reason to grant a new trial; the emails are not nearly so pivotal to the case as Diaz asserts.

8    "[W]hen discovery misconduct is alleged in a Rule 59 motion," the movant must "(1) prove by

9    clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or

10   other misconduct *and* "(2) establish that the conduct complained of prevented the losing party

11   from fully and fairly presenting his case or defense . . . [but not] that the result in the case would

12   be altered." *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878-79 (9th Cir. 1990) (citation omitted).

13   Diaz cannot show that withholding the emails prevented him from fully and fairly presenting his

14   case. He already had vivid and compelling testimony that Wheeler experienced this horrible

15   incident and complained to Tesla, and that Tesla failed to properly respond. The emails merely

16   confirm that Wheeler discovered feces on his cart and emailed Tesla, and Tesla said it would

17   investigate; they do not show whether Tesla took further action. Diaz asserts that "photographic

18   evidence" would have been helpful to his case, but Wheeler was a persuasive, credible witness

19   who emotionally recounted the feces incident and other racism he experienced at Tesla. His

20   testimony was relevant to show Tesla's practices and to help establish Diaz's credibility with

21   respect to the racism he experienced, which it did. Ultimately this lawsuit was about Diaz's

22   experiences and Diaz's claims. Diaz was able to use the Wheeler incident to make his case fully

23   and fairly, even without the emails. *See id.*

24        Accordingly, this exchange did not prejudice Diaz and is not a basis for granting a new

25   trial.

26                    **3.    Questions About Settlements**

27        Diaz also asserts that it was improper for Tesla's attorney to ask, "You settled your claims

28   with [Tesla's co-defendants]; correct?" because it was beyond the scope of the first trial. *See* Mot.

*United States District Court*
*Northern District of California*

13

Mist. 12:13-13:18; Repl. Mist. 8:3-15; Tr. 4-814:20-21. This was beyond the scope of the trial, and I sustained Diaz's objection to this line of questioning, striking the question and telling Tesla's counsel, "[D]on't do that." Tr. 4-814:19-25.

I am not convinced by Diaz's arguments that this portrayed him to the jury as "opportunistic" or "just looking for a huge payday," as both inferences would require quite a leap for the jury to make from such little information—especially where there was no mention of whether the fact of these settlements was true or how much he may have received. *See Hemmings*, 285 F.3d at 1193 (considering the nature, frequency, and relevancy of the comments when assessing prejudice). The questions certainly did not prejudice the jury by showing he had "already been sufficiently compensated," Mot. Mist. 13:13, because the second jury's verdict ultimately resulted in much more additional compensation, *see Hemmings*, 285 F.3d at 1193 (considering "the verdict itself" in assessing prejudice (citation omitted)). And I instructed the jury that the question was struck from the record; "a jury is presumed to follow the trial court's instructions." *Deck*, 814 F.3d at 979 (citation omitted). I do not find that the jury would have been prejudiced from this comment, and in any event, any prejudice would be assuaged by the fact that the jurors could not consider the question in their deliberations. This is not a basis for granting a new trial.

### 4. Accusations of Harassment

Tesla's counsel improperly questioned Diaz about allegedly making inappropriate racial and sexual comments to a woman he worked with. *See* Tr. 4-727:3-15. This was beyond the scope of the first trial and so directly contravened my order. Because Diaz's counsel did not object on this basis,[6] I review for plain error. *See Hemmings*, 285 F.3d at 1193. Here, the questions were inappropriate, irrelevant, improper, and blatant, *see id.*, as they were wholly untethered from any evidence or documents submitted in this case in the last six years, and

---

[6] Diaz says his counsel was "in a bind" and could not object because they "did not want to draw further accusations . . . while again appearing to be hiding evidence from the jury," Mot. 14 n.4, but Diaz's counsel *did* object to this line of questioning, *see* Tr. 4-727:16, for Tesla's counsel's "[h]arassing" "tone" rather than for improper questions, which I sustained before asking Diaz to answer the question, Tr. 4-727:17-18.

United States District Court
Northern District of California

certainly not within the scope of the first trial, as required by my order.

But it is not clear that the questions were prejudicial or that they "necessarily" prejudiced the jury. *See id.*; *Anheuser-Busch*, 69 F.3d at 346. The substance of the comments was serious and accusatory, but they were irrelevant to emotional distress and damages, as I later reminded the jury. *See* Tr. 5-1018:20-1019:1; *see also Hemmings*, 285 F.3d at 1193 (considering nature, relevancy, and frequency of comments in assessing prejudice). Diaz was able to deny that he harassed anyone, and I instructed Tesla's attorney to "tone it down a little bit" given his overbearing and insistent way of posing the questions, Tr. 4-727:17-18; I similarly instructed Diaz to focus on the questions and not the attorney's manner, Tr. 4-728:5-16; and I later instructed the jury to disregard the whole exchange, Tr. 5-1018:20-1019:1. I also instructed the jury many times throughout the trial that what lawyers say is not evidence. I made clear to the jury multiple times and in multiple ways that the comments were inappropriate and should be wholly disregarded. *See Hemmings*, 285 F.3d at 1193 (considering how the court treats the comments in assessing prejudice). Again, the jury is presumed to follow the court's instructions, *Deck*, 814 F.3d at 979, and again, the damages verdict ultimately favored Diaz, *see Hemmings*, 285 F.3d at 1193 (considering the verdict when assessing prejudice). Accordingly, though these questions were inflammatory and unnecessary, they did not necessarily prejudice the jury against Diaz. They are not a basis for granting a new trial.

### 5. Questions about Criminal History

Tesla's counsel stipulated, and I ordered, that Tesla would not "affirmatively introduce evidence . . . concerning Owen Diaz's past criminal convictions" unless Diaz first opened the door. [Dkt. No. 180]. Because of that, the exhibit with Diaz's job application redacted the part about his criminal history. At trial, Tesla's counsel apparently tried to impeach Diaz's credibility by asking questions about the criminal history portion of his job application to show that his responses on the application were inaccurate. *See* Tr. 3-643:19-23. It was not clear from the vague questions that was the goal, and Diaz was left clearly confused. *See* Tr. 3-644:7-13 (attempting to answer by addressing the unredacted portions of the application). At the time, so was I. I instructed Tesla's counsel to "[a]sk another question," which he ignored and instead

15

repeated his question, which Diaz's counsel objected to and moved to strike, resulting in me telling Tesla to "move on." Tr. 3-644:16-645:9.

The questions violated my prior order precluding affirmative introduction of evidence about Diaz's criminal history. But the phrasing of the questions did not reveal to the jury that they concerned criminal history, and Diaz's answers did not relate to criminal history, so it is clear that the jury was not prejudiced in a way that violated the spirit of my order (had Diaz answered the question as Tesla's counsel intended, Tesla's *counsel*, not Diaz, would have blatantly violated the text and spirit of the order). *Cf. Anheuser-Busch*, 69 F.3d at 341 (noting the district court found that counsel violated the "spirit" of the court's order). And though Diaz argues that these questions made him look evasive, the complicated way they were phrased and posed was far more likely to confuse the jury than prejudice it against him. Indeed, the confusing nature of the questions themselves, their infrequency and irrelevancy to the issues, and the manner in which all parties treated the comments—including that I instructed Tesla's counsel multiple times to move on—support finding that this line of questioning did not prejudice Diaz. *See Hemmings*, 285 F.3d at 1193; *cf. Anheuser-Busch*, 69 F.3d at 347 (affirming order for new trial given violation of the court order *and* prejudice from that violation). They do not support granting a new trial.

### 6.        Questions about Doctor's Note

Tesla's counsel asked Diaz questions about whether he wrote a doctor's note and passed it off as written by a doctor, which Diaz asserts went beyond the scope of the first trial and violated my prior order. Mot. 18:26-19:22; Tr. 3-798:16-800:10. Diaz's counsel objected to these questions for being "argumentative" and "asked and answered" but not for violating my orders. Tr. 3-798:16-800:10. I sustained the objections and struck the testimony, instructing Tesla's counsel to "move on," which he did. *Id.* The following day, I issued further curative instructions that the inquiry was immaterial and irrelevant and that the jury should not consider it in deliberations. Tr. 5-1019:6-9.

Like the questions about Diaz's alleged harassment of others, it is not clear how the jury was prejudiced by these comments. Diaz asserts that they affected his credibility, which would make sense except that the allegations were so baseless—as I noted to Tesla's counsel, it seemed

that he was trying to portray Diaz as a handwriting expert—that any impact to *Diaz's* credibility, as opposed to that of Tesla's counsel, would be minimal at best. And again, Diaz was able to fervently deny the accusation that he forged anything, I instructed the jury several times that what lawyers say is not evidence, and the damages verdict ultimately resulted in over three million dollars in favor of Diaz. *See Hemmings*, 285 F.3d at 1193 (assessing these factors to determine prejudice). Accordingly, I find that these comments did not necessarily prejudice the jury against Diaz and so are not the basis for granting a new trial.

### 7. Questions about Diaz's Son's Lawsuit

Diaz also argues it was improper to ask him about whether his son sued Tesla for race discrimination and whether that case was dismissed. *See* Mot. 19:23-20:11. During that part of the trial, Tesla's counsel was explaining an incident where Diaz witnessed his son being subjected to racist harassment at Tesla, and counsel asked, "When you gave that testimony about this incident with your son, you did so in a case also brought by your son. Your son sued Tesla too; true?" Tr. 4-752:19-21. Diaz's counsel objected, to which Tesla responded that the question went to motivation, and I overruled the objection on that basis—it was fair to question Diaz's credibility and motivation for providing the testimony as it was given at least partially to support his son's claims that his son experienced racism at work. But the following question—"And your son's case got dismissed; correct?"—was not relevant or proper and was clearly made "with the sole purpose of bringing to the jury something it should not have heard." *Anheuser-Busch*, 69 F.3d at 347 (citation omitted). I sustained the subsequent objection, told counsel to move on, and later instructed the jury to disregard the questions, *see* Tr. 5-1019:6-9, an instruction that it is presumed to follow, *see Deck*, 814 F.3d at 979.

Unlike in *Anheuser-Busch*, it is not clear how or whether Diaz was prejudiced from this comment. Diaz asserts that it led the jury to believe Diaz's son's claims were meritless, but that is mere speculation—and a leap of an inference from the statements that were made, given the jury would have to disregard my instruction and understand "dismissed" to be true and mean "meritless"—and at any rate the merit of his son's claims does not clearly affect the *damages* sustained by Diaz at Tesla. Because the statement was mostly irrelevant, made once, promptly

17

1   treated as improper by me and the parties, and later subject to a specific instruction, and because

2   the verdict favored Diaz, the likelihood of prejudice is de minimis.  *See Hemmings*, 285 F.3d at

3   1193.

### 8.      Discussion of Salary in Closing

5        Tesla's counsel pointed to evidence of Diaz's salary during trial and during closing

6   arguments, which Diaz says was improper and prejudiced the jury.  *See* Mot. 20:12-22:8; Repl.

7   11:4-18.  I sustained Diaz's objection to Tesla's statement during closings that he made $48,000

8   annually, *see* Tr. 5-1115:22-1116:9, and I previously precluded introduction of this evidence as

9   irrelevant to emotional distress, Tr. 4-804:11-806:3.  Accordingly, there was no evidence that this

10  was his salary besides the attorney's questions, and I instructed the jury many times that the

11  attorney's questions were not evidence.  The jury is presumed to follow this instruction, *see Deck*,

12  814 F.3d at 979, particularly when reminded of that specific instruction so many times.

13       Tesla's counsel did point to Diaz's hourly wage in closing, which was admitted at the

14  second trial in part because it had been admitted at the first.  *See* [Dkt. No. 417] 8:3-17.  Though

15  Diaz now says this was an improper reference to his hourly wage, his counsel did not object at

16  trial, so I review for plain error.  *See Hemmings*, 285 F.3d at 1193.  And it is not clear there was

17  plain error—Tesla did not assert that Diaz should be compensated only for lost wages, which

18  would not have been permitted because he sought emotional distress damages, not economic

19  damages or lost wages.  Nor did Tesla use the hourly wage to argue, as Diaz contends, that low

20  wage workers deserve less compensation for emotional distress than do higher wage workers.

21  Rather, Tesla recognized that Diaz tied his request for compensatory damages in part to his desire

22  to "fish and retire"—relevant to the loss of enjoyment of life, as provided in the jury instructions

23  for compensatory emotional distress damages—and so offered the hourly wage as a way for the

24  jury to calculate how much he might need to do so, particularly when the jury lacked any other

25  tangible or quantifiable way to calculate his damages.

26       But even if the error was plain, it was not prejudicial to Diaz.  First, his counsel had an

27  opportunity to respond in rebuttal and persuade the jury to compensate him differently.  Second, I

28  instructed the jury how to calculate compensatory and punitive damages and told the jury that I,

United States District Court
Northern District of California

18

not the attorneys, was the authority on the law.  *See* Tr. 5-1029:19-1032:10.  To the extent that Diaz took issue with those instructions, he was permitted to and did raise those issues before the jury was instructed, and the issues were addressed.  Finally, the verdict itself did not reflect that the jury even used Tesla's calculation method: it awarded Diaz $100,000 in past compensatory damages, which as Diaz concedes is over double the $48,000 figure that Tesla provided.  *See* Mot. Mist. 21:23-22:1.  Therefore, I do not find any prejudice or "miscarriage of justice" caused by these statements, and they are not a reason for granting a new trial.  *See Experience Hendrix*, 762 F.3d at 841.

### 9.     Statement of Law During Closing Arguments

Diaz asserts that Tesla repeatedly misstated the law during closing arguments because even though he was entitled to recover on his negligent supervision claim, Tesla told the jury he could recover damages only based on racial harassment.  *See* Mot. 22:9-23:9; Repl. 11:19-12:7.  Diaz did not object when the comment was made, and he subsequently had an opportunity to respond in his rebuttal and alleviate any misconception.  Diaz did not request additional curative instructions.

Importantly, I told the jury that the source of law came from my instructions, not from the attorneys, and I properly instructed the jury on the law, including that damages should include the negligent supervision claim.  *See* Tr. 5-1030:2-5.  Particularly in this case, where the jury was repeatedly reminded that lawyers' questions were not evidence and the lawyers were not the source of the law, the jury is presumed to follow my instructions.  At any rate, a "slight misstatement of law" by the attorney "can be rendered harmless by the court's proper instruction to the jury."  *Deck*, 814 F.3d at 979 (citation omitted).  Even if Tesla's counsel's statements were plain error, it is highly unlikely they were prejudicial because they were corrected by my proper instructions.  *See Hemmings*, 285 F.3d at 1193.

### 10.     Discovery Misconduct Alleged in Surreply

The parties filed supplemental briefs concerning recently revealed evidence that shows racist graffiti in the bathrooms at Tesla at the very end of Diaz's employment.  [Dkt. Nos. 485,

488, 490[7]].

Like the emails and photos concerning the feces incident, even if these photos should have been disclosed during discovery, they do not support granting a new trial because Diaz does not show they affected his ability to "fully and fairly present[] his case." *Jones*, 921 F.2d at 879.  At least two witnesses, including Diaz, compellingly testified about the racist graffiti in the bathrooms.  *See* Tr. 2-284:11-25, 332:23-333:2; 3-623:1-25, 648:17-19.  The fact of this graffiti was well-established, and the photos merely confirm the existing testimony.  The evidence shows only that there *was* racist graffiti in the bathrooms—which was not disputed by Tesla at trial—not that Diaz saw racist graffiti at certain times—which was disputed.  The new evidence is, at best, merely cumulative of other compelling evidence.  *Cf. Jones*, 921 F.2d at 879 (finding the withheld evidence was "much more than merely corroborative or cumulative evidence").  Its lack of disclosure did not prevent Diaz from fully and fairly presenting his case.

\*       \*       \*

None of the conduct of Tesla's counsel described above is excusable, and all of it was intentional.  But considering all of the instances addressed as well as the trial as a whole, I find Tesla's counsel's conduct did not prejudice Diaz.

As comparison, in *Jasper*, 678 F.3d at 1129, the Ninth Circuit affirmed the district court's denial of a motion for a new trial based on attorney misconduct where the district court found that the conduct "amount[ed] to a small number of isolated statements in lengthy closing and rebuttal arguments" and also reasoned that the fact that the jury found in favor of the moving party for some claims showed "the jury carefully weighed the evidence before it and did not merely presume liability."  This reasoning applies here, where the ten examples do not show that the misconduct was so pervasive as to permeate the entire proceeding.  Importantly, the proof is in the pudding: the damages verdict strongly favored Diaz.  *See id.*  As I discuss in a moment, that the jury awarded a lesser amount of damages after this trial than the first one, where the same

---

[7] The motions to file under seal, [Dkt. Nos. 487, 489], are GRANTED given the protective order in the state court case.  The motion for leave to file a reply brief, [Dkt. No. 490], is GRANTED because Diaz did not have the opportunity to provide substantive argument in the initial notice he filed given the protective order.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   evidence and exhibits were admitted but slightly different testimony and facts were elicited, does

2   not mean that any improper statements ultimately made the entire proceeding unfair.

3         Similarly, none of the allegedly improper statements came close to those in *Bird*, 255 F.3d

4   at 1140, where the court granted a new trial because "[t]he trial throughout had racial overtones

5   that culminated [in] a closing argument by [the plaintiff] that repeatedly appealed to racial and

6   ethnic prejudice," including by drawing explicit analogies between the issues of the case—alleged

7   denial of contractual and employment relationships based on bias against Indians—and the history

8   of killing and massacre of Indians and stealing of their lands. Despite the inherently race-based

9   allegations and findings in the present case, both sides (mostly) maintained strict professionalism

10  when it came to discussing race and racism. No comments made during trial so permeated the

11  proceedings in the way the racial undertones did in *Bird*. *See also Settlegoode*, 371 F.3d at 518

12  ("Using some degree of emotionally charged language during closing argument in a civil case is a

13  well-accepted tactic in American courtrooms.").

14        Further, even if curative instructions are not necessarily always sufficient to cure the risk

15  of bias, *see Arizona v. Washington*, 434 U.S. 497, 513 (1978), they were sufficient in this trial,

16  based on my observations of the jurors and their reactions as well as of the attorneys and their

17  tones, *see id.* at 513-14. I reminded the jury at least seven times that what the attorneys say is not

18  evidence, *see* Tr. 1-192:20-193:8, 202:18-19, 249:16-22; 2-260:25-261:1; 4-820:1-7; 5-1036:8-17,

19  1017:20-1018:6, and also multiple times that I was the source of the law, not the attorneys, *see* Tr.

20  1-203:1-3; 2-261:1-4, 5-1015:22-23. I issued these repeated reminders because counsel for *both*

21  parties made statements throughout trial that implied otherwise. *See, e.g.*, Tr. 1-246:22-23

22  (overruling Diaz's objection to Tesla's opening statement and noting, "You both have exceeded

23  the bounds of argument, and [I will] allow [Tesla's counsel] to continue.").[8] Though Diaz argues

24  that he was prejudiced by Tesla's counsel's statements, it is much more likely that these improper

25  statements affected the jury's view of Tesla's counsel—and Diaz's too, at times—because it was

26

27  [8] *See also* Tr. 4-820:1-7 ("This case is not about the lawyers, ladies and gentlemen. This case is
    about Mr. Diaz and the injuries that he suffered. . . . [Y]ou have heard a lot from both sides . . .

28  from the lawyers' tables, but what matters is what you're hearing from the witness tables and from
    the exhibits that you're receiving.").

1    clear that the attorneys were occasionally over-aggressive and hyperbolic.

2         Tesla's counsel did engage in some improper conduct. But that misconduct did not

3    prejudice Diaz, either independently or cumulatively. This was a retrial on damages, not a

4    recitation of the first trial's transcript into evidence. There were bound to be differences in how

5    questions were asked, how evidence was framed and presented to the jury, and how witnesses

6    testified and even remembered details two years further removed from the underlying events.

7    While the parties were limited to the same exhibits and witnesses as the first trial and could not

8    elicit new testimony going beyond the scope of the first trial, they were not limited to, as Diaz

9    seems to suggest at times, an identical presentation of facts, evidence, and arguments as that

10   presented in September 2021.

11        To the extent that Tesla violated any orders or made improper statements at trial, despite

12   the number of comments and under the totality of the circumstances, the comments' nature,

13   treatment by the court, and particularly their relevancy to the issues, supports finding that they did

14   not prejudice Diaz. *See Hemmings*, 285 F.3d at 1193. And the strength of Diaz's case—as

15   addressed further below, and particularly due to the testimony about the nature of the racism and

16   harassment that he endured—along with the multimillion-dollar verdict in his favor, show that

17   these comments did not necessarily prejudice the jury against him. *See Anheuser-Busch*, 69 F.3d

18   at 346.

19        **B.    Sufficiency of the Damages**

20        Diaz also asserts he should be granted a new trial because the damages award was

21   inadequate to compensate him or to deter or punish Tesla. *See* Mot. Mist. 23:15-35:17.

22             **1.    Compensatory Damages**

23        The second jury awarded Diaz $100,000 in compensatory damages and $75,000 in future

24   damages, which he says is inadequate based on the evidence and because the first jury awarded

25   him $6.9 million on the same evidence. After the first trial, I remitted the first jury's award to

26   $1.5 million, finding that was the highest award supportable by the evidence. *See* Order on Post-

27   Trial Mots. 26:19-37:10.

28        To begin with, there was plenty of evidence supporting the damages verdict—evidence

United States District Court
Northern District of California

United States District Court
Northern District of California

that was also presented in the first trial.  *See* Mot. Mistr. 24:23-30:21.  Diaz endured awful, pervasive racism in his workplace.  As I previously explained and as still holds true, the N-word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry."[9]  *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (citation omitted).  A shocking amount of evidence at trial showed Diaz was regularly subjected to being called the N-word and other racial slurs, including his own testimony, Tr. 3-603:23-604:7, 604:11-606:4, and the testimony of witnesses who confirmed that Diaz reported the slurs, Tr. 2-269:13-274:7, 3-551:8-552:20.  Though Tesla argues otherwise, several witnesses also corroborated Diaz's testimony that Tesla permitted the "rampant" use of N-word and racial slurs like "chongo" and "mayate" in its factories.  *See, e.g.*, Tr. 2-281:20-282:7, 326:12-21, 343:4-344:14, 381:4-382:7, 383:15-384:18.  Diaz also encountered racist graffiti and a racist picaninny drawing near his workstation, Tr. 3-616:6-619:25, 623:1-25, was told to "go back to Africa," Tr. 3-603:23-25, and was so deeply upset to learn that he played along when his harassers had called him "porch monkey" in Spanish that he had to take a break during his testimony to compose himself, Tr. 3-589:13-592:23.

The evidence at the second trial also showed that although Diaz complained several times, Tesla failed to adequately respond to the racism that permeated its workplace.  *See* Tr. 2-387:10-390:18, 394:24-395:11; 3-537:20-540:3, 542:15-543:7, 612:22-14, 613:5-14, 615:13-15; 5-954:15-955:6.  Though Tesla presented evidence that it says showed proper responses and corrective actions and that Diaz was satisfied with the outcomes, it failed to convincingly rebut Diaz's expert's testimony that the responses were inadequate.  *See, e.g.*, Tr. 3-508:6-509:20 (expert explaining that Martinez should have received very serious discipline for the picaninny

---

[9] Tesla repeatedly argued at trial and reasserts in its papers that there is a difference between an offensive or aggressive use of the N-word, and an unoffensive and nonaggressive use.  Tesla's attorney's lay opinion that the N-word can be used in a "friendly" way, as well as the testimony of other witnesses that they believed it could be used in an unoffensive manner—though the latter could be considered by the jury—are wholly irrelevant to how *Diaz* perceived the use of the word and how it impacted him.  *See also Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 981 (9th Cir. 2023) (explaining that the use of slurs and insults alone can create a hostile work environment based on race or sex (first citing *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1202 (9th Cir. 1991); and then citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114-16 (9th Cir. 2004))).

incident).

Based on the rampant racism and lack of sufficient response from Tesla, it is unsurprising that Diaz experienced significant emotional effects.  His personality changed during the months he was subjected to harassment, and he regularly felt overwhelmed, anxious, humiliated, and afraid.  Tr. 3-621:25-622:20, 624:3-625:7.  The enduring racism affected his sleep, appetite, involvement in his children's lives, and his intimate relations with his wife.  Tr. 3-626:17-23, 627:14-22; 4-890:8-892:3.  He "question[ed] [his] worth" and "fe[lt] less than a man."  Tr. 3-606:7-8.  This testimony alone was sufficient to establish emotional distress damages, *see Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000), and it was further bolstered by his stepdaughter's testimony, Tr. 4-889:24-892:20.  Additionally, Diaz was deeply upset by the picaninny, Tr. 3-620:9-621:4, which was also corroborated by other witnesses, *see* Tr. 2-352:11-354:6, 398:5-7, 428:4-6.  And an expert testified that workplace harassment, like that experienced by Diaz, can cause serious psychological injuries, adding that in 2019, Diaz met the criteria for adjustment disorder, threat disorder, and depression.  Tr. 4-832:3-12, 835:13-838:18.

Taken together, Diaz clearly showed by a preponderance of the evidence that he should be awarded a high amount for noneconomic damages based on his emotional distress.  And the jury did award Diaz a significant amount for noneconomic damages: $175,000 in total compensation for his past and future emotional distress.

The crux of Diaz's argument, though, is that the second jury's award is against the "clear weight of the evidence" because the first jury awarded higher damages, and according to Diaz the only possible reason for this disparity is that there was misconduct at the second trial.  *See* Mot. Mistr. 30:22-33:4; *see also Silver Sage Partners*, 251 F.3d at 819.  I strongly disagree.  As I just discussed, any alleged misconduct did not prejudice Diaz.  *See infra*, Part I.A.  Moreover, there is a plethora of reasons that the jury could have reached a different result on the same evidence.  To start, the makeup of the jury pool and jurors inevitably differed.  So did the context: the first trial—in September 2021, during the middle of the country's racial reckoning following the murder of George Floyd—represented a unique time in American culture and history that differed from the country's experience in March 2023.  And a new law firm represented Tesla, able to use

United States District Court
Northern District of California

the trial testimony from the first trial to recalibrate the theories presented to the jury. That is not to say the evidence or witnesses differed—but while the parties were limited to the same evidence and witnesses and could not go beyond the scope of the first trial, they were not limited to asking the same questions of the same people in the same ways.

At the first trial, Tesla's theory of the case was that it was not responsible for any alleged harassment. *See, e.g.*, [Dkt. No. 298] (Transcript from First Trial) (showing Tesla's closing argument focused almost exclusively on Tesla's lack liability)[10]; *see also* Order on Post-Trial Mots. 14:22-26:18 (addressing and rejecting Tesla's arguments for a new trial based on its argument that it was not liable). At the second trial, Tesla's theory of the case was different—as it had to be—and so its questions and framing were different. Because Tesla could no longer focus on "no liability" arguments, it turned its attention to emphasizing the evidence about the *damage* caused to Diaz, particularly by challenging his credibility and his mitigation of damages. Though Tesla relied on the same evidence and exhibits, it presented that evidence—as it was permitted to by my orders—differently.

All of that could have been anticipated by Diaz when he rejected the remittitur. But perhaps the most impactful difference between the trials occurred in Tesla's impeachment of Diaz's testimony about his emotional distress related to his relationship with his son, Demetric Di-Az. On direct examination, Diaz testified movingly that "one of the biggest regrets in my life" was encouraging Demetric to apply to Tesla, because he subsequently witnessed Demetric being called the N-word by his supervisor, but Diaz could not intervene or stand up for his son because the supervisor had seniority. Tr. 3-599:3-600:5, 608:5. Diaz testified that this incident "fractured

---

[10] That this was Tesla's theory of the case was made especially clear in its closing argument at the first trial, where it focused almost entirely on telling the jury that it was not liable, that it was not a joint employer, and that Diaz and his harassers were not employees but rather contractors over which Tesla had no responsibility. *See* Transcript from First Trial ("1st Tr.") [Dkt. No. 298] 6-927:3-956:12, 958:23-59:14; *see also* Order on Post-Trial Mots. 40:8-9 ("Tesla's strategy at trial was essentially to attempt to show that it was not Diaz's employer without much of a substantive defense of its actual employment practices."). Though Tesla spent a few minutes arguing against damages, 1st. Tr. 956:13-958:2, including that Diaz was not entitled to punitive damages, 1st Tr. 958:3-22, it never told the jury what to do should the jury find that Tesla *was* liable. And so when the jury found that Tesla was liable for Diaz's emotional distress—a finding strongly supported by the record at that trial, *see* Order on Post-Trial Mots.—Tesla's defense collapsed and the jury was left only with Diaz's framework as a way to assess and quantify damages.

25

our relationship," Tr. 3-745:14-20, 753:11-13, that Demetric stopped talking to him, Tr. 3-608:2-5, and "can't even look [Diaz] in the eye," Tr. 3-607:10-15.   Diaz testified that he ruined Demetric's life, that Demetric lost all respect for him and that whenever he looks at his son now, he "know[s] I destroyed [his] life with my decisions." Tr. 3-607:12-17, 608:2-3, 627:10-13.  Diaz told the jury that the racism he endured still affects him emotionally, and that he will never forget the harassment he experienced at Tesla in large part because of its permanent impact on his relationship with his son.  Tr. 3-627:8-13.  Dr. Reading, Diaz's expert on his emotional distress claim, emphasized how Diaz felt that there was an "irretrievable" change in his relationship with Demetric after the incident.  Tr. 4-833:17-834:8.

That testimony about Diaz's relationship with his son went well beyond what Diaz had described in the first trial.  *Cf.* 1st. Tr. 3-419:11-420:5, 483:8-10; 4-570:25-573:13 (discussing the incident in much less detail without mention of Demetric's loss of respect immediately after the incident or the destruction of Demetric's life based on the incident).  On cross-examination, Tesla's counsel elicited testimony that the argument Diaz witnessed between Demetric and his supervisor was not a racist exchange but rather "was about a baseball team and the hate and things like that."  Tr. 4-749:14-23.  Tesla's counsel further undermined Diaz's testimony by showing that Diaz and his son regularly took photos together and spoke to the press together after they sued Tesla, and that any fracture in the relationship was caused by Demetric "start[ing] [to] hang[] with the wrong crowd after Tesla."  Tr. 4-753:11-755:7.  And jarringly, Tesla's counsel impeached Diaz's testimony that his relationship with his son was fractured and that Demetric no longer speaks to him by playing Demetric's video deposition testimony taken two years after the incident, in which Demetric plainly—and compellingly—stated that his relationship with his father was good and that they spoke regularly.  *See* Tr. 5-1014:8-12 (transcript not recorded).

This impeachment evidence was within the scope of evidence that could be presented at the second trial.  Because Diaz's testimony about his fractured relationship with his son concerned his emotional distress, the jury could have disbelieved his testimony about the extent of the harm caused by this incident *and also* could have discredited his testimony about other noneconomic emotional damage he endured.  Undermining Diaz's credibility about the harm he suffered was

26

1    important because his evidence of emotional distress relied entirely on the subjective testimony of

2    witnesses—including his daughter, who testified in part that Diaz's personality went back to

3    normal after leaving Tesla, and Dr. Reading, a psychologist who never treated Diaz and only

4    assessed him years after the harassment—and did not include less subjective evidence, such as

5    medical records, diagnoses, or other contemporaneous documentation demonstrating changes to

6    his sleep, work performance, or mood.[11]  Like Diaz's testimony on this topic, Tesla's challenge to

7    his credibility concerning his emotional distress differed between trials, and the jury properly

8    could have incorporated this impeachment into its determination.  And for this reason, my prior

9    rejection of Tesla's request to remit the first jury's award to $300,000 as "untethered to record

10   evidence," Order on Post-Trial Mots. 29:6-11, is inapplicable here, where the second trial's record

11   includes such significant impeachment.

12        Diaz asserts in his papers that attacks on his credibility were often improper, but he did not

13   contest this line of questions concerning his relationship with his son.  I will add that Diaz's

14   credibility about his emotional distress was further undermined by the way his attorneys asked

15   repeated questions about "what three words would [he] use to describe" his feelings about certain

16   incidents, subsequently writing the words on a whiteboard for the jurors to see.  *See* Tr. 4-624:13-

17   6:25:5.  On cross, Tesla's counsel asked Diaz about how rehearsed the questions and answers

18   were, Tr. 5-813:18-814:16; even without cross-examination, these questions undermined Diaz's

19   credibility because the testimony came across as pre-planned and inauthentic.  And while other

20   questions at trial were asked differently, and other memories and responses shifted slightly

21   between trials, as they were bound to, these two challenges to Diaz's testimony alone are more

22   than enough to explain the lower compensatory damages award at the second trial.

23        Given the evidence, then, *see Landes*, 833 F.2d at 1371-72, the award of $100,000 for past

24   damages and $75,000 for future damages was not against the clear weight of the evidence.  Diaz

25

26   _____

27   [11] To be clear, I do not find that objective evidence is necessary to prove emotional distress—it is
     not.  *See Passantino*, 212 F.3d at 513; *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040-41

28   (9th Cir. 2003).  But where, as here, the evidence of emotional distress relies almost entirely on
     the testimony of a plaintiff who was impeached on the stand, more tangible evidence would have
     helped corroborate or rehabilitate the plaintiff's testimony.  Here, though, there was none.

United States District Court
Northern District of California

1    was obviously entitled to a substantial award, and the second jury gave him a substantial award,

2    albeit much less than the first jury awarded. The attacks on his credibility, which went directly to

3    the extent of his past and future emotional distress, were a valid basis on which the second jury

4    could have found that he was not entitled to anything close to $1.5 million. Though Diaz

5    belatedly asserts that "the award violates" the two instructions on awarding damages, *see* Repl.

6    Mistr. 15 n.8, his argument appears to be that the jury did not follow the instruction because it did

7    not award a higher amount—which is circular and unpersuasive for all the reasons explained

8    above. And there is no reason to believe that there were flaws in the jury's deliberation process, or

9    that the jury did not understand or follow the instructions, or that the jury failed to perform a

10   reasoned analysis. *See Holzhauer*, 2017 WL 3382316, at *2.

11       As further support for his motion for a new trial, Diaz points to comparable cases from my

12   first post-trial order, including *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014), and

13   *Passantino*, 212 F.3d 493. Those were and are valid comparison cases for all the reasons outlined

14   in my Order on Post Trial Motions and given the facts here. But those cases and my prior order

15   merely affirm that the maximum award of compensatory damages supported by the evidence and

16   law was $1.5 million; they did not and do not stand for the proposition that a lower award on this

17   record would be against the clear weight of the evidence.

18       Based on the facts, evidence, and legal theories, and particularly because of the challenge

19   to Diaz's testimony about his emotional distress, I am not convinced that the jury has made any

20   mistake, nor am I convinced that this damages award was "a miscarriage of justice" that must be

21   ameliorated. *Experience Hendrix*, 762 F.3d at 841-42, 845-46; *see also Holzhauer*, 2017 WL

22   3382316, at *2 (noting that damages for intangible, non-economic losses "is a matter peculiarly

23   within a jury's ken" (citation omitted)). The compensatory damages are sufficient to compensate

24   Diaz for past and future harm, given the evidence presented. The motion is DENIED.

25                        **2.    Punitive Damages**

26       Finally, Diaz seeks a new trial because he says the punitive damages award of $3 million

27   was insufficient to punish Tesla and deter future conduct. As a preliminary matter, Diaz cites no

28   case law that suggests I can grant a new trial for failure to award sufficient punitive damages.

United States District Court
Northern District of California

28

Assuming I can do so under the same standard as addressed above concerning a miscarriage of justice, I am not persuaded by Diaz's arguments for many of the same reasons as addressed above. Tesla's conduct was reprehensible and repeated, and it failed to take responsibility or change its ways during Diaz's time at the company, *infra* Part II, but Diaz does not point to evidence (or case law) suggesting that $3 million is insufficient to fulfill the purposes of punitive damages, punish Tesla, and deter its conduct. Instead, he repeats the arguments that Tesla acted badly and needs to be punished—at it will be, by the imposition of a damages award of over $3 million for its conduct toward a single individual.

The award is not against the clear weight of the evidence. The motion is DENIED on this basis. [12]

\*       \*       \*

Finally, Diaz's request for a choice between the original remittitur and a new trial is DENIED. If Diaz wanted the remitted amount, he should have accepted it two years ago and saved the parties, witnesses, and court time and energy. Now there is a different record and a different result. As I conclude after discussing Tesla's motion, the parties will have to live with the second verdict absent a successful appeal.

## II.    MOTION TO ALTER OR AMEND JUDGMENT

Tesla moves to alter or amend the judgment, asserting that the award of punitive damages should be reduced to $1,575,000, which is nine times the award of the compensatory damages. It argues that the judgment should be altered because I committed a clear error of law by allowing a punitive damages award greater than a 9:1 ratio. *See Kaufmann*, 32 F.4th at 850; Fed. R. Civ. Proc. 59.

---

[12] Tesla's Motion for Judgment as a Matter of Law, [Dkt. No. 454], argued that there was no evidentiary basis from which the jury could award punitive damages. [Dkt. No. 454]. I took the motion under submission and then it was not renewed. The motion argues that the jury instructions concerning punitive damages were legally incorrect, an argument I previously addressed and rejected several times. *Supra* n.1 (collecting docket entries); *see also* [Dkt. No. 432, 439]. Regardless, there was plenty of evidence presented to the jury showing that Diaz was entitled to punitive damages. And as discussed below, *infra* Part II, there was more than enough evidence supporting the jury's ultimate award of $3 million. To the extent there is any doubt, Tesla's motion for judgment as a matter of law is DENIED.

United States District Court
Northern District of California

The Supreme Court has held that the Fifth Amendment's Due Process Clause prohibits punitive damages that are "grossly excessive." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citations omitted). To determine whether an award of punitive damages is unconstitutionally large, the Supreme Court has set out "three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

Following the first trial and jury award, I remitted the punitive damages to a 9:1 ratio of the compensatory damages that were supported by the record and law, finding that this ratio was appropriate to "fulfill[] the purposes of punitive damages, accord[] appropriate deference to the jury's verdict, and stay[] within constitutional grounds." Order on Post-Trial Mots. 42:14-20. After the second trial and second verdict, I find the jury's award of $3 million meets the constitutional and statutory requirements for punitive damages and need not be remitted.

### A.     Reprehensibility

Reprehensibility is the "most important indicium of the reasonableness of a punitive damages award." *State Farm*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). The reprehensibility of the defendant's conduct considers whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (citing *Gore*, 517 U.S. at 579-77); *see also Hardeman v. Monsanto Co.*, 997 F.3d 941, 972-73 (9th Cir. 2021) (same). "[I]ntentional discrimination on the basis of race or ethnicity is especially reprehensible and 'a different kind of harm, a serious affront to personal liberty.'" *Flores v. City of Westminster*, 873 F.3d 739, 760 (9th Cir. 2017) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003)). As the Ninth Circuit has explained, "[t]here can be no question of the importance of our society's interest in combating discrimination; this nation fought the bloodiest war in its history in part to advance the goal of racial equality, adding several

United States District Court
Northern District of California

amendments to the Constitution to cement the battlefield victory." *Zhang*, 339 F.3d at 1043.  As a result, "[r]acial discrimination often results in large punitive damage awards." *Id.* (citation omitted).

As they did after the first trial, these factors again favor a high punitive damages award here.  First and most importantly, Tesla's actions were grievously reprehensible.  Diaz was subjected to a grossly racist workplace, with racist conduct perpetuated not only by coworkers or subordinates but also—and perhaps especially—by supervisors like Martinez, who called Diaz racist slurs and drew the racist picaninny, and Hurtado, who directed the N-word at Diaz over 30 times and informed Diaz that he wished he could get all "N-words" fired. *Cf. Flores*, 873 F.3d at 760; *Zhang*, 339 F.3d at 1043.  Reports to authority often went unanswered and when the company responded, it often failed to interview witnesses or review security footage.  Worse yet, a supervisor who learned of Diaz's complaints subsequently failed to investigate and was in fact told by Tesla to *not* personally investigate the complaint.  Tr. 3-541:22-542:1, 544:21-545:2, 549:13-550:16.  Another supervisor was told to stop investigating before he reached a conclusion, and Diaz and his harasser ended up being reprimanded for the conduct directed at Diaz.  *See* Tr. 2-387:10-390:18, 395:21-396:7.  Martinez, a Tesla supervisor and the main perpetrator of racist conduct, *still* works at Tesla, nearly a decade after he forced Diaz to endure repeated cruelty and shame.  Not only did the company turn a blind eye to the racism, but the jury also could have interpreted the evidence to show that Tesla knew what it was supposed to do and affirmatively chose to not carry out the proper responses.  Though Tesla argues its conduct was merely negligent at best, *see* Mot. Jdgmt. 4:19-5:17 & n.2, the jury could have credited the testimony of any number of witnesses that stated otherwise and demonstrated the company's intentionality and recklessness with respect to failing to maintain a safe, harassment-free workplace.

As after the first trial, other *State Farm* factors favor a high punitive damages award.  *See State Farm*, 538 U.S. at 419.  The harm was repeated, not isolated—not only the racist conduct itself but Tesla's repeated failure to properly respond.  The harm was not merely economic as Diaz suffered grave emotional harm and experienced physical manifestations, such as inability to sleep properly or have intimate relations with his wife.  The jury also could have interpreted Diaz's

31

testimony that Martinez threatened physical violence and used racial threats as showing a threat of physical violence—which would increase reprehensibility, *cf. Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 775 (9th Cir. 2005) (finding "no threat of physical harm . . . reduces reprehensibility")—even if the jury did not credit Diaz's testimony that this altercation reported was motivated by race. Further, the jury could have found that Diaz was financially vulnerable because he relied on the job to support his family and relied on the company to prevent discrimination at work, though this factor is less relevant for noneconomic damages cases. *See Hardeman*, 997 F.3d at 973-74.

Finally, it is telling and relevant that two separate juries awarded Diaz punitive damages beyond a single digit ratio. Though they reached different conclusions for the absolute number, the juries clearly agreed that the evidence showed Tesla's actions and subsequent failure to take responsibility—continuing during the trials themselves—necessitated a high award for punishment and deterrence.

Accordingly, the reprehensibility factors favor Diaz's position and do not warrant a reduction.

**B.      Ratio**

The second guidepost is the ratio of punitive damages to "actual harm." *Gore*, 517 U.S. at 580. The Supreme Court has explained that it is "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," but that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 424-25 (citations omitted). But the ratios are "instructive," not "binding," and there is no "bright-line" ratio for punitive damages. *Id.* at 425. Punitive damages must be "reasonable and proportionate" to the harm and compensatory damage, and larger ratios are more likely warranted when "a particularly egregious act has resulted in only a small amount of economic damages," while "a lesser ratio" may be warranted when "compensatory damages are substantial." *Id.* at 425-26 (citations omitted). And, of course, the "precise award . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* at 425.

United States District Court
Northern District of California

United States District Court
Northern District of California

I recognize that case law generally favors punitive damages awards that are within single digit ratios of the compensatory damages, and that the Supreme Court has expressed skepticism regarding higher numbers. *See id.* But the underlying principle of the general guidance was and is to protect a tortfeasor's due process rights and prevent irrational or arbitrary deprivations of property. *See id.* at 416-17, 425, 429; *Gore*, 517 U.S. at 562. Here, due process has been provided to both parties. There have been two trials, two juries, two sets of instructions, two occasions for every witness to testify, two opportunities for the parties to present their cases and receive a fair trial. Tesla received fair notice that it could be subject to a high damages award when it received—as the evidence showed—notice of the complaints, racism, and harassment, but failed to take corrective action. In other words, it could have known that it may be on the hook for significant damages but instead ignored the problem. And while the absolute numbers differed between trials, in both cases the jury chose to award punitive damages that exceeded the 9:1 ratio that Tesla now seeks. The reason for it is not arbitrary or irrational: it is because Tesla' conduct was shocking for 2015.

Rather than making much effort to defend its conduct, in both trials Tesla employed strategies that resulted in the high punitive damages award. At the first trial, it failed to present a *Faragher*/*Ellerth* defense and instead focused almost exclusively on arguing that it was not liable because Diaz and his harassers were not its employees. At the second trial, it focused on undermining witness credibility, which was successful in some ways, *supra* Part I.B.1, but failed in others, including when it repeatedly subjected itself to chastisement for trying to ask improper questions that I instructed it not to, *supra* Part I.A. In neither trial did Tesla present actual, compelling evidence of implementing its supposedly strong anti-harassment policies. The jury likely perceived these choices as Tesla continuing its efforts to evade responsibility, particularly given Tesla's failure to present convincing evidence that it was doing what it could and should to make its workplace safe and harassment-free. *Cf. Hardeman*, 997 F.3d at 974-75 (noting that lower punitive damages were warranted where there was no evidence of defendant concealing known risk). That was the risk of pursuing the chosen strategies given the egregiousness of the underlying conduct.

33

That is also the reason that two juries awarded high, strikingly similar punitive damages ratios, and the reason that this case is the exception to the general reluctance to exceed a single digit multiplier for punitive damages. Two separate juries imposed a punitive damages award beyond the standard single digit ratio: that itself demonstrates the award was not arbitrary or irrational, but rather firmly rooted in the evidence of Tesla's conduct. Though the juries viewed the absolute value of the damages differently, *two* separate juries viewed the ratios consistently and sought to punish Tesla's reprehensibility *and* its failure to take responsibility for its conduct. Given this combination of Tesla's reprehensibility and failure to take responsibility, the jury's desire to punish and deter the responsible entity was understandable. And the evidence shows the higher ratio is warranted. I will not reduce it on this basis.

### C.    Comparable Penalties

Finally, courts examine "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" *State Farm*, 538 U.S. at 428 (citation omitted). The Supreme Court has also permitted examining comparable criminal penalties to assess the seriousness of the actions but has warned that using criminal penalties to "determine the dollar amount of the award" is less useful. *Id.* The Ninth Circuit has said that the "$300,000 statutory limitation on punitive damages in Title VII cases [is] an appropriate benchmark for reviewing § 1981 damage awards." *Bains*, 405 F.3d at 777 (citing *Zhang*, 339 F.3d at 1044).

I previously found that the "sheer difference" between the first jury's award of $130 million in punitive damages and Title VII's $300,000 statutory limitation to weigh "somewhat" in favor of reduction, given the award was over 400 times greater than the limitation. *See* Order on Post-Trial Mots. 42:5-12. I subsequently remitted the award to $13.5 million, or about 45 times the statutory limitation. Now, the second jury's award of $3 million is only 10 times greater than the statutory limitation. Contrary to Tesla's argument, this favors maintenance of the award rather than reduction, in that it is much more closely aligned with what the statute permits. *See also Zhang*, 339 F.3d at 1045 (finding the discrepancy between the $300,000 statutory cap and the $2.6 million award was "not nearly so great" as those "between the $10,000 fines and multimillion dollar awards at issue in *BMW* and *State Farm*" and so did not warrant remitter).

34

United States District Court
Northern District of California

1    A final note—Tesla's wealth may properly be considered by the jury, and likely was, so

2  long as it is not used to make up for a dearth of other *State Farm* factors.  *See Bains*, 405 F.3d at

3  777.  Because the *State Farm* factors justify the awarded punitive damages, the jury was entitled

4  to consider Tesla's wealth in determining the necessary amount to punish and deter its conduct.

5  *See id.*

6                                         *        *        *

7    All in all, the jury's award is appropriate and reasonable.  The high reprehensibility of

8  Tesla's conduct, particularly the racism of its supervisors and its repeated failure to take

9  appropriate action, warrants a high punitive damages ratio.  There was no clear error.  *See*

10  *Kaufmann*, 32 F.4th at 850.  Tesla's motion is DENIED.

## CONCLUSION

12   For those reasons, both parties' motions are DENIED.

13   **IT IS SO ORDERED.**

14  Dated: October 4, 2023

William H. Orrick
United States District Judge

United States District Court
Northern District of California

35